**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| RUSTY STRICKLAND, | ) |
| ALAN AND AMY WEST FARMS, | ) |
| ALAN WEST, | ) |
| AMY WEST, | ) |
| DOUBLE B FARMS, LLC, and | ) |
| BRYAN BAKER, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 2:24-cv-60 |
| | ) |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, | ) |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | ) |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, and | ) |
| THE UNITED STATES OF AMERICA, | ) |
| Defendants. | ) |

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND, IN THE
ALTERNATIVE, FOR PARTIAL VACATUR AND REMAND**

---

## <u>INTRODUCTION</u>

1.      Natural disasters do not discriminate, and neither should the Department of Agriculture (USDA). The Constitution promises equal treatment to all Americans regardless of their race or sex. It also promises the separation of powers. USDA broke both promises through

the disaster and pandemic relief programs challenged here that it operates under the "Emergency Relief" umbrella. Plaintiffs are Texas farmers, ranchers, and business entities. They are all eligible for relief under one or more of the programs. Plaintiffs bring this lawsuit to challenge USDA's decision to discriminate based on race and sex through the programs in violation of the Fifth Amendment and the Administrative Procedure Act (APA).

2.      The agricultural industry's contribution to the American economy and quality of life cannot be overstated. According to USDA, in 2022, "[a]griculture, food, and related industries contributed roughly $1.420 trillion to U.S. gross domestic product (GDP), a 5.5-percent share." U.S. Dep't of Agric., Ag and Food Sectors and the Economy (2024), https://perma.cc/MSC2-ZT63.

3.      Agriculture is a risky business. One drought can wipe out an entire season's crops, one wildfire can kill an entire herd, and one hurricane can destroy an entire orchard.

4.      Recognizing the critical importance of sustaining our national agriculture, Congress maintains a farm bill and regularly appropriates funds to USDA to provide financial assistance to America's farmers, ranchers, communities, and businesses[1] that have suffered financial loss due to disasters.

5.      Over the past four years, Congress appropriated $13.7 billion to USDA to implement disaster assistance programs for crop and livestock disaster relief and nearly $11.2 billion to USDA to implement disaster assistance programs for coronavirus-related relief. USDA then took these funds and implemented a suite of programs to aid farmers who had lost income, crops, or livestock due to disasters and the pandemic.

---

[1] Throughout the complaint, "farmers" is used as a general term for all agricultural producers and entities covered by the programs.

6.  Unfortunately, USDA made the decision—despite a lack of congressional authorization—to base the amount of financial assistance provided by the programs on race and sex.

7.  Indeed, the relevant portions of the appropriations bills never mention race or sex. Yet, when providing nearly $25 billion in relief, USDA factored it in anyway.

8.  First, USDA created a category of farmers defined strictly by race and sex. It called these farmers "socially disadvantaged." USDA considers the following groups to be socially disadvantaged: (1) American Indians or Alaskan Natives; (2) Asians or Asian-Americans; (3) blacks or African-Americans; (4) Hispanics or Hispanic-Americans; (5) Native Hawaiians or other Pacific Islanders; and (6) women.

9.  Then, in each of the programs, USDA used two different methods for calculating the amount and type of financial assistance for farmers.

10.  One method was used for: (1) veteran farmers, distinguished by having served in the armed forces; (2) beginning farmers, distinguished by being new to the profession; (3) limited-resource farmers, distinguished by having low incomes; and (4) socially disadvantaged farmers, distinguished by being of a particular race or sex. Under this method, USDA awarded significant additional benefits to those groups of farmers, such as refunding insurance premiums, refunding fees, automatically enrolling farmers in programs to cover non-insured crops without the farmer even requesting it, or just giving farmers more money. USDA used a second method for all other farmers.

11.  USDA's message was simple: white men must be veterans, or new farmers, or poor to deserve additional disaster relief. Everyone else is entitled to it based on their race or sex.

12.     As a result, across the programs, USDA provided additional disaster relief in the form of more money to some farmers based solely on their race and sex.

13.     Plaintiffs all suffered financial losses due to disasters and/or the pandemic and they all qualified for and received financial assistance from some of the programs. But they did not qualify to receive the disaster relief that USDA provided based on race or sex, and thus received less disaster relief than farmers of a different race or sex.

14.     USDA's actions are both unlawful and unconstitutional. USDA, absent congressional authorization and in violation of the separation of powers, took upon itself the responsibility to use race and sex to decide how much money each disaster victim would get. And even if it had congressional authorization, awarding disaster relief based on race or sex is contrary to the Constitution's guarantee of equality.

15.     Through the programs, USDA acted unilaterally to enshrine into law race and sex classifications that divide American farmers, and which are unmoored from any interest that the government may have in remedying specific, identified instances of past discrimination.

16.     "The difficulty of overcoming the effects of past discrimination is as nothing compared with the difficulty of eradicating from our society the source of those effects, which is the tendency—fatal to a Nation such as ours—to classify and judge men and women on the basis of their country of origin or the color of their skin." *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 520 (1989) (Scalia, J., concurring).

17.     Plaintiffs bring this lawsuit to vindicate their constitutional right to equal protection of the laws, to uphold separation of powers principles, and to give all farmers fair and equal treatment in receiving much-needed disaster relief funding. They ask this Court to declare the programs contrary to constitutional right, power, privilege, or immunity, in excess of USDA's

statutory authority, and otherwise not in accordance with law, to set the programs aside, and enjoin USDA from perpetuating race and sex discrimination through regulation. Moreover, to the extent that USDA correctly interpreted relevant statutory authority, those statutory classifications must be declared unconstitutional.

## **PARTIES**

18.     Plaintiff Rusty Strickland lives in Wellington, Texas, and operates a farm with his wife Alison Strickland. Together, their farms grow cotton, peanuts, and wheat. They also raise cattle. Mrs. Strickland received full disaster relief under each of the programs because she is a woman. Because Mr. Strickland is a white man and not a veteran farmer, beginning farmer, or limited resource farmer, he received less disaster relief under the programs than his wife.

19.     The following chart depicts which of the programs Mr. Strickland was eligible for, the amount USDA calculated he had lost due to natural disasters or the pandemic for each, and the disaster relief he received:

| Rusty Strickland | | |
| --- | --- | --- |
| **USDA Program** | **Plaintiff's base program loss** | **Actual USDA payment to plaintiff** |
| ERP 2022 Track 1 | $        46,970 | $          7,273 |
| ERP 2021 (Total) | $      264,794 | $      207,863 |
| ELRP 2022 | $          8,240 | $          1,545 |
| ELRP 2021 Phase 1 | $          4,056 | $          3,042 |
| ELRP 2021 Phase 2 | $          3,042 | $             608 |
| CFAP 2 Bonus | $        59,459 | $                - |

20.     On information and belief, the following chart depicts what USDA would have paid Mr. Strickland if he were of a different race or sex:

5

| Rusty Strickland | | |
|---|---|---|
| **USDA Program** | **USDA payment if plaintiff was socially disadvantaged** | **Amount USDA withheld because plaintiff was not socially disadvantaged** |
| ERP 2022 Track 1 | $ 71,901 | $ (64,628) |
| ERP 2021 (Total) | $ 239,043 | $ (31,180) |
| ELRP 2022 | $ 1,854 | $ (309) |
| ELRP 2021 Phase 1 | $ 3,650 | $ (608) |
| ELRP 2021 Phase 2 | $ 730 | $ (122) |
| CFAP 2 Bonus | $ 8,919 | $ (8,919) |

21.     Plaintiff Alan and Amy West Farms is a joint venture based in Lubbock, Texas, owned and operated by Plaintiffs Alan West and Amy West. The farm grows cotton, wheat, grain sorghum, and hay. Alan and Amy West Farms is owned 52 percent by Mr. West, a white man who is not a veteran farmer, beginning farmer, or limited resource farmer, and only 48 percent by Mrs. West, a woman. Thus, because Amy West owned less than 50 percent of the joint venture, USDA did not consider Alan and Amy West Farms socially disadvantaged. As a result, Mr. and Mrs. West received less disaster relief.

22.     The following chart depicts which of the programs Alan and Amy West Farms was eligible for, the amount USDA calculated it had lost due to natural disasters for each, and the disaster relief it received:

| Alan and Amy West Farms | | |
|---|---|---|
| **USDA Program** | **Plaintiff's base program loss** | **Actual USDA payment to plaintiff** |
| ERP 2022 Track 1 | $ 208,706 | $ 19,403 |
| ERP 2022 Track 2 | $ 631,289 | $ 51,097 |
| ERP 2021 (Total) | $ 417,547 | $ 327,774 |

23.    On information and belief, the following chart depicts what USDA would have paid Alan and Amy West Farms if Alan West were of a different race or sex or if Amy West owned two percent more of the joint venture:

| Alan and Amy West Farms | | |
|---|---|---|
| USDA Program | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $ 206,553 | $ (187,151) |
| ERP 2022 Track 2 | $ 58,760 | $ (7,664) |
| ERP 2021 (Total) | $ 376,941 | $ (49,166) |

24.    Plaintiff Alan West lives in Lubbock, Texas, and co-owns and operates Alan and Amy West Farms as a 52-48 joint venture with Mrs. West. Mr. West owns 52 percent of their joint venture.

