**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS, | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, | ) | |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | ) | |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, and | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
|     Defendants. | ) | |

---

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY
INJUNCTION OR, IN THE ALTERNATIVE, RELIEF UNDER 5 U.S.C. § 705**

---

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES............................................................................ ii

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS .......................................................................... 3

ANALYSIS ................................................................................................ 8

I.      Plaintiffs present a substantial case on the merits and are likely to succeed.    10

        A.      USDA discriminated based on race and sex in violation of the Fifth
                Amendment........................................................................ 10

                1.      Race Discrimination.............................................. 10

                2.      Sex Discrimination................................................ 14

        B.      Congress did not grant USDA the authority it claims. ..................... 15

        C.      USDA's novel progressive factoring is arbitrary and capricious and
                discriminates based on race and sex. ................................... 19

                1.      Arbitrary and Capricious......................................... 19

                2.      Race and Sex Discrimination.................................... 21

II.     Plaintiffs are suffering irreparable harm. ...................................... 22

III.    An injunction is in the public interest. .......................................... 23

IV.     The Court should preliminarily enjoin, or stay, Defendants' race- and sex-based
        enhanced spending and progressive factoring. ............................. 24

CONCLUSION.......................................................................................... 25

CERTIFICATE OF COMPLIANCE........................................................... 26

CERTIFICATE OF SERVICE ................................................................... 27

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                                                    **<u>Page(s)</u>**

*Adarand Constructors v. Peña,*
    515 U.S. 200 (1995) ................................................................................................ 11, 17

*ADT, LLC v. Capital Connect, Inc.,*
    145 F. Supp. 3d 671 (N.D. Tex. 2015) ................................................................... 7

*Ala. Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021) .......................................................................................... 19

*Arnold v. Garlock, Inc.,*
    278 F.3d 426 (5th Cir. 2001) ................................................................................. 10

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) ................................................................................................... 11

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ...................................................................................... 15, 16

*Book People, Inc. v. Wong,*
    91 F.4th 318 (5th Cir. 2024) ............................................................................... 9, 22

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ............................................................................................... 15

*BST Holdings, L.L.C. v. OSHA,*
    17 F.4th 604 (5th Cir. 2021) .............................................................................. 10, 22

*Caspar v. Snyder,*
    77 F. Supp. 3d 616 (E.D. Mich. 2015) ................................................................. 22

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,*
    511 F.3d 535 (6th Cir. 2007) ................................................................................. 10

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989) ............................................................................................... 12

*Clarke v. CFTC,*
    74 F.4th 627 (5th Cir. 2023) ............................................................................... 9, 23

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................................... 22

*Faust v. Vilsack,*
    519 F. Supp. 3d 470 (E.D. Wis. 2021) ............................................................... 5, 12

*FCC v. Fox TV Stations, Inc.*,
 556 U.S. 502 (2009) ................................................................................... 19

*FDA v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000) ............................................................................. 15, 16

*Fisher v. Univ. of Tex. at Austin*,
 570 U.S. 297 (2013) ............................................................................. 11, 13

*Free Speech Coal., Inc. v. Paxton*,
 No. 23-50627, 2024 U.S. App. LEXIS 5555 (5th Cir. 2024) ............................... 23

*Frontiero v. Richardson*,
 411 U.S. 677 (1973) ................................................................................... 17

*Gratz v. Bollinger*,
 539 U.S. 244 (2003) ................................................................................... 11

*Grutter v. Bollinger*,
 539 U.S. 306 (2003) ................................................................................... 11

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
 968 F.3d 454 (5th Cir. 2020) ...................................................................... 18

*Holman v. Vilsack*,
 No. 21-1085, 2021 U.S. Dist. LEXIS 127334 (W.D. Tenn. 2021) ....................... 5, 12

*Jackson Women's Health Org. v. Currier*,
 760 F.3d 448 (5th Cir. 2014) ...................................................................... 23

*Jacksonville Port Auth. v. Adams*,
 556 F.2d 52 (D.C. Cir. 1977).......................................................................... 23

*Johnson v. California*,
 543 U.S. 499 (2005) ................................................................................... 12

*Judulang v. Holder*,
 565 U.S. 42 (2011) ..................................................................................... 20

*League of United Latin Am. Citizens v. Perry*,
 548 U.S. 399 (2006) ................................................................................... 11

*Louisiana v. Biden*,
 55 F.4th 1017 (5th Cir. 2022) ...................................................................... 23

*Massachusetts v. EPA*,
 549 U.S. 497 (2007) ................................................................................... 20

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ................................................................. 22

*Miller v. Vilsack,*
   No. 4:21-cv-0595, 2021 U.S. Dist. LEXIS 264778 (N.D. Tex. 2021) ....... 5, 12, 13, 17, 22, 24

*Miss. Univ. for Women v. Hogan,*
   458 U.S. 718 (1982) ............................................................................ 14

*Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto Ins.,*
   463 U.S. 29 (1983) .............................................................................. 20

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................................... 9, 10

*Nuziard v. Minority Bus. Dev. Agency,*
   No. 4:23-CV-0278, 2024 U.S. Dist. LEXIS 38050 (N.D. Tex. 2024) .................. 11, 13, 22

*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) ............................................................... 9, 22

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No.,*
   551 U.S. 701 (2007) ........................................................................... 10

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) .............................................................................. 19

*Rice v. Cayetano,*
   528 U.S. 495 (2000) ........................................................................... 10

*Rollerson v. Brazos River Harbor Navigation Dist.,*
   6 F.4th 633 (5th Cir. 2021) ................................................................. 23

*Sessions v. Morales-Santana,*
   582 U.S. 47 (2017) .............................................................................. 14

*Shaw v. Hunt,*
   517 U.S. 899 (1996) ........................................................................... 12

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
   143 S. Ct. 2141 (2023) .................................................................10, 11, 12, 13

*Tex. Democratic Party v. Abbott,*
   961 F.3d 389 (5th Cir. 2020) ............................................................... 10

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ............................................................... 9

*Texas v. NRC*,
  78 F.4th 827 (5th Cir. 2023) ................................................................... 16

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ................................................................... 24

*Ultima Servs. v. USDA*,
  No. 2:20-cv-00041, 2023 U.S. Dist. LEXIS 124268 (E.D. Tenn. 2023) ............... 5, 12

*United States v. Virginia*,
  518 U.S 515 (1996) ............................................................................... 14

*United States v. Windsor*,
  570 U.S. 744 (2013) .............................................................................. 17

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) .............................................................................. 8

*Chamber of Com. v. Consumer Fin. Prot. Bureau*,
  No. 6:22-cv-00381, 2023 U.S. Dist. LEXIS 159398 (E.D. Tex. 2023) ................ 18

*Vanderstok v. Garland*,
  625 F. Supp. 3d 570 (N.D. Tex. 2022) ...................................................... 9

