# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| RUSTY STRICKLAND, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 2:24-cv-00060-Z |
| THE UNITED STATES DEPARTMENT OF ARGRICULTURE, *et al.*, | |
| *Defendants.* | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

ALEXANDER V. SVERDLOV
 (NY Bar No. 4918793)
FAITH E. LOWRY
 (TX Bar No. 24099560)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8550
Email: alexander.v.sverdlov@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT ...................................................................................................................... 8

I.    A Preliminary Injunction Is Neither Necessary nor Appropriate Because Plaintiffs Do Not Face Imminent or Irreparable Injury........................................... 8

    A.    Plaintiffs Have Only Identified Past Harm, Which Cannot Justify Injunctive Relief........................................................................................... 9

    B.    Plaintiffs' Alleged Harm Is Reparable ........................................................ 13

II.   The Balance of Equities and Public Interest Weigh Heavily Against Granting the Broad Injunction Plaintiffs Seek......................................................... 20

III.  Plaintiffs Fail to Establish a Likelihood of Success on the Merits In Any Event....................................................................................................................... 22

    A.    ERP 2022's Progressive Factoring Payment Calculation System is Race- and Sex-Neutral, Discretionary, and Reasonable .............................. 22

    B.    USDA's Use of the "Socially Disadvantaged Farmer" Designations Falls Within the Secretary's Broad Discretion and Does Not Violate the Major Questions Doctrine ................................................................... 28

    C.    USDA's Use of the Socially Disadvantaged Farmer Designation Satisfies Strict Scrutiny ............................................................................. 30

CONCLUSION ................................................................................................................. 36

i

## TABLE OF AUTHORITIES

**Cases**

*AARP v. United States Equal Emp. Opportunity Comm'n*,
   226 F. Supp. 3d 7 (D.D.C. 2016) ............................................................. 20

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995) ...................................................................... 29, 30

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
   878 F.2d 806 (5th Cir. 1989) ............................................................... 8

*Anibowei v. Morgan*,
   70 F.4th 898 (5th Cir. 2023) ............................................................. 20

*Aransas Project v. Shaw*,
   775 F.3d 641 (5th Cir. 2014) ......................................................... 10, 13

*Armstrong v. Turner Indus., Inc.*,
   141 F.3d 554 (5th Cir. 1998) ......................................................... 10, 13

*Benisek v. Lamone*,
   585 U.S. 155 (2018) ................................................................... 16, 19

*Boire v. Pilot Freight Carriers, Inc.*,
   515 F.2d 1185 (5th Cir. 1975) ........................................................... 20

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024) ............................................................. 16

*BST Holdings, L.L.C. v. OSHA*,
   17 F.4th 604 & n.21 (5th Cir. 2021) ..................................................... 16

*Califano Yamasaki*,
   442 U. S. 682 (1979) ..................................................................... 22

*Canal Auth. of State of Fla. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) ............................................................. 9

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ........................................................... 17

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985) ......................................................... 19, 20

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ....................................................................... 10

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) ........................................................................ *passim*

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................... 10

*Dean v. City of Shreveport*,
    438 F.3d 448 (5th Cir. 2006) ............................................................ 30, 31

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981) .................................................................. 18

*Dennis Melancon*,
    703 F.3d (5th Cir. 2012) ............................................................. 13, 16, 19

*Dist. of Columbia v. U.S. Dep't of Agic.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) ............................................................ 8

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ................................................................ 26

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................... 16

*Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
    762 F.2d 464 (5th Cir. 1985) ....................................................... 13, 14, 15

*Faust v. Vilsack*,
    519 F. Supp. 3d 470 (E.D. Wis. 2021) ............................................. 11, 15

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) ........................................................................... 26

*Fisher v. U. of Tex.*
    136 S. Ct. 2198 (2016) ..................................................................... 33, 34

*Fullilove v. Klutznick*,
    448 U.S. 448 (1980) ............................................................................... 34

*Gill v. Whitford*,
    585 U.S. 48 (2018) ................................................................................. 22

*H.B. Rowe Co. v. Tippett*,
    615 F. 3d 233 (4th Cir. 2010) ............................................................... 30

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................... 25

*Hohe v. Casey*,
    868 F.2d 69 (3d Cir. 1989) .............................................................. 16, 18

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) ................................................... 30

*In re Stewart,*
    647 F.3d 553 (5th Cir. 2011) .................................... 10

*Interox Am. v. PPG Indus., Inc.,*
    736 F.2d 194 (5th Cir.1984) .................................... 13

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ............................... 13, 16

*Kossman Contracting, Co. v. City of Houston,*
    No. H-14-1203, 2016 WL 11473826 (S.D. Tex. Feb. 17, 2016) ................................... 31

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ................................................... 25

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*
    140 S. Ct. 2367 (2020) ............................................. 26

*Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC,*
    478 U.S. 421 (1986) ................................................... 34

*Make The Rd. New York v. Wolf,*
    962 F.3d 612 (D.C. Cir. 2020) ............................... 26

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................... 8

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .................................... 17

*Midwest Fence Corp. v. U.S. DOT,*
    840 F. 3d 932 (7th Cir. 2016) .................................... 30

*Milk Train, Inc. v. Veneman,*
    310 F.3d 747 (D.C. Cir. 2002) .................................... 2

*Miller v. Vilsack, No. 4:21-CV-0595-O,*
    2021 WL 11115194 (N.D. Tex. July 1, 2021) ..................................... 11, 15

*Morgan v. Fletcher,*
    518 F.2d 236 (5th Cir. 1975) ............................... 13, 18

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
    508 U.S. 656 (1993) ................................................... 10

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.,*
    896 F.2d 1283 (11th Cir. 1990) ............................... 16, 17

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................. 21

*Nuziard v. Minority Bus. Dev. Agency,*
    676 F. Supp. 3d 473 (N.D. Tex. 2023) (*Nuziard I*) .................................. 10, 11

*Nuziard v. Minority Bus. Dev. Agency,*
    No. 4:23-CV-00278-P, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) (*Nuziard II*) ........... 18

*O'Shea v. Littelton,*
    414 U.S. 488 (1974) ................................................................................. 10

*Opulent Life Church v. City of Holly Springs,*
    697 F.3d 279 (5th Cir. 2012) ................................................................. 16, 17

*Parks v. Dunlop,*
    517 F.2d 785 (5th Cir. 1975) ......................................................................... 9

*Physicians for Soc. Resp. v. Wheeler,*
    956 F.3d 634 (D.C. Cir. 2020) ..................................................................... 25

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.,*
    313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................... 25

*Pub. Serv. Co. of N.H. v. Town of West Newbury,*
    835 F.2d 380 (1st Cir. 1987) ................................................................. 17, 18

*Sampson v. Murray,*
    415 U.S. 61 (1974) ................................................................................ 13, 20

*Schieber v. United States,*
    77 F.4th 806 (D.C. Cir. 2023) ..................................................................... 26

*Scott v. Schedler,*
    826 F.3d 207 (5th Cir. 2016) ................................................................. 22, 23

*Sec'y of Lab. v. Twentymile Coal Co.,*
    456 F.3d 151 (D.C. Cir. 2006) ..................................................................... 25

*Shaw v. Hunt,*
    517 U.S. 899 (1996) ................................................................................. 32

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) ................................................................... 17

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ................................................................................... 10

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019) ................................................................. 10, 13

*Symetra Life Ins. Co. v. Rapid Settlements Ltd.*,
   612 F. Supp. 2d 759 (S.D. Tex. 2007) ....................................................... 20

*Tate v. Am. Tugs, Inc.*,
   634 F.2d 869 (5th Cir. 1981) ..................................................................... 9

*Tough Traveler, Ltd. v. Outbound Prod.*,
   60 F.3d 964 (2d Cir.1995) ......................................................................... 19

*United States v. Paradise*,
   480 U.S. 149 (1987) ..................................................................... 33, 34, 35

*Univ. of Tex. at Austin v. Camenisch*,
   451 U.S. 390 (1981) ................................................................................... 9

*Vita-Mix Corp. v. Tristar Prod., Inc.*,
   No. 1:07 CV 275, 2008 WL 11383504 (N.D. Ohio Sept. 30, 2008) ............. 20

*Vitolo v. Guzman*,
   999 F.3d 353 (6th Cir. 2021) ..................................................................... 17

*W.H. Scott Const. Co. v. City of Jackson, Miss.*,
   199 F.3d 206 (5th Cir. 1999) ..................................................................... 30

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ............................................................................... 29

*White v. Carlucci*,
   862 F.2d 1209 (5th Cir. 1989) ................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................ 2, 3, 8, 10

*Wynn v. Vilsack*,
   545 F. Supp. 3d 1271 (M.D. Fla. 2021) ............................................... *passim*

## United States Code

5 U.S.C. § 701 ................................................................................................. 24

7 U.S.C. §2279 ......................................................................................... 28, 35

7 U.S.C. § 2003 .............................................................................................. 28

7 USC § 2003 ................................................................................................. 28

22 U.S.C. § 2668a.......................................................................................... 26

## Regulations

7 CFR § 718.2 ................................................................................................ 37

66 Fed. Reg. 21617-01 (Apr. 30, 2001) ......................................................... 35

87 Fed. Reg. 19465 (April 4, 2022) ............................................................... 19, 32, 34, 37

87 Fed. Reg. 30164 (May 18, 2022) ...................................................................... 1, 3, 32

88 Fed. Reg. 1862 (Jan. 11, 2023) ............................................................................ 3, 32

88 Fed. Reg. 74404 (Oct. 31, 2023) ........................................................................ *passim*

**Other Authorities**

*Anthony DiSarro, A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation,*
    35 Harv. J.L. & Pub. Pol'y 743 (2012) ........................................................................ 17

