**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

RUSTY STRICKLAND, *et al.*,

      *Plaintiffs*,

    v.

THE UNITED STATES DEPARTMENT
OF ARGRICULTURE, *et al.*,

      *Defendants*.

Case No. 2:24-cv-00060-Z

**DECLARATION OF ZACHARY WAYNE DUCHENEAUX**

I, Zachary Wayne Ducheneaux, make the following declaration pursuant to 28 U.S.C. § 1746 in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction. The information included in this declaration is based upon my personal knowledge and information made known to me in the course of my employment.

**I.      General Background**

1.      I am the Farm Service Agency (FSA or Agency) Administrator, a position in which I have served since February 22, 2021.  As Administrator, I provide leadership and direction on agricultural policy, administration of loan programs, and management of conservation, commodity, disaster, and farm marketing programs through a national network of offices.  I report to the Under Secretary of Agriculture for Farm Production and Conservation.

2.      FSA is an agency of the United States Department of Agriculture that traces its history to 1933.  The Agency aims to provide America's farmers with a strong safety net through the administration of farm commodity programs. FSA also implements ad hoc

1

disaster programs. FSA's responsibilities are organized into five general areas: Farm Programs, Farm Loans, Commodity Operations, Management, and State Operations.

3. Since 2021, FSA has implemented numerous ad hoc disaster assistance and pandemic assistance programs. I understand that Plaintiffs in this case are challenging aspects of eight of these programs: the Emergency Relief Program 2022 (ERP 2022), the Emergency Relief Program 2020 and 2021 (ERP 2020/2021) Phase 1, ERP 2020/2021 Phase 2, the Emergency Livestock Relief Program (ELRP) Phase 1 and Phase 2, ERLP 2022, the Emergency Relief Program 2022 (ERP 2022), the Pandemic Assistance Revenue Program (PARP), and the Coronavirus Food Assistance Program 2 (CFAP 2).

4. I oversaw the development of and signups for each of those challenged programs. While I did not oversee the original development and implementation of CFAP 2, I oversaw the development of the challenged aspects of that program.

## II.   Overview of the eight challenged programs

### Coronavirus Food Assistance Program; Additional Assistance

5. In response to the COVID–19 outbreak, on March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act; Pub. L. 116–136). Title I of Division B of that Act provided "$9,500,000,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus by providing support for agricultural producers impacted by coronavirus, including producers of specialty crops, producers that supply local food systems, including farmers markets, restaurants, and schools, and livestock producers, including dairy producers."

6.     The Coronavirus Food Assistance Program (CFAP) provided assistance to agricultural producers impacted by the effects of the COVID–19 outbreak through two rounds of payments (CFAP 1 and CFAP 2).

7.     CFAP 1 was implemented through a final rule published in the Federal Register at 85 Fed. Reg. 30825 (May 21, 2020), with corrections published in the Federal Register at 85 Fed. Reg. 35799 (June 12, 2020), 85 Fed Reg 41328 (July 10, 2020), 85 Fed. Reg. 49589 (Aug. 14, 2020), and 85 Fed. Reg. 59174 (Sept. 21, 2020).

8.     CFAP 1 provided eligible producers with financial assistance to offset sales losses and increased marketing costs resulting from the COVID–19 pandemic. With respect to commodity and livestock losses due to price declines that occurred between mid-January 2020 and mid-April 2020 and, in the case of specialty crops, for products that were shipped but spoiled and no payment was received, CARES Act funds were used to partially compensate producers for on-going market disruptions and assist with the transition to a more orderly marketing system.

9.     CFAP 2 was implemented through a final rule published in the Federal Register at 85 Fed. Reg. 59380 (Sept. 22, 2020).  CFAP 2 provided an estimated $13.21 billion in Commodity Credit Corporation (CCC) funding as authorized by sections 5(b), (d), and (e) of the CCC Charter Act (15 U.S.C. 714c(b), (d), and (e)). CFAP 2 provided a second round of funding for producers who continued to face market disruptions, low prices, and significant marketing costs as result of COVID-19.

10.     USDA published a final rule January 19, 2021, to provide additional assistance for certain commodities under CFAP 1 and CFAP 2.  86 FR 4877 (Jan. 19, 2021).  However,

USDA suspended implementation of that rule on January 20, 2021, to allow further evaluation of the assistance offered through CFAP.

11.     In March 2021, Secretary Vilsack announced that USDA established policies and additional efforts to reach a broader set of producers including greater emphasis on outreach to small and socially disadvantaged producers, specialty crop producers, and organic producers.  (USDA Release No. 0056.21).

12.     A final rule published on August 27, 2021 (86 FR 48013–48018), revised the CFAP 2 application deadline, amended provisions for contract producers, and made certain adjustments to the payment calculation for certain commodities.  This rule also clarified that payments to contract producers will be funded using the $1 billion authorized by the Consolidated Appropriations Act, 2021 (CAA; Pub. L. 116-260).

13.     As part of a final rule issued on January 11, 2023, FSA issued an additional CFAP 2 payment to underserved farmers and ranchers.  These payments were issued under the same authority as the producers' previous CFAP 2 payments, using CCC funds as authorized by sections 5(b), (d), and (e) of the CCC Charter Act (15 U.S.C. 714c(b), (d), and (e)) and using CARES Act funding in the case of tobacco.  88 Fed. Reg. 1862, 1869, nn.19-20 (Jan 11, 2023).

14.     The additional payment for underserved producers was equal to 15 percent of a producer's previous CFAP 2 payment, subject to CFAP 2 payment limitation provisions in 7 C.F.R. § 9.7.  Total payments to eligible underserved producers under CFAP 2, including the 15 percent additional payment, were $331,725,380.

4

**Emergency Relief Program 2020/2021 Phase 1**

15.     In Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117–43), Congress provided "$10,000,000,000, which shall remain available until December 31, 2023, for necessary expenses related to losses of crops . . . , trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021 under such terms and conditions as determined by the Secretary."

16.     Pursuant to its statutory authority, FSA issued a Notice of Funding Availability, announcing the Emergency Relief Program (ERP 2020/2021) to provide assistance according to this appropriation.  87 Fed. Reg. 30164 (May 18, 2022).  Assistance was provided in two phases.

17.     ERP 2020/2021 Phase 1 provided payments for eligible crop production losses by calculating data from previously issued crop insurance indemnities and Noninsured Crop Disaster Assistance Program (NAP) payments. The ERP 2020/2021 Phase 1 implementation was a streamlined process consisting of a pre-filled application form being mailed to eligible producers who had data on file with FSA and Risk Management Agency (RMA), the agency that manages Federal crop insurance, as result of the producer previously receiving a NAP payment or a crop insurance indemnity.

