IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

RUSTY STRICKLAND, *et al.*,

      Plaintiffs,

v.

                              2:24-CV-60-Z

THE UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for Preliminary Injunction or, in the Alternative, Relief under 5 U.S.C. Section 705 ("Motion") (ECF No. 10), filed April 5, 2024. For the reasons explained below, the Court **GRANTS** the Motion **IN PART**.

Plaintiffs complain of eight United States Department of Agriculture ("USDA") Programs, but only Emergency Relief Program 2022 ("ERP 2022") is active. Pending resolution of this lawsuit and as to Plaintiffs, Defendants are **ENJOINED** under ERP 2022 from making or increasing payments, or providing any additional relief, based on its "socially disadvantaged farmer or rancher" designation, whether used directly or as a subset of its "underserved farmer or rancher" designation. Defendants may still apply progressive factoring on future relief applications if done independently of the protected classes "race" and "sex."

### BACKGROUND

Congress, through a series of legislative acts, provided billions of dollars in disaster relief to American farmers. *See, e.g.*, Title I of the Disaster Relief Supplemental Appropriations Act, 2023 (Division N of the Disaster Relief Supplemental Appropriations Act, 2023; Pub. L. 117–328, 136 Stat. 5201) (providing $3.74 billion in disaster relief to remain available until

expended). The Farm Service Agency ("FSA") of the USDA has issued eight Notices of Funds Availability ("Programs") to facilitate payments to eligible farmers.[1]

The Programs allocated more relief funds[2] to "socially disadvantaged farmers," which the regulations define to include: (1) American Indians or Alaskan Natives; (2) Asians or Asian-Americans; (3) blacks or African-Americans; (4) Hispanics or Hispanic-Americans; (5) Native Hawaiians or other Pacific Islanders; and (6) women.[3] The USDA admits that these Programs benefit "women and minority farmers" to the detriment of white male farmers because doing so "reflects the agency's interest and goal of remedying the persistent effects of past discrimination . . . ." ECF No. 21 at 13; *see id.* at 15 (citing legislative history to claim that these farmers had "more difficulty getting loans and credit from USDA," "were in a far more precarious financial situation" compared to white male farmers, and that a disproportionate number of black, Hispanic, Asian-American, and indigenous farmers "were in default on their direct loans").

---

[1] Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) (ELRP 2021 Phase 1), 87 Fed. Reg. 19465 (Apr. 4, 2022); Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP 2021 Phase 2), 88 Fed. Reg. 66366 (Sept. 27, 2023); Notice of Funds Availability; Emergency Relief Program (ERP) (ERP 2021 Phase 1), 87 Fed. Reg. 30164 (May 18, 2022); Pandemic Assistance Programs and Agricultural Disaster Assistance Programs, Subpart S — Emergency Relief Program Phase 2 (ERP 2021 Phase 2), 88 Fed. Reg. 1862 (Jan. 11, 2023) (codified at 7 C.F.R. § 760.1901); Subpart D — Pandemic Assistance Revenue Program (PARP), *id.* at 1877 (codified at 7 C.F.R. § 9.302); Subpart C — Coronavirus Food Assistance Program 2 (CFAP 2), *id.* (codified at 7 C.F.R. § 9.201); Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022 (ELRP 2022), 88 Fed. Reg. 66361 (Sept. 27, 2023); Notice of Funds Availability; Emergency Relief Program (ERP) 2022, 88 Fed. Reg. 74404 (Oct. 31, 2023).

[2] The challenged programs distribute more money or provide preferential treatment. For example, under ELRP 2021 Phases 1 and 2 and ELRP 2022, USDA paid socially disadvantaged farmers 20 percent more than non-underserved farmers. Under ERP 2021 Phase 1, USDA paid socially disadvantaged farmers 15 percent more than non-underserved farmers. 87 Fed. Reg. at 30169. Under ERP 2021 Phase 2, USDA paid socially disadvantaged farmers using a 15 percent greater differential. 7 C.F.R. § 760.1905(d). Under PARP, USDA paid socially disadvantaged farmers 12.5 percent more than non-underserved farmers. *Id.* §§ 9.306(a)(1)(iii)(A)–(B). Under CFAP 2, USDA made an additional payment equal to 15 percent of the original amount that went to socially disadvantaged farmers but not to non-underserved farmers. *Id.* § 9.203(p). And under ERP 2022, USDA (1) refunded insurance payments to socially disadvantaged farmers but not to non-underserved farmers; (2) exempted those insurance payments from a large reduction that it applied to other payments; and (3) paid socially disadvantaged farmers 15 percent more. 88 Fed. Reg. at 74410, 74414.

