USDA Economic Research Service
U.S. DEPARTMENT OF AGRICULTURE

Economic
Research
Service

Administrative
Publication
Number 096

December 2022

# Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities

## A Report to Congress

Scott Callahan and Daniel Hellerstein



Strickland AR 0558

**USDA** Economic Research Service
U.S. DEPARTMENT OF AGRICULTURE

Economic Research Service
www.ers.usda.gov

**Recommended citation format for this publication:**

Callahan, Scott and Daniel Hellerstein. December 2022. *Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities,* AP-096, U.S. Department of Agriculture, Economic Research Service.



Cover photos from Getty Images.

Use of commercial and trade names does not imply approval or constitute endorsement by USDA.

To ensure the quality of its research reports and satisfy governmentwide standards, ERS requires that all research reports with substantively new material be reviewed by qualified technical research peers. This technical peer review process, coordinated by ERS' Peer Review Coordinating Council, allows experts who possess the technical background, perspective, and expertise to provide an objective and meaningful assessment of the output's substantive content and clarity of communication during the publication's review.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

**Economic Research Service**

U.S. DEPARTMENT OF AGRICULTURE

Economic
Research
Service

Administrative
Publication
Number 096

December 2022

# Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities

Scott Callahan and Daniel Hellerstein

## Abstract

The 2017 Census of Agriculture reported that more than one-third of producers are over 65 years of age, and the distribution of agricultural land has shifted to fewer, larger landholders. Socially disadvantaged (SDA) producers (classified by race, ethnicity, and/or gender) may have fewer financial resources and face additional constraints when buying or raising capital for expanding farm operations. This report used USDA survey, census, and administrative data to examine measures of land access and other factors associated with the share of SDA and beginning farmers and ranchers in a county in 25 States. Several measures of land tenure, federal program participation, agricultural sales, and demographic information were used to estimate how land access and federal programs correlate with the percentage of SDA and beginning farming operations at the county level. The percentage of beginning farmers and ranchers in a county is positively correlated with the percent of rented farmland acres and negatively correlated with crop insurance premiums (measured in dollars per acre) and average farmer age. The study also found the percentage of SDA operations in a county is negatively correlated with the percentage of sales in field crops and positively correlated with the percentage of USDA's Farm Service Agency (FSA) loan applications granted, and percentage of direct-to-consumer sales. Results indicated the average lease size, the percentage of livestock sales, and decreasing urbanization are negatively correlated with the percentage of SDA and beginning operations. In contrast, the percentage of rented farmland and the percentage of SDA populations are positively correlated with the percentage of SDA operators in a county.

**Keywords:** land access, land tenure, landlords, socially disadvantaged (SDA) farmers, beginning farmers, TOTAL survey

## Acknowledgments

The authors thank Robert Hood of the USDA, National Agricultural Statistics Service (NASS) for providing data, and Jeff Hopkins, Robert Gibbs, and Krishna Paudel of the USDA, Economic Research Service (ERS) for their advice. The authors also thank the peer reviewers and USDA, ERS editors Casey Keel and Jeff Chaltas and USDA, ERS designer Chris Sanguinett.

## About the Authors

Scott Callahan and Daniel Hellerstein are economists with USDA, Economic Research Service.

# Contents

**Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**How Producer Characteristics and Farm Structure Affect Land Availability** . . . . . . . . . . . . . . . . 3

    The Distribution of Farm Size and Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Farm Size, Farmland Tenure, and Land Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**USDA Programs for SDA and Beginning Farms** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    USDA Loan and Loan Guarantee Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    USDA Conservation Programs: SDA and Beginning Farms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**The Geographic Distribution of Socially Disadvantaged and Beginning Farm Operations** . . . 8

    Definitions of Terms: Farm Operators and Producers, Beginning Farmers, and Socially
    Disadvantaged Farmers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Beginning Farms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**What Factors May Be Correlated With Land Access for Beginning and SDA Farmers?** . . . . . . . 13

    Measures of Land Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Measures of USDA Program Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Other Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Findings on Land Access: What Factors have Statistically Significant Correlations?** . . . . . . . . . 19

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Appendix A. Legal Definitions of Socially Disadvantaged and Beginning Farmers** . . . . . . . . . . 25

**Appendix B: USDA Loan Programs and SDA and Beginning Farmers** . . . . . . . . . . . . . . . . . . . . 26

**Appendix C: Results from Regression Models** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

Strickland AR 0561

**USDA** Economic Research Service

U.S. DEPARTMENT OF AGRICULTURE

---

*A report summary from the Economic Research Service*      *December 2022*

# Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities

Scott Callahan and Daniel Hellerstein

## What Is the Issue?

This report is in response to Section 12607 of the Agriculture Improvement Act of 2018 (the 2018 Farm Bill)[1], wherein the U.S. Congress tasked the U.S. Department of Agriculture (USDA) with analyzing the barriers preventing or hindering the ability of beginning and socially disadvantaged (SDA) farmers and ranchers to acquire or access farmland, and what USDA is doing to address these concerns.



Several factors may contribute to the challenges of accessing land for farming through purchase or rental, including the aging of the population of U.S. farmers, the increasing concentration of farmland ownership, credit constraints, and competition for land from urban and environmental uses. Beginning farms—those operated by farmers who have operated a farm or ranch for 10 years or less—as well as farms managed by operators defined by USDA as SDA—based on race, ethnicity, or gender—may have fewer financial resources and those that do face additional constraints when buying or raising capital for expansion. Due to significant gaps in available data, a robust analysis accurately measuring barriers to land access outcomes is not possible. Hence, this study uses regression analysis to measure the correlation between the share of farming operations classified as SDA or beginning operations by county and several measures of land access, federal program participation, and several USDA loan programs, including the Direct Loan Program and Guaranteed Loan Program.

## What Did the Study Find?

This study assessed the relationship between county share of SDA farmers and ranchers and possible influencing variables for the 25 states collected using the 2014 Tenure, Ownership and Transition of Agricultural Land (TOTAL) survey. These variables include indicators of the ease of land access, participation in Federal programs that directly or indirectly support beginning and SDA farm operations, and measures of county land use characteristics. The study also examined the correlation between the share of these farmers and the average age of farmers in the county, measures of agricultural land rental markets, and population growth as a proxy for local economic development.

---

[1] SEC. 12607 of the Agriculture Improvement Act of 2018 requests the Secretary of Agriculture to make publicly available a report on farmland access.

---

ERS is a primary source of economic research and analysis from the U.S. Department of Agriculture, providing timely information on economic and policy issues related to agriculture, food, the environment, and rural America.

Strickland AR 0592

The share of SDA and beginning farming operations is correlated with some measures of land availability, participation in USDA programs, and land use metrics.

- The percentage of SDA and beginning farming operations is negatively correlated with average lease size. The percentage of SDA operations is also negatively correlated with the percentage of cropland acreage. However, the percentage of rented farmland is positively correlated with the percentage of SDA and beginning farming operations.

- The percentage of SDA operations was positively correlated with the percentage of successful applications to the Farm Service Agency's (FSA) Direct and Guaranteed Loan Programs. When defining SDA operations to include race, ethnicity, and gender (REG), these are positively correlated with Conservation Reserve Program (CRP) acreage. However, the percentage of SDA-REG and beginning operations were negatively correlated with per-acre crop insurance premiums by county.

## How Was the Study Conducted?

This study examined the geographic distribution of beginning and socially disadvantaged (SDA) farmers and ranchers across counties in the United States. The county share of farm operations that identifies as the beginning or socially disadvantaged is used as a measure of the ease or difficulty of establishing or expanding farm enterprises for these groups. This study used data from the 2017 Census of Agriculture on farm demographics and beginning-farm numbers at the county level, as well as county-level data on land use and land tenure. To characterize the state of land ownership, tenure, and land availability, this research used USDA's Tenure, Ownership, and Transition of Agricultural Land (TOTAL) Survey from 2014. In addition, the study used USDA administrative data from 2012 to 2017 from USDA's Farm Service Agency (FSA), Risk Management Agency (RMA), and Natural Resources Conservation Service (NRCS). Data on participation in the FSA Direct and Guaranteed Farm Loan Programs came from the USDA Race, Ethnicity, and Gender Program Statistics (REGStats) site. Descriptive statistics were presented for the 48 contiguous States, but regression models using the entire data complement were restricted to 25 States—the extent of TOTAL Survey data coverage. Results from the fractional probit model indicated the factors correlated with variations in a county's share of beginning and SDA farms.



Strickland AR 0583

# Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities

## Introduction

As farmers retire or otherwise cease operations, agricultural production continues through a combination of consolidating existing farms and establishing beginning farm operations. Over time, farmland could be expected to pass from one generation of farmers to the next, which could provide beginning farmers with the land needed to farm, either through renting or purchase, as well as allowing existing farmers to expand operations.

Several demographic and financial trends may be limiting the availability of land for purchase or rental, which is referred to by the shorthand "land access" in this report. The 2017 Census of Agriculture reported the average age of agricultural producers to be 57.5 years and over one-third of producers are over 65. These numbers have increased over time (Boyce, 2019) and suggest farmers are holding onto land longer, which may affect land availability in a given year.

Furthermore, for several decades, the distribution of land (particularly cropland) has shifted to fewer and larger land holdings (MacDonald et al., 2018). Larger farms, on average, tend to be more productive and realize higher financial returns per acre (MacDonald et al., 2018). Higher returns are typically associated with higher land values and could limit the amount of land available for sale to operators with lower income or wealth. Larger farms also rent a greater share of their total acres operated, which could ultimately bid land away from beginning and socially disadvantaged (SDA) farmers.

This report explores the challenges beginning and SDA farmers may face when accessing land. Beginning farms—farms in which all operators have been farming for 10 years or less—may have difficulty competing for the purchase of land sold by exiting farms, compared with existing farms trying to expand, especially if the beginning farm is a small operation. Beginning farms are generally smaller operations with younger principal operators, and an average beginning farm household has about half the net worth of an average established farm—$1.2 million compared to $2.2 million, within 2013–17 (Key and Lyons, 2019). Given the limitations of available data, this is a correlative analysis rather than a causal one; that is, the goal is to identify important factors that are possibly correlated with land access, rather than to determine cause and effect.

Although not a new concern (Ruhf, 2013), land access may also present a serious challenge to enter farming for SDA operators. According to the 2017 Census of Agriculture, SDA operations defined by the race, ethnicity and gender criteria comprise 17 percent of farming operations, while SDA operations comprise 9 percent of farming operations when gender is excluded from the definition. SDA farmers on average have smaller financial resources than non-SDA producers, making land purchases more difficult. Thirty-three percent of SDA producers earn positive farm income, whereas nearly 45 percent of non-SDA farmers do. Median household income for SDA farmers is less than for non-SDA farmers—about $60,000

**1**

compared to about $75,000 (Todd, 2020).[2] The USDA has recognized barriers faced by SDA operators,[3] providing "outreach and technical assistance to encourage and assist socially disadvantaged farmers and ranchers to own and operate farms and ranches and to participate in agricultural programs."[4]

Since 1992,[5] the USDA has provided additional support to farmers with limited access to traditional lending markets (Congressional Research Service (CRS), 2008; Government Accountability Office (GAO), 2019; and USDA, Economic Research Service, 2018).[6] Since 2015, USDA has obligated between $5 billion and $7 billion per year to support Direct and Guaranteed Loan Programs.[7] As discussed below, these loan programs target and reserve a share of funding—70 percent of combined Direct Farm Ownership and Operating Loans in FY21—to underrepresented and SDA applicants and beginning farmers.[8]

Federal programs may have ambiguous effects on land access for beginning and SDA operators. For example, the Conservation Reserve Program removes about 20.7 million acres of cropland from production (USDA, Farm Service Agency, 2021). Although retiring this land does provide environmental benefits, it may shrink the land available to farmers, including beginning and SDA farmers. On the other hand, USDA conservation programs targeted toward preserving farmland or improving environmental outcomes on working lands can often help beginning and SDA farmers achieve conservation and sustainability goals through cost-sharing.[9]

This report provides an overview of the condition and structure of U.S. agriculture, including the aging of U.S. farmers, the evolution in the concentration of farmland, and trends in agricultural land sales and rental markets. The relationships between these factors may impact the ability of beginning and SDA farmers to access land. Several potential influencing variables are regressed against county-level measures of the share of SDA and beginning farmers. Variables that have statistically significant coefficients are identified and discussed.

---

[2] These statistics are based on a USDA, Economic Research Service (ERS) analysis of 2017–18 ARMS data. In 2017, about 10 percent of farms were operated by limited-resource (LR) farmers. An SDA farm may or may not also be an LR farm. USDA, NRCS classified LR farmers as those who operate farms with direct or indirect gross farm sales not more than $180,300 (in 2020 dollars) in each of the previous 2 years and who have total household income at or below the national poverty level for a family of four, or below 50 percent of the median income in the county where they live.

[3] Section 2501(c)(2) of the Food, Agriculture, Conservation, and Trade Act of 1990. 7 U.S.C. § 2279(c)(2). A description can be found at USDA, ERS topic page: Beginning, Limited Resource, Socially Disadvantaged, and Female Farmers.

[4] *Food*, Conservation and Energy Act of 2008. Pub. L. 110-246.

[5] The Agricultural Credit Improvement Act of 1992 (P.L. 102- 554) established the trend of gearing USDA farm loan funds more toward beginning and minority farmers (Congressional Research Service 1996).

[6] The GAO report finds some evidence on challenges hampering the ability of SDA farmers to access credit, though available data preclude definitive statements.

[7] Several states (such as Connecticut, Nebraska, New Jersey, South Dakota, Virginia, and Wisconsin) have State programs that address land access for beginning farmers. Due to data unavailability, the researchers focus on Federal programs in this report.

[8] The Consolidated Farm and Rural Development Act (CONACT), in section 346(b)(2), requires USDA to reserve at least 75 percent of Direct Farm Ownership and 50 percent of direct Operating Loans for use by beginning farmers. For SDA-focused programs, the targets are established annually following procedures set forth in 7 CFR § 761.208 (CFR 761) and are based on the number of minority groups in each State and county.

[9] Several USDA conservation programs have features that recognize beginning and SDA farmers. For example, since 2008, the CRP's Transitions Incentive Program (CRP-TIP) has provided incentives to beginning and SDA farmers to acquire land that will be exiting the CRP.

# How Producer Characteristics and Farm Structure Affect Land Availability

The condition and structure of U.S. agriculture—for instance, who owns and operates farmland and the extent and size of markets for agricultural land—may impact the ability of beginning and SDA farmers to access land. These structural features include the distribution of farmer age and land ownership, participation in rental markets, and the size and profitability of farm operators.

## The Distribution of Farm Size and Operation

As of 2019, land in farms was approximately 897 million acres (37 percent of the United States land mass), including around 400 million acres of cropland (USDA, NASS, 2019). This land is managed on about 2 million farms based on data from the 2020 ARMS survey (Whitt et al., 2020). Both values—total land in farm operations and the total number of farms—have been fairly steady since the 1990s (Burns and Hoppe, 2019) but have seen some decline since 2012. Between 2012 and 2017, land in farm operations dropped 1.8 percent and the number of farms dropped 4.1 percent.

Many of these 2 million farms are small. Based on 2017 data from USDA's Economic Research Service (ERS) and National Agricultural Statistics Service (NASS) (Burns and Hoppe, 2019), about 89 percent of U.S. farms are "small family farms," with annual gross cash farm income (GCFI) less than $350,000. However, production and acreage are concentrated in the remaining 11 percent of farms, with over 74 percent of total production occurring on just 48 percent of total farmland acreage. This concentration has increased over the last several decades (MacDonald et al., 2018), especially for cropland. As of 2012, 36 percent of all cropland was on farms with at least 2,000 acres of cropland, up from 15 percent in 1987.

Only a small fraction of total farmland changes hands annually. Bigelow et al. (2016) found between 2015 and 2019, about 10 percent of farmland (93 million acres) was expected to be transferred; 4 percent was anticipated to be sold in markets, and 6 percent transferred through gifts, trust, or wills.[10] Of that 4 percent projected to be sold, over half (21 million acres) was expected to be sold to nonrelatives, with most of the remainder expected to be exchanged between relatives. Additionally, some of the land expected to be transferred through gifts, trusts, and wills could be sold to new owners.

The aging producer population is partly correlated with this low rate of expected sales. According to the 2017 Census of Agriculture, the average age of U.S. farm producers was 57.5 years old, with over a third older than 65 years of age. The 2017 average age is 1.2 years older than the 2012 average, and 9.7 years older than the first average age reported for farmers in the 1945 Census.[11] In contrast, in 2020, about 14 percent of self-employed U.S. workers in nonagricultural businesses are 65 or older (Bureau of Labor Statistics, 2020)—up from the 11 percent reported by Hoppe in 2010.

Moreover, these older farmers continue to play a key role in production. Farms with principal operators 65 or older generated 23 percent of all U.S. farm sales in 2017. Their involvement in farm production is similar to that of younger farmers. For example, 87 percent of all age groups are involved in the day-to-day operations of a farm, and around three-quarters of both younger and older farmers make cropping and land-use decisions on behalf of their respective operation.

---

[10] These values are derived from table 5 of the Tenure, Ownership, and Transition of Agricultural Land (TOTAL) report: *Land expected to undergo ownership transfer in next 5 years, as of 2014.*

[11] For a summary of farmer age, see the 2017 U.S. Ag AGDAILY-Insights News: "2017 Census of Agriculture: An aging farm population but with optimism".

3

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096     Strickland AR 0566
USDA, Economic Research Service

## Farm Size, Farmland Tenure, and Land Access

Given that so little farmland typically changes hands through markets in any year, rented land is an important source of acreage for new or expanding farmers. According to the USDA Tenure, Ownership, and Transition of Agricultural Land (TOTAL) Survey of 2014, over 61 percent of U.S. farmland was owned and operated by the same entity (Bigelow et al., 2016). The remaining 39 percent was rented by landowners to tenant operators—with roughly 80 percent of this rented land owned by a non-operator landlord (Bawa and Callahan, 2021). The percentage of land rented varies by land use, with significantly more cropland being rented by tenant operators than pastureland. Although 54 percent of cropland is rented, only 28 percent of pastureland is rented (Bigelow et al., 2016).

Farms in different size classes use different methods to expand the land base needed for production.[12] Only 30 percent of small family farms—farms with a Gross Cash Farm Income (GCFI) less than $350,000—rent any land for their own operations. In aggregate, they rented 31 percent of the land they operated.[13] It is notable that small family farms often rented out a portion of their land and accounted for 81 percent of the 57 million acres rented out by farmers to other farmers.

In contrast, 79 percent of midsize family farms (GCFI $350,000 to $999,999) and 87 percent of large farms (GFCI over $1,000,000) rented at least some of the land they operated, and together about half of their operated farmland was rented from others.

Land rental markets are particularly important for younger farmers. Twenty-seven percent of the total acreage of farmland operated by those under 34 years of age is associated with full-tenant operations, whereas just 8 percent of land is in fully-owned operations. The remaining 65 percent of the land is in part-owner operations. Conversely, 7 percent of the total acreage of farmland operated by those who are 65 or older is found in full-tenant operations, and 43 percent of the land is in fully-owned operations. The remaining 50 percent of the land is in part-owner operations.

The relationship duration between a given landlord and tenants can affect rented land availability. Most landlords have long-term relationships with their tenants. In 2014, 70 percent of acres rented had been to the same tenant over 3 years and 28 percent for over 10 years. There is an even longer bond for non-operator landlords—84 percent for 3 years, 41 percent for 10 years.

Rates of return have affected land values and these vary by size of the farm. Since mid-1992, very large family farms (at least $5 million in GCFI) have earned rates of return—measured as the annual rate of return on assets—that have exceeded all other size classes in nearly every year. Farms with $1 million–$5 million in GCFI (large family farms) have estimated average returns exceeding those for the three smaller classes in every year. The smallest class—farms with less than $100,000 in sales—consistently earn the lowest returns.[14] To the extent that beginning and SDA farmers are small operations, their rates of return may be lower than established farms.

Another trend possibly impacting land access is growing urbanization. According to a 2020 report (Freedgood et al., 2020), about 11 million acres—or 2,000 acres a day—of farmland and ranchland were converted to either urban and highly developed land use (4.1 million acres) or low-density residential land use (nearly 7 million acres) between 2001 and 2016.

---

[12] See figure 5 in MacDonald et al., 2018.

[13] Gross Cash Farm Income (GCFI) is a measure of farm revenue that includes sales of crops and livestock, Government payments, and other farm-related income. Further details on farm income can be found on the USDA, ERS topic page on farm household income and characteristics.

[14] See figure 10 in MacDonald et al., 2018.

**4**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096    Strickland AR 0567
USDA, Economic Research Service

# USDA Programs for SDA and Beginning Farms

In recognition of the challenges facing beginning and SDA farmers, the USDA operates several programs to target beginning and SDA operators. In particular, the Farm Service Agency (FSA) administers a number of loan and loan guarantee programs. In addition, USDA conservation programs include initiatives that recognize beginning and SDA farmers and ranchers.

## USDA Loan and Loan Guarantee Programs

Since 1992 a portion of USDA loan programs operated by FSA have been directed toward SDA and beginning farms (CRS, 2008). These programs can be classified as either (1) direct loan programs that loan Federal dollars to recipients through local FSA offices or (2) guaranteed loan programs that guarantee and facilitate private loans made and serviced by commercial lenders. In general, participants in both categories of loan programs must meet all eligibility requirements, which include a documented inability to obtain sufficient credit elsewhere to finance actual needs at reasonable rates and terms.[15]

In fiscal years 2017, 2018, and 2019, between $1.04 and $1.47 billion was obligated annually to the three main Direct Farm Ownership (FO) Loans,[16] and between $2.05 and $2.28 billion per year were obligated to Guaranteed FO Loans (USDA, FSA, 2019b). As described in appendix B, these loan programs differ in interest rates, loan caps, and whether funds are directly provided by USDA.

Although beginning farms are just as likely as established farms to borrow from commercial banks (61 and 62 percent, respectively, of all loan sources to farms), they are twice as likely as established farms to obtain a direct loan from USDA's FSA—16 percent compared to 8 percent.

## USDA Conservation Programs: SDA and Beginning Farms

The USDA annually spends over $5 billion on conservation programs (Claassen et al., 2019), most of which goes toward land retirement programs such as the Conservation Reserve Program (CRP), and working lands programs such as the Environmental Quality Incentives Program (EQIP) and the Conservation Stewardship Program (CSP). Other conservation programs include the Agricultural Land Easements and the Wetland Reserve Easements of the Agricultural Conservation Easement Program (ACEP).

In contrast to commodity-related and insurance program payments, which tend to be positively correlated with farm acreage, conservation program payments, especially land retirement payments, are distributed to smaller farms (McFadden and Hoppe, 2017).[17] In 2019, about 80 percent of USDA's CRP payments went to retired farmers, farmers with off-farm occupations, and low-sales farms (farms with less than $150,000 in GCFI). About 31 percent of working lands conservation payments went to small family farms (GCFI less than $350,000), with another 31 percent to midsized (GCFI between $350,000 and $999,999) (Whitt et al., 2020).

---

[15] Eligibility requirements are listed in sections 764.101 for direct loans and 762.120 for guaranteed loans of the Code of Federal Regulations.

[16] In 2019, 3,851 beginning farmers and 1,155 SDA farmers received Direct Farm Ownership Loans.

[17] The values in this section were pulled from McFadden and Hoppe (2017) and Burns and Hoppe (2019).

**5**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096    Strickland AR 0568
USDA, Economic Research Service

As voluntary programs, USDA land retirement and working lands programs help farmers meet conservation and stewardship goals. While land enrolled in land retirement programs is not available to farmers, including beginning and SDA farmers, there is mixed evidence linking the CRP acreage and access to agricultural land.[18] Several program features may limit the program's impact on land access, including a 25 percent limit on the amount of a county's farmland that can be enrolled in the CRP or wetland easement programs and per acre payment caps based on county average dryland cropland rental rates.

A number of USDA's conservation programs include initiatives targeting beginning and SDA farmers. One such program is the CRP's Transition Incentives Program (CRP-TIP) created by the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill). It allows a retired or retiring landowner who has land enrolled in CRP to receive 2 additional years of payments if land is immediately transitioned back into production through being sold or leased to a beginning or SDA farmer or rancher. CRP-TIP was modified in the Agricultural Act of 2014 (the 2014 Farm Bill), with program eligibility expanded to veteran farmers and ranchers. The 2018 Farm Bill opened the program to all landowners with an expiring contract, whether retiring or not.[19]

Two years prior to the termination of their contract, a CRP-TIP contract holder can allow the incoming farmer to begin making conservation and land improvements—or begin the organic certification process—on the land covered by the CRP contract. On or near the date the CRP contract is terminated, the landowner must sell, enter a long-term lease, or lease with an option to purchase with some or all the land covered by CRP to the incoming farmer. The incoming farmer must then develop and implement a conservation plan on the land previously covered by CRP.

The 2008 Farm Bill provided $25 million in funding for this program between 2009 and 2014; the 2014 Farm Bill provided $33 million between 2014 and 2018; and the 2018 Farm Bill provides $50 million in funding between 2019 and 2023. Between 2014 and 2018, more than 1,500 CRP-TIP participants covered over 225,000 acres at a total cost of approximately $22 million (USDA, FSA, 2019c).

Program participation in CRP-TIP has varied geographically and has been influenced by several factors (Johnson, 2017):

- knowledge of the program with counties conducting multiple forms of outreach having greater participation;

- the existence of a strong relationship between owners of CRP land and prospective farmer or rancher—interested landowners and prospective farmers often have difficulty finding each other;

- the state of the agricultural economy with farm costs and profitability impacting prospective farmers; and

- the amounts of expiring land and the distribution of those acres. FSA (CRP Cost Benefit Analysis) estimates that up to 400,000 acres could potentially be enrolled in TIP during the 2018 Farm Bill period (USDA, FSA: Cost-Benefit Analysis for the Conservation Reserve Program (CRP), as amended by the Agriculture Improvement Act of 2018, November 2019).

---

[18] Sullivan et al. (2006), found that high CRP enrollment did not systematically spur the loss of farm populations (including beginning farmers). In contrast, Wu and Lin (2010), found in 1997 that CRP raised land values between 1.3 percent and 1.8 percent in the United States.

[19] FSA defines an eligible farmer as "An owner or operator of land enrolled in a CRP contract who has ended active labor in farming operations as a producer of agricultural crops or expects to do so within 5 years and has land expiring under a CRP contract."

In addition to CRP-TIP, USDA has several other resources to help new and beginning farmers. From 2017 to 2018, a USDA initiative like CRP-TIP allowed CRP contracts planted with certain CRP practices to be terminated early without having to repay past payments if the land is passed to a beginning or SDA operator. Eligible land includes the least environmentally-sensitive land in CRP. One difference between CRP provisions and CRP-TIP is that these new land tenure provisions were available to landowners who passed land on to family members, while CRP-TIP includes restrictions on transfer within a family. Another difference is that veterans were not targeted by this authority. Although formal data is not readily available, less than 10,000 acres were affected by this initiative.[20]

A variety of education and assistance programs also support new farmers, such as the Farming Opportunities Training and Outreach Program in the 2018 Farm Bill, which will provide over $90 million between 2019 and 2023. This combined two prior programs—Beginning Farmer and Rancher Development Program and the Outreach and Assistance to Socially Disadvantaged and Veteran Farmers and Ranchers Program—to support education, mentoring, and technical assistance initiatives for beginning and SDA farmers or ranchers.[21]

Although smaller in size than CRP, the Agricultural Conservation Easement Program (ACEP) may also affect the availability of farmland for beginning and SDA farmers. Created in the 2018 Farm Bill by merging several existing programs, including the Wetlands Reserve Program (WRP) and the Farm and Ranch Lands Protection Program (FRPP), ACEP has two main components: the Wetland Reserve Easement (WRE) and the Agricultural Land Easement (ALE). The WRE component is used to restore, protect, and enhance wetlands through the purchase of a long-term (permanent or 30-year) easement—with payments for restoring wetland features on formerly cropped landscapes and retiring the land from agricultural uses. The ALE component is used to cost share (with States and other entities) on the purchase of development restrictions on agricultural land. Farmland preserved under the ALE component may be available on the sales or rental markets, rather than being obtained by developers.

Agricultural land easements may improve land access for farmers, including SDA and beginning farmers. These easements have served to protect agricultural land from future urban development. Particularly for farmland where cities are expected to expand, the value of potential future development is capitalized into the value of farmland (Zhang and Nickerson, 2020). By facilitating the purchase of easements—which prohibit future development potential—the value of this land is reduced to its use value for agriculture.[22] This can reduce the cost of acquiring this farmland for agriculture. There is also explicit recognition of beginning farmers in ACEP, such as increased Federal cost share for ALE contracts facilitating the transfer to beginning farmers.

Between 2014 and 2019, obligations for the easement programs (or their predecessors) varied between $300 million and $536 million per year. In this time span, over 310,000 wetland acres were placed into easements, and over 850,000 acres entered an agricultural land easement.

---

[20] Based on personal communication with Alex Barbarika, USDA, FSA. FSA did not assign a formal name to this initiative.

[21] USDA, New Farmers: Education and Assistance.

[22] Conservation easements alter the property rights associated with the land by removing the development rights from the remaining rights, including agricultural use, of the land. The intention is twofold. First, removing the development rights ensures the land will not be developed and, therefore, remain available for agricultural use. Second, removing a portion of the rights—the right to develop the property—means the remaining land and rights (largely the agricultural rights) should theoretically be closer in value to the agricultural-use value and therefore more affordable to farmers. This helps to defray the purchase cost and reduces property tax liabilities (Bigelow et al., 2016).

7

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities,* AP-096    Strickland AR 0570
USDA, Economic Research Service

# The Geographic Distribution of Socially Disadvantaged and Beginning Farm Operations

As detailed in the box titled "Definitions of Terms", the definition of SDA and beginning farms varies across USDA programs.[23] As noted above, this research has employed two alternative definitions of SDA intended to approximate key definitional differences in USDA programs. Data used to define SDA and beginning farm operations come from the 2017 Census of Agriculture and were compiled by the USDA, National Agricultural Statistics Service (NASS) by special request from individual Census responses. According to the 2017 Census of Agriculture, 36.10 percent of producers were female; 2.33 percent were Native American, Alaskan, or of mixed race; 0.74 percent were of Asian or of mixed race; and 1.43 percent Black or African American or of mixed race.[24]

---

### Definitions of Terms: Farm Operators and Producers, Beginning Farmers, and Socially Disadvantaged Farmers

**Operators and producers:** A farm producer or operator is someone involved in running a farm who makes daily management decisions. In 2017, the Census of Agriculture and the USDA Agricultural Resource Management Survey (ARMS) identified up to four operators or producers on a farm.

**Beginning farmers:** This report uses the USDA, Economic Research Service definition of a "beginning farming operation," in which all operators have no more than 10 years of experience as an operator on any farm. This study is not accounting for multigenerational-family farming operations with a mixture of beginning and experienced farm operators in the definition of "beginning farming operations."

**Socially disadvantaged farmers**. In general, the classification of "socially disadvantaged farmers" (SDA) is based on the racial or ethnic status, or gender of the operators. However, as discussed in the appendix A, this definition is flexible. In some circumstances if a female operator is present, the farm is classified as SDA. In other circumstances, if a female operator shares the operation with a male operator, the farm is not classified as SDA. For quantifying SDA operations, this study constructed two definitions including: (1) The race and ethnicity-based definition classifies a farming operation as socially disadvantaged if any operator is non-White or Hispanic; and (2) The race, ethnicity, and gender-based definition additionally classifies operations as socially disadvantaged if any operator is non-White or Hispanic *or* all operators are female.

---

This study first defines SDA operations based on the race and ethnicity of the operators on the farm; an operation is considered SDA if any operator on the operation is either non-White or Hispanic, henceforth referred to as SDA-RE operations. This definition is used to approximate the USDA's Natural Resources Conservation Service (NRCS) definition of SDA and does not consider gender as a separate criterion in determining whether an operation meets the SDA definition.

---

[23] See the supplemental appendix for details.

[24] Note that these statistics express the percentage of producers, not the percentage of operations that our analysis focuses on.

Strickland AR 0571

Figure 1

**Distribution of socially disadvantaged farm operations, according to race and ethnicity definition, by county in 2017**



Notes: This map depicts the percentage of operations classified as socially disadvantaged (SDA)—using the SDA, by racial and ethnic status (SDA-RE) definition (Pct. SDA-RE op.). The models used in the regression analysis used data from Tenure, Ownership, and Transition of Agricultural Land (TOTAL) States (the non-gray regions in the map). The Western and Southern regions of the United States have a considerably higher percentage of SDA-RE operations than the Northern and Midwestern regions.

Source: USDA, Economic Research Service using 2017 Census of Agriculture data.

Figure 1 depicts the distribution of the percentage of farm operations that are SDA by county according to the definition of race and ethnicity. The Western and Southern regions of the United States have considerably higher percentages of SDA operations than the Midwestern and Northeastern U.S. regions.

The second SDA definition is intended to approximate the USDA Farm Service Agency (FSA) definition of SDA, which includes operations with one or more female operators in addition to those with Hispanic or non-White operators. However, the second SDA definition excludes operations consisting of a combination of White males and females, only including operations with White females if they are unaccompanied by White males. Note the FSA included women in their definition of SDA farmers without qualification. This study's definition differs because including all operations with women present would flag most U.S. farming operations as SDA. These operations will be henceforth referred to as SDA operations according to the race, ethnicity, and gender definition (SDA-REG).

9

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096    Strickland AR 0572
USDA, Economic Research Service

Figure 2

**Distribution of socially disadvantaged farm operations, according to race, ethnicity, and gender definition, by county in 2017**



Legend

**TOTAL States**

- ⬜ (gray) Non-TOTAL States
- ⬜ TOTAL States

**Pct. SDA-REG op.**

- 0.00% to 9.45%
- 9.46% to 18.36%
- 18.37% to 31.80%
- 31.81% to 58.82%
- 58.83% to 100.00%

Notes: This map depicts the percentage of operations classified socially disadvantaged (SDA)—using the SDA, according to race, ethnicity, and gender (SDA-REG) definition (Pct. SDA-REG op.). The models used in the regression analysis used data from Tenure, Ownership, and Transition of Agricultural Land (TOTAL) States (the non-gray regions in the map). In general, White female operations are more common in counties where non-Hispanic White people comprise large shares of the population.

Source: USDA, Economic Research Service using 2017 Census of Agriculture data.

Figure 2 depicts the share of SDA farm operations by county using the expanded race, ethnicity, and gender definition. There are higher percentages of SDA operations in the Midwestern and Northeastern U.S. regions relative to the race and ethnicity definition alone. In general, White female operations are more common in counties where non-Hispanic Whites comprise larger shares of the population.

This study defines beginning farm operations as any operation in which all operators have been farming for 10 years or less (Katchova and Ahearn, 2016; Key and Lyons, 2019). Box 2 describes the extent and characteristics of beginning farmers, and figure 3 depicts the share of beginning farmer operations by county. Beginning operations are somewhat less common in the Midwest and the Northern Plains States. However, unlike the distribution of SDA operations, the pattern of the beginning farmer geographic distribution is far more dispersed with less of a geographic pattern. Moreover, there are lower percentages of beginning farmers in most Midwestern and Northern Plains States.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service    Strickland AR 0573

## Beginning Farms

As of 2017, there were about 340,000 farms—with almost 900,000 operators—on which all operators were beginning farmers with 10 or less years of management experience on any farm. These new "beginning farms"[1] and ranches accounted for 17 percent of all farms in the United States and 8 percent of the total agricultural production (Key and Lyons, 2019).

Following the same pattern as with established farms, most beginning farms are small-scale operations that, in aggregate, contribute a relatively low share of total production value. For example, only about 33 percent of beginning farms produced more than $10,000 worth of output when compared with roughly 50 percent of established farms. About 2 percent of beginning farms have annual production value of more than $1,000,000—compared with 4 percent of established farms. These larger beginning farms are responsible for more than 50 percent of all output produced by beginning farms—compared with over 60 percent for established farms.

In 2017, among farms with at least $10,000 in production value or sales, principal operators of beginning farms were 43 years old—on average—whereas operators of established farms were 63 years old, on average. In addition, 30 percent of beginning-farm principal operators were 35 years old or younger, compared with only 2 percent of principal operators of established farms.

Beginning farm households (with at least $10,000 in production) earned almost as much total household income—around $150,000—as established farms, when averaged over 2013–17. Off-farm income represents a greater share of total income for beginning farms (77 percent) than for established farms (56 percent).

---

[1] As noted in the introduction, the definition of new "beginning farms" does not include multigenerational farms where an older operator is the primary operator and a secondary/tertiary operator is a beginning farmer.

**11**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096     Strickland AR 0574
USDA, Economic Research Service

Figure 3

**Distribution of beginning farming operations, by county, in 2017**



Notes: This map depicts the percentage of beginning farming operations (Pct. beginning op.), defined as an individual or entity that has operated a farm for not more than 10 consecutive years. The models used in the regression analysis used data from Tenure, Ownership, and Transition of Agricultural Land (TOTAL) States (the non-gray regions in the map). Beginning farming operations are more geographically dispersed than socially disadvantaged operations. There are lower percentages of beginning farmers in most Midwestern and Northern Plains States.

Source: USDA, Economic Research Service using 2017 Census of Agriculture data.

This study also considered whether the share of SDA farm operations in a county is representative of the share of the SDA population in the county.[25] Figure 4 has shown the average percentage point difference between the percentage of SDA farm operators and the percentage of the total population that is SDA within the county. SDA operators in the Southeastern United States and West Texas comprise a lower percentage of the farm operator population relative to the overall population. However, in Arizona, Utah, New Mexico, and Oklahoma, there are several counties in which SDA operators comprise a higher percentage of operators relative to their share of county population. These counties tended to include areas under tribal jurisdiction. Note that SDA demographic groups comprise less than 10 percent of the population of most counties in the Midwest and Northeast regions.

---

[25] This uses the percentage of the population that is non-White or Hispanic using county population estimates; obtained from table B03002 from the 2017 American Community Survey.

12

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service                                    Strickland AR 0575

Figure 4

**Percentage point difference between socially disadvantaged (SDA) producers and SDA populations, by county in 2017[1]**



**Legend**

**TOTAL States**

- ⬜ (gray) Non-TOTAL
- ⬜ (white) TOTAL

**Pct. point difference**

- 🟥 (dark red) -95.85% to -46.73%
- 🟥 (red) -46.72% to -29.27%
- 🟥 (light red) -29.26% to -16.10%
- 🟥 (pale pink) -16.09% to 0.00%
- 🟦 (blue) 0.01% to 86.73%
- ⬜ (gray) SDA<10% of population

This map depicts the percentage point difference (Pct. point difference) between the percentage of socially disadvantaged (SDA) farming operations and the percentage of SDA population. The models used in the regression analysis used data from Tenure, Ownership, and Transition of Agricultural Land (TOTAL) States (the non-gray regions in the map). SDA operators in the Southeastern United States and West Texas comprise a lower percentage of the farm operator population relative to the overall population. However, in Arizona, Utah, New Mexico, and Oklahoma, there are several counties in which SDA operators comprise a higher percentage of operators relative to their underlying population.

[1] Counties only included if SDA peoples comprise at least 10 percent of the population.

Source: USDA, Economic Research Service using 2017 Census of Agriculture and 2017 American Community Survey data.

# What Factors May Be Correlated With Land Access for Beginning and SDA Farmers?

Ultimately, this study is interested in discerning what factors—such as the current ownership of agricultural lands or the size and extent of Federal programs—affect the ability of beginning and SDA farmers to obtain or access farmland. However, given the gaps in available data, a robust analysis accurately measuring operator characteristics and land access outcomes is infeasible. Hence, this analysis of land access challenges used the share of farm operations by county SDA or beginning farming operations to approximate the relative ability of these farmers to thrive in their localities. Through regression analysis, this research estimated the correlation between the three measures of these groups—operation share using the two definitions of SDA operation and the share of beginning farming and ranching operations—and various associated factors. In addition to several measures of land availability, this research also incorporated measures of participation in supportive USDA programs that may counterbalance factors limiting access to land. To control other factors possibly

**13**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096    Strickland AR 0576
USDA, Economic Research Service

influencing the relationship between land access and operation shares, this research further included recent county-population growth as a measure of economic development and of commodity mixed into the analysis. This research used a county-level, cross-sectional dataset for the 25 States in the 2014 TOTAL Survey.[26] This methodology estimated statistical associations, not underlying causal mechanisms[27]. As such, this report's estimation results should be considered suggestive rather than definitive.

## Measures of Land Access

USDA's 2014 Tenure, Ownership, and Transition of Agricultural Land (TOTAL) Survey directly asked both operator and non-operator landlords about land-ownership characteristics, rental agreements, landlord/tenant relationships, and future land transition plans. From this survey, this research developed several measures to quantify land access for production.

Table 1
**Summary statistics for model variables, TOTAL States only**

| Variable | Source | N | Min | Max | Mean | Median | Standard deviation |
|---|---|---|---|---|---|---|---|
| Dependent variables | | | | | | | |
| Percentage of SDA operations (race/ethnicity/gender) | 2017 Ag Census | 2,263 | 0.00% | 100.00% | 15.60% | 11.21% | 11.20% |
| Percentage of SDA operations (race/ethnicity) | 2017 Ag Census | 2,263 | 0.00% | 96.36% | 8.42% | 3.60% | 10.24% |
| Percentage of beginning operations | 2017 Ag Census | 2,263 | 5.93% | 70.00% | 21.49% | 20.24% | 6.48% |
| Land access variables | | | | | | | |
| Percentage of farmland to be transferred to nonfamily members | 2014 TOTAL | | | | 3.01% | 0.00% | 0.18% |
| Average lease size (acres) | 2014 TOTAL | | | | 117.80 | 45.00 | 388.86 |
| Percentage of leases renewed annually | 2014 TOTAL | | | | 70.55% | 29.13% | 0.56% |
| Average landlord/tenant relationship length | 2014 TOTAL | | | | 10.707 | 8.170 | 0.089 |
| Percentage of rented farmland acres | 2014 TOTAL/ 2017 Ag Census | | | | 46.83% | 32.24% | 34.56% |
| Percentage of cropland acres | 2017 Ag Census | 2,251 | 0.05% | 99.98% | 56.64% | 66.83% | 28.63% |
| Land value per acre | 2017 Ag Census | 2,261 | 191 | 77,760.00 | 6,149.34 | 3,500.00 | 4,096.83 |

continued on next page ▶

---

[26] The independent variables in this regression were chosen to both measure the correlation of land access and Federal program measures on the percentage of SDA and beginning farming operations, and to control for as much omitted variable bias as possible. All dollar amounts are measured in per acre terms. All continuous variables are log transformed.

[27] Note that the TOTAL survey was designed to provide State level estimates for the top 25 States in terms of cash receipts. It was not intended to be used to construct county estimates. We do so because it was necessary to obtain a sufficient sample size to conduct the analysis. County level aggregates of TOTAL survey data are not guaranteed to be representative of the underlying population.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

Strickland AR 0577

| Variable | Source | N | Min | Max | Mean | Median | Standard deviation |
|---|---|---|---|---|---|---|---|
| *Government programs variables* | | | | | | | |
| Percentage of SDA (race/ethnicity/gender) granted DLP/ GLP loan applications | 2017 REGStats | 1,736 | 0.00% | 100.00% | 59.76% | 50.00% | 34.54% |
| Percentage of SDA (race/ethnicity) granted DLP/GLP loan applications | 2017 REGStats | 1,079 | 0.00% | 100.00% | 75.77% | 80.00% | 26.84% |
| Percentage of all granted DLP/GLP loan applications | 2017 REGStats | 2,213 | 0.00% | 100.00% | 75.36% | 75.61% | 12.19% |
| ARC/PLC payments per acre | 2014–2017 FSA | 2,311 | 0 | 120.875 | 8.089 | 4.854 | 11.628 |
| Crop insurance indemnity payments per acre | 2013–2017 RMA | 2,311 | 0 | 2,746.99 | 25.368 | 21.612 | 84.065 |
| Total crop insurance premium per acre | 2013–2017 RMA | 2,311 | 0 | 1,892.91 | 35.455 | 35.339 | 51.517 |
| Percentage of cropland acres enrolled in general signup CRP | 2014–2017 FSA | 2,279 | 0.00% | 59.11% | 3.53% | 0.54% | 6.21% |
| Percentage of cropland acres enrolled in continuous signup CRP | 2014–2017 FSA | 2,279 | 0.00% | 30.06% | 1.98% | 0.59% | 2.71% |
| Percentage of cropland enrolled in CRP-TIP | 2014–2017 FSA | 2,279 | 0.00% | 2.35% | 0.04% | 0.00% | 0.11% |
| Percentage of cropland acres enrolled in ACEP | Origin-2017 NRCS | 2,251 | 0.00% | 19.78% | 0.10% | 0.00% | 1.01% |
| *Share of sales (by type of agricultural commodity) variables* | | | | | | | |
| Percentage of sales in field crops | 2017 Ag Census | 2,222 | 0.00% | 100.00% | 44.51% | 45.49% | 29.04% |
| Percentage of sales in specialty crops | 2017 Ag Census | 2,222 | 0.00% | 100.00% | 9.96% | 1.15% | 12.76% |
| Percentage of sales in livestock | 2017 Ag Census | 2,222 | 0.00% | 99.92% | 26.03% | 20.31% | 27.83% |
| Percentage of direct-to-consumer sales | 2017 Ag Census | 2,222 | 0.00% | 49.41% | 0.45% | 0.15% | 2.74% |
| *Demographic variables* | | | | | | | |
| Percentage of SDA population (race/ethnicity) | 2017 ACS | 2,264 | 0.00% | 99.36% | 39.24% | 15.09% | 19.96% |
| Percentage change in population | 2010 Census/ 2017 ACS | 2,264 | -23.20% | 98.52% | 5.42% | -0.88% | 6.72% |
| Average age of farmers | 2017 Ag Census | 2,263 | 39.7 | 67.5 | 58.57 | 58.6 | 2.226 |
| Percentage change in farmer age | 2012–2017 Ag Census | 2,263 | -33.83% | 12.94% | 0.47% | 0.52% | 3.12% |
| Rural Urban Continuum Code | 2013 ERS | 2,264 | 1 | 9 | | | |

Note: Certain statistics are omitted for TOTAL survey variables to protect producer confidentiality.

Source: Sources depend on the variable and are listed in the second column, including USDA, Census of Agriculture, U.S. Census American Community Survey (ACS); USDA, National Resources Conservation Service (NRCS); USDA, Risk Management Agency (RMA) data; 2014–2017 Farm Service Agency (FSA): derived from FSA administrative data by USDA, Economic Research Service (ERS); USDA 2014 Tenure, Ownership, and Transition of Agricultural Land (TOTAL) Survey.

Table 1 reports summary statistics for the variables used in the empirical analysis, which included data for the 25 TOTAL core States. The TOTAL survey used an area frame stratified random sample. The core States are the 25 States with the highest cash receipts during the prior 3-year period. Although the microdata are intended to be aggregated to the State-level for the TOTAL core States, this study aggregated to the county-level to obtain a reasonable sample size, accounting for the survey weights in the aggregation process.[28]

This report measured land availability to include the following:

- *Percentage of farmland that landlords anticipate selling or transferring to nonfamily members within the next 5 years.* This represented how much farmland will likely be available for purchase by farmers including SDA and beginning farmers. The smaller this percentage is, the less land available for farmers to begin or expand operations by purchasing farmland.

- *Number of acres of farmland available for lease at the county level.* Holding other variables constant, more land available for rent means more acreage to create a new farming operation or expand an existing one.

- *Average size of a lease in acres.* Holding constant the total availability of land for lease, a larger average lease size will make it more difficult for farmers to start or expand operations. The national average size of a lease is 94 acres and the median is 11 acres. Although many parcels are small, there are a smaller number of much larger parcels.

- *Percentage of leases renewed annually.* More long-term leases make land less available for new entrants seeking to take advantage of changing market conditions. Higher shares of annual leases indicated landlords and tenants should be able to adjust leasing terms to changing market conditions with relative ease.

- *Average length of a landlord/tenant relationship.* Specific pairs of landlords and tenants remain in agreements an average of 10 years. This could suggest that, although most leases are renewed annually, these renewals are frequently maintained by the same tenants. Longer landlord/tenant relationships may make it more difficult for beginning farmers to enter the market or more difficult for existing tenants (SDA or otherwise) to expand operations. Alternatively, if leases are renewed annually but are inflexible to change, landlords might be happy to lease to new tenants (SDA or otherwise) if current tenants are unwilling to meet their terms.

This research also constructed three additional county-level measures of land availability based on data from the 2017 Census of Agriculture:

- *Percentage of rented farmland acres.* This variable measures the percentage of all farmland (both cropland and pastureland) that is rented. The researchers expect a higher percentage of rented farmland will be positively correlated with a higher percentage of SDA and beginning farming operations.

- *Percentage of farmland that is cropland.* This variable is a measure of a county's division of land between farming and ranching. The researchers hypothesize SDA operations are more common in areas where livestock is more common, implying counties with a higher percentage of cropland should have a lower percentage of SDA operations.

- *Average agricultural land value per acre.* This measure is constructed as total land value divided by the sum of cropland and pastureland acreage. The higher the land values are, the more difficult it would be for limited resources or beginning farmers to acquire land. Since land is often financed using existing land holdings as collateral, higher land values make it relatively easier for established farms to buy land

---

[28] Data obtained from the TOTAL survey were aggregated using the Survey Means procedure in Statistical Analysis System (SAS) software.

16

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities,* AP-096   Strickland AR 0579
USDA, Economic Research Service

and relatively harder for beginning farmers to do so. Average land values vary by land quality, land use, and future development potential. Higher quality land is both more expensive and more productive. All farmers—including SDA and beginning farmers—face a tradeoff between obtaining more productive and more expensive land versus less productive and less expensive land.

## Measures of USDA Program Participation

Although this study does not have county-level data on all USDA efforts to support SDA and beginning farms, it does have detailed demographic information on participation in the USDA, Farm Service Agency (FSA) Direct Loan Program (DLP) and Guaranteed Loan Program (GLP).[29] The researchers used this information as a proxy for participation in the subset of the Direct and Guaranteed Loan Programs by SDA and beginning farmers.[30] These measures include the following:

- *Total participation rate in the DLP and GLP (regardless of demographic group).* Seventy-five percent of producers who applied for DLP and GLP loans had successfully received them. This statistic provides context for the participation rates of SDA producers reported below. This measure is included in the beginning farming operation estimations because no measure exists specifically for beginning farming operations.

- *Participation rates in the DLP and GLP for both definitions of SDA producers.* Under the race and ethnicity definition, national participation rates have been 75 percent. When using the race, ethnicity, and gender definition, participation rates have been 60 percent. The effect of higher county-level participation in these loan programs is expected to be positively correlated with both the percentage of SDA and beginning operations in a county.[31]

In addition to loan programs intended to aid beginning, limited-resource, and SDA operations, the researchers also included measures of payments from major Federal farm programs.

- *Agriculture Risk Coverage (ARC)/Price Loss Coverage (PLC) payments per acre.* This variable is constructed as the level of ARC/PLC payments in a county—based on information obtained from FSA—divided by base acres and averaged from 2014 through 2017.[32]

- *Indemnity payments per acre and total premium payments per acre.* Based on figures from the Federal crop insurance program operated by the Risk Management Agency (RMA), these two crop insurance measures are intended to capture program payments and agricultural risk. This research aggregated across crop and insurance types to obtain payment information at the county level. To minimize the impact of weather and production outcomes in any single year, values of each measure were averaged across 2013–2017.

- *Percentage of cropland acres enrolled in the Conservation Reserve Program (CRP).* This study separately measured the percentage of cropland enrolled in general signup CRP, continuous signup CRP, and the CRP-TIP programs to assess the association between CRP and the percentage of beginning farmers.

---

[29] These data come from the USDA Race, Ethnicity, and Gender Program Statistics (REGStats).

[30] There are several possible loans measures—those accounting for who applies, who is accepted, and the amount of funding distributed. Our use of participation rates is conditioned on available data—including the SDA and beginning-farmer information. Thus, these measures are used as best available proxies—they may not fully control for the many factors influencing the capability of beginning and SDA farmers to obtain loans.

[31] There are several possible measures of loan distribution—those reflecting who applies, who is accepted, and amount of funding. Our use of participation rates is conditioned by available data, including the SDA or beginning-farmer information. Thus, these measures are used as best-available proxies that may not fully control for the many factors influencing the capability of beginning and SDA farmers to obtain loans.

[32] Data on ARC/PLC payments for crop year 2017 obtained from the USDA, FSA website.

**17**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities,* AP-096    Strickland AR 0580
USDA, Economic Research Service

Researchers expect a negative statistical association between the percentage of CRP cropland and the percentage of SDA or beginning farmers due to less land available for rent and the expectation of CRP-TIP being correlated with a higher percentage of SDA and beginning farmers.

## Other Measures

Many of the regional disparities in land values, farm income, and other factors depend on what crops can be farmed, which depends on soil characteristics, weather patterns, and other factors considered to be intrinsic productivity. Crop mix is included in the analysis to control for factors that may mediate the relationship between operator shares and land-access measures.[33] This research measured crop mixes in three ways: as the value of field crop sales, animal product (livestock) sales, and specialty crop sales as shares of total county agricultural sales. This study also included a measure of the percentage of direct sales to consumers and retailers since this is a more common marketing channel for beginning farmers in particular (Low et al., 2015).[34]

This research examined the correlation between the changes of a county's population—as a proxy for local economic opportunity data[35]—and shares of SDA and beginning farmers. This study calculated this measure as the percentage change between 2017 population estimates from the American Community Survey and the 2010 population from the 2010 Decennial Census. Counties with population growth have more economic opportunities—thus, it's expected these counties have more SDA and beginning farming operations.

Similarly, this study accounted for urbanization using the 2013 Rural Urban Continuum Code (USDA, ERS, Rural Urban Continuum Code 2020). This is a categorical value equaling 1 for the most urban counties and 9 for most rural. Since this is meant to be a proxy for urban influence, this value is used as is rather than using separate categorical dummies for each of the possible 9 value categories.

Finally, to gauge how farmer age may matter, this research used the county average age of the producer population from the 2017 Census of Agriculture. Further, this study used the percentage change in average farmer age between 2012 and 2017 to see if the change in operator age matters. Counties with older operators and counties where average operator age is increasing may (or many not) have fewer beginning farming operations. There are no expectations regarding operator age and SDA operations.

---

[33] The researchers obtained crop sales data from the 2017 Census of Agriculture.

[34] Although this study considered using various forms of cropland rental rates, it was unclear which of these rental rates would be the most applicable to SDA and beginning farmers. Additionally, including all of the cropland rental rates could result in a collinearity problem.

[35] Areas with economic growth tend to experience population growth, while areas in economic decline tend to experience population decline.

# Findings on Land Access: What Factors have Statistically Significant Correlations?

Table 2 reports on whether a correlated factor (such as average lease size) has a non-zero and statistically significant relationship with each of the three county measures: (1) percentage of SDA farming operations according to the race and ethnicity definition (SDA-RE); (2) percentage of socially disadvantaged farming operations according to the race, ethnicity, and gender definition (SDA-REG); and (3) percentage of beginning farmers.[36] To estimate these statistical associations, this research used a fractional probit model. Since this research lacks the necessary data to identify causal effects, the primary interest remains in the direction of any statistical associations. This research, therefore, only reports the sign of statistically significant effects in table 2. These statistical associations should not be thought of as causal effects. Instead, they indicate correlations that suggest a deeper association between the factor and the outcome variable—or the share of SDA and beginning operations.

Table 2
**Statistical evidence of non-zero relationship between possible explanatory factors and measures of SDA and beginning farmers (using fractional probit model)**

| Explanatory factors | Model | | |
|---|---|---|---|
| | SDA-RE | SDA-REG | Beginning |
| Percentage of farmland to be transferred to nonfamily members | 0 | 0 | 0 |
| Log of average lease size in acres | - | - | - |
| Percentage of leases renewed annually | + | 0 | 0 |
| Log of average landlord- or tenant-relationship length | 0 | 0 | 0 |
| Percentage of rented farmland acres | + | + | + |
| Percentage of cropland acres | - | - | 0 |
| Log of land value per acre | 0 | 0 | 0 |
| Percentage of granted SDA (Race/Ethnicity) DLP/GLP loan applications | + | na | na |
| Percentage of granted SDA (Race/Ethnicity/Gender) DLP/GLP loan applications | na | + | na |
| Percentage of all granted DLP/GLP loan applications | na | na | 0 |
| Log of ARC/PLC payments per acre | 0 | 0 | 0 |
| Log of crop insurance indemnity payments per acre | 0 | 0 | 0 |
| Log of total crop insurance premium per acre | 0 | - | - |
| Percentage of cropland acres enrolled in general signup CRP | 0 | + | 0 |
| Percentage of cropland acres enrolled in continuous signup CRP | 0 | + | 0 |
| Percentage of cropland enrolled in CRP-TIP | 0 | 0 | 0 |
| Percentage of cropland acres enrolled in ACEP | 0 | 0 | 0 |
| Percentage of sales in field crops | - | - | - |
| Percentage of sales in specialty crops | - | 0 | 0 |
| Percentage of sales in livestock | - | - | - |
| Percentage of direct-to-consumer sales | + | + | 0 |
| Percentage change in population (2010–2017) | 0 | 0 | 0 |

continued on next page ▶

---

[36] See appendix C for a description of the methodology and the coefficient estimates used to create table 2.

Strickland AR 0582

◄ continued from previous page

| Explanatory factors | Model | | |
|---|---|---|---|
| | SDA-RE | SDA-REG | Beginning |
| Percentage of total SDA population (race/ethnicity) | + | + | na |
| Average age of farmers (in county) | - | 0 | - |
| Percentage change in average farmer age (2012–2017) | 0 | 0 | - |
| Rural Urban Continuum Code (2013) | - | - | - |

SDA = socially disadvantaged. Log = logarithm. DLP = Direct Loan Program. GLP = Guaranteed Loan Program. ARC = Agricultural Risk Coverage. PLC = Price Loss Coverage. CRP = Conservation Reserve Program. CRP-TIP = CRP Transition Incentives Program. ACEP = Agricultural Conservation Easement Program.

Notes: Each cell indicates whether a statistically significant (at the 10-percent level) relationship exists between an outcome variable and a possible explanatory factor, where:

0 : not statistically different from 0

- : statistically significant negative relationship

+ : statistically significant positive relationship

na : this variable was not included in this model

See appendix 3 for the estimated fractional probit coefficients and robust standard errors used to construct this table.

SDA-RE classifies socially disadvantaged farmers using race and ethnicity; SDA-REG uses race, ethnicity, and gender.

Source: USDA, Economic Research Service.

Several measures of land availability are statistically correlated with the percentage of socially disadvantaged (SDA) operations or the percentage of beginning operations. First, this research found the average lease size is negatively correlated with the percentage of SDA and beginning operations. This finding implies counties with larger lease sizes—on average—have a lower percentage of SDA and beginning farming operations. Second, this research found the percentage of leases annually renewed is positively correlated with the percentage of SDA-RE operations in the county—though not with SDA-REG operations. Third, counties with a higher percentage of rented farmland acres have been statistically correlated with a higher percentage of SDA and beginning operations, which suggests SDA and beginning operations are more likely to rely on farmland rental markets than land purchase markets to gain access to farmland. Finally, this research found the percentage of cropland acreage as a portion of farmland acreage is negatively correlated with SDA operations.

Some measures of Government program participation and payments are also statistically correlated with the percentage of SDA and beginning operations. First, this study found the percentage of accepted DLP and GLP applications are positively correlated with the percentage of SDA operations—both SDA-RE and SDA-REG definitions—which suggests counties with higher percentages of SDA operations experience higher rates of accepted applications in these loan programs. Second, the research found a negative association between crop insurance premiums and the percentage of SDA-REG operations and the percentage of beginning operations—but not of SDA-RE operations. Further, the percentage of SDA-REG operations has been positively correlated with the percentage of cropland acres enrolled in both the general and continuous Conservation Reserve Program (CRP). This study found no statistical association between the percentage of SDA or beginning operations and the percentage of cropland acres in Conservation Reserve Program-Transition Incentives Program (CRP-TIP) or Agricultural Conservation Easement Program (ACEP).

Strickland AR 0583

Next, this study assessed the statistical significance of the percentage of total sales by crop category. The percentage of sales in field crops was found to be negatively correlated with the percentage of SDA and beginning operations. The percentage of sales in specialty crops was found to be negatively correlated with the percentage of SDA-RE operations but not with SDA-REG operations. This study also found that SDA and beginning operations are negatively correlated with the percentage of livestock sales. This finding is surprising because the percentage of SDA and beginning operations are negatively correlated with the percentage of sales in field crops. If livestock sales figures are skewed by large livestock operations such as concentrated animal feeding operations, and SDA livestock operations primarily focus on ranching, then the authors would expect this result. However, the authors lack sufficient data to determine if this is the cause. The percentage of direct-to-consumer sales was positively correlated with the percentage of SDA operations. Finally, this study considered farmer and regional demographic measures. The percentage of the overall population classified as SDA was found to be positively correlated with the percentage of SDA operations. This research also found the average age of farm operators has been negatively correlated with the percentage of SDA-RE and beginning operations, though not SDA-REG operations. Additionally, this study found a negative association with the percentage of beginning operations in counties with an increase in operator age between 2012 and 2017. Finally, decreasing urbanization—counties with larger Rural Urban Continuum Codes (RUCC)—has a negative association with SDA and beginning operations.

# Conclusion

The aging of the average U.S. farmer has raised questions about the pace of land transfer to the next generation of farm operators. In addition, the increasing concentration of land ownership and the impacts of land retirement programs may affect the ability of beginning and SDA farmers to obtain access to farmland. Reflecting the issue's importance, USDA has maintained a portfolio of farm financing and other support programs that help SDA and beginning farming and ranching operations to initiate and expand.

For both SDA and beginning operations, this study found negative correlations with average lease size, the percentage of sales in field crops, the percentage of sales in livestock, and with decreasing urbanization. However, this study also found a positive correlation with the percentage of rented farmland acres. In addition, results have shown associations specific to each operation group:

- *For SDA-REG operations*: This study found a negative correlation with the percentage of cropland acres and the size of crop insurance premium per acre. Conversely, positive correlations were found with land enrolled in CRP; the percentage of granted USDA, FSA DLP/GLP loans; the percentage of direct-to-consumer sales; and the percentage of county population that is SDA.

- *For SDA-RE operations*: This research found a negative correlation across the percentage of cropland acres, percentage of sales in specialty crops, and the average age of farmers, whereas a positive correlation was found across the percentage of leases renewed annually, the percentage of granted USDA, FSA DLP and GLP loans, the percentage of direct-to-consumer sales, and the percentage of county population that is SDA.

- *For beginning operations*: This research found a negative correlation with the size of crop insurance premiums, the average age of farmers, and the change in average age.

It is important to restate that this report identifies factors—such as land availability, farm policy, and economic characteristics—that have statistically significant correlation with the percentage of SDA and beginning farming operations. And that these statistical correlation findings do not necessarily imply causality.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

Strickland AR 0584

In particular, when a factor (such as crop insurance premium per acre) influences a measure of interest (such as the share of SDA-RE operations), a correlation will be measurable. However, the existence of a correlation does not necessarily mean that an influence exists. There may be other factors, which are unobservable, that influence both the factor and the measure of interest.

This distinction (finding correlation but not causality) is an unavoidable limitation of this report due to available data being insufficient (in terms of breadth, precision, and abundance) to support rigorous models capable of discerning causality. These results are intended to foster fruitful avenues of future research on the nexus between farm policy and the financial wellbeing of SDA and beginning farming operations. Analyzing new editions of the TOTAL survey could help researchers identify causal effects. The 2018 Farm Bill contains provisions for future versions of the TOTAL survey to follow each subsequent Census of Agriculture.

# References

Agricultural Act of 1961 & Consolidated Farm And Rural Development Act Pub. L. No. 87–128, 75 Stat. 294 (1961).

Agricultural Resources and Environmental Indicators. Hellerstein, D., D. Vilorio, and M. Ribaudo (editors). 2019. *Agricultural Resources and Environmental Indicators, 2019.* EIB-208, U.S. Department of Agriculture, Economic Research Service, May 2019.

Bawa, S., and S. Callahan. 2021. *Absent Landlords in Agriculture: A Statistical Analysis*, ERR-281, U.S. Department of Agriculture, Economic Research Service.

Bigelow, D., A. Borshers, and T. Hubbs. 2016. *U.S. Farmland Ownership, Tenure, and Transfer,* EIB-161, U.S. Department of Agriculture, Economic Research Service.

Bureau of Labor Statistics. 2020. Labor Force Statistics from the Current Population Survey: 2020.

Burns, C., and R. Hoppe. 2019. Agricultural Resources and Environmental Indicators, 2019, EIB-208, U.S. Department of Agriculture, Economic Research Service.

Boyce, B. 2019. "2017 Census of Agriculture: An Aging Farm Population But With Optimism," AGDAILY-Insights News.

Claassen, R., D. Hellerstein, and S. Wallander. December 2019. "2018 Farm Act Retains Conservation Programs but Could Reduce Payments for Land Retirement," Amber Waves, U.S. Department of Agriculture, Economic Research Service.

Congressional Research Service. 1996. Credit Provisions of the Enacted 1996 Farm Bill, 96-431 ENR, May 1996.

Congressional Research Service. 2008. The 2008 Farm Bill: Major Provisions and Legislative Action, RL34696, November 2008.

Freedgood, J., M. Hunger, J. Dempsey, and A. Sorensen. 2020. "Farms Under Thread: The State of the States," American Farmland Trust, Washington, DC.

Government Accountability Office. 2019. Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited, GAO-19-539.

Hoppe, R.A. 2014. Structure and Finances of U.S. Farms: Family Farm Report, 2014 Edition, EIB-132, U.S. Department of Agriculture, Economic Research Service.

Johnson, A., and G. Ready. 2017. "Pathways to Land Access: A Study of the Conservation Reserve Program – Transition Incentives Program in Four States," Center for Rural Affairs.

Katchova, A.L., and M.C. Ahearn. 2016. "Dynamics of Farmland Ownership and Leasing: Implications for Young and Beginning Farmers," *Applied Economic Perspectives and Policy* 38(2):334–350.

Key, N. and G. Lyons. 2019. *An Overview of Beginning Farms and Farmers,* EB-29, U.S. Department of Agriculture, Economic Research Service.

Low, S.A., A. Adalja, E. Beaulieu, N. Key, S. Martinez, A. Melton, A. Perez, K. Ralston, H. Stewart, S. Suttles, S. Vogel, and B.B.R. Jablonski. 2015. *Trends in U.S. Local and Regional Food Systems*, AP-068, U.S. Department of Agriculture, Economic Research Service.

MacDonald, J., P. Korf, and R. Hoppe. 2013. *Farm Size and the Organization of U.S. Crop Farming.* EIB-152, U.S. Department of Agriculture, Economic Research Service.

MacDonald, J., R. Hoppe, and D. Newton. 2018. *Three Decades of Consolidation in U.S. Agriculture.* EIB-189, U.S. Department of Agriculture, Economic Research Service.

MacDonald, J. 2020. "Consolidation in U.S. Agriculture Continues," *Amber Waves*, U.S. Department of Agriculture, Economic Research Service.

McFadden, J., and R. Hoppe. 2017. *The Evolving Distribution of Payments from Commodity, Conservation, and Federal Crop Insurance Programs*, EIB-184, U.S. Department of Agriculture, Economic Research Service.

Ruhf, K.Z. 2013. "Access to Farmland: A System Change Perspective," *Journal of Agriculture, Food Systems, and Community Development* 4(1): 51–60.

Sullivan, P., D. Hellerstein, D. McGranahan, and S. Vogel. July 2006. "Farmland Retirement's Impact on Rural Growth," *Amber Waves*, U.S. Department of Agriculture, Economic Research Service.

Target Participation Rates for Socially Disadvantaged Groups of 2010, CFR § 761.208 (2010).

Taylor, M.R., N.P. Hendricks, G.S. Sampson, and D. Garr. 2021. "The Opportunity Cost of the Conservation Reserve Program: A Kansas Land Example," *Applied Economic Perspectives and Policy* 43(2): 849–865.

Todd, J. March 2020. "U.S. Farm Household Finances*,"* presented at National Agricultural Credit Conference, March 2020.

U.S. Census Bureau. American Community Survey, 2017 American Community Survey 5-Year Estimates, Table B03002, February 2020.

U.S. Department of Agriculture, Economic Research Service. 2019. *Agriculture Improvement Act of 2018: Highlights and Implications. Credit: Title V.*

U.S. Department of Agriculture, Economic Research Service. 2020. *Rural-Urban Continuum Codes.*

U.S. Department of Agriculture, Farm Service Agency. 2019a. *Loans for Beginning Farmers and Ranchers: Fact Sheet.*

Strickland AR 0586

U.S. Department of Agriculture, Farm Service Agency. 2019b. *Farm Loan Overview: Fact Sheet.*

U.S. Department of Agriculture, Farm Service Agency. 2019c. *Conservation Reserve Program Monthly Summary, November 2019.*

U.S. Department of Agriculture, Farm Service Agency. 2020. *Farm Loan Programs.*

U.S. Department of Agriculture, Farm Service Agency. 2021. *Conservation Reserve Program Statistics.*

U.S. Department of Agriculture, National Agricultural Statistics Service. 2019. 2017 Census Full Report, Appendix B.

U.S. Department of Agriculture, National Agricultural Statistics Service. 2020. Farms and Land in Farms 2019 Summary.

U.S. Department of Agriculture, Race, Ethnicity, and Gender Program Statistics, February 2019.

U.S. Department of Agriculture, Risk Management Agency. 2018. *Summary of Business.*

Whitt, C., J. MacDonald, and J. Todd. 2020. *America's Diverse Family Farms: 2020 Edition,* EIB-220, U.S. Department of Agriculture, Economic Research Service.

Wu, J.J., and H. Lin. 2010. "The Effect of the Conservation Reserve Program on Land Values," *Land Economics* 86(1):1–21.

Zhang, W., and C.J. Nickerson. 2015. "The Housing Market Bust and Farmland Values: Identifying the Changing Influence of Proximity to Urban Centers," *Land Economics* 91(4):605–626.

Zulauf, C. 2013. "Putting the Age of U.S. Farmers in Perspective," University of Illinois at Urbana-Champaign Department of Agricultural and Consumer Economics, farmdoc daily (3):202.

# Appendix A. Legal Definitions of Socially Disadvantaged and Beginning Farmers

A socially disadvantaged (SDA) farmer or rancher belongs to a "socially disadvantaged group," which is any group "whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities."[37] USDA program agencies differ in their interpretation of this definition, and thus identify somewhat different populations as belonging to socially disadvantaged groups.

- For example, the USDA's Farm Service Agency (FSA) defines "socially disadvantaged groups" as including African Americans, Alaska Natives, American Indians, Hispanics (White or otherwise), Asian Americans, and women.[38]

- The USDA's Natural Resources Conservation Service (NRCS) definition, on the other hand, excludes women from their definition of "socially disadvantaged group."[39]

A "beginning farmer or rancher" is defined as a person who "has not operated a farm or ranch," or "has not operated a farm or ranch for not more than 10 years" and "meets such other criteria as the Secretary may establish."[40] As noted, the last clause of this definition likewise gives program agencies latitude in implementing more restrictive definitions of who qualifies as a "beginning farmer or rancher."

USDA, FSA restricts the definition of beginning farmer to exclude farmers who own operations that exceed 30 percent of the average size of a farm within that county as determined by the most recent Census of Agriculture.[41]

- The USDA, NRCS definition doesn't impose a restriction on farm size to qualify as a beginning farmer. However, their definition requires all operators on the operation to have less than 10 years of farming experience for the operation to qualify for beginning farming programs.[42]

---

[37] Definition comes from Section 335 87-128 of the Consolidated Farm and Rural Development Act of 1961.

[38] For further details, see USDA, FSA Newsroom, *Minority and Women Farmers and Ranchers*.

[39] For further details, see USDA, NRCS, *Historically Underserved Farmers & Rancher*.

[40] Definition comes from Section 2501 of the Food, Agricultural, Conservation and Trade Act of 1990.

[41] For further details, see USDA, FSA, *Farm Loan Programs: Beginning Farmers and Ranchers Loans*.

[42] For further details, see USDA, NRCS, *New and Beginning Farmer and Rancher*.

Strickland AR 0588

# Appendix B: USDA Loan Programs and SDA and Beginning Farmers

USDA, Farm Service Agency (FSA) delivers several types of loans through the Direct Loan Program, including intermediate term (7-year), annual operating loans, long-term real estate, and emergency loss loans. As described in table B.1, several types of long-term real estate loans—Direct Farm Ownership (FO) Loans—vary by loan limits, the fraction of the purchase price the loan will cover, and the provided interest rate. Between fiscal year (FY) 2017 and FY 2019, between $1.04 and $1.47 billion was annually obligated to the three main Direct FO loans (USDA, FSA, 2019a).

Table B.1
**Description of Farm Service Agency direct loan programs**

| Loan program name | Maximum loan (in dollars) | Maximum % of purchase price covered | Interest Rate (2019). This can vary by year. | Beginning and SDA farmer only? |
|---|---|---|---|---|
| Direct Farm Ownership loan | $600,000 | 100% | 3.25% | A "farm ownership: microloan" is available for beginning farmers program (with a maximum of $50,000). |
| Direct Down Payment | $300,000 | 45% | 1.50% | Available only to beginning and SDA farmers. Applicants may not own more than 30 percent of the average size farm at the time of the application. |
| Direct Farm Ownership participation | $600,000 | 50% | 2.50% | No |

Note: Joint financing loans are also known as participation loans.

Source: National Sustainable Agriculture Coalition: Grassroots Guide to Federal Farm and Food Programs; Overview of Farm Bill Programs and Grants; USDA, FSA: Guide to FSA Farm Loans; and USDA, FSA: Programs and Services, Farm Loan Programs (FSA, 2020a).

As described in table B.2, there are several types of real estate loans covered by the Guaranteed Loan Program. Although not subsidizing interest rates, these programs provide lenders with guarantees of up to 95 percent for beginning farmers in the case of operator default. Between 2017 and 2019, between $2.05 and $2.28 billion per year were obligated to Guaranteed FO Loans (USDA, FSA, 2019b).

Strickland AR 0589

Table B.2
**Description of FSA guaranteed loan programs**

| Program name | Maximum loan | Requirements | Rate | Beginning and SDA farmer only? |
|---|---|---|---|---|
| Guaranteed Farm Ownership | 1,750,000 | Negotiated with lender | Negotiated with lender | No |
| Land Contract Guarantee | $500,000 | 5% down payment required | Not more than 3% of the interest rate used for Direct Farm Ownership Loans (as described in table 1) | Provides federal loan guarantees to retiring farmers who self-finance the sale of their land to beginning and SDA farmers. |

Notes: FSA = USDA, Farm Service Agency. SDA = socially disadvantaged.

Source: USDA, FSA, Guaranteed Farm Loans, frequently asked questions and National Sustainable Agriculture Coalition: Grass Roots Guide to Federal Farm And Fool Programs, Direct and Guaranteed Farm Loans.

Socially disadvantaged (SDA) and beginning farms may participate in any Direct and Guaranteed Loan Programs if they meet all eligibility criteria. Some programs, however, are mostly reserved for SDA and beginning farms.

- At the start of 2019, 70 percent of Direct Farm Ownership funds was reserved for SDA and beginning farms. A total of $1.11 billion was obligated in Direct Loans in FY 2019 to SDA and beginning farms—up from $833 million in 2017.

- A total of $783 million was obligated in Guaranteed Farm Ownership in FY 2019 to SDA and beginning farms compared with from $779 million in 2017.

For calendar year—not fiscal year—2019, table B.3 breaks down the $1.195 billion obligated to Direct Loan Programs.

Table B.3
**2019 participation of beginning and SDA operators in Direct Farm Ownership (FO) loans**

| | Beginning farmers only | SDA farmers only |
|---|---|---|
| Millions of dollars | | |
| Total direct FO loans | $923 | $272 |
| Regular | $411 | $42 |
| Down payment | $192 | $18 |
| Participation | $320 | $212 |
| Number of borrowers | | |
| Total direct FO loans | 3,851 | 1,155 |
| Regular | 1,503 | 180 |
| Down payment | 1,134 | 122 |
| Participation | 1,214 | 853 |

Notes: These values are for calendar year 2019 (not fiscal year 2019). FO = farm ownership. SDA = socially disadvantaged.

Source: USDA Guaranteed Loan System (GLS) Obligations Database (January 2020).

For illustrative purposes, consider a highly stylized example comparing the impacts of different subsidized loan rates. For simplicity, assume a 30-year loan of $600,000, ignore down payments—assume the same down payment for all types of loans—and assume no inflation.

Strickland AR 0590

Table B.4

**Stylized examples of the impacts of subsidized loan rates: assuming a $600,000 loan with a 30-year term and no down payment**

| Type of loan | Source of funds | Interest rate | Total costs over life of loan, thousands of dollars |
|---|---|---|---|
| Commercial lender | Commercial lender (100%) | 6 | $1,295 |
| Direct Farm Ownership | USDA (100%) | 3.3 | $946 |
| Commercial lender and direct down payment | Commercial lender (50%) | 6 | $648 |
| | USDA (50%) | 1.5 | $373 |
| | Total cost | .. | $1,021 |
| Commercial lender and Direct Farm Ownership Participation | Commercial lender (50%) | 6 | $648 |
| | USDA (50%) | 2.5 | $428 |
| | Total cost | .. | $1,075 |
| Commercial lender | Commercial lender (100%) | 4.5 | $1,094 |
| Commercial lender and Direct Down Payment | Commercial lender (50%) | 4.5 | $547 |
| | USDA (50%) | 1.5 | $373 |
| | Total cost | .. | $920 |
| Commercial lender and Direct Farm Ownership participation | Commercial lender (50%) | 4.5 | $547 |
| | USDA (50%) | 2.5 | $428 |
| | Total cost | .. | $975 |

Source: USDA Economic Research Service calculations based on commercial bank rate derived from approximate average of 2018 and 2019 rates from the Kansas City Federal Reserve, table C.4.

Although this simplified example is not meant to describe real-world conditions, it does highlight a few broad features. Compared with the stylized commercial loan, the stylized Direct Loan from USDA, Farm Service Agency (FSA) would yield over 30 percent in savings on total payments for land acquisition. Similarly, the savings from a stylized subsidized Direct Down Payment Loan is lessened (relative to the Direct Farm Ownership) because the commercial source interest rate is higher.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

Strickland AR 0591

# Appendix C: Results from Regression Models

This study used several regression models to examine possible relationships between beginning farmers, SDA farmers, and several possible explanatory factors. These regressions offered a parsimonious statistical methodology that permits simultaneous consideration of many potential factors.

However, the available data are marked by differences in geographical scope and year. In particular, the TOTAL data is available for 25 States, and was collected to report State-level estimates. Hence many of the measures used in these models are imprecise. They are not suitable for causal inference. They are best used as proxy measures to approximate otherwise unobservable relationships.

Thus, it has been difficult to construct models to provide robust and efficient measures of causation. Hence, this research used these models to highlight correlative relationships between possible explanatory factors and the measures of beginning and SDA farmers. In addition, this study reported which variables have statistically significant—either negative or positive—impacts.

Table C.1

**Estimation results, including estimated coefficients and standard errors, for the fractional probit model and ordinary least squares (OLS) model**

| | Model | | | | | |
|---|---|---|---|---|---|---|
| | OLS | | | Fractional probit | | |
| | SDA-RE | SDA-REG | Beginning | SDA-RE | SDA-REG | Beginning |
| Explanatory factors | | | | | | |
| Percentage of farmland to be transferred to nonfamily members | 0.016 (0.026) | 0.023 (0.027) | 0.002 (0.010) | 0.055 (0.138) | 0.080 (0.102) | 0.008 (0.030) |
| Log of average lease size in acres | -0.008** (0.003) | -0.009** (0.003) | -0.006*** (0.001) | -0.042*** (0.012) | -0.032*** (0.011) | -0.020*** (0.005) |
| Percentage of leases renewed annually | 0.008 (0.006) | 0.008 (0.007) | 0.002 (0.004) | 0.064* (0.036) | 0.035 (0.027) | 0.010 (0.012) |
| Log of average landlord/tenant relationship length | -0.001 (0.002) | 0.000 (0.002) | -0.000 (0.001) | -0.006 (0.013) | 0.001 (0.007) | -0.001 (0.004) |
| Percentage of rented farmland acres | 0.018** (0.007) | 0.019** (0.007) | 0.017*** (0.005) | 0.119*** (0.041) | 0.077*** (0.029) | 0.060*** (0.017) |
| Percentage of cropland acres | -0.073*** (0.024) | -0.068*** (0.020) | -0.016 (0.010) | -0.322*** (0.117) | -0.223*** (0.074) | -0.053 (0.034) |
| Log of land value per acre | 0.011 (0.011) | 0.011 (0.014) | -0.003 (0.004) | 0.007 (0.067) | 0.014 (0.054) | -0.015 (0.012) |
| Percentage of SDA (race/ethnicity) DLP/GLP applications granted | 0.007*** (0.002) | na | na | 0.100*** (0.015) | na | na |
| Percentage of SDA (race/ethnicity/gender) DLP/GLP loan applications that are granted | na | 0.009 (0.006) | na | na | 0.052** (0.022) | na |
| Percentage of all DLP/GLP loan applications that are granted | na | na | -0.012 (0.009) | na | na | -0.036 (0.029) |
| Log of ARC/PLC payments per acre | -0.002 (0.002) | -0.001 (0.003) | -0.001 (0.001) | -0.007 (0.014) | -0.003 (0.011) | -0.001 (0.003) |
| Log of crop insurance indemnity payments per acre | 0.000 (0.003) | 0.005 (0.004) | 0.004* (0.003) | 0.003 (0.022) | 0.023 (0.016) | 0.014 (0.009) |

continued on next page ▶

Strickland AR 0592

◄ continued from previous page

| | Model | | | | | |
|---|---|---|---|---|---|---|
| | OLS | | | Fractional probit | | |
| | SDA-RE | SDA-REG | Beginning | SDA-RE | SDA-REG | Beginning |
| Log of total crop insurance premium per acre | 0.000 (0.003) | -0.007* (0.004) | -0.007** (0.003) | 0.002 (0.020) | -0.032** (0.016) | -0.023** (0.009) |
| Percentage of cropland acres enrolled in General Signup CRP | 0.033 (0.062) | 0.110** (0.046) | 0.013 (0.030) | -0.021 (0.276) | 0.318** (0.150) | 0.043 (0.101) |
| Percentage of cropland acres enrolled in Continuous Signup CRP | 0.124 (0.099) | 0.197** (0.075) | -0.021 (0.049) | 0.439 (0.446) | 0.694** (0.272) | -0.074 (0.173) |
| Percentage of cropland enrolled in CRP-TIP | -0.486 (1.062) | -0.243 (1.213) | -0.359 (0.767) | -8.175 (8.116) | -0.967 (5.646) | -1.633 (2.667) |
| Percentage of cropland acres enrolled in ACEP | -0.214 (0.151) | 0.117 (0.170) | 0.144 (0.190) | -0.248 (0.734) | 0.836 (0.555) | 0.478 (0.594) |
| Percentage of sales in field crops | -0.033 (0.024) | -0.041 (0.026) | -0.023* (0.012) | -0.276** (0.138) | -0.203** (0.100) | -0.078* (0.041) |
| Percentage of sales in specialty crops | -0.061 (0.037) | -0.042 (0.044) | -0.008 (0.021) | -0.289* (0.166) | -0.166 (0.150) | -0.026 (0.068) |
| Percentage of sales in livestock | -0.043** (0.018) | -0.050** (0.019) | -0.036*** (0.010) | -0.225*** (0.076) | -0.197*** (0.063) | -0.118*** (0.033) |
| Percentage of direct to consumer sales | -0.021 (0.057) | 0.118 (0.073) | 0.102 (0.103) | 0.346* (0.200) | 0.575** (0.237) | 0.341 (0.322) |
| Percentage change in population (2010–17) | -0.057 (0.034) | -0.031 (0.047) | 0.022 (0.039) | -0.222 (0.239) | -0.078 (0.199) | 0.077 (0.132) |
| Percentage of total population that is SDA (race/ethnicity) | 0.348*** (0.066) | 0.320*** (0.059) | na | 1.766*** (0.152) | 1.163*** (0.147) | na |
| Average age of farmers (in county) | -0.005** (0.002) | -0.001 (0.002) | -0.007*** (0.001) | -0.025*** (0.008) | 0.002 (0.007) | -0.022*** (0.004) |
| Percentage change in average age of farmers (2012–17) | 0.182** (0.075) | 0.074 (0.079) | -0.370*** (0.052) | 0.579 (0.454) | -0.028 (0.333) | -1.288*** (0.181) |
| Rural-Urban Continuum Code (2013) | 0.000 (0.000) | -0.001 (0.001) | -0.002*** (0.001) | -0.008*** (0.003) | -0.008*** (0.003) | -0.008*** (0.002) |
| R-Square | 0.619 | 0.606 | 0.505 | na | na | na |

na = not available/variable not included in this model. SDA = socially disadvantaged. SDA-REG = socially disadvantaged (race, ethnicity and gender definition), SDA-RE = socially disadvantaged (race and ethnicity definition). DLP = Direct Loan Program. GLP = Guaranteed Loan Program. CRP = Conservation Reserve Program. OLS = ordinary least squares. CRP = Conservation Reserve Program. CRP-TIP = CRP-Transition Incentive Program. ACEP = Agricultural Conservation Easement Program. ARC = Agriculture Risk Coverage. PLC = Price Loss Coverage.

*,**,*** = statistical significance at the 10-percent, 5-percent and 1-percent levels, respectively.

Notes: There are 2,162 observations. The fractional probit models do not generate R-squared measures. For a description of the fractional probit estimator, see the manual for the STATA statistical software, RFRACREG procedure.

Source: USDA, Economic Research Service.

**30**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service                    Strickland AR 0593

Table C.1 in appendix C has provided the actual coefficients and the significance measures from two sets of models. These were used to construct table C.2 to identify factors likely to have non-zero impacts.

- The ordinary least squares (OLS) models have yielded a straightforward interpretation—the coefficients are changes in probability with a unit change in a variable. However, this linear probability model estimator is subject to bias, especially when probabilities are near 0.0 and 1.0.

- The fractional probit model has provided unbiased estimates of coefficients. However, interpretation of the coefficients is not straightforward, as the impacts of a change in one variable depends on the values of other variables.

- Both models included State-specific fixed effects. To save space, they are not reported. It is important to note these fixed effects will capture overall—statewide—impacts of State-level programs designed to assist beginning and SDA farmers.

- Endogeneity and simultaneity were not accounted for. Hence, there may be pairs of dependent variables and explanatory factors both impacted by other factors. In such cases, the explanatory factor—even though it has a statistically significant coefficient—has not necessarily impacted a dependent variable.

Table C.2
**Summary of significant factors**

| Factor | Negative correlation | | | Positive correlation | | |
|---|---|---|---|---|---|---|
| | SDA-RE | SDA-REG | Begin | SDA-RE | SDA-REG | Begin |
| Log of average lease size in acres | ✓ | ✓ | ✓ | | | |
| Percent of cropland acres | ✓ | ✓ | | | | |
| Log of total crop insurance premium per acre | | ✓ | ✓ | | | |
| Percent of sales in field crops | ✓ | ✓ | ✓ | | | |
| Percent of sales in specialty crops | ✓ | | | | | |
| Percent of sales in livestock | ✓ | ✓ | ✓ | | | |
| Average age of farmers | | ✓ | | ✓ | | |
| Percent change in average age of farmers | | | ✓ | | | |
| Rural Urban Continuum Code (2013) | ✓ | ✓ | ✓ | | | |
| Percent of leases renewed annually | | | | ✓ | | |
| Percent of rented farmland acres | | | | ✓ | ✓ | ✓ |
| Percent of FSA DLP/GLP loan applications granted | | | | ✓ | ✓ | |
| Percent of cropland acres enrolled in CRP (general or continuous) | | | | | ✓ | |
| Percent of direct-to-consumer sale | | | | ✓ | ✓ | |
| Percent of total population that is SDA | | | | ✓ | ✓ | |

Notes: FSA = Farm Service Agency. DLP = Direct Loan Program. GLP = Guaranteed Loan Program. CRP = Conservation Reserve Program. SDA = socially disadvantaged. This is a condensed version of table 2 and only lists significant factors. Appendix table C.2, lists all factors and their significance levels. Bolded check marks indicate statistically significant status at 5 percent or 1 percent. Non-bolded check marks indicate statistically significant status at 10 percent. Empty cells indicate no statistical significance (t-stat significance above 10 percent). There are no variables that have a significant positive correlation in one model and a significant negative correlation in another model.

Source: USDA, Economic Research Service.

Strickland AR 0594

The report used the fractional probit model estimates to form table C.2. However, in all cases, the sign of the coefficients was the same between the OLS and fractional probit models. And about 70 percent of the factors that are statistically significant in the fractional probit model were also statistically significant—at the 10-percent level—in the OLS model. In addition, the State-specific fixed effects always have the same sign when comparing OLS and fractional probit models.

Dependent variables (county measures):

- SDA-RE: percentage of socially disadvantage farmers, using race and ethnicity.

- SDA-REG: percentage of socially disadvantage farmers, using race, ethnicity, and gender.

- Beginning: percentage of farmers who have farmed for 10 or less consecutive years.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096    Strickland AR 0595
USDA, Economic Research Service

Secretary Vilsack:    Good morning. And it's an honor to extend a warm welcome to the 2023 public meeting of the advisory committee on minority farmers. I want to thank the committee members and each of whom has ==volunteered their time to inform USDA's efforts to forge connections with minority farming communities== in ways that are long overdue.

Today's convening is an opportunity for individuals joining in person and virtually to lead the conversation on this important work. USDA centers equity, accessibility and inclusion in everything we do. This involves taking a hard look at our past, and dedicating ourselves to making adjustments in our programs, policies and structures so that we become a model department going forward.

And it's the advisory committees like this one that bridges the gap between us and those we aim to better serve. This meeting gives an opportunity to receive your valuable input, so that we can apply it throughout our policies and programs. As part of this broader work, just a few weeks ago, USDA received a set of 32 interim recommendations from our Equity Commission, which like this advisory certain, gives us feedback that USDA will implement to better our organization and improve the experience for our customers.

==The Equity Commission benefited form the prior work of this group, so thank you for those efforts as well. It's recommendations for broadening access to our agricultural programs span issues from heirs' property to technical assistance, base acres, and county committees. These are just a few examples.== And we're already working to implement many of these recommendations to ensure that USDA assists all farmers and ranchers across America.

Over the course of the week, representatives from USDA will update this advisory committee on steps taken since your last meeting. And I'll start it off today by sharing a few recent initiatives we've undertaken to reach underserved farmers and ranchers. One key to progress is President Biden's historic Inflation Reduction Act, or IRA. Under the IRA, farm loan borrowers with USDA, who face financial distress may be eligible for programs specifically designed to keep them on their farms.

In October 2022, ==USDA's Farms Service Agency provided 800 million dollars in IRA automatic assistance to more than 13000 USDA borrowers. That includes 600 million to 11000 delinquent borrowers whose accounts are now current. And more than 200 million dollars to 2100 borrowers who had their farms foreclosed== on, but were left with outstanding debts, which have now been resolved. And these payments are just the start.

The President's 2024 budget proposal also contains several congressional recommendations that would improve USDA's flexibility in making and servicing farm loans. These are steps that do so much for distressed borrowers, but they mean nothing if those impacted aren't aware of the opportunity.

That's why USDA is sending out letters to all of our 100000 direct borrowers, letting them know about a new tool to intervene earlier if they're experiencing cashflow challenges. Now, under a separate program, also funded by the IRA, USDA intends to provide financial assistance to producers who have experienced direct farm lending discrimination in the past. These programs are two steps of many in the long march towards justice and an inclusive, equitable USDA.

We're also proactively working to grow involvement of underserved producers in our department wide efforts. We dedicated a pool of funds under our partnership for climate smart commodities opportunity, as well as our forestry partnership initiative to focus on innovative environmental projects that emphasize enrolling small and underserved producers. And NRCS's Equity and Conservation Agreements Effort funds partnerships that deliver conservation assistance to underserved producers. Last year, this program administered $50 million through more than 100 agreements, and now we have a funding opportunity open through April 27th for up to 70 million dollars for the next round of agreements. These partnerships will play a critical role in reaching new producers through outreach and engagement.

Additionally, our Farm Service Agency, FSA, has been working to keep farmers farming as well. Among the first actions of the Biden-Harris administration at USDA, was to suspend farm loan foreclosures, which disproportionately involved underserved farmers, and to reopen the Coronavirus Food Assistance Program, or CFAP, with new targeted outreach partnerships. FSA also targeted assistance to underserved farmers through the various ad hoc and permanent natural disaster and pandemic assistance programs. The improved Emergency Relief Program, known as ERP, streamlined the application for producers with crop insurance or noninsured crop disaster assistance, or NAP, coverage, and cut the paperwork burden by an estimated 90%.

Both the CFAP and ERP programs recognize that underserved producers often have fewer resources to weather disaster and, as a result, increased the payment rate.

This Administration has also improved the permanent programs as well. In January, we made a major overhaul of the NAP Risk Management Program to streamline the process and make the basic catastrophic coverage that is free to underserved producers automatic with an opt-out. USDA even made this streamline NAP coverage retroactive for anyone already on file as being underserved, which includes minority farmers. And FSA is in the process of reaching out to eligible producers to sign them up before June 2023.

These are some of the USDA's many actions to better serve minority and other underserved farmers, but we know this work is a collaborative effort. We recognize that not only do farmers and ranchers of all races deserve a seat at the table, but America as well needs them to participate in our agricultural economy, and we're committed to listening to and supporting your vital work.

You bring these experiences to the forefront, and by doing so, you show us how we can better serve all farmers as we explore areas where we may be missing the mark.

As your Department liaison will explain, this year we'll highlight some questions on which your feedback will be particularly helpful. We're grateful for the opportunity to come to lasting solutions by working with advisory groups like this one. Best of luck on a successful meeting and thank you for your service. I look forward to our continued collaboration as we work to serve the many, and not just the few.

Strickland AR 0598

**LDF** Defense Fund

*Advancing racial justice since 1940*

June 15, 2023

The Honorable Thomas J. Vilsack
Secretary
U.S. Department of Agriculture
1400 Independence Avenue SW
Washington, DC 20250

     RE: Implementation of Inflation Reduction Act Sec. 22006

Dear Secretary Vilsack:

     We are writing to you to express our concerns about the implementation of Section 22006 of the Inflation Reduction Act of 2022, and to offer suggestions for additional steps the U.S. Department of Agriculture (USDA) should take to ensure that the debt relief provided by that Act reaches the farmers most in need, including Black farmers. While we appreciate the efforts the USDA has made to get relief to distressed farmers, we are concerned about how the remaining Section 22006 funds will be allocated. We urge the USDA to adopt the recommendations put forward in this letter so that distressed Black farmers reap the benefits of this historic financial assistance program, which is the result of their steadfast organizing efforts for over two decades.

     Unfortunately, Black agrarian communities have struggled for decades. Due to the lack of financial resources caused by USDA discrimination,[1] Black farmers have suffered devastating land loss and economic distress. Between 1910 and 1997, Black farmers lost 90 percent of their property.[2] White farmers lost only two percent in the same period.[3] A 2022 study published in *American Economic Association's Papers and Proceedings* found that Black farmers lost about $326 billion worth of land and generative wealth in the United States due to discrimination during the 20th century.[4] Because Black farmers were fighting to keep their land, they often could not make other investments in wealth-building assets.[5] Moreover, Black farmers still struggle to access USDA programs. Direct loans are supposed to be among the easiest to get at USDA.[6] Yet, in 2022, the USDA granted direct loans to only 36 percent of applicant farmers who identified as Black,

---

[1] Emma Hurt, *The USDA is Set to Give Black Farmers Debt Relief. They've Heard That One Before,* NPR (June 4, 2021, 4:48 PM ET), https://www.npr.org/2021/06/04/1003313657/the-usda-is-set-to-give-black-farmers-debt-relief-theyve-heard-that-one-before ("'When people do not have access to the broad array of services and benefits at the Department of Agriculture, they have been at a severe disadvantage,' [Sec. Vilsack] said. 'White farmers obviously had the full advantage. They had all the programs. And so they had a chance to grow, to expand. To buy the best equipment, to plant their crop in a timely way. Their yields were good. And so they got larger and larger.'").
[2] Nathan Rosenberg & Bryce W. Stucki, *How USDA Distorted Data to Conceal Decades of Discrimination Against Black Farmers*, THE COUNTER (Jun. 26, 2019), https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/.
[3] *Id.*
[4] Dana Francis, et al, *How the Government Helped White Americans Steal Black Farmland*, THE NEW REPUBLIC (May 5, 2022), https://newrepublic.com/article/166276/black-farm-land-lost-20th-century-billions.
[5] Chandelis Duster & Janie Boschma, *Many Black Farmers Nationwide Struggling to Keep Their Farms Afloat as they Face Disparities Across the Board*, CNN (Dec. 15, 2021), https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html.

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

naacpldf.org
212-965-2200

Strickland AR 0599



according to an NPR analysis of USDA data. Sixteen percent of Black farmers were rejected—the highest amount for all demographic groups.[7] In contrast, 72 percent of white farmers who applied were approved and only 4 percent of white farmers were denied. As a result of past discrimination and ongoing disparities, according to the Center for American Progress, full-time Black farmers today earn one-seventh of the farm income that white farmers earn.[8] A study by McKinsey similarly found that Black farmers are also more likely to generate a net loss, be given a long-term production contract, and operate on less land than white farmers.[9]

Section 22006 authorizes the USDA to provide $3.1 billion to provide payments to and for the cost of loans or loan modifications for economically distressed borrowers of direct or guaranteed loans administered by the Farm Service Agency (FSA).[10] We are pleased that approximately 19,000 distressed farmers have received relief under Section 22006 totaling over $1 billion. This relief includes assistance to several Black farmers who had suffered crushing debts, farm foreclosures, and financial ruin due to the disastrous implementation of the 1999 *Pigford v. Glickman* class action racial discrimination lawsuit. However, many distressed Black farmers are still awaiting relief. According to USDA data, the combined debt of Black farmers is less than $210 million.[11]

On May 19, 2023, the USDA released new criteria that makes farmers and ranchers who took "extraordinary measures" to pay their FSA loans eligible for Section 22006 funds, and explains how the agency will distribute the remaining relief.[12] Under these criteria, borrowers who made early withdrawals of retirement funds, college funds or long-term investments, as well as borrowers who made the sale of "essential assets" that were required to maintain the current operation level of the borrowers farm and household, would be eligible for relief.[13] In addition, the USDA announced that the FSA will begin accepting and reviewing individual requests for assistance from direct loan borrowers who missed a recent installment or are unable to make their next scheduled installment.

While we applaud the USDA for creating an individualized review process for distressed borrowers, we are concerned that aspects of the new criteria will not accurately identify distressed Black farmers. For example, Black farmers may not have retirement funds, college funds, or other

[8] ABRIL CASTRO & CAIUS Z. WILLINGHAM, CTR. FOR AM. PROGRESS, PROGRESSIVE GOVERNANCE CAN TURN THE TIDE FOR BLACK FARMERS 4 (2019), https://www.americanprogress.org/wp-content/uploads/2021/08/BlackFarmers-report1.pdf.

[8] ABRIL CASTRO & CAIUS Z. WILLINGHAM, CTR. FOR AM. PROGRESS, PROGRESSIVE GOVERNANCE CAN TURN THE TIDE FOR BLACK FARMERS 4 (2019), https://www.americanprogress.org/wp-content/uploads/2021/08/BlackFarmers-report1.pdf.

[9] Daniel Aminetzah, et al., *Black farmers in the US: The opportunity for addressing racial disparities in farming,* MCKINSEY & CO. (Nov. 10, 2021), https://www.mckinsey.com/industries/agriculture/our-insights/black-farmers-in-the-us-the-opportunity-for-addressing-racial-disparities-in-farming.

[10] Inflation Reduction Act of 2022 § 22006, Pub. L. 117-169, https://www.congress.gov/117/bills/hr5376/BILLS-117hr5376enr.pdf

[11] Letter from Rep. Alma Adams to U.S. Dep't of Agric. Sec. Thomas Vilsack (July 29, 2022) (on file with LDF).

[12] U.S. Dep't of Ag., Farm Service Agency, *Inflation Reduction Act Section 22006 Extraordinary Measures Assistance* (May 19, 2023), https://www.farmers.gov/sites/default/files/documents/farmersgov-letter-extraordinary-measures.pdf.

[13] *Id*.

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

Strickland AR 0600    naacpldf.org
212-965-2200

long-term investments. Due to past discrimination by the USDA and poor implementation of the *Pigford* consent decree, many Black farmers did not have the funds to save for retirement or their children's higher education.

By contrast, the new criteria leave out several categories that would identify many distressed Black farmers. For example, many young and beginning Black farmers have microloans. In our discussions with several farmer-led community-based organizations, if a farmer qualified only for a microloan from the USDA, they were already distressed because they did not qualify for a full loan they needed to maintain current operations levels. Also, as you are aware, until the passage of the American Rescue Plan Act of 2021, Black farmers had their tax refunds, social security, disability, and subsidy payments garnished through debt offsets. This policy led many farmers to suffer substantial financial distress. For example, for nine years, the USDA took over $41,000 in debt offsets from Eddie Slaughter, a *Pigford* farmer from Buena Vista, GA who is a double amputee, through tax refunds, social security payments, disability payments, and peanut subsidies. Similarly, the USDA took over $186,000 in debt offsets from Rob Bradshaw since the *Pigford* settlement. Farmers who have lost government benefits due to debt offsets should also be considered as potential distressed borrowers.

We urge the USDA to make farmers with the following indicators of financial distress eligible for individualized assessment for relief under Section 22006:

1. **Borrowers who were eligible only for a micro loan as of August 16, 2022**.
2. **Borrowers who still have direct or guaranteed loans with the USDA and who are subject to debt offsets**. This category should include both borrowers who are now current as well as those who are delinquent.
3. **Borrowers who did not have funds available to plant crops in 2023 and were not able to borrow money to plant crops**.
4. **Borrowers who have received debt relief for part of their loans but cannot make payments on the remaining loans.**
5. **Borrowers who have base acres and yields below the county average.** If farmers have base acres and yields below the county average, that is evidence that the farmer is struggling to produce crops.
6. **Prior borrowers who were subject to discrimination and received some settlement funds, but were forced to sign agreements that prohibit the farmers from getting additional USDA loans**. Farmers who signed these agreements may have had to take extraordinary measures and go outside the USDA/FSA loan system to obtain financial assistance—often at substantially worse terms—to maintain their current farming levels.
7. **Borrowers who do not have funds to pay taxes due on prior Sec. 22006 debt relief.** If a farmer is having trouble paying their federal taxes, this should be evidence that the farmer is financially distressed.

Expanding the criteria to include the following categories of farmers will help distressed Black famers obtain the relief they are entitled to under Section 22006.



The USDA should also consider the unique experiences of Black farmers as it decides what are "essential assets" under the new criteria. Due to the discrimination many Black farmers had to sell of personal items, livestock, and additional land to maintain current operation levels.[14] We hope that the USDA will consult advocacy groups with strong ties to Black farming communities to decide what are "essential assets" under the new criteria.

Section 22006 provides the USDA with the opportunity to help thousands of distressed farmers, including Black farmers who continue to suffer economically due to decades of discrimination by the USDA. The proposed additional criteria listed above represent experiences that Black farmers have had to endure for decades due to institutional racial discrimination, including not having enough funds to timely plant crops and having their social security benefits garnished due to USDA debt offsets. We believe that the USDA should utilize these additional criteria in order to fully realize the congressional intent of Section 22006 and help all distressed farmers, including Black farmers. We urge the USDA to adopt these recommendations and to move forward with canceling all debt of distressed Black farmers as quickly as possible including the return of debt offsets.

Thank you for your time and attention to these matters. If you have any questions or would like to discuss further, please contact Amalea Smirniotopoulos, Senior Policy Counsel, at asmirniotopoulos@naacpldf.org, or David Wheaton, Economic Justice Policy Fellow, at dwheaton@naacpldf.org.

Signed,

NAACP Legal Defense & Educational Fund, Inc. (LDF)

Organization Sign-Ons

African American Agriculturalist Association
Arkansas Land and Farm Development Corporation
Black Belt Justice Center
Black Family Land Trust
Black Farmers and Agriculturalists Association (BFAA)
Center for Community Based Enterprise (C2BE)
Center for Community Progress (National)
Center for Community Progress (Georgia)
Community Services Unlimited Inc.
EcoWomanist Institute
Environmental Working Group
Farm Research Cooperative
Farms to Grow, Inc.

---

[14] Chandelis Duster & Janie Boschma, *Many Black Farmers Nationwide Struggling to Keep Their Farms Afloat as they Face Disparities Across the Board*, CNN, December 15, 2021, https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html.

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

Strickland AR 0602    naacpldf.org
212-965-2200



Georgia STAND-UP
Hill Eco Inc.
Mississippi Minority Farmers Alliance
National Black Growers Council
Northeast Louisiana Black Farmers and Landowners Association
Oklahoma Black Historical Research Project, Inc
Reed-Wright Black Farmer Coalition
SJT Partners Law and Consulting
Socially Disadvantaged Farmers and Ranchers Policy Research Center at Alcorn State University
Southern Vision Alliance
Sustaining Environments Through Education and Economic Development, Inc. (SEED)
Taproot Earth
The KKAC Organization
Unitarian Universalist Service Committee (UUSC)
Winston County Self-Help Cooperative

<u>Farm and Individual Sign-Ons</u>
Barbara's Blueberry Batch
Bernard Bates Family, *Pigford* Legacy Farmer
Black Farmers of Chilton County
Bradshaw Farms
Brown Family Farms
Carpenter Farms
Carter Farms
Concerned Citizens of Tillery
Dr. Emily Burchfield, Emory University
Dr. Kimberly Ruffin, Roosevelt University
Everlyn Bryant, *Pigford* Legacy Farmer
Greer Farms
Lewis Farms
Outlaw Farms
*Pigford v. Glickman* Lead Plaintiffs (Timothy Pigford, Cecil Brewington, Lucious Abrams, George Hall, and Eddie Ross)
Provost Farm LLC
Soul Fire Farm
Steward of South of the Ferry Farm
Two G Ranch LLC



# USDA Farm Service Agency
## U.S. DEPARTMENT OF AGRICULTURE

**Farm Production and Conservation (FPAC)**

# Equity Action Plan

## (July 2023)

WWW.USDA.GOV/EQUITY/ACTION-PLAN

Strickland AR 0604

# Contents

Message From the Under Secretary ................................................................................................. 1

Message From the Farm Service Agency Administrator ..................................................................... 2

Introduction ................................................................................................................................... 3

Accomplishments............................................................................................................................ 4

    Ensuring Equitable Pandemic Assistance ................................................................................4

    Assisting Financially Distressed Borrowers .............................................................................4

    Simplified Direct Farm Loan Application Process......................................................................4

    Increasing Access to Non-Disaster Crop Assistance Program (NAP)......................................4

    Promoting Urban Agriculture ..................................................................................................5

    Access for Indian Country.......................................................................................................5

    Facilitating Wide Participation in FSA County Committees ......................................................5

    Helping Farmers Solve Succession Issues................................................................................5

    Outreach and Technical Assistance for Beginning Farmers and Ranchers. ..........................5

    Improving Safe, Healthy Work Environments for Farmworkers ..............................................6

    Engaging Stakeholder Feedback.............................................................................................6

Equity Actions................................................................................................................................. 7

    Action 1: Improve access to credit and lending processes based on feedback from beginning farmers, commercial lending partners, and other stakeholders. .........................................................................7

    Action 2: Provide additional support for new and beginning farmers, improving their access to FSA farm loan programs. ...................................................................................................................8

    Action 3:  Continue to implement distressed borrower payments under Section 22006 of the Inflation Reduction Act (IRA), which provides assistance for distressed borrowers. ...........................8

    Action 4:  Implement approved recommendations made by FSA Farm Loan Program Diversity, Equity, Inclusion and Access (DEIA) Reboot Task Force Report. ........................................................9

    Action 5:  Implement farm program and policy changes to ensure FSA programs meet the needs of all producers. ...................................................................................................................9

    Action 6:  Improve outreach, engagement, and service to producers by reducing barriers to accessing programs and training FSA employees in serving tribal and underserved customers. .......10

    Action 7:  Expand opportunities for heirs and tribal producers impacted by heirs' property and fractionated land issues by improving the Heirs' Property Relending Program and Highly Fractionated Indian Land Program.....................................................................................................11

Strickland AR 0605

Action 8:  Identify program gaps through the evaluation of covered Justice 40 programs to ensure the agency is reaching the broadest audience....................................................................................12

Action 9:  Provide Fiscal Year (FY) 2023-24 cooperative agreements that are targeted towards providing education to underserved producers on risk management strategies such as financial management and recordkeeping as well as climate, urban ag and local foods. ................................12

Action 10:  Reimagine FSA County Committees, currently an underutilized outreach, education, and technical assistance resource...............................................................................................................12

**Selected Equity Resources and Information** ........................................................................................ 15

USDA Equity-Related Summary Reports and Guidance ........................................................................15

Selected Farm Service Agency Resources ............................................................................................15

Selected Equity-Related Executive Orders and White House Resources..............................................15

**USDA Mission Statement** ..................................................................................................................... 16

**Department Equity Action Plan Strategies** ......................................................................................... 16

2

## Message From the Under Secretary


*Under Secretary Robert Bonnie*

The central aim of USDA's Farm Production and Conservation (FPAC) mission area is to support **all** American agricultural producers by providing financing, risk management tools, disaster aid, conservation assistance and a range of other services.  The doors to every USDA county service center and every office must be open to everyone.  The FPAC Business Center, Farm Service Agency, Natural Resources Conservation Service, and Risk Management Agency have all adopted Equity Action Plans that detail key actions and initiatives to improve FPAC for our existing customers while ensuring our agencies are welcoming and accessible to future customers as well.  These Agency plans describe specific steps we are taking to eliminate historic barriers to our programs, to improve program implementation, and to help farmers and ranchers grow and improve their agricultural operations.

We recognize that agriculture is composed of a diversity of crops, farm and ranch sizes, production systems, locations, individuals, and families—and that our efforts to support farmers, ranchers, and forest owners must consider and reflect that diversity. Implementation of these Equity Action Plans will guide each FPAC agency as we strive to serve all producers and foster a more prosperous, resilient, and sustainable agricultural economy.

*– Robert Bonnie*
*Under Secretary for Farm Production and Conservation*

1

## Message From the Farm Service Agency Administrator

Programmatic equity means embracing the varied needs of the producers we serve. FSA stands committed to addressing those needs to allow all farmers, ranchers, and agricultural producers opportunities to thrive.



*"FSA is continually evaluating how we can deliver our programs in a manner that is meaningful to the farmers and ranchers we serve. We are dedicated to improving customer service and to building equity into the fabric of our work as an agency."*

This critical work requires FSA to meaningfully engage with all the farmers, ranchers, and producers we serve and could serve, along with our partners and cooperators, as we work to deliver conservation, safety net, price support, and farm loan programs across our network of state and county offices.

Understanding that each of us has unique talents and abilities that can contribute to the success of the Farm Service Agency, we believe that those impacted by decisions and programs should be engaged in the process.  Our agency is taking steps to ensure everyone is included and respected when our programs are designed and implemented. We invite you to join us in this journey, and to continue to be a part of our efforts as we march forward in advancing equity at the Farm Service Agency.

The Farm Service Agency Equity Action Plan highlights high-leverage actions with the potential to create significant and long-term systemic change that benefits employees, Tribes, partners, and most importantly the broader American public.

*– Zach Ducheneaux*
*FSA Administrator*

Strickland AR 0608

## Introduction

**FSA's overall equity goal is to ensure agricultural resources and assistance are broadly accessible, while creating new, more, and better market opportunities, so our policies and programs advance agriculture for the "many and most."** In accordance with Executive Order 13985 "Advancing Racial Equity and Support for Underserved Communities through the Federal Government," and Executive Order 14091, "Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government," the Farm Service Agency is committed to proactively adopting policies and practices to reduce inequities in the conservation, safety net, price support and farm loan programs delivered across our network of state and county offices.

FSA is committed to advance equity by focusing on actions that will result in:

- Increased trust with producers, including currently and historically underserved producers
- Improved customer service to underserved farming communities
- Reduced program barriers
- Program and funding opportunities to address systemic inequities

FSA is developing external-facing efforts to empower all communities of producers and is building a diverse, equitable, and inclusive workforce to match the diverse farming population in the urban and rural communities that we serve.

The American Rescue Plan Act (ARP) established an Equity Commission for USDA. This 15-member independent commission is charged with evaluating USDA programs and services and recommending how our agencies can reduce barriers for accessing them. Earlier this year, the commission issued 31 interim recommendations. Many items in this equity action plan align with those recommendations; this is noted where applicable.



*"By advancing equity, inclusion, and diversity, the Farm Service Agency can harness the power of diverse perspectives and experiences to drive innovation and growth, while creating a more inclusive and equitable environment for all."*

3



## Accomplishments

### Ensuring Equitable Pandemic Assistance

Under the previous administration's Coronavirus Food Assistance Program (CFAP), only 4 percent of funding went to socially disadvantaged farmers (among those who identified their race and/or ethnicity). After identifying gaps in previous COVID-19 relief funding, USDA announced Pandemic Assistance for Producers, an initiative committed to distributing and directing resources more equitably, especially to the people and sectors who need assistance the most. Among other funding opportunities, the Pandemic Assistance for Producers Initiative included re-opening signup for CFAP2, and $2 million to establish partnerships with organizations to provide outreach and technical assistance to historically underserved farmers and ranchers who have historically faced barriers in accessing this type of FSA assistance. CFAP2 saw an approximately 21 percentage point increase of CFAP enrollment applications from socially disadvantaged producers. In addition, and most recently, FSA made automatic Coronavirus Food Assistance Program 2 (CFAP 2) top-up payments to underserved producers.

### Assisting Financially Distressed Borrowers

Section 22006 of the Inflation Reduction Act gives FSA $3.1 billion to help distressed farm loan borrowers. Since the IRA was signed by President Biden in August 2022, USDA has provided over $1 billion in assistance to more than 20,000 distressed borrowers, and counting, to distressed farm loan borrowers to help cure delinquencies, resolve uncollectable farm loan debts, and keep farmers farming. Borrowers who received immediate automatic payments in October 2022 include FSA direct and guaranteed loan borrowers who had a balance of 60 or more days past due as of Sept. 30, 2022. Automatic payments in March 2023 included direct loan borrowers whose interest exceeded principle owed on outstanding debts; borrowers who became 60 days delinquent between September 30, 2022, and October 18, 2022, and remained delinquent; and borrowers with a recent restructure between February 28, 2020, and March 27, 2023, or who had accepted an offer to restructure on or before March 27, 2023, but had not yet closed that restructure. FSA also announced new processes for borrowers to request individual, case-by-case assistance and support from the FSA.

### Simplified Direct Farm Loan Application Process

Approximately 26,000 producers submit a direct loan application to FSA annually, but there is a high rate of incomplete or withdrawn applications, due in part to a challenging and lengthy paper-based application process. In response, FSA implemented a simplified direct farm loan application process in February 2023, drastically reducing the burden and time spent on its forms. The agency has also rolled out a loan assistance tool that helps farmers and ranchers better navigate the farm loan application process.

### Increasing Access to Non-Disaster Crop Assistance Program (NAP)

FSA has long heard about the challenges underserved farmers have faced in navigating the Noninsured Crop Disaster Assistance Program (NAP). In January 2023, FSA announced program updates that reduce the paperwork burden on these producers to access free basic NAP coverage with a NAP service-fee waiver.  Specifically, FSA designated Form CCC-860 to serve as an application for basic 50/55 Noninsured Crop Disaster Assistance Program (NAP) coverage beginning with the 2022 crop year, which provides free basic NAP coverage and waives the NAP service fee for producers who have certified as a socially disadvantaged, limited resource, beginning or veteran farmer or rancher.

4

Strickland AR 0610

## Promoting Urban Agriculture

Historically, the lack of USDA's presence in urban and suburban areas and the absence of USDA farm programs that are aligned with the needs of urban and suburban agricultural producers have been barriers to access. In response, the Farm Service Agency is piloting urban agriculture county committees in 17 locations to have a voice in programs that support urban producers.

## Access for Indian Country

FSA made substantial changes to address barriers and inequities in Indian Country through updating the Livestock Indemnity Program's 2022 payment rates to (1) recognize tribal traditional animals and better reflect true market value of non-adult beef, beefalo, bison, and dairy animals; (2) update several livestock programs to include horses not intended to be used for racing and wagering, allowing participation by eligible tribal ranchers who use forage to raise their horses; and (3) modify the Conservation Reserve Enhancement Program and signing historic new agreements with three tribal nations in the Great Plains that will help enroll eligible agricultural land that lies within reservation boundaries.  In November 2022, the Farm Service Agency also announced new Conservation Reserve Enhancement Program (CREP) partnerships with three tribal nations in the Great Plains, covering 3.1 million acres, to help conserve, maintain, and improve grassland productivity, reduce soil erosion, and enhance wildlife habitat. These are the first-ever CREP agreements with tribal nations.

## Facilitating Wide Participation in FSA County Committees

Working to ensure diverse representation on FSA's County Committees, the Secretary has exercised his authority to appoint 93 socially disadvantaged voting members to committees lacking such representation.

In addition, many producers, advisory groups and the equity commission have recommended that FSA ensures that producers have access to county maps, increasing the potential for underserved producers to effectively participate in FSA's County Committee nominations and elections process. FSA has published a new GIS Locator Tool to solve this problem.

## Helping Farmers Solve Succession Issues

USDA has provided $67 million in competitive loans through its new Heirs' Property Relending Program. The program, launched in July 2021, allows intermediary lenders to help agricultural producers and landowners resolve heirs' land ownership and succession issues. Heirs' property and other land tenure issues have long been substantial barriers preventing access to USDA programs for many producers and landowners, and this relending program provides access to capital to help producers find a resolution. The program's benefits go far beyond its participants. It will keep farmland in farming, protect family farm legacies, and support economic viability.

## Outreach and Technical Assistance for Beginning Farmers and Ranchers.

The Farm Service Agency leads the Department's Beginning Farmer and Rancher Program. To increase support for young and beginning farmers, Beginning Farmer and Rancher Coordinators have been identified from State Office staff of the Farm Service Agency, Natural Resources Conservation Service,

5



Rural Development, and Risk Management Agency. These coordinators are leading development and implementation of beginning farmer education, outreach, and technical assistance plans for their states, including outreach to small, minority, and specialty crop producers as well as non-profits and other service providers. They are supported by the USDA National Beginning Farmer Coordinator and FSA Outreach Office staff.

## Improving Safe, Healthy Work Environments for Farmworkers

In coordination with other Federal agencies, in June 2022, USDA announced a pilot program using up to $65 million in American Rescue Plan funding to provide support for agricultural employers in implementing robust health and safety standards to promote a safe, healthy work environment for both U.S. workers and workers hired from Northern Central American countries under the seasonal H-2A visa program. FSA conducted three listening sessions in September 2022 to receive input from agricultural employer organizations, labor unions, farmworker advocates, farmworkers, and other relevant stakeholders, as it works to develop and implement this pilot program.

## Engaging Stakeholder Feedback.

In FY 2023, the Farm Production and Conservation (FPAC) mission area distributed two nationwide surveys that impact Farm Service Agency operations: (1) Farm Service Agency Farm Loans Customer Feedback Survey, (2) FPAC Prospective Customer Survey focusing on gaining a better understanding of farmers, ranchers and forest managers who have not previously worked with FPAC agencies. The surveys were translated into 13 languages and made available for online completion. FPAC is also actively seeking feedback through interactive buttons on the farmers.gov and FSA public-facing websites. Analytics of the survey results over time will provide insights into customer reactions to policy and operational changes, the simplified direct loan applications, and automation improvements.

Strickland AR 0612

## Equity Actions

The Farm Service Agency is pursuing 10 Actions for Fiscal Years (FYs) 2023-24 with supporting tasks and activities listed below as anticipated milestones. Each of our actions follows one or more of five strategies:

- Aligning farm lending and farm programs with USDA priorities and values.
- Removing hurdles and tailoring programs to all types of producers, production, and business models.
- Creating new, more, and better market opportunities for producers.
- Targeting direct assistance and technical support based on degree of need.
- Institutionalizing access for broader stakeholder viewpoints.

Our first four actions deal with **farm loan programs**. FSA is well underway in its journey to modify and improve farm loan programs, enhancing and creating loan servicing and loan-making tools that are more flexible and more proactive. Our overarching imperative, which will require leveraging all our tools, is the goal of "keeping farmers farming"—helping producers be in a position to take advantage of opportunities and build financial equity.

## Action 1: Improve access to credit and lending processes based on feedback from beginning farmers, commercial lending partners, and other stakeholders.
*This action and milestones align with the USDA Equity Commission Recommendation #6*

Overall, the goals here are to streamline and adjust FSA loan processes to reduce burdens on producers, field staff and lending partners; ensure loan programs meet the needs of producers; and reduce barriers to participation.

*Milestone 1:  Modernize FSA paperwork process. Standardize collected information and reduce duplicative paperwork.*

*Milestone 2:  Develop online loan tools to streamline processes, promote transparency and improve business processes.*

*Milestone 3:  Examine loan processes and use plain language to clearly describe eligibility criteria in loan programs.*

*Milestone 4:  Explore ways to increase farm loan participation and reduce barriers that result from family farm size, farm business structure, and experience requirements.*

*Milestone 5:  Collaborate with AMS and other USDA agencies to expand commodity pricing data used for farm loan application processing.  Expansion of this pricing data source can potentially assist in higher valued price per yield for farming operations.*

*Milestone 6:  Provide additional flexibility in loan processing and servicing times.  Accept preliminary paperwork or offer initial eligibility statement.*

*Milestone 7:  Improve timing and reduce delays in FSA loan title work and appraisals.*

*Milestone 8:  Improve consistency in loan experience among FSA county offices.*

Strickland AR 0613

*Milestone 9:  Improve Preferred Lender Program and explore additional flexibilities that could be made available to participating lenders.*

*Milestone 10:  Develop pilots and agreements to test and support lending process enhancements.*

## Action 2: Provide additional support for new and beginning farmers, improving their access to FSA farm loan programs.

***This action and milestones align with the USDA Equity Commission Recommendations #6***

*Milestone 1:  Review feedback from stakeholders and lenders to make administrative improvements that improve access to credit for beginning farmers in direct and guaranteed loan programs.*

*Milestone 2:  Collaborate with USDA agencies to identify gaps between FSA loans and USDA grant programs to ensure new programs (such as the Increasing Land Access & Market Program) are addressing the needs of underserved farmers.*

*Milestone 3:  Ensure farm loan officers have the necessary training to serve beginning farmers and ranchers (BFRs).*

*Milestone 4:  Explore pilots and cooperative agreements to test and support any proposed BFR process enhancements.*

## Action 3:  Continue to implement distressed borrower payments under Section 22006 of the Inflation Reduction Act (IRA), which provides assistance for distressed borrowers.

***This action and milestones align with the USDA Equity Commission Recommendations #6***

Section 22006 of the Inflation Reduction Act includes $3.1 billion to help distressed farm loan borrowers. Automatic payments were made in March 2023 to direct loan borrowers whose interest exceeded principle owed on outstanding debts; borrowers who became 60 days delinquent between September 30, 2022, and October 18, 2022, and remained delinquent; and borrowers with a recent restructure between February 28, 2020, through March 27, 2023, or who had accepted an offer to restructure on or before March 27, 2023, but had not yet closed that restructure. New processes for borrowers to request individual, case-by-case assistance and support from the FSA have been announced.

*Milestone 1:  FSA will develop and implement an outreach and communications campaign to inform borrowers of the Inflation Reduction Act (IRA) 22006 payment process.  FSA will also collaborate with community-based organizations and universities on outreach, technical assistance, and opportunities to provide borrowers with access to financial and tax planning services.*

*Milestone 2:  FSA will administer a process to evaluate the cases of borrowers who took extraordinary measures to avoid delinquency but are still in need of assistance. If a borrower meets the criteria for this assistance, FSA will issue a payment to the borrower based on their specific circumstances.*

Strickland AR 0614

*Milestone 3: FSA will administer a process to assist financially distressed direct farm loan borrowers by making a one-time installment payment to direct borrowers who may be unable to make their next installment.*

## Action 4:  Implement approved recommendations made by FSA Farm Loan Program Diversity, Equity, Inclusion and Access (DEIA) Reboot Task Force Report.
***This action and milestones align with the USDA Equity Commission Recommendation #13***



*Milestone 1:  Implement internal Diversity, Equity, Inclusion & Access (DEIA) training, dialogue, and other tools to engage FSA workforce to improve customer service.*

*Milestone 2:  Integrate coordinated FSA stakeholder engagement, diversity outreach and customer feedback as standard practices in process improvement and program delivery based on FSA's Diversity, Equity, Inclusion & Access Reboot (DEIA-R) report.*

Our next four equity actions focus on **improvements to non-loan programs that ensure barriers to access are low, and that outreach is broad**.  FSA has identified new, holistic approaches to provide economic support to producers in the wake of disasters.  Through FSA's implementation of the Emergency Relief Program (ERP) Phase 2 and the Pandemic Assistance Revenue Program (PARP), FSA is accommodating and including a more diverse set of producers by considering their overall revenue losses when determining program eligibility. FSA is also investing in cooperative agreements to ensure producers who are new to FSA have the support and tools they need to submit applications for these critical programs.

## Action 5:  Implement farm program and policy changes to ensure FSA programs meet the needs of all producers.
***This action and milestones align with the USDA Equity Commission Recommendation s #3, #7***

*Milestone 1:  Increase Non-Insured Crop Disaster Assistance Program (NAP) enrollment and usefulness by:*

- *Expand direct, local, and other value-added marketing prices within NAP or allow farmers to use their own yields and historic pricing data.*
- *Use acreage reporting data to conduct targeted outreach to eligible producers (primarily small specialty crop producers).*
- *Further simplifying NAP, build on application and reporting streamlining to provide automatic basic coverage for appropriate producers.*

*Milestone 2:  Modernize base acre policies to address producers' inability to receive necessary program payments that help stabilize on-farm revenue during economic downturns with commodity markets.*

9

Strickland AR 0615

*Milestone 3:  Adjust Conservation Reserve Program (CRP) practice standards to better integrate and equitably compensate for the use of Indigenous land management practices.*

*Milestone 4: Streamline and target ad-hoc natural disaster assistance through the Emergency Relief Program 2 (ERP 2). This includes simplified pre-filled applications for producers with crop insurance or NAP coverage, and whole-farm revenue approach operations without risk management coverage such as value-added, diversified operations.*

*Milestone 5:  To address gaps in previous pandemic assistance, accept applications and issue payments for Pandemic Assistance Revenue Program (PARP) for producers that target overall revenue losses and support producers with eligible commodities who were not previously eligible for pandemic assistance.*

*Milestone 6:  Provide cost share assistance for organic practices that support soil health, biodiversity and reduce erosion through the Organic Cost Certification Specialty Crop program.*

*Milestone 7:  Transform marketing opportunities for small and medium producers by implementing the food safety certification for a specialty crops program (FSCSC) that supports a more equitable ag economy.*

*Milestone 8:  Address unique marketing costs challenges faced by dairy operators through implementing the Organic Dairy Marketing Assistance Program (ODMAP) for certified dairy operations.*

*Milestone 9:  Increase staff knowledge of farmer and rancher profiles to better match relevant services and programs with USDA customers and potential customers. (Training on programs available for beginning, urban, tribal, historically underserved, specialty crop producers, etc.)*

*Milestone 10:  Review FSA programs for additional regulatory/administrative changes that will improve processes for beginning farmers and ranchers and historically underserved producers.*


## Action 6:  Improve outreach, engagement, and service to producers by reducing barriers to accessing programs and training FSA employees in serving tribal and underserved customers.

***This action and milestones align with the USDA Equity Commission Recommendation s #4 and 13***

*Milestone 1:  The FSA Outreach Office (OO) will design a flexible suite of interventions to support FSA staff in more effectively conducting outreach and helping tribal producers access the services, loans, and programs they need.*

*Milestone 2:  The FSA Outreach Office will work with Farm Loan Programs (FLP) staff to reduce barriers to tribal producer participation.  OO will work with the FLP and customer experience (C/X) offices to improve online resources and access to information for tribal producers and other underserved customers.*

*Milestone 3:  Implement Customer experience (C/X) tested solutions from recent C/X project working with tribal producers with all FSA customers and field employees.*

Strickland AR 0616

*Milestone 4:  Require diversity training related to working with underserved groups and issues to staff.*

*Milestone 5:  Monitor and assess all targeted outreach activities conducted and reported by each FSA state and county office quarterly.*

*Milestone 6:  Reduce producer barriers by increasing technical assistance cooperative agreements for community-based organizations (CBOs) and Minority Serving Institutions (MSIs) that work with specialty crop producers, beginning and underserved farmers and ranchers.*

Action 7:  Expand opportunities for heirs and tribal producers impacted by heirs' property and fractionated land issues by improving the Heirs' Property Relending Program and Highly Fractionated Indian Land Program.
**This action and milestones align with the USDA Equity Commission Recommendations #1 and 2**



The Heirs' Property Relending Program (HPRP) and the Highly Fractionated Indian Land Program (HIFL) allow opportunities for heirs' property descendants and tribal members to obtain loans to resolve title issues and/or purchase fractionated land interests through intermediary lenders.  As fractionation and heir issues increase, a producer's ability to use the land decreases. Resolution of heirs and fractionated land provides opportunities for wealth creation and an asset to leverage for credit, builds food sovereignty by putting farmland into production, and expands economic development in communities.

*Milestone 1:  Engage with Indigenous Community Development Financial Institutions (CDFIs) and community-based organizations (CBOs) and other interested entities in ensuring that heirship issues also address fractionization issues that tribal communities face.*

*Milestone 2:  Evaluate regulatory and procedural changes for HIFL Program.*

*Milestone 3:  Align HIFL Program with HPRP.*

*Milestone 4:   Provide cooperative agreements for community based nonprofit organizations to address and resolve fractionated land issues and heirs' property issues for underserved producers through the delivery of legal technical assistance, education, and drafting estate plans.*

*Milestone 5:  Promote availability of direct family loans that can be used to close heirs' property estates and legal costs.*

*Milestone 6:  Provide cooperative agreements to 501c3 organizations (with minimum 5 years' experience delivering legal services to indigent persons) to deliver legal technical assistance and education that will prevent the creation of heir's property and remedy title issue which caused heirs' property and fractionated land.*

11

*Milestone 7: Conduct cross training of staff and stakeholders to promote the HIFL program, its goals, and ease of use.*

## Action 8:  Identify program gaps through the evaluation of covered Justice 40 programs to ensure the agency is reaching the broadest audience.

*Milestone:  Track and report completion of actions for FSA Justice 40 covered programs using metrics and benefits methodologies created to increase benefits disadvantaged communities, using the Climate & Environmental Justice Screening Tool (CEJST). (The Justice 40 Initiative is a federal government-wide effort, covering selected programs, to deliver at least 40 percent of the benefits of those programs to identified disadvantaged communities).*

---

The final three actions **expand FSA's reach to all producers** by leveraging partnerships with trusted technical assistance institutions and organizations and modernizing and institutionalizing improved County Committees.

## Action 9:  Provide Fiscal Year (FY) 2023-24 cooperative agreements that are targeted towards providing education to underserved producers on risk management strategies such as financial management and recordkeeping as well as climate, urban ag and local foods.

***This action and milestones align with the USDA Equity Commission Recommendation #4***

*Milestone 1:  Partner with public and private organizations to deliver risk management education and training to underserved and socially disadvantaged farmers and ranchers.*

*Milestone 2:  Provide funding opportunities to eligible universities, Minority Service Institutions, community-based organizations in every state for projects that address Mission Area priorities.  Staff at national and state level will be substantially involved in all partnerships.*

## Action 10:  Reimagine FSA County Committees, currently an underutilized outreach, education, and technical assistance resource.

***This action and milestones align with the USDA Equity Commission Recommendation #8***

FSA will prioritize and enhance the role of County Committees (COCs) in conducting local outreach and education and providing technical assistance and mentorship to producers in their communities, in conjunction with agricultural extension specialists, cooperators, and other partners. Instead of reviewing farm program applications for errors or fraud detection, COCs will focus on engagement with local producers to increase awareness and enrollment in FSA programs. This pivot will allow FSA to invest in dedicated FSA staff with relevant subject matter expertise to guide accountability measures such as spot checks and programmatic audits. COCs can, in turn, raise issues of need in the community, engage with local producers, and work with county offices to improve program access. With their more intended focus on conducting and providing outreach, education, and technical assistance, COCs will be guided to

12

Strickland AR 0618

pay special attention to new, beginning, and underserved producers—who, as new customers to FSA, may need assistance understanding and accessing FSA programs and services.



*Milestone 1:  Prioritize and enhance the COCs' role in conducting local outreach and education and providing technical assistance and mentorship to producers in their communities, in conjunction with agricultural extension specialists, cooperators, and other partners, with an elevated focus on conducting and providing outreach, education, and technical assistance. COCs should also pay special attention to new, beginning, and underserved producers—who, as new customers to FSA, may need assistance understanding and accessing FSA programs and services.*

*Milestone 2: Develop targeted outreach strategies to provide awareness and eligibility of tribal members for county committees.*

*Milestone 3:  Establish a USDA COC Liaison responsible for identifying and instituting diverse representation on COCs.*

*Milestone 4:  Increase transparency and accountability for COCs by establishing a performance metric with controls/mechanisms to ensure equitable standards.  County Executive Director (CED) & COC members should be subject to oversight/evaluation by FSA w/civil rights, equity and demographic factors included as metrics.*

*Milestone 5:  Conduct a biannual assessment on performance measures that indicate equitable outcomes for COCs.  If it does not yield equitable outcomes, an external analysis/study on equity disparities & potential reform shall be conducted on the equity disparities of COCs and a potential reform of the COC system to be more equitable for all farmers The analysis should include the historic and current role of COCs creating disparities for and displacement of women and underserved farmers.*

13

*Milestone 6:  Require diversity training related to working with underserved groups and issues to staff and new committee members.  Members should also be trained on the role of the minority advisor and FSA appeals processes.*

*Milestone 7:  FSA will expand and institutionalize urban committees in identified areas, ensuring that urban producers' needs and situations are included in program design, implementation, and outreach.*

---

For more information on equity at FSA, and all of USDA, see usda.gov/equity.

14

Strickland AR 0620

## Selected Equity Resources and Information

### USDA Equity-Related Summary Reports and Guidance

- Programmatic Equity at USDA:
  - o  Equity Website
  - o  Equity Accomplishments
  - o  Equity Action Plan: Full Plan | Summary (February 2022)
- Equity Commission
  - o  Equity Commission Website
  - o  2023 Interim Report | USDA Response (English) (February 2023)
  - o  Informe Interino 2023 |Respuesta al Informe Interino de la Comisión de Equidad del USDA| (En Español) (Febrero 2023)
- USDA Environmental Justice Scorecard
- USDA Advisory Committees

### Selected Farm Service Agency Resources

- Farm Service Agency Website
- Farm Service Agency Office Locator
- Farm Service Agency Climate Adaptation Plan
- Farm Service Agency Cooperative Agreements
- Farm Service Agency County Committees and Urban County Committees
- Farm Loan Program Data
- Disaster Assistance Tool
- Get Started! A Guide to USDA Resources for Historically Underserved Farmers and Ranchers (July 2022) (PDF, 2 MB)
- Loan Assistance Tool
- Translated Farm Service Agency Program Fact Sheets
- USDA Beginning Farmers and Ranchers Resources
- USDA Certified Mediation Program
- What is Receipt for Service?

### Selected Equity-Related Executive Orders and White House Resources

- White House Equity Page
- Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (January 2021)
- Executive Order 14091, Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (February 2023)
- Executive Order 14096, Revitalizing our Nation's Commitment to Environmental Justice for All (April 2023)
- Executive Order 13175, Consultation and Coordination with Indian Tribal Governments (November 2000)
- Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships
- The Path to Achieving Justice40

15



## USDA Mission Statement

"To serve all Americans by providing effective, innovative, science-based public policy leadership in agriculture, food and nutrition, natural resource protection and management, rural development, and related issues with a commitment to delivering equitable and climate-smart opportunities that inspire and help America thrive."

## Department Equity Action Plan Strategies

1.  **Reducing Barriers to USDA Programs**
    USDA is reducing barriers to programs and improving support to underserved farmers, ranchers, landowners, businesses, and communities, including by providing ways for stakeholders to share their experiences, insights, and needs and by incorporating that input into policy development and implementation improvement.

2.  **Partnering with Trusted Technical Assistance Providers**
    USDA is partnering with trusted technical assistance providers to ensure that underserved producers and communities have the support they need to access USDA programs.

3.  **Directing USDA Programs to Those Who Need Them the Most**
    USDA programs are targeting those who need them the most, including by increasing infrastructure investments that benefit underserved communities.

4.  **Expanding Equitable Access to USDA Nutrition Assistance Programs**
    USDA is expanding equitable access to USDA nutrition assistance programs to ensure that those who qualify are able to participate, those who participate get benefits that are meaningful, and those who receive those benefits can use them conveniently and in ways that promote improvements in their health and well-being.

5.  **Advancing Equity in Federal Procurement**
    USDA is advancing equity in Federal procurement, by providing underserved and disadvantaged businesses, tools and resources to increase access to funding opportunities and expand their network to develop critical local, State, regional, and National relationships.

6.  **Upholding Federal Trust and Treaty Responsibilities to Indian Tribes**
    USDA is upholding general Federal trust and treaty responsibilities to Indian Tribes, removing barriers to access USDA programs, embracing Tribal self-determination principles, and incorporating indigenous values and perspectives in program design and delivery.

7.  **Committing Unwaveringly to Civil Rights**
    USDA has committed unwaveringly to civil rights, working to equip its civil rights offices with the tools, skills, capacity, and processes essential to enforce and uphold civil rights effectively and efficiently.

8.  **Operating with Transparency and Accountability**
    USDA is operating transparently and accountably, providing information on Department programs that Congress, stakeholders, and the general public need to hold us to account on our equity agenda, and working systematically to collect and take account of public feedback.

Strickland AR 0622



**USDA is an equal opportunity provider, employer, and lender.**

Strickland AR 0623

# Adequate Coverage for States and Underserved Producers

Report to Congress in response to section 11108 of the Agriculture Improvement Act of 2018

Strickland AR 0624

# I-    Executive Summary:

Federal crop insurance is an equal-opportunity critical component of the safety net for agricultural producers. In 2018 Federal crop insurance was utilized on 84 percent of U.S. acres for all commodities excluding hay, livestock, nursery, and pasture, range, and forage. The measurement of Federal crop insurance coverage is important for gauging where the risk management safety net could be strengthened or expanded.

In accordance with Section 11108 of the 2018 Farm Bill, the U.S. Department of Agriculture's (USDA) Risk Management Agency (RMA) conducted two separate analyses to determine where states or producer groups were underserved by the Federal crop insurance program. One analysis compared crop acreage reported to the RMA with crop acreage estimated by the USDA's National Agricultural Statistics Service (NASS) to measure if each state by crop was adequately served by crop insurance. A second analysis was done using 2017 Census of Agriculture responses to measure crop insurance participation among underserved producers.

RMA's analysis found a little over 100 state/crop participation rates that met the statutory definition of underserved, out of over a thousand state/crop participation rate comparisons. RMA analyzed crop insurance participation rates for Beginning, Veteran, Female, African American/Black, Asian American, Hispanic/Latino, American Indian/Native American, and Native Hawaiian and Other Pacific Islander farmers and ranchers, and found all groups participated in crop insurance at above 50% the rate of all producers.

Considering this analysis, RMA has provided an overview of actions taken to date, additional recommendations, and other policy options for Congress to consider.

# II- Introduction

RMA is providing this report to Congress in accordance with Section 11108 of the Agricultural Improvement Act of 2018, or 2018 Farm Bill.

Section 11108 modified Section 508(a)(7) of the Federal Crop Insurance Act (7 U.S.C. 1508(a)(7)) to read:

*(7) ADEQUATE COVERAGE FOR STATES AND UNDERSERVED PRODUCERS.—*

    *(A) DEFINITIONS.—In this paragraph:*

        *(i) ADEQUATELY SERVED.—The term ''adequately served'' means having a participation rate, by crop, that is at least 50 percent of the national average participation rate.*

        *(ii) UNDERSERVED PRODUCER.—The term ''underserved producer'' means an individual (including a member of an Indian Tribe) that is—*

            *(I) a beginning farmer or rancher;*

            *(II) a veteran farmer or rancher; or*

            *(III) a socially disadvantaged farmer or rancher.*

    *(B) REVIEW.—Using resources and information available to the Board or the Secretary, the Board shall review the policies and plans of insurance that are offered by approved insurance providers under this subtitle, including policies and plans of insurance for underserved producers, to determine if each State is adequately served by the policies and plans of insurance.*

    *(C) REPORT.—*

        *(i) IN GENERAL.—Not later than 30 days after completion of the review under subparagraph (B), and not less frequently than once every 3 years thereafter, the Board shall make publicly available and submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing the results of the review.*

        *(ii) RECOMMENDATIONS.—The report under clause (i) shall include recommendations to increase participation in States and among underserved producers that are not adequately served by the policies and plans of insurance, including any plans for administrative action or recommendations for Congressional action.*

Given the statutory definition of adequately served, RMA first calculated both a baseline percentage and specific percentage by state for the various crops nationwide. Those that fall below the 50% statutory cutoff are shown in Figure 1 below.  Methodologies for determining "adequately served" and other metrics used in this report are outlined in the Appendix (Section V).

Figure 1. States and Crops Without Adequate Coverage

| Commodity | 50% of national participation | Insurance participation by state that is less than 50% of national participation level | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apples | 35% | CA 34% | GA 24% | IL 23% | MA 34% | MN 17% | NJ 18% | NM 2% | OH 28% | SC 20% | TN 6% | UT 27% | WV 29% | WI 29% |
| Barley | 31% | MD 16% | MI 5% | NY 16% | PA 9% | SD 22% | VA 30% | WI 15% | | | | | | |
| Blueberries | 29% | AL 2% | MS 18% | | | | | | | | | | | |
| Buckwheat | 18% | MN 9% | | | | | | | | | | | | |
| Corn Combined | 44% | CA 31% | MT 38% | NV 15% | OR 41% | RI 33% | UT 15% | WA 32% | | | | | | |
| Cucumbers | 11% | FL 3% | NC 5% | | | | | | | | | | | |
| Dry Beans | 44% | CA 42% | ID 36% | MT 42% | TX 1% | WA 40% | | | | | | | | |
| Dry Peas | 45% | OR 43% | | | | | | | | | | | | |
| Flax | 43% | SD 41% | | | | | | | | | | | | |
| Forage Production | 6% | CO 1% | ID 1% | ME 5% | MI 4% | NE 1% | NY 1% | OR 1% | PA 1% | UT 2% | WA 2% | | | |
| Fresh Beans Combined | 18% | MN 16% | NJ 7% | OR 13% | TX 13% | WA 15% | | | | | | | | |
| Green Peas | 42% | IL 12% | | | | | | | | | | | | |
| Grapes | 26% | AR 1% | CT 1% | MD 3% | MO 1% | NE 9% | NJ 1% | NC 17% | OH 9% | VA 1% | | | | |
| Mandarins / Tangerines | 44% | FL 25% | | | | | | | | | | | | |
| Mint | 11% | OR 3% | | | | | | | | | | | | |
| Oats | 7% | AL 6% | CA 2% | CO 4% | GA 5% | ID 6% | IL 4% | KS 3% | MO 1% | OK 3% | OR 6% | TX 5% | WA 6% | |
| Onions | 39% | NM 20% | | | | | | | | | | | | |
| Peaches Combined | 35% | CT 17% | KY 7% | LA 4% | MA 33% | OK 14% | OR 12% | TN 29% | UT 14% | | | | | |
| Pecans | 18% | FL 1% | OK 3% | | | | | | | | | | | |
| Pistachios | 34% | NM 31% | | | | | | | | | | | | |
| Potatoes | 36% | NJ 15% | | | | | | | | | | | | |
| Sesame | 50% | KS 7% | | | | | | | | | | | | |
| Sorghum Combined | 38% | GA 28% | | | | | | | | | | | | |
| Sugar Beets | 44% | CA 40% | | | | | | | | | | | | |
| Tobacco Combined | 49% | PA 1% | | | | | | | | | | | | |
| Tomatoes Combined | 41% | NJ 19% | NY 17% | SC 7% | TN 36% | VA 9% | | | | | | | | |
| Triticale | 14% | ID 5% | | | | | | | | | | | | |
| Wheat | 41% | AZ 39% | CA 28% | DE 35% | FL 13% | GA 21% | IA 21% | MD 21% | NV 26% | PA 21% | WV 33% | | | |

Strickland AR 0627

The greatest frequency of low state participation rates for field crops was identified for oats, forage, and wheat. Several fruit crops including apples, grapes, and peaches were identified to have the most states with low participation rates. The participation for oats can appear to be low due to a significant amount of the NASS planted oat acreage being intended for purposes other than grain like cover crops. Forage production has a very low national participation rate and states with lower amounts of overall forage acres tended to have the lowest state participation rates. Low participation for perennial fruit crops could be the result of RMA limiting insurance offers to select counties in a state or to certain cropping practices where production experience demonstrates that insurance would be actuarially sound. Perennial crops can also have underwriting controls that limit insurance for new production areas with minimum age and production amount requirements that have to be met before acreage becomes insurable as opposed to annual crops that are insurable when the crop is planted.

In addition to states with low crop insurance participation there were also some state and crop combinations identified where Federal crop insurance is available, but no producers purchased such coverage. These combinations are stated in Figure 2.

Figure 2. States and Crops Where Insurance Coverage is Offered Without Any Insurance Participation

| State | Commodity | NASS Acreage |
|---|---|---|
| Alaska | Potatoes | 500 |
| Arizona | Chili Peppers | 1,100 |
| Idaho | Flax | 2,003 |
| Maryland | Forage Production | 40,000 |
| Massachusetts | Grapes | 173 |
| Mississippi | Grapes | 375 |
| Montana | Camelina | 792 |
| New Jersey | Forage Production | 9,000 |
| Oregon | Mustard | 1,066 |
| South Carolina | Blueberries | 750 |
| Tennessee | Snap Beans | 7,900 |

The most common states to have underserved crop seem to be in the west. However, these states also have some of the most diverse mixes of different insurable crops being produced. For example, California has over 50 different insurable crops.

To analyze the participation rate among underserved producers, RMA used producer responses to the 2017 NASS Census of Agriculture. RMA included all farms with gross sales over $50,000 in our review. This was the best data set RMA could locate that would allow the comparison of demographic data on operators to see if they utilized crop insurance. This method allows RMA to look at participation on an operator basis, but not on an acreage basis. RMA is exploring other ways to collect data for future versions of this report. This methodology is further explored in Section V.

Strickland AR 0628

Figure 3 shows the crop insurance participation rate for each demographic group and the number of producers that identified as members of that demographic group with gross sales over $50,000.

Figure 3. Crop Insurance Participation Rates for Different Demographic Groups

| Commodity: | All Crops | |
|---|---|---|
| Demographic Group | Participation Rate | Number of Producers |
| All Producers | 64% | 439,060 |
| Beginning Farmer | 60% | 92,842 |
| Current or Former Military Service | 62% | 73,870 |
| Female | 59% | 187,856 |
| African American/Black | 51% | 2,261 |
| Asian American | 45% | 4,545 |
| Hispanic/Latino | 50% | 11,851 |
| Native American/American Indian | 43% | 4,661 |
| Native Hawaiian or Other Pacific Islander | 38% | 506 |

Attached to this report is Exhibit 1, which shows the information in Figure 3 on an individual crop basis for all crops included in the Census of Agriculture. It may be difficult to make valid inferences from Exhibit 1 because the Census of Agriculture asks producers about crop insurance participation at a farm level, instead of at a crop level. However, if a farm has access to crop insurance for one crop, it means they are participating in the program and are able to make decisions about whether they want to use crop insurance on other crops where it is available in their area.

Figure 4 below shows the participation rate for each demographic group compared to the participation rate for all producers. Figure 4 can be interpreted by saying that Beginning Farmers participate in crop insurance at 94% the rate of all producers. No demographic group participates in crop insurance at under 50% of the participation rate of all producers.

Figure 4. Crop Insurance Participation for Underserved Producers Compared to Participation Rates for All Producers

| Commodity: | All Crops |
|---|---|
| Demographic Group | Participation Rate compared to Participation Rate for All Producers |
| Beginning Farmer | 94% |
| Current or Former Military Service | 98% |
| Female | 93% |
| African American/Black | 81% |
| Asian American | 72% |
| Hispanic/Latino | 78% |
| Native American/American Indian | 67% |
| Native Hawaiian or Other Pacific Islander | 59% |

# III-  Current Offerings and Outreach

In an effort to increase the availability of Federal crop insurance in underserved states, RMA has worked to expand the availability of existing multi-peril crop insurance policies across the country. Over the 2018, 2019, and 2020 crop years, RMA expanded insurance availability to 318 additional crop county combinations that would not have been available to producers responding to the 2017 NASS Census of Agriculture.

RMA's regional offices worked collaboratively with regional stakeholders and with the USDA's Farm Service Agency (FSA) to identify areas where expansion was needed and feasible to accomplish these expansions. These efforts will continue. Notably, RMA has emphasized expansion of perennial fruit programs in the mid-Atlantic and Northeast, which should lead to higher participation in those areas which are currently underserved as identified in Figure 1.

Additionally, RMA has worked to create and improve existing programs for areas and producers that are underserved. RMA's Pasture, Rangeland and Forage (PRF) insurance program, which allows producers who hay or graze land for livestock to purchase protection against rainfall shortages, is a popular and affordable program targeted towards livestock and hay producers. The program in particular has been popular with Native American tribes. PRF is currently undergoing its own program review and may have enhancements in the future. RMA has also done a recent overhaul of our Forage Production and Forage Seeding plans of insurance, in the hopes of improving producer participation in both programs.

Additionally, the Bipartisan Budget Act of 2018 removed the congressionally mandated $20 million cap on insurance for livestock producers. This has allowed RMA to offer more coverage to livestock producers through existing programs like Whole Farm Revenue Protection, Livestock Gross Margin, and Livestock Risk Protection. It also made the new Dairy Revenue Protection insurance product feasible. This flexibility aids RMA in continuing to develop new products that serve livestock producers. The Federal Crop Insurance Corporation Board of Directors also recently approved enhancements to the Livestock Gross Margin and Livestock Revenue Protection plans of insurance, including providing those producers additional premium subsidy.

For vegetable producers, RMA has updated the record requirements for direct market producers under the Whole Farm Revenue Protection insurance policy for 2021. In 2020, there were 2,072 Whole Farm Revenue Protection insurance policies sold nationwide, covering over $2.2 billion in liability. Whole Farm Revenue Protection is available for 124 different commodities. The 2021 changes were made with the intent of making that program more accessible to direct market vegetable producers who told RMA they did not keep the records previously required by the program. Along with these changes, RMA has designated a national Specialty Crops Coordinator per the instructions of the 2018 Farm Bill. This coordinator, along with regional specialty crops coordinators, has been tasked with identifying and addressing areas for specialty crop insurance expansion. As part of these efforts, RMA has introduced a new plan of insurance called Production and Revenue History (PRH).  This policy will help specialty crop producers access revenue coverage for their crops, based on their production histories and historical prices received. The initial implementation of PRH insurance was for Strawberries in Florida. PRH will soon be implemented for fresh market tomatoes, fresh market sweet corn, and fresh market green bell peppers.

In addition to expanding and improving our products to meet the needs of underserved areas and groups, RMA has also emphasized education about our programs to underserved states and producer groups. Until the 2018 Farm Bill, RMA provided additional education and outreach in underserved states through cooperative agreements with State Departments of Agriculture, land grant universities, and other qualified entities. The funding for these agreements was shifted from RMA to the National Institute of Food and Agriculture (NIFA) as part of the 2018 Farm Bill. RMA now works with NIFA in an advisory role as they administer this funding. Starting in fiscal year 2021, RMA is reengaging in these education and outreach efforts by using funding associated with Section 522 of the Federal Crop Insurance Act to enter into cooperative education agreements.

RMA has also worked to help these producers with risk management through partnerships with other USDA agencies, including the Agricultural Marketing Service (AMS) and Natural Resources Conservation Service (NRCS). RMA partnered with AMS on a project to enhance market access for fruit and vegetable producers by defraying the costs of undergoing voluntary USDA Harmonized Good Agricultural Practices (GAP) audits. These food safety audits are an important aspect of any farm marketing plan and will mitigate financial risk by expanding the number of market options available to the farm. RMA partnered with NRCS to fund high tunnels for producers in underserved states, with an emphasis on urban agriculture. High tunnel systems allow crops to be planted several weeks earlier and later and eliminate considerable risk from weather and pests.

RMA also provides a specific set of benefits for Beginning Farmers and Ranchers (BFR) to make Federal crop insurance more accessible. Figure 3 and Figure 4 above show that of the underserved groups, BFR are among the most likely to participate in Federal crop insurance Additionally, the 2018 Farm Bill extended these BFR benefits to Veteran Farmers and Ranchers (VFR). These benefits are listed below:

- Exemption from paying the administrative fee for catastrophic and additional coverage policies;
- Additional 10 percentage points of premium subsidy for additional coverage policies that have premium subsidy;
- Use of another person's production history for the specific acreage transferred to you that you were previously involved in the decision making or physical activities to produce the crop; and
- An increase in the substitute Yield Adjustment, which allows you to replace a low yield due to an insured cause of loss, from 60 to 80 percent of the applicable transitional yield (T-Yield).

The 2018 Farm Bill instructed USDA to create Beginning Farmer Rancher Coordinators for RMA, FSA, NRCS, and Rural Development (RD). These coordinators will develop goals and create plans to increase beginning farmer participation and access to programs while coordinating nationwide efforts on beginning farmers and ranchers. Each state coordinator will receive training and develop beginning farmer outreach plans for their state. Coordinators will help field employees to better reach and serve beginning farmers and ranchers and will also be available to assist beginning farmers and ranchers who need help navigating the variety of resources USDA has to offer. Additionally, the Farm Bill added Specialty Crop Liaisons to assist the Specialty Crop Coordinator in RMA. These positions will better help identify unique needs of specialty crops which are commonly underserved. RMA recommends using these positions as a centerpiece to target expansion to underserved crops and areas.

RMA has also started a contracted study to develop insurance programs for local foods. This research was a requirement in the 2018 Farm Bill. RMA will review any findings or recommendations to see how

our program can be more accessible to local food producers. RMA separately submitted a report on this topic to the committees as required.

RMA also plans to continue to expand the PRH plan of insurance and has been working through the specialty crop coordinators to identify specialty crops where PRH could be used as the basis for crops that currently do not have a specific policy.

# IV-   Recommendations and Other Options

To increase program participation by socially disadvantaged Farmers and Ranchers, RMA is exploring ways to give socially disadvantaged Farmers and Ranchers access to the benefits, listed in Section III above, that are currently available to BFR and VFR. These would include exemption from administrative fees, additional premium subsidy, and an increase in the substitute Yield Adjustment.  In addition, RMA is considering ways to give socially disadvantaged producers a way to adjust their historical yields to account for the historical impact of discriminatory lending practices on their operations.

Additionally, although agents are required to receive training on specialty crops and other topics relevant to underserved producers, there is not a major financial incentive involving underserved producers in most cases. Congress could also consider incentive options to agents to better market insurance options or to sell complex policies like Whole Farm Revenue Protection to these producers.

RMA is exploring what changes could be made administratively versus those that would require Congressional action.

Finally, the Fiscal Year 2022 President's Budget includes an increase of $9 million in discretionary funds for RMA to hire staff devoted to underserved communities, enter into contracts and agreements to develop new products for consideration, and to expand risk management education and outreach efforts.

# V-   Appendix with Methodology:

## Adequate Crop Insurance Coverage for States

**Methodology (based on acreage):**

Insurance availability is typically determined at the county level, and this presents a challenge when determining what will count as insurance availability at the State level. For simplicity, it's assumed that if one county has insurance then the State is said to have insurance. Crops that do not have access to crop insurance in a particular state are excluded. NASS does provide survey data at the county-level for the major field crops, but results are often limited. NASS only reports counties with more than 30 respondents and 25% of planted acres included, otherwise the county is aggregated to the county reporting district and state-level estimates. Therefore, aggregating RMA's state-level data with NASS state-level data provides the most available crop acreage data. There are still cases at even the state-level where NASS has too few respondents to publish the crop acreage for the state. NASS nationwide acreage estimates are unconstrained and include all the acreage for the crop in the United States.

Consideration was made between using NASS survey and NASS Census of Agriculture data. The Census of Agriculture is more comprehensive than NASS surveys, however, for row crops and vegetables only harvested acres are recorded. For crop that were hit by a natural disaster in 2017, the Census is a poor choice for establishing penetration rates. Also, the Census of Agriculture is only conducted every five years, with the last being in 2017.

For field crops and vegetables, the planted and harvested acreage is reported in NASS surveys. When NASS conducts acreage surveys, its conducting surveys in states that are major producing areas of the crop. For fruits and nuts, the NASS survey and census both provide bearing and non-bearing acres, but the census contains more useful state level acreage than surveys.

Even when using the NASS census or survey, there are certain crops that RMA may have a policy for that are not covered in the Census of Agriculture, such as clary sage. Additionally, NASS and RMA may classify crops differently, therefore, the crop classifications from one agency may need to be aggregated in order to be analogous with the classification from the other agency. For example, RMA has several different policies for tobacco based on the variety, while NASS only records "Tobacco" as the commodity.

For these reasons the primary NASS data source is the 2018 NASS survey. For field crops and vegetable crops the NASS planted acreage survey estimates were used. For fruit and nut crops the NASS bearing acres census estimates were used. Some crops don't have NASS planted acre estimates so the NASS harvested acreage survey estimates were used. These crops include mint, sugarcane, tobacco, and forage (alfalfa, alfalfa grass mixture).

RMA's Summary of Business acreage for the 2018 crop year was compared to the 2018 NASS survey acreage or 2017 census acreage. Comparison was first made with the nationwide totals by crop to establish the percentage of insurance participation by crop. This percentage was then multiplied by 50 percent to establish the adequately served baseline for each crop at the state level. Then the RMA summary of business acreage by crop for each state was compared to NASS state survey or census crop acreage to establish the insurance participation percentage by state and crop. These state/crop insurance participation percentages were then compared to the adequately served national/crop baseline percentages. Any state/crop insurance participation percentages below the national/crop baseline were then identified as not being adequately served. The states and crops without adequate coverage is displayed in Figure 1. Several states and crops identified to having NASS acreage estimates with crop insurance available, but no acres were insured in 2018 and are displayed in Figure 2.

## RMA's Interaction with Underserved Producers

**Methodology (based on numbers of producers):**

To measure how effectively Federal crop insurance is serving underserved producers, defined by Congress as beginning farmers and ranchers, veteran farmers and ranchers, and socially disadvantaged farmers and ranchers, RMA used the 2017 Census of Agriculture NASS to look at the percent of respondents who identify as beginning farmers and ranchers, veteran farmers and ranchers, or as a category considered socially disadvantaged, that say they use crop insurance.

Strickland AR 0633

Typically, RMA analyzes crop insurance participation by comparing total acres estimated by NASS to the acres reported to RMA by insured producers. However, RMA could not follow this technique for underserved producers, because of the lack of RMA data that contains demographic information. RMA does not keep demographic information on program participants. Data is shared between RMA and FSA containing some demographic information, but this data isn't as complete as the data available in the 2017 Census of Agriculture.

NASS provided RMA with Census information by crop, broken down by farm sales class, concerning crop insurance participation for farmers and ranchers that are classified as beginning, current or former servicemen, female, African American, Asian, Native American, Native Hawaiian or Other Pacific Islander, or Hispanic. NASS also provided RMA with the same dataset for all producers, to serve as a baseline. RMA analyzed farms with gross sales over $50,000 in order to focus on participation rates for farm operations where farming is a primary source of income for the operator. This sales class was selected to capture a significant portion of intermediate farms that the Economic Research Service (ERS) defines as farms with less than $350,000 in gross cash income and a principal operator whose primary occupation is farming.  The $50,000 sales class was also selected to provide a balanced comparison of family farm insurance participation without being overly weighted by residence farms that ERS defines as farms with less than $350,000 in gross farm income and where the principal operator is either retired from farming or has a primary occupation other than farming. Overall, the $50,000 sales class of farms account for 97% of farm sales nationwide according to NASS.

If producers provided an answer of more than zero to the 2017 Census of Agriculture question "How many acres in this operation were covered under any crop insurance policy in 2017?", they were included as crop insurance participants.

Due to the format of this question, RMA was able to identify if a producer's operation had some form of crop insurance but was unable to determine which specific crops produced under the farming operation were insured. This made it difficult to make inferences on an individual crop basis. However, RMA did perform this analysis, and this information is included in Exhibit 1.

If a producer had crop insurance on at least one crop, then they likely had access to a crop insurance agent and were able to make decisions about whether or not they wanted insurance for any other insurable crops they grew

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

# COMMODITY CREDIT CORPORATION CHARTER ACT

[Public Law 115-334]

[As Amended Through P.L. 115–334, Enacted December 20, 2018]

〖Currency: This publication is a compilation of the text of title I of Public Law 115-334. It was last amended by the public law listed in the As Amended Through note above and below at the bottom of each page of the pdf version and reflects current law through the date of the enactment of the public law listed at https://www.govinfo.gov/app/collection/comps/〗

〖Note: While this publication does not represent an official version of any Federal statute, substantial efforts have been made to ensure the accuracy of its contents. The official version of Federal law is found in the United States Statutes at Large and in the United States Code. The legal effect to be given to the Statutes at Large and the United States Code is established by statute (1 U.S.C. 112, 204).〗

## TABLE OF CONTENTS [1]

Sec. 1. Short title.
Sec. 2. Creation and purposes.
Sec. 3. Office.
Sec. 4. General powers.
Sec. 5. Specific powers.
Sec. 6. Existing statutes applicable to the Corporation.
Sec. 7. Capital stock.
Sec. 8. Funds.
Sec. 9. Directors, advisory board.
Sec. 10. Personnel of Corporation.
Sec. 11. Cooperation with other government agencies.
Sec. 12. Utilization of associations and trade facilities.
Sec. 13. Records; annual report.
Sec. 14. Interest of Members of the Congress.
Sec. 15. Crimes and offenses.
Sec. 16. Transfer of assets of Commodity Credit Corporation, a Delaware corporation.
Sec. 17. Dissolution of Delaware corporation.
Sec. 18. Effective date.
Sec. 19. Release of innocent purchasers of converted goods.

APPENDIX:

Comparability of storage payments (Sec. 1124 of Food, Agriculture, Conservation, and Trade Act of 1990).
Minimum acquisition of stocks by Commodity Credit Corporation (Sec. 402 of Food and Agriculture Act of 1962).

AN ACT To provide a Federal Charter for the Commodity Credit Corporation.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* 〖15 U.S.C. 714 note〗 That this Act may be cited as the "Commodity Credit Corporation Charter Act".

---

[1] This table of contents is not part of the Act but is included for user convenience.

1

Strickland AR 0635

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

SEC. 2. 〖15 U.S.C. 714〗 CREATION AND PURPOSES.—For the purpose of stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities, products thereof, foods, feeds, and fibers (hereinafter collectively referred to as "agricultural commodities"), and of facilitating the orderly distribution of agricultural commodities, there is hereby created a body corporate to be known as Commodity Credit Corporation (hereinafter referred to as the "Corporation"), which shall be an agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture (hereinafter referred to as the "Secretary").

SEC. 3. 〖15 U.S.C. 714a〗 OFFICE.—The Corporation may establish offices in such place or places as it may deem necessary or desirable in the conduct of its business.

SEC. 4. 〖15 U.S.C. 714b〗 GENERAL POWERS.—The Corporation—

(a) Shall have succession in its corporate name.

(b) May adopt, alter, and use a corporate seal, which shall be judicially noticed.

(c) May sue and be sued, but no attachment, injunction, garnishment or other similar process, mesne or final, shall be issued against the Corporation or its property. The district courts of the United States, including the district courts of the District of Columbia and of any Territory or possession, shall have exclusive original jurisdiction, without regard to the amount in controversy, of all suits brought by or against the Corporation: *Provided*, That the Corporation may intervene in any court in any suit, action, or proceeding in which it has an interest. Any suit against the Corporation shall be brought in the District of Columbia, or in the district wherein the plaintiff resides or is engaged in business. No suit by or against the Corporation shall be allowed unless (1) it shall have been brought within six years after the right accrued on which suit is brought, or (2) in the event that the person bringing such suit shall have been under legal disability or beyond the seas at the time the right accrued, the suit shall have been brought within three years after the disability shall have ceased or within six years after the right accrued on which suit is brought, whichever period is longer. The defendant in any suit by or against the Corporation may plead, by way of set-off or counter claim, any cause of action, whether arising out of the same transaction or not, which would otherwise be barred by such limitation if the claim upon which the defendant's cause of action is based had not been barred prior to the date that the plaintiff's cause of action arose: *Provided,* That the defendant shall not be awarded a judgment on any such set-off or counterclaim for any amount in excess of the amount of the plaintiff's claim established in the suit. All suits against the Corporation shall be tried by the court without a jury. Notwithstanding any other provision of this Act, the Federal Tort Claims Act (Public Law 601, Seventy-ninth Congress) shall be applicable to the Corporation. Any suit by or against the United States as the real party in interest based upon any claim by or against the Corporation shall be subject to the provisions of this subsection (c) to the same extent as though such suit were by or against the Cor-

Strickland AR 0636

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

**3**          **COMMODITY CREDIT CORPORATION CHARTER ACT**          **Sec. 4**

poration, except that (1) any such suit against the United States based upon any claim of the type enumerated in title 28, section 1491, of the United States Code, may be brought in the United States Claims Court, and (2) no such suit against the United States may be brought in a district court unless such suit might, without regard to the provisions of this Act, be brought in such court.

(d) May adopt, amend, and repeal bylaws, rules, and regulations governing the manner in which its business may be conducted and the powers vested in it may be exercised.

(e) Shall have all the rights, privileges, and immunities of the United States with respect to the right to priority of payment with respect to debts due from insolvent, deceased, or bankrupt debtors. The Corporation may assert such rights, privileges, and immunities in any suit, action, or proceeding.

(f) Shall be entitled to the use of the United States mails in the same manner and upon the same conditions as the executive departments of the Federal Government.

(g) May enter into and carry out such contracts or agreements as are necessary in the conduct of its business, except that obligations under all such contracts or agreements (other than reimbursable agreements under section 11) for equipment or services relating to automated data processing, information technologies, or related items (including telecommunications equipment and computer hardware and software) may not exceed $170,000,000 in fiscal year 1996 and not more than $193,000,000 in the 6-fiscal year period beginning on October 1, 1996, unless additional amounts for such contracts and agreements are provided in advance in appropriation Acts. State and local regulatory laws or rules shall not be applicable with respect to contracts or agreements of the Corporation or the parties thereto to the extent that such contracts or agreements provide that such laws or rules shall not be applicable, or to the extent that such laws or rules are inconsistent with such contracts or agreements.

(h) May contract for the use, in accordance with the usual customs of trade and commerce, of plants and facilities for the physical handling, storage, processing, servicing, and transportation of the agricultural commodities subject to its control. The Corporation shall not have power to acquire real property or any interest therein except that it may (a) rent or lease office space necessary for the conduct of its business and (b) acquire real property or any interest therein for the purpose of providing storage adequate to carry out effectively and efficiently any of the Corporation's programs, or of securing or discharging obligations owing to the Corporation, or of otherwise protecting the financial interests of the Corporation: *Provided,* That the authority contained in this subsection (h) shall not be utilized by the Corporation for the purpose of acquiring real property, or any interest therein, in order to provide storage facilities for any commodity unless the Corporation determines that existing privately owned storage facilities for such commodity in the area concerned are not adequate: *Provided further,* That no refrigerated cold storage facilities shall be constructed or purchased except with funds specially provided by Congress for that purpose: *And provided further,* That any contract entered into by the Corporation for the use of a storage facility shall provide at least that

Strickland AR 0637

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

(1) the rental rate charged for an extended term in excess of one year shall be at an annual rate less than that which is charged for a one-year contract, (2) any obligation of the Corporation to pay for the use of any space in a facility shall be relieved to the extent that the Corporation does not use the space and payment is made by another person for the use of such space, and (3) if the Corporation determines that it no longer needs the space reserved in the facility, the Corporation may be relieved for the remaining term of the contract, of its obligations to an extent and in a manner that will provide significant savings to the Corporation while permitting the owner of the facility reasonable time to lease such space to another person: *And provided further,* That nothing contained in this subsection (h) shall limit the duty of the Corporation, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and the effective and efficient conduct of its business, to utilize the usual and customary channels, facilities, and arrangements of trade and commerce in the warehousing of commodities: *And provided further,* That to encourage the storage of grain on farms, where it can be stored at the lowest cost, the Corporation may make loans to grain growers needing storage facilities when such growers shall apply to the Corporation for financing the construction or purchase of suitable storage, and these loans shall be deducted from the proceeds of price support loans or purchase agreements made between the Corporation and the growers, except that the Secretary shall make such loans in areas in which the Secretary determines that there is a deficiency of such storage: To encourage the alleviation of natural resource conservation problems that reduce the productive capacity of the Nation's land and water resources or that cause degradation of environmental quality, the Corporation may, beginning with enactment of the Agriculture and Food Act of 1981, make loans to any agricultural producer for those natural resource conservation and environmental enhancement measures that are recommended by the applicable county and State committees established under section 8(b) of the Soil Conservation and Domestic Allotment Act and are included in the producer's conservation plan approved by the local soil and water conservation district; such loans shall be for a period not to exceed ten years at a rate of interest based upon the rate of interest charged the Corporation by the United States Treasury; the Corporation may make loans to any one producer in any fiscal year in an amount not to exceed $25,000; loans up to $10,000 in amount may be unsecured and loans in excess of $10,000 shall be secured; and the total of such unsecured and secured loans made in each fiscal year shall not exceed $200,000,000: *Provided,* That the authority provided by this sentence to make loans shall be effective only to the extent and in such amounts as may be provided for in prior appropriation Acts. Notwithstanding any other provision of law, the Commodity Credit Corporation shall, to the maximum extent practicable, in consultation with the Secretary of State, and upon terms and conditions prescribed or approved by the Secretary of Agriculture, accept strategic and critical materials produced abroad in exchange for agricultural commodities acquired by the Corporation. Insofar as practicable, in effecting such exchange of goods, the Secretary shall: (1) use normal commercial trade channels; (2) take ac-

Strickland AR 0638

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

**5**          **COMMODITY CREDIT CORPORATION CHARTER ACT**          **Sec. 4**

tion to avoid displacing usual marketings of United States agricultural commodities and the products thereof; (3) take reasonable precautions to prevent the resale or transshipment to other countries, or use for other than domestic use in the importing country, of agricultural commodities used for such exchange; and (4) give priority to commodities easily storable and those which serve as prime incentive goods to stimulate production of critical and strategic materials. The Corporation may solicit bids from, and utilize, private trading firms to effect such exchange of goods. The determination of the quantities and qualities of such materials which are desirable for stockpiling and the determination of which materials are strategic and critical shall be made in the manner prescribed by section 3 of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98 et seq.). Strategic and critical materials acquired by Commodity Credit Corporation in exchange for agricultural commodities shall, to the extent approved by the President be transferred to the stock pile provided for by the Strategic and Critical Materials Stock Piling Act; and in the same fiscal year such materials are transferred to the stock pile the Commodity Credit Corporation shall be reimbursed for the strategic and critical materials so transferred to the stock pile from the funds made available for the purpose of the Strategic and Critical Materials Stock Piling Act, in an amount equal to the fair market value, as determined by the Secretary of the Treasury, of the material transferred to the stock pile. If the volume of petroleum products (including crude oil) stored in the Strategic Petroleum Reserve is less than the level prescribed under section 154 of the Energy Policy and Conservation Act (42 U.S.C. 6234), the Corporation shall, to the maximum extent practicable and with the approval of the Secretary of Agriculture, make available annually to the Secretary of Energy, upon the request of the Secretary of Energy, a quantity of agricultural products owned by the Corporation with a market value at the time of such request of at least $300,000,000 for use by the Secretary of Energy in acquiring petroleum products (including crude oil) produced abroad for placement in the Strategic Petroleum Reserve through an exchange of such agricultural products. The terms and conditions of each such exchange, including provisions of full reimbursement to the Commodity Credit Corporation, shall be determined by the Secretary of Energy and the Secretary of Agriculture. Nothing contained herein shall limit the authority of the Commodity Credit Corporation to acquire, hold, or dispose of such quantity of strategic and critical materials as it deems advisable in carrying out its functions and protecting its assets: *Provided,* That, notwithstanding any other provision of law, where a grain storage facility owned by the Corporation is not needed by the Corporation and, upon being offered for sale no person offers to pay the minimum price set by the Corporation for such facility for use in connection with storage or handling of agricultural commodities, then the Corporation may, without declaring such facility to be excess property, sell it by bids at not less than such minimum price to any public or private nonprofit agency or organization for use for the purposes of such agency or organization. This provision shall apply also to facilities which on the effective date of this Act have been declared excess to the needs of the Commodity Credit Corporation

Strickland AR 0639

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

but have not been claimed by any other Government agency, or surplus to the needs of the Government but not disposed of pursuant to the provisions of the Federal Property and Administrative Services Act of 1949, as amended.

(i) May borrow money subject to any provision of law applicable to the Corporation: *Provided,* That the total of all money borrowed by the Corporation, other than trust deposits and advances received on sales, shall not at any time exceed in the aggregate $30,000,000,000. The Corporation shall at all times reserve a sufficient amount of its authorized borrowing power which, together with other funds available to the Corporation, will enable it to purchase, in accordance with its contracts with lending agencies, notes, or other obligations evidencing loans made by such agencies under the Corporation's programs.

(j) Shall determine the character of and the necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, and paid.

(k) Shall have authority to make final and conclusive settlement and adjustment of any claims by or against the Corporation or the accounts of its fiscal officers.

(l) May make such loans and advances of its funds as are necessary in the conduct of its business.

(m) Shall have such powers as may be necessary or appropriate for the exercise of the powers specifically vested in the Corporation, and all such incidental powers as are customary in corporations generally; but any research financed by the Corporation shall relate to the conservation or disposal of commodities owned or controlled by the Corporation and shall be conducted in collaboration with research agencies of the Department of Agriculture. Notwithstanding any other provision of this Act, the Corporation may, in the exercise of its power to remove and dispose of surplus agricultural commodities, export, or cause to be exported, not to exceed such amounts of commodities owned by the Corporation as will enable the Corporation to finance research and development of external combustion engines using fuel other than that derived from petroleum and petroleum products. The total value of commodities exported annually for the purposes of the research authorized by the preceding sentence may not exceed $30,000,000.

SEC. 5. 〔15 U.S.C. 714c〕 SPECIFIC POWERS.—In the fulfillment of its purposes and in carrying out its annual budget programs submitted to and approved by the Congress pursuant to Chapter 91 of Title 31, the Corporation is authorized to use its general powers only to—

(a) Support the prices of agricultural commodities (other than tobacco) through loans, purchases, payments, and other operations.

(b) Make available materials and facilities required in connection with the production and marketing of agricultural commodities (other than tobacco).

(c) Procure agricultural commodities (other than tobacco) for sale to other Government agencies, foreign governments, and domestic, foreign, or international relief or rehabilitation agencies, and to meet domestic requirements.

(d) Remove and dispose of or aid in the removal or disposition of surplus agricultural commodities (other than tobacco).

Strickland AR 0640

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

(e) Increase the domestic consumption of agricultural commodities (other than tobacco) by expanding or aiding in the expansion of domestic markets or by developing or aiding in the development of new and additional markets, marketing facilities, and uses for such commodities.

(f) Export or cause to be exported, or aid in the development of foreign markets for, agricultural commodities (other than tobacco) (including fish and fish products, without regard to whether such fish are harvested in aquacultural operations).

(g) Carry out conservation or environmental programs authorized by law.

(h) Carry out such other operations as the Congress may specifically authorize or provide for.

In the Corporation's purchasing and selling operations with respect to agricultural commodities (other than tobacco) (except sales to other Government agencies), and in the warehousing, transporting, processing, or handling of agricultural commodities (other than tobacco), the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporations purposes and the effective and efficient conduct of its business, utilize the usual and customary channels, facilities, and arrangements of trade and commerce (including, at the option of the Corporation, the use of private sector entities).

SEC. 6. 【15 U.S.C. 714d】 EXISTING STATUTES APPLICABLE TO THE CORPORATION.—The Federal statutes applicable to Commodity Credit Corporation, a Delaware corporation, shall be applicable to the Corporation. Commodity Credit Corporation, a Delaware corporation, shall cease to be an agency of the United States as provided in section 7(a) of the Act of January 31, 1935, as amended (15 U.S.C., 1940 edition, Supp. V, 713(a)).

SEC. 7. 【15 U.S.C. 714e】 CAPITAL STOCK.—The Corporation shall have a capital stock of $100,000,000 which shall be subscribed by the United States. Such subscription shall be deemed to be fully paid by the transfer of assets to the Corporation pursuant to section 16 of this Act. The Corporation shall pay interest to the United States Treasury on the amount of its capital stock, and on the amount of the obligations of the Corporation purchased by the Secretary of the Treasury pursuant to the Act of March 8, 1938 (U.S.C., title 15, sec. 713a–4), as amended, at such rates as may be determined by the Secretary of the Treasury to be appropriate in view of the terms for which such amounts are made available to the Corporation.

SEC. 8. 【15 U.S.C. 714f】 FUNDS.—The Corporation is authorized to use in the conduct of its business all its funds and other assets, including capital and net earnings therefrom, and all funds and other assets, which have been or may hereafter be transferred or allocated to, borrowed by, or otherwise acquired by it.

SEC. 9. 【15 U.S.C. 714g】 DIRECTORS, ADVISORY BOARD.—(a) The management of the Corporation shall be vested in a Board of Directors (hereinafter referred to as the "Board"), subject to the general supervision and direction of the Secretary. The Secretary shall be an ex officio director and shall serve as Chairman of the Board. The Board shall consist of seven members (in addition to the Secretary), who shall be appointed by the President. In addi-

Strickland AR 0641

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

tion to their duties as members of the Board, such appointed members shall perform such other duties as may be prescribed by the Secretary. Each appointed member of the Board shall receive compensation at such rate not in excess of the maximum then payable under the Classification Act of 1923, as amended,[2] as may be fixed by the Secretary, except that any such member who holds another office or position under the Federal Government the compensation for which exceeds such rate may elect to receive compensation at the rate provided for such other office or position in lieu of the compensation provided by this section. A majority of the directors shall constitute a quorum of the Board and action shall be taken only by a majority vote of those present.[3]

(b) In addition to the Board of Directors there shall be an advisory board reflecting broad agricultural and business experience in its membership and consisting of five members who shall be appointed by the President, and who shall serve at the pleasure of the President. Not more than three of such members shall belong to the same political party. The advisory board shall meet at the call of the Secretary, who shall require it to meet not less often than once each ninety days; shall survey the general policies of the Corporation, including its policies in connection with the purchase, storage, and sale of commodities, and the operation of lending and price-support programs; and shall advise the Secretary with respect thereto. Members of the advisory board shall receive for their services as members compensation of not to exceed $50 per diem when actually engaged in the performance of their duties as such, together with their necessary traveling expenses while going to and coming from meetings.

SEC. 10. [15 U.S.C. 714h] PERSONNEL OF CORPORATION.—The Secretary shall appoint such officers and employees as may be necessary for the conduct of business of the Corporation, define their authority and duties, delegate to them such of the powers vested in the Corporation as he may determine. With the exception of experts, appointments shall be made pursuant to the civil service laws and the Classification Act of 1923, as amended (5 U.S.C., 1946 edition, 661).[4]

SEC. 11. [15 U.S.C. 714i] COOPERATION WITH OTHER GOVERNMENT AGENCIES.—The Corporation may, with the consent of the agency concerned, accept and utilize, on a compensated or uncompensated basis, the officers, employees, services, facilities, and information of any agency of the Federal Government, including any bureau, office, administration, or other agency of the Department of Agriculture, and of any State, the District of Columbia, any territory or possession, or any political subdivision thereof. The Corporation may allot to any bureau, office, administration, or other agency of the Department of Agriculture or transfer to such other agencies as it may request to assist it in the conduct of its business any of the funds available to it for administrative expenses. The personnel and facilities of the Corporation may, with the consent

---

[2] This reference is to be considered to mean the Classification Act of 1949, P.L. 429, 81st Cong., 63 Stat. 954, under Sec. 1106 of that Act.
[3] Meetings are subject to the Government in the Sunshine Act, P.L. 94–409, 90 Stat. 1241, 1242, Sept. 13, 1976.
[4] See footnote 9–1.

Strickland AR 0642

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

of the Corporation, be utilized on a reimbursable basis by any agency of the Federal Government, including any bureau, office, administration, or other agency of the Department of Agriculture, in the performance of any part or all of the functions of such agency. After September 30, 1996, the total amount of all allotments and fund transfers from the Corporation under this section (including allotments and transfers for automated data processing or information resource management activities but excluding any amounts used to provide technical assistance under title X of the Agriculture Improvement Act of 2018 or an amendment made by that title) for a fiscal year may not exceed the total amount of the allotments and transfers made under this section in fiscal year 1995.

SEC. 12. ⟦15 U.S.C. 714j⟧ UTILIZATION OF ASSOCIATIONS AND TRADE FACILITIES.—The Corporation may, in the conduct of its business, utilize on a contract or fee basis, committees or associations of producers, producer-owned and producer-controlled cooperative associations, and trade facilities.

SEC. 13. ⟦15 U.S.C. 714k⟧ RECORDS; ANNUAL REPORT.—The Corporation shall at all times maintain complete and accurate books of account and shall file annually with the Secretary of Agriculture a complete report as to the business of the Corporation, a copy of which shall be forwarded by the Secretary of Agriculture to the President for transmission to the Congress. In addition to the annual report, the Corporation shall submit to Congress on a quarterly basis an itemized report of all expenditures over $10,000 made under section 5 or 11 during the period covered by the report, including expenditures in the form of allotments or fund transfers to other agencies and departments of the Federal Government.

SEC. 14. ⟦15 U.S.C. 714l⟧ INTEREST OF MEMBERS OF THE CONGRESS.—The provisions of section 1 of the Act of February 27, 1877, as amended (41 U.S.C., 1940 edition, 22), shall apply to all contracts or agreements of the Corporation, except contracts or agreements of a kind which the Corporation may enter into with farmers participating in a program of the Corporation.

SEC. 15. ⟦15 U.S.C. 714m⟧ CRIMES AND OFFENSES.—

FALSE STATEMENTS; OVERVALUATION OF SECURITIES

(a) Whoever makes any statement knowing it to be false, or whoever willfully overvalues any security, for the purpose of influencing in any way the action of the Corporation, or for the purpose of obtaining for himself or another, money, property, or anything of value, under this Act, or under any other Act applicable to the Corporation, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both.

EMBEZZLEMENT, AND SO FORTH; FALSE ENTRIES; FRAUDULENT ISSUE OF OBLIGATIONS OF CORPORATION

(b) Whoever, being connected in any capacity with the Corporation or any of its programs, (i) embezzles, abstracts, purloins, or willfully misapplies any money, funds, securities, or other things of value, whether belonging to the Corporation or pledged, or other-

Strickland AR 0643

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

wise entrusted to it; or (ii) with intent to defraud the Corporation or any other body, politic or corporate, or any individual, or to deceive any officer, auditor, or examiner of the Corporation, makes any false entry in any book, report, or statement of, or to, the Corporation, or draws any order, or issues, puts forth or assigns any note or other obligation or draft, mortgage, judgment, or decree thereof; or (iii) with intent to defraud the Corporation, participates or shares in, or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of the Corporation, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both.

### LARCENY; CONVERSION OF PROPERTY

(c) Whoever shall willfully steal, conceal, remove, dispose of, or convert to his own use or to that of another any property owned or held by, or mortgaged or pledged to, the Corporation, or any property mortgaged or pledged as security for any promissory note, or other evidence of indebtedness, which the Corporation has guaranteed or is obligated to purchase upon tender, shall, upon conviction thereof, if such property be of any amount or value in excess of $500, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both, and, if such property be of an amount or value of $500 or less, be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both.

### CONSPIRACY TO COMMIT OFFENSE

(d) Whoever conspires with another to accomplish any of the acts made unlawful by the preceding provisions of this section shall, upon conviction thereof, be subject to the same fine or imprisonment, or both, as is applicable in the case of conviction for doing such unlawful acts.

### GENERAL STATUTES APPLICABLE

(e) All the general penal statutes relating to crimes and offenses against the United States shall apply with respect to the Corporation, its property, money, contracts and agreements, employees, and operations: *Provided,* That such general penal statutes shall not apply to the extent that they relate to crimes and offenses punishable under subsections (a), (b), (c), and (d) of this section: *Provided further,* That sections 114 and 115 of the Act of March 4, 1909, as amended (18 U.S.C., 1940 edition, 204, 205),[5] shall not apply to contracts or agreements of a kind which the Corporation may enter into with farmers participating in a program of the Corporation.

### USE OF WORDS "COMMODITY CREDIT CORPORATION"

(f) No individual, association, partnership, or corporation shall use the words "Commodity Credit Corporation" or any combination

---

[5] The Act of March 4, 1909, as amended, was repealed and superseded by the Act of June 25, 1948. P.L. 80–772, 62 Stat. 683 *et seq.* Sections 204 and 205 were superseded by sections 431 and 482 of title 18, U.S.C.

Strickland AR 0644

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

of the same, as the name or a part thereof under which he or it shall do or purport to do business. Every individual, partnership, association, or corporation violating this prohibition shall be guilty of a misdemeanor and shall be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both.

SEC. 16. 〔15 U.S.C. 714n〕 TRANSFER OF ASSETS OF COMMODITY CREDIT CORPORATION, A DELAWARE CORPORATION.—The assets, funds, property, and records of Commodity Credit Corporation, a Delaware corporation, are hereby transferred to the Corporation. The rights, privileges, and powers, and the duties and liabilities of Commodity Credit Corporation, a Delaware corporation, in respect to any contract, agreement, loan, account, or other obligation shall become the rights, privileges, and powers, and the duties and liabilities, respectively, of the Corporation. The enforceable claims of or against Commodity Credit Corporation, a Delaware corporation, shall become the claims of or against, and may be enforced by or against, the Corporation: *Provided,* That nothing in this Act shall limit or extend any period of limitation otherwise applicable to such claims against the Corporation.

SEC. 17. 〔15 U.S.C. 714o〕 DISSOLUTION OF DELAWARE CORPORATION.—The Secretary of Agriculture, representing the United States as the sole owner of the capital stock of Commodity Credit Corporation, a Delaware corporation, is hereby authorized and directed to institute or cause to be instituted such proceedings as are required for the dissolution of said Corporation under the laws of the State of Delaware.[6] The costs of such dissolution of said Corporation shall be borne by the Corporation.

SEC. 18. 〔15 U.S.C. 714 note〕 EFFECTIVE DATE.—This Act shall take effect as of midnight June 30, 1948.

SEC. 19. 〔15 U.S.C. 714p〕 RELEASE OF INNOCENT PURCHASERS OF CONVERTED GOODS.—A buyer in the ordinary course of business of fungible goods heretofore or hereafter sold and physically delivered by a warehouseman or other dealer who was regularly engaged in the business of buying and selling such goods shall take or be deemed to have taken such goods free of any claim, existing or hereafter arising, by Commodity Credit Corporation, based on the want of authority in the seller to sell such goods, provided the buyer purchased such goods for value in good faith and did not know or have reason to know of any defect in the seller's authority to sell such goods. To be entitled to relief under this section a buyer must assert as an affirmative defense and establish by a preponderance of the evidence the facts necessary to entitle him to such relief.

---

[6] The Delaware corporation was dissolved under the laws of the State of Delaware, effective 9 a.m. September 15, 1948.

Strickland AR 0645

PUBLIC LAW 116–260—DEC. 27, 2020          134 STAT. 2105

(b) HOME-DELIVERED NUTRITION SERVICES WAIVER.—For purposes of determining eligibility for the delivery of nutrition services under section 337 of the Older Americans Act of 1965 (42 U.S.C. 3030g), with funds received by a State under the Older Americans Act of 1965 (42 U.S.C. 2001 et seq.) for fiscal 2021, the State shall treat an older individual who is unable to obtain nutrition because the individual is practicing social distancing due to the public health emergency in the same manner as the State treats an older individual who is homebound by reason of illness.

<div style="float:right">Determination.<br>42 USC 3030g note.</div>

(c) DIETARY GUIDELINES WAIVER.—To facilitate implementation of subparts 1 and 2 of part C of title III of the Older Americans Act of 1965 (42 U.S.C. 3030d–2 et seq.), with funds received by a State for fiscal year 2021, the Assistant Secretary for Aging may waive, but continue to make every effort practicable to encourage the restoration of, the applicable requirements for meals provided under such subparts comply with the requirements of clauses (i) and (ii) of section 339(2)(A) of such Act (42 U.S.C. 3030g–21(2)(A)).

<div style="float:right">Compliance.<br>42 USC 3030g–21 note.</div>

# Subtitle B—Agriculture

## CHAPTER 1—AGRICULTURAL PROGRAMS

**SEC. 751. OFFICE OF THE SECRETARY.**

<div style="float:right">Payments.</div>

There is appropriated, out of any funds in the Treasury not otherwise appropriated, for an additional amount for the "Office of the Secretary", $11,187,500,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus by providing support for agricultural producers, growers, and processors impacted by coronavirus, including producers and growers of specialty crops, non-specialty crops, dairy, livestock, and poultry, producers that supply local food systems, including farmers markets, restaurants, and schools, and growers who produce livestock or poultry under a contract for another entity: *Provided*, That from the amounts provided in this section, the Secretary of Agriculture shall make supplemental payments to producers of price trigger crops for the 2020 crop year under section 9.202 of title 7, Code of Federal Regulations, on eligible acres of the crop, in an amount equal to $20 per eligible acre: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make supplemental payments to producers of flat-rate crops for the 2020 crop year under section 9.202 of title 7, Code of Federal Regulations, on eligible acres of the crop, in an amount equal to $20 per eligible acre: *Provided further*, That for the purposes of determining the amount of eligible sales under section 9.202(i) of title 7, Code of Federal Regulations, the Secretary of Agriculture shall also include indemnities received under crop insurance under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) and payments made or calculated under the noninsured crop disaster assistance program established by section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) and the wildfire and hurricane indemnity plus program under subpart O of part 760 of title 7, Code of Federal Regulations: *Provided further*, That for the purposes of determining the amount of eligible sales under section 9.202(i) of title 7, Code of Federal Regulations, the Secretary of Agriculture may allow producers to

<div style="float:right">Determination.</div>

<div style="float:right">Determination.</div>

Strickland AR 0646

134 STAT. 2106            PUBLIC LAW 116–260—DEC. 27, 2020

substitute 2018 sales for such commodities for 2019 sales: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make payments to producers of livestock or poultry (not including any packer (as defined in section 201 of the Packers and Stockyards Act, 1921 (7 U.S.C. 191)) or live poultry dealer (as defined in section 2(a) of that Act (7 U.S.C. 182(a)))) for losses of livestock or poultry depopulated before the date of enactment of this Act due to insufficient processing access, based on 80 percent of the fair market value of any livestock or poultry so depopulated, and for the cost of such depopulation (other than costs for which the producer has been compensated under the environmental quality incentives program under subchapter A of chapter 4 of subtitle D of title XII of the Food Security

Determination.

Act of 1985 (16 U.S.C. 3839aa et seq.)): *Provided further*, That in determining the cost of depopulation under the preceding proviso, the Secretary of Agriculture may take into consideration whether a producer has been compensated for the costs of such depopulation by any State program: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make payments to producers of cattle described in paragraphs (2), (3), and (4) of section 9.102(i) of title 7, Code of Federal Regulations, in an amount equal to the product obtained by multiplying the number of such cattle in inventory during the time period specified in paragraph (c)(2) of that section by 50 percent of the payment rate calculated by subtracting the applicable CCC payment rate specified in paragraph (h) of that section and the applicable payment rate specified in section 9.202(c) of that title from the applicable CARES Act payment rate specified in section 9.102(h) of that title: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make payments to producers of cattle described in paragraphs (1) and (5) of section 9.102(i) of title 7, Code of Federal Regulations, in an amount equal to the product obtained by multiplying the number of such cattle in inventory during the time period specified in paragraph (c)(2) of that section by 25 percent of the payment rate calculated by subtracting the applicable CCC payment rate specified in paragraph (h) of that section and the applicable payment rate specified in section 9.202(c) of that title (if applicable) from the applicable CARES Act payment rate specified in section 9.102(h) of that title:

Determination.
Time period.

*Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall use not more than $1,000,000,000 to make payments to contract growers of livestock and poultry to cover not more than 80 percent of revenue losses, as determined by the Secretary of Agriculture, for the period beginning on January 1, 2020, and ending on the date of enactment of this Act: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall use not less than $20,000,000 to improve and maintain animal disease prevention and response capacity:

Cotton.
Time periods.

*Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make payments to domestic users of upland cotton and extra-long staple cotton for the period beginning on March 1, 2020, and ending on December 31, 2020, in an amount equal to the product obtained by multiplying 10 by the product obtained by multiplying 6 cents per pound by the average monthly consumption of the domestic user for the period beginning on January 1, 2017, and ending on December 31, 2019:

Determination.

*Provided further*, That notwithstanding paragraph (e) of section

Strickland AR 0647

PUBLIC LAW 116–260—DEC. 27, 2020          134 STAT. 2107

9.7 of title 7, Code of Federal Regulations (or any successor regula-
tion), and subject to the availability of funds, taking into account
the requirements of the other provisos in this section, for purposes
of providing assistance under subparts B and C of part 9 of that
title, the Secretary of Agriculture shall make additional payments
to ensure that such assistance more closely aligns with the cal-
culated gross payment or revenue losses of any person or entity,
except that such assistance shall not exceed the calculated gross
payment or 80 percent of the loss, as determined by the Secretary
of Agriculture, of any entity or persons, and that for the purposes
of determining income derived from farming, ranching, and forestry
under paragraph (d) of that section, the Secretary of Agriculture
shall broadly consider income derived from agricultural sales
(including gains), agricultural services, the sale of agricultural real
estate, and prior year net operating loss carryforward as such
income: *Provided further*, That from the amounts provided in this
section, the Secretary of Agriculture may provide support to proc-
essors for losses of crops due to insufficient processing access:
*Provided further*, That the Secretary of Agriculture may extend
the term of a marketing assistance loan authorized by section
1201 of the Agricultural Act of 2014 (7 U.S.C. 9031), notwith-
standing section 1203(b) of that Act (7 U.S.C. 9033(b)), for any
loan commodity to 12 months: *Provided further*, That the authority
provided by the previous proviso shall expire on September 30,
2021: *Provided further*, That from the amounts provided in this
section, the Secretary of Agriculture shall use not less than
$1,500,000,000 to purchase food and agricultural products, including
seafood, to purchase and distribute agricultural products (including
fresh produce, dairy, and meat products) to individuals in need,
including through delivery to nonprofit organizations that can
receive, store, and distribute food items, and for grants and loans
to small or midsized food processors or distributors, seafood proc-
essing facilities and processing vessels, farmers markets, producers,
or other organizations to respond to coronavirus, including for meas-
ures to protect workers against the Coronavirus Disease 2019
(COVID–19): *Provided further*, That not later than 30 days after
the date of enactment of this Act and prior to issuing solicitations
for contracts under the previous proviso, the Secretary of Agri-
culture shall conduct a preliminary review of actions necessary
to improve COVID–19-related food purchasing, including reviewing
coordination, specifications, quality, and fairness of purchases,
including the distribution of purchased commodities, including the
fairness of food distribution, such as whether rural communities
received adequate support, the degree to which transportation costs
were sufficient to reach all areas, whether food safety was adequate
in the distribution of food, and the degree to which local purchases
of food were made: *Provided further*, That from the amounts pro-
vided in this section, the Secretary of Agriculture may use not
more than $200,000,000 to provide relief to timber harvesting and
timber hauling businesses that have, as a result of the COVID–
19 pandemic, experienced a loss of not less than 10 percent in
gross revenue during the period beginning on January 1, 2020,
and ending on December 1, 2020, as compared to the gross revenue
of that timber harvesting or hauling business during the same
period in 2019: *Provided further*, That in making direct support
payments in this section, the Secretary of Agriculture may take
into account price differentiation factors for each commodity based

Extension.
Time period.

Expiration date.

Deadline.
Review.

Time period.

Strickland AR 0648

134 STAT. 2108          PUBLIC LAW 116–260—DEC. 27, 2020

on specialized varieties, local markets, and farm practices, such as certified organic farms (as defined in section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502)): *Provided further*, That using amounts provided in this section, the Secretary of Agriculture may make payments to producers of advanced biofuel, biomass-based diesel, cellulosic biofuel, conventional biofuel, or renewable fuel (as such terms are defined in section 211(o)(1) of the Clean Air Act (42 U.S.C. 7545(o)(1))) produced in the United States, for unexpected market losses as a result of COVID–19: *Provided further*, That the Secretary of Agriculture may make recourse loans available to dairy product processors, packagers, or merchandisers impacted by COVID–19: *Provided further*, That each reference in this section to a section or other provision of the Code of Federal Regulations shall be considered to be a reference to that section or other provision as in effect on the date of enactment of this Act.

**Biofuels.**

**Loans.**

**SEC. 752. SPECIALTY CROP BLOCK GRANTS.**

Due to the impacts of COVID–19 on specialty crops, there is appropriated, out of any funds in the Treasury not otherwise appropriated, for Specialty Crop Block Grants under section 101 of the Specialty Crops Competitiveness Act of 2004 (7 U.S.C. 1621 note; Public Law 108–465), $100,000,000, to remain available until expended.

**SEC. 753. LOCAL AGRICULTURE MARKET PROGRAM.**

Due to the impacts that COVID–19 has had on many local agriculture markets, there is appropriated, out of any funds in the Treasury not otherwise appropriated, for the Local Agriculture Market Program established under section 210A of the Agricultural Marketing Act of 1946 (7 U.S.C. 1627c), $100,000,000, to remain available until expended: *Provided*, That notwithstanding any other provision of law, the Secretary of Agriculture may reduce the amount of matching funds otherwise required under that section 210A to an amount not greater than 10 percent of the total amount of the Federal funds obligated under this section only during the public health emergency declared by the Secretary of Health and Human Services under section 319 of the Public Health Service Act (42 U.S.C. 247d) on January 31, 2020, with respect to COVID–19 (or any renewal of that declaration): *Provided further*, That such match may be an in-kind contribution.

**SEC. 754. FARMING OPPORTUNITIES TRAINING AND OUTREACH PROGRAM.**

Due to the impacts of COVID–19 on certain producers, there is appropriated, out of any funds in the Treasury not otherwise appropriated, for the Farming Opportunities Training and Outreach Program under section 2501 of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279), $75,000,000, to remain available until expended: *Provided*, That notwithstanding any other provision of law, the Secretary of Agriculture may reduce the amount of matching funds otherwise required under that section 2501 to an amount not greater than 10 percent of the total amount of the Federal funds obligated under this section only during the public health emergency declared by the Secretary of Health and Human Services under section 319 of the Public Health Service Act (42 U.S.C. 247d) on January 31, 2020, with respect to COVID–19 (or any renewal of that declaration): *Provided further*, That

Strickland AR 0649

135 STAT. 356            PUBLIC LAW 117–43—SEPT. 30, 2021

TITLE I

DEPARTMENT OF AGRICULTURE

AGRICULTURAL PROGRAMS

PROCESSING, RESEARCH AND MARKETING

OFFICE OF THE SECRETARY

Determination.

For an additional amount for the "Office of the Secretary", $10,000,000,000, which shall remain available until December 31, 2023, for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021 under such terms and conditions as determined by the Secretary:

Grapes.
Determination.

*Provided*, That, with respect to smoke tainted wine grapes, the loss (including a quality loss) of such crop during the coverage period due to wildfire, as determined by the Secretary, is considered a qualified loss: *Provided further*, That losses due to drought shall only be eligible under this heading in this Act if any area within the county in which the loss occurs was rated by the U.S. Drought Monitor as having a D2 (Severe Drought) for eight consecutive weeks or a D3 (Extreme Drought) or higher level of drought inten-

Eligibility.

Determination.

sity during the applicable calendar years: *Provided further*, That of the amounts provided under this heading in this Act, the Secretary shall use $750,000,000 to provide assistance to producers of livestock, as determined by the Secretary of Agriculture, for losses incurred during calendar year 2021 due to drought or wildfires: *Provided further*, That at the election of a processor

Payments.
Determination.

eligible for a loan under section 156 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7272) or a cooperative processor of dairy, the Secretary shall make payments for losses in 2021 to such processors (to be paid to producer members, as determined by such processors) in lieu of payments to producers and under the same terms and conditions as payments made to processors pursuant to title I of the Additional Supplemental Appropriations for Disaster Relief Act, 2019 (Public Law 116–20) under the heading "Department of Agriculture—Agricultural Programs— Processing, Research and Marketing—Office of the Secretary", as last amended by section 791(c) of title VII of division B of the Further Consolidated Appropriations Act, 2020 (Public Law 116–

Payments.

94): *Provided further*, That notwithstanding section 760.1503(j) of title 7 of the Code of Federal Regulations, in the event that a processor described in the preceding proviso does not elect to receive payments under such clause, the Secretary shall make direct payments to producers under this heading in this Act: *Provided further*, That of the amounts provided under this heading in this Act, not more than one percent of the funds provided herein may be used for administrative costs, including for streamlining the application process and easing the burden on county office employees, to carry out the matter under this heading in this Act: *Provided further*, That, except as otherwise provided under this heading

Strickland AR 0650

PUBLIC LAW 117–43—SEPT. 30, 2021          135 STAT. 357

in this Act, the Secretary shall impose payment limitations consistent with section 760.1507 of title 7, Code of Federal Regulations (as in effect on the date of enactment of this Act): *Provided further*, That, in the case of specialty crops or high value crops, as determined by the Secretary, the Secretary shall impose payment limitations consistent with section 760.1507(a)(2) of title 7, Code of Federal Regulations (as in effect on January 1, 2019): *Provided further*, That, with respect to the payment limitations described under this heading in this Act, the Secretary shall apply separate payment limits for each of 2020 and 2021: *Provided further*, That the total amount of payments received under this heading in this Act and applicable policies of crop insurance under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) or the Noninsured Crop Disaster Assistance Program (NAP) under section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) (minus any premiums or fees paid for such coverages) shall not exceed 90 percent of the loss as determined by the Secretary: *Provided further*, That the total amount of payments received under this heading in this Act for producers who did not obtain a policy or plan of insurance for an insurable commodity for the applicable crop year under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) for the crop incurring the losses or did not file the required paperwork and pay the service fee by the applicable State filing deadline for a noninsurable commodity for the applicable crop year under NAP for the crop incurring the losses shall not exceed 70 percent of the loss as determined by the Secretary: *Provided further*, That producers receiving payments under this heading in this Act, as determined by the Secretary, shall be required to purchase crop insurance where crop insurance is available for the next two available crop years and producers receiving payments under this heading in this Act shall be required to purchase coverage under NAP where crop insurance is not available in the next two available crop years, as determined by the Secretary: *Provided further*, That not later than 120 days after the end of fiscal year 2021, the Secretary shall submit a report to the Congress specifying the type, amount, and method of such assistance by state and territory.

Determination.

Applicability.

Determination.

Determination.

Determinations.
Requirement.
Time period.

Reports.

FARM PRODUCTION AND CONSERVATION PROGRAMS

NATURAL RESOURCES CONSERVATION SERVICE

WATERSHED AND FLOOD PREVENTION OPERATIONS

For an additional amount for "Watershed and Flood Prevention Operations" for necessary expenses for the Emergency Watershed Protection Program, $275,000,000, to remain available until expended, which shall be in addition to amounts otherwise available for such purposes.

Strickland AR 0651

PUBLIC LAW 117–328—DEC. 29, 2022          136 STAT. 5201

TITLE VIII

GENERAL PROVISIONS—THIS ACT

SEC. 1801. Funds appropriated by this Act for intelligence or intelligence related activities are deemed to be specifically authorized by the Congress for purposes of section 504(a)(1) of the National Security Act of 1947 (50 U.S.C. 3094(a)(1)).

SEC. 1802. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

SEC. 1803. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 1804. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2023.

SEC. 1805. Each amount provided by this division is designated by the Congress as being for an emergency requirement pursuant to section 4001(a)(1) of S. Con. Res. 14 (117th Congress), the concurrent resolution on the budget for fiscal year 2022, and section 1(e) of H. Res. 1151 (117th Congress), as engrossed in the House of Representatives on June 8, 2022.

This division may be cited as the "Additional Ukraine Supplemental Appropriations Act, 2023".

## DIVISION N—DISASTER RELIEF SUPPLEMENTAL APPROPRIATIONS ACT, 2023

Disaster Relief Supplemental Appropriations Act, 2023.

TITLE I

DEPARTMENT OF AGRICULTURE

AGRICULTURAL PROGRAMS

PROCESSING, RESEARCH AND MARKETING

OFFICE OF THE SECRETARY

For an additional amount for "Office of the Secretary", $3,741,715,000, to remain available until expended, for necessary expenses related to losses of revenue, quality or production losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2022, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze, including a polar vortex, smoke exposure, and excessive moisture occurring in calendar year 2022 under such terms and conditions as determined by the Secretary: *Provided,* That of the amounts provided under this heading in this Act, the Secretary shall use up to $494,500,000 to provide assistance to producers of livestock, as determined by the Secretary of Agriculture, for losses incurred during calendar year 2022 due to drought or wildfires: *Provided further,* That the amount provided under this heading in this Act shall be subject to the terms and conditions set forth in the first, second, and fourth through twelfth

Determination.

Determination.

Strickland AR 0652

136 STAT. 5202          PUBLIC LAW 117–328—DEC. 29, 2022

provisos under this heading in title I of the Disaster Relief Supplemental Appropriations Act, 2022 (division B of Public Law 117–43), except that each reference to 2020 or 2021 in such provisos in such Act shall be deemed to be a reference instead to 2022.

### AGRICULTURAL RESEARCH SERVICE

#### BUILDINGS AND FACILITIES

For an additional amount for "Buildings and Facilities", $58,000,000, to remain available until expended.

#### FOOD SAFETY AND INSPECTION SERVICE

For an additional amount for "Food Safety and Inspection Service", $29,700,000, to remain available until expended.

### FARM PRODUCTION AND CONSERVATION PROGRAMS

#### FARM SERVICE AGENCY

##### EMERGENCY FOREST RESTORATION PROGRAM

For an additional amount for "Emergency Forest Restoration Program", $27,000,000, to remain available until expended.

#### NATURAL RESOURCES CONSERVATION SERVICE

##### WATERSHED AND FLOOD PREVENTION OPERATIONS

For an additional amount for "Watershed and Flood Prevention Operations" for necessary expenses for the Emergency Watershed Protection Program, $925,000,000, to remain available until expended.

### RURAL DEVELOPMENT PROGRAMS

#### RURAL HOUSING SERVICE

##### RURAL HOUSING ASSISTANCE GRANTS

For an additional amount for "Rural Housing Assistance Grants", $60,000,000, to remain available until expended, for necessary expenses related to homes damaged by Presidentially declared disasters in calendar year 2022: *Provided,* That 42 U.S.C. 1471(b)(3) shall not apply: *Provided further,* That the income limit shall be capped at 80 percent of the area median income: *Provided further,* That, notwithstanding section 1490m(c)(2) of such title, a grant made under 42 U.S.C. 1490m of such title using funds made available under this heading in this Act, may not exceed $50,000.

##### RURAL COMMUNITY FACILITIES PROGRAM ACCOUNT

For an additional amount for "Rural Community Facilities Program Account", $75,300,000, to remain available until expended: *Provided,* That of the amounts provided under this heading in this Act, $50,000,000 shall be for necessary expenses for grants to repair essential community facilities damaged by Presidentially

Strickland AR 0653

PUBLIC LAW 117–328—DEC. 29, 2022          136 STAT. 5203

declared disasters in calendar year 2022: *Provided further,* That the percentage of the cost of the facility that may be covered by a grant pursuant to the preceding proviso shall be 75 percent.

### RURAL UTILITIES SERVICE

#### RURAL WATER AND WASTE DISPOSAL PROGRAM ACCOUNT

For an additional amount for "Rural Water and Waste Disposal Program Account", $325,000,000, to remain available until expended: *Provided,* That of the amounts provided under this heading in this Act, $265,000,000 shall be for necessary expenses related to water systems damaged by Presidentially declared disasters in calendar year 2022: *Provided further,* That, notwithstanding section 343(a)(13)(B) of the Consolidated Farm and Rural Development Act, a grant using funds made available pursuant to the preceding proviso may not be awarded to a community with a population of more than 35,000 people: *Provided further,* That not to exceed $8,000,000 of the amount made available pursuant to the first proviso shall be for technical assistance grants for rural water and waste systems pursuant to section 306(a)(22) of the Consolidated Farm and Rural Development Act.

### GENERAL PROVISIONS—THIS TITLE

SEC. 2101. In addition to other funds available for such purposes, not more than three percent of the amounts provided in each account under the "Rural Development Programs" heading in this title shall be paid to the appropriation for "Rural Development, Salaries and Expenses" for administrative costs to carry out the emergency rural development programs in this title.

SEC. 2102. For necessary expenses for salary and related costs associated with Agriculture Quarantine and Inspection Services activities pursuant to 21 U.S.C. 136a(6), and in addition to any other funds made available for this purpose, there is appropriated, out of any money in the Treasury not otherwise appropriated, $125,000,000, to remain available until September 30, 2024, to offset the loss of quarantine and inspection fees collected pursuant to sections 2508 and 2509 of the Food, Agriculture, Conservation, and Trade Act of 1990 (21 U.S.C. 136, 136a): *Provided,* That amounts made available in this section shall be treated as funds collected by fees authorized under sections 2508 and 2509 of the Food, Agriculture, Conservation, and Trade Act of 1990 (21 U.S.C. 136, 136a) for purposes of section 421(f) of the Homeland Security Act of 2002 (6 U.S.C. 231(f)).

### TITLE II

### DEPARTMENT OF COMMERCE

#### ECONOMIC DEVELOPMENT ADMINISTRATION

#### ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

#### (INCLUDING TRANSFERS OF FUNDS)

Pursuant to section 703 of the Public Works and Economic Development Act (42 U.S.C. 3233), for an additional amount for

Strickland AR 0654



# Millions of Dollars Heading to Farmers, but Small Farms Won't See Much of it

Advocates say young and disadvantaged farmers won't benefit from the latest stimulus funds, and nor do those selling directly to consumers.

BY GOSIA WOZNIACKA      JUNE 1, 2020



Strickland AR 0655

On a recent weekday afternoon, Marsha Habib was delivering more than 100 boxes of produce to Bay Area customers in her Chevy pickup. The young farmer was exhausted from lack of sleep and disheartened about not being able to harvest a large field of lettuce that she had grown for Stanford University dining halls now shuttered by the pandemic.

"We were planning to move pallets of lettuce. We can only put so many in our CSA boxes," Habib said. "We've put so much work into these crops. . . . To see them come to harvest and not be able to pick them, it's a bummer."

Habib, who runs the 20-acre Hollister-based farm, Oya Organics, has lost most of her sales to restaurants and campus dining services, and several farmers' markets. Instead, practically overnight, and lacking any prior know-how, she has created a community supported agriculture (CSA) subscription to move some of her produce to new customers.

With no online ordering platform, no refrigerated truck, and no one to care for her two school-age children, Habib said she and seven other employees are working non-stop to keep the operation afloat. "We're just scraping by, trying to make it work," the 38-year-old told Civil Eats.

Like many other farmers, Habib probably won't benefit from the billions of dollars in aid earmarked to help struggling U.S. farmers survive the crisis. Last week, the signature piece of the farmer bailout program, the Coronavirus Food Assistance Program (CFAP), opened for applications. It largely leaves out farmers like Habib, or those who rely on direct-to-consumer sales and wholesale accounts.

Although tens of millions have been designated to help farmers survive the pandemic, most small, sustainable growers, including young and minority farmers and ranchers, will likely be left to fend for themselves.

"It seems like anything that comes from the government is geared to large commodity farmers."

Strickland AR 0656

"We could definitely use the financial help to be able to continue operations," said Habib. "But it seems like anything that comes from the government is geared to large commodity farmers."

## 'A Lot of Hurt'

Over the past two months, farmers large and small have faced difficult choices.

The virus has forced producers to plow ripe vegetables under or let them rot in the fields, abort baby pigs, euthanize chickens, hogs, and cattle, and dump milk. According to a Congressional Research Service report, COVID-related losses for agriculture approached $40 billion as of early May. Local and regional farmers, in particular, have seen significant disruptions. The National Sustainable Agriculture Coalition estimates a loss of up to $1.32 billion from lost local and regional sales from March to May 2020.

While some small farms have been able to transform their business models or ramp up sales through CSAs (which have, in some cases, doubled or tripled their memberships), not everyone has been able to pivot successfully, said Rachel Armstrong, the founder and executive director of Farm Commons, a national group that provides legal resources for farmers.

"We're seeing a lot of hurt, even from folks facing a surge in demand," she said.

The sudden shift was only feasible to farmers with existing CSA programs or those with the resources and know-how to create one quickly, Armstrong said. Many farmers also had already planted their spring crops by the time the pandemic hit, making it impossible to shift to the type or volume of crops required by CSA subscribers.

Some farmers also couldn't find enough workers as farmworkers tested positive for COVID-19 or opted to shelter in place and receive unemployment. Others lost off-farm jobs, which are critical for providing health insurance, and income—especially for new and young farmers who

Strickland AR 0657

don't make a profit on the farm for the first few years, Armstrong said. And many had to take care of out-of-school children. Even those with the capacity to pivot incurred new costs, she said, including added transportation, product packaging, marketing, and online sales costs.

## Direct Payments Going to Agribusinesses

The federal government has rolled out several programs aimed at helping farmers—including loans and direct payments—through the stimulus package. CFAP is geared to farmers who have suffered a 5 percent or greater price loss due to the pandemic. The American Farm Bureau Federation, which lobbies for large agribusinesses, has praised the program.

But while language in the CARES Act specifically includes "producers that supply local food systems, including farmers' markets, restaurants, and schools," critics say those producers are largely left out. Instead, the bulk of the $16 billion in direct payments will go to the biggest producers, especially those growing commodity crops, because of the way program rules are structured.

Since it's a "first come, first served" program, with no set-asides for smaller operations, large farmers with a simple production system (such as thousands of acres of corn) will have an easier time applying, said Eric Deeble, policy director at the National Sustainable Agriculture Coalition (NSAC). Smaller, diversified farm which sell through many channels will need to gather extensive documentation across multiple markets and products, he said. Most small-scale farmers are also unfamiliar with USDA programs, adding another layer of difficulty.

Most concerning is the fact that the aid program doesn't account for the higher value of direct to consumer sales, Deeble said. CFAP does not reimburse for a farmer's lost revenue; instead, it pays for lost sales volumes and price declines, and makes the calculation based on USDA's wholesale commodity prices.

Strickland AR 0658

While CFAP's payment structure is complicated, a farmer who typically sells organic strawberries for $5 a pound would be reimbursed at less than a dollar through CFAP. In addition, the CFAP aid program doesn't account for the costs of labor, CSA delivery boxes, pandemic-related hygiene, or transportation, Deeble said. And poultry growers and some specialty crops popular at farmers' markets, such as kale or arugula, are entirely excluded because the government says they did not suffer a 5 percent-or-greater price decline. "The more diversified, the more direct in sales, the more a farmer gets higher premiums on their goods, the smaller their [CFAP] payments," he said.

Just as the trade war bailout for farmers did last year, the CFAP program has also raised payment caps beyond those established by Congress and the USDA for farm aid programs; groups representing livestock producers and produce growers pushed for eliminating such payment limits altogether. While there is a $250,000 payment cap per person or entity, some large operations may qualify for up to $750,000. And if they're structured as a general partnership, "the sky is the limit," Deeble said.

That's because a loophole in farm subsidy policy permits general partnerships to claim larger payments. CFAP also expands who may be eligible for a payment, allowing those earning more than $900,000 to qualify for aid as long as more than 75 percent of the person's income comes from farming, ranching, or forestry.

"At every level, this program is going to help the biggest farmers, with the fewest crops and the most sophisticated management structures," Deeble said. "I'm not saying big farms didn't get hurt . . . they did, and every farmer that's been harmed deserves compensation. It's just that the larger ones will claim the maximum amount of payments, leaving out smaller farmers."

## Small-Scale, Underserved Farmers Left Behind

Sophie Ackoff, co-executive director of the National Young Farmers Coalition, is concerned about the lack of funds designated for disadvantaged farmers, including young producers and farmers of color.

Strickland AR 0659

Many disadvantaged farmers tend to mistrust the USDA due to a legacy of discrimination, said Ackoff. Others may not be familiar with the agency's programs, and many face language barriers or other limitations.

In a statement to Civil Eats, a USDA spokesperson said the CFAP program is open to all types of producers and farms and "treats both diversified and specialized farms equitably." Because of limited funding and extensive pandemic impacts to farmers, the agency said it was "unable to accommodate the plethora of market differentiation and instead relied on average national-level impacts to allocate a budget-limited assistance program to a much larger universe of economic damages."

Strickland AR 0660

Marsha Habib tending crops in the field.

The agency said local Farm Service Agency offices will conduct outreach to underserved farmers by working closely with specialty crop partner organizations, local governments, community-based organizations, and other groups.

Strickland AR 0661

But Ackoff said that's not enough. Many small, diversified growers and young producers simply have no time to figure out the complex process of applying for aid because they're too busy trying to save their farms in other ways.

"These farmers are working their butts off," Ackoff said. "Like nurses in emergency rooms, they're working 100 percent of daylight hours figuring out how to pivot to online sales, do doorstep deliveries, and put safety protocols in place. And the opportunity to support them has been lost."

That's the case for Habib, who said she has heard of the farmer bailout program, but has had no time to read through the rules or apply. She's been too busy managing CSA orders over the phone and email, making deliveries, ordering supplies, and taking care of her children.

"These farmers are working their butts off . . . working 100 percent of daylight hours figuring out how to pivot to online sales, do doorstep deliveries, and put safety protocols in place."

And if she did apply, Habib would need to spend a lot of time gathering documentation, given the fact that Oya Organics rotates between 50 annual crops. She suspects she wouldn't get much in aid anyway, since the program won't take into account the loss of her organic premiums and some crops aren't eligible for compensation.

But the young farmer's biggest worry is for the future. She said many crops would have to rot in the fields, given that a large percent had been planted for local restaurants and Stanford University's dining services.

She fears most of the new customers will leave once shelter-in-place orders are lifted, while wholesale customers won't return. "We've done all this work to create this program and I don't know if it's going to last," Habib said.

Strickland AR 0662

Ackoff with the National Young Farmers Coalition worries that many small-scale farmers like Habib are working on overdrive, nearing a breaking point. "The harvest season has not yet begun in full," she said, "and there's the question of how long they can work at this capacity, not making more money but providing more service and being exhausted by the end of the day."

A new bill might help. The Food Supply Protection Act, introduced by Debbie Stabenow (D-Michigan) last week, would help small and medium-sized farms retool their operations so as to better cater to new markets, including upgrading machinery, adding temporary cold storage, purchasing personal protective equipment and test kits, and cleaning. It would also support new partnerships to make purchases of excess food from farmers and increase donations to food banks, schools, nonprofits. But it's unclear whether the bill will move forward.

## Loan Programs a Mixed Bag

In addition to direct payments, farmers are also now eligible to apply for small business loans, including the Paycheck Protection Program (PPP) and the COVID-19 Economic Injury Disaster Loan (EIDL). But critics say the loan programs have not, thus far, been efficiently getting to farms.

The EIDL, a Small Business Administration program, was not initially available to farmers, but agricultural businesses became expressly eligible at the end of April. The "first come, first served" program offers loans with relaxed eligibility rules, as well as $10,000 loan advances that won't need to be repaid.

Since EIDL has only been open to farmers for a few weeks, its impacts are unclear. But experts say small farmers may be uncomfortable borrowing money. "Many farmers are not interested in loans, even on favorable terms, because they're not sure when the revenue will kick back in, and whether it will ever kick back in," said Armstrong with Farm Commons.

The PPP program, on the other hand, has seen some limited success among farmers. It covers up to eight weeks of payroll costs, including benefits, as well as other non-payroll expenses and can be forgiven as long as the business continues to employ workers. The program became

mired in controversy after some of the loans went to large companies (a few later vowed to return them), and a current lawsuit accuses the country's largest banks of prioritizing large borrowers over smaller businesses.

While the first round of PPP funding ran out in mid-April, Congress has approved a second round. Farms that have year-round workers are most likely to benefit, while those that hire seasonal workers or foreign guest workers on H-2A visas might not have enough labor costs to allow for the loan forgiveness. Also, farmers who have no employees and showed zero or negative income in 2019 are not eligible to apply.

"A lot of farms out there don't make a profit and aren't eligible, even though they did a lot work last year," Deeble said.

Jill Giacomini, co-owner of Point Reyes Farmstead Cheese Company in Northern California's Marin County, was lucky to secure a PPP loan. The company, which had 108 full- and part-time employees and more than 430 cows before the pandemic, produces aged cheese on the farm. It also makes pasteurized cheese from local farmers' milk at a second production facility in Petaluma. Before the pandemic, Giacomini said, the cheese was sold online, at three local farmers' markets, and to fine dining restaurants and institutions. The farm had also recently started exporting its cheeses to Canada, Asia, and Mexico.

When the virus hit, "we saw all of our food service business come to a screeching halt," Giacomini said. Nearly half of the company's sales were wiped out. Because it had a lot of cheese no one was buying, the farm immediately cut back on production. It laid off 22 employees, reduced shifts and salaries, and stopped buying milk from other farms. But its own cows were still producing more milk than they could use and were costly to feed, so the family sold over 70 animals.

"That was really heartbreaking," Giacomini said. "There is no market for these animals right now. They were healthy, viable, producing cows . . . and they were sold for beef."

Strickland AR 0664

The Paycheck Protection loan wasn't easy to secure, she added. The farm applied to four different banks before it was accepted. While the loan paid for employee salaries, allowing the farm to rehire laid-off staff, Giacomini worries the relief is temporary and she'll have to lay people off again after the eight weeks.

To help move excess cheese, the company has sold it to California food banks through a federal program. It also donates cheese to food banks in its own community. In recent weeks, another silver lining has emerged: online and farmers' market sales have grown exponentially, Giacomini said. The farm has increased its social media marketing and is about to launch a Zoom tasting series in the hopes of creating and retaining this new customer base—a move that could be key to securing the farm's survival.

"The way we work, travel for work, entertain for work, and spend money outside of work has changed," Giacomini said. "I question whether our old customers are coming back in a year, in two, or are they ever coming back?"

 Gosia Wozniacka is a senior reporter at Civil Eats. A multilingual journalist with more than fifteen years of experience, Gosia is currently based in Oregon. Wozniacka worked for five years as a staff reporter for The Associated Press in Fresno, California, and then in Portland, Oregon. She wrote extensively about agriculture, water, and other environmental issues, farmworkers and immigration policy. Email her at gosia (at) civileats.com and follow her on Twitter @GosiaWozniacka. Read more >

Strickland AR 0665

**News**Room

7/16/20 WashingtonPost.com (Pg. Unavail. Online)
2020 WLNR 19845311

WashingtonPost.com
Copyright (c) 2020 The Washington Post

July 16, 2020

Section: /business

Young farmers and farmers of color have been shut out of federal assistance during the pandemic

Laura Reiley

Talk to young farmers and one verb comes up repeatedly.

Pivot.

They have all had to pivot and then do it again as the coronavirus pandemic has decimated their customer bases and traditional supply chains.

Kate Edwards, 33, is entering her 10th year of farming in Solon, Iowa, north of Iowa City. She started with one acre and 11 customers for her community-supported agriculture (CSA) farm. Now, after retrofitting a 100-year-old farm to accommodate 30 varieties of vegetables, she has 250 customers and works 10 acres.

She says she has incurred at least $15,000 in additional expenses due to the pandemic, including laying a new $10,000 driveway to allow customers to drive up to her farm. She has spent an extra $1,000 for single-use paper bags, something in short supply these days. She has hired extra people to help pack bags: Where she used to spread her produce out buffet-style so customers could pick their own zucchinis and leafy greens, she now must box it all up for them to maintain social distancing. And she has had to rethink family finances after her husband lost his engineering job because of the economic downturn.

The pandemic has changed nearly everything about her business, and she says there has been little help from the federal government.

"Early on we started realizing that this wasn't going away very quick and we had to make decisions on how to deliver our product," Edwards says. "I haven't been able to access the Coronavirus Food Assistance Program because it's not set up for diversified farmers; it's oriented toward commodity farmers and it doesn't have a system set up for CSAs in terms of how to report."

Across the country, young farmers, first-generation farmers and farmers of color say they have been left out of coronavirus relief for the agricultural industry, because of the federal government's one-size-fits-all approach.

The oversight, which they say has left them on wobbly financial footing, threatens to cut off a promising growth area of small-scale farms and younger farmers against a wider backdrop of consolidation and aging of American agriculture.

Strickland AR 0666

The U.S. Agriculture Department's most recent five-year census, released last year, found a surge in the number of farms under nine acres, which increased by about 22 percent from 2012 to 2017, as well as farmers and ranchers below the age of 35, whose numbers increased roughly 11 percent to about 285,000. (They're thoroughly outnumbered by the 396,000 producers age 75 and older, however.)

In May, the USDA unveiled the $19 billion Coronavirus Food Assistance Program (CFAP), greenlighting direct payments largely to row-crop farmers and ranchers. Many who farm specialty crops — the fruits and vegetables that humans eat — were left out of that initial relief effort. On July 9, the USDA opened up eligibility for 40 more fruits and vegetables, adding a whole produce aisle of specialty crops that would be considered for farm aid including alfalfa sprouts, guava and greens, both collard and dandelion.

But because of how and what young farmers, first-generation farmers and farmers of color produce, it has not been easy for them to apply for CFAP assistance, or loans from the Paycheck Protection Program and Economic Injury Disaster Loan Program.

Many small farms are owner-operated, with very few employees, especially during the growing season before harvest. Under the PPP program, 60 percent of these loans must be spent on payroll (initially it was even higher, at 75 percent), and those employees must be retained to be eligible for loan forgiveness. The Economic Injury Disaster Loan Program, which awards loans up to $10,000, is also based on number of employees.

"I did get PPP, a few thousand dollars," says Edwards. "The amount of money we got is helpful, but I'm not sure if it will be forgiven. We started in March, but my payroll doesn't start until May. If I could have used summer income figures, when I employ more people, I could have gotten a lot more."

During the offseason and planting season she operates largely on her own, adding more workers during harvest and to service her CSA during summer months.

Because of the high cost of land and daunting upfront costs associated with beginning a farm business, many new farmers start with small plots of land and try to grow a diverse array of high-value crops such as heirloom tomatoes and herbs to mitigate risk and maximize potential profits.

Many young and first-generation farmers sell directly to institutions like restaurants or schools, or direct to consumers at farmers markets, farm stands or via CSA models where consumers buy shares of a farm's harvest in advance.

As restaurants and schools closed this spring, orders fell to zero. Farmers markets pushed off opening, opened with limited hours or had a diminished number of vendors, and customers were scant due to fears about social distancing.

In short, their markets dried up.

The National Young Farmers Coalition, an advocacy network that represents young farmers, has lobbied the USDA to add new categories of relief to make more funds available for small-scale producers, especially beginning farmers and farmers of color.

The National Sustainable Agriculture Coalition, an industry group, in March projected a decline in farm product sales of more than $680 million between March and May at farmers markets, restaurants, food hubs and other venues.

The group estimates that local and regional food markets will lose $1 billion in sales by the end of the year due to the pandemic, even as grocery store sales swell because of more people cooking and eating at home.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

The CFAP program compensates large-scale and commodity farmers for lost crops, but doesn't address local and regional markets drying up for small farmers. The National Young Farmers Coalition estimates that three-quarters of its members have experienced lost sales due to reduced outlets to sell their products.

The USDA's Farm Service Agency added missing commodities to its list and adjusted some prices, says Sophie Ackoff, the National Young Farmers Coalition's co-executive director, but because the program still bases compensation on wholesale commodity prices, and requires crop-by-crop reporting of losses, that doesn't work for many young farmers, who depend on commanding premium prices for their crops and growing a wide range of items.

Depending on the crop and loss type, payment rates ranged from $0.01 per pound for dry onions to $1.45 per pound for raspberries — prices that don't take into consideration premiums paid for local, organic and heirloom fruits and vegetables.

"One of the potato farmers in our network lost a $20,000 contract," Ackoff says. "The CFAP payment would have been $800. So many small farmers are looking at the price points and just laughing."

Bathazar, 39, and Chaparitta, 35 (originally from Guadalajara, Mexico, they spoke on the condition that their last names be omitted due to their immigration status), launched their organic farm last year on 1½ acres of rented land at the edge of Salinas, Calif., with a $5,000 loan from a local nonprofit.

Chaparitta lost her off-farm job as a housekeeper because of the pandemic, and Bathazar says it is hard finding buyers for their celery, green beans, sweet peas, beets and carrots.

"The majority of our fresh vegetables we sold straight to customers," he said by phone via an interpreter. "This year people don't want to spend too much money, they don't want to get close to us, so everything isn't getting sold. Some of the markets don't want us there and other markets are closed or are only open for a few hours. Last year we sold everything in Salinas; now we have to go outside of Salinas to look for different places to sell."

Because they are undocumented, the couple are ineligible for CFAP money for a PPP loan.

Because they don't grow crops in quantities sufficient to entice grocery stores, many young farmers have turned to online sales, hustling to launch websites and apps, thus adding to their daily workloads.

"It takes time to set up websites and keep them up to date in the middle of planting season. These farmers are innovative and entrepreneurial, but they are working 24/7 and are so exhausted," Ackoff says.

Roberto Meza, a 32-year-old former graduate student at MIT, farms in Bennett, Colo. He says young farmers often struggle with student debt and often have no way to access land. He and his partner grow microgreens in greenhouses.

"It was already a rough year before covid-19 hit because Lucky's, our main grocery store, went bankrupt at the beginning of the year," he says. "Fifty percent of our business was grocery stores, 35 percent was food service and the rest was direct to consumers. We pivoted, doubled down and streamlined to create a CSA food bundle farm box to recuperate lost sales."

He says he's incurred $15,000 in additional costs, but has applied to supply items for the food assistance program SNAP (commonly called food stamps).

Even as he's struggled, Meza doesn't think the pandemic has been universally bad for young farmers.

"The pandemic has been a great teacher," he says. "It has illuminated what is wrong with the current paradigm; the inconsistencies are laid bare and we can see where we need to redirect resources. People want to pay attention to where their food comes from — they don't take it for granted anymore."

And, he says, because the average age of American farmers is approaching 60, according to the USDA, creating viable market opportunities for beginning farmers, young farmers and farmers of color is imperative to maintain the country's future food supply.

**---- Index References ----**

Industry: (Agricultural Crops (1AG44); Agriculture (1AG63); Agriculture, Food & Beverage (1AG53); Food & Beverage Production (1FO79); Organic Farming (1OR41); Organic Foods (1OR43); Specialty Foods (1SP29))

Region: (Americas (1AM92); California (1CA98); Iowa (1IO85); North America (1NO39); U.S. Midwest Region (1MI19); U.S. West Region (1WE46); USA (1US73))

Language: EN

Word Count: 1602

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.



# The Counter

# A few farmers get huge USDA relief payments while many struggle for pennies

by <u>H. Claire Brown</u>     Business
07.30.2020, 10:59am

Share                   Save for later 



iStock / JJ Gouin

## "The fall is going to be an apocalypse for small farms."

When the coronavirus pandemic shuttered schools, restaurants, and many distributors in March, the disruption dealt a huge blow to farmers, who lost contracts overnight and were forced to let produce rot in the field. As part of its first round of Covid-19 relief funding, Congress allocated funding for agriculture through the Coronavirus Food Assistance Program (CFAP), which is set to pay out $16 billion in direct payments to growers on top of standard farm subsidies. The money was earmarked for farmers and livestock producers who had suffered income losses due to Covid-19, but beyond that, Congress left much of the program design up to the Department of Agriculture (USDA). By this week, the agency had distributed $6.5 billion across the ag industry, and the largest proportion of the money had gone to cattle, milk, corn, and hog producers. Democrats and Republicans both appear prepared to allocate billions ~~ollars~~ for direct payments to farmers in a new coronavirus relief package.

pay these people. And here's a big pile of money to go do it," says Eric Deeble, policy director for the National Sustainable Agriculture Coalition. Income limits for individuals are capped at $900,000, but the cap disappears if most of that income comes from farming. The payments themselves are capped at $250,000 per individual, or $750,000 for farms owned by corporations.

An analysis by The Counter of payments made from late May to late June by the USDA's Farm Service Agency—the office that administers the direct payment program—found that at least five farms collected single payments of significantly more than $750,000. The highest payment—for $1.4 million—went to Titan Swine, which also received two additional CFAP checks totaling an additional $1.1 million on the same day.

> # While a handful of farmers received hundreds of thousands of dollars, more than 300 received less than $10.

The Counter also found 13 instances in which multiple entities registered to the same business address received payments totaling more than $1 million, indicating that farms who share stakeholders or fall under the same umbrella organization may be receiving multiple payments. Many were also receiving loans from the Payroll Protection Program, meaning they were able to take advantage of multiple federal income-support programs. In one example, five dairies registered to the same P.O. box in a rural Georgia town received direct payments totaling $1.57 million from CFAP, as well as three Payroll Protection Program loans. Similarly, four dairies registered to the business address of Hollandia Farms in Hanford, California, received a total of $1.57 million over a nine-day period. The Hanford address was also linked to six PPP loans, totaling between $1.5-$4.5 million, all from the same bank and disbursed over a four-day stretch in April.

The disclosure underscores one of the persistent inequities of the Covid-19 business relief programs: There is money available, but it often privileges businesses with savvy accountants before it helps those with fewer resources, like young farmers (and restaurant owners, and Main Street shops, and street vendors). It's not technically illegal to collect payments higher than the $750,000 maximum—USDA allows farms with multiple owner-operators to collect maximum payments for each partner. But critics say astronomically high payments violate the intent of the program, and that CFAP's inequalities are further exacerbated by the program's design, which bases payment levels on production volume instead of annual income and allows farmers earning millions of dollars in personal income to claim maximum payments. While a handful of farmers received hundreds of thousands of dollars, more than 300 received less than $10. Many more have not benefited from the program at all.

[*Subscribe to our 2x-weekly newsletter and never miss a story.*]

"We do know that most of the money does go to wealthy large farms because that's how the programs are all designed. They're all based on acreage or production. So the more that you produce, the larger the farm you are and the more money you're going to be getting in subsidies," says Anne Schechinger, senior economic analyst at the Environmental Working Group.

> # "We do know that most of the money does go to wealthy large farms because that's how the programs are all designed."

The Coronavirus Food Assistance Program compensates farmers based on a complex formula that calculates lost income based on calculated futures, price declines, and unsold inventory. That means a tomato farmer would be compensated at a rate of $0.64 per pound for sales losses, or, alternatively, of $0.38 per pound for tomatoes that were picked but spoiled because of supply chain disruptions. Under these rules, an heirloom tomato that would normally fetch $4 per pound at the farmers' market is worth the same amount as a commodity tomato grown for a can of Campbell's.

rate can seem comically wide. To make matters worse, farmers growing relatively small amounts of several crops using complicated rotation schedules face a far more burdensome application process because they have to tally losses for more complicated farm layouts. "It doesn't work well for diversified farmers and it doesn't work well for small- and mid-sized farms," Deeble says. "It does not live up to its congressional intent."

Even some farmers who received hefty payments through CFAP say they're barely making ends meet. Dale Springer, owner of Twin Valley Enterprises and SKC Valley Farms in Independence, Kansas, was one of the producers whose business address registered more than $1 million in payments. He says the largest of those payments—to Springer Family Foods, for about $265,000—was for a hog operation he shares with his brother, nephew, and daughter. (Springer added that his daughter and nephew filled out the paperwork for all the family's CFAP payments, hence the matching address.)

## "Why would somebody who makes almost a million dollars a year need government subsidies?"

The Springers' hog business, which typically moves nine or 10 semi-trailer loads containing up to 170 pigs each week, went from breaking even to losing $35 per head before they received their payment, he said. "I hate to say this, but if the family farm like we've got does not get another round of payments, I'm afraid we're going to have to close our swine unit, and there's 30-some people employed that won't have a job," he said. (Springer Family Farms also received a Payroll Protection Program loan worth $150,000 to $350,000, according to government records, to offset payroll costs.) "I've been in the swine business on my own since 1980, and I have never seen it so bad. I have never seen the losses that we're seeing now. Never. I'm not crying wolf, I've been doing this a long time, and it's not working."

In fact, an alternative payment calculation option based on past income would go a long way to make the program more accessible for small- and mid-sized farmers who usually depend on farmers' markets and local restaurants to sell their product. "There is a general understanding that one of the most effective, simplest ways to get those folks paid is based on revenue. What did you make last year? We're going to pay you a certain percentage of that revenue shortfall for this year, right? That's pretty simple," says Deeble.

USDA could make this change immediately, without congressional approval, says Deeble. It hasn't yet done so. "USDA has not shown any interest in pushing back against anything other than a price-based program," he adds.

## As Congress debates the next round of Covid-19 relief, both parties have tentatively agreed to furnish billions of dollars of funding for another round of direct payments to farmers.

Before 2018, Congress authorized most farm subsidy programs through the Farm Bill, which is passed once every five years. But the Trump administration has dramatically expanded the scope of farm subsidies by offering billions of dollars in direct payments to farmers, meant to blunt the impact of ongoing trade disruptions with China, using a little-known piece of legislation that gives it the power to do so. "The bad thing about [the trade mitigation program] is that it set an awful precedent, in the sense that these payments are so much larger than the farm bill payments to begin with," says Joseph Glauber, researcher for the International Food Policy Research Institute and USDA Chief Economist from 2008 to 2014. "I think Congress has sort of abdicated its responsibilities," he adds.

As Congress debates the next round of Covid-19 relief, both parties have tentatively agreed to furnish billions of dollars of funding for another round of direct payments to farmers. But Deeble says he hopes legislators exact more control over the way the payments are distributed. He wants the bill to include stricter requirements for equitable distribution among all types

⟩

## The Counter

Barring the introduction of an alternate payment system, advocates say there are a few simple changes that would funnel more payments to smaller and lower-income growers. A stricter income cap, for instance, would guarantee that fewer high-income farmers received direct payments, reserving more money for smaller-scale growers. "Why would somebody who makes almost a million dollars a year need government subsidies? Like, realistically, that's not something that taxpayer money should be going towards," says Schechinger.

> **Allowing farms to make calculations based on gross annual income would make many more eligible for forgivable loans.**

Means-testing producers might even work better than imposing the $250,000 payment limits, Glauber adds. "It addresses the same issue that people are upset with, with payment limits. That is, people who are making a lot—who have a lot of money—are getting big, big payments. We talk about these programs all the time as being safety nets, but in fact, they go to people who oftentimes aren't nearly as vulnerable to others."

It might also make sense to earmark some of the money for small-scale and minority farmers. This isn't unprecedented—the Payroll Protection Program set aside $30 billion for smaller lenders (like local credit unions), with the aim of helping minority business owners. The USDA could reserve a portion of direct payment funds for underserved farmers, then spend a little money on outreach to growers who might not have heard about the relief program, Deeble says.

Additionally, many were excluded from the first round of PPP loans because farms often report negative net incomes. Allowing farms to make calculations based on gross annual income would make many more eligible for forgivable loans. Congress is currently looking at ways to make relief programs like the Payroll Protection Program more accessible to small-scale farmers.

If Congress passes the next round of coronavirus relief without requiring USDA to re-examine its payment model, Deeble predicts a disastrous fall for farmers who haven't been able to take advantage of the program. "If they do not act within the next week to provide some form of direct payments to farmers that have not been well-served by CFAP, the fall is going to be an apocalypse for small farms," he says.

 Covid- 19     Farms

Also tagged    cfap,   coronavirus,   covid-19,   farmers,   usda

 H. Claire Brown is a senior staff writer for The Counter. Her work has also appeared in The Atlantic, The Guardian, and The Intercept and has won awards from the Society for Advancing Business Editing and Writing, the New York Press Club, the Newswomen's Club of New York, and others. A North Carolina native, she now lives in Brooklyn.

**Explore**

**Series**

**Newsletter**

 

About Us

Contact Us

Code of Ethics

How We're Funded

Donate

Work for Us

Strickland AR 0673

**The Counter**



Fact and friction in American food

©2020 The Counter. All rights reserved. Use of this Site constitutes acceptance of our User Agreement and Privacy Policy. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of The Counter.

Strickland AR 0674

CORONAVIRUS

# Small farmers left behind in Trump administration's COVID-19 relief package

The uneven distribution of funds is stark. The top 10 percent got over 60 percent of the pot, while the bottom 10 percent got just 0.26 percent.



— Ahiki Acres, an organic farm on Oahu, Hawaii, usually sells to restaurants and farmers markets. When those markets collapsed because of the coronavirus, the farm began selling its fruit and vegetables online.

Haley Miyaoka

Strickland AR 0675

Aug. 9, 2020, 3:12 AM PDT

**By Kit Ramgopal and Andrew W. Lehren**

In March, Congress authorized a multibillion-dollar bailout for farms suffering losses because of the coronavirus pandemic and left the Agriculture Department to work out how the money would be spent. When the program was rolled out two months later, Agriculture Secretary Sonny Perdue said its $16 billion in direct payments would be a "lifeline" for farmers of "all sizes and all ... production."

But that's not what happened, according to an NBC News analysis of the first nearly 700,000 payments, totaling $5.6 billion, obtained through a public records request. The Coronavirus Food Assistance Program, while greatly appreciated by many farmers, has been marked by structural challenges. The preliminary data suggest that it has favored large, industrialized farms over smaller, diversified ones, provided loopholes for corporate farms and sent sizable payments to foreign-owned operations. Ultimately, many struggling farmers remain ineligible for assistance, unable to get access to any of Congress' funds.

The uneven distribution is stark. The top 1 percent of recipients got more than 20 percent of the money, totaling $1.2 billion. The top 10 percent got over 60 percent of the pot, while the bottom 10 percent got just 0.26 percent. The top 10 percent of recipients got average payments of almost $95,000, while the bottom 10 percent averaged around $300.

Strickland AR 0676

Case 2:24-cv-00060-Z    Document 39-2    Filed 07/31/24    Page 120 of 202    PageID 1057



Agriculture Secretary Sonny Perdue arrives in the Roosevelt Room at the White House on May 23, 2019.
Jabin Botsford / The Washington Post via Getty Images

"I'm sure the money helped those larger operations tremendously," said Lonnie Sigler, an Alabama rancher and high school agriscience teacher. "But for a person like myself that sells once every six months, it's hard to see how it can help you all that much."

Joseph Janzen, a professor of agricultural economics at Kansas State University, said: "It's a constant struggle in U.S. agricultural policy. The tension between the mass of small farms and the little group of huge farms makes the idea of equality in farm payments incredibly complicated."

Nearly 2,300 operations received more than $250,000, which was set as the payment limit for a single farm. But the rules gave corporate farms ways to get more money. For example, the Agriculture Department allows farms to get up to $750,000 if three shareholders each spent more than 400 hours working in the business. Experts also say there is no real payment limit for farms structured as "general partnerships," because of a long-standing loophole in farm subsidy policy. That's presumably how Titan Swine, a hog farming partnership of 20-plus independent

Strickland AR 0677

producers in northwest Iowa, got over $2.5 million in taxpayer cash and five other farms got $1 million or more.

"The payment limitations are supposed to help make things more fair," said Tyler Whitley, a program manager for the Rural Advancement Foundation International. It's "so USDA can spread money to more farmers and a couple farms don't suck in huge amounts."

In a statement, Titan Swine said it's comprised of "farm families involved in the day to day operation of the company."

"Titan Swine was formed to group assets, knowledge, and economies of scale to better compete with large corporate farms in livestock ownership," the company said.

### *Full coverage of the coronavirus outbreak*

It's first come, first served; the funds that have been paid so far are just 80 percent of each farm's maximum payment, and the rest will be released later if money remains. That's not saying much for folks at the bottom. Almost 7,000 farms got less than $200, and nearly 200 got less than $20. The lowest payout was 7 cents.

Sigler, the Alabama rancher, got about $2,000 from the Agriculture Department, but he still stands to lose as much as $9,000 in 2020. He has lost $4,500 so far and estimates that that will double unless prices for calves recover. He hasn't sold any because prices have been so bad that he would have been selling at a significant loss.

NBC News found over a dozen examples of bailouts that went to what appear to be foreign-owned farms, including a Swiss-owned farm in Texas, a Korean-owned farm in South Dakota and a series of Dutch-owned companies in Wisconsin. Their payments add up to over $3.6 million, an average payout above the Agriculture Department's payment cap.

NBC News identified the farms by cross-referencing data from Agricultural Foreign Investment Disclosures, obtained via a public records request in September 2019. Some matches may be out of date, given that the Agriculture Department's most recent records are from 2017. However, more foreign recipients could have applied under names that didn't precisely match their foreign ownership disclosures to the Agriculture Department.

Many of the issues aren't new. It's not easy to design a multibillion-dollar bailout in two months, so the Agriculture Department's program looks a lot like another recent bailout: $28 billion to help farmers through the U.S.-China trade war. The common criticisms of the Coronavirus Food Assistance Program were inherited from the earlier program's framework, experts say.

Strickland AR 0678

"If USDA had had a little more time to craft this, maybe it would have shaped up differently," said Mike Stranz, vice president of advocacy for the National Farmers Union. "But Congress was in a hurry, and that put USDA in a difficult position with this program, having to process, understand and evaluate all of the losses that farmers were feeling in this pandemic in just two months."

In a statement, the Agriculture Department said it had to act fast to provide relief given uncertainty and market volatility.

"The $16 billion Coronavirus Food Assistance Program (CFAP) has provided critical support to our farmers and ranchers, maintained the integrity of our food supply chain, and ensured every American continues to receive and have access to the food they need," a department spokesperson said. "USDA acted quickly to assist America's farmers and ranchers – of all sizes and for all market outlets – as they faced the initial fallout of COVID-19."

Said Joseph Glauber, a senior research fellow at the International Food Policy Research Institute who is a former chief economist at the Agriculture Department: "When you have a program in response to some emergency, you want to get money out as soon as possible. But at the same time, people want accountability for those monies. They want to make sure it's going to the right people and that somehow the amount of money going to people is commensurate with the amount of money lost, so you're not overpaying some and underpaying others. To get all those things right is tough."

## The problems with the formula

When Congress wrote up the bailout, it included specific language to ensure that funds went to "producers of specialty crops" and "producers that supply local food systems, including farmers markets, restaurants and schools."

But advocates say those very farmers are among the most likely to be left out.

"We were really hopeful that the program ... would take into account the specific needs of those smaller, newer businesses," said Sanaz Arjomand, federal policy director for the National Young Farmers Coalition. "This program really doesn't go where it needs to go for local and regional producers, the same ones called out in the legislative language."

Take Haley Miyaoka, 24, who started a farm on the island of Oahu in Hawaii to grow about 20 vegetables, like peppers, cucumbers, eggplant and herbs, for farmers markets and restaurants. She is the archetypal program recipient under the CARES Act language, but the Agriculture Department program wasn't even on her radar. If she had applied, she would have had to apply crop by crop, likely with scarce returns.

Strickland AR 0679



— Haley Miyaoka started her organic farm, Ahiki Acres, with a mission of increasing Oahu's food security. Her normal markets, like restaurants and farmers markets, collapsed when the coronavirus hit, so she started selling fruit and vegetables online. Ahiki Acres

The process was far simpler for Brady Cooper, who grows soybeans, wheat and corn in Oklahoma. He knows the drill with the Agriculture Department, having participated in past programs, like the trade war bailout. He said he got nearly $5,000 from the Coronavirus Food Assistance Program, which pretty much covers his losses.

"It helped make us whole," Cooper said.

Overall, much of the money has gone to the usual suspects, according to publicly available Agriculture Department data. The top five beneficiary states are Iowa, Nebraska, Minnesota, Wisconsin and Texas. Iowa tops the chart, with nearly $700 million, and Nebraska is next, with nearly $500 million. Ultimately, three commodities – cattle, dairy and corn – got over 80 percent of the pot.

"I don't see it as a situation where the secretary really understands and supports the diversity of American agriculture," said Sen. Debbie Stabenow of Michigan, the ranking Democrat on the

Committee on Agriculture, Nutrition and Forestry, who helped negotiate the CARES Act language for agriculture.

"I just want it to be fair," Stabenow said later. "They seem to weave in a lot of bias and favoritism for certain crops and regions. It just doesn't make sense based on actual losses."

To some degree, the payments reflect the demographics of U.S. agriculture. Payments are unequal because production levels are unequal; large-scale family farms, with over $1 million in cash farm income, account for just 3 percent of farms and nearly 50 percent of agricultural production. California and Illinois aside, the top five beneficiary states are all among the top producers of agricultural products.

"The program was designed to make sure farmers who are most impacted receive the most aid," the Agriculture Department said in a statement, saying large farms operate far more farmland and generate disproportionate production value. "COVID-19 impacts on these farmers was relatively greater, which means they received higher payments yet a smaller share of overall loss. USDA continues to do vast outreach to farmers and ranchers of all sizes and from all sectors of production agriculture to educate and promote CFAP sign up."

But critics contend that flaws in the formula cause it to exclude less traditional operations, like local farm systems and niche fruits and vegetables. The formula is based not on lost income but rather on a rigid system of lost sales volumes, inventory and price declines from mid-January and mid-April. Commodities sold before Jan. 15 aren't covered. Small farmers, who can't afford to store large crop inventories after harvest, may find themselves frustrated, experts say.

"If you're a bigger operation with more resources, you can afford to hang onto your crop until you get a price you like," Whitley said. "But in this farm economy, that's not a realistic option for a lot of people. They are really living crop to crop, and that crop has to go right out the door."

Because the Agriculture Department makes calculations using wholesale prices, farmers who rely on higher-priced markets may be undercompensated. While a pound of Miyaoka's organic, sustainably farmed basil brings in $12 in Hawaiian farmers markets, the Agriculture Department compensates a pound of basil at just $1.65.

"Smaller producers have definitely been hit hard by this and are seeing an inability to reach their customers in usual ways," Arjomand said. "Some have resources to pivot, but others really don't. Having a program that is equitably accessible to all folks and business models going forward is really important."

## 'What about me?'

Strickland AR 0681

The list of grievances continues, to the tune of over 1,500 comments sent in to the federal government. Many come from producers who aren't eligible for funds at all. A New York peony farmer writes that he lost $50,000 after weddings and big events slowed. A Sonoma, California, wine grapes producer has sold only 30 percent of her crop as tasting rooms and restaurants are closed. A Florida beekeeper described $30,000 in losses as fruit farmers plant and pollinate less. An oyster producer said that he has essentially no market without restaurants and that he has 50,000 oysters that will die soon if they aren't sold.

The list goes on: maple syrup, mink, ethanol, crawfish, tobacco, chicken, hemp, honey, eggs, cotton, alfalfa and many more.

"We were getting voicemails and emails from farmers all around the country saying: 'What am I going to do? I'm going to lose everything if I don't get something,'" said Michael Nepveux, an economist at the American Farm Bureau Federation.

Farmers struggle to survive during pandemic despite promised aid
02:59



"Our role was saying, 'Don't forget about these guys, and don't forget about those guys,'" Nepveux said. "Just because USDA doesn't collect price data on niche products like parsnips and passion fruit doesn't mean these farmers aren't suffering."

Strickland AR 0682

For farmers to receive payments, their crops must show price declines of more than 5 percent from mid-January and mid-April. Price drops after mid-April don't count, which could pose a problem for late spring and summer crops.

It was a bummer for wheat farmers, for example, who briefly experienced high wheat prices in mid-April as Americans panic-bought flour and bread. So when the program rolled out, the Agriculture Department covered only two of six wheat types: hard red spring (used for pizza and bagels) and durum (used for pasta). But Dave Milligan, the organization's president, grows soft white wheat, the kind used in cakes. It's not covered, and Milligan said the losses are weighing on his margins.

"We hope things will change in the future," Milligan said. "We know they absolutely cannot serve everybody with this program, because they had to roll it out so fast."

### Download the NBC News app for breaking news and politics

In the Agriculture Department statement, a spokesperson said the department wanted to be sure that it could cover COVID-19 effects in all production agriculture sectors focusing on only the first quarter and a small part of the second quarter, given uncertainty and volatile market conditions.

The Agriculture Department also said that the program includes 89 specialty crops and that additional specialty crops will be added in the coming weeks. It said it has conducted targeted outreach to specialty crop producers, including fruit and vegetable growers, to ensure that producers are knowledgeable about the program and are clear on how to apply. It also said it structured the program so leftover money could be used to offset coronavirus market effects in the rest of 2020 and into 2021 if it's available.

But even within well-endowed sectors like livestock and dairy, some farmers and ranchers say the Agriculture Department's aid still hasn't covered their wounds. That includes Titan Swine, the Iowa hog farming partnership, which has been the biggest single beneficiary of the program's funds.

"Titan Swine suffered market losses due to the COVID 19 pandemic in the amount of around -$6,000,000.00," Titan Swine said in a statement. "While the CFAP payment was helpful, it was a long ways from making our company close to whole. "

The company said it had to take the "unthinkable step" of euthanizing nearly 8,000 market animals because of the pandemic's effect on processing facilities. Agriculture Department funds still may not be enough to overcome the financial burden on some members, friends and neighbors, it said..

Strickland AR 0683

Case 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 127 of 202    PageID 1064

Nepveux said: "We're at a point in this country where the majority of food dollars that Americans spend go to food away from home. I don't know if there is any USDA program that could have absorbed all those losses."

Industry estimates of coronavirus-related losses approached $40 billion as of May, according to the Congressional Research Service. Lawmakers, advocates and Perdue, the agriculture secretary, have all said more money will be needed. Already, direct agriculture aid has hit a record high under President Donald Trump, with at least $50 billion in payments to farmers in 2019 and 2020.

"It seems like a never-ending cycle of ad hoc program after ad hoc program," said Janzen, of Kansas State University. "And in the end, I don't know if anyone is really totally satisfied with the outcome."

---

 Kit Ramgopal

Kit Ramgopal is a reporter with the NBC News Investigative Unit.

---

Andrew W. Lehren

Andrew W. Lehren is a senior editor with the NBC News Investigative Unit.

---

Strickland AR 0684

KIRSTEN GILLIBRAND
NEW YORK
SENATOR
RUSSELL SENATE OFFICE BUILDING
SUITE 478
WASHINGTON, DC 20510-3205
202-224-4451

**United States Senate**

WASHINGTON, DC 20510-3205

COMMITTEES:
ARMED SERVICES
ENVIRONMENTAL AND PUBLIC WORKS
AGRICULTURE
SPECIAL COMMITTEE ON AGING

August 26, 2020

The Honorable Sonny Perdue
Secretary of Agriculture
U.S. Department of Agriculture
1280 Maryland Avenue S.W.
Washington, D.C. 20250

Dear Secretary Perdue,

I write today to express my deep concern about the unequitable distribution of direct payments to farmers under the Coronavirus Food Assistance Program (CFAP). There have been recent reports detailing the fact that many farms have not received adequate relief under the Program. In a NBC report titled "Small farmers left behind in Trump administration's COVID-19 relief package", it was found through a Freedom of Information Act (FOIA) request, "almost 7,000 farms got less than $200, and nearly 200 got less than $20. The lowest payout was 7 cents."[1] This disparity among relief is not only unacceptable, but unfair to our small farmers who are also facing devastating losses due to coronavirus. Many small farmers are facing economic devastation as markets shuttered and they were left with millions of pounds of crops rotting in their fields. The low payouts from CFAP, coupled with having to apply crop by crop, have put a significant strain on small farmers when trying to benefit from the Program.

Future CFAP payments need to be more equitable for smaller and historically underserved producers to more accurately address their market losses. One way to do this would be to set aside at least 50 percent of all assistance funds specifically for small and mid-scale operations, with payment amounts calculated the same for all producers, based on revenue losses. While I certainly appreciate the intention of CFAP, and understand that not everyone can be made whole in regards to their losses due to the pandemic, the relief that we can provide to farmers can be more equitable and accessible.

Corporate agribusinesses have consistently reaped the largest share of benefits from USDA's agricultural relief efforts in recent years compared to smaller farms, even though 91 percent of farms in the United States are classified as "small" by USDA.[2] For example, data compiled by the American Enterprise Institute revealed that the top 20 percent of farms, as measured by crop sales, received 73 percent of all Market Facilitation Program payments in 2018 and 69 percent in 2019.[3] Another separate, but equally alarming fact that was released as part of the NBC FOIA request, is

---

[1] https://www.nbcnews.com/business/economy/small-farmers-left-behind-trump-administration-s-covid-19-relief-n1236158
[2] https://www.washingtonpost.com/business/2020/07/16/cfap-ppp-farmers-coronavirus/

ALBANY/CAPITAL DISTRICT OFFICE      BUFFALO OFFICE      LONG ISLAND OFFICE      NORTH COUNTRY OFFICE      ROCHESTER OFFICE      SYRACUSE/CENTRAL NY OFFICE      NEW YORK CITY OFFICE      HUDSON VALLEY OFFICE

Strickland AR 0685

that larger-scale foreign-owned farms have received millions of dollars through CFAP.[1] Federal relief money, particularly in time of crisis, should prioritize American family farmers, our rural communities, and our local food systems, not foreign corporations.

Due to the documented struggles of CFAP in providing adequate relief to small producers, I request responses to the following:

- Is USDA considering options to retool CFAP to make it more equitable for small farmer's ranchers and local system producers? If so, what are those options?
- Is USDA collecting data on the farm size and demographics of farmer applications and USDA approvals and denials for CFAP? If so, does USDA plan on releasing an aggregation of that data?
- Explain why USDA has not established set asides for small and mid-size operations and historically underserved producers with money allocated for CFAP.
- Publish details on the allocation of payments by farm size and commodity in order to be transparent with taxpayers about who is being helped by this program, and who is not.
- Explain if USDA will continue to allow foreign-owned corporations to benefit from CFAP.
- Provide information on the number of farm foreclosures and loan defaults on loans under USDA's jurisdiction since March 1, 2020, and how much debt is held by small-scale and historically underserved producers under USDA's jurisdiction.

With no end in sight for coronavirus, and given the results of how CFAP has been implemented so far, immediate action is needed to not only save small farms and homes, but the rural way of life. According to a 2019 USDA National Agricultural Statistics Service report, America lost 5,800 farms from 2018-2019.[4] This decrease in farms has been happening for decades, and the coronavirus has potentially only exacerbated that problem. We must do everything we can to ensure that our current, and next generation of farmers are able to stay in business both during and after this pandemic.

In this time of national crisis we must support the agricultural industry nationwide rather than just the corporate agribusinesses that dominate this sector. Small farms are essential to the economic health of both the citizens and economy at large of the United States as they provide jobs, food, and economic support to their local communities. While thousands of new, beginning, and small-scale farmers are struggling to keep their farms afloat, it is our duty to give them the support they deserve. We must not forget them as we attempt to relieve the economic burden this pandemic has caused. Thank you for your consideration and I look forward to your response.

Sincerely,

Kirsten Gillibrand
United States Senator

---

[3] https://www.aei.org/articles/how-the-biggest-farms-are-getting-more-per-acre-in-trade-war-subsidies/
[4] https://www.nass.usda.gov/Publications/Todays_Reports/reports/fnlo0220.pdf

| Age of separated employee at birthday before death | Multiplier by separated employee's year of birth | |
|---|---|---|
| | After 1966 | From 1950 through 1966 |
| 46 | .4881 | .5228 |
| 47 | .5194 | .5563 |
| 48 | .5531 | .5924 |
| 49 | .5894 | .6314 |
| 50 | .6283 | .6730 |
| 51 | .6704 | .7180 |
| 52 | .7154 | .7662 |
| 53 | .7638 | .8181 |
| 54 | .8162 | .8741 |
| 55 | .8725 | .9345 |
| 56 | .9338 | 1.0000 |

[FR Doc. 2020–20784 Filed 9–21–20; 8:45 am]

**BILLING CODE 6325–38–P**

---

# DEPARTMENT OF AGRICULTURE

## Office of the Secretary

### 7 CFR Part 9

[Docket ID: FSA–2020–0006]

RIN 0503–AA65

## Coronavirus Food Assistance Program

**AGENCY:** Office of the Secretary, USDA.

**ACTION:** Final rule.

**SUMMARY:** The Secretary of Agriculture is issuing this rule to provide additional assistance under the Coronavirus Food Assistance Program (CFAP) to agricultural producers who continue to be impacted by the effects of the COVID–19 outbreak. This rule specifies the eligibility requirements, payment calculations, and application procedures for a second round of payments (CFAP 2). In addition, it also extends the special payment limitation provisions to trusts and estates for CFAP 1 and amends the provisions regarding applicable year and direct attribution of payments to members of legal entities that qualify for the increased payment limitation.

**DATES:** Effective September 22, 2020.

**FOR FURTHER INFORMATION CONTACT:** William L. Beam; telephone: (202) 720–3175; email: *Bill.Beam@usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice).

**SUPPLEMENTARY INFORMATION:**

## Background

In response to the COVID–19 outbreak, USDA implemented CFAP through a final rule published in the **Federal Register** on May 21, 2020 (85 FR 30825–30835), with corrections published in the **Federal Register** on June 12, 2020 (85 FR 35799–35800), July 10, 2020 (85 FR 41328–41330), August 14, 2020 (85 FR 49593–49594), and documents published in the **Federal Register** on May 22, 2020 (85 FR 31062–31065), June 12, 2020 (85 FR 35812), July 10, 2020 (85 FR 41321–41323), and August 14, 2020 (85 FR 49589–49593). The application period for the first round of CFAP payments (referred to in this rule and hereinafter as CFAP 1) was May 26, 2020, through September 11, 2020.

In this final rule, USDA is implementing a second round of payments under CFAP (CFAP 2) for producers of agricultural commodities who face continuing market disruptions, low farm-level prices, and significant marketing costs. These additional significant marketing costs are associated with declines in demand, surplus production, and disruptions to shipping patterns and the orderly marketing of commodities.

CFAP 2 will provide eligible producers with financial assistance that gives them the ability to absorb increased marketing costs associated with the COVID–19 outbreak. In accordance with 15 U.S.C. 714b, the Secretary is using funds of the Commodity Credit Corporation (CCC) to assist producers with the purchase of materials and facilities required in connection with the production and marketing of agricultural commodities, with an estimated $13.21 billion being made available. These funds will be used as authorized by sections 5(b), (d), and (e) of the CCC Charter Act (15 U.S.C. 714c(b), (d), and (e)). These authorities will be used to partially compensate producers for on-going market disruptions and assist with the transition to a more orderly marketing system by enabling them to:

∀ Purchase materials and facilities required in connection with the production and marketing of agricultural commodities;

∀ Remove or dispose of surplus agricultural commodities; and

∀ Develop new and additional markets, marketing facilities, and uses for the commodities.

Funds available under 15 U.S.C. 714c(b), (d), and (e) cannot be used to provide assistance for tobacco; however, tobacco will be eligible for CFAP 2 with payments funded by remaining funds authorized by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act; Pub. L. 116–136).

## Payments

CFAP 2 payments will be made for three categories of commodities:

1. Price trigger commodities (major commodities that meet a minimum 5-percent price decline over a specified time period);

2. Flat-rate crops; and

3. Sales commodities.

Eligible price trigger commodities include barley, corn, sorghum, soybeans, sunflowers, upland cotton, wheat (all classes), broilers, eggs, beef cattle, dairy, hogs and pigs, and lambs and sheep. Price trigger commodities are commodities that had a 5 percent or greater price decline due to COVID–19 in a comparison of the average price for the week of January 13–17, 2020, and the average price for the week of July 27–31, 2020. For price trigger crops, payments will be based on eligible acres of the crop, which are the producer's share of 2020 determined acres if established by FSA, or reported acres on FSA–578 if determined acres have not been established by FSA, excluding prevented planting and experimental acres. Payments for price trigger crops will be the greater of: (1) The eligible acres multiplied by a payment rate of $15 per acre; or (2) the eligible acres multiplied by a nationwide crop marketing percentage, multiplied by a crop-specific payment rate, and then by

Strickland AR 0687

the producer's weighted 2020 Actual Production History (APH) approved yield, or if the APH is not available, 85 percent of the 2019 Agriculture Risk Coverage-County Option (ARC–CO) benchmark yield for that crop. For broilers and eggs, payments will be based on 75 percent of the producer's 2019 production. For dairy, payments will be based on April 1 to August 31, 2020, actual milk production and September 1, 2020, to December 31, 2020, estimated milk production (based on the producer's daily average production from April 1 to August 31, 2020, multiplied by the number of days the dairy operation commercially markets milk from September 1, 2020, through December 31, 2020). For price-triggered livestock, payments will be based on a fixed number of head, which is defined as the lower of the maximum owned inventory of eligible livestock, excluding breeding stock, on a date selected by the eligible producer from April 16, 2020, through August 31, 2020, or a specific number of head (4,546 head of cattle or 10,870 head of hogs). In the payment calculation, the maximum number of head of cattle and hogs, respectively, will be multiplied by the number of payment limitations for the producer.

Flat-rate crops are crops that either do not meet the 5-percent price decline trigger noted above or do not have data available to calculate a price change, but will have CFAP 2 payments calculated based on eligible acres of the crop planted in 2020, similar to price trigger crops. Eligible flat-rate crops include alfalfa, Extra Long Staple (ELS) cotton, oats, peanuts, and rice, as well as some crops with relatively small acreage—such as amaranth grain, buckwheat, canola, crambe (colwort), einkorn, emmer, flax, guar, hemp, indigo, industrial rice, kenaf, Khorasan, millet, mustard, oats, peanuts, quinoa, rice, sweet rice, wild rye, safflower, sesame, speltz, sugar beets, sugarcane, teff, triticale, and rapeseed. For flat-rate crops, payments will be computed by multiplying: (1) The producer's share of reported or determined 2020 planted acres of the crop, excluding prevented planted and experimental acres, by (2) $15 per acre.

The sales commodities category includes:

∀ Aquaculture grown in a controlled environment;

∀ Nursery crops and floriculture;

∀ Other livestock (excluding breeding stock) not included under the price trigger category that were grown for food, fiber, fur, or feathers;

∀ Other crops not included in the price trigger and flat-rate categories, including tobacco;

∀ Goat milk;

∀ Mink (including pelts);

∀ Mohair; and

∀ Wool.

Payment calculations for the sales commodities will use a sales-based approach based on five payment gradations associated with the producer's 2019 sales of the commodity.

Payments cannot be calculated using the methods described above for producers of broilers, eggs, and sales commodities who began farming in 2020 and had no 2019 production or sales. Payments for such producers will be based on the producer's actual 2020 production or sales as of the date the producer submits an application for payment.

**Eligibility**

Only commercially produced commodities are eligible.

Producer must be in the business of farming at the time of application.

Hay, except alfalfa, and crops intended for grazing are ineligible for CFAP 2 and will not receive a CFAP 2 payment. Crops with intended uses of green manure and left standing are also ineligible.

Contract growers are ineligible for CFAP 2 and will not receive a CFAP 2 payment.

**Average Adjusted Gross Income Limitation and Payment Limitation**

A person or legal entity, other than a joint venture or general partnership, is ineligible for payments if the person's or legal entity's average adjusted gross income (AGI), using the average of the adjusted gross incomes for the 2016, 2017 and 2018 tax years, is more than $900,000, unless at least 75 percent of that person's or legal entity's average AGI is derived from farming, ranching, or forestry-related activities. If at least 75 percent of the person's or legal entity's AGI is derived from farming, ranching, or forestry-related activities and the participant provides the required certification and documentation, the person or legal entity is eligible to receive CFAP payments up to the applicable payment limitation.

With respect to joint ventures and general partnerships, this AGI provision will be applied to each member of the joint venture and general partnership.

CFAP 2 payments are subject to a per person and legal entity payment limitation of $250,000. This payment limitation is separate from the CFAP 1 payment limitation, and it applies to the total amount of CFAP 2 payments made with respect to all eligible commodities under all three categories.

This rule also amends the special payment limitations in § 9.7(e) for both CFAP 1 and CFAP 2. Previously, the special payment limitation provisions applied to corporations, limited liability companies, and limited partnerships. Those corporate entities may receive up to $750,000 in CFAP 1 payments based on the number of shareholders or members (not to exceed three shareholders or members) who are contributing at least 400 hours of active personal labor or active personal management or combination thereof with respect to the operation of the corporate entity.

This change amends the CFAP general provisions to extend those special payment limitation provisions to trusts and estates, allowing them to be eligible for the optional payment limitation increase based on the labor or management contributions of the beneficiaries or heirs of such trusts and estates. Extending these provisions to trusts and estates is necessary to recognize that, similar to members, partners, and stockholders of corporate entities, beneficiaries and heirs of trusts and estates may contribute at least 400 hours of active personal labor or active personal management or a combination thereof. Furthermore, trusts and estates are also affected by the price declines caused by COVID–19.

This rule also changes the method by which payments under the special payment limitation provisions are attributed to individuals and legal entities for both CFAP 1 and CFAP 2. The increased CFAP payment limitation for corporations, limited liability companies, limited partnerships, trusts, and estates based on contributions of at least 400 hours of active personal labor or active personal management or combination thereof is unlike the payment limitation under any other program administered by FSA. FSA's method of attributing CFAP payments based on ownership share of the legal entity in accordance with 7 CFR 1400.105, which applies to other FSA-administered programs subject to payment limitation, creates inequity when the pay limit for the legal entity is increased under the special provisions but not increased for each member of the entity.

Under 7 CFR 1400.105 for attributing payments for most commodity programs, the maximum amount that a legal entity could receive is limited by the maximum amount each eligible member may receive (directly or indirectly) based on ownership interest

Strickland AR 0688

in the legal entity, which is $250,000. For example, under current attribution rules, a corporation that qualifies for the increased limitation of $500,000 may only receive $450,000 when stockholders have unequal ownership shares in the legal entity. In this example, Stockholder A holds 60 percent ownership share and Stockholder B holds 40 percent ownership share. The payment to the legal entity is determined by multiplying each stockholder's ownership interest by the payment limitation of the corporation. (For Stockholder A, 60 percent · $500,000 = $300,000 (not to exceed $250,000); for Stockholder B, 40 percent · $500,000 = $200,000). The maximum payment to the legal entity in this case is $450,000 ($250,000 + $200,000). With the change to attribution in this rule applicable to CFAP 1 and CFAP 2, the payment to the legal entity qualifying for the increased payment limitation will not be reduced for ownership share, except for ineligibility or prior payments to a member, stockholder, partner, heir or beneficiary. The correction in how FSA attributes and limits CFAP payments under the special provisions to the members of the legal entity provides the ability for the legal entity to receive the maximum amount, not to exceed $500,000 or $750,000 as applicable, under the increased payment limitation, regardless of the ownership interests of the members, partners, and stockholders, beneficiaries, or heirs contributing at least 400 hours of active personal labor or active personal management. However, a member, stockholder, partner, beneficiary, or heir cannot receive, directly or indirectly, more than $250,000 under each round of payments (CFAP 1 and CFAP 2), regardless of whether payments attributed to them are subject to the regular payment limitation or the special increased limitations.

This rule removes "2019" as the applicable commodity year in § 9.7(e)(2)(ii) and (iii) because CFAP eligibility may be based on 2019 or 2020 production of the commodity, as specified in the applicable payment calculations.

## CFAP General Requirements

The general eligibility requirements that applied to CFAP 1 also apply to CFAP 2, including requiring compliance with 7 CFR part 12, "Highly Erodible Land and Wetland Conservation" and 7 CFR part 1400 subpart E, "Foreign Persons." Appeal regulations in 7 CFR parts 11 and 780 also apply to CFAP 2.

As under CFAP 1, there is no requirement to have crop insurance

coverage or coverage under the Noninsured Crop Disaster Assistance Program (NAP) for an eligible CFAP commodity to be eligible for CFAP 2.

## Application Process

FSA will be responsible for implementing CFAP 2. FSA will accept CFAP 2 applications beginning September 21, 2020, and ending December 11, 2020. To apply for CFAP 2 payments, producers must submit a completed CFAP 2 application either in person, by mail, email, or facsimile to an FSA county office. A producer who applies must submit additional documentation for eligibility, such as certifications of compliance with adjusted gross income provisions and conservation compliance activities; those additional documents and forms must be submitted no later than 60 days from the date a producer signs the application. Payments will not be made until all necessary eligibility documentation is received, and will be reduced or not issued to the individuals or members of the entity when the documentation is not submitted timely. Producers who are applying for payment for price trigger or flat-rate crops must file a report of all acreage for the crop on FSA–578, Report of Acreage.

If supporting documentation is requested to verify the information specified on the application, the producer must provide records that substantiate the reported information. Examples of supporting documentation include evidence provided by the producer that is used to substantiate the acres, sales, inventory, or production reported, including copies of receipts, ledgers of income, income statements of deposit slips, veterinarian records, register tapes, invoices for custom harvesting, and records to verify production costs, contemporaneous measurements, truck scale tickets, or contemporaneous diaries that are determined acceptable by USDA.

## Provisions Requiring Refund to USDA

In the event that any application for a CFAP 2 payment resulted from erroneous information reported by the producer, the payment will be recalculated, and the producer must refund any excess payment to USDA. If the error was the producer's error, the refund must include interest [1] to be calculated from the date of the disbursement to the producer.

If USDA determines that the producer's application misrepresented either the total amount or producer's share of the acres, production, head of livestock, or sales, or if the CFAP 2 payment would exceed the payment as calculated based on the correct share of the acres, production, head of livestock, or sales, the application will be disapproved and the participant must refund to USDA all CFAP 2 payments made to the producer with interest from the date of disbursement.

Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

## Other Changes

In addition to the changes necessary to implement CFAP 2, USDA is moving definitions and payment calculation provisions that are specific to CFAP 1 to a new subpart B. This change is for organizational purposes only; this rule does not change those definitions and provisions.

This rule also adds a definition of "controlled environment" in § 9.2. This definition is consistent with how the term has been interpreted for the administration of CFAP 1 and for other FSA disaster programs (see FSA handbook for CFAP 1 and the NAP handbook, found under Disaster Assistance on the following web page: *https://www.fsa.usda.gov/programs-and-services/laws-and-regulations/handbooks/index*); it is added only to provide clarity.

## Notice and Comment and Effective Date

The Administrative Procedure Act (5 U.S.C. 553(a)(2)) provides that the notice and comment and 30-day delay in the effective date provisions do not apply when the rule involves specified actions, including matters relating to benefits. This rule governs CFAP for payments to certain commodity producers and therefore falls within the benefits exemption.

The Office of Management and Budget (OMB) designated this rule as major under the Congressional Review Act (CRA), as defined by 5 U.S.C. 804(2). Section 808 of the CRA allows an agency to make a major regulation effective immediately if the agency finds there is good cause to do so. The beneficiaries of this rule have been significantly impacted by the COVID–19 outbreak, which has resulted in significant declines in demand and market disruptions. USDA finds that notice and public procedure are contrary to the public interest. Therefore, even though this rule is a major rule for purposes of the Congressional Review Act, USDA is not

---

[1] The program interest rate is based on the CCC borrowing rate in effect for the month the payment was disbursed.

required to delay the effective date for 60 days from the date of publication to allow for Congressional review. Accordingly, this rule is effective upon publication in the **Federal Register**.

### Executive Orders 12866, 13563, and 13777

Executive Order 12866, "Regulatory Planning and Review," and Executive Order 13563, "Improving Regulation and Regulatory Review," direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The requirements in Executive Orders 12866 and 13563 for the analysis of costs and benefits apply to rules that are determined to be significant. Further, Executive Order 13777, "Enforcing the Regulatory Reform Agenda," established a federal policy to alleviate unnecessary regulatory burdens on the American people.

The Office of Management and Budget (OMB) designated this rule as economically significant under Executive Order 12866, "Regulatory Planning and Review," and therefore, OMB has reviewed this rule. The costs and benefits of this rule are summarized below. The full cost benefit analysis is available on *regulations.gov*.

### Cost Benefit Analysis Summary

CFAP 2 will provide producers with financial assistance that gives them the ability to absorb increased marketing costs associated with the COVID–19 outbreak. Producers will receive payments under the CCC Charter Act (section 5(b), (d), and (e)) with an estimated $13.21 billion being made available (after payment limitations).

Producers will be compensated for on-going market disruptions and to transition to a more orderly marketing system. Payments will assist producers with the purchase of materials and facilities required in connection with the production and marketing of agricultural commodities, aid in the removal or disposition of surplus agricultural commodities, and aid in the development of new and additional markets, marketing facilities, and uses for such commodities.

For the price trigger commodities, the approach to calculating CFAP 2 payments is very similar to that used for CFAP 1 (which covered Quarter 1 of 2020), although the focus now is on Quarter 2 through Quarter 4 of calendar 2020. Payments are based on the price decline calculated between mid-January and late-July and use an 80 percent coverage factor. Where available, mid-January and late July futures prices (for either the November or December contract) were used to estimate the market's price expectations toward the end of calendar 2020. Future contracts are not traded for all crops with a price trigger nor are they available for eggs, broilers, and lamb. For these commodities, actual prices received in mid-January and late July are used as a proxy. Depending on the yield for a given producer's crop in this category, the payment may calculate to less than $15 per acre. In such cases, the payment is raised to $15 per acre, which is the payment for the flat-rate category discussed below.

Producers of the flat-rate commodities receive a $15 per-acre payment based on their eligible 2020 acreage.

For the sales-based commodities, payment calculations will use a sales-based approach, where producers are paid based on five payment gradations associated with their 2019 sales. In addition, tobacco is a sales-based commodity under CFAP 2 and a CARES Act payment will be calculated using remaining CARES Act funds, not to exceed $100 million.

Estimated net payments to producers of $13.21 billion represent benefits to producers, which is the government cost of CFAP 2. Outlays are estimated at expected maximum levels.

### Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601–612), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA, Pub. L. 104–121), generally requires an agency to prepare a regulatory flexibility analysis of any rule whenever an agency is required by the Administrative Procedure Act or any other law to publish a proposed rule, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule is not subject to the Regulatory Flexibility Act because USDA is not required by the Administrative Procedure Act or any other law to publish a proposed rule for this rulemaking initiative.

### Environmental Review

The environmental impacts of this final rule have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and because USDA will be making the payments to producers the USDA regulations for compliance with NEPA (7 CFR part 1b).

Although OMB has designated this rule as "economically significant" under Executive Order 12866, ". . . economic or social effects are not intended by themselves to require preparation of an environmental impact statement" when not interrelated to natural or physical environmental effects (see 40 CFR 1508.14). CFAP 2 was designed to avoid skewing planting decisions. Producers continue to make their planting and production decisions with the market signals in mind, rather than any expectation of what a new USDA program might look like. The discretionary aspects of CFAP 2 (for example, determining AGI and payment limitations) were designed to be consistent with established USDA and CCC programs and are not expected to have any impact on the human environment, as CFAP 2 payments will only be made after the commodity has been produced. Accordingly, the following Categorical Exclusion in 7 CFR part 1b applies: 1b.3(2), which applies to activities that deal solely with the funding of programs, such as program budget proposals, disbursements, and the transfer or reprogramming of funds. As such, the implementation of and participation in CFAP 2 do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, an environmental assessment or environmental impact statement for this regulatory action, will not be prepared; this rule serves as documentation of the programmatic environmental compliance decision for this federal action.

### Executive Order 12372

Executive Order 12372, "Intergovernmental Review of Federal Programs," requires consultation with State and local officials that would be directly affect by proposed Federal financial assistance. The objectives of the Executive Order are to foster an intergovernmental partnership and a strengthened Federalism, by relying on State and local processes for State and local government coordination and review of proposed Federal Financial assistance and direct Federal development. For reasons specified in the final rule related notice to 7 CFR part 3015, subpart V (48 FR 29115, June 24, 1983), the programs and activities within this rule are excluded from the

scope of Executive Order 12372, which requires intergovernmental consultation with State and local officials.

## Executive Order 12988

This rule has been reviewed under Executive Order 12988, "Civil Justice Reform." This rule will not preempt State or local laws, regulations, or policies unless they represent an irreconcilable conflict with this rule. Before any judicial action may be brought regarding the provisions of this rule, the administrative appeal provisions of 7 CFR parts 11 and 780 must be exhausted.

## Executive Order 13132

This rule has been reviewed under Executive Order 13132, "Federalism." The policies contained in this rule do not have any substantial direct effect on States, on the relationship between the Federal government and the States, or on the distribution of power and responsibilities among the various levels of government, except as required by law. Nor does this rule impose substantial direct compliance costs on State and local governments. Therefore, consultation with the States is not required.

## Executive Order 13175

This rule has been reviewed for compliance with Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have Tribal implications, including regulations, legislative comments proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes or on the distribution of power and responsibilities between the Federal government and Indian Tribes.

USDA has assessed the impact of this rule on Indian Tribes and determined that this rule does not, to our knowledge, have Tribal implications that required Tribal consultation under Executive Order 13175. If a Tribe requests consultation, the USDA Office of Tribal Relations (OTR) will ensure meaningful consultation is provided where changes, additions, and modifications are not expressly mandated by Congress.

Outside of Tribal consultation, USDA is working with Tribes to provide information about CFAP 2 and other issues.

## The Unfunded Mandates Reform Act of 1995

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA, Pub. L. 104–4) requires Federal agencies to assess the effects of their regulatory actions on State local, and Tribal governments or the private sector. Agencies generally must prepare a written statement, including a cost benefit analysis, for proposed and final rules with Federal mandates that may result in expenditures of $100 million or more in any 1 year for State, local, or Tribal governments, in the aggregate, or to the private sector. UMRA generally requires agencies to consider alternatives and adopt the more cost effective or least burdensome alternative that achieves the objectives of the rule. This rule contains no Federal mandates, as defined in Title II of UMRA, for State, local, and Tribal governments or the private sector. Therefore, this rule is not subject to the requirements of sections 202 and 205 of UMRA.

## Federal Assistance Programs

The title and number of the Federal Domestic Assistance Program found in the Catalog of Federal Domestic Assistance to which this rule applies is Coronavirus Food Assistance Program 2 and 10.132.

## Paperwork Reduction Act

In accordance with the Paperwork Reduction Act of 1995, FSA submitted the CFAP 2 information collection request to OMB for emergency approval. OMB approved the 6-month emergency information collection.

## E-Government Act Compliance

USDA is committed to complying with the E-Government Act to promote the use of the internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

## List of Subjects in 7 CFR Part 9

Agricultural commodities, Agriculture, Disaster assistance, Indemnity payments.

For the reasons discussed above, this final rule amends 7 CFR part 9 as follows:

## PART 9—CORONAVIRUS FOOD ASSISTANCE PROGRAM

■ 1. The authority citation for part 9 continues to read as follows:

**Authority:** 15 U.S.C. 714b and 714c; and Division B, Title I, Pub. L. 116–136.

§§ 9.1 through 9.8 [Redesignated as Subpart A]

■ 2. Redesignate §§ 9.1 through 9.8 as subpart A and add a heading for subpart A to read as follows:

## Subpart A—General Provisions

■ 3. In § 9.1 amend paragraph (a) introductory text by adding two sentences after the second sentence to read as follows:

## § 9.1  Applicability and administration

(a) * * * CFAP is being implemented through two rounds of payments, with the first round (CFAP 1) determined as specified in subpart B of this part, and the second round (CFAP 2) determined as specified in subpart C of this part. To be eligible for CFAP payments, participants must comply with all provisions under this subpart and the relevant particular subpart for CFAP 1 or CFAP 2. * * *

* * * * *

■ 4. Amend § 9.2 by:
■ a. In the introductory text, removing the word "CFAP" and adding the words "this part" in its place;
■ b. Removing the definitions of "All other cattle", "Aquaculture", and "Cattle raised or maintained for breeding purposes";
■ c. Adding the definition of "Controlled environment"; and
■ d. Removing the definitions of "Crop", "Feeder cattle 600 pounds or more", "Feeder cattle less than 600 pounds", "First quarter", "Lambs and yearlings", "Non-specialty crop", "Producer", "Second quarter", "Slaughter cattle—fed cattle", "Slaughter cattle—mature cattle", "Specialty crops", and "Unpriced".
The addition reads as follows.

## § 9.2  Definitions.

* * * * *

*Controlled environment* means an environment in which everything that can practicably be controlled by the producer with structures, facilities, and growing media (including but not limited to water, soil, or nutrients), is in fact controlled by the producer, as determined by industry standards.

* * * * *

## § 9.3  [Amended]

■ 5. In § 9.3 amend paragraph (c) by removing the word "Have" and adding the words "For payments under § 9.102 of this part, have" in its place.

■ 6. Amend § 9.4 by revising paragraph (a) and adding paragraph (d) to read as follows:

**§ 9.4   Time and method of application.**

(a) A completed application under this subpart must be submitted in person, by mail, email, or facsimile to any FSA county office by the close of business on:

(1) September 11, 2020, for payments issued under § 9.102 of this part; and

(2) December 11, 2020, for payments issued under § 9.202 of this part.

\*     \*     \*     \*     \*

(d) A producer applying for assistance for a crop subject to § 9.202(a) or (b) must file a report of all acreage of the crop on FSA–578, Report of Acreage.

**§ 9.5   [Redesignated as § 9.102]**

■ 7. Redesignate § 9.5 as § 9.102.

**§ 9.5   [Reserved]**

■ 8. Add and reserve a new § 9.5.

■ 9. Amend § 9.7 by:

■ a. In paragraph (e)(1) adding the words "under each of subparts B and C" after "$250,000" both times it appears;

■ b. Revising paragraphs (e)(2) and (3); and

■ c. In paragraph (h), removing "September 11, 2020," and adding the words "the applicable date in § 9.4(a)" in its place.

The revisions read as follows.

**§ 9.7   Miscellaneous provisions.**

\*     \*     \*     \*     \*

(e) \* \* \*

(2)(i) The total amount of CFAP payments a corporation, limited liability company, limited partnership, trust, or estate may receive is $250,000 under each of subparts B and C unless the members, partners, stockholders, beneficiaries, or heirs of the legal entity meet the provisions of paragraphs (e)(2)(ii) or (iii) of this section.

(ii) The total amount of CFAP payments a corporation, limited liability company, limited partnership, trust, or estate may receive is $500,000 under each of subparts B and C if two different individual persons who are members, partners, stockholders, beneficiaries, or heirs of the legal entity each provided at least 400 hours of active personal labor or active personal management or combination thereof with respect to the production of commodities for which an application or applications are made in accordance with this part.

(iii) The total amount of CFAP payments a corporation, limited liability company, limited partnership, trust, or estate may receive is $750,000 under each of subparts B and C if three different individual persons who are members, partners, stockholders, beneficiaries, or heirs of the legal entity each provided at least 400 hours of active personal labor or active personal management or combination thereof with respect to the production of commodities for which an application or applications are made in accordance with this part.

(3)(i) Except for payments subject to the increased payment limitation in (e)(2)(ii) and (e)(2)(iii) of this section, a CFAP payment made to any legal entity will be attributed to individuals or legal entities with an ownership interest in the legal entity in accordance with § 1400.105 of this title. Payments attributed to a legal entity with an ownership interest in the legal entity will be further attributed in § 1400.105 of this title. If the legal entity does not qualify for an increased payment limitation under (e)(2)(ii) or (iii) of this section and the total amount of CFAP payments made directly or indirectly to an individual or legal entity has met the applicable amount specified in paragraph (e)(1) of this section, the payment to the legal entity will be reduced commensurate with the amount of the ownership interest of the individual or legal entity in the legal entity. CFAP payments subject to attribution under this paragraph will be attributed to individuals and legal entities until the attribution is made only to an individual except the attribution will stop at the fourth level of ownership.

(ii) A payment subject to the increased payment limitation in (e)(2)(ii) or (iii) of this section will be limited to the lesser of the amount specified in either (e)(2)(ii) or (iii) of this section, or the sum of the amount specified in (e)(1) of this section that each eligible member, stockholder, partner, heir, or beneficiary of the legal entity may receive, regardless of ownership share. Payments attributed to a legal entity with an ownership interest in the legal entity will be further attributed to individuals and legal entities until the attribution is made only to an individual, except the attribution will stop at the fourth level of ownership.

\*     \*     \*     \*     \*

■ 10. Add subpart B, consisting of § 9.101 and newly redesignated § 9.102, to read as follows:.

**Subpart B—CFAP 1**

Sec.
9.101   Definitions.
9.102   Calculation of payments.

**§ 9.101   Definitions.**

The following definitions apply to this subpart. The definitions in parts 718 and 1400 of this title also apply, except where they conflict with the definitions in this section.

*All other cattle* means commercially raised or maintained bovine animals not meeting the definition of another category of cattle in this part, excluding beefalo, bison, and animals used for dairy production or intended for dairy production.

*Aquaculture* means only those species as announced in a NOFA.

*Cattle raised or maintained for breeding purposes* means animals commercially raised or maintained for use as either a sire or dam for the production of livestock offspring or lactation.

*Crop* means non-specialty crops and specialty crops.

*Feeder cattle 600 pounds or more* means cattle weighing more than 600 pounds but less than the weight of slaughter cattle-fed cattle as defined in this section.

*Feeder cattle less than 600 pounds* means cattle weighing less than 600 pounds.

*First quarter* means January, February, and March of 2020.

*Lambs and yearlings* means all sheep less than 2 years old.

*Non-specialty crop* means any of the following crops: Barley, canola, corn, durum wheat, hard red spring wheat, millet, oats, sorghum, soybeans, sunflowers, and upland cotton. The term excludes crops intended for grazing.

*Producer* means a person or legal entity who shares in the risk of producing a crop or livestock and who is entitled to a share in the crop or livestock available for marketing or would have shared had the crop or livestock been produced and marketed. A contract grower who does not own the livestock, will be considered a producer if the contract allows the grower to have risk in the livestock.

*Second quarter* means April, May, and June of 2020.

*Slaughter Cattle—fed cattle* means cattle with a weight of 1,200 pounds or more that are intended for slaughter.

*Slaughter cattle—mature cattle* means culled cattle raised or maintained for breeding purposes, but which were removed from inventory and are intended for slaughter.

*Specialty crops* means any of the following crops: Almonds; apples; artichokes; asparagus; avocados; beans; blueberries; broccoli; cabbage; cantaloupe; carrots; cauliflower; celery; corn, sweet; cucumbers, eggplant; garlic; grapefruit; kiwifruit; lemons; lettuce, iceberg; lettuce, romaine; mushrooms; onions, dry; onions, green; oranges; papayas; peaches; pears; pecans;

peppers, bell type; peppers, other; potatoes; raspberries; rhubarb; spinach; squash; strawberries; sweet potatoes; tangerines; taro; tomatoes; walnuts; watermelons; and any crops for which funds are made available. The term excludes crops intended for grazing.

*Unpriced* means not subject to an agreed-upon price in the future through a forward contract, agreement, or similar binding document as of January 15, 2020.

■ 11. Add Subpart C, consisting of §§ 9.201 through 9.202, to read as follows:

**Subpart C—CFAP 2**

Sec.
9.201  Definitions.
9.202  Calculation of payments.

**§ 9.201  Definitions.**

The following definitions apply to this subpart. The definitions in parts 718 and 1400 of this title also apply, except where they conflict with the definitions in this section.

*Aquaculture* means any species of aquatic organisms grown as food for human consumption, fish raised as feed for fish that are consumed by humans, ornamental fish propagated and reared in an aquatic medium. Eligible aquacultural species must be raised by a commercial operator and in water in a controlled environment.

*Breeding stock* means:
(1) For cattle, bulls and cows;
(2) For hogs and pigs, boars and sows; and
(3) For lambs and sheep, rams and ewes.

*Broilers* includes any chicken that has been commercially produced for meat purposes that has left the farm for slaughter, and not used for laying or breeding purposes.

*Eggs* means dried, frozen, liquid, and shell eggs.

*Experimental* means a crop for which all of the following apply:
(1) The crop is planted for experimental purposes conducted under the direct supervision of a State experiment station or commercial company;
(2) Production of the crop is destroyed before harvest or used for testing or other experimental purposes; and
(3) A representative of the State experiment station or the commercial company certifies that any production harvested from the experiment will not be marketed in any form.

*Flat-rate crop* means alfalfa, amaranth grain, buckwheat, canola, cotton, Extra Long Staple (ELS) cotton, crambe (colewort), einkorn, emmer, flax, guar,

hemp, indigo, industrial rice, kenaf, khorasan, millet, mustard, oats, peanuts, quinoa, rapeseed, rice, rice, sweet, rice, wild, rye, safflower, sesame, speltz, sugar beets, sugarcane, teff, and triticale. The term excludes hay, except alfalfa, and crops with intended uses of grazing, green manure, or left standing.

*Floriculture* means cut flowers and cut greenery from annual and perennial flowering plants grown in a container or controlled environment for commercial sale. Floriculture is included in sales commodities.

*Fruits* means any of the following fruits: Abiu, acerola (Barbados cherry), achachairu, antidesma, apples, apricots, aronia (chokeberry), atemoya (custard apple), bananas, blueberries, breadfruit, cacao, caimito, calabaza melon, canary melon, canary seed, caneberries, canistel, cantaloupes, carambola (star fruit), casabamelon, cherimoya (sugar apple), cherries, Chinese bitter melon, citron, citron melon, coconuts, cranberries, crenshaw melon, dates, donaqua (winter melon), durian, elderberries, figs, genip, gooseberries, grapefruit, grapes, ground cherrry, guamabana (soursop), guava, guavaberry, honeyberries, honeydew, huckleberries, Israel melons, jack fruit, jujube, juneberries, kiwiberry, kiwifruit, Korean golden melon, kumquats, langsat, lemons, limequats, limes, longan, loquats, lychee, mangos, mangosteen, mayhaw berries, mesple, mulberries, nectarines, oranges, papaya, passion fruits, pawpaw, peaches, pears, pecans, pineapple, pitaya (dragon fruit), plantain, plumcots, plums, pomegranates, prunes, pummelo, raisins, rambutan, sapodilla, sapote, schizandra berries, sprite melon, star gooseberry, strawberries, tangelos, tangerines, tangors, wampee, watermelon, wax jamboo fruit, and wolfberry (goji).

*Hemp* means the plant species *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis, that is grown under a license or other required authorization issued by the applicable governing authority that permits the production of the hemp.

*Horticulture* means any of the following horticulture: Anise, basil, cassava, chervil (Fresh parsley), chia, chicory (radicchio), cilantro, cinnamon, curry leaves, galanga, ginger, ginseng, guayule, herbs, hops, lotus root, marjoram, meadowfoam, mint, moringa, niger seed, oregano, parsley,

pennycress, peppermint, pohole, psyllium, rosemary, sage, savory, shrubs (forbs), sorrel, spearmint, tangos, tea, thyme, turmeric, vanilla, wasabi, water cress, and yu cha.

*Ineligible commodities* for CFAP 2 means any of the following commodities: Birdsfoot and trefoil, clover, cover crop, fallow, forage soybeans, forage sorghum, gardens (commercial and home), grass, kochia (prostrata), lespedeza, milkweed, mixed forage, pelts (excluding mink), perennial peanuts, pollinators, sunn hemp, vetch, and seed of ineligible crops.

*Nursery crops* means decorative or nondecorative plants grown in a container or controlled environment for commercial sale. Nursery crops are included in sales commodities.

*Other livestock* means any of the following livestock: Animals commercially raised for food, fur, fiber, or feathers, including alpacas, bison, buffalo, beefalo, deer, ducks, elk, emus, geese, goats, guinea pigs, llamas, mink, ostrich, pheasants, quail, rabbits, reindeer, and turkey. It excludes all equine, breeding stock, companion or comfort animals, pets, and animals raised for hunting or game purposes.

*Prevented planting* means the inability to plant the intended crop acreage with proper equipment by the final planting date for the crop type because of a natural disaster.

*Price trigger commodities* means price trigger crops and price trigger livestock and products as defined in this section.

*Price trigger crops* means any of the following crops: Barley, corn, sorghum, soybeans, sunflowers, upland cotton, wheat (all classes), excluding crops with an intended use of grazing, green manure, or left standing.

*Price trigger livestock and products* means any of the following livestock and products: Beef cattle, broilers, dairy (cow milk), eggs, lambs, sheep, hogs, and pigs; excluding breeding stock.

*Producer* means a person or legal entity who shares in the risk of producing a commodity. The term does not include contract growers. Producers who are not in the business of farming at the time of application are not considered eligible producers.

*Sales-based commodities* means, as defined in this section, aquaculture, sales-based crops, nursery crops and floriculture, other livestock, and the following commodities: Goat milk, mink (including pelts); mohair, and wool.

*Sales-based crops* means ambrosia, arundo, camelina, cactus, cardoon, fruits, honey, horticulture, maple sap, tobacco, tree nuts, and vegetables. Fruits, horticulture, tree nuts, and vegetables are defined in this section.

The term excludes crops with an intended use of grazing, green manure, or left standing.

*Tree nuts* means any of the following tree nuts: Almonds, avocados, carob, cashew, chestnuts, coffee, hazel nuts, jojoba, macadamia nuts, noni, olives, persimmons, pine nuts, pistachios, quinces, and walnuts.

*Vegetables* means any of the following vegetables: Alfalfa sprouts, aloe vera, artichokes, arugula (greens), asparagus, bamboo shoots, batatas, bean sprouts, beans (including dry edible), beets, bok choy, broccoflower, broccoli, broccolini, broccolo-cavalo, Brussel sprouts, cabbage, calaloo, carrots, cauliflower, celeriac, celery, chickpea (see beans, garbanzo), chives, collard greens, coriander, corn, sweet, cucumbers, daikon, dandelion greens, dasheen (taro root, malanga), dill, eggplant, endive, escarole, frisee, gailon (gai lein, Chinese broccoli), garlic, gourds, greens, horseradish, Jerusalem artichokes (sunchoke), kale, kohlrabi, leeks, lentils, lettuce, melongene, mesculin mix, microgreens, mushrooms, okra, onions, parsnip, peas (including dry edible), pejibaye (heart of palm), peppers, potatoes, potatoes sweet, pumpkins, radicchio, radishes, rhubarb, rutabaga, salsify (oyster plant), scallions, seed—vegetable, shallots, spinach, squash, swiss chard, tannier, taro, tomatillos, tomatoes, truffles, turnip top (greens), turnips, yam, and yautia (malanga);

### §9.202   Calculation of payments.

(a) Payments for price trigger crops will be equal to the greater of:

(1) Eligible acres of the crop multiplied by a rate of $15 per acre; or

(2) Eligible acres of the crop multiplied by the applicable yield, multiplied by the crop marketing percentage in Table 1 of paragraph (j) of this section, multiplied by the crop payment rate in Table 1 of paragraph (j) of this section.

(3) Under paragraph (a) of this section, eligible acres include the producer's share of the determined acres, or reported acres if determined acres are not present, of the crop planted for the 2020 crop year, excluding prevented planted and experimental acres. For producers who insured acres of the crop under a policy or plan of insurance under the Federal Crop Insurance Act (7 U.S.C. 1501–1524), the yield will be the average of the producer's 2020 actual production history (APH) approved yield from all of the producer's insured acres nationwide. For producers for whom

FSA is unable to obtain a 2020 APH approved yield, the yield will be the 2019 Agriculture Risk Coverage-County Option (ARC–CO) benchmark yield multiplied by 85 percent. ARC–CO yields for producers growing a crop in multiple counties will be weighted based on the producer's crop acreage physically located in each county.

(b) Payments for flat-rate crops will be equal to eligible acres of the crop multiplied by a rate of $15 per acre. Eligible acres include the producer's share of the determined acres, or reported acres if determined acres are not present, excluding prevented planted and experimental acres.

(c) Payments for beef cattle will be equal to the lower of the producer's maximum owned inventory of eligible beef cattle, excluding breeding stock, on a date selected by the producer from April 16, 2020, through August 31, 2020, or 4,546 head multiplied by the number of payment limitations for the producer multiplied by a payment rate of $55 per head.

(d) Payments for hogs and pigs will be equal to the lower of the producer's maximum owned inventory of eligible hogs and pigs, excluding breeding stock, on a date selected by the producer from April 16, 2020, through August 31, 2020, or 10,870 head multiplied by the number of payment limitations for the producer, multiplied by a payment rate of $23 per head.

(e) Payments for lambs and sheep will be equal to the producer's highest owned inventory of eligible lambs and sheep, excluding breeding stock, on a date selected by the producer from April 16, 2020, through August 31, 2020, multiplied by a payment rate of $27 per head.

(f)(1) Payments for broilers will be equal to 75 percent of the producer's 2019 broiler production multiplied by a payment rate of $1.01 per bird (head).

(2) Payments for broiler producers who began farming in 2020 and had no production in 2019 will be calculated as provided in paragraph (f)(1) of this section, except that the payments will be based on the producer's actual 2020 broiler production as of the date the producer submits an application for payment under this part.

(g)(1) Payments for dairy (cow milk) will be equal to the sum of the following two calculations:

(i) The producer's total actual milk production from April 1, 2020, to August 31, 2020, multiplied by the payment $1.20 per hundredweight; and

(ii) The producer's estimated milk production from September 1, 2020, to December 31, 2020, based on the daily average production from April 1, 2020, through August 31, 2020, multiplied by 122, multiplied by a payment rate of $1.20 per hundredweight.

(2) Dairy operations that stop commercially marketing milk after the date they apply for CFAP 2 but before December 31, 2020, must notify FSA of the date they stop commercially marketing milk. Those dairies are eligible only for a prorated payment under paragraph (g)(1)(ii) of this section for the number of days the dairy operation commercially markets milk from September 1, 2020, through December 31, 2020.

(h)(1) Payments for eggs will be equal to 75 percent of the producer's 2019 egg production multiplied by the payment rate in Table 1 of paragraph (j) of this section.

(2) Payments for egg producers who began farming in 2020 and had no production in 2019 will be calculated as provided in paragraph (h)(1) of this section, except that the payments will be based on the producer's actual 2020 egg production as of the date the producer submits an application for payment under this part.

(i)(1) Payments for sales commodities will be equal to the sum of the results for the following calculation for each 2019 sales range in Table 2 of paragraph (j) of this section: the amount of the producer's eligible sales within the specified range in calendar year 2019, multiplied by the payment rate for that range in Table 2 of paragraph (j) of this section. Eligible sales only includes sales of raw commodities grown by the producer; the portion of sales derived from adding value to the commodity, such as processing and packaging, and from sales of products purchased for resale is not included in the payment calculation unless determined eligible by the Secretary.

(2) Payments for producers of sales commodities who began farming in 2020 and had no sales in 2019 will be calculated as provided in paragraph (i)(1) of this section, except that the payments will be based on the producer's actual 2020 sales as of the date the producer submits an application for payment under this section.

(j) The payment rates in Tables 1 and 2 of this paragraph (j) will be used to calculate CFAP payments:

Strickland AR 0694

TABLE 1 TO PARAGRAPH (J)—PAYMENT RATES FOR PRICE TRIGGER CROPS AND EGGS

| Commodity | Units | Crop marketing percentage (percent) | Payment rate ($/unit) |
|---|---|---|---|
| Barley | bu | 63 | $0.54 |
| Corn | bu | 40 | 0.58 |
| Cotton, Upland | lb | 46 | 0.08 |
| Sorghum | bu | 55 | 0.56 |
| Soybean | bu | 54 | 0.58 |
| Sunflowers | lb | 44 | 0.02 |
| Wheat (all classes) | bu | 73 | 0.54 |
| Shell Eggs | dozen | n/a | 0.05 |
| Liquid Eggs | lb | n/a | 0.04 |
| Dried Eggs | lb | n/a | 0.14 |
| Frozen Eggs | lb | n/a | 0.05 |

TABLE 2 TO PARAGRAPH (J)—PAYMENT RATES FOR SALES COMMODITIES

| 2019 Sales range | Percent payment factor |
|---|---|
| Up to $49,999 | 10.6 |
| $50,000–$99,999 | 9.9 |
| $100,000–$499,999 | 9.7 |
| $500,000–$999,999 | 9.0 |
| All sales over $1 million | 8.8 |

(k) CFAP 2 payments will not be calculated or issued for ineligible commodities.

**Stephen L. Censky,**

*Vice Chairman, Commodity Credit Corporation, and Deputy Secretary, U.S. Department of Agriculture.*

[FR Doc. 2020–20844 Filed 9–18–20; 4:15 pm]

**BILLING CODE 3410–05–P**

---

**DEPARTMENT OF AGRICULTURE**

**Rural Utilities Service**

**7 CFR Parts 1779 and 1780**

**Rural Housing Service**

**Rural Business-Cooperative Service**

**Rural Utilities Service**

**Farm Service Agency**

**7 CFR Chapter XVIII**

**Rural Housing Service**

**7 CFR Parts 3570 and 3575**

**Rural Business-Cooperative Service**

**Rural Utilities Service**

**7 CFR Parts 4279 and 4280**

**[Docket No. RBS–20–BUSINESS–31]**

**RIN 0570–AB04**

**Strategic Economic and Community Development**

**AGENCY:** Rural Business-Cooperative Service, Rural Housing Service, Rural Utilities Service, Farm Service Agency, Department of Agriculture (USDA).

**ACTION:** Final rule.

---

**SUMMARY:** The Rural Business-Cooperative Service, Rural Housing Service, and Rural Utilities Service, of the Rural Development (RD) mission area within the U.S. Department of Agriculture (USDA), hereinafter collectively referred to as the Agency, is issuing this final rule to implement statutory provisions found in Section 6401 of the Agricultural Improvement Act of 2018 ("2018 Farm Bill") that amends Section 379H of the Consolidated Farm and Rural Development Act. The intent of this rule is to amend the existing regulations governing Strategic Economic and Community Development (SECD) to implement Section 6401 of the 2018 Farm Bill. Additionally, conforming changes are being made to other regulations as a result of the aforementioned statutory changes. Finally, we are removing Farm Service Agency from a chapter in the CFR as they no longer use any of the parts under that chapter.

**DATES:** This final rule is effective September 22, 2020.

**FOR FURTHER INFORMATION CONTACT:** Greg Batson, Strategic Engagement, Rural Development Innovation Center, U.S. Department of Agriculture; *gregory.batson@usda.gov*; (573) 239–2945.

**SUPPLEMENTARY INFORMATION:**

**Background and Discussion**

The Agency administers a multitude of Federal programs for the benefit of rural America, ranging from housing and community facilities to infrastructure and business development. Its mission is to increase economic opportunity and improve the quality of life in rural communities by providing the leadership, infrastructure, capital, and technical support that enables rural communities to prosper. To achieve its mission, the Agency provides financial support (including direct loans, grants, and loan guarantees) and technical assistance.

Section 379H Strategic and Economic Community Development of the Consolidated Farm and Rural Development Act (7 U.S.C. 2008v) supports rural communities by promoting regional economic and community development. Reservation of targeted funds are available for covered Rural Development programs to encourage regional economic and community development. Section 6401 of the 2018 Farm Bill amended Section 379H, Strategic Economic and Community Development of the

Bleeding Heartland

Strickland AR 0696

Bleeding Heartland



# Under Trump, farm subsidies soared and the rich got richer

✎ Wednesday, Feb 24 2021 | <u>Anne Schechinger</u> | <u>1 Comment</u>

*Anne Schechinger: President Joe Biden and Congress must reform a wasteful and unfair farm subsidy system. This report first appeared on the <u>Environmental Working Group's website</u>. -promoted by Laura Belin*

Taxpayer-funded farm subsidies have long been skewed in favor of the richest farmers and landowners. But under the Trump administration, even more money went to the largest and wealthiest farms, further shortchanging smaller, struggling family farms.

The Environmental Working Group's analysis of records from the U.S. Department of Agriculture finds that subsidy payments to farmers ballooned from just over $4 billion in 2017 to more than $20 billion in 2020 — driven largely by ad hoc programs meant to offset the effects of President Trump's failed trade war.

Not only did the amount of subsidies skyrocket, but the richest farms also increased their share: In 2016, about 17 percent of total subsidies went to the top 1 percent of farms and about 60 percent to the top 10th. In 2019, the richest 1 percent received almost one-fourth of the total, and the top 10th received almost two-thirds. (Note: EWG has yet to receive USDA data needed to compute the distribution of subsidies for all of 2020. Through June, the breakdown was 23.7 percent to the top 1 percent and 64.3 percent to the top 10th.)

The staggering growth of subsidies and the worsening inequity in distribution underscore the urgency for the Biden administration and the new Congress to enact commonsense farm subsidy reforms that will benefit small, struggling farmers and the environment and make up for the mistakes of the Trump years.

**Traditional Subsidies Are Dwarfed by Ad Hoc Programs**

Strickland AR 0697

every year. These programs, the Agricultural Risk Coverage program, or ARC, and the Price Loss Coverage program, or PLC, are triggered if crop yields or prices are lower than expected. Farmers can choose to take part in either ARC or PLC for the entire length of each farm bill, typically five years. Not every farm receives payments from these programs every year, but many do, and the programs send out billions of dollars annually.

But even though these existing programs pay farmers for reductions in crop prices, the Trump administration established additional multi-billion-dollar ad hoc subsidy programs – subsidies for specific, limited and supposedly temporary purposes.

- The Market Facilitation Program, or MFP, paid billions to farmers in 2018 and 2019 for losses driven by tariffs that China placed on agricultural imports from the U.S. in retaliation for Trump's trade war.

- The Coronavirus Food Assistance Program, or CFAP, sent billions to farmers last year. The USDA is still accepting applications for this year, but Biden has ordered a freeze on payments until further notice.

ARC and PLC payments, from their inception in 2014 through 2019, the most recent year of payments, were $32.04 billion. But ad hoc subsidies far exceeded the total payments from those traditional programs in the final two years of the Obama administration and under Trump: a total of $49.08 billion in five years of annual disaster payments, two years of MFP payments and CFAP payments through October of last year.

Altogether, since 2014, ad hoc and traditional subsidy programs cost U.S. taxpayers more than $81.1 billion.

The chart below shows the growth in farm subsidies since 2018, when the MFP began. Since ARC and PLC payments are made in the calendar year after the year the crop was grown, we won't know the 2020 payments until this fall. So the chart below includes an estimate for 2020 ARC and PLC payments, provided by the Congressional Budget Office.

**Farm Subsidy Payments Between Program Years 2014 and 2020**



*Source: EWG, from data obtained through public records requests to the USDA, and the Congressional Budget Office's January 2020 Baseline for Farm Programs.*

Strickland AR 0698

3/7

South Dakota and Texas. Farmers in those states received more than $1 billion, or 51 percent of the total.

An interactive map that can be viewed here shows annual county-by-county subsidy payments since 2014. The 10 counties that received the highest ad hoc payments together received over $1.6 billion.

The massive outlays of taxpayer dollars aren't the only cost of wasteful farm subsidies.

Nationwide, nitrate contamination of drinking water – from nitrogen in fertilizer and manure running off farm fields – is a serious and growing health hazard. Analysis of USDA records shows how federal payments are subsidizing farms in counties with severe nitrate contamination.

For example, levels of nitrate in drinking water are especially high in the San Joaquin Valley of California, where communities with majority-Latino populations are the most likely to have high nitrate. Six of the 10 U.S. counties with the highest ad hoc subsidy payments are in the San Joaquin Valley – Fresno, Kern, Kings, Merced, Stanislaus and Tulare, which since 2014 received a total of $1.09 billion from disaster payments, MFP and CFAP.

Yet all of the traditional and ad hoc subsidies outlined above are only a part of the total payments American farmers receive every year. Federal crop insurance – a Depression-era ad hoc program written into law in 1980 – adds billions each year, and tends to pay farmers for the same reductions in crop prices as ARC and PLC. Conservation programs also make payments to farmers every year, but conservation payments are considerably smaller than farm subsidies or crop insurance.

**The Largest Farms Get the Most Money**

The USDA classifies 98 percent of all U.S. farms as "family farms," but the top 0.3 percent are considered "very large family farms." These biggest farms have a gross farm income of at least $5 million and in 2019 provided their operators a median household income of just under $1 million.

As USDA data shows, the great majority of both traditional commodity and ad hoc program payments go to the largest and wealthiest farms, which generally have considerable assets to fall back on in lean years. Small farms that struggle when crop prices are low or during the pandemic-triggered economic crisis get only a small portion of payments. It's no accident: The programs are designed so that farms with the largest acres or crop production get the highest payments.

For example, through the MFP in 2018 and 2019:

• The top 1 percent of recipients received 16 percent of payments, with an average total payment for both years of $524,298 per farm. The top 10 percent received 58 percent of payments, with an average total payment of $185,340.

• The bottom 80 percent of recipients received only 23 percent of payments – an average payment for both years of only $9,109 per recipient.

The ARC, PLC and CFAP programs had very similar payment concentrations. But compared to other Americans, do farmers need all this money?

In December, the USDA's Economic Research Service forecast that when all data for 2020 is in, the median income for all farm households is expected to be $86,992. That's almost 25 percent more than the 2019 median household income for all U.S. households of $69,703.

Strickland AR 0699

Just looking at income from farming, the huge ad hoc payments of recent years have made subsidies a large chunk of total farm income.

Between 2019 and 2020, total direct government payments to farms increased by over 107 percent, bringing the share of farm income from government payments to almost 40 percent. As the graphic below shows, that pushed 2020 farm income levels significantly above the 20-year average.

**Net Farm Income, 2000-2020**



Note: F=forecast. Values are adjusted for inflation using the Gross Domestic Product chain-type price index, 2020=100.
Source: USDA, Economic Research Service, Farm Income and Wealth Statistics. Data as of December 2, 2020.

*Source: EWG, from USDA Economic Research Service, 2020 Farm Sector Income Forecast*

It's clear that even most "small" farmers are better off than the average American – in 2019, only 3 percent of all farm households had levels of wealth that were lower than the average U.S. household.

Yet during the pandemic and economic crises of last year, when millions of Americans lost their jobs, had to close their small businesses and struggled to put food on the table, taxpayers sent over $20 billion to farmers through CFAP, plus annual disaster payments. (Like other subsidies, CFAP payments went disproportionately to the largest and richest farms, rather for direct aid to hungry Americans.) And that's before we know the figure for payments through ARC and PLC.

**How To Fix the Broken Farm Subsidy System**

The Biden administration and the new Congress have many opportunities to fix the traditional commodity farm subsidy programs of ARC and PLC, and to shift funding for the ad hoc programs into conservation programs that benefit farmers, all Americans and the environment. EWG recommends:

- Ending the huge ad hoc subsidy programs of the Trump administration. MFP, which paid out over $23 billion

Bleeding Heartland

are complete, it should not be renewed unless targeted to small farmers in need.

- Increasing funding for conservation programs. Instead of sending billions to the largest and wealthiest farms, funding for existing conservation programs should be increased. These programs still give money to farmers, but they also generate public health and environmental benefits through improved water quality and soil health. These programs also encourage the adoption of conservation practices that may reduce greenhouse gas emissions.

- Reforming traditional commodity farm subsidy programs. The ARC and PLC programs need a strict means test to stop most of the payments from going to the largest farms. Currently, farmers can receive payments as long as their income is less than $900,000 a year, or $1.8 million for a farmer and spouse. There is a $125,000 annual payment limit, but a farm can have an unlimited number of "partners" that can each receive up to $125,000, allowing many people who do not live or work on the farm to get a check every year. Restricting farms to just a few eligible managers could greatly reduce the number of city slickers who get payments.

- Changing farm subsidy programs to end USDA's racist legacy. Stricter payment and income limits that would send payments to small farms, instead of the largest farms, would benefit Black, Latino and Asian American farmers, who often own smaller farms than white farmers do.

*Anne Schechinger is senior analyst of economics for the Environmental Working Group.*



*Top photo of an Iowa cornfield by Natalia Kuzmina, available via Shutterstock.*

Tags: Advocacy, Agriculture, analysis, Commentary, COVID-19, Donald Trump, Federal Budget, Federal Government, Joe Biden

**About the Author(s)**

> **Anne Schechinger**

**1 Comment**

Leave your comment below

___

**Excellent column**

If certain Iowans ran the universe, every farmer/landowner who wanted to be eligible for any Farm Bill program or subsidy would have to follow a good water-protecting conservation plan, with monitored compliance. That would provide a powerful incentive to do effective conservation while still keeping conservation optional, which conservative farm interests are fanatical about.

But the outraged political screaming caused by such a proposal would ring from sea to shining sea, so shifting a lot of farm funding to conservation would be a great and more realistic idea. Fund-shifting would still cause some screaming, however. There are powerful interests that would like to keep the current conventional ag system going until our topsoil is gone.

Also, given Iowa land prices and the promise of higher crop prices, trying to get good conservation done here via public funds could be pricey. I've heard about two wealthy farm families in this area who are known for not doing any conservation except the minimum required for Farm Bill eligibility. One of the families already turned down existing cost-share money as not being nearly enough for them to do any more conservation.

**PrairieFan** Wed 24 Feb 6:23 PM

# Comments

You must be logged in to post a comment.

•

7/27/24, 11:56 AM    After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equit…

Case 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 146 of 202    PageID 1083

USDA **U.S. DEPARTMENT OF AGRICULTURE**

# After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equitably

*USDA Reopens Program Sign-Up to a Larger Share of Producers with Plans to Expand Outreach and New Programming*

**Press Release**
Release No. 0056.21

**Contact:** USDA Press
**Email:** press@usda.gov

**WASHINGTON, March 24, 2021** — Agriculture Secretary Tom Vilsack announced today that USDA is establishing new programs and efforts to bring financial assistance to farmers, ranchers and producers who felt the impact of COVID-19 market disruptions. The new initiative—**USDA Pandemic Assistance for Producers**—will reach a broader set of producers than in previous COVID-19 aid programs. USDA is dedicating at least $6 billion toward the new programs. The Department will also develop rules for new programs that will put a greater emphasis on outreach to small and socially disadvantaged producers, specialty crop and organic producers, timber harvesters, as well as provide support for the food supply chain and producers of renewable fuel, among others. Existing programs like the Coronavirus Food Assistance Program (CFAP) will fall within the new initiative and, where statutory authority allows, will be refined to better address the needs of producers.

Strickland AR 0703

7/27/24, 11:56 AM          After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equit…

Case 2:24-cv-00060-Z     Document 30-2     Filed 07/31/24     Page 147 of 202     PageID 1084

**USDA Pandemic Assistance for Producers** was needed, said Vilsack, after a review of previous COVID-19 assistance programs targeting farmers identified a number of gaps and disparities in how assistance was distributed as well as inadequate outreach to underserved producers and smaller and medium operations.

"The pandemic affected all of agriculture, but many farmers did not benefit from previous rounds of pandemic-related assistance. The Biden-Harris Administration is committed to helping as many producers as possible, as equitably as possible," said Vilsack. "Our new **USDA Pandemic Assistance for Producers** initiative will help get financial assistance to a broader set of producers, including to socially disadvantaged communities, small and medium sized producers, and farmers and producers of less traditional crops."

USDA will reopen sign-up for CFAP 2 for at least 60 days beginning on April 5, 2021. The USDA Farm Service Agency (FSA) has committed at least $2.5 million to improve outreach for CFAP 2 and will establish partnerships with organizations with strong connections to socially disadvantaged communities to ensure they are informed and aware of the application process.

The payments announced today (under Part 3, below) will go out under the existing CFAP rules; however, future opportunities for **USDA Pandemic Assistance** will be reviewed for verified need and during the rulemaking process, USDA will look to make eligibility more consistent with the Farm Bill. Moving forward, **USDA Pandemic Assistance for Producers** will utilize existing programs, such as the Local Agricultural Marketing Program, Farming Opportunities Training and Outreach, and Specialty Crop Block Grant Program, and others to enhance educational and market opportunities for agricultural producers.

# USDA Pandemic Assistance for Producers – 4 Parts Announced Today

### Part 1: Investing $6 Billion to Expand Help & Assistance to More Producers

USDA will dedicate at least $6 billion to develop a number of new programs or modify existing proposals using discretionary funding from the Consolidated Appropriations Act

Strickland AR 0704

7/27/24, 11:56 AM        After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equit…

Case 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 148 of 202    PageID 1085

and other coronavirus funding that went unspent by the previous administration. Where rulemaking is required, it will commence this spring. These efforts will include assistance for:

- Dairy farmers through the Dairy Donation Program or other means:

- Euthanized livestock and poultry;

- Biofuels;

- Specialty crops, beginning farmers, local, urban and organic farms;

- Costs for organic certification or to continue or add conservation activities

- Other possible expansion and corrections to CFAP that were not part of today's announcement such as to support dairy or other livestock producers;

- Timber harvesting and hauling;

- Personal Protective Equipment (PPE) and other protective measures for food and farm workers and specialty crop and seafood producers, processors and distributors;

- Improving the resilience of the food supply chain, including assistance to meat and poultry operations to facilitate interstate shipment;

- Developing infrastructure to support donation and distribution of perishable commodities, including food donation and distribution through farm-to-school, restaurants or other community organizations; and

- Reducing food waste.

### *Part 2: Adding $500 Million of New Funding to Existing Programs*

USDA expects to begin investing approximately $500 million in expedited assistance through several existing programs this spring, with most by April 30. This new assistance includes:

- $100 million in additional funding for the Specialty Crop Block Grant Program, administered by the Agricultural Marketing Service (AMS), which enhances the competitiveness of fruits, vegetables, tree nuts, dried fruits, horticulture, and nursery crops.

Strickland AR 0705

7/27/24, 11:56 AM     After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equit…

Case 2:24-cv-00060-Z     Document 30-2     Filed 07/31/24     Page 149 of 202     PageID 1086

- $75 million in additional funding for the Farmers Opportunities Training and Outreach program, administered by the National Institute of Food and Agriculture (NIFA) and the Office of Partnerships and Public Engagement, which encourages and assists socially disadvantaged, veteran, and beginning farmers and ranchers in the ownership and operation of farms and ranches.

- $100 million in additional funding for the Local Agricultural Marketing Program, administered by the AMS and Rural Development, which supports the development, coordination and expansion of direct producer-to-consumer marketing, local and regional food markets and enterprises and value-added agricultural products.

- $75 million in additional funding for the Gus Schumacher Nutrition Incentive Program, administered by the NIFA, which provides funding opportunities to conduct and evaluate projects providing incentives to increase the purchase of fruits and vegetables by low-income consumers

- $20 million for the Animal and Plant Health Inspection Service to improve and maintain animal disease prevention and response capacity, including the National Animal Health Laboratory Network.

- $20 million for the Agricultural Research Service to work collaboratively with Texas A&M on the critical intersection between responsive agriculture, food production, and human nutrition and health.

- $28 million for NIFA to provide grants to state departments of agriculture to expand or sustain existing farm stress assistance programs.

- Approximately $80 million in additional payments to domestic users of upland and extra-long staple cotton based on a formula set in the Consolidated Appropriations Act, 2021 that USDA plans to deliver through the Economic Adjustment Assistance for Textile Mills program.

### Part 3: Carrying Out Formula Payments under CFAP 1, CFAP 2, CFAP AA

The Consolidated Appropriations Act, 2021, enacted December 2020 requires FSA to make certain payments to producers according to a mandated formula. USDA is now expediting these provisions because there is no discretion involved in interpreting such directives, they are self-enacting.

Strickland AR 0706

7/27/24, 11:56 AM          After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equit…

Case 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 150 of 202    PageID 1087

- An increase in CFAP 1 payment rates for cattle. Cattle producers with approved CFAP 1 applications will automatically receive these payments beginning in April. Information on the additional payment rates for cattle can be found on farmers.gov/cfap. Eligible producers do not need to submit new applications, since payments are based on previously approved CFAP 1 applications. USDA estimates additional payments of more than $1.1 billion to more than 410,000 producers, according to the mandated formula.

- Additional CFAP assistance of $20 per acre for producers of eligible crops identified as CFAP 2 flat-rate or price-trigger crops beginning in April. This includes alfalfa, corn, cotton, hemp, peanuts, rice, sorghum, soybeans, sugar beets and wheat, among other crops. FSA will automatically issue payments to eligible price trigger and flat-rate crop producers based on the eligible acres included on their CFAP 2 applications. Eligible producers do not need to submit a new CFAP 2 application. For a list of all eligible row-crops, visit farmers.gov/cfap. USDA estimates additional payments of more than $4.5 billion to more than 560,000 producers, according to the mandated formula.

- USDA will finalize routine decisions and minor formula adjustments on applications and begin processing payments for certain applications filed as part of the CFAP Additional Assistance program in the following categories:

  - Applications filed for pullets and turfgrass sod;

  - A formula correction for row-crop producer applications to allow producers with a non-Actual Production History (APH) insurance policy to use 100% of the 2019 Agriculture Risk Coverage-County Option (ARC-CO) benchmark yield in the calculation;

  - Sales commodity applications revised to include insurance indemnities, Noninsured Crop Disaster Assistance Program payments, and Wildfire and Hurricane Indemnity Program Plus payments, as required by statute; and

  - Additional payments for swine producers and contract growers under CFAP Additional Assistance remain on hold and are likely to require modifications to the regulation as part of the broader evaluation and future assistance; however, FSA will continue to accept applications from interested producers.

*Part 4: Reopening CFAP 2 Sign-Up to Improve Access & Outreach to Underserved Producers*

7/27/24, 11:56 AM    After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equit…

Case 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 151 of 202    PageID 1088

As noted above, USDA will re-open sign-up for of CFAP 2 for at least 60 days beginning on April 5, 2021.

- FSA has committed at least $2.5 million to establish partnerships and direct outreach efforts intended to improve outreach for CFAP 2 and will cooperate with grassroots organizations with strong connections to socially disadvantaged communities to ensure they are informed and aware of the application process.

Please stay tuned for additional information and announcements under the **USDA Pandemic Assistance to Producers** initiative, which will help to expand and more equitably distribute financial assistance to producers and farming operations during the COVID-19 national emergency. Please visit www.farmers.gov for more information on the details of today's announcement.

USDA touches the lives of all Americans each day in so many positive ways. In the Biden-Harris administration, USDA is transforming America's food system with a greater focus on more resilient local and regional food production, ensuring access to healthy and nutritious food in all communities, building new markets and streams of income for farmers and producers using climate-smart food and forestry practices, making historic investments in infrastructure and clean-energy capabilities in rural America, and committing to equity across the Department by removing systemic barriers and building a workforce more representative of America. To learn more, visit www.usda.gov.

#

USDA is an equal opportunity provider, employer, and lender.

Strickland AR 0708

**Report to Congress**

**A Comparison of Transfers and Subsidies to Minority and Non-Minority Producers
Associated with Key Farm and Conservation Programs**

**as**

**Requested by House Report 116-107**

**Prepared by:**

**FPAC Business Center/Economic and Policy Analysis Division**

**FPAC Business Center/Civil Rights Division**

**FPAC/Farm Service Agency**

**FPAC/Natural Resources Conservation Service**

**August 5, 2021**

1

Strickland AR 0709

**Executive Summary**

House Report 116-107 requests that the U.S. Department of Agriculture (USDA) provide to the House Committee on Appropriations "a report on the distribution of farm subsidies, low-interest loans, and cost-share conservation programs and its impact on minority-owned farms."[1] Administrative data from the Farm Service Agency (FSA) and Natural Resources Conservation Service (NRCS) are used in this report to identify transfers and subsidies for select programs to minority and non-minority producers for (depending on the program) either program years 2015-2019 or program years 2015-2020.

Data from the 2017 Census of Agriculture indicate that nearly 8 percent of U.S. producers identified as minorities. Minorities accounted for 8 percent or fewer of the FSA and NRCS program payees analyzed in this report, with the exception of the Livestock Forage Program (LFP), at 10 percent, and the Environmental Quality Incentives Program (EQIP), at 11 percent. While minority producers accounted for 12 percent of EQIP payments between fiscal years 2015 and 2020, payments to minority producers did not exceed 8 percent for any other conservation or farm program. In general, minority producers accounted for a larger share of conservation program payees and payments than they did farm program payees and payments.

Much interest surrounds minority farmer participation in farm loan programs, and these programs are examined in depth, including primary loan servicing. Primary loan servicing is available to delinquent or distressed borrowers and may allow for restructuring, amortization with longer terms, and lower rates. On average, non-minority borrowers who received primary loan servicing had an average 71-basis point reduction in their rate, amounting to an average of $297 per borrower per year in interest subsidy. Minority borrowers received an average 82-basis point reduction from primary loan servicing, amounting to an average $309 subsidy per borrower per year. Minorities represented 6.6 percent of all borrowers receiving an interest write down.

The value of the explicit interest subsidy on an annual basis was estimated for down-payment and participation loans. The subsidy rate for obligations is the difference between the regular farm ownership interest rate and the interest rate for down-payment or participation loans. Between program years 2015 and 2020, FSA provided an explicit interest rate subsidy of $45.5 million (95 percent) to non-minorities and $2.2 million (5 percent) to minorities. The average subsidy per borrower was $2,664 for non-minorities and $2,235 for minorities.

FSA and NRCS continue to examine outreach and education processes to improve producer awareness and increase program participation. Solid steps are being taken to increase both awareness and participation in programs through employee outreach training, more in-depth data analysis, and stakeholder engagement and employee education regarding minority barriers and cultural sensitivities.

**Introduction**

---

[1] The definition of "minority" for the majority of programs in this report is based on the definition of "socially disadvantaged farmer or rancher" in section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)). We use the terms "minority," "socially disadvantaged (SDA)," and "historically underserved" as program guidance uses these definitions. Data used in this report are for racial and ethnic demographics.

2

The Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Bill, 2020 (H. Rept. 116-107) requests that USDA provide to the Committee "a report on the distribution of farm subsidies, low-interest loans, and cost-share conservation programs and its impact on minority-owned farms."

The definition of "minority" for the majority of programs in this report is based on the definition of "socially disadvantaged farmer or rancher" in section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)). We use the terms "minority," "socially disadvantaged" (SDA), and "historically underserved" in this report as program guidance uses these definitions. Data used in this report are for racial and ethnic demographics.

This report examines the distribution of benefits and payments associated with key farm subsidy, low-interest loan, and cost-share conservation programs managed by FSA and NRCS. Not all FSA subsidy programs are analyzed; rather, programs were chosen based on the volume of payments and to provide a comparison between longstanding farm bill ("mandatory") programs, other programs, and recent ad hoc programs.[2] Programs analyzed include:

- Safety Net Programs
  - ➤ Agriculture Risk Protection/Price Loss Coverage (ARC/PLC)
  - ➤ Livestock Indemnity Program (LIP)
  - ➤ Livestock Forage Program (LFP)

- Ad Hoc Programs
  - ➤ Market Facilitation Program (MFP)
  - ➤ Coronavirus Food Assistance Program (CFAP)

- Conservation Programs
  - ➤ Conservation Reserve Program (CRP)
  - ➤ Environmental Quality Incentives Program (EQIP)
  - ➤ Conservation Stewardship Program (CSP)
  - ➤ Agricultural Management Assistance (AMA)

- Farm Loan Programs
  - ➤ Direct Loan Programs with an Explicit Interest Rate Subsidy
    - ▪ Down-payment Loans
    - ▪ Participation Loans
    - ▪ Primary Loan Servicing
  - ➤ Total Value of Interest Rate Subsidy for Direct Loans

The safety net and ad hoc programs listed above have specific eligibility criteria with payments (cash transfers) based on the size of operation (typically in terms of some measure of acreage or number of animals). Conservation programs involve financial assistance and, in the case of CRP cash transfers in the form of annual rental payments. In contrast, farm loan programs are credit

---

[2] Crop insurance is not included given that subsidies are expressed as a discount on a producer's premium bill and are not transfer payments. If a producer purchases insurance and has no losses, the producer has received no net payment from the government.

Strickland AR 0711

programs that can contain an interest rate subsidy. As a result, a different approach is used to analyze subsidy issues for these programs and a more detailed analysis is provided in the report

Along with 2017 Census of Agriculture data, administrative data from FSA and NRCS for program years 2015-2019 or program years 2015-2020 form the basis for this report. Several notes are important to understanding the administrative data:

***Producer race and ethnicity data***—Historically, FSA employees would record the race and ethnicity of its customers based either on self-reporting by customers or often from visual observations by FSA staff. Currently, in accordance with Departmental Regulation 4370-001, farm program participants' reporting of race and ethnicity is entirely voluntary unless the applicant wishes to qualify for socially disadvantaged-targeted funds associated with FSA credit programs. With future customers, FSA is transitioning away from any employee and third-party observations and relying on voluntary self-reporting by customers. The data tables in this report rely on historical reporting of race and ethnicity which includes third-party observations by FSA staff.

If an FSA customer voluntarily provides race and ethnicity information on the AD-2106 or AD-2047 form for a farm program (such as ARC/PLC or CFAP), it is "Customer Declared." If the race or ethnicity of a customer is observed by an FSA employee or other third party, it is "Not Verified."

As shown in Table 1, the "Not Verified" category accounts for a large portion of the race and ethnicity data captured by FSA. The data in this report regarding FSA programs rely on both the "Customer Declared" and "Not Verified" data.

Table 1.  Proportion of FSA Minority Customers in FSA Data System by Method Identified: "Customer Declared" vs. "Not Verified"

|  | Asian, Pacific Islander, Hawaiian Native | Black or African American | American Indian and Alaska Native | Hispanic | White | Any Racial/Ethnic Minority |
|---|---|---|---|---|---|---|
| Customer Declared | 29% | 19% | 18% | 33% | 13% | 23% |
| Not Verified | 71% | 81% | 82% | 67% | 87% | 77% |

Source:  FSA Business Partner data system; accessed February 23, 2021.

NRCS uses a different data collection strategy, in addition to the use of the AD-2106 as authorized by DR 4370-001. NRCS conservation program applications contain a section where the producer may self-certify as socially disadvantaged. This election is available for all NRCS programs as many programs offer benefits in ranking or advanced payments to socially disadvantaged producers. This option involves "checking a box," which confirms that the producer is socially disadvantaged but does not ask for specifics regarding race or ethnicity. Thus, the NRCS data presented in this report include only "Customer Declared" data.

Strickland AR 0712

***Race and ethnicity reporting varies throughout the report depending on the data source***—For the 2017 Census of Agriculture data (Figure 1), individuals can report more than one race in addition to ethnicity, and producers are included in each category they report. If a producer declares that they are both "Black" and "Hispanic," then they appear in both categories. Similarly, if a producer declares both "Black" and "White," then they appear in both categories.

In contrast, most tables in this report use a more streamlined approach where a producer can be in only one category (Tables 2-11, 13, 15, 17, and 18). For the NRCS programs, any producer may self-certify as minority and all who do not are considered non-minority (no unknowns). For the FSA non-credit programs and CRP, producers who self-identified or were identified by local FSA staff as a racial minority or Hispanic ("not verified") are categorized as minorities, while producers who self-identified or were identified by FSA staff ("not verified") as White and not Hispanic are categorized as non-minority. Any others are considered "minority status unknown" (see discussion below). Thus, for FSA farm programs, all NRCS programs, and Farm Loan Programs, if a producer declares both "Black" and "Hispanic" or "White" and "Black," he or she appears just once in the "minority" category (see Tables 2-11, 13, 15, 17, and 18).

Data collection for Farm Loan Programs has a different history. The Farm Loan Programs section of this report contains a set of tables and maps (Tables 12, 14, 16, Figures 6, 7, and 8) that show distinct race and Hispanic categories. A producer declaring both "Black" and "Hispanic" will be reported in both categories. In addition, a producer can report up to five races. However, only one racial category is provided for **reporting** purposes to avoid duplication and the reporting of over 100 possible combinations. For borrowers choosing more than one race, Farm Loan Programs has historically identified race or ethnicity for reporting purposes in alphabetical order: Asian, Black, Native Indian/Alaska Native, Pacific Islander/Hawaiian, White.[3]

***Minority status unknown***—The administrative data tables appearing in this report contain a "minority status unknown" category. Corporations, partnerships, LLCs, and other entities may designate as to race and ethnicity (although it is not required). (See footnote for detail.)[4] Those who do not designate appear in the "minority status unknown" category.

***Producers include both owners and operators***—Both Census and USDA data include owners and operators as producers, since farm operators are involved in making day-to-day management decisions and can be eligible for many of the programs covered in this report. Producers who meet eligibility requirements may participate in more than one of the programs discussed in this report.

## Census Data on the Race and Ethnicity of Farm Producers

The Census of Agriculture, conducted every five years, provides context as to the proportion of minority farmers relative to total U.S. farmers. The Census of Agriculture is a complete count of

---

[3] For example, a borrower declaring "Asian" and any other racial category is reported as "Asian." A Black producer with any other race (other than "Asian") would be reported as "Black."

[4] The race, ethnicity, and gender data selection and system requirements for both individuals and entities are in Handbook 11-CM subparagraph 60 C, page 3-39. See: https://www.fsa.usda.gov/Internet/FSA_File/11-cm_r00_a03.pdf.

Strickland AR 0713

U.S. farms and ranches and the people who operate them. Even small plots of land—whether rural or urban—are counted if $1,000 or more of agricultural products were produced and sold, or normally would have been sold, during the Census year. The most recent Census year for which data were collected is 2017. USDA's National Agricultural Statistics Service (NASS) mailed 2017 Census of Agriculture questionnaires to farm and ranch operators in December 2017 to collect data for the 2017 calendar year.

This report takes the broadest approach for counting racial and ethnic minority producers. The 2017 Census of Agriculture collected data on up to four[5] producers from each of the nation's two million farms for a total of 3.4 million producers (Figure 1). All of these producers are counted, and if a producer reports more than one race (or race and Hispanic ethnicity), they are included in each category and therefore categories will sum to more than the total.[6]

The vast majority of producers, 96.2 percent, identified as White (Figure 1). The next largest racial category[7] was American Indian or Alaska Native, accounting for 2.3 percent of producers. Black or African American producers were 1.4 percent of all producers. Asian producers were 0.7 percent, and Pacific Islander, and Native Hawaiian producers accounted for 0.2 percent. In a separate question, Hispanic producers were 3.3 percent of the total. Combined, all minorities accounted for just under 8 percent of all U.S. producers.

Figure 1. Number of U.S. Producers by Race/Ethnicity,[a] 2017



[a] Producers may report (and be included in) more than one race, or by race and in the Hispanic category.
Source: 2017 U.S. Census of Agriculture.

Figure 2 shows farm specialization and average acreage for operations by different race and ethnicity categories. Several of the programs discussed later in this report have eligibility requirements based on crop type and other considerations. The differences in farm type and size among producers of different race/ethnicity is one contributing reason to the differences in payments detailed later.

---

[5] Fifty-four percent of farms had multiple producers.
[6] Note that other sources may take alternative approaches and calculate different totals than reported here.
[7] NASS publishes profiles that contain additional information about minority producers. See:
https://www.nass.usda.gov/Publications/AgCensus/2017/Online_Resources/Race,_Ethnicity_and_Gender_Profiles/cpd99000.pdf.

Strickland AR 0714

Figure 2. Percent of Farm Specialization and by Race/Ethnicity,[a] 2017



[a] Producers may report (and be included in) more than one race, or by race and in the Hispanic category.
Source: 2017 U.S. Census of Agriculture.

## Safety Net Programs

### Agriculture Risk Coverage-County (ARC-CO) and Price Loss Coverage (PLC)

The ARC-CO and PLC programs, first authorized by the Agricultural Act of 2014 (the 2014 Farm Bill), are administered by FSA. ARC-CO provides payments when actual crop revenue declines below a specified guarantee level established for the county in any given year, while PLC provides payments when the national effective price for a covered commodity falls below

Strickland AR 0715

its effective reference price. Producers must have base acres[8] associated with one of the 22 covered commodities[9] to be eligible for payment.

Table 2 shows the ARC-CO and PLC payee count and payments for non-minorities, minorities, and producers with unknown minority status over program years 2015-2019 and for the total of the years. (Note that a program year for ARC-CO and PLC encompasses a variety of different crop marketing years. Further, marketing year price data are necessary to compute ARC/PLC payments for every crop. As a result, program year 2018 payments for most crops, for example, were released in October of 2019. Payments for the last cycle of crops in any given year are made in February.

Table 2. Combined Agriculture Risk Coverage-County (ARC-CO) and Price Loss Coverage (PLC) Data, Program Years 2015–2019[a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| 2015 | 754,632 | $7,401,071,980 | 14,928 | $74,168,568 | 31,338 | $451,517,296 |
| 2016 | 711,468 | $6,539,336,815 | 14,505 | $88,404,459 | 30,685 | $458,517,660 |
| 2017 | 533,893 | $2,849,618,446 | 12,533 | $45,931,292 | 24,124 | $228,931,256 |
| 2018 | 478,762 | $2,367,350,333 | 12,193 | $42,065,745 | 23,781 | $212,333,976 |
| 2019 | 694,781 | $5,684,489,089 | 13,347 | $81,700,646 | 37,250 | $480,976,184 |
| 5-year average | 634,707 | $4,968,373,333 | 13,501 | $66,454,142 | 29,436 | $366,455,274 |

[a] The data for this report were developed early in calendar 2021, prior to the end of the 2020 ARC/PLC program year.

Non-minorities accounted for an average of 634,707 ARC-CO and PLC payees per year (94 percent) and an average of $4.97 billion in payments per year (92 percent) for the 2015-2019 program years. Minorities accounted for an average of 13,501 payees per year (2 percent) and an average of $66.45 million of payments per year (1 percent). USDA had no race or ethnicity data on the remaining payees.

**Livestock Indemnity Program (LIP)**

LIP, also administered by FSA, originated in the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill). It provides benefits to eligible livestock owners or contract growers for livestock deaths in excess of normal mortality caused by eligible loss conditions, including

---

[8] All programs discussed in this report require that a producer must: 1) be in compliance with highly erodible land conservation and wetland conservation provisions, and 2) have an average adjusted gross income that does not exceed $900,000 for the three most recent tax years. ARC/PLC is the only program containing a base acre requirement. Minority producers held 1 percent of enrolled base in 2019 that can be attributed by minority status. See Appendix for detailed data and information.

[9] The 22 covered commodities are: wheat, oats, barley, corn, grain sorghum, long grain rice, medium/short grain rice, temperate japonica rice, seed cotton, dry peas, lentils, large and small chickpeas, soybeans, peanuts, sunflower seed, canola, flaxseed, mustard seed, rapeseed, safflower, crambe, and sesame seed.

Strickland AR 0716

eligible adverse weather, eligible disease, and attacks by animals reintroduced into the wild by the Federal government or protected by federal law, including wolves and avian predators. The eligible loss condition must have directly resulted in the producer's livestock either dying or being injured and sold at a reduced price.

Table 3. Livestock Indemnity Program (LIP) Data, Program Years 2015–2019[a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| 2015 | 6,234 | $42,888,418 | 214 | $2,092,693 | 108 | $3,021,438 |
| 2016 | 3,170 | $19,954,717 | 150 | $735,195 | 68 | $918,126 |
| 2017 | 2,746 | $25,480,839 | 537 | $6,133,400 | 123 | $4,264,282 |
| 2018 | 5,164 | $29,532,504 | 339 | $3,689,226 | 141 | $2,087,314 |
| 2019 | 9,821 | $70,368,406 | 423 | $4,391,258 | 389 | $7,323,028 |
| 5-year average | 5,427 | $37,644,977 | 333 | $3,408,354 | 166 | $3,522,838 |

[a] Sign-up for the 2020 LIP program was not final until March 2021; hence, the 2020 data are not included here.

Table 3 details the number of LIP payees and payment totals for program years 2015-2019 by minority status. Non-minorities accounted for an average of 5,427 LIP payees per year (92 percent) and $37.64 million of payments per year (84 percent) for the 2015 through 2019 program years. Minorities accounted for an average of 333 payees per year (6 percent) and $3.41 million in payments per year (8 percent). USDA had no race or ethnicity data on the remaining payees.

**Livestock Forage Disaster Program (LFP)**

LFP, also originating in the 2008 Farm Bill and administered by FSA, provides payments to eligible livestock owners and contract growers who have covered livestock and who are also producers of grazed forage crop acreage (native and improved pasture land with permanent vegetative cover or certain crops planted specifically for grazing) that have suffered a loss of grazed forage due to a qualifying drought during the normal grazing period for the eligible county.[10] To be eligible for LFP, the grazing or pastureland must be physically located in a county rated by the U.S. Drought Monitor as in at least D2 (severe drought) status.[11]

---

[10] Eligible livestock graze forage grasses or legumes and include such species as alpacas, beef cattle, buffalo/bison, beefalo, dairy cattle, deer, elk, emus, equine, goats, llamas, reindeer or sheep. Within those species, animals that are eligible include those that are, or would have been, grazing the eligible grazing land or pastureland: 1) during the normal grazing period for the specific type of grazing land or pastureland for the county; or 2) when the Federal agency prohibited the livestock owner or contract grower from having livestock graze the normally permitted livestock on the managed rangeland due to fire.

[11] LFP also provides payments to eligible livestock owners or contract growers that have covered livestock and who are also producers of grazed forage crop acreage on rangeland managed by a Federal agency if the eligible livestock producer is prohibited by the Federal agency from grazing the normal permitted livestock on the managed rangeland due to a qualifying fire. The qualifying drought and qualifying grazing losses, and/or notification of prohibition to graze Federal land due to fire, must have occurred in the grazing period and crop year.

Strickland AR 0717

Table 4. Livestock Forage Disaster Program (LFP) Data, Program Years 2015–2019 [a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| 2015 | 58,779 | $478,636,786 | 7908 | $30,082,767 | 1330 | $22,653,822 |
| 2016 | 55,236 | $261,204,256 | 4975 | $14,048,028 | 841 | $9,733,498 |
| 2017 | 45,643 | $319,726,632 | 3730 | $21,319,693 | 1099 | $16,475,263 |
| 2018 | 76,931 | $437,584,492 | 7383 | $26,190,994 | 1978 | $23,068,227 |
| 2019 | 27,183 | $102,049,095 | 4384 | $9,746,737 | 748 | $6,005,567 |
| 5-year average | 52,754 | $ 319,840,252 | 5,676 | $20,277,644 | 1,199 | $15,587,275 |

[a] Sign-up for the 2020 LFP program was not final until February 2021; hence, the 2020 data are not included here.

Table 4 details the number of LFP payees and payment totals for program years 2015-2019 by minority status. Non-minorities accounted for an average of 52,754 LFP payees per year (88 percent) and an average of $319.84 million of payments per year (90 percent) for the 2015 through 2019 program years. Minorities accounted for an average of 5,676 payees per year (10 percent) and $20.28 million of payments per year (6 percent). USDA had no race or ethnicity data on the remaining payees. Note that minority LFP payments are higher than for many other farm programs. According to the 2017 Census of Agriculture, approximately 56 percent of all minority producers are located in Texas, California, Oklahoma, New Mexico, and Arizona—which have all experienced significant drought in recent years.

## Ad Hoc Programs

### Market Facilitation Program (MFP)

MFP, an ad hoc program using CCC Charter Act authority, was administered by FSA. It provided assistance to farmers and ranchers whose commodities in 2018 and 2019 were directly impacted by foreign retaliatory tariffs, resulting in the loss of traditional export markets. Program details were somewhat different in a comparison of 2018 and 2019 MFP. The 2018 MFP provided direct payments to help corn, cotton, sorghum, soybean, wheat, dairy, hog, shelled almond, and fresh sweet cherry producers. For crops, the payment was based on 2018 production.

In contrast, 2019 MFP assistance was available for producers of non-specialty crops,[12] dairy, hogs, and select specialty crops.[13] Assistance in 2019 for non-specialty crops was based on a single-county payment rate multiplied by a farm's total plantings of MFP-eligible crops in aggregate. Specialty crop producers received a payment based on 2019 acres of fruit or nut bearing plants, or in the case of ginseng, based on reported acres in 2019.

---

[12] Eligible non-specialty crops were: alfalfa hay, barley, canola, corn, crambe, dried beans, dry peas, extra-long staple cotton, flaxseed, lentils, long grain and medium grain rice, millet, mustard seed, oats, peanuts, rapeseed, rye, safflower, sesame seed, small and large chickpeas, sorghum, soybeans, sunflower seed, temperate japonica rice, triticale, upland cotton, and wheat. This acreage must have been planted by August 1, 2019, to be considered eligible for MFP payments.

[13] Eligible specialty crops were: almonds, cranberries, cultivated ginseng, fresh grapes, fresh sweet cherries, hazelnuts, macadamia nuts, pecans, pistachios, and walnuts.

10

Table 5. Market Facilitation Program (MFP) Data, Program Years 2018-2019

|  | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
|  | Payees | Payments | Payees | Payments | Payees | Payments |
| 2018 | 552,828 | 7,941,683,376 | 7,191 | 64,897,740 | 30,651 | 619,175,657 |
| 2019 | 612,210 | 13,153,507,091 | 10,274 | 168,101,106 | 35,538 | 1,176,855,183 |
| 2-year average | 582,519 | $10,547,595,234 | 8,733 | $116,499,423 | 33,095 | $898,015,420 |

Table 5 details the number of MFP payees and payments for 2018 and 2019 by minority status. Non-minorities accounted for an average of 582,519 MFP payees per year (93 percent) and an average of $10.55 billion of payments per year (91 percent) in 2018 and 2019, while minorities accounted for an average of 8,733 payees per year (1 percent) and an average of $116.50 million in payments per year (1 percent).

**Coronavirus Food Assistance Program (CFAP)**

CFAP, with funding provided by the Coronavirus Aid, Relief, and Economic Stability Act (CARES Act) and the CCC Charter Act, was administered by FSA via two programs—CFAP 1 and CFAP 2. They provided direct relief to producers who faced price declines and additional marketing costs due to the COVID-19 pandemic. Eligible producers of specified commodities were eligible for CFAP 1 payments if they suffered a 5 percent-or-greater price decline as a result of the COVID-19 pandemic and faced substantial marketing costs for inventories. The deadline for most producers to apply for CFAP 1 was September 11, 2020. Certain producers in Louisiana, Oregon, and Texas could apply through October 9, 2020.

CFAP 2 also provided producers with financial assistance to absorb some of the increased marketing costs associated with the COVID-19 pandemic. CFAP 2 sign-up opened on September 21 and ran through December 11, 2020;[14] commodity eligibility for CFAP 2[15] was broader than for CFAP 1.

Table 6. Coronavirus Food Assistance Program (CFAP) Data, through January 27, 2021

|  | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
|  | Payees | Payments | Payees | Payments | Payees | Payments |
| CFAP 1 | 595,302 | 9,047,821,024 | 28,962 | 375,755,073 | 27,609 | 1,172,717,079 |
| CFAP 2 | 817,919 | 11,442,486,251 | 31,860 | 348,928,936 | 43,738 | 1,539,200,507 |
| CFAP average | 706,611 | $10,245,153,638 | 30,411 | $362,342,005 | 35,674 | $1,355,958,793 |

Table 6 details the number of payees and payment totals for CFAP through January 27, 2021 by minority status. Non-minorities accounted for an average of 706,611 CFAP payees (91 percent) and an average of $10.25 billion in payments (86 percent), while minorities accounted for an

---

[14] On March 24, 2021, USDA announced that sign-up for CFAP 2 would be re-opened for at least 60 days beginning on April 5, 2021. This report covers CFAP payments through January 27, 2021.
[15] See https://www.farmers.gov/cfap1 and https://www.farmers.gov/cfap2 for eligible commodities.

Strickland AR 0719

average of 30,411payees (4 percent) and an average of $362.34 million of payments (3 percent). USDA had no race or ethnicity data on the remaining payees.

## Conservation Programs[16]

### Conservation Reserve Program (CRP)

FSA's CRP, first established in the Food Security Act of 1985 (the 1985 Farm Bill), involves producer entry into voluntary contracts so that environmentally sensitive agricultural land is not farmed but is instead devoted to conservation benefits. CRP participants establish long-term, resource-conserving plant species, such as approved grasses or trees to control soil erosion, improve water quality, and develop wildlife habitat. In return, FSA provides participants with rental payments and cost-share assistance. Contract duration is between 10 and 15 years. Cost-share assistance cannot be more than 50 percent of the participants' costs to establish approved practices.

Table 7. Conservation Reserve Program (CRP) Cost-Share Assistance Data, Fiscal Years 2015-2020average251265724

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| 2015 | 35,261 | $62,989,845 | 329 | $805,754 | 1,433 | $4,104,480 |
| 2016 | 48,593 | $99,090,866 | 387 | $1,377,847 | 2,218 | $5,990,036 |
| 2017 | 50,205 | $103,259,989 | 399 | $1,754,306 | 2,501 | $7,038,261 |
| 2018 | 51,339 | $99,815,169 | 470 | $961,837 | 2,817 | $7,505,325 |
| 2019 | 36,642 | $46,686,318 | 271 | $616,062 | 2,054 | $3,868,754 |
| 2020 | 30,905 | $33,573,382 | 203 | $314,031 | 1,878 | $2,559,830 |
| 6-year average | 42,158 | $74,235,928 | 343 | $971,639 | 2,150 | $5,177,781 |

Table 7 details the number of CRP payees and cost-share payment totals for fiscal years (FYs) 2015-2020 by minority status. Non-minorities accounted for an average of 42,158 CRP cost-share assistance payees per year (94 percent) for the 2015 through 2020 fiscal years with an average of $74.24 million of payments per year (92 percent), while minorities accounted for an average of 343 payees per year (1 percent) and an average of $971,639 of payments per year (1 percent).

### Environmental Quality Incentives Program (EQIP)

---

[16] The statutory language refers to "cost-share" conservation programs; as a result, only cost-share payments are reported in this section.

Strickland AR 0720

EQIP, first authorized by the Federal Agriculture Improvement and Reform Act of 1996 (the 1996 Farm Bill), is administered by NRCS. EQIP provides financial and technical assistance to agricultural producers to address natural resource concerns and deliver environmental benefits such as improved water and air quality, conserved ground and surface water, increased soil health and reduced soil erosion and sedimentation, improved or created wildlife habitat, and mitigation against drought and increasing weather volatility.

EQIP provides special provisions for historically underserved participants including socially disadvantaged producers (racial or ethnic minorities), limited resource farmers, beginning farmers and ranchers, and veteran farmers and ranchers.[17] EQIP pays up to 75 percent of the estimated incurred cost of practice implementation, and up to 90 percent of the estimated incurred cost for qualifying historically underserved producers. In addition, historically underserved producers are eligible for advance payments under EQIP to help offset the costs of purchasing materials or contracting. The 2018 Farm Bill authorized historically underserved producers to elect to receive an advanced payment of not less than 50 percent of the EQIP conservation practice payment amount. Upon completion of the conservation practice, the historically underserved producer receives the remainder of the conservation practice payment amount.

Table 8. Environmental Quality Incentives Program (EQIP) Payment Data, Fiscal Years 2015–2020

| Year | Non-Minorities | | Minorities | |
|---|---|---|---|---|
| | Payees | Payments | Payees | Payments |
| 2015 | 26,290 | $641,886,700 | 2,811 | $73,268,216 |
| 2016 | 28,995 | $745,047,809 | 3,390 | $98,896,819 |
| 2017 | 30,976 | $784,767,950 | 3,712 | $108,889,485 |
| 2018 | 34,863 | $804,460,153 | 4,593 | $121,629,698 |
| 2019 | 35,696 | $598,883,245 | 4,021 | $79,803,368 |
| 2020 | 29,926 | $131,875,539 | 3,679 | $21,311,505 |
| 6-year average | 31,124 | $617,820,233 | 3,701 | $83,966,515 |

Table 8 details the number of EQIP payees and payment totals for FYs 2015-2020 by minority status. Non-minorities accounted for an average of 31,124 EQIP payees per year (89 percent) and $617.82 million of EQIP payments per year (88 percent), while minorities accounted for an average of 3,701 payees per year (11 percent) and $83.97 million of payments per year (12 percent).

**Conservation Stewardship Program (CSP)**

CSP, also administered by NRCS, began with the 2008 Farm Bill and helps producers maintain and improve their existing conservation systems and adopt additional conservation activities to address priority resource concerns. CSP addresses various resource concerns including soil

---

[17] For more information, see: https://www.nrcs.usda.gov/wps/portal/nrcs/main/national/people/outreach/slbfr/

Strickland AR 0721

quality, soil erosion, water quality, water quantity, air quality, plant resources, and animal resources as well as energy. CSP pays participants for conservation performance—the higher the performance, the higher the payment.

Table 9. Conservation Stewardship Program (CSP) Payment Data, Fiscal Years 2015–2020

| Year | Non-Minorities | | Minorities | |
|------|--------|----------|--------|----------|
| | Payees | Payments | Payees | Payments |
| 2015 | 15,593 | $1,299,709,440 | 643 | $52,899,598 |
| 2016 | 11,080 | $895,720,973 | 620 | $38,744,214 |
| 2017 | 11,393 | $686,687,691 | 533 | $24,304,810 |
| 2018 | 9,894 | $435,821,763 | 479 | $14,539,790 |
| 2019 | 5,255 | $116,558,123 | 370 | $7,411,397 |
| 2020 | 6,235 | $51,042,106 | 428 | $2,451,169 |
| 6-year average | 9,908 | $580,923,349 | 512 | $23,391,830 |

Table 9 details the number of CSP payees and payment totals for FYs 2015-2020 by minority status. Non-minorities accounted for an average of 9,908 CSP payees per year (95 percent) and over $580.92 million of CSP payments per year (96 percent), while minorities accounted for an average of 512 payees per year (5 percent) and $23.39 million of payments per year (4 percent).

**Agricultural Management Assistance (AMA)**

AMA, first authorized by the Agricultural Risk Protection Act of 2000, helps agricultural producers manage financial risk through diversification, marketing, or natural resource conservation practices. NRCS administers the conservation provisions while USDA's Agricultural Marketing Service and Risk Management Agency implement the production diversification and marketing provisions. NRCS provides technical and financial assistance to AMA participants to address issues such as water management, water quality, and erosion control by incorporating conservation practices into their agricultural operations. AMA is only available in the sixteen states where crop insurance participation is historically low.

Table 10. Agricultural Management Assistance (AMA) Program Data, Fiscal Years 2015–2020

| Year | Non-Minorities | | Minorities | |
|------|--------|----------|--------|----------|
| | Payees | Payments | Payees | Payments |
| 2015 | 147 | $2,544,548 | 13 | $135,834 |
| 2016 | 233 | $2,809,554 | 10 | $124,338 |
| 2017 | 281 | $3,184,177 | 28 | $252,719 |
| 2018 | 129 | $2,025,268 | 10 | $64,453 |
| 2019 | 184 | $1,635,244 | 23 | $185,779 |
| 2020 | 418 | $722,357 | 30 | $26,028 |
| 6-year average | **232** | $2,153,525 | **19** | $131,525 |

Strickland AR 0722

Table 10 details the number of AMA payees and payment totals for FYs 2015-2020 by minority status. Non-minorities accounted for an average of 232 AMA payees per year (92 percent) and an average of $2.15 million of AMA payments per year (94 percent), while minorities accounted for an average of 19 payees per year (8 percent) and an average of $131,525 of payments per year (6 percent).

## Credit Programs

USDA's FSA provides farmers with low-interest loans, authorized under the Consolidated Farm and Rural Development Act of the Agricultural Act of 1961, as amended. The interest-rate subsidies associated with these loans can be explicit or implicit. For this report, an explicit interest subsidy is the interest amount provided to the borrower below the Federal Government's cost of funds, which was presumed to be the rate charged by FSA on regular direct farm ownership loans (DFOs) or direct operating loans (DOLs). An implicit subsidy occurs when the interest rate to the borrower compensates the Government for the cost of funds but is still below rates charged by commercial lenders.

Several programs[18] administered by FSA include an explicit interest subsidy, including direct farm ownership down-payment and participation loans.[19] The explicit interest rate subsidy is the difference between the regular farm ownership interest rate (which are made at the government cost of funds) and the interest rate for down-payment or participation loans. Though FSA has made few in recent years, the emergency loan program also includes an explicit interest rate subsidy equal to the difference between rates on regular DOLs and EM loans. Figure 3 shows average loan interest rates since 2015 for regular DFO loans, DFO down-payment loans, DFO participation loans, and Emergency Loans (EM). DFO down-payment loans are made at 4 percent below the current regular DFO rate with a floor at 1.5 percent. DFO participation loans are made at 2 percent below the current regular DFO rate with a floor at 2.5 percent.

With interest rates on FSA regular farm loans below 5 percent over the past 5 years, the DFO and DOL statutory floor of 5 percent (the limited resource rate) is less relevant.  In addition, regular DOL rates declined such that EM loans have not provided an explicit interest rate subsidy to farmers. Borrowers may also receive an explicit interest rate subsidy through the limited resource program, but as is the case with EM loans, limited resource rates have been above regular program rates over the past 5 years, negating their need.

---

[18] See https://www.fsa.usda.gov/programsand-services/farm-loan-programs/.
[19] For more information on these loans, see:  https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/2019/sda_loansfact_sheet-aug_2019.pdf and https://www.fsa.usda.gov/programsand-services/farm-loan-programs/farm-ownership-loans/index.

Strickland AR 0723

Figure 3. Average Interest Rates on New Direct Loans by Month, 2015–2020



Source: USDA FSA OBFN Database
Note: Gaps in Emergency Loan line indicate no loans occurring in that month.

Borrowers can also receive an explicit interest rate subsidy through primary loan servicing.[20] Primary loan servicing is available to borrowers who are 90 days delinquent on any direct loan. In addition, any borrower experiencing financial distress may request primary loan servicing, even if not 90 days delinquent. Under primary loan servicing, payments may be deferred or loans may be restructured through consolidation, amortization with longer terms, and lower interest rates. Any reduction in interest rates represents a cost to the government and is considered an explicit subsidy to borrowers.[21]

Since regular DFOs and DOLs are made at rates sufficient to cover the Government's cost of funds, they do not represent an explicit interest rate subsidy. These loans are, however, made at rates below what the borrower could receive from a commercial bank or Farm Credit institution. As such, they represent an implicit subsidy in that the receipt of a direct government loan provides a financial benefit in the form of reduced farm interest expense. In contrast, guaranteed loans are made and priced by commercial lenders at rates considered typical for comparable farm

---

[20] https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/archived-fact-sheets/Primary_and_Preservation_Loan_Servicing_for_Delinquent_FSA_Borrowers.pdf
[21] Under Primary Loan Servicing, interest rates may be reduced up to the current rate on new FSA loans. However, this is still considered a cost to the government as rates are reduced below the rate initially in the loan contract.

Strickland AR 0724

borrowers of similar risk.  For this analysis, guaranteed loans were considered to have neither an explicit nor implicit interest rate subsidy component.

Since minority farmers can access reserved direct loan funds,[22] it might be expected that minority farms would be well-represented in FSA direct loan programs. The following section presents data in several ways to shed light on the situation. Figure 4 is calculated for each state by dividing the number of minority direct loan participants by the total number of minority farms from the 2017 Census of Agriculture. The Census of Agriculture overstates the number of farms likely eligible for FSA loans;[23] therefore, Figure 4 can be interpreted as a lower bound for minority participation.

Minority farm participation in FSA direct loan programs varies significantly by state (Figure 4). Over 30 percent of minority farms in South Dakota and 23 percent in Oklahoma were direct loan borrowers in 2017. Other states with relatively high minority farm use of direct loans (over 10 percent) include Arkansas, Alabama, North Dakota, Vermont, Montana, and Nebraska. In 22 states, the percentage of minority farms participating in FSA's direct loan programs was in the range of 6-10 percent, and 20 states had 5 percent or fewer of minority farms with direct loans.

---

[22] Targeted funds refer to that portion of the annual allotment which is legislated set aside for exclusive use by minority farmers, women farmers, and beginning farmers.
[23] For FSA farm loan programs eligibility criteria, see:  https://www.fsa.usda.gov/programsand-services/farm-loan-programs/farm-ownership-loans/index.

Strickland AR 0725

Figure 4. Percent of Minority Farms Who were FSA Direct Loan Borrowers, 2017



Source: USDA 2017 Census of Agriculture data and September 31, 2017 FSA direct loan R540 data.

For comparison, Figure 5 is calculated for each state by dividing the number of non-minority direct loan participants by the total number of non-minority farms from the 2017 Census of Agriculture. The scale of both maps is the same for consistency, and Figure 5 shows that the *rate* of use of FSA direct loans is much lower among non-minority farms than minority farms. In absolute numbers, however, there are more non-minority borrowers as will be shown in tables later in this report.

18

Strickland AR 0726

Figure 5. Percent of Non-Minority Farms Who were FSA Direct Loan Borrowers, 2017



**Down-Payment Loans**

Down-payment loans represented 17 percent of all DFO obligations between FYs 2015 and 2020 and are targeted exclusively to beginning farmers and underserved groups, including minorities and veterans. Down-payment loans may only be used for farmland purchase. The qualified applicant must provide 5 percent equity toward the purchase and may borrow a down-payment through the program of up to 45 percent of the purchase price or $300,000, whichever is less. The balance of the purchase price not covered by the down payment loan and the loan applicant's down payment may be financed by a commercial lender, private lender, a cooperative, or the seller.

Table 11 details the number of borrowers and loan totals for DFO down-payment loans for FYs 2015-2020 by minority status.  For FYs 2015-2020, non-minorities accounted for an average of 1,159 down-payment loan borrowers per year (95 percent) and an average of $192.26 million of down-payment loan obligation volume per year (95 percent), while minorities accounted for an average of 55 borrowers per year (4 percent) and $7.85 million of down-payment loan obligation volume per year (4 percent). USDA had no race or ethnicity data on the remaining loan recipients identified as unknown. The average down-payment loan size for minorities was $143,082 compared to $165,886 for non-minorities.

Strickland AR 0727

Table 11. FSA Direct Farm Ownership Down-Payment Loan Data, Fiscal Years 2015–2020[a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Borrowers | Loans | Borrowers | Loans | Borrowers | Loans |
| 2015 | 1,131 | $184,968,485 | 57 | $7,723,115 | 6 | $773,520 |
| 2016 | 1,136 | $184,424,006 | 44 | $6,910,075 | 10 | $1,862,910 |
| 2017 | 1,082 | $177,695,319 | 48 | $7,018,710 | 14 | $2,486,540 |
| 2018 | 1,274 | $214,940,545 | 58 | $8,268,247 | 21 | $3,759,745 |
| 2019 | 1,241 | $206,967,640 | 66 | $9,303,720 | 10 | $1,303,160 |
| 2020 | 1,090 | $184,578,134 | 56 | $7,850,030 | 15 | $3,243,540 |
| 6-year average | 1,159 | $192,262,355 | 55 | $7,845,650 | 13 | $2,238,236 |

[a] Statute (Consolidated Farm and Rural Development Act, Section 355) requires that funds for farm ownership and operating loans be prioritized to minorities and women applicants.

DFO down-payment loans can draw from loan funds reserved for minorities. To qualify, a producer identifying as an underserved race or ethnicity must report their minority status. In these cases, race is identified by the customer rather than an employee and should be more precise than for other USDA programs. Organizational entities may qualify if their majority interest qualifies as minority. Some organizations may choose not to declare either race or ethnicity (for example, if they qualify due to beginning farmer or veteran status) and fall into the 'unknown' race category. Table 12 presents the number of down-payment loan borrowers by race and ethnicity for FYs 2015-2020. Due to overlap between race and ethnicity, the values do not sum to match those in Table 11.

Table 12. Down-Payment Loan Program Borrowers by Race/Ethnicity, Fiscal Years 2015-2020[a,b]

| Year | Asian, Pacific Islander, Hawaiian Native | Black or African American | American Indian and Alaska Native | Hispanic | Unknown | White |
|---|---|---|---|---|---|---|
| 2015 | 3 | 1 | 44 | 11 | 6 | 1,140 |
| 2016 | 1 | 0 | 36 | 10 | 10 | 1,144 |
| 2017 | 4 | 0 | 37 | 7 | 14 | 1,091 |
| 2018 | 5 | 4 | 38 | 11 | 21 | 1,293 |
| 2019 | 2 | 3 | 56 | 5 | 10 | 1,246 |
| 2020 | 3 | 0 | 44 | 9 | 15 | 1,104 |
| 6-year total | 18 | 8 | 255 | 53 | 59 | 7,018 |

[a] Data largely reflect new borrowers in each year.
[b] If a producer reports more than one race (or race and Hispanic ethnicity), they are included in each category and therefore categories will sum to more than the minority total in Table 11.

Strickland AR 0728

Approximately 75 percent of minority down-payment loan participants during FYs 2015-2020 were American Indians (Table 12), with 80 percent in Oklahoma[24] and another 10 percent in Kansas and Arkansas (Figure 6).

Figure 6.  Approximate Geographic Location of Down-Payment Loan Borrowers, Fiscal Years 2015-2020



**Participation Loans**

Participation loans have comprised one-third of all DFO obligations since FY 2015. Loans are made jointly with a commercial lender or State agency with FSA providing up to 50 percent of the proceeds. Loan amounts can be greater than down-payment loan amounts—up to $600,000— and can also be funded out of minority-targeted funds if a producer identifies as an underserved race or ethnicity. Table 13 indicates that, between FYs 2015-2020, on average 1,673 borrowers per year have been non-minorities (91 percent) who have received on average $366.32 million of participation loan obligation volume per year (92 percent), while minorities made up an average 143 borrowers per year (8 percent) and received on average $27.11 million of loan obligation volume per year (7 percent).

---

[24] Of the 129,619 Oklahoma producers recorded in the 2017 Census of Agriculture, 9 percent reported their race as American Indian only and an additional 4 percent reported being American Indian in combination with other races.

Strickland AR 0729

Table 13. Participation Loan Program Data, Fiscal Years 2015–2020[a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Borrowers | Loans | Borrowers | Loans | Borrowers | Loans |
| 2015 | 1,415 | $279,779,542 | 136 | $21,360,151 | 17 | $4,026,540 |
| 2016 | 1,452 | $289,551,577 | 153 | $26,412,560 | 27 | $7,143,140 |
| 2017 | 1,629 | $326,243,592 | 144 | $22,835,050 | 22 | $5,525,696 |
| 2018 | 1,981 | $394,420,541 | 142 | $24,497,370 | 40 | $9,339,889 |
| 2019 | 2,192 | $523,235,691 | 172 | $39,515,010 | 36 | $10,392,130 |
| 2020 | 1,371 | $384,685,305 | 109 | $28,057,500 | 15 | $4,306,720 |
| 6-year average | 1,673 | $366,319,375 | 143 | $27,112,940 | 26 | $6,789,019 |

[a] Statute (Consolidated Farm and Rural Development Act, Section 355) requires that funds for farm ownership and operating loans be prioritized to minorities and women applicants.

As with the down-payment loan program, loans to minorities were smaller, averaging $190,044 versus $218,916 (Table 13). And, like the down-payment loan borrowers, most minority participation loan borrowers have been American Indians located in Oklahoma or nearby in Kansas or Arkansas (Table 14, Figure 7).

Table 14. Participation Loan Program Borrowers by Race/Ethnicity, Fiscal Years 2015-2020 [a, b]

| Year | Asian, Pacific Islander, Hawaiian Native | Black or African American | American Indian and Alaska Native | Hispanic | Unknown | White |
|---|---|---|---|---|---|---|
| 2015 | 5 | 7 | 112 | 15 | 17 | 1,433 |
| 2016 | 8 | 7 | 119 | 20 | 27 | 1,476 |
| 2017 | 10 | 6 | 110 | 18 | 22 | 1,650 |
| 2018 | 10 | 7 | 109 | 19 | 40 | 2,004 |
| 2019 | 9 | 6 | 134 | 27 | 36 | 2,228 |
| 2020 | 14 | 5 | 74 | 22 | 15 | 1,393 |
| 6-year total | 56 | 38 | 658 | 121 | 157 | 10,184 |

[a] Data largely reflect new borrowers in each year.
[b] If a producer reports more than one race (or race and Hispanic ethnicity), they are included in each category and therefore categories will sum to more than the minority total in Table 13.

Strickland AR 0730

Figure 7 Approximate Geographic Location of Participation Loan Borrowers, Fiscal Years 2015-2020



## Primary Loan Servicing

Between 2015 and 2020, only about 3 percent of all direct borrowers received primary loan servicing, and only one-third of those receiving primary loan servicing received an interest rate adjustment which can happen under certain interest-rate conditions. A comparison of interest rates before and after restructuring for those who received an interest rate adjustment allows estimation of the subsidy provided through primary loan servicing.

On average overall, non-minority borrowers who received primary loan servicing had an average 71-basis point reduction in their rate, amounting to an average of $297 per borrower per year in interest subsidy (Table 15). Minority borrowers received an average 82-basis point reduction from primary loan servicing, amounting to an average $309 subsidy per borrower per year. The higher basis point reduction for minorities would be consistent with greater financial difficulties, which would require a greater interest rate reduction through loan restructuring to cash flow. While only 1,059 minorities received an interest rate reduction in Fiscal Years 2015-2020, this represented 6.6 percent of all borrowers receiving an interest write down. American Indians were the primary minority group receiving primary loan servicing (Table 16).

23

Table 15. Borrowers Receiving Interest Reduction through Primary Loan Servicing, Fiscal Years 2015-2020 [a]

| Fiscal Year | Borrowers Receiving Primary Loan Servicing | | Average rate reduction | | Average interest reduction per borrower ($) per year | |
|---|---|---|---|---|---|---|
| | Non-Minority | Minority | Non-Minority | Minority | Non-Minority | Minority |
| 2015 | 1,910 | 59 | 0.92 | 1.10 | $320 | $262 |
| 2016 | 3,167 | 112 | 0.50 | 0.51 | $224 | $285 |
| 2017 | 3,701 | 306 | 0.50 | 0.52 | $188 | $256 |
| 2018 | 2,389 | 207 | 0.77 | 1.21 | $142 | $127 |
| 2019 | 2,492 | 212 | 0.77 | 1.32 | $168 | $144 |
| 2020 | 2,439 | 163 | 1.00 | 0.94 | $850 | $783 |
| 6-year average | | | 0.71 | 0.82 | $297 | $309 |
| 6-year total | 16,098 | 1,059 | | | | |

[a] The averages in this table focus on the borrower level and therefore the summary row is weighted per borrower over the entire period rather than each year receiving equal weight.

Table 16. Borrowers Receiving Interest Reduction through Primary Loan Servicing, by Race/Ethnicity, Fiscal Years 2015–2020 [a, b]

| Year | Asian, Pacific Islander, Hawaiian Native | Black or African American | American Indian and Alaska Native | Hispanic | White |
|---|---|---|---|---|---|
| 2015 | 4 | 29 | 26 | 0 | 1,910 |
| 2016 | 16 | 49 | 45 | 2 | 3,167 |
| 2017 | 19 | 96 | 186 | 7 | 3,701 |
| 2018 | 17 | 74 | 113 | 7 | 2,389 |
| 2019 | 25 | 68 | 117 | 5 | 2,492 |
| 2020 | 11 | 36 | 112 | 6 | 2,439 |
| 6-year total | **92** | **352** | **599** | **27** | **16,098** |

[a] Data largely reflect new borrowers in each year.
[b] If a producer reports more than one race (or race and Hispanic ethnicity), they are included in each category and therefore categories will sum to more than the minority total in Table 15.

While many minority primary loan servicing recipients are in Oklahoma, the geographic distribution is more widespread than for down-payment or participation loans (Figure 8).

24

Strickland AR 0732

Figure 8.  Approximate Geographic Location of Primary Loan Servicing Borrowers, Fiscal Years 2015-2020



**Total Value of Interest Subsidy for Direct Loans**

The value of the explicit interest subsidy on an annual basis was estimated for down-payment and participation loans. The subsidy rate for obligations is the difference between the regular farm ownership interest rate and the interest rate for down-payment or participation loans. The value of the subsidy is estimated as the differential between the regular and subsidized rate multiplied by the outstanding loan balance for each of the two programs, then aggregated. The value of the subsidy is reported in the year in which the loan was obligated. Note that fluctuations in interest rates influence the amount of the direct subsidy and that, in recent years, low "regular" rates have reduced the value of the subsidy to borrowers.

Borrower totals and obligation amounts for down-payment and participation loans are listed in Tables 10 and 12. Table 17 details combined data on the two programs, highlighting the annual percent of minority borrowers and obligations over FYs 2015-2020. Minorities represented 7.7 percent of borrowers who received explicit interest subsidies for down-payment and participation loans which, on average, represented 5.8 percent of obligations per year reflecting a smaller average loan size for minorities. The value of subsidy was $45.5 million for non-minorities (95 percent) and $2.2 million (5 percent) to minorities. The average subsidy *per*

Strickland AR 0733

*borrower* was $2,664 per borrower for non-minorities compared to $2,235 for minorities, and the discounted present value of the subsidy per borrower was $44,664 for non-minorities and $38,067 for minorities (Table 17).

Table 17. Borrowers Receiving DFO Explicit Interest Subsidies for Participation and Down-Payment Loans), Fiscal Years 2015–2020[a, b]

| | | | Total Value of subsidy (millions) | | Average interest subsidy/borrower per year | | Discounted Present Value of Subsidy/borrower | |
|---|---|---|---|---|---|---|---|---|
| | Minority % of subsidy | | | | | | | |
| Year | Borrowers | Obligations | Non-Minority | Minority | Non-Minority | Minority | Non-Minority | Minority |
| 2015 | 7.82% | 5.83% | $6.9 | $0.36 | $2,720 | $2,176 | $45,099 | $36,961 |
| 2016 | 8.29% | 6.45% | $6.5 | $0.33 | $2,515 | $2,006 | $42,099 | $35,264 |
| 2017 | 7.76% | 5.51% | $7.7 | $0.39 | $2,829 | $2,260 | $47,210 | $38,809 |
| 2018 | 7.42% | 5.00% | $9.7 | $0.47 | $2,933 | $2,636 | $48,211 | $43,766 |
| 2019 | 7.64% | 6.17% | $11.0 | $0.53 | $3,188 | $2,748 | $54,177 | $46,223 |
| 2020 | 7.34% | 5.86% | $3.7 | $0.17 | $1,485 | $1,269 | $26,002 | $22,307 |
| 6-year average | 7.70% | 5.80% | | | $2,664 | $2,235 | $44,664 | $38,067 |
| 6-year total | | | $45.5 | $2.24 | | | | |

[a] The explicit subsidy is the difference between the regular FO rate and the rate on Participation/Down-payment loans. The present value is estimated over 20 years for down payment loans and 35 years for participation loans by discounting the annual subsidy at the regular FO rate at the time of obligation.
[b] The averages in this table focus on the borrower level and, therefore, the summary row is weighted per borrower over the entire period rather than each year receiving equal weight.

In addition to the direct subsidy discussed above, there is an implicit interest subsidy in all direct loans based upon the difference between commercial lender interest rates and rates charged by FSA. Interest rates on direct FSA loans are based on the Government's cost of borrowing and are priced below what a borrower would likely pay a commercial bank or Farm Credit System institution. The Federal Reserve Board's Agricultural Finance Databook provides data on rates charged on farm loans by commercial banks, which were compared with rates for regular DFO and DOL rates to provide an estimate of the implicit subsidy. Over the 5-year period, rates on DFO loans were 277 basis points below average interest rates charged by commercial banks on farm real estate loans (Figure 9).

FSA DOL rates were 304 basis points below interest rates charged by commercial banks for nonreal estate loans, while EM rates were 200 basis points below. These estimates may be conservative given that FSA borrowers are above average risk and would likely pay higher rates if they could receive loans from commercial lenders.

Strickland AR 0734

Figure 9. Average Interest Rates for Commercial Banks and Regular Direct Loans, 2001–2020



Source: Federal Reserve Bank, Ag Finance Databook and USDA OBFN Database

Table 18 details the value of implicit subsidies for borrowers from FYs 2015-2020. The average implicit annual benefit per borrower was $3,811 for non-minorities compared to $3,308 for minorities.  These subsidies would be expected to continue over the life of the loan. For example, on a 30-year FO, the borrower would benefit from the subsidy for the entire 30 years. The annual subsidies reported in Table 18 have been discounted back to the original obligation year to provide an estimate of the total economic value of receiving lower interest rates.  For non-minorities, this amounted to $59,765 per borrower over the 2015-2020 period. Because minorities had smaller loans, the present value of the subsidy was less, at $43,199 per borrower. These totals did not include the explicit interest rate subsidies inherent in down-payment and participation loans documented in Table 17. Adding in these totals shows that the total economic value of the interest subsidy for recipients of down-payment/participation loans exceeds $100,000 for non-minorities and $80,000 for minorities.

Strickland AR 0735

Table 18. Implicit Value of Subsidy Received by Direct Borrowers or DFO, DOL, and EM Loans, Fiscal Years 2015 – 2020[a,b]

| | Minority % of subsidy | | Average implicit subsidy/borrower per year | | Average Discounted Present Value of Subsidy[c] | |
|---|---|---|---|---|---|---|
| | Borrowers | Subsidy | Non-minority | Minority | Non-minority | Minority |
| 2015 | 7.2% | 5.5% | $2,947 | $2,408 | $47,606 | $32,749 |
| 2016 | 7.2% | 5.9% | $3,254 | $2,997 | $52,948 | $39,227 |
| 2017 | 6.5% | 5.1% | $3,262 | $2,667 | $51,833 | $34,465 |
| 2018 | 5.6% | 4.9% | $3,956 | $3,544 | $64,024 | $41,427 |
| 2019 | 6.5% | 5.6% | $4,916 | $4,617 | $76,433 | $60,831 |
| 2020 | 6.2% | 5.0% | $3,965 | $3,222 | $59,027 | $44,345 |
| 6-year average | 6.5% | 5.3% | $3,811 | $3,308 | $59,765 | $43,199 |

[a] Based on the difference in regular rates on FSA loans and average rate charged by commercial lenders. Excludes value of explicit subsidy presented in Table 16.
[b] The averages in this table focus on the borrower level and therefore the summary row is weighted per borrower over the entire period rather than each year receiving equal weight.
[cc] Based on a 25-year term for FO loans and a 5-year term for OLs, with subsidies expected in future years discounted at the FSA rate at time of loan obligation.

**Concluding Remarks**

The data and information in this report are being used to improve awareness of minority participation in FSA and NRCS programs and to inform an internal review of its programs as part of implementation of Executive Order 13895, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government. FSA is taking steps to increase minority participation in programs through employee outreach training, more in-depth data analysis, and stakeholder engagement and employee education.  Concurrently, the agency is striving to better understand the extent to which there are substantial barriers to access or discrimination—overt or unintentional—that present obstacles to minorities and other underserved communities from accessing and fully participating in USDA programs.  At USDA we are recommitting ourselves to the values of equity and inclusion and to upholding civil rights and equal opportunity for our employees and those we serve.

Strickland AR 0736

## Appendix

The table below identifies base acres enrolled in the 2019 ARC/PLC program by their minority status, calculated by using producers' payment shares.  As elsewhere in this report, a producer is considered a "minority" if the data indicates they are Black, Asian, American Indian, Native Alaskan, or Pacific Islander or if their ethnicity is listed as Hispanic.  A producer is considered a "non-minority" if the data indicates they are White (and have none of the other aforementioned race declared) and their ethnicity is listed as Non-Hispanic. All other producers are "Unknown."

Of the approximately 255 million base acres that exist, about 243 million base acres can be successfully attributed (see bottom of table). The bulk of the remaining base acres are enrolled in ARC-IC which does not use payment shares.  A smaller number of base acres have no assigned crop and are ineligible for enrollment in farm programs.  Farmers often set up their businesses as multi-member entities such as corporations. USDA is not required to assign a race or ethnicity to those entities, which explains a portion of the base acres included in the "Unknown" category.

**Table 19.  Attribution of 2019 Enrolled Base Acres by Minority Status**

| Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|
| Crop name | Base acres | Crop name | Base acres | Crop name | Base acres |
| Barley | 3,990,218 | Barley | 84,756 | Barley | 1,287,716 |
| Canola | 1,300,091 | Canola | 10,018 | Canola | 160,490 |
| Small chickpeas | 17,171 | Small chickpeas | 248 | Small chickpeas | 4,452 |
| Large chickpeas | 58,812 | Large chickpeas | 1,069 | Large chickpeas | 21,779 |
| Corn | 71,553,862 | Corn | 519,105 | Corn | 17,639,049 |
| Crambe | 2,181 | Crambe | 168 | Crambe | 246 |
| Dry peas | 342,234 | Dry peas | 4,533 | Dry peas | 86,808 |
| Grain sorghum | 6,569,065 | Grain sorghum | 158,361 | Grain sorghum | 1,894,346 |
| Flaxseed | 208,256 | Flaxseed | 1,554 | Flaxseed | 19,621 |
| Lentils | 213,550 | Lentils | 3,908 | Lentils | 60,628 |
| Mustard | 18,573 | Mustard | 54 | Mustard | 5,804 |
| Oats | 1,669,603 | Oats | 33,545 | Oats | 318,326 |
| Peanuts | 1,947,444 | Peanuts | 56,627 | Peanuts | 416,468 |
| Rapeseed | 1,767 | Rapeseed | 0 | Rapeseed | 700 |
| Rice-long grain | 2,534,549 | Rice-long grain | 49,961 | Rice-long grain | 1,361,580 |
| Rice-med grain | 102,684 | Rice-med grain | 1,428 | Rice-med grain | 67,559 |
| Rice- temperate japonica | 328,788 | Rice-temperate japonica | 21,461 | Rice-temperate japonica | 199,360 |
| Safflower | 57,254 | Safflower | 2,441 | Safflower | 23,579 |
| Seed cotton | 9,124,906 | Seed cotton | 321,970 | Seed cotton | 3,426,787 |
| Sesame | 5,162 | Sesame | 17 | Sesame | 912 |
| Soybeans | 40,843,861 | Soybeans | 360,308 | Soybeans | 9,412,669 |
| Sunflowers | 1,300,816 | Sunflowers | 17,694 | Sunflowers | 301,738 |
| Wheat | 49,065,909 | Wheat | 1,034,322 | Wheat | 12,632,287 |
| Total | 191,256,756 | Total | 2,683,548 | Total | 49,342,904 |
| | | | | | |
| All enrolled 2019 base acres: 255,135,147 | | | | | |
| Total base acres able to be attributed by minority status: 243,283,207 | | | | | |
| Unattributed ARC-IC and unassigned base acres: 11,851,940 | | | | | |

29

Strickland AR 0737

# Rules and Regulations

**Federal Register**

Vol. 86, No. 164

Friday, August 27, 2021

---

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

---

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

**7 CFR Part 9**

**[Docket ID: FSA–2020–0006]**

**RIN 0503–AA71**

### Coronavirus Food Assistance Program 2; Producers of Sale-Based Commodities and Contract Producers

**AGENCY:** Office of the Secretary, Department of Agriculture (USDA).

**ACTION:** Final rule.

**SUMMARY:** This rule amends the Coronavirus Food Assistance Program 2 (CFAP 2) provisions related to assistance for producers of sales-based commodities and contract producers. This rule also announces the deadline for submitting CFAP 2 applications and clarifies general provisions related to equitable relief and refunds.

**DATES:**
*Effective date:* August 27, 2021.
*Comment due date:* With grass seed being added as an eligible crop under CFAP, we will consider comments on the information collection requirements under the Paperwork Reduction Act that we receive by: October 26, 2021.

**ADDRESSES:** We invite you to submit comments on the information collection requirements. You may submit comments by any of the following methods:

∀ *Federal eRulemaking Portal:* Go to: *www.regulations.gov* and search for Docket ID FSA–2020–0006. Follow the online instructions for submitting comments.

∀ *Mail, Hand-Delivery, or Courier:* Director, Safety Net Division, Farm Service Agency, U.S. Department of Agriculture, 1400 Independence Avenue SW, Stop 0510, Washington, DC 20250–0522. In your comment, specify the docket ID FS–2020–0006.

You may also send comments to the Desk Officer for Agriculture, Office of

Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

Comments will be available for inspection online at *http://www.regulations.gov.* Copies of the information collection may be requested by contacting Brittany Ramsburg at the above address.

**FOR FURTHER INFORMATION CONTACT:** Kimberly Graham; telephone: (202) 720–6825; email: *Kimberly.Graham@usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:** USDA established CFAP to assist producers of agricultural commodities marketed in 2020 who faced continuing market disruptions, reduced farm-level prices, and increased production and marketing costs due to COVID–19. CFAP went through two rounds of payments (CFAP 1 and CFAP 2), and the Farm Service Agency (FSA) is administering CFAP 2, as directed by the Secretary of Agriculture. USDA announced CFAP 2 through a final rule published in the **Federal Register** on September 22, 2020. 85 FR 59380–59388. A second final rule was published on January 19, 2021. 86 FR 4877–4883. That rule amended CFAP 2 provisions and included assistance for contract producers of swine and poultry (including broilers, pullets, layers, chicken eggs, and turkeys), who were not originally eligible for CFAP 2. After publication of that rule, USDA suspended approval of applications from contract producers while that final rule was under review.

As a result of that review and for consistency with the provisions of the Consolidated Appropriations Act, 2021 (CAA), Public Law 116–260, USDA is making changes to the provisions for CFAP 2 as described below. These changes include adjusting the CFAP 2 application deadline, changing the calculation of payments for sales-based commodities, adding grass seed as an eligible sales-based commodity, changing aspects of the provisions for assistance for contract producers, and clarifying the applicability of equitable relief provisions and provisions requiring refunds.

### Application Deadline

On March 24, 2021, USDA announced in a news release that the application period for CFAP 2 was reopened for all eligible producers for at least 60 days beginning on April 5, 2021. This reopening allowed USDA to improve outreach efforts and ensure that producers in socially disadvantaged communities were informed and aware of the application process. This rule announces that the CFAP 2 application deadline will be October 12, 2021, and amends 7 CFR 9.4 to specify the deadline. This deadline applies to all producers applying for CFAP 2, including producers of sales-based commodities and contract producers who submit new applications or revise previously filed applications due to the changes included in this rule.

### Sales-Based Commodities

Consistent with section 751 of Subtitle B of Title VII of Division N of CAA, USDA is amending the CFAP 2 payment calculation for sales-based commodities in 7 CFR 9.203(i) and (j) to allow eligible producers to substitute 2018 sales for 2019 sales. Previously, payments for producers of sales-based commodities were based only on 2019 sales; however, various conditions occurring in 2019 could have adversely affected a producer's amount of sales and therefore their CFAP 2 payment. CFAP 2 uses a producer's 2019 sales as an approximation of what the producer would have expected to market in 2020, which could not be determined for most producers at the time of application. Under the final rule published on January 19, 2021, crop insurance indemnities under the Federal Crop Insurance Act, 7 U.S.C 1501–1524, and 2019 crop year payments under the Noninsured Crop Disaster Assistance Program (NAP) and Wildfires and Hurricanes Indemnity Program Plus (WHIP+), are included as eligible sales under 7 CFR 9.202(i) in addition to the amount of the producer's 2019 sales, as required by Subtitle B, section 751, of the CAA. That change is intended to more accurately represent what a producer would have expected to have marketed in 2020 by taking into account commodities that would have been available for marketing in 2019 but were lost due to natural events. However, crop insurance indemnities and NAP and WHIP+ program payments for a

crop are less than the full amount that a producer would have expected to receive for marketing the commodity if there was no loss. Giving producers the option to substitute 2018 sales (including 2018 crop insurance indemnities and 2018 crop year NAP and WHIP+ payments) for 2019 sales provides additional flexibility to producers who had reduced sales in 2019.

In addition, USDA has determined that producers of grass seed faced continuing market disruptions, low farm-level prices, and significant marketing costs associated with the COVID–19 outbreak, similar to producers of commodities that were previously determined to be eligible for CFAP 2 assistance. As a result, USDA is amending the definitions of ''Ineligible commodities'' and ''Sales-based commodities'' in § 9.201 to make grass seed an eligible commodity.

**Contract Producers**

The final rule published on January 19, 2021, added provisions to provide assistance for contract producers and specified that those payments would be issued with remaining funding authorized by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act; Pub. L. 116–136). Contract producer payments were suspended before any CARES Act funding was used to fund those payments. Subtitle B, section 751, of the CAA specifically directs the Secretary to use not more than $1 billion of the additional funding provided under the CAA to make payments to contract producers of livestock and poultry to cover not more than 80 percent of their revenue losses, as determined by the Secretary of Agriculture, from January 1, 2020, through December 27, 2020. While CAA uses the term ''contract grower'' and the CFAP 2 regulation uses the term ''contract producer'' both terms refer to and mean the same people or entities; this rule uses the term ''contract producer,'' for consistency. Payments to contract producers will be funded as authorized by the CAA rather than the CARES Act.

This rule also amends the provisions for contract producers based on additional evaluation of CFAP 2 and stakeholder concerns related to the payment calculation. The previous final rule provided assistance for contract producers of broilers, pullets, layers, chicken eggs, turkeys, hogs, and pigs. After further review, USDA has determined that contract producers of ducks, geese, pheasants, and quail will also be eligible, including contract producers of eggs of all eligible poultry

types. In addition to the listed livestock and poultry types, USDA may determine that additional livestock and poultry types are eligible at a later time. These changes are reflected in a new definition of ''eligible contract livestock or poultry'' in 7 CFR 9.201, in which USDA is also clarifying that contract producers of breeding stock of those defined eligible livestock and poultry are eligible for CFAP 2. Contract producers of breeding stock are included because those producers may have suffered a revenue loss for the livestock and poultry, regardless of the livestock owner's intended end use of the animals. This rule also amends the definition of ''producer'' in 7 CFR 9.201 to specify that the requirement that a producer must be in the business of farming at the time of application does not apply to contract producers because contract producers may have had contracts terminated for reasons outside of their control due to COVID–19.

The final rule published on January 19, 2021, specified that payments for contract producers would be based on a comparison of eligible revenue for the periods of January 1, 2019, through December 27, 2019, and January 1, 2020, through December 27, 2020. This rule amends the regulation in 7 CFR 9.202(b) and 9.203(l) to allow a contract producer to elect to use eligible revenue from the period of January 1, 2018, through December 27, 2018, in lieu of during that date range in 2019. This change is intended to provide flexibility and make the program more equitable for contract producers who had reduced revenue in 2019 compared to a normal year for their operation.

The payment calculation in the final rule published on January 19, 2021, specified that payments for contract producers would be equal to the eligible revenue received from January 1, 2019, through December 27, 2019, minus the eligible revenue received from January 1, 2020, through December 27, 2020, multiplied by 80 percent. In response to additional review and stakeholder concerns about certain situations when the original calculation would not accurately capture a contract producer's loss of eligible revenue due to COVID–19, this rule amends the regulation at 7 CFR 9.203(l)(4) to allow FSA to adjust a contract producer's eligible revenue based on information certified by the contract producer on supplemental form AD–3117B if a contract producer did not have a full period of revenue from January 1 to December 27 for either 2018 or 2019, or if the contract producer increased their operation size in 2020. Information required to calculate these adjustments includes a contract

producer's square footage increase to the operation in 2020, or a contract producer's production or number of turns for 2018, 2019, or 2020, as applicable.

This rule also provides assistance in 7 CFR 9.202(d) and 9.203(m) to producers who were not in operation in 2018 or 2019, who would have been ineligible under the previous final rule. Assistance for these producers is based on their 2020 eligible revenue and the average revenue loss level, which will be determined by USDA for a geographic area based on the best available data including, but not limited to, losses reported by other contract producers for the same area and type of livestock or poultry as reported in their CFAP 2 applications.

This rule also specifies that payments to contract producers will be calculated separately for the categories of livestock listed in § 9.203(n). As provided in the previous final rule, payments to contract producers may be factored if total calculated payments exceed the available funding under 7 CFR 9.203(o).

**Other Changes**

This rule amends § 9.7(a) to address situations where FSA determines that the applicant intentionally misrepresented either the total amount or producer's share of the commodities, acres, sales, or revenue on their application. In those cases, the producer's application will be disapproved and the participant must refund the full payment to FSA with interest from the date of disbursement. This rule also amends § 9.7(b) to specify that the equitable relief provisions of 7 CFR part 718, subpart D, apply to CFAP determinations.

**Notice and Comment, Effective Date, and Exemptions**

The Administrative Procedure Act (APA), 5 U.S.C. 553(a)(2), provides that the notice-and-comment and 30-day delay in the effective date requirements do not apply when the rule involves specified actions, including matters relating to benefits. This rule governs CFAP for payments to certain commodity producers and therefore falls within the benefits exemption.

This rule is exempt from the regulatory analysis requirements of the Regulatory Flexibility Act (5 U.S.C. 601–612), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). The requirements for the regulatory flexibility analysis in 5 U.S.C. 603 and 604 are specifically tied to the requirement for a proposed rule by section 553 or any other law; in

addition,  the definition  of rule in 5 U.S.C. 601 is tied to the publication of a proposed rule.

The Office of Management and Budget (OMB) designated this rule as major under the Congressional Review Act (CRA), as defined  by 5 U.S.C. 804(2). Section 808 of the CRA allows an agency to make a major regulation effective immediately  if the agency finds there is good cause to do so. The beneficiaries of this rule have been significantly  impacted  by the COVID–19 outbreak, which  has resulted in significant  declines in demand and market disruptions.  USDA finds that notice and public procedure would be contrary to the public  interest. Therefore, even though this rule is a major rule for purposes of the Congressional Review Act, USDA is not required to delay the effective date for 60 days from the date of publication  to allow  for Congressional review. Accordingly,  this rule is effective upon publication  in the **Federal Register**.

## Executive Orders 12866 and 13563

Executive Order 12866, "Regulatory Planning and Review," and Executive Order 13563, "Improving  Regulation and Regulatory Review," direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation  is necessary, to select regulatory approaches that maximize net benefits (including  potential economic, environmental,  public health, and safety effects; distributive  impacts; and equity). Executive Order 13563 emphasized the importance of quantifying  both costs and benefits, of reducing costs, of harmonizing  rules, and of promoting  flexibility.  The requirements in Executive Orders 12866 and 13563 for the analysis of costs and benefits apply to rules that are determined to be significant.

The Office of Management and Budget (OMB) designated this rule as economically  significant  under Executive Order 12866. Therefore, OMB has reviewed  this rule.

The costs and benefits of this rule are summarized below. The full  cost benefit analysis is available on *regulations.gov.*

## Cost Benefit Analysis Summary

CFAP 1 and CFAP 2 assisted producers of agricultural  commodities marketed in 2020 who faced continuing market disruptions,  reduced farm-level prices, and increased production  and marketing costs due to COVID–19. These additional  costs are associated with  declines in demand, surplus productions,  or disruptions  to shipping patterns and marketing  channels.

In implementing  these programs, additional  assistance was deemed necessary. Subdivision  B, section 751, of the CAA authorizes payments of up to 80 percent of contract producers' revenue loss and up to $1 billion  in funding. To qualify for payment, a producer must demonstrate a drop in revenue ("revenue loss") between 2019 and 2020. The producer can then choose their 2018 revenue in lieu of their 2019 revenue in the revenue loss calculation if their 2018 revenue is more representative of anticipated  revenue in 2020. In addition,  note that the CFAP Additional  Assistance regulation, published  on January 19, 2021, provided  assistance to contract producers. CFAP Additional  Assistance activity  was paused in late January 2021. No payments were issued to contract producers under that regulation.

This rule and cost-benefit analysis use an 80 percent payment factor, the maximum  allowed by the CAA, and apply  it to the individual  producer's actual 2019 to 2020 revenue change. Contract producer payments are highly uncertain and can depend on the number of animals received by the contractor and the price paid by the integrator to the contractor. The projections  contained in this assessment provide  an upper bound at over $1 billion.  However, available evidence suggests that year-to-year differences in animal volume may moderate that estimate. Broiler and hog contract producers will  receive the bulk of payments.

In contrast to assistance for contract producers, CAA provides authority  for, but does not mandate, use of 2018 or 2019 revenue data in the calculation of payments for sales-based[1] commodities. This provision,  included  in this rule, ensures that farmers who had lower sales in 2019 than in 2018—for example, those unable to plant  a 2019 crop—would  not be penalized in the payment calculation. Fifty-two percent of sales-based applicants  are projected to prefer the use of 2018 revenue data (relative to 2019 data) based on analysis of USDA cash receipts data. The expected cost associated with  this change is estimated at $207 million.

Upon implementation  of the CFAP 2 rule, FSA became aware that certain commodities  had experienced COVID–19 market disruptions  but had not been

explicitly  included  in the initial  CFAP 2 rule. For example,  grass seed was not included  in the initial  CFAP 2 rule, but evidence indicates that production  and revenue were significantly  affected. This rule clarifies  that grass seed is now an eligible sales-based commodity,  the expected cost is $41 million.

FSA, which implemented  CFAP 1 and 2, is implementing  these three provisions.  Producers must fill  out paperwork  to participate in these programs, and the associated administrative  costs are estimated at $1.5 million  for contract producers, $2.2 million  for the use of 2018 versus 2019 revenue in the calculations  for sales-based commodities,  and $0.1 million  for grass seed.

## Environmental Review

The environmental  impacts of this final rule have been considered in a manner consistent with  the provisions of the National Environmental  Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental  Quality  (40 CFR parts 1500–1508), and because USDA will  be making the payments to producers the USDA regulations for compliance  with NEPA (7 CFR part 1b).

Although  OMB has designated this rule as "economically  significant" under Executive Order 12866, "economic  or social effects are not intended  by themselves to require preparation  of an environmental  impact statement" when not interrelated to natural or physical environmental effects (see 40 CFR 1502.16(b)). CFAP was designed to avoid skewing planting decisions. Producers continue to make their planting  and production  decisions with  the market signals in mind, rather than any expectation  of what a new USDA program might look like. The discretionary  aspects of CFAP (for example, determining adjusted gross income (AGI) and payment limitations) were designed to be consistent with established USDA and the FSA administered  programs and are not expected to have any impact on the human environment,  as CFAP payments will  only be made after the commodity has been produced. Accordingly,  the following  Categorical Exclusion in 7 CFR part 1b applies: § 1b.3(a)(2), which applies to activities  that deal solely with the funding of programs, such as program budget proposals, disbursements, and the transfer or reprogramming  of funds. As such, the implementation  of and participation  in CFAP do not constitute major Federal actions that would  significantly  affect the quality of the human environment. Therefore, an environmental  assessment

---

[1] This category includes fruits,  vegetables, and nuts; dry edible beans, lentils,  dry edible peas, and chickpeas; and commodities including  aquaculture, turkeys, mink, mohair,  rabbits, and others. For more information,  see the CFAP 2 cost-benefit  assessment at: *https://www.farmers.gov/sites/default/files/ documents/CFAP2-CBA-09252020.pdf.*

or environmental impact statement for this regulatory action will not be prepared; this rule serves as documentation of the programmatic environmental compliance decision for this Federal action.

## Executive Order 12988

This rule has been reviewed under Executive Order 12988, "Civil Justice Reform." This rule will not preempt State or local laws, regulations, or policies unless they represent an irreconcilable conflict with this rule. Before any judicial actions may be brought regarding the provisions of this rule, the administrative appeal provisions of 7 CFR parts 11 and 780 are to be exhausted.

## Executive Order 13175

This rule has been reviewed in accordance with the requirements of Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have Tribal implications, including regulations, legislative comments, or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

USDA has assessed the impact of this rule on Indian Tribes and determined that this rule does not, to our knowledge, have Tribal implications that required Tribal consultation under Executive Order 13175 at this time. If a Tribe requests consultation, the USDA Office of Tribal Relations (OTR) will ensure meaningful consultation is provided where changes, additions, and modifications are not expressly mandated by law. Outside of Tribal consultation, USDA is working with Tribes to provide information about CFAP additional assistance and other issues.

## Unfunded Mandates

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, requires Federal agencies to assess the effects of their regulatory actions on State, local, and Tribal governments or the private sector. Agencies generally must prepare a written statement, including a cost benefit analysis, for proposed and final rules with Federal mandates that may result in expenditures of $100 million or more in any 1 year for State, local, or

Tribal governments, in the aggregate, or to the private sector. UMRA generally requires agencies to consider alternatives and adopt the more cost-effective or least burdensome alternative that achieves the objectives of the rule. This rule contains no Federal mandates, as defined in Title II of UMRA, for State, local, and Tribal governments or the private sector. Therefore, this rule is not subject to the requirements of sections 202 and 205 of UMRA.

## Federal Assistance Programs

The title and number of the Federal Domestic Assistance Program found in the Catalog of Federal Domestic Assistance to which this rule applies is 10.132—Coronavirus Food Assistance Program 2.

## Paperwork Reduction Act

In accordance with the Paperwork Reduction Act of 1995, FSA is administering the information collection activities under a currently approved information collection request of OMB control number of 0560–0297. Thus, there are no required changes to the information collection request for FSA in providing assistance for contract producers of eligible contract livestock and poultry and to provide additional assistance for other commodities as described in this rule.

Additionally, the new information collection request for the eligible grass seed that will be included in the CFAP was submitted to OMB for emergency approval. FSA will collect and evaluate the application from the producers and other required paperwork. Following the 60-day public comment period provided by this rule, FSA intends to merge the burden hours associated with the new grass seed information collection request (ICR) into the main CFAP 2 ICR that is currently approved under OMB control number 0560–0297.

*Title:* CFAP 2.

*OMB Control Number:* 0560–New.

*Type of Request:* New Collection.

*Abstract:* This information collection is required to support CFAP 2 information collection activities to provide payments to eligible producers who, with respect to their agricultural commodities, have been impacted by the effects of the COVID–19 pandemic. The information collection is necessary to evaluate the application and other required paperwork for determining the producer's eligibility and assist in the producer's payment calculations.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average

time per response multiplied by the estimated total annual responses.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.43 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collections of information.

*Type of Respondents:* Producers or farmers.

*Estimated Annual Number of Respondents:* 2,204.

*Estimated Number of Responses per Respondent:* 2.005.

*Estimated Total Annual Responses:* 4,419.

*Estimated Average Time per Response:* 0.43 hours.

*Estimated Annual Burden on Respondents:* 1,892 hours.

FSA is requesting comments on all aspects of this information collection to help us to:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of FSA, including whether the information will have practical utility;

(2) Evaluate the accuracy of the FSA's estimate of burden including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this document, including names and addresses when provided, will be a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

## USDA Non-Discrimination Policy

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political

beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or (844) 433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**List of Subjects in 7 CFR Part 9**

Agricultural commodities, Agriculture, Disaster assistance, Indemnity payments.

For the reasons discussed above, this final rule amends 7 CFR part 9 as follows:

**PART 9—CORONAVIRUS FOOD ASSISTANCE PROGRAM**

■ 1. The authority citation for part 9 continues to read as follows:

**Authority:** 15 U.S.C. 714b and 714c; Division B, Title I, Pub. L. 116–136, 134 Stat. 505; and Division N, Title VII, Subtitle B, Chapter 1, Pub. L. 116–260.

**Subpart A—General Provisions**

■ 2. Amend § 9.4 as follows:
■ a. Revise paragraphs (a)(1) and (2); and
■ b. Remove paragraph (a)(3).

The revisions read as follows:

**§ 9.4   Time and method of application.**

(a) * * *
(1) September 11, 2020, for payments issued under § 9.102; and

(2) October 12, 2021, for payments issued under § 9.203.

* * * * *

■ 3. Amend § 9.7 as follows:
■ a. Revise paragraph (a); and
■ b. In paragraph (b), remove the words "in parts" and add "in part 718, subpart D, and parts" in their place.

The revision reads as follows:

**§ 9.7   Miscellaneous provisions.**

(a) If a CFAP payment resulted from erroneous information provided by a participant, or any person acting on their behalf, the payment will be recalculated and the participant must refund any excess payment with interest calculated from the date of the disbursement of the payment.

(1) If FSA determines that the applicant intentionally misrepresented either the total amount or applicant's share of the commodities, acres, sales, or revenue on their application, the application will be disapproved and the applicant must refund the full payment to FSA with interest from the date of disbursement.

(2) Any required refunds must be resolved in accordance with part 3 of this title.

* * * * *

**Subpart C—CFAP 2**

■ 4. Amend § 9.201 as follows:
■ a. Add the definitions of "Average revenue loss level" and "Eligible contract livestock or poultry" in alphabetical order;
■ b. In the definition of "Eligible revenue", remove the words "broilers, pullets, layers, chicken eggs, turkeys, hogs, or pigs" and add the words "eligible contract livestock or poultry" in their place;
■ c. In the definition of "Ineligible commodities", remove the words "ineligible crops" and add the words "ineligible crops other than grass seed" in their place;
■ d. In the definition of "Producer", in the second sentence, remove the word "Producers" and add the words "Except for contract producers, producers" in its place;
■ e. In the definition of "Sales-based commodities", remove the words "milk, mink (including pelts);" and add the words "milk, grass seed, mink (including pelts)," in its place; and
■ f. Add the definition of "Turn" in alphabetical order.

The additions read as follows:

**§ 9.201   Definitions.**

* * * * *

*Average revenue loss level* means the average percentage of revenue loss for

contract producers determined by USDA for a geographic area based on the best available data including, but not limited to, losses reported by contract producers for the same area and type of livestock or poultry.

* * * * *

*Eligible contract livestock or poultry* means broilers, pullets, layers, poultry eggs, turkeys, ducks, geese, pheasants, quail, hogs, pigs, and other livestock or poultry types determined eligible and announced by USDA, including breeding stock of those eligible livestock and poultry types.

* * * * *

*Turn* means a group of eligible contract livestock or poultry that is delivered to a contract producer who provides labor and equipment to produce the livestock or poultry for the integrator or owner.

* * * * *

■ 5. Amend § 9.202 by revising paragraphs (b)(1) through (3) and adding paragraphs (b)(4) and (d) to read as follows:

**§ 9.202   Eligibility.**

* * * * *

(b) * * *
(1) Produced eligible contract livestock or poultry under a contract in either the 2018 or 2019 calendar year and in the 2020 calendar year;
(2) Received revenue under such a contract during the period from January 1, 2020, through December 27, 2020;
(3) Had a loss in eligible revenue for the period from January 1, 2020, through December 27, 2020, as compared to the period from:
(i) January 1, 2018, through December 27, 2018; or
(ii) January 1, 2019, through December 27, 2019; and
(4) Meet all other requirements for eligibility under this part.

* * * * *

(d) Contract producers are eligible for payment under § 9.203(m) if they:
(1) Did not receive eligible revenue from January 1 through December 27 2018 or 2019, but received eligible revenue for the period from January 1, 2020, through December 27, 2020; and
(2) Meet all other requirements for eligibility under this part.

■ 6. Amend § 9.203 as follows:
■ a. Revise paragraph (i);
■ b. In Table 2 to paragraph (j), revise the first column heading;
■ c. Revise paragraph (l); and
■ d. Add paragraphs (m) through (o).

The revisions and additions read as follows:

**§ 9.203   Calculation of payments.**

* * * * *

(i) Payments for sales-based commodities will be:

(1) Based on one of the following as elected by the producer:

(i) The producer's sales for calendar year 2018 and crop insurance indemnities and NAP and WHIP+ payments for the 2018 crop year for all sales-based commodities; or

(ii) The producer's sales for calendar year 2019 and crop insurance indemnities and NAP and WHIP+ payments for the 2019 crop year for all sales-based commodities.

(2) Equal to the sum of the results for the following calculation for each sales range in Table 2 of paragraph (j) of this section:

(i) The sum of the amount of the producer's eligible sales for the sales-based commodities in the applicable calendar year and the producer's crop insurance indemnities and NAP and WHIP+ payments for the sales commodities for the applicable crop year within the specified range, multiplied by the payment rate for that range in Table 2 of paragraph (j) of this section.

(ii) Eligible sales only includes sales of raw commodities grown by the producer; the portion of sales derived from adding value to the commodity, such as processing and packaging, and from sales of products purchased for resale is not included in the payment calculation unless determined eligible by the Secretary.

(3) Payments for producers of sales commodities who began farming in 2020 and had no sales in 2019, calculated as provided in paragraph (i)(2) of this section, except that the payments will be based on the producer's actual 2020 sales, without crop insurance indemnities, NAP or WHIP+ payments, as of the date the producer submits an application for payment under this section.

(j) * * *

TABLE 2 TO PARAGRAPH (J)—PAYMENT RATES FOR SALES COMMODITIES

| 2018 or 2019 Sales range (including crop insurance indemnities and NAP and WHIP+ payments) | | | | | | Percent payment factor |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

* * * * *

(l) For eligible contract producers, if eligible revenue for the period from January 1, 2020, through December 27, 2020, decreased compared to eligible revenue for the period from January 1, 2018, through December 27, 2018, or the period from January 1, 2019, through December 27, 2019, then payments will be equal to:

(1) Eligible revenue received from January 1, 2018, through December 27, 2018, or from January 1, 2019, through December 27, 2019; minus

(2) Eligible revenue received from January 1, 2020, through December 27, 2020; multiplied by

(3) 80 percent.

(4) USDA will adjust the eligible revenue based on information certified by the contract producer on form AD–3117B for contract producers who did not have a full period of revenue from January 1 to December 27 for either 2018 or 2019, or who increased their operation size in 2020. Information required to calculate these adjustments may include a contract producer's square footage increase to the operation in 2020, or a contract producer's production or number of turns for 2018, 2019, or 2020, as applicable.

(m) For eligible contract producers who did not receive eligible revenue from January 1 through December 27 in 2018 or 2019, but received eligible revenue for the period from January 1, 2020, through December 27, 2020:

(1) FSA will divide the eligible revenue received from January 1, 2020, through December 27, 2020, by the result of 1 minus the average revenue loss level, determined by USDA for a geographic area based on the best available data including, but not limited to, losses reported by other contract producers for the same area and type of livestock or poultry; and

(2) The payment will be equal to:

(i) The result of the calculation in paragraph (m)(1) of this section minus the contract producer's eligible revenue received from January 1, 2020, through December 27, 2020; multiplied by

(ii) 80 percent.

(n) Payments under paragraphs (l) and (m) of this section and the average revenue loss levels under paragraph (m)(1) of this section will be calculated separately for the following categories:

(1) Chickens—broilers, pullets, and layers;

(2) Chicken eggs;

(3) Turkeys;

(4) Hogs and pigs;

(5) Ducks, geese, pheasants, quail; and

(6) All other eligible poultry eggs.

(o) The calculations in paragraphs (l) and (m) of this section are subject to the availability of funds and will be factored, if needed.

**Gloria Montaño Greene,**

*Deputy Under Secretary, Farm Production and Conservation, U.S. Department of Agriculture.*

[FR Doc. 2021–18423 Filed 8–26–21; 8:45 am]

BILLING CODE 3410–05–P

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

## 14 CFR Part 71

**[Docket No. FAA–2021–0075; Airspace Docket No. 21–ASO–2]**

**RIN 2120–AA66**

## Amendment of Class E Airspace; Muscle Shoals, AL

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action amends Class E airspace extending upward from 700 feet above the surface in Muscle Shoals, AL, due to the decommissioning of the Muscle Shoals Very High Frequency Omni-Directional Radio Range Tactical Air Navigation Aid (VORTAC), and cancellation of the associated approach at Northwest Alabama Regional Airport. This action also updates the airport name under the Class E surface airspace and makes an editorial change replacing the term Airport/Facility Directory with the term Chart Supplement in the legal descriptions of associated Class E airspace. Controlled airspace is necessary for the safety and management of instrument flight rules (IFR) operations in the area.

**DATES:** Effective 0901 UTC, December 2, 2021. The Director of the Federal Register approves this incorporation by reference action under 1 CFR part 51, subject to the annual revision of FAA Order 7400.11 and publication of conforming amendments.

Strickland AR 0743



Office of the Secretary

Washington, D.C. 20250

January 18, 2022

The Honorable Glenn Thompson
Republican Leader
Committee on Agriculture
U.S. House of Representatives
1301 Longworth House Office Building
Washington, D.C.  20515

Dear Ranking Member Thompson:

Thank you for your letter of May 19, 2021, regarding gaps and disparities in distribution of COVID
relief funds prior to the Biden-Harris Administration. I apologize for the delay in this written response.

Your comments and concerns are appreciated.  On March 24, 2021, I announced the Pandemic
Assistance for Producers initiative aimed at addressing gaps and disparities in distributing assistance
under the Coronavirus Food Assistance Program (CFAP).  Further assistance to producers and business
as part of this initiative was announced on June 15 and again on August 24, 2021. The gaps and
disparities we continue to focus on addressing have been brought to our attention by farmers, ranchers,
producers, organizations, and members of Congress. We have provided the latest information about the
Pandemic Assistance for Producers initiative on www.farmers.gov/coronavirus/pandemic-assistance.

From the start, USDA has sought to engage stakeholders directly to collect information about losses
incurred and has invited members of Congress to identify areas for further scrutiny so that we can best
target the limited dollars based on demonstrated need.

To that end, we have announced the following programs:

- The **Spot Market Hog Pandemic Program (SMHPP)** provides pandemic assistance to hog
  producers who sold hogs through a negotiated sale from April 16, 2020 through September 1,
  2020, which reflects when producers faced the greatest reduction in market prices due to the
  pandemic.
- The **Organic and Transitional Education and Certification Program (OTECP)** provides
  pandemic assistance to cover eligible certification and education expenses for agricultural
  producers who are certified organic or transitioning to organic. The economic challenges due to
  the pandemic have made obtaining and renewing USDA organic certification financially
  challenging for many operations.
- The **Pandemic Livestock Indemnity Program (PLIP)** provides relief to chicken, turkey, and
  swine producers who suffered losses during the pandemic due to insufficient access to
  processing.
- The **Pandemic Assistance for Timber Harvesters and Haulers program (PATHH)** provides
  financial relief to timber harvesting and timber hauling businesses that experienced losses in
  2020 due to COVID-19 due to significant disruptions in the logging industry.
- The **Dairy Donation Program (DDP)** allocates $400 million to facilitate dairy product
  donations and reduce food waste. Under this program, eligible dairy organizations partner with

Strickland AR 0744

The Honorable Glenn Thompson
Page 2

- non-profit feeding organizations that distribute food to individuals and families. Those partnerships may apply for and receive reimbursements to cover some expenses related to eligible dairy product donations.
- USDA opened signup for the **Dairy Margin Coverage (DMC) program** and expanded the program to allow dairy producers to better protect their operations by enrolling supplemental production through Supplemental DMC. **Supplemental DMC** will provide $580 million to better help small- and mid-sized dairy operations that have increased production over the years but were not able to enroll the additional production.
- Through the **Pandemic Market Volatility Assistance Program (PMVAP)**, USDA will provide pandemic assistance payments to dairy farmers who received a lower value due to market abnormalities caused by the pandemic and ensuing Federal policies. Payments will reimburse qualified dairy farmers for 80% of the revenue difference per month based on an annual production of up to 5 million pounds of milk marketed and on fluid milk sales from July through December 2020.
- The **Pandemic Response and Safety (PRS) Grant Program** and the **Seafood Processors Pandemic Response and Safety (Seafood PRS) Block Grant Program** will provide approximately $700 million in assistance to small scale specialty crop producers and processors, shellfish, aquaculture and other select producers, meat and other processors, distributors, farmers markets, seafood facilities, and processing vessels impacted by the coronavirus pandemic and who received insufficient federal support to address the costs they incurred to keep workers safe and help keep the U.S. food supply intact during the crisis.
- The **Pandemic Cover Crop Program (PCCP)** provided premium support to producers who insured their spring crop with most insurance policies and planted a qualifying cover crop during the 2021 crop year due to the additional economic challenges the pandemic created for producers working to maintain cover cropping systems.
- Through the **Biofuel Producer Program**, USDA is providing relief to eligible biofuel producers for unexpected market losses as a result of the pandemic in order to maintain a viable and significant biofuels market for agricultural producers that supply biofuel producers. Payments will be based upon the volume of market loss the biofuel producer experienced in the calendar year 2020.
- USDA re-opened and extended the sign-up period for **CFAP 2** in April 2021 and initiated cooperative agreements to provide additional education and outreach informing all producers of the assistance available and the extended enrollment period. In August 2021, grass seed was added as an eligible commodity and additional flexibility was provided to contract producers and producers of sales-based commodities to reflect challenges experienced. As a result, we saw a fourfold increase in applications from historically underserved producers.

In addition to these new programs, USDA has been able to allocate additional funds targeted for pandemic relief through the following existing programs: Value-Added Producer Grant Program, Specialty Crop Block Grant Program, Gus Schumacher Nutrition Incentive Program, Beginning Farmer and Rancher Development Program, and the Local Agriculture Market Program.

As assistance has been developed and finalized, USDA has conducted congressional notifications and

The Honorable Glenn Thompson
Page 3

briefings. USDA is working to provide relief as expeditiously as possible to America's producers who have felt the impact of COVID–19 market disruptions.

I apologize for the delayed written response. Please let me know if you have further questions.

Thank you for writing and for the opportunity to respond.

Sincerely,

Thomas J. Vilsack
Secretary

Received: 1 April 2022 | Accepted: 30 August 2022

DOI: 10.1002/aepp.13325

SUBMITTED ARTICLE

AAEA
Agricultural & Applied
Economics Association

WILEY

# Analysis of the payments from the coronavirus food assistance program and the market facilitation program to minority producers

**Anil K. Giri | Dipak Subedi | Kathleen Kassel**

Economic Research Service, USDA, Washington, DC, USA

**Correspondence**
Anil K. Giri, Economic Research Service, USDA, 1400 Independence Avenue, S.W., Washington, DC 20250, USA.
Email: anil.giri@usda.gov

**Funding information**
This research was supported by the U.S. Department of Agriculture, Economic Research Service. The findings and conclusions in this publication are those of the author(s) and should not be construed to represent any official USDA or U.S. Government determination or policy.

**Editor in charge**: Mindy Mallory

**Abstract**

This paper examines the payments made to minority producers, focused on African American producers, from the COVID-19 program, Coronavirus Food Assistance Program (CFAP), of the United States Department of Agriculture (USDA) and compares it with one of the other more recent ad hoc program payments, the Market Facilitation Program (MFP). There were two rounds of the CFAP, and combinedly (as of March 2022), the program made direct payments of $31.0 billion ($11.8 billion from CFAP 1 and $19.2 billion from CFAP 2) starting in 2020. The MFP made a total payment of $23.5 billion (in two rounds, MFP 2018 and MFP 2019) to producers affected by the retaliatory tariffs placed on US producers by trade partners across multiple years. CFAP made almost $600 million in direct payments to minority producers, including Black or African American producers. Black or African American only producers received more than $52 million in CFAP payments. CFAP payments were proportional to the value of agricultural commodity sold for most minority producers. The 2017 Census of Agriculture showed that the majority of minority producers, including African American producers but excluding Asian producers, raised livestock. CFAP made the highest payments to livestock minority producers. The CFAP

Published 2022. This article is a U.S. Government work and is in the public domain in the USA.

Strickland AR 0747

payment distribution pattern shows that payments reached minority producers who often did not receive Government payments. CFAP made more payments and as a share of total program outlays to minority producers compared to MFP. However, for Black or African American only producers, even though the magnitude increased (because CFAP disbursed more funds compared to MFP), the share of payment received did not increase.

**KEYWORDS**

African American, Coronavirus Food Assistance program (CFAP), government payments, Market Facilitation Program (MFP)

**JEL CLASSIFICATION**

Q1 (Agriculture), Q18 (Agricultural Policy), Q28 (Government Policy)

We saw 99% of the money going to White farmers and 1% going to socially disadvantaged farmers and if you break that down to how much went to Black farmers, it's 0.1%.

-Tom Vilsack, Secretary, USDA, as quoted in Washington Post, March 25, 2021 (Riley, 2021)

The above quote was in reference to the CFAP1 fund disbursed by USDA related to the COVID-19 relief program. After the Secretary Vilsack's statement above, USDA implemented changes with the goal of improving access to COVID-19 relief funds for minority farmers, including Black or African American producers. These changes included expanding eligibility to commodities that were initially not eligible to receive payments. For instance, poultry and contract producers initially were ineligible to receive USDA COVID relief payments. However, on August 24, 2021, USDA updated the Coronavirus Food Assistance Program 2 (CFAP 2) for eligible livestock and poultry contract producers and specialty crops, and other sales-based commodity producers (USDA Farm Service Agency, 2021). Furthermore, the USDA emphasized outreach to small and socially disadvantaged producers, specialty crop and organic producers, timber harvesters, and renewable fuel producers (USDA Press Release, 2021).

Recent studies do not show racial discrimination in the delivery of USDA programs to minority producers after some instances in the past. There was no evidence of racial discrimination in loan approval (Escalante et al., 2006) and loan amounts and maturities (Escalante et al., 2018) from the USDA's Farm Service Agency (FSA). Ghimire et al. (2020) provide evidence in support of reforms made by the USDA's FSA to lend without bias, especially to socially disadvantaged producers and ranchers. They found certain minority borrowers with lower loan amounts at higher interest rates and with shorter maturities. However, this was not because of

Strickland AR 0748

Case 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 192 of 202    PageID 112

discrimination but because of credit risk management considerations (Ghimire et al., 2020). While the lending practice of the USDA has been investigated thoroughly, there are not as many studies that examine the payments made to producers from the USDA. This paper aims to fill that void by examining payments from two recent USDA programs, the CFAP and the Market Facilitation Program (MFP).

This paper examines the payments made to minority producers, focused on African American producers, from the COVID-19 program, CFAP, of the United States Department of Agriculture (USDA) and compares it with one of the other more recent ad hoc program payments. Almost all the payments from CFAP have been made and the USDA is no longer accepting any new applications for the CFAP. Therefore, this paper provides a robust ex-post analysis using a novel dataset of the actual payments and sheds light on payments differentiated by race. It also compares payments from CFAP with payments from the MFP for minority producers, including Black producers. Analysis and findings of this paper have the potential to be useful to policymakers and others when drafting new USDA programs as there is more flexibility in rulemaking and disbursement of payments in ad hoc programs compared to existing farm bill programs.

The CFAP was the main COVID-19 relief program of the USDA. There were two rounds of the CFAP, and combinedly (as of March 2022), the program made direct payments of $31.0 billion ($11.8 billion from CFAP 1 and $19.2 billion from CFAP 2) starting in 2020 (U.S. Department of Agriculture, Farm Service Agency, 2020a, 2020b). Total direct Government payments (in inflation-adjusted 2020 dollars) for 2019, 2020, and the 20-year average (2000 through 2019) were $22.7 billion, $45.7 billion, and $17.8 billion, respectively. These values show that the combined payments from CFAP were significantly larger than the total pre-pandemic year direct Government payments in 2019 and higher than the average total direct Government payment for the past 20 pre-pandemic years.

Figure 1 shows the total direct Government payments from 2000 to 2020 in inflation-adjusted 2020 dollars. Total direct Government payments are payments made from the standing Farm Bill programs and new ad hoc payments to the farm sector. In 2020, the farm sector received the highest recorded direct Government payment in real (inflation-adjusted) dollars. Total direct Government payments for 2020 were $45.7 billion, out of which more than half ($23.5 billion) were from the CFAP program. The other COVID-19 program, the Paycheck Protection Program (PPP), made forgivable loans to offset labor expenses and made up $6.0 billion, or 13% of total direct Government payments. PPP was designed and administered by the Small Business Administration with the help of the Treasury. Combined, the COVID-19 relief programs, CFAP and PPP, made payments of $29.5 billion, or nearly two-thirds of total direct Government payments in 2020. Figure 1 also shows another recent ad hoc program, the MFP. The MFP made a total payment of $23.5 billion (in two rounds, MFP 2018 and MFP 2019) to producers affected by the retaliatory tariffs placed on US producers by trade partners (Giri et al., 2020) across multiple years. The CFAP program was larger than the MFP program, and in 1 year (2020), made more in payments than payments from both rounds of MFP.

The CFAP made direct payments to producers who faced additional pandemic-related marketing costs, market disruptions, increased production costs, and reduced farm-level prices (USDA, 2020a, 2020b). The second round of CFAP 2 was one of the most comprehensive USDA programs as 97% of commodities, measured in terms of cash receipts, were eligible for CFAP 2 funding (Giri et al., 2020). The first round of CFAP (CFAP 1) was also more comprehensive than most of the standing Farm Bill programs, which do not generally make payments to livestock producers. Only 18% of commodities, measured in terms of cash receipts, were ineligible for CFAP 1 funding (Giri et al., 2020).



**FIGURE 1**  Direct government payments to U.S. producers, 2000–2020
*Source*: USDA, Economic Research Service, farm income and wealth statistics, data as of February 4, 2022.
Values are adjusted for inflation using the U.S. Bureau of Economic Analysis Gross Domestic Product Price
Index (BEA API series code: A191RG) rebased to 2020 by USDA, Economic Research Service

## DATA

CFAP outlays in this report and their demographic distributions are taken from USDA FSA administrative data. FSA tabulates payment receipts for those who receive a payment directly and those that benefit indirectly from the payment. As an illustration, consider a small farming operation with four shareholders, each with a 25% ownership share. Farm program payments will be made directly to the operation and attributed to the four owner-operators, or beneficiaries, according to their ownership shares. Therefore, when the operation receives a $100 payment each owner is attributed a $25 benefit. This report analyzes the demographic breakdown and payment receipts of the four beneficiaries, not the operation.

To put the payments in context, we use data from the 2017 Census of Agriculture. Every 5 years, the USDA does a comprehensive survey and collects data on land use and ownership, operator characteristics, production practices, income, and expenditures (USDA NASS 2017 Census of Agriculture). The Census of Agriculture is a complete count of U.S. farms and ranches and the people who operate them (USDA NASS Census of Agriculture). The most recent census of Agriculture for which data is available is the 2017 Census of Agriculture (U.S. Department of Agriculture, 2020c).

## MINORITY PRODUCER CHARACTERISTICS

In the subsequent short sections, we provide the producer characteristics of minority producers, including Black producers, from the 2017 Census of Agriculture. These characteristics are financial as well as demographics related. We provide data on the number of producers, the number of farms operated, agricultural products sold, and total Government payments received in 2017 for each minority producer type.

Strickland AR 0750

ase 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 194 of 202    PageID 113

## Black producers

The 2017 Census of Agriculture reported 48,697 producers who were Black, either alone or in combination with another race and they accounted for 1.4% of the country's 3.4 million producers, and they lived and farmed primarily in southeastern and mid-Atlantic states (USDA, 2019a). The same Census found farms operated by Black producers were smaller on average and accounted for $1.4 billion (0.4%) of agricultural products sold, with 61% ($858 million) in crop sales and 39% ($559 million) in sales of livestock and livestock products (USDA, 2019a). Finally, they received $59 million in government payments in 2017 (USDA, 2019a). Nearly half (48%) of Black-operated farms specialized in cattle and dairy production in 2017, almost all in beef cattle production (USDA, 2019a).

## Asian producers

The 2017 Census of Agriculture reported 25,310 producers who were Asian, either alone or in combination with another race, and they accounted for 0.7% of the country's 3.4 million producers (USDA, 2019b). The 2017 Census found farms operated by Asians were highly concentrated in California and Hawaii. Asian producers were younger and more likely to have recently started farming than U.S. producers overall. In 2017, Asian-operated farms sold $7.5 billion in agricultural products, with 58% ($4.3 billion) in crop sales and 42% ($3.2 billion) in sales of livestock and livestock products (USDA, 2019b). In 2017, Asian-operated farms accounted for less than 2% of total U.S. agriculture sales; more than half specialized in the production of specialty crops and received $27 million in Government payments (USDA, 2019b).

## American Indian/Alaska native producers

The 2017 Census of Agriculture reported 79,198 producers who were American Indian or Alaska Natives, either alone or in combination with another race and they accounted for 2.3% of the country's 3.4 million producers (USDA, 2019c). The same Census found that most farms operated by American Indians or Alaska Natives were in Western and Plains states. Furthermore, the Census also revealed that American Indians or Alaska Natives producers were younger and more likely to be female than U.S. producers overall. In 2017, American Indian/Alaska Natives–operated farms sold $3.5 billion in agricultural products, with 40% ($1.4 billion) in crop sales and 60% ($2.1 billion) in sales of livestock and livestock products (USDA, 2019c). In 2017, these farms accounted for 0.9% of U.S. agriculture sales and received $103 million in government payments (USDA, 2019c).

## CORONAVIRUS FOOD ASSISTANCE PROGRAM (CFAP) PAYMENTS

In the following sections, we examine the CFAP payments at the national and state level. The 2017 Census of Agriculture identifies states with the highest number of African American producers. So, we examine the distribution of CFAP payments in those states. Furthermore, we also compare payments by commodity to minority groups at the national level.

Strickland AR 0751

# CORONAVIRUS FOOD ASSISTANCE PROGRAM (CFAP) PAYMENTS AT NATIONAL LEVEL

Table 1 shows total CFAP payments by race in nominal dollars. The largest share—97.92%, or more than $30 billion out of a total of $30.9 billion—went to White producers. Black or African American producers received 0.17% of total CFAP payments, or $52.72 million. In relative terms, this is slightly lower than their reported share of contribution to the total market value of agricultural products sold based on 2017 Agricultural Census data (the last data available). Producers who identified as Black or African American only (and not in combination with other races) contributed 0.27% of the total market value in 2017 (Census of Agriculture 2017) but received 0.17% of total CFAP payments. It is important to note that share of production can and does change year to year. Factors such as the price of commodities planted and harvested by producers, change in commodities produced, and other local and regional factors (such as weather) can affect the market value. Therefore, it is possible that the share of market value for 2020 could be the same as the share of CFAP received by Black producers.

Overall, for producers differentiated by race, the CFAP payments **were more** closely aligned to the market value of products sold at the national level. Where differences existed, the difference was marginal. Producers identified as Asians contributed 1.82% ($7.1 billion) of the market value of agricultural products sold in 2017 and received 0.64% ($196.78 million) of total CFAP dollars. American Indians or Alaska Natives received $261.51 million (0.85% of total CFAP, slightly higher than their share of the market value of agricultural products sold). Native Hawaiian or Other Pacific Islanders received $17.97 million (0.06% of total CFAP, slightly lower than their share of the market value of agricultural products sold). White-only producers received the largest amount at $30.2 billion (97.92% of total CFAP, slightly higher than their

**TABLE 1** Coronavirus food assistance program (CFAP) payments and market value of agricultural products sold by race

| Race | Total CFAP payments (in $ million) | Share (%) of total CFAP | Market value of agricultural products sold ($ million) | Share (%) of market value of agricultural products sold |
|---|---|---|---|---|
| American Indian or Alaska Natives only | $261.51 | 0.85% | $2340.80 | 0.60% |
| Asian only | $196.78 | 0.64% | $7106.41 | 1.82% |
| Black or African American only | $52.72 | 0.17% | $1076.05 | 0.27% |
| Native Hawaiian or other Pacific Islander only | $17.97 | 0.06% | $517.03 | 0.13% |
| White only | $30,216.27 | 97.92% | $380,286.34 | 97.18% |

*Note*: This table shows CFAP payments and market value of agricultural products sold by race categories. Among minority American Indian or Alaska Native only producers received the most payments, but the value of production was highest for Asian only producers. Asian only producers tend to produce specialty crops (fruits, vegetables, and nursery crops).
*Source*: CFAP payments are from FSA. Market value of agricultural product sold are from the 2017 Census of Agriculture, Table 61. Race categories used to determine shares of value of production are for producer reporting that race alone, not in combination with other races.

Strickland AR 0752

ase 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 196 of 202    PageID 113

share of market value at 97.18% of total agricultural products sold). *T*-test showed the share of CFAP payments and share of the market value of agricultural products sold (in Table 1) were not statistically significantly different.

## CORONAVIRUS FOOD ASSISTANCE PROGRAM (CFAP) PAYMENTS AT STATE LEVEL

Figure 2 shows the distribution of total CFAP dollars at the state level. The states where Black or African American only producers received the highest CFAP dollars were Mississippi ($8.9 million), Alabama ($6.4 million), Texas ($5.7 million), Georgia ($5.1 million), Louisiana ($3.5 million), Arkansas ($3.2 million), Florida ($2.8 million), North Carolina ($2.6 million), Oklahoma ($2.5 million), Virginia ($2.4 million), South Carolina ($2.3 million), and Tennessee ($1.9 million). Black or African American only producers of these 12 states received 95% of all CFAP payments made to Black or African American only producers.

Figure 2 also shows the share of total CFAP received by Black or African American only producers for each of the States. Black or African American only producers in five states



| State (top 12) | CFAP payments to Black or African American producers ($) | Share of total State CFAP payments that went to Black or African American producers (%) |
|---|---|---|
| Mississippi | $8,898,798 | 2.60 |
| Alabama | $6,370,186 | 2.44 |
| South Carolina | $2,316,699 | 1.89 |
| Louisiana | $3,516,463 | 1.21 |
| Georgia | $5,116,196 | 1.15 |
| Virginia | $2,426,315 | 0.86 |
| Arkansas | $3,236,312 | 0.65 |
| Florida | $2,774,217 | 0.62 |
| North Carolina | $2,558,449 | 0.56 |
| Tennessee | $1,919,310 | 0.50 |
| Texas | $5,738,958 | 0.32 |
| Oklahoma | $2,531,240 | 0.29 |

**FIGURE 2**  Distribution of total coronavirus food assistance program (CFAP) payments to black or African American only producers by state
*Source*: Farm Service Agency (FSA), USDA.

Strickland AR 0753

received more than 1% of the total CFAP dollars received by all producers of that state. Those five states were: Mississippi (2.6%), Alabama (2.4%), South Carolina (1.9%), Louisiana (1.2%), and Georgia (1.2%). Figure 1 suggests that Black or African American only producers in states with higher numbers received more in CFAP dollars and more as a share of total CFAP dollars for the states. This suggests that participation and allocation of CFAP dollars in States with a higher population of African American producers were relatively proportional. We explicitly list the total CFAP dollars and share of total CFAP dollars received by Black or African American only producers for the top 12 states, based on the number of producers, from the 2017 Census of Agriculture.

## CORONAVIRUS FOOD ASSISTANCE PROGRAM PAYMENTS BY COMMODITY AND RACE

Table 2 shows the total CFAP payments (at the national level) by commodities for minority producers. There are a few key observations from Table 2. First, except for Asian producers, the highest CFAP payments were for cattle producers. American Indian or Alaska Natives only producers received the highest CFAP cattle payments ($165.4 million), followed by Black or African American only cattle producers ($28.9 million). Native Hawaiian or other Pacific Islander only cattle producers received $22.7 million in CFAP payments. This aligns with the Census of Agriculture finding that the majority of minority producers, except Asians, are engaged in livestock production, especially cattle production. Asian American producers engaged more in poultry production. It is important to note that cattle producers of all races do not generally receive Government payments from standing Farm Bill programs. Therefore, it is more likely than not that many minority cattle producers, including Black producers, received Government payments for the first time. The CFAP payment distribution pattern shows that payments reached minority producers who often did not receive Government payments.

Cattle producers not only received larger payments but also a larger share of total CFAP payments for that race (i.e., distribution of CFAP payments was skewed toward cattle producers), except for Asian producers. Sixty-six percent, 60%, and 51% of total CFAP payment made to American Indian or Alaska Natives only, Black or African American only, Native Hawaiian or other Pacific Islander only producers, respectively, went to cattle producers of that race. Asian only cattle producers received 3% of total CFAP payments made to all Asian producers. Asian producers received the highest payment in all other categories, which includes specialty crops. This is also consistent with the Census of Agriculture finding that showed more than half of Asian-operated farms specialized in the production of specialty crops. Black or African American only producers received the second largest amount of soybean CFAP dollars at $7.1 million, or 37% of total CFAP dollars.

## CORONAVIRUS FOOD ASSISTANCE PROGRAM PAYMENTS BY COMMODITIES TO BLACK OR AFRICAN AMERICAN ONLY PRODUCERS AT STATE LEVEL

The 2017 Census of Agriculture identifies the share of farms specializing by commodity types for Black producers. The Census shows more than 54% of farms operated by Black producers specialized in livestock enterprises: cattle and dairy (48%), sheep and goats (4%), hogs and pigs

Strickland AR 0754

(1%), and poultry and eggs (1%) operations. Eighteen percent of Black-operated farms specialized in other crops and 12% in specialty crops. It is not possible, using publicly available Census tabulations, to break down the other crop and specialty crops categories. The Census identifies the top 12 states with Black producers. Therefore, we examine CFAP payments by livestock commodities for those top 12 states.

Table 3 shows CFAP payments by commodity for 12 states with the most Black or African American only producers. We find for half of the 12 States more than half of CFAP dollars went to cattle producers. More than 96% of total CFAP dollars in Oklahoma went to Black or African American only cattle producers. The share was 91%–80% for Black or African American only cattle producers of Texas and Alabama, respectively. For some other states such as North Carolina, Arkansas, and Virginia the share of total CFAP payments to cattle producers was less than one-third. In fact, the share of total CFAP dollars going to all livestock enterprises was less than one-third for these states suggesting Black or African American only producers engage more in crop enterprises in these states.

**TABLE 2**  Coronavirus food assistance program payments by commodities to minority producers

| Commodity | American Indian or Alaska natives only | Black or African American only | Asian only | Mixed race | Native Hawaiian or other Pacific islander only |
|---|---|---|---|---|---|
| Alfalfa | $5,183,958 | $15,737 | $242,745 | $860,799 | $210,433 |
| Almonds | $745,282 | $38,854 | $12,148,244 | $2,049,760 | $157,395 |
| Basil | N/A | $1266 | $2,318,190 | N/A | N/A |
| Cattle | $165,374,112 | $28,948,052 | $6,048,560 | $22,669,496 | $8,611,355 |
| Chickens | $6,687,273 | $845,199 | $26,891,495 | $2,302,785 | N/A |
| Corn | $10,940,008 | $2,945,072 | $1,391,221 | $4,215,719 | $2,007,505 |
| Cotton | $5,386,447 | $2,529,984 | $166,815 | $821,401 | $74,337 |
| Guava | N/A | N/A | $7,091,342 | $79,610 | N/A |
| Hogs | $662,214 | $691,670 | $153,779 | $240,906 | $217,482 |
| Milk | $2,470,887 | $166,055 | N/A | $616,796 | $293,934 |
| Milk/Lbs | $2,694,662 | $162,225 | N/A | $377,049 | $141,269 |
| Mushrooms | $2,087,689 | N/A | $102,093 | N/A | N/A |
| Pistachios | $206,494 | $16,259 | $2,271,937 | $195,063 | $2881 |
| Soybeans | $7,999,815 | $7,154,988 | $762,302 | $2,638,996 | $720,628 |
| Squash | $22,810 | $186,593 | $2,338,151 | N/A | N/A |
| Strawberries | $3,098,262 | $14,109 | $1,477,785 | N/A | $73,128 |
| Tomatoes | N/A | $19,458 | $1,833,914 | N/A | $23,766 |
| Walnuts | $964,671 | N/A | $6,723,399 | $537,113 | $40,121 |
| Wheat | $13,053,537 | $847,903 | $553,388 | $2,680,480 | $664,294 |
| All other | $23,862,185 | $3,820,011 | $107,111,575 | $16,409,930 | $3,727,328 |

*Note*: This table shows CFAP payments by commodity differentiated by race. Cattle producers of all races but Asian only received the largest payments.
*Source*: Farm Service Agency, USDA.

Strickland AR 0755

**TABLE 3**  Coronavirus food assistance program payments by commodities to Black or African American only producers for census identified top states

| State | Cattle | Hogs and pigs | Poultry and eggs | Sheep and goats | Total CFAP |
|---|---|---|---|---|---|
| Alabama | $5,109,902 | $27,641 | N/A | $6210 | $6,370,186 |
| Arkansas | $762,341 | N/A | N/A | $5921 | $3,236,312 |
| Florida | $969,517 | $128,328 | N/A | $23,430 | $2,774,217 |
| Georgia | $2,335,267 | $95,039 | $291,867 | $38,514 | $5,116,196 |
| Louisiana | $2,201,393 | $4002 | $127,646 | N/A | $3,516,463 |
| Mississippi | $6,007,946 | $57,154 | $215,768 | N/A | $8,898,798 |
| North Carolina | $376,916 | $188,351 | N/A | $7921 | $2,558,449 |
| Oklahoma | $2,440,935 | N/A | N/A | N/A | $2,531,240 |
| South Carolina | $1,203,855 | $83,302 | $48,028 | N/A | $2,316,699 |
| Tennessee | $701,818 | N/A | N/A | N/A | $1,919,310 |
| Texas | $5,225,990 | $29,555 | N/A | $26,757 | $5,738,958 |
| Virginia | $629,915 | $53,505 | $161,890 | N/A | $2,426,315 |
| Total | $28,948,052 | $691,670 | $845,199 | $166,413 | $52,722,269 |

*Note*: This table shows payments to Black or African American producers in states with the largest Black or African American producers. Black or African American producers of Mississippi received the largest CFAP payments.
*Source*: Farm Service Agency, USDA. Top states identified by the 2017 Census of Agriculture.

# COMPARISON OF THE CORONAVIRUS FOOD ASSISTANCE PROGRAM AND MARKET FACILITATION PROGRAM PAYMENTS BY RACE

The MFP and CFAP programs were implemented for entirely different purposes. The MFP made payments to producers impacted by retaliatory tariffs placed on American producers. The CFAP made assistance payments to producers impacted by the COVID-19 pandemic. Fewer commodities were eligible for MFP payments compared to CFAP payments. Finally, payment rates and payment structure were different for the two programs. Therefore, there are significant limitations to drawing conclusions by comparing payments from these two programs. However, the programs had some similarities, including payment limitations. Both programs were new programs designed by the USDA. So, comparing the share of total payments made to producers differentiated by race can still provide insights into designing future programs to reach more minority producers.

Table 4 lists the total and share of MFP and CFAP payments by race and shows a higher share of CFAP payments went to minority producers. While 99.18% of total MFP payments went to White only producers, 97.92% of total CFAP payments went to White only producers. This information provides evidence that more payments as a share of total payments from CFAP went to minority producers compared to MFP. However, this gain was not realized by Black or African American only producers.

An interesting observation from Table 4 is that even though the two programs were significantly different in scope and propose, they both paid 0.17% of total payments to Black or

Strickland AR 0756

ase 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 200 of 202    PageID 113

**TABLE 4**  Payments from the market facilitation program and coronavirus food assistance program differentiated by race

| Race | Total CFAP payments ($ million) | Share (%) of total CFAP | Total MFP ($ million) | Share (%) of total MFP |
|---|---|---|---|---|
| American Indian or Alaska Natives only | $261.51 | 0.85% | $64.90 | 0.28% |
| Asian only | $196.78 | 0.64% | $26.44 | 0.11% |
| Black or African American only | $52.72 | 0.17% | $40.35 | 0.17% |
| Mixed race | $59.35 | 0.19% | $22.77 | 0.10% |
| Native Hawaiian or other Pacific Islander only | $17.97 | 0.06% | $7.35 | 0.03% |
| Unknown race | $52.40 | 0.17% | $27.30 | 0.12% |
| White only | $30,216.27 | 97.92% | $22,938.39 | 99.18% |
| Total | $30,857.01 | 100.00% | $23,127.52 | 100.00% |

*Note*: This table shows CFAP and MFP payments by race. Among identified minority producers, American Indian or Alaska Natives only producers received the largest total CFAP and MFP payments.
*Source*: Farm Service Agency, USDA.

African American only producers. Table 4 also shows in absolute terms the CFAP's total outlay was $7.7 billion, or 33%, more than MFP. The amount of money received by Black or African American only producers increased from $40.35 million from MFP to $52.72 million from CFAP, a 31% increase.

The gain of more CFAP payments being disbursed (as a share of total payments) to minority producers was realized by American Indian or Alaska Natives only producers, Asian only producers, and Native Hawaiian or other Pacific Islander only producers. These producers received more than double in actual payments and as a share of total payments from CFAP compared to MFP. American Indian or Alaska Natives only producers received a higher share (0.85%) of total CFAP payments compared to (0.28% of total) MFP payments. Asian only producers received a higher share (0.64%) of total CFAP payments compared to (0.11% of total) MFP payments. Native Hawaiian or Other Pacific Islander only producers received a higher share (0.06%) of total CFAP payments compared to (0.03% of total) MFP payments.

## CONCLUSION

The CFAP was the main USDA program that provided economic relief to producers impacted by the COVID-19 pandemic. CFAP made almost $600 million in direct payments to minority producers, including Black or African American producers. Black or African American only producers received more than $52 million in CFAP payments. CFAP payments were proportional to the value of agricultural commodity sold for most minority producers. The 2017 Census of Agriculture showed that the majority of minority producers, including African American producers but excluding Asian producers, raised livestock. CFAP made the highest payments to livestock minority producers. In some States, such as Oklahoma, 96% of CFAP dollars received

Strickland AR 0757

by Black or African American only producers went to cattle producers. Producers of almost all commodities, measured in cash receipts, were eligible to receive CFAP payments. Therefore, many producers of all races that do not generally receive Government payments received payments in 2020. CFAP made more payments in actual dollars and as a share of total program outlays to minority producers compared to MFP. However, for Black or African American only producers, even though the magnitude increased (because CFAP disbursed more funds compared to MFP), the share of payment received did not increase. CFAP payments were more than double and as a share of total program dollars to minority producers (except for Black or African- American producers) compared to MFP.

## ACKNOWLEDGMENTS

We thank USDA economists John Jinkins and Melinda Wengrin for the data and review. We also thank USDA economists Jeff Hopkins and Krishna Paudel for their review and input. Finally, we also thank anonymous reviewers and Mindy Mallory for their review and feedback.

## REFERENCES

Escalante, Cesar L., Rodney L. Brooks, James E. Epperson, and Forrest E. Stegelin. 2006. "Credit Risk Assessment and Racial Minority Lending at the Farm Service Agency." *Journal of Agricultural and Applied Economics* 38(1): 61–75.

Escalante, Cesar L., Adenola Osinubi, Charles Dodson, and Carmina E. Taylor. 2018. "Looking beyond Farm Loan Approval Decisions: Loan Pricing and Nonpricing Terms for Socially Disadvantaged Farm Borrowers." *Journal of Agricultural and Applied Economics* 50(1): 129–48.

Ghimire, Jyotsna, Cesar L. Escalante, Ramesh Ghimire, and Charles B. Dodson. 2020. "Do Farm Service Agency borrowers' Double Minority Labels Lead to more Unfavorable Loan Packaging Terms?" *Agricultural Finance Review* 80(5): 633–46.

Anil K. Giri, Tia M. McDonald, Dipak Subedi, and Christine Whitt (2021). COVID-19 Working Paper: Financial Assistance for Farm Operations and Farm Households in the Face of COVID-19 (No. 1962-2021-2204).

Giri, Anil, E. Wesley F. Peterson, Sankalp Sharma, and Iuliia Tetteh. 2020. "Ex-Post Analysis of the 2018–2019 Market Facilitation Programs." *Choices* 35(3): 1–12. Available online: https://www.choicesmagazine.org/choices-magazine/submitted-articles/ex-post-analysis-of-the-2018-and-2019-market-facilitation-programs.

Reiley, Laura. Agriculture Secretary tom Vilsack Says Only 0.1 Percent of Trump administration's Covid Farm Relief Went to Black Farmers. The Washington Post. 2021. Available online: https://www.washingtonpost.com/business/2021/03/25/vilsack-interview-usda-rescue-plan/.

U.S. Department of Agriculture. 2019a. *2017 Census of Agriculture Highlights Black Producers*. Washington, DC: National Agricultural Statistics Service, United States Department of Agriculture. https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Black_Producers.pdf.

U.S. Department of Agriculture. 2019b. *2017 Census of Agriculture Highlights Asian Producers*. Washington, DC: National Agricultural Statistics Service, United States Department of Agriculture. https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Asian_Producers.pdf.

U.S. Department of Agriculture. 2019c. *2017 Census of Agriculture Highlights American Indian/Alaska Native Producers*. Washington, DC: National Agricultural Statistics Service, United States Department of Agriculture. https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_AmericanIndianAlaskaNative_Producers.pdf.

U.S. Department of Agriculture. 2020a. *Coronavirus Food Assistance Program 2 Cost-Benefit Analysis*. Washington, DC: U.S. Department of Agriculture.

U.S. Department of Agriculture. 2020b. *Coronavirus Food Assistance Program Cost-Benefit Analysis*. Washington, DC: U.S. Department of Agriculture.

U.S. Department of Agriculture. 2020c. *Census of Agriculture*. Washington, DC: U.S. Department of Agriculture, National Agricultural Statistics Service. Available online: https://www.nass.usda.gov/AgCensus/.

U.S. Department of Agriculture, Farm Service Agency. 2020a. *Coronavirus Food Assistance Program 1 Data*. Washington, DC: U.S. Department of Agriculture, Farm Service Agency.

ase 2:24-cv-00060-Z    Document 30-2    Filed 07/31/24    Page 202 of 202    PageID 113

U.S. Department of Agriculture, Farm Service Agency. 2020b. *Coronavirus Food Assistance Program 2 Data*. Washington, DC: U.S. Department of Agriculture, Farm Service Agency.

U.S. Department of Agriculture, Farm Service Agency's Newsroom. 2021. *USDA Updates Pandemic Assistance for Livestock, Poultry Contract Producers and Specialty Crop Growers*. Washington, DC: U.S. Department of Agriculture, Farm Service Agency. Available online: https://www.fsa.usda.gov/news-room/news-releases/2021/usda-updates-pandemic-assistance-for-livestock-poultry-contract-producers-and-specialty-crop-growers.

U.S. Department of Agriculture Press Release. 2021. *After Identifying Gaps in Previous Aid, USDA Announces "Pandemic Assistance for Producers" to Distribute Resources more Equitably*. U.S. Department of Agriculture: Washington, DC. Available online: https://www.usda.gov/media/press-releases/2021/03/24/after-identifying-gaps-previous-aid-usda-announces-pandemic.

**How to cite this article:** Giri, Anil K., Dipak Subedi, and Kathleen Kassel. 2022. "Analysis of the Payments from the Coronavirus Food Assistance Program and the Market Facilitation Program to Minority Producers." *Applied Economic Perspectives and Policy* 1–13. https://doi.org/10.1002/aepp.13325