**USDA**
OFFICE OF INSPECTOR GENERAL
U. S. DEPARTMENT OF AGRICULTURE

# USDA Coronavirus Food Assistance Program Data Story



OAI Report 22-033-01
December 2022

Strickland AR 0760

# OFFICE OF INSPECTOR GENERAL
## United States Department of Agriculture

**DATE:** December 1, 2022

**PRODUCT NUMBER:** 22-033-01

**TO:** Zach Ducheneaux
Administrator
Farm Service Agency

**ATTN:** Gary Weishaar
Branch Chief
External Audits and Investigations Division

**FROM:** Craig M. Goscha
Deputy Assistant Inspector General for Analytics and Innovation

**SUBJECT:** USDA Coronavirus Food Assistance Program Data Story

The U.S. Department of Agriculture (USDA) Office of Inspector General (OIG) has launched a series of data products called data stories. The purpose of these data stories is to enhance transparency of significant USDA programs using data analytics and visualizations while integrating data storytelling methods.

This data story is the second in the series and focuses on the USDA Coronavirus Food Assistance Program (CFAP). This product utilized data analytics, visualizations, and data storytelling methods to enhance transparency of how the CFAP 1 and CFAP 2 programs evolved over time. The data utilized for this data story were unaudited.

CFAP 1 and CFAP 2 provided payments to agricultural producers to help address the economic hardships created when COVID-19 disrupted the agricultural supply chain. This CFAP data story invites the reader to explore both programs and how they evolved from inception to the end of February 2022 in response to changing pandemic conditions.

Farm Service Agency's written response to the data story is included in its entirety in the data story and this report. OIG applied the established Office of Analytics and Innovation quality assurance standards to ensure the information presented in this product is adequately supported.

We appreciate the courtesies and cooperation extended to us by members of your staff during the development of this data story. The product will be posted in its entirety to our website (usdaoig.oversight.gov) in the near future.

Attachment

| Topic: | **Response to the Office of Inspector General Data Story on the Coronavirus Food Assistance Program** |
|---|---|

| To: | Craig Goscha, Craig.Goscha@oig.usda.gov<br>Deputy Assistant Inspector General, Analytics and Innovation, Office of Inspector General |
|---|---|
| From: | Zach Ducheneaux, Zach.Ducheneaux@usda.gov<br>Administrator, Farm Service Agency, U.S. Department of Agriculture |

The U.S. Department of Agriculture's (USDA's) Farm Service Agency (FSA) commends the Office of Inspector General's launch of its new product, Data Stories, and its efforts to use this product to enhance the transparency of significant USDA programs using data analytics and visualization while integrating data storytelling methods.  Below are our comments:

FSA agrees with OIG's explanation of the sizable disruptions to food supply chains caused by the onset of the COVID-19 pandemic and the impacts of those disruptions on American farmers, ranchers, and producers. Through funds passed by Congress in response to this unprecedented crisis, USDA under the previous Administration distributed tens of billions of dollars in supplemental assistance to agricultural producers.  Part of this assistance was distributed through the Coronavirus Food Assistance Program (CFAP).

The previous Administration announced the CFAP on April 17, 2020. This program, which totaled over $19 billion, initially provided support to farmers and ranchers impacted by the COVID-19 pandemic.  The vast majority of this funding—$16 billion—was administered as direct payments to producers who suffered price declines and faced additional significant marketing costs as a result of lower demand, surplus production, and disruptions to shipping patterns and the orderly marketing of commodities.

OIG appropriately notes that, following the initial payments under the original CFAP ("CFAP 1"), in September 2020, the previous Administration announced details of another multi-billion "CFAP 2."   Unlike CFAP 1, payments under CFAP 2 were divided into multiple categories, including price trigger commodities, flat-rate commodities, and sales commodities. In December 2021, Congress also approved additional funding for relief to agricultural producers, including a third round of CFAP payments.

As all forms of CFAP assistance were paid out to producers, Congressional leaders and agricultural stakeholders raised concern that the relief was not reaching a broad enough set of producers, and many of the most vulnerable agricultural communities were not receiving the assistance they needed to weather the pandemic.

While the OIG Data Story elevates the fact that more than 200 commodities were ultimately included under both CFAP 1 and CFAP 2—and that both programs were amended over time to include "wider varieties of producers and commodities"—it is important to understand that

both iterations of the program had very low participation among minority producers. When CFAP 1 was initially implemented, the program had a minority participation rate of 4.4 percent (3.5 percent of payments), and prior to being reopened, CFAP 2 had a minority participation rate of 4.2 percent (3 percent of payments). That is why, one of the first actions of Biden-Harris Administration leadership was to temporarily pause CFAP payments; the Administration paused payments so that USDA could conduct a detailed analysis of the payments that had been issued and the gaps in assistance that remained. The Administration deemed it essential to ensure that future CFAP payments were targeted towards producers and industries that had not yet benefitted from the program.

During its review and analysis of previous CFAP payments, USDA found that, under CFAP 2 in particular, sign-up appeared rushed and lacked normal procedures focused on ensuring effective outreach, from translated forms to partnerships focused on reaching underserved and nontraditional customers. USDA also found that, while the sales commodity category of payments under CFAP 2 provided a new opportunity to reach specialty crop and diversified producers who normally do not participate in USDA's price support programs, data continued to reflect a lack of nontraditional producers' participation through this category.

After completing its analysis of the program, in March 2021, USDA shared that it would re-open signup for CFAP 2 for at least 60 days beginning on April 5, 2021. USDA's FSA committed at least $2 million to improve outreach for CFAP 2 and established partnerships with organizations with strong connections to historically underserved communities to ensure they were informed and aware of the application process. The formula payments to finish out CFAP went out under the then-existing CFAP rules due to statutory requirements. However, future opportunities for USDA pandemic assistance were reviewed for verified need, and during the rulemaking process, USDA was committed to making eligibility more consistent with the Farm Bill.

It is important to note that the re-opening of CFAP sign-up under the Biden-Harris Administration was for all eligible producers and was based on the clear discovery of inadequate outreach under previous iterations of the program. As a result of USDA's efforts, USDA saw a fourfold increase in CFAP 2 participation by underserved producers during the reopening period.

Moreover, in addition to reopening CFAP and intentionally working to expand its reach in underserved communities, USDA concurrently established several new programs and efforts to bring financial assistance to farmers, ranchers, and producers who felt the impacts of COVID-19 market disruptions but had not received assistance through CFAP. USDA dedicated $6 billion to a new Pandemic Assistance for Producers initiative, putting a greater emphasis on outreach to small and underserved producers, including but not limited to specialty crop and organic producers, timber harvesters, and others impacted by COVID.

The Department remains focused on reaching a better understanding of where barriers to accessing USDA programs and services exist, so that they can be better addressed both in program design as authorities allow and in USDA's outreach efforts. FSA respectfully

requests the OIG CFAP data story reflect the additional context and information this management response provides.

Learn more about USDA OIG
Visit our website: **https://usdaoig.oversight.gov/**
Follow us on Twitter:  @OIGUSDA

How to Report Suspected Wrongdoing in USDA Programs

Fraud, Waste, and Abuse
File complaint online: **https://usdaoig.oversight.gov/hotline**

Monday–Friday, 9:00 a.m.– 3:00 p.m. ET
In Washington, DC 202-690-1622
Outside DC 800-424-9121
TDD (Call Collect) 202-690-1202

Bribes or Gratuities
202-720-7257 (24 hours)

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public
assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

All photographs on the front and back covers are from USDA's Flickr site and are in the public domain. They do not depict any particular audit, inspection, or investigation.

Strickland AR 0765

**Sum of Total Payments**

| Gender /Race | | Hispanic Ltno | Not Hispanic | (blank) | Grand Total |
|---|---|---|---|---|---|
| **Female** | **$407,994.35** | **$8,745,361.80** | **$1,269,534,627.78** | **$49,111,693.19** | **$1,327,799,677.12** |
| Amer Ind/Alaska | | $537,000.49 | $3,309,720.68 | $38,950.25 | $3,885,671.42 |
| Asian | | $2,537.48 | $1,826,391.92 | $1,423.14 | $1,830,352.54 |
| Black | | $40,105.51 | $1,863,168.49 | $67,689.41 | $1,970,963.41 |
| Hawaiian/Pcf Is | | $3,743.44 | $681,090.87 | $95,936.41 | $780,770.72 |
| Two or More | | | $780,263.82 | $13,970.41 | $794,234.23 |
| White | | $8,025,933.42 | $1,261,073,992.00 | $48,893,723.57 | $1,317,993,648.99 |
| (blank) | $407,994.35 | $136,041.46 | | | $544,035.81 |
| **Male** | **$378,893.75** | **$54,853,936.70** | **$11,819,817,640.33** | **$153,764,976.72** | **$12,028,815,447.50** |
| Amer Ind/Alaska | | $2,074,623.73 | $31,609,011.27 | $44,615.36 | $33,728,250.36 |
| Asian | | $4,984.80 | $7,079,422.35 | $12,062.52 | $7,096,469.67 |
| Black | | $54,052.44 | $23,452,369.04 | $385,263.47 | $23,891,684.95 |
| Hawaiian/Pcf Is | | $91,043.92 | $2,752,580.39 | $19,125.51 | $2,862,749.82 |
| Two or More | | $8,700.47 | $11,591,711.88 | $77,580.59 | $11,677,992.94 |
| White | | $52,426,509.60 | $11,743,332,545.40 | $153,226,329.27 | $11,948,985,384.27 |
| (blank) | $378,893.75 | $194,021.74 | | | $572,915.49 |
| **Org Other** | **$223,537,039.84** | **$19,747,940.35** | **$2,454,257,212.33** | **$2,291,564,781.10** | **$4,989,106,973.62** |
| Amer Ind/Alaska | | $611,126.46 | $5,348,391.14 | $6,168,622.58 | $12,128,140.18 |
| Asian | | | $2,793,903.29 | $279,868.80 | $3,073,772.09 |
| Black | | | $3,420,993.34 | $2,597,022.02 | $6,018,015.36 |
| Hawaiian/Pcf Is | | | $818,589.10 | $269,870.76 | $1,088,459.86 |
| Two or More | | $240,759.49 | $3,420,085.84 | $1,843,101.07 | $5,503,946.40 |
| White | | $16,245,125.79 | $2,390,949,266.53 | $2,280,406,295.87 | $4,687,600,688.19 |
| (blank) | $223,537,039.84 | $2,650,928.61 | $47,505,983.09 | | $273,693,951.54 |
| **Org/Fem-Owned** | **$16,878,297.75** | **$787,857.57** | **$126,247,857.93** | **$20,739,265.94** | **$164,653,279.19** |
| Amer Ind/Al | | $25,004.04 | | | $25,004.04 |
| Amer Ind/Ala | | | $493,687.79 | | $493,687.79 |
| Asian | | | $435,460.56 | $15,078.25 | $450,538.81 |
| Black | | | $834,981.05 | $94,668.44 | $929,649.49 |
| Hawaiian/Pcf | | | $49,835.27 | | $49,835.27 |
| Two or More | | | $2,102.40 | $5,122.65 | $7,225.05 |
| White | | $731,206.48 | $120,647,378.31 | $20,624,396.60 | $142,002,981.39 |
| (blank) | $16,878,297.75 | $31,647.05 | $3,784,412.55 | | $20,694,357.35 |
| **Org/Male-Owned** | **$159,701,846.56** | **$10,794,919.82** | **$1,694,682,052.60** | **$281,200,512.84** | **$2,146,379,331.82** |
| Amer Ind/A | | $315,641.17 | | | $315,641.17 |
| Amer Ind/Al | | | $3,014,559.88 | | $3,014,559.88 |
| Amer Ind/Alaska | | | | $128,453.14 | $128,453.14 |
| Asian | | | $2,540,893.25 | $339,673.23 | $2,880,566.48 |
| Black | | $21,254.68 | $3,996,578.67 | $227,709.24 | $4,245,542.59 |
| Hawaiian/P | | $2,821.88 | | | $2,821.88 |
| Hawaiian/Pc | | | $2,311,020.89 | | $2,311,020.89 |
| Hawaiian/Pcf Is | | | | $642,293.98 | $642,293.98 |
| Two or More | | $3,772.80 | $174,486.39 | | $178,259.19 |
| White | | $9,492,049.30 | $1,636,764,773.72 | $279,862,383.25 | $1,926,119,206.27 |
| (blank) | $159,701,846.56 | $959,379.99 | $45,879,739.80 | | $206,540,966.35 |
| **Unknown** | **$1,171,100,701.51** | **$3,831,296.21** | **$953,058,008.72** | **$285,633,241.37** | **$2,413,623,247.81** |
| Amer Ind/Alaska | | $165,996.21 | $1,971,170.80 | $254,680.82 | $2,391,847.83 |
| Asian | | $2,918.02 | $1,375,098.88 | $156,542.62 | $1,534,559.52 |
| Black | | | $1,180,264.18 | $4,818.95 | $1,185,083.13 |
| Hawaiian/Pcf Is | | | $532,843.19 | $140,410.59 | $673,253.78 |
| Two or More | | | $322,783.85 | | $322,783.85 |
| White | | $3,425,416.46 | $840,768,635.72 | $285,076,788.39 | $1,129,270,840.57 |
| (blank) | $1,171,100,701.51 | $236,965.52 | $106,907,212.10 | | $1,278,244,879.13 |
| **Grand Total** | **$1,572,004,773.76** | **$98,761,312.45** | **$18,317,597,399.69** | **$3,082,014,471.16** | **$23,070,377,957.06** |

**Sum of Total Payment  (blank)**

| Gender / Race | | Hispanic Ltno | Not Hispanic | Grand Total |
|---|---|---|---|---|
| **Female** | **$13,973,615.14** | **$5,513,351.78** | **$420,986,891.32** | **$440,473,858.24** |
| | $62,408.07 | $25,316.29 | | $87,724.36 |
| Amer Ind/Alaska | $28,775.52 | $462,505.40 | $8,839,569.91 | $9,330,850.83 |
| Asian | | $5,796.00 | $1,476,769.52 | $1,482,565.52 |
| Black | $34,486.21 | $6,103.24 | $1,412,418.17 | $1,453,007.62 |
| Hawaiian/Pcf Is | $50,841.40 | $8,278.00 | $690,692.56 | $749,811.96 |
| Two or more | $5,214.00 | | $1,034,665.97 | $1,039,879.97 |
| White | $13,791,889.94 | $5,005,352.85 | $407,532,775.19 | $426,330,017.98 |
| **Male** | **$78,717,164.87** | **$41,588,442.05** | **$4,157,572,131.34** | **$4,277,877,738.26** |
| | $393,606.67 | $762,229.12 | | $1,155,835.79 |
| Amer Ind/Alaska | $270,836.88 | $2,604,248.23 | $59,806,027.72 | $62,681,112.83 |
| Asian | $3,284.97 | $121,593.95 | $6,370,541.32 | $6,495,420.24 |
| Black | $405,538.74 | $223,924.46 | $12,067,784.53 | $12,697,247.73 |
| Hawaiian/Pcf Is | $57,466.08 | $164,104.09 | $2,775,287.55 | $2,996,857.72 |
| Two or more | $143,157.86 | $356,638.95 | $10,272,268.77 | $10,772,065.58 |
| White | $77,443,273.67 | $37,355,703.25 | $4,066,280,221.45 | $4,181,079,198.37 |
| **Org Other** | **$1,020,193,249.42** | **$22,623,729.41** | **$1,093,221,189.56** | **$2,136,038,168.39** |
| | $144,356,857.68 | $2,160,507.74 | $21,523,936.91 | $168,041,302.33 |
| Amer Ind/Alaska | $2,852,902.14 | $1,250,201.19 | $3,455,031.09 | $7,558,134.42 |
| Asian | $937,809.24 | | $3,518,203.30 | $4,456,012.54 |
| Black | $726,731.97 | $32,858.74 | $402,733.43 | $1,162,324.14 |
| Hawaiian/Pcf Is | $41,115.03 | | $286,623.33 | $327,738.36 |
| Two or more | $737,690.60 | $1,358.46 | $1,357,702.27 | $2,096,751.33 |
| White | $870,540,142.76 | $19,178,803.28 | $1,062,676,959.23 | $1,952,395,905.27 |
| **Org/Fem-Owned** | **$11,068,471.46** | **$3,179,467.80** | **$42,116,192.52** | **$56,364,131.78** |
| | $4,404,110.83 | $21,299.41 | $725,645.12 | $5,151,055.36 |
| Amer Ind/Alaska | $3,300.00 | $1,656.57 | $187,650.00 | $192,606.57 |
| Asian | | | $891,484.10 | $891,484.10 |
| Black | $5,510.57 | | $92,595.36 | $98,105.93 |
| Hawaiian/Pcf Is | | | $69,160.33 | $69,160.33 |
| Two or more | $655.03 | | $79,682.08 | $80,337.11 |
| White | $6,654,895.03 | $3,156,511.82 | $40,069,975.53 | $49,881,382.38 |
| **Org/Male-Owned** | **$243,714,006.18** | **$22,511,539.55** | **$830,942,959.48** | **$1,097,168,505.21** |
| | $99,853,088.13 | $690,336.77 | $24,400,758.66 | $124,944,183.56 |
| Amer Ind/Alaska | $32,928.58 | $840,339.80 | $2,032,835.28 | $2,906,103.66 |
| Asian | $352,884.26 | | $4,484,638.95 | $4,837,523.21 |
| Black | $364,083.00 | $14,936.47 | $920,450.40 | $1,299,469.87 |
| Hawaiian/Pcf Is | $136,266.30 | $31,680.00 | $1,977,630.72 | $2,145,577.02 |
| Two or more | | $62,606.69 | $587,015.23 | $649,621.92 |
| White | $142,974,755.91 | $20,871,639.82 | $796,539,630.24 | $960,386,025.97 |
| **Unknown** | **$788,795,210.41** | **$4,591,388.32** | **$378,927,878.43** | **$1,172,314,477.16** |
| | $630,595,844.49 | $974,630.68 | $43,823,474.56 | $675,393,949.73 |
| Amer Ind/Alaska | $174,109.07 | $711,575.98 | $1,901,858.34 | $2,787,543.39 |
| Asian | $301,986.06 | $8,556.40 | $821,540.69 | $1,132,083.15 |
| Black | $28,666.11 | $6,270.00 | $99,862.62 | $134,798.73 |
| Hawaiian/Pcf Is | $474,224.63 | | $503,221.60 | $977,446.23 |
| Two or more | | | $73,157.08 | $73,157.08 |
| White | $157,220,380.05 | $2,890,355.26 | $331,704,763.54 | $491,815,498.85 |
| **Grand Total** | **$2,156,461,717.48** | **$100,007,918.91** | **$6,923,767,242.65** | **$9,180,236,879.04** |

Strickland AR 0767

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

### 7 CFR Part 9

### Farm Service Agency

### 7 CFR Parts 701 and 760

### Commodity Credit Corporation

### 7 CFR Parts 1400, 1416, 1437, and 1450

[Docket ID: USDA–2021–0012]

RIN 0503–AA75

### Pandemic Assistance Programs and Agricultural Disaster Assistance Programs

**AGENCY:** Commodity Credit Corporation (CCC), Farm Service Agency (FSA), and Office of the Secretary, Department of Agriculture (USDA).

**ACTION:** Final rule.

**SUMMARY:** This rule announces Phase 2 of the Emergency Relief Program (ERP), which provides assistance to producers who suffered crop losses due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, and qualifying droughts occurring in calendar years 2020 and 2021. It also announces Pandemic Assistance Revenue Program (PARP), a new program that provides support for agricultural producers impacted by the COVID–19 pandemic. In addition, this rule makes changes to the Coronavirus Food Assistance Program (CFAP); the Emergency Conservation Program (ECP); the Emergency Forest Restoration Program (EFRP); the Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program (ELAP); the Livestock Forage Disaster Program (LFP); the Livestock Indemnity Program (LIP); the Noninsured Crop Disaster Assistance Program (NAP); and general payment eligibility provisions. This rule also makes a technical correction to the Biomass Crop Assistance Program (BCAP).

**DATES:**
*Effective date:* January 11, 2023.
*Comment due date:* For PARP, ECP, and ERP, we will consider comments on the information collection requirements under the Paperwork Reduction Act that we receive by March 13, 2023.

**ADDRESSES:** We invite you to submit comments on the information collection requirements. You may submit comments by any of the following methods:

∀ *Federal eRulemaking Portal:* Go to: *www.regulations.gov* and search for docket ID USDA–2021–0012. Follow the online instructions for submitting comments.

∀ *Mail, Hand-Delivery, or Courier:* Director, Safety Net Division, FSA, USDA, 1400 Independence Avenue SW, Stop 0510, Washington, DC 20250–0522. In your comment, specify the docket ID USDA–2021–0012.

Comments will be available for inspection online at *http:// www.regulations.gov.* Copies of the information collection may be requested by contacting Kathy Sayers or Shanita Landon, respectively (see **FOR FURTHER INFORMATION CONTACT** below). You may also send comments to the Desk Officer for Agriculture, Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

**FOR FURTHER INFORMATION CONTACT:** For CFAP, ERP, ELAP, LFP, LIP, NAP, PARP, and PARP information collection activity, and payment eligibility, Kathy Sayers; telephone: (202) 720–6825; email: kathy.sayers@usda.gov. For ECP, EFRP, and BCAP, Shanita Landon; telephone: (202) 690–1612; email: *shanita.landon@usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice).

**SUPPLEMENTARY INFORMATION:**

### Background

This rule announces ERP Phase 2 and PARP, a new program. In addition, this rule amends the CFAP regulations to provide an additional CFAP 2 payment for underserved producers;[1] makes clarifying changes based on previously implemented provisions of the Consolidated Appropriations Act, 2021 (CAA); and amends the payment provisions for producers of swine. It also updates provisions for and makes technical changes to the regulations for BCAP, ECP, ELAP, LFP, LIP, NAP, and payment eligibility provisions of 7 CFR part 1400, as described in this document.

### ERP Phase 2

Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of crops (including milk, on-farm stored

commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021. FSA previously announced ERP Phase 1 through a notice of funds availability on May 18, 2022 (87 FR 30164–30172),[2] which provided assistance for crop, tree, bush, and vine losses through a streamlined process with pre-filled applications using data already on file with FSA or the Risk Management Agency (RMA), as a result of the producer previously receiving a NAP payment or a crop insurance indemnity. This rule provides the eligibility requirements, application process, and payment calculations for ERP Phase 2, which is intended to address eligible crop losses not included in ERP Phase 1.[3] ERP Phase 2 provides assistance for necessary expenses related to both production and quality losses of eligible crops. Where loss information is not already on file with FSA or RMA through NAP or Federal crop insurance, and therefore included in ERP Phase 1, FSA has determined that the best approximation of such losses is a producer's decrease in gross revenue, which will reflect losses in both production and quality without requiring the more extensive calculations and documentation required under previous programs addressing crop losses due to disaster events.[4] Using a decrease in gross revenue in the calculation of ERP Phase 2 payments also captures a producer's loss due to a qualifying disaster event regardless of whether the loss occurs before harvest or after harvest while the

---

[1] Throughout this document, the term "underserved farmer or rancher" refers to a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

[2] A clarification to the notice of funds availability for ERP Phase 1 was published on August 18, 2022 (87 FR 50828–50830).

[3] Additional assistance authorized by the Extending Government Funding and Delivering Emergency Assistance Act for losses to milk and livestock will be announced in subsequent documents to be published in the **Federal Register**. FSA previously announced Phase 1 of the Emergency Livestock Relief Program (ELRP), which provided payments to producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021 on April 4, 2022 (87 FR 19465–19470).

[4] Assistance for crop losses that occurred prior to harvest due to disaster events in the 2018 and 2019 calendar years was provided through two separate programs: the Wildfires and Hurricanes Indemnity Program Plus (WHIP+) for production losses, and the Quality Loss Adjustment (QLA) Program for quality losses.

Strickland AR 0768

**Federal Register**/Vol. 88, No. 7/Wednesday, January 11, 2023/Rules and Regulations **1863**

crop is in storage, further streamlining the delivery of assistance.

Decreases in gross revenue are strongly correlated to crop production and quality losses due to disaster events. Gross revenue is essentially the aggregation of the value of all of a producer's crops, and a decrease in gross revenue in a year when a producer suffered a loss due to a disaster event reflects the producer's crop losses resulting from decreased production or from obtaining a lower price due to a reduction in quality for that year. Previous FSA disaster assistance programs have similarly been based on a producer's loss of value compared to their expected value, using payment calculations based on crop acres, price, and yield (or inventory and price for value loss crops) as a way to estimate the value of a crop. While ERP Phase 2 uses a different calculation than previous disaster assistance programs to capture that value loss, it accounts for crop losses in a streamlined way that minimizes the burden on producers and improves efficiency of application processing at FSA county offices.

**ERP Phase 2 Eligibility**

To be eligible for ERP Phase 2, a producer must have suffered a loss of an eligible crop due in whole or in part to a qualifying disaster event that occurred in the 2020 or 2021 calendar year (referred to as the "disaster year"). Qualifying disaster events include wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. "Qualifying drought" means an area within the county was rated by the U.S. Drought Monitor as having a drought intensity of D2 (severe drought) for 8 consecutive weeks or D3 (extreme drought) or higher level for any period of time during the applicable calendar year.

To receive a payment for ERP Phase 2, the eligible crop loss must have resulted in a decrease of allowable gross revenue, as described in the next section of this document. "Eligible crop" for ERP Phase 2 means a crop, including eligible aquaculture, that is produced in the United States as part of a farming operation and is intended to be commercially marketed. It excludes crops for grazing, aquatic species that do not meet the definition of aquaculture, *Cannabis sativa L.* and any part of that plant that does not meet the definition of hemp, and timber.

For ERP, "producer" refers to a person or legal entity who was entitled to a share in the eligible crop available for marketing or would have shared had the eligible crop been produced and marketed. In addition, to be eligible for ERP Phase 2, a producer must be one of the following:

(1) Citizen of the United States;
(2) Resident alien, which for purposes of this subpart means "lawful alien" as defined in 7 CFR part 1400;
(3) Partnership organized under State Law;
(4) Corporation, limited liability company, or other organizational structure organized under State law; or
(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304).

**ERP Phase 2 Allowable Gross Revenue**

In general, ERP Phase 2 payments are based on the difference in allowable gross revenue between a benchmark year (2018 or 2019), reflective of a typical year, as elected by the producer, intended to represent a typical year of revenue for the producer's operation, and the applicable disaster year (2020 or 2021). For the purposes of ERP Phase 2, "allowable gross revenue" includes revenue from:

∀ Sales of eligible crops produced by the producer, which includes sales resulting from value added through post-production activities (for example, sales of jam from the processing of strawberries) that were reportable on IRS Schedule F;

∀ Sales of eligible crops a producer purchased for resale that had a change in characteristic due to the time held (for example, a plant purchased at a size of 2 inches and sold as an 18-inch plant after 4 months), less the cost or other basis of such eligible crops;

∀ The taxable amount of cooperative distributions directly related to the sale of the eligible crops produced by the producer;

∀ Benefits under the following agricultural programs: 2017 Wildfires and Hurricanes Indemnity Program (WHIP), Agriculture Risk Coverage (ARC) and Price Loss Coverage (PLC), Biomass Crop Assistance Program (BCAP), Loan Deficiency Payment (LDP) program, marketing loan gains (MLG) under the Marketing Assistance Loan (MAL), 2018 and 2019 Market Facilitation Programs (MFP), Seafood Trade Relief Program (STRP), and the On-Farm Storage Loss Program;

∀ CCC loans, if treated as income and reported to IRS;

∀ Crop insurance proceeds, minus the amount of administrative fees and premiums;

∀ NAP payments, minus the amount of service fees and premiums;

∀ ELAP payments for an aquaculture crop;

∀ Payments issued through grant agreements with FSA for losses of eligible crops;

∀ Grants from the Department of Commerce, National Oceanic and Atmospheric Administration, and State program funds providing direct payments for the loss of eligible crops or the loss of revenue from eligible crops;

∀ Other revenue directly related to the production of eligible crops that IRS requires the producer to report as income;

∀ For the applicable disaster year only, ERP Phase 1 payments issued to another person or entity for the producer's share of an eligible crop, regardless of the tax year in which the payment would be reported to IRS;[5] and

∀ For the benchmark year only, 2018, 2019 and 2020 WHIP+ and QLA payments.

The allowable gross revenue will be based on the year for which the revenue would be reported for the purpose of filing a tax return. Producers who file or would be eligible to file a joint tax return will certify their allowable gross revenue based on what it would have been had they filed taxes separately for the applicable year.

If a producer decreased their operation capacity in a disaster year, as compared to the benchmark year, the producer must certify to an adjusted benchmark revenue on form FSA–521 that represents the producer's reasonably expected allowable gross revenue for the disaster year prior to the impact of the qualifying disaster event. A producer may also certify to an adjusted benchmark revenue on form FSA–521 if the producer did not have a full year of benchmark allowable gross revenue or expanded their operation capacity in a disaster year, compared to their benchmark year. If requested by FSA, producers are required to submit documentation to support these adjustments within 30 calendar days of the request. The documentation to support an adjustment due to a change in operation capacity must show that

---

[5] ERP Phase 1 allowed producers who received pre-filled application forms to indicate shares in the crop. In some cases, payment for a producer's share of a crop may have been issued to a different person or entity than the producer applying for a related revenue loss under ERP Phase 2. Applications for ERP Phase 2 must include any ERP Phase 1 payments issued to another person or entity for the producer's share of an eligible crop in order to prevent duplicate benefits being issued for the same loss.

the adjustment to the producer's benchmark revenue is due to an:

∀ Addition or decrease in production capacity of the farming operation;

∀ Increase or decrease in the use of existing production capacity; or

∀ Physical alterations that were made to existing production capacity.

Change in production capacity does not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals.

If a producer began farming in 2020 or 2021 and did not have allowable gross revenue in a benchmark year, the producer may certify to an adjusted benchmark allowable gross revenue on form FSA–521 that represents what had been the producer's reasonably expected disaster year revenue prior to the impact of the qualifying disaster event. If requested by FSA, documentation required to support a producer's certification must be provided within 30 calendar days of FSA's request, or the producer will be considered ineligible for ERP Phase 2. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the disaster event and includes, but is not limited to:

∀ Financial documents such as a business plan or cash flow statement that demonstrate an expected level of revenue;

∀ Sales contracts or purchase agreements; and

∀ Documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

FSA is providing an optional form, FSA–521A, Continuation Sheet for Emergency Relief Program (ERP) Adjusted Revenue, to help producers calculate their adjusted benchmark revenue if they are certifying to an adjustment on FSA–521.

In addition to providing their allowable gross revenue for the benchmark and disaster years, producers will certify to the percentage of their expected allowable gross revenue from specialty and high value crops and the percentage from other crops for the applicable disaster year on their application form. This information is used in the payment calculation to determine the amount applied to the separate payment limitations for specialty and high value crops and for all other crops, as described later in this document. The percentages certified must be equal to the percentages that the producer would have reasonably expected for the disaster year if the

qualifying disaster event had not occurred. For ERP Phase 2 purposes, "specialty crop" has the same meaning as in ERP Phase 1.[6] A crop may be considered a high value crop based on either the crop itself, or how the crop is marketed. High value crop includes any eligible crop not specifically identified as a specialty crop or listed in the definition of "other crop" (that is, cotton, peanuts, rice, feedstock, and any crop grown with an intended use of grain, silage, or forage), and it also includes any eligible crop, regardless of whether the crop is identified as a specialty crop or listed in the definition of "other crop," if the crop is a direct market crop, organic crop, or a crop grown for a specific market in which specialized products can be sold resulting in an increased value compared to the typical market for the crops (for example, soybeans intended for tofu production), as determined by the Deputy Administrator for Farm Programs (Deputy Administrator).

## Applying for ERP Phase 2

A completed FSA–521, Emergency Relief Program (ERP) Phase 2 Application, must be submitted to any FSA county office by the close of business on the date announced by the Deputy Administrator. Applications may be submitted in person or by mail, email, facsimile, or other methods announced by FSA.

Producers must also submit the following forms if not already on file with FSA within 60 days of the ERP Phase 2 application deadline:

(1) Form AD–2047, Customer Data Worksheet, for new customers or existing customers who need to update their customer profile;

(2) Form FSA–521A, Continuation Sheet for Emergency Relief Program (ERP) Adjusted Revenue, if applicable;

(3) Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the program year or years for which the producer is applying for ERP;[7]

(4) Form CCC–901, Member Information for Legal Entities, if applicable;

(5) Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

(6) Form FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity, for each applicable program year, including the legal entity's members, partners, or shareholders, as provided in 7 CFR part 1400; and

(7) Form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification, for the ERP Phase 2 applicant and applicable affiliates as provided in 7 CFR part 12.

If requested by FSA, the producer must provide additional documentation that establishes the producer's eligibility for ERP Phase 2. If supporting documentation is requested, the documentation must be submitted to FSA within 30 calendar days from the request or the application will be disapproved by FSA. FSA may request supporting documentation to verify information provided by the producer and the producer's eligibility including, but not limited to, the producer's:

(1) Allowable gross revenue as reported on the ERP Phase 2 application;

(2) Percentages of the expected allowable gross revenue from specialty and high value crops and other crops; and

(3) Ownership share in the agricultural commodities.

## ERP Phase 2 Payment Calculation

Although producers will be able to apply for both the 2020 and 2021 disaster years, as applicable, on one form, ERP Phase 2 payments will be calculated separately for each disaster year. If a producer indicates that they have expected revenue for both specialty and high value crops and other crops for a disaster year, a payment will be calculated separately for specialty

---

[6] As defined for ERP Phase 1, "specialty crops" means fruits, tree nuts, vegetables, culinary herbs and spices, medicinal plants, and nursery, floriculture, and horticulture crops. This includes common specialty crops identified by USDA's Agricultural Marketing Service at *https://www.ams.usda.gov/services/grants/scbgp/specialty-crop* and other crops as designated by the Deputy Administrator for Farm Programs.

[7] An individual who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent CCC–860 certifying their status for a later program year because an individual's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran

farmer or rancher includes the relevant date needed to determine for what program years the status would apply. An entity that has filed CCC–860 certifying its status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of its status for a later program year unless the entity's status has changed due to changes in membership. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit CCC–860 for each applicable program year.

and high value crops and other crops for a disaster year.

To determine a producer's ERP Phase 2 payment amount, FSA will calculate:

(1) The ERP factor of 70 percent[8] multiplied by the producer's benchmark year allowable gross revenue, adjusted according to 7 CFR 760.1903, if applicable, minus

(2) The producer's disaster year allowable gross revenue; minus

(3) The sum of the producer's net ERP Phase 1 payments for the 2020 program year, if the calculation is for the 2020 disaster year, or for the 2021 and 2022[9] program years, if the calculation is for the 2021 disaster year; minus

(4) The sum of the producer's net CFAP payments (excluding payments for contract producer revenue), net 2020 WHIP+ payments, and net 2020 Quality Loss Adjustment (QLA) Program payments, if the calculation is for the 2020 disaster year; and

(5) Multiplied by the percentage of the expected disaster year revenue for specialty and high value crops or other crops, as applicable.

ERP Phase 2 payments are subject to the availability of funds. FSA will issue an initial payment equal to the lesser of:

∀ The amount calculated as described above; or

∀ A maximum initial payment of $2,000.

If a producer has also received a payment under ERP Phase 1, FSA will reduce the producer's initial ERP Phase 2 payment amount by subtracting their ERP Phase 1 gross payment amount.[10] If total calculated payments exceed the total funding available for ERP Phase 2, the ERP Factor may be adjusted and the final payment amounts will be prorated to stay within the amount of available funding. If there are insufficient funds, a differential of 15 percent will be used for underserved producers similar to ERP Phase 1, but with a cap at the statutory maximum of 70 percent.[11] For

example, if the ERP Factor is set at 50 percent, the factor used for underserved producers will be 65 percent, but if the factor is set at 55 percent or higher, the factor for underserved producers will be capped at 70 percent. An initial payment to a producer will not be recalculated or reduced if the total calculated ERP Phase 2 factored payment for that producer is less than the initial payment amount.

If a producer receives additional assistance through CFAP or ERP Phase 1 after a producer's ERP Phase 2 payment is calculated, the producer's ERP Phase 2 payment will be recalculated and the producer must refund any resulting overpayment.

**ERP Phase 2 Payment Limitation and Attribution**

As required by the Extending Government Funding and Delivering Emergency Assistance Act and consistent with 7 CFR 760.1507, the payment limitation for ERP is determined by the producer's average adjusted gross farm income (income from activities related to farming, ranching, or forestry). Specifically, if the producer's average adjusted gross farm income is less than 75 percent of the producer's average adjusted gross income (AGI) for the 3 taxable years preceding the most immediately preceding complete tax year, a producer, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments for specialty crops and high value crops[12] and $125,000 in payment for all other crops under:

(1) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(2) ERP Phase 1 for program years 2021 and 2022[13] and ERP Phase 2 for program year 2021, combined.

If at least 75 percent of the producer's average AGI is derived from farming, ranching, or forestry related activities and the producer provides the required certification and documentation, as discussed below, the producer, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to:

(1) $900,000 for specialty crops and high value crops combined for:

(i) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(ii) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined; and

(2) $250,000 for all other crops for:

(i) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(ii) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined.

The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, or forestry related activities are:

(1) 2016, 2017, and 2018 for program year 2020; and

(2) 2017, 2018, and 2019 for program year 2021.

To receive more than $125,000 in ERP payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certified AGI. If a producer requesting the increased payment limitation is a legal entity, all members of that entity must also complete form FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the increased payment limitation based on the legal entity's average AGI derived from farming, ranching, or forestry related activities but a member of that legal entity either does not complete a form FSA–510 and provide the required certification or is not eligible for the increased payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ERP Phase 2 payment attributed to that member.

If a producer files form FSA–510 and the accompanying certification after their ERP Phase 2 payment is issued but

---

[8] The Extending Government Funding and Delivering Emergency Assistance Act provides that the total amount of payments cannot exceed 70 percent of the loss for producers who did not obtain federal crop insurance or NAP coverage for the crop incurring the losses.

[9] For ERP Phase 1, the program year was based on the crop year, as defined in the applicable crop insurance policy or NAP provisions, and 2022 was included because a qualifying disaster event occurring in the 2021 calendar year may have caused a loss of a crop during the 2022 crop year. The program year for ERP Phase 2 is based on the disaster year (2020 or 2021) because the payment is based on a producer's allowable gross revenue, which may include revenue from multiple crops.

[10] If the producer's ERP Phase 1 payment is equal to or exceeds the producer's initial ERP Phase 2 payment amount, the producer will not receive an initial ERP Phase 2 payment.

[11] FSA calculates payments based on a higher payment factor for underserved farmers and

ranchers (or specific groups included in that term) in several programs, such as ECP, ELAP, and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, ELRP Phase 1, and ERP Phase 1. In addition, NAP provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

[12] High value crops were not defined in ERP Phase 1; therefore, only ERP Phase 1 payments to specialty crops, as defined in the ERP Phase 1 notice, will be counted toward the increased payment limitation for specialty and high value crops.

[13] For ERP Phase 1, the program year was based on the crop year, as defined in the applicable crop

insurance policy or NAP provisions, and 2022 was included because a qualifying disaster event occurring in the 2021 calendar year may have caused a loss of a crop during the 2022 crop year. The program year for ERP Phase 2 is based on the disaster year (2020 or 2021) because the payment is based on a producer's allowable gross revenue, which may include revenue from multiple crops.

before the deadline announced by FSA, FSA will process the form FSA–510 and issue the additional payment amount if a maximum initial payment amount has not been reached.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility. Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as described in § 760.1906.

Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

## ERP Phase 2 Miscellaneous Provisions

If an ERP Phase 2 payment resulted from erroneous information provided by a producer, or any person acting on their behalf, the payment will be recalculated and the producer must refund any excess payment with interest calculated from the date of the disbursement of the payment. If FSA determines that the producer intentionally misrepresented information provided on the producer's application, the application will be disapproved and the producer must refund the full amount of any payments to FSA with interest from the date of disbursement.

## ERP Phase 2 Requirement To Purchase Crop Insurance or NAP Coverage

All producers who receive ERP Phase 2 payments are statutorily required to purchase federal crop insurance, or NAP coverage where crop insurance is not available, for the next 2 available crop years (Pub. L. 117–43, 135 STAT. 357) as described in this section and as determined by the Secretary. To identify which crops suffered losses that resulted in a revenue loss due to a qualifying disaster event, producers must complete form FSA–522, Crop Insurance and/or NAP Coverage Agreement. For each of those crops, a producer must file an acreage report and obtain federal crop insurance or NAP, as may be applicable:

(1) At a coverage level equal to or greater than 60 percent for insurable crops; or

(2) At the catastrophic level or higher for NAP crops.

The timing for the requirement to purchase federal crop insurance or NAP

for the next 2 available crop years will be determined from the date a producer receives an ERP payment and may vary depending on the timing and availability of crop insurance or NAP for a producer's particular crops. The final crop year to purchase crop insurance or NAP coverage to meet the second year of coverage for this requirement is the 2026 crop year.

In situations where federal crop insurance is unavailable for a crop, a producer must obtain NAP coverage. Section 1001D of the Food Security Act of 1985 (1985 Farm Bill) provides that a person or entity with an AGI greater than $900,000 is not eligible to participate in NAP; however, producers with an AGI greater than $900,000 are eligible for ERP. To reconcile this restriction in the 1985 Farm Bill and the requirement to obtain NAP or crop insurance coverage, a producer may meet the purchase requirement by purchasing Whole-Farm Revenue Protection (WFRP) crop insurance coverage, if eligible, or they may pay the applicable NAP service fee despite their ineligibility for a NAP payment. In other words, the service fee must be paid even though no NAP payment may be made because the AGI of the person or entity exceeds the 1985 Farm Bill limitation.

If both federal crop insurance and NAP coverage are unavailable for a crop, the producer must obtain WFRP crop insurance coverage, if available.

For all crops listed on form FSA–522, any producer who has the crop or crop acreage in subsequent years and who fails to obtain the 2 years of crop insurance or NAP coverage required as specified in this document, must refund the full amount of any ERP Phase 2 payments with interest from the date of disbursement. Any producer who does not plant a crop listed on form FSA–522 in a year for which this requirement applies is not subject to the crop insurance or NAP purchase requirement for the crop for that year.

Producers who received an ERP Phase 1 payment for a crop are not required to obtain additional years of crop insurance or NAP coverage for that crop, to the extent the producer is already complying with the requirement in connection with an ERP Phase 1 payment, if they also receive an ERP Phase 2 payment for a loss associated with that crop.

## PARP

Secretary Tom Vilsack announced the USDA Pandemic Assistance for Producers initiative on March 24, 2021. Through that initiative, USDA is reaching a broader set of producers than in previous COVID–19 assistance

programs, with a specific focus on strengthening outreach to underserved producers and communities and small and medium agricultural operations. PARP, a new program administered by FSA, is part of that initiative.

PARP will use funding authorized by the Consolidated Appropriations Act, 2021 (CAA; Pub. L. 116–260), which provides funding to prevent, prepare for, and respond to the COVID–19 pandemic by providing support for agricultural producers, growers, and processors impacted by coronavirus. This rule establishes PARP to respond to the COVID–19 pandemic by providing support for eligible producers of agricultural commodities who suffered an eligible revenue loss in calendar year 2020 due to the COVID–19 pandemic. PARP is intended to provide assistance to a wide variety of agricultural producers, including those who produced agricultural commodities that were not eligible for CFAP 1 and 2 (7 CFR part 9).

For PARP, ''producer'' refers to a person or legal entity (including a general partnership or joint venture) who was in the business of farming to produce an agricultural commodity in calendar year 2020, and who was entitled to a share in the agricultural commodity available for marketing or would have shared had the agricultural commodity been produced and marketed. ''Producer'' also includes cattle feeder operations, which were not eligible for CFAP 1 and CFAP 2. To be eligible for PARP, a producer must:

∀ Have been in the business of farming during at least part of the 2020 calendar year; and

∀ Have had at least a 15 percent decrease in ''allowable gross revenue'' [14] for the 2020 calendar year, as compared to:

Æ The 2018 or 2019 calendar year (similar to the benchmark year for ERP Phase 2), reflective of a typical year, as elected by the producer, if they received allowable gross revenue during the 2018 or 2019 calendar years; or

Æ The producer's expected 2020 allowable gross revenue, if the producer had no allowable gross revenue in 2018 and 2019.[15]

In addition, to be eligible for PARP, a producer must be one of the following:

---

[14] ''Allowable gross revenue'' is explained later in this section of this document.

[15] PARP provides assistance to participants whose allowable gross revenue for the 2020 calendar year was at or below 85 percent of the ''benchmark'' allowable gross revenue. This uses the same maximum level of coverage available under RMA's Whole Farm Revenue Program (WFRP), coverage that requires 15 percent or more decrease in revenue to trigger a payment.

**Federal Register** / Vol. 88, No. 7 / Wednesday, January 11, 2023 / Rules and Regulations    **1867**

∀ A citizen of the United States;

∀ A resident alien, which for purposes of this subpart means "lawful alien" as defined in 7 CFR part 1400;

∀ A partnership organized under State Law;

∀ A corporation, limited liability company, or other organizational structure organized under State law;

∀ An Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304); or

∀ A foreign person or foreign entity who meets all requirements as described in 7 CFR part 1400.

For PARP, "agricultural commodity" means a crop, aquaculture, livestock, livestock byproduct, or other animal or animal byproduct that is produced as part of a farming operation and is intended to be commercially marketed. It includes only commodities produced in the United States, and commodities produced outside the United States by a producer located in the United States and marketed inside the United States. It excludes:

∀ Wild free-roaming animals;

∀ Horses and other animals used or intended to be used for racing or wagering;

∀ Aquatic species that do not meet the definition of aquaculture;

∀ *Cannabis sativa L.* and any part of that plant that does not meet the definition of hemp; and

∀ Timber.

As provided in § 9.304, allowable gross revenue for PARP includes revenue from:

∀ Sales of agricultural commodities produced by the producer, including the sales resulting from value added through post-production activities (for example, sales of jam from the processing of strawberries);

∀ Sales of agricultural commodities a producer purchased for resale, less the cost or other basis of such commodities;

∀ The taxable amount of cooperative distributions directly related to the sale of the agricultural commodities produced by the producer;

∀ Benefits under certain federal agricultural programs and disaster programs (excluding conservation programs, CFAP 1 and 2, 2020 program year ERP, the Pandemic Livestock Indemnity Program (PLIP), and the Spot Market Hog Pandemic Program (SMHPP));

∀ CCC loans, if treated as income and reported to IRS;

∀ Crop insurance proceeds;

∀ Payments issued through grant agreements with FSA for losses of agricultural commodities;

∀ Grants from the Department of Commerce, National Oceanic and Atmospheric Administration and State program funds providing direct payments for the loss of agricultural commodities or the loss of revenue from agricultural commodities;

∀ Revenue from raised breeding livestock;

∀ Revenue earned as a cattle feeder operation;

∀ Other revenue directly related to the production of agricultural commodities that IRS requires the producer to report as income; and

∀ For 2020 allowable gross revenue, payments under the Pandemic Market Volatility Assistance Program regardless of the calendar year in which the payment was received.

An optional worksheet is available to assist producer's in computing their revenue from the sources listed above. Producers who file or would be eligible to file a joint tax return will certify their revenue based on what their revenue would have been had they filed taxes separately for the applicable year. Revenue earned as a contract producer of an agricultural commodity is not included in allowable revenue for PARP.

If a producer did not have a full year of revenue for 2018 or 2019 or physically expanded their operation in 2020, the producer may certify to an adjusted 2018 or 2019 allowable gross revenue on form FSA–1122A. Producers must provide documentation to support the adjusted amount within 30 calendar days of submitting their PARP application. The documentation must show that the producer added production capacity to the farming operation, increased the use of existing production capacity, or made physical alterations to existing production capacity that would have resulted in increased revenue in 2020. Increases in production capacity do not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals.

If a producer did not have allowable gross revenue in 2018 and 2019 but was in the business of farming in 2020, the producer must certify on form FSA–1122A as to what had been their reasonably expected 2020 allowable gross revenue prior to the impact of the COVID–19 pandemic. Producers must provide documentation to support their expected 2020 allowable gross revenue within 30 days of submitting their PARP application. Acceptable documentation must be generated in the ordinary course of business and dated prior to the

impact of the COVID–19 pandemic and includes, but is not limited to, financial documents such as a business plan or cash flow statement that demonstrates an expected level of revenue; sales contracts or purchase agreements; and documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

**PARP Application Process**

FSA will accept PARP applications until the date announced by the Deputy Administrator. To apply for PARP, producers must submit a complete FSA–1122, Pandemic Assistance Revenue Program Application, in person, by mail, email, facsimile, or other method announced by FSA to any FSA county office.[16] Applicants must also submit all of the following items, if not previously filed with FSA:

∀ Form AD–2047, Customer Data Worksheet, for new customers or existing customers who need to update their customer profile;

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2020 program year, if the applicant is an underserved farmer or rancher;[17]

∀ Form CCC–901, Member Information for Legal Entities, if applicable;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–941, Average Adjusted Gross Income (AGI) Certification and Consent to Disclosure of Tax Information, for the 2020 program year for the producer, including the legal entity's members, partners, shareholders, heirs, or beneficiaries as provided in 7 CFR part 1400;

∀ Form FSA–1123, Certification of 2020 Adjusted Gross Income, if applicable;

∀ Form FSA–1122A, Pandemic Assistance Revenue Program (PARP) Application, if applicable;

∀ Form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification, for the

---

[16] The FSA county office locator can be found through the "Find Your Local Service Center" section on: *https://www.farmers.gov/.*

[17] For PARP, socially disadvantaged groups include the following: American Indians or Alaskan Natives, Asians or Asian-Americans, Blacks or African Americans, Hispanics or Hispanic Americans, Native Hawaiians or other Pacific Islanders, and women. Form CCC–860 is not required for underserved farmers and ranchers to receive a payment; however, failure to submit form CCC–860 will result in an producer's payment being calculated using a lower payment factor. Also, see footnote 7.

Strickland AR 0773

**1868** Federal Register / Vol. 88, No. 7 / Wednesday, January 11, 2023 / Rules and Regulations

PARP applicant and applicable affiliates as provided in 7 CFR part 12.

The required eligibility forms specified above must be submitted no later than 60 days from the PARP application deadline. When the producer does not timely submit the required eligibility forms, or when a member of a legal entity who is required to submit AD–1026 has not done so, FSA will not issue a payment to the producer. When any other required eligibility forms are not timely submitted for a member of a legal entity, FSA will reduce the payment based on that member's ownership share of the legal entity.

In addition, producers must provide documentation within 30 calendar days of submitting the FSA–1122, if applicable, to verify:

∀ The producer's certified expected 2020 allowable gross revenue; and

∀ The physical expansion of a producer's operation in 2020.

If requested by FSA, the producer must provide additional documentation that establishes the producer's eligibility for PARP. If any supporting documentation is requested, the documentation must be submitted to FSA within 30 days from the request or the application will be disapproved by FSA.

**PARP Payment Calculation**

The PARP payment calculation is based on the difference in a producer's revenue compared to a prior "benchmark" year. Producers who had allowable gross revenue in 2018 or 2019 will elect which of those years is most reflective of a typical year to use as a benchmark for the purposes of calculating a PARP payment. FSA will determine the result of the producer's 2018 or 2019 allowable gross revenue, minus the producer's 2020 allowable gross revenue, multiplied by a payment factor. The adjusted 2018 or 2019 allowable gross revenue, as described above, will be used for producers who did not have a full year of revenue for 2019 or increased their operation size in 2020. The payment factor will be 90 percent for underserved farmers and ranchers who have filed CCC–860 certifying their status for the 2020 program year.[18] The payment rate for all other producers will be 80 percent. The PARP payment will be equal to the result of that calculation minus any 2020 program year ERP payments and pandemic assistance received by the producer under CFAP 1 and 2 (not including any CFAP 2 payments for contract producer revenue), PLIP, and

SMHPP. If a producer receives assistance through any of those programs after their PARP payment is calculated, their PARP payment will be recalculated and the producer must refund any resulting overpayment to FSA.

If a producer was in the business of farming in 2020 but did not have allowable gross revenue in 2018 and 2019, then the payment calculation will be equal to the producer's expected 2020 allowable gross revenue minus the producer's actual 2020 allowable gross revenue, multiplied by a payment factor of 90 percent for underserved farmers and ranchers who have filed the form CCC–860, or 80 percent for all other producers. As described above, the PARP payment will be equal to the result of that calculation minus any assistance received by the producer under CFAP 1 and 2 (not including any CFAP 2 payments for contract producer revenue), 2020 program year ERP, PLIP, and SMHPP, and the PARP payment will be recalculated if the producer receives additional payments under those programs. Those producers must provide documentation to support their certification of their expected 2020 allowable gross revenue within 30 days of submitting their PARP application or they will be ineligible for payment.

PARP payments will be issued after the application period ends. PARP payments are subject to the availability of funds and may be factored if total calculated payments exceed the available funding. PARP payments are not subject to offset.

**PARP Payment Limitation, Average AGI Limitation, and Attribution**

PARP payments are subject to a per person or legal entity payment limitation of $125,000. USDA may establish a lower maximum payment amount per person, legal entity, or member of a joint venture or general partnership after the application period has ended if calculated payment amounts exceed available funding. Similar to the manner in which payment limitations are applied in the major commodity and disaster assistance programs administered by FSA, payments will be attributed to an individual through the direct attribution process used in those programs. The total payment amount of PARP payments attributed to an individual will be determined by taking into account the direct and indirect ownership interests of the individual in all legal entities participating in PARP.

A producer, other than a joint venture or general partnership, is ineligible for payments if the producer's average AGI,

using the average of the adjusted gross incomes for the 2016, 2017, and 2018 tax years, is more than $900,000, unless the producer's AGI for 2020 is $900,000 or less. To be eligible for payment, a producer whose average AGI for 2016, 2017, and 2018 exceeds $900,000 but whose 2020 AGI is $900,000 or less must submit form FSA–1123 and provide a certification from a licensed CPA or attorney affirming the producer's 2020 AGI is not more than $900,000. With respect to joint ventures and general partnerships, this AGI provision will be applied to each member of the joint venture and general partnership.

To be eligible for payment and facilitate administration of payment limitation, payment attribution, AGI, and rules applicable to foreign persons, producers that are a legal entity must provide the names, addresses, valid taxpayer identification numbers, and ownership share of each person or each legal entity that holds or acquires a direct or indirect ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share in cases where a person or legal entity holds less than a 10 percent direct or indirect ownership interest and fails to provide a taxpayer identification number to USDA.

**PARP General Requirements**

General requirements that apply to other FSA-administered commodity programs also apply to PARP, including compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation."

The regulations in 7 CFR part 1400, subpart E, are applicable to foreign persons and legal entities containing members, stockholders, or partners who are not U.S. citizens or resident aliens that own more than 10 percent of the legal entity. In order for a foreign person to receive a PARP payment, the person must provide land, capital, and a substantial amount of active personal labor to the farming operation, as required by § 1400.401(a), and comply with the other requirements of subpart E.

Additionally, United States Federal, State, and local governments (including public schools) are not eligible for PARP payments.

Appeal regulations specified in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under PARP. The determination of matters of general applicability that are not in response to, or result from, an individual set of facts in an individual

---

[18] See footnotes 7 and 11.

producer's application for payment are not matters that can be appealed. Such matters of general applicability include, but are not limited to, eligibility criteria, the payment calculation, and payment rates.

In the event that any application for a PARP payment resulted from erroneous information reported by the producer, the payment will be recalculated, and the producer must refund any excess payment to USDA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information provided on their application, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

**CFAP**

USDA established CFAP to assist producers of agricultural commodities marketed in 2020 who faced continuing market disruptions, reduced farm-level prices, and increased production and marketing costs due to COVID–19 under authority provided by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act; Pub. L. 116–136) and sections 5(b), (d), and (e) of the CCC Charter Act (15 U.S.C. 714c(b), (d), and (e)). USDA implemented CFAP through two rounds of payments (CFAP 1 and CFAP 2), administered by FSA. CFAP 1 was implemented through a final rule published in the **Federal Register** on May 21, 2020 (85 FR 30825–30835), with corrections published in the **Federal Register** on June 12, 2020 (85 FR 35799–35800), July 10, 2020 (85 FR 41328–41330), August 14, 2020 (85 FR 49593–49594), and September 21, 2020 (85 FR 59174–59175), and documents published in the **Federal Register** on May 22, 2020 (85 FR 31062–31065), June 12, 2020 (85 FR 35812), July 10, 2020 (85 FR 41321–41323), and August 14, 2020 (85 FR 49589–49593). USDA implemented CFAP 2 through a final rule published in the **Federal Register** on September 22, 2020 (85 FR 59380–59388). USDA also published a final rule in the **Federal Register** on January 19, 2021 (86 FR 4877–4883), to provide additional assistance for certain commodities under CFAP 1 and CFAP 2, but suspended implementation of that rule on January 20, 2021, to allow further evaluation of the assistance offered through CFAP. A final rule published on August 27, 2021 (86 FR 48013–48018), revised the CFAP 2 application deadline, amended

provisions for contract producers, and allowed producers of sales-based commodities to use 2018 sales for their payment calculation.

FSA is issuing an additional CFAP 2 payment to underserved farmers and ranchers.[19] These payments will be issued under the same authority as the producers' previous CFAP 2 payments, using CCC funds as authorized by sections 5(b), (d), and (e) of the CCC Charter Act (15 U.S.C. 714c(b), (d), and (e)), except for payments for tobacco which will use remaining funds authorized by the CARES Act. As provided in § 9.203(p), the additional payment will be equal to 15 percent of a producer's previous CFAP 2 payment, subject to CFAP 2 payment limitation provisions in § 9.7.[20] Contract producers are not eligible for this additional payment because CFAP 2 payments to contract producers were authorized and funded through the CAA, which specified that those payments could "cover not more than 80 percent of revenue losses." Previous CFAP 2 payments to contract producers were already calculated to have covered 80 percent of contract producers' revenue losses.

As specified in § 9.4(e), CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, must be on file with FSA with a certification applicable for the 2020 program year to receive the additional payment.[21] Producers who have not previously certified to their status for the 2020 program year may submit CCC–860 until the date announced by the Deputy Administrator to be eligible for the additional payment.

The final rule published on January 19, 2021, included a provision for an additional CFAP 1 payment for hog and pig inventory owned between April 16, 2020, and May 14, 2020, based on a rate of $17 per head. USDA suspended implementation of that provision and, after further review, USDA has determined that it will not issue the additional CFAP 1 payment for hog and pig inventory. To provide assistance to

hog producers, FSA implemented the Spot Market Hog Pandemic Program (SMHPP), which provided targeted assistance to producers who sold hogs through a spot market sale from April 16, 2020, through September 1, 2020, the period in which those producers faced the greatest reduction in market prices due to the COVID–19 pandemic. Producers of hogs and pigs may also be eligible for PARP as previously discussed in this rule if they suffered an eligible revenue loss in 2020.

FSA previously implemented mandatory provisions of CAA that provide additional assistance for producers of cattle, price trigger crops, and flat-rate crops. Cattle payments are based on inventory owned between April 16, 2020, to May 14, 2020, based on a producer's previously filed CFAP 1 application, multiplied by the following payment rates per head: $14.75 for slaughter cattle—mature cattle, $63 for slaughter cattle—fed cattle, $7 for feeder cattle less than 600 pounds, $25.50 for feeder cattle 600 pounds or more, and $17.25 for all other cattle. Payments for flat-rate and price-trigger crops, as defined in § 9.201, are equal to the eligible acres of the crop included on a producer's CFAP 2 application, multiplied by a payment rate of $20 per eligible acre. This rule amends the payment calculations for cattle in § 9.102(c), price trigger crops in § 9.203(a), and flat-rate crops in § 9.203(b) for consistency with CAA to reflect these additional payments. FSA already issued these payments and producers were not required to take any additional action to qualify. These payments were subject to existing CFAP payment limitations and eligibility requirements.

This rule amends the general CFAP provisions to clarify how FSA will handle applications when the taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest in a business structure is not provided to USDA. To receive a CFAP payment, a person or legal entity must provide their name, address, and taxpayer identification number to USDA. In addition, consistent with most other FSA programs, a legal entity must provide the name, taxpayer identification number, address and ownership share of each person or legal entity that holds or acquires a direct or indirect ownership interest in the legal entity; however, the previous CFAP rules did not specify how the failure to provide such information would affect the producer's payment eligibility. Previously, FSA had implemented this requirement by determining that the

---

[19] See footnote 11.

[20] This additional CFAP payment is similar to FSA's administration of ELRP Phase 1 and ERP Phase 1, which provided a 15 percent increase for payments to underserved producers and Congress has directed for underserved producers in some permanent disaster programs a 15 percent higher payment rate (Emergency Livestock Assistance Program or Emergency Conservation Program). Consistent with those programs, 15 percent has been determined as the increased rate for underserved producers.

[21] See footnote 7 for an explanation of how long an underserved producer's certification remains valid and the requirement to file CCC–860 in subsequent years.

**1870**    **Federal Register**/Vol. 88, No. 7/Wednesday, January 11, 2023/Rules and Regulations

producer was ineligible for payment. Rather than determining the producer ineligible for payment, in caseswhere a person or legal entity holding less than 10 percent direct or indirect ownership interest does not submit a taxpayer identification number, FSA will reduce the producer's payment in proportion to a member's ownership share when the taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent at, or above, the fourth level of ownership in the business structure is not provided to USDA as provided in § 9.7(i). Additionally, a legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater at, or above the fourth level of ownership in the business structure is not provided to USDA as provided in § 9.7(i). USDA is making this change becausemany farm operations suffered sales losses and had increased marketing costs in 2020 due to the COVID–19 pandemic, and the ability to receive a partial CFAP payment will assist those operations in managing those losses and costs. USDA is not reopening the CFAP application period; this change only affects how FSA will process CFAP applications currently on file.

This rule also updates references throughout 7 CFR part 9, subparts A through C, to refer specifically to those subparts rather than part 9 due to the addition of subpart D for PARP.

**ECP, EFRP, and BCAP**

The Agricultural Credit Act of 1978 (16 U.S.C. 2201), amended by section 2403 of the Agriculture Improvement Act of 2018 (Pub. L. 115–334), authorizes ECP, and generally authorizes payments to farmers and ranchers to rehabilitate farmland damaged by certain natural disasters and to implement emergency water conservation measures in periods of severe drought. The ECP regulations are in 7 CFR part 701, subpart B.

Prior to this rule, land owned or controlled by the United States or States, including State agencies or other political subdivisions, was specified in the regulation as ineligible for cost share. This rule amends the general ECP provision at § 701.105 to allow eligibility of that land under certain conditions. The intent of this change is to allow producers who lease Federal and State land the opportunity to participate in ECP. This is consistent with the previous operational policy,

which allowed payments as specified in the FSA Handbook 1–ECP.[22]

This rule also corrects a typographical error in a section number to redesignate § 718.128 to be § 701.128. Prior to this rule, the ECP regulation authorized advance payment only for fence repair or replacement. This rule further amends § 701.128 to allow advance payments for all ECP practices. Consistent with the authorization for fence repair or replacement, ECP will provide advance payments of up to 25 percent of the cost for all ECP practices before the restoration is carried out. In the event this cost share assistance is not spent within 60 calendar days of being issued, the participant will be required to refund the advance cost-share payment. To reflect these changes, we are revising the section heading of § 701.128 to "Advance Payment."

Additionally, this rule clarifies the duplicate benefits provisions in § 701.111. The language was modified to further define parameters surrounding restoration activities being performed on the same piece of land. This will ensure that other Federal program-related benefits do not cover the same or similar expenses so as to create duplicative payments on the same piece of land and that any other Federal cost-share payments would not result in paying more than is authorized for ECP.

This rule also makes minor technical amendments to the existing ECP and EFRP regulations. Specifically, this rule:

∀ Adds the definition of "Socially disadvantaged farmer or rancher" and, within that definition, defines "Socially disadvantaged group" in § 701.2 to be consistent with the definition (7 U.S.C. 2279(a)) used in its authorizing legislation instead of defaulting to using the definition in § 718.2 and makes the same technical correction in § 1450.2 for the BCAP regulation;

∀ Removes outdated provisions, specifically removing: 7 CFR 701.44, 701.45, and 701.150 through 701.157;

∀ Adds the definition for "Forestland," removes the definition of "Commercial forestland," and corrects the definition of "Non-industrial private forestland" to remove the words "commercial forest" in § 701.102.

∀ Recognizes Public Law 117–180, the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023, Division G, section 104(k)(3)(A) authorizing 100 percent Federal assistance for the cost of damagesto producers associated with the "Hermit's Peak/Calf Canyon" Fire. This rule is amending the regulations in

7 CFR 701.126, 701.127, and 701.226 to authorize the Secretary to waive the maximum limitations to the maximum extent otherwise allowed by law.

**Supplemental Agricultural Disaster AssistancePrograms**

This rule makes discretionary changes to ELAP, LFP, and LIP to amend what is considered eligible livestock. Previously, livestock that were maintained for pleasure, roping, pets, or show were ineligible under ELAP, LFP, and LIP. This rule removes those restrictions in §§ 1416.104, 1416.204, and 1416.304 because FSA recognizes that animals maintained in a commercial operation for those purposes have value and could be available for marketing from the farm. In addition, FSA is clarifying that horses and other animals used or intended to be used for racing or wagering are considered ineligible livestock for ELAP, LFP, and LIP.

This rule also amends §§ 1416.104 and 1416.204 to remove the restriction on ostrich eligibility for LFP and ELAP. FSA is making this change because ostriches satisfy more than 50 percent of their net energy requirement through the consumption of growing forage grassesand legumes; therefore, they are considered "grazing animals," as defined in §§ 1416.102 and 1416.202, for the purpose of LFP and ELAP. This change is effective for the 2022 program year for both LFP and ELAP. ELAP requires a notice of loss to be filed within 30 days of when the loss is first apparent. Because that deadline may have passed for producers' 2022 losses related to ostriches that occurred prior to publication of this rule, FSA is extending the deadline for those notices of loss through February 10, 2023.

This rule removes and reserves § 1416.5, which provides policy related to equitable relief determinations under ELAP, LFP, LIP, and the Tree Assistance Program (TAP). These programs are already subject to the general equitable relief provisions in 7 CFR part 718, subpart C; therefore, the provisions in § 1416.5 are unnecessary. Equitable relief for these programs will be administered in a manner that is consistent with other FSA programs to which part 718 applies. This rule also makes minor clarifications and technical corrections to the definition of "eligible loss condition" in § 1416.102 and to §§ 1416.103(a), 1416.103(d)(6), 1416.304(c)(3), 1416.305(g), and 1416.305(i).

**NAP**

FSA is amending the NAP regulations to update provisions related to

---

[22] See *https://www.fsa.usda.gov/internet/FSA_File/i-ecp_r06_a01.pdf.*

applications for coverage. This rule updates the definition of "application for coverage" and 7 CFR 1437.7(a) to reflect that the application for coverage may be filed in any FSA county office, rather than only in the producer's administrative county. The definition of "application for coverage" is also amended to provide flexibility as FSA reviews ways to streamline the application process for underserved farmers and ranchers who are eligible for catastrophic coverage without paying a service fee.

Following the change to the regulation, FSA intends to designate the CCC–860 to be an application for catastrophic coverage for NAP if filed before the deadline for application for the coverage period. The catastrophic coverage for underserved producers, once in effect, will be treated as continuous coverage for all eligible crops as long as the producer's certification is valid. [23] Once the applicable status expires, a producer will need to apply for NAP coverage by the deadline and pay the applicable service fee. Many underserved producers have previously filed a certification of their underserved status with FSA, and those producers will be considered as having timely applied for catastrophic coverage for the 2022 crop year if the certification was filed before the deadline for application for the NAP coverage period.

As provided in 7 CFR 1437.2(e), the Deputy Administrator may authorize State and county committees to waive or modify deadlines in cases where lateness or failure to meet such other requirements does not adversely affect the operation of NAP; therefore, FSA is amending 7 CFR 1437.6(a) to remove an unnecessary provision related to applications filed after the deadline. This rule also makes minor clarifications in 7 CFR 1437.7.

**Payment Eligibility**

Notification of interest requirements in § 1400.107 provide that an entity is ineligible for any payment under any program listed in § 1400.1, including certain programs administered by the Natural Resources Conservation Service (NRCS), when the names and taxpayer identification numbers for members holding an ownership interest in the legal entity are not provided to FSA. FSA has determined for the programs that it administers that prohibiting payments to a legal entity when member

information is provided for some, but not all members, may adversely impact a farm operation's sustainability during times when farm program payments may be a large portion of the farm's income. FSA recognizes that names, addresses, valid taxpayer identification numbers, and ownership shares are important elements necessary to facilitate administration of FSA's rules for payment eligibility and establishing maximum payment limitations for each program. However, if a valid taxpayer identification number is not provided for a member of a legal entity, FSA is still able to make applicable determinations of eligibility and establish a maximum payment limitation for the legal entity and its other members.

With this rule change, for programs administered by FSA, FSA will reduce the payment to a legal entity in proportion to a member's ownership share in cases where a person or legal entity holding less than a 10 percent direct or indirect ownership interest fails to provide a valid taxpayer identification number, instead of prohibiting any payment to the legal entity. Additionally, a legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater, at or above the fourth level of ownership in the business structure, is not provided to USDA. This change will allow the legal entity to earn a partial payment based on the ownership shares of the members whose valid taxpayer identification numbers are submitted in cases where a member or members holding less than a 10 percent interest do not submit a valid taxpayer identification number.

NRCS has determined that such change in the notification requirements is not appropriate for the programs it administers. Unlike the intended purposes of FSA program payments, NRCS conservation program payments are not intended to provide economic support, including in times of disaster, to keep operations economically viable. Rather, they are payments made to reimburse a participant for costs incurred by a participant to voluntarily implement conservation practices and activities or payments made for the conveyance of a conservation easement. Therefore, for the programs NRCS administers, the participant is ineligible to receive any payment specified in § 1400.1(a)(7) or as NRCS provides in individual program regulations if the participant fails to provide: (1) the name, address, valid taxpayer identification number, and ownership

share of each person; or (2) the name, address, valid taxpayer identification number, and ownership share of each legal entity, that holds or acquires an ownership interest in the legal entity.

For programs administered by FSA that are subject to the provisions of § 1400.107, this change will be effective for the current and subsequent program years. FSA is also making this change retroactive to the 2020 program year, subject to funding availability, because many farm operations suffered income losses in 2020 due to the COVID–19 pandemic, and the ability to receive a partial payment under the applicable programs will assist those operations in managing those losses. FSA is not reopening sign up periods for programs with payments that could be affected by this change; it will only affect the way payments are processed for legal entities that previously filed applications. Because the notification of interest provisions are general provisions that are applicable to part 1400, subparts B, C, E, and F, FSA is also moving the notification of interest requirement from § 1400.107 in subpart B, Payment Limitation, to § 1400.10 in subpart A, General Provisions.

**Notice and Comment and Effective Date**

The Administrative Procedure Act (APA, 5 U.S.C. 553(a)(2)) provides that the notice and comment and 30-day delay in the effective date provisions do not apply when the rule involves specified actions, including matters relating to benefits or contracts. This rule governs pandemic assistance and disaster assistance payments to certain commodity producers and therefore falls within the benefits exemption for ERP, PARP, ECP, BCAP, and the disaster assistance programs.

As specified in 7 U.S.C. 9091, the regulations to implement the ELAP, LIP, LFP, and NAP are:

∀ Exempt from the notice and comment provisions of 5 U.S.C. 553, and

∀ Exempt from the Paperwork Reduction Act (44 U.S.C. chapter 35).

As specified in 16 U.S.C. 3648, the regulations to implement EFRP are exempt from the Paperwork Reduction Act (44 U.S.C. chapter 35).

This rule is exempt from the regulatory analysis requirements of the Regulatory Flexibility Act (5 U.S.C. 601–612), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). The requirements for the regulatory flexibility analysis in 5 U.S.C. 603 and 604 are specifically tied to the requirement for a proposed rule by section 553 or any other law; in

---

[23] See footnote 7 for an explanation of how long an underserved producer's certification remains valid and the requirement to file CCC–860 in subsequent years.

**1872**   **Federal Register**/Vol. 88, No. 7/Wednesday, January 11, 2023/Rules and Regulations

addition, the definition of rule in 5 U.S.C. 601 is tied to the publication of a proposed rule.

The Office of Management and Budget (OMB) designated this rule as major under the Congressional Review Act (CRA), as defined by 5 U.S.C. 804(2). Section 808 of the CRA allows an agency to make a major regulation effective immediately if the agency finds there is good cause to do so. The beneficiaries of this rule have been significantly impacted by the COVID–19 outbreak and disaster events, which has resulted in significant declines in demand and market disruptions. USDA finds that notice and public procedure are contrary to the public interest. Therefore, even though this rule is a major rule for purposes of the Congressional Review Act, USDA is not required to delay the effective date for 60 days from the date of publication to allow for Congressional review. Accordingly, this rule is effective upon publication in the **Federal Register**.

**Executive Orders 12866 and 13563**

Executive Order 12866, ''Regulatory Planning and Review,'' and Executive Order 13563, ''Improving Regulation and Regulatory Review,'' direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasized the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The requirements in Executive Orders 12866 and 13563 for the analysis of costs and benefits apply to rules that are determined to be significant.

The Office of Management and Budget (OMB) designated this rule as economically significant under Executive Order 12866 and therefore, OMB has reviewed this rule. The costs and benefits of this rule are summarized below. The full cost benefit analysis is available on *regulations.gov*.

**Cost Benefit Analysis Summary**

The cost-benefit analysis covers the unrelated programs or program changes, which are included in this rule, that largely address pandemic assistance or natural disaster assistance.

The accompanying rule announces *Phase 2 of the Emergency Relief Program (ERP)*, which addresses eligible crop losses not included in ERP Phase 1. ERP is authorized in the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117–43), which provided $10 billion for expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, and other events occurring in calendar years 2020 and 2021. Targeted outlays for ERP Phase 2 are $1.2 billion; a pro-rate in payments is likely as gross outlays are projected at $1.5 billion (see Table 1).

Two programs—including a new pandemic assistance program and additional assistance for underserved producers—address COVID–19 losses. Prior rules associated with the COVID–19 pandemic, CFAP 1, CFAP 2, and CFAP 2: Producers of Sales-Based Commodities and Contract Producers, assisted producers of agricultural commodities marketed in 2020 who faced continuing market disruptions, reduced farm-level prices, and increased production and marketing costs due to COVID–19. The additional costs are associated with declines in demand, surplus production, or disruptions to shipping patterns and marketing channels.

In implementing the pandemic related programs, USDA determined that additional assistance was necessary:

▿ PARP will assist producers with revenue loss resulting from the COVID–19 pandemic for eligible agricultural commodities. Payments will be made on a whole farm basis and not on a commodity-by-commodity basis. The aggregate allocation for PARP is targeted at $250 million; a pro-rate in payments is likely as gross outlays are projected at $2.7 billion (Table 1).

▿ CFAP 2 recipients who are underserved (beginning, limited resource, socially disadvantaged, and veteran farmers and ranchers), excluding contract producers, will receive a 15-percent top-up payment. Net outlays are estimated at $325 million (Table 1). As few underserved producers are likely to have AGI issues or reach the payment limit, gross and net outlays are assumed to be identical.

The other changes relate to existing FSA programs or requirements:

▿ *Expanded Eligibility of Animals in Livestock Disaster Programs*—This rule makes discretionary changes to ELAP, LFP, and LIP to amend the definition of eligible livestock. Previously, animals that contributed to the commercial viability of an operation and were maintained for the purposes of pleasure, roping, hunting, pets, or show, as well as animals intended for consumption by an owner, lessee, or contract grower, were ineligible for ELAP, LFP, and LIP. This rule removes those restrictions. Estimated net outlays (accounting for AGI considerations, payment limits, and other reductions) are $17.7 million annually.

▿ *Flexibility in Non-Insured Crop Disaster Assistance Program (NAP) Enrollment for Underserved Producers*—FSA is updating NAP provisions regarding program flexibilities for underserved producers. For example, the ''application of coverage'' is amended to provide flexibility as FSA reviews ways to streamline the application process for underserved farmers and ranchers. Net outlays are estimated at $4.3 million annually (identical to the gross outlay estimate).

▿ *Notification of Interest Changes*—Prior to this rule, a legal entity was ineligible for farm programs when the names and valid taxpayer identification numbers for all members holding an ownership interest in the entity were not provided to USDA. Now, a legal entity can receive a partial payment in cases where a person or legal entity holding less than a 10 percent direct or indirect ownership interest fails to provide a taxpayer identification number. Net outlays are estimated at $3.7 million annually.

▿ *ECP Expansion to Public Lands (that is, Federally- and State-owned Land)*—ECP provides payments to farmers and ranchers to rehabilitate farmland damaged by certain natural disasters and to implement emergency water conservation measures in periods of severe drought. ECP eligibility on public lands has not been included in the regulation until now. ECP coverage of public lands has FSA policy, as specified in the FSA handbook, for many years, however, and FSA staff in the field have provided ECP assistance to both public and private lands since at least the 1990s. As a result, no increase in net outlays is expected.

▿ *ECP and EFRP and the Hermit's Peak/Calf Canyon Fire*—Section 104(3)(A) of the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023 authorizes the Federal government to pay 100 percent of the ECP and Emergency Forest Restoration Program (EFRP) cost for damage associated with the Hermit's Peak/Calf Canyon Fire. This fire burned over 340,000 acres from April 2022 to June 2022 and was the largest wildfire in recorded history in New Mexico. The cost-share rate for both ECP and EFRP, prior to this legislation, was generally 75 percent regardless of location. The legislation

Strickland AR 0778

**Federal Register**/Vol. 88, No. 7/Wednesday, January 11, 2023/Rules and Regulations **1873**

applies only to the locale of the Hermit's Peak/Calf Canyon Fire. The expected net cost is $22.5 million for FY 2023.

Gross outlays for these items are estimated at $4.5 billion (see Table 1). After taking into account AGI considerations and payment limitations,

as well as the targeted caps on ERP Phase 2 and PARP spending, net outlays are estimated at $1.8 billion. ERP Phase 2 accounts for about two-thirds of expected total net outlays.

FSA will administer all programs in Table 1. Producers must fill out

paperwork to participate in these programs, and the associated administrative costs are estimated at $18.4 million. Note that ERP Phase 2, PARP, and the Hermit's Peak/Calf's Canyon ECP/EFRP item use exclusively appropriated funds.

TABLE 1—ESTIMATED GROSS AND NET OUTLAYS FOR THE PANDEMIC ASSISTANCE AND AGRICULTURAL DISASTER ASSISTANCE PROGRAMS RULE FOR FY 2023

| Item | Gross estimated outlays in 2023 | Net estimated outlays | Implementing agency | Funding source |
|---|---|---|---|---|
| Item 1—Emergency Relief Program (ERP) Phase 2. | $1.504 billion [a] ...... | $1.2 billion ............ | FSA ...................... | Extending Government Funding and Delivering Emergency Assistance Act. |
| Item 2—PARP ..................................... | $2.662 billion [b] ...... | 250 million ............ | FSA ...................... | CAA. |
| Item 3—15 Percent Top-Up for Underserved Recipients of CFAP 2 Payments. | 325 million ............ | 325 million ............ | FSA ...................... | CCC net transfer except for the tobacco portion, which is from the CARES Act. |
| Item 4—Recreational Animals and Livestock Disaster Programs. | 19.5 million ........... | 17.7 million ........... | FSA ...................... | CCC. |
| Item 5—Flexibility in NAP Enrollment for Underserved Producers [d]. | 4.3 million ............. | 4.3 million ............. | FSA ...................... | CCC. |
| Item 6—Notification of Interest Changes. | 3.7 million ............. | 3.7 million ............. | FSA ...................... | CCC. |
| Item 7—ECP and Public Lands ............ | No change in cost | No change in cost | FSA ...................... | CCC. |
| Item 8—ECP and EFRP and the Hermit's Peak/Calf's Canyon Fire [c]. | 24.2 million ........... | 22.5 million ........... | FSA ...................... | Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023. |
| Total ................................... | 4.54 billion ........... | 1.82 billion ........... | | |

[a] This estimate uses the 50-percent loss scenario. Note that both 2020 and 2021 losses are expected to be paid in FY 2023. The significant difference between gross and net outlays is because the targeted amount for ERP Phase 2 spending is $1.2 billion.

[b] This estimate represents the most plausible scenario but, as discussed below, gross estimated outlays could be considerably higher. Note that the significant difference between gross and net outlays is because the targeted amount for PARP spending is $250 million.

[c] The difference between the gross and net amount is due to adjusted gross income (AGI) considerations, payment limitations, and other reductions.

[d] This estimate uses the 20 percent increase-in-participation scenario.

**Note:** Benefits associated with items 4 through 7 continue in FY 2023 and in perpetuity in each FY beyond. Payments associated with Items 1, 2, 3, and 8 are assumed to be paid in FY 2023 and to not continue beyond.

**Environmental Review**

The environmental impacts of this final rule have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and because USDA will be making the payments to producers, the USDA regulation for compliance with NEPA (7 CFR part 1b).

Although OMB has designated this rule as "economically significant" under Executive Order 12866, ". . . economic or social effects are not intended by themselves to require preparation of an environmental impact statement" when not interrelated to natural or physical environmental effects (see 40 CFR 1502.16(b)). The pandemic assistance and disaster assistance programs were designed to avoid skewing planting decisions. Producers continue to make their planting and production decisions with the market signals in mind, rather than

any expectation of what a new USDA program might look like.

This rule includes discretionary amendments for ECP and EFRP. Accordingly, the discretionary provisions of this action are covered by the Categorical Exclusion, in 7 CFR 799.31(b)(2)(iii) for minor amendments or revisions to previously approved actions and § 799.31(b)(3)(i), for the issuance of minor technical corrections to regulations.

The rule implements discretionary amendments for BCAP, CFAP, ELAP, LIP, LFP, NAP, and PARP. The discretionary aspects are to improve administration of the programs and clarify existing program requirements. The change to BCAP is a technical clarification and does not alter the impacts or alternatives previously considered in the BCAP Programmatic Environmental Impact Statement and Record of Decision dated June 2010. FSA is providing the disaster assistance under ELAP, LIP, LFP, and NAP to eligible producers. The discretionary provisions would not alter any

environmental impacts resulting from implementing the mandatory changes to those programs. Accordingly, these discretionary aspects are coved by the following Categorical Exclusion: in 7 CFR 799.31(b)(6)(vi) safety net programs administrated by FSA. ERP Phase 2 is a new regulation, which is a benefit program providing assistance after specific natural disasters; therefore, similar to the other programs discussed in this paragraph, ERP Phase 2 has similar discretionary aspects that are coved by the following Categorical Exclusion: in 7 CFR 799.31(b)(6)(vi) safety net programs administrated by FSA.

Through this review, FSA determined that the proposed discretionary changes in this rule fit within the categorical exclusions listed above. Categorical exclusions apply when no extraordinary circumstances (§ 799.33) exist. Therefore, as this rule presents only discretionary amendments that will not have an impact to the human environments, individually or cumulatively, FSA will not prepare an

environmental assessment or environmental impact statement for this rule; this rule serves as documentation of the programmatic environmental compliance decision for this federal action.

## Executive Order 12988

This rule has been reviewed under Executive Order 12988, ''Civil Justice Reform.'' This rule will not preempt State or local laws, regulations, or policies unless they represent an irreconcilable conflict with this rule. For the payment eligibility regulation changes, payments will be adjusted retroactively, starting in January 2020, as discussed above in the Payment Eligibility section, above. For the ELAP regulation changes, payments will be made retroactively starting at January 1, 2021, as discussed in the Cost Benefit Analysis Summary section, above. Before any judicial actions may be brought regarding the provisions of this rule, the administrative appeal provisions of 7 CFR parts 11 and 780 are to be exhausted.

## Executive Order 13175

This rule has been reviewed in accordance with the requirements of Executive Order 13175, ''Consultation and Coordination with Indian Tribal Governments.'' Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have Tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

USDA has assessed the impact of this rule on Indian Tribes and determined that this rule does not, to our knowledge, have Tribal implications that required Tribal consultation under Executive Order 13175 at this time. If a Tribe requests consultation, the USDA Office of Tribal Relations (OTR) will ensure meaningful consultation is provided where changes, additions, and modifications are not expressly mandated by law. Outside of Tribal consultation, USDA is working with Tribes to provide information about pandemic assistance, agricultural disaster assistance, and other issues.

## Unfunded Mandates

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA, Pub. L. 104–4) requires Federal agencies to

assess the effects of their regulatory actions of State, local, and Tribal governments or the private sector. Agencies generally must prepare a written statement, including cost benefits analysis, for proposed and final rules with Federal mandates that may result in expenditures of $100 million or more in any 1 year for State, local or Tribal governments, in the aggregate, or to the private sector. UMRA generally requires agencies to consider alternatives and adopt the more cost effective or least burdensome alternative that achieves the objectives of the rule. This rule contains no Federal mandates, as defined in Title II of UMRA, for State, local and Tribal governments or the private sector. Therefore, this rule is not subject to the requirements of sections 202 and 205 of UMRA.

## Federal Assistance Programs

The titles and numbers of the Federal Domestic Assistance Programs found in the Catalog of Federal Domestic Assistance to which this rule applies are:

10.051—Commodity Loans and Loan Deficiency Payments
10.054—Emergency Conservation Program
10.069—Conservation Reserve Program
10.087—Biomass Crop Assistance Program
10.088—Livestock Indemnity Program
10.089—Livestock Forage Disaster Program
10.091—Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program
10.092—Tree Assistance Program
10.112—Price Loss Coverage
10.113—Agriculture Risk Coverage
10.130—Coronavirus Food Assistance Program 1
10.132—Coronavirus Food Assistance Program 2
10.143—Pandemic Assistance Revenue Program
10.451—Noninsured Assistance
10.912—Environmental Quality Incentives Program
10.917—Agricultural Management Assistance
10.964—Emergency Relief Program

## Paperwork Reduction Act

As noted above, the regulations to implement the EFRP, ELAP, LIP, LFP, and NAP changes are exempt from PRA as specified in 7 U.S.C. 9091(c)(2)(B) and 16 U.S.C. 3846(b)(1).

For ECP and BCAP, there are no changes to the information collection activities approved by OMB under control number 0560–0082.

In accordance with the Paperwork Reduction Act of 1995, the PARP

information collection activity was submitted to OMB for emergency approval. FSA will collect and evaluate the application and other required paperwork from the producers for PARP. The forms are described above in the PARP Application Process section. Following the 60-day public comment period provided by this rule, FSA intends to request 3-year OMB approval to cover the PARP information collection request.

*Title:* PARP.

*OMB Control Number:* 0560–New.

*Type of Request:* New Collection.

*Abstract:* This information collection is required to support PARP information collection activities to provide payments to eligible producers who, with respect to their agricultural commodities, have been impacted by the effects of the COVID–19 pandemic. The information collection is necessary to evaluate the application and other required paperwork for determining the producer's eligibility and assist in the producer's payment calculations. The forms are included in the request.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.51385 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collections of information.

*Type of Respondents:* Producers or farmers.

*Estimated Annual Number of Respondents:* 313,901.

*Estimated Number of Responses per Respondent:* 1.6550.

*Estimated Total Annual Responses:* 519,506.

*Estimated Average Time per Response:* 0.51385 hours.

*Estimated Annual Burden on Respondents:* 266,947 hours.

Also, FSA is requesting comments from all interested individuals and organizations on a new information collection associated with ERP Phase 1 and 2. The emergency request was approved for the ERP Phase 1 using OMB control number 0560–0309. The emergency request was approved for the ERP Phase 2 using temporary OMB control number. The ERP Phase 2 will be merged with the approved 0560–0309 information collection request. ERP is for the producers who suffered

Strickland AR 0780

losses of crops, trees, bushes, and vines due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. FSA needs to disburse the payments to the eligible producers to cover the losses of crops, trees, bushes and vines, and the payments will seriously assist the producers not to consider making business decisions to lose the farm business.

*Title:* ERP Phase 2.

*Type of Request:* New.

*Abstract:* ERP is for the producers who suffered losses of crops, trees, bushes, and vines due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. FSA needs to disburse the payments to the eligible producers to cover the losses of crops, trees, bushes and vines, and the payments will seriously assist the producers not to consider making business decisions to lose the farm business.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.54492 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collections of information.

*Type of Respondents:* Producers or farmers.

*Estimated Annual Number of Respondents:* 48,402.

*Estimated Number of Responses per Respondent:* 2.085.

*Estimated Total Annual Responses:* 100,918.

*Estimated Average Time per Response:* 0.54492 hours.

*Estimated Annual Burden on Respondents:* 54,992 hours.

Also, FSA is requesting comments from all interested individuals and organizations on a new information collection associated with CFAP 2. The emergency request was approved under a temporary OMB control number and will merge with CFAP 2 under the OMB control number 0560–0297.

*Title:* CFAP 2.

*Type of Request:* New.

*Abstract:* This information collection is required to support CFAP 2 information collection activities to provide payments to eligible producers who, with respect to their agricultural commodities, have been impacted by the effects of the COVID–19 pandemic. The information collection is necessary to evaluate the application and other required paperwork for determining the producer's eligibility and assist in the producer's payment calculations.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.0999 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collections of information.

*Type of Respondents:* Producers or farmers.

*Estimated Annual Number of Respondents:* 96,973.

*Estimated Number of Responses per Respondent:* 1.

*Estimated Total Annual Responses:* 96,973.

*Estimated Average Time per Response:* 0.0999 hours.

*Estimated Annual Burden on Respondents:* 9,697 hours.

FSA is requesting comments on all aspects of this information collection to help FSA to:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of FSA, including whether the information will have practical utility;

(2) Evaluate the accuracy of the FSA's estimate of burden including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this document, including names and addresses when provided, will be a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or (844) 433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**List of Subjects**

*7 CFR Part 9*

Agricultural commodities, Agriculture, Disaster assistance, Indemnity payments.

*7 CFR Part 701*

Disaster assistance, Environmental protection, Forests and forest products, Grant programs—agriculture, Grant programs—natural resources, Reporting and recordkeeping requirements, Rural

areas, Soil conservation, Water resources, Wildlife.

*7 CFR Part 760*

Dairy products, Indemnity payments, Reporting and recordkeeping requirements.

*7 CFR Part 1400*

Agriculture, Grant programs— agriculture, Loan programs—agriculture, Natural resources, Price support programs.

*7 CFR Part 1416*

Administrative practice and procedure, Agriculture, Disaster assistance, Fruits, Livestock, Nursery stock, Seafood.

*7 CFR Part 1437*

Acreage allotments, Agricultural commodities, Crop insurance, Disaster assistance, Fraud, Penalties, Reporting and recordkeeping requirements.

*7 CFR Part 1450*

Administrative practice and procedure, Agriculture, Energy, Environmental protection, Grant programs-agriculture, Natural resources, Reporting and recordkeeping requirements, Technical assistance.

For the reasons discussed above, this final rule amends 7 CFR parts 9, 701, 760, 1400, 1416, 1437, and 1450 as follows:

## PART 9—PANDEMIC ASSISTANCE PROGRAMS

■ 1. The authority citation for part 9 continues to read as follows:

**Authority:** 15 U.S.C. 714b and 714c; Division B, Title I, Pub. L. 116–136, 134 Stat. 505; and Division N, Title VII, Subtitle B, Chapter 1, Pub. L. 116–260.

■ 2. Revise the heading for part 9 to read as set forth above.

## Subpart A—CFAP General Provisions

■ 3. Revise the heading for subpart A to read as set forth above.

### §9.1 [Amended]

■ 4. Amend §9.1 as follows:
■ a. In paragraph (a) introductory text, remove the words "This part specifies" and add "Subparts A through C of this part specify" in their place, and remove the words "payment made under this part" and add "CFAP payment" in their place;
■ b. In paragraph (c), remove the words "this part" each time they appear and add "subparts A through C of this part" in their place; and

■ c. In paragraph (d), remove words "the programs of this part" and add "CFAP" in their place.
■ 5. Amend §9.2 as follows:
■ a. In the introductory text, remove the words "this part" and add "subparts A through C of this part" in its place;
■ b. In the definition of "NOFA", remove the words "under this part"; and
■ c. Add a definition for "Ownership interest" in alphabetical order.

The addition reads as follows:

### §9.2 Definitions.

\* \* \* \* \*

*Ownership interest* means to have either legal ownership interest or beneficial ownership interest in a legal entity. For the purposes of administering CFAP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity, and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is also considered to have an ownership interest in such legal entity.

\* \* \* \* \*

### §9.3 [Amended]

■ 6. Amend §9.3 as follows:
■ a. In paragraph (a), remove the words "this part" and add "subparts A through C of this part" in their place; and
■ b. In paragraph (b)(2), remove the words "this part means" and add "subparts A through C of this part means" in its place.
■ 7. Amend §9.4 by adding paragraph (e) to read as follows:

### §9.4 Time and method of application.

\* \* \* \* \*

(e) To receive an additional payment under §9.203(p), a producer must submit form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, with a certification applicable to the 2020 program year by the date announced by the Deputy Administrator.

■ 8. Amend §9.7 as follows:
■ a. In paragraphs (b), (c), (d), and (e)(2)(ii) and (iii), add the words "subparts A through C of" before the words "this part" each time they appear;
■ b. In paragraph (h), remove the words "This part applies" and add "Subparts A through C of this part apply" in their place; and

■ c. Add paragraph (i).

The addition reads as follows.

### §9.7 Miscellaneous provisions.

\* \* \* \* \*

(i) To be eligible to receive a CFAP payment and facilitate administration of paragraphs (d) and (e) of this section, a person or legal entity must provide their name, address, and taxpayer identification number to USDA. In addition, a legal entity must provide the name taxpayer identification number, address and ownership share of each person or legal entity that holds or acquires a direct or indirect ownership interest in the legal entity. CFAP payments to a legal entity will be reduced in proportion to a member's ownership share when the taxpayer identification number for a person or legal entity that holds less than a 10 percent direct or indirect ownership interest at, or above, the fourth level of ownership in the business structure is not provided to USDA. Additionally, a legal entity will not be eligible to receive CFAP payments when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater, at or above the fourth level of ownership in the business structure, is not provided to USDA.

## Subpart B—CFAP 1

### §9.101 [Amended]

■ 9. Amend §9.101, in the definition of "All other cattle", by removing the word "part" and adding "subpart" in its place.
■ 10. Amend §9.102 as follows:
■ a. In paragraph (c) introductory text, remove the word "two" and add "three" in its place;
■ b. In paragraph (c)(1), remove the word "and";
■ c. In paragraph (c)(2), remove the period and add "; and" at the end of the paragraph;
■ d. Add paragraph (c)(3);
■ e. In paragraph (d) introductory text, remove the word "three" and add "two" in its place;
■ f. In paragraph (d)(1), add the word "and" at the end of the paragraph;
■ g. In paragraph (d)(2), remove "; and" and add a period in its place; and
■ h. Remove paragraph (d)(3).

The addition reads as follows.

### §9.102 Calculation of payments.

\* \* \* \* \*

(c) \* \* \*

(3) Cattle inventory owned between April 16, 2020, to May 14, 2020, multiplied by:
(i) $14.75 for slaughter cattle—mature cattle;

(ii) $63 for slaughter cattle—fed cattle;
(iii) $7 for feeder cattle less than 600 pounds;
(iv) $25.50 for feeder cattle 600 pounds or more; and
(v) $17.25 for all other cattle.

\* \* \* \* \*

## Subpart C—CFAP 2

■ 11. In § 9.201, add definitions for "Beginning farmer or rancher", "Limited resource farmer or rancher", "Socially disadvantaged farmer or rancher", "Underserved farmer or rancher", and "Veteran farmer or rancher" in alphabetical order to read as follows:

### § 9.201 Definitions.

\* \* \* \* \*

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

\* \* \* \* \*

*Limited resource farmer or rancher* means a farmer or rancher:
(1) Who is a person whose:
(i) Direct or indirect gross farm sales did not exceed $180,300 in each calendar year for 2017 and 2018 (the relevant years for the 2020 program year); and
(ii) Total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1)(i) of this definition; [24] or
(2) That is an entity and all members who hold an ownership interest in the entity meet the criteria in paragraph (1) of this definition.

\* \* \* \* \*

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;
(2) Asians or Asian-Americans;
(3) Blacks or African Americans;
(4) Hispanics or Hispanic Americans;
(5) Native Hawaiians or other Pacific Islanders; and
(6) Women.

\* \* \* \* \*

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

\* \* \* \* \*

*Veteran farmer or rancher* means a farmer or rancher:
(1) Who has served in the Armed Forces (as defined in 38 U.S.C. 101(10) [25]) and:
(i) Has not operated a farm or ranch for more than 10 years; or
(ii) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2) [26]) during the most recent 10-year period; or
(2) That is an entity and at least 50 percent of the ownership interest is held by members who meet the criteria in paragraph (1) of this definition.

\* \* \* \* \*

### § 9.202 [Amended]

■ 12. Amend § 9.202 as follows:
■ a. In paragraph (a), remove the words "this part" and add the words "subpart A of this part and this subpart" in their place; and
■ b. In paragraphs (b)(4) and (d)(2), remove the words "this part" and add the words "subpart A of this part and this subpart" in their place.
■ 13. Amend § 9.203 as follows:
■ a. Add paragraph (a)(5);
■ b. In paragraph (b), add a sentence at the end of the paragraph;
■ c. In paragraphs (f)(2) and (h)(2), remove the word "part" and add the word "subpart" in its place; and
■ d. Add paragraph (p).
The additions read as follows:

### § 9.203 Calculation of payments.

(a) \* \* \*
(5) An additional payment will be issued for price trigger crops equal to the eligible acres of the crop multiplied by a payment rate of $20 per acre.
(b) \* \* \* An additional payment will be issued for flat-rate crops equal to the eligible acres of the crop multiplied by a payment rate of $20 per acre.

\* \* \* \* \*

(p) An additional payment equal to 15 percent of a producer's CFAP 2 payment calculated according to paragraphs (a) through (k) of this section will be issued to producers who have certified their status as an underserved farmer or rancher, applicable to the 2020 program year, on CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification.

■ 14. Add subpart D, consisting of §§ 9.301 through 9.310, to read as follows:

### Subpart D—Pandemic Assistance Revenue Program

Sec.
9.301  Applicability and administration.
9.302  Definitions.
9.303  Producer eligibility requirements.
9.304  Allowable gross revenue.
9.305  Time and method of application.
9.306  Payment calculation.
9.307  Adjusted gross income limitation, payment limitation, and attribution.
9.308  Eligibility subject to verification.
9.309  Miscellaneous provisions.
9.310  Perjury.

## Subpart D—Pandemic Assistance Revenue Program

### § 9.301 Applicability and administration.

(a) This subpart specifies the eligibility requirements and payment calculations for the Pandemic Assistance Revenue Program (PARP). FSA is administering PARP to respond to the COVID–19 pandemic by providing support for eligible producers of agricultural commodities who suffered an eligible revenue loss in calendar year 2020 due to the COVID–19 pandemic. To be eligible for PARP payments, participants must comply with all provisions under this subpart.

(b) PARP is administered under the general supervision and direction of the Administrator, Farm Service Agency (FSA).

(c) The FSA State committee will take any action required by this subpart that an FSA county committee has not taken. The FSA State committee will also:
(1) Correct, or require an FSA county committee to correct, any action taken by such county FSA committee that is not in accordance with the regulations of this subpart; or
(2) Require an FSA county committee to withhold taking any action that is not in accordance with this subpart.

(d) No provision or delegation to an FSA State or county committee will preclude the FSA Administrator, the Deputy Administrator, or a designee or other such person, from determining any question arising under the programs of this subpart, or from reversing or

---

[24] Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through Natural Resources Conservation Service at *https://lrftool.sc.egov.usda.gov*.

[25] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[26] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

modifying any determination made by an FSA State or county committee.

(e) The Deputy Administrator has the authority to permit State and county committees to waive or modify deadlines (except deadlines specified in a law) and other requirements or program provisions not specified in law, in cases where lateness or failure to meet such other requirements or program provisions do not adversely affect operation of PARP.

**§ 9.302   Definitions.**

The following definitions apply to this subpart. The definitions in part 1400 of this title apply, except where they conflict with the definitions in this section.

*2017 WHIP* means the 2017 Wildfires and Hurricanes Indemnity Program under 7 CFR part 760, subpart O.

*Agricultural commodity* means a crop, aquaculture, livestock, livestock byproduct, or other animal or animal byproduct that is produced as part of a farming operation and is intended to be commercially marketed. It includes only commodities produced in the United States, or produced outside the United States by a producer located in the United States and marketed inside the United States. It excludes:

(1) Wild free-roaming animals;

(2) Horses and other animals used or intended to be used for racing or wagering;

(3) Aquatic species that do not meet the definition of aquaculture;

(4) *Cannabis sativa* L. and any part of that plant that does not meet the definition of hemp; and

(5) Timber.

*Applicable pandemic assistance* includes payments received directly by an applicant under the following programs:

(1) The Coronavirus Food Assistance Program (CFAP);

(2) The Pandemic Livestock Indemnity Program (PLIP); and

(3) The Spot Market Hog Pandemic Program (SMHPP).

*Application* means the PARP application form.

*Aquaculture* means any species of aquatic organisms grown as food for human or livestock consumption or for industrial or biomass uses, fish raised as feed for fish that are consumed by humans, and ornamental fish propagated and reared in an aquatic medium. Eligible aquacultural species must be raised by a commercial operator and in water in a controlled environment.

*ARC and PLC* means the Agriculture Risk Coverage (ARC) and Price Loss Coverage (PLC) programs under 7 CFR part 1412.

*BCAP* means the Biomass Crop Assistance Program under 7 CFR part 1450.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Cattle feeder operation* means an operation that intensely feeds cattle on behalf of another person or entity for finishing purposes and is compensated based on feed, yardage, or weight gain of the cattle.

*CCC* means the Commodity Credit Corporation.

*CFAP* means the Coronavirus Food Assistance Program 1 and 2 under 7 CFR part 9, subparts A through C, excluding assistance for contract producers specified in § 9.203(l) through (o).

*Contract producer* means a producer who grows or produces an agricultural commodity under contract for or on behalf of another person or entity. The contract producer does not have ownership in the commodity and is not entitled to a share from sales proceeds of the commodity. The term "contract producer" does not include cattle feeder operations.

*Controlled environment* means an environment in which everything that can practicably be controlled by the producer with structures, facilities, and growing media (including but not limited to water, soil, or nutrients), is in fact controlled by the producer, as determined by industry standards.

*County* means the county or parish of a state. For Alaska, Puerto Rico, and the Virgin Islands, a county is an area designated by the State committee with the concurrence of the Deputy Administrator.

*County committee* means the FSA county committee.

*Crop insurance* means an insurance policy reinsured by Federal Crop Insurance Corporation under the provisions of the Federal Crop Insurance Act, as amended, or a private plan of insurance.

*Deputy Administrator* means Deputy Administrator for Farm Programs, Farm Service Agency, U.S. Department of Agriculture, or their designee.

*DMC* means the Dairy Margin Coverage Program under 7 CFR part 1430, subpart D.

*ELAP* means the Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program under 7 CFR part 1416, subpart B.

*ERP* means the Emergency Relief Program, which was administered in 2 phases:

(1) ERP Phase 1, administered according to the notice of funds availability published in the **Federal Register** on May 18, 2022 (87 FR 30164–30172) and the clarification to the notice of funds availability that was published on August 18, 2022 (87 FR 50828–50830); and

(2) ERP Phase 2, administered according to 7 CFR part 760, subpart S.

*Farming operation* means a business enterprise engaged in the production of agricultural products, commodities, or livestock, operated by a person, legal entity, or joint operation, and that is eligible to receive payments, directly or indirectly, under this subpart. A person or legal entity may have more than one farming operation if the person or legal entity is a member of one or more legal entity or joint operation.

*Foreign entity* means a corporation, trust, estate, or other similar organization that has more than 10 percent of its beneficial interest held by individuals who are not:

(1) Citizens of the United States; or

(2) Lawful aliens possessing a valid Alien Registration Receipt Card.

*Foreign person* means any person who is not a citizen or national of the United States or who is admitted into the United States for permanent residence under the Immigration and Nationality Act and possesses a valid Alien Registration Receipt Card issued by the United States Citizenship and Immigration Services, Department of Homeland Security.

*Hemp* means the plant species *Cannabis sativa* L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis, that is grown under a license or other required authorization issued by the applicable governing authority that permits the production of the hemp.

*IRS* means the Department of Treasury, Internal Revenue Service.

*LDP* means the Loan Deficiency Payment programs in 7 CFR parts 1421, 1425, 1427, 1434, and 1435.

*Legal entity* means a corporation, joint stock company, association, limited partnership, irrevocable trust, estate, charitable organization, or other similar organization including any such organization participating in a business structure as a partner in a general partnership, a participant in a joint venture, a grantor of a revocable trust,

or as a participant in a similar organization. A business operating as a sole proprietorship is considered a legal entity.

*Limited resource farmer or rancher* means a farmer or rancher:

(1) Who is a person whose:

(i) Direct or indirect gross farm sales did not exceed $180,300 in each calendar year for 2017 and 2018 (the relevant years for the 2020 program year); and

(ii) Total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1)(i) of this definition; [1] or

(2) That is an entity and all members who hold an ownership interest in the entity meet the criteria in paragraph (1) of this definition.

*LFP* means the Livestock Forage Disaster Program under CFR part 1416, subpart C.

*LIP* means the Livestock Indemnity Program under 7 CFR part 1416, subpart D.

*Minor child* means a person who is under 18 years of age as of June 1, 2020.

*MFP* means the 2018 Market Facilitation Program under 7 CFR part 1409, subpart A, and the 2019 Market Facilitation Program under 7 CFR part 1409, subpart B.

*Milk Loss Program* means the Milk Loss Program under 7 CFR part 760, subpart Q.

*MLG* means a marketing loan gain under the Marketing Assistance Loan programs in 7 CFR parts 1421, 1425, 1427, 1434, and 1435.

*MPP-Dairy* means the Margin Protection Program for Dairy under 7 CFR part 1430, subpart A.

*NAP* means the Noninsured Crop Disaster Assistance Program under section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) and 7 CFR part 1437.

*On-Farm Storage Loss Program* means the On-Farm Storage Loss Program under 7 CFR part 760, subpart P.

*Ownership interest* means to have either legal ownership interest or beneficial ownership interest in a legal entity. For the purposes of administering PARP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such

entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is also considered to have a beneficial ownership interest in such legal entity.

*Person* means an individual, natural person and does not include a legal entity.

*PLIP* means the Pandemic Livestock Indemnity Program announced in the notice of funds availability published on July 19, 2021 (86 FR 37990–37994).

*PMVAP* means the Pandemic Market Volatility Assistance Program administered by USDA's Agricultural Marketing Service.

*Producer* means a person or legal entity who was in the business of farming to produce an agricultural commodity in calendar year 2020, and who was entitled to a share in the agricultural commodity available for marketing or would have shared had the agricultural commodity been produced and marketed. For PARP, "producer" also includes cattle feeder operations.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*TAP* means the Tree Assistance Program under 7 CFR part 1416, subpart E.

*SMHPP* means the Spot Market Hog Pandemic Program announced in the notice of funds availability published on December 14, 2021 (86 FR 71003–71007).

*STRP* means the Seafood Trade Relief Program announced in the notice of funds availability published on September 14, 2020 (85 FR 56572–56575).

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*United States* means all 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

*Veteran farmer or rancher* means a farmer or rancher:

(1) Who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[2]) and:

(i) Has not operated a farm or ranch for more than 10 years; or

(ii) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[3]) during the most recent 10-year period; or

(2) That is an entity and at least 50 percent of the ownership interest is held by members who meet the criteria in paragraph (1) of this definition.

*WHIP+* means the Wildfires and Hurricanes Indemnity Program Plus under 7 CFR part 760, subpart O.

**§ 9.303  Producer eligibility requirements.**

(a) To be eligible for PARP, a producer must:

(1) Have been in the business of farming in the 2020 calendar year;

(2) Have had at least a 15 percent decrease in allowable gross revenue for the 2020 calendar year, as compared to the:

(i) Actual allowable gross revenue for the 2018 or 2019 calendar year, whichever is reflective of a typical year, as elected by the producer, if the producer had allowable gross revenue in the 2018 or 2019 calendar year; or

(ii) Producer's expected allowable gross revenue for the 2020 calendar year, if the producer had no allowable gross revenue for the 2018 and 2019 calendar years; and

(3) Meet all other requirements for eligibility under this subpart.

(b) To be eligible for a PARP payment, a producer must be a:

(1) Citizen of the United States;

(2) Resident alien, which for purposes of this subpart means "lawful alien" as defined in part 1400 of this title;

(3) Partnership organized under State Law;

(4) Corporation, limited liability company, or other organizational structure organized under State law;

(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304); or

---

[1] Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through Natural Resources Conservation Service at *https://lrftool.sc.egov. usda.gov.*

[2] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[3] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

(6) Foreign person or foreign entity who meets all requirements as described in 7 CFR part 1400.

### § 9.304 Allowable gross revenue.

(a) For the purposes of this subpart, "allowable gross revenue" includes revenue from:

(1) Sales of agricultural commodities produced by the producer, including sales resulting from value added through post-production activities;

(2) Sales of agricultural commodities a producer purchased for resale that had a change in characteristic due to the time held (for example, a plant purchased at a size of 2 inches and sold as an 18-inch plant after 4 months), less the cost or other basis of such commodities;

(3) The taxable amount of cooperative distributions directly related to the sale of the agricultural commodities produced by the producer;

(4) Benefits under the following agricultural programs: ARC and PLC, BCAP, DMC, LDP, MFP, MLG, and MPP-Dairy;

(5) CCC loans, if treated as income and reported to IRS;

(6) Crop insurance proceeds;

(7) Federal disaster program payments under the following programs: 2017 WHIP, ELAP, LFP, LIP, NAP, Milk Loss Program, On-Farm Storage Loss Program, STRP, TAP, and WHIP+;

(8) Payments issued through grant agreements with FSA for losses of agricultural commodities;

(9) Grants from the Department of Commerce, National Oceanic and Atmospheric Administration and State program funds providing direct payments for the loss of agricultural commodities or the loss of revenue from agricultural commodities;

(10) Revenue from raised breeding livestock;

(11) Revenue earned as a cattle feeder operation;

(12) Other revenue directly related to the production of agricultural commodities that IRS requires the producer to report as income and

(13) For 2020 allowable gross revenue, payments PMVAP regardless of the calendar year in which the payment was received.

(b) Allowable gross revenue does not include revenue from sources other than those listed in paragraph (a) of this section, including but not limited to, revenue from:

(1) Applicable pandemic assistance;

(2) Sales of commodities that are excluded from "agricultural commodities,"

(3) Resale items not held for characteristic change;

(4) Income from a pass-through entity such as an S Corp or limited liability company;

(5) Conservation program payments;

(6) Any pandemic assistance payments that were not intended to compensate for the loss of agricultural commodities or the loss of revenue from agricultural commodities due to the pandemic (for example, payments to provide assistance with the cost of purchasing personal protective equipment, retrofitting facilities for worker and consumer safety, shifting to online sales platforms, transportation, worker housing, or medical costs);

(7) Custom hire income;

(8) Net gain from hedging or speculation;

(9) Wages, salaries, tips, and cash rent;

(10) Rental of equipment or supplies; and

(11) Acting as a contract producer of an agricultural commodity.

(c) If a producer did not have a full year of revenue for 2018 or 2019, or increased their production capacity in 2020 compared to 2018 or 2019, the producer may certify to an adjusted 2018 or 2019 allowable gross revenue on form FSA–1122A. Increases in production capacity do not include changes due to crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals. Documentation required to support such an adjustment must be provided within 30 calendar days of submitting their PARP application and demonstrate that the producer:

(1) Had the production capacity to support the expected full year revenue;

(2) Added production capacity to the farming operation;

(3) Increased the use of existing production capacity; or

(4) Made physical alterations to existing production capacity.

(d) If a producer did not have allowable gross revenue in 2018 and 2019, the producer must certify on form FSA–1122A as to what had been their reasonably expected 2020 allowable gross revenue prior to the impact of the COVID–19 pandemic. Documentation required to support the producer's certification must be provided within 30 calendar days of submitting the producer's PARP application. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the COVID–19 pandemic and includes, but is not limited to:

(1) Financial documents such as a business plan or cash flow statement

that demonstrate an expected level of revenue;

(2) Sales contracts or purchase agreements; and

(3) Documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

(e) A producer who does not provide acceptable documentation described in paragraph (c) or (d) of this section within 30 calendar days of submitting their application is not eligible for an adjustment to their 2019 allowable gross revenue or to have their payment calculated using an expected 2020 allowable gross revenue, as applicable.

(f) Except as provided in paragraph (a)(13) of this section, the allowable gross revenue for a specific calendar year will be based on the calendar year in which that revenue was received by the producer.

(g) Producers who file or would file a joint tax return will certify their allowable gross revenue based on what it would have been had they filed taxes separately for the applicable year.

### § 9.305 Time and method of application.

(a) A completed PARP application under this subpart must be submitted to any FSA county office by the close of business on the date announced by the Deputy Administrator. Applications may be submitted in person or by mail, email, facsimile, or other methods announced by FSA.

(b) Failure of an individual, entity, or a member of an entity to submit the following payment limitation and payment eligibility forms within 60 days from the PARP application deadline, may result in no payment or a reduced payment:

(1) Form AD–2047, Customer Data Worksheet, for new customers or existing customers who need to update their customer profile;

(2) Form FSA–1122A, PARP Application, if applicable;

(3) Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, if applicable;

(4) Form CCC–901, Member Information for Legal Entities, if applicable;

(5) Form CCC–902 Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

(6) Form CCC–941, Average Adjusted Gross Income (AGI) Certification and Consent to Disclosure of Tax Information, for the 2020 program year for the person or legal entity, including the legal entity's members, partners, or shareholders, as provided in 7 CFR part 1400;

Strickland AR 0786

(7) Form FSA–1123, Certification of 2020 Adjusted Gross Income (AGI), if applicable; and

(8) Form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification, for the PARP applicant and applicable affiliates as provided in 7 CFR part 12.

(c) If requested by USDA, the producer must provide additional documentation that establishes the producer's eligibility for PARP. If supporting documentation is requested, the documentation must be submitted to USDA within 30 calendar days from the request or the application will be disapproved by USDA. FSA may request supporting documentation to verify information provided by the producer and their eligibility including, but not limited to, the producer's:

(1) Allowable gross revenue reported on the PARP application; and

(2) Ownership share in the agricultural commodities.

**§ 9.306    Payment calculation.**

(a) If the producer's allowable gross revenue for 2020 decreased by at least 15 percent compared to the producer's allowable gross revenue for 2018 or 2019, as elected by the producer:

(1) FSA will calculate:

(i) The producer's 2018 or 2019 allowable gross revenue, as elected by the producer and as adjusted according to § 9.304(c), if applicable; minus

(ii) The producer's 2020 allowable gross revenue; multiplied by

(iii) A payment factor of:

(A) Ninety (90) percent for underserved farmers or ranchers, who have submitted form CCC–860 certifying they meet the definition for at least one of the applicable groups; or

(B) Eighty (80) percent for all other producers; and

(2) The producer's PARP payment will be equal to the result of the calculation in paragraph (a)(1) of this section minus the producer's applicable pandemic assistance, and 2020 program year ERP payments.

(b) If a producer did not have allowable gross revenue in 2018 and 2019 and the producer's allowable gross revenue for 2020 decreased by at least 15 percent compared to the producer's expected 2020 allowable gross revenue:

(1) FSA will calculate:

(i) The producer's expected 2020 allowable gross revenue, as specified in § 9.304(d), minus

(ii) The producer's actual 2020 allowable gross revenue;

(iii) Multiplied by a payment factor of:

(A) 90 percent for underserved farmers or ranchers who have submitted form CCC–860 certifying they meet the definition for at least one of the applicable groups; or

(B) 80 percent for all other producers; and

(2) The producer's PARP payment will be equal to the result of the calculation in paragraph (b)(1) of this section minus the producer's applicable pandemic assistance, and 2020 program year ERP payments.

(c) If a producer receives assistance through 2020 program year ERP or any program included under applicable pandemic assistance after their PARP payment is calculated, their PARP payment will be recalculated and the producer must refund any resulting overpayment.

(d) Payments calculated according to this section are subject to the availability of funds and may be factored if total calculated payments exceed the available funding.

**§ 9.307    Adjusted gross income limitation, payment limitation, and attribution.**

(a) To be eligible to receive a PARP payment and facilitate administration of paragraphs (b) through (f) of this section, a person or legal entity must provide their name, address, valid taxpayer identification number, and ownership share to USDA. In addition, a legal entity must provide the name, address, valid taxpayer identification number, and ownership share of each person or legal entity, that holds or acquires a direct or indirect ownership interest in the legal entity. PARP payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds less than a 10 percent direct or indirect ownership interest, at or above the fourth level of ownership in the business structure, is not provided to USDA. Additionally, a legal entity will not be eligible to receive PARP payments when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater, at or above the fourth level of ownership in the business structure, is not provided to USDA.

(b) The $900,000 average adjusted gross income limitation provisions in 7 CFR part 1400 relating to limits on income for persons or legal entities, including members of legal entities, joint ventures, and general partnerships applies to PARP. The average adjusted gross income will be calculated for a person or legal entity based on the 2016, 2017, and 2018 tax years. If the person's or legal entity's average adjusted gross income exceeds $900,000, the applicant is ineligible for PARP except as provided in paragraph (c) of this section.

(c) A person or legal entity that does not meet the average adjusted gross income requirements described in paragraph (b) of this section, may otherwise meet the adjusted gross income requirements, provided the person's or legal entity's 2020 adjusted gross income, as defined under 26 U.S.C. 62 or comparable measure, is not more than $900,000. Except for general partnerships and joint ventures, a PARP applicant that is a person or legal entity, including members holding an ownership interest in the legal entity, is required to:

(1) Certify, on a form that is approved for that purpose by the Deputy Administrator, that their 2020 adjusted gross income or comparable measure is not more than $900,000; and

(2) Submit a certification from a licensed CPA or attorney affirming the person's or legal entity's 2020 adjusted gross income is not more than $900,000.

(d) Members of general partnerships and joint ventures not meeting the income requirements described in paragraph (b) of this section may otherwise meet the income requirements, provided the member's 2020 adjusted gross income, as defined under 26 U.S.C. 62 or comparable measure, is not more than $900,000. The member is required to provide the information described in paragraphs (c)(1) and (2) of this section.

(e) A person or legal entity other than a joint venture or general partnership cannot receive, directly or indirectly, more than $125,000 under PARP. USDA may establish a lower maximum payment amount per person, legal entity, or member of a joint venture or general partnership after the application period has ended if calculated payment amounts exceed available funding. Payments made to a PARP applicant who is a joint operation, including a joint venture or a general partnership, may not exceed the amount determined by multiplying $125,000 (or the reduced maximum payment limitation, if applicable) by the number of persons or legal entities that comprise the first-level membership of the joint operation.

(f) A PARP payment made to a legal entity will be considered in combination with other PARP payments attributed to every person or legal entity with a direct or indirect ownership interest in the legal entity. The maximum limitation described in paragraph (e) of this section for a legal entity is determined based on payments to the legal entity and members who are an individual person or a legal entity. If a member's combined PARP payments

reach the maximum payment limitation when summed from all businesses in which the person or legal entity has an ownership interest, then subsequent payments to the legal entity will be reduced by the proportionate ownership interest of the member. A payment to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility. Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

(1) *First level of ownership:* Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

(2) *Second level of ownership:* Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

(3) *Third and fourth levels of ownership:* Except as provided in the second-level ownership in paragraph (f)(2) of this section and in the fourth level of ownership in paragraph (f)(4) of this section, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in paragraph (f)(2) of this section; and

(4) *Fourth-level of ownership:* If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first or payment legal entity by the fourth-level legal entity.

(g) Payments made to a PARP applicant that is an Indian Tribe or Tribal organization, as defined in the section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), are not subject to:

(1) AGI requirements described in paragraphs (b) through (d) of this section;

(2) Payment limitation described in paragraph (e) of this section; and

(3) Attribution of payments described in paragraph (f) of this section.

(h) Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor child's parent or legal guardian.

## § 9.308   Eligibility subject to verification.

(a) Producers who are approved for participation in PARP are required to retain documentation in support of their application for 3 years after the date of approval.

(b) Participants receiving PARP payments must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

## § 9.309   Miscellaneous provisions.

(a) If a PARP payment resulted from erroneous information provided by a producer, or any person acting on their behalf, the payment will be recalculated and the producer must refund any excess payment with interest calculated from the date of the disbursement of the payment.

(b) If FSA determines that the producer intentionally misrepresented information provided on their application, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement.

(c) Any required refunds must be resolved in accordance with part 3 of this title.

(d) The regulations in 7 CFR part 718, subpart D, and 7 CFR parts 11 and 780 apply to determinations made under this subpart.

(e) A producer, whether a person or legal entity that either fails to timely provide all required documentation or fails to satisfy any eligibility requirement for PARP, is not eligible to receive PARP payments, directly or indirectly. A PARP payment to an eligible legal entity applicant whose member(s) either fails to timely provide all required documentation or fails to satisfy any eligibility requirement for PARP will be reduced proportionate to that member's ownership interest in the legal entity.

(f) Any payment under this subpart will be made without regard to questions of title under State law and without regard to any claim or lien

against the commodity or proceeds from the sale of the commodity. The regulations governing offsets in part 3 of this title do not apply to payments made under this subpart.

(g) For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under PARP but only as to beneficiaries who, as a condition of the waiver, agree to apply the PARP payments to reduce the amount of the judgment lien.

(h) The provisions in 7 CFR 718.3, 718.4, 718.5, 718.6, 718.8, 718.9, 718.10, and 718.11 are applicable to multiple programs and apply to PARP.

(i) In addition to any other Federal laws that apply to PARP, the following laws apply: 15 U.S.C. 714; 18 U.S.C. 286, 287, 371, and 1001.

## § 9.310   Perjury.

In either applying for or participating in PARP, or both, the producer is subject to laws against perjury and any resulting penalties and prosecution, including, but not limited to, 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in PARP, or both, then the producer may be guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or without the United States.

# PART 701—EMERGENCY CONSERVATION PROGRAM, EMERGENCY FOREST RESTORATION PROGRAM, AND CERTAIN RELATED PROGRAMS PREVIOUSLY ADMINISTERED UNDER THIS PART

■ 15. The authority citation for part 701 continues to read as follows:

**Authority:** 16 U.S.C. 2201–2206; Sec. 101, Pub. L. 109–148, 119 Stat. 2747; and Pub. L. 111–212, 124 Stat. 2302.

## Subpart A—General

■ 16. Amend § 701.2 in paragraph (b) as follows:

■ a. Remove the definition of "Commercial forest land";

■ b. Add the definition of "Forestland" in alphabetical order;

■ c. In a definition for "Nonindustrial private forest land", remove the words "commercial forest"; and

■ d. Add a definition for ''Socially disadvantaged farmer or rancher'' in alphabetical order.

The additions read as follows:

### § 701.2    Abbreviations and definitions.

\*    \*    \*    \*    \*

(b) \* \* \*

*Forestland* means land that is at least 120 feet wide and 1 acre in size and at least 10 percent covered by live trees of any size.

\*    \*    \*    \*    \*

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a socially disadvantaged group. A socially disadvantaged group is a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities.

### §§ 701.44 and 701.45    [Removed and Reserved]

■ 17. Remove and reserve §§ 701.44 and 701.45.

### Subpart B—Emergency Conservation Program

■ 18. Amend § 701.105 as follows:
■ a. Remove paragraphs (b)(1) and (2);
■ b. Redesignate paragraphs (b)(3) through (13) as paragraphs (b)(1) through (11), respectively;
■ c. Add paragraph (d).

The addition reads as set forth below.

### § 701.105    Land eligibility.

\*    \*    \*    \*    \*

(d) Additional provisions making Government-owned land eligible is specified in § 701.106.

■ 19. Add § 701.106 to read as follows:

### § 701.106    Government-owned land.

(a) *State-owned land.* When land is owned by a State, whether it is eligible for cost share is as specified in this paragraph (a) in addition to the requirements in § 701.105.

(1) If an eligible person or legal entity has a lease for the State-owned land that allows cost share, and files a cost share request for the State-owned land, the land is eligible for cost share if, as determined by FSA, the:

(i) Eligible person or legal entity will directly benefit from the practice; or

(ii) The land will remain in agricultural production throughout the established practice life span.

(2) If an eligible person or legal entity files a cost-share request for State-owned land, the land is ineligible for cost share if, as determined by FSA, the:

(i) Practice is for the primary benefit of the State or State agencies; or

(ii) Eligible person or legal entity is prohibited by the lease from accepting cost-share.

(b) *Federally-owned farmland.* When land is federally owned, whether it is eligible for cost-share is as specified in this paragraph (a), in addition to the requirements in § 701.105.

(1) If an eligible person or legal entity files a cost-share request on federally owned farmland, the land is eligible if all of the following apply:

(i) An eligible private person or legal entity is farming or ranching the farmland;

(ii) An eligible person or legal entity has a lease that does not prohibit cost-share;

(iii) The practice will primarily benefit nearby or adjacent privately owned farmland of the eligible person or legal entity performing the practice;

(iv) A person or legal entity performing the practice has authorization from a Federal agency to install and maintain the practice;

(v) The Federal land is the most practical location for the eligible practice; and

(vi) During a drought, the practice will primarily benefit the livestock owned or managed by the eligible person or legal entity performing the practice.

(2) If an eligible person or legal entity files a cost share request on federally-owned land, the land is ineligible if the practices performed on these lands are for the benefit of land owned by a Federal agency.

(c) *Federal or State agency.* For the purposes of this subpart, private persons or legal entities exclude Federal and State agencies.

■ 20. Amend § 701.111 by revising paragraph (a) to read as follows:

### § 701.111    Prohibition on duplicate payments.

(a) *Duplicate payments.* Participants are not eligible to receive funding under ECP on the same piece of land for which the participant has or will receive funding under any other Federal or State program that covers the same or similar expenses so as to create duplicate payments, or, in effect, a higher rate of cost share than is allowed under this part.

\*    \*    \*    \*    \*

■ 21. Amend § 701.126 by adding paragraph (d) to read as follows.

### § 701.126    Maximum cost-share percentages.

\*    \*    \*    \*    \*

(d) The Secretary may waive the maximum limitations described in

paragraphs (a) through (c) of this section to the maximum extent allowed by law.

■ 22. Amend § 701.127 by designating the undesignated paragraph as paragraph (a) and adding paragraph (b) to read as follows.

### § 701.127    Maximum ECP payments per person or legal entity.

\*    \*    \*    \*    \*

(b) The Secretary may waive the maximum limitations described in paragraph (a) of this section to the maximum extent allowed by law.

■ 23. Amend § 701.128 by revising the section heading and paragraph (a) to read as follows.

### § 701.128    Advance payment.

(a) With respect to a payment to an agricultural producer for any eligible ECP practice, the agricultural producer has the option of receiving up to 25 percent of the projected payment, determined based on the applicable percentage of the fair market value of the cost of the practice, as determined by FSA, before the agricultural producer carries out the restoration.

\*    \*    \*    \*    \*

### §§ 701.150 through 701.157    [Removed]

■ 25. Remove §§ 701.150 through 701.157.

### Subpart C—Emergency Forest Restoration Program

■ 26. Amend § 701.226 by adding paragraph (c) to read as follows.

### § 701.226    Maximum cost-share percentages.

\*    \*    \*    \*    \*

(c) The Secretary may waive the maximum limitations described in paragraphs (a) and (b) of this section to the maximum extent allowed by law.

### Farm Service Administration

#### Chapter VII

### PART 760—INDEMNITY PAYMENT PROGRAMS

■ 27. The authority citation for part 760 is revised to read as follows:

**Authority:** 7 U.S.C. 4501 and 1531; 16 U.S.C. 3801, note; 19 U.S.C. 2497; Title III, Pub. L. 109–234, 120 Stat. 474; Title IX, Pub. L. 110–28, 121 Stat. 211; Sec. 748, Pub. L. 111–80, 123 Stat. 2131; Title I, Pub. L. 115–123, 132 Stat. 65; Title I, Pub. L. 116–20, 133 Stat. 871; Division B, Title VII, Pub. L. 116–94, 133 Stat. 2658; and Division B, Title I, Pub. L. 117– 43, 135 Stat. 344.

■ 28. Add subpart S to read as follows.

### Subpart S—Emergency Relief Program

Sec.

760.1900 Applicability and administration.
760.1901 Definitions.
760.1902 Producer eligibility requirements.
760.1903 Allowable gross revenue.
760.1904 Time and method of application.
760.1905 Payment calculation.
760.1906 Payment limitation and attribution.
760.1907 Eligibility subject to verification.
760.1908 Miscellaneous provisions.
760.1909 Perjury.
760.1910 Requirement to purchase crop insurance or NAP coverage.

## Subpart S—Emergency Relief Program

### § 760.1900 Applicability and administration.

(a) This subpart specifies the eligibility requirements and payment calculations for Phase 2 of the Emergency Relief Program (ERP). ERP provides payments to producers who suffered eligible crop losses due to qualifying disaster events, which include wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021.[1] To be eligible for ERP Phase 2 payments, participants must comply with all provisions under this subpart.

(b) ERP is administered under the general supervision and direction of the Administrator, Farm Service Agency (FSA).

(c) The FSA State committee will take any action required by this subpart that an FSA county committee has not taken. The FSA State committee will also:

(1) Correct, or require an FSA county committee to correct, any action taken by such county FSA committee that is not in accordance with the regulations of this subpart; or

(2) Require an FSA county committee to withhold taking any action that is not in accordance with this subpart.

(d) No provision or delegation to an FSA State or county committee will preclude the FSA Administrator, the Deputy Administrator, or a designee or other such person, from determining any question arising under the programs of this subpart, or from reversing or modifying any determination made by an FSA State or county committee.

(e) The Deputy Administrator has the authority to permit State and county committees to waive or modify deadlines (except deadlines specified in a law) and other requirements or program provisions not specified in law,

in cases where lateness or failure to meet such other requirements or program provisions do not adversely affect operation of ERP.

### § 760.1901 Definitions.

The following definitions apply to this subpart. The definitions in parts 718 and 1400 of this title apply, except where they conflict with the definitions in this section.

*2017 WHIP* means the 2017 Wildfires and Hurricanes Indemnity Program under 7 CFR part 760, subpart O.

*Administrative fee* means the amount an insured producer paid for catastrophic risk protection, and additional coverage for each crop year as specified in the applicable crop insurance policy.

*Application* means the ERP Phase 2 application form.

*Aquaculture* means any species of aquatic organisms grown as food for human or livestock consumption or for industrial or biomass uses, fish raised as feed for fish that are consumed by humans, and ornamental fish propagated and reared in an aquatic medium. Eligible aquacultural species must be raised by a commercial operator and in water in a controlled environment.

*ARC and PLC* means the Agriculture Risk Coverage (ARC) and Price Loss Coverage (PLC) programs under 7 CFR part 1412.

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income derived from farming, ranching, or forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year.

(1) If the resulting average adjusted gross farm income is at least 66.66 percent of the average adjusted gross income of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(i) The sale of equipment to conduct farm, ranch, or forestry operations; and

(ii) The provision of production inputs and services to farmers, ranchers, foresters, and farm operations.

(2) The relevant tax years are:

(i) For the 2020 program year, 2016, 2017, and 2018; and

(ii) For the 2021 program year, 2017, 2018, and 2019.

*Average adjusted gross income* means the average of the adjusted gross income as defined under 26 U.S.C. 62 or comparable measure of the person or legal entity. The relevant tax years are:

(1) For the 2020 program year, 2016, 2017, and 2018; and

(2) For the 2021 program year, 2017, 2018, and 2019.

*BCAP* means the Biomass Crop Assistance Program under 7 CFR part 1450.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Benchmark revenue* means allowable gross revenue for the benchmark year. If a producer began farming in 2020 or 2021 and did not have allowable gross revenue in either 2018 or 2019, the benchmark revenue is the producer's reasonably expected allowable gross revenue for the disaster year prior to the impact of the qualifying disaster event.

*Benchmark year* means the 2018 or 2019 tax year, as elected by the producer.

*Buy-up NAP coverage* means NAP coverage at a payment amount that is equal to an indemnity amount calculated for buy-up coverage computed under section 508(c) or (h) of the Federal Crop Insurance Act and equal to the amount that the buy-up coverage yield for the crop exceeds the actual yield for the crop.

*Catastrophic coverage* has the same meaning as in 7 CFR 1437.3.

*CCC* means the Commodity Credit Corporation.

*Certifying agent* means a private or governmental entity accredited by the USDA Secretary for the purpose of certifying a production, processing, or handling operation as organic.

*CFAP* means the Coronavirus Food Assistance Program 1 and 2 under 7 CFR part 9, subparts A through C, excluding assistance for contract producers specified in § 9.203(l) through (o).

*Controlled environment* means an environment in which everything that can practicably be controlled by the producer with structures, facilities, and growing media (including but not limited to water, soil, or nutrients), is in fact controlled by the producer, as determined by industry standards.

*County* means the county or parish of a state. For Alaska, Puerto Rico, and the Virgin Islands, a county is an area designated by the State committee with the concurrence of the Deputy Administrator.

*County committee* means the FSA county committee.

*Coverage level* means the percentage determined by multiplying the elected yield percentage under a crop insurance

---

[1] ERP Phase 1 was administered according to the notice of funds availability published in the **Federal Register** on May 18, 2022 (87 FR 30164–30172). A clarification to the notice of funds availability for ERP Phase 1 was published on August 18, 2022 (87 FR 50828–50830).

Strickland AR 0790

policy or NAP coverage by the elected price percentage.

*Crop insurance* means an insurance policy reinsured by the Federal Crop Insurance Corporation under the provisions of the Federal Crop Insurance Act, as amended.

*Crop insurance indemnity* means the payment to a participant for crop losses covered under crop insurance administered by RMA in accordance with the Federal Crop Insurance Act (7 U.S.C. 1501–1524).

*Deputy Administrator* means Deputy Administrator for Farm Programs, Farm Service Agency, U.S. Department of Agriculture, or their designee.

*Direct market crop* means a crop sold directly to consumers without the intervention of an intermediary such as a registered handler, wholesaler, retailer, packer, processor, shipper, or buyer (for example, a crop sold at a farmer's market or roadside stand), excluding crops sold for livestock consumption.

*Disaster year* means the calendar year in which the qualifying disaster event occurred (that is, 2020 or 2021).

*Disaster year revenue* means the allowable gross revenue for:

(1) The 2020 or 2021 tax year, as elected by the producer, for the 2020 disaster year; and

(2) The 2021 or 2022 tax year, as elected by the producer, for the 2021 disaster year.

(3) Producers must choose consecutive tax years if they are applying for both the 2020 and 2021 disaster years (that is, they may choose 2020 tax year revenue for the 2020 disaster year, and 2021 tax year revenue for the 2021 disaster year; or they may choose 2021 tax year revenue for the 2020 disaster year and 2022 tax year revenue for the 2021 disaster year).

*ELAP* means the Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program under part 1416, subpart B, of this title.

*Eligible crop* means a crop, including eligible aquaculture, that is produced in the United States as part of a farming operation and is intended to be commercially marketed. It excludes:

(1) Crops for grazing;

(2) Aquatic species that do not meet the definition of aquaculture;

(3) *Cannabis sativa* L. and any part of that plant that does not meet the definition of hemp; and

(4) Timber.

*Farming operation* means a business enterprise engaged in the production of agricultural products, commodities, or livestock, operated by a person, legal entity, or joint operation, and that is eligible to receive payments, directly or indirectly, under this subpart. A person or legal entity may have more than one farming operation if the person or legal entity is a member of one or more legal entity or joint operation.

*FCIC* means the Federal Crop Insurance Corporation, a wholly owned Government Corporation of USDA, administered by RMA.

*Hemp* means the plant species *Cannabis sativa* L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis, that is grown under a license or other required authorization issued by the applicable governing authority that permits the production of the hemp.

*High value crop* means:

(1) Any eligible crop not specifically identified as a specialty crop or listed in the definition of ''other crop''; and

(2) Any eligible crop, regardless of whether it is identified as a specialty crop or listed in the definition of ''other crop,'' if the crop is a direct market crop, organic crop, or a crop grown for a specific market in which specialized products can be sold resulting in an increased value compared to the typical market for the crops (for example, soybeans intended for tofu production), as determined by the Deputy Administrator.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, forestry commodities including renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, Interest Charge Domestic International Sales Corporation (IC–DISC), or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, or forestry activities as defined in this document; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator.

*IRS* means the Department of Treasury, Internal Revenue Service.

*LDP* means the Loan Deficiency Payment programs in 7 CFR parts 1421, 1425, 1427, 1434, and 1435.

*Legal entity* means a corporation, joint stock company, association, limited partnership, irrevocable trust, estate, charitable organization, or other similar organization including any such organization participating in a business structure as a partner in a general partnership, a participant in a joint venture, a grantor of a revocable trust, or as a participant in a similar organization. A business operating as a sole proprietorship is considered a legal entity.

*Limited resource farmer or rancher* means a farmer or rancher:

(1) Who is a person whose:

(i) Direct or indirect gross farm sales did not exceed:

(A) $180,300 in each calendar year for 2017 and 2018 (the relevant years for the 2020 program year); or

(B) $179,000 in each of the 2018 and 2019 calendar years for the 2021 program year; and

(ii) Total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1)(i) of this definition; [1] or

---

[1] Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through Natural Resources Conservation Service at *https://lrftool.sc.egov. usda.gov.*

(2) That is an entity and all members who hold an ownership interest in the entity meet the criteria in paragraph (1) of this definition.

*LFP* means the Livestock Forage Disaster Program under CFR part 1416, subpart C.

*MLG* means marketing loan gains under the Marketing Assistance Loan program provisions in 7 CFR parts 1421, 1425, 1427, 1434, and 1435.

*Minor child* means a person who is under 18 years of age as of June 1, 2020.

*MFP* means the 2018 Market Facilitation Program under 7 CFR part 1409, subpart A, and the 2019 Market Facilitation Program under 7 CFR part 1409, subpart B.

*NAP* means the Noninsured Crop Disaster Assistance Program under section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) and 7 CFR part 1437.

*On-Farm Storage Loss Program* means the On-Farm Storage Loss Program under 7 CFR part 760, subpart P.

*Organic crop* means a crop that is organically produced consistent with section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502) and grown on acreage certified by a certifying agent as conforming to organic standards specified in 7 CFR part 205.

*Other crop* means cotton, peanuts, rice, feedstock, and any crop grown with an intended use of grain, silage, or forage, unless the crop meets the requirements in paragraph (2) of the definition of ''high value crop.''

*Ownership interest* means to have either legal ownership interest or beneficial ownership interest in a legal entity. For the purposes of administering ERP Phase 2, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is also considered to have a beneficial ownership interest in such legal entity.

*Person* means an individual, natural person and does not include a legal entity.

*Premium* means the premium paid by the producer for crop insurance coverage or NAP buy-up coverage levels.

*Producer* means a person or legal entity who was entitled to a share in the eligible crop available for marketing or

would have shared had the eligible crop been produced and marketed.

*Program year* means:

(1) For ERP Phase 2, the disaster year; and

(2) For all other programs, the program year as defined in the applicable program provisions.

*Qualifying disaster event* means wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions.

*Qualifying drought* means an area within the county was rated by the U.S. Drought Monitor as having a drought intensity of D2 (severe drought) for eight consecutive weeks or D3 (extreme drought) or higher level for any period of time during the applicable calendar year.

*Related condition* means damaging weather and adverse natural occurrences that occurred concurrently with and as a direct result of a specified qualifying disaster event. Related conditions include, but are not limited to:

(1) Excessive wind that occurred as a direct result of a derecho;

(2) Silt and debris that occurred as a direct and proximate result of flooding;

(3) Excessive wind, storm surges, tornados, tropical storms, and tropical depressions that occurred as a direct result of a hurricane; and

(4) Excessive wind and blizzards that occurred as a direct result of a winter storm.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Specialty crops* means fruits, tree nuts, vegetables, culinary herbs and spices, medicinal plants, and nursery, floriculture, and horticulture crops. This includes common specialty crops identified by USDA's Agricultural Marketing Service at *https://*

*www.ams.usda.gov/services/grants/ scbgp/specialty-crop* and other crops as designated by the Deputy Administrator.

*Substantial beneficial interest (SBI)* has the same meaning as specified in the applicable crop insurance policy. For the purposes of ERP Phase 1, Federal crop insurance records for ''transfer of coverage, right to indemnity'' are considered the same as SBIs.

*STRP* means the Seafood Trade Relief Program announced in the notice of funds availability published on September 14, 2020 (85 FR 56572–56575).

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*United States* means all 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

*U.S. Drought Monitor* means the system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http://droughtmonitor.unl.edu.*

*Veteran farmer or rancher* means a farmer or rancher:

(1) Who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[2]) and:

(i) Has not operated a farm or ranch for more than 10 years; or

(ii) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[3]) during the most recent 10-year period; or

(2) That is an entity and at least 50 percent of the ownership interest is held by members who meet the criteria in paragraph (1) of this definition.

*WHIP+* means the Wildfires and Hurricanes Indemnity Program Plus under 7 CFR part 760, subpart O.

### §760.1902   Producer eligibility requirements.

(a) To be eligible for ERP Phase 2, a producer must have suffered a loss in

---

[2] The term ''Armed Forces'' means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[3] The term ''veteran'' means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

Strickland AR 0792

disaster year allowable gross revenue, as compared to the benchmark allowable gross revenue, due to necessary expenses associated with losses of eligible crops due in whole or in part to a qualifying disaster event that occurred in the 2020 or 2021 calendar year.

(b) To be eligible for an ERP Phase 2 payment, a producer must be a:

(1) Citizen of the United States;

(2) Resident alien, which for purposes of this subpart means "lawful alien" as defined in part 1400 of this title;

(3) Partnership organized under State Law;

(4) Corporation, limited liability company, or other organizational structure organized under State law; or

(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304).

**§ 760.1903  Allowable gross revenue.**

(a) For the purposes of this subpart, "allowable gross revenue" includes revenue from:

(1) Sales of eligible crops produced by the producer, which includes sales resulting from value added through post-production activities that were reportable on IRS Schedule F;

(2) Sales of eligible crops a producer purchased for resale that had a change in characteristic due to the time held (for example, a plant purchased at a size of 2 inches and sold as an 18-inch plant after 4 months), less the cost or other basis of such eligible crops;

(3) The taxable amount of cooperative distributions directly related to the sale of the eligible crops produced by the producer;

(4) Benefits under the following agricultural programs: 2017 WHIP, ARC and PLC, BCAP, LDP, MLG, MFP, the On-Farm Storage Loss Program, and STRP;

(5) CCC loans, if treated as income and reported to IRS;

(6) Crop insurance proceeds for eligible crops, minus the amount of administrative fees and premiums;

(7) NAP payments for eligible crops, minus the amount of service fees and premiums;

(8) ELAP payments for an aquaculture crop;

(9) Payments issued through grant agreements with FSA for losses of eligible crops;

(10) Grants from the Department of Commerce, National Oceanic and Atmospheric Administration and State program funds providing direct payments for the loss of eligible crops or the loss of revenue from eligible crops;

(11) Other revenue directly related to the production of eligible crops that IRS requires the producer to report as income;

(12) For the disaster year only, ERP Phase 1 payments issued to another person or entity for the producer's share of an eligible crop, regardless of the tax year in which the payment would be reported to IRS; and

(13) For the benchmark year only, 2018, 2019 and 2020 WHIP+ and QLA payments.

(b) Allowable gross revenue does not include revenue from sources other than those listed in paragraph (a) of this section, including but not limited to, revenue from:

(1) Federal assistance programs not included in paragraph (a) of this section;

(2) Sales of livestock, animal by-products, and any commodities that are excluded from "eligible crops";

(3) Resale items not held for characteristic change;

(4) Income from a pass-through entity such as an S Corp or limited liability company;

(5) Conservation program payments;

(6) Any pandemic assistance payments that were not for the loss of eligible crops or the loss of revenue from eligible crops;

(7) Custom hire income;

(8) Net gain from hedging or speculation;

(9) Wages, salaries, tips, and cash rent;

(10) Rental of equipment or supplies; and

(11) Acting as a contract producer of an agricultural commodity.

(c) A producer is required to certify to an adjusted allowable gross revenue for the benchmark year on FSA–521 if the producer had a decreased operation capacity in a disaster year for which they are applying for ERP Phase 2, compared to the benchmark year.

(d) A producer may certify to an adjusted allowable gross revenue for the benchmark year on FSA–521 if either of the following apply:

(1) The producer did not have a full year of revenue for 2018 or 2019; or

(2) The producer had expanded their operation capacity in a disaster year for which they are applying for ERP Phase 2, compared to the benchmark year.

(e) Change in operation capacity does not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals. If requested by FSA, producers are required to submit documentation to FSA to support adjustments described in paragraphs (c) and (d) of this section within 30

calendar days of the request. The documentation to support an adjustment due to a change in operation capacity must show that the adjustment to the producer's benchmark revenue is due to an:

(1) Addition or decrease in production capacity of the farming operation;

(2) Increase or decrease in the use of existing production capacity; or

(3) Physical alterations that were made to existing production capacity.

(f) If a producer began farming in 2020 or 2021 and did not have allowable gross revenue in a benchmark year, the producer may certify to an adjusted benchmark allowable gross revenue on form FSA–521 that represents what had been the producer's reasonably expected disaster year revenue prior to the impact of the qualifying disaster event. If requested by FSA, documentation required to support a producer's certification must be provided within 30 calendar days of FSA's request, or the producer will be considered ineligible for ERP Phase 2. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the disaster event and includes, but is not limited to:

(1) Financial documents such as a business plan or cash flow statement that demonstrate an expected level of revenue;

(2) Sales contracts or purchase agreements; and

(3) Documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

(g) The allowable gross revenue will be based on the year for which the revenue would be reported for the purpose of filing a tax return, except for the ERP Phase 1 payments specified in paragraph (a)(12) of this section.

(h) Producers who file or would be eligible to file a joint tax return will certify their allowable gross revenue based on what it would have been had they filed taxes separately for the applicable year.

(i) On form FSA–521, for each applicable disaster year, producers must indicate the percentage of their allowable gross revenue from specialty and high value crops and the percentage from other crops. The percentages certified must be equal to the percentages that the producer would have reasonably expected to receive for the disaster year if not for the qualifying disaster event.

**§ 760.1904   Time and method of application.**

(a) A completed FSA–521, Emergency Relief Program (ERP) Phase 2 Application, must be submitted to the producer's recording county office by the close of business on the date announced by the Deputy Administrator. Applications may be submitted in person or by mail, email, facsimile, or other methods announced by FSA.

(b) Failure of an individual, entity, or a member of an entity to submit the following payment limitation and payment eligibility forms within 60 days from the date of the ERP Phase 2 application deadline, may result in no payment or a reduced payment:

(1) Form AD–2047, Customer Data Worksheet, for new customers or existing customers who need to update their customer profile;

(2) Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the program year or years for which the producer is applying for ERP;

(3) Form CCC–901, Member Information for Legal Entities, if applicable;

(4) Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

(5) Form FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity, for each applicable program year, including the legal entity's members, partners, or shareholders, as provided in 7 CFR part 1400; and

(6) Form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification, for the ERP Phase 2 applicant and applicable affiliates as provided in 7 CFR part 12.

(c) If requested by FSA, the producer must provide additional documentation that establishes the producer's eligibility for ERP Phase 2. If supporting documentation is requested, the documentation must be submitted to FSA within 30 calendar days from the request or the application will be disapproved by FSA. FSA may request supporting documentation to verify information provided by the producer and the produce's eligibility including, but not limited to, the producer's:

(1) Allowable gross revenue reported on the ERP Phase 2 application;

(2) Percentage of the expected allowable gross revenue from:

(i) Specialty and high value crops; and

(ii) Other crops; and

(3) Ownership share in the agricultural commodities.

**§ 760.1905   Payment calculation.**

(a) ERP Phase 2 payments will be calculated separately for each disaster year. If a producer indicates that they have expected revenue for both specialty and high value crops and other crops for a disaster year, a payment will be calculated separately for:

(1) Specialty and high value crops; and

(2) Other crops.

(b) To determine a producer's ERP Phase 2 payment amount, FSA will calculate:

(1) The producer's benchmark year allowable gross revenue, adjusted according to 7 CFR 760.1903, if applicable, multiplied by the ERP factor of 70 percent; minus

(2) The producer's disaster year allowable gross revenue; minus

(3) The sum of the producer's net ERP Phase 1 payments for the 2020 program year, if the calculation is for the 2020 disaster year, or for the 2021 and 2022 program years, if the calculation is for the 2021 disaster year; minus

(4) The sum of the producer's net CFAP payments (excluding payments for contract producer revenue), net 2020 WHIP+ payments, and net 2020 Quality Loss Adjustment (QLA) Program payments, if the calculation is for the 2020 disaster year; and

(5) Multiplied by the percentage of the expected disaster year revenue for specialty and high value crops or other crops, as applicable, to determine the separate payments for specialty and high value crops or other crops.

(c) FSA will issue an initial payment equal to the lesser of the amount calculated according to this section or the maximum initial payment amount of $2,000. If a producer has also received a payment under ERP Phase 1, FSA will reduce the producer's initial ERP Phase 2 payment amount by subtracting the producer's ERP Phase 1 gross payment amount.

(d) After the close of the ERP Phase 2 application period, FSA will issue a final payment equal to the amount calculated according to this section minus the amount of the producer's initial payment. If total calculated payments exceed the total funding available for ERP Phase 2, the ERP factor may be adjusted and the final payment amounts will be prorated to stay within the amount of available funding. If there are insufficient funds, a differential of 15 percent will be used for underserved

producers similar to ERP Phase 1, but with a cap at the statutory maximum of 70 percent. For example, if the ERP Factor is set at 50 percent, the factor used for underserved producers will be 65 percent, but if the factor is set at 55 percent or higher, the factor for underserved producers will be capped at 70 percent.

(e) If a producer receives assistance through CFAP or ERP Phase 1 after their ERP Phase 2 payment is calculated, the producer's ERP Phase 2 payment will be recalculated and the producer must refund any resulting overpayment.

**§ 760.1906   Payment limitation and attribution.**

(a) The payment limitation for ERP is determined by the person's or legal entity's average adjusted gross farm income (income from activities related to farming, ranching, or forestry). Specifically, if their average adjusted gross farm income is less than 75 percent of their average adjusted gross income (AGI) for the three taxable years preceding the most immediately preceding complete tax year, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments for specialty crops and high value crops [1] and $125,000 in payments for all other crops under:

(1) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(2) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined.

(b) If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities and the producer provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to:

(1) $900,000 for specialty crops and high value crops combined for:

(i) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(ii) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined.; and

(2) $250,000 for all other crops for:

(i) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

---

[1] High value crops were not defined in ERP Phase 1; therefore, only ERP Phase 1 payments for specialty crops, as defined in the ERP Phase 1 notice of funds availability, will be counted toward the increased payment limitation for specialty and high value crops.

Strickland AR 0794

(ii) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined.

(c) The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, or forestry related activities are:

(1) Years 2016, 2017, and 2018 for program year 2020; and

(2) Years 2017, 2018, and 2019 for program year 2021.

(d) To receive more than $125,000 in ERP payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification. If a producer requesting the increased payment limitation is a legal entity, all members of that entity must also complete form FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the increased payment limitation based on the legal entity's average AGI from farming, ranching, or forestry related activities but a member of that legal entity either does not complete a form FSA–510 and provide the required certification or is not eligible for the increased payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ERP Phase 2 payment attributed to that member.

(e) If a producer files form FSA–510 and the accompanying certification after their ERP Phase 2 payment is issued but before the deadline announced by FSA, FSA will process the form FSA–510 and issue the additional payment amount if a maximum initial payment amount has not been reached.

(f) A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility. Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

(1) First level of ownership: Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

(2) Second level of ownership: Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be

attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

(3) Third and fourth levels of ownership: Except as provided in the second-level ownership in paragraph (f)(2) of this section and in the fourth level of ownership in paragraph (f)(4) of this section, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in paragraph (f)(2) of this section; and

(4) Fourth-level of ownership: If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first-level or payment legal entity by the fourth-level legal entity.

(g) Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

(h) A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

(i) If an individual or legal entity is not eligible to receive ERP Phase 2 payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity.

(j) Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

### § 760.1907  Eligibility subject to verification.

(a) Producers who are approved for participation in ERP Phase 2 are required to retain documentation in support of their application for 3 years after the date of approval.

(b) Participants receiving ERP Phase 2 payments must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

### § 760.1908  Miscellaneous provisions.

(a) If an ERP Phase 2 payment resulted from erroneous information provided by a producer, or any person acting on their behalf, the payment will be recalculated and the producer must refund any excess payment with interest calculated from the date of the disbursement of the payment.

(b) If FSA determines that the producer intentionally misrepresented information provided on their application, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement.

(c) Any required refunds must be resolved in accordance with part 3 of this title.

(d) A producer, whether a person or legal entity, that either fails to timely provide all required documentation or fails to satisfy any eligibility requirement for ERP Phase 2, is not eligible to receive ERP Phase 2 payments, directly or indirectly. An ERP Phase 2 payment to an eligible legal entity applicant whose member(s) either fails to timely provide all required documentation or fails to satisfy any eligibility requirement for ERP Phase 2 will be reduced proportionate to that member's ownership interest in the legal entity.

(e) Any payment under this subpart will be made without regard to questions of title under State law and without regard to any claim or lien against the commodity or proceeds from the sale of the commodity. The regulations governing offsets in part 3 of this title apply to payments made under this subpart.

(f) For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ERP Phase 2 but only as to beneficiaries who, as a condition of the waiver, agree

to apply the ERP Phase 2 payments to reduce the amount of the judgment lien.

(g) In addition to any other Federal laws that apply to ERP Phase 2, the following laws apply: 15 U.S.C. 714; 18 U.S.C. 286, 287, 371, and 1001.

### § 760.1909  Perjury.

In either applying for or participating in ERP Phase 2, or both, the producer is subject to laws against perjury and any resulting penalties and prosecution, including, but not limited to, 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ERP Phase 2, or both, then the producer may be guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or without the United States.

### § 760.1910  Requirement to purchase crop insurance or NAP coverage.

(a) Producers must report all crops that suffered a revenue loss in whole or in part due to a qualifying disaster event on form FSA–522, Crop Insurance and/or NAP Coverage Agreement.

(b) All producers who receive ERP Phase 2 payments must file an accurate acreage report and purchase crop insurance or NAP coverage where crop insurance is not available, for the next 2 available crop years. For each crop reported according to paragraph (a) of this section, participants must obtain crop insurance or NAP, as may be applicable:

(1) At a coverage level equal to or greater than 60 percent for insurable crops; or

(2) At the catastrophic level or higher for NAP crops.

(c) Availability will be determined from the date a producer receives an ERP payment and may vary depending on the timing and availability of crop insurance or NAP for a producer's particular crops. The final crop year to purchase crop insurance or NAP coverage to meet the second year of coverage for this requirement is the 2026 crop year.

(d) In situations where crop insurance is unavailable for a crop, an ERP participant must obtain NAP coverage. Section 1001D of the Food Security Act of 1985 (1985 Farm Bill) provides that a person or entity with an AGI greater than $900,000 is not eligible to

participate in NAP; however, producers with an AGI greater than $900,000 are eligible for ERP. To reconcile this restriction in the 1985 Farm Bill and the requirement to obtain NAP or crop insurance coverage, ERP participants may meet the purchase requirement by purchasing Whole-Farm Revenue Protection (WFRP) crop insurance coverage, if eligible, or they may pay the applicable NAP service fee despite their ineligibility for a NAP payment. In other words, the service fee must be paid even though no NAP payment may be made because the AGI of the person or entity exceeds the 1985 Farm Bill limitation.

(e) If both Federal crop insurance and NAP coverage are unavailable for a crop, the producer must obtain WFRP crop insurance coverage, if eligible.

(f) For all crops listed on form FSA–522, producers who have the crop or crop acreage in subsequent years and who fail to obtain the 2 years of crop insurance or NAP coverage required as required by this section, must refund the ERP Phase 2 payment with interest from the date of disbursement. Producers who do not plant a crop listed on form FSA–522 in a year for which this requirement applies are not subject to the crop insurance or NAP purchase requirement for that year.

(g) Producers who received an ERP Phase 1 payment for a crop are not required to obtain additional years of crop insurance or NAP coverage for that crop if they also receive an ERP Phase 2 payment for a loss associated with that crop.

## PART 1400—PAYMENT LIMITATION AND PAYMENT ELIGIBILITY

■ 29. The authority citation for part 1400 continues to read as follows:

**Authority:** 7 U.S.C. 1308, 1308–1, 1308–2, 1308–3, 1308–3a, 1308–4, and 1308–5; and Title I, Pub. L. 115–123.

## Subpart A—General Provisions

■ 30. Add § 1400.10 to read as follows:

### § 1400.10  Notification of interests.

(a) To facilitate administration of subparts B, C, E, and F of this part for programs specified in § 1400.1, or any other program as provided in individual program regulations in this chapter, a person or legal entity must provide information in the manner as prescribed by the Deputy Administrator.

(b) The information required to be submitted under paragraph (a) of this section must include:

(1) The name, address, valid taxpayer identification number, and ownership share of each person, or the name, address, valid taxpayer identification

number, and ownership share of each legal entity, that holds or acquires an ownership interest in the legal entity; and

(2) The name, address, valid taxpayer identification number, and ownership share of each legal entity in which the person or legal entity holds an ownership interest.

(c) Except as provided in paragraph (d) of this section, payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent at, or above the fourth level of ownership in the business structure is not provided to USDA. Additionally, A legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater at, or above the fourth level of ownership in the business structure is not provided to USDA.

(d) In order to be eligible to receive any payment specified in § 1400.1(a)(7) or as provided by the Natural Resources Conservation Service in individual program regulations in this chapter, a person or legal entity must provide information in the manner as prescribed by the Deputy Administrator as identified in paragraph (b) of this section. Paragraph (c) of this section does not apply to the identified Natural Resources Conservation Service programs (programs specified in § 1400.1(a)(7) or any other Natural Resources Conservation Service program as specified in the individual program regulations in this chapter).

## Subpart B—Payment Limitation

### § 1400.107  [Removed]

■ 31. Remove § 1400.107.

## PART 1416—EMERGENCY AGRICULTURAL DISASTER ASSISTANCE PROGRAMS

■ 32. The authority citation for part 1416 continues to read as follows:

**Authority:** Title I, Pub. L. 113–79, 128 Stat. 649; Title I, Pub. L. 115–123; Title VII, Pub. L. 115–141; and Title I, Pub. L. 116–20.

## Subpart A—General Provisions for Supplemental Agricultural Disaster Assistance Programs

### § 1416.5  [Removed and Reserved]

■ 33. Remove and reserve § 1416.5.

Strickland AR 0796

## Subpart B—Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program

■ 34. In § 1416.102, in the definition of "eligible loss condition", add a sentence at the end of the definition to read as follows:

### § 1416.102   Definitions.

* * * * *

*Eligible loss condition* * * * All other causes of losses are not covered, including, but not limited to, negligence, mismanagement, or wrongdoing by the producer.

* * * * *

■ 35. Amend § 1416.103 as follows:
■ a. Add a sentence to the end of paragraph (a); and
■ b. In paragraph (d)(6), in the first sentence, remove "transport," and add "transport" in its place.

The addition reads as follows:

### § 1416.103   Eligible losses, adverse weather, and other loss conditions.

(a) * * * All other causes of loss are not considered an eligible loss condition, including, but not limited to, negligence, mismanagement or wrongdoing by the producer.

* * * * *

■ 36. Amend § 1416.104 as follows:
■ a. Redesignate paragraphs (b)(16) and (17) as (b)(17) and (18), respectively;
■ b. Add new paragraph (b)(16);
■ c. Remove paragraph (c)(4);
■ d. Redesignate paragraphs (c)(5) through (8) as paragraphs (c)(4) through (7), respectively;
■ e. In newly redesignated paragraph (c)(6), add the word "and" at the end;
■ f. Revise newly redesignated paragraph (c)(7); and
■ g. Remove paragraph (c)(9).

The addition and revision read as follows.

### § 1416.104   Eligible livestock, honeybees, and farm-raised fish.

* * * * *

(b) * * *
(16) Ostriches,

* * * * *

(c) * * *
(7) Livestock that are not produced for commercial use or those that are not produced or maintained in a commercial operation for livestock products, such as milk from dairy, including, but not limited to:
(i) Any wild free roaming livestock;
(ii) Horses and other animals used or intended to be used for racing or wagering;
(iii) Animals produced or maintained for hunting; and

(iv) Animals produced or maintained for consumption by owner.

* * * * *

## Subpart C—Livestock Forage Disaster Program

■ 37. Amend § 1416.204 as follows:
■ a. In paragraph (a)(1), add "ostriches," after "llamas,";
■ b. Revise paragraph (a)(5);
■ c. Redesignate paragraphs (b)(15) and (16) as (b)(16) and (17), respectively;
■ d. Add new paragraph (b)(15);
■ e. Remove paragraph (c)(4);
■ f. Redesignate paragraphs (c)(5) through (9) as (c)(4) through (8), respectively; and
■ g. Revise newly redesignated paragraph (c)(8).

The revisions and addition read as follows.

### § 1416.204   Covered livestock.

* * * * *

(a) * * *
(5) Not have been produced and maintained for reasons other than commercial use as part of a farming operation. Such excluded uses include, but are not limited to:
(i) Any uses of wild free roaming livestock;
(ii) Racing or wagering;
(iii) Hunting; and
(iv) Consumption by owner; and

* * * * *

(b) * * *
(15) Ostriches,

* * * * *

(c) * * *
(8) Livestock produced or maintained for reasons other than commercial use, including, but not limited to, livestock produced or maintained for racing or wagering purposes, hunting, or consumption by owner.

## Subpart D—Livestock Indemnity Program

■ 38. Amend § 1416.304 as follows:
■ a. In paragraph (c)(3), remove the words "for livestock" and add "for livestock sale or" in their place; and
■ b. Revise paragraph (c)(4).

The revision reads as follows.

### § 1416.304   Eligible livestock.

* * * * *

(c) * * *
(4) Not be produced or maintained for reasons other than commercial use for livestock sale or for the production of livestock products such as milk or eggs. Livestock excluded from being eligible include, but are not limited to:
(i) Wild free roaming animals;
(ii) Horses and other animals used or intended to be used for racing or wagering;

(iii) Animals produced or maintained for hunting; and
(iv) Animals produced or maintained for consumption by owner.

* * * * *

■ 39. Amend § 1416.305 as follows:
■ a. In paragraph (g) introductory text, remove the words "if reliable" and add the words "if the livestock are not owned by the licensed veterinarian and reliable" in their place;
■ b. Revise paragraph (i) introductory text; and
■ c. In paragraph (i)(1) introductory text, remove the words "For 2017 and subsequent calendar years, livestock inventory reports by livestock unit must be provided to the local county FSA office by the later of December 3, 2018, or" and add "Livestock inventory reports by livestock unit must be provided to the FSA local county office by" in their place.

The revision reads as follows.

### § 1416.305   Application process.

* * * * *

(i) Unweaned livestock operations may provide proof of death by using the LBIH.

* * * * *

## PART 1437—NONINSURED CROP DISASTER ASSISTANCE PROGRAM

■ 40. The authority citation for part 1437 continues to read as follows:

**Authority:** 7 U.S.C. 1501–1508 and 7333; 15 U.S.C. 714–714m; 19 U.S.C. 2497, and 48 U.S.C. 1469a.

### Subpart A—General Provisions

■ 41. In § 1437.3, revise the definition of "Application for coverage" to read as follows:

### § 1437.3   Definitions.

* * * * *

*Application for coverage* means:
(1) The form specified by FSA to be completed by a producer applying for NAP coverage for an eligible crop that is accompanied by the service fee or the service fee waiver form, or
(2) Another applicable form, designated by the Deputy Administrator to qualify as an application for NAP, that the producer has on file with FSA before the deadline for application for the coverage period which certifies they are eligible for a service fee waiver.

* * * * *

### § 1437.6   [Amended]

■ 42. Amend § 1437.6 as follows:
■ a. Remove paragraph (a)(1); and
■ b. Redesignate paragraphs (a)(2) and (3) as (a)(1) and (2), respectively.

**1892** **Federal Register**/Vol. 88, No. 7/Wednesday, January 11, 2023/Rules and Regulations

## § 1437.7 [Amended]

■ 43. Amend § 1437.7 as follows:

■ a. In paragraph (a), remove the words "in the administrative county office";

■ b. In paragraph (b) introductory text, remove the words "request for" and add the words "certification of eligibility for a" in their place; and

■ c. In paragraph (g) add the words "for any buy-up coverage elected" at the end of the first sentence.

## PART 1450—BIOMASS CROP ASSISTANCE PROGRAM (BCAP)

■ 44. The authority citation for part 1450 continues to read as follows:

**Authority:** 7 U.S.C. 8111.

■ 45. In § 1450.2, add a definition for "Socially disadvantaged farmer or rancher" in alphabetical order to read as follows.

## § 1450.2 Definitions.

\* \* \* \* \*

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a socially disadvantaged group. A socially disadvantaged group is a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities.

\* \* \* \* \*

**Gloria Montaño Greene,**

*Deputy Under Secretary, Farm Production and Conservation, U.S. Department of Agriculture.*

[FR Doc. 2023–00005 Filed 1–9–23; 8:45 am]

**BILLING CODE 3411–E2–P**

# Notices

Federal Register

Vol. 87, No. 96

Wednesday, May 18, 2022

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

[Docket ID FSA–2022–0004]

### Notice of Funds Availability; Emergency Relief Program (ERP)

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ERP. ERP will provide assistance to producers for losses to crops, trees, bushes, and vines due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. ERP assistance will be provided in two phases. This document provides the eligibility requirements, application process, and payment calculations for ERP Phase 1, which will provide payments for crop production losses and tree, bush, and vine losses calculated using certain data from previously issued crop insurance indemnities and Noninsured Crop Disaster Assistance Program (NAP) payments.

**DATES:**

*Funding availability:* Implementation will begin May 18, 2022.

*Comment Date:* We will consider comments on the Paperwork Reduction Act that we receive by: July 18, 2022.

**ADDRESSES:** We invite you to submit comments on the information collection request. You may submit comments by any of the following methods, although FSA prefers that you submit comments electronically through the Federal eRulemaking Portal:

∀ *Federal eRulemaking Portal:* Go to *http://www.regulations.gov* and search for Docket ID FSA–2022–0004. Follow

the online instructions for submitting comments.

∀ *Mail, Hand-Delivery, or Courier:* Director, Safety Net Division, FSA, USDA, 1400 Independence Avenue SW, Stop 0510, Washington, DC 20250–0522. In your comment, specify the docket ID FSA–2022–0004.

All comments will be posted without change and publicly available on *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Tona Huggins; telephone: (202) 720–6825; email: *tona.huggins@usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

## Background

Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of:

∀ Crops;
∀ Trees;
∀ Bushes; and
∀ Vines.

To be eligible for assistance, the loss must be a consequence of one of the following qualifying disaster events occurring in the 2020 or 2021 calendar years:

∀ Droughts;
∀ Wildfires;
∀ Hurricanes;
∀ Floods;
∀ Derechos;
∀ Excessive heat;
∀ Winter storms;
∀ Freeze, including a polar vortex;
∀ Smoke exposure; and
∀ Excessive moisture.

Losses due to drought are only eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity.[1]

FSA is using the funding to assist producers who suffered eligible losses through several programs.[1] In this

document, FSA is announcing ERP, which will assist producers who suffered losses of crops, trees, bushes, or vines due to qualifying disaster events. FSA will administer ERP in two phases:

∀ ERP Phase 1 will use a streamlined process with pre-filled application forms. It will provide payments for crop production losses and tree, bush, and vine losses in certain situations where data are already on file with FSA or the Risk Management Agency (RMA), as a result of the producer previously receiving a NAP payment or a crop insurance indemnity under certain crop insurance policies. This document provides the eligibility requirements, application process, and payment calculations for ERP Phase 1.

∀ ERP Phase 2 will provide payments for other eligible losses through a more traditional application process during which eligible producers will provide all data required to calculate a payment. FSA will announce ERP Phase 2 provisions and application period in a future **Federal Register** document.

## Definitions

The definitions in 7 CFR parts 718 and 1400 apply to ERP, except as otherwise provided in this document. The following definitions also apply.

*Administrative fee* means the amount an insured paid for catastrophic risk protection, and additional coverage for each crop year as specified in the applicable crop insurance policy.

*Average adjusted gross farm income* means the average of the portion of the person or legal entity's adjusted gross income derived from farming, ranching, or forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year. The relevant tax years are:

(1) For the 2020 program year, 2016, 2017, and 2018;

(2) For the 2021 program year, 2017, 2018, and 2019; and

(3) For the 2022 program year,[2] 2018, 2019, and 2020.

*Average adjusted gross income* means the average of the adjusted gross income as defined under 26 U.S.C. 62 or comparable measure of the person or legal entity. The relevant tax years are:

---

[1] FSA previously announced ELRP on April 4, 2022 (87 FR 19465–19470). The Milk Loss Program and On-Farm Stored Commodity Loss Program will be announced in a future rule. These programs and ERP have the same funding source.

[2] The 2022 crop year is included because a qualifying disaster event occurring in the 2021 calendar year may have caused a loss of a crop during the 2022 crop year, based on how "crop year" is defined in the applicable crop insurance policy or NAP provisions.

(1) For the 2020 program year, 2016, 2017, and 2018;

(2) For the 2021 program year, 2017, 2018, and 2019; and

(3) For the 2022 program year, 2018, 2019, and 2020.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Bush* means a low, branching, woody plant, from which at maturity of the bush, an annual fruit or vegetable crop is produced for commercial market for human consumption, such as a blueberry bush. The definition does not cover nursery stock or plants that produce a bush after the normal crop is harvested.

*Buy-up NAP coverage* means NAP coverage at a payment amount that is equal to an indemnity amount calculated for buy-up coverage computed under section 508(c) or (h) of the Federal Crop Insurance Act and equal to the amount that the buy-up coverage yield for the crop exceeds the actual yield for the crop.

*Catastrophic coverage* has the same meaning as in 7 CFR 1437.3.

*Coverage level* means the percentage determined by multiplying the elected yield percentage under a crop insurance policy or NAP coverage by the elected price percentage.

*Crop insurance* means an insurance policy reinsured by the Federal Crop Insurance Corporation under the provisions of the Federal Crop Insurance Act, as amended. It does not include private plans of insurance.

*Crop insurance indemnity* means the payment to a participant for crop losses covered under crop insurance administered by RMA in accordance with the Federal Crop Insurance Act (7 U.S.C. 1501–1524).

*Crop year* means:

(1) For insured crops, trees, bushes, and vines, the crop year as defined according to the applicable crop insurance policy; and

(2) For NAP-covered crops, the crop year as defined in 7 CFR 1437.3.

*Deputy Administrator* means the FSA Deputy Administrator for Farm Programs.

*FCIC* means the Federal Crop Insurance Corporation, a wholly owned Government Corporation of USDA, administered by RMA.

*Historically underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or

rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, forestry commodities including renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, and Interest Charge Domestic International Sales Corporation (IC–DISC) or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, or forestry activities as defined in this document; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales, based on 2 years, did not exceed:

(a) $180,300 in each of the 2017 and 2018 calendar years for the 2020 program year;

(b) $179,000 in each of the 2018 and 2019 calendar years for the 2021 program year; or

(c) $189,200 in each of the 2019 and 2020 calendar years for the 2022 program year; and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the same two previous calendar years referenced in paragraph (1) of this definition. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through National Resource and Conservation Service at *https://lrftool.sc.egov. usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*NAP* means the Noninsured Crop Disaster Assistance Program, which is authorized by section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) and regulations in 7 CFR part 1437.

*NAP service fee* means the fee the producer paid to obtain NAP coverage specified in 7 CFR 1437.7.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ERP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is considered to have a beneficial ownership interest in such legal entity.

*Premium* means the premium paid by the producer for crop insurance coverage or NAP buy-up coverage levels.

*Program year* means the crop year.

*Qualifying disaster event* means wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions.

*Qualifying drought* means an area within the county that was rated by the U.S. Drought Monitor as having a drought intensity of D2 (severe drought) for eight consecutive weeks or D3 (extreme

Strickland AR 0800

drought) or higher level for any period of time during the applicable calendar year.

*Related condition* means damaging weather and adverse natural occurrences that occurred concurrently with and as a direct result of a specified qualifying disaster event. Related conditions include, but are not limited to:

∀ Excessive wind that occurred as a direct result of a derecho;

∀ Silt and debris that occurred as a direct and proximate result of flooding;

∀ Excessive wind, storm surges, tornados, tropical storms, and tropical depressions that occurred as a direct result of a hurricane; and

∀ Excessive wind and blizzards that occurred as a direct result of a winter storm.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Specialty crops* means fruits, tree nuts, vegetables, culinary herbs and spices, medicinal plants, and nursery, floriculture, and horticulture crops. This includes common specialty crops identified by USDA's Agricultural Marketing Service at *https://www.ams. usda.gov/services/grants/scbgp/ specialty-crop* and other crops as designated by the Deputy Administrator.

*Substantial beneficial interest (SBI)* has the same meaning as specified in the applicable crop insurance policy. For the purposes of ERP Phase 1, Federal crop insurance records for "transfer of coverage, right to indemnity" are considered the same as SBIs.

*Tree* means a tall, woody plant having comparatively great height, and a single trunk from which an annual crop is produced for commercial market for human consumption, such as a maple tree for syrup, or papaya or orchard tree for fruit. It includes immature trees that

are intended for commercial purposes. Nursery stock, banana and plantain plants, and trees used for pulp or timber are not considered eligible trees.

*Unit* means the unit structure as defined under the applicable crop insurance policy for insured crops or in 7 CFR 1437.9 for NAP-covered crops.

*USDA* means the U.S. Department of Agriculture.

*U.S. Drought Monitor* means the system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http://droughtmonitor.unl.edu* .

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[3]) and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[4]) during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*Vine* means a perennial plant grown under normal conditions from which an annual fruit crop is produced for commercial market for human consumption, such as grape, kiwi, or passion fruit, and that has a flexible stem supported by climbing, twining, or creeping along a surface. Nursery stock, perennials that are normally propagated as annuals such as tomato plants, biennials such as strawberry plants, and annuals such as pumpkin, squash, cucumber, watermelon, and other melon plants, are excluded from the term vine.

**ERP Phase 1**

ERP Phase 1 will provide a streamlined application process for eligible losses during the 2020, 2021, or 2022 crop years[5] for which a producer had:

∀ A Federal Crop Insurance policy that provided coverage for crop production losses or tree losses related to the qualifying disaster events and received an indemnity [6] for a crop and unit, excluding perennial crops with an intended use of grazing; livestock policies; nursery; forage seeding; and Margin Protection Plan policies purchased without a base policy; or

∀ NAP coverage and received a NAP payment for a crop and unit.

ERP Phase 1 excludes losses to aquacultural species that were compensated under the Emergency Assistance for Livestock, Honey Bees, and Farm-raised Fish Program (generally referred to as ELAP) to avoid providing duplicate benefits for losses already at least partially compensated for by ELAP.

The applicable crop insurance policies and NAP provide payments to producers for crop, tree, bush, and vine losses due to eligible causes of loss as defined respectively in the producer's crop insurance policy or NAP, which includes crop production losses and tree losses due to the qualifying disaster events eligible for ERP. Where such an overlap has been identified, RMA and FSA are using certain data submitted by producers for crop insurance or NAP purposes to calculate a producer's eligible loss under ERP Phase 1. The ERP calculation is intended to compensate producers for a percentage of that loss determined by the applicable ERP factor, which varies based on the producer's level of crop insurance or NAP coverage, as described later in this document.

Producers who did not qualify for assistance under Phase 1 who experienced losses to crops, trees, bushes, and vines, will be addressed under ERP Phase 2. Other losses to crops, trees, bushes, and vines will also be addressed under ERP Phase 2.[7] ERP Phase 2 will address situations where a producer's records at RMA do not match the records at FSA. Further, producers who apply for payment under ERP Phase 1 may also apply under ERP Phase 2; however, payments under ERP

---

[3] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[4] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[5] The 2022 crop year is included because a qualifying disaster event occurring in the 2021 calendar year may have caused a loss of a crop during the 2022 crop year, based on how "crop

year" is defined in the applicable crop insurance policy or NAP provisions.

[6] For purposes of this program, indemnity does not include cottonseed endorsement payments, downed rice endorsement payments, sugarcane crop replacement endorsement payments, replant payments, or raisin reconditioning payments.

[7] Losses covered under ERP Phase 2 may include crop quality losses, losses for which the producer did not have an applicable crop insurance policy or NAP coverage for the crop and unit, and losses for which the producer had an applicable crop insurance policy or NAP coverage but the loss was not significant enough to result in a crop insurance indemnity or NAP payment or was otherwise excluded from ERP Phase 1.

Strickland AR 0801

Phase 2 will take into account any amounts received for the crop and unit under ERP Phase 1. ERP Phase 2 provisions will be specified in a future **Federal Register** document.

**Eligibility**

To be eligible for payment under ERP Phase 1, a producer must have suffered a crop, tree, bush, or vine loss that was caused, in whole or in part, by a qualifying disaster event. Because under certain policies the amount of loss due to a qualifying disaster event cannot be separated from the amount of loss caused by other eligible causes of loss as defined by the applicable crop insurance policy or NAP, the ERP Phase 1 payment will be based on the producer's loss as long as those losses are in whole or in part caused by a qualifying disaster event.

In addition, consistent with other FSA disaster assistance programs, a producer must be a:

(1) Citizen of the United States;

(2) Resident alien, which for purposes of ERP means ''lawful alien'' as defined in 7 CFR 1400.3;

(3) Partnership consisting of solely of citizens of the United States or resident aliens;

(4) Corporation, limited liability company, or other organizational structure organized under State law consisting solely of citizens of the United States or resident aliens; or

(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304).

Eligible crops include all crops for which crop insurance or NAP coverage was available, except for crops intended for grazing.

**Application Process**

FSA and RMA will identify the producers who meet the criteria described above to apply for ERP Phase 1. For each of those producers, FSA will generate an FSA–520, Emergency Relief Program (ERP) Phase 1 Application, with certain items pre-filled with information already on file with USDA. A separate application form will be generated for each applicable program year. FSA expects to begin mailing application forms in May to producers who received crop insurance indemnities, and to begin mailing forms to producers who received NAP payments later in the summer. FSA will mail application forms for policy holders with 2021 crop year coverage under Stacked Income Protection (STAX), Supplemental Coverage Option (SCO), Enhanced Coverage Option

(ECO), Margin Protection (MP), and Area Risk Protection Insurance (ARPI) when data become available.

For producers who received a crop insurance indemnity for eligible policies, the pre-filled application will include the producer's physical State and county codes, pay unit numbers, crops, and gross indemnities. While the majority of crop insurance policies may cover an eligible crop loss, a small number do not and are not eligible for ERP, including livestock policies and margin policies. Even if a policy is included in ERP Phase 1, the producer will need to certify that their payment under any such policy was in whole or in part due to a crop loss related to a qualifying disaster event. For producers who received a NAP payment, the pre-filled applications will include the producer's administrative State and county codes, unit numbers, crops, pay groups, and gross NAP payments. FSA will also pre-fill the calculated ERP Phase 1 payment amounts, prior to any payment reductions. [8] Producers cannot alter the data in these pre-filled items. If a producer believes that any information that has been pre-filled is incorrect, the producer should contact their crop insurance agent for insured crops or their FSA county office for NAP-covered crops.

Receipt of a pre-filled application form is not a confirmation that the producer is eligible to receive an ERP Phase 1 payment. In order to receive a payment, the producer must certify that their crop insurance indemnity or NAP payment on which the ERP Phase 1 payment will be based was due, in whole or in part, to a crop production loss or a loss of trees, bushes, or vines caused by a qualifying disaster event. Producers are responsible for reviewing the list of qualifying disaster events, and if a loss was due to drought, producers must also ensure that the county where the crop and unit was located meets the definition of "qualifying drought." FSA will provide a factsheet and other materials to provide examples and more details on the qualifying disaster events to assist producers. In addition, producers must also certify that they will meet the requirement to purchase crop insurance or NAP coverage for the next 2 available crop years, as described later in this document.

The portion of the form for producers who had crop insurance will also list

the primary policy holder and all producers with an SBI who have a record established with FSA. If one or more producers with an SBI had a share in a crop, the primary policy holder must update the application to show the share in the crop for each of those producers in addition to the primary policy holder. If determined eligible, any payments will be issued to the primary policy holder and to any producers with an SBI who have a share in the crop according to their shares in the crop entered on the application. To receive a payment, each person or entity that is listed as having a share of the ERP Phase 1 payment for a crop and unit must sign the application and agree to purchase crop insurance or NAP coverage for that crop and unit, as described later in this document. If multiple crops and units are listed on an application, producers may agree to purchase crop insurance or NAP coverage for only some of the crops and units; an ERP Phase 1 payment will be issued only for those crops and units for which the producer agrees to meet that requirement.

Producers, including any producers with an SBI who have a share in a crop as indicted on the application, must also have the following forms on file with FSA by within 60 days of the ERP Phase 1 deadline announced by the Deputy Administrator to receive an ERP Phase 1 payment:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026 Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the producer and applicable affiliates.

Many producers, especially if they have participated in FSA programs recently, will already have these forms on file with FSA. Producers who are unsure of whether a form is on file may contact their local FSA service center. Contact information for service centers is available at *https://www.farmers.gov/ working-with-us/service-center-locator*.

In addition to the forms listed above, certain producers will also need to submit the following forms to qualify for an increased payment rate or payment limitation, as described later in this document:

---

[8] Similar to other disaster programs administered by FSA, payment reductions will be made to account for payment limitation, lack of compliance with highly erodible land conservation and wetland conservation requirements, and prorating of payments to stay within available funding as discussed later in this document.

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the program year or years for which the producer is applying for ERP;[9] or

∀ Form FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's

certification, for a legal entity and all members of that entity, for each applicable program year.

FSA will continue to accept forms CCC–860 and FSA–510 from producers for the purpose of establishing eligibility for an increased payment rate or payment limitation until the deadline announced by FSA.

**Payment Calculation**

RMA and FSA will calculate ERP Phase 1 payments based on the data on file with the agencies at the time of calculation. The ERP Phase 1 payment calculation for a crop and unit will depend on the type and level of coverage obtained by the producer. Each calculation will use an ERP factor based on the producer's level of crop insurance or NAP coverage, as specified in the following tables.

| | ERP factor (percent) |
| --- | --- |
| Crop Insurance Coverage Level: | |
| Catastrophic coverage | 75.0 |
| More than catastrophic coverage but less than 55 percent | 80.0 |
| At least 55 percent but less than 60 percent | 82.5 |
| At least 60 percent but less than 65 percent | 85.0 |
| At least 65 percent but less than 70 percent | 87.5 |
| At least 70 percent but less than 75 percent | 90.0 |
| At least 75 percent but less than 80 percent | 92.5 |
| At least 80 percent | 95.0 |
| NAP Coverage Level: | |
| Catastrophic coverage | 75.0 |
| 50 percent | 80.0 |
| 55 percent | 85.0 |
| 60 percent | 90.0 |
| 65 percent | 95.0 |

When determining the ERP factors, analysis was conducted to ensure that payments do not exceed available funding and, in aggregate across all producers, do not exceed 90 percent of losses, as required by the Extending Government Funding and Delivering Emergency Assistance Act. The difference between the ERP payment factor for crop insurance and NAP is due to differences in the available coverage levels. Crop insurance is available at the catastrophic coverage level (50 percent production coverage of 55 percent of the price) and buy-up coverage levels (50 percent to 85 percent of the production for 100 percent of the price). NAP is limited by law to a maximum of 65 percent buy-up coverage. For both NAP and crop insurance, the ERP payment factor for the catastrophic and maximum buy-up levels are 75 percent and 95 percent respectively, with the ERP factors stair-stepping for the buy-up options in-between as shown in the tables above. The Extending Government Funding and Delivering Emergency Assistance Act provides that payments to producers who did not have crop

insurance or NAP coverage cannot exceed 70 percent of their loss; therefore, the lowest ERP factor for producers who had crop insurance or NAP is set at 75 percent. Payment limits and other reductions will reduce ERP payments, further lowering the percent of losses covered.

For crop insurance, RMA will use the producer's data that is already on file, which provides the necessary information to determine the producer's amount of loss. Crop insurance provides financial assistance for crop losses due to specified natural disasters and uses a producer's data to calculate a payment based on the type of crop insurance coverage elected by the producer. As previously discussed, ERP is intended to compensate producers for a percentage of their loss determined by the applicable ERP factor based on the level of crop insurance coverage purchased; therefore, RMA will calculate each producer's loss consistent with the loss procedures for the type of coverage purchased [10] but using the ERP factor. This calculated amount would then be adjusted by subtracting out the net crop insurance indemnity, which is

equal to the producer's gross crop insurance indemnity already received for those losses minus service fees and premiums.

For NAP-covered crops, FSA will use the producer's crop production or inventory data that is already on file, which provides the necessary information to determine the producer's amount of loss. NAP provides financial assistance for crop losses due to specified natural disasters and uses a producer's crop production or inventory data to calculate a payment based on the level of NAP coverage elected by the producer. As previously discussed, ERP is intended to compensate producers for a percentage of loss determined by the applicable ERP factor based on their NAP coverage level; therefore, FSA will perform a calculation that is consistent with the NAP payment calculation for the crop and unit, as provided in 7 CFR part 1437, but using the ERP factor in the table above applicable to the producer's NAP coverage level as the applicable guarantee in those calculations. For example, the guarantee for a producer that had purchased 60 percent NAP coverage would be

---

[9] A producer who has filed form CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of their status for a later program year because a producer's status as socially disadvantaged would not change in different years,

and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what programs years the status would apply. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must

submit form CCC–860 for each applicable program year.

[10] For example, ERP for Area Risk Protection Insurance (ARPI) and STAX is based on area-wide (for example, county) production losses.

Strickland AR 0803

adjusted and recalculated based on a 90 percent ERP factor. The calculated amount using the ERP factor would then be adjusted by subtracting the net NAP calculated payment, which is equal to the producer's gross NAP payment already received by the producer minus service fees and premiums. [11] For NAP, actual value equals the dollar value of the crop and unit at the time of loss as determined by USDA. For example, a producer had a crop that had a value of $150,000 and a 50 percent loss, resulting in a loss of $75,000. They had a NAP coverage level of 60 percent, so their NAP guarantee was $90,000. Their NAP guarantee of $90,000 minus the $75,000 value of the crop that was not lost is equal to a net NAP calculated payment of $15,000. The new ERP guarantee based on the ERP factor of 90 percent is calculated to be $135,000. The ERP guarantee of $135,000 minus the $75,000 value of the crop that was not lost is equal to $60,000, which is reduced by the net NAP calculated payment amount of $15,000, resulting in a calculated ERP Phase 1 payment of $45,000.

Similar to other FSA disaster assistance programs like ELAP and other recent ad hoc disaster programs, historically underserved farmers and ranchers will receive an increase to their ERP Phase 1 payment that is equal to 15 percent of the amount calculated as described above. For example, if a historically underserved farmer or rancher's calculated amount is $1,000, their ERP Phase 1 payment will be $1,150. To qualify for the increased payment amount, a historically underserved farmer or rancher must have certified their status on form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification. FSA will issue ERP Phase 1 payments as applications are processed and approved. If a producer files form CCC–860 after their ERP Phase 1 payment is issued but before the deadline to be announced by FSA, FSA will process the form CCC–860 and issue the additional payment amount.

A total of $10 billion was allocated to certain disaster relief programs. Congress allocated $750 million for livestock assistance, with the first phase of the Emergency Livestock Relief Program (ELRP) already paying over $560 million. ERP Phase 1 payments for crops covered by crop insurance will be

prorated by 75 percent to ensure that total ERP payments, including payments under ERP Phase 2, do not exceed the available funding. ERP Phase 1 payments for NAP-covered crops will not be prorated due to the significantly smaller NAP portfolio that by its nature only covers smaller acreages and specialty crops that are not covered by crop insurance.

**Payment Limitation**

The payment limitation for ERP Phase 1 is determined by the person's or legal entity's average adjusted gross farm income (income from activities related to farming, ranching, or forestry). Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments for specialty crops and $125,000 in payment for all other crops under ERP (for Phase 1 and Phase 2 combined) for a program year if their average adjusted gross farm income is less than 75 percent of their average AGI the three taxable years preceding the most immediately preceding complete tax year. If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to:

∀ $900,000 for each program year for specialty crops; [12] and

∀ $250,000 for each program year for all other crops.

The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, or forestry related activities are:

∀ 2016, 2017, and 2018 for program year 2020;

∀ 2017, 2018, and 2019 for program year 2021; and

∀ 2018, 2019, and 2020 for program year 2022.

To receive more than $125,000 in ERP payments for a program year, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney

as to that person or legal entity's certification. If a producer requesting the increased payment limitation is a legal entity, all members of that entity must also complete form FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the increased payment limitation based on the legal entity's average AGI from farming, ranching, or forestry related activities but a member of that legal entity either does not complete a form FSA–510 and provide the required certification or is not eligible for the increased payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ERP Phase 1 payment attributed to that member. FSA will issue ERP Phase 1 payments as applications are processed and approved. If a producer files form FSA–510 and the accompanying certification after their ERP Phase 1 payment is issued but before the deadline announced by FSA, FSA will process the form FSA–510 and issue the additional payment amount.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ First level of ownership—any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first level or payment legal entity; [13]

∀ Second level of ownership—any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of

---

[11] The gross NAP payment is the amount calculated according to 7 CFR part 1437, prior to any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and the applicant or member of an applicant that is an entity exceeding the average AGI limitation.

[12] The Extending Government Funding and Delivering Emergency Assistance Act provides that in the case of specialty crops or high value crops, as determined by the Secretary, the Secretary shall impose payment limitations consistent with 7 CFR 760.1507(a)(2), which specified that a producer could receive up to $900,000 if not less than 75 percent of the average adjusted gross income of the person or legal entity was average adjusted gross farm income. USDA is continuing to evaluate how to define "high value crops" and will address those crops during ERP Phase 2.

[13] The "first level or payment legal entity" means that the payment entity will have a reduction applied, and if the payment entity happens to be a joint venture, that reduction is applied to the first level, or highest level, for payments. The "first level or payment legal entity" is the highest level of ownership of the applicant to whom payments can be attributed or limited. If the applicant is a business type that does not have a limitation or attribution, the reduction is applied to the first level, but if the business type can have the reduction applied directly to it, then the limitation applies.

the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ Third and fourth levels of ownership—except as provided in the second level of ownership bullet above and in the fourth level of ownership bullet below, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ Fourth-level of ownership—if the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first level or payment legal entity by the fourth-level legal entity.

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

If an individual or legal entity is not eligible to receive ERP Phase 1 payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity. Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**Requirement To Purchase Crop Insurance or NAP Coverage**

All producers who receive ERP Phase 1 payments, including those receiving a payment based on tree, bush, or vine crop insurance policies, are statutorily required to purchase crop insurance, or NAP coverage where crop insurance is not available, for the next 2 available crop years, as determined by the Secretary. Participants must obtain crop insurance or NAP, as may be applicable:

∀ At a coverage level equal to or greater than 60 percent for insurable crops; or

∀ At the catastrophic level or higher for NAP crops.

Availability will be determined from the date a producer receives an ERP payment, and may vary depending on the timing and availability of crop insurance or NAP for a producer's particular crops. The final crop year to purchase crop insurance or NAP coverage to meet the second year of coverage for this requirement is the 2026 crop year.

In situations where crop insurance is unavailable for a crop, an ERP participant must obtain NAP coverage. Section 1001D of the Food Security Act of 1985 (1985 Farm Bill) provides that a person or entity with an AGI in amount greater than $900,000 is not eligible to participate in NAP; however, producers with an AGI greater than $900,000 are eligible for ERP. To reconcile this restriction in the 1985 Farm Bill and the requirement to obtain NAP or crop insurance coverage, ERP participants may meet the purchase requirement by purchasing Whole-Farm Revenue Protection (WFRP) crop insurance coverage, if eligible, or they may pay the applicable NAP service fee despite their ineligibility for a NAP payment. In other words, the service fee must be paid even though no NAP payment may be made because the AGI of the person or entity exceeds the 1985 Farm Bill limitation. The crop insurance and NAP coverage requirements are specific to the crop and county (which is the county where the crop is physically located for insured crops and the administrative county for NAP-covered crops) for which ERP Phase 1 payments are paid. This means that a producer is required to purchase crop insurance or NAP coverage for the crop in the county for which the producer was issued an ERP Phase 1 payment. Producers who receive an ERP Phase 1 payment that was calculated based on an indemnity under a Pasture, Rangeland, and Forage (PRF); Annual Forage; or WFRP policy must purchase the same type of policy or a combination of individual policies for the crops that had covered losses under ERP to meet the linkage requirement. Producers who receive a payment on a crop in a county and who have the crop or crop acreage in subsequent years, as provided in this document, and who fail to obtain the 2 years of crop insurance or NAP coverage required as specified in this document must refund all ERP Phase 1 payments for that crop in that county with interest from the date of disbursement. Producers who were paid under ERP Phase 1 for a crop in a county, but do not plant that crop in that county in a year for which this requirement applies, are not subject to the crop insurance or NAP purchase requirement for that year.

**Provisions Requiring Refund to FSA**

In the event that any ERP Phase 1 payment resulted from erroneous information reported by the producer or if the producer's data are updated after RMA or FSA calculate a producer's ERP Phase 1 payment, the ERP Phase 1 payment will be recalculated and the producer must refund any excess payment to FSA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ERP Phase 1 payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. All persons with a financial interest in a legal entity receiving payments are jointly and severally liable for any refund, including related charges, which is determined to be due to FSA for any reason. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

**General Provisions**

Applicable general eligibility requirements, including recordkeeping requirements and required compliance with HELC and Wetland Conservation provisions, are similar to those for the previous ad hoc crop disaster programs and current permanent disaster programs.

General requirements that apply to other FSA-administered commodity programs also apply to ERP, including compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation," and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ERP. As described above, ERP Phase 1 payments are calculated using data on file with RMA and FSA at the

time of calculation. Producers who receive an ERP Phase 1 application and disagree with the calculated payment amount or data used in the calculation may apply for ERP Phase 2, which will allow them to provide their data to FSA through a traditional application process.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. All information provided to FSA for program eligibility and payment calculation purposes, including certification that a producer suffered a loss due to a qualifying disaster event, is subject to spot check. Participants receiving ERP Phase 1 payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

Applicants have a right to a decision in response to their application. If an applicant files a late ERP Phase 1 application, the application is subject to the following conditions:

∀ A late ERP application will be considered a request to waive the deadline.

∀ Requests to waive or modify program provisions are at the discretion of the Deputy Administrator. The Deputy Administrator has the authority to waive or modify application deadlines and other requirements or program provisions not specified in law in cases where the Deputy Administrator determines it is (1) equitable to do so and (2) where the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ERP.

∀ Applicants who request to waive or modify ERP provisions do not have a right to a decision on those requests.

∀ The Deputy Administrator's refusal to exercise discretion on requests to waive or modify ERP provisions will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ERP will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ERP payments.

If any person who would otherwise be eligible to receive a payment dies before the payment is received, payment may be released as specified in 7 CFR 707.3.

Similarly, if any person or legal entity who would otherwise have been eligible to apply for a payment dies or is dissolved, respectively, before the payment is applied for, payment may be released in accordance with this document if a timely application is filed by an authorized representative. Proof of authority to sign for the deceased producer or dissolved entity must be provided. If a participant is now a dissolved general partnership or joint venture, all members of the general partnership or joint venture at the time of dissolution or their duly authorized representatives must sign the application for payment. Eligibility of such participant will be determined, as it is for other participants, based upon ownership share and risk in producing the crop.

In either applying for or participating in ERP, or both, the producer is subject to laws against perjury (including, but not limited to, 18 U.S.C. 1621). If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ERP, or both, then the producer may be found to be guilty of perjury. Except as otherwise provided by law, if guilty of perjury the applicant may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ERP but only as to beneficiaries who, as a condition of the waiver, agree to apply the ERP payments to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ERP, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

**Paperwork Reduction Act Requirements**

In compliance with the Paperwork Reduction Act of 1995 (44 U.S.C. chapter 35), FSA is requesting comments from interested individuals and organizations on the information collection request associated with ERP. After the 60-day period ends, the information collection request will be submitted to the Office of Management and Budget (OMB) for a 3-year approval to cover ERP information collection. To start the ERP information collection approval, prior to publishing this notice,

FSA received emergency approval from OMB for 6 months. The emergency approval covers ERP information collection activities.

*Title:* ERP.

*OMB Control Number:* 0560–0309.

*Type of Request:* New Collection.

*Abstract:* FSA will make payments to eligible producers who suffered losses to crops, trees, bushes, and vines due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. This request includes both ERP Phase 1, which uses a streamlined application process for producers whose data is already on file with FSA or RMA, and ERP Phase 2, which will use a traditional application process during which producers will provide the information required to calculate a payment.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses. The estimated average time per response is rounded to 3 decimal places instead of showing all 7 decimal places, so the calculation based on the numbers shown below is not exact.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.176 hours per response to include the time for reviewing instructions, searching for information, gathering and maintaining the data, and completing and reviewing the collection of information.

*Type of Respondents:* Individuals or households, businesses or other for profit farms.

*Estimated Annual Number of Respondents:* 505,000.

*Estimated Number of Reponses per Respondent:* 1.

*Estimated Total Annual Responses:* 505,000.

*Estimated Average Time per Response:* 0.176 hours.

*Estimated Total Annual Burden on Respondents:* 88,650.

We are requesting comments on all aspects of this information collection to help us to:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the FSA, including whether the information will have practical utility;

(2) Evaluate the accuracy of the FSA's estimate of burden including the

Strickland AR 0806

validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; or

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this notice, including names and addresses when provided, will be a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

**Environmental Review**

The environmental impacts of this final rule have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799). ERP is authorized by the Extending Government Funding and Delivering Emergency Assistance Act. The intent of ERP Phase 1 is to provide payments to producers who suffered eligible crop, tree, bush, and vine losses due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, and qualifying drought, and related conditions occurring in calendar years 2020 and 2021.

The limited discretionary aspects of the program (for example, determining payment limitations) were designed to be consistent with established FSA disaster programs. As such, the Categorical Exclusions found at 7 CFR part 799.31 apply, specifically 7 CFR 799.31(b)(6)(iv) and (vi) (that is, §799.31(b)(6)(iv) Individual farm participation in FSA programs where no ground disturbance or change in land use occurs as a result of the proposed action or participation; and §799.31(b)(6)(vi) Safety net programs administered by FSA). No Extraordinary Circumstances (7 CFR 799.33) exist. As such, FSA has determined that the implementation of ERP and the participation in ERP do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or environmental impact statement for this regulatory action.

**Federal Assistance Programs**

The title and number of the Federal assistance programs, as found in the Assistance Listing,[14] to which this document applies is 10.964—Emergency Relief Program.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or (844) 433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2022–10628 Filed 5–17–22; 8:45 am]

**BILLING CODE 3410–05–P**

---

[14] See *https://sam.gov/content/assistance-listings.*

**COMMISSION ON CIVIL RIGHTS**

**Notice of Public Meetings of the Kansas Advisory Committee**

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Announcement of meeting.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act that the Kansas Advisory Committee (Committee) will hold a series of meeting(s) via web conference on, May 26, 2022; June 9, 2022 and June 23, 2022 at 12:00 p.m. Central Time. The purpose of the meetings is for the committee to discuss potential topics and panelists for the upcoming briefing(s).

**DATES:** The meeting will be held on:

∀ Thursday, May 26, 2022 at 12:00 p.m.–1:00 p.m. Central Time

∀ Thursday, June 9, 2022 at 12:00 p.m.–1:00 p.m. Central Time

∀ Thursday, June 23, 2022 at 12:00 p.m.–1:00 p.m. Central Time

*https://civilrights.webex.com/civilrights/j.php?MTID=m5f3e3516a1 d9b8db382795f2452d782a* or Join by phone: 800–360–9505, USA Toll Free Access code: 2763 733 5933

**FOR FURTHER INFORMATION CONTACT:** David Barreras, Designated Federal Officer, at *dbarreras@usccr.gov* or (202) 656–8937

**SUPPLEMENTARY INFORMATION:** Members of the public may listen to this discussion through the above call-in number. An open comment period will be provided to allow members of the public to make a statement as time allows. Callers can expect to incur regular charges for calls they initiate over wireless lines, according to their wireless plan. The Commission will not refund any incurred charges. Individuals who are deaf, deafblind and hard of hearing may also follow the proceedings by first calling the Federal Relay Service at 1–800–877–8339 and providing the Service with the conference call number and conference ID number.

Members of the public are entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be emailed to David Barreras at *dbarreras@usccr.gov.*

Records generated from this meeting may be inspected and reproduced at the Regional Programs Unit Office, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights,

Strickland AR 0807

# Notices

Federal Register

Vol. 87, No. 64

Monday, April 4, 2022

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF AGRICULTURE

### Submission for OMB Review; Notice of Request for Emergency Approval

In compliance with the requirements of the Paperwork Reduction Act of 1995 (PRA), the Department of Agriculture (USDA) has submitted a request to the Office of Management and Budget (OMB) for a six-month emergency approval of the following information collection: ICR 0578–NEW, Urban Agriculture and Innovative Production (UAIP). The requested approval would enable the implementation for NRCS to collect the necessary information to accept and review proposals and manage agreements for the FY22 Urban Agriculture and Innovative Production (UAIP) Grant Program.

### Natural Resources Conservation Service (NRCS)

*Title:* Urban Agriculture and Innovative Production (UAIP) Grant Program.

*OMB Control Number:* 0578–NEW.

*Summary of Collection:* The Natural Resources Conservation Service (NRCS) is requesting emergency clearance and review through 5 CFR 1320.13 for a new information collection for the Urban Agriculture and Innovative Production (UAIP) Grant Program. The NRCS is using funds provided by the American Rescue Plan of 2021 (Pub. L. 117–2) to assist local units of government in implementing projects that improve access to local foods in areas where access to fresh, healthy food is limited or unavailable.

Dated: March 29, 2022.

**Ruth Brown,**
*Departmental Information Collection Clearance Officer.*

[FR Doc. 2022–06947 Filed 4–1–22; 8:45 am]
**BILLING CODE 3410–05–P**

## DEPARTMENT OF AGRICULTURE

### Submission for OMB Review; Notice of Request for Emergency Approval

In compliance with the requirements of the Paperwork Reduction Act of 1995 (PRA), the Department of Agriculture (USDA) has submitted a request to the Office of Management and Budget (OMB) for a six-month emergency approval of the following information collection: ICR 0578–NEW, Composting and Food Waste Reduction (CFWR) Cooperative Agreement Program. The requested approval would enable NRCS to carry out pilot projects under which local units of government, schools, and tribal communities enter into cooperative agreements to develop and test strategies for planning and implementing municipal composting plans and food waste reduction plans.

### Natural Resources Conservation Service (NRCS)

*Title:* Composting and Food Waste Reduction (CFWR) Cooperative Agreements.

*OMB Control Number:* 0578–NEW.

*Summary of Collection:* The Natural Resources Conservation Service (NRCS) is requesting emergency clearance and review through 5 CFR 1320.13 for a new information collection for the NRCS is using CFWR funds provided by the American Rescue Plan of 2021 (Pub. L. 117–2) to assist local units of government, schools, and tribal communities in implementing projects that help their communities generate compost, improve soil quality, and reduce food waste.

Dated: March 29, 2022.

**Ruth Brown,**
*Departmental Information Collection Clearance Officer.*

[FR Doc. 2022–06952 Filed 4–1–22; 8:45 am]
**BILLING CODE 3410–05–P**

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

**[Docket ID FSA–2022–0004]**

### Notice of Funds Availability; Emergency Livestock Relief Program (ELRP)

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing the new Emergency Livestock Relief Program (ELRP). This document provides the eligibility requirements and payment calculation for the first phase of ELRP assistance, which will provide payments to producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021 using data already submitted to FSA through the Livestock Forage Disaster Program (LFP).

**DATES:** *Funding availability:* Implementation will begin April 4, 2022.

**FOR FURTHER INFORMATION CONTACT:** Kimberly Graham; telephone: (202) 720–6825; email: *Kimberly.Graham@ usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

**Background**

The Extending Government Funding and Delivering Emergency Assistance Act, (Division B, Title I, Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021. From the $10 billion, the Secretary of Agriculture is to use $750 million to assist producers of livestock for losses incurred during calendar year 2021 due to qualifying droughts or wildfires. The livestock producers who suffered losses due to drought are eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity during the applicable year.

FSA will assist livestock producers through ELRP. This document provides the eligibility requirements and payment calculation for Phase 1 of ELRP, which will assist eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021. For eligible producers, ELRP Phase 1 will pay for a portion of the increased feed costs in 2021 based on the number of animal units (AU), limited by available grazing acreage, in eligible drought counties. Although payments made under the Livestock Forage Disaster Program (LFP) do not have a direct correlation to the increased feed costs incurred, in order to deliver this assistance quickly, for Phase 1, FSA is using certain LFP data and a percentage of the payment made through LFP applications will be used as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP Phase 1.

According to the US Drought Monitor, more than one-third of the country was categorically in a ''D–2 Severe'' to ''D–3 Exceptional'' drought throughout the entire calendar year 2021. Extreme drought predominately affected areas highly concentrated with rangeland needed for livestock production, therefore drought and wildfire caused economic hardship on producers that were reliant on rangeland, requiring them to purchase supplemental feed at elevated prices to sustain production throughout 2021 and not just during the normal grazing periods. Due to the excessive and expansive drought and wildfires in 2021, livestock participants:

∀ Suffered extreme grazing losses;

∀ Incurred related costs to purchase feed in the grazing period, which is limited to a 5-month maximum period under LFP;

∀ Purchased feed, beyond normal for a drought year, to supplement grazing and to support livestock outside of the grazing period because forage was not available for harvest and storage; and

∀ Were faced with higher feed costs during 2021 due to less availability of feed resulting from drought severity and feed cost inflation.

LFP provided payments to eligible owners and contract growers of covered livestock who suffered livestock grazing losses due to qualifying drought or fire [1] not to exceed five months during the grazing period based on the documented livestock inventory eligible for LFP. The gross LFP calculated payment represented a 60 percent reimbursement of monthly feed costs for a maximum of 5 months, based on a feed grain equivalent that is calculated according to 7 CFR 1416.207 as specified in 7 U.S.C. 9081(c), which uses the higher of the national average corn price per bushel for the 12- or 24-month period immediately preceding March 1 of the calendar year. Because LFP requires the use of this period, it does not take into account any increases in price paid for supplemental feed during 2021. For LFP, the 2021 monthly value of forage, resulted in an LFP payment rate of $18.71 per month per eligible animal unit for drought and the rate for fire is based on the number of fire-restricted days and was not a single rate.

LFP does not compensate for the increased costs of supplemental feed during 2021 due to drought and wildfires in 2021.

The actual cost of supplemental feed prices, based on corn, alfalfa, and soybean meal, increased substantially in 2021, compared to previous years. Using the Dairy Margin Coverage (DMC) program model for an adequate supplemental feed ratio, the 5-year average (2016 through 2020) cost to maintain 1 AU for one month was $61.28, compared to the actual average cost from January through October, 2021 of $85.68 per month, an increase of 39.82 percent.

The cost of feeding one AU per month increased in 2021 compared to the 5-year average by $24.40 ($85.68 minus $61.28) for livestock producers affected by drought and wildfires, which was not covered by LFP. See Table 1.

TABLE 1—2021 CALCULATED COSTS (DMC MODEL) TO MAINTAIN 1 AU/MONTH

| 5 Year avg (corn, alfalfa, soybean meal) | 2021 cost (corn, alfalfa, soybean meal) | Increase in cost 2021 | 2021 LFP Payment rate * | ELRP payment percentage | ELRP calculated benefit/month/ eligible AU | % of increased supplemental feed costs in 2021 compensated by ELRP phase 1 |
|---|---|---|---|---|---|---|
| $61.28 ...................................................... | $85.68 | $24.40 | $18.71 | 75 90 | $14.03 16.84 | 57.5 69.0 |

*The 2021 LFP payment rate may be adjusted according to LFP provisions in 7 CFR 1416.207 for mitigated livestock and restricted grazed animal units due to a qualifying fire.

The ELRP Phase 1 calculated benefit is based on using the LFP payment rate of $18.71 per animal unit per month; calculated as follows:

75% · $18.71 = $14.03 (equivalent to 57.5 percent of increased supplemental feed costs in 2021) and

90% · $18.71 = $16.84 (equivalent to 69 percent of increased supplemental feed costs in 2021).

To stay within the available funding, ELRP Phase 1 payments for increased supplemental feed costs in 2021 are 90 percent of the gross LFP calculated payment for historically underserved farmers and ranchers and 75 percent of the gross LFP calculated payment for all other producers, which equates to 57.5 percent and 69 percent, respectively, of the estimated increases in supplemental feed costs in 2021 for eligible producers.

Because FSA is using LFP information to generate a reasonable approximation for the costs covered by ELRP Phase 1, no action is required for eligible

---

[1] A grazing loss due to drought qualifies for LFP only if the grazing loss occurs on land that is native or improved pastureland with permanent vegetative cover or is planted to a crop planted specifically for the purpose of providing grazing for covered livestock, and the land is physically located in a county rated by the U.S. Drought Monitor as having a D2 (severe drought) intensity for at least 8 consecutive weeks or D3 (extreme drought) or D4 (exceptional drought) intensity at any time during the normal grazing period for the specific type of grazing land or pastureland.

A grazing loss due to fire qualifies for LFP only if the grazing loss occurs on rangeland that is managed by a Federal agency and the eligible livestock producer is prohibited by the Federal agency from grazing the normal permitted livestock on the managed rangeland due to a fire.

See 7 CFR 1416.205 for further information on eligible grazing losses under LFP.

Strickland AR 0809

producers to receive these payments. FSA is continuing to evaluate the impacts of drought and wildfire in calendar year 2021, and if additional ELRP assistance for livestock producers is necessary, it will be announced as Phase 2 in a subsequent document to be published in the **Federal Register**.

## Definitions

The definitions in 7 CFR parts 718, 1400, and 1416 apply to ELRP, except as otherwise provided in this document. The following definitions also apply.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Historically underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, forestry commodities including renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, and IC–DISC or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, or forestry activities as defined in this part; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator for Farm Programs (Deputy Administrator).

*LFP* means the Livestock Forage Disaster Program under section 1501 of the Agricultural Act of 2014 (7 U.S.C. 9081) and 7 CFR part 1416, subpart C.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales did not exceed $179,000 (the amount applicable to the 2021 program year) in each of the 2018 and 2019 calendar years; and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1) of this definition. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through National Resources and Conservation Service at *https://lrftool.sc.egov.usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ELRP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is considered to have a beneficial ownership interest in such legal entity.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;
(2) Asians or Asian-Americans;
(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;
(5) Native Hawaiians or other Pacific Islanders; and
(6) Women.

*U.S. Drought Monitor* is a system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http://drought monitor.unl.edu.*

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[2]) and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[3]) during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*Wildfire* for ELRP Phase 1 means fire as used in 7 CFR part 1416, subpart C.

## Eligible Livestock Producers

Eligible livestock producers for ELRP Phase 1 are producers with an approved 2021 LFP application. For ELRP Phase 1, the eligibility criteria applicable to LFP (7 CFR part 1416, subparts A and C) also applies to ELRP Phase 1, excluding the LFP average adjusted gross income (AGI) limitation. FSA will use livestock inventories, forage acreage, restricted animal units and grazing days due to fire, and drought intensity levels already reported to FSA for the 2021 Livestock Forage Disaster Program Application [4] (on form number CCC–853), to determine eligibility and calculate a ELRP Phase 1 payment, if applicable. Eligible livestock producers are not required to submit an application for ELRP Phase 1; however, they must have the following additional forms on file with FSA within 60-days of ELRP deadline announced by the

---

[2] The term ''Armed Forces'' means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[3] The term ''veteran'' means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[4] As provided in 7 CFR 1416.206 and publicized by FSA, the LFP application deadline for the 2021 program year was January 31, 2022.

Strickland AR 0810

Deputy Administrator to be eligible to receive a payment:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the ELRP producer and applicable affiliates.

For a producer to be eligible for a payment based on the higher payment rate for eligible historically underserved farmers or ranchers or increased payment limitation as described below, the following must be submitted within 60-days of the ELRP deadline announced by the Deputy Administrator:

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2021 program year[5]; or

∀ FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity.

**Payment Calculation**

The ELRP Phase 1 payment will be equal to the eligible livestock producer's gross 2021 LFP calculated payment[6] multiplied by the applicable ELRP payment percentage. The ELRP Phase 1 payment percentage will be 90 percent for historically underserved farmers and ranchers, and 75 percent for all other producers.

---

[5] A producer who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of their status for the 2021 program year because a producer's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what programs years the status would apply. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit CCC–860 for each applicable program year.

[6] The gross LFP calculated payment is the amount calculated according to 7 CFR 1416.207, prior to any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and the applicant or member of an applicant that is an entity exceeding the average AGI limitation.

For example, a historically underserved eligible livestock producer's gross 2021 LFP calculation payment is $10,000 multiplied by the 90 percent ELRP payment percentage results in an ELRP Phase 1 payment of $9,000. This ELRP payment is intended to represent a reasonable approximation of 69 percent of the increased supplemental feed costs for that producer in 2021.

Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, must be on file with FSA with a certification applicable for the 2021 program year to receive the higher ELRP payment rate of 90 percent.

FSA will issue ELRP Phase 1 payments as 2021 LFP applications are processed and approved. If a producer files the CCC–860 or FSA–510 form and the accompanying certification by the deadline announced by the Deputy Administrator but after their ELRP Phase 1 payment is issued, FSA will recalculate the ELRP Phase 1 payment and issue the additional calculated amount as applicable.

**Payment Limitation**

The payment limitation for ELRP is determined by the person's or legal entity's average adjusted gross farm income (income derived from farming, ranching, and forestry operations). Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments under ELRP if their average adjusted gross farm income is less than 75 percent of their average AGI for tax years 2017, 2018, and 2019. If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to $250,000 in ELRP payments. The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, or forestry related activities for ELRP are 2017, 2018, and 2019. To receive more than $125,000 in ELRP payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification. If a producer requesting the $250,000 payment limitation is a legal entity, all members of that entity must also complete FSA–510 and provide the required certification

according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the $250,000 payment limitation based on the legal entity's average AGI from farming, ranching, or forestry related activities but a member of that legal entity either does not complete an FSA–510 and provide the required certification or is not eligible for the $250,000 payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ELRP payment attributed to that member.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ First level of ownership: Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

∀ Second level of ownership: Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ Third and fourth levels of ownership: Except as provided in the second-level of ownership bullet above and in the fourth-level of ownership bullet below, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ Fourth level of ownership: If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first-level or payment legal entity by the fourth-level legal entity.

Strickland AR 0811

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

If an individual or legal entity is not eligible to receive ELRP payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity. Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**Provisions Requiring Refund to FSA**

In the event that any ELRP Phase 1 payment resulted from erroneous information reported by the producer or if the producer's 2021 LFP payment is recalculated after the ELRP Phase 1 payment is issued, the ELRP Phase 1 payment will be recalculated, and the producer must refund any excess payment to FSA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ELRP Phase 1 payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

**General Provisions**

General requirements that apply to other FSA-administered commodity programs also apply to ELRP, including compliance with the provisions of 7 CFR part 12, ''Highly Erodible Land and Wetland Conservation,'' and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ELRP. The determination of matters of general applicability that are not in response to, or result from, an individual set of facts are not matters that can be appealed. Such matters of general applicability include, but are not limited to, the ELRP Phase 1 eligibility criteria and payment calculation.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. Participants receiving ELRP payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

The Deputy Administrator has the discretion and authority to waive or modify filing deadlines and other requirements or program provisions not specified in law, in cases where the Deputy Administrator determines it is equitable to do so and where the Deputy Administrator finds that the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ELRP. Although producers have a right to a decision on whether they filed applications by the deadline or not, producers have no right to a decision in response to a request to waive or modify deadlines or program provisions. The Deputy Administrator's refusal to exercise discretion to consider the request will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ELRP will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ELRP payments.

In either applying for or participating in ELRP, or both, the producer is subject to laws against perjury and any penalties and prosecution resulting therefrom, with such laws including but not limited to 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ELRP, or both, then the producer is guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ELRP but only as to beneficiaries who, as a condition of the waiver, agree to apply the ELRP payments to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ELRP, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

**Paperwork Reduction Act Requirements**

In accordance with the Paperwork Reduction Act, the information collection request that supports Emergency Livestock Relief Program (ELRP) was submitted to OMB for emergency approval. OMB approved the 6-month emergency information collection. This new ELRP will be available to the producers up to 6 months only.

**Environmental Review**

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799).

As previously stated, ELRP Phase 1 is providing payments to eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021. The limited discretionary aspects of ELRP do not have the potential to impact the human environment as they are administrative. Accordingly, these discretionary aspects are covered by the FSA Categorical Exclusions specified in § 799.31(b)(6)(iv) that applies to individual farm participation in FSA programs where no ground disturbance or change in land use occurs as a result of the proposed action or participation; and § 799.31(b)(6)(vi) that applies to safety net programs.

No Extraordinary Circumstances (§ 799.33) exist. As such, the implementation of ELRP and the

participation in ELRP do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessmentor environmental impact statement for this action and this document serves as documentation of the programmatic environmental compliance decision for this federal action.

## Federal Assistance Programs

The title and number of the Federal assistance programs, as found in the Assistance Listing [7] (formerly referred to as the Catalog of Federal Domestic Assistance), to which this document applies is 10.148—Emergency Livestock Relief Program.

## USDA Non-Discrimination Policy

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or 844–433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https:// www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant

Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@ usda.gov*.

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**
*Administrator, Farm Service Agency.*
[FR Doc. 2022–06950 Filed 4–1–22; 8:45 am]
**BILLING CODE 3410–05–P**

## DEPARTMENT OF AGRICULTURE

## Food and Nutrition Service

## Agency Information Collection Activities: Reasons for Underredemption of the WIC Cash-Value Benefit

**AGENCY:** Food and Nutrition Service (FNS), USDA.

**ACTION:** Notice.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, this notice invites the general public and other public agencies to comment on this proposed information collection. This collection is a NEW information collection. This study informs the U.S. Department of Agriculture's Food and Nutrition Service (FNS) about the reasons behind underredemption of the cash-value benefit (CVB) issued to participants in the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). In particular, the American Rescue Plan Act of 2021 (ARPA), which was signed into law in March 2021, included provisions allowing the USDA to temporarily increase the CVV/B for certain food packages through September 30, 2021. This increased CVB amount may reduce barriers to full utilization of the benefit. FNS is particularly interested in how State agency policies and practices as well as the temporary benefit increase affects CVB redemption rates.

**DATES:** Written comments must be received on or before June 3, 2022.

**ADDRESSES:** Comments may be sent to Ruth Morgan, Food and Nutrition Service, U.S. Department of Agriculture, 1320 Braddock Place, Alexandria, VA 22314. Comments may also be submitted via fax to the attention of Ruth Morgan at 703–305–2576 or via email at *ruth.morgan@usda.gov.* Comments will also be accepted through the Federal eRulemaking Portal. Go to *http://www.regulations.gov,* and follow the online instructions for submitting comments electronically.

All responses to this notice will be summarized and included in the request

for Office of Management and Budget approval. All comments will be a matter of public record.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or copies of this information collection should be directed to Ruth Morgan at 703–457–7759.

**SUPPLEMENTARY INFORMATION:** Comments are invited on (a) whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions that were used; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on those who are to respond, including use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

*Title:* Reasons for Underredemption of the WIC Cash-Value Benefit.

*Form Number:* N/A.

*OMB Number:* Not Yet Assigned.

*Expiration Date:* Not Yet Determined.

*Type of Request:* New Collection.

*Abstract:* The Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) provides nutritious supplemental foods, healthcare referrals, breastfeeding support, and nutrition education to low-income pregnant, breastfeeding, and postpartum women, infants and children up to age 5 who are at nutritional risk. A Final Rule, Special Supplemental Nutrition Program for Women, Infants, and Children (WIC): Revisions in the WIC Food Packages, was published in the **Federal Register** on March 4, 2014 (79 FR 12274) that revised the WIC food packages to add a monthly cash-value benefit (CVB) for the purchase of fruits and vegetables. This rule also detailed specific provisions for the value of the CVB, the types of fruits and vegetables authorized, and other State options for providing this benefit. Recent studies have estimated that redemption rates for CVBs range from 73 percent to 77 percent;[1 2] however, the reasons for

[1] Phillips, D., Bell, L., Morgan, R., & Pooler, J. (2014). *Transition to EBT in WIC: Review of impact and examination of participant redemption patterns: Final report.* Retrieved from *https:// altarum.org/sites/default/files/uploaded-publication-files/Altarum_Transition%20to%20 WIC%20EBT_Final%20Report_071614.pdf.*

[2] National Academies of Sciences, Engineering, and Medicine. (2017). *Review of WIC food*

**50828**   **Federal Register** / Vol. 87, No. 159 / Thursday, August 18, 2022 / Notices

added to the cost of providing the service.

All rates are per-hour except when a per-unit cost is noted. The specific

amounts in each rate calculation are available upon request.

### 2022/2023 RATES

| | Regular | Overtime | Holiday | Includes travel costs in rate | Start date |
|---|---|---|---|---|---|
| **Specialty Crops Fees** | | | | | |
| **7 CFR Part 51—Fresh Fruits, Vegetables and Other Products (Inspection, Certification, and Standards)** | | | | | |
| Subpart A—Requirements; | | | | | |
| §§ 51.37–51.44   Schedule of Fees and Charges at Destination Markets | | | | | |
| § 51.45   Schedule of Fees and Charges at Shipping Point Areas | | | | | |
| Quality and Condition Inspections for Whole Lots ...................... | | $225.00 per lot | | ............... | Oct. 1, 2022. |
| Quality and Condition Half Lot or Condition-Only Inspections for Whole Lots. | | $186.00 per lot | | ............... | Oct. 1, 2022. |
| Condition—Half Lot ........................................................... | | $172.00 per lot | | ............... | Oct. 1, 2022. |
| Quality and Condition or Condition-Only Inspections for Additional Lots of the Same Product. | | $103.00 per lot | | ............... | Oct. 1, 2022. |
| Dockside Inspections—Each package weighing <30 lbs ........... | | $0.044 per pkg. | | ............... | Oct. 1, 2022. |
| Dockside Inspections—Each package weighing >30 lbs ........... | | $0.068/pkg. | | ............... | Oct. 1, 2022. |
| Charge per Individual Product for Dockside Inspection ............. | | $225.00/lot | | ............... | Oct. 1, 2022. |
| Charge per Each Additional Lot of the Same Product .............. | | $103.00/lot | | ............... | Oct. 1, 2022. |
| Inspections for All Hourly Work ........................................ | $100.00 | $137.00 | $175.00 | ............... | Oct. 1, 2022. |
| Audit Services—Federal ................................................... | | $132.00 | | ............... | Oct. 1, 2022. |
| Audit Services—State ...................................................... | | $132.00 | | ............... | Oct. 1, 2022. |
| GFSI Certification Fee [1] .................................................. | | $250.00/audit | | ............... | Oct. 1, 2022. |
| **7 CFR Part 52—Processed Fruits and Vegetables, Processed Products Thereof, and Other Processed Food Products** | | | | | |
| Subpart A—Requirements Governing Inspection and Certification; | | | | | |
| §§ 52.41—52.51  Fees and Charges | | | | | |
| Lot Inspections ............................................................... | $85.00 | $112.00 | $139.00 | ............... | Oct. 1, 2022. |
| In-plant Inspections Under Annual Contract (year-round) .......... | $85.00 | $107.00 | $129.00 | ............... | Oct. 1, 2022. |
| Additional Graders (in-plant) or Less Than Year-Round ............ | $91.00 | $120.00 | $149.00 | ............... | Oct. 1, 2022. |
| Audit Services—Federal ................................................... | | $132.00 | | ............... | Oct. 1, 2022. |
| Audit Services—State ...................................................... | | $132.00 | | ............... | Oct. 1, 2022. |
| GFSI Certification Fee[1] ................................................... | | $250.00/audit | | ............... | Oct. 1, 2022. |

[1] Global Food Safety Initiative (GFSI) Certification Fee—$250 per GFSI audit to recoup the costs associated with attaining technical equivalency to the GFSI benchmarking requirements.

*Authority:* 7 U.S.C. 1621–1627.

**Melissa Bailey,**

*Associate Administrator, Agricultural Marketing Service.*

[FR Doc. 2022–17744 Filed 8–17–22; 8:45 am]

**BILLING CODE 3410–02–P**

---

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

**[Docket ID FSA–2022–0008]**

### Emergency Livestock Relief Program (ELRP) and Emergency Relief Program (ERP) Clarification

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notice of funds availability; clarification and revision.

**SUMMARY:** The Farm Service Agency (FSA) is amending the definition of ''income derived from farming,

ranching, and forestry operations'' for ELRP and ERP and clarifying policy around the filing of certifications of average adjusted gross farm income. FSA is clarifying the ERP Phase 1 policy related to producers who received both a crop insurance indemnity and a Noninsured Crop Disaster Assistance Program (NAP) payment. FSA is also amending ERP Phase 1 to include eligibility for Federal Crop Insurance policies with an intended use for nursery.

**FOR FURTHER INFORMATION CONTACT:**
Tona Huggins; telephone: (202) 720–6825; email: *tona.huggins@usda.gov*. Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

**Revision and Clarification**

FSA announced ELRP in a Notification of Funding Availability (NOFA) on April 4, 2022 (87 FR 19465–19470), and ERP in a NOFA on May 18, 2022 (87 FR 30164–30172). Implementation of ELRP Phase 1 began on April 4, 2022. Implementation of ERP Phase 1 began on May 18, 2022. In those documents, FSA provided the eligibility requirements, application process, and payment calculations for Phase 1 of each program. In this document, FSA is making clarifications and revising policy for those programs, as described below.

**Clarification to Income Derived From Farming, Ranching, and Forestry Operations**

The payment limits under both ELRP and ERP are higher for producers whose average adjusted gross farm income is at least 75 percent of their average

Strickland AR 0814

adjusted gross income (AGI) based on the 3 taxable years preceding the most immediately preceding complete tax year. Under the ERP and ELRP NOFAs income derived from farming, ranching, and forestry operations includes any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator. The Deputy Administrator considered the definition of "income derived from farming, ranching, and forestry operations" used in prior disaster programs and determined the need to clarify that the sale of equipment to conduct farm, ranch, or forestry operations and the provision of production inputs and services to farmers, ranchers, foresters and farm operations are considered eligible sources of income derived from farming, ranching, and forestry operations under certain conditions. Production inputs are materials to conduct farming operations, such as seeds, chemicals, and fencing supplies. Production services are services provided to support a farming operation, such as custom farming, custom feeding, and custom fencing. In this document, FSA is providing clarification regarding how the sale of equipment to conduct farm, ranch or forestry operations and the provision of production inputs and services will be considered for the purpose of determining whether at least 75 percent of the producer's average AGI was from income derived from farming, ranching, and forestry operations. This is only to the extent a producer's income derived from these sources is not already included under items 1 through 12 of the definition of income derived from farming, ranching, and forestry operations.

The sale of equipment used to conduct farm, ranch, or forestry operations and the provision of production inputs and services to farmers, ranchers, foresters, and farm operations will only be taken into account in an applicant's average adjusted gross farm income if the average adjusted gross farm income is at least 66.66 percent of the applicant's average AGI based on items 1 through 12 of the definition of income derived from farming, ranching, and forestry operations. For clarity, the full definition of "average adjusted gross farm income" is provided below. This definition is applicable to both ELRP and ERP. It replaces the definition provided in the ERP NOFA and will also apply to the ELRP NOFA.

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income derived from farming, ranching, or forestry

operations for the 3 taxable years preceding the most immediately preceding complete taxable year.

(a) If the resulting average adjusted gross farm income derived from items 1 through 12 of the definition of income derived from farming, ranching and forestry operations is at least 66.66 percent of the average adjusted gross income of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(1) The sale of equipment to conduct farm, ranch, or forestry operations; and

(2) The provision of production inputs and services to farmers, ranchers, foresters, and farm operations.

(b) The relevant tax years are:

(1) For the 2020 program year, 2016, 2017, and 2018;

(2) For the 2021 program year, 2017, 2018, and 2019; and

(3) For the 2022 program year, 2018, 2019, and 2020.

In response to inquiries made by CPAs and attorneys, FSA is providing additional clarity related to the certifications of average adjusted gross farm income. For legal entities not required to file a federal income tax return, or a person or legal entity that did not have taxable income in one or more tax years, the average will be the adjusted gross farm income, including losses, averaged for the 3 taxable years preceding the most immediately preceding complete taxable year, as determined by FSA. A new legal entity will have its adjusted gross farm income averaged only for those years of the base period for which it was in business; however, a new legal entity will not be considered "new" to the extent it takes over an existing operation and has any elements of common ownership interest and land with the preceding person or legal entity. When there is such commonality, income of the previous person or legal entity will be averaged with that of the new legal entity for the base period. For a person filing a joint tax return, the certification of average adjusted farm income will be reported as if the person had filed a separate federal tax return and the calculation is consistent with the information supporting the filed joint return.

ELRP and ERP applicants filing certifications of average adjusted gross farm income are subject to an FSA audit of information submitted for the purpose of increasing the program's payment limitation. As a part of this audit, FSA may request income tax returns, and if requested, must be supplied by all related persons and legal entities. In addition to any other

requirement under any Federal statute, relevant Federal income tax returns and documentation must be retained a minimum of 2 years after the end of the calendar year corresponding to the year for which payments or benefits are requested. Failure to provide necessary and accurate information to verify compliance, or failure to comply with these requirements will result in ineligibility for ELRP and ERP benefits. This is consistent with the current requirements for participants in both ERP Phase 1 and ELRP to retain documentation in support of their application for 3 years after the date of approval.

### ERP Phase 1 Payments—Crop Insurance Policies and NAP

ERP Phase 1 covers certain losses for which a producer received a crop insurance indemnity or Noninsured Crop Disaster Assistance Program (NAP) payment. In some situations, a producer may have received both a NAP payment for a crop loss and an indemnity under a crop insurance policy that was included in ERP Phase 1 to address the same loss. Examples of these policies include Rainfall Index plans for Annual Forage; Pasture, Rangeland, and Forage; or Apiculture. In those situations, the producer's ERP Phase 1 payment will be calculated based only on the data associated with their indemnity under the crop insurance policy; for those producers no ERP Phase 1 payment will be calculated based on the data associated with their NAP payment. This policy is necessary to avoid compensating producers twice for the same loss under ERP Phase 1.

### ERP Phase 1 Payments—Nursery

The original NOFA for ERP Phase 1 excluded payments for nursery stock covered by a Federal Crop Insurance policy. After further consideration, FSA has determined that nursery stock covered by a Federal Crop Insurance policy suffered qualifying losses similar to other crops covered under ERP Phase 1 and to be consistent with prior disaster programs administered by FSA, we are revising the policy to include eligible nursery losses during the 2020, 2021, or 2022 crop years for which a producer had a Federal Crop Insurance policy that provided coverage for eligible losses related to the qualifying disaster events and received an indemnity for a crop and unit.

### Paperwork Reduction Act

In compliance with the Paperwork Reduction Act (44 U.S.C. 3501–3520), this NOFA does not change the approved information collection under

OMB control numbers 0560–0307 and 0560–0309, respectively.

**Federal Assistance Programs**

The titles and numbers of the Federal assistance programs, as found in the Assistance Listing,[1] to which this document applies are 10.148—Emergency Livestock Relief Program, and 10.964—Emergency Relief Program.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or (844) 433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov*.

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2022–17795 Filed 8–17–22; 8:45 am]

**BILLING CODE 3410–05–P**

---

**COMMISSION ON CIVIL RIGHTS**

**Notice of Public Meeting of the Pennsylvania Advisory Committee to the U.S. Commission on Civil Rights**

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Announcement of meeting.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act that the Pennsylvania Advisory Committee (Committee) to the U.S. Commission on Civil Rights will hold a business meeting on Tuesday September 13, 2022 at 2:00 p.m. Eastern time. The Committee will discuss testimony received regarding the study of civil rights and fair housing in the state.

**DATES:** The meeting will take place on Tuesday September 13, 2022 from 2:00 p.m.–3:00 p.m. Eastern time.

**ADDRESSES:**

*Join Online (Audio/Visual): https://www.zoomgov.com/j/1610157596?pwd=YlRaUUdDanMwZTI4TFRaRTZnazJrQT09.*

*Telephone (Audio Only):* Dial 1–669–254–5252 USA Toll Free; Access code: 161 015 7596.

**FOR FURTHER INFORMATION CONTACT:** Melissa Wojnaroski, DFO, at *mwojnaroski@usccr.gov* or 312–353–8311.

**SUPPLEMENTARY INFORMATION:** Members of the public may listen to this discussion. Committee meetings are available to the public through the above listed online registration link or call in number. Any interested member of the public may call this number and listen to the meeting. An open comment period will be provided to allow members of the public to make a statement as time allows. Callers can expect to incur regular charges for calls they initiate over wireless lines, according to their wireless plan. The Commission will not refund any incurred charges. Callers will incur no charge for calls they initiate over land-line connections to the toll-free telephone number. Individuals who are deaf, deafblind and hard of hearing may also follow the proceedings by first

calling the Federal Relay Service at 1–800–877–8339 and providing the Service with the conference call number and conference ID number.

Members of the public are also entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be emailed to Corrine Sanders at *csanders@usccr.gov*. Persons who desire additional information may contact the Regional Programs Unit at (312) 353–8311.

Records generated from this meeting may be inspected and reproduced, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Pennsylvania Advisory Committee link. Persons interested in the work of this Committee are directed to the Commission's website, *http://www.usccr.gov*, or may contact the Regional Programs Unit at the above email address.

**Agenda**

Welcome and Roll Call
Discussion: Civil Rights and Fair
  Housing in Pennsylvania
Future Plans and Actions
Public Comment
Adjournment

Dated: August 15, 2022.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2022–17782 Filed 8–17–22; 8:45 am]

**BILLING CODE P**

---

**COMMISSION ON CIVIL RIGHTS**

**Notice of Public Meetings of the Ohio Advisory Committee to the U.S. Commission on Civil Rights**

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Announcement of meeting.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act, that the Ohio Advisory Committee (Committee) will hold a web-based meeting on Wednesday August 24, 2022, at 12:00 p.m. Eastern Time. The purpose of the meeting is to discuss the concept stage in the planning process and explore various civil rights topics for the Committee's first project.

**DATES:** The meeting will be held on: Wednesday, August 24, 2022, at 12:00 p.m. Eastern Time.

---

[1] See *https://sam.gov/content/assistance-listings*.

Strickland AR 0816

expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Individuals who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**
*Administrator, Farm Service Agency.*
[FR Doc. 2023–21068 Filed 9–26–23; 8:45 am]
**BILLING CODE 3411–EB–P**

---

# DEPARTMENT OF AGRICULTURE

## Farm Service Agency

[Docket ID FSA–2023–00015]

## Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ELRP Phase 2. This document provides the eligibility requirements and payment calculation for the second phase of ELRP assistance. ELRP Phase 2 will provide assistance to eligible livestock producers for the loss of the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by a continued lack of precipitation. This document also makes a correction and amendment to ELRP Phase 1.

**DATES:** *Funding availability:* Implementation will begin September 27, 2023.

**FOR FURTHER INFORMATION CONTACT:** Kathy Sayers, telephone: (202) 720–7649; email: *Kathy.Sayers@usda.gov.* Individuals with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

## Background

The Extending Government Funding and Delivering Emergency Assistance Act, (Division B, Title I, Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021. From the $10 billion, the Secretary of Agriculture is to use $750 million to assist producers of livestock for losses incurred during calendar year 2021 due to qualifying droughts or wildfires. The livestock producers who suffered losses due to drought are eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity during the applicable year.

On April 4, 2022, FSA announced that assistance for livestock producers would be provided through ELRP (87 FR 19465–19470).[1] ELRP Phase 1 paid for a portion of eligible producers' increased supplemental feed costs in 2021 based on the number of animal units (AU), limited by available grazing acreage, in eligible drought counties. In order to deliver this assistance quickly, FSA used certain 2021 Livestock Forage Disaster Program (LFP) data and a percentage of the payment made through LFP applications as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP Phase 1.

To stay within the available funding, ELRP Phase 1 payments were calculated at 90 percent of the gross LFP calculated payment for underserved farmers and ranchers and 75 percent of the gross LFP calculated payment for all other producers.[2]

This document provides the eligibility requirements and payment calculation for ELRP Phase 2 assistance. It also corrects an error in the ELRP Phase 1 provisions related to payment eligibility and amends ELRP Phase 1 to be consistent with LFP and ELRP Phase 2.

## ELRP Phase 2

For each eligible livestock producer who previously received an ELRP Phase 1 payment, FSA will issue an ELRP Phase 2 payment to assist with losses in the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by the continued lack of precipitation, using the ELRP Phase 1 payment as a proxy to calculate those losses. ELRP Phase 2 assistance is subject to the same ELRP payment limitation provided in the previous notice of funds availability. Because FSA is using LFP and ELRP Phase 1 information to calculate a producer's ELRP Phase 2 payment and determine eligibility due to a qualifying drought or wildfire during the 2021 normal grazing period, no action is required for eligible

---

[1] In addition, a clarification to the notice of funds availability for ELRP Phase 1 was published on August 18, 2022 (87 FR 50828–50830).

[2] "Underserved farmer or rancher" means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher. FSA calculates payments based on a higher payment factor for underserved farmers and ranchers (or specific groups included in that term) in several programs, such as Emergency Conservation Program; Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program; and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, Emergency Relief Program, and Pandemic Assistance Revenue Program. In addition, the Noninsured Crop Disaster Assistance Program provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

Strickland AR 0817

producers to receive ELRP Phase 2 payments.

For eligible producers, ELRP Phase 2 will provide assistance for a portion of the loss in value of winter grazing in 2021 based on the Phase 1 payment which used the number of AU, limited by available grazing acreage, in eligible drought and wildfire counties. In order to deliver this assistance quickly, FSA is using the ELRP Phase 1 payment calculation data as a proxy to issue an additional payment equal to 20 percent of the ELRP Phase 1 payment to pay for a percentage (44 percent or 52 percent) of the estimated losses in the value of winter forage to eliminate the requirement for producers to resubmit information for ELRP Phase 2.

According to the US Drought Monitor, more than one-third of the country was categorically in a "D2 Severe" to "D4 Exceptional" drought throughout the entire calendar year 2021. Extreme drought predominately affected areas highly concentrated with rangeland needed for livestock production, therefore drought and wildfire caused economic hardship on producers that were reliant on rangeland, requiring them to purchase supplemental feed at elevated prices to sustain production throughout 2021 and not isolated to during the normal grazing periods.

For eligible producers, ELRP Phase 1 compensated 57 to 69 percent of the calculated increased supplemental feed costs. Due to the excessive and expansive drought and wildfires in 2021, these livestock participants suffered extreme grazing losses that were not concentrated only to the normal grazing periods which directly impacted winter grazing. According to

USDA's September 28, 2021, Weekly Weather and Crop Bulletin (see *https://www.fsa.usda.gov/programs-and-services/emergency-relief/index*), "on August 29, rangeland and pastures were rated more than one-half very poor to poor in every state along and northwest of a line from California to Minnesota," that is generally the same area that was determined eligible for 2021 LFP and ELRP Phase 1. According to the report, pasture and range conditions for the week ending September 25, 2021, for the states that triggered for LFP in 2021 and received ELRP Phase 1 assistance, rated 46 percent poor to very poor conditions going into the winter grazing months. The weekly weather data in the bulletin indicated the percentage of normal precipitation at that time in those areas was 79.4 percent, which results as a direct indicator of a 20.6 percent negative impact to winter forage availability beginning in October 2021. LFP calculated the monthly value of forage in 2021, which based on corn prices was $31.18 per AU per month. A 20.6 percent decrease to normal precipitation equates to a $6.42 impact ($31.18 x 20.6 percent) per AU per month.

An additional factor that contributed to the lack of winter grazing availability during the 2021 drought was the lack of optimal grazing use. Recommended grazing use rates or percentages commonly used by the Natural Resource Conservation services and university extension services provide that a grazing plan should allow for vigorous plant re-growth following a period of grazing and never have more than 50 percent use during the major growing season,

and not more than 65 percent use during the dormant season or slowed growth period to maintain or improve range ecological condition and rangeland health, reduce soil erosion, as well as improve livestock performance. The drought and wildfire impact to the losses to winter grazing were not considered when developing ELRP Phase 1 but have been determined to be significant and, after considering funding limitations, FSA will compensate for the estimated impact of winter forage availability on eligible livestock producers at 52 percent and 44 percent for underserved farmers and ranchers and for all other farmers and ranchers, respectively.

Therefore, for eligible producers, the ELRP Phase 2 payment will be equal to 20 percent of the 2021 gross ELRP Phase 1 payment to compensate for the loss of winter grazing directly affected by the drought and wildfire conditions during the normal grazing period that continued to be exacerbated by conditions in the final quarter of 2021, which was not compensated by LFP or ELRP Phase 1. The payment per AU per month is calculated as follows:

∀ 20 percent of $16.84 = $3.37 (equivalent to 52 percent of the calculated winter grazing loss per month per AU based on percentage of normal precipitation as of October 1, 2021) for underserved farmers and ranchers, and

∀ 20 percent of $14.03 = $2.81 (equivalent to 44 percent of the calculated winter grazing loss per month per AU based on percentage of normal precipitation as of October 1, 2021) for all other farmers and ranchers.

TABLE 1—REVIEW OF 2021 ELRP PHASE 1 CALCULATED ASSISTANCE

| ELRP Phase 1 assistance for increased supplement feed costs | | | |
|---|---|---|---|
| 2021 LFP monthly value of forage | 2021 LFP payment rate—60% per month (max 5 months)* | 2021 ELRP Phase 1 payment percentage | Gross 2021 ELRP Phase 1 calculated benefit per month per eligible AU |
| $31.18 .......................................................................... | $18.71 | 75 90 | $14.03 16.84 |

TABLE 2—2021 ELRP PHASE 2 CALCULATED ASSISTANCE

| ELRP Phase 2 assistance for winter grazing losses in relation to % of normal precipitation on October 1, 2021 | | | | |
|---|---|---|---|---|
| Gross 2021 ELRP Phase 2 calculated benefit (20% of Phase 1 payment) per month per eligible AU | Oct 1% of normal precipitation | Result of % impact to winter grazing beginning Oct 1 | $ Impact to winter grazing per month per AU on Oct 1 ($31.18 · 20.6%) | % 2021 ELRP Phase 2 assistance coverage of winter grazing loss per month per eligible AU |
| $2.81 .......................................................................... | 79.4 | 20.6 | $6.42 | 44 |

Strickland AR 0818

TABLE 2—2021 ELRP PHASE 2 CALCULATED ASSISTANCE—Continued

ELRP Phase 2 assistance for winter grazing losses in relation to % of normal precipitation on October 1, 2021

| Gross 2021 ELRP Phase 2 calculated benefit (20% of Phase 1 payment) per month per eligible AU | Oct 1% of normal precipitation | Result of % impact to winter grazing beginning Oct 1 | $ Impact to winter grazing per month per AU on Oct 1 ($31.18 · 20.6%) | % 2021 ELRP Phase 2 assistance coverage of winter grazing loss per month per eligible AU |
|---|---|---|---|---|
| 3.37 | | | | 52 |

\* The 2021 LFP payment rate may be adjusted according to LFP provisions in 7 CFR 1416.207 for mitigated livestock and restricted grazed AU due to a qualifying fire.

Because FSA is using ELRP Phase 1 payment information to generate a reasonable approximation for the loss covered by ELRP Phase 2, no action is required for eligible producers to receive these payments. If funding remains available after initial payments, an additional payment(s) may be issued, not to exceed 80 percent of the calculated winter grazing loss per AU per month based on the percentage of normal precipitation data as of October 1, 2021.[3]

**Definitions**

The definitions in 7 CFR parts 718, 1400, and § 1416.202 apply to ELRP Phase 2, except as otherwise provided in this document. The following definitions also apply.

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income derived from farming, ranching, and forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year.

(a) If the resulting average adjusted gross farm income derived from items 1 through 12 of the definition of income derived from farming, ranching and forestry operations is at least 66.66 percent of the average adjusted gross income of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(1) The sale of equipment to conduct farm, ranch, or forestry operations; and

(2) The provision of production inputs and services to farmers, ranchers, foresters, and farm operations.

(b) The relevant tax years for the 2021 program year are 2017, 2018, and 2019.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, forestry commodities including renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, and Interest Charge Domestic International Sales Corporation (IC–DISC) or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, or forestry activities as defined in this part; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator for Farm Programs (Deputy Administrator).

*LFP* means the Livestock Forage Disaster Program under section 1501 of the Agricultural Act of 2014 (7 U.S.C. 9081) and 7 CFR part 1416, subpart C.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales did not exceed $179,000 (the amount applicable to the 2021 program year) in each of the 2018 and 2019 calendar years; and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1) of this definition. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through National Resources and Conservation Service at *https://lrftool.sc.egov. usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ELRP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a

---

[3] FSA is using an 80 percent threshold similar to the Coronavirus Food Assistance Program 2 (also known as CFAP 2) which provided pandemic assistance payments to livestock contract growers to cover not more than 80 percent of revenue losses.

beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is considered to have a beneficial ownership interest in such legal entity.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10))[4] and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2))[5] during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*Wildfire* for ELRP Phase 2 means fire as used in 7 CFR part 1416, subpart C.

### Eligible Livestock Producers

Eligible livestock producers for ELRP Phase 2 are producers with an approved 2021 LFP application who received an ELRP Phase 1 payment. For ELRP Phase 2, the eligibility criteria applicable to LFP (7 CFR part 1416, subparts A and C) also applies, excluding the LFP average adjusted gross income (AGI) limitation. FSA will use livestock inventories, forage acreage, restricted

AU and grazing days due to fire, and drought intensity levels already reported to FSA for the 2021 Livestock Forage Disaster Program Application [6] (form number CCC–853), and the ELRP Phase 1 payment to determine eligibility and calculate a ELRP Phase 2 payment. Eligible livestock producers are not required to submit an application for ELRP Phase 2; however, if not already on file, they must have the following additional forms on file with FSA within 60-days of ELRP Phase 2 deadline announced by the Deputy Administrator to be eligible to receive a payment:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the ELRP Phase 2 producer and applicable affiliates.

For a producer to be eligible for a payment based on the higher payment rate for eligible underserved farmers or ranchers or increased payment limitation as described below, the following must be submitted within 60-days of the ELRP Phase 2 deadline announced by the Deputy Administrator:

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2021 program year; [7] or

∀ FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity.

### Payment Calculation

The ELRP Phase 2 payment will be equal to the eligible livestock producer's gross 2021 ELRP Phase 1 payment [8] multiplied by 20 percent. The same percentage will be applied to underserved farmers and ranchers and all other producers. If funding remains available after initial payments, an additional payment(s) may be issued, not to exceed 80 percent of the calculated winter grazing loss per AU per month based on the percentage of normal precipitation data as of October 1, 2021.

For example, a livestock producer's gross 2021 ELRP Phase 1 calculated payment of $10,000 is multiplied by 20 percent, resulting in an ELRP Phase 2 payment of $2,000. This ELRP Phase 2 payment is intended to represent a reasonable approximation of 44 to 52 percent of the calculated winter grazing loss per AU per month based on the percentage of normal precipitation data as of October 1, 2021.

FSA will issue ELRP Phase 2 payments as 2021 ELRP Phase 1 payments are processed and approved. If a producer files the CCC–860 Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification or FSA–510 form and the accompanying certification by the deadline announced by the Deputy Administrator but after their ELRP Phase 2 payment is issued, FSA will recalculate the ELRP Phase 1 and Phase 2 payment and issue the additional calculated amount as applicable until the ELRP deadline announced by the Deputy Administrator.

### Payment Limitation

The payment limitation for ELRP is determined by the person's or legal entity's average adjusted gross farm income (as defined above). Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments under ELRP if their average adjusted gross farm income is less than 75 percent of their average AGI for tax years 2017, 2018, and 2019. If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal

---

[4] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[5] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[6] As provided in 7 CFR 1416.206 and publicized by FSA, the LFP application deadline for the 2021 program year was January 31, 2022.

[7] A producer who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of their status for the 2021 program year because a producer's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what programs years the status would apply. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit CCC–860 for each applicable program year.

[8] The gross ELRP Phase 1 calculated payment is the amount calculated according to the ELRP Phase 1 NOFA, prior to any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and the applicant or member of an applicant that is an entity exceeding the average AGI limitation.

entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to $250,000 in ELRP payments.

To receive more than $125,000 in ELRP payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification. If a producer requesting the $250,000 payment limitation is a legal entity, all members of that entity must also complete FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the $250,000 payment limitation based on the legal entity's average adjusted gross farm income but a member of that legal entity either does not complete an FSA–510 and provide the required certification or is not eligible for the $250,000 payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ELRP payment attributed to that member.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ *First level of ownership:* Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

∀ *Second level of ownership:* Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ *Third and fourth levels of ownership:* Except as provided in the second-level of ownership bullet above and in the fourth-level of ownership bullet below, any payments made to a

legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ *Fourth level of ownership:* If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first-level or payment legal entity by the fourth-level legal entity.

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent, at the first through fourth levels of ownership in the business structure, is not provided to FSA. A legal entity is not eligible to receive ELRP payments when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or more, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

If an individual or legal entity is not eligible to receive ELRP payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity. Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**Provisions Requiring Refund to FSA**

If any ELRP payment resulted from erroneous information reported by the producer or if the producer's 2021 LFP payment is recalculated after the ELRP Phase 1 payment or ELRP Phase 2 payment is issued, the ELRP payment will be recalculated, and the producer must refund any excess payment to

FSA. This includes interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ELRP payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

**General Provisions**

General requirements that apply to other FSA-administered commodity programs also apply to ELRP, including compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation," and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ELRP. The determination of matters of general applicability that are not in response to, or result from, an individual set of facts are not matters that can be appealed. Such matters of general applicability include, but are not limited to, the ELRP eligibility criteria and payment calculation.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. Participants receiving ELRP payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

The Deputy Administrator has the discretion and authority to waive or modify filing deadlines and other requirements or program provisions not specified in law, in cases where the Deputy Administrator determines it is equitable to do so and where the Deputy Administrator finds that the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ELRP. Although producers have a right to a decision on whether they filed applications by the deadline or not, producers have no right to a decision in response to a request to waive or modify deadlines or program

provisions. The Deputy Administrator's refusal to exercise discretion to consider the request will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ELRP will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ELRP payments.

In either applying for or participating in ELRP, or both, the producer is subject to laws against perjury and any penalties and prosecution resulting therefrom, with such laws including but not limited to 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ELRP, or both, then the producer is guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ELRP but only as to beneficiaries who, as a condition of the waiver, agree to apply the ELRP payments to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ELRP, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

### ELRP Phase 1

FSA announced ELRP Phase 1 in a NOFA published on April 4, 2022 (87 FR 19465–19470). This document corrects an error in that NOFA and amends ELRP Phase 1 related to the requirement to provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in a legal entity. The ELRP Phase 1 NOFA provided that "the eligibility criteria applicable to LFP . . . also applies to ELRP Phase 1," which would include notification of interest provisions applicable to LFP.

LFP is subject to the payment eligibility provisions of 7 CFR part 1400, including the notification of interest requirements. When the ELRP Phase 1 NOFA was published, the provisions in § 1400.107 required a legal entity to provide the names, addresses, ownership share, and valid taxpayer

identification numbers of the members holding an ownership interest in order to receive any LFP payment. This is how FSA has been implementing ELRP Phase 1, consistent with LFP prior to January 2023, despite certain conflicting language in the ELRP Phase 1 NOFA that appears to permit partial ELRP payments to be issued after reduction in proportion to a member's share if the required information was not provided to FSA.

On January 11, 2023, FSA published a final rule (88 FR 1862–1892) that removed § 1400.107 and added a new § 1400.10, which specified that for certain FSA programs, including LFP, payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent, at or above the fourth level of ownership in the business structure, is not provided to USDA. The provisions in § 1400.10 also specify that a legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater at, or above the fourth level of ownership in the business structure, is not provided to USDA. This change was made retroactive to the 2020 program year for LFP.

This document amends ELRP Phase 1 to be consistent with these provisions of § 1400.10 that currently apply to LFP for the 2021 program year, and which also apply to ELRP Phase 2.

### Paperwork Reduction Act Requirements

In compliance with the Paperwork Reduction Act (44 U.S.C. chapter 35), the information collection request for ELRP Phase 2 has been approved by OMB under the control number 0503–0028. FSA will collect the information from the livestock producer to qualify for the payment to assist with the loss of winter grazing. This NOFA is the one-time announcement of the new ELRP Phase 2 federal financial assistance. For the ELRP Phase 1 correction, there is no new information collection required.

### Environmental Review

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500 through 1508), and the FSA regulation for compliance with NEPA (7 CFR part 799).

As previously stated, ELRP Phase 2 is providing payments to eligible livestock producers for loss of the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by a continued lack of precipitation. The limited discretionary aspects of ELRP do not have the potential to impact the human environment as they are administrative. Accordingly, these discretionary aspects are covered by the FSA categorical exclusions specified in § 799.31(b)(6)(iv) that applies to individual farm participation in FSA programs where no ground disturbance or change in land use occurs as a result of the proposed action or participation; and § 799.31(b)(6)(vi) that applies to safety net programs.

No Extraordinary Circumstances exist under § 799.33. As such, the implementation of ELRP and the participation in ELRP do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or environmental impact statement for this action and this document serves as documentation of the programmatic environmental compliance decision for this federal action.

### Federal Assistance Programs

The title and number of the Federal assistance program, as found in the Assistance Listing [9] (formerly referred to as the Catalog of Federal Domestic Assistance), to which this document applies is 10.148—Emergency Livestock Relief Program.

### USDA Non-Discrimination Policy

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

---

[9] See https://sam.gov/content/assistance-listings.

Individuals who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or the USDA TARGET Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by: (1) mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410; (2) fax: (202) 690–7442; or (3) email: *program.intake@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2023–21088 Filed 9–26–23; 8:45 am]

**BILLING CODE 3410–05–P**

---

## DEPARTMENT OF AGRICULTURE

### Food Safety and Inspection Service

**[Docket No. FSIS–2023–0021]**

### Notice of Request to Renew an Approved Information Collection: Egg Products Hazard Analysis and Critical Control Point and Sanitation Standard Operating Procedures

**AGENCY:** Food Safety and Inspection Service (FSIS), U.S. Department of Agriculture (USDA).

**ACTION:** Notice and request for comments.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 and the Office of Management and Budget (OMB) regulations, FSIS is announcing its intention to request renewal of the approved information collection regarding egg products Hazard Analysis and Critical Control Point (HACCP) and Sanitation Standard Operating Procedures (Sanitation SOPs). There are no changes to the information

collection. The approval for this information collection will expire on January 31, 2024.

**DATES:** Submit comments on or before November 27, 2023.

**ADDRESSES:** FSIS invites interested persons to submit comments on this **Federal Register** notice. Comments may be submitted by one of the following methods:

∀ *Federal eRulemaking Portal:* This website provides commenters the ability to type short comments directly into the comment field on the web page or to attach a file for lengthier comments. Go to *https://www.regulations.gov.* Follow the on-line instructions at that site for submitting comments.

∀ Mail: Send to Docket Clerk, U.S. Department of Agriculture, Food Safety and Inspection Service, 1400 Independence Avenue SW, Mailstop 3758, Washington, DC 20250–3700.

∀ Hand- or courier-delivered submittals: Deliver to 1400 Independence Avenue SW, Jamie L. Whitten Building, Room 350–E, Washington, DC 20250–3700.

*Instructions:* All items submitted by mail or electronic mail must include the Agency name and docket number FSIS–2023–0021. Comments received in response to this docket will be made available for public inspection and posted without change, including any personal information, to *https://www.regulations.gov.*

*Docket:* For access to background documents or comments received, call (202) 937–4272 to schedule a time to visit the FSIS Docket Room at 1400 Independence Avenue SW, Washington, DC 20250–3700.

**FOR FURTHER INFORMATION CONTACT:** Gina Kouba, Office of Policy and Program Development, Food Safety and Inspection Service, USDA, 1400 Independence Avenue SW, Mailstop 3758, South Building, Washington, DC 20250–3700; (202) 937–4272.

**SUPPLEMENTARY INFORMATION:** *Title:* Egg Products Hazard Analysis and Critical Control Point and Sanitation Standard Operating Procedures

*OMB Number:* 0583–0172.

*Expiration Date of Approval:* January 31, 2024.

*Type of Request:* Renewal of an approved information collection.

*Abstract:* FSIS has been delegated the authority to exercise the functions of the Secretary (7 CFR 2.18, 2.53), as specified in the Egg Products Inspection Act (EPIA) (21 U.S.C. 1031, *et seq.*). This statute mandates that FSIS protect the public by verifying that egg products are safe, wholesome, and properly labeled and packaged.

FSIS is requesting renewal of the approved information collection regarding egg products HACCP and Sanitation SOPs. There are no changes to the information collection. The approval for this information collection will expire on January 31, 2024.

FSIS requires official plants to develop and maintain HACCP plans and Sanitation SOPs, as well as various transaction records. The plant maintains on file the name and a brief resume of the HACCP trained individuals who participate in the hazard analysis and subsequent development of the HACCP plans. Plants develop written HACCP plans that include: identification of hazards reasonably likely to occur in the production process; identification and description of the critical control point (CCP) for each identified hazard; specification of the critical limit which may not be exceeded at the CCP, and, if appropriate, a target limit; description of the monitoring procedure or device to be used; description of the corrective action to be taken if the limit is exceeded; description of the records which would be generated and maintained regarding this CCP; and description of the facility verification activities and the frequency at which they are to be conducted. The adequacy of a plant's HACCP plan must be reassessed at least annually and whenever changes occur that could affect the hazard analysis or alter the HACCP plan.

Each processor is also required to develop and maintain a Sanitation SOP. The Sanitation SOP specifies the cleaning and sanitizing procedures for all equipment and facilities involved in the production of every product. As part of the Sanitation SOP, a plant employee records results of daily sanitation checks at the frequencies stated in the Sanitation SOP. The burden of documenting the adherence to the Sanitation SOP is based on three factors: Recording, reviewing, and storage. Recording encompasses conducting and inscribing the finding from an observation and filing of the document produced.

FSIS has made the following estimates based upon an information collection assessment:

*Respondents:* Official egg products plants.

*Estimated No. of Respondents:* 132.

*Estimated No. of Responses:* 138,596.

*Estimated Total Annual Burden on Respondents:* 76,280 hours.

All responses to this notice will be summarized and included in the request for OMB approval. All comments will also become a matter of public record. Copies of this information collection

Strickland AR 0823

# Notices

Federal Register

Vol. 88, No. 186

Wednesday, September 27, 2023

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

[Docket ID FSA–2023–0011]

### Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ELRP 2022. This document provides the eligibility requirements and payment calculation for ELRP 2022 assistance. ELRP 2022 will provide payments to producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2022, using data already submitted to FSA through the Livestock Forage Disaster Program (LFP).

**DATES:** *Funding availability:* Implementation will begin September 27, 2023.

**FOR FURTHER INFORMATION CONTACT:** Kathy Sayers; telephone: (202) 720–6870; email: *Kathy.Sayers@usda.gov.* Individuals who require alternative means of communication for program information should contact the USDA Target Center at (202) 720–2600 (voice) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone).

**SUPPLEMENTARY INFORMATION:**

## Background

Title I of the Disaster Relief Supplemental Appropriations Act, 2023 (Division N of the Consolidated Appropriations Act, 2023; Public Law 117–328) provides $3,741,715,000 for necessary expenses related to losses of revenue, quality, or production losses of crops (including milk, on-farm stored

commodities, crops prevented from planting in 2022, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze, including a polar vortex, smoke exposure, and excessive moisture occurring in calendar years 2022. From that amount, the Secretary of Agriculture is to use up to $494.5 million to provide assistance to livestock producers for losses incurred during calendar year 2022 due to qualifying droughts or wildfires. The livestock producers who suffered losses due to drought are eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity during the applicable year.

FSA will assist livestock producers through ELRP 2022. This document provides the eligibility requirements and payment calculation for ELRP 2022, which will assist eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2022. For eligible producers, ELRP 2022 will pay for a portion of the increased feed costs in 2022 based on the number of animal units (AU), limited by available grazing acreage, in eligible drought counties. Although LFP payments do not have a direct correlation to the increased feed costs incurred, in order to deliver this assistance quickly, FSA is using certain LFP data and a percentage of the payment made through LFP applications will be used as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP 2022. The ELRP 2022 payment percentage will be 90 percent for historically underserved farmers and ranchers, and 75 percent for all other producers.

According to the US Drought Monitor, more than one-third of the country was categorically in a ''D2 Severe'' to ''D4 Exceptional'' drought throughout the entire calendar year 2022. Extreme drought predominately affected areas highly concentrated with rangeland needed for livestock production. Therefore, drought and wildfire caused

economic hardship on producers that were reliant on rangeland, requiring them to purchase supplemental feed at elevated prices to sustain production throughout 2022 and not just during the normal grazing periods. Due to the excessive and expansive drought and wildfires in 2022, livestock participants experienced the following, they:

∀ Suffered extreme grazing losses;

∀ Incurred related costs to purchase feed in the grazing period;

∀ Purchased feed, beyond normal for a drought year, to supplement grazing and to support livestock outside of the grazing period because forage was not available for harvest and storage; and

∀ Were faced with higher feed costs during 2022 due to less availability of feed resulting from drought severity and feed cost inflation.

LFP provided payments to livestock owners and contract growers of covered livestock who suffered livestock grazing losses due to qualifying drought or fire [1] not to exceed 5 months during the grazing period based on the documented livestock inventory eligible for LFP. The gross LFP calculated payment represented a 60 percent reimbursement of monthly feed costs for a maximum of 5 months, based on a feed grain equivalent that is calculated according to 7 CFR 1416.207 as specified in 7 U.S.C. 9081(c), which uses the higher of the national average corn price per bushel for the 12- or 24-month period immediately preceding March 1 of the calendar year. Because LFP requires the use of this period, it does not take into account any increases in price paid for supplemental feed during 2022. For LFP, the 2022 monthly value of forage, resulted in an LFP payment rate of $28.37 per month per eligible animal unit for drought. The rate for fire is

---

[1] A grazing loss due to drought qualifies for LFP only if the grazing loss occurs on land that is native or improved pastureland with permanent vegetative cover or is planted to a crop planted specifically for the purpose of providing grazing for covered livestock, and the land is physically located in a county rated by the U.S. Drought Monitor as having a D2 intensity for at least 8 consecutive weeks or D3 or D4 intensity at any time during the normal grazing period for the specific type of grazing land or pastureland.

A grazing loss due to fire qualifies for LFP only if the grazing loss occurs on rangeland that is managed by a Federal agency and the eligible livestock producer is prohibited by the Federal agency from grazing the normal permitted livestock on the managed rangeland due to a fire.

See 7 CFR 1416.205 for further information on eligible grazing losses under LFP.

Strickland AR 0824

based on the number of fire-restricted days and was not a single rate.

LFP does not compensate for the increased costs of supplemental feed, including during 2022 due to drought and wildfires in 2022.

The actual cost of supplemental feed prices, based on corn, alfalfa, and soybean meal, increased substantially in 2022, compared to previous years. Using the Dairy Margin Coverage (DMC) [2] program model for an adequate supplemental feed ratio, the 5-year average cost to maintain 1 AU for one month was $66.79, compared to the actual average cost from January through December, 2022 of $107.51 per month, an increase of 61 percent.

The cost of feeding one AU per month increased in 2022 compared to the 5-year average by $40.72 ($107.51 ¥ $66.79) for livestock producers affected by drought and wildfires, which was not covered by LFP. See Table 1.

TABLE 1—2022 CALCULATED COSTS (DMC MODEL) TO MAINTAIN 1 AU/MONTH

| 5 Year avg. cost (corn, alfalfa, soybean meal) | 2022 Cost (corn, alfalfa, soybean meal) | 2022 Increase in cost | 2022 LFP payment rate * | ELRP 2022 payment percentage | Gross ELRP 2022 calculated benefit/ month/eligible AU prior to factor | Percentage of increased supplemental feed costs in 2022 compensated by ELRP 2022 prior to factor |
|---|---|---|---|---|---|---|
| $66.79 ..................................... | $107.51 | $40.72 | $28.37 | 75 | $21.28 | 52.2 |
|  |  |  |  | 90 | 25.53 | 62.7 |

*The 2022 LFP payment rate may be adjusted according to LFP provisions in 7 CFR 1416.207 for mitigated livestock and restricted grazed animal units due to a qualifying fire.

The ELRP 2022 calculated benefit is based on using the LFP payment rate of $28.37 per animal unit per month, calculated as follows:

75 percent · $28.37 = $21.28 (equivalent to 52.2 percent of increased supplemental feed costs in 2022) and

90 percent · $28.37 = $25.53 (equivalent to 62.7 percent of increased supplemental feed costs in 2022).

To stay within the available funding, ELRP 2022 payments for increased supplemental feed costs in 2022 will be factored initially by 25 percent. If funds remain available after initial payments, a second payment of up to 75 percent may be issued.

Because FSA is using LFP information to generate a reasonable approximation for the costs covered by ELRP 2022, no action is required for eligible producers to receive ELRP 2022 payments.

**Definitions**

The definitions in 7 CFR parts 718, 1400, and 1416 apply to ELRP 2022, except as otherwise provided in this document. The following definitions also apply.

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income derived from farming, ranching, and forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year.

(a) If the resulting average adjusted gross farm income derived from items 1 through 12 of the definition below for "income derived from farming, ranching and forestry operations" is at least 66.66 percent of the average adjusted gross income of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(1) The sale of equipment to conduct farm, ranch, or forestry operations; and

(2) The provision of production inputs and services to farmers, ranchers, foresters, and farm operations.

(b) The relevant tax years for ELRP 2022 are 2018, 2019, and 2020.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, or forestry commodities including for renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, and IC–DISC (Interest Charge Domestic International Sales Corporation) or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, and forestry activities as defined in this part; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator for Farm Programs (Deputy Administrator).

[2] ELRP 2022 uses the DMC model to calculate actual feed costs producers experienced in 2022. The DMC formula aims to calculate feed costs to maintain a dairy cow to produce one hundredweight of milk, however FSA is using this model, and converting to maintain 1 animal unit.

DMC, as outlined in 7 CFR part 1430, calculates a national average feed cost using the following three items and are added together:

(1) The product determined by multiplying 1.0728 by the price of corn per bushel;

(2) The product determined by multiplying 0.00735 by the price of soybean meal per ton; and

(3) The product determined by multiplying 0.0137 by the price of alfalfa hay per ton.

*LFP* means the Livestock Forage Disaster Program under section 1501 of the Agricultural Act of 2014 (7 U.S.C. 9081) and 7 CFR part 1416, subpart C.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales did not exceed $179,400 (the amount applicable to the 2022 program year) in each of the 2019 and 2020 calendar years; and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the same 2 previous years referenced in paragraph (1) of this definition. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through National Resources and Conservation Service at *https://lrftool.sc.egov. usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ELRP 2022, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is considered to have a beneficial ownership interest in such legal entity.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*U.S. Drought Monitor* is a system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http:// droughtmonitor.unl.edu.*

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[3]) and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[4]) during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*Wildfire* for ELRP 2022 means fire as used in 7 CFR part 1416, subpart C.

**Eligible Livestock Producers**

Eligible livestock producers for ELRP 2022 are producers with an approved 2022 LFP application. For ELRP 2022, the eligibility criteria applicable to LFP (7 CFR part 1416, subparts A and C) also applies to ELRP 2022, excluding the LFP average adjusted gross income (AGI) limitation. FSA will use livestock inventories, forage acreage, restricted animal units, and grazing days due to fire, and drought intensity levels already reported to FSA for the 2022 Livestock Forage Disaster Program Application [5] (on form number CCC–853), to determine eligibility and calculate an ELRP 2022 payment, if applicable. Eligible livestock producers are not required to submit an application for ELRP 2022; however, they must have the following additional forms on file

with FSA within 60-days of ELRP 2022 deadline announced by the Deputy Administrator to be eligible to receive a payment:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the ELRP 2022 producer and applicable affiliates.

For a producer to be eligible for a payment based on the higher payment rate for eligible underserved farmers or ranchers or increased payment limitation as described below, the following must be submitted within 60-days of the ELRP 2022 deadline announced by the Deputy Administrator:

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2022 program year [6]; or

∀ FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity.

**Payment Calculation**

The initial ELRP 2022 payment will be equal to the eligible livestock producer's gross 2022 LFP calculated payment [7] multiplied by the applicable

[3] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[4] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[5] As provided in 7 CFR 1416.206 and publicized by FSA, the LFP application deadline for the 2022 program year was January 30, 2023.

[6] An individual who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of their status for the 2022 program year because an individual's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what programs years the status would apply. An entity that has filed CCC–860 certifying its status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of its status for a later program year unless the entity's status has changed due to changes in membership. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit CCC–860 for each applicable program year.

[7] The gross LFP calculated payment is the amount calculated according to 7 CFR 1416.207, prior to
Continued

ELRP 2022 payment percentage of 90 percent for underserved farmers and ranchers and 75 percent for all other producers multiplied by a 25 percent factor to stay within available funding. [8] If funds remain available after initial payments, a second payment of up to 75 percent may be issued. For example, an underserved eligible livestock producer's gross 2022 LFP calculation payment is $10,000 multiplied by the 90 percent ELRP 2022 payment percentage multiplied by the 25 percent factor results in an initial ELRP 2022 payment of $2,250. The ELRP 2022 payment is intended to represent a reasonable approximation of 63 percent, factored by 25 percent, of the increased supplemental feed costs for that producer in 2022.

Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, must be on file with FSA with a certification applicable for the 2022 program year to receive the higher ELRP 2022 payment rate of 90 percent.

FSA will issue ELRP 2022 payments as 2022 LFP applications are processed and approved. If a producer files the CCC–860 or FSA–510 form and the accompanying certification by the deadline announced by the Deputy Administrator but after their ELRP 2022 payment is issued, FSA will recalculate the ELRP 2022 payment and issue the additional calculated amount as applicable.

**Payment Limitation**

The payment limitation for ELRP 2022 is determined by the person's or legal entity's average adjusted gross farm income (as defined above). Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or

any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and the applicant or member of an applicant that is an entity exceeding the average AGI limitation.

[8] FSA calculates payments based on a higher payment factor for underserved farmers and ranchers (or specific groups included in that term) in several programs, such as Emergency Conservation Program, Emergency Assistance for Livestock, Honeybees, and Farm-raised Fish Program (also known as ELAP), and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, previous ELRP Phase 1, and ERP. In addition, NAP provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

indirectly, more than $125,000 in payments under ELRP 2022 if their average adjusted gross farm income is less than 75 percent of their average AGI for tax years 2018, 2019, and 2020. If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, and forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to $250,000 in ELRP 2022 payments. To receive more than $125,000 in ELRP 2022 payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification. If a producer requesting the $250,000 payment limitation is a legal entity, all members of that entity must also complete FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the $250,000 payment limitation based on the legal entity's average adjusted gross farm income but a member of that legal entity either does not complete an FSA–510 and provide the required certification or is not eligible for the $250,000 payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ELRP 2022 payment attributed to that member.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ First level of ownership: Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

∀ Second level of ownership: Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part

by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ Third and fourth levels of ownership: Except as provided in the second-level of ownership bullet above and in the fourth-level of ownership bullet below, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ Fourth level of ownership: If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first-level or payment legal entity by the fourth-level legal entity.

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent, at the first through fourth levels of ownership in the business structure, is not provided to FSA. A legal entity is not eligible to receive ELRP 2022 payments when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or more, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

If an individual or legal entity is not eligible to receive ELRP 2022 payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity. Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education

Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**Provisions Requiring Refund to FSA**

In the event that any ELRP 2022 payment resulted from erroneous information reported by the producer or if the producer's 2022 LFP payment is recalculated after the ELRP 2022 payment is issued, the ELRP 2022 payment will be recalculated, and the producer must refund any excess payment to FSA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ELRP 2022 payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

**General Provisions**

General requirements that apply to other FSA-administered commodity programs also apply to ELRP 2022, including compliance with the provisions of 7 CFR part 12, ''Highly Erodible Land and Wetland Conservation,'' and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ELRP 2022. The determination of matters of general applicability that are not in response to, or result from, an individual set of facts are not matters that can be appealed. Such matters of general applicability include, but are not limited to, the ELRP 2022 eligibility criteria and payment calculation.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. Participants receiving ELRP 2022 payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

The Deputy Administrator has the discretion and authority to waive or modify filing deadlines and other requirements or program provisions not specified in law, in cases where the Deputy Administrator determines it is equitable to do so and where the Deputy Administrator finds that the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ELRP 2022. Although producers have a right to a decision on whether they filed applications by the deadline or not, producers have no right to a decision in response to a request to waive or modify deadlines or program provisions. The Deputy Administrator's refusal to exercise discretion to consider the request will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ELRP 2022 will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ELRP 2022 payments.

In either applying for or participating in ELRP 2022, or both, the producer is subject to laws against perjury and any penalties and prosecution resulting therefrom, with such laws including but not limited to 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ELRP 2022, or both, then the producer is guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(Ö), USDA waives the restriction on receipt of funds under ELRP 2022 but only as to beneficiaries who, as a condition of the waiver, agree to apply the ELRP 2022 payments to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ELRP 2022, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

**Paperwork Reduction Act Requirements**

In compliance with the provisions of the Paperwork Reduction Act (44 U.S.C. chapter 35), the information collection request has been approved by OMB under the control number of 0503–0028. FSA will collect the information from the livestock producers to qualify for the payment to assist with increased supplemental feed costs. This NOFA is the one-time announcement of the new ELRP 2022 federal financial assistance funding.

**Environmental Review**

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799).

As previously stated, ELRP 2022 is providing payments to eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2022. The limited discretionary aspects of ELRP 2022 do not have the potential to impact the human environment as they are administrative. Accordingly, these discretionary aspects are covered by the FSA Categorical Exclusions specified in §799.31(b)(6)(iv) that applies to individual farm participation in FSA programs where no ground disturbance or change in land use occurs as a result of the proposed action or participation; and §799.31(b)(6)(vi) that applies to safety net programs.

No Extraordinary Circumstances (§799.33) exist. As such, the implementation of ELRP 2022 and the participation in ELRP 2022 do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or environmental impact statement for this action and this document serves as documentation of the programmatic environmental compliance decision for this federal action.

**Federal Assistance Programs**

The title and number of the Federal assistance programs, as found in the Assistance Listing, [9] to which this document applies is 10.980—Emergency Livestock Relief Program 2022.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender

---

[9] See https://sam.gov/content/assistance-listings.

expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Individuals who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https:// www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@ usda.gov*.

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2023–21068 Filed 9–26–23; 8:45 am]

**BILLING CODE 3411–EB–P**

---

# DEPARTMENT OF AGRICULTURE

## Farm Service Agency

**[Docket ID FSA–2023–00015]**

## Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ELRP Phase 2. This document provides the eligibility requirements and payment calculation for the second

phase of ELRP assistance. ELRP Phase 2 will provide assistance to eligible livestock producers for the loss of the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by a continued lack of precipitation. This document also makes a correction and amendment to ELRP Phase 1.

**DATES:** *Funding availability:* Implementation will begin September 27, 2023.

**FOR FURTHER INFORMATION CONTACT:** Kathy Sayers, telephone: (202) 720–7649; email: *Kathy.Sayers@usda.gov.* Individuals with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

## Background

The Extending Government Funding and Delivering Emergency Assistance Act, (Division B, Title I, Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021. From the $10 billion, the Secretary of Agriculture is to use $750 million to assist producers of livestock for losses incurred during calendar year 2021 due to qualifying droughts or wildfires. The livestock producers who suffered losses due to drought are eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity during the applicable year.

On April 4, 2022, FSA announced that assistance for livestock producers would be provided through ELRP (87 FR 19465–19470).[1] ELRP Phase 1 paid for a portion of eligible producers' increased supplemental feed costs in 2021 based on the number of animal units (AU), limited by available grazing

acreage, in eligible drought counties. In order to deliver this assistance quickly, FSA used certain 2021 Livestock Forage Disaster Program (LFP) data and a percentage of the payment made through LFP applications as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP Phase 1.

To stay within the available funding, ELRP Phase 1 payments were calculated at 90 percent of the gross LFP calculated payment for underserved farmers and ranchers and 75 percent of the gross LFP calculated payment for all other producers.[2]

This document provides the eligibility requirements and payment calculation for ELRP Phase 2 assistance. It also corrects an error in the ELRP Phase 1 provisions related to payment eligibility and amends ELRP Phase 1 to be consistent with LFP and ELRP Phase 2.

## ELRP Phase 2

For each eligible livestock producer who previously received an ELRP Phase 1 payment, FSA will issue an ELRP Phase 2 payment to assist with losses in the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by the continued lack of precipitation, using the ELRP Phase 1 payment as a proxy to calculate those losses. ELRP Phase 2 assistance is subject to the same ELRP payment limitation provided in the previous notice of funds availability. Because FSA is using LFP and ELRP Phase 1 information to calculate a producer's ELRP Phase 2 payment and determine eligibility due to a qualifying drought or wildfire during the 2021 normal grazing period, no action is required for eligible

---

[1] In addition, a clarification to the notice of funds availability for ELRP Phase 1 was published on August 18, 2022 (87 FR 50828–50830).

[2] "Underserved farmer or rancher" means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher. FSA calculates payments based on a higher payment factor for underserved farmers and ranchers (or specific groups included in that term) in several programs, such as Emergency Conservation Program; Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program; and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, Emergency Relief Program, and Pandemic Assistance Revenue Program. In addition, the Noninsured Crop Disaster Assistance Program provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

Strickland AR 0829



**USDA** Economic Research Service
**U.S. DEPARTMENT OF AGRICULTURE**

Economic
Research
Service

Economic
Information
Bulletin
Number 231

December 2021

# America's Diverse Family Farms

*2021 Edition*

Christine Whitt, Jessica E. Todd, and Andrew Keller



Strickland AR 0830

For further information, contact

Christine E. Whitt        (202) 694-5288        christine.whitt1@usda.gov
Jessica E. Todd          (202) 694-5363        jessica.todd@usda.gov
Andrew Keller            (202) 694-5610        andrew.keller@usda.gov

**Errata**
On January 10, 2022, the Federal crop insurance figure on page 27 was revised to correct "All family farms" to "Nonfamily farms." No other figures were impacted.

Images used in this publication are a derivative of images from Getty Images.

Use of commercial and trade names does not imply approval or constitute endorsement by USDA.

To ensure the quality of its research reports and satisfy governmentwide standards, ERS requires that all research reports with substantively new material be reviewed by qualified technical research peers. This technical peer review process, coordinated by ERS' Peer Review Coordinating Council, allows experts who possess the technical background, perspective, and expertise to provide an objective and meaningful assessment of the output's substantive content and clarity of communication during the publication's review.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

Strickland AR 0831

Broad descriptions of farms based on U.S. averages can mask variation among the many sizes and types of farms. For example, in 2020, the average value of production on the 2 million U.S. farms amounted to $183,467. Few farms, however, are near the average; half of the farms had production valued at $7,000 or less, whereas 66 percent of all production occurred on farms with at least $1 million of agricultural output.

This report uses a farm classification, or typology, developed by the U.S. Department of Agriculture's (USDA) Economic Research Service (ERS) to categorize farms into more homogeneous groupings to better understand conditions across the Nation's diverse farm sector. The classification is based largely on the farm's annual revenue, the main occupation of the farm's principal operator, and family versus nonfamily farm ownership. This report includes many sections that appear in each annual edition; generally, data and statistics for these sections have varied little across the years as changes in the agricultural sector's structure are usually gradual. Some sections in this edition include a comparison with 2011, the first year the current farm typology was in place. These 10-year reflections are not comprehensive over the entire decade, but they do give a sense of how little has changed in farm structure, value of production, and financial risk by farm type.

This edition also reports on some areas in which the coronavirus (COVID-19) pandemic may have affected farms and farm households; exploring changes in direct sales and off-farm employment in farm households; and examines the distribution of farm and non-farm pandemic assistance farms received in 2020. The pandemic and its impacts were not limited to 2020, and the Government response continues into 2021.

Strickland AR 0832

# Farm Typology

The farm typology, developed by USDA, ERS, focuses primarily on the "family farm," or any farm where the majority of the business is owned by the principal operator—the person who is most responsible for making day-to-day decisions for the farm—and by individuals who are related to the principal operator. USDA defines a farm as any place that, during a given year, produced, and sold—or normally would have produced and sold—at least $1,000 of agricultural products. USDA uses acres of crops and head of livestock to determine whether a place with sales of less than $1,000 could normally produce and sell the minimum amount required to be categorized as a farm. Farm size is measured by gross cash farm income (GCFI), a measure of the farm's revenue including sales of crops and livestock, Government payments, and other farm-related income, including fees received by operators from production contracts.

*This report used data from the Agricultural Resource Management Survey (ARMS), an annual survey conducted by USDA, National Agricultural Statistics Service (NASS) and USDA, ERS. Most of the analysis in this report is based on a sample of approximately 11,841 farms from the 2020 ARMS. Some analyses also use earlier years of the survey and the sample size in each year of data varies.*



Strickland AR 0833



**Small family farms (GCFI less than $350,000)**

- **Retirement farms:** Small farms whose principal operators report having retired from farming, though continuing to farm on a small scale (219,288 farms; 10.9 percent of U.S. farms in 2020).

- **Off-farm-occupation farms:** Small farms whose principal operators report a primary occupation other than farming (779,767 farms; 38.8 percent of U.S. farms).

- **Farming-occupation farms:** Small farms whose principal operators report farming as their primary occupation. Farming occupation farms are further sorted into two classes:

    — **Low-sales:** Farms with GCFI less than $150,000 (683,514 farms; 34.0 percent of U.S. farms).

    — **Moderate-sales:** Farms with GCFI between $150,000 and $349,999 (110,865 farms; 5.5 percent of U.S. farms).

**Midsize family farms (GCFI between $350,000 and $999,999)**

- Farms with GCFI between $350,000 and $999,999 (112,122 farms; 5.6 percent of U.S. farms).

**Large-scale family farms (GCFI of $1,000,000 or more)**

- **Large farms:** Farms with GCFI between $1,000,000 and $4,999,999 (51,708 farms; 2.6 percent of U.S. farms).

- **Very large farms:** Farms with GCFI of $5,000,000 or more (6,124 farms; 0.3 percent of U.S. farms).

**Nonfamily farms**

- Any farm where the principal operator and people related to the principal operator do not own a majority of the business (47,275 farms; 2.4 percent of U.S. farms).

# Farms, Production, and Farmland

**Most U.S. farms are small family farms; these farms operate almost half of U.S. farmland and account for 20 percent of production.**

- In 2020, approximately 89 percent of all farms were small family farms. Compared with 2011—the earliest year using the current farm typology—the share of land operated by small family farms fell from 52 to 48 percent, and the share of the value of production on small family farms declined from 26 to 20 percent.

- Large-scale family farms accounted for 46 percent of the total value of production in 2020, an increase from 35 percent in 2011. These farms also accounted for an increased share of total land operated, up from 16 percent in 2011 to 24 percent in 2020.

- In total, family farms accounted for about 98 percent of total farms and 87 percent of total production in 2020.

- Nonfamily farms accounted for the remaining 2 percent of farms and 13 percent of production. Among nonfamily farms, 18 percent had a GCFI of $1 million or more. Such farms accounted for 90 percent of nonfamily farms' production. Examples of nonfamily farms include partnerships of unrelated partners, closely held nonfamily corporations, farms with a hired operator unrelated to the owners, and publicly held corporations.



Strickland AR 0835

*4*  **America's Diverse Family Farms:** 2021 Edition

**Distribution of farms, land operated, and value of production by farm type, 2011 and 2020**



Note: Due to rounding, numbers may not add to 100.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2011 and 2020 Agricultural Resource Management Survey.



**America's Diverse Family Farms:** 2021 Edition    *5*

Strickland AR 0836

**Large-scale family farms produce the majority of some—but not all—commodities.**

- The majority of the values of cotton (62 percent), dairy (73 percent), and high-value crops (57 percent) was produced on large-scale family farms in 2020. Small family farms produced the majority of hay (59 percent).

- Most poultry production is done under production contracts with a contractor paying a fee to a farmer who raises poultry to maturity. Small family farms produced 49 percent of U.S. poultry and egg output in 2020.

- Over one-quarter of beef production occurred on small family farms in 2020, whereas another 57 percent occurred on midsized and large-scale family farms. Small family farms generally have cow/calf operations, while large-scale family farms are more likely to operate feedlots.

- Nonfamily farms produced 27 percent of all high-value crops; 57 percent was produced on large-scale family farms in 2020.

**Value of production of selected commodities by farm type, 2020**



Notes: Specialty crops include fruits, nuts, vegetables, and nursery/greenhouse crops. Due to rounding, numbers may not add to 100.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.



Strickland AR 0837

# Farm Financial Performance

**The Operating Profit Margin (OPM)—the share of gross income that is profit—is one way to gauge a farm's financial performance. Most small family farms have an OPM of less than 10 percent—indicating a higher risk of financial problems—whereas most midsize, large, and very large family farms report higher OPMs.**

- In 2020, between 57 and 83 percent of small family farms—depending on the farm type—had an OPM in the high-risk (red) zone (less than 10 percent OPM). Income from off-farm sources is not reflected in the OPM. Many retirement, off-farm occupation, and low-sales farm households earn little from farming with the majority of their income coming from off-farm sources.

- Large-scale family farms were most likely to have OPMs in the low-risk (green) zone (OPM>25 percent)—between 43 and 45 percent—and least likely to be in the red zone in 2020—between 26 and 30 percent. These farms are more likely to have positive on-farm income.

**Farms by operating profit margin and type, 2020**



Notes: Due to rounding, sums may not add to 100 percent. Operating profit margin (OPM)=100 times (net farm income plus interest paid minus charges for unpaid labor and management)/gross farm income. OPM ratios are not calculated for operations with zero or negative gross farm income.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0839

**During the past 10 years, small farms were least likely to operate in the low-risk zone and most likely to operate in the high-risk zone.**

- The share of small family farms with an OPM greater than 25 percent declined from 18 percent in 2011 to just over 10 percent in 2020, while the share operating in the red zone—OPM of less than 10 percent—rose from 71 percent to 77 percent.

- Large-scale family farms were the most likely to operate in the low-risk zone and least likely to operate in the high-risk zone. The share of large-scale family farms with low-risk OPMs declined from 48 percent in 2011 to 43 percent in 2020. The share of large-scale family farms operating in the high-risk zone ranged between 27 and 37 percent during the same period.

- Nonfamily farms experienced an increase in the share of farms operating at low risk, and a decrease in the share operating at low risk in 2020 relative to 2019, as did midsize and large-scale family farms.

**Percent of farms with high- and low-operating profit margins by farm type, 2011–20**



Percent of farms in low-risk zone (OPM >25%)

- Large-scale family farms
- Midsized family farms
- Nonfamily farms
- Small family farms



Percent of farms in high-risk zone (OPM <10%)

- Small family farms
- Nonfamily farms
- Midsized family farms
- Large-scale family farms

Notes: Operating profit margin (OPM)=100 times (net farm income plus interest paid minus charges for unpaid labor and management)/gross farm income. OPM ratios are not calculated for operations with zero gross farm income.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2011–2020 Agricultural Resource Management Survey.



Strickland AR 0841

# Farm Operating Expenses

**The distribution of farm operating expenses varies across commodity specializations but remains largely unchanged over the 10-year period from 2011 to 2020.**

- A large share of total expenses on field crop farms went toward fertilizers and other chemicals (26 percent) in 2020, which was slightly less than the share spent in 2011 (27 percent). Spending on seed and plants accounted for another 14 percent of expenses on field crop operations in 2020, which was slightly more than in 2011 (13 percent).

- Feed expenses made up 48 percent of all expenses on dairy operations, 19 percent on cattle operations, and 29 percent on other livestock operations in 2020. The share of expenses allocated to feed on dairy and other livestock operations was similar in 2011. Livestock purchases accounted for a greater share of all expenses on beef cattle operations than did feed at 28 percent in 2020.

- The share of labor costs across all farms increased by 24 percent since 2011, despite a 22-percent decrease in the share allocated to labor costs for beef cattle operations. The largest increase in the share of operating expenses allocated to labor was in "other livestock" farms and specialty crops—19- and 13-percent increases, respectively.

- Unlike expenses such as seed or feed that follow closely with crop and livestock operations, respectively, certain expenses had relatively consistent shares across all types of farms in 2020. Machine-hire and custom work ranged from 1 to 5 percent; fuels and oils ranged from 3 to 6 percent; repairs and maintenance ranged from 4 to 8 percent; and other variable expenses ranged from 3 to 7 percent across all farm specializations. These shares of expenses were similar in 2011.

- Conversely, certain costs varied widely across farm specializations. Fixed costs ranged from 9 percent of dairy costs and 30 percent of field crop costs. Additionally, labor cost shares ranged from 6 percent for beef cattle operations to 40 percent of specialty crops.

## Production expenses by farm specialization category, 2011 and 2020



Notes: The field crops category includes farms specializing in wheat, corn, soybeans, sorghum, rice, tobacco, cotton, peanuts, and general crops; specialty crops include farms specializing in fruit and nuts, vegetables, and nursery crops; other livestock includes farms specializing in hogs, poultry, and general livestock. Fixed expenses include insurance, interest, rent and lease payments, and property and estate taxes. Livestock purchases exclude purchases of breeding stock, which is a capital expense. Other livestock-related expenses include livestock leasing, veterinarian services, bedding/litter/straw, removal of dead animals, and any other expense for livestock not counted elsewhere. Utilities includes electricity, telephone, and water/irrigation. Labor costs include all salary and wages paid to hired and contract laborers, including employment taxes and fringe benefits, but excludes wages paid to owner operators.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2011 and 2020 Agricultural Resource Management Survey.

> ### Definition of Operating Expenses
> This section summarizes cash "operating expenses" paid by the operation as excluding any expenses paid by a landlord or contractor as well as capital expenses, such as expenditures on land improvements, new buildings, cars, trucks, and other vehicles, and land purchases.

Strickland AR 0843



# Farm Operator Household Income and Wealth

**As in previous years, the median total income of all family farm households was greater than the median income of all U.S. households in 2020.**

- Median total farm household annual income varied across farm types, with very large family farms having the largest median income at over $1 million compared with low-sales family farms at $55,455. Low-sales and retirement farms ($65,526) had median household income below all U.S. households ($67,521) and the median among U.S. households with self-employment income ($89,492).

- The percent of family farms with income below the U.S. median-income level varied from 9 to 68 percent, depending on the type of farm.

- Operators of small family farms—especially retirement, off-farm occupation, and low-sales farms—often reported losses from farming. In 2020, the average farm income among off-farm occupation farms was –$2,427 and low-sales farms was –$1,637. Retirement farm households reported average farm income of $5,430 in 2020.

- Farm households often use off-farm income to cover farm expenses. While self-employment and wage/salary jobs are the primary sources of off-farm income for farm households, public and private pensions, interest and dividend payments, asset sales, Social Security payments, and other sources of income have provided a significant share of off-farm income, particularly for retirement farms, which—in 2020—reported $42,634 in unearned income on average.

- Most family farms also have higher wealth than the median household in the United States. The share of family farms that have wealth below the median wealth held by all U.S. households ranged from 1 to 5 percent, depending on the type of farm. Land comprises most farm households' wealth.

**Median operator household income by farm type, 2020**



Notes: Farm households are the households of the principal operator on family farms. Operator household income is not estimated for nonfamily farms. Operator household income includes both farm and off-farm income received by household members. Half of all households had incomes above the median, and half had incomes below the median.

Sources: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey; and U.S. Department of Commerce, Bureau of the Census, 2020 Current Population Survey, March supplement, for all U.S. households.



Strickland AR 0845

*14*   **America's Diverse Family Farms:** 2021 Edition

**Farm households with income or wealth below the median for all U.S. households, 2020**

| | Farm households with | |
| | Income below U.S. median ($67,521) | Wealth below U.S. median ($123,358) |
| --- | --- | --- |
| | Percent | |
| **Small family farms** | | |
| Retirement | 51.4 | 0.9 |
| Off-farm occupation | 21.1 | 2.7 |
| Low sales | 67.6 | 2.4 |
| Moderate sales | 29.6 | 2.7 |
| **Midsize family farms** | 19.2 | 5.3 |
| **Large-scale family farms** | | |
| Large | 12.7 | 3.6 |
| Very large | 8.5 | 3.1 |
| **All family farms** | 40.8 | 2.6 |

Notes: Farm households are the households of the principal operator on family farms. Operator household income and wealth are not estimated for nonfamily farms. Wealth is the value of household assets minus household debt. Given that net income is a calendar year flow, all income and expenses are included when they occur from January 1 to December 31. U.S. median wealth was adjusted to 2020 dollars using the Gross Domestic Product chain-type price index.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey; U.S. Department of Commerce, Bureau of the Census, 2021 Current Population Survey data; and the Federal Reserve Board, Board of Governors in cooperation with the U.S. Department of the Treasury, 2019 Survey of Consumer Finances.



**America's Diverse Family Farms:** 2021 Edition     *15*

Strickland AR 0846

**Farm operator household income by source and farm type, 2020**

| Farm type | Mean total income | Income from farming | | Mean income from off-farm sources | | |
| | | Mean amount | Is negative | Total | Earned | Unearned |
| | Dollars per household | | Percent of households | Dollars per household | | |
| **Small family farms** | | | | | | |
| Retirement | 78,028 | 5,430 | 49 | 72,599 | 29,964 | 42,634 |
| Off-farm occupation | 139,571 | –2,427 | 68 | 141,998 | 112,239 | 29,759 |
| Low sales | 61,245 | –1,637 | 59 | 62,883 | 27,331 | 35,552 |
| Moderate sales | 122,814 | 53,695 | 19 | 69,120 | 40,042 | 29,077 |
| **Midsize family farms** | 212,109 | 140,136 | 14 | 71,973 | 41,384 | 30,589 |
| **Large-scale family farms** | | | | | | |
| Large | 438,076 | 361,727 | 11 | 76,350 | 49,580 | 26,770 |
| Very large | 2,000,335 | 1,913,814 | 8 | 86,522 | 52,106 | 34,416 |
| **All family farms** | 122,291 | 25,603 | 54 | 96,688 | 63,530 | 33,158 |

Notes: Operator household income is not estimated for nonfamily farms. Earned income comes from off-farm self-employment or wage/salary jobs. Unearned income includes interest and dividends, benefits from Social Security and other public pensions, alimony, annuities, net income of estates or trusts, private pensions, etc. Components may not sum to total due to rounding.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.



Strickland AR 0847

# Coronavirus (COVID-19) Pandemic and Direct Sales

**Definition of Direct Sales**

Direct sales are the sales of commodities produced, raised, or grown on the farm and sold either direct to the consumer (such as at farmers markets, farm stores, and community supported agriculture (CSA) arrangements) or to intermediary supply chains (such as retail outlets and regional distributors) that are subsequently sold directly to individuals or to institutions (such as schools and hospitals). Christmas trees and flowers, nursery products, craft items, and processed products, such as jellies, sausages, and hams, are excluded from the analysis of direct sales of commodities. Also, commodities produced under production contracts are excluded from this analysis because the farmer does not own the commodity. Farm-size categories used in this section differ from those used in the rest of the report because only a small share of operations participate in direct sales and these operations tend to be quite small.

**In 2020, 7 percent of all farms sold commodities through direct sales, 7 percent sold direct-to-consumer (DTC), and 1 percent sold through intermediary supply chains.**

- Direct sales amounted to almost $10.7 billion—a nearly $2.8 billion (35 percent) increase from the value reported in the 2019 ARMS. Only 27 percent of total direct sales were DTC, whereas the remaining 73 percent occurred through intermediary supply chains. Among farms with less than $75,000 in GCFI, 85 percent of all direct sales were DTC in 2020.

- Changes in direct sales varied across farm-size categories. Farms with less than $75,000 in GCFI had $2.5 million less in overall direct sales in 2020 than in 2019. These smaller farms accounted for 8 percent of all the direct sales in 2020, down from 10 percent in 2019. Farms with direct sales and a GCFI between $75,000 and $350,000 increased their direct sales by $0.4 billion—which accounted for 11 percent of all direct sales—whereas farms with direct sales and a GCFI greater than $350,000 increased their direct sales by $2.4 billion, which accounted for 81 percent of all direct sales.

- The overall increase in direct sales in 2020 occurred across most direct sales marketing channels. Sales at farmers markets and restaurants increased by 11 and 13 percent, respectively, whereas sales at farm stores, CSAs, and other DTC channels, as well as sales to regional distributors, increased by 79 and 73 percent, respectively. However, sales to institutions declined by 86 percent in 2020 relative to 2019, which was likely due to pandemic closures or restricted operations.

- When reporting direct sales in 2020, operators were asked to recall and compare their sales with 2019 sales. Not all farms experienced increases in direct sales in all marketing channels. A larger share of farms selling at farmers markets, restaurants, and regional distributors in 2020 reported their 2020 sales were lower compared with 2019 than was the share selling in these outlets that reported their 2020 sales were higher than in 2019. On the other hand, a larger share of farms selling directly to consumers through farm stores, CSAs, and/or to grocery stores reported their 2020 sales were higher compared with 2019 than the share that reported 2020 sales were lower compared with their 2019 sales.

Strickland AR 0849

**Direct sales by marketing channel and farm size, 2019 and 2020**



Notes: GCFI = gross cash farm income. CSA=Community Supported Agriculture. The "Farm store/CSA" category also includes sales from roadside stands, u-pick, and other informal direct-to-consumer sales. Regional distributors include food hubs and internet aggregators that then sell directly to consumers. Institutions include schools, hospitals, and other businesses providing dining services to consumers.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2019 and 2020 Agricultural Resource Management Survey.

Strickland AR 0850

**Farm-level direct sales in 2020 relative to 2019 direct sales among farms that had direct sales in 2020 by direct sales channel**



Notes: CSA=Community Supported Agriculture. The above percentages are calculated from respondents who had direct sales in 2019 and/or 2020 as reported in 2020. The "Farm store/CSA" category also includes sales from roadside stands, u-pick, and other informal direct-to-consumer sales. Regional distributors include food hubs and internet aggregators that then sell directly to consumers. Institutions include schools, hospitals, and other businesses providing dining services to consumers.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0851

# Coronavirus (COVID-19) Pandemic and Farm Household Employment

**Over 11 percent of all farm households had at least one household member lose an off-farm job due to the COVID-19 pandemic during 2020.**

- Over half (52 percent) of all family farm operations had at least one household member with an off-farm job in 2020, but the share varies by farm type. Fifty-three percent of households operating small farms, 44 percent of households operating midsize farms, and 33 percent of households operating large-scale farms had household members with off-farm jobs.

- In 2020, COVID-19-related disruptions caused 11 percent of all farm households to experience the loss or furlough of at least one of its member's off-farm jobs. Small-farm households experienced the greatest losses with 12 percent of households affected. On the other hand, 6 percent of households operating midsize and large-scale farms experienced a job loss or furlough.

- Individuals who became unemployed or were furloughed due to the pandemic could file for unemployment benefits. Households operating large-scale farms enjoyed higher rates of approvals of their applications for unemployment benefits. Of those large-scale farm households with someone applying for benefits, 83 percent reported receiving benefits. The acceptance rate was only 74 percent for households operating small farms.

- In total, 4 percent of households operating small farms reported at least one person receiving unemployment benefits in 2020, while only 2 percent and 1 percent of households operating midsize and large-scale farms, respectively, received unemployment benefits. These reports are consistent with the higher rate of job loss among households operating small farms.

**Off-farm unemployment and receipt of unemployment benefits among farm households by farm type, 2020**



Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0853

# Government Payments and Federal Crop Insurance

**Distribution of direct Government payments varied by farm and program type in 2020.**

- Small family farms received 81 percent of all payments from USDA's Conservation Reserve Program (CRP), which removes environmentally sensitive cropland from production. In contrast, working-land payments—such as those from the Environmental Quality Incentives Program (EQIP) and the Conservation Stewardship Program (CSP)—incentivize certain production practices on agricultural land and were more likely received by midsize family farms, large-scale family farms, and nonfamily farms. Overall, they received 68 percent of all working-land payments.

- The distribution of commodity-linked payments and other payments is similar to the contribution to the total value of production. Midsized and large-scale family farms along with nonfamily farms accounted for 80 percent of the total value of production and received 78 percent of commodity-linked, agricultural disaster programs, and other Federal, State, and local farm program payments.

- Small family farms received 16 percent of all farm-level pandemic assistance from USDA and 22 percent of all other Government payments—excluding pandemic assistance and conservation program payments—which was consistent with the smaller production scale. Large-scale family farms received 52 percent of all farm-level pandemic assistance and 44 percent of all other payments.

- Additionally, 64 percent of all farm-level pandemic assistance reported as having been received from the Coronavirus Food Assistance Programs (CFAP, programs 1 and 2) in 2020. Another 21 percent came from loans from the Small Business Administration (SBA) under the Paycheck Protection Program (PPP) and advances from the Economic Injury Disaster Loan (EIDL) program. PPP was created in 2020 to help cover employment costs and lost profits for all business sectors, including agriculture, while eligibility for the preexisting EIDL program was extended to agricultural operators in response to the pandemic. Fifteen percent came from other Federal, State, and local pandemic-assistance programs to operators.

- CFAP comprised most of all pandemic assistance reported as having been received among all farm types. The share of total assistance coming from the SBA was greatest among very large family farms (45 percent). This is likely because these farms have the most employees and are also more likely to earn a profit in any given year.

- Overall, 40 percent of all farms reported as having received some type of Government payment in 2020.



Strickland AR 0855

*24*  **America's Diverse Family Farms:** 2021 Edition

**Distribution of selected Government agricultural program payments, 2020**



Notes: Pandemic Assistance includes loans from the Small Business Administration through the Paycheck Protection Program (PPP) and advances from the Economic Injury Disaster Loan (EIDL) program, payments from the Coronavirus Food Assistance Program, and other agricultural pandemic assistance. All other payments include commodity-linked programs such as the Agricultural Risk Coverage (ARC), Price Loss Coverage (PLC), and Dairy Margin Coverage program, as well as agricultural disaster payments and ad-hoc programs such as the Market Facilitation Program (MFP). The bars of the same color add to 100 percent.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0856

**Distribution of total reported pandemic assistance, by farm type and type of assistance program, 2020**



Notes: CFAP = Coronavirus Food Assistance Program. SBA = Small Business Administration. *Includes loans from Paycheck Protection Program (PPP), all of which are assumed to be forgiven, and advances from the Economic Injury Disaster Loan (EIDL), but not the total amount of EIDL loan, and overlap between PPP and EIDL advances is accounted for. Other pandemic agriculture assistance includes any other Federal, State, or local pandemic assistance to agriculture, excluding CFAP payments and SBA loans.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0857

**Indemnities from Federal crop insurance were roughly proportional to acres of harvested cropland and concentrated among midsize and large-scale farms in 2020.**

- Overall, 14 percent of farms participated in Federal crop insurance programs, but participation rates varied widely across farm types. Less than 10 percent of retirement, off-farm occupation, and low-sales farms purchased Federal crop insurance, whereas 40 percent or more of other family farm types participated in these programs. Large family farms were the most likely to participate with 71 percent in 2020.

- Although midsize and large family farms made up 8 percent of all U.S. farms in 2020, they accounted for 38 percent of Federal crop insurance participants and 58 percent of all harvested cropland acres.

- Midsize and large-scale family farms together accounted for 65 percent of all program harvested acres and received 77 percent of indemnities from Federal crop insurance in 2020. These family farms were also the most likely to participate in Federal crop insurance.

**Federal crop insurance participants, harvested cropland, and indemnities, 2020**



Note: The bars of the same color add to 100 percent.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

# Conclusions and Implications

- **Farming is still overwhelmingly a family business.** Ninety-eight percent of U.S. farms are family farms, and they account for 87 percent of farm production.

- **Small family farms make up about 90 percent of the farm count and operate almost half of the farmland.** The largest share of the value of farm production (46 percent), however, occurs on large-scale family farms. Small family farms account for 49 percent of the value of poultry and eggs and 59 percent of hay production.

- **The share of farms with a low-risk operating profit margin (OPM) varied by farm size in 2020.** Between 57 and 83 percent of small family farms have an OPM in the high-risk zone—depending on the farm type—compared with 26 and 40 percent of midsize and large-scale family farms, respectively. Some small family farms in each type operate at the low-risk zone, as do more than 37 percent of midsize, large, and very large family farms.

- **The distribution of farm operating expenses varies across commodity specializations.** Crop farms allocate a large share of their total expenses to seed and fertilizer, while feed and livestock purchases comprise a large share of total expenses among cattle and livestock operations. How farm specializations allocate their expenses did not change dramatically between 2011 and 2020.

- **Farm households, in general, are neither low income nor low wealth.** In 2020, median farm household income, which includes both farm and off-farm income sources, exceeded that for all U.S. households, but it was lower than the median income of all U.S. households with self-employment income. About 41 percent of farm households had income below that of the median for all U.S. households, and 3 percent had wealth less than the U.S. median in 2020.



Strickland AR 0859

- **The share of farm operations having reported participating in direct sales fell from 8 percent in 2019 to 7 percent in 2020.** However, total direct sales amounted to about $10.7 billion in 2020, which is $2.8 billion, or 35 percent, higher than in 2019. Direct sales to restaurants and grocery stores made up the largest share of direct sales in 2020—42 percent—and witnessed a nearly $500 million increase in sales from 2019. Likely due to institutional shutdowns in response to COVID-19, direct sales to institutions saw an 86-percent decline in sales in 2020. Sales at farmers markets, on-farm stores, u-pick, roadside stands, and the like, as well as through regional distributors or aggregators, saw an increase in 2020 relative to 2019.

- **Over half of all farm family households had at least one person with an off-farm job.** Eleven percent of all farm households reported either a loss of—or furlough from—an off-farm job in 2020, and 4 percent of all farm households received unemployment benefits.

- **More Conservation Reserve Program (CRP) payments went to different types of farms than other Government payments.** CRP payments target environmentally-sensitive cropland, with most payments going to retirement, off-farm occupation, and low-sales farms. In contrast, most commodity-related and working-land payments went to family farms with a gross cash farm income (GCFI) of $350,000 or more.

- **Most of the pandemic assistance to agriculture was from the Coronavirus Food Assistance Program (CFAP).** Farms also received loans from the Small Business Administration through the Paycheck Protection Program (PPP) and the Economic Injury Disaster Loan (EIDL) program. Very large family farms received a greater share of their pandemic assistance from SBA loans, likely because they employed more workers and are also more likely to earn a profit in any given year.

- **Overall, 14 percent of farms participated in Federal crop insurance in 2020.** Indemnities from Federal crop insurance were roughly proportional to acres of harvested cropland. Midsize and large-scale family farms together accounted for 65 percent of all program harvested acres and received 77 percent of indemnities from Federal crop insurance in 2020.

The mission of USDA's Economic Research Service is to anticipate trends and emerging issues in agriculture, food, the environment, and rural America and to conduct high-quality, objective economic research to inform and enhance public and private decision making. ERS shapes its research program and products to serve those who routinely make or influence public policy and program decisions.

Follow us on Twitter
@USDA_ERS

**www.ers.usda.gov**

Strickland AR 0861

**2022 EMERGENCY RELIEF DECISIONS**
**MAY 19, 2023**

---

**OVERVIEW:**

This memo provides the final decision for the following key items pertaining to ERP 2022:

- ERP Track 1 Payment Calculation using Progressive Factoring
- ERP 2022 Track 2 Determination of Benchmark Year

**ERP Track 1 Payment Calculations**

The basic track 1 ERP payment calculation considers the following data elements and math:

*\*\* RMA calculated gross ERP payment \* share \* progressive factoring + premiums/fees for underserved producers*

This calculation substantiates the highest benefit for the UP producer by adding the premiums/fees after factoring.

Progressive factoring will occur at the Producer Payee Level

**Progressive factor is at the producer level (only using the eligible units the producer selected for payment)**

- RMA Estimated ERP payment \* share calculated for primary insured and SBI producers
- Progressive payment factor applied per producer, including all SBI producers
- Add on premiums and service fees to calculate payment for each underserved producer

  - *Applying progressive factor at the producer level will not have any impact on the application process.*
  - *Results in higher payment to primary policy holder and all SBI's.*
  - *More accurate calculation of a progressive factor based on their calculated Track 1 payment.*
  - *Easily accommodates producer's ability to not select ineligible units and/or crops producers do not want to be required to meet linkage*



EXAMPLE 1: PROGRESSIVE FACTOR AT PRODUCER LEVEL (APPLIES ONLY TO RMA)

Strickland AR 0862

## Who will implement the Progressive Factoring (FSA/RMA)

Recommendation: FSA

Pros:

- Ability to easily update the factors/ranges (through a program load table handled within FSA) without a change on the application.
  **Note:**   After the application is live, only increases are allowed not decreases to the factors, because obligation has been committed and overpayment would not be due to changed data elements or producer provided information.
- Implementation on FSA's payment side can illustrate how the progressive factoring was calculated for ease of county office/producer.
- Would not require communications with RMA for questions on progressive factoring.
- If progressive factoring is done at a policyholder level, an addition of a record from RMA will not alter the application but only change the Estimated Calculated Payment Report (ECPR).
- Payment factoring is typically done on payment side.
- If progressive factors are changed it may delay implementation of the program if RMA applies the factors because of data calculations and subsequent transmission of information to FSA.
- The progressive factor will need to be built by FSA for Track 2.  If utilized in Track 1 code will be existing for Track 2.
- RMA has acknowledged that it would be more difficult for RMA to address corrections if they are doing the progressive payment factor.
- Corrections process can be developed and improved if FSA implements progressive payment factor.
- Would allow FSA to calculate progressive factoring based only on the crops/units elected by the producer. (in cases of no qualifying disaster event/not wanting to meet linkage).  RMA can only calculate a progressive payment factor to all crops/units that received an indemnity regardless of whether a producer elects payment.

Cons:

- FSA will be accountable and responsible for calculations and corrections.

Strickland AR 0863

**Data to be Shared from RMA to FSA:**

The RMA data elements required would be the same whether FSA implements progressive factoring or not. These are required because of statutory requirements of eligible disaster conditions and linkage requirements, as well as accommodating a simplified and timely corrections process.

The following are the required data elements:

- CCID
- Reinsurance Year
- AIP Code
- AIP Policy Producer Key
- First Name
- Middle Name
- Last Name
- Business Name
- Entity Type Code
- Primary Location State Code
- Primary Location County Code
- Insurance Plan Code
- Commodity Code(s)*
- Commodity Name(s)*
- Commodity Year
- Unit Structure Code
- Unit Number*
- Total Indemnity
- Producer Premium
- Administrative Fees
- Calculated ERP Payment(prior to progressive factoring and applying premiums and administrative fees)

SBI File needs:

- CCID
- Reinsurance Year
- AIP Code
- AIP Policy Producer Key
- First Name
- Last Name
- Middle name
- Business Name
- Entity Type Code
- Landlord/Tenant Flag

Strickland AR 0864

**Revenue Calculation for Track 2 - Benchmark Year with option to use Expected Disaster Year Revenue in Comparison to Actual Disaster Year Revenue**

**Background**:

ERP Phase 2 required producers to select either 2018 and 2019 as their benchmark year.  For many producers, both 2018 and 2019 were disaster years and were not reflective of a typical year of revenue for the farming operation. This was further exacerbated by high commodity prices in 2021 – 2022.  These concerns have been received from producers, state and county offices, and stakeholders as a flaw in the current structure of the program.

Under the 2020/2021 ERP Phase 2, adjustments to benchmark year revenue were only required for new producers who did not have a benchmark year revenue in 2018 or 2019 or if the producer had a decrease in operation capacity in the disaster year as compared to the benchmark year.  For new producers, adjusted benchmark year revenue was based on Expected Disaster Year Revenue.  As such, Phase 2 policy already has the methodology for calculating expected disaster year revenue which can be expanded and applied to all producers.  As a result, benchmark year revenue would be calculated consistently for all producers.

**Decision:**

Based on the identified concerns the decision for ERP 2022, Track 2 benchmark revenue has been expanded and will utilize one of the following:

- Tax Year 2018 or 2019 revenue for benchmark, (Same calculation as Phase 2) or
- Expected disaster year revenue. (Producer calculation of benchmark based on the income expected for the crop year)

Adding the available criteria of expected disaster year revenue for the benchmark year necessitates a change to what is included as revenue in the disaster year.  When a producer chooses to utilize expected revenue as their benchmark year revenue, the benchmark will consist of the expected revenue for eligible crops (absent any disaster conditions) compared to *actual disaster year* revenue.  This comparison would reflect the actual revenue loss due to qualifying disaster conditions.

Disaster year revenue would only include:

- revenue from actual crop sales,
- revenue from crop insurance indemnities and NAP payments, less premiums and fees, and
- the actual value of the crop for crops not sold (such as wine grapes/forage)

Strickland AR 0865

*Examples provided are for yield-based crops.

Note:  For non-yield-based crops, expected revenue could also easily be certified by the producer using the expected vs actual approach.

Example 1:

Producer A grows NI Yellow corn gr and soybeans com gr.  (Price/Yield data from NCT, – McHenry ND)

Expected Disaster Year Revenue (Benchmark):

Corn 1000ac (Planted Acres)  x 103 Bu (Expected Yield) x $5.90 (Expected Price) = $607,700 expected revenue

Soybeans 500ac (Planted Acres) x 33 Bu (Expected Yield) x $14.33 (Expected Price)= *$236,445 expected revenue*

*$844,145 Total Expected revenue * 90% factor (over 60% insured/NAP covered)  = $759,731*

Actual Disaster Year Revenue:

Corn Sales = $388,960

Soybean Sales = $186,450

Crop insurance indemnity for Corn (less premiums and fees) = $75,000

*$650,410 Total actual revenue*

 ***Payment Calculation: $759,731 - $650,410 = $109,321 * 15% UP =  $125,719***


Example 2:

Expected Disaster Year Revenue: Example 2

Producer B grows, hay for feed, wheat, barley

IGS Mixed Forage for feed (not sold) = $45,867 (Producer certified crop value (since the crop was not sold) based on planted acres (500) x expected yield (1.28 ton) x expected price ($71.6667).

Wheat HRS Gr 500ac(Expected Acres) x 65 Bu (Expected Yield) x $7.22 (Expected Price) = $234,650

Barley Spr Gr 500ac (Expected Acres) x 80 Bu (Expected Yield) x $6.95 (Expected Price)  = $278,000

*$ 558,517 Total Expected revenue * $502,666*

Actual Revenue: Example 2

IGS Mixed Forage not sold = $26,875 (producer certified value of actual production)  Producer certified amount based on total acres (500), harvested production (.75 tons), and county expected price ($71.6667).

Wheat sales = $191,250

Barley sales =  $198,900
*$417,025 Total actual revenue*

***Payment Calculation: $502,666 - $417,025 = $85,641 * 15% UP =  $98,487***

Strickland AR 0866

| | |
|---|---|
| **From:** | White, Jamie - FPAC-FSA, DC |
| **Sent:** | Monday, July 3, 2023 8:49 AM |
| **To:** | Sayers, Kathy - FPAC-FSA, DC; Walter, Michael - FPAC-FSA, DC |
| **Cc:** | Berge, John - FPAC-FSA, NE; Graham, Kimberly - OSEC, DC |
| **Subject:** | FW: Pending ERP 2022 Decision Items - High Priority |
| **Importance:** | High |

Kathy and Mike,

DAFP met with Mike Schmidt on Friday to review progressive factoring and the two pending ERP 2022 decision items. Please be advised that DAFP and Mike have concurred with the following two recommendations detailed below.

This should close out decision items pending review. Please do not hesitate to reach out if there are any questions or concerns.

Thank you!

**Jamie White**
Assistant to Deputy Administrator for Farm Programs (DAFP)
Farm Service Agency (FSA)
U.S. Department of Agriculture (USDA)

**Phone** 605.352.1181  **Mobile** 605.461.8052
**Email** jamie.white@usda.gov
1400 Independence Ave., Washington, DC 20250

---

**From:** Berge, John - FPAC-FSA, NE <John.Berge@usda.gov>
**Sent:** Monday, June 26, 2023 4:06 PM
**To:** Mehta, Riya - FPAC-FSA, DC <Riya.Mehta@usda.gov>; Gannon, Timothy - OSEC, DC <Timothy.Gannon@usda.gov>; Schmidt, Michael - OSEC, DC <Michael.Schmidt3@usda.gov>
**Cc:** White, Jamie - FPAC-FSA, DC <jamie.white@usda.gov>; Graham, Kimberly - OSEC, DC <kimberly.graham@usda.gov>
**Subject:** FW: Pending ERP 2022 Decision Items - High Priority
**Importance:** High

Good afternoon – per my email earlier, I wanted to share the items below for your review and perhaps for your concurrence. It is my hope that by highlighting these recommendations for each of these decision items, we can keep these moving, but want to be sure that each of you individually and all of you collectively are comfortable with the direction that we are working toward as we have made these recommendations based on the guiding principles that you all have offered. Please let us know if you have objections. Getting these decisions made will allow us to move forward with rule-making and software development. If you would prefer to discuss or offer alternatives, please do. Thanks so much.

**<span style="color:red">Decision Item 1: Track 2 – Application of Insured (90%) and Uninsured (70%) ERP Factor</span>**

ERP Track 2 has been designed to accommodate an ERP factor of up to 90% for producers who suffer revenue losses attributed to crops covered by crop insurance and/or NAP. Statute is prescriptive and requires that assistance for uninsured losses cannot exceed 70% of the crop's value as determined by the Secretary. ***FSA recommends that application of the ERP Factor of 90% (insured factor) under Track 2 be based on participant certification that ALL CROPS included in claimed revenue are insured or covered by NAP.*** This approach comports with statute and minimizes

1

the application burden on the participant.  Any bifurcation of revenue by crop to support the application of both the insured and uninsured ERP Factor under Track 2 creates additional software complexity and becomes overly burdensome for the participant.

**Decision Item 2: Track 2 – UP Factor Payment Calculation**

To comport with statute, any UP top-up factor (15%) cannot exceed the statutory payment cap of 90% or 70% of the crop value.  Track 2 embraces an insured and uninsured payment factor further incentivizing crop insurance and NAP, necessitating the establishment of a payment calculation demonstrating gross ERP Track 2 assistance (including UP top-up) does not exceed the 90% or 70% factor payment cap established by statute.

***FSA recommends calculating the 15% UP top-up AFTER progressive factoring with built in software logic ensuring the final payment issued does not exceed 100% of the gross ERP Track 2 payment.  Calculation:  Gross ERP Payment x Progressive Factor x UP factor (115%) = Total Payment NTE Gross ERP Payment.***  While the combined Track 2 gross payment and additional UP benefit exceed the statutory limits of 90% or 70%, this approach leverages the use of the progressive factor for levels that do not pay at 100% by demonstrating the statutory limits are not exceeded as the final payment will not exceed the gross calculated ERP benefit.  While this methodology will not provide an UP benefit to participants whose gross payment falls within the first bucket (paid at 100%), this approach maximizes available assistance to all small-scale operations while supporting the additional UP top-up benefit for non-traditional operations and participants.

*Example:*
- Progressive Factoring Sample Criteria:  First $5K pays at 100%, 2nd $5K pays at 75%, 3rd $5K pays at 50%, Greater than $15K pays at 25%.
- Gross calculated Track 2 payment of $40,000 is progressively factored to $17,500, with UP top-up of 15% the final payment issued to the participant is $20,125 which does not exceed the gross ERP 2 benefit calculated.

Strickland AR 0868







United States
Department of
Agriculture

Farm
Service
Agency

fsa.usda.gov

Strickland AR 0869

# Emergency Relief Program
# 2022

**United States Department of Agriculture**

**Farm Service Agency**

fsa.usda.gov

## Background

Agricultural losses due to natural disaster were widespread across crops and geography in <u>2022</u>

Funding to address impacts to crops is approximately $3.2 billion

Losses not covered by crop insurance or NAP are estimated at $10 billion - About equal to 2020 and 2021 combined

**This presentation details how the $3.2 billion appropriated for the Emergency Relief Program in 2022 (ERP 2022) will be distributed over $10.6 billion in 2022 losses that were not covered by crop insurance or the Noninsured Crop Disaster Assistance Program (NAP)**

Strickland AR 0870

**United States
Department of
Agriculture**

**ERP 2022 for crop losses will be implemented in two tracks:**

1. **Track 1 (Includes Losses Indemnified by Crop Insurance or NAP) uses data from existing USDA programs to prefill producer applications, streamlining and expediting the process for producers**

   A. **Track 1A/RMA Records represent around 80% of the $10 billion in uncovered losses and uses crop insurance data from the Risk Management Agency**

   B. **Track 1B/NAP Records uses program data from FSA's NAP**

2. **Track 2 (Whole Farm Revenue Model) allows producers to seek relief for losses missed by Track 1**

   A. **Based on expected revenue vs. actual revenue**

Strickland AR 0871

**Farm
Service
Agency**

**fsa.usda.gov**



**United States
Department of
Agriculture**

## Comparison of ERP 2022 to ERP 2020/21 Features:

**What's the same?**

1. **The higher the coverage level on producers' crop insurance or NAP policy, the higher the factor that will be used in calculating their gross ERP payment**

2. **Track 1B (NAP Records) gross payments will be paid at a factor of 100%**

3. **Premiums/Fees refunded under Track 1B (NAP Records)**

4. **The types of natural disaster event that establish eligibility:**

   - Qualifying Drought (D2 for 8 weeks, D3 or greater)
   - Wildfires
   - Hurricanes
   - Floods
   - Derechos
   - Excessive Heat
   - Tornadoes – New in ERP 2022
   - Winter Storms
   - Freeze
   - Smoke Exposure
   - Excessive Moisture
   - Related Conditions (occurred as a direct result of a qualifying disaster event)

**Farm
Service
Agency**

fsa.usda.gov

Strickland AR 0872

**United States
Department of
Agriculture**

## Comparison of ERP 2022 to ERP 2020/21 Features:

**What's new?**

1. **Track 1A (RMA Records) and Track 2 (Whole Farm Revenue Model) gross payments will be paid using progressive factors instead of a flat factor**

   A. This approach targets payments to 2 groups:

      i. Losses incurred by smaller producers

      ii. Shallow losses (those that are small relative to overall crop size or those that are already partially indemnified)

2. **Premiums/Fees refunded for underserved producers under Track 1A (RMA Records)**

   A. Given the reduced funding available for ERP 2022, reducing outlays attributed to the full refund of premiums and fees (estimated $2 billion) under Track 1A (RMA Records) optimizes funding available to support equitable assistance under both tracks of ERP 2022 while targeting assistance to smaller operations and underserved participants

   B. Refund of premiums and fees for underserved participants under Track 1A (RMA Records) is estimated to be approximately $432 million

3. **On Track 2, a 90% revenue guarantee has been added, and producers can use 2022 expected revenue as a benchmark instead of 2018 or 2019**

4. **Track 1 and 2 applications will be accepted simultaneously**

Strickland AR 0873

**Farm
Service
Agency**

**fsa.usda.gov**

United States
Department of
Agriculture

# PRODUCER PAYMENT CALCULATIONS...

**Farm Service Agency**

fsa.usda.gov

Strickland AR 0874

**United States Department of Agriculture**

## PRODUCER PAYMENT calculation steps: Track 1A/RMA

| Crop Insurance Coverage Level | ERP Factor (percent) |
|---|---|
| Catastrophic coverage | 75.0 |
| More than catastrophic coverage but less than 55 percent | 80.0 |
| At least 55 percent but less than 60 percent | 82.5 |
| At least 60 percent but less than 65 percent | 85.0 |
| At least 65 percent but less than 70 percent | 87.5 |
| At least 70 percent but less than 75 percent | 90.0 |
| At least 75 percent but less than 80 percent | 92.5 |
| At least 80 percent | 95.0 |

1. **Gross payment = (RMA calculated loss - net crop insurance indemnity) * ERP factor associated with coverage level (See table on left)**

   **Note: The greater the crop insurance coverage level, the greater the ERP factor**

2. **Track 1A (RMA Records) gross payments are then progressively factored**

3. **Premiums/fees are refunded for underserved producers (UP)**

**Farm Service Agency**

fsa.usda.gov

Strickland AR 0875

**United States Department of Agriculture**

# PRODUCER PAYMENT calculation steps: Track 1B/NAP Records

1. **Gross payment = new revenue guarantee - salvage value - NAP payment**

   **Note: The greater the NAP coverage level, the higher the new revenue guarantee**

2. **Track 1B (NAP Records) gross payments are not progressively factored but, instead, are paid at 100%**

3. **Premiums/fees are refunded for underserved producers (UP); however, budgetary impact is negligible as these were already waived for UPs enrolled in NAP at the catastrophic coverage level**

   **Note: > 90% of participants are enrolled in NAP at catastrophic coverage level**

| NAP Coverage Level | ERP Factor (percent) |
|---|---|
| Catastrophic coverage | 75.0 |
| 50 percent | 80.0 |
| 55 percent | 85.0 |
| 60 percent | 90.0 |
| 65 percent | 95.0 |

**Farm Service Agency**

**fsa.usda.gov**

Strickland AR 0876

**United States**
**Department of**
**Agriculture**

## PRODUCER PAYMENT calculation steps: Track 2 (Whole Farm Record Model)

1. Gross payment = benchmark year revenue * ERP factor - disaster year revenue - Track 1 payments

   A. Benchmark year can be 2018, 2019, or expected revenue for 2022

   B. ERP factor is 90% for insured crops and 70% for uninsured crops

2. Track 2 gross payments are then progressively factored

3. Payments to underserved producers under Track 2 will then be multiplied by 115%

   Note: The Total Track 2 benefit including the Underserved Producer benefit (Step 3) will not exceed the calculated Gross ERP Track 2 benefit calculated in Step 1 to ensure the payment caps of 70% and 90% prescribed by statute are not exceeded.

**Farm**
**Service**
**Agency**

**fsa.usda.gov**

Strickland AR 0877

United States
Department of
Agriculture

**Farm
Service
Agency**

**fsa.usda.gov**

# AGGREGATE - Cost of ERP 2022 Estimated at $2.74 billion:

| | ($ billions) | |
|---|---|---|
| Tract 1A/RMA: | | |
| The sum of all PRODUCER PAYMENTS after progressively factoring $7.9 billion in losses (effective factor = 27%) | 2.14 | |
| Plus: Premium/fee refund for underserved producers: | 0.43 | |
| Less: Payment limitations, attributions, netting, etc. | 0.26 | 2.31 |
| Track 1B/NAP: | | |
| The sum of all PRODUCER PAYMENTS made at 100% factor | 0.20 | |
| Less: Payment limitations, attributions, netting, etc. | 0.02 | 0.18 |
| Track 2: | | |
| The sum of all PRODUCER PAYMENTS after progressively factoring 1.9 billion in losses (effective factor = 13%) | 0.25 | |
| Plus: 15% benefit for underserved producers | 0.02 | |
| Less: Payment limitations, attributions, netting, etc. | 0.03 | 0.24 |
| ERP 2022 Total Payment: | | **2.74** |

Strickland AR 0878



**United States Department of Agriculture**

# Progressive Factoring

## Used for Track 1A (RMA Records) and Track 2 (Whole Farm Revenue Model)

**Farm Service Agency**

**fsa.usda.gov**

Strickland AR 0879

**USDA**
United States
Department of
Agriculture

| Gross Payment Band | Factor |
|---|---|
| $0 to $2,000 | 100% |
| $2,001 to $4,000 | 80% |
| $4,001 to $6,000 | 60% |
| $6,000 to $8,000 | 40% |
| $8,001 to $10,000 | 20% |
| > $10,000 | 10% |

**Example of how a $5K gross payment for an individual producer would be factored:**

**$2K in band 1 * 100%**

**$2K in band 2 *  80%**

**$1K in band 3 *  60%**

**Pays a higher portion of small or shallow losses**

**Progressive Factoring changes the distribution of payments but does not increase costs**

Farm
Service
Agency

fsa.usda.gov

Strickland AR 0880

**United States Department of Agriculture**

**Farm Service Agency**

**fsa.usda.gov**

Strickland AR 0881

Progressive Factoring is designed to pay more to program participants who are due a gross payment of less than $30,000 under Track 1A (RMA Records), which is 82% of producers.

**United States Department of Agriculture**

# Ex. Net payment calculation steps under Track 1A/RMA Records for producer with $20,000 gross payment

1. **Calculate producer's gross payment**

2. **Divide into standardized "bands"**

3. **Multiply respective factor by amount from each band**

4. **Total across all bands to achieve net payment**

**Note: This producer would receive a 29% higher net payment than under a program using the flat factor of 27%, which has equal outlays to the proposed progressive factoring**

| Bucket min | Bucket max | Gross | Progressive factor | Net | Flat factor | Net |
|---|---|---|---|---|---|---|
| $0 | $2,000 | $2,000 | 1.00 | $2,000 | 0.27 | $541 |
| $2,001 | $4,000 | $2,000 | 0.80 | $1,600 | 0.27 | $541 |
| $4,001 | $6,000 | $2,000 | 0.60 | $1,200 | 0.27 | $541 |
| $6,001 | $8,000 | $2,000 | 0.40 | $800 | 0.27 | $541 |
| $8,001 | $10,000 | $2,000 | 0.20 | $400 | 0.27 | $541 |
| $10,001 | $12,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $12,001 | $14,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $14,001 | $16,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $16,001 | $18,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $18,001 | $20,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $20,001 | $22,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $22,001 | $24,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $24,001 | $26,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $26,001 | $28,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $28,001 | $30,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $30,001 | $32,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $32,001 | $34,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $34,001 | $36,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $36,001 | $38,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $38,001 | $40,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $40,001 | $42,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $42,001 | $44,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $44,001 | $46,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $46,001 | $48,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $48,001 | $50,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $50,001 | No max | $0 | 0.10 | $0 | 0.27 | $0 |
| **Gross Payment** | $20,000 | | **Net payment** | $7,000 | **Net payment** | $5,409 |

**Farm Service Agency**   fsa.usda.gov

Strickland AR 0882

**United States Department of Agriculture**

## Ex. Net payment calculation under Track 1A/RMA Records for producer with $30,000 gross payment

**Gross payments $30K and larger would net lower payments under progressive factoring**

**RMA data indicate that 18 percent of producers in Track 1A are due a gross payment of $30k or more**

**By using progressive factoring, the approach increases emergency relief payments to most participants while scaling back those at the top end**

| Bucket min | Bucket max | Gross | Progressive factor | Net | Flat factor | Net |
|---|---|---|---|---|---|---|
| $0 | $2,000 | $2,000 | 1.00 | $2,000 | 0.27 | $541 |
| $2,001 | $4,000 | $2,000 | 0.80 | $1,600 | 0.27 | $541 |
| $4,001 | $6,000 | $2,000 | 0.60 | $1,200 | 0.27 | $541 |
| $6,001 | $8,000 | $2,000 | 0.40 | $800 | 0.27 | $541 |
| $8,001 | $10,000 | $2,000 | 0.20 | $400 | 0.27 | $541 |
| $10,001 | $12,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $12,001 | $14,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $14,001 | $16,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $16,001 | $18,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $18,001 | $20,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $20,001 | $22,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $22,001 | $24,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $24,001 | $26,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $26,001 | $28,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $28,001 | $30,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $30,001 | $32,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $32,001 | $34,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $34,001 | $36,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $36,001 | $38,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $38,001 | $40,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $40,001 | $42,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $42,001 | $44,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $44,001 | $46,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $46,001 | $48,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $48,001 | $50,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $50,001 | No max | | | $0 | | $0 |
| Gross Payment | $30,000 | | Net payment | $8,000 | Net payment | $8,114 |

**Farm Service Agency**

fsa.usda.gov

Strickland AR 0883

**United States
Department of
Agriculture**

**Farm
Service
Agency**

fsa.usda.gov

Strickland AR 0884

## Conclusion

**Progressive factors allow payments to be targeted to smaller producers and shallower losses, without increasing costs**

**Total aggregate outlays for ERP 2022 (Both Tracks 1 and 2) are estimated at $2.74 billion**

**This includes an additional 5% on track 1A/RMA Records to account for outstanding crop insurance claims**

**Outlays could outpace expectations by nearly 10% and still remain within budget**

**To provide further protection against cost overruns, a 75% max initial payment will be instituted**

**This lowers the projected cost to $2.06 billion**

**Producers will receive 75% of their net payment initially**

**As budget permits, the remaining portion of their net payment will be issued**

**If funds are not exhausted, factors can be increased and additional payments issued**

**United States Department of Agriculture**

**Farm Service Agency**

fsa.usda.gov

Strickland AR 0885

## Notes on Track 1 (Losses Indemnified by Crop Insurance or NAP) cost estimate methodology

### Track 1A/RMA Records

Assumption: some crop year 2023 losses will be paid in program year 2022

> For example, winter wheat planted in fall 2022 that experienced winter kill in December 2022 before spring 2023 harvest

> Or late-season Florida oranges that were subject to a December 2022 freeze in the middle of the May 1, 2022, to June 30, 2023, crop insurance coverage period

### Track 2B/NAP Records

Assumption: crop units receiving payment had low salvage values

Grass is the largest commodity covered under NAP; however, only grass harvested for forage is eligible for ERP

Assumption: 50% of ERP 1B payments will be for grass

> Follows the trend of an increasing share: in 2020, 16 percent of gross ERP 1B payments were on grass and, in 2021, 28% of gross ERP 1B payments were on grass

> Widespread drought in the Plains during 2022 supports a higher portion of payments to grass

**United States
Department of
Agriculture**

# Notes on Track 2 (Whole Farm Revenue Model) cost estimate methodology

Assumption: ERP track 2 gross payments will equal to those of 2020 and 2021 combined

**This phenomenon was observed in RMA data and is generalized to track 2
Producers can use expected revenue in lieu of 2018 and 2019 as a benchmark year
More producers will participate, and losses will be inflated by higher commodity prices**

Gross ERP track 2 payments from 2020/2021 are summed, then multiplied by 1.29 to account for the higher revenue guarantee available this year

**90% / 70% = 1.29**

The impacts of progressive factoring are estimated by assuming the same distribution of payments as 2020/2021

**Only 6% of total gross payments are in or below the $10K band
Larger gross payments in Track 2 means higher savings by using progressive factoring**

**Farm
Service
Agency**

**fsa.usda.gov**

Strickland AR 0886

Strickland AR 0887

## RE: Updated cost estimate -- ERP 2022



Aulbur, Chris - FPAC-RMA, MO
To  Vuillemin, Jacob - FPAC-FBC, MO
Cc  Ferreira, Gustavo - FPAC-FBC, DC

Retention Policy  USDA 7 Year Permanently Delete (7 years)    Expires  8/20/2030

You replied to this message on 8/23/2023 7:23 AM.

Reply | Reply All | Forward

Tue 8/22/2023 4:07 PM

Here you go, let me know how it works out.



| range | | amount |
|---|---|---|
| 0-2000 | 2 | 588274284 |
| 2001-4000 | 4 | 460712735 |
| etc | 6 | 387067004 |
| | 8 | 337052421 |
| | 10 | 293549898 |
| | 12 | 267520925 |
| | 14 | 242544370 |
| | 16 | 211389377 |
| | 18 | 203762809 |
| | 20 | 186059182 |
| | 22 | 174727063 |
| | 24 | 162566340 |
| | 26 | 151559860 |
| | 28 | 142069412 |
| | 30 | 133220844 |
| | 32 | 125442398 |
| | 34 | 118329382 |
| | 36 | 111714437 |
| | 38 | 105627499 |
| | 40 | 99871377 |
| | 42 | 94306575 |
| | 44 | 89740646 |
| | 46 | 85115699 |
| | 48 | 81085250 |
| | 50 | 77253237 |
| | >50 | 2767467070 |
| total | | 7716266284 |

0-2000
2001-4000
etc

2   588274284
4   460712735
6   387067004
8   337052421
10  293549898
12  267520925
14  242544370
16  211389377
18  203762809
20  186059182
22  174727063
24  162566340
26  151559860
28  142069412
30  133220844
32  125442398
34  118329382
36  111714437
38  105627499
40  99871377
42  94306575
44  89740646
46  85115699
48  81085250
50  77253237
>50  2767467070

total 7716266284

Strickland AR 0888

ERP 2022 COST ESTIMATE 09272023.xlxs

TAB 1B-NAP

[REDACTED—NOT PART OF ADMINISTRATIVE RECORD]

Strickland AR 0889

ERP 2022 COST ESTIMATE 09272023.xlxs

TAB 1B-NAP grass adj.

[REDACTED—NOT PART OF ADMINISTRATIVE RECORD]

Strickland AR 0890

ERP 2022 COST ESTIMATE 09272023.xlxs

TAB ERP2

[REDACTED—NOT PART OF ADMINISTRATIVE RECORD]

Strickland AR 0891

| Bucket min | Bucket max | Track 1A – RMA | | | | Track 1B – NAP | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | RMA gross | Share | Factor | RMA net | NAP gross | Share | Factor | NAP net |
| $0 | $2,000 | $588,274,284 | 8% | 1.00 | $588,274,284 | $51,579,246 | 23% | 1.00 | $51,579,246 |
| $2,001 | $4,000 | $460,712,735 | 6% | 0.80 | $368,570,188 | $27,921,273 | 13% | 1.00 | $27,921,273 |
| $4,001 | $6,000 | $387,687,004 | 5% | 0.60 | $232,612,202 | $18,638,813 | 8% | 1.00 | $18,638,813 |
| $6,001 | $8,000 | $317,053,421 | 4% | 0.40 | $134,822,968 | $13,849,117 | 6% | 1.00 | $13,849,117 |
| $8,001 | $10,000 | $298,343,898 | 4% | 0.20 | $59,669,980 | $10,848,227 | 5% | 1.00 | $10,848,227 |
| $10,001 | $12,000 | $267,520,925 | 3% | 0.10 | $26,752,093 | $8,734,623 | 4% | 1.00 | $8,734,623 |
| $12,001 | $14,000 | $242,544,370 | 3% | 0.10 | $24,254,437 | $7,230,894 | 3% | 1.00 | $7,230,894 |
| $14,001 | $16,000 | $221,389,577 | 3% | 0.10 | $22,138,958 | $6,113,706 | 3% | 1.00 | $6,113,706 |
| $16,001 | $18,000 | $203,762,809 | 3% | 0.10 | $20,376,281 | $5,267,150 | 2% | 1.00 | $5,267,150 |
| $18,001 | $20,000 | $188,509,182 | 2% | 0.10 | $18,850,918 | $4,520,812 | 2% | 1.00 | $4,520,812 |
| $20,001 | $22,000 | $174,733,063 | 2% | 0.10 | $17,473,306 | $4,537,461 | 2% | 1.00 | $4,537,461 |
| $22,001 | $24,000 | $162,566,340 | 2% | 0.10 | $16,256,634 | $3,481,319 | 2% | 1.00 | $3,481,319 |
| $24,001 | $26,000 | $151,599,860 | 2% | 0.10 | $15,159,986 | $3,058,620 | 2% | 1.00 | $3,058,620 |
| $26,001 | $28,000 | $142,069,412 | 2% | 0.10 | $14,206,941 | $2,730,023 | 1% | 1.00 | $2,730,023 |
| $28,001 | $30,000 | $133,320,844 | 2% | 0.10 | $13,332,084 | $2,461,921 | 1% | 1.00 | $2,461,921 |
| $30,001 | $32,000 | $125,442,398 | 2% | 0.10 | $12,544,240 | $2,218,617 | 1% | 1.00 | $2,218,617 |
| $32,001 | $34,000 | $118,329,382 | 2% | 0.10 | $11,832,938 | $2,009,345 | 1% | 1.00 | $2,009,345 |
| $34,001 | $36,000 | $111,716,437 | 1% | 0.10 | $11,171,644 | $1,703,741 | 1% | 1.00 | $1,703,741 |
| $36,001 | $38,000 | $105,627,489 | 1% | 0.10 | $10,562,749 | $1,646,842 | 1% | 1.00 | $1,646,842 |
| $38,001 | $40,000 | $99,871,377 | 1% | 0.10 | $9,987,138 | $1,520,438 | 1% | 1.00 | $1,520,438 |
| $40,001 | $42,000 | $94,530,575 | 1% | 0.10 | $9,453,058 | $1,404,376 | 1% | 1.00 | $1,404,376 |
| $42,001 | $44,000 | $89,740,646 | 1% | 0.10 | $8,974,065 | $1,303,961 | 1% | 1.00 | $1,303,961 |
| $44,001 | $46,000 | $85,115,699 | 1% | 0.10 | $8,511,570 | $1,222,981 | 1% | 1.00 | $1,222,981 |
| $46,001 | $48,000 | $81,085,250 | 1% | 0.10 | $8,108,525 | $1,143,307 | 1% | 1.00 | $1,143,307 |
| $48,001 | $50,000 | $77,253,237 | 1% | 0.10 | $7,725,324 | $1,038,129 | 0% | 1.00 | $1,038,129 |
| $50,001 | No max | $2,767,467,070 | 36% | 0.10 | $276,746,707 | $36,189,457 | 16% | 1.00 | $36,189,457 |
| Total | | $7,716,266,284 | | 0.27 | $2,045,784,947 | $221,884,398 | | 1.00 | $221,884,398 |
| UP | 0.10 | $432,192,149 | | | $432,192,149 | $0 | | | $0 |
| Less payment limitations, attribution, netting, etc. | | ($814,845,843) | | | ($247,797,710) | ($222,188,440) | | | ($222,188,440) |
| Final | | $7,333,612,590 | | | $2,230,179,387 | $199,695,958 | | | $199,695,958 |

Strickland AR 0892

|  | Track 2 | | | | All ERP 2022 | | | |
| ERP 2 gross | Share | Factor | ERP 2 net | Gross | Gross share | Effective factor | Net | Net share |
|---|---|---|---|---|---|---|---|---|
| $48,607,874 | 1.21% | 1.00 | $48,607,874 | $688,461,405 | 6% | 1.00 | $688,461,405 | 25% |
| $46,441,359 | 1.16% | 0.80 | $37,153,088 | $535,075,368 | 4% | 0.81 | $433,644,549 | 16% |
| $44,511,569 | 1.11% | 0.60 | $26,706,941 | $450,837,386 | 4% | 0.62 | $277,957,956 | 10% |
| $42,986,821 | 1.07% | 0.40 | $17,194,728 | $333,486,559 | 3% | 0.42 | $165,784,814 | 6% |
| $41,145,427 | 1.03% | 0.20 | $8,229,085 | $350,343,552 | 3% | 0.22 | $78,747,292 | 3% |
| $39,562,342 | 0.99% | 0.10 | $3,956,234 | $315,817,890 | 3% | 0.12 | $39,442,950 | 1% |
| $38,047,528 | 0.95% | 0.10 | $3,804,753 | $287,822,792 | 2% | 0.12 | $35,290,084 | 1% |
| $36,736,590 | 0.92% | 0.10 | $3,673,659 | $264,239,874 | 2% | 0.12 | $31,926,323 | 1% |
| $35,631,185 | 0.89% | 0.10 | $3,563,118 | $244,661,143 | 2% | 0.12 | $29,206,549 | 1% |
| $34,557,941 | 0.86% | 0.10 | $3,456,794 | $227,597,935 | 2% | 0.12 | $26,828,524 | 1% |
| $33,715,683 | 0.84% | 0.10 | $3,371,568 | $213,265,368 | 2% | 0.12 | $24,665,385 | 1% |
| $32,552,436 | 0.81% | 0.10 | $3,255,244 | $198,640,095 | 2% | 0.12 | $22,957,196 | 1% |
| $31,673,342 | 0.79% | 0.10 | $3,167,334 | $186,331,822 | 1% | 0.11 | $21,385,940 | 1% |
| $30,811,307 | 0.77% | 0.10 | $3,081,131 | $175,610,743 | 1% | 0.11 | $20,018,095 | 1% |
| $29,935,413 | 0.75% | 0.10 | $2,993,541 | $165,718,178 | 1% | 0.11 | $18,787,546 | 1% |
| $29,101,726 | 0.73% | 0.10 | $2,910,173 | $156,762,741 | 1% | 0.11 | $17,673,029 | 1% |
| $28,315,772 | 0.71% | 0.10 | $2,831,577 | $148,654,499 | 1% | 0.11 | $16,673,860 | 1% |
| $27,598,974 | 0.69% | 0.10 | $2,759,897 | $141,101,163 | 1% | 0.11 | $15,897,282 | 1% |
| $26,886,912 | 0.67% | 0.10 | $2,688,691 | $134,101,163 | 1% | 0.11 | $14,808,282 | 1% |
| $26,182,479 | 0.65% | 0.10 | $2,618,248 | $127,574,293 | 1% | 0.11 | $14,125,823 | 1% |
| $25,545,021 | 0.64% | 0.10 | $2,554,502 | $121,479,972 | 1% | 0.11 | $13,411,935 | 0% |
| $24,912,423 | 0.62% | 0.10 | $2,491,242 | $115,957,030 | 1% | 0.11 | $12,769,268 | 0% |
| $24,327,918 | 0.61% | 0.10 | $2,432,792 | $110,666,599 | 1% | 0.11 | $12,167,343 | 0% |
| $23,763,713 | 0.59% | 0.10 | $2,376,371 | $105,992,270 | 1% | 0.11 | $11,628,203 | 0% |
| $23,219,293 | 0.58% | 0.10 | $2,321,929 | $105,530,680 | 1% | 0.11 | $11,105,383 | 0% |
| $3,185,926,205 | 79.40% | | $318,592,620 | $5,989,586,732 | 50% | | $631,528,785 | 23% |
| | | | | | | | | |
| $4,012,387,256 | 0.13 | 0.13 | $516,701,138 | $11,950,537,937 | | 0.23 | $2,784,370,483 | |
| $300,929,044 | | | $38,752,585 | $733,121,193 | | | $470,944,734 | |
| ($431,331,630) | | | ($55,545,372) | ($1,268,365,913) | | | ($325,531,522) | |
| $3,881,984,670 | | | **$499,908,351** | $11,415,293,217 | | | **$2,929,783,695** | |

| Gross | Net |
|---|---|
| Add 2.5 percent | $3,003,028,288 |
| Add 5 percent | $3,076,272,880 |
| Add 10 percent | $3,222,762,065 |
| **Apply 75% max initial payment** | **$2,197,337,772** |
| Add 2.5 percent | $2,252,271,216 |
| Add 5 percent | $2,307,204,660 |
| Add 10 percent | $2,417,071,549 |

bringing about a balance between production, and utilization of agricultural products.'' The collection of information in this request is based on the AMA, title II, subtitle A, § 203, principally, paragraphs (b), (g), and (k) that direct the Secretary of Agriculture to determine agricultural marketing costs and develop efficient marketing methods to reduce the price spread between producer and consumer; to collect and disseminate marketing information to bring about a balance between production and utilization of agricultural products; and to collect, tabulate, and disseminate agricultural marketing statistics.

Under this authority, the Agricultural Marketing Service (AMS) Livestock, Poultry, and Grain Market News (LPGMN) Division works to provide timely information of prices, supply, demands, trends, movement, and other details affecting the trade of livestock, poultry, meat, eggs, grain, and their related products, as well as locally produced and marketed products. The information requested is used to compile and disseminate market reports that provide current, unbiased information to all stakeholders in the U.S. agricultural industry.

*Need and Use of the Information:* Information is used by the private sector to make economic decisions to establish market values for application in contracts or settlement value, and to address specific concerns or issues related to trade agreements and disputes as well as being used by educational institutions, specifically, agricultural colleges and universities. Government agencies such as the Foreign Agricultural Service, Economic Research Service and the National Agricultural Statistics Service use market news data in the performance of their missions. LPGMN reports provide interested segments of the market chain and the general public with unbiased comprehensive livestock, poultry, meat, eggs, wool, grain market data which helps equalize the competitive position of all market participants. The absence of these data would deny primary and secondary users information that otherwise would be available to aid them in their production and marketing decisions, analyses, research and knowledge of current market conditions. The omission of these data could adversely affect prices, supply, and demand.

*Description of Respondents:* Business or other for-profit; Farms.

*Number of Respondents:* 3,220.

*Frequency of Responses:* Reporting: Weekly; Annually.

*Total Burden Hours:* 17,970.

**Levi S. Harrell,**
*Departmental Information Collection Clearance Officer.*

[FR Doc. 2023–23952 Filed 10–30–23; 8:45 am]

**BILLING CODE 3410–02–P**

---

# DEPARTMENT OF AGRICULTURE

## Submission for OMB Review; Comment Request

The Department of Agriculture has submitted the following information collection requirement(s) to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. Comments are requested regarding; whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; ways to enhance the quality, utility and clarity of the information to be collected; and ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

Comments regarding this information collection received by November 30, 2023 will be considered. Written comments and recommendations for the proposed information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

An agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

## Food and Nutrition Service

*Title:* Understanding States' SNAP Customer Service Strategies (NEW).

*OMB Control Number:* 0584–NEW.

*Summary of Collection:* The Food and Nutrition Service (FNS) is interested in exploring how State agencies define and measure the quality of customer service for Supplemental Nutrition Assistance Program (SNAP) applicants and participants, particularly strategies that go beyond the minimum requirements set by FNS; and how State SNAP agencies implement and refine their customer service approaches. This study will conduct case studies in up to nine states to understand their approaches to defining, measuring, and improving customer service in SNAP.

*Need and Use of the Information:* (1) Review of existing studies, reports, and data on customer services strategies and approaches. (2) Case studies in up to nine states with diverse approaches to supporting and monitoring customer service in SNAP.

The research team will collect case study data during two-day in-person site visits to each selected State that will include interviews with State, regional (*e.g.,* call center), and local SNAP staff and key stakeholders, review of relevant documents and reports, and observations of staff interactions with customer service systems.

*Description of Respondents:* State, Local and Tribal Governments, Businesses.

*Number of Respondents:* 116.

*Frequency of Responses:* Reporting: Once.

*Total Burden Hours:* 144.

**Ruth Brown,**
*Departmental Information Collection Clearance Officer.*

[FR Doc. 2023–23960 Filed 10–30–23; 8:45 am]

**BILLING CODE 3410–30–P**

---

# DEPARTMENT OF AGRICULTURE

## Farm Service Agency

**[Docket ID FSA–2023–0020]**

## Notice of Funds Availability; Emergency Relief Program 2022 (ERP 2022)

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notice of funds availability.

---

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ERP 2022, which will provide payments to eligible crop producers for losses due to qualifying disaster events including wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions that occurred in calendar year 2022. ERP 2022 will be administered through 2 tracks (referred to as Track 1 and Track 2). Track 1 will

assist eligible crop producers who received indemnities for eligible crop or tree losses through certain Federal crop insurance policies or payments for crop losses through the Noninsured Crop Disaster Assistance Program (NAP). Track 2 will assist eligible crop producers for other eligible crop and tree losses through a revenue-based approach.

**DATES:**
*Funding availability:* Application period for Track 1 will begin October 31, 2023. Application period for Track 2 will begin October 31, 2023.

*Comments:* We will consider comments we receive by January 2, 2024.

**ADDRESSES:** You may submit comments by the following method: Federal eRulemaking Portal: Go to *https:// www.regulations.gov* and search for Docket ID FSA–2023–0020. You may also send comments to the Desk Officer for Agriculture, Office of the Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503. Comments will be available for public inspection online at *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:**
Kathy Sayers; telephone: (202) 720–6825; email: *kathy.sayers@usda.gov.* Individuals who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay service (both voice and text telephone users can initiate this call from any telephone).

**SUPPLEMENTARY INFORMATION:**

**Background**

Title I of the Disaster Relief Supplemental Appropriations Act, 2023 (Division N of the Consolidated Appropriations Act, 2023; Pub. L. 117–328) provides approximately $3.74 billion, to remain available until expended, for necessary expenses related to losses of revenue, quality, or production losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2022, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze, including a polar vortex, smoke exposure, and excessive moisture occurring in calendar year 2022. Losses due to drought are only eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for 8 consecutive weeks

or a D3 (extreme drought) or higher level of drought intensity.

FSA is using the funding to assist eligible producers who suffered eligible losses through several programs.[1] In this document, FSA is announcing ERP 2022, which will assist eligible crop producers who suffered eligible losses due to qualifying disaster events as defined in this document. These producers have been significantly impacted by qualifying disaster events occurring in 2022, and have resulted in significant losses. FSA has designed ERP 2022 consistent with the public interest in streamlining and expediting disaster assistance payments to agricultural producers to the greatest extent possible. ERP 2022 will be administered through 2 tracks:

∀ Track 1 will use a streamlined process with pre-filled application forms, as discussed in this document. It will provide payments for eligible crop losses and tree losses, described below, where data are already on file with FSA or the Risk Management Agency (RMA), as a result of the producer previously receiving a NAP payment or an indemnity under certain Federal crop insurance policies for a loss in the same year that could have been affected by a qualifying disaster event; and

∀ Track 2 will provide payments for eligible crop and tree losses through a revenue-based approach using data provided by eligible producers on application forms.

Producers with losses that are eligible for Track 1 may apply for Track 1, Track 2, or both tracks; however, the Track 2 payment calculation will take into account any payments the producer receives under Track 1 to ensure a producer is not receiving duplicate benefits under both tracks.

Both tracks cover the same eligible crops, as defined below. For payment limitation purposes, ERP 2022 classifies eligible crops into the following categories:

∀ specialty crops;
∀ non-specialty crops;
∀ high value crops; and
∀ other crops.

The term "non-specialty crop" only applies to Track 1, the terms "high value crop" and "other crop" only apply to Track 2, and the term "specialty crop" applies to both tracks; those terms are defined in this

document and discussed below in the payment limitation section.

**Definitions**

The definitions in 7 CFR parts 718 and 1400 apply to ERP 2022, except as otherwise provided in this document. The following definitions also apply.

*2017 WHIP* means the 2017 Wildfires and Hurricanes Indemnity Program (7 CFR part 760, subpart O).

*Administrative fee* means the amount an insured producer paid for catastrophic risk protection and any additional coverage for each crop year as specified in the applicable Federal crop insurance policy.

*Aquaculture* means any species of aquatic organisms grown as food for human or livestock consumption or for industrial or biomass uses, fish raised as feed for fish that are consumed by humans, and ornamental fish propagated and reared in an aquatic medium. Eligible aquacultural species must be raised by a commercial operator and in water in a controlled environment.

*ARC* means the Agriculture Risk Coverage program (7 CFR part 1412).

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income (AGI) derived from farming, ranching, and forestry operations, including losses, for the base period consisting of the 2018, 2019, and 2020 tax years.

If the resulting average adjusted gross farm income derived from items 1 through 12 of the definition of income derived from farming, ranching, and forestry operations is at least 66.66 percent of the average AGI of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(1) The sale of equipment to conduct farm, ranch, or forestry operations; and

(2) The provision of production inputs and production services to farmers, ranchers, foresters, and farm operations.

For legal entities not required to file a Federal income tax return, or a person or legal entity that did not have taxable income in one or more tax years during the base period, the average will be the adjusted gross farm income, including losses, averaged for the 2018, 2019, and 2020 tax years, as determined by FSA. A new legal entity will have its adjusted gross farm income averaged only for those years of the base period for which it was in business; however, a new legal entity will not be considered "new" to the extent it takes over an existing operation and has any elements of common ownership interest and land

---

[1] FSA previously announced Emergency Livestock Relief Program 2022 (ELRP 2022) on September 27, 2023 (88 FR 66361–66366) and the Milk Loss Program on September 11, 2023 (88 FR 62285–62292). ELRP 2022 and Milk Loss Program payments for 2022 losses have the same funding source as ERP 2022.

Strickland AR 0894

with the preceding person or legal entity from which it took over. When there is such commonality, income of the previous person or legal entity will be averaged with that of the new legal entity for the base period. For a person filing a joint tax return, the certification of average adjusted farm income may be reported as if the person had filed a separate Federal tax return and the calculation is consistent with the information supporting the filed joint return.

*Average AGI* means the average of the AGI as defined under 26 U.S.C. 62 or comparable measure of the person or legal entity. The relevant tax years for the 2022 program year are 2018, 2019, and 2020.

*BCAP* means the Biomass Crop Assistance Program (7 CFR part 1450).

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Buy-up NAP coverage* means NAP coverage at a payment amount that is equal to an indemnity amount calculated for buy-up coverage computed under section 508(c)l or (h) of the Federal Crop Insurance Act and equal to the amount that the buy-up coverage yield for the crop exceeds the actual yield for the crop.

*Catastrophic coverage* has the same meaning as for NAP (in 7 CFR 1437.3), which is:

(1) For insured crops, the coverage offered by the Federal Crop Insurance Corporation (FCIC) under section 508(b) of the Federal Crop Insurance Act.

(2) For eligible NAP crops, coverage at the following levels due to an eligible cause of loss impacting the NAP covered crop during the coverage period:

(i) Prevented planting in excess of 35 percent of the intended acres;

(ii) A yield loss in excess of 50 percent of the approved yield;

(iii) A value loss in excess of 50 percent; or

(iv) An animal-unit-days (AUD) loss greater than 50 percent of expected AUD.

*CFAP* means the Coronavirus Food Assistance Program 1 and 2 under 7 CFR part 9, subparts A through C, excluding assistance for contract producers specified in § 9.203(l) through (o).

*Certifying agent* means a private or governmental entity accredited by the USDA Secretary for the purpose of certifying a production, processing, or handling operation as organic.

*Controlled environment* means an environment in which everything that can practicably be controlled by the producer with structures, facilities, and growing media (including but not limited to water, soil, or nutrients), is in fact controlled by the producer, as determined by industry standards.

*Coverage level* means the percentage determined by multiplying the elected yield percentage under a Federal crop insurance policy or NAP coverage by the elected price percentage.

*Crop year* means:

(1) For insured crops and trees, the crop year as defined according to the applicable Federal crop insurance policy; and

(2) For NAP-covered crops, the crop year as defined in 7 CFR 1437.3.

*Deputy Administrator* means the FSA Deputy Administrator for Farm Programs.

*Direct market crop* means a crop sold directly to consumers without the intervention of an intermediary such as a registered handler, wholesaler, retailer, packer, processor, shipper, or buyer (for example, a crop sold at a farmer's market or roadside stand), excluding crops sold for livestock consumption.

*Disaster year* means the calendar year in which the qualifying disaster event occurred (that is, 2022).

*ELAP* means the Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program (7 CFR 1416, subpart B).

*Eligible crop* means a crop, including eligible aquaculture, that is produced, or would have been produced if the qualifying disaster event had not occurred (for example, crops prevented from planting), in the United States as part of a farming operation. It excludes:

(1) Crops for grazing;

(2) Aquatic species that do not meet the definition of aquaculture;

(3) *Cannabis sativa L.* and any part of that plant that does not meet the definition of hemp; and

(4) Timber.

*Farming operation* means a business enterprise engaged in the production of agricultural products, commodities, or livestock, operated by a person, legal entity, or joint operation. A person or legal entity may have more than one farming operation if the person or legal entity is a member of one or more legal entity or joint operation.

*FCIC* means the Federal Crop Insurance Corporation, a wholly owned Government Corporation of USDA, administered by RMA.

*Federal crop insurance* means an insurance policy reinsured by FCIC

administered by RMA under the provisions of the Federal Crop Insurance Act (7 U.S.C. 1501–1524), as amended. It does not include private plans of insurance.

*Federal crop insurance indemnity* means the payment to a participant for crop losses covered under Federal crop insurance administered by RMA in accordance with the Federal Crop Insurance Act.

*Feedstock* means a crop including, but not limited to, grassesor legumes, algae, cotton, peanuts, coarse grains, small grains, oilseeds, or short rotation woody crops grown expressly for the purpose of producing a biobased material or product, and does not include residues and by-products of crops grown for any other purpose.

*Hemp* means the plant species *Cannabis sativa L.* and any part of that plant, including the seeds and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis, that is grown under a license or other required authorization issued by the applicable governing authority that permits the production of the hemp.

*High value crop* means, for Track 2:

(1) Any eligible crop that is not specifically identified as a specialty crop or listed in the definition of "other crop"; and

(2) Any eligible crop, regardless of whether it is identified as a specialty crop or listed in the definition of "other crop," if the crop is a direct market crop, organic crop, or a crop grown for a specific market in which specialized products can be sold resulting in an increased value compared to the typical market for the crops (for example, soybeans intended for tofu production), as determined by the Deputy Administrator.

**Note:** The term "high value crop" does not apply to Track 1.

*Income derived from farming, ranching, and forestry operations* means income of a person or legal entity derived from:

(1) Production of crops and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, or forestry commodities including for renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, Federal crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Benefits (including, but not limited to, cost-share assistance and other payments) from any Federal program made available and applicable to payment eligibility and payment limitation rules, as provided in 7 CFR part 1400;

(11) Income reported on IRS Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, an Interest Charge Domestic International Sales Corporation (IC–DISC), or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, and forestry activities as defined in this document; and

(13) Any other activity related to farming, ranching, or forestry, as determined by the Deputy Administrator.

*IRS* means the Department of the Treasury, Internal Revenue Service.

*LDP* means the Loan Deficiency Payment programs (7 CFR parts 1421, 1425, 1427, 1434, and 1435).

*Legal entity* means a corporation, joint stock company, association, limited partnership, limited liability company, irrevocable trust, estate, charitable organization, general partnership, joint venture, or other similar organization created under Federal or State law including any such organization participating in a business structure as a partner in a general partnership, a participant in a joint venture, a grantor of a revocable trust, or as a participant in a similar organization. A business operating as a sole proprietorship is considered a legal entity.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales did not exceed $189,200 in each of the 2019 and 2020

calendar years (the relevant years for the 2022 program year); and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the 2019 and 2020 calendar years. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through the Natural Resources Conservation Service at *https://lrftool.sc.egov.usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*LFP* means the Livestock Forage Disaster Program (7 CFR part 1416, subpart C).

*MLG* means marketing loan gains from the Marketing Assistance Loan program (7 CFR parts 1421, 1425, 1427, 1434, and 1435).

*Minor child* means a person who is under 18 years of age as of June 1, 2022.

*MFP* means the 2018 Market Facilitation Program (7 CFR part 1409, subpart A) and the 2019 Market Facilitation Program (7 CFR part 1409, subpart B).

*NAP* means the Noninsured Crop Disaster Assistance Program (7 CFR part 1437).

*NAP service fee* means the fee the producer paid to obtain NAP coverage specified in 7 CFR 1437.7.

*Non-specialty crop* means a crop, under Track 1, that does not meet the definition of specialty crop. Note: The term "non-specialty crop" does not apply to Track 2.

*On-Farm Storage Loss Program* means the On-Farm Storage Loss Program (7 CFR part 760, subpart P).

*Organic crop* means a crop that is grown on acreage certified by a certifying agent as conforming to organic standards (7 CFR part 205) and organically produced consistent with section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502).

*Other crop* means, for Track 2, cotton, peanuts, rice, feedstock, and any crop grown with an intended use of grain, silage, or forage, unless the crop meets the requirements in paragraph (2) of the definition of "high value crop." Note: The term "other crop" does not apply to Track 1.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ERP 2022, a person or legal entity that owns a share or stock in a legal entity that is a corporation,

limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is also considered to have a beneficial ownership interest in such legal entity.

*Person* means an individual who is a natural person and does not include a legal entity.

*PLC* means the Price Loss Coverage program (7 CFR part 1412).

*Premium* means the premium paid by the producer for Federal crop insurance coverage or NAP buy-up coverage levels.

*Producer* means a person or legal entity who was entitled to a share in the eligible crop or would have shared had the eligible crop been produced.

*Production inputs* mean material to conduct farming operations, such as seeds, chemicals, and fencing supplies.

*Production services* mean services provided to support a farming operation, such as custom farming, custom feeding, and custom fencing.

*Qualifying disaster event* means wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in 2022.

*Qualifying drought* means an area within the county was rated by the U.S. Drought Monitor as having a drought intensity of D2 (severe drought) for 8 consecutive weeks or D3 (extreme drought) or higher level for any period of time during the applicable calendar year.

*QLA Program* means the Quality Loss Adjustment Program (7 CFR part 760, subpart R).

*Related condition* means damaging weather and adverse natural occurrences that occurred concurrently with and as a direct result of a specified qualifying disaster event. Related conditions include, but are not limited to:

(1) Excessive wind that occurred as a direct result of a derecho;

(2) Silt and debris that occurred as a direct and proximate result of flooding;

(3) Excessive wind, storm surges, tropical storms, and tropical depressions that occurred as a direct result of a hurricane; and

(4) Excessive wind and blizzards that occurred as a direct result of a winter storm.

Strickland AR 0896

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Specialty crops* means fruits, tree nuts, vegetables, culinary herbs and spices, medicinal plants, and nursery, floriculture, and horticulture crops. This includes common specialty crops identified by USDA's Agricultural Marketing Service at *https://www.ams.usda.gov/services/grants/scbgp/specialty-crop* and other crops as designated by the Deputy Administrator. This term also includes trees covered by Federal crop insurance policies included in Track 1.

*STRP* means the Seafood Trade Relief Program (announced in the notice of funds availability published on September 14, 2020 (85 FR 56572)).

*Substantial beneficial interest (SBI)* has the same meaning as specified in 7 CFR 457.8. For the purposes of ERP 2022 Track 1, Federal crop insurance records for "transfer of coverage, right to indemnity" are considered the same as SBIs.

*Tree* means a tall, woody plant having comparatively great height, and a single trunk from which an annual crop is produced for commercial market for human consumption, such as a maple tree for syrup, or papaya or orchard tree for fruit. It includes immature trees that are intended for commercial purposes. Nursery stock, banana and plantain plants, and trees used for pulp or timber are not considered eligible trees.

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*Unit* means the unit structure as defined under the applicable Federal crop insurance policy for insured crops or in 7 CFR 1437.9 for NAP-covered crops.

*United States* means all 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

*USDA* means the U.S. Department of Agriculture.

*U.S. Drought Monitor* means the system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http://droughtmonitor.unl.edu.*

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)) [2] and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)) [3] during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*WFRP* means Whole-Farm Revenue Protection available through the FCIC, including coverage under the Micro Farm Program.

*WHIP+* means the Wildfires and Hurricanes Indemnity Program Plus (7 CFR part 760, subpart O).

**Producer Eligibility**

To be eligible for ERP 2022, a producer must meet all requirements described below for Track 1 or Track 2, as applicable, and be a:

(1) Citizen of the United States;

(2) Resident alien, which for purposes of ERP 2022 means "lawful alien" as defined in 7 CFR part 1400;

(3) Partnership organized under State law;

(4) Corporation, limited liability company, or other organizational structure organized under State law;

(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304); or

(6) Foreign person or foreign entity who meets all requirements as described in 7 CFR part 1400.

**Track 1 Overview**

Track 1 will provide a streamlined application process for eligible crop and tree losses during the 2022 or 2023 crop years [4] for which a producer had:

∀ A Federal crop insurance policy that provided coverage for crop production losses or tree losses related to the qualifying disaster events and received an indemnity [5] for a crop and unit, excluding:

—crops with an intended use of grazing,[6]

—livestock policies,

—forage seeding,

—Margin Protection Plan policies purchased without a base policy, [7]

—banana plants insured under the Hawaii Tropical Trees provisions, [8] and

—policies issued in Puerto Rico; [9] or

∀ NAP coverage and received a NAP payment for a crop and unit, excluding crops with an intended use of grazing.

The applicable Federal crop insurance policies and NAP provide payments to producers for crop and tree losses due to eligible causes of loss, as defined in the producer's Federal crop insurance policy or NAP regulations and basic provisions. RMA and FSA are using data submitted by producers for Federal crop insurance or NAP purposes to calculate a producer's eligible loss under Track 1. The Track 1 payment calculation is intended to compensate eligible crop and tree producers for a percentage of that loss determined by the applicable ERP factor, which varies based on the producer's level of Federal crop insurance or NAP coverage, as described later in this document. To be eligible for payment under Track 1, a producer must have suffered a crop or tree loss that was caused, in whole or in part, by a qualifying disaster event. Because the amount of loss due to a

---

[2] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[3] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[4] The 2023 crop year is included because a qualifying disaster event occurring in the 2022 calendar year may have caused a loss of a crop during the 2023 crop year, based on how "crop year" is defined in the applicable Federal crop insurance policy or NAP provisions.

[5] For purposes of Track 1, "indemnity" does not include cottonseed endorsement payments, downed rice endorsement payments, sugarcane crop replacement endorsement payments, replant payments, or raisin reconditioning payments.

[6] Crops with an intended use of grazing are covered under ELRP 2022.

[7] While the majority of crop insurance policies cover an eligible crop loss, a small number do not and are not eligible for ERP, including livestock policies, forage seeding, and margin policies.

[8] While bananas are covered under crops, the banana plants are not a tree, bush or a vine.

[9] Federal crop insurance policies issued in Puerto Rico are not transmitted through the standardized Policy Acceptance and Storage System. Therefore, pre-filled applications cannot be automatically generated under Track 1.

Strickland AR 0897

qualifying disaster event cannot be separated from the amount of loss caused by other causes of loss covered by some Federal crop insurance policies or NAP, the Track 1 payment will be based on the producer's loss as long as those losses were caused, in whole or in part, by a qualifying disaster event.

Track 1 excludes losses to aquacultural species for which the producer received a payment under ELAP to avoid providing duplicate benefits for losses already at least partially compensated for by ELAP. It also excludes losses for which the producer received a Phase 1 payment under the previous ERP.[10]

In some situations, a producer may have received both a NAP payment for a crop loss and an indemnity under a Federal crop insurance policy that is included in Track 1 to address the same loss. Examples of these policies include Rainfall Index plans for Annual Forage; Pasture, Rangeland, and Forage; and Apiculture. In those situations, the producer must elect whether to receive the Track 1 payment based only on the data associated with their Federal crop insurance indemnity or their NAP payment, but they cannot receive a Track 1 payment based on both the crop insurance indemnity and NAP payment. This policy is necessary to avoid compensating producers twice for the same loss under Track 1.

**Track 1 Applications**

FSA and RMA will identify the producers who meet the criteria described above to apply for Track 1. For each of those producers, FSA will generate an FSA–523, Emergency Relief Program (ERP) 2022 Track 1 Application, with certain items pre-filled with information already on file with USDA, as listed below. Producers cannot alter the data in these pre-filled items; any alterations in the pre-filled data on the application will result in the producer's Track 1 application being considered incomplete and the application will not be processed by FSA. FSA will not calculate Track 1 payments using data manually submitted by producers. Track 1 payments will only be calculated using data already on file with RMA and FSA. If a producer believes that any information that has been pre-filled is incorrect, the producer should contact their Federal crop insurance agent for insured crops or their FSA county office

for NAP-covered crops. Once the corrected data have been received and processed by RMA and FSA, an updated Track 1 application may be generated for the producer.

For producers who received a Federal crop insurance indemnity for eligible policies, the pre-filled application will include:

∀ the producer's physical State and county codes,
∀ unit numbers,
∀ crops, and
∀ crop years.

For producers who received a NAP payment, the pre-filled applications will include:

∀ the producer's administrative State and county codes,
∀ unit numbers,
∀ crop years,
∀ pay crops, and
∀ pay groups.

FSA will also pre-fill the calculated Track 1 payment amounts, prior to any payment reductions for reasons such as payment limitation and factoring of payments to stay within available funding.

Receipt of a pre-filled application form is not a confirmation that the producer is eligible to receive a Track 1 payment. In order to receive a payment, the producer must certify that their Federal crop insurance indemnity or NAP payment on which the Track 1 payment will be based was due, in whole or in part, to a crop production loss or a tree loss caused by a qualifying disaster event. Producers are responsible for reviewing the list of qualifying disaster events, and if a loss was due to drought, producers must also ensure that the county where the crop and unit was located meets the definition of "qualifying drought." FSA will provide a factsheet and other materials to provide examples and more details on the qualifying disaster events to assist producers (available through FSA county offices and at *https://www.fsa.usda.gov/programs-and-services/emergency-relief/index*). Producers who received a Federal crop insurance indemnity under a WFRP policy or for a whole-farm unit must also certify to the percentage of their expected revenue or total liability for the unit, respectively, from specialty crops for the purpose of administration of ERP 2022 payment limitations. [11]

Producers must also certify on FSA–523 that they will meet the requirement to purchase Federal crop insurance or NAP coverage for the next 2 available crop years, as described later in this document. If multiple crops and units are listed on an application and the producer only agrees to purchase Federal crop insurance or NAP coverage for only some of the crops and units, a Track 1 payment will be issued only for those crops and units for which the producer agrees to purchase Federal crop insurance or NAP coverage for the next 2 available crop years.

The portion of the form for producers who had Federal crop insurance will list the primary policy holder and all producers with an SBI who have a record established with FSA. If one or more producers with an SBI had a share in a crop, the primary policy holder must update the application to show the share in the crop for each of those producers in addition to the primary policy holder. If the producer(s) are determined to be eligible, payments will be issued to the primary policy holder and to any eligible producers with an SBI based on their ownership share of the crop. To receive a payment, each person or entity that is listed as having a share of the Track 1 payment for a crop and unit must sign the application and agree to purchase Federal crop insurance or NAP coverage for that crop and unit.

**Track 1 Payment Calculation**

FSA and RMA will calculate Track 1 payments using the loss data on file with FSA or RMA at the time of payment calculation or as later updated by FSA or RMA upon identification of an error in the data on file at time of payment calculation. [12] The Track 1 payment calculation for a crop and unit will depend on the type and level of Federal crop insurance or NAP coverage obtained by the producer. Crops covered under a WFRP policy or included in a whole-farm unit will be treated as a single crop for payment calculation purposes. Separate payment limitations will apply to the portions of the payments that attributed to specialty and to non-specialty crops, as described later in this document.

Each payment calculation will use an ERP factor based on the producer's level of Federal crop insurance or NAP coverage for that eligible crop or tree, as specified in the following tables.

---

[10] The previous ERP provided assistance for eligible crop losses due to qualifying disaster events in calendar years 2020 and 2021. Phase 1 of that program included 2022 crop year losses if the loss was due, in whole or in part, to a qualifying disaster event that occurred in the 2021 calendar year.

[11] WFRP provides risk management safety for specialty and non-specialty crops under one Federal crop insurance policy. The producer certifies to the percentage of expected revenue or total liability for the unit for specialty crops, which results in the attribution of the specialty and non-specialty crop portions of the ERP 2022 payment to the separate payment limitations.

[12] Track 1 payments will be calculated using only data on file with RMA and FSA. FSA will not calculate Track 1 payments using data manually submitted by producers.

Strickland AR 0898

| Federal crop insurance coverage level | ERP factor (%) |
|---|---|
| Catastrophic coverage .............. | 75.0 |
| More than catastrophic coverage but less than 55 percent | 80.0 |
| At least 55 percent but less than 60 percent ...................... | 82.5 |
| At least 60 percent but less than 65 percent ...................... | 85.0 |
| At least 65 percent but less than 70 percent ...................... | 87.5 |
| At least 70 percent but less than 75 percent ...................... | 90.0 |
| At least 75 percent but less than 80 percent ...................... | 92.5 |
| At least 80 percent .................. | 95.0 |

| NAP coverage level | ERP factor (%) |
|---|---|
| Catastrophic coverage .............. | 75.0 |
| 50 percent ................................. | 80.0 |
| 55 percent ................................. | 85.0 |
| 60 percent ................................. | 90.0 |
| 65 percent ................................. | 95.0 |

When determining the ERP factors, analysis was conducted to ensure that payments do not exceed available funding and, in aggregate across all eligible crop and tree producers, do not exceed 90 percent of losses, as required by Title I of the Disaster Relief Supplemental Appropriations Act, 2023. The difference between the ERP factors for Federal crop insurance and NAP is due to differences in the available coverage levels under Federal crop insurance and NAP. Federal crop insurance is available at the catastrophic coverage level (50 percent production coverage of 55 percent of the price) and buy-up coverage levels (50 percent to 85 percent of the production for 100 percent of the price). The coverage level for NAP is limited by law to a maximum of 65 percent buy-up coverage. For both NAP and Federal crop insurance, the ERP payment factor for the catastrophic and maximum buy-up levels are 75 percent and 95 percent, respectively, with the ERP factors stair-stepping for the buy-up options in-between as shown in the tables above. Title I of the Disaster Relief Supplemental Appropriations Act, 2023, provides that payments to eligible crop and tree producers who did not have Federal crop insurance or NAP coverage cannot exceed 70 percent of their loss. The lowest ERP factor for eligible crop and tree producers who had Federal crop insurance or NAP is set at 75 percent. Payment limits and other reductions will result in reducing ERP 2022 payments, further lowering the percent of losses covered.

For eligible crop producers who received Federal crop insurance indemnities, RMA will use the producer's data that are already on file, which provide the necessary information to determine the producer's amount of loss. Federal crop insurance provides financial assistance for crop losses due to specified natural disasters and uses a producer's data to calculate a payment based on the type of Federal crop insurance coverage elected by the producer. As previously discussed, Track 1 is intended to compensate eligible crop and tree producers for a percentage of their loss determined by the applicable ERP factor based on the level of Federal crop insurance coverage purchased; therefore, RMA will calculate each producer's loss consistent with the approved RMA loss procedures for the type of coverage purchased [13] but using the ERP factor. This calculated amount will then be adjusted by subtracting the gross Federal crop insurance indemnity.

After calculating the producer's loss and subtracting the gross Federal crop insurance indemnity as described above for each crop and unit, progressive factoring [14] will be applied. Progressive factoring will be applied by payment range, according to the table below, and FSA will calculate the sum of each of those calculations.

| Payment range | Progressive factor (%) |
|---|---|
| Up to $2,000 ............................. | 100 |
| $2,001 to $4,000 ...................... | 80 |
| $4,001 to $6,000 ...................... | 60 |
| $6,001 to $8,000 ...................... | 40 |
| $8,001 to $10,000 .................... | 20 |
| Over $10,000 ............................ | 10 |

For example, to apply progressive factoring to a calculated loss (after subtraction of indemnities) of $5,000, FSA would multiply:

∀ the first $2,000 by a factor of 100 percent ($2,000 · 100% = $2,000),

∀ the second $2,000 by a factor of 80 percent ($2,000 · 80% = $1,600), and

∀ the remaining $1,000 by a factor of 60 percent ($1,000 · 60% = $600).

The sum of those calculations is $4,200, which is the calculated ERP 2022 payment after progressive factoring.

For another example, to apply progressive factoring to a calculated loss (after subtraction of indemnities) of $430,000, FSA would multiply:

∀ the first $2,000 by a factor of 100 percent ($2,000 · 100% = $2,000),

∀ the second $2,000 by a factor of 80 percent ($2,000 · 80% = $1,600),

∀ the third $2,000 by a factor of 60 percent ($2,000 · 60% = $1,200),

∀ the fourth $2,000 by a factor of 40 percent ($2,000 · 40% = $800),

∀ the fifth $2,000 by a factor of 20% ($2,000 · 20% = $400), and

∀ the remaining $420,000 by a factor of 10 percent ($420,000 · 10% = $42,000).

The sum of those calculations is $48,000, which is the calculated ERP 2022 payment after progressive factoring.

For underserved producers, the producer's share of the Federal crop insurance administrative fee and premium will be added to the resulting sum.[15]

For all eligible crop producers, FSA will then apply a final payment factor of 75 percent, resulting in the producer's calculated Track 1 payment.

For NAP-covered crops and trees, FSA will use the producer's crop production or inventory data that are already on file, which provides the necessary information to determine the producer's amount of loss. NAP provides financial assistance for crop losses due to specified natural disasters and uses a producer's crop production or inventory data to calculate a payment based on the level of NAP coverage elected by the producer. As previously discussed, ERP 2022 is intended to compensate eligible crop and tree producers for a percentage of loss determined by the applicable ERP factor based on their NAP coverage level;

---

[13] For example, ERP 2022 for Area Risk Protection Insurance (ARPI) and Stacked Income Protection (STAX) is based on area-wide (for example, county) production losses.

[14] Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

[15] Providing a refund of underserved producers' premiums and fees supports the equitable administration of FSA programs by targeting limited resources to support underserved farmers and ranchers, who are more likely to lack financial reserves and access to capital to invest in future risk protection while coping with losses due to unexpected events outside of their control. The refund of premiums and fees for these more-often vulnerable and smaller operations who often lack financial resources supports access to higher levels of coverage available through Federal crop insurance or NAP. This approach is consistent with the intent to provide reduced service fees and premium reductions to underserved farmers and ranchers for other FSA programs as authorized by law. NAP provides a reduced service fee and premium for underserved farmers and ranchers (7 U.S.C. 7333(k)(2) and 7 U.S.C. 7333(l)(3)). In addition, Federal crop insurance provides an administrative fee waiver for limited resource farmers, beginning farmers or ranchers, and veteran farmers or ranchers; and offers a premium reduction for beginning farmers or ranchers and veteran farmers or ranchers (7 U.S.C. 1508(b)(5)(E)(i) and 7 U.S.C. 1508(e)(8)).

Strickland AR 0899

therefore, FSA will perform a calculation that is consistent with the NAP payment calculation for the pay crop and unit, as provided in 7 CFR part 1437, but using the ERP factor in the table above applicable to the producer's NAP coverage level as the applicable guarantee in those calculations. For example, the guarantee for a producer that had purchased 60 percent NAP coverage would be adjusted and recalculated based on a 90 percent ERP factor. The calculated amount using the ERP factor would then be adjusted by subtracting the producer's gross NAP payment. [16] For underserved producers, the producer's share of the NAP service fees and premium will be added to the result of that calculation. [17]

The calculated amount for NAP-covered crops will not be subject to the progressive factoring [18] that applies to ERP 2022 payments based on Federal crop insurance indemnities; however, it will be multiplied by a final payment factor of 75 percent to ensure that total payments do not exceed the available funding.

FSA will issue Track 1 payments as applications are processed and approved. All ERP 2022 payments are subject to the availability of funding. If additional funding is available after all eligible ERP 2022 applications have been processed and payments have been issued, FSA may issue an additional payment, not to exceed the maximum amount allowed by law.

**Track 2 Overview**

Track 2 will provide assistance for eligible revenue, production, and quality losses of eligible crops not included in Track 1. FSA has determined that the best estimation of such losses is a producer's decrease in disaster year revenue compared to a benchmark year revenue, where benchmark year revenue represents a producer's revenue prior to the impact of the qualifying disaster event. This difference in revenue will reflect losses in both production and quality due in whole or in part to qualifying disaster events without requiring the more extensive calculations and documentation required under some previous FSA programs addressing crop losses due to disaster events. Decreases in disaster year revenue compared to benchmark revenue also reflect a producer's loss due to a qualifying disaster event regardless of whether the loss occurs before harvest or after harvest while the crop is in storage, further streamlining the delivery of assistance.

To be eligible for Track 2, a producer must certify that they suffered a loss in disaster year revenue, as compared to a benchmark year revenue, that was due to necessary expenses associated with losses of eligible crops due in whole or in part to a qualifying disaster event that occurred in the 2022 calendar year. Track 2 provides 2 options for determining the benchmark and disaster year revenues:

∀ The tax year option, which allows producers to use certain information located in their tax records to apply for Track 2; [19] or

∀ The expected revenue option, which is intended to better address situations such as a change in operation capacity [20] in the disaster year, as compared to the 2018 or 2019 benchmark year; the 2018 and 2019 tax years not reasonably reflecting a normal year's revenue for reasons including losses due to disaster events in 2018 and 2019 or changes in crop prices; or production of crops that do not generate revenue for the producer directly from the sale of the crop (for example, forage fed to livestock or grapes used by the producer to make wine).

The following table summarizes benchmark and disaster year revenue for the 2 options. Sources of revenue to be included in allowable gross revenue, expected revenue, and actual revenue are explained below in greater detail.

| Option | Benchmark year revenue | Disaster year revenue |
|---|---|---|
| Tax Year ...................... | A producer's allowable gross revenue for the 2018 or 2019 tax year, as elected by the producer. | A producer's allowable gross revenue for the 2022 or 2023 tax year, as elected by the producer. |
| Expected Revenue ....... | A producer's expected revenue from all eligible crops that could have been affected by a qualifying disaster event in calendar year 2022. | A producer's actual revenue from all eligible crops that were included in the producer's expected revenue. |

Although most producers may choose between the 2 options when applying for Track 2, there are two situations that require a producer to use a specific option:

∀ *Situation 1:* Producers who received a payment under the previous ERP for the 2021 disaster year and elected the 2022 tax year for their representative disaster year for Phase 2 can only apply for Track 2 using the tax year option, and they must select 2023 as their representative disaster year to ensure that they are not paid for the same loss under both programs, as those producers had previously certified that 2022 losses were the result of 2021 disaster events.[21]

∀ *Situation 2:* Producers, except those described in Situation 1, must use the expected revenue option if they had a decrease in operating capacity during their disaster year, as compared to the 2018 or 2019 benchmark year, were a new producer with no benchmark year revenue in 2018 or 2019, or produced any crop or crops that did not generate revenue directly from the sale of the crop and that the producer uses within their ordinary operation.

Producers who had an increase in operation capacity may elect either the tax year option or the expected revenue option; however, they may not adjust benchmark year revenue under the tax year option to reflect the change, which

---

[16] The gross NAP payment is the amount calculated according to 7 CFR part 1437, prior to any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and average AGI limitations.

[17] See footnote 15. NAP service fees are waived for producers with a CCC–860 certification of underserved status on file; however, if an underserved producer did not previously file CCC–860 to receive a service fee waiver, but files one now, their service fee will be added in the Track 1 payment calculation.

[18] Progressive factoring will not apply to ERP Track 1 payments calculated based on NAP payments as they traditionally support smaller producers and non-traditional crops. Non-traditional crops are not typically covered by Federal crop insurance products so the higher levels of coverage and risk protection under Federal crop insurance are not available to offset losses for producers of those crops in times of disaster.

[19] The tax year option is similar to the approach used in Phase 2 of the previous ERP, which provided assistance for crop losses due to disaster events in 2020 and 2021.

[20] Change in operation capacity does not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or changing the amount of fertilizers or chemicals used.

[21] Producers applying for Phase 2 of the previous ERP for losses due to qualifying disaster events in the 2021 calendar year selected either the 2021 or 2022 tax year as the applicable disaster year. Producers who selected the 2022 tax year have already been compensated for their 2022 tax year losses, but may select the 2023 tax year for the disaster year for Track 2.

is likely to result in a lower Track 2 payment because the 2018 or 2019 tax year would not accurately reflect their expected revenue at their 2022 operating capacity.

Producers must use the same option to calculate both the benchmark year revenue and disaster year revenue. For example, a producer who uses the expected revenue option for the benchmark year must also use the actual revenue option for the disaster year; they cannot use 2022 or 2023 tax year revenue for the disaster year.

### Track 2 Tax Year Option

Producers who use the tax year option for Track 2 will select 2018 or 2019 for their benchmark year revenue and 2022 or 2023 as their representative year for the disaster year revenue and will certify to their allowable gross revenue for those years. Allowable gross revenue is based on the year for which the revenue would be reported for the purpose of filing a tax return, except for the ERP 2022 Track 1 payments specified below. Producers who file or would be eligible to file a joint tax return will certify their allowable gross revenue based on what it would have been had they filed taxes separately for the applicable year.

Allowable gross revenue includes revenue from:

(1) Sales of eligible crops produced by the producer, which includes sales resulting from value added through post-production activities (for example, sales of jam from the processing of strawberries) that were reportable on IRS Schedule F;

(2) Sales of eligible crops a producer purchased for resale that had a change in characteristic due to the time held (for example, a plant purchased at a size of 2 inches and sold as an 18-inch plant after 4 months), less the cost or other basis of such eligible crops;

(3) Cooperative distributions directly related to the sale of the eligible crops produced by the producer, such as patronage paid to producers for gross grain sales;

(4) Benefits for eligible crops under the following agricultural programs: 2017 WHIP, ARC and PLC, BCAP, CFAP, ELAP (for aquaculture crops), ERP Phases 1 and 2, LDP, MLG, MFP, the On-Farm Storage Loss Program, Pandemic Assistance Revenue Program, QLA Program, STRP, and WHIP+;

(5) Commodity Credit Corporation loans for eligible crops, if treated as income and reported to the IRS;

(6) Federal crop insurance proceeds for eligible crops, minus the amount of administrative fees and premiums;

(7) NAP payments for eligible crops, minus the amount of service fees and premiums;

(8) Proceeds for eligible crops under private insurance policies;

(9) Payments issued through grant agreements with FSA for losses of eligible crops;

(10) Grants from the Department of Commerce, National Oceanic and Atmospheric Administration (NOAA) and State program funds providing direct payments for the loss of eligible crops or the loss of revenue from eligible crops;

(11) Other revenue directly related to the production of eligible crops that the IRS requires the producer to report as income, such as commodity-specific income received from State or local governments and net gain from hedging; and

(12) For the disaster year only, ERP 2022 Track 1 payments issued to another person or entity for the producer's share of an eligible crop, regardless of the tax year in which the payment would be reported to the IRS.[22]

Allowable gross revenue does not include revenue from sources other than those listed above, including but not limited to, revenue from:

(1) Federal assistance programs not included above;

(2) Sales of livestock, animal by-products, and any commodities that are excluded from "eligible crops;"

(3) Resale items not held for characteristic change;

(4) Income from a pass-through entity such as an S Corp or limited liability company;

(5) Conservation program payments;

(6) Any pandemic assistance payments that were not for the loss of eligible crops or the loss of revenue from eligible crops including, but not limited to, the Pandemic Livestock Indemnity Program, Pandemic Assistance for Timber Harvesters and Haulers, and Spot Market Hog Pandemic Program;

(7) Custom hire income;

(8) Net gain from speculation;

(9) Wages, salaries, tips, and cash rent;

(10) Rental of equipment or supplies; and

(11) Acting as a contract producer of an agricultural commodity.

---

[22] Track 1 allows producers who received pre-filled application forms to indicate shares in the crop. In some cases, payment for a producer's share of a crop may have been issued to a different person or entity than the producer applying for a related revenue loss under Track 2. Applications for Track 2 must include any Track 1 payments issued to another person or entity for the producer's share of an eligible crop in order to prevent duplicate benefits being issued for the same loss.

Form FSA–524–A, Emergency Relief Program (ERP) 2022 Track 2 Tax Year Revenue Worksheet, is an optional form that producers may use to assist in determining their allowable gross revenue. It is available at *https://www.fsa.usda.gov/programs-and-services/emergency-relief/index.*

### Track 2 Tax Year Option Special Provisions for Certain Producers

As stated above, producers who received a payment under the previous ERP for the 2021 program year and elected the 2022 tax year for their representative disaster year revenue are required to use the tax year option for Track 2, and they must use the 2023 tax year for disaster year revenue.

Those producers must certify to an allowable gross revenue for the benchmark year that they adjusted if the producer had a decreased operation capacity in a disaster year for which they are applying for ERP Track 2, compared to the benchmark year. Those producers may certify to an allowable gross revenue that they adjusted for the benchmark year on FSA–524 if either of the following apply:

(1) The producer did not have a full year of revenue for 2018 or 2019; or

(2) The producer had expanded their operation capacity in the disaster year compared to the benchmark year.

Change in operation capacity does not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals.

If requested by FSA, producers are required to submit documentation to FSA to support their adjustments within 30 calendar days of the request. The documentation to support an adjustment due to a change in operation capacity must show that the adjustment to the producer's benchmark year revenue is due to:

(1) An addition or decrease in production capacity of the farming operation;

(2) An increase or decrease in the use of existing production capacity; or

(3) Physical alterations that were made to existing production capacity.

If a producer did not have allowable gross revenue in a benchmark year because they began farming in 2020 or later, the producer may adjust benchmark year revenue on FSA–524 that represents the producer's reasonably expected disaster year revenue prior to the impact of the qualifying disaster event.

If requested by FSA, documentation required to support a producer's certification must be provided within 30

Strickland AR 0901

**Federal Register** / Vol. 88, No. 209 / Tuesday, October 31, 2023 / Notices    **74413**

calendar days of FSA's request, or the producer will be considered ineligible for ERP Track 2. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the qualifying disaster event and includes, but is not limited to:

(1) Financial documents such as a business plan or cash flow statement that demonstrate an expected level of revenue;

(2) Sales contracts or purchase agreements; and

(3) Documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

Producers who received a payment under the previous ERP for the 2021 program year and elected the 2022 tax year for their representative disaster year must also include in the allowable gross revenue a value for certain crops, when and as determined by the Deputy Administrator, that they produced that did not generate revenue directly from the sale of the crop and that the producer uses within their ordinary operation. This would include, for example, wine makers who grow their own wine grapes and process those grapes into wine and producers of forage crops who store the crop to feed to livestock on their farm. These producers would not have revenue from the sale of the portion of their crop used for these purposes. The determination that producers may include a crop's value is at the Deputy Administrator's discretion. Wine grapes used to process grapes into wine, forage crops that are stored and fed to livestock, and certain other crops, as listed on the FSA website at *https://www.fsa.usda.gov/programs-and-services/emergency-relief/index,* have been determined by the Deputy administrator to qualify for including the crop's value.

The value of the eligible crop reported in the producer's allowable gross revenue will be based on the producer's actual production of the crop and a price for the crop based on the best available data for each crop, such as published price data for the crop [23] or the average price obtained by other producers in the area, as determined by the Deputy Administrator and published through guidance on FSA's website. This provision is intended to address a gap in how crop losses in these situations may be accounted for in

a producer's payment, and it does not cover crops that were sold by a producer.

These adjustment provisions only apply to producers that received a payment under the previous ERP for the 2021 program year based on the 2022 tax year for their representative disaster year revenue because those producers must use the tax year option. All other producers that would require such adjustments must use the expected revenue option, as previously explained in this document.

**Track 2 Expected Revenue Option**

As mentioned above, for Track 2, as an alternative to using the tax year option, a producer may certify to a benchmark year revenue that represents the producer's reasonably expected revenue prior to the impact of the qualifying disaster event, as well as their actual disaster year revenue. The producer's total expected revenue must include all eligible crops that could have been affected by a qualifying disaster event in calendar year 2022, including crops prevented from being planted, planted crops (including annual, perennial, and inventory), and crops that were in storage. It does not include revenue from crop by-products, such as cotton seed and corn stalks. Expected revenue will be based on:

∀ For perennial, planted, and prevented planted yield-based crops, the producer's expected acres multiplied by their expected yield per acre, multiplied by the expected price;

∀ For inventory crops, the total inventory prior to the impact of the qualifying disaster event multiplied by the expected price; and

∀ For crops in storage, the producer's production in storage multiplied by the expected price.

Expected revenue must be based on realistic projections that can be supported by acceptable documentation of expected inventory, acres, yield, and unit price, such as the following:

∀ sales contracts,
∀ purchase agreements,
∀ market agreements,
∀ settlement sheets,
∀ scale tickets,
∀ lease agreements,
∀ local market prices,
∀ FCIC established yield and prices,
∀ Federal crop insurance documents,
∀ historical yield data,
∀ appraisals,
∀ farm business plans,
∀ acreage reports,
∀ FSA National Crop Table (NCT) data,[24]

∀ ARC and PLC prices and yields [25]
∀ cooperative extension service and university data,
∀ financial institute documentation, and
∀ National Agricultural Statistics Service data.

The producer must maintain sufficient documentation to support that their projection is reasonable and realistic; that documentation must be available if requested.

Actual disaster year revenue for the expected revenue option is equal to the actual revenue from all crops that were included in the producer's expected revenue. Actual disaster year revenue includes:

∀ Revenue from sales of eligible crops;

∀ Federal crop insurance indemnities for eligible crops, minus premiums and administrative fees;

∀ NAP payments for eligible crops, minus premiums and service fees;

∀ Indemnities for eligible crops under private crop insurance policies;

∀ The value of eligible crops produced but not sold (such as crops in storage or inventory, or fed to the producer's livestock);

∀ FSA Payments issued for 2022 calendar year disaster losses, including but not limited to payments under:

Æ ELAP for aquaculture crops,
Æ ARC,
Æ LDP,
Æ MLG;

∀ Net gains from hedging from eligible crops produced;

∀ Grants from NOAA and State programs for the direct loss of eligible crops or the loss of revenue for eligible crops; and

∀ Other revenue directly related to the production of eligible crops that IRS requires the producer to report as income.

For crops produced in the 2022 or 2023 crop years but not sold, the value included in actual disaster year revenue may differ from the expected revenue for the crops due to market price fluctuations between planting and time of marketing, quality losses, or production losses related to qualifying disaster events occurring in the 2022 calendar year. Crops in storage from 2021 or earlier must use the expected price to calculate the value included in actual disaster year revenue if the crop remains in storage at the time of application since ERP 2022 does not pay

---

[23] Published sources of price data that the Deputy Administrator may consider include, but are not limited to, FCIC-established prices, FSA-established NCT prices, and National Agricultural Statistic Service prices.

[24] NCT data are available at *https://www.fsa.usda.gov/programs-and-services/disaster-*

*assistance-program/noninsured-crop-disaster-assistance/index.*

[25] ARC and PLC information is available at *https://www.fsa.usda.gov/programs-and-services/arcplc_program/arcplc-program-data/index.*

Strickland AR 0902

for market fluctuations for prior year crops.

Form FSA–524–B, Emergency Relief Program (ERP) 2022 Track 2 Expected Revenue Worksheet, is an optional form that producers may use to assist in calculating their expected and actual revenue. It is available at *https:// www.fsa.usda.gov/programs-and-services/emergency-relief/index.*

**Track 2 Applications**

Producers applying for Track 2 must submit FSA–524, Emergency Relief Program (ERP) 2022 Track 2 Application, certifying their benchmark year revenue and disaster year revenue. The FSA–524 Appendix provides a guide for what should be included as applicable revenue for the option elected by the producer. In addition, all producers applying for Track 2 must submit FSA–525, Crop Insurance and/or NAP Coverage Agreement, by the application deadline to have a complete application on file.

For the purpose of administration of the ERP 2022 payment limitations, producers applying for Track 2 must certify to the percentage of their disaster year revenue from specialty and high value crops combined, and from other crops on their application. The percentages certified must be equal to the percentages that the producer would have reasonably expected to receive for the disaster year if not for the qualifying disaster event. Producers must also certify to whether all acreage of all eligible crops (including crops grown, prevented from being planted, and in storage or inventory in the disaster year) were covered by Federal crop insurance or NAP, for the purpose of determining the applicable ERP factor, as explained below.

If requested by FSA, documentation required to support a producer's certifications of revenue and other information provided on the application must be submitted within 30 calendar days of FSA's request, or the producer will be considered ineligible for Track 2.

**Track 2 Payment Calculation**

To determine a producer's Track 2 payment amount, FSA will calculate:

Step 1 The producer's benchmark year revenue, multiplied by the ERP factor of 90 percent if all acres of all eligible crops were covered by Federal crop insurance or NAP, or 70 percent if not all acres of all eligible crops were covered by Federal crop insurance or NAP; minus

Step 2 The producer's disaster year revenue; minus

Step 3 The sum of the producer's gross Track 1 payments.[26]

After performing the calculation described above, progressive factoring[27] will be applied to the calculated amount according to the table below.

| Payment range | Progressive factor (%) |
|---|---|
| Up to $2,000 .............................. | 100 |
| $2,001 to $4,000 ...................... | 80 |
| $4,001 to $6,000 ...................... | 60 |
| $6,001 to $8,000 ...................... | 40 |
| $8,001 to $10,000 .................... | 20 |
| Over $10,000 ............................ | 10 |

For example, to apply progressive factoring to a calculated loss of $5,000, FSA would multiply:

∀ the first $2,000 by a factor of 100 percent ($2,000 · 100% = $2,000),

∀ the second $2,000 by a factor of 80 percent ($2,000 · 80% = $1,600), and

∀ the remaining $1,000 by a factor of 60 percent ($1,000 · 60% = $600).

∀ The sum of those calculations is $4,200.

For another example, to apply progressive factoring to a calculated loss of $430,000, FSA would multiply:

∀ the first $2,000 by a factor of 100 percent ($2,000 · 100% = $2,000),

∀ the second $2,000 by a factor of 80 percent ($2,000 · 80% = $1,600),

∀ the third $2,000 by a factor of 60 percent ($2,000 · 60% = $1,200),

∀ the fourth $2,000 by a factor of 40 percent ($2,000 · 40% = $800),

∀ the fifth $2,000 by a factor of 20% ($2,000 · 20% = $400), and

∀ the remaining $420,000 by a factor of 10 percent ($420,000 · 10% = $42,000).

The sum of those calculations is $48,000, which is the gross ERP 2022 payment after progressive factoring.

FSA will calculate the total of the results for each range above. For underserved producers, the sum of the results will be multiplied by a factor of 115 percent, and the underserved

producer's calculated Track 2 payment will be equal to the lesser of the resulting amount or the amount calculated after step 3 above.[28] For all other eligible producers, the sum of the results for each range will be the calculated Track 2 payment. FSA will multiply that amount by the percentage of the expected disaster year revenue for specialty and high value crops or other crops, as applicable, to determine the amounts that will apply to the payment limitations for specialty and high value crops (combined) and other crops.

For example, the amount calculated after step 3 above is $430,000 and is reduced to $48,000 after progressive factoring. For an underserved producer, FSA would multiply $48,000 times 115 percent which equals $55,200 which is less than the max payment amount of $430,000. The producer certified to 50 percent of expected revenue as being from specialty crops. FSA would multiply $55,200 times 50 percent which equals $27,600 gross payment attributed to specialty crops. FSA would subtract $27,600 from $55,200 which equals $27,600 gross payment attributed to other crops. The producer's total payment is $55,200 ($27,600 + $27,600 = $55,200). FSA will apply a final payment factor of 75 percent to all calculated Track 2 payments, including payments to underserved producers, to ensure payments do not exceed available funding.

If a producer receives a Track 1 payment after their Track 2 payment is calculated, the producer's Track 2 payment will be recalculated and the producer must refund any resulting overpayment.

FSA will issue Track 2 payments as applications are processed and approved. All ERP 2022 payments are subject to the availability of funding. If additional funding is available after ERP

---

[26] The gross ERP Track 1 calculated payment is the calculated payment amount after all applicable factoring and prior to any payment reductions for reasons including, but not limited to, sequestration and payment limitation.

[27] Track 2 applies progressive factoring in a manner consistent with the progressive factoring of Track 1 payments based on Federal crop insurance indemnified losses. Track 2 assistance is calculated based on a decrease in disaster year revenue for eligible revenue, production, and quality losses of eligible insured, non-insurable, and uninsured crops not included in Track 1. While Track 1 payments based on NAP payments are not subject to progressive factoring, Track 2 assistance is calculated based on the overall decrease in disaster year revenue and does not calculate assistance independently for insured crops and NAP crops in a manner similar to Track 1; therefore, progressive factoring is applied to all Track 2 payments.

[28] Underserved producers will receive an increase to their Track 2 payment that is equal to 15 percent of the gross Track 2 payment after progressive factoring not to exceed the calculated Track 2 payment before progressive factoring. FSA calculates payments based on a higher payment factor for underserved farmers and ranchers (or specific groups included in that term) in several programs, such as Emergency Conservation Program, ELAP, and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, Pandemic Assistance Revenue Program, and the previous ELRP and ERP programs for qualifying disaster events in calendar years 2020 and 2021. In addition, NAP provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

2022 payments are issued, FSA may issue an additional payment, not to exceed the maximum amount allowed by law as explained above.

## Applying for ERP 2022

FSA expects to begin mailing Track 1 application forms on or around November 8, 2023, to producers who received Federal crop insurance indemnities, and to begin mailing forms to producers who received NAP payments on or around November 8, 2023. For Track 2, FSA will begin accepting applications on October 31, 2023, and producers may obtain an application form and FSA–525, Crop Insurance and/or Nap Coverage Agreement for ERP 2022, through their county office or online at https://www.fsa.usda.gov/programs-and-services/emergency-relief/index.

Applications may be submitted in person or by mail, email, facsimile, or other methods announced by FSA. A complete application for each track a producer is applying for must be submitted to the producer's recording county office by the close of business on the deadline announced by FSA (the ERP 2022 deadline).

To receive an ERP 2022 payment, producers, including any producers with an SBI who have a share in a crop as indicated on a Track 1 application, must also have the following forms on file with FSA within 60 days of the ERP 2022 deadline:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026 Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the producer and applicable affiliates.

Many producers, especially if they have participated in FSA programs recently, will already have these forms on file with FSA.

In addition to the forms listed above, certain producers will also need to submit the following forms in order to have their payment calculated as described above for underserved producers or to qualify for an increased payment limitation, as described in the Payment Limitation section in this document:

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2022 program year; [29] or

∀ Form FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, including the certification from a certified public accountant or attorney that the person or legal entity has met the requirements to be eligible for the increased payment limitation, for a person or a legal entity and all members of that entity, for the 2022 program year.

FSA will continue to accept forms CCC–860 and FSA–510 for ERP 2022 until 60 days after the ERP 2022 deadline. If a producer files a CCC–860 or FSA–510 and the accompanying certification after their ERP 2022 payment is issued but before the deadline to submit these forms, FSA will process the form CCC–860 or FSA–510 and issue any resulting additional payment amount.

## Payment Limitation

As required by Title I of the Disaster Relief Supplemental Appropriations Act, 2023, the payment limitation for ERP 2022 is determined by the person's or legal entity's average adjusted gross farm income. Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments for specialty and high value crops combined and $125,000 in payment for all non-specialty crops and other crops under ERP 2022 (for Track 1 and Track 2 combined) if their average adjusted gross farm income is less than 75 percent of their average AGI the 3 taxable years preceding the most immediately preceding complete tax year.

If at least 75 percent of the person or legal entity's average AGI is income derived from farming, ranching, and forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to:

∀ $900,000 for specialty crops under Tracks 1 and 2 and high value crops under Track 2 combined; and

∀ $250,000 for non-specialty crops under Track 1 and other crops under Track 2, combined.

The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, and forestry related activities are 2018, 2019, and 2020.

To receive more than $125,000 in ERP 2022 payments, producers must submit form FSA–510, including the certification from a certified public accountant or attorney that the person or legal entity has met the requirements to be eligible for the increased payment limitation. If a producer requesting the increased payment limitation is a legal entity, all members of that entity must also complete form FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the increased payment limitation based on the legal entity's average AGI that is income derived from farming, ranching, and forestry related activities but a member of that legal entity either does not complete a form FSA–510 and provide the required certification or is not eligible for the increased payment limitation, the payment to the legal entity will be reduced for the payment limitation applicable to the share of the payment attributed to that member.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ First level of ownership—any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first level or payment legal entity; [30]

---

[29] A person who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent CCC–860 certifying their status for a later program year because a person's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what program years the status would apply.

An entity that has filed CCC–860 certifying its status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of its status for a later program year unless the entity's status has changed due to changes in membership.

Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales and household income, those producers must submit CCC–860 for each applicable program year.

[30] The "first level or payment legal entity" means that the payment entity will have a reduction

Continued

∀ Second level of ownership—any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ Third and fourth levels of ownership—except as provided in the second level of ownership bullet above and in the fourth level of ownership bullet below, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ Fourth-level of ownership—if the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first level or payment legal entity by the fourth-level legal entity.

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A person or legal entity must provide the name, address, valid taxpayer identification number, and ownership share of each person, or the name, address, valid taxpayer identification number, and ownership share of each legal entity, that holds or acquires an ownership interest in the legal entity. ERP 2022 payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent at or above the fourth level of ownership in the business structure is not provided to USDA. A legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership

interest of 10 percent or greater at or above the fourth level of ownership in the business structure is not provided to USDA.

If a person or legal entity is not eligible to receive ERP 2022 payments due to the person or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the person or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible person or ineligible legal entity.

Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**Requirement To Purchase Federal Crop Insurance or NAP Coverage**

Title I of the Disaster Relief Supplemental Appropriations Act, 2023, requires all producers who receive ERP 2022 payments, including those receiving a Track 1 payment for a tree loss under a Federal crop insurance policy, to purchase Federal crop insurance, or NAP coverage where Federal crop insurance is not available, for the next 2 available crop years, as determined by the Secretary. Participants must file an accurate acreage report and obtain Federal crop insurance or NAP coverage, as may be applicable:

∀ At a coverage level equal to or greater than 60 percent for insurable crops and trees; or

∀ At the catastrophic level or higher for NAP-eligible crops.

Availability will be determined from the date a producer receives an ERP 2022 payment and may vary depending on the timing and availability of Federal crop insurance or NAP coverage for a producer's particular crops. The final crop year to purchase Federal crop insurance or NAP coverage to meet the second year of coverage for this requirement is the 2027 crop year.

In situations where Federal crop insurance is unavailable for a crop, an ERP 2022 participant must obtain NAP coverage. Section 1001D of the Food Security Act of 1985 (1985 Farm Bill; Pub. L. 99–198) provides that a person or entity with an average AGI greater than $900,000 is not eligible to participate in NAP; however, producers with an average AGI greater than $900,000 are eligible to participate in ERP 2022. To reconcile this restriction in the 1985 Farm Bill and the

requirement to obtain NAP or Federal crop insurance coverage, ERP 2022 participants may meet the purchase requirement by purchasing WFRP coverage, if eligible, or they may pay the applicable NAP service fee despite their ineligibility for a NAP payment. In other words, the service fee must be paid even though no NAP payment may be made because the average AGI of the person or entity exceeds the 1985 Farm Bill limitation.

For Track 1, the Federal crop insurance and NAP coverage requirements are specific to the crop and county (which is the county where the crop is physically located for insured crops and the administrative county for NAP-covered crops) for which Track 1 payments are paid.

Producers who receive a Track 1 payment that was calculated based on an indemnity under a Pasture, Rangeland, and Forage policy; Annual Forage policy; or WFRP policy must purchase the same type of policy or a combination of individual policies for the crops that had covered losses under ERP 2022 to meet the Federal crop insurance and NAP coverage requirement.

Producers who receive a Track 1 payment on a crop in a county and who have the crop or crop acreage in subsequent years, as provided in this document, and who fail to obtain the 2 years of Federal crop insurance or NAP coverage required as specified in this document must refund all Track 1 payments for that crop in that county with interest from the date of disbursement.

Producers who were paid under Track 1 for a crop in a county, but do not plant that crop in that county in a year for which the Federal crop insurance and NAP coverage requirement applies, are not subject to the Federal crop insurance or NAP purchase requirement for that year.

For Track 2, producers must report all crops that suffered a revenue loss in whole or in part due to a qualifying disaster event on form FSA–525, Crop Insurance and/or NAP Coverage Agreement, and obtain the required level of Federal crop insurance or NAP coverage in all counties where the crop is grown for the applicable years. For all crops listed on form FSA–525, producers who have the crop or crop acreage in subsequent years and who fail to obtain the required 2 years of Federal crop insurance or NAP coverage must refund the ERP Track 2 payment with interest from the date of disbursement.

If both Federal crop insurance and NAP coverage are unavailable for a crop,

applied, and if the payment entity happens to be a joint venture, that reduction is applied to the first level, or highest level, for payments. The "first level or payment legal entity" is the highest level of ownership of the applicant to whom payments can be attributed or limited. If the applicant is a business type that does not have a limitation or attribution, the reduction is applied to the first level, but if the business type can have the reduction applied directly to it, then the limitation applies.

**Federal Register**/Vol. 88, No. 209/Tuesday, October 31, 2023/Notices **74417**

the producer must obtain WFRP Federal crop insurance coverage, if eligible.

Producers who receive an ERP Track 1 payment for a crop are not required to obtain additional years of Federal crop insurance or NAP coverage for that crop if they also receive an ERP Track 2 payment for a loss associated with that crop.

Producers who do not plant a crop listed on form FSA–525 in a year for which the Federal crop insurance and NAP coverage requirement applies are not subject to the Federal crop insurance or NAP purchase requirement for that crop for that year.

### Provisions Requiring Refund to FSA

In the event that any ERP 2022 payment resulted from erroneous information reported by the producer, or any person acting on their behalf, or if the producer's data are updated after RMA or FSA calculates a producer's Track 1 payment, the ERP 2022 payment for both Track 1 and Track 2, as applicable, will be recalculated and the producer must refund any excess payment to FSA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ERP 2022 payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. All persons with a financial interest in a legal entity receiving payments are jointly and severally liable for any refund, including related charges, which is determined to be due to FSA for any reason. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

### General Provisions

Applicable general eligibility requirements, including recordkeeping requirements and required compliance with HELC and Wetland Conservation provisions, are similar to those for previous ad hoc crop disaster programs and current permanent disaster programs.

General requirements that apply to other FSA-administered commodity programs also apply to ERP 2022. Accordingly, producers that receive ERP 2022 must be in compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation," and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780

and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ERP 2022. As described above, Track 1 payments are calculated using data on file with RMA and FSA at the time of payment calculation, unless that data are later updated. Producers who receive a Track 1 application and disagree with the calculated payment amount or data used in the calculation may apply for Track 2, which will allow them to provide their data to FSA through a traditional application process.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. All information provided to FSA for program eligibility and payment calculation purposes, including certification that a producer suffered a loss due to a qualifying disaster event, is subject to spot check. Participants receiving ERP 2022 payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

If requested by FSA, the producer must provide additional documentation that establishes the producer's eligibility for ERP 2022. If supporting documentation is requested, the documentation must be submitted to FSA within 30 calendar days from the request or the application will be disapproved by FSA. FSA may request supporting documentation to verify information provided by the producer and the producer's eligibility including, but not limited to, the producer's ownership share in the crop or commodity, benchmark year revenue, disaster year revenue, and percentage of expected revenue from specialty and high value crops and other crops.

ERP 2022 applicants filing an FSA–510 are subject to an FSA audit of information submitted for the purpose of increasing the program's payment limitation. As a part of this audit, FSA may request income tax returns, and if requested, must be supplied by all related persons and legal entities. In addition to any other requirement under any Federal statute, relevant Federal income tax returns and documentation must be retained a minimum of 3 years after the end of the calendar year corresponding to the year for which payments or benefits are requested.

Failure to provide necessary and accurate information to verify compliance, or failure to comply with these requirements will result in ineligibility for ERP 2022 benefits and require refund of any ERP 2022 payments, including interest to be calculated from the date of the disbursement to the producer.

Applicants have a right to a decision in response to a timely-filed complete application.

If an applicant files a late ERP 2022 application, the application will be considered a request to waive the deadline. Requests to waive or modify program provisions are at the discretion of the Deputy Administrator. The Deputy Administrator has the authority to waive or modify application deadlines and other requirements or program provisions not specified in law in cases where the Deputy Administrator determines it is equitable to do so and the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ERP 2022. Applicants who request to waive or modify program provisions do not have a right to a decision on those requests. The Deputy Administrator's refusal to exercise discretion on requests to waive or modify ERP 2022 provisions will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ERP 2022 will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ERP 2022 payments.

If any person who would otherwise be eligible to receive a payment dies before the payment is received, payment may be released as specified in 7 CFR 707.3. Similarly, if any person or legal entity who would otherwise have been eligible to apply for a payment dies or is dissolved, respectively, before the payment is applied for, payment may be released in accordance with this document if a timely application is filed by an authorized representative. Proof of authority to sign for the deceased producer or dissolved entity must be provided. If a participant is now a dissolved general partnership or joint venture, all members of the general partnership or joint venture at the time of dissolution or their duly authorized representatives must sign the application for payment. Eligibility of such participant will be determined, as it is for other participants, based on ownership share and risk in producing the crop.

In either applying for or participating in ERP 2022, or both, the producer is

Strickland AR 0906

subject to laws against perjury (including, but not limited to, 18 U.S.C. 1621). If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ERP 2022, or both, then the producer may be found to be guilty of perjury. Except as otherwise provided by law, if guilty of perjury the applicant may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ERP 2022 under the following condition: by applying for ERP 2022, applicants agree, as a condition of the waiver, that the ERP 2022 payments will be applied to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ERP 2022, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

**Paperwork Reduction Act Requirements**

In compliance with the provisions of the Paperwork Reduction Act (44 U.S.C. chapter 35), the information collection request has been approved by OMB under an emergency request under control number 0560–0316. FSA will collect the information from producers to qualify for an ERP 2022 payment. ERP 2022 is a one-time funding as described in this NOFA.

In accordance with the Paperwork Reduction Act, FSA is requesting comments from all interested individuals and organizations on a new information collection request that supports ERP 2022.

**Description of Information Collection**

*Title:* Emergency Relief Program 2022 (ERP 2022).

*OMB Control Number:* 0560–0316.

*Type of Request:* New.

*Abstract:* FSA is providing assistance to eligible crop producers to cover the necessary expenses related losses of revenue, quality, or production of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, tornadoes, floods, derechos,

excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar year 2022.

FSA is administering ERP in two tracks (referred to as Track 1 and Track 2). ERP Track 1 will use a streamlined process with pre-filled application forms for losses where the data are already on file with FSA or the Risk Management Agency (RMA) as a result of the producers previously receiving a Noninsured Crop Disaster Assistance Program (NAP) payment or a Federal crop insurance indemnity under certain Federal crop insurance policies. ERP Track 2 will provide payments for other eligible losses through a revenue-based approach using a traditional application process during which producers will provide the information required to calculate a payment.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hours is the estimated average time per response multiplied by the estimated total annual responses.

*Estimate of Average Time to Respond:* Public reporting burden for collecting information under this notice is estimated to average 0.305 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collections of information.

*Type of Respondents:* Producers.

*Estimated Number of Respondents:* 230,000.

*Estimated Average Number of Responses per Respondent:* 1.43.

*Estimated Total Annual Responses:* 327,855.

*Estimated Total Annual Burden on Respondents:* 100,072 hours.

The purpose of this notice is to request comments from the public (as well as affected agencies) concerning the information collection request.

The comments will help us:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of burden of the collection of information including the validity of the methodology and assumptions used;

(3) Evaluate the quality, utility and clarity of the information technology; and

(4) Minimize the burden of the information collection on those who

respond through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this notice, including names and addresses where provided, will be made a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

**Environmental Review**

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799). ERP 2022 is authorized by Title I of the Disaster Relief Supplemental Appropriations Act, 2023. The intent of ERP 2022 is to provide payments to eligible crop producers who suffered eligible crop and tree losses due to wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, and qualifying drought, and related conditions occurring in calendar year 2022.

The limited discretionary aspects of the program were designed to be consistent with established FSA disaster programs. As such, the Categorical Exclusions in 7 CFR part 799.31 apply, specifically 7 CFR 799.31(b)(6)(iv) and (vi) (that is, § 799.31(b)(6)(iv) Individual farm participation in FSA programs where no ground disturbance or change in land use occurred as a result of the action or participation; and § 799.31(b)(6)(vi) Safety net programs administered by FSA). No Extraordinary Circumstances (7 CFR 799.33) exist. As such, FSA has determined that the implementation of ERP 2022 and the participation in ERP 2022 do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or environmental impact statement for this regulatory action, and this notice serves as documentation of the programmatic environmental compliance decision.

**Federal Assistance Programs**

The titles and numbers of the Federal assistance programs, as found in the Assistance Listings, to which this document applies are 10.964—

Emergency Relief Program and 10.979— Emergency Relief Program 2022.

## USDA Non-Discrimination Policy

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Individuals who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or the USDA TARGET Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by: (1) mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410; (2) fax: (202) 690–7442; or (3) email: *program.intake@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2023–24009 Filed 10–30–23; 8:45 am]

**BILLING CODE 3410–05–P**

## COMMISSION ON CIVIL RIGHTS

### Notice of Public Briefing of the Minnesota Advisory Committee to the U.S. Commission on Civil Rights

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Notice of public briefing.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act, that the Minnesota Advisory Committee (Committee) to the U.S. Commission on Civil Rights will hold a public briefing via Zoom at 12 p.m. CT on Wednesday, January 17, 2024. The purpose of this briefing is to hear testimony on housing affordability in the state.

**DATES:** Wednesday, January 17, 2024, from 12 p.m.–2 p.m. Central Time.

**ADDRESSES:** The meeting will be held via Zoom.

*Registration Link (Audio/Visual): https://www.zoomgov.com/j/1610159425.*

*Join by Phone (Audio Only):* (833) 435–1820 Toll-Free; Meeting ID: 161 015 9425.

**FOR FURTHER INFORMATION CONTACT:** Ana Victoria Fortes, Designated Federal Officer, at *afortes@usccr.gov* or (202) 519–2938.

**SUPPLEMENTARY INFORMATION:** This committee meeting is available to the public through the registration link above. Any interested member of the public may listen to the meeting. An open comment period will be provided to allow members of the public to make a statement as time allows. Per the Federal Advisory Committee Act, public minutes of the meeting will include a list of persons who are present at the meeting. If joining via phone, callers can expect to incur regular charges for calls they initiate over wireless lines, according to their wireless plan. The Commission will not refund any incurred charges. Callers will incur no charge for calls they initiate over land-line connections to the toll-free telephone number. Closed captioning will be available for individuals who are deaf, hard of hearing, or who have certain cognitive or learning impairments. To request additional accommodations, please email Liliana Schiller, Support Services Specialist, at *lschiller@usccr.gov* at least 10 business days prior to the meeting.

Members of the public are entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be emailed to Ana Victoria Fortes at *afortes@usccr.gov.* Persons who desire additional information may contact the Regional Programs Coordination Unit at (312) 353–8311.

Records generated from this meeting may be inspected and reproduced at the Regional Programs Coordination Unit Office, as they become available, both before and after the meeting. Records of the meetings will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Minnesota Advisory Committee link. Persons interested in the work of this Committee are directed to the Commission's website, *http://www.usccr.gov,* or may contact the Regional Programs Coordination Unit at *lschiller@usccr.gov.*

### Agenda

I. Welcome & Roll Call
II. Introductory Remarks
III. Panelist Presentations & Committee Q&A
IV. Public Comment
V. Closing Remarks
VI. Adjournment

Dated: October 25, 2023.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2023–23945 Filed 10–30–23; 8:45 am]

**BILLING CODE P**

## COMMISSION ON CIVIL RIGHTS

### Notice of Public Briefing of the Minnesota Advisory Committee to the U.S. Commission on Civil Rights

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Notice of public briefing.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act, that the Minnesota Advisory Committee (Committee) to the U.S. Commission on Civil Rights will hold a public briefing via Zoom at 12 p.m. CT on Friday, January 26, 2024. The purpose of this briefing is to hear testimony on housing affordability in the state.

**DATES:** Friday, January 26, 2024, from 12 p.m.–2 p.m. Central Time.

**ADDRESSES:** The meeting will be held via Zoom.

*Registration Link (Audio/Visual): https://www.zoomgov.com/j/1613104128.*

*Join by Phone (Audio Only):* (833) 435–1820 USA Toll-Free; Meeting ID: 161 310 4128.