**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS, | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, | ) | |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | ) | |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, and | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
|     Defendants. | ) | |

---

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ............................................................................... 1

STATEMENT OF FACTS.................................................................... 3

STANDARD OF REVIEW................................................................... 8

ARGUMENT..................................................................................... 10

I.      USDA discriminated based on race and sex in violation of the Fifth Amendment.    10

      A.      USDA unlawfully discriminated based on race................................ 10

            1.      USDA has no compelling interest. .................................... 10

            2.      USDA's race discrimination is not narrowly tailored. ....... 15

      B.      USDA unlawfully discriminated based on sex................................. 16

II.     Congress did not grant USDA the authority it claims. ................................. 17

III.    Progressive factoring violates the Fifth Amendment and the APA. ............. 24

      A.      Progressive factoring unlawfully discriminates based on race and sex.    24

      B.      Progressive factoring is arbitrary and capricious.............................. 28

IV.    The Court should declare the race and sex preferences unlawful and order partial vacatur and remand...................................................................... 33

      CONCLUSION.................................................................................. 35

## TABLE OF AUTHORITIES

**<u>Constitutional provisions</u>**                                                                          <u>Page(s)</u>

U.S. Const., Amend. V ................................................................................ 14

U.S. Const., Amend. XIV ............................................................................ 14

U.S. Const., Art. I, § 1 ................................................................................ 17

U.S. Const., Art. IV .................................................................................... 14

**<u>Cases</u>**

*Adarand Constructors v. Peña,*
    515 U.S. 200, 217 (1995) ...................................................................... 11, 19

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) .............................................................................. 22, 24

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) .............................................................................. 24

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .............................................................................. 8

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) .................................................................................. 11

*Biden v. Nebraska,*
    600 U.S. 477 (2023) .............................................................................. 18, 19, 22

*BNSF Ry. Co. v. EEOC,*
    385 F. Supp. 3d 512 (N.D. Tex. 2018) .................................................. 9

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) .............................................................................. 17

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,*
    419 U.S. 281 (1974) .............................................................................. 29, 31, 33

*Camp v. Pitts,*
    411 U.S. 138 (1973) .............................................................................. 8

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023) ................................................................ 33

*Chamber of Com. v. Consumer Fin. Prot. Bureau,*
    691 F. Supp. 3d 730 (E.D. Tex. 2023) .................................................. 23

*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989)............................................................................... 15

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)............................................................................... 18

*Fisher v. Univ. of Tex. at Austin*,
    570 U.S. 297 (2013)............................................................................ 11, 15

*Frizelle v. Slater*,
    111 F.3d 172 (D.C. Cir. 1997)............................................................... 29

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)............................................................................... 19

*Gratz v. Bollinger*,
    539 U.S. 244 (2003)............................................................................... 11

*Grutter v. Bollinger*,
    539 U.S. 306, 339 (2003) ...................................................................... 15

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020).................................................................. 24

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2023).................................................................. 9, 29

*Johnson v. California*,
    543 U.S. 499 (2005)............................................................................... 12

*La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*,
    745 F.3d 653 (3d Cir. 2014).................................................................... 9

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006)............................................................................... 11

*Michigan v. EPA*,
    576 U.S. 743 (2015)................................................................................ 9

*Miller v. Vilsack*,
    No. 4:21-cv-0595, 2021 U.S. Dist. LEXIS 264778 (N.D. Tex. July 1, 2021) ...... 14, 21

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982)............................................................................... 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)........................................................... 9, 28, 29, 33

*Nuziard v. Minority Bus. Dev. Agency,*
  No. 4:23-CV-0278, 2024 U.S. Dist. LEXIS 38050 (N.D. Tex. 2024) .................11, 15, 16, 23

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No.,*
  551 U.S. 701 (2007)............................................................................................. 10

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015)............................................................................................... 28

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979)........................................................................................ 25, 28

*Plessy v. Ferguson,*
  163 U.S. 537 (1896)............................................................................................... 1

*Rice v. Cayetano,*
  528 U.S. 495 (2000)............................................................................................. 10

*Rollerson v. Brazos River Harbor Navigation Dist.,*
  6 F.4th 633 (5th Cir. 2021).................................................................................... 3

*Sessions v. Morales-Santana,*
  582 U.S. 47 (2017).............................................................................................. 16

*Sierra Club v. EPA,*
  939 F.3d 649 (5th Cir. 2019).................................................................................. 9

*Southwestern Elec. Power Co. v. U.S. EPA,*
  920 F.3d 999 (5th Cir. 2019)................................................................................ 33

*Strickland v. USDA,*
  No. 2:24-CV-60-Z, 2024 U.S. Dist. LEXIS 101547 (N.D. Tex. June 7, 2024) .... *passim*

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
  600 U.S. 181 (2023)........................................................................1, 10, 11, 12, 16

*Tex. Med. Ass'n v. U.S. HHS,*
  654 F. Supp. 3d 575 (E.D. Tex. 2023).................................................................. 34

*Tex. Office of Pub. Util. Counsel v. FCC,*
  183 F.3d 393 (5th Cir. 1999)................................................................................. 9

*Texas v. NRC,*
  78 F.4th 827 (5th Cir. 2023)................................................................................ 18

*Ultima Servs. v. USDA,*
  683 F. Supp. 3d 745 (E.D. Tenn. 2023)............................................................. 5, 23

iv

*United States v. Virginia,*
   518 U.S. 515 (1996) ................................................................... 16

*United States v. Windsor,*
   570 U.S. 744 (2013) ................................................................... 19

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) ...................................................... 24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ................................................................... 25

*Vitolo v. Guzman,*
   999 F.3d 353 (6th Cir. 2021) .................................................. 11, 17

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ...............................................17, 18, 19, 20, 23

**Statutes**

5 U.S.C. § 553 ............................................................................ 28

5 U.S.C. § 702 ............................................................................ 34

5 U.S.C. § 706 ............................................................................. 9

7 U.S.C. § 2003 ...................................................................... 20, 21

7 U.S.C. § 2279 ........................................................................... 21

Inflation Reduction Act of 2022, Pub. L. 117-169, § 22007(e) .............. 14, 21

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................... 8

**Regulations**

7 C.F.R. § 9.201 .......................................................................... 4

7 C.F.R. § 9.203(p) ...................................................................... 6

7 C.F.R. § 9.302 .......................................................................... 4

7 C.F.R. § 9.306(a)(1)(iii)(A) ......................................................... 6

7 C.F.R. § 9.306(a)(1)(iii)(B) ......................................................... 6

7 C.F.R. § 760.1901 ..................................................................... 4

7 C.F.R. § 760.1905(d)......................................................................................... 6

7 C.F.R. § 764.202 ............................................................................................... 5

7 C.F.R. § 767.151 ............................................................................................... 5

Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2
  (ELRP 2021 Phase 2),
    88 Fed. Reg. 66366 (Sept. 27, 2023) ............................................................. 4

Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022,
  (ELRP 2022)
    88 Fed. Reg. 66361 (Sept. 27, 2023) ............................................................. 5

Notice of Funds Availability; Emergency Livestock Relief Program (ELRP),
    87 Fed. Reg. 19465 (Apr. 4, 2022) ................................................................ 4

Notice of Funds Availability; Emergency Relief Program 2022 (ERP 2022),
    88 Fed. Reg. 74404 (Oct. 31, 2023)............................................................... 5

Notice of Funds Availability; Emergency Relief Program (ERP),
    87 Fed. Reg. 30164 (May 18, 2022) .............................................................. 4

Notice: Emergency Relief Program 2022 (ERP 2022),
    89 Fed. Reg. 68125 (Aug. 23, 2024) ............................................................. 8

Pandemic Assistance Programs and Agricultural Disaster Assistance Programs, Subpart S—
  Emergency Relief Program,
    88 Fed. Reg. 1862 (Jan. 11, 2023)................................................................. 4

Revocation of Statement of Policy on Public Participation in Rule Making,
    78 Fed. Reg. 33045 (June 3, 2013).......................................................... 28, 33

**Executive Orders**

Executive Order 13985....................................................................................... 3, 19

Executive Order 14091....................................................................................... 3, 19

## INTRODUCTION

This case is about whether the United States Department of Agriculture (USDA) can discriminate based on race and sex when awarding disaster relief to American farmers, particularly when such discrimination was never authorized by Congress.

