

Rural Coalition /Coalición Rural
And
Federation of Southern Cooperatives/
Land Assistance Fund



# A TIME TO CHANGE:

# A REPORT BY THE ASSESSMENT CONVERSATIONS TEAM (ACT REPORT)

*By Rural Coalition/Coalición Rural*
*And*
*The Federation of Southern Cooperatives/Land Assistance Fu nd*

## September 22, 2010

@2010 Rural Coalition and the Federation of Southern Cooperatives. Please do not copy without permission.

## PREFACE

The release of this long-awaited report is the culmination of a long journey.  The content was collected during 5 USDA/Community Based Organization Partners Meetings, the latest of which was held in August 2008 just as USDA was beginning to implement the 2008 Farm Bill. The compilation and design of the structure of the report, begun just as President Barack Obama was taking office, was completed in Spring 2009 in cooperation with the USDA staff who served as members of the Assessment Conversations Team.  The authors completed writing in September 2009 at which time the final report was submitted to the new Secretary of Agriculture, Tom Vilsack.

USDA has used the report findings in its internal work but refrained from official public release. It has however agreed that the authors, whose work was entirely supported by their respective organizations, may release the report at this time. In the almost one year since the writing was completed, many recommendations have been implemented.  Yet much else still needs to change to assure that the people of color farmers, ranchers, farmworkers and rural and urban communities of color benefit from the fruits of the labor and the care they invest in their land and communities.

We offer this ACT report as a final summary of the five-year USDA-CBO Partners Process. USDA and communities of color might productively use the findings and recommendations to measure both forward motion and sticking points encountered on our journey into the *"New Era of Civil Rights in Agriculture"* that USDA Secretary Tom Vilsack has initiated.  We extend our gratitude to all who participated in the Partners process  and who provided input into this process.  We hope the work presented here reflects the depth of our discussions and the wisdom shared by the many organizations that have sacrificed so much to support socially disadvantaged communities and assure their continued presence on the land and contribution to production agriculture.  We commend and thank the Assessment Conversations Team and the Partners Planning and Solutions Teams (listed in Appendix V) for their dedicated efforts.

The report identifies discriminatory practices and long-standing barriers to fair access to USDA programs.  It summarizes the comprehensive statutory changes adopted in the 2008 Farm Bill, largely at the behest of t he CBO partners, to provide USDA stronger tools to assure accessibility and accountability and to measure performance.  The report's recommendations address what change should look like, and outline specific changes in statute, regulation and program delivery that have been made and still need to be made to assure USDA programs are fairly administered in compliance with existing civil rights and related laws. The new Minority Farm Advisory Committee authorized in the 2008 Farm Bill is now being formed, and we call upon that Committee to utilize this report to help guide their work.  The report should also help guide the priorities of all USDA agencies as they work to make the structure of USDA more accessible to this important sector of agriculture.

We further offer this document as a potentially useful basis for analysis and recommendations to both the Administration and Congress regarding funding levels and regulatory and statutory changes that should be considered before and during the 2012 Farm Bill deliberations.

**Sincerely,**
  **Lorette Picciano, Rural Coalition/Coalición Rural**
  **Edward Pennick, Federation of Southern Cooperatives/Land Assistance Fund**

**July 7, 2010**

*A Time To Change: Report of the Conversations Assessment Team*                    3
*@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED*

# TABLE OF CONTENTS

PREFACE                                                                                          2

TABLE OF CONTENTS                                                                                 3

INTRODUCTION                                                                                      4

ISSUE # 1:  EQUITABLE ACCESS TO USDA PROGRAMS AND SERVICES                                        7

ISSUE # 2:  EQUITY AND USDA'S RELATIONSHIP WITH AMERICAN INDIAN TRIBES            16

ISSUE # 3:  IMPROVED COORDINATION OF USDA OUTREACH AND ADVOCACY                   24

ISSUE # 4:  FARMWORKERS, USDA, AND U.S. AGRICULTURE                               30

ISSUE # 5:  NEW AND EMERGING FARMERS AND RANCHERS                                 35

ISSUE # 6:  ACCESS TO USDA GRANT AND COOPERATIVE AGREEMENT PROGRAMS 44

ISSUE # 7:  RISK MANAGEMENT                                                       50

ISSUE # 8:  DISASTER PREPAREDNESS AND RESPONSE                                    55

ISSUE # 9:  RURAL DEVELOPMENT                                                     62

ISSUE # 10: RENEWABLE ENERGY                                                      69

ISSUE # 11: CONSERVATION AND FORESTRY                                             77

ISSUE #12:  COMMUNITY FOOD SECURITY AND NUTRITION ASSISTANCE                      85

ISSUE # 13: FOOD SAFETY AND INSPECTION SERVICE                                    91

ISSUE # 14: NATIONAL ANIMAL IDENTIFICATION SYSTEM (NAIS)                          96

ISSUE # 15: SPECIALTY CROPS AND ACCESS TO MARKETING PROGRAMS              101

ISSUE # 16: ACCESS TO CREDIT                                                      108

ISSUE # 17: SETTLE OUTSTANDING CIVIL RIGHTS CLAIMS AND HALT FORECLOSURES,
            ACCELERATIONS, AND SALES                                              116

ISSUE # 18: COMMODITY PROGRAMS AND COUNTY COMMITTEES                              122

ISSUE # 19: USDA ADVISORY COMMITTEES AND BOARDS                                   128

CONCLUSION: DEFINING THE CHANGE WE SEEK                                           132

APPENDIX 1: SUMMARY OF REPORTS RELATED TO EQUITY IN ACCESS TO USDA
            PROGRAMS AND SERVICES                                                 134

APPENDIX II: SOME CURRENT USDA ADVISORY COMMITTEES

APPENDIX III: GLOSSARY OF DEFINITIONS AND TERMS

APPENDIX IV: LIST OF THE ASSESSMENT CONVERSATION TEAM (ACT) MEMBERS

APPENDIX V: USDA-CBO PARTNERS AND SOLUTIONS COMMITTEES

## INTRODUCTION

In February 2009, Acting Deputy Assistant Secretary for Civil Rights Robin E. Heard charged a group of U.S. Department of Agriculture (USDA) employees to work with identified representatives of community-based organizations (CBOs) to assess findings from the USDA/CBO Partners Meetings, an annual forum in which USDA listens to the voices and concerns of its underserved constituents and with those constituents identifies real and tangible solutions. Outreach and Diversity Director Carl-Martin Ruiz assembled the USDA team and led this effort on behalf of the Department with Geraldine Herring and staff from many USDA agencies assisting. CBO Partners Planning Team Chair Shirley Sherrod assigned Jerry Pennick of the Federation of Southern Cooperatives/Land Assistance Fund and Lorette Picciano of the Rural Coalition to coordinate the input of the CBOs in the monumental undertaking that has resulted in this report.  (See Appendix IV for full list of team members).

The USDA/CBO group, named the Assessment Conversation Team (ACT), reviewed, assessed, integrated, and analyzed all documents from past Partners meetings, including the 22 conversations—dialogues focusing on strategies to remove barriers that reduce the economic capacity and the well-being of small, beginning, socially disadvantaged, and limited-resource farmers and ranchers, as well as landowners, farmworkers, and other low-income individuals, and rural and urban communities—as well as accomplishments resulting from the conversations.

Secretary Thomas J. Vilsack reiterated the importance of the assessment in his April 21, 2009, memorandum to USDA employees, "A New Civil Rights Era for USDA," in which he called for a report summarizing the information gleaned from previous Partners Meetings, to be used in an analysis of the Department's program delivery "to ensure that programs are delivered equitably, and that access is afforded to all constituents, with particular emphasis on socially disadvantaged farmers, ranchers, and other constituents."

When Dr. Joe Leonard was confirmed and joined USDA as the new Assistant Secretary for Civil Rights, he and Deputy Assistant Secretary for Civil Rights Mary McNeil, assumed leadership of the process.

For the CBOs, this has been a very long journey, in some cases dating back many decades. Most of the reports written since 1965 by the US Civil Rights Commission and other government entities (see Appendix I for list of reports) that have addressed inequitable service by USDA have relied heavily on the input of the CBOs. The CBOs have also been involved in Congressional hearings, listening sessions, and other USDA reports, such as the series of reports and studies on inequities with respect to American Indian agriculture. The CBOs have successfully developed and championed legislative changes beginning with the 1985 Farm Bill.

Most recently, the CBOs, through the Farm and Food Policy Diversity Initiative, were able to secure language in some 30 sections of the 2008 Farm Bill aimed at equity and

structural change. For instance, the Farm Bill includes provisions to help Socially Disadvantaged Farmers and Ranchers (SDFRs) restore and preserve their communities' land, reduce loan accelerations and foreclosures on farms, and which improve, expand and add set-asides in order to ensure access by SDFRs.  The bill also strengthens tools that ensure equitable access to USDA programs and provides for settlement of ongoing civil rights claims; expands food security, nutrition education, and other assistance; and increases support for the CBOs who represent SDFRs and farmworkers in USDA grant programs.

Since 1993, and especially in 1996 and 1997, the CBOs as a group have approached USDA to seek systemic change. As a result, reports were issued and meetings were held. The CBOs made significant contributions to the development and implementation of the 1997 Civil Rights Action Team report and the Small Farms Commission's report. Changes of administration, farm bill debates, and the necessity to seek court action were important phases in this work and the CBOs' evolution.

In 2003, USDA's Office of the Assistant Secretary for Civil Rights (OASCR) was established   as a result of a provision in the 2002 Farm Bill strongly supported by the CBOs. OASCR worked with the CBOs to initiate innovative strategies to open dialogues with small, limited-resource, and socially disadvantaged farmers and ranchers, and other underserved communities.  These strategies included listening sessions with African-American, Latino, Asian-American, and American Indian organizations in the communities where members of those groups lived and worked, across the United States. The sessions provided a venue for OASCR and the CBOs to address issues in the areas of civil rights and equitable access to USDA programs and services.

USDA and the CBOs—the Partners—have worked closely together to open channels of communication between the Department and its stakeholders, creating a collaborative process that could be used to address systemic problems in the delivery of programs and services.  This process has included Partners meetings, held annually in Washington, DC, since 2004. Over eighty conversations and training sessions were held during this period involving diverse community based organizations and producers from across the country.  The Partners meetings served as a call to action for CBO leaders and USDA to work together and think through solutions to problems faced by socially disadvantaged farmers and ranchers.

As a result of the Partners meetings, there have been proposals for actions that have not been effectively communicated to nor implemented by USDA agencies, and therefore have not solved the fundamental problems of equitable access or contributed to improving the conditions of USDA's relationship with many groups of small and disadvantaged farmers and ranchers, as well as the CBOs that represent them.

The Assessment Conversations Team welcomes the opportunity to cure this deficiency by presenting this report with our recommended changes to ensure that all socially disadvantaged farmers, ranchers, farmworkers, and their communities receive equitable service from the U.S. Department of Agriculture (USDA).  This report provides

comprehensive recommendations that can be used proactively by USDA in redressing the Department's long and documented history of discrimination, and to build a more equitable future in America's food and agriculture system for socially disadvantaged farmers and ranchers and farm workers and their communities.

With a new administration and new authority from the 2008 Farm Bill, we have another opportunity to work together to implement these long-awaited changes.  The CBOs have observed the commitment to change expressed by Secretary Vilsack and believe his proactive leadership is essential to securing equity. As the Secretary has stated: *"We will be guided by the values that President Obama has outlined for this Administration:* **transparency, participation, and collaboration**. *We have an obligation to the public to make our programs as open as possible so that everyone can participate. We need to engage the public in conversation, discussion, and debate about policy decisions. In particular, we need to reach out to underserved constituencies and other groups who have been left out of the process, so that there is no question that the Department serves everyone and not just the special interests."*

The report will also be useful in establishing the structure, format, and agenda for future Partners meetings or whatever new processes are instituted.  USDA has expressed its commitment to working with its CBO partners and communities to build bridges for strengthening rural America.  Through continued dialogue and effective relationships, we believe that SDFRs, farm workers, and their communities will enjoy more opportunities that will foster their personal dignity, cultural integrity, and economic well being.

**ISSUE # 1:  EQUITABLE ACCESS TO USDA PROGRAMS AND SERVICES**

**PROBLEMS RAISED IN THE PARTNERS PROCESS**

The local offices and program delivery systems of the U.S. Department of Agriculture (USDA) are often closely intertwined with the dominant social and economic interests and systems in local communities. For many years, socially disadvantaged farmers and ranchers (SDFRs) have been discouraged from applying for USDA services with comments such as "this program is not for you" or "we are out of money." Such rejections have been reported throughout the United States, although they seem to occur more frequently in some regions, states, and localities.

The challenges that SDFRs face in gaining equitable access to USDA programs have been raised repeatedly by the community-based organizations (CBOs) and exhaustedly documented in countless reports, Congressional hearings, and lawsuits over the years, starting with a 1965 report by the U.S. Commission on Civil Rights and continuing through the 2008 Government Accountability Office (GAO) report on civil rights at USDA. All the reports demonstrate that these problems are systemic, and all have recommended specific and substantive actions needed to reverse inequities. USDA has failed to address these concerns over the years and has not utilized authorities and mandates that have been available since the passage of the Civil Rights Act of 1964.

The participation of SDFRs and Indian tribes in U.S. agriculture and the value of their economic contributions to their states and communities have also been historically underreflected in the Census of Agriculture and reports of the Economic Research Service (ERS). As a result, these communities are left with far fewer tools to make the case for increased Federal investment.

The CBOs have also raised the continuing need for better coordination of outreach across USDA, while emphasizing that sharing of information about USDA programs will not achieve the desired impact without creating the data systems and other tools necessary to hold local and state offices accountable for actually serving the producers who come through their doors. Many producers are struggling, and their access to services is complicated by USDA's multiagency program delivery system. But SDFS in particular suffer from persistent discrimination and neglect. This well-documented and costly history demonstrates the need to objectively and continually monitor the participation of the nation's socially disadvantaged producers in USDA programs, and gaps in the service SDFRs receive.

For more than a decade, the CBOs have called for the institution of an independent data collection and documentation process to ensure transparency and accountability. USDA has had the authority to utilize real data to assess equity within its systems for many years. However, the Department has failed to publicize these data and use them to conduct compliance reviews and document gaps between the number of producers of a particular race, gender, or ethnicity and those producers' participation in USDA programs at all levels, from the national to the county.

*A Time To Change: Report of the Conversations Assessment Team*                8
*@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED*

Without real compliance reviews and analyses of gaps in service, the burden of changing the system fell to SDFRs, who could seek relief only by filing individual or class action lawsuits, at great risk to their operations. Without an independent data system, complaints essentially become one producer's word against that of the relevant USDA agency, with the producer regularly denied access to the data needed to support his or her claim.

For every producer who was denied a loan, countless other producers were turned away from USDA without being given the opportunity to apply. USDA has lacked any system to record these requests and denials of service and has failed to act while SDFRs were, and still are, effectively denied billions of dollars in farm program benefits. The CBOs have contended for years that a data collection system was essential to holding USDA employees accountable for inequities in program and service delivery by linking data on service delivery to performance reviews.

During the Partners process, the net impact of this failure to reach to SDFRs has also been repeatedly discussed. While some of the problems relate to gaps in statutory authority, there remain serious problems in service delivery and accountability that can profoundly impact the viability of farm and ranch operations. The CBOs have stressed that instead of allowing agencies to deny that problems exist, USDA must place a high priority on solving problems so that the unique needs of SDFRs can be met.

SDFRs should not have to rely only on USDA grant programs for support—they should have equitable access to all applicable USDA programs and services.

USDA has not yet fully implemented the transparency and accountability provisions in the 2002 Farm Bill and previous legislation. At the urging of the CBOs, in 2008 Congress strengthened and clarified these requirements by making them mandates. Implementation of these new tools, including a receipt for service, remains an urgent priority.

Additionally, the CBOs have also raised concerns about the overall accuracy of USDA data systems. The Farm Service Agency (FSA) recently reported at a 2008 Farm Bill implementation meeting that the FSA Service Center Information Management System (SCIMS) list now Includes 13 million individuals and entities, compared to some 2 million farm operations counted in the Census of Agriculture. Some of the difference is explained by the facts that the criteria for data collection differ for SCIMS and the Census of Agriculture, and that some of what FSA counts as multiple entities are counted as single farms by the National Agricultural Statistics Service (NASS). However, a discrepancy of this magnitude is cause for concern, particularly because the SCIMS list is used to collect the data that will form the basis of reports that will meet the transparency and accountability requirements of Section 14006 of the 2008 Farm Bill and will be used for many other purposes.

## AGENCIES AFFECTED

Policies that have been adopted in the 2008 Farm Bill and elsewhere require the involvement of virtually every USDA mission area, agency, and office to ensure equitable access to services and programs.

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

There is no clear relationship between USDA and the CBOs. Most of the Department's efforts thus far to grant equitable access to USDA programs have been token at best, especially at the state and local levels.

USDA has made no overall effort to require accountability at all levels. In too many cases, its contractors and technical service providers do not reflect the demographics, cultures, and languages of the communities they serve.

**Recommended Actions**

1.1) The Secretary should immediately implement Section 14006, Improved Data Requirements for Monitoring Participation in USDA Programs, first passed as Section 10708 of the 2002 Farm Bill but never been fully implemented, and

> 1.1 a) Employ expanded authority for data collection and reports by race, gender and ethnicity, for routine use as the basis for planning, evaluation, and analysis from the local to the national level, providing a system that establishes norms for service and identifies gaps in services.

> 1.1 b) Report on discrepancies in regular reports that compare the application and participation rate data to data from the Census of Agriculture to the county level. Local and state USDA staff and the CBOs should be trained to use both the census and the transparency and accountability data for their program planning, as well as evaluations of outreach and programmatic efforts.

> 1.1 c) Utilize the data to implement the many set-asides for socially disadvantaged producers provided in the 2008 Farm Bill in conservation, Rural Development (RD) and other programs for socially disadvantaged and beginning producers.

1.2) The Secretary should further use the Section 14006 reports and the Census of Agriculture in meeting the targeting provisions contained in agriculture credit programs dating back to the 1987 Agriculture Credit Act, and

> 1.2 a) Provide more information to CBOs on what numbers Farm Service Agency (FSA) uses to govern targeting in farm operating loan programs including how and when it updates required targets for farm ownership loans—based, as required, on the proportion of the overall population in any area that is socially disadvantaged according to the U.S. Census.

1.2 b) Review the reports to help CBOs understand this system and the importance of achieving accuracy in the U.S. Census as well as the Census of Agriculture.

1.3) The Secretary should implement Section 14003, Require a Receipt for Service or Denial of Service for all Transactions, and require FSA, the Natural Resources Conservation Service (NRCS), RD and other agencies with programs serving farmers and ranchers, to provide, upon request, a receipt to current or prospective producers and landowners requesting assistance, to include the time, date, and place of the request; actions taken; and applications made, or service denied.

1.3 a) Since the Section contains no prohibition preventing further action, the Secretary should further require all USDA offices to offer and file this receipt for every transaction, including how the request was handled and any information or instruction given to the producer, since the Section 14003 contains no prohibition against additional action,

1.3 b) The Secretary should use the receipts as a vital tool at the field office level to assess the quality of service provided to all producers, and to help ensure that every request is handled the same way every day, to identify offices where requests exceed staff capacity, and to help curtail practices that result in the inequitable allocation of funds.

1.4) The Secretary should immediately implement Section 14007, Transparency and Accountability, that requires the use of data collected under Section 14006 to conduct oversight of civil rights compliance and Section 14010, Civil Rights Oversight and Compliance, that requires an annual report on the number of civil rights complaints by agency, the number of discrimination findings, and the number and type of personnel actions taken.

1.4 a) The Secretary should delegate the authority for Sections 14007 and 14010 to the Office of the Assistant Secretary for Civil Rights (OASCR) and use the data and reports prepared under the sections to hold agencies accountable for performance and to measure and document progress in the participation of SDFRs in USDA programs.

1.4 b) The report mandated in Section 14010, with first submission due in May 2009, should be prepared annually and released to the public, as well as being reviewed by the Secretary with the head of each mission area and agency.

1.4 c) USDA, especially the relevant agencies and the Assistant Secretary for Administration (ASA), should also use the 14006 and 14003 reports as an integral part of the performance reviews of field and program staff, their supervisors, and agency leaders. Norms for service and performance goals should be established and monitored, and appropriate action should be taken when they are not met.

1.4 d) The Secretary should provide authority to the Assistant Secretary for Administration (ASA) to include the data collected according to Sections 14003 and 14006 in performance measures during personnel reviews.

1.5) The Secretary should immediately implement Section 14005, Accurate Documentation of SDFRs by the National Agriculture Statistics Service (NASS) and the Economic Research Service (ERS). The section requires that the Census of Agriculture and ERS studies accurately reflect the number, location, and economic contributions of SDFRs.

1.5 a) The Secretary should issue regulations for public comment that specify how this section shall be implemented by NASS and ERS.

1.5 b) The ERS should establish working relationships with the CBO Partners and commit funding for collaboration with CBOs to identify strategies for ensuring that ERS studies accurately reflect the role and economic contributions of SDFRs, Indian tribes, and farmworkers.

1.5 c) The NASS-CBO partnership, including collaborations with the state statisticians, should be continued. Their collaborative experience on the 2007 Census of Agriculture should be evaluated for results, and NASS should seek adequate resources to continue to work with CBOs on the utilization of data from, and on ongoing methods to increase participation in, the Census of Agriculture. A comprehensive work plan and adequate budget for the 2012 Census of Agriculture should be developed no later than 2010.

1.5 d) USDA should develop a memorandum of agreement (MOA) with the U.S. Census Bureau that recognizes the ability of CBOs to recruit skilled census enumerators with the appropriate cultural and language skills and familiarity with communities. The MOA should specifically give priority to CBO members and encourage them to apply, receive training, and participate as enumerators in the 2010 U.S. Census in socially disadvantaged and farmworker communities, and on Indian reservations.

1.5 e) NASS should expand the number of trained enumerators from CBO communities with the capacity to reach producers in their diverse communities, and report by state on the numbers trained and hired by state departments of agriculture.  If diversity is not expanded, alternate contracting arrangements should be developed to train and deploy enumerators.

1.6) USDA should immediately restore the funds cut from the Community Outreach Program of the Risk Management Agency (RMA) and provide RMA with authority to make multiyear grants (see Issue # 7, Risk Management).

1.7) The Secretary should prepare and publicly release an annual report on staff diversity for each agency at every level, from headquarters to the field, and include

diversity hiring practices and data on program access. Each agency's staff demographics should more closely mirror the communities the agency serves. USDA agencies should, where needed, be required to develop specific plans to diversify their workforces, using existing models of employment and program outreach.

1.8) The Office of Advocacy and Outreach (OAO) should work with the CBOs to develop a definition of outreach and a departmental regulation on it, with public comment.

>1.8 a) OAO should also develop a CBO registry compiled from national, state, and local contact lists and CBO recommendations, with appropriate privacy controls that should be regularly updated and shared with all agencies.

>1.8 b) OAO should establish a working group—including CBOs—with appropriate cultural competence to review implementation of the Executive Order on Limited English Proficiency.  OAO should also guarantee the acquisition of adequate translation equipment and services for USDA events.

1.9) The Secretary should ensure that the President's budget places priority on equity, including advocating for full funding of all programs serving Indian tribes, SDFRs, and farmworkers for FY 2010 and subsequent years. The CBOs' input should be sought and considered, and CBOs should educate policymakers on the needs that such funding would address, and the results being achieved in the programs.

1.10) USDA should investigate and disclose to the CBOs and the public the reasons for the large discrepancy between the 13 million entities included in the SCIMS list and the number of farms counted in the Census of Agriculture, and determine whether action is needed to ensure that all producers—especially SDFRs—are being accurately counted.

>1.10 a) FSA needs to improve its practices for updating and ensuring the accuracy of the SCIMS list, and should review data at the county level from SCIMS list with CBOs to assess the data's accuracy.

1.11) USDA must halt its routine practice of promoting or transferring—rather than reprimanding, sanctioning, or firing—staff whose actions have made USDA (and the taxpayers) liable for large payments in discrimination cases The Secretary should institute policies and practices that hold supervisors, managers, state directors, and agency leaders directly accountable for the actions of their staffs.

## PROGRESS TO DATE

Working together, the CBOs have developed and shared with USDA and Congress proposals to address the problems in this area for more than 40 years, and have used their proposals to impact USDA programs and policies since at least 1985.

The CBOs proposed and worked to secure the creation of ASCR and to include the transparency and accountability requirements which Congress adopted in Section 10708 of the 2002 Farm Bill.

The CBOs worked to develop proposals adopted in some 30 separate sections of the 2008 Farm Bill to address issues raised in the Partners process. These achievements were detailed in *A Seat at the Table*, a widely circulated report by the policy team of the Farm and Food Policy Diversity Initiative.

USDA and the CBOs have held hundreds of meetings leading up to and since passage of the 2008 Farm Bill, covering almost all of the bill's titles. Areas of discussion for USDA have included: country of origin labeling, the Supplemental Nutrition Assistance Program (SNAP), specialty crops, school nutrition assistance, forestry, the Chesapeake Bay watershed, conservation, the Bio-Preferred Labeling Program, bioenergy, the Beginning Farmer and Rancher Development Program (BFRDP), the National Animal Identification System (NAIS), and biotechnology. Priority areas for the CBOs center on the need for equity and accountability measures.

Another accomplishment that emerged directly from the Partners process is the CBO-NASS partnership that focused on improving the accuracy of the 2007 Census of Agriculture. As a result of joint workshops and outreach activities funded by NASS and conducted with the CBOs, an increased number of SDFRs were included in that census. The partnership has continued with the active engagement of the agency and of a group of state census directors, who have created new relationships with CBOs in their states. In several states, enumerators were hired from the CBO community. The most recent NASS-CBO partners workshop in April in Kansas City, MO, focused on using findings from the census in the work of the CBOs, on the coordination of data collection across USDA, and on the process of engaging enumerators recommended by CBOs in the U.S. Census and in future censuses conducted by NASS.

Most recently, the new Administration has since the transition phase reached out to CBOs and has made priorities both the resolution of past injustices and the improvement of USDA functions.  The new Secretary has moved quickly to implement change by establishing a more diverse leadership with the expertise needed to solve longstanding problems. The Secretary has also laid out, in a landmark memo released May 4, 2009, a plan to secure a new era in civil rights. This plan gives thoughtful attention to implementing proactive solutions to some of the most critical issues that the CBOs and others have raised for years.

Sections of the 2008 Farm Bill that directly address the problems raised in the USDA-CBO Partners process include:

∞ Section 14003, Receipt for Service or Denial of Service from Certain Department of Agriculture Agencies, which requires FSA, NRCS, and RD to provide upon request a receipt to current or prospective producers and landowners requesting assistance. The receipt should include time, date, and place of request; actions

taken; applications made, or service denied the receipt for service. USDA has established a working group to address this issue. Authority for implementation of this section was recently redelegated to ASCR instead of the program agencies, and work is proceeding on establishing the necessary procedures and rules. The CBOs are providing input to USDA.

- Section 14005, Accurate Documentation in the Census of Agriculture and Certain Studies, which requires that the Census of Agriculture and Economic Research Service (ERS) studies accurately reflect the number, location, and economic contributions of SDFRs. National Agricultural Statistics Service (NASS) is working on measures to increase the accuracy of the Census of Agriculture.

- Section 14006, Transparency and Accountability for Socially Disadvantaged Farmers or Ranchers, which strengthens data requirements first adopted in Section 10708 of the 2002 Farm Bill for monitoring SDFR participation in USDA programs. Section 14006 requires the Secretary, using NASS technology, to collect and publish data on the application and participation rate in USDA programs of producers by race, gender, and ethnicity at the county level, and provides authority to the relevant agencies to collect the necessary data. Privacy protections are included. The data are to be compared to the data from the Census of Agriculture at the county level. The Secretary must make this report readily available to the public in electronic and paper form. The requirements of the 2002 Farm Bill have never been fully implemented. USDA has now established a working group involving all key agencies to collect the required data, and to secure additional authorities necessary for the full implementation of the relevant sections of the 2008 Farm Bill. The CBOs are providing input to USDA.

- Section 14007, Oversight and Compliance, which requires the Secretary, through ASCR, to use the reports as described in Section 14006 to conduct oversight and evaluation of civil rights compliance.

- Section 14010, Report of Civil Rights Complaints, Resolutions, and Actions, which requires the Secretary to issue an annual public report on program and employment civil rights complaints by agency, and the number of discrimination findings and number and type of personnel actions taken following the resolution of the complaints.

## DEFINING CHANGE

Change would mean a system is in place to hold USDA staff accountable for providing equitable service, and the diversity and cultural sensitivity of USDA agencies are measurably improved.

Change would mean an increase in the number of small and socially disadvantaged farmers and ranchers who participate in USDA programs, and sustaining that increase over time.

Change would mean making USDA programs more suitable for small farmers, who—according to the most recent Census of Agriculture and additional ERS data—are a growing and increasingly viable part of U.S. agriculture.

## ISSUE # 2: EQUITY AND USDA'S RELATIONSHIP WITH AMERICAN INDIAN TRIBES

## PROBLEMS RAISED IN THE PARTNERS PROCESS

The United States has a unique legal relationship with Indian tribal governments, as set forth in the Constitution, treaties, statutes, Executive Orders, and court decisions. Despite this relationship, American Indian tribes were long excluded altogether from the federally funded services of the U.S. Department of Agriculture (USDA), or given inadequate access to these services because delivery systems at the state and county levels failed to recognize the right of the tribes to receive these benefits. USDA did not secure the authorities needed to correct these inequities.

Although the Federal government has a direct government-to-government relationship with Indian nations, USDA lacks a formal structural relationship with tribes. Many Federal agencies have offices at the secretarial level to allow direct intergovernmental relationships with tribal coordinators in many agencies and mission areas. Although the first Director of Native American Programs in the Bush Administration was physically housed in the Office of the Assistant Secretary for Civil Rights (OASCR) for a time, the position was structurally located in the Office of External and Intergovernmental Affairs (OEIA) in the Office of Congressional Relations. The fact that USDA appeared to have relocated the position to OASCR diminished the government-to-government relationship between USDA and Indian nations.

American Indians living on reservations do not have equitable access to the agricultural extension services provided by the 1862 land-grant institutions. Even with the 1990 establishment of the Federally Recognized Tribal Extension Program (FRTEP)—previously called the Extension Indian Reservation Program, which has received $3 million in funds—less than 4 percent of America's over 563 tribes have dedicated cooperative extension programs. In comparison, over 96 percent of all counties in the United States have offices that offer extension services. These county-based extension offices that are not on reservations are prevented by their funding protocols and historical relationships from conducting meaningful agricultural extension programs on reservations. Agriculture extension inequities of this magnitude place Native Americans at a significant disadvantage in starting or maintaining agricultural enterprises.

While county-based extension programs have received dedicated formula funding since 1914, FRTEP programs must compete every year for funding through a formal process specified by the Cooperative State Research, Education, and Extension Service (CSREES). Changes in legislative authorities, coupled with the lack of a strong initiative by USDA to seek necessary authority and expanded appropriations, have imperiled needed progress in FRTEP.

USDA's current administration and funding of FRTEP have led to the virtual elimination of three critical programs, on the Navajo, Zuni, and Jicarilla reservations. All three are central to meeting the energy production, human nutrition, and agricultural needs of

young farmers on these reservations. Although the programs were afforded a temporary lifeline, the three affected tribes have yet to be notified that their long-term programs were defunded. The government-to-government consultation process with Indian tribes was not followed. CSREES did not work through its FRTEP consultative panel, as the law requires.

Community-based organizations (CBOs) representing Indian tribes have long raised the issues of severe undercounts of Indian producers and the underrepresentation of their economic contributions to the agriculture sector in the Census of Agriculture and studies conducted by the Economic Research Service (ERS).

## AGENCIES AFFECTED

The Office of the Secretary, as well as CSREES, ERS, FNS, FSA, and NASS. In addition, all USDA agencies have a responsibility to properly follow the departmental regulations requiring tribal consultation.

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

The structures and processes of USDA control of land and program delivery reflect the injustices that characterize the relationship of tribes and Indian people with the Federal, state, and county governments of the United States, especially the abrogation of treaties made with Indian nations. This context must be remembered as changes are implemented to transform USDA's relationship with Indian nations.

Several rapidly implemented changes resulting from the 2008 Farm Bill will imperil, not advance, equity. Three existing FRTEP programs that were threatened with the loss of all funds were given a six-month extension, but their full reestablishment remains a matter of urgent concern, as does addressing the structural problems that threaten all of FRTEP.

While other USDA agencies have found ways in recent years to support staff and offices on many reservations, FRTEP is a puzzling exception and remains a small, underfunded, marginalized program.

New authorities to address the issues mentioned above were secured in the 2008 Farm Bill and should be implemented expeditiously.

USDA also needs to improve its relationship with tribes and fully implement the Executive Order on Tribal consultation.

The need for additional authorities and mandates to improve federal nutrition programs on reservations, to promote Indian management of Indian resources, to ensure access to public lands, and to otherwise improve the relationship of USDA with the tribes should be considered in a consultative process.

**Recommended Actions**

2.1) USDA should improve its relationships with tribes at the departmental level by establishing a permanent USDA structure for a direct government-to-government relationship with tribes, with adequate staff and resources.

> 2.1 a) A revised Department-wide tribal consultation program should be implemented and its procedures followed in compliance with existing departmental regulations.

> 2.1 b) Additional tribal coordinators should be added to USDA agencies and mission areas to enhance the consultative process throughout USDA.

> 2.1 c) The most appropriate location for the Director of Native American Programs and the USDA/1994 Programs, which was established in OASCR in January 2005, should be determined in consultation with the tribes, and the office located and funded there.

2.2) The Secretary should immediately utilize the authority provided in Section 14001 to require that the Farm Service Agency (FSA), the Natural Resources Conservation Service (NRCS), and other relevant agencies establish a consolidated suboffice at or near tribal headquarters on Indian reservations where there is a demonstrated or petitioned need.

> 2.2 a) The Secretary should further ensure that, as nonreservation USDA offices are realigned, USDA should consult with the tribes and develop strategies to expand services to them, with funded consolidated suboffices on reservations to reach Indian producers.

> 2.2 b) The Secretary should coordinate with FSA, NRCS, Rural Development (RD), and CSREES to ensure that adequate funds are provided for these purposes, and that this issue is addressed in the roadmap process in CSREES, related to the national assessment of FRTEP.

2.3) USDA should immediately meet the requirements of Section 14002, Moratorium on Foreclosures, by enacting a moratorium on all adverse actions against Indian tribes and individuals and stopping all sales of Indian-owned or tribal land.

2.4) The Secretary should immediately consult with the Attorney General to develop a plan to expeditiously settle all outstanding claims as provided in Section 14011, Settle Outstanding Civil Rights Claims, including the Keepseagle case (see Issue # 17, Settle Outstanding Civil Rights Claims and Halt Foreclosures, Accelerations, and Sales).

2.5) With respect to implementing the language in Section 5501 regarding the loan program for purchases of highly fractionated land, FSA has begun to implement this

program as a separate program rather than as a part of the existing program for tribes, without employing the tribal consultative process. FSA should revise the implementation by expanding the existing loan program to include insuring loans to individual Indian producers. In the Secretary's FY 2010 budget submission to the Congress, the Secretary should recommend and set aside a contingency fund to carry out this program. FSA should follow the consultative process with the tribes on the implementation of this program.

2.6) The Secretary should ensure consultation and coordination with the tribes with respect to the implementation of Section 4211, Food Distribution Program on Indian Reservations (FDPIR), and ensure that adequate funds are available to carry out the program. The required report to the Secretary on food preference in the program should be completed expeditiously.

2.7) The Secretary should implement the provisions in Sections 8101-07 designed to provide access to forest land, and to increase cultural respect and equity for Indian nations and people. (See Issue # 12, Conservation and Forestry).

2.8) With respect to Section 14005, Accurate Documentation, work should continue between the Tribes and the National Agricultural Statistics Service (NASS) to improve the accuracy of the Census of Agriculture, and action should be taken to improve accuracy of ERS studies (see Issue # 1, Equitable Access).

2.9) The Secretary should recognize that new FRTEP programs would enable tribes to better utilize new authorities in the 2008 Farm Bill that support the procurement of traditional or locally grown food in the programs that provide food distribution on Indian reservations, and that expand community development, 4-H, and youth development programs, as well as resource, economic, and leadership development and education programs in Indian country. Enhanced relationships with USDA agencies and the land-grant institutions gained through FRTEP will also improve the tribes' capacity to identify, assess, and resolve issues relating to natural resources and the environment.

2.9 a) FRTEP should be fully funded and reestablished as a self-standing extension program, on institutional parity with county-based extension programs. It should be expanded immediately to all 85 Indian reservations larger than 120,000 acres whose sustenance remains agriculture—as intended in the enabling legislation in the 1990 Farm Bill.

2.9 b) USDA should maintain programs and relationships in all current areas and should ensure that the three FRTEP programs on the Navajo, Zuni, and Jicarilla reservations are immediately restored and permanently funded. Funding sources might include FY 2009 salaries and expense accounts, as well as authorities to designate Indian extension services as a high priority research extension activity and to establish cooperative agreements to further USDA's extension work.

2.9 c) In addition, the Secretary should ensure that the President's FY 2011 budget request includes no less than the $15 million needed to extend FRTEP from 24 to at least 85 reservations in the next fiscal year, to address current imbalances and enable the creation of 60 new professional positions on participating reservations.

2.10) The Secretary should ensure that the roadmap specified in Section 7404 is completed and addresses the future of FRTEP. CSREES should also establish a consultative panel specifically charged with conducting, by April 1, 2010, the analysis required under Section 7405, Budget Submission, to assess the demand for and the status of extension services on Indian reservations.

2.10 a) At least $500,000 in discretionary funds should be allocated for the consultative panel, which should include representatives from several of the state-level extension programs that are the most involved with work on Indian reservations, as well as the Southwest Indian Agriculture Association (SWIAA), and the Intertribal Agriculture Council (IAC).

2.10 b) The panel's recommendations should address not only how many programs to establish, but also a modified organizational, institutional, legal and cooperative financial model for extension work in Indian country, with a plan to permit this program to meet the needs of all Indian nations in the future.

2.10 c) The Secretary should reflect those needs in future USDA budget submissions and use the panel's findings to document the need for authority to allow FRTEP to operate in parity with other extension programs.

2.10 d) USDA should report on the outcome of the panel's consultations with the tribes, on agreed changes, and on the timetable for their implementation.

2.11) USDA must consider recommendations from the tribes and intertribal organizations with respect to the USDA-CBO Partners process, and all other issues pertaining to the tribes' relationship to outreach, advocacy, and technical assistance programs and functions.

2.11 a) The CBOs and USDA should support joint strategies to help improve the relationship of the tribes to the Office of Advocacy and Outreach (OAO) and to other CBOs representing socially disadvantaged farmers and ranchers (SDFRs).

## PROGRESS TO DATE

There has been some progress with respect to the 2007 Census of Agriculture. Due to the collaboration of NASS with the CBOs, new data show a 50 percent increase in the number of Indian producers on reservation lands, highlighting the need for expanded funding of FRTEP and other services for Indian tribes.

Where FRTEP has been implemented, it has provided a model for more positive and productive relationships between the federal government and the tribes. In the handful of places where FRTEP operated in the early 1990s, extension agents were responsible for making initial contacts with Indian agriculture producers, leading to the level of access to USDA programs that Indian producers and tribes have today. On the 24 reservations where FRTEP now operates, its agents play a major role in assisting American Indian producers with on-farm technical assistance that improves farm-gate income potential. FRTEP also conducts valued programs in youth development, 4-H, human nutrition, and family services, much like what is readily accessible in many non-Indian and nonreservation communities. This new access would not have happened without the long-term efforts of these extension agents. Other USDA agencies—such as NRCS, FSA, and the Risk Management Agency (RMA)—have a presence in Indian country because of the pioneering work of FRTEP.

The following 2008 Farm Bill provisions, many enacted with support from the CBOs and tribal organizations, grant new authorities to the Secretary specifically related to tribes. In addition to the specific provisions noted below, all other provisions relating to SDFRs also afford rights to, or have implications for, Indian producers.

∞ Section 4211, Food Distribution Program on Indian Reservations (FDPIR), explicitly makes tribes eligible to manage food distribution programs, establishes a Traditional and Locally Grown Food Fund that allows the purchase of foods designated as traditional or locally grown, supports the procurement of the foods by Native American farmers and ranchers up to 50 percent where practicable, and allows for the purchase of bison meat from Native American bison producers and producer-owned cooperatives of bison ranchers. The section also specifies that the Secretary should conduct a survey to determine which foods are most desired, and directs the Secretary to submit a report to Congress, within 180 days of enactment, assessing the nutritional value of the FDPIR food package, how foods are selected, and how the Secretary plans to update the packages or if not, why.

∞ Section 5501, Loans to Purchasers of Highly Fractionated Land, gives the Secretary authority to allow this program to be utilized by individual Indians to purchase highly fractionated parcels of land according to the Indian Land Consolidation Act amendments of 2004. In addition to loans to tribes, FSA may now make and insure loans to individual American Indian farmers and ranchers to keep tribal lands in agricultural production.

∞ Section 6007, Tribal College and University Essential Community Facilities, reduces the matching funds requirement for tribal colleges by stipulating that the Secretary may not require non-Federal support greater than 5 percent of the total cost of the facility.

∞ Section 6009, Water Systems for Rural and Native Villages in Alaska, reauthorizes the program and authorizes $1.5 million in funding to the Denali Commission to provide assistance to municipalities.

∞ Section 6105, Substantially Underserved Trust Areas, creates a discretionary initiative to improve utility service and programs in a Substantially Underserved Trust Area (SUTA) by making Rural Utilities Service (RUS) loans available with interest rates as low as 2 percent, and allowing the Secretary to waive nonduplication restrictions and matching funds requirements, and give the highest funding priority to designated projects in SUTAs.

∞ Section 6110, Access to Broadband Telecommunications Services in Rural Areas, creates a new broadband fund to provide loans and loan guarantees for the development of broadband service in rural areas, with priority to areas with no incumbent providers. This provision applies to many tribal areas. The broadband fund is authorized at $25 million a year.

∞ Section 7504, Roadmap, calls for the Secretary to produce a roadmap for agricultural research, education, and extension that no single entity within USDA would be able to address individually. Although the language in the section does not refer specifically to tribes, it is broad and would incorporate all the issues related to identifying current trends, constraints, and major gaps with respect to FRTEP.

∞ Section 7505, Budget Submission and Funding, outlines priorities and processes for USDA budget submissions. The statement of the managers requires consultation on emerging problems, including the adequacy of FRTEP funding, explaining that the managers "expect the Secretary to review, in conjunction with the consultative panel on the Extension Indian Reservation Program (also known as the Federally Recognized Tribes Extension Program), the demand for and status of extension services on Indian reservations and reflect that need" in future budget submissions.

∞ Sections 8101 to 8107, Cultural and Heritage Cooperation Authority, authorize the Secretary to implement procedures to ensure cultural and heritage cooperation authority for Indian tribes, including providing for the reburial of human remains and cultural items on National Forest System land; preventing unauthorized disclosure of information regarding burial sites, as well as other culturally sensitive information, under the Freedom of Information Act (FOIA); allowing the temporary closure of National Forest System land for traditional and cultural purposes with approval by the Secretary; allowing free gathering of forest products for cultural and traditional purposes; increasing the availability of Forest Service (FS) programs and resources to Indian tribes; and otherwise strengthening support of traditional practices in accordance with the American Indian Religious Freedom Act.

∞ Section 14001, Improved Program Delivery by Department of Agriculture on Indian Reservations, authorizes the Secretary to require that FSA, NRCS, and any other offices and functions the Secretary chooses to include establish a consolidated

suboffice at tribal headquarters on Indian reservations, where there is a demonstrated need. The section strikes a requirement enacted in 1990 that requires a tribe to provide office space for USDA staff in consolidated suboffices on reservations if it wishes to participate in the program.

∞   Section 14011, Sense of Congress Relating to Claims Brought by Socially Disadvantaged Farmers or Ranchers, states that the Secretary should resolve all claims and class actions brought against USDA based on racial, ethnic, or gender discrimination in an expeditious and just manner, including the Keepseagle class action law suit, filed on November 14, 1999, for Indian producers.

## DEFINING CHANGE

Change would mean that USDA establishes and staffs an appropriate structure to conduct government-to-government relationships with tribes. A Department-wide tribal consultation program would operate in compliance with existing departmental regulations.

Extension services would finally, after nearly 100 years, reach all tribes and Indian producers who need them. Fractionation issues would be solved. The Census of Agriculture and ERS studies would accurately reflect the economic contributions of Indian agriculture. Equitable access to programs, services and decision-making structures would be ensured. The Keepseagle class action lawsuit and all outstanding civil rights claims for American Indian producers would be resolved with justice.

RD and other programs would provide increased investments to develop an infrastructure for the provision of services that have been denied to Indian nations and people. Access to forest lands and other public lands would be ensured, as would the protection of culture.

Farming and ranching would thrive on Indian lands, contribute to the economic base of Indian communities, and supply culturally appropriate food to nourish all Indian people.

## ISSUE # 3: IMPROVED COORDINATION OF USDA OUTREACH AND ADVOCACY

### PROBLEMS RAISED IN THE PARTNERS PROCESS

The subject of outreach to socially disadvantaged farmers and ranchers (SDFRs) has been a continual topic of discussion by community-based organizations (CBOs). Outreach and outreach funding programs by the U.S. Department of Agriculture (USDA) have been relocated repeatedly since their initial establishment in the mid-1980s. Priorities have changed over the years, and at times, the outreach function has been used more as a public-relations tool in the area of USDA's civil rights performance than as a way to ensure access to programs.

This lack of a permanent location has hampered the ability of the CBOs to build a productive relationship with USDA. The CBOs worked hard to get the position of Assistant Secretary for Civil Rights (ASCR) created in the 2002 Farm Bill. USDA outreach functions were located in this office following its establishment. However, the CBOs have long raised concerns about the need for a permanent and appropriate placement of outreach functions, pointing out the importance of separating these functions from the civil rights duties of USDA.

For many years, relationships between USDA and the SDFR sector have been primarily and necessarily focused on problems related to the failure of USDA to provide equitable access to services. The just settlement of discrimination cases and the implementation of systems of transparency and accountability to prevent the occurrence of such cases in the future remain critical tasks for USDA. In order for this emerging sector to succeed in the complex agriculture system of today, a wide range of connected programs and services is necessary.

CBOs have worked productively for many years with outreach and small and beginning farm coordinators, and with the working groups and offices responsible for coordination among them. But these offices and coordinators have often lacked the power and authority within their agencies to evaluate programs and policies, to build connections with other agencies, and to close the gaps in services they have witnessed or learned about from SDFRs and CBOs.

The 2008 report by the Government Accountability Office (GAO) on beginning farmers and ranchers (BFRs) pointed to the need for better interagency coordination in program delivery. A significant proportion of SDFRs and BFRs are concentrated in the specialty crop sector, where USDA services are scattered across agencies. The growing numbers of SDFRs, BFRs, and farmworkers urgently need the real support that only program coordination can provide them.

### AGENCIES AFFECTED

OAO, as well as ASA, ASCR, CSREES, the Office of the Secretary, and all program agencies

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

The Office of Advocacy and Outreach (OAO) established in Section 14013 of the 2008 Farm Bill will become only another in a long line of public-relations tools and will not advance equity for SDFRs unless it has the authority to evaluate and propose changes to farm programs, to fill gaps, and to provide coordination of vision and function across USDA agencies.

**Recommended Actions**

In consultation with the CBOs, the Secretary should:

3.1) Establish OAO as authorized, with two branches to ensure coordination of outreach, advocacy, and other programmatic services to SDFRs and farmworkers:

3.1 a) A Socially Disadvantaged Farmers and Ranchers Group, which would be responsible for the Outreach and Technical Assistance Program for Socially Disadvantaged Farmers and Ranchers (OTASDFR), also known as the 2501 Program, the Advisory Committee on Minority Farmers, the Farmworker Coordinator, and the functions and duties previously assigned to the Office of Outreach and Diversity under ASCR.

3.1 b) A Small Farms and Beginning Farmers and Ranchers Group, which would be responsible for the current functions of Small and Beginning Farms Coordination, the liaison to the Beginning Farmer and Rancher Development Program, and the Advisory Committee for Beginning Farmers and Ranchers.

3.2) Utilize OAO to ensure that small farmers and ranchers, BFRs, and SDFRs are able to participate in USDA programs and services, by assigning the following duties to OAO:

3.2 a) Establishing and monitoring USDA's goals and objectives to increase participation in Departmental programs by small, beginning, or socially disadvantaged farmers and ranchers.

3.2 b) Assessing the effectiveness of USDA outreach programs.

3.2 c) Developing and implementing a plan to coordinate USDA outreach activities and services.

3.2 d) Providing input to USDA agencies and offices on programmatic and policy decisions.

3.2 e) Measuring the outcomes of USDA programs and activities on small farms and ranches, BFRs, and SDFRs.

3.2 f) Recommending new initiatives and programs to the Secretary.

3.2 g) Carrying out any other related duties that the Secretary determines to be appropriate.

3.3) Select staff for OAO from the career service with backgrounds and expertise in farm and conservation programs, and a demonstrated commitment to SDFRs and farmworkers.

3.4) Establish the position of Farmworker Coordinator (see Issue # 4, Farmworkers, USDA, and U.S. Agriculture) and assign functions to that position to ensure that farmworkers' needs are met, and additional services are provided to farmworkers wishing to establish farm operations.

3.5) Delegate to OAO the full authority provided in the 2002 and 2008 Farm Bills, under Section 2501 of the 1990 Farm Bill as updated, not only to provide long-term contracts and cooperative agreements with CBO partners through the 2501 Program, but also to bundle resources from other agencies to ensure adequate support for an integrated package of technical assistance (see Issue # 6, Outreach Programs).

3.6) Establish a Minority Farmer and Rancher Advisory Committee authorized in Section 14013 to provide advice on the implementation of the 2501 Program, methods of maximizing participation in USDA programs, and civil rights activities within the Department and should seek nominations for this committee from the CBOs.

3.7) Work directly with mission area and agency heads to ensure that the success of the sector of producers served by OAO is a priority, and that regular attention is paid to developing and monitoring programs, actions, and providing public reports:

3.7 a) Require OAO, with ASCR, to review the results of the data collected on program participation, as required by Section 14006 of the 2008 Farm Bill, to evaluate changes in participation and in consultation with the CBOS and the USDA agencies, recommend improvements in programs and outreach as needed.

3.7 b) With the CBOs, complete an assessment of all agency outreach efforts and grant programs of the agencies and determine how these resources could be better programmed to fill gaps in service to SDFRs, BFRs and other small producers. Programs should be measured by the access they give these producers.

3.7 c) OAO should use the authority granted by Congress to recommend how farm programs could better serve SDFRs and propose restructuring of USDA programs to reflect the type of production in which SDFRs are engaged. For

instance, many SDFRs engage in small livestock or diversified fruit and vegetable operations. More programs that focus on these areas of production are needed.

3.7 d) Work with Farm Service Agency (FSA) and other agencies to establish more user-friendly office hours in areas heavily populated by SDFRs and BFRs, including possibly opening local USDA offices on Saturdays once a month and assure the staff of FSA and other agencies are in the field more, and should attend CBO conferences and other events.

3.7 f) Require OAO to work with CBOs and USDA agencies to define the needs—and seek changes in authority and procedures to address them—producers who are able to secure only shorter-term leases and informal leases, which are standard for SDFRs and many BFRs. In addition, USDA agencies should work with the CBOs to educate producers on strategies to legally secure the land they farm.

3.7 g) Require OAO to provide additional assistance to the CBOs, as they have requested.  For example, if a CBO applied for a specific grant and was denied, USDA should notify the applicant of other available grants appropriate to the CBO's profile.

3.8) Develop a structure, mission, and goals for the USDA-CBO Partnership, and provide the Partnership adequate resources to accomplish its critical tasks including:

3.8 a) Implementation of a strategic process to regularly exchange information on outreach plans, and the current status of programs in state and local USDA offices, and provide for the direct involvement of the CBOs in all activities under recommendation # 3.7.

3.8 b) Develop, and disseminate among CBOs and USDA agencies general guidelines for essential knowledge and skills sets needed to foster equitable access for SDFRs to the various programs and services offered by USDA agencies, and how these services are related and accessed,

3.8 c) Provision of regular support to the CBOs to help implement the outreach and technical assistance plans necessary to increase program participation to meet goals established.

3.8 d) Development of tools and approaches to identify best practices in program delivery, and in farming and ranching.

3.8 e) Otherwise ensuring that SDFRs who are affected by the farm bill and the stimulus bill have direct input into changes in their provisions and the regulatory process.

3.8 f) Maintaining an updated registry of CBOs for use by USDA agencies.

3.9) Ensure that USDA staff and agencies support and participate in regular events by CBOs and other USDA constituents, and also that meetings and distribution of brochures and fliers are considered an addition to, but not a substitute for USDA staff providing one-on-one service to SDFRs.

3.10) Initiate proactive strategies to increase cultural sensitivity and understanding by USDA agencies of CBOs and the populations they serve, including

> 3.10 a) Proactive use of tools such as Interagency Personnel Agreements (IPAs) to exchange personnel between the CBOs and the Department. Field placements with CBOs should be made part of mentorships and executive leadership programs.

> 3.10 b) Ensuring access to programs and services, which the Executive Order on Language Accessibility makes an obligation for USDA. With the CBOs, USDA should develop a specific plan to reach producers with limited English proficiency and should invest in adequate translation equipment and services for use at meetings.

> 3.10 c) Require USDA agencies to utilize media like Spanish or Hmong radio programs and newspapers to reach out to producers who speak these languages.

3.11) The Secretary should work with the President and the CBOs to ensure the President's budget includes a request for full funding for the OAO.  The CBOs should actively support full funding.  OAO should issue annual reports summarizing goals and accomplishments in order to support the funding requests and should share these reports with the CBOs.

## PROGRESS TO DATE

In 2008, GAO, with input from CBOs representing SDFRs and BFRs, outlined the need for better coordination across USDA agencies in their reports and testimony to Congress on civil rights and beginning farms at USDA.

In the 2008 Farm Bill, at the behest of the CBOs, Congress responded by providing new authority for USDA to enhance coordination within the department by establishing OAO. Congress made clear that the new office is to be led by members of the career service, and given a permanent location.

The authority links outreach to advocacy and the programmatic functions that SDFRs and farmworkers so urgently need, specifically authorizing the new office to work across all mission areas and agencies and to link the many outreach, small and beginning farmers, and tribal functions already in place across USDA.  The 2008 Farm Bill also mandates that the 2501 Program (see issue # 6, Access to USDA Grant and

Cooperative Programs) and its contracting authorities be located in OAO.

The new authority in the 2008 Farm Bill is in Section 14013, Office of Advocacy and Outreach (OAO); its specific actions have been described above. In general, the establishment of this office will help coordinate and improve programs and services for SDFRs and BFRs, and help USDA address the issues and problems raised in GAO reports on the beginning farmer program and on civil rights. The Cooperative State Research, Education, and Extension Service (CSREES) has authority to administer the Beginning Farmer and Rancher program, which has targeted funding for SDFRs, in coordination with OAO.

## DEFINING CHANGE

Change would mean that OAO creates a structure to organize USDA programs and services into a seamless web, designed to serve the full range of needs of SDFRs, BFRs, and farmworkers. This investment in their success would increase the supply of culturally appropriate fresh foods and vegetables, as well as specialty meat products, and contribute to the economic foundation of rural communities where these products are most needed.

Integration and improved function of grant programs would provide ongoing support for the CBOs to continue their important functions without interruptions.

The Farmworker Coordinator (see Issue # 4, Farmworkers, USDA, and U.S. Agriculture) would assume functions assigned to that position in the 2008 Farm Bill and would ensure that farmworkers' needs are met, helping farmworkers who so desire to become farmers and ranchers.

Change would mean that all socially disadvantaged producers are served equitably, and that new farmers and ranchers can more easily enter agriculture. The average age of farmers and ranchers would be significantly reduced.

*A Time To Change: Report of the Conversations Assessment Team*     30
@2010 Rural Coalition and the Federation of Southern Cooperatives. ALL RIGHTS RESERVED
APP. 000030

## ISSUE # 4:  FARMWORKERS, USDA, AND U.S. AGRICULTURE

## PROBLEMS RAISED IN THE PARTNERS PROCESS

The nation's four million farmworkers are fundamental to the viability of the agriculture and food system. This important sector remains marginalized within agriculture, with no place at the table. Its interests should be directly represented so that its members are treated with dignity and have fair working conditions. Many issues that affect farmworkers are addressed under labor, environmental, and immigration laws not administered by the U.S. Department of Agriculture (USDA). Exempted from many Federal and state labor requirements, the agriculture industry has not increased wages or provided benefits in order to maintain a stable supply of U.S. farmworkers, so it depends on immigrant workers—some of whom are recruited legally under guest-worker programs that offer few, rarely enforced labor protections, and some of whom are undocumented aliens who have no protections at all. Despite these immigrants' years of work in the United States, current immigration policies treat them as outsiders rather than as contributing members of our society. As a result, farmworkers remain the least protected and most exploited workers.

USDA, which has the strongest relationship with the agriculture system, could make immediate improvements in farmworkers' lives. Since the inception of the Partners process between USDA and community-based organizations (CBOs), the CBOs have called for the establishment of a Farmworker Coordinator position at USDA to begin the process of dialogue and coordination on the many issues within agriculture that affect farmworkers.

The CBOs have also called for the relocation, expansion, funding, and improved implementation of an emergency grant program to ensure that farmworkers, like producers, receive relief when they are affected by natural disasters. The need for better coordination of disaster response among USDA agencies with respect to farmworkers was also noted (see Issue # 8, Disaster Preparedness and Response).

The inadequacy of statistics on the number and status of farmworkers remains a primary concern, with the termination of previous Department of Labor studies opening a large gap in understanding the contributions and critical role of farmworkers in agriculture.

The CBOs have pointed out the special needs of farmworkers with respect to housing. Farmworkers across the United States have inadequate housing, and they face special risks in time of disasters. Many farmworkers reside in rented trailers that do not meet the new standards set to reduce the impact of disasters. The trailers often lack working smoke alarms and may have security bars installed on all windows, which prevent escape from fires.

The CBOs are also concerned about child labor; the operation of the farm-labor contracting system, which removes responsibility for working conditions from producers

and processing and packing plants; physical dangers prevalent in the workplace; sexual harassment; and farmworkers' lack of access to health insurance and workers' compensation protection. Other issues raised in the Partners process include the need for improved protection from pesticides, and for ways to better engage farmworkers in the overall agriculture sector. Improved policies and coordination are necessary; for example, to give farmworkers the opportunity to buy land and access to new programs that will help them become producers.

## AGENCIES AFFECTED

The Farmworker Coordinator and OAO, as well as CSREES, ERS, FNS, FSA, NASS, NRCS, RD (especially RHS), and RMA

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

Farmworkers are being denied an active voice and role in decisions that affect them. USDA is not engaging farmworkers as active partners in the agriculture sector, and therefore their role and participation in the food and agriculture system is not being accurately reflected.

### Recommended Actions

4.1) The Secretary should expeditiously establish the Farmworker Coordinator position authorized by the 2008 Farm Bill in the Office of Advocacy and Outreach (OAO).

> 4.1 a) A Farmworker Coordinator with appropriate knowledge, background, and dedication should be hired expeditiously and should assume the specific functions and purposes assigned to that position by the 2008 Farm Bill, including serving as a liaison to CBOs working with farmworkers, and coordinating the work of the CBOs and USDA agencies to ensure that farmworkers' needs are met.

> 4.1 b) The Coordinator should work with USDA agencies to establish processes to meet farmworkers' needs during disasters and other emergencies, in conjunction with the other disaster response activities that USDA regularly conducts (see Issue # 8, Disaster Preparedness and Response).

4.2) The Secretary should delegate authority for managing the emergency grants for farmworkers program and other programs such as those in Sections 14024 and 7402 of the 2008 Farm Bill to the Farmworker Coordinator or—in the case of the 7402 Program—managed by the Cooperative State Research, Education, and Extension Service (CSREES) with input and liaison assistance from the Farmworker Coordinator.

> 4.2 a) These programs should be implemented and funded as expeditiously as possible. The Secretary should ensure the President's budget includes a request for adequate funds as authorized for the Farmworker Coordinator function, as well as

for the emergency grants to farmworker program and the programs authorized in Sections 7402 and 14024 of the 2008 Farm Bill.

4.2 b) Program staff should work with the Farmworker Coordinator and the CBOs to ensure that appropriate outreach is provided for eligible groups, and that CBOs representing farmworkers make up a significant proportion of any review panels.

4.3) USDA should collaborate with the CBOs to ensure that adequate resources and authority are developed to take an accurate count of farmworkers.

4.3 a) The National Agricultural Statistics Service (NASS) and the Economic Research Service (ERS) should, in consultation with the CBOs, improve data collection and analysis related to farmworkers and their economic contribution, including additional questions in the 2012 Census of Agriculture.

4.3 b) Data collection efforts should include a guarantee of confidentiality, which is necessary for an accurate count.

4.3 c) ERS should issue a report on the rural development impact of farmworkers and should combine datasets to better depict the numbers and needs of farmworkers and workers in the food industry, in order to determine their status and contributions in agriculture.

4.4) Agricultural mediation programs should be expanded to assist farmworkers in resolving issues such as wage and hour violations and the failure of employers to provide adequate housing.

4.5) USDA should help the CBOs address health and safety issues in coordination with the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), and the National Institutes of Health (NIH). CSREES, the National Institute of Environmental and Health Sciences (NIEHS), and other entities within NIH should analyze health issues related to unsafe chemicals and support community participatory research projects.

4.6) Organic agriculture standards, good agricultural practices, and food safety standards should specifically address the protection of farmworkers' health and safety. USDA and the CBOs should expand efforts to educate socially disadvantaged farmers and ranchers (SDFRs) and other small-scale producers on how to meet all regulations related to farmworkers.

4.7) Laws and regulations that protect farmworkers should be fully enforced. Safety and health disparities between that sector and others in agriculture—including in the areas of worker protection standards, and enforcement of standards for pesticide application and field sanitation—and the need for health insurance for farmworkers should be addressed.

4.8) The Farmworker Coordinator should work with CBOs representing farmworkers to develop specific proposals for how USDA can improve farmworkers' access to safe housing, health and safety training, adequate nutrition, jobs, credit unions, economic development, and other services.

4.9) USDA should take steps to reduce barriers and expand assistance for farmworkers who want to become farmers or ranchers.

> 4.9 a) Specific outreach programs and strategies should be developed to assist farmworkers to acquire land. These programs should include funding authority with adequate support for grants to CBOs that work with farmworkers to help them transition to farm ownership.

> 4.9 b) Farm Service Agency (FSA) programs for beginning farmers should be revised to recognize farmworker experience in its criteria for creditworthiness. If authorities to do so are inadequate, new authority should be requested.

## <u>PROGRESS TO DATE</u>

The CBOs worked to achieve significant new authorities and coordination in the 2008 Farm Bill, including the following:

- Section 14013(f), Farmworker Coordinator, establishes within USDA the position of Farmworker Coordinator to ensure access to services and support for low-income migrant and seasonal farmworkers. The section details responsibilities and authorizes funding for this position, and specifies that it be located within OAO.

- Section 14013(f)(2)(A), Administration of Emergency Grants to Assist Low-Income Migrant and Seasonal Farmworkers, assigns responsibility for administering the emergency grants to farmworkers program to the Farmworker Coordinator.

- Section 14204, Grants to Improve Supply, Stability, Safety, and Training of Agricultural Labor Force, directs the Secretary to make grants to assist agricultural employers and farmworkers with services, including agriculture labor skills development, transportation, short-term housing, workplace literacy and English as a Second Language (ESL) training, health and safety instruction, and other services as the Secretary deems appropriate. The section provides authority for the appropriation of such sums as are necessary for the program, and limits administration expenses to operate the program to 15 percent of the funds provided.

- Section 7204 (subsection 38), Agricultural Worker Safety Research Initiative, defines the initiative as a High Priority Research and Extension Area and provides authority to make grants to study and demonstrate methods to minimize exposure to pesticides of farm and ranch owners, pesticide handlers, and agriculture workers, and to address concerns of farmworkers related to long-term pesticide exposure. The section also provides authority to make grants for the development of rapid tests

for on-farm use, to better inform farmers, ranchers, and workers of when it is safe to reenter fields on which pesticides have been used.

The Secretary has retained a special assistant to cover labor issues, including those of farmworkers, and has begun to seek the funds needed for the grant programs and functions noted.

## DEFINING CHANGE

Change would mean that the position of Farmworker Coordinator is established and permanently assigned to OAO, and the grant programs discussed above are delegated to the Farmworker Coordinator and funded.

Change would mean that farmworkers' needs are routinely considered and addressed in times of agriculture disaster, a strategic relationship with farmworkers and the CBOs representing them is in place, farmworkers' housing is adequate and safe, and comprehensive policies and programs exist to help farmworkers who desire to become farmers or ranchers.

Finally, change would mean that Federal laws are in place to afford farmworkers the same protections enjoyed by other workers, safety in agricultural workplaces is improved, and immigration policies are in place that protect farmworkers and allow them to secure an equitable place at the table in our society.

**ISSUE # 5:  NEW AND EMERGING FARMERS AND RANCHERS**

**PROBLEMS RAISED IN THE PARNERS PROCESS**

Prospective producers in the United States come from a variety of backgrounds and may be either re-entry or new entry farmers. Data from the 2007 Census of Agriculture indicate that socially disadvantaged farmers and ranchers (SDFRs) and farmworkers aspiring to become farmers and ranchers comprise a large sector of the new and re-entry farm population. These new and returning farmers have much to contribute to their communities, but they need better access to the programs and services of the U.S. Department of Agriculture (USDA).

According to data compiled and released under Section 10708 of the 2002 Farm Bill, in 2003, 92.5 percent of participants in the Beginning Farm Down Payment Loan Program of the Farm Service Agency (FSA) were non-Hispanic white males, and 3.9 percent were non-Hispanic white females. Curiously, in 2005, the percentage of non-Hispanic white males declined to 59 percent, while the percentage of non-Hispanic whites of unknown gender increased to 36.5 percent, with no other category (including non-Hispanic white females) making up more than 3 percent. It appears that people who used to be counted as non-Hispanic white males are now being counted as non-Hispanic whites of unknown gender, or that more down payment loan funds are going to new-entry corporate farms. What is clear is that SDFRs were not accessing funds from the program designed to help new-entry producers buy land.

FSA's youth lending program showed slightly more SDFR participation. In 2005, the only year for which data have been released, 3.9 percent of youth loans went to African-American males, 3.2 percent to American Indian and Alaska Native males, and 31.1 percent to non-Hispanic white females. However, no Hispanic youth in the country received a loan.

New and emerging farmers and ranchers face numerous challenges, including lack of information about financing options, financial management skills, and the availability of resources critical to their success. Other concerns raised by the community-based organizations (CBOs) include:

∞   New farmers find it difficult to understand the regulations and legal issues associated with new markets and nontraditional farm enterprises (such as agrotourism). Immigrant producers also face language barriers and lack access to technical assistance.

∞   The legal definition of a beginning farmer and rancher (BFR) is problematic for SDFRs: any person farming for 10 years or less is a beginning farmer, but a SDFR must have three years of experience, which does not at present include experience as a farmworker. The definition of a beginning farmer also differs from the definition of a limited resource farmer for determining eligibility for assistance. And the Natural

Resources Conservation Service (NRCS) definition of a beginning farmer has no monetary restriction, so the owner of a large, multimillion-dollar farm can qualify.

∞  The average age of U.S. farm operators increased from 55.3 in 2002 to 57.1 in 2007. The majority of farmers and ranchers are nearing retirement age, and there is a need to increase the numbers of new and emerging farmers and ranchers, who tend to be younger. Women and immigrant producers are the fastest growing source of new producers, and American Indian producers have doubled since the last Census of Agriculture.

∞  The 25% matching grant program in the Beginning Farmer and Rancher Development Program is a significant barrier to SDFR participation.

∞  The lack of adequate data on the number of SDFRs, including American Indian producers and new immigrant farmers, creates numerous impediments to the SDFRs' ability to gain equitable access to USDA programs. CBOs have long raised concerns that data from the Census of Agriculture seriously underrepresents their socially disadvantaged constituents. USDA has not released Section 10708 data since 2005 and has only released percentages of participation, not numbers or amount of loans received. The lack of clear numbers has severely reduced the willingness of Congress to address gaps and to fund programs for SDFRs.

∞  While the benefits of the Environmental Quality Incentives Program (EQIP) are of unique importance to BFRs, their participation in the program has been severely hampered by its prohibitive cost share requirements, and its requirement that funds be invested up front for the installation of conservation practices  covered under programs for later reimbursement.

∞  The lack of a diverse, multilingual USDA field office staff restricts access by SDFRs to program funding and other resources and services.

∞  The Advisory Committee on Beginning Farmers and Ranchers that advises the Secretary on BFR issues is not sufficiently diverse, and the CBOs should be allowed to recommend more nominees.

∞  Many SDFRs remain suspicious of FSA, which continues to deny them access to programs.

## AGENCIES AFFECTED

CSREES, FSA, NASS, NRCS, OAO, RD. and RMA, as well as ASCR and OIG

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

While all BFRs need support, USDA programs and services at present better serve new producers who are engaged in commodity programs and other more-traditional forms of production, and who are therefore largely non-Hispanic white males.

**Recommended Actions**

5.1) USDA needs to coordinate across agencies and mission areas to provide optimal support to new producers. As called for in the 2008 report from the Government Accountability Office (GAO) on new and beginning farmers, USDA must establish Department-wide strategic goals and reportable outcomes for new farmers' access to services.

5.2) USDA and CBOs need to fully review what barriers are posed by program procedures and requirements to the participation of specific groups of new entry farmers and ranchers, especially SDFRs.

5.3) The Small and Beginning Farmer and Rancher function should be immediately moved to its new permanent location in the Office of Advocacy and Outreach (OAO), be given a diverse staff, and receive prominent attention, as required in Section 14013 of the 2008 Farm Bill.

5.4) The transfer of the Beginning Farmer and Rancher Advisory Committee to the OAO should be implemented immediately, and the Secretary should consider continuing the Council of Small and Beginning Farmers and Ranchers, headed by the Deputy Secretary.

5.5) The Secretary should ensure that full funding for OAO and all other grant and loan programs that benefit BFRs is requested annually or as needed in the President's budget, and CBOs should work with Congress to actively support these requests.

5.6) USDA and the CBOs should review all current definitions of "new and beginning farmer and rancher" to determine if greater consistency and inclusivity could be achieved.

5.7) The Secretary should ensure that BFRs and SDFRs have access to set-asides as set in place in the 2008 Farm Bill, including the opportunity to clarify their status to FSA and NRCS in order to be eligible for new benefits and set-asides.

5.7 a) Procedures and regulations to collect the data necessary should be implemented to ensure that these goals are met according to Section 14006 of the 2008 Farm Bill.

5.7 b) The data collected through the provisions in Section 14006 should be used by the agencies, the CBOs and by Assistant Secretary for Civil Rights (ASCR) in compliance reviews (as required by Section 14007 of the 2008 Farm Bill) to

measure progress in meeting set asides and to develop specific plans to correct any gaps in meeting required set asides.

5.8) With the CBOs, USDA should develop a comprehensive plan for communications with new immigrant and refugee farmers, including farmworkers seeking to become producers. Better support is also needed for technical assistance (such as access to land, loans, leases, and credit), and knowledge of U.S. systems of banking and record keeping.

5.9) CBOs and USDA should collaborate to make agriculture a viable option for youth. Grants, scholarships, mentorships and technical assistance are among the options that should be considered and participation in the youth loan program should be expanded.

5.10) USDA, especially OAO, and the CBOs should define specific strategies to meet the critical needs of all BFRs and cooperatives for risk management and technical assistance on legal issues and regulations, access to new markets, and food safety.

5.11) Barriers to the participation of SDFRs in individual development accounts for BFRs must be addressed and the matching requirement in the Beginning Farmer and Rancher Development Program should be removed for SDFR's.

5.12) USDA should ensure broadband service is extended to all rural areas, and should work with CBOs to secure funds for making broadband accessible at local community centers.

5.13) The Secretary and USDA should immediately implement the following programs and provisions of the 2008 Farm Bill for the benefit of BFRs, with special attention to ensuring equity for SDFRs—especially SDFR youth:

> 5.13 a) Section 5002, Conservation Loan and Loan Guarantee Program. Regulations should specify how the priorities for SDFRs and BFRs will be implemented and monitored.

> 5.13 b) Section 5004, Down Payment Loan Program. FSA should implement changes in loan terms and limits and make SDFRs eligible for the loans as soon as possible, as well as seeking additional funds for the program. FSA should request input from CBOs in developing regulations on the establishment of annual performance goals, and how they should be implemented and evaluated.

> 5.13 c) Section 5005, Beginning Farmer or Rancher and Socially Disadvantaged Farmer or Rancher Contract Land Sales Programs. FSA should address how it will inform buyers and sellers of their eligibility for the program. The Secretary should issue a directive instructing all USDA employees to prevent lands from being sold to BFRs and SDFRs that include fraudulent or hidden liens or encumbrances. FSA should also require that BFRs and SDFRs be given a copy

of the title report 20 days before settlement, and ensure compliance with Federal appraisal laws and regulations (see Issue # 16, Access to Credit).

5.13 d) Section 5101, Direct Loans. FSA should, in consultation with the CBOs, change regulations to allow farm experience gained as a farmworker or on a farm in another nation to be considered.

5.13 e) Section 5301, Beginning Farmer and Rancher Individual Development Accounts Pilot Program. FSA should evaluate how well this program meets the needs of qualified SDFRs, and whether any organizations that represent them— including credit unions—can qualify to administer the program.

5.13 f) Section 5302(a), Inventory Sales Preferences. FSA should develop a clear process to communicate this change to SDFRs and to field offices, and establish procedures to ensure that information on available properties is provided at the same time to all prospective buyers.

5.13 g) Section 5302(b), Loan Fund Set-asides. FSA should develop clear policies on how to collect, publish, and utilize data related to the set-asides, and the CBOs and ASCR should review the data and suggest improvements to correct any inequities.

5.13 h) Section 6202, Value-Added Agricultural Product Market Development Grants. USDA should create new regulations to give priority to projects that increase opportunities for producers—especially BFRs and SDFRs to develop new ventures that do not have well-established markets, and to determine how the 10 percent set-aside for SDFRs and BFRs will be implemented.

5.13 i) Section 7410, Beginning Farmer and Rancher Development Program (BFRDP). The Managers' Statement indicates that immigrant and limited resource farmers are to be included in this program. The Cooperative State Research, Education, and Extension Service (CSREES) should take steps to assure that CBOs representing SDFRs are included as peer reviewers, and that set-aside requirements in this section as well as data compilation and publication requirements in Section 14006 are met. As soon as OAO is established, a staff member should be assigned to act as liaison to this program, and ASCR should work with the CBOs to review whether the set-aside requirements were met in the first round of funding, and if not, to determine what steps should be taken to make sure they are met in the future. The impact of the 25% matching requirement should be assessed for SDFRs with authorizing changes made in the next Farm Bill if it poses a significant barrier.

5.13 j) Section 12026, Risk Management Education for Beginning Farmers or Ranchers. The President's FY 2010 budget should create a separate line item to ensure that the funding level of the program is increased. The Under Secretary for Research, Education and Economics (REE) should also include language in

REE's annual roadmap to Congress emphasizing risk management funding opportunities for BFRs.

5.13 k) Section 12033, Supplemental Revenue Assistance Payments (SURE), and Section 15101, the Supplemental Agricultural Disaster Assistance Program (SADA). SDFRs have had great difficulty in accessing disaster programs, and meeting crop insurance requirements. These sections should be implemented as soon as possible, with clear instructions provided to local USDA offices to let producers know they must sign up even if insurance purchase requirements are waived. The transparency and accountability requirements in Section 14006 should be applied to this section, and the level of participation of SDFRs compared to the participation of other farmers and ranchers, with appropriate compliance reviews.

## PROGRESS TO DATE

USDA provided for better coordination of efforts for small and beginning farmers in its August 6, 2006, Departmental Regulation 97-001, which gave formal recognition to the SBFR Coordination Committee and other functions. At the same time, USDA created a Council of Small and Beginning Farmers and Ranchers headed by the Deputy Secretary, with subcabinet leaders as members.

GAO released a report in 2008 on USDA's BFR activities that boosted the visibility of BFR issues.

FSA has included provisions to expand loans for BFR families in its 2005-11 strategic plan. The Section 10708 data for the FSA youth loan program for 2005 showed increased SDFR participation in a few states. African-Americans received 31.1 percent of the youth loans in Alabama, 30 percent in Mississippi, and 7 percent in Louisiana. African-American males received 11.9 percent of the loans in North Carolina, 9.3 percent in Florida, and 9 percent in Pennsylvania.

In the same year, American Indians received 40 percent of the youth loans in Arizona, 10.7 percent in Michigan, and 10 percent in Washington State. American Indian males received 39 percent of the loans in New Mexico, and 16.7 percent in Maryland.  Asian-Pacific Americans received 80 percent of the loans in Hawaii and 11 percent in Maine. In Oklahoma, 28.7 percent of youth loans went to American Indians, and 4.8 percent to African-Americans.

The National Agriculture Statistics Service (NASS) is working with the CBOs and doing a better of job of enumerating these new farmers in the Census of Agriculture. With the better data, the focus can soon become how best to reach BFRs with the programs and information they need. The securing of mandatory funding of $75 million over five years for the BFRDP was a major success in the 2008 Farm Bill, as were the advance payments and increased cost-share payments for BFRs in conservation programs, and set-asides for BFRs in many programs.

These and other 2008 Farm Bill changes in funding authority should allow USDA to greatly expand the benefits of conservation programs to BFRs and SDFRs. See details below and in Issues # 3, Improved Coordination of USDA Outreach and Advocacy; 8, Disaster Preparedness and Response; 11, Conservation and Forestry; 16, Access to Credit.

∞   Section 2111, Conservation Reserve Program Transition Incentives, provides $25 million over 10 years to facilitate the transition of Conservation Reserve Program land held by a retired or retiring owner or operator to BFRs and SDFRs who agree to return some or all the land to sustainable grazing or crop production.

∞   Section 2503, Establishment and Administration of Environmental Quality Incentives Program, authorizes NRCS to provide advance payments of up to 30 percent for SDFRs, BFRs, and limited-resource farmers or ranchers in EQIP and increases the cost share rate for SDFRs and BFRs to 90 percent.

∞   Section 2704, Assistance to Certain Farmers and Ranchers to Improve their Access to Conservation Programs, reserves 5 percent of total funds made available to carry out EQIP, and of total acres made available to carry out the Conservation Stewardship Program (CSP), for SDFRs, and 5 percent for BFRs.

∞   Section 2708, Administrative Requirements for Conservation Programs, requires the Secretary to provide incentives to BFRs, SDFRs, limited resource farmers and ranchers, and Indian tribes to participate in any conservation program, with some limitations. The section also requires the simplification of application processes for conservation programs, to encourage the participation of new applicants.

∞   Section 5002, Conservation Loan and Loan Guarantee Program, retains and strengthens conservation loan authorization for direct and guaranteed loans and for conversion to sustainable and organic farming, and adds priority for SDFRs and BFRs. FSA is in the process of drafting proposed regulations to implement this program. Regulations will be published in the *Federal Register* as a proposed rule, and public comments will be requested. Funds must be appropriated in the budget for this program.

∞   Section 5004, Down Payment Loan Program, changes loan limits and terms for a loan program designed for BFRs, and expands the program to include all SDFRs. FSA is required to establish annual performance goals for the program, and make joint financing loans the preferred use of direct farm ownership funds by BFRs and SDFRs. This provision was implemented in January 2009, and increased funds were requested (see Issue # 16, Access to Credit).

∞   Section 5005, Beginning Farmer or Rancher and Socially Disadvantaged Farmer or Rancher Contract Land Sales Program, makes permanent a program that provides loan guarantees to sellers who self-finance the sale of land to BFRs and expands eligibility to SDFRs. A transition period is authorized for all changes, which must be in place by FY 2011. FSA is in the process of drafting proposed regulations to

implement this expanded program. The changes will be published in the *Federal Register* as a proposed rule, and public comments will be requested.

∞ Section 5101, Direct Loans, provides that any farm experience, no matter when it occurred, must be considered in determining whether a loan applicant meets the experience requirements for direct operating loan eligibility. Proposed regulations have been drafted to make this change and will be published in the *Federal Register*. Public comments will be requested.

∞ Section 5301, Beginning Farmers and Rancher Individual Development Accounts Pilot Program, establishes a five-year pilot program in at least 15 states that offers qualified, low-income BFRs an opportunity to establish saving accounts with monthly deposit plans, which FSA will match on an 2:1 basis. Up to $10 million in annual funding is provided, and the program authorizes grants to qualified nonprofit organizations who then deliver the program to eligible participants. The non-Federal match is increased to 50 percent, and the maximum grant amount limited to $250,000 per project. FSA is drafting a notice of funds availability (NOFA) to implement this program; it will be published in the *Federal Register* once funds have been appropriated.

∞ Section 5302(a), Inventory Sales Preferences, reestablishes SDFRs as a priority group for purchase of FSA inventory property, with equal priority to BFRs. If more than one eligible farmer offers to purchase the same property in the first 135 days, the buyer is to be chosen randomly.

∞ Section 5302(b), Loan Fund Set-asides, increases the percentage of loan funds set aside in the direct ownership loan program to 75 percent for BFRs. Sixty-six percent of funds are reserved for the down payment loan program and joint financing arrangements. Priorities established in 1987 and 1990 for SDFRs remain.

∞ 6202, Value-Added Agricultural Product Market Development Grants, requires the Secretary to give priority to projects that increase opportunities for BFRs, SDFRs, and others to develop new ventures that do not have well-established markets, and provided $15 million in mandatory funds, and authority for appropriations of up to $40 million a year. The section includes a 10 percent set-aside for SDFRs and BFRs.

∞ Section 7410, Beginning Farmer and Rancher Development Program (BFRDP), provides mandatory funding of $75 million through FY 2012 for a competitive grants program authorized in the 2002 Farm Bill, which supports training, education, and mentoring efforts conducted by CBOs and other entities. Twenty-five percent of the funds are set aside for SDFRs. Section 14013 establishes a liaison to this program in the Small Farms and Beginning Farmers and Ranchers Group in OAO. The request for applications (RFA) closed in May 2009. Funding of the initial round of grant awardees will occur before the end of FY 2009. The release of the FY 2010 BFRDP RFA will follow a similar scheduled.

∞   Section 12026, Risk Management Education for Beginning Farmers or Ranchers, requires the Secretary to place special emphasis on risk management strategies, education, and outreach targeted to BFRs, SDFRs, transitioning (to becoming owners or entering new production systems and markets) farmers and ranchers, farmworkers seeking to become farm operators or owners, and producers seeking new markets.

∞   Section 12033, the Supplemental Revenue Assistance Program (SURE) Crop Insurance Waiver, allows the Secretary to waive the crop insurance purchase requirement for BFRs and SDFRs participating in SURE, and to provide disaster assistance at a level deemed to be equitable and appropriate.  Section 15101 provides a similar waiver in the Supplemental Agricultural Disaster Assistance Program (SADA) for SDFRs.

∞   Section 14013, Office of Advocacy and Outreach, establishes a Small Farms and Beginning Farmers and Ranchers Group within OAO, and authorizes this group to coordinate Small and Beginning Farm efforts at USDA and to manage the Advisory Committee on Beginning Farmers and Ranchers.

**DEFINING CHANGE**

The 2007 Census of Agriculture demonstrates that BFRs are a diverse and growing part of our agricultural system, and in many ways represent the survival of family farming. Change would mean that USDA recognizes the importance of these producers by designating support specifically for them and providing ongoing coordination across agencies with CBO partners to provide adequate resources.

Change would mean that the provisions of the 2008 Farm Bill that provide set-asides and other preferences for BFRs are fully and equitably implemented. OAO, with a Small and Beginning Farmers Group, would be in place with a diverse staff. A review of programs would be undertaken, and proposals to improve policies, programs, coordination, and equity would be developed and implemented. USDA would have a more practical and consistent definition of "new and beginning farmer."

The BFRDP would be more accessible to CBOs with demonstrated experience in serving SDFRs, with barriers to SDFR participation addressed and the 25 percent set aside fully implemented and the 25% match requirement removed.

Change would mean that the average age of producers is reduced, and the growing population of younger producers is more diverse.

## ISSUE # 6:  ACCESS TO USDA GRANT AND COOPERATIVE AGREEMENT PROGRAMS

### PROBLEMS RAISED IN THE PARTNERS PROCESS

The programs for grants, cooperative agreements, and technical assistance of the U.S. Department of Agriculture (USDA) are vital to supporting the important services that community-based organizations (CBOs) provide to socially disadvantaged farmers and ranchers (SDFRs). USDA needs to do more to ensure that CBOs receive this support to do what USDA cannot do: rebuild trust between SDFRs and USDA field offices.

USDA has many grant programs that appear fair on the surface. Yet the CBOs have stated their belief that many USDA agencies and offices have different standards of service for different producers. While CBOs that serve SDFRs may not be overtly refused access to these programs, other entities appear to have an inside track for receiving benefits under them.  This inequity appears to relate to USDA's relationships with organizations. As more CBOs develop relationships with the Department, their access has increased in some areas, underscoring the need to ensure that USDA's relationships with CBOs are improved.

Concerns about inequities in the peer review processes that agencies use have been raised throughout the Partners process (see Issues # 2, Equity and USDA's Relationship with American Indian Tribes; 4, Farmworkers, USDA, and U.S. Agriculture; 7, Risk Management; 9, Rural Development; 10, Renewable Energy; 12, Community Food Security and Nutrition Assistance; and 15, Specialty Crops and Access to Marketing Programs). The review process for many grant rounds, especially at the state level, remains very subjective, with great discretion provided to reviewers. Proposals may be submitted at the state and national level from diverse groups and regions, but fail in grant rounds in part because reviewers lack the diversity and field experience to understand what constitutes quality work, or because reviewers score more favorably proposals from entities they know.

Specific complaints raised by the CBOs about inequities and disparate service in several states have not been resolved. USDA has not exerted the leadership to restore severe cuts in grant programs and undo changes in the review process that threaten the few programs that are working, such as the Federally Recognized Tribal Extension Program (FRTEP) and the Civil Rights and Community Outreach Partnership Program of the Risk Management Agency (RMA) (see Issues # 2 and # 7).

CBOs are hampered by irregular funding, complicated requirements for applications, and an almost constant need to compete for funds.

The lack of access to high-speed Internet and adequate computer technology in rural areas limits access to grant rounds that require submission through the grants.gov system. Different grant rounds have different proposal requirements, and the time needed to understand the requirements of each round in order to successfully compete

also limits CBO access to funds. For example, the Cooperative State Research, Education, and Extension Service (CSREES) has more than 60 competitive grant rounds, and CBOs have been successful in very few of them. Data as required to be collected by Section 10708 of the 2002 Farm Bill and Section 14006 of the 2008 Farm Bill have not been released, although they are needed to analyze equity in participation by groups that represent SDFRs and farmworkers, and to ensure that set-asides for SDFRs in the Rural Cooperative Development, the Rural Value Added, and the Beginning Farmer and Rancher Development Programs are met.

During the Partners process, much attention was given to the need to improve the grant-writing skills of the CBOs. While these skills are important, providing training in grant writing does not create more hours in the day or more staff positions in an organization to prepare proposals. In most cases, organizations with a stable structure have the tools needed to win grants. But lack of access to multiyear support, the necessity to compete in numerous annual grants rounds, and requirements that limit the inclusion of administrative costs or that require matching funds are all factors that limit the CBOs' ability to hire and retain the staff they need to receive grants—and without grants, they cannot deliver the important services that only they can provide in the field.

The CBOs have also pointed out the inequity of the annual limit of $100,000 arbitrarily imposed on grant applications in the Outreach and Technical Assistance Program for Socially Disadvantaged Farmers and Ranchers (OTASDFR), also known as the 2501 Program. The staff involved in the administration of the program has explained that the limit, not required in the legislation, was set in place because CSREES determined that the target population does not have the capacity to effectively utilize more than $100,000 per year. That reasoning is not only wrong, it is also paternalistic and underscores the fact that USDA does not understand the role CBOs play in delivering services to SDFRs.

While the CBOs have worked for many years to increase support for the 2501 and other programs, USDA has failed to substantively increase its requests for funds from Congress or highlight and report on program successes to increase the likelihood of increased funds. The value of a partnership can be measured in its bottom line. For years, CBOs have served as a lifeline for SDFRs, at great organizational cost. Most of the changes in grant program authority and funding levels have been recommended by the CBOs, while USDA has generally failed to do its part to recognize the value of its CBO Partners, and to support them.

The cycle of competition for resources, inconsistent support, and loss of trained personnel when funding dries up needs to change.

## Agencies Affected

All USDA agencies with authority for grants, cooperative agreements, and other outreach programs, in particular OAO and CSREES, as well as AMS, FNS, FSA, FSIS, NRCS, RD, and RMA

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

 USDA's CBO Partners have for many years provided capacity-building and other expert services that have helped thousands of SDFRs retain their land and produce crops under extremely adverse conditions. The CBOs have functioned in effect as extension and capacity-building entities, yet they do not receive the recognition and support from USDA for their services and expertise.

The CBOs believe that effective collaborative outreach and technical assistance involving USDA, CBOs, the 1890 and 1994 institutions, Hispanic serving institutions (HSIs), and other minority serving land-grant institutions can contribute to expanding SDFR participation in USDA programs and services. Continuity is a critical issue in the provision of these services. Many of the ideas proposed by CBOs to secure better support and help USDA enter a new era of civil rights and coordination are not being implemented.

**Recommended Actions**

6.1) The CBOs have worked with Congress to secure significant increases in funding and authority for outreach programs. USDA needs to work with the CBOs to ensure that new authority is properly implemented and achieves the intended results.

6.2) The 2501 Program should be recognized and supported as a key element in USDA's relationship with SDFRs and CBOs, and the minority serving institutions that have long worked with them.

> 6.2 a) The Secretary should prepare a transition plan to move the 2501 Program to its permanent location in the Socially Disadvantaged Farmers and Ranchers Group of the Office of Advocacy and Outreach (OAO), as required under Section 14013 of the 2008 Farm Bill.

> 6.2 b) The Secretary should fully implement Section 14004, Outreach and Technical Assistance for Socially Disadvantaged Farmers or Ranchers, which reauthorizes and increases funding for the program and strengthens its ability to improve participation by SDFRs in USDA programs.

> 6.2 c) The Secretary should expand the program to ensure better support to CBOs, including delegating to OAO the direct authority to enter into grants and contracts with the CBOs that are critical to the program's mission. This delegation should allow OAO to bundle grant resources from multiple agencies in contracts with CBOs, as authorized under Section 10708 of the 2002 Farm Bill.

> 6.2 d) With the CBOs, USDA should develop and release for public comment a new regulation and request for Applications (RFA) that clarify eligibility for the 2501 Program according to new criteria in Section 14004, and that reserve

funding for eligible CBOs and minority serving institutions with a history of successfully providing outreach and technical assistance to SDFRs.

6.2 e) The RFA should require reports that document successes and barriers encountered, and should establish a process to compile these results in the required annual report to the House and Senate Agriculture Committees, detailing program accomplishments and problems and gaps in services. The report should be made public and shared with the CBOs.

6.2 f) The Secretary should immediately remove the arbitrary annual $100,000 limitation on the 2501 Program for contracts now being written with FY 2009 funds and in the future.

6.2 g) FY 2010 and future funding limits for the grant round should be developed in consultation with the CBOs and should be more in line with the levels provided in the Beginning Farmer and Rancher Development Program (BFRDP). Adequately funded, multiyear agreements of up to five years should be allowed for organizations with a track record of delivering results.

6.3) The transparency and accountability requirements of Section 14006 of the 2008 Farm Bill should be implemented with respect to all USDA grant programs of the Department that benefit producers, and the resulting data should be analyzed by the Assistant Secretary for Civil Rights (ASCR), according to the requirements of per Section 14007.

6.4) The Secretary should instruct OAO to conduct a full inventory and review of the outreach programs and resources in all mission areas and agencies, and to review participation data in these programs with ASCR and the CBOs. OAO should make specific recommendations to increase the participation in these programs of SDFRs, American Indian tribes, and farmworkers, and their communities.

6.5) USDA and its agencies should better coordinate outreach activities to ensure that SDFRs and the CBOs that serve them are reached by every agency, and that real partnerships are developed.

6.6) Wherever possible, USDA should provide multi-year grants and adopt uniform applications and submission procedures across programs and agencies.

6.7) Matching requirements should be eliminated for all grants to groups serving SDFRs, and advance payments allowed.

6.8) Grant review processes should be transparent and consistent across localities, so that everyone knows how the process works, how decisions are made, and what the rationales for selection are.  The CBOs should have input on review criteria to ensure that they do not create barriers to SDFR participation.

6.9) USDA should encourage CBO representatives to participate as reviewers on grant panels to better understand the grant process and make it more fair.

6.10) All agencies using panel reviews should be required report annually on the diversity of all their panels, regardless of subject. These reports, which ASCR should be review, should include participation by race, sex, age, and ethnicity, and should summarize all efforts taken to improve diversity on panels. USDA must provide alternative means of submitting applications when grants.gov is not operating properly; the system should be fixed, or the contract for it terminated.

6.11) CBOs and other potential applicants should be able to go to one part of the USDA website and find information about all available grants, cooperative agreements, and partnerships, with links to all open RFAs. Closed RFAs should also be listed.

6.12) SDFRs should not have to rely only on USDA grant programs for support. They should receive equitable access to regular, ongoing farm programs that support other producers.

6.13) USDA must report proactively to Congress on program needs and outcomes and on the number of proposals rejected due to lack of funding.

## PROGRESS TO DATE

Some USDA grant programs are working, notably the RMA's Civil Rights and Community Outreach Partnership Program, FRTEP, and also several Rural Development (RD) housing and cooperative and business development programs. For example, the Rural Cooperative Development Program instituted a special funding round for cooperatives that serve SDFRs, using the funds set aside for those producers.

USDA has provided grant-writing workshops for stakeholders and shared more information on funding rounds with them.

With leadership from the Farm and Food Policy Diversity Initiative, the CBOs secured significant additional funding—which is now mandatory—for the 2501 and other programs in the 2008 Farm Bill. The 2501 Program will finally have a permanent location in OAO. Through OAO and in conjunction with other agencies and mission areas, USDA now has the opportunity to develop a better relationship with its CBO Partners.

The 2008 Farm Bill includes new authority and support for grant programs serving SDFRs. Specifically, Section 14004, Outreach and Technical Assistance for Socially Disadvantaged Farmers or Ranchers, reauthorized and strengthened the 2501 Program and its ability to improve SDFR participation in agriculture programs. Funding was greatly increased and made mandatory, with $15 million for FY 2009 and $20 million for each of FYs 2010 through 2012, for a total of $75 million. The section also gives the Secretary authority to make contracts with CBO's and requires an annual report, detailing program accomplishments, problems, and gaps in service.

In addition, funding increases and improved authority were provided in many other sections of the 2008 Farm Bill (see Issues # 2, 4, 7, 9, 10, 12, and 15, listed in the problems raised section).

Many of these grant programs for SDFRs have already released RFAs and awarded funds. Other programs have drafted RFAs which they will release, once they have received final approval or secured funds, if appropriations were needed.

## **DEFINING CHANGE**

Change would mean that USDA recognizes CBOs as essential partners in achieving equity in all of its programs and services, and provides support to greatly expand the CBOs' important work, including:

- ∞ Outreach and technical assistance funds to increase the CBOs' ability to help farmers and ranchers have viable operations.

- ∞ Improved application and review processes, leading to greater success by CBO and SDFR applicants in all USDA grant rounds.

- ∞ More substantive, better coordinated, and longer-term funding opportunities, allowing the CBOs to have more-stable operations, and achieving the goal of the 2501 Program—to support CBOs and minority serving land-grant institutions in their outreach and technical assistance efforts.

Change would mean that the requirement for matching funds to receive some grants would not be used to disqualify CBOs that have a proven track record of providing critical assistance to SDFRs.

It would also mean that USDA, through OAO and in conjunction with all the Department's critical agencies and mission areas, will work in partnership with the CBOs to move to a new era of equity.

## ISSUE # 7:  RISK MANAGEMENT

## PROBLEMS RAISED IN THE PARTNERS PROCESS

Socially disadvantaged farmers and ranchers (SDFRs) continue to experience problems in gaining access to markets, negotiating fair contracts and prices, and securing insurance and other protection from natural disasters and market-related risks.

The Federal Crop Insurance Corporation (FCIC) has an agreement with the crop insurance industry, which designates selected insurance companies as the sole providers of federally subsidized crop insurance. The agreement requires that these companies serve all producers. However, research by community-based organizations (CBOs) has found that less than 20 percent of SDFRs currently have crop insurance policies. The private delivery system for insurance is flawed, and crop insurance products are not universally available, or suitable for all forms of production.

The Risk Management Agency's Community Outreach and Partnership Program, which was designed to directly assist small and socially disadvantaged farmers and ranchers by providing them with risk management tools other than crop insurance, was one of a handful of programs of the U.S. Department of Agriculture (USDA) that was functioning well. But in implementing the 2008 Farm Bill, the Risk Management Agency (RMA) utilized discretionary authority to cut at least $5 million from this important program in order to fund computer and data-mining capacity for the crop insurance industry. The reallocation of these critical resources forces underserved SDFRs to essentially subsidize the industry that has failed utterly to serve them. In addition:

- ∞ Crop insurance agents have little incentive to reach out and work with smaller farmers and ranchers, as the agents can make higher commissions signing up larger producers—and those commissions stay high in subsequent years.

- ∞ There is a lack of diversity and understanding of diverse communities among crop insurance agents and adjusters, and CBOs have been unable to build a real partnership with crop insurance companies.

- ∞ Small producers lack access to or cannot afford general product liability insurance policies, which are not covered under FCIC but which are necessary to enter key markets.

- ∞ SDFRs have had great difficulty in accessing disaster programs and meeting crop insurance requirements, including the record-keeping requirements for adjusted gross revenue (AGR) and other crop insurance products. The lack of access to crop insurance effectively limits the ability of SDFRs to qualify for credit and other Farm Service Agency (FSA) programs.

- ∞ Risk management tools and training tailored to SDFRs are critically needed to prepare them to:

    o   Adopt financial record-keeping and farm business-planning systems, and retirement and estate planning.

    o   Meet standards for good agricultural practices, so they can acquire liability insurance and access new markets.

    o   Meet standards for organic certification, as organic products command premium prices in the market.

∞  CBOs are critical to delivering training in these areas but lack adequate resources to reach more producers and encourage them to make wise decisions.

∞  Congress expressed its discontent with the crop insurance industry by adopting Section 12024 of the 2008 Farm Bill, which reduces mandatory spending for a general fund for RMA by $20 million per year, with $7.5 million coming from new insurance product research and development, and $12.5 million from contracting and partnerships. The industry secured language that allows, but does not require, RMA to use up to $5 million of otherwise unused funds to strengthen crop insurance compliance oversight activities, including information technology and data mining. In 2008 USDA compounded the problem by using this authority to make the majority of the cuts in the Community Outreach Partnership Program, reducing funding from $8 million to less than $4 million for FY 2009.

∞  USDA and FCIC have failed to take specific measures to hold the insurance companies accountable for delivering equitable service to all producers.

## AGENCIES AFFECTED

RMA, as well as AMS, FSA, FSIS, and RD

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

The Risk Management Agency's outreach and education programs are functioning well, but USDA is not investing enough resources in them or adopting them as models for other agencies.

### Recommended Actions

7.1) RMA and FCIC should promulgate new regulations to implement new standards of service and accountability that ensure that crop insurance companies demonstrate progress in reaching SDFRs and in developing and refining products that serve their needs.

7.2) The Secretary should renegotiate the Standard Reinsurance Agreement to require that the crop insurance companies:

7.2 a) Deliver on their agreement to serve all producers.

7.2 b) Implement a data collection system that is compliant with the improved data requirements contained in Section 14006 of the 2008 Farm Bill, and release to the public data on the level of participation in crop insurance programs of SDFRs, compared to other farmers and ranchers.

7.2 c) Increase the diversity of crop insurance agents and adjusters, making sure they are recruited from and have the capacity to serve the diverse communities where their services are most needed.

7.2 d) Commission rates should be lowered for renewing clients and raised for bringing in new clients.

7.2 e) Consult and collaborate with CBOs to correct deficiencies in service. Any future standard insurance agreement should state specific terms for such collaboration, including the development of a crop insurance company expressly designed and staffed to meet the needs of these producers.

7.3) RMA and FCIC should work with CBOs to ensure that SDFRs are served by:

7.3 a) Ensuring that SDFRs and their needs are represented on the FCIC Board. RMA should work with the CBOs to find qualified SDFRs to fill vacancies on the FCIC Board.

7.3 b) Assigning the RMA Office of Civil Rights and Community Outreach and the Assistant Secretary for Civil Rights (ASCR) to review participation rate data and work with the CBOs to recommend strategies for correcting any deficiencies in crop insurance program delivery or services that come to light. Specific goals should be set to ensure that insurance programs reach and serve the increased numbers of SDFRs and beginning farmers and ranchers (BFRs) documented in the 2007 Census of Agriculture.

7.3 c) Expanding insurance programs, as required in the 2008 Farm Bill, to lower risk for SDFRs and BFRs, particularly in the specialty crop and livestock sectors. An example is RMA's Adjusted Gross Revenue-Lite (AGR-Lite) whole-farm revenue protection plan, which provides protection against low revenue due to unavoidable natural disasters and market fluctuations that affect income during the insurance year. Regulatory changes should be explored to remove barriers to SDFRs in AGR-Lite, including allowing them to use expected production as an alternative to five years of tax records for the initial years of their participation.

7.4) The CBOs and USDA agencies should collaborate to develop a record-keeping system that is acceptable for <u>all</u> USDA programs, and for access to credit from non-USDA sources.

7.5) The Secretary should increase funding and support for the risk management outreach and education programs that are working, including intensive support for one-on-one assistance to producers, and authority for multiyear contracts with CBOs.

7.6) The Secretary should use authority elsewhere in the 2008 Farm Bill to modernize information technology and data mining systems for the benefit of crop insurance companies and should immediately restore full funding of at least $8 million annually to the Risk Management Community Outreach Partnership Program, with expansion in future years.

7.7) If funding is not secured, the crop insurance companies should provide funds for data mining, or for outreach grants.

7.8) In the FY 2010 budget submission, the President should create a separate line item to ensure that the funding level of the Risk Management Education for Beginning Farmers or Ranchers is increased. To meet SDFRs' needs for training in handling business risk and financial management, the budget should seek a minimum of $50 million in annual funding for grants under RMA's Community Outreach and Partnership Program and the Risk Management Education Program, giving priority to CBOs, with no matching funds required.

7.9) The waivers in the 2008 Farm Bill exempting SDFRs from the requirement to purchase crop insurance should be implemented as soon as possible, with clear instructions provided to local USDA offices about these waivers, and assistance to CBOs and their constituents in securing the waivers.

## <u>PROGRESS TO DATE</u>

The RMA Civil Rights and Community Partnerships Program has done a distinguished job of supporting the efforts of CBOs to develop tools and strategies to reduce SDFRs' risks. The Extension Risk Management Education (RME) program has funded a large number of CBO-related projects designed to increase producers' skills in risk management.

These programs, which operate in a climate of mutual respect, are unique in their focus on SDFRs as producers who are important and valuable to agriculture and the food system, and on CBOs as critical partners in helping these producers succeed. The programs provide hope that the term "socially disadvantaged farmer and rancher" will one day be replaced simply by "farmer and rancher," and the programs should be recognized as models of partnership and achievement to be replicated across USDA agencies.

Several sections of the 2008 Farm Bill strengthened protections for SDFRs:

∞  Section 12026, Risk Management Education for Beginning Farmers or Ranchers, requires the Secretary to place special emphasis on risk management strategies, education, and outreach targeted to BFRs, SDFRs, transitioning (to becoming owners or entering new production systems and markets) farmers and ranchers, farmworkers seeking to become farm operators or owners, and producers seeking new markets. The section also requires the Secretary to utilize funds available to address the needs of these farmers in underserved states.

∞  Section 12033, the Supplemental Revenue Assistance Payments (SURE) Crop Insurance Waiver, allows the Secretary to waive the crop insurance purchase requirement for BFRs and SDFRs participating in the SURE program, and to provide disaster assistance at a level deemed to be equitable and appropriate. Section 15101 provides a similar waiver in the Supplemental Agricultural Disaster Assistance Program (SADA) for SDFRs.

## DEFINING CHANGE

Change would mean ensuring that CBOs have sufficient resources to help SDFRs develop risk management plans, creating crop insurance programs and delivery systems that serve SDFRs, holding the crop insurance industry accountable for providing equitable service to all producers, and ensuring representative participation of SDFRs on the FCIC Board.

**ISSUE # 8:  DISASTER PREPAREDNESS AND RESPONSE**

**PROBLEMS RAISED IN THE PARTNERS PROCESS**

Socially disadvantaged farmers and ranchers (SDFRs) and farmworkers have always suffered disproportionately in times of disaster. The federal response to Hurricane Katrina and other disasters has demonstrated that in times of disaster, these sectors are not treated as an integral part of our agriculture system.

The needs of farmworkers are often overlooked during disasters. The U.S. Department of Agriculture (USDA) is the agency that works most closely with the producers who employ and are most directly in contact with farmworkers in times of disaster. While USDA regularly conducts postdisaster farm visits and evaluates crop losses, it does not conduct analyses of the impact of disasters on farmworkers.

Meanwhile, farmworker organizations are called upon on an ad hoc basis to respond to disasters, but are not helped to obtain even essential tools like emergency radios and cellphones that work when towers are down. Funding to help individuals pay for housing, food, and medicine after natural disasters, including droughts or freezes, can help families stay in place when agricultural jobs disappear and leave people ready to work again when producers are ready to hire. Yet when USDA seeks emergency response funds from Congress to assist producers, it does not routinely request even a small appropriation to fund its emergency grants program for farmworkers.

SDFRs are also often ill protected in the face of disasters. They frequently lack crop insurance or are underinsured.  Without crop insurance, SDFRs are excluded when Congress provides other forms of disaster aid. In cases where producers have coverage, crop adjusters often provide loss estimates that result in very low payments, and these payments often come too late to have the maximum impact on recovery.

SDFRs perceive they are often excluded from, or not made aware of how to qualify for, disaster programs that distribute hundreds of millions of dollars to other producers. USDA has not implemented transparency and accountability practices that clearly show how disaster assistance is distributed at the county level by race, gender, and ethnicity. SDFRs are frequently turned away from offices when aid is not available in the immediate aftermath of a disaster, and not signed up or told how to access the programs they would be eligible for when aid becomes available.

The new tools that the 2008 Farm Bill provided for disaster response may make aid more immediately available to many producers, but do not fully address the needs of SDFRs and farmworkers. Many SDFRs still find Farm Service Agency (FSA) offices intimidating. Additional problems that require attention are:

∞   The status of short- and long-term disaster relief efforts for SDFRs, farmworkers, and rural populations, especially in the Gulf Coast Region, has not received a full review, and recovery from many disasters remains incomplete and unequal.

  ∞ The needs of producers and farmworkers in areas facing recurring droughts or floods should be assessed and action taken where necessary.

  ∞ Housing in rural areas is often inadequate in the face of repeated natural disasters and needs upgrading or replacement. Farmworkers have urgent housing needs, as they often live in mobile homes that do not meet new standards set in response to hurricanes and other disasters.

  ∞ Rural communities, especially SDFRs and farmworkers, may be isolated from emergency warning systems, particularly when electrical systems and radio or cellphone towers are damaged. Immigrant producers, for example, often work and spend nights on land where housing and electricity are not available, making them vulnerable to storms and tornadoes that may arise with little warning.

## AGENCIES AFFECTED

FSA and the Farmworker Coordinator under OAO, as well as other USDA agencies, including AMS, APHIS, ARS, ASA, ASCR, CPD, CSREES, FNS, FS, FSA, FSIS, IGA, NASS, NRCS, OHS, RD, and RMA; and other Federal agencies, including EPA and FEMA

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

The needs of SDFRs and marginalized rural communities, including farmworkers, are not being adequately addressed in times of disasters. USDA's interagency disaster response process, including coordination with other Federal agencies as well as community-based organizations (CBOs), is not sufficient.

The new agriculture disaster programs authorized in the 2008 Farm Bill are complex. SDFRs have had great difficulty in accessing disaster programs in the past, and the new authorities do not make that access easier.

As USDA implements these new programs, it has not yet sought the new authorities that are needed to close gaps in disaster assistance for SDFRs and farmworkers.

**Recommended Actions:**

8.1) The Secretary should take into consideration the needs of SDFRs when implementing the new programs in Section 12033, Supplemental Revenue Assistance Payments (SURE), and Section 15010, Supplemental Agricultural Disaster Assistance Program (SADA).  Regulations developed to implement these programs should include clear instructions to local offices on how to assist producers, and especially SDFRs, to meet program requirements.

8.2) USDA should develop the regulations, policies, and procedures needed to expeditiously implement the transparency and accountability requirements of Section 14006 of the 2008 Farm Bill, as well as the provisions for receipt for service in Section 14003, with respect to all disaster programs, including subsidized crop insurance programs (see Issue # 7, Risk Management).

> 8.2 a) The Assistant Secretary for Civil Rights (ASCR) and USDA agencies should use data collected according to Section 14006 of the 2008 Farm Bill to conduct regular evaluations and compliance reviews on disaster programs. Action plans should be developed to address any gaps in the participation of SDFRs, compared to other farmers and ranchers.

> 8.2 b) ASCR and the Risk Management Agency (RMA) should conduct a review of equity in pricing, loss adjustment, and service in crop insurance programs and the Noninsured Crop Disaster Assistance Program (NAP) to ensure that losses are properly and fairly reviewed for all producers, and that a diverse pool of qualified adjusters exists. The review should identify any problems and recommend appropriate remedies.

8.3) USDA should ensure that CBOs receive adequate support to educate SDFRs on benefits of the new programs, and how to meet requirements such as the need to file paperwork to obtain a payment waiver.

8.4) Projects funded under Section 12026 of the 2008 Farm Bill, Risk Management Education for Beginning Farmers or Ranchers, should provide education and technical assistance to help SDFRs and beginning farmers and ranchers (BFRs) to understand new disaster programs (see Issue # 7, Risk Management).

8.5) The Secretary should expeditiously establish and fill the Farmworker Coordinator position and immediately delegate authority to that position to manage the program of emergency grants to farmworkers.

> 8.5 a) The Secretary should delegate authority to the Farmworker Coordinator to gather information to assess farmworker needs in response to emergencies and inform the Secretary of the level of need. The Secretary should ensure that adequate support for the program of emergency grants to farmworkers is reflected in requests to Congress, and integrated into any plan the Secretary develops for disaster response.

> 8.5 b) The Farmworker Coordinator should work with CBOs and help coordinate their efforts with the states, organizations advocating for improved nutrition, and others to meet nutrition, housing, and health needs during and after a natural disaster.

8.6) USDA should improve coordination of disaster response and assistance across all agencies, clearly assigning responsibilities and developing a system for interagency coordination and coordination with field partners, including CBOs.

8.6 a) USDA should conduct a review of its response to previous disasters in partnership with CBOs and others from communities impacted by Katrina and other disasters. This working group should assess the overall role of food and agriculture programs in disaster response, pinpoint additional needs, and recommend improvements to ensure equity and improve preparedness, response, and coordination.

8.6 b) USDA agencies and CBOs with experience in disaster response should, in light of this review, evaluate Departmental Regulation 1800-1, "Departmental Emergency Programs Responsibilities," for adequacy. The working group should also review National Response Plan Emergency Support Function # 11, with its requirements for coordination between the USDA Office of Homeland Security (OHS), the Federal Emergency Management Agency (FEMA), and responsible USDA agencies to provide emergency support in the area of food and agriculture once the President declares a Federal emergency. The working group should recommend improvements, and USDA should then reissue the regulation.

8.6 c) USDA should support the emergency response efforts coordinated by the Continuity of Operations Planning Division (CPD) and FEMA.

8.6 d) Any new regulation on disasters should include a review and updating of protocols on the preparation of preliminary disaster reports that assess the state of agricultural and post disaster needs. These should be revised to include CBO collaboration and tools to pinpoint the immediate needs of farmworkers and SDFRs.

8.6 e) The Farmworker Coordinator, the Office of Advocacy and Outreach (OAO), and Intergovernmental Affairs (IA) should establish a system to work collaboratively with state and local disaster teams. With the CBOs, these USDA agencies should develop and test cross-government response mechanisms in farm and rural-based scenarios and ensure that communication channels are established well in advance of any emergency, with effective follow-up to mitigate a disaster's impact on communities.

8.6 f) USDA should work with CBOs to evaluate the adequacy of policies and programs that address preparedness, response, and recovery, particularly with respect to cleaning up and repairing rural infrastructure, and develop specific procedures to involve CBOs in disaster preparedness and response.

8.6 f i) USDA and CBOs should develop links with state Resource Conservation and Development (RC&D) programs that focus on emergency preparedness and response.

8.6 f ii) Local producers, farmworkers, and members of Indian tribes, cooperatives, and CBOs should be identified, encouraged, and trained to become first responders in their communities.
Essential tools for teams, such as emergency phones, should be provided before disasters to CBOs and others who receive response training in disaster-prone areas.

8.6 f iii) USDA and CBOs should identify places where producers and farmworkers have insufficient access to emergency communication. They should be encouraged to get crank radios, cellphone chargers, and flashlights with emergency response channels. Funding should be found to buy these items in bulk and distribute them at low cost or no cost to populations who cannot afford to buy them.

8.6 g) The Secretary assign a staff member specifically to handle community liaison and ombudsman activities with CBOs  in times of disaster. ASCR and OAO should be involved in this work.

8.6 h) USDA with its CBO partners should prepare a resource guide that catalogs stakeholder options in emergency conditions and their aftermath. USDA should also prepare a plan to communicate information about disasters. That information should be provided in culturally appropriate formats, such as on Hispanic and Hmong radio programs; in brochures and Websites in Spanish and Hmong; and through 1-800-HELP lines where speakers of Spanish and other languages will respond to callers.

## PROGRESS TO DATE

USDA, through CPD, has made provisions for the continuity of the Department's operations in the case of a threat or disaster that impacts the nation and the Federal government's ability to function. In such a situation, USDA agencies will work through CPD and in conjunction with FEMA to ensure that essential services are maintained and that disaster support is effectively provided, including ensuring food safety, providing emergency food supplies in shelters, construction and/ reconstruction of facilities damaged by the disaster, and disaster assistance through the Supplemental Nutrition Assistance Program (SNAP).

Through the Partners process, USDA staff has begun sharing information with CBOs on CPD and USDA disaster response mechanisms that were previously unclear.

The longstanding CBO recommendation that a Farmworker Coordinator position be created was finally endorsed when Congress implemented the CBOs' proposal in the 2008 Farm Bill. Section 14013(f) establishes a Farmworker Coordinator to ensure access to services and support for low-income migrant and seasonal farmworkers in disaster and other programs, details responsibilities, authorizes funding for this position, and specifies that the position be located within OAO.

Section 14013(f)(2)(A), Administration of Emergency Grants to Assist Low-Income Migrant and Seasonal Farmworkers, assigns responsibility for administering this emergency grants program to the Farmworker Coordinator.

The 2008 Farm Bill also made substantive changes in the structure of USDA disaster programs. A permanent agricultural disaster assistance trust fund would replace ad hoc disaster responses, with several programs designed to comprehensively address agricultural disasters across the nation:

∞   Section 12033, Supplemental Revenue Assistance Payments (SURE), calls for fair and equitable coverage for whole-farm crop losses due to natural disasters.

∞   Producers are required to purchase crop insurance or NAP in order to be eligible for disaster assistance, but fees are waived for SDFRs who file required paperwork. Producers who are otherwise ineligible may exercise a buy-in waiver by paying a fee. Those carrying higher levels of insurance will be eligible if they make higher payments.

∞   The section also authorizes a buy-in waiver for the Supplemental Agricultural Disaster Assistance Program (SADA) that allows farmers and ranchers who would otherwise be ineligible for the new disaster assistance programs to become eligible by paying a fee.

Section 12033 further fills many gaps in coverage with new programs that could benefit SDFRs and provide continued work for farmworkers:

∞   The Livestock Forage Program extends assistance for livestock forage to ranchers located in a county that is experiencing a severe, extreme, or exceptional drought condition.

∞   The Orchard and Nursery Tree Assistance Program provides compensation to allow specialty crop farmers to replant trees and vines that have been destroyed by natural disasters such as hurricanes, freezing rain, or severe temperatures.

∞   The Livestock Indemnity Program provides indemnity payments to ranchers whose livestock are lost due to disasters such as extreme heat, blizzards, or hurricanes.

∞   The Emergency Assistance for Livestock, Honeybees, and Farm Raised Fish addresses unique disasters not adequately covered by any other program, including unique or isolated disasters such as floods, tornadoes, hurricanes, or colony collapse disorder.

Section 15101, which establishes SADA, also requires all producers to obtain crop insurance for insured commodities or to pay administrative fees for NAP. The section contains a purchase requirement waiver for SDFRs and BFRs that waives the fees for their participation in the program, but they must still file appropriate paperwork.

## DEFINING CHANGE

Change would mean that SDFR's and farmworkers are recognized as an important and growing part of America's food and agriculture system and an economic engine for their communities. A coordinated and effective emergency preparedness and response system would address the unique needs of this important sector, rather than having a "one size fits all" approach.

USDA disaster programs would equitably address the needs of SDFRs, and tools would be in place to reduce their vulnerability to disasters. Adequate resources and technical assistance would be available to CBOs serving SDFRs and farmworkers.

## ISSUE # 9:  RURAL DEVELOPMENT

## PROBLEMS RAISED IN THE PARTNERS PROCESS

The Rural Development (RD) mission area of the U.S. Department of Agriculture (USDA) has not built a strong enough relationship with community based organizations (CBOs) to ensure that socially disadvantaged farmers and ranchers (SDFRs), their communities, Indian tribes, and farmworkers have access to the full range of RD services that they need.

Current and proposed programs and priorities suggest that RD is increasingly divorced from agriculture. At the same time, rural-based agricultural businesses and value-added enterprises that serve SDFRs, Indian tribes, and farmworkers need access to RD services in order to succeed.

CBOs representing SDFRs and their communities feel that they have not received the amount of information and assistance they need to successfully access and participate in RD programs, nor have they received the same standard of service provided to others.

RD lacks programs tailored to the needs of SDFRs and their businesses, especially access to credit and the building of marketing infrastructure. Stringent requirements for matching funds pose a disproportionate burden on to SDFRs, who already suffer from a lack of capital and investment. At the time of the August 2008 Partners meeting, RD had not implemented the transparency and accountability requirements of Section 10708 of the 2002 Farm Bill, nor had it reviewed the data it had collected with the CBOs to make improvements in the access SDFRs have to its services.

For the most part, SDFRs have not had access to value-added grants and related resources from RD. The criteria for these grants are written in a way that favors large-scale farmers, ranchers, and cooperatives. The grant review process for many RD programs are also biased against SDFRs. Reviewers and state level personnel don't know the socially disadvantaged communities in their areas and/or don't want to share resources with CBOs and SDFRs outside their own personal and professional networks. For example, programs with the notice of funds availability (NOFA) system may work with multifamily housing because of the formal review process, but programs such as community facility loans and grants continuously accept applications but lack a clear and accountable review process. (See Issue # 6, Access to USDA Grant and Cooperative Agreement Programs for additional detail on grant related issues).

The dominant perception in USDA that SDFRs and CBOs can successfully access funds with training to improve grant-making skills is false. Recommended changes to grant programs, including measures to ensure equitable representation of SDFRs in peer review processes, have not been implemented. The lack of support for technical assistance delivered by CBOs and the limited assistance provided to SDFRs directly from RD also contribute to gaps in service to SDFRs. So does the lack of support

dedicated to CBOs from USDA, which means CBOs cannot maintain trained staff with adequate time to successfully write and submit grants. Many rural CBOs do not have access to high-speed broadband and thus find it difficult to respond to growing requirements for online submissions for loans, applications, and extension services.

Indian nations and farmworkers' communities lack access to critical infrastructure to meet basic needs. The Federal government often overlooks farmworkers and their needs for financial and medical relief during natural and manmade disasters. Farmworkers often live in substandard housing that cannot withstand extreme weather conditions, such as hurricanes (see Issue # 4, Farmworkers, USDA, and U.S. Agriculture).

The following systemic concerns were also identified:

- ∞  Staff at RD field, state, and headquarters offices lacks diversity and adequate cultural sensitivity.

- ∞  Not enough publications are available in languages other than English.

- ∞  The location of some field offices restricts SDFRs' access to services.

## AGENCIES AFFECTED

RD, as well as AMS, ARS, CSREES, ERS, the Farmworker Coordinator, FSA, FSIS, NASS, NRCS, and OAO

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

 In many states, there is no effective partnership between RD and the CBOs, who do not receive the same standard of service as other RD constituents.

RD's role in rural economic development, such as value-added businesses and infrastructure, is not being equitably extended to SDFR communities.

USDA is not addressing the perception that RD is divorced from agriculture.

### Recommended Actions

9.1) When the President appoints the new state directors of RD, he should select a diverse group of people who are committed to building relationships with SDFRs, Indian tribes, and farmworkers and ensuring equity in RD programs in their respective states.

9.2) The diversity of staff at every level of RD should be reviewed with CBOs and made public. Plans to increase diversity should be developed for the national, state, and field offices.

9.3) Productive partnerships between CBOs and RD staff and leaders should be established at every level. RD should work with the CBOs to develop a strategic plan for outreach from the national and state offices, with performance measures for service to SDFRs, Indian tribes, farmworkers, and their communities. RD's Office of Outreach should serve as a focal point for the mission area outreach activity and work with the Office of Advocacy and Outreach (OAO) and counterparts in other USDA agencies.

9.4) The Secretary must take steps to ensure equal access to all RD programs:

> 9.4 a) A baseline assessment of the participation of SDFRs and their communities in RD programs should be undertaken, with the results shared and discussed with CBOs, and actions taken to address gaps in service. Clear goals for improvement should be set.

> 9.4 b) RD must adopt procedures and develop data collection systems that meet the requirements of Section 14006 of the 2008 Farm Bill, and that produce the set-asides for SDFRs established in several RD programs in the bill. The problems that SDFRs and their communities face in accessing these programs should be taken into consideration as new regulations are issued.

> 9.4 c) RD should ensure consistency and equity in all offices, in part by instituting the requirements for a receipt for service or denial of service of Section 14003 of the 2008 Farm Bill.

9.5) RD should relate to American Indian tribes on a nation-to-nation basis and employ the required consultative process as it implements the new authorities related to tribes in the 2008 Farm Bill (see Issue # 2, Equity and USDA's Relationship with American Indian Tribes).

9.6) A consultative process between RD, the Farmworker Coordinator, and CBOs serving the farmworker community should be established to review the adequacy of programs for farmworkers.

9.7) Education materials and outreach should be provided in various languages and through accessible means of communication, such as in large type or by voice for the vision or hearing impaired. Information on new and existing programs and services should be publicized in local rural media.

9.8) RD should work with the CBOs to ensure the adequacy of programs designed to provide broadband access to underserved communities.

9.9) RD needs to work with CBOs to develop a plan to provide grants and services targeted specifically to SDFRs.

9.10)  While producers' education and financial literacy are clearly issues in their access to programs, the biggest problem remains discrimination in program delivery. USDA must recognize that the major factor compromising the ability of CBOs to secure funding

*A Time To Change: Report of the Conversations Assessment Team*                    65
*@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED*

is the absence of general, ongoing support from USDA or any other source that would allow them to train and retain staff with time to focus on grant writing. RD should also earmark dollars and provide separate grant pools to support programs by CBOs and other constituent-friendly groups to provide technical assistance and encouragement to SDFRs to submit proposals.

9.11) RD needs to ensure that SDFRs have equitable access to the Rural Value Added and Rural Cooperative Development Grants. A fair peer-review process should be implemented, with reviewers from socially disadvantaged communities. RD must also collect the data necessary to ensure that the funding set-asides for SDFRs are executed.

9.12) RD should, in consultation with the CBOs, consider a process that allows proposals from SDFRs and the CBOs or cooperatives that represent them to be first evaluated at the state level. Those not funded at the state level should be reviewed in a funding pool at the national level.

9.13) Loan review groups and the review process used for housing grants should be explored as models for other review panels.

9.14) USDA needs to help CBOs provide training and assist SDFRs in creating and maintaining cooperatives. RD needs to better support CBOs and cooperatives by providing technical assistance to help SDFRs meet the legal, record-keeping, and taxation requirements associated with cooperatives.

9.15) RD should work with CBOs to secure additional authority and funding from Congress to help SDFRs develop infrastructure—including packing sheds, processing infrastructure, and refrigerated trucks—so they can meet the requirements of the marketplace. Improving SDFRs' access to venture capital, alternative capital, and micro loans should also be explored as ways to meet infrastructure needs.

9.16) RD should provide program information events of the CBOs, SDFRs, farmworkers, Indian tribes, and underserved rural communities.

9.17) RD should develop a process to fund CBOs' education of SDFRs on RD programs and services, especially with regard to stimulus package funding. In collaboration with the other USDA agencies listed above, RD should work with CBOs to identify and seek funding for "ready to go" projects eligible for stimulus funds.

9.18) RD should use the Appropriate Technology Transfer for Rural Areas (ATTRA) Program to provide information about accessing resources provided in the 2008 Farm Bill and the stimulus package.

9.19) RD should develop disaster response plans with cooperatives and CBOs and ensure that those organizations are used as first responders in their communities. RD should help CBOs and rural communities obtain business and community facility loans in case of disaster, which are available for purposes such as the purchase of fire trucks

and ambulances, and the development of affordable housing and day-care and medical facilities (see Issue # 8, Disaster Preparedness and Response).

## PROGRESS TO DATE

The CBOs recognize that RD has had some success in assisting cooperative and small business development. RD programs have also served farmworkers, and RD has developed some relationships with the farmworker community. Ongoing housing programs, including the successful ones, were not covered in this report but merit review.

The 2008 Farm Bill increased authority for expanded RD programs, providing set-asides and other assistance to SDFRS, American Indian tribes, and farmworkers:

∞ Section 6007, Tribal College and University Essential Community Facilities, provides that the Secretary may not require non-Federal support greater than 5 percent of the total cost of the facility.

∞ Section 6009, Water Systems for Rural and Native Villages in Alaska, reauthorizes the program and authorizes $1.5 million in funding to the Denali Commission to provide assistance to municipalities.

∞ Section 6105, Substantially Underserved Trust Areas (SUTAs), improves utility service on trust areas by making Rural Utilities Service (RUS) loans available with interest rates as low as 2 percent. The section also allows the Secretary to waive nonduplication restrictions and matching funds requirements, and to give the highest funding priority to projects in SUTAs.

∞ Section 6013, Rural Cooperative Development Grants, authorizes grants to nonprofit institutions for establishing and operating centers for rural cooperative development, including multiyear grants for centers with a proven track record of success. The grants may be used to promote and assist the development of cooperatively owned businesses. Appropriations of up to $50 million are authorized for FYs 2008 through 2012. In years when more than $7.5 million is appropriated, 20 percent of the funds must go toward cooperatives serving SDFRs. RD has implemented the set-aside provision and provided a recently closed grant round specifically tailored to cooperatives of small and socially disadvantaged producers.

∞ Section 6016, Appropriate Technology Transfer for Rural Areas, creates a permanent authorization for a national technology transfer program to assist agricultural producers to reduce input costs, conserve energy, diversify their production, and expand their markets through sustainable farming practices. The section authorizes up to $5 million for each of FYs 2008 through 2012.

∞ Section 6202, Value-Added Agricultural Product Marketing Development Grants, reauthorizes the program and requires the Secretary to give priority to projects that increase opportunities for beginning farmers and ranchers (BFRs), SDFRs, and

others to develop new ventures that do not have well-established markets or product-development staffs or budgets. The section provides $15 million in mandatory funds, with authority for appropriations of up to $40 million a year, and includes a 10 percent set-aside for SDFRs and BFRs and priority for technical assistance to underserved areas. Proposed rules for this program were published in October 2008, with comments due by December 2008. The Notice of Funds Available (NOFA) Announcement of Value-Added Producer Grants was published in the Federal Register on Tuesday, September 1, 2009.

∞ Section 6002, Special Evaluation Assistance for Rural Communities and Households (SEARCH), establishes a program to provide predevelopment planning grants to financially distressed communities in rural areas, with populations of 2,500 or less, for feasibility studies, design assistance, and technical assistance for water and waste-disposal projects.

∞ Section 6010, Grants to Nonprofit Organizations to Finance the Construction, Refurbishing and Servicing of Individually-owned House Water Well Systems In Rural Areas for Individuals with Low or Moderate Incomes, provides grants to nonprofit organizations to finance the construction, refurbishing, and servicing of individually owned household-water well systems in rural areas for individuals with low or moderate incomes. The RUS NOFA was published on November 20, 2008, and applications closed on May 31, 2009.

∞ Section 6011, Interest Rates for Water and Waste Disposal Facilities, requires the Secretary to reduce interest rates on loans for water and waste disposal.

∞ Section 6015, Business and Industry Loan Program, provides loan guarantees to establish and support enterprises that process, distribute, aggregate, store, and market locally or regionally produced food products.

∞ Section 6022, Rural Microenterprise Assistance Program, provides loans and grants to nonprofit organizations and Indian tribes to support the development and success of rural microenterprises. A 15 percent match is required.

∞ Section 6110, Access to Broadband Telecommunications Services in Rural Areas, creates a new broadband fund—authorized for up to $25 million per year—to provide loans and loan guarantees for the development of broadband service in rural areas, with priority for areas with no incumbent providers.

∞ Section 6112, Comprehensive Rural Broadband Strategy, requires development, with the Federal Communications Commission (FCC), of a comprehensive rural broadband strategy. RUS and FCC are working together to implement this strategy, and a report is expected in 2009 A fact sheet on the American Recovery and Reinvestment Act (ARRA) broadband investment program was issued by RUS on March 26, 2009.

∞ Section 6206, Study of Rural Transportation Issues, authorizes USDA and the U.S. Department of Transportation (DOT) to conduct a joint study of transportation issues

regarding the movement of agricultural products, domestically produced renewable fuels, and domestically produced resources for the production of electricity for rural areas of the United States and for economic development in those areas. The study is to be presented as a report to Congress not later than one year after the enactment of the 2008 Farm Bill.

∞ Section 6302, Assistance to Housing Assistance Council (HAC), authorizes appropriations to HAC of up to $10 million for FYs 2009 through 2011 for technical assistance, loans, grants, and other activities that expand the capacity of community-based housing-development organizations to undertake community development and affordable housing projects and programs in rural areas.

## DEFINING CHANGE

Change would mean an increase in access to RD programs, and an increase in the number of approved applications for assistance from Indian tribes and SDFRs and their communities.

Change would mean that RD programs are more suitable for small farmers, and the diversity and cultural sensitivity of USDA agencies are measurably improved.  More partnerships between CBOs and   RD state directors would be established.

Change would mean that the peer review process for all RD programs would be fairer and more inclusive. CBOs and the communities they represent would have access to stimulus funds and other budget resources. New energy programs would be implemented and accessible to socially disadvantaged communities. Rural communities would become more viable and prosperous.

## ISSUE # 10:  RENEWABLE ENERGY

## PROBLEMS RAISED IN THE PARTNERS PROCESS

In the 2008 Farm Bill, the stimulus bill, and in emerging multiagency work, the Federal government is rapidly developing new programs and policies to promote renewable energy and better use of energy resources. As with many new and emerging programs, the challenge remains how to give socially disadvantaged farmers and ranchers (SDFRs) and their communities access to these programs.

Concerns over the cost, supply, and security of petroleum, along with awareness of the effects of carbon emissions on the environment have dramatically increased public awareness of renewable energy production. Renewable energy is defined as any form of energy derived from non–fossil fuel sources, such as renewable biomass and wind, solar, and geothermal energy; it is used to produce fuels, heat, and electricity.

The Federal government largely supports greater renewable energy research and development, as well as capital investment in renewable energy production by farmers, ranchers, and small businesses. Indeed, both the steep increase from 1 billion gallons of domestic ethanol produced in 2000 to the current level of 6 billion gallons per year and the current administration's goal of having 20 percent of the country's energy supply come from renewable sources are dramatic indications of the successful expansion of domestic production of renewable energy.

Diversification of American agriculture to include the production of renewable energy presents many opportunities and challenges. Renewable energy opportunities are dominated by a few big corporations. Most new energy programs have complex requirements. Only a few include specific language designed to make them accessible to SDFRs and the community-based organizations (CBOs) and cooperatives that represent them.

Programs are not tailored to small landowner participation, and program administrators lack knowledge not only of those landowners' needs, but also of the true cost of making renewable energy production financially viable. The U.S. Department of Agriculture (USDA) must work with the SDFRs and CBOs to provide resources to allow SDFRs to quickly gain the expertise they need to access these new programs for the benefit of socially disadvantaged communities.

Other problems raised in the Partners process include:

∞ Energy cost is the biggest budget item in farming, and increased fuel costs have a huge impact on producers' profitability. On-farm applications of wind, solar, biomass, and geothermal energy all need to be looked at, in addition to using ethanol as an alternative energy source.

*A Time To Change: Report of the Conversations Assessment Team*     70
*@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED*

∞ It is essential to conduct further analysis in the near future of the costs and benefits of sources of renewable energy, including their full environmental impact.

∞ New programs are not always accessible to, and do not always benefit, the intended parties.

## AGENCIES AFFECTED

RD, as well as ARS, CSREES, FS, FSA, and NRCS

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

Renewable energy is a new yet important area for SDFRs and most CBOs. USDA needs to consult with the Indian tribes and CBOs in order to identify and address challenges to their participation in the developing field of renewable energy production, and needs to begin working with them to develop strategies for their inclusion. There are concerns that, without proactive efforts by USDA to address resource inequities in existing programs, most CBOs and SDFRs will not be able to participate in energy programs or in the lucrative market for renewable energy, and many SDFRs will be unable to meet their energy needs.

### Recommended Actions

10.1) Monitoring the distribution of funds through the many new 2008 Farm Bill and 2009 Stimulus package programs is essential. The Secretary should ensure implementation of data collection under the transparency and accountability requirements of Section 14006 of the 2008 Farm Bill, and issue reports on the participation of producers and businesses by race, gender, and ethnicity. If SDFRs and the CBOs that represent them do not gain access to programs, the Secretary should take action to investigate why that is the case, and with the CBOs should develop solutions to remove barriers.

10.2) The Secretary should take action to ensure that peer review panels include a critical mass of groups representing, and familiar with the needs of, SDFRs.

10.3) With respect to Section 9011, Biomass Crop Assistance Program, of the 2008 Farm Bill, the Secretary must issue regulations for public comment, outlining how preferences for beginning farmers and ranchers (BFRs) and SDFRs will be implemented.

10.4) The Secretary should ensure that the implementation and regulatory process on energy programs results in a level playing field and provides real access for SDFRs. For example, USDA needs to take immediate remedial actions to remove barriers to SDFRs in Section 9007 of the 2008 Farm Bill, Rural Energy for America Program. The Secretary should consider forming a group of SDFRs, CBOs, and USDA agencies to review issues relating to access to energy programs and policies, and to make

recommendations that will make the programs more accessible.  These should include waivers of matching requirements for grant programs.

10.5) The National Agriculture Law Center and other legal entities serving SDFRs should be engaged to train SDFRs regarding the legal, ownership, and management issues associated with renewable energy development. With CBOs and minority serving educational institutions, these entities should develop programs to ensure that SDFRs are familiar with the legal and ownership issues, including the impact on land tenure and continued access to water, natural resources, surface rights, and all other property and contract rights.

10.6) The CBOs and their legal partners should develop templates of buyer's and preference contracts for selling crops and utility power purchase agreements, and should share and evaluate contracts provided to SDFRs. The Assistant Secretary for Civil Rights (ASCR) should make sure the contracts are equitable, and all regulations should clearly and prominently require recipients' compliance with all applicable civil rights laws.

10.7) USDA needs to work with CBOs, historically black colleges and universities (HBCUs), and cooperatives to develop comprehensive strategies to ensure that SDFRS have enough technical assistance to take advantage of the financial rewards involved in producing renewable energy.

10.8) USDA should create an energy efficiency program and provide grants under it to help SDFRs address environmental issues and produce energy for their farm operations.

10.9) USDA should evaluate the need to secure sources of equity funding for SDFRs and CBOs to cover startup costs. USDA should develop strategies to either waive matching requirements or ensure that SDFRs and CBOs have access to sources of funding to meet the required match.

10.10) USDA should work with SDFRs to develop sustainable production of ethanol in addition to corn and should consider subsidizing oil prices to help small and underserved farmers and ranchers pay for fuel.

10.11) USDA should consider creating certification programs for renewable energy production and establishing biomass zones similar to empowerment zones. It should contract with the Small Business Administration (SBA) to create sole source power purchase opportunities for small farmers, to help regions develop alternative energy sources and create new businesses using many types of renewable energy, such as solar, wind, biomass, geothermal, hydroelectric, and ocean (tidal, wave, current, and thermal) energy.

## PROGRESS TO DATE

Renewable energy today has endless possibilities. SDFRs have shared success stories in reducing the impact of the high cost of fuel on their family farm operations. One family that moved to biodiesel production reduced its annual fuel cost from $24,000 to $1,000, after developing its first reactor to convert cooking oil to biodiesel. The family is working to set up its farm as a demonstration project that other small-scale and limited-resource farmers can use as a model.

The CBOs worked to include set-asides for socially disadvantaged communities in farm bill energy programs, with modest success. The following is a summary of the substantive new authorities found in the 2008 Farm Bill, and the status of these programs.

∞ Section 9002, Biobased Market Program, creates a Federal procurement program and a voluntary labeling program for biobased products, with mandatory funding of $1 million for FY 2008 and $2 million per year from FYs 2009 through 2012. Additional appropriations of $2 million per year, from FY 2009 to 2012, are authorized.

∞ Section 9003, Biorefinery Assistance, establishes loan guarantees for the development, construction, and retrofitting of commercial-scale biorefineries, and grants to help pay for the development and construction costs of demonstration-scale biorefineries. Mandatory funding of $75 million in FY 2009 and $245 million in FY 2010 is provided for pilot projects, facility conversions, and feasibility studies related to biomass conversion, with authority for an additional $150 million in appropriations for each of FYs 2009 through 2012 for both demonstration- and commercial-scale biorefineries.

∞ On January 16, 2009, USDA approved a conditional commitment for an $80 million guarantee for a cellulosic ethanol plant in Soperton, GA. Having received an earlier grant from the U.S. Department of Energy (DOE), the plant is under construction. A second application for a guaranteed loan for $25 million for a commercial-scale biorefinery plant was approved on June 24. An additional $245 million in budget authority from the 2008 Farm Bill, which would support about $691 million in loan guarantees, becomes available in FY 2010. Pending actions include the development of ongoing regulations, and a notice of funds availability (NOFA) to make funding available for FY 2010.

∞ Section 9004, Repowering Assistance, provides payments to biorefineries that were in existence at the time the 2008 Farm Bill was passed to convert their operations from fossil fuels to renewable biomass. Funds of $35 million were provided for FY 2009 and will remain available until exhausted. Additional funding of $15 million per year is authorized from FYs 2009 through 2012. A NOFA was published in the *Federal Register* on June 12, 2009, making up to $20 million available for projects for the conversion of biorefinery heating and power systems to renewable biomass. The remaining $15 million in mandatory funding will be available in FY 2010.

*A Time To Change: Report of the Conversations Assessment Team*
@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED

73

∞ Section 9005, Bioenergy Program for Advanced Biofuels, provides payments to eligible agricultural producers to support and ensure expanded production of advanced biofuels. Mandatory funds of $55 million are provided in FYs 2009 and 2010, $85 million in FY 2011, and $105 million in FY 2012, with authorization for additional funds of up to $25 million per year for FYs 2009 through 2012. A notice of contract proposals (NOCP) for $30 million to make payments to biorefineries for the production of advanced biofuels (other than kernel corn starch) was published in the *Federal Register* on June 12, 2009. The remaining $25 million in mandatory funding will be available in FY 2010.

∞ Section 9006, Biodiesel Fuel Education Program, provides competitive grants to assist farmers, ranchers, and small rural businesses to increase energy efficiency and use renewable energy. It removes oil refiners, auto companies, and fleet owners as targeted entities and provides $1 million for each of FYs 2008 through 2012. The $1 million in funding available for FY 2008 has been obligated by the Cooperative State Research, Education, and Extension Service (CSREES) to the National Biodiesel Board and the University of Idaho. CSREES awarded continuation grants for an initial period of one year and agreed to support the project for a predetermined period continent on the availability of appropriated funds and the satisfactory progress of the project. If these criteria are met, additional support will be provided for FYs 2009 through 2012.

∞ Section 9007, Rural Energy for America Program (REAP), expands and renames the program formerly called the Renewable Energy Systems and Energy Efficiency Improvements Program. The program promotes energy efficiency and renewable energy development for agricultural producers and small businesses through grants for energy audits, renewable energy development assistance, and financial assistance for energy efficiency improvements and renewable energy systems. The section makes hydroelectric source technologies eligible and increases loan limits. Mandatory funds of $55 million for FY 2009, $60 million for FY 2010, and $70 million for FYs 2011 and 2012 are provided, with authority for additional funds of $25 million per yearfor FYs 2009 through 2012.

o A notice of solicitation of applications (NOSA), soliciting applications for about $2.4 million in grants for energy audits, was published in the *Federal Register* on March 11, 2009. A NOSA for the remaining portion of the $60 million available for FY 2009 (including $5 million from the Omnibus Appropriations Act and $55 million from the 2008 Farm Bill) was published in the *Federal Register* on May 26. This funding may be used for guaranteed loans and grants for feasibility studies, and a wide range of energy-efficiency improvements and renewable-energy systems. Although the April 15 deadline for reserving a portion of the REAP funding for energy audits has passed, Rural Development (RD) plans to consider applications for such audits along with all other applications received. REAP is limited to agricultural producers and rural small businesses. Current regulations do not allow REAP funds to be used in nonrural areas. However, RD plans to change its regulations to

allow agricultural producers in nonrural areas to qualify for REAP funds beginning in FY 2010.

∞ Section 9008, Biomass Research and Development Initiative (BRDI), provides competitive grants, contracts, and financial assistance to eligible entities to carry out research on and development and demonstration of biofuels and biobased products, and the methods, practices, and technologies for their production. The bill provides $20 million in mandatory funds in FY 2009, $28 million in FY 2010, $30 million in FY 2011, and $40 million in FY 2012, with authorization for additional appropriations of up to $35 million per year for FYs 2009 through 2012.

  o An announcement of the availability of $25 million in funding ($20 million from the 2008 Farm Bill and $5 million from DOE) was made on January 30, 2009. The deadline for submitting preapplications has passed, and those received are being evaluated.

∞ Section 9009, Rural Energy Self-Sufficiency Initiative, provides grants to enable eligible rural communities to substantially increase their energy self-sufficiency, with authority for funds of $5 million per year, from FY 2009 to FY 2012.

  o Implementation progress includes preparation of a decision memo currently being drafted by the Under Secretary for Rural Development to determine what will be considered an "eligible project" and what will be considered an "eligible rural community." Delivery to the Office of Budget and Program Analysis (OBPA) is expected by September 1, 2009, but the program has no mandatory funding. It authorized for discretionary funding of $5 million for each fiscal year 2009-2012.

∞ Section 9010, Feedstock Flexibility Program for Bioenergy Producers, provides funds to subsidize the use of sugar for ethanol production through Federal purchases of surplus sugar for sale to ethanol producers. The program is on standby status until the Commodity Credit Corporation (CCC) acquires an inventory of sugar.

∞ Section 9011, Biomass Crop Assistance Program (BCAP), establishes a program to encourage the sustainable production of energy, and provides financial and technical assistance for operators of eligible cropland who produce eligible crops in a defined project area. A BCAP project area must have specified boundaries, be located within an economically practical distance from a biomass conversion facility, and include a producer able to supply the biomass needed by that facility. The program, to be implemented by the Farm Service Agency (FSA), requires that the Secretary consider the participation rates of BFRs or SDFRS in the project as a criterion in selecting BCAP project areas. Mandatory funding of "such sums as are necessary" is provided for each of FYs 2008 through 2012 for projects sponsored by a group of agricultural producers or a biomass conversion facility that pay producers to establish perennial or annual crops (not including

commodity program, noxious, or invasive crops) or trees destined for a biomass conversion facility. Certain land, such as "native sod" and land enrolled in reserve programs, is not eligible. Matching funds of up to $45 per ton are included for collection, harvest, storage, and transportation of eligible material to a biomass conversion facility, and support may be used to establish and produce crops for conversion to bioenergy. FSA is working on a two-track approach to develop BCAP. Portions of the program that provide payments for the collection, harvest, storage, and transfer of eligible biomass were implemented in a NOFA that was published in the *Federal Register* on June 11, 2009. FSA will continue to develop implementing regulations for the remaining portions of the program, which provide payments for the use of such biomass in the production of biofuels.

∞ Section 9012, Forest Biomass for Energy, authorizes the Forest Service (FS) to conduct a comprehensive research and development program to use forest biomass for energy. FS, other Federal agencies, state and local governments, Indian tribes, land-grant institutions, and private entities are eligible to compete for program funds. Priority research areas include the use of low-value forest biomass for energy through programs to reduce hazardous fuels and increaseforest health, integrated production of energy from forest biomass into biorefineries or other existing manufacturing facilities, the development of new transportation fuels from forest biomass, and improved growth and yield of trees for renewable energy production.

 o FS has begun implementation- a Catalogue of Federal Domestic Assistance (CFDA) description was submitted. No funds have been appropriated for this program.

∞ Section 9013, Community Wood Energy Program, provides grants to state, local, and tribal governments to develop community wood energy plans and to acquire or upgrade wood energy systems. The program encourages and demonstrates the use of community wood energy plans for public facilities or community-wide energy systems, promoting the use of biomass wastes from forestry hazardous fuel reduction and forest health projects, catastrophic weather events, and woody debris from municipal landfills; it also helps FS accelerate the development and use of new technologies to utilize these resources more productively. This program, which helps public entities use this local source of renewable energy as a viable addition to their overall community energy plan, authorizes funds in the amount of $5 million per year from FY 2009 through FY 2012.

 o Delegation from the Secretary to FS to administer the program is in place, but direct funding to implement it has not been provided as authorized. FS is pursuing the program's implementation, using funding from its overall state and private appropriation. An agency working group is developing a work plan for the Community Wood Energy Program, coordinating with RD to ensure that the new program is complementary with other biomass energy programs administered by RD. Separately, FS has awarded $49 million in funding from

the American Recovery and Reinvestment Act (ARRA) for funding wood-to-energy projects.

## DEFINING CHANGE

Change would mean that SDFRs, Indian tribes, cooperatives, and small businesses would participate on an equitable basis in new and emerging energy programs, with access both to the programs' full benefits and to support for achieving greater energy efficiency and commercial energy production. Change would also mean that alternative fuel production would not in any way hinder the production of affordable food crops.

**ISSUE # 11:  CONSERVATION AND FORESTRY**

<u>**PROBLEMS RAISED IN THE PARTNERS PROCESS**</u>

Although the Natural Resources Conservation Service (NRCS) has made improvements in its field operations, challenges remain in the conservation and forestry programs of the U.S. Department of Agriculture (USDA).

Additional support and services are needed at the state and district levels to ensure that socially disadvantaged farmers and ranchers (SDFRs) have access to the complex array of programs. For example, SDFRs will require special support to meet the eligibility requirements of the Conservation Stewardship Program; otherwise, new set-aside criteria will not be met.

While the Environmental Quality Incentives Program (EQIP) has the potential to benefit SDFRs, community-based organizations (CBOs) have reported that their participation in it has been hampered both by prohibitive cost share rates and the requirement that funds be invested up front for the installation of conservation practices covered under the program for later reimbursement.

While NRCS has improved diversity and program access, SDFRs in many places continue to face barriers to participation in conservation and forestry programs, services, and activities. Some problems come from the statutory authority for programs, while others are related to ineffective program delivery and lack of public notification and agency accountability. Producers must register with the Farm Service Agency (FSA) to be eligible for NRCS programs that provide payments, and the unwillingness of many producers to enter offices of FSA—because of previous negative experiences—remains a barrier.

Moreover, NRCS local staff and committees in some areas remain linked to what many SDFRs describe as the "old boys' network," an insider network. SDFRs report that local NRCS offices do not routinely provide information on many programs. When SDFRs learn about programs' benefits—such as new benefits for those producers in the 2008 Farm Bill—from CBOs, local NRCS staff sometimes refuse to acknowledge that they know anything about them.

The Forest Service (FS) has a long history of employment discrimination that has not yet been fully resolved. SDFRs have shared with CBOs their concern that grazing permits on FS land are handed down within the same families, and that SDFRs are generally excluded from access to grazing rights. Relationships between CBOs and FS, state foresters, and other FS staff have not been developed in most regions, and SDFRs are unfamiliar with many FS programs.

The following concerns have also been raised:

∞ USDA's consultative process with Indian tribes needs strengthening, especially with respect to FS.

∞ USDA employees from headquarters to the field level are not held sufficiently accountable for their inequitable treatment of SDFRs.

∞ Outreach is not a priority in USDA's strategic plans, and those who are responsible for conducting effective outreach lack adequate authority and resources.

∞ Local field offices are not accessible to all SDFRs.

## AGENCIES AFFECTED

FS and NRCS, as well as FSA and RD

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

The USDA agencies in this mission area are not held to acceptable standards of cultural sensitivity.

Challenges remain in overly complex program criteria and requirements, and in the need to equip SDFRs, Indian tribes, farmer cooperatives, and producer associations such as acequias with the skills they require to successfully access USDA programs.

### Recommended Actions

11.1) Partnerships between CBOs and state conservationists and foresters should be expanded, including collaboration with the NRCS civil rights committee.

11.2) FS should review NRCS accomplishments in achieving diversity and changing culture, and expand the relationships FS has begun building with CBOs, SDFRs, and landowners.

11.3) Natural Resources and the Environment (NRE) should provide reports on staff diversity by grade for all levels—i.e., national headquarters and regional, state, and field offices—and recommend strategies for minority recruitment and leadership development that will enable its employees to effectively serve multicultural communities and groups.

11.4) NRE should improve employee accountability measures to enhance program outreach efforts at all levels. Outreach and transparency and accountability results should be included as critical elements of performance reviews when staff are evaluated, and staff at the local levels should be promoted according to their ability to work with diverse constituents and their success in including SDFRs in programs.

11.5) NRE agencies should work with CBOs, conservation districts, state forestry agencies, and state technical committees to develop joint outreach priorities and implement the many tools in the 2008 Farm Bill that can help SDFRs participate equitably in conservation and forestry programs.

11.6) NRE should disseminate information about programs and other opportunities to CBOs in a timely fashion, beginning by developing a database of CBOs, communities, tribes, and other organizations.

11.7) NRCS and FS should develop and implement plans, with input from the CBOs, to reach potential beneficiaries who speak languages other than English, in accordance with the Limited English Proficiency (LEP) program of the U.S. Department of Justice (DOJ). The agencies should invest in state-of-the-art translation equipment and hire multicultural translators.

11.8) FS should work to expand CBOs' knowledge about forestry programs, opportunities, and issues. FS should increase awareness of the need to preserve forests by making the public more aware of forestry programs—for instance, by providing forestry camps for children.

11.9) NRCS and the CBOs should work with FSA and, if necessary, with the Assistant Secretary for Civil Rights (ASCR) to address areas where FSA services and culture need improvement.

11.10) NRCS should work with the CBOs to increase the number of certified technical service providers who are SDFRs or staff of the CBOs that represent them, to make sure that SDFRs have the level of technical support needed to qualify for NRCS programs.

11.11) The following 2008 Farm Bill provisions should be fully implemented expeditiously:

   11.11 a) NRCS and FS should institute the receipt for service or denial of service, as required in Section 14003.

   11.11 b) Regulations and procedures to collect the data necessary to meet the transparency and accountability requirements of Section 14006 should be implemented to ensure that the set-asides for SDFRs and beginning farmers and ranchers (BFRs) provided in Section 2704 for EQIP and CSP are met.

   11.11 c) All SDFRs should be given the opportunity to clarify their status as SDFRs with NRCS, to ensure their eligibility for increased cost share rates and advance payments of 30 percent of costs in EQIP.

   11.11 d) NRCS and FS should compile and release the data required under Section 14006 to determine how specific conservation funds are spent at the county level,

and what levels of funding SDFRs are receiving, compared to other producers. ASCR should use the results to measure civil rights compliance, and NRCS and FS should work with the CBOs to set shared goals to improve program participation.

11.11 e) NRCS should also report if any CSP acres are not obligated under Section 2704, and if authority provided in the section to repool the acres is used in any state or region. NRCS should work with the CBOs to make sure this authority is not misused in any state or locality, and that additional outreach and technical assistance is provided in areas wherever set-aside requirements are not met.

11.11 f) With respect to Section 2506, regulations should define the term "producer associations" to include acequia associations and should enable both acequias and producer cooperatives to submit EQIP applications on behalf of their members.

11.11 g) With respect to Section 2707, the Secretary should ensure that data on participation rates is compiled and made public to guarantee the inclusion of CBOs, cooperatives, and other organizations that serve SDFRs and Indian tribes.

11.11 h) The Secretary should implement the provisions in Sections 8101-07 designed to provide access to forest land, and to increase cultural respect and equity for Indian nations and people. (See Issue # 2, Equity and USDA's Relationship with American Indian Tribes).

11.12) The Small Farms Initiative, which has been successful in some southeastern states, should be evaluated as a model for reaching small producers, and possibly expanded with an effective accountability system.

11.13) The CBOs and the Office of Advocacy and Outreach (OAO) should work with NRCS to develop proposals to modify conservation programs to reflect SDFRs' type of production and conservation needs. A working group should be established to review the barriers raised by program procedures and requirements to participation by specific groups of farmers and ranchers, especially SDFRs and small acreage producers.

11.14) NRCS should share with farmers—through CBOs and tribal governments—the tools that the conservation districts have developed to assist CBOs, SDFRs, and others address local zoning and urban encroachment issues.

## PROGRESS TO DATE

NRCS is unique among USDA agencies in its commitment to reach and include SDFRs in its programs. NRCS has worked for many years to increase diversity in its workforce at every level, resulting in a more open organizational culture, more-productive relationships with CBOs and SDFRs at every level, and greater willingness to address barriers and problems as they arise.

The Small Farms Initiative implemented several years ago in selected states has achieved good results. The provision of wells and irrigation in the Mississippi River

Delta, for example, has led to the emergence of a community food system that has helped bring fresh, locally grown products to socially disadvantaged communities. The state conservationists also developed a Civil Rights Committee that appears open to collaboration with CBOs.

FS has worked with CBOs in the southeast on innovative programs to expand participation in forestry programs to protect land, while ensuring that SDFRs who use the programs have appropriate legal documents, including wills, to maintain their land tenure. This program should be evaluated for possible replication and expansion. Recent farm bills have provided increased focus on and funding for conservation programs, and have included new authorities in forestry programs in the NRE mission area.

Numerous sections of Title II of the 2008 Farm Bill—drafted and adopted in a collaboration among the CBOs, NRCS staff, and the Senate and House Agriculture Committees—provide new tools and expanded resources to reduce barriers to participation in conservation programs (see Issue # 5, New and Emerging Farmers and Ranchers). The proposals for set-asides in NRCS programs by the previous administration contributed to the ability of the CBOs and Congress to build the support necessary to secure passage of the set-asides.

Specific 2008 Farm Bill provisions that benefit SDFRs include:

∞ Section 2111, Conservation Reserve Program Transition Incentives, provides $25 million over 10 years to facilitate the transition of Conservation Reserve Program (CRP) land held by a retired or retiring owner or operator to BFRs and SDFRs who agree to return some or all the land to sustainable grazing or crop production (see Issue # 5, New and Emerging Farmers and Ranchers).

∞ Section 2202, Maximum Enrollment and Enrollment Methods, recognizes Indian tribes as partners for the Water Enhancement Program and the Wetlands Reserve Program (WRP). The section makes tribes eligible for a 30-year contract (to be valued equivalent to a 30-year easement) and restoration cost-share agreements.

∞ Section 2503, Establishment and Administration of Environmental Quality Incentives Program, authorizes NRCS to provide advance payments of up to 30 percent to SDFRs, BFRs, and limited resource farmers or ranchers in EQIP and increases the cost share rate for SDFRs and BFR up to 90 percent.

∞ Section 2503(g), Funding for Federally Recognized Native American Indian Tribes and Alaska Native Corporations, allows the Secretary to enter into alternative funding arrangements with tribes that meet program goals and objectives and do not exceed statutory limitations on contracts.

∞ Section 2506, Environmental Quality Incentives Program Plan of Operations, allows a forest management or stewardship plan to serve as an EQIP plan of operation, and considers a permit required under a regulatory program to serve as

a plan. The 2008 Farm Bill Statement of the Managers includes a directive to the Secretary to allow producer associations and farmer cooperatives to act on behalf of their members in submitting applications to participate in EQIP.

∞  Section 2704, Assistance to Certain Farmers and Ranchers to Improve their Access to Conservation Programs, reserves 5 percent of total funds made available to carry out EQIP and of total acres made available to carry out CSP for SDFRs, and 5 percent for BFRs. Section 2706, Delivery of Technical Assistance, addresses the need to provide sufficient technical assistance to producers and landowners with non-Federal assistance and lays out a process for the certification of third-party providers. The section gives NRCS an opportunity to conduct training and to increase services to the SDFRs and BFRs who need them most.

∞  Section 2708, Administrative Requirements for Conservation Programs, authorizes the Secretary to provide incentives to participate in any conservation program to BFRs, SDFRs, limited resource producers, and Indian tribes, with some limitations. It also calls for the simplification of application processes to conservation programs to encourage the participation of new applicants, minimizing complexity and redundancy in the application process.

∞  Section 2707, Cooperative Conservation Partnership Initiative, encourages producers to cooperate to enhance conservation outcomes on agricultural and forest land in any conservation program except CRP, WRP, the Grassland Reserve Program (GRP), and the Farm and Ranchland Protection Program (FRPP). Eligible partners include state and local governments, Indian tribes, producer associations, farmer cooperatives, higher-education institutions, and nongovernmental organizations with a history of working cooperatively with producers on the conservation of agricultural and non-industrial forest land. The partners are to be chosen through a competitive grants process for multiyear agreements not to exceed five years.

∞  Section 14001, Improved Program Delivery by the Department of Agriculture on Indian Reservations, authorizes the Secretary to require NRCS and other agencies to establish consolidated suboffices at tribal headquarters on Indian reservations where there is a demonstrated need, and strikes the requirement enacted in 1990 that a tribe must pay for necessary office space if it wishes to participate in the program (see Issue # 2, Equity and USDA's Relationship with American Indian Tribes).

∞  Title VIII, Forestry, Subtitle B, Cultural and Heritage Cooperation Authority, allows the Secretary to implement procedures to work with American Indian tribes to protect cultural items and to strengthen traditional practices, in accordance with the American Indian Religious Freedom Act (see Issue # 2).

∞  Section 8402, Hispanic-Serving Institution Agricultural Land National Resources Leadership Program, establishes a competitive grant program for Hispanic serving institutions (HSIs) to establish an undergraduate scholarship program for Hispanics

and other underrepresented groups pursuing careers in forestry and related fields. NRCS has developed a database of its CBO partners and increased its sharing of information, including hosting several online conferences about the 2008 Farm Bill, with CBOs and other organizations. NRCS's timely and comprehensive dissemination of 2008 Farm Bill regulations and comment deadlines increased the CBOs' ability to submit substantive comments. NRE has also developed a translation and communication plan responsive to the Executive Order on LEP.

∞ Other 2008 Farm Bill implementation results include:

∞ FS is preparing to implement a range of programs that are dependent on the appropriation of funds.  FS is also working with other USDA agencies to establish and fill the Forest Resource Coordinating Committee, which will advise the Secretary on issues related to private forests.

∞ USDA announced a plan to create an Office of Ecosystems Services and Markets and the establishment of a Federal Conservation and Land Management Environmental Services Board to fulfill the Environmental Services Markets of the 2008 Farm Bill. This office and board will assist the Secretary in developing new technical guidelines and science-based methods to assess environmental service benefits, which in turn will promote markets for ecosystem services, including carbon trading to mitigate climate change.

∞ Funding increases for conservation programs implemented for FY 2008 include an additional $200 million for EQIP, $150 million for WRP, and $7.5 million for the Agricultural Management Assistance (AMA) Program.

∞ More than $4 billion in conservation program funding was made available for FY 2009, including $1.8 billion for CRP, $1 billion for EQIP, $570 million for WRP, $100 million for FRPP, and $74 million for the Wildlife Habitat Incentives Program (WHIP). Similar levels are available through FY 2012.

∞ Regulations for eight programs—AMA, CRP, EQIP, FRPP, GRP, Healthy Forest Reserve Program (HFRP), WHIP, and WRP—needed to implement financial awards and payments were published for comment between November 2008 and January 2009, the as were regulations for state technical committees, technical service providers, and the regional equity provisions that directly affect the operation, management, and support of the major conservation programs.

The CBOs have submitted numerous comments about proposed regulations and continue working on comments in response to regulations issued to date.

## DEFINING CHANGE

Change would mean an increase in participation by SDFRs and landowners in conservation and forestry programs to achieve equity and meet the set-aside requirements at the national, state, and local levels for EQIP and CSP.

Change would mean that the CBOs have productive relationships with state conservationists and foresters, and with USDA staff at all levels.

Change would mean that NRE provides all services and programs in an equitable and fair manner. Any problems encountered would be immediately addressed, and there would be an overall increase in positive feedback from CBOs and SDFRs about programs and services rendered. SDFRs would have access to irrigation and other resources they need to expand their production of specialty crops and other fresh products. SDFRs and landowners would have equitable access to FS grazing permits.

Change would mean that these benefits enable SDFRs to improve the sustainability of land and water resources, as well as the economic viability and sustainability of farm and ranch operations, and to expand the supply of quality fresh products in the local food system.

**ISSUE #12: COMMUNITY FOOD SECURITY AND NUTRITION ASSISTANCE**

**PROBLEMS RAISED IN THE PARTNERS PROCESS**

Expenditures on food and nutrition programs comprise the largest share of the U.S. Department of Agriculture (USDA) budget. Currently, however, only 60 percent of those qualified for the Supplemental Nutrition Assistance Program (SNAP) participate in it. Farmworkers have very limited access to nutrition programs despite their critical needs (see Issue  # 4, Farmworkers, USDA, and U.S. Agriculture). Many socially disadvantaged farmers and ranchers (SDFRs) are eligible for food program benefits, but asset limits may restrict their participation.

SDFRs and Indian tribes have limited relationships with key USDA agencies, including the Food and Nutrition Service (FNS) and the Agriculture Marketing Service (AMS), and the ability of these producers to meet the nutritional needs of low-income populations with culturally appropriate foods is undervalued. They lack equitable access to the many USDA resources and programs that purchase and deliver foods (see Issue # 15, Specialty Crop and Access to Marketing Programs). Coordination with Indian tribes was also viewed as inadequate (see Issue # 2**,** Equity and USDA's Relationship with American Indian Tribes).

Barriers to the participation of SDFRs and Indian tribes in food purchasing and other programs include congressional mandates, lack of access to information on relevant programs, the inability to control or impact state and local marketing and purchasing, and the complexity of prescribed emergency response processes. USDA is too rigid in operating many programs, lacks coordination, and lacks accountability in addressing the needs of community-based organizations (CBOs) and encouraging SDFRs' participation. Positive relationships between SDFRs and state-level USDA administrators and state agriculture, nutrition, and related agencies do not exist in most states.

While USDA offers emergency food assistance to communities affected by disasters, including congregate feeding (commodity support) and disaster SNAP, coordination with groups representing SDFRs and farmworkers during emergencies is limited (see Issue # 8, Disaster Preparedness and Response).

The definition of the term "food security" is not clear—does it mean access to food, adequate nutrition, or access to food assistance? Might it refer to other USDA activities, including assurance of production plant safety and security by AMS, or food defense against microbiological terrorist actions as addressed by the Food Safety and Inspection Service (FSIS)?

**AGENCIES AFFECTED**

FNS, as well as AMS, ASA, ASCR, CSREES, the Farmworker Coordinator, FSIS, and OAO

**PENDING CONCERNS RAISED IN THE PARTNERS PROCESS**

SDFRs, farmworkers, and their communities lack adequate access to a secure, affordable, culturally appropriate and nutritious food supply. A stronger connection between SDFRs and consumers in local communities is needed, including support to help SDFRs develop the infrastructure necessary to meet the nutritional needs of their communities and to take advantage of growing market opportunities.

SDFRs and Indian tribes have much to contribute to ensuring a secure, adequate, and affordable supply of nutritious and culturally appropriate food. USDA should recognize that their involvement in this task has great potential to improve the health and economic development of their communities and the viability of their operations.

**Recommended Actions**

12.1) USDA and the CBOs should develop and implement strategies that connect local producers to USDA nutrition campaigns, including SNAP, the Women, Infants and Children Program (WIC) nutrition education, Team Nutrition™, Healthier U.S. Schools, the President's initiative to eliminate childhood hunger by 2015, and other efforts to strengthen the connection between nutrition and agriculture, as well as to promote the importance of locally grown fresh food.

12.2) USDA should establish a single contact point that producers and CBOs can use to obtain assistance and education about food and nutrition programs, and the Department's agencies can use for information about each other's programs.

12.3) The CBOs, FNS, AMS, and the Cooperative State Research, Education, and Extension Service (CSREES) should collaborate to identify and address gaps in food programs related to farmers and ranchers, including changes in authority that sometimes allow farm assets to prohibit eligibility. These agencies and the CBOs should further consider how food program authorities might be changed to increase the relationship between producers and low-income consumers. One suggestion is to use 10 percent of every SNAP dollar to support small producers.

12.4) USDA should, in consultation with the CBOs, develop outreach strategies to ensure that SDFR and farmworker families know the eligibility requirements for programs like SNAP, including a fact sheet on eligibility.

12.5) USDA should work with the CBOs to ensure that SDFRs and their communities gain equitable access to the full range of nutrition-related market opportunities, including farmers markets and farm-to-school programs. USDA agencies like AMS, CSREES, and FNS should provide technical assistance and other resources necessary to help SDFRs meet food safety certification standards to facilitate their access to these markets.

12.6) The Section 14006 Transparency and Accountability requirements should be implemented to measure progress in including SDFRs in community food, farm to school, and related grant programs.

12.7) The dialogue among AMS, FNS, and CSREES to determine the state of farm-to-school efforts should be renewed, and technical assistance provided to strengthen connections between the agencies, the states, and the CBOs to expand markets for SDFRs.

12.8) USDA and the CBOs should develop strategies to improve collaboration with agencies involved in direct marketing—including state departments of agriculture, extension agents, universities, tribal governments, and farmer associations—and to build partnerships with nonprofit nutrition groups such as the School Nutrition Association, in order to ensure that the fruit and vegetable purchase provisions of the 2008 Farm Bill benefit SDFRs.

12.9) USDA should work with the CBOs to secure new opportunities in the upcoming reauthorization of child nutrition programs to expand SDFR and tribal opportunities when meeting children's nutrition needs.

12.10) USDA should ensure enhanced coordination across its agencies regarding SDFR eligibility criteria and provide one-stop shopping, a department checklist of programs and services, and new communications mechanisms, such as webinars, to convey critical information to producers. USDA should also meet the transparency and accountability requirements of Section 14006 of the 2008 Farm Bill and ensure that CBOs and cooperatives representing SDFRs have equitable access to the Community Food Security Program, the SNAP outreach program, and related grant programs.

12.11) USDA should create a pilot program to collaborate with state and local disaster teams and CBOs to develop and test cross-government response under farm-based scenarios for disaster, to supplement local emergency response planning (see Issue # 8, Disaster Preparedness and Response).

## PROGRESS TO DATE

The WIC Farmers Market Nutrition Program (FMNP) expands awareness about and provides access to fresh, nutritious, locally grown fruits, vegetables, and herbs by providing WIC participants with coupons for use at farmers markets. The Senior Farmers Market Nutrition Program (SFMNP) awards grants to states and Federally recognized Indian tribes to provide low-income seniors with coupons for eligible foods at farmers markets, roadside stands, and community-supported agriculture (CSA) programs.

FMNP provides grants to help expand farmers markets, roadside stands, agritourism and other direct producer-to-consumer opportunities. SNAP provides competitive outreach grants for nonprofit organizations to improve access to the program for all

eligible individuals, with a special focus on the working poor, seniors, and legal immigrants.

The 2008 Farm Bill increased authority and funding to improve access to nutrition programs for producers and consumers:

∞  Section 4211, Food Distribution Program on Indian Reservations (FDPIR), explicitly makes tribes eligible to manage food distribution programs and establishes a Traditional and Locally Grown Food Fund, allowing the purchase of bison and other foods designated as traditional or locally grown, requiring that 50 percent of covered foods be produced by Native American farmers and ranchers. The section requires the Secretary to conduct a survey to determine which foods are most desired, and to submit a report to Congress by January 2009 that assesses the nutritional value of the FDPIR food package, describes how foods are selected; and explains plans to update the packages, or if the packages will not be updated, explains why. **This program is subject to the appropriation of funds.**

∞  Section 4302, Purchases of Locally Produced Foods, clarifies that the Secretary shall encourage institutions receiving funds under the National School Lunch Act and Child Nutrition Act to purchase locally produced foods to the maximum extent possible, and to use geographic preference in the procurement of locally produced and unprocessed products.

∞  Section 4402, Assistance for Community Food Projects, reauthorized and provided $5 million in mandatory funding annually for community-based projects that increase the food self-reliance of low-income individuals and communities, and promote comprehensive responses to local food and agricultural needs. One-time projects receive up to $300,000 for up to three years and require a dollar-for-dollar match in resources.  The section also establishes the Healthy Food Enterprise Development Program to provide grants for outreach, technical assistance, and feasibility studies to develop enterprises to distribute and market healthy and locally produced foods to underserved urban, rural, and tribal communities, with mandatory funding of $3 million for FYs 2009 through 2011, and authorization for $2 million for FY 2012.

∞  Section 7311, Specialty Crop Research Initiative, authorizes the Agricultural Research Service (ARS) to award extramural competitive grants to conduct research and extension on plant breeding, genetics, and genomics; invasive species; mechanization; and food safety—including methods to prevent, monitor, detect, and respond to potential food safety hazards in the production and processing of specialty crops—with $230 million in mandatory funding, and authority for an additional $500 million over five years.

∞  In Title IV, the Nutrition Title of the 2008 Farm Bill, the Food Stamp Program was renamed the Supplemental Nutrition Assistance Program (SNAP) and additional changes in funding and authority were included:

- On October 1, 2008, all states implemented mandatory changes that increased the minimum benefit and standard deduction; removed retirement and education savings accounts as offsetting income resources, and combat pay as income, when determining eligibility; and allowed the inclusion of the full costs of child care as expenses. USDA held conference calls with state SNAP agencies, to ensure that SNAP's clients received the full benefit of these changes, and took action to raise awareness of the change in the program's name among the states, CBOs, retailers, current and potential clients, and USDA employees.

- A final rule published on December 30, 2008, implemented changes—effective March 2, 2009—to SNAP retailer policies, requiring stores that have been disqualified or penalized for more than six months to furnish a collateral bond or irrevocable letter of credit to cover the value of benefits that the store may redeem in violation of the 2008 Farm Bill.

The 2008 Farm Bill also contained substantial funding increases for nutrition programs made available soon after the new law was enacted, including:

- The purchase of $390 million in fruits and vegetables in FY 2008 for distribution through domestic feeding programs, with $393 million planned for FY 2009.

- The provision of $40 million for the Fresh Fruit and Vegetable Program for School Year 2008–9, to increase the consumption of fresh fruits and vegetables by children in elementary schools.

- The provision of $21 million in grants to 49 state agencies and tribal organizations for SFMNP for FY 2008.

- The provision of $50 million for the Emergency Food Assistance Program for FY 2008, bringing total distributions to $190 million.

FNS implementation efforts also included providing information about forthcoming changes in other nutrition programs—including FDPIR, SFMNP, the Emergency Food Assistance Program (TEFAP), the Commodity Supplemental Food Program, and the Fresh Fruit and Vegetable Program—to program partners to ensure prompt and complete implementation of the changes.

The American Recovery and Reinvestment Act (ARRA) passed in early 2009 with the following provisions of importance to SDFRs and farmworkers. ARRA provided the following funding increases:

- $20 billion over five years for SNAP recipients, including an increase of $80 in monthly benefits for a participating household of four starting in April 2009; and nearly $300 million to states for SNAP administrative expenses in FYs 2009 and 2010.

∞ $500 million for WIC, including $400 million to support participation in the program should the Secretary determine that costs or participation exceed budget estimates, and $100 million to establish, improve, or administer the program's management information systems to meet new legislative or regulatory requirements.

∞ $100 million for the National School Lunch Program (NSLP) for competitive grants to schools for the purchase of food service equipment.

∞ $100 million to purchase commodities to refill emptying food-bank shelves, and $50 million for administrative functions in TEFAP.

∞ $5 million for FDPIR, for facility improvements and equipment upgrades.

## DEFINING CHANGE

Change would mean increased collaboration among USDA, SDFRs, and underserved communities to meet nutrition needs and expand access to nutrition programs and applicable markets.

Change would mean improved coordination among USDA agencies, led by the Office of Advocacy and Outreach (OAO), and the development of proactive strategies to expand the participation of SDFRs and Indian tribes in community and school food programs, as well as those related to nutrition. The unique capacity of SDFRs to provide culturally appropriate foods in their communities and beyond would be valued and supported.

Change would mean the existence of an improved food system for all USDA constituents and their communities, including SDFRs, farmworkers, rural communities, and Indian tribes. Programs at every level of government would link producers more directly to consumers and work together to ensure an adequate, locally controlled supply of safe, affordable, and nutritious food.

*A Time To Change: Report of the Conversations Assessment Team*                    91
@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED
APP. 000091

## ISSUE # 13:  FOOD SAFETY AND INSPECTION SERVICE

## PROBLEMS RAISED IN THE PARTNERS PROCESS

The U.S. Department of Agriculture (USDA) needs be more inclusive of socially disadvantaged farmers and ranchers (SDFRs) in programs and policies directed toward improving food safety.   SDFRs and Indian livestock producers face many challenges in this area. Most do not own or have access to the necessary infrastructure, their transportation and distribution costs are high, and the requirements of the marketplace are stringent.

In order to be able to access markets, producers require substantive food-safety training and certifications. The cost for certifications is high, but producers who operate without them may face penalties so severe that the producers risk losing their farms.

While the full range of issues related to food safety are of concern to SDFRs, discussion over the years at the Partners meetings involving USDA and community-based organizations (CBOs) has focused on issues related to meat goat production and marketing.

The production and sale of goat meat can be a profitable enterprise for small producers, which is one reason for the steady increase of meat goat producers. However, due to the fact that policies and the marketing infrastructure were designed for large-scale producers, many small farmers are not able to develop a viable and sustainable meat goat operation. In addition, some USDA agencies do not consider meat goat production a priority. Lack of data collection creates misinformation that has an adverse impact on policymaking and SDFRs' access to programs and services.

Additional problems faced by goat meat producers include:

∞  There is no infrastructure equivalent to that used by red-meat producers, such as processing, transportation, and commercial marketing in the retail and distribution sectors, and the inspection certification process is difficult and imposes a great economic burden on SDFRs.

∞  Although there is more demand for meat goat products from federally inspected slaughter plants than there is for products from state inspected plants, federally inspected facilities are not available in many places. Many producers have reported traveling over three hours to get to an inspected slaughter plant.

∞  Lack of access to inspected slaughter plants may cause producers to employ more "backyard" slaughtering practices, which could create public-health problems.

∞  SDFRs often have difficulty qualifying for USDA programs and services, such as the Environmental Quality Incentives Program (EQIP).

∞  Producers lack access to the resources they need to make their operations viable, such as equipment, business plans, feasibility studies, and facilities. USDA programs and services are inadequate to meet current needs and future potential.

∞  Imported meat goat products have an unfair competitive advantage over domestic products.

## AGENCIES AFFECTED

FSIS, as well as other USDA agencies, including AMS, ARS, CSREES, ERS, FNS, FSA, NRCS, OAO, RD, and RMA; and other Federal, state, and local agencies, including EPA and FDA

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

SDFRs, lacking equitable access to traditional commercial markets, often have to produce specialty products, such as meat goats. However, USDA has given little assistance to SDFR meat goat producers in comparison to the support the Department provides for the production and processing of swine, poultry, and cattle. Producers perceive that the lack of USDA support for meat goat producers is because current policies, preferences, and agency outreach strongly favor mega-agribusinesses over small farm and ranch operations.

### Recommended Actions

13.1) The Secretary should make FSIS and OAO responsible for improving the coordination and integration of USDA programs, so that USDA agencies can work effectively and efficiently with the CBOs to address the concerns of meat goat producers. Coordination should also occur with the many agencies beyond USDA that address food safety and goat meat production.

13.1 a) FSIS and the other USDA agencies listed above must make support for meat goat production and marketing a priority, and ensure enhanced data collection in the Census of Agriculture and elsewhere relating to this sector of agriculture as the basis for new policies and programs.

13.1 b) USDA and the CBOs should review policies, positions, and perceptions on meat goat operations to determine what needs to be changed.  Methods should be identified to hold USDA accountable for implementing effective strategies to meet small producers' needs and to address the biases of agencies that do not support the meat goat industry or other programs or markets that predominantly serve SDFRs, with adequate funds.

13.1 c) The Secretary should develop and support appropriate partnership programs with CBOs designed specifically to address the special circumstances of SDFRs.

13.1 d) The program should focus on enhancing production, processing, and marketing and provide technical assistance to help producers to manage risk from seasonal weather conditions like unexpected droughts or excessive rain, and from market conditions or increased energy costs, address unforeseen adverse circumstances like medical expenses, farming accidents, and adverse changes in family circumstances, develop feasibility studies and business plans, and organize cooperatives to reduce expenses and secure processing facilities.

13.1 e) Matching requirements for all current and any new partnership grants to CBOs that serve SDFRs should be eliminated.

13.1 f) USDA should ensure that SDFRs can gain access to "ready to go" program funding and other opportunities that have been in a holding pattern. More support for these local projects would also help create jobs, especially in rural communities.

13.1 g) USDA agencies should work with producers to develop markets and meet the rising demand for nontraditional meat products, including meat goat products. The agencies should actively seek opportunities to work with CBOs and other stakeholders, like the 1890 and 1994 institutions, to create marketing strategies for meat goat producers, especially in Hispanic, Muslim, and other ethnic markets.

13.1 h) Public education campaigns should be developed to address cultural barriers to goat meat consumption, and to increase awareness of goat meat's health and nutritional benefits.

13.1 i) Producers should be encouraged to adopt halal standards to attract more consumers with specific cultural or religious preferences.

13.1 j) USDA and the CBOs should consider creating a partnership or advisory group in the area of meat goat production. This partnership could educate producers about the importance of meeting food safety and other market requirements so that the market for meat goat products can grow and be sustained.

13.1 k) Programs authorized by the Talmadge-Aiken Act should be made available in more states, so that more state inspection establishments are included in Federal programs. This would allow goat meat to be marketed on an interstate basis instead of just an intrastate one.

13.2) Outreach and education activities by FSIS should be expanded to increase producers' awareness of its inspection and surveillance programs, such as the National Residue Program.

13.3) Regulatory policies should be reviewed for adequacy, and changes proposed in policies that are unnecessarily burdensome to small enterprises.

13.4) Problems in some states related to the processing of bison should be reviewed, and administrative solutions should be considered.

13.5) FSIS should consult with the Farmworker Coordinator and farmworker organizations on methods to involve farmworkers in the development of regulations to improve food safety as well as farmworker health and safety.

## PROGRESS TO DATE

FSIS has begun to recognize and respond to the needs of small and socially disadvantaged farmers and ranchers, and to acknowledge the important role that CBOs play in providing technical assistance and training.

∞ It has expanded its collaboration with diverse groups. For example, FSIS's Office of Outreach, Employee Education, and Training (OOEET) recently included small farmers in its outreach and education programs. Since most meat goat producers are small farmers, this should have a positive impact on meat goat production.

∞ FSIS has increased its participation in interagency committees that work directly with CBOs and other stakeholders, including AMS's Farmers Market Consortium and CSREES's Working Women, Working Lands Committee.

∞ FSIS is creating new partnerships with cooperatives and other organizations to support meat goat producers.

∞ The 2008 Farm Bill included several provisions that will benefit SDFRs and other small-scale producers:

    o Section 11015, Interstate Shipment of Meat and Poultry Products Inspected by Federal and State Agencies for Certain Small Establishments, amends the Federal-state cooperative inspection program to allow state-inspected plants with 25 or fewer employees (under certain conditions) to ship products interstate, providing more opportunities for SDFRs to sell their products.

    o Section 11016, Mandatory Inspection of Catfish, requires FSIS to provide inspection activities for farm-raised catfish.

## DEFINING CHANGE

Change would mean that Federal and other government agencies would work with relevant CBOs and other stakeholders to ensure that consumers could easily purchase safe, nutritious, and wholesome meat products from SDFRs in their region.

USDA would provide the necessary support to give SDFRs the resources and expertise to play a significant role in enhancing the share of healthy meat and other products in their communities' food systems. There would be measurable indicators of progress based on accurate data collection, increased funding, and new USDA programs and services tailored to meet the needs of meat goat and other specialty livestock producers.

The bias against goat meat at USDA and other agencies would be eliminated, and technical assistance would be provided so goat meat production would increase. Given a chance, many producers of meat goats and other livestock would expand their businesses and create new jobs. USDA and the CBOs would develop strategies to develop and serve markets.

**ISSUE # 14: NATIONAL ANIMAL IDENTIFICATION SYSTEM (NAIS)**

**PROBLEMS RAISED IN THE PARTNERS PROCESS**

The National Animal Identification System (NAIS) was created in response to outbreaks of major animal-borne diseases such as avian influenza and bovine spongiform encephalopathy (BSE), also known as mad cow disease, with the goal of safeguarding public health. This system has many implications for Socially Disadvantaged Farmers and Ranchers (SDFRs).

Many family farmers and other mid-scale producers oppose the way NAIS is being implemented. Their concerns are shared by SDFRs and are based on the structure of the system, which places the cost and the burdens of risk and liability on the producer rather than on the processors and distributors of animal products, in whose operations most food-borne diseases arise. Producers feel that supporting more localized production and distribution of meat products directly to consumers may better protect public health. Barriers to more localized processing and sales must be addressed (see Issue # 13, Food Safety).

The SDFRs and community-based organizations (CBOs) do not perceive the current NAIS as voluntary. Rather, they feel farmers and ranchers must participate in order to sell animals to the highly integrated processing and distribution system.

If NAIS is mandated in its current form, the responsibility for tracking livestock and produce is placed on producers, including SDFRs and Indian tribes.  Any such farm-based system is likely to be a burden for small-scale operators. While processing and packing industry often funds the tags and tracking systems for large operations, smaller-scale producers must in most cases assume the costs themselves.

The U.S. Department of Agriculture (USDA) and its Animal and Plant Health Inspection Service (APHIS) have emphasized that NAIS is a universal program but a voluntary one, which could greatly benefit both the owners of livestock and the public in emergencies. The CBOs point out that current ID systems are not uniform, and there is no way to integrate or coordinate them in case of a national public-health crisis. These systems may need to change in a mandatory program. If so, USDA must ensure input from all constituents to minimize burdens on producers. Other issues the CBOs feel must be addressed include:

∞   SDFRs want more specifics about the costs and benefits of NAIS. Who will bear the cost of buying the necessary identification materials? If the program requires buying computer chips, where are SDFRs going to obtain the funds to buy them? SDFRs also need to know how and where chips can be scanned, given that their infrastructure is typically modest at best.

∞   Socially disadvantaged groups are particularly concerned about privacy, as many of them have great skepticism and fear of government tracking in general.

Producers' records of vaccines, birth herd, and other information are private in the voluntary system, but if NAIS is made mandatory, producers feel the Freedom of Information Act (FOIA) and Federal policies may require disclosure and make producers liable for health risks that arise after animals and other products leave the farm. Producers also want more information on whether USDA or any other government agency has unlimited access to their premises without authorization.

∞ The CBOs remain concerned about making NAIS mandatory, and what the penalties would be if farmers and ranchers do not register with the program. USDA has stated that there are no plans to make NAIS mandatory, but in states like Wisconsin that require registering, penalties can be imposed for failure to register. Producers want an assessment of potential liabilities and protection from legal risk.

∞ The CBOs want to understand how NAIS might preempt existing state ID programs.

∞ Because state departments of agriculture will determine which local producers will receive NAIS money from USDA to ID animals, the CBOs are concerned that the funds will go disproportionately to large-scale producers.

∞ SDFRs feel that APHIS funds would need to be set aside to ensure that NAIS money reaches them. APHIS has given funds for registering premises to organizations like the Future Farmers of America (FFA), the Pork Board, and the Angus Organization, but similar support has not been given to the CBOs that are trusted by SDFRs. NAIS funds partnerships with CBOs, but those payments are based directly on enrolling a required number of producers, instead of being designated for outreach and education, which would address producers' concerns about the program.

∞ The office of Federal Veterinarian does not always have an impact, since much of its work is done at the state level. If there is a problem there, USDA should get involved.

## AGENCIES AFFECTED

APHIS and FSIS, as well as ARS, ASCR, CSREES, DHS, OAO, and RMA

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

The establishment of NAIS has raised many difficult and important concerns among stakeholders. USDA is not doing a good job of explaining to SDFRs how NAIS actually works, and what its benefits are. The fundamental issues raised in this debate, such as concerns about providing information to the government, any legal implications, and equity in the allocation of costs and benefits between producers and industry, are not

being sufficiently considered and resolved as steps are being taken to implement the system.

**Recommended Actions**

14.1) USDA should discuss with the CBOs the informal outline for implementation of NAIS prepared by the Agricultural Research Service (ARS) before proceeding with the implementation of NAIS, particularly in the case of SDFRs.

14.2) USDA must work with stakeholders to transparently assess who bears the costs and liabilities and who receives the benefits of NAIS. While the protection of consumers is paramount, the Secretary should ensure that there is equity in the allocation of costs and benefits, without undue burdens on SDFRs. The processing and packing industry should assume a fair share of the costs and should not be allowed to avoid liability or transfer it to producers.

14.3) USDA should conduct or update cost-benefit analyses to identify the financial impacts of NAIS on SDFRs who will be required to be in compliance, and study how these impacts could be addressed.

14.4) USDA should clarify privacy and liability concerns. The Federal government contends that some information from private livestock owners cannot be obtained through FOIA, but if the information is considered to be from a business, some of it is available through FOIA. If information is collected at the state level, what is the impact on privacy and liability?

14.5) USDA should include on the NAIS Website information about FOIA in a variety of scenarios, such as case studies on how local, state, and Federal NAIS authorities will respond to requests for information.

14.6) USDA should thoroughly discuss liability issues in future information about NAIS, and make information about those issues available online for full evaluation by producers.

14.7) USDA must do a better job of communicating information about NAIS to the CBOs, their members, and other farmers and ranchers including changes in the 2008 Farm Bill.

14.8) The CBOs, 1890 institutions, Hispanic serving institutions (HSIs), and 1994 institutions should work together to deliver information and materials about NAIS to socially disadvantaged communities. Included should be information about NAIS's purpose, methods, costs, and guidelines for confidentiality.

14.9) Information about NAIS should be publicized in different languages. The media should be used in local educational efforts.

14.10) USDA should use the Appropriate Technology Transfer for Rural Areas Program to help provide information to producers on issues related to NAIS.

14.11) USDA should consult with the CBOs to update allocation of funds for NAIS partnerships.

14.12) APHIS should set aside funds to help CBOs conduct outreach to SDFRs that is specific to APHIS.

14.13) There must be equity and adequate funds for such outreach and education. The Assistant Secretary for Civil Rights (ASCR) should be responsible for ensuring that the transparency and accountability requirements in Section 14006 of the 2008 Farm Bill are met.

14.14) The CBOs need to do a better job as liaisons between their members and USDA, as well as with other farmers and ranchers.

14.15) Tribal veterinarians and governments must be fully consulted with regard to NAIS implementation on tribal lands and with tribal herds and flocks.Tribal farmers and ranchers must be approached as nations, and not simply receive dictates from USDA as if tribal farmers and ranchers are like all others.

14.16) The states should have more input in discussions between CBOs and USDA.

14.17) USDA should expand the veterinary staff, now limited by inadequate resources, and ensure that veterinarians are able to work with diverse farmers and ranchers.

## PROGRESS TO DATE

APHIS has been working with state organizations and CBOs to provide information to animal and livestock owners and has developed an action plan for helping small and socially disadvantaged farmers and ranchers to participate in NAIS. APHIS has hosted several meetings through cooperative agreements to share information with land-grant institutions and communities, including Virginia State University, New Mexico State University, and groups representing socially disadvantaged communities, such as the Texas Mexico Border Coalition, HSIs, and tribal institutions.

APHIS has issued Request for Proposals (RFPs) to provide outreach and assistance to SDFRs concerning NAIS. APHIS set aside $1.8 million to create six cooperative agreements aimed at outreach regarding NAIS in targeted communities.

APHIS is conducting listening sessions to gather producers' comments and concerns, as well as potential ways to create a program those producers can feel comfortable supporting. The listening sessions will include information about NAIS and give the public an opportunity to give testimony or ask program-related questions.

The CBOs have participated actively in this debate, to be sure that the concerns of SDFRs are addressed.

Equity, access, and accountability measures are contained in the 2008 Farm Bill for specified program areas. These need to be implemented with respect to SDFRs' participation in NAIS.

## DEFINING CHANGE

Change would mean that a system is developed that is trusted and seen as fair by family farmers and SDFRs, and that adequate resources are in place to adopt such a system.

Partnerships between USDA, the states, and the CBOs would be established and maintained to the benefit of SDFRs as well as other farmers.

More assessment and dialogue would occur, to develop goals for food safety and to ensure that liability is allocated appropriately and responsibility placed at the appropriate levels of the food system to ensure the safety of the food supply.

**ISSUE # 15: SPECIALTY CROPS AND ACCESS TO MARKETING PROGRAMS**

<u>**PROBLEMS RAISED IN THE PARNERS PROCESS**</u>

Consumer demand for organic, specialty, and locally and sustainably grown foods in the United States is rapidly expanding. Despite this expansion, community-based organizations (CBOs) have raised the concern that socially disadvantaged farmers and ranchers (SDFRs) lack real access to many of these markets.

According to the U.S. Department of Agriculture (USDA), almost one-third of cash receipts for U.S. crops come from specialty crops, such as fruits, vegetables, and tree nuts. The proportion of cash receipts from this sector is one-half when floriculture, greenhouse, and nursery crop sales are included. In 2002, data from National Agricultural Statistics Service (NASS) showed that SDFRs operated 11 percent of specialty farms and white farmers operated 89 percent. Specialty crops are produced on 21 percent of the farms operated by SDFRs, but on only 9 percent of the farms operated by white farmers. SDFRs are a significant portion of specialty crop producers, but they feel that large retailers dominate the sector, and that there is a lack of investment in increasing their ability to access specialty crop markets of all types.

The 2008 Farm Bill greatly increased resources to purchase fresh food and vegetables for nutrition programs, but an opportunity was missed because the new policies did not include enough measures giving preference to the locally produced products preferred by consumers, or recognizing the special role SDFRs, represented by CBOs, can play in providing culturally appropriate foods in schools. In addition, alternate and direct markets such as farmers markets and community-supported agriculture (CSA) are often concentrated in more-affluent population centers and are unavailable in areas where nutrition needs are greatest.

The potential and the needs of immigrant farmers must to be addressed. Immigrant farmers and ranchers are revitalizing farmers markets with ethnic vegetables and possess extensive knowledge and skills from all over the world.

CBOs also raised concerns about improving the condition of farmworkers, many of whom are concentrated in the specialty crop industry. The CBOs cited the lack of attention to enforcement of fair labor and other standards in the often large-scale specialty crop sector, which now receives increased Federal support but is held to no greater accountability for its treatment of workers.

Other issues raised include:

∞  Access to seeds is more limited and biodiversity is declining because industrial agriculture is producing many kinds of seeds that do not reproduce and cannot be saved for future use.

∞  Access to electronic benefit transfer (EBT) systems that allow Supplemental Nutrition Assistance Program (SNAP) and Women, Infants and Children Program (WIC) coupons to be used at farmers markets vary from state to state. For example, in California, EBT machines are free to use at farmers market, but some farmers markets don't want to manage them or can't afford to pay someone to manage them.

∞  SDFRs face special challenges, such as:

    o  Lack of access to financial support for infrastructure, other resources, and technical assistance to move from conventional to organic agriculture.

    o  Less training in completing the financial records essential to accessing USDA programs and insurance coverage. Each new market requires a new business plan, a new financial management approach, and a new assessment of risk and liabilities.

    o  Limited access to product liability and other insurance, and higher insurance costs because of differences in the products being marketed and the experience of the producer.

    o  Lack of coordination of USDA support and services for socially disadvantaged specialty crop producers and for the CBOs that are their primary sources of technical assistance.

## AGENCIES AFFECTED

AMS, as well as ACSR to ensure transparency and accountability; CSREES, RMA, NRCS, OAO for training, grants, and related technical assistance programs; FSIS for food safety issues; FNS for WIC and related food access programs; and many other USDA agencies

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

As the 2008 Farm Bill programs and policies concerning specialty crops, nutrition, and related issues are implemented, states and the specialty crop industry are not conducting the outreach necessary to ensure that SDFRs who produce specialty crops have the support they need to access markets, and that the needs of farmworkers are being met. It is unclear whether the states and the specialty crop industry are being held accountable by USDA.

### Recommended Actions

15.1) USDA should proactively utilize 2008 Farm Bill and other authorities to improve access of SDFRs to specialty crop programs.

15.1 a) When implementing Section 10109, Specialty Crop Block Grants, which provide increased funding to enhance the competitiveness of specialty crops, the Secretary must set in place application and review requirements to ensure that states take into consideration the needs of socially disadvantaged producers. The Secretary should require the states to respond to the transparency and accountability requirements in Section 14006 of the 2008 Farm Bill in reporting how funds were used.

15.1 b) With regard to Section 10301, the National Organic Certification Cost-Share Program, the Secretary should ensure that SDFRs receive sufficient support to secure organic certification and that regulations for this program consider SDFRs' needs, and require 14006 reports to include the participation of producers by race, gender, and ethnicity.

15.1 c) The Secretary should also require and make public Section 14006 reports with respect to the participation of SDFRs, organizations, and businesses in the Section 10403 Grant Program to Improve Movement of Specialty Crops, and in the allocation of funds to purchase fruits, vegetables, and nuts to provide nutritious foods for use in domestic nutrition assistance programs under Section 4404.

15.1 d)  USDA should ensure that Section 10103, Inclusion of Specialty Crops in Census of Agriculture, is implemented with adequate support to reach SDFRs who produce specialty crops, and that these data are used to develop goals to track national progress in engaging the 11 percent of specialty crop producers who are SDFRs in this and all other specialty crop programs.

15.1 e) With respect to nutrition programs, the special role that SDFRs can play in providing culturally appropriate food needs to be recognized and fostered in the regulatory process, and in outreach and technical assistance efforts.

15.2) USDA must recognize that specialty crop production and the standards relating to it profoundly affect farmworkers.

15.2 a) Farmworkers should be included as partners, not objects, when organic and food safety standards are reviewed and updated. When any standard beneficial to consumers is considered for adoption, its effect on the workers closest to production should also be assessed.

15.2 b) The Farmworker Coordinator should be engaged in all rule-making efforts in these areas, and should ensure that CBOs and farmworkers are consulted and given the opportunity to provide input.

15.2 c) USDA and the CBOs should work to secure participation by farmworker representatives on the National Organic Standard Board and other related boards and committees.

15.2 d) The Agricultural Marketing Service (AMS) should build productive and equitable partnerships with CBOs and take time to learn and understand their views.

15.3) The Office of Advocacy and Outreach (OAO) should conduct an inventory of all USDA programs, including outreach and technical assistance resources, and work with AMS and other USDA agencies to develop focused programs and strategies to help CBOs acquire the resources they need to deliver technical assistance to SDFRs and ensure that they are able to access markets. Such assistance should give SDFRS the capacity to:

15.3 a) Establish entities appropriate to their agricultural and value-added businesses and organizations, which may include sole proprietorships, cooperatives, partnerships, corporations, and limited liability companies.

15.3 b) Develop the capacity to meet the increasing food safety requirements associated with being in any market. Meet legal requirements with respect to their rights, duties, and responsibilities as producers in the marketplace, and certification and licensing requirements and quality standards such as good agricultural practices, good handling practices, and trace back certification.

15.3 c) Develop new markets and make good business decisions with respect to the challenges and opportunities created by these markets by using Internet-based and other tools necessary to improve their skills in market economics, market analysis, risk analysis, financial management related to new markets, and all other associated tools and knowledge necessary to succeed in new markets.

15.4) AMS, the Food and Nutrition Service (FNS), OAO, the Risk Management Agency (RMA), other USDA agencies, and CBOs should collaborate to:

15.4 a) Develop strategies to enhance CBO participation in the Farmers Market Promotional Grant Program, nutrition programs, and all related programs.

15.4 b) Assess the need for and create new insurance tools (crop and general liability) to ensure risk protection for producers as they access new markets and provide increased access to organic production.

15.4 c) Provide information and assist cooperatives to obtain liability insurance for those who are or desire to be cooperative members.

15.4 d) Find resources or development programs to help SDFRs and their organizations and cooperatives invest in new infrastructure (such as packing sheds, processing plants, freezing and storage equipment, and transportation) to support new market access, and use AMS tools to locate new markets.

15.4 e) Revise USDA commodity listings to include all specialty crops, particularly Asian crops. There are currently fewer than 30 listed.

15.4 f) Assess the need for more certified livestock processing and value-added facilities, and develop strategies to meet the need.

15.4 g) Work with the Natural Resources Conservation Service (NRCS) to include organic certification steps in conservation plans.

15.4 h) Develop more programs to bring young SDFRs into specialty crop farming.

15.4 i) Expand the focus on beginning and immigrant farmers and include three types of operations: gardeners with less than a quarter acre, microfarmers with a half acre for family consumption and farmers' markets. and farmers who produce food solely for sale. Help the latter group of farmers plan, look at markets, and determine what profitable crops they can grow.

15.4 j) Increase support for mentoring programs for new and transitioning producers.

15.5) USDA, other Federal agencies, and foundations should develop strategies, programs, and investments to help CBOs and SDFRs engage equitably and profitably with local and regional food networks and movements. All producers should receive the benefits of growing crops appropriate to a specific area and reducing "food miles," or the distance food has to be transported.

15.6) CBOs should address domestic fair-trade issues, including advocating a fair system that includes nonextractive land practices, no discrimination, fair wages, access to food for all people, and fair prices for farmers and consumers.

15.7) SDFRs should adopt creative strategies to develop new markets:

15.7 a) Build relationships with distributors such as Cisco and get them to sit on organizational boards, attend and sponsor events, etc.

15.7 b) Use stories about or the history of producers and cooperatives to break into the growing markets for organic and sustainably grown food.

## **PROGRESS TO DATE**

USDA has in place numerous programs and initiatives that support local marketing of agricultural products, which could expand opportunities for SDFRs, and funding for a number of these was increased in the 2008 Farm Bill. USDA should now implement Section 14006's Transparency and Accountability Requirements and report on—as well as take steps to increase—the participation of SDFRs and the groups who represent them in these programs, including the Senior Farmers Market Nutrition Program (SFMNP), the Farmers Market Promotion Program (FMPP), the Small Farms/School Meals Initiative, the National Organic Program (NOP), the Federal-State Marketing

Improvement Program (FSMIP), WIC, and the Farmers Market Nutrition Program (FMNP).

FNS is promoting the use of SNAP at farmers markets. AMS is working with the states to modify the EBT system to allow its use at farmers markets.

The 2008 Farm Bill includes significant changes in funding levels for these programs and several others designed to help producers access new markets.  Risk management education (RME) programs received continued funding.  The Beginning Farmer and Rancher Development Program (BFRDP) was fully funded and contains opportunities for grant funding in a variety of areas relevant to successful access of markets (see Issue # 7, Risk Management, and Issue # 5, New and Emerging Farmers and Ranchers).

The 2008 Farm Bill also expanded direct support and benefits for the specialty crop sector:

∞   Section 4404, Use of Section 32 Funds for Purchase of Fruits, Vegetables, and Nuts to Support Domestic Nutrition Assistance Programs, authorizes the Secretary to make purchases of fruits, vegetables, and nuts to provide nutritious foods for use in domestic nutrition assistance programs, and to use approximately $1 billion in funds through 2012 to purchase fresh fruits and vegetables for the National School Lunch Program (NSLP).

∞   Section 10103, Inclusion of Specialty Crops in the Census of Agriculture, calls for the inclusion of specialty crops as a category in the Census of Agriculture.

∞   Section 10106, Farmers Market Promotion Program, provides competitive grants to improve and expand farmers markets, roadside stands, CSA programs, and other direct marketing opportunities. It provides mandatory funding of $3 M for FY 2008, $5 M for FYs 2009–10, and $10 M for FYs 2011–12. It further specifies that 10 percent of all funding should be used to support the use of EBT at farmers markets. Language in the manager's report asks for this funding to examine and help ameliorate the uneven distribution of farmers markets. The Secretary should ensure coordination with the Assistant Secretary for Civil Rights (ASCR) and OAO to address the issue of uneven distribution of farmers markets.

∞   Section 10107, Specialty Crops Market News Allocation, authorizes $9 M in discretionary funding for each of FYs 2008 through 2012 to support the marketing of specialty crops.

∞   Section 10109, Specialty Crop Block Grants, provides increased funding to enhance the competitiveness of specialty crops. It also amends the previous specialty crops definition to include horticulture and makes U.S. Territories eligible as states to receive funding through state agriculture departments.

o Mandatory funding for block grants is provided in the amounts of $10 M for FY 2008, $49 M for FY 2009, and $55 M for each FY for 2010 through 2012. Each state will receive a minimum grant equal to the higher of $100,000 or one-third of 1 percent of the total amount of funding made available for the fiscal year.

o States must apply for grants and are required to include an assessment of the needs of socially disadvantaged specialty crop producers in their applications.

o AMS has agreed to conduct outreach directly to CBOs and farmer cooperatives, and to attempt to enhance and encourage more contact between CBOs and their states' departments of agriculture during the next grant period.

∞ Section 10301, the National Organic Certification Cost-Share Program, defrays the costs of producers and handlers seeking organic certification. The Federal share requirement was deleted, but record keeping is mandated. $22 M in mandatory funding is provided, to remain until expended.

∞ Section 10403, Grant Program to Improve Movement of Specialty Crops, authorizes discretionary funding for grants to improve the cost-effective movement of specialty crops to markets, and requires that grantees provide at least a 100 percent match of non-Federal funds. The section allows national, state, and regional organizations of producers, shippers, and carriers to be eligible for these monies.

USDA is also exploring ways to expand purchases of local produce, such as by placing limits on distance or on the number of days that produce can be in transit as part of the evaluation criteria used to award contracts.

## DEFINING CHANGE

Change would mean that SDFRs producing specialty crops are able to thrive, with increased access to new markets. USDA will support their efforts and hold the specialty crop industry accountable for creating equitable opportunity for SDFRs. Resources and opportunities contained in the 2008 Farm Bill will be equitably distributed to all producers, and SDFRs will receive the specialized technical assistance necessary to grow and market specialty crops.

Change would mean an increase in the consumption of fruits and vegetables in food assistance programs, with SDFRs gaining a proportional share of these new markets.

Change would mean that farmworkers are engaged directly in regulatory processes which involve them; organic and other food safety standards include protections for them; and the Federal government, in cooperation with CBOs, enforces and improves labor standards.

## ISSUE # 16:  ACCESS TO CREDIT

**PROBLEMS RAISED IN THE PARTNERS PROCESS**

The denial of equitable access to credit has compromised the ability of socially disadvantaged farmers and ranchers (SDFRs) to build and maintain viable operations and increase their economic contributions to their communities.

Most SDFRs experience grave difficulties in securing any affordable and timely credit, and most are unable to borrow from commercial lenders at affordable rates due to patterns of discrimination. SDFRs chiefly grow vegetable and other nontraditional crops and lack government support payments to collateralize loans, which makes it difficult to qualify for guaranteed and other loan programs.

For SDFRs, the direct loan program of the Farm Service Agency (FSA) is the first and only resort. Yet their participation rates in credit and other FSA programs remain low. As a result, they often depend on seed and fertilizer merchants, vegetable brokers, and other predatory lenders who often charge exorbitantly high interest rates and/or force the borrower to sell products at unfairly low prices.

When SDFRs try to organize cooperatives, they often have difficulties because they cannot borrow small amounts of money (between $5,000 and $50,000) to implement cooperative value-added projects that would help them to be successful on relatively small pieces of land.

The factors that impede SDFRs' success include racial discrimination, which is evident in the costly lawsuits and resulting settlements that are costing the government billions of dollars. FSA and its predecessor agencies have failed to provide the basic quality service that any constituent should expect from the Federal government. For example, the agencies have not provided adequate support and assistance with financial management and farm planning, and have prevented SDFRs from gaining access to other programs and services of the U.S. Department of Agriculture (USDA) that could help them succeed.

The culture of FSA often merges with that of local communities that are resistant to change and seek ways to acquire or control the land of SDFRs. While statistics have not been released, the staff and leadership of FSA remains less diverse, less culturally sensitive, and less competent than is the case in other USDA agencies, notably the National Resources Conservation Service (NRCS) and the Risk Management Agency (RMA). FSA state directors and agency leaders for the most part have failed to work directly and collegially with community-based organizations (CBOs) to develop strategies to resolve the issues mentioned here and to provide better service.

Specific problems raised include:

∞ Direct loan limits are too low, and the maximum purchase price for ownership loans is far below market prices.

∞ Interest rates and lending terms make credit unaffordable, and congressionally mandated restrictions on the number of write downs deny credit to many producers.

∞ With respect to the down payment loan program, a seller taking back a mortgage is allowed only a three-year guarantee, and borrowers' rights are compromised.

∞ Participation rates by SDFRs in FSA credit programs remain very low, according to the most recent 10708 reports released. For example, in 2005, an overwhelming percentage of beginning farm loans went to white producers, and youth loans were made to socially disadvantaged youth in only a handful of states, and none were made to Hispanic youth anywhere in the nation.

∞ FSA, citing lack of resources, continually refers CBOs to other agencies for resources to conduct outreach that is the responsibility of FSA.

∞ FSA is not following mediation agreements signed to resolve cases.

∞ Continuing problems were cited in the loan appraisal system.

## AGENCIES AFFECTED

FSA and RD, as well as ASA, ASCR, CSREES, NRCS, OAO, and RMA

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

FSA's institutional culture of discrimination has not significantly changed even after several lawsuits, and therefore SDFRs do not get the same excellent services as other farmers. Unlike some USDA agencies, FSA has been reluctant to form partnerships at the local level with CBOs, partnerships that could mend the broken relationship between FSA and SDFRs.

Recent changes in regulations appear to have eliminated access to lease-back, buy-back and other important loan servicing options provided under credit statutes.

### Recommended Actions

16.1) USDA needs to select and train diverse new leadership at the state and county level and ensure that FSA leaders and state directors work directly with CBOs to develop immediate strategies to resolve outstanding problems.

16.2) There must be a new focus on diversity, constituent service, and accountability at FSA. Antidiscrimination training must be coupled with clear performance standards and participation goals for program delivery.

16.3) In addition to completing the fair resolution of outstanding complaints and cases, as discussed in Issue # 17, Settle Outstanding Civil Rights Claims and Halt Foreclosures, Accelerations, and Sales, USDA should work with the CBOs to review the structure and outcomes of credit programs at the state and county levels, and implement necessary changes in service delivery, program structure, and funding.

16.4) Many of the tools provided in the Miscellaneous Title of the 2008 Farm Bill were specifically designed to address problems in FSA. USDA agencies should expeditiously and fully implement systems such as the receipt for service or denial of service (Section 14003) and the transparency and accountability provisions (Section 14006) to ensure that SDFRs receive equitable treatment from FSA, and use the data collected through the provisions in Section 14006 in compliance reviews (Section 14007) and the report of the inspector general on the resolution of civil rights cases.

16.5) FSA should work with the CBOs to review data on the participation of SDFRs in its programs to clearly define the barriers to participation. Particular attention should be paid to comparisons of the application and participation rates of producers, the length of time between the first request for service and its approval or denial, and the month and year in which loans are actually made by race, gender, and ethnicity.

16.6) USDA leaders should take action to prevent future complaints and lawsuits that would further minimize its effectiveness. FSA should establish a collaborative process with the CBOs, the Assistant Secretary for Administration (ASA), and the Assistant Secretary for Civil Rights (ASCR) to review application and participation rates of SDFRs at the state and county level and establish norms and goals for service. These norms and goals should be communicated to FSA leaders, managers, and state directors, monitored on a regular basis, and be part of the performance criteria for evaluating employees and offices. Failure to show progress should be properly sanctioned, and success rewarded.

16.7) The loan appraisal system needs new standards and monitoring for fairness.

16.8) The level of participation of SDFRs in other USDA programs should also be evaluated, and the participation rates of producers who received loans under the stimulus package should be reviewed and made public.

16.9) The issue of outreach by and with FSA must also be addressed. FSA needs to restore the public's trust by making its programs accessible. It must recognize that CBOs are the most appropriate bridge to deliver outreach, training, and technical assistance on FSA programs and services.

16.10) FSA must secure funds to create partnerships with CBOs as a crucial way to provide training and technical assistance to SDFRs on FSA loan programs. One-on-one

technical assistance should focus on improving skills in record keeping, cash flow, and risk and debt management, and on meeting the technical requirements of a broad range of FSA loan and other USDA programs.

16.11) FSA and the CBOs should work together on a process to develop a walk-through, hands-on farm loan application process and to secure approval of CBO training programs as official FSA borrower training. The Secretary should ensure that resources are made available as necessary to complete this task, and results should be reported to the Secretary and the CBOs and new regulations issued if needed. Coordination with risk management and crop insurance programs is essential.

16.12) In cooperation with the CBOs, USDA should develop a process to disseminate information on all 2008 Farm Bill regulations and procedures, and to ensure that constituents nationwide receive equitable treatment and training on available loans. The Office of Advocacy and Outreach (OAO) should assist SDFRs to identify their state or local outreach coordinator or liaison, and the CBOs working in their area.

16.13) FSA and the CBOs should review the unique tax challenges faced by SDFRs and the impact of tax laws on building a successful operation. Strategies to increase SDFRs' knowledge of the tax code and proposals to change the code to improve the viability of smaller agricultural operations should be developed.

16.14) The full implementation of other 2008 Farm Bill provisions should be completed.

> 16.14 a) The data systems required by Section 14006 are necessary to implement and monitor SDFR set-asides in the new 2008 Farm Bill credit programs and should be set in place immediately and monitored regularly to ensure equitable outreach to SDFRs.

> 16.14 b) Regulations for Section 5002, Conservation Loan and Loan Guarantee Program, should specify how the priorities for SDFRs and beginning farmers and ranchers (BFRs) would be implemented and monitored. The Secretary should make sure that funding for this program is included in the President's budget and receives the necessary appropriations.

> 16.14 c) FSA should implement Section 5004, Down Payment Loan Program, as soon as possible and seek additional funds for the program. FSA should seek input from CBOs in establishing annual performance goals and developing regulations for their implementation. FSA should seek the needed authority to raise the three-year limit on loan guarantees when the seller takes back a mortgage, as well as addressing the loss of borrower protections.

> 16.14 d) In implementing Section 5005, Beginning Farmer or Rancher and Socially Disadvantaged Farmer or Rancher Contract Land Sales Program, FSA should address how it will inform buyers and sellers of their eligibility for the program. The Secretary should issue a directive informing FSA employees to make all efforts to prevent the sale to SDFRs of lands that include fraudulent or

hidden liens or encumbrances. New regulations should be drafted, released for comment, and implemented by FY 2011. Regulations should require that in each transaction, the SDFR be given a copy of the title report 20 days before settlement and that FSA comply with Federal appraisal laws and regulations.

16.14 e) The Secretary should work with CBOs to use the authority provided in Section 5101, Direct Loans, to eliminate the barriers that new entry SDFRs face because the type of farm experience they have does not qualify them for loans. FSA should develop regulations to reduce these barriers in general, and in particular should allow the consideration of farm experience gained as a farmworker or on a farm in another nation.

16.14 f) With respect to Section 5302(a), Inventory Sales Preferences, FSA should, in consultation with the CBOs, develop and publish new regulations and then institute a clear process to communicate the new regulations to SDFRs and field offices.  These regulations should establish procedures to ensure that information on available properties is provided at the same time to all prospective buyers and that data related to the preferences are collected and published.

16.14 g) With respect to Section 5304, Transition to Commercial or Other Sources of Credit, requiring a plan and the issuing of regulations to promote the graduation of loan program borrowers to private credit in the shortest practicable time, FSA should consult with the CBOs to establish performance criteria, and should ensure coordination with borrower training, loan assessment, and supervised credit requirements. FSA and the CBOs should also ensure that this section contains no negative consequences for SDFRs.

16.14 h) The provisions in Section 5305, Extension of Right of First Refusal to Reacquire Homestead Property to Immediate Family Members of Borrower-Owner should be implemented immediately and made available to any producer or owner who has not prevailed in a civil rights claim.

16.14 i) FSA should also report on whether rights for lease back and buy back of homes and farms established in past legislation still exist, and if they can be granted to producers who face the loss of their farms and/or their homes.

16.15) The Secretary should seek increases from Congress in direct loan funds for the farm operating and farm ownership program at the lowest possible interest rates.

16.16) The Secretary should require that FSA treat any signed mediation agreement as a binding contract with respect to loan servicing.

16.17) The Secretary should seek additional authority, if needed, to increase the number of debt write downs from one to two for limited resource and socially disadvantaged farmers, using with a sliding formula for the second write down based on the level of income the farmer has received in program payments.

16.18) In consultation with the CBOs, FSA, NRCS, OAO, Rural Development (RD), and other USDA agencies, the Secretary should develop model low-documentation operating loan programs that could give SDFRs the ability to engage in collective, cooperative, and value added strategies to increase income from their farms. These programs should include operating loans of under $50,000, which could be made available to farmers on an expedited basis. If possible, this should be done using existing legislative and program authorities of FSA and USDA.

16.19) The Secretary should work with CBOs to seek authority to change FSA loan eligibility to make it easier for SDFRs to secure direct loans by reducing experience requirements; limiting the amount of collateral required to no more than 75 percent of the principal of the loan; and making SDFRs who previously received a write down of USDA loans eligible for a second loan write down in order to continue or re-enter farming.

## **PROGRESS TO DATE**

A significant proportion of the CBOs have collaborated with USDA to secure changes in the 1987 Agriculture Credit Act and all major farm legislation since that time. Some of the provisions that the CBOs wrote and championed in the 1987 Act include the protection of borrowers' rights, the establishment of state mediation programs, and the adoption of an official definition of SDFRs.

Workshops held by the CBOs—with support from NRCS, and in cooperation with FSA—in 1996 and 1997 helped raise awareness of FSA policies on the part of a significant number of CBOs, and called attention to problems in the delivery of services. The workshops eventually led to the current push for better data collection and documentation of the participation of producers by race, gender, and ethnicity.

The CBOs worked with allies in the movement for sustainable agriculture to strengthen authority for credit programs and to ensure that the 2008 Farm Bill included set-asides and priorities for the SDFRs who most need them.

The CBOs also worked to secure the receipt for service and the transparency and accountability requirements discussed elsewhere in this report (see Issue # 1, Equitable Access), and to give USDA the tools needed to make sure that FSA's record improves in all states and counties.

The 2008 Farm Bill included specific provisions related to SDFRs:

∞ Section 5002, Conservation Loan and Loan Guarantee Program, strengthens authorization for direct and guaranteed loans for conversion to sustainable and organic farming, and adds priority for SDFRs and BFRs.

∞   Section 5003, Limitations on the Amount of Farm Ownership Loans, increases the maximum loan amount authorized from $200,000 to $300,000. The section was implemented in January 2009.

∞   Section 5004, Down Payment Loan Program, increases the maximum sales price to $500,000, extends maximum loan terms to 20 years, and adjusts the minimum interest rate to 4 percent below the regular direct farm ownership interest rate, or 1.5 percent, whichever is greater. The section also expands the program to include SDFRs as well as beginning farmers as eligible entities. FSA is required to establish annual performance goals for the program and make joint financing loans as the preferred use of direct farm ownership funds by BFRs and SDFRs. The changed limits were implemented in January 2009, and increased funds were requested.

∞   Section 5005, Beginning Farmer or Rancher and Socially Disadvantaged Farmer or Rancher Contract Land Sales Program, makes permanent a pilot program initiated in the 2002 Farm Bill that provides loan guarantees to sellers who self-finance the sale of land to BFRs. Program eligibility is expanded to include SDFRs. The program is similar to the pilot program, but expanded to provide a guarantee of 90 percent of principal and interest, in addition to the prompt payment guarantee provided in the pilot program. The 2008 Farm Bill extends the current two-year limit on payment guarantees to three years, provides land sellers the option of choosing either the three-year guarantee or a standard 90% percent guarantee, and makes the program available nationwide. The asset guarantee option is included if the seller obtains the services of a loan-servicing agent (see Issue # 5, New and Emerging Farmers and Ranchers). FSA is in the process of drafting proposed regulations to implement this expanded program. The changes will be published in the *Federal Register* as a proposed rule, and public comments will be requested.

∞   Section 5101, Direct Loans, provides that any farm experience, no matter when it occurred, must be considered in determining whether a loan applicant meets the experience requirements for loan eligibility.

∞   Section 5103, Suspension of Limitation on Period for Which Borrowers Are Eligible for Guaranteed Assistance, adopts an enhanced graduation process to permanently eliminate guaranteed loan limits. Term limits on direct loans were continued, and the 15-year limit for FSA borrowers to receive guaranteed operating loans was waived through December 31, 2010. This provision was implemented in January 2009.

∞   Section 5302(a), Inventory Sales Preferences, reestablishes SDFRs as a priority group for the purchase of FSA inventory property, providing them equal priority with BFRs. If more than one eligible farmer offers to purchase the same property in the first 135 days, the buyer is to be chosen randomly.

∞   Section 5302(b), Loan Fund Set-asides, increases the percentage of direct ownership loan funds set aside for BFRs to 75 percent. Of those funds, 66 percent are reserved for the down-payment loan program and joint financing arrangements. The priorities for SDFRs as established in 1987 and 1990 remain in effect.

∞   Section 5303, Loan Authorization Levels, increases authorization levels for direct operating loans from $565M to $850M, and for direct ownership loans from $205M to $350M.

∞   Section 5304, Transition to Commercial or Other Sources of Credit, requires FSA to establish a plan and promulgate regulations, including performance criteria, intended to promote the graduation of borrowers from the farm ownership and farm operating loan program to private credit in the shortest practicable time.

∞   Section 5305, Extension of Right of First Refusal to Reacquire Homestead Property to Immediate Family Members of Borrower-Owner, provides that immediate family members have the first opportunity to reacquire homestead property lost by a borrower who is a member of a socially disadvantaged group.

∞   Section 5501, Loans to Purchasers of Highly Fractionated Land, provides that in addition to loans to tribes, FSA may now make and insure loans to individual American Indian farmers or ranchers to keep tribal lands in agricultural production (see Issue # 2, Equity and USDA's Relationship with American Indian Tribes).

See also Issues # 5, New and Emerging Farmers and Ranchers; # 7, Risk Management; # 8, Disaster Preparedness and Response; and # 18, Commodity Programs County Committees.

## DEFINING CHANGE

Change would mean that FSA welcomes and values the contributions of SDFRs. The receipt for service system would be implemented. Equitable access to credit would be demonstrated in the Section 10708 reports, and SDFRs' farms would be more economically viable.

The culture of discrimination at the state and local levels of USDA would no longer exist, and accountability for those who discriminate, as well as their supervisors and managers, would be held accountable for their actions. Legislation action to prevent discrimination would no longer be necessary.

USDA personnel would no longer try to find ways to deny services to SDFRs, but would instead endeavor to provide services to them.

**ISSUE # 17: SETTLE OUTSTANDING CIVIL RIGHTS CLAIMS AND HALT FORECLOSURES, ACCELERATIONS, AND SALES**

**PROBLEMS RAISED IN THE PARTNERS PROCESS**

The fair, expeditious, and complete resolution of all outstanding civil rights cases and claims is essential if the U.S. Department of Agriculture (USDA) is to include socially disadvantaged farmers and ranchers (SDFRs) equitably in all of its programs. The organizational culture that led to the African-American farmers' lawsuit (*Pigford*), which has resulted in payments to date of over $1 billion, and similar pending suits needs to be transformed at every level.

At present, thousands of accelerations, foreclosures, and farm sales are pending against SDFRs. These actions threaten large numbers of SDFRs involved in long-unresolved claims and class action suits brought against USDA based on racial, ethnic, and gender discrimination, including the *Keepseagle* (Indian producers, filed November 24, 1999), *Garcia* (Latino producers, filed October 13, 2000), and *Love* (women producers, filed October 19, 2000) class action suits.

These pending foreclosures threaten to reduce drastically the number SDFRs when more just alternatives would keep them as productive members of our food and agriculture system. The issue is of particular importance to *Pigford* claimants. A massive foreclosure effort is being readied against some participants in the litigation—especially those whose claims and appeals were unsuccessful. While foreclosure actions were stayed during litigation, some lawyers advised farmers not to pay on their debts. Subsequently, compounded interest has increased debt to unreasonable levels. In addition, a number of successful claimants did not receive the debt writeoff they were led to believe they were entitled to under the settlement. When USDA refuses to help, many of these SDFRs become victims of predatory lending practices in order to avoid financial catastrophe.

One representative of a community-based organization (CBO) recounted the preparation of more than 500 claims against a single Farm Service Agency (FSA) county executive director (CED), the majority of which were upheld. After costing taxpayers millions of dollars, the CED retired with full Federal benefits. This failure to hold employees accountable creates a system that makes discriminatory actions acceptable. A change in USDA culture and accountability is long overdue. Other concerns raised by the CBOs include:

∞  Heir property and fractionation issues prevalent in African-American and American Indian communities lead to high rates of foreclosure.

∞  USDA has failed to address situations such as those faced by Hmong farmers in the Arkansas area, raised at the 2006 Partners meeting and now under investigation by the Office of the Inspector General (OIG).

∞ USDA has failed to provide clear data on acceleration and foreclosures affecting SDFRs, with breakdowns by race, ethnicity, and gender.

∞ Producers who have paid off loans and have no debt are told they are not eligible for FSA loans, and unresolved claims and issues restrict SDFRs' access to capital.

∞ Many USDA offices still lack diversity, cultural sensitivity, and competence.

∞ Resistance to change from field office staff and at higher levels still occurs.

∞ The lack of funding for CBOs to provide outreach, training, and technical assistance with USDA programs and services hampers their ability to help spur changes at the local level.

∞ Due to restrictions imposed by Congress, farmers and ranchers who have had a previous (not related to civil rights) debt write-down or debt settlement are ineligible for FSA loans.

∞ The failure of USDA to adopt policies and practices that make supervisors accountable for employee actions that have left the agency liable for over a billion dollars gives tacit permission to field staff to continue business as usual.

∞ Often the most dangerous thing an SDFR can do is to borrow from USDA. In too many cases, debt servicing is administered in a way that guarantees default and foreclosure.

## AGENCIES AFFECTED

FSA and RD, as well as ASA and ASCR

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

The 2008 Farm Bill does not include enough money to settle all outstanding claims, including those of late filers under *Pigford*. This could lead to mass foreclosures among African-American farmers. Many farmers who prevailed under *Pigford* are having difficulty gaining access to USDA services.

Systems of accountability and transparency that are integrated with USDA employee performance reviews are not yet in place.

### Recommended Actions

17.1) The moratorium authorized in Section 14002 of the 2008 Farm Bill should be implemented expeditiously and continued until all civil rights cases are resolved.  All accelerations, foreclosures, and sales should be halted until all cases are reviewed to determine if they were handled properly, and all claims of discrimination are settled.

17.2) Relief of accrued interest and offsets while discrimination allegations are investigated should be provided to the full extent of the law.

17.3) The Secretary should consult with the President and the Attorney General to clarify how Section 14012, regarding *Pigford* late claims, will be implemented and what USDA's role should be. The pending estimates of budgetary exposure for USDA's role in resolving the cases should be closely examined, and a report issued to the public and Congress on the basis of these estimates.

17.4) The Secretary should work with the Attorney General to use authority in Section 14011 to settle all outstanding civil rights class action suits and claims expeditiously.

17.5) USDA should set up an independent mechanism under the auspices of the Office of the Secretary, not under FSA, to review each pending case slated for foreclosure, to see if negotiations, mediations, further write downs of interest, and full and fair use of all loan restructuring and bankruptcy protection options can solve the case in any other way.

17.6) USDA should carefully examine and change its policies of offsetting farmers' income from government payments to reduce debts, including seeking an exemption for farm loan programs from the Treasury Department's offset requirement and other administrative offset provisions.

17.7) The Secretary should ensure that OIG completes and issues the report required by the 2008 Farm Bill on SDFR loan foreclosure proceedings, due by May 2009, one year from enactment of the Farm Bill.

17.8) The implementation of the Loan Program for Producers on Highly Fractionated Lands should be corrected to allow individual Indian producers to participate immediately in the current program (see Issue # 2, Establish a Direct Government-to-Government Relationship with Indian Tribes).  Funding levels should also be increased as part of the President's budget request.

17.9) Transparency and accountability, and compliance and performance review systems should be set in place to hold employees accountable for their actions. This will ensure that discrimination in loan servicing is met with prompt investigation, and further action addressing employee misconduct. The Secretary's office should develop, with the CBOs, a series of employee memoranda and an outreach plan to make clear the Department's new focus on ending discrimination in program access and loan servicing.

17.10) Claims of discrimination should be settled in an expeditious manner. Prompt investigation is required, and those responsible for causing discrimination should be held accountable.

17.11) The Assistant Secretary for Administration (ASA) should develop specific procedures to include accountability for discriminatory actions in personnel and

performance review processes. Front-line employees, supervisors, and all supervisory personnel up the chain of command must be engaged in changing the culture of USDA. ASA should update performance evaluations to include elements that would measure constituent service and civil rights, and hold supervisors accountable for the performance of their employees. These standards should be enforced with regard to county employees who deliver USDA programs.

17.12) Sensitivity training and training in the transparency and accountability requirements and those for receipt for service are essential for field office staff. The Secretary should send frequent memos to all staff about this issue.

17.13) USDA should train FSA county office and credit staff on a full range of loan servicing options, including leaseback and buyback if they are still available.

17.14) Rural Development (RD) should increase funding to support an analysis of the impact of heir property situations on farm and home acquisition and retention, and to develop strategies to solve related problems. Such an analysis should be conducted in partnership with CBOs that have experience in the area.

17.15) A system should be created to settle all claims under *Pigford,* as well as all other civil rights claims and class action lawsuits that are currently pending. Progress on this system should be reported to the CBOs by the fall of 2009. The Secretary should issue a report on the progress of the elements in his 14-point memorandum on bringing about a "new era for civil rights" at USDA.

17.16) The CBOs should provide continuous input in the areas listed above, and should work with USDA to keep their members informed and involved, especially at the county and state levels.

## PROGRESS TO DATE

The CBOs developed and secured approval of numerous sections in the 2008 Farm Bill, as detailed below, to address problems in this issue. USDA has begun implementing some of the sections and has sought increased funds for settlement of *Pigford* claims.

FSA has streamlined areas of its farm loan programs by revising loan making and servicing requirements and procedures to serve applicants and borrowers better. The streamlining of direct loans included:

∞  Reducing applicable federal regulations by more than 80 percent.

∞  Modifying requirements to more closely conform to those used by other lenders.

∞  Reducing the number of forms required by nearly 50 percent, and ensuring that all forms are available online.

∞  Consolidating guidance into six handbooks instead of nearly 40 instruction manuals.

*A Time To Change: Report of the Conversations Assessment Team*                    120
@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED

∞ RD, FSA, and the Natural Resources Conservation Service (NRCS) are implementing the receipt for service or denial of service on an interim basis, by directive or unnumbered letter. A temporary receipt form was also issued. A task force consisting of representatives from all three agencies is currently working on the permanent regulation and forms for approval and issuance.

The following 2008 Farm Bill provisions, most drafted or advocated by the CBOs, provide direction and authority to the Secretary to address past discrimination:

∞ Section 14002, Moratorium on Foreclosures, directs the Secretary to implement a moratorium on all accelerations, foreclosures, and sales until all cases are reviewed to determine if they were handled properly, and all claims of discrimination are settled. The section also directs the Secretary to waive interest and offsets while discrimination allegations are investigated. Interest and offsets that are waived must be repaid if the claimant is unsuccessful.

∞ Section 14011, Sense of Congress Relating to Claims Brought by Socially Disadvantaged Farmers or Ranchers, calls for the resolution of all outstanding claims and class actions brought against USDA based on racial, ethnic, or gender discrimination in an expeditious and just manner, including the *Keepseagle*, *Garcia,* and *Love* class action suits.

∞ Section 14012, Determination on Merits of Pigford Claims, allows claimants under the consent decree in the *Pigford* class action case that have not obtained a determination on the merits of their claim (i.e., claims filed late) to obtain a determination through civil action, including noncredit program claims. Acceleration and foreclosure is prohibited on any claimant's FSA loan accounts if the claimant makes a prima facie case that the foreclosure is connected to his or her *Pigford* claim. The 2008 Farm Bill provides $100 million in mandatory funding to resolve claims, and the President has requested $1.25 billion in additional funding to settle all outstanding claims under *Pigford* and issued a 90-day moratorium on all foreclosures.

RD has provided limited funding to CBOs to begin analyzing the heir property problem as it relates to SDFRs.

## DEFINING CHANGE

Change would mean:

∞ Every producer entering an USDA office receives the same standard of service, with a receipt for service and a clear explanation of what else is necessary to secure service.

∞ FSA reaches out to rural communities to ensure that all producers are on FSA lists and receive every service for which they are eligible.

∞  All outstanding claims are fairly resolved.

∞  Performance standards for equitable service are set, and employees are held accountable immediately for any disparate treatment or neglect. Employees and supervisors who fail to uphold these standards are dismissed.

∞  Socially disadvantaged and beginning producers have real access not only to loans but also to commodity programs, disaster programs, insurance, and every other benefit offered to any other producer.

∞  The land holdings of SDFRs are growing significantly instead of contracting.

∞  There is no longer a need to target resources and technical assistance to SDFRs, and USDA is truly the people's department.

## ISSUE # 18:  COMMODITY PROGRAMS AND COUNTY COMMITTEES

## PROBLEMS RAISED IN THE PARTNERS PROCESS

The county office committees (COCs) of the Farm Service Agency (FSA), which are elected by local agricultural producers, retain significant authority over the operation of local county offices and the allocation of benefits through commodity, disaster, and other farm programs. For years, the participation rates of socially disadvantaged farmers and ranchers (SDFRs) in these programs have been minuscule, denying SDFRs billions of dollars of federal farm benefits and the opportunity to develop viable operations.

COCs are widely viewed as a critical barrier to SDFRs' receiving equitable access to farm programs. The problems are ongoing because the U.S. Department of Agriculture (USDA) has failed to hold the committees and the county executive directors. USDA has not disciplined supervisors, state directors, or agency leaders who tolerate this failure to achieve equity.

The FSA established a system of appointing minority advisers to the COCs to remedy inequities. However, this system does not solve the problem because the advisers are chosen by the COCs, which are the primary source of the problem. Minority advisers cannot vote as full committee members.

While most discrimination complaints and class action lawsuits focus on FSA credit programs, it does not follow that discrimination does not exist in the commodity and disaster programs the COCs are responsible for delivering. The Equal Credit Opportunity Act gave producers the right to sue for damages for credit-related discrimination. Sovereign immunity, a general principle of federal law that protects the government from liability unless specifically waived, has shielded FSA from lawsuits that seek damages for discrimination in most noncredit programs.

More importantly, over the years, with no system for a receipt for service or denial of service, thousands of producers were simply turned away by local offices of FSA and the Agriculture Stabilization and Conservation Service (ASCS, which administered farm programs before FSA was created) with no explanation, no record of their visit, and no way to document and seek redress for discriminatory practices. Other more recent concerns identified in the Partners process are:

∞  FSA has made little investment in the outreach partnerships it funded in 1996 and 1997 with community-based organizations (CBOs). Those partnerships, which made progress in increasing the number of SDFRs on COCs, have been discontinued.

∞  Many SDFRs remain reluctant to participate in COCs or even to enter an FSA office because of the history of discrimination. Representation of SDFRs on COCs remains disproportionately low even in counties with high numbers of SDFRs.  Concerns

about ballot and election integrity remain.  Consolidation of COCs has led to concern that the offices are being relocated to areas that are predominantly white.

∞   While data on the number of SDFR representatives on COCs are being released each year as required under Section 10708 of the 2002 Farm Bill, the number of producers on FSA's basic list, called the Service Center Information Management System list (SCIMS list), as compared to those who actually cast ballots in COC elections is no longer broken down by race, gender, and ethnicity. This comparison is essential as many COC members are elected with very low participation rates—in some cases, few people vote beyond the members of the COCs themselves. (The SCIMS list itself, which now includes over 13 million individuals and entities, compared to some 2 million farms counted in the Census of Agriculture, might not correctly reflect the users of FSA programs and services in each county.)

∞   FSA has not implemented the requirements of Section 10708 with respect to commodity and disaster programs. SDFRs' participation remains disproportionately low in these programs. The Assistant Secretary for Civil Rights (ASCR) has not developed a system to review compliance, based on these data.

∞   Applications for disaster and other programs are not suited to vegetable producers. The distribution of base acres on which commodity program payments are based continues deep historic inequities and will reduce payments to SDFRs into the future.

∞   FSA remains one of the least diverse USDA agencies and does not hold its personnel accountable for inequitable service. Lack of access to commodity programs has contributed to the lack of access to credit (see Issue # 16, Access to Credit).

## AGENCIES AFFECTED

FSA

## PENDING CONCERNS RAISED IN THE PARTNERS PROCESS

Local resistance to change remains great. Opposition to sharing power and changing the status quo are strong barriers to equitable access and representation. The strong relationship between FSA and the old boys' network of producers makes SDFRs reluctant to seek services or get involved in the COC election process. FSA must understand the need to build a service delivery system that transcends this old boys' network and reaches out to all producers. FSA needs a change in culture and attitude at all levels.

Too many COCs do not work in partnership with CBOs, yet CBOs are vital to building trust between SDFRs and FSA.

**Recommended Actions**

18.1) The Secretary should ensure that a diverse pool of dedicated FSA leaders and state executive directors (SEDs) are recruited, and that the need to change in way FSA does business is thoroughly conveyed at every level.

18.2) The Secretary should ensure diversity of staff in local offices. FSA state directors and field staff should establish partnerships with local CBOs and other minority groups.

18.3) FSA must continue to release COC election data and add the number of producers who are on the SCIMS list in each county, and the number who cast ballots. Data should be reported by race, gender, and ethnicity and should be reviewed by ASCR and shared with the CBOs. Deficiencies in the SCIMS list must be rectified.

18.4) USDA should immediately implement and utilize the transparency and accountability tools of Section 14006 of the 2008 Farm Bill. These data should be released to the public and used to assess participation in COCs and the degree to which the counties have improved participation of SDFRs in elections and in USDA annual commodity and farm programs.

18.5) This analysis should be performed immediately, and the results should be used to assess what steps FSA needs to take to demonstrate progress in improving equity.

18.6) Previous farm bills authorized the Secretary to appoint SDFRs as full members of COCs. However, this discretionary power was never utilized. Based on participation rates, the Secretary should level the playing field by exercising his discretionary authority to appoint SDFRs to the COCs as full members. That would satisfy the intent of Congress, which included language on this point in Section 10708 of the 2002 Farm Bill.

18.7) FSA should work in partnership with CBOs on a plan for outreach, training, education, and evaluation at the state and county levels. At the outset, a baseline of participation at the county level should be developed, with an evaluation process to measure improvements in participation in both elections and the programs overseen by COCs. FSA must secure budget resources for these partnerships and must commit substantive funds to them, to conduct outreach on COC elections and to improve participation in commodity and disaster programs, especially the new 2008 Farm Bill disaster programs (see Issue # 8, Disaster Preparedness and Response).

18.8) Focus groups and surveys should be developed in cooperation with the CBOs and conducted at gatherings of SDFRs to assess the level of their awareness of, interest in, and perception of COCs.

18.9) In implementing Section 1615 of the 2008 Farm Bill, the Secretary should expeditiously develop clear regulations for public comment to ensure that SDFRs have the opportunity to participate fairly in COC and to access FSA services. The Secretary should seek input from CBOs and issue regulations and procedures to assess the impact of county office consolidations on SDFRs and Indian tribes.

18.10) The 2008 Farm Bill conference report for Sections 1101 and 1302, Direct Payments and Counter-Cyclical Payments Base Acres, and Base Acres for Peanuts for a Farm, directs the Secretary to collect and publish data and survey information on farm profiles, land utilization, and crop production, and to evaluate the impact of the suspension of payments for small base acres on the price and supply of fruit and vegetables. The Secretary should ensure that this evaluation includes SDFRs in both the data collection and publication, and assesses the impact on acreage base by race, gender, and ethnicity. The Secretary and ASCR should also take measures to document the proportions of crop base allocated to SDFRs, any changes in allocation resulting from adjustment of base acres, and SDFRs' participation in all direct, counter-cyclical, peanut, and Average Crop Revenue Election (ACRE) programs.

18.11) To ensure accessibility to native speakers of languages other than English and to those at lower reading levels, translations and other forms of technical support should be provided during meetings of COCs.

18.12) State FSA committees should be made responsible for making changes in the boundaries of local administrative areas, with input from CBOs. This responsibility should be removed from the purview of county offices. All state and county offices should be required to develop a comprehensive outreach plan for COC elections.

18.13) SEDs and state committees should appoint diverse elections committees—consisting of representatives from the state office, COCs, county offices, and CBOs—to oversee the election process and increase the representation of SDFRs on COCs.

18.14) As required in the 2002 Farm Bill, sealed ballots must be kept together and opened and counted openly at the same time to ensure integrity of the election process. CBO representatives should observe the counting of ballots.

18.15) FSA and the CBOs together should review all current and pending departmental regulations relating to COC elections and the collection of data on voters, votes cast, and the composition of current committees, including the rule on maintaining SDFR participation when committees are consolidated.

18.16) FSA and the CBOs should develop a partnership with adequate funding for activities designed to secure increases in the percentage of SDFRs serving on COCs, modeled on the work done in the CBO workshops of 1996 and 1997 and on the partnerships of the CBOs with the National Agricultural Statistics Service (NASS).

18.17) USDA and the CBOs should further revisit the 1930s legislation that created the COC system and closely examine the impact of changes made in recent farm bills to assess their effectiveness in improving equity. If improvements are not made in participation in elections and more importantly, in access to the full range of USDA programs, replacing the COC system should be considered.

## **PROGRESS TO DATE**

In 1996 and 1997, FSA provided funds for a national workshop and partnership with CBO leaders on COC election procedures, with additional funds for field activities to increase SDFRs' participation. In those years, participants in the process increased their knowledge of the role of COCs and how to participate in them. SDFR representation improved in several places, notably in Montana.

The knowledge gained through this partnership about the internal workings, power, and consequences of COCs helped the CBOs develop strategies and achieve changes in legislative authority, notably the transparency and accountability provisions in Section 10708 of the 2002 Farm Bill. USDA now has additional tools to better regulate or change how the COCs do business, and to guide and improve outreach efforts.

FSA has expanded its educational and outreach efforts about the COC election process, upcoming elections, and important dates, including advertising in *Minority Landowners* magazine, currently distributed in over 783 county offices in 11 states with large concentrations of SDFRs.

Increased information about elections provided through publications and directly to CBOs, can affect election outcomes, as demonstrated by the 2005 and 2007 election returns. The number of SDFRs nominated increased by 50 percent from the 2003 to the 2006 election cycle, although the number elected has remained constant. In 2007, three additional African-Americans were elected.

FSA implemented the transparency and accountability requirements in Section 10708 of the 2002 Farm Bill with respect to COCs and has regularly released required data on the number of elected members by race, gender, and ethnicity. These data allow independent analysis of the adequacy of representation in each county. Coupled with the requirements for data on program participation adopted in the 2002 and 2008 Farm Bills, FSA and ASCR have the tools to assess whether local committees are doing their jobs.

Several sections of the 2008 Farm Bill included protections for SDFRs:

∞ Sections 1101 and 1302, Direct Payments and Counter-Cyclical Payments Base Acres, and Base Acres for Peanuts for a Farm, exempt SDFRs from the base-acreage minimum of 10 acres adopted for producers receiving direct, counter-cyclical, or average crop revenue election payments. Authority is provided to collect data and evaluate the impact and application of the exemption. The sections allow adjustment of acreage base when a conservation reserve contract terminates or when the producer has eligible oilseed or pulse acreage.

∞ Section 1615, State, County, and Area Committees, extends requirements in Section 10708 of the 2002 Farm Bill that improved election procedures, required disclosure of data on the outcome of elections, and provided authority to the Secretary to intervene when representation was inadequate. Section 1615 addresses the issue of producer representation when county or area committees are consolidated. The Secretary is required to develop procedures to ensure that

combined committees be elected by and be fairly representative of producers who cooperate with or participate in programs administered by that local committee.

## DEFINING CHANGE

Change would mean that FSA expands its commitment to provide information to SDFRs in those areas where SDFRs exceed 10 percent of the producers in the county, forming a partnership with CBOs that provides funding for activities designed to increase the percentage of SDFRs serving on COCs.

Change would mean that a larger percentage of SDFRs participate in elections and more SDFRs are nominated for membership in COCs. Participation rates of SDFRs on COCs and in all FSA programs would increase dramatically. SDFRs would receive greatly increased support from commodity and related programs.

Change would mean that COCs better reflect and represent the communities they were established to serve, and SDFRs no longer view FSA as their enemy—or, if by the end of 2012 SDFRs still do not have equitable access to resources and services, the COC system would be abolished and FSA personnel would be held accountable for any continued inequity.

**ISSUE # 19: USDA ADVISORY COMMITTEES AND BOARDS**

**PROBLEMS RAISED IN THE PARTNERS PROCESS**

Advisory committees and boards play a key role in influencing the programs and services of the U.S. Department of Agriculture (USDA). But none of the 59 active advisory committees directly addresses issues particular to socially disadvantaged farmers and ranchers (SDFRs). The Minority Farmer and Rancher Advisory Committee authorized in the 2008 Farm Bill awaits establishment as the deadline for its creation nears.

The Federal Crop Insurance Corporation (FCIC), which governs the crop insurance system, has significant power to negotiate USDA's agreements with the crop insurance industry. Socially disadvantaged producers and the community-based organizations (CBOs) that work with them lack real representation in FCIC and similar entities, as well as on most advisory boards, and the needs of SDFRs and CBOs are not being adequately addressed.

USDA agencies may incorrectly assume that their SDFR constituents have sufficient knowledge of opportunities to serve on advisory committees and boards. While some agencies do extensive outreach to SDFRs and the CBOs that represent them, others do not. Additional issues that affect SDFR participation on USDA committees and boards include:

∞  It is difficult to identify representatives of CBOs in certain rural areas that have few SDFRs, and that lack diversity.

∞  Participants of color who are selected to serve on committees and boards may not actually represent or have any awareness of the needs of socially disadvantaged communities, and are often chosen to achieve an appearance of diversity rather than real representation.

∞  Several committees and boards do not reimburse members' travel costs, making the expense of participation in meetings a barrier to SDFRs.

∞  The lack of a system-wide open-door policy for USDA means that not everyone feels comfortable participating.  Due to this fundamental lack of comfort and trust, issues such as requirements for security clearance or background checks may further reduce participation.

∞  The criteria for membership on committees and boards are geared more toward exclusion than inclusion.  New legislative authority may be needed to remove barriers or make participation more balanced.

∞  Participation requires a substantial commitment of time, and many SDFRs doubt the benefits of serving on boards and committees

**AGENCIES AFFECTED**

Most agencies within USDA

**PENDING CONCERNS RAISED IN THE PARTNERS PROCESS**

USDA advisory committees and boards are not taking advantage of the knowledge and understanding that members of CBOs have of local issues. Although SDFRs can bring key issues and concerns to decision makers, too often the SDFRs who are chosen to serve on boards and committees are selected just to fill a quota—rather than because of their knowledge of, and ability to represent, their community.

CBOs are not having enough input in the selection process.

**Recommended Actions**

19.1) Section 14013 of the 2008 Farm Bill, the Advisory Committee on Minority Farmers, authorizes the creation of this committee. The section should be implemented before November 2009. The Secretary should utilize this committee as a source of advice on issues including full implementation of Section 2501 of the Food, Agriculture, Conservation, and Trade Act of 1990, as amended, and methods of maximizing SDFRs' participation in USDA programs. The Secretary is to appoint up to 15 members of the Advisory Committee on Minority Farmers, including:

- o Not less four SDFRs.

- o Not less than two representatives of nonprofit organizations with a history of working with SDFRs.

- o Not less than two civil rights professionals.

- o Not less than two representatives of institutions of higher education with demonstrated experience working with SDFRs.

- o Other persons the Secretary considers appropriate. For instance, the Secretary may appoint USDA employees to serve as ex officio members.

19.2) USDA should require that boards and committees adopt methods used by socially disadvantaged and Tribal communities to ensure adequate representation. The boards and committees should report regularly on the diversity of their composition, and on their strategies to address any lack of diversity. A report on the demographic composition of USDA advisory boards and committees should be shared at the next Partners meeting.

19.3) USDA agencies and CBO representatives who have served on these boards and committees should share information regarding participation on committees and boards, and why it is important, with SDFRs.

19.4) Working together, the CBOs should determine which advisory committees are most important, and develop candidates to participate in them and report back to their communities on the committees' work.

19.5) Each committee and board should include more than one representative of the CBO and SDFR community, so that no representative is a lone voice.

19.6) The Secretary should place special priority on increasing the representation of SDFRs and CBOs on the Research, Education, and Economics Task Force in order to increase collaboration between CBOs and land grant universities, and to ensure that the needs of SDFRs are better met in this mission area.

19.7) Certain agencies, including the Agricultural Marketing Service (AMS), should conduct periodic rule-making sessions to update procedures based on recommendations from USDA advisory committees and boards. Agencies should issue reports that include the number of such recommendations that are made and implemented. These reports should be shared with CBOs through the Office of Advocacy and Outreach (OAO).

19.8) CBOs should visit the following Website to view the complete details of USDA Advisory Committees and Boards at: http://www.usda.gov.

19.9) USDA and the CBOs should consider the following methods to promote participation on USDA programs and advisory committees including:

19.9 a) Delegating responsibility to OAO to work through appropriate CBOs to announce program opportunities and identify potential members of committees and boards.

19.9 b) Use of local media such as radio and newspapers, especially minority-targeted media.

19.9 c) Working with local minority organizations and chambers of commerce.

19.9 d) Providing workshops and training sessions about USDA advisory committees at conferences conducted by CBOs representing socially disadvantaged producers, farmworkers, and communities.

19.10) Advisory committees and boards should look at alternative ways, such as teleconferences and videoconferences, to facilitate participation by socially disadvantaged members who are unable to travel to designated meeting locations.

19.11) USDA and CBOs representing SDFRs should provide outreach on how to identify key opportunities to have an impact on USDA programs and prepare potential board or committee members for service.

19.12) USDA should increase the number of liaisons available for educating rural communities about opportunities to serve on advisory committees and boards.

## PROGRESS TO DATE

The following advisory committees now include SDFRs or members of organizations who represent them:

- ∞ Advisory Committee on Agriculture Statistics
- ∞ Advisory Committee on Beginning Farmers and Ranchers

Socially disadvantaged producers or organizations have previously been represented on the Research, Education, and Economics Task Force.

Section 14013 of the 2008 Farm Bill includes language requiring the Secretary to establish an Advisory Committee on Minority Farmers not later than 18 months after the enactment of the 2008 Farm Bill——in other words, by November 2009.

## DEFINING CHANGE

Change would mean establishing the Advisory Committee on Minority Farmers, and having it report to the next Partners meeting.

CBO and SDFR participation on advisory committees and boards would increase to representative levels. Regular reports on the composition of the boards and committees would be made to the Partners, and any gaps would be addressed.

**CONCLUSION:  DEFINING THE CHANGE WE SEEK**

In order to fully address these long-term USDA inequities, our tools must include both statutory and regulatory change.  The CBOs have benefited greatly from the insight provided by our USDA colleagues in the Partners process on USDA policies, procedures and systems and we recognize and honor their efforts.  Our ability to propose legislation to solve problems expanded through the dialogue and interchange we have developed with them.

The many sections of the 2008 Farm Bill that can be employed to increase equity grew from our work over the past five years.  The benefit of our collaboration may be most evident with respect to our work with the Natural Resources and Conservation Service and the House and Senate Agriculture Committees.  The trust and respect we developed as we constructed a shared knowledge of problems and solutions made possible the legislative victories and the emerging regulatory changes now being completed.

We caution the Secretary however, that the hard part is yet to come.  In August 2009, Assistant Secretary for Civil Rights Dr. Joe Leonard, and CBO Partners Planning Team Chair Shirley Sherrod, held a call to report to the CBOs on the current status of the report and the implementation of the 2008 Farm Bill and other work in the Partners process.

Immediately afterwards, we were contacted by several producers who shared with us present day stories that verify the conditions we hope to put in the past but which still exist to this day.  The situations, which we have heard many times before, remain endemic to the USDA system, and if these conditions are not changed, all our other work is for naught.

One socially disadvantaged producer recounted a recent visit to the local USDA Service Center during which he requested new benefits provided to SDFRs provided under the farm bill.  Through the wall, he overheard USDA staff in another room discuss how they did not think it fair that they be forced to provide the producer certain benefits required by law for any SDFR.  We verified that the producer was indeed eligible for the benefit, and asked if we might work with him to raise this matter with higher ups in the agency to seek swift resolution.  He asked that we not do so, sharing the very prevalent reticence of producers to file a complaint or otherwise question such treatment, feeling that if they do so, they will not receive access to any programs.

A CBO leader who is also a socially disadvantaged producer cautioned that the CBOs should expose the specifics of what happened only if they are willing to stand behind the producer to "the bitter end," because *"even when you think you can take it, they can come to your farm and dig for stuff that is not there.  They also can be very intimidating to your family and it really stresses everyone in your personal life."*

Producers continue to emphasize that USDA leaders at headquarters don't realize what

*A Time To Change: Report of the Conversations Assessment Team*                                   133
@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED

goes on in the field, and that producers should not be asked to file complaints unless there is a commitment from the top leaders at USDA to protect producers from retaliation.  This retaliation may not be confined to issues related to USDA program participation, but may also affect their social and economic relationships in their local community.

Thus, the circle of injustice continues that will not be solved by improved data or set-asides or any other method than truly holding local staff, their supervisors, managers, and state and national leaders accountable to demonstrate with results that they have fairly served all producers.

Beyond everything that is written here, we stress once more that achieving change in rural areas requires an understanding of the social context that underlies the conditions faced by SDFRs and farmworkers.

When USDA, or county staff fully paid by USDA-- who have already cost the department over a billion dollars in liability for discrimination-- remain in place with not even a reprimand, and when their supervisors are retained and promoted, those who wish will find ways to assure that benefits are provided to some producers and denied to others and will feel free to continue their discriminatory practices.  But when their supervisors and leaders allow them continue these practices with impunity and remain staff members of USDA, it is this failure of leadership that gives them permission to continue business as usual.  Until this situation changes, nothing else will.

This report summarizes the conditions in place when we began this phase of our work in January 2009.  We have worked as hard as we are able to be fair and productive in our comments and we thank the Secretary and his staff for their openness to our role as partners in this work.  We urge the Secretary and USDA leaders to read this report carefully and track progress in implementing these proposals.

We believe the value of this report and partnership process rests in its ability to achieve our goal of developing strategic working relationships within all agencies and mission areas of USDA to recommend standards and build support to ensure equitable access to USDA programs and resources.  Success will also depend on the equitable allocation by USDA of financial resources for socially disadvantaged producers and farmworkers, to make them full participants in agriculture and to acquire, retain and develop land and become part of rural communities.

In Secretary Vilsack's words, "*This is a new day for equal employment opportunity, program delivery, and civil rights at USDA.  I intend to lead the Department in correcting its past errors, learning from its mistakes, and moving forward to a new era of equitable service and access for all.*"

## APPENDIX 1: SUMMARY OF REPORTS RELATED TO EQUITY IN ACCESS TO USDA PROGRAMS AND SERVICES

A multitude of reports have identified inequities in USDA programs and services.  These include:

∞ 2008 Government Accountability Office (GAO) Report on Civil Rights and USDA

∞ 2008 GAO Report on Beginning Farm Programs at USDA

∞ 1998 Small Farms Commission Report, A Time to Act.

∞ 1997 Civil Rights Action Team Report on Civil Rights at USDA

∞ 1996 United States Commission on Civil Rights report on Title VI enforcement by various federal agencies, including USDA[1]

∞ 1990 investigation, hearing, and report of the House Committee on Government Operations on the Farmers Home Administration's role in the decline in minority farming[2]

∞ 1983 Report of the USDA Task Force On Black Farm Ownership[3]

∞ 1982 Report of the United States Commission on Civil Rights (Commission) on The Decline of Black Farming in America[4]

∞ May 1979 Report "Where mules outrate men: migrant and seasonal farmworkers in North Carolina." North Carolina Advisory Committee to the United States Commission on Civil Rights. Washington, DC.

---

[1] U.S. Comm'n On Civil Rights, Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs 254 (June, 1996) [hereinafter Title VI Report].

[2] Decline of Minority Farming in the United States:  Hearing Before the Government Information, Justice, and Agriculture Subcommittee of the Committee on House Committee on Government Operations, 101st Cong., 2d Sess. 19-58  (July 25, 1990) [hereinafter Hearing Before the Government Information, Justice, and Agriculture Subcommittee. House Comm. on Government Operations, The Minority Farmer: A Disappearing American Resource; Has The Farmers Home Administration Been The Primary Catalyst?, H.R. Rep. No. 984, 101st Cong., 2d Sess. 1-2 (1990) [hereinafter The Minority Farmer: A Disappearing American Resource].

[3] USDA, Report of the USDA Task Force On Black Farm Ownership (Sept. 22, 1993) (written in response to the 1982 Civil Rights Commission Report).

[4] U.S. Comm'n On Civil Rights,  The Decline of Black Farming in America (Feb., 1982) [hereinafter 1982 Commission Report].

*A Time To Change: Report of the Conversations Assessment Team*                              135
*@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED*

∞ June 1978 Report "People who follow the crops. United States Commission on Civil Rights."  Washington, DC.

∞ July 1977 Report. "Working and living conditions of mushroom workers". Delaware and Pennsylvania Advisory Committees to the United States Commission on Civil Rights. Washington, DC.

∞ March 1974. "Indiana migrants: blighted hopes, slighted rights". Indiana Advisory Committee to the United States Commission on Civil Rights. Washington, DC.

∞ 1970 Commission report entitled <u>Cycle to Nowhere</u>[5]

∞ 1967 Commission report also focusing on Georgia[6]

∞ A brief 1966 Commission report focusing on Georgia[7]

∞ 1965 Commission report entitled <u>Equal Opportunity in Farm Programs</u>[8]

---

[5] U.S. Comm'n On Civil Rights, <u>Cycle to Nowhere</u> (Clearinghouse Pub. No. 14) (1970)

[6] U.S. Comm'n On Civil Rights Ga. State Advisory Committee, <u>Equal Opportunity in Federally Assisted Agricultural Programs in Georgia</u> (1967).

[7] U.S. Comm'n On Civil Rights, <u>Progress in Implementing Civil Rights Policies in Selected Agricultural Programs in the State of Georgia</u> (1966).

[8] U.S. Comm'n On Civil Rights, <u>Equal Opportunity in Farm Programs</u> (1965).

## APPENDIX II: <u>SOME CURRENT USDA ADVISORY COMMITTEES</u>

1.   Advisory Committee on Agriculture Statistics

2.   Advisory Committee on Beginning Farmers and Ranchers

3.   Advisory Committee on Biotechnology & 21st Century Agriculture (AC21)

4.   Advisory Committee on Emerging Markets

5.   Advisory Committee on Foreign Animal and Poultry Diseases

6.   Advisory Committee on Meat and Poultry Inspection

7.   Advisory Committee on Universal Cotton Standards

8.   Advisory Committee on Provincial Interagency Executive Committees

9.   Agricultural Policy Advisory Committee for Trade

10.  Agricultural Technical Advisory Committee for Trade in Animal and Animal Products

11.  Agricultural Technical Advisory Committee for Trade in Fruits and Vegetables

12.  Agricultural Technical Advisory Committee for Trade in Grain, Feed, and Oilseeds

13.  Agricultural Technical Advisory Committee for Trade in Processed Food

14.  Agricultural Technical Advisory Committee for Trade in Sweeteners and Sweetener Products

15.  Agricultural Technical Advisory Committee for Trade in Tobacco, Cotton, Peanuts, and Planting Seeds

16.  National Dairy Promotion and Research Board

17.  National Fluid Milk Processor Promotion Board

18.  National Genetic Resources Advisory Council

19.  National Honey Board

20.  National Mango Promotion Board

*A Time To Change: Report of the Conversations Assessment Team*                137
@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED

21. National Organic Standards Board

22. National Peanut Board

23. National Pork Board

24. National Potato Promotion Board

25. National Sheep Industry Improvement Center

26. National Urban and Community Forestry Advisory Council

27. National Watermelon Promotion Board

28. National Wildlife Services Advisory Board

29. Opal Creek Scenic Recreation Area Advisory Council

30. Peanut Standards Board

31. Plant Variety Protection Advisory Council

32. Popcorn Board

33. Pork Delegate Body

34. Research, Education, and Economics Task Force

35. Resource Advisory Committees for the State of Montana

36. Task Force on Agricultural Air Quality Research

37. United Soybean Board

38.  U.S. Highbush Blueberry Council

39. USDA Technology and e-Government Advisory Council

## **APPENDIX III: GLOSSARY OF DEFINITIONS AND TERMS**

1890 institutions. These colleges and universities were founded as a result of provisions in the second Morrill Act, which prohibited racial discrimination in land-grant institutions (see the definition of those institutions below). States had the option of creating separate institutions to serve African-American students. The southern states elected to have separate educational institutions, sometimes referred to as historically black colleges and universities (HBCUs). While not a land-grant institution, Tuskegee University has traditionally been associated with the 1890 institutions. It was granted 25,000 acres of land by Congress in 1899 and has espoused the land-grant philosophy throughout its history.

1994 institutions. These colleges and universities are land-grant institutions (see the definition of those institutions below) that traditionally served Native Americans. The Equity in Educational Land-Grant Status Act of 1994 conferred land-grant status on 29 tribal colleges that address agriculture and mechanical arts.

# **A**

Acequia. A Spanish word meaning irrigation ditch (derived from the Arabic *assaquiya*, or water carrier), acequia refers both to historic irrigation ditches and, in New Mexico, to a community association that owns and cares for such a ditch. Acequias are recognized under New Mexico law as political subdivisions of the state, and many of the state's acequia associations have been in existence since the seventeenth century.

ACRE. Average Crop Revenue Election.

ACT. Assessment Conversation Team.

AGR. Adjusted gross revenue.

AGR-Lite. Adjusted Gross Revenue-Lite, a whole-farm revenue protection plan.

AMA. Agricultural Management Assistance Program.

AMS. Agricultural Marketing Service.

APHIS. Animal and Plant Health Inspection Service.

ARRA. American Recovery and Reinvestment Act of 2009.

ARS.  Agricultural Research Service.

ASA. Assistant Secretary for Administration, reporting to the Secretary of Agriculture.

ASCR. Assistant Secretary for Civil Rights, reporting to the Secretary of Agriculture.

ASCS. The Agriculture Stabilization and Conservation Service.

ATTRA. Appropriate Technology Transfer for Rural Areas Program.

AWEP. Agricultural Water Enhancement Program.

# B

BCAP. Biomass Crop Assistance Program.

BFR. Beginning farmers or ranchers are farmers or ranchers (or all members of an entity that owns a farm or ranch) who: 1) have not operated a farm or ranch for more than 10 consecutive years and 2) will materially or substantially participate in the operation of the farm or ranch. Throughout this report, the terms "emerging" and "beginning" farmer and rancher are used interchangeably.

BFRDP. Beginning Farmer and Rancher Development Program.

BRDI. Biomass Research and Development Initiative.

BSE. Bovine spongiform encephalopathy, also known as mad cow disease.

# C

CBO. Community-based organization.  Community based organizations are organizations that are have and are governed by a defined and verifiable membership, with a democratically chosen and accountable board and governance structure and a proven history, of representing and providing services to a particular grassroots

constituency. For the purposes of this report, the CBOs referred to would have a history of representing and serving socially disadvantaged producers and farmworkers.  The term also refers to networks of CBOs that join together groups who meet the definition of CBO.

CCC. The Commodity Credit Corporation is a Federally owned and operated corporation within USDA, created to stabilize and support agricultural prices and farm income by making loans and payments to producers, purchasing commodities, and engaging in various other operations. CCC handles all money transactions for agricultural price and income support and related programs.

CCPI. Conservation Cooperative Partnership Initiative.

CED. County executive director.

CFDA. Catalogue of Federal Domestic Assistance.

COC. County office committee.

Constituents. USDA's constituents are individuals, groups, populations, communities, American Indian and Alaska Native tribal governments, communities, organizations, and other organizations that receive, purchase, or are otherwise affected by a product, service, or process of an USDA agency. Constituents receive products and services either directly from USDA agencies or indirectly through other individuals or organizations. USDA's constituents are the individuals and organizations that actually receive the intended benefit of its products and services.

CPD. Continuity of Operations Planning Division.

CRP. The Conservation Reserve Program is administered by NRCS.

CSA. Community-supported agriculture is a form of direct marketing whereby farmers have direct relationships with the communities that directly support their farming operation, usually by selling shares of the farm's production to the communities.

CSP. The Conservation Stewardship Program was established when the 2008 Farm Bill amended the Food Security Act of 1985. CSP provides payments to producers for adopting or maintaining a wide range of conservation management and land-based structural practices that address one or more resources of concern, such as soil, water, and wildlife habitat.

CSREES. Cooperative State Research, Education, and Extension Service. By October 1, 2009, CSREES will be renamed the National Institute for Food and Agriculture (NIFA), as directed by the 2008 Farm Bill.

## D

DET. Delivery Enhancement Task Force.
DHS. U.S. Department of Homeland Security.
DOE. U.S. Department of Energy.
DOJ. U.S. Department of Justice.
DOT. U.S. Department of Transportation.

## E

EBT. Electronic benefit transfer is a debit card technology used for issuing food stamp benefits.

ECP. Emergency Conservation Program.

EFNEP. Expanded Food and Nutrition Education Program.

EPA. Environmental Protection Agency.

EQIP. The Environmental Quality Incentives Program was established by the 1996 Farm Bill to consolidate and better direct the efforts of the Agricultural Conservation Program, Water Quality Incentives Program, Great Plains Conservation Program, and Colorado River Basin Salinity Program. The program provides education and technical assistance, as well as financial assistance through cost-share payments for structural and vegetative practices and incentive payments for management practices. EQIP is run by NRCS and is funded through CCC.

ERS. Economic Research Service.
ESL. English as a Second Language.
EWP. Emergency Watershed Protection Program.

# F

FBO. Faith-based organization.

FCC. Federal Communications Commission.

FCIC. Federal Crop Insurance Corporation.
FDA. Food and Drug Administration.
FDPIR. Food Distribution Program on Indian Reservations.

FEMA. The Federal Emergency Management Agency focuses on providing disaster relief as necessary throughout the United States.

FFA. The Future Farmers of America is a national, youth-oriented agricultural education organization with state and local chapters.

FMIA. The Federal Meat Inspection Act program is administered by FSIS and requires certain species of livestock and meat animals to be slaughtered only under Federal or state inspection.

FMPP. The Farmers Market Promotion Program is a grant program administered by AMS.

FMNP. The Farmers Market Nutrition Program is administered by FNS.

FNS.  Food and Nutrition Service.

FOIA. Freedom of Information Act.

FRPP. The Farm and Ranchland Protection Program is administered by NRCS and focuses on providing resources to producers and landowners to solve problems of farm and ranchland protection.

FRTEP. Federally Recognized Tribal Extension Program.

FS. Forest Service.

FSA. Farm Service Agency.

FSIS. Food Safety and Inspection Service.

FSMIP. Federal-State Marketing Improvement Program.

## G

GAO. Government Accountability Office.

GIPSA. Grain Inspection Packers and Stockyards Administration.

GRP. The Grassland Reserve Program was established in the 2002 Farm Bill to assist owners, through long-term contracts or easements, in restoring grassland and conserving virgin grassland. The program is administered jointly by NRCS, FSA, and FS.

GSA. General Services Administration.

# H

HAC. Housing Assistance Council.

HBCUs. Historically black colleges and universities. See 1890 institutions.

HFRP. The Healthy Forest Reserve Program is administered by NRCS and focuses on providing resources to producers and landowners to solve problems related to forest health.

HSI. A Hispanic serving institution is a nonprofit college or university with an enrollment that is at least 25 percent Hispanic full-time equivalent (FTE) students.

HUD. U.S. Department of Housing and Urban Development.

# I

IAC. Intertribal Agriculture Council.

IGA. Intergovernmental Affairs Division of the Office of Congressional Relations.

IPA. Interagency Personnel Agreement.

ITO. Indian Tribal Organization.

# L

Land-grant institutions. The original land-grant colleges and universities are sometimes called "1862 institutions" as they were established by the Land Grant College Act of 1862, also known as the first Morrill Act. A land-grant institution is a college or university designated by its state legislature or by Congress to receive benefits under the Morrill Acts of 1862 and 1890. A principal mission of these institutions is to teach agriculture and the mechanical arts. The first Morrill Act granted each state Federal land to be sold to provide an endowment for at least one land-grant institution. Additional colleges and universities have been established with land-grant status, and certain existing institutions have received land-grant status.

LEP. Limited English Proficiency.

Limited-resource farmer or rancher. Farmers and ranchers are considered to have limited resources if they have: 1) direct or indirect gross farm sales of $116,800 or less (adjusted for inflation starting in 2005) in each of the previous two years; and 2) total household income at or below the national poverty level for a family of four, or less than 50 percent of their county's median household income in each of the previous two years.

## M

MOA. Memorandum of agreement.

## N

NAIS. The National Animal Identification System is administered by APHIS. It is a national program designed to identify and track all livestock within the United States.

NAP. Noninsured Crop Disaster Assistance Program.

NASS. National Agricultural Statistics Service.

NGOs. Nongovernmental organizations, also known as nonprofit organizations.

NIEHS. The National Institute of Environmental and Health Sciences.

NIFA. National Institute for Food and Agriculture (see CSREES).

NIH. National Institutes of Health.

NOCP. Notice of contract proposals.

NOFA. Notice of funds availability.

NOP. National Organic Program.

NOSA. Notice of solicitation of applications.

NRCS. Natural Resources Conservation Service.

NRE. Natural Resources and the Environment, a mission area of USDA that includes NRCS and FS.

NSLP. National School Lunch Program.

NTIA. National Telecommunications Information Administration.

# **O**

OASCR. Office of the Assistant Secretary for Civil Rights, who reports to the Secretary of Agriculture.

OBPA. Office of Budget and Program Analysis.

OAO. Office of Advocacy and Outreach.

OEIA. The Office of External and Intergovernmental Affairs is in the Office of Congressional Relations.

OGC. Office of the General Counsel in USDA.

OHS. Office of Homeland Security in USDA.

OIG. Office of the Inspector General.

Operating loan. FSA operating loans may be used to purchase livestock, farm equipment, feed, seed, fuel, farm chemicals, and insurance, or pay for other operating expenses.

OMB. Office of Management and Budget.

OOEET. Office of Outreach, Employee Education, and Training.

OSHA. Occupational Safety and Health Administration.

OTASDFR. Outreach and Technical Assistance Program for Socially Disadvantaged Farmers and Ranchers, also known as the 2501 Program.

# P

PACA. Perishable Agricultural Commodities Act.

Partners. Representatives from the CBOs and USDA who meet annually to together identify and propose solutions resolve problems in program delivery and allegations of past discrimination against USDA employees.

PMS. Payment Management System.

# R

RC&D Program. Resource Conservation and Development Program.

RD. Rural Development.

REAP. Rural Energy for America Program.

REE. Research, Education and Economics.

RFA. A request for applications is a formal statement that invites grant or cooperative agreement applications in a well-defined area to accomplish specific program objectives. The RFA indicates the estimated amount of funds set aside for the competition, the estimated number of awards to be made, and the application receipt date(s). Applications submitted in response to an RFA usually are reviewed by an initial review group convened by the agency or organization that issued the RFA.

RFP. Request for proposals to provide specific government-commissioned work.

RHS. The Rural Housing Service.

RMA. The Risk Management Agency at USDA administers the programs of the FCIC.

RME. Risk Management Education programs are funded through RMA and CSREES. The extension RME program delivers subgrantee opportunities in four regions of the United States through four regional RME centers; while the RME programs funded by RMA are delivered at the regional and national level. Both the programs administered directly through RMA and those administered through CSREES focus on the five areas of RME: production, price/income, marketing, legal, and human resource risks.

RUS. Rural Utilities Service.

## S

SADA. Supplemental Agricultural Disaster Assistance Program.

SBA. Small Business Administration.

SBFs. Small and beginning farmers.

Schedule F.  An additional schedule to attach to annual income tax forms filed with the Internal Revenue Service relating to farming operations.

SCIMS. Service Center Information Management System.

SDFR. A socially disadvantaged farmer or rancher belongs to a group whose members have been subjected to racial or ethnic (and in some cases gender) prejudice because of their identity as  members of the group. The precise definition of SDFRs varies by title of the farm bill.

SEARCH. Special Evaluation Assistance for Rural Communities and Households.

Section 10708. Section 10708 (a) of the Farm Security and Rural Investment Act of 2002, "Transparency and Accountability for Socially Disadvantaged Farmers and Ranchers; Public Disclosure Requirements for County Committee Elections," requires an annual compilation and public disclosure of data relating to the participation of SDFRs in USDA programs. Expanded in Section 14006 of the 2008 Farm Bill.

SED. State executive director for Farm Services Agency.

SFMNP. The Senior Farmers Market Nutrition Program is administered by the FNS.

SNAP. Supplemental Nutrition Assistance Program, formerly called the Food Stamp Program.

Specialty crops. Fruits, vegetables, tree nuts, dried fruits, nursery crops, and floriculture, which are also referred to as horticulture crops.

SURE. Supplemental Revenue Assistance Payments.

SUTA. Substantially Underserved Trust Area.

SWIAA. Southwest Indian Agriculture Association.

## **T**

TEFAP. The Emergency Food Assistance Program.

Tribes. Native American or American Indian tribes, including tribal governments functioning in a government-to-government relationship with the federal government of the United States.

## **U**

USDA. The U.S. Department of Agriculture.

## **W**

WHIP. The Wildlife Habitat Incentives Program was created in the 1996 Farm Bill to provide cost-sharing and technical assistance to landowners for developing habitats for upland wildlife, wetland wildlife, threatened and endangered species, fish, and other types of wildlife.

WIC. The Women, Infants and Children Program is administered by the FNS.

WRP. The Wetlands Reserve Program was established in the 1985 Farm Bill and is administered by NRCS in consultation with FSA and other Federal agencies.

**APPENDIX IV - USDA-CBO PARTNERS ASSESSMENT CONVERSATIONS TEAM (ACT)**

**USDA Members**

**Geraldine Herring**
Special Outreach Program Manager
USDA Office of Outreach
Office of the Assistant Secretary for Civil Rights
300 Seventh Street, SW
Ag Stop 9473
Washington, DC  20024
Ph:  (202) 720-1637
Fax:  (202) 720-7489
Email: geraldine.herring@usda.gov

**Sibyl Wright**
Agency Outreach and Small Farms Coordinator
USDA, FSIS, OOEET, Outreach and Partnership Staff
Room 397, Aerospace Center
901 D Street, SW
Washington, DC 20024
Ph: 202.720.4923
Fax: 202-690-6519
Email: sibyl.wright@fsis.usda.gov

**Sonya Neal Reeves**
Senior Program Analyst
Resource Conservation, Development
    and Outreach Division
Outreach Branch
5601 Sunnyside Avenue, Mail Stop 5474
Beltsville, MD 20705
Ph:  (301) 504-2224
Fax:  (301) 504-2248
Email: sonya.neal-reeves@wdc.usda.gov

**Janie Simms Hipp, J.D., LL.M**.
National Program Leader
Farm Financial Management
Risk Management Education
Trade Adjustment Assistance
Beginning Farmer & Rancher Development Program
Cooperative State Research, Education, and Extension Service, USDA
Ph:  (202) 720-3605
Fax:  (202) 690-3162
Email: janie.hipp@rma.usda.gov

**Rhonda Brown, RD**
FBCI Coordinator/Agency Outreach Coordinator
Operations and Management
USDA Rural Development

*A Time To Change: Report of the Conversations Assessment Team*                    152
*@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED*

300 7th St. SW, 8th Flr.
Washington, DC 20024
Ph. (202) 692-0298
Fax: (202) 260-0885
Email: rhonda.brown@wdc.usda.gov

**Edgar Lewis**
Agricultural Economist
1890 Program Manager
Rural Business/Cooperative Service
Rural Development
Ph. (202) 690-3407
Fax: (202) 690-2723
Email: edgar.lewis@wdc.usda.gov

**Tracy L. Jones**
Senior Loan Officer
USDA Farm Service Agency
Loan Making Division
Guaranteed Loan Branch
1250 Maryland Avenue, SW Suite 508
Portals building Washington, DC 20024
Ph: (202) 720-6771
Fax: (202) 720-6797
Email: Tracy.Jones@wdc.usda.gov

**John D. Jefferson, Jr.**
Public Affairs Outreach Specialist
Office of External Affairs
Farm Service Agency
Washington, DC 20250
Ph: (202) 720-5534
Fax: (202) 720-2979
Email: john.jefferson@wdc.usda.gov

**Bill Buchanan**
Director
Civil Rights and Community Outreach
Risk Management Agency
Ph: (202) 690-6068
Fax: (202) 690-1518
Email: william.buchanan@wdc.usda.gov

**Pamela Kelly Phillips**
Outreach Branch Chief
Office of Strategic Initiatives, Partnerships and Outreach
Food Nutrition Service
Ph: (703) 305-2298
Fax: (703) 605-0220
Email: pam.phillips@fns.usda.gov

*A Time To Change: Report of the Conversations Assessment Team*          153
@2010 Rural Coalition and the Federation of Southern Cooperatives. ALL RIGHTS RESERVED

**Alfonzo Drain**
Statistician
Office of the Associate Administrator
National Agricultural Statistics Service
Ph:  (202) 720-3238
Fax:  (202) 720-0443
Email: alfonzo_drain@nass.usda.gov

<u>**CBO Partner Members**</u>

**Lorette Picciano**
Executive Director
Rural Coalition/Coalición Rural
1012 14th Street, NW, Suite 1100
Washington, DC 20005
Phone: 202-628-7160
Fax: 202-393-1816
Email:  Lpicciano@ruralco.org

**Edward "Jerry" Pennick**
Director, Land Assistance Fund (LAF)
Federation of Southern Cooperatives/LAF
2769 Church Street
East Point, GA 30344
Phone:  (404) 765-0991
Fax: (404) 765-9178
Email:  LaFund@mindspring.com

APPENDIX V

# USDA-CBO Partners and Solutions Committee Members and Charges

**1.  Partners Planning Committee**
  *Charge:  Provide oversight for the Partners Meeting Planning and Implementation, the continuing evolution of the "Partners" concept and the USDA/CBO partnering process*

*Members:*
Shirley Sherrod, Federation of Southern Cooperatives/Land Assistance Fund
Ross Racine, Intertribal Agricultural Council,
Chukou Thao, National Hmong American Farmers
Rudy Arredondo, HOLA/National Latino Farmers and Ranchers Trade Association
Georgia Good, Rural Advancement Fund
Annette Hiatt, Land Loss Prevention Project
Savonala Horne, Land Loss Prevention Project
Calvin King, Arkansas Land and Farm Development Corporation
Lou Anne Kling, National Tribal Development Corporation
Tirso Moreno, Farmworker Association of Florida
Ralph Paige, Federation of Southern Cooperatives/Land Assistance Fund
Jerry Pennick, Federation of Southern Cooperatives/Land Assistance Fund
Lorette Picciano, Rural Coalition/Coalición Rural
Dr. Gladys Gary Vaughn, Office of Outreach, US Department of Agriculture
Geraldine Herring, Office of Outreach, US Department of Agriculture
Al Drain, National Agricultural Statistical Service, US Department of Agriculture
William Buchanan, Risk Management Agency, US Department of Agriculture

**2.  Partners Solutions Follow-Up Team**
*Charge:  Ensure that there is adequate and consistent follow-up for the issues and concerns addressed at each Partners Meeting*

*Members:*
Chukou Thao,  CBO Partner**,** National Hmong American Farmers, Chair
Geraldine Herring, USDA, Office of Outreach, Co-chair
Maria Alvarez, CBO Partner, National Immigrant Farming Initiative
Cornelius Blanding, CBO Partner, Federation of Southern Cooperatives/LAF
Michael Harris, CBO Partner, California Black Farmers and Agriculturists Association
Annette Hiatt, CBO Partner, Land Loss Prevention Project
Lorette Picciano, CBO Partner, Rural Coalition
Brandon Terrazas, USDA, FSA
Dan Abeyta, USDA, FSA
Rhonda Brown, USDA, RD
William Buchanan, USDA, RMA
Sonya Neal Reeves, USDA, NRCS
Dr. Gladys Gary Vaughn, USDA, Office of Outreach

*A Time To Change: Report of the Conversations Assessment Team*                    155
@2010 Rural Coalition and the Federation of Southern Cooperatives.  ALL RIGHTS RESERVED

# A TIME TO CHANGE:

# A REPORT BY THE ASSESSMENT CONVERSATIONS TEAM (ACT REPORT)

*By Rural Coalition/Coalición Rural*
*And*
*The Federation of Southern Cooperatives/Land Assistance Fu nd*

*September 22, 2010*

*Copies available for download at www.ruralco.org.  For hard copies, send request for ACT report to Rural Coalition, 1012 14th Street NW, Suite 1100, Washington, DC 20005.  Include $6 for each copy by check or money order for printing and shipping and handling, or $10 by priority mail.*

| row | Item | All Farms | All Farms CV | Minority Farms | Minority Farms CV | Non-minority Farms | Non-minority Farms CV |
|---|---|---|---|---|---|---|---|
| 1 | Farms, number | 2,042,220 | 2.1 | 193,494 | 6.0 | 1,848,726 | 2.0 |
| 2 | Producers, number | 3,399,834 | 2.4 | 336,664 | 7.5 | 3,063,170 | 2.2 |
| 3 | Land in farms, acres | 900,217,576 | 1.7 | 94,129,419 | 3.4 | 806,088,157 | 1.7 |
| 4 | Average size of farm, acres | 441 | 2.5 | 486 | 5.9 | 436 | 2.2 |
| 5 | Owned land in farms, farms | 1,917,281 | 2.1 | 180,134 | 6.5 | 1,737,147 | 2.0 |
| 6 | Owned land in farms, acres | 547,756,082 | 2.0 | 73,083,892 | 4.8 | 474,672,190 | 1.9 |
| 7 | Owned land in farms, avg acres per farm | 286 | 2.7 | 406 | 6.5 | 273 | 2.3 |
| 8 | Rented land in farms, farms | 616,954 | 1.8 | 45,926 | 5.0 | 571,028 | 1.7 |
| 9 | Rented land in farms, acres | 352,461,494 | 1.5 | 21,045,527 | 3.2 | 331,415,967 | 1.4 |
| 10 | Rented land in farms, avg acres per farm | 571 | 2.1 | 458 | 4.7 | 580 | 2.0 |
| 11 | Government payments, farms | 643,145 | 0.7 | 28,019 | 3.2 | 615,126 | 0.8 |
| 12 | Government payments, dollars | 8,943,574,000 | 1.8 | 329,627,000 | 44.5 | 8,613,948,000 | 1.0 |
| 13 | Government payments, avg per farm ($) | 13,906 | 2.1 | 11,764 | 48.7 | 14,004 | 0.9 |
| 14 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, farms | 238,041 | 1.3 | 6,554 | 4.5 | 231,487 | 1.3 |
| 15 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, dollars | 1,661,505,000 | 1.3 | 42,487,000 | 4.6 | 1,619,018,000 | 1.3 |
| 16 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, avg per farm ($) | 6,980 | 1.0 | 6,483 | 4.5 | 6,994 | 1.0 |
| 17 | Amount from other Federal farm programs, farms | 554,195 | 0.8 | 25,311 | 3.7 | 528,884 | 0.8 |
| 18 | Amount from other Federal farm programs, dollars | 7,282,069,000 | 2.2 | 287,140,000 | 50.9 | 6,994,929,000 | 1.2 |
| 19 | Amount from other Federal farm programs, avg per farm ($) | 13,140 | 2.6 | 11,344 | 55.6 | 13,226 | 1.0 |
| 20 | Commodity Credit Corporation Loans, | 18,185 | 4.4 | 474 | 9.2 | 17,711 | 4.6 |
| 21 | Commodity Credit Corporation Loans, | 2,480,261,000 | 3.8 | 59,197,000 | 23.3 | 2,421,064,000 | 3.8 |
| 22 | Commodity Credit Corporation Loans, avg per farm ($) | 136,390 | 3.8 | 124,887 | 29.3 | 136,698 | 4.0 |
| 23 | Net cash farm income of the operations, farms | 2,042,220 | 1.9 | 193,494 | 5.5 | 1,848,726 | 1.7 |
| 24 | Net cash farm income of the operations, dollars | 87,923,453,000 | 1.3 | 6,257,811,000 | 4.9 | 81,665,642,000 | 1.3 |
| 25 | Net cash farm income of the operations, avg per farm ($) | 43,053 | 1.3 | 32,341 | 4.9 | 44,174 | 1.3 |
| 26 | Farms with net gains, farms | 891,329 | 1.2 | 57,430 | 4.2 | 833,899 | 1.2 |
| 27 | Farms with net gains, dollars | 112,088,509,000 | 0.9 | 8,917,981,000 | 2.6 | 103,170,528,000 | 0.9 |
| 28 | Farms with net losses, farms | 1,150,891 | 3.2 | 136,064 | 7.7 | 1,014,827 | 3.0 |
| 29 | Farms with net losses, dollars | 24,165,056,000 | 1.7 | 2,660,170,000 | 7.4 | 21,504,886,000 | 1.8 |
| 30 | Net cash farm income of producers, farms | 2,042,220 | 1.9 | 193,494 | 5.5 | 1,848,726 | 1.7 |
| 31 | Net cash farm income of producers, | 65,795,218,000 | 1.5 | 4,375,809,000 | 5.4 | 61,419,409,000 | 1.5 |
| 32 | Net cash farm income of producers, avg per farm ($) | 32,217 | 1.5 | 22,615 | 5.4 | 33,223 | 1.5 |
| 33 | Producers reporting net gains, farms | 881,472 | 1.2 | 57,046 | 4.4 | 824,426 | 1.1 |
| 34 | Producers reporting net gains, dollars | 91,479,912,000 | 1.0 | 7,110,416,000 | 2.1 | 84,369,495,000 | 1.0 |
| 35 | Producers reporting net losses, farms | 1,160,748 | 3.2 | 136,448 | 7.6 | 1,024,300 | 3.0 |
| 36 | Producers reporting net losses, dollars | 25,684,693,000 | 1.6 | 2,734,607,000 | 6.7 | 22,950,086,000 | 1.6 |
| 37 | Livestock, poultry, and their products sales, farms | 986,790 | 2.0 | 94,510 | 6.3 | 892,280 | 1.9 |
| 38 | Livestock, poultry, and their products sales, dollars | 194,975,996,000 | 1.1 | 14,573,557,000 | 3.3 | 180,402,439,000 | 1.2 |
| 39 | Livestock, poultry, and their products sales, avg per farm ($) | 197,586 | 2.4 | 154,201 | 6.2 | 202,181 | 2.0 |
| 40 | Commodities Raised and Delivered Under Production Contracts: Broilers and other meat-type chickens, farms | 14,598 | 3.3 | 1,494 | 9.0 | 13,104 | 3.5 |
| 41 | Commodities Raised and Delivered Under Production Contracts: Broilers and other meat-type chickens, number | 8,560,877,264 | 2.8 | 1,107,253,867 | 10.1 | 7,453,623,397 | 2.8 |
| 42 | Commodities Raised and Delivered Under Production Contracts: Eggs, chicken (dozens), farms | 2,777 | 5.2 | 259 | 19.3 | 2,518 | 5.5 |
| 43 | Commodities Raised and Delivered Under Production Contracts: Eggs, chicken (dozens), number | 1,746,778,249 | 4.4 | 143,064,267 | 17.9 | 1,603,713,982 | 4.3 |
| 44 | Commodities Raised and Delivered Under Production Contracts: Layers, farms | 2,533 | 5.0 | 246 | 19.7 | 2,287 | 5.2 |
| 45 | Commodities Raised and Delivered Under Production Contracts: Layers, number | 68,012,545 | 5.2 | 6,443,035 | 20.1 | 61,569,510 | 5.0 |
| 46 | Commodities Raised and Delivered Under Production Contracts: Pullets for laying flock replacement, farms | 1,510 | 11.5 | 62 | 14.8 | 1,448 | 11.9 |
| 47 | Commodities Raised and Delivered Under Production Contracts: Pullets for laying flock replacement, number | 136,669,132 | 11.6 | 3,498,800 | 9.4 | 133,170,332 | 11.8 |
| 48 | Commodities Raised and Delivered Under Production Contracts: Turkeys, farms | 1,926 | 4.6 | 55 | 32.6 | 1,871 | 4.3 |
| 49 | Commodities Raised and Delivered Under Production Contracts: Turkeys, number | 198,153,009 | 3.6 | 6,793,074 | 15.9 | 191,359,935 | 3.3 |
| 50 | Commodities Raised and Delivered Under Production Contracts: Custom fed cattle shipped directly for slaughter, farms | 1,070 | 12.8 | 30 | 65.4 | 1,040 | 13.0 |
| 51 | Commodities Raised and Delivered Under Production Contracts: Custom fed cattle shipped directly for slaughter, number | 9,397,176 | 3.1 | 777,063 | 5.2 | 8,620,113 | 3.1 |
| 52 | Commodities Raised and Delivered Under Production Contracts: Hogs and pigs, | 8,386 | 1.8 | 146 | 10.1 | 8,240 | 1.8 |
| 53 | Commodities Raised and Delivered Under Production Contracts: Hogs and pigs, | 99,869,561 | 1.9 | 2,720,343 | 11.3 | 97,149,218 | 1.9 |
| 54 | Commodities Raised and Delivered Under Production Contracts: Replacement dairy heifers, farms | 2,286 | 11.7 | 35 | 108.9 | 2,251 | 12.3 |
| 55 | Commodities Raised and Delivered Under Production Contracts: Replacement dairy heifers, number | 997,700 | 13.4 | 19,578 | 25.6 | 978,122 | 14.0 |
| 56 | Commodities Raised and Delivered Under Production Contracts: Other cattle, sheep, livestock, or poultry, farms | 1,045 | 7.1 | 26 | 69.5 | 1,019 | 7.3 |
| 57 | Commodities Raised and Delivered Under Production Contracts: Other cattle, sheep, livestock, or poultry, number | (X) | (X) | (X) | (X) | (X) | (X) |
| 58 | Commodities Raised and Delivered Under Production Contracts: Grains, oilseeds, vegetables, melons, potatoes, and other crops, farms | 1,763 | 5.2 | 36 | 56.8 | 1,727 | 4.9 |
| 59 | Commodities Raised and Delivered Under Production Contracts: Grains, oilseeds, vegetables, melons, potatoes, and other crops, number | (X) | (X) | (X) | (X) | (X) | (X) |
| 60 | Commodities Raised and Delivered Under Production Contracts: All poultry and eggs, farms | 20,637 | 3.2 | 1,862 | 9.0 | 18,775 | 3.3 |
| 61 | Commodities Raised and Delivered Under Production Contracts: All poultry and eggs, number | (X) | (X) | (X) | (X) | (X) | (X) |
| 62 | Value of commodities delivered under contract, farms | 34,420 | 2.4 | 2,121 | 8.6 | 32,299 | 2.3 |
| 63 | Value of commodities delivered under contract, dollars | 67,687,952,000 | 1.8 | 5,906,542,000 | 7.1 | 61,781,410,000 | 1.8 |
| 64 | Total Dollars Received for Delivering under Contract, farms | 34,420 | 2.4 | 2,121 | 8.6 | 32,299 | 2.3 |
| 65 | Total Dollars Received for Delivering under Contract, dollars | 7,226,669,000 | 2.0 | 678,253,000 | 6.7 | 6,548,416,000 | 2.0 |
| 66 | Market value of agricultural products sold, dollars | 388,522,695,000 | 0.8 | 32,684,714,000 | 3.0 | 355,837,981,000 | 0.8 |
| 67 | Market value of agricultural products sold and government payments, dollars | 397,466,269,000 | 0.8 | 33,014,340,000 | 3.0 | 364,451,929,000 | 0.8 |
| 68 | Farms with Production contracts: Net cash farm income of the operations, farms | 34,420 | 2.5 | 2,121 | 7.8 | 32,299 | 2.4 |
| 69 | Farms with Production contracts: Net cash farm income of the operations, dollars | 22,651,922,000 | 2.7 | 2,087,266,000 | 8.6 | 20,564,657,000 | 2.6 |
| 70 | Farms with Production contracts: Net cash farm income of the operations, avg per farm ($) | 658,103 | 2.7 | 984,095 | 8.6 | 636,696 | 2.6 |
| 71 | Farms with Production contracts: Farms with net gains, farms | 32,166 | 2.6 | 2,017 | 7.8 | 30,149 | 2.5 |
| 72 | Farms with Production contracts: Farms with net gains, dollars | 23,050,893,000 | 2.7 | 2,105,990,000 | 8.6 | 20,944,903,000 | 2.6 |
| 73 | Farms with Production contracts: Farms with net losses, farms | 2,254 | 6.3 | 104 | 50.3 | 2,150 | 7.6 |
| 74 | Farms with Production contracts: Farms with net losses, dollars | 398,971,000 | 3.6 | 18,724,000 | 21.2 | 380,247,000 | 4.2 |
| 75 | Farms with Production contracts: Net cash farm income of producers, farms | 34,420 | 2.4 | 2,121 | 7.7 | 32,299 | 2.3 |
| 76 | Farms with Production contracts: Net cash farm income of producers, dollars | 4,652,603,000 | 2.9 | 338,865,000 | 6.8 | 4,313,738,000 | 2.9 |
| 77 | Farms with Production contracts: Net cash farm income of producers, avg per farm | 135,172 | 2.9 | 159,767 | 6.8 | 133,556 | 2.9 |
| 78 | Farms with Production contracts: Producers reporting net gains, farms | 28,278 | 2.8 | 1,786 | 8.6 | 26,492 | 2.6 |
| 79 | Farms with Production contracts: Producers reporting net gains, dollars | 5,797,800,000 | 2.1 | 400,286,000 | 5.4 | 5,397,514,000 | 2.1 |
| 80 | Farms with Production contracts: Producers reporting net losses, farms | 6,142 | 5.1 | 335 | 15.8 | 5,807 | 5.3 |
| 81 | Farms with Production contracts: Producers reporting net losses, dollars | 1,145,197,000 | 4.3 | 61,421,000 | 12.2 | 1,083,776,000 | 4.8 |
| 82 | Farms with Production contracts: Livestock, poultry, and their products | 33,263 | 2.4 | 2,093 | 9.0 | 31,170 | 2.3 |
| 83 | Farms with Production contracts: Livestock, poultry, and their products | 71,635,646,000 | 1.8 | 5,949,721,000 | 7.1 | 65,685,925,000 | 1.8 |
| 84 | Farms with Production contracts: Livestock, poultry, and their products sales, avg per farm ($) | 2,153,613 | 1.9 | 2,842,676 | 6.2 | 2,107,344 | 1.9 |
| 85 | Farms without Production contracts: Net cash farm income of the operations, farms | 2,007,800 | 1.9 | 191,373 | 5.6 | 1,816,427 | 1.8 |
| 86 | Farms without Production contracts: Net cash farm income of the operations, | 65,271,531,000 | 1.6 | 4,170,545,000 | 5.8 | 61,100,986,000 | 1.5 |
| 87 | Farms without Production contracts: Net cash farm income of the operations, avg per farm ($) | 32,509 | 1.6 | 21,793 | 5.8 | 33,638 | 1.5 |
| 88 | Farms without Production contracts: Farms with net gains, farms | 859,163 | 1.2 | 55,413 | 4.5 | 803,750 | 1.2 |
| 89 | Farms without Production contracts: Farms with net gains, dollars | 89,037,616,000 | 1.0 | 6,811,991,000 | 2.1 | 82,225,625,000 | 1.0 |
| 90 | Farms without Production contracts: Farms with net losses, farms | 1,148,637 | 3.2 | 135,960 | 7.7 | 1,012,677 | 3.0 |
| 91 | Farms without Production contracts: Farms with net losses, dollars | 23,766,086,000 | 1.7 | 2,641,446,000 | 7.4 | 21,124,639,000 | 1.8 |
| 92 | Farms without Production contracts: Net cash farm income of producers, farms | 2,007,800 | 1.9 | 191,373 | 5.6 | 1,816,427 | 1.8 |
| 93 | Farms without Production contracts: Net cash farm income of producers, dollars | 61,142,615,000 | 1.7 | 4,036,944,000 | 5.8 | 57,105,671,000 | 1.6 |
| 94 | Farms without Production contracts: Net cash farm income of producers, avg per farm ($) | 30,453 | 1.7 | 21,095 | 5.8 | 31,438 | 1.6 |
| 95 | Farms without Production contracts: Producers reporting net gains, farms | 853,194 | 1.2 | 55,260 | 4.6 | 797,934 | 1.2 |
| 96 | Farms without Production contracts: Producers reporting net gains, dollars | 85,682,112,000 | 1.1 | 6,710,131,000 | 2.2 | 78,971,981,000 | 1.1 |
| 97 | Farms without Production contracts: Producers reporting net losses, farms | 1,154,606 | 3.2 | 136,113 | 7.7 | 1,018,493 | 3.0 |
| 98 | Farms without Production contracts: Producers reporting net losses, dollars | 24,539,497,000 | 1.7 | 2,673,186,000 | 6.9 | 21,866,310,000 | 1.7 |
| 99 | Farms without Production contracts: Livestock, poultry, and their products sales, farms | 953,527 | 2.1 | 92,417 | 6.4 | 861,110 | 2.0 |
| 100 | Farms without Production contracts: Livestock, poultry, and their products sales, dollars | 123,340,350,000 | 1.4 | 8,623,836,000 | 1.3 | 114,716,514,000 | 1.5 |
| 101 | Farms without Production contracts: Livestock, poultry, and their products sales, avg per farm ($) | 129,352 | 2.6 | 93,314 | 5.7 | 133,219 | 2.3 |
| 102 | Acres covered by crop insurance, farms | 380,236 | 1.3 | 18,026 | 5.6 | 362,210 | 1.2 |
| 103 | Acres covered by crop insurance, acres | 284,359,292 | 1.3 | 10,476,392 | 6.6 | 273,882,900 | 1.3 |
| 104 | Acres covered by crop insurance, avg acres per farm | 748 | 1.4 | 581 | 4.4 | 756 | 1.3 |
| 105 | Minority farms, farms | 193,494 | 6.0 | 193,494 | 6.0 | (X) | (X) |
| 106 | Minority farms, minority producers | 260,751 | 7.9 | 260,751 | 7.9 | (X) | (X) |

| row | Item | All Farms | All Farms CV | Minority Farms | Minority Farms % of all farms | Minority Farms CV | Non-minority Farms | Non-minority Farms % of all farms | Non-minority Farms CV |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Farms, number | 2,042,220 | 2.1 | 193,494 | 9% | 6.0 | 1,848,726 | 91% | 2.0 |
| 2 | Producers, number | 3,399,834 | 2.4 | 336,664 | 10% | 7.5 | 3,063,170 | 90% | 2.2 |
| 3 | Land in farms, acres | 900,217,576 | 1.7 | 94,129,419 | 10% | 3.4 | 806,088,157 | 90% | 1.7 |
| 4 | Average size of farm, acres | 441 | 2.5 | 486 | 110% | 5.9 | 436 | 99% | 2.2 |
| 5 | Owned land in farms, farms | 1,917,281 | 2.1 | 180,134 | 9% | 6.5 | 1,737,147 | 91% | 2.0 |
| 6 | Owned land in farms, acres | 547,756,082 | 2.0 | 73,083,892 | 13% | 4.8 | 474,672,190 | 87% | 1.9 |
| 7 | Owned land in farms, avg acres per farm | 286 | 2.7 | 406 | 142% | 6.5 | 273 | 96% | 2.3 |
| 8 | Rented land in farms, farms | 616,954 | 1.8 | 45,926 | 7% | 5.0 | 571,028 | 93% | 1.7 |
| 9 | Rented land in farms, acres | 352,461,494 | 1.5 | 21,045,527 | 6% | 3.2 | 331,415,967 | 94% | 1.4 |
| 10 | Rented land in farms, avg acres per farm | 571 | 2.1 | 458 | 80% | 4.7 | 580 | 102% | 2.0 |
| 11 | Government payments, farms | 643,145 | 0.7 | 28,019 | 4% | 3.2 | 615,126 | 96% | 0.8 |
| 12 | Government payments, dollars | 8,943,574,000 | 1.8 | 329,627,000 | 4% | 44.5 | 8,613,948,000 | 96% | 1.0 |
| 13 | Government payments, avg per farm ($) | 13,906 | 2.1 | 11,764 | 85% | 48.7 | 14,004 | 101% | 0.9 |
| 14 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, farms | 238,041 | 1.3 | 6,554 | 3% | 4.5 | 231,487 | 97% | 1.3 |
| 15 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, dollars | 1,661,505,000 | 1.3 | 42,487,000 | 3% | 4.6 | 1,619,018,000 | 97% | 1.3 |
| 16 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, avg per farm ($) | 6,980 | 1.0 | 6,483 | 93% | 4.5 | 6,994 | 100% | 1.0 |
| 17 | Amount from other Federal farm programs, farms | 554,195 | 0.8 | 25,311 | 5% | 3.7 | 528,884 | 95% | 0.8 |
| 18 | Amount from other Federal farm programs, dollars | 7,282,069,000 | 2.2 | 287,140,000 | 4% | 50.9 | 6,994,929,000 | 96% | 1.2 |
| 19 | Amount from other Federal farm programs, avg per farm ($) | 13,140 | 2.6 | 11,344 | 86% | 55.6 | 13,226 | 101% | 1.0 |
| 20 | Commodity Credit Corporation Loans, | 18,185 | 4.4 | 474 | 3% | 9.2 | 17,711 | 97% | 4.6 |
| 21 | Commodity Credit Corporation Loans, | 2,480,261,000 | 3.8 | 59,197,000 | 2% | 23.3 | 2,421,064,000 | 98% | 3.8 |
| 22 | Commodity Credit Corporation Loans, avg per farm ($) | 136,390 | 3.8 | 124,887 | 92% | 29.3 | 136,698 | 100% | 4.0 |
| 23 | Net cash farm income of the operations, farms | 2,042,220 | 1.9 | 193,494 | 9% | 5.5 | 1,848,726 | 91% | 1.7 |
| 24 | Net cash farm income of the operations, dollars | 87,923,453,000 | 1.3 | 6,257,811,000 | 7% | 4.9 | 81,665,642,000 | 93% | 1.3 |
| 25 | Net cash farm income of the operations, avg per farm ($) | 43,053 | 1.3 | 32,341 | 75% | 4.9 | 44,174 | 103% | 1.3 |
| 26 | Farms with net gains, farms | 891,329 | 1.2 | 57,430 | 6% | 4.2 | 833,899 | 94% | 1.2 |
| 27 | Farms with net gains, dollars | 112,088,509,000 | 0.9 | 8,917,981,000 | 8% | 2.6 | 103,170,528,000 | 92% | 0.9 |
| 28 | Farms with net losses, farms | 1,150,891 | 3.2 | 136,064 | 12% | 7.7 | 1,014,827 | 88% | 3.0 |
| 29 | Farms with net losses, dollars | 24,165,056,000 | 1.7 | 2,660,170,000 | 11% | 7.4 | 21,504,886,000 | 89% | 1.8 |
| 30 | Net cash farm income of producers, farms | 2,042,220 | 1.9 | 193,494 | 9% | 5.5 | 1,848,726 | 91% | 1.7 |
| 31 | Net cash farm income of producers, | 65,795,218,000 | 1.5 | 4,375,809,000 | 7% | 5.4 | 61,419,409,000 | 93% | 1.5 |
| 32 | Net cash farm income of producers, avg per farm ($) | 32,217 | 1.5 | 22,615 | 70% | 5.4 | 33,223 | 103% | 1.5 |
| 33 | Producers reporting net gains, farms | 881,472 | 1.2 | 57,046 | 6% | 4.4 | 824,426 | 94% | 1.1 |
| 34 | Producers reporting net gains, dollars | 91,479,912,000 | 1.0 | 7,110,416,000 | 8% | 2.1 | 84,369,495,000 | 92% | 1.0 |
| 35 | Producers reporting net losses, farms | 1,160,748 | 3.2 | 136,448 | 12% | 7.6 | 1,024,300 | 88% | 3.0 |
| 36 | Producers reporting net losses, dollars | 25,684,693,000 | 1.6 | 2,734,607,000 | 11% | 6.7 | 22,950,086,000 | 89% | 1.6 |
| 37 | Livestock, poultry, and their products sales, farms | 986,790 | 2.0 | 94,510 | 10% | 6.3 | 892,280 | 90% | 1.9 |
| 38 | Livestock, poultry, and their products sales, dollars | 194,975,996,000 | 1.1 | 14,573,557,000 | 7% | 3.3 | 180,402,439,000 | 93% | 1.2 |
| 39 | Livestock, poultry, and their products sales, avg per farm ($) | 197,586 | 2.4 | 154,201 | 78% | 6.2 | 202,181 | 102% | 2.0 |
| 40 | Commodities Raised and Delivered Under Production Contracts: Broilers and other meat-type chickens, farms | 14,598 | 3.3 | 1,494 | 10% | 9.0 | 13,104 | 90% | 3.5 |
| 41 | Commodities Raised and Delivered Under Production Contracts: Broilers and other meat-type chickens, number | 8,560,877,264 | 2.8 | 1,107,253,867 | 13% | 10.1 | 7,453,623,397 | 87% | 2.8 |
| 42 | Commodities Raised and Delivered Under Production Contracts: Eggs, chicken (dozens), farms | 2,777 | 5.2 | 259 | 9% | 19.3 | 2,518 | 91% | 5.5 |
| 43 | Commodities Raised and Delivered Under Production Contracts: Eggs, chicken (dozens), number | 1,746,778,249 | 4.4 | 143,064,267 | 8% | 17.9 | 1,603,713,982 | 92% | 4.3 |
| 44 | Commodities Raised and Delivered Under Production Contracts: Layers, farms | 2,533 | 5.0 | 246 | 10% | 19.7 | 2,287 | 90% | 5.2 |
| 45 | Commodities Raised and Delivered Under Production Contracts: Layers, number | 68,012,545 | 5.2 | 6,443,035 | 9% | 20.1 | 61,569,510 | 91% | 5.0 |
| 46 | Commodities Raised and Delivered Under Production Contracts: Pullets for laying flock replacement, farms | 1,510 | 11.5 | 62 | 4% | 14.8 | 1,448 | 96% | 11.9 |
| 47 | Commodities Raised and Delivered Under Production Contracts: Pullets for laying flock replacement, number | 136,669,132 | 11.6 | 3,498,800 | 3% | 9.4 | 133,170,332 | 97% | 11.8 |
| 48 | Commodities Raised and Delivered Under Production Contracts: Turkeys, farms | 1,926 | 4.6 | 55 | 3% | 32.6 | 1,871 | 97% | 4.3 |
| 49 | Commodities Raised and Delivered Under Production Contracts: Turkeys, number | 198,153,009 | 3.6 | 6,793,074 | 3% | 15.9 | 191,359,935 | 97% | 3.3 |
| 50 | Commodities Raised and Delivered Under Production Contracts: Custom fed cattle shipped directly for slaughter, farms | 1,070 | 12.8 | 30 | 3% | 65.4 | 1,040 | 97% | 13.0 |
| 51 | Commodities Raised and Delivered Under Production Contracts: Custom fed cattle shipped directly for slaughter, number | 9,397,176 | 3.1 | 777,063 | 8% | 5.2 | 8,620,113 | 92% | 3.1 |
| 52 | Commodities Raised and Delivered Under Production Contracts: Hogs and pigs, | 8,386 | 1.8 | 146 | 2% | 10.1 | 8,240 | 98% | 1.8 |
| 53 | Commodities Raised and Delivered Under Production Contracts: Hogs and pigs, | 99,869,561 | 1.9 | 2,720,343 | 3% | 11.3 | 97,149,218 | 97% | 1.9 |
| 54 | Commodities Raised and Delivered Under Production Contracts: Replacement dairy heifers, farms | 2,286 | 11.7 | 35 | 2% | 108.9 | 2,251 | 98% | 12.3 |
| 55 | Commodities Raised and Delivered Under Production Contracts: Replacement dairy heifers, number | 997,700 | 13.4 | 19,578 | 2% | 25.6 | 978,122 | 98% | 14.0 |
| 56 | Commodities Raised and Delivered Under Production Contracts: Other cattle, sheep, livestock, or poultry, farms | 1,045 | 7.1 | 26 | 2% | 69.5 | 1,019 | 98% | 7.3 |
| 57 | Commodities Raised and Delivered Under Production Contracts: Other cattle, sheep, livestock, or poultry, number | (X) | (X) | (X) | (X) | (X) | (X) | (X) | (X) |
| 58 | Commodities Raised and Delivered Under Production Contracts: Grains, oilseeds, vegetables, melons, potatoes, and other crops, farms | 1,763 | 5.2 | 36 | 2% | 56.8 | 1,727 | 98% | 4.9 |
| 59 | Commodities Raised and Delivered Under Production Contracts: Grains, oilseeds, vegetables, melons, potatoes, and other crops, number | (X) | (X) | (X) | (X) | (X) | (X) | (X) | (X) |
| 60 | Commodities Raised and Delivered Under Production Contracts: All poultry and eggs, farms | 20,637 | 3.2 | 1,862 | 9% | 9.0 | 18,775 | 91% | 3.3 |
| 61 | Commodities Raised and Delivered Under Production Contracts: All poultry and eggs, number | (X) | (X) | (X) | (X) | (X) | (X) | (X) | (X) |
| 62 | Value of commodities delivered under contract, farms | 34,420 | 2.4 | 2,121 | 6% | 8.6 | 32,299 | 94% | 2.3 |
| 63 | Value of commodities delivered under contract, dollars | 67,687,952,000 | 1.8 | 5,906,542,000 | 9% | 7.1 | 61,781,410,000 | 91% | 1.8 |
| 64 | Total Dollars Received for Delivering under Contract, farms | 34,420 | 2.4 | 2,121 | 6% | 8.6 | 32,299 | 94% | 2.3 |
| 65 | Total Dollars Received for Delivering under Contract, dollars | 7,226,669,000 | 2.0 | 678,253,000 | 9% | 6.7 | 6,548,416,000 | 91% | 2.0 |
| 66 | Market value of agricultural products sold, dollars | 388,522,695,000 | 0.8 | 32,684,714,000 | 8% | 3.0 | 355,837,981,000 | 92% | 0.8 |
| 67 | Market value of agricultural products sold and government payments, dollars | 397,466,269,000 | 0.8 | 33,014,340,000 | 8% | 3.0 | 364,451,929,000 | 92% | 0.8 |
| 68 | Farms with Production contracts: Net cash farm income of the operations, farms | 34,420 | 2.5 | 2,121 | 6% | 7.8 | 32,299 | 94% | 2.4 |
| 69 | Farms with Production contracts: Net cash farm income of the operations, dollars | 22,651,922,000 | 2.7 | 2,087,266,000 | 9% | 8.6 | 20,564,657,000 | 91% | 2.6 |
| 70 | Farms with Production contracts: Net cash farm income of the operations, avg per farm ($) | 658,103 | 2.7 | 984,095 | 150% | 8.6 | 636,696 | 97% | 2.6 |
| 71 | Farms with Production contracts: Farms with net gains, farms | 32,166 | 2.6 | 2,017 | 6% | 7.8 | 30,149 | 94% | 2.5 |
| 72 | Farms with Production contracts: Farms with net gains, dollars | 23,050,893,000 | 2.7 | 2,105,990,000 | 9% | 8.6 | 20,944,903,000 | 91% | 2.6 |
| 73 | Farms with Production contracts: Farms with net losses, farms | 2,254 | 6.3 | 104 | 5% | 50.3 | 2,150 | 95% | 7.6 |
| 74 | Farms with Production contracts: Farms with net losses, dollars | 398,971,000 | 3.6 | 18,724,000 | 5% | 21.2 | 380,247,000 | 95% | 4.2 |
| 75 | Farms with Production contracts: Net cash farm income of producers, farms | 34,420 | 2.4 | 2,121 | 6% | 7.7 | 32,299 | 94% | 2.3 |
| 76 | Farms with Production contracts: Net cash farm income of producers, dollars | 4,652,603,000 | 2.9 | 338,865,000 | 7% | 6.8 | 4,313,738,000 | 93% | 2.9 |
| 77 | Farms with Production contracts: Net cash farm income of producers, avg per farm | 135,172 | 2.9 | 159,767 | 118% | 6.8 | 133,556 | 99% | 2.9 |
| 78 | Farms with Production contracts: Producers reporting net gains, farms | 28,278 | 2.8 | 1,786 | 6% | 8.6 | 26,492 | 94% | 2.6 |
| 79 | Farms with Production contracts: Producers reporting net gains, dollars | 5,797,800,000 | 2.1 | 400,286,000 | 7% | 5.4 | 5,397,514,000 | 93% | 2.1 |
| 80 | Farms with Production contracts: Producers reporting net losses, farms | 6,142 | 5.1 | 335 | 5% | 15.8 | 5,807 | 95% | 5.3 |
| 81 | Farms with Production contracts: Producers reporting net losses, dollars | 1,145,197,000 | 4.3 | 61,421,000 | 5% | 12.2 | 1,083,776,000 | 95% | 4.8 |
| 82 | Farms with Production contracts: Livestock, poultry, and their products | 33,263 | 2.4 | 2,093 | 6% | 9.0 | 31,170 | 94% | 2.3 |
| 83 | Farms with Production contracts: Livestock, poultry, and their products | 71,635,646,000 | 1.8 | 5,949,721,000 | 8% | 7.1 | 65,685,925,000 | 92% | 1.8 |
| 84 | Farms with Production contracts: Livestock, poultry, and their products sales, avg per farm ($) | 2,153,613 | 1.9 | 2,842,676 | 132% | 6.2 | 2,107,344 | 98% | 1.9 |
| 85 | Farms without Production contracts: Net cash farm income of the operations, farms | 2,007,800 | 1.9 | 191,373 | 10% | 5.6 | 1,816,427 | 90% | 1.8 |
| 86 | Farms without Production contracts: Net cash farm income of the operations, | 65,271,531,000 | 1.6 | 4,170,545,000 | 6% | 5.8 | 61,100,986,000 | 94% | 1.5 |
| 87 | Farms without Production contracts: Net cash farm income of the operations, avg per farm ($) | 32,509 | 1.6 | 21,793 | 67% | 5.8 | 33,638 | 103% | 1.5 |
| 88 | Farms without Production contracts: Farms with net gains, farms | 859,163 | 1.2 | 55,413 | 6% | 4.5 | 803,750 | 94% | 1.2 |
| 89 | Farms without Production contracts: Farms with net gains, dollars | 89,037,616,000 | 1.0 | 6,811,991,000 | 8% | 2.1 | 82,225,625,000 | 92% | 1.0 |
| 90 | Farms without Production contracts: Farms with net losses, farms | 1,148,637 | 3.2 | 135,960 | 12% | 7.7 | 1,012,677 | 88% | 3.0 |
| 91 | Farms without Production contracts: Farms with net losses, dollars | 23,766,086,000 | 1.7 | 2,641,446,000 | 11% | 7.4 | 21,124,639,000 | 89% | 1.8 |
| 92 | Farms without Production contracts: Net cash farm income of producers, farms | 2,007,800 | 1.9 | 191,373 | 10% | 5.6 | 1,816,427 | 90% | 1.8 |
| 93 | Farms without Production contracts: Net cash farm income of producers, dollars | 61,142,615,000 | 1.7 | 4,036,944,000 | 7% | 5.8 | 57,105,671,000 | 93% | 1.6 |
| 94 | Farms without Production contracts: Net cash farm income of producers, avg per farm ($) | 30,453 | 1.7 | 21,095 | 69% | 5.8 | 31,438 | 103% | 1.6 |
| 95 | Farms without Production contracts: Producers reporting net gains, farms | 853,194 | 1.2 | 55,260 | 6% | 4.6 | 797,934 | 94% | 1.2 |
| 96 | Farms without Production contracts: Producers reporting net gains, dollars | 85,682,112,000 | 1.1 | 6,710,131,000 | 8% | 2.2 | 78,971,981,000 | 92% | 1.1 |
| 97 | Farms without Production contracts: Producers reporting net losses, farms | 1,154,606 | 3.2 | 136,113 | 12% | 7.7 | 1,018,493 | 88% | 3.0 |
| 98 | Farms without Production contracts: Producers reporting net losses, dollars | 24,539,497,000 | 1.7 | 2,673,186,000 | 11% | 6.9 | 21,866,310,000 | 89% | 1.7 |
| 99 | Farms without Production contracts: Livestock, poultry, and their products sales, farms | 953,527 | 2.1 | 92,417 | 10% | 6.4 | 861,110 | 90% | 2.0 |
| 100 | Farms without Production contracts: Livestock, poultry, and their products sales, dollars | 123,340,350,000 | 1.4 | 8,623,836,000 | 7% | 1.3 | 114,716,514,000 | 93% | 1.5 |
| 101 | Farms without Production contracts: Livestock, poultry, and their products sales, avg per farm ($) | 129,352 | 2.6 | 93,314 | 72% | 5.7 | 133,219 | 103% | 2.3 |
| 102 | Acres covered by crop insurance, farms | 380,236 | 1.3 | 18,026 | 5% | 5.6 | 362,210 | 95% | 1.2 |
| 103 | Acres covered by crop insurance, acres | 284,359,292 | 1.3 | 10,476,392 | 4% | 6.6 | 273,882,900 | 96% | 1.3 |
| 104 | Acres covered by crop insurance, avg acres per farm | 748 | 1.4 | 581 | 78% | 4.4 | 756 | 101% | 1.3 |
| 105 | Minority farms, farms | 193,494 | 6.0 | 193,494 | 100% | 6.0 | (X) | (X) | (X) |
| 106 | Minority farms, minority producers | 260,751 | 7.9 | 260,751 | 100% | 7.9 | (X) | (X) | (X) |

| row | Item | All Farms | All Farms CV | Minority Farms | Minority Farms CV | Non-minority Farms | Non-minority Farms CV |
|---|---|---|---|---|---|---|---|
| 1 | Farms, number | 2,042,220 | 2.1 | 9% | 6.0 | 91% | 2.0 |
| 2 | Producers, number | 3,399,834 | 2.4 | 10% | 7.5 | 90% | 2.2 |
| 3 | Land in farms, acres | 900,217,576 | 1.7 | 10% | 3.4 | 90% | 1.7 |
| 4 | Average size of farm, acres | 441 | 2.5 | 110% | 5.9 | 99% | 2.2 |
| 5 | Owned land in farms, farms | 1,917,281 | 2.1 | 9% | 6.5 | 91% | 2.0 |
| 6 | Owned land in farms, acres | 547,756,082 | 2.0 | 13% | 4.8 | 87% | 1.9 |
| 7 | Owned land in farms, avg acres per farm | 286 | 2.7 | 142% | 6.5 | 96% | 2.3 |
| 8 | Rented land in farms, farms | 616,954 | 1.8 | 7% | 5.0 | 93% | 1.7 |
| 9 | Rented land in farms, acres | 352,461,494 | 1.5 | 6% | 3.2 | 94% | 1.4 |
| 10 | Rented land in farms, avg acres per farm | 571 | 2.1 | 80% | 4.7 | 102% | 2.0 |
| 11 | Government payments, farms | 643,145 | 0.7 | 4% | 3.2 | 96% | 0.8 |
| 12 | Government payments, dollars | 8,943,574,000 | 1.8 | 4% | 44.5 | 96% | 1.0 |
| 13 | Government payments, avg per farm ($) | 13,906 | 2.1 | 85% | 48.7 | 101% | 0.9 |
| 14 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, farms | 238,041 | 1.3 | 3% | 4.5 | 97% | 1.3 |
| 15 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, dollars | 1,661,505,000 | 1.3 | 3% | 4.6 | 97% | 1.3 |
| 16 | Amount from Conservation Reserve, Wetlands Reserve, Farmable Wetlands, or Conservation Reserve Enhancement Programs, avg per farm ($) | 6,980 | 1.0 | 93% | 4.5 | 100% | 1.0 |
| 17 | Amount from other Federal farm programs, farms | 554,195 | 0.8 | 5% | 3.7 | 95% | 0.8 |
| 18 | Amount from other Federal farm programs, dollars | 7,282,069,000 | 2.2 | 4% | 50.9 | 96% | 1.2 |
| 19 | Amount from other Federal farm programs, avg per farm ($) | 13,140 | 2.6 | 86% | 55.6 | 101% | 1.0 |
| 20 | Commodity Credit Corporation Loans, | 18,185 | 4.4 | 3% | 9.2 | 97% | 4.6 |
| 21 | Commodity Credit Corporation Loans, | 2,480,261,000 | 3.8 | 2% | 23.3 | 98% | 3.8 |
| 22 | Commodity Credit Corporation Loans, avg per farm ($) | 136,390 | 3.8 | 92% | 29.3 | 100% | 4.0 |
| 23 | Net cash farm income of the operations, farms | 2,042,220 | 1.9 | 9% | 5.5 | 91% | 1.7 |
| 24 | Net cash farm income of the operations, dollars | 87,923,453,000 | 1.3 | 7% | 4.9 | 93% | 1.3 |
| 25 | Net cash farm income of the operations, avg per farm ($) | 43,053 | 1.3 | 75% | 4.9 | 103% | 1.3 |
| 26 | Farms with net gains, farms | 891,329 | 1.2 | 6% | 4.2 | 94% | 1.2 |
| 27 | Farms with net gains, dollars | 112,088,509,000 | 0.9 | 8% | 2.6 | 92% | 0.9 |
| 28 | Farms with net losses, farms | 1,150,891 | 3.2 | 12% | 7.7 | 88% | 3.0 |
| 29 | Farms with net losses, dollars | 24,165,056,000 | 1.7 | 11% | 7.4 | 89% | 1.8 |
| 30 | Net cash farm income of producers, farms | 2,042,220 | 1.9 | 9% | 5.5 | 91% | 1.7 |
| 31 | Net cash farm income of producers, | 65,795,218,000 | 1.5 | 7% | 5.4 | 93% | 1.5 |
| 32 | Net cash farm income of producers, avg per farm ($) | 32,217 | 1.5 | 70% | 5.4 | 103% | 1.5 |
| 33 | Producers reporting net gains, farms | 881,472 | 1.2 | 6% | 4.4 | 94% | 1.1 |
| 34 | Producers reporting net gains, dollars | 91,479,912,000 | 1.0 | 8% | 2.1 | 92% | 1.0 |
| 35 | Producers reporting net losses, farms | 1,160,748 | 3.2 | 12% | 7.6 | 88% | 3.0 |
| 36 | Producers reporting net losses, dollars | 25,684,693,000 | 1.6 | 11% | 6.7 | 89% | 1.6 |
| 37 | Livestock, poultry, and their products sales, farms | 986,790 | 2.0 | 10% | 6.3 | 90% | 1.9 |
| 38 | Livestock, poultry, and their products sales, dollars | 194,975,996,000 | 1.1 | 7% | 3.3 | 93% | 1.2 |
| 39 | Livestock, poultry, and their products sales, avg per farm ($) | 197,586 | 2.4 | 78% | 6.2 | 102% | 2.0 |
| 40 | Commodities Raised and Delivered Under Production Contracts: Broilers and other meat-type chickens, farms | 14,598 | 3.3 | 10% | 9.0 | 90% | 3.5 |
| 41 | Commodities Raised and Delivered Under Production Contracts: Broilers and other meat-type chickens, number | 8,560,877,264 | 2.8 | 13% | 10.1 | 87% | 2.8 |
| 42 | Commodities Raised and Delivered Under Production Contracts: Eggs, chicken (dozens), farms | 2,777 | 5.2 | 9% | 19.3 | 91% | 5.5 |
| 43 | Commodities Raised and Delivered Under Production Contracts: Eggs, chicken (dozens), number | 1,746,778,249 | 4.4 | 8% | 17.9 | 92% | 4.3 |
| 44 | Commodities Raised and Delivered Under Production Contracts: Layers, farms | 2,533 | 5.0 | 10% | 19.7 | 90% | 5.2 |
| 45 | Commodities Raised and Delivered Under Production Contracts: Layers, number | 68,012,545 | 5.2 | 9% | 20.1 | 91% | 5.0 |
| 46 | Commodities Raised and Delivered Under Production Contracts: Pullets for laying flock replacement, farms | 1,510 | 11.5 | 4% | 14.8 | 96% | 11.9 |
| 47 | Commodities Raised and Delivered Under Production Contracts: Pullets for laying flock replacement, number | 136,669,132 | 11.6 | 3% | 9.4 | 97% | 11.8 |
| 48 | Commodities Raised and Delivered Under Production Contracts: Turkeys, farms | 1,926 | 4.6 | 3% | 32.6 | 97% | 4.3 |
| 49 | Commodities Raised and Delivered Under Production Contracts: Turkeys, number | 198,153,009 | 3.6 | 3% | 15.9 | 97% | 3.3 |
| 50 | Commodities Raised and Delivered Under Production Contracts: Custom fed cattle shipped directly for slaughter, farms | 1,070 | 12.8 | 3% | 65.4 | 97% | 13.0 |
| 51 | Commodities Raised and Delivered Under Production Contracts: Custom fed cattle shipped directly for slaughter, number | 9,397,176 | 3.1 | 8% | 5.2 | 92% | 3.1 |
| 52 | Commodities Raised and Delivered Under Production Contracts: Hogs and pigs, | 8,386 | 1.8 | 2% | 10.1 | 98% | 1.8 |
| 53 | Commodities Raised and Delivered Under Production Contracts: Hogs and pigs, | 99,869,561 | 1.9 | 3% | 11.3 | 97% | 1.9 |
| 54 | Commodities Raised and Delivered Under Production Contracts: Replacement dairy heifers, farms | 2,286 | 11.7 | 2% | 108.9 | 98% | 12.3 |
| 55 | Commodities Raised and Delivered Under Production Contracts: Replacement dairy heifers, number | 997,700 | 13.4 | 2% | 25.6 | 98% | 14.0 |
| 56 | Commodities Raised and Delivered Under Production Contracts: Other cattle, sheep, livestock, or poultry, farms | 1,045 | 7.1 | 2% | 69.5 | 98% | 7.3 |
| 57 | Commodities Raised and Delivered Under Production Contracts: Other cattle, sheep, livestock, or poultry, number | (X) | (X) | (X) | (X) | (X) | (X) |
| 58 | Commodities Raised and Delivered Under Production Contracts: Grains, oilseeds, vegetables, melons, potatoes, and other crops, farms | 1,763 | 5.2 | 2% | 56.8 | 98% | 4.9 |
| 59 | Commodities Raised and Delivered Under Production Contracts: Grains, oilseeds, vegetables, melons, potatoes, and other crops, number | (X) | (X) | (X) | (X) | (X) | (X) |
| 60 | Commodities Raised and Delivered Under Production Contracts: All poultry and eggs, farms | 20,637 | 3.2 | 9% | 9.0 | 91% | 3.3 |
| 61 | Commodities Raised and Delivered Under Production Contracts: All poultry and eggs, number | (X) | (X) | (X) | (X) | (X) | (X) |
| 62 | Value of commodities delivered under contract, farms | 34,420 | 2.4 | 6% | 8.6 | 94% | 2.3 |
| 63 | Value of commodities delivered under contract, dollars | 67,687,952,000 | 1.8 | 9% | 7.1 | 91% | 1.8 |
| 64 | Total Dollars Received for Delivering under Contract, farms | 34,420 | 2.4 | 6% | 8.6 | 94% | 2.3 |
| 65 | Total Dollars Received for Delivering under Contract, dollars | 7,226,669,000 | 2.0 | 9% | 6.7 | 91% | 2.0 |
| 66 | Market value of agricultural products sold, dollars | 388,522,695,000 | 0.8 | 8% | 3.0 | 92% | 0.8 |
| 67 | Market value of agricultural products sold and government payments, dollars | 397,466,269,000 | 0.8 | 8% | 3.0 | 92% | 0.8 |
| 68 | Farms with Production contracts: Net cash farm income of the operations, farms | 34,420 | 2.5 | 6% | 7.8 | 94% | 2.4 |
| 69 | Farms with Production contracts: Net cash farm income of the operations, dollars | 22,651,922,000 | 2.7 | 9% | 8.6 | 91% | 2.6 |
| 70 | Farms with Production contracts: Net cash farm income of the operations, avg per farm ($) | 658,103 | 2.7 | 150% | 8.6 | 97% | 2.6 |
| 71 | Farms with Production contracts: Farms with net gains, farms | 32,166 | 2.6 | 6% | 7.8 | 94% | 2.5 |
| 72 | Farms with Production contracts: Farms with net gains, dollars | 23,050,893,000 | 2.7 | 9% | 8.6 | 91% | 2.6 |
| 73 | Farms with Production contracts: Farms with net losses, farms | 2,254 | 6.3 | 5% | 50.3 | 95% | 7.6 |
| 74 | Farms with Production contracts: Farms with net losses, dollars | 398,971,000 | 3.6 | 5% | 21.2 | 95% | 4.2 |
| 75 | Farms with Production contracts: Net cash farm income of producers, farms | 34,420 | 2.4 | 6% | 7.7 | 94% | 2.3 |
| 76 | Farms with Production contracts: Net cash farm income of producers, dollars | 4,652,603,000 | 2.9 | 7% | 6.8 | 93% | 2.9 |
| 77 | Farms with Production contracts: Net cash farm income of producers, avg per farm | 135,172 | 2.9 | 118% | 6.8 | 99% | 2.9 |
| 78 | Farms with Production contracts: Producers reporting net gains, farms | 28,278 | 2.8 | 6% | 8.6 | 94% | 2.6 |
| 79 | Farms with Production contracts: Producers reporting net gains, dollars | 5,797,800,000 | 2.1 | 7% | 5.4 | 93% | 2.1 |
| 80 | Farms with Production contracts: Producers reporting net losses, farms | 6,142 | 5.1 | 5% | 15.8 | 95% | 5.3 |
| 81 | Farms with Production contracts: Producers reporting net losses, dollars | 1,145,197,000 | 4.3 | 5% | 12.2 | 95% | 4.8 |
| 82 | Farms with Production contracts: Livestock, poultry, and their products | 33,263 | 2.4 | 6% | 9.0 | 94% | 2.3 |
| 83 | Farms with Production contracts: Livestock, poultry, and their products | 71,635,646,000 | 1.8 | 8% | 7.1 | 92% | 1.8 |
| 84 | Farms with Production contracts: Livestock, poultry, and their products sales, avg per farm ($) | 2,153,613 | 1.9 | 132% | 6.2 | 98% | 1.9 |
| 85 | Farms without Production contracts: Net cash farm income of the operations, farms | 2,007,800 | 1.9 | 10% | 5.6 | 90% | 1.8 |
| 86 | Farms without Production contracts: Net cash farm income of the operations, | 65,271,531,000 | 1.6 | 6% | 5.8 | 94% | 1.5 |
| 87 | Farms without Production contracts: Net cash farm income of the operations, avg per farm ($) | 32,509 | 1.6 | 67% | 5.8 | 103% | 1.5 |
| 88 | Farms without Production contracts: Farms with net gains, farms | 859,163 | 1.2 | 6% | 4.5 | 94% | 1.2 |
| 89 | Farms without Production contracts: Farms with net gains, dollars | 89,037,616,000 | 1.0 | 8% | 2.1 | 92% | 1.0 |
| 90 | Farms without Production contracts: Farms with net losses, farms | 1,148,637 | 3.2 | 12% | 7.7 | 88% | 3.0 |
| 91 | Farms without Production contracts: Farms with net losses, dollars | 23,766,086,000 | 1.7 | 11% | 7.4 | 89% | 1.8 |
| 92 | Farms without Production contracts: Net cash farm income of producers, farms | 2,007,800 | 1.9 | 10% | 5.6 | 90% | 1.8 |
| 93 | Farms without Production contracts: Net cash farm income of producers, dollars | 61,142,615,000 | 1.7 | 7% | 5.8 | 93% | 1.6 |
| 94 | Farms without Production contracts: Net cash farm income of producers, avg per farm ($) | 30,453 | 1.7 | 69% | 5.8 | 103% | 1.6 |
| 95 | Farms without Production contracts: Producers reporting net gains, farms | 853,194 | 1.2 | 6% | 4.6 | 94% | 1.2 |
| 96 | Farms without Production contracts: Producers reporting net gains, dollars | 85,682,112,000 | 1.1 | 8% | 2.2 | 92% | 1.1 |
| 97 | Farms without Production contracts: Producers reporting net losses, farms | 1,154,606 | 3.2 | 12% | 7.7 | 88% | 3.0 |
| 98 | Farms without Production contracts: Producers reporting net losses, dollars | 24,539,497,000 | 1.7 | 11% | 6.9 | 89% | 1.7 |
| 99 | Farms without Production contracts: Livestock, poultry, and their products sales, farms | 953,527 | 2.1 | 10% | 6.4 | 90% | 2.0 |
| 100 | Farms without Production contracts: Livestock, poultry, and their products sales, dollars | 123,340,350,000 | 1.4 | 7% | 1.3 | 93% | 1.5 |
| 101 | Farms without Production contracts: Livestock, poultry, and their products sales, avg per farm ($) | 129,352 | 2.6 | 72% | 5.7 | 103% | 2.3 |
| 102 | Acres covered by crop insurance, farms | 380,236 | 1.3 | 5% | 5.6 | 95% | 1.2 |
| 103 | Acres covered by crop insurance, acres | 284,359,292 | 1.3 | 4% | 6.6 | 96% | 1.3 |
| 104 | Acres covered by crop insurance, avg acres per farm | 748 | 1.4 | 78% | 4.4 | 101% | 1.3 |
| 105 | Minority farms, farms | 193,494 | 6.0 | 100% | 6.0 | (X) | (X) |
| 106 | Minority farms, minority producers | 260,751 | 7.9 | 100% | 7.9 | (X) | (X) |

| Producer Numbers | | SDA | Non-SDA | Difference | Ratio | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Dollars Paid | Total | SDA-W | Non-SDA | Difference | Ratio | | | | | | | | |
| MFP | | Indicate growing | | | | | | | | | | | |
| Market Facilitation Program - Non-specified commodity crops | $16,892,133,171 | | From NASS Data 2017 | | | | | | | | | | |
| Market Facilitation Program - Soybeans | $4,524,174,641 | | | | | | | | | | | | |
| **Market Facilitation Program - Dairy and Hogs** | **$570,262,380** | | | **Number of Farms** | **Acres** | **Program Payments** | **Total Payments** | **Ratio** | **Total acres** | **Market Value** | **Net Farm Income** | **per acre** | **Total Net Farm Income** |
| Market Facilitation Program - Specialty Crops | $371,413,955 | | American Indian | 60,083 | 2.76% | 976 | $ 12,601 | 2.50% | 58,749,543 | 6.19% | $ 3,537,975,000 | 0.85% | $ 8,577 | 8.70994 | $ 515,331,891 | 0.56% |
| Market Facilitation Program - Wheat | $169,268,007 | | Black | 35,470 | 1.63% | 132 | $ 7,108 | 0.81% | 4,673,140 | 0.49% | $ 1,416,256,000 | 0.34% | $ 3,109 | 34.58333 | $ 124,464,230 | 0.13% |
| Market Facilitation Program - Dairy | $150,364,652 | | Hispanic | 86,278 | 3.96% | 372 | $ 13,692 | 4.41% | 32,079,930 | 3.38% | $ 21,765,056,000 | 5.23% | $ 45,226 | 121.57527 | $ 3,902,008,828 | 4.21% |
| Market Facilitation Program - Sorghum | $129,296,711 | | **Asian American** | 18,339 | 0.84% | 160 | $ 14,000 | 0.64% | 206,732,000 | 0.85% | 2,931,365 | 0.31% | $ 7,457,497,000 | 1.79% | $ 111,109 | 685.74375 | $ 2,041,367,822 | 2.20% |
| Market Facilitation Program - Hogs | $128,218,404 | | **Caucasian** | 1,873,006 | **90.61%** | 441 | $ 14,004 | **91.23%** | 849,816,724 | **89.52%** | $ 381,050,061,000 | **91.61%** | $ 43,608 | 98.88431 | $ 86,038,841,644 | **92.76%** |
| Market Facilitation Program - Dairy and Hogs | $78,580,425 | | NH/PI | 4,341 | 0.20% | 240 | $ 12,704 | 0.14% | 55,148,064 | 0.14% | 1,043,566 | 0.11% | $ 710,952,000 | 0.17% | $ 24,867 | 103.6125 | $ 107,947,647 | 0.12% |
| Market Facilitation Program - Corn | $72,125,461 | | | | | | | | | | | | | |
| Market Facilitation Program - Cotton | $70,518,920 | | | 2,177,516 | | 12,012 | 30,287,701,507 | | 949,294,610 | | $ 415,937,797,000 | | | | $ 92,729,966,066 |
| Market Facilitation Program - Fresh Sweet Cherries | $20,210,018 | | | 204,310 | | | | Total Payments 2017 | | | | | | |
| Market Facilitation Program - Shelled Almonds | $1,878,974 | | | | | | | | | | | | | |
| | $23,178,269,202 | | | | | | | | | | | | | |

3,537,975 60,083 Crops 1,432,256 17,913 Grains, oilseeds, dry beans, dry peas 496,585 4,823 Tobacco 4,360 14 Cotton and cottonseed 78,171 151 Vegetables, melons, potatoes, sweet potatoes 128,823 2,654 Fruits, tree nuts, berries 369,090 2,708 Nursery/greenhouse, floriculture, sod 108,041 876 Cultivated Christmas trees, short rotation woody crops 7,242 123 Other crops and hay 239,945 10,106 Livestock, poultry, and

products 2,105,719 33,219 Poultry and eggs 642,955 5,268 Cattle and calves 1,101,542 20,777 Milk from cows 188,199 238 Hogs and pigs 53,062 1,827 Sheep, goats, wool, mohair, milk 48,803 8,320 Horses, ponies, mules, burros, donkeys 32,191 3,527 Aquaculture 21,913 116 Other animals and animal products 16,362 1,506

**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

441 G St. N.W.
Washington, DC 20548

August 21, 2020

The Honorable Debbie Stabenow
Ranking Member
Committee on Agriculture, Nutrition, and Forestry
United States Senate

**USDA Market Facilitation Program: Information on Payments for 2019**

Dear Senator Stabenow:

In May 2019, the U.S. Department of Agriculture (USDA) announced its plans to assist farmers directly affected by trade disruptions and tariffs targeting a variety of U.S. agricultural products. USDA announced it would distribute up to $14.5 billion in direct payments to farming operations that produced three types of commodities in 2019: (1) nonspecialty crops (including grains and oilseeds, such as corn and soybeans); (2) specialty crops (including nuts and fruits, such as pecans and cranberries); and (3) dairy and hogs.

The 2019 payments were in addition to the approximately $8.6 billion USDA announced it had distributed for 2018. USDA's Farm Service Agency (FSA) administered these 2018 and 2019 payments, which USDA refers to as the Market Facilitation Program (MFP). In comparison with 2018, in 2019, USDA changed the payment structure for the three types of commodities, including by establishing county-specific payment rates for nonspecialty crops and increasing the payment limit—the cap on payments members of farming operations can receive—from $125,000 to $250,000 for each type, not to exceed $500,000 per person or legal entity.[1]

To receive the 2019 MFP payments, individuals and legal entities that are members of farming operations had to meet certain eligibility requirements. For example, individuals—including members of legal entities—who received payments for most types of nonspecialty crops, had to have been determined to be actively engaged in farming.[2] USDA also issues projections each month that forecast the market price of various agricultural commodities, including eight commodities that were eligible for 2019 MFP payments.

You requested that we review the distribution of MFP payments for 2019. This report examines: (1) MFP payment rates for selected commodities and USDA's price projections for these commodities in 2019; (2) MFP payments for 2019 and how the payments varied by location, farming operation, and type of commodity; and (3) additional MFP payments for 2019 compared with 2018 that resulted from increased payment limits. On May 28, 2020, we briefed members

---

[1]A farming operation is a business enterprise engaged in the production of agricultural products, commodities, or livestock that is operated by an individual, legal entity (e.g., limited liability company), or joint operation (e.g., a general partnership). A member of a farming operation can be either an individual or an entity.

[2]Specifically, an individual or entity must provide the farming operation with a significant contribution of capital, land, or equipment, as well as a significant contribution of personal labor or active personal management. Those contributions must be in proportion to the share of the operation's profits and losses, and the contributions must be at risk.

APP. 000162

of your staff on the results of our review. This report formally transmits the briefing slides (see enc. 1).

To provide information on MFP payment rates for selected commodities in 2019, we relied on data from FSA. To provide information on USDA's price projections for these selected commodities, we relied on USDA's World Agricultural Supply and Demand Estimates (WASDE) data from May 2019. Specifically, we obtained information on the eight major commodities for which WASDE had price projections.[3] We calculated MFP payment rates in 2019 for those commodities as a percentage of the WASDE price projections. We assessed the reliability of USDA's data, including by reviewing related documentation and internal controls. We determined that the data were sufficiently reliable for the purposes of this report.

To determine the total MFP payments for 2019 and how these payments varied by location, farming operation, and type of commodities, we analyzed FSA data on 2019 MFP payments.[4] FSA distributed MFP payments for 2019 in three installments, the last of which it distributed in February 2020.[5]

We assessed the reliability of FSA's data by, among other steps, (1) reviewing information about the data and the system that produced them and (2) interviewing agency officials knowledgeable about the data. We determined that the data were sufficiently reliable for the purposes of this report.

We selected the 25 farming operations that received the highest 2019 MFP payments for additional review.[6] We obtained information on the number of members who contributed active personal management or labor from the 13 FSA state offices responsible for administering payment eligibility requirements for these farming operations. We also obtained information from FSA state officials on the primary (i.e., those with the highest number of acres) nonspecialty crops that these operations produced.[7] To assess the accuracy of the information on the number of managers at these operations—individuals who claimed active personal management or a combination of active personal management and labor—that we obtained from FSA state offices, we compared this information with our analysis of FSA data on farming operations. To assess the accuracy of the FSA information on the primary crops that the farming operations produced, we compared this information with publicly available information and found it to be consistent with that information.

---

[3]USDA issues the WASDE monthly reports on certain grains and oilseeds as well as cotton, sugar, meat, poultry, eggs, and milk. We used the WASDE price projections of May 10, 2019, for eight commodities that were eligible for 2019 MFP payments: corn, cotton, dairy (milk), hogs, rice, sorghum, soybeans, and wheat.

[4]We excluded payments made to Indian tribes from our analysis because, according to an FSA handbook, such payments are not subject to payment limits. Because we did not include payments to Indian tribes, our totals may be lower than other publicly reported figures.

[5]The data we reviewed were from March 2020, the latest available at the time of our review.

[6]The results of this review are not generalizable to other farming operations that received MFP payments for 2019.

[7]Eligible nonspecialty crops for 2019 MFP include alfalfa hay, barley, canola, corn, crambe, dried beans, dry peas, extra-long staple cotton, flaxseed, lentils, long- and medium-grain rice, millet, mustard seed, oats, peanuts, rapeseed, rye, safflower, sesame seed, small and large chickpeas, sorghum, soybeans, sunflower seed, temperate japonica rice, triticale, upland cotton, and wheat.

To determine the additional MFP payments that FSA distributed for 2019 because of the increased payment limits, we analyzed FSA data to identify payments for 2019 above the payment limits for the 2018 MFP. The additional payments were the sum of those that individuals received above the 2018 limit for each commodity type.

We conducted this performance audit from March 2020 to August 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

In summary, we found that MFP payment rates for the eight selected commodities in 2019 varied as a percentage of the projected prices of these commodities, ranging from a high of 56.3 percent (sorghum) to a low of 1.1 percent (dairy). MFP payments for 2019 were about $14.4 billion, and payments varied by location, farming operation, and type of commodity. Moreover, USDA distributed approximately $519 million in additional MFP payments for 2019 compared with 2018 because of increased payment limits.

**Background**

USDA categorized the 2019 MFP payments by three commodity types and calculated payment rates for each type differently.

- **Nonspecialty crops.** According to the MFP handbook, USDA was to multiply the payment rate per acre it calculated for each county by a farming operation's total eligible acres of nonspecialty crops.[8] MFP payment rates varied across counties based on the average of each county's planted acres of eligible crops from 2015 to 2018 and the yields of those crops from 2015 to 2017. The county payment rates varied from a minimum of $15 per acre to a maximum of $150 per acre, as shown in figure 1.[9]

---

[8]U.S. Department of Agriculture, Farm Service Agency, *Market Facilitation Program*, 1-MFP, Amendment 5.

[9]USDA also used a nationwide payment rate of $15 per acre if a nonspecialty crop could not be planted, but a cover crop could be planted. According to the MFP handbook, cover crops may include grasses, legumes, and forbs planted for seasonal cover intended for harvest.

GAO-20-700R 2019 Market Facilitation Program

**Figure 1: MFP Payment Rates in 2019 for Nonspecialty Crops, by County**



Source: GAO analysis of Farm Service Agency data. | GAO-20-700R

- **Specialty crops.** USDA used a national payment rate per acre for each type of eligible specialty crop. Eligible specialty crops for 2019 include almonds, cranberries, cultivated ginseng, fresh grapes, fresh sweet cherries, hazelnuts, macadamia nuts, pecans, pistachios, and walnuts. The payment rates varied from $146 to about $1,500 per acre depending on the type of crop.

- **Dairy and hogs.** USDA used a national payment rate for milk ($0.20 per hundred pounds) and hogs ($11 per head).

## Agency Comments

We provided a draft of this report to USDA for comment. USDA provided technical comments, which we incorporated as appropriate.

---

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the appropriate congressional committees, the Secretary of Agriculture, and other interested parties. In addition, the report is available at no charge on the GAO website at http://www.gao.gov.

APP. 000165

If you or your staff have any questions about this report, please contact me at (202) 512-3841 or morriss@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report include Thomas M. Cook (Assistant Director), Ruth Solomon (Analyst in Charge), Sahar Angadjivand, Josey Ballenger, Meghan Kubit, Donna Morgan, Cynthia Norris, Kevin S. Bray, John Mingus, and Sara Sullivan.

Sincerely yours,

Steve D. Morris
Director, Natural Resources and Environment

Enclosure(s) – 1

**GAO**

---

**Enclosure I: Briefing to Senate Committee on Agriculture, Nutrition, and Forestry, May 28, 2020**

---

# USDA Market Facilitation Program:
# Information on Payments for 2019

Briefing to Senate Committee on Agriculture, Nutrition, and Forestry

May 28, 2020

APP. 000167



## MFP Payment Rates and USDA's Price Projections in 2019

Table 1 provides information on the Market Facilitation Program (MFP) payment rates in 2019 as a percentage of the U.S. Department of Agriculture's (USDA) projected prices, which ranged from a high of 56.3 percent (sorghum) to a low of 1.1 percent (dairy).[10]

### Table 1: Market Facilitation Program (MFP) Payment Rates and USDA's Price Projections for Selected Commodities in 2019

| Commodity | MFP payment rate in 2019 (dollars) | USDA's price projection as of May 2019 (dollars) | 2019 MFP payment rate as a percentage of the USDA projected price |
|---|---|---|---|
| Sorghum | 1.69 per bushel | 3.00 per bushel | 56.3 |
| Cotton | 0.26 per pound | 0.65 per pound | 40.0 |
| Soybeans | 2.05 per bushel | 8.10 per bushel | 25.3 |
| Wheat | 0.41 per bushel | 4.70 per bushel | 8.7 |
| Hogs | 11.00 per head | 156.42 per head[a] | 7.0 |
| Rice | 0.63 per hundred pounds | 11.20 per hundred pounds | 5.6 |
| Corn | 0.14 per bushel | 3.30 per bushel | 4.2 |
| Dairy (milk) | 0.20 per hundred pounds | 18.80 per hundred pounds[b] | 1.1 |

Source: GAO analysis of U.S. Department of Agriculture (USDA) data. | GAO-20-700R

Note: USDA's *World Agricultural Supply and Demand Estimates* (WASDE) data from May 10, 2019, include price projections for selected commodities eligible for the 2019 MFP: sorghum, cotton (upland), soybeans, wheat, hogs, rice, corn, and dairy (milk). For sorghum, cotton (upland), soybeans, wheat, rice, and corn, the WASDE price projections reflect the average prices farmers would receive in the 2019-2020 marketing year. For hog and dairy (milk) price projections, the WASDE price projections reflect calendar year 2020.

[a]We converted the WASDE price projection for hogs to a per-head basis using an average live weight of 287 pounds, based on USDA National Agricultural Statistics Service's *Livestock Slaughter* data from May 23, 2019.

[b]The dairy (milk) price projection is the simple average of monthly prices received by farmers for milk.

[10]The WASDE price projections in May 2019 for six MFP-eligible crop commodities (corn, upland cotton, rice, sorghum, soybeans, and wheat) referred to the 2019-2020 marketing year, and the price projections for hogs and dairy (milk) referred to calendar year 2020. Marketing years span calendar years (e.g., 2019-2020), and can differ by commodity.

APP. 000168



# MFP Payments Were about $14.4 Billion for 2019

For 2019, USDA's Farm Service Agency (FSA) distributed about $14.4 billion in MFP payments in all 50 states and Puerto Rico to 643,965 farming operations comprised of 870,427 individual members. As shown in table 2, average payments by state per individual ranged from a high of about $42,500 in Georgia to less than $2,000 in Rhode Island.

## Table 2: 2019 Market Facilitation Program (MFP) Payments by State and Number of Farming Operations and Individuals Receiving Payments

| State[a] | MFP payments | | Farming operations | | Individuals | | Average payment per farming operation (dollars) | Average payment per individual (dollars) |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | Number | Percentage | | |
| Georgia | 310,832,608 | 2.2 | 5,479 | 0.9 | 7,306 | 0.8 | 56,732 | 42,545 |
| Mississippi | 323,593,329 | 2.3 | 4,690 | 0.7 | 9,107 | 1.0 | 68,996 | 35,532 |
| North Dakota | 693,157,967 | 4.8 | 18,953 | 2.9 | 21,750 | 2.5 | 36,572 | 31,869 |
| Arizona | 49,709,777 | 0.3 | 596 | 0.1 | 1,586 | 0.2 | 83,406 | 31,343 |
| South Carolina | 60,098,839 | 0.4 | 1,796 | 0.3 | 2,287 | 0.3 | 33,463 | 26,278 |
| Alabama | 121,995,760 | 0.8 | 3,399 | 0.5 | 4,682 | 0.5 | 35,892 | 26,056 |
| Florida | 24,095,215 | 0.2 | 718 | 0.1 | 986 | 0.1 | 33,559 | 24,437 |
| Minnesota | 1,066,556,872 | 7.4 | 36,532 | 5.7 | 43,883 | 5.0 | 29,195 | 24,305 |
| North Carolina | 194,690,509 | 1.4 | 7,269 | 1.1 | 9,026 | 1.0 | 26,784 | 21,570 |
| Texas | 1,075,174,517 | 7.5 | 36,639 | 5.7 | 51,117 | 5.9 | 29,345 | 21,034 |
| Iowa | 1,581,719,579 | 11.0 | 61,433 | 9.5 | 79,464 | 9.1 | 25,747 | 19,905 |
| Arkansas | 441,658,607 | 3.1 | 12,975 | 2.0 | 22,820 | 2.6 | 34,039 | 19,354 |
| New Mexico | 36,940,198 | 0.3 | 1,255 | 0.2 | 2,002 | 0.2 | 29,434 | 18,452 |
| Virginia | 72,526,934 | 0.5 | 2,956 | 0.5 | 4,037 | 0.5 | 24,535 | 17,966 |
| California | 317,077,273 | 2.2 | 9,992 | 1.6 | 18,133 | 2.1 | 31,733 | 17,486 |
| Nebraska | 960,181,906 | 6.7 | 42,340 | 6.6 | 56,131 | 6.4 | 22,678 | 17,106 |
| Tennessee | 231,581,245 | 1.6 | 11,717 | 1.8 | 13,733 | 1.6 | 19,765 | 16,863 |
| Louisiana | 162,263,358 | 1.1 | 6,717 | 1.0 | 9,957 | 1.1 | 24,157 | 16,296 |
| Delaware | 18,152,902 | 0.1 | 726 | 0.1 | 1,124 | 0.1 | 25,004 | 16,150 |

APP. 000169



| Stateª | MFP payments | | Farming operations | | Individuals | | Average payment per farming operation (dollars) | Average payment per individual (dollars) |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | Number | Percentage | | |
| South Dakota | 523,467,014 | 3.6 | 20,991 | 3.3 | 32,433 | 3.7 | 24,938 | 16,140 |
| Indiana | 725,298,539 | 5.0 | 34,660 | 5.4 | 45,050 | 5.2 | 20,926 | 16,100 |
| Michigan | 260,601,255 | 1.8 | 13,844 | 2.1 | 16,959 | 1.9 | 18,824 | 15,367 |
| Maryland | 55,536,024 | 0.4 | 2,607 | 0.4 | 3,656 | 0.4 | 21,303 | 15,190 |
| Missouri | 632,689,068 | 4.4 | 31,901 | 5.0 | 42,055 | 4.8 | 19,833 | 15,044 |
| Illinois | 1,452,547,648 | 10.1 | 76,129 | 11.8 | 98,380 | 11.3 | 19,080 | 14,765 |
| Ohio | 523,892,947 | 3.6 | 29,513 | 4.6 | 37,350 | 4.3 | 17,751 | 14,027 |
| Kentucky | 229,938,635 | 1.6 | 14,407 | 2.2 | 16,992 | 2.0 | 15,960 | 13,532 |
| Kansas | 1,010,635,043 | 7.0 | 58,599 | 9.1 | 76,545 | 8.8 | 17,247 | 13,203 |
| New Jersey | 9,932,766 | 0.1 | 609 | 0.1 | 825 | 0.1 | 16,310 | 12,040 |
| Wisconsin | 347,868,224 | 2.4 | 23,259 | 3.6 | 29,409 | 3.4 | 14,956 | 11,829 |
| Oklahoma | 206,404,611 | 1.4 | 16,662 | 2.6 | 19,971 | 2.3 | 12,388 | 10,335 |
| Massachusetts | 6,812,715 | 0.0 | 458 | 0.1 | 748 | 0.1 | 14,875 | 9,108 |
| New York | 65,399,722 | 0.5 | 4,848 | 0.8 | 7,506 | 0.9 | 13,490 | 8,713 |
| Pennsylvania | 79,416,392 | 0.6 | 7,009 | 1.1 | 9,169 | 1.1 | 11,331 | 8,661 |
| Colorado | 105,337,276 | 0.7 | 8,212 | 1.3 | 12,190 | 1.4 | 12,827 | 8,641 |
| Idaho | 74,319,215 | 0.5 | 5,851 | 0.9 | 9,240 | 1.1 | 12,702 | 8,043 |
| Oregon | 42,475,903 | 0.3 | 3,782 | 0.6 | 6,365 | 0.7 | 11,231 | 6,673 |
| Washington | 107,378,042 | 0.7 | 8,460 | 1.3 | 16,705 | 1.9 | 12,692 | 6,428 |
| Montana | 128,406,508 | 0.9 | 9,958 | 1.5 | 20,440 | 2.3 | 12,895 | 6,282 |
| West Virginia | 3,520,806 | 0.0 | 435 | 0.1 | 567 | 0.1 | 8,094 | 6,210 |
| Nevada | 4,120,435 | 0.0 | 380 | 0.1 | 665 | 0.1 | 10,843 | 6,196 |
| Vermont | 6,049,146 | 0.0 | 644 | 0.1 | 1,064 | 0.1 | 9,393 | 5,685 |
| Hawaii | 179,349 | 0.0 | 29 | 0.0 | 36 | 0.0 | 6,184 | 4,982 |
| Alaska | 95,278 | 0.0 | 12 | 0.0 | 21 | 0.0 | 7,940 | 4,537 |
| Puerto Rico | 1,343,339 | 0.0 | 248 | 0.0 | 331 | 0.0 | 5,417 | 4,058 |
| Connecticut | 1,072,357 | 0.0 | 115 | 0.0 | 269 | 0.0 | 9,325 | 3,986 |
| Utah | 10,926,775 | 0.1 | 1,907 | 0.3 | 2,869 | 0.3 | 5,730 | 3,809 |
| Maine | 2,312,500 | 0.0 | 405 | 0.1 | 625 | 0.1 | 5,710 | 3,700 |
| New Hampshire | 610,166 | 0.0 | 104 | 0.0 | 190 | 0.0 | 5,867 | 3,211 |
| Wyoming | 7,689,807 | 0.1 | 1,704 | 0.3 | 2,599 | 0.3 | 4,513 | 2,959 |

APP. 000170



| State[a] | MFP payments | | Farming operations | | Individuals | | Average payment per farming operation (dollars) | Average payment per individual (dollars) |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | Number | Percentage | | |
| Rhode Island | 121,410 | 0.0 | 41 | 0.0 | 72 | 0.0 | 2,961 | 1,686 |
| **Total** | **14,368,406,309** | **100.0** | **643,965** | **100.0** | **870,427** | **100.0** | **22,312** | **16,507** |

Source: GAO analysis of Farm Service Agency data. | GAO-20-700R

Note: Percentages may not sum to 100 because of rounding.

[a]Also includes Puerto Rico.

GAO-20-700R 2019 Market Facilitation Program



Payments for nonspecialty crops accounted for about $13.5 billion or about 94 percent of total MFP payments for 2019. As shown in table 3, average 2019 MFP payments ranged from a high of $119 per acre in Georgia to a low of $15 per acre in Maine, Utah, Montana, Wyoming, and Alaska.[11]

**Table 3: 2019 Market Facilitation Program (MFP) Payments for Acres of Nonspecialty Crops, by State**

| State[a] | MFP payments | | Acres | | Average MFP payment per acre (dollars) |
|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | |
| Georgia | 292,934,291 | 2.2 | 2,456,729 | 1.0 | 119 |
| Mississippi | 322,415,680 | 2.4 | 2,991,630 | 1.3 | 108 |
| Puerto Rico | 22,139 | 0.0 | 218 | 0.0 | 102 |
| Alabama | 121,222,526 | 0.9 | 1,248,091 | 0.5 | 97 |
| Arizona | 43,075,521 | 0.3 | 460,654 | 0.2 | 94 |
| Arkansas | 439,660,174 | 3.2 | 5,001,091 | 2.1 | 88 |
| Tennessee | 229,971,611 | 1.7 | 2,708,883 | 1.1 | 85 |
| Louisiana | 160,880,127 | 1.2 | 1,995,006 | 0.8 | 81 |
| Texas | 1,050,030,036 | 7.8 | 13,670,948 | 5.7 | 77 |
| Florida | 21,065,088 | 0.2 | 275,141 | 0.1 | 77 |
| Illinois | 1,422,433,078 | 10.5 | 20,083,275 | 8.4 | 71 |
| Missouri | 623,615,714 | 4.6 | 8,866,470 | 3.7 | 70 |
| Ohio | 504,870,729 | 3.7 | 7,378,108 | 3.1 | 68 |
| Indiana | 705,497,094 | 5.2 | 10,415,302 | 4.4 | 68 |
| Iowa | 1,496,136,773 | 11.1 | 22,467,111 | 9.4 | 67 |
| Kentucky | 226,233,993 | 1.7 | 3,446,413 | 1.4 | 66 |
| North Carolina | 190,154,095 | 1.4 | 3,138,649 | 1.3 | 61 |
| South Carolina | 59,377,524 | 0.4 | 988,012 | 0.4 | 60 |
| Minnesota | 995,859,597 | 7.4 | 16,690,206 | 7.0 | 60 |
| Virginia | 69,967,443 | 0.5 | 1,192,519 | 0.5 | 59 |
| California | 95,542,599 | 0.7 | 1,664,335 | 0.7 | 57 |

[11]We included payments for cover crops with those for nonspecialty crops. USDA used a nationwide payment rate of $15 per acre if a nonspecialty crop could not be planted, but a cover crop was planted.

APP. 000172



| State[a] | MFP payments | | Acres | | Average MFP payment per acre (dollars) |
|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | |
| Nebraska | 943,314,968 | 7.0 | 16,919,254 | 7.1 | 56 |
| Michigan | 240,722,159 | 1.8 | 4,482,073 | 1.9 | 54 |
| Maryland | 53,977,881 | 0.4 | 1,011,197 | 0.4 | 53 |
| Delaware | 18,011,662 | 0.1 | 356,019 | 0.1 | 51 |
| Kansas | 1,001,433,931 | 7.4 | 19,890,942 | 8.3 | 50 |
| New Jersey | 8,623,235 | 0.1 | 175,716 | 0.1 | 49 |
| South Dakota | 505,028,416 | 3.7 | 10,981,989 | 4.6 | 46 |
| West Virginia | 3,348,624 | 0.0 | 76,082 | 0.0 | 44 |
| Wisconsin | 286,112,783 | 2.1 | 6,658,121 | 2.8 | 43 |
| Pennsylvania | 63,485,277 | 0.5 | 1,574,523 | 0.7 | 40 |
| New Mexico | 20,969,938 | 0.2 | 629,277 | 0.3 | 33 |
| North Dakota | 691,468,149 | 5.1 | 20,974,450 | 8.8 | 33 |
| Oklahoma | 195,737,697 | 1.4 | 5,978,036 | 2.5 | 33 |
| New York | 42,142,965 | 0.3 | 1,365,628 | 0.6 | 31 |
| Washington | 64,510,625 | 0.5 | 2,775,345 | 1.2 | 23 |
| Colorado | 98,411,437 | 0.7 | 4,532,840 | 1.9 | 22 |
| Oregon | 19,966,933 | 0.1 | 951,731 | 0.4 | 21 |
| Idaho | 54,459,817 | 0.4 | 2,721,216 | 1.1 | 20 |
| Massachusetts | 235,341 | 0.0 | 12,301 | 0.0 | 19 |
| Rhode Island | 15,022 | 0.0 | 842 | 0.0 | 18 |
| Vermont | 1,344,331 | 0.0 | 76,492 | 0.0 | 18 |
| Nevada | 2,943,191 | 0.0 | 183,834 | 0.1 | 16 |
| Connecticut | 362,685 | 0.0 | 22,808 | 0.0 | 16 |
| New Hampshire | 148,253 | 0.0 | 9,418 | 0.0 | 16 |
| Maine | 1,105,210 | 0.0 | 71,409 | 0.0 | 15 |
| Utah | 7,157,297 | 0.1 | 464,496 | 0.2 | 15 |
| Montana | 125,117,133 | 0.9 | 8,124,958 | 3.4 | 15 |
| Wyoming | 7,449,042 | 0.1 | 496,603 | 0.2 | 15 |
| Alaska | 82,026 | 0.0 | 5,468 | 0.0 | 15 |
| **Total** | **13,528,651,862** | **100.0** | **238,661,858** | **100.0** | **57** |

Source: GAO analysis of Farm Service Agency data. | GAO-20-700R

APP. 000173



Notes: Total MFP payments and number of acres include cover crops. To calculate the number of acres, we divided the payments for each county by the applicable nonspecialty crop payment rate and summarized across each state. This may result in an undercount of the acres and an overestimate of the average MFP payment per acre in some counties.

Percentages may not sum to 100 because of rounding.

[a]Also includes Puerto Rico.



Farming operations that produced specialty crops accounted for about $274 million or about 2 percent of total MFP payments for 2019 and dairy and hogs operations accounted for about $566 million or about 4 percent of total MFP payments for 2019. As shown in table 4 below, FSA distributed about half of the specialty crops payments to farming operations in California and about half of the dairy and hogs payments to farming operations in Iowa, Minnesota, California, Wisconsin, and Illinois.

**Table 4: 2019 Market Facilitation Program (MFP) Payments for Specialty Crops and Dairy and Hogs, by State**

| | MFP payments | | | | | |
| | Specialty crops | | Dairy and hogs | | Total | |
| State[a] | Dollars | Percentage | Dollars | Percentage | Dollars | Percentage |
|---|---|---|---|---|---|---|
| California | 153,302,903 | 56.0 | 68,231,771 | 12.1 | 221,534,674 | 26.4 |
| Iowa | 100,406 | 0.0 | 85,482,400 | 15.1 | 85,582,806 | 10.2 |
| Minnesota | 59,056 | 0.0 | 70,638,218 | 12.5 | 70,697,274 | 8.4 |
| Wisconsin | 12,329,507 | 4.5 | 49,425,934 | 8.7 | 61,755,441 | 7.4 |
| Washington | 33,605,157 | 12.3 | 9,262,260 | 1.6 | 42,867,417 | 5.1 |
| Illinois | 128,567 | 0.0 | 29,986,003 | 5.3 | 30,114,570 | 3.6 |
| Texas | 9,592,809 | 3.5 | 15,551,672 | 2.7 | 25,144,481 | 3.0 |
| New York | 410,987 | 0.2 | 22,845,770 | 4.0 | 23,256,757 | 2.8 |
| Oregon | 19,188,198 | 7.0 | 3,320,772 | 0.6 | 22,508,970 | 2.7 |
| Michigan | 907,785 | 0.3 | 18,971,311 | 3.4 | 19,879,096 | 2.4 |
| Idaho | 590,577 | 0.2 | 19,268,821 | 3.4 | 19,859,398 | 2.4 |
| Indiana | 31,175 | 0.0 | 19,770,270 | 3.5 | 19,801,445 | 2.4 |
| Ohio | 75,741 | 0.0 | 18,946,476 | 3.3 | 19,022,218 | 2.3 |
| South Dakota | 7,131 | 0.0 | 18,431,467 | 3.3 | 18,438,598 | 2.2 |
| Georgia | 15,269,014 | 5.6 | 2,629,303 | 0.5 | 17,898,317 | 2.1 |
| Nebraska | 40,710 | 0.0 | 16,826,228 | 3.0 | 16,866,938 | 2.0 |
| New Mexico | 3,571,123 | 1.3 | 12,399,137 | 2.2 | 15,970,259 | 1.9 |
| Pennsylvania | 166,795 | 0.1 | 15,764,320 | 2.8 | 15,931,115 | 1.9 |
| Oklahoma | 9,596,137 | 3.5 | 1,070,778 | 0.2 | 10,666,915 | 1.3 |
| Kansas | 687,097 | 0.3 | 8,514,015 | 1.5 | 9,201,112 | 1.1 |
| Missouri | 1,041,042 | 0.4 | 8,032,312 | 1.4 | 9,073,354 | 1.1 |

APP. 000175



| | MFP payments | | | | | |
|---|---|---|---|---|---|---|
| | Specialty crops | | Dairy and hogs | | Total | |
| State[a] | Dollars | Percentage | Dollars | Percentage | Dollars | Percentage |
| Colorado | 317,183 | 0.1 | 6,608,656 | 1.2 | 6,925,839 | 0.8 |
| Arizona | 598,895 | 0.2 | 6,035,362 | 1.1 | 6,634,256 | 0.8 |
| Massachusetts | 6,107,392 | 2.2 | 469,983 | 0.1 | 6,577,374 | 0.8 |
| Vermont | 0 | 0.0 | 4,704,816 | 0.8 | 4,704,816 | 0.6 |
| North Carolina | 294,442 | 0.1 | 4,241,971 | 0.7 | 4,536,413 | 0.5 |
| Utah | 232,565 | 0.1 | 3,536,912 | 0.6 | 3,769,478 | 0.4 |
| Kentucky | 21,760 | 0.0 | 3,682,881 | 0.7 | 3,704,641 | 0.4 |
| Montana | 416,538 | 0.2 | 2,872,837 | 0.5 | 3,289,375 | 0.4 |
| Florida | 166,984 | 0.1 | 2,863,144 | 0.5 | 3,030,128 | 0.4 |
| Virginia | 47,910 | 0.0 | 2,511,582 | 0.4 | 2,559,492 | 0.3 |
| Arkansas | 997,979 | 0.4 | 1,000,455 | 0.2 | 1,998,434 | 0.2 |
| North Dakota | 5,360 | 0.0 | 1,684,457 | 0.3 | 1,689,818 | 0.2 |
| Tennessee | 56,328 | 0.0 | 1,553,306 | 0.3 | 1,609,635 | 0.2 |
| Maryland | 42,006 | 0.0 | 1,516,137 | 0.3 | 1,558,143 | 0.2 |
| Louisiana | 1,064,486 | 0.4 | 318,745 | 0.1 | 1,383,231 | 0.2 |
| Puerto Rico | 0 | 0.0 | 1,321,200 | 0.2 | 1,321,200 | 0.2 |
| New Jersey | 1,053,071 | 0.4 | 256,461 | 0.0 | 1,309,531 | 0.2 |
| Maine | 43,832 | 0.0 | 1,163,458 | 0.2 | 1,207,290 | 0.1 |
| Mississippi | 685,719 | 0.3 | 491,930 | 0.1 | 1,177,649 | 0.1 |
| Nevada | 35,040 | 0.0 | 1,142,203 | 0.2 | 1,177,243 | 0.1 |
| Alabama | 564,618 | 0.2 | 208,616 | 0.0 | 773,234 | 0.1 |
| South Carolina | 186,183 | 0.1 | 535,132 | 0.1 | 721,315 | 0.1 |
| Connecticut | 7,006 | 0.0 | 702,665 | 0.1 | 709,672 | 0.1 |
| New Hampshire | 3,851 | 0.0 | 458,062 | 0.1 | 461,913 | 0.1 |
| Wyoming | 0 | 0.0 | 240,765 | 0.0 | 240,765 | 0.0 |
| Hawaii | 129,739 | 0.0 | 49,610 | 0.0 | 179,349 | 0.0 |
| West Virginia | 3,110 | 0.0 | 169,072 | 0.0 | 172,182 | 0.0 |
| Delaware | 2,830 | 0.0 | 138,410 | 0.0 | 141,240 | 0.0 |
| Rhode Island | 72,338 | 0.0 | 34,050 | 0.0 | 106,388 | 0.0 |
| Alaska | 0 | 0.0 | 13,252 | 0.0 | 13,252 | 0.0 |

GAO-20-700R 2019 Market Facilitation Program



| State[a] | MFP payments | | | | | |
|---|---|---|---|---|---|---|
| | Specialty crops | | Dairy and hogs | | Total | |
| | Dollars | Percentage | Dollars | Percentage | Dollars | Percentage |
| **Total** | **273,859,081** | **100.0** | **565,895,366** | **100.0** | **839,754,447** | **100.0** |

Source: GAO analysis of Farm Service Agency data. | GAO-20-700R

Note: Percentages may not sum to 100 because of rounding.

[a]Also includes Puerto Rico.



FSA paid the 25 farming operations that received the highest MFP payments for 2019 about $37 million. As shown in table 5, FSA made all but three of these payments to operations that produced only nonspecialty crops.

**Table 5: Payments, Number of Members, and Contributions of Management and Labor for the 25 Farming Operations Receiving the Highest Market Facilitation Program (MFP) Payments for 2019**

| Farming operation | Census Bureau region[b] | Nonspecialty crops (dollars) | Specialty crops (dollars) | Dairy and hogs (dollars) | Total (dollars)[c] | Primary crops[d] | Number of members[e] | Active personal management only | Personal labor only | Combination of active personal management and personal labor |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | **MFP payments** | | | | | **Number of individuals contributing management or labor, by type[a]** | | |
| 1 | South | 2,077,999 | 0 | 0 | 2,077,999 | Corn, cotton, sorghum | 10 (all individuals) | 0 | 0 | 6 (plus 4 spouses) |
| 2 | Midwest and South | 1,980,118 | 0 | 0 | 1,980,118 | Corn, rice, soybeans | 8 (6 corporations and 2 individuals) | 4 (plus 4 spouses) | 0 | 0 |
| 3 | South | 1,940,323 | 0 | 0 | 1,940,323 | Cotton, sorghum, wheat | 8 (all individuals) | 0 | 0 | 5 (plus 3 spouses) |
| 4 | South | 1,886,334 | 0 | 0 | 1,886,334 | Corn, cotton, soybeans | 9 (all corporations) | 0 | 7 (plus 3 spouses) | 0 |
| 5 | Midwest | 1,740,248 | 0 | 0 | 1,740,248 | Corn, soybeans | 8 (2 individuals and 6 corporations) | 0 | 5 (plus 3 spouses) | 0 |
| 6 | South | 1,622,520 | 0 | 0 | 1,622,520 | Corn, cotton, soybeans | 8 (all corporations) | 5 (plus 3 spouses) | 0 | 0 |
| 7 | Midwest | 1,528,311 | 0 | 0 | 1,528,311 | Corn, soybeans | 7 (all individuals) | 1 | 0 | 3 (plus 3 spouses) |
| 8 | South | 1,519,383 | 0 | 0 | 1,519,383 | Cotton, sorghum | 6 (2 joint ventures and 4 corporations) | 0 | 3 (plus 2 spouses) | 1 (plus 1 spouse) |

APP. 000178



| Farming operation | Census Bureau region[b] | Nonspecialty crops (dollars) | Specialty crops (dollars) | Dairy and hogs (dollars) | Total (dollars)[c] | Primary crops[d] | Number of members[e] | Active personal management only | Personal labor only | Combination of active personal management and personal labor |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **MFP payments** | | | | | | **Number of individuals contributing management or labor, by type[a]** | | |
| 9 | Midwest and South | 1,496,728 | 0 | 0 | **1,496,728** | Corn, soybeans, wheat | 6 (all individuals) | 0 | 5 | 0 |
| 10 | South | 807,341 | 0 | 680,944 | **1,488,285** | Corn, soybeans | 4 (all LLCs) | 0 | 0 | 4 |
| 11 | South | 1,381,885 | 0 | 0 | **1,381,885** | Corn, cotton, soybeans | 6 (all LLCs) | 5 (plus 1 spouse) | 0 | 0 |
| 12 | South | 1,377,422 | 0 | 0 | **1,377,422** | Corn, cotton, soybeans | 8 (4 corporations and 4 individuals) | 4 (plus 1 spouse) | 0 | 0 |
| 13 | Midwest | 1,374,279 | 0 | 0 | **1,374,279** | Corn, soybeans | 6 (5 corporations and 1 individual) | 0 | 5 (plus 1 spouse) | 0 |
| 14 | South | 1,361,268 | 0 | 0 | **1,361,268** | Corn, cotton, soybeans | 8 (all individuals) | 4 (plus 4 spouses) | 0 | 0 |
| 15 | Midwest | 1,355,509 | 0 | 0 | **1,355,509** | Corn, soybeans | 11 (7 corporations and 4 individuals) | 1 | 6 (plus 2 spouses) | 0 |
| 16 | Midwest | 1,348,866 | 0 | 0 | **1,348,866** | Corn, sorghum, wheat | 6 (all individuals) | 3 (plus 3 spouses) | 0 | 0 |
| 17 | South | 1,348,273 | 0 | 0 | **1,348,273** | Corn, soybeans, wheat | 8 (all LLPs) | 0 | 0 | 4 |
| 18 | Midwest | 1,338,208 | 0 | 0 | **1,338,208** | Corn, soybeans, wheat | 7 (all individuals) | 0 | 0 | 6 (plus 1 spouse) |
| 19 | South | 1,326,477 | 0 | 0 | **1,326,477** | Cotton, sorghum, soybeans | 6 (all corporations) | 0 | 4 (plus 2 spouses) | 0 |
| 20 | South | 1,203,330 | 0 | 119,645 | **1,322,975** | Corn, soybeans, wheat | 9 (all individuals) | 1 | 0 | 4 (plus 1 spouse) |

GAO-20-700R 2019 Market Facilitation Program



| | | MFP payments | | | | | Number of individuals contributing management or labor, by type[a] | | |
| Farming operation | Census Bureau region[b] | Nonspecialty crops (dollars) | Specialty crops (dollars) | Dairy and hogs (dollars) | Total (dollars)[c] | Primary crops[d] | Number of members[e] | Active personal management only | Personal labor only | Combination of active personal management and personal labor |
|---|---|---|---|---|---|---|---|---|---|---|
| 21 | South | 1,322,196 | 0 | 0 | 1,322,196 | Rice, soybeans, wheat | 8 (all LLCs) | 4 (plus 4 spouses) | 0 | 0 |
| 22 | South | 1,308,888 | 0 | 0 | 1,308,888 | Cotton, peanuts, sorghum | 9 (all individuals) | 8 | 1 | 0 |
| 23 | Midwest | 0 | 0 | 1,282,590 | 1,282,590 | N/A | 22 (10 corporations and 12 individuals) | N/A, livestock determination only | | |
| 24 | Midwest and South | 1,276,172 | 0 | 0 | 1,276,172 | Corn, cotton, soybeans | 8 (all corporations) | 0 | 7 (plus 2 spouses) | 0 |
| 25 | South | 1,269,369 | 0 | 0 | 1,269,369 | Corn, cotton, soybeans | 7 (all LLCs) | 4 (plus 3 spouses) | 0 | 0 |
| Total | N/A | 35,191,445 | 0 | 2,083,179 | 37,274,624 | N/A | N/A | N/A | N/A | N/A |

Legend:

LLC = limited liability company

LLP = limited liability partnership

N/A = not applicable

Sources: Farm Service Agency (FSA) state officials and GAO analysis of FSA data. | GAO-20-700R

Notes: We analyzed FSA data to identify the 25 farming operations—general partnerships and joint ventures—that received the highest MFP payments for 2019. A joint venture is a short-term association of individuals or entities, where the association exists without an actual partnership.

We provide the Census Bureau region where each farming operation is located to provide a general, rather than a specific location (e.g., state or county).

[a]Type of individual contribution is based on information provided by FSA state officials. Individuals may contribute active personal management or personal labor (or a combination of the two) and can provide these contributions on behalf of entities within a general partnership or joint venture. Both spouses may be considered "actively engaged in farming" and qualify for farm program payments if one spouse makes the requisite contributions to meet the actively engaged in farming requirements.

APP. 000180



[b]The U.S. Census Bureau divides the 50 states among 4 regions—Northeast, South, Midwest, and West. The Northeast region includes Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont. The South region includes Alabama, Arkansas, Delaware, District of Columbia, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia. The Midwest region includes Indiana, Illinois, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin. The West region includes Alaska, Arizona, California, Colorado, Hawaii, Idaho, Nevada, New Mexico, Montana, Oregon, Utah, Washington, and Wyoming.

[c]Total reflects the MFP payments each farming operation received for 2019. The national average MFP payment per farming operation for 2019 was $22,312.

[d]Primary crops are those with the most acreage, according to FSA officials. They are listed in alphabetical order.

[e]Members of a general partnership or joint venture can be individuals or entities (e.g., corporations or limited liability companies). The number of members consists of the number of entities and individuals who are members of the general partnership or joint venture.

GAO-20-700R 2019 Market Facilitation Program

APP. 000181

![GAO]

The average MFP payment per farming operation for 2019 was $22,312 but varied by county, ranging from $44 to $295,299. As shown in figure 2, a number of counties had average payments of $50,000 or more.

**Figure 2: Average MFP Payment for 2019 per Farming Operation, by County**



Average Market Facilitation Program (MFP)
payment for 2019 per farming operation, by county

  No data
  Less than $15,000
  $15,000 to less than $25,000
  $25,000 to less than $50,000
  $50,000 or more

Source: GAO analysis of Farm Service Agency data   |   GAO-20-700R

APP. 000182



## USDA Distributed Approximately $519 Million in Additional MFP Payments for 2019

USDA's FSA distributed approximately $519 million in additional MFP payments for 2019 compared with 2018 because of increased payment limits. Farming operations in Texas received approximately 22 percent of all additional payments. Farming operations in five states—Texas, Illinois, Iowa, Missouri, and Minnesota—received almost half of all additional payments, as shown in table 6.

**Table 6: Additional Market Facilitation Program (MFP) Payments because of Increased 2019 Payment Limits, by State**

| State | Farming operations that received additional payments | | Number of individuals who received additional payments | | Number of individuals who received above $125,000, by commodity type[a] | | | Additional MFP payments | |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Percentage of farming operations that received MFP payments | One additional payment[b] | More than one additional payment[c] | Nonspecialty crops | Specialty crops | Dairy and hogs | Dollars | Percentage |
| Texas | 1,605 | 4.4 | 2,000 | 8 | 1,996 | 1 | 19 | 114,875,919 | 22.2 |
| Illinois | 961 | 1.3 | 1,057 | 2 | 1,033 | 0 | 28 | 44,146,789 | 8.5 |
| Iowa | 739 | 1.2 | 793 | 11 | 752 | 0 | 63 | 30,914,726 | 6.0 |
| Missouri | 538 | 1.7 | 634 | 0 | 633 | 0 | 1 | 29,716,634 | 5.7 |
| Minnesota | 618 | 1.7 | 673 | 6 | 629 | 0 | 56 | 28,687,919 | 5.5 |
| North Dakota | 690 | 3.6 | 763 | 0 | 762 | 0 | 1 | 28,523,411 | 5.5 |
| Kansas | 593 | 1.0 | 665 | 2 | 665 | 0 | 4 | 26,564,292 | 5.1 |
| Tennessee | 352 | 3.0 | 476 | 0 | 476 | 0 | 0 | 24,197,268 | 4.7 |
| Georgia | 458 | 8.4 | 560 | 1 | 556 | 5 | 1 | 23,927,029 | 4.6 |
| Indiana | 425 | 1.2 | 468 | 3 | 462 | 0 | 12 | 17,873,864 | 3.4 |
| Arkansas | 271 | 2.1 | 392 | 0 | 390 | 0 | 2 | 16,893,584 | 3.3 |
| Mississippi | 278 | 5.9 | 393 | 0 | 393 | 0 | 0 | 16,593,006 | 3.2 |
| Kentucky | 242 | 1.7 | 323 | 0 | 323 | 0 | 0 | 15,246,369 | 2.9 |
| Nebraska | 402 | 0.9 | 427 | 2 | 422 | 0 | 9 | 14,558,035 | 2.8 |
| South Dakota | 283 | 1.3 | 319 | 0 | 315 | 0 | 4 | 13,494,175 | 2.6 |
| Ohio | 244 | 0.8 | 274 | 0 | 260 | 0 | 14 | 11,517,934 | 2.2 |

APP. 000183



| State | Farming operations that received additional payments | | Number of individuals who received additional payments | | Number of individuals who received above $125,000, by commodity type[a] | | | Additional MFP payments | |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Percentage of farming operations that received additional MFP payments | One additional payment[b] | More than one additional payment[c] | Nonspecialty crops | Specialty crops | Dairy and hogs | Dollars | Percentage |
| California | 184 | 1.8 | 197 | 12 | 63 | 92 | 66 | 11,440,468 | 2.2 |
| North Carolina | 162 | 2.2 | 187 | 0 | 186 | 0 | 1 | 8,965,597 | 1.7 |
| Oklahoma | 111 | 0.7 | 132 | 0 | 132 | 0 | 0 | 7,843,622 | 1.5 |
| Alabama | 105 | 3.1 | 128 | 0 | 128 | 0 | 0 | 5,315,577 | 1.0 |
| Louisiana | 112 | 1.7 | 146 | 0 | 146 | 0 | 0 | 4,786,019 | 0.9 |
| Michigan | 82 | 0.6 | 91 | 1 | 85 | 0 | 8 | 3,602,030 | 0.7 |
| Virginia | 65 | 2.2 | 71 | 0 | 70 | 0 | 1 | 2,874,489 | 0.6 |
| Arizona | 31 | 5.2 | 50 | 0 | 44 | 0 | 6 | 2,480,889 | 0.5 |
| Wisconsin | 65 | 0.3 | 67 | 1 | 61 | 5 | 3 | 2,190,126 | 0.4 |
| Maryland | 36 | 1.4 | 36 | 0 | 36 | 0 | 0 | 1,582,625 | 0.3 |
| Washington | 22 | 0.3 | 22 | 0 | 1 | 16 | 5 | 1,442,137 | 0.3 |
| South Carolina | 38 | 2.1 | 43 | 0 | 43 | 0 | 0 | 1,387,014 | 0.3 |
| Pennsylvania | 18 | 0.3 | 18 | 0 | 10 | 0 | 8 | 1,207,644 | 0.2 |
| Idaho | 17 | 0.3 | 18 | 1 | 4 | 0 | 16 | 1,157,107 | 0.2 |
| Colorado | 20 | 0.2 | 22 | 1 | 20 | 0 | 4 | 1,119,190 | 0.2 |
| Florida | 23 | 3.2 | 26 | 0 | 25 | 0 | 1 | 1,011,054 | 0.2 |
| New Mexico | 21 | 1.7 | 22 | 0 | 6 | 1 | 15 | 761,392 | 0.1 |
| Montana | 13 | 0.1 | 13 | 0 | 13 | 0 | 0 | 514,111 | 0.1 |
| Delaware | 11 | 1.5 | 15 | 0 | 15 | 0 | 0 | 425,234 | 0.1 |
| Oregon | 7 | 0.2 | 7 | 0 | 0 | 7 | 0 | 365,844 | 0.1 |
| New Jersey | 5 | 0.8 | 5 | 0 | 3 | 2 | 0 | 283,029 | 0.1 |
| New York | 4 | 0.1 | 4 | 0 | 4 | 0 | 0 | 143,989 | 0.0 |
| West Virginia | 1 | 0.2 | 1 | 0 | 1 | 0 | 0 | 65,000 | 0.0 |
| **Total** | **9,852** | **1.5** | **11,538** | **51** | **11,163** | **129** | **348** | **518,695,139** | **100.0** |

Source: GAO analysis of Farm Service Agency (FSA) data. | GAO-20-700R

Notes: There may have been additional MFP payments for 2019 compared with 2018 because of the increase in the types of eligible specialty and nonspecialty crops; we were not able to determine what these additional payments may have been because FSA did not report payment data for individual crops.

Percentages may not sum to 100 because of rounding.

APP. 000184



[a]Because individuals could have had additional payments for multiple commodity types, the sum of these payments across commodity types may not equal the number of individuals who received one and more than one additional payments in each state.

[b]One additional payment means an individual received a payment above the payment limit for the 2018 MFP for one type of commodity.

[c]More than one additional payment means an individual received payments above the payment limits for the 2018 MFP for two or three types of commodities.

APP. 000185

As shown in figure 3, the amount of additional 2019 MFP payments because of increased payment limits compared with 2018 varied by county, but farming operations in most counties did not receive additional payments.

**Figure 3: Additional MFP Payments because of Increased Payment Limits for 2019, by County**



Additional Market Facilitation Program (MFP)
payments for 2019, by county

- Zero or no data
- Less than $200,000
- $200,000 to less than $400,000
- $400,000 to less than $800,000
- $800,000 or more

Source: GAO analysis of Farm Service Agency data  |  GAO-20-700R

![GAO]

FSA distributed additional MFP payments for 2019 to about 10,000 farming operations across 39 states because of increased payment limits compared with 2018, as shown in figure 4.

**Figure 4: Location and Number of Farming Operations That Received Additional MFP Payments because of Increased Payment Limits for 2019**



Number of farming operations that received additional Market Facilitation Program (MFP) payments for 2019

● Two farming operations

Source: GAO analysis of Farm Service Agency data.  |  GAO-20-700R

(104150)

GAO-20-700R 2019 Market Facilitation Program

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (https://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to https://www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact: |
| | Website: https://www.gao.gov/fraudnet/fraudnet.htm |
| | Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

2021 WL 12232328

CQ-Roll Call, Inc. All Rights Reserved.

Copyright © 2024 Provided under license from CQ-Roll Call

Verbatim Transcript

March 25, 2021 12:00 P.M.

News Event

House Agriculture Committee Holds Hearing on State of Black Farmers

House Agriculture Committee Holds Hearing On State Of Black Farmers

SPEAKERS:


REP. DAVID SCOTT (D-GA.), CHAIRMAN

REP. JIM COSTA (D-CALIF.)

REP. JIM MCGOVERN (D-MASS.)

REP. FILEMON VELA (D-TEXAS)

REP. ALMA ADAMS (D-N.C.)

REP. ABIGAIL SPANBERGER (D-VA.)

REP. JAHANA HAYES (D-CONN.)

REP. ANTONIO DELGADO (D-N.Y.)

REP. BOBBY L. RUSH (D-ILL.)

REP. CHELLIE PINGREE (D-MAINE)

DEL. GREGORIO KILILI CAMACHO SABLAN (I-N. MARIANAS)

REP. ANN MCLANE KUSTER (D-N.H.)

REP. CHERI BUSTOS (D-ILL.)

REP. SEAN PATRICK MALONEY (D-N.Y.)

DEL. STACEY PLASKETT (D-V.I.)

REP. TOM O'HALLERAN (D-ARIZ.)

REP. SALUD CARBAJAL (D-CALIF.)

REP. RO KHANNA (D-CALIF.)

REP. AL LAWSON (D-FLA.)

REP. LOU CORREA (D-CALIF.)

REP. ANGIE CRAIG (D-MINN.)

REP. JOSH HARDER (D-CALIF.)

REP. CINDY AXNE (D-IOWA)

REP. KIM SCHRIER (D-WASH.)

REP. JIMMY PANETTA (D-CALIF.)

REP. ANN KIRKPATRICK (D-ARIZ.)

REP. SANFORD D. BISHOP JR. (D-GA.)

REP. GLENN 'GT' THOMPSON (R-PA.), RANKING MEMBER

REP. AUSTIN SCOTT (R-GA.)

REP. RICK CRAWFORD (R-ARK.)

REP. SCOTT DESJARLAIS (R-TENN.)

REP. VICKY HARTZLER (R-MO.)

REP. DOUG LAMALFA (R-CALIF.)

REP. RODNEY DAVIS (R-ILL.)

REP. RICK W. ALLEN (R-GA.)

REP. DAVID ROUZER (R-N.C.)

REP. TRENT KELLY (R-MISS.)

REP. DON BACON (R-NEB.)

REP. DUSTY JOHNSON (R-S.D.)

REP. JIM BAIRD (R-IND.)

REP. JIM HAGEDORN (R-MINN.)

REP. CHRIS JACOBS (R-N.Y.)

REP. TROY BALDERSON (R-OHIO)

REP. MICHAEL CLOUD (R-TEXAS)

REP. TRACEY MANN (R-KAN.)

REP. RANDY FEENSTRA (R-IOWA)

REP. MARY MILLER (R-ILL.)

REP. BARRY MOORE (R-ALA.)

REP. KAT CAMMACK (R-FLA.)

REP. MICHELLE FISCHBACH (R-MINN.)

[*]DAVID SCOTT: (OFF MIC) Of the Committee on Agriculture entitled A Hearing to Resolve the State of Black Farmers in the United States will now come to order. Welcome and I wanna thank everyone for joining us in today's hearings. After brief opening remarks members will receive testimony from the witnesses today and then the hearing will be open to our members' questions. Members who will be recognized in the order of seniority, alternating between majority and minority members, and in the order of arrival for those members who have joined us after the hearing was called on. And when you are recognized you will be asked to please unmute your microphone and you will have five minutes to ask your question and make your statements.

And if you are not speaking, please I ask that you remain muted in order to minimize the background noise so--so we can hear what our witnesses and our members are saying. And in order to get to all of your questions, the timer will stay consistently visible on your screen and your chairman is going to be very strict. Five minutes, the hammer's coming down. We want everybody to participate in this extraordinary event. And--and ladies and gentlemen, my opening statement. This is an historic hearing. And I want to begin this hearing with these words. We all know that all things work together for good to them who love God. And to them who are called according to God's purpose. There could be no more glorious words to use to set off this historic hearing that we are having today.

And we all are very pleased to have the opportunity today to examine this topic which is deeply embedded in each of our hearts. Both Democrats and Republicans care about the plight of our black farmers. And when our minds and our hearts are together we are truly doing God's will. And so as always, I certainly appreciate the opportunity to work on this issue alongside my colleague, the Republican ranking member of this committee and my friend, Congressman Thompson of Pennsylvania. And I want to thank our Secretary of Agriculture Tom Vilsack, for appearing before our committee today. And this is our first committee conversation with our second tenure of the USDA, Mr. Secretary, and we are so delighted and glad that you are before us today. And I want you to know from the bottom of my heart I thank you for joining us today.

I have the--I--I have heard that you are extremely busy and I want to just doubly appreciate your time that you're taking to speak with us on this important and historic issue, an issue that I know that you have been working on. And I thank you for the work that we have done together in putting forward a helping hand in the rescue package to bring four million dollars to help our farmers pay their loans and the one million dollars that will help provide technical cert. We appreciate your working with us on that.

For decades, the discrimination against black farmers by the United States Department of Agriculture has been well documented. Reports by the United States Commission on Civil Rights, the Government Accountability Office, and even the United States

APP. 000192

Department of Agriculture itself describes the discriminatory practices that en--were enabled by laws dating back all the way to the 1930s. That's why I'm saying this is historic.

And--and hallowed ground that we are working on this day. In fact, in 1997 a group of black farmers, including Mr. Timothy Pigford, filed a class action lawsuit against the United States Department of Agriculture over the agency's discrimination against black farmers in farm loan programs and other benefit programs as well as over the agency's failure to investigate racial discrimination complaints--complaints.

The evidence is in. It is before us today. And this is why this is so meaning for us and why I prefaced it with that message from the Lord that he has given to us this day to serve his purpose that he has brought us together today. And that is to bring justice to our black farmers. Well, the United States Department of Agriculture settled this class action lawsuit and as a part of that settlement, some black farmers--just some--received $50,000. Now many of my House colleagues may think that $50,000 is indeed a lot of money. But when a new tractor costs as much as a half of a million dollars, $50 is barely enough for a down payment on a reasonably good used tractor.

So it isn't enough to make improvements to the land. It's--it--it's going to even--it may not even be enough to finance next year's purchases of seed and fertilizer. And in my frank opinion, $50,000 is not enough to make up for the decades of discrimination and generational wealth that has been lost among black farming families, losing the land and the livelihood of our black families.

Black farms are by and large black family farms. And further, adding insult to injury black farmers were saddled with IRS tax bills from that Pigford settlement, leaving many of them worse off than before they even got the $50,000. And that's why what we did together in the bill we just passed when people say what is this in here talking about paying the tax bill--it's because we learned from the Pigford bill. So there's money here that takes into consideration up to 20 percent over what we're getting so that those taxes are paid for. Because the IRS uses that money as income. And they tax that loan forgiveness.

So I thank--and I want to thank Secretary Vilsack for helping us put that package together. So in short the Pigford settlement was too little. It was too late for our black farmers who lost their farms and livelihoods due to longstanding systemic discrimination and this dis--systemic discrimination continues to be felt by black farmers right today. Who are still disadvantaged in our United States Department of Agriculture programs.

This festering wound on the soul of American agriculture must be healed. This isn't just a festering wound in the black farming area. It's a festering wound on all of agriculture because we've got to excise and heal this wound so that once and for all, my fellow members, we will be able to make the statement that we no longer have racial discrimination in our United States Department of Agriculture. And that we want our glorious and wonderful world of agriculture to be open, to have opportunities for everybody regardless of race, creed, or color.

And that is why I have repeatedly called for a new conversation between black farmers and the United States Department of Agriculture. And this hearing is an opportunity for us to gather with Secretary Vilsack here joining us to begin that conversation, examine the secretary of Agriculture's ideas, and reforms that, I understand, he is already working on. And we have this opportunity to hear firsthand from our secretary. And I thank God for that.

This hearing is--today is very public and it's a public way to address the deep mistrust that many of our farmers of color feel towards the United States Department of Agriculture. We're not hiding anything here because when you hide it, you can't solve it. This is why this hearing is historic.

And to make sure that an increasingly competitive agriculture economy, no talent or ability is ignored or left behind, we are--no longer can afford that approach. The black farmer representatives who are here today with us today, they will discuss this longstanding systemic discrimination against our black farmers. Who better to do that than our black farmers themselves? And that's why I'm so glad that they are here along with Secretary Vilsack.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

In 1920, black farm operators were 14 percent of all the United States farmers and in the south, they were over 20 percent of all the farms were owned by African Americans. You know what it is now? It's less than 2 percent; 1.8 percent to be exact. Lack of equal access to our federal farm loan programs is a large reason black farms have lost 90 percent of their land. In 1937, Congress required that local elected county commissioners and committees certify the eligibility of farmers for the Farm Loan Program. And when a farmer applied for a farm program, the county committees received sensitive information about the applicants. This left credit worthiness up to the elected officials, county officials on the committee, many of whom were land guards on this land. Talk about a conflict of interest in addition to the racism.

So, there was built-in bias against our black farmers for decades. And I'm not speaking to you as one that don't know. You're looking at your chairman who was born on a black farm, my grandparents' farm in Aynor, South Carolina. And you talk about farming, that was the heart of it in Aynor. I know what it was there. For those of you who feel the number of loans to fairly-- is fairly representative of the number of black farmers today, I say they totally miss the point. Most farmers who can't get a loan are simply not farming. But we are here to find out why they aren't farming, to examine the built-in barriers to the loan system and to see how to remove them.

We have six farmers and farmer advocates here on the panel with us today who will share their experience and solutions to address the effects of discrimination and improve the profitability and sustainability of our black farmers. That is the bottom line. We've got to increase the market share of our black farmers. So, as we do that and our black farmers are making money, we will never have to be in the position to have them to pay lending bills if they get the proper amount of market share to sell their products on the market. Folks, I'm noticing our good work here in Congress as well and I have a letter of support for policies including the American Rescue Plan for relief for farmers of color. If there's no objection, I will enter this letter of support from Bayer, a major agricultural industry giant, Bayer, for the record. Thank you.

I'd now like to welcome the distinguished ranking member, my friend, the gentleman from Pennsylvania, Mr. Thompson, for his opening remarks. Thank you.

THOMPSON: Well, good afternoon, and thank you, chairman. Always a privilege and an honor to--to work with you on the issues that are so important to rural America and to our agriculture industry. And so--and thank you for holding today's hearing on such an important issue that I--I know is not only near and dear to your heart but it's an issue of such importance that each and every one of us participating today, including those tuning in to our livestream, can-- can learn something from.

Today's hearing to review the state of black farmers in the United States is an opportunity to address some questions that, quite frankly, have gone unanswered for far too long. Everyone participating today is familiar with the 1999 class action suit, Pigford versus Glickman, a case that alleged decades of discrimination by the U.S. Department of Agriculture against black farmers applying for farm loans and other government assistance. But since the original Pigford settlement, more than $2 billion have been allocated as compensation for black farmers.

Without a doubt, there's been discrimination at USDA in the past against black farmers and other socially disadvantaged groups. Sadly, I'm sure, instances of discrimination remain today. Now, the American Rescue Plan was signed into law on--two weeks ago today. Among the nearly $2 trillion in spending was $5 billion allocated for black farmers, 4 billion of which was designated for loan forgiveness.

Now, let me be clear. I didn't vote for this bill for many obvious reasons. The fact that the bulk of the multi-trillion-dollar bill had virtually nothing to do with COVID was chief among them. It was also drafted behind closed doors with no input from minority party. We never get the best product whenever we allow--when--when either party allows that to happen. And moreover, the bill was drafted based on hypotheticals, misinformation, and incomplete data. Unfortunately, that's what happens when you force through partisan legislation through budget reconciliation.

Paying off the loans of seriously disadvantaged farmers may help in the short-term, but it does very little to address the root cause of this--of this issue. And I know my healthcare practice for 28 years, we had to get to the root cause of an issue to--to truly address it long-term. I think that applies--just as important lessons to apply to legislation or dealing with public policy issues, such as--especially as--as grievous--grievous ones as--as discrimination with agriculture programs and the support of those.

It--it does nothing to attack discrimination head-on. It certainly doesn't prevent racial exclusion for black farmers or any other socially disadvantaged group in the future. Now, how did USDA leadership fail so spectacularly to allow this ongoing discrimination for so many years? Why were bad actors allowed to continue their comfortable government or appointed jobs when they so brazenly allowed discrimination to continue, even if not having directly engaged in discrimination itself? Where was the oversight? Where was the supervision of these bad actors?

Is simply forgiving debt the best way to address this problem and provide a forward-thinking and equitable outcome? The American Rescue Plan gives USDA blanket authority to handle the funds provided through legislation. Surely, leaving an unelected bureaucracy with a decades long track record of racial discrimination to their own devices cannot be the west wa--the best way to right wrongs.

We cannot forget the progress Congress has already made by authorizing programs and initiatives through previous farm bills I'm very proud of to assist our black and other socially disadvantaged farmers. From credit to conservation, there have been a number of provisions that seek to address inequalities. For example, USDA's Farm Service Agency now targets direct loans and guarantees loans to eligible socially disadvantaged farmers to buy and to operate family-sized farms and ranches. When it comes to conservation forestry, the Natural Resources Conservation Service has made a concerted effort to provide resources for socially disadvantaged and historically underserved producers.

Every year, NRCS targets 5 percent of its EQIP investments at program for socially disadvantaged farmers. However, over the last decade, the NRCS has exceeded expectations with 33 percent of EQIP funds--funding going to historically underserved producers and beginning farmers. Now, of course, I'd be remiss not to mention that 2018 Farm Bill and--and chairman, recognize your efforts when it came to doing better and providing the investments in our historically black 1890 land grant universities. Thank you for your leadership on that initiative as a part--part of that farm bill process. Including the $80 million in scholarships for those HBCU students to pursue agricultural education.

While much work remains, we should look to these--these previous--this previous progress as really a blueprint in continued--in our continued discussions. We must work together as a farm team, farmers, ranchers, producers, legislators, stakeholders, and activists alike to reduce barriers that are preventing black and other socially disadvantaged farmers from participating fully in a robust farm economy. We must support a strong farm economy that lifts up all.

Now, I'd like to thank our chairman once again. I would especially like to thank our witnesses. We have an impressive list of witnesses here. And having read and digested your--your written testimony, it just--it was certainly heartfelt. There was a lot of passion, emotion sharing your life stories throughout that. And--and that's--that's appreciated. Much appreciated. Your testimony is critical in helping us better understand the discrimination black farmers have faced. And also, it will play a crucial role to ensure our agriculture policy does not discriminate. Rather, it empowers farms of all races, sizes, and commodities.

Now, I'm here to listen. We're all here to listen. And I look forward to participating in this long overdue conversation.

Thank you, chairman. And I yield back.

DAVID SCOTT: Thank you, ranking member, for those excellent comments and words. The chair would request that other members submit their opening statements for the record so witnesses may begin their testimony, and to ensure that there is ample time for all of your questions. So without objection, the chair is authorized at any time to declare the committee in recess, subject to the call of the chair.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  6

And now, let us turn our attention to our distinguished panelists who are here with us today, and we're so delighted. First, I am very pleased to welcome back to the Agriculture Committee Secretary Tom Vilsack, who is now leading our Department of Agriculture for the second time. Secretary Vilsack needs no introduction to many of us on this committee, but I will note that he did serve two terms also as the governor of Iowa, before joining the Obama administration as the 30th secretary of Agriculture in 2009. He was President Obama's longest-serving cabinet secretary. He was confirmed again in February of this year for his second tenure as secretary.

Our next witness is Mr. John Boyd, Jr., founder and president of the National Black Farmers Association. Mr. Boyd is a fourth-generation farmer from Baskerville, Virginia, where he owns and operates a 300-acre farm raising corn, wheat, soybeans, and beef cattle. Mr. Boyd is a familiar presence here in Washington, DC, as the founder and president of the National Black Farmers Association.

Since 1995, the National Black farmers Association has fought hard for equal treatment for our black farmers at USDA's Farm Service Agency, particularly with equal access to credit. Also, Mr. Boyd was a key spokesperson for black farmers during both Pigford one and Pigford two. And Mr. Boyd continues to promote inclusion, equality, of opportunity, for black farmers across all sectors of our agriculture industry across the nation. It's good to have you here today, Mr. Boyd, and we appreciate your testimony as well.

And now I'm pleased to welcome our third witness, Mr. Cornelius Blanding, executive director of the Federation of Southern Cooperatives. Mr. Blanding joins us today with a deep background in management consulting and business development, including 24 years in support of black farmers and rural landowners. He has served on more boards and committees than exactly we have time to name here today.

Of note, though, our USDA's Advisory Committee on Beginning Farmers and Ranchers, as well as a member of the Advisory Board of the Socially Disadvantaged Farmers and Ranchers Policy Research Center. We are very grateful for your time, your experience, and your commitment to black farmers. And thank you, also, for joining us today.

Our fourth witness is Mr. Phillip Haynie, III--Phillip J. Haynie, III. He is chairman of the National Black Growers Council. Mr. Haynie is a fifth-generation farmer based in Reidsville, Virginia, where he and his family have a grain farm, a timber harvesting operation, a bulk transport business, in addition to a landscaping and excavating company.

He's a graduate of Virginia Tech. Mr. Haynie is currently the chairman of the National Black Growers Council. Welcome, Mr. Haynie. You are clearly a very busy man. Mr. Haynie, we appreciate your participation for being here today, and look forward to your excellent testimony.

Next, I'd like to welcome Mr. Sedrick Rowe. Mr. Rowe is an organic farmer from Rowe Organic Farms. Mr. Rowe is from Albany, Georgia, where he operates a USDA certified organic farm producing peanuts, hemp, watermelons, and canofa-- canola, excuse me, canola.

His commitment to agriculture extends from creation of the first Georgia organic peanut association, his pursuit of a PhD in soil health--that's going to come in very handy as we grapple with our climate change, no till farming and cover crops. And his commitment to rural Georgia is evident by his work with young farmers in his community and as a recognized leader of young farmers. He is an example of hard work and brains, and I hear he knows how to play football, too. Thank you for being with us, Mr. Rowe.

Our fifth witness is Ms. Shirley Sherrod, an extraordinary individual and a legendary leader in the fight to help our black farmers. Ms. Shirley Sherrod is an executive director of the Southwest Georgia Project for Community Education, Inc. Mrs. Sherrod is a

distinguished fellow Georgian who has served in multiple positions, promoting rural communities and agriculture. Ms. Sherrod is a graduate of Albany State in Albany, Georgia.

And Ms. Sherrod was the first person of color to be appointed as Georgia state director of the United States Department of Agriculture's Rural Development in 2009. And I'm really looking forward to, as we move, to really address rural development and rural broadband.

Ms. Sherrod brings years of cumulative expertise to today's panel of witnesses as a founder and vice president of development for New Communities, Inc., the nation's first community land trust, and the executive director of Southwest George's Project for Community Education, Inc., as well as the state lead for Southern Rural Black Women's Initiatives for Economic and Social Justice. Thank you so very much for sharing your wealth of experience and knowledge with us today, Ms. Sherrod.

And to introduce our final witness, I am pleased now to yield to our colleague on the Agriculture Committee, the distinguished gentleman from Kansas, Mr. Mann.

MANN: Thank you, Chairman Scott, and thank you for this hearing. I'm honored to introduce to you Arnetta and Earrak Cotton, the owners of Kingdom Community Development Services and Cattle tor the Kingdom in Wagoner, Oklahoma. The Cottons have more than 54 years of farm and ranch experience, and have dedicated their lives to outreach and assistance for rural and underserved communities.

I'm especially grateful for the Cottons and the recent work to distribute USDA Farmers to Families Food Boxes in Kansas, among other states, and through the Rural Impact Food Pantry at the church that they lead. I very much enjoyed getting to know the Cottons. They are wonderful people. They're the perfect example of serving, educating, and finding ways to farm and ranch despite adversity. Mr. and Mrs. Cotton, we look forward to hearing your testimony in a few minutes.

DAVID SCOTT: I thank the gentleman for his remarks and for his introduction. Now, we will now proceed to our historic hearing and with our testimony, and each of our panelists will have five minutes. Now, I am going to be strict on the timer, so that we can get everybody in and heard. And so the timer will be visible to everyone on your monitors, so that you will have a countdown to zero, at which point your time will be expired and I will bring down the gavel.

So now let us start with our distinguished chairman of the agriculture--the United States Agriculture Department, Mr. Vilsack, our distinguished secretary. You are now recognized for five minutes. Please begin now.

VILSACK: Mr. Chairman, thank you very much to you and to Ranking Member Thompson for calling this historic hearing on the state of black farmers in America and discrimination directed at black farmers by the department of Agriculture. In the interest of time and my belief that the testimony of the other panelists on this panel is far more relevant and more compelling than anything I would offer, I won't read my prepared statement, but would ask that it simply be placed in the record.

What I wish to do today is to speak from the heart. And I want to provide you, Mr. Chairman, and members of this committee a single and solemn commitment from me and from the team at USDA. That we will over the next four years do everything we can to root out whatever systemic racism and barriers may exist at the department of Agriculture directed at black farmers, socially disadvantaged farmers, and people who live in persistently poor areas in rural America.

Efforts have already been made in the past, as you have indicated, Mr. Chairman, good faith efforts, to respond to specific acts of discrimination. But more needs to be done to dig deeper into the systemic causes and barriers that perpetuate discriminatory practices, and to deal directly with the cumulative effect of discrimination, the gap that now exists between those who had the full array of services at USDA, the full array of programs at USDA, and those who for far too long have not had that array.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  8

Work has begun already to start with the implementation of President Biden's executive order on equity. A working group has been formed at USDA across all agencies, and they've already begun to meet and to begin the work of the assessment of services, benefits, contracts, and procurements, and barriers and problems that may exist.

We'll have the--I will have the benefit of the guidance and direction for the first time ever of a senior advisor for equity in the secretary's office. Dr. Duane Goldman has been appointed in that position, and he will work with our new team at the Civil Rights Office and with the dedicated men and women at USDA to provide advice and direction on equity issues throughout the USDA. And I certainly look forward to the day of Senate confirmation of Dr. Jewel Bronaugh, who once confirmed will be the first African American deputy secretary at the United States Department of Agriculture. She and I will partner together to carry out and fulfill the commitment that I made to you today.

Finally, I'm grateful for your leadership, Mr. Chairman, and that of Mr. Bishop, Senators Booker, Warnock and Warren, who helped to shepherd through the American Rescue Plan, that contains a historic step forward in responding to the cumulative effect of discrimination in the past, by providing debt relief for socially disadvantaged producers, by establishing an equity commission to review barriers that exist at USDA, to assist with heirs' property issues, expanded outreach, market development, and land access.

These resources will help restore some balance in the USDA covenant relief approach and allow an external review of all of our programs at USDA. We're prepared to move quickly, efficiently and thoughtfully to implement the American Rescue Plan sections related to black farmers and socially disadvantaged framers and other sections of the Rescue Plan that relate to rural America. As part of my commitment to you today, I also wanna provide an additional guarantee and that is, I plan to have in place a system of rigorous reporting, accountability and oversight in all of our equity efforts. Let me be clear, there is no place at the USDA for discrimination, none, nor for that matter, anywhere. This historic moment to advance equity must not be lost, and I intend to do everything I can, to ensure that it isn't. Mr. Chairman, I look forward to the questions from the committee, at your pleasure.

DAVID SCOTT: Thank you, Mr. Secretary. Thank you very much for your very good testimony that we have just heard. Now, I want to recognize for five minutes our next panelist, Mr. Boyd, you are now recognized to begin. Mr. Boyd, you may be muted? Is he...

BOYD: There we go, I'm sorry is it--okay. Mr. Chairman--

DAVID SCOTT: --Yes--

BOYD: --Thank you very--thank you very much. First, I'd like to give honor to God first and foremost and I would like to thank you the Ranking Member, Mr. Thomas--Thompson, the other congressperson from North Carolina, the Vice-Chair Alma Adams and I spent some time visiting with most members of the Agriculture Committee to--to talk to them about the plight of the black farmers this week.

So I would like to thank all of the members who took time to visit with me personally, to talk about the plight of the black farmers. It is an honor to be here today to talk to you and this committee, this is a hearing, Mr. Chairman that I personally been advocating for--for over 30 years. When I first began to advocate and press the issue on Capitol Hill, we could never even get a full committee Agricultural hearing.

So, for people who are watching here, this is a very, very historic hearing in nature, where the only hearing we could get at that time was with the Congressional Black Caucus, in 1997 where all of the members participated and listened to the plights of black farmers. On behalf of every enslaved black man in this country, on behalf of every sharecropper in this country, on behalf of every black farmer who tilled the soil, past and present, we thank you and this committee for finally hearing our cries.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

I'm a fourth-generation farmer, a fourth-generation farmer, and I was trained to farm by my grandfather, Thomas Boyd, an my--also my other grandfather, Lee Robinson a sharecropper and my father John Boyd Senior, who's probably watching this hearing today. I have a long, rich history of farming along Run Up River (PH) in Mecklenburg County, Virginia, where my great grandfather Andrew Boyd was a slave.

And so, we bring a lot of history and wealth and pride and wisdom to this committee to--committee today as we reach out to talk to you. Currently today, I raise corn, wheat and soybeans but I was trained as a tobacco, cotton and peanut farmer.

Many of those things were bought out under the government buy-outs and I too switched over to--to those type of commodities. Today as you know, Mr. Chairman in your comments, we are less than 1 percent of the nation's farmers and we are facing extinction. At the turn of the century, we were one million black farm family strong, tiling 20 milloin acres of land in this country. Today we're down to 4.5 milloin acres of land in this country and less than 50,000 black farmers in this country. And we got to this place partly by the United States Department Of Agriculture and its discrimination. And I can attest that discrimination was live, and well at--at the Department Of Agriculture and we need to resolve the backlog of complaints that exist there. We need to emperl (PH)--improve program delivery at local offices around the country, where those are farmers even today when they walk into the office and they enquire about the Farmers of Color Act that recently passed and we're getting a snappy and disrespected type of tone from the local offices that they don't know anything about it and don't know how it's going to--to move forward, that was the--the same type of information that--that got us here in the first place, Mr. Chairman.

So this committee worked hard to get that measure passed and we need to--I'm urging the Secretary today and I heard his comment, to move swiftly, to move swiftly and implement the bill so that the farmers can get the debt relief. And also the $29 billion dollars that was tolled out in the Trump Administration, less than 0--0.1 percent went to black farmer, 0.1 percent out of the $29 billion went to black farmers Mr. Chairman. We can do better than that and it was due to the active discrimination, we're using the same programs, the same policies by rolling these--information out through the county offices and it's failing because black farmers don't trust the United States Department of Agriculture. We have to find a better way to do that and that's why we named it Mr. Chairman, The Last Plantation and rightfully so.

And today, we need to move in a more cohesive way. This isn't a Republican issue, it's not a Democratic issue, it's happened on the hands of all presidents and I've met with Sonny Perdue and it was the worst meeting in history for me, as a--as a leader, where he said 'Black farmers had to get big or get out. He didn't need any tokens or people who didn't wanna work on these committees' That's the type of discrimination that black farmers are facing and it looks like I'm running out of my time, but I can talk to you Mr. Chairman about this all day long. I'm looking forward to getting all of the questions and input from this committee and again, thank you for having this very, very important hearing.

DAVID SCOTT: Thank you so much, Mr. Boyd, for your excellent testimony. And next, we have Mr. Blanding. Please begin your testimony.

BLANDING: Good afternoon, Mr. Chairman, Madam Vice Chair, Mr. Ranking Member, and members of the committee. My name is Cornelius Blanding, and I'm the executive director of the Federation of Southern Cooperatives Land Assistance Fund, a 54-year-old Cooperative Association of Black farmers, landowners and cooperatives from all across the south. Founded directly out of the Civil Rights Movement in 1967, the federation is the oldest and largest black farmer owned and serving institution in the country. It is also the only cooperatively owned organization of black farmers, landowners and cooperatives focusing primarily on black land laws, and the use of cooperatives as a tool to increase income and build wealth in the south, where 80 percent of all black farmers are located.

I'm honored to be before this committee today testifying on the realities, struggles, and perseverance of black farmers and landowners in the U. S. south. I've submitted my full statement to the Committee, which I ask to be made part of the hearing record. As part of my brief opening statement.

I would like to thank this committee again for this opportunity to testify before--on part of this historical hearing on black farmers. I have served the Federation of Southern Cooperatives and Black Farmers for the past 24 years, and as the Executive Director of the Federation for the past six years.

We, the Federation of Southern cooperatives, based on a study we did 41 years ago in 1980, entitled 'The impact--am I lost--The Impact Of Heirs Property On Black Rural Land Tenure In The Southeastern Region Of The United States,' that was commissioned by Congress and funded by the United States Department of Agriculture.

And based on over 50 years of work, we estimate that approximately 60 percent of all black owned land is heirs property, land that lacks a clear title that the landowner dies without a will or estate plan, and it is passed down informally to the heirs of deceased landowners. It is the reason that I and thousands of others in the black community are not black (SP) landowners are still farming today.

So you see this work is personal for me, just like it is for other folks on this--I've testified on this hearing today like this, like it is for thousands of black farmers and advocates across this country. Heirs property is a civil rights issue, all the citizens of our country should have access to government services, but because of heirs property, many don't. And for decades, black farmers haven't, and this has resulted in black land loss.

These are all things that could have been addressed with good and reasonable legislation, including the $1.9 trillion-dollar American Rescue Plan recently passed by the Senate and the House and signed into law by the President. As I mentioned in my opening statement, Mr. Chairman, I'm here to testify on the reality, struggles and perseverance of black farmers and landowners. The reality is that black farmers have gone out of business and lost the highest percentage of land in any other group in this country, over the past century. In 1910, there were 218,000 black farmers owning roughly 15 million acres of land, according to the US Census Bureau in 1992, there were only 18,000 black farmers own and 2.3 million acres of land.

That's over a 90 percent loss of black farmers, as well as almost a 90 percent lo--loss of black owned land. Another reality is that the majority of black farmers get their credit from USDA's Farm Service Agency, the lender of last resort, which they are expected to graduate out of their system in seven years. And after that they're supposed to qualify for credit in a traditional market, however, that day never comes for most black farmers. Instead, they're relegated to predatory style lenders at best, and farming out of their pockets at worst, no business especially farming, can survive in this reality. This-- reality is also the fact (INAUDIBLE) USDA, as shown in historical lawsuit 'People versus Grignon.' These realities have led to the struggles of black farmers, the struggles to hold on to land for generations because of unsecure or crowded titles and discrimination.

The realities of black farmers have also led to the struggle to successfully operate bonds in a sector where they buy in a retail market and sell in the wholesale market, primarily because of lack of scale, 80 percent of black farmers operate on 100 acres or less. These realities have also led to the struggles to access enough fair and equitable credit for farmers to grow their business and become part-time--beyond a part time subsistence farm. However, these struggles and realities have forced black farmers and landowners to be some of the most resilient people in their communities and this--and in this country.

Black farmers have persevered through the difficult days of sharecropping and the long nights of racism and discrimination and continue to persevere in spite of the issues of heirs property, the lack of access to fair and equitable credit. I believe--and they continue to be on the front lines of feeding families, anchoring rural communities and protecting our environment, regardless of these realities and struggles. The black farmer story is of perseverance. It's about this story, and it's about time this story is told, it's about time for a hearing such as this. It's about our--time for our country to support those that have given so much but received so little in exchange.

In closing. Mr. Chairman, I reiterate the black farmer story is one of struggle and perseverance. And so, I--I'll end with that, Mr. Chairman, but our--our air, our water and soil and our lives depend on black farmers. Thank you, Mr. Chairman, members of this committee for this opportunity to appear before you today. I stand ready to answer any questions that you may have. Thank you.

DAVID SCOTT: Thank you so much, appreciate your excellent testimony. Mr. Haynie, please begin now.

HAYNIE: Mr. Chairman, Secretary Vilsack, members of the committee, staff of the committee, and to the many others that have worked tirelessly in making this hearing possible, I would like to say thank you. Thank you on behalf of the black farmers and landowners who have been asking, praying and waiting so long for relief. I would also like to say thank you, on behalf of the black farmers who have passed on without personally being able to witness this day.

Mr. Chairman, I come before you today on behalf of the National Black Growers Council, an organization that consists of multi-generational farmers who advocate for the interests of black farmers in their local communities, in their states, and to the federal government. An organization whose mission is to improve the efficiency, productivity, and sustainability of black row crop farms. Mr. Chairman, I think we all know the statistics that 2 percent of the U.S. population of farmers, and that black farmers represent less than 2 percent of the entire 100 percent of farmers in the United States.

What I would like the committee to truly recognize is that black row crop farmers represent less than 8 percent of the entire black farm population. Mr. Chairman, black farmers that grow corn, cotton, soybeans, peanuts, and rice are on the verge of extinction. Mr. Chairman, it is imperative that we support the remaining black farmers that exists. It is imperative that we address the disparities and inequities that exist between black farmers and their white neighbors, and it is imperative that we put programs in place that remove the economic need that is on the neck of a lot of black farmers and landowners.

As the National Black Growers Council have said before, land is a farmers' most valuable and productive asset. As you canvass the country, you will often find black farmers on non-irrigated land trying to compete with their white farmer neighbors who have used USDA programs to put irrigation on their land. You will also find black farmers who have not been able to participate in land leveling and drainage and other USDA programs to improve their farms like their white neighbors.

These inequities place black farmers at a significant disadvantage to producing higher yields and being profitable. Mr. Chairman, on a trip to the local USDA office to inquire about a beginning farmer loan, the county executive director brandished my father and I with a loaded handgun and told me that I did not need to get involved in farming, and go get a job. My father, like many other black farmers across this nation, was a victim of discrimination by USDA.

After selling his case for 25 percent of his economic losses, they barred him from ever borrowing money from USDA. These issues are discriminatory, and if not addressed, you and I will witness the extinction of black grow crop farmers. In 2020, the world changed. And we were and still are in what is called a pandemic. Unfortunately, black farmers have been going through a pandemic for years. We have watched our fellow black farmers be forced out of business and lose their land at far greater rates than our white neighbors.

Mr. Chairman, the National Black Growers Council is committed to the cause, and is working with our corporate partners, fellow farm advocacy groups, and the Department of Agriculture to reverse the declining trend of black farmers and landowners across these United States. Mr. Chairman, I was a college student in 1997, and watched my father, John Boyd, and other black farmers from across this nation sit before legislators and policymakers to explain these disparities that exists between black and white farmers. Twenty-four years later, I'm sitting before you echoing the same tones and explaining to lawmakers about the inequities that still exist.

Too many black farmers have died with their cry for help falling on deaf ears. Mr. Chairman, I would hope and pray that my children do not have to sit at this table 24 years from now, still asking for you to right the wrongs on behalf of black farmers. Mr. Chairman, for all the people who have been working on policy and legislation to help right the wrongs of black farmers, I would like to leave them with these words of faith found in Galatians chapter 6, verse 9. 'Let us not become weary of doing good. For at the proper time, we will reap a harvest if we do not give up.' Thank you, Mr. Chairman.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

DAVID SCOTT: Thank you very much, Mr. Haynie, for your excellent, excellent report to us. And now I recognize Mr. Rowe. Please begin your testimony.

ROWE: Thank you for the opportunity to be able to be on this call and be able to share my testimony. My name is Sedrick Rowe. I'm a farmer from South Georgia. I do grow crop. And I do also organic farming. I'm a first generational farmer. I've been farming for four years on my own. I had an opportunity to graduate from a land grant institution that also taught me a little bit more about farming.

And my experience of it, it has--nothing hasn't changed since the past. And here, my granddaddy, older people talk about farming back in the day, and how they wasn't able to access land and equipment. I'm going through that personally myself. I applied for beginning farmers program, micro loans. The reason I didn't get funding, I don't know. I have legit reason why I need the assistance. And also, the red flags are still there there because I'm giving them all of my information all of my life just for them to tell me no again.

So it holds it back--it holds me back as a farmer. So when you--I see the--the effort we're doing to allocate money for those program. But are those programs actually funding these farmers (INAUDIBLE)? Are these farmers taking advantage of those programs? We're not able to because when you look at a black farmer, you're thinking small. That's why we're on that 1 percent, 2 percent level. We, you know--we, you know, speaking from my personal experience, it's just been hard to, you know, even get into the market with peanuts.

As you know, peanuts is a commodity. In order for you to grow a peanut--a commodity, it sells itself. So as a black farmer, I can't just take my peanut to any peanut mill, because they'll say, oh, we're full. They give me some excuse for why they can't take my peanuts. So as a young farmer, you know, I created my own avenue to--to create my own market, organic peanuts. Something that I know, large farmers can't compete with.

That's why it's happening to another market, like hemp. So I started doing more organic, started focusing on the soil and the land, something that, you know, that we always focused on growing up. Take care of the land, the land take care of you. So, you know, being--coming from that era, and having that mentality, you know, even my little, small piece of land, it--it matters just like a larger farmer. And I see, to this day, our money is being allocated to help out, you know, young and black farmers and socially disadvantaged farmers, but you know, that--it comes with so much just for that farmer to access that money. You look, on the other hand--hand, you know, it's easy for them to access money. They'll--they'll tell you I qualify for it. But when I get there, it's a whole other story. So we--we need to change up, you know--you know, how--who qualifies, and who doesn't. You know, a lot of the black farmers miss out on opportunity to, you know, keep the land in their--in their family name.

So they're forced to go get a loan from--from the government, which--where, you know, nine times out of ten bring them, you know, into more debt, because everyone know farming is a risk. Every year is not a profitable year. You know, so farmer, like me will--look, you know, in order for me to feel like the government has given me the right assistance--you know--it's--it's funny how we have a pandemic, and during the pandemic, you have other banks and all that that have forgiveness on their loans. But, you know, government, USDA has--have had loans out allocated for these farmers. But you've never gave them option for the forgiveness so their family can keep--keep that land in their name.

You know, something to be able to show, you know, with forgiveness, you have to show what you're doing, show--to show how you at this one step, and how it better you to the next step. So you know, I--I feel like we need to take more steps. And the people at the top need to focus more on the people at the bottom. And you know, just to leave with a scenario that I--something that I used to always tell people, the important person in the--in the building is the janitor.

We, as black farmers, are the janitors. The top person, that can be the principal or the president. If the president is not in tune with the janitor, he--it's not a good structure. So we need to make sure we build that structure from the top all the way bottom, to the farmers. And you know, the people that's allocating this money need to know exactly who's using it, why they're using it,

who really needs it. And I think it's a--it's a separation in between there because, yeah, it's a different when saying, yeah, we're putting money out there for you. But when we're not able to access it, you know, it's more like saying, well, we put it there. It's up to you to get it. That's not-- that's not hope. That's not, you know, that's not given a farmer, or a black farmer, any hope to be able to continue to hold on to what they--what they had in their family. So, you know, that was just some personal, you know, stuff that I've been through that I can still see that hasn't changed within the system.

DAVID SCOTT: All right. Thank you very much, Mr. Rowe, for your very good and very informative hearing. Thank you. And now, Ms. Sherrod, we recognize you. Please begin now.

SHERROD: Oops. Sorry.

DAVID SCOTT: Okay. We hear you now.

SHERROD: You hear me now? I'm sorry. Thank you, Chairman Scott. Can you hear? Okay. And the committee for inviting me to speak today. I grew up on a farm. And my life's work has been with farmers and people in rural communities in the south. On a more personal note, though, today, March 25th, marks the 56th anniversary of the death of my father, a farmer who was murdered by a white farmer that the racist system failed to prosecute. It is within this context, that I've dedicated my life to help make this world more just and equitable for everyone.

For over five decades, I've worked with and on behalf of farmers, especially black farmers, and rural communities--and rural communities in which they live. Although black farmers share many of the problems faced by all small farmers, their situation is compounded by systemic racism within the USDA and other public and private intuitions that are--that are supposed to serve all farmers no matter their race or agenda.

The USDA is assumed to be the source of last resort when the private sector falls short. Unfortunately, it's--since its inception USDA itself has fallen short and failed to meet its obligations to black farmers. Regrettably, the USDA has been the driving force behind the standard--

(AUDIO GAP)

--Poor health outcomes and brain drain among other things. Now, the USDA did admit in the Pigford case that it has a history of discrimination against black farmers. That admission and subsequent settlement did not bring about any systemic changes and left in place many of the individuals who perpetrated the racism and discrimination.

In fact, to my knowledge, I, a black woman, am the only person ever fired by the USDA for discrimination, a claim that was later disproven. Although Pigford itself was historic and exposed the real USDA, unfortunately, because the government was so incompetent, over 90 percent of the farmers who prevailed in the lawsuit were not made whole. So where do we go from here?

We need to restore Section 2501. This policy was the brainchild of the Federation of Southern Cooperatives. Nearly three decades ago, I was a staff member of the Federation, and therefore very familiar with all the work and documentation that led to its passing as a permanent part of the farm bill. Its original intent was to provide farmers of color, especially black farmers, with outreach and technical assistance so that they can better access USDA services. The second one, eliminate burdensome matching requirements. Many USDA programs require a match that is out of reach for most black farmers.

This is akin to a poll tax. It keeps the benefit out of our hands. Three, engage in real problem solving. Use the Georgia StrikeForce example as a model--model and fully fund it. Invest in 1890s. 1890 universities and key black farmers--are key to black farmers' success and ensure that they have funded equitably, let's say. Launch infrastructure fund. Provide funds for black farmers to develop or improve processing facilities, secure transportation, organize cooperatives, and more.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Diversify the staff. Moderate--mandate increasing diversity in USDA staff makeup. And lastly, culture change. Staff culture flows from the culture of the leaders. Secretary Vilsack invests significant time and effort into building a culture in which discrimination is not tolerated and is with the aim in which the dismantling of systemic racism is rewarded. Thank you so much for giving me this opportunity.

These are but a few things that we can begin to put in place today while we wait on the fate of policies currently under consideration. We must also understand that even if these policies improve, they only represent a down payment on what is owed to black farmers and their communities after more than a century of neglect and discrimination. Thank you.

DAVID SCOTT: Thank you so much for your testimony, Ms. Sherrod. We're learning so much here. And the purpose of this hearing is, we're putting together a bill, a piece of legislation to address and come out with. So rest assured that your testimony, your ideas will not be--are not in vain because we're putting together black farmers and a piece of legislation to bring this. So this is just the beginning. Thank you all so very much. And now we have, I believe, Ms. Cotton. Ms. Cotton, would you begin your testimony? Ms. Cotton, you may want to unmute.

COTTON: Chairman Scott?

DAVID SCOTT: Yes.

COTTON: Chairman Scott, Ranking Member Thompson and distinguished members of the committee. We would like to begin--

Can you see me? Can you hear me?

DAVID SCOTT: Yes, go right ahead. We can hear and see you.

COTTON: Okay.

Chairman Scott, Ranking Member Thompson and distinguished members of the committee, we would like to begin by thanking you and God for the privilege and honor of testifying in this hearing. It is our hope that something said or done will result in greater understanding, reconciliation and change.

Thank you, Representative Tracey Mann, for the introduction.

Little children across the United States who grew up watching their parents passionately work the land from torrential rains, incessant droughts, troublesome pestilence and extreme poverty were often consumed by the idea that one day this land will be mine. Somewhere between working behind the plow for several hours at a time, in the blazing sun for days on end to get the crops in and out and the rare opportunities to reward themselves with a soda or an ice cream, they developed an insatiable obsession with nature.

However, to be black and possess that type of intensity towards the Earth in the United States at a young age can accurately be compared to someone laboring under the sweltering sun in a desert towards something that appears to be real (INAUDIBLE). Over time as the mirage steadily relocates, the child matures to adulthood. What remains is a diminutive essence of potential. Yet despite years of imagining, the slightest scent of possibility is all that is required to stimulate hope in the hole--in the heart of a black farmer. We felt that hope so. So when at the age of twenty-four and married less than five years with two baby girls, we were advised that the then FMHA was an agency that existed to assist young and beginning farmers, especially minorities.

We thought we would be welcomed with open arms. Instead, when we stepped into our county FMHA Office in 1984, the secretary looked up and continued working without ever acknowledging our presence. Ma'am, is this the FMHA? We asked. Yes, she answered, never moving from her desk. An unwelcoming aura and overwhelming strangeness filled the room. Without

Case 2:24-cv-00060-Z Document 33-1 Filed 08/23/24 Page 205 of 500 PageID 5840

ever a word spoken, its presence seems to demand that we simply turn around and leave, but we didn't. The county supervisor's tenure could not be denied, but neither could his unorthodox practices and forgetfulness.

We had meetings at his home. Our file was lost and misplaced several times. Some years later, our initial contract transition-- contract transitioned out of his role, and we were buried under the transition of powers. For example, on several occasions, the FMHA contractor and Langston University representatives reworked our farm plan on the same application, and they concluded we had good records.

Our cattle were in excellent condition, and that was an average production. And some non-farm income, the plan was feasible. Yet, despite their findings, the county committee rebutted that they were not comfortable with our abilities, that the entire application should be changed. And since we could not effectively explain the reworked plan, we could not possibly implement them with any degree of success. All of our alternative plans were repeatedly denied, but no viable plan for success was ever offered.

Were it not for the elders who had a keen eye for identifying those with work-- ethics and more complex and instinctive cunning were perfectly suited for the land, they would have become extinct. Thankfully, one such elder offered her wisdom and trust to us, so we appealed the decision of the county supervisor. We--we appealed, and the decision was overturned. But despite it--overturning, the FSA Office said maybe we should go ahead and let the applicant know that further information is needed. So the county supervisor told us that we needed to get our property--property a prey--appraised, and he selected the appraiser. Coincidentally, that appraisal--appraiser appraised our property for less than it was valued for a year earlier. And despite winning our appeal, we lost the denial of our application.

It was not our county office who told us about the designation and how language was expressly written to extend help to disadvantaged people. A friend helped us to navigate through the system. And we went to RS--USDA in Washington, D.C. and met with several officials. These consultations resulted in our first community meeting. There were over a hundred people there in four inches of rain. We partnered with Langston University.

Let me--let me just skip down to this, if you would, please, Chairman.

One of the reasons the local churches and faith-based organizations are the backbones in communities in the F2F program is because people trust them. We serve from hearts of love with boots on the ground. It is the same spirit that we really--We only ask this committee--.

DAVID SCOTT: I'm sorry.

COTTON: Let me say this. May I please? May I say this?

DAVID SCOTT: (INAUDIBLE)

COTTON: Just as we have faith in God to create one race of people, the human race and who created the earth, the one in which we exist together, and the heavens, the ones that we continue to explore, we believe that he gave us the ability in him to equitably dwell together in peace, harmony and love to preserve this beautiful land.

DAVID SCOTT: Thank you. Thank you. Thank you.

I tell you what fantastic and very informative and very impressive testimony that we have heard from our distinguished panelists, all about black farmers here. It's been tremendous and very helpful. And from our secretary, as well. And now we are going to now proceed to getting questions from us members. And I'm going to start, then the ranking member, and then we're going to go with each of our member--members on the committee, alternating between Democrats and Republicans.

And--and first of all, let me start with this question, if I may. And I recognize myself for five minutes, and I'll be held to that to be sure to set the proper example. I hope everybody heard me there.

Secretary Vilsack, again, let me thank you for coming, but I want to go to it to clear up for us. Yes, we have--can you hear me, secretary.

VILSACK: Yes, sir.

DAVID SCOTT: Good.

We have just passed the Rescue Act, in which we have a total of right at $5 billion to get to our black farmers. First of all, four billion of it was for the loan forgiveness. Now, tell me how--what are the instructions for how our farmers can make sure they--get access to that money? How long will it take? And will there be some cumbersome bureaucracy in the way of them getting it? First of all.

Second of all, is it true that this money for the loan forgiveness that our black farmers will be getting will be subject to taxation? That the IRS will count as income, and then they've got another bill to pay. Clear up the entire disposition, and let's get it plain how we can make sure that this big hit we're giving to help our farmers get right to them quickly, immediately.

VILSACK: Mr. Chairman, the instructions, first and foremost, is to do this as quickly, as thoughtfully and carefully as possible.

Two types of loans we're dealing with direct loans and guaranteed loans. Let me deal with the direct loans first. To the extent that it's a relatively simple, straightforward loan, we're going to try to get this--these done sort of in a tiered circumstance in situations as quickly as possible. One hundred and twenty percent, basically, the loan gets paid off, and twenty percent goes to the farmer. Now, farmers are going to have to think about this because to your question on taxation--.

DAVID SCOTT: Wait just a minute. You say of the amount, twenty percent goes to the farmer?

VILSACK: Twenty percent goes to the farmer for the purpose of paying the tax.

DAVID SCOTT: Good. Thank you.

VILSACK: And there--but farmers need to think about this, Mr. Chairman, because depending upon the size of the loan, the tax issue may be so that you may want to divide potentially the forgiveness of the loan over more than one tax year in order to minimize your tax liability. That's why it's going to be necessary for us to use a portion of the money from Section 1006 to provide outreach, technical assistance and advice so that people can make the best decision for their farm, so they don't find themselves in a deeper hole when this is all said and done.

On the guaranteed loan side, remember, we're dealing with banks where we have essentially guaranteed the loan. And we have sent a letter today to those banks basically indicating that they have to take no further action whatsoever to enforce--to--to foreclose on the farmers that we are going to work with them to get these loans paid off.

Now, a question is going to come up if there is a prepayment penalty. There may be a prepayment penalty in that loan. We're going to ask for documentation of that prepayment penalty, and we're going to try to figure out how to deal with that.

I don't have an answer today. I just know that it's an issue that we're going to have to confront and think about it. And some of these guaranteed loans have themselves been sold by the banks, which makes a bit of a complication. But at the end of the day, this whole purpose is to try to get this done as quickly as possible, as effectively as possible, and to provide farmers enough

information and outreach so they can make informed decisions about their direct loan and the tax implications. And we can settle up their guaranteed loan without any further disruption.

DAVID SCOTT: Now, very quickly, Mr. Secretary, how much of your time personally will be devoted to getting the full five billion dollars out to our black farmers? How much time will you be putting into that? Because I believe if you've got that as your top agenda, it will speed the process down the line. And because you're working it out, there are problems here.

Go ahead.

VILSACK: I--I don't have any doubt that my staff understands that this is at the top of my list in terms of priorities. The whole equity issue, the whole equity effort, is at the top of the list in terms of time that we will spend collectively as a team focused on all these issues and specifically with the debt relief portion of it.

DAVID SCOTT: All right. Thank you. I'll bring the gavel of myself here.

I now recognize the distinguished ranking member, the gentleman from Pennsylvania, Mr. Thompson, for five minutes.

THOMPSON: Chairman, thank you so much.

First of all, thank you. Thank you for the compelling testimony to each of the witnesses today in your--your verbal testimony, and quite frankly, you read the testimony that you provided us.

The--I want to reach out to Pastor and Mrs. Cotton and say thank you so much for your--your ministry and how you've, you know, really focused--just on all aspects of your ministry. As it is, I've going through your testimony, it--what a blessing, what a blessing. All the work that you do, really and how you bring glory to--all glory and honor to God in--in your work. I much appreciate it.

You--in your testimony, you mentioned the USDA's Office of Partnerships and Public Engagement. Can you elaborate more on your experience with the Faith Fellows Training that you attended in Washington and how that experience contributed to your interactions with the USDA?

COTTON: Absolutely.

It was during that Faith Fellows Training, and it was the--the initial, the inaugural training that every department--nearly every department within the USDA was present. And not only did they give individual presentations to the entire group, but at the end of the fifth day--by the end of the fifth day, they--we all gathered into an auditorium in sections, and we could go to those different departments individually to ask questions, and they were able to answer those questions.

As a result, we stayed in contact with them. As we began to implement the--the instructions that they had given us and the different suggestions they had given, we began to implement it. We became a 51--501(c) 34 Community Outreach Organization. We partnered with Land Grant Universities, both the Langston University and OSU. We partnered with Convoy of Hope and other things. But this was, as a result, even Islamic Relief USA. We were able to partner with them as a result.

When we had questions that could not be answered on the local level, we could reach out to those people in D.C., and all of that was as a result of OPPE. When--even when information conflicted on--from here to there, they would get involved and help us to resolve.

We begin to have community outreach meetings. We've had, I believe, six to date. We partnered with NRCS. We entered into the Conservation Program. And everyone who attends our program, as information is forwarded to us, we forward that information

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

on to them. So we field telephone calls, answer questions, and then we attend every single meeting that we can on our local, district, state, and national level, regarding all of these different entities. So we are busy beavers.

THOMPSON: Yeah, you are very busy, and thank you for what you do. It sounds like it's very successful, those partnerships, that collaboration. Based on your experience so far into this, you know, we always look for opportunities. Even when we're getting things right, you know, we always try to do better, right?

COTTON: Yes.

THOMPSON: I think we're called to do that. Is there any lessons you've learned so far on improvements you would recommend on how we can continue to develop and maintain those partnerships with black farmers and other socially disadvantaged farmers?

COTTON: Definitely. In most of the community outreach meetings, they are conducted by governmental employees, and they're basically saying the same thing. They come in. I've likened it to a USDA infomercial group, because they say basically the same thing.

If other nongovernmental employees with organizations who have proven records, who maybe possibly could even be trained by the government to have a--they have a certain trust level that's garnered with communities of color and people of color. If those outreaches could be conducted by them, in partnership with land-grant universities, in partnership with active black organizations; farming organizations such as the Oklahoma Black Historical Society, and even our own group to put--put out these community outreach meetings and then follow through.

Because I understand that in the USDA, many of the organizations have been compiled, joined in, so there are less bodies out in the field. And that strain on the local employees is felt with the local farmer. So we believe that if some sort of pilot program could be implemented to help us to be your feet on the ground, in order to get this information out. We have proven these organizations that I've named, including USD--Langston and OSU, they've proved--they have a good proven record.

THOMPSON: Very effective. Well, thank you Ms. Cotton. Thank you, Chairman, and I yield back.

DAVID SCOTT: Thank you, Ranking Member Thompson. I appreciate that. I now recognize the gentleman from California, Mr. Costa, for five minutes.

COSTA: Thank you very much, Mr. Chairman, for this historic hearing with the Agriculture Committee. And it's good to see you, Secretary Vilsack, my friend; and for all your years of service to our country and your commitment today to root out racism and discrimination that has been historic, as we've noted by the testimony. And what terrific testimony our witnesses have provided, and suggestions and advice for legislation that, as the chairman indicated, we will act on.

In preparation for this hearing, I asked a constituent of mine, Mr. Will Scott, president of the African-American Farmers of California, to provide some testimony, which Mr. Chairman, I ask unanimous consent to submit for the record.

In his testimony, he details a history of discrimination from loan denials, as has been stated in the testimony earlier, to inequal access to markets, which is a problem. But I wanted to read a line that really stood out to me. Mr. Will Scott, a third-generation farmer like myself and our family, he said, members of the African-American Farmers of California are fearful to apply for any loans from the USDA, and do not want to deal with government, as they will-- fear they will lose everything they have. That's a sad commentary.

You know, we all know that farmers are risktakers. And when you have to deal with the discrimination that African-American farmers and other minority farmers have had to deal with, it makes the risk-taking all that greater. And it's clear today from the history of discrimination at the USDA that there is still an impact.

I remember Secretary Vilsack talking to President Obama, and I shared this with John Boyd the other day. That I told him, President Obama, I said, you know, farmers are risktakers; but they're also price takers, not price makers. And President Obama's a very smart guy, but he's from a city. He says, price takers, not price makers; what do you mean? I said, well, you put all this investment every year into your crop, and then at the end of the year, you get whatever the prices. He says, I never thought about it that way. Price takers, not price makers.

Mr. Secretary, it's critical that you work to provide and rebuild trust with black and other socially disadvantaged farmers, so that American agriculture can better reflect the diversity in our country and our minority populations. In my own district, the USDA has indicated that we've got 14 African American farmers, over 76 Native American farmers, 771 Asian farmers--mainly Pacific Asian farmers--over 1000 Hispanic farmers, and over 5600, five thousand six hundred, Caucasian white farmers.

It's important to note that out, because discrimination is not only for African American farmers, but Southeast Asian farmers in my district. It's estimated that approximately over the thousand Southeast Asian farmers in the Central Valley, many of them (INAUDIBLE), that settled after the Vietnam War. The USDA--USDA aid has not been there for them.

I'd like to submit testimony from the Asian Pacific Institute & Resource in Fresno--Zang Xiong is the chair of that--detailing the shortcomings on providing support for those farmers. And I've asked unanimous consent to submit that testimony as well, Mr. Chairman.

Mr. Secretary, one of the barriers to access of the USDA programs by black farmers and southeast Asian farmers, Latino farmers, in my district seems to be a complicated and burdensome application to requirements and the backlog of local Farm Service Agency offices, FSA. Sanford Bishop, my colleague--and he's a Cardinal and he chairs the subcommittee on this--and I have talked about it.

As part of your efforts to get more aid socially to disadvantaged farmers, can you commit to ensuring that local FSA offices are properly staffed with the diversity reflected that the farmers they serve, and have language capabilities?

VILSACK: Yes.

COSTA: That's so important. You know, the previous administration, we complained that there wasn't sufficient support in these FSA offices. The testimony we've heard already today has indicated that as such. You're going to have to focus that, not only for the American Rescue Plan, but to really expedite the support for this. We have a backlog in CFAP 1 of over four months already in my own district.

VILSACK: Representative, I think there are several things to this. First, there has to--we have to cast a wider net for people to work in these local offices. Secondly, as has been mentioned earlier, we need more partnerships and more connections with community building organizations that can assist us. As has been indicated, there is a trust issue that needs to be addressed.

COSTA: My time--my time is going to expire, but Mr. Chairman, I want to submit a third level of testimony. A staff member, Major Henry Nunez, who's just retired and is going to go to work for me, dedicated outreach to listen to stories needed for socially disadvantaged farmers in my district. I'd like to submit his report for the record--

DAVID SCOTT: --The time of the gentleman has expired there. Thank you, and I appreciate it.

COSTA: I want to submit his testimony. Is that possible?

DAVID SCOTT: Yes, that is possible. Thank you, we'll take it.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   20

COSTA: Mr. Secretary, I'd like you to look at it, and I'll share it with you. Thank you very much, Mr. Chairman.

DAVID SCOTT: You're quite welcome. Thank you, Mr. Costa. And now, I recognize the gentleman from Georgia, Mr. Austin Scott, for five minutes.

AUSTIN SCOTT: Thank you, Mr. Chairman. And Ms. Sherrod and Mr. Blanding and Mr. Rowe are from right down the road from where I am. I actually live in Tifton, Georgia. Ms. Sherrod, I don't have a question for you, but I'm very familiar with what happened to you where somebody changed the context of what you said, and you lost your job because of that in 2010. And you won a--I'm glad you won that suit against that news organization that ran that false article. I heard what you said and I saw what they reported, and I thought they very much changed--changed the context.

Mr. Blanding, I think you're very much right about the heirs' related issue. I think that's something that we can work on together that is--that has happened. And I hope that some of the money that has come through the recent legislation will help with that.

And Mr. Rowe, you're obviously a young farmer in Albany, Georgia, and I'm right down the road in Tifton. If I can ever help you, you know, please feel free to reach out to us. And Mr. Boyd, certainly enjoyed my conversation with you and your wife the other day.

And as I mentioned to you, you know, to me, some of the challenges of the African American farmers are--they're not limited African American farmers. It's pretty much all of our small farmers, beginning farmers. And, you know, I hope as we go forward, we're able to look at young, beginning, small--you know, regardless of race with regard to how we handle things at the USDA. Because there are a lot of people out there that need--that need help, and we need more farmers, not fewer farmers in the United States.

So I do have--and I told you this, Mr. Boyd, don't have a question for you. But I do have an issue with the language in Section 1005, Secretary Vilsack. And can you tell me, Secretary Vilsack, were all of the socially disadvantaged farmers included in the relief provided in Section 1005?

VILSACK: If you are defining socially disadvantaged farmers as consistent with the 1990 act, yes, which is based on race and ethnicity. There are other definitions--

AUSTIN SCOTT: The current definition of a socially disadvantaged farmer, can you tell me who is excluded from Section 1005, versus the current definition of a socially disadvantaged farmer?

VILSACK: I want to make sure I understand your question, congressman. Are you asking me, does the provisions of the American Rescue Plan define socially disadvantaged, or are you referring to some other definition of socially disadvantaged?

AUSTIN SCOTT: Secretary Vilsack, the current definition--you know what I'm getting at; you're wasting time. The current definition of a socially disadvantaged farmer, which farmers that are currently eligible for the socially disadvantaged farmer loans are not eligible for the relief under Section 1005?

VILSACK: White women.

AUSTIN SCOTT: Yes, sir, that's correct. Secretary Vilsack, are you familiar with the case Love v. Vilsack?

VILSACK: Yes, sir.

AUSTIN SCOTT: And so respectfully, and this isn't-- you were named, not personally but as secretary of the USDA, so I don't-- this is not a personal accusation. But there was a settlement with that case as well, correct?

2021 WL 12232328, 2021 WL 12232328 (2021)

VILSACK: There was. There's a difference--there's a significant difference, congressman, as I suspect you know, between what we dealt with in Love and what we're dealing with here.

AUSTIN SCOTT: There is, yes, sir. But my concern is I think there are a lot of socially disadvantaged farmers. I think there are a lot of small farmers. I think there are a lot of people that need the help. And my concern is when we start to group certain people out because of the color of their skin, then it becomes harder to get anything done.

If it's not equitable and it's not inclusive, then by definition, it's discriminatory. And when it's discrimination based on the color of someone's skin, then it's racist. That's just my personal belief, and I think most people would accept that definition.

So one last question for you, Secretary Vilsack. Would you commit to me that only American farmers would receive the relief under Section 1005, and not foreign nationals?

VILSACK: I can't commit to that, senator--or congressman, because that's not what the law that's been passed and signed by the president says, as you well know.

AUSTIN SCOTT: So you're going--

VILSACK: Well, let me--let me finish. It's important for people to understand that contained within the definitions covered by the American Rescue Plan are people that legitimately are entitled to borrow money from the FSA as a result of actions that were taken in 1984, when Jesse Helms was the chair of the Ag Committee and Ronald Reagan was president, that opened up the opportunity at USDA to work with folks who were not citizens but were legitimately here.

So to the extent that Congress passing the American Rescue Act includes all of those folks, that is what I am mandated to do and that's what we will do. We will follow the law, and I would expect you would want me to do that.

AUSTIN SCOTT: So you're going to pay off the loans for foreign nationals, but you will not pay off the loans for--

DAVID SCOTT: --The time of the gentleman has expired. Thank you very much, Mr. Scott, for your questions. I now recognize the gentlewoman from North Carolina, Ms. Adams, for five minutes.

ADAMS: Thank you, Mr. Chairman. Thank you, Ranking Member, as well for hosting the hearing today, and to all of your witnesses. Our witnesses, thank you for your personal and compelling testimony. This is, as our chair has said, a landmark hearing. The need for federal support for black farmers cannot be overstated.

I want to just put on the record, I am a proud graduate twice of an 1890 North Carolina A&T.

ADAMS: But particularly, because the most recent statistics from USDA make it clear, that black producers were not served by the last administration's COVID relief programs. That's why last month, I introduced the House version of the Justice for Black Farmers Act to address discrimination at USDA, to provide that relieve, and to support a new generation of black farmers.

It was good to speak with you, Mr. Secretary, and with you as well, Mr. Boyd, just a day or two ago.

I'm proudly a supporter of the debt forgiveness for farmers of color in--in the American Rescue Plan Act. Some of my colleagues, though, on the other side have raised questions about the constitutionality of that provision. But we studied the Constitution. We know that race-based actions by the government is subject to strict scrutiny by the courts.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

APP. 000211

And in its 1995 Adarand decision, the supreme court held that government may use race-based remedies that are narrowly tailored to respond to the practice and effects of racial discrimination. After the Office of Legal Counsel at the Department of Justice issued a legal memo, which noted that Congress may be entitled to deference when it acts on the basis of race to remedy the--the effects of discrimination.

And Mr. Chair, I ask for unanimous consent to submit for the record a copy of that 1995 memo.

DAVID SCOTT: Without objection.

ADAMS: And--and that's what we have--thank you. And that's what we have in the American Rescue Plan. Congress narrowly tailoring legislation to address well documented racial discrimination against farmers of color.

Mr. Secretary, my question for you--and thank you for your testimony. We've been talking about USDA's discrimination against black farmers and other farmers of color for decades now.

In 1988, Congress tried to address it by requiring USDA to set target participation rates for farmers of color in farm loan programs, but target participation rates and other important programs, like the 2501 program, are limited in scope and haven't fully addressed the barriers faced by our black farmers.

In the past five years, the number of direct farm loans to black producers decreased by nearly 50 percent from 945 to 460.

So, Mr. Secretary, what do you think might account for this steep drop in direct farm loans to black producers? And what steps is USDA willing to take to increase that participation?

VILSACK: Congresswoman, I'm not quite sure why during the Trump administration the number of loans decreased. But what I can tell you is I think it's a combination of factors that we have to focus on.

First, we have to have people in the farm service agency offices and in the county committees that reflect the population that they serve. When I was secretary the last time, I did, for the first time ever, appoint minority members to county committees that did not have minority membership. I think that's important that we take a look at that county committee structure.

I think it is important, as I said earlier, to connect with community building organizations to make sure that outreach is taking place. One of the problems with COVID relief is that I don't--we're pretty convinced that the outreach to socially disadvantaged population was not what it needed to be, which is why we announced yesterday as part of the--CFAP announcement, an effort to try to expand outreach and to reopen CFAP to--to give socially disadvantaged farmers greater opportunity to apply.

So, it's outreach.

ADAMS: Okay. Go ahead.

VILSACK: I'm sorry. I could--could--it's--it's outreach and it's also accountability. It--it--it reports to me directly, keeping an eye on precisely how much progress we're making. And if we're not making progress, demanding a-- a--some accountability and a reason why.

There's a lot more to this, which--

ADAMS: --Let me--let me--

VILSACK: --I can talk to you offline.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    23

ADAMS: Right. Let me quickly ask you, in the plan, Congress provided for a--a new equity commission to address racial discrimination. We do need individuals on the commission who bring fresh eyes to the problems.

And so, I wanted you to share your plans to ensure that congressional and stakeholder input would be used in establishing the commission.

VILSACK: We're going to--

ADAMS: --I'm not sure if I'm out of time.

VILSACK: We're--we're going to follow FACA, congresswoman. We're going to make sure that Congress and everyone else has an understanding of participation. You can be assured that it's--we'll follow the rules and regulations of--of FACA.

ADAMS: Okay. Great. Thank you. Mr. Chair, I think I'm out of time. I'm going to submit my other questions to--to the--to the other guests.

DAVID SCOTT: That'll be fine. I now recognize the gentleman from Tennessee, Mr. DesJarlais, for five minutes.

DESJARLAIS: Thank you, Mr. Chairman. I thank you for holding this important hearing today. And it's always disturbing to hear issues of discrimination. And I--I feel for the people and the stories that I was told today.

I did want to mention--there was a comment about Secretary Perdue. I'm sorry. In Tennessee, everything is in bloom. So, forgive the--the voice and the allergies.

But Secretary Perdue was a great ag secretary and great to work with. And I think when he said that you need to go big, that was probably a comment if you're a mom-and-pop store, it--it's hard to compete against Walmarts. If you're a hardware store, it's hard to compete against Lowes and Home Depot. And--and I would just say that knowing Secretary Perdue, he did not mean that in--in any ill fashion.

Also, very appreciative to be able to work again with Secretary Vilsack. Much appreciated for him reaching out to members of the ag committee. Not all secretaries take time to do that. So, thank you, Secretary Vilsack, for that.

I--I think this hearing could've been better today if alongside these witnesses were witnesses that were Hispanic and other people, anyone who's been discriminated against. Because farmers of every race, color, national origin, gender, and religion are struggling. U.S. farmers are saddled with near record debt. There's high suicide rate among families and farmers who are losing their livelihood.

So, it's a little troubling when some of the legislation that's been put forth to--to have to see what's happening and then come back to my district--I--I could put the camera out my backdoor. There's cattle grazing. There's rural crops. It's a rural area. There's small farmers and they're struggling, too.

So, it's hard for me to tell them that there's help on the way but only if you're a certain skin color. And it--it seems like that's discrimination in itself.

And I would think that the panelists and witnesses today didn't like the way they were treated and wouldn't want other people to be treated that way either. And it seems like what Austin Scott was saying where foreign nationalists can get money under this COVID plan but not white women, that--that would bother a lot of people. And I know they didn't get to finish that line of questioning.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

But discrimination in this country is already illegal, as it should be. And it's the job of the courts to rule on discrimination and award damages, not Congress.

We saw the 2.3 billion go out to farmers in the Pigford settlement with dubious results. So, now, we have the American Rescue Plan that includes language for loan forgiveness for socially disadvantaged farmers except the ones that Austin spoke of for up to 220 (PH) percent of the outstanding debt.

Secretary Vilsack, did you feel that USDA was discriminatory while you were the head of the agency under the Obama administration?

VILSACK: Congressman, I--I am certain that there were times and circumstances where people who were of color, black producers, Hispanic producers were not treated as fairly or as equitably as they should've been when I was secretary. We have over 4,000 offices. We have 100,000 folks working at USDA. So, I--I--I am--I'm not surprised if there were circumstances.

What we did do, however, was we began a process which we're going to continue and deepen in cultural transformations so that the number of discriminatory actions was reduced and ultimately got to zero. We're going to keep a record of EEO complaints and program complaints and make sure that if there was a spike in those complaints, we would find out why and take action to--to solve.

And I will tell you, sir, with--with due respect to this--this con--this discussion, I think people are losing sight of the fact that the Pigford case was designed to respond to specific acts of discrimination and compensate for this.

The American Rescue Plan was designed to do two things. One, to deal with the cumulative impact of discrimination over time where some people had the full range of suite--of--of programs at USDA and were able to grow and--and ex--and expand and others did not.

Just give you an example, CFAP 1 and CFAP 2. Of those who have been self-identified--

DESJARLAIS: (INAUDIBLE)

VILSACK: --Of self-identified--now, congressman--

DESJARLAIS: (INAUDIBLE)

VILSACK: --This is really important. Self-identified--

DESJARLAIS: (INAUDIBLE)

VILSACK: --The--the--black farmers--

DESJARLAIS: --I just wanted--

VILSACK: --Received $20 million--

DESJARLAIS: (INAUDIBLE) the fact--I just wanted to finish with I want us all be aware as we try to unite as a nation that actions like Senator Hirono and Senator Duckworth in the--in the Senate just recently saying they wouldn't vote for nominees unless they were diverse. That's discrimination in itself.

We need to get rid of all discrimination. We need to come together as a people. I hope our panelists agree. That's what Mr. King would've wanted, and that's where we need to go. And so, we need to be careful of that moving forward.

I'm sorry to interrupt you, sir. Thank you, Mr. Chairman. I yield back.

DAVID SCOTT: Thank you so much there for your testimony.

BOYD: Mr. Chairman.

DAVID SCOTT: Let me make this brief announcement. Before we move to our next member to be recognized, I want to make all of our members aware that the committee will take a short 15-minute recess following this question period with the gentlelady from Connecticut, Ms. Hayes. Immediately after that, we will take a 15-minute recess and then we will come back.

I now recognize the gentlewoman from Connecticut, Ms. Hayes, for her five minutes.

HAYES: Good afternoon, Mr. Chair, and thank you. And thank you to all of our witnesses for being here.

I just want to add that no one on this committee or in Congress woke up and just decided let's send relief only to black farmers or have this hearing. This is the result of years of pervasive discrimination and a problem that has existed that we in Congress recognize we have an obligation to address.

So, this isn't about, you know, what Dr. King would've wanted or, you know, we're leaving other groups out. It is about we are addressing an area of need that has gone unaddressed for so many years.

This is a pervasive problem even in my district in Connecticut, which is not generally seen as an agrarian district. But according to the Northeast Farmers of Color Land Trust, white land owners currently control about 95 to 98 percent of farm land in the United States, and nearly 100 percent in the northeast.

This stark disparity in land ownership is reflected in the demographics of Connecticut farmers. Now, white farmers represent just 2 percent of farmers in the state according to our Census Bureau, which is an extremely low number when considering non-white communities represent nearly 35 percent of the state's overall population.

So, I'm happy that we are here today brainstorming solutions to address this and not taking the ostrich approach and sticking our hand--head in the sand and pretending that the problem does not exist.

So, my question is for you, Mr. Boyd. Can you speak to the disparities between black farmers and their white counterparts in assessing subsidies, capital, and land for their farms?

BOYD: Yes, I can. And thank you very much for--for the comments.

And I also would like to take a step back and--and address the Sonny Perdue issue because I was the one that stated about that and the meeting I had with him. And I do believe that he meant every word of it.

He also said if he wanted to know where blacks are, go to TSA and look at New York City and Atlanta, Georgia. And based on all of my experience with meeting with agriculture secretaries going back to the Carter administration, that was my very first sit-down meeting and my worst meeting in--in history with Agriculture secretary.

And as it relates to farm subsidies, 90 percent of all subsidies--while the top 10 percent receive on average 118,000, the bottom 80 percent annually in Mecklenburg County, Virginia receive about $700 annually.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    26

And when you looked at how we participated in the Trump administration, the $29 billion that was tolled out in those payments, black farmers received zero--.05 percent. Those numbers are people are--are dramatic.

And if I can't compete--if I can't compete as far as staying and the--the Farm Subsidy Program--and receive farm subsidies the way that my white counterpart, I can't compete. I can't pay the--the--the land rent and--and--and so on and so forth.

So, this hasn't just began, people. This has been going on for decades. For decades.

So, when you hear people say about the relief that's out there now, congresswoman, that is--it's--it's a new loan program is what I've been watching on the news.

This is a new loan program that excludes whites, white farmers. That's not true. It's debt relief and, as Secretary Vilsack already said, only for those farmers that already have loans on the books. It's not a new loan. It doesn't exclude whites. We simply are trying to level the playing field and--and to-- the way to do that is to have full transparency. By having transparency--

HAYES: --Thank you--

BOYD: --Yes. By having transparency, we can fix a whole lot of things.

HAYES: Thank you. And I'm happy that you mentioned transparency. The time goes by so quickly. But, the disparities that you just highlighted really stress the need for a robust, effective civil rights office within the United States Department of Agriculture.

Due to this long history of civil rights cases being backed up in the USDA, with the 2008 Farm Bill--it required a report to Congress describing the number of civil rights complaints filed against the USDA, how--the length of time it took to process those complaints, and any follow up for the resolution. The average complaint was resolved in what amounted to about six years.

So, I--I know we really don't have time to address this. But, Secretary Vilsack, I hope that you can really think about plans for improving the process for addressing civil rights cases within the USDA and making sure that we are providing equitable access to all farmers. Our job here is to help all farmers. But, we also have a responsibility to address those areas of greatest concern and need. And right now, black farmers happens to be one of those areas.

With that, Mr. Chair, I yield back.

DAVID SCOTT: Thank you very much.

UNKNOWN: Mr. Chairman--

DAVID SCOTT: The committee will now stand in recess until 2:15.

[*](RECESS)

DAVID SCOTT: I'd now recognize the gentlelady from Missouri, Ms. Hartzler, for five minutes.

HARTZLER: Thank you, Mr. Chairman, for holding this hearing. Thank you to all our witnesses, and I also want to thank Secretary Vilsack for reaching out to us members of Ag Committee to hear our ideas and concerns in agriculture and where we need to go. I really appreciate that.

Case 2:24-cv-00060-Z Document 30-1 Filed 08/23/24 Page 217 of 500 PageID 5752

And, Mr. Secretary, I wanted to follow up on some of your comments in your opening statement about some of the challenges of--of rolling out this provision, specifically, I've been hearing from some banks, and you did reference that you don't know how you're going to deal with a prepayment penalty, but I'm hearing that banks that originate FSA Guaranteed Farm Loans have raised concerns about the unintended consequences that the prepayment of these loans will have on lenders, including their ability to make and service these loans in the future. So can you go into more detail about what USDA is going to do to work with these banks to mitigate the costs and to provide certainty for our farmers?

VILSACK: Well, thank you very much for the--the question. And I think the first thing is we need to have a very detailed understanding of precisely what concerns they have and why they have them. I've asked the team to reach out to and to identify those loans that potentially have prepayment issues, rea--reach out to the banks, ask for the documentation of the prepayment penalties and begin a conversation and discussion in terms of how that's to be handled. So it's going to take obviously, a little time to do this, but we're going to be focused on making sure we put adequate staff behind this effort to get it done, and done as I said, as quickly as possible, as thoughtfully as possible, and as efficiently as possible.

HARTZLER: Right. How many of these loans are there that you'll be forgiving?

VILSACK: Well, I don't think we necessarily know precisely how many we--I'm going to give you a range. Our best knowledge and best information today is somewhere between 13,000 and 15,000 loans that are potentially impacted by this. It could be more, it could--it could be less, but I think it's somewhere in that neighborhood.

HARTZLER: Okay, very good. Thank you so much. I wanted to follow up with Phillip Haynie, thank you so much for your-- your passionate testimony. But I was concerned to hear about how you said you can't access USDA irrigation loans, and you can't participate in land leveling programs like other farmers. I just wondered, could you share more? What happened or--or how come you couldn't? What happened there?

HAYNIE: Yes, ma'am. Thank you for the question. A lot of black farmers throughout the Delta where there are common practices in place for land leveling, and irrigation, these programs that are issued by USDA-NRCS, and oftentimes, they're told they weren't available to them. So they're competing against neighbors side by side, and they often find themselves on an island where they are a non-irrigated farm, and they have irrigated farmers on all four sides of them. So the practices of--

HARTZLER: --Yeah--

HAYNIE: --of irrigation on their farms are something that needs to be implemented--

HARTZLER: --Sure--

HAYNIE: --through the USDA, and there should be cost share allowing for that.

HARTZLER: Sure. Yeah. Could you tell me more, though, that--you were told, or, you know some farmers that were told that these aren't available to you?

HAYNIE: Yes, oftentimes, farmers go into apply for these programs, and they're told that there are no funds available to assist them with that. The cost share that's available for the EQIP Program for Land Leveling and Irrigation, those funds often dry up. And at the costs of implementing these improvements on their farms, they aren't able to forbear them, unlike their neighbors who were able to get these programs implemented during the crux of discrimination at USDA back in the '80s. So these farmers are still without and their neighbors are with irrigation, right beside them.

HARTZLER: Okay, so the--the problem is that the EQIP funds have run out when-- when the--that you've gone in and asked and they didn't have the funds available, or the matching requirement was a--was the problem. Is that what I'm hearing?

HAYNIE: Well, oftentimes farmers are told there are funds not available, and they make--that may not be the case. I don't think there's enough oversight in that issuance of those subsidy programs for land leveling and irrigation for improvements on the farm. Oftentimes that pot runs out of money very soon, and farmers have to wait for it to be refilled. I think--

HARTZLER: --I gotcha--

HAYNIE: --Thank you.

HARTZLER: Yeah. Yes, thank you that was--you know I think that's really helpful we get to the bottom of what's--you know, being alleged happened here. And--and I wanted to ask Mr. Boyd, well, I only have 12 seconds. Okay. But I appreciate your-- your all's testimony. Thank you. I yield back.

DAVID SCOTT: Thank you very much. I now recognize the gentlelady from Maine, Ms. Pingree, for five minutes.

PINGREE: Thank you so much, Mr. Chair, and thank you to the witnesses. I have actually been in one of my other committees, so I have missed all of your wonderful questions and answers. But I really do appreciate that you're all here and have certainly appreciated reading your testimony. So Mr. Rowe, I'm particularly interested in you being an organic farmer. And I know that you're very focused on soil health and carbon sequestration, which is certainly a topic of this committee and--and one moving forward. As the USDA considers possible initiatives to encourage farmers to adopt climate friend--friendly practices, what recommendations would you make to Secretary Vilsack or the members of this committee to make sure that you and other black farmers are able to benefit?

ROWE: Okay, are you gonna repeat that question one more time? Can you repeat the question one more time?

PINGREE: Oh, absolutely. So as you are an organic farmer, I know you're very focused, and you have educational background in soil health. And because this committee is focused on soil health and carbon sequestration, and some interesting new initiatives to encourage farmers to adopt climate friendly practices, I'm wondering what recommendations you would make to the Secretary and to this committee, to make sure that you and other black farmers are able to benefit from future initiatives?

ROWE: Okay, the--the standards were the--in order for you to obtain your certification to be organic certified, you have to follow strict guidelines on how--what you put into your soil what--what equipment you use and stuff like that. I feel like if you apply that to farming period, it'll help with a lot of stuff when it comes to like climate change, just because--you know, the carbon that comes out in the soil--no (INAUDIBLE) organic practices is a way to make sure we're staying healthy, and also, they're keeping their environment healthy.

As you know, conventional farming takes a lot of chemicals and a lot of stuff to make stuff growth. But that affects us as humans, it affects the air and pollution and stuff like that. So I--you know, I--I would recommend--you know, more--you know, observing the organic standards and qualifications you need to be organic certified. And that's something I think, if I had, you know, something just to say, that'll be my opinion on it.

PINGREE: Great. Well, thank you. I've spent some time as a certified organic farmer. So I certainly sympathize with the challenges and the expenses of facing that, so more support is important. Secretary Vilsack, I'm sorry, I have not been able to hear most of the hearing, but I did hear your opening remarks. And I--I do appreciate you returning, particularly at such a challenging time. Welcome back as secretary, again, for agriculture. So I know a lot of your agenda will be around some very interesting climate initiatives, soil health, a whole variety of things that you've already talked about.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                                   29

How do you make sure that small to medium sized farmers and particularly, black farmers are able to participate, and this doesn't just become another program that--you know only applies to the large farmers or those that have the means to apply for a grant or--you know, any of the complications that might get in the way?

VILSACK: Quickly, I would respond three ways. First, that we--I have Dr. Dewayne Goldman, in my office now as the senior advisor on equity. Part of his responsibility is to put an equity lens on everything we do, and to encourage those who are developing these programs to make sure that there is an equity lens when the program is being developed. Secondly, is to make sure that we are keeping track of the resources that are being allocated in various programs, and how much of it is in fact going to socially disadvantaged producers? If we see, as we saw with COVID, some--some imbalance, we can obviously make corrections, we can ask questions about that. I think it's also important for us to have partners who can help us with outreach. Sometimes we--it's not that people don't want to help, it's that people don't know that they need the help or--or don't know where to go to get the help.

As has been indicated earlier, there's a trust issue that we--I think we have to build trust. And I think the way to do that is by connecting ourselves with community building organizations that are already trusted, to get the word out. You know, I think it's also making sure that as--as we put our budgets together, we look at places and--and programs that we know will be most helpful. And one of the purposes of this hearing, I'm taking notes right now of the suggestions that people are making, obviously, that's going to impact and effect as we make future budget decisions.

So it's a combination of all of those things, and--and make--basically saying to the folks, and I'll end with this, basically saying to your team, 'This is a priority, and it needs to be reflected in every decision you make, you need to be able to justify and explain how equity has been applied. The president's been very clear about this, it is his expectation that everything we do at USDA is done through an equity lens.' And I think that's a fair point to one that we are looking forward to--to doing.

PINGREE: Well, I certainly appreciate your answer there, and--and the importance of all of the points that you've mentioned, particularly around outreach, because we often find that people have no idea that there are programs out there that would bene--benefit them. But also, I think the USDA having that lens--you know, we often write into a program that there should be a set aside for this or set aside for that. But clearly, it's--it's going to be far more effective if the USDA sees that as their responsibility to make sure that the distribution is fair, and particularly, that underserved farmers have those opportunities. So I only have seven seconds, so I will yield back and--

VILSACK: --Congressman we'll also get some suggestions from the Equity Commission in terms of overall structure and strategy that will be helpful as well.

PINGREE: Great. Well, thank you so much--

DAVID SCOTT: --Thank you. I now recognize the gentleman from Illinois, Mr. Davis, for five minutes.

DAVIS: Thank you, Chairman Scott and Ranking Member Thompson. And thank you to the witnesses in my good friend Secretary Vilsack for being here today, to discuss the impact of racism in the United States, and the work we must continue to do to ensure there's equity across programs at the USDA. As a former chair of the Subcommittee on Biotechnology, Horticulture and Research, I spent a lot of my time in Congress focused on the importance of our ag research and extension programs, which should help serve farmers across the board and particularly minority and socially disadvantaged farmers. I appreciate the opportunity to discuss how we can work to bolster extension programs, those that help serve minority and socially disadvantaged farmers, in a way that decreases barriers to access and increases participation in USDA programs.

Mr. Rowe, thank you for being here today and for sharing your experience as a black organic farmer. I was particularly interested in your experience in navigating the new hemp program, along with other USDA Organic programs, which have proved challenging for so many. Can you please share more, regarding the unique challenges you face trying to navigate the hemp

program, specifically in light of the 2018 Farm Bill, and what you need from us in the department, to ensure you have certainty and access to profitable markets?

ROWE: Okay, it was a challenge--you know, growing the hemp because as you know, Georgia, just got--you know, we was just able to grow organic hemp or hemp in general. And where a lot of farmers are uneducated on it, federal--government assistance doesn't--don't have a lot of research on it also. So working with universities and doing research on this new crop that just--you know, just the Georgia is just now growing will also be helpful. Some of the things that I was--as growing up my first year, I knew for us like diseases or what variety would grow, things like that a farmer didn't know. So like having those land grant and research available for farmers to be able to reach out.

I know we used--Florida Valley State University does a lot of field research, like when people--they'll have a field day when they'll do a particular crop and you know, explain how to grow and what it takes and all of that. If we can get something like that implemented with the hemp program, it'll be very helpful because it's--it's less knowledge on this new crop that's just came into Georgia.

DAVIS: Well, thank you, Mr. Rowe. I--I'd be interested in keeping a working relationship with you, as we move forward to identify any other problems that you're experiencing in the organic sector. So Secretary Vilsack, hey, great to see you again. I just wanted to make sure that you and I have chatted about the work across agencies and with the FDA that's needed to ensure that we're providing regulatory certainty for hemp and organic farmers, including black, minority and socially disadvantaged farmers.

VILSACK: Well, Congressman I think first order--we--we have to have our own house in order in terms of being able to work effectively with other agencies, which is why it was important for us to get the hemp rule out. It had been stuck for a while. We're--we--we're doing that. We're now in a position, I think, to reach across to HHS and FDA to make sure that there is a coordination.

And, frankly--you mentioned biotechnology. There's obviously a need for us to coordinate effectively with both FDA and EPA, and I expect to do that. We have to have a process--I would say, in this day and age with change rapidly occurring so quickly, our regulatory processes have to keep pace with the pace of change. And, frankly, sometimes, we basically slow innovation down because our regulatory process is not communicating effectively between the agencies. That's something we need to work on.

DAVIS: Well, thank you, sir, for that. And--and welcome back. As I told you before, I look forward to working with you again. And congratulations on--on getting back into the USDA on more time.

VILSACK: Thank you, sir.

DAVIS: I yield back, Mr. Chair.

DAVID SCOTT: Thank you very much. I now recognize the gentlelady from New Hampshire, Mrs. Kuster, for five minutes. I think you may be muted.

KUSTER: I'm just trying to get my--my mute off here. Thank you, Mr. Chairman, and Secretary Vilsack, we appreciate you being here. Thank you for all the work that you're doing. And I'm grateful for the farmers and producers on the panel for coming forward to share all of your challenges and insights.

Our country is in the midst of a reckoning on racial justice and addressing systemic racism. And I think that's the difference. This is not a question of simply prejudice or discrimination. We need to go back to the beginning and the racism since slavery that has led to black farmers not even being able to show title to their land.

Case 2:24-cv-00060-Z Document 33-1 Filed 08/23/24 Page 226 of 562 PageID 6056

This past year has not only brought a global pandemic, but countless painful reminders that we still have so much work ahead of us on equality and justice here in America. And has been discussed today--we have a glaring problem when it comes to American agriculture. Instead of improving the number of black farmers in our country and the amount of land they own has shrunk dramatically and continues to decline. And we need to ask why and make changes that will turn that trend around. It's incumbent on Congress and the USDA to reverse this trend and ensure that our agriculture sector is diverse and that every single farmer and producer is treated with fairness and equality.

So, let's be clear, if black farmers and socially disadvantaged farmers are systematically driven out of our culture, there will be horrible consequences for consumers and growers across the country. We have to right things--these wrongs and move forward together.

Ms. Sherrod, as you noticed in your testimony, black farmers are still impacted by discrimination because government came and sort of tied to production. Systemic discrimination has resulted in black owned farms being smaller than white farms. So, black farmers typically receive smaller government payments. From your experience, how can Congress help level the playing field and make sure that black farmers with smaller operations aren't penalized when it comes to applying to the USDA?

DAVID SCOTT: You may need to unmute.

KUSTER: That was for Ms. Sherrod. Did it go back--

DAVID SCOTT: --Ms. Sherrod--

KUSTER: --No, I'm sorry. That was for Ms. Sherrod--

DAVID SCOTT: --Is it Sherrod, you mean?

KUSTER: Sherrod, yes. I'm sorry.

DAVID SCOTT: Yeah. Alright. You may need to unmute. Okay, you've got it, Ms. Sherrod.

SHERROD: Okay, okay. Can you hear me?

DAVID SCOTT: Yes, yeah, go ahead.

SHERROD: Alright. Let me say that, you know--are we still mute?

DAVID SCOTT: No.

KUSTER: No, you're good. We can hear you.

DAVID SCOTT: Now you're muted. Go back the way you were.

SHERROD: Okay, okay. Okay. Let me say that I've worked on this issue for many, many years, almost 56 years. And I've--I've actually gone through a period where I had to go in the office with farmers for--because they were afraid to go--they couldn't speak up for themselves. And I could speak for them, and I could help represent that.

What that has done is--in addition to farmers trying and being denied, they don't feel there's a place for them to go. We have to go back and try to--try to help farmers understand that this agency is there for them because so many of them think that is not the case. So many of them think, like one of my grandfathers, when--when he had the opportunity to try to apply for

APP. 000221

money, he said, 'I'll never borrow money from Farmers Home Administration because it's just a way to take a black farmers' land.' That has proven to be true.

You were breaking up. So, I didn't hear all of your questions. But, let me say we have to go back and make people feel that this is a place they can come to for help.

KUSTER: Great. Well, thank you so much. Dr. Boyd, could you speak to the unique challenges that you've seen black farmers with smaller farms face when it comes to ensuring that their land can be passed to the next generation?

BOYD: Yes, it's been a difficult task. And one of the challenges is--is access to credit. Black farmers simply don't have access to credit. USDA has been-- played into that and also the top ten banks. And we haven't got to talk about corporate America and the--the discrimination that black farmers face there and--and companies like Monsanto, John Deere, PepsiCo. All have failed to--to deliver contracts and services to--to black farmers.

So, these are things that--that are coupled all together that has affected us. USDA certificates of liens that were on my property when I had debt relief at the United States Department of--I was one of the first black farmers to be offered debt relief in the settlement agreement. Those things--

UNKNOWN: --(INAUDIBLE)--

BOYD: --For over 20 years until we were able to--to try to purchase another farm. We had to hire a law firm to get those liens off of my farm.

UNKNOWN: Yes--

DAVID SCOTT: --Gentlelady has expired.

KUSTER: Thank you. I yield back, Mr. Chairman.

DAVID SCOTT: Thank you for the comments, I appreciate them Mr. Boyd and Ms. Kuster. Now I recognize the gentleman from Nebraska, Mr. Bacon, for his comments.

BACON: Thank you, Mr. Chairman. Thank you, Mr. Chairman. I appreciate the panelists today and each of you, we appreciate reaching out across the aisle. And I also appreciate the opportunity to meet (INAUDIBLE) there is no doubt that our African American farmers, following Reconstruction, were faced with discrimination and prejudice, extended for over a century.

And our history supports (INAUDIBLE) your testimony mentioned the (INAUDIBLE) did not bring about systemic change. Deep rooted changes to a system or an agency do take time. Have there been any improvements, to your knowledge, that can lead to the systematic change that you are referencing? Thank you.

BOYD: Well, basically what--what the lawsuit did was really bring about discrimination issues to the Department of Agriculture. But, many of the issues that we were--that was part of the lawsuit never went to black farmers, such as injunctive relief, such as debt breakdown, land out of federal inventory. None of the farmers received those things. And that's why it's vitally important that we have this measure. So many people think that it's-- it's a new issue. It's not a new issue. We asked for--we asked for debt relief and the actual lawsuit.

And also we need transparency. If you want to fix any of this, we need transparency to see who's getting what and what programs, such as farm subsidies. And we had those real numbers, this hearing would be a lot clearer today. We'd be able to say, 'This race

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 33

received this amount of subsidies, black farmers received this amount.' So, we need full transparency and for those committee members that are here today, we should really take a pretty good look at that.

And also, those persons who were found guilty of discrimination were never filed or penalized. And, as you heard Ms. Sherrod testified, she was the only--someone who got fired. How in the world can you have two settlements, and all those people that were investigated that were found guilty of discrimination and nobody was fired? And it's a shame for the taxpayers who had to pay for that. So, we need to look at those people who--past and present--who are still working at USDA, 30 year (INAUDIBLE) who still have their jobs. Black farmers lost their land and farms. But, these people still have their job. So, I would like to work with the committee to--to move forward on a transparency measure.

BACON: Well, thank you, Mr. Boyd. I was also asking Ms. Sherrod if she sees the systematic change that does take a long time to do--if she sees progress and a systematic change in the agencies she's working in.

SHERROD: Let me say that there--you know, there has been some change, but not nearly enough to make up for what's been done. And what, you know--if you--if you keep messing with someone and they keep getting hurt, they eventually stop going in that direction. So, we have so many farmers who need to go to the agency and they can't and don't feel they should go to the agency because they've never been able to get help there. And if we were not for--for groups like us, even workers who (INAUDIBLE) and others try to help navigate that for them. You know, there's just no way they'll ever get help.

The--the--the culture there is changing some because I've been at this 50 something years. But, I haven't seen enough change.

BACON: Thank you, Ms. Sherrod. And I think you have a good point. If your (INAUDIBLE) you something, your father tells you something you've got to do so. With my remaining minute, I've got another follow up for Mr. Boyd. You highlighted the need to improve technical assistance and outreach to black farmers. Are you starting to see that now? Are we making progress there? Thank you.

BOYD: I believe that--and thank you, Congressman, for the question. I believe that the mechanism that's on the table right now in the Farmers of Color Act, the $1 billion the secretary and his team should reach out to and work with organizations like the National Black Farmers Association and all of the other panelists that are here today. We have a unique opportunity to fix outreach and technical assistance in this measure, something that's been lacking, as you heard my colleagues testify to, in the 2501 program.

This is the opportunity, right now, to fix that where organizations like ours are--we need resources. Since this bill has been announced, our phones are ringing off the hook for farmers that are looking for direction. They want to know how this debt relief is going to be paid out, how it's going to apply to them. And we haven't heard enough yet from the administration. And I would like to ask Secretary Vilsack--he mentioned the commission. Who's going to be on the commission (INAUDIBLE).

DAVID SCOTT: The gentleman's time has expired. I now recognize the gentlewoman from Illinois, Ms. Bustos, for five minutes.

BUSTOS: Thank you so much, Chairman Scott. And also, let me just say thank you for holding this very, very important hearing today. I want to thank all of our witnesses. You've all done a wonderful job. Mr. Secretary, thank you for being here.

I want to start out with a question for you, sir. And I'm actually going to use some facts that Dr. Boyd shared in his opening remarks. So, thank you, Dr. Boyd, for laying the--the picture out for what black farmers in America have gone through.

The numbers have fallen dramatically. As Dr. Boyd pointed out, from 900,000 in 1920 to less than 15,000 today. Dr. Boyd also pointed out that the amount of land that's farmed by black farmers has fallen from 41 million acres to less than five million acres today. So--so, again, Dr. Boyd, thank you for--for laying that out. It helps us get an understanding that we've got something going wrong here.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   34

So--so, Secretary Vilsack, if I may, what steps can Congress take to help you at the Department of Agriculture to ensure that black farmers get involved in and remain in agriculture?

VILSACK: Well, I think you've taken a very important first step with the American Rescue Plan. The debt relief process, as we've talked about, is an important step. The Equity Commission, which we will set up, pursuant to congressional directive, with the (INAUDIBLE) we have to go through that process to get committee members appointed, is going to be very helpful to identify systemic barriers that exist.

From an external view, we've got a working group inside USDA focused on internally examining this. I think Dr. Boyd's right about the $1 billion. There's tremendous opportunity there, not only to improve outreach, but also to look at ways in which we can do better marketing assistance for farmers in that local and regional food system that they need to be part of and also creating opportunities potentially for more market opportunities and more land access.

I think Congress could help us by talking to other federal agencies, in addition to the USDA, that have land ownership. I'm thinking of the Department of Defense, for example. They have a lot of land that surrounds a lot of the military installations. A lot of that land is in rural communities. A lot of that land is farmable. Where and who do they have farming that land? Can that be something that could potentially be made available to minority and socially disadvantaged and beginning farmers?

That's one thing I think Congress could ask, and certainly to the extent that you would provide the resources for us at USDA. Our budgets over the course of the last several years have been pretty--have been cut, which makes it harder for us to have the people and the personnel necessary to do the job. Hopefully, we will see some additional support and help on the operations side of the budget.

BUSTOS: All right, thank you, Mr. Secretary. And I appreciate that innovative approach that we can take a look at. So we know that--obviously, again, this has been spelled out very clearly. We need to do more to level the playing field between black farmers and white farmers, including greater transparency in subsidy and loan programs. That's been discussed today. We need to approve access to land, as you just talked about, Mr. Secretary, in credit. Improve our outreach to black farmers, you just laid that out very nicely.

So I'm lucky enough to be chair of the General Farm Commodities and Risk Management Subcommittee this congressional session. And I know that these are all issues that are important to me as we get to work on our agenda this Congress and gear up for the next farm bill. So this question is actually to whoever would like to answer it among the panelists. And Dr. Boyd, I'm going to ask you to start. But what have your experiences been with the commodity programs at USDA? Again, this falls under the committee that I'll be chairing.

And the second part of that is what steps can Congress take to ensure that black farmers feel welcome at the USDA?

BOYD: Well, one thing I would do, and I've said this to every member of Congress--and thank you for taking the time to speak with me the other day--

BUSTOS: Thank you.

BOYD: --is that, Mr. Secretary, black farmers need to hear from you, that USDA is open for business for black farmers; open for business for farmers of color, Native American, women, all of these persons of color. Make that announcement and make it with conviction, because we're going to have to get black farmers reintegrated back into USDA.

Because as you heard Ms. Sherrod and my other colleagues say today, black farmers don't trust the United States Department of Agriculture, which has really hurt us in participation. And it's because of all the discrimination that I and others have faced.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    35

And we also need to do more to get new beginning farmers into farm programs at USDA, and remove the three-year requirement, so that black farmers and other new or beginning farmers can actually take part into the USDA programs there. So removing that three-year barrier has been a big problem, and I would like to work with you guys to remove that.

UNKNOWN: (INAUDIBLE)

BOYD: Yes.

BUSTOS: I wish I had time to listen to everybody, but my time is expired. And Secretary Vilsack, I do want to follow up on your idea with Department of Defense. Thank you, Mr. Chairman, and I yield back.

DAVID SCOTT: Absolutely. I recognize the gentleman from Indiana, Mr. Baird, for five minutes.

BAIRD: Thank you, Mr. Chairman, and thank Ranking Member Thompson for putting on this informative program. I'm going to start with the Office of Partnerships and Public Engagement, and mention that, you know, they hosted last year, I think, 50 statewide community prosperity summits to focus on solutions to challenges facing rural and underserved communities. And connect them to the education, tools, and resources available to them through the USDA programs and initiatives.

And in 2020, as an example, they connected hundreds of faith-based as well as youth, as well as military and community organizations, to distributors to form partnerships through the Farmers to the Families Food Box Program during the COVID-19. So I guess my first question is going to go to Mr. and Mrs. Cotton.

In your testimony, you mentioned USDA's Office of Partnerships and Public Engagement. Can you elaborate more on your experience with the Faith Fellows training you attended in Washington, DC, and how that experience contributed to your interactions with the USDA? Mr. and Mrs. Cotton.

COTTON: Thank you, sir, for this opportunity and the question. By being at the Faith Fellows inaugural training, we met the Convoy of Hope. We also met CityServe. We also met Islamic Relief USA. We met those various organizations. When we came back to Oklahoma, we reached out to Convoy of Hope and then subsequently had meetings with them. After those meetings, then we rented us a big semi-truck and we drove to Missouri to pick up our first food.

In the interim, as we began to distribute food, we learned that there was a hub here in Oklahoma called NorthStar Bridge for Convoy of Hope. And from NorthStar Bridge, we began to pick up food; first in a car, then a truck; then a horse trailer, 14 foot; then a 20 foot horse trailer. After the Farmers to Families Food Box Program started, NorthStar Bridge saw that we were serious about helping our community. So they began to distribute trucks to us. We were receiving up to four semi-trucks a week in our small rural area.

The people come because we've been consistent. They come because they trust. There's not been any training in what we do. We've been in the service of the Lord for most of our lives. It's just reaching people, helping people be humble servants. And so because the government realized that faith-based entities are the bottom kind of rung of the latter for individuals who have their trust in someone, they began to use the Faith Fellows so that--as a pin point for this activity.

The thing of it is, is that it was a truck-to-truck program. And often the vendors across the U.S., as they receive these fundings to distribute the food, were sending it out. But that last mile delivery, the people were not realizing any financial help from it.

Today, as a matter of fact, we canceled two semi-trucks so that we could be here today, all right? Tomorrow we'll have a once a month senior program that we'll distribute food there. But this has created great opportunities for us to continue to figure out how in the world we can get from busyness, you know, to actual business in reaching our communities.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Yes, sir. My husband just said community togetherness. In our community, the testimonies are a mile-long. That's basically what we have to offer on that.

BAIRD: Thank you. Secretary Vilsack, would you care to comment about the Office of Partnerships and Public Engagement? I think you made reference to that earlier. And give you an opportunity to--we've got about 37 seconds.

VILSACK: Well, it is an important integral part of our effort to improve outreach, but I think we have to do more in that area. And we have to basically cast a much wider net, in terms of the partnerships that we're developing. And I think the opportunity for us at USDA starts with the sort of black colleges and minority-serving institutions. Because they have an incredible network, and I think we need to tap into that network more effectively and more efficiently than we have in the past. That's where I would start.

BAIRD: So I've got about four seconds left, and I just have to put a plug in for the land-grant universities and the cooperative extension service, because they've played a vital role over the years in making sure we got the research information out to these rural communities.

And I know, Mr. Chairman, you're ready to hammer--put the hammer on because I've reached my time. So thank you.

DAVID SCOTT: Certainly. I appreciate the gentleman realizing his time is expired. I now recognize the gentle lady from the United States Virgin Islands, Ms. Plaskett, for five minutes.

PLASKETT: Thank you very much, Mr. Chairman, and thank you to all of our witnesses for being here today. And particularly, thank you, Secretary Vilsack, for your commitment to the issues that we are addressing in this hearing, which has long been overdue at the full committee level. And I want to also just, you know, applaud my colleagues for their patience and their steadfastness in getting to the meat of the issues here in this hearing.

Secretary Vilsack, one of the questions that I have is related to the Coronavirus Food Assistance Program and CFAP-2 payments, which have been successfully compensated all producers, at least partially, who have experienced unexpected economic loss--costs due to the COVID-19 during the second through fourth quarters of 2020.

Are we aware or what are the mechanisms and data that we have to know that CFAP-2 funds have been distributed in a fair manner to every producer and for every commodity sector that experienced COVID-19 related costs? I ask that question in particular, as you have shown through your quick, you know, appointment to agriculture the disparity in distribution to black farmers in the other funding.

VILSACK: If you take a look at the payments that have been made to those who have self-identified as white, black, and other socially disadvantaged categories; in CFAP-1 and CFAP-2, black farmers would have received approximately $20 to $21 million. White farmers, white men and women farmers, would've received $5.6 billion.

So that's why I think that one of the things you did in the American Rescue Plan was to essentially understand and appreciate the disparity, in terms of how the COVID relief was distributed, in terms of how much went to white farmers and how much went to socially disadvantaged farmers. And part of what you've done, I think, is you basically created a better sense of balance, if you will, in the COVID relief efforts.

We tried to complement that recently with the announcement that we're going to do additional outreach on CFAP-2, to make sure that those socially disadvantaged producers that have not yet applied for the ability to participate in that program are given a 60-day opportunity to do so. And the hope is with additional outreach that we'll see more applications from socially disadvantaged producers.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    37

PLASKETT: Thank you. As a follow-up to that question, sir--Mr. Secretary. With the debt relief that you have--that has been provided for black farmers, is there an assumption or shouldn't there be an assumption that other tacit forms of discrimination at the department need to be corrected? And what is being done to identify what those other areas might have been, and how they can be rectified and monitored?

VILSACK: Well, there are three parts to the American Rescue Plan. We met--we talked about debt relief, and we've also talked about the $1 billion that could potentially increase outreach land access and financial marketing. The third element is the Equity Commission, and this commission is going to be an external commission. It's going to take a detailed look at every single aspect of USDA's activities to determine and to identify those systemic barriers that may exist in the way in which programs are operated.

At the same time that that is going on, we're also going to have, pursuant to President Biden's executive order, an internal review. We already have a working group that has been established. They've already begun the process of assessing our benefits, our services, our contracts, and our procurements. And I would put particular emphasis in response to your question on the issue of contracts and procurements.

As we're looking at ways of increasing market opportunities, but especially for small and midsized operators, for socially disadvantaged farmers, for beginning farmers; the opportunity to use federal purchasing power, the procurement power of the federal government, may be a strategy that will provide some quick wins, if you will, in terms of market access. And that's something I hope our team will be taking a very close look at.

PLASKETT: Thank you. And as a final thought, in having conversations with some of the witnesses prior to the hearing today, I'm particularly moved by and concerned with regard to discussions with Mr. Boyd, where he talked about not necessarily just at the Department of Agriculture but in the whole lifecycle of black farming, issues of access to farm credit, to bank loans, even to have those companies who they rely on for equipment to have different policies and leverages for black farmers than they do for others.

Have you been thinking of or would you be willing to sit with us as legislators to come up with ways to both incentivize those organizations and those outside and private entities to support black farming, to grow it, as well as to find ways to enforce federal law against discrimination and to support them?

DAVID SCOTT: (INAUDIBLE) has expired. I now recognize the--

PLASKETT: May he answer the question, Mr. Chairman?

DAVID SCOTT: (INAUDIBLE)

VILSACK: Mr. Chairman, I'll just respond yes to your question, Congressman.

PLASKETT: Thank you.

DAVID SCOTT: Yeah. And also, Mr. Secretary, you can respond more in writing for the record. And I apologize to everyone, but we're trying to get everyone in, and so I hope you will help me here. I want to hear from everybody, too. And perhaps, Mr. Boyd can relate to your question, when he is recognized, again. Thank you for your consideration, members.

I now recognize the gentleman from South Dakota, Mr. Johnson, for five minutes.

JOHNSON: Thank you very much, Mr. Chairman. And I'll direct my comments and questions to Secretary Vilsack.

I would first note, sir, that you've invested a remarkable amount of time, already, in speaking with me and other members of the committee, since you were sworn in. So, thanks for that. I think it shows an authenticity and an earnestness on your part to do this work, together.

And I think this committee hearing has been fantastic because we talk about how to make sure that we are serving all of agriculture and all producers. It's been a wonderful hearing.

And in that vein, I want to call out and commend USDA, sir, for the appointment of Zack Ducheneaux as administrator of the Farm Service Agency. Mr. Ducheneaux has been an incredible advocate for South Dakota agriculture, for tribal agriculture, for socially disadvantaged farmers. He's an enrolled member at Cheyenne River and he's going to be really good at the job.

And so, thank you to USDA for walking your interest and diversity, sir, on that front.

The one question I've got for you, Mr. Secretary, follows up on my March 3 letter and gives you a little real-time update, related to my concerns with the U.S. Forest Service recommendation to reduce the timber sale program.

And there is a real impact here on socially disadvantaged people because a huge portion of the forestry workers who were impacted are Latino.

And the update is just this week in Hill City, that's a town of about 1000 in the Black Hills of South Dakota, a large soul mill has announced that it's closing; 40 percent of those 120 employees are Hispanic. That comes the same week that we have the Forest Service announce via a general technical report that they think that the timber harvest coming out of the Black Hills should be reduced by 50 percent or 60 percent.

And we know that, when you lose those jobs, from socially disadvantaged people in forestry, in timber, they are highly unlikely to come back. That capacity doesn't come back, very easily. We've seen that across the country.

And so, I just want to make sure, sir, that that's on your front burner and just asking for a commitment to work with you and the Forest Service and continuing to analyze the science behind these studies. We want to make sure that, when we've got socially disadvantaged employees, they've got an opportunity to keep those good paying jobs and help out their communities.

Any thoughts, sir?

VILSACK: Congressman, I certainly appreciate the important comments about reaching connection with stakeholders who have a strong interest, as you expressed, in the Black Hills.

I would hope that our Forest Service and believe our Forest Service will continue to be engaged in continued collaboration.

As you've indicated, the scientists from the Northern Research Stations Forest Inventory and Analysis Program recently concluded their study.

I would point out that this is a scientific document. It is not a policy or a decision document. So, I think it is important to note that.

To your point of whether or not there are other considerations or other science or other information that needs to be considered, obviously, I think we need to take everything into consideration, before any specific decisions are made.

It's a large body of science, obviously, that's now available to managers in the Black Hills that can take a look at it, they can respond to it. They can react to it and then it will give us the opportunity to sort of take into consideration, as we finalize the general technical report.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Hopefully, folks are going to provide us the input necessary for us to, ultimately, make the very best decision for folks in that area.

Let me just simply say, however, you know, this is a very difficult issue, generally, this issue of timber and this issue of timber sales and mills.

And we have got to figure out ways in which we can increase market opportunity for forest and wood products, across the board, whether it's using cross laminated timber to build tall buildings or some other mechanism because we want to make sure that we maintain the carbon then stored in those trees, as opposed to, unfortunately and tragically, watching too much of it burn up in fires that we've seen that have been historic.

JOHNSON: I think that's well said, sir. And we know that a managed forest is a healthy forest. And I like your problem-solving approach.

With the time I've got left, I would just note that you write it to scientific document. I think there's an opportunity for entrepreneurial policymakers like you and me to try to find some different solutions.

For instance, that scientific report only really analyzes the timber available in suitable timberlands, meaning areas that have, traditionally, been forested or rather, been harvested.

You know, if we can get your team the resources they need to build additional timber roads, that's going to give us new areas to forest, that's going to give us new jobs, including for the socially disadvantaged people.

Thank you very much, Mr. Secretary. Mr. Chairman, I will yield back.

DAVID SCOTT: Thank you very much. I now recognize the gentleman from California, Mr. Carbajal, for five minutes.

CARBAJAL: Thank you so much. Thank you to all of you for participating, today. And thank you, Mr. Chairman, for holding this important hearing.

In my district, we have over 800 Latino farmers. And I've had the opportunity to speak with some of them about the discriminatory barriers that they face, every day, such as language barriers, lack of access to technical assistance, and the need for improved access to land and capital.

USDA's Civil Rights Action Team reported in 1997 that Latino farmers were systematically excluded from USDA's programs.

And in the year 2000, Guadalupe Garcia, and a group of Latino farmers filed a lawsuit similar to the Pigford. And that was, ultimately, settled by the USDA.

This lawsuit alleged that discriminatory lending practices by USDA deprived Latino farmers of opportunities afforded to their white counterparts.

For example, one of the Latino farmers, in this case, was denied a loan to buy land by her local FSA office because they claimed that the land didn't have sufficient water to farm it, even though the land in the same area was also being farmed by two white farmers, who were financed with FSA operating loans.

I would ask for unanimous consent to include in the record, the amended complaint in the Garcia lawsuit, Mr. Chair.

DAVID SCOTT: Done.

CARBAJAL: Without objection.

DAVID SCOTT: Without objection, thank you.

CARBAJAL: Thank you. Continuing the current discussion of black farmers. Let me ask you this, Secretary Vilsack.

In my district, the Natural Resource Conservation District, NRCS, technical assistance and the expertise of cooperative extension service have proven to be critical to ensuring that the latest science-based practices and the management techniques reach farmers, especially, regarding carbon sequestration.

In what ways can technical assistance be improved to better benefit black farmers?

VILSACK: Well, I think there are a couple things, Congressman. First of all, I think we need more folks, more boots on the ground. That's obviously an appropriation issue.

I think, based on our targets and based on what we think is adequate for servicing the needs of people, we're about 10 percent to 15 percent below where we need to be with NRCS, boots on the ground. So, first and foremost, boots on the ground.

Secondly, partnerships. We mentioned this before, the ability to align ourselves with folks who are trusted in the community to expand our reach, if you will. That starts with land grant universities, Hispanic serving institutions and other community building organizations.

I think it's also--we've recently requested input from folks on the issues of climate through the federal registry. I would encourage you to, encourage your stakeholders in your congressional district to respond to the set of questions that we put forward, so we get better ideas and better input on how to structure efforts, in terms of carbon in the future at USDA.

That may also be a way of increasing our understanding of what's necessary and needed on the ground.

CARBAJAL: Thank you, Secretary. I welcome the other witnesses to also weigh in, if you could.

HAYNIE: Congressman, I think one thing we need to recognize is that we need more diversity within the agency, more people that can relate to the constituents that they serve, more African-American and Latino representatives from NRCS that can go engage with these communities and have conversations that relate to those audiences.

I think that's a big factor and would help play a big role in continuing the communication and the services that are available to the farmers.

COTTON: And this is Arnetta Cotton. I would like to--this is Arnetta Cotton. I would like to add that you talked about the language barrier. It's not just, you know, a Latino barrier. It's the whole, all the acronyms used by the government, all of the different forms that are not down to the language or the capacity of a regular farmer.

And then it's a fact that it's the same people in the office who were there through Garcia, through Pigford, through all of the others. They have not been let go.

So, they feel it's okay. And if they have the blessing of the agency. And it's a poor representation because the USDA is the peoples' agency.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          41

Case 2:21-cv-00061-Z Document 330-1 Filed 08/23/24 Page 236 of 502 PageID 61566

BLANDING: Congressman, I would also like to add to that, if you don't mind. I think, as a nation, we have to realize that all of our, that all of our challenges have solutions. And it's incumbent upon all of us, the government, our corporations, our organizations, farmers and all of our citizens to be a part of those solutions.

And until we do that, we're going to constantly run around in circles.

Farmers need to be educated but also the USDA--

DAVID SCOTT: --The gentleman has expired. Thank you so very much.

CARBAJAL: Thank you very much. I yield back.

DAVID SCOTT: I now recognize the gentleman from Georgia, Mr. Allen, for five minutes.

ALLEN: Can you hear me?

DAVID SCOTT: Yes, we can. Go ahead, Congressman Allen.

ALLEN: Thank you, chairman, and thank you for holding this hearing. It is important that we know the state of--of--of our food supply in this nation because we're focused on our black farmers in the U.S.

You know, when I grew up, I grew up on a farm. Ninety seven percent, I think, of the population of this country was involved, in some way when I grew up, and agribusiness. And it's changed quite a bit, since I grew up.

I think it's less than 2 percent of the people in this country, Mr. Secretary, that are now involved in agriculture.

And of course, what happened was, you know, my dad was a dairy farmer. We timbered and other things. And of course, along comes production ag. And in fact, the milk company was going to finance the expansion of my dad's dairy. But when my dad looked at the numbers and the fact that he had to put his land on the line, he turned them down.

And so, he went into competition with them, and they put us out of business. And so, you know, again, we're somewhat of a casualty to what's happened in agriculture, since the 1960s.

And I'm sure it's affected the folks in this hearing, today. And that's, you know, it's unfortunate because my dad loved it. But we just couldn't continue on.

And obviously, you know, from the standpoint of bringing this nation together, and I understand, you know, the feelings on both sides. But you know, as people of faith, we've got--it's not an option that we come together.

In fact, I--Samuel--Chairman, this one's for you because I know every time I get on an airplane, you're reading the Bible. But I Samuel 16:7 says, 'For the Lord sees not a man--not as man sees. Man looks on the outward appearance, but the Lord looks at the heart.'

And we know that God is an impartial God. So, but we are following the world and we have to deal with our differences. And, but you know, in that respect, Secretary Vilsack, and you know, I'm just going to tell you what I've heard floating around out here. And I just want, you know, to get your, find out what you have seen there.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

APP. 000231

But the American Rescue Plan includes $4 billion for USDA for loans to disadvantaged farmers. But in that definition of disadvantaged farmers and, again, what we're hearing is like, if you want a change in this country, if you decide you want to change your gender, then you can change your gender.

Is there a possibility that farmers could say, hey, I want to change my race and benefit from this program?

VILSACK: Congressman, I think what you're getting to is a very fundamental question. And that is, is whether we trust farmers or don't trust them.

When we had COVID relief, we trusted farmers. When they told us that they were producing corn or soybeans, we didn't ask them to prove that. We trusted them and we sent out billions and billions of dollars.

If you want to create some kind of mechanism that says that we're supposed to distrust farmers? Well, we could do that but I--I--I don't think that's what you want, certainly not what I want. We didn't ask for that in CFAP and--and I don't think we can ask for it in--in this particular situation. The reality is, we're going to--we're dealing with people that the department knows--

ALLEN: --Not to--

VILSACK: --these are people--

ALLEN: --sir, not to interrupt you, I'm not talking about trust, I'm talking about what is the legality of that?

VILSACK: Well--

ALLEN: --Did you all look at the legality of that in this law when you made the law?

VILSACK: Well, it--it--I think it's constitutional--

ALLEN: --All right, I'm not talking about a trust issue here. If it's legal to do this and someone can legally do it, is that possible?

VILSACK: Well, first of all, I think the statute is--I think the law is constitutional for the reasons that are articulated earlier. It's tailored, it's focused on a particular set of issues and trying to resolve those issues, and it certainly is dealing with the cumulative impact of discrimination.

So I--but I do think it is a trust issue at the end of the day. And I think, you know, we're going to trust folks. These are people that have dealt with somebody at the--at the FSA office. They've had to make a loan. It's not like these are people that we don't know, we know these people. And the reality is, they're going to sign a document that says that they're attesting to the truth of whatever it is they're representing. And there are serious, serious civil and criminal penalties if you don't tell the truth.

So I--I, for one, I'm going to trust the farmers to be truthful and if they're not they're going to be held accountable.

ALLEN: Okay, well, I just--you know, again, we make these laws, we appropriate money, but from a legality standpoint, and that question was asked to me and I don't think they were joking. I mean, at the first I thought it was a joke--

(GAVEL)

DAVID SCOTT: --The gentleman has expired--

ALLEN: --Okay.--

DAVID SCOTT: -with all respect, Mr.--

ALLEN: --I yield back, Mr. Chairman.--

DAVID SCOTT: I now recognize the gentleman from California, Mr. Khanna, for five minutes. You may need to unmute, Mr. Khanna.

KHANNA: Can you hear me, Mr. Chairman?

DAVID SCOTT: Yeah, we got it. Go ahead.

KHANNA: Thank you. Thank you.

Well, let me just first say how pleased I am to see Secretary Vilsack in--in his role. He has demonstrated such a commitment in his record of public service to inclusivity, to expanding opportunity, to caring about rural America, both black and white rural America. And I have great confidence in--in his leadership and I'm glad that President Biden selected him and that he was willing to come back to Washington.

And I also want to thank Mr. Boyd and--for his leadership for decades in bringing issues of equity to the forefront. And really, it's a testament, sir, to your leadership and to the chairman's vision that we are having a hearing that is long overdue about basic equity for black farmers.

Mr. Secretary, you spoke eloquently about USDA's long history of discrimination and--and some of the practices. How do you think we can hold some of the local county committees accountable for the bad actors? There are still some bad actors in some of these local county committees, and how do you think we can get accountability there?

VILSACK: Well, I think first and foremost, is making sure that those county committees have adequate representation that reflects the population that they serve. And oftentimes, when I was secretary last, we had 385 counties, I believe, that didn't have a minority representative. I appointed minority representatives on those committees.

So first of all, there's that and to the extent that people do provide discrimination, I think the--the point has been well taken. I've taken notes on this. The reality is if--if we say that discrimination is not to be tolerated, and in fact, discrimination occurs then we do need to take disciplinary action. And--and it needs to be effective, and it needs to be forceful, and it needs to be relatively quick so that people do get the message that this is serious and this is a new day. And I expect and anticipate that our team will act in that-- act accordingly.

I think it's also the Equity Commission is going to be looking at all aspects of our operation and I suspect that they will be looking at the structure and the basis and the mechanisms by which decisions have been made and the appeals will take place and--and how that--how that operates, and they may make a set of suggestions or recommendations. Clearly, our internal review of this from our working group, consistent with President Biden's executive order, may also result in recommendations. That process is just getting started and I want to make sure that that process is able to work its way through the process so that we get the very best recommendations.

KHANNA: Mr. Secretary, you've spoken to a number of us on this committee about the importance of technology, about the importance of--of broadband biomanufacturing, precision agriculture, and I wonder how you think we can address some of the digital divide and access to technology where the African American community and black farmers, the black rural South has been excluded from a lot of that technology, and what can we do to help alleviate that?

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

VILSACK: Well, I think first and foremost, making a true, fully funded commitment to expanding access to rural broadband, so that in fact, the technology exists. In many communities that does not exist.

Secondly, I think it is working, again, as we talked about community building organizations, funding and--and providing the resources, extension, land grant universities, historic black colleges, et cetera, being able to give them the resources that will allow them to do the training, so that people understand whether it's a small businessperson or a--a farmer, how technology can be utilized appropriately.

I think it's, frankly, also basically getting younger people into the United States Department of Agriculture from these areas in the form of internships so that they, in turn, can go back home and with an understanding of how USDA works, and what they need in their rural communities, and be able to see if--if we can create career opportunities for them at USDA in their local communities to be able to solve some of the problems that they know firsthand. It's a combination of--of that and I'm sure much, much more.

KHANNA: No, I appreciate that. I've been surprised in--in just my work how much of our economic development is funded with the U.S. Department of Agriculture. And I look forward to your leadership on that.

One question for Mr. Boyd and Mr. Blanding and--and thank you, again, for both of your work. You have correctly testified that black farmers are still impacted by discrimination and government payouts are linked to production. Black farmers have had less land, are smaller because of the historical legacy of racism. How do we then level the playing field, given that black farmers are at this disadvantage because of having less land?

BOYD: Yes, I'll--I'll take a crack at that first.

First of all, we need to redo the base calculation, the way that they are calculated and also, we need caps. We need caps so all the money just won't go to the big farms. We have to figure out a way to do that. During those Trump payouts there was no sense in having one county, like in Mecklenburg County, receive $40 an acre and then a Georgia county receive $140 an acre. We have to figure out, you know, redo those--

DAVID SCOTT: --The time of the gentleman, unfortunately, has expired. Perhaps, again, Mr. Boyd--

BOYD: --I'm trying--

DAVID SCOTT: --find a way to answer that (INAUDIBLE) when a question is put to you.

What you're hearing.

I now recognize the gentleman from Ohio, Mr. Balderson, for five minutes.

BALDERSON: Thank you, Mr. Chairman.

I want to thank the panel for being here and I also want to thank Secretary Vilsack for--for joining today and look forward--I'm having a phone call with you next week. But I just want to remind you and you won't remember me but I met you with Zack Space. You were in my hometown of Zanesville, Ohio, Muskingum County, when Zack represented us in Congress. And were kind of doing a nice photo tour and you did a--you did a really nice job. You were down at the Zanesville Welcome Center. So pretty close to Zack's downtown office here. But look forward to working with you from being that member of Congress now.

But and Rep. Plaskett kind of touched on this a little bit, Secretary, but, you know, one month after Congress appropriated additional money for the--the Coronavirus Food Assistance Program, or as she referred to it as CFAP, President Biden froze--

Case 2:24-cv-00061-Z Document 30-1 Filed 08/23/24 Page 235 of 500 PageID 61570

froze payments. Can you discuss why the administration suspended CFAP payments and--and what the agency discovered in the nearly two month halt?

VILSACK: It's standard practice in changes of demonstration for the incoming administration to take a look at what may have taken place just before the new administration took over. And so we wanted the opportunity to basically take a look. We also wanted an opportunity to--to analyze who wasn't being served, who wasn't being helped, who could--who--who wasn't being helped as much as they needed to be?

And that's why yesterday, we made the announcement, a four part announcement, payments now going under CFAP two and CFAP one to cattle producers and some of the commodity producers, but also resources now for local regional food system opportunities, as well as a series of steps we're going to take with roughly $6 billion to help those we've now identified were not served, not helped, by previous COVID packages.

We will, over the course of the next several months, be involved in rule-making to get those resources out the door as quickly as possible. So it was designed primarily to give us a chance to analyze who had been helped and who hadn't been helped and to create and--and construct an effort to make sure that we had equitable assistance throughout the COVID.

And I will just say, as part of this hearing, it allowed us to identify the fact that CFAP-2, the outreach to as socially disadvantaged producers wasn't what it needed to be. That's why we're going to expand the sign up for 60 days to give people a chance to--to--to apply for those benefits.

BALDERSON: Okay. Well, thank you. Mr. Secretary, I look forward to speaking with you again next week.

My next question is for--for the panel and you all can answer this. And I--I appreciate all your testimonies that you have given today. But if each of you could target one area for the USDA to improve its practices or programs what would that be? And--and let's start with Mr. Boyd since he kind of gets shut off every time he gets to start talking. So Mr. Boyd, lead the way.

BOYD: Well, first of all, I would do away with the three year limitation requirement for newer beginning farmers. That's the first thing I would do. And I will make sure that we have full participation, and farm ownership loans, farm operating loans, all of those areas where black farmers today are pretty much--pretty much absent.

And the only way to do that is to have oversight and--and transparency, something I've been trying to get in hearing and--and I haven't been able to get it in. We need transparency so when we have hearings like this we will be able to lay out the numbers by state, counties, zip code, by race, and when you how people that bring up these issues up you'll be able to go right to those numbers and--and see what they are. That's the way that you improve it.

BALDERSON: Thank you. Anybody--we'll, go ahead and go next. Mr. Haynes (PH), or anybody would like to go next, go ahead.

HAYNIE: I--I think the one thing we need to address is the subsidy programs. John mentioned it earlier, but right now we're seeing 20 cents for black farmers compared to $1 for white farmers on the subsidy programs. That is something that really needs to be addressed, when you have black farmers right beside white farmers and they're only getting a quarter on $1 for what their neighbors are receiving in (INAUDIBLE). These programs were established back in the 80s, during the crux of discrimination at USDA, and they really need to be addressed. So--so--so that is one issue.

The secretary mentioned about the COVID program. You know, one of the benefits, we've had one where the larger farmers had grain storage and capacities that a lot of small farmers didn't have. So if you didn't have grain stored in your bands you weren't able to benefit. A lot of black farmers had to sell their grains in the fall of the year and weren't privileged to storage to benefit.

So--so the commodity programs, and Congresswoman Bustos from Illinois mentioned it, that is a large pot of money that go out. And--and the disparities really start to show themselves when you look at subsidy programs and--and the difference in dollars paid out to--to black farmers and white farmers. Thank you--

SHERROD: If may, please allow me the opportunity to say that farmers are smaller acreage can't compete with the commodity crops. So we've actually have them in co-op. We are organizing cooperatives and we are organizing them to grow and sell into other markets, vegetables and so forth.

They need the infrastructure. They can't afford to put in a--a--a facility to wash, dry, cool, and get products to market. It's very important for those small growers, those small landowners, to have access to money like this to give them a chance to survive.

DAVID SCOTT: Thank you. Thank you.

BALDERSON: Thank you very much. Mr. Chairman, I yield back.

DAVID SCOTT: Thank you, so--thank you so much. And I appreciate you all panelists. This is such an energetic hearing. It is great. It is certainly historic. And I appreciate you all.

I now recognize the gentlewoman from Washington, Ms. Schrier, for five minutes.

SCHRIER: Thank you, Mr. Chairman. And thank you to our guests.

The first issue I want to focus on is land and water access for black farmers. Our witnesses today have left no doubt that farmers of color have faced and still face systemic barriers to land ownership and water access. And today, black farmers are more likely to rent rather than own farmland. They have smaller farms, own less land, generate less wealth from farming compared with white farmers. And these factors leave black farmers at a huge disadvantage because farmland real estate represents nearly 80 percent of total U.S. farm assets so farmers who do not own land or have a clear title to land can't leverage that land or capital to invest in, sustain and improve their farming operations.

Now, this is especially challenging in urban and suburban areas, like King and Pierce County in my district. For example, in Washington State in general, the average price for an acre of cropland in 2020 was just over $2,600, but by comparison, in King County the average price for an acre is more than $35,000 and in Pierce County is around $21,500 per acre.

So I've heard from farmers of color in--in Washington State about the difficulty in obtaining farmland because of these prices and the historic systems of discrimination that prevent them from ever purchasing farmland.

So my question, Dr. Blanding, Mr. Blanding, can you speak about the importance of access to land and actually land ownership for black farmers? And can you talk about what systemic barriers to the purchase and ownership of farmland exists for black farmers today?

BLANDING: Yes, ma'am. Thank you,

BOYD: That--that question is for Blanding or Boyd? I--I'm sorry, I didn't hear.

SCHRIER: Mr. Blanding.

BOYD: Thank you.

BLANDING: Thank you, Congresswoman, for that question.

So the problems of black farmers and black--black land ownership is historic. First, in terms of ownership or getting access to land, first of all, there has to be access to equitable credit in order to get access to that land. And I think there's been systemic problems in the credit industry for years. I think this is an opportunity for there to be a black farmer financial institution, modeled after the Farm Credit System where black farmers can get the kind of credit that they need and serve themselves, just like the Farm Credit System, which is a great system, by the way. But again, bad farmers need to have access to that type of credit.

As it--but our problem is around maintaining and holding on to existing land. As property is a major issue in the black farming community and the black community overall, we estimate 60 percent of all black landowners have this property issue. And so we must figure out ways to make sure that there's things that can be done to make sure there's property situation is cleared up.

There's things that already existed, like the Heirs Property Relenting Program that was approved for the 2018 Farm Bill but has yet to be implemented and funded. So things like that can be done immediately. But also a lot of education and technical assistance around that area will go a long way to make sure black farmers continue to hold on to their land base and continue to thrive in this country.

But I would also like to say, Congresswoman, that we as a country have to look at the value of not only all farmers but black farmers and specifically around dealing with the issues around land and water, as you suggested--

SCHRIER: --I agree.--

BLANDING: --because we're all part of that equation and you have to make sure that black farmers--

SCHRIER: --Thank you.--

BLANDING: --are part of that as well.

SCHRIER: I need to--to address one more question. Thank you for your comments.

I just want to also address black indigenous people of color from our participation in conservation programs, specifically. Among white farmers in Washington State about 9 percent received conservation reserve, wetlands reserve, farmable wetlands, or Conservation Reserve Enhancement Program payments. For black farmers in Washington it's less than 1 percent.

So Secretary Vilsack, under your leadership how will the USDA work to combat historic and current racial injustices in climate in agricultural policy? And how can the USDA continue to support existing conservation programs and make them more equitable and accessible?

VILSACK: Well, there are several things. First of all, we're going to ask the current acting chief of the NRCS, Terry Cosby, she's African American, to help lead that effort to make sure that resources are more equitably available to-- to socially disadvantaged producers.

Secondly, again, the internal review and the external review, whether it's the Equity Commission or the internal review from President Biden's executive order, will obviously identify recommendations.

Third, it's about accountability, to John Boyd's question or--or his comment about transparency. It's about asking for information on an ongoing basis to make sure that you see whether they're--that whether there is, in fact, investment being made and if it-- if there is not why there is not and who's responsible for making sure that there is? So it's a combination of a lot of those things.

I think it's also a combination of working, again, with--with better outreach. It may not be that folks don't qualify or it may not be that they're prevented from qualifying, it's that they may not even know about the program. They may not know what they have to do.

And I think this--this money in the American Rescue Plan gives us an enormous opportunity to improve outreach and to take a look at additional opportunities to help farmers access more revenue, I think as that's what the market process--

DAVID SCOTT: --The gentlewoman has expired.

SCHRIER: Thank you, Mr. Secretary. I yield back.

DAVID SCOTT: The gentleman from Kansas. Mr. Mann, for five minutes.

MANN: Thank you, Mr. Chairman.

My question is for Mrs. Cotton. Thank you for your incredible service to your community. In your written testimony and in our conversation, I know you've mentioned that you've helped deliver food to more than a million people in five states during COVID-19 through the USDA's Farmers to Families Food Box Program. What do you foresee is the future for this program and how can the USDA assist with connecting more rural and underserved communities or communities in the last mile to get them the food that they need?

COTTON: Thank you, Representative Mann. I appreciate that question.

It is an excellent program. It's viable and it's much needed. We have people coming, as you know, from five different states to Oklahoma because in their areas it's not as function, all right.

And so what happened, some of the food banks, for a sense of--of--of efficiency, some of the--the dollars were sent to food banks in these last two programs, in the last few phases. By being sent to food banks then organizations then have to qualify through the food bank in order to be--you know, in order to pick up from them or to be considered a hub.

What would make it more viable is if the people who are actually getting the work done in integrity, there have been people who have taken advantage of the system, but who are operating in integrity and getting the food out to the people where they belong, I believe that it will continue to be a good program.

As far as the Last Mile is concerned, it is--it goes back to transparency and accountability. If those vendors were awarded monies that included Last Mile delivery. So if, from me, I'm sending out to different places then from me then that person who was doing that work, networking with other people, should get that Last Mile.

And so how do we continue to do so? By percentages. It's documentable. They know how many trucks that they are delivering. They know where the trucks are going. They know how much is being disseminated and what's not being returned to them. That's--that's an easy, easy fix.

By allowing some of the cold storage, which they have had refrigerated trucks, if they would allow some of the cold storage to include thermal blankets. So in some of the really--because our communities are so rural they can't afford to get a semi-truck. So if they would allow thermal blankets to suffice in cold storage we'd be able to get it out quicker. And if they would underwrite the cost of providing those blankets to individuals who are picking up and then taking to other people. Our community is less than 2,000 and so there are a lot of seniors who are home-bound and we need that service, we actually do.

But it is wonderful. And some (INAUDIBLE) our volunteers. I would say that I would say that, too.

MANN: Yeah.

COTTON: Our community has come together. Yeah.

MANN: You don't feed a million people or have them without a lot of volunteers. So no, thank--thank you for that.

Second question. This one is for Mr. Haney, Mr. Haynie, in your testimony, you mentioned that you have formed partnerships with land grant universities. We all know the land grant universities play an important role in educating our next generation of farmers. Can you talk more about your partnership with these land grant universities and how they have helped?

HAYNIE: Well, I mentioned partnerships for corporations and then our local and state agencies. But--but--but we have relationships with the land grant universities where we have the National Black Growers Council has a field day strategy and we want to work with those land grant universities to bring the-- the--the agricultural community, who typically not serviced, they--they can come out and see the latest and greatest that agriculture has to offer.

So what corporations have to offer as far as seed and chemistry and technology, these--these communities are often not served by the salesman who would typically go to the white farmer who's the larger spin and the bigger accounts. They--they take all this information there and--and oftentimes they drive right past the driveways where the black farmers exist.

So we wanted to make sure that we were a conduit in a pipeline for information for the black farm community to be aware of everything that's available in production agriculture.

MANN: Right, great. Thank you.

Thank you, Mr. Chairman. I--I yield back.

DAVID SCOTT: Thank you very much.

I now recognize the gentlewoman from Arizona., Ms. Kirkpatrick, for five minutes.

KIRKPATRICK: Well, good afternoon from Arizona. Thank you, Chairman Scott, for bringing us together with this panel on such an important topic. I grew up in the White Mountain Apache Reservation and in rural Arizona and was raised in a ranching family so I know just how important these USDA programs are for farming and ranching families.

In my state of Arizona, there are more Native American farmers than any other state and I want to mention the unique challenges they face in getting access to USDA programs. Just as Heirs Property created a barrier for black farmers getting financial aid from farm loans, Native American farmers have also struggled to participate in USDA programs due to the nature of land ownership of Indian trust lands.

For Native American farmers historical program rules requiring land ownership for eligibility prevented them from accessing the assistance they need to develop their land. So a common thread in all of the testimony today is that these obstacles create systemic inequity. Not surprisingly, due to the systemic inequities, white farmers are 70 percent more profitable than Native American farms, despite Native American farms being over twice the size.

So first, Mr. Chair, I'd like to ask unanimous consent to include in the record a 2019 report by the GAO, describing the needs and barriers to agricultural lending on tribal land.

DAVID SCOTT: It's done without objection.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KIRKPATRICK: Thank you so much.

So my first question is for Mr. Sherrod. I'm moved by your testimony and I'm so sorry to hear about this grim anniversary of your father's death. And it saddens me to hear that you never received justice in your father's case. I'm also very troubled by the problems you detailed that still plague the USDA today and continue a cycle of inequity.

So here's my question, can you describe some things that the USDA can do to improve its outreach to black farmers? And what are the main barriers to black farmers accessing USDA programs?

SHERROD: Let me say that working with community-based organized organizations, we are on the ground. We've been working with them to help change their situations, in spite of all the--the issues they face with USDA. So I think it's very important. That's why we fought for Section 2501 way back in the 90s to try to get funds specifically targeted to minority farmers and through community-based organizations in 1889 grants. That program is now serving everybody. They've thrown the kitchen sink towards that program so black farmers are not getting the benefit of something we fought so hard to get past.

There's so many--there are different BB barriers now, because people have been kicked out of the agency. You have to make them feel they can come back there for help and that can happen if you work with people on the ground who are working with them. We--you know, USDA is there but they need us, you know. And we can help turn that around but we can't get funding to do it.

KIRKPATRICK: They--they do, indeed, need you so thank--thank you for recognizing that.

My--my second question is for Mr. Rowe. I'm inspired by your testimony today and by your decision to become a first generation farmer. Further, I can only imagine the difficulty in not only start bringing the farm completely from scratch, but going through the process to ensure you're producing organic crops.

From my conversations with farmers back home I know that going through the organic certification process is something that scares a lot of farmers off or they don't know where to start, even if they are already operating under USDA organic practices.

Can you describe for us, some of the reasons you chose to produce organically, and if you see an opportunity to help more black farms through the USDA organic certification?

DAVID SCOTT: I'm going to have to ask if you might be kind enough to reply in writing. We're way past the time. I deeply appreciate your consideration. We want to get every member in this important hearing. So, now, I recognize the gentleman from Iowa, Mr. Feenstra, for five minutes.

FEENSTRA: Thank--thank you, Mr. Chairman Scott, and Ranking Member Thompson. First, I just want to thank each of the witnesses for their testimony today and sharing their experiences you, your family and your friends have faced. I appreciate you saying these things. And I also definitely appreciate Mr. Secretary of Agriculture Vilsack, for being here today. He is from my home state. And I--I appreciate that.

Ms. Cotton. In your testimony, you speak to the importance of local community organizations in relaying USDA resources. Can you expand on how USDA could better engage with community organizations and non-governmental organizations to conduct outreach and to implement USDA training programs?

COTTON: Absolutely. We have land grant--thank you so very much for that question. And for the opportunity. We have land grant Universities here in Oklahoma, through which, as Ms. Sherrod just talked about, the 2501 programs. We--we have that available to us, that we can partner with the USDA.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   51

They are educational institutions, and they're--are established as minorities. And so, it would be wonderful if through those University's programs, with existing community outreach programs, they would partner together in order to be the hands and feet, or rather the boots on the ground, or the people in the communities. They are big enough to partner with the USDA offices and all of their branches, FSA, NRCS, RD, in order to talk to the people in their language, kind of break it down.

Break it down from what the government expects, you know, break it down to its simplest denomination, so everyone can understand it. And then they be there to help walk the people through all the technical, given technical advice, without coming back and saying, yes, you did it right. Let's follow up on that, let's follow through to see that it was successful, are two different things. With-- by partnering with the USDA and the land grant Universities, we can do that. They can absolutely create educational programs that can go out to the field, and then be applied to those in the communities.

FEENSTRA: I--I appreciate that, Ms. Cotton. And I'm just curious. So, in Iowa, we have the ext--Iowa extension service that does some of this, that--that sort of works together. I didn't know if the extension service is available in your area or not. This is pretty big for--for our area, for our farmers. And I find it--I'm a local farmer here. My family is and we use that Extension Service, a lot.

COTTON: The extension services are available to us. OSU Extension is available to us in the area. But when it comes to combining the two programs, you know, they--they focus more on the agricultural side, actually the agricultural side. But the implementation of USDA programs needs the partnerships, primarily with land grant Universities that are historically underserved.

FEENSTRA: Yep. Yep. No, I--I appreciate your comments. I agree 100 percent with you. And, you know, I--I would love to work with--with the chairman and things like that on trying to figure out how that partnership can occur. I have a land grant university in my--in my state, also Iowa State University. And, you know, they're very big into agriculture and trying to figure out how we can help one another and--and--and you know, continue to expand and especially in diversity. So, thank--thank you so much for your comments. And, Mr. Chair, I yield back. Thank you.

DAVID SCOTT: Thank you very much. And now I recognize the gentleman from Georgia, Mr. Sanford Bishop, for five minutes.

BISHOP: Thank you very much, Mr. Chairman. Let me thank you so very much for holding this historic hearing on the state of black farmers in the United States. Let me thank you for bringing together such a tremendous panel to help us understand how we can bring equity to black farmers. Let me thank, especially, Secretary Vilsack, for his commitment to bring equity.

I want to also thank him for his efforts to reconcile with Ms. Sherrod, who was once in the last administration, where he was secretary, rural development for Georgia. I want to welcome the other witnesses from Georgia, with whom I have worked. And I'm so delighted that they were able to--to testify. And for Ms. Cotton and Reverend Cotton, I want to welcome you and I'm delighted to meet you.

Let me go back to what was just raised with regard to outreach and advocacy. One of the tremendous needs for black farmers to be able to fully access the resources of USDA, is to know what resources are available and how to get to them. Advocacy and outreach is extremely important. And of course, the Office of Partnerships and Engagements is performing that function. And I think under the previous Vilsack administration, the advocacy and outreach function was performed there.

But it seems to me that to bring together the 1890's, the land grants, the community based programs, the 2501 programs, you need to have within the USDA, a focused office whose sole responsibility is to make sure that that outreach happens in each and every sub agency of USDA, Farm Service, Rural Development, Housing, Utilities NRCS, Marketing, the export opportunities, research, and the opportunity to develop young farmers. The 1890's National (PH) Scholars Program, for example, the internship programs, all of these things are vitally important. But somebody at USDA, and right now I think it's being done by the Office of partnerships and engagement. But I--I want to ask the secretary if he can assure us, and I--I congratulate him on--as deputy

Case 2:24-cv-00060-Z Document 30-1 Filed 03/23/24 Page 247 of 502 PageID 6277

Deputy Secretary Haston, who we hope will soon be confirmed, to work with him to make this happen. Can you comment on that briefly, Mr. Secretary, and then I'd like to,

if you could be brief on that, to ask Ms. Sherrod and Ms. Cotton to comment on the impact and experience that they have had as black women farmers.

VILSACK: Mr. Chairman, thank you very much for the question. The answer, the quick answer is yes. And we know this works. Because of advice that Shirley Sherrod gave me in my last time at USDA, we did create the StrikeForce Initiative that she made reference to. It ended up operating in over 20 states and made over 200,000 investments. This system works. We need more of it.

SHERROD: And I want to add to that. As a--as a female in the field of agriculture, working with farmers and farming, we--we--we make major contributions, just let me say--say that. And I'm, you know, I've gone from having to sit down with a farmer and help him understand what it meant to change. For example, if I go back years from the old Allotment Program with peanuts, to the the--the--well, I won't go back that far.

But farmers are focused on farming. Women focus on the business as well. And when you put those together, we can make progress. We also plan and--and developing cooperatives and looking at markets and--and helping our farmers to transitions from row crops when they don't have enough land. We make those contributions to this work that no one really recognizes.

COTTON: And let me add to that. In addition to all of that, we do the actual work, haul the hay, fix the fence, work the cows. But when we go into the offices, I've had to even prove, I'm four foot 11 y'all, and I've had to go in and show video of me staging hay, because they said there was no way that I could do it. It--it--

DAVID SCOTT: I'm sorry, the time of gentleman Bishop has expired.

BISHOP: Thank you very much.

DAVID SCOTT: Now, I recognize the gentlewoman from Minnesota, Ms. Fischbach, for five minutes.

FISCHBACH: Thank you, Mr. Chair, I appreciate the opportunity. And I thank all of the testifiers for being here today. It's been very, very interesting. And I just have a couple of questions for the secretary. You know, just--I--I've heard a couple of the testifiers mention, you know, passing on the farm and several generations worth of farming.

And Mr. Secretary, the--the Biden administration has been talking about potentially making some changes to the calculation of the stepped up basis. And I'm wondering if you could maybe comment on that, on how that might affect some of these folks that are trying to pass (PH) acts (PH) on farms, particularly in the socially disadvantaged communities.

VILSACK: Congresswoman, I have not had an opportunity to visit with anyone in the Biden administration on the issue of stepped up basis. I do know that it is an important aspect of the countryside, where people who pass away, the appreciation of their farmland is essentially not taxed, not subject to income tax. And an opportunity--it provides an opportunity for transfer to the next generation.

I'm happy to look into that issue and find out more about it. But I'm--I'm sorry to say, I'm not prepared to respond to that question today. I didn't anticipate that one.

FISCHBACH: And--and Mr. Secretary, I appreciate that. Just as, like I said, as we were talking, some of the testifiers were talking a little bit about the generational farms. And so, I just thought that that might be something that would be of concern.

But Mr. Secretary, just one other thing. Congressman Bishop was talking a little bit about some of the outreach. And I was just kind of wondering if maybe you could expand a little bit on some of that, and what kind of outreach is being done on some of the existing programs, to make sure, in particular, those--that younger generation of farmers? But you know, with an emphasis on the--on these--on those groups in the socially disadvantaged communities?

VILSACK: Well, obviously, COVID has made somewhat of a--somewhat of a different situation over the last year. But--but historically, the, you know, I think that these folks, the panelists have basically put their finger on the real problem here, which is that it's very, very hard for farmers to initiate the conversation that leads to providing the technical assistance and outreach, if you don't trust the people that you are asking for help. And that is the fundamental issue here, one of the fundamental issues.

We have got to restore trust of the countryside. And frankly, we can't do that, in my estimation. We can't do that by walking in to--or walking on the farm and saying, as we say, 'hi, I am here from the government, I'm here to help you.' We have got to walk on the farm with someone who they trust, a community building organization, a land grant university, extension, whatever it might be, and basically say, we are here to listen. We're here to learn how we can help you.

And then there has to be a commitment to make it a successful relationship and transaction. It can't be just we listen and then we give you 15 reasons why it won't happen. We've got to figure out ways in which we take care of each one of those reasons, and ultimately get to success, so that people actually-- recognize that there is a reason for the federal government, there is a reason for the Department of Agriculture, that we are there to help.

And it creates the relationship that ultimately leads to further opportunities. So, I think it starts fundamentally with building trust. And I think that starts with making sure that we're not alone when we go providing assistance.

And help and that we listen, that we respect the folks, that we respect and acknowledge the reason why they are distrustful. It's absolutely rational, what we're dealing with here.

FISCHBACH: And--and Mr. Secretary, I appreciate that. And I just, because we have existing programs, we just have to make sure that--that, you know, there are--there are programs within the USDA and that it just want to make sure that we're--we're making sure that people are aware of those.

And I appreciate the issue of the trust and that you will be reaching out in that way with a trusted individual, which you, or however you determine that it's going to be working. But I thank you very much, Mr. Chairman. I appreciate the opportunity, and I yield back my whole 45 seconds.

DAVID SCOTT: Wonderful. Thank you so much. I now recognize the gentleman from Florida, Mr. Lawson, for five minutes.

LAWSON: Thank you, Mr. Chairman, and I'm delighted that you called this meeting. I wanted to thank you all, and I want to welcome the witnesses here. And I know that there's been a lot of questions today--but I'm interested to ask Mr. Boyd that when you talk about all of the problems that we've had, especially with the relationship between black farmers and USDA, what-- what mechanisms should we be doing now? We have a new secretary here now to help rebuild the relationship.

BOYD: Thank you very much for the question, and I--I tapped on it a little bit earlier, and everybody has today, outreach and technical assistance, and building trust. We have 116,000 members in 46 states, and we--we are overwhelmed with just inquiries on all of this stuff. So, there has to be better communication. And I'm going to say this to Secretary Vilsack, who I have an enormous amount of respect, organizations like the National Black Farmers Association has to be engaged at the highest levels at the United States Department of Agriculture if this thing is going to work.

So, when you're forming these committees, and you're having these inside panels, we need to be at the table too, so we can make sure that we're injecting the right information. You know, government can't fix itself, you know, the fox can't--can't watch

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

the hen house here. You've got to have some people at the table on the outside, and these groups at the table to help advise and make sure that--that we do this thing right, you know, that we get it right this time.

So, we have a wonderful opportunity here, I believe, to do some great things here in--in the next four years. And the only way to do that is work collaboratively together and in an expeditious way, because right now we're facing extinction. And our farmers are hurting, and they're looking for answers, and they're looking for next steps. So, I'm looking forward to working with this administration to putting all of those things in place, you know, especially the outreach and technical assistance piece.

LAWSON: Okay, thank you very much. And Mr. Secretary, a year ago or two years ago when Mr. Perdue was secretary, I brought him down to Tallahassee, to Florida A&M University, to speak with the Agricultural Department HBCU, and he was very helpful on a lot of things that he said, that they were going to do. And I just wanted to ask you a second--how do you intend for your agents to support the needs of black students, black women, black veterans who are trying to enter into the agriculture industry for the first time?

VILSACK: Well, I think there's tremendous opportunity with the resources that have recently been provided to--to really expand and to deepen our commitment to internships, getting these young people to--to be connected to the USDA in a variety of different mission areas, so they have experience. They develop relationships, they develop an understanding and appreciation for the opportunities that may exist. And then, basically, make sure that that's connected potentially to a job opportunity.

We have a tremendous internship program. Chairman Scott I think is a great supporter of that, Chairman Bishop is a great supporter of that. I would anticipate and expect that they will continue to have support for that effort, to--to link internships with--with job opportunities. And I think that's one way of getting people involved and--and active. The second way, there is a program called Together We Grow, that's currently working out of Colorado State University, but it includes historic black colleges as well.

And they are working collaboratively with agribusiness, with the USDA and other entities to try to expand opportunities for minority students in all of agribusiness. And I would say that the USDA probably should be looking for ways at some point to--to link up with that effort or similar efforts to make sure that agribusiness is also engaged in this outreach effort.

LAWSON: Okay, thank you very much. And I've got about 40 seconds, but I want to ask Mr. Rowe, how do you get more black farmers interested in--in organic farming? Did anyone--

DAVID SCOTT: Is Mr. Rowe--

SHERROD: One thing is to help farmers like Mr. Rowe become successful. He hasn't been able to access financing through the agency. Helping him--he's an example for so many others. And there are other examples out there; we need to really help them. And--and in showing that there is a possibility.

DAVID SCOTT: The time of the gentleman has--

LAWSON: --My time has expired. Mr. Chairman, I yield back.

DAVID SCOTT: Fortunately, now I recognize the gentlewoman from Illinois, Ms. Miller, for five minutes.

MILLER: Thank you, Mr. Chairman. I have a question for Ms. Sherrod. You make the statement in your written testimony that the USDA has been the driving force behind the steady decline in the number of black farms and black-owned farmland. So, I was just curious what--could you specifically tell me--expand by what you mean by that statement? And then give me what would--what your prioritized solutions would be?

SHERROD: Okay. Well, I can give you lots of--of information on--on justifying the statement that I made, going back to our own farm, going back to land that--that as an organization, we have to create as an answer to land being taken. We created the First Community Land Trust, and the--the discrimination we faced by USDA caused us in 1985 to lose 6,000 acres of land. You know, a white farmer can want your property, and I've worked on so many cases like this.

And the next thing you know, you're in real trouble with the agency if you're a borrower. I've seen it happen so many times; I've worked through so many of those--those issues through the years. And again, having people who the farmers trust, and--and are willing to get to know the various programs that they need to access, and helping them to do that is part of the answer to this. Because there's so many programs out there they can take advantage of.

They're afraid to even try to go to the agency. There's no trust there, and they think it's a place where they'll definitely lose their land.

MILLER: Okay, thank you.

LAWSON: Is that--

MILLER: --I yield back, Mr. Chairman.

DAVID SCOTT: Oh, I'm sorry, Ms. Miller. Thank you very much. I now recognize the gentleman from Illinois, Mr. Bobby Rush, for five minutes.

RUSH: Good morning. I want to thank you, Mr. Chairman, for this outstanding and historic hearing, as shining a bright light on one of the long-standing problems that we have in our nation. Mr. Chairman, I am currently reading a book called--entitled, The Color of Money, by Mehrsa Baradaran. And one particular passage in the book that really resonated with me as I prepared for today's (INAUDIBLE) and long overdue hearing, goes like this, and I quote, 'When the Emancipation Proclamation was signed in 1863, the black community owned 0.5 percent of the total wealth in the United States. More than 115 years later, that number has barely budged, but still owning about 1 percent of wealth in the United States.'

When Martin--when Martin Luther King stood on the steps of the Lincoln Memorial in 1963, he said, and I quote, 'America has given the negro people a bad check; a check marked for insufficient funds.' Yet, despite a century of (INAUDIBLE) the check has continued to be marked insufficient funds.

And Mr. Chairman, it is clear for today's hearing that black farmers exemplify how the black community has received as (INAUDIBLE) an--an insufficient check. And I want to thank all of the witnesses before us. Mr. Chairman, I want to ask Secretary Vilsack. Secretary Vilsack, (INAUDIBLE) that you are committed to prioritizing an immersed team to addressing the long-standing racial equity issue, that led to the vast majority of black farmers and black-owned farm land.

Secretary Vilsack, I--I have a number of questions here. Will you expand upon the concrete steps that you are taking to foster trust and ensure the timely access to capital for black farmers? Include a timeline in that.

Do you need any additional authorities from Congress to enact policies to directly help struggling black farmers and to reverse the impact of decades of discriminatory practice in the USDA? It's my understanding that they're returning insufficient transparency regarding assistance to farmers based on race.

To that end, I'd like to know, can you tell me the number of black farmers who grow wrote crop-insuring policies in 2019 compared to white farmers? Can you tell me how much black farmers received in premium on income (INAUDIBLE) compared to white farmers? Can you tell me how many black farmers--farm ownership--received farm ownership or operating loans in 2019 compared to white farmers? Given the decades of discrimination that has--has led to the vast majority of black farmers

having to sell their farms, can you support (INAUDIBLE) on something (INAUDIBLE) loan minimum to black farmers? Mr. Secretary, can you answer any or most of those questions?

VILSACK: Congressman, I'm happy to provide you the data on the last question you asked concerning transparency to the extent that we have it. I know, for example, from 2017 to 2020, there were 2131 direct loans to socially disadvantaged farmers of approximately a hundred--$112 million, was lent out. That I know. Happy to provide you with information on that.

I don't know that I necessarily need more authority, but I am interested in knowing what the Equity Commission and our internal review pursuant to President Biden's executive order. We'll identify and we may come back to you asking for additional authority.

You know, in terms of specific steps, over the course of the next six months, I think we're going to take--we're going to learn a lot. We're going to take an effort to try to better connect with the--the historic black colleges and other community-building organizations with the resources you have provided, the American Rescue Plan. And I would anticipate and hope that we have--begin the process, and I emphasize 'begin,' begin the process of improved outreach as a result of the Section 1006 money that's provided in the rescue plan.

DAVID SCOTT: Thank you very much. Let me--

RUSH: --Mr. Chairman, may I have unanimous consent to enter into the record the book, The Color of Money, by Mehrsa Baradaran, who I referenced earlier in my testimony? Unanimous consent?

DAVID SCOTT: It is--it is so done, without objection.

RUSH: Thank you.

DAVID SCOTT: Thank you, Mr. Rush. And ladies and gentlemen, it looks like we have entered the end of our member's questions. And so, what we want to do now is have concluding remarks from my ranking member, Congressman Thompson, and myself. But let me just say this, please. This has been extraordinary.

You know, when I opened this hearing, I opened it with the precious words of the Lord, as was expounded by his greater Apostle Paul, when Paul wrote, that all things come together for good, to them who love God, and to them who are called, according to God's purpose. And ladies and gentlemen, we have done that today. And I just want to say from the bottom of my heart, thank you, and God bless you.

And I want you to know that this testimony that we have had today will become the basis, the foundation of the legislation that we are working on in our committee right now to address racial discrimination against our black farmers. And it will be on two major foundations, all of which you said. We will make it wrong, unlawful for all and each of the discriminatory practices that you all have outlined to us will be in this legislation written into law.

That never again will we have any of the discriminatory practices that you all have exposed for us today within our United States Department of Agriculture. But this legislation isn't going to stop there because the fundamental problem that we have is to make sure that we increase the market share of the products that our black farmers are bringing and producing to the agricultural market. We're going to have some incentives in there so that we can increase that.

We will also have things in this bill that will increase the number of black farmers we have, the acreage we're. But we had to hear from you first. And you have outline God's purpose, that he has brought you and me and this great committee together.

And so right now, I want to introduce and have my partner, because let me tell you this, you didn't just hear from Democrats today who said they are concerned to eliminate the racial discrimination. You heard from Republicans. And let me tell you

something else. That great Republican, Abraham Lincoln, who freed the slaves, he not only did that. When he created the Agriculture Department, it was Abraham Lincoln who said, 'this is the people's department.' Abraham Lincoln said that.

I think that and his freeing of my people, and our black people, makes him the final statement that I want to make before I introduce my Republican friend. Because let me tell you all this, we talked about that 1890s Land Grant African American colleges and universities.

It was a Republican senator named Senator Morrill, it was the Morrill Act that establish the land grant colleges in 1860. And then after Plessy v. Ferguson, that's when it was separate but equal establish, and everywhere there was a white land grant, by law, it was this same Republican Senator Morrill, and it's called the Morrill Act, it was he was establish that 19 land grant colleges and universities.

That's why I'm telling you, man, we did God's work in here today. Republicans and Democrats together. And Republicans and Democrats are going to put this bill together that's based upon what you all have testified and asked us to put in to this bill. And now, with that, I want to present my distinguished partner and the Ranking Member, Rep--Congressman Thompson.

THOMPSON: Well, Chairman, thank you. David, appreciate the partnership as we-- we work for this amazing industry of agriculture that provides the food and the fiber, the building materials, construction materials all come off of agriculture land. I--I like to say without a robust rural economy, every American is going to wake up in the cold, dark and hungry. And so-- and thank you for this hearing today.

I thought it was great hearing. First of all, thank you to all of our witnesses. Your written testimony, your--your oral testimony was--was compelling. It was insightful. You made it passionate and personal. And--and so I think we succeeded. And so thank you--thank you to each and every one of you.

Thank you to all the members that--that--that weighed in and participated and asked thoughtful, insightful questions. I'd be remiss, I think, if both the chairman, I wouldn't say thank you to all the staff. The both our--both committee staff of both parties, and quite frankly, the--the--the Ag-- agriculture staff of these individual members who put their heart and soul into working on--on this issue.

And this is--this is a conversation that was long overdue. And the fact that we've elevated this, we've had this conversation, you know, we've--if we're-- you know, if we're going to really achieve that vision, the vision that--that I--that I think we share of a--of restoring a robust rural economy, that means we have to lift everyone up and we can leave no one behind.

And so I think, you know, the--the discrimination that we've seen a record of in the past, the documentation, you know, whether, you know, was systemic in terms of policy, or whether it was the attitudes that were unacceptable, just cruel attitudes that certain folks perhaps had that--that had authority of USDA, you know, their time has passed.

I'm confident we've got a secretary that will be a great partner with us as we go forward. I'm--I'm confident that, you know, that we'll learn from this and-- and the practices we have in place. I'm also very proud of--of what we have done the past couple farm bills in terms of the set asides that we put out there for--for black farmers and socially disadvantaged farmers.

And--and so we--we, I think we have momentum. We've got great momentum, we need to build on it. And--and as we--and I think we just, you know, we have the--the right--right farm team together, let me put it that way, to--to be successful. So once again, thank you all the witnesses. Chairman. Thank you.

DAVID SCOTT: Thank you.

THOMPSON: And I yield back.

DAVID SCOTT: Yes. And I wanted to just use my closing remarks to thank this panel. Secretary Vilsack, God bless you, my friend. You came and you stayed for this entire hearing and you heard what I heard. And the reason that is so important is that you and I and our committee, along with this testimony that we've heard from Mr. John Boyd, from Ms. Shirley Sherrod, from Ms. Arnetta Cotton and a Earrak (PH) Cotton, from Cornelius Blanding, from Sedrick Rowe, and from Phillip Haynie, what--what a blessing that God has given us with the wisdom, the information that these individuals have given to you and me and this committee.

Now our charge is the take this wisdom, take what they are asking us to do, this bill that we will be working on to end, end racial discrimination in the United States Department of Agriculture and in our wonderful world of agriculture. Our entire industry, we will be able to do. And let me assure you, this is truly God's work. And I want to thank again my Republican partner, because he and I have to put this bill together. But we couldn't do it until we heard from the black farmers. And that is what we will base this on.

And Mr. Secretary, I want you to know, from me personally, what your participation in this hearing means, not just for me, not just for our committee, but the entire nation to see you here because so many of these charges of racial discrimination are laid at your feet. This is why it is so important that we recognize your participation and the fact of your willingness to be the leader in making sure that your Agriculture Department, of which you lead, will eliminate all vestiges of discrimination.

I couldn't do it. None of us can do it. The only one that can make sure, regardless of what we put in the law or paper, is because we have a secretary of Agriculture--of agriculture that is built on the legacy of the man who put our agriculture together and who free black people from the vestiges of slavery when he called the Department of Agriculture the people's department.

Abraham Lincoln did that. And that's whose shoulders we stand on this day. And I thank you so much for being a part of this. God bless you. And God bless this panel. Thank you.

Under the rules of the committee, the record of today's hearing will remain open for 10 calendar days to receive additional material and supplementary written responses for the witnesses to any questions posed by a member. This hearing of the committee on agriculture is adjourned. Thank you.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# ERS Staff Analysis

**Summary of farm and household characteristics by Socially Disadvantaged Farmer and Rancher (SDFR) status**

Table 1. Average farm and household characteristics by SDFR status

| | Non-SDFR mean (CV %) | SDFR mean (CV %) |
|---|---|---|
| **Farm characteristics** | | |
| Farm net worth ($) | 1,058,970 (1.04) | 802,657 (5.26) |
| Acres owned | 261 (2.46) | 181 (7.52) |
| Acres operated | 413 (1.92) | 306 (10.55) |
| Total value of production ($) | 173,612 (1.88) | 162,817 (8.40) |
| Farm income to the household ($) | 21,265 (4.26) | 13,851 (16.49) |
| Farm assets ($) | 1,163,613 (0.93) | 877,111 (4.86) |
| Debt-to-asset ratio | 0.09 (3.05) | 0.07 (11.13) |
| Total current and non-current liabilities ($) | 122,486 (1.55) | 90,569 (6.99) |
| **Household characteristics** | | |
| Total household income[1] ($) | 116,782 (2.57) | 103,400 (4.99) |
| Non-farm assets | 677,939 (2.53) | 509,136 (3.94) |
| **Total number of farms** | 1,860,436 | 162,80 |

|  |  | 1 |
|---|---|---|

[1] includes farm and non-farm sources. Source: USDA, National Agricultural Statistics Service and Economic Research Service, Agricultural Resource Management Survey 2017-2019

Table 2. Median farm and household characteristics by SDFR status

|  | Non-SDFR | SDFR |
|---|---|---|
| **Farm characteristics** |  |  |
| Farm net worth ($) | 464,414 | 298,252 |
| Acres owned | 67 | 27 |
| Acres operated | 85 | 40 |
| Total value of production | 7,140 | 2,625 |
| Farm income to the household ($) | -660 | -2,680 |
| Farm assets ($) | 510,100 | 313,499 |
| Debt-to-asset ratio | 0.00212 | 0.00208 |
| Total current and non-current liabilities ($) | 1,010 | 550 |
| **Household characteristics** |  |  |
| Total household income[1] ($) | 76,905 | 67,165 |
| Non-farm assets ($) | 366,701 | 312,081 |

[1] includes farm and non-farm sources. Source: USDA, National Agricultural Statistics Service and Economic Research Service, Agricultural Resource Management Survey 2017-2019.

Prepared by Tia McDonald, USDA-ERS, 5/21/2021

6/20/24, 10:36 PM
'Rampant issues': Black farmers are still left out at USDA - POLITICO
Case 2:24-cv-00060-Z   Document 30-1   Filed 08/23/24   Page 256 of 502   PageID 6386

 

# POLITICO

---

AGRICULTURE

## 'Rampant issues': Black farmers are still left out at USDA

Black farmers are far behind in obtaining grants and loans, a POLITICO analysis of data shows.



Rod Bradshaw stands in a field of wheat on his farm near Jetmore, Kan. President Joe Biden&#39;s nomination of Tom Vilsack to lead the Agriculture Department is getting a chilly reaction from many Black farmers who contend he didn&#39;t do enough to help them the last time he had the job. | AP Photo/ Charlie Riedel File

---

By XIMENA BUSTILLO
07/ 05/ 2021 07:00 AM EDT

  

The Biden administration is trying to make up for decades of racial discrimination in U.S. farm assistance by forgiving loans to farmers of color. But Black farmers and their advocates say that plan, while welcome, won't fix the ongoing problem: Agriculture Department programs are still biased against them.

The agency granted loans to only 37 percent of Black applicants last year in one program that helps farmers pay for land, equipment and repairs but accepted 71 percent of applications from white farmers, according to a POLITICO

APP: 000251

analysis of USDA data. In a grant program to help producers weather the
coronavirus pandemic, farmers of color received less than one percent of the
payments even though they are five percent of all U.S. farmers.

AD

AD

In addition to forgiving debt, advocates for Black farmers want the
administration to address barriers such as loan terms that favor large, wealthy
farms, a complex application process, and poor service and inequity at local
USDA offices.

"This data affirms what our elder farmers have been saying about the U.S.
Department of Agriculture for decades," said Tracy Lloyd McCurty, executive
director of the Black Belt Justice Center, a legal and advocacy nonprofit that
represents Black farmers. It reveals the "abysmal failures" of previous legal
settlements in dismantling pervasive racial discrimination, she said.

### Black farmers were denied USDA loans at higher rates than other groups in 2020

Status of USDA direct loan applications for each race and ethnicity group in fiscal 2020



White Non-Hispanic/ Unknown
Totals may not add to 100 due to rounding.
Chart: Ximena Bustillo • Source: U.S. Department of Agriculture

How the administration approaches USDA lending will be a major test of
whether President Joe Biden can make good on his broader pledge to combat
racial discrimination.

The plan to use $4 billion from the recent coronavirus aid package to forgive
loans to farmers of color is now tied up in legal challenges filed by white
farmers. But even if USDA prevails in court, Agriculture Secretary Tom Vilsack
will still face the onerous tasks of overhauling entrenched practices and
convincing Black farmers and their advocates that change has come.

APP: 000252

"The American Rescue Plan's effort is to begin addressing the cumulative effect of that discrimination in terms of socially disadvantaged producers," Vilsack told reporters in May. "I think there is a very legitimate reason for doing what we are doing. I think it has to be complemented with additional steps."

The USDA said it is reviewing all of the department's agencies and programs through an internal working group. It will examine how to provide better technical assistance for socially disadvantaged and local producers, as well as improve access to land and markets. An external review is set to begin in the fall.

"The secretary is committed to building a new USDA at every level, but this work has just begun and it will require a steady focus and march forward," a USDA spokesperson told POLITICO.



The work will require fundamentally rethinking USDA programs stretching back decades.

USDA is a sprawling bureaucracy whose nearly 100,000 employees are deployed in more than 4,500 locations across the country and abroad. The department, which was created during the Civil War, has by its own accounting a lengthy history of bias against small farms in general and in particular against Black farmers, many of whom run operations with annual sales of less than $250,000.

AD

APP. 000253

Black farmers filed a class-action lawsuit in 1997, complaining that USDA denied them timely loans and debt restructuring, forcing many into foreclosure.

A settlement in that case, *Pigford v. Glickman*, led to payouts of up to $50,000 per farmer in 1997 and 2010, but many farmers failed to submit requests because of restrictive deadlines and the burden of gathering documents. The settlement fell short of addressing the problems resulting from the discriminatory lending, advocates contend.

The problem, many say, lies at the local level. County offices of USDA's lending arm, the Farm Service Agency, are often the first and only point of contact for farmers seeking access to government assistance programs. Black farmers say their interactions with FSA officials, who play a pivotal role in determining whether loans are granted, are plagued by racial bias, inexperienced personnel and lack of bandwidth to help with applications.

"I don't even know if USDA understands how rampant the issues are in 2021 in these small, local county offices," said Carolyn Jones, a Black farmer and executive director for the Mississippi Minority Farmers Alliance.

"The process put in place keeps you from being able to apply," Jones said, citing issues including overly complex applications, a lack of access to a competitive market and outright discrimination.

To address the disparate treatment, USDA should consider increasing outside oversight of its branches and programs and remodeling its approach to extending credit, said Jillian Hishaw, who launched Family Agriculture Resource Management Services to help farmers from historically disadvantaged groups.

AD

APP. 000254

"There should always be some type of objective, external party reviewing, especially when it comes to lending and FSA," Hishaw said, adding that the agency should "also consider other criteria when it comes to qualifying for loans."

Other advocates are pushing for passage of Sen. Cory Booker's Justice for Black Farmers Act, S. 300 (117), — legislation that they say includes many of the changes they want to see at USDA, such as increased oversight and an independent financial institution to provide unbiased lending.

Some argue that the USDA should re-conceive the criteria it uses for extending credit, which favors large, wealthy farms. The average farm for a Black farmer is 132 acres, according to the 2017 Agricultural Census, the lowest of any socially disadvantaged group. That compares with 431 acres for white farmers.



Cesar Escalante, a professor of agricultural and applied economics at the University of Georgia who has studied loan patterns for socially disadvantaged farmers, co-authored a study published last year in the Agricultural Finance Review, showing that minority borrowers were often given smaller loan amounts with higher interest rates because they had poorer results in credit scoring models.

AD

"We know that race is not a factor in determining credit scores," Escalante said. "It comes down to profitability and size."

Farm size was also a reason so few farmers of color received aid under the Coronavirus Food Assistance Program, which were grant payments to farmers intended to offset lost sales during the pandemic. Black farmers received the smallest share among socially disadvantaged groups.

"It's pretty clear white farmers did pretty well under that program because of the way it was structured. It's structured on size, it's structured on production," Vilsack said during a recent White House press conference.

The total number of direct loans to Black farmers has fallen precipitously in recent years, from a peak of 945 in 2015 to a 10-year low of 460 in 2020. Direct loans are available for farmers to put toward a wide variety of purchases, repairs and investments.

### Black farmers' share of direct loans hits a 10-year low in 2020

Percentage of direct loans going to Black and African American farmers, out of all loans approved, per fiscal year



Chart: Ximena Bustillo • Source: U.S. Department of Agriculture

Poor credit is the most common reason cited for rejection of Black farmers' direct loan applications, even though the program is designed for farmers who are unable to get loans from other financial institutions. That irony is not lost on farmers like Travis Cleaver of Hodgenville, Ky., who says he has extensive experience dealing with USDA lending programs.

AD

APP. 000256

"If you have good credit they say 'go get a loan at a primary institute, you don't need us'. So it's a double-edged sword," Cleaver said in an interview. "To me it's just trickery because you have bad credit or you have too good credit. They have too many loopholes."

For their part, farmers would like to see the agency's local offices play a more helpful role than they typically have in the past.

Thelonious Cook, who started a small Virginia farm in 2015, said that when he asked his local FSA office about potential loans or programs for socially disadvantaged farmers, he was told that none existed, even though the agency does target a portion of aid for that group.

Cook said he was also frustrated by the complicated application process.

"It's a waste of my time going through the mound of applications. You need someone to help you sift through it. You need people who are there," he said.



### The Fifty

In the unfolding pandemic, economic crisis and reckoning on race, governors and mayors are shaping our shared future. Who are the power players, and how are they driving politics and influencing Washington?

Full coverage »

That sentiment was echoed by Cleaver, the Black farmer from Kentucky, who said the process can be especially daunting when seeking money to buy land because an approval letter is required from a real estate agent before applying.

"You might waste all your time trying to get an approval letter and still not get a loan. I probably messed the loan up four times in the application just because I didn't understand it," he said. "The package is so thick and so intimidating, it's not something you are accustomed to doing."

What helped Cleaver was a woman in the FSA office who took the time to explain the processes.

"She was like an angel. I had been going through the loan officers and the HBCU [historically Black colleges and universities] that was here and they couldn't get anything done," he said. "[She] held my hand and she told me everything step by step. She was patient, she was polite."

APP. 000257

**FILED UNDER:** TOM VILSACK, USDA, KENTUCKY, AFRICAN-AMERICANS, ⋯

# Playbook

The unofficial guide to official Washington, every morning and weekday afternoons.

**EMAIL**

Your Email

**EMPLOYER**

Employer

**JOB TITLE**

Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

© 2024 POLITICO LLC



**Board of Directors**

**John Zippert, Chair***
*Federation of Southern Cooperatives/*
*Land Assistance Fund, Epes, AL*

**Georgia Good, Vice Chair***
*Rural Advancement Fund*
*Orangeburg, SC*

**Dorathy Barker, Treasurer***
*Operation Spring Plant, Oxford, NC*

**Tirso Moreno, Secretary***
*Latino Farmers of the Southeast*
*Apopka, FL*

**Mily Trevino-Sauceda, Assistant Secretary***
*Organización en California de Líderes Campesinas, Inc., Pomona, CA*

**Lisa Bellanger, Assistant Treasurer***
*3 Fires Ojibwe Spiritual & Cultural Education Society, Minneapolis, MN*

**Darnella Burkett Winston, Youth Representative***
*Mississippi Association of Cooperatives Petal, MS*

**Savonala Horne***
*Land Loss Prevention Project*
*Durham, NC*

**Lorena Andrade**
*La Mujer Obrera,*
*El Paso, TX*

**Rudy Arredondo**
*National Latino Farmers and Ranchers Trade Association, Washington, DC*

**Starry Krueger**
*Rural Development Leadership Network,*
*New York, NY*

**Maria Moreira**
*World Farmers, Lancaster, MA*

**Gary Redding**
*Concerned Citizens of Tillery,*
*Tillery, NC*

**Barbara Shipman**
*Cottage House, Inc.*
*Ariton, AL*

**Willard Tillman**
*Oklahoma Black Historical Research Project Oklahoma City, OK*

**Carlos Marentes, Chair Emeritus**
*Border Agricultural Workers Project El Paso, TX*

**Margo Townsend, Emeritus**
*North American Farm Alliance Windsor, OH*

**John Bloch, Emeritus**
*Markham Center, Montpelier, VT*

**Hubert Sapp, Chair Emeritus**

**Patricia Bellanger, Founding Mother**
*American Indian Movement*

**Lorette Picciano, Ex-officio**
*Executive Director*

*\*Executive Committee*

1029 Vermont Ave NW Suite 601
Washington, DC 20005
Phone: 202-628-7161 Web: http://ruralco.org
www.facebook.com/RuralCoalition
Twitter: @RuralCo

For further information contact lpicciano@ruralco.org.

August 24, 201

Secretary Tom Vilsack
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

*Via regulations.gov* - Re: Docket Number: USDA-2021-0006 – Comments on Advancing Racial Justice and Equity and Support for Underserved Communities at USDA-
https://www.regulations.gov/document/USDA-2021-0006-0001

Dear Secretary Vilsack:

The Rural Coalition/Coalición Rural appreciate the opportunity to comment on President Biden's Executive Order 13985 on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, 86 Fed. Reg. 7009 (Jan. 20, 2021) (the "EO") and the USDA's request for information on Identifying Barriers in USDA Programs and Services, 86 Fed. Reg. 32013 (June 16, 2021). We submit the following comments on behalf of our board and members:

## ABOUT RURAL COALITION

Born of the civil rights and anti-poverty rural movements, Rural Coalition/Coalición Rural (RC) has served as a voice of African-American, American Indian, Asian-American, Euro-American and Latino farmers, farmworkers, and rural communities in the US, as well as indigenous and campesino groups in Mexico and beyond for over 42 years. We work to assure that the voice of our over 50 diverse member organizations from all regions, ethnic and racial groups and genders have the opportunity to work in solidarity on the issues that affect us all.

Our recommendations reflect our guiding principles adopted at our founding in 1978 that:

- o Justice and equal opportunity are the right of all people regardless of race, gender, ethnicity, immigration status, or place of residence.
- o All people are entitled to the goods and services essential to a decent quality of life, including education, health and employment services, housing, and basic community facilities.
- o They are also entitled to democratic community institutions dedicated to serving their interests.
- o The long-term viability of rural and urban communities rests on effective care, control and use of resources by the people living there.
- o Community-based organizations are instrumental in the development of communities. Public policy should encourage their growth and strength.
- o The federal government has the responsibility to ensure the rights of all citizens and to help secure the fulfillment of these rights.

With our member organizations and the farmers and ranchers that we serve, we have submitted hundreds of comments to the Department of Agriculture and the US Congress for over 30 years. We have worked collectively to help thousands of our members file claims in the discrimination claims settlements processes. We have translated our concerns into concrete policy recommendations, many of which have been incorporated into over 45 sections of policy passed by the United States Congress. While participation of the BIPOC producers and workers we represent has in some areas has improved over the years, particularly with respect to participation in conservation programs, we still do not find a clear standard of service delivered in all USDA offices that assures equitable and fair service with accountability and respect for the dignity of this nation's diverse agricultural producers and farmworkers. Nor do we find this nation honors and ascribes value to their immeasurable contributions to our overall food farm and ecosystem.

In our comments we will highlight a few of the specific recommendations we have shared over the years. Most of all, we pledge to work with the United States Department of Agriculture to articulate and implement a clear vision of what equitable service would look like for all farmers and how accountability for that standard could be achieved and enforced. We thank you for the opportunity to comment on these important matters.

Cooperatively Yours,

John Zippert
Chairperson

Lorette Picciano
Executive Director

*With our strong roots in the movements for human, civil, indigenous, and farmworker rights, Rural Coalition/Coalición Rural members share the belief that rural communities everywhere can have a better future and that community-based organizations who have long served the needs of rural communities and people have a fundamental role in building that future. Investments in their work will provide important returns to our economy, our environment, and our society*

2

### 1. Introduction

USDA's request for comments for a required assessment to develop a plan to eliminate any barriers to full and equal participation in programs and procurement opportunities, defines the terms racial equity and underserved communities as follows:

*"The term "equity" means the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality."*

*"The term "underserved communities" means populations sharing a particular characteristic, as well as geographic communities, that have been systematically denied a full opportunity to participate in aspects of economic, social, and civic life, as exemplified by the list in the preceding definition of "equity."*

We recommend that USDA and its Equity Commission begin this inquiry by setting forth a vision of what fair service and equity would actually look like in the context of current agriculture and procurement programs. What is the baseline standard of how a county office should operate? Where does this standard of service exist today and who is currently receiving service that meets this standard?

Moreover, what is this nation's larger vision for our agriculture and food system, and its land, water, forests, and rural communities? Who are the farmers and workers of the future and what is their value to this system? How can the Department successfully secure equity at the margins of an increasingly fragile vertically integrated and extractive food and agriculture system that rewards volume over value and in which fewer and fewer farmers can survive much less thrive?

The leaders and members of the Rural Coalition have for decades worked to intervene and advocate on behalf of thousands of Black, Indigenous and People of Color farmers and ranchers, as well as the farmworkers we serve, many of whom aspire to be farmers.

During these years, we have repeatedly called for accountability especially with respect to the county offices of USDA. While there are many hardworking and committed USDA field staff members who go to great lengths to assist farmers and ranchers navigate complex program requirements and delivery systems, there are still far too many who do not. We have in our years of work seen far too few

3

instances where employees and their supervisors who fail to assure fair service delivery suffer any consequence or demonstrate any change in practice. Conversely, we have too frequently found that it is the very employees who went to bat to help the farmers they serve who have instead faced sanctions, including reassignment and removal from their posts.

The statement of our colleague and sister, Mrs. Shirley Sherrod, that she was "the only person ever fired by USDA for discrimination,[1]" underscore the tragic fact that our decades long call for accountability for a fair standard of service remains fundamentally unaddressed.

We call for the Equity Commission to pay particular attention to their own call to identify "Opportunities in current agency policies, regulations, and guidance to address affirmatively and equitably "***the underlying causes of systemic inequities in society.***" Attention to the form in which these systemic inequities manifest themselves is essential to identifying and mitigating the fundamental conflicts of interest embedded in the local service delivery system of USDA, which themselves maybe perpetrated by and inextricably connected to systemic inequities and manifest power imbalances of an inequitable society.

Our Executive Director reported a decade ago that during outreach meeting hosted by an 1890 Institution in a southeastern state, an attorney engaged by the Extension Service conducted a workshop on the need for families to get wills to pass housing and other assets to future generations. She asked if the attorney also addressed the need for succession plans for farms. The lawyer replied that farm families would have to engage a real estate attorney to complete such a plan. She observed that our organization has cautioned producers to select real estate attorneys with care. A farmer in the audience motioned that he wished to talk with her. He told her that he had connected with his Cherokee relatives, and they secured several parcels of what they determined to be ancestral land at the outskirts of what is now a large city in the Southeast. He had sought help from a local real estate attorney to halt continual incursions by entities seeking to take adverse possession of their land. The attorney spread out and reviewed the deeds and land titles the aspiring producer showed him and then rolled them all up and returned them to him. *"Yes, you do indeed have all the titles. But I cannot help you. I am conflicted."*

The reality is that local lawyers, real estate entities and local banks may be conflicted in dealing with BIPOC and other small farmers who require their services compounds the issues of the communities most facing heirs' property challenges, especially Black Farmers. These same powerful entities may have financial contracts, exchanges or other business with the employees and committees of USDA local offices that lend themselves to conflicts of interest. The detailed financial and legal information they hold on the farm families they serve may, coupled with knowledge of the interests of other producers or family members who may be seeking land pose

---

[1] Statement of Mrs. Shirley Sherrod to the Committee on Agriculture of the US House of Representatives Hearing on the State of Black Farmers," Washington, DC, March 25, 2021 .

4

an inherent conflict with their duty to provide proactive outreach to these farmers to help them thrive.

Late last year, a Black farmer in Oklahoma requested assistance from our organization.  He was employed in another state while he sought the loan he needed to operate the family farm where he grew up and farm throughout his life. He had filed all necessary documentation of ownership with Farm Service Agency.  He learned that his neighbor had been farming and collecting benefits for crops grown over several years on his land. The local office told him that he had to demonstrate three years of experience before he would be eligible for a loan.  They also wrote him a letter directing him to provide a certified copy of a lease to his neighbor so the neighbor could collect benefits from the crops he reported he grew on this farmer's land.  The farmer provided the office with a copy of the "cease and desist" letter he had sent to his neighbor to stop using his land and complained to them about their role in enabling this incursion on his land.   The local office then asked him ***"do you want to sell your land?"*** They further instructed him not bring this complaint to a higher level because he would "get the previous staff of the office in trouble."  He was unable to secure the loan in 2020, which would have left him unable to benefit from the Section 1005 ARP program.  He filed a complaint with the inspector general which remains unanswered and has filed a civil rights complaint that is pending.

What remains unclear is what tools USDA has, needs, and will use to hold this and other offices accountable for such inequitable and patently fraudulent practices. ***The failure to do so in any tangible way is in our view the single biggest impediment to ever achieving equity and accountability in service to all producers.***

Our leaders worked to help halt foreclosures for all farmers in the wake of the farm debt crisis through passage of the 1987 Agriculture Credit.  We pushed for the inclusion at that time of the first socially disadvantaged farmer definition of discrimination by race and ethnicity, and to call attention to the fact that even at that time, farmers of color faced an even greater burden than the thousands of other farmers who struggled to hold onto farms during that crisis. The inherent struggle that must be recognized in any effort to achieve societal equity is summed up by a question posed by a farmer and faith community leader at the time that is even more relevant to this inquiry today when society is even more deeply rent: **"Do you want your neighbor more than you want your neighbor's land."**

### 2.  **Endorsement of Member and Allies Comments**

Rural Coalition expresses its support and endorsement of numerous comments and recommendations submitted by our members and allies.  In particular, we endorse the comments of our member groups including Natural Resources Defense Council and National Young Farmers Coalition.  We further endorse the comments of our allies including the National Sustainable Agriculture Coalition, Earth Justice, and the Center for Food Safety.

5

We join NSAC in expressing appreciation for USDA's extension of the comment period to 60 days but agree that "it is still insufficient to ensure robust BIPOC farmer participation." We further support the additional steps they recommend including extending the comment period for at least 120 days and in additional languages and with additional proactive outreach.

We further emphasize the need to allow producers and farmworkers to comment in trusted settings with assurance they will be protected from retaliation, including assuring their anonymity where required.

We further endorse NRDC's analysis that by "Evaluating systemic barriers to access and opportunity in all USDA policies, practices, and programs for the ways in which they perpetuate [discrimination and inequities], the USDA takes just the first step in rectifying decades of compounded racism and discrimination against historically underserved producers. While undertaking this agency-wide self-evaluation, the USDA should consider reformations in the following program areas."

We further agree with NRDC that "…USDA should support a just transition to organic and regenerative agriculture, implement policies to eliminate the worst health and community impacts from industrial animal agriculture (including pollution from Concentrated Animal Feeding Operations (CAFOs)), phase out policies supporting pesticide use, and increase producer access to debt relief programs."

The White House, USDA and the US Congress are at present deeply engaged in rolling out, securing passage and implement an ambitious "Build Back Better" initiative. Critical parts of this vision have involved supporting the basic income for families and children, including with refundable tax credits that have already slashed child poverty in this nation. As this nation struggles to combat the Covid-19 Pandemic, the value of essential workers was made clear, and a $15 minimum wage is no longer a distant aspiration. It is now a reality for federal workers and contractors and for workers in many industries. Similarly, over the past decade access to health care as begun to be viewed as right for most families.

Build Back Better investments to address climate change have a clear stated goal: jobs. As the nation looks to the agriculture sector not only to continue to churn out food and fiber, balance the US trade deficit, and now to offset the carbon output of industries who have not yet adopted practices to cease emitting carbon, the focus is not on jobs. The system continues to value most of all the volume of product produced and exported and now also the quantity of carbon sequestered.

The agriculture sector and its farmers and workers also need a minimum wage, workplace protections, and access to medical care. For farmers, the equivalent of a minimum wage is a fair price that covers the cost of production and allows BIPOC and other farmers to survive and thrive as they nourish and sustain their local

6

communities and economies.  That is why the decades long efforts to address the unfair competition in the agriculture sector, including the new Executive Order on Competition, are critical for all producers, including BIPOC producers.

During the pandemic, BIPOC farmer coops and organization quickly developed systems to feed their local communities.  These systems that worked especially well while the dominant vertically integrated suppliers were unable to meet the needs of all communities.  But once the dominant suppliers returned, they priced out the local suppliers with often inferior goods that did not meet the cultural needs and preference of the communities, and with a much greater degree of waste.

We urge USDA to look beyond the mere adaptation of its current program and delivery systems if it is serious about achieving equity.  Without real investments in construction new program and building new infrastructure that serves long excluded BIPOC and small farmers and workers, equity can become merely a word that excludes or sets apart a critical group of rural peoples as if they do not matter to the centrality of the agriculture and food system.

In fact, the diverse land-based peoples of this nation are the farmers, ranchers and workers who possess the deep knowledge and experience necessary to help the Biden-Harris Administration reach its important goals of eradicating the pandemic, building resilience, fighting climate change, and restoring rural economies and ecosystems.

One important outcome of Obama-Biden administration's focus on resolution of the major discrimination lawsuits against USDA was the securing of authority allowing the strategic reinvestment of the remainder of the Cy Pres funds from the Keepseagle case. The funds continue to support an extensive network of technical assistance staff of the Intertribal Agriculture Council who continue today helping tribal farmers to navigate USDA loans and programs.  The funds also support the Indigenous Food and Agriculture Initiative and the Native Farm Bill Coalition formed to pursue additional equity focused policies in the 2018 Farm Bill.

An additional investment in the Native American Agriculture Fund enabled the engagement of qualified leaders with sufficient time to conduct a comprehensive analysis of current agriculture and food policy to generate concrete ideas for a future food system.  We refer you to the *Regaining Our Future* Report commissioned by the Seeds of Health Campaign and authored by Janie Simms Hipp and Colby Duran for the depth and breadth of its analysis covering commodities, credit, rural development, food and nutrition, livestock, forestry, energy and more and the reimagining of food hubs and food systems.  While some of the proposals were particular to the tribal nations engaged in agriculture, many are also applicable and important to the other diverse rural, urban and immigrant communities we collectively represent.  Similar investments in developing a strategic new step-up program for BIPOC farmers and workers that values their knowledge and work would not only create the access to infrastructure long denied them.  It would also

7

support the reorientation of the farm and food system in a way that constructs an infrastructure that grows local economies and sustains farmers and workers.

**General Questions**

**USDA is also requesting input on the following general questions where applicable:**

**1. Have you experienced injustice, inequity, or unfairness in one or more USDA programs? If so, which ones? Please explain the situation(s).**

We have heard and witnessed countless examples of farmers experience injustice. Our Chairperson, John Zippert, who has filed hundreds of complaints and discrimination claims, has twice asserted to the US Congress that has "never met a black farmer who was not experienced discrimination."

Our first attachment is statement separately submitted by our Board member, Mrs. Barbara Shipman, citing what she has encountered in her decades of effort to help the farmers she serves in Southeast Alabama fairly access service.

We have also attached the Amicus Brief filed on behalf of Rural Coalition, Land Loss Prevention Project, and Intertribal Agriculture Council with of 26 Amici, to the court in Green Bay, Wisconsin in opposition to their Temporary Restraining Order halting ARP 1005 payments to BIPOC producers.  Included in this brief are numerous additional farmer declarations citing recent discrimination and the negative consequences these court actions are having.

These are only a small portion of what we hear on a far too regular basis.  We would note that at this time, many producers are afraid to go on the record about their experiences for fear of retaliation.

**2. Have you had difficulty accessing one or more USDA programs? If so, which ones? Please explain the difficulty.**

The above references instances include a sampling of difficulties encountered.

8

**3. Did you experience problems with required USDA paperwork, the USDA internet sites, the attitudes of USDA workers, or the locations of USDA offices?**

Our members have experienced many such problems on a routine basis. At present farmers have options to file an appeal of a decision to the National Appeals Division, to file a complaint to the office of Civil Rights and report of fraud to the Inspector General. There is a lack of clear guidance to help producers know which system to use to resolve issues that they are facing. We believe USDA should establish a process with specific contact information designed to immediately address and correct problems with program requirements, and internet access, but especially on the attitudes of USDA workers, and not only the location of USDA offices but of the failure of USDA field staff to let farmers know how and when they can be reached.

It is critical the producers begin to see results and correction occur and to know that USDA has got their back.

**4. Are there USDA policies, practices, or programs that perpetuate systemic barriers to opportunities and benefits for people of color or other underserved groups? How can those programs be modified, expanded, or made less complicated or streamlined, to deliver resources and benefits more equitably?**

There are examples too numerous to detail here that perpetuate systemic barriers to opportunities and benefits. The most fundamental barrier is the failure of local offices to share information and help every farmer and rancher access the full range of benefits for which they are eligible. In our recent work to conduct outreach to help producers access the CFAP 2 program, we have had more than a dozen reports of farmers who requested information about the program at their local office and were asked "who told you about that program?" They were also not told they had the right to submit an application before any documentation was required.

Almost all the producers who contacted us reported that they had not received a receipt for service during their visit to the office. Our member groups worked hard to secure the approval of a mandatory receipt for service enacted in the 2014 to end one of the primary practices of local offices that gave rise to the 4 major discrimination claims against USDA and which ultimately required $4 billion to settle claims by thousands of farm families. In the majority of the case, the basis of discrimination was the failure to tell all farmers about the availability of benefits.

A tribal producer reported to us within the past week that he is angered and saddened by the way that BIPOC farmers and ranchers, as well as elders, are ignored

9

by local offices in his area, unable to reach county staff by phone or at the office. He believes that the present way that discrimination is manifest is in the way the farmers are dismissed and ignored in the belief and hope that they will go away and stop trying. He believes he needs to be a voice for them, but he also documented that his advocacy to change things has cost him program benefits and services the office has denied to him. He believes that if he complains about his personal treatment, he will lose the ability to advocate for producers that without him have no voice. This is a choice that no farmer leader should ever have to make.

USDA must, as National Young Farmers Coalition has proposed, update its handbooks and field instruction and training.

USDA should also work with the networks of community-based organization who have for years served this nation's BIPOC farmers to develop a rapid response network to report deficiencies in service and set in place strategies to model the standard of service that all offices must deliver.

But in the most immediate term, the Secretary should issue a clear directive to all field offices requiring them to provide the required receipts for service to every farmer or rancher for every visit. USDA should next begin conducting regular reviews of these receipts particularly in any office where service deficiencies have been reported. Were producers provided clear instructions of what they needed to do to access benefits, and were these in concert with the requirements of the programs? Were farmers denied applications for service that were provided at the same time to other farmers?

We also call your attention to an additional longstanding issue that has particular implications for the level of farm and disaster benefits farmers receive. There has long been a practice of understating the base acres and yields of BIPOC farmers and ranchers, which compounds the impact of previous discrimination and consignment to smaller and less productive parcels of land. We recommend immediate action as follows, and an analysis of any statutory barriers that need to be addressed to ensure fair service.

- ***7 USCA 2279a.(a) base acres discrimination as connected to Receipt for Service.*** The U.S. Department of Agriculture must engage in immediate and effective implementation of 7 USCA 2279a.(a) ***Fair crop acreage bases and farm program payments yield.***

- Effective implementation is important for all farmers, but the failure to implement is more defined and realized among Native American producer who farm on Indian trust land, which is often rented to non-native American farmers, especially in Oklahoma. When the lease of a non-native American farmer expires

10

with respect to production on Indian trust lands, the value of the base acres remains on the Indian trust land and inures to the benefit of the next farmer which may be a Native American farmer.  It is common practice for FSA to allow the base program acres to travel with the non-native American farmer and not benefit the next Native American farmer.  In order to achieve full implementation of 7 USCA 2279a(a), FSA must give adequate notice that the reconstitution or restructuring of base acres will inure to the benefits of the Indian trust farmland or reservation land.

- This failure to act is deemed an adverse action within the context of a farm loan application or servicing transaction. 12 CFR 1002.9(a) (2).  The statute is clear on this issue: "If the Secretary of Agriculture determines that crop acreage bases  or farm program payment yields established for farms owned or operated by socially disadvantaged producers are not established in accordance with the title V of the Agricultural Act of 1949 ( 7 USC 1461 et seq.), the Secretary shall adjust the bases and yields to conform to the requirements of such title and make available any appropriate commodity program benefits." 7 USCA 2279a.(a)

- Information regarding program benefits attached to base acres is valuable to minority farmers and farm credit loan making and loan servicing.  When FSA does not provide adequate information regarding base acres, FSA violates the principles of the receipt for service regulation and the information requirements of the Equal Credit Opportunity Act.  **See Regulation B of the Equal Credit Opportunity Act, 12 CFR Section 1002.2(c)(1)(i).**

- **Receipt for Service.** The USDA National Appeals Division recognizes that FSA's employees have a greater understanding of program requirements.  Administrative Law Judges recognize and understand that "while a program participant is responsible for exercising due diligence in understanding the requirements of a program, NAD case decisions recognized that it is not reasonable to expect a program participant to have greater understanding of program requirements than FSA's own employees.  This is why receipt for service is so important to understand what farmers are told by FSA staff.  It is also important to note that the receipt for service reveals what the farmer was not told in terms of program benefits and services.  ***See NAD Case No. 2018E000577; and NAD Case No. 2013W000271.***

*Long Quote from NRDC's Racial Equity Comments*

A.  Ensure equitable access to financial resources.

"Preferential treatment in agricultural lending undermines the ability of farmers of color to compete in a fair marketplace and access agricultural support programs. White farmers have benefited from decades-long preferential treatment in USDA's

11

loan and assistance programs that has not been afforded to farmers of color. Examples of discrimination in USDA lending programs and funding include:

· Failing to provide minority farmers with loan program information and applications.[1]
· Awarding minority farmers smaller loans at higher interest rates than white farmers.[2]
· Frequently delaying loan processing for minority farmers. [3]
· Applying minority farmers' loan payments to the wrong accounts. [4]
· Accelerating minority farmers' loans without explanation. [5]
· Directing almost 97% of early COVID relief funds for agriculture to white farmers.[6] Despite the fact that minority farmers suffered a disproportionately large share of the economic impact of the COVID-19 pandemic, they did not receive a sufficient share of relief.
· Employing race-neutral selection criteria in USDA loan and aid programs that systematically exclude socially disadvantaged farmers and ranchers from loans. Race-neutral formulas fail to account for significant circumstantial differences between socially disadvantaged farmers and non-socially disadvantaged farmers. For example, because minority farmers often have small acreages [7] and because USDA provides a set dollar figure per acre in its aid programs,[8] these programs fail to provide enough relief to meet the costs and expenses of minority farmers while satisfying the needs of farmers with large holdings.
· Placing unreasonable restrictions on loans and requiring more collateral than is justified, making it difficult for minority farmers to obtain additional credit.[9]

When farmers cannot access credit and financial resources, farms struggle to survive and the American economy suffers.[10] To advance equity in access to capital, USDA should take the following actions:

· Proactively examine how USDA discretionary funding is distributed and redirect more resources to producers of color within existing programs. During this process, the USDA should identify resource gaps in existing funding mechanisms and make recommendations to Congress about where further funding is necessary to sustain producers of color.
· Exercise enforcement discretion and extend foreclosure moratoriums and forbearance for producers of color to the fullest extent of USDA's authority, to ensure that producers of color can keep their farms and build their businesses successfully.
· Consider specific needs of BIPOC and historically underserved farmers when establishing procedures for agricultural loan and aid programs. USDA loan and aid programs should identify barriers to lending that BIPOC, socially disadvantaged, and other underserved farmers face and incorporate solutions to those barriers within lending programs.
· Prioritize land access for socially disadvantaged and next-generation producers. USDA should expand and prioritize the USDA Transition Incentives Program (TIP) and the Farm Service Agency Land Contract

12

Guarantee for socially disadvantaged organic farmers, to help them lease and/or buy farmland.

· Examine geographic and demographic trends in USDA lending and support programs, to identify local and regional USDA offices that may be contributing to ongoing discriminatory outcomes in distribution of resources.

· Complete the National Agricultural Statistics Agency (NASS) TOTAL Survey, the results of which will provide comprehensive data on farmland ownership, tenure, transition, and entry of beginning and socially disadvantaged farmers and ranchers, as a follow-on to the Census of Agriculture. These data can help USDA direct needed resources to underserved producers, address ongoing heirs' property issues, and support succession planning.

· Dedicate staff to redressing discrimination and access to support, beyond the civil rights and appeals process that many farmers find difficult to navigate and inadequate for addressing their concerns. USDA should have regional staff across the country who proactively reach out to farmers to understand whether they have needs that are not met, connect them with resources, and advise USDA leadership and Congress on gaps in services.

· Eliminate requirements for past participation in programs and experience requirements that may create barriers to accessing resources for small-scale producers, beginning producers, and producers of color who may not have the resources to apply to programs or whose relevant experience may not be easily documented or adequately valued by USDA.

## 5. How can USDA establish and maintain connections to a wider and more diverse set of stakeholders representing underserved communities?

USDA should engage it career staff in reviving long term relationships with its stakeholders and to reinstitute regular consultations in partnership with its CBO and minority serving institution partners.

## 6. Please describe USDA programs or interactions that have worked well for underserved communities. What successful approaches to advancing justice and equity have been undertaken by USDA that you recommend be used as a model for other programs or areas?

Multi-year investments in BIPOC led community-based organizations whose leadership includes and represents the farmers they serve have been invaluable in establish an infrastructure of trust and assistance that can make a real impact in connecting producers to services. The long-term investment in these programs pays dividends as the CBO staff team develops a network of relationships with the local offices, often helping them effectively understand and meet the needs of farmers

13

whose cultures, crops, production method or languages may be unfamiliar to the existing staff.

In years past, these community-based organizations have organized invaluable partnership efforts linking their extensive and skilled networks with USDA leadership and career staff.  The results of the USDA Partners Process conducted from 2005- 2010 are summarized in the **2010 report - A Time to Change: A Report by the Assessment Conversations Team**.  Many recommendations from this report informed the development of over 30 sections of policy passed in the 2008 Farm Bill.  The process also established proactive and ongoing relationships between USDA career staff across agencies and mission areas, and with community-based organizations. Many career staff cited the process as a highlight of their careers.  BIPOC led CBO's established relationships to a wide range of USDA agencies, open the door to accessing outreach, technical assistance, and research programs they had not known existed.  These partners are invaluable to help USDA improve its program and services, and to help assure that Congress addresses statutory barriers to improve access to programs.

**7. Does USDA currently collect information, use forms, or require documentation that impede access to USDA programs or are not effective to achieve program objectives? If so, what are they and how can USDA revise them to reduce confusion or frustration, and increase equity in access to USDA programs?**

We have addressed concerns related to required forms and documentation in several of the attached comments.  We believe USDA should focus attention on who is and is not required to submit what documentation.  Thus, it is our understanding that BIPOC producers have been required to provide a level of documentation in the CFAP program, for example, that is not required of all producers before they apply or are awarded benefits.

USDA should develop a system to require and then review receipts for service to measure and root out unreasonable requests for information, and failure to request at the outset a full detailing of what a farmer would need to provide, rather than requiring the farmer to provide one document, and then requiring another.

What is also critical is that the level of benefits provided by a program makes the level of effort to secure the benefit worthwhile.  With respect to the CFAP program, all the outreach CBO's conduct is offset in some areas when one farmer goes to the trouble to apply for the program only to learn the benefit awarded is miniscule. One of our board members reported that that news travels to other farmers "faster than the delta variant."

14

**8. Is there information you believe USDA currently collects that it does not need to achieve statutory or regulatory objectives?**

We believe that the much larger problem is that USDA does not use the information it is required to collect in order to conduct proactive assessments of the fairness of the service it provides.

**9. Are there data-sharing activities in which USDA agencies should engage, so that repetitive collections of the same data do not occur from one USDA component to the next?**

We think some changes could be made but the bigger problem is that USDA does not fully utilize data it already has and does not make public its findings.

**10. How can USDA use technology to improve customer service? Do you have suggestions on how technology or online services can help streamline and reduce regulatory or policy requirements? What are those technological programs or processes and how can USDA use them to achieve equity for all?**

USDA must first assure that all farmers, ranchers, and workers have access to broadband and basic cell phone service, and the training and skills to employ these tools before it moves to a system that requires them. But technology should be used to assess the level of services provided.

**11. Are there sources of external data and metrics that USDA can use to evaluate the effects on underserved communities of USDA policies or regulations? If so, please identify or describe them.**

USDA needs to routinely measure outcomes in program participation. But it should move beyond data on the application and participation in programs by race, gender, and ethnicity to the county level. It should also measure additional metrics related to its lending programs – specifically the month in which the farmer first contacts the office about a loan, and the month the loan is actually provided. The delays in loan making and slow walking the provision of benefits contributes is a continual factor in the precarious financial position of many producers whose cases we have reviewed.

USDA should use comparative date from NASS and from the US Census to assess land tenure, land concentration, broadband access, and factors including poverty and health disparities.

15

A comprehensive profile should be developed of each county and region to identify factors that contribute to relatively economically and ecological healthy communities as compared to ecologically and ecologically vulnerable communities.  The lessons should be applied with the goal of fostering models of economic and ecological resilience rooted in equity and with good outcomes for families and communities.

**12. What suggestions do you have for how USDA can effectively assess and measure its outreach and inclusion of underserved groups and individuals?**

We have addressed this issue in the attached items related to data collection. But we urge USDA to begin with a top to bottom review of at least a set of local offices. USDA should endeavor to assess not only what barriers BIPOC producers encounter, but also who gets service first, and who gets service most.  Who is informed and contacted as soon as programs are available?  Who is discouraged from applying? Fairness could best be assessed by a comprehensive review the variation between the farmers who receive the most service and participate in the most programs and the farmers who do not participate at all.  We agree with the proposal of National Young Farmers Coalition to engage OBPA in this analysis which should begin with an initial review to develop clear goals to reduce evident disparities.

**13. How can USDA remove or reduce barriers that underserved communities and individuals face when they participate or attempt to participate in agency procurement and contracting opportunities?**

We will address this issue at a later date.

**14. Have you made recommendations for improvement in the past to USDA? If so, please list or attach those recommendations.**

The Rural Coalition has offered extensive recommendations and comments over our four-decade history. The following is a sampling of our comments on equity and related issues over nearly two decades, where we have invested significantly to assure that a diverse range of stakeholders are included.

2019 - fagundes, C., Picciano, L., Willard, T., Mleczko, J., Schwier, S., Hall, F., . . . Graddy-Lovelace, G. (2019). Ecological costs of discrimination: racism, red cedar and resilience in farm bill conservation policy in Oklahoma. *Renewable Agriculture and Food Systems.*

2017- Oklahoma Black Historical Research Project. 2017. "100 Farmers Summit Report Addressing the Needs and Concerns of the Underserved Minority Family

16

Farming Community." *Report produced in cooperation with the Rural Coalition and American University School of International Service 2017 Farm Bill Practicum.*

2015 - Picciano, L. 2015. "Critical Needs of Small Farmers and Ranchers." *Small Farm Digest* 17(Fall): 3-8.
2010 - Rural Coalition/Coalición Rural and Federation of Southern Cooperatives/Land Assistance Fund. 2010. "A Time to Change: A Report by the Assessment Conversations Team (ACT Report).

2008 - Picciano, L. et al. "A Seat at the Table: Diversity and the 2008 Farm Bill." A Report on the Farm and Food Policy Diversity Initiative. Rural Coalition/ Coalición Rural.

2004 - Picciano, L., B. Toommaly, & J. Green. 2004. "Assessing the Needs and Interests of Women in Agriculture: A Summary Review of Results from Community-Based Research." Institute for Community-Based Research & Rural Coalition/ Coalición Rural.

2003- Green, J., L. Picciano, etal. 2003. "A Multi-Community Assessment of the Risk Management Needs of Small, Limited Resource, and Minority Farmers." Rural Coalition.

2001- Green, J. 2001. "Small, Limited Resource, and Minority Farmers Discuss Conservation: Analysis of Focus Groups." Missouri Action Research Connection & Rural Coalition/

## <mark>Additional Equity Focused</mark> Recommendations

1. *Develop a Comprehensive New Step Up Program to Undergird Historically Underserved and New Entry Farmers and the Infrastructure they need to thrive.*

2. *Pandemic Response* – Rural Coalition and Alianza Naciónal de Campesinas worked with our members and allies to seeking Congressional comprehensive list of critical actions to mitigate the impact of the pandemic with particular attention to farmers and workers in the food system.  USDA should also continue providing substantive support to shore up and strengthen rural hospitals and clinics.  Over 160 groups endorsed the letter which includes proposals that can be initiated administratively.
https://static1.squarespace.com/static/5b2c7bebcef3725e593fb2fe/t/5f57fcf8
2112373f1ac33185/1599601923092/Final_Pandemic_Response_Letter.pdf

3. *Extend Relief to immigrant families excluded from all forms of emergency relief* – USDA should use every authority in its power to assure that relief,

17

ranging from food assistance to securing access to health care, COVID-19 protections and care, and safe and secure housing, reaches all immigrant families regardless of their immigrant status. This should include support for categorical eligibility in school feeding programs, and support for the community-based organizations who supply emergency support to workers and their communities.

4. *Protect Farmworkers and Their Livelihoods* – According to ERS, the majority of farmworkers are immigrants, with those undocumented comprising over half of the crop farmworker labor force. An already vulnerable population, immigrant communities have been excluded from many coronavirus relief programs. Farmworkers - many of whom are temporary guest workers, immigrants, and refugees – are facing severe healthcare inaccessibility or fear accessing medical services, inadequate housing, and harmful work conditions. We strongly support the efforts to "provide legal status based on prior agricultural work history, ensure they can earn paid sick time, and require that labor and safety rules, including overtime, humane living conditions, and protection from pesticide and heat exposure, are strictly enforced." The Department of Agriculture needs to take an active role in ensuring that all applicable protections and rules are enforced in agricultural workplaces.

5. *Emergency Food Programs* –USDA should secure authority needed to establish a preference for local products in any emergency program, with specific set asides for entities working with socially disadvantaged farmers and ranchers, and flexibility in the mix of products based on what can be produced locally. We also urge that the lessons of the food box program be used to inform future efforts for both emergency and response and on the restructuring and reorientation of the food system to increase resilience in the face of future emergencies.

6. *Credit Issues and Protecting Distressed Farmers who are Still Operational* – USDA should develop a plan for standing disaster program that automatically goes into effect in the face of emergencies. USDA should extend as far as possible a moratorium on acceleration, graduation, and foreclosure for duration of the pandemic and economic recovery.

   USDA must continue to pursue every avenue to secure the level of debt relief promised to BIPOC producers before it was halted by litigation. USDA should investigate ways that remaining funds in pandemic relief programs are directed to BIPOC farmers to keep them operational and engage to produce items, for example, for the food box program or any successor.

18

We further endorse the proposals in the Top Priorities for COVID-19 C4 Response Legislation from the Native Farm Bill Coalition including the following:

1. Immediately defer of all FSA loan principal due for the 2020 and 2021 production years and extend all loans for 2 years.
2. Offer payments to any lenders if they reduce the interest rate of current loans by 2% and offer the same reduced loan payments and extensions to their borrowers; and
3. Use FSA Farm Ownership loans to refinance real estate and other debt to aid in recovery from this crisis.

We further urge the Biden-Harris Administration to ensure that the Equitable Relief Provision in the 2018 Farm Bill is immediately and fully implemented with clear directives in handbooks to field offices. The intent of this provision is to protect farmers from adverse action in cases where errors were made on the part of FSA offices. In the time of this pandemic and the extreme stress on both producers and FSA and other USDA field office staff, this protection is critical. Every effort should be made to help farmers and ranchers hold onto their land and have the economic base they need to build back better both their farms and the economic underpinnings of their communities.

*6) Extend Emergency Feeding Programs - Feeding America's* report indicated that one in four children will be food insecure due to the unprecedented pandemic. We urge sustained emergency pandemic food assistance for those who need it, including the Supplemental Nutrition Assistance Program (SNAP); the Pandemic Electronic Benefits Transfer (P-EBT); universal free feeding program (Seamless Summer Feeding Option), the Farm to School Program and child and elder nutrition programs to ensure the food is distributed from the farmers that grow it to those who need it. We pledge to work with the Biden-Harris Administration to support any additional statutory and funding support needed to extend and increase such assistance. We further urge piloting new ideas to increase the connections to between USDA food programs and the nation's small and diverse farmers in a manner that meets the needs of communities for healthy, local food, while directly supporting the farmers who can most dependably supply it, in the face of the pandemic. Successful models to reorient food systems by increasing direct connections should be evaluated and studied to inform the development of future policies consistent with the goals of the Biden-Harris Administration.

**7)** *Livestock and Specialty Crop Sectors* – Nowhere were the vulnerabilities of the food and agriculture system revealed than in the pandemic generated crisis in the livestock sector. Protection of farm and food chain workers is a necessity at every level, and all entities, and especially those who receive any form of aid or support from USDA, must be held accountable for the protection of the health and safety and fair compensation of workers. The

19

crisis also reveals the critical importance of restructuring the food system to reduce concentration and oriented systems exchange more locally and less vertically.

Concentrated operations continue to dominate the market and government intervention is needed to protect both workers and small and mid-size farmers and ranchers in the fresh food and protein sector. The concentration of food processing and delivery is in itself a huge risk that needs to be comprehensively addressed.  As the pandemic is brought under control, we urge the Biden-Harris Administration to begin working with the stakeholders including workers and small farmers to generate the new ideas necessary to make policies to construct a resilient food system in the future.

In the immediate term, we urge USDA to withdraw the Undue and Unreasonable Preferences and Advantages Under the Packers and Stockyards Act rule. The rule was inundated with loopholes. We recommend publishing similar regulations as those under the Obama-Biden Administration.

8)  *Broadband Access for all Families* – The lack of access to affordable broadband services should be a right of all communities, and securing it is of paramount importance in the face of this pandemic. Every effort should be made to devote all available funds to providing emergency access to broadband especially for the nation's most vulnerable children and families, including to tribal and border communities.  Families require this support to continue schooling for children and communities need it to provide access to critical information they need to access the resources they need to protect themselves and their communities from the pandemic.  Rural, tribal, farmworker and border communities should be consulted and involved in all efforts to assure communities are connected to networks and provided and trained to use computers and devices needed to benefit from these networks.

20

## References Cited

[1] *See*, *e.g.*, U.S. Comm'n on Civil Rights, *The Decline of Black Farming in America* 85, 87 (1982),
https://files.eric.ed.gov/fulltext/ED222604.pdf.
[2] *See*, *e.g.*, U.S. Comm'n on Civil Rights, *The Decline of Black Farming in America* 85, 87 (1982),
https://files.eric.ed.gov/fulltext/ED222604.pdf.
[3] *See*, *e.g.*, U.S. Comm'n on Civil Rights, *The Decline of Black Farming in America* 85, 87 (1982),
https://files.eric.ed.gov/fulltext/ED222604.pdf.
[4] *Decline of Minority Farming in the United States: Hearing Before the Gov't Just., Info., & Agric. Subcommittee. of the H. Comm. on Gov't Operations*, 101st Cong. 27 (July 25, 1990) (statement of David Harris, Jr., Executive Director, Land Loss Prevention Project),
https://www.google.com/books/edition/Decline_of_Minority_Farming_in_the_U nite/XdD4pV3tgeEC?hl=en&gbpv=1.
[5] *Decline of Minority Farming in the United States: Hearing Before the Gov't Just., Info., & Agric. Subcommittee. of the H. Comm. on Gov't Operations*, 101st Cong. 27 (July 25, 1990) (statement of David Harris, Jr., Executive Director, Land Loss Prevention Project),
https://www.google.com/books/edition/Decline_of_Minority_Farming_in_the_U nite/XdD4pV3tgeEC?hl=en&gbpv=1.
[6] *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, EWG (Feb. 18, 2021), https://www.ewg.org/news-insights/news/usda-data-nearly-all-pandemic-bailout-funds-went-white-farmers.
[7] *See Lending to Farmers of Color and Women: New Report Examines Trends And Barriers*, Nat'l Sustainable Agric. Coalition (Aug. 27, 2019), https://sustainableagriculture.net/blog/gao-report-lending-sdfr/.
[8] *See*, *e.g.*, *USDA to Provide Additional Direct Assistance to Farmers and Ranchers Impacted by the Coronavirus*, U.S. Dep't of Agric. (Sept. 18, 2020), https://www.usda.gov/media/press-releases/2020/09/18/usda-provideadditional-direct-assistance-farmers-and-ranchers.
[9] *See Management of Civil Rights at the USDA: Hearing Before the Subcommittee. On Gov't Mgmt., Org., & Procurement of The H. Comm. On Oversight and Gov't Reform*, 110th Cong. At 24–26 (May 4, 2008),
https://www.google.com/books/edition/Management_of_Civil_Rights_at_the_US DA/uU8FKm6V3cC?hl=en&gbpv=0 (testimony of Guadalupe L. Garcia Jr.).
[10] See *Ag and Food Sectors and the Economy*, U.S. Dep't of Agric. Econ. Rsch. Serv. (noting that agriculture and related industries support 5.2% of the overall American GDP, accounting for $1.1 trillion annually and supporting 11% of total U.S. employment, with direct on-farm employment accounting for 2.6 million American

jobs), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/ag-and-food-sectors-and-the-economy/#:~:text=Agriculture%2C%20food%2C%20and%20related%20industries,about%200.6%20percent%20of%20GDP.

22

August 13, 2021

Secretary Tom Vilsack
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

*Via regulations.gov*

**Re: Docket Number: USDA-2021-0006** – **Barbara Shipman's Comments on Advancing Racial Justice and Equity and Support for Underserved Communities at USDA**

Secretary Vilsack:

I am an African American woman, a fifth-generation farmer, and a community leader in rural Southeastern Alabama. I am also a U.S. Army Veteran of the Gulf War and have served in the Georgia and Alabama National Guard. I work with recently returned service members from Fort Rucker to consider careers in farming.

My farm is certified organic by USDA. USDA has also certified my farm for good agricultural practices (GAP) growing fresh vegetables. These certifications are rare enough in my region—especially among African Americans and veterans—that teaching others about how to succeed as a farmer has become my second calling.

In addition to farming full time, I am the founder and Executive Director of Cottage House Incorporation, a nonprofit organization that works to inspire youth and help promote sustainable agricultural solutions and economic development in rural Southeastern Alabama through community programs, entrepreneurship, leadership, life skills and more. I have spent the last 15 years creating a beginning farmer curriculum, hosting over 1,000 children per year at Farmer Bootcamp that introduces them to farming, animal husbandry, planting and markets. Farmer Bootcamp also teaches an average of 20 new farmers per year to plan, plant, and operate farm business operations.

I am a member of Rural Coalition and serve on the organization's Board of Directors. I joined Rural Coalition because I support its goal of ensuring that socially disadvantaged farmers, youth with limited resources, and veteran women are included in the opportunities, economies, and future for small scale operators of agriculture business.

Every year I accompany 40-60 farmers to FSA offices to make sure they get the service and information they are entitled to, and I currently work as a Rural Coalition recruiter to help farmers secure CFAP funds.

My responses to the customer experience questions below reflect both my own experiences as a farmer and the experiences of producers I advise and mentor.

Customer Experience Questions

1. **Have you applied for or accessed USDA programs and services in the past? If so, please describe your experience.**

I am advising farmers applying for CFAP 2, as a Rural Coalition recruiter. I placed an ad to publicize this opportunity for our local producers in Barbour County, Alabama. Based on the qualification information for the program that was publicly available, the ad said that producers could apply for compensation due to loss of "Livestock (cattle, pigs, sheep/wool, chickens, eggs, or goats and more)" (not including breeding stock), as well as row or specialty crops.

However, my local office in Clayton, Alabama has told farmers that the South African Boer Goats that I and others produce for meat in our region are not eligible for CFAP. These goats are the best quality meat breed, a significant product and source of income for numerous farmers, and a dietary staple for Muslim communities in our region. The office has not provided receipts of service or any other written explanation for this decision that I can rely on and share with the farmers I advise.

We were also asked for 2019 sales receipts for these goats, and the office did not explain why this would be necessary for goats, but not for beef cattle or other animals that are more typically raised by Caucasian producers. The CFAP 2 application instructions specifically say that this is a self-certification program and that documentation of sales, inventory, and other records "will not need to be submitted with the application."[1]

Native American Indian producers who I work with in Montana have also sought payments for bison and elk and been turned away or asked for substantial documentation of losses, such as pictures of animal carcasses.

**2. If you have not applied for or accessed USDA programs and services in the past, why not? What would have made it easier for you to apply or access USDA programs and services?**

Farmers hear stories from their peers about disparate treatment, as well as extra and unclear requirements for applications, and many decide not to apply at all. It takes significant time and work to understand a program and put together an application, as well as drive to the FSA office. When farmers are rejected with little explanation, it deters them from following up or participating in future opportunities. Others who hear about these hurdles do not apply at all.

**3. How can USDA, its cooperators, grantees, and partners, better share information with underserved stakeholders about our programs and services? What are the best ways to notify and engage underserved stakeholders about new programs and services or changes to existing services?**

---

[1] USDA, Apply for Coronavirus Food Assistance Program 2, https://www.farmers.gov/coronavirus/pandemic-assistance/cfap2/apply (last visited Aug. 12, 2021) ("To complete the CFAP 2 application, producers will need to reference their sales, inventory, and other records. However, since CFAP 2 is a self-certification program, this documentation will not need to be submitted with the application. Because applications are subject to County Committee review and spot check, some producers will be required to provide documentation. Producers should retain the records and documentation they use to complete the application.").

As a program recruiter, I need clear information about program eligibility and requirements, and I need to know that the rules will be the same for everyone. When rules and decisions are not written down, I cannot be sure that the rules are being applied fairly and consistently.

I also need specific guidance from our local offices about what is missing from applications, and why it is required. I will not send a farmer to drive over an hour to a USDA office to apply for a program unless I know for sure that they will qualify, so I need to be able to rely on the forms and other materials USDA provides.

For example, it is not clear from the CFAP 2 paperwork how to report losses of goats, bison, elk, or other specialty animals. There is not enough guidance on what details to provide along with it. The paperwork should help producers provide all the necessary information, so there are no surprises.

**4. Describe your experience(s) interacting with USDA staff when trying to access USDA programs and services. How were they helpful? Are local USDA offices staffed sufficiently and do they provide good customer service? What are areas for improvement?**

As an African American woman, I have not been treated respectfully by local staff and I seem to have to follow a different set of rules than Caucasian farmers. I have been talked over and not given a chance to explain myself or ask questions. I also get different information from different staff, which adds to confusion and mistrust.

Poor service and extra requirements for the producers I work with is not new. For example, in the past, a farmer who I was advising went into an NRCS office and FSA office to request assistance. The young lady threw and not only hit him in the face with his folder, but she also told him *"get out of the office and don't come back until you have three years' worth of farm records."* In addition to being disrespectful, this behavior is particularly triggering for veterans. Returning military members have PTSD, and the snap of a finger can put them in the military zone again.

Another time, I accompanied two farmers to visit *four separate county offices* to determine who was supposed to serve them. One was not open for a prescheduled appointment; another was closed. In the last office, the staff member agreed to get on the computer to ascertain the correct service center. She said it was closing time, but she could provide service there at another time. I told her, "that's fine as long as this farmer leaves here with two things – a letter of receipt for service that provides his farm and tract number and a copy of the technology map of where his land is located. Then in the future all you have to do is give the address and you can pull it down on the computer and print it all." If we hadn't gotten that receipt, it's likely that they would have turned them away the next time. These offices rarely offer receipts of service unless we request them, and very few farmers know that they can ask for them.

**5. Are USDA agency websites helpful in providing useful information on programs and services, explaining how specific programs and services work, and explaining how applications for participation are considered? What are areas for improvement?**

I often experience a disconnect between what I see written on website and what I'm told by our local offices. I need the local offices to provide more, written detail and help farmers through the process.

**6. What are the barriers to applying for loan and grant programs? How can USDA make loan and grant processes easier to understand and more accessible to underserved groups?**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

_____

**CASE NO. 1:21-CV-548-WCG**

_____

ADAM P. FAUST; CHERYL J. ASH; JAMES C. ASH; CHRISTOPHER C. BAIRD;
BRANDON BANDUCCI; TEENA J. BANDUCCI; CHRISTOPHER D. BOHNENKAMP;
JOSEPH W. SCHMITZ; THEODORE G. SHIELDS, JR.; JAY T. SLABA; JONATHAN P.
STEVENS; and LORI J. WATKINS,

Plaintiffs,

v.

THOMAS J. VILSACK, in his official capacity as Secretary the U.S. Department of Agriculture;
and ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service
Agency;

Defendants.

_____

**BRIEF OF AMICI CURIAE**
**THE RURAL COALITION, THE INTERTRIBAL AGRICULTURE COUNCIL,**
**NORTH CAROLINA ASSOCIATION OF BLACK LAWYERS LAND LOSS**
**PREVENTION PROJECT, AND**
**23 ADDITIONAL FARMING ADVOCACY ORGANIZATIONS**
**IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

_____

Keisha Stokes-Hough
Alexandra M. Jordan
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, AL 36104
Tel:    (334) 956-8200

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................................ 1

INTRODUCTION ...................................................................................................... 9

ARGUMENT ............................................................................................................ 10

    I.   Congress Enacted Section 1005 to Address Two Compelling Government Interests: Remedying Discrimination Against Minority Farmers, and Ensuring that COVID-19 Relief Reaches Those Most Impacted by the Crisis. ........................ 10

        A.  Minority farmers have been harmed by persistent discrimination in the USDA's farm loan programs. ................................................................. 10

        B.  Minority farmers' precarious financial circumstances have been exacerbated by the COVID-19 pandemic. ............................................. 13

    II.  Section 1005 Is a Narrowly Tailored Measure, Employing the Least Restrictive Means to Achieve Congress's Policy Goals. ......................................................... 16

        A.  Race-neutral efforts have been attempted, and failed to remedy the effects of USDA's long and persistent history of discrimination. .................................... 16

        B.  Relief under Section 1005 will benefit the most vulnerable and underserved farmers: those impacted by USDA discrimination and at the greatest risk of failure. ......................................................................................................... 19

        C.  Section 1005 provides temporary relief in response to the exigencies of the COVID-19 pandemic. ......................................................................... 21

    III. The Balance of Harms Weighs Strongly Against a Preliminary Injunction, Because Minority Farmers and the Public Will Be Harmed, But Plaintiffs Are Not Harmed. ....................................................................................................... 21

        A.  Discrimination in lending has made it more difficult for minority farmers to survive times of crisis. ......................................................................... 22

        B.  Delay in delivering debt relief will irreparably harm minority farmers. .............. 23

        C.  Delaying assistance to minority farmers is also harmful to the public interest. ..................................................................................................... 25

        D.  An injunction of Section 1005 would undermine Congress's goal of remedying ongoing inequities in USDA funding. ................................. 26

CONCLUSION ......................................................................................................... 28

## INTEREST OF AMICI CURIAE

Amici Curiae are twenty-six advocacy organizations that work with and represent the interests of farmers and ranchers across the country.

The **Rural Coalition** is a collection of more than 50 diverse, community-based member organizations that have worked for 42 years to advance the interests of historically underserved producers and rural communities. Since 1978, the Rural Coalition has developed and secured passage of over 45 key federal policies to strengthen rural agriculture, with a critical focus on equitable access and new generation of diverse producers.

The **Intertribal Agriculture Council** (IAC) is a nonprofit 501(c)(3) national organization to pursue and promote the conservation, development, and use of Tribal agriculture resources for the betterment of the 574 federally recognized Tribal governments and over 80,000 Tribal producers. The IAC was founded on the heels of the 1980s farm financial crisis when a report to Congress determined that Tribal producers needed direct and specific technical assistance to support access to USDA programs, especially access to credit through Farm Service Agency. Many of our individual Tribal membership have a direct interest in the outcome of this case and will be irreparably harmed if the debt relief is not provided.

**North Carolina Association of Black Lawyers Land Loss Prevention Project** (LLPP) was founded in 1983 and is a non-profit, public interest organization providing comprehensive legal services and technical support to North Carolina's financially distressed and socially disadvantaged farmers and landowners seeking to preserve their farms, homes, land, and rural livelihoods. Many of our farmers were struggling to retain their farm operations prior to the COVID-19 Pandemic, which has only worsened their conditions. Debt relief is critical for farmers who have experienced discrimination in the implementation of USDA programs, so that they may receive timely access to credit and secure favorable loan terms and servicing of loans.

1

The **Natural Resources Defense Council** (NRDC) is a national, not-for-profit environmental and public health membership organization that works, on behalf of our 3 million members and activists, to ensure the rights of all people to clean air, clean water, and healthy communities. NRDC is committed to advancing environmental and social justice and seeks to break down the patterns of disproportionate environmental burdens borne by people of color who face social or economic inequities, including in our agricultural system and farming communities.

**Rural Advancement Fund of the National Sharecroppers Fund, Inc.** (RAF) is a 501(c)(3) organization that represents rural farmers, with special focus on African American farmers and young farmers. Denial of American Rescue Plan funds to RAF members will immediately impact at least 20 African American farmers in three counties in South Carolina, many of whom own small family farms that have been passed down for generations.

The **National Latino Farmers and Ranchers Trade Association** (NLFRTA) is a nonprofit based in Washington, DC, that organizes, engages, and empowers Latino farm and ranching advocacy groups, farmworkers transitioning into farm ownership, and, generally, small producers, throughout the United States and beyond. Latino farmers have historically suffered — and continue to suffer — under the discriminatory treatment of USDA staff. The relief offered under the 1005 program is the only possible relief for operations that are rendered even more vulnerable by economic, market, and climate conditions intensified by the pandemic.

**American Indian Mothers, Inc.** (AIMI) is a not-for-profit organization serving the education, health, social service, and agriculture and cultural needs of American Indians and minorities in North Carolina. AIMI serves our communities through 12 different programs in order to fill the gaps in services throughout rural communities. The socially disadvantaged farmers

served by AIMI have experienced extreme hardships during the COVID Pandemic, and without the Section 1005 assistance, these farmers will not be able to plant or plan for the future.

**Arkansas Land and Farm Development Coalition** (ALFDC) is a nonprofit organization founded in 1980 with the mission of stopping Black farmers from losing their land and family farm operations. We serve farmers who, after decades of discrimination and the pandemic, urgently need the debt relief afforded justly to them in Section 1005. Any delay in this relief will limit the few options available for them to retain land and continue to pass land to the incoming generations for the benefit and viability of the rural communities we have long served.

**Cottage House Incorporation** (CHI), founded in 2007, works to promote sustainable agriculture solutions through education of new and beginning farmers, veterans, youth, and women in agriculture. During the pandemic, the farmers served by CHI have experienced food insecurity; been unable to sell their cows, hogs, pigs, and chickens; and lacked funds to buy feed for their animals. Without debt relief, they won't be able to buy seeds or plant or plan for the future. CHI is especially concerned about five producers with FSA Youth loans: without Section 1005, these young farmers will go into default and may not have a way to continue farming.

**Family Farm Defenders** (FFD) is a 501(c)(3) organization and has over 3500 members in all 50 states, including many farmers of color. FFD's mission is to create a farmer-controlled and consumer-oriented food and fiber system, based upon democratically controlled institutions that empower farmers to speak for and respect themselves in their quest for social and economic justice. To this end, FFD supports agroecology, farm and food worker rights, racial justice, animal welfare, consumer safety and right to know, fair trade, and food sovereignty.

**Kansas Black Farmers Association** (KBFA), a 501(c)(3) organization, was founded by fourteen African American Kansas farmers in 1999. KBFA represents more than 150 rural and

3

urban farmers, agribusiness owners, youth farmers, and associate organizations and works to sustain Black land ownership. Over 50 of KBFA's members are eligible for Section 1005 relief, which they are depending on to continue their farming. The relief will allow the farmers to plant/drill — though a few weeks late due to late rains. An injunction will further delay this season, resulting in some of KBFA's farmers not having a milo, corn, or soybean crop this year.

The **Land Stewardship Project** (LSP) is a member-driven nonprofit organization founded in 1982 in Minnesota to foster an ethic of stewardship for farmland, promote sustainable agriculture, and develop sustainable communities. LSP represents over 6,000 members and thousands more supporters who are farmers, food system workers, and other residents dedicated to creating transformational change in our food and farming system. LSP believes it is critical to address the needs of farmers of color who have endured decades of discrimination in USDA programs and have not received adequate support during the pandemic. The debt relief included in the American Rescue Plan is a necessary step toward creating resilient rural communities.

The **National Young Farmers Coalition** (Young Farmers) aims to shift power and change policy to equitably resource a new generation of working farmers. Young Farmers represents aspiring and working farmers, ranchers, and land stewards who are reorienting agriculture in service to our communities. Young Farmers believes justice is foundational to a transformation in our food and farm systems; we've advocated for the Section 1005 loan-forgiveness program and other necessary programs that serve to increase the security and accessibility of agricultural livelihoods for farmers of color.

The **Oklahoma Black Historical Research Project, Inc.** (OBHRPI) was founded in 1998 to assist historically underserved farmers and ranchers by means of outreach, technical training, and cultural awareness to operate sustainable farms and ranches with an emphasis on sustaining

historic American Indian and African American communities. We are advocates for Socially Disadvantaged Farmers and Ranchers who have been historically underserved and deserve — and urgently need — the relief that is due to them in the ARP.

**Operation Spring Plant, Inc.** is a grassroots 501(c)(3) organization with over 34 years of experience organizing rural and urban, predominantly Black, small family farmers in North Carolina and throughout the southern US. We have served over 1500 farmers, youth, and landowners per year in North and South Carolina, Georgia, and Oklahoma. The farmers we serve are counting on Section 1005 relief to overcome numerous challenges, from a severe drought in 2013 to crop losses, restaurant closures, and inaccessible markets due to COVID-19.

The **Texas Coalition of Rural Landowners** was founded and incorporated in Cypress, Texas, as a Domestic Nonprofit Corporation on May 30, 2021, to assist farmers and ranchers who have sought aid from various USDA agencies. The Coalition's mission is to develop training to provide farmers information, skills, and awareness, in a cultural context; assist rural landowners building strong communities; build an equitable and sustainable food system that is beneficial to underserved rural landowners; and provide assistance to underserved landowners. The producers served by the Coalition have struggled with discrimination, and the disruptions of the pandemic. They are depending upon the relief in the American Rescue Plan.

**World Farmers** advocates for and supports immigrant, refugee, and historically underserved small-scale farmers from farm to market. Started in 1984, our Flats Mentor Farm Program, located in Lancaster, MA, provides access to the land, farming infrastructure, and technical assistance in agricultural production and marketing necessary for several hundred small-scale diversified farmers to grow and market their produce. Section 1005 debt relief payments are critical to supporting farmers without generational wealth in this country, including the immigrant

5

and refugee farmers with whom we work, and to supporting those farmers of color who are operating within an agricultural system of historic exclusion and displacement.

**Farm Aid** is a nonprofit organization whose mission is to keep family farmers on the land. Since the first Farm Aid Concert in 1985, Farm Aid has raised $60 million to promote a strong and resilient family farm system of agriculture. Farm Aid operates 1-800-FARM-AID to provide immediate and effective support services to farm families in crisis. We have worked with thousands of farmers and hear every day how the pandemic has stressed them to the limit — most of all the nation's socially disadvantaged farmers. We have joined this action because we know these farmers need and deserve the aid that is being delayed by this action.

The **Health, Environment, Agriculture, Labor Food Alliance** (HEAL) is a national multi-sector, multi-racial coalition of 50 organizations who represent over two million producers, workers, indigenous groups, scientists, advocates, organizers, and activists. Many of HEAL's members and their communities have borne the brunt of COVID-19, and many of the producers who are part of our Alliance have gone above and beyond to produce and distribute food for their communities during the pandemic — and have gone into debt as a result. The HEAL Food Alliance opposes preventing the USDA from moving forward with a program designed to relieve debt for farmers of color, and supports the USDA's defense of debt relief for these farmers.

The **National Family Farm Coalition** (NFFC) was established in 1986 to avert the demise of family farmers caught in the 1980s farm credit crisis. NFFC membership consists of 30 grassroots farm, ranch, and fishing organizations in 42 states and the nation's capital. Our members are fighting for food providers' rights, fair prices, clean air and water, strong local economies, and much more. NFFC believes that an attempt to overturn this act of Congress that enables USDA to

meet the urgent and particular needs of socially disadvantaged producers has no merit and only undermines the ability of family farmers who feed us with dignity and respect.

The **Rural Advancement Foundation International-USA** (RAFI-USA) was founded in 1990 to serve and advocate for farmers struggling to keep their farms. Today, our mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities. Our Farmers of Color Network program works with more than 300 farmers of color in North Carolina and the Southeast U.S.

The **National Sustainable Agriculture Coalition** (NSAC), founded in 2009, is an alliance of 130+ member organizations and their combined 2+ million members that advocates for federal policy reform to advance the sustainability of agriculture, food systems, natural resources, and rural communities. NSAC has heard directly from our members how Black, Indigenous and other People of Color (BIPOC) are treated worse than white farmers within the same applicant pool, including: when seeking fair and timely access to credit, when attempting to apply for and obtain direct USDA aid through support programs (including the Coronavirus Food Assistance Program), and when applying to participate in conservation programs. Consequently, these farmers are at direct risk of losing their livelihoods without urgent relief.

**California FarmLink** is a 501(c)(3) nonprofit organization and lender certified by the U.S. Treasury as a Community Development Financial Institution (CDFI). In 2020, more than 70% of California FarmLink's loans provided capital to Socially Disadvantaged Farmers and Ranchers, including Latina/o farmers in the Central Coast region and Hmong-American refugee farmers in the Fresno region. California FarmLink has at least three borrowers who are in immediate risk of bankruptcy and will likely enter bankruptcy if they do not receive debt relief.

<p style="text-align:center">7</p>

**Community Farm Alliance** (CFA) was founded by Kentucky farmers in 1985 during the Farm Crisis as a vehicle for farmers to collaboratively address the issues facing them, their neighbors and their communities. The COVID-19 pandemic was particularly hard for Kentucky BIPOC farmers, and CFA responded by rallying private donations large and small to create the Kentucky Black Farmer Fund.

**Women, Food, and Agriculture Network** (WFAN) was founded in 1997 with a mission to engage women in building an ecological and just food and agricultural system through individual and community power. WFAN is a national organization, with women and non-binary members across the United States. Delaying debt relief for our BIPOC farmer-members compounds the challenges that they regularly face, particularly during the pandemic, which hit these communities exponentially harder. WFAN believes in the maxim that "justice delayed is justice denied," and supports the immediate release of these much-needed relief funds.

**Steward Holdings** (Steward) is a private lending partner offering commercial loans and expert support services to regenerative farmers, ranchers, fishermen, and producers so they can expand and sustain their businesses. Steward currently works with over 100 human-scale regenerative farmers, ranchers, fishermen, and producers across the United States. Each day that relief under Section 1005 is delayed only adds to the economic burden being shouldered by farmers we work with, causing additional harm to them, their families, and their communities.

## INTRODUCTION

A preliminary injunction in this case will unnecessarily deprive minority farmers of debt relief, compounding harm from decades of racial discrimination and the COVID-19 crisis. The American Rescue Plan Act (ARPA) was signed into law on March 11, 2021. Section 1005 of the ARPA provides direct, emergency debt relief for socially disadvantaged farmers and ranchers, to ensure their survival in the wake of the COVID-19 crisis. Congress recognized that minority farmers were already operating at a disadvantage when the COVID-19 pandemic struck, and needed immediate support. Accordingly, the legislation authorized the U.S. Department of Agriculture (USDA) to spend "sums as may be necessary" to relieve certain debt burdens for socially disadvantaged producers. Pub. L. No. 117-2, § 1005(a)(1) (2021).[1]

Longstanding federal law defines "socially disadvantaged farmer or rancher" as "a member of a socially disadvantaged group . . . whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(5)–(6). In its Notice of Funds Availability, USDA explained that such groups "include, *but are not limited to*: American Indians or Alaskan Natives; Asians; Blacks or African Americans; Native Hawaiians or other Pacific Islanders; and Hispanics or Latinos."[2]

Plaintiffs seek a preliminary injunction to forestall implementation of Section 1005, arguing that relief to socially disadvantaged farmers and ranchers amounts to a constitutionally impermissible racial classification. But Supreme Court precedent is clear that Congress may employ race-conscious measures if needed to address a compelling government interest, s*ee, e.g.,*

---

[1] *See also* USDA Notice of Funds Availability (NOFA), https://public-inspection.federalregister.gov/2021-11155.pdf (noting that USDA "received emergency approval" from Office of Management and Budget for ARPA information collection).

[2] *See* NOFA, *supra* note 1, at 6 (emphasis added).

9

*Grutter v. Bolinger*, 539 U.S. 306, 326–27 (2003), and the balance of harms weighs strongly against injunctive relief.

As discussed below, Section 1005 is a measured response to past and present discrimination in USDA's programs, and the disproportionate impact of the COVID-19 pandemic on the nation's most vulnerable farmers. Having been underserved by prior USDA lending and aid programs, socially disadvantaged farmers are relying on Section 1005 to meet their farming needs this season, and will be irreparably harmed if the promised assistance is delayed or denied.

## ARGUMENT

I. **Congress Enacted Section 1005 to Address <u>Two</u> Compelling Government Interests: Remedying Discrimination Against Minority Farmers, and Ensuring that COVID-19 Relief Reaches Those Most Impacted by the Crisis.**

"The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995).

In crafting Section 1005, Congress was acting in response to *two* compelling, appreciable problems that have particularly disadvantaged minorities: a clear and persistent pattern of racial and ethnic discrimination in USDA's loan and assistance programs, and the disproportionate economic impact of the COVID-19 pandemic on minority farmers, which threatens to perpetuate the lingering effects of USDA's discriminatory practices.

### A. *Minority farmers have been harmed by persistent discrimination in the USDA's farm loan programs.*

The Supreme Court has recognized that the government has a compelling interest in "remedying the effects of past or present racial discrimination." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996). And as government officials have acknowledged in this case, it is "no secret" that the

USDA's loan programs "have historically been infected by discrimination against minority farmers."[3]

Through its Farm Service Agency (FSA) and, formerly, Farmers Home Administration (FmHA), the USDA has operated as the "'lender of last resort' to small farmers — a source of direct farm financing for those borrowers who cannot obtain credit elsewhere."[4] But minority farmers have often been excluded from the benefits of this assistance. In various fora over the last four decades, including congressional hearings,[5] civil rights reports,[6] and class action litigation,[7] minority farmers have decried unfair and discriminatory lending practices in USDA programs. Such practices include failing to provide minority farmers with loan program information and applications;[8] awarding minority farmers smaller loans, at higher interest rates, than white farmers;[9] frequent delays in processing loans for minority farmers;[10] applying minority farmers'

---

[3] Doc. 17, p. 4.

[4] *Decline of Minority Farming in the United States: Hearing Before the Gov't Just., Info., & Agric. Subcomm. of the H. Comm. on Gov't Operations*, 101st Cong. 27 (July 25, 1990) (statement of David Harris, Jr., Executive Director, Land Loss Prevention Project), https://www.google.com/books/edition/Decline_of_Minority_Farming_in_the_Unite/XdD4pV3tgeEC?hl=en&gbpv=1.

[5] *See, e.g.*, *Management of Civil Rights at the USDA: Hearing Before the Subcomm. On Gov't Mgmt., Org., & Procurement of The H. Comm. On Oversight And Gov't Reform*, 110th Cong. (May 4, 2008), https://www.google.com/books/edition/Management_of_Civil_Rights_at_the_USDA/uU8FKm6V3cC?hl=en&gbpv=0

[6] *See, e.g.*, U.S. Comm'n on Civil Rights, *The Decline of Black Farming in America* 85–134 (1982), https://files.eric.ed.gov/fulltext/ED222604.pdf.

[7] *See, e.g.*, *Keepseagle v. Veneman*, No. Civ.A.9903119EGS1712, 2001 WL 34676944 (D.D.C. Dec. 12, 2001) (class action of Native American farmers); *Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) (class action of Black farmers); *see also Garcia v. Veneman*, 224 F.R.D. 8 (D.D.C. 2004) (putative class of Hispanic farmers).

[8] *See* U.S. Comm'n on Civil Rights, *supra* note 6, at 87.

[9] *See id.;* Exhibit H, p. 2 (Statement of Rural Coalition to the H. Comm. on Agric. Hearing on the State of Black Farmers (March 25, 2021)).

[10] *See* U.S. Comm'n on Civil Rights, *supra* note 6, at 87.

11

loan payments to the wrong accounts;[11] and accelerating minority farmers' loans without explanation.[12]

Amici represent thousands of minority farmers, many of whom have directly suffered economic injury due to discriminatory practices in the administration of USDA's loan programs. For instance, Alfonso A. Abeyta, a Latino rancher in Antonito, Colorado, has a 400-acre ranch where he raises sheep and cows.[13] He recalls several painful instances of discrimination by USDA representatives. When he first sought a USDA loan to own and operate a ranch, a USDA employee told him that "Mexicans were more suited to being farm workers, not farm owners."[14] He later attempted to take out USDA loans because of several natural disasters. However, USDA representatives denied his applications because he and his family worked other jobs to supplement their income.[15] To Mr. Abeyta's knowledge, white farmers in his area have routinely been able to take out USDA loans even though they worked outside of their ranches.[16] He estimates that his losses from USDA lending discrimination are in excess of $2.9 million.[17]

Nathaniel Bradford is a Black farmer and rancher from Creek County, Oklahoma, who has worked in agriculture for 30 years.[18] He has been repeatedly discriminated against by FSA offices

---

[11] *See Decline of Minority Farming*, *supra* note 4, at 9 (statement of Congressman Mike Espy of Mississippi).

[12] *Id.*

[13] *See* Exhibit A (Declaration of Alfonso A. Abeyta), ¶¶ 3–4.

[14] *Id.* at ¶ 7.

[15] *Id.* at ¶ 9.

[16] *Id.*

[17] *Id.* at ¶ 8.

[18] *See* Exhibit B (Declaration of Nathaniel Bradford), p. 1.

in neighboring Payne and Okfuskee Counties.[19] For the past 15 years, he has been repaying an FSA loan without adequate servicing.[20] Last year, he applied for a new FSA loan to replace a 100-year-old barn.[21] Instead of giving him a loan to build a new barn, FSA appraised the old, derelict barn at $30,000, and told Mr. Bradford that he would need to pay the full amount in order to remove USDA's lien.[22]

In enacting Section 1005, Congress took action in response to a longstanding and well-documented pattern of discrimination against minority farmers in USDA programs. As Section 1005 authorizes USDA to remedy discrimination that is "traceable to its own actions," the relief afforded to socially disadvantaged farmers is clearly appropriate under existing Supreme Court precedent. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 288 (1986) (O'Connor, J., concurring in part and concurring in the judgment).

### B. Minority farmers' precarious financial circumstances have been exacerbated by the COVID-19 pandemic.

When crafting Section 1005, Congress not only grappled with USDA's extensive history of racial discrimination, but also confronted the devastating economic impact of the COVID-19 pandemic on already struggling minority farmers. Researchers have identified clear racial disparities in the impact of COVID-19: minorities are more likely to lose jobs and wages due to the pandemic;[23] and Black, Hispanic, and Native American people are approximately three times

---

[19] *Id.*

[20] *Id.* at p. 2.

[21] *Id.*

[22] *Id.*

[23] *See* Nishesh Chalise & Violeta Gutkowski, *How COVID-19's Economic Impact Varies by Geography and Race*, Federal Reserve Bank of St. Louis: Open Vault Blog (April 21, 2021), https://www.stlouisfed.org/open-vault/2021/april/how-covid-19-economic-impact-varies-by-geography-and-race; Mark Hugo Lopez et al., *Financial And Health Impacts Of COVID-19 Vary Widely By Race And Ethnicity*, Pew Research Center (May 5, 2020),

13

as likely to be hospitalized, and twice as likely to die, from COVID-19 infection.[24] While minority farmers have been disproportionately impacted by the pandemic, prior COVID-19 relief through USDA has failed to reach many of them.[25] Nearly 97% of the $9.2 billion appropriated through USDA's Coronavirus Food Assistance Program (CFAP) went to white farmers.[26]

Amici represent minority farmers who have been impacted by COVID-19, but received little or no relief under previous USDA pandemic assistance programs. For instance, Mr. Bradford tried to participate in CFAP, but was subjected to extra processes and scrutiny relative to white farmers.[27] Other Black farmers he knows were treated similarly, and Mr. Bradford believes that such roadblocks to participation were initiated by FSA county committees.[28] As a result, white farmers received more government support, including emergency assistance.[29]

Leroy Brinkley, Jr., is a Black rancher who lives in Haskell, Oklahoma.[30] He has operated his 80-acre ranch for 23 years.[31] Both his family and business suffered due to COVID-19. Mr. Brinkley, his wife, and his two-week-old granddaughter all contracted COVID-19.[32] The entire

---

https://www.pewresearch.org/fact-tank/2020/05/05/financial-and-health-impacts-of-covid-19-vary-widely-by-race-and-ethnicity/#:~:text=3The%20COVID%2D19%20economic,according%20to%20the%20April%20survey

[24] Centers for Disease Control and Prevention, *Risk for COVID-19 Infection, Hospitalization, and Death by Race/Ethnicity* (updated May 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

[25] Jared Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, Environmental Working Group (Feb. 18, 2021), https://www.ewg.org/news-insights/news/usda-data-nearly-all-pandemic-bailout-funds-went-white-farmers.

[26] *Id.*

[27] *See* Exhibit B, p. 2.

[28] *Id.* at pp. 2–3.

[29] *Id.* at p. 3.

[30] *See* Exhibit C (Declaration of Leroy Brinkley, Jr.), ¶ 3.

[31] *Id.* at ¶ 4.

[32] *Id.* at ¶ 8.

14

family had to quarantine apart from each other for 21 days, and his wife was hospitalized for nine days. Due to the pandemic, Mr. Brinkley could not work for two months, and was only able to work part-time for nearly a year.[33] His ranch was impacted as well, due to lost customers, and higher costs for feed, fuel, and production. Mr. Brinkley hopes to use the debt relief from Section 1005 to cover his losses related to COVID-19.

Henry Brown, a 71-year-old Black farmer, found prior COVID assistance programs impossible to navigate to his benefit.[34] His cow-calf business experienced significant income loss during the pandemic.[35] In addition, from March 2020 to February 2021, his off-farm household income decreased by $2,200 per month, due to economic costs associated with the COVID-19 pandemic.[36] Mr. Brown made a successful application to the Small Business Administration (SBA) for an Economic Injury Disaster Loan to help with his farm.[37] But he was ultimately penalized by USDA for participating in SBA's coronavirus relief program.[38]

By providing debt relief to the most disproportionately impacted farmers, who were largely left out of prior COVID assistance, Section 1005 lawfully redresses the "persistence" and "lingering effects" of discrimination in USDA's loan programs. *Adarand*, 515 U.S. at 237.

Congress has spent decades receiving and reviewing complaints from minority farmers, holding hearings on and studying the problem of racial discrimination in USDA's programs, and relying on race-neutral alternatives that have proven ineffective in remedying the harm of past and

---

[33] *Id.*

[34] *See* Exhibit D (Declaration of Henry Brown).

[35] *Id.* at ¶ 5.

[36] *Id.* at ¶ 7.

[37] *Id.* at ¶ 8.

[38] *Id.* at p. 3.

present USDA discrimination. *Cf. Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 970 (8th Cir. 2003) (approving race-conscious measures where "Congress has spent decades compiling evidence of race discrimination in government highway contracting, of barriers to the formation of minority-owned construction businesses, and of barriers to entry"). In enacting Section 1005, Congress was also taking urgent action to support the continued viability of minority farmers, who were already economically distressed, due in part to longstanding discrimination in USDA's programs, and whom evidence confirms are disproportionally impacted by COVID-19.[39] As there is a "strong basis in the evidence" to support Section 1005, and compelling government interests are implicated, the debt relief to socially disadvantaged farmers is constitutionally permissible. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (citation omitted).

## II. Section 1005 Is a Narrowly Tailored Measure, Employing the Least Restrictive Means to Achieve Congress's Policy Goals.

The government's consideration of race must be narrowly tailored to further its compelling interests. *Croson*, 488 U.S. at 507. Although "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative," it does "require serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339. Reviewing courts should also consider "the flexibility and duration of the relief" provided. *United States v. Paradise*, 480 U.S. 149, 171 (1987).

### A. Race-neutral efforts have been attempted, and failed to remedy the effects of USDA's long and persistent history of discrimination.

Discrimination based on race and ethnicity has been pervasive in USDA's programs for decades.[40] In response to complaints about discriminatory and arbitrary implementation, USDA

---

[39] *See supra* notes 23–25.

[40] *See, e.g.*, Exhibit H (Statement of Rural Coalition to the H. Comm. on Agric. Hearing on the State of Black Farmers (March 25, 2021)).

16

has engaged in a series of race-neutral reforms and actions, discussed below, but these changes have been insufficient to overcome continuing harms from past and present discrimination.

First, USDA Farm Loan Programs are themselves an example of race-neutral efforts to expand opportunity for farmers. Access to credit is a routine barrier for socially disadvantaged farmers, and congressional efforts to expand credit access for farmers began decades ago. USDA eventually created farm loan programs that target disadvantaged farmers.[41] To get a loan, farms must be of a modest size, that is to say "family farms;"[42] applicants must have been unable to get credit anywhere else;[43] strict loan limits apply; and officials' wide latitude in making loans was tightened with voluminous rules designed to make lending more fair. If any race-neutral and targeted program for credit scarcity is imaginable, this is it. Nevertheless, "SDFRs received proportionately fewer loans and less agricultural credit overall than non-SDFRs."[44]

Aid programs are also administered in a race-neutral manner. In practice, such programs perpetuate inequality, because the race-neutral formulas fail to account for important differences in the circumstances, accessibility, and needs of socially disadvantaged farmers. For instance, an aid program that provides a set dollar figure per acre[45] may meet the needs of farmers with large holdings, but farmers with small acreages — which describes most minority farmers[46] — often

---

[41] *Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited*, U.S. Gov't Accountability Off., 13 (July 2019), https://www.gao.gov/assets/gao-19-539.pdf.

[42] *See FSA Farm Loan Programs*, U.S. Dep't of Agric., https://www.fsa.usda.gov/programsand-services/farm-loan-programs/.

[43] *See* U.S. Comm'n on Civil Rights, *supra* note 6, at 76.

[44] *Agricultural Lending*, *supra* note 41, at 20.

[45] *See, e.g.*, *USDA to Provide Additional Direct Assistance to Farmers and Ranchers Impacted by the Coronavirus*, U.S. Dep't of Agric. (Sept. 18, 2020), https://www.usda.gov/media/press-releases/2020/09/18/usda-provide-additional-direct-assistance-farmers-and-ranchers.

[46] *See Lending to Farmers of Color and Women: New Report Examines Trends And Barriers*, Nat'l Sustainable Agric. Coalition (Aug. 27, 2019), https://sustainableagriculture.net/blog/gao-report-lending-sdfr/.

17

receive too little relief to meet their costs and expenses. The CFAP, for example, afforded the average white farmer $3,398, whereas the average Black farmer received $422.[47]

USDA reformed its county committee system, created decades ago, in an effort to provide accountability and fairness in USDA programs in a race-neutral way. County committees are elected by local farmers to make important decisions in the local implementation of USDA programs.[48] Given the realities on the ground, this race-neutral approach to USDA accountability itself became an instrument of discrimination.[49] Seeking a race-neutral solution, in a series of reforms, USDA has transformed the county committee system to make it less powerful and more representative of the whole farming community.[50] But this race-neutral approach has flatly failed to provide racial equality in USDA programs.[51]

Lastly, in response to longstanding complaints that farmers had no means of reversing arbitrary and discriminatory decisions, USDA created an elaborate appeals system, the National Appeals Division (NAD), in 1994.[52] NAD allows farmers to appeal any adverse decision to a relatively autonomous decisionmaker. While NAD may have improved accountability within

---

[47] *See* Hayes, *supra* note 25.

[48] *See Farm Service Agency County Committees: In Brief*, Cong. Rsch. Serv. (Jan. 29, 2021), https://www.everycrsreport.com/files/2021-01-29_R40179_111b8ebb8c5a99b497fb6c42c31be43a9681924a.pdf

[49] *See* Susan Youngblood Ashmore, *Carry It On: The War on Poverty and the Civil Rights Movement in Alabama 1964–1972*, 81, 140–52 (2008), https://www.google.com/books/edition/Carry_it_on/SSdp-dtMM1sC?hl=en&gbpv=0; *see also* Pete Daniel, *Dispossession: Discrimination Against African American Farmers in the Age of Civil Rights* (2013).

[50] *See* Farm Security and Rural Investment Act of 2002, § 2501A, https://www.congress.gov/107/plaws/publ171/PLAW107publ171.pdf; *see also Farm Service Agency: County Committee Elections 2001*, U.S. Dep't of Agric., https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/coc_elections-fact_sheet.pdf.

[51] *See, e.g.*, Exhibit B, pp. 2–3.

[52] *See* Department of Agriculture Reorganization Act of 1994, Subtitle H, 7 U.S.C. §§ 6991–7002.

18

USDA, it has done nothing to address discrimination. A farmer, for example, is not even allowed to raise discrimination as an issue in a NAD hearing.[53]

As USDA officials have acknowledged in this case, "[t]he necessity of the debt relief in § 1005 is underscored by the inefficacy of the race-neutral alternatives that Congress used before enacting § 1005."[54]

### B. Relief under Section 1005 will benefit the most vulnerable and underserved farmers: those impacted by USDA discrimination and at the greatest risk of failure.

Amici advocate for policies that will level the playing field for small farms and socially disadvantaged farmers and ranchers. A remedy for USDA discrimination should do several things. First, it should identify actual farmers who have struggled to succeed in farming. Second, it should target farmers who have participated directly in USDA programs, especially USDA loan programs, because that is where the most thorough record of discrimination exists. Third, the remedy should do something tangible that benefits the farmer, is directly related to the discrimination at hand, and makes that farm more likely to succeed.

Section 1005 meets all three of these criteria.

First, all recipients of relief are actual farmers. USDA farm loan regulations require that Farm Loan Program recipients be farmers when the loan is closed.[55] They can be relatively new farmers, but every loan recipient is an actual farmer. Further, these operations are all large enough to be considered farms, and not just rural residences or tiny homesteads with a small garden.[56] In

---

[53] *See Common Questions Related to Appeals*, U.S. Dep't of Agric., https://www.nad.usda.gov/content/common-appeal-related-questions.

[54] Doc. 17-1, p. 33.

[55] *See Your Guide to FSA Farm Loans*, U.S. Dep't of Agric., 17–21, https://www.fsa.usda.gov/Internet/FSA_File/fsa_br_01_web_booklet.pdf

[56] *Id.* at 70.

19

addition, the farms receiving relief are of modest size. USDA rules require that they be no larger than a family farm — mainly defined as the borrower doing a large proportion of the work on the farm.[57] None of the recipients of a USDA farm loan, in other words, is a massive farming operation that is in no danger of failure.

Second, because each loan recipient can only receive the loan if the farmer could not get the loan anywhere else,[58] we know that these farms are in danger of being lost due to lack of credit, repossession, foreclosure, bankruptcy or some other financial catastrophe.

Third, we know that these socially disadvantaged farmers — actual borrowers with USDA loans — have faced the brunt of ongoing, well-documented discrimination. These farmers may get loans, but get them late, making successful farming all but impossible.[59] They get loans of smaller amounts than are needed and provided for in the rules.[60] USDA places unreasonable restrictions on the loans and requires more collateral than is justified, thus making additional credit difficult to get.[61] If the farmer has difficulty repaying the debt, USDA rushes to accelerate, repossess, foreclose,[62] and does not use the wide panoply of loan servicing options — including debt write-

---

[57] *See id.*

[58] *See Agricultural Lending*, *supra* note 41, at 13.

[59] *See Decline of Minority Farming*, *supra* note 4, at 9 (statement of Congressman Mike Espy), 20 (statement of David Harris, Jr.).

[60] *See Decline of Minority Farming*, *supra* note 4, at 61, 97 (statement of Randi Ilyse Roth, Staff Attorney, Farmers' Legal Action Group).

[61] *See Management of Civil Rights*, *supra* note 5, at 24–26 (testimony of Guadalupe L. Garcia Jr.).

[62] *See id.* at 12 (statement of John Boyd, President, Nat'l Black Farmers Assoc.), 22 (testimony of Guadalupe L. Garcia Jr.).

20

downs — that the farmers are entitled to when experiencing payment difficulties, and which seem so widely available to white borrowers.[63]

Further, we know that ongoing debt is the most likely way a farm will be lost.[64] Behind virtually every farm collapse is a debt crisis. By relieving the debt, this USDA program provides a precise remedy to help socially disadvantaged farmers survive.

### C.  Section 1005 provides temporary relief in response to the exigencies of the COVID-19 pandemic.

In crafting a relief program for the most vulnerable farmers, Congress also had to consider their urgent financial needs in the context of typically rigid farming schedules.[65] Section 1005 is the most narrowly tailored approach that could deliver relief rapidly during the pandemic (in time to help farmers this season), and without creating problematic barriers to participation (as a grant application process would).

Given the inefficacy of race-neutral attempts to redress the impact of discrimination within USDA, and the urgent need to extend temporary aid to the most vulnerable farmers impacted by the COVID-19 pandemic, Congress's race-conscious measure in Section 1005 is appropriate.

### III.    The Balance of Harms Weighs Strongly Against a Preliminary Injunction, Because Minority Farmers and the Public Will Be Harmed, But Plaintiffs Are Not Harmed.

If the Court enjoins Section 1005, socially disadvantaged producers will be further and irreparably harmed financially, which will have devastating impacts on their operations,

---

[63] *See Civil Rights at the U.S. Department of Agriculture (C.R.A.T. Report)*, U.S. Dep't of Agric. Civil Rights Action Team, 22, 26 (Feb. 1997), https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1997-crat-report.pdf.

[64] *See* J. Rabin, *Excess Farm Indebtedness: Not a Sustainable Practice*, Rutgers Cooperative Extension: Sustainable Farming on the Urban Fringe (Oct. 15, 2010), https://sustainable-farming.rutgers.edu/excess-farm-debt-not-sustainable/.

[65] *See, e.g.*, *Monthly Crop Stage Calendars*, U.S. Dep't of Agric., https://ipad.fas.usda.gov/ogamaps/cropmapsandcalendars.aspx

21

customers, families, and communities. Both historic and continued racial discrimination has put

them in precarious financial positions that have been exacerbated by the COVID-19 pandemic. As

earlier pandemic relief did not reach or have a substantial positive impact on these producers, their

financial positions worsened relative to their peers. Congress enacted Section 1005 to provide

needed relief to socially disadvantaged farmers, recognizing that if action were not taken soon,

they would face irreversible harm.

### A. Discrimination in lending has made it more difficult for minority farmers to survive times of crisis.

In few other industries is regular infusion of capital, borrowed at fair terms, so necessary

to success as in agriculture. Discriminatory practices against minority farmers — particularly in

agricultural lending — have forced minority farms and ranches into foreclosure or hampered the

economic viability of their operations. USDA has acknowledged that "minority farmers have lost

significant amounts of land and potential farm income as a result of discrimination by FSA

programs and the programs of its predecessor agencies, ASCS and FmHA."[66]

Decades of discrimination in lending have set minority farmers up for failure, particularly

in times of extreme crisis like a global pandemic. In enacting Section 1005, Congress took this

long history of discrimination in lending, and its continuing effects during the coronavirus

pandemic, into account. In the committee report accompanying H.R. 1319, Congress explained:

> The USDA spends billions of dollars annually to provide crucial support to
> American agricultural producers. Black farmers and other agricultural producers
> belonging to racial or ethnic minority groups have received a disproportionately
> small share of the farm loans and payments administered by USDA as a result of
> the longstanding and widespread discrimination against these groups. Despite
> multiple lawsuits, numerous government reports, and the limited programs created
> by Congress since the 1980s attempting to address the disproportionately low rates
> of agricultural spending on socially disadvantaged groups, USDA farm loan and
> payment programs continue to disproportionately benefit farmers who are not racial

---

[66] *See C.R.A.T. Report*, *supra* note 63, at 6.

or ethnic minorities. Consequently, the Committee has agreed to achieve its directed spending target by using a tailored approach to increase spending to address these longstanding inequities.[67]

### B.  Delay in delivering debt relief will irreparably harm minority farmers.

Enjoining Section 1005 and denying needed debt relief to minority farmers would destabilize the farm sector as a whole. The immediate harm would not be borne by the Plaintiffs, but rather by the over 250,000 minority farmers this relief was designed to protect. They have already suffered disproportionately from the COVID-19 pandemic, and delaying or denying debt relief while the world is still in the midst of the pandemic would only exacerbate those impacts. The devastating market impacts of the pandemic on American agriculture have already been exceptionally disastrous for minority farmers, as the pandemic has compounded negative externalities from decades of discriminatory lending practices.

These deep impacts on minority farming operations include production to processing gaps, market closures, and loss of sales, all of which result in an inability to generate profit and repay debt. In a survey conducted by amicus curiae Intertribal Agriculture Council (IAC),[68] 86 percent of the Tribal producers who responded have been negatively impacted by the COVID-19 pandemic; 85 percent stated the need for financial assistance and support as a result of the pandemic; and 79 percent reported a production to processing gap.

Amici represent struggling minority farmers who have relied on the Government's assurances of debt relief, and will be harmed if this needed assistance is withheld. For instance, Mr. Bradford's ranch is already in serious jeopardy because of past due balances and delayed farm

---

[67] *Rep. of H. Comm. on the Budget to Accompany H.R. 1319*, 12 (Feb. 24, 2021), https://www.congress.gov/117/crpt/hrpt7/CRPT-117hrpt7.pdf.

[68] *See Covid-19 Preliminary Survey Results*, Intertribal Agric. Council, https://www.indianag.org/post/covid-19-preliminary-survey-results.

and ranch activities stemming from the pandemic.[69] He has made plans for his farm based on the promise of loan forgiveness, putting all of his family's savings into keeping the farm going.[70] If Mr. Bradford does not receive debt relief through Section 1005, he will go bankrupt.[71]

Jane Doe is an Asian poultry farmer in North Carolina.[72] She is also a refugee.[73] She owes hundreds of thousands of dollars in loans which were used to start her family's poultry business.[74] Since her husband's death, she has struggled to manage the farm on her own.[75] The pandemic has caused delays with processing facilities, which have been harmful to her business, and she has been denied participation in aid programs.[76] If she does not receive debt relief through Section 1005, she will not be able to keep the farm going for much longer, and she fears that she will be financially taken advantage of as a widowed, female farmer.[77]

Additionally, without debt relief through Section 1005, debt-to-income ratio restrictions will prevent many socially disadvantaged farmers from obtaining the lending they need to plant and harvest their crops and maintain their farms this season.[78]

---

[69] *See* Exhibit B, p. 3.

[70] *Id.*

[71] *Id.*

[72] *See* Exhibit E (Declaration of Jane Doe), ¶¶ 2–5. Ms. Doe uses a pseudonym due to concerns about retaliation.

[73] *Id.* at ¶ 5.

[74] *Id.* at ¶ 7.

[75] *Id.* at ¶ 11.

[76] *Id.* at ¶¶ 10, 12.

[77] *Id.* at ¶ 15.

[78] *See, e.g.,* Exhibit B, p. 3; Exhibit F (Declaration of George McNary III), ¶ 13; Exhibit G (Statement of Cassandra P.), pp. 2–3. Ms. P. uses a pseudonym due to concerns about retaliation.

24

### *C.   Delaying assistance to minority farmers is also harmful to the public interest.*

Without equitable access to credit, farms and ranches simply cannot survive; without profitable farms and ranches and the related businesses they help sustain, the American economy suffers.[79] American Indian and Alaska Native farmers alone produce $3.5 billion in raw market value of agricultural commodities annually, according to the National Census of Agriculture.[80] Black farmers produce $1.4 billion annually.[81] Hispanic farmers produce $21 billion annually.[82] All told, approximately 250,000 socially disadvantaged farmers and ranchers contribute $26 billion to the U.S. economy each year, and this is despite carrying a disproportionate amount of debt — an estimated $20 billion in farm debt[83] — and having less access to farm programs.

If socially disadvantaged farmers are unable to survive pandemic-related losses, that would otherwise be ameliorated by Section 1005 as Congress intended, a loss of that magnitude — after all the losses that the American economy broadly, and the American farm sector particularly, have had to bear since March 2020 — would have devastating economic consequences for all producers, not just those eligible for debt relief under Section 1005. The death of minority-owned farming operations undermines the entire American economy, imperils American farming and ranching

---

[79] *See Ag and Food Sectors and the Economy*, U.S. Dep't of Agric. Econ. Rsch. Serv. (noting that agriculture and related industries support 5.2% of the overall American GDP, accounting for $1.1 trillion annually and supporting 11% of total U.S. employment, with direct on-farm employment accounting for 2.6 million American jobs), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/ag-and-food-sectors-and-the-economy/#:~:text=Agriculture%2C%20food%2C%20and%20related%20industries,about%200.6%20percent%20of%20GDP.

[80] *See American Indian/Alaskan Native Producers, 2017 Census of Agriculture: Highlights*, U.S. Dep't of Agric., 2 (ACH17-7/October 2019), https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_AmericanIndianAlaskaNative_Producers.pdf

[81] *See Black Producers, 2017 Census of Agriculture: Highlights*, U.S. Dep't of Agric. (ACH17-9/October 2019), https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Black_Producers.pdf

[82] *See Hispanic Producers, 2017 Census of Agriculture: Highlights*, U.S. Dep't of Agric. (ACH17-10/October 2019), https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Hispanic_Producers.pdf

[83] *See Agricultural Lending*, *supra* note 41, at 14.

25

writ large, and could potentially push the farm sector into another farm financial crisis like that of the 1980s. It is difficult to imagine a more compelling government interest than staving off total farm financial collapse.

Potential closure of minority farmers' agricultural operations would also have disastrous consequences for the American food system, particularly for those Americans who are relying on some form of food assistance in the wake of the pandemic-related economic downturn. Preliminary data from a survey of American Indian and American Native households conducted by the Native American Agriculture Fund and the Food Research & Action Center suggest a nearly 1500% rise in usage of federal food programs that connect individuals in need with American-grown or raised food, like the Farmers-to-Families Food Box. These food assistance programs are connected with local producers. In many Tribal communities, the closest local producers are socially disadvantaged farmers. Accordingly, enjoining debt relief will not only devastate these farms, but will also have a disproportionate impact on Tribal citizens' food systems.

### D. An injunction of Section 1005 would undermine Congress's goal of remedying ongoing inequities in USDA funding.

When Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) on March 23, 2020, they fully recognized the threat facing agriculture. Nearly $9.2 billion was designated in the CARES Act for the Secretary of Agriculture to use to provide direct support to agriculture producers. The funding went overwhelmingly to white producers, making little to no impact on USDA's socially disadvantaged producers. [84]

Utilizing the CARES Act funding, USDA created a set of programs through the Coronavirus Food Assistance Program (CFAP): direct payments to producers and a Farmers-to-

---

[84] *See* Hayes, *supra* note 25.

26

Families Food Box Program (FFFB). Both programs did not provide adequate access or financial assistance to socially disadvantaged producers, exacerbating their precarious financial standings going into the pandemic.

In addition to the great disparity between who received and did not receive direct CFAP payments, it took USDA several months before making particular commodities produced by socially disadvantaged farmers and ranchers eligible for CFAP payments. In the first round of CFAP, which ran from April to September 2020, livestock made up more than 48 percent of the total payments.[85] However, bison, a major livestock category for Tribal nations, were not included. With livestock producers making up nearly 60 percent of all Tribal agriculture sales,[86] many producers went months without this funding.

Under the FFFB program, many socially disadvantaged producers did not have access to the program, and/or had their participation limited. Based on the structure of the program and outreach by USDA, very few Tribal producers, if any, were selected to be distributors/purchasers for the programs, and very few Tribal members sold into the program. Many found the requirements to get into the program difficult. Even when the FFFB program reached socially disadvantaged producers, that support was cut abruptly short. One award that went to an organization representing approximately 35 African American producers provided food boxes to predominately minority groups for two rounds of the program.[87] However, despite their demonstrated success, the organization was not provided an award for a third round.[88]

---

[85] *See Coronavirus Food Program 1 Data*, U.S. Dep't of Agric., https://www.farmers.gov/cfap1/data.

[86]  *See American Indian/Alaskan Native Producers*, *supra* note 80.

[87] *An Evaluation of the Farmers to Families Food Box Program*, Harvard Law School: Food Law & Pol'y Clinic, 15 (Feb. 2021), https://www.chlpi.org/wp-content/uploads/2013/12/F2F-Food-Box-Report-Online-Final1.pdf.

[88] *Id*.

The totality of the history of past and present discrimination in USDA programs, including the ones created by USDA in response to the economic crisis facing America's agricultural producers, required the creation of Section 1005 to stave off an impending financial crisis for socially disadvantaged producers. Enjoining these payments would not only disregard congressional intent and a clear history of discrimination, but would also fail to acknowledge the current crisis facing minority farmers, who are desperately awaiting relief that has been consistently promised, but never delivered.

## CONCLUSION

Section 1005 is a constitutionally appropriate remedy for past and present discrimination in USDA's programs, enacted by Congress during a time of crisis that has disproportionally impacted minority producers. For the foregoing reasons, Plaintiffs' request for a preliminary injunction should be denied.


Date: June 23, 2021                          Respectfully submitted,

                                             /s/Keisha Stokes-Hough
                                             Keisha Stokes-Hough (Miss. Bar No. 103717)
                                             Alexandra M. Jordan (Ala. Bar No. 4624-X00X)
                                             **SOUTHERN POVERTY LAW CENTER**
                                             400 Washington Avenue
                                             Montgomery, AL 36104
                                             Tel:    (334) 956-8200
                                             Fax:    (334) 956-8481
                                             keisha.stokeshough@splcenter.org
                                             alexandra.jordan@splcenter.org

                                             *Counsel for Amici Curiae*


28

# EXHIBIT A

# DECLARATION OF ALFONSO A. ABEYTA

## <u>DECLARATION OF ALFONSO A. ABEYTA</u>

My name is Alfonso A. Abeyta. I am over the age of 18 and fully competent to make this declaration.

1.      I am a Latino rancher who is a member of the National Latino Farmers and Ranchers Trade Association (NLFRTA).

2.      I want the NLFRTA and the Rural Coalition to represent my interests in this lawsuit, *Faust v. Vilsack*, No. 1:21-cv-548 (E.D. Wis.).

3.      I live in Antonito, a rural town of approximately 656 people in southern Colorado.

4.      I own and operate a ranch of over 400 acres, where I raise 500 sheep and 300 cows. I have operated this ranch for 61 years. I am 82 years old.

5.      I currently have farm ownership and farm operating loans from FSA. Around the year 1995, I took out USDA loans in the amount of approximately $350,000.00. I used the loans for real estate loans or ownership.

6.      As of June 21, 2021, the outstanding balance on my loans was approximately $455,000.

7.      I believe I have experienced racial discrimination from USDA representatives. For example, when I first sought a USDA loan to own and operate a ranch, a USDA representative told me that "Mexicans were more suited to being farm workers, not farm owners."

8.      From 1981 to 2000, I estimate that my losses directly or indirectly associated with FHA/FSA discrimination were in excess of $2.9 million.

9.      In the past, I have attempted to take out USDA loans because of several natural disasters. However, USDA representatives denied my requests for loans because my family and I

1

were working other jobs to supplement our income. To my knowledge, white farmers in my area have routinely been able to take out USDA loans even though they worked outside of their ranches.

10.     As a result of these loan denials, I had to sell off small pieces of my land to stay afloat financially.

11.     In order to pay off my USDA loans, I entered into a land trade agreement with the Bureau of Land Management. However, as a result of delays in USDA representatives' compliance with the land trade agreement, I lost several hundred thousand dollars.

12.     In 1996, USDA representatives denied my request for loan subordination based on miscalculations of the improvements I made to the property. While USDA representatives eventually reversed course after I appealed the decision, these delays resulted in a shortened growing season and loss of revenue. In addition, USDA representatives made adverse changes to an agreed upon farm plan for loan subordination without notifying me. These changes caused additional delays and loss of revenue.

13.     In 2019, I was denied USDA disaster set-aside loan assistance because I participated in an industrial hemp crop pilot program authorized by the 2014 Farm Bill, which the USDA found was ineligible for loan assistance. I sought direction from USDA representatives before entering into the contract for hemp production and was not clearly advised that the crop would be ineligible for loan assistance.

14.     I have filed a formal civil rights complaint with the USDA, appealed a USDA decision to the National Appeals Division, and reached out to the USDA and the President of the United States regarding my experiences of discrimination.

15.     Specifically, the staff of the Farm Service Agency referred to my request for loan servicing in a derogatory manner when a loan officer stated: "trash in – trash out."

<div align="center">2</div>

16.     In a discriminatory manner during a farm loan servicing action on my loan in 2019, the FSA office deliberately provided me with inaccurate loan servicing information.  More particularly, the FSA provided information on hemp production that was not correct.  Later the FSA denied my equitable participation in the disaster set aside program.  White farmers were treated more favorable under the same or similar conditions.

17.     My business has suffered because of the COVID-19 pandemic. There are fewer buyers available leading to lower market prices.

18.     I believe I am eligible for loan forgiveness under Section 1005 of the American Rescue Plan Act because I am a socially disadvantaged farmer who has an outstanding loan balance on a loan with USDA. I recently received a letter from USDA Farm Service Agency informing me that I am eligible to have my loan paid off.

19.     If the injunction is not lifted immediately, my farm operations will be harmed in a major financial way.

20.     Based on the letter from USDA regarding my eligibility for debt relief, I planned to catch up with yearly ranch obligations that I have been unable to attend to because of the past 3 years of drought conditions in my area.

21.     I will be financially harmed if the debt relief is delayed.

I declare under penalty of perjury that the foregoing is true and correct.


Date: ____June 22, 2021_____                    Respectfully submitted,


X _Alfonzo A. Abeyta_
Alfonzo Abeyta

3

# EXHIBIT B

# DECLARATION OF NATHANIEL BRADFORD

# DECLARATION OF NATHANIEL BRADFORD

My name is Nathaniel Bradford, and I am a Black farmer in Oklahoma. I am over the age of 18 and fully competent to make this declaration.

1.      I am a member of one of Oklahoma Black Historical Research Project and I have a substantial interest in the outcome of this litigation.

2.       I want amicus Rural Coalition and amicus Oklahoma Black Historical Research Project, Inc to represent my interests in this lawsuit, *Faust v. Vilsack*, No. 1:21-cv-548 (E.D. Wis.).

3.      I live in Creek County in the state of Oklahoma.

4.      I offer the following personal narrative:

I have been farming and ranching for thirty years and know the community of minority farmers and ranchers in the counties of Okfuskee, Creek and Okmulgee counties in Oklahoma. The USDS Farm Services Agency (FSA) has a known track record of not working with minority farmers in these counties. I farm 2000 acres, mostly leased in several counties, making my operation one of the largest farms owned by an African American rancher.  I feel I have been continuously discriminated against in the FSA offices in both Payne and Okfuskee County. My complaints of discrimination have been of no avail.  I've filed formal civil rights complaints; I filed an appeal to the National Appeals Division, and I've discussed this situation with my with my neighboring farms and organizations with which I work.  I filed one complaint with USDA, and it was denied due to them stating the filing time. We've been subject to discrimination on multiple occasions which are all documented.

My experiences with FSA and other agencies of the USDA are similar to other smaller minority farmers/ ranchers. The size of our farms/ranch does not matter; we are all subjects of bad

1

local government agents. For the past 15 years, I have been repaying FSA on a farm ownership without adequate servicing of the loan which is required by federal government regulations.

I have been in mediation for years. I hired lawyer to help him to work out more favorable terms with FSA including a debt restructuring.  I learned during the mediation that my attorney was having a private conversation with the FSA people prospecting for more clients instead of instead of representing me.

 Last year, I tried to get a new loan to build a new barn to replace one that is over 100 years old and in poor condition. Even though this barn had not been included on my appraisal nor had they required me to insure it. They suddenly they told me it was understood that the barn was included.  They appraised it at $30,000 and required me to me repay that amount in order to remove the lien. Now they said that the barn is of no value, and have removed the lien, but they increased the appraisal by $30,000. This decisions flies in the face of known convention in borrowing – they have inflated the value of an asset that is essentially worthless and then increased the appraised value anyhow, making my cost of borrowing to finance the new barn I really need prohibitive. This is tantamount to a predatory lending.

I had 110 head of cattle in 2005.  Due to the drought of 2007, I lost most of my herd. Climate change is a key factor limiting in my ability to scale up my operation. I was down to 15 cows and after hard work, have rebuild to 115 head of cattle after almost 20 years. During the pandemic, I saw the opportunity to scale up production, and a new barn was part of my plan.

During the pandemic I sought to participate in the CFAP program. I feel I was subjected to extra processes and scrutiny to secure my participation.  These roadblocks to participation seem to have been created by the FSA county committee only certain farmers.  Other Black farmers have

experienced similar situations. White farmers get more government support including emergency assistance.

 I am currently a borrower with the Farm Service Agency.  I have a farm ownership and a farm operating loan, and also have a bank loan guaranteed by the Farm Service Agency. I have received a letter from Farm Service Agency saying that I'm eligible to have my debt paid off. I have not yet received a formal offer to pay.  During the pandemic, I have been impacted by many factors, including market challenges with cattle prices inflation and feed and fertilizer and other costs I've had to delay production due to lack of the necessary services to operate.

I have made plans based on the proposed loan forgiveness. The delay in these payments will cause me financial harm due to my past due balances, delayed farm and ranch activities and not being able to purchase necessary supplies such as fertilizer feed seed and fuel.  We have put all of our savings into our farm in order to improve production. If I don't receive this assistance as promised, we will go bankrupt because we have payments to the USDA and others that we simply will not be able to pay; therefore, our ranch is in serious jeopardy.


I declare under penalty of perjury that the foregoing is true and correct.

Date: ___6-22-2021_____                    Respectfully submitted,

                                                            /s/ Nathaniel Bradford

                                                            Nathaniel Bradford

3

# EXHIBIT C

# DECLARATION OF LEROY BRINKLEY, JR.

## <u>DECLARATION OF LEROY BRINKLEY, JR.</u>

My name is Leroy Brinkley, Jr. I am over the age of 18 and fully competent to make this declaration.

1.     I am an African-American rancher who is a member of the Oklahoma Black Historical Research Project.

2.     I want the Oklahoma Black Historical Research Project and Rural Coalition to represent my interests in this lawsuit, *Faust v. Vilsack*, No. 1:21-cv-548 (E.D. Wis.).

3.     I live in Haskell, Oklahoma.

4.     I own and operate a ranch of 80 acres, where I raise livestock. I have operated this ranch for 23 years and worked as a rancher for 28 years.

5.     I currently have farm operating loans from FSA. I have a bank loan from a Farm Credit System lender which is guaranteed by the FSA through the Muscogee (Creek) Nation. I applied for the loans around fall 2020, but due to delays, the application was processed around March 2021. I took out USDA loans in the amount of approximately $60,000. I planned to use the loans to expand my cattle herd and to establish a construction shop for farming equipment.

6.     As of June 21, 2021, the outstanding balance on my loan was approximately $63,000.

7.     I believe I have experienced racial discrimination from USDA and its representatives. For example, I could not participate directly in USDA loan programs because I am a Tribal member. Instead, I had to apply for loans through the Muscogee (Creek) Nation. USDA representatives were unresponsive when I applied for USDA loans. I had a similar experience when I applied for loans in 1991. I did not receive any assistance and my loan

1

application was rejected. I have discussed these experiences of discrimination with other farmers and Tribal members in my area, and they have shared similar experiences.

8.      My family and business have suffered because of the COVID-19 pandemic. My wife contracted COVID-19 and was in the hospital for 9 days. I also contracted COVID-19, along with our 2-week-old granddaughter. Our family had to quarantine apart from each other for 21 days. As a result of the pandemic, I could not go to work for two months and I had to work part-time for approximately 1 year. The pandemic also caused hardship for my ranch operation because I had higher costs for feed, fuel, and production and we lost customers due to COVID-19.

9.      I have used my USDA loan in part to cover losses I suffered because of the pandemic, including extra hay and feed at higher prices due to the pandemic, equipment repair, and insurance.

10.     I believe I am eligible for loan forgiveness under Section 1005 of the American Rescue Plan Act because I am a socially disadvantaged farmer who has an outstanding loan balance on a loan with USDA.

11.     My family and my farm are still recovering from the impacts of the COVID-19 crisis, and it will be much harder to recover if the USDA's debt repayment is delayed.

I declare under penalty of perjury that the foregoing is true and correct.

Date: June 22, 2021                   Respectfully submitted,

                                       /s/ Leroy Brinkley, Jr.
                                       Leroy Brinkley, Jr.

2

# EXHIBIT D

# DECLARATION OF HENRY BROWN

# DECLARATION OF HENRY BROWN

1. I, Henry L. Brown, am a 71 African American.  I meet the definition of a new and beginning farmer and rancher for purposes of loan making and loan servicing.

2. I desire to have the Amici, Rural Coalition, represent my interests in Civil Action No. 21 – cv-548-WCG.

3. If the injunction is not lifted, I will continue to suffer irreparable financial and economic harm to my farm operation.

4. I am eligible to participate in the Section 1005 program benefits.

5. During the months of March 2020 to February of 2021, I experienced farm income loss due to the COVID 19 pandemic.  DOC Family Farms, LLC, a cow – calf operation,  is a qualified agricultural business for purposes of Economic Injury Disaster Loans **(EIDL).** **See Section 18(b) of the Small Business Act (15 U.S.C. 647(b).**  See 7 CFR 766.104(a) (1) (i), (ii), (iii), (iv), (v).

6. The economic effects of the coronavirus (COVID-19) pandemic caused farmers to miss farm loan payments.

**7.** During the months of March 2020 to February of 2021, my off farm house hold income decreased monthly by **$2,200.00** due to work place health and safety dislocations associated with the COVID 19 pandemic, an event that is beyond my control.  **See 7 CFR 766.104(a) (1) (i), (ii), (iii), (iv), (v).**

8. As authorized under law the ***CARES ACT*** (P.L. 116-136) and in order to meet home and farm operational financial obligations that could have been met had the **COVID-19** disaster not occurred, I made a successful application for a Small Business Administration (SBA)  Economic Injury Disaster Loans (EIDL) loan pursuant to the amended ***CARES ACT.***

9. My Economic Injury Disaster Loans (EIDL) pursuant to Section 18(b) of the Small Business Act **(15 U.S.C. 647(b)** did not require the Small Business Administration to take a security interest in my cows, calves or related offspring.

10. I have two loans with the U.S. Department of Agriculture Farm Service Agency.  One loan is current and not in default.  The second loan, identified as 10-079-348420796, was placed in default by Newton Gilman February 19, 2021.

11. The original FSA Promissory Note, identified as 10-079-348420796, in the amount of $8,980.00 signed on December 21, 2018.  The due date for this payment was on June 21, 2020 and has been declared in default on February 19, 2021.

12. I completed a Farm Business Plan dated October 17, 2020 for the purpose of farm loan servicing of the cattle loan identified as 10-079-348420796.

13. According to SBA's **EIDL** requirements, I was not required to include SBA in any financing or loan servicing transactions.

14.  On February 4, 2021, USDA temporarily suspended non-judicial foreclosures, debt offsets or wage garnishments, and referring foreclosures to the Department of Justice. USDA is working with the U.S. Attorney's Office to stop judicial foreclosures and evictions on accounts that were previously referred to the Department of Justice. This is

for both direct loans and Farm Storage Facility Loans.  Additionally, USDA extended

deadlines for producers to respond to loan servicing actions, including loan deferral

consideration for financially distressed and delinquent borrowers.

***Acts of farm loan discrimination based on race, age and source of income on February 19, 2021 when FSA:***

(A) Denied adequate farm loan servicing in accordance with the ***CARES Act' EIDL*** program;

(B)  Treated, erroneously and in a discriminatory manner, FSA stated that I did not act in

good faith during participation in the ***CARES Act's EIDL*** program and the U.S.

Department of Agriculture Farm Service Agency farm loan servicing process;

(C) I was penalized for lawful participation in ***CARES Act's EIDL*** program on  June 9, 2020;

(D)  FSA stated in relevant part: " Additionally, you did not disclose to FSA that you had

obtained financing from SBA on your application as required by Handbook 3 – FLP Par.

65 and as you certified when signing the application."

**/s/ Henry Brown,**                    June 22, 2021


Henry Brown
Declarant

# EXHIBIT E
# DECLARATION OF JANE DOE

## <u>DECLARATION OF JANE DOE</u>

My name is Jane Doe and I am an Asian farmer in North Carolina. I am over the age of 18 and fully competent to make this declaration.  In support of this Declaration, I offer the following:

1.      I have a substantial interest in the outcome of this litigation and I am a member of the Farmers of Color Network of the Rural Advancement Foundation International.  I am an individual that would be negatively impacted by the Temporary Restraining Order issued by the Court in this lawsuit, *Faust v. Vilsack*, No. 1:21-cv-548 (E.D. Wis.).

2.      I live in North Carolina.

3.      I am a poultry grower and have been raising poultry for sixteen years.

4.      USDA is the guarantor on my loans with a Farm Credit system commercial lender.

5.      As an Asian refugee and female farmer, I am a "socially disadvantaged farmer" pursuant to 7 U.S.C § 2279 (e)(2).

6.      As an Asian farmer, I am eligible for the debt payment pursuant to Section 1005 of the American Rescue Plan, as passed by Congress and signed by President Biden on March 11, 2021.

7.      My husband and I took out loans to start our poultry operation and still have several hundred thousand owing on those loans.

8.      I am not delinquent in my loan payments.

9.      I have participated in NRCS conservation programs.

10.      I feel that as a female farmer and an Asian farmer, I am always forced to take an extra step.  I have been denied participation in programs and have had to ask multiple times for assistance.

1

11.     My husband passed away and it is nearly impossible for me to maintain the poultry operation on my own.

12.     The coronavirus epidemic has created several kinds of instability in the industry. In the spring of 2020, there were substantial delays with processing facilities, which created disruption with flock size allowances, getting birds to processors and supply of new flocks.

13.     I will be significantly damaged if the payment permitted by Congress is delayed by the action of the Court in this matter.

14.     Because of the need for constant facility upgrades and the high demands of the poultry farming industry, I cannot continue to farm.

15.     The payment of the guaranteed loan will provide me with the ability to consider marketing my property without pressure from buyers that want to take advantage of my status as a widowed female farmer.

16.     If the debt payment authorized by law was made in a timely manner, I feel that I would have more options to consider for the stability of my farm and family.  Because of the delay, I may not have a choice.

I declare under penalty of perjury that the foregoing is true and correct.

Date: ___6-21-2021_____              Respectfully submitted,

                                           Jane Doe
                                           _____
                                           [Pseudonym]

2

APP. 000331

# EXHIBIT F

# DECLARATION OF GEORGE MCNARY III

## DECLARATION OF GEORGE MCNARY III

My name is George McNary III. I am over the age of 18 and fully competent to make this declaration.

1. I am an African American farmer/rancher who is a member of the African American Texas Coalition of Rural Landowners.

2. I want the NLFRTA and the Rural Coalition to represent my interests in this lawsuit, *Faust v. Vilsack*, No. 1:21-cv-548 (E.D. Wis).

3. I live in Hempstead, Texas, which has a population of less than 10,000 residence.

4. I own and operate a ranch/farm that is 110 acres.

5. I am 37 years old. I have operated this farm/ranch for 12 years. I received my first USDA loan in 2010. I subsequently took out two more loans in 2012 and 2019.

6. I currently have approximately $900,000 in farming debt.

7. I believe I have experienced racial discrimination from USDA representatives. Initially I did not realize that my loan applications were being highly scrutinized. The average dollar amount did not allow for a profitable business, I was given a hard time regarding my agricultural income, which delayed me receiving loans, low ball appraisals, loans not funded/fully funded, never received funding in certain circumstances.

8. Prior to the announcement that the American Rescue Plan passed, the night before it became public information, I received an email from the local county USDA FSA agency asking me to fill out graduation papers within 30 days. I have never received an email like this before. This means I would be expected to pay off the loan and get a commercial loan, which would have made me ineligible for debt relief.

9. I estimate my losses to be approximately $130,000 from 2010 to the present.

10. In the past, I have applied for USDA loans because of land acquisition. I currently have two loans for this reason.

11. I am a socially disadvantaged farmer/rancher that had to care for a close family member who contracted the COVID-19 virus. I had to take time away from my farm to tend to my family member, as well as help them financially. Which left me unable to buy feed and fertilizer due to the economic hardship.

12. Because daycare was closed due to the pandemic, my wife and I took turns working and caring for our kids, ages one and three years old. As a result, I had to pay someone to do the things that I was not able to do.

13. If the debt forgiveness is delayed due to the TRO, I will not be able to secure additional loans until the loan is paid off due to my current debt to income ratio.

14. I need to purchase equipment. I would also like to purchase land that is currently for sale that I can afford. However, the delay will cause the land that I can afford to be sold, and the more expensive land will be all that is left.

15. If the TRO is granted, there is a chance that my family and I will struggle. There is also a possibility that I will be delinquent in paying my $18,000 mortgage, which was due in January.

I declare under penalty of perjury that the foregoing document is true and correct.

Date: 6-22-2021

Sign: _George L McNay III_

Print: George McNay III

# EXHIBIT G

# STATEMENT OF CASSANDRA P.

Statement of Cassandra P.

Cassandra P. is a pseudonym for an African American woman farmer who resides in Northport, Alabama and farms 50 acres of pasture and vegetables in Pickens County, Alabama. I am concerned about reprisals from the local FSA office and white farmers who assist me with my farming operation, if my actual name is used.

I am connected to the Rural Coalition and their chairperson John Zippert who may represent me in this case. I have received assistance from the outreach and technical assistance programs run by their member groups for over twenty years.

I am primarily a cattle farmer with over 25 head of brood cows.

I have had three loans with the USDA Farm Services Agency. I received my first loan for $25,000 in 2008 and used the funds to purchase a farm truck, pea sheller and other equipment. I was able to repay this loan from the results of my farming operation.

In 2011, I borrowed an additional $25,000 for an FSA Microloan Program for farm equipment although I wanted more funds, the local FSA agent limited me to this amount. In 2013, I received another FSA Microloan for $25,000 to purchase additional cows. The FSA took a mortgage on two rental houses, with a value of $40 to $50,000 on property in Birmingham, I inherited from my mother

I am a school teacher and decided to continue farming my family land utilizing old equipment that my father passed down to me. The equipment is 40 to 50 years old and breaks down often during farming season. One tractor no long goes into reverse which makes it difficult to use for some farming tasks such as moving around hay bales to feed the cows.

I have had as many as 25 brood cows on the land. I now have 18 brood cows.

Prior to the COVID-19 pandemic, I had encountered some problems with my farm operation. I need to improve the grazing with fertilization and some cross fencing. I also have had problems with calving which reduced my revenue stream. In 2018, Hurricane Michael damaged my farm and caused trees to fall killing three breeding animals. A timber harvesting contractor on a neighboring landowner's farm damaged my fence and allowed part of my herd to wander away. I recovered some but not all of the cows that I had.

The timber contractor came back and fixed the fence after I called him numerous times. Overall, I lost five head from the fence problem but I am still planning to sue the timber contractor in small claims court.

These difficulties meant that I fell behind in paying my full payments to FSA on the two outstanding loans. Mr. Phillips in the Tuscaloosa FSA Office told me that I would not be able to get any more farm loans because of my bad payment history. I called a Mr. Coles in the FSA State Office in Montgomery to complain of discrimination and discouragement by the local agent. The situation improved a little after I spoke up, but I still need more help to get my farm to where I want it to be.

During the past 18 months of the COVID-19 pandemic, I continued to experience difficulties in marketing my livestock and vegetables due to low prices and market disruptions. Several members of my immediate family, including a sister and several cousins were directly impacted by the disease. One cousin died of COVID-19 and related health problems.

I was happy to learn of the relief from the Section 1005 ARPA funding to forgive my outstanding loans after years of less than satisfactory loan servicing by FSA. I received my offer letter last week, indicating a balance of $15,000 on the 2011 loan and $16,000 on the 2013 loan.

My plan after the loans were paid, was to make a new loan. I was hoping to use these new funds to lime, fertilize and level my pasture land to make it more productive. I also hope to purchase new farm equipment, including a rolled hay bailer and tractor, which would help to upgrade and modernize my operation and make it more productive.

When I learned of the TRO and pending injunction, from my farm organization, I said that once again I would have to put my dreams on hold and try to make do with the brood stock and farm equipment I have until better days.

When the loans are paid, I hope FSA will release my two rental houses in Birmingham, which they took as collateral for the Microloans. This action by FSA, was questionable under the regulations, since they said for a Microloan, you only had to pledge what you bought as collateral. This shows the disparate treatment in lending and over-collateralization faced by most small Black farmers.

Once the rental houses are released from the mortgage, I plan to borrow funds, from a commercial lender, to repair and renovate them so that they can bring in additional revenue to further supplement my teaching

and farming income. I am unable to borrow against these assets now as they are part of the collateral on my FSA Microloans.

In further reflection on the delay in implementation of Section 1005, I say if this loan forgiveness does not come through, I might have to stop farming altogether and turn my land over to some white farmers."

I declare under penalty of perjury that the foregoing statement is true and correct.

Signed this  ____21st____ day of June 2021.

By: /s/ Casandra P.

Note: John Zippert of the ASAC/Federation staff assisted in preparing this farmer declaration. Zippert also serves as Chair of the Rural Coalition Board of Directors.

# EXHIBIT H
# STATEMENT OF RURAL COALITION

# STATEMENT OF

# RURAL COALITION/COALICIÓN RURAL

With

**Alabama State Association of Cooperatives**
**Concerned Citizens of Tillery**
**Cottage House, Inc.**
**North Carolina Association of Black Lawyers Land Loss Prevention Project**
**Oklahoma Black Historical Research Project, Inc.**
**Operation Spring Plant, Inc.**
**Rural Advancement Fund of the National Sharecroppers Fund**

To the

**Committee on Agriculture**
**U.S. House of Representatives**

**For the Record of the Hearing on the State of Black Farmers Washington, DC**
**Thursday, March 25, 2021**

**For More Information Contact:**

John Zippert, RC Chairperson
Rural Coalition
Eutaw, Alabama
205-657-0274
Jzippert@aol.com

Lorette Picciano, Executive Director
Rural Coalition
1029 Vermont Avenue NW Suite 601
Washington, DC 20005
lpicciano@ruralco.org
202-628-7160, Direct: 703-624-8869
Website: **www.ruralco.org**

Savonala (Savi) Horne, ESQ, Executive Director
Savi@landloss.org
Land Loss Prevention Project
401 N. Mangum Street, 2nd Floor
Durham, NC 27701
Phone: (919) 667-8821
www.landloss.org

1

## Introduction

Black farmers have been some of our nation's most vital stewards of the land, productive and industrious farmers, and resilient and determined producers.  Remarkably, they have also used their farming and business acumen to produce more generations of farmers and landowners, schools, college graduates, separate business ventures, progressive community organizations, and more.  Many black farmers and their communities thrived until they made the decision to acquire loans or other financing from the United States Department of Agriculture (USDA).  The USDA was supposedly designed to help farmers in times of expansion, blight, and disasters.  Yet, its racist lending and supervisory policies caused countless black farmers unwarranted stress and heart ache, debilitating illnesses, financial ruin, constant threats of government takeover, and premature deaths.  Consequently, black farmers continue their more than century-old struggle for justice and equality from the U.S. government.

Matthew Grant (1918 – 2001) and Florenza Moore Grant (1921 – 2001) were farmers in Tillery, Halifax County, North Carolina.  In the 1940s, they bought their family to the Tillery Resettlement Farms community under the federal Resettlement Administration that offered landless rural people an opportunity for hard work and survival.  The Tillery Resettlement (Colored Section) was established as a segregated community with African American families like the Grants receiving smaller farms, smaller houses, and less farm equipment than their white neighbors.  African American farmers were offered an opportunity to purchase land in the flood plain of the Roanoke River, while the White area of the Resettlement was out of the river's reach.

Toiling under the material and mental pressures of segregation, Matthew and Florenza raised a family and became leaders in their community. In the early 1970s, under pressures of mechanization of agriculture and competition from big agribusiness, they borrowed money under a U.S. Department of Agriculture (USDA) program that was supposed to help small farmers. They believed that unlike the local government, with its historical role in maintaining racial oppression, the federal program would be fair and supportive of a rapidly disappearing pillar in the nation – the African American family farmer.

By the late 1970s, the Grant family realized their hopes were misplaced. African American farmers were given smaller loans at higher rates than White farmers. In the spring, when White farmers were receiving funds to buy seed and fertilizer, African American farmers were still waiting for their loans. In the local Agriculture Department office, the Grants and their neighbors were told to wait until all White farmers had been seen first. They watched as checks were given out to Whites, only to be told that their money had not yet arrived. Loans to the Grants and other African American famers were closely supervised, requiring extra signatures and trips to the county seat before farm supplies could be purchased. These hard working, proud survivors of the rural south, farming land that their slave ancestors worked for plantation owners, were treated with disrespect and racial hatred.

Drought years and discriminatory practices prevented the Grants from repaying the loan during the 1970s. In 1981 they signed a Consent Judgment against their property in an agreement that the USDA would release farm equipment and the Grants would withdraw a discrimination

2

lawsuit. This according to the USDA was a "settlement of sorts" that would allow the Grants to continue farming and moving on with their lives, but the USDA refused to work with them on a means of repayment on the delinquent debt. Subsequently, Matthew and Florenza's children tried to "assume the debt," but their proposed monthly payment plan was not accepted. Matthew was actually told by the FmHA district director, "It does not matter who you go to see, who you bring or what you come up with, we are going to see you out." Meanwhile, White farmers who had been affected by crop losses were given flexibility to settle their debts. Matthew and Florenza did not deny the debt, but they protested that their financial situation had been worsened by illegal racists practices.

In 1996, the USDA admitted that it had discriminated against the Grant family. However, they prevented the Grants from collecting the settlement that could have paid off their debt. Since that time the Grant family has worked without success to achieve a reasonable settlement with the government. Matthew and Florenza Moore Grant both died in 2001, six months apart from one another.

The Grant family requests that the USDA clear the Matthew and Florenza Moore Grant family debt, meet with our family to discuss an adequate settlement for years of discrimination and turmoil, and assist our family with starting an agricultural education fund for young students interested in farming and being stewards of the land.

**Cumulative Impact and Consequences of Discrimination**

Experiences such as that of the Grant family are not uncommon, when alternate financial arrangements are used to prevent permanent loss of land, especially when the underlying factor is discriminatory treatment by the government. The USDA has maintained that the Equal Credit Opportunity Act does not cover the impact of pain and suffering. The cumulative impact to the communities where these families farmed included a loss of feeling of good faith in any sort of debt settlement with the government. As a result, many farmers were unwilling to deal with USDA.

The Secretary and the Congress are urged first to hear their stories. As Section 1006 of the American Rescue Plan is implemented, we also urge that the Secretary consider how BIPOC who've taken over operations of their family farm can be given a release from prior debts as long as their debt arose out of some discriminatory actions. USDA and the Congress should take such action to assure that the cloud over the family is lifted so that the next generation farmers can participate in USDA programs on their own as new and beginning farmers. Their eligibility should not be barred because of a look back to debts of their parents or anybody else within their family who had the previous ownership of the farm.

The following excerpt from the introduction of the Statement by John Zippert that the Federation of Southern Cooperatives/Land Assistance Fund and the Rural Coalition to the U.S House of Representatives Committee on Agriculture Subcommittee on Conservation, Credit, Energy and Research on March 27, 2007 summarizes our past recommendation Congress, including issues that remain relevant today:

3

"Collectively, the Federation, and the Rural Coalition and its members and allies, have worked with thousands of farmers on the intricacies of their dealings with USDA and to seek structural change both administratively and in policy to assure equity and accountability in programs and services.

Over the past decade, we have supplied documents, analysis and testimony to the Civil Rights Action Team, the National Small Farms Commission, the US Congress and the US Civil Rights Commission. A half dozen of us served on the National Small Farms Commission, and we have also participated on other committees and in many sessions with the Secretary and the staff of the Department. We have led efforts to institute the USDA Partners meeting held annually for the past three years to allow USDA to develop relationships and understanding of the work and experience of its Community Based Organization Partners.

Our collaborative legal and legislative work included the 1987 Agriculture Credit Act, the Minority Farmers Rights Act of 1990 that was accepted as section 2501 of the 1990 Farm Bill, the 1994 Agriculture Reorganization Act, and collaborative efforts towards passage of the 1999 Waiver of the Statute of Limitations that removed a critical barrier to the settlement of the longstanding class action lawsuits. Over the years, we have also worked on disaster response, especially following hurricanes Katrina, Rita and Wilma.

We have also worked with this Committee on the most recent 2002 Farm Bill. We appreciate the support the members of this committee who helped assure that structural changes instituted to promote equity were included in that bill.

The average age of farmers continues to rise, especially among African American and other socially disadvantaged producers. For many years, inadequacies and inequities in programs and services have hastened the loss of African-American and other people of color owned farms. Access to credit is essential for all agricultural producers and those who aspire to be agricultural producers. This committee has the ability to take the actions needed to assure that new generations of people of color farmers and ranchers will have access to land and production.

In my years of work with the Federation of Southern Cooperatives/Land Assistance Fund, I have never met a black farmer who was not discriminated against. I believe the same is true for most of the diverse group of African-American, Latino, American Indian, Asian American and female farmers I have encountered within the Rural Coalition. As you well know, there remain issues surrounding the settlement of the Pigford v. Veneman and other still pending class action lawsuits against USDA that need to be addressed. We will provide a supplemental appendix for the record with updated statistics of the status of this settlement and on late claims.

For the past several months, our organizations have worked with a group of colleagues who represent a wide and diverse array of minority farmer and farmworker organizations called the Farm and Food Policy Diversity Initiative. As you begin your work on the 2007 Farm Bill, we share with you the collective wisdom of our organizations and our

4

partners on some essential changes that Congress can and should make in order to prevent the actions that necessitated legal action in the first place and assure transparency and accountability in the provision of services.

We want to help bring about the day when African American and other minority farmers can turn their attention to growing crops and revitalizing rural communities instead of filing complaints and lawsuits to secure the equitable service to which they are entitled in the first place.

Because of the cumulative effects of many years of discrimination and neglect, we are also proposing remedial measures and special services intended to reverse the impact of years of discrimination and neglect on many minority farmers. Our other recommendations include actions that can be taken to improve services to the many farmers who have suffered disasters in recent years, and some ideas on how to assure that new farmer programs will also serve socially disadvantaged producers."

We have also attached for the use of this Committee an extensive appendix of the research and policy recommendations Rural Coalition with our members have developed and shared over several decades.  Central to this work especially as related to Black farmers were our founding members including the Rural Advancement Fund of the National Sharecroppers Fund (founded 1937) and the Federation of Southern Cooperatives/Land Assistance Fund (founded 1967), and members who have formed and joined since, including Concerned Citizens of Tillery, Cottage House, Inc., North Carolina Association of Black Lawyers Land Loss Prevention Project, Operation Spring Plant and Oklahoma Black Historical, and our allies and partners including Intertribal Agriculture Council and Arkansas Land and Farm Development Corporation and the National Family Farm Coalition and Farm Aid.

The attached Congressional Testimonies include the many policy recommendations we jointly made over the years to this committee and to the U.S. Senate since the first hearings in 2000. On the issue of credit, we have also attached numerous policy briefs related to Farm Credit, many authored by our Policy Advisor, Quinton Robinson, who in 2002 was the House Agriculture Committee staff member who organized the first hearing in the Subcommittee on Departmental Operations. Of particular relevance at present is the need for USDA Farm Services Agency to issue regulations to fully implement the Equitable Relief Provisions and the Heirs Property Relending Fund passed in the 2018 Farm Bill

Over these years, our team of collaborated have worked with the House and Senate Agriculture Committees to develop and promote passage of 40 sections passed in Farm Bills and related legislation since 1986. In those years, we worked with Rep. Edolphus Towns, whose staff member Brenda Pillars gave us access to a typewriter when the opportunity for a new amendment arose, including the amendment for matching grants for state mediation programs. The most extensive work began in the 1987 Agriculture Credit Act when discrimination by race and ethnicity was first defined in the context of federal Agriculture Policy.

It continued in section 2501 of the 1990 Farm Bill, which authorized the first program to tangibly support the organizations who serve black and other farmers who had suffered

5

discrimination, called the Outreach and Assistance for Socially Disadvantaged Farmers and Ranchers (OASDVFR). That statute for the first time that recognized the importance of this network of community-based organizations, including many who testified in this hearing, by making them eligible for grants and contracts.  We will underscore the importance of the direct one-on-one technical assistance they have long been doing as a critical factor in stopping foreclosures and helping Black farmers hold onto their land.

We call particular attention to the aforementioned USDA Partners Process.  Beginning in 2005 and continuing into the Obama Administration, this process convened a series of dialogues, or conversations, on critical barriers faced by BIPOC farmers and the community-based groups who served them with interagency teams of USDA career staff.  The process was led by Shirley Sherrod and other CBO leaders. We estimate that as many as 500 people contributed over those 5 years.  The comprehensive A Time to Change: A Report by the Assessment Conversations Team, Sept. 22, 2010 remains useful today both to measure progress and to identify additional changes.  It was structured to identify problems, propose solutions including statutory changes needed, and also to describe what success would like.  Many of the recommendations informed our proposals to you for the 2008 Farm Bill, and around 30 passed in the statute.

Since that time, many recommendations developed by the wide network of community-based organization who work directly every day with this nation's Black farmers and ranchers, and other Tribal, Latino, Asian Pacific, and other small-scale producers have been passed into law, with some implemented more fully than ever. We have also mobilized our communities to help lawmakers understand the degree of support for this proposals, including with sign on letters and collaboration with Members of Congress especially in Congressional Black and Hispanic Caucuses, including annual Dear Colleague Letters.  One of the early ones was led by Rep. Sanford Bishop who for years led efforts to continually press for more funding for the 2501 Program, from $1 million to its present funding level.  We will continue to work also with Secretary Vilsack and his team to assure these funds more effectively reach and support the eligible entities as defined by statute.  We will be forwarding additional recommendations to you on how the full suite of Outreach, Beginning Farmer and Local Food programs can best complement each other.

 The drafting and action by this committee in this year of 2021 represents a historic and significant step forward in a new effort to begin to right some of the longstanding wrongs faced by Black farmers.  We have attached for your record a copy of our March 3 sign on letter that we prepared to help support passage of the historic provisions included in the American Rescue Plan and a brief authored by our Policy Advisor on the relevant authorities supporting these provisions. We are deeply grateful to Chairman David Scott and the members of this committee, several of whom we have worked with for decades, for this action.

**Relevant Data and Research**

We are already working with USDA on the implementation of Sections 1005 and 1006 of the American Rescue Plan.  As the committee's work of oversight continues and the preparation for the 2023 Farm Bill commences, we share additional proposals we are refining with our members and allies to support black farmers in securing land tenure for their families and generations into the future and restoring the agriculture as an economic base of their communities.

6

Particularly as the debate over climate mitigation begins, we will be highlighting the importance issue of land tenure. New investments of federal dollars over time have often favored larger scale farmers at the expense of others. But as the recent pandemic has shown us, crises such as these cause fundamental disruptions in existing food chains. Resiliency now and in the future point toward the value of reorienting the processing and distribution of food to shorter and more direct local and regional farm to food networks that are closer and more readily adaptable to serve the food needs of some of this nation's most vulnerable communities.

We will specifically address the issue of heirs property later in this piece. First, we thought it helpful to share a sampling of charts we have developed in connection with a research project under an Agriculture and Food Research Initiative project with the National Institute of Food and Agriculture. This AFRI standard research project, "*Community Resilience Through Land Tenure Rights,*" will examine the impacts of land tenure arrangements, non-ownership and related encumbrances on the management of small to medium-sized farm operations in a diverse cross section of socially disadvantaged agricultural communities. Rural Coalition and its co-principal investigators include both CBO's and researchers from Tuskegee University and Kansas State University and North Carolina Association of Black Lawyers Land Loss Prevention Project are co-Principal Investigators, with almost a dozen other CBO partners.

We will also use similar profiles in related research under a Sustainable Agriculture and Research grant, *Securing Land Tenure Rights for Heirs Property Owners.* The North Carolina Association of Black Lawyers Land Loss Prevention Project is Principal Investigator. The Rural Coalition and Tuskegee University and Virginia State University are Co-Principal Investigators along with multiple CBOs and Farmers in the Southern Region. The second grant focuses on the quality and availability of legal services.

These charts provide a snapshot of the trends in loss of land over time as far back as 1959 for Orangeburg County, SC. There also charts for Barber County, AL and Halifax County, NC. While there are specific issues with data at various points in time, we have found that the trends reflected are consistent with data we and others including the 1890 Universities have collected.

What the charts clearly provide is a sense of the cumulative impact of the past and in some places ongoing failure to address and halt discrimination. The result is the unjust and unnecessary loss of land by African American producers whose place on the land predates the arrival of many others in farming today.

7

State of Black Farmers in the U.S. – Historic Land Tenure by County









**Net Cash Farm Income by Race in Barbour County, Alabama, 2007-2017**

**Black/African American Land in farms (acres) in Dale County, Alabama, 1969-2017**



**Decrease in Black/African American Farms and Land in Halifax County, North Carolina , 1978-2017**



Chart Averment Payments by Race Ethnicity in Halifax County, North Carolina, 2007-2017

In almost every county we have already researched over several decades, land ownership has become more concentrated. Many farmers and ranchers have been unable to retain their land. The evidence of disparate treatment is particularly notable with respect to Black farmers and ranchers.

10

In collaboration with our farmer and rancher leaders, we organized several participatory research projects designed to better understand their views of USDA. The first was around issues related to participation in Crop Insurance programs. The second followed a series of farmer-led training we developed with our members. Our reports are included in the appendix, but the following charts provide a snapshot of how the needs of farmers overlap or diverge with the structure and operation of USDA programs and services.

**Table 1: Socio-Demographic Characteristics of Participants from Rural Coalition Financial Training Project (2004/2005)**

| Characteristic | Percent |
|---|---|
| Gender | |
| Male | 67.5 |
| Female | 32.5 |
| | (1048) |
| Race/Ethnicity | |
| American Indian | 24.8 |
| Asian American | 3.5 |
| Black/African American | 54.9 |
| White | 5.0 |
| Hispanic/Latino | 10.7 |
| Other | 1.1 |
| | (1052) |
| Highest Level of Education | |
| Less than High School Degree | 29.6 |
| High School Degree | 34.8 |
| Some College, No Bachelor's Degree | 29.6 |
| Bachelor's Degree or Higher | 6.0 |
| | (1050) |
| Total Farm Income (after expenses) in 2003 | |
| Less than $4,999 | 54.0 |
| $5,000 - $9,999 | 23.5 |
| $10,000 - $19,999 | 13.9 |
| $20,000 - $29,999 | 4.3 |
| $30,000 or More | 4.3 |
| | (814) |

11

**Table 2: Farm Characteristics of Participants from Rural Coalition Financial Training Project (2004/2005)**

| Characteristic | Percent |
|---|---|
| Own Land | 84.5 (911/1078) |
| Rent Land from Others | 38.8 (409/1053) |
| Own *and* Rent Land | 28.1 (295/1048) |
| Acres in agricultural production in 2003*<br>    Mean<br>    Median<br>    Minimum – Maximum | <br>85.2<br>15.0<br>0 – 2400<br>(937) |
| Acres in agricultural production in 2004*<br>    Mean<br>    Median<br>    Minimum – Maximum | <br>87.4<br>15.0<br>0 – 2600<br>(935) |
| Produced Commodity Crops in 2003 or 2004 | 54.5 (561/1030) |
| Produced Fruits/Vegetables in 2003 or 2004 | 54.6 (553/1013) |
| Raised Livestock in 2003 or 2004 | 47.1 (480/1020) |
| Produced Commodity Crops, Fruits/Vegetables *and* Livestock in 2003 or 2004 | 14.3 (137/960) |

*Ranchers often did not include grazing acreage in their estimates of land in agricultural production. Therefore, the numbers presented here are conservative estimates.

**Table 3: Risk Management Strategies of Participants from Rural Coalition Financial Training Project (2004/2005)**

| Risk Management Strategy | Percent |
| --- | --- |
| Have Risk Management Plan | 4.7<br>(45/961) |
| Use a Tax Accountant | 42.7<br>(439/1029) |
| Make Use of IRS Form Schedule F | 18.6<br>(165/886) |
| Ever Purchased Crop Insurance<br>    Yes, Currently Have Policy<br>    Yes, But No Current Policy<br>    No, Never | <br>9.6<br>5.8<br>84.6<br>(971) |

**Table 4: Labor Use of Participants from Rural Coalition Financial Training Project (2004/2005)**

| Risk Management Strategy | Percent |
| --- | --- |
| Spouse, Children or Other Family Members Receive Wages from Farm | 17.7<br>(154/869) |
| Number of Full-Time Employees<br>    None<br>    1-10<br>    11-20<br>    21 or More | <br>85.4<br>14.0<br>0.3<br>0.3<br>(988) |
| Number of Regular Part-Time Employees<br>    None<br>    1-10<br>    11-20<br>    21 or More | <br>80.6<br>17.9<br>0.9<br>0.6<br>(987) |
| Employed any Seasonal or Migrant Employees in the Past Year | 16.4<br>(127/773) |
| *Any Seasonal or Migrant Employees Participate in H2A Program* | *50.4<br>(64/127)* |
| Understand Tax Rules for Farm Labor | 14.5<br>(126/870) |

**Table 5: Awareness of and Participation in Government Programs Among Participants from Rural Coalition Financial Training Project (2004/2005)**

| Agency/Program | Percent Aware |
|---|---|
| Farm Services Agency Credit Programs | 52.5 (533/1015) |
| Farm Services Agency Disaster Payments | 54.4 (522/959) |
| Natural Resources Conservation Service | 48.7 (465/955) |
| Cooperative Extension Service | 58.1 (567/976) |
| Rural Development | 42.0 (400/953) |
| Risk Management Agency | 35.7 (335/939) |

| Program | Program Participation |
|---|---|
| Ever Applied for a Loan from USDA | 27.9 (234/839) |
| *Ever Been Denied a Loan from USDA* | *91.3 (210/230)* |
| *Ever Received a Loan from USDA* | *32.0 (72/225)* |
| Ever Received USDA Disaster Assistance | 36.2 (354/977) |
| Participate in any Annual Commodity Program | 13.5 (113/839) |
| Participate in any Conservation Program | 8.1 (84/1040) |

The farmer/mentors requested that we ask not only questions about the number of farmers who prepared schedule F of their tax return. Only 18.6 % said yes. They also wanted to know how many used tax preparers. 40% responded they did. Many of the groups who participated in this research continue to this day provide direct technical assistance to producers on the importance of good financial records, and the need also to provide required reports to document production and report losses.

These findings also underscore the importance of sustaining community-based organizations who are trusted by farmers for assistance in understanding and navigating USDA programs.

Also instructive is one chart from an earlier study which included a slightly different population of producers. We will have more to share as this committee begins work on the next farm bill and on climate issues. We looked at the level of participants in all types of insurance and these are our findings from the year 2002:

14

**Table 4. Insurance Use from Small, Limited Resource and Minority Farmers Survey**

| Variable | Frequency | Percent |
|---|---|---|
| **Currently use any form of insurance** | | |
| Respondents answering yes | 116 | 84.7 |
| | 137 | 100.0 |
| **Types of insurance used** | | |
| Health insurance* | 97 | 83.6 |
| | 116 | 100.0 |
| Dental insurance | 43 | 37.1 |
| | 116 | 100.0 |
| Accident insurance | 39 | 33.6 |
| | 116 | 100.0 |
| Life insurance | 74 | 63.8 |
| | 116 | 100.0 |
| Disability insurance | 29 | 25.0 |
| | 116 | 100.0 |
| Auto insurance | 100 | 86.2 |
| | 116 | 100.0 |
| General homeowner or renter insurance | 84 | 72.4 |
| | 116 | 100.0 |
| Disaster insurance | 25 | 21.6 |
| | 116 | 100.0 |
| General liability insurance for farm operation | 43 | 37.1 |
| | 116 | 100.0 |
| Crop insurance | 29 | 25.0 |
| | 116 | 100.0 |

We underscore the importance of the Farm Opportunities Outreach and Training Programs, including the Outreach and Assistance Program for Socially Disadvantaged Farmers and Ranchers. Our community-based organization members routinely accompany farmers the farmers we serve to USDA offices to make sure they are prepared to request services they need and to navigate USDA systems.

Our research findings highlight the need for improved connections and restoration of trust with USDA. Our organizations led efforts to establish systems that would allow USDA to monitor how these systems are working. One particular recommendation as far back as the 2002 Farm Bill was to require the farmer be provided a Receipt for Service on each visit to the agency. Language in the 2008 required USDA to provide a Receipt upon request. Rep. (and now HUD Secretary) Marcia Fudge offered an amendment during the 2014 Farm Bill Mark-up which is now a statutory requirement whose validity is affirmed including in an Administrative Law Judge opinion on a farm appeal. We remind the committee that the required receipt for service is

not uniformly provided in all offices and farmers are still facing push back for asking or outright refusal of their request.

Just last evening, our Rural Coalition Board Member Barbara Shipman of Cottage House, Inc. in Ariton, Alabama shared this story. "I had one of my farmers to go into a particular NRCS office and FSA office to request assistance. The young lady threw and not only hit him in the face with his folder, but she also told him *"get out of the office and don't come back until you have three years' worth of farm records."* Let me tell you please - returning military members have PTSD so it didn't take the snap of a finger to get them in the military zone again so that's why I go with them. So, I ended up having to talk to State Director. He said he was going to get involved. He called back to say he did so and said I should have no problem with anybody else like that."

Mrs. Shipman, herself an Army veteran of the Gulf War, routinely welcomes recently returned service members from Fort Rucker to consider farming. This particularly newly returned Veteran had grown up on a farm and had a plan for producing pecans and goats.

She also recounted that she recently accompanied two farmers to visit four separate county offices to determine who was supposed to serve them. One was not open for a prescheduled appointment; another was closed. In the last office, the staff member agreed to get on the computer to ascertain the correct service center. She said it was closing time, but she could provide service there at another time. Barbara told her, "that's fine as long as he leaves here with two things – a letter of receipt for service that provides his farm and tract number and a copy of the technology map of where his land is located. Then in future all you have to do give the address and you can pull it down on the computer and print it all. When we walked out of the office, I told him that when you get ready to go back to the office you let me know. We will go together because that's what I do. I will walk him through how to get those things he wants, and I know he's in that computer system. He can't march over to the NRCS, no way, if he's not in the computer system in FSA, step number one." She works with 40-60 farmers every year to assure service is done right. Without her, "they'll just turn him away and they won't even tell them about the receipt for service and they will not tell him he's due a copy of that topology map of his land or get him a farm and tract number - because that farmer number goes on that letter receipt for something so when he goes in the next time he has to do his put his farm in tracking down in the system and it brings up his file right and then he should have access."

**Technical Service Providers and Community Based Organizations -** Mrs. Shipman has many other examples to share. Community based organizations need to have a sustained funding, perhaps in new ways, to assure the many CBO staff members who provide such services can be compensated, retained and prepare to train others to perform these services. They could form the foundation of a network of CBO based technical service providers with authority to work on technical assistance for both FSA and NRCS programs.

She and many of our other members, including Mr. Willard Tillman of the Oklahoma Black Historical Research Project, have the stressed the need for ongoing support in order to do the work necessary to help farmers and ranchers connect with USDA. They are also able to build relationships with service centers and assure farmers are able to do what they need to do. These CBO technical service provides are also provide the invaluable service of calling inadequate

16

service to the attention of USDA leaders at the state and national level, so immediate intervention can be made, with appropriate accountability. It is critical to set in place new policy to provide this kind of trusted technical support to help farmers, ranchers, forest land owners and their families secure land and rebuild local economies.

Technical Support Providers are now used extensively in conservation programs. Authority should be provided to allow these providers who work with CBO's to cover FSA programs also. This would help CBO's to build a sustainable network of next generation leaders trained by our skilled leaders who have supplied technical assistance to our farmer members for over 4 decades. We believe that such investmen ts would improve family wealth, stabilize land values and secure a tax base with improvements to the education, public works and the economic situation of the whole community.

**Critical and Continuing Issues – County Committees**

Our early collaborative work began in 1997, when we convened a group to address the issue of Farm Service Agency County Committees. After a week of training and dialogue at USDA headquarters coordinated in cooperation with NRCS Chief Pearlie Reed and FSA Credit Director Lou Ann Kling, we examined voting patterns, and eligibility and access issues. Our members looked at county data of eligible voters and how many voted in county committee elections, and ballot counting procedures. We encouraged turnout with some results in subsequent years.

We have also examined over the past few decades the data systems of USDA and how transparency and accountability could be advanced with modification of these systems. In 2000, we prepared testimony for the Senate Committee on Agriculture where we were invited to testify by Senator Richard Lugar. This statement, which we have not located, was very similar to the one shared of the House hearing at the same time.

Senator Lugar, with Senator Blanche Lambert Lincoln and others, included language we recommended to assure transparency and accountability in USDA practices, including the collection and publication of data on the participate rates of producers in USDA programs by race, gender and ethnicity. These provisions were added and were updated in subsequent farm bills. More work is necessary to assure these are available to farmers and groups working with them at the county level. They are also essential to help the Secretary and his team to in a proactive way identify offices that are doing a good job, and offices where improvements or other action are needed.

For many years we urged USDA and the Congress to move from a complaint generated system of solving exclusions proactively instead of only after farmers had have to enter the long and risky process of appeals, civil rights complaints and litigation. We urge the Secretary to also engage the office of the Assistant Secretary for Civil Rights to have the ability to transform systems of analysis necessary to offset problems before the pose a barrier to more farmers.

We share the following story from our Rural Coalition newsletter of December 2000 which recounts the proceedings of the first Senate Agriculture Committee Hearing on Civil Rights in September that year.

17

# Senate Agriculture Committee Holds First Hearing on Civil Rights in Agriculture: RC Chair Zippert Testifies

On September 12, John Zippert, Chair of the Rural Coalition and Program Director of the Federation of Southern Cooperatives, testified on behalf of both organizations at a landmark Senate hearing on Civil Rights in Agriculture, convened and led by Agriculture Committee Chairman Senator Richard Lugar (R-IN). The results of research done by Rural Coalition Member groups in 1996 and 1997 were included in Zippert's statement and provided the most specific evidence the committee received to support farmers' contentions of long-standing problems of disparate treatment by the county committees that oversee most Farm Services Agency (FSA) programs.

The USDA Inspector General (IG) Roger Viadero gave impassioned testimony on the state of the complaints processing system at the Department, with supporting statements from the U.S. General Accounting Office. Viadero has posted on the IG Web page a complete county-by-county breakdown of complaints filed. He singled out the USDA Office of Civil Rights as the key barrier to USDA's civil rights record, but noted that he had studied FSA county committees and found no problems. He asked what could be wrong with the committees, because they are elected by farmers.

A diverse array of Senators then asked incisive and pointed questions of U.S. Department of Agriculture (USDA) witnesses. Senators Thad Cochran (R-MS), Kent Conrad (D-ND), and Blanche Lincoln (D-AR) joined Senator Lugar in seeking answers from USDA officials about Viadero's testimony: why USDA remained so slow to act on complaints and why civil rights office operations had not yet improved.

In response, USDA Assistant Secretary for Administration Paul Fiddick outlined his plan to professionalize the management of the civil rights operation with techniques he developed in his work in private sector businesses. He pointed in particular to his creation of a new career post in the Civil Rights office, that of Deputy Director, and he introduced David Widdingham, who is responsible for Operations. When the Senators asked Mr. Widdingham to recount his expertise for the job, he responded that he had been the long-time Director of Civil Rights for the FSA. The USDA employees who testified later had to explain to the Senators why the audience reacted incredulously upon hearing the appointment of a former FSA employee cited as a solution to USDA's longstanding civil rights problems. The real answer: FSA is widely seen as the agency with the worst record of treatment of minority producers, and the very one whose failure to address civil rights complaints for many years led to the *Pigford v. Glickman* lawsuit.

The tone of the hearing then changed, with more scrutiny placed on employment practices and program delivery within USDA. Senator Tom Harkin (D-IA) noted that he was less interested in how the Civil Rights Office was processing complaints than he was in learning why complaints were still being generated. The answer came from the third panel, which included farm and employee organizations such as John Boyd of the National Black Farmers; Lawrence Lucas of the Coalition of Minority Employees; Alexander Piries, the lead attorney on the *Pigford v. Glickman* lawsuit; and others told him why. There was marked similarity in the issues they raised. USDA programs, particularly within FSA, still do not operate fairly, and USDA employees in several agencies still work in an atmosphere of discrimination and hostility.

John Zippert provided the committee not only with evidence of problems, but with recommended solutions. He called for the complete removal of FSA employees from any action responding to complaints in the *Pigford v. Glickman* lawsuit and asked that USDA and the Justice Department be told to stop appealing cases where African American farmers had their claims accepted. He urged the Senators to assure that full funding was made for the Section 2501 minority farms outreach program. He advocated that bureaucratic barriers to the Minority Farm Registry be addressed and the Registry be implemented immediately.

Zippert also countered Viadero's assertion that he found no systemic problems with the county committee system. Zippert noted that if the IG knew so little about the problems with the county committees, perhaps his other findings were also inaccurate. Senator Lugar thanked the Rural Coalition specifically for the new details on county committee elections. Both he and Senator Harkin outlined the need for more action on county committees. After many years of work by the RC and others, attention is finally being paid to the real problems with the committees and the continuing injustices within USDA. The final RC statement will soon be available on our Web site: www.ruralco.org.

Update is published several times a year for Member organizations and Friends of the Rural Coalition/Coalición Rural, 1411 K St., NW Suite 901, Washington, DC 20005. Phone: 202-628-7160, fax: 202-628-7165, email: ruralco@ruralco.org; Web: www.ruralco.org. Subscriptions are $25 per year. Questions about and submissions for *Update* can be directed to our Membership Coordinator, Beth Kanter.

Rural Coalition is an alliance of regionally and culturally diverse organizations, throughout the U.S. and Mexico, working to build a more just and sustainable food system. We envision a food system which:

- brings fair returns to minority and other small farmers, as well as rural communities;
- supports just and fair working conditions for farmworkers;
- protects the environment; and
- brings safe and healthy food to consumers.

December 2000

2

**County Committees –** Below is a snapshot – the last we have – of data on the number of votes cast in the county election of 2009.  This election was in only one Local Administrative area.

Data on the over composition of county committees is also included in some attached statements.

#### TOTAL BALLOTS CAST BY RACE, ETHNICITY, AND GENDER IN 2009[1]

| Gender | Ethnicity | American Indian or Alaska Native | Asian | Black or African American | Native Hawaiian or Other Pacific Islander | Unknown | White | Total Ballots Cast by Gender and Ethnicity |
|---|---|---|---|---|---|---|---|---|
| Female | Hispanic or Latino | 73 | 2 | 34 | 9 | 145 | 960 | 1223 |
| | Not Hispanic or Latino | 172 | 108 | 408 | 226 | | 3316 | 4230 |
| | Unknown | 123 | 78 | 319 | 147 | 1095 | 1782 | 3544 |
| Female Total | | 368 | 188 | 761 | 382 | 1240 | 6058 | 8997 |
| Male | Hispanic or Latino | 100 | 52 | 27 | 10 | 366 | 1332 | 1887 |
| | Not Hispanic or Latino | 392 | 106 | 823 | 125 | | 44837 | 46283 |
| | Unknown | 379 | 175 | 992 | 113 | 774 | 40435 | 42868 |
| Male Total | | 871 | 333 | 1842 | 248 | 1140 | 86604 | 91038 |
| Organization | Hispanic or Latino | 14 | 3 | 9 | 1 | 314 | 494 | 835 |
| | Not Hispanic or Latino | 142 | 95 | 448 | 28 | 277 | 78620 | 79610 |
| | Unknown | 116 | 45 | 607 | 41 | 1217 | 66204 | 68230 |
| Organization Total | | 272 | 143 | 1064 | 70 | 1808 | 145318 | 148675 |
| Unknown | Hispanic or Latino | 0 | 0 | 3 | | 8 | 92 | 103 |
| | Not Hispanic or Latino | 3 | 20 | 43 | 11 | 416 | 1325 | 1818 |
| | Unknown | 6 | 6 | 6 | 7 | 1772 | 454 | 2251 |
| Unknown Total | | 9 | 26 | 52 | 18 | 2196 | 1871 | 4172 |
| Total Ballots Cast by Race[2] | | 1520 | 690 | 3719 | 718 | 6384 | 239851 | 252882 |

#### Ballot Summary

| | |
|---|---|
| LAA Total Eligible Voters | 2,021,637 |
| LAA Total Ballots Cast | 252,494 |
| Percentage of Eligible Voters that Cast Ballots | 12% |
| National Total of Ballots Disqualified | 13,156 |
| Percentage of Ballots Disqualified vs. Ballots Received | 5% |

[1] Represents only those LAAs in which an election was held in 2009

[2] Due to producers' ability to select more than 1 race, the Total Ballots Cast in 2009 may be greater than LAA Total Ballots Cast in the Ballot Summary Table

When requirements were added in the 2002 and 2008 Farm Bills to authorize the assignment of minority advisors to county committees and to update election provisions, the Congress also changed the law to tie eligibility to participate on county committees to those who participated in farm programs.  This should be extended to include farmers who are eligible to participate and registered with USDA, even if they choose not to participate.

However, issues with county committees also continue. In the past two weeks, we were contacted by an Oklahoma farmer who is employed in another state.  He had informed the County Office a few years ago that the farm had been transferred to his name.  He was seeking help because he currently has a neighbor who has been planting wheat on land that belongs to him and filing claims for payments. He has provided documentation to show that the FSA county office reached written to him demanding he send the certified lease so the

19

neighboring farmer could collect his payment.  The farmer owner wrote a cease and desist letter to his neighbor and asked the office to address the issue of the illegal claims.  He also noted that the lease given to the office by the neighbor was fraudulent.  While he was seeking response from the county, he reported that the staff asked him not to report this as it would "get a former employee in trouble."  A county committee member also asked him if he wants to sell his land.

We believe these issues merit a full review of the role and practices of the use of county committees and their continuing failure to include and serve the needs of all farmers but especially Black Farmers.  In the next farm bill, we believe it is time that this committee review ways to replace county committees with a more professional and accountable system.

**FSA Farm Credit – Immediate Actions Needed**

We have worked extensively on the issues of Farm Credit over many years and hope we can provide additional recommendations as the committee addresses those particular issues.

At present, the two most essential credit related issues are to assure that Farm Service Agency issue regulations and implement the following:

1) Ensure Equitable Relief Provisions to protect the farmer in the case of errors or intentional actions in loan agreements by Farm Service Agency staff members, and
2) Implement the Heirs Property Relending Program.

With respect to the Relending program, Congress since the 2018 Farm Bill has appropriated $20 million for FSA to relend to entities qualified to lend as community development financial institution, and who have significant demonstrated experience serving the needs of socially disadvantaged farmers and ranchers.

There are such institutions available to begin working with families to resolve heirs property encumbrances which keep them out of full participation in USDA programs.  These funds are urgently needed.  The pandemic has caused the loss of over half a million members of our society. Some of them are farmers.  Their families urgently need assistance in handling the difficult issues of settling estates.  Making these program available will enable the groups who know how to do this work to immediately assist black and other people of color landowners to secure land tenure in a way the addresses the rights of all interest holders, and to emerge with a succession plan to guide that family in the future.

**Direct and Guaranteed Loans and Borrowers Rights**

Section 1005 of the American Rescue Plan provides funds to Black farmers and other people of color borrowers to pay off loans from both FSA and Farm Credit Administration.  We will have attached a brief we provided to the General Accounting Office in advance of the study they did on the availability of credit to Socially Disadvantaged Farmers and Ranchers.  The report suggests several issues for the attention of the Administration and the Congress.  We will prepare future input on these provisions.

20

It is also important to understand the issues farmers are encountering due to lack of data collection and clear procedures to assure that all borrowers rights, including the Equal Credit Opportunity are assured. We have recommended to the Secretary that clear procedures for Farm Credit Borrowers to identify themselves as socially disadvantaged and eligible for the Emergency Relief provided must be set in place.

We further refer you to correspondence between Rural Coalition and both the FSA and the Farm Credit Administration referring to the case of a young farmer. We have redacted the farmer's name. These letters show how FCA tells the farmer to go to the lender, the lender says to go to FCA, and FSA asserts they have no authority on guaranteed loans. These illustrate the point that there is no clarity for the borrower and no real explanation if anyone has authority to act if farmers feel they were discriminated against on a guaranteed loan.

We urge Congress to address these gaps. We further endorse the recommendations provided in the hearing by the Federation of Southern Cooperatives that a separate entity within or similar to other farm credit institutions be established to attend to the unmet needs of this sector of farmers and ranchers.

**Heirs Property, Insecure Land Tenure, Climate and Rural Communities**

The Federation of Southern Cooperatives/Land Assistance Fund has been identifying the importance of addressing heirs property issues for decades, beginning with a 1980 Report by the Emergency Land Fund.

In 2017, the Oklahoma Black Historical Research Project convened the 100 Farmers Summit In Oklahoma City in March 2017 for in input in advance of the 2018 Summit. [1] The 100 Summit Report: *Addressing the Needs and Concerns of the Underserved Minority Family Farming Community* is included in the attachments . The following issues raised by the 100 Black farmers on heirs property include:

A) <u>**Specific Issues Related to Heir Property**</u> – The following were the key issues that needed to be addressed to restore access to programs for producers lacking clear title or lease on the land they farm or seek to farm:

**Heir Property:** If you have land but there is no will or document saying who will be the administrator of it, your ability to administer and use it is very difficult. If there is not an administrator for the land, you will not be able to get a loan through the USDA. For example, when you want to take out a loan, but you are the beneficiary of land along with your siblings -you have to get all other siblings to sign on to your loan. You will end up in a case with the bank and your siblings to settle your claim interest in the land. Speculators will seek out one or two siblings to see if they can buy them out, then they can petition the courts for the full property to be sold. Called a "speculating interest" in the land to cause land loss. You get a minimal amount of the value of that land.

---

[1] Oklahoma Black Historical Research Project, with Rural Coalition, etal, [1] The 100 Summit Report: *Addressing the Needs and Concerns of the Underserved Minority Family Farming Community,"* 2017.

21

APP. 000360

Arkansas' law has changed – the Uniform Partition of Heirs Property Act allows an heir who is a co-owner to buy out another who wants to sell their share of a property at the market value of the property. [2]

**Adverse Possession** is also used by white farmers, investors and property owners to take land.  They pay property taxes and take ownership, even where there are not their property issues.  For example, an African American woman rented her land to a white farmer and as part of the rent he paid her taxes for 5 years.  One year he did not pay rent and told he did not owe it because now he owned the land

**Strategies:** Get more protections in place for African-American families.  A lot of risk factors that can result in land loss – need to address them comprehensively.

**Key point: There is a systemic lack of access to information and resources to resolve heir property issues -** We see a great deal of land that is idle, land that could be productive but isn't. The legal risk varies from state to state. In some states, someone can seize rights to a property simply by paying delinquent taxes.  The time in which one is considered to have relinquished their rights to their land varies by state. There was a provision in the 2014 Farm Bill to help get Black farmers' land back; but it didn't go anywhere. We need new support for education on wills and estate planning."

## Heirs Property and the Ecological Costs of Discrimination

Oklahoma Black Historical Research Project worked over the past decade to engage Black farmers in NRCS programs. With Rural Coalition and the Scholars of the America University Farm Bill practicum, the researched the data and experiences of Black farmers in access USDA programs.  Their findings are summarized and published in the research paper on the **Ecological Costs of Discrimination**[3]

Invasive species thrive in places facing climatic changes and put farmers at further risk. In Oklahoma, *eastern redcedar* is spreading at the rate of 800 acres a day. Without help for mitigation from USDA especially for historically underserved farmers who farm on heirs property, small cow and calf operations have seen their grazing land taken over by redcedar, which competes with pastureland by consuming up to 55,000 gallons of water per acre per year and puts the viability of their operations at further risk. Other risks they have faced over the past decade include severe cycles of floods, droughts, fires, freezes and tornados. Farmers who were deemed ineligible for NRCS program, the OBHRPI learned, were denied because they lacked the documentation to secure farm and tract numbers to demonstrate their control of the land on which they sought benefits.

---

[2] In addition to Arkansas;  Alabama, Connecticut, Georgia, Montana, Nevada, New Mexico and Texas numerous states have now adopted or have introduced versions of the Uniform Partition of Heirs Property Act.  Passage of the Fair Access to Farmers and Ranchers provisions in the 2018 Farm have helped build support to enact the law drafted by the nonprofit Uniform Law Commission to make it easier to divide property and preserve family wealth as the owners multiply over generations.
[3] Fagundes, Tillman, etal. **Ecological costs of discrimination: racism, red cedar and resilience in farm bill conservation policy in Oklahoma,** October 2019, Renewable Agriculture and Food Systems 35(4):1-15, DOI: 10.1017/S1742170519000322

22

The Fair Access for Farmers and Ranchers Act, drafted by then Rep. Fudge, and introduced in the Senate by Senators Doug Jones and Senator Tim Scott, authorized the aforementioned the heirs property relending fund.  It also authorized the use of alternate methods of documentation to allow access for farmers to NRCS and other programs to allow them to care for land. For the first time in federal law, it made some of the methods consistent with the processes outlined in the Uniform Partition of Heirs Property state passed law.  The third provision, Section 12607 of the 2018 Farm Bill authorized Farmland Ownership Data Collection in order to identify the land tenure trends that may affect generational transitions, and barriers to entry for beginning and socially disadvantaged farmers and ranchers.

The data and studies compiled under Section 12607 are critical inform and guide all levels of agricultural policy making that concern the critical dynamics of heirs' property and absentee land ownership in farming communities. Appropriations of $3 million annually were authorized**. We urge this committee to assure this important initiative is full funded.  This baseline study is essential to allow the Congress to anticipate the impact of various kinds of climate interventions on farm and forest land tenure especially for Black Farmers.**

**Heirs Property and Forest Land**

Securing and building land tenure is also critical to protecting the intergenerational transfer of land and wealth and building a community with a healthy ecosystem and a tax base to sufficient to support quality education, employment opportunities, and a strong infrastructure. The following abstract of the paper "Taking Goldschmidt to the Woods: Timberland Ownership and Quality of Life in Alabama [4] summarizes the impact of the degree of highly concentrated land ownership on children, families and the communities:

> *Abstract: We use a database of property tax records for 13.6 million acres representing every parcel of privately owned timberland in 48 rural Alabama counties to test two hypotheses inspired by Walter Goldschmidt relating land ownership and quality of life. Our data show private ownership is highly concentrated and 62 percent is absentee owned. We employed Pearson correlations alongside Poisson and negative binomial regression models to estimate influence of both concentrated private ownership and absentee ownership of timberland. Our findings support Goldschmidt-inspired hypotheses that concentrated and absentee ownership of timberland exhibit a significant adverse relationship with quality of life as measured by educational attainment, poverty, unemployment, food insecurity, eligibility for free or reduced-price lunch at public schools, Supplemental Nutritional Assistance Program participation, and population density. Low property taxes in Alabama limit the ability of local governments to generate revenue to support public education or meet other infrastructural or service needs in rural areas. We call on rural sociologists and kindred spirits to pay more attention to the fundamental importance of land ownership which shapes the foundations of power and inequality affecting rural life in America and beyond. [5]*

---

[4] September 2020 Rural Sociology 86(1) DOI: 10.1111/ruso.12344 **Authors:** Conner Bailey, Abhimanyu Gopaul, Ryan Thomson, Auburn University; Andrew Gunnoe, Maryville College
[5] https://www.researchgate.net/publication/344021201_Taking_Goldschmidt_to_the_Woods_Timberland_Ownership_and_Quality_of_Life_in_Alabama

23

We look forward to other opportunities sharing our proposals to more fully full address the set of issues we have raised, including with respect to climate. We further point to a critical need to assure farmers have access to the qualified and trusted legal and technical assistance necessary to protect their land.

In October 2019, the North Carolina Association of Black Lawyers Land Loss Prevention Project authored a Continuing Legal Education (CLE) manuscript "Assisting Heir Property Owners Facing Natural Disasters: History and Overview of Heir Property Issues." We participated in person as a panelist in the collaborative CLE webinar to train NC Legal Aid volunteer attorneys on service to impacted heir property owners. The webinar took place on October 23. According to Legal Aid's coordinator, there were approximately 124 webinar participants on that date and the course will continue to be available for training purposes.

Through individual direct legal intervention, technical assistance, outreach and policy innovation and implementation, the overall outlook for North Carolina's disaster-affected families has been substantially improved.  The benefits include increased property retention, removal of barriers to assistance programs, enhanced food access, heightened farm business risk management, and family engagement in multi-generational planning as a safeguard against inherent co-ownership vulnerabilities.

We project that the pandemic will continue to emphasize the need for education on what defines sustainability and how environmental, economic, health stressors are intertwined and cumulative. This highlights the importance of collaborative work we have all done to expand the framework of justice and increase the tools and resources available to communities to take direct action to promote community health. We see our engagement with Black and Brown-led coalitions and initiatives advancing sustainable  environments and community-controlled food only deepening and expanding.

We will provide a letter to Chairman Scott and the Committee in  upcoming weeks that better summarizes our immediate recommendations for action.

**Conclusion**

Today, black farmers find themselves still seeking financial compensation from years of discrimination by the United States Department of Agriculture (USDA).  This financial compensation, along with the American Rescue Plan, has been called "unfair reparations," "another handout," or some other dehumanizing term by prominent and influential elected officials and others.  This continued systemic and institutionalized racism is further evidence of the unrelenting discrimination that black farmers and their communities experience on a daily basis.  Furthermore, many black farmers, their families and communities continue to be on the brink of bankruptcy, foreclosure, and homelessness.  The USDA must act now to implement the American Rescue Plan and related initiatives to empower black farmers and their communities. The American Rescue Plan and related initiatives can only be successful if the USDA pays off black farmers' USDA farm loan debts, creates an inclusive and equitable implementation process for the $1B authorized by Section 1006, and prioritizes policies that help black farmers and their communities to hold onto their land and protect it from further discriminatory practices.

24

# EXHIBIT I
# DECLARATION OF MYKIA XIONG

APP. 000364

## DECLARATION OF MAYKIA XIONG

My name is Maykia Xiong and I am a Hmong farmer in North Carolina. I am over the age of 18 and fully competent to make this declaration.    In support of this Declaration, I offer the following:

1.    I have a substantial interest in the outcome of this litigation and I am a member of the Farmers of Color Network of the Rural Advancement Foundation International.

2.    I live and farm in North Carolina.

3.    I am a poultry grower in Moore County and have been raising poultry for more than fifteen years.

4.    USDA is the guarantor on my loans with a Farm Credit system commercial lender.

5.    As a Southeast Asian refugee and female farmer, I am a "socially disadvantaged farmer" pursuant to 7 U.S.C § 2279 (e)(2).

6.    As an Asian farmer, I am eligible for the debt payment pursuant to Section 1005 of the American Rescue Plan, as passed by Congress and signed by President Biden on March 11, 2021.

7.    My husband and I took out loans to start our poultry operation and still have several hundred thousand owing on those loans.

8.    I am not delinquent in my loan payments.

9.    I have participated in NRCS conservation programs.

10.    I feel that as a female farmer and an Asian farmer, I am always forced to take an extra step.  I have been denied participation in programs and have had to ask multiple times for assistance.

1

11.     The coronavirus epidemic has created several kinds of instability in the industry. In the spring of 2020, there were substantial delays with processing facilities, which created disruption with flock size allowances, getting birds to processors and supply of new flocks.

12.     I will be significantly damaged if the payment permitted by Congress is delayed by the action of the Court in this matter.

13.     Poultry growers are always asked to consider upgrades and improvements and it is a constant reality in this industry.

14.     The payment of the guaranteed loan will allow me to continue farming without as much financial pressure.

15.     This payment will also provide me with the ability to consider additional ways to make my farming enterprise more sustainable for my family and community.

I declare under penalty of perjury that the foregoing is true and correct.


Date: ___6-21-2021_____            Respectfully submitted,

                                         /s/Maykia Xiong_____
                                         Maykia Xiong

2

April 29, 2021

Secretary Tom Vilsack
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

*via regulations.gov*

**RE:** **Comments in response to Notice of Request for Public Comment on the Executive Order on Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 14403 (Mar. 16, 2021), Docket No. USDA–2021–0003**

Rural Coalition, an alliance of farmers, farmworkers, migrant and working people in rural areas across the nation, submits the following comments on behalf of the undersigned, in response to the request from the Chief Economist, U.S. Department of Agriculture Office for input on the development and implementation of a climate change mitigation strategy intended to shift American agriculture to net zero greenhouse gas emissions under the Executive Order on Tackling the Climate Crisis at Home and Abroad.

## Introduction

In developing our comments, we the undersigned sought to understand the goals USDA has in setting out the questions posed to commenters. In order to make our answers to these questions more specific and hopefully useful to USDA, we have drawn from the Climate 21 Project Transition Memo prepared for USDA as a possible basis for new USDA policies on tackling the Climate Crisis.[1] We share the following analysis and recommendations, which build from that understanding.

### Equity is a Foundational Basis for Tackling the Climate Crisis

A food and agriculture system that is not equitable, inclusive and just is, by definition, not sustainable. Treating equity concerns as separate or additional concerns guarantees failure. These are fundamental considerations that must be integrated into all USDA climate-related decision making.

The Climate 21 memo raises the issues of diversity, equity and inclusion at its very outset:

---

[1] (Bonnie, Jones, & Harrell, 2020)

*Issues of diversity, inclusion, and environmental justice are important in all of USDA's work, including climate change. Given USDA's history of past discrimination against minorities, tribes and women in the implementation of farm and other programs, it is vital that USDA's efforts around climate change seek input from diverse stakeholders and that policies are administered such that access to resources and program outreach and delivery to these communities are prioritized.[2]*

The memo further underscores the need to emphasize the historic commitment of producers and landowners in resetting the narrative for climate change solutions:

"***Reset the narrative of agriculture and forestry as climate change solutions with rural stakeholders*** *by emphasizing producers' and landowners' historic commitment to stewardship, and economic opportunities presented by investments in climate mitigation and resilience.*"[3]

In order to effectively tackle climate change, USDA must employ a more holistic frame. A wider reorientation of this nation's food and farming system, including a reversal of many of the extractive and harmful policies of the past, is essential to achieve solutions to the climate crisis. USDA needs more than just "input" from this nation's tribal and other historically discriminated-against producers and more than a "resetting of the narrative" for rural stakeholders. USDA will benefit from valuing and learning from the traditional ecological knowledges these long excluded producers still hold. They have utilized and developed them to survive over the centuries in which they have been removed from and denied access to the most valued land and left to survive on the most fragile holdings with paltry investments from the federal purse.

In creating new strategies, USDA should not neglect these *very old* strategies that work. TEK (traditional ecological knowledges) are not new strategies but they *are* neglected strategies. This body of knowledge should be treated as, supported, and funded as a new strategy. Practices and land management systems that have built and maintained healthy soils and balanced ecosystems for centuries often don't qualify for grants because they are not repairing damage. What often works, for example for dryland farming, simply doesn't fit with or can't be funded by existing NRCS programs which require three years of irrigation records. The knowledge and practices of they have long employed yield real results, and any preservation of healthy, high-carbon soils should be rewarded and incentivized.

---

[2] (Bonnie, Jones, & Harrell, 2020)
[3] (Bonnie, Jones, & Harrell, 2020)

2

**Through the lens of deep equity**, which addresses not just great inclusion and diversity of voices, but the recognition that structural change is also needed to foster true equity for all, this comment focuses on the reorientation of agriculture towards a regenerative, holistic, science-based, and "climate-smart" system. We address and highlight the following topics:

- **Climate-Smart Agriculture and Forestry**
  - **Concentration, Land Tenure and Climate**
  - **Carbon Markets Will Intensify Destructive Concentration**
  - **Federal Climate Investments Must Address a Wider Range of Environmental Injustice and Ecological Threats**
- **Biofuels, Wood and Other Bioproducts, and Renewable Energy**
  - **Renewable Energy Production, Including Solar and Wind, Raise Equity and Environmental Justice Concerns**
- **Addressing Catastrophic Wildfire**
- **Environmental Justice and Disadvantaged Communities Questions**
  - **Additional Equity Recommendations**

<u>**Climate-Smart Agriculture and Forestry Questions**</u>

"Climate-smart agriculture" has been defined as an integrated, whole farm approach to managing landscapes that addresses the interconnection of food security and climate change. Such integrated practices provide ecosystem services, which play a role in air and water purification, nutrient cycling, erosion and flood control, and carbon sequestration. Remediating the current climate crisis requires a holistic, comprehensive approach in which whole farms produce both ecosystem services and food and fiber. Current proposals focus instead on conservation carve outs and carbon sequestration. Carbon markets are a reductionist and performative approach that employ farms and forests to compensate for or offset active emitters of greenhouse gases with ineffective, disjointed programs that carry significant dangers.

USDA must more clearly define what it means by "climate smart." "Climate smart" must not be reductionist and centered on technology -- whole ecosystems, agroecology, community and environmental resilience must be the focus. Carbon sequestration cannot be the sole metric, out of context of the system in which it is occurring. Furthermore, it is a matter of national security and economic and public health to restore and build soil health and natural ecosystems to build resilience, nutrition, water retention, pollution reduction, biodiversity and an economic foundation for rural areas.

USDA would do well to begin by building upon existing programs, provided that *at the same time it invests in eliminating existing gaps that have effectively excluded smaller-scale, largely Black, Indigenous and People of Color (BIPOC), producers* from these programs. USDA should

3

restructure its Noninsured Crop Disaster Assistance Program (NAP) and crop insurance programs to better address climate risks and reward practices that are known to increase climate resilience and reduce risk for farmers and the insurance program. The goal should be comprehensive programs that economically support all producers who engage whole farm solutions based on best practice for their regions, operations, local economies and the climate. Production and conservation are not inherently separate practices. Each can seamlessly support the other.

Central to development of any practice-based incentives or carbon banking system must be equity. Institutional racism in agriculture continues to be prevalent and its impacts are cumulative, lasting and detrimental to climate solutions. A participatory-based study conducted in partnership with Rural Coalition titled "Ecological costs of discrimination: racism, red cedar and resilience in farm bill conservation policy in Oklahoma" found "*a disproportionate amount of USDA program funds, including conservation, commodities and loans, still flow to white farmers and ranchers. Per capita, Black farmers received about 50% of what other farmers received in government payouts in 2012.*" [4]

Figures 1 - 3 further illustrate that "*disparities in farm size and income in Oklahoma represented in Figures 1 -3 reflect similar patterns seen across the USA. Social science and legal literature argue that these trends are connected to the well-documented history of discrimination toward nonwhite and non-male farmers by the USDA, especially in the county-level Farm and Home Administration (FmHA; now the Farm Service Agency, FSA) offices—biases that prevented generations of farmers and ranchers from obtaining the USDA loans they needed to acquire land and keep their farm operating.*"[5]

---

[4] (fagundes, et al., 2019)
[5] (fagundes, et al., 2019)

4



**Fig. 1. Conservation Reserve Program (CRP) acreage with socially disadvantaged farmers and ranchers in 2014.** [6]



**Fig. 2. Conservation Stewardship Program (CSP) funding with socially disadvantaged farmers and ranchers, from 2011 to 2014** [7]

---

[6] (fagundes, et al., 2019)
[7] (fagundes, et al., 2019)

5



**Fig. 3. Environmental Quality Incentives Program (EQIP) funding with socially disadvantaged farmers and ranchers from 1998 to 2015.**[8]

The study goes on to note that "a disproportionate amount of USDA program funds, including conservation, commodities and loans, still flow to white farmers and ranchers. Per capita, Black farmers received about 50% of what other farmers secured in government payouts in 2012 (USDA, 2014a). The latest study available on subsidy disparities found that in 2005, the average Black beneficiary of USDA program funds received $9,555 less than the average received for all other beneficiaries (NBFA & EWG, 2007)."[9] This highlights the urgent obligation of any payment for ecological services or carbon sequestration incentive programs to emphasize equity through payments, outreach and technical assistance.

As part of its efforts to promote climate-smart agriculture, USDA and policy makers must also revisit policies that drive down the prices of commodities far below the cost of production. Such policies have been a key driver of over-production and the extraction and depletion of organic matter and nutrients from the soil and of water from aquifers. This highly vertically integrated, monoculture-based production model has destroyed the wealth of families and communities the world over.

Numerous producers and forest owners already implement innovative and climate-smart practices that sequester carbon and provide ecosystem services. These producers, notably Tribal

---

[8] (fagundes, et al., 2019)
[9] (fagundes, et al., 2019)

6

governments, and BIPOC, small-scale and new entry producers, who have adopted and implemented such regenerative practices under the most extreme of circumstances, should be the first to receive any benefits or credit within a carbon or greenhouse gas program. For example, the Oklahoma Association of Conservation Districts works with many farmers who have adopted soil building practices, and indigenous producers have been implementing practices rooted in Traditional Ecosystem Knowledges (TEK) for decades, if not centuries.

In Arizona, Michael Kotutwa Johnson has documented in his recent dissertation[10] how management based on Indigenous Agricultural Knowledge (IAK), one aspect of TEK, leads to the same conservation outcomes as NRCS standard practices, but getting IAK based conservation methods approved by NRCS is a complicated process that happens on a case-by-case basis." He further notes that American Indian participation in USDA Natural Resources Conservation Service programs remains very low. Mr. Johnson has also shared with our members his methods of cultivating corn, squash and beans on dry land in a continual system that has remained productive for over 100 years, as documented in his photos. His dissertation provides clear evidence of how the ancestral practice of continuous planting, saving, selecting, and sorting of seeds over decades assures the seeds adapt to changing conditions. This is one example of the kind of practices that should be highly valued for payments for ecological services under any new or expanded programs that work toward climate mitigation.

**The USDA should center its support on small- to mid-scale farmers using sustainable and regenerative systems such as managed rotational grazing, which can build soil health and sequester carbon. It should invest in this sector by removing cost-share and matching requirements for BIPOC, limited resource and beginning producers, set minimums, increase payments for practices and reduce the amount of paperwork required to participate in such programs.** There is clear evidence that such requirements result in under-enrollment by these populations in programs that would benefit them, such as the Value-Added Producer Grant (VAPG) program. [11]

It is also imperative that USDA engage Tribal governments and groups representing BIPOC producers, including those supporting this comment, to conduct a systematic review of the barriers to equitable and adequate access to *existing* programs and how these can be mitigated, building on existing scholarship and direct consultation with these communities. USDA should further incorporate their proposals to incentivize adoption of practices to advance regenerative, agro-ecological, organic, and other traditional approaches to farming, forestry, and ranching that are proven but now neglected or undermined by existing programs.

---

[10] (Johnson, 2019)
[11] (Ayazi & Elsheikh, 2015)

7

**Concentration, Land Tenure and Climate**

Over several centuries, the food and agriculture, fiber, and energy systems within the boundaries of this nation have been reoriented continuously. These changes have been directed to feed, clothe, shelter, and power a growing population, and later a growing desire to utilize agriculture exports to balance trade. Capital investments have been employed to replace labor and to develop highly vertically integrated processing, distribution supply chains heavily reliant on energy. This highly extractive system is itself a clear driver of the climate crisis.

Our members and allies, including Family Farm Action Alliance, the Campaign for Family Farms and our environmental allies, who represent family farmers and/or have clear proposals to define and address the extreme concentration and vertical integration in agriculture. We support their analysis particularly of the livestock sector, which by its very structure and concentration, is a major source of ecological damage to land, water and air. We urge USDA to adopt their essential proposals to address concentration and mitigate the dangers it poses for the climate and the economy.

The COVID 19 pandemic has illustrated the fundamental need to consider and address the costs of highly concentrated processing and distribution. The need to protect the workers in the meat processing sector was suddenly viewed as essential not only as a matter of basic justice, but also because when the lives and health of the workers were imperiled, existing distribution channels were frozen with formidable costs from farm to fork.

A system where global trade routes can be disrupted by a single ship stuck in the Suez Canal lacks resilience. The pandemic further illustrated the value of domestic production of essential products both in the US and across the world. It also demonstrated the value of local and regional production and distribution of food. Increased federal investments in more local systems would increase resilience, increase the quality of food and catalyze this system as a base for economic development and ecological health in rural and urban communities.

In addition to addressing the impacts of extreme concentration in the processing and distribution of food products, climate policy must also address and mitigate current economic factors that trend toward ever greater concentration of land ownership as well as ownership of seeds, production capacity, and distribution. Concentration of ownership and growth of absentee owners have undermined and continue to destroy ecological, economic, community, and public health in communities across this nation and world.

USDA must also immediately work to understand and stem the loss of land tenure including an issuance of regulations to implement the 2018 Farm Bill provision supporting relending to heirs property owners. A regulation must also be issued, and USDA field offices must be trained in the

8

use of the alternate documentation provisions which allow heirs property owners to access USDA programs. The Administration should request full funding for immediate implementation of the National Agricultural Statistics Service Survey of Tenure Ownership, and Transition of Agricultural Land authorized in the Farm Bill. That study is critical to understanding the degree to which land by county and state is held in undivided interests (heirs property) or absentee ownership. The Civil Rights Office should be fully funded and staffed.

Local and rural landowners are the stewards upon which we all rely and must be central to our climate policy. Through land ownership, job creation and business can expand.

The Climate 21 memo appropriately noted the need to connect climate policies to rural economies, a connection which we strongly endorse:

> **"Issue a Secretarial Order on Climate Change and Rural Investment** *to signal climate change as a top priority of the department, frame USDA's interest in investing in agriculture, forestry, technology, innovation, and rural economies, and to set agendas for policy and programmatic actions needed to act on climate."*[12]

New climate investments have the potential to catalyze the reorientation of food, agriculture, fiber, and energy systems. We urge USDA to consider investing in bolder approaches, including the holistic approach such as that set forward by Native American Agriculture Fund (NAAF) in their "*Vision for Native Food and Agriculture Rebuilding and Recovery."*[13] The comprehensive framing and incorporation of a wide range of elements including a new system of food hubs, repurposing existing financing mechanisms, and focusing on investing in next generation producers could become a model for other regions and other communities of BIPOC producers.

Any climate policy must be evaluated for its impact on land tenure, land ownership and control of land. USDA must adopt such measures as necessary to ensure that the role of this nation's farmers and ranchers, and particularly its BIPOC producers, is enhanced and not erased by climate policies. It must also act to ensure that climate policies work to enhance, not destroy, the economic and ecological resilience of rural communities and advance agriculture and forestry as foundational to their economies.

**Carbon Markets Will Intensify Destructive Concentration**

If USDA takes on a new role in treating carbon as a commodity, it should proceed with great caution. Commoditizing carbon is a reductionist approach that has attracted venture capital, threatening land tenure. Bill Gates, a nonfarmer, now is the largest owner of U.S. agricultural

---

[12] (Bonnie, Jones, & Harrell, 2020)
[13] (Simms Hipp & Givens)

9

lands, and there has been exponential growth of farmland purchase by unaccountable global investors.[14] As we address in the next section, concentration of the control of forest lands and resources is proceeding at a rate that should cause alarm. Further privatization of the commons (carbon) has already resulted in significant concentration of wealth.

The commoditization of carbon poses additional risks of further consolidation of land, wealth and power. It rewards the reductionist methods that define the current, extractive system, which must instead be fundamentally reformed to reduce climate impacts. If the federal government enters this arena, it must assure that markets are regulated and transparent, and robust measures must be put in place to mitigate the disproportionate burden on small and socially disadvantaged producers. Metrics must also prioritize small farmers, multi-crop, and specialty crop farmers. Allowing polluters to buy the right to continue polluting by concentrating land and trading offsets props up high emitting entities and further harms vulnerable and socially disadvantaged communities, who also disproportionately live in the most polluted and underserved communities. It is inequitable and deeply unjust. While with new federal support, landowners and producers can be engaged to remediate the environment, policies must also require that high emitting corporations also reduce their own emissions to have any significant effect on a changing climate.

Federal policies that incentivize emerging carbon markets are likely to reverse, not advance, equity, inclusion and justice. The effects of existing private carbon markets should be examined before the federal government embraces this approach. What mechanisms would private markets have to make assure that carbon credits do not simply allow industries to continue polluting without demonstrable emissions reductions. The continued pollution has disparate consequences for socially disadvantaged communities, exacerbating inequities. The money "invested" does not benefit local communities. For example, where hedge funds have purchased forest property in the rural South, studies show poverty increases. If these markets cannot advantage local ownership by farmers and forest stewards who know how to protect their lands and are interested in the welfare of their communities, they should be avoided. Pilot projects could measure proof of concept but should not be a focus of major federal investment.

Voluntary adoption of enhanced conservation practices that build from current programs necessitates expanded access to markets (which could include enhanced SNAP funding for fruits and vegetables), support for aggregation hubs, access to processing facilities, labor, seeds, secure land tenure, research, technical support, and funding, as well as antitrust enforcement that would free farmers and ranchers to adopt alternatives.  Any emerging federal interventions to reduce carbon or greenhouse gases must primarily recognize and remunerate such early adopters who have prioritized ecological health in their operations, uplift them, and then train and incentivize others to adopt these practices.

---

[14] (Ross, Mittal, Johnson, & Word, 2014)

10

USDA should also work with producers to develop conservation compliance verification procedures so that shortcuts are not rewarded. The current trap of debt, costs of production in excess of price, and forced reliance on concentrated sources of inputs preclude adoption of new practices. Whole farm revenue and crop insurance reform are also necessary.

It is imperative to note that due to the nature of carbon cycling, rates of sequestration and ecosystem services vary depending upon location, climate, soil, biomes and more. Such a systems would mean that producers who have been subject to decades of discrimination and exclusion after to being pushed to the most fragile and vulnerable land would receive only a fraction of the benefits of other producers.

Furthermore, this form of "climate smart" policies do not stop the existing polluting practices they offset. Small to mid-size farm operations cannot maintain their viability and employ sound practices in an extractive system while commodity prices continue a downward trend in an increasingly vertically integrated global market. Sustainable agriculture must be reflected systemically throughout the entire agricultural chain, from soil to table and through to compost.

For that reason, USDA should adopt climate policies that implement payments for integrative and regenerative ecological practices rather than for quantities of carbon sequestered. Such an approach may also reduce the danger of land consolidation by absentee owners and investors seeking to accrue and profit from the passive benefits and payments for carbon sequestration. USDA must foster programs which keep producers practicing climate-smart methodologies on their land.

If establishment of a carbon bank is inevitable, USDA and other federal agencies must make clear how and where such an entity would be constructed and located, and how it would be regulated. In particular, clear policies and procedures to assure racial equity and environmental justice must be developed and instituted in direct nation to nation consultation with Tribal governments, and with the involvement of rural rooted and other communities with experience in addressing equity.

If the USDA is truly committed to equity, it must not just make programs more accessible, but include consideration of the structural impacts of its decisions -- for example, incentivizing factory farm biogas projects inadvertently contributes to increased scale of these operations and greater consolidation, putting small-scale dairies out of business. A systemic, or "deep equity" lens is essential if USDA is to meaningfully support and engage tribal governments and BIPOC producers who already suffer many disadvantages, as well as workers in family farms.

11

Food and farming systems in the United States are highly complex and intersect with many of today's most pressing problems. It is absolutely essential that the USDA's overarching approach to climate-smart farming and forestry honor and appropriately navigate this complexity by taking an integrated, holistic approach. Specifically, any and all new decisions and programs should be governed by a set of guiding criteria. We urge USDA not to myopically focus on carbon sequestration, but only enact decisions if the action meets a set of key guiding criteria. The following may serve as a starting point:

- Will not inadvertently incentivize GHG-emitting chemical inputs;
- Does not create disproportionate barriers for small- and mid-scale farms or socially disadvantaged farmers;
- Has been developed in a participatory process that includes tribal government consultation and representation of populations, including BIPOC producers and farm and food chain workers most likely to be impacted by the decision(s), and/or is embraced by these communities;
- Does not reward entities that cause high levels of environmental or community harm;
- Does not create inequity by driving further consolidation of wealth or control in the sector.

**Federal Climate Investments Must Address a Wider Range of Environmental Injustice and Ecological Threats**

Our current food and agriculture system is dependent upon the labor of millions of farm and food chain workers. While capital can move freely across borders without restrictions, labor cannot. Immigration policies and lack of labor protections mean farm and food chain workers and their families are routinely denied fair wages, and the ability to secure legal presence and live and work safely and with dignity in their communities. Women workers are often the least protected and most vulnerable to low wages and sexual harassment. The combined impact of these factors profoundly affects farming and farm laborer communities.

These workers are often the first and most exposed to the documented dangers of pesticides, herbicides and other agricultural chemicals, including nutrients; these dangers also pose broad ecological impacts.  Farmworkers, and farmworker women in particular, routinely experience exposures and injuries that have long term consequences on their health and that of their children and families.

In addition, growing climate impacts are already posing new threats to workers, impacts which are being largely overlooked. The incidence of heat related illnesses among farmworkers is rising rapidly. The threat was intensified during the pandemic where essential personal protective equipment also increased the incidence of heat stress.  Several years ago, a group of women farmworkers, or *campesinas*, who are part of the Rural Coalition were a part of a delegation to

12

New Mexico.  There, the leaders of the southwest USDA Climate Hub shared the very useful information then available.  One feature was the posting of a heat stress index for cattle.  The women immediately asked why there are not such tools to measure the risk of heat stress for workers. We thus reiterate here their recommendation that workers receive protections from heat stress, including personal protective equipment to measure the heat they are experiencing.  We further recommend that such any heat index also indicate dangers for human health, especially for workers; and that enforceable protections for all workers regardless of immigration status are set in place with regard to heat stress and pesticide exposures and working conditions.

Our communities have long raised concerns about the impact both habitat disruptions and agricultural chemicals are having on land and water. They cite a growing incidence of invasive species incursion and plant and animal diseases. Our communities have observed that overuse of pesticides and especially herbicides, which are frequently employed main to reduce the need for labor, are a factor contributing to more noxious weeds, and plant diseases including citrus greening disease.  The agroecological cultivation methods they have long employed have been protective against these threats. They believe these methods could be tested more widely for their efficacy in removing toxins and healing and restoring land exhausted by chemicals and compaction.  Farmworkers who suffer the costs of overuse of agricultural chemicals most directly strongly support reductions and much stronger restrictions on their use to reduce ecological and human health consequences.

Any climate strategy must also value and foster real protections and enhancement of habitats for another population that provides critical and irreplaceable ecological services-pollinators. Our environmental members and allies have developed strong and compelling evidence for reducing and eliminating the use of many agriculture chemicals and adopting agroecological and other beneficial practices to restore the land and reduce or eliminate the need for these chemicals.  We support their recommendations in this important area.

## Biofuels, Wood and Other Bioproducts, and Renewable Energy Questions

As USDA pursues ideas for new investment in bioproducts and renewable energy, it would do well to begin with a holistic approach to guide investments.  Recent and continuing massive power grid failures had broad social consequences that require our urgent attention. While some of these issues are likely to be addressed in an infrastructure bill, USDA must consider what role bioproducts and renewable energy can and should play in a future energy transportation system.

The production and distribution of energy, including electricity and fuel for transportation, are already highly consolidated industries dependent on complex supply networks that are starkly lacking in resilience. (Bailey, Gopaul, Thompson, & Gunnoe, 2020). Substituting biofuels or large-scale renewable sources including wind energy for other fuels into the existing power and

13

transportation systems will not address the current costs and vulnerabilities of these systems. Investing in biogas digesters to turn the massive waste of concentrated animal feeding operations into an energy product does not remediate the worker safety, food safety or ecological and economic costs of these concentrated operations for farmers, workers and communities. Nor will those approaches take advantage of new technologies and opportunities to build a more resilient and localized system of energy production and distribution.

While other federal agencies will also be considering these questions, we urge USDA to consider that these transportation and energy systems and how they are reoriented bears significant consequences for rural communities, and especially for persistently poor communities and the tribal and BIPOC communities who live there. Smaller scale and more localized energy production could reorient energy distribution and increase the resilience of these systems instead of just expanding the current system, which is by its very nature, extractive. Transportation systems bypass and fail to serve rural residents who need alternatives to cars. There are deep equity issues involved at every level.

We also seek to understand what role USDA is envisioning for forests in its energy equations and in its overall approach to wood, fiber, carbon markets and climate.

There is a growing body of research that details the impact of the degree of highly concentrated ownership of forest land on children, families and the communities. This research documents the need for policies that secure land tenure as the basis of community and child wellbeing, protecting the intergenerational transfer of land and building a community with a healthy ecosystem and a tax base sufficient to support quality education, employment opportunities, and a strong infrastructure.

We place them here in the conversation because trends related to privately held forest land, in this case the transition from companies owning forests for producing paper to companies who own and manage the land as a financial asset, relates to how these forests might be used and valued both for biofuels and carbon credits.

In the paper "Taking Goldschmidt to the Woods: Timberland Ownership and Quality of Life in Alabama," Dr. Connor Bailey and colleagues used *"a database of property tax records for 13.6 million acres representing every parcel of privately owned timberland in 48 rural Alabama counties to test two hypotheses inspired by Walter Goldschmidt relating land ownership and quality of life."*[15]

Like the historic Goldschmidt study that linked concentration in land ownership to poverty in communities of the Central Valley of California, the data *"show private ownership is highly*

---

[15]  (Bailey, Gopaul, Thompson, & Gunnoe, 2020)

14

*concentrated and 62 percent is absentee owned...Our findings support Goldschmidt-inspired hypotheses that concentrated and absentee ownership of timberland exhibit a significant adverse relationship with quality of life as measured by educational attainment, poverty, unemployment, food insecurity, eligibility for free or reduced price lunch at public schools, Supplemental Nutrition Assistance Program participation, and population density. Low property taxes in Alabama limit the ability of local governments to generate revenue to support public education or meet other infrastructural or service needs in rural areas. We call on rural sociologists and kindred spirits to pay more attention to the fundamental importance of land ownership which shapes the foundations of power and inequality affecting rural life in America and beyond."*

The paper goes on to detail how investments in timberland in Alabama, driven by investment decisions of large corporations with little connection to the communities, has changed:

*Since 1990, and in particular during the period 2000–2008, corporations in the forest products industry sold most of their lands—approximately 50 million acres nationally (Bliss et al. 2010; Gunnoe, Bailey, and Ameyaw 2018). This large-scale divestiture was motivated by shareholders who reasoned the value of timberland should be used to pay down corporate debt and buy back stock shares, thus increasing share values (Gunnoe 2014). The primary buyers of these lands were other corporations and financial managers and investors classified as Timber Investment Management Organizations (TIMOs) and Real Estate Investment Trusts (REITs). TIMOs manage land for investors (e.g., pension funds) which own land as a financial asset but lack timberland management expertise. REITs are corporations which own land on behalf of shareholders and enjoy a tax-free status as long as they distribute 90 percent of their profits directly to shareholders and have minimal income from any form of manufacturing activity.*

*TIMOs and REITs have replaced paper companies as the largest owners of timberland in Alabama. The five largest owners of timberland in Alabama are either TIMOs or REITS, owning 1.9 million acres representing 10 percent of all privately owned timberland in the state. Similar changes in timberland ownership are happening elsewhere in the U.S., where three REITs and six TIMOs own a combined 31.4 million acres (FORISK 2018). The connection between absentee TIMO and REIT investors with the land or people who live near their land is distant at best (Gunnoe et al. 2018)."* [16]

We have observed similar trends particularly in the State of Georgia. In Alabama, Georgia and other southern states, there remain many private forest landowners, including many Black landowners. There has been a push to address the heirs property issues that many black landowners face as land transitions into undivided interests held by survivors when owners pass

---

[16] (Bailey, Gopaul, Thompson, & Gunnoe, 2020)

15

away without a will. However, the process of probating a will or an estate left with no will or executor, even in states where the Uniform Partition of Heirs Property Law has been enacted, is complex and expensive.

The Federation of Southern Cooperatives which has studied these trends for decades, estimates that at least 40% of black owned properties are now held in undivided interests or heirs property. Such properties are left wide open to partition sales which happen when outside interests offer to purchase the interest usually of one distant family member, forcing a sale of the whole property with distribution of the usually small proceeds among all family members. The risk of such forced sales grows as potential federal payments for ecological services for forest land investments makes them a more desirable asset for timber interests or even pension funds. BIPOC families are less likely to have access to affordable and unconflicted legal services necessary to create wills and succession plans. In the aftermath of a pandemic that has left over 560,000 families coping with the loss of family members, USDA and other federal agencies lack information to assess how many more properties are at risk. It is likely however that at least some of those properties include farm and forest land.

It is essential that USDA work with its BIPOC community-based organization partners to identify and address these risks and how new federal investments may make the critically important securing of land tenure for the nation's Tribes and BIPOC communities even more difficult and important. USDA should begin by issuing regulations to implement the heirs property relending program established in the 2018 farm bill.  It should also issue a regulation and field directives to help farm and forest landowners faced with succession issues to utilize the alternate documentation provisions in the 2018 Farm Bill to access conservation and forestry programs they need to care for and protect the land as these issues are resolved. Finally, as mentioned elsewhere, USDA must assure that NASS Land Tenure study is funded and implemented to help understand the degree to which land is held in undivided interests and absentee ownership and to serve as baseline - and a warning sign - to document how the incidence of these land tenure patterns changes as new policies are implemented.

In addition to properties that are left vulnerable to losses through unresolved heirs property issues, we have reports from our members of the incidence of parties seeking to take possession of land not actively managed by use of adverse possession. Thus, a party that uses land of a certain period of time has specific rights on property law in some states to claim that property without a sale. Thus, when property owners must work outside, their neighboring producers use the land and sometimes cut the timber or otherwise legally challenge the property rights of the rightful owners by their adverse possession and use of it.

Another concerning trend is the growing use by wide networks of entities who entice BIPOC producers in particular to sign a power of attorney appointing an outside party to manage their

16

utilization of USDA services. These entities often charge a significant percentage of the benefits without informing the producers that USDA provides these services at no cost. There are multiple examples in states including Florida, Arkansas and New Mexico where such parties are charging between 10 and 30% of USDA benefits, including loans, in return for securing these benefits. The farmers are often not aware that qualified technical assistance is available from many trained and trusted community-based members to do the same thing without cost.

Timber Investment Management Organizations are among such entities reaching out to BIPOC landowners seeking to manage their land and timber assets for a cost. Any increase in payments for the ecological benefits forests can provide, or in their potential for new biomass facilities, pose potential risks for landowners who are not provided with a full understanding of how these tools work, and how benefits are accrued to owners vs. those who manage them for profit. USDA should assure that landowners have the information they need to assess these risks.

As we have noted elsewhere, USDA would be well advised instead to provide funds that will sustain the technical assistance programs offered by many community-based organizations who have helped thousands of Tribal and BIPOC farmers and ranchers navigate USDA programs at no cost. Such technical assistance programs should include support for consulting foresters to help navigate current and any new USDA programs and to access any local tax reductions relating to holding the land in forestry use.

USDA has not demonstrated it has the tools to understand how investments in ecological services, particularly if these create incentive or expand carbon markets, will impact the ownership and control of the land.

**Renewable Energy Production, Including Solar and Wind, Raise Equity and Environmental Justice Concerns**

Our members have further informed us that the terms of contracts related to renewable energy including wind turbines, solar farms and easements for power lines and other energy related uses of farmland are also subject to abuse. In Oklahoma for example, Black and tribal farmers were told essentially that the wind seemed to blow around their properties and was therefore less valuable than the wind blowing elsewhere. Because virtually all these types of contracts (as well as gas and mineral leases) include non-disclosure agreements, producers are unable to compare terms with their neighbors and have no way of knowing if these are fair.

In Oklahoma, Texas and other southern states, farmers and rural residents have installed solar energy systems for their own use. However, if these systems are connected to power company grids, the companies charge the farmers and families for distributing the clean energy they produce.

17

We expect these predatory enterprises and forced sales of heirs properties to grow if USDA provides new investments in ecological services or promotes carbon markets. We urge USDA to develop a full understanding of the risks of these practices for all farmers, and particularly the imminent threat they pose to the land holdings of BIPOC communities. Moreover, USDA must, in consultation with Tribal governments and BIPOC communities, develop tools to identify and mitigate these threats to land tenure. This should include a new focus on ways to promote the development of succession plans by all farm families. USDA should also upgrade its power of attorney forms to require written disclosure by outside entities who require producers to pay them for services USDA provides without cost.

Any large-scale change in federal policies has the potential to create a new set of winners and losers. Without the NASS study on land tenure, USDA has no database to serve as a baseline to determine the impact of current trends and new policies on who controls the land and what impact such changes have on environmental justice and equity.

We also urge USDA to consider the role of education, research and community investment in rural regions. While the reorientation of transportation and energy systems bears significant consequences for rural communities, and especially for persistently poor communities and the tribal and BIPOC communities who live there, there is great opportunity for investment and development of highly skilled workforces. Rural communities must be involved in the development of any new systems or reorientation. Producers and rural communities are already very well versed in environmental science, economics and mechanical engineering. Further investment into rural regions starting with youth through high schools and community colleges will only improve development of alternative renewable energy sources and on farm technologies.

In order to phase out fuel-based systems and incentivize renewable electricity we must look to innovative renewable solutions that engage agriculture and support agricultural communities. For example, vast research shows that hemp fiber, which is often composted or destroyed after harvest, is proven to outperform current battery technology with better energy capacity and storage. The cost to produce hemp electric batteries is also far cheaper and destructive than current battery production. Moreover, hemp producers have been able to invent numerous products from hemp, such as concrete and fiber, which processes emit much less greenhouse gas than traditional methods. Investment into such technologies and rural solutions is imperative, this smaller scale and more localized energy production could reorient energy distribution and increase the resilience of current systems.

## Addressing Catastrophic Wildfire Questions

The communities we serve stress the fact that healthy forests are valuable and complex ecosystems that are important to the health of our entire planet. It is important to consider their ecological value and the economic importance of protecting it.

Monoculture forest plantations featuring a single species grown as an economic product do not provide the same ecological benefits as natural forests. Tree planting on a massive scale cannot replace these forests. USDA should work with private landowners and other federal agencies to identify and take steps to protect the forests that are relatively healthy and already sequestering significant amounts of carbon. It should also promote research to detail the benefits of protecting forests primarily for that purpose. USDA should construct programs that incentivize that protection in a permanent and sustainable manner with benefits to tribal governments, private landowners including BIPOC forest landowners, and the forest and park users and communities that surround national forests and other federally held lands that include forests.

While wood is a valuable resource, more research on how to sustainably harvest timber, and on how to meet needs for wood, energy and fiber in ways that protect forests represent critical research topics worthy of USDA investments.

It is further important to note that catastrophic wildfires are occurring largely on federal and state land and often in the Western US. USDA is urged to consult with other federal departments and particularly the Interior Department, on the land management practices on federal land. Moreover, USDA must consult directly with Tribal Governments and BIPOC producers including ranchers from the historic land grant communities of New Mexico and Colorado who use or have historically held land on the status and issues related to allocation of grazing leases and other rights to use land. These communities possess a deep understanding of traditional methods to enhance ecologically based management of the land, and the role of grazing animals in protecting forest health.

### Environmental Justice and Disadvantaged Communities Questions

We have included numerous equity focused proposals in previous sections and in the recommendations that follow. Here we stress the need for USDA to consult closely with Tribal governments as well as its community-based organizational partners on how to resolve the many historical and structural barriers that prevent Tribal and BIPOC producers from engaging with and attaining the same degree of support and benefits most other farmers and ranchers receive from USDA. Even in the present day this sector of producers receives only a miniscule level of the support other producers depend upon.

In order to address this gap, we urge USDA to pilot and the US Congress establish a comprehensive *USDA **Equity and Access Program*** that supports and enables Tribal and BIPOC

19

farmers and ranchers to secure land tenure and fair access to USDA programs and services, and to build and secure viable operations that also benefit and provide an economic base for the poor rural communities where many reside.

A more holistic approach to fulling gaps in programs and services would jumpstart opportunities for BIPOC farmers to survive and thrive. We will be sharing a comprehensive template for such program, but essential elements include:

☐ Access to land ownership and secure land tenure – A significant percentage of producers and aspiring producers we serve lack farm and tract numbers and the documentation required to acquire them, even if they are cultivating land that has been in the family for generations. A land access program should provide incentives, cost shares or other support to help families resolve heirs property issues, secure clear title to their land and secure and maintain a succession plan for the future of their farmer. This could include assistance to help heirs property owners secure a Power of Attorney agreement or a Tenant in Common agreement. Such instruments would allow and encourage family agreement on the use and management of the property but doesn't require them to deed the property over to one owner or encourage the use of partitions by one party to force a sale or transfer of the property.

☐ USDA should provide more options to work with a mentor farmer or otherwise substitute work on a family operation, as a farmworker, or farming experience outside the US in order to meet the 3-year requirement to qualify for beginning farm loans.

☐ Access to farm operating loans – Producers recommend that USDA make available options for operating loans that defer the first payment for 24 months and provide interest rates reductions. These terms would allow them to build up the equity that many BIPOC producers lack due to the cumulative effect of discrimination.

☐ We further strongly recommend that Congress remove the statutory requirement that FSA serve only as a lender of last resort so farmers can remain eligible for USDA loans even as they progress in building equity and experience.

☐ Provide support for new incentives and tools to help producers improve record keeping systems, general farm and financial management practices and meeting all regulatory requirements.

☐ Provide incentives for participation in cooperatives to market their products, and to farmers to serve as mentors to other producers.

☐ Ongoing support for a network of qualified technical assistance based in the community-based entities that have developed the trust of producers to help them navigate the full suite of farm, credit and conservation programs. These technical assistance providers should receive support to help producers access both FSA and NRCS systems. Producers are already noting that recently instituted requirements to address ecological practices and benefits require them to use different language to define their needs for assistance. It is imperative that they have trusted technical assistance to navigate these and other coming changes.

20

Under this initiative, producers would receive support and incentives (which could be constructed as tiered grants, cost share payments or a comprehensive loan with loan forgiveness for meeting requirements of each tier) combined with technical assistance provided directly to farmers and ranchers through community-based organizations that already serve them.

We understand that these recommendations do not appear to directly address climate issues. However, in order to engage fully in the many conservation programs USDA already has, a significant percentage of BIPOC producers first need to meet eligibility requirements to access FSA before all the current and proposed programs will become available to them. Also, care of the often vulnerable land base they hold is in the interest of their families, their communities, and our nation. Addressing these gaps is the first step to building racial equity and environmental justice.

## Additional Equity Recommendations:

1. USDA should immediately request funds from Congress to implement and complete the National Ag Statistics Survey of land ownership as a baseline to measure the impact of any payments for ecological services on land tenure, including changes in the incidence of land held in undivided interests and absentee ownership. The NASS Total Land Survey should be repeated within 5 years and once a decade thereafter with data collected on land ownership by race, gender and ethnicity, age of producer and other demographic and economic characteristics to the county level.

2. USDA should immediately implement the heirs property relending fund authorized in the 2018 Farm Bill and funded by Congress annually since to assure the required pilot projects are set in places with results ready to inform the next Farm Bill.

3. USDA should revisit how land tenure is reflected in its data systems. The categories of owner, renter and operator are insufficient, and the very large number of entities whose status is described as "unknown" in the payment system managed by FSA masks the degree to which land is held in undivided interests, in corporate or other forms of absentee ownership, and also the degree to which crop, grazing and forest land is managed by outside interests. Data on who actually controls land are essential to developing any long-term plan to mitigate the climate crisis.

4. USDA should promote the development of succession plans by all farm families.

21

5.  FSA power of attorney forms should require outside entities to provide written disclosure to producers of the amounts of any payments they require to provide them with services USDA provides without cost.

6.  USDA should also develop programs to support qualified technical assistance from trusted entities who already help producers and forest owners secure USDA program access and services at no cost to producers.

7.  Carbon sequestration should be seen as an important but not the only factor in evaluating success. New investments should also be evaluated based on total ecological benefit and related factors including increases in overall resilience, in pollinator habitats, restoration of watersheds and water quality and disaster resilience.

8.  Climate investments should be practice based.  USDA should modify the EQIP and CSP programs to include a wider range of practices informed by traditional ecological knowledges and indigenous agriculture knowledges. These should include support for practices as well as new uses of the conservation reserve program that promote the continuous planting, saving, selecting and sorting of seeds over decades to assure they adapt to changing conditions.  Set asides should be expanded to include tribal run projects and projects developed by traditional communities focused on increasing the ability of seeds and breeds to adapt to changing conditions. At the same time, USDA should consult with Tribal government and BIPOC communities to institute essential measures to protect the rights of tribal and other communities to retain control of these seeds and breeds.

9.  USDA should increase incentives and reduce the amount of paperwork for BIPOC, limited resource and beginning producers in existing conservation programs. This should include eliminating costs shares and matching funds requirements, increasing minimum payments and utilizing payments for practices rather than carbon sequestration.

10. USDA must also invest in providing sustained support to expand the essential network of technical assistance providers connected to the community-based organizations who have the capacity and experience to provide this essential hands-on assistance.

11. USDA and other federal agencies should ensure workplace protections for all farmworkers and food chain workers, including protections against sexual harassment and discrimination. USDA should work with other federal agencies to address heat

22

stress. It should also institute immediate reduction of line speeds in poultry processing.

12. USDA must assure that any USDA Climate Policy and Rural Investment Advisory Board, or similar federal advisory committee established with the purpose of advising the Secretary on climate policy[17] include a critical mass of representation identified by Tribal Governments and from groups with documented experience representing socially disadvantaged producers and landowners including forest landowners.

13. USDA should engage career staff with deep familiarity and trusted relationships with Tribes and BIPOC communities in the development of effective policies, including the outreach, small farms and civil rights offices within NRCS, FSA, APHIS, NIFA, NASS and many other USDA agencies. They should restore the cross-agency collaborations among career staff that generated many effective policy ideas that have informed equity advances in federal law. They should also reinstitute the structures that allow such collaborations and restore ongoing partnerships with community-based partners who are delivering services at the field level.

**Conclusion**

In any transition in our food, agriculture, fiber and energy systems to address the climate crisis, it is of course essential that solutions benefit both the economy and ecology. In closing, we reflect that the terms ecology and economy both derive from the same root – the Greek word "oikos" which means household. Our efforts to restore a resilient household – one that sustains our planet and its people into the future – requires deep humility and the capacity to begin to know what we do not know. Our solutions require the humility to consult and respect tribal and indigenous and traditional ecological knowledge in order to inform and deepen our understanding of how we can make the equitable transition essential to the future of our planet and its people.

In our view, this starts with assuring that in the US and beyond, land and resources are reconnected with the persons and communities who know how to care for them, for the benefit of all who live, work and depend on these systems. This requires a focus on secure land tenure, and a basic reorientation of systems from extraction to investment in true and durable resilience.

We appreciate this opportunity to share our insights and recommendations with you. We are most willing to answer now or in the future any questions you may have or to offer any assistance on refining and implementing a vision that reorients our current food and agriculture systems to one that is resilient and just and equitable.

---

[17] (Bonnie, Jones, & Harrell, 2020)

23

Submitted by
Rural Coalition, Washington, DC
Rural Advancement Fund of the National Sharecroppers Fund, Orangeburg, SC
North Carolina Association of Black Lawyers Land Loss Prevention Project, Durham, NC
National Latino Farmers and Ranchers Trade Association, Washington, DC
Oklahoma Black Historical Research Project, OK
Kansas Black Farmers Association, Nicodemus, KS
Rural Development Leadership Network, New York, NY
American Indian Mothers Inc. DBA/Three Sisters Farm & Ranch C-op, Red Springs NC
Alianza Naciónal de Campesinas, Oxnard, CA
World Farmers, Lancaster, MA
Family Farm Action Alliance
Etc….(List in process)

---

**Works Cited**

Ayazi, H., & Elsheikh, E. (2015). *The US Farm Bill: Corporate Power and Structural Racialization in the United States Food System.* Berkeley, CA: UC Berkeley Haas Institute.

Bailey, C., Gopaul, A., Thompson, R., & Gunnoe, A. (2020). Taking Goldschmidt to the Woods Timberland Ownership and Quality of Life in Alabama. *Rural Sociology. 86.*

Bonnie, R., Jones, L., & Harrell, M. (2020). *Climate 21 Project Transition Memo: Department of Agriculture.* climate21.org.

fagundes, C., Picciano , L., Willard, T., Mleczko, J., Schwier, S., Hall, F., . . . Graddy-Lovelace, G. (2019). Ecological costs of discrimination: racism, red cedar and resilience in farm bill conservation policy in Oklahoma. *Renewable Agriculture and Food Systems.*

Johnson, M. K. (2019). *INDIGENOUS AGRICULTURE KNOWLEDGE: BARRIERS, INTEGRATION, POLICY, AND OUTREACH.* University of Arizona: A Dissertation Submitted to the Faculty of the SCHOOL OF NATURAL RESOURCES AND THE ENVIRONMENT in Partial Fulfillment of the Requirements for the Degree of DOCTOR OF PHILOSOPHY WITH A MAJOR IN NATURAL RESOURCES in the Graduate College.

24

Ross, L., Mittal, A., Johnson, N., & Word, J. (2014). *Down on the Farm Wall Street: America's New Farmer.* Oakland: The Oakland Institute.

Simms Hipp, J. L., & Givens, M. (n.d.). *A VISION FOR NATIVE FOOD AND AGRICULTURE INFRASTRUCTURE REBUILDING AND RECOVERY.* Native American Agriculture Fund.

25

March 3, 2019

The Honorable Gene L. Dodaro

Comptroller General

U.S. General Accounting Office

441 G Street NW

Washington, DC 20548

Re:  **SEC. 5416. GAO Report on Credit Service to Socially Disadvantaged Farmers and Ranchers**

Dear General Dodaro:

<div align="center">

I.        **INTRODUCTION**

</div>

As the General Accounting Office prepares to fulfill its duties under Section 5416 of Public Law 115-334,

the 2018 Farm Bill, the undersigned organizations representing the agriculture lending interests of

minority and socially disadvantaged farmers and ranchers encourage the adoption of methodologies

that examine and evaluate farm lending policies having a negative impact on minority farmers and

ranchers.  The study's methodology should examine, from our perspective, and evaluate certain

"unique" lending patterns, practices and policies that reliable sources, academic and legal, verifiably

document as contributors to farm loan default, acceleration and foreclosure within the minority farming

community.

The undersigned organizations over the years have reviewed thousands of loan documents, and assisted

minority farmers with loan servicing options.  Before and after Keepseagle, Love, and Garcia Pigford

Farmer settlements, the undersigned organization labored with minority and socially disadvantaged

<div align="center">1</div>

family farmers and ranchers in the areas of farm credit applications, collateral requirements, and loan servicing.  As a collective of over 100 years of experience in family farm foreclosure prevention and farm wealth transition, we know firsthand the consequences of late loans, disparate treatment and disparate impact in loan servicing and other hidden farming lending discriminatory policies and procedures.

A history of loan service to our farmers gives us the knowledge and credibility to offer suggestions that will accommodate efforts to determine other appropriate details of the study's methodology.  As you develop a methodology to gather and organize reliable report data to present to the House and Senate Agriculture Committee, consider farm loan practices from our practical and historical perspective.

As delineated herein, our methodology suggestions find general acceptance in 7 U.S.C. 1983c which authorized the Secretary of Agriculture to implement pilot loan programs when there is a finding of loan program irregularities.  This study is much needed as it will point out farm lending irregularities for the purpose of improving credit for all farmers.  Farmers appreciate the fact that the legislative language mandates a product completion within 120 days of December 18, 1018, the execution date of the 2018 Farm bill.

## II.  LEGISLATIVE REQUIREMENTS

The statutory language requiring of the study is general and purposely vague.  We point out the vagueness of the language, not as a criticism, but to augment the necessity of a broader methodology that captures real irregularities faced by minority farm borrowers.

*Essentially, Section 5416. of Title V of the 2018 Farm Bill requires the Comptroller General of the United States to conduct a study to (A) assess the credit and related services provided by agricultural credit providers to socially disadvantaged farmers and ranchers; (B) to review the overall participation of socially disadvantaged farmers and ranchers in the services described in subparagraph (A); and (C) to*

2

*identify barriers that limit the availability of agricultural credit to socially disadvantaged farmers and ranchers.*  **Title 5416, Sec. 5416 of Public Law 115-334.**

The language's general reference to terms like access, participation rates and barriers by implication suggests that the functionality of the methodology encompasses the time, place, manner of access, and foreclosures that may violate federal laws if the irregularities are found to be within the consumer protection prohibitions of statutes like the *Equal Credit Opportunity Act (ECOA) –* ***15 U.S.C. 1691- 1691f,*** *Fair Housing Act (FHA) –* 42 U.S.C. 3601 – 3631; *Dodd Frank Unfair Deceptive and Abusive Practices Act* (UDAP) - ***12 U.S.C. Section 5531(d).***

Even though not specifically mentioned, it is permissible that the study's methodology must be comprehensive to the extent that access, participation and barriers will be quantitatively and qualitatively articulated by examining or evaluating lending irregularities and discriminatory practices against relevant regulatory guidance of relevant consumer protection statutes.   If a plain meaning interpretation of Section 5416 applies without permissible considerations, the data could be limited to the number of minority farm loans granted and denied and miss critical data on key issues such as lending patterns, policies and practices that have a disparate impact or serve as disparate treatment. Missing the real issues of farm loan irregularities and discriminatory terms and conditions may cause further extractions of land wealth from minority farmers while denying the same or similar viable, economically appropriate lending risk management tools offered to nonminority farmers and ranchers.

We understand that not every aspect of a farm loan transaction can be studied.  But critical irregularities must be studied.  The Congressional intent of Section 5416 reveals that the results must inform and guide policy makers and practitioners on how to create program efficiencies while ensuring fair farm lending.

Reviewing overall farm lending participation rates does not address associated issues of barriers to participation such as fair and equitable participation.  The fact that a minority farmer participates in a private or federal loan program does not automatically equal meaningful, fair participation.  Some farm credit transactions run afoul of consumer credit statutes and we can attest to such examples evincing lending irregularities and discrimination.   Therefore, participation in harmful discriminatory lending transactions is more detrimental economically than straight forward credit denial, especially when the loan is over collateralized, and a personal residence security interest is mandated but is unnecessary to secure the loan in question.  Minority farmers understand that agriculture is a high economic risk industry and their reliance on fairness in credit transactions must be guaranteed by the lenders offering various credit options.

Farm lending, especially when directed by the government or guaranteed by the government, should be a consistent and evenly applied farm risk management toll.  In accordance with 7 CFR 1779.63 and 7 CFR 4279.281 the U.S. Department of Agriculture and the Small Business Administration must make sure that lending irregularities and discrimination is not a part of any loan guaranteed by the government.  Minority farmers confront the same floods, droughts, and market fluctuations as nonminority farmers.  Inequities and irregularities within farm lending sector should not be held in the same farm risk category as natural disasters.

### III.     IRREGULAR AND DISCRIMINATORY LENDING PRACTICES

The data collected for analysis, under Section 5416, must include loan transactional components such as **(a)** excessive collateral requirements,  **(b)** unwarranted late disbursement of loan funds,  **(c)** misapplication or calculation of actual or average farm production, **(d)** evaluation of loan applications based the association of credit risk identified with third party non applicants, **(e )** directing  or requiring borrowers to purchased equipment or inputs from entities related to the transactional lender,  **(f)**

4

suggesting or requiring underfunded or over funded annual crop loans with the intent to gravely impact

repayment ability, and **(g)** denying or forcing loan servicing options that diminish annual farm operations

and loan repayment ability.  While not exhaustive, this list is a compendium of discriminatory or

irregular lending conduct that is prohibited by the Equal Credit Opportunity Act, the Fair Housing Act,

and the Dodd Frank Unfair Deceptive and Abusive Practices Act.  These aspects must be studied.

## IV.     DEVELOP A METHODOLOGY FROM APPLICABLE CONSUMER CREDIT; CIVIL RIGHTS;  FARM CREDIT STATUTES AND REGULATIONS

The goal of this study is to collect data on access to fair credit since the lack of access to fair credit is the

same as a barrier to credit.  **We recommend that the study examines 8 (eight) standards.**

(a) **Effects Test** – The Equal Credit Opportunity Act and its implementing regulations found at 15

U.S.C. 1691, and 12 CFR 1002, Regulation B, may prohibit certain credit practices that are

discriminatory in effect because the practice or policy has a disproportionately negative impact

on a prohibited basis such as race, age, gender, etc.  Under the effects test, the policy or

practice of the creditor does not have the intent to discriminate.  The lending practice, under

the effects test, appears to be neutral on its face.  It is the application of the policy or practice

that presents the irregular, discriminatory disparate impact or disparate treatment problem for

the minority or socially disadvantaged farmer borrower.  For example, the lender informs

nonminority similarly situated farm loan borrowers on the best and lowest price seed, tractors

or fertilizer.  Or the nonminority borrower may get detailed information on where to find low

priced farm land for rental.  In contrast, the minority farmer does not get the same "best source

to purchase" advice.  Another example is appropriate as is the "best source to purchase"

example.  Consider a lender loan requirement specific to the minority farmer where a refinance

of personal residence using a USDA guaranteed loan is mandatory for the closing of a farm

5

APP. 000396

operating loan.  Under the "effects test" a disparate impact problem arises where, in contrast, the nonminority, similarly situated farm borrower is not required to refinance his personal residence and or use the personal residence as collateral for a farm operating loan.  It is easy to see that the minority farmer, in these examples are subjected to disparate treatment.  Granted, some lender policies or practices will pass muster if it meets a legitimate business need of the lender that cannot reasonably be achieved as well by means that are less disparate in their impact.  ***See Regulation B, 12 CFR Section 1002.2(c), (m), (n), (t) and (z)***.

(b) **Deceptive and Abusive Lending** – Although less frequently, a lender may subject a farm loan borrower to terms and conditions that are designed to put the farmer out of business.  A farmer may be subjected to coercive tactics whereby a farmer can be lured into a farm loan that is not affordable or guaranteed to result in foreclosure.  Lender decisions to such abusive or deceptive tactics in loan making or terms and conditions may violate the Dodd Frank Unfair Deceptive and Abusive Practices Act (UDAP).  In the farming area, like other consumer credit, a UDAP claim can be successful only when the lenders conduct shows the following:  **"(1)** materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or **(2)** takes unreasonable advantage of  - **(A)** a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;**(B)** the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or **(C)** the reasonable reliance by the consumer on a covered person to act in the interest of the consumer.  ***Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. Section 5531(d).***

(c) **Residential Real Estate –** In order to obtain a farm operating loan, a farmer may be required to offer his personal residence as collateral for such loan.  On its face the offering of a personal residence can be a lender requirement that is based on the credit risk of the particular loan.

6

However, Civil Rights statutes and implementing regulations such as 24 CFR Section 100.130 (a) prohibit a lender from imposing different terms or conditions for the availability of loans or other financial assistance because of race where the transaction is secured by residential real estate.  **See 42 U.S.C. 3604(b); 24 CFR Section 100.130 (a); and 24 CFR Section 100.130 (b)(1)(2)(3).**

(d) **Excessive Collateral Requirements** - Whether minority farmers are required more frequently than non-minority farmers to tender excessive collateral in order to receive a farm loan or to acquire meaningful loan servicing through workout and loan modifications.  ***See Regulation B, 12 C.F.R. 1002.6(b)(4); Regulation B 12 C.F.R. 1002.2 (n)***

(e) **Discriminatory Loan Terms and Conditions**. - Whether minority farmers more frequently than non-minority farmers receive loan funds after April of any given crop year.  Under the guidance of 12 C.R.R. 1002.6(b)(4) a lender cannot provide two different systems of credit application, loan pricing or loan servicing. ***See Regulation B, 12 C.F.R. 1002.6(b)(4).***

(f) **Third Party Influence**. - Whether minority farmer loan application packages and lending decisions are unduly influenced by third party entities such as equipment dealers, agricultural input suppliers and or processors and millers of raw agricultural products. **See Regulation B, 12 C.F.R. 1002.2 (c); 12 C.F.R. 1002.4 (a)(b); and Unfair Deceptive Abusive Practices Act - *12 U.S.C. Section 5531(d).***

(g) **Lender Control Over Farmer Operations.** - Whether farm lender's more frequently exert control over the daily management of minority farmer operations in terms of acreage planted and equipment purchased. **Unfair Deceptive Abusive Practices Act - *12 U.S.C. Section 5531(d).***

(h) **Intentional Lender Mistakes**. - Whether certain lender decisions are implemented with intent to cause irreparable damage to the economic viability of minority farm operations. **Unfair Deceptive Abusive Practices Act - 12 *U.S.C. Section 5531(d) (UDAP).*** We do not infer that every

7

farm loan, whether USDA Direct or USDA guaranteed, is made and designed with the intent to defraud or damage the farming operations of minority operators. But, history and experience, nevertheless, inform us that such problems like this do appear occasionally and have the intended effect of causing harm and failure to minority farmer operations. Again, we stress that these practices do not happen every day, but our farmers tell when they exist, and the farmers tell us when lenders make lending mistakes – intentionally or not. Having made a compelling argument to the U.S. Congress during the 2018 Farm Bill debate, the House and Senate Agriculture Conference Committee, responded proactively to provide a provision of "equitable relief" for farm loan borrowers in those circumstances where a FSA farm loan employee makes a mistake – knowingly or unknowingly - and that mistake causes a borrower to be in noncompliance on a USDA direct loan. Section 5304 of the 2018 Farm Bill conference report gives the Secretary of Agriculture the authority to offer a farm loan borrower a provision of "equitable relief" when a decision of a farm loan officer causes the borrower to be out of compliance with the loan program. Noncompliance with a loan term or provision can lead to default, acceleration, and foreclosure. The "equitable relief" provisions of Section 5304 are far afield from the fraud prevention provision of the UDAP. *12 U.S.C. Section 5531(d).* Lender mistakes whether intentional or not will cause economic damage to farm business operations. We mention the presence of "equitable relief" in Section 5304 to highlight the existence of a problem and the necessity that the GAO study look into irregular lending practices having a flavor of mistake or fraud. *Sec. 5304 of Public Law 115-334.*

**V.    INDUSTRY SPECIFIC CREDIT TRANSACTIONS : SUGAR CANE AND CONTRACT POULTRY**

Although not often implemented by the U.S. Department of Agriculture, 7 U.S.C. 1983c permits the Secretary of Agriculture to conduct pilot loan programs in areas of lending irregularities, such as those endemic to industries such as contract poultry and sugar cane production. The existence of pilot loan

8

programs under 7 U.S.C. 1983c provides additional credibility to the research questions and

methodologies that we suggest be made a part of this study. Our suggested approach makes a valid

attempt to explain farm lending irregularities whether they be historical and race based or neutral loan

making business decisions that have a disparate impact on minority farm loan borrowers. Upon the

general applicability of 7 U.S.C. 1983c, we urge a methodology that informs the Secretary of Agriculture

of the benefits of frequent, effective utilization of 7. U. S. C. 1983c when presented with a petition by a

farm group showing that an area, or group of farmers are defaulting on loans on a consistent and

increasing rate with a similar pattern or practice of lending or loan servicing. Under 7 U.S.C. 1983c, a

petition from a farm group requires the Secretary to create a farmer Loan Pilot Project designed to

prevent and restructure loans in the area of concern. FSA direct and private guaranteed lending in the

contract poultry industry presents a good example of consistent farm lending irregularities. For

example, in the years 2004-2007, approximately, we worked with Hmong organizations and producers,

holding focus groups and other reviews of the difficulties faced by Hmong farmers who had relocated to

northwest Arkansas near Fayetteville, to purchase poultry operations. We reviewed practices and called

these to the attention of the Secretary of Agriculture. Many of the families included parents who

entered the US as refugees, and children who had worked in fields such as engineering. A group

primarily from Wisconsin began to move to northwest Arkansas at the recommendation of respected

people, who had served in public positions within USDA and elsewhere. They had some resources, and

it appears the local real estate industry worked in cooperation with the banks to secure guaranteed

loans to buy out poultry operations that were not economically viable for their former owners. The

producers showed us that in many cases identical or nearly identical farm and home plans were

submitted to the banks for approval, and farmers were told they could secure certain conservation

benefits used by previous owners. The prices of the farms rose as more producers moved in, and in

most cases the families were not aware of the additional costs they must incur before the integrators

9

would allow them to enter production. The loans provided were proving highly risky, and many of the new producers lost their operations. The "solution" recommended at the national level after Rural Coalition and many other groups called for action, was to pressure the Natural Resources and Conservation Service to engage trainers from groups who worked as farm advocates to teach producers how to better meet the requirements of the poultry integrators. The GAO should review the loan porfolios in that region over the past 15 years to examine lending practices. Producers told us that the bankers, the real estate agents, and many others benefited. The producers are left with debts most likely still held by the Farm Service Agency.

Minority and socially disadvantaged farmers and ranchers are often subjected to lending irregularities deemed "non business credit risk" loan terms and conditions. The following terms and conditions are deemed "non business credit risk" terms and conditions: **(i)** lender loan servicing mandate to sell borrowers existing income producing collateral and use the sales proceeds to buy new replacement collateral from a single tractor equipment source identified by the lender; **(ii)** farmer requirement to purchase a piece of farm harvesting equipment and immediately lease the equipment to a third party business; and **(iii)** consideration of the past bad debt of a parent or other family member. The outgrowth of these and related lending irregularities **fosters** barriers to meaningful access to farm credit for minority farmers.

VI.     **EFFECTIVE COMPLAINTS PROCESSING AND SETTLEMENT**

We further note that the Farm Credit System lacks a specific system or methodology to act on civil rights complaints consistent with ECOA and related requirements and that one needs to be developed and implemented in order to assure fair implementation of guaranteed programs.

We have attached correspondence that we conducted with the Farm Credit Administration on behalf of a young African American producer in South Carolina, and correspondence between he and FCA in 2014.

10

We also have correspondence and many documents on the case of a Hmong woman who had an operation in Missouri with her husband, and how she lost her operation after he passed away.  In these cases and many others, producers come to us at a point when it is very difficult to save their operations.  What is similar in all the cases we have mentioned is that there is substantial confusion not only for the guaranteed loan borrowers we have encountered, but also on the part of advocates, on how to secure the rights provided these borrowers under the Equal Credit Opportunity Act.  The Farm Credit Administration has not included equal credit opportunity under the protected rights it lists on its website, and to file a discrimination complaint, producers are told to write to the FCA Office of Congressional Relations and Public Affairs.  The questions asked and responses provided indicate there is no formal process to investigate claims under ECOA.  There do not appear to be any statements or other information to tell farmers how to secure their rights.  We urge you to review these attachments.  The GAO study should examine what system FCA and the banks that make guaranteed farm loans should have and how producers should be informed of and assured their rights.  Thus, producers who encounter unfair treatment lose valuable time trying to figure out the avenues of protection they do have.  The GAO should consider what measures are necessary to correct these deficiencies and assure guaranteed lenders abide by ECOA in loan making and loan servicing.

The study methodology should also take a look at the specific minority farmer lending practices within certain crops or industries such as poultry in Arkansas, North Carolina and elsewhere, vegetable crops in South Carolina and sugar cane crops in Louisiana.   The study will be much more valuable if it examines the lending practices in these industries as related to African American, Hispanic, Hmong and other Asian Pacific American, and Native Americans borrowers. A specific portion of the inquiry should address how the details of loan transactions may have caused or contributed to the exodus of minority and socially disadvantaged farmers from specific farm industries in specific areas, and who benefited and who lost in these areas.

11

VII.     THE NEED FOR A SYSTEM OF COMPLIANCE MONITORING

Our Coalition has worked on the issue of compliance monitoring in direct lending and on the issue of

equitable access to all federal programs for farmers and ranchers for many years.  In particular, we have

worked to assure the data is available to understand patterns and barriers that interfere with the

assurance of equitable access and opportunities.  Since 1987, we have worked to secure authority for

the collection and analysis of program participation data by race, gender and ethnicity at the national,

state and county levels. The Agriculture Credit Act in 1987 required the calculation of target

participation rates for lending to the county level for direct and guaranteed loans.  Farm Service Agency

and its predecessor, the Farmers Home Administration, has done so for years.  These data are available

to guaranteed lenders and the Farm Credit System.  Over the years, in each Farm Bill we have added

other authorities for data and documentation.  Following the 2012 Census of Agriculture, we urged the

National Agriculture Statistics Service to provide data to the county level on the demographics,

economics and crop produced by race, gender and ethnicity.  They complied, and this data is now

available at

https://www.nass.usda.gov/Publications/AgCensus/2012/Online_Resources/Race,_Ethnicity_and_Gend
er_Profiles/index.php.

We have seen no evidence that the Farm Credit System and other guaranteed lenders have any system

to evaluate their lending to minority producers as compared to other producers,  or that they collect the

data they would need to proactively monitor their compliance with ECOA.

In 2011, Farm Credit Administration released for public comment a "Proposed Operating and Strategic

Planning Rule, 76 Fed. Reg. 101 (May 25, 2011). Its recommendations were based on marketing

practices related to addressing "diversity" in the marketing practices of the Farm Credit System

Institutions, while avoiding the more central issue of compliance with ECOA. The following is an excerpt from our comments:

*"The Rural Coalition, and other undersigned partners and allies, submitted detailed recommendations with respect to the proposed rule, which we share with you now as they are pertinent to the current report and merit re-examination for the outcomes achieved following the issuance of this rule:*

***The Final Rule Should Require the Federal Credit System Institutions to Engage Historically Underserved Farmers and Community-Based Organizations that Serve Socially Disadvantaged and Limited Resource Farmers in the Development of Their Marketing Plans.***

*According to Section 618.8440(b)(8), the marketing plans of Farm Credit System institutions would have to include, at a minimum, a description of the institution's chartered territory by geographic region, types of agriculture practiced and market segment and the strategies and the actions to ensure the institution's products and services are equally accessible by all farmers, with an emphasis on outreach to historically underserved farming communities. Furthermore, the proposed rule advises institutions to use an array of demographic information, down to the county level, to identify the characteristics and market segmentation of its territory (i.e., Websites of the Census of Agriculture, the U.S. Census Bureau, and the United States Department of Agriculture's Economic Research Service).*

*In addition to these sources, the Farm Credit System institutions should also engage their state National Agricultural Statistics Service (NASS) Directors to generate data specific queries in order to obtain a deeper understanding of the farmers that the institutions are mandated to serve.*

*Additionally, institutions should also specifically work with the USDA to obtain the annual application and participation rate data mandated in Section 14006 of the 2008 Farm Bill, including numbers and percentages, for each county or parish and state in the United States, organized by race, gender and ethnicity, from USDA's Farm Service Agency and Rural Development programs. The Farm Credit should*

13

also look at this authority and other more recent authorities to generate their own data on participation in their programs.

Section 618.8440(b)(8), also advises that the "marketing plans of institutions include grassroots outreach activities and education efforts that market to underserved populations regarding business and financial planning and leadership and loan programs for persons who are creditworthy and eligible to borrow."

Although outreach to underserved farming communities is an essential component of an institution's marketing plan, the unique perspective and reality of the underserved farmer should be incorporated in the developmental process of the institution's marketing plan. Accordingly, the final rule should require institutions to include historically underserved farmers and community-based farming organizations that serve socially disadvantaged and limited resource farmers in the developmental process of the institutions' marketing plans.

In preparing our Coalition's comments to this proposed rule, we spoke to several members about the Farm Credit System and there exists a universal perception that the Farm Credit System institutions are not accessible to the underserved farmer and have failed to conduct outreach to these communities to educate them regarding the institutions' programs and services. In the words of a long-time Latino farmer and advocate, "the Federal Credit System is further beyond the reach of the farmer than a commercial bank, we never felt this was a source of assistance."

Moreover, institutions should work to develop meaningful relationships with the USDA Minority Farms Advisory Committee authorized in the 2008 Farm Bill and now established, community-based organizations that serve socially disadvantaged and limited resource farmers, 1890 and 1994 Land Grant Colleges and Universities, and grantees under the 2501 Outreach and Technical Assistance Program, as well as identify persons from these committees, institutions and organizations to assist in the development of marketing plans. Furthermore, the Farm Credit System Diversity Workgroup should also

14

*identify members from the aforementioned committees, institutions and organizations to assist in the development of its programmatic efforts to reach historically underserved farming communities.  The development of such relationships is essential if progress is to be made in expanding credit to this growing market.*

*As required by Section 4.19 of the Farm Credit Act, Farm Credit System associations and institutions should continue to tailor credit programs and services to address the needs of Young, Beginning, and Small farmers and ranchers.  Although these programs do not have the explicit objective of advancing customer diversity and inclusion, these programs should be used as essential outreach portals to socially disadvantaged farmers and ranchers.  As mentioned in a previous section of these comments, the current participation rate data of the USDA Beginning Farmers and Ranchers Program serves as a cautionary illustration of how well-intentioned programs can neglect the needs of historically underserved farming communities, especially if these communities are not included throughout the program development process.*

*Moreover, the final rule should emphasize the importance of allowing institutions to use discretion in determining whether farmers are creditworthy and eligible to borrow.  If the Farm Credit System institutions want to make significant strides in serving historically underserved farming communities, these institutions must recognize that their credit requirements should not be rigidly enforced and should allow for case-by-case exceptions (i.e., waiver or lowering of collateral requirements).  The language "creditworthy and eligible to borrow" should not be interpreted or implemented in such a manner to undermine the spirit of the proposed rule, which is to make the institutions more responsive to the needs to historically underserved farming communities.*

***The Final Rule Should Include Revisions to the Proposed Rule's Working Definition of Diversity***

15

2. **<u>EXPANDED LOAN SERVICING</u>**. - Loan servicing options such as debt write down pursuant to <u>(7 CFR §§ 766.101 - 766.116-766.150)</u>.

3. **<u>TREASURY OFFSET RELIEF.</u> Additional Debt Relief: Treasury Offset Prohibition –** We further recommend that farm loan borrowers receiving debt relief under the American Recovery Act who submit a plan to continue operations may be further released from debt collection activities under ***<u>26 U.S.C. 6402(d)</u>*** upon the submission, within in 12 months of debt relief of a plan to continue farm operations.  Upon satisfactory receipt of notice of continued farm operations, the Secretary shall, within 30 days of notice of continued farm operations, instruct the U.S. Department of Treasury to discontinue debt collections pursuant to ***7 CFR 1951.102; 7 CFR 1951.137 and 26 U.S.C. 6402(d)."***

Throughout the proposed rule, diversity is purported to be achieved through the inclusion of all individuals of varying race, ethnicity, sexual orientation, age, disability, social class, religious and ideological beliefs and not through a list of demographic criteria.

This working definition of diversity is problematic and provides a loophole for institutions to avoid implementing a marketing plan that actually promotes diversity and inclusiveness within the institutions' borrower base. Demographic criteria should be given equal weight in determining whether institutions are in fact providing equal access to credit to all farmers.

Consequently, an institution's commitment to diversity and inclusion cannot be ascertained by an institution's lofty mission statement (as suggested by the Farm Credit Administration's Request for Comments) **rather by the institution's actions and achievement of assessment benchmarks**.  The final rule should include a revised definition of diversity to address these concerns and should also assure that the diversity includes actual borrowers or potential borrowers from the socially disadvantaged community who actually understand the issues, the history and the complexity of small rural communities and their racial, ethnic and gender dynamics and history.

**The Final Rule Should Require the Farm Credit System Institutions and Diversity Workgroup to Make Their Final Marketing Plans and Participation Rate Data Public**

The Farm Credit System Diversity Workgroup was established in 2006 to increase diversity awareness, promote understanding of inclusiveness, and serve as a diversity resource within the Farm Credit System. Since its inception, the Diversity Workgroup is purported to have sponsored a diversity conference, several trainings workshops, speakers, outreach and communications.  Despite the laudable efforts of the Diversity Workgroup, the effectiveness of the Workgroup's efforts to achieve a more inclusive workforce and borrower base must be evaluated through various assessment and accountability

16

*benchmarks.  For example, some pertinent questions that must be addressed by the Diversity Workgroup*

*[and at the current time by the Farm Credit System and lenders in General]:*

*(1) How many farmers from historically underserved farming communities have applied for and received*

*loans from Farm Credit System institutions;*

*(2) Are the institutions' borrower base reflective of the market segmentation of their chartered*

*territories?  If not, what specific steps has the Workgroup recommended to the institutions to ensure*

*they adhere to their mandate of providing equal access to credit to all farmers.*

*The final rule should require the Farm Credit System institutions and Diversity Workgroup to make their*

*marketing plans as well as their assessment and accountability findings public.  Moreover, if there are*

*egregious shortcomings in the marketing plans efforts to respond effectively to the needs of historically*

*underserved farming communities, these plans must be revised to address these gaps in services.  In*

*essence, the institutions should view their marketing plans as fluid plans that can be amended as*

*necessary to be more responsive to the institutions' diverse borrower base.*

*… Farm Credit System institutions should take affirmative steps to ensure that data systems are in place*

*to record the important demographic and participation rate data of all borrowers to allow comparisons*

*and track progress.*

***The Final Rule Should Require Farm Credit System Banks and Associations Board of Directors to***

***Appoint Directors From Historically Underserved Farming Communities or Community Based***

***Organizations that Serve Socially Disadvantaged and Limited Resource Farmers***

*Reiterating Farm Credit Administration Bookletter BL-009, the proposed rule encourages all Farm Credit*

*System Institutions' Board of Directors to appoint directors to serve on the Board that would further the*

*aim of facilitating diversity, when feasible.  Again, the discretionary language of the proposed rule (i.e.,*

17

*"encourages") will not bring about transformative change in the corporate culture of the Farm Credit System institutions. In order to bring about substantive change in the corporate culture of these institutions, the final rule should mandate that at least one appointment to the institution's Board of Directors be a member from a historically underserved farming community or a community-based organization that serves socially disadvantaged or limited resource farmers.*

Now in 2019, we further recommend a review of racial, ethnic and gender diversity among the directors and staff of the lending institutions of the Farm Credit System.

While some statutes have been updated since our recommendations in 2011, we see no evidence FCA has changed their systems to comply with ECOA and to assure fair service to all borrowers and potential borrowers. The GAO report should address these fundamental issues of the ability of the Farm Credit System and guaranteed lenders to assure fair service to all producers, as ECOA requires them to do.

**VIII.**     <u>**CONCLUSION**</u>

The results and findings of a comprehensive study could assist lender and government agencies with the legal mandate to offer the same loan products and loan servicing options offered to each and every farmer regardless of social status. The success of highlighting irregular farm lending patterns, and lack of systems to address these patterns, will be instructive to all farmers, lenders and reduce the overall costs of farm lending transactions while preventing questionable or unlawful family farm foreclosures.

18



**Board of Directors**

**John Zippert, Chair\***
*Federation of Southern Cooperatives/ Land Assistance Fund, Epes, AL*

**Georgia Good, Vice Chair\***
*Rural Advancement Fund Orangeburg, SC*

**Dorathy Barker, Treasurer\***
*Operation Spring Plant, Oxford, NC*

**Tirso Moreno, Secretary\***
*Latino Farmers of the Southeast Apopka, FL*

**Mily Trevino-Sauceda, Assistant Secretary\***
*Organización en California de Lideres Campesinas, Inc., Pomona, CA*

**Lisa Bellanger, Assistant Treasurer\***
*3 Fires Ojibwe Spiritual & Cultural Education Society, Minneapolis, MN*

**Darnella Burkett Winston, Youth Representative\***
*Mississippi Association of Cooperatives Petal, MS*

**Savonala Horne\***
*Land Loss Prevention Project Durham, NC*

**Lorena Andrade**
*La Mujer Obrera, El Paso, TX*

**Rudy Arredondo**
*National Latino Farmers and Ranchers Trade Association, Washington, DC*

**Starry Krueger**
*Rural Development Leadership Network, New York, NY*

**Maria Moreira**
*World Farmers, Lancaster, MA*

**Gary Redding**
*Concerned Citizens of Tillery, Tillery, NC*

**Barbara Shipman**
*Cottage House, Inc. Ariton, AL*

**Willard Tillman**
*Oklahoma Black Historical Research Project Oklahoma City, OK*

**Carlos Marentes, Chair Emeritus** *Border Agricultural Workers Project El Paso, TX*

**Hubert Sapp, Chair Emeritus**
*Atlanta, GA*

1029 Vermont Ave NW Suite 601
Washington, DC 20005
Phone: 202-628-7161  Web:  http://ruralco.org
www.facebook.com/RuralCoalition
Twitter: @RuralCo

# Debt Justice: Examining Farm, Ranch and Forestry Land Owner Debt Relief Within the Agriculture Sector

Compiled by Rural Coalition
March 12, 2021

As you prepare to implement the Emergency Relief for Farmers of Color provisions of the American Recovery Act, we offer guidance on the use of statutes and regulations to ensure that the law's intent and purposes reach all classifications of socially disadvantaged farmer and ranchers as identified in that law.

The debt relief provisions require that the Secretary of Agriculture make loan modifications and defined payments to identified farmers and ranchers.  Effective implementation requires permits the Secretary to take the following steps:   **(1)** modify applicable loans by writing down exiting debt; **(2)** make payments to producers to pay off the new loan amounts based on loan modifications pursuant to **7 CFR 766.401(b), and** (7 CFR §§ 766.101 - 766.116-766.150) ; and **(3)** make a single payment to

the Internal Revenue Service to pay the tax consequences of any for loan debt forgiveness.

## A. FARM LOAN DEBT RELIEF ELIGIBILITY REQUIREMENTS

Farm loan borrowers are deemed eligible for debt relief pursuant to the American Recovery Act upon proof of one or more of the following debt related circumstances:

1. ***PENDING BANKRUPTCY.*** - Cases currently pending in a federal bankruptcy proceeding;

2. ***DISMISSED BANKRUPTCY.*** – Prior dismissed bankruptcy filings within the last 30 years;

3. ***FARM LOAN FORECLOSURES.*** Current farm debt default, acceleration, or pending foreclosure.

4. ***FARM LOAN FORECLOSURES.*** Prior farm debt default, acceleration, or foreclosure occurring within 30 years of March 13, 2021.

5. **PENDING CIVIL RIGHTS.** - Cases with pending unresolved civil rights complaints pursuant to Title VI of the Civil Rights Act of 1964 (§§ 15.1 - 15.12.

6. **FINDINGS OF CIVIL RIGHTS DISCRIMINAITON.** Cases with resolved civil rights complaints pursuant to Title VI of the Civil Rights Act of 1964 (§§ 15.1 - 15.12 with ruling in favor of the agency and against the farm loan borrower.

7. **PENDING PROGRAM APPEALS BEFORE THE NATIONAL APPEALS DIVISION (NAD).** - Cases with pending before the U.S. Department of Agriculture National Appeals Division pursuant to 7 CFR 11;

8. **FINAL DECISIONS ON PROGRAM NAD APPEALS.** - Cases decided with final decision issued by the U.S. Department of Agriculture National Appeals Division pursuant to 7 CFR 11;

9. **LITIGATION.** Farm loan disputes involving ECOA discrimination filed and pending in federal or state courts;

10. **EQUITABLE RELIEF – FARM SUPPORT PROGRAM.** – Cases involving farmer requests for program equitable relief pursuant to 7 U.S.C. **§** 7996 (d) ; 7 U.S.C. **§** 6998 (d), and 7 U.S.C. **§** 1339 (*causation based on misaction or misinformation*); and

11. **EQUITABLE RELIEF – FARM LOAN.** Cases involving farmer requests for farm loan equitable relief pursuant to 7 U.S.C. 2008a. (*causation based on government farm loan error or mistake*).

**B. STATUTES AND REGULATIONS IN SUPPORT OF FARMER DEBT RELIEF**

1. **SECRETARY'S DEBT COLLECTION EXCEPTION AUTHORITY. Pursuant to 7 CFR 766.401(b),** the Secretary of Agriculture may, to advance the financial interests of the farm loan program, relieve the debt of farmers under circumstances where by the debt relief promotes a financial interest of the Agency. 7 C.F.R. 766.401(b) states in relevant part: "(b) the Agency's financial interest would be adversely affected by acting in accordance with published regulations or policies and granting the exception would resolve or eliminate the adverse affect upon its financial interest." **7 CFR 766.401(b).**

**TO: Biden-Harris Agriculture Agency Review Team**
**FROM: Rural Coalition**
**DATE: December 3, 2020**
**SUBJECT: Transition Memo for the U.S. Department of Agriculture First 100 Days**

ABOUT RURAL COALITION

Born of the civil rights and anti-poverty rural movements, Rural Coalition/Coalición Rural (RC) has served as a voice of African-American, American Indian, Asian-American, Euro-American and Latino farmers, farmworkers, and rural communities in the US, as well as indigenous and campesino groups in Mexico and beyond for over 40 years. We work to assure that the voice of our over 50 diverse member organizations from all regions, ethnic and racial groups and genders have the opportunity to work in solidarity on the issues that affect us all.

Our recommendations to you are reflect our guiding principles that
- o Justice and equal opportunity are the right of all people regardless of race, gender, ethnicity, immigration status, or place of residence.
- o All people are entitled to the goods and services essential to a decent quality of life, including education, health and employment services, housing and basic community facilities.
- o They are also entitled to democratic community institutions dedicated to serving their interests.
- o The long-term viability of rural and urban communities rests on effective care, control and use of resources by the people living there.
- o Community-based organizations are instrumental in the development of communities. Public policy should encourage their growth and strength
- o The federal government has the responsibility to ensure the rights of all citizens and to help secure the fulfillment of these rights.

INTRODUCTION

As the Biden-Harris Administration takes office, RC looks forward to working closely with the President, the Vice President and the leaders they bring on board to *Build Back America for Rural Resilience.*

The unprecedented coronavirus pandemic has exposed inequities and vulnerabilities in our agriculture, food and health systems with a disparate impact on rural, tribal and immigrant communities predicated by systemic racism and oppression, economic injustice and neglect, and the labor exploitation particularly of Black, Indigenous, and people of color in the rural United States. We strongly support the administration's

1

outlined day one priorities of eradicating the coronavirus pandemic, economic recovery, securing racial equity and reversing climate change.

We submit the following initial recommendations for immediate actions to undo harmful changes and to usher in a new climate at USDA.

RECOMMENDATIONS FOR IMMEDIATE ACTION ON DAY ONE

1. **Immediately Restore Data Collection for the National Agricultural Statistics Service Agricultural Labor Survey**-A Federal Notice signed at Washington, DC, September 24, 2020 by William Northey, Under Secretary, Farm Production and Conservation USDA. [FR Doc. 2020-21592 Filed 9-29-20; 8:45 am] and published 9/30/2020 indicated that the USDA National Agricultural Statistics Service (NASS) would not be collecting data on agricultural wages, hours worked, and wage rates in October 2020 as originally planned, nor publishing the biannual Farm Labor report in November 2020. Cessation of collecting data would be harmful to H-2A workers and local farmworkers, especially during this unprecedented pandemic. We urge the Biden Administration to cancel the notice and immediately restart and maintain data collection and publication of the Farm Labor report. We also question why the Notice was signed by the Undersecretary of the mission area responsible for farm and conservation programs while the data is collected under the authority of the Research, Education and Extension area including agencies- in this case the National Agriculture Statistics Service- with the statutory mandate to collect the data – which we view as a politicization of the data collection process. (*Rural Coalition will share our in-process comments as soon as these are completed.*)

2. **Repeal Executive Order on Combating Race and Sex Stereotyping** – This order is counter to years of effort to combat discrimination and racial and gender inequities and should be immediately repealed and any training or grants program or actions taken to implement the order should be immediately and fully reversed.
https://www.whitehouse.gov/presidential-actions/executive-order-combating-race-sex-stereotyping/

3. **Repeal SNAP Work Requirements** –This USDA rule published on April 1, 2020, narrowed state options to waive work requirements for able-bodied adults without dependents (ABAWDs). Reports indicate that roughly 76 percent of counties (712 total) currently eligible for waivers to the food stamp or Supplemental Nutrition Assistance Program (SNAP) will no longer have that flexibility. The impact is immediate and egregious, especially during this

2

unprecedented pandemic. Instead of limiting SNAP beneficiaries and requirements, we recommend that the Biden-Harris Administration repeal the SNAP work requirements rule and approve all waivers requested. We further urge USDA to increase flexibilities to extend SNAP benefits to ensure that the food this nation's diverse producers in rural and urban areas alike directly reaches those who need it the most, especially in the persistently poor rural and urban communities in which we serve and which have reported higher food insecurity. https://www.federalregister.gov/documents/2019/12/05/2019-26044/supplemental-nutrition-assistance-program-requirements-for-able-bodied-adults-without-dependents

4. **Withdraw the Inadmissibility on Public Charge Grounds Rule** – This Department of Health and Human Services rule, which expands the definition of a public charge, has had a devastating impact on the willingness of farmworker and other immigrant worker families to receive any public benefit, no matter how critical, for fear of compromising their current or future immigration or residency status. This means that families who need food provided through the school lunch, Women Infants and Children (WIC) program or the SNAP program, or any other program, are fearful to accept food they really need at a time when they have also been denied the basic emergency pandemic relief benefits available to all other families. Repeal and subsequent restoration of trust and good faith is of even more urgent import to assure the immigrant workers irrespective of immigration status, do not avoid COVID-19 testing or vaccines essential to protecting their health and the health of other frontline workers especially in the food and agriculture system. https://www.uscis.gov/archive/final-rule-on-public-charge-ground-of-inadmissibility

5. **Repeal the Schedule F Excepted Service Executive Order and Restore full Protections for the Federal Civil Service** – This Executive Order, issued on October 21, 2020, is one more of numerous abridgements of the rights of the federal workforce, including the employees of the US Department of Agriculture. This order which removes civil service protections from a large class of federal workers, is in addition to other orders and workplace changes that have abridged rights to participate in federal employee associations and unions, and subjected worker to arbitrary and capricious retraction of benefits, and changes in working conditions specifically devised to drive them out of their jobs. The federal government, including the Department of Agriculture, must demonstrate, especially in the course of this pandemic, that federal employees are valued and essential to the orderly functioning of the government. A first step is repealing

3

this and other Executive Orders. https://www.whitehouse.gov/presidential-actions/executive-order-creating-schedule-f-excepted-service/

PANDEMIC RESPONSE

1. **Pandemic Response** – Rural Coalition and Alianza Naciónal de Campesinas worked with our members and allies to author a letter to Congress outlining a comprehensive list of critical action to mitigate the impact of the pandemic with particular attention to the food system.  Over 160 groups endorsed the letter.  We have attached it for your review, as it also includes proposals that can be initiated administratively.  It can also be downloaded here: https://static1.squarespace.com/static/5b2c7bebcef3725e593fb2fe/t/5f57fcf82112373f1a___c33185/1599601923092/Final_Pandemic_Respon_se_Letter.pdf

2. **Extend Relief to immigrant families excluded from all forms of emergency relief.** – USDA should use every authority in its power to assure that relief, ranging from food assistance to securing access to health care, COVID-19 protections and care, and safe and secure housing, reaches all immigrant families regardless of their immigrant status.  We have further proposals forthcoming in this area.

3. **Protect Farmworkers and Their Livelihoods** – We know from experience, and confirmed by data from USDA Economic Research Service that majority of farmworkers are immigrants, with those undocumented comprising over half of the crop farmworker labor force. An already vulnerable population, immigrant communities have been excluded from many coronavirus relief. Farmworkers - many of whom are temporary guest workers, immigrants, and refugees – are facing severe healthcare inaccessibility or fear accessing medical services, inadequate housing, and harmful work conditions. We strongly support the Biden campaign initiative to "provide legal status based on prior agricultural work history, ensure they can earn paid sick time, and require that labor and safety rules, including overtime, humane living conditions, and protection from pesticide and heat exposure, are strictly enforced." The Department of Agriculture needs to take an active role in ensuring that all applicable protections and rules are enforced in agricultural workplaces.

4. **Food Box Program** – Several of the leaders represented on our call have participated in this program and will have additional proposals on how to assure any funds remaining in this program are immediately allocated with preference to the farmers and communities that most need them.  There should be specific set asides for entities working with socially disadvantaged farmers and ranchers,

4

and flexibility in the mix of products based on what can be produced locally. We also urge that the lessons of this program inform future efforts for both emergency and response and on the restructuring and reorientation of the food system to increase resilience in the face of future emergencies.

5. **Credit Issues and Protecting Distressed Farmers who are Still Operational** – USDA is in need of a standing disaster program that automatically goes into effect in the face of emergencies.

USDA should immediately halt foreclosures for the duration of the pandemic and economic recovery and make a moratorium on foreclosures part of a standing disaster program.

There is also an urgent need for debt relief which Congress has thus far not provided. USDA should investigate ways that some of the remaining funds in pandemic relief programs are provided to distressed farmers who are still operational and able to produce items, for example, for the food box program.

We further endorse the proposals in the **Top Priorities for COVID-19 C4 Response Legislation** from the Native Farm Bill Coalition including the following:
1.     Immediately defer of all FSA loan principal due for the 2020 and 2021 production years, and extend all loans for 2 years;
2.     Offer payments to any lenders if they reduce the interest rate of current loans by 2% and offer the same reduced loan payments and extensions to their borrowers; and
3.     Use FSA Farm Ownership loans to refinance real estate and other debt to aid in recovery from this crisis.

We further urge the Biden-Harris Administration to ensure that the Equitable Relief Provision in the 2018 Farm Bill are immediately and fully implemented. The intent of this provision is to protect farmers from adverse action in cases where errors were made on the part of FSA offices. In the time of this pandemic and the extreme stress on both producers and FSA and other USDA field office staff, this protection is critical.

USDA should provide instructions and training to field staff to assure they proactively provide such loan servicing to all producers facing adverse action. Every effort should be made to help farmers and ranchers hold onto their land and retain the economic base they need to build back better both their farms and the economic underpinnings of their communities.

5

5) **Extend Emergency Feeding Programs** - Feeding America's report indicated that one in four children will be food insecure due to the unprecedented pandemic. We urge sustained emergency pandemic food assistance for those who need it, including the Supplemental Nutrition Assistance Program (SNAP); the Pandemic Electronic Benefits Transfer (P-EBT); universal free feeding program (Seamless Summer Feeding Option), the Farm to School Program and child and elder nutrition programs to ensure the food is distributed from the farmers that grow it to those who need it. We pledge to work with the Biden-Harris Administration to support any additional statutory and funding support needed to extend and increase such assistance.

We further urge the incoming administration to pilot of new ideas to increase the connections to between USDA food programs and the nation's small and diverse farmers in a manner that meets the needs of communities for healthy, local food, while directly supporting the farmers who can most dependably supply it in the face of the pandemic. Successful models to reorient food systems by increasing direct connections should be evaluated and studied to inform the development of future policies consistent with the goals of the Biden-Harris Administration.

6) **Livestock and Specialty Crop Sectors** – Nowhere were the vulnerabilities of the food and agriculture system revealed than in the pandemic generated crisis in the livestock sector. Protection of farm and food chain workers is a necessity at every level, and all entities, and especially those who receive any form of aid or support from USDA, must be held accountable for the protection of the health and safety and fair compensation of workers. The crisis also reveals the critical importance of restructuring the food system to reduce concentration and oriented systems exchange more locally and less vertically.

Concentrated operations continue to dominate the market and government intervention is needed to protect both workers and small and mid-size farmers and ranchers in the fresh food and protein sector. The concentration of food processing and delivery is in itself a huge risk that needs to be comprehensively addressed. As the pandemic is brought under control, we urge the Biden-Harris Administration to begin working with the stakeholders including workers and small farmers to generate the new ideas necessary to make policies to construct a resilient food system in the future.

In the immediate term, we urge USDA to withdraw the Undue and Unreasonable Preferences and Advantages Under the Packers and Stockyards Act rule. The rule was inundated with loopholes. We recommend publishing similar regulations as those under the Obama-Biden Administration.

6

7) **Broadband Access for all Families** – The lack of access to affordable broadband services should be a right of all communities, and securing it is of paramount importance in the face of this pandemic. Every effort should be made to devote all available funds to providing emergency access to broadband especially for the nation's most vulnerable children and families, including to tribal and border communities. Families require this support to continue schooling for children and communities need it to provide access to critical information they need to access the resources they need to protect themselves and their communities from the pandemic. We are willing to work with you further on this issue.

8) **Rural Hospitals** – Rural hospitals, many already on the brink of collapse, are more stressed than ever in the face of this pandemic which stretches health care workers and facilities far beyond their already limited capacities. All possible USDA resources should be invested to support them, and there should be close coordination with other federal agencies to supply the Personal Protective Equipment and all resources that can help them to meet the current and emerging challenges.

## ADVANCING EQUITY IN AGRICULTURE AS A FUNDAMENTAL STEP TOWARD ACHIEVING BUILD BACK BETTER GOALS

The Biden-Harris Plan to Build Back Better includes strong aspirations to advance equity, proposals which Rural Coalition strongly supports:

"**ADVANCE RACIAL EQUITY IN RURAL AMERICA**: *Biden will pursue a dedicated agenda to close racial wealth gaps – including for rural Americans of color. One key way in which Biden will advance racial economic equity in rural America is by addressing longstanding in inequities in agriculture. Black, Brown, and Native farmers have long faced barriers to growing their agricultural businesses, including unfair prices, unequal access to government support, retaliation for civil rights complaints, and outright injustice…As President, Biden will build upon the historic progress made during the Obama-Biden administration, taking additional steps to support the rights of Black, Brown and Native farmers.*"

We have heard many discussions of equity in agriculture. Without real action, equity can become merely a word that excludes or sets apart a critical group of rural peoples as if they do not matter to the centrality of the agriculture and food system. In fact, the diverse land-based peoples of this nation are the farmers, ranchers and workers who possess the deep knowledge and experience necessary to help the Biden-Harris Administration reach its important goals of eradicating the pandemic, building resilience, fighting climate change and restoring rural economies and ecosystems.

One outgrowth of the Obama-Biden administration's focus on resolution of the major discrimination lawsuits against USDA was the reinvestment of the remainder of the Cy

Pres funds from the Keepseagle case into entities including the Indigenous Food and Agriculture Initiative and the Native Farm Bill Coalition formed around work on the 2018 Farm Bill. This investment provided the time and resources necessary to engage qualified leaders with sufficient time to provide a comprehensive analysis of current agriculture and food policy with concrete ideas of for advancement. We refer you to the *Regaining Our Future* report commissioned by the Seeds of Health Campaign and authored by Janie Simms Hipp and Colby Duran for the depth and breadth of its analysis covering commodities, credit, rural development, food and nutrition, livestock, forestry, energy and more. While some of the proposals were particular to the tribal nations engaged in agriculture, many are also applicable and important to the other diverse rural, urban and immigrant communities we collectively represent.

We believe the Biden-Harris Administration will benefit greatly by both hiring at leadership levels and engaging Black, Indigenous, Latino, Asian Pacific and other leaders steeped in the deep knowledge and the capacity to work together necessary to bring about the essential transition to reorient food, agriculture, forest, fiber and energy systems in a manner that that regenerates both land and communities with a view to the future. We further urge the new Administration to both hire and engage leaders who represent and deeply understand the critical role of labor and immigrant workers in agriculture and food systems. Each leader and the full team should also be well versed in the intersection of these critical issues, and able to catalyze the holistic approach essential to generate real solutions that reach the people and communities who most need them. Such an approach will engage and benefit rural and urban communities alike.

FIRST ONE HUNDRED DAYS

We urge the incoming administration to invest in the fundamental participation of Black, Indigenous and people of color producers, farmworkers and food system workers and rural and tribal communities in making and carrying out these plans. That means assuring their inclusion at every level.

A true commitment to racial equity requires that the resources provided by the federal government actually result in wealth creation. This means resources must be accessible in reality to all communities and particularly those excluded in the past. Reversing the racial wealth gap starts at every level and in every program of the department, and in creating programs and access, and in the case of farmworker communities in particular, relationships, where none exist at present.

The most immediate damage of the outgoing administration that needs correction relates to the misuse and invasive scrutiny applied in the allocation of funding to BIPOC communities in particular.

8

We would call out in particular the need to reverse the dismantling of the Rural Development Mission area and using its funds for projects of favored political allies while abandoning diverse rural communities in the midst of the worst emergency in memory.

We further call to you attention the immediate need to correct the misuses of the Outreach and Assistance Program for Socially Disadvantaged and Veteran Farmers and Ranchers, and to reverse or eliminate the Farm Programs and Conservation Business Center and particularly its grants and agreements section, and to return these functions to the respective program agencies.

We will address in another section the related urgent need to revive USDA administrative entities and functions essential to consultation and fostering input by all the communities we represent.

We wish to state that over the years all programs and functions authorized by Congress and built through difficult struggle to reverse and repair injustice, engage and support BIPOC communities, and especially the African American communities, have been among the most scrutinized and investigated entities in the history of the Department of Agriculture, none more so than the Outreach and Assistance Program for Socially Disadvantaged and Veteran Farmers and Ranchers. The Request for Proposals for the most recent OASDVFR includes yet another example of how organizations and entities struggling to provide service to engage excluded farmers are treated. Rather than allowing the maximum level of funding of $250,000 a year for 3 years, the Office of Partnerships and Public Engagement reduced the maximum level to $150,000. And it added arbitrary and indicative budget restrictions in addition to the ordinary requirements to abide by applicable regulations – that required more detail and set a cap of $10 per day for food at included activities. These arbitrary and disrespectful restrictions were not included in the second round created by OPPE for their favored misuse of the funds. (We have addressed these issues in our comments noted below).

Under an administration and with a Congress where massive and wealthy corporate entities and well-heeled businesses received huge Federal Reserve loans and Paycheck Protection subsidies and other federal benefits with back of the envelope level of financial detail and oversight, the creation of the FPAC Business Center bears special scrutiny and review within USDA. The Grants and Agreements Section had subjected contracts already approved by the Natural Resources and Conservation Service to intense reviews seemingly purposely created to delay the approval and initiation of these contracts. One contract, for example, was delayed over a rounding error of .02 cents. These arbitrary requirements are especially counterproductive at a time when maximum flexibility is advised at a time when the course of the pandemic will determine when the in-person and hands-on forms of outreach and assistance essential in our communities can start again.

9

We strongly suspect – and this team should ascertain – that such scrutiny is not uniformly applied, and that the level of detail required in projects that make the effort to engage in the smallest and most critical places far exceeds what is required for larger entities.

We would also note that reports have already been prepared on the misuses of funds in the AMS Food Box program, with scant oversight and quick renewal of contracts to large entities while the handful of effective programs that connected actual farmers with actual communities were not continued.

There are many other examples we could cite. Our main point is that in order to achieve equity, and conquer racial wealth gaps, the federal government must begin with the money. Instead of delivering programs with an ethic of what one of our members called "supervised credit" requiring scrutiny with the expectation of misuse, and with an apparent intention of making access so difficult that the entity would stop seeking funds, it is imperative to afford the same – or greater- respect and trust afforded to large entities who have much less need of the funds.

We would further note the same principle of fairness in accessing and allocation of funds should be true at every level of government from the IRS conducting a disproportionate number of audits in low-income rural communities, to the public charge rule designed to threaten and frighten hard working immigrant families away from programs to feed their children and care for their families while they undertake a disproportionate share of the essential and difficult work needed to feed and care for all our families.

Here we share our proposals for immediate action:

9) **Immediately Restore the Integrity of the Outreach and Assistance Program for Socially and Veteran Disadvantaged Farmers and Ranchers and Initiate the FY 2021 Funding Round** - As the only program dedicated to providing outreach, technical assistance, and education to socially disadvantaged farmers and ranchers, we urge the Biden-Harris Administration to restore the Outreach and Assistance for Socially Disadvantaged and Veteran Farmers and Ranchers Program (2501 Program). We strongly recommend increasing the maximum award amount to the statutory level $250,000 a year for three years. We further urge that the Administration request an additional appropriation beyond the mandatory funds provided of no less than $20 million of the additional funds authorized for appropriations for the Farm Outreach and Training Opportunities (FOTO) program, to be split equally between OASDVFR and the Beginning Farmer and Rancher Development Program. We also refer you to our recent comments signed on by almost 60 of our member and partner groups. These comments, which include recommendations to immediately fix many other

10

technical and substantive issues in the FY 2020 round, can be downloaded here: https://static1.squarespace.com/static/5b2c7bebcef3725e593fb2fe/t/5fc7d5666d2b7b26a14e1e38/1606931815285/Rural+Coalition_USDA2501+Comments2020_Fin.pdf

*10)* **Eliminate or Reorganize the FPAC Business Center and reduce or eliminate the broad array of functions** *(Acquisition and Procurement, Appeals and Litigation, Budget, Civil Rights & Equal Employment Opportunity, Customer Experience, Economic and Policy Analysis, Environmental Activities, External Affairs, Financial Management, Grants and Agreements, Homeland Security, Human Resources, Information Solutions, Management Services, Performance Accountability and Risk)* it has created or taken over. Any essential functions on budget and contracting and especially the grants and agreements function should be returned to the program agencies with the knowledge and experience to undertake them in a manner consistent with the goals of the programs.
https://www.fpacbc.usda.gov/about/index.html
The shared funds of the federal government should be invested into program and services that solve problems and create results. As such, funds need to be closely connected to the agencies and functions who understand their purpose and to the people who deliver them to the field level. The FPAC Business Center represents a massive diversion of scarce funds to management and oversight functions that divert from the programs and investments that are critical to communities.

11) **Utilize and Seek Funding for the Heirs Property Authorities in the 2018 Farm Bill** – The closing of the racial wealth gap in rural areas (and the solving of the climate crisis) is integrally related to halting land loss and restoring land tenure to the farmers, the tribes and the communities who know how to care for and nurture it. To accomplish this, we need first of all to halt land loss and build a future for a diverse new generation of producers. Approximately one-third of all black-owned land in the south is held as heirs' property. This insecure form of land tenure has been the cause or a large portion of black land dispossession and has prevented landowners from accessing key land and farm protection programs.

The 2018 Farm Bill created a provision to allow farmers and families who lack a clear title to their land to utilize forms of alternate documentation to demonstrate control of the land for the purposes of register their farm and qualifying for a farm and tract number that allows them access USDA farm and conservation programs. This new authority primarily helps producers access conservation programs. (Further review and authority may be needed with respect to opening access to some Farm Service Agency programs for heirs property owners. USDA

11

should also work with Tribes and the Office of Tribal Relations to determine whether how the alternate documentation provisions could beneficially be applied to allow access to producers farming on fractionated land.)

We urge Farm Service Agency and Natural Resources and Conservation Service to undertake a special effort to assure its field staff understand and are prepared to help producers utilize the new alternate documentation authority, with special attention to any producer who may be subject to rejection of a program application related to lack of documentation of control of land.

The Farm Bill also authorized a relending program (Section 5104) with up to $10 million authorized annually under the Credit Title for the Farm Service Agency (FSA) to make loans through qualified intermediaries to resolve heir's property on farmland with multiple owners. Congress has already provided funding for this program, with more in the pending Agriculture Appropriations bill. This program has yet to be made available to qualified intermediaries, including for the first time, cooperatives; with demonstrated experience in serving socially disadvantaged farmers and ranchers. The Biden-Harris Administration should immediately make this pilot program available to qualified intermediaries, especially to assure that results are available to farm families and to demonstrate to Congress the value of the program and the need for its full funding and permanent continuation.

Section 12607 of the 2018 Farm Bill also created a Farmland Ownership Data Collection Initiative with the purpose of analyzing trends in farmland ownership, land tenure (including the incidence of farmland held in undivided interests), generational transitions, and barriers to entry for beginning and socially disadvantaged farmers and ranchers.  The analysis is critical to inform and guide all levels of agricultural policy making that concern the critical dynamics of heirs' property and absentee land ownership in farming communities.  The $3 million authorized annually has not yet been funded.

We urge the Biden-Harris Administration to request full funding for both Section 5104, and 12607.  We further urge the Administration request full funding for the state mediation programs that are no authorized to help farm families navigate and resolve complex succession issues.

**12)** Re**lationship of Heirs Property and Insecure Land Tenure to Resilience** – As the Biden-Harris Administration shapes its it climate and economic plans, we would emphasize the importance of including practical equity focused solutions that have a potentially larger impact on improving resilience.  Insecure land tenure renders hundreds of thousands of properties, farm, residential and

12

forested, unable to recover from growing disasters including floods and fires. The Federal Reserve Bank of Atlanta identified the issue of heirs property as a critical factor that impeded recovery in New Orleans in particular following Hurricane Katrina.  A colleague with a national actuarial firm we have worked with to understand these issues noted that less than 5% of homes in New Orleans were covered by flood insurance.  Homes that lack documentation are likely ineligible also for USDA and HUD programs to repair and improve housing.

We worked with the offices of Rep. Marcia Fudge and Senator Doug Jones to investigate coverage of heirs property by flood insurance and FEMA.  We discovered that the National Flood Insurance Policy Office is itself uncertain if heirs properties are eligible to either purchase or have claims paid by the Flood Insurance Program.

The insurance issue is especially complex as insurance, including sale of flood insurance, is regulated at the state level.  Even more glaring than the gaps in flood insurance is the lack of property and casualty insurance to help families recover in the face of growing disasters.  Improving resilience of communities to disasters is essential, and this starts with a focus on identifying and crafting solutions to some of the most critical issues that impede progress.  One of those is access to insurance and the ability to rebuild homes, replace equipment and other farm structures, and clear land following disasters.  Along with the crises faced by un- or under-insured families facing medical insurance, lack of ability to recover for natural disasters remains an unaddressed issue with massive implications for the goal of building wealth and resilience of communities.

The unavailability of risk protection for vulnerable families also has broad implications for the availability and quality of rental housing.  As families unable to solve succession issues succumb to disasters and predatory lenders, their land is often purchased at below market rates by outside and often predatory investors who rent to poor and immigrant families at high rates with little enforcement of any regulations to protect the quality of their dwellings, a factor of particular concern related to manufactured housing and farmworker housing.

While we understand that the issues raised in this point are not ones that can be resolved in the first 100 days, we urge the Biden-Harris Administration in its plans to underscore the importance of protecting and building land and housing tenure and the right to safe and affordable housing are fundamental core of any effort to repair racial wealth gaps.

We will have additional recommendations to share as the new USDA team comes on board but here please find a few additional items.

13

<u>Data Collection and Civil Rights Analysis</u>- Collecting demographic data is imperative to restoring equity in agricultural program participation and application. To streamline the process for both farmers and USDA Service Centers and the Office and Civil Rights, we recommend that the USDA establishes a uniform system for data collection by using the Services Center Information Management Systems (SCIMS) to capture data directly when a farmer registers with FSA and provides available information on race and gender for use by the Office of Civil Rights and other relevant agencies. We have just submitted comments which can be downloaded <u>here</u>.

<u>Research</u> – The whole research framework and the career employees of the Department have been under siege. We urge the Agency Review Team to begin conversations of what changes are essential to assure critical research and staff capacity is restored and leadership with a vision for the future be recruited to lead in this critical area.

<u>USDA Career Staff</u>- We urge that entire career staff of USDA be valued and supported in tangible ways and the USDA work to increase cross agency collaboration between and among staff of different mission areas, and to restart collaboration with community-based organizations and other critical partners.

<u>Outreach and Technical Assistance</u> – Funds for outreach and technical assistance must be directed to support the kinds of collaborations that are essential with particular attention to including excluded communities including farmworkers, socially disadvantaged producers, and rural, urban and tribal communities, especially those seeking to end persistent poverty.

<u>Forestry, Energy, Industrial Hemp, Rural Jobs of the Futue</u> – there is more to say and that we will share with you and the incoming team.


<u>USDA STRUCTURES AND AUTHORITIES</u>

**Restore Rural Development Mission Area at USDA-** The coronavirus pandemic has exposed the inequities and neglect of rural communities. Within the USDA, the Biden Administration must prioritize appointing an Undersecretary for Rural Development and reestablishing Rural Development as a USDA Mission Area that helps "improve the economy and quality of life in all of rural America by providing financial programs to support essential public facilities and services as water and sewer systems, housing, health clinics, emergency service facilities and electric and telephone service." USDA must take immediate actions to prioritize investments infrastructure development to include broadband development, housing and community anchor institutions assistance,

14

increase and support for rural healthcare and health facilities, and support for local businesses and cooperatives.

**Office of Tribal Relations** – The Office of Tribal Relations must be restored as a self-standing entity in the office of the Secretary with adequate funding and representation in the subcabinet.

**Farmworker Coordinator/Office** - The USDA needs a real office to assure representation of farmworkers in decisions that affect their lives. The Office should also include liaisons with other key federal offices including but not limited to the Environmental Protection Agency, the Department of Labor, the Federal Emergency Management Office, and others. USDA must consult with leaders of the farmworker community in shaping and locating this function.

**Office of Advocacy and Outreach, and related functions** – All these entities were damaged over the past years and diverted from their essential functions. We ask to be put in touch with anyone within the Biden-Harris administration who will be responsible for restoring these offices and assuring they are placed and led in the manner necessary to accomplish their critical functions.


RECOMMENDATIONS FOR PRESIDENT'S BUDGET

The following are our initial recommendations to Biden- Harris administration in order to move forward with its goals on equity include the following requests in their FY 2022 budget.

1) Emergency Assistance for Farmworker Housing and Food Access
2) Increased funding for the FOTO program, including Outreach and Assistance Program for Socially Disadvantaged and Veteran Farmers and Ranchers and Beginning Farmer Development program; as well as the LAMP and Urban Agriculture programs.
3) Full funding for the NASS Land Tenure Study
4) Full Funding for Heirs Property Relending
5) Full Funding for State Mediation Programs
6) Loan Forgiveness for Farmers
7) Rural Development including broadband and rural hospitals
8) Funding for 1890 and 1994 Research Institutions
9) Continued funding for the full range of nutrition programs.


PERSONNEL

15

We believe the USDA needs a skilled leadership teams that includes at high levels leaders who come from and are steeped in the wisdom of our diverse communities. We request that we be informed of the best way to share recommendations with those on the Biden-Harris transition team responsible for recruiting this leadership team.

<u>CONCLUSION</u>

We look forward to continuing our conversations and assisting this team and the Biden-Harris Administration to defeat the pandemic and build all of our communities back better to progress into an equitable and resilient future.

16



For further information contact: Lorette Picciano at lpicciano@ruralco.org, or DeShawn Blanding at deshawn@ruralco.org

November 30, 2020

Ruth Brown, Departmental Information Collection Clearance Officer
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250-0517

RE: USDA Race, Ethnicity and Gender Data Collection, FR Docket 2020-23956
    *OMB Control Number:* 0503-0019.

Dear Ms. Brown,

The Rural Coalition has worked for 42 years on behalf of our diverse farmers, ranchers, and member organizations. We provide the following comments regarding the continuation of the data collection to determine the race, ethnicity and gender of farmers and ranchers who apply for and who participate in USDA programs and services. We support the continuation of the collection of this data and offer the following additional input.

As indicated in the Federal Register (FR) announcement per section 14006 and 14007 of the 2008 Farm Bill (7 U.S.C. 8701), the USDA is annually required to "compile application and participation rate data regarding socially disadvantaged farmers or ranchers by computing for each program of the Department of Agriculture that serves agriculture producers and landowners (a) raw numbers of applicants and participants by race, ethnicity, and gender, subject to appropriate privacy protection, as determined by the Secretary; and (b) the application and participation rate, by race, ethnicity, and gender as a percentage of the total participation rate of all agricultural producers and landowners for each county and State in the United States." Demographic data collection is imperative to ensuring equitable participation in USDA programs and access to services by not only collecting data but through the synthesis of the data to determine where additional attention, outreach and resources are needed.

The notice indicates that:

*"Data will be collected on a voluntary basis through a questionnaire to determine the race, ethnicity and gender of farmers and ranchers who apply for and who participate in USDA programs and services."*



Congress has provided USDA with the authority to collect the required data by race, gender and ethnicity. In order to meet the requirements of Section 14006 and 14007, and related statutes, USDA must collect data using methods that allow it to report participation rates in all programs that serve farmers and ranchers who apply for and participate in programs. We do not believe that a voluntary questionnaire is a sufficient method to provide the necessary information.

USDA should instead incorporate the voluntary collection of race, gender and ethnicity data as part of the fundamental entry of information on producers when the register for farm and tract numbers in the Service Center Information Management Systems (SCIMS). USDA already reports data upon request on participation by race, gender and ethnicity. Any identification in SCIMS should be consistent with the voluntarily collected self-identification by the producer. Such data should be used for the purposes outlined in sections 14006 and 14007 and used only in a manner that assures "the data collection under this section shall not be used in the evaluation of individual applications for assistance."

The SCIMS is the central system collection and maintenance of customer data for the Services Center Agencies - Farm Service Agency (FSA), the Natural Resources Conservation Service (NRCS), and Rural Development (RD). Connecting data on race, gender and ethnicity to the data in SCIMS is essential to carrying out the purposes of sections 14006 and 14007.

Section 14006 requires "using the technologies and systems of the National Agricultural Statistics Service… to compile and present the data compiled under paragraph (1) for each program described in that paragraph in a manner that includes the raw numbers and participation rates." The categories for race, ethnicity and data collected in SCIMS and in any other way should be consistent with the categories used by the National Agricultural Statistics Service to allow comparisons to the county level on program applications and participation as related to farm production, value, and viability.

Reports on program applications and participation on race, gender and ethnicity should be shared with the Office of Civil Rights to accomplish the purposes noted in the Federal Register Notice, purposes which we strongly support:

> *"The data will enable the Secretary and the Office of the Assistant Secretary for Civil Rights and the agencies' outreach offices in reaching current and prospective socially disadvantaged farmers or ranchers in a linguistically appropriate manner to focus resources in a particular county or region where low participation is indicated by the data to improve the participation of those farmers and ranchers in USDA programs. The data is intended to be used as one indicator in targeting and designing outreach activities and in assessing compliance with civil rights laws in program delivery. The data may*



*also be used as an indicator in directing compliance reviews to geographic areas where there are indications of low participation in USDA programs by minorities and women, thus serving as an "early warning system" that warrants further investigations."*

Per section 14003 of the 2008 Farm Bill and subsequent statutes, USDA is required to provide current or prospective landowners and producers "Receipts for Service or Denial of Service that includes "(1) the date, place, and subject of the request; and (2) the action taken, not taken, or recommended to the producer or landowner." We urge USDA to integrate data collection systems in such a way that the program agencies and the Office of Civil Rights will be enabled to analyze the data in the receipts for service with regard to the quality and timing of services provided to producers by race, gender and ethnicity, and can review situations where there are disparities in the adequacy and timing of service.

The orderly, comprehensive and consistent collection and release of information are important to assure equity at every level at USDA. These systems are also essential in understanding the current demography of participation and application and determining where there is low participation in USDA programs and services by women and socially disadvantaged farmers and ranchers. Only by identifying such areas will it be possible to focus efforts to improve the quality of service.

We agree that *"Failure to collect this information will have a negative impact on USDA's outreach activities and could result in an inability of the agencies to equitably deliver programs and services to applicant and producers."* We strongly support the continuation of this data collection and urge USDA to do all it can to assure these data are collected in a manner that allows the data collection to achieve the purposes outlined in the statute.

Please contact us if we can provide additional input of use to you.

Cooperatively,

Rural Coalition

Cc: Sarah Campbell, National Beginning Farmer and Rancher Program Coordinator
    Latrice Hill, USDA Farm Service Agency
    Winona Scott, USDA Office of Civil Rights

**FACT SHEET: USDA Activities to Promote Equity**

Since Day One of the Biden-Harris Administration, USDA has committed itself to building back better for historically underserved communities. That commitment spans many projects across all of USDA's mission areas and agencies. Here are some of the core actions USDA has taken to level the playing field for our constituents:

<u>EQUITY IN AGRICULTURE</u>

- **Standing Up an Equity Commission:** USDA is standing up an independent Equity Commission to examine USDA programs and services. The Commission will be charged with reviewing USDA programs to identify and make recommendations for how USDA can reduce barriers to access and advance equity. The Commission will also ensure accountability within and empower customers from underserved communities outside of USDA to take fuller advantage of our programs and services, signaling the beginning of the kinds of systemic, structural and cultural changes essential to advancing equity.

- **Engaging with Congress:** Secretary Vilsack <u>testified</u> at the House Agriculture Committee's first-ever Hearing to Review the State of Black Farmers; he also <u>testified</u> before the Senate Judiciary <u>Committee</u> in support of the Farm Worker Modernization Act. In these first opportunities to provide his priorities to congressional leaders he clearly laid out his commitment to equity and justice. In House Ag his testimony and comments were included racial equity and social justice work at USDA and the need to address past discrimination.

- **Ensuring Equitable Pandemic Assistance:** Under the previous administration's Coronavirus Food Assistance Program (CFAP), only 4% of funding went to socially disadvantaged farmers (among those who identified their race and/or ethnicity). After identifying gaps in previous COVID-19 relief funding, <u>USDA announced 'Pandemic Assistance for Producers'</u> to distribute resources more equitably and committed to directing to the people and sectors who needed assistance most via the newly-established initiative. Among other funding opportunities, the <u>Pandemic Assistance Initiative</u> includes re-opening signup for CFAP2, $700 million in grants to provide <u>relief to farm and food workers</u> affected by COVID-19, $700 million to provide relief for <u>small producers, processors, farmers markets and seafood vessels affected</u> by COVID-19, and $2 million to establish partnerships with organizations to provide outreach and technical assistance to historically underserved farmers and ranchers. CFAP2 has seen an increase of enrollment to approximately 21% of CFAP applications since April being from socially disadvantaged producers.

- **Restoring the Nation to Nation Relationship with Indian Country**: As part of USDA's commitment to restoring the nation to nation relationship with Indian Country and implementing both President Biden's Executive Order on Advancing Racial Equity and Support for Under Served Communities and the Executive Order on Tribal Consultation, USDA held and Secretary Vilsack participated in an all-of-USDA tribal consultation in March 2021, within weeks of being confirmed.

1

- **Restoring the Office of Tribal Relations** – Secretary Vilsack restored and empowered a free-standing Office of Tribal Relations that reports directly to him. During the Trump administration the Office of Tribal Relations was minimized and folded under the Office of Partnerships and Public Engagement. USDA is restoring the Office of Tribal Relations to a free-standing office that can maintain the nation-to-nation relationship as is required both by law and by treaty.
- **Resolving Heirs' Property Succession Issues:** In July, USDA announced it was providing $67 million in competitive loans through its new Heirs' Property Relending Program to help agricultural producers and landowners resolve heirs' land ownership and succession issues.
- **Supporting Socially Disadvantaged Farmers**: In July, USDA announced approximately $16.6 million in funding to community-based and nonprofit organizations, institutions of higher education, and Tribal entities that help socially disadvantaged and veteran farmers and ranchers own and operate successful farms.
- **Investing in HBCUs:** USDA announced an investment of over $21.8 million to 1890 Land grant-Institutions to support research at Historically Black Colleges and Universities at our nation's Land-grant University System. These investments are designed to build capacity for teaching, research and extension activities at eligible institutions including curriculum design, materials development, faculty development, student recruitment and retention, and expansion program development support.
- **Providing Conservation Assistance to Underserved Producers:** In August, USDA's Natural Resource Conservation Service announced up to $50 million in cooperative agreements to support historically underserved farmers and ranchers with climate-smart agriculture and forestry. These Racial Justice and Equity Conservation Cooperative Agreements are available to entities and individuals for two-year projects that expand the delivery of conservation assistance to farmers who are beginning, limited resource, socially disadvantaged, and veteran farmers.
- **Advancing Equity in Agriculture via Economic Opportunity and Next Gen Leaders:** The American Rescue Plan includes $1 billion that will enable USDA to better support address the needs of historically underserved populations via technical assistance, access to land and support for efforts to resolve land title issues, access to credit, and support reaching new markets. To implement these funds USDA is designing new programs from scratch; the structure, focus and design will reflect input from historically underserved communities, including those received via a recent equity-focused Request For Information. The funds also direct USDA to develop career pathways for the next generation of leaders in agriculture in partnership with minority serving institutions, which will enable USDA to expand, for example, the Pathways Programs.
- **Working toward Debt Relief for Socially Disadvantaged Farmers**: The American Rescue Plan included provisions for USDA to provide debt relief to socially disadvantaged producers with Farm Service Agency Direct and Guaranteed Loans and Farm Storage Facility Loans.  USDA took swift action to implement the program. In light of numerous lawsuits and injunctions that prevent payments, USDA is working closely with the Department of Justice to defend the program in district courts.

<u>**BUILDING A MORE DIVERSE USDA**</u>

- **Leading with Diversity, Equity, Inclusion and Access Front and Center**: USDA's commitment to diversity and equity includes strong leadership and experience. The Administration has sought out key leaders from across the country known for their work in agriculture, experience in working with historically underrepresented communities, and their commitment to shape policy at USDA to be more inclusive.
- **Issuing Strong USDA Civil Rights Policies and Updating Anti-Harassment Policies:** The Secretary has issued internal memoranda and communications recommitting USDA to civil rights. The Office of Civil Rights is leading a collaborative effort to revise USDA's anti-harassment rules and program. Both are important to upholding values, setting expectations and holding USDA employees accountable.
- **Appointing a Senior Advisor for Equity in the Office of the Secretary:** To ensure equity is front and center in policy development and decision making in a cross cutting way, USDA for the first time ever, created a position—Senior Advisor for Equity —in the Office of the Secretary to be an internal advocate for underserved communities.
- **Appointing a Diverse Leadership Team**: Within the first two months of this Administration, the President appointed and nominated the first African American woman to serve as Deputy Secretary (Dr. Jewel Bronaugh), the Department's first Senior Advisor for Racial Equity in the Office of the Secretary (Dr. Dewayne Goldmon), the first Native American to serve as General Counsel (Janie Hipp), the first Latinx woman to serve as Deputy Under Secretary for Farm Production and Conservation (Gloria Montaño Greene), the first Native American to serve as Administrator of the Farm Service Agency (Zach Ducheneaux), new leadership in the Office of Civil Rights led by Monica Rainge, and many others reflective of a commitment to build a team that reflects the diversity of America and with deep knowledge of the communities USDA serves.
- **Racial Justice and Equity Internal Working Group:** As part of its implementation of President Biden's executive order on advancing equity, USDA launched its first-ever Racial Justice and Equity Internal Working Group to identify gaps and inadequacies. The group includes representatives from every USDA Mission Area and is a forum for learning and advancing an all-of-USDA equity effort
- **Request for Information**: In June, USDA published a [Request for Information on Racial Justice and Equity](#) and held over 15 hours of listening sessions with a wide-range of stakeholders to learn about experiences and receive feedback about its programs and services. The information collected will serve as a strong foundation for both the Equity Commission and to ensure these funds are deployed effectively and in response to the needs and priorities of underserved communities.

<u>**LOWERING BARRIERS FOR UNDERSERVED COMMUNITIES**</u>

<u>***Food and Nutrition Service***</u>

- **Expanding Pandemic Food Assistance:** USDA increased the Pandemic-EBT food assistance benefit by approximately 15%, providing more money for low-income families and millions of children missing meals due to school closures. This action provided additional support to millions of low-income and food insecure children during the pandemic

- **Temporarily Increasing SNAP Benefits in Response to Pandemic Challenges: In March,** USDA extended a 15% increase in SNAP benefits— providing over $1.1 billion per month in additional benefits for about 41 million participants—through September 2021.

- **Permanently Raising SNAP Benefits to Reflect True Costs**: USDA released a re-evaluation of the Thrifty Food Plan in August, a tool used to calculate Supplemental Nutrition Assistance Program (SNAP) benefits. As a result, the average SNAP benefit will increase by about 27%

- **Bolstering Access to SNAP:** USDA provided states with $1.135 billion from the American Rescue Plan Act to support and enhance their administration of the Supplemental Nutrition Assistance Programs (SNAP) for a variety of purposes, including investing in technology to improve access to SNAP benefits, exploring opportunities to better reach vulnerable populations, and improving reporting on program outcomes to enable data-driven decision making.

- **Increasing Benefits for WIC Recipients:** USDA announced nearly $900 million for the Special Supplemental Nutrition Program Woman, Infants, and Children (WIC). This funding went toward implementing a temporary increase in fruit and vegetable vouchers to $35 per month and a historic investment in innovation and outreach to better serve more than 6.2 million people who use WIC to support a healthy start for infants and young children.

- **Boosting Assistance for Homeless Youth:** USDA expanded eligibility for homeless young adults under the age of 25 to be able to receive meals at emergency shelters participating in the Child and Adult Care Food Program (CACFP) to reach the most vulnerable populations experiencing food hardship due to the pandemic under the America Rescue Plan.

### *Rural Development*

- **Eviction and Foreclosure Moratorium**: In one of his first acts in office, President Joe Biden requested federal agencies to extend eviction and foreclosure moratoriums for millions of Americans. In response, the U.S. Department of Agriculture announced an extension of eviction and foreclosure moratoriums on USDA Single Family Housing Direct and Guaranteed loans (SFHDLP and SFHGLP) and extended the eviction and foreclosure moratorium to affected multifamily housing residents.

- **Expanding Electric Service in Tribal Communities**: The Rural Utilities Service obligated a $235 million loan to the Navajo Tribal Utility Authority to improve electric service to the Navajo and Hopi tribes and deploy fiber-based smart grid infrastructure. These investments were part of a broader $598 million investment to Improve and Modernize Rural Electric Infrastructure After Serve Weather and Age Test the Grid:

- **Sharing Resources for Rural Child Care:** USDA's Rural Development (RD) and Health and Human Services (HHS) unveiled a joint resource guide aimed to help people in rural and Tribal communities increase access to child-care services. The guide provides useful information to help stakeholders in rural communities address the need for improved access to affordable, high-quality child-care and early learning facilities.
- **Supporting Economic Growth in Underserved Rural Areas**: USDA's newly-announced Rural Innovation Stronger Economy (RISE) grants help rural communities create good-paying jobs and support new business opportunities in high-growth fields.
- **Promoting Environmental Justice**: USDA Rural Development submitted its plan to implement the Justice40 Initiative, a whole-of-government effort to ensure that at least 40% of climate-related spending is in under-served areas. The pilot uses the Rural Energy for America Plan, which finances renewable energy systems and energy efficiency improvements for agricultural producers and rural small businesses, to bring USDA within Justice40's parameters.

### _Forest Service_

- **Agreement on the Tongass National Forest**: The USDA Forest Service Alaska Region has entered into a 5-year agreement with the Central Council of the Tlingit and Haida Indians of Alaska to strengthen tribal relations and center tribal perspectives on the Tongass National Forest.
- **Anti-Harassment Directive:** On March 25, USDA's Forest Service published new guidance continuing their commitment to maintaining a work environment where all people are treated with dignity, fairness, and respect, and are free from harassment. Incorporating employee feedback, the updates establish expectations and responsibilities to prevent and address harassment and retaliation to sustain a productive, respectful work environment.



United States Government Accountability Office

Report to the Chairwoman, Committee on Agriculture, Nutrition, and Forestry, U.S. Senate

January 2022

# USDA MARKET FACILITATION PROGRAM

# Oversight of Future Supplemental Assistance to Farmers Could Be Improved

January 2022

# GAO Highlights

Highlights of GAO-22-104259, a report to the Chairwoman, Committee on Agriculture, Nutrition, and Forestry, U.S. Senate

# USDA MARKET FACILITATION PROGRAM

## Oversight of Future Supplemental Assistance to Farmers Could Be Improved

## Why GAO Did This Study

To offset losses in agricultural export sales caused by international trade disruptions and increased tariffs on certain U.S. exported products, FSA distributed payments to farms through the MFP, a USDA supplemental assistance program. Such programs aid eligible farms that have been affected by various situations or events, including financial hardship or crop damage and loss following natural disasters.

FSA collects demographic information from farmers who participate in programs such as the MFP, including whether they belong to historically underserved groups and their income levels.

GAO was asked to review aspects of USDA's implementation and oversight of the MFP. This report examines (1) USDA's distribution of MFP payments to historically underserved and high-income farms for both 2018 and 2019 and (2) the extent to which USDA verified farms' compliance with MFP eligibility requirements for both 2018 and 2019.

GAO reviewed USDA documents and data and interviewed agency officials.

## What GAO Recommends

GAO is making four recommendations, including that FSA issue guidance for future compliance reviews of supplemental assistance programs to (1) design data collection and analysis in a way that ensures reliable results, (2) assess risk characteristics and take a more complete risk-based approach, and (3) communicate results and identify corrective actions. FSA generally agreed with the recommendations.

View GAO-22-104259. For more information, contact Steve D. Morris at (202) 512-3841 or MorrisS@gao.gov.

## What GAO Found

Under the Market Facilitation Program (MFP) launched by the U.S. Department of Agriculture (USDA) for 2018 and 2019, USDA's Farm Service Agency (FSA) made payments totaling $23 billion to farms and farmers. GAO's analysis of FSA data found that historically underserved farmers—such as those belonging to socially disadvantaged groups that have been subject to racial, ethnic, or gender prejudice—received $818.9 million collectively (3.6 percent) in MFP payments (see table; data shown cannot be totaled across groups).

**Payments to Farmers from Historically Underserved Groups by USDA's Market Facilitation Program (MFP)**

| Historically underserved group | 2018 MFP farmers (number) | 2018 MFP payments to farmers (dollars) | 2019 MFP farmers (number) | 2019 MFP payments to farmers (dollars) | Total payments to farmers (dollars) |
|---|---|---|---|---|---|
| Socially disadvantaged | 14,688 | 141,491,542 | 19,038 | 294,204,730 | 435,696,272 |
| Military veterans | 6,664 | 91,287,315 | 7,418 | 149,293,571 | 240,580,886 |
| Beginning to farm | 5,124 | 40,704,803 | 8,053 | 111,403,615 | 152,108,417 |
| Limited resource | 538 | 1,436,917 | 995 | 4,478,125 | 5,915,042 |

Source: GAO analysis of Farm Service Agency data. | GAO-22-104259

Note: Some farmers belonged to more than one historically underserved group.

FSA also paid $163.4 million (0.7 percent) to 883 high-income farms and 1,164 farmers with adjusted gross incomes (AGI) over $900,000 per year. To be eligible for MFP payments, FSA required applicants to have average AGIs of $900,000 or less per year—unless they certified that at least 75 percent of their income was derived from farming, ranching, or forestry, in which case no income cap applied.

USDA agencies conducted several reviews of MFP payments to ensure they had gone to eligible applicants. However, FSA's review to verify that 2018 MFP payments were based on accurate information was limited in its usefulness for several reasons. For example:

- FSA did not ensure the results of its review were reliable because the agency did not collect or analyze information in a statistically valid manner.
- FSA reviewed a sample of larger payments at a higher rate than smaller payments but did not focus on other characteristics posing risk to the accuracy of payments, such as farms with which FSA lacked familiarity or historical data to corroborate eligibility.
- FSA did not communicate the results of its review, including a summary of findings and the types of errors found, or identify corrective actions.

FSA's guidance for the 2018 MFP review did not direct the agency to (1) ensure results were reliable using sound statistical methodologies; (2) take a more complete risk-based approach, as used for other FSA programs; or (3) communicate results and identify corrective actions. In addition, FSA discontinued its 2019 MFP compliance review because of competing agency priorities, including implementation of another supplemental assistance program. FSA would improve its oversight of payments and enhance the usefulness of future compliance reviews for supplemental assistance programs by developing better guidance for conducting such reviews.

United States Government Accountability Office

# Contents

| | | |
|---|---|---|
| **Letter** | | **1** |
| | Background | 6 |
| | Historically Underserved and High-Income Farmers Received a Small Percentage of 2018 and 2019 MFP Payments | 11 |
| | USDA Agencies Reviewed Farming Operations' Compliance with MFP Eligibility Requirements, but FSA's Reviews Were Limited in Their Usefulness | 15 |
| | Conclusions | 32 |
| | Recommendations for Executive Action | 33 |
| | Agency Comments | 33 |
| **Appendix I** | Additional Information on the Distribution of 2018 Market Facilitation Program (MFP) Payments | 35 |
| **Appendix II** | Additional Information on the Distribution of 2019 Market Facilitation Program (MFP) Payments | 41 |
| **Appendix III** | Comments from the U.S. Department of Agriculture | 48 |
| **Appendix IV** | GAO Contact and Staff Acknowledgments | 50 |
| **Related GAO Products** | | 51 |

**Tables**

| | |
|---|---|
| Table 1: Payments to Farming Operation Members from Socially Disadvantaged, Veteran, and Other Historically Underserved Groups by the U.S. Department of Agriculture's Market Facilitation Program (MFP) | 13 |
| Table 2: High-Income Farming Operations and Members That Qualified for 2018 and 2019 Market Facilitation Program (MFP) Payments | 14 |

Table 3: 2018 Market Facilitation Program (MFP) Payments to
Farming Operations and Members, by State and Average
Payment per Member                                                    35
Table 4: Top 25 Market Facilitation Program (MFP) Payments for
2018                                                                  37
Table 5: 2018 Market Facilitation Program (MFP) Payments for
Nonspecialty Crops, Specialty Crops, and Dairy and
Hogs, by State                                                       39
Table 6: 2019 Market Facilitation Program (MFP) Payments to
Farming Operations and Members, by State and Average
Payment per Member                                                    41
Table 7: Top 25 Market Facilitation Program (MFP) Payments for
2019                                                                  43
Table 8: 2019 Market Facilitation Program (MFP) Payments for
Nonspecialty Crops, Specialty Crops, and Dairy and
Hogs, by State                                                       44

Figures

Figure 1: Eligibile Commodities in the 2018 and 2019 Market
Faciltiation Program, by Year                                         7
Figure 2: Summary of 2018 and 2019 Market Facilitation Program
(MFP) Payment Limits                                                  8
Figure 3: Average 2018 MFP Payment in the Contiguous U.S.             9
Figure 4: Farming Operations That Produced Nonspecialty Crops
Received About 95 Percent of Total 2018 MFP Payments                 10
Figure 5: Average 2019 MFP Payment in the Contiguous U.S.            47

APP. 000441

---

**Abbreviations**

| | |
|---|---|
| AGI | adjusted gross income |
| Business Center | Farm Production and Conservation Business Center |
| FSA | Farm Service Agency |
| MFP | Market Facilitation Program |
| USDA | United States Department of Agriculture |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

APP. 000442

**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**
*A Century of Non-Partisan Fact-Based Work*

441 G St. N.W.
Washington, DC 20548

January 4, 2022

The Honorable Debbie Stabenow
Chairwoman
Committee on Agriculture, Nutrition, and Forestry
United States Senate

Dear Madam Chairwoman:

To offset losses in U.S. agricultural export sales caused by international trade disruptions and tariffs in the 2018 and 2019 calendar years, the U.S. Department of Agriculture (USDA) launched the Market Facilitation Program (MFP) to provide supplemental financial assistance to farming operations for those years.[1] USDA's Farm Service Agency (FSA) administered the program, including reviewing applicants' compliance with MFP eligibility requirements and distributing $23 billion in MFP payments to eligible farming operations—$8.6 billion for 2018 MFP payments and $14.4 billion for 2019. FSA made these payments to farming operations across the nation that produced various eligible commodities, including specific crops, dairy, and hogs.

To receive MFP payments, farming operations and, where applicable, their members had to meet certain eligibility requirements, such as (1) having ownership in the commodities produced, (2) complying with federal conservation regulations for highly erodible land and wetlands, and (3) meeting income criteria.[2] To demonstrate their eligibility for

---

[1]USDA established and funded the MFP using its authority under the Commodity Credit Corporation Charter Act. *Market Facilitation Program*, 83 Fed. Reg. 44,173 (Aug. 30, 2018); *Trade Mitigation Program*, 84 Fed. Reg. 36,456 (July 29, 2019).

USDA regulations define a farming operation as a business enterprise engaged in the production of agricultural products, commodities, or livestock that is operated by a person, legal entity (e.g., a corporation, limited liability company, estate, or trust), or joint operation (e.g., a general partnership). 7 C.F.R. § 1400.3(b). A member of a farming operation can be either a person or an entity. For the purposes of determining payment limitations for applicable Farm Bill programs, a person is defined as a natural person (an individual) and does not include a legal entity. 7 U.S.C. § 1308(a)(4).

[2]With assistance from the Internal Revenue Service, FSA determines whether farming operations and their members meet income eligibility requirements based on average adjusted gross income (AGI) for 3 consecutive tax years that precede the year for which the payment is made. For the 2018 MFP, tax years 2014, 2015, and 2016 were applicable. For the 2019 MFP, tax years 2015, 2016, and 2017 were applicable.

GAO-22-104259 Market Facilitation Program

payments, farming operations were required to submit forms supplementing their MFP applications. For example, farming operations were required to certify on a separate form whether their average adjusted gross income (AGI) was $900,000 or less per year. Those farming operations with AGIs exceeding $900,000 were required to submit an additional form certifying that at least 75 percent of their income was derived from farming, ranching, or forestry-related activities.[3] Farming operations and members that qualified under this "75 percent rule" did not have a cap on their income—and thus could receive MFP payments that they would not have received under Farm Bill programs, such as the Agriculture Risk Coverage, Price Loss Coverage, and Marketing Assistance Loan programs, that are subject to the AGI requirement.[4] (Throughout this report, we refer to farming operations and members with AGIs exceeding $900,000 as "high-income.")

In addition, to be eligible for the MFP, farming operations were required to certify on their 2018 and 2019 MFP applications that the information they provided—including their claimed production or planted acres for eligible commodities, on which payments were based—was accurate and subject

---

[3]A provision in the Additional Supplemental Appropriations for Disaster Relief Act, 2019, Pub. L. No. 116-20, tit. I, § 103, 133 Stat. 871, 874, eliminated the original AGI limit of $900,000 for the MFP in cases where at least 75 percent of a person's, legal entity's, or farming operation member's AGI was derived from farming, ranching, or forestry. In those cases, applicants were required to provide a certification from a licensed certified public accountant or an attorney that the applicant qualified for MFP payments because of the 75 percent rule. Farming operations and members who certified that they met the rule could qualify for MFP benefits for either or both program years.

For couples who file joint tax returns, FSA state offices are to use the joint income levels to make eligibility determinations, unless a certified public accountant or attorney provides a statement detailing what each individual's income would have been had the couple filed separate tax returns. FSA state offices are then to review the tax returns and accountants' and attorneys' statements to determine whether each individual was eligible under the statutory income limits.

[4]Programs authorized by the Agricultural Act of 2014, Pub. L. No. 113-79, 128 Stat. 649, and reauthorized by the Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490, include the Agriculture Risk Coverage, Price Loss Coverage, and Marketing Assistance Loan programs. These farm programs provide financial assistance payments or loans to farming operations when the average market price over a certain time period for an eligible commodity drops below a statutory minimum or when revenue is below a guaranteed level.

to verification.[5] The MFP applications stated that by signing the application, farming operations understood that failure to accurately certify any of this information may result in a loss of program benefits, and the applications stated that appropriate civil or criminal actions may be imposed in reference to the information provided by the applicant.

In addition, FSA provided MFP applicants an opportunity to certify that they belong to groups categorized by USDA as historically underserved.[6] Such groups include members of farming operations who are beginning to farm, have limited resources, are socially disadvantaged (defined in statute as groups that have been subject to racial, ethnic, or gender prejudice),[7] or are military veterans. FSA provides criteria for farming operations to qualify for one or more of these historically underserved groups based on 2018 Farm Bill provisions and USDA regulations.[8] (Throughout this report, we refer to farming operation members who belong to these groups or are high-income as "farmers," although such members also includes ranchers.) We have previously reported on historically underserved farmers and the specific challenges they

---

[5]For the 2018 MFP, payments were based on the amounts of claimed production for eligible nonspecialty and specialty crops that the farming operations certified on their applications (e.g., the number of bushels of corn or pounds of fresh sweet cherries), whereas 2019 MFP payments were based on farming operations' certified planted acres for nonspecialty and specialty crops. For both program years, payments for farming operations with dairy and hogs were based on their claimed production (e.g., number of hogs).

[6]The 2018 Farm Bill includes provisions that address the unique circumstances and concerns of farming operation members who belong to groups categorized as beginning, limited resource, socially disadvantaged, or veteran. These groups are collectively referred to as historically underserved farmers. Pub. L. No. 115-334, tit. XII, subtit. C, 132 Stat. 4490, 4950.

[7]7 U.S.C. § 2003(e)(1).

[8]To be determined socially disadvantaged, farmers voluntarily certify their status (i.e., their race, ethnicity, or gender) on an FSA form. For beginning, limited resource, and veteran status, FSA determines if farming operations meet the criteria to qualify based on supplemental information they are required to provide.

For statistical information on historically underserved farmers, see USDA's 2017 Census of Agriculture (National Agricultural Statistics Service, *2017 Race, Ethnicity and Gender Profiles*, accessed September 7, 2021, https://www.nass.usda.gov/AgCensus). The census collected information on the total number of persons, and their demographic information for up to four persons per farming operation. This contrasts from our analysis; we included all members of farming operations—which, in some cases, exceeded four persons per farming operation.

APP. 000445

encounter; a list of GAO products related to these farmers and other aspects of the MFP is included at the end of this report.[9]

You requested that we review aspects of USDA's implementation and oversight of the MFP. This report examines (1) USDA's distribution of MFP payments to historically underserved and high-income farmers for both 2018 and 2019, and (2) the extent to which USDA verified farming operations' compliance with MFP eligibility requirements for both 2018 and 2019.

The scope of our review was generally the 2018 and 2019 MFP, but we focused on the distribution of payments by type of commodity and location for 2018 because we previously reported on the distribution of 2019 MFP payments.[10] For all objectives, we reviewed relevant FSA handbooks, notices, application forms, and other documents such as USDA's MFP methodology reports;[11] relevant GAO reports;[12] and Congressional Research Service reports.[13]

To examine USDA's distribution of 2018 and 2019 MFP payments to historically underserved and high-income farmers, we analyzed FSA

---

[9]See, for example, GAO, *Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited,* GAO-19-539 (Washington, D.C.: July 11, 2019); *Indian Issues: Agricultural Credit Needs and Barriers to Lending on Tribal Lands,* GAO-19-464 (Washington, D.C.: May 9, 2019); *U.S. Department of Agriculture: Progress toward Implementing GAO's Civil Rights Recommendations,* GAO-12-976R (Washington, D.C.: Aug. 29, 2012); and *Beginning Farmers: Additional Steps Needed to Demonstrate the Effectiveness of USDA Assistance*, GAO-07-1130 (Washington, D.C.: Oct. 18, 2007).

[10]GAO, *USDA Market Facilitation Program: Information on Payments for 2019*, GAO-20-700R (Washington, D.C.: Aug. 21, 2020).

[11]U.S. Department of Agriculture, Office of the Chief Economist, *Trade Damage Estimation for the Market Facilitation Program and Food Purchase and Distribution Program* (Washington, D.C.: Sept. 13, 2018); and *Trade Damage Estimation for the 2019 Market Facilitation Program and Food Purchase and Distribution Program* (Washington, D.C.: Aug. 22, 2019).

[12]See, for example, GAO, *USDA Market Facilitation Program: Stronger Adherence to Quality Guidelines Would Improve Future Economic Analyses*, GAO-22-468 (Washington, D.C.: Nov. 18, 2021); *Farm Programs: USDA Has Improved Its Completion of Eligibility Compliance Reviews, but Additional Oversight Is Needed*, GAO-21-95 (Washington, D.C.: Oct. 30, 2020); and GAO-20-700R.

[13]See, for example, Congressional Research Service, *Farm Policy: Comparison of 2018 and 2019 MFP Programs,* IF11289 (Washington, D.C.: Aug. 12, 2019); and *U.S. Farm Programs: Eligibility and Payment Limits*, R46248 (Washington, D.C.: Mar. 3, 2020).

payment data from March 2020 and other FSA data for both program years.[14] As part of this analysis, we also determined the distribution of 2018 MFP payments to all farming operations and how these payments varied by location and commodity types. For historically underserved farmers, we analyzed FSA data to determine the number who participated in MFP and their associated payments. For high-income farming operations and members, our analysis focused on the number of operations and members that qualified for the MFP under the 75 percent rule and their associated payments.

We assessed the reliability of FSA's data by (1) reviewing information about the data and the systems that produced them, (2) reviewing relevant FSA handbooks, (3) interviewing agency officials knowledgeable about the data, and (4) conducting electronic tests for anomalies and missing data. We determined that the data were sufficiently reliable for the purposes of this report.

To examine the extent to which USDA verified farming operations' compliance with MFP eligibility requirements for 2018 and 2019, we reviewed documentation describing how FSA selected samples of payments for these reviews and the summary results. We also interviewed knowledgeable FSA officials and received written responses regarding the methodology and results of the agency's compliance reviews. We determined that the control activities component of internal control was significant to this objective—along with the underlying principles that management should define its objectives clearly to enable the identification of risks and risk tolerances and use quality information to achieve the entity's (in this case, the agency's) objectives. We assessed the design of FSA's sampling methodology for selecting farming operations for its 2018 MFP compliance review to determine whether it was capable of achieving the agency's objectives, and we determined that it was sufficiently sound for the purpose of describing that methodology in this report. However, FSA did not provide documentation for how the agency processed the sample of 2018 MFP farming operations it reviewed into summarized results, nor did FSA provide us with information that would allow us to assess the quality of its estimates of compliance with measures of precision. Therefore, we determined the agency's analytical methodology was not sufficiently sound for the

---

[14]In addition to FSA's MFP payment data from March 2020, we relied on data from FSA's Subsidiary Eligibility files from March 2021 regarding historically underserved and high-income farmers.

purpose of summarizing the results of FSA's 2018 MFP compliance review in our report.

In addition, we reviewed documentation and interviewed officials from USDA's Farm Production and Conservation Business Center (Business Center) regarding its review of national random samples of MFP payments made in fiscal years 2019 and 2020. We did not independently verify the Business Center's results; however, we assessed the design of the agency's sampling and analytical methodologies and determined that they were sufficiently sound for the purpose of summarizing the Business Center's results in this report.

We conducted this performance audit from March 2020 to January 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

USDA's supplemental assistance programs (commonly referred to as "ad hoc" programs) provide payments to eligible farming operations that have been affected by a variety of situations or events, including financial hardship or crop damage and loss following natural disasters. These supplemental assistance programs are not part of Farm Bill programs that support farm income (such as Price Loss Coverage or Agriculture Risk Coverage), and they usually cover recent, not future, production. In addition to the MFP, other examples of supplemental assistance programs administered by FSA—sometimes in partnership with other USDA agencies—include the Coronavirus Food Assistance Program (which has provided $31 billion as of November 14, 2021, with more payments to be made in the future) and the Pandemic Assistance for Timber Harvesters and Haulers Program (which was authorized to provide up to $200 million in relief).[15]

FSA made MFP payments to farming operations that produced eligible commodities within three commodity types (see fig. 1). For the 2019 MFP, USDA expanded the list of eligible commodities, compared with the 2018 program year. Our analysis of FSA data shows there were 582,862

---

[15]Pub. L. No. 116-260, div. N, tit. VII, subtit. B, ch. 1, § 751, 134 Stat. 1182, 2107 (2020).

farming operations that participated in the 2018 MFP and 643,965 farming operations that participated in the 2019 program year.

**Figure 1: Eligible Commodities in the 2018 and 2019 Market Facilitation Program, by Year**

| Commodity type | 2018 | 2019 |
|---|---|---|
| Nonspecialty crops | Corn, cotton (upland and extra-long-staple), sorghum, soybeans, and wheat | Alfalfa hay, barley, canola, cotton (upland and extra-long-staple), corn, crambe, dried beans, dry peas, flaxseed, lentils, long- and medium-grain rice, millet, mustard seed, oats, peanuts, rapeseed, rye, safflower, sesame seed, small and large chickpeas, sorghum, soybeans, sunflower seed, temperate japonica rice, triticale, and wheat |
| Specialty crops | Fresh sweet cherries and shelled almonds | Almonds, cranberries, cultivated ginseng, fresh grapes, fresh sweet cherries, hazelnuts, macadamia nuts, pecans, pistachios, and walnuts |
| Livestock and dairy | Milk and hogs | Milk and hogs |

Source: Farm Service Agency documents, USDA and silver-john/stock.adobe.com (photos). | GAO-22-104259

The MFP also had other key differences across the two program years, including how USDA's Office of the Chief Economist calculated the trade damage and payment rates for each commodity, and payment limits.[16] For example, the 2018 MFP methodology to determine payment rates included each specific commodity's trade damage divided by 2017 production to determine a national, commodity-specific MFP payment rate.[17] In contrast, the 2019 MFP payment rate methodology was derived and used to establish a single, per-acre MFP rate for each county. The

---

[16]We recently reported on USDA's methodologies for determining the trade damage estimates and payment rates for the MFP for both program years; see GAO-22-468.

[17]To calculate trade damage for both program years, USDA's Office of the Chief Economist used an economic model to estimate the percentage decline in the values of U.S. exports of eligible MFP commodities caused by foreign retaliatory tariffs relative to baseline trade values, which changed from 2018 to 2019.

APP. 000449

MFP also had its own per-person or per-legal-entity payment limitations, which differed from Farm Bill programs. The 2018 MFP payment limit—the cap on payments that farming operations could receive—was generally set at $125,000 per person or legal entity for each commodity type, with an overall maximum of $375,000.[18] For the 2019 MFP, USDA changed the payment structure for the three commodity types, including by establishing county-specific payment rates for nonspecialty crops and by increasing the payment limit from $125,000 to $250,000 for each commodity type, not to exceed $500,000 per person or legal entity (see fig. 2).

**Figure 2: Summary of 2018 and 2019 Market Facilitation Program (MFP) Payment Limits**



Source: GAO analysis of Farm Service Agency documents. | GAO-22-104259

In total, according to our analysis of FSA data, the agency distributed $8.6 billion in 2018 MFP payments (see app. I for details).[19] The average 2018 MFP payment per farming operation ranged from $6 to almost $135,000 by county (see fig. 3). We found that 49 counties had average payments of $50,000 or more.

---

[18]Joint operations—which include general partnerships, joint ventures, or other similar business organizations in which the members are jointly and severally liable for the organization's obligations—do not have a payment limit at the farming operation level. Instead, by law, each member of a joint operation is treated separately and individually for the purpose of determining eligibility and payment limits. Thus, a joint operation's payment limit is equal to the number of its qualifying members multiplied by the per-person payment limit.

[19]We excluded payments made to Indian tribes from our analysis because, according to FSA's payment limitation handbook, such payments are not subject to payment limits. Because we did not include payments to Indian tribes, our totals may be lower than other publicly reported figures.

GAO-22-104259  Market Facilitation Program

**Figure 3: Average 2018 MFP Payment in the Contiguous U.S.**



Average Market Facilitation Program (MFP) payment for 2018 per farming operation, by county

- No data
- Less than $15,000
- $15,000 to less than $25,000
- $25,000 to less than $50,000
- $50,000 or more

Source: GAO analysis of Farm Service Agency data.  |  GAO-22-104259

Farming operations that produced nonspecialty crops received about 95 percent of total 2018 MFP payments, according to our analysis of FSA data (see fig. 4). Dairy and hog operations received about 4 percent, and specialty crop operations received less than 1 percent. (For more information on the distribution of the 2018 MFP payments, see app. I.)

APP. 000451

Figure 4: Farming Operations That Produced Nonspecialty Crops Received About 95 Percent of Total 2018 MFP Payments



$351.1 million
Livestock
(dairy and hogs)

$72.2 million
Specialty crops
(fresh sweet cherries and shelled almonds)

$8.2 billion
Non-specialty crops
(corn, cotton, sorghum, soybeans, and wheat)

Source: GAO analysis of Farm Service Agency data. | GAO-22-104259

Note: This figure does not include $961,339 in 2018 MFP payments made to farming operations in Puerto Rico.

For the 2019 MFP, as we previously reported, FSA distributed a total of $14.4 billion in payments.[20] Our analysis of FSA data shows the average 2019 MFP payment per farming operation ranged from $44 to $295,299 by county, and 201 counties had average payments of $50,000 or more. Similar to the 2018 program year, farming operations that received the highest 2019 MFP payments were predominantly located in the South and Midwest; those operations also generally produced nonspecialty crops. (For more information on the distribution of the 2019 MFP payments, see app. II.)

As part of USDA's efforts to ensure that farming operations comply with eligibility requirements and that internal controls are in place to minimize the potential for improper payments—payments that should not have been made or were made in an incorrect amount—FSA and other USDA agencies typically conduct reviews of selected farm program payments. For example, using a risk-based approach, FSA annually reviews a national sample of payments for programs it administers that were authorized in the Farm Bill to ensure that farming operations meet

[20]GAO-20-700R.

APP. 000452

eligibility requirements and, where appropriate, the agency seeks the return of payments found to be ineligible.[21] As a further line of defense to help manage program risks for FSA, a separate USDA agency—the Farm Production and Conservation Business Center—conducts reviews spanning multiple USDA programs to identify, report, and reduce improper payments.[22]

# Historically Underserved and High-Income Farmers Received a Small Percentage of 2018 and 2019 MFP Payments

Of the $23 billion in MFP payments to farming operations over the 2018 and 2019 program years, FSA distributed $818.9 million (3.6 percent) to historically underserved farmers and $163.4 million (0.7 percent) to high-income farmers, according to our analysis of agency data.

## MFP Payments to Historically Underserved Farmers

FSA collected information from 2018 and 2019 MFP applicants, on a voluntary basis, regarding whether they belonged to historically underserved groups (for definitions of these groups, see text box).[23] Farming operations and their members may qualify for one or more of these historically underserved groups based on criteria outlined in FSA documents.

---

[21]In addition to verifying that farming operations meet income and other eligibility requirements, FSA determines whether persons (including members of farming operations) that produce most types of nonspecialty crops are "actively engaged in farming." To be determined actively engaged in farming, a person must provide the farming operation with a significant contribution of capital, land, or equipment, as well as a significant contribution of personal labor or active personal management. The person's share of the operation's profits and losses must be commensurate with the person's contribution to the farming operation, and the contributions must be at risk. Actively engaged in farming determinations apply to certain commodities. For more information, see GAO-21-95.

[22]The Business Center was created in October 2018 to provide administrative services such as financial management, human resources, and information technology to FSA and certain other USDA agencies.

[23]The 2018 Farm Bill includes provisions that address the unique circumstances and concerns of farming operation members who belong to groups categorized as beginning, limited resource, socially disadvantaged, or veteran. Pub. L. No. 115-334, tit. XII, subtit. C, 132 Stat. 4490, 4950. These groups are collectively referred to as historically underserved farmers. Throughout this report, we refer to farming operation members who belong to these groups as "farmers," although this term also includes ranchers.

APP. 000453

Case 2:24-cv-00060-Z Document 30-1 Filed 08/23/24 Page 459 of 562 PageID 3489

---

**Definitions of Historically Underserved Groups**

A **beginning farmer** has not operated a farm or ranch for more than 10 years and materially and substantially participates in the farming operation. For farming operations to be considered beginning, at least 50 percent of the ownership interest must be held by beginning farmer members.

A **limited resource farmer** has a total household income at or below the national poverty level for a family of four, or less than 50 percent of the county median household income, in each of the previous 2 years. For farming operations to be considered limited resource, the sum of gross sales and household income must be considered for all members.

A **socially disadvantaged farmer** is a member of a group that has been subject to racial, ethnic, or gender prejudice, without regard to its members' individual qualities. Those groups include African Americans, American Indians or Alaskan Natives, Hispanics, Asians or Asian Americans, Hawaiians or Pacific Islanders, and women. For farming operations to be considered socially disadvantaged, at least 50 percent of the ownership interest must be held by socially disadvantaged members.

A **veteran farmer** has served in the Armed Forces and has not operated a farm or ranch for more than 10 years total—or first obtained status as a veteran during the most recent 10-year period. For farming operations to be considered veteran, at least 50 percent of the ownership interest must be held by veteran farmer members.

Source: U.S. Department of Agriculture, Commodity Credit Corporation, *Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification,* CCC-860 (Washington, D.C.: July 21, 2020). | GAO-22-104259

---

We found, based on our analysis of FSA data, that historically underserved farmers collectively received $818.9 million across both program years.[24] FSA distributed $435.7 million of the 2018 and 2019 MFP payments to socially disadvantaged farmers, who received the largest amount of payments among historically underserved groups.

---

[24]Because a person and farming operation member may qualify for more than one historically underserved group (e.g., a farmer can have both socially disadvantaged and veteran status), the number of such persons and members and their associated payments cannot be totaled across the groups without overcounting. However, by analyzing FSA data, we were able to determine how many persons and farming operation members were categorized as belonging to each historically underserved group. We were also able to determine that some of these farmers were categorized as belonging to two or more groups and that farmers categorized as being in one or more of these groups collectively received $818.9 million across both program years.

APP. 000454

Beginning farmers received $152.1 million, limited resource farmers received $5.9 million, and veteran farmers received $240.6 million.[25]

**Table 1: Payments to Farming Operation Members from Socially Disadvantaged, Veteran, and Other Historically Underserved Groups by the U.S. Department of Agriculture's Market Facilitation Program (MFP)**

| | 2018 MFP | | 2019 MFP | | Total |
|---|---|---|---|---|---|
| Historically underserved group | Persons and members of farming operations (number) | Payments to persons and members (dollars) | Persons and members of farming operations (number) | Payments to persons and members (dollars) | Payments to persons and members (dollars) |
| Socially disadvantaged | 14,688 | 141,491,542 | 19,038 | 294,204,730 | **435,696,272** |
| Veterans | 6,644[a] | 91,287,315[a] | 7,418 | 149,293,571 | **240,580,886** |
| Beginning | 5,124 | 40,704,803 | 8,053 | 111,403,615 | **152,108,417** |
| Limited resource | 538 | 1,436,917 | 995 | 4,478,125 | **5,915,042** |

Source: GAO analysis of Farm Service Agency (FSA) data. | GAO-22-104259

Notes: A person is defined in statute as a natural person (an individual) and does not include a legal entity. 7 U.S.C. § 1308(a)(4). A member of a farming operation can be either a person or an entity.

Numbers and payment amounts shown cannot be totaled across groups without overcounting because some persons and farming operation members belonged to more than one historically underserved group.

[a]FSA began collecting data on persons and members of farming operations that qualified as veterans in 2019. We estimated the number of 2018 MFP persons and members of farming operations that qualified as veterans, and their associated payments, based on FSA's 2019 MFP data on veterans.

According to our analysis, a total of at least 26,276 persons and members of farming operations who belonged to one or more of these groups received MFP payments for 2018, and a total of at least 34,300 such persons and members received MFP payments for 2019. The MFP did not offer special benefits for historically underserved groups, and persons who may belong to such groups were not required to apply for status as beginning, limited resource, socially disadvantaged, or veteran farmers for the purpose of the MFP.[26] Thus, they were not necessarily categorized as being members of these groups when they received payments, and

[25]FSA began collecting data on persons and members of farming operations that qualified as veterans in 2019. We estimated the number of 2018 MFP persons and members of farming operations that qualified as veterans, and their associated payments, based on FSA's 2019 MFP data on veterans.

[26]Using different data sources, USDA's Office of Inspector General has previously reported on historically underserved farmers who participated in the MFP. See U.S. Department of Agriculture, Office of Inspector General, *Market Facilitation Program - Interim Report*, 03601-0003-31 (1) (Washington, D.C.: Sept. 30, 2020).

the numbers of such persons and the payments they received may be greater than shown in table 1.

## MFP Payments to High-Income Farmers

Of the $23 billion in total 2018 and 2019 MFP payments, FSA distributed $163.4 million (0.7 percent) to 883 farming operations that qualified for MFP payments based on certifications by the operations or their members, or both, that at least 75 percent of their income was derived from farming, ranching, or forestry-related activities (see table 2).[27] (As previously noted, we refer to these farming operations and members as high-income because their AGI exceeded $900,000.) Specifically, 2019 MFP payments to high-income farming operations and members ($126.4 million) is more than three times higher compared with 2018 MFP payments to such operations and members ($37 million). According to FSA officials, participation in the 2019 MFP was higher compared with the 2018 MFP, largely because of the expansion in the number of eligible commodities in the 2019 program year. High-income farming operations and members could qualify for MFP benefits for either or both program years.

**Table 2: High-Income Farming Operations and Members That Qualified for 2018 and 2019 Market Facilitation Program (MFP) Payments**

|  | 2018 MFP | 2019 MFP | Total |
|---|---|---|---|
| Number of farming operations | 297 | 586 | 883 |
| Number of members | 428 | 736 | 1,164 |
| Payments (dollars) | 36,999,844 | 126,438,193 | 163,438,037 |

Source: GAO analysis of Farm Service Agency (FSA) data.  |  GAO-22-104259

Notes: High-income farming operations and members qualified for 2018 and 2019 MFP payments based on a provision in the Additional Supplemental Appropriations for Disaster Relief Act, 2019, Pub. L. No. 116-20, tit. I, § 103, 133 Stat. 871, 874. This provision eliminated the adjusted gross income (AGI) limit of $900,000 for the MFP if at least 75 percent of AGI was derived from farming, ranching, or forestry. Farming operations and members who, along with a certified public accountant or attorney, certified that they met this "75 percent rule" could qualify for MFP benefits for either or both program years.

According to FSA officials, participation in the 2019 MFP was higher compared with the 2018 MFP, largely because of the expansion in the number of eligible commodities in the 2019 program year.

[27]An FSA handbook indicates, and FSA officials confirmed, that the agency did not independently verify that farming operations and members qualified for MFP payments under the 75 percent rule; FSA officials told us that the agency relied on the certifications signed by certified public accountants or attorneys. See U.S. Department of Agriculture, Farm Service Agency, *Payment Limitation, Payment Eligibility, and Average Adjusted Gross Income,* Handbook 6-PL, Amendment 2 (Washington, D.C.: Oct. 28, 2020).

APP. 000456

## USDA Agencies Reviewed Farming Operations' Compliance with MFP Eligibility Requirements, but FSA's Reviews Were Limited in Their Usefulness

FSA and another USDA agency conducted multiple reviews of MFP payments to verify that farming operations that received such payments complied with eligibility requirements. However, FSA's review to verify the basis for 2018 MFP payments was limited in its usefulness, and the agency has not completed its 2019 MFP compliance review.

### FSA and the Business Center Reviewed Farming Operations' Compliance with MFP Eligibility Requirements

FSA and USDA's Farm Production and Conservation Business Center (Business Center) conducted multiple reviews intended to ensure that farming operations complied with eligibility requirements for 2018 and 2019 MFP payments. As described below, these compliance reviews included (1) FSA conducting "spot checks" to verify that a sample of farming operations entered accurate production information on their 2018 MFP applications, on which payments were based; (2) FSA using the 2019 MFP as a pilot program to evaluate whether a new software system had internal controls in place to ensure farming operations complied with payment eligibility requirements; and (3) the Business Center estimating the extent of improper payments—including payments to ineligible recipients[28]—which it found to be significant for the 2018 and 2019 MFP.[29]

---

[28]Improper payments are payments that under statutory, contractual, administrative, or other legally applicable requirements should not have been made or were made in an incorrect amount and may include fraud. Improper payments include overpayments and underpayments, any payment to an ineligible recipient, any payment for an ineligible good or service, any duplicate payment, any payment for a good or service not received (except for such payments where authorized by law), any payment that does not account for credit for applicable discounts, and any payment for which an agency's review is unable to discern propriety due to insufficient documentation.

[29]In addition to the other compliance reviews described in this report, as of November 2021, USDA's Office of Inspector General was reviewing a national, random sample of 100 MFP farming operations to evaluate compliance with production, income, and payment eligibility requirements. Officials in that office told us that most of these farming operations received payments for both 2018 and 2019, and the officials expected to publish the results of their findings in January 2022.

FSA Conducted a 2018 MFP Spot Check Review That Focused on Production Information

For a spot check review, FSA selects a sample of farming operations to verify their eligibility to participate in and receive payments from a given program. For the 2018 MFP spot check review, FSA county offices focused on the accuracy of information that farming operations entered on their applications—particularly the amount of production they claimed for eligible commodities—on which payments were based. Farming operations were not required to submit evidence of their production with their MFP applications, but the operations certified that the information on their applications, including claimed production (e.g., bushels of corn or number of hogs), was accurate and subject to verification by FSA.

The forms of production evidence that FSA determined to be acceptable as verification varied by commodity.

- For nonspecialty crops, acceptable forms of production evidence included delivery receipts, feeding records, sales receipts, warehouse receipts, or production records used for crop insurance provided by USDA's Risk Management Agency; and, for cotton, gin bale listing or warehouse receipts.

- For specialty crops, acceptable forms of production evidence included sales receipts, ledgers of income, or truck scale tickets (for fresh sweet cherries) or an official document providing the number of pounds of total edible kernels or similar-meaning term (for shelled almonds).

- For dairy and hogs, FSA accepted production records used for the Margin Protection Program, a separate FSA program to manage the risk of milk price declines (for dairy); and breeding, feeding, inventory, or veterinary records or sales receipts (for hogs).

To conduct the 2018 MFP spot check review, FSA selected a sample of at least 35,186 (6 percent) of the 582,862 farming operations that received payments.[30] Of those selected, FSA officials told us that at least 29,746 farming operations were selected at random nationally, and at least 5,440 were selected based on the operations being associated with an FSA employee, county committee member, or state technical

---

[30]FSA could not provide us with the precise number of farming operations that it selected for the 2018 MFP spot check review.

committee member or based on judgmental factors.[31] For each farming operation that was spot-checked, FSA examined production evidence to determine whether the operation claimed accurate production on its application—and, therefore, was compliant or noncompliant with eligibility requirements—using the following terms:

- **Within tolerance.** FSA found that the farming operation's evidence showed actual production to be within 85 to 100 percent of the production claimed on the operation's 2018 MFP application. This meant that, upon being spot-checked, a farming operation could have up to 15 percent of its claimed production exceed its actual production and still be considered compliant. For example, under this 15-percent tolerance level, if a farming operation claimed 100 bushels of soybeans on its 2018 MFP application but provided FSA production evidence of only 85 bushels, FSA would consider the operation to be within tolerance and, therefore, eligible for payment for the 85 bushels. However, the operation would have to return the "overpayment" associated with the portion of the payment not supported by production evidence (in this example, 15 bushels).[32]

- **Good-faith effort.** FSA found actual production to be less than 85 percent of claimed production, but the agency determined the farming operation attempted to comply with MFP eligibility requirements. In such cases, FSA considered the farming operations to be compliant, even though they were not within tolerance. Like overpayments to farming operations within tolerance, overpayments to farming operations that made a good-faith effort had to be returned to USDA.

- **Lack of good-faith effort.** FSA determined the farming operation did not attempt to comply with eligibility requirements and, therefore, was

---

[31]FSA officials told us that the agency selected farming operations associated with an FSA employee, county committee member, or state technical committee member to avoid potential conflict-of-interest concerns with their participating in the MFP. FSA county committees consist of local farmers elected by their peers for up to three consecutive 3-year terms. State technical committees—composed of members from a variety of natural resource and agricultural interests—serve in an advisory capacity to USDA agencies on the implementation of certain provisions of the Farm Bill.

[32]According to agency officials, FSA was unable to provide the overpayment amounts that were subject to return to USDA as a result of the 2018 MFP spot check review versus a separate USDA improper payments review conducted by the Business Center (which we discuss later in this report). However, FSA officials did provide documentation indicating that USDA had collected $45.4 million in overpayments, "wrote off" overpayments (for amounts of less than $25 each) totaling $15,091, and had an outstanding balance of $7.5 million to be collected as of September 30, 2021.

completely ineligible for payment. In such cases, FSA found the farming operations to be noncompliant, and their entire payments were subject to return to USDA.

FSA officials told us that farming operations did not face penalties for overpayments—even in cases where the agency found the operations to be noncompliant (i.e., showed lack of good-faith effort) with program eligibility requirements—because the rule establishing the MFP did not specifically provide for FSA to impose penalties for the program.[33] In addition, the officials stated that the agency did not have general authority to impose penalties for noncompliance. However, the officials told us that FSA charged interest for overpayments that were not returned to the agency within 30 days of the farming operations being notified. Farming operations had the right to appeal FSA's decisions regarding ineligibility or overpayment within 30 days of receipt of the agency's determination. FSA officials also told us that, consistent with the agency's practice for other programs, overpayments of less than $25 were written off, meaning the farming operations did not need to refund those small amounts.

As previously noted, FSA did not provide documentation for how the agency processed the sample of farming operations it reviewed into summarized results, nor did FSA provide us with information that would allow us to assess the quality of its estimates of compliance with measures of precision. Therefore, we do not report the results of FSA's 2018 MFP compliance.

## FSA Started but Discontinued a 2019 MFP Pilot Oversight Review to Evaluate Internal Controls

Using the 2019 MFP as a pilot program, FSA started an oversight review to evaluate whether the agency had internal controls in place to ensure that farming operations complied with eligibility requirements—such as meeting income requirements—but FSA did not complete its review, citing other priorities. FSA focused this review on the internal controls of a new software system used to document eligibility and track payments.[34] FSA selected for review a national random sample of 4,572 (0.7 percent) of the 643,965 farming operations that received 2019 MFP payments, with payments to the operations in that sample totaling nearly $52.1 million. However, FSA officials told us they discontinued this review in September 2020 because of other workload priorities, such as

---

[33]*Market Facilitation Program*, 83 Fed. Reg. 44,173 (Aug. 30, 2018).

[34]U.S. Department of Agriculture, Farm Service Agency, *2020 Pilot State Oversight Review Completion*, Notice IA-2 (Washington, D.C.: May 4, 2020).

implementing another supplemental assistance program, the Coronavirus Food Assistance Program.

In addition, FSA officials noted that for the 2019 MFP program year, USDA had changed the basis of payments to be the farming operations' claimed number of planted acres for nonspecialty and specialty crops—which together constituted about 96 percent of payments that year—rather than claimed production.[35] As a result of this program change and because FSA county offices had access to individual farming operations' historical planted acres data to gauge the reasonableness of claimed acres on 2019 MFP applications, agency officials told us that there was less risk of inaccurate payments for the 2019 MFP. Nonetheless, FSA officials told us they plan to analyze and communicate in fiscal year 2022 the results for the portion (1,433 farming operations) of the 2019 MFP pilot oversight review that was conducted before it was discontinued.

## Business Center Conducted Broad Reviews That Estimated FSA Made Significant MFP Improper Payments

The Business Center annually conducts broad reviews spanning multiple USDA programs to identify programs and activities that may be susceptible to significant improper payments and to develop statistically valid estimates of improper payment amounts.[36] As part of its 2020 review, the Business Center estimated that FSA made significant improper payments—which the Office of Management and Budget defines as improper payments exceeding both 1.5 percent of program outlays and $10 million of all program payments made during the fiscal year reported—for the 2018 and 2019 MFP. More specifically, the agency estimated, based on a number of errors it found, that $477.6 million (5.6 percent) of 2018 MFP payments and $308 million (5.7 percent) of 2019

---

[35]The payment basis for 2019 MFP dairy and hog farming operations remained production—specifically, milk production history reported for USDA's Dairy Margin Coverage program and the certified number of hogs owned on a producer-selected day from April 1 to May 15, 2019. However, FSA officials told us that because they had access to Dairy Margin Coverage production data to verify claimed production and because farming operations producing hogs often produce nonspecialty crops for which FSA had historical acres data, the agency saw less risk for inaccurate information on 2019 MFP applications compared to 2018 MFP applications.

[36]Federal agencies are required by the Payment Integrity Information Act of 2019 to conduct annual improper payments reviews for certain programs. Pub. L. No. 116-117, § 2, 134 Stat. 113 (2020) (codified at 21 U.S.C. §§ 3351-3358). Improper payments—payments that should not have been made or were made in an incorrect amount—include those that are the result of fraud. The Office of Management and Budget has established requirements for federal agencies to conduct improper payments reviews in Circular A-123, Appendix C.

MFP payments were improper.[37] Those errors included production evidence not supporting claimed production, missing or incomplete forms, and payments not being approved by an authorized FSA employee. (In contrast to FSA's 2018 MFP spot check review—in which county officials focused on production evidence—the Business Center looked at a broad array of forms submitted by farming operations to meet various MFP eligibility requirements. In addition, FSA's 2018 MFP spot check review, as previously discussed, selected a much larger number of farming operations in its sample.)

The Business Center's findings were published in USDA's *2020 Agency Financial Report*.[38] In response to these findings, the report indicates that FSA took several actions, including (1) changing its software system for the 2019 MFP to automatically create a record for payment upon an application's approval date being recorded, which decreased the number of improper payments, according to the report; (2) checking payment eligibility before obligating funds and making applicable reductions, as necessary; and (3) developing a corrective action plan summarizing the MFP improper payment rates and providing guidance on how to address common errors.

More recently, the Business Center completed its 2021 improper payments review, which again included a sample of 2018 and 2019 MFP payments.[39] At the time of this report, USDA had not published the results, and FSA had not yet developed corrective action plans in response, but Business Center officials told us they again estimated that the 2019 MFP had significant improper payments based on the Office of Management and Budget criteria. More specifically, the Business Center estimated that $7.4 million (15.5 percent) of 2018 MFP payments and $84.1 million (11.4 percent) of 2019 MFP payments made in fiscal year 2020 were improper. The Business Center found that the types of errors that led to the improper payments included missing or incomplete forms,

---

[37]With the assistance of a statistician, the Business Center selected for its 2020 improper payments review a generalizable, stratified random sample of 600 payments totaling $26.7 million from the 2018 MFP, and 600 payments totaling $29.4 million from the 2019 MFP, that were made in fiscal year 2019. (MFP payments spanned multiple fiscal years.)

[38]U.S. Department of Agriculture, *2020 Agency Financial Report* (Washington, D.C.: Dec. 8, 2020).

[39]With the assistance of a statistician, the Business Center selected for its 2021 improper payments review a generalizable, stratified random sample of 300 payments totaling $22.1 million from the 2018 MFP, and 300 payments totaling $12.9 million from the 2019 MFP, that were made in fiscal year 2020. (MFP payments spanned multiple fiscal years.)

the MFP application not being signed by the farming operation or before the applicable deadline, and payments not being approved by an authorized FSA employee.

## FSA's Compliance Reviews Were Limited in Their Usefulness

FSA conducted a relatively large spot check review of 2018 MFP payments, as described above, but its efforts to verify that payments were based on accurate production information were limited in their usefulness. Specifically, FSA did not (1) ensure that the results of its 2018 MFP spot check review were reliable, (2) focus on certain characteristics posing risk to the accuracy of payments, (3) document the rationale for tolerating a greater difference between claimed and actual production compared with other farm programs, or (4) evaluate and communicate results or identify corrective actions. USDA's guidelines for statistical and financial information, federal standards for internal control, and our prior work indicate that addressing these elements would enhance the usefulness of such a review. However, FSA's guidance did not direct the agency to address these elements in the 2018 MFP spot check review. In addition, as noted above, FSA has not completed its 2019 MFP pilot oversight review, although the agency plans to analyze and communicate some results in fiscal year 2022. As a result, FSA has not ensured that it provided adequate oversight of farming operations' compliance with MFP eligibility requirements—including that payments were based on accurate information—or that it spent agency resources efficiently.

## FSA Did Not Ensure the Results of Its 2018 MFP Spot Check Review Were Reliable

We found that FSA did not ensure the results of its 2018 MFP spot check review were reliable because the agency did not design its information collection and analysis using sound statistical methodologies and did not document results. For example, FSA did not work with a statistician or similarly qualified individual to design the review's data collection or develop a sampling and analysis plan defining how the agency would select a sample of farming operations and analyze results in a statistically valid manner. Consequently, FSA could not provide us with reliable information summarizing the compliance and noncompliance results of its review.[40]

For this review, FSA selected farming operations based on four subpopulations, or sample components: two random groups based on the

---

[40]Because this review focused on the accuracy of production information as the basis for payments, compliance in this context referred to FSA's determination that the farming operation was within tolerance or made a good-faith effort in showing evidence for its claimed production, and noncompliance referred to FSA's determination that the farming operation showed a lack of good-faith effort.

size of their MFP payments, a group made up of all farming operations associated with FSA employees or county or state technical committee members, and a judgmental sample group selected by county offices based on payment size or perceived risk of fraud. FSA selected the four subpopulations at different rates in proportion to the overall MFP population.

However, the agency did not collect and analyze compliance data for each of these subpopulations or weight (adjust) their results to make them representative of the overall MFP population. For example, because payments to 100 percent of farming operations associated with an FSA employee or committee member were selected for review, that subpopulation might have had a higher rate of compliance compared to the overall MFP population—for instance, if that subpopulation knew it would be selected for review—therefore biasing FSA's summary of results. Consequently, FSA was unable to estimate compliance results accurately for the overall MFP population, without over- or underrepresenting results for a given subpopulation. Without working with a qualified individual to apply statistical methodologies, FSA was also unable to generate estimates of compliance or noncompliance rates with statistical measures of precision, such as margins of error, which are important indicators of how useful those results are.[41]

In addition, FSA's sample rates were 3 percent of farming operations that received payments of less than $100,000 and 5 percent of farming operations that received payments of $100,000 or more. These sample rates may have been too large given the level of risk of inaccurate payments and the agency's available resources. These subpopulations could have been sampled at significantly lower but statistically valid rates to measure compliance, depending on the agency's objective—for example, if FSA's objective was to monitor compliance on a national scale. (Other objectives, such as precise estimates of compliance at the local level, may have required the relatively large sample size of more than 35,000 farming operations; however, this seems unlikely, given that FSA did not produce such estimates.) The use of a statistician or similarly

---

[41]As previously noted, FSA did not provide documentation for how the agency processed the sample of farming operations it reviewed into summarized results, nor did FSA provide us with information that would allow us to assess the quality of its estimates of compliance with measures of precision. Therefore, we determined the agency's analytical methodology was not sufficiently sound for the purpose of summarizing the results of FSA's 2018 MFP compliance review in our report.

qualified individual could have allowed FSA to avoid "oversampling" and the inefficient use of resources in its spot check review.

Regarding documentation, FSA did not keep track of data concerning compliance or noncompliance of the farming operations it selected for review in a manner that would allow the agency to compile an accurate and complete analysis of those results. For example, FSA officials stated they could not provide us documentation on the following:

- how many total farming operations the agency selected for review, in general or for the two nonrandom subpopulations;

- how many total farming operations the agency actually reviewed (i.e., how many operations responded to FSA's requests for evidence of production to support their 2018 MFP applications);[42] or

- compliance and noncompliance results by the subpopulations sampled.

This lack of documentation further impaired FSA's ability to analyze the data and produce reliable results. For example, because FSA did not document how many farming operations it reviewed, nonresponses were not factored into compliance results—even though operations that did not respond to FSA's requests might have been nonresponsive because they were at a higher risk of having inaccurate production information—contributing to potentially biased results. If FSA had designed its data collection and analysis for the 2018 MFP spot check review using sound statistical methodologies and if FSA had appropriately documented its review, the agency could have reliably estimated compliance rates. Reliable estimates of compliance would have allowed management to make informed decisions about whether corrective actions were necessary to be reasonably assured that MFP farming operations received accurate payments based on their actual production.

USDA's guidelines for statistical and financial information state that USDA agencies will (1) conduct sample surveys or other data collection using sound statistical, survey, and data collection methodologies that are consistent with generally accepted professional and industry standards; and (2) provide a clear explanation of data sources, methodologies used, and assumptions made in analyzing and reporting statistical or financial

---

[42]In cases where a farming operation was selected for review but did not provide the agency with production evidence, FSA guidance instructed county offices to notify the operation that it was ineligible for the MFP payment and to provide the operation with information on its right to appeal that determination.

information. These guidelines are applicable to the 2018 MFP spot check review because compliance review results should contain statistical as well as financial information. To ensure that sample rates are appropriate, these guidelines also state that the department's agencies will design information collection activities to minimize respondent burden balanced against the need and value of the information to be obtained.

In addition, federal standards for internal control state that management should define objectives clearly to enable the identification of risks and risk tolerances and use quality information to achieve the agency's objectives.[43] Specifically, management should define objectives in specific and measurable terms to enable the design of internal controls for related risks, identify information requirements to achieve the objectives and address risks, and process obtained data into quality information that is appropriate, current, complete, accurate, accessible, and provided on a timely basis.

According to FSA officials, compliance reviews for supplemental assistance programs such as MFP are not generally subject to the same requirements or oversight as programs authorized by the 2018 Farm Bill. To ensure the accuracy of payments and the integrity of Farm Bill programs—including the Agriculture Risk Coverage, Price Loss Coverage, and Marketing Assistance Loan programs—FSA county offices are directed every year to conduct compliance reviews for selected farming operations participating in the programs. For those reviews, FSA issues annual notices to supplement general requirements for compliance reviews established in an FSA handbook, in part to produce reliable results. For example, USDA's National Agricultural Statistics Service provides FSA with the list of farming operations that are selected for those reviews through a statistical sampling process. However, because the MFP provided supplemental assistance funded by USDA's Commodity Credit Corporation, FSA did not include the program in those

---

[43]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014). Risk tolerance is defined as the acceptable level of variation in performance relative to the achievement of objectives.

GAO-22-104259  Market Facilitation Program

compliance reviews, and FSA issued separate notices for the 2018 MFP spot check review.[44]

One of those notices stated that the purpose of the 2018 MFP spot check review was to examine the accuracy of production information entered on applications, on which payments were based, and the notice described how FSA would select sample components and record results from the review into a database. However, FSA's notice did not

- direct the use of sound statistical methodologies;

- define specific objectives—such as estimating the rate of inaccurate payments (overall or by subpopulation), reducing fraudulent payments, or reducing other types of inaccurate payments;

- identify the information requirements needed to support those objectives; or

- direct FSA to process data into quality information that achieves defined objectives.

FSA officials told us that compliance reviews of supplemental assistance programs are designed and implemented by their program managers, and the agency is not required to work with a statistician or similarly qualified individual to develop a sampling and analysis plan for such reviews. Furthermore, FSA officials told us that in practice, they have not had statistical support (such as from USDA's National Agricultural Statistics Service) to design, implement, and analyze compliance reviews for supplemental assistance programs such as the MFP. Agency officials also told us they recognized the need to address these issues.

Until FSA issues guidance for supplemental assistance programs' compliance reviews to (1) design data collection and analysis using sound statistical methodologies, (2) define objectives, (3) identify the information requirements needed to meet those objectives, and (4) process data into quality information that achieves defined objectives, FSA cannot provide reasonable assurance that it is producing reliable results for determining compliance. Such guidance could, for example, direct FSA to sample farming operations at appropriate rates based on risk and to design its information system to track results from those

---

[44]U.S. Department of Agriculture, Farm Service Agency, *Performing Compliance Reviews of CCC-910, Market Facilitation Program (MFP) Applications*, Notice MFP-10 (Washington, D.C.: April 18, 2019); and *Recording Compliance Reviews in Market Facilitation Program (MFP) Application Software*, Notice MFP-14 (Washington, D.C.: May 20, 2019).

subpopulations for analysis and reporting purposes. Reliable results of compliance reviews could help inform management actions, such as identifying and implementing effective strategies for mitigating the risk of payments based on inaccurate information.

**FSA Sampled a Higher Rate of Larger MFP Payments but Did Not Focus on Other Characteristics Posing Risk**

In its 2018 MFP spot check review, FSA sampled farming operations that received larger payments ($100,000 or more) at a higher rate and selected a judgmental sample of farming operations. These aspects of the review appropriately targeted the risk of payments that could have been based on inaccurate production information. However, the agency did not specifically focus on other characteristics posing risk, such as farming operations that do not normally qualify for farm program payments—for which the agency did not have either familiarity to corroborate eligibility or historical data to compare with the operations' claimed production.

As previously noted, FSA sampled a relatively large number of farming operations—at least 35,186 (6 percent) of the 582,862 operations that received payments for the 2018 MFP. An FSA Notice described three of the four components of the sample of farming operations, as follows:

1. a random selection of 5 percent of farming operations that were paid $100,000 or more,

2. a random selection of 3 percent of farming operations that received less than $100,000, and

3. all applications associated with any FSA employee, county office committee member, or state technical committee member (we subsequently refer to this as the employee and committee member component).

According to the notice, FSA's headquarters office provided the list of random selections to county offices; these selections were to contain, in general, between 10 and 50 farming operations per county.[45]

Separately, FSA officials told us that county office staff were allowed to select a fourth component at their discretion—a judgmental sample of farming operations—based on the staff's perception of characteristics posing risk, including suspected fraud, that could lead to inaccurate

---

[45]U.S. Department of Agriculture, Farm Service Agency, *Performing Compliance Reviews of CCC-910*, *Market Facilitation Program (MFP) Applications*, Notice MFP-10 (Washington, D.C.: April 18, 2019).

payments.[46] However, because of the lack of documentation described earlier in this report, FSA could not provide us with the precise number of farming operations selected using each of the sample's four components, although officials told us that a total of at least 35,186 farming operations were sampled. Of that total, at least 29,746 farming operations were selected from the two random components and at least 5,440 were from the employee and committee member component and the judgmental component, combined—indicating the random sample components were much larger than the risk-based, judgmental component.[47]

In addition, FSA did not focus on other characteristics posing risk, which may have resulted in an inaccurate basis for payments, such as:

- farming operations that received substantially large payments (such as those exceeding $250,000),

- high-income farming operations that qualified for the MFP under the 75 percent rule but do not normally qualify for programs authorized under the Farm Bill, or

- other "new customers"—such as hog and specialty crop farming operations that have not participated in other FSA programs—for which the agency did not have either familiarity to corroborate eligibility or historical data to compare with the applicants' claimed production.[48]

According to our analysis of FSA data, the 25 farming operations that received the highest 2018 MFP payments received more than $20.6 million or an average of $824,912, compared with the national average of $14,791 for all farming operations (see app. I). In addition, as discussed earlier in this report, we found that high-income farming operations—one type of new customer for the MFP—received $163.4 million across both

---

[46]FSA Notice MFP-10 authorized the agency's state executive directors to increase the number of reviews performed in any county at their discretion. FSA officials told us that county offices are to report to the state offices when they suspect, or have knowledge of, a violation of a federal criminal statute in association with fraud or abuse that could lead to inaccurate payments. FSA officials also told us the agency did not conduct a formal fraud risk assessment to determine the actual risks.

[47]As previously noted, FSA officials could not provide us a breakdown of the number of 2018 MFP applications sampled from the employee and committee member component or the judgmental component.

[48]FSA's farm programs authorized by the Farm Bill, such as the Price Loss Coverage and Dairy Margin Coverage programs, benefit nonspecialty crop and dairy farming operations, whereas specialty crop and hog operations are not traditionally covered by FSA farm programs, which made them more likely to be new customers for the MFP.

years. As a result of FSA's not focusing on these risk characteristics, these types of farming operations had no greater probability of being selected for review than farming operations with significantly smaller payments or established histories.

Although FSA takes a more complete risk-based approach in its annual compliance reviews encompassing multiple farm programs authorized by the 2018 Farm Bill, FSA's spot check guidance for the 2018 MFP did not instruct the agency to take a similar approach. FSA officials also told us that they did not take a more complete risk-based approach because the agency could compare individual farming operations' claimed production for nonspecialty crops against their counties' average production yield data to determine the reasonableness of claimed production when the farming operations initially applied for the MFP. (As previously noted, nonspecialty crops accounted for about 95 percent of 2018 MFP payments.) In addition, agency officials told us that if those farming operations were selected for a spot check and also produced hogs or specialty crops, the agency would have reviewed evidence of actual production for those commodities as well. However, this approach did not fully address characteristics posing risk (such as substantially large payments, high-income farming operations that do not normally qualify for farm programs, or other types of new customers) because the agency did not specifically focus on these characteristics in selecting its sample.

As we have previously reported, a risk-based approach enables agencies to (1) achieve their objectives (in this case, ensuring payments are based on accurate production information) and (2) increase the efficiency of compliance checks by better focusing limited resources.[49] In addition, the 2018 Farm Bill requires FSA to establish policies, procedures, and plans to improve program accountability and integrity through targeted and coordinated activities, including data mining to identify and reduce errors, waste, fraud, and abuse in programs administered by FSA.[50]

By issuing guidance for similar future supplemental assistance programs' compliance reviews to assess risk characteristics and take a more complete risk-based approach in selecting samples, FSA could strengthen its efforts to ensure payments are accurate and increase

---

[49]GAO, *Farm Programs: USDA Should Take Additional Steps to Ensure Compliance with Wetland Conservation Provisions*, GAO-21-241 (Washington, D.C.: April 2, 2021).

[50]Data mining is the process of finding anomalies, patterns, and correlations within large data sets to predict outcomes and can be used to reduce risks, among other things.

efficiency by better focusing limited agency resources. Such an approach could include focusing on risk characteristics such as farming operations that received substantially large payments and new customers for which FSA does not have information to corroborate the farming operations' eligibility for program participation.

**FSA Tolerated a Greater Difference between Claimed and Actual Production Compared with Other Programs but Did Not Document the Rationale**

In reviewing the accuracy of production information as the basis for payments in its 2018 MFP spot check review, FSA tolerated a greater difference between claimed and actual production compared with other programs it administers, but it did not document the rationale for doing so. As noted earlier, the 2018 MFP spot check review used a 15-percent tolerance level—under which a farming operation could have up to 15 percent of its claimed production exceed its actual production and still be considered compliant—although any overpayments found to be unsupported by production evidence were subject to return to USDA.

FSA officials confirmed to us that this tolerance level was more lenient than is typical for other certified production-based programs. For example, FSA uses a 10-percent tolerance level in the Marketing Assistance Loan and Loan Deficiency Payments programs. FSA officials told us that a major reason they established MFP tolerance at a more lenient level was to minimize the administrative oversight and workload burden on county office staff. FSA officials also told us that implementing the program was urgent and that documenting the rationale for the tolerance level was not a priority. However, FSA may have set a precedent for other FSA programs to exercise such lenience without a documented rationale. FSA officials told us that the agency subsequently established 15 percent as the tolerance level for the first round of Coronavirus Food Assistance Program spot check reviews without a documented rationale.

Under federal standards for internal control, management should design control activities to achieve objectives and respond to risks.[51] As an example of designing such control activities, management should clearly document internal control and significant events in a manner that allows the documentation to be readily available for examination.[52] The documentation may appear in management directives, administrative

---

[51]GAO-14-704G.

[52]Because compliance reviews assess compliance with laws and regulations to ensure the accuracy of payments, FSA's basis for determining a tolerance level would qualify as a significant event.

policies, or operating manuals (such as an FSA handbook). In addition, federal internal control standards direct agencies to consider the potential for fraud when identifying, analyzing, and responding to risks. GAO's leading practices for managing fraud risks in government programs—contained in the Fraud Risk Management Framework—call for federal managers to determine risk tolerances when assessing fraud risks and to use that determination as part of the basis for developing responses to identified fraud risks, including specific controls to address the risks.[53]

A tolerance level that is too lenient—especially if combined with a lack of penalties for farming operations that overstate their production—may reduce the incentive for farming operations to report accurate information on their applications to participate in future supplemental assistance programs. By issuing guidance directing FSA to document the rationale for the tolerance level used to determine compliance in such programs, the agency would improve transparency and better ensure it is appropriately responding to the risk of payments based on inaccurate information.

## FSA Did Not Evaluate and Communicate Results of Its MFP Compliance Reviews or Identify Corrective Actions

FSA did not evaluate and communicate the results of its 2018 MFP spot check review—including a summary of findings and the types of errors found—or identify corrective actions to manage the risk of payments being based on inaccurate claimed production. In particular, FSA did not ensure that the results of its 2018 MFP spot check review were evaluated or communicated beyond informal, oral discussions with county offices. FSA officials told us that they were not required to evaluate or report results, or identify corrective actions to be taken, and that senior management did not ask for such information. Further, as previously stated, FSA has not completed its 2019 MFP pilot oversight review,

---

[53]GAO, *A Framework for Managing Fraud Risks in Federal Programs*, GAO-15-593SP (Washington, D.C.: July 2015). The Fraud Risk Management Framework also states that risk tolerance reflects managers' willingness to accept fraud risks, which may vary depending on the circumstances of the program. For example, when determining risk tolerance in urgent situations, managers weigh the program's operational objective of expeditiously providing assistance against the objective of lowering the likelihood of fraud because activities to lower the risk related to fraudulent applications may cause delays in service. The framework provides a basis for managers to decide how to respond to fraud risks, including determining the specific controls to design and implement, given managers' defined risk tolerances.

although the agency plans to analyze and communicate some results in fiscal year 2022.

By contrast, as directed by the Office of Management and Budget, FSA published a summary report describing common errors and corrective actions in response to the Business Center's estimates of improper MFP payments described in USDA's *2020 Agency Financial Report*.[54] In an effort to strengthen program integrity, that report identified "sub-root" (underlying) causes of the improper payments, and it identified corrective actions to be taken within designated time frames.

FSA officials told us they recognized that such a report is a management tool and that ordinarily the agency would issue a notice to employees, summarizing results and providing references to an FSA handbook or other policy documents for appropriate actions. However, they said that because the agency was conducting its 2018 MFP spot checks while implementing the 2019 MFP, issuing such a report was not a priority.

USDA's strategic plan for fiscal years 2018 through 2022 contains an objective to improve the stewardship of resources and utilize data-driven analyses to maximize the return on investment.[55] For example, the strategic plan states that by using accurate and reliable data, USDA can make decisions, evaluate outcomes, improve programs, and share how the department invests the public's resources. This objective supports USDA's strategic goal to ensure programs are delivered efficiently, effectively, and with integrity and a focus on customer service.

In addition, under federal standards for internal control, management should use quality information to achieve the agency's objectives, monitor the internal control system and evaluate results, internally communicate the necessary quality information to achieve the agency's objectives, and remediate identified internal control deficiencies on a timely basis.[56] For example, management uses quality information to make informed decisions and evaluate the agency's performance in achieving key objectives and addressing risks, documents the results of ongoing

---

[54]U.S. Department of Agriculture, Farm Service Agency, *FSA Corrective Action Plans for FY 2020*; accessed June 24, 2021, https://www.fsa.usda.gov/programs-and-services/financial-management-info/index.

[55]U.S. Department of Agriculture, *USDA Strategic Plan FY 2018-2022* (Washington, D.C.: May 2018).

[56]GAO-14-704G.

monitoring to identify internal control issues, and communicates quality information throughout the agency to enable personnel to perform key roles in achieving objectives, addressing risks, and supporting the internal control system. In the context of compliance reviews for supplemental assistance programs, as previously noted, quality information could inform management actions, such as identifying and implementing effective strategies for mitigating the risk of payments based on inaccurate information.

During our review, the agency issued a new handbook on internal controls and accountability.[57] Among other things, the new handbook states that national program oversight reviews should evaluate results and determine what risk mitigation and corrective actions are necessary to improve program integrity and accountability. The new handbook defines national program oversight reviews as FSA monitoring, reviews, and audits conducted on specific programs to measure and document the extent to which policy and internal controls are being followed. According to FSA officials, such reviews would include compliance reviews of supplemental assistance programs.

FSA would further strengthen its oversight by ensuring that guidance for supplemental assistance programs like the MFP directs the agency to communicate the results of its compliance reviews—including a summary of findings, the types of errors that caused inaccurate payments, and the corrective actions needed to improve the accuracy of payments—to FSA management and personnel. Such enhanced oversight could improve farming operations' compliance with eligibility requirements for such programs and help ensure that FSA's payments are accurate.

## Conclusions

From time to time, FSA administers programs such as the MFP that provide farming operations with supplemental assistance to address events that are not covered by Farm Bill programs. In the case of the MFP, FSA distributed $23 billion to more than a half-million farming operations that produced certain commodities affected by international trade disruptions and tariffs in 2018 and 2019. For the 2018 MFP payments, FSA invested considerable effort in trying to verify that payments were based on accurate production information, but the usefulness of FSA's review was limited, in part because FSA's guidance for conducting the review was less rigorous than its guidance for reviews

---

[57]U.S. Department of Agriculture, Farm Service Agency, *Integrity and Accountability in FSA Programs*, Handbook 1-IA, Amendment 1 (Washington, D.C.: Sept. 30, 2021).

of Farm Bill programs. FSA did not complete its review of the 2019 MFP payments, citing other urgent priorities, such as implementing the Coronavirus Food Assistance Program—another supplemental assistance program. While such programs may be developed and implemented quickly, FSA would improve its oversight of payments and enhance the usefulness of its compliance reviews for supplemental assistance programs in the future by developing better guidance for conducting such reviews.

## Recommendations for Executive Action

We are making the following four recommendations to FSA:

The Administrator of FSA should issue guidance directing the agency to design its data collection and analysis for future compliance reviews of supplemental assistance programs in a way that ensures reliable results by using sound statistical methodologies, defining objectives, identifying the information requirements to meet objectives, and processing data into quality information that achieves objectives. (Recommendation 1)

The Administrator of FSA should issue guidance directing the agency to assess risk characteristics and take a more complete risk-based approach in selecting samples for future compliance reviews of supplemental assistance programs. This approach could include focusing on farming operations that received substantially large payments and new customers for which FSA does not have other information to corroborate eligibility for program participation. (Recommendation 2)

The Administrator of FSA should issue guidance directing the agency to document the rationale for the tolerance level (e.g., the allowable percentage difference between farming operations' actual production and their claimed production) used in future compliance reviews of supplemental assistance programs. (Recommendation 3)

The Administrator of FSA should issue guidance directing the agency to communicate the results of its future compliance reviews of supplemental assistance programs, including a summary of findings and the types of errors found, and identify corrective actions to be taken. (Recommendation 4)

## Agency Comments

We provided a draft of this report to USDA for review and comment. In its comments, reproduced in app. III, USDA's FSA generally agreed with our findings and recommendations. FSA also provided technical comments, which we incorporated as appropriate. For each of the recommendations, FSA provided a response describing the actions that it plans to take; the

extent to which these actions address our recommendations will depend on how they are implemented. In addition, we note FSA's response to our fourth recommendation states that the agency will continue to utilize national directives to report the results of compliance reviews, which will include a summary of findings, the types of errors found, and corrective actions to be taken. However, FSA did not utilize such a directive for the MFP.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the appropriate congressional committees, the Secretary of Agriculture, the Administrator of FSA, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-3841 or morriss@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in app. IV.

Sincerely yours,

Steve D. Morris
Director, Natural Resources and Environment

APP. 000476

# Appendix I: Additional Information on the Distribution of 2018 Market Facilitation Program (MFP) Payments

## MFP Payments Averaged About $15,000 per Farming Operation in 2018 and Were Mostly Distributed to Operations in the South and Midwest

For the 2018 MFP, the Farm Service Agency (FSA) distributed $8.6 billion to 582,596 farming operations (excluding Puerto Rico), with payments varying by location and commodity type.[1] As shown in table 3, the average 2018 MFP payment per farming operation was $14,791. Average payments per member ranged from a high of about $24,000 in Mississippi to about $400 in Alaska.[2]

**Table 3: 2018 Market Facilitation Program (MFP) Payments to Farming Operations and Members, by State and Average Payment per Member**

Average payments per member ranged from a high of about $24,000 in Mississippi to about $400 in Alaska.

| State[a] | MFP payments | | Farming operations | | Members | | Average payment per farming operation (dollars) | Average payment per member (dollars) |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | Number | Percentage | | |
| Mississippi | 218,485,861 | 2.5 | 4,801 | 0.8 | 9,128 | 1.1 | 45,508 | 23,936 |
| North Dakota | 447,068,787 | 5.2 | 16,430 | 2.8 | 19,109 | 2.4 | 27,211 | 23,396 |
| Minnesota | 683,653,961 | 7.9 | 34,486 | 5.9 | 41,587 | 5.2 | 19,824 | 16,439 |
| South Dakota | 431,898,574 | 5.0 | 19,091 | 3.3 | 29,502 | 3.7 | 22,623 | 14,640 |
| Arizona | 15,264,425 | 0.2 | 351 | 0.1 | 1,104 | 0.1 | 43,488 | 13,826 |
| Louisiana | 106,682,547 | 1.2 | 4,831 | 0.8 | 7,720 | 1.0 | 22,083 | 13,819 |
| Iowa | 991,215,238 | 11.5 | 59,249 | 10.2 | 77,388 | 9.7 | 16,730 | 12,808 |
| Virginia | 45,763,049 | 0.5 | 2,614 | 0.4 | 3,604 | 0.5 | 17,507 | 12,698 |

[1]A farming operation is a business enterprise engaged in the production of agricultural products, commodities, or livestock that is operated by a person, legal entity (e.g., a corporation, limited liability company, estate, or trust), or joint operation (e.g., a general partnership). A member of a farming operation can be either a person or an entity. A person is defined in statute as a natural person (an individual) and does not include a legal entity. 7 U.S.C. § 1308(a)(4).

[2]The variation in payments from state to state is a result of the types and quantities of commodities produced in each state and the MFP payment rates for those types of commodities.

Appendix I: Additional Information on the
Distribution of 2018 Market Facilitation
Program (MFP) Payments

| State[a] | MFP payments | | Farming operations | | Members | | Average payment per farming operation (dollars) | Average payment per member (dollars) |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | Number | Percentage | | |
| Indiana | 575,578,229 | 6.7 | 34,955 | 6.0 | 45,488 | 5.7 | 16,466 | 12,653 |
| Arkansas | 282,646,432 | 3.3 | 12,510 | 2.1 | 22,411 | 2.8 | 22,594 | 12,612 |
| New Mexico | 12,281,919 | 0.1 | 558 | 0.1 | 979 | 0.1 | 22,011 | 12,545 |
| North Carolina | 106,041,789 | 1.2 | 6,772 | 1.2 | 8,519 | 1.1 | 15,659 | 12,448 |
| Ohio | 473,030,057 | 5.5 | 30,821 | 5.3 | 38,875 | 4.9 | 15,348 | 12,168 |
| Michigan | 194,789,619 | 2.3 | 13,329 | 2.3 | 16,381 | 2.1 | 14,614 | 11,891 |
| Georgia | 62,761,058 | 0.7 | 3,937 | 0.7 | 5,321 | 0.7 | 15,941 | 11,795 |
| South Carolina | 24,199,868 | 0.3 | 1,590 | 0.3 | 2,090 | 0.3 | 15,220 | 11,579 |
| Illinois | 1,115,050,226 | 12.9 | 76,912 | 13.2 | 100,176 | 12.6 | 14,498 | 11,131 |
| Nebraska | 577,259,813 | 6.7 | 39,873 | 6.8 | 53,601 | 6.7 | 14,477 | 10,770 |
| Delaware | 11,541,322 | 0.1 | 691 | 0.1 | 1,074 | 0.1 | 16,702 | 10,746 |
| Alabama | 47,601,195 | 0.6 | 3,199 | 0.5 | 4,442 | 0.6 | 14,880 | 10,716 |
| Maryland | 37,263,079 | 0.4 | 2,502 | 0.4 | 3,511 | 0.4 | 14,893 | 10,613 |
| Tennessee | 138,774,260 | 1.6 | 11,231 | 1.9 | 13,261 | 1.7 | 12,356 | 10,465 |
| Missouri | 446,879,307 | 5.2 | 32,603 | 5.6 | 43,239 | 5.4 | 13,707 | 10,335 |
| Kentucky | 155,741,279 | 1.8 | 12,966 | 2.2 | 15,434 | 1.9 | 12,012 | 10,091 |
| New Jersey | 6,705,361 | 0.1 | 538 | 0.1 | 721 | 0.1 | 12,463 | 9,300 |
| California | 93,692,657 | 1.1 | 5,193 | 0.9 | 10,679 | 1.3 | 18,042 | 8,774 |
| Nevada | 676,519 | 0.0 | 29 | 0.0 | 84 | 0.0 | 23,328 | 8,054 |
| Florida | 4,901,038 | 0.1 | 394 | 0.1 | 612 | 0.1 | 12,439 | 8,008 |
| Wisconsin | 203,680,259 | 2.4 | 20,686 | 3.5 | 26,503 | 3.3 | 9,846 | 7,685 |
| Kansas | 541,244,641 | 6.3 | 55,149 | 9.5 | 73,131 | 9.2 | 9,814 | 7,401 |
| Texas | 246,832,977 | 2.9 | 25,071 | 4.3 | 36,437 | 4.6 | 9,845 | 6,774 |
| Pennsylvania | 51,337,860 | 0.6 | 6,428 | 1.1 | 8,468 | 1.1 | 7,987 | 6,063 |
| New York | 41,497,838 | 0.5 | 4,400 | 0.8 | 6,856 | 0.9 | 9,431 | 6,053 |
| West Virginia | 1,905,440 | 0.0 | 236 | 0.0 | 340 | 0.0 | 8,074 | 5,604 |
| Oklahoma | 66,234,581 | 0.8 | 9,757 | 1.7 | 12,173 | 1.5 | 6,788 | 5,441 |
| Idaho | 24,841,918 | 0.3 | 3,395 | 0.6 | 5,902 | 0.7 | 7,317 | 4,209 |
| Oregon | 15,519,141 | 0.2 | 2,364 | 0.4 | 4,135 | 0.5 | 6,565 | 3,753 |
| Washington | 55,712,062 | 0.6 | 7,648 | 1.3 | 15,436 | 1.9 | 7,285 | 3,609 |
| Vermont | 3,361,077 | 0.0 | 654 | 0.1 | 1,047 | 0.1 | 5,139 | 3,210 |
| Utah | 2,729,474 | 0.0 | 558 | 0.1 | 987 | 0.1 | 4,892 | 2,765 |
| Colorado | 23,383,775 | 0.3 | 5,965 | 1.0 | 9,223 | 1.2 | 3,920 | 2,535 |
| Connecticut | 465,484 | 0.0 | 90 | 0.0 | 233 | 0.0 | 5,172 | 1,998 |

APP. 000478

| State[a] | MFP payments | | Farming operations | | Members | | Average payment per farming operation (dollars) | Average payment per member (dollars) |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | Number | Percentage | | |
| Maine | 767,301 | 0.0 | 253 | 0.0 | 402 | 0.1 | 3,033 | 1,909 |
| Montana | 28,937,748 | 0.3 | 6,632 | 1.1 | 15,529 | 2.0 | 4,363 | 1,863 |
| New Hampshire | 300,883 | 0.0 | 89 | 0.0 | 163 | 0.0 | 3,381 | 1,846 |
| Hawaii | 51,232 | 0.0 | 12 | 0.0 | 30 | 0.0 | 4,269 | 1,708 |
| Massachusetts | 362,751 | 0.0 | 146 | 0.0 | 232 | 0.0 | 2,485 | 1,564 |
| Wyoming | 836,618 | 0.0 | 596 | 0.1 | 947 | 0.1 | 1,404 | 883 |
| Rhode Island | 13,947 | 0.0 | 8 | 0.0 | 20 | 0.0 | 1,743 | 697 |
| Alaska | 3,583 | 0.0 | 3 | 0.0 | 9 | 0.0 | 1,194 | 398 |
| **Total** | **8,617,468,059** | **100.0** | **582,596** | **100.0** | **794,243** | **100.0** | **14,791** | **10,850** |

Source: GAO analysis of Farm Service Agency data.  |  GAO-22-104259

Note: Percentages may not sum to 100 because of rounding.

[a]In addition, Puerto Rico's 2018 MFP payments totaled $961,339, with 266 farming operations and 353 members receiving payments. The average payment per farming operation was $3,614, and the average payment per member was $2,723.

FSA paid $20.6 million in total, or an average of $824,912 per farming operation, to 25 farming operations that received the highest 2018 MFP payments, as shown in table 4. These 25 farming operations were general partnerships located in the South and Midwest and mostly received payments for nonspecialty crops.

**Table 4: Top 25 Market Facilitation Program (MFP) Payments for 2018**

These 25 farming operations received an average payment of $824,912, whereas the average payment for all farming operations was $14,791.

| Farming operation | Census Bureau region[a] | MFP payments | | | |
|---|---|---|---|---|---|
| | | Nonspecialty crops (dollars) | Specialty crops (dollars) | Dairy and hogs (dollars) | Total (dollars) |
| 1 | South | 987,768 | 0 | 0 | **987,768** |
| 2 | Midwest | 986,202 | 0 | 0 | **986,202** |
| 3 | South | 975,625 | 0 | 0 | **975,625** |
| 4 | South | 959,077 | 0 | 0 | **959,077** |
| 5 | Midwest | 945,952 | 0 | 0 | **945,952** |
| 6 | South | 914,153 | 0 | 0 | **914,153** |
| 7 | South | 903,108 | 0 | 0 | **903,108** |

APP. 000479

Appendix I: Additional Information on the
Distribution of 2018 Market Facilitation
Program (MFP) Payments

| Farming operation | Census Bureau region[a] | MFP payments | | | |
|---|---|---|---|---|---|
| | | Nonspecialty crops (dollars) | Specialty crops (dollars) | Dairy and hogs (dollars) | Total (dollars) |
| 8 | South | 874,842 | 0 | 0 | 874,842 |
| 9 | South | 863,560 | 0 | 0 | 863,560 |
| 10 | South | 840,624 | 0 | 0 | 840,624 |
| 11 | South | 819,370 | 0 | 0 | 819,370 |
| 12 | South | 796,952 | 0 | 0 | 796,952 |
| 13 | Midwest | 789,772 | 0 | 0 | 789,772 |
| 14 | South | 708,333 | 0 | 71,784 | 780,117 |
| 15 | South | 754,144 | 0 | 0 | 754,144 |
| 16 | Midwest | 750,000 | 0 | 0 | 750,000 |
| 17 | South | 750,000 | 0 | 0 | 750,000 |
| 18 | South | 750,000 | 0 | 0 | 750,000 |
| 19 | Midwest | 746,495 | 0 | 0 | 746,495 |
| 20 | South | 745,218 | 0 | 0 | 745,218 |
| 21 | Midwest | 744,942 | 0 | 0 | 744,942 |
| 22 | South | 744,169 | 0 | 0 | 744,169 |
| 23 | South | 741,320 | 0 | 0 | 741,320 |
| 24 | South | 741,005 | 0 | 0 | 741,005 |
| 25 | Midwest | 718,390 | 0 | 0 | 718,390 |
| **Total** | — | **20,551,021** | **0** | **71,784** | **20,622,805** |

Source: GAO analysis of Farm Service Agency (FSA) data. | GAO-22-104259

Notes: We analyzed FSA data to identify the 25 farming operations that received the highest 2018 MFP payments; these 25 farming operations were organized as general partnerships.

To preserve farming operations' confidentiality, we provide the U.S. Census Bureau region where each farming operation is located to provide a general, rather than a specific, location (e.g., state or county).

[a]The U.S. Census Bureau divides the 50 states among four regions—Northeast, South, Midwest, and West. The Northeast region includes Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont. The South region includes Alabama, Arkansas, Delaware, District of Columbia, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia. The Midwest region includes Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin. The West region includes Alaska, Arizona, California, Colorado, Hawaii, Idaho, Nevada, New Mexico, Montana, Oregon, Utah, Washington, and Wyoming.

Payments for nonspecialty crops (corn, cotton, sorghum, soybeans, and wheat) received $8.2 billion (about 95 percent) of total 2018 MFP payments, and about 44 percent of total payments went to farming operations in Illinois, Iowa, Minnesota, Nebraska, and Indiana. Farming operations that produced specialty crops (fresh sweet cherries and

shelled almonds) received $72.2 million (0.8 percent), while dairy and hog operations received $351.1 million (4.1 percent) of total 2018 MFP payments. FSA distributed about 90 percent of the specialty crop payments to farming operations in California and Washington, and about half of the dairy and hog payments to farming operations in California, Iowa, Minnesota, and Wisconsin. Table 5 shows 2018 MFP payments for commodity types, by state.

**Table 5: 2018 Market Facilitation Program (MFP) Payments for Nonspecialty Crops, Specialty Crops, and Dairy and Hogs, by State**

Farming operations that produced nonspecialty crops received $8.2 billion, specialty crops received $72.2 million, and dairy and hog operations received $351.1 million of total 2018 MFP payments.

| State[a] | Nonspecialty crops | | Specialty crops | | Dairy and hogs | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Dollars | Percentage | Dollars | Percentage | Dollars | Percentage |
| Illinois | 1,095,407,366 | 13.4 | 0 | 0 | 19,642,860 | 5.6 | **1,115,050,226** | **12.9** |
| Iowa | 936,034,454 | 11.4 | 0 | 0 | 55,180,784 | 15.7 | **991,215,238** | **11.5** |
| Minnesota | 639,523,880 | 7.8 | 0 | 0 | 44,130,081 | 12.5 | **683,653,961** | **7.9** |
| Nebraska | 566,828,108 | 6.9 | 0 | 0 | 10,431,705 | 3 | **577,259,813** | **6.7** |
| Indiana | 562,635,836 | 6.9 | 333 | 0 | 12,942,060 | 3.7 | **575,578,229** | **6.7** |
| Kansas | 536,156,563 | 6.5 | 0 | 0 | 5,088,078 | 1.4 | **541,244,641** | **6.3** |
| Ohio | 461,170,760 | 5.6 | 26,345 | 0 | 11,832,952 | 3.4 | **473,030,057** | **5.5** |
| North Dakota | 445,898,601 | 5.4 | 470 | 0 | 1,169,716 | 0.3 | **447,068,787** | **5.2** |
| Missouri | 441,778,628 | 5.4 | 0 | 0 | 5,100,679 | 1.4 | **446,879,307** | **5.2** |
| South Dakota | 420,386,209 | 5.1 | 0 | 0 | 11,512,365 | 3.3 | **431,898,574** | **5.0** |
| Arkansas | 282,270,886 | 3.4 | 0 | 0 | 375,546 | 0.1 | **282,646,432** | **3.3** |
| Texas | 238,118,270 | 2.9 | 10,796 | 0 | 8,703,911 | 2.5 | **246,832,977** | **2.9** |
| Mississippi | 218,316,314 | 2.7 | 0 | 0 | 169,547 | 0 | **218,485,861** | **2.5** |
| Wisconsin | 173,390,963 | 2.1 | 9,640 | 0 | 30,279,656 | 8.6 | **203,680,259** | **2.4** |
| Michigan | 182,687,935 | 2.2 | 124,435 | 0.2 | 11,977,249 | 3.4 | **194,789,619** | **2.3** |
| Kentucky | 153,596,690 | 1.9 | 0 | 0 | 2,144,589 | 0.6 | **155,741,279** | **1.8** |
| Tennessee | 137,818,151 | 1.7 | 164 | 0 | 955,945 | 0.3 | **138,774,260** | **1.6** |
| Louisiana | 106,478,656 | 1.3 | 0 | 0 | 203,891 | 0.1 | **106,682,547** | **1.2** |
| North Carolina | 103,499,177 | 1.3 | 0 | 0 | 2,542,612 | 0.7 | **106,041,789** | **1.2** |
| California | 17,012,705 | 0.2 | 34,831,361 | 48.2 | 41,848,591 | 11.9 | **93,692,657** | **1.1** |
| Oklahoma | 65,676,156 | 0.8 | 2,640 | 0 | 555,785 | 0.2 | **66,234,581** | **0.8** |
| Georgia | 61,451,802 | 0.7 | 0 | 0 | 1,309,256 | 0.4 | **62,761,058** | **0.7** |
| Washington | 20,973,100 | 0.3 | 29,006,918 | 40.2 | 5,732,044 | 1.6 | **55,712,062** | **0.6** |
| Pennsylvania | 41,345,493 | 0.5 | 16,285 | 0 | 9,976,082 | 2.8 | **51,337,860** | **0.6** |
| Alabama | 47,441,499 | 0.6 | 0 | 0 | 159,696 | 0 | **47,601,195** | **0.6** |

Appendix I: Additional Information on the
Distribution of 2018 Market Facilitation
Program (MFP) Payments

| State[a] | Nonspecialty crops | | Specialty crops | | Dairy and hogs | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Dollars | Percentage | Dollars | Percentage | Dollars | Percentage |
| Virginia | 44,223,692 | 0.5 | 604 | 0 | 1,538,753 | 0.4 | **45,763,049** | **0.5** |
| New York | 27,361,802 | 0.3 | 116,544 | 0.2 | 14,019,492 | 4 | **41,497,838** | **0.5** |
| Maryland | 36,293,569 | 0.4 | 9,712 | 0 | 959,798 | 0.3 | **37,263,079** | **0.4** |
| Montana | 26,691,595 | 0.3 | 252,840 | 0.3 | 1,993,313 | 0.6 | **28,937,748** | **0.3** |
| Idaho | 13,191,985 | 0.2 | 239,491 | 0.3 | 11,410,442 | 3.2 | **24,841,918** | **0.3** |
| South Carolina | 23,760,402 | 0.3 | 0 | 0 | 439,466 | 0.1 | **24,199,868** | **0.3** |
| Colorado | 19,832,444 | 0.2 | 98,889 | 0.1 | 3,452,442 | 1 | **23,383,775** | **0.3** |
| Oregon | 6,015,531 | 0.1 | 7,387,674 | 10.2 | 2,115,936 | 0.6 | **15,519,141** | **0.2** |
| Arizona | 11,776,436 | 0.1 | 4,680 | 0 | 3,483,309 | 1 | **15,264,425** | **0.2** |
| New Mexico | 4,263,804 | 0.1 | 1,308 | 0 | 8,016,807 | 2.3 | **12,281,919** | **0.1** |
| Delaware | 11,423,781 | 0.1 | 0 | 0 | 117,541 | 0 | **11,541,322** | **0.1** |
| New Jersey | 6,564,286 | 0.1 | 1,756 | 0 | 139,319 | 0 | **6,705,361** | **0.1** |
| Florida | 3,081,491 | 0 | 41,639 | 0.1 | 1,777,908 | 0.5 | **4,901,038** | **0.1** |
| Vermont | 455,353 | 0 | 0 | 0 | 2,905,724 | 0.8 | **3,361,077** | **0.0** |
| Utah | 632,218 | 0 | 47,402 | 0.1 | 2,049,854 | 0.6 | **2,729,474** | **0.0** |
| West Virginia | 1,777,741 | 0.1 | 0 | 0 | 127,699 | 0 | **1,905,440** | **0.0** |
| Wyoming | 691,465 | 0 | 0 | 0 | 145,153 | 0 | **836,618** | **0.0** |
| Maine | 60,368 | 0 | 0 | 0 | 706,933 | 0.2 | **767,301** | **0.0** |
| Nevada | 38,499 | 0 | 0 | 0 | 638,020 | 0.2 | **676,519** | **0.0** |
| Connecticut | 29,550 | 0 | 0 | 0 | 435,934 | 0.1 | **465,484** | **0.0** |
| Massachusetts | 43,168 | 0 | 7,526 | 0 | 312,057 | 0.1 | **362,751** | **0.0** |
| New Hampshire | 1,446 | 0 | 856 | 0 | 298,581 | 0.1 | **300,883** | **0.0** |
| Hawaii | 0 | 0 | 0 | 0 | 51,232 | 0 | **51,232** | **0.0** |
| Rhode Island | 0 | 0 | 0 | 0 | 13,947 | 0 | **13,947** | **0.0** |
| Alaska | 1,123 | 0 | 0 | 0 | 2,460 | 0 | **3,583** | **0.0** |
| **Total** | **8,194,109,951** | **100.0** | **72,240,308** | **100.0** | **351,117,800** | **100.0** | **8,617,468,059** | **100.0** |

Source: GAO analysis of Farm Service Agency data.  |  GAO-22-104259

Note: Percentages may not sum to 100 because of: rounding.

[a]Farming operations in Puerto Rico received a total of $848,767 in 2018 MFP payments for dairy and hogs and $112,572 for nonspecialty crops. Farming operations in Puerto Rico did not receive 2018 MFP payments for specialty crops.

APP. 000482

# Appendix II: Additional Information on the Distribution of 2019 Market Facilitation Program (MFP) Payments

For the 2019 MFP, the Farm Service Agency (FSA) distributed about $14.4 billion in payments in all 50 states and Puerto Rico to 643,965 farming operations, with payments varying by location. As shown in table 6, the average 2019 MFP payment per farming operation was $22,312. Average payments per member ranged from a high of about $42,500 in Georgia to about $1,700 in Rhode Island.

**Table 6: 2019 Market Facilitation Program (MFP) Payments to Farming Operations and Members, by State and Average Payment per Member**

Average payments per member ranged from a high of about $42,500 in Georgia to about $1,700 in Rhode Island.

| State[a] | MFP payments | | Farming operations | | Members | | Average payment per farming operation (dollars) | Average payment per member (dollars) |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | Number | Percentage | | |
| Georgia | 310,832,608 | 2.2 | 5,479 | 0.9 | 7,306 | 0.8 | 56,732 | 42,545 |
| Mississippi | 323,593,329 | 2.3 | 4,690 | 0.7 | 9,107 | 1.0 | 68,996 | 35,532 |
| North Dakota | 693,157,967 | 4.8 | 18,953 | 2.9 | 21,750 | 2.5 | 36,572 | 31,869 |
| Arizona | 49,709,777 | 0.3 | 596 | 0.1 | 1,586 | 0.2 | 83,406 | 31,343 |
| South Carolina | 60,098,839 | 0.4 | 1,796 | 0.3 | 2,287 | 0.3 | 33,463 | 26,278 |
| Alabama | 121,995,760 | 0.8 | 3,399 | 0.5 | 4,682 | 0.5 | 35,892 | 26,056 |
| Florida | 24,095,215 | 0.2 | 718 | 0.1 | 986 | 0.1 | 33,559 | 24,437 |
| Minnesota | 1,066,556,872 | 7.4 | 36,532 | 5.7 | 43,883 | 5.0 | 29,195 | 24,305 |
| North Carolina | 194,690,509 | 1.4 | 7,269 | 1.1 | 9,026 | 1.0 | 26,784 | 21,570 |
| Texas | 1,075,174,517 | 7.5 | 36,639 | 5.7 | 51,117 | 5.9 | 29,345 | 21,034 |
| Iowa | 1,581,719,579 | 11.0 | 61,433 | 9.5 | 79,464 | 9.1 | 25,747 | 19,905 |
| Arkansas | 441,658,607 | 3.1 | 12,975 | 2.0 | 22,820 | 2.6 | 34,039 | 19,354 |
| New Mexico | 36,940,198 | 0.3 | 1,255 | 0.2 | 2,002 | 0.2 | 29,434 | 18,452 |
| Virginia | 72,526,934 | 0.5 | 2,956 | 0.5 | 4,037 | 0.5 | 24,535 | 17,966 |
| California | 317,077,273 | 2.2 | 9,992 | 1.6 | 18,133 | 2.1 | 31,733 | 17,486 |
| Nebraska | 960,181,906 | 6.7 | 42,340 | 6.6 | 56,131 | 6.4 | 22,678 | 17,106 |
| Tennessee | 231,581,245 | 1.6 | 11,717 | 1.8 | 13,733 | 1.6 | 19,765 | 16,863 |
| Louisiana | 162,263,358 | 1.1 | 6,717 | 1.0 | 9,957 | 1.1 | 24,157 | 16,296 |
| Delaware | 18,152,902 | 0.1 | 726 | 0.1 | 1,124 | 0.1 | 25,004 | 16,150 |
| South Dakota | 523,467,014 | 3.6 | 20,991 | 3.3 | 32,433 | 3.7 | 24,938 | 16,140 |
| Indiana | 725,298,539 | 5.0 | 34,660 | 5.4 | 45,050 | 5.2 | 20,926 | 16,100 |
| Michigan | 260,601,255 | 1.8 | 13,844 | 2.1 | 16,959 | 1.9 | 18,824 | 15,367 |
| Maryland | 55,536,024 | 0.4 | 2,607 | 0.4 | 3,656 | 0.4 | 21,303 | 15,190 |
| Missouri | 632,689,068 | 4.4 | 31,901 | 5.0 | 42,055 | 4.8 | 19,833 | 15,044 |

APP. 000483

Appendix II: Additional Information on the Distribution of 2019 Market Facilitation Program (MFP) Payments

| Stateª | MFP payments | | Farming operations | | Members | | Average payment per farming operation (dollars) | Average payment per member (dollars) |
|---|---|---|---|---|---|---|---|---|
| | Dollars | Percentage | Number | Percentage | Number | Percentage | | |
| Illinois | 1,452,547,648 | 10.1 | 76,129 | 11.8 | 98,380 | 11.3 | 19,080 | 14,765 |
| Ohio | 523,892,947 | 3.6 | 29,513 | 4.6 | 37,350 | 4.3 | 17,751 | 14,027 |
| Kentucky | 229,938,635 | 1.6 | 14,407 | 2.2 | 16,992 | 2.0 | 15,960 | 13,532 |
| Kansas | 1,010,635,043 | 7.0 | 58,599 | 9.1 | 76,545 | 8.8 | 17,247 | 13,203 |
| New Jersey | 9,932,766 | 0.1 | 609 | 0.1 | 825 | 0.1 | 16,310 | 12,040 |
| Wisconsin | 347,868,224 | 2.4 | 23,259 | 3.6 | 29,409 | 3.4 | 14,956 | 11,829 |
| Oklahoma | 206,404,611 | 1.4 | 16,662 | 2.6 | 19,971 | 2.3 | 12,388 | 10,335 |
| Massachusetts | 6,812,715 | 0.0 | 458 | 0.1 | 748 | 0.1 | 14,875 | 9,108 |
| New York | 65,399,722 | 0.5 | 4,848 | 0.8 | 7,506 | 0.9 | 13,490 | 8,713 |
| Pennsylvania | 79,416,392 | 0.6 | 7,009 | 1.1 | 9,169 | 1.1 | 11,331 | 8,661 |
| Colorado | 105,337,276 | 0.7 | 8,212 | 1.3 | 12,190 | 1.4 | 12,827 | 8,641 |
| Idaho | 74,319,215 | 0.5 | 5,851 | 0.9 | 9,240 | 1.1 | 12,702 | 8,043 |
| Oregon | 42,475,903 | 0.3 | 3,782 | 0.6 | 6,365 | 0.7 | 11,231 | 6,673 |
| Washington | 107,378,042 | 0.7 | 8,460 | 1.3 | 16,705 | 1.9 | 12,692 | 6,428 |
| Montana | 128,406,508 | 0.9 | 9,958 | 1.5 | 20,440 | 2.3 | 12,895 | 6,282 |
| West Virginia | 3,520,806 | 0.0 | 435 | 0.1 | 567 | 0.1 | 8,094 | 6,210 |
| Nevada | 4,120,435 | 0.0 | 380 | 0.1 | 665 | 0.1 | 10,843 | 6,196 |
| Vermont | 6,049,146 | 0.0 | 644 | 0.1 | 1,064 | 0.1 | 9,393 | 5,685 |
| Hawaii | 179,349 | 0.0 | 29 | 0.0 | 36 | 0.0 | 6,184 | 4,982 |
| Alaska | 95,278 | 0.0 | 12 | 0.0 | 21 | 0.0 | 7,940 | 4,537 |
| Puerto Rico | 1,343,339 | 0.0 | 248 | 0.0 | 331 | 0.0 | 5,417 | 4,058 |
| Connecticut | 1,072,357 | 0.0 | 115 | 0.0 | 269 | 0.0 | 9,325 | 3,986 |
| Utah | 10,926,775 | 0.1 | 1,907 | 0.3 | 2,869 | 0.3 | 5,730 | 3,809 |
| Maine | 2,312,500 | 0.0 | 405 | 0.1 | 625 | 0.1 | 5,710 | 3,700 |
| New Hampshire | 610,166 | 0.0 | 104 | 0.0 | 190 | 0.0 | 5,867 | 3,211 |
| Wyoming | 7,689,807 | 0.1 | 1,704 | 0.3 | 2,599 | 0.3 | 4,513 | 2,959 |
| Rhode Island | 121,410 | 0.0 | 41 | 0.0 | 72 | 0.0 | 2,961 | 1,686 |
| **Total** | **14,368,406,309** | **100.0** | **643,965** | **100.0** | **870,427** | **100.0** | **22,312** | **16,507** |

Source: GAO analysis of Farm Service Agency data. | GAO-22-104259

Note: Percentages may not sum to 100 because of rounding.

ªThis table includes 2019 MFP payments made to farming operations in Puerto Rico.

APP. 000484

FSA paid about $37.3 million in total, or an average of $1.5 million per farming operation, to 25 farming operations that received the highest 2019 MFP payments, as shown in table 7. These 25 farming operations were located in the South and Midwest and mostly received payments for nonspecialty crops.

**Table 7: Top 25 Market Facilitation Program (MFP) Payments for 2019**

These 25 farming operations received an average payment of $1.5 million, whereas the average payment for all farming operations was $22,312.

| Farming operation | Census Bureau region[a] | MFP payments | | | |
| --- | --- | --- | --- | --- | --- |
| | | Nonspecialty crops (dollars) | Specialty crops (dollars) | Dairy and hogs (dollars) | Total (dollars) |
| 1 | South | 2,077,999 | 0 | 0 | 2,077,999 |
| 2 | Midwest and South | 1,980,118 | 0 | 0 | 1,980,118 |
| 3 | South | 1,940,323 | 0 | 0 | 1,940,323 |
| 4 | South | 1,886,334 | 0 | 0 | 1,886,334 |
| 5 | Midwest | 1,740,248 | 0 | 0 | 1,740,248 |
| 6 | South | 1,622,520 | 0 | 0 | 1,622,520 |
| 7 | Midwest | 1,528,311 | 0 | 0 | 1,528,311 |
| 8 | South | 1,519,383 | 0 | 0 | 1,519,383 |
| 9 | Midwest and South | 1,496,728 | 0 | 0 | 1,496,728 |
| 10 | South | 807,341 | 0 | 680,944 | 1,488,285 |
| 11 | South | 1,381,885 | 0 | 0 | 1,381,885 |
| 12 | South | 1,377,422 | 0 | 0 | 1,377,422 |
| 13 | Midwest | 1,374,279 | 0 | 0 | 1,374,279 |
| 14 | South | 1,361,268 | 0 | 0 | 1,361,268 |
| 15 | Midwest | 1,355,509 | 0 | 0 | 1,355,509 |
| 16 | Midwest | 1,348,866 | 0 | 0 | 1,348,866 |
| 17 | South | 1,348,273 | 0 | 0 | 1,348,273 |
| 18 | Midwest | 1,338,208 | 0 | 0 | 1,338,208 |
| 19 | South | 1,326,477 | 0 | 0 | 1,326,477 |
| 20 | South | 1,203,330 | 0 | 119,645 | 1,322,975 |
| 21 | South | 1,322,196 | 0 | 0 | 1,322,196 |
| 22 | South | 1,308,888 | 0 | 0 | 1,308,888 |
| 23 | Midwest | 0 | 0 | 1,282,590 | 1,282,590 |
| 24 | Midwest and South | 1,276,172 | 0 | 0 | 1,276,172 |
| 25 | South | 1,269,369 | 0 | 0 | 1,269,369 |
| **Total** | **—** | **35,191,445** | **0** | **2,083,179** | **37,274,624** |

Sources: Farm Service Agency (FSA) state officials and GAO analysis of FSA data.  |  GAO-22-104259

Note: To preserve farming operations' confidentiality, we provide the Census Bureau region where each farming operation is located to provide a general, rather than a specific , location (e.g., state or county).

[a]The U.S. Census Bureau divides the 50 states among four regions —Northeast, South, Midwest, and West. The Northeast region includes Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont. The South region includes Alabama, Arkansas, Delaware, District of Columbia, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia. The Midwest region includes Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin. The West region includes Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.

Payments for nonspecialty crops received $13.5 billion (94 percent) of total 2019 MFP payments, and about 44 percent of total payments went to farming operations in Iowa, Illinois, Texas, Minnesota, and Kansas. Farming operations that produced specialty crops received $273.9 million (1.9 percent), while dairy and hog operations received $565.9 million (3.9 percent) of total 2019 MFP payments. FSA distributed 68 percent of the specialty crop payments to farming operations in California and Washington, and more than half of the dairy and hog payments to farming operations in Iowa, Minnesota, California, Wisconsin, and Illinois. Table 8 shows 2019 MFP payments for commodity types, by state.

**Table 8: 2019 Market Facilitation Program (MFP) Payments for Nonspecialty Crops, Specialty Crops, and Dairy and Hogs, by State**

Farming operations that produced nonspecialty crops received $13.5 billion, specialty crops received $273.9 million, and dairy and hog operations received $565.9 million.

| State[a] | Nonspecialty crops | | Specialty crops | | Dairy and hogs | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Dollars | % | Dollars | % | Dollars | % | Dollars | % |
| Iowa | 1,496,136,773 | 11.1 | 100,406 | 0 | 85,482,400 | 15.1 | **1,581,719,579** | **11.1** |
| Illinois | 1,422,433,078 | 10.5 | 128,567 | 0 | 29,986,003 | 5.3 | **1,452,547,648** | **10.5** |
| Texas | 1,050,030,036 | 7.8 | 9,592,809 | 3.5 | 15,551,672 | 2.7 | **1,075,174,517** | **7.8** |
| Minnesota | 995,859,597 | 7.4 | 59,056 | 0 | 70,638,218 | 12.5 | **1,066,556,871** | **7.4** |
| Kansas | 1,001,433,931 | 7.4 | 687,097 | 0.3 | 8,514,015 | 1.5 | **1,010,635,043** | **7.4** |
| Nebraska | 943,314,968 | 7 | 40,710 | 0 | 16,826,228 | 3 | **960,181,906** | **7** |
| Indiana | 705,497,094 | 5.2 | 31,175 | 0 | 19,770,270 | 3.5 | **725,298,539** | **5.2** |
| North Dakota | 691,468,149 | 5.1 | 5,360 | 0 | 1,684,457 | 0.3 | **693,157,966** | **5.1** |
| Missouri | 623,615,714 | 4.6 | 1,041,042 | 0.4 | 8,032,312 | 1.4 | **632,689,068** | **4.6** |
| Ohio | 504,870,729 | 3.7 | 75,741 | 0 | 18,946,476 | 3.3 | **523,892,946** | **3.7** |
| South Dakota | 505,028,416 | 3.7 | 7,131 | 0 | 18,431,467 | 3.3 | **523,467,014** | **3.7** |
| Arkansas | 439,660,174 | 3.2 | 997,979 | 0.4 | 1,000,455 | 0.2 | **441,658,608** | **3.2** |
| Wisconsin | 286,112,783 | 2.1 | 12,329,507 | 4.5 | 49,425,934 | 8.7 | **347,868,224** | **2.1** |

| State[a] | Nonspecialty crops | | Specialty crops | | Dairy and hogs | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Dollars | % | Dollars | % | Dollars | % | Dollars | % |
| Mississippi | 322,415,680 | 2.4 | 685,719 | 0.3 | 491,930 | 0.1 | 323,593,329 | 2.4 |
| California | 95,542,599 | 0.7 | 153,302,903 | 56 | 68,231,771 | 12.1 | 317,077,273 | 0.7 |
| Georgia | 292,934,291 | 2.2 | 15,269,014 | 5.6 | 2,629,303 | 0.5 | 310,832,608 | 2.2 |
| Michigan | 240,722,159 | 1.8 | 907,785 | 0.3 | 18,971,311 | 3.4 | 260,601,255 | 1.8 |
| Tennessee | 229,971,611 | 1.7 | 56,328 | 0 | 1,553,306 | 0.3 | 231,581,245 | 1.7 |
| Kentucky | 226,233,993 | 1.7 | 21,760 | 0 | 3,682,881 | 0.7 | 229,938,634 | 1.7 |
| Oklahoma | 195,737,697 | 1.4 | 9,596,137 | 3.5 | 1,070,778 | 0.2 | 206,404,612 | 1.4 |
| North Carolina | 190,154,095 | 1.4 | 294,442 | 0.1 | 4,241,971 | 0.7 | 194,690,508 | 1.4 |
| Louisiana | 160,880,127 | 1.2 | 1,064,486 | 0.4 | 318,745 | 0.1 | 162,263,358 | 1.2 |
| Montana | 125,117,133 | 0.9 | 416,538 | 0.2 | 2,872,837 | 0.5 | 128,406,508 | 0.9 |
| Alabama | 121,222,526 | 0.9 | 564,618 | 0.2 | 208,616 | 0 | 121,995,760 | 0.9 |
| Washington | 64,510,625 | 0.5 | 33,605,157 | 12.3 | 9,262,260 | 1.6 | 107,378,042 | 0.5 |
| Colorado | 98,411,437 | 0.7 | 317,183 | 0.1 | 6,608,656 | 1.2 | 105,337,276 | 0.7 |
| Pennsylvania | 63,485,277 | 0.5 | 166,795 | 0.1 | 15,764,320 | 2.8 | 79,416,392 | 0.5 |
| Idaho | 54,459,817 | 0.4 | 590,577 | 0.2 | 19,268,821 | 3.4 | 74,319,215 | 0.4 |
| Virginia | 69,967,443 | 0.5 | 47,910 | 0 | 2,511,582 | 0.4 | 72,526,935 | 0.5 |
| New York | 42,142,965 | 0.3 | 410,987 | 0.2 | 22,845,770 | 4 | 65,399,722 | 0.3 |
| South Carolina | 59,377,524 | 0.4 | 186,183 | 0.1 | 535,132 | 0.1 | 60,098,839 | 0.4 |
| Maryland | 53,977,881 | 0.4 | 42,006 | 0 | 1,516,137 | 0.3 | 55,536,024 | 0.4 |
| Arizona | 43,075,521 | 0.3 | 598,895 | 0.2 | 6,035,362 | 1.1 | 49,709,778 | 0.3 |
| Oregon | 19,966,933 | 0.1 | 19,188,198 | 7 | 3,320,772 | 0.6 | 42,475,903 | 0.1 |
| New Mexico | 20,969,938 | 0.2 | 3,571,123 | 1.3 | 12,399,137 | 2.2 | 36,940,198 | 0.2 |
| Florida | 21,065,088 | 0.2 | 166,984 | 0.1 | 2,863,144 | 0.5 | 24,095,216 | 0.2 |
| Delaware | 18,011,662 | 0.1 | 2,830 | 0 | 138,410 | 0 | 18,152,902 | 0.1 |
| Utah | 7,157,297 | 0.1 | 232,565 | 0.1 | 3,536,912 | 0.6 | 10,926,774 | 0.1 |
| New Jersey | 8,623,235 | 0.1 | 1,053,071 | 0.4 | 256,461 | 0 | 9,932,767 | 0.1 |
| Wyoming | 7,449,042 | 0.1 | 0 | 0 | 240,765 | 0 | 7,689,807 | 0.1 |
| Massachusetts | 235,341 | 0 | 6,107,392 | 2.2 | 469,983 | 0.1 | 6,812,716 | 0 |
| Vermont | 1,344,331 | 0 | 0 | 0 | 4,704,816 | 0.8 | 6,049,147 | 0 |
| Nevada | 2,943,191 | 0 | 35,040 | 0 | 1,142,203 | 0.2 | 4,120,434 | 0 |
| West Virginia | 3,348,624 | 0 | 3,110 | 0 | 169,072 | 0 | 3,520,806 | 0 |
| Maine | 1,105,210 | 0 | 43,832 | 0 | 1,163,458 | 0.2 | 2,312,500 | 0 |
| Puerto Rico | 22,139 | 0 | 0 | 0 | 1,321,200 | 0.2 | 1,343,339 | 0 |
| Connecticut | 362,685 | 0 | 7,006 | 0 | 702,665 | 0.1 | 1,072,356 | 0 |
| New Hampshire | 148,253 | 0 | 3,851 | 0 | 458,062 | 0.1 | 610,166 | 0 |
| Hawaii | 0 | 0 | 129,739 | 0 | 49,610 | 0 | 179,349 | 0 |

| State[a] | Nonspecialty crops | | Specialty crops | | Dairy and hogs | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Dollars | % | Dollars | % | Dollars | % | Dollars | % |
| Rhode Island | 15,022 | 0 | 72,338 | 0 | 34,050 | 0 | 121,410 | 0 |
| Alaska | 82,026 | 0 | 0 | 0 | 13,252 | 0 | 95,278 | 0 |
| Total | 13,528,651,860 | 100 | 273,859,082 | 100 | 565,895,368 | 100 | 14,368,406,310 | 100 |

Source: GAO analysis of Farm Service Agency data. | GAO-22-104259

Notes: Percentages may not sum to 100 because of rounding.

The 2019 MFP eligible nonspecialty crops were alfalfa hay, barley, canola, cotton (upland and extra-long-staple), corn, crambe, dried beans, dry peas, flaxseed, lentils, long- and medium-grain rice, millet, mustard seed, oats, peanuts, rapeseed, rye, safflower, sesame seed, small and large chickpeas, sorghum, soybeans, sunflower seed, temperate japonica rice, triticale, and wheat. Eligible specialty crops were almonds, cranberries, cultivated ginseng, fresh grapes, fresh sweet cherries, hazelnuts, macadamia nuts, pecans, pistachios, and walnuts. In addition, dairy (milk) and hogs were eligible.

[a]This table includes 2019 MFP payments made to farming operations in Puerto Rico.

In total, FSA distributed $14.4 billion in 2019 MFP payments.[1] The average 2019 MFP payment per farming operation ranged from $44 to $295,299 by county, and 201 counties had average payments of $50,000 or more. As shown in figure 5, farming operations that received the highest 2019 MFP payments were predominantly located in the South and Midwest; those operations also generally produced nonspecialty crops.

---

[1]We excluded payments made to Indian tribes from our analysis because, according to FSA's payment limitation handbook, such payments are not subject to payment limits. Because we did not include payments to Indian tribes, our totals may be lower than other publicly reported figures.

**Appendix II: Additional Information on the Distribution of 2019 Market Facilitation Program (MFP) Payments**

**Figure 5: Average 2019 MFP Payment in the Contiguous U.S.**



Source: GAO analysis of Farm Service Agency data | GAO-22-104259

APP. 000489

# Appendix III: Comments from the U.S. Department of Agriculture



**United States Department of Agriculture**

Farm
Production
and
Conservation

Farm
Service
Agency

Farm Programs
1400 Independence,
SW
Room 3612
Washington DC
20250-0510

Voice: 202-720-3175

**DATE:**     December 6, 2021

**TO:**     Steve D. Morris
Director, Natural Resources & Environment
Government Accountability Office

**FROM:**     Zach Ducheneaux
Administrator, Farm Service Agency

**SUBJECT:**     **Agency Response to Market Facilitation Program (MFP) Report GAO-22-104259**

The U.S. Department of Agriculture (USDA) Farm Service Agency (FSA) appreciates the opportunity to respond to the U.S. Government Accountability Office (GAO) draft report GAO-22-104259 USDA Market Facilitation Program (MFP) received November 22, 2021. The original purpose of the audit was to examine USDA's distribution of MFP payments for both 2018 and 2019 to historically underserved and high-income farmers, and the extent to which USDA verified farms' compliance with MFP eligibility requirements.

FSA agrees with the findings, but with the recognition of conflicting program priorities and limited resources devoted to developing and delivering pandemic assistance to producers who faced market disruptions due to COVID-19. Signup for MFP ended December 20, 2019. In addition to technical comments previously provided to GAO by e-mail, FSA addressed the four GAO recommendations which will be implemented for future ad hoc assistance programs and, if necessary, existing programs.

**Finding 1: FSA Did not Ensure the Results of Its 2018 MFP Spot Check Review Were Reliable**

**Recommendation 1 -** "Design data collection and analysis for future compliance reviews of supplemental assistance programs in a way that ensures reliable results."

**Response 1:** For future programs, the agency will use sound statistical methodologies, define objectives, and identify requirements/documentation to support those objectives with assistance from PAR to ensure sampling methods are consistent across programs.

USDA is an equal opportunity provider, employer, and lender.

Steve D. Morris                                                        Page 2

**Finding 2: FSA Sampled a Higher Rate of Larger MFP Payments but Did
Not Focus on Other Characteristics Posing a Risk**

**Recommendation 2** — "Assess risk characteristics and take a more complete
risk-based approach in selecting samples for future compliance reviews of
supplemental assistance programs."

**Response 2** – The agency will collaborate with supporting agency divisions to
identify and assess risk characteristics that may include payment eligibility as
well as program eligibility for a more complete risk-based approach in selecting
samples.

**Finding 3: FSA Tolerated a Greater Difference between Claimed and Actual
Production Compared with Other Programs but Did Not Document the
Rationale**

**Recommendation 3** – "Document the rationale for the tolerance level (e.g., the
allowable percentage difference between farming operations' actual production
and their claimed production) used in future compliance reviews of supplemental
programs."

**Response 3** – The agency will utilize variances allowed in established programs
for certified production and acreage-based benefit programs, as well as
acceptable documentation to support certified ownership share of production for
payment.

**Recommendation 4** – "Communicate the results of its future compliance
reviews of supplemental assistance programs, including a summary of findings
and types of errors found, and identify corrective actions to be taken."

**Response 4** – The agency communicated through regularly scheduled
teleconferences and supplemental notes to State Office officials of common
compliance findings, payment issues, and corrective actions to resolve findings.
The agency will continue to utilize national directives to report the results of
compliance reviews, including reviews conducted by other divisions or audits
conducted by other agencies or contractors, which will include a summary of the
findings, the types of errors found, and the corrective actions to be taken.

# Appendix IV: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Steve D. Morris at (202) 512-3841 or morriss@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Thomas M. Cook (Assistant Director), Josey Ballenger (Analyst-in-Charge), Sahar Angadjivand, Kevin S. Bray, Cindy Gilbert, Joe Maher, Donna Morgan, John Mingus, Cynthia Norris, and Khristi Wilkins made key contributions to this report. Other contributors included Gary Brown, Michael Simon, and Ruth Solomon. |

# Related GAO Products

*USDA Market Facilitation Program: Stronger Adherence to Quality Guidelines Would Improve Future Economic Analyses.* GAO-22-468. Washington, D.C.: Nov. 18, 2021.

*Farm Programs: USDA Should Take Additional Steps to Ensure Compliance with Wetland Conservation Provisions.* GAO-21-241. Washington, D.C.: April 2, 2021.

*Farm Programs: USDA Has Improved Its Completion of Eligibility Compliance Reviews, but Additional Oversight Is Needed.* GAO-21-95. Washington, D.C.: Oct. 30, 2020.

*USDA Market Facilitation Program: Information on Payments for 2019.* GAO-20-700R. Washington, D.C.: Aug. 21, 2020.

*Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited.* GAO-19-539. Washington, D.C.: July 11, 2019.

*Indian Issues: Agricultural Credit Needs and Barriers to Lending on Tribal Lands.* GAO-19-464. Washington, D.C.: May 9, 2019.

*Farm Programs: Additional Steps Needed to Help Prevent Payments to Participants Whose Incomes Exceed Limits.* GAO-13-741. Washington, D.C.: Aug. 29, 2013.

*U.S. Department of Agriculture: Progress toward Implementing GAO's Civil Rights Recommendations.* GAO-12-976R. Washington, D.C.: Aug. 29, 2012.

*U.S. Department of Agriculture: Recommendations and Options to Address Management Deficiencies in the Office of the Assistant Secretary for Civil Rights.* GAO-09-62. Washington, D.C.: Oct. 22, 2008.

*Beginning Farmers: Additional Steps Needed to Demonstrate the Effectiveness of USDA Assistance.* GAO-07-1130. Washington, D.C.: Sept. 18, 2007.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube.<br>Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.<br>Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet:<br><br>Website: https://www.gao.gov/about/what-gao-does/fraudnet<br><br>Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

# Congress of the United States
## Washington, DC 20515

February 2, 2022

The Honorable Thomas J. Vilsack
Secretary
United States Department of Agriculture
1400 Independence Avenue, SW
Washington, D.C. 20250

Secretary Vilsack,

Thank you for appearing before the House Committee on Agriculture (Committee) on January 20, 2022. This correspondence serves as follow-up to a line of questioning that began in April 2021, including a request for data and reasoning that supports the U.S. Department of Agriculture's (USDA, Department) longstanding claims that formulaic pandemic relief lacks equity in its dissemination.

On May 19, 2021, I wrote asking for clarification to the numerous references to "gaps and disparities" in the level of assistance producers received in initial rounds of COVID-related relief. Nearly eight months later, on January 18, 2022, I received a response from your office that included a regurgitation of Departmental press releases.

The statements made by you and the Department, dating back to April 2021, allude to a race-based disparity in how aid was, or is, being released. This claim was reiterated in your written testimony delivered to the Committee on January 19, 2022. After exchanges on the topic during the January 20 hearing, our Members maintain the need for the Department to adequately respond to this matter.

I respectfully request the following information be submitted to my office no later than February 18, 2022:

- ☐ The Department has repeatedly stated "a review" of USDA programs revealed "gaps and disparities" in the distribution of COVID-related funds. Please provide this "review" and any related data and analysis conducted by the Department.
- ☐ Prior to remarks regarding "gaps and disparities" from the Department, was the impact of any demographic information, including race, analyzed? Please provide this analysis, including the Agencies and/or stakeholders who contributed.
- ☐ In response to my letter, the Department, stated *"[t]he gaps and disparities we continue to focus on addressing have been brought to our attention by farmers, ranchers, producers, organizations, and members of Congress."* This commentary has not been made available to the public. Please provide my office with the list of organizations and Members of Congress who weighed in, including any data or analysis used to justify their position.

☐ Did any demographic information, including race, lead to adjustments in how aid was allocated in 2021?

☐ If not, then what information/data was used in assessing Department actions related to this notion of "gaps and disparities" in aid?

☐ While the Department's online dashboard provides some information, please provide the raw data that shows the number/amount of payments and number of acres enrolled—by program—per State, and further broken down by race and ethnicity of recipient.

As I have said before, I share the concern and interest in making sure any program relief is equitable in its distribution. But, for that goal to be achieved, it is imperative the Department provide the data and analysis to its claims.

Sincerely,

_____

Representative Glenn 'GT' Thompson (PA-15)
Republican Leader
House Committee on Agriculture

Case 2:24-cv-00060-Z Document 130-1 Filed 08/23/24 Page 497 of 500 PageID 8732



FARM SECURITY ADMINISTRATION/OFFICE OF WAR INFORMATION PHOTOGRAPH COLLECTION/LIBRARY OF CONGRESS

Henry Holt, a farmer near Black River Falls, Wisconsin, in 1937, who was moved off land by the Resettlement Administration.

WEALTH GAP

# How the Government Helped White Americans Steal Black Farmland

There was once a thriving Black middle class based on farm ownership. But during the twentieth century, the USDA helped erase that source of wealth.

Dania Francis, Darrick Hamilton, Thomas Mitchell, Nathan Rosenberg, Bryce Wilson Stucki /
May 5, 2022

**Your inbox is your home page, and *The New Republic* makes it smarter. Sign up now for your free newsletter.**

The office of civil rights at the Agriculture Department is located on the third floor of a building named after a white supremacist. The Jamie Whitten Building, named in 1994,

APP. 000497

Case: 24-cv-006067-7   Document 330-1   Filed 08/28/24   Page 503 of 502   PageID 87833

honors a member of Congress who started his career by eliminating a federal agency because
its studies encouraged "racial intermingling" and ended it by referring to Mike Espy, a Black
member of Congress and future secretary of agriculture, as "boy." Whitten's prejudices were
reflected in the policies he supported: floods of cash for wealthy white farmers and next to
nothing for Black farmers.

The representative from Mississippi never worked for USDA, but as chair of the House
Appropriations subcommittee on agriculture for over four decades, he exercised so much
control over the department's budget that he became known as the "Permanent Secretary of
Agriculture."

In a "typical year" in the 1960s, writes historian James Cobb in *The Most Southern Place on
Earth*, Whitten secured $23.5 million for wealthy farmers who made up 0.3 percent of his
district—and just $4 million in food stamps for the 59 percent of his district that lived below
the poverty line. He once explained to Senator George McGovern that if "hunger was not a
problem, [*n*-word]s won't work."

While Whitten was less abashed in his racism than many of his fellow lawmakers, they were
no less committed to defending rich white farmers. From the start of Whitten's political
career to the present, lawmakers in both parties have set their differences aside to send the
exceeding majority of federal funds to commercial farmers, almost all of them white men.

Black farmers not only lost out on these massive subsidies—they have been effectively
disenfranchised within the modern agricultural system. Under conditions of savage
oppression, Black families emerged in the early 1900s with almost 20 million acres of
farmland and "the largest amount of property they would ever own within the United States,"
according to the historian Manning Marable. Since then, they have lost roughly 90 percent of
that acreage.

APP. 000498



CENSUS OF AGRICULTURE DATA

Despite the scale of this deliberate, state-sanctioned dispossession, no one has estimated how much Black families lost. For the first time, in a forthcoming paper to be published in the American Economic Association's *Papers and Proceedings* journal, our team conducted a comprehensive analysis of historical data from 1920 to 1997 and found that the lost wealth and income from the land totals about $326 billion—roughly the size of Hong Kong's annual gross domestic product. This enormous loss not only cost the families who saw their land and dreams taken from them, but destroyed a rural Black middle class that had, by sheer will, emerged in the aftermath of slavery. Since family wealth is iterative—growing slowly at first, adding to itself, and accumulating and expanding over time—this blow to a nascent Black middle class has reverberated down the generations.

# What happened

The Civil War destroyed the basis of wealth in the Old South—slavery—and with it a system of social relations. In their struggle to create a new society, amid universal oppression and disadvantage, Black families acquired property at an astounding rate.

By 1890, about 20 percent of Black farm families owned their land, and by 1910 that figure had reached 25 percent. Even as white creditors cheated them, white planters worked them ragged, white politicians disenfranchised them, and white mobs targeted them with arsons and lynchings, over 425,000 Black families were able to save enough to purchase almost 20 million acres in the Jim Crow South. The number of people in these families roughly

numbered the total African Americans who migrated north in the first Great Migration, and the acreage they owned approached the size of South Carolina.

This rural Black middle class was the hope of a generation. W.E.B. DuBois—who completed several extensive studies of Black farmers in the early twentieth century—numbered 200,000 farmers among 250,000 Black "independents" in America, so-named for their economic power. "Landowning farmers and entrepreneurs," writes historian Debra Reid, "reorganized rural society by founding fraternal societies and building schools, churches, and businesses to cater to a black clientele."



B.C. Corbett and his son, grading and stripping tobacco on their farm. Corbett owned a prosperous farm of over 600 acres.

FARM SECURITY ADMINISTRATION, 1939/LOC

In his study of a rural county in Alabama, the sociologist Charles Johnson found that farm owners had larger, better quality homes; more equipment and livestock; kept their kids in school longer; grew more food for themselves; and had more magazine subscriptions than non-farm owners. Other writers found similar results in North Carolina, Georgia, Virginia, and elsewhere in the South.

*/ **Free Pick of the Week:** Homeland Security's New Disinformation Board Is a Bad Idea, Just Not for the Reason Tucker Carlson Says It Is.*

Numerous descendants of Black farm owners have used the leg up to build better lives for themselves, and many of those who stayed on the farm used their independence from the white power structure to advocate for civil rights in the middle of the twentieth century.