Case 2:24-cv-00164-Z   Document 30-1   Filed 08/26/24   Page 506 of 2062   PageID 8336

These landowners provided refuge and support for civil rights activists who assisted local people as they campaigned for political rights in the 1960s. "What really is important about how the movement was able to take root in Mississippi [is] there was a network of Black landowners," Bob Moses, a key civil rights figure, said in a recent documentary. "This was really our secret weapon."

Yet the federal government acted against these families. Hard-pressed as they were already, the modern agricultural system created as part of the New Deal was the single greatest cause of the decline of Black farmers. As Ira Katznelson makes clear in *When Affirmative Action Was White,* New Deal liberals needed Southern legislators to pass their agenda, which gave the South's elite immense control over legislation. These elites were determined to maintain the South's racial order and moved as a bloc to crush any program that threatened it.

Unable to draft legislation that discriminated explicitly on race, Southern policymakers instead drafted laws that discriminated by scale.

These lawmakers attacked programs for small farmers, like those run by the underfunded and short-lived Farm Security Administration, for turning Black farmers into "lazy, thriftless loafers" and for being "un-American" and "communistic." As U.S. Representative Harold Cooley of North Carolina explained at a hearing in 1943, subsidies for large farmers were "money earned" for "the benefit of the general welfare," while Farm Security Administration programs for small farmers turned the recipients into "ward[s] of the government."

As politicians killed assistance for Black farmers, they established enormous financial programs for the planter class many of them had emerged from. The government initiated massive subsidy programs in this era—federal payments went from 3 percent of farm income in 1929 to 31 percent in 1940—and almost all of the money went to wealthy white landowners. Southern legislators, wary of federal bureaucrats interfering with their region's racial order, ensured that these new agricultural programs and dollars would be managed locally, under white control.

In 1934, an anonymous correspondent from Arkansas warned the readers of *The Crisis,* the NAACP's magazine, that New Deal policies would spell the end of Black farmers. Almost all the state's Black-owned farms, "the whole [life] savings of from one to three generations," would be "swept off the map" unless "the colored people can get some of the Government set-up as well as the others…. If one could help in this it would do Negroes nearly as much good as the Civil War."

As planters started to receive large payments not to plant, they evicted their tenants, invested in labor-saving machines, and started to reap profits that would make it impossible for most Black farmers to compete. By the 1950s, the modern agricultural system was in place in the South, and Black farmers would see their farmland decline by four million acres in the next decade.

Around the same time, Black farmers became targets in the white backlash to the civil rights movement. After *Brown v. Board,* when the courts indicated that they would no longer reflexively defend segregation, Southern white politicians and elites—fearful that their Black

APP. 000501

constituents would threaten their power—took any measure they could to defend their positions, which included taking advantage of USDA's power in the still heavily agricultural South.

As policymakers continued to fund industrialized agriculture, the founder of the Citizens' Council drew up a plan in 1956 to remove 200,000 African Americans from Mississippi over the decade by way of "the tractor, the mechanical cotton picker … and the decline of the small independent farmers."

"The situation for rural blacks was bad enough before the *Brown* decision," writes Pete Daniel, a historian whose book, _Dispossession_, covers this era. But afterward, "USDA programs were sharpened into weapons to punish civil rights activity."

USDA agents refused loans to Black farmers, interfered in elections for county committees that distributed federal funds, restricted the crops Black farmers could grow, and sometimes participated in outright theft. William Strider, a USDA agent in Mississippi, would delay paying out operating loans to Black farmers who had posted their land as collateral to his friend, Norman Weathersby. Weathersby required Black farmers to put up their entire farms as collateral for loans to purchase farm equipment, so when the USDA farm operating loan failed to come through, and the farmers missed their payment to Weathersby, he acquired the farmland. An AP report found that Weathersby acquired over 700 Black-owned acres in this way.

APP. 000502

Case 2:24-cv-00041-Z   Document 24-1   Filed 09/26/24   Page 5 of 200   PageID 8338



A farm owner and his brother at a well on their farm in Jefferson, Texas.

FARM SECURITY ADMINISTRATION, 1939/LOC

Black farmers understood "technology" and "land consolidation" were not to blame for their circumstances: "The removal of Negroes from land ownership in the South," wrote a black

APP. 000503

farmers' organization in 1966, "is part of a conscious policy to destroy the political power of the black vote." Black farmers lost two-thirds of their remaining acreage between 1950 and 1974.

Black farmers still say that the government decided to enact policies and enable discrimination that dispossessed previous generations of their land. In a letter to Senator Elizabeth Warren, sent during the 2020 Democratic presidential primary, a group of Black farmers called for "something very simple, something that white farmers in this country have enjoyed for more than a century. We want a department that works for us, not against us." "Technocratic adjustments" and "audits," they said, were not enough to make up for the intense discrimination they had faced.

"The disaster we suffered was unnatural," says Will Muhammad, a Black farmer in Alabama. "We were assaulted by white folk."

# Resistance

Even in an era of USDA vote-fixing and intimidation, the white establishment blamed impersonal "economic forces" for Black land loss. A front-page article in *The New York Times* in 1965 announced that Black farmers were "doomed" because of "economic threats" like the "mechanical tobacco harvester" and an unexplained "lack of capital." One expert predicted that Black farmers would be gone in 10 years, while another gave them a little over two decades to "virtually disappear."

The *Times* forgot to mention that the U.S. Commission on Civil Rights had released a major report earlier that year that concluded there was "unmistakable evidence that racial discrimination has served to accelerate the displacement and impoverishment of the Negro farmer."

Black farmers were well aware of this discrimination. Despite being excluded from the modern credit system, owning few resources, and having little public support, they banded together to keep their land.

Civil rights leader and former sharecropper Fannie Lou Hamer is known for her run for Congress in the 1964 Democratic primary, a race where she challenged Jamie Whitten. Hamer also helped raise funds for Black farmer organizations and started a cooperative named Freedom Farm in the Mississippi Delta. Her 680-acre operation was one of hundreds of Black-led cooperatives founded in the late 1960s and '70s that helped slow the dispossession of Black families.

In 1967, a group of 22 of these cooperatives came together as the Federation of Southern Cooperatives to pool resources and preserve Black farmland. As Joe Rosenberg Johnson told *Jet* in an interview that year about his Alabama cooperative, "We don't have the conservation service experts testing our land. We don't have the bankers lending us money. We don't have the Agriculture Dept. giving us help, loans, or information. But we're pulling together now."

By 1977, the FSC included more than 130 cooperatives and approximately 30,000 member families. The organization, which still serves cooperatives and Black farmers today, saved millions of dollars' worth of Black-owned farmland. Through this work, the group defied mainstream accounts of Black land loss as the inevitable result of mechanization and "progress," and of Black farmers as "less sophisticated" than white landowners.

# The house that Jamie built

The FSC and similar groups won critical victories, but they still worked in the shadow cast by the USDA. Even as the civil rights movement made progress in the 1960s, Jamie Whitten ensured that the department's powerful white supremacist bureaucracy remained untouched.

As head of a key House committee, Whitten used his influence over the budget to control USDA offices and staffing. Under President Dwight Eisenhower, he killed a research agency because of its studies on economic and racial disparities in rural areas. When John Kennedy's administration sought to replace it with a new agency, the Economic Research Service, Whitten secured a promise that the new division would not publish studies on Black farmers, farmworkers, and other marginalized groups—a promise that successive administrations also kept. Under President Lyndon Johnson, Whitten unilaterally killed the Great Society's rural poverty office by defunding and absorbing it into a more conservative part of the department.

The "Permanent Secretary" cut staff from projects he disliked, while he secured political appointments for friends and cronies. Orville Freeman, Johnson's secretary of agriculture, told reporters that he had "two bosses. One is President Johnson. The other is Jamie Whitten."

Whitten successfully institutionalized his vision of aristocratic racial hierarchy at the USDA. He was famous for attacking "hound dog projects"—that is, any program he thought might help Black Southerners. He killed food programs, studies of Black sharecroppers, and even a small program to help Black workers learn how to drive tractors.

Case 2:24-cv-00113-Z   Document 30-1   Filed 07/03/24   Page 17 of 200   PageID 8641



Home of an African American farmer in Erin, New York

FARM SECURITY ADMINISTRATION, 1940/LOC

Meanwhile, with his blessing, the department not only sent almost all its loans to wealthy, white farmers, it even guaranteed millions in loans to suburban swimming pools and segregated country clubs—including Whitten's own. Since his influence over the department's offices, staff, and work was so sweeping, it is no surprise that Black farmers still know the USDA as "the Last Plantation."

The Commission on Civil Rights confirmed pervasive discrimination at the department in two major reports, one in 1965 and another in 1982. White outlets gave these reports little coverage at the time, as they continued to claim "land consolidation" and technology were to blame for the decline of Black farmers.

A 1990 congressional study concluded that "little [had] changed" at the department since the 1982 report and that the USDA continued to "implement policies ... directly responsible for the loss of land and resources" of Black farmers. The USDA's response was to adopt the rhetoric of equal rights, writes the historian Pete Daniel, while systematically denying rights to Black families in practice.

In 1997, Black farmers sued for widespread discrimination at the department between 1981 and 1996. (The USDA had no civil rights office from 1983, when President Ronald Reagan effectively closed it, to 1996, when President Bill Clinton restored it.) Although the farmers won a settlement in the case—called *Pigford v. Glickman*—the payments did little to relieve

APP. 000506

Case 2:24-cv-00060-Z   Document 30-1   Filed 07/26/24   Page 7 of 200   PageID 8842

the enormous debts many Black farmers held or to help them get their land back. After a bipartisan but erroneous narrative took hold—repeated everywhere from Breitbart to *The New York Times*—that the settlement was rife with fraud, many Black farmers were left off worse than they were before, their white neighbors resentful against them and legislators in Congress unwilling to offer help. And most Black farmers had already lost their land by the 1980s, making them ineligible for relief under *Pigford*.

Although Obama-era officials claimed *Pigford* helped bring a "new era for civil rights," business proceeded as usual at the USDA. The Government Accountability Office released six reports documenting patterns of discrimination at the USDA between 1999 and 2009. One independently commissioned study found ongoing discrimination against minorities within the department in 2011. A wide-ranging investigation by two of us found rampant deception and discrimination throughout the Obama years. Reports from current employees and Black farmers indicate that little changed under President Donald Trump.

# The cost

When the federal government undertook to assist white Southerners in the dispossession of Black-owned farmland, it succeeded in destroying a significant share of Black wealth. Black families lost at least 14 million acres after 1910. We estimate that the portion lost between 1920 and 1997, along with the lost income from that land, would be worth around $326 billion today. If this amount were distributed across all Black families, their median household wealth would nearly double, from $21,000 to $37,000.

APP. 000507

Case 2:24-cv-00162-Z    Document 30-1    Filed 06/06/24    Page 5 of 200    PageID 8643



A group of men straining sorghum syrup into a barrel on the farm of an African American owner, Wes Chris, in a prosperous Black settlement near Orange County, North Carolina.

FARM SECURITY ADMINISTRATION, 1939/LOC

We developed this estimate based on records from the Census of Agriculture. We looked at acreage owned over time, applying adjustments for undercounts of Black farmers. We used land values in the census to assess the value of lost land, then applied an interest rate based on historical returns to farmland to get our final estimates.

These estimates are conservative in some important ways. Many Black farmers once owned land in what are now some of the most fertile areas of the country, where farm returns have long been much higher than what we used in our estimates. Developers have turned some of this land, like in Hilton Head, South Carolina, into incredibly expensive residential and commercial properties. We also did not account for land lost before 1920. As the historian John C. Willis documented in *Forgotten Time,* two-thirds of farm owners in the Mississippi Delta were Black in 1900, but that share had fallen to less than one-fifth by 1910.

APP. 000508

Case 2:24-cv-00060-Z   Document 38-11   Filed 07/26/24   Page 9 of 200   PageID 8894

Neither does our estimate account for Black families' lost investments in their children's education, their diminished political rights, their lost self-determination and autonomy, their lost dreams, hopes, aspirations, and way of life. No calculation could ever account for these things.

But our estimate sets a starting point for reckoning with the way that federal policy undercut what was once the single largest source of Black wealth. This land loss explains a significant role in the enormous Black-white wealth gap. That gap is more than 10 times larger than the income gap between Black and white families; even white high school dropouts have twice as much average wealth as Black college graduates.

This racial chasm has its origins in numerous government policies—the general exclusion of Black veterans from the G.I. bill, political disenfranchisement, widespread denial of home loans, failure to enforce equal hiring, mass incarceration—and in merciless white violence against Black people, including reprisals against organizing agricultural workers and farmers in the Leflore Massacre of 1889 and the Elaine Massacre of 1919. One pattern we see throughout history is that when Black Americans make relative progress the white establishment comes in and takes it away.

Last year, Congress passed debt relief for anyone from a "socially disadvantaged group" who had certain types of loans with or guaranteed by the USDA's Farm Service Agency. Before the Agriculture Department disbursed any of the money, a Florida judge froze the program in response to a lawsuit brought by a white farmer backed by a powerful conservative legal fund.

Black farmers and their advocates criticized the USDA for not getting the money out faster. "We're probably not even going to get it," Lloyd Wright, a Black farmer and former director of civil rights at the Agriculture Department, told *The Guardian* last year. "They could have done it within weeks. They were aware some angry people were trying to stop it. I think we'll get the debt relief around the same time we get the 40 acres and a mule."

The year Jamie Whitten retired, Congress named the USDA's headquarters after him. When he died the next year, in 1995, Bill Clinton said he had "worked tirelessly on behalf of America's farmers" and "never gave up working to build more opportunity for all Americans willing to make the most of their lives."

Whitten's work lives on. In 2018, just 2,900 farms in Mississippi received over $170 million in soybean subsidies while Mississippi farmers, as a whole, received $363 million in subsidies and payments. The average commercial farmer in Mississippi has a net income of $396,000, according to the 2017 Census of Agriculture. Meanwhile, the 20 percent of Mississippians living below the poverty line, 587,000 people in total, received only $7 million in payments from Temporary Assistance for Needy Families, or what remains of welfare. Mississippi's farmers are 86 percent white, and its TANF recipients are 84 percent Black. The "Permanent Secretary" is dead. Why do we still have his policies?

APP. 000509

Case 2:24-cv-00060-Z Document 36-1   Filed 08/28/24   Page 510 of 200   PageID 9045

**Dania Francis** @DaniaFrancis

Dania Francis is an economist at the University of Massachusetts Boston.

---

**Darrick Hamilton** @DarrickHamilton

Darrick Hamilton is the Henry Cohen professor of economics and urban policy and university professor at the New School.

---

**Thomas Mitchell** @ProfTWMitchell

Thomas Mitchell is currently a law professor at Texas A&M University School of Law, but will be joining the Boston College Law School faculty this summer.

---

**Nathan Rosenberg** @rosenblawg

Nathan Rosenberg is a visiting scholar at the Food Law and Policy Clinic at Harvard Law School.

---

**Bryce Wilson Stucki**

Bryce Wilson Stucki is a writer and researcher in Washington, D.C.

---

**Read More:** The Soapbox, Agriculture, Farming, Department Of Agriculture, Inequality, Economic Inequality, Racism, Jamie L. Whitten, Racial Wealth Gap, Wealth Inequality, Jim Crow, Politics

---

Editor's Picks

APP. 000510

Case 2:24-cv-00067-Z Document 30-11 Filed 07/28/24 Page 516 of 200 PageID 8946

Evictions Are Back. Black Renters Are Suffering the Most—Again.
Lori Teresa Yearwood

Lori Teresa Yearwood
Evictions Are Back. Black Renters Are Suffering the Most—Again.

Legalized Pot Was Supposed to Help Build Black Wealth in Los Angeles. It Failed.
Amanda Chicago Lewis

APP. 000511

Case 2:24-cv-00060-Z   Document 30-1   Filed 07/28/24   Page 12 of 200   PageID 847

Amanda Chicago Lewis
Legalized Pot Was Supposed to Help Build Black Wealth in Los Angeles. It Failed.

APP. 000512

![USDA logo]
United States
Department of
Agriculture

Office of the Secretary
Washington, D.C. 20250

June 23, 2022

The Honorable Glenn "GT" Thompson
U.S. House of Representatives
2231 Rayburn House Office Building
Washington, D.C. 20515

Dear Ranking Member Thompson:

Thank you for your letter regarding a request for data and reasoning that supports the U.S. Department of Agriculture's (USDA) efforts in expanding pandemic assistance program relief to ensure that programs, benefits, and services are equitably disseminated. I apologize for the delayed response.

USDA's effort to review programs was not a singular process nor was it comprised of one document or data set. The review has been an iterative process, and we have examined many aspects of what constitutes a gap or disparity. Our focus has been to identify all potential gaps, confirm the scale and scope of those disparities, and design programs to address issues within the constraints of our authority and resources. This has resulted in both designing new programs that reach producers or focus on communities that have not received aid and in making adjustments to program availability within an industry as disparities were identified.

For example, we found that many dairy farmers have been disproportionately harmed by the Federal Milk Marketing Order pricing anomalies that were exacerbated by the dairy purchases under the Farmers to Families Food Box Program. In response, we developed the Pandemic Market Volatility Pandemic Assistance Program, which targets relief to dairy producers based on the extent of that harm. Similarly, we learned that the previous Administration's plans to assist contract growers during the pandemic under the Coronavirus Food Assistance Program did not have a way to account for new producers, expanding operations, or to allow an apples-to-apples comparison between the reference year and the pandemic year to calculate an accurate revenue decline. That is why we paused the program and worked with growers and groups, like the National Chicken Council and American Farm Bureau Federation, to make changes to be fair to all contract growers.

For all pandemic assistance programs, USDA has both heard from and proactively consulted agricultural producers, organizations, and Congress. Please see the attachment that includes organizations and individuals with whom we have had written correspondence or meetings. This list is not fully comprehensive. We continue to seek feedback to ensure our programs are implemented in an equitable and efficient manner that will help American producers weather the challenges they have faced and continue to face as our economy gets back on track.

In your letter, you ask if the impact of any demographic information, including race, was analyzed. Indeed, race information was one element the Department analyzed as part of the Biden Administration's review of previous payment data for the Coronavirus Food Assistance Programs (CFAP 1 and CFAP 2).

When CFAP 1 was initially implemented, the program had a minority participation rate of 4.4 percent (3.5 percent of payments), and prior to being reopened on April 5, 2021, CFAP 2 had a minority participation rate of 4.2 percent (3 percent of payments). When USDA reopened CFAP 2, the Department worked to

The Honorable Glenn "GT" Thompson
Page 2

provide additional education and outreach to inform producers of the assistance available and the extended enrollment period. As a result of FSA's efforts, the minority participation rate during that reopening period jumped to 16 percent and equated to a 15 percent payment rate for payments made after the reopening of CFAP 2.

This administration is focused on reaching a better understanding of where barriers to accessing USDA programs and services exist so that we can address them, both in program design as authorities allow and in our outreach efforts. USDA's challenge of underrepresentation in program participation and payments is not limited to race and ethnicity, though the data is clear about this challenge.

In February, GAO reported[1] that only 1.9 percent of all Market Facilitation Program payments went to minorities and women, despite minorities by race and ethnicity making up approximately 8 percent of the farmers and women being the principal operators of 30 percent of farms according to the Census of Agriculture.

Other major farm, disaster, and conservation programs often show similar disparities. Minority farmers only account for 1.1 percent of ARC/PLC enrolled base acres in 2019, 2 percent of ARC/PLC participants, and 0.8 percent of Conservation Reserve Program cost-share recipients. Among major farm and conservation programs, only the Livestock Forage Program and the Environmental Quality Incentives Program are at or above 8 percent for minority producer participation (see enclosure). In many cases the percentage based on the payment amounts is even more pronounced than looking at the number of participants.

As we have developed and implemented Pandemic Assistance for Producers Initiative programs, we have provided clear rationale and analysis of policy design in the respective press releases, handbook guidance, Federal register notices, and rules. We have posted these items on farmers.gov/pandemic-assistance/. I will refrain from including a list of these documents, but please have your staff request them if they cannot retrieve them from the various public repositories.

Thank you for your letter and interest in working together to ensure pandemic assistance reaches producers in need. I invite you to join me in working to identify barriers that may be preventing underserved producers from participating in USDA programs, and I look forward to working with you to support rural America and our farm families.

Sincerely,

Thomas J. Vilsack
Secretary

Enclosure

---

[1] https://www.gao.gov/products/gao-22-104259

**Enclosure: Participation and payment rates for minority producers (based on race and ethnicity) for major farm, disaster, and conservation programs[2]**

| Program | # minority participants | % minority participants | Payments to minorities (millions) | % of payments to minorities |
|---|---|---|---|---|
| ARC-PLC[3] | 13,501 (out of 677,644) | 2.02% | $66.45 (out of $5,401) | 1.23% |
| Base Acres[4] | 2,683,548 (out of 243,283,208) | 1.10% | N/A | N/A |
| LFP[5] | 5,676 (out of 59,629) | 9.52% | $20.3 (out of $356) | 5.7% |
| LIP[6] | 333 (out of 3,926) | 5.62% | $3.41 (out of $44.6) | 7.64% |
| MFP[7] | 8,733 (out of 624,347) | 1.40% | $116.5 (out of $11,563) | 1.01% |
| CFAP[8] | 30,411 (out of 772,696) | 3.94% | $362 (out of $11,963) | 3.03% |
| CRP Cost-share[9] | 343 (out of 44,651) | 0.77% | $0.97 (out of $80.3) | 1.21% |
| CSP[10] | 512 (out of 10,420) | 4.91% | $23.4 (out of $604) | 3.87% |
| EQIP[11] | 3,701 (out of 32,825) | 11.3% | $84.0 (out of $702) | 12.0% |

[2] According to the 2017 Census of Agriculture minority producers account for just under 8% of producers (based on race and ethnicity)
[3] Average of 2015-2019
[4] Based on enrolled base acres in 2019
[5] Average of 2015-2019
[6] Average of 2015-2109
[7] Average of 2018 and 2019
[8] Average of CFAP1 and CFAP2 through January 27, 2021
[9] Average of 2015-2020
[10] Average of 2015-2020
[11] Average of 2015-2020

**Pandemic Assistance Programs and Agricultural Disaster Assistance Programs Rule**

**Cost-Benefit Analysis**

**Points of Contact:**



Emergency Relief Program (ERP) Phase 2— Privileged—Not Part of Administrative Record

Pandemic Assistance Revenue Program (PARP)— Privileged—Not Part of Administrative Record

Top-Up for Underserved CFAP2 Recipients— Privileged—Not Part of Administrative Record
Privileged—Not Part of Administrative Record

Recreational Animals and Livestock Disaster Programs— Privileged—Not Part of Administrative Record

Flexibility in NAP Enrollment for Underserved Producers— Privileged—Not Part of Administrative Record

Notification of Interest— Privileged—Not Part of Administrative Record

Emergency Conservation Program (ECP) and Public Lands— Privileged—Not Part of Administrative Record
Privileged—Not Part of Administrative Record

ECP/Emergency Forest Restoration Program (EFRP) and the Hermit's Peak/Calf Canyon Fire— Privileged—Not Part of Administrative Record

**November 22, 2022**

## Executive Summary

This cost-benefit analysis covers numerous unrelated programs or program changes that largely address pandemic assistance or natural disaster assistance.

The accompanying rule announces ***Phase 2 of the Emergency Relief Program (ERP)***, which addresses eligible crop losses not included in ERP Phase 1. ERP is authorized in the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117– 43), which provided $10 billion for expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, and other events occurring in calendar years 2020 and 2021. Targeted outlays for ERP Phase 2 are $1.2 billion; a pro-rate in payments is likely as gross outlays are projected at $2.3 billion (see Table 1).

The rule also contains two programs—including a new pandemic assistance program and additional assistance for underserved producers—that address COVID-19 losses. Prior rules associated with the COVID-19 pandemic were published in the Federal Register on May 21, 2020 (Coronavirus Food Assistance Program (CFAP) 1); September 22, 2020 (CFAP 2); and August 27, 2021 (CFAP2: Producers of Sales-Based Commodities and Contract Producers).[1] These programs assisted producers of agricultural commodities marketed in 2020 who faced continuing market disruptions, reduced farm-level prices, and increased production and marketing costs due to COVID-19. These additional costs are associated with declines in demand, surplus production, or disruptions to shipping patterns and marketing channels.

In implementing these COVID-related programs, additional assistance was deemed necessary:

- ***Pandemic Assistance Revenue Program (PARP)***—The new PARP program assists producers with revenue loss resulting from the COVID-19 pandemic for eligible agricultural commodities. Payments are made on a whole farm basis and not on a commodity-by-commodity basis. The aggregate allocation for PARP is targeted at $250 million; a pro-rate in payments is likely as gross outlays are projected at $2.7 billion (Table 1).
- ***Additional Assistance for Underserved CFAP2 Recipients***—CFAP2 recipients who are underserved (beginning, limited resource, socially disadvantaged, and veteran farmers and ranchers), excluding contract producers, will receive a 15-percent top-up payment. Net outlays are estimated at $325 million (Table 1). As few underserved producers are likely to have Adjusted Gross Income (AGI) issues or reach the payment limit, gross and net outlays are assumed to be identical.

The other changes relate to existing programs or requirements:

---

[1] Note that several notices of funds availability related to pandemic assistance have also been published, including Pandemic Assistance for Timber Harvesters and Haulers (July 23, 2021) and the Pandemic Livestock Indemnity Program (July 19, 2021).

- ***Recreational Animals and Livestock Disaster Programs***—This rule makes discretionary changes to the Emergency Assistance for Livestock, Honey Bees, and Farm-Raised Fish Program (ELAP), the Livestock Forage Program (LFP), and the Livestock Indemnity Program (LIP) to amend the definition of eligible livestock. Previously, animals that were maintained for recreational purposes, such as for pleasure, roping, hunting, pets, or show, as well as animals intended for consumption by an owner, lessee, or contract grower, were ineligible for ELAP, LFP, and LIP. This rule removes those restrictions. Estimated net outlays (accounting for AGI considerations, payment limits, and other reductions) are $17.7 million annually.
- ***Flexibility in Non-Insured Crop Disaster Assistance Program (NAP) Enrollment for Underserved Producers***—FSA is updating NAP provisions regarding program flexibilities for underserved producers. For example, the "definition of coverage" is amended to provide flexibility as FSA reviews ways to streamline the application process for underserved farmers and ranchers. Net outlays are estimated at $4.3 million annually (identical to the gross outlay estimate).
- ***Notification of Interest Changes***—Prior to this rule, a legal entity was ineligible for farm programs when the names and valid taxpayer identification numbers for all members holding an ownership interest in the entity were not provided to USDA. Now, a legal entity can receive a partial payment. Net outlays are estimated at $2.5 million annually.
- ***Emergency Conservation Program (ECP) expansion to public lands (Federally- and State-owned Land)***—ECP provides payments to farmers and ranchers to rehabilitate farmland damaged by certain natural disasters and to implement emergency water conservation measures in periods of severe drought. ECP eligibility on public lands has not been included in the regulation until now. ECP coverage of public lands has been in the FSA handbook for many years, however, and FSA staff in the field have provided ECP assistance to both public and private lands since at least the 1990s. As a result, no increase in net outlays is expected.
- ***ECP/EFRP and the Hermit's Peak/Calf Canyon Fire*--**Section 104 (3) (A) of the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023 authorizes the Federal government to pay 100 percent of the ECP and Emergency Forest Restoration Program (EFRP) cost for damage associated with the Hermit's Peak/Calf Canyon Fire. This fire burned over 340,000 acres from April 2022 to June 2022 and was the largest wildfire in recorded history in New Mexico. The cost-share rate for both ECP and EFRP, prior to this legislation, was 75 percent regardless of location. The legislation applies only to the locale of the Hermit's Peak/Calf Canyon Fire. The expected net cost is $22.5 million for FY 2023.

Gross outlays for these items are estimated at $6.0 billion (Table 1). After taking into account AGI considerations and payment limitations, as well as the targeted caps on ERP Phase 2 and PARP spending, net outlays are estimated at $1.8 billion. ERP Phase 2 accounts for about two-thirds of expected total net outlays. The Farm Service Agency (FSA) will administer all programs in Table 1. Producers must fill out paperwork to participate in these programs and the associated administrative costs are estimated at $18.4 million.

Table 1. Estimated Gross and Net Outlays for the Pandemic Assistance and Agricultural Disaster Assistance Programs Rule for FY2023

| Item | Gross Estimated Outlays in FY2023 | Net Estimated Outlays in FY2023 | Implementing Agency | Funding Source |
|---|---|---|---|---|
| Item 1—Emergency Relief Program (ERP) Phase 2 | $2.973 billion[a] | $1.2 billion | FSA | Extending Government Funding and Delivering Emergency Assistance Act P.L. 117-43 |
| Item 2—Pandemic Assistance Revenue Program (PARP) | $2.662 billion[b] | $250 million | FSA | Consolidated Appropriations Act, 2021 (CAA) P. L. 116-260 |
| Item 3—15-Percent Top-Up for Underserved Recipients of CFAP 2 Payments | $325 million | $325 million | FSA | Commodity Credit Corporation (CCC) net transfer except for the tobacco portion, which is from the Coronavirus Aid, Relief, and Economic Security (CARES) Act P. L. 116-136 |
| Item 4—Recreational Animals and Livestock Disaster Programs[c] | $19.5 million | $17.7 million | FSA | Commodity Credit Corporation (CCC) |
| Item 5—Flexibility in NAP Enrollment for Underserved Producers[d] | $4.3 million | $4.3 million | FSA | CCC |
| Item 6  Notification of Interest Changes | $2.5 million | $2.5 million | FSA | CCC |
| Item 7—Emergency Conservation Program and Public Lands | No change in cost | No change in cost | FSA | CCC |
| Item 8  ECP/EFRP and the Hermit's Peak/Calf's Canyon Fire[e] | $24.2 million | $22.5 million | FSA | Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023 P.L. 117-180 |
| Total | **$5.99 billion** | **$1.82 billion** | | |

[a] This estimate uses the 50-percent loss scenario. Note that both 2020 and 2021 losses are expected to be paid in FY 2023. The significant difference between gross and net outlays is because the targeted amount for ERP Phase 2 spending is $1.2 billion.
[b] This estimate represents the most plausible scenario but, as discussed below, gross estimated outlays could be considerably higher. Note that the significant difference between gross and net outlays is because the targeted amount for PARP spending is $250 million.
[c] The difference between the gross and net amount is due to adjusted gross income (AGI) considerations, payment limitations, and other reductions.
[d] This estimate uses the 20-percent increase-in-participation scenario.
Note: Benefits associated with Items 4-7 continue in FY 2023 and in perpetuity in each fiscal year beyond. Payments associated with Items 1, 2, 3, and 8 are assumed to be paid in FY 2023 and to not continue beyond.

[ PAGE  \* MERGEFORMAT ]

**Economic Analysis by Item**

**Item 1— Emergency Relief Program (ERP) Phase 2**

ERP Phase 1 provided assistance for crop, tree, bush, and vine losses in calendar years 2020 and 2021 to producers already participating in the Federal crop insurance program or NAP. ERP Phase 1 used a streamlined process with pre-filled applications and relied on data on file with the Risk Management Agency (in the case of crop insurance) or FSA (in the case of NAP). Phase 1 assisted producers who had previously received a NAP payment or a crop insurance indemnity. In contrast, Phase 2 addresses eligible crop losses among producers who were not participating in crop insurance or NAP and those that may have had crop insurance or NAP, but the loss was not large enough to trigger a payment ("shallow losses"). Phase 2 also covers crops not eligible for either crop insurance or NAP (such as medicinal crops) and quality losses not accounted for in Phase 1. Eligible causes of loss for Phase 2 include drought, wildfire, hurricane, flood, derecho, excessive heat, winter storm, freeze (including a polar vortex), smoke exposure, reduced quality, and excessive moisture.

Phase 2 payments are based on the following equation:

$$\sum_{i=1}^{n} Estimated\ ERP\ Phase\ 2\ Payments_i$$

$$[Estimated\ market\ value\ of\ U.S.\ agricultural\ products\ sold\ not\ covered\ by\ crop\ insurance\ or\ NAP_i$$
$$times$$
$$Historical\ average\ percentage\ of\ farms\ receiving\ agricultural\ disaster\ payments\ _i$$
$$times$$
$$Three\ scenarios\ with\ different\ assumed\ crop\ losses_i]$$
$$plus$$
$$\sum_{i=1}^{n}(Estimated\ shallow\ losses + Estimated\ quality\ losses)$$

The "$i$" represents different product categories covered by Phase 2. Livestock and livestock products are not included as the Emergency Livestock Relief Program (ELRP Phases 1 and 2) covers those losses.

The market value of product sales not covered by RMA or NAP are estimated in Step 1 below. In Step 2, Phase 2 payments are calculated using Step 1 data and three crop-loss scenarios: 75, 50, and 25 percent. For example, the 25 percent scenario means that the expected crop market value has been reduced by a quarter due to some qualifying event. In Step 3, shallow losses are calculated using average shallow loss incidence rates developed by academic sources.[2] Quality losses are also estimated in Step 3 using 2018-2019 FSA data on quality loss payments.

---

[2] Carl Zulauf and Gary Schnitkey (2015). "Understanding ARC-CO as a Shallow Loss Program," *FarmDoc Daily*, University of Illinois.
https://farmdocdaily.illinois.edu/2015/12/understanding-arc-co-as-a-shallow-loss-program.html

**Step 1—***Estimate the market value of U.S. sales not covered by crop insurance or NAP—*The market value of agricultural products sales covered by RMA is first estimated. Column A in Table 2 lists the market value of agricultural products sales by different product categories as reported in the 2017 Census of Agriculture.[3] Column B lists the 2015 market penetration rates of crop insurance across different crop categories, as reported by RMA in 2017.[4] Market penetration is estimated by comparing insured acres to U.S. planted acres (or other units, if planted acres are not applicable). Crop-specific RMA market penetration rates are used for row crops (e.g., wheat) while category-wide market penetration rates estimated by RMA (e.g., fruits and nuts) were used for: (1) vegetables, melons, potatoes, and sweet potatoes; (2) fruits, tree nuts, and berries; (3) nursery/greenhouse. Values in Column C are the product of Columns A and B and represent the estimated market value of sales under crop insurance and are therefore excluded from ERP Phase 2 payment calculations.

Table 2. Estimated Market Value of Agricultural Sales Covered by Crop Insurance

| Product Categories Listed in the 2017 Census of Agriculture | (A) Market Value of Agricultural Products Sold in 2017 Agricultural Census ($) | (B) RMA Crop Insurance Penetration Rates in 2015 | (C) Estimated Market Value of Agricultural Products Sold Covered by Crop Insurance ($) (A*B) |
|---|---|---|---|
| Corn | 51,219,763,000 | 85% | 43,536,798,550 |
| Wheat | 7,882,905,000 | 85% | 6,700,469,250 |
| Soybeans | 40,304,487,000 | 90% | 36,274,038,300 |
| Grain sorghum | 1,576,008,000 | 80% | 1,260,806,400 |
| Barley | 685,026 | 73% | 500,069 |
| Rice | 2,123,480,000 | 100% | 2,123,480,000 |
| Other grains, oilseeds, dry beans, and dry peas | 3,076,456 | 63% | 1,938,167 |
| Tobacco | 1,474,376,000 | 93% | 1,371,169,680 |
| Cotton | 6,685,609,000 | 100% | 6,685,609,000 |
| Peanuts | 1,634,017,000 | 92% | 1,503,295,640 |
| Vegetables, melons, potatoes, and sweet potatoes | 19,583,739 | 34% | 6,658,471 |
| Fruits, tree nuts, and berries | 28,581,398,000 | 74% | 21,150,234,520 |
| Nursery/greenhouse | 16,174,082,000 | 20% | 3,234,816,400 |
| Total | 141,505,388,221 | | 120,614,998,048 |

Data from FSA's Wildfires and Hurricanes Indemnity Program Plus (WHIP+) are used to calculate parallel estimates for NAP. According to FSA data, 3.78 percent of WHIP+ payments went to producers enrolled in NAP. Total sales values by product category (Column A of Table 3) were then multiplied by 3.75 percent (rounding the 3.78 percent) to estimate the market value of agricultural products sales covered by NAP. The results, shown in Column B, are also excluded from ERP Phase 2 calculations. It is important to note that approximately 100 percent

---

[3] USDA-NASS 2017 Census of Agriculture, Table 2. Market Value of Agricultural Products Sold Including Landlord's Share, Food Marketing Practices, and Value-Added Products: 2017 and 2012. [ HYPERLINK "https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_1_US/st99_1_0002_0 002.pdf" ].

[4] USDA-RMA, *The Risk Management Safety Net: Market Penetration and Market Potential - Analysis of the Federal Crop Insurance Portfolio*, September 2017. Calculation of the market penetration for selected crops using more recent data were consistent with those reported in this study. [ HYPERLINK "https://www.rma.usda.gov/-/media/RMA/Publications/Market-Penetration-and-Market-Potential-2017.ashx?la=en" ]

of cotton and rice acres were covered by crop insurance according to an RMA market penetration study. Thus, no NAP enrollment is assumed for those two crops.

Table 3. Estimated Market Value of Sales Covered by NAP

| Product Categories Listed in the 2017 Census of Agriculture | (A)<br>Market Value of Agricultural Products Sold in 2017 Agricultural Census ($) | (B)<br>Estimated Market Value of Agricultural Products Sold Covered by NAP ($)<br>(A*0.0375) |
|---|---|---|
| Corn | 51,219,763,000 | 1,920,741,113 |
| Wheat | 7,882,905,000 | 295,608,938 |
| Soybeans | 40,304,487,000 | 1,511,418,263 |
| Grain sorghum | 1,576,008,000 | 59,100,300 |
| Barley | 685,026 | 25,688 |
| Rice | 2,123,480,000 | 0* |
| Other grains, oilseeds, dry beans, and dry peas | 3,076,456 | 115,367 |
| Tobacco | 1,474,376,000 | 55,289,100 |
| Cotton | 6,685,609,000 | 0* |
| Peanuts | 1,634,017,000 | 61,275,638 |
| Vegetables, melons, potatoes, and sweet potatoes | 19,583,739 | 734,390 |
| Fruits, tree nuts, and berries | 28,581,398,000 | 1,071,802,425 |
| Nursery/greenhouse | 16,174,082,000 | 606,528,075 |
| Total | 141,505,388,221 | 5,582,639,296 |

* Because approximately 100 percent of rice and cotton acres were under crop insurance, it is assumed that there is no enrollment in NAP for these two crops.

Column D in Table 4 represents the estimated market value of agricultural products sold that is not covered by either crop insurance or NAP. This column represents the universe of sales that fall under ERP Phase 2.

Table 4. Estimated Market Value of Agricultural Sales Not Covered by Crop Insurance or NAP

| Product Categories Listed in the 2017 Census of Agriculture | (A) Market Value of Agricultural Products Sold in 2017 Agricultural Census ($) | (B) Estimated Market Value of Agricultural Products Sold Covered by Crop Insurance ($) | (C) Estimated Market Value of Agricultural Products Sold Covered by NAP ($) | (D) Estimated Market Value of Agricultural Products Sold Not Covered by Crop Insurance or NAP ($) (A-B-C) |
|---|---|---|---|---|
| Corn | 51,219,763,000 | 43,536,798,550 | 1,920,741,113 | 5,762,223,338 |
| Wheat | 7,882,905,000 | 6,700,469,250 | 295,608,938 | 886,826,813 |
| Soybeans | 40,304,487,000 | 36,274,038,300 | 1,511,418,263 | 2,519,030,438 |
| Grain sorghum | 1,576,008,000 | 1,260,806,400 | 59,100,300 | 256,101,300 |
| Barley | 685,026 | 500,069 | 25,688 | 159,269 |
| Rice | 2,123,480,000 | 2,123,480,000 | 0 | 0 |
| Other grains, oilseeds, dry beans, and dry peas | 3,076,456 | 1,938,167 | 115,367 | 1,022,922 |
| Tobacco | 1,474,376,000 | 1,371,169,680 | 55,289,100 | 47,917,220 |
| Cotton | 6,685,609,000 | 6,685,609,000 | 0 | 0 |
| Peanuts | 1,634,017,000 | 1,503,295,640 | 61,275,638 | 69,445,723 |
| Vegetables, melons, potatoes, and sweet potatoes | 19,583,739 | 6,658,471 | 734,390 | 12,190,878 |
| Fruits, tree nuts, and berries | 28,581,398,000 | 21,150,234,520 | 1,071,802,425 | 6,359,361,055 |
| Nursery/greenhouse | 16,174,082,000 | 3,234,816,400 | 606,528,075 | 12,332,737,525 |
| Total | 141,505,388,221 | 120,614,998,048 | 5,912,980,133 | 28,247,016,478 |

**Step 2—*Estimate Phase 2 payments for all commodity categories*—**The next step involves estimating the value of sales affected by a qualifying disaster but not covered by crop insurance or NAP. For that, the average percentage of farms receiving agricultural disaster payments by crop category during the 2011-2020 period was used (see Column B of Table 5).

Three possible scenarios of loss severity are evaluated: 75 percent, 50 percent, and 25 percent losses. As shown in Table 5, the products of Columns (A), (B), and one of the three different scenarios (Columns D through F) represent estimated ERP Phase 2 payments for each product category.

Table 5. Estimated ERP Phase 2 Payments under Three Scenarios

| (A) Estimated Market Value of Agricultural Products Sold in 2017 Not Under Crop Insurance or NAP ($) | (B) 2011-2020 average percentage of farms receiving agricultural disaster payments by farm specialization | (C) Estimated Value of ERP Phase 2 Payments Assuming 100% Losses in Market Value (A)*(B) * 1.0 | (D) Estimated Value of ERP Phase 2 Payments Assuming 75% Losses in Market Value (A)*(B) * 0.75 | (E) Estimated Value of ERP Phase 2 Payments Assuming 50% Losses in Market Value (A)*(B) * 0.50 | (F) Estimated Value of ERP Phase 2 Payments Assuming 25% Losses in Market Value (A)*(B) * 0.25 |
|---|---|---|---|---|---|
| 5,762,223,338 | 0.033 | 190,426,805 | 142,820,104 | 95,213,402 | 47,606,701 |
| 886,826,813 | 0.066 | 58,861,016 | 44,145,762 | 29,430,508 | 14,715,254 |
| 2,519,030,438 | 0.045 | 113,170,484 | 84,877,863 | 56,585,242 | 28,292,621 |
| 256,101,300 | 0.056 | 14,346,798 | 10,760,099 | 7,173,399 | 3,586,700 |
| 159,269 | 0.075 | 11,986 | 8,990 | 5,993 | 2,997 |
| 0 | 0.025 | 0 | 0 | 0 | 0 |
| 1,022,922 | 0.075 | 76,985 | 57,739 | 38,492 | 19,246 |
| 47,917,220 | 0.119 | 5,705,805 | 4,279,354 | 2,852,902 | 1,426,451 |
| 0 | 0.123 | 0 | 0 | 0 | 0 |
| 69,445,723 | 0.094 | 6,514,153 | 4,885,615 | 3,257,077 | 1,628,538 |
| 12,190,878 | 0.014 | 173,226 | 129,919 | 86,613 | 43,306 |
| 6,359,361,055 | 0.010 | 61,968,409 | 46,476,307 | 30,984,205 | 15,492,102 |
| 12,332,737,525 | 0.043 | 533,158,732 | 399,869,049 | 266,579,366 | 133,289,683 |
| 28,247,016,478 | | 984,414,399 | 738,310,799 | 492,207,200 | 246,103,600 |

**Example:** Estimation of ERP Phase 2 payments using the 50 percent loss scenario for wheat.

$886.83 million (market value of wheat sold not covered by crop insurance or NAP)

*times*

6.6 percent (2011-2020 average percentage of wheat farmers receiving agricultural disaster payments)

*times*

50 percent (assuming 50 percent crop losses across all wheat producers)

=

$29.43 million

Table 5 indicates an aggregate ERP Phase 2 payment of about $492 million under the 50 percent losses severity scenario. In the 75 percent scenario, estimated ERP Phase 2 payments total about $738 million and approximately $246 million in the 25 percent scenario.

**Step 3—Estimate shallow losses and quality losses payments for all commodity categories—**Phase 2 compensates producers who had shallow losses or quality losses in 2020 or 2021 and that did not qualify for ERP Phase 1.

*Shallow losses*

A shallow loss does not meet the deductible level. Data published by the University of Illinois estimate shallow loss severity rates of 6 percent for corn (e.g., the average amount of revenue lost when a shallow loss occurs) , 4 percent for soybeans, 7 percent for wheat, 10 percent for sorghum, and 7 percent for all other commodities. In addition, a 10 percent incidence rate of shallow losses is assumed based on discussions with program managers. Using this information, shallow losses payments are based on the following equation:

$$Shallow\ losses\ payments_i =$$
$$Market\ value\ under\ crop\ insurance\ reported\ by\ 2017\ Census\ of\ Agriculture_i$$
$$times$$
$$Severity\ rates\ for\ shallow\ losses_i$$
$$times\ 10\ percent\ incidence\ rate\ of\ shallow\ losses_i$$

**Example:** Estimation of shallow losses for wheat producers

$6,700 million (market value of wheat sold under crop insurance reported in the 2017 Census)
*times*
7 percent (Severity rate of shallow losses for wheat producers)
*times*
10 percent incidence rate of shallow loss
=
$46.90 million

Adjusting for premium payments and fees, annual shallow losses for all included agricultural products total $818.75 million. Payments for both 2020 and 2021 losses are therefore estimated at $1,637.51 million.

*Quality losses*

According to FSA data, quality loss payments in 2018 and 2019 averaged $146.12 million. This amount is multiplied by 20 percent to adjust for premiums and fees. Annual quality losses addressed by ERP Phase 2 are estimated at $175.35 million. Payments for both 2020 and 2021 losses are therefore estimated at $350.70 million.

Table 6 shows estimated annual ERP Phase 2 payments compensating eligible producers not paid under Phase 1 for their eligible losses. This includes losses not covered by crop insurance or NAP, shallow losses, and quality losses. Depending on the scenario used, ERP Phase 2 payments range from $2.48 billion to $3.29 billion. Note that ERP Phase 2 spending is targeted at $1.2 billion and a pro-rate of payments is likely. The $1.2 billion estimate appears in Table 1.

Table 6. Estimated ERP Phase 2 Payments in FY 2023

| Estimated ERP Payments | Estimated Payments for Farmers not Covered by Crop Insurance or NAP | Estimated Payments for Shallow Losses | Estimated Payments for Quality Losses | Total Estimated ERP Phase 2 Payments |
|---|---|---|---|---|
| Assuming 75% Loss in Market Value | $1,476.622 million | $1,637.507 million | $350.696 million | $3,289.477 million |
| Assuming 50% Loss in Market Value | $984.414 million | $1,637.507 million | $350.696 million | $2,972.61 million |
| Assuming 25% Loss in Market Value | $492.207 million | $1,637.507 million | $350.696 million | $2,480.410 million |

**Item 2—Pandemic Assistance Revenue Program**
*(a whole farm revenue payment program)*

PARP assists producers with revenue loss resulting from the COVID-19 pandemic for eligible CFAP commodities based on a producer's gross revenue (such as from a producer's IRS Schedule F or similar tax filing). It is an "umbrella" program covering gaps in prior CFAP assistance.[5] Payments are made on a whole farm basis and not on a commodity-by-commodity basis. The aggregate allocation for PARP is targeted at $250 million; proration of payments is likely (depending on Consolidated Appropriations Act, 2021, outlays associated with other pandemic programs).

Prior pandemic assistance was targeted at specific loss aspects, such as price loss, rather than overall revenue losses in 2020. As such, this prior assistance had significant holes in coverage. Now that producers can document their 2020 revenues, pandemic support can target remaining 2020 pandemic revenue losses. PARP does so by calculating for eligible producers the difference between a producer's 2018 or 2019 farm gross revenue[6] from allowable sources, and the producer's 2020 revenue, multiplied by a coverage factor, given that this revenue decrease is 15 percent or more in order to qualify for payment.[7] Any prior pandemic assistance payments

---

[5] Note that RMA operates the Whole Farm Revenue Protection (WFRP) program. Participation in WFRP has been relatively low throughout time; in commodity year 2020, a total of 2,030 WFRP policies earned premiums. In contrast, over 800,000 Revenue Protection policies earned premiums that year. Crop insurance indemnities, including those from WFRP, are accounted for in PARP, so there is no overlap.

[6] The choice of the 2018 or 2019 year is made by the producer.

[7] The requirement that the producer's revenue decrease by 15 percent or more to qualify for a payment was chosen as it is comparable to the maximum deductible in major federal crop insurance policies.

[ PAGE \* MERGEFORMAT ]

(such as CFAP 1 and 2 payments, Pandemic Livestock Indemnity Program payments, Spot Market Hog Pandemic Program payments, and Economic Relief Program (ERP) program year 2020 payments) are then subtracted from this calculated amount. By allowing the choice of 2018 or 2019, the program ensures farmers who had lower sales in 2019—for example, those unable to plant a 2019 crop—are not penalized. To avoid paying for the same losses, prior coronavirus payments, and certain other Federal and State agricultural payments, are subtracted out in the payment calculation.

PARP payments will be calculated in three steps:

- **Step 1:** *Calculate a producer's annual gross farm revenue from allowable sources (2018 or 2019, and 2020)—* This includes not only commodity sales, but also certain Federal agricultural support, including but not limited to, Federal crop insurance gross indemnities[8] and Non-insured Crop Disaster Assistance Program (NAP), Market Facilitation Program (MFP), Wildfire and Hurricane Indemnity Program Plus (WHIP+), and Emergency Relief Program (ERP) Phase 1 and 2 payments.[9]

- **Step 2:** *Calculate the revenue loss payment unadjusted for prior COVID-19 assistance and apply the coverage rate—* The eligible producer's 2020 allowable gross farm revenue is subtracted from the producer's allowable 2018 or 2019 gross revenue. If this revenue difference represents a 15 percent or greater loss, the revenue difference is then multiplied by the 80 percent coverage rate.[10]

- **Step 3:** *Account for prior COVID-19 and 2020 ERP assistance to calculate the PARP payment—* The producer's gross PARP payment is the producer's revenue loss less USDA coronavirus-related and 2020 ERP payments already received. The producer's net payment is the gross payment less reductions needed to stay within the payment limit of $125,000 per producer.

Two examples illustrate the calculations:

- **Example 1 with no prior pandemic assistance payments—**Suppose a producer's 2018 revenue is $45,000 and his 2019 revenue is $50,000; as a result, the producer elects the 2019 revenue for use in PARP. The producer's 2020 revenue is $40,000. The revenue difference is calculated as ($50,000−$40,000)/$50,000, which represents a 20 percent revenue decrease, and the producer qualifies for a payment. With a coverage rate of 80 percent, and no prior pandemic payments, the producer's gross payment is:

$$0.8 \times (\$50,000 - \$40,000) = \$8,000$$

---

[8] The use of gross indemnities in the analysis of program costs, rather than net, is to ensure consistency with the Schedule F approach used for PARP.

[9] ERP Phase 1 payments for 2020 losses are included in the PARP payment calculations in Table 2.

[10] The coverage rate is 90 percent for socially disadvantaged, limited resource, beginning, and veteran farmers and ranchers.

- ***Example 2 with prior pandemic assistance payments***—Suppose instead that the producer had a 2020 revenue of $30,000 and that the producer again elected the 2019 revenue, which remains at $50,000. The producer also received $4,000 in CFAP 1 and 2 payments. As the percent revenue difference is 40 percent ($50,000-$30,000/$50,000), the producer qualifies for a PARP payment. With a coverage rate of 80 percent, the producer's gross payment is:

$$0.8 \text{ x } (\$50,000 - \$30,000) = \$16,000$$
$$\$16,000 - \$4,000 \text{ in CFAP payments} = \$12,000$$

While producers will certify allowable revenue losses to FSA based on their farm's IRS Schedule F or other tax filings, such whole farm data are not available for analyzing program costs. Instead, 2020 eligible revenue is compared to, for analytical purposes, the higher of revenue in 2018 or 2019 using Economic Research Service (ERS) cash receipts data and Federal commodity support data.

Using this approach has limitations, however. First, the data are available by individual commodity, requiring that revenue losses be estimated by commodity. In practice, whole farm losses will be lower than totals summed across each of a producer's commodities—or across ERS commodity groupings—given that individual-commodity revenues are not perfectly correlated. Hence, the sum of losses across commodities will overestimate whole farm losses. Second, ERS cash receipts data are U.S.-level estimates; they mask the diversity of individual farm revenue experiences and obscure farm-level revenue variability.[11] [12] Some producers had revenue gains in 2018 or 2019 relative to 2020 and others had losses. The greater that producer-level revenue gains are relative to losses, the greater the under-estimation of eligible losses represented in the ERS data, as national receipts for each commodity are the sum of both losses and gains. The analysis below adjusts the national results to compensate for these limitations.

Table 7 presents estimated outlays. Column A contains estimated gross payments using the national ERS by-commodity data, the 15 percent revenue loss requirement, and the payment coverage rate of 80 percent. Due to uncertainty in the farm-level variability adjustment (column B), two scenarios are examined. Scenario I assumes that the share of farm-level losses reflected in the national data is high, at 60 percent, as it was in 2012, a year of widespread Corn Belt drought. Scenario II assumes that the share of farm-level losses reflected in the national data is relatively low, at 20 percent, a more typical situation. The multiplicative adjustment factors for farm level losses shown in column B are the inverses of these values, or 1.6667 (1/0.6) and 5 (1/0.2), respectively. Both adjustments are based on RMA's analysis of Federal crop insurance data. The whole farm adjustment factor in column C is 0.7 and is based on RMA's analysis of Whole Farm Revenue Program data; it indicates that farm revenue losses are 30 percent lower

---

[11] State-level estimates are available for some commodities and states, but these estimates also represent a substantial aggregation of farm-level data.

[12] Farm-level revenue diversity across producers is considerable. For outlays based on sales data for just one year, total estimated payments using farm-level sales should, in principle, be the same as the estimate based on national-level sales, as the expected value of individual producer sales is the simple sales average. However, when outlays are based on the difference between 2020 sales and the coverage rate times the producer's 2018 or 2019 sales, the expected value becomes more complex, and the outlay total using a national-level aggregation will be lower than one which sums across individual producer payments.

than individual losses by commodity. The adjustment factor that accounts for reductions due to payment limits of $125,000 per individual recipient is 0.72 (column D). The net final payment estimate in column E is the product of columns A, B, C, and D.

Under the Scenario I assumption, total net payments in column E of Table 7 are $2.7 billion, which is above the $250 million targeted for PARP. Under the assumption that national loss estimates reflect a relatively small share of farm level loss estimates (Scenario II), the estimated payment is $8.0 billion.[13]

Given that 2020 was a year with systemic losses due to COVID-19 (that is, many producers suffered losses), Scenario I more likely reflects the relationship between national and farm level losses than does Scenario II. Because of uncertainty regarding net final payments, payments will be made after the application deadline and payments will be factored as necessary so that they do not exceed the $250 million limit (depending on CAA outlays associated with other pandemic programs).

Table 7. Estimated Pandemic Assistance Revenue Program Outlays

| Unadjusted Estimated Gross Payment (million $) | Adjustment Factor for Farm-Level Variability | Adjustment Factor for Whole Farm Reduction | Adjustment Factor for Payment Limits | Net Final Payments A×B×C ×D (million $) |
|---|---|---|---|---|
| A | B | C | D | E |
| Scenario I: national level losses reflect most farm level losses[a] | | | | |
| $3,169.364 million | 1.6667 | 0.7 | 0.72 | $2,662.265 million |
| Scenario II: national level losses reflect a small share of farm level losses | | | | |
| $3,169.364 million | 5 | 0.7 | 0.72 | $7,986.796 million |

[a] The value in column E differs slightly from the product of A×B×C×D as the value in column B is carried to more decimal places in the calculation than is shown in the table.

Note that the Adjusted Gross Income (AGI) eligibility test used for certain programs is being modified for PARP. Specifically, policy for certain benefits states that, if a person's or legal entity's AGI for the 3 taxable years preceding the most immediately preceding taxable year for which the benefits are requested exceeds the $900,000 limitation, then the person or legal entity is ineligible for the program benefit. For crop year 2020, the three taxable years are 2016, 2017,

---

[13] The adjustment factors for farm-level variability in column B of Table 7 are based on the range of estimates from RMA. If instead one assumes the lower-end estimate of the coefficient of variation of farm level revenue for major row crops from Cooper (2010) and Belasco, Cooper, and Smith (2019)—a coefficient of variation of 0.25 (including crop insurance)—and uses these to create variability around mean farm level revenue, estimated payments are approximately 4.5 times higher than the high estimate in scenario I and 1.5 times higher than in scenario II in Table 7.

and 2018. Because of market disruptions caused by COVID-19, this requirement is modified for PARP.[14] To be eligible for PARP, a person or legal entity with an average AGI for 2016, 2017, and 2018 exceeding $900,000 is eligible if their 2020 AGI is $900,000 or less.

No cost is associated with this change as funding for PARP is appropriated and all funds are expected to be spent. PARP payments are funded by the CAA and are targeted at $250 million. Requests for assistance are expected to far exceed that amount. As a result, modifying the AGI limitation is not expected to have a cost as the $250 million remains the limit, and if benefits do not flow to a given individual or entity for AGI reasons, they will flow to another individual or entity.

**Item 3--15-Percent Top-Up for Underserved Recipients of CFAP2 Payments**

CFAP2 recipients who are underserved (beginning, limited resource, socially disadvantaged, and veteran farmers and ranchers) will receive a 15-percent top-up payment. Producers may file a CCC-860[15] form to verify their underserved producer status. FSA records indicate that slightly more than 200,000 producers currently are listed as underserved (including both those who have filled out the CCC-860 and those who have "not verified" status). Those producers have, in total, received $2.2 billion in CFAP2 payments (Table 8).

Table 8. CFAP2 Estimated Top-Up Outlays for Underserved Producers

| Description | CFAP2 Aggregate Payments through 12/26/21 (million $) | CFAP2 Payments to Underserved Producers through 12/26/21 (million $) | Added Payment Associated with 15% Top-Up (million $) |
|---|---|---|---|
|  |  |  |  |
| Tobacco | $110.47 | $12.68 | $1.90 |
| Acre-based crops | $11,182.82 | $1,283.92 | $192.59 |
| All other CFAP 2 commodities (excluding contract growers) | $7,591.08 | $871.55 | $130.73 |
| Total | **$18,884.37** | **$2,168.15** | **$325.22** |

The CFAP2 application period has closed and changes to the application cannot be made. As indicated above, a participant can, however, fill out the CCC-860 and qualify as an underserved producer and receive this payment. Note that participants that are entities qualify for payment if

---

[14] This modification was also made for Spot Market Hog Payment Program (SMHPP) payments.
[15] See: [ HYPERLINK
"https://forms.sc.egov.usda.gov/efcommon/eFileServices/eFormsAdmin/CCC0860_140402V01.pdf" ].

the entity meets the definition of beginning, limited resource, socially disadvantaged (including racial minorities and women), or veteran farmer or rancher. For an entity to qualify as a beginning, socially disadvantaged, or veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members meeting the applicable definition. For an entity to qualify as a limited resource farmer or rancher (based on farm sales and total household income—see the rule for specifics), all members who hold an ownership interest in the entity must meet the limited resource definition.

The number of operations that would meet the entity and limited resource farmer provisions is unknown. As a result, the $325 million outlay estimate shown in Table 8 should be viewed as a minimum. Further, it is also unknown the extent to which any new form CCC-860 filings will change future producer reporting behavior (such as providing the incentive for a husband/wife operation to report a 50 percent or greater share for the wife).

**Item 4—Recreational Animals and Livestock Disaster Programs**

This rule amends the definition of eligible livestock used in the LIP, LFP and ELAP programs. Previously, animals that were maintained for recreational purposes, such as for pleasure, roping, hunting, pets, or show, as well as animals intended for consumption by an owner, lessee, or contract grower, were ineligible for LIP, LFP and ELAP. This rule removes those restrictions because those animals have value and could be marketed as part of the operation. Horses and other animals used or intended to be used for racing or wagering continue to be ineligible for ELAP, LFP, and LIP. Table 9 shows the species covered by each of the three programs.

Table 9. Animal Species Covered by LIP, LFP, and ELAP

| LIP | LFP | ELAP |
|---|---|---|
| Alpacas | Alpacas | Alpacas |
| Beef cattle | Beef cattle | Beef cattle |
| Buffalo/bison | Buffalo/bison | Buffalo/bison |
| Caribou | Dairy cattle | Dairy cattle |
| Dairy cattle | Deer | Deer |
| Deer | Elk | Elk |
| Ducks | Emus | Emus |
| Elk | Equine | Equine |
| Emus | Goats | Goats |
|  | Llamas | Llamas |
| Equine | Ostriches[a] | Ostriches[a] |
| Geese | Reindeer | Reindeer |
| Goats | Sheep | Sheep |
| Llamas |  | Honeybees |
| Reindeer |  | Farm-Raised Fish |
| Sheep |  |  |
| Swine |  |  |
| Ostriches |  |  |
| Poultry |  |  |

| Turkeys | |
|---|---|

<sup>a</sup> The associated rule now makes ostriches eligible for LFP (if they graze) and for ELAP.

**Livestock Indemnity Program (LIP) Estimates**

LIP provides benefits to owners or contract growers for livestock deaths in excess of normal mortality caused by adverse weather, disease, and attacks by animals reintroduced into the wild by the Federal government or protected by Federal law, including wolves and avian predators. LIP payments are 75 percent of the market value of the species or a grouping of species; for example, the 2021 LIP payment rate for equine is $648.61 per head.

Several steps are taken to estimate the additional LIP payments associated with coverage of recreational animals:

***Step 1 – Determine the U.S. population of animal species covered by LIP that are maintained commercially***—With the exception of horses, U.S. animal numbers by species maintained for *commercial* purposes are drawn from the 2017 USDA-NASS Census of Agriculture and 2020 USDA-NASS surveys. For example, in 2017 there were 121,904 alpacas raised on U.S. commercial farms. For horses, inventory is from the 2017 Economic Impact Study of the U.S. Horse Industry published by the American Horse Council, which breaks out horses by activity: recreational, showing, racing, and work.

***Step 2 – Determine the U.S. population of animal species covered by LIP that are maintained for recreational purposes***—Except for horses, no data exist regarding *recreational* animals by species. Assumptions were made as to the share by species devoted to recreational purposes, as shown in Table 10. Using these percentages, the data in Step 1 were used to extrapolate the total species population and the share used for recreational purposes. For example, it was assumed that 10 percent of all U.S. alpacas are maintained for recreational purposes. When applied to the 121,904 alpacas raised for *commercial* purposes, the total U.S. alpaca population is 135,499 (121,904/.90). With 10 percent of the population assumed to be for recreation, there are 13,545 recreational alpacas.

Table 10.  Estimated Population of Animals by Species for Recreational Purposes

| Animal Species | 2020 NASS Quick Stats (number) | 2017 Census of Agriculture (number) | Assumed Share of Recreation Population to Total Population (percent) | Estimated Total Population (number) | Estimated Recreation Population (number) |
|---|---|---|---|---|---|
| Alpacas | -- | 121,904 | 0.10 | 135,449 | 13,545 |
| Buffalo/bison | -- | 183,780 | 0.01 | 185,636 | 1,856 |
| Caribou | N/A | N/A | N/A | N/A | N/A |
| Cattle and calves | -- | 93,648,041 | 0.01 | 94,593,981 | 945,940 |
| Dairy cattle | -- | 9,539,631 | 0.05 | 10,041,717 | 502,086 |
| Deer | -- | 212,449 | 0.01 | 214,595 | 2,146 |
| Ducks | -- | 4,962,694 | 0.15 | 5,838,464 | 875,770 |
| Elk | -- | 31,555 | 0.01 | 31,874 | 319 |
| Emus | -- | 11,535 | 0.01 | 11,652 | 117 |
| Equine | | | | | 4,686,998[a] |
| Geese | -- | 101,619 | 0.01 | 102,645 | 1,026 |
| Goats | 2,582,000 | -- | 0.15 | 3,037,647 | 455,647 |
| Llamas | -- | 39,599 | 0.10 | 43,999 | 4,400 |
| Ostriches | -- | 4,738 | 0.01 | 4,786 | 48 |
| Reindeer | N/A | N/A | N/A | N/A | N/A |
| Sheep | 5,200,000 | -- | 0.10 | 5,777,778 | 577,778 |
| Swine | -- | 72,381,007 | 0.05 | 76,190,534 | 3,809,527 |
| Layers | -- | 368,241,393 | 0.10 | 409,157,103 | 40,915,710 |
| Broilers | -- | 1,621,400,316 | 0.01 | 1,637,778,097 | 16,377,781 |
| Turkeys | -- | 104,322,709 | 0.01 | 105,376,474 | 1,053,765 |

[a] Equine data for horses are from the American Horse Council.

***Step 3 – Estimate the incidence rate of LIP annual payments for each species***—To estimate the LIP participation or "incidence" rate, average LIP annual payments from 2016 to 2020, by species, were divided by the value of U.S. commercial inventory or sales for the corresponding species as reported in the 2017 Census of Agriculture.  For alpacas, LIP payments averaged $2,678, and the 2017 value of inventory/sales of U.S. alpacas was $15.478 million.  Thus, the incidence rate for commercial use is estimated at 0.0179 percent ($2,768 divided by $15.478 million).  The same incidence rate is assumed for recreational alpacas.

***Step 4 – Estimate additional LIP annual payments for animals maintained for recreational purposes***—The total number of animals, by species, maintained for recreational purposes, as estimated in Step 2, is multiplied by the corresponding incidence rates from Step 3.  As an example, 13,545 recreational alpacas are multiplied by the 0.0179 percent incidence rate, resulting in 2.42 recreational alpacas estimated to receive LIP payments each year.  LIP annual payments for recreational alpacas are projected at $686 (2.42 alpacas multiplied by the 2021 LIP rate for alpacas of $283.33).  As shown in Table 11, additional gross LIP annual payments for all covered recreational animals are projected at $977,050.

Table 11. Estimated Gross Annual LIP Payments for Animals Maintained for Recreational Purposes

| Animal Species | Estimated Recreational Population | Estimated Annual Incidence[a] | Estimated Number of Animals Receiving LIP Payments | 2021 LIP Rates per Animal | Estimated Gross Annual LIP Payments for Recreational Animals |
|---|---|---|---|---|---|
| Alpacas | 13,545 | 0.0179% | 2.42 | $283.33 | $686 |
| Buffalo/bison* | 1,856 | 0.0083% | 0.15 | $1,231.46 | $190 |
| Caribou [b] | N/A | N/A | N/A | $382.60 | N/A |
| Cattle and calves* | 945,940 | 0.0978% | 924.72 | $724.15 | $669,635 |
| Dairy cattle* | 502,086 | 0.0042% | 21.21 | $588.64 | $12,487 |
| Deer | 2,146 | 0.1748% | 3.75 | $382.60 | $1,435 |
| Duck* [c] | 875,770 | 0.0010% | 8.76 | $4.24 | $37 |
| Elk | 319 | 0.0481% | 0.15 | $531.09 | $81 |
| Emus[c] | 117 | 0.0010% | 0.00 | $152.61 | $0 |
| Equine | 4,686,998 | 0.0023% | 108.79 | $648.61 | $70,563 |
| Geese* [c] | 1,026 | 0.0010% | 0.01 | $24.91 | $0 |
| Goats* | 455,647 | 0.0804% | 366.21 | $159.50 | $58,411 |
| Llamas | 4,400 | 0.0252% | 1.11 | $229.02 | $254 |
| Ostriches[c] | 48 | 0.0010% | 0.00 | $648.00 | $0 |
| Reindeer | N/A | N/A | N/A | $382.60 | N/A |
| Sheep* | 577,778 | 0.0963% | 556.23 | $237.77 | $132,255 |
| Swine* | 3,809,527 | 0.0008% | 31.52 | $67.24 | $2,120 |
| Layers | 40,915,710 | 0.0141% | 5778.45 | $4.00 | $23,117 |
| Broilers | 16,377,781 | 0.0141% | 2313.00 | $2.12 | $4,915 |
| Turkeys* | 1,053,765 | 0.0045% | 47.94 | $18.00 | $863 |
| **Total** | | | | | **$977,050** |

[a] Data for caribou and reindeer are not available.
[b] Incidence rates were estimated based on methodology described in Step 3.
[c] Sufficient data were not available to estimate the incidence rate for these species or there is no history of LIP payments for these animals in recent years. Thus, a 0.001% rate was assumed.
* LIP rates were estimated as an average of different sizes and types or were based on the adult category:
- The buffalo/bison rate represents the average rate of three categories (adult bulls, adult cows, and non-adult);
- The cattle and calves rate represents the average rate of three categories (adult bulls, adult cows, and non-adult);
- The dairy rate represents the average rate for all dairy categories (adult bulls and cows and all non-adult categories);
- The duck rate represents the average rate for ducks only and excludes ducklings;
- The geese rate represents the average rate for geese only and excludes goslings;
- The goat rate represents the average rate of three goat categories (bucks, nannies, and slaughter goats/kids);
- The sheep rate represents the average rate of three sheep categories (ewes, lambs, and rams);
- The swine rate represents the average rate of all dairy categories (suckling nursery pigs, barrows, gilts, and sows); and
- The turkey rate includes toms, fryers, and roasters.

[ PAGE \* MERGEFORMAT ]

**Livestock Forage Disaster Program (LFP) Estimates**

The Livestock Forage Disaster Program (LFP) provides payments to eligible livestock owners and contract growers who have suffered a loss of grazed forage due to a qualifying drought during the normal grazing period for a given county. The qualifying drought and qualifying grazing losses, and/or notification of prohibition to graze Federal land due to fire, must have occurred in the grazing period of the crop year.

Several steps are taken to estimate the additional LFP payments associated with coverage of recreational animals:

***Step 1 – Estimate the LFP payment incidence rate***—The *commercial* incidence rate is obtained by dividing total LFP payments in 2020 by the sum of the value of inventory/sales of all animal species currently covered by this program using the data sources noted above. Dividing total 2020 LFP payments ($381.892 million) by the value of all covered species used for commercial purposes ($1.611 billion) yields a commercial incidence rate of 24 percent and a total value of the entire population equal to $1.696 billion ($1.611 billion/(1-.24)).

***Step 2 – Estimate additional LFP annual payments for animals maintained for recreational purposes***—Assuming the value of recreational animals represents 5 percent of the total inventory/sales value of all animals covered by LFP, the value of species maintained for recreational purposes is $84.807 million (5 percent * $1.696 billion)—see Table 12. It is also assumed that recreational owners are slightly less likely to file an application for payment, so a 20 percent incidence rate is used, rather than the 24 percent calculated above. As a result, additional gross annual LFP payments for recreational livestock are calculated at $16.961 million ($84.807 million * 20 percent).

Table 12. Estimated Gross Annual LFP Payments for Livestock Maintained for Recreational Purposes

| Assumed Share of Recreational Animals to Total Value (percent) | Total Value of Production/Inventory by Commercial and Recreational Owners (billion $) | Estimated Value of Species Maintained by Recreational Owners (million $) | Estimated Incidence Rate of LFP Payments for Recreational Species (percent) | Estimated Gross Additional LFP Payments for Recreational Species (million $) |
|---|---|---|---|---|
| 5 | 1.696 | 84.807 | 20 | **16.961** |

**Emergency Assistance for Livestock, Honeybees and Farm-Raised Fish Program (ELAP) Estimates**

ELAP provides financial assistance to eligible producers of livestock, honeybees, and farm-raised fish for losses due to disease, and certain adverse weather events or loss conditions, such as blizzards and wildfires. ELAP assistance is focused on losses not covered by LIP or LFP. For example, ELAP provides assistance for livestock feed and grazing losses not caused by drought or wildfire on federally managed lands. ELAP also assists with the cost of transporting water to

[ PAGE  \* MERGEFORMAT ]

livestock due to drought and costs associated with gathering livestock for treatment or inspection related to cattle tick fever. Lastly, ELAP provides assistant with honeybee feed, colony, and hive losses, and farm-raised fish feed and death losses.

Between 2017 and 2020, FSA data indicate that 80 percent of all ELAP payments were for honeybee losses,[16] 19 percent assisted livestock producers,[17] and 1 percent covered farm-raised fish losses.[18] Thus, additional ELAP payments for recreational animals are estimated separately for honeybee-related losses and livestock losses.

### i) ELAP recreational honeybee estimates

***Step 1 – Estimate the incidence rate of ELAP payments for honeybee losses***—Dividing 2017-2020 average annual ELAP payments for honeybee losses ($39.327 million)[19] by the total value of U.S. honey production in 2021 ($299.616 million) reported in the USDA NASS Honey Report[20] yields an estimated incidence rate for ELAP honeybee payments of 13 percent.

***Step 2 – Estimate additional ELAP annual payments for honeybee losses for recreational owners***—According to the USDA 2018 Honey Bee Colonies report, out of a total of 2.69 million colonies, only 40,000 (1.5 percent) were maintained by beekeepers with 5 or fewer colonies—which are assumed to be recreational beekeepers. It is assumed that the value of honey produced by recreational beekeepers is 2 percent of the U.S. total value of honey. Hence, the total value of honey production for both commercial and recreational purposes is $305.731 million ($299.616 million/(1-.02)) and the estimated value of U.S. honey produced by recreational beekeepers in 2021 is $6.115 million.

Multiplying this $6.115 million estimate by the 13 percent ELAP incidence rate calculated above yields additional gross annual ELAP payments for recreational honeybees of $0.795 million (Table 13).

Table 13. Estimated Gross Annual Additional ELAP Payments Maintained for Recreational Honeybees

| Assumed Share of Recreational Honey Production Total Value (%) | Estimated 2021 Value of U.S. Honey Produced by Commercial and Recreational Beekeepers (million $) | Estimated 2021 Value of U.S. Honey Produced by Recreational Beekeepers (million $) | Estimated Incidence Rate for ELAP Payments for Colonies and Hives (percent) | Estimated of Additional Gross ELAP Payments for Honeybee Colonies, Hives, and Feed (million $) |
|---|---|---|---|---|
| 2 | 305.731 | 6.115 | 13 | **0.795** |

---

[16] ELAP payments for honeybee losses are broken down into three subcategories that include payments for colonies, for hives, and payments for honeybee feed.

[17] ELAP payments for livestock losses are broken down into five subcategories: livestock death, feed, grazing, cattle tick fever, and water hauling.

[18] The two ELAP payments for farm-raised fish include death and feed.

[19] This is the combined ELAP payments for losses to colonies, hives and bee feed.

[20] [ HYPERLINK "https://downloads.usda.library.cornell.edu/usda-esmis/files/hd76s004z/7h14bh90x/w9505v43v/hony0321.pdf" ].

ii)     **ELAP recreational livestock estimates**

***Step 1 – Estimate the incidence rate of ELAP payments for livestock losses***—The incidence rate for commercial livestock is estimated by dividing 2017-2020 average annual ELAP payments for livestock losses ($9.121 million) by the inventory/sales value of commercially maintained livestock species covered by ELAP ($111.505 billion).[21]  This results in an estimated incidence rate of 0.01 percent.

The value of all recreational livestock production eligible for ELAP relative to the U.S. total livestock value for ELAP purposes is assumed at 7 percent (based on assumptions made for LIP but only for the subcategories eligible for ELAP).  When applied to the value of covered livestock raised for *commercial* purposes, the total U.S. value of livestock for both commercial and recreational purposes is $120.383 billion ($111.5 billion/(1-.07)).  With 7 percent of the total population assumed to be for recreational purposes, the estimated value of covered livestock for recreational purposes is $8.878 billion.

***Step 2 – Estimate additional ELAP annual payments for livestock losses from recreational owners***—Additional ELAP payments for recreational livestock are estimated by multiplying the estimated value of recreational livestock ($8.878 billion) by the assumed 0.01 percent ELAP incidence rate.  As shown in Table 14, additional gross annual ELAP payments for recreational livestock are estimated at $0.726 million.

Table 14.  Estimated Gross Annual Additional ELAP Payments Maintained for Recreational Livestock

| Assumed Share of Recreational Livestock Production Total Value (percent) | Estimated Value of U.S. Recreational Livestock and Commercial Owners (billion $) | Estimated Value of U.S. Recreational Livestock (billion $) | Estimated Incidence Rate for ELAP Payments for Recreational Livestock (percent) | Estimated Gross Additional ELAP Payments for Recreational Livestock (million $) |
|---|---|---|---|---|
| 7 | 120.383 | 8.878 | 0.01 | **0.726** |

When combined, additional ELAP gross annual payments for recreational honeybee and livestock losses are estimated at $1.521 million.

Estimated additional gross annual payments across all three programs are $19.460 million (Table 15).  Net outlays, adjusting for historical payment limitations—with a 6.9 percent factor for LIP, a 9.3 percent factor for LFP, and a 7.9 percent factor for ELAP (including honeybees)—are $17.695 million in FY 2022.

---

[21] Data are obtained from the 2017 Census of Agriculture, 2020 USDA-NASS surveys, and a 2017 report published by the American Horse Council.

[ PAGE  \* MERGEFORMAT ]

Table 15. Estimated Recreational Animal LIP, LFP and ELAP
Annual Fiscal Year Payments

| Program | Estimated Gross Annual Additional Payments for Recreational Animals (million $) | Estimated Net Annual Additional Payments for Recreational Animals (million $) |
|---------|-------------------------------------------------------------------------------|------------------------------------------------------------------------------|
| LIP | 0.977 | 0.910 |
| LFP | 16.961 | 15.384 |
| ELAP | 1.521 | 1.401 |
| Total | 19.460 | 17.695 |

[a] Note that these estimates are for FY22 through FY31 and are at the same level in each year.

## Item 5—Flexibility in NAP Enrollment for Underserved Producers

FSA is updating Non-Insured Assistance Program (NAP) provisions to make the program more flexible for underserved producers. Specifically, the "definition of coverage" is amended to provide flexibility as FSA reviews ways to streamline the application process for underserved farmers and ranchers.[22] In addition, a redundant provision related to applications filed after the deadline is removed from the existing regulation, as FSA's Deputy Administrator for Farm Programs already has the ability to authorize State and county committees to waive or modify deadlines in cases where lateness or failure to meet certain requirements does not adversely affect program operations. Lastly, for any producer, the application for coverage now may be filed in any FSA county office, rather than only in the producer's administrative county.

This analysis, performed in 6 steps, focuses on changes to NAP outlays for underserved producers, as additional underserved producers are expected to apply for enrollment in the program. Underserved producers are defined as: (1) socially disadvantaged; (2) limited resource; (3) beginning; and (4) veteran farmers and ranchers.[23]

**Step 1—Gather data on CCC-860 filings by FSA customers who have certified that they or their entity or joint operation qualify in at least one of the four underserved categories**—Table 16 indicates that socially disadvantaged producers compose the bulk of underserved certifications. Except for the limited resource category, the number of certified underserved producers in each class has grown since 2018.

---

[22] Note that these producers are eligible for catastrophic coverage without paying a service fee.
[23] For detailed definitions of each of the underserved categories see: [ HYPERLINK
"https://www.farmers.gov/sites/default/files/2022-07/farmersgov-historically-underserved-factsheet-07-20-2022.pdf" ].

[ PAGE \* MERGEFORMAT ]

Table 16. Number of Certified Underserved Producers, by Category, 2018-2022

| Year | Socially Disadvantaged [a] | Limited Resource | Beginning | Veteran | Total |
|---|---|---|---|---|---|
| 2018 | 158,303 | 3,579 | 19,483 | --[b] | 181,365 |
| 2019 | 166,966 | 2,679 | 23,347 | 48,844 | 241,836 |
| 2020 | 195,967 | 2,886 | 32,167 | 49,182 | 280,202 |
| 2021 | 212,765 | 2,495 | 36,913 | 49,467 | 301,640 |
| 2022 | 221,164 | 2,191 | 39,359 | 49,744 | 312,458 |
| 2018-2022 average | 191,033 | 2,766 | 30,254 | 39,447 | 263,500 |

[a] By statute, the socially disadvantaged category for NAP includes women.
[b] The veteran farmer category was not introduced until the 2018 Farm Bill and was not implemented until 2019.

**Step 2—*Gather data on the number of underserved producers enrolled in NAP, by category—***
Table 17 shows that NAP enrollments increased among all underserved categories from 2018 to 2022, with the exception of limited resource producers. Comparing Table 16 to Table 17 reveals that not all producers who certify as underserved producers are enrolled in NAP.

Table 17. Certified Underserved Producers Enrolled in NAP, 2018-2022

| Year | Socially Disadvantaged | Limited Resource | Beginning | Veteran | Total |
|---|---|---|---|---|---|
| 2018 | 21,669 | 2,285 | 6,853 | -- | 30,807 |
| 2019 | 25,083 | 1,972 | 7,572 | -- | 34,627 |
| 2020 | 27,188 | 2,130 | 7,663 | 1 | 36,982 |
| 2021 | 29,513 | 1,481 | 8,405 | 108 | 39,507 |
| 2022 | 32,591 | 1,401 | 8,945 | 196 | 43,133 |
| 2018-2022 average | 27,209 | 1,854 | 7,888 | 76 | 37,011 |

**Step 3—*Estimate the percent of certified underserved producers enrolled in NAP—***Table 18 indicates that underserved NAP enrollments were 14 percent of the total certified underserved population, although percentages vary greatly across categories.

Table 18. Percent of Total Certified Underserved Producers Enrolled in NAP

|  | Socially Disadvantaged | Limited Resource | Beginning Farmer and Rancher | Veteran Farmer and Rancher | Total |
|---|---|---|---|---|---|
| Percent of underserved producers enrolled in NAP in 2022 | 14.74% | 63.94% | 22.73% | 0.39% | 13.80% |
| Percent of underserved producers enrolled in NAP in 2018-2022 | 14.24% | 67.02% | 26.07% | 0.19% | 14.05% |

**Step 4 –***Calculate the incidence of NAP payments and the percent of underserved-enrolled producers who received NAP payments, by category*—NAP payment data for 2020 and 2021 indicate that the socially disadvantaged category received the highest number of NAP payments (in terms of *count*, not dollar value) in the 2020-2021 period, with an average of 2,124 NAP payments per year (Table 19). On average, 7.49 percent of socially disadvantaged producers enrolled in NAP received a NAP payment in 2020-2021 (2,124 payments divided by the average of 27,188 and 29,513 applications). Beginning farmers and ranchers received the highest percent of payments per population enrolled in NAP during the 2020-2021 period.

Table 19. Number of NAP Payments to Underserved Producers during 2020 and 2021 and the Percent Enrolled Receiving NAP Payments

|  | Socially Disadvantaged | Limited Resource | Beginning | Veteran | Total |
|---|---|---|---|---|---|
| Annual Average Number of NAP Payments to Underserved Producers during 2020-2021 | 2,124 | 123 | 772 | 2 | 3,020 |
| Percent of NAP Underserved Enrollees Receiving NAP Payments during 2020-2021 | 7.49% | 6.81% | 9.61% | 2.75% | 7.90% |

**Step 5–***Gather the total number and dollar value of NAP payments over the 2020-2021 period to calculate the average NAP payment, by underserved category*—Farm-level data for 2020-21 were used to calculate the average NAP payment for each underserved category (Table 20). Beginning producers received the highest average NAP payment, followed by socially disadvantaged producers.

Table 20.  Estimated 2020-2021 Average NAP Payments to Underserved Producers

|  | Socially Disadvantaged | Limited Resource | Beginning | Veteran | Total |
|---|---|---|---|---|---|
| Sum of the number of 2020 and 2021 NAP payments to underserved producers | 4,247 | 246 | 1,544 | 3 | 6,040 |
| Total NAP payments to underserved producers in 2020 and 2021 | $27.14 million | $0.89 million | $10.23 million | $4,147 | $38.27 million |
| Average NAP payments to underserved producers in 2020-2021 | $6,390 | $3,632 | $6,627 | $1,382 | $6,336 |

**Step 6—*Estimate additional outlays resulting from greater NAP participation by underserved producers*—**The first scenario assumes a 10-percent increase in NAP enrollments by underserved producers from the number enrolled in 2022.  The second scenario calculates the change in NAP outlays if there is a 20-percent increase in NAP enrollment by underserved producers.

**Outlays are calculated as:**

[Number of underserved NAP applications in 2022 (Table 17) *times* 1.10] *times* (estimated incidence of receiving a payment (Table 19)) *times* the 2020-2021 average NAP payment (Table 20)

*minus*

[Number underserved NAP applications in 2022 (Table 17)] *times* (estimated incidence of receiving a payment (Table 19)) *times* the 2020-2021 average NAP payment (Table 20)

**Example** additional outlay calculation for Socially Disadvantaged producers =

(32,591 NAP applications from Socially Disadvantaged producers in 2022 *times* 1.10) *times* 7.49% (percent of Socially Disadvantaged producers receiving NAP payments in 2020-2021) *times* $6,390 (2020-2021 average NAP payments to Socially Disadvantaged producers) = $17.16 million

*minus*

(32,591 NAP applications from Socially Disadvantaged producers in 2022) *times* 7.49% (percent of Socially Disadvantaged producers receiving NAP payments in 2020-2021) *times* $6,390 (2020-2021 average NAP payments to Socially Disadvantaged producers) = $15.60 million

Additional outlays for Socially Disadvantaged producers = $17.16 million minus $15.60 million, or $1.56 million.

Prior to the policy change, underserved NAP payments in 2022 are estimated at $21.58 million (Table 21). For comparison, the 2020-2021 average totaled $19 million. Assuming a 10 percent increase in NAP enrollment by underserved producers, total NAP payments to underserved producers increase to $23.74 million, or by $2.17 million. With a 20 percent increase in underserved NAP applications, outlays increase by $4.33 million or double the amount estimated in the 10 percent scenario (Table 22). For every 10 percent incremental increase in underserved NAP applications, payments to underserved producers increase by $2.17 million.

Table 21. Estimated Additional Outlays from a 10 Percent Increase in NAP Participation by Underserved Producers

|  | Socially Disadvantaged | Limited Resource | Beginning Farmer and Rancher | Veteran Farmer and Rancher | Total |
|---|---|---|---|---|---|
| Number of underserved enrolled in NAP in 2022 | 32,591 | 1,401 | 8,945 | 196 | 43,133 |
| A 10% increase in underserved NAP enrollment from 2022 | 35,850 | 1,541 | 9,840 | 216 | 47,446 |
| Estimated NAP payments for 2022 (without change) | $15,599,843 | $346,622 | $5,696,494 | $7,457 | $21,581,124 |
| Estimated payments under a 10% increase in NAP participation | $17,159,827 | $381,285 | $6,266,144 | $8,203 | $23,739,237 |
| **Additional outlays** | $1,559,984 | $34,662 | $569,649 | $746 | $2,165,042 |

Table 22. Estimated Additional Outlays from a 20 Percent Increase in NAP Participation by Underserved Producers

|  | Socially Disadvantaged | Limited Resource | Beginning Farmer and Rancher | Veteran Farmer and Rancher | Total |
|---|---|---|---|---|---|
| Estimated NAP payments for 2022 (without change) | $15,599,843 | $346,622 | $5,696,494 | $7,457 | $21,581,124 |
| A 20% increase in NAP participation from 2022 application numbers | 39,109 | 1,681 | 10,734 | 235 | 51,760 |
| Payments under a 20% increase in NAP participation | $18,719,811 | $415,947 | $6,835,793 | $8,948 | $25,897,349 |
| **Additional outlays** | $3,119,969 | $69,324 | $1,139,299 | $1,491 | $4,330,083 |

[ PAGE \* MERGEFORMAT ]

## Item 6—Notification of Interest Changes

Prior to this rule, a legal entity was ineligible for farm programs listed in 7 C.F.R § 1400.1[24] when the names and valid taxpayer identification numbers (TINs) for all members holding an ownership interest in the entity were not provided to USDA. Now, a legal entity can receive a partial payment, as described below. This is because prohibiting payments to a legal entity when member information is provided for some, but not all, members could adversely impact a farm's sustainability. Further, if a member of an entity does not provide a valid TIN, FSA is still able to make eligibility determinations and establish a maximum payment limitation for the entity and its other members.

After USDA implements this rule, the payment reduction proportion will equal the sum of the ownership shares of members for whom a valid TIN is not provided. This change allows the legal entity to earn a partial payment based on the ownership shares of members who have submitted valid TINs. It will be effective retroactively to the 2020 program year because many farm operations suffered income losses due to the COVID-19 pandemic and a partial payment will help those operations financially. FSA is not reopening sign up for programs affected by this change; it will only affect payment processing for legal entities that previously filed applications.

As an example, consider the fictional Granjeno Farms, Inc., which produces a wide variety of vegetables. This corporation has three members, each with a one-third ownership share of the corporation. With lower vegetable prices in 2020, Granjeno submitted its application shortly after Coronavirus Food Assistance Program (CFAP) sign-up opened and could have received a $750,000 CFAP payment. However, one of the three members declined to provide a valid TIN. Since it could not provide valid tax ID information for all members, USDA denied its CFAP payment, reducing outlays by $750,000.

With this rule, USDA will re-evaluate Granjeno Farms Inc. and this corporation will receive a payment proportional to the ownership share of the two members that provided valid TINs. The revised regulation increases Government outlays by $500,000 (.33 + .33) x $750,00 = $500,000. Granjeno does not receive the $250,000 for the member lacking a valid TIN that they would have otherwise received had the member provided this information (.33 x $750,000 = $250,000).

This rule will not affect NRCS outlays. Note that NRCS programs have caps on permissible annual outlays and NRCS outlays approach those caps each year. If an entity earns a higher payment because a larger portion of its members provide verifiable TINs, the pool of money available for other applicants decreases and net outlays remain constant.

From 2018 to 2020, USDA reduced payments for FSA programs by $19 million due to entities not providing complete TINs for their members (Table 23). Those reductions were much higher

---

[24] These programs include the Agricultural Risk Coverage and Price Loss Programs, Price Support Programs in parts 1421, 1427, and 1434, Conservation Reserve Program, Noninsured Crop Disaster Assistance Program, Livestock Forage Disaster Program, Livestock Indemnity Program, Emergency Assistance for Livestock, Honey Bees and Farm-raised Fish Program, and Tree Assistance Program. Natural Resources Conservation Service (NRCS) conservation programs include the Agricultural Management Assistance Program, Conservation Stewardship Program, Environmental Quality Incentives Program, and Agricultural Conservation Easement Programs, and other USDA programs as specified in individual program regulations.

in 2018, 2019, and 2020 compared to prior years due to Market Facilitation Program (MFP) and CFAP payments.[25] Both MFP and CFAP provided benefits to many non-traditional FSA participants (such as specialty crop and livestock producers), some of whom may not have had ready access to required TINs.

USDA estimated additional annual costs associated with this rule change, both with and without ad hoc MFP and CFAP payments included, using the data shown in Table 23. The calculation steps involve:

- ***Step 1:*** *Calculate payment reductions net of reductions for MFP and CFAP.* For 2018 through 2020, reductions excluding MFP and CFAP were about $4 million, far less than the $19 million result when MFP and CFAP are included. This difference emphasizes the role of MFP and CFAP in generating tax ID-related reductions.

- ***Step 2:*** *Calculate an average annual reduction using annual reductions both with and without MFP and CFAP.* (Table 23, data are from columns B and D):

($1.2 million + $0.71 million +$2.10 million + $0.76 million + $15.41 million + $2.12 million) / 6 = $3.72 million

- ***Step 3:*** *Calculate the average ownership share of entity members that did not supply TINs.* FSA administrative data for program years 2018-20 indicate that the average share reduction per entity is one-third.

Absent the changes made by this rule, the $3.72 million average annual reduction indicates expected outlay reductions in future years. This rule lowers the average reduction by two-thirds, the ownership shares of members that provide valid TINs. The annual cost of the rule change is therefore $3.72 x .66 = $2.45 million and the cost over ten years is $25 million.

---

[25] MFP provided benefits for 2018 and 2019 crops, while CFAP benefits were for 2020 crops.

Table 23.  FSA Payment Reductions Due to Business Members Not Supplying Tax Identification Numbers

| Program Year | Type of Business Organization | Including MFP and CFAP | | Excluding MFP and CFAP | |
|---|---|---|---|---|---|
| | | Customer Count | Reductions ($) | Customer Count | Reductions ($) |
| | | **A** | **B** | **C** | **D** |
| **2018** | Limited Liability Company | 68 | 440,883 | 56 | 230,443 |
| | Corporation | 24 | 242,905 | 22 | 66,909 |
| | Limited Partnership | 23 | 219,086 | 20 | 174,308 |
| | General Partnership | 10 | 178,572 | 10 | 147,664 |
| | Trust - Irrevocable | 30 | 85,078 | 24 | 63,826 |
| | Estate | 18 | 15,744 | 13 | 9,554 |
| | Joint Venture | 3 | 15,709 | 1 | 4,009 |
| | Trust - Revocable | 3 | 13,395 | 3 | 10,703 |
| **2018 Totals** | | 179 | 1,211,372 | 149 | 707,416 |
| **2019** | Limited Liability Company | 83 | 536,482 | 76 | 200,592 |
| | Corporation | 33 | 515,715 | 29 | 225,651 |
| | General Partnership | 8 | 441,443 | 7 | 53,914 |
| | Limited Partnership | 21 | 323,355 | 18 | 214,429 |
| | Joint Venture | 2 | 125,414 | 1 | 3,076 |
| | Trust - Irrevocable | 23 | 92,696 | 22 | 38,061 |
| | Estate | 18 | 30,722 | 17 | 20,582 |
| | Trust - Revocable | 7 | 20,866 | 7 | 6,320 |
| **2019 Totals** | | 195 | 2,086,692 | 177 | 762,625 |
| **2020** | Corporation | 28 | 8,013,452 | 5 | 747,136 |
| | Limited Liability Company | 73 | 6,949,782 | 19 | 1,343,643 |
| | General Partnership | 11 | 234,393 | 2 | 7,671 |
| | Limited Partnership | 4 | 106,584 | 1 | 307 |
| | Trust - Irrevocable | 16 | 46,258 | 6 | 18,800 |
| | Estate | 13 | 31,363 | 2 | 3,728 |
| | Joint Venture | 1 | 15,124 | 0 | 0 |
| | Trust - Revocable | 8 | 8,571 | 1 | 685 |
| **2020 Totals** | | 154 | 15,405,528 | 36 | 2,121,970 |
| **Grand Totals** | | 528 | 18,703,592 | 362 | 3,592,011 |

Source:  FSA Enterprise Data Warehouse.

## Item 7—ECP and Public Lands

ECP provides cost-share payments to farmers and ranchers to rehabilitate farmland damaged by natural disasters and to implement emergency water conservation measures in periods of severe drought. The program helps producers with activities such as replacement and repair of structures such as fencing,[26] debris removal from farmland, and restoration of conservation structures (waterways, terraces, diversion ditches). Up to 75 percent[27] of the cost of implementing emergency conservation practices can be covered by ECP.[28]

ECP eligibility on public lands[29] has not been included in the regulation until now. ECP coverage of public lands has been in the FSA handbook[30] for many years, however, and FSA staff in the field have provided ECP assistance to both public and private lands since at least the 1990s (Bomar, Dhillon). By historical practice, ECP payments may supplement payments from other programs (see discussion below) as long as total payments do not cover more than 75 percent of total eligible costs associated with rehabilitation of the loss (for example, repairing or replacing damaged fencing) (Bomar).

Unlike many other FSA programs, ECP funding is appropriated and any unspent funding is carried over to the next year. Total ECP cost-share outlays have increased significantly in recent years (Table 24) as appropriated funding has increased. Common natural disasters resulting in ECP assistance include severe storms, hurricanes, tornados, and wildfires (a primary peril on public lands).

Public lands are largely located in fifteen Western states. To provide context, ECP spending in those Western states peaked at 60 percent of ECP spending in FY 2016 and since that time generally has been in the 30 percent to 35 percent range (Table 24). Forty-five percent of ECP spending in the fifteen Western states over the FY 2014 - FY2020 period has been for fence repair (largely to contain cattle) compared to 18 percent in all other states. A smaller portion of assistance in Western states has been for debris removal (20 percent); drought emergency measures[31] (21 percent); grading, shaping, and re-leveling (7 percent); and restoration of conservation structures (7 percent).

---

[26] Fencing includes livestock cross fences, boundary fences, cattle gates, and wildlife exclusion fencing on agricultural land.

[27] Qualified limited resource, socially disadvantaged, and beginning farmers/ranchers may earn up to 90 percent cost-share.

[28] The final amount is determined by the FSA committee reviewing the application. The FSA County Committee is authorized to approve applications of up to $125,000, while applications of $125,001 to $250,000 require state committee approval. Amounts of over $250,000 require the approval of the national FSA office.

[29] Public lands are defined as lands owned or controlled by the United States or States, including State agencies or other political subdivisions.

[30] See: https://www.fsa.usda.gov/Internet/FSA_File/1-ecp_r06_a01.pdf.

[31] These measures include: constructing and deepening wells for livestock water; installing pipe to an existing or newly developed source of water because the primary source is inadequate; storage facilities, including tanks incorporated into a new or existing water distribution systems, and troughs above ground, if needed to supply water for immediate needs of livestock.

Table 24.  ECP Outlays by Year[a]

| Fiscal Year | Appropriated Amount (million $) | Total Program Outlays (million $) | ECP Spending in Western States as a Share of Total ECP Spending Nationally[c] (percent) | Share of ECP Spending on Fencing in Western States (percent) |
|---|---|---|---|---|
| 2014 | 0 | 22.9 | 49.3 | 41.3 |
| 2015 | 9.2 | 23.9 | 36.4 | 30.5 |
| 2016 | 108.0 | 28.2 | 60.0 | 36.3 |
| 2017 | 131.6 | 57.1 | 34.6 | 59.8 |
| 2018 | 400.0 | 97.3 | 31.5 | 39.5 |
| 2019 | 558.0 | 74.6 | 36.9 | 65.2 |
| 2020 | 0 | 125.8 | 34.5 | 38.5 |
| Total | 1,206.8 | 429.8 | 36.7 | 44.9 |

[a] ECP funds can be carried from one year to the next; hence, outlays occur in years where no funds have been appropriated by Congress.
[b] Western states include Arizona, California, Colorado, Idaho, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington, and Wyoming.

Sources:  Appropriated funding and outlays are from the FY 2022 President's Budget Explanatory Notes.  The final two columns are from FSA administrative data for ECP.


Several Federal agencies allow grazing (largely cattle but also sheep and horses) on public lands in return for a fee,[32] including the Bureau of Land Management (BLM), USDA's Forest Service (FS), the National Park Service, the Fish and Wildlife Service, the Bureau of Indian Affairs, and the Department of Defense.  Most Western state land agencies have grazing programs as well.  BLM and FS are the largest Federal agencies in terms of grazing permits (in the case of FS) and permits and leases[33] (in the case of BLM).

Both FS and BLM help farmers and ranchers cope with wildfires.  For example, FS operates the pilot emergency response component of the Burned Area Emergency Stabilization and Rehabilitation Program (BAER).  BLM's BAER equivalent is the Emergency Stabilization (ES) program, which combined with BLM's Burned Area Rehabilitation (BAR) program, comprises Emergency Stabilization & Rehabilitation.  The ES budget for FY 2021 was about $27 million and the BAR budget was about $11.5 million (Anthony).  Funding for the BAER pilot in its first

---

[32] Fees from leasing are used in part for "range betterment," including range rehabilitation, protection, and improvement. This may include practices such as grass seeding and reseeding, fence construction, weed control, water development, and fish and wildlife habitat improvement.
[33] The Taylor Grazing Act dictates whether an allotment is managed under a grazing permit (section 7 of the Act) or lease (section 15 of the Act).

year—fires occurring in 2020—was $1.9 million (Jackson). Note that funding for these programs is small relative to ECP (and generally oversubscribed)[34] and the BLM and FS programs generally do not provide assistance for boundary fencing (between public and private lands).[35]

As noted above, ECP payments have been made on public lands for many years. As a result, no change in cost is associated with inclusion of public lands in the regulation. When making ECP cost-share payments, FSA has not collected data distinguishing a payment for rehabilitation on public lands vs. a payment on private lands. FSA does, however, associate any given payment with a specific land parcel, identified by a common land unit (CLU). Matching CLUs with a public lands overlay indicates that ECP outlays on public lands range from a low of 5.8 percent of total ECP outlays in Nebraska to 85.6 percent in Arizona (Table 25).

Consistent with the authorization for fence repair or replacement provided in this regulation, ECP will also provide advance payments of up to 25 percent of the cost for additional ECP practices before the restoration is carried out. The cost in total does not change, however, and is not analyzed here.

---

[34] For example, FY 2021 requests for BLM's ES boundary fence and fencing for protective seedlings assistance totaled $1.1 million; funding was $0.122. For BAR, requests for pasture fence and protective fencing for seedlings assistance was $2.70 million; funding was $2.53 million. FS data from the 2020 BAER pilot indicate that 20 range facility requests (out of 48 submitted) were authorized in full and 6 requests were partially funded.

[35] BLM may consider boundary fences if: 1) the fence was originally constructed by the BLM and has a valid project number; 2) the fence meets the criteria found in the Wyden Amendment; or 3) if it can be clearly shown that construction of this fence results in a cost savings to the government compared to fencing only on public lands (Anthony).

Table 25.  ECP Outlays, and Share of Outlays for Public Lands, by State

| State | Total ECP Outlays (2016-2019)[a] | ECP Outlays on Public Lands (2016-2019)[b] | ECP Outlays for Public Lands as a Share of Total State ECP Outlays (percent) |
|---|---|---|---|
| Arizona | 183,680 | 157,255 | 85.6% |
| California | 11,156,198 | 2,567,389 | 23.0% |
| Colorado | 757,632 | 78,123 | 10.3% |
| Idaho | 3,112,765 | 2,510,092 | 80.6% |
| Montana | 10,716,227 | 3,494,328 | 32.6% |
| Nebraska | 5,919,598 | 344,717 | 5.8% |
| Nevada | 1,205,947 | 968,441 | 80.3% |
| New Mexico | 1,083,888 | 428,622 | 39.5% |
| North Dakota | 274,654 | 84,968 | 30.9% |
| Oklahoma | 21,839,058 | 609,450 | 2.8% |
| Oregon | 5,944,999 | 4,049,935 | 68.1% |
| South Dakota | 15,304,950 | 3,984,207 | 26.0% |
| Utah | 186,813 | 12,218 | 6.5% |
| Washington | 9,340,292 | 2,745,571 | 29.4% |
| Wyoming | 2,600,402 | 1,222,837 | 47.0% |
| Totals: | 89,627,103 | 23,258,153 | 25.9% |

a Data from 2016-2019 were used due to availability of a GIS layer from this period that could be linked to identify payments on Federal lands.

b Matched to Federal lands at the tract level.  If any portion of an application was on Federal land, the entire payment for the application is associated with Federal lands.

**Item 8—ECP/EFRP and the Hermit's Peak/Calf Canyon Fire**

Section 104 (3) (A) of the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023 authorizes the Federal government to pay 100 percent of the ECP and EFRP cost for damage associated with the Hermit's Peak/Calf Canyon Fire.[36]  This fire burned over 340,000 acres from April 2022 to June 2022 (InciWeb).  It was the largest wildfire in recorded history in New Mexico and was not declared fully contained until August 21, 2022 (InciWeb).  The cost-share rate for both ECP and EFRP, prior to this legislation, was 75[37] percent regardless of location.  The legislation applies only to the locale of the Hermit's Peak/Calf Canyon Fire.

[36] The Hermits Peak Fire and the Calf Canyon Fire—which started on April 6 and April 19, respectively, burned into each other during extreme fire weather conditions on April 22, 2022.

[37] ECP and EFRP provide up to 75 percent of the cost to implement approved restoration practices. For ECP only, up to 90 percent of the cost of implementing approved restoration practices is provided for producers who certify as limited resource, socially disadvantaged, or beginning farmers/ranchers.

[ PAGE  \* MERGEFORMAT ]

FSA data on applications entered in the system as of October 17, 2022 indicate 708 combined ECP and EFRP applications on file for Mora and San Miguel counties in New Mexico (the Hermit's Peak/Calf Canyon area) (Smiley). Adjusting these cost-share requests to the 100 percent rate totals $91.1 million (about approximately $129,000 per application). EFRP requests account for about 90 percent of the total. Given that signup was extended until November 7, 2022, a modest number of additional applications are expected as of this writing.

Assuming 750 applications in total, at an average payment of $129,000 per application, produces a cost of $96.8 million (using unrounded data) at the 100 percent rate. If the 75 percent rate were still in place, the cost would be $72.6 million, a difference of $24.2 million relative to use of the 100 percent rate ($96.8 million - $72.6 million).

## Respondent Reporting Cost Estimate

The value of the total annual burden on respondents is based on the estimated number of total annual responses, the estimated average time per response, and the respondent cost per hour. This analysis is in several parts as the responses per respondent and the time per response vary by program. The total estimated respondent burden cost for the categories below is $18.4 million, with PARP accounting for a significant share of the total burden cost.

**Emergency Relief Program (ERP) Phase 2—**

Estimated Number of Respondents: 48,402.

Estimated Number of Responses Per Respondent: 2.035.

Estimated Total Responses: 98,498

Estimated Average Time Per Response: 0.5596 hours.

Estimated Total Time for Responses: 55,120 hours.

Respondent cost per hour was estimated using U.S. Bureau of Labor Statistics Occupational Employment and Wages data—specifically, NAICs code 11-9013 for Farmers, Ranchers, and Other Agricultural Managers.[38] The U.S. mean hourly wage for this category, as measured by the Bureau of Labor Statistics, is $41.35. Fringe benefits for all private industry workers are an additional 29.9 percent, or $12.36, resulting in a total of $53.71 per hour.

The estimated cost is $2.96 million ($53.71 per hour times 55,120 hours).

**Pandemic Assistance Revenue Program—**A stochastic analysis applied to Scenario I data suggests that PARP payments would trigger for a representative producer 32.45 percent of the time. This value was then multiplied by the 967,337 unique customers participating in CFAP 1 and 2 to yield an estimate of 313,901 respondents. The public reporting for this information collection is estimated as follows:

---

[38] See: [ HYPERLINK "https://www.bls.gov/oes/current/naics2_11.htm" ].

Estimated Number of Respondents: 313,901.

Estimated Number of Responses Per Respondent: 2.0050 (includes multiple forms).

Estimated Total Responses: 629,372.

Estimated Average Time Per Response: 0.42810 hours.

Estimated Total Time for Responses: 269,434 hours.

Respondent cost per hour was estimated using U.S. Bureau of Labor Statistics Occupational Employment and Wages data—specifically, NAICs code 11-9013 for Farmers, Ranchers, and Other Agricultural Managers.[39] The U.S. mean hourly wage for this category, as measured by the Bureau of Labor Statistics, is $41.35. Fringe benefits for all private industry workers are an additional 29.9 percent, or $12.36, resulting in a total of $53.71 per hour.

The estimated cost is $14.47 million ($53.71 per hour times 269,434 hours).


**Additional Assistance for Underserved CFAP2 Recipients—**

Estimated Number of Respondents: 96,973 (estimate of qualifying producers who have not yet filled out a CCC-860 form).

Estimated Number of Responses Per Respondent: 1.00.

Estimated Total Responses: 96,973.

Estimated Average Time Per Response: 0.1 hours.

Estimated Total Time for Responses: 9,697 hours.

Respondent cost per hour was estimated using U.S. Bureau of Labor Statistics Occupational Employment and Wages data—specifically, NAICs code 11-9013 for Farmers, Ranchers, and Other Agricultural Managers.[40] The U.S. mean hourly wage for this category, as measured by the Bureau of Labor Statistics, is $41.35. Fringe benefits for all private industry workers are an additional 29.9 percent, or $12.36, resulting in a total of $53.71 per hour.

The estimated cost is $520,826 ($53.71 per hour times 9,697 hours).


**Recreational Analysis and Livestock Disaster Programs—**The estimated number of responses per respondent and the average time per response is the same as for ELAP and LIP, but the time per respondent differs for LFP, as indicated below.

***ELAP:***

---

[39] See: [ HYPERLINK "https://www.bls.gov/oes/current/naics2_11.htm" ].
[40] See: [ HYPERLINK "https://www.bls.gov/oes/current/naics2_11.htm" ].

Estimated Number of Respondents: 154.

Estimated Number of Responses Per Respondent: 1.9550 (includes multiple forms).

Estimated Total Responses: 301.

Estimated Average Time Per Response: 0.43265 hours.

Estimated Total Time for Responses: 130 hours.

Respondent cost per hour was estimated using U.S. Bureau of Labor Statistics Occupational Employment and Wages data—specifically, NAICs code 11-9013 for Farmers, Ranchers, and Other Agricultural Managers. The U.S. mean hourly wage for this category, as measured by the Bureau of Labor Statistics, is $41.35. Fringe benefits for all private industry workers are an additional 29.9 percent, or $12.36, resulting in a total of $53.71 per hour.

The estimated cost is $6,996 ($53.71 per hour times 130 hours).

*LIP:*

Estimated Number of Respondents: 2.

Estimated Number of Responses Per Respondent: 1.9550 (includes multiple forms).

Estimated Total Responses: 3.91.

Estimated Average Time Per Response: 0.43265 hours.

Estimated Total Time for Responses: 1.7 hours.

Respondent cost per hour was estimated using U.S. Bureau of Labor Statistics Occupational Employment and Wages data—specifically, NAICs code 11-9013 for Farmers, Ranchers, and Other Agricultural Managers. The U.S. mean hourly wage for this category, as measured by the Bureau of Labor Statistics, is $41.35. Fringe benefits for all private industry workers are an additional 29.9 percent, or $12.36, resulting in a total of $53.71 per hour.

The estimated cost is $91 ($53.71 per hour times 1.7 hours).

*LFP:*

Estimated Number of Respondents: 137

Estimated Number of Responses Per Respondent: 1.9550 (includes multiple forms).

Estimated Total Responses: 268.

Estimated Average Time Per Response: 0.30477 hours.

Estimated Total Time for Responses: 82 hours.

Respondent cost per hour was estimated using U.S. Bureau of Labor Statistics Occupational Employment and Wages data—specifically, NAICs code 11-9013 for Farmers, Ranchers, and Other Agricultural Managers. The U.S. mean hourly wage for this category, as measured by the

[ PAGE \* MERGEFORMAT ]

Bureau of Labor Statistics, is $41.35. Fringe benefits for all private industry workers are an additional 29.9 percent, or $12.36, resulting in a total of $53.71 per hour.

The estimated cost is $4,384 ($53.71 per hour times 82 hours).

**Flexibility in NAP Enrollment for Underserved Producers—**

Estimated Number of Respondents: 8,627

Estimated Number of Responses Per Respondent: 7 (includes multiple forms; many producers are new to farm programs).

Estimated Total Responses: 60,389.

Estimated Average Time Per Response: 0.1329 hours.

Estimated Total Time for Responses: 8,023 hours.

Respondent cost per hour was estimated using U.S. Bureau of Labor Statistics Occupational Employment and Wages data—specifically, NAICs code 11-9013 for Farmers, Ranchers, and Other Agricultural Managers. The U.S. mean hourly wage for this category, as measured by the Bureau of Labor Statistics, is $41.35. Fringe benefits for all private industry workers are an additional 29.9 percent, or $12.36, resulting in a total of $53.71 per hour.

The estimated cost is $430,915 ($53.71 per hour times 8,023 hours).

**Notification of Interest and AGI Changes—**No additional paperwork is required of participants affected by the notification of interest change and hence, no paperwork burden estimate is provided here. FSA is not reopening sign up for programs affected by this change; it will only affect "behind the scenes" FSA payment processing for legal entities that previously filed applications.

**ECP Expansion to Public Lands—**ECP coverage of public lands has been in the FSA handbook for many years and FSA staff in the field have provided ECP assistance on both public and private lands since at least the 1990s. Adding language to the regulation regarding ECP coverage of public lands is a housekeeping change. No additional ECP participants are expected as a result.

**ECP/EFRP and the Hermit's Peak/Calf Canyon Fire--**Adding language to the regulation regarding ECP coverage of the Hermit's Peak/Calf Canyon Fire does not result in an increase in the paperwork burden for applicants. In addition, no additional ECP participants are expected.

[ PAGE  \* MERGEFORMAT ]

## Alternative Considered

Four of the items listed in Table 1—ERP Phase 2, PARP, the 15 percent top-up to underserved producers who have received CFAP2 funds, and the Hermit's Peak/Calf's Canyon Fire—are mandated by law (ERP Phase 2 and the Hermit's Peak/Calf's Canyon Fire), correct an inequity associated with prior CFAP programs (PARP), or help a disadvantaged group of producers (the CFAP payment). The other items are at the discretion of USDA and are not associated with emergency assistance or the pandemic. One alternative is to implement only the four items noted. Implementing only these four items would save a net of approximately $25 million annually (except for the Hermit's Peak/Calf's Canyon Fire, where all payments are assumed to occur in FY 2023).

## References

Anthony, Molly.  Emergency Stabilization and Rehabilitation Program Lead.  Bureau of Land Management – Headquarters.  Division of Forest, Rangeland, and Vegetation Resources. Personal communication.  September 2021.

Belasco, Eric, Joseph Cooper, and Vincent Smith. "The Development of a Weather-based Crop Disaster Program," *American Journal of Agricultural Economics* Vol. 102/1(August 2019):240-258.

Bomar, Martin.  Former FSA/ECP Program Manager.  Personal communication.  September 2021.

Cooper, Joseph. "Average Crop Revenue Election: A Revenue-Based Alternative to Price-Based Commodity Payment Programs," *American Journal of Agricultural Economics*, Vol. 92/4 (July 2010): 1214-1228.

"Coronavirus Food Assistance Program" regulation. *Federal Register*.  A rule by the Agriculture Department on May 21, 2020.  [ HYPERLINK "https://www.federalregister.gov/documents/2020/05/21/2020-11025/coronavirus-food-assistance-program" ].

"Coronavirus Food Assistance Program" regulation. *Federal Register*.  A rule by the Agriculture Department on September 22, 2020.  [ HYPERLINK "https://www.federalregister.gov/documents/2020/09/22/2020-20844/coronavirus-food-assistance-program" ].

"Coronavirus Food Assistance Program 2; Producers of Sale-Based Commodities and Contract Producers." *Federal Register*. A rule by the Agriculture Department on August 27, 2021.  [ HYPERLINK "https://www.federalregister.gov/documents/2021/08/27/2021-18423/coronavirus-food-assistance-program-2-producers-of-sale-based-commodities-and-contract-producers" ].

Dhillon, Navdeep. Production Flexibility/Compliance Chief Specialist. U.S. Department of Agriculture, California State Farm Service Agency Office. Personal communication. September 2021.

Jackson, Gilbert. Range Program Manager. U.S. Department of Agriculture, U.S. Forest Service, Forest and Rangelands Management and Vegetation Ecology. Person communication. September 2021.

"Notice of Funds Availability (NOFA); Pandemic Assistance for Timber Harvesters and Haulers Program." *Federal Register*. A notice by the Farm Service Agency on July 23, 2021. [ HYPERLINK "https://www.federalregister.gov/documents/2021/07/23/2021-15683/notice-of-funds-availability-nofa-pandemic-assistance-for-timber-harvesters-and-haulers-program" ].

"Notice of Funds Availability (NOFA); Pandemic Livestock Indemnity Program (PLIP)." *Federal Register*. A notice by the Farm Service Agency on July 19, 2021. [ HYPERLINK "https://www.federalregister.gov/documents/2021/07/19/2021-15295/notice-of-funds-availability-pandemic-livestock-indemnity-program-plip" ].

Smiley, Sharon. ECP/EFRP Specialist. U.S. Department of Agriculture, Farm Service Agency. Personal communication. October 2022.

U.S. Department of Agriculture. Economic Research Service. *U.S. and State-Level Farm Income and Wealth Statistics—Cash Receipts*. [ HYPERLINK "https://www.ers.usda.gov/data-products/farm-income-and-wealth-statistics/data-files-us-and-state-level-farm-income-and-wealth-statistics/" ].

U.S. Department of Agriculture. Farm Production and Conservation mission area. *A Guide to USDA Resources for Historically Underserved Farmers and Ranchers*. [ HYPERLINK "https://www.farmers.gov/sites/default/files/2022-07/farmersgov-historically-underserved-factsheet-07-20-2022.pdf" ].

U.S. Department of Agriculture. Farm Service Agency Handbooks. *Acreage and Compliance Determinations*. 2-CP. [ HYPERLINK "https://www.fsa.usda.gov/programs-and-services/laws-and-regulations/handbooks/index" ].

U.S. Department of Agriculture. *InciWeb--Incident Information System*. Accessed October 19, 2022. https://inciweb.nwcg.gov/incident/8069/.

U.S. Department of Agriculture. National Agricultural Statistics Service. *2017 Census of Agriculture*. [ HYPERLINK "https://www.nass.usda.gov/Publications/AgCensus/2017/index.php" ].

U.S. Department of Agriculture. National Agricultural Statistics Service. *QuickStats*. Accessed September 2021. [ HYPERLINK "https://quickstats.nass.usda.gov/" \l "195ADDFC-B736-3410-B0D7-FDDBEB6C2889" ].

[ PAGE  \* MERGEFORMAT ]

U.S. Department of Agriculture. Risk Management Agency. *The Risk Management Safety Net: Market Penetration and Market Potential - Analysis of the Federal Crop Insurance Portfolio*. September 2017. [ HYPERLINK "https://www.rma.usda.gov/-/media/RMA/Publications/Market-Penetration-and-Market-Potential-2017.ashx?la=en" ].

U.S. Department of Labor. Bureau of Labor Statistics. "Occupational Employment Statistics. Sector 11: Agriculture, Forestry, Fishing, and Hunting." [ HYPERLINK "https://www.bls.gov/oes/current/naics2_11.htm" ].

Zulauf, Carl and Gary Schnitkey (2015). "Understanding ARC-CO as a Shallow Loss Program." *FarmDoc Daily*. University of Illinois. [ HYPERLINK "https://farmdocdaily.illinois.edu/2015/12/understanding-arc-co-as-a-shallow-loss-program.html" ].

**USDA** Economic Research Service
U.S. DEPARTMENT OF AGRICULTURE

Economic
Research
Service

Administrative
Publication
Number 096

December 2022

# Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities

## A Report to Congress

Scott Callahan and Daniel Hellerstein



# Economic Research Service
## U.S. DEPARTMENT OF AGRICULTURE

# Economic Research Service
# www.ers.usda.gov

**Recommended citation format for this publication:**

Callahan, Scott and Daniel Hellerstein. December 2022. *Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities,* AP-096, U.S. Department of Agriculture, Economic Research Service.



Cover photos from Getty Images.

Use of commercial and trade names does not imply approval or constitute endorsement by USDA.

To ensure the quality of its research reports and satisfy governmentwide standards, ERS requires that all research reports with substantively new material be reviewed by qualified technical research peers. This technical peer review process, coordinated by ERS' Peer Review Coordinating Council, allows experts who possess the technical background, perspective, and expertise to provide an objective and meaningful assessment of the output's substantive content and clarity of communication during the publication's review.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

**Economic Research Service**

U.S. DEPARTMENT OF AGRICULTURE

Economic
Research
Service

Administrative
Publication
Number 096

December 2022

# Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities

Scott Callahan and Daniel Hellerstein

## Abstract

The 2017 Census of Agriculture reported that more than one-third of producers are over 65 years of age, and the distribution of agricultural land has shifted to fewer, larger landholders. Socially disadvantaged (SDA) producers (classified by race, ethnicity, and/or gender) may have fewer financial resources and face additional constraints when buying or raising capital for expanding farm operations. This report used USDA survey, census, and administrative data to examine measures of land access and other factors associated with the share of SDA and beginning farmers and ranchers in a county in 25 States. Several measures of land tenure, federal program participation, agricultural sales, and demographic information were used to estimate how land access and federal programs correlate with the percentage of SDA and beginning farming operations at the county level. The percentage of beginning farmers and ranchers in a county is positively correlated with the percent of rented farmland acres and negatively correlated with crop insurance premiums (measured in dollars per acre) and average farmer age. The study also found the percentage of SDA operations in a county is negatively correlated with the percentage of sales in field crops and positively correlated with the percentage of USDA's Farm Service Agency (FSA) loan applications granted, and percentage of direct-to-consumer sales. Results indicated the average lease size, the percentage of livestock sales, and decreasing urbanization are negatively correlated with the percentage of SDA and beginning operations. In contrast, the percentage of rented farmland and the percentage of SDA populations are positively correlated with the percentage of SDA operators in a county.

**Keywords:** land access, land tenure, landlords, socially disadvantaged (SDA) farmers, beginning farmers, TOTAL survey

## Acknowledgments

The authors thank Robert Hood of the USDA, National Agricultural Statistics Service (NASS) for providing data, and Jeff Hopkins, Robert Gibbs, and Krishna Paudel of the USDA, Economic Research Service (ERS) for their advice. The authors also thank the peer reviewers and USDA, ERS editors Casey Keel and Jeff Chaltas and USDA, ERS designer Chris Sanguinett.

## About the Authors

Scott Callahan and Daniel Hellerstein are economists with USDA, Economic Research Service.

# Contents

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

How Producer Characteristics and Farm Structure Affect Land Availability . . . . . . . . . . . . . . . 3

The Distribution of Farm Size and Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Farm Size, Farmland Tenure, and Land Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

USDA Programs for SDA and Beginning Farms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

USDA Loan and Loan Guarantee Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

USDA Conservation Programs: SDA and Beginning Farms . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Geographic Distribution of Socially Disadvantaged and Beginning Farm Operations . . . 8

Definitions of Terms: Farm Operators and Producers, Beginning Farmers, and Socially
Disadvantaged Farmers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Beginning Farms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

What Factors May Be Correlated With Land Access for Beginning and SDA Farmers? . . . . . . . 13

Measures of Land Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Measures of USDA Program Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Other Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Findings on Land Access: What Factors have Statistically Significant Correlations? . . . . . . . . . 19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Appendix A. Legal Definitions of Socially Disadvantaged and Beginning Farmers . . . . . . . . . 25

Appendix B: USDA Loan Programs and SDA and Beginning Farmers . . . . . . . . . . . . . . . . . . . 26

Appendix C: Results from Regression Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ii

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities, AP-096*
USDA, Economic Research Service
APP. 000561

**USDA** Economic Research Service

U.S. DEPARTMENT OF AGRICULTURE

*A report summary from the Economic Research Service*  *December 2022*

# Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities

Scott Callahan and Daniel Hellerstein

## What Is the Issue?

This report is in response to Section 12607 of the Agriculture Improvement Act of 2018 (the 2018 Farm Bill)[1], wherein the U.S. Congress tasked the U.S. Department of Agriculture (USDA) with analyzing the barriers preventing or hindering the ability of beginning and socially disadvantaged (SDA) farmers and ranchers to acquire or access farmland, and what USDA is doing to address these concerns.



Several factors may contribute to the challenges of accessing land for farming through purchase or rental, including the aging of the population of U.S. farmers, the increasing concentration of farmland ownership, credit constraints, and competition for land from urban and environmental uses. Beginning farms—those operated by farmers who have operated a farm or ranch for 10 years or less—as well as farms managed by operators defined by USDA as SDA—based on race, ethnicity, or gender—may have fewer financial resources and those that do face additional constraints when buying or raising capital for expansion. Due to significant gaps in available data, a robust analysis accurately measuring barriers to land access outcomes is not possible. Hence, this study uses regression analysis to measure the correlation between the share of farming operations classified as SDA or beginning operations by county and several measures of land access, federal program participation, and several USDA loan programs, including the Direct Loan Program and Guaranteed Loan Program.

## What Did the Study Find?

This study assessed the relationship between county share of SDA farmers and ranchers and possible influencing variables for the 25 states collected using the 2014 Tenure, Ownership and Transition of Agricultural Land (TOTAL) survey. These variables include indicators of the ease of land access, participation in Federal programs that directly or indirectly support beginning and SDA farm operations, and measures of county land use characteristics. The study also examined the correlation between the share of these farmers and the average age of farmers in the county, measures of agricultural land rental markets, and population growth as a proxy for local economic development.

---

[1] SEC. 12607 of the Agriculture Improvement Act of 2018 requests the Secretary of Agriculture to make publicly available a report on farmland access.

ERS is a primary source of economic research and analysis from the U.S. Department of Agriculture, providing timely information on economic and policy issues related to agriculture, food, the environment, and rural America.

**www.ers.usda.gov**

The share of SDA and beginning farming operations is correlated with some measures of land availability, participation in USDA programs, and land use metrics.

- The percentage of SDA and beginning farming operations is negatively correlated with average lease size. The percentage of SDA operations is also negatively correlated with the percentage of cropland acreage. However, the percentage of rented farmland is positively correlated with the percentage of SDA and beginning farming operations.

- The percentage of SDA operations was positively correlated with the percentage of successful applications to the Farm Service Agency's (FSA) Direct and Guaranteed Loan Programs. When defining SDA operations to include race, ethnicity, and gender (REG), these are positively correlated with Conservation Reserve Program (CRP) acreage. However, the percentage of SDA-REG and beginning operations were negatively correlated with per-acre crop insurance premiums by county.

## How Was the Study Conducted?

This study examined the geographic distribution of beginning and socially disadvantaged (SDA) farmers and ranchers across counties in the United States. The county share of farm operations that identifies as the beginning or socially disadvantaged is used as a measure of the ease or difficulty of establishing or expanding farm enterprises for these groups. This study used data from the 2017 Census of Agriculture on farm demographics and beginning-farm numbers at the county level, as well as county-level data on land use and land tenure. To characterize the state of land ownership, tenure, and land availability, this research used USDA's Tenure, Ownership, and Transition of Agricultural Land (TOTAL) Survey from 2014. In addition, the study used USDA administrative data from 2012 to 2017 from USDA's Farm Service Agency (FSA), Risk Management Agency (RMA), and Natural Resources Conservation Service (NRCS). Data on participation in the FSA Direct and Guaranteed Farm Loan Programs came from the USDA Race, Ethnicity, and Gender Program Statistics (REGStats) site. Descriptive statistics were presented for the 48 contiguous States, but regression models using the entire data complement were restricted to 25 States—the extent of TOTAL Survey data coverage. Results from the fractional probit model indicated the factors correlated with variations in a county's share of beginning and SDA farms.

**www.ers.usda.gov**

# Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities

## Introduction

As farmers retire or otherwise cease operations, agricultural production continues through a combination of consolidating existing farms and establishing beginning farm operations. Over time, farmland could be expected to pass from one generation of farmers to the next, which could provide beginning farmers with the land needed to farm, either through renting or purchase, as well as allowing existing farmers to expand operations.

Several demographic and financial trends may be limiting the availability of land for purchase or rental, which is referred to by the shorthand "land access" in this report. The 2017 Census of Agriculture reported the average age of agricultural producers to be 57.5 years and over one-third of producers are over 65. These numbers have increased over time (Boyce, 2019) and suggest farmers are holding onto land longer, which may affect land availability in a given year.

Furthermore, for several decades, the distribution of land (particularly cropland) has shifted to fewer and larger land holdings (MacDonald et al., 2018). Larger farms, on average, tend to be more productive and realize higher financial returns per acre (MacDonald et al., 2018). Higher returns are typically associated with higher land values and could limit the amount of land available for sale to operators with lower income or wealth. Larger farms also rent a greater share of their total acres operated, which could ultimately bid land away from beginning and socially disadvantaged (SDA) farmers.

This report explores the challenges beginning and SDA farmers may face when accessing land. Beginning farms—farms in which all operators have been farming for 10 years or less—may have difficulty competing for the purchase of land sold by exiting farms, compared with existing farms trying to expand, especially if the beginning farm is a small operation. Beginning farms are generally smaller operations with younger principal operators, and an average beginning farm household has about half the net worth of an average established farm—$1.2 million compared to $2.2 million, within 2013–17 (Key and Lyons, 2019). Given the limitations of available data, this is a correlative analysis rather than a causal one; that is, the goal is to identify important factors that are possibly correlated with land access, rather than to determine cause and effect.

Although not a new concern (Ruhf, 2013), land access may also present a serious challenge to enter farming for SDA operators. According to the 2017 Census of Agriculture, SDA operations defined by the race, ethnicity and gender criteria comprise 17 percent of farming operations, while SDA operations comprise 9 percent of farming operations when gender is excluded from the definition. SDA farmers on average have smaller financial resources than non-SDA producers, making land purchases more difficult. Thirty-three percent of SDA producers earn positive farm income, whereas nearly 45 percent of non-SDA farmers do. Median household income for SDA farmers is less than for non-SDA farmers—about $60,000

APP. 000564

compared to about $75,000 (Todd, 2020).[2] The USDA has recognized barriers faced by SDA operators,[3] providing "outreach and technical assistance to encourage and assist socially disadvantaged farmers and ranchers to own and operate farms and ranches and to participate in agricultural programs."[4]

Since 1992,[5] the USDA has provided additional support to farmers with limited access to traditional lending markets (Congressional Research Service (CRS), 2008; Government Accountability Office (GAO), 2019; and USDA, Economic Research Service, 2018).[6] Since 2015, USDA has obligated between $5 billion and $7 billion per year to support Direct and Guaranteed Loan Programs.[7] As discussed below, these loan programs target and reserve a share of funding—70 percent of combined Direct Farm Ownership and Operating Loans in FY21—to underrepresented and SDA applicants and beginning farmers.[8]

Federal programs may have ambiguous effects on land access for beginning and SDA operators. For example, the Conservation Reserve Program removes about 20.7 million acres of cropland from production (USDA, Farm Service Agency, 2021). Although retiring this land does provide environmental benefits, it may shrink the land available to farmers, including beginning and SDA farmers. On the other hand, USDA conservation programs targeted toward preserving farmland or improving environmental outcomes on working lands can often help beginning and SDA farmers achieve conservation and sustainability goals through cost-sharing.[9]

This report provides an overview of the condition and structure of U.S. agriculture, including the aging of U.S. farmers, the evolution in the concentration of farmland, and trends in agricultural land sales and rental markets. The relationships between these factors may impact the ability of beginning and SDA farmers to access land. Several potential influencing variables are regressed against county-level measures of the share of SDA and beginning farmers. Variables that have statistically significant coefficients are identified and discussed.

---

[2] These statistics are based on a USDA, Economic Research Service (ERS) analysis of 2017–18 ARMS data. In 2017, about 10 percent of farms were operated by limited-resource (LR) farmers. An SDA farm may or may not also be an LR farm. USDA, NRCS classified LR farmers as those who operate farms with direct or indirect gross farm sales not more than $180,300 (in 2020 dollars) in each of the previous 2 years and who have total household income at or below the national poverty level for a family of four, or below 50 percent of the median income in the county where they live.

[3] Section 2501(c)(2) of the Food, Agriculture, Conservation, and Trade Act of 1990. 7 U.S.C. § 2279(c)(2). A description can be found at USDA, ERS topic page: Beginning, Limited Resource, Socially Disadvantaged, and Female Farmers.

[4] *Food*, Conservation and Energy Act of 2008. Pub. L. 110-246.

[5] The Agricultural Credit Improvement Act of 1992 (P.L. 102- 554) established the trend of gearing USDA farm loan funds more toward beginning and minority farmers (Congressional Research Service 1996).

[6] The GAO report finds some evidence on challenges hampering the ability of SDA farmers to access credit, though available data preclude definitive statements.

[7] Several states (such as Connecticut, Nebraska, New Jersey, South Dakota, Virginia, and Wisconsin) have State programs that address land access for beginning farmers. Due to data unavailability, the researchers focus on Federal programs in this report.

[8] The Consolidated Farm and Rural Development Act (CONACT), in section 346(b)(2), requires USDA to reserve at least 75 percent of Direct Farm Ownership and 50 percent of direct Operating Loans for use by beginning farmers. For SDA-focused programs, the targets are established annually following procedures set forth in 7 CFR § 761.208 (CFR 761) and are based on the number of minority groups in each State and county.

[9] Several USDA conservation programs have features that recognize beginning and SDA farmers. For example, since 2008, the CRP's Transitions Incentive Program (CRP-TIP) has provided incentives to beginning and SDA farmers to acquire land that will be exiting the CRP.

# How Producer Characteristics and Farm Structure Affect Land Availability

The condition and structure of U.S. agriculture—for instance, who owns and operates farmland and the extent and size of markets for agricultural land—may impact the ability of beginning and SDA farmers to access land. These structural features include the distribution of farmer age and land ownership, participation in rental markets, and the size and profitability of farm operators.

## The Distribution of Farm Size and Operation

As of 2019, land in farms was approximately 897 million acres (37 percent of the United States land mass), including around 400 million acres of cropland (USDA, NASS, 2019). This land is managed on about 2 million farms based on data from the 2020 ARMS survey (Whitt et al., 2020). Both values—total land in farm operations and the total number of farms—have been fairly steady since the 1990s (Burns and Hoppe, 2019) but have seen some decline since 2012. Between 2012 and 2017, land in farm operations dropped 1.8 percent and the number of farms dropped 4.1 percent.

Many of these 2 million farms are small. Based on 2017 data from USDA's Economic Research Service (ERS) and National Agricultural Statistics Service (NASS) (Burns and Hoppe, 2019), about 89 percent of U.S. farms are "small family farms," with annual gross cash farm income (GCFI) less than $350,000. However, production and acreage are concentrated in the remaining 11 percent of farms, with over 74 percent of total production occurring on just 48 percent of total farmland acreage. This concentration has increased over the last several decades (MacDonald et al., 2018), especially for cropland. As of 2012, 36 percent of all cropland was on farms with at least 2,000 acres of cropland, up from 15 percent in 1987.

Only a small fraction of total farmland changes hands annually. Bigelow et al. (2016) found between 2015 and 2019, about 10 percent of farmland (93 million acres) was expected to be transferred; 4 percent was anticipated to be sold in markets, and 6 percent transferred through gifts, trust, or wills.[10] Of that 4 percent projected to be sold, over half (21 million acres) was expected to be sold to nonrelatives, with most of the remainder expected to be exchanged between relatives. Additionally, some of the land expected to be transferred through gifts, trusts, and wills could be sold to new owners.

The aging producer population is partly correlated with this low rate of expected sales. According to the 2017 Census of Agriculture, the average age of U.S. farm producers was 57.5 years old, with over a third older than 65 years of age. The 2017 average age is 1.2 years older than the 2012 average, and 9.7 years older than the first average age reported for farmers in the 1945 Census.[11] In contrast, in 2020, about 14 percent of self-employed U.S. workers in nonagricultural businesses are 65 or older (Bureau of Labor Statistics, 2020)—up from the 11 percent reported by Hoppe in 2010.

Moreover, these older farmers continue to play a key role in production. Farms with principal operators 65 or older generated 23 percent of all U.S. farm sales in 2017. Their involvement in farm production is similar to that of younger farmers. For example, 87 percent of all age groups are involved in the day-to-day operations of a farm, and around three-quarters of both younger and older farmers make cropping and land-use decisions on behalf of their respective operation.

---

[10] These values are derived from table 5 of the Tenure, Ownership, and Transition of Agricultural Land (TOTAL) report: *Land expected to undergo ownership transfer in next 5 years, as of 2014.*

[11] For a summary of farmer age, see the 2017 U.S. Ag AGDAILY-Insights News: "2017 Census of Agriculture: An aging farm population but with optimism".

## Farm Size, Farmland Tenure, and Land Access

Given that so little farmland typically changes hands through markets in any year, rented land is an important source of acreage for new or expanding farmers. According to the USDA Tenure, Ownership, and Transition of Agricultural Land (TOTAL) Survey of 2014, over 61 percent of U.S. farmland was owned and operated by the same entity (Bigelow et al., 2016). The remaining 39 percent was rented by landowners to tenant operators—with roughly 80 percent of this rented land owned by a non-operator landlord (Bawa and Callahan, 2021). The percentage of land rented varies by land use, with significantly more cropland being rented by tenant operators than pastureland. Although 54 percent of cropland is rented, only 28 percent of pastureland is rented (Bigelow et al., 2016).

Farms in different size classes use different methods to expand the land base needed for production.[12] Only 30 percent of small family farms—farms with a Gross Cash Farm Income (GCFI) less than $350,000—rent any land for their own operations. In aggregate, they rented 31 percent of the land they operated.[13] It is notable that small family farms often rented out a portion of their land and accounted for 81 percent of the 57 million acres rented out by farmers to other farmers.

In contrast, 79 percent of midsize family farms (GCFI $350,000 to $999,999) and 87 percent of large farms (GFCI over $1,000,000) rented at least some of the land they operated, and together about half of their operated farmland was rented from others.

Land rental markets are particularly important for younger farmers. Twenty-seven percent of the total acreage of farmland operated by those under 34 years of age is associated with full-tenant operations, whereas just 8 percent of land is in fully-owned operations. The remaining 65 percent of the land is in part-owner operations. Conversely, 7 percent of the total acreage of farmland operated by those who are 65 or older is found in full-tenant operations, and 43 percent of the land is in fully-owned operations. The remaining 50 percent of the land is in part-owner operations.

The relationship duration between a given landlord and tenants can affect rented land availability. Most landlords have long-term relationships with their tenants. In 2014, 70 percent of acres rented had been to the same tenant over 3 years and 28 percent for over 10 years. There is an even longer bond for non-operator landlords—84 percent for 3 years, 41 percent for 10 years.

Rates of return have affected land values and these vary by size of the farm. Since mid-1992, very large family farms (at least $5 million in GCFI) have earned rates of return—measured as the annual rate of return on assets—that have exceeded all other size classes in nearly every year. Farms with $1 million–$5 million in GCFI (large family farms) have estimated average returns exceeding those for the three smaller size classes in every year. The smallest class—farms with less than $100,000 in sales—consistently earn the lowest returns.[14] To the extent that beginning and SDA farmers are small operations, their rates of return may be lower than established farms.

Another trend possibly impacting land access is growing urbanization. According to a 2020 report (Freedgood et al., 2020), about 11 million acres—or 2,000 acres a day—of farmland and ranchland were converted to either urban and highly developed land use (4.1 million acres) or low-density residential land use (nearly 7 million acres) between 2001 and 2016.

---

[12] See figure 5 in MacDonald et al., 2018.

[13] Gross Cash Farm Income (GCFI) is a measure of farm revenue that includes sales of crops and livestock, Government payments, and other farm-related income. Further details on farm income can be found on the USDA, ERS topic page on farm household income and characteristics.

[14] See figure 10 in MacDonald et al., 2018.

# USDA Programs for SDA and Beginning Farms

In recognition of the challenges facing beginning and SDA farmers, the USDA operates several programs to target beginning and SDA operators. In particular, the Farm Service Agency (FSA) administers a number of loan and loan guarantee programs. In addition, USDA conservation programs include initiatives that recognize beginning and SDA farmers and ranchers.

## USDA Loan and Loan Guarantee Programs

Since 1992 a portion of USDA loan programs operated by FSA have been directed toward SDA and beginning farms (CRS, 2008). These programs can be classified as either (1) direct loan programs that loan Federal dollars to recipients through local FSA offices or (2) guaranteed loan programs that guarantee and facilitate private loans made and serviced by commercial lenders. In general, participants in both categories of loan programs must meet all eligibility requirements, which include a documented inability to obtain sufficient credit elsewhere to finance actual needs at reasonable rates and terms.[15]

In fiscal years 2017, 2018, and 2019, between $1.04 and $1.47 billion was obligated annually to the three main Direct Farm Ownership (FO) Loans,[16] and between $2.05 and $2.28 billion per year were obligated to Guaranteed FO Loans (USDA, FSA, 2019b). As described in appendix B, these loan programs differ in interest rates, loan caps, and whether funds are directly provided by USDA.

Although beginning farms are just as likely as established farms to borrow from commercial banks (61 and 62 percent, respectively, of all loan sources to farms), they are twice as likely as established farms to obtain a direct loan from USDA's FSA—16 percent compared to 8 percent.

## USDA Conservation Programs: SDA and Beginning Farms

The USDA annually spends over $5 billion on conservation programs (Claassen et al., 2019), most of which goes toward land retirement programs such as the Conservation Reserve Program (CRP), and working lands programs such as the Environmental Quality Incentives Program (EQIP) and the Conservation Stewardship Program (CSP). Other conservation programs include the Agricultural Land Easements and the Wetland Reserve Easements of the Agricultural Conservation Easement Program (ACEP).

In contrast to commodity-related and insurance program payments, which tend to be positively correlated with farm acreage, conservation program payments, especially land retirement payments, are distributed to smaller farms (McFadden and Hoppe, 2017).[17] In 2019, about 80 percent of USDA's CRP payments went to retired farmers, farmers with off-farm occupations, and low-sales farms (farms with less than $150,000 in GCFI). About 31 percent of working lands conservation payments went to small family farms (GCFI less than $350,000), with another 31 percent to midsized (GCFI between $350,000 and $999,999) (Whitt et al., 2020).

---

[15] Eligibility requirements are listed in sections 764.101 for direct loans and 762.120 for guaranteed loans of the Code of Federal Regulations.

[16] In 2019, 3,851 beginning farmers and 1,155 SDA farmers received Direct Farm Ownership Loans.

[17] The values in this section were pulled from McFadden and Hoppe (2017) and Burns and Hoppe (2019).

**5**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service
APP. 000568

As voluntary programs, USDA land retirement and working lands programs help farmers meet conservation and stewardship goals. While land enrolled in land retirement programs is not available to farmers, including beginning and SDA farmers, there is mixed evidence linking the CRP acreage and access to agricultural land.[18] Several program features may limit the program's impact on land access, including a 25 percent limit on the amount of a county's farmland that can be enrolled in the CRP or wetland easement programs and per acre payment caps based on county average dryland cropland rental rates.

A number of USDA's conservation programs include initiatives targeting beginning and SDA farmers. One such program is the CRP's Transition Incentives Program (CRP-TIP) created by the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill). It allows a retired or retiring landowner who has land enrolled in CRP to receive 2 additional years of payments if land is immediately transitioned back into production through being sold or leased to a beginning or SDA farmer or rancher. CRP-TIP was modified in the Agricultural Act of 2014 (the 2014 Farm Bill), with program eligibility expanded to veteran farmers and ranchers. The 2018 Farm Bill opened the program to all landowners with an expiring contract, whether retiring or not.[19]

Two years prior to the termination of their contract, a CRP-TIP contract holder can allow the incoming farmer to begin making conservation and land improvements—or begin the organic certification process—on the land covered by the CRP contract. On or near the date the CRP contract is terminated, the landowner must sell, enter a long-term lease, or lease with an option to purchase with some or all the land covered by CRP to the incoming farmer. The incoming farmer must then develop and implement a conservation plan on the land previously covered by CRP.

The 2008 Farm Bill provided $25 million in funding for this program between 2009 and 2014; the 2014 Farm Bill provided $33 million between 2014 and 2018; and the 2018 Farm Bill provides $50 million in funding between 2019 and 2023. Between 2014 and 2018, more than 1,500 CRP-TIP participants covered over 225,000 acres at a total cost of approximately $22 million (USDA, FSA, 2019c).

Program participation in CRP-TIP has varied geographically and has been influenced by several factors (Johnson, 2017):

- knowledge of the program with counties conducting multiple forms of outreach having greater participation;

- the existence of a strong relationship between owners of CRP land and prospective farmer or rancher—interested landowners and prospective farmers often have difficulty finding each other;

- the state of the agricultural economy with farm costs and profitability impacting prospective farmers; and

- the amounts of expiring land and the distribution of those acres. FSA (CRP Cost Benefit Analysis) estimates that up to 400,000 acres could potentially be enrolled in TIP during the 2018 Farm Bill period (USDA, FSA: Cost-Benefit Analysis for the Conservation Reserve Program (CRP), as amended by the Agriculture Improvement Act of 2018, November 2019).

---

[18] Sullivan et al. (2006), found that high CRP enrollment did not systematically spur the loss of farm populations (including beginning farmers). In contrast, Wu and Lin (2010), found in 1997 that CRP raised land values between 1.3 percent and 1.8 percent in the United States.

[19] FSA defines an eligible farmer as "An owner or operator of land enrolled in a CRP contract who has ended active labor in farming operations as a producer of agricultural crops or expects to do so within 5 years and has land expiring under a CRP contract."

In addition to CRP-TIP, USDA has several other resources to help new and beginning farmers. From 2017 to 2018, a USDA initiative like CRP-TIP allowed CRP contracts planted with certain CRP practices to be terminated early without having to repay past payments if the land is passed to a beginning or SDA operator. Eligible land includes the least environmentally-sensitive land in CRP. One difference between CRP provisions and CRP-TIP is that these new land tenure provisions were available to landowners who passed land on to family members, while CRP-TIP includes restrictions on transfer within a family. Another difference is that veterans were not targeted by this authority. Although formal data is not readily available, less than 10,000 acres were affected by this initiative.[20]

A variety of education and assistance programs also support new farmers, such as the Farming Opportunities Training and Outreach Program in the 2018 Farm Bill, which will provide over $90 million between 2019 and 2023. This combined two prior programs—Beginning Farmer and Rancher Development Program and the Outreach and Assistance to Socially Disadvantaged and Veteran Farmers and Ranchers Program—to support education, mentoring, and technical assistance initiatives for beginning and SDA farmers or ranchers.[21]

Although smaller in size than CRP, the Agricultural Conservation Easement Program (ACEP) may also affect the availability of farmland for beginning and SDA farmers. Created in the 2018 Farm Bill by merging several existing programs, including the Wetlands Reserve Program (WRP) and the Farm and Ranch Lands Protection Program (FRPP), ACEP has two main components: the Wetland Reserve Easement (WRE) and the Agricultural Land Easement (ALE). The WRE component is used to restore, protect, and enhance wetlands through the purchase of a long-term (permanent or 30-year) easement—with payments for restoring wetland features on formerly cropped landscapes and retiring the land from agricultural uses. The ALE component is used to cost share (with States and other entities) on the purchase of development restrictions on agricultural land. Farmland preserved under the ALE component may be available on the sales or rental markets, rather than being obtained by developers.

Agricultural land easements may improve land access for farmers, including SDA and beginning farmers. These easements have served to protect agricultural land from future urban development. Particularly for farmland where cities are expected to expand, the value of potential future development is capitalized into the value of farmland (Zhang and Nickerson, 2020). By facilitating the purchase of easements—which prohibit future development potential—the value of this land is reduced to its use value for agriculture.[22] This can reduce the cost of acquiring this farmland for agriculture. There is also explicit recognition of beginning farmers in ACEP, such as increased Federal cost share for ALE contracts facilitating the transfer to beginning farmers.

Between 2014 and 2019, obligations for the easement programs (or their predecessors) varied between $300 million and $536 million per year. In this time span, over 310,000 wetland acres were placed into easements, and over 850,000 acres entered an agricultural land easement.

---

[20] Based on personal communication with Alex Barbarika, USDA, FSA. FSA did not assign a formal name to this initiative.

[21] USDA, New Farmers: Education and Assistance.

[22] Conservation easements alter the property rights associated with the land by removing the development rights from the remaining rights, including agricultural use, of the land. The intention is twofold. First, removing the development rights ensures the land will not be developed and, therefore, remain available for agricultural use. Second, removing a portion of the rights—the right to develop the property—means the remaining land and rights (largely the agricultural rights) should theoretically be closer in value to the agricultural-use value and therefore more affordable to farmers. This helps to defray the purchase cost and reduces property tax liabilities (Bigelow et al., 2016).

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

# The Geographic Distribution of Socially Disadvantaged and Beginning Farm Operations

As detailed in the box titled "Definitions of Terms", the definition of SDA and beginning farms varies across USDA programs.[23] As noted above, this research has employed two alternative definitions of SDA intended to approximate key definitional differences in USDA programs. Data used to define SDA and beginning farm operations come from the 2017 Census of Agriculture and were compiled by the USDA, National Agricultural Statistics Service (NASS) by special request from individual Census responses. According to the 2017 Census of Agriculture, 36.10 percent of producers were female; 2.33 percent were Native American, Alaskan, or of mixed race; 0.74 percent were of Asian or of mixed race; and 1.43 percent Black or African American or of mixed race.[24]

---

**Definitions of Terms: Farm Operators and Producers, Beginning Farmers, and Socially Disadvantaged Farmers**

**Operators and producers:** A farm producer or operator is someone involved in running a farm who makes daily management decisions. In 2017, the Census of Agriculture and the USDA Agricultural Resource Management Survey (ARMS) identified up to four operators or producers on a farm.

**Beginning farmers:** This report uses the USDA, Economic Research Service definition of a "beginning farming operation," in which all operators have no more than 10 years of experience as an operator on any farm. This study is not accounting for multigenerational-family farming operations with a mixture of beginning and experienced farm operators in the definition of "beginning farming operations."

**Socially disadvantaged farmers**. In general, the classification of "socially disadvantaged farmers" (SDA) is based on the racial or ethnic status, or gender of the operators. However, as discussed in the appendix A, this definition is flexible. In some circumstances if a female operator is present, the farm is classified as SDA. In other circumstances, if a female operator shares the operation with a male operator, the farm is not classified as SDA. For quantifying SDA operations, this study constructed two definitions including: (1) The race and ethnicity-based definition classifies a farming operation as socially disadvantaged if any operator is non-White or Hispanic; and (2) The race, ethnicity, and gender-based definition additionally classifies operations as socially disadvantaged if any operator is non-White or Hispanic *or* all operators are female.

---

This study first defines SDA operations based on the race and ethnicity of the operators on the farm; an operation is considered SDA if any operator on the operation is either non-White or Hispanic, henceforth referred to as SDA-RE operations. This definition is used to approximate the USDA's Natural Resources Conservation Service (NRCS) definition of SDA and does not consider gender as a separate criterion in determining whether an operation meets the SDA definition.

---

[23] See the supplemental appendix for details.

[24] Note that these statistics express the percentage of producers, not the percentage of operations that our analysis focuses on.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

Figure 1

**Distribution of socially disadvantaged farm operations, according to race and ethnicity definition, by county in 2017**



Notes: This map depicts the percentage of operations classified as socially disadvantaged (SDA)—using the SDA, by racial and ethnic status (SDA-RE) definition (Pct. SDA-RE op.). The models used in the regression analysis used data from Tenure, Ownership, and Transition of Agricultural Land (TOTAL) States (the non-gray regions in the map). The Western and Southern regions of the United States have a considerably higher percentage of SDA-RE operations than the Northern and Midwestern regions.

Source: USDA, Economic Research Service using 2017 Census of Agriculture data.

Figure 1 depicts the distribution of the percentage of farm operations that are SDA by county according to the definition of race and ethnicity. The Western and Southern regions of the United States have considerably higher percentages of SDA operations than the Midwestern and Northeastern U.S. regions.

The second SDA definition is intended to approximate the USDA Farm Service Agency (FSA) definition of SDA, which includes operations with one or more female operators in addition to those with Hispanic or non-White operators. However, the second SDA definition excludes operations consisting of a combination of White males and females, only including operations with White females if they are unaccompanied by White males. Note the FSA included women in their definition of SDA farmers without qualification. This study's definition differs because including all operations with women present would flag most U.S. farming operations as SDA. These operations will be henceforth referred to as SDA operations according to the race, ethnicity, and gender definition (SDA-REG).

9

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service
APP. 000572

Figure 2

**Distribution of socially disadvantaged farm operations, according to race, ethnicity, and gender definition, by county in 2017**



Notes: This map depicts the percentage of operations classified socially disadvantaged (SDA)—using the SDA, according to race, ethnicity, and gender (SDA-REG) definition (Pct. SDA-REG op.). The models used in the regression analysis used data from Tenure, Ownership, and Transition of Agricultural Land (TOTAL) States (the non-gray regions in the map). In general, White female operations are more common in counties where non-Hispanic White people comprise large shares of the population.

Source: USDA, Economic Research Service using 2017 Census of Agriculture data.

Figure 2 depicts the share of SDA farm operations by county using the expanded race, ethnicity, and gender definition. There are higher percentages of SDA operations in the Midwestern and Northeastern U.S. regions relative to the race and ethnicity definition alone. In general, White female operations are more common in counties where non-Hispanic Whites comprise larger shares of the population.

This study defines beginning farm operations as any operation in which all operators have been farming for 10 years or less (Katchova and Ahearn, 2016; Key and Lyons, 2019). Box 2 describes the extent and characteristics of beginning farmers, and figure 3 depicts the share of beginning farmer operations by county. Beginning operations are somewhat less common in the Midwest and the Northern Plains States. However, unlike the distribution of SDA operations, the pattern of the beginning farmer geographic distribution is far more dispersed with less of a geographic pattern. Moreover, there are lower percentages of beginning farmers in most Midwestern and Northern Plains States.

10

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

APP. 000573

## Beginning Farms

As of 2017, there were about 340,000 farms—with almost 900,000 operators—on which all operators were beginning farmers with 10 or less years of management experience on any farm. These new "beginning farms"[1] and ranches accounted for 17 percent of all farms in the United States and 8 percent of the total agricultural production (Key and Lyons, 2019).

Following the same pattern as with established farms, most beginning farms are small-scale operations that, in aggregate, contribute a relatively low share of total production value. For example, only about 33 percent of beginning farms produced more than $10,000 worth of output when compared with roughly 50 percent of established farms. About 2 percent of beginning farms have annual production value of more than $1,000,000—compared with 4 percent of established farms. These larger beginning farms are responsible for more than 50 percent of all output produced by beginning farms—compared with over 60 percent for established farms.

In 2017, among farms with at least $10,000 in production value or sales, principal operators of beginning farms were 43 years old—on average—whereas operators of established farms were 63 years old, on average. In addition, 30 percent of beginning-farm principal operators were 35 years old or younger, compared with only 2 percent of principal operators of established farms.

Beginning farm households (with at least $10,000 in production) earned almost as much total household income—around $150,000—as established farms, when averaged over 2013–17. Off-farm income represents a greater share of total income for beginning farms (77 percent) than for established farms (56 percent).

_____

[1] As noted in the introduction, the definition of new "beginning farms" does not include multigenerational farms where an older operator is the primary operator and a secondary/tertiary operator is a beginning farmer.

_Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities_, AP-096
USDA, Economic Research Service

Figure 3

**Distribution of beginning farming operations, by county, in 2017**



Notes: This map depicts the percentage of beginning farming operations (Pct. beginning op.), defined as an individual or entity that has operated a farm for not more than 10 consecutive years. The models used in the regression analysis used data from Tenure, Ownership, and Transition of Agricultural Land (TOTAL) States (the non-gray regions in the map). Beginning farming operations are more geographically dispersed than socially disadvantaged operations. There are lower percentages of beginning farmers in most Midwestern and Northern Plains States.

Source: USDA, Economic Research Service using 2017 Census of Agriculture data.

This study also considered whether the share of SDA farm operations in a county is representative of the share of the SDA population in the county.[25] Figure 4 has shown the average percentage point difference between the percentage of SDA farm operators and the percentage of the total population that is SDA within the county. SDA operators in the Southeastern United States and West Texas comprise a lower percentage of the farm operator population relative to the overall population. However, in Arizona, Utah, New Mexico, and Oklahoma, there are several counties in which SDA operators comprise a higher percentage of operators relative to their share of county population. These counties tended to include areas under tribal jurisdiction. Note that SDA demographic groups comprise less than 10 percent of the population of most counties in the Midwest and Northeast regions.

---

[25] This uses the percentage of the population that is non-White or Hispanic using county population estimates; obtained from table B03002 from the 2017 American Community Survey.

12

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service
APP. 000575

Figure 4

**Percentage point difference between socially disadvantaged (SDA) producers and SDA populations, by county in 2017[1]**



Legend

TOTAL States
- Non-TOTAL
- TOTAL

Pct. point difference
- -95.85% to -46.73%
- -46.72% to -29.27%
- -29.26% to -16.10%
- -16.09% to 0.00%
- 0.01% to 86.73%
- SDA<10% of population

This map depicts the percentage point difference (Pct. point difference) between the percentage of socially disadvantaged (SDA) farming operations and the percentage of SDA population. The models used in the regression analysis used data from Tenure, Ownership, and Transition of Agricultural Land (TOTAL) States (the non-gray regions in the map). SDA operators in the Southeastern United States and West Texas comprise a lower percentage of the farm operator population relative to the overall population. However, in Arizona, Utah, New Mexico, and Oklahoma, there are several counties in which SDA operators comprise a higher percentage of operators relative to their underlying population.

[1] Counties only included if SDA peoples comprise at least 10 percent of the population.

Source: USDA, Economic Research Service using 2017 Census of Agriculture and 2017 American Community Survey data.

## What Factors May Be Correlated With Land Access for Beginning and SDA Farmers?

Ultimately, this study is interested in discerning what factors—such as the current ownership of agricultural lands or the size and extent of Federal programs—affect the ability of beginning and SDA farmers to obtain or access farmland. However, given the gaps in available data, a robust analysis accurately measuring operator characteristics and land access outcomes is infeasible. Hence, this analysis of land access challenges used the share of farm operations by county SDA or beginning farming operations to approximate the relative ability of these farmers to thrive in their localities. Through regression analysis, this research estimated the correlation between the three measures of these groups—operation share using the two definitions of SDA operation and the share of beginning farming and ranching operations—and various associated factors. In addition to several measures of land availability, this research also incorporated measures of participation in supportive USDA programs that may counterbalance factors limiting access to land. To control other factors possibly

13

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service
APP. 000576

influencing the relationship between land access and operation shares, this research further included recent county-population growth as a measure of economic development and of commodity mixed into the analysis. This research used a county-level, cross-sectional dataset for the 25 States in the 2014 TOTAL Survey.[26] This methodology estimated statistical associations, not underlying causal mechanisms[27]. As such, this report's estimation results should be considered suggestive rather than definitive.

## Measures of Land Access

USDA's 2014 Tenure, Ownership, and Transition of Agricultural Land (TOTAL) Survey directly asked both operator and non-operator landlords about land-ownership characteristics, rental agreements, landlord/tenant relationships, and future land transition plans. From this survey, this research developed several measures to quantify land access for production.

Table 1
**Summary statistics for model variables, TOTAL States only**

| Variable | Source | N | Min | Max | Mean | Median | Standard deviation |
|---|---|---|---|---|---|---|---|
| Dependent variables | | | | | | | |
| Percentage of SDA operations (race/ethnicity/gender) | 2017 Ag Census | 2,263 | 0.00% | 100.00% | 15.60% | 11.21% | 11.20% |
| Percentage of SDA operations (race/ethnicity) | 2017 Ag Census | 2,263 | 0.00% | 96.36% | 8.42% | 3.60% | 10.24% |
| Percentage of beginning operations | 2017 Ag Census | 2,263 | 5.93% | 70.00% | 21.49% | 20.24% | 6.48% |
| Land access variables | | | | | | | |
| Percentage of farmland to be transferred to nonfamily members | 2014 TOTAL | | | | 3.01% | 0.00% | 0.18% |
| Average lease size (acres) | 2014 TOTAL | | | | 117.80 | 45.00 | 388.86 |
| Percentage of leases renewed annually | 2014 TOTAL | | | | 70.55% | 29.13% | 0.56% |
| Average landlord/tenant relationship length | 2014 TOTAL | | | | 10.707 | 8.170 | 0.089 |
| Percentage of rented farmland acres | 2014 TOTAL/ 2017 Ag Census | | | | 46.83% | 32.24% | 34.56% |
| Percentage of cropland acres | 2017 Ag Census | 2,251 | 0.05% | 99.98% | 56.64% | 66.83% | 28.63% |
| Land value per acre | 2017 Ag Census | 2,261 | 191 | 77,760.00 | 6,149.34 | 3,500.00 | 4,096.83 |

continued on next page ▶

---

[26] The independent variables in this regression were chosen to both measure the correlation of land access and Federal program measures on the percentage of SDA and beginning farming operations, and to control for as much omitted variable bias as possible. All dollar amounts are measured in per acre terms. All continuous variables are log transformed.

[27] Note that the TOTAL survey was designed to provide State level estimates for the top 25 States in terms of cash receipts. It was not intended to be used to construct county estimates. We do so because it was necessary to obtain a sufficient sample size to conduct the analysis. County level aggregates of TOTAL survey data are not guaranteed to be representative of the underlying population.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service
APP. 000577

◀ continued from previous page

| Variable | Source | N | Min | Max | Mean | Median | Standard deviation |
|---|---|---|---|---|---|---|---|
| Government programs variables | | | | | | | |
| Percentage of SDA (race/ethnicity/gender) granted DLP/GLP loan applications | 2017 REGStats | 1,736 | 0.00% | 100.00% | 59.76% | 50.00% | 34.54% |
| Percentage of SDA (race/ethnicity) granted DLP/GLP loan applications | 2017 REGStats | 1,079 | 0.00% | 100.00% | 75.77% | 80.00% | 26.84% |
| Percentage of all granted DLP/GLP loan applications | 2017 REGStats | 2,213 | 0.00% | 100.00% | 75.36% | 75.61% | 12.19% |
| ARC/PLC payments per acre | 2014–2017 FSA | 2,311 | 0 | 120.875 | 8.089 | 4.854 | 11.628 |
| Crop insurance indemnity payments per acre | 2013–2017 RMA | 2,311 | 0 | 2,746.99 | 25.368 | 21.612 | 84.065 |
| Total crop insurance premium per acre | 2013–2017 RMA | 2,311 | 0 | 1,892.91 | 35.455 | 35.339 | 51.517 |
| Percentage of cropland acres enrolled in general signup CRP | 2014–2017 FSA | 2,279 | 0.00% | 59.11% | 3.53% | 0.54% | 6.21% |
| Percentage of cropland acres enrolled in continuous signup CRP | 2014–2017 FSA | 2,279 | 0.00% | 30.06% | 1.98% | 0.59% | 2.71% |
| Percentage of cropland enrolled in CRP-TIP | 2014–2017 FSA | 2,279 | 0.00% | 2.35% | 0.04% | 0.00% | 0.11% |
| Percentage of cropland acres enrolled in ACEP | Origin-2017 NRCS | 2,251 | 0.00% | 19.78% | 0.10% | 0.00% | 1.01% |
| Share of sales (by type of agricultural commodity) variables | | | | | | | |
| Percentage of sales in field crops | 2017 Ag Census | 2,222 | 0.00% | 100.00% | 44.51% | 45.49% | 29.04% |
| Percentage of sales in specialty crops | 2017 Ag Census | 2,222 | 0.00% | 100.00% | 9.96% | 1.15% | 12.76% |
| Percentage of sales in livestock | 2017 Ag Census | 2,222 | 0.00% | 99.92% | 26.03% | 20.31% | 27.83% |
| Percentage of direct-to-consumer sales | 2017 Ag Census | 2,222 | 0.00% | 49.41% | 0.45% | 0.15% | 2.74% |
| Demographic variables | | | | | | | |
| Percentage of SDA population (race/ethnicity) | 2017 ACS | 2,264 | 0.00% | 99.36% | 39.24% | 15.09% | 19.96% |
| Percentage change in population | 2010 Census/ 2017 ACS | 2,264 | -23.20% | 98.52% | 5.42% | -0.88% | 6.72% |
| Average age of farmers | 2017 Ag Census | 2,263 | 39.7 | 67.5 | 58.57 | 58.6 | 2.226 |
| Percentage change in farmer age | 2012–2017 Ag Census | 2,263 | -33.83% | 12.94% | 0.47% | 0.52% | 3.12% |
| Rural Urban Continuum Code | 2013 ERS | 2,264 | 1 | 9 | | | |

Note: Certain statistics are omitted for TOTAL survey variables to protect producer confidentiality.

Source: Sources depend on the variable and are listed in the second column, including USDA, Census of Agriculture, U.S. Census American Community Survey (ACS); USDA, National Resources Conservation Service (NRCS); USDA, Risk Management Agency (RMA) data; 2014–2017 Farm Service Agency (FSA): derived from FSA administrative data by USDA, Economic Research Service (ERS); USDA 2014 Tenure, Ownership, and Transition of Agricultural Land (TOTAL) Survey.

15

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service
APP. 000578

Table 1 reports summary statistics for the variables used in the empirical analysis, which included data for the 25 TOTAL core States. The TOTAL survey used an area frame stratified random sample. The core States are the 25 States with the highest cash receipts during the prior 3-year period. Although the microdata are intended to be aggregated to the State-level for the TOTAL core States, this study aggregated to the county-level to obtain a reasonable sample size, accounting for the survey weights in the aggregation process.[28]

This report measured land availability to include the following:

- *Percentage of farmland that landlords anticipate selling or transferring to nonfamily members within the next 5 years.* This represented how much farmland will likely be available for purchase by farmers including SDA and beginning farmers. The smaller this percentage is, the less land available for farmers to begin or expand operations by purchasing farmland.

- *Number of acres of farmland available for lease at the county level.* Holding other variables constant, more land available for rent means more acreage to create a new farming operation or expand an existing one.

- *Average size of a lease in acres.* Holding constant the total availability of land for lease, a larger average lease size will make it more difficult for farmers to start or expand operations. The national average size of a lease is 94 acres and the median is 11 acres. Although many parcels are small, there are a smaller number of much larger parcels.

- *Percentage of leases renewed annually.* More long-term leases make land less available for new entrants seeking to take advantage of changing market conditions. Higher shares of annual leases indicated landlords and tenants should be able to adjust leasing terms to changing market conditions with relative ease.

- *Average length of a landlord/tenant relationship.* Specific pairs of landlords and tenants remain in agreements an average of 10 years. This could suggest that, although most leases are renewed annually, these renewals are frequently maintained by the same tenants. Longer landlord/tenant relationships may make it more difficult for beginning farmers to enter the market or more difficult for existing tenants (SDA or otherwise) to expand operations. Alternatively, if leases are renewed annually but are inflexible to change, landlords might be happy to lease to new tenants (SDA or otherwise) if current tenants are unwilling to meet their terms.

This research also constructed three additional county-level measures of land availability based on data from the 2017 Census of Agriculture:

- *Percentage of rented farmland acres.* This variable measures the percentage of all farmland (both cropland and pastureland) that is rented. The researchers expect a higher percentage of rented farmland will be positively correlated with a higher percentage of SDA and beginning farming operations.

- *Percentage of farmland that is cropland.* This variable is a measure of a county's division of land between farming and ranching. The researchers hypothesize SDA operations are more common in areas where livestock is more common, implying counties with a higher percentage of cropland should have a lower percentage of SDA operations.

- *Average agricultural land value per acre.* This measure is constructed as total land value divided by the sum of cropland and pastureland acreage. The higher the land values are, the more difficult it would be for limited resources or beginning farmers to acquire land. Since land is often financed using existing land holdings as collateral, higher land values make it relatively easier for established farms to buy land

---

[28] Data obtained from the TOTAL survey were aggregated using the Survey Means procedure in Statistical Analysis System (SAS) software.

and relatively harder for beginning farmers to do so. Average land values vary by land quality, land use, and future development potential. Higher quality land is both more expensive and more productive. All farmers—including SDA and beginning farmers—face a tradeoff between obtaining more productive and more expensive land versus less productive and less expensive land.

## Measures of USDA Program Participation

Although this study does not have county-level data on all USDA efforts to support SDA and beginning farms, it does have detailed demographic information on participation in the USDA, Farm Service Agency (FSA) Direct Loan Program (DLP) and Guaranteed Loan Program (GLP).[29] The researchers used this information as a proxy for participation in the subset of the Direct and Guaranteed Loan Programs by SDA and beginning farmers.[30] These measures include the following:

- *Total participation rate in the DLP and GLP (regardless of demographic group).* Seventy-five percent of producers who applied for DLP and GLP loans had successfully received them. This statistic provides context for the participation rates of SDA producers reported below. This measure is included in the beginning farming operation estimations because no measure exists specifically for beginning farming operations.

- *Participation rates in the DLP and GLP for both definitions of SDA producers.* Under the race and ethnicity definition, national participation rates have been 75 percent. When using the race, ethnicity, and gender definition, participation rates have been 60 percent. The effect of higher county-level participation in these loan programs is expected to be positively correlated with both the percentage of SDA and beginning operations in a county.[31]

In addition to loan programs intended to aid beginning, limited-resource, and SDA operations, the researchers also included measures of payments from major Federal farm programs.

- *Agriculture Risk Coverage (ARC)/Price Loss Coverage (PLC) payments per acre.* This variable is constructed as the level of ARC/PLC payments in a county—based on information obtained from FSA—divided by base acres and averaged from 2014 through 2017.[32]

- *Indemnity payments per acre and total premium payments per acre.* Based on figures from the Federal crop insurance program operated by the Risk Management Agency (RMA), these two crop insurance measures are intended to capture program payments and agricultural risk. This research aggregated across crop and insurance types to obtain payment information at the county level. To minimize the impact of weather and production outcomes in any single year, values of each measure were averaged across 2013–2017.

- *Percentage of cropland acres enrolled in the Conservation Reserve Program (CRP).* This study separately measured the percentage of cropland enrolled in general signup CRP, continuous signup CRP, and the CRP-TIP programs to assess the association between CRP and the percentage of beginning farmers.

---

[29] These data come from the USDA Race, Ethnicity, and Gender Program Statistics (REGStats).

[30] There are several possible loans measures—those accounting for who applies, who is accepted, and the amount of funding distributed. Our use of participation rates is conditioned on available data—including the SDA and beginning-farmer information. Thus, these measures are used as best available proxies—they may not fully control for the many factors influencing the capability of beginning and SDA farmers to obtain loans.

[31] There are several possible measures of loan distribution—those reflecting who applies, who is accepted, and amount of funding. Our use of participation rates is conditioned by available data, including the SDA or beginning-farmer information. Thus, these measures are used as best-available proxies that may not fully control for the many factors influencing the capability of beginning and SDA farmers to obtain loans.

[32] Data on ARC/PLC payments for crop year 2017 obtained from the USDA, FSA website.

Researchers expect a negative statistical association between the percentage of CRP cropland and the percentage of SDA or beginning farmers due to less land available for rent and the expectation of CRP-TIP being correlated with a higher percentage of SDA and beginning farmers.

## Other Measures

Many of the regional disparities in land values, farm income, and other factors depend on what crops can be farmed, which depends on soil characteristics, weather patterns, and other factors considered to be intrinsic productivity. Crop mix is included in the analysis to control for factors that may mediate the relationship between operator shares and land-access measures.[33] This research measured crop mixes in three ways: as the value of field crop sales, animal product (livestock) sales, and specialty crop sales as shares of total county agricultural sales. This study also included a measure of the percentage of direct sales to consumers and retailers since this is a more common marketing channel for beginning farmers in particular (Low et al., 2015).[34]

This research examined the correlation between the changes of a county's population—as a proxy for local economic opportunity data[35]—and shares of SDA and beginning farmers. This study calculated this measure as the percentage change between 2017 population estimates from the American Community Survey and the 2010 population from the 2010 Decennial Census. Counties with population growth have more economic opportunities—thus, it's expected these counties have more SDA and beginning farming operations.

Similarly, this study accounted for urbanization using the 2013 Rural Urban Continuum Code (USDA, ERS, Rural Urban Continuum Code 2020). This is a categorical value equaling 1 for the most urban counties and 9 for most rural. Since this is meant to be a proxy for urban influence, this value is used as is rather than using separate categorical dummies for each of the possible 9 value categories.

Finally, to gauge how farmer age may matter, this research used the county average age of the producer population from the 2017 Census of Agriculture. Further, this study used the percentage change in average farmer age between 2012 and 2017 to see if the change in operator age matters. Counties with older operators and counties where average operator age is increasing may (or many not) have fewer beginning farming operations. There are no expectations regarding operator age and SDA operations.

---

[33] The researchers obtained crop sales data from the 2017 Census of Agriculture.

[34] Although this study considered using various forms of cropland rental rates, it was unclear which of these rental rates would be the most applicable to SDA and beginning farmers. Additionally, including all of the cropland rental rates could result in a collinearity problem.

[35] Areas with economic growth tend to experience population growth, while areas in economic decline tend to experience population decline.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

# Findings on Land Access: What Factors have Statistically Significant Correlations?

Table 2 reports on whether a correlated factor (such as average lease size) has a non-zero and statistically significant relationship with each of the three county measures: (1) percentage of SDA farming operations according to the race and ethnicity definition (SDA-RE); (2) percentage of socially disadvantaged farming operations according to the race, ethnicity, and gender definition (SDA-REG); and (3) percentage of beginning farmers.[36] To estimate these statistical associations, this research used a fractional probit model. Since this research lacks the necessary data to identify causal effects, the primary interest remains in the direction of any statistical associations. This research, therefore, only reports the sign of statistically significant effects in table 2. These statistical associations should not be thought of as causal effects. Instead, they indicate correlations that suggest a deeper association between the factor and the outcome variable—or the share of SDA and beginning operations.

Table 2

**Statistical evidence of non-zero relationship between possible explanatory factors and measures of SDA and beginning farmers (using fractional probit model)**

| Explanatory factors | Model | | |
|---|---|---|---|
| | SDA-RE | SDA-REG | Beginning |
| Percentage of farmland to be transferred to nonfamily members | 0 | 0 | 0 |
| Log of average lease size in acres | - | - | - |
| Percentage of leases renewed annually | + | 0 | 0 |
| Log of average landlord- or tenant-relationship length | 0 | 0 | 0 |
| Percentage of rented farmland acres | + | + | + |
| Percentage of cropland acres | - | - | 0 |
| Log of land value per acre | 0 | 0 | 0 |
| Percentage of granted SDA (Race/Ethnicity) DLP/GLP loan applications | + | na | na |
| Percentage of granted SDA (Race/Ethnicity/Gender) DLP/GLP loan applications | na | + | na |
| Percentage of all granted DLP/GLP loan applications | na | na | 0 |
| Log of ARC/PLC payments per acre | 0 | 0 | 0 |
| Log of crop insurance indemnity payments per acre | 0 | 0 | 0 |
| Log of total crop insurance premium per acre | 0 | - | - |
| Percentage of cropland acres enrolled in general signup CRP | 0 | + | 0 |
| Percentage of cropland acres enrolled in continuous signup CRP | 0 | + | 0 |
| Percentage of cropland enrolled in CRP-TIP | 0 | 0 | 0 |
| Percentage of cropland acres enrolled in ACEP | 0 | 0 | 0 |
| Percentage of sales in field crops | - | - | - |
| Percentage of sales in specialty crops | - | 0 | 0 |
| Percentage of sales in livestock | - | - | - |
| Percentage of direct-to-consumer sales | + | + | 0 |
| Percentage change in population (2010–2017) | 0 | 0 | 0 |

continued on next page ▶

---

[36] See appendix C for a description of the methodology and the coefficient estimates used to create table 2.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities, AP-096*
USDA, Economic Research Service

APP. 000582

| Explanatory factors | Model | | |
|---|---|---|---|
| | SDA-RE | SDA-REG | Beginning |
| Percentage of total SDA population (race/ethnicity) | + | + | na |
| Average age of farmers (in county) | - | 0 | - |
| Percentage change in average farmer age (2012–2017) | 0 | 0 | - |
| Rural Urban Continuum Code (2013) | - | - | - |

SDA = socially disadvantaged. Log = logarithm. DLP = Direct Loan Program. GLP = Guaranteed Loan Program. ARC = Agricultural Risk Coverage. PLC = Price Loss Coverage. CRP = Conservation Reserve Program. CRP-TIP = CRP Transition Incentives Program. ACEP = Agricultural Conservation Easement Program.

Notes: Each cell indicates whether a statistically significant (at the 10-percent level) relationship exists between an outcome variable and a possible explanatory factor, where:

0 : not statistically different from 0

- : statistically significant negative relationship

+ : statistically significant positive relationship

na : this variable was not included in this model

See appendix 3 for the estimated fractional probit coefficients and robust standard errors used to construct this table.

SDA-RE classifies socially disadvantaged farmers using race and ethnicity; SDA-REG uses race, ethnicity, and gender.

Source: USDA, Economic Research Service.

Several measures of land availability are statistically correlated with the percentage of socially disadvantaged (SDA) operations or the percentage of beginning operations. First, this research found the average lease size is negatively correlated with the percentage of SDA and beginning operations. This finding implies counties with larger lease sizes—on average—have a lower percentage of SDA and beginning farming operations. Second, this research found the percentage of leases annually renewed is positively correlated with the percentage of SDA-RE operations in the county—though not with SDA-REG operations. Third, counties with a higher percentage of rented farmland acres have been statistically correlated with a higher percentage of SDA and beginning operations, which suggests SDA and beginning operations are more likely to rely on farmland rental markets than land purchase markets to gain access to farmland. Finally, this research found the percentage of cropland acreage as a portion of farmland acreage is negatively correlated with SDA operations.

Some measures of Government program participation and payments are also statistically correlated with the percentage of SDA and beginning operations. First, this study found the percentage of accepted DLP and GLP applications are positively correlated with the percentage of SDA operations—both SDA-RE and SDA-REG definitions—which suggests counties with higher percentages of SDA operations experience higher rates of accepted applications in these loan programs. Second, the research found a negative association between crop insurance premiums and the percentage of SDA-REG operations and the percentage of beginning operations—but not of SDA-RE operations. Further, the percentage of SDA-REG operations has been positively correlated with the percentage of cropland acres enrolled in both the general and continuous Conservation Reserve Program (CRP). This study found no statistical association between the percentage of SDA or beginning operations and the percentage of cropland acres in Conservation Reserve Program-Transition Incentives Program (CRP-TIP) or Agricultural Conservation Easement Program (ACEP).

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities, AP-096*
USDA, Economic Research Service

Next, this study assessed the statistical significance of the percentage of total sales by crop category. The percentage of sales in field crops was found to be negatively correlated with the percentage of SDA and beginning operations. The percentage of sales in specialty crops was found to be negatively correlated with the percentage of SDA-RE operations but not with SDA-REG operations. This study also found that SDA and beginning operations are negatively correlated with the percentage of livestock sales. This finding is surprising because the percentage of SDA and beginning operations are negatively correlated with the percentage of sales in field crops. If livestock sales figures are skewed by large livestock operations such as concentrated animal feeding operations, and SDA livestock operations primarily focus on ranching, then the authors would expect this result. However, the authors lack sufficient data to determine if this is the cause. The percentage of direct-to-consumer sales was positively correlated with the percentage of SDA operations. Finally, this study considered farmer and regional demographic measures. The percentage of the overall population classified as SDA was found to be positively correlated with the percentage of SDA operations. This research also found the average age of farm operators has been negatively correlated with the percentage of SDA-RE and beginning operations, though not SDA-REG operations. Additionally, this study found a negative association with the percentage of beginning operations in counties with an increase in operator age between 2012 and 2017. Finally, decreasing urbanization—counties with larger Rural Urban Continuum Codes (RUCC)—has a negative association with SDA and beginning operations.

# Conclusion

The aging of the average U.S. farmer has raised questions about the pace of land transfer to the next generation of farm operators. In addition, the increasing concentration of land ownership and the impacts of land retirement programs may affect the ability of beginning and SDA farmers to obtain access to farmland. Reflecting the issue's importance, USDA has maintained a portfolio of farm financing and other support programs that help SDA and beginning farming and ranching operations to initiate and expand.

For both SDA and beginning operations, this study found negative correlations with average lease size, the percentage of sales in field crops, the percentage of sales in livestock, and with decreasing urbanization. However, this study also found a positive correlation with the percentage of rented farmland acres. In addition, results have shown associations specific to each operation group:

- *For SDA-REG operations*: This study found a negative correlation with the percentage of cropland acres and the size of crop insurance premium per acre. Conversely, positive correlations were found with land enrolled in CRP; the percentage of granted USDA, FSA DLP/GLP loans; the percentage of direct-to-consumer sales; and the percentage of county population that is SDA.

- *For SDA-RE operations*: This research found a negative correlation across the percentage of cropland acres, percentage of sales in specialty crops, and the average age of farmers, whereas a positive correlation was found across the percentage of leases renewed annually, the percentage of granted USDA, FSA DLP and GLP loans, the percentage of direct-to-consumer sales, and the percentage of county population that is SDA.

- *For beginning operations*: This research found a negative correlation with the size of crop insurance premiums, the average age of farmers, and the change in average age.

It is important to restate that this report identifies factors—such as land availability, farm policy, and economic characteristics—that have statistically significant correlation with the percentage of SDA and beginning farming operations. And that these statistical correlation findings do not necessarily imply causality.

In particular, when a factor (such as crop insurance premium per acre) influences a measure of interest (such as the share of SDA-RE operations), a correlation will be measurable. However, the existence of a correlation does not necessarily mean that an influence exists. There may be other factors, which are unobservable, that influence both the factor and the measure of interest.

This distinction (finding correlation but not causality) is an unavoidable limitation of this report due to available data being insufficient (in terms of breadth, precision, and abundance) to support rigorous models capable of discerning causality. These results are intended to foster fruitful avenues of future research on the nexus between farm policy and the financial wellbeing of SDA and beginning farming operations. Analyzing new editions of the TOTAL survey could help researchers identify causal effects. The 2018 Farm Bill contains provisions for future versions of the TOTAL survey to follow each subsequent Census of Agriculture.

# References

Agricultural Act of 1961 & Consolidated Farm And Rural Development Act Pub. L. No. 87–128, 75 Stat. 294 (1961).

Agricultural Resources and Environmental Indicators. Hellerstein, D., D. Vilorio, and M. Ribaudo (editors). 2019. *Agricultural Resources and Environmental Indicators, 2019.* EIB-208, U.S. Department of Agriculture, Economic Research Service, May 2019.

Bawa, S., and S. Callahan. 2021. *Absent Landlords in Agriculture: A Statistical Analysis*, ERR-281, U.S. Department of Agriculture, Economic Research Service.

Bigelow, D., A. Borshers, and T. Hubbs. 2016. *U.S. Farmland Ownership, Tenure, and Transfer,* EIB-161, U.S. Department of Agriculture, Economic Research Service.

Bureau of Labor Statistics. 2020. Labor Force Statistics from the Current Population Survey: 2020.

Burns, C., and R. Hoppe. 2019. Agricultural Resources and Environmental Indicators, 2019, EIB-208, U.S. Department of Agriculture, Economic Research Service.

Boyce, B. 2019. "2017 Census of Agriculture: An Aging Farm Population But With Optimism," AGDAILY-Insights News.

Claassen, R., D. Hellerstein, and S. Wallander. December 2019. "2018 Farm Act Retains Conservation Programs but Could Reduce Payments for Land Retirement," Amber Waves, U.S. Department of Agriculture, Economic Research Service.

Congressional Research Service. 1996. Credit Provisions of the Enacted 1996 Farm Bill, 96-431 ENR, May 1996.

Congressional Research Service. 2008. The 2008 Farm Bill: Major Provisions and Legislative Action, RL34696, November 2008.

Freedgood, J., M. Hunger, J. Dempsey, and A. Sorensen. 2020. "Farms Under Thread: The State of the States," American Farmland Trust, Washington, DC.

Government Accountability Office. 2019. Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited, GAO-19-539.

Hoppe, R.A. 2014. Structure and Finances of U.S. Farms: Family Farm Report, 2014 Edition, EIB-132, U.S. Department of Agriculture, Economic Research Service.

Johnson, A., and G. Ready. 2017. "Pathways to Land Access: A Study of the Conservation Reserve Program – Transition Incentives Program in Four States," Center for Rural Affairs.

Katchova, A.L., and M.C. Ahearn. 2016. "Dynamics of Farmland Ownership and Leasing: Implications for Young and Beginning Farmers," *Applied Economic Perspectives and Policy* 38(2):334–350.

Key, N. and G. Lyons. 2019. *An Overview of Beginning Farms and Farmers,* EB-29, U.S. Department of Agriculture, Economic Research Service.

Low, S.A., A. Adalja, E. Beaulieu, N. Key, S. Martinez, A. Melton, A. Perez, K. Ralston, H. Stewart, S. Suttles, S. Vogel, and B.B.R. Jablonski. 2015. *Trends in U.S. Local and Regional Food Systems*, AP-068, U.S. Department of Agriculture, Economic Research Service.

MacDonald, J., P. Korf, and R. Hoppe. 2013. *Farm Size and the Organization of U.S. Crop Farming.* EIB-152, U.S. Department of Agriculture, Economic Research Service.

MacDonald, J., R. Hoppe, and D. Newton. 2018. *Three Decades of Consolidation in U.S. Agriculture.* EIB-189, U.S. Department of Agriculture, Economic Research Service.

MacDonald, J. 2020. "Consolidation in U.S. Agriculture Continues," *Amber Waves*, U.S. Department of Agriculture, Economic Research Service.

McFadden, J., and R. Hoppe. 2017. *The Evolving Distribution of Payments from Commodity, Conservation, and Federal Crop Insurance Programs*, EIB-184, U.S. Department of Agriculture, Economic Research Service.

Ruhf, K.Z. 2013. "Access to Farmland: A System Change Perspective," *Journal of Agriculture, Food Systems, and Community Development* 4(1): 51–60.

Sullivan, P., D. Hellerstein, D. McGranahan, and S. Vogel. July 2006. "Farmland Retirement's Impact on Rural Growth," *Amber Waves*, U.S. Department of Agriculture, Economic Research Service.

Target Participation Rates for Socially Disadvantaged Groups of 2010, CFR § 761.208 (2010).

Taylor, M.R., N.P. Hendricks, G.S. Sampson, and D. Garr. 2021. "The Opportunity Cost of the Conservation Reserve Program: A Kansas Land Example," *Applied Economic Perspectives and Policy* 43(2): 849–865.

Todd, J. March 2020. "U.S. Farm Household Finances*,"* presented at National Agricultural Credit Conference, March 2020.

U.S. Census Bureau. American Community Survey, 2017 American Community Survey 5-Year Estimates, Table B03002, February 2020.

U.S. Department of Agriculture, Economic Research Service. 2019. *Agriculture Improvement Act of 2018: Highlights and Implications. Credit: Title V.*

U.S. Department of Agriculture, Economic Research Service. 2020. *Rural-Urban Continuum Codes.*

U.S. Department of Agriculture, Farm Service Agency. 2019a. *Loans for Beginning Farmers and Ranchers: Fact Sheet.*

**23**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities,* AP-096
USDA, Economic Research Service
APP. 000586

U.S. Department of Agriculture, Farm Service Agency. 2019b. *Farm Loan Overview: Fact Sheet.*

U.S. Department of Agriculture, Farm Service Agency. 2019c. *Conservation Reserve Program Monthly Summary, November 2019.*

U.S. Department of Agriculture, Farm Service Agency. 2020. *Farm Loan Programs.*

U.S. Department of Agriculture, Farm Service Agency. 2021. *Conservation Reserve Program Statistics.*

U.S. Department of Agriculture, National Agricultural Statistics Service. 2019. 2017 Census Full Report, Appendix B.

U.S. Department of Agriculture, National Agricultural Statistics Service. 2020. Farms and Land in Farms 2019 Summary.

U.S. Department of Agriculture, Race, Ethnicity, and Gender Program Statistics, February 2019.

U.S. Department of Agriculture, Risk Management Agency. 2018. *Summary of Business.*

Whitt, C., J. MacDonald, and J. Todd. 2020. *America's Diverse Family Farms: 2020 Edition,* EIB-220, U.S. Department of Agriculture, Economic Research Service.

Wu, J.J., and H. Lin. 2010. "The Effect of the Conservation Reserve Program on Land Values," *Land Economics* 86(1):1–21.

Zhang, W., and C.J. Nickerson. 2015. "The Housing Market Bust and Farmland Values: Identifying the Changing Influence of Proximity to Urban Centers," *Land Economics* 91(4):605–626.

Zulauf, C. 2013. "Putting the Age of U.S. Farmers in Perspective," University of Illinois at Urbana-Champaign Department of Agricultural and Consumer Economics, farmdoc daily (3):202.

**24**

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities,* AP-096
USDA, Economic Research Service
APP. 000587

# Appendix A. Legal Definitions of Socially Disadvantaged and Beginning Farmers

A socially disadvantaged (SDA) farmer or rancher belongs to a "socially disadvantaged group," which is any group "whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities."[37] USDA program agencies differ in their interpretation of this definition, and thus identify somewhat different populations as belonging to socially disadvantaged groups.

- For example, the USDA's Farm Service Agency (FSA) defines "socially disadvantaged groups" as including African Americans, Alaska Natives, American Indians, Hispanics (White or otherwise), Asian Americans, and women.[38]

- The USDA's Natural Resources Conservation Service (NRCS) definition, on the other hand, excludes women from their definition of "socially disadvantaged group."[39]

A "beginning farmer or rancher" is defined as a person who "has not operated a farm or ranch," or "has not operated a farm or ranch for not more than 10 years" and "meets such other criteria as the Secretary may establish."[40] As noted, the last clause of this definition likewise gives program agencies latitude in implementing more restrictive definitions of who qualifies as a "beginning farmer or rancher."

USDA, FSA restricts the definition of beginning farmer to exclude farmers who own operations that exceed 30 percent of the average size of a farm within that county as determined by the most recent Census of Agriculture.[41]

- The USDA, NRCS definition doesn't impose a restriction on farm size to qualify as a beginning farmer. However, their definition requires all operators on the operation to have less than 10 years of farming experience for the operation to qualify for beginning farming programs.[42]

---

[37] Definition comes from Section 335 87-128 of the Consolidated Farm and Rural Development Act of 1961.

[38] For further details, see USDA, FSA Newsroom, *Minority and Women Farmers and Ranchers.*

[39] For further details, see USDA, NRCS, *Historically Underserved Farmers & Rancher.*

[40] Definition comes from Section 2501 of the Food, Agricultural, Conservation and Trade Act of 1990.

[41] For further details, see USDA, FSA, *Farm Loan Programs: Beginning Farmers and Ranchers Loans.*

[42] For further details, see USDA, NRCS, *New and Beginning Farmer and Rancher.*

25

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities,* AP-096
USDA, Economic Research Service
APP. 000588

# Appendix B: USDA Loan Programs and SDA and Beginning Farmers

USDA, Farm Service Agency (FSA) delivers several types of loans through the Direct Loan Program, including intermediate term (7-year), annual operating loans, long-term real estate, and emergency loss loans. As described in table B.1, several types of long-term real estate loans—Direct Farm Ownership (FO) Loans—vary by loan limits, the fraction of the purchase price the loan will cover, and the provided interest rate. Between fiscal year (FY) 2017 and FY 2019, between $1.04 and $1.47 billion was annually obligated to the three main Direct FO loans (USDA, FSA, 2019a).

Table B.1
**Description of Farm Service Agency direct loan programs**

| Loan program name | Maximum loan (in dollars) | Maximum % of purchase price covered | Interest Rate (2019). This can vary by year. | Beginning and SDA farmer only? |
|---|---|---|---|---|
| Direct Farm Ownership loan | $600,000 | 100% | 3.25% | A "farm ownership: microloan" is available for beginning farmers program (with a maximum of $50,000). |
| Direct Down Payment | $300,000 | 45% | 1.50% | Available only to beginning and SDA farmers. Applicants may not own more than 30 percent of the average size farm at the time of the application. |
| Direct Farm Ownership participation | $600,000 | 50% | 2.50% | No |

Note: Joint financing loans are also known as participation loans.

Source: National Sustainable Agriculture Coalition: Grassroots Guide to Federal Farm and Food Programs; Overview of Farm Bill Programs and Grants; USDA, FSA: Guide to FSA Farm Loans; and USDA, FSA: Programs and Services, Farm Loan Programs (FSA, 2020a).

As described in table B.2, there are several types of real estate loans covered by the Guaranteed Loan Program. Although not subsidizing interest rates, these programs provide lenders with guarantees of up to 95 percent for beginning farmers in the case of operator default. Between 2017 and 2019, between $2.05 and $2.28 billion per year were obligated to Guaranteed FO Loans (USDA, FSA, 2019b).

Table B.2

**Description of FSA guaranteed loan programs**

| Program name | Maximum loan | Requirements | Rate | Beginning and SDA farmer only? |
|---|---|---|---|---|
| Guaranteed Farm Ownership | 1,750,000 | Negotiated with lender | Negotiated with lender | No |
| Land Contract Guarantee | $500,000 | 5% down payment required | Not more than 3% of the interest rate used for Direct Farm Ownership Loans (as described in table 1) | Provides federal loan guarantees to retiring farmers who self-finance the sale of their land to beginning and SDA farmers. |

Notes: FSA = USDA, Farm Service Agency. SDA = socially disadvantaged.

Source: USDA, FSA, Guaranteed Farm Loans, frequently asked questions and National Sustainable Agriculture Coalition: Grass Roots Guide to Federal Farm And Fool Programs, Direct and Guaranteed Farm Loans.

Socially disadvantaged (SDA) and beginning farms may participate in any Direct and Guaranteed Loan Programs if they meet all eligibility criteria. Some programs, however, are mostly reserved for SDA and beginning farms.

- At the start of 2019, 70 percent of Direct Farm Ownership funds was reserved for SDA and beginning farms. A total of $1.11 billion was obligated in Direct Loans in FY 2019 to SDA and beginning farms—up from $833 million in 2017.

- A total of $783 million was obligated in Guaranteed Farm Ownership in FY 2019 to SDA and beginning farms compared with from $779 million in 2017.

For calendar year—not fiscal year—2019, table B.3 breaks down the $1.195 billion obligated to Direct Loan Programs.

Table B.3

**2019 participation of beginning and SDA operators in Direct Farm Ownership (FO) loans**

| | Beginning farmers only | SDA farmers only |
|---|---|---|
| Millions of dollars | | |
| Total direct FO loans | $923 | $272 |
| Regular | $411 | $42 |
| Down payment | $192 | $18 |
| Participation | $320 | $212 |
| Number of borrowers | | |
| Total direct FO loans | 3,851 | 1,155 |
| Regular | 1,503 | 180 |
| Down payment | 1,134 | 122 |
| Participation | 1,214 | 853 |

Notes: These values are for calendar year 2019 (not fiscal year 2019). FO = farm ownership. SDA = socially disadvantaged.

Source: USDA Guaranteed Loan System (GLS) Obligations Database (January 2020).

For illustrative purposes, consider a highly stylized example comparing the impacts of different subsidized loan rates. For simplicity, assume a 30-year loan of $600,000, ignore down payments—assume the same down payment for all types of loans—and assume no inflation.

27

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service
APP. 000590

Table B.4

**Stylized examples of the impacts of subsidized loan rates: assuming a $600,000 loan with a 30-year term and no down payment**

| Type of loan | Source of funds | Interest rate | Total costs over life of loan, thousands of dollars |
|---|---|---|---|
| Commercial lender | Commercial lender (100%) | 6 | $1,295 |
| Direct Farm Ownership | USDA (100%) | 3.3 | $946 |
| Commercial lender and direct down payment | Commercial lender (50%) | 6 | $648 |
| | USDA (50%) | 1.5 | $373 |
| | Total cost | .. | $1,021 |
| Commercial lender and Direct Farm Ownership Participation | Commercial lender (50%) | 6 | $648 |
| | USDA (50%) | 2.5 | $428 |
| | Total cost | .. | $1,075 |
| Commercial lender | Commercial lender (100%) | 4.5 | $1,094 |
| Commercial lender and Direct Down Payment | Commercial lender (50%) | 4.5 | $547 |
| | USDA (50%) | 1.5 | $373 |
| | Total cost | .. | $920 |
| Commercial lender and Direct Farm Ownership participation | Commercial lender (50%) | 4.5 | $547 |
| | USDA (50%) | 2.5 | $428 |
| | Total cost | .. | $975 |

Source: USDA Economic Research Service calculations based on commercial bank rate derived from approximate average of 2018 and 2019 rates from the Kansas City Federal Reserve, table C.4.

Although this simplified example is not meant to describe real-world conditions, it does highlight a few broad features. Compared with the stylized commercial loan, the stylized Direct Loan from USDA, Farm Service Agency (FSA) would yield over 30 percent in savings on total payments for land acquisition. Similarly, the savings from a stylized subsidized Direct Down Payment Loan is lessened (relative to the Direct Farm Ownership) because the commercial source interest rate is higher.

# Appendix C: Results from Regression Models

This study used several regression models to examine possible relationships between beginning farmers, SDA farmers, and several possible explanatory factors. These regressions offered a parsimonious statistical methodology that permits simultaneous consideration of many potential factors.

However, the available data are marked by differences in geographical scope and year. In particular, the TOTAL data is available for 25 States, and was collected to report State-level estimates. Hence many of the measures used in these models are imprecise. They are not suitable for causal inference. They are best used as proxy measures to approximate otherwise unobservable relationships.

Thus, it has been difficult to construct models to provide robust and efficient measures of causation. Hence, this research used these models to highlight correlative relationships between possible explanatory factors and the measures of beginning and SDA farmers. In addition, this study reported which variables have statistically significant—either negative or positive—impacts.

Table C.1

**Estimation results, including estimated coefficients and standard errors, for the fractional probit model and ordinary least squares (OLS) model**

| | Model | | | | | |
|---|---|---|---|---|---|---|
| | OLS | | | Fractional probit | | |
| | SDA-RE | SDA-REG | Beginning | SDA-RE | SDA-REG | Beginning |
| **Explanatory factors** | | | | | | |
| Percentage of farmland to be transferred to nonfamily members | 0.016 (0.026) | 0.023 (0.027) | 0.002 (0.010) | 0.055 (0.138) | 0.080 (0.102) | 0.008 (0.030) |
| Log of average lease size in acres | -0.008** (0.003) | -0.009** (0.003) | -0.006*** (0.001) | -0.042*** (0.012) | -0.032*** (0.011) | -0.020*** (0.005) |
| Percentage of leases renewed annually | 0.008 (0.006) | 0.008 (0.007) | 0.002 (0.004) | 0.064* (0.036) | 0.035 (0.027) | 0.010 (0.012) |
| Log of average landlord/tenant relationship length | -0.001 (0.002) | 0.000 (0.002) | -0.000 (0.001) | -0.006 (0.013) | 0.001 (0.007) | -0.001 (0.004) |
| Percentage of rented farmland acres | 0.018** (0.007) | 0.019** (0.007) | 0.017*** (0.005) | 0.119*** (0.041) | 0.077*** (0.029) | 0.060*** (0.017) |
| Percentage of cropland acres | -0.073*** (0.024) | -0.068*** (0.020) | -0.016 (0.010) | -0.322*** (0.117) | -0.223*** (0.074) | -0.053 (0.034) |
| Log of land value per acre | 0.011 (0.011) | 0.011 (0.014) | -0.003 (0.004) | 0.007 (0.067) | 0.014 (0.054) | -0.015 (0.012) |
| Percentage of SDA (race/ethnicity) DLP/GLP applications granted | 0.007*** (0.002) | na | na | 0.100*** (0.015) | na | na |
| Percentage of SDA (race/ethnicity/gender) DLP/GLP loan applications that are granted | na | 0.009 (0.006) | na | na | 0.052** (0.022) | na |
| Percentage of all DLP/GLP loan applications that are granted | na | na | -0.012 (0.009) | na | na | -0.036 (0.029) |
| Log of ARC/PLC payments per acre | -0.002 (0.002) | -0.001 (0.003) | -0.001 (0.001) | -0.007 (0.014) | -0.003 (0.011) | -0.001 (0.003) |
| Log of crop insurance indemnity payments per acre | 0.000 (0.003) | 0.005 (0.004) | 0.004* (0.003) | 0.003 (0.022) | 0.023 (0.016) | 0.014 (0.009) |

continued on next page ▶

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

| | Model | | | | | |
|---|---|---|---|---|---|---|
| | OLS | | | Fractional probit | | |
| | SDA-RE | SDA-REG | Beginning | SDA-RE | SDA-REG | Beginning |
| Log of total crop insurance premium per acre | 0.000 (0.003) | -0.007* (0.004) | -0.007** (0.003) | 0.002 (0.020) | -0.032** (0.016) | -0.023** (0.009) |
| Percentage of cropland acres enrolled in General Signup CRP | 0.033 (0.062) | 0.110** (0.046) | 0.013 (0.030) | -0.021 (0.276) | 0.318** (0.150) | 0.043 (0.101) |
| Percentage of cropland acres enrolled in Continuous Signup CRP | 0.124 (0.099) | 0.197** (0.075) | -0.021 (0.049) | 0.439 (0.446) | 0.694** (0.272) | -0.074 (0.173) |
| Percentage of cropland enrolled in CRP-TIP | -0.486 (1.062) | -0.243 (1.213) | -0.359 (0.767) | -8.175 (8.116) | -0.967 (5.646) | -1.633 (2.667) |
| Percentage of cropland acres enrolled in ACEP | -0.214 (0.151) | 0.117 (0.170) | 0.144 (0.190) | -0.248 (0.734) | 0.836 (0.555) | 0.478 (0.594) |
| Percentage of sales in field crops | -0.033 (0.024) | -0.041 (0.026) | -0.023* (0.012) | -0.276** (0.138) | -0.203** (0.100) | -0.078* (0.041) |
| Percentage of sales in specialty crops | -0.061 (0.037) | -0.042 (0.044) | -0.008 (0.021) | -0.289* (0.166) | -0.166 (0.150) | -0.026 (0.068) |
| Percentage of sales in livestock | -0.043** (0.018) | -0.050** (0.019) | -0.036*** (0.010) | -0.225*** (0.076) | -0.197*** (0.063) | -0.118*** (0.033) |
| Percentage of direct to consumer sales | -0.021 (0.057) | 0.118 (0.073) | 0.102 (0.103) | 0.346* (0.200) | 0.575** (0.237) | 0.341 (0.322) |
| Percentage change in population (2010–17) | -0.057 (0.034) | -0.031 (0.047) | 0.022 (0.039) | -0.222 (0.239) | -0.078 (0.199) | 0.077 (0.132) |
| Percentage of total population that is SDA (race/ethnicity) | 0.348*** (0.066) | 0.320*** (0.059) | na | 1.766*** (0.152) | 1.163*** (0.147) | na |
| Average age of farmers (in county) | -0.005** (0.002) | -0.001 (0.002) | -0.007*** (0.001) | -0.025*** (0.008) | 0.002 (0.007) | -0.022*** (0.004) |
| Percentage change in average age of farmers (2012–17) | 0.182** (0.075) | 0.074 (0.079) | -0.370*** (0.052) | 0.579 (0.454) | -0.028 (0.333) | -1.288*** (0.181) |
| Rural-Urban Continuum Code (2013) | 0.000 (0.000) | -0.001 (0.001) | -0.002*** (0.001) | -0.008*** (0.003) | -0.008*** (0.003) | -0.008*** (0.002) |
| R-Square | 0.619 | 0.606 | 0.505 | na | na | na |

na = not available/variable not included in this model. SDA = socially disadvantaged. SDA-REG = socially disadvantaged (race, ethnicity and gender definition), SDA-RE = socially disadvantaged (race and ethnicity definition). DLP = Direct Loan Program. GLP = Guaranteed Loan Program. CRP = Conservation Reserve Program. OLS = ordinary least squares. CRP = Conservation Reserve Program. CRP-TIP = CRP-Transition Incentive Program. ACEP = Agricultural Conservation Easement Program. ARC = Agriculture Risk Coverage. PLC = Price Loss Coverage.

*,**,*** = statistical significance at the 10-percent, 5-percent and 1-percent levels, respectively.

Notes: There are 2,162 observations. The fractional probit models do not generate R-squared measures. For a description of the fractional probit estimator, see the manual for the STATA statistical software, RFRACREG procedure.

Source: USDA, Economic Research Service.

Table C.1 in appendix C has provided the actual coefficients and the significance measures from two sets of models. These were used to construct table C.2 to identify factors likely to have non-zero impacts.

- The ordinary least squares (OLS) models have yielded a straightforward interpretation—the coefficients are changes in probability with a unit change in a variable. However, this linear probability model estimator is subject to bias, especially when probabilities are near 0.0 and 1.0.

- The fractional probit model has provided unbiased estimates of coefficients. However, interpretation of the coefficients is not straightforward, as the impacts of a change in one variable depends on the values of other variables.

- Both models included State-specific fixed effects. To save space, they are not reported. It is important to note these fixed effects will capture overall—statewide—impacts of State-level programs designed to assist beginning and SDA farmers.

- Endogeneity and simultaneity were not accounted for. Hence, there may be pairs of dependent variables and explanatory factors both impacted by other factors. In such cases, the explanatory factor—even though it has a statistically significant coefficient—has not necessarily impacted a dependent variable.

Table C.2
**Summary of significant factors**

| Factor | Negative correlation | | | Positive correlation | | |
|---|---|---|---|---|---|---|
| | SDA-RE | SDA-REG | Begin | SDA-RE | SDA-REG | Begin |
| Log of average lease size in acres | ✓ | ✓ | ✓ | | | |
| Percent of cropland acres | ✓ | ✓ | | | | |
| Log of total crop insurance premium per acre | | ✓ | ✓ | | | |
| Percent of sales in field crops | ✓ | ✓ | ✓ | | | |
| Percent of sales in specialty crops | ✓ | | | | | |
| Percent of sales in livestock | ✓ | ✓ | ✓ | | | |
| Average age of farmers | ✓ | | ✓ | | | |
| Percent change in average age of farmers | | | ✓ | | | |
| Rural Urban Continuum Code (2013) | ✓ | ✓ | ✓ | | | |
| Percent of leases renewed annually | | | | ✓ | | |
| Percent of rented farmland acres | | | | ✓ | ✓ | ✓ |
| Percent of FSA DLP/GLP loan applications granted | | | | ✓ | ✓ | |
| Percent of cropland acres enrolled in CRP (general or continuous) | | | | | ✓ | |
| Percent of direct-to-consumer sale | | | | ✓ | ✓ | |
| Percent of total population that is SDA | | | | ✓ | ✓ | |

Notes: FSA = Farm Service Agency. DLP = Direct Loan Program. GLP = Guaranteed Loan Program. CRP = Conservation Reserve Program. SDA = socially disadvantaged. This is a condensed version of table 2 and only lists significant factors. Appendix table C.2, lists all factors and their significance levels. Bolded check marks indicate statistically significant status at 5 percent or 1 percent. Non-bolded check marks indicate statistically significant status at 10 percent. Empty cells indicate no statistical significance (t-stat significance above 10 percent). There are no variables that have a significant positive correlation in one model and a significant negative correlation in another model.

Source: USDA, Economic Research Service.

The report used the fractional probit model estimates to form table C.2. However, in all cases, the sign of the coefficients was the same between the OLS and fractional probit models. And about 70 percent of the factors that are statistically significant in the fractional probit model were also statistically significant—at the 10-percent level—in the OLS model. In addition, the State-specific fixed effects always have the same sign when comparing OLS and fractional probit models.

Dependent variables (county measures):

- SDA-RE: percentage of socially disadvantage farmers, using race and ethnicity.

- SDA-REG: percentage of socially disadvantage farmers, using race, ethnicity, and gender.

- Beginning: percentage of farmers who have farmed for 10 or less consecutive years.

*Access to Farmland by Beginning and Socially Disadvantaged Farmers: Issues and Opportunities*, AP-096
USDA, Economic Research Service

Secretary Vilsack:     Good morning. And it's an honor to extend a warm welcome to the 2023 public meeting of the advisory committee on minority farmers. I want to thank the committee members and each of whom has ==volunteered their time to inform USDA's efforts to forge connections with minority farming communities== in ways that are long overdue.

Today's convening is an opportunity for individuals joining in person and virtually to lead the conversation on this important work. USDA centers equity, accessibility and inclusion in everything we do. This involves taking a hard look at our past, and dedicating ourselves to making adjustments in our programs, policies and structures so that we become a model department going forward.

And it's the advisory committees like this one that bridges the gap between us and those we aim to better serve. This meeting gives an opportunity to receive your valuable input, so that we can apply it throughout our policies and programs. As part of this broader work, just a few weeks ago, USDA received a set of 32 interim recommendations from our Equity Commission, which like this advisory certain, gives us feedback that USDA will implement to better our organization and improve the experience for our customers.

==The Equity Commission benefited form the prior work of this group, so thank you for those efforts as well. It's recommendations for broadening access to our agricultural programs span issues from heirs' property to technical assistance, base acres, and county committees. These are just a few examples.== And we're already working to implement many of these recommendations to ensure that USDA assists all farmers and ranchers across America.

Over the course of the week, representatives from USDA will update this advisory committee on steps taken since your last meeting. And I'll start it off today by sharing a few recent initiatives we've undertaken to reach underserved farmers and ranchers. One key to progress is President Biden's historic Inflation Reduction Act, or IRA. Under the IRA, farm loan borrowers with USDA, who face financial distress may be eligible for programs specifically designed to keep them on their farms.

In October 2022, ==USDA's Farms Service Agency provided 800 million dollars in IRA automatic assistance to more than 13000 USDA borrowers. That includes 600 million to 11000 delinquent borrowers whose accounts are now current. And more than 200 million dollars to 2100 borrowers who had their farms foreclosed== on, but were left with outstanding debts, which have now been resolved. And these payments are just the start.

The President's 2024 budget proposal also contains several congressional recommendations that would improve USDA's flexibility in making and servicing farm loans. These are steps that do so much for distressed borrowers, but they mean nothing if those impacted aren't aware of the opportunity.

That's why USDA is sending out letters to all of our 100000 direct borrowers, letting them know about a new tool to intervene earlier if they're experiencing cashflow challenges. Now, under a separate program, also funded by the IRA, USDA intends to provide financial assistance to producers who have experienced direct farm lending discrimination in the past. These programs are two steps of many in the long march towards justice and an inclusive, equitable USDA.

We're also proactively working to grow involvement of underserved producers in our department wide efforts. We dedicated a pool of funds under our partnership for climate smart commodities opportunity, as well as our forestry partnership initiative to focus on innovative environmental projects that emphasize enrolling small and underserved producers. And NRCS's Equity and Conservation Agreements Effort funds partnerships that deliver conservation assistance to underserved producers. Last year, this program administered $50 million through more than 100 agreements, and now we have a funding opportunity open through April 27th for up to 70 million dollars for the next round of agreements. These partnerships will play a critical role in reaching new producers through outreach and engagement.

Additionally, our Farm Service Agency, FSA, has been working to keep farmers farming as well. Among the first actions of the Biden-Harris administration at USDA, was to suspend farm loan foreclosures, which disproportionately involved underserved farmers, and to reopen the Coronavirus Food Assistance Program, or CFAP, with new targeted outreach partnerships. FSA also targeted assistance to underserved farmers through the various ad hoc and permanent natural disaster and pandemic assistance programs. The improved Emergency Relief Program, known as ERP, streamlined the application for producers with crop insurance or noninsured crop disaster assistance, or NAP, coverage, and cut the paperwork burden by an estimated 90%.

Both the CFAP and ERP programs recognize that underserved producers often have fewer resources to weather disaster and, as a result, increased the payment rate.

This Administration has also improved the permanent programs as well. In January, we made a major overhaul of the NAP Risk Management Program to streamline the process and make the basic catastrophic coverage that is free to underserved producers automatic with an opt-out. USDA even made this streamline NAP coverage retroactive for anyone already on file as being underserved, which includes minority farmers. And FSA is in the process of reaching out to eligible producers to sign them up before June 2023.

These are some of the USDA's many actions to better serve minority and other underserved farmers, but we know this work is a collaborative effort. We recognize that not only do farmers and ranchers of all races deserve a seat at the table, but America as well needs them to participate in our agricultural economy, and we're committed to listening to and supporting your vital work.

You bring these experiences to the forefront, and by doing so, you show us how we can better serve all farmers as we explore areas where we may be missing the mark.

As your Department liaison will explain, this year we'll highlight some questions on which your feedback will be particularly helpful. We're grateful for the opportunity to come to lasting solutions by working with advisory groups like this one. Best of luck on a successful meeting and thank you for your service. I look forward to our continued collaboration as we work to serve the many, and not just the few.

June 15, 2023

The Honorable Thomas J. Vilsack
Secretary
U.S. Department of Agriculture
1400 Independence Avenue SW
Washington, DC 20250

RE: Implementation of Inflation Reduction Act Sec. 22006

Dear Secretary Vilsack:

We are writing to you to express our concerns about the implementation of Section 22006 of the Inflation Reduction Act of 2022, and to offer suggestions for additional steps the U.S. Department of Agriculture (USDA) should take to ensure that the debt relief provided by that Act reaches the farmers most in need, including Black farmers. While we appreciate the efforts the USDA has made to get relief to distressed farmers, we are concerned about how the remaining Section 22006 funds will be allocated. We urge the USDA to adopt the recommendations put forward in this letter so that distressed Black farmers reap the benefits of this historic financial assistance program, which is the result of their steadfast organizing efforts for over two decades.

Unfortunately, Black agrarian communities have struggled for decades. Due to the lack of financial resources caused by USDA discrimination,[1] Black farmers have suffered devastating land loss and economic distress. Between 1910 and 1997, Black farmers lost 90 percent of their property.[2] White farmers lost only two percent in the same period.[3] A 2022 study published in *American Economic Association's Papers and Proceedings* found that Black farmers lost about $326 billion worth of land and generative wealth in the United States due to discrimination during the 20th century.[4] Because Black farmers were fighting to keep their land, they often could not make other investments in wealth-building assets.[5] Moreover, Black farmers still struggle to access USDA programs. Direct loans are supposed to be among the easiest to get at USDA.[6] Yet, in 2022, the USDA granted direct loans to only 36 percent of applicant farmers who identified as Black,

---

[1] Emma Hurt, *The USDA is Set to Give Black Farmers Debt Relief. They've Heard That One Before,* NPR (June 4, 2021, 4:48 PM ET), https://www.npr.org/2021/06/04/1003313657/the-usda-is-set-to-give-black-farmers-debt-relief-theyve-heard-that-one-before ("'When people do not have access to the broad array of services and benefits at the Department of Agriculture, they have been at a severe disadvantage,' [Sec. Vilsack] said. 'White farmers obviously had the full advantage. They had all the programs. And so they had a chance to grow, to expand. To buy the best equipment, to plant their crop in a timely way. Their yields were good. And so they got larger and larger.'").

[2] Nathan Rosenberg & Bryce W. Stucki, *How USDA Distorted Data to Conceal Decades of Discrimination Against Black Farmers,* THE COUNTER (Jun. 26, 2019), https://thecounter.org/usda-black-farmers-discrimination-tom-vilsack-reparations-civil-rights/.

[3] *Id.*

[4] Dana Francis, et al, *How the Government Helped White Americans Steal Black Farmland,* THE NEW REPUBLIC (May 5, 2022), https://newrepublic.com/article/166276/black-farm-land-lost-20th-century-billions.

[5] Chandelis Duster & Janie Boschma, *Many Black Farmers Nationwide Struggling to Keep Their Farms Afloat as they Face Disparities Across the Board,* CNN (Dec. 15, 2021), https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html.

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

naacpldf.org
212-965-2200

APP. 000599

according to an NPR analysis of USDA data. Sixteen percent of Black farmers were rejected—the highest amount for all demographic groups.[7] In contrast, 72 percent of white farmers who applied were approved and only 4 percent of white farmers were denied. As a result of past discrimination and ongoing disparities, according to the Center for American Progress, full-time Black farmers today earn one-seventh of the farm income that white farmers earn.[8] A study by McKinsey similarly found that Black farmers are also more likely to generate a net loss, be given a long-term production contract, and operate on less land than white farmers.[9]

Section 22006 authorizes the USDA to provide $3.1 billion to provide payments to and for the cost of loans or loan modifications for economically distressed borrowers of direct or guaranteed loans administered by the Farm Service Agency (FSA).[10] We are pleased that approximately 19,000 distressed farmers have received relief under Section 22006 totaling over $1 billion. This relief includes assistance to several Black farmers who had suffered crushing debts, farm foreclosures, and financial ruin due to the disastrous implementation of the 1999 *Pigford v. Glickman* class action racial discrimination lawsuit. However, many distressed Black farmers are still awaiting relief. According to USDA data, the combined debt of Black farmers is less than $210 million.[11]

On May 19, 2023, the USDA released new criteria that makes farmers and ranchers who took "extraordinary measures" to pay their FSA loans eligible for Section 22006 funds, and explains how the agency will distribute the remaining relief.[12] Under these criteria, borrowers who made early withdrawals of retirement funds, college funds or long-term investments, as well as borrowers who made the sale of "essential assets" that were required to maintain the current operation level of the borrowers farm and household, would be eligible for relief.[13] In addition, the USDA announced that the FSA will begin accepting and reviewing individual requests for assistance from direct loan borrowers who missed a recent installment or are unable to make their next scheduled installment.

While we applaud the USDA for creating an individualized review process for distressed borrowers, we are concerned that aspects of the new criteria will not accurately identify distressed Black farmers. For example, Black farmers may not have retirement funds, college funds, or other

---

[8] ABRIL CASTRO & CAIUS Z. WILLINGHAM, CTR. FOR AM. PROGRESS, PROGRESSIVE GOVERNANCE CAN TURN THE TIDE FOR BLACK FARMERS 4 (2019), https://www.americanprogress.org/wp-content/uploads/2021/08/BlackFarmers-report1.pdf.

[8] ABRIL CASTRO & CAIUS Z. WILLINGHAM, CTR. FOR AM. PROGRESS, PROGRESSIVE GOVERNANCE CAN TURN THE TIDE FOR BLACK FARMERS 4 (2019), https://www.americanprogress.org/wp-content/uploads/2021/08/BlackFarmers-report1.pdf.

[9] Daniel Aminetzah, et al., *Black farmers in the US: The opportunity for addressing racial disparities in farming,* MCKINSEY & CO. (Nov. 10, 2021), https://www.mckinsey.com/industries/agriculture/our-insights/black-farmers-in-the-us-the-opportunity-for-addressing-racial-disparities-in-farming.

[10] Inflation Reduction Act of 2022 § 22006, Pub. L. 117-169, https://www.congress.gov/117/bills/hr5376/BILLS-117hr5376enr.pdf

[11] Letter from Rep. Alma Adams to U.S. Dep't of Agric. Sec. Thomas Vilsack (July 29, 2022) (on file with LDF).

[12] U.S. Dep't of Ag., Farm Service Agency, *Inflation Reduction Act Section 22006 Extraordinary Measures Assistance* (May 19, 2023), https://www.farmers.gov/sites/default/files/documents/farmersgov-letter-extraordinary-measures.pdf.

[13] *Id.*

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

naacpldf.org
212-965-2200

APP. 000600

long-term investments. Due to past discrimination by the USDA and poor implementation of the *Pigford* consent decree, many Black farmers did not have the funds to save for retirement or their children's higher education.

By contrast, the new criteria leave out several categories that would identify many distressed Black farmers. For example, many young and beginning Black farmers have microloans. In our discussions with several farmer-led community-based organizations, if a farmer qualified only for a microloan from the USDA, they were already distressed because they did not qualify for a full loan they needed to maintain current operations levels. Also, as you are aware, until the passage of the American Rescue Plan Act of 2021, Black farmers had their tax refunds, social security, disability, and subsidy payments garnished through debt offsets. This policy led many farmers to suffer substantial financial distress. For example, for nine years, the USDA took over $41,000 in debt offsets from Eddie Slaughter, a *Pigford* farmer from Buena Vista, GA who is a double amputee, through tax refunds, social security payments, disability payments, and peanut subsidies. Similarly, the USDA took over $186,000 in debt offsets from Rob Bradshaw since the *Pigford* settlement. Farmers who have lost government benefits due to debt offsets should also be considered as potential distressed borrowers.

We urge the USDA to make farmers with the following indicators of financial distress eligible for individualized assessment for relief under Section 22006:

1. **Borrowers who were eligible only for a micro loan as of August 16, 2022**.
2. **Borrowers who still have direct or guaranteed loans with the USDA and who are subject to debt offsets**. This category should include both borrowers who are now current as well as those who are delinquent.
3. **Borrowers who did not have funds available to plant crops in 2023 and were not able to borrow money to plant crops**.
4. **Borrowers who have received debt relief for part of their loans but cannot make payments on the remaining loans.**
5. **Borrowers who have base acres and yields below the county average.** If farmers have base acres and yields below the county average, that is evidence that the farmer is struggling to produce crops.
6. **Prior borrowers who were subject to discrimination and received some settlement funds, but were forced to sign agreements that prohibit the farmers from getting additional USDA loans**. Farmers who signed these agreements may have had to take extraordinary measures and go outside the USDA/FSA loan system to obtain financial assistance—often at substantially worse terms—to maintain their current farming levels.
7. **Borrowers who do not have funds to pay taxes due on prior Sec. 22006 debt relief.** If a farmer is having trouble paying their federal taxes, this should be evidence that the farmer is financially distressed.

Expanding the criteria to include the following categories of farmers will help distressed Black famers obtain the relief they are entitled to under Section 22006.

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

naacpldf.org
212-965-2200

APP. 000601

The USDA should also consider the unique experiences of Black farmers as it decides what are "essential assets" under the new criteria. Due to the discrimination many Black farmers had to sell of personal items, livestock, and additional land to maintain current operation levels.[14] We hope that the USDA will consult advocacy groups with strong ties to Black farming communities to decide what are "essential assets" under the new criteria.

Section 22006 provides the USDA with the opportunity to help thousands of distressed farmers, including Black farmers who continue to suffer economically due to decades of discrimination by the USDA. The proposed additional criteria listed above represent experiences that Black farmers have had to endure for decades due to institutional racial discrimination, including not having enough funds to timely plant crops and having their social security benefits garnished due to USDA debt offsets. We believe that the USDA should utilize these additional criteria in order to fully realize the congressional intent of Section 22006 and help all distressed farmers, including Black farmers. We urge the USDA to adopt these recommendations and to move forward with canceling all debt of distressed Black farmers as quickly as possible including the return of debt offsets.

Thank you for your time and attention to these matters. If you have any questions or would like to discuss further, please contact Amalea Smirniotopoulos, Senior Policy Counsel, at asmirniotopoulos@naacpldf.org, or David Wheaton, Economic Justice Policy Fellow, at dwheaton@naacpldf.org.


Signed,

NAACP Legal Defense & Educational Fund, Inc. (LDF)


Organization Sign-Ons

African American Agriculturalist Association
Arkansas Land and Farm Development Corporation
Black Belt Justice Center
Black Family Land Trust
Black Farmers and Agriculturalists Association (BFAA)
Center for Community Based Enterprise (C2BE)
Center for Community Progress (National)
Center for Community Progress (Georgia)
Community Services Unlimited Inc.
EcoWomanist Institute
Environmental Working Group
Farm Research Cooperative
Farms to Grow, Inc.

---

[14] Chandelis Duster & Janie Boschma, *Many Black Farmers Nationwide Struggling to Keep Their Farms Afloat as they Face Disparities Across the Board*, CNN, December 15, 2021, https://www.cnn.com/2021/12/15/politics/black-farmers-debt-relief-disparities/index.html.

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

naacpldf.org
212-965-2200

APP. 000602

Georgia STAND-UP
Hill Eco Inc.
Mississippi Minority Farmers Alliance
National Black Growers Council
Northeast Louisiana Black Farmers and Landowners Association
Oklahoma Black Historical Research Project, Inc
Reed-Wright Black Farmer Coalition
SJT Partners Law and Consulting
Socially Disadvantaged Farmers and Ranchers Policy Research Center at Alcorn State University
Southern Vision Alliance
Sustaining Environments Through Education and Economic Development, Inc. (SEED)
Taproot Earth
The KKAC Organization
Unitarian Universalist Service Committee (UUSC)
Winston County Self-Help Cooperative

Farm and Individual Sign-Ons
Barbara's Blueberry Batch
Bernard Bates Family, *Pigford* Legacy Farmer
Black Farmers of Chilton County
Bradshaw Farms
Brown Family Farms
Carpenter Farms
Carter Farms
Concerned Citizens of Tillery
Dr. Emily Burchfield, Emory University
Dr. Kimberly Ruffin, Roosevelt University
Everlyn Bryant, *Pigford* Legacy Farmer
Greer Farms
Lewis Farms
Outlaw Farms
*Pigford v. Glickman* Lead Plaintiffs (Timothy Pigford, Cecil Brewington, Lucious Abrams, George Hall, and Eddie Ross)
Provost Farm LLC
Soul Fire Farm
Steward of South of the Ferry Farm
Two G Ranch LLC

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

naacpldf.org
212-965-2200

Case 2:24-cv-00060-Z Document 88-2 Filed 08/28/24 Page 104 of 200 PageID 4939

# USDA · Farm Service Agency

U.S. DEPARTMENT OF AGRICULTURE

**Farm Production and Conservation (FPAC)**

# Equity Action Plan

## (July 2023)



WWW.USDA.GOV/EQUITY/ACTION-PLAN

# Contents

Message From the Under Secretary ........................................................................................ 1

Message From the Farm Service Agency Administrator ........................................................ 2

Introduction ......................................................................................................................... 3

Accomplishments.................................................................................................................. 4

Ensuring Equitable Pandemic Assistance .............................................................................4

Assisting Financially Distressed Borrowers ..........................................................................4

Simplified Direct Farm Loan Application Process..................................................................4

Increasing Access to Non-Disaster Crop Assistance Program (NAP).....................................4

Promoting Urban Agriculture ...............................................................................................5

Access for Indian Country.....................................................................................................5

Facilitating Wide Participation in FSA County Committees ..................................................5

Helping Farmers Solve Succession Issues .............................................................................5

Outreach and Technical Assistance for Beginning Farmers and Ranchers. ..........................5

Improving Safe, Healthy Work Environments for Farmworkers ...........................................6

Engaging Stakeholder Feedback...........................................................................................6

Equity Actions...................................................................................................................... 7

Action 1: Improve access to credit and lending processes based on feedback from beginning farmers, commercial lending partners, and other stakeholders. ........................................................7

Action 2: Provide additional support for new and beginning farmers, improving their access to FSA farm loan programs. ...............................................................................................................8

Action 3:  Continue to implement distressed borrower payments under Section 22006 of the Inflation Reduction Act (IRA), which provides assistance for distressed borrowers. ...........................8

Action 4:  Implement approved recommendations made by FSA Farm Loan Program Diversity, Equity, Inclusion and Access (DEIA) Reboot Task Force Report. ..........................................................9

Action 5:  Implement farm program and policy changes to ensure FSA programs meet the needs of all producers. ...................................................................................................................9

Action 6:  Improve outreach, engagement, and service to producers by reducing barriers to accessing programs and training FSA employees in serving tribal and underserved customers. .......10

Action 7:  Expand opportunities for heirs and tribal producers impacted by heirs' property and fractionated land issues by improving the Heirs' Property Relending Program and Highly Fractionated Indian Land Program...................................................................................................11

1

Action 8:  Identify program gaps through the evaluation of covered Justice 40 programs to ensure the agency is reaching the broadest audience. .................................................................................... 12

Action 9:  Provide Fiscal Year (FY) 2023-24 cooperative agreements that are targeted towards providing education to underserved producers on risk management strategies such as financial management and recordkeeping as well as climate, urban ag and local foods. ............................... 12

Action 10:  Reimagine FSA County Committees, currently an underutilized outreach, education, and technical assistance resource. ................................................................................................................ 12

**Selected Equity Resources and Information** ...................................................................................... 15

USDA Equity-Related Summary Reports and Guidance ........................................................................ 15

Selected Farm Service Agency Resources ............................................................................................. 15

Selected Equity-Related Executive Orders and White House Resources ............................................. 15

**USDA Mission Statement** .................................................................................................................... 16

**Department Equity Action Plan Strategies** ........................................................................................ 16

2

# Message From the Under Secretary



*Under Secretary Robert Bonnie*

The central aim of USDA's Farm Production and Conservation (FPAC) mission area is to support **all** American agricultural producers by providing financing, risk management tools, disaster aid, conservation assistance and a range of other services.  The doors to every USDA county service center and every office must be open to everyone.  The FPAC Business Center, Farm Service Agency, Natural Resources Conservation Service, and Risk Management Agency have all adopted Equity Action Plans that detail key actions and initiatives to improve FPAC for our existing customers while ensuring our agencies are welcoming and accessible to future customers as well.  These Agency plans describe specific steps we are taking to eliminate historic barriers to our programs, to improve program implementation, and to help farmers and ranchers grow and improve their agricultural operations.

We recognize that agriculture is composed of a diversity of crops, farm and ranch sizes, production systems, locations, individuals, and families—and that our efforts to support farmers, ranchers, and forest owners must consider and reflect that diversity. Implementation of these Equity Action Plans will guide each FPAC agency as we strive to serve all producers and foster a more prosperous, resilient, and sustainable agricultural economy.

*– Robert Bonnie*
*Under Secretary for Farm Production and Conservation*

1


## Message From the Farm Service Agency Administrator

Programmatic equity means embracing the varied needs of the producers we serve. FSA stands committed to addressing those needs to allow all farmers, ranchers, and agricultural producers opportunities to thrive.



*"FSA is continually evaluating how we can deliver our programs in a manner that is meaningful to the farmers and ranchers we serve. We are dedicated to improving customer service and to building equity into the fabric of our work as an agency."*

This critical work requires FSA to meaningfully engage with all the farmers, ranchers, and producers we serve and could serve, along with our partners and cooperators, as we work to deliver conservation, safety net, price support, and farm loan programs across our network of state and county offices.

Understanding that each of us has unique talents and abilities that can contribute to the success of the Farm Service Agency, we believe that those impacted by decisions and programs should be engaged in the process.  Our agency is taking steps to ensure everyone is included and respected when our programs are designed and implemented. We invite you to join us in this journey, and to continue to be a part of our efforts as we march forward in advancing equity at the Farm Service Agency.

The Farm Service Agency Equity Action Plan highlights high-leverage actions with the potential to create significant and long-term systemic change that benefits employees, Tribes, partners, and most importantly the broader American public.

*– Zach Ducheneaux*
*FSA Administrator*

2



## Introduction

**FSA's overall equity goal is to ensure agricultural resources and assistance are broadly accessible, while creating new, more, and better market opportunities, so our policies and programs advance agriculture for the "many and most."** In accordance with Executive Order 13985 "Advancing Racial Equity and Support for Underserved Communities through the Federal Government," and Executive Order 14091, "Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government," the Farm Service Agency is committed to proactively adopting policies and practices to reduce inequities in the conservation, safety net, price support and farm loan programs delivered across our network of state and county offices.

FSA is committed to advance equity by focusing on actions that will result in:

- Increased trust with producers, including currently and historically underserved producers
- Improved customer service to underserved farming communities
- Reduced program barriers
- Program and funding opportunities to address systemic inequities

FSA is developing external-facing efforts to empower all communities of producers and is building a diverse, equitable, and inclusive workforce to match the diverse farming population in the urban and rural communities that we serve.

The American Rescue Plan Act (ARP) established an Equity Commission for USDA. This 15-member independent commission is charged with evaluating USDA programs and services and recommending how our agencies can reduce barriers for accessing them. Earlier this year, the commission issued 31 interim recommendations. Many items in this equity action plan align with those recommendations; this is noted where applicable.



---

*"By advancing equity, inclusion, and diversity, the Farm Service Agency can harness the power of diverse perspectives and experiences to drive innovation and growth, while creating a more inclusive and equitable environment for all."*

---

3



## Accomplishments

### Ensuring Equitable Pandemic Assistance

Under the previous administration's Coronavirus Food Assistance Program (CFAP), only 4 percent of funding went to socially disadvantaged farmers (among those who identified their race and/or ethnicity). After identifying gaps in previous COVID-19 relief funding, USDA announced Pandemic Assistance for Producers, an initiative committed to distributing and directing resources more equitably, especially to the people and sectors who need assistance the most. Among other funding opportunities, the Pandemic Assistance for Producers Initiative included re-opening signup for CFAP2, and $2 million to establish partnerships with organizations to provide outreach and technical assistance to historically underserved farmers and ranchers who have historically faced barriers in accessing this type of FSA assistance. CFAP2 saw an approximately 21 percentage point increase of CFAP enrollment applications from socially disadvantaged producers. In addition, and most recently, FSA made automatic Coronavirus Food Assistance Program 2 (CFAP 2) top-up payments to underserved producers.

### Assisting Financially Distressed Borrowers

Section 22006 of the Inflation Reduction Act gives FSA $3.1 billion to help distressed farm loan borrowers. Since the IRA was signed by President Biden in August 2022, USDA has provided over $1 billion in assistance to more than 20,000 distressed borrowers, and counting, to distressed farm loan borrowers to help cure delinquencies, resolve uncollectable farm loan debts, and keep farmers farming. Borrowers who received immediate automatic payments in October 2022 include FSA direct and guaranteed loan borrowers who had a balance of 60 or more days past due as of Sept. 30, 2022. Automatic payments in March 2023 included direct loan borrowers whose interest exceeded principle owed on outstanding debts; borrowers who became 60 days delinquent between September 30, 2022, and October 18, 2022, and remained delinquent; and borrowers with a recent restructure between February 28, 2020, and March 27, 2023, or who had accepted an offer to restructure on or before March 27, 2023, but had not yet closed that restructure. FSA also announced new processes for borrowers to request individual, case-by-case assistance and support from the FSA.

### Simplified Direct Farm Loan Application Process

Approximately 26,000 producers submit a direct loan application to FSA annually, but there is a high rate of incomplete or withdrawn applications, due in part to a challenging and lengthy paper-based application process. In response, FSA implemented a simplified direct farm loan application process in February 2023, drastically reducing the burden and time spent on its forms. The agency has also rolled out a loan assistance tool that helps farmers and ranchers better navigate the farm loan application process.

### Increasing Access to Non-Disaster Crop Assistance Program (NAP)

FSA has long heard about the challenges underserved farmers have faced in navigating the Noninsured Crop Disaster Assistance Program (NAP). In January 2023, FSA announced program updates that reduce the paperwork burden on these producers to access free basic NAP coverage with a NAP service-fee waiver.  Specifically, FSA designated Form CCC-860 to serve as an application for basic 50/55 Noninsured Crop Disaster Assistance Program (NAP) coverage beginning with the 2022 crop year, which provides free basic NAP coverage and waives the NAP service fee for producers who have certified as a socially disadvantaged, limited resource, beginning or veteran farmer or rancher.

4



## Promoting Urban Agriculture

Historically, the lack of USDA's presence in urban and suburban areas and the absence of USDA farm programs that are aligned with the needs of urban and suburban agricultural producers have been barriers to access. In response, the Farm Service Agency is piloting urban agriculture county committees in 17 locations to have a voice in programs that support urban producers.

## Access for Indian Country

FSA made substantial changes to address barriers and inequities in Indian Country through updating the Livestock Indemnity Program's 2022 payment rates to (1) recognize tribal traditional animals and better reflect true market value of non-adult beef, beefalo, bison, and dairy animals; (2) update several livestock programs to include horses not intended to be used for racing and wagering, allowing participation by eligible tribal ranchers who use forage to raise their horses; and (3) modify the Conservation Reserve Enhancement Program and signing historic new agreements with three tribal nations in the Great Plains that will help enroll eligible agricultural land that lies within reservation boundaries.  In November 2022, the Farm Service Agency also announced new Conservation Reserve Enhancement Program (CREP) partnerships with three tribal nations in the Great Plains, covering 3.1 million acres, to help conserve, maintain, and improve grassland productivity, reduce soil erosion, and enhance wildlife habitat. These are the first-ever CREP agreements with tribal nations.

## Facilitating Wide Participation in FSA County Committees

Working to ensure diverse representation on FSA's County Committees, the Secretary has exercised his authority to appoint 93 socially disadvantaged voting members to committees lacking such representation.

In addition, many producers, advisory groups and the equity commission have recommended that FSA ensures that producers have access to county maps, increasing the potential for underserved producers to effectively participate in FSA's County Committee nominations and elections process. FSA has published a new GIS Locator Tool to solve this problem.

## Helping Farmers Solve Succession Issues

USDA has provided $67 million in competitive loans through its new Heirs' Property Relending Program. The program, launched in July 2021, allows intermediary lenders to help agricultural producers and landowners resolve heirs' land ownership and succession issues. Heirs' property and other land tenure issues have long been substantial barriers preventing access to USDA programs for many producers and landowners, and this relending program provides access to capital to help producers find a resolution. The program's benefits go far beyond its participants. It will keep farmland in farming, protect family farm legacies, and support economic viability.

## Outreach and Technical Assistance for Beginning Farmers and Ranchers.

The Farm Service Agency leads the Department's Beginning Farmer and Rancher Program. To increase support for young and beginning farmers, Beginning Farmer and Rancher Coordinators have been identified from State Office staff of the Farm Service Agency, Natural Resources Conservation Service,

5



Rural Development, and Risk Management Agency. These coordinators are leading development and implementation of beginning farmer education, outreach, and technical assistance plans for their states, including outreach to small, minority, and specialty crop producers as well as non-profits and other service providers. They are supported by the USDA National Beginning Farmer Coordinator and FSA Outreach Office staff.

## Improving Safe, Healthy Work Environments for Farmworkers

In coordination with other Federal agencies, in June 2022, USDA announced a pilot program using up to $65 million in American Rescue Plan funding to provide support for agricultural employers in implementing robust health and safety standards to promote a safe, healthy work environment for both U.S. workers and workers hired from Northern Central American countries under the seasonal H-2A visa program. FSA conducted three listening sessions in September 2022 to receive input from agricultural employer organizations, labor unions, farmworker advocates, farmworkers, and other relevant stakeholders, as it works to develop and implement this pilot program.

## Engaging Stakeholder Feedback.

In FY 2023, the Farm Production and Conservation (FPAC) mission area distributed two nationwide surveys that impact Farm Service Agency operations: (1) Farm Service Agency Farm Loans Customer Feedback Survey, (2) FPAC Prospective Customer Survey focusing on gaining a better understanding of farmers, ranchers and forest managers who have not previously worked with FPAC agencies. The surveys were translated into 13 languages and made available for online completion. FPAC is also actively seeking feedback through interactive buttons on the farmers.gov and FSA public-facing websites. Analytics of the survey results over time will provide insights into customer reactions to policy and operational changes, the simplified direct loan applications, and automation improvements.

APP. 000612


## Equity Actions

The Farm Service Agency is pursuing 10 Actions for Fiscal Years (FYs) 2023-24 with supporting tasks and activities listed below as anticipated milestones. Each of our actions follows one or more of five strategies:

- Aligning farm lending and farm programs with USDA priorities and values.
- Removing hurdles and tailoring programs to all types of producers, production, and business models.
- Creating new, more, and better market opportunities for producers.
- Targeting direct assistance and technical support based on degree of need.
- Institutionalizing access for broader stakeholder viewpoints.

Our first four actions deal with **farm loan programs**. FSA is well underway in its journey to modify and improve farm loan programs, enhancing and creating loan servicing and loan-making tools that are more flexible and more proactive. Our overarching imperative, which will require leveraging all our tools, is the goal of "keeping farmers farming"—helping producers be in a position to take advantage of opportunities and build financial equity.

## Action 1: Improve access to credit and lending processes based on feedback from beginning farmers, commercial lending partners, and other stakeholders.
*This action and milestones align with the USDA Equity Commission Recommendation #6*

Overall, the goals here are to streamline and adjust FSA loan processes to reduce burdens on producers, field staff and lending partners; ensure loan programs meet the needs of producers; and reduce barriers to participation.

*Milestone 1:  Modernize FSA paperwork process. Standardize collected information and reduce duplicative paperwork.*

*Milestone 2:  Develop online loan tools to streamline processes, promote transparency and improve business processes.*

*Milestone 3:  Examine loan processes and use plain language to clearly describe eligibility criteria in loan programs.*

*Milestone 4:  Explore ways to increase farm loan participation and reduce barriers that result from family farm size, farm business structure, and experience requirements.*

*Milestone 5:  Collaborate with AMS and other USDA agencies to expand commodity pricing data used for farm loan application processing.  Expansion of this pricing data source can potentially assist in higher valued price per yield for farming operations.*

*Milestone 6:  Provide additional flexibility in loan processing and servicing times.  Accept preliminary paperwork or offer initial eligibility statement.*

*Milestone 7:  Improve timing and reduce delays in FSA loan title work and appraisals.*

*Milestone 8:  Improve consistency in loan experience among FSA county offices.*

7


*Milestone 9:  Improve Preferred Lender Program and explore additional flexibilities that could be made available to participating lenders.*

*Milestone 10:  Develop pilots and agreements to test and support lending process enhancements.*

### Action 2: Provide additional support for new and beginning farmers, improving their access to FSA farm loan programs.

***This action and milestones align with the USDA Equity Commission Recommendations #6***

*Milestone 1:  Review feedback from stakeholders and lenders to make administrative improvements that improve access to credit for beginning farmers in direct and guaranteed loan programs.*

*Milestone 2:  Collaborate with USDA agencies to identify gaps between FSA loans and USDA grant programs to ensure new programs (such as the Increasing Land Access & Market Program) are addressing the needs of underserved farmers.*

*Milestone 3:  Ensure farm loan officers have the necessary training to serve beginning farmers and ranchers (BFRs).*

*Milestone 4:  Explore pilots and cooperative agreements to test and support any proposed BFR process enhancements.*

### Action 3:  Continue to implement distressed borrower payments under Section 22006 of the Inflation Reduction Act (IRA), which provides assistance for distressed borrowers.

***This action and milestones align with the USDA Equity Commission Recommendations #6***

Section 22006 of the Inflation Reduction Act includes $3.1 billion to help distressed farm loan borrowers. Automatic payments were made in March 2023 to direct loan borrowers whose interest exceeded principle owed on outstanding debts; borrowers who became 60 days delinquent between September 30, 2022, and October 18, 2022, and remained delinquent; and borrowers with a recent restructure between February 28, 2020, through March 27, 2023, or who had accepted an offer to restructure on or before March 27, 2023, but had not yet closed that restructure. New processes for borrowers to request individual, case-by-case assistance and support from the FSA have been announced.

*Milestone 1:  FSA will develop and implement an outreach and communications campaign to inform borrowers of the Inflation Reduction Act (IRA) 22006 payment process.  FSA will also collaborate with community-based organizations and universities on outreach, technical assistance, and opportunities to provide borrowers with access to financial and tax planning services.*

*Milestone 2:  FSA will administer a process to evaluate the cases of borrowers who took extraordinary measures to avoid delinquency but are still in need of assistance. If a borrower meets the criteria for this assistance, FSA will issue a payment to the borrower based on their specific circumstances.*

8

 

*Milestone 3: FSA will administer a process to assist financially distressed direct farm loan borrowers by making a one-time installment payment to direct borrowers who may be unable to make their next installment.*

## Action 4:  Implement approved recommendations made by FSA Farm Loan Program Diversity, Equity, Inclusion and Access (DEIA) Reboot Task Force Report.
### *This action and milestones align with the USDA Equity Commission Recommendation #13*



*Milestone 1:  Implement internal Diversity, Equity, Inclusion & Access (DEIA) training, dialogue, and other tools to engage FSA workforce to improve customer service.*

*Milestone 2:  Integrate coordinated FSA stakeholder engagement, diversity outreach and customer feedback as standard practices in process improvement and program delivery based on FSA's Diversity, Equity, Inclusion & Access Reboot (DEIA-R) report.*

---

Our next four equity actions focus on **improvements to non-loan programs that ensure barriers to access are low, and that outreach is broad**.  FSA has identified new, holistic approaches to provide economic support to producers in the wake of disasters.  Through FSA's implementation of the Emergency Relief Program (ERP) Phase 2 and the Pandemic Assistance Revenue Program (PARP), FSA is accommodating and including a more diverse set of producers by considering their overall revenue losses when determining program eligibility. FSA is also investing in cooperative agreements to ensure producers who are new to FSA have the support and tools they need to submit applications for these critical programs.

## Action 5:  Implement farm program and policy changes to ensure FSA programs meet the needs of all producers.
### *This action and milestones align with the USDA Equity Commission Recommendation s #3, #7*

*Milestone 1:  Increase Non-Insured Crop Disaster Assistance Program (NAP) enrollment and usefulness by:*

- *Expand direct, local, and other value-added marketing prices within NAP or allow farmers to use their own yields and historic pricing data.*
- *Use acreage reporting data to conduct targeted outreach to eligible producers (primarily small specialty crop producers).*
- *Further simplifying NAP, build on application and reporting streamlining to provide automatic basic coverage for appropriate producers.*

*Milestone 2:  Modernize base acre policies to address producers' inability to receive necessary program payments that help stabilize on-farm revenue during economic downturns with commodity markets.*

9

*Milestone 3: Adjust Conservation Reserve Program (CRP) practice standards to better integrate and equitably compensate for the use of Indigenous land management practices.*

*Milestone 4: Streamline and target ad-hoc natural disaster assistance through the Emergency Relief Program 2 (ERP 2). This includes simplified pre-filled applications for producers with crop insurance or NAP coverage, and whole-farm revenue approach operations without risk management coverage such as value-added, diversified operations.*

*Milestone 5: To address gaps in previous pandemic assistance, accept applications and issue payments for Pandemic Assistance Revenue Program (PARP) for producers that target overall revenue losses and support producers with eligible commodities who were not previously eligible for pandemic assistance.*

*Milestone 6: Provide cost share assistance for organic practices that support soil health, biodiversity and reduce erosion through the Organic Cost Certification Specialty Crop program.*

*Milestone 7: Transform marketing opportunities for small and medium producers by implementing the food safety certification for a specialty crops program (FSCSC) that supports a more equitable ag economy.*

*Milestone 8: Address unique marketing costs challenges faced by dairy operators through implementing the Organic Dairy Marketing Assistance Program (ODMAP) for certified dairy operations.*

*Milestone 9: Increase staff knowledge of farmer and rancher profiles to better match relevant services and programs with USDA customers and potential customers. (Training on programs available for beginning, urban, tribal, historically underserved, specialty crop producers, etc.)*

*Milestone 10: Review FSA programs for additional regulatory/administrative changes that will improve processes for beginning farmers and ranchers and historically underserved producers.*


## Action 6: Improve outreach, engagement, and service to producers by reducing barriers to accessing programs and training FSA employees in serving tribal and underserved customers.

*This action and milestones align with the USDA Equity Commission Recommendations #4 and 13*

*Milestone 1: The FSA Outreach Office (OO) will design a flexible suite of interventions to support FSA staff in more effectively conducting outreach and helping tribal producers access the services, loans, and programs they need.*

*Milestone 2: The FSA Outreach Office will work with Farm Loan Programs (FLP) staff to reduce barriers to tribal producer participation. OO will work with the FLP and customer experience (C/X) offices to improve online resources and access to information for tribal producers and other underserved customers.*

*Milestone 3: Implement Customer experience (C/X) tested solutions from recent C/X project working with tribal producers with all FSA customers and field employees.*

10


*Milestone 4:  Require diversity training related to working with underserved groups and issues to staff.*

*Milestone 5:  Monitor and assess all targeted outreach activities conducted and reported by each FSA state and county office quarterly.*

*Milestone 6:  Reduce producer barriers by increasing technical assistance cooperative agreements for community-based organizations (CBOs) and Minority Serving Institutions (MSIs) that work with specialty crop producers, beginning and underserved farmers and ranchers.*

Action 7:  Expand opportunities for heirs and tribal producers impacted by heirs' property and fractionated land issues by improving the Heirs' Property Relending Program and Highly Fractionated Indian Land Program.
*This action and milestones align with the USDA Equity Commission Recommendations #1 and 2*



The Heirs' Property Relending Program (HPRP) and the Highly Fractionated Indian Land Program (HIFL) allow opportunities for heirs' property descendants and tribal members to obtain loans to resolve title issues and/or purchase fractionated land interests through intermediary lenders.  As fractionation and heir issues increase, a producer's ability to use the land decreases. Resolution of heirs and fractionated land provides opportunities for wealth creation and an asset to leverage for credit, builds food sovereignty by putting farmland into production, and expands economic development in communities.

*Milestone 1:  Engage with Indigenous Community Development Financial Institutions (CDFIs) and community-based organizations (CBOs) and other interested entities in ensuring that heirship issues also address fractionization issues that tribal communities face.*

*Milestone 2:  Evaluate regulatory and procedural changes for HIFL Program.*

*Milestone 3:  Align HIFL Program with HPRP.*

*Milestone 4:   Provide cooperative agreements for community based nonprofit organizations to address and resolve fractionated land issues and heirs' property issues for underserved producers through the delivery of legal technical assistance, education, and drafting estate plans.*

*Milestone 5:  Promote availability of direct family loans that can be used to close heirs' property estates and legal costs.*

*Milestone 6:  Provide cooperative agreements to 501c3 organizations (with minimum 5 years' experience delivering legal services to indigent persons) to deliver legal technical assistance and education that will prevent the creation of heir's property and remedy title issue which caused heirs' property and fractionated land.*

11



*Milestone 7: Conduct cross training of staff and stakeholders to promote the HIFL program, its goals, and ease of use.*

## Action 8:  Identify program gaps through the evaluation of covered Justice 40 programs to ensure the agency is reaching the broadest audience.

*Milestone:  Track and report completion of actions for FSA Justice 40 covered programs using metrics and benefits methodologies created to increase benefits disadvantaged communities, using the Climate & Environmental Justice Screening Tool (CEJST). (The Justice 40 Initiative is a federal government-wide effort, covering selected programs, to deliver at least 40 percent of the benefits of those programs to identified disadvantaged communities).*

---

The final three actions **expand FSA's reach to all producers** by leveraging partnerships with trusted technical assistance institutions and organizations and modernizing and institutionalizing improved County Committees.

## Action 9:  Provide Fiscal Year (FY) 2023-24 cooperative agreements that are targeted towards providing education to underserved producers on risk management strategies such as financial management and recordkeeping as well as climate, urban ag and local foods.

***This action and milestones align with the USDA Equity Commission Recommendation #4***

*Milestone 1:  Partner with public and private organizations to deliver risk management education and training to underserved and socially disadvantaged farmers and ranchers.*

*Milestone 2:  Provide funding opportunities to eligible universities, Minority Service Institutions, community-based organizations in every state for projects that address Mission Area priorities.  Staff at national and state level will be substantially involved in all partnerships.*

## Action 10:  Reimagine FSA County Committees, currently an underutilized outreach, education, and technical assistance resource.

***This action and milestones align with the USDA Equity Commission Recommendation #8***

FSA will prioritize and enhance the role of County Committees (COCs) in conducting local outreach and education and providing technical assistance and mentorship to producers in their communities, in conjunction with agricultural extension specialists, cooperators, and other partners. Instead of reviewing farm program applications for errors or fraud detection, COCs will focus on engagement with local producers to increase awareness and enrollment in FSA programs. This pivot will allow FSA to invest in dedicated FSA staff with relevant subject matter expertise to guide accountability measures such as spot checks and programmatic audits. COCs can, in turn, raise issues of need in the community, engage with local producers, and work with county offices to improve program access. With their more intended focus on conducting and providing outreach, education, and technical assistance, COCs will be guided to

12



pay special attention to new, beginning, and underserved producers—who, as new customers to FSA, may need assistance understanding and accessing FSA programs and services.



*Milestone 1: Prioritize and enhance the COCs' role in conducting local outreach and education and providing technical assistance and mentorship to producers in their communities, in conjunction with agricultural extension specialists, cooperators, and other partners, with an elevated focus on conducting and providing outreach, education, and technical assistance. COCs should also pay special attention to new, beginning, and underserved producers—who, as new customers to FSA, may need assistance understanding and accessing FSA programs and services.*

*Milestone 2: Develop targeted outreach strategies to provide awareness and eligibility of tribal members for county committees.*

*Milestone 3: Establish a USDA COC Liaison responsible for identifying and instituting diverse representation on COCs.*

*Milestone 4: Increase transparency and accountability for COCs by establishing a performance metric with controls/mechanisms to ensure equitable standards. County Executive Director (CED) & COC members should be subject to oversight/evaluation by FSA w/civil rights, equity and demographic factors included as metrics.*

*Milestone 5: Conduct a biannual assessment on performance measures that indicate equitable outcomes for COCs. If it does not yield equitable outcomes, an external analysis/study on equity disparities & potential reform shall be conducted on the equity disparities of COCs and a potential reform of the COC system to be more equitable for all farmers The analysis should include the historic and current role of COCs creating disparities for and displacement of women and underserved farmers.*

13

*Milestone 6:  Require diversity training related to working with underserved groups and issues to staff and new committee members.  Members should also be trained on the role of the minority advisor and FSA appeals processes.*

*Milestone 7:  FSA will expand and institutionalize urban committees in identified areas, ensuring that urban producers' needs and situations are included in program design, implementation, and outreach.*

---

For more information on equity at FSA, and all of USDA, see usda.gov/equity.

14

# Selected Equity Resources and Information

## USDA Equity-Related Summary Reports and Guidance

- Programmatic Equity at USDA:
  - Equity Website
  - Equity Accomplishments
  - Equity Action Plan: Full Plan | Summary (February 2022)
- Equity Commission
  - Equity Commission Website
  - 2023 Interim Report | USDA Response (English) (February 2023)
  - Informe Interino 2023 |Respuesta al Informe Interino de la Comisión de Equidad del USDA| (En Español) (Febrero 2023)
- USDA Environmental Justice Scorecard
- USDA Advisory Committees

## Selected Farm Service Agency Resources

- Farm Service Agency Website
- Farm Service Agency Office Locator
- Farm Service Agency Climate Adaptation Plan
- Farm Service Agency Cooperative Agreements
- Farm Service Agency County Committees and Urban County Committees
- Farm Loan Program Data
- Disaster Assistance Tool
- Get Started! A Guide to USDA Resources for Historically Underserved Farmers and Ranchers (July 2022) (PDF, 2 MB)
- Loan Assistance Tool
- Translated Farm Service Agency Program Fact Sheets
- USDA Beginning Farmers and Ranchers Resources
- USDA Certified Mediation Program
- What is Receipt for Service?

## Selected Equity-Related Executive Orders and White House Resources

- White House Equity Page
- Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (January 2021)
- Executive Order 14091, Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (February 2023)
- Executive Order 14096, Revitalizing our Nation's Commitment to Environmental Justice for All (April 2023)
- Executive Order 13175, Consultation and Coordination with Indian Tribal Governments (November 2000)
- Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships
- The Path to Achieving Justice40

15


## USDA Mission Statement

"To serve all Americans by providing effective, innovative, science-based public policy leadership in agriculture, food and nutrition, natural resource protection and management, rural development, and related issues with a commitment to delivering equitable and climate-smart opportunities that inspire and help America thrive."

## Department Equity Action Plan Strategies

1. **Reducing Barriers to USDA Programs**
   USDA is reducing barriers to programs and improving support to underserved farmers, ranchers, landowners, businesses, and communities, including by providing ways for stakeholders to share their experiences, insights, and needs and by incorporating that input into policy development and implementation improvement.

2. **Partnering with Trusted Technical Assistance Providers**
   USDA is partnering with trusted technical assistance providers to ensure that underserved producers and communities have the support they need to access USDA programs.

3. **Directing USDA Programs to Those Who Need Them the Most**
   USDA programs are targeting those who need them the most, including by increasing infrastructure investments that benefit underserved communities.

4. **Expanding Equitable Access to USDA Nutrition Assistance Programs**
   USDA is expanding equitable access to USDA nutrition assistance programs to ensure that those who qualify are able to participate, those who participate get benefits that are meaningful, and those who receive those benefits can use them conveniently and in ways that promote improvements in their health and well-being.

5. **Advancing Equity in Federal Procurement**
   USDA is advancing equity in Federal procurement, by providing underserved and disadvantaged businesses, tools and resources to increase access to funding opportunities and expand their network to develop critical local, State, regional, and National relationships.

6. **Upholding Federal Trust and Treaty Responsibilities to Indian Tribes**
   USDA is upholding general Federal trust and treaty responsibilities to Indian Tribes, removing barriers to access USDA programs, embracing Tribal self-determination principles, and incorporating indigenous values and perspectives in program design and delivery.

7. **Committing Unwaveringly to Civil Rights**
   USDA has committed unwaveringly to civil rights, working to equip its civil rights offices with the tools, skills, capacity, and processes essential to enforce and uphold civil rights effectively and efficiently.

8. **Operating with Transparency and Accountability**
   USDA is operating transparently and accountably, providing information on Department programs that Congress, stakeholders, and the general public need to hold us to account on our equity agenda, and working systematically to collect and take account of public feedback.

16



**USDA is an equal opportunity provider, employer, and lender.**

# Adequate Coverage for States and Underserved Producers

Report to Congress in response to section 11108 of the Agriculture Improvement Act of 2018

# I- Executive Summary:

Federal crop insurance is an equal-opportunity critical component of the safety net for agricultural producers. In 2018 Federal crop insurance was utilized on 84 percent of U.S. acres for all commodities excluding hay, livestock, nursery, and pasture, range, and forage. The measurement of Federal crop insurance coverage is important for gauging where the risk management safety net could be strengthened or expanded.

In accordance with Section 11108 of the 2018 Farm Bill, the U.S. Department of Agriculture's (USDA) Risk Management Agency (RMA) conducted two separate analyses to determine where states or producer groups were underserved by the Federal crop insurance program. One analysis compared crop acreage reported to the RMA with crop acreage estimated by the USDA's National Agricultural Statistics Service (NASS) to measure if each state by crop was adequately served by crop insurance. A second analysis was done using 2017 Census of Agriculture responses to measure crop insurance participation among underserved producers.

RMA's analysis found a little over 100 state/crop participation rates that met the statutory definition of underserved, out of over a thousand state/crop participation rate comparisons. RMA analyzed crop insurance participation rates for Beginning, Veteran, Female, African American/Black, Asian American, Hispanic/Latino, American Indian/Native American, and Native Hawaiian and Other Pacific Islander farmers and ranchers, and found all groups participated in crop insurance at above 50% the rate of all producers.

Considering this analysis, RMA has provided an overview of actions taken to date, additional recommendations, and other policy options for Congress to consider.

# II-  Introduction

RMA is providing this report to Congress in accordance with Section 11108 of the Agricultural Improvement Act of 2018, or 2018 Farm Bill.

Section 11108 modified Section 508(a)(7) of the Federal Crop Insurance Act (7 U.S.C. 1508(a)(7)) to read:

*(7) ADEQUATE COVERAGE FOR STATES AND UNDERSERVED PRODUCERS.—*

> *(A) DEFINITIONS.—In this paragraph:*
>
> > *(i) ADEQUATELY SERVED.—The term ''adequately served'' means having a participation rate, by crop, that is at least 50 percent of the national average participation rate.*
> >
> > *(ii) UNDERSERVED PRODUCER.—The term ''underserved producer'' means an individual (including a member of an Indian Tribe) that is—*
> >
> > > *(I) a beginning farmer or rancher;*
> > >
> > > *(II) a veteran farmer or rancher; or*
> > >
> > > *(III) a socially disadvantaged farmer or rancher.*
>
> *(B) REVIEW.—Using resources and information available to the Board or the Secretary, the Board shall review the policies and plans of insurance that are offered by approved insurance providers under this subtitle, including policies and plans of insurance for underserved producers, to determine if each State is adequately served by the policies and plans of insurance.*
>
> *(C) REPORT.—*
>
> > *(i) IN GENERAL.—Not later than 30 days after completion of the review under subparagraph (B), and not less frequently than once every 3 years thereafter, the Board shall make publicly available and submit to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate a report describing the results of the review.*
> >
> > *(ii) RECOMMENDATIONS.—The report under clause (i) shall include recommendations to increase participation in States and among underserved producers that are not adequately served by the policies and plans of insurance, including any* plans for administrative action or recommendations for Congressional action.

Given the statutory definition of adequately served, RMA first calculated both a baseline percentage and specific percentage by state for the various crops nationwide. Those that fall below the 50% statutory cutoff are shown in Figure 1 below.  Methodologies for determining "adequately served" and other metrics used in this report are outlined in the Appendix (Section V).

Figure 1. States and Crops Without Adequate Coverage

| Commodity | 50% of national participation | Insurance participation by state that is less than 50% of national participation level | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apples | 35% | CA 34% | GA 24% | IL 23% | MA 34% | MN 17% | NJ 18% | NM 2% | OH 28% | SC 20% | TN 6% | UT 27% | WV 29% | WI 29% |
| Barley | 31% | MD 16% | MI 5% | NY 16% | PA 9% | SD 22% | VA 30% | WI 15% | | | | | |
| Blueberries | 29% | AL 2% | MS 18% | | | | | | | | | | |
| Buckwheat | 18% | MN 9% | | | | | | | | | | | |
| Corn Combined | 44% | CA 31% | MT 38% | NV 15% | OR 41% | RI 33% | UT 15% | WA 32% | | | | | |
| Cucumbers | 11% | FL 3% | NC 5% | | | | | | | | | | |
| Dry Beans | 44% | CA 42% | ID 36% | MT 42% | TX 1% | WA 40% | | | | | | | |
| Dry Peas | 45% | OR 43% | | | | | | | | | | | |
| Flax | 43% | SD 41% | | | | | | | | | | | |
| Forage Production | 6% | CO 1% | ID 1% | ME 5% | MI 4% | NE 1% | NY 1% | OR 1% | PA 1% | UT 2% | WA 2% | | |
| Fresh Beans Combined | 18% | MN 16% | NJ 7% | OR 13% | TX 13% | WA 15% | | | | | | | |
| Green Peas | 42% | IL 12% | | | | | | | | | | | |
| Grapes | 26% | AR 1% | CT 1% | MD 3% | MO 1% | NE 9% | NJ 1% | NC 17% | OH 9% | VA 1% | | | |
| Mandarins / Tangerines | 44% | FL 25% | | | | | | | | | | | |
| Mint | 11% | OR 3% | | | | | | | | | | | |
| Oats | 7% | AL 6% | CA 2% | CO 4% | GA 5% | ID 6% | IL 4% | KS 3% | MO 1% | OK 3% | OR 6% | TX 5% | WA 6% |
| Onions | 39% | NM 20% | | | | | | | | | | | |
| Peaches Combined | 35% | CT 17% | KY 7% | LA 4% | MA 33% | OK 14% | OR 12% | TN 29% | UT 14% | | | | |
| Pecans | 18% | FL 1% | OK 3% | | | | | | | | | | |
| Pistachios | 34% | NM 31% | | | | | | | | | | | |
| Potatoes | 36% | NJ 15% | | | | | | | | | | | |
| Sesame | 50% | KS 7% | | | | | | | | | | | |
| Sorghum Combined | 38% | GA 28% | | | | | | | | | | | |
| Sugar Beets | 44% | CA 40% | | | | | | | | | | | |
| Tobacco Combined | 49% | PA 1% | | | | | | | | | | | |
| Tomatoes Combined | 41% | NJ 19% | NY 17% | SC 7% | TN 36% | VA 9% | | | | | | | |
| Triticale | 14% | ID 5% | | | | | | | | | | | |
| Wheat | 41% | AZ 39% | CA 28% | DE 35% | FL 13% | GA 21% | IA 21% | MD 26% | NV 21% | PA 23% | WV 33% | | |

The greatest frequency of low state participation rates for field crops was identified for oats, forage, and wheat. Several fruit crops including apples, grapes, and peaches were identified to have the most states with low participation rates. The participation for oats can appear to be low due to a significant amount of the NASS planted oat acreage being intended for purposes other than grain like cover crops. Forage production has a very low national participation rate and states with lower amounts of overall forage acres tended to have the lowest state participation rates. Low participation for perennial fruit crops could be the result of RMA limiting insurance offers to select counties in a state or to certain cropping practices where production experience demonstrates that insurance would be actuarially sound. Perennial crops can also have underwriting controls that limit insurance for new production areas with minimum age and production amount requirements that have to be met before acreage becomes insurable as opposed to annual crops that are insurable when the crop is planted.

In addition to states with low crop insurance participation there were also some state and crop combinations identified where Federal crop insurance is available, but no producers purchased such coverage. These combinations are stated in Figure 2.

Figure 2. States and Crops Where Insurance Coverage is Offered Without Any Insurance Participation

| State | Commodity | NASS Acreage |
|---|---|---|
| Alaska | Potatoes | 500 |
| Arizona | Chili Peppers | 1,100 |
| Idaho | Flax | 2,003 |
| Maryland | Forage Production | 40,000 |
| Massachusetts | Grapes | 173 |
| Mississippi | Grapes | 375 |
| Montana | Camelina | 792 |
| New Jersey | Forage Production | 9,000 |
| Oregon | Mustard | 1,066 |
| South Carolina | Blueberries | 750 |
| Tennessee | Snap Beans | 7,900 |

The most common states to have underserved crop seem to be in the west. However, these states also have some of the most diverse mixes of different insurable crops being produced. For example, California has over 50 different insurable crops.

To analyze the participation rate among underserved producers, RMA used producer responses to the 2017 NASS Census of Agriculture. RMA included all farms with gross sales over $50,000 in our review. This was the best data set RMA could locate that would allow the comparison of demographic data on operators to see if they utilized crop insurance. This method allows RMA to look at participation on an operator basis, but not on an acreage basis. RMA is exploring other ways to collect data for future versions of this report. This methodology is further explored in Section V.

Figure 3 shows the crop insurance participation rate for each demographic group and the number of producers that identified as members of that demographic group with gross sales over $50,000.

Figure 3. Crop Insurance Participation Rates for Different Demographic Groups

| Commodity: | All Crops | |
|---|---|---|
| Demographic Group | Participation Rate | Number of Producers |
| All Producers | 64% | 439,060 |
| Beginning Farmer | 60% | 92,842 |
| Current or Former Military Service | 62% | 73,870 |
| Female | 59% | 187,856 |
| African American/Black | 51% | 2,261 |
| Asian American | 45% | 4,545 |
| Hispanic/Latino | 50% | 11,851 |
| Native American/American Indian | 43% | 4,661 |
| Native Hawaiian or Other Pacific Islander | 38% | 506 |

Attached to this report is Exhibit 1, which shows the information in Figure 3 on an individual crop basis for all crops included in the Census of Agriculture. It may be difficult to make valid inferences from Exhibit 1 because the Census of Agriculture asks producers about crop insurance participation at a farm level, instead of at a crop level. However, if a farm has access to crop insurance for one crop, it means they are participating in the program and are able to make decisions about whether they want to use crop insurance on other crops where it is available in their area.

Figure 4 below shows the participation rate for each demographic group compared to the participation rate for all producers. Figure 4 can be interpreted by saying that Beginning Farmers participate in crop insurance at 94% the rate of all producers. No demographic group participates in crop insurance at under 50% of the participation rate of all producers.

Figure 4. Crop Insurance Participation for Underserved Producers Compared to Participation Rates for All Producers

| Commodity: | All Crops |
|---|---|
| Demographic Group | Participation Rate compared to Participation Rate for All Producers |
| Beginning Farmer | 94% |
| Current or Former Military Service | 98% |
| Female | 93% |
| African American/Black | 81% |
| Asian American | 72% |
| Hispanic/Latino | 78% |
| Native American/American Indian | 67% |
| Native Hawaiian or Other Pacific Islander | 59% |

# III- Current Offerings and Outreach

In an effort to increase the availability of Federal crop insurance in underserved states, RMA has worked to expand the availability of existing multi-peril crop insurance policies across the country. Over the 2018, 2019, and 2020 crop years, RMA expanded insurance availability to 318 additional crop county combinations that would not have been available to producers responding to the 2017 NASS Census of Agriculture.

RMA's regional offices worked collaboratively with regional stakeholders and with the USDA's Farm Service Agency (FSA) to identify areas where expansion was needed and feasible to accomplish these expansions. These efforts will continue. Notably, RMA has emphasized expansion of perennial fruit programs in the mid-Atlantic and Northeast, which should lead to higher participation in those areas which are currently underserved as identified in Figure 1.

Additionally, RMA has worked to create and improve existing programs for areas and producers that are underserved. RMA's Pasture, Rangeland and Forage (PRF) insurance program, which allows producers who hay or graze land for livestock to purchase protection against rainfall shortages, is a popular and affordable program targeted towards livestock and hay producers. The program in particular has been popular with Native American tribes. PRF is currently undergoing its own program review and may have enhancements in the future. RMA has also done a recent overhaul of our Forage Production and Forage Seeding plans of insurance, in the hopes of improving producer participation in both programs.

Additionally, the Bipartisan Budget Act of 2018 removed the congressionally mandated $20 million cap on insurance for livestock producers. This has allowed RMA to offer more coverage to livestock producers through existing programs like Whole Farm Revenue Protection, Livestock Gross Margin, and Livestock Risk Protection. It also made the new Dairy Revenue Protection insurance product feasible. This flexibility aids RMA in continuing to develop new products that serve livestock producers. The Federal Crop Insurance Corporation Board of Directors also recently approved enhancements to the Livestock Gross Margin and Livestock Revenue Protection plans of insurance, including providing those producers additional premium subsidy.

For vegetable producers, RMA has updated the record requirements for direct market producers under the Whole Farm Revenue Protection insurance policy for 2021. In 2020, there were 2,072 Whole Farm Revenue Protection insurance policies sold nationwide, covering over $2.2 billion in liability. Whole Farm Revenue Protection is available for 124 different commodities. The 2021 changes were made with the intent of making that program more accessible to direct market vegetable producers who told RMA they did not keep the records previously required by the program. Along with these changes, RMA has designated a national Specialty Crops Coordinator per the instructions of the 2018 Farm Bill. This coordinator, along with regional specialty crops coordinators, has been tasked with identifying and addressing areas for specialty crop insurance expansion. As part of these efforts, RMA has introduced a new plan of insurance called Production and Revenue History (PRH). This policy will help specialty crop producers access revenue coverage for their crops, based on their production histories and historical prices received. The initial implementation of PRH insurance was for Strawberries in Florida. PRH will soon be implemented for fresh market tomatoes, fresh market sweet corn, and fresh market green bell peppers.

In addition to expanding and improving our products to meet the needs of underserved areas and groups, RMA has also emphasized education about our programs to underserved states and producer groups. Until the 2018 Farm Bill, RMA provided additional education and outreach in underserved states through cooperative agreements with State Departments of Agriculture, land grant universities, and other qualified entities. The funding for these agreements was shifted from RMA to the National Institute of Food and Agriculture (NIFA) as part of the 2018 Farm Bill. RMA now works with NIFA in an advisory role as they administer this funding. Starting in fiscal year 2021, RMA is reengaging in these education and outreach efforts by using funding associated with Section 522 of the Federal Crop Insurance Act to enter into cooperative education agreements.

RMA has also worked to help these producers with risk management through partnerships with other USDA agencies, including the Agricultural Marketing Service (AMS) and Natural Resources Conservation Service (NRCS). RMA partnered with AMS on a project to enhance market access for fruit and vegetable producers by defraying the costs of undergoing voluntary USDA Harmonized Good Agricultural Practices (GAP) audits. These food safety audits are an important aspect of any farm marketing plan and will mitigate financial risk by expanding the number of market options available to the farm. RMA partnered with NRCS to fund high tunnels for producers in underserved states, with an emphasis on urban agriculture. High tunnel systems allow crops to be planted several weeks earlier and later and eliminate considerable risk from weather and pests.

RMA also provides a specific set of benefits for Beginning Farmers and Ranchers (BFR) to make Federal crop insurance more accessible. Figure 3 and Figure 4 above show that of the underserved groups, BFR are among the most likely to participate in Federal crop insurance Additionally, the 2018 Farm Bill extended these BFR benefits to Veteran Farmers and Ranchers (VFR). These benefits are listed below:

- Exemption from paying the administrative fee for catastrophic and additional coverage policies;
- Additional 10 percentage points of premium subsidy for additional coverage policies that have premium subsidy;
- Use of another person's production history for the specific acreage transferred to you that you were previously involved in the decision making or physical activities to produce the crop; and
- An increase in the substitute Yield Adjustment, which allows you to replace a low yield due to an insured cause of loss, from 60 to 80 percent of the applicable transitional yield (T-Yield).

The 2018 Farm Bill instructed USDA to create Beginning Farmer Rancher Coordinators for RMA, FSA, NRCS, and Rural Development (RD). These coordinators will develop goals and create plans to increase beginning farmer participation and access to programs while coordinating nationwide efforts on beginning farmers and ranchers. Each state coordinator will receive training and develop beginning farmer outreach plans for their state. Coordinators will help field employees to better reach and serve beginning farmers and ranchers and will also be available to assist beginning farmers and ranchers who need help navigating the variety of resources USDA has to offer. Additionally, the Farm Bill added Specialty Crop Liaisons to assist the Specialty Crop Coordinator in RMA. These positions will better help identify unique needs of specialty crops which are commonly underserved. RMA recommends using these positions as a centerpiece to target expansion to underserved crops and areas.

RMA has also started a contracted study to develop insurance programs for local foods. This research was a requirement in the 2018 Farm Bill. RMA will review any findings or recommendations to see how

our program can be more accessible to local food producers. RMA separately submitted a report on this topic to the committees as required.

RMA also plans to continue to expand the PRH plan of insurance and has been working through the specialty crop coordinators to identify specialty crops where PRH could be used as the basis for crops that currently do not have a specific policy.

# IV- Recommendations and Other Options

To increase program participation by socially disadvantaged Farmers and Ranchers, RMA is exploring ways to give socially disadvantaged Farmers and Ranchers access to the benefits, listed in Section III above, that are currently available to BFR and VFR. These would include exemption from administrative fees, additional premium subsidy, and an increase in the substitute Yield Adjustment. In addition, RMA is considering ways to give socially disadvantaged producers a way to adjust their historical yields to account for the historical impact of discriminatory lending practices on their operations.

Additionally, although agents are required to receive training on specialty crops and other topics relevant to underserved producers, there is not a major financial incentive involving underserved producers in most cases. Congress could also consider incentive options to agents to better market insurance options or to sell complex policies like Whole Farm Revenue Protection to these producers.

RMA is exploring what changes could be made administratively versus those that would require Congressional action.

Finally, the Fiscal Year 2022 President's Budget includes an increase of $9 million in discretionary funds for RMA to hire staff devoted to underserved communities, enter into contracts and agreements to develop new products for consideration, and to expand risk management education and outreach efforts.

# V- Appendix with Methodology:

## Adequate Crop Insurance Coverage for States

**Methodology (based on acreage):**

Insurance availability is typically determined at the county level, and this presents a challenge when determining what will count as insurance availability at the State level. For simplicity, it's assumed that if one county has insurance then the State is said to have insurance. Crops that do not have access to crop insurance in a particular state are excluded. NASS does provide survey data at the county-level for the major field crops, but results are often limited. NASS only reports counties with more than 30 respondents and 25% of planted acres included, otherwise the county is aggregated to the county reporting district and state-level estimates. Therefore, aggregating RMA's state-level data with NASS state-level data provides the most available crop acreage data. There are still cases at even the state-level where NASS has too few respondents to publish the crop acreage for the state. NASS nationwide acreage estimates are unconstrained and include all the acreage for the crop in the United States.

Consideration was made between using NASS survey and NASS Census of Agriculture data. The Census of Agriculture is more comprehensive than NASS surveys, however, for row crops and vegetables only harvested acres are recorded. For crop that were hit by a natural disaster in 2017, the Census is a poor choice for establishing penetration rates. Also, the Census of Agriculture is only conducted every five years, with the last being in 2017.

For field crops and vegetables, the planted and harvested acreage is reported in NASS surveys. When NASS conducts acreage surveys, its conducting surveys in states that are major producing areas of the crop. For fruits and nuts, the NASS survey and census both provide bearing and non-bearing acres, but the census contains more useful state level acreage than surveys.

Even when using the NASS census or survey, there are certain crops that RMA may have a policy for that are not covered in the Census of Agriculture, such as clary sage. Additionally, NASS and RMA may classify crops differently, therefore, the crop classifications from one agency may need to be aggregated in order to be analogous with the classification from the other agency. For example, RMA has several different policies for tobacco based on the variety, while NASS only records "Tobacco" as the commodity.

For these reasons the primary NASS data source is the 2018 NASS survey. For field crops and vegetable crops the NASS planted acreage survey estimates were used. For fruit and nut crops the NASS bearing acres census estimates were used. Some crops don't have NASS planted acre estimates so the NASS harvested acreage survey estimates were used. These crops include mint, sugarcane, tobacco, and forage (alfalfa, alfalfa grass mixture).

RMA's Summary of Business acreage for the 2018 crop year was compared to the 2018 NASS survey acreage or 2017 census acreage. Comparison was first made with the nationwide totals by crop to establish the percentage of insurance participation by crop. This percentage was then multiplied by 50 percent to establish the adequately served baseline for each crop at the state level. Then the RMA summary of business acreage by crop for each state was compared to NASS state survey or census crop acreage to establish the insurance participation percentage by state and crop. These state/crop insurance participation percentages were then compared to the adequately served national/crop baseline percentages. Any state/crop insurance participation percentages below the national/crop baseline were then identified as not being adequately served. The states and crops without adequate coverage is displayed in Figure 1. Several states and crops were identified to having NASS acreage estimates with crop insurance available, but no acres were insured in 2018 and are displayed in Figure 2.

## RMA's Interaction with Underserved Producers

**Methodology (based on numbers of producers):**

To measure how effectively Federal crop insurance is serving underserved producers, defined by Congress as beginning farmers and ranchers, veteran farmers and ranchers, and socially disadvantaged farmers and ranchers, RMA used the 2017 Census of Agriculture NASS to look at the percent of respondents who identify as beginning farmers and ranchers, veteran farmers and ranchers, or as a category considered socially disadvantaged, that say they use crop insurance.

Typically, RMA analyzes crop insurance participation by comparing total acres estimated by NASS to the acres reported to RMA by insured producers. However, RMA could not follow this technique for underserved producers, because of the lack of RMA data that contains demographic information. RMA does not keep demographic information on program participants. Data is shared between RMA and FSA containing some demographic information, but this data isn't as complete as the data available in the 2017 Census of Agriculture.

NASS provided RMA with Census information by crop, broken down by farm sales class, concerning crop insurance participation for farmers and ranchers that are classified as beginning, current or former servicemen, female, African American, Asian, Native American, Native Hawaiian or Other Pacific Islander, or Hispanic. NASS also provided RMA with the same dataset for all producers, to serve as a baseline. RMA analyzed farms with gross sales over $50,000 in order to focus on participation rates for farm operations where farming is a primary source of income for the operator. This sales class was selected to capture a significant portion of intermediate farms that the Economic Research Service (ERS) defines as farms with less than $350,000 in gross cash income and a principal operator whose primary occupation is farming.  The $50,000 sales class was also selected to provide a balanced comparison of family farm insurance participation without being overly weighted by residence farms that ERS defines as farms with less than $350,000 in gross farm income and where the principal operator is either retired from farming or has a primary occupation other than farming. Overall, the $50,000 sales class of farms account for 97% of farm sales nationwide according to NASS.

If producers provided an answer of more than zero to the 2017 Census of Agriculture question "How many acres in this operation were covered under any crop insurance policy in 2017?", they were included as crop insurance participants.

Due to the format of this question, RMA was able to identify if a producer's operation had some form of crop insurance but was unable to determine which specific crops produced under the farming operation were insured. This made it difficult to make inferences on an individual crop basis. However, RMA did perform this analysis, and this information is included in Exhibit 1.

If a producer had crop insurance on at least one crop, then they likely had access to a crop insurance agent and were able to make decisions about whether or not they wanted insurance for any other insurable crops they grew

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

## COMMODITY CREDIT CORPORATION CHARTER ACT

[Public Law 115-334]

[As Amended Through P.L. 115–334, Enacted December 20, 2018]

〖Currency: This publication is a compilation of the text of title I of Public Law115-334. It was last amended by the public law listed in the As Amended Through note above and below at the bottom of each page of the pdf version and reflects current law through the date of the enactment of the public law listed at https://www.govinfo.gov/app/collection/comps/〗

〖Note: While this publication does not represent an official version of any Federal statute, substantial efforts have been made to ensure the accuracy of its contents. The official version of Federal law is found in the United States Statutes at Large and in the United States Code. The legal effect to be given to the Statutes at Large and the United States Code is established by statute (1 U.S.C. 112, 204).〗

### TABLE OF CONTENTS [1]

Sec. 1. Short title.
Sec. 2. Creation and purposes.
Sec. 3. Office.
Sec. 4. General powers.
Sec. 5. Specific powers.
Sec. 6. Existing statutes applicable to the Corporation.
Sec. 7. Capital stock.
Sec. 8. Funds.
Sec. 9. Directors, advisory board.
Sec. 10. Personnel of Corporation.
Sec. 11. Cooperation with other government agencies.
Sec. 12. Utilization of associations and trade facilities.
Sec. 13. Records; annual report.
Sec. 14. Interest of Members of the Congress.
Sec. 15. Crimes and offenses.
Sec. 16. Transfer of assets of Commodity Credit Corporation, a Delaware corporation.
Sec. 17. Dissolution of Delaware corporation.
Sec. 18. Effective date.
Sec. 19. Release of innocent purchasers of converted goods.

APPENDIX:
Comparability of storage payments (Sec. 1124 of Food, Agriculture, Conservation, and Trade Act of 1990).
Minimum acquisition of stocks by Commodity Credit Corporation (Sec. 402 of Food and Agriculture Act of 1962).

AN ACT To provide a Federal Charter for the Commodity Credit Corporation.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* 〖15 U.S.C. 714 note〗 That this Act may be cited as the "Commodity Credit Corporation Charter Act".

---

[1] This table of contents is not part of the Act but is included for user convenience.

1

SEC. 2. 〔15 U.S.C. 714〕 CREATION AND PURPOSES.—For the purpose of stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities, products thereof, foods, feeds, and fibers (hereinafter collectively referred to as "agricultural commodities"), and of facilitating the orderly distribution of agricultural commodities, there is hereby created a body corporate to be known as Commodity Credit Corporation (hereinafter referred to as the "Corporation"), which shall be an agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture (hereinafter referred to as the "Secretary").

SEC. 3. 〔15 U.S.C. 714a〕 OFFICE.—The Corporation may establish offices in such place or places as it may deem necessary or desirable in the conduct of its business.

SEC. 4. 〔15 U.S.C. 714b〕 GENERAL POWERS.—The Corporation—

(a) Shall have succession in its corporate name.

(b) May adopt, alter, and use a corporate seal, which shall be judicially noticed.

(c) May sue and be sued, but no attachment, injunction, garnishment or other similar process, mesne or final, shall be issued against the Corporation or its property. The district courts of the United States, including the district courts of the District of Columbia and of any Territory or possession, shall have exclusive original jurisdiction, without regard to the amount in controversy, of all suits brought by or against the Corporation: *Provided*, That the Corporation may intervene in any court in any suit, action, or proceeding in which it has an interest. Any suit against the Corporation shall be brought in the District of Columbia, or in the district wherein the plaintiff resides or is engaged in business. No suit by or against the Corporation shall be allowed unless (1) it shall have been brought within six years after the right accrued on which suit is brought, or (2) in the event that the person bringing such suit shall have been under legal disability or beyond the seas at the time the right accrued, the suit shall have been brought within three years after the disability shall have ceased or within six years after the right accrued on which suit is brought, whichever period is longer. The defendant in any suit by or against the Corporation may plead, by way of set-off or counter claim, any cause of action, whether arising out of the same transaction or not, which would otherwise be barred by such limitation if the claim upon which the defendant's cause of action is based had not been barred prior to the date that the plaintiff's cause of action arose: *Provided,* That the defendant shall not be awarded a judgment on any such set-off or counterclaim for any amount in excess of the amount of the plaintiff's claim established in the suit. All suits against the Corporation shall be tried by the court without a jury. Notwithstanding any other provision of this Act, the Federal Tort Claims Act (Public Law 601, Seventy-ninth Congress) shall be applicable to the Corporation. Any suit by or against the United States as the real party in interest based upon any claim by or against the Corporation shall be subject to the provisions of this subsection (c) to the same extent as though such suit were by or against the Cor-

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

poration, except that (1) any such suit against the United States based upon any claim of the type enumerated in title 28, section 1491, of the United States Code, may be brought in the United States Claims Court, and (2) no such suit against the United States may be brought in a district court unless such suit might, without regard to the provisions of this Act, be brought in such court.

(d) May adopt, amend, and repeal bylaws, rules, and regulations governing the manner in which its business may be conducted and the powers vested in it may be exercised.

(e) Shall have all the rights, privileges, and immunities of the United States with respect to the right to priority of payment with respect to debts due from insolvent, deceased, or bankrupt debtors. The Corporation may assert such rights, privileges, and immunities in any suit, action, or proceeding.

(f) Shall be entitled to the use of the United States mails in the same manner and upon the same conditions as the executive departments of the Federal Government.

(g) May enter into and carry out such contracts or agreements as are necessary in the conduct of its business, except that obligations under all such contracts or agreements (other than reimbursable agreements under section 11) for equipment or services relating to automated data processing, information technologies, or related items (including telecommunications equipment and computer hardware and software) may not exceed $170,000,000 in fiscal year 1996 and not more than $193,000,000 in the 6-fiscal year period beginning on October 1, 1996, unless additional amounts for such contracts and agreements are provided in advance in appropriation Acts. State and local regulatory laws or rules shall not be applicable with respect to contracts or agreements of the Corporation or the parties thereto to the extent that such contracts or agreements provide that such laws or rules shall not be applicable, or to the extent that such laws or rules are inconsistent with such contracts or agreements.

(h) May contract for the use, in accordance with the usual customs of trade and commerce, of plants and facilities for the physical handling, storage, processing, servicing, and transportation of the agricultural commodities subject to its control. The Corporation shall not have power to acquire real property or any interest therein except that it may (a) rent or lease office space necessary for the conduct of its business and (b) acquire real property or any interest therein for the purpose of providing storage adequate to carry out effectively and efficiently any of the Corporation's programs, or of securing or discharging obligations owing to the Corporation, or of otherwise protecting the financial interests of the Corporation: *Provided,* That the authority contained in this subsection (h) shall not be utilized by the Corporation for the purpose of acquiring real property, or any interest therein, in order to provide storage facilities for any commodity unless the Corporation determines that existing privately owned storage facilities for such commodity in the area concerned are not adequate: *Provided further,* That no refrigerated cold storage facilities shall be constructed or purchased except with funds specially provided by Congress for that purpose: *And provided further,* That any contract entered into by the Corporation for the use of a storage facility shall provide at least that

(1) the rental rate charged for an extended term in excess of one year shall be at an annual rate less than that which is charged for a one-year contract, (2) any obligation of the Corporation to pay for the use of any space in a facility shall be relieved to the extent that the Corporation does not use the space and payment is made by another person for the use of such space, and (3) if the Corporation determines that it no longer needs the space reserved in the facility, the Corporation may be relieved for the remaining term of the contract, of its obligations to an extent and in a manner that will provide significant savings to the Corporation while permitting the owner of the facility reasonable time to lease such space to another person: *And provided further,* That nothing contained in this subsection (h) shall limit the duty of the Corporation, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and the effective and efficient conduct of its business, to utilize the usual and customary channels, facilities, and arrangements of trade and commerce in the warehousing of commodities: *And provided further,* That to encourage the storage of grain on farms, where it can be stored at the lowest cost, the Corporation may make loans to grain growers needing storage facilities when such growers shall apply to the Corporation for financing the construction or purchase of suitable storage, and these loans shall be deducted from the proceeds of price support loans or purchase agreements made between the Corporation and the growers, except that the Secretary shall make such loans in areas in which the Secretary determines that there is a deficiency of such storage: To encourage the alleviation of natural resource conservation problems that reduce the productive capacity of the Nation's land and water resources or that cause degradation of environmental quality, the Corporation may, beginning with enactment of the Agriculture and Food Act of 1981, make loans to any agricultural producer for those natural resource conservation and environmental enhancement measures that are recommended by the applicable county and State committees established under section 8(b) of the Soil Conservation and Domestic Allotment Act and are included in the producer's conservation plan approved by the local soil and water conservation district; such loans shall be for a period not to exceed ten years at a rate of interest based upon the rate of interest charged the Corporation by the United States Treasury; the Corporation may make loans to any one producer in any fiscal year in an amount not to exceed $25,000; loans up to $10,000 in amount may be unsecured and loans in excess of $10,000 shall be secured; and the total of such unsecured and secured loans made in each fiscal year shall not exceed $200,000,000: *Provided,* That the authority provided by this sentence to make loans shall be effective only to the extent and in such amounts as may be provided for in prior appropriation Acts. Notwithstanding any other provision of law, the Commodity Credit Corporation shall, to the maximum extent practicable, in consultation with the Secretary of State, and upon terms and conditions prescribed or approved by the Secretary of Agriculture, accept strategic and critical materials produced abroad in exchange for agricultural commodities acquired by the Corporation. Insofar as practicable, in effecting such exchange of goods, the Secretary shall: (1) use normal commercial trade channels; (2) take ac-

APP. 000638

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

tion to avoid displacing usual marketings of United States agricultural commodities and the products thereof; (3) take reasonable precautions to prevent the resale or transshipment to other countries, or use for other than domestic use in the importing country, of agricultural commodities used for such exchange; and (4) give priority to commodities easily storable and those which serve as prime incentive goods to stimulate production of critical and strategic materials. The Corporation may solicit bids from, and utilize, private trading firms to effect such exchange of goods. The determination of the quantities and qualities of such materials which are desirable for stockpiling and the determination of which materials are strategic and critical shall be made in the manner prescribed by section 3 of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98 et seq.). Strategic and critical materials acquired by Commodity Credit Corporation in exchange for agricultural commodities shall, to the extent approved by the President be transferred to the stock pile provided for by the Strategic and Critical Materials Stock Piling Act; and in the same fiscal year such materials are transferred to the stock pile the Commodity Credit Corporation shall be reimbursed for the strategic and critical materials so transferred to the stock pile from the funds made available for the purpose of the Strategic and Critical Materials Stock Piling Act, in an amount equal to the fair market value, as determined by the Secretary of the Treasury, of the material transferred to the stock pile. If the volume of petroleum products (including crude oil) stored in the Strategic Petroleum Reserve is less than the level prescribed under section 154 of the Energy Policy and Conservation Act (42 U.S.C. 6234), the Corporation shall, to the maximum extent practicable and with the approval of the Secretary of Agriculture, make available annually to the Secretary of Energy, upon the request of the Secretary of Energy, a quantity of agricultural products owned by the Corporation with a market value at the time of such request of at least $300,000,000 for use by the Secretary of Energy in acquiring petroleum products (including crude oil) produced abroad for placement in the Strategic Petroleum Reserve through an exchange of such agricultural products. The terms and conditions of each such exchange, including provisions of full reimbursement to the Commodity Credit Corporation, shall be determined by the Secretary of Energy and the Secretary of Agriculture. Nothing contained herein shall limit the authority of the Commodity Credit Corporation to acquire, hold, or dispose of such quantity of strategic and critical materials as it deems advisable in carrying out its functions and protecting its assets: *Provided,* That, notwithstanding any other provision of law, where a grain storage facility owned by the Corporation is not needed by the Corporation and, upon being offered for sale no person offers to pay the minimum price set by the Corporation for such facility for use in connection with storage or handling of agricultural commodities, then the Corporation may, without declaring such facility to be excess property, sell it by bids at not less than such minimum price to any public or private nonprofit agency or organization for use for the purposes of such agency or organization. This provision shall apply also to facilities which on the effective date of this Act have been declared excess to the needs of the Commodity Credit Corporation

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

but have not been claimed by any other Government agency, or surplus to the needs of the Government but not disposed of pursuant to the provisions of the Federal Property and Administrative Services Act of 1949, as amended.

(i) May borrow money subject to any provision of law applicable to the Corporation: *Provided,* That the total of all money borrowed by the Corporation, other than trust deposits and advances received on sales, shall not at any time exceed in the aggregate $30,000,000,000. The Corporation shall at all times reserve a sufficient amount of its authorized borrowing power which, together with other funds available to the Corporation, will enable it to purchase, in accordance with its contracts with lending agencies, notes, or other obligations evidencing loans made by such agencies under the Corporation's programs.

(j) Shall determine the character of and the necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, and paid.

(k) Shall have authority to make final and conclusive settlement and adjustment of any claims by or against the Corporation or the accounts of its fiscal officers.

(l) May make such loans and advances of its funds as are necessary in the conduct of its business.

(m) Shall have such powers as may be necessary or appropriate for the exercise of the powers specifically vested in the Corporation, and all such incidental powers as are customary in corporations generally; but any research financed by the Corporation shall relate to the conservation or disposal of commodities owned or controlled by the Corporation and shall be conducted in collaboration with research agencies of the Department of Agriculture. Notwithstanding any other provision of this Act, the Corporation may, in the exercise of its power to remove and dispose of surplus agricultural commodities, export, or cause to be exported, not to exceed such amounts of commodities owned by the Corporation as will enable the Corporation to finance research and development of external combustion engines using fuel other than that derived from petroleum and petroleum products. The total value of commodities exported annually for the purposes of the research authorized by the preceding sentence may not exceed $30,000,000.

Sec. 5. 〔15 U.S.C. 714c〕 SPECIFIC POWERS.—In the fulfillment of its purposes and in carrying out its annual budget programs submitted to and approved by the Congress pursuant to Chapter 91 of Title 31, the Corporation is authorized to use its general powers only to—

(a) Support the prices of agricultural commodities (other than tobacco) through loans, purchases, payments, and other operations.

(b) Make available materials and facilities required in connection with the production and marketing of agricultural commodities (other than tobacco).

(c) Procure agricultural commodities (other than tobacco) for sale to other Government agencies, foreign governments, and domestic, foreign, or international relief or rehabilitation agencies, and to meet domestic requirements.

(d) Remove and dispose of or aid in the removal or disposition of surplus agricultural commodities (other than tobacco).

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

(e) Increase the domestic consumption of agricultural commodities (other than tobacco) by expanding or aiding in the expansion of domestic markets or by developing or aiding in the development of new and additional markets, marketing facilities, and uses for such commodities.

(f) Export or cause to be exported, or aid in the development of foreign markets for, agricultural commodities (other than tobacco) (including fish and fish products, without regard to whether such fish are harvested in aquacultural operations).

(g) Carry out conservation or environmental programs authorized by law.

(h) Carry out such other operations as the Congress may specifically authorize or provide for.

In the Corporation's purchasing and selling operations with respect to agricultural commodities (other than tobacco) (except sales to other Government agencies), and in the warehousing, transporting, processing, or handling of agricultural commodities (other than tobacco), the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporations purposes and the effective and efficient conduct of its business, utilize the usual and customary channels, facilities, and arrangements of trade and commerce (including, at the option of the Corporation, the use of private sector entities).

SEC. 6. 【15 U.S.C. 714d】 EXISTING STATUTES APPLICABLE TO THE CORPORATION.—The Federal statutes applicable to Commodity Credit Corporation, a Delaware corporation, shall be applicable to the Corporation. Commodity Credit Corporation, a Delaware corporation, shall cease to be an agency of the United States as provided in section 7(a) of the Act of January 31, 1935, as amended (15 U.S.C., 1940 edition, Supp. V, 713(a)).

SEC. 7. 【15 U.S.C. 714e】 CAPITAL STOCK.—The Corporation shall have a capital stock of $100,000,000 which shall be subscribed by the United States. Such subscription shall be deemed to be fully paid by the transfer of assets to the Corporation pursuant to section 16 of this Act. The Corporation shall pay interest to the United States Treasury on the amount of its capital stock, and on the amount of the obligations of the Corporation purchased by the Secretary of the Treasury pursuant to the Act of March 8, 1938 (U.S.C., title 15, sec. 713a–4), as amended, at such rates as may be determined by the Secretary of the Treasury to be appropriate in view of the terms for which such amounts are made available to the Corporation.

SEC. 8. 【15 U.S.C. 714f】 FUNDS.—The Corporation is authorized to use in the conduct of its business all its funds and other assets, including capital and net earnings therefrom, and all funds and other assets, which have been or may hereafter be transferred or allocated to, borrowed by, or otherwise acquired by it.

SEC. 9. 【15 U.S.C. 714g】 DIRECTORS, ADVISORY BOARD.—(a) The management of the Corporation shall be vested in a Board of Directors (hereinafter referred to as the "Board"), subject to the general supervision and direction of the Secretary. The Secretary shall be an ex officio director and shall serve as Chairman of the Board. The Board shall consist of seven members (in addition to the Secretary), who shall be appointed by the President. In addi-

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

tion to their duties as members of the Board, such appointed members shall perform such other duties as may be prescribed by the Secretary. Each appointed member of the Board shall receive compensation at such rate not in excess of the maximum then payable under the Classification Act of 1923, as amended,[2] as may be fixed by the Secretary, except that any such member who holds another office or position under the Federal Government the compensation for which exceeds such rate may elect to receive compensation at the rate provided for such other office or position in lieu of the compensation provided by this section. A majority of the directors shall constitute a quorum of the Board and action shall be taken only by a majority vote of those present.[3]

(b) In addition to the Board of Directors there shall be an advisory board reflecting broad agricultural and business experience in its membership and consisting of five members who shall be appointed by the President, and who shall serve at the pleasure of the President. Not more than three of such members shall belong to the same political party. The advisory board shall meet at the call of the Secretary, who shall require it to meet not less often than once each ninety days; shall survey the general policies of the Corporation, including its policies in connection with the purchase, storage, and sale of commodities, and the operation of lending and price-support programs; and shall advise the Secretary with respect thereto. Members of the advisory board shall receive for their services as members compensation of not to exceed $50 per diem when actually engaged in the performance of their duties as such, together with their necessary traveling expenses while going to and coming from meetings.

SEC. 10. 〔15 U.S.C. 714h〕 PERSONNEL OF CORPORATION.—The Secretary shall appoint such officers and employees as may be necessary for the conduct of business of the Corporation, define their authority and duties, delegate to them such of the powers vested in the Corporation as he may determine. With the exception of experts, appointments shall be made pursuant to the civil service laws and the Classification Act of 1923, as amended (5 U.S.C., 1946 edition, 661).[4]

SEC. 11. 〔15 U.S.C. 714i〕 COOPERATION WITH OTHER GOVERNMENT AGENCIES.—The Corporation may, with the consent of the agency concerned, accept and utilize, on a compensated or uncompensated basis, the officers, employees, services, facilities, and information of any agency of the Federal Government, including any bureau, office, administration, or other agency of the Department of Agriculture, and of any State, the District of Columbia, any territory or possession, or any political subdivision thereof. The Corporation may allot to any bureau, office, administration, or other agency of the Department of Agriculture or transfer to such other agencies as it may request to assist it in the conduct of its business any of the funds available to it for administrative expenses. The personnel and facilities of the Corporation may, with the consent

---

[2] This reference is to be considered to mean the Classification Act of 1949, P.L. 429, 81st Cong., 63 Stat. 954, under Sec. 1106 of that Act.

[3] Meetings are subject to the Government in the Sunshine Act, P.L. 94–409, 90 Stat. 1241, 1242, Sept. 13, 1976.

[4] See footnote 9–1.

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

of the Corporation, be utilized on a reimbursable basis by any agency of the Federal Government, including any bureau, office, administration, or other agency of the Department of Agriculture, in the performance of any part or all of the functions of such agency. After September 30, 1996, the total amount of all allotments and fund transfers from the Corporation under this section (including allotments and transfers for automated data processing or information resource management activities but excluding any amounts used to provide technical assistance under title X of the Agriculture Improvement Act of 2018 or an amendment made by that title) for a fiscal year may not exceed the total amount of the allotments and transfers made under this section in fiscal year 1995.

SEC. 12. 〔15 U.S.C. 714j〕 UTILIZATION OF ASSOCIATIONS AND TRADE FACILITIES.—The Corporation may, in the conduct of its business, utilize on a contract or fee basis, committees or associations of producers, producer-owned and producer-controlled cooperative associations, and trade facilities.

SEC. 13. 〔15 U.S.C. 714k〕 RECORDS; ANNUAL REPORT.—The Corporation shall at all times maintain complete and accurate books of account and shall file annually with the Secretary of Agriculture a complete report as to the business of the Corporation, a copy of which shall be forwarded by the Secretary of Agriculture to the President for transmission to the Congress. In addition to the annual report, the Corporation shall submit to Congress on a quarterly basis an itemized report of all expenditures over $10,000 made under section 5 or 11 during the period covered by the report, including expenditures in the form of allotments or fund transfers to other agencies and departments of the Federal Government.

SEC. 14. 〔15 U.S.C. 714l〕 INTEREST OF MEMBERS OF THE CONGRESS.—The provisions of section 1 of the Act of February 27, 1877, as amended (41 U.S.C., 1940 edition, 22), shall apply to all contracts or agreements of the Corporation, except contracts or agreements of a kind which the Corporation may enter into with farmers participating in a program of the Corporation.

SEC. 15. 〔15 U.S.C. 714m〕 CRIMES AND OFFENSES.—

FALSE STATEMENTS; OVERVALUATION OF SECURITIES

(a) Whoever makes any statement knowing it to be false, or whoever willfully overvalues any security, for the purpose of influencing in any way the action of the Corporation, or for the purpose of obtaining for himself or another, money, property, or anything of value, under this Act, or under any other Act applicable to the Corporation, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both.

EMBEZZLEMENT, AND SO FORTH; FALSE ENTRIES; FRAUDULENT ISSUE OF OBLIGATIONS OF CORPORATION

(b) Whoever, being connected in any capacity with the Corporation or any of its programs, (i) embezzles, abstracts, purloins, or willfully misapplies any money, funds, securities, or other things of value, whether belonging to the Corporation or pledged, or other-

G:\COMP\AGCOM\COMMODITY CREDIT CORPORATION CHARTER ACT.XML

wise entrusted to it; or (ii) with intent to defraud the Corporation or any other body, politic or corporate, or any individual, or to deceive any officer, auditor, or examiner of the Corporation, makes any false entry in any book, report, or statement of, or to, the Corporation, or draws any order, or issues, puts forth or assigns any note or other obligation or draft, mortgage, judgment, or decree thereof; or (iii) with intent to defraud the Corporation, participates or shares in, or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of the Corporation, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both.

#### LARCENY; CONVERSION OF PROPERTY

(c) Whoever shall willfully steal, conceal, remove, dispose of, or convert to his own use or to that of another any property owned or held by, or mortgaged or pledged to, the Corporation, or any property mortgaged or pledged as security for any promissory note, or other evidence of indebtedness, which the Corporation has guaranteed or is obligated to purchase upon tender, shall, upon conviction thereof, if such property be of any amount or value in excess of $500, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both, and, if such property be of an amount or value of $500 or less, be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both.

#### CONSPIRACY TO COMMIT OFFENSE

(d) Whoever conspires with another to accomplish any of the acts made unlawful by the preceding provisions of this section shall, upon conviction thereof, be subject to the same fine or imprisonment, or both, as is applicable in the case of conviction for doing such unlawful acts.

#### GENERAL STATUTES APPLICABLE

(e) All the general penal statutes relating to crimes and offenses against the United States shall apply with respect to the Corporation, its property, money, contracts and agreements, employees, and operations: *Provided,* That such general penal statutes shall not apply to the extent that they relate to crimes and offenses punishable under subsections (a), (b), (c), and (d) of this section: *Provided further,* That sections 114 and 115 of the Act of March 4, 1909, as amended (18 U.S.C., 1940 edition, 204, 205),[5] shall not apply to contracts or agreements of a kind which the Corporation may enter into with farmers participating in a program of the Corporation.

#### USE OF WORDS "COMMODITY CREDIT CORPORATION"

(f) No individual, association, partnership, or corporation shall use the words "Commodity Credit Corporation" or any combination

---

[5] The Act of March 4, 1909, as amended, was repealed and superseded by the Act of June 25, 1948. P.L. 80–772, 62 Stat. 683 *et seq.* Sections 204 and 205 were superseded by sections 431 and 482 of title 18, U.S.C.

**11**  COMMODITY CREDIT CORPORATION CHARTER ACT  **Sec. 19**

of the same, as the name or a part thereof under which he or it shall do or purport to do business. Every individual, partnership, association, or corporation violating this prohibition shall be guilty of a misdemeanor and shall be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both.

SEC. 16. 〔15 U.S.C. 714n〕 TRANSFER OF ASSETS OF COMMODITY CREDIT CORPORATION, A DELAWARE CORPORATION.—The assets, funds, property, and records of Commodity Credit Corporation, a Delaware corporation, are hereby transferred to the Corporation. The rights, privileges, and powers, and the duties and liabilities of Commodity Credit Corporation, a Delaware corporation, in respect to any contract, agreement, loan, account, or other obligation shall become the rights, privileges, and powers, and the duties and liabilities, respectively, of the Corporation. The enforceable claims of or against Commodity Credit Corporation, a Delaware corporation, shall become the claims of or against, and may be enforced by or against, the Corporation: *Provided,* That nothing in this Act shall limit or extend any period of limitation otherwise applicable to such claims against the Corporation.

SEC. 17. 〔15 U.S.C. 714o〕 DISSOLUTION OF DELAWARE COR-PORATION.—The Secretary of Agriculture, representing the United States as the sole owner of the capital stock of Commodity Credit Corporation, a Delaware corporation, is hereby authorized and di-rected to institute or cause to be instituted such proceedings as are required for the dissolution of said Corporation under the laws of the State of Delaware.[6] The costs of such dissolution of said Cor-poration shall be borne by the Corporation.

SEC. 18. 〔15 U.S.C. 714 note〕 EFFECTIVE DATE.—This Act shall take effect as of midnight June 30, 1948.

SEC. 19. 〔15 U.S.C. 714p〕 RELEASE OF INNOCENT PURCHASERS OF CONVERTED GOODS.—A buyer in the ordinary course of business of fungible goods heretofore or hereafter sold and physically deliv-ered by a warehouseman or other dealer who was regularly en-gaged in the business of buying and selling such goods shall take or be deemed to have taken such goods free of any claim, existing or hereafter arising, by Commodity Credit Corporation, based on the want of authority in the seller to sell such goods, provided the buyer purchased such goods for value in good faith and did not know or have reason to know of any defect in the seller's authority to sell such goods. To be entitled to relief under this section a buyer must assert as an affirmative defense and establish by a pre-ponderance of the evidence the facts necessary to entitle him to such relief.

---

[6] The Delaware corporation was dissolved under the laws of the State of Delaware, effective 9 a.m. September 15, 1948.

As Amended Through P.L. 115-334, Enacted December 20, 2018

PUBLIC LAW 116–260—DEC. 27, 2020    134 STAT. 2105

(b) Home-delivered Nutrition Services Waiver.—For purposes of determining eligibility for the delivery of nutrition services under section 337 of the Older Americans Act of 1965 (42 U.S.C. 3030g), with funds received by a State under the Older Americans Act of 1965 (42 U.S.C. 2001 et seq.) for fiscal 2021, the State shall treat an older individual who is unable to obtain nutrition because the individual is practicing social distancing due to the public health emergency in the same manner as the State treats an older individual who is homebound by reason of illness.

<span style="float:right">Determination.<br>42 USC 3030g note.</span>

(c) Dietary Guidelines Waiver.—To facilitate implementation of subparts 1 and 2 of part C of title III of the Older Americans Act of 1965 (42 U.S.C. 3030d–2 et seq.), with funds received by a State for fiscal year 2021, the Assistant Secretary for Aging may waive, but continue to make every effort practicable to encourage the restoration of, the applicable requirements for meals provided under such subparts comply with the requirements of clauses (i) and (ii) of section 339(2)(A) of such Act (42 U.S.C. 3030g–21(2)(A)).

<span style="float:right">Compliance.<br>42 USC 3030g–21 note.</span>

# Subtitle B—Agriculture

## CHAPTER 1—AGRICULTURAL PROGRAMS

### SEC. 751. OFFICE OF THE SECRETARY.

<span style="float:right">Payments.</span>

There is appropriated, out of any funds in the Treasury not otherwise appropriated, for an additional amount for the "Office of the Secretary", $11,187,500,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus by providing support for agricultural producers, growers, and processors impacted by coronavirus, including producers and growers of specialty crops, non-specialty crops, dairy, livestock, and poultry, producers that supply local food systems, including farmers markets, restaurants, and schools, and growers who produce livestock or poultry under a contract for another entity: *Provided*, That from the amounts provided in this section, the Secretary of Agriculture shall make supplemental payments to producers of price trigger crops for the 2020 crop year under section 9.202 of title 7, Code of Federal Regulations, on eligible acres of the crop, in an amount equal to $20 per eligible acre: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make supplemental payments to producers of flat-rate crops for the 2020 crop year under section 9.202 of title 7, Code of Federal Regulations, on eligible acres of the crop, in an amount equal to $20 per eligible acre: *Provided further*, That for the purposes of determining the amount of eligible sales under section 9.202(i) of title 7, Code of Federal Regulations, the Secretary of Agriculture shall also include indemnities received under crop insurance under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) and payments made or calculated under the noninsured crop disaster assistance program established by section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) and the wildfire and hurricane indemnity plus program under subpart O of part 760 of title 7, Code of Federal Regulations: *Provided further*, That for the purposes of determining the amount of eligible sales under section 9.202(i) of title 7, Code of Federal Regulations, the Secretary of Agriculture may allow producers to

<span style="float:right">Determination.</span>

<span style="float:right">Determination.</span>

134 STAT. 2106          PUBLIC LAW 116–260—DEC. 27, 2020

substitute 2018 sales for such commodities for 2019 sales: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make payments to producers of livestock or poultry (not including any packer (as defined in section 201 of the Packers and Stockyards Act, 1921 (7 U.S.C. 191)) or live poultry dealer (as defined in section 2(a) of that Act (7 U.S.C. 182(a)))) for losses of livestock or poultry depopulated before the date of enactment of this Act due to insufficient processing access, based on 80 percent of the fair market value of any livestock or poultry so depopulated, and for the cost of such depopulation (other than costs for which the producer has been compensated under the environmental quality incentives program under subchapter A of chapter 4 of subtitle D of title XII of the Food Security

Determination.    Act of 1985 (16 U.S.C. 3839aa et seq.)): *Provided further*, That in determining the cost of depopulation under the preceding proviso, the Secretary of Agriculture may take into consideration whether a producer has been compensated for the costs of such depopulation by any State program: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make payments to producers of cattle described in paragraphs (2), (3), and (4) of section 9.102(i) of title 7, Code of Federal Regulations, in an amount equal to the product obtained by multiplying the number of such cattle in inventory during the time period specified in paragraph (c)(2) of that section by 50 percent of the payment rate calculated by subtracting the applicable CCC payment rate specified in paragraph (h) of that section and the applicable payment rate specified in section 9.202(c) of that title from the applicable CARES Act payment rate specified in section 9.102(h) of that title: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall make payments to producers of cattle described in paragraphs (1) and (5) of section 9.102(i) of title 7, Code of Federal Regulations, in an amount equal to the product obtained by multiplying the number of such cattle in inventory during the time period specified in paragraph (c)(2) of that section by 25 percent of the payment rate calculated by subtracting the applicable CCC payment rate specified in paragraph (h) of that section and the applicable payment rate specified in section 9.202(c) of that title (if applicable) from the applicable CARES Act payment rate specified in section 9.102(h) of that title:

Determination.    *Provided further*, That from the amounts provided in this section,
Time period.    the Secretary of Agriculture shall use not more than $1,000,000,000 to make payments to contract growers of livestock and poultry to cover not more than 80 percent of revenue losses, as determined by the Secretary of Agriculture, for the period beginning on January 1, 2020, and ending on the date of enactment of this Act: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall use not less than $20,000,000 to improve and maintain animal disease prevention and response capacity:

Cotton.    *Provided further*, That from the amounts provided in this section,
Time periods.    the Secretary of Agriculture shall make payments to domestic users of upland cotton and extra-long staple cotton for the period beginning on March 1, 2020, and ending on December 31, 2020, in an amount equal to the product obtained by multiplying 10 by the product obtained by multiplying 6 cents per pound by the average monthly consumption of the domestic user for the period beginning on January 1, 2017, and ending on December 31, 2019:

Determination.    *Provided further*, That notwithstanding paragraph (e) of section

PUBLIC LAW 116–260—DEC. 27, 2020          134 STAT. 2107

9.7 of title 7, Code of Federal Regulations (or any successor regulation), and subject to the availability of funds, taking into account the requirements of the other provisos in this section, for purposes of providing assistance under subparts B and C of part 9 of that title, the Secretary of Agriculture shall make additional payments to ensure that such assistance more closely aligns with the calculated gross payment or revenue losses of any person or entity, except that such assistance shall not exceed the calculated gross payment or 80 percent of the loss, as determined by the Secretary of Agriculture, of any entity or persons, and that for the purposes of determining income derived from farming, ranching, and forestry under paragraph (d) of that section, the Secretary of Agriculture shall broadly consider income derived from agricultural sales (including gains), agricultural services, the sale of agricultural real estate, and prior year net operating loss carryforward as such income: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture may provide support to processors for losses of crops due to insufficient processing access: *Provided further*, That the Secretary of Agriculture may extend the term of a marketing assistance loan authorized by section 1201 of the Agricultural Act of 2014 (7 U.S.C. 9031), notwithstanding section 1203(b) of that Act (7 U.S.C. 9033(b)), for any loan commodity to 12 months: *Provided further*, That the authority provided by the previous proviso shall expire on September 30, 2021: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture shall use not less than $1,500,000,000 to purchase food and agricultural products, including seafood, to purchase and distribute agricultural products (including fresh produce, dairy, and meat products) to individuals in need, including through delivery to nonprofit organizations that can receive, store, and distribute food items, and for grants and loans to small or midsized food processors or distributors, seafood processing facilities and processing vessels, farmers markets, producers, or other organizations to respond to coronavirus, including for measures to protect workers against the Coronavirus Disease 2019 (COVID–19): *Provided further*, That not later than 30 days after the date of enactment of this Act and prior to issuing solicitations for contracts under the previous proviso, the Secretary of Agriculture shall conduct a preliminary review of actions necessary to improve COVID–19-related food purchasing, including reviewing coordination, specifications, quality, and fairness of purchases, including the distribution of purchased commodities, including the fairness of food distribution, such as whether rural communities received adequate support, the degree to which transportation costs were sufficient to reach all areas, whether food safety was adequate in the distribution of food, and the degree to which local purchases of food were made: *Provided further*, That from the amounts provided in this section, the Secretary of Agriculture may use not more than $200,000,000 to provide relief to timber harvesting and timber hauling businesses that have, as a result of the COVID–19 pandemic, experienced a loss of not less than 10 percent in gross revenue during the period beginning on January 1, 2020, and ending on December 1, 2020, as compared to the gross revenue of that timber harvesting or hauling business during the same period in 2019: *Provided further*, That in making direct support payments in this section, the Secretary of Agriculture may take into account price differentiation factors for each commodity based

Extension.
Time period.

Expiration date.

Deadline.
Review.

Time period.

Biofuels.

Loans.

on specialized varieties, local markets, and farm practices, such as certified organic farms (as defined in section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502)): *Provided further*, That using amounts provided in this section, the Secretary of Agriculture may make payments to producers of advanced biofuel, biomass-based diesel, cellulosic biofuel, conventional biofuel, or renewable fuel (as such terms are defined in section 211(o)(1) of the Clean Air Act (42 U.S.C. 7545(o)(1))) produced in the United States, for unexpected market losses as a result of COVID–19: *Provided further*, That the Secretary of Agriculture may make recourse loans available to dairy product processors, packagers, or merchandisers impacted by COVID–19: *Provided further*, That each reference in this section to a section or other provision of the Code of Federal Regulations shall be considered to be a reference to that section or other provision as in effect on the date of enactment of this Act.

## SEC. 752. SPECIALTY CROP BLOCK GRANTS.

Due to the impacts of COVID–19 on specialty crops, there is appropriated, out of any funds in the Treasury not otherwise appropriated, for Specialty Crop Block Grants under section 101 of the Specialty Crops Competitiveness Act of 2004 (7 U.S.C. 1621 note; Public Law 108–465), $100,000,000, to remain available until expended.

## SEC. 753. LOCAL AGRICULTURE MARKET PROGRAM.

Due to the impacts that COVID–19 has had on many local agriculture markets, there is appropriated, out of any funds in the Treasury not otherwise appropriated, for the Local Agriculture Market Program established under section 210A of the Agricultural Marketing Act of 1946 (7 U.S.C. 1627c), $100,000,000, to remain available until expended: *Provided*, That notwithstanding any other provision of law, the Secretary of Agriculture may reduce the amount of matching funds otherwise required under that section 210A to an amount not greater than 10 percent of the total amount of the Federal funds obligated under this section only during the public health emergency declared by the Secretary of Health and Human Services under section 319 of the Public Health Service Act (42 U.S.C. 247d) on January 31, 2020, with respect to COVID–19 (or any renewal of that declaration): *Provided further*, That such match may be an in-kind contribution.

## SEC. 754. FARMING OPPORTUNITIES TRAINING AND OUTREACH PROGRAM.

Due to the impacts of COVID–19 on certain producers, there is appropriated, out of any funds in the Treasury not otherwise appropriated, for the Farming Opportunities Training and Outreach Program under section 2501 of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279), $75,000,000, to remain available until expended: *Provided*, That notwithstanding any other provision of law, the Secretary of Agriculture may reduce the amount of matching funds otherwise required under that section 2501 to an amount not greater than 10 percent of the total amount of the Federal funds obligated under this section only during the public health emergency declared by the Secretary of Health and Human Services under section 319 of the Public Health Service Act (42 U.S.C. 247d) on January 31, 2020, with respect to COVID–19 (or any renewal of that declaration): *Provided further*, That

135 STAT. 356          PUBLIC LAW 117–43—SEPT. 30, 2021

TITLE I

DEPARTMENT OF AGRICULTURE

AGRICULTURAL PROGRAMS

PROCESSING, RESEARCH AND MARKETING

OFFICE OF THE SECRETARY

Determination.

For an additional amount for the "Office of the Secretary", $10,000,000,000, which shall remain available until December 31, 2023, for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021 under such terms and conditions as determined by the Secretary:

Grapes.
Determination.

*Provided*, That, with respect to smoke tainted wine grapes, the loss (including a quality loss) of such crop during the coverage period due to wildfire, as determined by the Secretary, is considered

Eligibility.

a qualified loss: *Provided further*, That losses due to drought shall only be eligible under this heading in this Act if any area within the county in which the loss occurs was rated by the U.S. Drought Monitor as having a D2 (Severe Drought) for eight consecutive weeks or a D3 (Extreme Drought) or higher level of drought inten-

Determination.

sity during the applicable calendar years: *Provided further*, That of the amounts provided under this heading in this Act, the Secretary shall use $750,000,000 to provide assistance to producers of livestock, as determined by the Secretary of Agriculture, for losses incurred during calendar year 2021 due to drought or

Payments.
Determination.

wildfires: *Provided further*, That at the election of a processor eligible for a loan under section 156 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7272) or a cooperative processor of dairy, the Secretary shall make payments for losses in 2021 to such processors (to be paid to producer members, as determined by such processors) in lieu of payments to producers and under the same terms and conditions as payments made to processors pursuant to title I of the Additional Supplemental Appropriations for Disaster Relief Act, 2019 (Public Law 116–20) under the heading "Department of Agriculture—Agricultural Programs—Processing, Research and Marketing—Office of the Secretary", as last amended by section 791(c) of title VII of division B of the Further Consolidated Appropriations Act, 2020 (Public Law 116–

Payments.

94): *Provided further*, That notwithstanding section 760.1503(j) of title 7 of the Code of Federal Regulations, in the event that a processor described in the preceding proviso does not elect to receive payments under such clause, the Secretary shall make direct payments to producers under this heading in this Act: *Provided further*, That of the amounts provided under this heading in this Act, not more than one percent of the funds provided herein may be used for administrative costs, including for streamlining the application process and easing the burden on county office employees, to carry out the matter under this heading in this Act: *Provided further*, That, except as otherwise provided under this heading

PUBLIC  LAW  117–43—SEPT. 30, 2021          135 STAT. 357

in this Act, the Secretary shall impose payment limitations  consistent with  section 760.1507 of title  7, Code of Federal Regulations (as in effect on the date of enactment of this Act): *Provided further* , That, in the case of specialty crops or high value crops, as determined by the Secretary, the Secretary shall impose payment limitations consistent with  section 760.1507(a)(2) of title  7, Code of Federal Regulations (as in effect on January  1, 2019): *Provided further* , That, with respect to the payment limitations  described under this heading in this Act, the Secretary shall apply separate payment limits  for each of 2020 and 2021: *Provided further* , That the total amount of payments received under this heading in this Act and applicable policies of crop insurance under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) or the Noninsured  Crop Disaster Assistance Program (NAP) under section 196 of the Federal Agriculture  Improvement  and Reform Act of 1996 (7 U.S.C. 7333) (minus any premiums  or fees paid for  such coverages) shall  not exceed 90 percent of the loss as determined  by the Secretary: *Provided further* , That the total amount of payments received under this heading in this Act for producers who did  not obtain a policy or plan of insurance for an insurable  commodity for the applicable crop year under the Federal  Crop Insurance Act (7 U.S.C. 1501 et seq.) for the crop incurring  the losses or did not file the required paperwork  and pay the service fee by the applicable State filing deadline for a noninsurable  commodity for the applicable  crop year under NAP for the crop incurring  the losses shall  not exceed 70 percent of the loss as determined  by the Secretary: *Provided further* , That producers receiving payments under this heading in this Act, as determined  by the Secretary, shall  be required  to purchase crop insurance where crop insurance is available for the next two available  crop years and producers receiving payments under this heading in this  Act shall  be required  to purchase coverage under NAP where crop insurance is not available  in the next two available crop years, as determined  by the Secretary: *Provided further* , That not later  than  120 days after  the end  of fiscal year 2021, the Secretary  shall submit  a report to the Congress specifying the type, amount,  and method of such assistance by state and territory.

*Determination.*

*Applicability.*

*Determination.*

*Determination.*

*Determinations.*
*Requirement.*
*Time period.*

*Reports.*

FARM  PRODUCTION  AND  CONSERVATION  PROGRAMS

NATURAL  RESOURCES  CONSERVATION  SERVICE

WATERSHED   AND  FLOOD  PREVENTION   OPERATIONS

For an additional  amount for "Watershed and Flood Prevention Operations" for necessary expenses for the Emergency Watershed Protection  Program,  $275,000,000,  to remain  available  until expended, which shall  be in addition  to amounts otherwise available for such purposes.

PUBLIC LAW 117–328—DEC. 29, 2022          136 STAT. 5201

## TITLE VIII

## GENERAL PROVISIONS—THIS ACT

Sec. 1801. Funds appropriated by this Act for intelligence or intelligence related activities are deemed to be specifically authorized by the Congress for purposes of section 504(a)(1) of the National Security Act of 1947 (50 U.S.C. 3094(a)(1)).

Sec. 1802. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

Sec. 1803. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

Sec. 1804. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2023.

Sec. 1805. Each amount provided by this division is designated by the Congress as being for an emergency requirement pursuant to section 4001(a)(1) of S. Con. Res. 14 (117th Congress), the concurrent resolution on the budget for fiscal year 2022, and section 1(e) of H. Res. 1151 (117th Congress), as engrossed in the House of Representatives on June 8, 2022.

This division may be cited as the "Additional Ukraine Supplemental Appropriations Act, 2023".

## DIVISION N—DISASTER RELIEF SUPPLEMENTAL APPROPRIATIONS ACT, 2023

Disaster Relief Supplemental Appropriations Act, 2023.

## TITLE I

### DEPARTMENT OF AGRICULTURE

### AGRICULTURAL PROGRAMS

#### PROCESSING, RESEARCH AND MARKETING

##### OFFICE OF THE SECRETARY

For an additional amount for "Office of the Secretary", $3,741,715,000, to remain available until expended, for necessary expenses related to losses of revenue, quality or production losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2022, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze, including a polar vortex, smoke exposure, and excessive moisture occurring in calendar year 2022 under such terms and conditions as determined by the Secretary: *Provided,* That of the amounts provided under this heading in this Act, the Secretary shall use up to $494,500,000 to provide assistance to producers of livestock, as determined by the Secretary of Agriculture, for losses incurred during calendar year 2022 due to drought or wildfires: *Provided further,* That the amount provided under this heading in this Act shall be subject to the terms and conditions set forth in the first, second, and fourth through twelfth

Determination.

Determination.

136 STAT. 5202          PUBLIC LAW 117–328—DEC. 29, 2022

provisos under this heading in title I of the Disaster Relief Supplemental Appropriations Act, 2022 (division B of Public Law 117–43), except that each reference to 2020 or 2021 in such provisos in such Act shall be deemed to be a reference instead to 2022.

### AGRICULTURAL RESEARCH SERVICE

#### BUILDINGS AND FACILITIES

For an additional amount for "Buildings and Facilities", $58,000,000, to remain available until expended.

#### FOOD SAFETY AND INSPECTION SERVICE

For an additional amount for "Food Safety and Inspection Service", $29,700,000, to remain available until expended.

### FARM PRODUCTION AND CONSERVATION PROGRAMS

#### FARM SERVICE AGENCY

##### EMERGENCY FOREST RESTORATION PROGRAM

For an additional amount for "Emergency Forest Restoration Program", $27,000,000, to remain available until expended.

#### NATURAL RESOURCES CONSERVATION SERVICE

##### WATERSHED AND FLOOD PREVENTION OPERATIONS

For an additional amount for "Watershed and Flood Prevention Operations" for necessary expenses for the Emergency Watershed Protection Program, $925,000,000, to remain available until expended.

### RURAL DEVELOPMENT PROGRAMS

#### RURAL HOUSING SERVICE

##### RURAL HOUSING ASSISTANCE GRANTS

For an additional amount for "Rural Housing Assistance Grants", $60,000,000, to remain available until expended, for necessary expenses related to homes damaged by Presidentially declared disasters in calendar year 2022: *Provided,* That 42 U.S.C. 1471(b)(3) shall not apply: *Provided further,* That the income limit shall be capped at 80 percent of the area median income: *Provided further,* That, notwithstanding section 1490m(c)(2) of such title, a grant made under 42 U.S.C. 1490m of such title using funds made available under this heading in this Act, may not exceed $50,000.

##### RURAL COMMUNITY FACILITIES PROGRAM ACCOUNT

For an additional amount for "Rural Community Facilities Program Account", $75,300,000, to remain available until expended: *Provided,* That of the amounts provided under this heading in this Act, $50,000,000 shall be for necessary expenses for grants to repair essential community facilities damaged by Presidentially

PUBLIC LAW 117–328—DEC. 29, 2022          136 STAT. 5203

declared disasters in calendar year 2022: *Provided further,* That the percentage of the cost of the facility that may be covered by a grant pursuant to the preceding proviso shall be 75 percent.

RURAL UTILITIES SERVICE

RURAL WATER AND WASTE DISPOSAL PROGRAM ACCOUNT

For an additional amount for "Rural Water and Waste Disposal Program Account", $325,000,000, to remain available until expended: *Provided,* That of the amounts provided under this heading in this Act, $265,000,000 shall be for necessary expenses related to water systems damaged by Presidentially declared disasters in calendar year 2022: *Provided further,* That, notwithstanding section 343(a)(13)(B) of the Consolidated Farm and Rural Development Act, a grant using funds made available pursuant to the preceding proviso may not be awarded to a community with a population of more than 35,000 people: *Provided further,* That not to exceed $8,000,000 of the amount made available pursuant to the first proviso shall be for technical assistance grants for rural water and waste systems pursuant to section 306(a)(22) of the Consolidated Farm and Rural Development Act.

GENERAL PROVISIONS—THIS TITLE

SEC. 2101. In addition to other funds available for such purposes, not more than three percent of the amounts provided in each account under the "Rural Development Programs" heading in this title shall be paid to the appropriation for "Rural Development, Salaries and Expenses" for administrative costs to carry out the emergency rural development programs in this title.

SEC. 2102. For necessary expenses for salary and related costs associated with Agriculture Quarantine and Inspection Services activities pursuant to 21 U.S.C. 136a(6), and in addition to any other funds made available for this purpose, there is appropriated, out of any money in the Treasury not otherwise appropriated, $125,000,000, to remain available until September 30, 2024, to offset the loss of quarantine and inspection fees collected pursuant to sections 2508 and 2509 of the Food, Agriculture, Conservation, and Trade Act of 1990 (21 U.S.C. 136, 136a): *Provided,* That amounts made available in this section shall be treated as funds collected by fees authorized under sections 2508 and 2509 of the Food, Agriculture, Conservation, and Trade Act of 1990 (21 U.S.C. 136, 136a) for purposes of section 421(f) of the Homeland Security Act of 2002 (6 U.S.C. 231(f)).

TITLE II

DEPARTMENT OF COMMERCE

ECONOMIC DEVELOPMENT ADMINISTRATION

ECONOMIC DEVELOPMENT ASSISTANCE PROGRAMS

(INCLUDING TRANSFERS OF FUNDS)

Pursuant to section 703 of the Public Works and Economic Development Act (42 U.S.C. 3233), for an additional amount for



# Millions of Dollars Heading to Farmers, but Small Farms Won't See Much of it

Advocates say young and disadvantaged farmers won't benefit from the latest stimulus funds, and nor do those selling directly to consumers.

BY GOSIA WOZNIACKA      JUNE 1, 2020



APP. 000655

Case 2:24-cv-00060-Z　Document 83-2　Filed 07/23/24　Page 156 of 200　PageID 3691

On a recent weekday afternoon, Marsha Habib was delivering more than 100 boxes of produce to Bay Area customers in her Chevy pickup. The young farmer was exhausted from lack of sleep and disheartened about not being able to harvest a large field of lettuce that she had grown for Stanford University dining halls now shuttered by the pandemic.

"We were planning to move pallets of lettuce. We can only put so many in our CSA boxes," Habib said. "We've put so much work into these crops. . . . To see them come to harvest and not be able to pick them, it's a bummer."

Habib, who runs the 20-acre Hollister-based farm, Oya Organics, has lost most of her sales to restaurants and campus dining services, and several farmers' markets. Instead, practically overnight, and lacking any prior know-how, she has created a community supported agriculture (CSA) subscription to move some of her produce to new customers.

With no online ordering platform, no refrigerated truck, and no one to care for her two school-age children, Habib said she and seven other employees are working non-stop to keep the operation afloat. "We're just scraping by, trying to make it work," the 38-year-old told Civil Eats.

Like many other farmers, Habib probably won't benefit from the billions of dollars in aid earmarked to help struggling U.S. farmers survive the crisis. Last week, the signature piece of the farmer bailout program, the Coronavirus Food Assistance Program (CFAP), opened for applications. It largely leaves out farmers like Habib, or those who rely on direct-to-consumer sales and wholesale accounts.

Although tens of millions have been designated to help farmers survive the pandemic, most small, sustainable growers, including young and minority farmers and ranchers, will likely be left to fend for themselves.

"It seems like anything that comes from the government is geared to large commodity farmers."

APP. 000656

"We could definitely use the financial help to be able to continue operations," said Habib. "But it seems like anything that comes from the government is geared to large commodity farmers."

## 'A Lot of Hurt'

Over the past two months, farmers large and small have faced difficult choices.

The virus has forced producers to plow ripe vegetables under or let them rot in the fields, abort baby pigs, euthanize chickens, hogs, and cattle, and dump milk. According to a Congressional Research Service report, COVID-related losses for agriculture approached $40 billion as of early May. Local and regional farmers, in particular, have seen significant disruptions. The National Sustainable Agriculture Coalition estimates a loss of up to $1.32 billion from lost local and regional sales from March to May 2020.

While some small farms have been able to transform their business models or ramp up sales through CSAs (which have, in some cases, doubled or tripled their memberships), not everyone has been able to pivot successfully, said Rachel Armstrong, the founder and executive director of Farm Commons, a national group that provides legal resources for farmers.

"We're seeing a lot of hurt, even from folks facing a surge in demand," she said.

The sudden shift was only feasible to farmers with existing CSA programs or those with the resources and know-how to create one quickly, Armstrong said. Many farmers also had already planted their spring crops by the time the pandemic hit, making it impossible to shift to the type or volume of crops required by CSA subscribers.

Some farmers also couldn't find enough workers as farmworkers tested positive for COVID-19 or opted to shelter in place and receive unemployment. Others lost off-farm jobs, which are critical for providing health insurance, and income—especially for new and young farmers who

APP. 000657

don't make a profit on the farm for the first few years, Armstrong said. And many had to take care of out-of-school children. Even those with the capacity to pivot incurred new costs, she said, including added transportation, product packaging, marketing, and online sales costs.

## Direct Payments Going to Agribusinesses

The federal government has rolled out several programs aimed at helping farmers—including loans and direct payments—through the stimulus package. CFAP is geared to farmers who have suffered a 5 percent or greater price loss due to the pandemic. The American Farm Bureau Federation, which lobbies for large agribusinesses, has praised the program.

But while language in the CARES Act specifically includes "producers that supply local food systems, including farmers' markets, restaurants, and schools," critics say those producers are largely left out. Instead, the bulk of the $16 billion in direct payments will go to the biggest producers, especially those growing commodity crops, because of the way program rules are structured.

Since it's a "first come, first served" program, with no set-asides for smaller operations, large farmers with a simple production system (such as thousands of acres of corn) will have an easier time applying, said Eric Deeble, policy director at the National Sustainable Agriculture Coalition (NSAC). Smaller, diversified farm which sell through many channels will need to gather extensive documentation across multiple markets and products, he said. Most small-scale farmers are also unfamiliar with USDA programs, adding another layer of difficulty.

Most concerning is the fact that the aid program doesn't account for the higher value of direct to consumer sales, Deeble said. CFAP does not reimburse for a farmer's lost revenue; instead, it pays for lost sales volumes and price declines, and makes the calculation based on USDA's wholesale commodity prices.

APP. 000658

While CFAP's payment structure is complicated, a farmer who typically sells organic strawberries for $5 a pound would be reimbursed at less than a dollar through CFAP. In addition, the CFAP aid program doesn't account for the costs of labor, CSA delivery boxes, pandemic-related hygiene, or transportation, Deeble said. And poultry growers and some specialty crops popular at farmers' markets, such as kale or arugula, are entirely excluded because the government says they did not suffer a 5 percent-or-greater price decline. "The more diversified, the more direct in sales, the more a farmer gets higher premiums on their goods, the smaller their [CFAP] payments," he said.

Just as the trade war bailout for farmers did last year, the CFAP program has also raised payment caps beyond those established by Congress and the USDA for farm aid programs; groups representing livestock producers and produce growers pushed for eliminating such payment limits altogether. While there is a $250,000 payment cap per person or entity, some large operations may qualify for up to $750,000. And if they're structured as a general partnership, "the sky is the limit," Deeble said.

That's because a loophole in farm subsidy policy permits general partnerships to claim larger payments. CFAP also expands who may be eligible for a payment, allowing those earning more than $900,000 to qualify for aid as long as more than 75 percent of the person's income comes from farming, ranching, or forestry.

"At every level, this program is going to help the biggest farmers, with the fewest crops and the most sophisticated management structures," Deeble said. "I'm not saying big farms didn't get hurt . . . they did, and every farmer that's been harmed deserves compensation. It's just that the larger ones will claim the maximum amount of payments, leaving out smaller farmers."

## Small-Scale, Underserved Farmers Left Behind

Sophie Ackoff, co-executive director of the National Young Farmers Coalition, is concerned about the lack of funds designated for disadvantaged farmers, including young producers and farmers of color.

APP. 000659

Many disadvantaged farmers tend to mistrust the USDA due to a legacy of discrimination, said Ackoff. Others may not be familiar with the agency's programs, and many face language barriers or other limitations.

In a statement to Civil Eats, a USDA spokesperson said the CFAP program is open to all types of producers and farms and "treats both diversified and specialized farms equitably." Because of limited funding and extensive pandemic impacts to farmers, the agency said it was "unable to accommodate the plethora of market differentiation and instead relied on average national-level impacts to allocate a budget-limited assistance program to a much larger universe of economic damages."

APP. 000660

Marsha Habib tending crops in the field.

The agency said local Farm Service Agency offices will conduct outreach to underserved farmers by working closely with specialty crop partner organizations, local governments, community-based organizations, and other groups.

APP. 000661

But Ackoff said that's not enough. Many small, diversified growers and young producers simply have no time to figure out the complex process of applying for aid because they're too busy trying to save their farms in other ways.

"These farmers are working their butts off," Ackoff said. "Like nurses in emergency rooms, they're working 100 percent of daylight hours figuring out how to pivot to online sales, do doorstep deliveries, and put safety protocols in place. And the opportunity to support them has been lost."

That's the case for Habib, who said she has heard of the farmer bailout program, but has had no time to read through the rules or apply. She's been too busy managing CSA orders over the phone and email, making deliveries, ordering supplies, and taking care of her children.

"These farmers are working their butts off . . . working 100 percent of daylight hours figuring out how to pivot to online sales, do doorstep deliveries, and put safety protocols in place."

And if she did apply, Habib would need to spend a lot of time gathering documentation, given the fact that Oya Organics rotates between 50 annual crops. She suspects she wouldn't get much in aid anyway, since the program won't take into account the loss of her organic premiums and some crops aren't eligible for compensation.

But the young farmer's biggest worry is for the future. She said many crops would have to rot in the fields, given that a large percent had been planted for local restaurants and Stanford University's dining services.

She fears most of the new customers will leave once shelter-in-place orders are lifted, while wholesale customers won't return. "We've done all this work to create this program and I don't know if it's going to last," Habib said.

APP. 000662

Ackoff with the National Young Farmers Coalition worries that many small-scale farmers like Habib are working on overdrive, nearing a breaking point. "The harvest season has not yet begun in full," she said, "and there's the question of how long they can work at this capacity, not making more money but providing more service and being exhausted by the end of the day." A new bill might help. The Food Supply Protection Act, introduced by Debbie Stabenow (D-Michigan) last week, would help small and medium-sized farms retool their operations so as to better cater to new markets, including upgrading machinery, adding temporary cold storage, purchasing personal protective equipment and test kits, and cleaning. It would also support new partnerships to make purchases of excess food from farmers and increase donations to food banks, schools, nonprofits. But it's unclear whether the bill will move forward.

## Loan Programs a Mixed Bag

In addition to direct payments, farmers are also now eligible to apply for small business loans, including the Paycheck Protection Program (PPP) and the COVID-19 Economic Injury Disaster Loan (EIDL). But critics say the loan programs have not, thus far, been efficiently getting to farms.

The EIDL, a Small Business Administration program, was not initially available to farmers, but agricultural businesses became expressly eligible at the end of April. The "first come, first served" program offers loans with relaxed eligibility rules, as well as $10,000 loan advances that won't need to be repaid.

Since EIDL has only been open to farmers for a few weeks, its impacts are unclear. But experts say small farmers may be uncomfortable borrowing money. "Many farmers are not interested in loans, even on favorable terms, because they're not sure when the revenue will kick back in, and whether it will ever kick back in," said Armstrong with Farm Commons.

The PPP program, on the other hand, has seen some limited success among farmers. It covers up to eight weeks of payroll costs, including benefits, as well as other non-payroll expenses and can be forgiven as long as the business continues to employ workers. The program became

mired in controversy after some of the loans went to large companies (a few later vowed to return them), and a current lawsuit accuses the country's largest banks of prioritizing large borrowers over smaller businesses.

While the first round of PPP funding ran out in mid-April, Congress has approved a second round. Farms that have year-round workers are most likely to benefit, while those that hire seasonal workers or foreign guest workers on H-2A visas might not have enough labor costs to allow for the loan forgiveness. Also, farmers who have no employees and showed zero or negative income in 2019 are not eligible to apply.

"A lot of farms out there don't make a profit and aren't eligible, even though they did a lot work last year," Deeble said.

Jill Giacomini, co-owner of Point Reyes Farmstead Cheese Company in Northern California's Marin County, was lucky to secure a PPP loan. The company, which had 108 full- and part-time employees and more than 430 cows before the pandemic, produces aged cheese on the farm. It also makes pasteurized cheese from local farmers' milk at a second production facility in Petaluma. Before the pandemic, Giacomini said, the cheese was sold online, at three local farmers' markets, and to fine dining restaurants and institutions. The farm had also recently started exporting its cheeses to Canada, Asia, and Mexico.

When the virus hit, "we saw all of our food service business come to a screeching halt," Giacomini said. Nearly half of the company's sales were wiped out. Because it had a lot of cheese no one was buying, the farm immediately cut back on production. It laid off 22 employees, reduced shifts and salaries, and stopped buying milk from other farms. But its own cows were still producing more milk than they could use and were costly to feed, so the family sold over 70 animals.

"That was really heartbreaking," Giacomini said. "There is no market for these animals right now. They were healthy, viable, producing cows . . . and they were sold for beef."

The Paycheck Protection loan wasn't easy to secure, she added. The farm applied to four different banks before it was accepted. While the loan paid for employee salaries, allowing the farm to rehire laid-off staff, Giacomini worries the relief is temporary and she'll have to lay people off again after the eight weeks.

To help move excess cheese, the company has sold it to California food banks through a federal program. It also donates cheese to food banks in its own community. In recent weeks, another silver lining has emerged: online and farmers' market sales have grown exponentially, Giacomini said. The farm has increased its social media marketing and is about to launch a Zoom tasting series in the hopes of creating and retaining this new customer base—a move that could be key to securing the farm's survival.

"The way we work, travel for work, entertain for work, and spend money outside of work has changed," Giacomini said. "I question whether our old customers are coming back in a year, in two, or are they ever coming back?"



Gosia Wozniacka is a senior reporter at Civil Eats. A multilingual journalist with more than fifteen years of experience, Gosia is currently based in Oregon. Wozniacka worked for five years as a staff reporter for The Associated Press in Fresno, California, and then in Portland, Oregon. She wrote extensively about agriculture, water, and other environmental issues, farmworkers and immigration policy. Email her at gosia (at) civileats.com and follow her on Twitter @GosiaWozniacka. Read more >

**News**Room

7/16/20 WashingtonPost.com (Pg. Unavail. Online)
2020 WLNR 19845311

WashingtonPost.com
Copyright (c) 2020 The Washington Post

July 16, 2020

Section: /business

Young farmers and farmers of color have been shut out of federal assistance during the pandemic

Laura Reiley

Talk to young farmers and one verb comes up repeatedly.

Pivot.

They have all had to pivot and then do it again as the coronavirus pandemic has decimated their customer bases and traditional supply chains.

Kate Edwards, 33, is entering her 10th year of farming in Solon, Iowa, north of Iowa City. She started with one acre and 11 customers for her community-supported agriculture (CSA) farm. Now, after retrofitting a 100-year-old farm to accommodate 30 varieties of vegetables, she has 250 customers and works 10 acres.

She says she has incurred at least $15,000 in additional expenses due to the pandemic, including laying a new $10,000 driveway to allow customers to drive up to her farm. She has spent an extra $1,000 for single-use paper bags, something in short supply these days. She has hired extra people to help pack bags: Where she used to spread her produce out buffet-style so customers could pick their own zucchinis and leafy greens, she now must box it all up for them to maintain social distancing. And she has had to rethink family finances after her husband lost his engineering job because of the economic downturn.

The pandemic has changed nearly everything about her business, and she says there has been little help from the federal government.

"Early on we started realizing that this wasn't going away very quick and we had to make decisions on how to deliver our product," Edwards says. "I haven't been able to access the Coronavirus Food Assistance Program because it's not set up for diversified farmers; it's oriented toward commodity farmers and it doesn't have a system set up for CSAs in terms of how to report."

Across the country, young farmers, first-generation farmers and farmers of color say they have been left out of coronavirus relief for the agricultural industry, because of the federal government's one-size-fits-all approach.

The oversight, which they say has left them on wobbly financial footing, threatens to cut off a promising growth area of small-scale farms and younger farmers against a wider backdrop of consolidation and aging of American agriculture.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    1

The U.S. Agriculture Department's most recent five-year census, released last year, found a surge in the number of farms under nine acres, which increased by about 22 percent from 2012 to 2017, as well as farmers and ranchers below the age of 35, whose numbers increased roughly 11 percent to about 285,000. (They're thoroughly outnumbered by the 396,000 producers age 75 and older, however.)

In May, the USDA unveiled the $19 billion Coronavirus Food Assistance Program (CFAP), greenlighting direct payments largely to row-crop farmers and ranchers. Many who farm specialty crops — the fruits and vegetables that humans eat — were left out of that initial relief effort. On July 9, the USDA opened up eligibility for 40 more fruits and vegetables, adding a whole produce aisle of specialty crops that would be considered for farm aid including alfalfa sprouts, guava and greens, both collard and dandelion.

But because of how and what young farmers, first-generation farmers and farmers of color produce, it has not been easy for them to apply for CFAP assistance, or loans from the Paycheck Protection Program and Economic Injury Disaster Loan Program.

Many small farms are owner-operated, with very few employees, especially during the growing season before harvest. Under the PPP program, 60 percent of these loans must be spent on payroll (initially it was even higher, at 75 percent), and those employees must be retained to be eligible for loan forgiveness. The Economic Injury Disaster Loan Program, which awards loans up to $10,000, is also based on number of employees.

"I did get PPP, a few thousand dollars," says Edwards. "The amount of money we got is helpful, but I'm not sure if it will be forgiven. We started in March, but my payroll doesn't start until May. If I could have used summer income figures, when I employ more people, I could have gotten a lot more."

During the offseason and planting season she operates largely on her own, adding more workers during harvest and to service her CSA during summer months.

Because of the high cost of land and daunting upfront costs associated with beginning a farm business, many new farmers start with small plots of land and try to grow a diverse array of high-value crops such as heirloom tomatoes and herbs to mitigate risk and maximize potential profits.

Many young and first-generation farmers sell directly to institutions like restaurants or schools, or direct to consumers at farmers markets, farm stands or via CSA models where consumers buy shares of a farm's harvest in advance.

As restaurants and schools closed this spring, orders fell to zero. Farmers markets pushed off opening, opened with limited hours or had a diminished number of vendors, and customers were scant due to fears about social distancing.

In short, their markets dried up.

The National Young Farmers Coalition, an advocacy network that represents young farmers, has lobbied the USDA to add new categories of relief to make more funds available for small-scale producers, especially beginning farmers and farmers of color.

The National Sustainable Agriculture Coalition, an industry group, in March projected a decline in farm product sales of more than $680 million between March and May at farmers markets, restaurants, food hubs and other venues.

The group estimates that local and regional food markets will lose $1 billion in sales by the end of the year due to the pandemic, even as grocery store sales swell because of more people cooking and eating at home.

The CFAP program compensates large-scale and commodity farmers for lost crops, but doesn't address local and regional markets drying up for small farmers. The National Young Farmers Coalition estimates that three-quarters of its members have experienced lost sales due to reduced outlets to sell their products.

The USDA's Farm Service Agency added missing commodities to its list and adjusted some prices, says Sophie Ackoff, the National Young Farmers Coalition's co-executive director, but because the program still bases compensation on wholesale commodity prices, and requires crop-by-crop reporting of losses, that doesn't work for many young farmers, who depend on commanding premium prices for their crops and growing a wide range of items.

Depending on the crop and loss type, payment rates ranged from $0.01 per pound for dry onions to $1.45 per pound for raspberries — prices that don't take into consideration premiums paid for local, organic and heirloom fruits and vegetables.

"One of the potato farmers in our network lost a $20,000 contract," Ackoff says. "The CFAP payment would have been $800. So many small farmers are looking at the price points and just laughing."

Bathazar, 39, and Chaparitta, 35 (originally from Guadalajara, Mexico, they spoke on the condition that their last names be omitted due to their immigration status), launched their organic farm last year on 1½ acres of rented land at the edge of Salinas, Calif., with a $5,000 loan from a local nonprofit.

Chaparitta lost her off-farm job as a housekeeper because of the pandemic, and Bathazar says it is hard finding buyers for their celery, green beans, sweet peas, beets and carrots.

"The majority of our fresh vegetables we sold straight to customers," he said by phone via an interpreter. "This year people don't want to spend too much money, they don't want to get close to us, so everything isn't getting sold. Some of the markets don't want us there and other markets are closed or are only open for a few hours. Last year we sold everything in Salinas; now we have to go outside of Salinas to look for different places to sell."

Because they are undocumented, the couple are ineligible for CFAP money for a PPP loan.

Because they don't grow crops in quantities sufficient to entice grocery stores, many young farmers have turned to online sales, hustling to launch websites and apps, thus adding to their daily workloads.

"It takes time to set up websites and keep them up to date in the middle of planting season. These farmers are innovative and entrepreneurial, but they are working 24/7 and are so exhausted," Ackoff says.

Roberto Meza, a 32-year-old former graduate student at MIT, farms in Bennett, Colo. He says young farmers often struggle with student debt and often have no way to access land. He and his partner grow microgreens in greenhouses.

"It was already a rough year before covid-19 hit because Lucky's, our main grocery store, went bankrupt at the beginning of the year," he says. "Fifty percent of our business was grocery stores, 35 percent was food service and the rest was direct to consumers. We pivoted, doubled down and streamlined to create a CSA food bundle farm box to recuperate lost sales."

He says he's incurred $15,000 in additional costs, but has applied to supply items for the food assistance program SNAP (commonly called food stamps).

Even as he's struggled, Meza doesn't think the pandemic has been universally bad for young farmers.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.         3

"The pandemic has been a great teacher," he says. "It has illuminated what is wrong with the current paradigm; the inconsistencies are laid bare and we can see where we need to redirect resources. People want to pay attention to where their food comes from — they don't take it for granted anymore."

And, he says, because the average age of American farmers is approaching 60, according to the USDA, creating viable market opportunities for beginning farmers, young farmers and farmers of color is imperative to maintain the country's future food supply.

**---- Index References ----**

Industry: (Agricultural Crops (1AG44); Agriculture (1AG63); Agriculture, Food & Beverage (1AG53); Food & Beverage Production (1FO79); Organic Farming (1OR41); Organic Foods (1OR43); Specialty Foods (1SP29))

Region: (Americas (1AM92); California (1CA98); Iowa (1IO85); North America (1NO39); U.S. Midwest Region (1MI19); U.S. West Region (1WE46); USA (1US73))

Language: EN

Word Count: 1602

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.



Case 2:24-cv-00060-Z Document 30-2 Filed 07/25/24 Page 170 of 200 PageID 3005

## The Counter

# A few farmers get huge USDA relief payments while many struggle for pennies

by H. Claire Brown

07.30.2020, 10:59am

Business

Share

Save for later



iStock / JJ Gouin

## "The fall is going to be an apocalypse for small farms."

When the coronavirus pandemic shuttered schools, restaurants, and many distributors in March, the disruption dealt a huge blow to farmers, who lost contracts overnight and were forced to let produce rot in the field. As part of its first round of Covid-19 relief funding, Congress allocated funding for agriculture through the Coronavirus Food Assistance Program (CFAP), which is set to pay out $16 billion in direct payments to growers on top of standard farm subsidies. The money was earmarked for farmers and livestock producers who had suffered income losses due to Covid-19, but beyond that, Congress left much of the program design up to the Department of Agriculture (USDA). By this week, the agency had distributed $6.5 billion across the ag industry, and the largest proportion of the money had gone to cattle, milk, corn, and hog producers. Democrats and Republicans both appear prepared to allocate billions ~~ollars~~ for direct payments to farmers in a new coronavirus relief package.

APP. 000670

pay these people. And here's a big pile of money to go do it," says Eric Deeble, policy director for the National Sustainable Agriculture Coalition. Income limits for individuals are capped at $900,000, but the cap disappears if most of that income comes from farming. The payments themselves are capped at $250,000 per individual, or $750,000 for farms owned by corporations.

An analysis by The Counter of payments made from late May to late June by the USDA's Farm Service Agency—the office that administers the direct payment program—found that at least five farms collected single payments of significantly more than $750,000. The highest payment—for $1.4 million—went to Titan Swine, which also received two additional CFAP checks totaling an additional $1.1 million on the same day.

> # While a handful of farmers received hundreds of thousands of dollars, more than 300 received less than $10.

The Counter also found 13 instances in which multiple entities registered to the same business address received payments totaling more than $1 million, indicating that farms who share stakeholders or fall under the same umbrella organization may be receiving multiple payments. Many were also receiving loans from the Payroll Protection Program, meaning they were able to take advantage of multiple federal income-support programs. In one example, five dairies registered to the same P.O. box in a rural Georgia town received direct payments totaling $1.57 million from CFAP, as well as three Payroll Protection Program loans. Similarly, four dairies registered to the business address of Hollandia Farms in Hanford, California, received a total of $1.57 million over a nine-day period. The Hanford address was also linked to six PPP loans, totaling between $1.5-$4.5 million, all from the same bank and disbursed over a four-day stretch in April.

The disclosure underscores one of the persistent inequities of the Covid-19 business relief programs: There is money available, but it often privileges businesses with savvy accountants before it helps those with fewer resources, like young farmers (and restaurant owners, and Main Street shops, and street vendors). It's not technically illegal to collect payments higher than the $750,000 maximum—USDA allows farms with multiple owner-operators to collect maximum payments for each partner. But critics say astronomically high payments violate the intent of the program, and that CFAP's inequalities are further exacerbated by the program's design, which bases payment levels on production volume instead of annual income and allows farmers earning millions of dollars in personal income to claim maximum payments. While a handful of farmers received hundreds of thousands of dollars, more than 300 received less than $10. Many more have not benefited from the program at all.

[*Subscribe to our 2x-weekly newsletter and never miss a story.*]

"We do know that most of the money does go to wealthy large farms because that's how the programs are all designed. They're all based on acreage or production. So the more that you produce, the larger the farm you are and the more money you're going to be getting in subsidies," says Anne Schechinger, senior economic analyst at the Environmental Working Group.

> # "We do know that most of the money does go to wealthy large farms because that's how the programs are all designed."

The Coronavirus Food Assistance Program compensates farmers based on a complex formula that calculates lost income based on calculated futures, price declines, and unsold inventory. That means a tomato farmer would be compensated at a rate of $0.64 per pound for sales losses, or, alternatively, of $0.38 per pound for tomatoes that were picked but spoiled because of supply chain disruptions. Under these rules, an heirloom tomato that would normally fetch $4 per pound at the farmers' market is worth the same amount as a commodity tomato grown for a can of Campbell's.

rate can seem comically wide. To make matters worse, farmers growing relatively small amounts of several crops using complicated rotation schedules face a far more burdensome application process because they have to tally losses for more complicated farm layouts. "It doesn't work well for diversified farmers and it doesn't work well for small- and mid-sized farms," Deeble says. "It does not live up to its congressional intent."

Even some farmers who received hefty payments through CFAP say they're barely making ends meet. Dale Springer, owner of Twin Valley Enterprises and SKC Valley Farms in Independence, Kansas, was one of the producers whose business address registered more than $1 million in payments. He says the largest of those payments—to Springer Family Foods, for about $265,000—was for a hog operation he shares with his brother, nephew, and daughter. (Springer added that his daughter and nephew filled out the paperwork for all the family's CFAP payments, hence the matching address.)

> ## "Why would somebody who makes almost a million dollars a year need government subsidies?"

The Springers' hog business, which typically moves nine or 10 semi-trailer loads containing up to 170 pigs each week, went from breaking even to losing $35 per head before they received their payment, he said. "I hate to say this, but if the family farm like we've got does not get another round of payments, I'm afraid we're going to have to close our swine unit, and there's 30-some people employed that won't have a job," he said. (Springer Family Farms also received a Payroll Protection Program loan worth $150,000 to $350,000, according to government records, to offset payroll costs.) "I've been in the swine business on my own since 1980, and I have never seen it so bad. I have never seen the losses that we're seeing now. Never. I'm not crying wolf, I've been doing this a long time, and it's not working."

In fact, an alternative payment calculation option based on past income would go a long way to make the program more accessible for small- and mid-sized farmers who usually depend on farmers' markets and local restaurants to sell their product. "There is a general understanding that one of the most effective, simplest ways to get those folks paid is based on revenue. What did you make last year? We're going to pay you a certain percentage of that revenue shortfall for this year, right? That's pretty simple," says Deeble.

USDA could make this change immediately, without congressional approval, says Deeble. It hasn't yet done so. "USDA has not shown any interest in pushing back against anything other than a price-based program," he adds.

> ## As Congress debates the next round of Covid-19 relief, both parties have tentatively agreed to furnish billions of dollars of funding for another round of direct payments to farmers.

Before 2018, Congress authorized most farm subsidy programs through the Farm Bill, which is passed once every five years. But the Trump administration has dramatically expanded the scope of farm subsidies by offering billions of dollars in direct payments to farmers, meant to blunt the impact of ongoing trade disruptions with China, using a little-known piece of legislation that gives it the power to do so. "The bad thing about [the trade mitigation program] is that it set an awful precedent, in the sense that these payments are so much larger than the farm bill payments to begin with," says Joseph Glauber, researcher for the International Food Policy Research Institute and USDA Chief Economist from 2008 to 2014. "I think Congress has sort of abdicated its responsibilities," he adds.

As Congress debates the next round of Covid-19 relief, both parties have tentatively agreed to furnish billions of dollars of funding for another round of direct payments to farmers. But Deeble says he hopes legislators exact more control over the way the payments are distributed. He wants the bill to include stricter requirements for equitable distribution among all types

                                                                                                              ✕

                                                                                                              ⟩

Case 2:24-cv-00060-Z Document 30-2 Filed 07/31/24 Page 163 of 200 PageID 3308

Barring the introduction of an alternate payment system, advocates say there are a few simple changes that would funnel more payments to smaller and lower-income growers. A stricter income cap, for instance, would guarantee that fewer high-income farmers received direct payments, reserving more money for smaller-scale growers. "Why would somebody who makes almost a million dollars a year need government subsidies? Like, realistically, that's not something that taxpayer money should be going towards," says Schechinger.

> **Allowing farms to make calculations based on gross annual income would make many more eligible for forgivable loans.**

Means-testing producers might even work better than imposing the $250,000 payment limits, Glauber adds. "It addresses the same issue that people are upset with, with payment limits. That is, people who are making a lot—who have a lot of money—are getting big, big payments. We talk about these programs all the time as being safety nets, but in fact, they go to people who oftentimes aren't nearly as vulnerable to others."

It might also make sense to earmark some of the money for small-scale and minority farmers. This isn't unprecedented—the Payroll Protection Program set aside $30 billion for smaller lenders (like local credit unions), with the aim of helping minority business owners. The USDA could reserve a portion of direct payment funds for underserved farmers, then spend a little money on outreach to growers who might not have heard about the relief program, Deeble says.

Additionally, many were excluded from the first round of PPP loans because farms often report negative net incomes. Allowing farms to make calculations based on gross annual income would make many more eligible for forgivable loans. Congress is currently looking at ways to make relief programs like the Payroll Protection Program more accessible to small-scale farmers.

If Congress passes the next round of coronavirus relief without requiring USDA to re-examine its payment model, Deeble predicts a disastrous fall for farmers who haven't been able to take advantage of the program. "If they do not act within the next week to provide some form of direct payments to farmers that have not been well-served by CFAP, the fall is going to be an apocalypse for small farms," he says.

Covid-19    Farms

Also tagged    cfap, coronavirus, covid-19, farmers, usda



H. Claire Brown is a senior staff writer for The Counter. Her work has also appeared in The Atlantic, The Guardian, and The Intercept and has won awards from the Society for Advancing Business Editing and Writing, the New York Press Club, the Newswomen's Club of New York, and others. A North Carolina native, she now lives in Brooklyn.

Explore
Series
Newsletter


About Us
Contact Us
Code of Ethics
How We're Funded
Donate
Work for Us

# The Counter



Fact and friction in American food

©2020 The Counter. All rights reserved. Use of this Site constitutes acceptance of our User Agreement and Privacy Policy. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of The Counter.

Case 2:24-cv-00060-Z Document 30-2 Filed 07/28/24 Page 175 of 200 PageID: 3610

CORONAVIRUS

# Small farmers left behind in Trump administration's COVID-19 relief package

The uneven distribution of funds is stark. The top 10 percent got over 60 percent of the pot, while the bottom 10 percent got just 0.26 percent.



—— Ahiki Acres, an organic farm on Oahu, Hawaii, usually sells to restaurants and farmers markets. When those markets collapsed because of the coronavirus, the farm began selling its fruit and vegetables online.

Haley Miyaoka

APP. 000675

Aug. 9, 2020, 3:12 AM PDT

**By Kit Ramgopal and Andrew W. Lehren**

In March, Congress authorized a multibillion-dollar bailout for farms suffering losses because of the coronavirus pandemic and left the Agriculture Department to work out how the money would be spent. When the program was rolled out two months later, Agriculture Secretary Sonny Perdue said its $16 billion in direct payments would be a "lifeline" for farmers of "all sizes and all ... production."

But that's not what happened, according to an NBC News analysis of the first nearly 700,000 payments, totaling $5.6 billion, obtained through a public records request. The Coronavirus Food Assistance Program, while greatly appreciated by many farmers, has been marked by structural challenges. The preliminary data suggest that it has favored large, industrialized farms over smaller, diversified ones, provided loopholes for corporate farms and sent sizable payments to foreign-owned operations. Ultimately, many struggling farmers remain ineligible for assistance, unable to get access to any of Congress' funds.

The uneven distribution is stark. The top 1 percent of recipients got more than 20 percent of the money, totaling $1.2 billion. The top 10 percent got over 60 percent of the pot, while the bottom 10 percent got just 0.26 percent. The top 10 percent of recipients got average payments of almost $95,000, while the bottom 10 percent averaged around $300.

APP. 000676



— Agriculture Secretary Sonny Perdue arrives in the Roosevelt Room at the White House on May 23, 2019.

Jabin Botsford / The Washington Post via Getty Images

"I'm sure the money helped those larger operations tremendously," said Lonnie Sigler, an Alabama rancher and high school agriscience teacher. "But for a person like myself that sells once every six months, it's hard to see how it can help you all that much."

Joseph Janzen, a professor of agricultural economics at Kansas State University, said: "It's a constant struggle in U.S. agricultural policy. The tension between the mass of small farms and the little group of huge farms makes the idea of equality in farm payments incredibly complicated."

Nearly 2,300 operations received more than $250,000, which was set as the payment limit for a single farm. But the rules gave corporate farms ways to get more money. For example, the Agriculture Department allows farms to get up to $750,000 if three shareholders each spent more than 400 hours working in the business. Experts also say there is no real payment limit for farms structured as "general partnerships," because of a long-standing loophole in farm subsidy policy. That's presumably how Titan Swine, a hog farming partnership of 20-plus independent

producers in northwest Iowa, got over $2.5 million in taxpayer cash and five other farms got $1 million or more.

"The payment limitations are supposed to help make things more fair," said Tyler Whitley, a program manager for the Rural Advancement Foundation International. It's "so USDA can spread money to more farmers and a couple farms don't suck in huge amounts."

In a statement, Titan Swine said it's comprised of "farm families involved in the day to day operation of the company."

"Titan Swine was formed to group assets, knowledge, and economies of scale to better compete with large corporate farms in livestock ownership," the company said.

### *Full coverage of the coronavirus outbreak*

It's first come, first served; the funds that have been paid so far are just 80 percent of each farm's maximum payment, and the rest will be released later if money remains. That's not saying much for folks at the bottom. Almost 7,000 farms got less than $200, and nearly 200 got less than $20. The lowest payout was 7 cents.

Sigler, the Alabama rancher, got about $2,000 from the Agriculture Department, but he still stands to lose as much as $9,000 in 2020. He has lost $4,500 so far and estimates that that will double unless prices for calves recover. He hasn't sold any because prices have been so bad that he would have been selling at a significant loss.

NBC News found over a dozen examples of bailouts that went to what appear to be foreign-owned farms, including a Swiss-owned farm in Texas, a Korean-owned farm in South Dakota and a series of Dutch-owned companies in Wisconsin. Their payments add up to over $3.6 million, an average payout above the Agriculture Department's payment cap.

NBC News identified the farms by cross-referencing data from Agricultural Foreign Investment Disclosures, obtained via a public records request in September 2019. Some matches may be out of date, given that the Agriculture Department's most recent records are from 2017. However, more foreign recipients could have applied under names that didn't precisely match their foreign ownership disclosures to the Agriculture Department.

Many of the issues aren't new. It's not easy to design a multibillion-dollar bailout in two months, so the Agriculture Department's program looks a lot like another recent bailout: $28 billion to help farmers through the U.S.-China trade war. The common criticisms of the Coronavirus Food Assistance Program were inherited from the earlier program's framework, experts say.

"If USDA had had a little more time to craft this, maybe it would have shaped up differently," said Mike Stranz, vice president of advocacy for the National Farmers Union. "But Congress was in a hurry, and that put USDA in a difficult position with this program, having to process, understand and evaluate all of the losses that farmers were feeling in this pandemic in just two months."

In a statement, the Agriculture Department said it had to act fast to provide relief given uncertainty and market volatility.

"The $16 billion Coronavirus Food Assistance Program (CFAP) has provided critical support to our farmers and ranchers, maintained the integrity of our food supply chain, and ensured every American continues to receive and have access to the food they need," a department spokesperson said. "USDA acted quickly to assist America's farmers and ranchers – of all sizes and for all market outlets – as they faced the initial fallout of COVID-19."

Said Joseph Glauber, a senior research fellow at the International Food Policy Research Institute who is a former chief economist at the Agriculture Department: "When you have a program in response to some emergency, you want to get money out as soon as possible. But at the same time, people want accountability for those monies. They want to make sure it's going to the right people and that somehow the amount of money going to people is commensurate with the amount of money lost, so you're not overpaying some and underpaying others. To get all those things right is tough."

## The problems with the formula

When Congress wrote up the bailout, it included specific language to ensure that funds went to "producers of specialty crops" and "producers that supply local food systems, including farmers markets, restaurants and schools."

But advocates say those very farmers are among the most likely to be left out.

"We were really hopeful that the program ... would take into account the specific needs of those smaller, newer businesses," said Sanaz Arjomand, federal policy director for the National Young Farmers Coalition. "This program really doesn't go where it needs to go for local and regional producers, the same ones called out in the legislative language."

Take Haley Miyaoka, 24, who started a farm on the island of Oahu in Hawaii to grow about 20 vegetables, like peppers, cucumbers, eggplant and herbs, for farmers markets and restaurants. She is the archetypal program recipient under the CARES Act language, but the Agriculture Department program wasn't even on her radar. If she had applied, she would have had to apply crop by crop, likely with scarce returns.

— Haley Miyaoka started her organic farm, Ahiki Acres, with a mission of increasing Oahu's food security. Her normal markets, like restaurants and farmers markets, collapsed when the coronavirus hit, so she started selling fruit and vegetables online.  Ahiki Acres

The process was far simpler for Brady Cooper, who grows soybeans, wheat and corn in Oklahoma. He knows the drill with the Agriculture Department, having participated in past programs, like the trade war bailout. He said he got nearly $5,000 from the Coronavirus Food Assistance Program, which pretty much covers his losses.

"It helped make us whole," Cooper said.

Overall, much of the money has gone to the usual suspects, according to publicly available Agriculture Department data. The top five beneficiary states are Iowa, Nebraska, Minnesota, Wisconsin and Texas. Iowa tops the chart, with nearly $700 million, and Nebraska is next, with nearly $500 million. Ultimately, three commodities – cattle, dairy and corn – got over 80 percent of the pot.

"I don't see it as a situation where the secretary really understands and supports the diversity of American agriculture," said Sen. Debbie Stabenow of Michigan, the ranking Democrat on the

Committee on Agriculture, Nutrition and Forestry, who helped negotiate the CARES Act language for agriculture.

"I just want it to be fair," Stabenow said later. "They seem to weave in a lot of bias and favoritism for certain crops and regions. It just doesn't make sense based on actual losses."

To some degree, the payments reflect the demographics of U.S. agriculture. Payments are unequal because production levels are unequal; large-scale family farms, with over $1 million in cash farm income, account for just 3 percent of farms and nearly 50 percent of agricultural production. California and Illinois aside, the top five beneficiary states are all among the top producers of agricultural products.

"The program was designed to make sure farmers who are most impacted receive the most aid," the Agriculture Department said in a statement, saying large farms operate far more farmland and generate disproportionate production value. "COVID-19 impacts on these farmers was relatively greater, which means they received higher payments yet a smaller share of overall loss. USDA continues to do vast outreach to farmers and ranchers of all sizes and from all sectors of production agriculture to educate and promote CFAP sign up."

But critics contend that flaws in the formula cause it to exclude less traditional operations, like local farm systems and niche fruits and vegetables. The formula is based not on lost income but rather on a rigid system of lost sales volumes, inventory and price declines from mid-January and mid-April. Commodities sold before Jan. 15 aren't covered. Small farmers, who can't afford to store large crop inventories after harvest, may find themselves frustrated, experts say.

"If you're a bigger operation with more resources, you can afford to hang onto your crop until you get a price you like," Whitley said. "But in this farm economy, that's not a realistic option for a lot of people. They are really living crop to crop, and that crop has to go right out the door."

Because the Agriculture Department makes calculations using wholesale prices, farmers who rely on higher-priced markets may be undercompensated. While a pound of Miyaoka's organic, sustainably farmed basil brings in $12 in Hawaiian farmers markets, the Agriculture Department compensates a pound of basil at just $1.65.

"Smaller producers have definitely been hit hard by this and are seeing an inability to reach their customers in usual ways," Arjomand said. "Some have resources to pivot, but others really don't. Having a program that is equitably accessible to all folks and business models going forward is really important."

## 'What about me?'

APP. 000681

The list of grievances continues, to the tune of over 1,500 comments sent in to the federal government. Many come from producers who aren't eligible for funds at all. A New York peony farmer writes that he lost $50,000 after weddings and big events slowed. A Sonoma, California, wine grapes producer has sold only 30 percent of her crop as tasting rooms and restaurants are closed. A Florida beekeeper described $30,000 in losses as fruit farmers plant and pollinate less. An oyster producer said that he has essentially no market without restaurants and that he has 50,000 oysters that will die soon if they aren't sold.

The list goes on: maple syrup, mink, ethanol, crawfish, tobacco, chicken, hemp, honey, eggs, cotton, alfalfa and many more.

"We were getting voicemails and emails from farmers all around the country saying: 'What am I going to do? I'm going to lose everything if I don't get something,'" said Michael Nepveux, an economist at the American Farm Bureau Federation.

Farmers struggle to survive during pandemic despite promised aid
02:59



"Our role was saying, 'Don't forget about these guys, and don't forget about those guys,'" Nepveux said. "Just because USDA doesn't collect price data on niche products like parsnips and passion fruit doesn't mean these farmers aren't suffering."

For farmers to receive payments, their crops must show price declines of more than 5 percent from mid-January and mid-April. Price drops after mid-April don't count, which could pose a problem for late spring and summer crops.

It was a bummer for wheat farmers, for example, who briefly experienced high wheat prices in mid-April as Americans panic-bought flour and bread. So when the program rolled out, the Agriculture Department covered only two of six wheat types: hard red spring (used for pizza and bagels) and durum (used for pasta). But Dave Milligan, the organization's president, grows soft white wheat, the kind used in cakes. It's not covered, and Milligan said the losses are weighing on his margins.

"We hope things will change in the future," Milligan said. "We know they absolutely cannot serve everybody with this program, because they had to roll it out so fast."

*Download the NBC News app for breaking news and politics*

In the Agriculture Department statement, a spokesperson said the department wanted to be sure that it could cover COVID-19 effects in all production agriculture sectors focusing on only the first quarter and a small part of the second quarter, given uncertainty and volatile market conditions.

The Agriculture Department also said that the program includes 89 specialty crops and that additional specialty crops will be added in the coming weeks. It said it has conducted targeted outreach to specialty crop producers, including fruit and vegetable growers, to ensure that producers are knowledgeable about the program and are clear on how to apply. It also said it structured the program so leftover money could be used to offset coronavirus market effects in the rest of 2020 and into 2021 if it's available.

But even within well-endowed sectors like livestock and dairy, some farmers and ranchers say the Agriculture Department's aid still hasn't covered their wounds. That includes Titan Swine, the Iowa hog farming partnership, which has been the biggest single beneficiary of the program's funds.

"Titan Swine suffered market losses due to the COVID 19 pandemic in the amount of around -$6,000,000.00," Titan Swine said in a statement. "While the CFAP payment was helpful, it was a long ways from making our company close to whole. "

The company said it had to take the "unthinkable step" of euthanizing nearly 8,000 market animals because of the pandemic's effect on processing facilities. Agriculture Department funds still may not be enough to overcome the financial burden on some members, friends and neighbors, it said..

Case 2:24-cv-00060-Z Document 30-12 Filed 07/23/24 Page 184 of 200 PageID 8019

Nepveux said: "We're at a point in this country where the majority of food dollars that Americans spend go to food away from home. I don't know if there is any USDA program that could have absorbed all those losses."

Industry estimates of coronavirus-related losses approached $40 billion as of May, according to the Congressional Research Service. Lawmakers, advocates and Perdue, the agriculture secretary, have all said more money will be needed. Already, direct agriculture aid has hit a record high under President Donald Trump, with at least $50 billion in payments to farmers in 2019 and 2020.

"It seems like a never-ending cycle of ad hoc program after ad hoc program," said Janzen, of Kansas State University. "And in the end, I don't know if anyone is really totally satisfied with the outcome."



Kit Ramgopal

Kit Ramgopal is a reporter with the NBC News Investigative Unit.

Andrew W. Lehren

Andrew W. Lehren is a senior editor with the NBC News Investigative Unit.

APP. 000684

KIRSTEN GILLIBRAND
NEW YORK
SENATOR
RUSSELL SENATE OFFICE BUILDING
SUITE 478
WASHINGTON, DC 20510-3205
202-224-4451

COMMITTEES:
ARMED SERVICES
ENVIRONMENTAL AND PUBLIC WORKS
AGRICULTURE
SPECIAL COMMITTEE ON AGING

## United States Senate

WASHINGTON, DC 20510-3205

August 26, 2020

The Honorable Sonny Perdue
Secretary of Agriculture
U.S. Department of Agriculture
1280 Maryland Avenue S.W.
Washington, D.C. 20250

Dear Secretary Perdue,

I write today to express my deep concern about the unequitable distribution of direct payments to farmers under the Coronavirus Food Assistance Program (CFAP). There have been recent reports detailing the fact that many farms have not received adequate relief under the Program. In a NBC report titled "Small farmers left behind in Trump administration's COVID-19 relief package", it was found through a Freedom of Information Act (FOIA) request, "almost 7,000 farms got less than $200, and nearly 200 got less than $20. The lowest payout was 7 cents."[1] This disparity among relief is not only unacceptable, but unfair to our small farmers who are also facing devastating losses due to coronavirus. Many small farmers are facing economic devastation as markets shuttered and they were left with millions of pounds of crops rotting in their fields. The low payouts from CFAP, coupled with having to apply crop by crop, have put a significant strain on small farmers when trying to benefit from the Program.

Future CFAP payments need to be more equitable for smaller and historically underserved producers to more accurately address their market losses. One way to do this would be to set aside at least 50 percent of all assistance funds specifically for small and mid-scale operations, with payment amounts calculated the same for all producers, based on revenue losses. While I certainly appreciate the intention of CFAP, and understand that not everyone can be made whole in regards to their losses due to the pandemic, the relief that we can provide to farmers can be more equitable and accessible.

Corporate agribusinesses have consistently reaped the largest share of benefits from USDA's agricultural relief efforts in recent years compared to smaller farms, even though 91 percent of farms in the United States are classified as "small" by USDA.[2] For example, data compiled by the American Enterprise Institute revealed that the top 20 percent of farms, as measured by crop sales, received 73 percent of all Market Facilitation Program payments in 2018 and 69 percent in 2019.[3] Another separate, but equally alarming fact that was released as part of the NBC FOIA request, is

---

[1] https://www.nbcnews.com/business/economy/small-farmers-left-behind-trump-administration-s-covid-19-relief-n1236158
[2] https://www.washingtonpost.com/business/2020/07/16/cfap-ppp-farmers-coronavirus/

ALBANY/CAPITAL DISTRICT OFFICE    BUFFALO OFFICE    LONG ISLAND OFFICE    NORTH COUNTRY OFFICE    ROCHESTER OFFICE    SYRACUSE/CENTRAL NY OFFICE    NEW YORK CITY OFFICE    HUDSON VALLEY OFFICE

that larger-scale foreign-owned farms have received millions of dollars through CFAP.[1] Federal relief money, particularly in time of crisis, should prioritize American family farmers, our rural communities, and our local food systems, not foreign corporations.

Due to the documented struggles of CFAP in providing adequate relief to small producers, I request responses to the following:

- Is USDA considering options to retool CFAP to make it more equitable for small farmer's ranchers and local system producers? If so, what are those options?
- Is USDA collecting data on the farm size and demographics of farmer applications and USDA approvals and denials for CFAP? If so, does USDA plan on releasing an aggregation of that data?
- Explain why USDA has not established set asides for small and mid-size operations and historically underserved producers with money allocated for CFAP.
- Publish details on the allocation of payments by farm size and commodity in order to be transparent with taxpayers about who is being helped by this program, and who is not.
- Explain if USDA will continue to allow foreign-owned corporations to benefit from CFAP.
- Provide information on the number of farm foreclosures and loan defaults on loans under USDA's jurisdiction since March 1, 2020, and how much debt is held by small-scale and historically underserved producers under USDA's jurisdiction.

With no end in sight for coronavirus, and given the results of how CFAP has been implemented so far, immediate action is needed to not only save small farms and homes, but the rural way of life. According to a 2019 USDA National Agricultural Statistics Service report, America lost 5,800 farms from 2018-2019.[4] This decrease in farms has been happening for decades, and the coronavirus has potentially only exacerbated that problem. We must do everything we can to ensure that our current, and next generation of farmers are able to stay in business both during and after this pandemic.

In this time of national crisis we must support the agricultural industry nationwide rather than just the corporate agribusinesses that dominate this sector. Small farms are essential to the economic health of both the citizens and economy at large of the United States as they provide jobs, food, and economic support to their local communities. While thousands of new, beginning, and small-scale farmers are struggling to keep their farms afloat, it is our duty to give them the support they deserve. We must not forget them as we attempt to relieve the economic burden this pandemic has caused. Thank you for your consideration and I look forward to your response.

Sincerely,

Kirsten Gillibrand
United States Senator

[3] https://www.aei.org/articles/how-the-biggest-farms-are-getting-more-per-acre-in-trade-war-subsidies/
[4] https://www.nass.usda.gov/Publications/Todays_Reports/reports/fnlo0220.pdf

| Age of separated employee at birthday before death | Multiplier by separated employee's year of birth | |
|---|---|---|
| | After 1966 | From 1950 through 1966 |
| 46 | .4881 | .5228 |
| 47 | .5194 | .5563 |
| 48 | .5531 | .5924 |
| 49 | .5894 | .6314 |
| 50 | .6283 | .6730 |
| 51 | .6704 | .7180 |
| 52 | .7154 | .7662 |
| 53 | .7638 | .8181 |
| 54 | .8162 | .8741 |
| 55 | .8725 | .9345 |
| 56 | .9338 | 1.0000 |

[FR Doc. 2020–20784 Filed 9–21–20; 8:45 am]

BILLING CODE 6325–38–P

# DEPARTMENT OF AGRICULTURE

## Office of the Secretary

### 7 CFR Part 9

[Docket ID: FSA–2020–0006]

RIN 0503–AA65

### Coronavirus Food Assistance Program

**AGENCY:** Office of the Secretary, USDA.

**ACTION:** Final rule.

**SUMMARY:** The Secretary of Agriculture is issuing this rule to provide additional assistance under the Coronavirus Food Assistance Program (CFAP) to agricultural producers who continue to be impacted by the effects of the COVID–19 outbreak. This rule specifies the eligibility requirements, payment calculations, and application procedures for a second round of payments (CFAP 2). In addition, it also extends the special payment limitation provisions to trusts and estates for CFAP 1 and amends the provisions regarding applicable year and direct attribution of payments to members of legal entities that qualify for the increased payment limitation.

**DATES:** Effective September 22, 2020.

**FOR FURTHER INFORMATION CONTACT:** William L. Beam; telephone: (202) 720–3175; email: *Bill.Beam@usda.gov*. Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice).

**SUPPLEMENTARY INFORMATION:**

## Background

In response to the COVID–19 outbreak, USDA implemented CFAP through a final rule published in the **Federal Register** on May 21, 2020 (85 FR 30825–30835), with corrections published in the **Federal Register** on June 12, 2020 (85 FR 35799–35800), July 10, 2020 (85 FR 41328–41330), August 14, 2020 (85 FR 49593–49594), and documents published in the **Federal Register** on May 22, 2020 (85 FR 31062–31065), June 12, 2020 (85 FR 35812), July 10, 2020 (85 FR 41321–41323), and August 14, 2020 (85 FR 49589–49593). The application period for the first round of CFAP payments (referred to in this rule and hereinafter as CFAP 1) was May 26, 2020, through September 11, 2020.

In this final rule, USDA is implementing a second round of payments under CFAP (CFAP 2) for producers of agricultural commodities who face continuing market disruptions, low farm-level prices, and significant marketing costs. These additional significant marketing costs are associated with declines in demand, surplus production, and disruptions to shipping patterns and the orderly marketing of commodities.

CFAP 2 will provide eligible producers with financial assistance that gives them the ability to absorb increased marketing costs associated with the COVID–19 outbreak. In accordance with 15 U.S.C. 714b, the Secretary is using funds of the Commodity Credit Corporation (CCC) to assist producers with the purchase of materials and facilities required in connection with the production and marketing of agricultural commodities, with an estimated $13.21 billion being made available. These funds will be used as authorized by sections 5(b), (d), and (e) of the CCC Charter Act (15 U.S.C. 714c(b), (d), and (e)). These authorities will be used to partially compensate producers for on-going market disruptions and assist with the transition to a more orderly marketing system by enabling them to:

∀ Purchase materials and facilities required in connection with the production and marketing of agricultural commodities;

∀ Remove or dispose of surplus agricultural commodities; and

∀ Develop new and additional markets, marketing facilities, and uses for the commodities.

Funds available under 15 U.S.C. 714c(b), (d), and (e) cannot be used to provide assistance for tobacco; however, tobacco will be eligible for CFAP 2 with payments funded by remaining funds authorized by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act; Pub. L. 116–136).

## Payments

CFAP 2 payments will be made for three categories of commodities:

1. Price trigger commodities (major commodities that meet a minimum 5-percent price decline over a specified time period);

2. Flat-rate crops; and

3. Sales commodities.

Eligible price trigger commodities include barley, corn, sorghum, soybeans, sunflowers, upland cotton, wheat (all classes), broilers, eggs, beef cattle, dairy, hogs and pigs, and lambs and sheep. Price trigger commodities are commodities that had a 5 percent or greater price decline due to COVID–19 in a comparison of the average price for the week of January 13–17, 2020, and the average price for the week of July 27–31, 2020. For price trigger crops, payments will be based on eligible acres of the crop, which are the producer's share of 2020 determined acres if established by FSA, or reported acres on FSA–578 if determined acres have not been established by FSA, excluding prevented planting and experimental acres. Payments for price trigger crops will be the greater of: (1) The eligible acres multiplied by a payment rate of $15 per acre; or (2) the eligible acres multiplied by a nationwide crop marketing percentage, multiplied by a crop-specific payment rate, and then by

the producer's weighted 2020 Actual Production History (APH) approved yield, or if the APH is not available, 85 percent of the 2019 Agriculture Risk Coverage-County Option (ARC–CO) benchmark yield for that crop. For broilers and eggs, payments will be based on 75 percent of the producer's 2019 production. For dairy, payments will be based on April 1 to August 31, 2020, actual milk production and September 1, 2020, to December 31, 2020, estimated milk production (based on the producer's daily average production from April 1 to August 31, 2020, multiplied by the number of days the dairy operation commercially markets milk from September 1, 2020, through December 31, 2020). For price-triggered livestock, payments will be based on a fixed number of head, which is defined as the lower of the maximum owned inventory of eligible livestock, excluding breeding stock, on a date selected by the eligible producer from April 16, 2020, through August 31, 2020, or a specific number of head (4,546 head of cattle or 10,870 head of hogs). In the payment calculation, the maximum number of head of cattle and hogs, respectively, will be multiplied by the number of payment limitations for the producer.

Flat-rate crops are crops that either do not meet the 5-percent price decline trigger noted above or do not have data available to calculate a price change, but will have CFAP 2 payments calculated based on eligible acres of the crop planted in 2020, similar to price trigger crops. Eligible flat-rate crops include alfalfa, Extra Long Staple (ELS) cotton, oats, peanuts, and rice, as well as some crops with relatively small acreage—such as amaranth grain, buckwheat, canola, crambe (colwort), einkorn, emmer, flax, guar, hemp, indigo, industrial rice, kenaf, Khorasan, millet, mustard, oats, peanuts, quinoa, rice, sweet rice, wild rye, safflower, sesame, speltz, sugar beets, sugarcane, teff, triticale, and rapeseed. For flat-rate crops, payments will be computed by multiplying: (1) The producer's share of reported or determined 2020 planted acres of the crop, excluding prevented planted and experimental acres, by (2) $15 per acre.

The sales commodities category includes:

∀ Aquaculture grown in a controlled environment;

∀ Nursery crops and floriculture;

∀ Other livestock (excluding breeding stock) not included under the price trigger category that were grown for food, fiber, fur, or feathers;

∀ Other crops not included in the price trigger and flat-rate categories, including tobacco;

∀ Goat milk;

∀ Mink (including pelts);

∀ Mohair; and

∀ Wool.

Payment calculations for the sales commodities will use a sales-based approach based on five payment gradations associated with the producer's 2019 sales of the commodity.

Payments cannot be calculated using the methods described above for producers of broilers, eggs, and sales commodities who began farming in 2020 and had no 2019 production or sales. Payments for such producers will be based on the producer's actual 2020 production or sales as of the date the producer submits an application for payment.

**Eligibility**

Only commercially produced commodities are eligible.

Producer must be in the business of farming at the time of application.

Hay, except alfalfa, and crops intended for grazing are ineligible for CFAP 2 and will not receive a CFAP 2 payment. Crops with intended uses of green manure and left standing are also ineligible.

Contract growers are ineligible for CFAP 2 and will not receive a CFAP 2 payment.

**Average Adjusted Gross Income Limitation and Payment Limitation**

A person or legal entity, other than a joint venture or general partnership, is ineligible for payments if the person's or legal entity's average adjusted gross income (AGI), using the average of the adjusted gross incomes for the 2016, 2017 and 2018 tax years, is more than $900,000, unless at least 75 percent of that person's or legal entity's average AGI is derived from farming, ranching, or forestry-related activities. If at least 75 percent of the person's or legal entity's AGI is derived from farming, ranching, or forestry-related activities and the participant provides the required certification and documentation, the person or legal entity is eligible to receive CFAP payments up to the applicable payment limitation.

With respect to joint ventures and general partnerships, this AGI provision will be applied to each member of the joint venture and general partnership.

CFAP 2 payments are subject to a per person and legal entity payment limitation of $250,000. This payment limitation is separate from the CFAP 1 payment limitation, and it applies to the total amount of CFAP 2 payments made with respect to all eligible commodities under all three categories.

This rule also amends the special payment limitations in §9.7(e) for both CFAP 1 and CFAP 2. Previously, the special payment limitation provisions applied to corporations, limited liability companies, and limited partnerships. Those corporate entities may receive up to $750,000 in CFAP 1 payments based on the number of shareholders or members (not to exceed three shareholders or members) who are contributing at least 400 hours of active personal labor or active personal management or combination thereof with respect to the operation of the corporate entity.

This change amends the CFAP general provisions to extend those special payment limitation provisions to trusts and estates, allowing them to be eligible for the optional payment limitation increase based on the labor or management contributions of the beneficiaries or heirs of such trusts and estates. Extending these provisions to trusts and estates is necessary to recognize that, similar to members, partners, and stockholders of corporate entities, beneficiaries and heirs of trusts and estates may contribute at least 400 hours of active personal labor or active personal management or a combination thereof. Furthermore, trusts and estates are also affected by the price declines caused by COVID–19.

This rule also changes the method by which payments under the special payment limitation provisions are attributed to individuals and legal entities for both CFAP 1 and CFAP 2. The increased CFAP payment limitation for corporations, limited liability companies, limited partnerships, trusts, and estates based on contributions of at least 400 hours of active personal labor or active personal management or combination thereof is unlike the payment limitation under any other program administered by FSA. FSA's method of attributing CFAP payments based on ownership share of the legal entity in accordance with 7 CFR 1400.105, which applies to other FSA-administered programs subject to payment limitation, creates inequity when the pay limit for the legal entity is increased under the special provisions but not increased for each member of the entity.

Under 7 CFR 1400.105 for attributing payments for most commodity programs, the maximum amount that a legal entity could receive is limited by the maximum amount each eligible member may receive (directly or indirectly) based on ownership interest

in the legal entity, which is $250,000. For example, under current attribution rules, a corporation that qualifies for the increased limitation of $500,000 may only receive $450,000 when stockholders have unequal ownership shares in the legal entity. In this example, Stockholder A holds 60 percent ownership share and Stockholder B holds 40 percent ownership share. The payment to the legal entity is determined by multiplying each stockholder's ownership interest by the payment limitation of the corporation. (For Stockholder A, 60 percent · $500,000 = $300,000 (not to exceed $250,000); for Stockholder B, 40 percent · $500,000 = $200,000). The maximum payment to the legal entity in this case is $450,000 ($250,000 + $200,000). With the change to attribution in this rule applicable to CFAP 1 and CFAP 2, the payment to the legal entity qualifying for the increased payment limitation will not be reduced for ownership share, except for ineligibility or prior payments to a member, stockholder, partner, heir or beneficiary. The correction in how FSA attributes and limits CFAP payments under the special provisions to the members of the legal entity provides the ability for the legal entity to receive the maximum amount, not to exceed $500,000 or $750,000 as applicable, under the increased payment limitation, regardless of the ownership interests of the members, partners, and stockholders, beneficiaries, or heirs contributing at least 400 hours of active personal labor or active personal management. However, a member, stockholder, partner, beneficiary, or heir cannot receive, directly or indirectly, more than $250,000 under each round of payments (CFAP 1 and CFAP 2), regardless of whether payments attributed to them are subject to the regular payment limitation or the special increased limitations.

This rule removes "2019" as the applicable commodity year in § 9.7(e)(2)(ii) and (iii) because CFAP eligibility may be based on 2019 or 2020 production of the commodity, as specified in the applicable payment calculations.

## CFAP General Requirements

The general eligibility requirements that applied to CFAP 1 also apply to CFAP 2, including requiring compliance with 7 CFR part 12, "Highly Erodible Land and Wetland Conservation" and 7 CFR part 1400 subpart E, "Foreign Persons." Appeal regulations in 7 CFR parts 11 and 780 also apply to CFAP 2.

As under CFAP 1, there is no requirement to have crop insurance coverage or coverage under the Noninsured Crop Disaster Assistance Program (NAP) for an eligible CFAP commodity to be eligible for CFAP 2.

## Application Process

FSA will be responsible for implementing CFAP 2. FSA will accept CFAP 2 applications beginning September 21, 2020, and ending December 11, 2020. To apply for CFAP 2 payments, producers must submit a completed CFAP 2 application either in person, by mail, email, or facsimile to an FSA county office. A producer who applies must submit additional documentation for eligibility, such as certifications of compliance with adjusted gross income provisions and conservation compliance activities; those additional documents and forms must be submitted no later than 60 days from the date a producer signs the application. Payments will not be made until all necessary eligibility documentation is received, and will be reduced or not issued to the individuals or members of the entity when the documentation is not submitted timely. Producers who are applying for payment for price trigger or flat-rate crops must file a report of all acreage for the crop on FSA–578, Report of Acreage.

If supporting documentation is requested to verify the information specified on the application, the producer must provide records that substantiate the reported information. Examples of supporting documentation include evidence provided by the producer that is used to substantiate the acres, sales, inventory, or production reported, including copies of receipts, ledgers of income, income statements of deposit slips, veterinarian records, register tapes, invoices for custom harvesting, and records to verify production costs, contemporaneous measurements, truck scale tickets, or contemporaneous diaries that are determined acceptable by USDA.

## Provisions Requiring Refund to USDA

In the event that any application for a CFAP 2 payment resulted from erroneous information reported by the producer, the payment will be recalculated, and the producer must refund any excess payment to USDA. If the error was the producer's error, the refund must include interest [1] to be calculated from the date of the disbursement to the producer.

If USDA determines that the producer's application misrepresented either the total amount or producer's share of the acres, production, head of livestock, or sales, or if the CFAP 2 payment would exceed the payment as calculated based on the correct share of the acres, production, head of livestock, or sales, the application will be disapproved and the participant must refund to USDA all CFAP 2 payments made to the producer with interest from the date of disbursement.

Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

## Other Changes

In addition to the changes necessary to implement CFAP 2, USDA is moving definitions and payment calculation provisions that are specific to CFAP 1 to a new subpart B. This change is for organizational purposes only; this rule does not change those definitions and provisions.

This rule also adds a definition of "controlled environment" in § 9.2. This definition is consistent with how the term has been interpreted for the administration of CFAP 1 and for other FSA disaster programs (see FSA handbook for CFAP 1 and the NAP handbook, found under Disaster Assistance on the following web page: *https://www.fsa.usda.gov/programs-and-services/laws-and-regulations/handbooks/index*); it is added only to provide clarity.

## Notice and Comment and Effective Date

The Administrative Procedure Act (5 U.S.C. 553(a)(2)) provides that the notice and comment and 30-day delay in the effective date provisions do not apply when the rule involves specified actions, including matters relating to benefits. This rule governs CFAP for payments to certain commodity producers and therefore falls within the benefits exemption.

The Office of Management and Budget (OMB) designated this rule as major under the Congressional Review Act (CRA), as defined by 5 U.S.C. 804(2). Section 808 of the CRA allows an agency to make a major regulation effective immediately if the agency finds there is good cause to do so. The beneficiaries of this rule have been significantly impacted by the COVID–19 outbreak, which has resulted in significant declines in demand and market disruptions. USDA finds that notice and public procedure are contrary to the public interest. Therefore, even though this rule is a major rule for purposes of the Congressional Review Act, USDA is not

---

[1] The program interest rate is based on the CCC borrowing rate in effect for the month the payment was disbursed.

required to delay the effective date for 60 days from the date of publication to allow for Congressional review. Accordingly, this rule is effective upon publication in the **Federal Register**.

### Executive Orders 12866, 13563, and 13777

Executive Order 12866, "Regulatory Planning and Review," and Executive Order 13563, "Improving Regulation and Regulatory Review," direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The requirements in Executive Orders 12866 and 13563 for the analysis of costs and benefits apply to rules that are determined to be significant. Further, Executive Order 13777, "Enforcing the Regulatory Reform Agenda," established a federal policy to alleviate unnecessary regulatory burdens on the American people.

The Office of Management and Budget (OMB) designated this rule as economically significant under Executive Order 12866, "Regulatory Planning and Review," and therefore, OMB has reviewed this rule. The costs and benefits of this rule are summarized below. The full cost benefit analysis is available on *regulations.gov*.

### Cost Benefit Analysis Summary

CFAP 2 will provide producers with financial assistance that gives them the ability to absorb increased marketing costs associated with the COVID–19 outbreak. Producers will receive payments under the CCC Charter Act (section 5(b), (d), and (e)) with an estimated $13.21 billion being made available (after payment limitations).

Producers will be compensated for on-going market disruptions and to transition to a more orderly marketing system. Payments will assist producers with the purchase of materials and facilities required in connection with the production and marketing of agricultural commodities, aid in the removal or disposition of surplus agricultural commodities, and aid in the development of new and additional markets, marketing facilities, and uses for such commodities.

For the price trigger commodities, the approach to calculating CFAP 2 payments is very similar to that used for

CFAP 1 (which covered Quarter 1 of 2020), although the focus now is on Quarter 2 through Quarter 4 of calendar 2020. Payments are based on the price decline calculated between mid-January and late-July and use an 80 percent coverage factor. Where available, mid-January and late July futures prices (for either the November or December contract) were used to estimate the market's price expectations toward the end of calendar 2020. Future contracts are not traded for all crops with a price trigger nor are they available for eggs, broilers, and lamb. For these commodities, actual prices received in mid-January and late July are used as a proxy. Depending on the yield for a given producer's crop in this category, the payment may calculate to less than $15 per acre. In such cases, the payment is raised to $15 per acre, which is the payment for the flat-rate category discussed below.

Producers of the flat-rate commodities receive a $15 per-acre payment based on their eligible 2020 acreage.

For the sales-based commodities, payment calculations will use a sales-based approach, where producers are paid based on five payment gradations associated with their 2019 sales. In addition, tobacco is a sales-based commodity under CFAP 2 and a CARES Act payment will be calculated using remaining CARES Act funds, not to exceed $100 million.

Estimated net payments to producers of $13.21 billion represent benefits to producers, which is the government cost of CFAP 2. Outlays are estimated at expected maximum levels.

### Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601–612), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA, Pub. L. 104–121), generally requires an agency to prepare a regulatory flexibility analysis of any rule whenever an agency is required by the Administrative Procedure Act or any other law to publish a proposed rule, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule is not subject to the Regulatory Flexibility Act because USDA is not required by the Administrative Procedure Act or any other law to publish a proposed rule for this rulemaking initiative.

### Environmental Review

The environmental impacts of this final rule have been considered in a manner consistent with the provisions of the National Environmental Policy

Act (NEPA), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and because USDA will be making the payments to producers the USDA regulations for compliance with NEPA (7 CFR part 1b).

Although OMB has designated this rule as "economically significant" under Executive Order 12866, ". . . economic or social effects are not intended by themselves to require preparation of an environmental impact statement" when not interrelated to natural or physical environmental effects (see 40 CFR 1508.14). CFAP 2 was designed to avoid skewing planting decisions. Producers continue to make their planting and production decisions with the market signals in mind, rather than any expectation of what a new USDA program might look like. The discretionary aspects of CFAP 2 (for example, determining AGI and payment limitations) were designed to be consistent with established USDA and CCC programs and are not expected to have any impact on the human environment, as CFAP 2 payments will only be made after the commodity has been produced. Accordingly, the following Categorical Exclusion in 7 CFR part 1b applies: 1b.3(2), which applies to activities that deal solely with the funding of programs, such as program budget proposals, disbursements, and the transfer or reprogramming of funds. As such, the implementation of and participation in CFAP 2 do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, an environmental assessment or environmental impact statement for this regulatory action, will not be prepared; this rule serves as documentation of the programmatic environmental compliance decision for this federal action.

### Executive Order 12372

Executive Order 12372, "Intergovernmental Review of Federal Programs," requires consultation with State and local officials that would be directly affect by proposed Federal financial assistance. The objectives of the Executive Order are to foster an intergovernmental partnership and a strengthened Federalism, by relying on State and local processes for State and local government coordination and review of proposed Federal Financial assistance and direct Federal development. For reasons specified in the final rule related notice to 7 CFR part 3015, subpart V (48 FR 29115, June 24, 1983), the programs and activities within this rule are excluded from the

scope of Executive Order 12372, which requires intergovernmental consultation with State and local officials.

### Executive Order 12988

This rule has been reviewed under Executive Order 12988, "Civil Justice Reform." This rule will not preempt State or local laws, regulations, or policies unless they represent an irreconcilable conflict with this rule. Before any judicial action may be brought regarding the provisions of this rule, the administrative appeal provisions of 7 CFR parts 11 and 780 must be exhausted.

### Executive Order 13132

This rule has been reviewed under Executive Order 13132, "Federalism." The policies contained in this rule do not have any substantial direct effect on States, on the relationship between the Federal government and the States, or on the distribution of power and responsibilities among the various levels of government, except as required by law. Nor does this rule impose substantial direct compliance costs on State and local governments. Therefore, consultation with the States is not required.

### Executive Order 13175

This rule has been reviewed for compliance with Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have Tribal implications, including regulations, legislative comments proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes or on the distribution of power and responsibilities between the Federal government and Indian Tribes.

USDA has assessed the impact of this rule on Indian Tribes and determined that this rule does not, to our knowledge, have Tribal implications that required Tribal consultation under Executive Order 13175. If a Tribe requests consultation, the USDA Office of Tribal Relations (OTR) will ensure meaningful consultation is provided where changes, additions, and modifications are not expressly mandated by Congress.

Outside of Tribal consultation, USDA is working with Tribes to provide information about CFAP 2 and other issues.

### The Unfunded Mandates Reform Act of 1995

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA, Pub. L. 104–4) requires Federal agencies to assess the effects of their regulatory actions on State local, and Tribal governments or the private sector. Agencies generally must prepare a written statement, including a cost benefit analysis, for proposed and final rules with Federal mandates that may result in expenditures of $100 million or more in any 1 year for State, local, or Tribal governments, in the aggregate, or to the private sector. UMRA generally requires agencies to consider alternatives and adopt the more cost effective or least burdensome alternative that achieves the objectives of the rule. This rule contains no Federal mandates, as defined in Title II of UMRA, for State, local, and Tribal governments or the private sector. Therefore, this rule is not subject to the requirements of sections 202 and 205 of UMRA.

### Federal Assistance Programs

The title and number of the Federal Domestic Assistance Program found in the Catalog of Federal Domestic Assistance to which this rule applies is Coronavirus Food Assistance Program 2 and 10.132.

### Paperwork Reduction Act

In accordance with the Paperwork Reduction Act of 1995, FSA submitted the CFAP 2 information collection request to OMB for emergency approval. OMB approved the 6-month emergency information collection.

### E-Government Act Compliance

USDA is committed to complying with the E-Government Act to promote the use of the internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

### List of Subjects in 7 CFR Part 9

Agricultural commodities, Agriculture, Disaster assistance, Indemnity payments.

For the reasons discussed above, this final rule amends 7 CFR part 9 as follows:

### PART 9—CORONAVIRUS FOOD ASSISTANCE PROGRAM

■ 1. The authority citation for part 9 continues to read as follows:

**Authority:** 15 U.S.C. 714b and 714c; and Division B, Title I, Pub. L. 116–136.

### §§ 9.1 through 9.8 [Redesignated as Subpart A]

■ 2. Redesignate §§ 9.1 through 9.8 as subpart A and add a heading for subpart A to read as follows:

### Subpart A—General Provisions

■ 3. In § 9.1 amend paragraph (a) introductory text by adding two sentences after the second sentence to read as follows:

### § 9.1 Applicability and administration

(a) * * * CFAP is being implemented through two rounds of payments, with the first round (CFAP 1) determined as specified in subpart B of this part, and the second round (CFAP 2) determined as specified in subpart C of this part. To be eligible for CFAP payments, participants must comply with all provisions under this subpart and the relevant particular subpart for CFAP 1 or CFAP 2. * * *

* * * * *

■ 4. Amend § 9.2 by:
■ a. In the introductory text, removing the word "CFAP" and adding the words "this part" in its place;
■ b. Removing the definitions of "All other cattle", "Aquaculture", and "Cattle raised or maintained for breeding purposes";
■ c. Adding the definition of "Controlled environment"; and
■ d. Removing the definitions of "Crop", "Feeder cattle 600 pounds or more", "Feeder cattle less than 600 pounds", "First quarter", "Lambs and yearlings", "Non-specialty crop", "Producer", "Second quarter", "Slaughter cattle—fed cattle", "Slaughter cattle—mature cattle", "Specialty crops", and "Unpriced".

The addition reads as follows.

### § 9.2 Definitions.

* * * * *

*Controlled environment* means an environment in which everything that can practicably be controlled by the producer with structures, facilities, and growing media (including but not limited to water, soil, or nutrients), is in fact controlled by the producer, as determined by industry standards.

* * * * *

### § 9.3 [Amended]

■ 5. In § 9.3 amend paragraph (c) by removing the word "Have" and adding the words "For payments under § 9.102 of this part, have" in its place.

■ 6. Amend § 9.4 by revising paragraph (a) and adding paragraph (d) to read as follows:

**§9.4 Time and method of application.**

(a) A completed application under this subpart must be submitted in person, by mail, email, or facsimile to any FSA county office by the close of business on:

(1) September 11, 2020, for payments issued under §9.102 of this part; and

(2) December 11, 2020, for payments issued under §9.202 of this part.

\* \* \* \* \*

(d) A producer applying for assistance for a crop subject to §9.202(a) or (b) must file a report of all acreage of the crop on FSA–578, Report of Acreage.

**§9.5 [Redesignated as §9.102]**

■ 7. Redesignate §9.5 as §9.102.

**§9.5 [Reserved]**

■ 8. Add and reserve a new §9.5.

■ 9. Amend §9.7 by:

■ a. In paragraph (e)(1) adding the words "under each of subparts B and C" after "$250,000" both times it appears;

■ b. Revising paragraphs (e)(2) and (3); and

■ c. In paragraph (h), removing "September 11, 2020," and adding the words "the applicable date in §9.4(a)" in its place.

The revisions read as follows.

**§9.7 Miscellaneous provisions.**

\* \* \* \* \*

(e) \* \* \*

(2)(i) The total amount of CFAP payments a corporation, limited liability company, limited partnership, trust, or estate may receive is $250,000 under each of subparts B and C unless the members, partners, stockholders, beneficiaries, or heirs of the legal entity meet the provisions of paragraphs (e)(2)(ii) or (iii) of this section.

(ii) The total amount of CFAP payments a corporation, limited liability company, limited partnership, trust, or estate may receive is $500,000 under each of subparts B and C if two different individual persons who are members, partners, stockholders, beneficiaries, or heirs of the legal entity each provided at least 400 hours of active personal labor or active personal management or combination thereof with respect to the production of commodities for which an application or applications are made in accordance with this part.

(iii) The total amount of CFAP payments a corporation, limited liability company, limited partnership, trust, or estate may receive is $750,000 under each of subparts B and C if three different individual persons who are members, partners, stockholders, beneficiaries, or heirs of the legal entity each provided at least 400 hours of active personal labor or active personal management or combination thereof with respect to the production of commodities for which an application or applications are made in accordance with this part.

(3)(i) Except for payments subject to the increased payment limitation in (e)(2)(ii) and (e)(2)(iii) of this section, a CFAP payment made to any legal entity will be attributed to individuals or legal entities with an ownership interest in the legal entity in accordance with §1400.105 of this title. Payments attributed to a legal entity with an ownership interest in the legal entity will be further attributed as provided in §1400.105 of this title. If the legal entity does not qualify for an increased payment limitation under (e)(2)(ii) or (iii) of this section and the total amount of CFAP payments made directly or indirectly to an individual or legal entity has met the applicable amount specified in paragraph (e)(1) of this section, the payment to the legal entity will be reduced commensurate with the amount of the ownership interest of the individual or legal entity in the legal entity. CFAP payments subject to attribution under this paragraph will be attributed to individuals and legal entities until the attribution is made only to an individual except the attribution will stop at the fourth level of ownership.

(ii) A payment subject to the increased payment limitation in (e)(2)(ii) or (iii) of this section will be limited to the lesser of the amount specified in either (e)(2)(ii) or (iii) of this section, or the sum of the amount specified in (e)(1) of this section that each eligible member, stockholder, partner, heir, or beneficiary of the legal entity may receive, regardless of ownership share. Payments attributed to a legal entity with an ownership interest in the legal entity will be further attributed to individuals and legal entities until the attribution is made only to an individual, except the attribution will stop at the fourth level of ownership.

\* \* \* \* \*

■ 10. Add subpart B, consisting of §9.101 and newly redesignated §9.102, to read as follows:.

**Subpart B—CFAP 1**

Sec.
9.101 Definitions.
9.102 Calculation of payments.

**§9.101 Definitions.**

The following definitions apply to this subpart. The definitions in parts 718 and 1400 of this title also apply,

except where they conflict with the definitions in this section.

*All other cattle* means commercially raised or maintained bovine animals not meeting the definition of another category of cattle in this part, excluding beefalo, bison, and animals used for dairy production or intended for dairy production.

*Aquaculture* means only those species as announced in a NOFA.

*Cattle raised or maintained for breeding purposes* means animals commercially raised or maintained for use as either a sire or dam for the production of livestock offspring or lactation.

*Crop* means non-specialty crops and specialty crops.

*Feeder cattle 600 pounds or more* means cattle weighing more than 600 pounds but less than the weight of slaughter cattle-fed cattle as defined in this section.

*Feeder cattle less than 600 pounds* means cattle weighing less than 600 pounds.

*First quarter* means January, February, and March of 2020.

*Lambs and yearlings* means all sheep less than 2 years old.

*Non-specialty crop* means any of the following crops: Barley, canola, corn, durum wheat, hard red spring wheat, millet, oats, sorghum, soybeans, sunflowers, and upland cotton. The term excludes crops intended for grazing.

*Producer* means a person or legal entity who shares in the risk of producing a crop or livestock and who is entitled to a share in the crop or livestock available for marketing or would have shared had the crop or livestock been produced and marketed. A contract grower who does not own the livestock, will be considered a producer if the contract allows the grower to have risk in the livestock.

*Second quarter* means April, May, and June of 2020.

*Slaughter Cattle—fed cattle* means cattle with a weight of 1,200 pounds or more that are intended for slaughter.

*Slaughter cattle—mature cattle* means culled cattle raised or maintained for breeding purposes, but which were removed from inventory and are intended for slaughter.

*Specialty crops* means any of the following crops: Almonds; apples; artichokes; asparagus; avocados; beans; blueberries; broccoli; cabbage; cantaloupe; carrots; cauliflower; celery; corn, sweet; cucumbers, eggplant; garlic; grapefruit; kiwifruit; lemons; lettuce, iceberg; lettuce, romaine; mushrooms; onions, dry; onions, green; oranges; papayas; peaches; pears; pecans;

peppers, bell type; peppers, other; potatoes; raspberries; rhubarb; spinach; squash; strawberries; sweet potatoes; tangerines; taro; tomatoes; walnuts; watermelons; and any crops for which funds are made available. The term excludes crops intended for grazing.

*Unpriced* means not subject to an agreed-upon price in the future through a forward contract, agreement, or similar binding document as of January 15, 2020.

■ 11. Add Subpart C, consisting of §§ 9.201 through 9.202, to read as follows:

## Subpart C—CFAP 2

Sec.
9.201 Definitions.
9.202 Calculation of payments.

### § 9.201 Definitions.

The following definitions apply to this subpart. The definitions in parts 718 and 1400 of this title also apply, except where they conflict with the definitions in this section.

*Aquaculture* means any species of aquatic organisms grown as food for human consumption, fish raised as feed for fish that are consumed by humans, ornamental fish propagated and reared in an aquatic medium. Eligible aquacultural species must be raised by a commercial operator and in water in a controlled environment.

*Breeding stock* means:

(1) For cattle, bulls and cows;

(2) For hogs and pigs, boars and sows; and

(3) For lambs and sheep, rams and ewes.

*Broilers* includes any chicken that has been commercially produced for meat purposes that has left the farm for slaughter, and not used for laying or breeding purposes.

*Eggs* means dried, frozen, liquid, and shell eggs.

*Experimental* means a crop for which all of the following apply:

(1) The crop is planted for experimental purposes conducted under the direct supervision of a State experiment station or commercial company;

(2) Production of the crop is destroyed before harvest or used for testing or other experimental purposes; and

(3) A representative of the State experiment station or the commercial company certifies that any production harvested from the experiment will not be marketed in any form.

*Flat-rate crop* means alfalfa, amaranth grain, buckwheat, canola, cotton, Extra Long Staple (ELS) cotton, crambe (colewort), einkorn, emmer, flax, guar,

hemp, indigo, industrial rice, kenaf, khorasan, millet, mustard, oats, peanuts, quinoa, rapeseed, rice, rice, sweet, rice, wild, rye, safflower, sesame, speltz, sugar beets, sugarcane, teff, and triticale. The term excludes hay, except alfalfa, and crops with intended uses of grazing, green manure, or left standing.

*Floriculture* means cut flowers and cut greenery from annual and perennial flowering plants grown in a container or controlled environment for commercial sale. Floriculture is included in sales commodities.

*Fruits* means any of the following fruits: Abiu, acerola (Barbados cherry), achachairu, antidesma, apples, apricots, aronia (chokeberry), atemoya (custard apple), bananas, blueberries, breadfruit, cacao, caimito, calabaza melon, canary melon, canary seed, caneberries, canistel, cantaloupes, carambola (star fruit), casabamelon, cherimoya (sugar apple), cherries, Chinese bitter melon, citron, citron melon, coconuts, cranberries, crenshaw melon, dates, donaqua (winter melon), durian, elderberries, figs, genip, gooseberries, grapefruit, grapes, ground cherrry, guamabana (soursop), guava, guavaberry, honeyberries, honeydew, huckleberries, Israel melons, jack fruit, jujube, juneberries, kiwiberry, kiwifruit, Korean golden melon, kumquats, langsat, lemons, limequats, limes, longan, loquats, lychee, mangos, mangosteen, mayhaw berries, mesple, mulberries, nectarines, oranges, papaya, passion fruits, pawpaw, peaches, pears, pecans, pineapple, pitaya (dragon fruit), plantain, plumcots, plums, pomegranates, prunes, pummelo, raisins, rambutan, sapodilla, sapote, schizandra berries, sprite melon, star gooseberry, strawberries, tangelos, tangerines, tangors, wampee, watermelon, wax jamboo fruit, and wolfberry (goji).

*Hemp* means the plant species *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis, that is grown under a license or other required authorization issued by the applicable governing authority that permits the production of the hemp.

*Horticulture* means any of the following horticulture: Anise, basil, cassava, chervil (Fresh parsley), chia, chicory (radicchio), cilantro, cinnamon, curry leaves, galanga, ginger, ginseng, guayule, herbs, hops, lotus root, marjoram, meadowfoam, mint, moringa, niger seed, oregano, parsley,

pennycress, peppermint, pohole, psyllium, rosemary, sage, savory, shrubs (forbs), sorrel, spearmint, tangos, tea, thyme, turmeric, vanilla, wasabi, water cress, and yu cha.

*Ineligible commodities* for CFAP 2 means any of the following commodities: Birdsfoot and trefoil, clover, cover crop, fallow, forage soybeans, forage sorghum, gardens (commercial and home), grass, kochia (prostrata), lespedeza, milkweed, mixed forage, pelts (excluding mink), perennial peanuts, pollinators, sunn hemp, vetch, and seed of ineligible crops.

*Nursery crops* means decorative or nondecorative plants grown in a container or controlled environment for commercial sale. Nursery crops are included in sales commodities.

*Other livestock* means any of the following livestock: Animals commercially raised for food, fur, fiber, or feathers, including alpacas, bison, buffalo, beefalo, deer, ducks, elk, emus, geese, goats, guinea pigs, llamas, mink, ostrich, pheasants, quail, rabbits, reindeer, and turkey. It excludes all equine, breeding stock, companion or comfort animals, pets, and animals raised for hunting or game purposes.

*Prevented planting* means the inability to plant the intended crop acreage with proper equipment by the final planting date for the crop type because of a natural disaster.

*Price trigger commodities* means price trigger crops and price trigger livestock and products as defined in this section.

*Price trigger crops* means any of the following crops: Barley, corn, sorghum, soybeans, sunflowers, upland cotton, wheat (all classes), excluding crops with an intended use of grazing, green manure, or left standing.

*Price trigger livestock and products* means any of the following livestock and products: Beef cattle, broilers, dairy (cow milk), eggs, lambs, sheep, hogs, and pigs; excluding breeding stock.

*Producer* means a person or legal entity who shares in the risk of producing a commodity. The term does not include contract growers. Producers who are not in the business of farming at the time of application are not considered eligible producers.

*Sales-based commodities* means, as defined in this section, aquaculture, sales-based crops, nursery crops and floriculture, other livestock, and the following commodities: Goat milk, mink (including pelts); mohair, and wool.

*Sales-based crops* means ambrosia, arundo, camelina, cactus, cardoon, fruits, honey, horticulture, maple sap, tobacco, tree nuts, and vegetables. Fruits, horticulture, tree nuts, and vegetables are defined in this section.

The term excludes crops with an intended use of grazing, green manure, or left standing.

*Tree nuts* means any of the following tree nuts: Almonds, avocados, carob, cashew, chestnuts, coffee, hazel nuts, jojoba, macadamia nuts, noni, olives, persimmons, pine nuts, pistachios, quinces, and walnuts.

*Vegetables* means any of the following vegetables: Alfalfa sprouts, aloe vera, artichokes, arugula (greens), asparagus, bamboo shoots, batatas, bean sprouts, beans (including dry edible), beets, bok choy, broccoflower, broccoli, broccolini, broccolo-cavalo, Brussel sprouts, cabbage, calaloo, carrots, cauliflower, celeriac, celery, chickpea (see beans, garbanzo), chives, collard greens, coriander, corn, sweet, cucumbers, daikon, dandelion greens, dasheen (taro root, malanga), dill, eggplant, endive, escarole, frisee, gailon (gai lein, Chinese broccoli), garlic, gourds, greens, horseradish, Jerusalem artichokes (sunchoke), kale, kohlrabi, leeks, lentils, lettuce, melongene, mesculin mix, microgreens, mushrooms, okra, onions, parsnip, peas (including dry edible), pejibaye (heart of palm), peppers, potatoes, potatoes sweet, pumpkins, radicchio, radishes, rhubarb, rutabaga, salsify (oyster plant), scallions, seed—vegetable, shallots, spinach, squash, swiss chard, tannier, taro, tomatillos, tomatoes, truffles, turnip top (greens), turnips, yam, and yautia (malanga);

**§ 9.202  Calculation of payments.**

(a) Payments for price trigger crops will be equal to the greater of:

(1) Eligible acres of the crop multiplied by a rate of $15 per acre; or

(2) Eligible acres of the crop multiplied by the applicable yield, multiplied by the crop marketing percentage in Table 1 of paragraph (j) of this section, multiplied by the crop payment rate in Table 1 of paragraph (j) of this section.

(3) Under paragraph (a) of this section, eligible acres include the producer's share of the determined acres, or reported acres if determined acres are not present, of the crop planted for the 2020 crop year, excluding prevented planted and experimental acres. For producers who insured acres of the crop under a policy or plan of insurance under the Federal Crop Insurance Act (7 U.S.C. 1501–1524), the yield will be the average of the producer's 2020 actual production history (APH) approved yield from all of the producer's insured acres nationwide. For producers for whom

FSA is unable to obtain a 2020 APH approved yield, the yield will be the 2019 Agriculture Risk Coverage-County Option (ARC–CO) benchmark yield multiplied by 85 percent. ARC–CO yields for producers growing a crop in multiple counties will be weighted based on the producer's crop acreage physically located in each county.

(b) Payments for flat-rate crops will be equal to eligible acres of the crop multiplied by a rate of $15 per acre. Eligible acres include the producer's share of the determined acres, or reported acres if determined acres are not present, excluding prevented planted and experimental acres.

(c) Payments for beef cattle will be equal to the lower of the producer's maximum owned inventory of eligible beef cattle, excluding breeding stock, on a date selected by the producer from April 16, 2020, through August 31, 2020, or 4,546 head multiplied by the number of payment limitations for the producer multiplied by a payment rate of $55 per head.

(d) Payments for hogs and pigs will be equal to the lower of the producer's maximum owned inventory of eligible hogs and pigs, excluding breeding stock, on a date selected by the producer from April 16, 2020, through August 31, 2020, or 10,870 head multiplied by the number of payment limitations for the producer, multiplied by a payment rate of $23 per head.

(e) Payments for lambs and sheep will be equal to the producer's highest owned inventory of eligible lambs and sheep, excluding breeding stock, on a date selected by the producer from April 16, 2020, through August 31, 2020, multiplied by a payment rate of $27 per head.

(f)(1) Payments for broilers will be equal to 75 percent of the producer's 2019 broiler production multiplied by a payment rate of $1.01 per bird (head).

(2) Payments for broiler producers who began farming in 2020 and had no production in 2019 will be calculated as provided in paragraph (f)(1) of this section, except that the payments will be based on the producer's actual 2020 broiler production as of the date the producer submits an application for payment under this part.

(g)(1) Payments for dairy (cow milk) will be equal to the sum of the following two calculations:

(i) The producer's total actual milk production from April 1, 2020, to August 31, 2020, multiplied by the payment $1.20 per hundredweight; and

(ii) The producer's estimated milk production from September 1, 2020, to December 31, 2020, based on the daily average production from April 1, 2020, through August 31, 2020, multiplied by 122, multiplied by a payment rate of $1.20 per hundredweight.

(2) Dairy operations that stop commercially marketing milk after the date they apply for CFAP 2 but before December 31, 2020, must notify FSA of the date they stop commercially marketing milk. Those dairies are eligible only for a prorated payment under paragraph (g)(1)(ii) of this section for the number of days the dairy operation commercially markets milk from September 1, 2020, through December 31, 2020.

(h)(1) Payments for eggs will be equal to 75 percent of the producer's 2019 egg production multiplied by the payment rate in Table 1 of paragraph (j) of this section.

(2) Payments for egg producers who began farming in 2020 and had no production in 2019 will be calculated as provided in paragraph (h)(1) of this section, except that the payments will be based on the producer's actual 2020 egg production as of the date the producer submits an application for payment under this part.

(i)(1) Payments for sales commodities will be equal to the sum of the results for the following calculation for each 2019 sales range in Table 2 of paragraph (j) of this section: the amount of the producer's eligible sales within the specified range in calendar year 2019, multiplied by the payment rate for that range in Table 2 of paragraph (j) of this section. Eligible sales only includes sales of raw commodities grown by the producer; the portion of sales derived from adding value to the commodity, such as processing and packaging, and from sales of products purchased for resale is not included in the payment calculation unless determined eligible by the Secretary.

(2) Payments for producers of sales commodities who began farming in 2020 and had no sales in 2019 will be calculated as provided in paragraph (i)(1) of this section, except that the payments will be based on the producer's actual 2020 sales as of the date the producer submits an application for payment under this section.

(j) The payment rates in Tables 1 and 2 of this paragraph (j) will be used to calculate CFAP payments:

---

### TABLE 1 TO PARAGRAPH (J)—PAYMENT RATES FOR PRICE TRIGGER CROPS AND EGGS

| Commodity | Units | Crop marketing percentage (percent) | Payment rate ($/unit) |
|---|---|---|---|
| Barley .................................................................... | bu | 63 | $0.54 |
| Corn ...................................................................... | bu | 40 | 0.58 |
| Cotton, Upland ...................................................... | lb | 46 | 0.08 |
| Sorghum ............................................................... | bu | 55 | 0.56 |
| Soybean ................................................................ | bu | 54 | 0.58 |
| Sunflowers ............................................................ | lb | 44 | 0.02 |
| Wheat (all classes) .............................................. | bu | 73 | 0.54 |
| Shell Eggs ............................................................ | dozen | n/a | 0.05 |
| Liquid Eggs .......................................................... | lb | n/a | 0.04 |
| Dried Eggs ............................................................ | lb | n/a | 0.14 |
| Frozen Eggs ......................................................... | lb | n/a | 0.05 |

### TABLE 2 TO PARAGRAPH (J)—PAYMENT RATES FOR SALES COMMODITIES

| 2019 Sales range | Percent payment factor |
|---|---|
| Up to $49,999 ........................ | 10.6 |
| $50,000-$99,999 ................... | 9.9 |
| $100,000-$499,999 ............... | 9.7 |
| $500,000-$999,999 ............... | 9.0 |
| All sales over $1 million ....... | 8.8 |

(k) CFAP 2 payments will not be calculated or issued for ineligible commodities.

**Stephen L. Censky,**

*Vice Chairman, Commodity Credit Corporation, and Deputy Secretary, U.S. Department of Agriculture.*

[FR Doc. 2020–20844 Filed 9–18–20; 4:15 pm]

**BILLING CODE 3410–05–P**

---

**DEPARTMENT OF AGRICULTURE**

**Rural Utilities Service**

**7 CFR Parts 1779 and 1780**

**Rural Housing Service**

**Rural Business-Cooperative Service**

**Rural Utilities Service**

**Farm Service Agency**

**7 CFR Chapter XVIII**

**Rural Housing Service**

**7 CFR Parts 3570 and 3575**

**Rural Business-Cooperative Service**

**Rural Utilities Service**

**7 CFR Parts 4279 and 4280**

**[Docket No. RBS–20–BUSINESS–31]**

**RIN 0570–AB04**

**Strategic Economic and Community Development**

**AGENCY:** Rural Business-Cooperative Service, Rural Housing Service, Rural Utilities Service, Farm Service Agency, Department of Agriculture (USDA).

**ACTION:** Final rule.

---

**SUMMARY:** The Rural Business-Cooperative Service, Rural Housing Service, and Rural Utilities Service, of the Rural Development (RD) mission area within the U.S. Department of Agriculture (USDA), hereinafter collectively referred to as the Agency, is issuing this final rule to implement statutory provisions found in Section 6401 of the Agricultural Improvement Act of 2018 ("2018 Farm Bill") that amends Section 379H of the Consolidated Farm and Rural Development Act. The intent of this rule is to amend the existing regulations governing Strategic Economic and Community Development (SECD) to implement Section 6401 of the 2018 Farm Bill. Additionally, conforming changes are being made to other regulations as a result of the aforementioned statutory changes. Finally, we are removing Farm Service Agency from a chapter in the CFR as they no longer use any of the parts under that chapter.

**DATES:** This final rule is effective September 22, 2020.

**FOR FURTHER INFORMATION CONTACT:** Greg Batson, Strategic Engagement, Rural Development Innovation Center, U.S. Department of Agriculture; *gregory.batson@usda.gov;* (573) 239–2945.

**SUPPLEMENTARY INFORMATION:**

**Background and Discussion**

The Agency administers a multitude of Federal programs for the benefit of rural America, ranging from housing and community facilities to infrastructure and business development. Its mission is to increase economic opportunity and improve the quality of life in rural communities by providing the leadership, infrastructure, capital, and technical support that enables rural communities to prosper. To achieve its mission, the Agency provides financial support (including direct loans, grants, and loan guarantees) and technical assistance.

Section 379H Strategic and Economic Community Development of the Consolidated Farm and Rural Development Act (7 U.S.C. 2008v) supports rural communities by promoting regional economic and community development. Reservation of targeted funds are available for covered Rural Development programs to encourage regional economic and community development. Section 6401 of the 2018 Farm Bill amended Section 379H, Strategic Economic and Community Development of the

Bleeding Heartland



# Under Trump, farm subsidies soared and the rich got richer

✎ Wednesday, Feb 24 2021 | Anne Schechinger | 1 Comment

*Anne Schechinger: President Joe Biden and Congress must reform a wasteful and unfair farm subsidy system. This report first appeared on the Environmental Working Group's website. -promoted by Laura Belin*

Taxpayer-funded farm subsidies have long been skewed in favor of the richest farmers and landowners. But under the Trump administration, even more money went to the largest and wealthiest farms, further shortchanging smaller, struggling family farms.

The Environmental Working Group's analysis of records from the U.S. Department of Agriculture finds that subsidy payments to farmers ballooned from just over $4 billion in 2017 to more than $20 billion in 2020 – driven largely by ad hoc programs meant to offset the effects of President Trump's failed trade war.

Not only did the amount of subsidies skyrocket, but the richest farms also increased their share: In 2016, about 17 percent of total subsidies went to the top 1 percent of farms and about 60 percent to the top 10th. In 2019, the richest 1 percent received almost one-fourth of the total, and the top 10th received almost two-thirds. (Note: EWG has yet to receive USDA data needed to compute the distribution of subsidies for all of 2020. Through June, the breakdown was 23.7 percent to the top 1 percent and 64.3 percent to the top 10th.)

The staggering growth of subsidies and the worsening inequity in distribution underscore the urgency for the Biden administration and the new Congress to enact commonsense farm subsidy reforms that will benefit small, struggling farmers and the environment and make up for the mistakes of the Trump years.

**Traditional Subsidies Are Dwarfed by Ad Hoc Programs**

APP. 000697

every year. These programs, the Agricultural Risk Coverage program, or ARC, and the Price Loss Coverage program, or PLC, are triggered if crop yields or prices are lower than expected. Farmers can choose to take part in either ARC or PLC for the entire length of each farm bill, typically five years. Not every farm receives payments from these programs every year, but many do, and the programs send out billions of dollars annually.

But even though these existing programs pay farmers for reductions in crop prices, the Trump administration established additional multi-billion-dollar ad hoc subsidy programs — subsidies for specific, limited and supposedly temporary purposes.

- The Market Facilitation Program, or MFP, paid billions to farmers in 2018 and 2019 for losses driven by tariffs that China placed on agricultural imports from the U.S. in retaliation for Trump's trade war.

- The Coronavirus Food Assistance Program, or CFAP, sent billions to farmers last year. The USDA is still accepting applications for this year, but Biden has ordered a freeze on payments until further notice.

ARC and PLC payments, from their inception in 2014 through 2019, the most recent year of payments, were $32.04 billion. But ad hoc subsidies far exceeded the total payments from those traditional programs in the final two years of the Obama administration and under Trump: a total of $49.08 billion in five years of annual disaster payments, two years of MFP payments and CFAP payments through October of last year.

Altogether, since 2014, ad hoc and traditional subsidy programs cost U.S. taxpayers more than $81.1 billion.

The chart below shows the growth in farm subsidies since 2018, when the MFP began. Since ARC and PLC payments are made in the calendar year after the year the crop was grown, we won't know the 2020 payments until this fall. So the chart below includes an estimate for 2020 ARC and PLC payments, provided by the Congressional Budget Office.

**Farm Subsidy Payments Between Program Years 2014 and 2020**



*Source: EWG, from data obtained through public records requests to the USDA, and the Congressional Budget Office's January 2020 Baseline for Farm Programs.*

South Dakota and Texas. Farmers in those states received more than $7 billion, or 51 percent of the total.

An interactive map that can be viewed here shows annual county-by-county subsidy payments since 2014. The 10 counties that received the highest ad hoc payments together received over $1.6 billion.

The massive outlays of taxpayer dollars aren't the only cost of wasteful farm subsidies.

Nationwide, nitrate contamination of drinking water – from nitrogen in fertilizer and manure running off farm fields – is a serious and growing health hazard. Analysis of USDA records shows how federal payments are subsidizing farms in counties with severe nitrate contamination.

For example, levels of nitrate in drinking water are especially high in the San Joaquin Valley of California, where communities with majority-Latino populations are the most likely to have high nitrate. Six of the 10 U.S. counties with the highest ad hoc subsidy payments are in the San Joaquin Valley – Fresno, Kern, Kings, Merced, Stanislaus and Tulare, which since 2014 received a total of $1.09 billion from disaster payments, MFP and CFAP.

Yet all of the traditional and ad hoc subsidies outlined above are only a part of the total payments American farmers receive every year. Federal crop insurance – a Depression-era ad hoc program written into law in 1980 – adds billions each year, and tends to pay farmers for the same reductions in crop prices as ARC and PLC. Conservation programs also make payments to farmers every year, but conservation payments are considerably smaller than farm subsidies or crop insurance.

**The Largest Farms Get the Most Money**

The USDA classifies 98 percent of all U.S. farms as "family farms," but the top 0.3 percent are considered "very large family farms." These biggest farms have a gross farm income of at least $5 million and in 2019 provided their operators a median household income of just under $1 million.

As USDA data shows, the great majority of both traditional commodity and ad hoc program payments go to the largest and wealthiest farms, which generally have considerable assets to fall back on in lean years. Small farms that struggle when crop prices are low or during the pandemic-triggered economic crisis get only a small portion of payments. It's no accident: The programs are designed so that farms with the largest acres or crop production get the highest payments.

For example, through the MFP in 2018 and 2019:

• The top 1 percent of recipients received 16 percent of payments, with an average total payment for both years of $524,298 per farm. The top 10 percent received 58 percent of payments, with an average total payment of $185,340.

• The bottom 80 percent of recipients received only 23 percent of payments – an average payment for both years of only $9,109 per recipient.

The ARC, PLC and CFAP programs had very similar payment concentrations. But compared to other Americans, do farmers need all this money?

In December, the USDA's Economic Research Service forecast that when all data for 2020 is in, the median income for all farm households is expected to be $86,992. That's almost 25 percent more than the 2019 median household income for all U.S. households of $69,703.

Just looking at income from farming, the huge ad hoc payments of recent years have made subsidies a large chunk of total farm income.

Between 2019 and 2020, total direct government payments to farms increased by over 107 percent, bringing the share of farm income from government payments to almost 40 percent. As the graphic below shows, that pushed 2020 farm income levels significantly above the 20-year average.

**Net Farm Income, 2000-2020**



Note: F=forecast. Values are adjusted for inflation using the Gross Domestic Product chain-type price index, 2020=100.
Source: USDA, Economic Research Service, Farm Income and Wealth Statistics. Data as of December 2, 2020.

*Source: EWG, from USDA Economic Research Service, 2020 Farm Sector Income Forecast*

It's clear that even most "small" farmers are better off than the average American – in 2019, only 3 percent of all farm households had levels of wealth that were lower than the average U.S. household.

Yet during the pandemic and economic crises of last year, when millions of Americans lost their jobs, had to close their small businesses and struggled to put food on the table, taxpayers sent over $20 billion to farmers through CFAP, plus annual disaster payments. (Like other subsidies, CFAP payments went disproportionately to the largest and richest farms, rather for direct aid to hungry Americans.) And that's before we know the figure for payments through ARC and PLC.

**How To Fix the Broken Farm Subsidy System**

The Biden administration and the new Congress have many opportunities to fix the traditional commodity farm subsidy programs of ARC and PLC, and to shift funding for the ad hoc programs into conservation programs that benefit farmers, all Americans and the environment. EWG recommends:

- Ending the huge ad hoc subsidy programs of the Trump administration. MFP, which paid out over $23 billion

5/7