25.    Plaintiff Amy West lives in Lubbock, Texas, and co-owns and operates Alan and Amy West Farms as a 52-48 joint venture with Mr. West. Mrs. West owns 48 percent of their joint venture.

26.    Plaintiff Bryan Baker lives in Sudan, Texas, and operates a sole proprietorship farm and a limited liability company, Double B Farms, LLC, which he owns in full. His farms grow cotton, black eyed peas, grain sorghum, and sorghum silage. Because Mr. Baker is a white man who is not a veteran farmer, beginning farmer, or limited resource farmer, USDA did not consider his sole proprietorship socially disadvantaged. As a result, he received less disaster relief.

27.    The following chart depicts which of the programs Bryan Baker was eligible for, the amount USDA calculated he had lost due to natural disasters or the pandemic for each, and the disaster relief he received:

| Bryan Baker | | |
|---|---|---|
| **USDA Program** | **Plaintiff's base program loss** | **Actual USDA payment to plaintiff** |
| ERP 2022 Track 1 | $ 53,850 | $ 7,789 |
| ERP 2022 Track 2 | $ 372,890 | $ 31,717 |
| ERP 2021 (Total) | $ 67,990 | $ 53,372 |
| PARP | $ 225,613 | $ 9,448 |

28.     On information and belief, the following chart depicts what USDA would have paid Bryan Baker if he were of a different race or sex:

| Bryan Baker | | |
|---|---|---|
| **USDA Program** | **USDA payment if plaintiff was socially disadvantaged** | **Amount USDA withheld because plaintiff was not socially disadvantaged** |
| ERP 2022 Track 1 | $ 48,154 | $ (40,365) |
| ERP 2022 Track 2 | $ 36,474 | $ (4,758) |
| ERP 2021 (Total) | $ 61,378 | $ (8,006) |
| PARP | $ 11,591 | $ (2,143) |

29.     Plaintiff Double B Farms, LLC is registered in Sudan, Texas. Mr. Baker owns Double B Farms, LLC in full. Because Mr. Baker is a white man and not a veteran farmer, beginning farmer, or limited resource farmer, Double B Farms, LLC did not receive full disaster relief under any of the programs. The following chart depicts which of the programs Double B Farms, LLC was eligible for, the amount USDA calculated it had lost due to natural disasters for each, and the relief it received.

8

| Double B Farms | | |
|---|---|---|
| **USDA Program** | **Plaintiff's base program loss** | **Actual USDA payment to plaintiff** |
| ERP 2022 Track 1 | $              130,136 | $              13,510 |
| ERP 2022 Track 2 | $              973,083 | $              76,731 |
| ERP 2021 (Total) | $              193,150 | $              151,623 |

30.     On information and belief, the following chart depicts what USDA would have paid Double B Farms, LLC if Bryan Baker were of a different race or sex:

| Double B Farms | | |
|---|---|---|
| **USDA Program** | **USDA payment if plaintiff was socially disadvantaged** | **Amount USDA withheld because plaintiff was not socially disadvantaged** |
| ERP 2022 Track 1 | $              110,689 | $              (97,179) |
| ERP 2022 Track 2 | $              88,241 | $              (11,510) |
| ERP 2021 (Total) | $              174,366 | $              (22,743) |

31.     Defendant USDA is a federal executive department. USDA was given the authority by Congress to spend nearly $25 billion for coronavirus and natural disaster relief. It promulgated the challenged programs.

32.     Defendant Thomas J. Vilsack is the Secretary of Agriculture. He is responsible for leading USDA, including the Farm Service Agency. At all times relevant to this complaint, he enacted and enforced the challenged programs. He is sued in his official capacity.

33.     Defendant Zach Ducheneaux is the Administrator for USDA's Farm Service Agency. At all times relevant to this complaint, his responsibilities included administering loan programs and managing relief programs, including the programs challenged here. He is sued in his official capacity.

9

34.     Defendant United States of America is a government entity. It can be sued under the Administrative Procedure Act. *See* 5 U.S.C. § 703.

## JURISDICTION AND VENUE

35.     This case arises under both the Fifth Amendment to the United States Constitution and the Administrative Procedure Act. *See* 5 U.S.C. § 701 *et seq*.

36.     The Court has jurisdiction over this complaint under 28 U.S.C. § 1331 (federal question) because this case presents substantial questions of federal law, specifically whether USDA has violated the United States Constitution's guarantee of equal protection of the laws and the Administrative Procedure Act. *See* 5 U.S.C. § 701 *et seq*.

37.     This Court has authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act) and Fed. R. Civ. P. 57. It may also set aside the challenged agency actions, postpone their effective date pending judicial review, hold them unlawful, and grant preliminary and permanent injunctive relief. *See* 5 U.S.C. §§ 705, 706; Fed. R. Civ. P. 65.

38.     Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to this claim occurred in this district and a plaintiff resides in this district.

## STATEMENT OF FACTS

**The Biden Administration's Whole-of-Government Approach to Racial Equity**

39.     On day one of his administration, President Biden issued Executive Order 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, 86 Fed. Reg. 7009 (Jan. 25, 2021), which declared that his administration was taking

a "comprehensive approach to advancing equity for all" and would establish "an ambitious whole-of-government equity agenda."

40.     As Judge Ho recently explained, the difference between equity and equality is "the difference between securing equality of opportunity regardless of race and guaranteeing equality of outcome based on race. It's the difference between color blindness and critical race theory." *See Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 648 (5th Cir. 2021) (Ho, J., concurring in part and concurring in the judgment).

41.     On April 14, 2022, in response to President Biden's directive to "the whole of the federal government to advance an ambitious equity and racial justice agenda," more than ninety federal agencies released their first-ever Equity Action Plans. *See* The White House, Biden-Harris Administration Releases Agency Equity Action Plans to Advance Equity and Racial Justice Across the Federal Government (2022), https://perma.cc/PF3B-D5R6.

42.     On February 16, 2023, President Biden updated his equity initiative through Executive Order 14091, *Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*. *See* 88 Fed. Reg. 10825 (Feb. 22, 2023).

43.     In EO 14091, President Biden proclaimed that his "[a]dministration has embedded a focus on equity into the fabric of Federal policymaking and service delivery" and "vigorously championed racial equity." *Id*.

44.     President Biden then reaffirmed that his policy would be to "advance an ambitious, whole-of-government approach to racial equity and support for underserved communities and to continuously embed equity into all aspects of Federal decision-making" and directed agencies to "support ongoing implementation of a comprehensive equity strategy . . . *to yield equitable outcomes*." *Id*. at 10826, 10828 (emphasis added).

11

45.     Every federal agency must comply with these executive orders.

**USDA's Race- and Sex-Based Approach to Equity**

46.     In the words of Secretary Vilsack himself, "Under this Administration, equity is more than a catchphrase. It's a promise." U.S. Dep't of Agric., Equity Action Plan 2023 Update, 2 (2024), https://perma.cc/PQH3-4B3W.

47.     In February 2022, USDA published its Equity Action Plan. U.S. Dep't of Agric., USDA Equity Action Plan in Support of Executive Order (EO) 13985 Advancing Racial Equity and Support for Underserved Communities through the Federal Government (Feb. 10, 2022), https://perma.cc/9CVL-2FG9.

48.     In its Equity Action Plan, USDA declared that "[it] strives to institutionalize this emphasis on equity" and will "remain steadfast in [its] commitment to advance equity in every facet of [its] mission." *Id*. at 1, 5.

49.     In January 2024, USDA published an annual report on its Equity Action Plan informing Americans that USDA has "continued meaningful steps to fortify equity and racial justice" by centering equity in everything USDA does. Equity Action Plan 2023 Update, at 1.

50.     In furtherance of its commitment to equity, USDA uses a category of farmers that it calls "underserved farmers," which includes veteran farmers, beginning farmers, limited resource farmers, and, most relevant to this complaint, socially disadvantaged farmers. *Id.* at 6.

51.     If a farmer wants USDA to classify him as an underserved farmer, he must submit USDA's Form CCC-860. U.S. Dep't of Agric. Commodity Credit Corp., CCC-860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification (2020), https://perma.cc/W7BF-Q93Q.

52.     Form CCC-860 allows farmers to classify themselves as a veteran farmer (based on veteran status), a beginning farmer (started farming in past 10 years), and/or a limited resource farmer (based on low annual income). *Id.* Plaintiffs do not challenge any these categories because they do not consider the race or sex of the farmer.