*Vitolo v. Guzman*,
  999 F.3d 353 (6th Cir. 2021) .............................................................. 11, 12, 14, 22

*Voting for Am., Inc. v. Andrade*,
  488 F. App'x 890 (5th Cir. 2012) ............................................................ 9

*Wages & White Lion Invs. v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ................................................................. 23

*Weingarten Realty Invs. v. Miller*,
  661 F.3d 904 (5th Cir. 2011) .................................................................. 10

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) .......................................................................... 15, 16, 18

*Wynn v. Vilsack*,
  545 F. Supp. 3d 1271 (M.D. Fla. 2021) ..................................................... 5, 12

**<u>Statutes</u>**

5 U.S.C. § 553 ....................................................................................... 19

5 U.S.C. § 702 ....................................................................................... 23

5 U.S.C. § 705 ....................................................................................... i, 9

7 U.S.C. § 2279 ................................................................................................... 5, 17

7 U.S.C. § 2003 ................................................................................................... 5, 17

Pub. L. 116-260 .................................................................................................. 18

Pub. L. 117-43 .................................................................................................... 18

Pub. L. 117-328 .................................................................................................. 18

Pub. L. 117-2 ...................................................................................................... 4

Pub. L. 117-169 .................................................................................................. 5, 17

U.S. Const., Art. I, § 1 ...................................................................................... 15

**Rules**

Fed. R. Civ. P. 65 ............................................................................................... 24

Fed. R. Civ. P. 65(c) .......................................................................................... 24

**Regulations**

7 C.F.R. § 9.201 ................................................................................................. 4

7 C.F.R. § 9.203 ................................................................................................. 6

7 C.F.R. § 9.306 ................................................................................................. 6

7 C.F.R. § 760.1702 ........................................................................................... 6

7 C.F.R. § 760.1704 ........................................................................................... 6

7 C.F.R. § 760.1901 ........................................................................................... 4

7 C.F.R. § 760.1905 ........................................................................................... 6

7 C.F.R. § 764.202 ............................................................................................. 5

7 C.F.R. § 767.151 ............................................................................................. 5

Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2
(ELRP 2021 Phase 2), 88 Fed. Reg. 66366 (Sept. 27, 2023) ................................. 4

Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022
(ELRP 2022), 88 Fed. Reg. 66361 (Sept. 27, 2023) .............................................. 4

Notice of Funds Availability; Emergency Livestock Relief Program (ELRP),
  87 Fed. Reg. 19465 (Apr. 4, 2022) ......................................................... 4

Notice of Funds Availability; Emergency Relief Program 2022 (ERP 2022),
  88 Fed. Reg. 74404 (Oct. 31, 2023) ....................................................... 4

Notice of Funds Availability; Emergency Relief Program (ERP),
  (ERP 2021 Phase 1), 87 Fed. Reg. 30164 (May 18, 2022) .................... 4

Pandemic Assistance Programs and Agricultural Disaster Assistance Programs,
  88 Fed. Reg. 1862 (Jan. 11, 2023) .......................................................... 4

Notice of Funds Availability; American Rescue Plan Act of 2021 Section 1005 Loan
  Payment, 86 Fed. Reg. 28329 (May 26, 2021) ....................................... 5

**<u>Other Authorities</u>**

Executive Order, 13985 *Advancing Racial Equity and Support for Underserved Communities
  Through the Federal Government*,
  86 Fed. Reg. 7009 (Jan. 25, 2021) .......................................................... 3, 16

Executive Order 14091, *Further Advancing Racial Equity and Support for Underserved
  Communities through the Federal Government*,
  88 Fed. Reg. 10825 (Feb. 22, 2023) ....................................................... 3, 16

**INTRODUCTION**

When natural disasters strike, they don't discriminate based on race and sex. Neither should the Department of Agriculture (USDA). The Constitution promises equal treatment to all Americans regardless of their race or sex. It also promises the separation of powers. USDA broke both promises through the disaster and pandemic relief programs challenged here.

Since 2020, Congress has appropriated nearly $25 billion to USDA in emergency disaster and pandemic relief to aid farmers. And while Congress never instructed USDA to allocate those funds based on race or sex, that is exactly what USDA did. Through the eight disaster relief programs challenged here, USDA gives more money to some farmers based on those characteristics alone. USDA does this by first defining farmers who are black/African-American, American Indian, Alaskan native, Hispanic, Asian-American, Native Hawaiian, Pacific Islander, or a woman as "socially disadvantaged." Then, it provides farmers who qualify as socially disadvantaged *more* money for the *same* loss than those it deems non-underserved, along with other preferential treatment.[1]

Plaintiffs are Texas farmers and their businesses. They each received less disaster relief than farmers who qualified as socially disadvantaged because they are white men, co-own a business with a white man, or are a business owned by a white man. Like most farmers in northwest Texas, Plaintiffs suffered losses due to drought and excessive heat. Those disasters were not any less devastating to Plaintiffs' crops and livestock than they were to socially disadvantaged farmers'

---

[1] USDA provides greater relief to "underserved" farmers than to "non-underserved" farmers. *See infra* pp. 6–7. That group includes veterans, beginning farmers, limited resource farmers, and socially disadvantaged farmers. The former three categories do not discriminate based on race or sex and are not challenged here. The term "non-underserved" is used to clarify only that USDA provided full disaster relief to *some* white men despite their race.

1

crops and livestock. Yet based solely on Plaintiffs' race and sex, USDA gave them less money when it provided disaster relief.

This Court should either issue a preliminary injunction or impose a stay under Section 705 of the Administrative Procedure Act (APA) to prevent USDA from relying on discriminatory criteria as it issues disaster relief. Plaintiffs satisfy the preliminary injunction requirements. First, Plaintiffs are likely to succeed on the merits of their claims. The Constitution requires demanding scrutiny of any race or sex preference, and USDA's discriminatory choices will not withstand it. Although the government may use race and sex classifications to redress specific instances of discrimination when it has no other options, USDA's preferences apply to *every* farmer that belongs to a socially disadvantaged category, while excluding every farmer that does not.

And USDA has no statutory authority to consider race and sex, also making Plaintiffs likely to prevail. The decision to treat Americans unequally based on race and sex to achieve equal outcomes among groups is a hotly debated and politically significant topic. The agricultural sector is of vast economic significance. That makes USDA's decision to implement race and sex preferences a major question that only Congress can address. When elected officials make this divisive choice, they rightly expect that they will have to answer to the American people. Yet Congress never mentioned race or sex in the relevant disaster relief appropriations. USDA also acted arbitrarily and capriciously by failing to explain its shift to a novel "progressive factoring" system that reduces relief to those who suffer the most losses.