Congressional Research Service (CRS), FSA Comms.: In Brief (Jan. 29, 2021),
    available at https://perma.cc/HA3L-PDPG .............................................................. 33

Economic Research Institute,
    available at https://ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=106496 ........................................................................................... 24

Form CCC-860,
    available at https://perma.cc/6SE9-7GFJ ............................................................ 28, 29

Jared Hayes, USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers, EWG (Feb. 18, 2021),
    https://perma.cc/PVZ7-QMFD ................................................................................. 35

Nat'l Young Farmers Coal.,
    Cal. Young Farmers Rep. 32 (Apr. 2019) ..................................................................... 7

USDA to Begin Issuing Pandemic Assistance Revenue Program Payments,
    https://perma.cc/4A5Y-S8WX (Dec. 13, 2023) ........................................................ 18

## INTRODUCTION

As part of the support it provides farmers, Congress at times authorizes the U.S. Department of Agriculture (USDA) to provide monetary "assistance to producers for losses" they sustain "due to wildfires, hurricanes, floods," and other natural disasters. *Notice of Funds Availability; Emergency Relief Program*, 87 Fed. Reg. 30164 (May 18, 2022). Two years ago, Plaintiffs applied for this kind of monetary relief under one such program and received it. *See* Compl., ECF No. 1 ¶¶ 19, 23, 27, 29. Since then, they applied for relief under seven other disaster or pandemic programs and received that too. *Id.* ¶¶ 174, 180-93, 199-213, 217-45 (detailing payments Plaintiffs received). In each instance, Plaintiffs applied knowing the factors that USDA would use to evaluate their applications and calculate their payments— and they obtained monetary assistance consistent with the formulas USDA announced.

Now, months after receiving the last disaster-relief payment and two *years* after receiving the first one, Plaintiffs have come to Court alleging that the agency's approach to calculating their benefit amounts for the various programs was unlawful—and requesting immediate injunctive relief. *See* Pls. Mot. for Prelim. Injunction, ECF No. 10; Pls. Br. in Support, ECF No. 11 (Pls. Br.). Plaintiffs fall far short of establishing entitlement to that extraordinary remedy.

According to Plaintiffs, USDA improperly paid them less than it did other producers solely because of their race and sex—and improperly structured payments in the most recent disaster relief program to prioritize more relief to smaller producers who are most in need of the assistance (which the agency did in a race-neutral and sex-neutral methodology called "progressive factoring"). Compl. ¶¶ 13-17. But Congress has given USDA wide discretion to structure its pandemic and disaster relief programs—and the race-neutral and sex-neutral choices that USDA has made about how to allocate limited funding are fully consistent with that authorization and raise no legal concerns. Simply put, neither the Constitution nor the Administrative Procedure Act (APA) provides a basis to second-guess USDA's reasoned response to a severe shortfall in Congressional appropriations. Separately, even in areas

1

where USDA has chosen to take account of race or sex, it has done so in an attempt to remedy the lingering effects of the discriminatory way that it has administered farm programs in the past. This ongoing attempt to rectify that historic discrimination satisfies strict scrutiny. So Plaintiffs' arguments fail on the merits.

But the Court need not—and should not—even consider the merits at this juncture. The defining purpose of a preliminary injunction is to prevent some imminent and irreparable harm that would otherwise befall a plaintiff. Only where a plaintiff faces an injury that cannot be remedied or made whole at the conclusion of the action can the Court begin to entertain the "extraordinary" possibility of preliminary relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, however, Plaintiffs have alleged no imminent harm at all—much less harm that is irreparable. The injuries they have identified in their complaint and preliminary injunction papers—namely, insufficient payment for disaster relief—are all *in the past* and are chiefly (if not exclusively) financial. These kinds of past injuries would not—and cannot be—remedied by a prospective injunction. And, as detailed in the attached declaration of Zachary Ducheneaux, the Administrator of USDA's Farm Service Agency (FSA) that administers the challenged programs, the alleged underpayments can be remedied by providing Plaintiffs adjusted benefits at the conclusion of this case given the level of program funds that are anticipated to be available at that time. *See* Decl. of Zachary Ducheneaux ¶ 89. Indeed, Plaintiffs' complaint itself details the exact monetary amounts they believe they are owed—and funds remain available to make those payments should Plaintiffs prevail.

The lack of irreparable injury is only confirmed by Plaintiffs' litigation tactics. Having known since at least 2022 about the criteria that USDA uses to process disaster relief applications, Plaintiffs cannot plausibly claim that they face irreparable injury today. Nor, for that matter, can Plaintiffs establish that the balance of equities favors enjoining USDA's ongoing distribution of disaster relief funds. To the contrary, the remedy that Plaintiffs seek would be enormously disruptive to USDA, inhibiting its ability to provide needed relief to the

2

approximately 60 percent of producers still expected to apply under one of the available assistance tracks, while doing nothing to remedy the past injuries Plaintiffs have asserted here.

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and allow the litigation to proceed in the normal course.

## BACKGROUND

*Disaster Relief Programs.* Over the past several years, Congress has regularly appropriated funds to support farmers facing crop loss and other hardships caused by natural disasters and the COVID-19 pandemic.  Ducheneaux Decl. ¶ 3, Part II (Overview of the eight challenged programs).  These programs provide vital relief that sustains vulnerable farm operations, supplementing federal crop insurance.  *Id.* ¶ 120.  To this end, USDA often works with Congress to ensure that appropriated funds adequately cover suffered losses, and Congress leaves to USDA's discretion how to structure these *ad hoc* relief programs and distribute the funds.  *See id.* ¶¶ 15, 45.  When appropriated funds are insufficient to cover existing losses, USDA must determine how to distribute available funds to accomplish Congressional objectives.  *See id.* ¶ 50.

For example, in 2021, Congress passed the Extending Government Funding and Delivering Emergency Assistance Act, which provided $10 billion to cover crop losses due to natural disasters in 2021 and 2022 "under such terms and conditions as determined by the Secretary," to "remain available until December 31, 2023."  *Id.* ¶ 15; Pub. L. 117–43.  USDA used these funds to establish the Emergency Relief Program 2020 and 2021 (ERP 2020/2021).

ERP 2020/2021 Phase 1 relief payments were tied to a farmer's existing crop insurance and Noninsured Crop Disaster Assistance coverage, applying a flat recovery rate that was designed to ensure that payments would not exceed available funding and, in aggregate across all farmers, would not exceed 90% of losses, as required by the Extending Government Funding and Delivering Emergency Assistance Act. *See, e.g.*, 87 Fed. Reg. 30168; *see also* 88 Fed. Reg. 1862 (implementing ERP 2020/2021 Phase 2).  Under parts of the program, historically underserved farmers—including veterans, beginning farmers, and limited

3

resource farmers, as well as socially disadvantaged minority and women farmers—received a 15% increase to their calculated ERP payments. *Id.*

Plaintiffs Alan & Amy West Farms, Bryan Baker, Double B Farms LLC, and Rusty Strickland each participated in ERP 2020/2021, and received sizeable payments. *See, e.g., id.* ¶ 70-73. ERP 2020/2021 is now closed, and funding has expired. *Id.* ¶ 77. Only obligations for payment calculation errors, omissions, and appeals can be created. *Id.*

Last year, Congress similarly appropriated approximately $3.2 billion in the Disaster Relief Supplemental Appropriations Act, 2023, "to remain available until expended," to cover crop losses due to natural disasters, again leaving the Secretary discretion in how to distribute the funds. *Id.* ¶¶ 45-46. Based upon this authority, FSA designed the Emergency Relief Program 2022 (ERP 2022) based on the same model it had used for 2020 and 2021 emergency disaster assistance, incorporating similar method of payments, and separating the dispersal of assistance into two tracks, Track 1 and Track 2. *Id.* ¶¶ 47-48.

Notably, however, Congress's appropriated funds for ERP 2022 fell approximately $8 billion short of the expected losses. *Id.* ¶ 50. To help address this shortfall in available funding, ERP 2022 introduced a payment calculation method called "progressive factoring," which applied equally to all producers and covered 100% of initial losses while providing gradually diminishing coverage for higher amounts of loss. *Id.* ¶¶ 51–59 (explaining how the method applies). Under this calculation method, more than 80% of farmers received a greater payment than they would have under a 27% flat rate percentage system. *Id.* ¶ 112 ("If a flat factor was applied, the factor would have been 27% based on Agency estimates"). For underserved farmers—including veterans, beginning farmers, and limited resource farmers, as well as minority and women farmers—USDA also provides a separate reimbursement for crop insurance administrative fees and premiums, which is added to the calculated payment. *Id.* ¶ 59. That separate payment is not part of the progressive factoring calculation. "Progressive factoring is calculated independent from and prior to any additional benefits added for being an underserved producer." *Id.*

ERP 2022 Track 1 and Track 2 are both open for applications, and no application deadlines have been announced. *Id.* ¶ 85. Plaintiffs Bryan Baker, Double B Farms, and Alan & Amy West Farms received funds under both Tracks. *Id.* ¶¶ 70-73. Plaintiff Rusty Strickland applied for and received funds under Track 1 but has not applied for Track 2. *Id.* ¶ 73.

In total, Plaintiffs challenge eight such *ad hoc* disaster relief programs, Pls. Br. at 9, each of which specifically directed some portion of the appropriated funds to underserved farmers, including minority and women farmers, consistent with Congress and USDA's shared goal of addressing discrimination and other unique challenges faced by underserved farmers.[1] *E.g.*, *id.* ¶¶ 14, 21, 34, 64. Like ERP 2020/2021, several of the funding sources for these challenged programs have expired and/or application deadlines have passed, including the Emergency Livestock Relief Program 2021, the Emergency Livestock Relief Program 2022, the Pandemic Assistance Revenue Program, and the Coronavirus Food Assistance Program 2. *Id.* ¶¶ 77-79, 94. However, funding for each of those programs remains available to reconsider past, timely-submitted applications and to make adjusted benefit payments to those producers who timely applied. *Id.* ¶¶ 77-79, 94.