18.     In order to receive a payment, producers had to certify that their crop insurance indemnity or NAP payment on which the ERP 2020/2021 Phase 1 payment was based was due, in whole or in part, to a crop production loss caused by a qualifying disaster event.

19.     FSA factored ERP 2020/2021 Phase 1 payments—that is, adjusted them by a multiplier ranging from 75 percent to 95 percent, depending upon the level of crop insurance or NAP coverage.  FSA utilized these payment factors, "to ensure that payments did not exceed available funding and, in aggregate across all producers, did not exceed 90 percent of losses, as required by the Extending Government Funding and Delivering Emergency Assistance Act." 87 Fed. Reg. 30164, 30168 (May 18, 2022).

20.     In addition, final ERP 2020/2021 Phase 1 payments to all producers were adjusted by taking into account any indemnities received minus service fees and premiums, in effect refunding fees and premiums for all producers.  *Id.* at 30168-69.

21.     Historically underserved farmers and ranchers received an increase to their ERP 2020/2021 Phase 1 payment equal to 15 percent of the amount calculated. *Id.* at 30169. This was designed to align with the increase available to underserved producers in other FSA disaster assistance programs, such as the congressionally-authorized higher percentage rate of coverage for losses under the Emergency Assistance for Livestock, Honey Bees, and Farm-raised Fish program (ELAP).

22.     Payment limits were imposed on ERP 2020/2021 Phase 1 payments depending upon the person or legal entities average adjusted gross farm income.  *Id.* A person or legal entity, other than a joint venture or general partnership, had a payment limit of $125,000 in payments for specialty crops and $125,000 in payment for all other crops under ERP (for Phase 1 and Phase 2 combined), unless at least 75 percent of the person or legal entity's average adjusted gross income (AGI) is derived from farming, ranching, or forestry related activities, in which case higher payment limits applied.  *Id.*

6

**Emergency Relief Program 2020/2021 Phase 2**

23.     ERP 2020/2021 Phase 2 was authorized by the same authority as Phase 1, Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117–43).  FSA published a final rule implementing ERP 2020/2021 Phase 2 as part of a larger rule that also announced the Pandemic Assistance Revenue Program (PARP). 88 Fed. Reg. 1862 (Jan. 11, 2023).

24.     ERP 2020/2021 Phase 2 was intended to address eligible crop losses not included in ERP Phase 1.  Thus, ERP 2020/2021 Phase 2 provided assistance for necessary expenses related to both production and quality losses of eligible crops where loss information was not already on file with FSA or RMA through NAP or Federal crop insurance. *Id.*

25.     FSA determined that the best approximation of such losses is a producer's decrease in gross revenue, which reflected losses in both production and quality without requiring more extensive calculations and documentation required under previous programs addressing crop losses due to disaster events. *Id.*  Accordingly, FSA decided to generally base ERP 2020/2021 Phase 2 payments on the difference in allowable gross revenue between a benchmark year (2018 or 2019), reflective of a typical year, as elected by the producer, intended to represent a typical year of revenue for the producer's operation, and the applicable disaster year (2020 or 2021). 88 Fed. Reg. 1862, 1863 (Jan. 11, 2023). The details of how FSA calculated a producer's ERP 2020/2021 Phase 2 payment were described in the notice. *Id.* at 1865.

26.     FSA issued an initial payment equal to the lesser of the amount calculated or the maximum initial payment amount of $2,000. If a producer had also received a payment

under ERP Phase 1, FSA reduced the producer's initial ERP Phase 2 payment amount by subtracting the producer's ERP Phase 1 gross payment amount.  *Id.*

27.     If total calculated payments exceeded the total funding available for ERP Phase 2, factors would have been adjusted, payments would have been prorated, and a differential of 15 percent would have been used for underserved producers similar to ERP Phase 1, but with a cap at the statutory maximum of 70 percent as required for producers without Federal crop insurance or NAP coverage.  *Id.* at 1865.

28.     Total calculated payments did not exceed funding available for ERP 2020/2021 Phase 2 so final payments were not prorated and the 15 percent differential for underserved producers was not used in calculating ERP 2020/2021 Phase 2 payments.  ERP Phase 2 payments were just subject to the statutory cap of 70 percent for all participants.

29.     ERP 2020/2021 Phase 2 payments were subject to combined payment limitations with the ERP 2020/2021 payments.  *See* Paragraph 22; *Id.* at 1888.

**Emergency Livestock Relief Program (ELRP) 2021 Phase 1 and Phase 2**

30.     ELRP 2021 Phase 1 and 2 were authorized by Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117-43), which provided $10 billion for crop losses, and of those funds, provided that, "the Secretary shall use $750,000,000 to provide assistance to producers of livestock, as determined by the Secretary of Agriculture, for losses incurred during calendar year 2021 due to drought or wildfires."

31.     FSA announced its implementation of ELRP 2021 Phase 1 by publishing a notice of funding availability at 87 Fed. Reg. 19465 (April 4, 2022).

32.    Phase 1 of ELRP 2021 assisted eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021.  *Id.*  FSA used certain Livestock Forage Disaster Program (LFP) data and a percentage of the payment made through applications for that program as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP 2021 Phase 1.  *Id.* at 19466.

33.    FSA calculated ELRP 2021 Phase 1 benefits based on using the LFP payment rate of $18.71 per animal unit per month; calculated as follows: 75% × $18.71 = $14.03 (equivalent to 57.5 percent of increased supplemental feed costs in 2021) and 90% × $18.71 = $16.84 (equivalent to 69 percent of increased supplemental feed costs in 2021).  *Id.* at 19466.

34.    To stay within the available funding, ELRP 2021 Phase 1 payments used a payment factor.  For increased supplemental feed costs in 2021 the factor was 90 percent of the gross LFP calculated payment for historically underserved farmers and ranchers and 75 percent of the gross LFP calculated payment for all other producers, which equates to 57.5 percent and 69 percent, respectively, of the estimated increases in supplemental feed costs in 2021 for eligible producers.  *Id.*

35.    FSA announced its implementation of ELRP 2021 Phase 2 by publishing a notification of funding availability at 88 Fed. Reg. 66366 (Sept. 27, 2023).