[3] 87 Fed. Reg. at 19467; 88 Fed. Reg. at 66369; 87 Fed. Reg. at 30166; 88 Fed. Reg. at 1886; *id.* at 1879; *id.* at 1877; 88 Fed. Reg. at 66363; 88 Fed. Reg. at 74408.

Plaintiffs are the farmers and entities to whom the USDA denied disaster relief money based on their race and sex. ECF No. 11 at 15. In most cases, the USDA denied Plaintiffs between 10 and 20 percent in Program payments. *See, e.g.*, ECF No. 10-1 ¶ 15 (Rusty Strickland declaration). But in other cases, they were excluded from additional payments, *id.* ¶ 14, and under the most recent Program, Plaintiffs each received only a tenth of what they otherwise would have received had they been of a different race or sex, *id.* ¶ 20.

This ten-to-one disparity is a notable development in the USDA's most recent program, ERP 2022. Notice of Funds Availability; Emergency Relief Program, 88 Fed. Reg. 74404 (Oct. 31, 2023). That Program employs "progressive factoring" as opposed to a "flat rate" for remunerating disaster losses. Under a flat-rate model, for example, the FSA paid 90 percent of losses to socially disadvantaged farmers and a flat 75 percent of losses to white male farmers. Notice of Funds Availability; Emergency Livestock Relief Program (ELRP 2021 Phase 1), 87 Fed. Reg. 19465, 19466 (Apr. 4, 2022). Under a progressive-factoring model, by contrast, farmers losing more recover less, while farmers losing less recover more. So, a farmer claiming losses of up to $2,000 may recover 100 percent of that loss, while a farmer claiming losses over $10,000 may recover only 10 percent of that loss. 88 Fed. Reg. at 74410.

The FSA exempted refunds of insurance premiums from progressive factoring — a relief determination made on the basis of race and sex. *See id.* ("For underserved producers, the producer's share of the Federal crop insurance administrative fee and premium will be added to the resulting sum."); *id.* at 74408 ("*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, *socially disadvantaged farmer or rancher*, or veteran farmer or rancher.") (emphasis added); *see also id.* at 74410, n.15 ("Providing a refund of underserved producers' premiums and fees supports the equitable administration of FSA

3

programs by targeting limited resources to support underserved farmers and ranchers, who are more likely to lack financial reserves and access to capital . . . ."); ECF No. 10-1 ¶ 20 (explaining that Mr. Strickland received $7,272.71 for his half, but Mrs. Strickland received $71,900.96, a difference based on insurance premium refunds).

Plaintiffs' instant Motion seeks preliminary relief or, in the alternative, relief under 5 U.S.C. Section 705 on the following bases: (1) race and sex discrimination in violation of the Fifth Amendment; (2) the USDA lacked authority to discriminate on the basis of race and sex under the major questions doctrine; and (3) the USDA's progressive-factoring model is arbitrary and capricious. ECF No. 11 at 18–30. Defendants chiefly respond that Plaintiffs have suffered no irreparable injury, and in any event, the Programs are either race- and sex-neutral or otherwise justified. ECF No. 21 at 16–44.

### LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood that they will ultimately prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to them outweighs whatever damage the proposed injunction may cause Defendants; and (4) that granting the injunction is not against the public interest. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

### ANALYSIS

It is a "well established principle governing the prudent exercise of [the Supreme Court's] jurisdiction that normally [it] will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia Cty. v. McMillan*, 466 U.S. 48, 51

(1984); *Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016). Plaintiffs argue that ERP 2022, *inter alia*, is arbitrary and capricious, implicates the major questions doctrine, and violates the Equal Protection Clause of the Fifth Amendment.

## I.   The eight challenged Programs are not arbitrary and capricious and do not implicate the major questions doctrine.

The Administrative Procedure Act ("APA") precludes judicial review of an agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). That is especially true when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). The Fifth Circuit clarifies, however, that *Heckler* applies, "if at all, to one-off agency enforcement decisions rather than to agency rulemakings." *Texas v. Biden*, 20 F.4th 928, 984  (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528, 2548 (2022). Because ERP 2022 is a rule that promulgates progressive factoring, *inter alia*, it is reviewable. *See* 5 U.S.C. § 551(4) (defining "rule").

### A.   Progressive factoring is not arbitrary and capricious.

To satisfy arbitrary-and-capricious review, the USDA must "articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (quotations omitted). Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness . . . ." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Plaintiffs complain only that ERP 2022's progressive factoring — not its designation of "socially disadvantaged farmers" — is arbitrary and capricious. ECF No. 11 at 27. Because progressive factoring is a shift from prior flat-rate relief models, Plaintiffs argue that Defendants

5

needed — but failed — to explain in detail how this change accounts for serious reliance interests on the prior model. *Id.* (citing *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009)).