It cannot, most obviously because the Constitution is colorblind. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 230 (2023) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). Despite USDA's repeated failed efforts to smuggle in discrimination through programs for "socially disadvantaged" farmers and ranchers, it has tried again. *See Strickland v. USDA*, No. 2:24-CV-60-Z, 2024 U.S. Dist. LEXIS 101547, at *19 (N.D. Tex. June 7, 2024) (citing cases rejecting USDA's socially disadvantaged definition). Put simply, USDA won't give up unless this Court enters judgment against it. As the undisputed evidence shows, USDA remains determined to subordinate equality, a constitutional guarantee, to "equity," a top policy priority for this executive branch. Compl., App. 918–20 ¶¶ 39, 43–44, 46–49. But equity, as this Administration conceives of it, can never satisfy the Constitution. That is because equity, as USDA defines it, demands equal *outcomes* between races, and thus requires *unequal* treatment. *See* U.S. Dep't of Agric., What is Equity, 2 (2023), https://perma.cc/7G76-EYS8 ("The route to achieving Equity will not be accomplished through treating everyone equally."). If there were ever a time to enforce the promise of equality under the law, it is in response to natural disasters, which by their nature do not discriminate.

But USDA never had no statutory authority to consider race and sex for any of these programs. Even if discrimination in disaster relief could ever be justified in theory, USDA's actions should still fail, because the decision to engage in discrimination is always a major question requiring clear statutory authorization from Congress. It is undisputed that Congress never

1

mentioned the need for remedial discrimination. If it wanted USDA to do that, it would have said so. After all, the decision to engage in state-sanctioned discrimination is laden with political and social significance—especially in 2024. When Congress intended for race to be considered in other programs, even USDA programs, it said so explicitly, and for good reason. When elected officials make this divisive choice, they know that they will have to answer to the American people. They do not hand off questions this important to unaccountable bureaucrats.

Finally, USDA acted unlawfully when it shifted to a novel "progressive factoring" system that reduces relief to those who suffer the most losses. As the administrative record reveals, USDA was motivated by racial animus in designing progressive factoring. It designed the payment structure to maximize payments to its preferred races and sex. Further, when designing progressive factoring, USDA never explained its reasoning. The dollar thresholds and percentages used changed suddenly and with no explanation after a "final decision" was made. The system introduced bizarre incentives that reward business owners for arbitrary choices about how to file with USDA. USDA never considered either of these obvious and significant problems. And it never explained how it arrived at its conclusions, or why it favored the results of progressive factoring.

Plaintiffs are Texas farmers and their businesses. They each suffered losses due to drought and excessive heat. USDA has authority to spend approximately $25 billion on emergency disaster and pandemic relief to help farmers. Yet by regulation, USDA awarded less disaster relief to Plaintiffs than other farmers because Plaintiffs are white men, are a woman who co-owns a business with a white man, or are a business owned by a white man. This Court has already rightly found that this was likely unconstitutional for USDA's ongoing disaster relief program, Emergency Relief Program 2022 (ERP 2022).

2

This Court should thus convert its preliminary injunction order into a summary judgment order. The parties agree that there are no disputes in fact. The administrative record shows that USDA defied both the Constitution and the APA. This Court should permanently enjoin USDA and partially vacate and remand all eight programs for USDA to remedy these defects.

## STATEMENT OF FACTS

On January 20, 2021, President Biden declared that the federal government would pursue a "comprehensive approach to advancing equity for all" through "an ambitious whole-of-government equity agenda." Executive Order 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, 86 Fed. Reg. 7009 (Jan. 25, 2021). President Biden doubled down on this order on February 16, 2023, pledging to "continuously embed equity into all aspects of Federal decision-making," by requiring agencies to ensure "equitable outcomes." Executive Order 14091, *Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, 88 Fed. Reg. 10825 (Feb. 22, 2023). *But see Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 648 (5th Cir. 2021) (Ho, J., concurring in part and concurring in the judgment) (explaining that the difference between equity and equality is "the difference between color blindness and critical race theory"). In furtherance of this whole-of-government approach, Thomas Vilsack, Secretary of USDA, proclaimed that he "emphatically agreed" with the President's orders. U.S. Dep't of Agric., Equity Action Plan 2023 Update, 2 (2024), https://perma.cc/PQH3-4B3W. And, at his direction, USDA "embraced the Administration's equity agenda" and is "[c]entering equity in everything [it] do[es]." *Id.* That includes emergency disaster relief. *See also* A. Williams, The Hill, *Harris's suggestion to distribute disaster relief 'equitably' isn't just wrong — it's dangerous* (Oct. 4, 2022) ("That's right, the vice president of the United States stated that disaster relief should be distributed

based on 'equity,' not necessarily need—and that low-income communities and communities of color should receive aid first, evidently regardless of the urgency of their situation.").[1]

Since 2020, Congress appropriated nearly $25 billion to USDA in emergency disaster and pandemic relief to aid farmers.[2] *See Strickland*, 2024 U.S. Dist. LEXIS 101547, at *2–3. Through the eight disaster relief programs challenged here, USDA gives more money to farmers who are black/African-American, American Indian, Alaskan native, Hispanic, Asian-American, Native Hawaiian, Pacific Islander, or a woman, declaring them "socially disadvantaged." *Id.* at *2 & n.1; *see* Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) (ELRP 2021 Phase 1), 87 Fed. Reg. 19465, 19467 (Apr. 4, 2022); Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2 (ELRP 2021 Phase 2), 88 Fed. Reg. 66366, 66369 (Sept. 27, 2023); Notice of Funds Availability; Emergency Relief Program (ERP) (ERP 2021 Phase 1), 87 Fed. Reg. 30164, 30166 (May 18, 2022); Pandemic Assistance Programs and Agricultural Disaster Assistance Programs, Subpart S—Emergency Relief Program Phase 2 (ERP 2021 Phase 2), 88 Fed. Reg. 1862, 1886 (Jan. 11, 2023) (codified at 7 C.F.R. § 760.1901); Subpart D—Pandemic Assistance Revenue Program (PARP), *id.* at 1879 (codified at 7 C.F.R. § 9.302); Subpart A—Coronavirus Food Assistance Program 2 (CFAP 2), *id.* at 1877 (codified at 7 C.F.R. § 9.201); Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022 (ELRP

---

[1] https://thehill.com/opinion/civil-rights/3672683-harriss-suggestion-to-distribute-disaster-relief-equitably-isnt-just-wrong-its-dangerous/.

[2] USDA lumps these programs together under the title, "Emergency Relief." *See* U.S. Dep't of Agric., Emergency Relief (2024), https://perma.cc/S7V3-GLY8.

2022), 88 Fed. Reg. 66361, 66363 (Sept. 27, 2023); Notice of Funds Availability; Emergency Relief Program 2022 (ERP 2022), 88 Fed. Reg. 74404, 74408 (Oct. 31, 2023).[3]

This is not the first time USDA has used a race-based definition of "socially disadvantaged." The Court noted in its earlier opinion that USDA's justifications for "socially disadvantaged" benefits have consistently failed when challenged in court. *See Strickland*, 2024 U.S. Dist. LEXIS 101547, at *14 (citing cases). But USDA did not abandon its race- and sometimes sex-based definition of "socially disadvantaged." It employs the term liberally throughout its regulations with more additions every year, *see, e.g.*, 7 C.F.R. § 764.202 (2023); 7 C.F.R. § 767.151 (2023), even though its record of defending its race- and sex-based definitions is entirely unblemished by success. *See also Ultima Servs. v. USDA*, 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023) (declaring use of rebuttable presumption that certain races are disadvantaged a violation of the Fifth Amendment and preliminarily enjoining its use).