53.     Form CCC-860 also allows farmers to classify themselves as a socially disadvantaged farmer, which USDA expressly defines as only members of certain races and one sex. *Id*.

54.     The programs and Form CCC-860 specify that farmers of the following races qualify as socially disadvantaged:

    a.   American Indians or Alaskan Natives;

    b.   Asians or Asian Americans;

    c.   Blacks or African Americans;

    d.   Hispanics or Hispanic Americans; and

    e.   Native Hawaiians or other Pacific Islanders.

*Id.*; *see also* Notice of Funds Availability; Emergency Relief Program (ERP) (ERP 2021 Phase 1), 87 Fed. Reg. 30164, 30166 (May 18, 2022); Pandemic Assistance Programs and Agricultural Disaster Assistance Programs, Subpart S—Emergency Relief Program Phase 2 (ERP 2021 Phase 2), 88 Fed. Reg. 1862, 1886 (Jan. 11, 2023) (codified at 7 C.F.R. § 760.1901); Subpart A—Coronavirus Food Assistance Program 2 (CFAP 2), *id.* at 1877 (codified at 7 C.F.R. § 9.201); Subpart D—Pandemic Assistance Revenue Program (PARP), *id.* at 1879 (codified at 7 C.F.R. § 9.302); Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) (ELRP 2021 Phase 1), 87 Fed. Reg. 19465, 19467 (Apr. 4, 2022); Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2 (ELRP 2021 Phase 2), 88 Fed. Reg. 66366,

66369 (Sept. 27, 2023); Notice of Funds Availability; Emergency Relief Program 2022 (ERP 2022), 88 Fed. Reg. 74404, 74408 (Oct. 31, 2023); Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022 (ELRP 2022), 88 Fed. Reg. 66361, 66363 (Sept. 27, 2023).

55.     These definitions also specify that women qualify as socially disadvantaged. *See, e.g.*, ERP 2022, 88 Fed. Reg. at 74408.

56.     For an entity to qualify as socially disadvantaged, members of the listed races and sex must own at least a 50 percent interest in the entity. *Id.*

**Statutory and Regulatory Background**

57.     USDA provides emergency disaster relief to farmers through many different programs.

58.     In 2021, Congress provided $10 billion to USDA for "necessary expenses related to losses" due to natural disasters and other weather events. Extending Government Funding & Delivering Emergency Assistance Act, Pub. L. 117-43, Div. B, Title I, 135 Stat. 344, 356 (2021).

59.     In 2022, Congress provided a further $3.7 billion for substantially the same purpose. Consolidated Appropriations Act, 2023, Pub. L. 117-328, Div. N, Title I, 136 Stat. 4459, 5201 (2022).

60.     And in 2020, Congress provided nearly $11.2 billion to USDA for coronavirus-related relief. Consolidated Appropriations Act, 2021, Pub. L. 116-260, Div. N, Title VII, Subtitle B, 134 Stat. 1182, 2105 (2020).

61.     These appropriations total nearly $25 billion.

62.     Through these three laws, Congress granted USDA the authority to use the appropriated funds to provide financial assistance to farmers who lost crops, livestock, or revenue due to disasters like wildfires, hurricanes, and the pandemic.

63.     The relevant provisions of all three laws never mention race or sex and never direct or authorize USDA to consider the race or sex of disaster or pandemic relief recipients.

64.     In response to the congressional appropriations, USDA created and funded numerous relief programs it placed under the umbrella category of "Emergency Relief." U.S. Dep't of Agric., Emergency Relief (2024), https://perma.cc/S7V3-GLY8.

65.     This action is brought to challenge eight different programs within that umbrella: (1) the Emergency Relief Program 2021 Phase 1 (ERP 2021 Phase 1), 87 Fed. Reg. 30164; (2) the Emergency Relief Program 2021 Phase 2 (ERP 2021 Phase 2), 88 Fed. Reg. 1862, 1862−66; (3) the Coronavirus Food Assistance Program 2 (CFAP 2) bonus payment, *id.* at 1869−70; (4) the Pandemic Assistance Revenue Program (PARP), *id.* at 1866−69; (5) the Emergency Livestock Relief Program 2021 Phase 1 (ELRP 2021 Phase 1), 87 Fed. Reg. 19465; (6) the Emergency Livestock Relief Program 2021 Phase 2 (ELRP 2021 Phase 2), 88 Fed. Reg. 66366; (7) the Emergency Relief Program 2022 Track 1 and Track 2 (ERP 2022), 88 Fed. Reg. 74404; and (8) the Emergency Livestock Relief Program 2022 (ELRP 2022), 88 Fed. Reg. 66361.

66.     Apart from CFAP 2, USDA funded these programs with the nearly $25 billion in appropriations from the three laws.

67.     USDA funded the CFAP 2 bonus payment using Commodity Credit Corporation (CCC) funds. CFAP 2, 88 Fed. Reg. at 1869.

68.     The CCC is a USDA-run corporation created by the Commodity Credit Corporation Charter Act that funds and administers USDA programs to stabilize agriculture prices and market conditions. 15 U.S.C. § 714. It can borrow up to $30 billion and operates under the supervision and direction of the Secretary of Agriculture. 15 U.S.C. §§ 714, 714b(i).

**Emergency Relief Program (ERP) 2021 Phase 1 and Phase 2**

69.     On May 18, 2022, USDA published a Notice of Funds Availability for the Emergency Relief Program, establishing ERP 2021 Phase 1 to provide emergency relief to farmers who suffered crop losses due to adverse weather events in 2020 or 2021. ERP 2021 Phase 1, 87 Fed. Reg. 30164.

70.     On January 11, 2023, USDA published a Final Rule titled Pandemic Assistance Programs and Agricultural Disaster Assistance Programs, establishing ERP 2021 Phase 2 to provide emergency relief to farmers who suffered crop losses due to adverse weather events in 2020 or 2021. ERP 2021 Phase 2, 88 Fed. Reg. 1862.

71.     USDA funded ERP 2021 Phases 1 and 2 with funds from Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. 117-43. ERP 2021 Phase 1, 87 Fed. Reg. at 30164; ERP 2021 Phase 2, 88 Fed. Reg. at 1862.

72.     Under ERP 2021, USDA calculated relief payments for farmers who qualified as socially disadvantaged differently than non-underserved farmers.

73.     For ERP 2021 Phase 1, USDA performed a complex series of calculations including: (1) a farmer's level of insurance coverage; (2) a farmer's total crop losses; (3) the amount a farmer already received from insurance; and (4) the amount a farmer paid in premiums and fees for insurance, to arrive at a farmer's "calculated ERP Phase 1 payment," a dollar value. ERP 2021 Phase 1, 87 Fed. Reg. at 30169; *see also id.* at 30168.

74.     USDA paid more money to farmers that had better insurance coverage, more crop losses, or paid more in premiums and fees for insurance. *Id.*

75.     USDA paid less money to farmers who were compensated more by their insurance. *Id.*

76.    At the last step of the calculation, USDA increased that payment by 15 percent if the farmer was socially disadvantaged or underserved. *Id.* at 30169.

77.    Non-underserved farmers like Plaintiffs did not receive that 15 percent increase. *Id.*

78.    When it unveiled ERP 2021 Phase 2 on January 11, 2023, USDA announced that it intended to make the difference between socially disadvantaged farmers and non-underserved farmers like Plaintiffs even larger if it ran low on funds. *See* 88 Fed. Reg. at 1888 (codified at 7 C.F.R. § 760.1905(d) (2023) ("If there are insufficient funds, a *differential* of 15 percent will be used for [socially disadvantaged and other] underserved producers similar to ERP [2021] Phase 1 . . . ." (emphasis added)).

79.    A *differential* of 15 percent is very different from the 15 percent *increase* that USDA used in ERP 2021 Phase 1.

80.    For example, if two farmers lose $100,000 and USDA pays one of them $30,000 and the other $15,000, that is a 15 percent differential—despite one farmer getting double what the other got.

81.    If USDA instead paid them $17,250 and $15,000, that would be a 15 percent increase.

82.    USDA thus decided not just to continue discriminating based on race and sex, but to increase the amount of discrimination as remaining funds ran lower.

**Emergency Livestock Relief Program (ELRP) 2021 Phase 1 and Phase 2**

83.    On April 4, 2022, USDA published a Notice of Funds Availability to establish ELRP 2021 Phase 1 to provide emergency relief to farmers for livestock-related losses. ELRP 2021 Phase 1, 87 Fed. Reg. at 19467.

84.     On September 27, 2023, USDA published a Notice of Funds Availability to establish ELRP 2021 Phase 2 to provide emergency relief to farmers for livestock-related losses. ELRP 2021 Phase 2, 88 Fed. Reg. at 66369.