Plaintiffs also satisfy the other preliminary injunction factors. The threatened injury is to Plaintiffs' constitutional right to equality and is thus irreparable. There is no public interest in permitting unlawful and unconstitutional agency actions to continue. Also, it will harm the public less, and be easier for USDA to remedy the discrimination at issue, if less money has unlawfully

left the government's coffers. USDA can continue to provide disaster relief without consideration of race or sex and hold any remaining funds in reserve pending resolution of this litigation.

USDA is hurting the people that Congress told it to help. This Court should stop it.

## STATEMENT OF FACTS

On January 20, 2021, President Biden declared it to be the policy of his administration that the federal government would pursue a "comprehensive approach to advancing equity for all" through "an ambitious whole-of-government equity agenda." Executive Order 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, 86 Fed. Reg. 7009 (Jan. 25, 2021). President Biden doubled down on this order on February 16, 2023, pledging to "continuously embed equity into all aspects of Federal decision-making," by requiring agencies to ensure "equitable outcomes." Executive Order 14091, *Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, 88 Fed. Reg. 10825 (Feb. 22, 2023); *but see Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 648 (5th Cir. 2021) (Ho, J., concurring in part and concurring in the judgment) (explaining that the difference between equity and equality is "the difference between color blindness and critical race theory"). In furtherance of this whole-of-government approach, Thomas Vilsack, Secretary of USDA, proclaimed that he "emphatically agreed" with the President's orders. U.S. Dep't of Agric., Equity Action Plan 2023 Update, 2 (2024), https://perma.cc/PQH3-4B3W. And, at his direction, USDA "embraced the Administration's equity agenda" and is "[c]entering equity in everything [it] do[es]." *Id*. Even, apparently, in emergency disaster relief.

USDA has thus given, and is continuing to give, more money for disaster relief to the races and the sex that it prefers by defining farmers who fall into those categories as "socially

disadvantaged farmers" in the eight challenged "emergency relief" programs.[2] USDA's definition is based purely on race and sex: (1) American Indians or Alaskan Natives; (2) Asians or Asian-Americans; (3) Blacks or African-Americans; (4) Hispanics or Hispanic-Americans; (5) Native Hawaiians or other Pacific Islanders; and (6) women. *See* Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) (ELRP 2021 Phase 1), 87 Fed. Reg. 19465, 19467 (Apr. 4, 2022); Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2 (ELRP 2021 Phase 2), 88 Fed. Reg. 66366, 66369 (Sept. 27, 2023); Notice of Funds Availability; Emergency Relief Program (ERP) (ERP 2021 Phase 1), 87 Fed. Reg. 30164, 30166 (May 18, 2022); Pandemic Assistance Programs and Agricultural Disaster Assistance Programs, Subpart S—Emergency Relief Program Phase 2 (ERP 2021 Phase 2), 88 Fed. Reg. 1862, 1886 (Jan. 11, 2023) (codified at 7 C.F.R. § 760.1901); Subpart D—Pandemic Assistance Revenue Program (PARP), *id.* at 1879 (codified at 7 C.F.R. § 9.302); Subpart A—Coronavirus Food Assistance Program 2 (CFAP 2), *id.* at 1877 (codified at 7 C.F.R. § 9.201); Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022 (ELRP 2022), 88 Fed. Reg. 66361, 66363 (Sept. 27, 2023); Notice of Funds Availability; Emergency Relief Program 2022 (ERP 2022), 88 Fed. Reg. 74404, 74408 (Oct. 31, 2023). No other groups are included in the definition, unless approved in writing by USDA. *Id.*

This is not the first time USDA has used a race-based definition of "socially disadvantaged." In 2021, Congress directed USDA to forgive the loans of "socially disadvantaged farmers." American Rescue Plan Act of 2021, Pub. L. 117-2, § 1005 (2021). USDA then employed

---

[2] USDA lumps these programs together under the title, "Emergency Relief." *See* U.S. Dep't of Agric., Emergency Relief (2024), https://perma.cc/S7V3-GLY8.

the same racial categories at the heart of this case.[3] That race-based loan forgiveness program was promptly halted by a cascade of preliminary injunctive relief, including from this Court. *See Miller v. Vilsack*, No. 4:21-cv-0595, 2021 U.S. Dist. LEXIS 264778, at *28 (N.D. Tex. July 1, 2021) ("[T]he loan forgiveness program is simultaneously overinclusive and underinclusive . . . ."); *Holman v. Vilsack*, No. 21-1085, 2021 U.S. Dist. LEXIS 127334, at *31 (W.D. Tenn. Jul. 8, 2021) ("Plaintiff will be irreparably harmed if he is denied his constitutional right to equal protection."); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1284–85 (M.D. Fla. 2021) ("To allow the perpetuation of discrimination in such a manner would undermine the Supreme Court's ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race." (internal quotation marks omitted)); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 475–76 (E.D. Wis. 2021) ("Defendants lack a compelling interest for the racial classifications. . . . Defendants have not established that the remedy is narrowly tailored."). USDA declined to appeal even one of these injunctions. Then, rather than allow USDA to continue to defend the indefensible, Congress repealed it. Inflation Reduction Act, Pub. L. 117-169 § 22008, 136 Stat. 1818, 2023 (2022).

But USDA did not abandon the race- and sometimes sex-based definition of "socially disadvantaged." It employs the term liberally throughout its regulations, *see, e.g.*, 7 C.F.R. § 764.202 (2023); 7 C.F.R. § 767.151 (2023), even though its record of defending its race- and sex-based definitions is unblemished by success. *See also Ultima Servs. v. USDA*, No. 2:20-cv-00041, 2023 U.S. Dist. LEXIS 124268, at *60 (E.D. Tenn. July 19, 2023) (declaring use of rebuttable presumption that certain races are disadvantaged a violation of the Fifth Amendment

---

[3] USDA did not include women as socially disadvantaged under the loan forgiveness program and used slightly different language to define its favored races. *See* Notice of Funds Availability; American Rescue Plan Act of 2021 Section 1005 Loan Payment, 86 Fed. Reg. 28329, 28330 (May 26, 2021). It did not explain why. *See id.*; *see also* 7 U.S.C. § 2279(a) (including gender-based prejudice).

and preliminarily enjoining its use). Indeed, USDA to this day continues to issue regulations incorporating the term "socially disadvantaged" despite Congress's abrupt about-face on the loan forgiveness program. *See, e.g.*, Milk Loss Program, 7 C.F.R. §§ 760.1702, 760.1704(a) (2023) (entitling underserved farmers and ranchers to greater reimbursement rate for milk loss payments and including socially disadvantaged within the definition of underserved).