*USDA's History of Discrimination.* USDA's consideration of the socially disadvantaged designation for women and minority farmers in certain aspects of its programs reflects the agency's interest and goal of remedying the persistent effects of past discrimination that the agency had itself inflicted upon certain groups of farmers. Although USDA aims to serve all farmers equitably, decades of evidence shows that not all USDA program participants have received equitable treatment in its services. This history is reflected in several lawsuits against USDA by groups of minority farmers, including *Pigford v. Glickman* (*Pigford I*), No. 97-1978 (D.D.C.); *Keepseagle v. Veneman*, No. 99-03119 (D.D.C.); *Garcia*, No. 00-2445 (D.D.C.); *Love*

---

[1] These programs include: (A) Emergency Relief Program (ERP) 2022, Track 1 & Track 2; (B) ERP 2021, Phase 1 and Phase 2; (C) Coronavirus Food Assistance Program 2; (D) Pandemic Assistance Revenue Program (PARP); (E) Emergency Livestock Relief Program (ELRP) 2021, Phase 1 & Phase 2; and (F) ELRP 2022.

*v. Glickman*, No. 00-2502 (D.D.C.); *In re Black Farmers Discrimination Litigation* (*Pigford II*), No. 08-mc-0511 (D.D.C.), and was extensively discussed in litigation challenging the American Rescue Plan Act (ARPA) § 1005, including in *Miller v. Vilsack*, 4:21-cv-00595-O (N.D. Tex.) (ECF No. 27), and related cases.

Congress has repeatedly recognized this history.  As Chairman of the House Agriculture Committee, David Scott, put it in his floor statement leading to the passage of ARPA, "[t]he systemic discrimination against … farmers of color by USDA is longstanding and well-documented and continues to present barriers for these producers to participate in the agricultural economy."  167 Cong. Rec. H765 (Feb. 26, 2021).  As a result of these practices, Black farmers dwindled from 14 to two percent of all farmers and lost about 80% of their land.  *See* S.278, "Emergency Relief for Farmers of Color Act of 2021," § 2, ¶ 5(A)-(C) (intr'd Feb. 8, 2021).

At the same time, Congress acknowledged that its previous efforts to remedy the persistent effects of discrimination against minority farmers in USDA programs "ha[d] fallen short." 167 Cong. Rec. S1262 (Stabenow).  Congress began targeting USDA assistance to socially disadvantaged farmers during the agriculture credit crisis in the 1980s, created a program to provide outreach and technical assistance to socially disadvantaged farmers in 1990 (the "2501 Program"), and permanently funded the 2501 Program in 2018. *See id.* S1263-64.  Congress suspended statutes of limitations for Equal Credit Opportunity Claims in 1998, and in 2010, it provided $1.25 billion to ensure that minority claimant groups received payments under their respective settlements. *See id*. S1264. In 2002, Congress created the Office of the Assistant Secretary for Civil Rights at USDA to ensure better compliance with civil rights laws. *See id.* And in 2014, it created a permanent Office of Tribal Relations under the Secretary of Agriculture.  *See id.*

Despite these efforts, Congress found that minority farmers continued to suffer the persistent effects of discrimination in USDA programs.  Two GAO reports mandated by Congress in 2018 illuminated the extent of the problem.  *See* GAO-19-539, Ag'l Lending: Info.

on Credit & Outreach to [Socially Disadvantaged Farmers and Ranchers] Is Limited 2 (2019)13; GAO-19-464, Indian Issues: Ag'l Credit Needs and Barriers to Lending on Tribal Lands (2019). Those reports revealed that socially disadvantaged farmers still had "more difficulty getting loans and credit from USDA … [that] can help beginning farmers break into the business and help existing farmers continue running their operations," S1264 (Stabenow) (citing Nat'l Young Farmers Coal., Cal. Young Farmers Rep. 32 (Apr. 2019)).

Congress also found that, due to the persistent effects of the longstanding discrimination against minority farmers, "Black farmers and other farmers of color were in a far more precarious financial situation before the COVID–19 pandemic hit"—and a year into the pandemic, some "ha[d] simply not been able to weather the storm." *Id*. S1265-66 (Booker). For instance, Congress observed that a disproportionate number of Black, Hispanic, Asian-American, and Indigenous farmers were in default on their direct loans, putting farmers of color at risk of "facing yet another wave of foreclosures and potential land loss." *Id*. (citing statistics showing that 13% of borrowers with FSA direct loans were currently delinquent and that this number increased to 35% for Black farmers and 24% for Hispanic, Asian-American, and Indigenous farmers); *see also id*. at S1264 (Stabenow) (explaining that socially disadvantaged farmers are more likely to have loans in default because they "are less likely to have the same access to adequate loan servicing … as their White counterparts" due to discrimination in USDA loan programs); Review of the Off. of the Assistant Sec'y for Civil Rights, Hr'g before the House Subcomm. on Nutrition, Oversight, and Dep't Ops., Comm. on Ag., 116th Cong. 25, 9 (2019) (2019 Civil Rights Hr'g) (Adams) (citing reports that Black farmers were subject to 13% of USDA foreclosures despite being less than 3 percent of direct loan recipients).

Moreover, lawmakers cited reporting that the overwhelming majority of recent agricultural subsidies and pandemic relief prior to ARPA went to non-minority farmers, despite minority farmers occupying a more vulnerable financial position than their white counterparts. Specifically, the reporting indicated that nearly the entirety of USDA's Market

Facilitation Program (MFP) payments, *see* S1264-65; *see also id.* H766 and almost all of the $9.2 billion provided through USDA's first Coronavirus Food Assistance Program (CFAP), went to non-minority farmers, *see id.* S1264-65; H766.  This disproportionate allocation of funding, Congress again found, was partly due to the persistent effects of discrimination in USDA programs.  *Id.* S1264.  Additionally, a letter introduced into the record from 13 professors who specialize in agricultural issues explained that federal farm programs "have perpetuated and exacerbated the problem" of discrimination, by preferring certain crops (those produced by white farmers) and "reward[ing] the largest farms the most" (those owned by white farmers).  *Id.*  All of this, the academics concluded, had "distort[ed] credit, land, input costs, and markets" to the disadvantage of minority farmers. *Id.*

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.  To justify this "drastic remedy," a plaintiff must make a "clear showing" that (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in his favor; and (4) preliminary relief serves the public interest.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  This same four-part test governs the issuance of a § 705 stay.  *Dist. of Columbia v. U.S. Dep't of Agic.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).  Failure to demonstrate any one of these elements requires denial of preliminary relief.  *See, e.g.*, *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

## ARGUMENT

I.   A PRELIMINARY INJUNCTION IS NEITHER NECESSARY NOR APPROPRIATE BECAUSE PLAINTIFFS DO NOT FACE IMMINENT OR IRREPARABLE INJURY

The "limited purpose" of a "preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. at Austin v. Camenisch*, 451 U.S. 390, 395 (1981).  As a result, an "indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury."  *Tate v. Am. Tugs, Inc.*, 634

F.2d 869, 870 (5th Cir. 1981).  Simply put, it "is the threat of harm that cannot be undone which authorizes exercise of this equitable power to enjoin before the merits are fully determined."  *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975); *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.").  And Plaintiffs have failed to establish such a threat twice over because (1) their alleged injuries are all in the past and (2) consist of monetary harms that can be remedied at the conclusion of this action.

A.   <u>Plaintiffs Have Only Identified Past Harm, Which Cannot Justify Injunctive Relief</u>

Plaintiffs' complaint and preliminary injunction motion challenge how USDA processed their applications under eight disaster relief programs administered over the last three years.  *See, e.g.*, Pls. Br. at 4, 6-7 (identifying the programs); Compl. ¶¶ 174, 180-93, 199-213, 217-245 (detailing alleged underpayments to Plaintiffs under the challenged programs).  According to Plaintiffs, USDA denied them certain payments under each of those programs "because [Plaintiffs] are not members of USDA's preferred race[] or sex"—and compounded that alleged injury by employing the race-neutral and sex-neutral progressive factoring system in the latest disaster relief program, which generally reduced payments to larger producers.  Pls. Br. at 7; *see also* Compl. ¶ 245 (identifying the exact amounts of alleged underpayments).  These allegations may demonstrate past harm.  But they do not—and cannot—justify a prospective injunction.

The law in the Fifth Circuit and beyond is clear:  to "pursue an injunction," plaintiffs have to "allege a likelihood of *future* violations of their rights" by defendants, "not simply future effects from past violations."  *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563 (5th Cir. 1998) (emphasis added); *see also Aransas Project v. Shaw*, 775 F.3d 641, 663 (5th Cir. 2014) ("[A] plaintiff seeking injunctive relief must show a real and immediate threat of future or continuing injury.").  "Past exposure to illegal conduct does not in itself show" entitlement to

injunctive relief.  *In re Stewart,* 647 F.3d 553, 557 (5th Cir. 2011) (quoting *O'Shea,* 414 U.S. at 495); *see generally City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) ("Past wrongs do not in themselves amount to that real and immediate threat of injury necessary" for an injunction). This rule derives from foundational Article III principles, which "limit[] the relief that [] plaintiff[s] may seek to that which is likely to remedy [their] alleged injuries."  *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019).  "Because injunctive and declaratory relief 'cannot conceivably remedy any past wrong,'" plaintiffs must point to some "continuing or threatened future injury" to invoke the Court's equitable power.  *Id.* at 720-21 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).  And the standard is high:  the injury must "be 'imminent,'" not speculative or theoretical, and plaintiffs "must also show that there is a *substantial* risk that they will suffer" the injury "absent their requested relief."  *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)); *see also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy.").