36.    Under ELRP Phase 2, FSA issued an ELRP Phase 2 payment to those producers who already received an ELRP Phase 1 payment to assist with losses in the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period.  FSA used the ELRP Phase 1 payment as a proxy to calculate those losses. *Id.*

37.     FSA compensated for the estimated impact of winter forage availability on eligible livestock producers at 52 percent for underserved farmers and ranchers and 44 percent for all other farmers and ranchers, respectively.  The details of the payment calculation are described in the Federal Register notice.  *Id.* at 66367.

38.     ELRP Phase 1 and 2 were both subject to a combined payment limitation of $125,000 if a producer's average adjusted gross farm income for relevant tax years was less than 75 percent of their average AGI and $250,000 if at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities.  *Id.*

**Emergency Livestock Relief Program 2022**

39.     In 2023, Congress earmarked $494,500,000 of a lump sum ad hoc disaster appropriation in the Disaster Relief Supplemental Appropriations Act, 2023 (Division N of the Consolidated Appropriations Act, 2023; Pub. L. 117-328) for livestock producers suffering losses due to drought or wildfires.  FSA used those funds to implement the Emergency Livestock Relief Program (ELRP) 2022.

40.     ELRP 2022 was announced via NOFA on September 27, 2023. 88 Fed. Reg. 66361 (Sept. 27, 2023).

41.     ELRP 2022 assists eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2022.  *Id.* For eligible producers, FSA paid a portion of producers' increased feed costs in 2022 based on the number of animal units, limited by available grazing acreage, in eligible drought counties. To deliver this assistance quickly, FSA used certain data from the LFP and calculated a percentage of the payment made through LFP applications as a

proxy for increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP 2022. *Id.*

42.     Producers did not need to apply for ELRP 2022 and payments were automatically issued to participants who were approved for a 2022 LFP payment. *Id.* at 66363.

43.     Additional ELRP 2022 payments were automatically processed as remaining 2022 LFP applications were approved.

44.     The initial ELRP 2022 payment was equal to the eligible livestock producer's gross LFP calculated payment multiplied by the applicable ELRP 2022 payment percentage of 90 percent for underserved farmers and ranchers and 75 percent for all other producers. A 25 percent factor was applied to all payments to stay within available funding.  *Id.* at 66363-66364.

### Emergency Relief Program (ERP) 2022 Track 1 and Track 2

45.     Title I of the Disaster Relief Supplemental Appropriations Act, 2023 (Division N of the Consolidated Appropriations Act, 2023; Pub. L. 117-328) provided $3,741,715,000, "to remain available until expended, for necessary expenses related to losses of revenue, quality, or production losses of crops . . . , trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze, including a polar vortex, smoke exposure, and excessive moisture occurring in calendar year 2022 under such terms and conditions "as determined by the Secretary."

46.     Congress directed that up to $494,500,000 of the appropriated funds were to be used to provide assistance to producers of livestock for drought or wildfires.  *Id.*  Congress directed that up to $112,800,000 of the funds could be used for administrative expenses.  After

subtracting the funds made available for livestock losses and administrative expenses, $3,134,415,000 remained for crop losses for ERP 2022.

47.     FSA published a Notice of Funds Availability (NOFA) announcing ERP 2022 October 31, 2023, with sign-up beginning the same day.  88 Fed. Reg. 74404 (Oct. 31, 2023). Applications are still being accepted.

48.     The design for ERP 2022 follows the model used in ERP 2020/2021 Phase 1 and Phase 2 emergency disaster assistance and incorporates a similar method of payments, but is referred to as Track 1 and Track 2.

49.     Specifically, ERP 2022 was designed to provide assistance through a streamlined pre-filled application process available under Track 1 and the revenue-based model under Track 2.  Producers can apply for both Track 1 and/or Track 2 payments, which cover the same eligible crops.

50.     However, because the approximately $3.2 billion that Congress made available provided less than a third of the $11 billion that would be needed to cover 2022 disaster losses, based on early USDA estimates, USDA imposed several additional payment limitations as part of the program design.  Later estimates have this number at approximately $12 billion. These payment limitations included the use of progressive factoring alongside other limits on how much a person or legal entity can receive.

<u>Progressive Factoring</u>

51.     As it did for ERP 2021/2021, each Track 1 payment calculation in ERP 2022 used a payment factor—i.e. multiplier—based on the producer's level of Federal crop insurance or Noninsured Crop Disaster Assistance (NAP) coverage for that eligible crop or tree.  *Id.* at 74409.

52.     When determining this payment factor, FSA conducted analysis to ensure that payments do not exceed available funding and, in aggregate across all eligible crop and tree producers, do not exceed 90 percent of losses, as required by Title I of the Disaster Relief Supplemental Appropriations Act, 2023. *Id.* at 74410.

53.     For producers applying for Track 1 with crop insurance, RMA first applied the ERP factor corresponding to the producer's crop insurance coverage level to determine the producer's loss.  RMA then subtracts any indemnities received by the producer to determine the calculated loss which is provided to FSA.

54.     To stay within the budgetary constraints, FSA also determined that it would use "progressive factoring" to the producer's calculated loss to determine the producer's payment.  Progressive factoring is a factoring system, "that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers."  *Id.* at 74410, n.4.

55.     The basic idea behind progressive factoring is that the payment factor decreases in inverse proportion to the amount of loss.  Progressive factoring is applied by payment range and FSA calculates the sum of such calculations as follows:

| Payment Range | Progressive Factor (%) |
|---|---|
| Up to $2,000 | 100% |
| $2,001 to $4,000 | 80% |
| $4,001 to $6,000 | 60% |
| $6,001 to $8,000 | 40% |
| $8,001 to $10,000 | 20% |
| Over $10,000 | 10% |

*Id.* at 74410.

56.    For example, to apply progressive factoring to an estimated ERP payment of $5,000, FSA would multiple (1) the first $2,000 by a factor of 100 percent ($2,000x100%=$2,000); (2) the second $2,000 by a factor of 80 percent ($2,000x80%=$1,600); (3) the remaining $1,000 by a factor of 60 percent ($1,000x60%=$600) for a progressive factored payment of $4,200.

57.    Progressive factoring is only applied when calculating payments for those crops with Federal crop insurance coverage.  *Id.* at 74410-74411 & n.18

58.    Progressive factoring had not previously been used by FSA for its pandemic or disaster assistance programs because funding available for previous programs was typically sufficient to cover a majority of losses and therefore did not require this new approach to factoring.

59.    Crucially, progressive factoring is calculated independent from and prior to any additional benefits added for being an underserved producer.  *Id.* at 74410.  Rather, for underserved producers, FSA simply adds the amount of the producer's Federal crop insurance premiums and fees on top of the payment amount calculated using progressive factoring at the end.  *Id.* at 74410, 74411.