> ERP 2022 provides:

> Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding to smaller producers.

88 Fed. Reg. at 74410, n.14. This explanation, per Plaintiffs, fails to consider their serious reliance interests on the prior flat-rate model such that progressive factoring cannot withstand arbitrary-and-capricious review. ECF No. 11 at 28. But Plaintiffs are unavailing because the flat-rate rule never engendered "serious reliance interests that must be taken into account." *Fox TV*, 556 U.S. at 515.

The "reliance interests" Plaintiffs invoke concern party reliance on an agency's prior statutory interpretation. *See id.* (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996) (explaining that a "change that does not take account of legitimate reliance on prior interpretation . . . may be arbitrary, capricious [or] an abuse of discretion" (citations omitted))). But here, Plaintiffs' stated reliance interests involve the means of remuneration subject to agency discretion. This distinction makes a difference because the USDA consistently changes flat-rate relief on an *ad hoc* basis, ECF No. 21 at 35, while an agency's statutory interpretation is fixed until changed. A flat-rate relief model, thus, does not engender the sort of reliance interests at issue in *Fox TV* and *Smiley*.

Plaintiffs' inability to articulate concrete reliance interests illustrates the point. They proffer "reliance on USDA's past practice of simply paying farmers directly proportionate to their losses and refunding insurance premiums." ECF No. 11 at 28. Because "Plaintiffs run

sizable businesses for which they budget carefully . . . . USDA owes them a reasoned explanation that considers their reliance interests." *Id.* While Plaintiffs might *anticipate* disaster relief, the *ad hoc* nature of these Programs forecloses specific budgeting — and hence, concrete reliance interests.

The Programs are *ad hoc* because "they are always subject to Congressional appropriations," meaning that "when Congress provides adequate funding, USDA can extend greater benefits to farmers." ECF No. 21 at 35. But when "Congressional appropriations are more limited, USDA must determine how to allocate these limited resources — and those decisions are necessarily unique to each program and context-specific." *Id.* For example, under a recent Pandemic Assistance Revenue Program, the USDA received 38,500 applications triggering nearly $7 billion in relief payments. *Id.* In that case, the USDA applied a flat 9.5 percent payment factor to all payments. *See* USDA to Begin Issuing Pandemic Assistance Revenue Program Payments, https://perma.cc/4A5Y-S8WX (Dec. 13, 2023). And payment factors are just one USDA tool for budgeting its programs — it also uses payment caps and other eligibility qualifications. ECF No. 21 at 35.

Turning back to ERP 2022, then, "progressive factoring does not reflect a change in any consistent payment calculation policy — payment terms always vary." *Id.* at 35–36. Accordingly, "[n]o reasonable producer can or should do any sort of financial planning based on the assumption that an ad hoc disaster program that depends entirely on Congressional funding will cover their losses entirely or adequately." *Id.* at 36. Thus, to the extent Plaintiffs could articulate the proper kind of reliance interests relevant to arbitrary-and-capricious review — they cannot — they cannot reasonably have relied on past Programs because they allocate *ad hoc* relief based on available funding.

Therefore, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better . . . ." *Fox TV*, 556 U.S. at 515. Here, Title I of the Disaster Relief Supplemental Appropriations Act, 2023 provided $3,741,715,000 in a lump sum "to remain available until expended, for necessary expenses related to losses of revenue, quality, or production losses of crops" under such terms and conditions "as determined by the Secretary." Pub. L. 117–328, 136 Stat. at 5201. The USDA was well within its discretion to apply progressive factoring to "ensure[] the limited available funding is distributed in a manner benefitting the majority of producers rather than a few." 88 Fed. Reg. at 74410, n.14. This policy of distributing less to more farmers satisfies the low threshold *Fox TV* imposes on agencies. So, based on the foregoing, progressive factoring easily satisfies arbitrary-and-capricious review under the APA.

**B.   Progressive factoring does not implicate the major questions doctrine.**

Neither does progressive factoring implicate the major questions doctrine. That doctrine applies only in "extraordinary cases" involving "decisions of vast economic and political significance" or assertions of "extravagant statutory power over the national economy" or of "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022) (quotations omitted). And it is relevant only when an agency action involves a "novel" or "unprecedented" interpretation of regulatory authority involving "ancillary" statutory provisions." *Id.* at 716.