Under ELRP 2021 Phases 1 and 2 and ELRP 2022, which are programs that help farmers feed their livestock, USDA paid socially disadvantaged farmers 20 percent more money than non-underserved farmers. *See* ELRP 2021 Phase 1, 87 Fed. Reg. at 19466; ELRP 2021 Phase 2, 88 Fed. Reg. at 66369; ELRP 2022, 88 Fed. Reg. at 66362; *see also* App. 925–30 ¶¶ 83–101, 116–24. Under ERP 2021 Phase 1—a program that helps farmers recover from natural disasters that damage crops—USDA paid socially disadvantaged farmers 15 percent more money than non-underserved farmers. 87 Fed. Reg. at 30169; *see also* App. 924–25 ¶¶ 73–77. Under ERP 2021

---

[3] USDA provides greater relief to "underserved" farmers than to "non-underserved" farmers. *See infra* pp. 5–6. That group includes veterans, beginning farmers, limited resource farmers, and socially disadvantaged farmers. The former three categories do not discriminate based on race or sex and are not challenged here. The term "non-underserved" is used to clarify only that USDA provided full disaster relief to *some* white men despite their race. As of 2022, more than 70% of underserved farmers qualified for extra benefits based on their race or sex rather than the former three categories. App. 540.

5

Phase 2, USDA paid socially disadvantaged farmers using a 15 percent greater differential. 7 C.F.R. § 760.1905(d); *see also* App. 925 ¶¶ 78–82. Under PARP, a program that paid farmers who lost revenue during the pandemic, USDA paid socially disadvantaged farmers 12.5 percent more money than non-underserved farmers. 7 C.F.R. §§ 9.306(a)(1)(iii)(A)–(B) (2023); *see also* App. 928–29 ¶¶ 109–15. Under CFAP 2, which helped farmers cope with pandemic-related losses, USDA made an additional payment equal to 15 percent of the original amount that went to socially disadvantaged farmers but not to non-underserved farmers. 7 C.F.R. § 9.203(p) (2023); *see also* App. 928 ¶¶ 102–08. And under ERP 2022, a program like ERP 2021 that helps farmers recover from natural disasters that damage crops, USDA (1) refunded insurance payments to socially disadvantaged farmers but not to non-underserved farmers; (2) exempted those insurance payments from a large reduction called progressive factoring that it applied to other payments; and (3) paid socially disadvantaged farmers 15 percent more. 88 Fed. Reg. at 74410, 74414. Each program is an attempt by USDA to continue the race and sex discrimination that courts unanimously halted back in 2021.

Plaintiffs are farmers or entities who received less relief money based on their race and/or sex.[4] *See* Rusty Strickland Decl., App. 970–72 ¶¶ 14–22; Alan West Decl., App. 958–59 ¶¶ 14–21; Amy West Decl., App. 961–63 ¶¶ 11–18; Bryan Baker Decl., App. 965–67 ¶¶ 12–21. In most cases, USDA denied Plaintiffs between 10 and 20 percent of their payment on account of their race and sex. *See, e.g.*, App. 970 ¶ 15. Rusty Strickland was excluded from one benefit altogether. App. 970 ¶ 14.

---

[4] Plaintiff Amy West is a woman and thus of USDA's preferred sex. App. 961 ¶¶ 9–10. But because USDA set a threshold of 50 percent ownership for a business entity to qualify as socially disadvantaged and Mrs. West only owns 48 percent of Alan and Amy West Farms, she was denied disaster relief money based on her husband's race and sex. *See* App. 963 ¶ 18; ERP 2022, 88 Fed. Reg. at 74408.

The latest program, ERP 2022, inflicted a further injury through the institution of what USDA calls "progressive factoring." *See* App. 958–59 ¶¶ 16–19; App. 962–63 ¶¶ 13–16; App. 965–67 ¶¶ 6, 17–18. Progressive factoring is a novel system that paid the farmers hit hardest by disasters the smallest portion of their losses and that was applied unevenly based on race and sex. *See* 88 Fed. Reg. at 74410. In prior years, USDA distributed funds directly proportionally to losses using what it calls a "flat factor." *See, e.g.*, ELRP 2021 Phase 1, 87 Fed. Reg. at 19466 (paying a flat 90 percent of losses to socially disadvantaged farmers and a flat 75 percent of losses to farmers like Plaintiffs). ERP 2022 marks a sudden departure. A farmer whose calculated loss was $2,000 would receive $1,500, or 75 percent, but a farmer whose calculated loss was $200,000 would receive $18,750, or 9.37 percent. *See* 88 Fed. Reg. at 74410. USDA's only justification is in a brief footnote:

> Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

*Id.* at n.14.

In addition, USDA exempted from progressive factoring refunds of insurance premiums— a form of relief Plaintiffs were not eligible for based on race and sex. *Id.* at 74411; *see also Strickland*, 2024 U.S. Dist. LEXIS 101547, at *4 (refund of insurance was "made on the basis of race and sex"). Because of this, all the money USDA paid to Plaintiffs underwent progressive factoring, but only part of the money paid to socially disadvantaged farmers was. *See* 88 Fed. Reg. at 74411. Plaintiffs each received only a tenth of what they would have if they were of USDA's preferred races or sex, *see, e.g.*, App. 971–72 ¶ 20; *see also Strickland*, 2024 U.S. Dist. LEXIS 101547, at *3 (noting Plaintiffs received a tenth of what they would have had they been of a "different race or sex").

These decisions—to withhold refunds of insurance premiums from Plaintiffs based on race and sex and to apply progressive factoring—had a dramatic impact. It created the ten-to-one disparity seen in payments under ERP 2022. *See, e.g.*, App. 971–72 ¶ 20 (explaining that Mr. Strickland received $7,272.71 for his half, but Mrs. Strickland received $71,900.96, a difference caused entirely by the insurance premium refund); *see also Strickland*, 2024 U.S. Dist. LEXIS 101547, at *3 (noting the "ten-to-one disparity" caused by the insurance premium refunds).

On June 7, 2024, this Court preliminarily enjoined USDA from making further race- and sex-discriminatory payments under ERP 2022. *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *30– 31. On August 23, 2024, USDA published a notice in the Federal Register detailing its compliance with the injunction. Notice: Emergency Relief Program 2022 (ERP 2022), 89 Fed. Reg. 68125 (Aug. 23, 2024).

## STANDARD OF REVIEW

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "Summary judgment is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency." 10B Adam N. Steinman & Mary Kay Kane, Federal Practice and Procedure § 2733 (4th ed.). That is because "the focal point for judicial review" is "the administrative record already in existence." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To prevail under the APA, a plaintiff must: (1) identify final agency action; (2) "show that he has suffered legal wrong because of the challenged agency action, or is adversely affected or

aggrieved by that action within the meaning of a relevant statute," *BNSF Ry. Co. v. EEOC*, 385 F. Supp. 3d 512, 519 (N.D. Tex. 2018) (cleaned up); and (3) show that the agency action was (i) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (ii) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or (iii) "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. §§ 706(2)(A)–(C).

Determining whether an agency action is "contrary to constitutional right" requires *de novo* review of the challenged action. *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 419 n.34 (5th Cir. 1999) (citing 5 U.S.C. § 706). And whether an agency action is "in excess of statutory . . . authority" involves "a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority." *La. Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 679 (3d Cir. 2014) (cleaned up).

An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983). Under *State Farm*, "[t]he agency must articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2023) (quotation marks omitted). This is because agencies "are required to engage in 'reasoned decisionmaking.'" *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

9

**ARGUMENT**

This Court has already found, and the parties agree, that the eight challenged programs constitute final agency action. This Court has already found, and the parties agree, that Plaintiffs suffered legal wrong or were adversely affected or aggrieved by those final agency actions. This leaves only the third prong of the review: whether the APA requires that this Court "hold unlawful and set aside" the challenged programs. *See* 5 U.S.C. § 706. It does.

First, USDA's use of race and sex preferences via the "socially disadvantaged" category violates the Fifth Amendment's guaranty of equality. Second, even if it were constitutional, USDA lacked statutory authority to use race and sex preferences. Third, progressive factoring discriminates based on race and sex and is also arbitrary and capricious. The administrative record shows that progressive factoring was designed with an explicit intent to benefit certain races and sexes at the expense of others. USDA's institution of progressive factoring is arbitrary and capricious because the agency did not engage in reasoned decision-making—in fact, USDA engaged in no reasoning whatsoever.