85.     USDA funded both phases of ELRP 2021 with funds from the Extending Government Funding & Delivering Emergency Assistance Act. Pub. L. 117-43, Div. B, Title I (2021). ELRP 2021 Phase 1, 87 Fed. Reg. at 19465; ELRP 2021 Phase 2, 88 Fed. Reg. at 66366.

86.     Through ELRP 2021, USDA reimbursed farmers for purchasing feed for livestock due to reduced grazing opportunities caused by droughts or wildfires. *See* ELRP 2021 Phase 1, 87 Fed. Reg. at 19466; ELRP 2021 Phase 2, 88 Fed. Reg. at 66367.

87.     USDA reimbursed farmers based on a measurement called animal unit months (AUMs). ELRP 2021 Phase 1, 87 Fed. Reg. at 19466.

88.     An AUM is a unit of measurement equivalent to "the amount of forage necessary for the sustenance of one cow or its equivalent for a period of 1 month." Grazing Administration Definitions, 43 C.F.R. § 4100.0-5 (2023).

89.     For example, a farmer who owned five cows for which he needed to purchase feed for three months due to reduced grazing opportunities caused by droughts or wildfires would be reimbursed for fifteen AUMs.

90.     USDA calculated ELRP 2021 Phase 1 payments in three steps.

91.     First, USDA selected a base reimbursement rate for ELRP 2021 Phase 1 of $18.71 per AUM worth of feed that a farmer needed to purchase due to lost grazing opportunities. 87 Fed. Reg. at 19466.

92.     Second, USDA multiplied the $18.71 per AUM base rate by either 90 percent for socially disadvantaged and other underserved farmers or by 75 percent for non-underserved farmers. *Id.*

93.     This resulted in an ELRP 2021 Phase 1 per AUM reimbursement price of $16.84 for socially disadvantaged farmers and $14.03 for non-underserved farmers like Plaintiffs. *Id.*

94.     Finally, USDA multiplied each farmer's ELRP 2021 Phase 1 per AUM reimbursement price by that farmer's number of AUMs. *Id.*

95.     Through this three-step process under ELRP 2021 Phase 1, USDA paid socially disadvantaged farmers 20 percent more than non-underserved farmers like Plaintiffs. *See id.*

96.     USDA calculated ELRP 2021 Phase 2 payments by first multiplying each farmer's ELRP 2021 Phase 1 per AUM reimbursement price by 20 percent to get the ELRP 2021 Phase 2 per AUM reimbursement price and then multiplying that per AUM price by that farmer's total AUMs. ELRP 2021 Phase 2, 88 Fed. Reg. at 66367.

97.     USDA stated that for ELRP 2021 Phase 2, "[t]he same percentage will be applied to underserved farmers and ranchers and all other producers." *Id.* at 66369.

98.     Although USDA did apply the "same percentage" to all farmers, it continued discriminating based on whether recipients were socially disadvantaged or underserved farmers because it applied that same percentage to the earlier, discriminatory payment rates.

99.     Under ELRP 2021 Phase 2, USDA paid socially disadvantaged farmers $3.37 per AUM, or 20 percent of the $16.84 they had been paid before. *Id.* at 66367.

100.    Under ELRP 2021 Phase 2, USDA paid non-underserved farmers like Plaintiffs $2.81 per AUM, or 20 percent of the lesser $14.03 they had been paid before. *Id.*

101.    Thus, even though USDA stated that "[t]he same percentage will be applied to underserved farmers and ranchers and all other producers," *id.* at 66369, it continued to pay more to socially disadvantaged farmers than to non-underserved farmers like Plaintiffs, *id.* at 66366−69.

**Coronavirus Food Assistance Program 2**

102.    On September 22, 2020, under President Trump, USDA announced CFAP 2. Coronavirus Food Assistance Program, 85 Fed. Reg. 59380 (Sept. 22, 2020).

103.    Initially, USDA did not administer CFAP 2 in a discriminatory manner; it calculated CFAP 2 payments the same way for all recipients, regardless of their race or sex. *See id.* at 59380−81.

104.    In furtherance of President Biden's whole-of-government equity agenda, though, USDA began discriminating based on race and sex in CFAP 2 payments in 2023.

105.    On January 11, 2023, USDA announced in the same Notice of Funds Availability establishing ERP 2021 Phase 2 that it would provide an additional payment under CFAP 2 equal to 15 percent of the initial CFAP 2 payment. ERP 2021 Phase 2, 88 Fed. Reg. at 1869.

106.    USDA funded this additional payment using Commodity Credit Corporation funds. *Id.*

107.    USDA only gave this additional payment to socially disadvantaged and other underserved farmers. *Id.*

108.    USDA did not make an additional payment to non-underserved farmers. *See id.*

**Pandemic Assistance Revenue Program**

109.    On January 11, 2023, USDA announced in the same Notice of Funds Availability establishing ERP 2021 Phase 2 a new program called PARP. *Id.* at 1866−69.

110.    USDA funded PARP using funds from the Consolidated Appropriations Act, 2021, Pub. L. 116-260. *Id.* at 1866.

111.    Through PARP, USDA paid farmers whose 2020 revenue had decreased from their 2018 or 2019 revenue. *Id.* at 1868.

112.    USDA set the calculated payment rate at 90 percent of lost revenue for socially disadvantaged and other underserved farmers. *Id.*

113.    USDA set the calculated payment rate at 80 percent of lost revenue for non-underserved farmers. *Id.*

114.    USDA determined each farmer's PARP payment by subtracting the amount of assistance a farmer had received from a list of other USDA programs from the calculated payment. *Id.*

115.    Through PARP's higher calculated payment rate for socially disadvantaged farmers, USDA discriminated against non-underserved farmers like Plaintiffs based on race and sex.

**Emergency Livestock Relief Program 2022**

116.    On September 27, 2023, USDA published a Notice of Funds Availability establishing ELRP 2022. 88 Fed. Reg. 66361.

117.    USDA funded ELRP 2022 with funds from Title I of the Disaster Relief Supplemental Appropriations Act, part of Division N of the Consolidated Appropriations Act of 2023, Pub. L. 117-328 (2023). *Id.* at 66361.

118.    Through ELRP 2022, USDA reimbursed farmers for purchasing feed for livestock due to reduced grazing opportunities caused by droughts or wildfires. *Id.* at 66361−62.

119.   USDA again used AUMs to calculate ELRP 2022 payments in three steps. *Id.* at 66362.

120.   First, USDA selected a base reimbursement rate for ELRP 2022 of $28.37 per AUM worth of feed that a farmer needed to purchase due to lost grazing opportunities. *Id.*

121.   Second, USDA multiplied the $28.37 per AUM base rate by either 90 percent for socially disadvantaged and other underserved farmers or by 75 percent for non-underserved farmers. *Id.*

122.   This resulted in an ELRP 2022 per AUM reimbursement price of $25.53 for socially disadvantaged farmers and $21.28 for non-underserved farmers like Plaintiffs. *Id.*

123.   Finally, USDA multiplied each farmer's ELRP 2022 per AUM reimbursement price by that farmer's number of AUMs. *Id.*

124.   Through this three-step process under ELRP 2022, USDA paid socially disadvantaged farmers 20 percent more than non-underserved farmers like Plaintiffs. *See id.*

**Emergency Relief Program 2022**

125.   On October 31, 2023, USDA published a Notice of Funds Availability establishing ERP 2022 to provide emergency relief to farmers who suffered crop losses due to adverse weather events that occurred in 2022. 88 Fed. Reg. 74404.

126.   USDA funded ERP 2022 with funds from Title I of the Disaster Relief Supplemental Appropriations Act, part of Division N of the Consolidated Appropriations Act of 2023, Pub. L. 117-328 (2023). *Id.* at 74405.

127.   USDA established ERP 2022 to cover the same kinds of losses as ERP 2021 Phases 1 and 2. *Compare id.* at 74405, *with* ERP 2021 Phase 1, 87 Fed. Reg. at 30164.

128.    In fact, the funding used for ERP 2022 was appropriated using nearly identical statutory language. *Compare* Extending Government Funding & Delivering Emergency Assistance Act, Pub. L. 117-43, Div. B, Title I (2021), *with* Consolidated Appropriations Act, 2023, Pub. L. 117-328, Div. N, Title I (2023).

129.    USDA split ERP 2022 into Track 1 (losses of crops) and Track 2 (losses of revenue). *Id.* at 74404−05.

130.    USDA made two shifts in policy from ERP 2021 to ERP 2022 without meaningful explanation.

**Shift One: USDA Moves from Flat Factor Payments to "Progressive Factoring"**

131.    The first policy shift occurred when USDA introduced what it termed "progressive factoring." *See* ERP 2022, 88 Fed. Reg. at 74410 & n.14.

132.    In every other program challenged here, USDA paid farmers using a simple formula: the amount lost multiplied by a percentage.