Each challenged program gives more money, and some provide preferential treatment, to "socially disadvantaged" farmers, but not to non-underserved farmers like Plaintiffs. Under ELRP 2021 Phases 1 and 2 and ELRP 2022, which are programs that help farmers feed their livestock, USDA paid socially disadvantaged farmers 20 percent more money than non-underserved farmers. *See* ELRP 2021 Phase 1, 87 Fed. Reg. at 19466; ELRP 2021 Phase 2, 88 Fed. Reg. at 66369; ELRP 2022, 88 Fed. Reg. at 66362; *see also* Compl., ECF No. 1 ¶¶ 83–101, 116–24. Under ERP 2021 Phase 1—a program that helps farmers recover from natural disasters that damage crops—USDA paid socially disadvantaged farmers 15 percent more money than non-underserved farmers. 87 Fed. Reg. at 30169; *see also* ECF No. 1 ¶¶ 73–77. Under ERP 2021 Phase 2, USDA paid socially disadvantaged farmers using a 15 percent greater differential. 7 C.F.R. § 760.1905(d); *see also* ECF No. 1 ¶¶ 78–82. Under PARP, a program that paid farmers who lost revenue during the pandemic, USDA paid socially disadvantaged farmers 12.5 percent more money than non-underserved farmers. 7 C.F.R. §§ 9.306(a)(1)(iii)(A)–(B) (2023); *see also* ECF No. 1 ¶¶ 109–15. Under CFAP 2, which helped farmers cope with pandemic-related losses, USDA made an additional payment equal to 15 percent of the original amount that went to socially disadvantaged farmers but not to non-underserved farmers. 7 C.F.R. § 9.203(p) (2023); *see also* ECF No. 1 ¶¶ 102–08. And under ERP 2022, a program like ERP 2021 that helps farmers recover from natural disasters that damage crops, USDA (1) refunded insurance payments to socially disadvantaged

6

farmers but not to non-underserved farmers; (2) exempted those insurance payments from a large reduction that it applied to other payments; and (3) paid socially disadvantaged farmers 15 percent more. 88 Fed. Reg. at 74410, 74414; *see also* ECF No. 1 ¶¶ 125–73. Each program is an attempt by USDA to continue the race and sex discrimination that courts unanimously halted back in 2021.

Plaintiffs in this case are farmers, and business entities owned and controlled by them, that USDA denied disaster relief money to because they are not members of USDA's preferred races or sex.[4] Plaintiffs detailed which programs injured them by discriminating against them based on race and sex. *See* Rusty Strickland Decl. ¶¶ 14–22; Alan West Decl. ¶¶ 14–21; Amy West Decl. ¶¶ 11–18; Bryan Baker Decl. ¶¶ 12–21; *see also ADT, LLC v. Capital Connect, Inc.,* 145 F. Supp. 3d 671, 683–84 (N.D. Tex. 2015) (using declarations to decide whether to grant preliminary injunction without a hearing). In most cases, USDA denied Plaintiffs between 10 and 20 percent of their payment. *See, e.g.*, Strickland Decl. ¶ 15. But Rusty Strickland was excluded from one benefit, *id.* ¶ 14, and under ERP 2022 Plaintiffs each received only a tenth of what they would have if they were of USDA's preferred races or sex, *see, e.g.*, *id.* ¶ 20. Plaintiffs were also injured by USDA's institution of progressive factoring and their reliance on past USDA practice. *See* Alan West Decl. ¶¶ 16–19; Amy West Decl. ¶¶ 13–16; Baker Decl. ¶¶ 6, 17–18.

The newest program, ERP 2022, instituted what USDA calls "progressive factoring," a novel system that paid the farmers hit hardest by disasters the smallest portion of their losses and that was applied unevenly based on race and sex. *See* 88 Fed. Reg. at 74410. In prior years, USDA distributed funds directly proportionally to losses using what it calls a "flat factor." *See, e.g.*, ELRP

---

[4] Plaintiff Amy West is a woman and thus of USDA's preferred sex. Amy West Decl. ¶¶ 9–10. But because USDA set a threshold of 50 percent ownership for a business entity to qualify as socially disadvantaged and Mrs. West only owns 48 percent of Alan and Amy West Farms, she was denied disaster relief money based on her husband's race and sex. *See id.* ¶ 18; ERP 2022, 88 Fed. Reg. at 74408.

2021 Phase 1, 87 Fed. Reg. at 19466 (paying a flat 90 percent of losses to socially disadvantaged farmers and a flat 75 percent of losses to farmers like Plaintiffs). ERP 2022 marks a sudden departure from that—a farmer whose calculated loss was $2,000 would receive $1,500, or 75 percent, but a farmer whose calculated loss was $200,000 would receive $18,750, or 9.37 percent. *See* 88 Fed. Reg. at 74410. USDA's only justification is in a brief footnote:

> Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

*Id.* at n.14. In addition, USDA exempted from progressive factoring refunds of insurance premiums—a form of relief Plaintiffs were not eligible for based on race and sex. *Id.* at 74411. Because of this, all the money USDA paid to Plaintiffs underwent progressive factoring, but only part of the money paid to socially disadvantaged farmers was. *See id.* These decisions—to withhold refunds of insurance premiums from Plaintiffs based on race and sex and to apply progressive factoring—created the ten-to-one disparity seen in payments under ERP 2022. *See, e.g.*, Strickland Decl. ¶ 20 (explaining that Mr. Strickland received $7,272.71 for his half, but Mrs. Strickland received $71,900.96, a difference caused entirely by the insurance premium refund). Plaintiffs were harmed not only by this change but also by their reliance on the longstanding prior policy of USDA to provide funds proportionally to losses. *See* Alan West Decl. ¶¶ 16–19; Amy West Decl. ¶¶ 13–16; Baker Decl. ¶¶ 6, 17–18.

## ANALYSIS

Federal Rule of Civil Procedure 65 provides trial courts with authorization to grant injunctive relief. The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A preliminary injunction is customarily based on procedures that are "less formal and evidence that is less complete than in a

trial on the merits." *Id*. To obtain a preliminary injunction, Plaintiffs must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that granting the injunction is in the public interest." *Clarke v. CFTC*, 74 F.4th 627, 640–41 (5th Cir. 2023). Alternatively, a stay may be granted under 5 U.S.C. § 705, which applies a largely identical four-factor test. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (noting the "substantial overlap" between factors for a stay pending appeal and a preliminary injunction); *Texas v. EPA*, 829 F.3d 405, 424 (5th Cir. 2016) (reciting the *Nken* stay factors when staying an agency's final rule under 5 U.S.C. § 705); *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 893 (5th Cir. 2012) (per curiam) (describing stay and preliminary injunction factors as "virtually the same"). In either case, all four factors favor Plaintiffs.