Plaintiffs alleging equal protection claims typically satisfy this standard by showing that they are *currently* being excluded from a program or subject to some barrier that could be removed by an injunction.  *See, e.g.*, *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (finding injury from "the inability to compete on an equal footing in the bidding process").  That was true in *Nuziard v. Minority Business Development Agency*, 676 F. Supp. 3d 473 (N.D. Tex. 2023) (*Nuziard I*), which Plaintiffs cite extensively.  As the court in that case explained, the named plaintiff was currently being "den[ied] an opportunity to apply for" certain services and assistance offered by the Minority Business Development Agency because those services were reserved for other "race and ethnicity" groups.  *Id.* at 477, 481.  So the court found that "[e]njoining the [agency] from considering Nuziard's race and ethnicity when he applies [would] likely redress his injury."  *Id.* at 481.

10

Likewise, courts granted injunctions in challenges to § 1005 of the American Rescue Plan—which offered USDA debt relief to minority farmers—because they concluded that plaintiffs were "completely excluded from participation in" an ongoing "program based on their race." *Faust v. Vilsack*, 519 F. Supp. 3d 470, 477 (E.D. Wis. 2021); *Miller v. Vilsack*, No. 4:21-CV-0595-O, 2021 WL 11115194, at *10 (N.D. Tex. July 1, 2021) (noting that plaintiffs were being injured by the existing "application process"); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1275 (M.D. Fla. 2021) ("Plaintiff is a White farmer in Jennings, Florida who has qualifying farm loans but is ineligible for debt relief under Section 1005 solely because of his race."). Those courts determined that an injunction could remedy those alleged injuries because it would remove the barrier or the disadvantage, placing plaintiffs on equal footing with those to whom the benefit was otherwise made available. *See, e.g.*, *Wynn*, 545 F. Supp. 3d at 1292 (injunction appropriate because "debt relief [to minority farmers] cannot be clawed back or undone, [and] the Court will have no power to order Congress to provide the substitute remedy of debt relief not authorized by Section 1005").

None of that is true here. Of the eight programs that Plaintiffs challenge, only one, ERP 2022, is still open. Ducheneaux Decl. ¶¶ 85; *see generally id.* ¶¶ 74-88 (explaining status of all the challenged programs). All the others are now closed and/or not accepting new applications. *Id.* ¶¶ 74-88. And USDA has *already* resolved all the applications that Plaintiffs submitted—both for the closed programs and for the open one. *Id.* ¶¶ 69-73 (detailing the "timelines of Plaintiffs' applications and FSA actions on them"); *see also* Decl. of Rusty Strickland, ECF No. 10-1 ¶¶ 14-21 (identifying the applications submitted and payments received); Decl. of Alan West, ECF No. 10-2 ¶¶ 14-20 (same); Decl. of Brian Baker, ECF No. 10-4 ¶¶ 12-20 (same).[2] Plaintiffs have not identified, either in their complaint or in the declarations they submitted in support of their preliminary injunction motion, any other

---

[2] As noted above, Plaintiffs Bryan Baker and Double B Farms received funds under both Tracks of ERP 2022. Ducheneaux Decl. ¶¶ 71–72. Plaintiff Alan & Amy West Farms applied for and received funds under Track 1. *Id.* ¶ 70. Plaintiff Rusty Strickland also received funds under Track 1. *Id.* ¶ 73.

application that they could or intend to submit.  *See generally* Compl. ¶¶ 174, 180-93, 199-213, 217-45.  To the extent Plaintiffs believe their prior applications were improperly adjudicated, that is definitionally a *past* injury that has already happened.  That alleged injury may be remedied by a retroactive finding that the standards USDA used to process the application were unlawful.  *See* Ducheneaux Decl. ¶¶ 89-94 (explaining "FSA's ability to make adjusted benefit payments to Plaintiffs based on the applications they have submitted" if they obtain a favorable decision at the conclusion of the case).  But that is not achieved by prospectively enjoining the agency's *other* operations.

Tellingly, Plaintiffs provide absolutely no explanation for how a prospective injunction would ameliorate their retrospective harm.  *See generally* Pls. Br. at 22-24.  Instead, Plaintiffs generally claim that, so long as USDA continues to use the challenged designations, they "will continue to be irreparably harmed by being treated differently based on race and sex." *Id.* at 22.  But it is hard to see how this is so.  Congress appropriates money for disaster relief programs on an *ad hoc* basis, so Plaintiffs can have no certainty about which programs, if any, may be available in the future—much less what criteria USDA may use in administering any such programs.  *See* Ducheneaux Decl. ¶¶ 95-97 (explaining that "disaster assistance is not guaranteed and even when it is authorized, the funding levels change from year-to-year depending on Congressional priorities" such that "[n]o reasonable producer would or should do any financial planning based on an assumption that an ad hoc disaster program" would be available).  And Plaintiffs do not even attempt to demonstrate that USDA's continued use of the challenged classifications in the two open programs—even if applied to *other* producers whose applications may still be pending—would cause them any ongoing or continued injury. *Compare* Pls. Br. at 23 (alleging need to "halt the challenged programs . . . before additional payments go out") *with Wynn*, 545 F. Supp. 3d at 1289 (rejecting "Plaintiff's claim of irreparable harm by virtue of the loss of competitive advantage" where Plaintiff had not described the relevant market "or to what extent loan assistance would result in his competition gaining a[n] . . . advantage against him").  By their own telling, Plaintiffs have

*already* been treated unequally when they were denied certain payments in all the relevant programs. *See, e.g.*, Compl. ¶ 245. They are not being treated *more* unequally as time goes on. *See*, *e.g.*, *Stringer*, 942 F.3d at 721 ("[D]epriv[ation] of [Plaintiffs'] individual right to simultaneous voter registration applications . . . was not a continuing or threatened future injury, but a past injury" (quotes omitted)).

At most, Plaintiffs' alleged harm from USDA's adjudication of their applications might be said to constitute continuing effects from alleged past discrimination. But this is not enough to secure a prospective remedy. The "future effects from past violations" are "clearly insufficient under well-established law to support" the injunction Plaintiffs seek. *Armstrong*, 141 F.3d at 563; *see, e.g.*, *Aransas Project*, 775 F.3d at 664 ("Injunctive relief for the indefinite future cannot be predicated on the unique events of one year without proof of their likely, imminent replication.").

### B. <u>Plaintiffs' Alleged Harm Is Reparable</u>

Nor are Plaintiffs' alleged injuries irreparable. It is "well-established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.,* 736 F.2d 194, 202 (5th Cir. 1984)); *see also Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) ("A harm is irreparable where there is no adequate remedy at law, such as monetary damages."). "Mere injuries, however substantial in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[]s heavily against a claim of irreparable harm." *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 474 (5th Cir. 1985) (quotes and citation omitted)). And that is the case here.

13

1.     As noted above, Plaintiffs have quantified the exact dollar amount of "their injuries." Compl. ¶ 245 (chart showing "[s]ummary" of what Plaintiffs "believe they would have received had USDA considered them socially disadvantaged"). In total, Plaintiffs allege that, between all of them, they "would have received" a little over $536,000 from the eight challenged programs if USDA did not use the challenged designations of social disadvantage. *Id.*[3] As explained in the attached declaration of Mr. Zachary Ducheneaux, based on current estimates, those types of adjusted benefits can be provided to Plaintiffs if they prevail at the conclusion of this case. *See* Ducheneaux Decl. ¶¶ 89-93 (detailing payments FSA could make to each of the Plaintiffs under each challenged program).

In particular, Mr. Ducheneaux explains—based on the information currently available to FSA—how much additional payments Plaintiffs could obtain if they prevail on their claims and USDA re-processes their applications. *Id.* The calculations Mr. Ducheneaux sets forth incorporate various race-neutral and sex-neutral program criteria and limitations that Plaintiffs do not challenge in this lawsuit (such as payment caps that are not related to the underserved producer designation), and thus reflect a more complete accounting of the overall amount of adjusted benefits Plaintiffs could potentially obtain. *Id.* Crucially, the declaration makes clear that—even for the closed programs—funding remains available to correct errors, process appeals, and otherwise make corrections to the initial payments. *Id.* ¶¶ 74-88 (explaining the funding status of each of the challenged programs and detailing how, in each instance, funds "would be available to apply to any application that [had been] timely filed and approved"). This means that, barring unexpected and unprecedented developments, USDA will have funding available to provide Plaintiffs "adjusted benefit payments" for *each*

---

[3]     Plaintiffs further allege that they would have received unspecified "increased payments under ERP 2022 Tracks 1 and 2" if USDA had not used the progressive factoring system. Compl. ¶ 246. Mr. Ducheneaux's declaration quantifies what these payments would be for each of the Plaintiffs. Ducheneaux Decl. ¶¶ 90-93 (calculating the payments for ERP 2022 Track 1 with "a flat 27 percent factor").

of the applications they claim were improperly processed "if they obtain a favorable decision at the conclusion of this case." *Id.* ¶¶ 89-93.