60.    As the last step in calculating payments under ERP 2022, a final 75 percent payment factor is applied to all Track 1 payments to determine the producer's total factored payment for a Track 1 payment.  This final payment factor was applied to ensure payments do not exceed available funding.  *Id.* at 74411.

61.    For producers applying for Track 1 with NAP-covered crops and trees, FSA uses the ERP factor corresponding to the producer's NAP coverage level and the producer's crop production or inventory data already on file with FSA to determine the producer's loss.

14

FSA then subtracts any NAP payments received by the producer to determine their Gross NAP Crop Payment.  However, FSA does not apply a progressive payment factor to NAP covered crops because "NAP payments traditionally support smaller producers and non-traditional crops."  Id. at 74404, 74411 & n.18.

62.     ERP 2022 Track 2 is a revenue-based certification program designed to assist producers who suffered a loss in revenue resulting from 2022 calendar year eligible disasters when compared with revenue in a benchmark year. Track 2 provides assistance for eligible revenue, production, and quality losses of eligible crops not included in Track 1. *Id.* at 74411.

63.     Once a producer's benchmark year revenue is established, it is multiplied by a 90 percent factor if all acres of all eligible crops were covered by crop insurance or NAP or 70 percent if not all acres of all eligible were covered by crop insurance or NAP. Then, the producer's disaster year revenue and the sum of the producer's Track 1 payments are subtracted from the ERP factored benchmark year revenue. The result is subject to the same progressive factoring as Track 1.  *Id.* at 74414.  FSA will apply a final payment factor of 75 percent to all calculated Track 2 payments, including payments to underserved producers, to ensure payments do not exceed available funding. Id. at 74414.

64.     The final Track 2 result is multiplied by a factor of 115 percent for underserved producers.  *Id.* at n.28

65.     Under progressive factoring, every dollar of loss is treated exactly the same. This generally results in smaller farming operations receiving a benefit that was more economically significant to their operation than larger farming operations because a dollar lost for a smaller operation has a higher economic impact.  For example, in Texas, 85 percent

15

of the producers eligible for Track 1 assistance received a higher payment under the progressive factor, and 15 percent received a lower payment.

**Pandemic Assistance Revenue Program (PARP)**

66.    Section 751 of Subtitle B of Title VII of the Consolidated Appropriations Act, 2021 (CAA; Pub. L. 116–260), provided "$11,187,500,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus by providing support for agricultural producers, growers, and processors impacted by coronavirus, including producers and growers of specialty crops, non-specialty crops, dairy, livestock, and poultry, producers that supply local food systems, including farmers markets, restaurants, and schools, and growers who produce livestock or poultry under a contract for another entity[.]" Pub. L. 116-260 (2021).  FSA funded several pandemic assistance programs using the appropriated funds from the CAA, including PARP.

67.    FSA implemented PARP by issuing a final rule which provided support for eligible producers of agricultural commodities who suffered an eligible revenue loss in calendar year 2020 due to the COVID-19 pandemic and was intended to provide assistance to a wide variety of agricultural producers, including those who produced agricultural commodities that were not eligible for CFAP 1 and 2. 88 Fed. Reg. 1862 (Jan. 11, 2023).

68.    FSA applied a payment rate of 90 percent for underserved farmers and ranchers who had filed a CCC–860 certifying their status for the 2020 program year. The payment rate for all other producers was 80 percent. The PARP payment is equal to the result of that calculation minus any 2020 program year ERP payments and pandemic assistance received by the producer under other programs. *Id.*

16

**III.    Plaintiffs' Applications to the Challenged Programs**

69.    I have familiarized myself with FSA records concerning Plaintiffs' applications to each of the programs they challenge.  The general timelines of Plaintiffs' applications and FSA actions on them are as follows:

70.    Alan & Amy West Farms applied for and received the following assistance:

A.    Coronavirus Food Assistance Program 2 (CFAP 2)

- FSA disbursed $86,795.26 on December 17, 2020, and $74,448.15 on April 2, 2021.

B.    Emergency Relief Program (ERP) 2020/2021 Phase 1

- FSA disbursed $303,308.00 on June 2, 2022, $9,852.25 on June 13, 2022, and $14,614.21 on February 7, 2024.

C.    Emergency Relief Program (ERP) 2020/2021 Phase 2

- The producer did not receive any payments under this program.

D.    Emergency Livestock Relief Program (ELRP) 2021

- The producer did not apply.

E.    Emergency Livestock Relief Program (ELRP) 2022

- The producer either did not apply or was not approved for LFP for 2022, which is required for eligibility for ELRP 2022.

F.    Emergency Relief Program (ERP) 2022 Track 1

- FSA disbursed $19,402.94 on November 14, 2023.

G.    Emergency Relief Program (ERP) 2022 Track 2

- FSA disbursed $51,096.68 on March 27, 2024.

H.    Pandemic Assistance Revenue Program (PARP)

- The producer did not apply.

17

71.     Bryan Baker

    A.     Coronavirus Food Assistance Program 2 (CFAP 2)

- FSA disbursed $15,428.49 on October 30, 2020, and $10,216.20 on April 6, 2021.

    B.     Emergency Relief Program (ERP) 2020/2021 Phase 1

- FSA disbursed $61,603.50 on June 16, 2022, and $2,874.86 on February 12, 2024.

    C.     Emergency Relief Program (ERP) 2020/2021 Phase 2

- The producer did not apply.

    D.     Emergency Livestock Relief Program (ELRP) 2021

- The producer did not apply.

    E.     Emergency Livestock Relief Program (ELRP) 2022

- The producer either did not apply or was not approved for LFP for 2022, which is required for eligibility for ELRP 2022.

    F.     Emergency Relief Program (ERP) 2022 Track 1

- FSA disbursed $7,788.75 on November 17, 2023.

    G.     Emergency Relief Program (ERP) 2022 Track 2

- FSA disbursed $31,716.73 on February 20, 2024.

    H.     Pandemic Assistance Revenue Program (PARP)

- FSA disbursed $9,674.10 on December 14, 2023.

72.     Double B Farms LLC

    A.     Coronavirus Food Assistance Program 2 (CFAP 2)

- FSA disbursed $51,509.78 on October 30, 2020, and $39,808.04 on April 6, 2021.

B.    Emergency Relief Program (ERP) 2020/2021 Phase 1

- FSA disbursed $1195,762.75 on June 16, 2022, and $9,135.65 on February 12, 2024.

C.    Emergency Relief Program (ERP) 2020/2021 Phase 2

- The producer did not apply.