The major questions doctrine is not at issue here. First, Plaintiffs do not even address the scale of ERP 2022's relief to women and minorities. *See* ECF No. 21 at 37 (explaining that "the modest benefits afforded to socially disadvantaged farmers do not have the scale or effect necessary" to qualify as an "extraordinary case"); *see* Pub. L. 117–328, 136 Stat. at 5201

8

(appropriating only $3.74 billion in disaster relief — a number which, as Plaintiffs admit, is significantly lower compared to previous years). Second, the USDA's "socially disadvantaged farmer" designation, while constitutionally problematic, is neither novel nor unprecedented. On the contrary, "[i]t has been used in USDA's programs for roughly 20 years. And its use in disaster relief programs is far from unprecedented — Plaintiffs themselves have identified eight recent programs using this designation." ECF No. 21 at 37.

In summary, it is not likely at this stage that any of the eight challenged Programs implicates the major questions doctrine. Neither is progressive factoring likely arbitrary and capricious under the APA. The constitutional question before the Court, therefore, remains the only ground for relief, so the Court must now address it. *McMillan*, 466 U.S. at 51.

## II. Plaintiffs present a substantial case on the merits and are likely to succeed on their Equal Protection claim.

When "(1) 'a *serious legal question* is involved' and (2) 'the balance of equities weighs *heavily* in favor of granting the stay,'" a "movant need only present a substantial case on the merits." *Tex. Democratic Pty. v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020) (emphasis original) (quoting *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001)); *see also Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (preliminary injunction).

### A. The USDA racially discriminated in violation of the Fifth Amendment.

"It is a sordid business, this divvying us up by race," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring), and consistent Supreme Court precedent bears little tolerance for the practice, *see Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 748 (2007) ("The way to stop discrimination on the

9

basis of race is to stop discriminating on the basis of race."); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (SFFA), 143 S. Ct. 2141, 2161 (2023) ("Eliminating racial discrimination means eliminating all of it."). That is because, as applied to the individual, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 2162–63 (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). As applied to the political body, "[w]ithout this principle of equal justice . . . there is no republican government and none that is really worth maintaining." *SFFA*, 143 S. Ct. at 2159 (quotation omitted). The Fifth Amendment precludes such maladies. *Adarand Constructors v. Peña*, 515 U.S. 200, 217 (1995).

Race-based classifications are presumptively unconstitutional. To overcome that presumption, the USDA must satisfy the "daunting two-step examination" of strict scrutiny. *SFFA*, 143 S. Ct. at 2162; *see also Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) ("[T]he moral imperative of racial neutrality is the driving force of the Equal Protection Clause, and racial classifications are permitted only as a last resort.") (internal marks omitted). First, the USDA must demonstrate that favoring one race over another is used to "further compelling government interests." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). Second, it must show that its "use of race is 'narrowly tailored' — meaning 'necessary' — to achieve that interest." *SFFA*, 143 S. Ct. at 2162 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013)).

### 1.    ERP 2022 discriminates on the basis of race.

Before applying strict scrutiny, we must determine to what extent, if at all, the USDA discriminated on the basis of race. Plaintiffs complain, *inter alia*, that ERP 2022 employs progressive factoring and refunds insurance premiums and fees based, in part, on race. *See* 88 Fed. Reg. at 74410, n.15 (providing justification for insurance refunds to socially

10

disadvantaged farmers). The USDA responds that progressive factoring does not discriminate based on race or sex, ECF No. 21 at 31–32, and that USDA's choice to designate socially disadvantaged farmers based on race otherwise satisfies strict scrutiny, *id.* at 37–44.

The USDA correctly explains that progressive factoring, considered apart from how ERP actually applies it, does not discriminate on the basis of race. ERP 2022 is the first Program to employ "progressive factoring" when remunerating disaster losses. 88 Fed. Reg. at 74410. Put simply, the more a claimant loses, the less he receives, while the less he loses, the more he receives. *See id.* (providing a table to illustrate this inverse-remuneration principle). And this determination alone is race-neutral.

As part of an overall scheme in ERP 2022, however, progressive factoring is not race-neutral.[4] As the USDA explains, "[f]or underserved farmers, which includes farmers who are socially disadvantaged, FSA adds the farmer's share of their federal crop insurance premiums and fees to the progressive factored sum." ECF No. 21 at 32. "Thus, and after applying progressive factoring, an underserved farmer's Track 1 calculation is multiplied by 115% (before applying an additional flat 75% factor across the board)." *Id.* In short, ERP 2022 applies progressive factoring to all farmers first and then exempts underserved farmers — including socially disadvantaged farmers — from its adverse consequences. *See* 88 Fed. Reg. at 74414, n.15 ("Underserved producers will receive an increase to their Track 2 payment that is equal to 15 percent of the gross Track 2 payment after progressive factoring not to exceed the calculated Track 2 payment before progressive factoring.").

---

[4] *See* 88 Fed. Reg. at 74408 (defining "socially disadvantaged farmers" as: (1) American Indians or Alaskan Natives; (2) Asians or Asian-Americans; (3) blacks or African-Americans; (4) Hispanics or Hispanic-Americans; (5) Native Hawaiians or other Pacific Islanders; and (6) women).