**I.      USDA discriminated based on race and sex in violation of the Fifth Amendment.**

**A.      USDA unlawfully discriminated based on race.**

**1.      USDA has no compelling interest.**

"Eliminating racial discrimination means eliminating all of it," *SFFA*, 600 U.S. at 206, because "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality op.). "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *SFFA*, 600 U.S. at 208 (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)); *see also League of United*

10

*Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring) ("It is a sordid business, this divvying us up by race."). The Constitution's guarantee of equality "give[s] to the humblest, the poorest, the most despised of the race the same rights and the same protection before the law as it gives to the most powerful, the most wealthy, or the most haughty." *SFFA*, 600 U.S. at 202 (internal quotation marks and citation omitted). "Without this principle of equal justice . . . there is no republican government and none that is really worth maintaining." *Id.* That principle is protected by the Fifth Amendment, barring the federal government from discriminating based on race and sex. *Adarand Constructors v. Peña*, 515 U.S. 200, 217 (1995).

Race-based classifications are presumptively unconstitutional. To overcome that presumption, USDA must satisfy the "daunting two-step examination" of strict scrutiny. *SFFA*, 600 U.S. at 206; *see also Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) ("[T]he moral imperative of racial neutrality is the driving force of the Equal Protection Clause, and racial classifications are permitted only as a *last resort.*" (emphasis added) (internal quotation marks omitted)); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003); *Adarand Constructors*, 515 U.S. at 224. USDA must first show that favoring one race over another is used to "further compelling government interests." *Gratz*, 539 U.S. at 270. And in the rare instances the government can show that, it must then show that its "use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 184 (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311–12 (2013)).

As this Court has already recognized, USDA cannot justify these programs under strict scrutiny. *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *13–24. Similar programs under other agencies have failed that test every time. *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 356 (6th Cir. 2021) (enjoining program providing coronavirus relief to restaurant owners based on their race and sex); *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-0278, 2024 U.S. Dist. LEXIS

38050, at *134 (N.D. Tex. 2024) (granting summary judgment to plaintiffs and permanently enjoining agency from only aiding specific races). Indeed, USDA *knows* that it cannot do what it did here—because USDA itself, using near-identical definitions of "socially disadvantaged" in near-identical situations, has lost every time it has been challenged. *See Strickland*, 2024 U.S. Dist. LEXIS 101547, at *19 (citing cases).

As this Court correctly held, USDA lacks a compelling interest because "[m]inimizing past discrimination here is not a compelling interest." *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *18. Although the government may sometimes adopt discriminatory policies to remediate "specific, identified instances of past discrimination that violated the Constitution or a statute,"[5] *SFFA*, 600 U.S. at 207 (citing cases), USDA never "identifies discriminatory actions taken by the USDA or in any way links them to its statistical findings," *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *18.

It is discrimination for the sake of discrimination. USDA operates under its own priorities, elevating "equity" because "this Administration has identified "Equity" with a capital-E as a priority for all levels of federal government." United States Dep't of Agric., *Why* Achieving Equity is a priority, 2 (2023), https://perma.cc/7G76-EYS8. And under USDA's definition of "equity," which "is not only about dividing resources fairly and equally, but also *factoring in differences among people or communities*," *id.* (emphasis added), discriminatory treatment is its own justification. Equity is not a compelling interest. USDA may not reject colorblindness.

Even USDA's own data undermines its conclusions. As this Court explained, USDA's recent study demonstrated "that white farmers are at a *greater* financial risk than Hispanic farmers

---

[5] The second permissible situation, "avoiding imminent and serious risk to human safety in prisons," is not relevant here. *SFFA*, 600 U.S. at 207 (citing *Johnson v. California*, 543 U.S. 499, 512–13 (2005)).

in three out of four metrics and are at a greater financial risk than non-Hispanic, socially disadvantaged farmers in two out of four metrics." *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *18 (citation omitted). And that study was published in February 2024, four months after ERP 2022, meaning USDA could not have relied on it anyway. *Id.* at *18–19. The data included in the administrative record is no different. USDA recounted its decision to give an additional 15 percent payment under CFAP 2 based on race and sex in order to "support[] the equitable administration of FSA programs." *See* 88 Fed. Reg. at 1865 n.11, 1869. But the research in front of USDA had concluded that CFAP 2 *was* administered fairly. An extensive analysis USDA reviewed concluded that "CFAP payments were proportional to the value of agricultural commodity sold for most minority producers." App. 757.

Even the best data USDA could muster up, presented in the best way it could manage, fails to come close to supporting race preferences. In response to a letter from Congressman Glenn Thompson, Secretary Vilsack put together a chart summarizing minority participation and minority payments under a variety of USDA programs. App. 515. Of the eight programs he reported data on, three of them showed that minority producers received *more* money as a percentage than their participation rate. App. 515. And the other five programs showed only a small gap. App. 515. The only conclusion to draw is that these programs were administered fairly—especially when the data is properly framed. USDA constantly acknowledged that minority farmers run smaller operations. It is not a surprise, then, that in a comparison between the percentage of producers and the percentage of money received, minority producers sometimes received less; it follows logically that people with smaller farms get less money. There was nothing odd in the program distribution, and certainly not the kind of discrepancies that show overt racial discrimination that would require a blunt, discriminatory response by USDA.

13

Any evidence of USDA's own discrimination must be recent, but none of what it included in the administrative record is. *See Strickland*, 2024 U.S. Dist. LEXIS 101547, at *19 (explaining that courts have consistently found that USDA "put[] forward no evidence of intentional discrimination . . . in at least the past decade" (alteration in original) (citing *Miller v. Vilsack*, No. 4:21-cv-0595, 2021 U.S. Dist. LEXIS 264778, at *9 (N.D. Tex. July 1, 2021))). USDA's proffered evidence was rejected by multiple courts in 2021. And USDA has not shown that it engaged in active discrimination against "socially disadvantaged" farmers since 2021. In fact, "[o]nly the opposite has occurred since then." *Id.* (citing the Inflation Reduction Act of 2022, Pub. L. 117-169, § 22007(e), 136 Stat. 1818, 2022-23, which provided an additional $2.2 billion dollars to farmers who alleged they had been discriminated against by USDA); *see also* Biden-Harris Administration Issues Financial Assistance to More than 43,000 Farmers, Ranchers, and Forest Landowners through the Inflation Reduction Act's Discrimination Financial Assistance Program (July 31, 2024), https://perma.cc/3DM7-CKN6 (detailing USDA's payments under § 22007, which averaged nearly $82,000 each to 23,000 farmers who alleged discrimination by USDA). The only discrimination anywhere in the record that postdates 2021 was against farmers like Plaintiffs, who have been discriminated against in at least the eight challenged programs on account of their race and sex.

USDA's decision to resort to racial discrimination based on this record is hard to understand as anything but a dead-end commitment to equity as the highest goal. Equity is not in the Constitution, and it is certainly not a compelling interest for circumventing the Constitution. It does not matter how strongly the Administration and Secretary Vilsack wish it were. App. 918–20 ¶¶ 39, 43–44, 46–49. The Constitution is the highest authority. U.S. Const., Art. IV. And it requires equality. U.S. Const., Amends. V, XIV.

14

### 2.    USDA's race discrimination is not narrowly tailored.

This Court also correctly held that USDA's racial discrimination is not narrowly tailored. *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *19. Narrow tailoring requires the government to show "that no workable race-neutral alternatives" would achieve the government's compelling interest. *Fisher*, 570 U.S. at 312; *accord Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). A policy that is over- or under-inclusive fails narrow tailoring. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507–08 (1989). "It doesn't matter if it's the easiest, most administrable, most well-intentioned program in the world—it cannot be based on race if it is not strictly necessary to achieve the relevant compelling interest." *Nuziard*, 2024 U.S. Dist. LEXIS 38050, at *99 (citing *Fisher*, 570 U.S. at 312).