133.    USDA refers to this as a "flat factor." U.S. Dep't of Agric., Emergency Relief Program 2022 (Track 1) Delivery Snapshot for Texas, 1 (2023), https://perma.cc/VPV5-R8JK.

134.    If USDA had used a flat factor for ERP 2022, the rate would have been 27 percent. *See id.* ("If a flat factor was applied, the factor would have been 27%.").

135.    Instead, USDA used its new progressive factoring for ERP 2022 and, as a result, it paid out dramatically less money as a percentage to farmers with greater losses.

136.    Under progressive factoring, USDA pays 100 percent of the first $2,000 in losses; 80 percent of the loss between $2,001 and $4,000; 60 percent of the loss between $4,001 and $6,000; 40 percent of the loss between $6,001 and $8,000; 20 percent of the loss between $8,001 and $10,000; and 10 percent of any losses over $10,000. ERP 2022, 88 Fed. Reg. at 774410.

137.    USDA provided a two-sentence footnote explaining this change:

Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

*Id.* at 74410 n.14.

138.    Because of this progressive factoring system, victims of natural disasters who operated comparatively larger farms and were counting on disaster relief from ERP 2022 under the prior formula, like Plaintiffs here, lost out on a significant amount of the disaster relief funds Congress had appropriated for them.

139.    For example, Alan and Amy West Farms had a calculated loss of $208,706.00 for ERP 2022 Track 1.

140.    Because USDA applied progressive factoring to ERP 2022, Alan and Amy West Farms received approximately $19,403 in relief for those losses.

141.    If USDA had applied the flat factor, Alan and Amy West Farms would have received approximately $42,263 in relief—more than double—for those very same losses.

142.    USDA applied progressive factoring to both Track 1 and Track 2. *Id.* at 74410, 74414.

**Shift Two: Only Underserved Farmers Receive Insurance Refunds**

143.    The second policy shift occurred when USDA limited insurance premium refunds available under ERP 2022 to only socially disadvantaged and other underserved farmers. *Id.* at 74410.

24

144.    With ERP 2021, USDA had returned a significant portion of Federal Crop Insurance or Noninsured Crop Disaster Assistance Program (NAP)[2] premiums and fees to all farmers regardless of their race or sex. *See* ERP 2021 Phase 1, 87 Fed. Reg. at 30168−69.

145.    Instead, as part of ERP 2022 Track 1, USDA decided to refund Federal Crop Insurance and NAP premiums and fees only to socially disadvantaged and other underserved farmers, discriminating based on race and sex. 88 Fed. Reg. at 74410.

**The Impact of the Policy Shifts**

*Insurance Premiums and Fees Refunds*

146.    First, USDA funneled much greater benefits to socially disadvantaged and other underserved producers by selectively applying progressive factoring to only certain portions of the payment. *Id.* at 74410−11.

147.    USDA did not subject refunds of insurance premiums and fees to progressive factoring and only gave refunds of insurance premiums and fees under ERP 2022 to socially disadvantaged and other underserved producers. *Id.* at 74411.

148.    Because of this, USDA's progressive factoring system compounded the discriminatory effect of the insurance refunds, because socially disadvantaged and other underserved farmers who received insurance refunds did not lose up to 90 percent of that money to progressive factoring. *See id.*

149.    For example, in every other program challenged here that they were eligible for, USDA paid Plaintiff Rusty Strickland between 10 and 20 percent less than his wife Alison for identical actual losses because USDA classified her as socially disadvantaged.

---

[2] NAP is an insurance program that covers certain kinds of uninsured or specialty crops that are not covered by ordinary crop insurance. *See* 7 C.F.R. §§ 1437.1, 1437.4 (2023).

150.    But for ERP 2022 Track 1, Mrs. Strickland received nearly ten times what Mr. Strickland received: $71,900.96 compared to his $7,272.71, even though they suffered identical actual losses as equal partners.

151.    USDA paid her this additional money solely because Mrs. Strickland is a woman and thus received a refund of insurance premiums and fees because of her sex.

152.    This entire difference is attributable to the fact that she received a refund of Federal Crop Insurance administrative fees and premiums and he did not.

*Preferential Treatment for NAP*

153.    Second, USDA used preferential treatment to steer additional benefits towards socially disadvantaged and other underserved farmers through NAP.

154.    USDA awarded preferential treatment to socially disadvantaged farmers who had crops eligible for NAP by: (1) backdating and automatically enrolling them in NAP coverage; (2) fully refunding the cost of NAP; (3) making them eligible for both Track 1 and Track 2 of ERP 2022; (4) not applying progressive factoring to their Track 1 losses of NAP-covered crops; and (5) providing them a higher payment factor of 90 percent instead of 70 percent on Track 2.

155.    Although the large additional benefits granted to NAP-covered crops might seem nondiscriminatory, they are just discrimination with extra steps: USDA made sure that *every* farmer who was not a white man had NAP coverage on all of their eligible crops *free of charge*, but white men who were not veterans, beginning farmers, or limited resource farmers had to manually apply for it and pay full price.

156.    Normally, farmers must apply specifically for NAP coverage and pay for it by a set closing date, with fees increasing the later a farmer applies for insurance, *see* 7 C.F.R. § 1437.7(a), (b) (2023), but USDA changed that for socially disadvantaged and other underserved farmers.

157.    Back when it announced ERP 2021 Phase 2, USDA decided to retroactively construe applications from farmers to be considered socially disadvantaged (Form CCC-860) as applications for catastrophic[3] insurance coverage under NAP. *See* 88 Fed. Reg. at 1871 ("Following the change to the regulation, FSA intends to designate the CCC-860 to be an application for catastrophic coverage for NAP if filed before the deadline for application for the coverage period. . . . Many underserved producers have previously filed a certification of their underserved status with FSA, and those producers will be considered as having timely applied for catastrophic coverage for the 2022 crop year if the certification was filed before the deadline for application for the NAP coverage period.").

158.    Then, in ERP 2022, USDA refunded in full the cost of NAP to socially disadvantaged and other underserved farmers. 88 Fed. Reg. at 74411.

159.    Finally, USDA decided not to apply progressive factoring to losses of crops covered by NAP. *Id.*

160.    To illustrate, consider how USDA treats two hypothetical farmers, one who qualifies as socially disadvantaged and one who qualifies as neither socially disadvantaged nor otherwise underserved.

161.    Both farmers lost $100,000 worth of crops eligible for coverage under NAP, but neither intended to apply for NAP.

162.    USDA completely excludes the non-underserved farmer's NAP-eligible crops from ERP 2022 Track 1 because his crops were not insured and he never received a NAP payment. 88 Fed. Reg. at 74408−09.

163.    Instead, USDA only allows him to apply for ERP 2022 Track 2. *See id.* at 74414.

---

[3] This is the lowest tier of coverage available under NAP. *See* 7 C.F.R. § 1437.3 (2023).

164.    Under Track 2, USDA will apply the minimum ERP factor of 70 percent when calculating his losses because his NAP-eligible crops were not insured by NAP. *Id.*

165.    In fact, because these NAP-eligible crops were not insured by NAP, USDA will apply the minimum factor of 70 percent when calculating *all* his Track 2 losses, even if most of his crops were covered by insurance. *Id.*

166.    In addition, USDA will apply progressive factoring to payments based on his losses of NAP-eligible crops. *Id.* at 74414 n.27.

167.    In contrast, USDA allows the socially disadvantaged farmer to use ERP 2022 Track 1 even though he did not intend to apply for NAP coverage because, back in ERP 2021 Phase 2, USDA retroactively construed his application to be considered socially disadvantaged as an application for catastrophic NAP coverage. *See* ERP 2021 Phase 2, 88 Fed. Reg. at 1871.

168.    USDA calculates the socially disadvantaged farmer's NAP-eligible crop losses using the ERP factor of 75 percent used for minimum insurance coverage, again because USDA construed his application to be considered socially disadvantaged as an application for NAP coverage. ERP 2022, 88 Fed. Reg. at 74410 (providing a table that lists an ERP payment factor of 75 percent for catastrophic NAP coverage).

169.    Then, USDA does not apply progressive factoring because NAP-covered crops are excluded from progressive factoring under Track 1. *Id.* at 74411 ("The calculated amount for NAP-covered crops will not be subject to the progressive factoring that applies to ERP 2022 payments based on Federal [C]rop [I]nsurance indemnities . . . ." (footnote omitted)).

170.    And USDA also refunds the cost of NAP coverage to the socially disadvantaged farmer. *Id.*

171.    After the socially disadvantaged farmer has received his Track 1 payment, USDA allows him to apply for ERP 2022 Track 2 to cover any losses he had that were not covered by Track 1. 88 Fed. Reg. at 74414.