In cases involving a constitutional right or illegal agency action, the analysis is condensed. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th Cir. 2024) (quoting *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012)). A preliminary injunction or stay is also warranted by the lack of clear congressional authorization for a regulation carrying the force and effect of law. *See, e.g.*, *Vanderstok v. Garland*, 625 F. Supp. 3d 570, 577–82 (N.D. Tex. 2022)[5] (finding likelihood of success prong met by argument that agency lacked statutory authority and issuing preliminary injunction); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 612–14 (5th Cir. 2021). The threatened harm and public interest factors "merge" and are considered together where, as here, "the Government is the

---

[5] This opinion appears to overlap with an unrelated case found at the same citation. Plaintiffs include this footnote to provide an alternative citation: Case No. 4:22-cv-00691-O, ECF No. 56, at *6–15 (N.D. Tex. Sep. 2, 2022).

opposing party." *Nken*, 556 U.S. at 435. Plaintiffs will nevertheless analyze all four factors and show why USDA's actions warrant preliminary relief.

**I.      Plaintiffs present a substantial case on the merits and are likely to succeed.**

When "(1) 'a *serious legal question* is involved' and (2) 'the balance of the equities weighs *heavily* in favor of granting the stay,'" a "movant need only present a substantial case on the merits." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020) (quoting *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001)); *see also Weingarten Realty Invs. v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011) (stay); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (preliminary injunction). Because this case presents a serious legal question—the lawfulness of race and sex discrimination in pandemic and disaster relief programs—and the balance of the equities weighs overwhelmingly in favor of preventing that kind of invidious discrimination, Plaintiffs need only present a substantial case on the merits.

**A.      USDA discriminated based on race and sex in violation of the Fifth Amendment.**

**1.      Race Discrimination**

"Eliminating racial discrimination means eliminating all of it," *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (SFFA)*, 143 S. Ct. 2141, 2161 (2023), because "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race," *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality op.). "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *SFFA*, 143 S. Ct. at 2162 (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring) ("It is a sordid business, this divvying us up by race."). The Constitution's guarantees of equal protection "give to the humblest, the poorest, the most despised of the race the same rights and the same protection

before the law as it gives to the most powerful, the most wealthy, or the most haughty." *SFFA*, 143 S. Ct. at 2159 (internal quotation marks and citation omitted). "Without this principle of equal justice . . . there is no republican government and none that is really worth maintaining." *Id.* That same guarantee flows through the Fifth Amendment, barring the federal government from discriminating based on race and sex. *Adarand Constructors v. Peña*, 515 U.S. 200, 217 (1995).

Race-based classifications are presumptively unconstitutional. To overcome that presumption, USDA must satisfy the "daunting two-step examination" of strict scrutiny. *SFFA*, 143 S. Ct. at 2162; *see also Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) ("[T]he moral imperative of racial neutrality is the driving force of the Equal Protection Clause, and racial classifications are permitted only as a *last resort*." (emphasis added) (internal quotation marks omitted)); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003); *Adarand Constructors*, 515 U.S. at 224. USDA must first show that favoring one race over another is used to "further compelling government interests." *Gratz*, 539 U.S. at 270. And in the rare instances the government can show that, it must then show that its "use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 143 S. Ct. at 2162 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013)).

USDA cannot justify these programs under strict scrutiny. Similar programs under other agencies have failed that test every time. *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 356 (6th Cir. 2021) (enjoining program providing coronavirus relief to restaurant owners based on their race and sex); *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-0278, 2024 U.S. Dist. LEXIS 38050 (N.D. Tex. Mar. 5, 2024) (granting summary judgment to plaintiffs and permanently enjoining agency from only aiding specific races). Indeed, USDA *knows* that it cannot do what it did here— because *USDA itself*, using near-identical language in near-identical situations, has lost every time it has been haled into court. *See Holman*, 2021 U.S. Dist. LEXIS 127334, at *31; *Miller*, 2021

11

U.S. Dist. LEXIS 264778, at *28; *Wynn*, 545 F. Supp. 3d at 1284–85; *Faust*, 519 F. Supp. 3d at 475–76; *see also Ultima Servs.*, 2023 U.S. Dist. LEXIS 124268, at *60.

USDA's asserted interests fail at step one. It seeks to remedy general societal inequities: specifically, its belief that certain races of farmers usually run smaller businesses, have less access to capital, and are more likely to fail. *See, e.g.*, ERP 2022, 88 Fed. Reg. at 74410 n.15. But the Supreme Court has "identified only two compelling interests that permit resort to race-based government action. One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute." [6] *SFFA*, 143 S. Ct. at 2162 (citing cases). That compelling interest has three components. *Vitolo*, 999 F.3d at 361. First, "[i]t cannot rest on a 'generalized assertion that there has been past discrimination in an entire industry.'" *Id.* (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989)). "Second, there must be evidence of *intentional* discrimination in the past." *Id.* (citing *J.A. Croson Co.*, 488 U.S. at 503). "Third, the government must have had a hand in the past discrimination it now seeks to remedy." *Id.* USDA's claim that it is acting to cure general societal inequity fails all three prongs. *Id.* at 361 ("[A]lleviat[ing] the effects of societal discrimination is not a compelling interest." (quoting *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996))).

USDA would also fail step two because the challenged programs are not narrowly tailored. Narrow tailoring requires the government to show "that no workable race-neutral alternatives" would achieve the compelling interest. *Fisher*, 570 U.S. at 312; *accord Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). A policy that is over- or under-inclusive fails narrow tailoring. *J.A. Croson Co.*, 488 U.S. at 507–08. "It doesn't matter if it's the easiest, most administrable, most well-

---

[6] The second, "avoiding imminent and serious risk to human safety in prisons," is not relevant here. *SFFA*, 143 S. Ct. at 2162 (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)).

intentioned program in the world—it cannot be based on race if it is not strictly necessary to achieve the relevant compelling interest." *Nuziard*, 2024 U.S. Dist. LEXIS 38050, at *99 (citing *Fisher*, 570 U.S. at 312).

USDA demonstrated that race-neutral alternatives are workable in the most obvious way: by creating and using race-neutral alternatives. The "underserved farmer" classification, of which the challenged race-based definition is part, includes new farmers and low-income farmers— exactly who USDA claims its race discrimination aids. *See, e.g.*, ERP 2022, 88 Fed. Reg. at 74410 n.15 (explaining USDA targets extra relief to "underserved farmers" because they are "more likely to lack financial reserves and access to capital," and run "vulnerable and smaller operations"). Race-neutral alternatives are workable and so the challenged programs are not narrowly tailored.