This availability of funding once again distinguishes this case from the other precedent Plaintiffs cite, such as the cases challenging § 1005 of ARPA. *See* Pls. Br. at 4-5. In all those cases, courts issued injunctions because they concluded that money would not otherwise be available to pay plaintiffs—either because that money would all be expended or because such distributions would otherwise be barred. *See Faust*, 519 F. Supp. 3d at 477 (absent an injunction "the USDA [would] spend the allocated money and forgive the loans of minority farmers while the case is pending" leaving no money available for plaintiffs); *see also Miller* No. 4:21-CV-0595-O, 2021 WL 11115194, at *10 (noting "the risk that any Plaintiffs who do establish the right to relief on the merits will be unable to access program funding by the time they receive a judgment in their favor"); *Wynn*, 545 F. Supp. 3d at 1290, 1292 (finding "no authority to award Plaintiff any debt relief under Section 1005" at the conclusion of the case). The opposite is true here. As detailed by Mr. Ducheneaux, the money to adjust Plaintiffs' benefits would come from the very same funds that Congress had appropriated for the disaster programs in the first place and would tie back to Plaintiffs' timely-filed applications—meaning there would be no legal barrier to recovery. *See id.* ¶¶ 89-93. And, based on current estimates, there is enough money in each of the programs to pay Plaintiffs should they prevail. *Compare id.* ¶¶ 75-87 (detailing the millions of dollars in funding available under each of the programs) *with* ¶¶ 90-93 (calculating how much each Plaintiff could receive in adjusted benefits); *contra*, *e.g.*, *Faust*, 519 F. Supp. 3d at 477 (finding an injunction appropriate because without it "USDA will spend the allocated money and forgive the loans of minority farmers while the case is pending and will have no incentive to provide similar relief on an equitable basis to others").

Given the availability of funds, Plaintiffs cannot show the *sine qua non* of injunctive relief—namely, that a "meaningful decision on the merits would be impossible without an injunction." *Janvey*, 647 F.3d at 600. To the contrary, "should Plaintiffs ultimately prevail

on the merits of their suit, they have recourse . . . to recover the" payments they believe were erroneously withheld from them. *Dennis Melancon*, 703 F.3d at 279–80. So, "because Plaintiffs' only alleged harm can be obviated by monetary relief, it does not constitute the 'irreparable' injury necessary to obtain the extraordinary relief of a preliminary injunction." *Id.*

2.    Plaintiffs cannot evade this accounting by claiming that their injury is irreparable solely because they have alleged violations of their "constitutional right to equal treatment under the Fifth Amendment," for which there "is no true recompense." Pls. Br. at 22. Such an approach would collapse the irreparable harm inquiry with the merits of their case. *See* Pls. Br. at 9 (arguing that the traditional four-factor "analysis [should be] condensed" in this case). And courts, including the Supreme Court, have cautioned against doing so. *See*, *e.g.*, *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) ("As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."); *see also Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) ("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits.").

Plaintiffs' support for their categorical approach comes from a series of Fifth Circuit cases all of which involved alleged First Amendment violations, and which based their reasoning on a statement by a three-justice plurality in a political-speech case, *Elrod v. Burns,* 427 U.S. 347, 373 (1976). *See Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) ("Because [the Act] threatens Plaintiffs' right to be free from compelled speech, Plaintiffs have shown an irreparable injury."); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 & n.21 (5th Cir. 2021) (analyzing burden on "liberty interests" and "free religious exercise"); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (presuming irreparable harm from a church's claims under the First Amendment and

Religious Land Use and Institutionalized Persons Act).[4]  But, as courts have repeatedly recognized, First Amendment violations are unique because chilled speech is inherently difficult to monetize or redress after the fact.  *See, e.g.*, *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (explaining that the "only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence," which, "because of their intangible nature, [cannot] be compensated for by monetary damages; in other words, plaintiffs could not be made whole"); *Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (observing that cases finding *per se* irreparable injury for constitutional violations "are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief").

Not surprisingly then, in other constitutional contexts including in equal protection challenges, courts have explained that irreparable injury should not be presumed—especially when "the damage to plaintiff [] is chiefly, if not completely, economic." *Ne. Fla.*, 896 F.2d at 1286; *Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) ("Plaintiffs [] contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far"); *see also Wynn*, 545 F. Supp. 3d at 1291 ("the Court does not go so far as to suggest that a showing of a violation of the right to equal protection would give rise to a

---

[4]  Plaintiffs also cite out-of-circuit cases applying this reasoning in other constitutional contexts.  *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).  Those cases, of course, are not binding on this tribunal.  And the reach of *Elrod* even within the context of First Amendment jurisprudence is contested.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 300–01 (D.C. Cir. 2006) (discussing cases analyzing the reach of *Elrod* even within the First Amendment); *see generally* Anthony DiSarro, *A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation*, 35 Harv. J.L. & Pub. Pol'y 743, 764 (2012) (arguing that "the *Elrod* plurality's remarks do not correctly describe the law" and "are indefensible" outside their narrow context).

presumption of irreparable harm."); *see generally Hohe,* 868 F.2d at 73 ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."); *West Newbury*, 835 F.2d at 382 (rejecting argument that alleged due process violation automatically establishes threat of irreparable injury).  This is true in the Fifth Circuit as well.  Where, as here, there are mechanisms to compensate a plaintiff for quantifiable harm at the conclusion of a case, the Fifth Circuit has declined to find a constitutional harm irreparable.  *See*, *e.g.*, *Morgan*, 518 F.2d 236 (no irreparable harm in sex discrimination case seeking an injunction against termination because injuries could be made whole by a monetary award).

This distinction—between harms that are intangible and those for which remedies can be quantified—was recognized by the court in *Nuziard*.  The reason that "racial classifications" are typically irreparable, the court observed, "isn't that damages could *never* work—everyone has their price."  *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-00278-P, 2024 WL 965299, at *45 (N.D. Tex. Mar. 5, 2024) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 722 (1989)) (*Nuziard II*) (emphasis in original).  Rather, it is because courts normally "lack[] clear metrics to compute damages."  *Id.*; *see Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (noting irreparable injuries "cannot be undone by money damages" or are "especially difficult" to compute); *see also Wynn*, 545 F. Supp. 3d at 1291 (distinguishing instances in which damages can be ascertained from "constitutional violation for which damages cannot be measured" and where damages are not available).  But the opposite is true here.  A set of "standards [to] compute" Plaintiffs' adjusted benefits certainly exists.  *Nuziard II*, 2024 WL 965299, at *45.  Plaintiffs have, in fact, articulated their own vision of what those standards look like.  *See*, *e.g.*, Compl. ¶ 245 (summarizing Plaintiffs' alleged financial losses).

Under these circumstances, finding that Plaintiffs' measurable financial injuries constitute irreparable harm would be unjustified.  Plaintiffs may well believe that they have suffered a financial harm *because* of a constitutional violation.  But because that harm "can be

obviated by monetary relief, it does not constitute the 'irreparable' injury necessary to obtain the extraordinary relief of a preliminary injunction." *Dennis Melancon*, 703 F.3d at 279–80.

3.      Separately, Plaintiffs' own litigation conduct undermines their assertions of irreparable harm.  The Supreme Court has emphasized that "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("A delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").  Yet Plaintiffs have displayed no such urgency.

Plaintiffs have known for *years* that USDA programs use the socially disadvantaged designation—and have repeatedly applied to such programs.  *See* Ducheneaux Decl. ¶¶ 70-73 (detailing when each of the Plaintiffs received payments for each of the challenged programs).  For example, USDA published the criteria for the first emergency relief program Plaintiffs challenge, ERP 2020/2021 Phase 1, in April 2022.  87 Fed. Reg. at 19467.  And Plaintiffs received payments under that program the same year.  *See*, *e.g.*, Ducheneaux Decl. ¶¶ 70-73.  Plaintiffs then continued applying for—and receiving—payments from the other programs over the next 20 months.  *Id.*  Yet Plaintiffs did not seek to challenge any of those programs or payments while they were ongoing; instead, they waited months *after* their last payment to bring a claim for prospective relief.

Courts around the country have rejected claims of irreparable harm after delays that are far shorter.  *See*, *e.g.*, *Tough Traveler, Ltd. v. Outbound Prod.,* 60 F.3d 964, 968 (2d Cir.1995) (vacating a preliminary injunction where the movant waited four months to seek relief after filing suit); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) (finding that a ten-week delay in seeking injunction for trademark infringement undercut the claim of irreparable harm); *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming the district court's denial of temporary injunctive relief where the movant, among other things, delayed three months in making its request); *AARP v. United States Equal Emp. Opportunity*

*Comm'n*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) ("unexplained delay" from when the "final rules at issue [] were promulgated in May 2016 . . . until the end of October to file this suit" "weighs against a finding of irreparable harm"); *Vita-Mix Corp. v. Tristar Prod., Inc.*, No. 1:07 CV 275, 2008 WL 11383504, at *9 (N.D. Ohio Sept. 30, 2008) ("[N]umerous courts have recognized that any presumption of irreparable injury . . . is rebutted by a delay of even a few months in seeking preliminary injunctive relief." (collecting cases)). So Plaintiffs' "substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759, 774 (S.D. Tex. 2007) (internal cites and quotations omitted).

*   *   *

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson,* 415 U.S. at 88. The absence of such irreparable harm here provides a sufficient—and necessary—basis to deny the preliminary injunction. *See*, *e.g.*, *Anibowei v. Morgan*, 70 F.4th 898, 905 (5th Cir. 2023) (court "need not separately address whether [Plaintiff] established the other criteria" where there was no irreparable injury); *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) ("Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue."). Plaintiffs' legal claims can be litigated in the normal course.

## II. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY AGAINST GRANTING THE BROAD INJUNCTION PLAINTIFFS SEEK

On the other side of the ledger, the harm to the government and to the public interest from an injunction would be "grave and immediate." Ducheneaux Decl. ¶ 98; *see generally Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that harm to opposing party and weighing the public interest "merge" when relief is sought against the government).