D.    Emergency Livestock Relief Program (ELRP) 2021

- The producer did not apply.

E.    Emergency Livestock Relief Program (ELRP) 2022

- The producer either did not apply or was not approved for LFP for 2022, which is required for eligibility for ELRP 2022.

F.    Emergency Relief Program (ERP) 2022 Track 1

- FSA disbursed $13,510.20 on November 17, 2023.

G.    Emergency Relief Program (ERP) 2022 Track 2

- FSA disbursed $76,731.25 on February 20, 2024.

H.    Pandemic Assistance Revenue Program (PARP)

- The producer did not receive any payments under this program.

73.    Rusty Strickland

A.    Coronavirus Food Assistance Program 2 (CFAP 2)

- FSA disbursed $32,436.54 on December 1, 2020, and $27,022.49 on May 6, 2021.

B.    Emergency Relief Program (ERP) 2020/2021 Phase 1

- FSA disbursed $123,867.86 on June 10, 2022, $74,727.79 on January 13, 2023, and $9,267.69 on February 7, 2024.

C.    Emergency Relief Program (ERP) 2020/2021 Phase 2

- The producer did not apply.

19

D.   Emergency Livestock Relief Program (ELRP) 2021

- FSA disbursed $3,042.00 on April 4, 2022, and $608.40 on September 28, 2023.

E.   Emergency Livestock Relief Program (ELRP) 2022

- FSA disbursed $1,545.00 on September 28, 2023.

F.   Emergency Relief Program (ERP) 2022 Track 1

- FSA disbursed $7,272.71 on December 20, 2023.

G.   Emergency Relief Program (ERP) 2022 Track 2

- As of the date of this declaration, the producer has not applied to Track 2.

H.   Pandemic Assistance Revenue Program (PARP)

- The producer did not apply.

## IV.   Funding Status of the Challenged Programs

74.   I have familiarized myself with FSA records concerning the current status of the challenged programs and the availability of funding within each of those programs.   To the best of my understanding, the status of those programs and the available funding is as follows:

### Coronavirus Food Assistance Program 2 (CFAP 2)

75.   There is $260.30 in CARES funding available, $4,401,401.03 in CAA funding available, and $107,728,102.48 CCC funding available as of March 31, 2024.   The only obligations that can be created are for errors, omissions, and appeals, where an applicant was successful through appeal, or in the case of misaction/misinformation where an application can be determined to be timely filed. Any adjudication that would require a new payment

that is not tied back to the originally approved application would be considered a new obligation and funding would not be available as it is expired.

76.     If a producer's approved application is adjudicated as being incorrectly calculated, the funding noted above would be available to apply to any application that was timely filed and approved.

### Emergency Relief Program (ERP) 2020/2021 Phase 1

77.     There is $243,502,145.57 in program funding and $646,836.62 in administrative funding available as of March 31, 2024. Funding is expired and no new obligations can be made.  The only obligations that can be created are for errors, omissions, and appeals, where an applicant was successful through appeal, or in the case of misaction/misinformation where an application can be determined to be timely filed.  Any adjudication that would require a new payment that is not tied back to the originally approved application would be considered a new obligation and funding would not be available as it is expired.

78.     If a producer's approved application is adjudicated as being incorrectly calculated, the funding noted above would be available to apply to any application that was timely filed and approved.

### Emergency Relief Program (ERP) 2020/2021 Phase 2

79.     There is $43,757,186.23 in program funding and $646,836.62 in administrative funding available as of March 31, 2024. Funding is expired and no new obligations can be made.  The only obligations that can be created are for errors, omissions, and appeals, where an applicant was successful through appeal, or in the case of misaction/misinformation where an application can be determined to be timely filed. Any adjudication that would require a

new payment that is not tied back to the originally approved application would be considered a new obligation and funding would not be available as it is expired.

80.    If a producer's approved application is adjudicated as being incorrectly calculated, funding as noted above would be available to apply to any application that was timely filed and approved.

### Emergency Livestock Relief Program (ELRP) 2021

81.    There is $20,471,546.59 in program funding and $646,836.62 in administrative funding available as of March 31, 2024. Funding is expired and no new obligations can be made.  The only obligations that can be created are in the case of errors, omissions, and appeals, where an applicant was successful through appeal, or for misaction/misinformation where an application can be determined to be timely filed. If a producer's approved application is adjudicated as being incorrectly calculated, funding as noted above would be available to apply to any application that was timely filed and approved.

82.    If a producer's approved application is adjudicated as being incorrectly calculated, funding as noted above would be available to apply to any application that was timely filed and approved.

### Emergency Livestock Relief Program (ELRP) 2022

83.    There is $108,949,096.44 in program funding and $26,721,646.98 in administrative funding available as of March 31, 2024. Funding associated with ELRP 2022 does not expire and payments may be issued until funding is exhausted.  ELRP 2022 does not require an application; payments are made based on approved LFP applications for 2022. The deadline for applying for LFP for 2022 has passed. According to Pub. Law 117-328, not more than 1 percent of the funds provided may be used for administrative costs, including for

streamlining the application process and easing the burden on county office employees, to implement the program. Administrative funding can be moved to program funding.

84.    If a producer's approved application is adjudicated as being incorrectly calculated, funding as noted above would be available to apply to any application that was timely filed and approved.

### Emergency Relief Program (ERP) 2022

85.    There is $1,630,390,589.86 in program funding and $26,721,646.98 in administrative funding available as of March 31, 2024. The ERP 2022 program is currently open for applications and payments may be issued on approved applications until funding is exhausted. To receive a payment a producer must file an application, be determined eligible for the program by the County Committee and provide all required eligibility documentation by the program application deadline.  As of the date of this declaration, a program application deadline has not yet been announced. According to Pub. Law 117-328, not more than 1 percent of the funds provided may be used for administrative costs, including for streamlining the application process and easing the burden on county office employees, to implement the program. Administrative funds can be moved to program funding.

86.    If a producer's approved application is adjudicated as being incorrectly calculated, funding as noted above would be available to apply to any application that was timely filed and approved.

### Pandemic Revenue Assistance Program (PARP)

87.    There is $12,330,245.61 in program funding available as of March 31, 2024. Program enrollment is closed, and new applications cannot be accepted.  The only obligations that can be created are for errors, omissions, and appeals, where an applicant was successful

through appeal, or in the case of misaction/misinformation where an application can be determined to be timely filed. Any adjudication that would require a new payment that is not tied back to the originally approved application would be considered a new obligation and funding would not be available as it is expired.