Neither is ERP 2022's refund of insurance premiums and fees race-neutral, irrespective of progressive factoring. The Program explains that "[f]or underserved farmers, the producer's share of the Federal crop insurance administrative fee and premium will be added to the resulting sum," *id.* at 74410, meaning that socially disadvantaged farmers secure more refunds under the program than white male farmers. This disparity, the USDA explains, "supports the equitable administration of FSA programs by targeting limited resources to support underserved farmers and ranchers," because they "are more likely to lack financial reserves and access to capital to invest in future risk protection while coping with losses due to unexpected events outside of their control." *Id.*

In summary, there is little question that ERP 2022, which is an ongoing program, is racially discriminatory. First, ERP 2022 applies progressive factoring, hurting farmers claiming large losses, and then exempts certain races from the adverse consequences. Second, ERP 2022 refunds insurance premiums and fees for certain races because the USDA believes that those races, *qua* race, are "more likely to lack financial reserves and access to capital . . . ." *Id.*

### 2. The USDA lacks a compelling interest to racially discriminate.

The Supreme Court has "identified only two compelling interests that permit resort to race-based government action. One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute."[5] *SFFA*, 143 S. Ct. at 2162. This interest has three components. *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021). First, "[i]t cannot rest on a 'generalized assertion that there has been past discrimination in an entire industry.'" *Id.* (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989)). "Second, there must

---

[5] The second, "avoiding imminent and serious risk to human safety in prisons," is not relevant here. *SFFA*, 143 S. Ct. at 2162 (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)).

be evidence of *intentional* discrimination in the past." *Vitolo*, 999 F.3d at 361 (emphasis original) (citing *Croson*, 488 U.S. at 503). "Third, the government must have had a hand in the past discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361. Importantly, "alleviat[ing] the effects of societal discrimination is not a compelling interest." *Id.* (quoting *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996)).

The USDA argues that it has a compelling interest in "minimizing and remediating the effects of [past] discrimination." ECF No. 21 at 38. It claims a "strong basis in evidence to conclude that race-based action is necessary to remedy the discrimination that has stunted the success of socially disadvantaged farmers." *Id.* It finds this "strong basis" in only one study, which "found farms owned by socially disadvantaged persons still operate fewer acres, earn lower net farm income on average, are less likely to specialize in cash grains, are more likely to hold loans for their farm business than non-Hispanic [w]hite, male-owned, and high-sales farms, respectively." *Id.* at 39 (citing Todd, Jessica E. et al., *An Overview of Farms Operated by Socially Disadvantaged, Women, and Limited Resource Farmers and Ranchers in the United States*, Washington, D.C.: Economic Research Service, U.S. Department of Agriculture, 2024) (2024 SDFR Overview).

Minimizing past discrimination here is not a compelling interest. First, no portion of the 2024 SDFR Overview identifies discriminatory actions taken by the USDA or in any way links them to its statistical findings. Second, it finds that white farmers are at a *greater* financial risk than Hispanic farmers in three out of four metrics and are at a greater financial risk than non-Hispanic, socially disadvantaged farmers in two out of four metrics. 2024 SDFR Overview at 18. Third, given that the study was published in February 2024, while ERP 2022 was published on October 31, 2023, the USDA cannot have used it in crafting these regulations. *See SEC v. Chenery*

*Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

The Court also notes that the USDA's justifications for "socially disadvantaged" benefits programs consistently fail when challenged in court. *See, e.g., Holman v. Vilsack*, No. 21-1085, 2021 WL 2877915 (W.D. Tenn. Jul. 8, 2021); *Miller v. Vilsack*, No. 21-CV-0595, 2021 WL 11115194 (N.D. Tex. Jul. 1, 2021); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271 (M.D. Fla. 2021); *Faust v. Vilsack*, 519 F. Supp. 3d 470 (E.D. Wis. 2021). In these cases, courts have found that the USDA "put[] forward no evidence of intentional discrimination . . . in at least the past decade." *Miller*, 2021 WL 11115194, at *9. Only the opposite has occurred since then. *See* Inflation Reduction Act of 2022, Pub. L. 117-169, § 22007(e), 136 Stat. 1818, 2022–23 (providing an additional outlay in 2022 of $2.2 billion for farmers who allegedly suffered USDA discrimination). In short, the USDA cannot carry its burden to demonstrate a compelling interest in its racially discriminatory Programs.