USDA demonstrated that race-neutral alternatives are workable in the most obvious way: creating and using race-neutral alternatives. The "underserved farmer" classification, of which the challenged race-based definition is part, includes new farmers and low-income farmers—exactly who USDA claims its race discrimination aids. *See, e.g.*, ERP 2022, 88 Fed. Reg. at 74410 n.15 (explaining USDA targets extra relief to "underserved farmers" because they are "more likely to lack financial reserves and access to capital," and run "vulnerable and smaller operations"). As this Court put it, "USDA could serve the same racial groups through extant race-neutral alternatives." *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *20. Race-neutral alternatives are workable—they exist already—and so USDA's "racial classification system cannot survive." *Id.*

The Court's holding that the challenged programs would fail strict scrutiny by being both over- and under-inclusive is also correct. *Id.* at *20–21. "USDA provides additional relief to farmers of its preferred races absent any showing that they *needed* additional relief," while simultaneously "deny[ing] additional aid to farmers not of the USDA's preferred races who are in

15

danger of financial ruin." *Id.* at *21. Beyond that failing, the races it has chosen are "incoherent" when reviewed critically. *See SFFA*, 600 U.S. at 291 (Gorsuch, J., concurring) ("Where do these boxes come from? Bureaucrats."); App. 531 (acknowledging the arbitrary nature in internal cost-benefit analysis and expecting producers to shift ownership percentages to qualify as "underserved"); *Nuziard*, 2024 U.S. Dist. LEXIS 38050, at *89 ("But it is no secret that Congress's findings behind late-1970s racial classifications were ill-considered—if considered at all. It shows."). As this Court's survey of precedent shows, USDA selected races for preferential treatment seemingly at random. *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *21. Rich descendants of Spanish royalty are eligible. The grandchildren of white dustbowlers who eked out a living from the land are ineligible. Or their grand*sons* are, *see infra* I.B., but that only highlights the illogic.

The Court also shot down USDA's disingenuous claim that the racial discrimination at issue does not burden farmers like Plaintiffs simply because white men still receive some benefits. "One of the Plaintiffs, for example, received one tenth of what he otherwise would have received . . . ." *Id.* at *22. USDA's race discrimination is a clear affront to the Constitution's guarantee of equal treatment.

### B.      USDA unlawfully discriminated based on sex.

Sex discrimination, too, is presumptively invalid. *United States v. Virginia*, 518 U.S. 515, 531 (1996). "Successful defense of legislation that differentiates on the basis of gender, we have reiterated, requires an 'exceedingly persuasive justification.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) (quoting *Virginia*, 518 U.S. at 531). To justify the classification, USDA must prove that (1) a sex-based classification serves "important governmental objectives," and (2) the

classification is "substantially and directly related" to its objectives. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 730 (1982) (quotation marks omitted). It cannot do so.

First, as with race discrimination, "general claims of societal [sex] discrimination are not enough." *Vitolo*, 999 F.3d at 364 (citing *Hogan*, 458 U.S. at 727–29). USDA again advances a mere general desire to remedy alleged inequities. *See, e.g.*, ERP 2022, 88 Fed. Reg. at 74410 n.15. This is insufficient. Second, as with race discrimination, the under- and over-inclusive nature of the benefits to women conflicts with USDA's stated goal. Women who do not need additional assistance received it. *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *23. Women who arrived in the United States recently and thus—unless USDA believes it still discriminates against women today—could not have suffered discrimination at USDA's hands received it. *Id.* Entities like Plaintiff Alan and Amy West Farms are arbitrarily denied additional disaster relief because Amy West, a woman, owns only 48 percent of the joint venture. *See* App. 963 ¶ 18; *see also* App. 531 (acknowledging that this arbitrary breakpoint encouraged producers to shift ownership from husbands to wives to qualify for better relief payments). USDA thus violated the Fifth Amendment by embedding race and sex discrimination in every aspect of the challenged programs. It also violated separation of powers principles by engaging in that sordid business without being directed to by Congress.

## II.    Congress did not grant USDA the authority it claims.

USDA lacked statutory authority to discriminate based on race and sex. The Constitution vests the legislative power exclusively in Congress. U.S. Const., Art. I, § 1; *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Thus, when an agency asserts authority, the necessary inquiry is whether Congress "in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). That inquiry, in turn, "must be 'shaped, at least in some measure, by the nature of the question presented'"—the question presented being the

problem the agency seeks to answer through its action. *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). Here, the question USDA seeks to answer is "how should the United States resolve alleged longstanding economic disparities between people of different races and sexes?" *Cf. Biden v. Nebraska*, 600 U.S. 477, 503–04 (2023) (rejecting the dissent's vague formulation of the issue as the Secretary merely "giv[ing] borrowers more relief when an emergency has inflicted greater harm" and instead considering whether the Secretary can "use his powers to abolish $430 billion in student loans . . . as a pandemic winds down to its end?"). But Congress did not authorize USDA to decide whether those alleged longstanding disparities exist. Nor did it authorize USDA to act if it decided they do exist. Congress told USDA to dispense disaster relief. That's it. Doing that based on race and sex is the sort of thing Congress mentions.

The major questions doctrine guards the separation of powers against the "particular and recurring problem [of] agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. In cases such as this, the "'economic and political significance' of [the agency's asserted authority] provide[s] a 'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* at 721 (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159–60). The challenged programs come within the ambit of the major questions doctrine and thus are valid only if there is a clear congressional statement authorizing them. And even if the challenged programs need only regular statutory authorization, USDA lacks that.

The programs seek to answer a question "of vast . . . political significance." *Id.* at 716 (quotation marks omitted); *see also Texas v. NRC*, 78 F.4th 827, 844 (5th Cir. 2023) (explaining that depositing nuclear waste is a major question because it "has been hotly politically contested for over a half century"). Few questions have been given more political focus by the current

administration than the alleged existence of race and sex inequities and how to resolve them. President Biden's administration has made this a major policy cornerstone. *See, e.g.*, Executive Order 13985 (declaring "an ambitious whole-of-government equity agenda"); Executive Order 14091 (reinvigorating his administration's commitment to "embed[ding] a focus on equity into the fabric" of government, focused on "redressing unfair disparities" between Americans of different races and sexes). When the President says an issue is paramount and embeds it throughout official policy it is, by definition, highly politically significant. He is entitled to be taken at his word.

Among the many answers available to USDA, discrimination to achieve equal outcomes across race and sex categories ("equity") is perhaps the most controversial. This political tension is something elected members of Congress would ordinarily address, given how highly disfavored discriminating based on race and sex is and the divisive nature of equity. *See Nebraska*, 600 U.S. at 503 (contrasting the "sharp debates" that resulted from the Secretary's proposal with the near-unanimous passage of the HEROES Act); *West Virginia*, 597 U.S. at 732 (objecting to an agency's resolution of a problem that "has been the subject of an earnest and profound debate across the country" (quotation omitted)). The Constitution's careful separation of powers makes this the sort of decision reserved for the elected branch who must ultimately answer to the American people for their choice, not insulated bureaucrats.

In the rare circumstances where Congress wishes to carefully enact legislation using a suspect method of discrimination, it has been crystal clear in saying just that. *See, e.g.*, *Frontiero v. Richardson*, 411 U.S. 677, 678−79 (1973); *Adarand Constructors*, 515 U.S. at 205; *cf. United States v. Windsor*, 570 U.S. 744, 752 (2013). And Congress can only do this when it is a targeted solution that remedies specific, identified instances of discrimination. USDA's decision to include race and sex preferences following Congressional silence is novel and unprecedented.

USDA has used the socially disadvantaged category for a little more than 20 years, a fact that it insists means that using it for disaster relief is not novel and thus cannot present a major question. First, USDA is incorrect that novelty is required for major questions cases. Major questions cases do not *require* novelty; novelty is just one of many factors that can lead to that conclusion. *See* Josh Blackman, *Gridlock*, 130 Harv. L. Rev. 241, 266 (2016) ("The case law suggests at least nine factors, none dispositive, to determine if a decision is major . . . ." (citing cases)).

Second, USDA is incorrect. The way it uses "socially disadvantaged" here is novel. The contexts in which it has used that category before were different: they were clearly authorized and not related to disaster relief. *Cf. West Virginia*, 597 U.S. at 725 ("The legality of that choice was controversial at the time and was never addressed by a court."). When Congress first provided the category to USDA, it did so to resolve past racial discrimination in loanmaking by USDA. *See* 7 U.S.C. § 2003. Congress was explicit that USDA should use a racial component because Congress sought to rectify a specific problem: USDA had discriminated based on race and Congress needed to step in to fix it. But here, Congress said nothing about race or sex—it just provided funding for disaster relief. Silence has never been the way in which Congress speaks when it intends for the government to employ racial discrimination in a government program. There is no example of Congress ever authorizing a race or sex preference through congressional silence in any program, let alone in a *disaster relief program*. And if USDA can employ one anyway, then there are no limits to its ability to employ one in any other context where it dispenses a governmental benefit.