172.    USDA calculates the socially disadvantaged farmer's Track 2 losses using a 90 percent ERP factor rather than the 70 percent ERP factor used for the non-underserved farmer, again because USDA construed the socially disadvantaged farmer's application to be considered socially disadvantaged as an application for NAP coverage. *Id.*

173.    Then, at the penultimate step of the calculation, USDA multiplies the socially disadvantaged farmer's payment by 115 percent, additional disaster relief that USDA provides only to socially disadvantaged and other underserved farmers. *Id.* at 74414 & n.28.

**Injury to Plaintiffs**

### Rusty Strickland

174.    Defendants injured Plaintiff Rusty Strickland through ERP 2022 Track 1, ELRP 2022, ERP 2021 Phases 1 and 2, ELRP 2021 Phases 1 and 2, and CFAP 2 when they provided him less money than they would have under these programs if he were of a different race or sex.

175.    Plaintiff Rusty Strickland operates a farm with his wife Alison Strickland.

176.    USDA paid Mrs. Strickland more money than Mr. Strickland for all losses covered by the programs because she is a woman and he is a white man, even though they operate their farm together.

177.    This is because USDA classifies Mrs. Strickland as socially disadvantaged because she is a woman.

178.    Mr. Strickland is a white man and thus does not qualify as socially disadvantaged.

179.    Mr. Strickland is not a veteran farmer, beginning farmer, or limited resource farmer, the categories that qualify as underserved other than socially disadvantaged.

180.    On information and belief, the following chart depicts the programs for which Mr. Strickland was eligible, the amount USDA calculated he had lost due to natural disasters or the pandemic for each, the payments received, and the amount USDA would have paid him if Mr. Strickland were of a different race or sex:

| Rusty Strickland | | | | |
|---|---|---|---|---|
| USDA Program | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $ 46,970 | $ 7,273 | $ 71,901 | $ (64,628) |
| ERP 2021 (Total) | $ 264,794 | $ 207,863 | $ 239,043 | $ (31,180) |
| ELRP 2022 | $ 8,240 | $ 1,545 | $ 1,854 | $ (309) |
| ELRP 2021 Phase 1 | $ 4,056 | $ 3,042 | $ 3,650 | $ (608) |
| ELRP 2021 Phase 2 | $ 3,042 | $ 608 | $ 730 | $ (122) |
| CFAP 2 Bonus | $ 59,459 | $ - | $ 8,919 | $ (8,919) |

*ERP 2022 Track 1*

181.    Mr. and Mrs. Strickland each suffered $46,969.50 in losses due to weather events covered by ERP 2022 Track 1.

182.    Mr. Strickland received $7,272.71 from USDA for his losses under ERP 2022 Track 1; Mrs. Strickland received $71,900.96 for hers—nearly ten times as much for the same losses—because she is a woman.

183.    If USDA had applied a flat factor instead of the progressive factor, Mr. and Mrs. Strickland would each have received an additional $2,238.61 under ERP 2022 Track 1.

*ELRP 2022*

184.    Mr. and Mrs. Strickland each suffered calculated livestock losses of $8,240 due to weather events covered by ELRP 2022.

185.    Mr. Strickland received $1,545 for his share of losses under ELRP 2022; Mrs. Strickland received $1,854 for hers because she is a woman.

*ERP 2021 Phases 1 and 2*

186.    Mr. and Mrs. Strickland each suffered $264,794 in calculated losses due to weather events covered by ERP 2021 Phase 1 and Phase 2.

187.    Mr. Strickland received $207,863.34 for his share of calculated losses under ERP 2021 Phases 1 and 2; Mrs. Strickland received $239,042.92 for hers because she is a woman.

*ELRP 2021 Phases 1 and 2*

188.    Mr. and Mrs. Strickland each suffered $4,056 in losses covered by ELRP 2021 Phase 1 and Phase 2.

189.    For his losses, Mr. Strickland received $3,042 under ELRP 2021 Phase 1 and $608 under ELRP 2021 Phase 2; Mrs. Strickland received $3,650.40 under ELRP 2021 Phase 1 and $730.08 under ELRP 2021 Phase 2 for hers because she is a woman.

*CFAP 2*

190.    Mr. Strickland suffered $59,459.03 in losses and Mrs. Strickland suffered $59,404.03[4] in losses due to disaster and pandemic events covered by CFAP 2 for 2020.

191.    Mr. Strickland did not receive an additional payment for his losses under CFAP 2; Mrs. Strickland received $8,910.61 for hers because she is a woman.

192.    If USDA considered Mr. Strickland socially disadvantaged, he would have received an additional payment of $8,918.86, similar to what it paid Mrs. Strickland.

---

[4] The $55 discrepancy is owed to a single head of cattle allocated to Mr. Strickland instead of Mrs. Strickland.

**Alan and Amy West and Alan and Amy West Farms**

193.    Defendants injured Plaintiffs Alan West, Amy West, and Alan and Amy West Farms through ERP 2022 Tracks 1 and 2 and ERP 2021 Phases 1 and 2 when they provided them less money than they would have under these programs if Alan West were of a different race or sex.

194.    Plaintiffs Alan and Amy West operate a farm, Alan and Amy West Farms, together.

195.    Mr. West owns 52 percent of the farm and Mrs. West owns 48 percent.

196.    Mr. West is a white man and thus does not qualify as socially disadvantaged.

197.    Mrs. West is a woman and thus does qualify as socially disadvantaged, but because she owns only 48 percent of the farm, the entity does not qualify as socially disadvantaged with respect to the programs.

198.    Neither Mr. West is not a veteran farmer, beginning farmer, or limited resource farmer, the categories that qualify as underserved other than socially disadvantaged.

199.    On information and belief, the following chart depicts the programs for which Alan and Amy West Farms was eligible, the amount USDA calculated it had lost due to natural disasters or the pandemic for each, the payments received, and the amount USDA would have paid it if Mr. West were of a different race or sex:

| Alan and Amy West Farms | | | | |
|---|---|---|---|---|
| USDA Program | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $ 208,706 | $ 19,403 | $ 206,553 | $ (187,151) |
| ERP 2022 Track 2 | $ 631,289 | $ 51,097 | $ 58,760 | $ (7,664) |
| ERP 2021 (Total) | $ 417,547 | $ 327,774 | $ 376,941 | $ (49,166) |

*ERP 2022 Track 1*

200.    Alan and Amy West Farms suffered losses of $208,706 due to weather events covered by ERP 2022 Track 1.

201.    Alan and Amy West Farms received $19,402.94 from USDA under ERP 2022 Track 1.

202.    If it qualified as socially disadvantaged, Alan and Amy West Farms would have received $206,533.44 under the same program—more than ten times as much.

203.    If USDA had applied a flat factor instead of the progressive factor, Alan and Amy West Farms would have received an additional $22,860.02 under ERP 2022 Track 1.

*ERP 2022 Track 2*

204.    Alan and Amy West Farms suffered losses of $631,289.01 due to weather events covered by ERP 2022 Track 2.[5]

205.    Alan and Amy West Farms received $51,096.68 from USDA under ERP 2022 Track 2.

206.    If it qualified as socially disadvantaged, Alan and Amy West Farms would have received $58,760.40 under ERP 2022 Track 2.

207.    If USDA had applied a flat factor instead of the progressive factor, Alan and Amy West Farms would have received at least an additional $76,739.34 under ERP 2022 Track 2.

*ERP 2021 Phases 1 and 2*

208.    Alan and Amy West Farms suffered losses of $417,547.00 due to losses of cotton and forage covered by ERP 2021 Phases 1 and 2.

---

[5] Because one component used in calculating Track 2 losses is the gross Track 1 payment, *see* ERP 2022, 88 Fed. Reg. at 74414, all Track 2 calculations would change if Alan and Amy West Farms' Track 1 payment changed.

209.    Alan and Amy West Farms received $327,774.46 from USDA under ERP 2021 Phases 1 and 2.

210.    If it qualified as socially disadvantaged, Alan and Amy West Farms would have received $376,940.55 under the same program.

211.    If USDA considered Mr. West socially disadvantaged, Alan and Amy West Farms would have received additional disaster relief because at least 50 percent of the entity would have been owned by socially disadvantaged farmers, benefiting both Mr. and Mrs. West.

**Bryan Baker and Double B Farms, LLC**

212.    Defendants injured Plaintiffs Bryan Baker and Double B Farms, LLC through ERP 2021 Phases 1 and 2 and ERP 2022 Tracks 1 and 2 when Defendants provided them less money than they would have received under these programs if Mr. Baker were of a different race or sex.

213.    Plaintiff Bryan Baker was also injured through PARP because he suffered losses covered by the program and received less money than he would have from the program if he were of a different race or sex.

214.    Mr. Baker operates a sole proprietorship farm and Double B Farms, LLC.

215.    Mr. Baker is a white man and thus does not qualify as socially disadvantaged.

216.    Mr. Baker is not a veteran farmer, beginning farmer, or limited resource farmer, the categories that qualify as underserved other than socially disadvantaged.