Even if race-neutral alternatives were unworkable, the challenged programs would still fail by being both over- and under-inclusive. Instead of providing aid based on need or likelihood of business failure, USDA provides aid based on skin color and sex. USDA provides additional relief to farmers of its preferred races absent any showing that they needed additional relief. *See Miller*, 2021 U.S. Dist. LEXIS 264778, at *28 (finding USDA's loan forgiveness program overinclusive because it gave benefits to those who "never experienced discrimination or pandemic-related hardship"). And it will deny additional aid to farmers not of its preferred races who are in danger of financial ruin. Beyond that failing, the races it has chosen are "incoherent" when reviewed critically. *See SFFA*, 143 S. Ct. at 2210 (Gorsuch, J., concurring) ("Where do these boxes come from? Bureaucrats."). Jewish-Americans are excluded despite a well-documented history of discrimination; the same is true of Italian-Americans, Irish-Americans, Slavic-Americans, and Arab-Americans. Yet an ethnic South Korean or Nigerian who arrived in 2020 receives enhanced

benefits.[7] Such over- and under-inclusivity fails the strict standards of narrow tailoring. *See Vitolo*, 999 F.3d at 364 ("[Those from] Pakistan and India qualify for special treatment. But those from Afghanistan, Iran, and Iraq do not. Those from China, Japan, and Hong Kong all qualify. But those from Tunisia, Libya, and Morocco do not. This scattershot approach does not conform to the narrow tailoring strict scrutiny requires.").

### 2. Sex Discrimination

Sex discrimination is also presumptively invalid. *United States v. Virginia*, 518 U.S. 515, 531 (1996). "Successful defense of legislation that differentiates on the basis of gender, we have reiterated, requires an 'exceedingly persuasive justification.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *Virginia*, 518 U.S. at 531). To justify the classification, USDA must prove that (1) a sex-based classification serves "important governmental objectives," and (2) the classification is "substantially and directly related" to its objectives. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 730 (1982) (quotation marks omitted). It cannot do so.

First, as with race discrimination, "general claims of societal [sex] discrimination are not enough." *Vitolo*, 999 F.3d at 364 (citing *Hogan*, 458 U.S. at 727–29). USDA again advances a mere general desire to remedy alleged inequities. *See, e.g.*, ERP 2022, 88 Fed. Reg. at 74410 n.15. This is insufficient. Second, as with race discrimination, the under- and over-inclusive nature of the benefits to women conflicts with USDA's stated goal. Women who do not need additional assistance received it. Women who arrived in the United States recently and thus—unless USDA believes it still discriminates against women today—could not have suffered discrimination at USDA's hands received it. Entities like Plaintiff Alan and Amy West Farms are arbitrarily denied

---

[7] Plaintiffs presume USDA does not believe it was discriminating against ethnic South Koreans or Nigerians as recently as 2020.

additional disaster relief because Amy West, a woman, owns only 48 percent of the joint venture. *See* Amy West Decl. ¶ 18. USDA thus violated the Fifth Amendment by embedding race and sex discrimination in every aspect of the challenged programs. It also violated separation of powers principles by engaging in that sordid business without being directed to by Congress.

**B.    Congress did not grant USDA the authority it claims.**

USDA lacked statutory authority to discriminate based on race and sex. The Constitution vests the legislative power exclusively in Congress. U.S. Const., Art. I, § 1; *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, when an agency asserts authority, the necessary inquiry is whether Congress "in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022). That inquiry, in turn, "must be 'shaped, at least in some measure, by the nature of the question presented'"—the question presented being the problem the agency seeks to answer through its action. *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). Here, the problem USDA seeks to answer is "how should the United States resolve alleged longstanding economic disparities between people of different races and sexes?" *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023) (rejecting the dissent's vague formulation of the issue as the Secretary merely "giv[ing] borrowers more relief when an emergency has inflicted greater harm" and instead considering whether the Secretary can "use his powers to abolish $430 billion in student loans . . . as a pandemic winds down to its end?").

This case exemplifies the concern animating the major questions doctrine—protecting the separation of powers against the "particular and recurring problem [of] agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. In cases such as this, the "'economic and political significance' of [the agency's asserted authority] provide[s] a 'reason to hesitate before concluding that

Congress' meant to confer such authority." *Id.* at 2608 (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159–60). The challenged programs come within the ambit of the major questions doctrine and thus are valid only if there is a clear congressional statement authorizing them.

The programs seek to answer a question "of vast . . . political significance." *Id.* at 2605; *see also Texas v. NRC*, 78 F.4th 827, 844 (5th Cir. 2023) (explaining that depositing nuclear waste is a major question because it "has been hotly politically contested for over a half century"). Few questions have been given more political focus by President Biden than the alleged existence of race and sex inequities and how to resolve them. President Biden's administration has made this a major policy cornerstone. *See, e.g.*, Executive Order 13985 (declaring "an ambitious whole-of-government equity agenda"); Executive Order 14091 (reinvigorating his administration's commitment to "embed[ding] a focus on equity into the fabric" of government, focused on "redressing unfair disparities" between Americans of different races and sexes).

Among the many answers available to USDA, discrimination to achieve equal outcomes across race and sex categories ("equity") is perhaps the most controversial. This political tension is something elected members of Congress would ordinarily address, given how highly disfavored discriminating based on race and sex is and the divisive nature of equity. *See Nebraska*, 143 S. Ct. at 2374 (contrasting the "sharp debates" that resulted from the Secretary's proposal with the near-unanimous passage of the HEROES Act); *West Virginia*, 142 S. Ct. at 2614 (objecting to an agency's resolution of a problem that "has been the subject of an earnest and profound debate across the country" (quotation omitted)). The Constitution's careful separation of powers makes this the sort of decision reserved for the elected branch who must ultimately answer to the American people for their choice, not insulated bureaucrats.

16

In the rare circumstances where Congress wishes to carefully enact legislation using a suspect method of discrimination, it has been crystal clear in saying just that. *See, e.g.*, *Frontiero v. Richardson*, 411 U.S. 677, 678−79 (1973); *Adarand Constructors*, 515 U.S. at 205; *c.f. United States v. Windsor*, 570 U.S. 744, 752 (2013). And Congress can only do this when it is a highly targeted solution that remedies specific, identified instances of discrimination.

Congress has shown that when it wishes to express a preference for farmers who are socially disadvantaged or who "have experienced discrimination," it makes that known.[8] *See* 7 U.S.C. §§ 2003(a), (c) (directing target participation rates for loans to socially disadvantaged groups); *id.* § 2003(e) (defining socially disadvantaged groups); 7 U.S.C. § 2279(a)(5) (defining socially disadvantaged farmers); *id.* § 2279(b) (directing outreach efforts to socially disadvantaged farmers); *id.* § 2279(c) (directing outreach assistance for socially disadvantaged farmers); Inflation Reduction Act of 2022, Pub. L. 117-169, § 22007(e) (2022) (setting aside $2.2 billion for farmers who "have experienced discrimination" in USDA farm lending programs); *see also Miller*, 2021 U.S. Dist. LEXIS 264778, at *5 (describing how Congress authorized now-repealed loan forgiveness for socially disadvantaged farmers).[9]

USDA also seeks to answer a question "of vast economic . . . significance." *West Virginia*, 142 S. Ct. at 2605. The agricultural industry's overall contribution to the American economy is economically significant. According to USDA, in 2022, "[a]griculture, food, and related industries contributed roughly $1.420 trillion to U.S. gross domestic product (GDP), a 5.5-percent share."