As Mr. Ducheneaux explains in his declaration, even a narrow construction of the injunction that Plaintiffs request would intrude on USDA's ongoing implementation of the

ERP 2022 program—and would be enormously disruptive to agency operations and broad swaths of producers.  *See* Ducheneaux Decl. ¶¶ 99, 103-20 (detailing the harm from the kind of injunction Plaintiffs are seeking).  Specifically, if "a preliminary injunction directed the Agency to stop consideration of socially disadvantaged producer status" in ERP 2022, USDA "would need to halt program operations" while it determined whether and to what extent it is possible to continue providing the same level of payments "to veteran, limited resource, and beginning farmers and ranchers, the other underserved producer groups that are not race- or sex-based categories." *Id.* ¶¶ 104-107.  "This process would result in a total halt of regular Agency operations for ERP 2022 for an unknown period of time." *Id.* ¶ 107.  The same is true for an injunction against the use of progressive factoring.  *Id.* ¶ 111 ("Enjoining the use of progressive factoring in ERP 2022 entirely would require the Agency to halt all payments under the program" and "severely impact applicants who have not yet applied or who have applied, but not yet been issued payments").  Indeed, such an injunction would either halt payments entirely or, after a delay of an unknown period of time, "decrease payments for the approximately 82 percent of eligible recipients"—a dramatic number, that would put "the declining number of smaller American agricultural producers at further risk of ceasing operation." *Id.* ¶ 113-18.  And it would risk all of these impacts in a lawsuit brought by producers who have already received substantial funding from these programs.

These harms would result from even a narrow injunction.  *See id.* ¶ 101 (explaining how the agency understands the scope of Plaintiffs' requested relief for purposes of addressing the resulting harms).  And they would be magnified if an injunction were extended more broadly to unspecified USDA programs, as Plaintiffs at times urge.  *See id.* ¶ 102; *see generally* Pls. Proposed Order, ECF No. 10 at 5-6 (proposed order asking the Court to enjoin USDA "from using race, sex, or progressive factoring when administering disaster and pandemic programs, including but not limited to [the Programs]" challenged in the litigation).  Plaintiffs, of course, have not even attempted to support this kind of broad injunction with *any* showing of harm from unnamed programs or general USDA operations.  *See generally* Pls. Br. at 22-

23.   But granting any kind of injunction would fly in the face of the Supreme Court's admonition that a federal court may not issue an equitable remedy "more burdensome to the defendant than necessary to [redress]" the plaintiff's injuries for all the reasons explained above.  *Califano Yamasaki*, 442 U. S. 682, 702 (1979); *Gill* v. *Whitford*, 585 U.S. 48, 68 (2018) ("[A] 'remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established'"); *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (injunction "is overbroad if it is not narrowly tailor[ed] ... to remedy the specific action which gives rise to the order as determined by the substantive law at issue" (internal quotes and citation omitted).

III.   **PLAINTIFFS FAIL TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS IN ANY EVENT**

Given Plaintiffs' failure to satisfy the necessary predicates for a preliminary injunction, there is no need for the Court to consider the merits of their claims at this time.  Nonetheless, even if the Court were to consider them, those claims would fail.  Plaintiffs move for a preliminary injunction on two categories of claims:  the first challenges ERP 2022's progressive factoring payment calculation, and the second challenges USDA's use of the socially disadvantaged designation to provide certain benefit increases to minority and women farmers in the challenged programs.  But Plaintiffs' arguments on the former misunderstand the nature of progressive factoring as a payment calculation.  And, on the latter, USDA's use of modest benefit increases to specified groups is both reasonable and constitutional given the persistent effects of USDA's undisputed history of discrimination in farm lending programs.

A.   **ERP 2022's Progressive Factoring Payment Calculation System is Race- and Sex-Neutral, Discretionary, and Reasonable**

When Congress passed the Disaster Relief Supplemental Appropriations Act in 2023, the approximately $3.2 billion it appropriated to USDA for disaster relief related to crop losses was less than one third of the funding needed to adequately cover more than $11 billion in uncovered 2022 disaster crop losses.  Ducheneaux Decl. ¶ 50.  USDA therefore designed ERP

2022 within these funding constraints. *Id.* For example, following Congressional direction, ERP 2022 imposed limits on the amount of payments a person or legal entity can receive under the program. *Id.*; 88 Fed. Reg. 74404 (Oct. 31, 2023). In addition, rather than applying a general flat payment factor (*e.g.*, covering 10% of all uncovered losses) as it has in prior programs, USDA incorporated an initial "progressive factoring" payment calculation system that covered 100% of losses from 0 to $2,000 and provided diminishing coverage for successive losses, as follows:

| Payment Range | Progressive Factor (%) |
|---|---|
| Up to $2,000 | 100% |
| $2,001 to $4,000 | 80% |
| $4,001 to $6,000 | 60% |
| $6,001 to $8,000 | 40% |
| $8,001 to $10,000 | 20% |
| Over $10,000 | 10% |

Ducheneaux Decl. ¶ 54.

Progressive factoring had not previously been used by FSA for its pandemic or disaster assistance programs because funding for previous *ad hoc* disaster programs was typically sufficient to cover a majority of losses. *Id.* But, under this system, 82% of farmers received larger payments than they would have under a flat factor payment calculation— thus ensuring that, even with limited funds, the agency is able to effectively provide assistance. *Id.* ¶ 112.

> i. *Progressive factoring does not discriminate based on race or sex.*

Plaintiffs argue that progressive factoring "was applied unevenly based on race and sex." Pls. Br. at 8. But this contention is simply incorrect. Progressive factoring is both race- and sex-neutral and applies without regard to any socially disadvantaged status. Ducheneaux Decl. ¶¶ 50–59. Indeed, while fewer than 10% of all farms are considered socially disadvantaged,[5] progressive factoring benefitted more than 80% of farmers, who received a

---

[5] Economic Research Service, *Socially Disadvantaged Farm Operations*, https://ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=106496

greater benefit under progressive factoring than they would have under a general flat factor. *Id.* ¶¶ 112-15. This generally resulted in smaller farmers receiving a benefit that was more economically significant to their operation than larger farmers because a dollar lost for a smaller farmer has a higher economic impact than a dollar lost for a large farming operation. *Id.* ¶ 66. Plaintiffs may thus believe that they have been disadvantaged because they are *bigger* farmers, but the size of their operations is not constitutionally protected.

To be sure, ERP 2022 did include certain determinations based on the socially disadvantaged designation, but these applied independently of progressive factoring. For underserved farmers, which includes farmers who are socially disadvantaged, FSA adds the farmer's share of their federal crop insurance premiums and fees to the progressive factored sum. *Id.* ¶ 58. Thus, and after applying progressive factoring, an underserved farmer's Track 1 calculation is multiplied by 115% (before applying an additional flat 75% factor across the board). 88 Fed. Reg. 74414, at n.28 (Oct. 31, 2023); Ducheneaux Decl. ¶¶ 64, 65. Simply put, application of any underserved and socially disadvantaged classification occurs after and apart from progressive factoring. Because the initial progressive factoring of ERP payments is race- and sex-neutral and is decoupled from these provisions, Plaintiffs cannot show that its use implicates constitutional issues under any standard.

>     ii.   *USDA's decision to use progressive factoring when administering limited funds is discretionary and therefore beyond the Court's review.*

Beyond their equal protection challenge, Plaintiffs cannot show that the use of progressive factoring violates the APA.

The APA expressly precludes judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2)). That exception applies to "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (quoting

---

(last visited May 3, 2024) ("Overall, socially disadvantaged farms accounted for 9.4 percent of the 2 million farms in the United States, according to the 2017 Census of Agriculture.").

*Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)), as well as instances where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  In such cases, "'the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion.'"  *Id.* at 643 (quoting *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)).

USDA's disbursement of funding in ERP 2022 falls well within the category of administrative decisions that have traditionally been regarded as committed to agency discretion.  In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to reallocate funding away from a children's health program was committed to the agency's discretion and thus unreviewable.  508 U.S. at 184.  The Court reasoned that "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion" because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192.  Thus, "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude."  *Id.* at 193.

The D.C. Circuit has "extended *Lincoln*'s reasoning to agency decisions involving *non-lump sum appropriations as well.*"  *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75 (D.D.C. 2018) (Brown Jackson, J.).  In *Milk Train, Inc. v. Veneman*, for example, the D.C. Circuit concluded that USDA's decision to impose a cap on a milk subsidy program was committed to agency discretion because Congress "left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers[.]"  310 F.3d 747, 751 (D.C. Cir. 2002).  And just last year, the D.C. Circuit held that the Department of State's administration of a compensation fund was unreviewable because the governing statute did not "direct[] the Secretary to allocate funds in any particular way—it just requires him to 'determine the amounts due.'"  *Schieber v. United States*, 77 F.4th 806, 814 (D.C. Cir.

25

2023) (quoting 22 U.S.C. § 2668a), *cert. denied*, 144 S. Ct. 688 (2024).  USDA's administration of ERP 2022 is unreviewable for the same reasons.

ERP 2022 similarly lacks any "statutory reference point" that could furnish a "meaningful standard against which to judge the agency's exercise of discretion." *Drake v. FAA*, 291 F.3d 59, 72 (D.C. Cir. 2002).  Title I of the Disaster Relief Supplemental Appropriations Act, 2023 provided $3,741,715,000 in a lump sum "to remain available until expended, for necessary expenses related to losses of revenue, quality, or production losses of [certain] crops" under such terms and conditions "as determined by the Secretary."  Aside from certain broad parameters and payment limitations, the statute does not impose any specific conditions on *how* USDA is to disburse this assistance to farmers, so Plaintiffs cannot show that progressive factoring violates the statute.  And "[i]n looking for judicially administrable standards by which to judge the Secretary's decision, that language is an empty vessel." *Make The Rd. New York v. Wolf*, 962 F.3d 612, 633 (D.C. Cir. 2020).  Because the statute did not direct to the Secretary to allocate funds in any particular way and progressive factoring helps USDA meet the permissible objective of providing disaster relief to farmers, its decision is not reviewable.