88.    If a producer's approved application is adjudicated as being incorrectly calculated, funding as noted above would be available to apply to any application that was timely filed and approved.

## V.    Program Funds Remain Available to Make Adjusted Benefit Payments to Plaintiffs

89.    Based upon FSA's experience administering ad hoc disaster programs, including the programs being challenged, and based on an evaluation of the funds available for certain purposes in each of the programs, as enumerated above, in my opinion there is not a serious likelihood that the funds necessary to make adjusted benefit payments to Plaintiffs under each program will be exhausted prior to the conclusion of this litigation. It would require a historic number of errors, omissions or appeals in any of these programs for the funds to be exhausted. FSA has estimated the amount of any adjusted benefit payments to Plaintiffs based upon each program's payment calculations; however, other factors may impact these preliminary calculations, such as the fact that certain programs take into account payments from other programs.  In the absence of unprecedented errors, omissions or appeals, I believe that FSA could make the following adjusted benefit payments to the Plaintiffs if they obtain a favorable decision at the conclusion of this case:

90.    Alan & Amy West Farms

A.    Coronavirus Food Assistance Program 2 (CFAP 2)

24

- It is estimated that this Plaintiff could receive an additional $24,186.51 if the 15 percent underserved producer factor is applied.

B.     Emergency Relief Program (ERP) 2020/2021 Phase 1

- It is estimated that this producer would receive an additional $49,166.09 if they received the 15 percent underserved producer factor.

C.     Emergency Relief Program (ERP) 2020/2021 Phase 2

- The Plaintiff did not receive any payment under this program, and, therefore, could not receive an adjusted payment.

D.     Emergency Livestock Relief Program (ELRP) 2021

- This Plaintiff did not apply.

E.     Emergency Livestock Relief Program (ELRP) 2022

- This Plaintiff either did not apply or was not approved for LFP for 2022, which is required for eligibility for ELRP 2022.

F.     Emergency Relief Program (ERP) 2022 Track 1

- It is estimated that this Plaintiff could receive an additional $22,860.03 to $210,010.53 depending on the selected path. Applying a flat 27 percent factor and providing no underserved producer premium and fee reimbursement will result in receipt of an additional $22,860.03. Applying a flat 27 percent factor and also providing the underserved producer premium and fee reimbursement will result in receipt of additional $210,010.53. Maintaining the existing factoring method and providing the underserved producer premium and fee reimbursement will result in receipt of an additional $187,150.50. The available payment limitation for Alan West is $88,340.20 and for Amy West is $91,160.18. Given that the amount of the estimated payment this Plaintiff could receive is greater than the available payment limitation, payments will be capped by available payment limitations.

G.     Emergency Relief Program (ERP) 2022 Track 2

- It is estimated that this Plaintiff could be required to repay $8,477.23 or could receive an additional $45,234.04 to $70,567.14 depending on the selected path. Applying a flat 27 percent factor and providing

no underserved producer premium and fee reimbursement will result in receipt of an additional $70,567.14. Applying a flat 27 percent factor and also providing the underserved producer premium and fee reimbursement will result in receipt of additional $45,234.04. Maintaining the existing factoring method and providing the underserved producer premium and fee reimbursement will result in repayment of $8,477.23. The available payment limitation for Alan West is $88,340.20 and for Amy West is $91,160.18. Given the reduced payment limitation available, payments will be capped by available payment limitation.

H.    Pandemic Revenue Assistance Program (PARP)

- This Plaintiff did not apply.

91.    Bryan Baker

A.    Coronavirus Food Assistance Program 2 (CFAP 2)

- It is estimated that this Plaintiff could receive an additional $3,846.70 if the 15 percent underserved producer differential is applied.

B.    Emergency Relief Program (ERP) 2020/2021 Phase 1

- It is estimated that this Plaintiff could receive an additional $9,671.72 if the 15 percent underserved producer factor is applied.

C.    Emergency Relief Program (ERP) 2020/2021 Phase 2

- This Plaintiff did not apply.

D.    Emergency Livestock Relief Program (ELRP) 2021

- This Plaintiff did not apply.

E.    Emergency Livestock Relief Program (ELRP) 2022

- This Plaintiff either did not apply or was not approved for LFP for 2022, which is required for eligibility for ELRP 2022.

F.    Emergency Relief Program (ERP) 2022 Track 1

- It is estimated that this Plaintiff could receive an additional $3,115.88 to $43,480.88 depending on the selected path. Applying a flat 27 percent factor and providing no underserved producer

26

premium and fee reimbursement will result in receipt of an additional $3,115.88. Applying a flat 27 percent factor and also providing the underserved producer premium and fee reimbursement will result in receipt of additional $43,480.88. Maintaining the existing factoring method and providing the underserved producer premium and fee reimbursement will result in receipt of an additional $40,364.94. Bryan Baker also receives payments as a member of Double B Farms LLC. Payments made to Bryan Baker as an individual and as a member of Double B Farms LLC are under one combined payment limitation. As a result, payments may be capped by available payment limitation.

G.   Emergency Relief Program (ERP) 2022 Track 2

- It is estimated that this Plaintiff could receive an additional $1,276.03 to $44,752.48. Applying a flat 27 percent factor and providing no underserved producer differential will result in receipt of an additional $42,952.15. Applying a flat 27 percent factor and also providing the underserved producer differential will result in receipt of an additional $44,752.48. Maintaining the existing factoring method and providing the underserved producer differential will result in receipt of an additional $1,276.03. Bryan Baker also receives payments as a member of Double B Farms LLC. Payments made to Bryan Baker as an individual and as a member of Double B Farms LLC are under one combined payment limitation. As a result, payments may be capped by available payment limitation.

H.   Pandemic Revenue Assistance Program (PARP)

- It is estimated that this Plaintiff could receive an additional $1,017.33 if the 10 percent underserved producer differential is applied.

92.   Double B Farms LLC

A.   Coronavirus Food Assistance Program 2 (CFAP 2)

- It is estimated this Plaintiff could receive an additional $13,697.67 if the 15 percent underserved producer differential is applied.

B.   Emergency Relief Program (ERP) 2020/2021 Phase 1

- It is estimated that this Plaintiff could receive an additional $30,734.69 if the 15 percent underserved producer factor is applied.

C.      Emergency Relief Program (ERP) 2020/2021 Phase 2

- This Plaintiff did not apply.

D.      Emergency Livestock Relief Program (ELRP) 2021

- This Plaintiff did not apply.

E.      Emergency Livestock Relief Program (ELRP) 2022

- This Plaintiff either did not apply or was not approved for LFP for 2022, which is required for eligibility for ELRP 2022.