### 3.    The USDA's relief was not narrowly tailored.

Even if it could establish a compelling interest, the ERP 2022 did not narrowly tailor its relief. Narrow tailoring requires the government to show "that no workable race-neutral alternatives" would achieve the compelling interest. *Fisher*, 570 U.S. at 312. An over- or under-inclusive policy, therefore, fails narrow tailoring. *Croson*, 488 U.S. at 507–508. "It doesn't matter if it's the easiest, most administrable, most well-intentioned program in the world — it cannot be based on race if it is not strictly necessary to achieve the relevant compelling interest." *Nuziard v. Minority Bus. Dev. Agency*, No. 23-CV-0278, 2024 WL 965299, at *37 (N.D. Tex. Mar. 5, 2024) (Nuziard II) (citing *Fisher*, 570 U.S. at 312).

The USDA argues that its alleged compelling interest is narrowly tailored in these Programs because they are: (1) necessary; (2) flexible and time-limited; (3) fair to third parties; and (4) neither over- nor under-inclusive. ECF No. 21 at 40–44.

These arguments fail. First, the USDA could serve the same racial groups through extant race-neutral alternatives. For example, the "underserved farmer" classification includes the race-based socially disadvantaged farmers alongside new and low-income farmers. 88 Fed. Reg. at 74408. But ERP 2022 conflates the latter two categories with the former racial groups. *See id.* at 74410, n.15 (targeting extra relief to underserved farmers because they are "more likely to lack financial reserves and access to capital" and run "vulnerable and smaller operations"). Because the USDA could have addressed its alleged racial inequities through a "workable race-neutral alternative," *Fisher*, 570 U.S. at 312, its racial classification system cannot survive.

Second, the racial classification system is both over- and under-inclusive. It's over-inclusive because the USDA provides additional relief to farmers of its preferred races absent any showing that they *needed* additional relief. *See Miller*, 2021 WL 11115194, at *9 (finding USDA's loan forgiveness program overinclusive because it gave benefits to those who "may never have experience discrimination or pandemic-related hardship"). It's under-inclusive because it will deny additional aid to farmers not of the USDA's preferred races who are in danger of financial ruin. *See SFFA*, 143 S. Ct. at 2210 (Gorsuch, J., concurring) ("Where do these boxes come from? Bureaucrats."). "Jewish-Americans," for example, "are excluded despite a well-documented history of discrimination; the same is true of Italian-Americans, Irish-Americans, Slavic-Americans, and Arab-Americans." ECF No. 11 at 21. "Yet an ethnic South Korean or Nigerian who arrived in 2020 receives enhanced benefits." *Id.* at 21–22; *see Vitolo*, 999 F.3d at 364 ("[Those from] Pakistan and India qualify for special treatment. But those from

15

Afghanistan, Iran, and Iraq do not. Those from China, Japan, and Hong Kong all qualify. But those from Tunisia, Libya, and Morocco do not. This scattershot approach does not conform to the narrow tailoring strict scrutiny requires.").

Third, prioritizing certain races in the "socially disadvantaged" benefits negatively impacts third parties. Not so, the USDA argues, because these unequal benefits "do[] not impose an impermissible burden on white male farmers, who continue to receive the vast majority of agricultural funding, nor burden Plaintiffs specifically." ECF No. 21 at 42. That claim is untrue. One of the Plaintiffs, for example, received one tenth of what he otherwise would have received had he been a woman. *See* ECF No. 10-1 ¶ 20 (explaining that Mr. Strickland received $7,272.71 for his half, but Mrs. Strickland received $71,900.96, based on insurance premium refunds).

To summarize, the challenged programs invite strict scrutiny because they overtly discriminate on the basis of race. And they fail strict scrutiny because the USDA cannot identify a compelling interest to racially discriminate. Even if it could, such racial discrimination fails the strict requirements of narrow tailoring. The challenged Programs, therefore, are likely to violate the Fifth Amendment on the merits.

### B. The USDA discriminated based on sex in violation of the Fifth Amendment.

Just like racial discrimination, sex discrimination is presumptively invalid under the Constitution. *United States v. Virginia*, 518 U.S. 515, 531 (1996). "Successful defense of legislation that differentiates on the basis of gender, we have reiterated, requires an 'exceedingly persuasive justification.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *Virginia*, 518 U.S. at 531). To justify sex-based classification, the USDA must prove that (1) it serves "important governmental objectives" and (2) it is "substantially and directly related" to such objectives. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 730 (1982)

(quotation marks omitted). The USDA admits that its Programs discriminate based on sex, *see supra* at Section II.A.1, so the only question is whether it can survive intermediate scrutiny.