On the rare occasions Congress wishes to express a preference for farmers who are socially disadvantaged or who "have experienced discrimination," it makes that known. *See* 7 U.S.C. §§ 2003(a), (c) (directing target participation rates for loans to socially disadvantaged groups); *id*. §

2003(e) (defining socially disadvantaged groups); 7 U.S.C. § 2279(a)(5) (defining socially disadvantaged farmers); *id*. § 2279(b) (directing outreach efforts to socially disadvantaged farmers); *id*. § 2279(c) (directing outreach assistance for socially disadvantaged farmers); Inflation Reduction Act of 2022, Pub. L. 117-169, § 22007(e) (2022) (setting aside $2.2 billion for farmers who "have experienced discrimination" in USDA farm lending programs); *see also Miller*, 2021 U.S. Dist. LEXIS 264778, at *5 (describing how Congress authorized now-repealed loan forgiveness for socially disadvantaged farmers).[6] And these examples show another way in which USDA's behavior is novel: Congress stops short of listing specific races; USDA enumerates its preferred skin colors. *Compare* 7 U.S.C. § 2003(e) (defining "socially disadvantaged group" as "a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities"), *with* ERP 2022, 88 Fed. Reg. at 74408 (defining "socially disadvantaged farmer or rancher" as "includ[ing] the following, and no others unless approved in writing," and enumerating specific racial groups and women). Congress created the "socially disadvantaged" category and writes it into law when it wants it employed. USDA's decision to use it absent congressional authorization is a major departure from how the term has been used in the past.

---

[6] In the loan forgiveness program rejected in *Miller*, USDA identified specific racial groups that qualified through a Notice of Funds Availability. 2021 U.S. Dist. LEXIS 264778, at *5. The same races are included in the programs challenged here. USDA also included women in the challenged programs but did not include them in the loan forgiveness program. *Id.*; *see also* 7 U.S.C. § 2279(a) (defining socially disadvantaged for purposes of the loan forgiveness program to include farmers subjected to racial, ethnic, or gender prejudice).

USDA's interpretation lacks a limiting principle in the statute.[7] USDA's expansive claim of power is another reason why this question is major. A similar overstepping of Congress's boundaries came to the fore in *Biden v. Nebraska*. 600 U.S. at 496 ("It is highly unlikely that Congress authorized such a sweeping loan cancellation program through such a subtle device as permission to 'modify.'" (internal quotation marks omitted)). USDA's behavior here is even more egregious than the Secretary of Education's efforts to claim "unfettered discretion to cancel student loans," through the phrase, "waive or modify." *Id.* USDA does not even have vague language to point to. Rather, it has interpreted congressional silence to give it free rein to discriminate based on race and sex. USDA's view means that congressional silence would permit it to create a new class called "socially *advantaged* farmers," define it by race and sex, and then deny all disaster relief benefits to that newly-created group—again, without a single word, even an amorphous, discretionary word, from Congress. *Cf. id.* ("The Secretary's plan has 'modified' the cited provisions only in the same sense that the French Revolution 'modified' the status of the French nobility—it has abolished them and supplanted them with a new regime entirely." (internal quotation marks omitted)). USDA's claim of power has no principled limits and would allow the government to use racial preferences in any benefit program it so chooses. The scope of this asserted authority is breathtaking and demands clear congressional authorization. *Cf. Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764−65 (2021) ("It is hard to see what measures this interpretation would place outside the CDC's reach, and the Government has identified no limit . . . .").

---

[7] The Fifth Amendment, as discussed elsewhere in the brief, limits USDA's authority to discriminate based on race and sex by requiring it to pass scrutiny. But the Fifth Amendment provides no limit on USDA's attempt to lay claim to limitless federal power through congressional silence.

USDA also seeks to answer a question "of vast economic . . . significance." *West Virginia*, 597 U.S. at 716. For ERP 2022 alone, USDA budgeted more than $450 million for additional payments to underserved producers. App. 878. This amount is more than enough to present a major question. *See, e.g.*, *Chamber of Com. v. Consumer Fin. Prot. Bureau*, 691 F. Supp. 3d 730, 740 (E.D. Tex. 2023) (holding economic impact shown to be significant "by the millions of dollars per year" in compliance costs). And that is only one program. The CFAP 2 bonus payment that went only to underserved producers cost at least $325 million. App. 519. And USDA specified that the "$325 million outlay estimate . . . should be viewed as a minimum." App. 531. NAP payments— an insurance program given out for free to USDA's preferred races and sex—were over $27 million a year to socially disadvantaged farmers. App. 542. And this goes on top of the many other forms of race-based spending USDA likes to tout. *See generally* https://www.usda.gov/equity/activities (listing, by year, examples of USDA's race-based spending and initiatives). Clear congressional authorization is required for a race or sex preference.

USDA did not get clear authorization here. USDA, *not* Congress, injected "equity" into disaster relief even though it had to have known what constitutional thin ice it was on. *Strickland*, 2024 U.S. Dist. LEXIS 101547, at *19 ("The Court also notes that the USDA's justifications for 'socially disadvantaged' benefits programs consistently fail when challenged in court." (citing cases)); *see also Nuziard*, 2024 U.S. Dist. LEXIS 38050, at *99; *Ultima Servs.*, 683 F. Supp. 3d at 774.

USDA has injected race and sex into every program it can. It will continue to do so in the face of congressional silence unless it is permanently stopped. And the millions add up quickly. Summing the figures in the challenged programs, they total nearly $25 billion in spending. Out of ERP 2022's initial $2.7 billion, $450 million went specifically to underserved farmers, App. 898,

70% of whom receive that designation based on their race or sex, App. 540. If the other programs assigned a similar amount of money based on race and sex, that would be over $3 billion based on race and sex alone. USDA must show clear congressional authorization before it can continue to employ race and sex discrimination as an across-the-board solution.

Even if the bar were set lower and the challenged programs were reviewed for authorization as a simple matter of statutory interpretation, USDA would still fail to justify the race and sex preferences. The applicable appropriations are completely silent on this question. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020); *cf. Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself."). An even "more fundamental problem with the agency's position" is that Congress has, as shown above, long been taking affirmative steps to assist socially disadvantaged farmers. *Gulf Fishermens Ass'n*, 968 F.3d at 460. Yet when Congress appropriated money to aid those in need following disasters, it did so without any indication that it found that there were specific and identifiable reasons to employ a race preference. Congress did not even mention race or sex. The natural read of the relief appropriations is that Congress expected USDA to allocate funds based on need. USDA nevertheless "decided to do" through regulatory action "what Congress had not" done through statute. *Ala. Ass'n of Realtors*, 594 U.S. at 760.

## III.    Progressive factoring violates the Fifth Amendment and the APA.

### A.    Progressive factoring unlawfully discriminates based on race and sex.

USDA designed progressive factoring with the explicit intent of benefiting certain races and sexes at the expense of others. And it succeeded. "The challengers bear the burden to show that racial discrimination was a substantial or motivating factor behind enactment of the law; if they meet that burden, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016)

(quotation marks and citations omitted). The record contains evidence that "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Progressive factoring discriminates based on race and sex explicitly through favorable treatment of NAP-covered crops and because it is applied before refunds of race- and sex-discriminatory insurance premium refunds. The record also reveals that it was designed and intended to benefit certain races and sexes at the expense of others.

To begin with, USDA extended Noninsured Crop Disaster Assistance Program (NAP) coverage to farmers of its preferred races and sex—for free and without even requiring that they apply—and then exempted crops covered by NAP from progressive factoring. ERP 2022, 88 Fed. Reg. at 74411; ERP 2021 Phase 2, 88 Fed. Reg. at 1871. The effect of this change is to apply progressive factoring for NAP-eligible crops only to farmers who are not members of USDA's preferred races and sex. USDA then chose to apply progressive factoring to a farmer's total before refunding Federal crop insurance and NAP fees and premiums. ERP 2022, 88 Fed. Reg. at 74410. This means that those refunds evaded progressive factoring. And unlike in prior years, when all farmers received those refunds, under ERP 2022 USDA only gave them to socially disadvantaged and other underserved farmers. These refunds are why Mr. Strickland received only a tenth of what Mrs. Strickland received. *See* App. 971–72 ¶ 20. USDA's decision to exempt NAP-covered crops from progressive factoring and not to apply progressive factoring to its discriminatory insurance

premium refunds are both forms of race and sex discrimination in its implementation of progressive factoring.