217.    On information and belief, the following chart depicts the programs for which Double B Farms, LLC was eligible, the amount USDA calculated it had lost due to natural disasters or the pandemic for each, the payments received, and the amount USDA would have paid it if Mr. Baker were of a different race or sex:

| Double B Farms | | | | |
|---|---|---|---|---|
| **USDA Program** | **Plaintiff's base program loss** | **Actual USDA payment to plaintiff** | **USDA payment if plaintiff was socially disadvantaged** | **Amount USDA withheld because plaintiff was not socially disadvantaged** |
| ERP 2022 Track 1 | $ 130,136 | $ 13,510 | $ 110,689 | $ (97,179) |
| ERP 2022 Track 2 | $ 973,083 | $ 76,731 | $ 88,241 | $ (11,510) |
| ERP 2021 (Total) | $ 193,150 | $ 151,623 | $ 174,366 | $ (22,743) |

*ERP 2022 Track 1*

218.    Double B Farms, LLC suffered $130,136 in losses due to weather events covered by ERP 2022 Track 1.

219.    It received $13,510.20 under ERP 2022 Track 1.

220.    If it were classified as socially disadvantaged, it would have received $110,688.75 under ERP 2022 Track 1.

221.    If USDA had applied a flat factor instead of the progressive factor, Double B Farms, LLC would have received an additional $12,842.34 under ERP 2022 Track 1.

*ERP 2022 Track 2*

222.    Double B Farms, LLC suffered $973,083.32 in losses due to weather events covered by ERP 2022 Track 2.

223.    It received $76,731.25 under ERP 2022 Track 2.

224.    If it were classified as socially disadvantaged, it would have received $88,241 under ERP 2022 Track 2.[6]

---

[6] Because one component used in calculating Track 2 losses is the gross Track 1 payment, *see* ERP 2022, 88 Fed. Reg. at 74414, all Track 2 calculations would change if Double B Farms, LLC's Track 1 payment changed.

225.    If USDA had applied a flat factor instead of the progressive factor, Double B Farms, LLC would have received an additional $120,318.12 under ERP 2022 Track 2, or $138,365.84 more if it qualified as socially disadvantaged as well.

*ERP 2021 Phase 1*

226.    Double B Farms, LLC suffered $193,150 in losses due to weather events covered by ERP 2021 Phase 1.

227.    It received $151,622.79 under ERP 2021 Phase 1.

228.    If it were classified as socially disadvantaged, it would have received $174,366.16 under ERP 2021 Phase 1.

229.    The following chart depicts the programs for which Mr. Baker, through his sole proprietorship farm, was eligible, the amount USDA calculated he had lost due to natural disasters or the pandemic for each, the payments received, and the amount USDA would have paid him if he were of a different race or sex:

| Bryan Baker | | | | |
|---|---|---|---|---|
| USDA Program | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $          53,850 | $            7,789 | $          48,154 | $          (40,365) |
| ERP 2022 Track 2 | $        372,890 | $          31,717 | $          36,474 | $            (4,758) |
| ERP 2021 (Total) | $          67,990 | $          53,372 | $          61,378 | $            (8,006) |
| PARP | $        225,613 | $            9,448 | $          11,591 | $            (2,143) |

*ERP 2022 Track 1*

230.    Mr. Baker's sole proprietorship farm suffered $53,850 in losses due to weather events covered by ERP 2022 Track 1.

231.    He received $7,788.75 under ERP 2022 Track 1.

232.    If he were classified as socially disadvantaged, he would have received $48,153.74 under ERP 2022 Track 1.

233.    If USDA had applied a flat factor instead of the progressive factor, Bryan Baker would have received an additional $3,115.87 under ERP 2022 Track 1.

*ERP 2022 Track 2*

234.    Mr. Baker's sole proprietorship farm suffered $372,889.73 in losses due to weather events covered by ERP 2022 Track 2.

235.    He received $31,716.73 under ERP 2022 Track 2.

236.    If he were classified as socially disadvantaged, he would have received $36,474.24 under ERP 2022 Track 2.[7]

237.    If USDA had applied a flat factor instead of the progressive factor, Bryan Baker would have received at least an additional $43,794.17 under ERP 2022 Track 2.

*ERP 2021 Phase 1*

238.    Mr. Baker's sole proprietorship farm suffered $67,990 in losses due to weather events covered by ERP 2021 Phase 1.

239.    He received $53,372.17 under ERP 2021 Phase 1.

240.    If he were classified as socially disadvantaged, he would have received $61,377.97.

*PARP*

241.    Mr. Baker's sole proprietorship farm suffered calculated losses of $225,612.80 in 2020 covered by PARP.

242.    He received $9,448.03 under PARP.

---

[7] Because one component used in calculating Track 2 losses is the gross Track 1 payment, *see* ERP 2022, 88 Fed. Reg. at 74414, all Track 2 calculations would change if Mr. Baker's Track 1 payment changed.

243.    If he were classified as socially disadvantaged, he would have received $11,591.35.

244.    If USDA considered Mr. Baker socially disadvantaged, both he and Double B Farms, LLC would have received additional relief as detailed above.

**Summary of Injuries to Plaintiffs**

245.    On information and belief, Plaintiffs provide the following chart showing their injuries based on what they believe they would have received had USDA considered them socially disadvantaged:

| USDA Program | Plaintiff | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
|---|---|---|---|---|---|
| ERP 2022 Track 1 | Alan & Amy West Farms | $ 208,706 | $ 19,403 | $ 206,553 | $ (187,151) |
| ERP 2022 Track 2 | Alan & Amy West Farms | $ 631,289 | $ 51,097 | $ 58,760 | $ (7,664) |
| ERP 2021 (Total) | Alan & Amy West Farms | $ 417,547 | $ 327,774 | $ 376,941 | $ (49,166) |
| ERP 2022 Track 1 | Bryan Baker | $ 53,850 | $ 7,789 | $ 48,154 | $ (40,365) |
| ERP 2022 Track 2 | Bryan Baker | $ 372,890 | $ 31,717 | $ 36,474 | $ (4,758) |
| ERP 2021 (Total) | Bryan Baker | $ 67,990 | $ 53,372 | $ 61,378 | $ (8,006) |
| PARP | Bryan Baker | $ 225,613 | $ 9,448 | $ 11,591 | $ (2,143) |
| ERP 2022 Track 1 | Double B Farms | $ 130,136 | $ 13,510 | $ 110,689 | $ (97,179) |
| ERP 2022 Track 2 | Double B Farms | $ 973,083 | $ 76,731 | $ 88,241 | $ (11,510) |
| ERP 2021 (Total) | Double B Farms | $ 193,150 | $ 151,623 | $ 174,366 | $ (22,743) |
| ERP 2022 Track 1 | Rusty Strickland | $ 46,970 | $ 7,273 | $ 71,901 | $ (64,628) |
| ERP 2021 (Total) | Rusty Strickland | $ 264,794 | $ 207,863 | $ 239,043 | $ (31,180) |
| ELRP 2022 | Rusty Strickland | $ 8,240 | $ 1,545 | $ 1,854 | $ (309) |
| ELRP 2021 Phase 1 | Rusty Strickland | $ 4,056 | $ 3,042 | $ 3,650 | $ (608) |
| ELRP 2021 Phase 2 | Rusty Strickland | $ 3,042 | $ 608 | $ 730 | $ (122) |
| CFAP 2 Bonus | Rusty Strickland | $ 59,459 | $ - | $ 8,919 | $ (8,919) |

246.    If USDA had used a flat factor to calculate payments under ERP 2022, Plaintiffs would have received increased payments under ERP 2022 Tracks 1 and 2.

247.    Plaintiffs are thus injured by USDA's decision to abandon flat factoring and institute progressive factoring.

248.    If Mr. Strickland, Mr. Baker, and Mr. West were women, American Indians, Alaskan Natives, Asians, Asian-Americans, blacks, African-Americans, Hispanics, Hispanic-

Americans, Native Hawaiians, or Pacific Islanders, USDA would consider them socially disadvantaged farmers.

249.    Plaintiffs are thus disadvantaged relative to similarly situated farmers because of their race and sex.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
(Administrative Procedure Act)
(*Ultra Vires* Action; Major Questions Doctrine)

250.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

251.    Agencies have only those powers provided to them by statute; agency actions exceeding congressional delegation are unlawful.

252.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(C), instructs courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

253.    Through Executive Orders 13985 and 14091, President Biden made it the policy of his administration to advance racial "equity" by using federal programs to tip the scales of outcomes, rather than working to ensure equal opportunities for all Americans. *See* 86 Fed. Reg. 7009; 88 Fed. Reg. 10825.

254.    The challenged programs seek to advance "equity" by remedying alleged disparities between races and sexes in the United States through the constitutionally suspect and highly disfavored use of race and sex discrimination.