---

[8] Unlike USDA, however, Congress stops short of listing specific races.

[9] In the loan forgiveness program rejected in *Miller*, USDA identified specific racial groups that qualified through a Notice of Funds Availability. 2021 U.S. Dist. LEXIS 264778, at *5. The same races are included in the programs challenged here. *Id.* USDA also included women in the challenged programs but did not include them in the loan forgiveness program. *Id.*; *see also* 7 U.S.C. § 2279(a) (defining socially disadvantaged for purposes of the loan forgiveness program to include farmers subjected to racial, ethnic, or gender prejudice).

U.S. Dep't of Agric., Ag and Food Sectors and the Economy (2024), https://perma.cc/MSC2-ZT63. The three appropriations funding most of the challenged programs total nearly $25 billion on their own. *See* Extending Government Funding & Delivering Emergency Assistance Act, Pub. L. 117-43, Div. B, Title I (2021) ($10 billion); Consolidated Appropriations Act, 2023, Pub. L. 117-328, Div. N, Title I (2023) ($3.7 billion); Consolidated Appropriations Act, 2021, Pub. L. 116-260, Div. N, Title VII, Subtitle B (2021) ($11.2 billion). For perspective, non-defense federal discretionary spending in 2023 was $917 billion, meaning these appropriations comprise 2.7 percent of annual federal discretionary spending—a colossal amount, even though they are spread over three years. *See* Congressional Budget Office, The Federal Budget in Fiscal Year 2023 (2024), https://perma.cc/7ZDC-H2LR. This is more than enough to present a major question. *See, e.g.*, *Chamber of Com. v. Consumer Fin. Prot. Bureau*, No. 6:22-cv-00381, 2023 U.S. Dist. LEXIS 159398, at *19 (E.D. Tex. Sept. 8, 2023) (holding economic impact shown to be significant "by the millions of dollars per year[]" in compliance costs). The Court should require USDA to show clear congressional authorization before it can employ race and sex discrimination as a solution.

Even if the bar were set lower and the challenged programs were reviewed as a simple matter of statutory interpretation, USDA would still fail to justify the race and sex preferences. The applicable appropriations are completely silent on this question. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020). An even "more fundamental problem with the agency's position" is that Congress has, as shown above, long been taking affirmative steps to assist socially disadvantaged farmers. *Id.* Yet when Congress appropriated money to aid those in need following disasters, it did so without any indication that it found that there were specific and identifiable reasons to employ a race preference. Congress didn't even mention race or sex. The natural read of the disaster and pandemic relief appropriations is that

Congress expected USDA to allocate funds based on need. USDA nevertheless "decided to do" through regulatory action "what Congress had not" done through statute. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2486 (2021).

## C.    USDA's novel progressive factoring is arbitrary and capricious and discriminates based on race and sex.

### 1.    Arbitrary and Capricious

In ERP 2022, USDA added a new twist that it calls "progressive factoring." *See* 88 Fed. Reg. at 74410. USDA was not required to submit to notice-and-comment rulemaking for ERP 2022. *See* 5 U.S.C. § 553(a)(2). But even when it escapes the strictures of notice-and-comment rulemaking, it remains bound by the APA's requirement that it not behave arbitrarily and capriciously. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105–06 (2015). The key requirement of arbitrary and capricious review is "that an agency provide a reasoned explanation for its action." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency changes position, this requirement "would ordinarily demand that it display awareness that it *is* changing position." *Id.* "This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* But at times it must—such as "when its prior policy has engendered serious reliance interests that must be taken into account." *Id.*

USDA fails to satisfy those two requirements. It does not display awareness that this is a change in position from prior disaster relief programs. In fact, the entire discussion of the institution of the progressive factor is in footnote 14 of the ERP 2022 Notice of Funding Availability, which reads in whole:

> Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

88 Fed. Reg. at 74410 n.14. This cursory explanation defies the Supreme Court's repeated instructions about agency deviation from past practice. And because that deviation implicates serious reliance interests engendered by past disaster relief practice, consideration of those interests was required but omitted. Plaintiffs here were injured not only by the policy shift itself— which reduced their payments by tens of thousands of dollars—but also by their reliance on USDA's past practice of simply paying farmers directly proportionate to their losses and refunding insurance premiums. *See* Alan West Decl. ¶¶ 16–19; Amy West Decl. ¶¶ 13–16; Baker Decl. ¶¶ 6, 18. Plaintiffs run sizable businesses for which they budget carefully. At a minimum, USDA owes them a reasoned explanation that considers their reliance interests.

Beyond failing to provide a reasoned explanation for its action, USDA's action is also arbitrary and capricious because it considered factors that Congress did not instruct it to. *See Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983) (noting that it is arbitrary and capricious for an agency to "rel[y] on factors which Congress had not intended it to consider"); *see also, e.g., Massachusetts v. EPA*, 549 U.S. 497, 529–30 (2007) (criticizing EPA for considering factors beyond the statutory text); *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (criticizing BIA for blending relevant considerations from a related statute into another that did not require those considerations despite their plausible relevance). Here, the law does not ask USDA to consider structures like progressive factoring, nor does it ask the agency to try to help small farmers more.

### 2.    Race and Sex Discrimination

Progressive factoring discriminates based on race and sex. To begin with, USDA exempted crops covered by the Noninsured Crop Disaster Assistance Program (NAP) from progressive factoring. ERP 2022, 88 Fed. Reg. at 74411. Before doing so, USDA extended NAP coverage— for free and without even requiring that they apply—to its preferred races and sex. *Id.;* ERP 2021

Phase 2, 88 Fed. Reg. at 1871. The impact of this change is to apply progressive factoring for NAP-eligible crops only to farmers who are not members of USDA's preferred races and sex.

In addition, USDA chose to apply progressive factoring to a farmer's total before refunding Federal crop insurance and NAP insurance fees and premiums. ERP 2022, 88 Fed. Reg. at 74410. This means that those refunds evaded progressive factoring. And unlike in prior years, when all farmers received those refunds, under ERP 2022 USDA only gave them to socially disadvantaged and other underserved farmers. These refunds are why Mr. Strickland received only a tenth of what Mrs. Strickland received. *See* Strickland Decl. ¶ 20. USDA's decision to exempt the discriminatory refunds from progressive factoring highlights that progressive factoring itself ends up discriminating based on race and sex.