### iii.  *Even if the agency's use of progressive factoring were reviewable, it is not arbitrary and capricious.*

Even if Plaintiffs could establish the necessary predicates to APA review, they are not likely to succeed on the merits of this claim.  To pass muster under arbitrary-and-capricious review, USDA need only "articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (quotation omitted).  Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

Here, USDA's decision to cover 100% of initial losses and provide diminishing coverage for subsequent losses through progressive factoring helps ensure the limited available

funding is distributed in a manner benefitting the majority of producers rather than a few, as stated in the Notice of Funding Availability. 88 Fed. Reg. 74404, 74410, n.4. (Oct. 31, 2023). This has generally resulted in smaller farmers receiving a benefit that is more economically significant to their operations. Ducheneaux Decl. ¶ 65. Under this payment structure, more than 80% of farmers received a greater benefit than they would have received under a general flat factor. That Plaintiffs are among the 18% of farmers that received a relatively smaller benefit does not show that the decision to use progressive factoring was unreasonable.

Nor can Plaintiffs show that USDA's use of progressive factoring reflected a change of course without explanation or violated any reasonable reliance interests. *See* Pls. Br. at 8, 19. *Ad hoc* disaster benefits are never guaranteed; they are always subject to Congressional appropriations. This means that when Congress provides adequate funding, USDA can extend greater benefits to farmers. By contrast, when Congressional appropriations are more limited, USDA must determine how to allocate these limited resources—and those decisions are necessarily unique to each program and context-specific.

For example, when USDA opened the Pandemic Assistance Revenue Program (PARP) program, it received more than 38,500 applications triggering payments totaling nearly $7 billion in assistance. As Mr. Ducheneaux said at the time, "[t]he demand for PARP assistance greatly exceeds available funding resources. We left no stone unturned in our efforts to find additional funding. We worked to assist as many producers in need of help as possible in designing PARP, which requires the current decision to heavily factor payments consistent with program regulations." *See* USDA to Begin Issuing Pandemic Assistance Revenue Program Payments, https://perma.cc/4A5Y-S8WX (Dec. 13, 2023). A flat 9.5% payment factor was applied to all payments. *Id.* And payment factors are just one way that USDA keeps program benefits within funding limits—USDA also uses tools such as payment caps and other eligibility qualifications, among other features.

Like PARP, ERP is not a permanently authorized disaster program. By the nature of this kind of *ad hoc* relief program, progressive factoring does not reflect a change in any

27

consistent payment calculation policy—payment terms always vary.  No reasonable producer can or should do any sort of financial planning based on the assumption that an *ad hoc* disaster program that depends entirely on Congressional funding will cover their losses entirely or adequately.  Plaintiffs therefore have no reasonable reliance interest in any of ERP 2022's payment terms.  And USDA acted reasonably in—and properly explained the underlying basis for—applying a payment structure than benefited more than 80% of farmers.  *See, e.g.*, Ducheneaux Decl. ¶¶ 113-15; 88 Fed. Reg. at 74410, n.14.

**B.**    **USDA's Use of the "Socially Disadvantaged Farmer" Designations Falls Within the Secretary's Broad Discretion and Does Not Violate the Major Questions Doctrine**

Since the 1990s, veterans, beginning farmers, farmers who are socially disadvantaged, and limited-resource farmers—collectively, historically underserved farmers and ranchers— have been eligible to receive benefits from a variety of Farm Bill programs.  Economic Resource Service, Socially Disadvantaged, Beginning, Limited Resource, and Female Farmers and Ranchers; *see also*, *e.g.*, 7 USC § 2003(e)(1).  For the purposes of USDA's programs, Congress has defined socially disadvantaged farmers as those belonging to groups that have been subject to racial or ethnic prejudice, 7 U.S.C. §2279(a)(5), (6), and those who have been subject to racial, ethnic, and gender prejudice, *see* 7 U.S.C. § 2003(e)(1), (2). Socially disadvantaged farmers typically include farmers who are Black or African American, American Indian or Alaska Native, Hispanic or Latino, and Asian or Pacific Islander.  Form CCC-860, available at https://perma.cc/6SE9-7GFJ (used in certain FSA programs, including the challenged programs).  For some but not all USDA programs, the socially disadvantaged farmer category also includes women.  *Id.*

At the outset, aside from certain broad parameters and payment limitations, each of the statutes authorizing the challenged programs are silent as to how the appropriated funds should be distributed, including the use of the socially disadvantaged farmer designation. Rather, these issues were expressly committed to the Secretary's discretion in designing the

28

challenged programs, *see infra* Part III.A.ii., and Plaintiffs cannot show that USDA acted contrary to the statutory texts in its implementation of the challenged programs.

Nor have Plaintiffs shown that the modest benefits provided to minority and female farmers in these *ad hoc* disaster relief programs—which range from 10 to 15% bump-up payment rates to refunds of insurance fees and premiums—implicate the major questions doctrine.  First, this doctrine applies only in "extraordinary cases" involving "decisions of vast economic and political significance" or assertions of "extravagant statutory power over the national economy" or of "highly consequential power beyond what Congress could reasonably be understood to have granted."  *See West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022) (citations omitted).  The modest benefits afforded to socially disadvantaged farmers do not have the scale or effect necessary to implicate the major questions doctrine.

And second, major-questions principles are relevant only when an agency action involves a "novel" or "unprecedented" interpretation of regulatory authority involving "ancillary" statutory provisions.  *Id.* at 2605.  But here, USDA's use of the socially disadvantaged farmer designation is anything but novel.  It has been used in USDA's programs for roughly 20 years.  And its use in disaster relief programs is far from unprecedented—Plaintiffs themselves have identified eight recent programs using this designation.  That Congress continued to bestow upon the Secretary broad discretion to establish the terms and conditions of these programs, even as USDA continuously provided benefits to socially disadvantaged farmers, further undercuts Plaintiffs' claim.

### C.   USDA's Use of the Socially Disadvantaged Farmer Designation Satisfies Strict Scrutiny

Unlike progressive factoring, USDA's application of the "historically underserved" and "socially disadvantaged" designations in the challenged policies *does* consider race and sex, and so their use must satisfy strict scrutiny.  *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).  The Supreme Court has cautioned that although the test for strict scrutiny is demanding, it should not be interpreted as "strict in theory, but fatal in fact."  *Id.* at 237

(internal citation omitted). "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Id*.

Here, USDA has used the socially disadvantaged farmer designation to help remedy the lingering effects of its own well-documented historical discriminatory practices in farm lending programs, which have prevented minority farmers from accessing credit and capital and competing equally in the market and, by extension, has made them less able to confront natural disasters and sustain farming operations.

       i.      *USDA has a compelling interest in minimizing and remediating the effects of discrimination.*

There is no question that remedying the effects of past discrimination constitutes a compelling governmental interest. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (a government "has a compelling interest in assuring that public dollars … do not serve … private prejudice."); *see also W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 217 (5th Cir. 1999) (noting that the government may enact race-conscious remedies where the remedy is factually tied to a past injury). Such an interest exists where the Government has a strong basis in evidence to conclude that race-based action is necessary to remedy the discrimination that has stunted the success of socially disadvantaged farmers. *Croson,* 488 U.S. at 500. Notably, however, courts do not require the government to "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence." *H.B. Rowe Co. v. Tippett*, 615 F. 3d 233, 241 (4th Cir. 2010); *see also Midwest Fence Corp. v. U.S. DOT,* 840 F. 3d 932, 945 (7th Cir. 2016). Rather, Defendants are permitted to provide either direct or circumstantial evidence to satisfy the strong basis in evidence standard. *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999). And it is well settled that statistical evidence is one type of circumstantial evidence that may be used. *See Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) ("[t]here is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of

discrimination'") (quoting *Croson*, 488 U.S. at 501); *see also Kossman Contracting, Co. v. City of Houston*, No. H-14-1203, 2016 WL 11473826 (S.D. Tex. Feb. 17, 2016) (report and recommendation).

Here, a vast body of statistical and anecdotal evidence demonstrates historical discrimination against socially disadvantaged farmers in USDA programs, resulting in a decline in minority farm ownership, barriers to access of capital, and socially disadvantaged farmers receiving a disproportionately smaller share of USDA program funds. This includes Congressional reports and studies, USDA's own commissioned studies, and academic materials, among other sources. This specific evidence, tied to USDA's own programs and practices, is worlds removed from "general societal inequities" that Plaintiffs baldly suggest USDA is trying to remedy. Pls. Br. at 12. Rather, the evidence documents the effects of USDA's lamentable history—a history the agency is working hard to overcome.

Crucially, and contrary to Plaintiffs' suggestion, Congress has joined USDA in identifying the need to consider this history—and attempt to rectify it—when structuring USDA's programs. The most recent farm bill, for example, the Agriculture Improvement Act of 2018,[6] reauthorized and expanded support for socially disadvantaged farmers. Yet despite these efforts, a recent USDA study found farms owned by socially disadvantaged persons still operate fewer acres, earn lower net farm income on average, are less likely to specialize in cash grains, are more likely to hold loans for their farm business than non-Hispanic White, male-owned, and high-sales farms, respectively. Todd, Jessica E. et al., *An Overview of Farms Operated by Socially Disadvantaged, Women, and Limited Resource Farmers and Ranchers in the United States*, Washington, D.C: Economic Research Service, U.S. Department of Agriculture, 2024. These disparities reflect the persistent effects of past discrimination that USDA has a compelling interest in addressing.

---

[6] On Nov. 16, 2023, President Biden signed into law H.R. 6363, the Further Continuing Appropriations and Other Extensions Act, 2024, which extended the Agriculture Improvement Act of 2018, more commonly known as the 2018 Farm Bill. This extension allows authorized programs to continue through Sept. 30, 2024.