F.      Emergency Relief Program (ERP) 2022 Track 1

- It is estimated that this Plaintiff could receive an additional $12,842.34 to $116,698.59 depending on the selected path. Applying a flat 27 percent factor and providing no underserved producer premium and fee reimbursement will result in receipt of an additional $12,842.34. Applying a flat 27 percent factor and also providing the underserved producer premium and fee reimbursement will result in receipt of additional $116,698.59. Maintaining the existing factoring method and providing the underserved producer premium and fee reimbursement will result in receipt of an additional $103,856.24. The available payment limitation is $159,758.55. Given the reduced payment limitation available, payments may be capped by available payment limitation.

G.      Emergency Relief Program (ERP) 2022 Track 2

- It is estimated that this Plaintiff could be receive an additional $2,552.09 to $121,702.46. Applying a flat 27 percent factor and providing no underserved producer differential will result in receipt of an additional $116,850.69. Applying a flat 27 percent factor and also providing the underserved producer differential will result in receipt of an additional $121,702.46. Maintaining the existing factoring method and providing the underserved producer differential will result in receipt of an additional $2,552.09. The available payment limitation is $159,758.55. Given the reduced payment limitation available, payments may be capped by available payment limitation.

H.      Pandemic Revenue Assistance Program (PARP)

- The Plaintiff did not receive any payment under this program, and, therefore, could not receive an adjusted payment.

28

93.   Rusty Strickland

    A.    Coronavirus Food Assistance Program 2 (CFAP 2)

- It is estimated that this Plaintiff could receive an additional $8,918.86 if the 10 percent differential is applied.

    B.    Emergency Relief Program (ERP) 2020/2021 Phase 1

- It is estimated that this Plaintiff could receive an additional $31,179.48 if the 15 percent underserved producer factor is applied.

    C.    Emergency Relief Program (ERP) 2020/2021 Phase 2

- This Plaintiff did not apply.

    D.    Emergency Livestock Relief Program (ELRP) 2021

- It is estimated that this Plaintiff could receive an additional $730.08 if the 15 percent underserved producer factor is applied.

    E.    Emergency Livestock Relief Program (ELRP) 2022

- It is estimated that this Plaintiff could receive an additional $309.00 if the 15 percent underserved producer factor is applied.

    F.    Emergency Relief Program (ERP) 2022 Track 1

- It is estimated that this Plaintiff could receive an additional $2,238.61 to $66,866.86 depending on the selected path. Applying a flat 27 percent factor and providing no underserved producer premium and fee reimbursement will result in receipt of an additional $2,238.61. Applying a flat 27 percent factor and also providing the underserved producer premium and fee reimbursement will result in receipt of additional $66,866.86. Maintaining the existing factoring method and providing the underserved producer premium and fee reimbursement will result in receipt of an additional $64,628.25.

    G.    Emergency Relief Program (ERP) 2022 Track 2

- As of the date of this declaration, this Plaintiff has not applied to Track 2.

    H.    Pandemic Revenue Assistance Program (PARP)

- This Plaintiff did not apply.

**VI.    Harm from enjoining the challenged programs**

94.    Given FSA's ability to make adjusted benefit payments to Plaintiffs based on the applications they have submitted, Plaintiffs would suffer no irreparable harm at this time absent an injunction.

95.    Plaintiffs state that they suffered irreparable injury because they relied on USDA to distribute funds through the use of a flat factor, and that they run a sizeable business for which they budget carefully. *See* Compl. ¶¶ 292-295.  However, ERP 2022 is not a permanently authorized disaster program.  Ad hoc disaster assistance is not guaranteed and even when it is authorized, the funding levels change from year-to-year depending on Congressional priorities.

96.    This is especially true given that funding and program eligibility of these ad hoc programs have varied over time.

97.    No reasonable producer would or should do any financial planning based on an assumption that an ad hoc disaster program would cover their losses entirely or even adequately as result of a natural disaster event.

98.    By contrast, the harm to USDA and the public from an injunction would be grave and immediate.

99.    As of April 23, 2024, under ERP 2022, 169,707 producers have received a total of $1,574,578,142 in funding.  As of May 3, 2024, applications are still being accepted under both Track 1 and Track 2 of ERP 2022.  The Agency expects that most producers who were eligible to apply under Track 1 based on the information that those producers had on file with FSA, have applied to the program, although there are still more than 37,000 pre-filled

30

applications outstanding as of May 3, 2024, that were sent to producers. In addition, FSA predicts an influx in applications by Track 2 applicants as tax season winds to a close because producers will have records readily available to identify reportable revenue from the 2023 tax year, which assists producers in finalizing Track 2 applications. Based on USDA estimates, FSA has only received 40 percent of the expected applications under Track 2. All of this would be disrupted by an injunction as explained below.

100.    The application deadlines for all other programs challenged in this litigation have passed. However, any outstanding errors, omissions, and timely-filed appeals are still being addressed, and an injunction would disrupt that process.

*Enjoining consideration of socially disadvantaged status*

101.    Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction requests that the Court stay or enjoin the Agency from "making or increasing payments or providing any extra relief based on the 'socially disadvantaged,' *i.e.*, race- and sex-based, category." (Pls. Br. at 24). It is unclear on its face whether Plaintiffs intend the scope of this request to be limited to the programs challenged in the litigation. The Agency has interpreted the request to be so limited due to Plaintiffs' statement in the same section regarding their request being an attempt to allow "the Programs" to continue. (*Id.*) In the alternative, Plaintiffs request that the Court "enjoin[] Defendants or stay[] the programs in whole."

102.    Plaintiffs' Proposed Order (Pls. Mot. at 6), if entered, is much broader than the relief sought in Plaintiffs' Memorandum. The Proposed Order seeks to enjoin USDA as a whole "from using race, sex, or progressive factoring when administering disaster and pandemic programs, including but not limited to [the Programs]" challenged in the litigation. The Agency addresses the potential harm from an injunction specific to the challenged

programs at issue in this litigation. If the scope of the injunction were expanded, these harms would only increase.

103.    Such an injunction would hamper the Agency's ability to refund Federal crop insurance and NAP premiums and fees under Track 1 to socially disadvantaged producers and enjoin any increase to Track 2 payments for socially disadvantaged producers. This would likely result in at least a temporary halt of ERP 2022 program payments and inflict harm on all producers eligible under the program who have not yet applied or those who have applied but have not yet been approved or been issued a payment.