It cannot. First, the USDA advances a generalized desire to remedy alleged inequities, 88 Fed. Reg. at 74410, n.15, which is insufficient under the Fifth Amendment. *See Vitolo*, 999 F.3d at 364 (stating that "general claims of societal [sex] discrimination are not enough") (citing *Hogan*, 458 U.S. at 727–29). Second, as with its race discrimination, the over- and under-inclusive nature of the benefits to women conflicts with the USDA's stated goal. "Women who do not need additional assistance received it." ECF No. 11 at 22. And "[w]omen who arrived in the United States recently and thus — unless USDA believes it still discriminates against women today — could not have suffered discrimination at USDA's hands received it." *Id.* Further, entities like Plaintiff Alan and Amy West were arbitrarily denied additional disaster relief because Amy West, a woman, owns only 48 percent of the joint venture. ECF No. 10-3 ¶ 18. The USDA falters under intermediate scrutiny, and therefore its challenged Programs are likely to violate the Fifth Amendment on the merits.

### III.     Plaintiffs suffer irreparable harm.

A "loss of constitutional freedoms even for minimal periods of time . . . unquestionably constitutes irreparable injury." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (internal marks omitted). That is because "racial classifications cause 'stigmatic harm.'" *Nuziard II*, 2024 WL 965299, at *45 (quoting *Croson*, 488 U.S. at 722); *see Shaw*, 517 U.S. at 908 (stating that "a racial classification causes fundamental injury to the individual rights of a person.") (internal marks omitted). These stigmatic harms are ongoing because "[t]he badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself . . . ." *Moore v. USDA ex rel. FMHA*, 993 F.2d 1222, 1224 (5th Cir. 1993).

17

Harm is irreparable when equal protection is at issue. *See League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 182 (W.D. Tex. 2022) (explaining that equal protection violations "inflict irreparable injuries because the loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury") (internal marks omitted); *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 651 (N.D. Tex. 2021) (holding that plaintiffs denied equal treatment were irreparably harmed).

Plaintiffs claim economic injuries but seek no economic relief because their "injuries are not purely economic." ECF No. 22 at 10 (citing *SFFA*, 143 S. Ct. at 2170 ("The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is *not* like treating them differently . . . because they play the violin poorly or well.") (emphasis original)). Had the USDA done the latter, Plaintiffs' "only harm would be monetary. But that is not what happened here." ECF No. 22 at 10.

Defendants respond that (1) Plaintiffs identify only past harm, which cannot justify injunctive relief, ECF No. 21 at 17–21; (2) the alleged harms are reparable because Plaintiffs provide an exact compensatory dollar amount, *id.* at 22–24, meaning the alleged equal protection violations are not presumptively harmful at this stage, *id.* at 24–27; and (3) Plaintiffs' delay in bringing this lawsuit undercuts their claims of irreparability, *id.* at 27–28.

### A.    Plaintiffs identify current, ongoing harms.

Courts recognize an injury from "the denial of equal treatment resulting from the imposition of [race-and-ethnicity requirements], not the ultimate inability to obtain the benefit." *Nuziard v. Minority Business Development Agency*, 676 F. Supp. 3d 473, 481 (N.D. Tex. 2023) (Nuziard I) (internal marks omitted). And enjoining an agency from considering race and ethnicity in its regulations "will likely redress [the] injury." *Id.*

Just so here. First, Plaintiffs have applied for almost every USDA disaster-relief Program and, in some cases, received multiple payments under those programs. *See, e.g.*, ECF Nos. 10-1 ¶¶ 14–20, 10-2 ¶¶ 14–20, 10-3 ¶¶ 12–18. Because Plaintiffs budget for disaster relief under these programs and claim to suffer excess losses under the USDA's "socially disadvantaged" designation, ECF No. 10-2 ¶ 18, they will apply for any remaining available funding. ERP 2022, meanwhile, is still open and distributing funds to applicants, making redress likely here.

Second, Plaintiffs have pending applications before USDA Programs that employ "socially disadvantaged" benefits designations. ECF No. 23-1 ¶ 10. Plaintiff Alan West, for example, "applied to USDA's Natural Resources Conservation Service (NCRS) on behalf of Alan and Amy West Farms for a grant under the Environmental Quality Incentives Program (EQIP) to replace two center pivots on [his] farm in the summer of 2023." *Id.* ¶ 4. But two EQIP administrators told West "that whether a farmer was socially disadvantaged or otherwise underserved was a factor in ranking their proposals for EQIP funding." *Id.* ¶ 9. That application is "still under consideration." *Id.* ¶ 12. An injunction on constitutional grounds, therefore, will likely redress Plaintiffs' stigmatic harm in their ongoing applications to USDA Programs.