USDA itself admitted that it took these actions to benefit its preferred races. In an internal memorandum finalizing the ERP 2022 structure for Track 1, it laid out the formula it was using. First, it calculated the gross ERP payment, then multiplied it by the producer's share, and then applied progressive factoring to it. App. 862. Only then did USDA refund premiums and fees for underserved producers. App. 862. USDA's reason was because "[t]his calculation substantiates the highest benefit for the UP [underserved producer] by adding the premiums/fees after factoring." App. 862. Every farmer who is not a white man is an underserved producer. In other words, USDA intentionally designed the progressive factoring payment formula with discriminatory intent.

USDA also took care to design progressive factoring for ERP 2022 Track 2 to maximize benefits to underserved producers. Faced with options for how to apply progressive factoring alongside the underserved producer "top-up benefit" (USDA's internal term for the additional 15% payment increase denied to some farmers based on their race and sex, *see* App. 868), USDA used a methodology that "maximizes available assistance to all small-scale operations while supporting the additional UP top-up benefit for non-traditional operations and participants." App. 868.

USDA justified progressive factoring by explaining it intended to target relief to smaller producers—the same fact that it used to try to justify its assumption that producers of its preferred races and sex were disadvantaged and needed additional disaster relief. *Compare* ERP 2022, 88 Fed. Reg. at 74410 n.14 (justifying progressive factoring as a method of increasing "the proportion of funding provided to smaller producers"), *with id.* at n.15 (justifying providing benefits based on race and sex by explaining USDA's view that farms owned by its preferred races and sex are

"smaller operations" that "lack financial reserves"). According to USDA, it designed progressive factoring to give more money to smaller farmers at the expense of comparatively larger farmers. *Id.* at n.14. And USDA believed that its preferred races and sex usually operated smaller farms, meaning USDA knew that its preferred races and sex were more likely to receive more money from progressive factoring. *Id.* at n.15.

The administrative record for ERP 2022 demonstrates that USDA made every effort to steer its limited resources directly to "underserved producers"—a category that discriminates based on race and sex—based on the application of progressive factoring before refunding insurance premiums and fees. *See* App. 862 (giving insurance refunds after progressive factoring to maximize race- and sex-based benefits); App. 873 (explaining that with only $3 billion to cover more than $10 billion in uncovered losses, USDA was prioritizing $432 million to race- and sex-discriminatory premium and fee refunds). When USDA explained that it was using progressive factoring to make "target[ed] payments" to "losses incurred by smaller producers" and "shallow losses," App. 873, while also explaining that underserved producers run "smaller operations" and "lack financial reserves," ERP 2022, 88 Fed. Reg. at 74410 n.15, it was saying that it also designed progressive factoring to steer disaster relief payments towards USDA's preferred races and sex.

The decision to explicitly discriminate based on race and sex and the decision to apply progressive factoring are based on the same consideration: operation size. Other areas of ERP 2022 discriminate against white men in favor of USDA's preferred races and sex. *See* ERP 2022, 88 Fed. Reg. at 74410 (withholding insurance premiums and refunds based on race and sex); *id.* at 74414 (providing an additional 15% based on race and sex). The other seven challenged programs each explicitly discriminate based on race and sex. *See supra* n.3. Progressive factoring is a race- and sex-neutral policy enacted by a policymaker with a profound recent history of animus towards

27

white men. And according to USDA itself, it had a disparate impact. The inference to draw is obvious: USDA did not adopt progressive factoring just "merely 'in spite of,' its adverse effects upon an identifiable group"—it adopted it "because of" those effects. *See Pers. Adm'r of Mass.*, 442 U.S. at 279. This Court should grant summary judgment to Plaintiffs because there is sufficient undisputed evidence in the record to demonstrate both a discriminatory impact and intent in USDA's implementation of progressive factoring, and remand ERP 2022 with instructions to USDA while maintaining jurisdiction after remand to ensure this defect has been cured.

        **B.**      **Progressive factoring is arbitrary and capricious.**

*State Farm* provides four ways agency action can be arbitrary and capricious. 463 U.S. at 43. USDA miraculously managed all four as it hastily rushed progressive factoring out the door in ERP 2022. Progressive factoring considers factors Congress never asked USDA to look at; it was implemented counter to how the agency initially planned it; USDA ignored several important aspects of the problem when implementing it; and its flaws are so plain that it could not plausibly be the product of agency expertise. *See id.* USDA was not required to submit to notice-and-comment rulemaking for ERP 2022. *See* 5 U.S.C. § 553(a)(2). But even when it escapes the strictures of notice-and-comment rulemaking, it remains bound by the APA's requirement that it not behave arbitrarily and capriciously. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105–06 (2015). This record makes the danger of USDA's decision to no longer voluntarily undergo notice-and-comment for benefits rulemaking obvious. *See* Revocation of Statement of Policy on Public Participation in Rule Making, 78 Fed. Reg. 33045 (June 3, 2013). Without the wisdom of public comment, agencies are more likely to act hastily and without fulsome consideration. Here, USDA never analyzed the effects of progressive factoring. Nor did it carefully decide the numbers that went into it. USDA ignored important aspects of its decision and failed to engage in reasoned

decisionmaking. By all appearances in the record, progressive factoring and its many components appeared out of thin air. This flouts the most basic requirements of the APA.

The deferential standard of the APA does not require that an agency's decision be "a model of analytic precision to survive a challenge." *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997). But agencies must articulate a "satisfactory explanation" for their actions, and that includes "a rational connection between the facts found and the choices made." *Huawei Techs. USA, Inc.*, 2 F.4th at 434. Thus, an agency rule is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, or when the agency's path to its eventual decision cannot "reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974). And the APA affirmatively prohibits a reviewing court from "supply[ing] a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc.*, 419 U.S. at 286.

This deferential standard requires that USDA produce a record that the Court can review to see the thought behind USDA's action. This record fails to meet that basic expectation. USDA acted thoughtlessly. It did not consider alternatives, nor did it articulate why it preferred the results of progressive factoring, nor did it leave behind a reasonably discernable path for a reviewing court to follow. The administrative record ignores the most important questions surrounding progressive factoring. There is not one mention in the record of (1) where to set the payment thresholds and why; (2) why USDA has chosen to steer funds to smaller operations and shallower losses; or (3) why USDA calculated it on a per-producer basis, disadvantaging single-owner businesses and favoring multi-owner businesses independent of size. USDA's institution of progressive factoring is arbitrary and capricious.

The payment thresholds provide a perfect example of the administrative record's recounting of USDA's decisionmaking "process." In the final version of ERP 2022, published October 31, 2023, there are six payment thresholds: up to $2,000; up to $4,000; up to $6,000; up to $8,000; up to $10,000; and over $10,000. ERP 2022, 88 Fed. Reg. at 74410, 74414. The payment amounts scale linearly downward, decreasing by 20 percent at each threshold until reaching $10,000; any loss over $10,000 is paid 10 percent. *Id.* at 74410, 74414. These same payment thresholds appear in USDA's presentation to the OMB given on July 21, 2023. App. 869–86. But in the May 19, 2023, memorandum clearly marked "2022 EMERGENCY RELIEF DECISIONS" that begins by stating that "[t]his memo provides the final decisions for the following key items pertaining to ERP 2022 . . . ERP Track 1 Payment Calculation using Progressive Factoring," the thresholds are completely different. App. 862.

Rather than change every $2,000, they changed every $5,000. App. 862. Rather than decrease by 20 percent, they decreased by 25 percent. App. 862. Rather than end at 10 percent, they ended at 25 percent. App. 862. This difference is substantial. A farmer with $100,000 in losses would be progressively factored down to $15,000 under the published system, but $32,500 under the formula in the memo that "provides the final decision[.]" App. 862. And that formula stuck around for a while. It was used as recently as an email on June 26, 2023—just three weeks before the OMB presentation that included the revamped formula. App. 868. Why did USDA make this change? There is zero information in the record—not just about the change, but about selecting the formula at all. Progressive factoring could have been the result of sophisticated calculations or well-placed darts. The APA demands more than the possibility of a dartboard being used to design a payment formula.

The progressive factoring payment thresholds are arbitrary and capricious. USDA does not explain why it set the thresholds the way it did, nor does it explain why it shifted from the "final decision" of May 19, 2023, to a different decision mere weeks later.