255.    The question whether these disparities should be addressed through overt race and sex preferences involves some of the most hotly debated topics and the most politically and economically significant questions facing the country.

256.    The executive orders and USDA's Equity Action Plan show that USDA and the Biden Administration believe that these are among the most important questions facing the country.

257.    The appropriations used to fund the programs total nearly $25 billion.

258.    Thus, through the challenged programs, Defendants seek to answer a "major question" involving vast political and economic significance.

259.    "Major questions" can be answered only by agencies when Congress has articulated a clear statement authorizing such expansive powers. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022).

260.    When Congress does wish to enact a benefit that discriminates based on race or sex, it does so clearly and in express terms.

261.    Congress has provided no authorization whatsoever for Defendants' actions, let alone clear authorization; instead, it simply provided funds for disaster and pandemic relief.

262.    Defendants have thus acted unlawfully and *ultra vires*.

## SECOND CLAIM FOR RELIEF
(Administrative Procedure Act)
(Fifth Amendment Equal Protection Violation – Race Discrimination)

263.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

264.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), instructs courts to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity."

265.    The programs discriminate based on race in violation of the Fifth Amendment to the United States Constitution.

266.    Plaintiffs, except Amy West, received less money under the programs than a similarly situated farmer of a different race would have.

267.    Plaintiff Amy West received less money under the programs than a similarly situated farmer whose business partner were of a different race would have.

268.    Plaintiffs are harmed by Defendants' racial classifications because, but for Defendants' racial discrimination, they would be receiving greater disaster and pandemic relief from the programs.

269.    The racial classifications of the programs do not satisfy strict scrutiny. *Adarand Constructors v. Peña*, 515 U.S. 200, 224 (1995) ("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.").

270.    Defendants do not have a compelling interest in providing enhanced disaster or pandemic relief to farmers simply based on their membership in a particular race. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986) ("This Court never has held that societal discrimination alone is sufficient to justify a racial classification.").

271.    Defendants' preference for farmers of certain races is not narrowly tailored to any compelling interest. *See Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-0278, 2024 U.S. Dist. LEXIS 38050, at *99 (N.D. Tex. Mar. 5, 2024) ("It doesn't matter if it's the easiest, most

administrable, most well-intentioned program in the world—it cannot be based on race if it is not strictly necessary to achieve the relevant compelling interest.")

272.    The programs are not narrowly tailored since they are both underinclusive—they do not provide additional benefits to groups that have histories of discrimination in the United States, such as Jewish-Americans, Arab-Americans, Italian-Americans, Slavic-Americans, and Irish-Americans—and overinclusive—they include farmers who may meet the racial qualifications, but who have never suffered discrimination on that basis or are wealthy and not in danger of catastrophe absent additional disaster relief.

### THIRD CLAIM FOR RELIEF
(Administrative Procedure Act)
(Fifth Amendment Equal Protection Violation – Sex Discrimination)

273.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

274.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), instructs courts to" hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity."

275.    The programs discriminate based on sex in violation of the Fifth Amendment to the United States Constitution.

276.    Defendants are responsible for implementing the programs.

277.    Plaintiffs, except Amy West, received less money under the programs than a similarly situated farmer of a different sex would have.

278.    Plaintiff Amy West received less money under the programs than a similarly situated farmer whose business partner were of a different sex would have.

279.    Plaintiffs are harmed by Defendants' sex classifications because, but for Defendants' sex discrimination, they would be receiving greater disaster and pandemic relief from the programs.

280.    Defendants' preference for women is not substantially related to any exceedingly persuasive objective. *See Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017).

281.    General claims of societal sex discrimination cannot justify the challenged programs. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 727–29 (1982).

282.    The challenged programs are both underinclusive and overinclusive—they fail to include farmers who are not women but who have suffered discrimination based on their sex and they do include farmers who are women but who have never suffered discrimination based on their sex.

### FOURTH CLAIM FOR RELIEF
(Administrative Procedure Act)
(Arbitrary and Capricious – Progressive Factoring and Insurance Refunds)

283.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

284.    In prior years, USDA had used a simple system for disaster relief. First, it would calculate how much each farmer had lost to specific disaster events and sum that up. Second, it would refund a portion of each farmer's Federal Crop Insurance and/or NAP premiums and fees. Third, it would see how much money it had to spend. Fourth, it would divide the money proportional to each farmer's losses using a flat factor.

285.    But it abruptly shifted its policy when it published the Notice of Funding Availability for ERP 2022 in October 2023.

286.    Suddenly and without warning, it abandoned flat factoring and implemented what it calls progressive factoring and stopped providing refunds of Federal Crop Insurance and NAP premiums and fees to all farmers.

287.    Under progressive factoring, farmers with large losses are given reduced assistance and farmers with small losses are given additional assistance.

288.    This is a dramatic shift from prior policy, and the agency provided only a cursory, two-sentence explanation of its reasoning for the shift.

289.    USDA's only explanation is found in a footnote in the Notice of Funding Availability, 88 Fed. Reg. at 74410 n.14, saying:

> Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

290.    This sudden change had a dramatic effect, which harmed and continues to harm Plaintiffs in two distinct ways.

291.    First, Plaintiffs will receive less in disaster relief because of this change; for instance, Plaintiff Rusty Strickland would have received $9,511.32 under the flat factor system but received only $7,271.71 under the progressive factoring system.

292.    Second, Plaintiffs were injured because they relied on USDA's past practice of disaster relief.

293.    For example, Plaintiffs Alan West and Amy West made plans for the next year in part based on their expected ERP 2022 payment.

294.    When USDA's decision to reduce their relief payments via progressive factoring caused Mr. and Mrs. West to suffer shortfalls, they ended up dipping into their retirement savings and using an advance on their operating note to run Alan and Amy West Farms.

295.    In addition, all Plaintiffs expected they would receive a refund of their Federal Crop Insurance premiums and fees as they had in prior years.

296.    Although USDA provided a bare-bones explanation for its institution of progressive factoring, it did not explain its decision to no longer extend a refund of Federal Crop Insurance premiums and fees to all farmers.

297.    Agencies must always provide a reasoned explanation for their actions, and when an agency changes from its past policy, it must at minimum "display awareness that it *is* changing position." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

298.    This requirement is particularly important where, as here, the agency's "prior policy has engendered serious reliance interests that must be taken into account." *Id.*

299.    USDA's two-sentence explanation fails to provide even the most basic explanation of its reasoning and its implementation of progressive factoring is thus arbitrary and capricious.

300.    The footnote does not consider reliance interests; it does not acknowledge the shift in policy; it does not explain alternatives that USDA considered; it does not explain how its reasoning was based on the factors Congress intended it to consider. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983) (explaining that an agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider").

**RELIEF REQUESTED**

Plaintiffs respectfully request that this Court:

A.      Hold unlawful and set aside the programs under 5 U.S.C. § 706(2);

B.      Enter a declaratory judgment that Congress never authorized USDA to allocate disaster and pandemic relief to individuals based on race or sex;

C.      Enter an order preliminarily and permanently enjoining Defendants from enforcing or implementing any categories based on race or sex absent clear congressional authorization;

D.      In the alternative, enter a declaratory judgment that the race and sex preferences of the challenged programs are unconstitutional under the Equal Protection principles protected by the Due Process Clause of the Fifth Amendment to the United States Constitution, both facially and as applied;

E.      Enter an order preliminarily and permanently enjoining Defendants from enforcing or implementing any race or sex preferences and remand the programs to USDA to remedy the Fifth Amendment violations;

F.      In the alternative, vacate and set aside the provisions of each of the challenged programs that apply race or sex preferences and remand the challenged programs to USDA to remedy the Fifth Amendment violations;

G.      Enter an order permanently enjoining Defendants from reducing or increasing payments using the Notice of Funding Availability's progressive factoring system;

H.      Vacate and set aside the portion of the Notice of Funding Availability instituting progressive factoring and remand to the agency;

I.      Exercise its discretion to mandate a 90-day remand timeline, maintain jurisdiction over the action to ensure compliance, and provide guidance to USDA on available curative responses;

J.      Award Plaintiffs such costs and attorneys' fees as allowed by law;

K.      Grant such other and further relief as the Court deems appropriate.


Dated: <u>March 29, 2024</u>.                    Respectfully submitted,


<u>/s/ Braden H. Boucek</u>
BRADEN H. BOUCEK
  Georgia Bar No. 396831
  Tennessee Bar No. 021399
BENJAMIN I. B. ISGUR
  Virginia Bar No. 98812
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
(770) 977-2131
bboucek@southeasternlegal.org
bisgur@southeasternlegal.org

WILLIAM E. TRACHMAN
  Colorado Bar No. 45684
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
wtrachman@mslegal.org

*Attorneys for Plaintiffs*