Even USDA's proffered justification for progressive factoring is deeply intertwined with its justification for providing additional relief based on race and sex. *Compare* ERP 2022, 88 Fed. Reg. at 74410 n.14 (justifying progressive factoring as a method of increasing "the proportion of funding provided to smaller producers"), *with id.* at n.15 (justifying providing benefits on the basis of race and sex by explaining USDA's view that farms owned by its preferred races and sex are "smaller operations" that "lack financial reserves"). According to USDA, it designed progressive factoring to give more money to smaller farmers at the expense of comparatively larger farmers. *Id.* at n.14. But USDA believed that its preferred races and sex usually operated smaller farms, meaning USDA knew that its preferred races and sex were more likely to receive more money from progressive factoring. *Id.* at n.15. Discriminatory intent can thus properly be inferred from the bald race and sex discrimination throughout the challenged programs, including ERP 2022. *See, e.g.*, *id.* at n.15 (attempting to justify race and sex discrimination in refunds of insurance premiums and service fees).

Plaintiffs are likely to succeed on the merits of their claims because USDA acted without congressional authorization and discriminated both based on race and sex. A preliminary injunction is a necessary equitable remedy to prevent imminent irreparable harm.

## II.    Plaintiffs are suffering irreparable harm.

A "loss of constitutional freedoms for even minimal periods of time . . . unquestionably constitutes irreparable injury." *BST Holdings*, 17 F.4th at 618 (internal quotation marks omitted); *see also Nuziard*, 2024 U.S. Dist. LEXIS 38050, at *119–20 & n.81 (explaining that "constitutional violations are irreparable," because "[s]uch rights are sacrosanct and must be vindicated if infringed," and collecting cases); *Miller*, 2021 U.S. Dist. LEXIS 264778, *30 ("An ongoing constitutional deprivation can be sufficient to establish irreparable harm."); *Vitolo*, 999 F.3d at 360 ("[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed."); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (holding "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury,'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Caspar v. Snyder*, 77 F. Supp. 3d 616, 640 (E.D. Mich. 2015) (holding equal protection violation irreparable). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc.*, 91 F.4th at 340–41 (citing *Opulent Life Church*, 697 F.3d at 295). This case is in part about Plaintiffs' constitutional right to equal treatment under the Fifth Amendment. There is no true recompense for the government's willful violation of this most hard-won of all American rights. Absent an injunction, Plaintiffs will continue to be irreparably harmed by being treated differently based on race and sex. *See* Strickland Decl. ¶ 23; Alan West Decl. ¶ 22; Baker Decl. ¶ 22.

The time to halt the challenged programs is now, before additional payments go out and before USDA launches even more programs using this same discriminatory language. Plaintiffs therefore respectfully ask the Court to act swiftly.

## III.    An injunction is in the public interest.

Neither the government nor the public has an interest "in the perpetuation of an unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quotation omitted); *see also Free Speech Coal., Inc. v. Paxton*, No. 23-50627, 2024 U.S. App. LEXIS 5555, at *43 (5th Cir. Mar. 7, 2024) ("[T]he government suffers no injury when a court prevents it from enforcing an unlawful law."). The public interest lies in preventing "the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quotation omitted). The public is harmed by "the perpetuation of unlawful agency action," *Louisiana*, 55 F.4th at 1035, because the public interest lies in agencies obeying their obligations under the APA and authorizing statutes. *Clarke*, 74 F.4th at 643–44; *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1977).

The interests of all farmers receiving disaster relief are served by halting further payments based on race or sex. Plaintiffs cannot seek damages. *See Wages & White Lion Invs. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); 5 U.S.C. § 702 (precluding APA suits for monetary damages). That means that if they prevail, USDA must make the disaster relief equal, even though it has already spent much of what Congress has given it. Whether that means providing more relief to non-underserved farmers, or less relief to socially disadvantaged farmers, USDA's task will be made more manageable by promptly halting its unlawful behavior.

Finally, USDA's pattern and practice of instituting benefit programs that discriminate based on race and sex makes a preliminary injunction or a stay in the best interest of the public. As detailed above, USDA has been down this road before. It got sued, lost, didn't appeal, and then

turned around and did the same thing again. USDA's pattern demonstrates that it will continue to reuse the "socially disadvantaged" category to unlawfully discriminate until courts stop it.

Either a preliminary injunction or a Section 705 stay will preserve the status quo as it was "absent the unlawful agency action." *Texas v. United States*, 40 F.4th 205, 219–29 (5th Cir. 2022). As explained more fully below, the injunctive relief here can be tailored to prevent only USDA's unlawful actions, while preserving the lawful portions of the programs.

## IV.     The Court should preliminarily enjoin, or stay, Defendants' race- and sex-based enhanced spending and progressive factoring.

The Court can grant effective relief by staying or enjoining Defendants (1) from making or increasing payments or providing any extra relief based on the "socially disadvantaged," *i.e.*, race- and sex-based, category, while still permitting much of the available relief to head out the door; and (2) from making any payments that are larger than they would otherwise be absent progressive factoring.[10]  USDA can hold excess funds in reserve to be used once a final ruling is reached. This limited-scope preliminary injunction would allow the lawful portions of the Programs to continue unimpeded, while also preventing further unlawful behavior by Defendants. In the alternative, the Court can grant effective relief by enjoining Defendants or staying the programs in whole.

---

[10] The motion for a preliminary injunction complies with Rule 65. No bond should be required because the government will not suffer costs or damages from the proposed preliminary injunction. *See* Fed. R. Civ. P. 65(c); *Miller*, 2021 U.S. Dist. LEXIS 264778, at *34 (requiring no bond).

## CONCLUSION

Plaintiffs respectfully request that this Court enter an immediate injunction or stay halting USDA's race- and sex-based discrimination and progressive factoring.

Dated: <u>April 5, 2024</u>.                    Respectfully submitted,

<div style="margin-left: 50%;">

<u>/s/ Braden H. Boucek</u>
BRADEN H. BOUCEK
  Georgia Bar No. 396831
  Tennessee Bar No. 021399
BENJAMIN I. B. ISGUR
  Virginia Bar No. 98812
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
(770) 977-2131
bboucek@southeasternlegal.org
bisgur@southeasternlegal.org

WILLIAM E. TRACHMAN
  Colorado Bar No. 45684
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
wtrachman@mslegal.org

ED MCCONNELL
  Texas Bar No. 13442500
Tormey & McConnell, LLC
310 SW 6th Ave.
Amarillo, TX 79101
Tel. (806) 355-2700; Fax. (806) 355-4771
ed@tmcattorneys.com

*Attorneys for Plaintiffs*

</div>

## CERTIFICATE OF COMPLIANCE

This brief conforms to the requirements of Local Rule 7.2. It was prepared in 12-point Times New Roman Font. It is double-spaced and has margins that are at least one inch on all four sides. No text other than page numbers is in the margins.

Respectfully submitted,


/s/ Braden H. Boucek
BRADEN H. BOUCEK

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. I further certify that I will email Alexander Sverdlov and Faith Lowry, the attorneys assigned to represent Defendants, at their doj.gov email addresses.

Respectfully submitted,

/s/ Braden H. Boucek
BRADEN H. BOUCEK

27