These interests are particularly acute in the challenged programs, which utilize acreage, insurance coverage, and production revenues—the precise metrics on which evidence shows that socially disadvantaged farmers fall behind as a consequence of USDA's past conduct—to measure losses and deliver relief funds. *See*, *e.g.*, ERP Phase 2 (using gross revenues to approximate losses), 88 Fed. Reg. 1862 (Jan. 11, 2023); ERP Phase 1 (using federal crop insurance and Noninsured Crop Disaster Assistance Program (NAP) payments to calculate crop production payments), 87 Fed. Reg. 30164 (May 18, 2022); ELRP Phase 1 (using grazing acreage and number of animal products to calculate losses), 87 Fed. Reg. 19465 (April 4, 2022); PARP (using benchmark gross revenues to calculate losses), 88 Fed. Reg. 1862 (Jan. 11, 2023). All the historical evidence available to USDA suggests that, without taking race and sex into account, lingering effects of discrimination would therefore be perpetuated by USDA relief programs.

> ii.     *Providing modest monetary benefits to socially disadvantaged farmers is narrowly tailored to that compelling interest.*

For similar reasons, "the means chosen to accomplish" USDA's compelling interest in remedying description are "specifically and narrowly framed to accomplish that purpose." *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) (internal quotation marks and citation omitted); *see generally Croson*, 488 U.S. at 493 (plurality opinion) (narrow tailoring ensures that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype"). To assess narrow tailoring, courts consider: (1) the necessity for the relief and the efficacy of alternative remedies; (2) the flexibility and duration of the relief; (3) the relationship of the numerical goals to the relevant labor market (which is not relevant to the programs challenged here), and (4) the impact of the relief on third parties. *United States v. Paradise*, 480 U.S. 149, 171, 187 (1987). All of these support USDA's use of the challenged classifications here.

First, as noted above, the necessity for USDA's remedial action is firmly rooted in the evidence showing lingering effects of historical discrimination against minority and women

farmers in USDA programs. Indeed, the need for race-based relief is underscored by the inefficacy of the neutral alternatives that Congress has repeatedly attempted. For example, over the course of the last 20 years Congress changed the role of county committees in USDA loan programs and enacted measures to achieve greater minority representation on those committees in 2002 and 2008, and yet testimony and reporting shows continuing disparities in the number, amounts, and servicing of USDA loans for minority farmers as compared to non-minority farmers. *See* Congressional Research Service (CRS), FSA Comms.: In Brief (Jan. 29, 2021) (FSA Comms.), available at https://perma.cc/HA3L-PDPG. Likewise, Congress created an Assistant Secretary of Civil Rights at USDA to attempt to address the agency's poor civil rights record; and yet subsequent testimony and reports showed continuing issues in processing civil rights complaints, House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill (Apr. 21, 2010); House Ag. Comm. Hr'g on USDA Oversight 45, 50 (July 22, 2015). Before that, Congress created the 2501 Program to increase minority farmers' awareness of, and access to, USDA resources, and permanently funded the program in 2018; and yet recent reporting indicated that minority farmers were still not aware of USDA resources, including recent pandemic relief, *see* 167 Cong. Rec. S1262 (Stabenow). Even more recently, Congress created the Coronavirus Food Assistance Program (CFAP) to help farmers who had been adversely impacted by the pandemic—and yet the vast majority of the billions in CFAP funding did not reach minority farmers due to structural biases in federal farm programs. *See id*. S1264-65; H766. Where, as here, Congress has tried for decades to use race-neutral means to remedy the lingering effects of past discrimination against minority farmers, the relative failure of those race-neutral efforts shows the necessity for race-conscious benefits programs. *See Fisher v. U. of Tex.*, 136 S. Ct. 2198, 2213 (2016) (race-conscious admissions program was narrowly tailored where university failed to achieve compelling interest after trying to do so for seven years via race-neutral means).

Second, in addition to being necessary, the challenged *ad hoc* disaster relief programs are both flexible and time-limited. Each program has different eligibility criteria and payment

structures and uses the socially disadvantaged farmer designation in various ways to provide modest additional benefits. Thus, the Emergency Livestock Relief Program applied a payment factor of 90% for historically underserved farmers compared to 75% for all other farmers, 87 Fed. Reg. 19465 (April 4, 2022); ERP 2022 Track 1 added underserved producers' share of federal crop insurance administrative fees and premiums to their factored awards, 88 Fed. Reg. 74404 (Oct. 31, 2023). USDA's uses of the socially disadvantaged farmer designation (included within the definition of underserved producer) in its disaster relief programs are thus "flexib[le] in administration," *Fullilove v. Klutznick*, 448 U.S. 448, 460 (1980), and "temporary in application," *Paradise*, 480 U.S. at 178, thereby ensuring that the race-conscious measure endures no longer than necessary to serve its purposes.

Third, USDA's provision of supplemental disaster relief to socially disadvantaged farmers does not impose an unacceptable burden on innocent third parties, namely white male farmers. White male farmers are eligible to participate in each of the challenged programs. The Plaintiffs themselves received hundreds of thousands of dollars in disaster relief benefits under the challenged programs. Ducheneaux Decl., Part III. And they point to no evidence that white male farmers are either competitively disadvantaged by USDA's additional assistance to socially disadvantaged farmers or that white farmers were historically denied equal treatment by USDA. *See generally supra* Part I. The use of temporary and comparatively small disaster relief to relieve the sizeable burden socially disadvantaged farmers have long borne does not impose an impermissible burden on white male farmers, who continue to receive the vast majority of agricultural funding, nor burden Plaintiffs specifically. *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 481 (1986) (finding 29.3% nonwhite union membership goal to remedy past discrimination had "only a marginal impact on the interests of white workers" where whites were "denied certain benefits available to their nonwhite counterparts" but still constituted "a majority of those entering the union").

Fourth and finally, USDA's use of the socially disadvantaged farmer designation to provide some additional benefits to minority and female farmers is neither over nor under-

inclusive.  As explained, there is a large body of evidence that the minority groups included in USDA's definition of "socially disadvantaged groups" on Form CCC-860 have suffered from discrimination at the hands of USDA.  USDA has defined socially disadvantaged groups to include racial and ethnic groups who have been shown to have been the victims of that discrimination since at least 2001.  *See* 66 Fed. Reg. 21617-01 (Apr. 30, 2001) (interpreting 7 U.S.C. § 2279 to include those groups for purposes of Outreach and Assistance).  And studies before and since then have recounted historical discrimination in federal programs against those socially disadvantaged groups, including by addressing a particular socially disadvantaged group, *see*, *e.g.*, GAO 19-464 (addressing Native Americans); *see also* Jackson Lewis Report, or socially disadvantaged groups as a whole as defined by the USDA, *see*, *e.g.*, GAO 19-539 at 1.  Studies also show that recent agricultural funding has gone disproportionately to those who do not fall within USDA's definition of socially disadvantaged groups.  *See* Jared Hayes, USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers, EWG (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD.  Where particular racial and ethnic groups have historically suffered discrimination in USDA programs and been largely left out of relief efforts, issuing enhanced disaster relief to those particular groups to ameliorate the effects of that discrimination and unequal funding is not over-inclusive.  *See Paradise*, 480 U.S. at 149.  Indeed, the amount of enhanced relief USDA provided is consistent with what Congress has historically authorized and reflects appropriate judgment about the measure of additional benefits that are necessary to remedy persistent effects of past discrimination.  *See* Ducheneaux Decl. ¶ 21.

Nor is the definition underinclusive because it excludes white male farmers who are not veterans, of limited resources, or beginning farmers.  *Contra* Pls. Br. at 12.  As noted, the evidence does not show that white male farmers as a group have suffered the same history of discrimination as socially disadvantaged farmers or failed to receive recent funding.  Where Congress sought to remedy the lingering effects of historical discrimination and funding inequities unique to minority farmers, the definition of socially disadvantaged farmers is not

under-inclusive because it does not include white farmers who generally have not suffered the same discrimination and unequal treatment. *See Croson*, 488 U.S. at 506 (noting that if relief program was meant "to compensate black contractors for past discrimination, one might legitimately ask why" remedial relief must be shared with those who were not shown to have been discriminated against). That some white farmers may also have smaller or less successful farms does not show that they have smaller farms *because* of past USDA conduct—and it therefore does not establish that USDA is prohibited from trying to give additional help to those farmers who are especially vulnerable to natural disasters because of the lingering effects of USDA's past acts. And indeed, white male farmers with smaller or less successful farms who qualify as limited resource (as well as veterans and beginning farmers) may likewise qualify for benefits as underserved producers.

In any event, USDA's presumption of social disadvantage in these programs for particular racial or ethnic groups is flexible; the list of those who may qualify for the presumption is not static. While the current categories derive from historical evidence, Plaintiffs have not alleged any facts demonstrating that the statute or regulations limit the ability for USDA to reconsider the eligible categories based on updated evidence. Because the regulations require any presumption to be based in strong evidence, the statute is appropriately tailored. It is not over-inclusive, because it provides a remedy for groups only where historic discrimination has been shown through evidence. Nor is it under-inclusive, because any group may seek approval from the Deputy Administrator for inclusion. *See*, *e.g.*, 87 Fed. Reg. 19465. For each of these reasons, Plaintiffs are not likely to succeed on their Fifth Amendment claims.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for preliminary relief.

Dated: May 3, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Alexander V. Sverdlov*
ALEXANDER V. SVERDLOV (NY Bar No.
 4918793)
FAITH E. LOWRY (TX Bar No. 24099560)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8550
Email: alexander.v.sverdlov@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

On May 3, 2024, I electronically submitted the foregoing document with the Clerk of
Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case
filing system. I hereby certify that I have served all parties electronically or by another manner
authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Alexander V. Sverdlov*
ALEXANDER V. SVERDLOV
Trial Attorney
U.S. Department of Justice