104.    If a preliminary injunction directed the Agency to stop consideration of socially disadvantaged producer status in accordance with the terms of the NOFA, the Agency would need to halt program operations to modify policy and program software that is used to process and administer the program and retrain Agency staff, resulting in an additional draw down of ERP 2022 administrative funds and a halt of issuing all program payments while this administrative process was completed.

105.    FSA employs fully automated software solutions in order to ensure consistent program delivery to all FSA field offices. The automated software is used by field office staff to administer FSA programs to producers quickly and effectively. FSA has multiple categories of software: Common, Application, and Payment. Common software is used to record basic customer data, farm records, and producer eligibility. Application software is used to record a producer's program application. Payment software is used to calculate and disburse payments to producers. All of the FSA systems are interconnected so that when a producer applies for a program, the program application software is able to retrieve all common data for the producer to enable a complete application for the program. The payment

software retrieves common data and application data in order to accurately calculate a program benefit. If a preliminary injunction directed the Agency to stop consideration of socially disadvantaged producer status in accordance with the terms of the NOFA, FSA would need to make changes to Common, Application, and Payment systems. System changes involve requirements gathering, system development, and system testing. These three steps would need to be completed for multiple Common, Application, and Payment systems.

106.    Based on FSA's experience, it is estimated that this process would take months to complete and will require increased human capital and budgetary resources on both the program side and the information technology side.

107.    Undertaking this process would result in a total halt of regular Agency operations for ERP 2022.  USDA does not know the feasibility of updating software and program processes while continuing to provide refunds of premiums and fees and higher payments to veteran, limited resource, and beginning farmers and ranchers, the other underserved producer groups that are not race- or sex-based categories. Modifying program software and retraining Agency staff will result in an additional draw down of ERP 2022 administrative funds and a halt of issuing all program payments while this administrative process was completed.

108.    The Agency would similarly have to halt consideration of errors, omissions, and timely-filed appeals in all other challenged programs, while the Agency implements any required changes to those programs.

*Enjoining progressive factoring*

109.    Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction requests that the Court stay or enjoin the Agency from "making any payments that are larger

33

than they would otherwise be absent progressive factoring." (Pls. Br. at 24)  In the alternative, Plaintiffs request that the Court "enjoin[] Defendants or stay[] the programs in whole."

110.    Plaintiffs' Proposed Order (Pls. Mot. at 6), if entered, is much broader than the relief sought in Plaintiffs' Memorandum.  The Proposed Order seeks to enjoin USDA as a whole "from using race, sex, or progressive factoring when administering disaster and pandemic programs, including but not limited to [the Programs]" challenged in the litigation. However, progressive factoring has only been used by the Agency in ERP 2022, which is what I address in this section.

111.    Enjoining the use of progressive factoring in ERP 2022 entirely would require the Agency to halt all payments under the program.  This would severely impact applicants who have not yet applied or who have applied, but not yet been issued payments, as these applicants would face a delay of unknown length in receiving congressionally-approved and much-needed disaster assistance.

112.    Enjoining the Agency from making any payments that are larger than they would otherwise be absent progressive factoring would require FSA to cap all payments at what they would have been had flat factor been applied.  If a flat factor had been applied, the factor would have been 27 percent based on Agency estimates.  This would require the Agency to modify policy and program software, and retrain Agency staff, resulting in additional delays and draw downs of ERP 2022 administrative funds.

113.    While the injunction is in place, this would decrease payments for the approximately 82 percent of eligible recipients who receive greater benefits under progressive factoring than if a flat factor had been applied.

114.    Those 82 percent of producers represent smaller producers, less able to withstand disaster impacts as their larger counter parts and who are also less likely to purchase crop insurance.  Progressive factoring is intended to provide a greater proportion of limited funding to smaller producers.

115.    The approximately 18 percent of producers that did receive a smaller benefit as a result of the progressive factoring in ERP, receive on average of 10 times the amount of federal assistance available to their smaller counterparts.

116.    While the largest operations did not receive the same level of ERP 2022 benefit proportionally to their losses like they did in ERP 2020 and 2021, these producers are more likely to participate in risk management programs, such as Federal crop insurance and FSA's NAP.  These producers also receive indemnities that are larger and benefit from larger crop insurance subsidies. The combination of indemnity and progressively-factored emergency relief payments represent a balanced investment in all producers. Enjoining progressive factoring therefore disproportionately impacts the ability of smaller producers to recover from disasters.

117.    This puts the declining number of smaller American agricultural producers at further risk of ceasing operation, leading to greater consolidation in the face of increasingly severe weather events.  If progressive factoring is enjoined entirely, the Agency would need to halt further payments under ERP 2022 during the pendency of the litigation.  The loss of even a flat-factored payment to agricultural producers will likely lead to irreversible financial harm to these operations.

118.    The additional time needed to implement policy and software changes, complete related analysis, and process updated payments is likely to take months, further

delaying critical 2022 emergency relief to affected participants under even a more limited preliminary injunction.   If the Agency is enjoined entirely from the use of progressive factoring, the Agency would need to halt implementation of ERP 2022, impacting all eligible producers who have not yet received assistance.

*Harm of injunction generally:*

119.   Both an injunction on the use of socially disadvantaged status in calculations and the use of progressive factoring would require the Agency to expend limited disaster assistance resources on restructuring the program, retraining staff, and developing and implementing software changes, if it remains viable to continue to make payments under ERP 2022.

120.   This would immediately halt the delivery of program funds to producers who suffered uncovered losses, which are losses not covered by Federal crop insurance or NAP, stopping ERP 2022 program payments for an unknown period of time at the same time as FSA is expecting an influx of applications under Track 2 by disaster-impacted producers. Further delaying critical emergency relief directly impacts the sustainability of vulnerable operations and limits their ability to make time sensitive planting and risk management decisions that require financial resources.

121.   Delaying payment in this way would contradict the Congressional intent of expediting providing disaster funding to agricultural producers on whom American national and food security rely.

122.   Any injunction would impede the Agency's ability to effectively deliver disaster programs to all producers, which comes at a high cost to producers and the sustainability of American agriculture.

123.    Any injunction will likely disproportionately impact Track 2 producers who are less likely to have Federal crop insurance or NAP coverage, making ERP 2022 assistance all the more crucial for the continuing viability of their operations.

124.    The Agency received $3.2 billion in available funding for an estimated $11 billion in uncovered crop losses due to disaster.  Halting this already-limited necessary assistance for any length of time will cause severe impacts to eligible producers who have not yet applied or received assistance.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated: May 3, 2024                    _____

                                      Zachary W. Ducheneaux