### B.   Calculable economic damages do not repair these harms.

Defendants argue that "in other constitutional contexts . . . courts have explained that irreparable injury should not be presumed — especially when 'the damage to plaintiff [] is chiefly, if not completely, economic." ECF No. 21 at 25 (citing *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1286 (11th Cir. 1990)). And "[w]here, as here, there are mechanisms to compensate a plaintiff for quantifiable harm at the conclusion of a case, the Fifth Circuit has declined to find a constitutional harm irreparable." ECF No. 21 at 26 (citing *Morgan v. Fletcher*, 518 F.2d 236 (5th Cir. 1975)).

19

Economic relief will not help Plaintiffs here. First, Plaintiffs don't even seek economic relief. ECF No. 1 at 46–47 (requesting relief). Second, "[d]amages don't remedy stigmatic harms" anyways. *Nuziard II*, 2024 WL 965299, at *45. That must be the case here, where the *only* predicate for relief is stigmatic harm.

### C.    Plaintiffs exercised reasonable diligence in bringing this lawsuit.

"[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Defendants cite cases from "[c]ourts around the country . . . reject[ing] claims of irreparable harm after delays . . . ." ECF No. 21 at 27. Those cases all involve Lanham Act and commercial cases. *See, e.g., Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (trade dress infringement); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (trademark); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (labor and employment).

But here, as in *NRA of Am., Inc. v. Bureau of ATF*, "the cases relied on by Defendants involved commercial trademark rights, whereas this case involves constitutional rights and regulations affecting those rights." No. 3:23-CV-1471, 2024 WL 1349307, at *11 (N.D. Tex. Mar. 29, 2024). When constitutional rights are involved, the courts consider all the "circumstances . . . [to] determine[] that the delay . . . was not so unreasonable to militate against a finding of irreparable harm." *Id.*

Plaintiffs' minimal delay is excusable for purposes of preliminary relief. The most recent Program went into effect on October 31, 2023. 88 Fed. Reg. at 74404. Plaintiffs explain that "[o]nce the programs start, it takes time to find counsel, study complex federal programs, understand the extent of the discrimination that is occurring, prepare and file litigation, and then seek preliminary relief." ECF No. 22 at 13. This is reasonable because ERP 2022, the USDA's

20

October 31, 2023 Program, employs "byzantine funding formulas buried in the Federal Register, and released without the long deliberative process of notice-and-comment rulemaking." *Id.* This is the kind of case where "delays were 'caused by [plaintiff's] good faith efforts to investigate facts and law.'" *ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 699 (N.D. Tex. 2015) (quoting *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333–34 (S.D.N.Y. 2011)).

In short, Plaintiffs have met their burden to show irreparable harm at this stage. Suffering racial and sexual discrimination is a stigmatic harm that economic relief cannot ameliorate. These harms are ongoing, and Plaintiffs filed suit as soon as they reasonably could given the complexity of the Programs at issue here.

## IV.   The balance of interests favors Plaintiffs, and an injunction would not disserve the public interest.

The public interest lies in preventing "the violation of a party's constitutional rights." *Jackson v. Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quotation omitted). It also lies in agencies obeying their obligations under the APA and authorizing statutes. *Clarke v. CFTC*, 74 F.4th 627, 643–44 (5th Cir. 2023).

Here, "[t]he interests of all farmers receiving disaster relief are served by halting further payments based on race or sex." ECF No. 11 at 31. If Plaintiffs prevail, the USDA "must make the disaster relief equal . . . . Whether that means providing more relief to non-underserved farmers, or less relief to socially disadvantaged farmers, USDA's task will be made more manageable by promptly halting its unlawful behavior." *Id.*

Defendants respond only that an injunction would be halt or decrease payments for an unspecified period of time. ECF No. 21 at 29–30. This claim is unavailing. At most, it would require the USDA to prepare an addendum to the calculation process and ultimately give it *more* money to spend on disaster relief.

### CONCLUSION

Courts should not issue an equitable remedy "more burdensome to the defendant than necessary to redress" Plaintiffs' injuries. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Gill v. Whitford*, 585 U.S. 48, 68 (2018) (explaining that "a remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established") (internal marks omitted).

With this in mind, the Court **GRANTS** the Motion **IN PART**. The only active Program capable of being enjoined is ERP 2022. As to Plaintiffs, therefore, Defendants are **ENJOINED** from making or increasing payments, or providing any additional relief, based on its "socially disadvantaged farmer or rancher" designation under that Program, whether used directly or as a subset of its "underserved farmer or rancher" designation. 88 Fed. Reg. at 77408. Defendants may, however, continue to apply progressive factoring on future relief applications, so long as that is done independently of any race- or sex-based considerations. Thus, for example, Defendants may not apply progressive factoring to all farmers first and then exempt underserved farmers — including socially disadvantaged farmers — from its adverse consequences. *Id.* at 74414, n.15.

**SO ORDERED**.

June **7**, 2024

_____

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

22