USDA's decision to steer additional funds toward smaller operations and shallower losses is also arbitrary and capricious. USDA repeats the same hollow line many times throughout the record: progressive factoring targets payments towards smaller operations and shallower losses. But it never explains *why* it thinks that is a good idea. The problem is not that there are no plausible good reasons—for instance, if USDA has data that shows that smaller operations are more likely to go bankrupt without the extra assistance provided by progressive factoring, that would be a plausible reason—it is that USDA did not explain its reasons at all. And the Court may not supply reasons for it. *See Bowman Transp., Inc.*, 419 U.S. at 286. The heart of arbitrary and capricious review is the requirement that agencies must make rational choices, connecting the facts found to the decisions made. USDA chose to provide additional disaster relief to smaller operations and shallower losses. The record makes that (somewhat) clear. But it does not explain—at all—why USDA did that. That trend continues and worsens as we turn to USDA's decision to apply progressive factoring on a per-producer basis.

USDA applied progressive factoring to each beneficiary individually rather than to each entity. App. 862. This means that if a single-owner farm, or a corporate-entity farm, loses $10,000 of crops, that will be progressively factored down to $6,000.[8] But if a dual-owner farm of the same size loses $10,000 of crops, that will be progressively factored down to a total of $8,400. Strangely, USDA does not seem to display awareness that this was even a policy decision. The only

---

[8] Example numbers provided in this section use the Federal Register formulas rather than the Emergency Relief Decisions memo formulas. *Compare* ERP 2022, 88 Fed. Reg. at 74410, 74414, *with* App. 862.

31

discussion of this fact is in the Emergency Relief Decisions memo, and the memo cursorily notes that this "[r]esults in higher payment to primary policy holder and all [beneficiaries]." App. 862. The record does not discuss whether USDA realized that the switch from a flat factor to a progressive factor caused these odd results, or whether USDA decided that these were not a problem, or that it had a way to handle them. There is simply no discussion. And the effect of this decision on Plaintiffs is substantial and, frankly, bizarre.

Plaintiffs Alan West and Amy West co-own Plaintiff Alan and Amy West Farms; Alan owns 52 percent, and Amy owns 48 percent. Alan and Amy West Farms suffered $208,706.00 in losses covered by ERP 2022 Track 1. App. 958 ¶ 15. This was progressively factored down to $25,870.60. App. 958 ¶ 15. But Plaintiff Rusty Strickland and his wife Alison were treated differently for the farm they each own 50 percent of. App. 971–72 ¶ 20. Their farm's losses were split into "shares" of 50 percent each and their losses were progressively factored separately. App. 971–72 ¶ 20. This meant that they each received $9,696.95 for their losses of $46,969.50. App. 971–72 ¶ 20. Had Alan and Amy West's payments been split into shares the same way, the difference would have been an additional $5,000.

It is hard to overstate how odd this system is. It creates powerful incentives to structure a farm's ownership and to structure how it files the losses with USDA.[9] It provides a much greater benefit to farms with many owners and denies benefits to large farms organized as single corporate entities. Most disturbing, it does not appear from the record that USDA ever considered this decision. Had it, it likely would have reached a different conclusion about the propriety of this

---

[9] One example of the odd behavior this system incentivizes includes restructuring your farm as a series of much smaller farms. Each corporate entity would receive separate progressive factoring. In Alan and Amy West's case, if they had restructured Alan and Amy West Farms as Alan and Amy West Farms numbers 1 through 20 and filed separately, with each entity losing about $10,000, USDA would apparently have paid them an additional $100,000.

decision. Decisions like this serve as a reminder about the value of notice-and-comment rulemaking. Until 2013, USDA voluntarily participated in notice-and-comment rulemaking even for benefits programs. *See* 78 Fed. Reg. at 33045. Without any process, the administrative record lacks the kind of reasoned deliberation that makes a rule legally valid.

Because the decision it made "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," it is arbitrary and capricious. *State Farm*, 463 U.S. at 43. So too because USDA "entirely failed to consider an important aspect of the problem" by not considering the results of the producer-payee structure. *See id.*

Nor can USDA's path to its most basic decisions about progressive factoring reasonably be discerned. *See Bowman Transp., Inc.*, 419 U.S. at 286. There is no discussion in the record of why USDA selected the $2,000 breakpoints. There is no discussion in the record of why USDA selected the 20 percent intervals. There is no discussion in the record of the sudden change from the 2022 Emergency Relief Decisions memo that "provides the final decision" for progressive factoring and contained $5,000 breakpoints at intervals of 25 percent. *See* App. 862. Arbitrary and capricious review is deferential, yes. But the bar it sets is not so low as to permit the agency to blindly stumble over it and pass with flying colors.

## IV. The Court should declare the race and sex preferences unlawful and order partial vacatur and remand.

"[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023). However, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* Here, the most appropriate remedy is partial vacatur of the race and sex preferences and a remand of all eight challenged programs for USDA to consider how to remedy the defects identified in the Court's order in the first instance. *See Southwestern Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating portions of a rule by

specifically describing them as "regulating legacy wastewater and residual combustion leachate"); *Tex. Med. Ass'n v. U.S. HHS*, 654 F. Supp. 3d 575, 594 (E.D. Tex. 2023) (vacating individual words from a regulation and remanding). Plaintiffs respectfully request that the Court (1) maintain jurisdiction over the action on remand and impose a 90-day or shorter timeline; (2) issue a declaration that the race and sex preferences in the challenged programs are unlawful, both because they violate the Fifth Amendment and because they were promulgated without statutory authority; (3) permanently enjoin USDA from employing race and sex preferences in the challenged programs; and (4) permanently enjoin USDA from instituting future race and sex preferences absent clear congressional authorization. *See* 5 U.S.C. § 702 (authorizing these forms of relief); *see also* App. 954–55 ¶¶ A–K (providing a detailed request for forms of relief in the alternative).

To remedy the race and sex preferences, USDA must correct the payments made once the preferences have been removed. The agency should be permitted to decide how to correct the payments made in the first instance on remand. USDA could accomplish this by clawing back funds from farmers who were paid more on account of their race or sex, or by paying more to farmers who were discriminated against because of their race and sex, or by a mix of the two. It is conceivable other remedies exist as well. USDA, as the agency, is best positioned to decide how to handle its budget and correct the constitutional defect. ERP 2022 should also be remanded for the agency to reconsider, but progressive factoring should not be vacated to allow the agency to continue making payments. *See Tex. Med. Ass'n*, 654 F. Supp. 3d at 594 (discussing disruptiveness of vacatur and the importance of avoiding disruption in crafting a remedy). Instead, the Court should enjoin USDA from making any payments using an average total payment factor greater than 27 percent, which is what the agency claims would have been the flat factor used.

34

## CONCLUSION

Plaintiffs ask this Court to grant summary judgment for plaintiffs and partially vacate and remand the challenged programs. The Court should also enjoin USDA from using progressive factoring to enhance payments and declare that USDA's race and sex preferences are unlawful.

Dated: <u>August 28, 2024</u>.

Respectfully submitted,

<u>/s/ Braden H. Boucek</u>
BRADEN H. BOUCEK
  Georgia Bar No. 396831
  Tennessee Bar No. 021399
BENJAMIN I. B. ISGUR
  Virginia Bar No. 98812
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
(770) 977-2131
bboucek@southeasternlegal.org
bisgur@southeasternlegal.org

WILLIAM E. TRACHMAN
  Colorado Bar No. 45684
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
wtrachman@mslegal.org

ED MCCONNELL
  Texas Bar No. 13442500
Tormey & McConnell, LLC
310 SW 6th Ave.
Amarillo, TX 79101
Tel. (806) 355-2700; Fax. (806) 355-4771
ed@tmcattorneys.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This brief conforms to the requirements of Local Rule 7.2. It was prepared in 12-point Times New Roman Font. It is double-spaced and has margins that are at least one inch on all four sides. No text other than page numbers is in the margins.

Respectfully submitted,

/s/ Braden H. Boucek
BRADEN H. BOUCEK

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by the Court's electronic filing system to all parties indicated on the electronic filing receipt.

Respectfully submitted,

/s/ Braden H. Boucek
BRADEN H. BOUCEK