are complete, it should not be renewed unless targeted to small farmers in need.

- Increasing funding for conservation programs. Instead of sending billions to the largest and wealthiest farms, funding for existing conservation programs should be increased. These programs still give money to farmers, but they also generate public health and environmental benefits through improved water quality and soil health. These programs also encourage the adoption of conservation practices that may reduce greenhouse gas emissions.

- Reforming traditional commodity farm subsidy programs. The ARC and PLC programs need a strict means test to stop most of the payments from going to the largest farms. Currently, farmers can receive payments as long as their income is less than $900,000 a year, or $1.8 million for a farmer and spouse. There is a $125,000 annual payment limit, but a farm can have an unlimited number of "partners" that can each receive up to $125,000, allowing many people who do not live or work on the farm to get a check every year. Restricting farms to just a few eligible managers could greatly reduce the number of city slickers who get payments.

- Changing farm subsidy programs to end USDA's racist legacy. Stricter payment and income limits that would send payments to small farms, instead of the largest farms, would benefit Black, Latino and Asian American farmers, who often own smaller farms than white farmers do.

*Anne Schechinger is senior analyst of economics for the Environmental Working Group.*



*Top photo of an Iowa cornfield by Natalia Kuzmina, available via Shutterstock.*

Tags: Advocacy, Agriculture, analysis, Commentary, COVID-19, Donald Trump, Federal Budget, Federal Government, Joe Biden

**About the Author(s)**

**Anne Schechinger**

**1 Comment**

Leave your comment below

***

Excellent column

If certain Iowans ran the universe, every farmer/landowner who wanted to be eligible for any Farm Bill program or subsidy would have to follow a good water-protecting conservation plan, with monitored compliance. That would provide a powerful incentive to do effective conservation while still keeping conservation optional, which conservative farm interests are fanatical about.

APP. 000701

But the outraged political screaming caused by such a proposal would ring from sea to shining sea, so shifting a lot of farm funding to conservation would be a great and more realistic idea. Fund-shifting would still cause some screaming, however. There are powerful interests that would like to keep the current conventional ag system going until our topsoil is gone.

Also, given Iowa land prices and the promise of higher crop prices, trying to get good conservation done here via public funds could be pricey. I've heard about two wealthy farm families in this area who are known for not doing any conservation except the minimum required for Farm Bill eligibility. One of the families already turned down existing cost-share money as not being nearly enough for them to do any more conservation.

**PrairieFan**  Wed 24 Feb 6:23 PM

# Comments

You must be logged in to post a comment.

•

7/27/24, 11:56 AM          After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equit…

Case 2:24-cv-00060-Z   Document 30-2   Filed 08/28/24   Page 48 of 272   PageID 10638

![USDA logo] **U.S. DEPARTMENT OF AGRICULTURE**

# After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equitably

*USDA Reopens Program Sign-Up to a Larger Share of Producers with Plans to Expand Outreach and New Programming*

---

**Press Release**
Release No. 0056.21

**Contact:** USDA Press
**Email:** press@usda.gov

---

**WASHINGTON, March 24, 2021** — Agriculture Secretary Tom Vilsack announced today that USDA is establishing new programs and efforts to bring financial assistance to farmers, ranchers and producers who felt the impact of COVID-19 market disruptions. The new initiative—**USDA Pandemic Assistance for Producers**—will reach a broader set of producers than in previous COVID-19 aid programs. USDA is dedicating at least $6 billion toward the new programs. The Department will also develop rules for new programs that will put a greater emphasis on outreach to small and socially disadvantaged producers, specialty crop and organic producers, timber harvesters, as well as provide support for the food supply chain and producers of renewable fuel, among others. Existing programs like the Coronavirus Food Assistance Program (CFAP) will fall within the new initiative and, where statutory authority allows, will be refined to better address the needs of producers.

APP. 000703

**USDA Pandemic Assistance for Producers** was needed, said Vilsack, after a review of previous COVID-19 assistance programs targeting farmers identified a number of gaps and disparities in how assistance was distributed as well as inadequate outreach to underserved producers and smaller and medium operations.

"The pandemic affected all of agriculture, but many farmers did not benefit from previous rounds of pandemic-related assistance. The Biden-Harris Administration is committed to helping as many producers as possible, as equitably as possible," said Vilsack. "Our new **USDA Pandemic Assistance for Producers** initiative will help get financial assistance to a broader set of producers, including to socially disadvantaged communities, small and medium sized producers, and farmers and producers of less traditional crops."

USDA will reopen sign-up for CFAP 2 for at least 60 days beginning on April 5, 2021. The USDA Farm Service Agency (FSA) has committed at least $2.5 million to improve outreach for CFAP 2 and will establish partnerships with organizations with strong connections to socially disadvantaged communities to ensure they are informed and aware of the application process.

The payments announced today (under Part 3, below) will go out under the existing CFAP rules; however, future opportunities for **USDA Pandemic Assistance** will be reviewed for verified need and during the rulemaking process, USDA will look to make eligibility more consistent with the Farm Bill. Moving forward, **USDA Pandemic Assistance for Producers** will utilize existing programs, such as the Local Agricultural Marketing Program, Farming Opportunities Training and Outreach, and Specialty Crop Block Grant Program, and others to enhance educational and market opportunities for agricultural producers.

# USDA Pandemic Assistance for Producers – 4 Parts Announced Today

### Part 1: Investing $6 Billion to Expand Help & Assistance to More Producers

USDA will dedicate at least $6 billion to develop a number of new programs or modify existing proposals using discretionary funding from the Consolidated Appropriations Act

APP. 000704

and other coronavirus funding that went unspent by the previous administration. Where rulemaking is required, it will commence this spring. These efforts will include assistance for:

- Dairy farmers through the Dairy Donation Program or other means:

- Euthanized livestock and poultry;

- Biofuels;

- Specialty crops, beginning farmers, local, urban and organic farms;

- Costs for organic certification or to continue or add conservation activities

- Other possible expansion and corrections to CFAP that were not part of today's announcement such as to support dairy or other livestock producers;

- Timber harvesting and hauling;

- Personal Protective Equipment (PPE) and other protective measures for food and farm workers and specialty crop and seafood producers, processors and distributors;

- Improving the resilience of the food supply chain, including assistance to meat and poultry operations to facilitate interstate shipment;

- Developing infrastructure to support donation and distribution of perishable commodities, including food donation and distribution through farm-to-school, restaurants or other community organizations; and

- Reducing food waste.

### *Part 2: Adding $500 Million of New Funding to Existing Programs*

USDA expects to begin investing approximately $500 million in expedited assistance through several existing programs this spring, with most by April 30. This new assistance includes:

- $100 million in additional funding for the Specialty Crop Block Grant Program, administered by the Agricultural Marketing Service (AMS), which enhances the competitiveness of fruits, vegetables, tree nuts, dried fruits, horticulture, and nursery crops.

7/27/24, 11:56 AM        After Identifying Gaps in Previous Aid, USDA Announces 'Pandemic Assistance for Producers' to Distribute Resources More Equit…

Case 2:24-cv-00060-Z   Document 30-2   Filed 07/22/24   Page 40 of 202   PageID 1061

- $75 million in additional funding for the Farmers Opportunities Training and Outreach program, administered by the National Institute of Food and Agriculture (NIFA) and the Office of Partnerships and Public Engagement, which encourages and assists socially disadvantaged, veteran, and beginning farmers and ranchers in the ownership and operation of farms and ranches.

- $100 million in additional funding for the Local Agricultural Marketing Program, administered by the AMS and Rural Development, which supports the development, coordination and expansion of direct producer-to-consumer marketing, local and regional food markets and enterprises and value-added agricultural products.

- $75 million in additional funding for the Gus Schumacher Nutrition Incentive Program, administered by the NIFA, which provides funding opportunities to conduct and evaluate projects providing incentives to increase the purchase of fruits and vegetables by low-income consumers

- $20 million for the Animal and Plant Health Inspection Service to improve and maintain animal disease prevention and response capacity, including the National Animal Health Laboratory Network.

- $20 million for the Agricultural Research Service to work collaboratively with Texas A&M on the critical intersection between responsive agriculture, food production, and human nutrition and health.

- $28 million for NIFA to provide grants to state departments of agriculture to expand or sustain existing farm stress assistance programs.

- Approximately $80 million in additional payments to domestic users of upland and extra-long staple cotton based on a formula set in the Consolidated Appropriations Act, 2021 that USDA plans to deliver through the Economic Adjustment Assistance for Textile Mills program.

### Part 3: Carrying Out Formula Payments under CFAP 1, CFAP 2, CFAP AA

The Consolidated Appropriations Act, 2021, enacted December 2020 requires FSA to make certain payments to producers according to a mandated formula. USDA is now expediting these provisions because there is no discretion involved in interpreting such directives, they are self-enacting.

APP. 000706

- An increase in CFAP 1 payment rates for cattle. Cattle producers with approved CFAP 1 applications will automatically receive these payments beginning in April. Information on the additional payment rates for cattle can be found on farmers.gov/cfap. Eligible producers do not need to submit new applications, since payments are based on previously approved CFAP 1 applications. USDA estimates additional payments of more than $1.1 billion to more than 410,000 producers, according to the mandated formula.

- Additional CFAP assistance of $20 per acre for producers of eligible crops identified as CFAP 2 flat-rate or price-trigger crops beginning in April. This includes alfalfa, corn, cotton, hemp, peanuts, rice, sorghum, soybeans, sugar beets and wheat, among other crops. FSA will automatically issue payments to eligible price trigger and flat-rate crop producers based on the eligible acres included on their CFAP 2 applications. Eligible producers do not need to submit a new CFAP 2 application. For a list of all eligible row-crops, visit farmers.gov/cfap. USDA estimates additional payments of more than $4.5 billion to more than 560,000 producers, according to the mandated formula.

- USDA will finalize routine decisions and minor formula adjustments on applications and begin processing payments for certain applications filed as part of the CFAP Additional Assistance program in the following categories:

  - Applications filed for pullets and turfgrass sod;

  - A formula correction for row-crop producer applications to allow producers with a non-Actual Production History (APH) insurance policy to use 100% of the 2019 Agriculture Risk Coverage-County Option (ARC-CO) benchmark yield in the calculation;

  - Sales commodity applications revised to include insurance indemnities, Noninsured Crop Disaster Assistance Program payments, and Wildfire and Hurricane Indemnity Program Plus payments, as required by statute; and

  - Additional payments for swine producers and contract growers under CFAP Additional Assistance remain on hold and are likely to require modifications to the regulation as part of the broader evaluation and future assistance; however, FSA will continue to accept applications from interested producers.

*Part 4: Reopening CFAP 2 Sign-Up to Improve Access & Outreach to Underserved Producers*

As noted above, USDA will re-open sign-up for of CFAP 2 for at least 60 days beginning on April 5, 2021.

- FSA has committed at least $2.5 million to establish partnerships and direct outreach efforts intended to improve outreach for CFAP 2 and will cooperate with grassroots organizations with strong connections to socially disadvantaged communities to ensure they are informed and aware of the application process.

Please stay tuned for additional information and announcements under the **USDA Pandemic Assistance to Producers** initiative, which will help to expand and more equitably distribute financial assistance to producers and farming operations during the COVID-19 national emergency. Please visit www.farmers.gov for more information on the details of today's announcement.

USDA touches the lives of all Americans each day in so many positive ways. In the Biden-Harris administration, USDA is transforming America's food system with a greater focus on more resilient local and regional food production, ensuring access to healthy and nutritious food in all communities, building new markets and streams of income for farmers and producers using climate-smart food and forestry practices, making historic investments in infrastructure and clean-energy capabilities in rural America, and committing to equity across the Department by removing systemic barriers and building a workforce more representative of America. To learn more, visit www.usda.gov.

\#

USDA is an equal opportunity provider, employer, and lender.

**Report to Congress**


**A Comparison of Transfers and Subsidies to Minority and Non-Minority Producers Associated with Key Farm and Conservation Programs**


**as**

**Requested by House Report 116-107**


**Prepared by:**

**FPAC Business Center/Economic and Policy Analysis Division**

**FPAC Business Center/Civil Rights Division**

**FPAC/Farm Service Agency**

**FPAC/Natural Resources Conservation Service**




**August 5, 2021**

1

## Executive Summary

House Report 116-107 requests that the U.S. Department of Agriculture (USDA) provide to the House Committee on Appropriations "a report on the distribution of farm subsidies, low-interest loans, and cost-share conservation programs and its impact on minority-owned farms."[1] Administrative data from the Farm Service Agency (FSA) and Natural Resources Conservation Service (NRCS) are used in this report to identify transfers and subsidies for select programs to minority and non-minority producers for (depending on the program) either program years 2015-2019 or program years 2015-2020.

Data from the 2017 Census of Agriculture indicate that nearly 8 percent of U.S. producers identified as minorities. Minorities accounted for 8 percent or fewer of the FSA and NRCS program payees analyzed in this report, with the exception of the Livestock Forage Program (LFP), at 10 percent, and the Environmental Quality Incentives Program (EQIP), at 11 percent. While minority producers accounted for 12 percent of EQIP payments between fiscal years 2015 and 2020, payments to minority producers did not exceed 8 percent for any other conservation or farm program. In general, minority producers accounted for a larger share of conservation program payees and payments than they did farm program payees and payments.

Much interest surrounds minority farmer participation in farm loan programs, and these programs are examined in depth, including primary loan servicing. Primary loan servicing is available to delinquent or distressed borrowers and may allow for restructuring, amortization with longer terms, and lower rates. On average, non-minority borrowers who received primary loan servicing had an average 71-basis point reduction in their rate, amounting to an average of $297 per borrower per year in interest subsidy. Minority borrowers received an average 82-basis point reduction from primary loan servicing, amounting to an average $309 subsidy per borrower per year. Minorities represented 6.6 percent of all borrowers receiving an interest write down.

The value of the explicit interest subsidy on an annual basis was estimated for down-payment and participation loans. The subsidy rate for obligations is the difference between the regular farm ownership interest rate and the interest rate for down-payment or participation loans. Between program years 2015 and 2020, FSA provided an explicit interest rate subsidy of $45.5 million (95 percent) to non-minorities and $2.2 million (5 percent) to minorities. The average subsidy per borrower was $2,664 for non-minorities and $2,235 for minorities.

FSA and NRCS continue to examine outreach and education processes to improve producer awareness and increase program participation. Solid steps are being taken to increase both awareness and participation in programs through employee outreach training, more in-depth data analysis, and stakeholder engagement and employee education regarding minority barriers and cultural sensitivities.

## Introduction

---

[1] The definition of "minority" for the majority of programs in this report is based on the definition of "socially disadvantaged farmer or rancher" in section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)). We use the terms "minority," "socially disadvantaged (SDA)," and "historically underserved" as program guidance uses these definitions. Data used in this report are for racial and ethnic demographics.

The Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Bill, 2020 (H. Rept. 116-107) requests that USDA provide to the Committee "a report on the distribution of farm subsidies, low-interest loans, and cost-share conservation programs and its impact on minority-owned farms."

The definition of "minority" for the majority of programs in this report is based on the definition of "socially disadvantaged farmer or rancher" in section 2501(a) of the Food, Agriculture, Conservation, and Trade Act of 1990 (7 U.S.C. 2279(a)). We use the terms "minority," "socially disadvantaged" (SDA), and "historically underserved" in this report as program guidance uses these definitions. Data used in this report are for racial and ethnic demographics.

This report examines the distribution of benefits and payments associated with key farm subsidy, low-interest loan, and cost-share conservation programs managed by FSA and NRCS. Not all FSA subsidy programs are analyzed; rather, programs were chosen based on the volume of payments and to provide a comparison between longstanding farm bill ("mandatory") programs, other programs, and recent ad hoc programs.[2] Programs analyzed include:

- Safety Net Programs
  - Agriculture Risk Protection/Price Loss Coverage (ARC/PLC)
  - Livestock Indemnity Program (LIP)
  - Livestock Forage Program (LFP)

- Ad Hoc Programs
  - Market Facilitation Program (MFP)
  - Coronavirus Food Assistance Program (CFAP)

- Conservation Programs
  - Conservation Reserve Program (CRP)
  - Environmental Quality Incentives Program (EQIP)
  - Conservation Stewardship Program (CSP)
  - Agricultural Management Assistance (AMA)

- Farm Loan Programs
  - Direct Loan Programs with an Explicit Interest Rate Subsidy
    - Down-payment Loans
    - Participation Loans
    - Primary Loan Servicing
  - Total Value of Interest Rate Subsidy for Direct Loans

The safety net and ad hoc programs listed above have specific eligibility criteria with payments (cash transfers) based on the size of operation (typically in terms of some measure of acreage or number of animals). Conservation programs involve financial assistance and, in the case of CRP cash transfers in the form of annual rental payments. In contrast, farm loan programs are credit

---

[2] Crop insurance is not included given that subsidies are expressed as a discount on a producer's premium bill and are not transfer payments. If a producer purchases insurance and has no losses, the producer has received no net payment from the government.

programs that can contain an interest rate subsidy. As a result, a different approach is used to analyze subsidy issues for these programs and a more detailed analysis is provided in the report

Along with 2017 Census of Agriculture data, administrative data from FSA and NRCS for program years 2015-2019 or program years 2015-2020 form the basis for this report. Several notes are important to understanding the administrative data:

***Producer race and ethnicity data***—Historically, FSA employees would record the race and ethnicity of its customers based either on self-reporting by customers or often from visual observations by FSA staff. Currently, in accordance with Departmental Regulation 4370-001, farm program participants' reporting of race and ethnicity is entirely voluntary unless the applicant wishes to qualify for socially disadvantaged-targeted funds associated with FSA credit programs. With future customers, FSA is transitioning away from any employee and third-party observations and relying on voluntary self-reporting by customers. The data tables in this report rely on historical reporting of race and ethnicity which includes third-party observations by FSA staff.

If an FSA customer voluntarily provides race and ethnicity information on the AD-2106 or AD-2047 form for a farm program (such as ARC/PLC or CFAP), it is "Customer Declared." If the race or ethnicity of a customer is observed by an FSA employee or other third party, it is "Not Verified."

As shown in Table 1, the "Not Verified" category accounts for a large portion of the race and ethnicity data captured by FSA. The data in this report regarding FSA programs rely on both the "Customer Declared" and "Not Verified" data.

Table 1. Proportion of FSA Minority Customers in FSA Data System by Method Identified: "Customer Declared" vs. "Not Verified"

|  | Asian, Pacific Islander, Hawaiian Native | Black or African American | American Indian and Alaska Native | Hispanic | White | Any Racial/Ethnic Minority |
|---|---|---|---|---|---|---|
| Customer Declared | 29% | 19% | 18% | 33% | 13% | 23% |
| Not Verified | 71% | 81% | 82% | 67% | 87% | 77% |

Source: FSA Business Partner data system; accessed February 23, 2021.

NRCS uses a different data collection strategy, in addition to the use of the AD-2106 as authorized by DR 4370-001. NRCS conservation program applications contain a section where the producer may self-certify as socially disadvantaged. This election is available for all NRCS programs as many programs offer benefits in ranking or advanced payments to socially disadvantaged producers. This option involves "checking a box," which confirms that the producer is socially disadvantaged but does not ask for specifics regarding race or ethnicity. Thus, the NRCS data presented in this report include only "Customer Declared" data.

4

***Race and ethnicity reporting varies throughout the report depending on the data source***—For the 2017 Census of Agriculture data (Figure 1), individuals can report more than one race in addition to ethnicity, and producers are included in each category they report. If a producer declares that they are both "Black" and "Hispanic," then they appear in both categories. Similarly, if a producer declares both "Black" and "White," then they appear in both categories.

In contrast, most tables in this report use a more streamlined approach where a producer can be in only one category (Tables 2-11, 13, 15, 17, and 18). For the NRCS programs, any producer may self-certify as minority and all who do not are considered non-minority (no unknowns). For the FSA non-credit programs and CRP, producers who self-identified or were identified by local FSA staff as a racial minority or Hispanic ("not verified") are categorized as minorities, while producers who self-identified or were identified by FSA staff ("not verified") as White and not Hispanic are categorized as non-minority. Any others are considered "minority status unknown" (see discussion below). Thus, for FSA farm programs, all NRCS programs, and Farm Loan Programs, if a producer declares both "Black" and "Hispanic" or "White" and "Black," he or she appears just once in the "minority" category (see Tables 2-11, 13, 15, 17, and 18).

Data collection for Farm Loan Programs has a different history. The Farm Loan Programs section of this report contains a set of tables and maps (Tables 12, 14, 16, Figures 6, 7, and 8) that show distinct race and Hispanic categories. A producer declaring both "Black" and "Hispanic" will be reported in both categories. In addition, a producer can report up to five races. However, only one racial category is provided for **reporting** purposes to avoid duplication and the reporting of over 100 possible combinations. For borrowers choosing more than one race, Farm Loan Programs has historically identified race or ethnicity for reporting purposes in alphabetical order: Asian, Black, Native Indian/Alaska Native, Pacific Islander/Hawaiian, White.[3]

***Minority status unknown***—The administrative data tables appearing in this report contain a "minority status unknown" category. Corporations, partnerships, LLCs, and other entities may designate as to race and ethnicity (although it is not required). (See footnote for detail.)[4] Those who do not designate appear in the "minority status unknown" category.

***Producers include both owners and operators***—Both Census and USDA data include owners and operators as producers, since farm operators are involved in making day-to-day management decisions and can be eligible for many of the programs covered in this report. Producers who meet eligibility requirements may participate in more than one of the programs discussed in this report.

**Census Data on the Race and Ethnicity of Farm Producers**

The Census of Agriculture, conducted every five years, provides context as to the proportion of minority farmers relative to total U.S. farmers. The Census of Agriculture is a complete count of

---

[3] For example, a borrower declaring "Asian" and any other racial category is reported as "Asian." A Black producer with any other race (other than "Asian") would be reported as "Black."

[4] The race, ethnicity, and gender data selection and system requirements for both individuals and entities are in Handbook 11-CM subparagraph 60 C, page 3-39. See: https://www.fsa.usda.gov/Internet/FSA_File/11-cm_r00_a03.pdf.

U.S. farms and ranches and the people who operate them. Even small plots of land—whether rural or urban—are counted if $1,000 or more of agricultural products were produced and sold, or normally would have been sold, during the Census year. The most recent Census year for which data were collected is 2017. USDA's National Agricultural Statistics Service (NASS) mailed 2017 Census of Agriculture questionnaires to farm and ranch operators in December 2017 to collect data for the 2017 calendar year.

This report takes the broadest approach for counting racial and ethnic minority producers. The 2017 Census of Agriculture collected data on up to four[5] producers from each of the nation's two million farms for a total of 3.4 million producers (Figure 1). All of these producers are counted, and if a producer reports more than one race (or race and Hispanic ethnicity), they are included in each category and therefore categories will sum to more than the total.[6]

The vast majority of producers, 96.2 percent, identified as White (Figure 1). The next largest racial category[7] was American Indian or Alaska Native, accounting for 2.3 percent of producers. Black or African American producers were 1.4 percent of all producers. Asian producers were 0.7 percent, and Pacific Islander, and Native Hawaiian producers accounted for 0.2 percent. In a separate question, Hispanic producers were 3.3 percent of the total. Combined, all minorities accounted for just under 8 percent of all U.S. producers.

Figure 1. Number of U.S. Producers by Race/Ethnicity,[a] 2017



[a] Producers may report (and be included in) more than one race, or by race and in the Hispanic category.
Source: 2017 U.S. Census of Agriculture.

Figure 2 shows farm specialization and average acreage for operations by different race and ethnicity categories. Several of the programs discussed later in this report have eligibility requirements based on crop type and other considerations. The differences in farm type and size among producers of different race/ethnicity is one contributing reason to the differences in payments detailed later.

---

[5] Fifty-four percent of farms had multiple producers.
[6] Note that other sources may take alternative approaches and calculate different totals than reported here.
[7] NASS publishes profiles that contain additional information about minority producers. See: https://www.nass.usda.gov/Publications/AgCensus/2017/Online_Resources/Race,_Ethnicity_and_Gender_Profiles/cpd99000.pdf.

APP. 000714

Figure 2. Percent of Farm Specialization and by Race/Ethnicity,[a] 2017



<sup>a</sup> Producers may report (and be included in) more than one race, or by race and in the Hispanic category.
Source: 2017 U.S. Census of Agriculture.

## Safety Net Programs

### Agriculture Risk Coverage-County (ARC-CO) and Price Loss Coverage (PLC)

The ARC-CO and PLC programs, first authorized by the Agricultural Act of 2014 (the 2014 Farm Bill), are administered by FSA. ARC-CO provides payments when actual crop revenue declines below a specified guarantee level established for the county in any given year, while PLC provides payments when the national effective price for a covered commodity falls below

APP. 000715

its effective reference price. Producers must have base acres[8] associated with one of the 22 covered commodities[9] to be eligible for payment.

Table 2 shows the ARC-CO and PLC payee count and payments for non-minorities, minorities, and producers with unknown minority status over program years 2015-2019 and for the total of the years. (Note that a program year for ARC-CO and PLC encompasses a variety of different crop marketing years. Further, marketing year price data are necessary to compute ARC/PLC payments for every crop. As a result, program year 2018 payments for most crops, for example, were released in October of 2019.  Payments for the last cycle of crops in any given year are made in February.

Table 2. Combined Agriculture Risk Coverage-County (ARC-CO) and Price Loss Coverage (PLC) Data, Program Years 2015–2019[a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| 2015 | 754,632 | $7,401,071,980 | 14,928 | $74,168,568 | 31,338 | $451,517,296 |
| 2016 | 711,468 | $6,539,336,815 | 14,505 | $88,404,459 | 30,685 | $458,517,660 |
| 2017 | 533,893 | $2,849,618,446 | 12,533 | $45,931,292 | 24,124 | $228,931,256 |
| 2018 | 478,762 | $2,367,350,333 | 12,193 | $42,065,745 | 23,781 | $212,333,976 |
| 2019 | 694,781 | $5,684,489,089 | 13,347 | $81,700,646 | 37,250 | $480,976,184 |
| 5-year average | 634,707 | $4,968,373,333 | 13,501 | $66,454,142 | 29,436 | $366,455,274 |

[a] The data for this report were developed early in calendar 2021, prior to the end of the 2020 ARC/PLC program year.

Non-minorities accounted for an average of 634,707ARC-CO and PLC payees per year (94 percent) and an average of $4.97 billion in payments per year (92 percent) for the 2015-2019 program years. Minorities accounted for an average of 13,501 payees per year (2 percent) and an average of $66.45 million of payments per year (1 percent). USDA had no race or ethnicity data on the remaining payees.

**Livestock Indemnity Program (LIP)**

LIP, also administered by FSA, originated in the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill). It provides benefits to eligible livestock owners or contract growers for livestock deaths in excess of normal mortality caused by eligible loss conditions, including

---

[8] All programs discussed in this report require that a producer must: 1) be in compliance with highly erodible land conservation and wetland conservation provisions, and 2) have an average adjusted gross income that does not exceed $900,000 for the three most recent tax years. ARC/PLC is the only program containing a base acre requirement.  Minority producers held 1 percent of enrolled base in 2019 that can be attributed by minority status. See Appendix for detailed data and information.

[9] The 22 covered commodities are: wheat, oats, barley, corn, grain sorghum, long grain rice, medium/short grain rice, temperate japonica rice, seed cotton, dry peas, lentils, large and small chickpeas, soybeans, peanuts, sunflower seed, canola, flaxseed, mustard seed, rapeseed, safflower, crambe, and sesame seed.

eligible adverse weather, eligible disease, and attacks by animals reintroduced into the wild by the Federal government or protected by federal law, including wolves and avian predators. The eligible loss condition must have directly resulted in the producer's livestock either dying or being injured and sold at a reduced price.

Table 3. Livestock Indemnity Program (LIP) Data, Program Years 2015–2019[a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| 2015 | 6,234 | $42,888,418 | 214 | $2,092,693 | 108 | $3,021,438 |
| 2016 | 3,170 | $19,954,717 | 150 | $735,195 | 68 | $918,126 |
| 2017 | 2,746 | $25,480,839 | 537 | $6,133,400 | 123 | $4,264,282 |
| 2018 | 5,164 | $29,532,504 | 339 | $3,689,226 | 141 | $2,087,314 |
| 2019 | 9,821 | $70,368,406 | 423 | $4,391,258 | 389 | $7,323,028 |
| 5-year average | 5,427 | $37,644,977 | 333 | $3,408,354 | 166 | $3,522,838 |

[a] Sign-up for the 2020 LIP program was not final until March 2021; hence, the 2020 data are not included here.

Table 3 details the number of LIP payees and payment totals for program years 2015-2019 by minority status. Non-minorities accounted for an average of 5,427 LIP payees per year (92 percent) and $37.64 million of payments per year (84 percent) for the 2015 through 2019 program years. Minorities accounted for an average of 333 payees per year (6 percent) and $3.41 million in payments per year (8 percent). USDA had no race or ethnicity data on the remaining payees.

**Livestock Forage Disaster Program (LFP)**

LFP, also originating in the 2008 Farm Bill and administered by FSA, provides payments to eligible livestock owners and contract growers who have covered livestock and who are also producers of grazed forage crop acreage (native and improved pasture land with permanent vegetative cover or certain crops planted specifically for grazing) that have suffered a loss of grazed forage due to a qualifying drought during the normal grazing period for the eligible county.[10] To be eligible for LFP, the grazing or pastureland must be physically located in a county rated by the U.S. Drought Monitor as in at least D2 (severe drought) status.[11]

---

[10] Eligible livestock graze forage grasses or legumes and include such species as alpacas, beef cattle, buffalo/bison, beefalo, dairy cattle, deer, elk, emus, equine, goats, llamas, reindeer or sheep. Within those species, animals that are eligible include those that are, or would have been, grazing the eligible grazing land or pastureland: 1) during the normal grazing period for the specific type of grazing land or pastureland for the county; or 2) when the Federal agency prohibited the livestock owner or contract grower from having livestock graze the normally permitted livestock on the managed rangeland due to fire.

[11] LFP also provides payments to eligible livestock owners or contract growers that have covered livestock and who are also producers of grazed forage crop acreage on rangeland managed by a Federal agency if the eligible livestock producer is prohibited by the Federal agency from grazing the normal permitted livestock on the managed rangeland due to a qualifying fire. The qualifying drought and qualifying grazing losses, and/or notification of prohibition to graze Federal land due to fire, must have occurred in the grazing period and crop year.

Table 4. Livestock Forage Disaster Program (LFP) Data, Program Years 2015–2019 [a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| 2015 | 58,779 | $478,636,786 | 7908 | $30,082,767 | 1330 | $22,653,822 |
| 2016 | 55,236 | $261,204,256 | 4975 | $14,048,028 | 841 | $9,733,498 |
| 2017 | 45,643 | $319,726,632 | 3730 | $21,319,693 | 1099 | $16,475,263 |
| 2018 | 76,931 | $437,584,492 | 7383 | $26,190,994 | 1978 | $23,068,227 |
| 2019 | 27,183 | $102,049,095 | 4384 | $9,746,737 | 748 | $6,005,567 |
| 5-year average | 52,754 | $ 319,840,252 | 5,676 | $20,277,644 | 1,199 | $15,587,275 |

[a] Sign-up for the 2020 LFP program was not final until February 2021; hence, the 2020 data are not included here.

Table 4 details the number of LFP payees and payment totals for program years 2015-2019 by minority status. Non-minorities accounted for an average of 52,754 LFP payees per year (88 percent) and an average of $319.84 million of payments per year (90 percent) for the 2015 through 2019 program years. Minorities accounted for an average of 5,676 payees per year (10 percent) and $20.28 million of payments per year (6 percent). USDA had no race or ethnicity data on the remaining payees.  Note that minority LFP payments are higher than for many other farm programs.  According to the 2017 Census of Agriculture, approximately 56 percent of all minority producers are located in Texas, California, Oklahoma, New Mexico, and Arizona—which have all experienced significant drought in recent years.

### Ad Hoc Programs

### Market Facilitation Program (MFP)

MFP, an ad hoc program using CCC Charter Act authority, was administered by FSA. It provided assistance to farmers and ranchers whose commodities in 2018 and 2019 were directly impacted by foreign retaliatory tariffs, resulting in the loss of traditional export markets. Program details were somewhat different in a comparison of 2018 and 2019 MFP. The 2018 MFP provided direct payments to help corn, cotton, sorghum, soybean, wheat, dairy, hog, shelled almond, and fresh sweet cherry producers. For crops, the payment was based on 2018 production.

In contrast, 2019 MFP assistance was available for producers of non-specialty crops,[12] dairy, hogs, and select specialty crops.[13] Assistance in 2019 for non-specialty crops was based on a single-county payment rate multiplied by a farm's total plantings of MFP-eligible crops in aggregate. Specialty crop producers received a payment based on 2019 acres of fruit or nut bearing plants, or in the case of ginseng, based on reported acres in 2019.

[12] Eligible non-specialty crops were: alfalfa hay, barley, canola, corn, crambe, dried beans, dry peas, extra-long staple cotton, flaxseed, lentils, long grain and medium grain rice, millet, mustard seed, oats, peanuts, rapeseed, rye, safflower, sesame seed, small and large chickpeas, sorghum, soybeans, sunflower seed, temperate japonica rice, triticale, upland cotton, and wheat. This acreage must have been planted by August 1, 2019, to be considered eligible for MFP payments.
[13] Eligible specialty crops were: almonds, cranberries, cultivated ginseng, fresh grapes, fresh sweet cherries, hazelnuts, macadamia nuts, pecans, pistachios, and walnuts.

Table 5. Market Facilitation Program (MFP) Data, Program Years 2018-2019

| | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| 2018 | 552,828 | 7,941,683,376 | 7,191 | 64,897,740 | 30,651 | 619,175,657 |
| 2019 | 612,210 | 13,153,507,091 | 10,274 | 168,101,106 | 35,538 | 1,176,855,183 |
| 2-year average | 582,519 | $10,547,595,234 | 8,733 | $116,499,423 | 33,095 | $898,015,420 |

Table 5 details the number of MFP payees and payments for 2018 and 2019 by minority status. Non-minorities accounted for an average of 582,519 MFP payees per year (93 percent) and an average of $10.55 billion of payments per year (91 percent) in 2018 and 2019, while minorities accounted for an average of 8,733 payees per year (1 percent) and an average of $116.50 million in payments per year (1 percent).

**Coronavirus Food Assistance Program (CFAP)**

CFAP, with funding provided by the Coronavirus Aid, Relief, and Economic Stability Act (CARES Act) and the CCC Charter Act, was administered by FSA via two programs—CFAP 1 and CFAP 2. They provided direct relief to producers who faced price declines and additional marketing costs due to the COVID-19 pandemic. Eligible producers of specified commodities were eligible for CFAP 1 payments if they suffered a 5 percent-or-greater price decline as a result of the COVID-19 pandemic and faced substantial marketing costs for inventories. The deadline for most producers to apply for CFAP 1 was September 11, 2020. Certain producers in Louisiana, Oregon, and Texas could apply through October 9, 2020.

CFAP 2 also provided producers with financial assistance to absorb some of the increased marketing costs associated with the COVID-19 pandemic. CFAP 2 sign-up opened on September 21 and ran through December 11, 2020;[14] commodity eligibility for CFAP 2[15] was broader than for CFAP 1.

Table 6. Coronavirus Food Assistance Program (CFAP) Data, through January 27, 2021

| | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Payees | Payments | Payees | Payments | Payees | Payments |
| CFAP 1 | 595,302 | 9,047,821,024 | 28,962 | 375,755,073 | 27,609 | 1,172,717,079 |
| CFAP 2 | 817,919 | 11,442,486,251 | 31,860 | 348,928,936 | 43,738 | 1,539,200,507 |
| CFAP average | 706,611 | $10,245,153,638 | 30,411 | $362,342,005 | 35,674 | $1,355,958,793 |

Table 6 details the number of payees and payment totals for CFAP through January 27, 2021 by minority status. Non-minorities accounted for an average of 706,611 CFAP payees (91 percent) and an average of $10.25 billion in payments (86 percent), while minorities accounted for an

---

[14] On March 24, 2021, USDA announced that sign-up for CFAP 2 would be re-opened for at least 60 days beginning on April 5, 2021. This report covers CFAP payments through January 27, 2021.
[15] See https://www.farmers.gov/cfap1 and https://www.farmers.gov/cfap2 for eligible commodities.

average of 30,411 payees (4 percent) and an average of $362.34 million of payments (3 percent). USDA had no race or ethnicity data on the remaining payees.

## Conservation Programs[16]

### Conservation Reserve Program (CRP)

FSA's CRP, first established in the Food Security Act of 1985 (the 1985 Farm Bill), involves producer entry into voluntary contracts so that environmentally sensitive agricultural land is not farmed but is instead devoted to conservation benefits. CRP participants establish long-term, resource-conserving plant species, such as approved grasses or trees to control soil erosion, improve water quality, and develop wildlife habitat. In return, FSA provides participants with rental payments and cost-share assistance. Contract duration is between 10 and 15 years. Cost-share assistance cannot be more than 50 percent of the participants' costs to establish approved practices.

Table 7. Conservation Reserve Program (CRP) Cost-Share Assistance Data, Fiscal Years 2015-2020 average 251265724

| | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| Year | Payees | Payments | Payees | Payments | Payees | Payments |
| 2015 | 35,261 | $62,989,845 | 329 | $805,754 | 1,433 | $4,104,480 |
| 2016 | 48,593 | $99,090,866 | 387 | $1,377,847 | 2,218 | $5,990,036 |
| 2017 | 50,205 | $103,259,989 | 399 | $1,754,306 | 2,501 | $7,038,261 |
| 2018 | 51,339 | $99,815,169 | 470 | $961,837 | 2,817 | $7,505,325 |
| 2019 | 36,642 | $46,686,318 | 271 | $616,062 | 2,054 | $3,868,754 |
| 2020 | 30,905 | $33,573,382 | 203 | $314,031 | 1,878 | $2,559,830 |
| 6-year average | 42,158 | $74,235,928 | 343 | $971,639 | 2,150 | $5,177,781 |

Table 7 details the number of CRP payees and cost-share payment totals for fiscal years (FYs) 2015-2020 by minority status. Non-minorities accounted for an average of 42,158 CRP cost-share assistance payees per year (94 percent) for the 2015 through 2020 fiscal years with an average of $74.24 million of payments per year (92 percent), while minorities accounted for an average of 343 payees per year (1 percent) and an average of $971,639 of payments per year (1 percent).

### Environmental Quality Incentives Program (EQIP)

---

[16] The statutory language refers to "cost-share" conservation programs; as a result, only cost-share payments are reported in this section.

APP. 000720

EQIP, first authorized by the Federal Agriculture Improvement and Reform Act of 1996 (the 1996 Farm Bill), is administered by NRCS. EQIP provides financial and technical assistance to agricultural producers to address natural resource concerns and deliver environmental benefits such as improved water and air quality, conserved ground and surface water, increased soil health and reduced soil erosion and sedimentation, improved or created wildlife habitat, and mitigation against drought and increasing weather volatility.

EQIP provides special provisions for historically underserved participants including socially disadvantaged producers (racial or ethnic minorities), limited resource farmers, beginning farmers and ranchers, and veteran farmers and ranchers.[17] EQIP pays up to 75 percent of the estimated incurred cost of practice implementation, and up to 90 percent of the estimated incurred cost for qualifying historically underserved producers. In addition, historically underserved producers are eligible for advance payments under EQIP to help offset the costs of purchasing materials or contracting. The 2018 Farm Bill authorized historically underserved producers to elect to receive an advanced payment of not less than 50 percent of the EQIP conservation practice payment amount. Upon completion of the conservation practice, the historically underserved producer receives the remainder of the conservation practice payment amount.

Table 8. Environmental Quality Incentives Program (EQIP) Payment Data, Fiscal Years 2015–2020

| Year | Non-Minorities | | Minorities | |
|---|---|---|---|---|
| | Payees | Payments | Payees | Payments |
| 2015 | 26,290 | $641,886,700 | 2,811 | $73,268,216 |
| 2016 | 28,995 | $745,047,809 | 3,390 | $98,896,819 |
| 2017 | 30,976 | $784,767,950 | 3,712 | $108,889,485 |
| 2018 | 34,863 | $804,460,153 | 4,593 | $121,629,698 |
| 2019 | 35,696 | $598,883,245 | 4,021 | $79,803,368 |
| 2020 | 29,926 | $131,875,539 | 3,679 | $21,311,505 |
| 6-year average | 31,124 | $617,820,233 | 3,701 | $83,966,515 |

Table 8 details the number of EQIP payees and payment totals for FYs 2015-2020 by minority status. Non-minorities accounted for an average of 31,124 EQIP payees per year (89 percent) and $617.82 million of EQIP payments per year (88 percent), while minorities accounted for an average of 3,701 payees per year (11 percent) and $83.97 million of payments per year (12 percent).

**Conservation Stewardship Program (CSP)**

CSP, also administered by NRCS, began with the 2008 Farm Bill and helps producers maintain and improve their existing conservation systems and adopt additional conservation activities to address priority resource concerns. CSP addresses various resource concerns including soil

---

[17] For more information, see: https://www.nrcs.usda.gov/wps/portal/nrcs/main/national/people/outreach/slbfr/

quality, soil erosion, water quality, water quantity, air quality, plant resources, and animal resources as well as energy. CSP pays participants for conservation performance—the higher the performance, the higher the payment.

Table 9. Conservation Stewardship Program (CSP) Payment Data, Fiscal Years 2015–2020

| Year | Non-Minorities | | Minorities | |
|---|---|---|---|---|
| | Payees | Payments | Payees | Payments |
| 2015 | 15,593 | $1,299,709,440 | 643 | $52,899,598 |
| 2016 | 11,080 | $895,720,973 | 620 | $38,744,214 |
| 2017 | 11,393 | $686,687,691 | 533 | $24,304,810 |
| 2018 | 9,894 | $435,821,763 | 479 | $14,539,790 |
| 2019 | 5,255 | $116,558,123 | 370 | $7,411,397 |
| 2020 | 6,235 | $51,042,106 | 428 | $2,451,169 |
| 6-year average | 9,908 | $580,923,349 | 512 | $23,391,830 |

Table 9 details the number of CSP payees and payment totals for FYs 2015-2020 by minority status. Non-minorities accounted for an average of 9,908 CSP payees per year (95 percent) and over $580.92 million of CSP payments per year (96 percent), while minorities accounted for an average of 512 payees per year (5 percent) and $23.39 million of payments per year (4 percent).

**Agricultural Management Assistance (AMA)**

AMA, first authorized by the Agricultural Risk Protection Act of 2000, helps agricultural producers manage financial risk through diversification, marketing, or natural resource conservation practices. NRCS administers the conservation provisions while USDA's Agricultural Marketing Service and Risk Management Agency implement the production diversification and marketing provisions. NRCS provides technical and financial assistance to AMA participants to address issues such as water management, water quality, and erosion control by incorporating conservation practices into their agricultural operations. AMA is only available in the sixteen states where crop insurance participation is historically low.

Table 10. Agricultural Management Assistance (AMA) Program Data, Fiscal Years 2015–2020

| Year | Non-Minorities | | Minorities | |
|---|---|---|---|---|
| | Payees | Payments | Payees | Payments |
| 2015 | 147 | $2,544,548 | 13 | $135,834 |
| 2016 | 233 | $2,809,554 | 10 | $124,338 |
| 2017 | 281 | $3,184,177 | 28 | $252,719 |
| 2018 | 129 | $2,025,268 | 10 | $64,453 |
| 2019 | 184 | $1,635,244 | 23 | $185,779 |
| 2020 | 418 | $722,357 | 30 | $26,028 |
| 6-year average | **232** | $2,153,525 | **19** | $131,525 |

14

Table 10 details the number of AMA payees and payment totals for FYs 2015-2020 by minority status. Non-minorities accounted for an average of 232 AMA payees per year (92 percent) and an average of $2.15 million of AMA payments per year (94 percent), while minorities accounted for an average of 19 payees per year (8 percent) and an average of $131,525 of payments per year (6 percent).

**Credit Programs**

USDA's FSA provides farmers with low-interest loans, authorized under the Consolidated Farm and Rural Development Act of the Agricultural Act of 1961, as amended. The interest-rate subsidies associated with these loans can be explicit or implicit. For this report, an explicit interest subsidy is the interest amount provided to the borrower below the Federal Government's cost of funds, which was presumed to be the rate charged by FSA on regular direct farm ownership loans (DFOs) or direct operating loans (DOLs). An implicit subsidy occurs when the interest rate to the borrower compensates the Government for the cost of funds but is still below rates charged by commercial lenders.

Several programs[18] administered by FSA include an explicit interest subsidy, including direct farm ownership down-payment and participation loans.[19] The explicit interest rate subsidy is the difference between the regular farm ownership interest rate (which are made at the government cost of funds) and the interest rate for down-payment or participation loans. Though FSA has made few in recent years, the emergency loan program also includes an explicit interest rate subsidy equal to the difference between rates on regular DOLs and EM loans. Figure 3 shows average loan interest rates since 2015 for regular DFO loans, DFO down-payment loans, DFO participation loans, and Emergency Loans (EM). DFO down-payment loans are made at 4 percent below the current regular DFO rate with a floor at 1.5 percent. DFO participation loans are made at 2 percent below the current regular DFO rate with a floor at 2.5 percent.

With interest rates on FSA regular farm loans below 5 percent over the past 5 years, the DFO and DOL statutory floor of 5 percent (the limited resource rate) is less relevant.  In addition, regular DOL rates declined such that EM loans have not provided an explicit interest rate subsidy to farmers. Borrowers may also receive an explicit interest rate subsidy through the limited resource program, but as is the case with EM loans, limited resource rates have been above regular program rates over the past 5 years, negating their need.

---

[18] See https://www.fsa.usda.gov/programsand-services/farm-loan-programs/.
[19] For more information on these loans, see:  https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/2019/sda_loansfact_sheet-aug_2019.pdf and https://www.fsa.usda.gov/programsand-services/farm-loan-programs/farm-ownership-loans/index.

Figure 3. Average Interest Rates on New Direct Loans by Month, 2015–2020



Source: USDA FSA OBFN Database
Note: Gaps in Emergency Loan line indicate no loans occurring in that month.

Borrowers can also receive an explicit interest rate subsidy through primary loan servicing.[20] Primary loan servicing is available to borrowers who are 90 days delinquent on any direct loan. In addition, any borrower experiencing financial distress may request primary loan servicing, even if not 90 days delinquent. Under primary loan servicing, payments may be deferred or loans may be restructured through consolidation, amortization with longer terms, and lower interest rates. Any reduction in interest rates represents a cost to the government and is considered an explicit subsidy to borrowers.[21]

Since regular DFOs and  DOLs are made at rates sufficient to cover the Government's cost of funds, they do not represent an explicit interest rate subsidy. These loans are, however, made at rates below what the borrower could receive from a commercial bank or Farm Credit institution. As such, they represent an implicit subsidy in that the receipt of a direct government loan provides a financial benefit in the form of reduced farm interest expense. In contrast, guaranteed loans are made and priced by commercial lenders at rates considered typical for comparable farm

---

[20] https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/archived-fact-sheets/Primary_and_Preservation_Loan_Servicing_for_Delinquent_FSA_Borrowers.pdf
[21] Under Primary Loan Servicing, interest rates may be reduced up to the current rate on new FSA loans.  However, this is still considered a cost to the government as rates are reduced below the rate initially in the loan contract.

APP. 000724

borrowers of similar risk.  For this analysis, guaranteed loans were considered to have neither an explicit nor implicit interest rate subsidy component.

Since minority farmers can access reserved direct loan funds,[22] it might be expected that minority farms would be well-represented in FSA direct loan programs. The following section presents data in several ways to shed light on the situation. Figure 4 is calculated for each state by dividing the number of minority direct loan participants by the total number of minority farms from the 2017 Census of Agriculture. The Census of Agriculture overstates the number of farms likely eligible for FSA loans;[23] therefore, Figure 4 can be interpreted as a lower bound for minority participation.

Minority farm participation in FSA direct loan programs varies significantly by state (Figure 4). Over 30 percent of minority farms in South Dakota and 23 percent in Oklahoma were direct loan borrowers in 2017. Other states with relatively high minority farm use of direct loans (over 10 percent) include Arkansas, Alabama, North Dakota, Vermont, Montana, and Nebraska. In 22 states, the percentage of minority farms participating in FSA's direct loan programs was in the range of 6-10 percent, and 20 states had 5 percent or fewer of minority farms with direct loans.

---

[22] Targeted funds refer to that portion of the annual allotment which is legislated set aside for exclusive use by minority farmers, women farmers, and beginning farmers.
[23] For FSA farm loan programs eligibility criteria, see:  https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/farm-ownership-loans/index.

APP. 000725

Figure 4. Percent of Minority Farms Who were FSA Direct Loan Borrowers, 2017



Source: USDA 2017 Census of Agriculture data and September 31, 2017 FSA direct loan R540 data.

For comparison, Figure 5 is calculated for each state by dividing the number of non-minority direct loan participants by the total number of non-minority farms from the 2017 Census of Agriculture. The scale of both maps is the same for consistency, and Figure 5 shows that the *rate* of use of FSA direct loans is much lower among non-minority farms than minority farms. In absolute numbers, however, there are more non-minority borrowers as will be shown in tables later in this report.

18

Figure 5. Percent of Non-Minority Farms Who were FSA Direct Loan Borrowers, 2017



**Down-Payment Loans**

Down-payment loans represented 17 percent of all DFO obligations between FYs 2015 and 2020 and are targeted exclusively to beginning farmers and underserved groups, including minorities and veterans. Down-payment loans may only be used for farmland purchase. The qualified applicant must provide 5 percent equity toward the purchase and may borrow a down-payment through the program of up to 45 percent of the purchase price or $300,000, whichever is less. The balance of the purchase price not covered by the down payment loan and the loan applicant's down payment may be financed by a commercial lender, private lender, a cooperative, or the seller.

Table 11 details the number of borrowers and loan totals for DFO down-payment loans for FYs 2015-2020 by minority status.  For FYs 2015-2020, non-minorities accounted for an average of 1,159 down-payment loan borrowers per year (95 percent) and an average of $192.26 million of down-payment loan obligation volume per year (95 percent), while minorities accounted for an average of 55 borrowers per year (4 percent) and $7.85 million of down-payment loan obligation volume per year (4 percent). USDA had no race or ethnicity data on the remaining loan recipients identified as unknown. The average down-payment loan size for minorities was $143,082 compared to $165,886 for non-minorities.

19

Table 11. FSA Direct Farm Ownership Down-Payment Loan Data, Fiscal Years 2015–2020[a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|------|-----------|------|-----------|------|-----------|------|
| | Borrowers | Loans | Borrowers | Loans | Borrowers | Loans |
| 2015 | 1,131 | $184,968,485 | 57 | $7,723,115 | 6 | $773,520 |
| 2016 | 1,136 | $184,424,006 | 44 | $6,910,075 | 10 | $1,862,910 |
| 2017 | 1,082 | $177,695,319 | 48 | $7,018,710 | 14 | $2,486,540 |
| 2018 | 1,274 | $214,940,545 | 58 | $8,268,247 | 21 | $3,759,745 |
| 2019 | 1,241 | $206,967,640 | 66 | $9,303,720 | 10 | $1,303,160 |
| 2020 | 1,090 | $184,578,134 | 56 | $7,850,030 | 15 | $3,243,540 |
| 6-year average | 1,159 | $192,262,355 | 55 | $7,845,650 | 13 | $2,238,236 |

[a]  Statute (Consolidated Farm and Rural Development Act, Section 355) requires that funds for farm ownership and operating loans be prioritized to minorities and women applicants.

DFO down-payment loans can draw from loan funds reserved for minorities. To qualify, a producer identifying as an underserved race or ethnicity must report their minority status. In these cases, race is identified by the customer rather than an employee and should be more precise than for other USDA programs. Organizational entities may qualify if their majority interest qualifies as minority. Some organizations may choose not to declare either race or ethnicity (for example, if they qualify due to beginning farmer or veteran status) and fall into the 'unknown' race category. Table 12 presents the number of down-payment loan borrowers by race and ethnicity for FYs 2015-2020. Due to overlap between race and ethnicity, the values do not sum to match those in Table 11.

Table 12. Down-Payment Loan Program Borrowers by Race/Ethnicity, Fiscal Years 2015-2020[a,b]

| Year | Asian, Pacific Islander, Hawaiian Native | Black or African American | American Indian and Alaska Native | Hispanic | Unknown | White |
|------|------|------|------|------|------|------|
| 2015 | 3 | 1 | 44 | 11 | 6 | 1,140 |
| 2016 | 1 | 0 | 36 | 10 | 10 | 1,144 |
| 2017 | 4 | 0 | 37 | 7 | 14 | 1,091 |
| 2018 | 5 | 4 | 38 | 11 | 21 | 1,293 |
| 2019 | 2 | 3 | 56 | 5 | 10 | 1,246 |
| 2020 | 3 | 0 | 44 | 9 | 15 | 1,104 |
| 6-year total | 18 | 8 | 255 | 53 | 59 | 7,018 |

[a] Data largely reflect new borrowers in each year.
[b] If a producer reports more than one race (or race and Hispanic ethnicity), they are included in each category and therefore categories will sum to more than the minority total in Table 11.

20

Approximately 75 percent of minority down-payment loan participants during FYs 2015-2020 were American Indians (Table 12), with 80 percent in Oklahoma[24] and another 10 percent in Kansas and Arkansas (Figure 6).

Figure 6.  Approximate Geographic Location of Down-Payment Loan Borrowers, Fiscal Years 2015-2020



**Participation Loans**

Participation loans have comprised one-third of all DFO obligations since FY 2015. Loans are made jointly with a commercial lender or State agency with FSA providing up to 50 percent of the proceeds. Loan amounts can be greater than down-payment loan amounts—up to $600,000—and can also be funded out of minority-targeted funds if a producer identifies as an underserved race or ethnicity. Table 13 indicates that, between FYs 2015-2020, on average 1,673 borrowers per year have been non-minorities (91 percent) who have received on average $366.32 million of participation loan obligation volume per year (92 percent), while minorities made up an average 143 borrowers per year (8 percent) and received on average $27.11 million of loan obligation volume per year (7 percent).

---

[24] Of the 129,619 Oklahoma producers recorded in the 2017 Census of Agriculture, 9 percent reported their race as American Indian only and an additional 4 percent reported being American Indian in combination with other races.

Table 13. Participation Loan Program Data, Fiscal Years 2015–2020[a]

| Year | Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|---|
| | Borrowers | Loans | Borrowers | Loans | Borrowers | Loans |
| 2015 | 1,415 | $279,779,542 | 136 | $21,360,151 | 17 | $4,026,540 |
| 2016 | 1,452 | $289,551,577 | 153 | $26,412,560 | 27 | $7,143,140 |
| 2017 | 1,629 | $326,243,592 | 144 | $22,835,050 | 22 | $5,525,696 |
| 2018 | 1,981 | $394,420,541 | 142 | $24,497,370 | 40 | $9,339,889 |
| 2019 | 2,192 | $523,235,691 | 172 | $39,515,010 | 36 | $10,392,130 |
| 2020 | 1,371 | $384,685,305 | 109 | $28,057,500 | 15 | $4,306,720 |
| 6-year average | 1,673 | $366,319,375 | 143 | $27,112,940 | 26 | $6,789,019 |

[a] Statute (Consolidated Farm and Rural Development Act, Section 355) requires that funds for farm ownership and operating loans be prioritized to minorities and women applicants.

As with the down-payment loan program, loans to minorities were smaller, averaging $190,044 versus $218,916 (Table 13). And, like the down-payment loan borrowers, most minority participation loan borrowers have been American Indians located in Oklahoma or nearby in Kansas or Arkansas (Table 14, Figure 7).

Table 14. Participation Loan Program Borrowers by Race/Ethnicity, Fiscal Years 2015-2020 [a, b]

| Year | Asian, Pacific Islander, Hawaiian Native | Black or African American | American Indian and Alaska Native | Hispanic | Unknown | White |
|---|---|---|---|---|---|---|
| 2015 | 5 | 7 | 112 | 15 | 17 | 1,433 |
| 2016 | 8 | 7 | 119 | 20 | 27 | 1,476 |
| 2017 | 10 | 6 | 110 | 18 | 22 | 1,650 |
| 2018 | 10 | 7 | 109 | 19 | 40 | 2,004 |
| 2019 | 9 | 6 | 134 | 27 | 36 | 2,228 |
| 2020 | 14 | 5 | 74 | 22 | 15 | 1,393 |
| 6-year total | 56 | 38 | 658 | 121 | 157 | 10,184 |

[a] Data largely reflect new borrowers in each year.
[b] If a producer reports more than one race (or race and Hispanic ethnicity), they are included in each category and therefore categories will sum to more than the minority total in Table 13.

Figure 7 Approximate Geographic Location of Participation Loan Borrowers, Fiscal Years 2015-2020



## Primary Loan Servicing

Between 2015 and 2020, only about 3 percent of all direct borrowers received primary loan servicing, and only one-third of those receiving primary loan servicing received an interest rate adjustment which can happen under certain interest-rate conditions. A comparison of interest rates before and after restructuring for those who received an interest rate adjustment allows estimation of the subsidy provided through primary loan servicing.

On average overall, non-minority borrowers who received primary loan servicing had an average 71-basis point reduction in their rate, amounting to an average of $297 per borrower per year in interest subsidy (Table 15). Minority borrowers received an average 82-basis point reduction from primary loan servicing, amounting to an average $309 subsidy per borrower per year. The higher basis point reduction for minorities would be consistent with greater financial difficulties, which would require a greater interest rate reduction through loan restructuring to cash flow. While only 1,059 minorities received an interest rate reduction in Fiscal Years 2015-2020, this represented 6.6 percent of all borrowers receiving an interest write down. American Indians were the primary minority group receiving primary loan servicing (Table 16).

Table 15. Borrowers Receiving Interest Reduction through Primary Loan Servicing, Fiscal Years 2015-2020 [a]

| Fiscal Year | Borrowers Receiving Primary Loan Servicing | | Average rate reduction | | Average interest reduction per borrower ($) per year | |
|---|---|---|---|---|---|---|
| | Non-Minority | Minority | Non-Minority | Minority | Non-Minority | Minority |
| 2015 | 1,910 | 59 | 0.92 | 1.10 | $320 | $262 |
| 2016 | 3,167 | 112 | 0.50 | 0.51 | $224 | $285 |
| 2017 | 3,701 | 306 | 0.50 | 0.52 | $188 | $256 |
| 2018 | 2,389 | 207 | 0.77 | 1.21 | $142 | $127 |
| 2019 | 2,492 | 212 | 0.77 | 1.32 | $168 | $144 |
| 2020 | 2,439 | 163 | 1.00 | 0.94 | $850 | $783 |
| 6-year average | | | 0.71 | 0.82 | $297 | $309 |
| 6-year total | 16,098 | 1,059 | | | | |

[a] The averages in this table focus on the borrower level and therefore the summary row is weighted per borrower over the entire period rather than each year receiving equal weight.

Table 16. Borrowers Receiving Interest Reduction through Primary Loan Servicing, by Race/Ethnicity, Fiscal Years 2015–2020 [a, b]

| Year | Asian, Pacific Islander, Hawaiian Native | Black or African American | American Indian and Alaska Native | Hispanic | White |
|---|---|---|---|---|---|
| 2015 | 4 | 29 | 26 | 0 | 1,910 |
| 2016 | 16 | 49 | 45 | 2 | 3,167 |
| 2017 | 19 | 96 | 186 | 7 | 3,701 |
| 2018 | 17 | 74 | 113 | 7 | 2,389 |
| 2019 | 25 | 68 | 117 | 5 | 2,492 |
| 2020 | 11 | 36 | 112 | 6 | 2,439 |
| 6-year total | **92** | **352** | **599** | **27** | **16,098** |

[a] Data largely reflect new borrowers in each year.
[b] If a producer reports more than one race (or race and Hispanic ethnicity), they are included in each category and therefore categories will sum to more than the minority total in Table 15.

While many minority primary loan servicing recipients are in Oklahoma, the geographic distribution is more widespread than for down-payment or participation loans (Figure 8).

APP. 000732

Figure 8.  Approximate Geographic Location of Primary Loan Servicing Borrowers, Fiscal Years 2015-2020



**Total Value of Interest Subsidy for Direct Loans**

The value of the explicit interest subsidy on an annual basis was estimated for down-payment and participation loans. The subsidy rate for obligations is the difference between the regular farm ownership interest rate and the interest rate for down-payment or participation loans. The value of the subsidy is estimated as the differential between the regular and subsidized rate multiplied by the outstanding loan balance for each of the two programs, then aggregated. The value of the subsidy is reported in the year in which the loan was obligated. Note that fluctuations in interest rates influence the amount of the direct subsidy and that, in recent years, low "regular" rates have reduced the value of the subsidy to borrowers.

Borrower totals and obligation amounts for down-payment and participation loans are listed in Tables 10 and 12. Table 17 details combined data on the two programs, highlighting the annual percent of minority borrowers and obligations over FYs 2015-2020. Minorities represented 7.7 percent of borrowers who received explicit interest subsidies for down-payment and participation loans which, on average, represented 5.8 percent of obligations per year reflecting a smaller average loan size for minorities. The value of subsidy was $45.5 million for non-minorities (95 percent) and $2.2 million (5 percent) to minorities. The average subsidy *per*

*borrower* was $2,664 per borrower for non-minorities compared to $2,235 for minorities, and the discounted present value of the subsidy per borrower was $44,664 for non-minorities and $38,067 for minorities (Table 17).

Table 17. Borrowers Receiving DFO Explicit Interest Subsidies for Participation and Down-Payment Loans), Fiscal Years 2015–2020[a, b]

| Year | Minority % of subsidy | | Total Value of subsidy (millions) | | Average interest subsidy/borrower per year | | Discounted Present Value of Subsidy/borrower | |
|---|---|---|---|---|---|---|---|---|
| | Borrowers | Obligations | Non-Minority | Minority | Non-Minority | Minority | Non-Minority | Minority |
| 2015 | 7.82% | 5.83% | $6.9 | $0.36 | $2,720 | $2,176 | $45,099 | $36,961 |
| 2016 | 8.29% | 6.45% | $6.5 | $0.33 | $2,515 | $2,006 | $42,099 | $35,264 |
| 2017 | 7.76% | 5.51% | $7.7 | $0.39 | $2,829 | $2,260 | $47,210 | $38,809 |
| 2018 | 7.42% | 5.00% | $9.7 | $0.47 | $2,933 | $2,636 | $48,211 | $43,766 |
| 2019 | 7.64% | 6.17% | $11.0 | $0.53 | $3,188 | $2,748 | $54,177 | $46,223 |
| 2020 | 7.34% | 5.86% | $3.7 | $0.17 | $1,485 | $1,269 | $26,002 | $22,307 |
| 6-year average | 7.70% | 5.80% | | | $2,664 | $2,235 | $44,664 | $38,067 |
| 6-year total | | | $45.5 | $2.24 | | | | |

[a] The explicit subsidy is the difference between the regular FO rate and the rate on Participation/Down-payment loans. The present value is estimated over 20 years for down payment loans and 35 years for participation loans by discounting the annual subsidy at the regular FO rate at the time of obligation.
[b] The averages in this table focus on the borrower level and, therefore, the summary row is weighted per borrower over the entire period rather than each year receiving equal weight.

In addition to the direct subsidy discussed above, there is an implicit interest subsidy in all direct loans based upon the difference between commercial lender interest rates and rates charged by FSA. Interest rates on direct FSA loans are based on the Government's cost of borrowing and are priced below what a borrower would likely pay a commercial bank or Farm Credit System institution. The Federal Reserve Board's Agricultural Finance Databook provides data on rates charged on farm loans by commercial banks, which were compared with rates for regular DFO and DOL rates to provide an estimate of the implicit subsidy. Over the 5-year period, rates on DFO loans were 277 basis points below average interest rates charged by commercial banks on farm real estate loans (Figure 9).

FSA DOL rates were 304 basis points below interest rates charged by commercial banks for nonreal estate loans, while EM rates were 200 basis points below. These estimates may be conservative given that FSA borrowers are above average risk and would likely pay higher rates if they could receive loans from commercial lenders.

APP. 000734

Figure 9. Average Interest Rates for Commercial Banks and Regular Direct Loans, 2001–2020



Source: Federal Reserve Bank, Ag Finance Databook and USDA OBFN Database

Table 18 details the value of implicit subsidies for borrowers from FYs 2015-2020. The average implicit annual benefit per borrower was $3,811 for non-minorities compared to $3,308 for minorities. These subsidies would be expected to continue over the life of the loan. For example, on a 30-year FO, the borrower would benefit from the subsidy for the entire 30 years. The annual subsidies reported in Table 18 have been discounted back to the original obligation year to provide an estimate of the total economic value of receiving lower interest rates. For non-minorities, this amounted to $59,765 per borrower over the 2015-2020 period. Because minorities had smaller loans, the present value of the subsidy was less, at $43,199 per borrower. These totals did not include the explicit interest rate subsidies inherent in down-payment and participation loans documented in Table 17. Adding in these totals shows that the total economic value of the interest subsidy for recipients of down-payment/participation loans exceeds $100,000 for non-minorities and $80,000 for minorities.

27

Table 18. Implicit Value of Subsidy Received by Direct Borrowers or DFO, DOL, and EM Loans, Fiscal Years 2015 – 2020[a,b]

| | Minority % of subsidy | | Average implicit subsidy/borrower per year | | Average Discounted Present Value of Subsidy[c] | |
|---|---|---|---|---|---|---|
| | Borrowers | Subsidy | Non-minority | Minority | Non-minority | Minority |
| 2015 | 7.2% | 5.5% | $2,947 | $2,408 | $47,606 | $32,749 |
| 2016 | 7.2% | 5.9% | $3,254 | $2,997 | $52,948 | $39,227 |
| 2017 | 6.5% | 5.1% | $3,262 | $2,667 | $51,833 | $34,465 |
| 2018 | 5.6% | 4.9% | $3,956 | $3,544 | $64,024 | $41,427 |
| 2019 | 6.5% | 5.6% | $4,916 | $4,617 | $76,433 | $60,831 |
| 2020 | 6.2% | 5.0% | $3,965 | $3,222 | $59,027 | $44,345 |
| 6-year average | 6.5% | 5.3% | $3,811 | $3,308 | $59,765 | $43,199 |

[a] Based on the difference in regular rates on FSA loans and average rate charged by commercial lenders. Excludes value of explicit subsidy presented in Table 16.
[b] The averages in this table focus on the borrower level and therefore the summary row is weighted per borrower over the entire period rather than each year receiving equal weight.
[cc] Based on a 25-year term for FO loans and a 5-year term for OLs, with subsidies expected in future years discounted at the FSA rate at time of loan obligation.

## Concluding Remarks

The data and information in this report are being used to improve awareness of minority participation in FSA and NRCS programs and to inform an internal review of its programs as part of implementation of Executive Order 13895, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government. FSA is taking steps to increase minority participation in programs through employee outreach training, more in-depth data analysis, and stakeholder engagement and employee education.  Concurrently, the agency is striving to better understand the extent to which there are substantial barriers to access or discrimination—overt or unintentional—that present obstacles to minorities and other underserved communities from accessing and fully participating in USDA programs.  At USDA we are recommitting ourselves to the values of equity and inclusion and to upholding civil rights and equal opportunity for our employees and those we serve.

APP. 000736

## Appendix

The table below identifies base acres enrolled in the 2019 ARC/PLC program by their minority status, calculated by using producers' payment shares.  As elsewhere in this report, a producer is considered a "minority" if the data indicates they are Black, Asian, American Indian, Native Alaskan, or Pacific Islander or if their ethnicity is listed as Hispanic.  A producer is considered a "non-minority" if the data indicates they are White (and have none of the other aforementioned race declared) and their ethnicity is listed as Non-Hispanic. All other producers are "Unknown."

Of the approximately 255 million base acres that exist, about 243 million base acres can be successfully attributed (see bottom of table). The bulk of the remaining base acres are enrolled in ARC-IC which does not use payment shares.  A smaller number of base acres have no assigned crop and are ineligible for enrollment in farm programs.  Farmers often set up their businesses as multi-member entities such as corporations. USDA is not required to assign a race or ethnicity to those entities, which explains a portion of the base acres included in the "Unknown" category.

**Table 19.  Attribution of 2019 Enrolled Base Acres by Minority Status**

| Non-Minorities | | Minorities | | Minority Status Unknown | |
|---|---|---|---|---|---|
| Crop name | Base acres | Crop name | Base acres | Crop name | Base acres |
| Barley | 3,990,218 | Barley | 84,756 | Barley | 1,287,716 |
| Canola | 1,300,091 | Canola | 10,018 | Canola | 160,490 |
| Small chickpeas | 17,171 | Small chickpeas | 248 | Small chickpeas | 4,452 |
| Large chickpeas | 58,812 | Large chickpeas | 1,069 | Large chickpeas | 21,779 |
| Corn | 71,553,862 | Corn | 519,105 | Corn | 17,639,049 |
| Crambe | 2,181 | Crambe | 168 | Crambe | 246 |
| Dry peas | 342,234 | Dry peas | 4,533 | Dry peas | 86,808 |
| Grain sorghum | 6,569,065 | Grain sorghum | 158,361 | Grain sorghum | 1,894,346 |
| Flaxseed | 208,256 | Flaxseed | 1,554 | Flaxseed | 19,621 |
| Lentils | 213,550 | Lentils | 3,908 | Lentils | 60,628 |
| Mustard | 18,573 | Mustard | 54 | Mustard | 5,804 |
| Oats | 1,669,603 | Oats | 33,545 | Oats | 318,326 |
| Peanuts | 1,947,444 | Peanuts | 56,627 | Peanuts | 416,468 |
| Rapeseed | 1,767 | Rapeseed | 0 | Rapeseed | 700 |
| Rice-long grain | 2,534,549 | Rice-long grain | 49,961 | Rice-long grain | 1,361,580 |
| Rice-med grain | 102,684 | Rice-med grain | 1,428 | Rice-med grain | 67,559 |
| Rice- temperate japonica | 328,788 | Rice-temperate japonica | 21,461 | Rice-temperate japonica | 199,360 |
| Safflower | 57,254 | Safflower | 2,441 | Safflower | 23,579 |
| Seed cotton | 9,124,906 | Seed cotton | 321,970 | Seed cotton | 3,426,787 |
| Sesame | 5,162 | Sesame | 17 | Sesame | 912 |
| Soybeans | 40,843,861 | Soybeans | 360,308 | Soybeans | 9,412,669 |
| Sunflowers | 1,300,816 | Sunflowers | 17,694 | Sunflowers | 301,738 |
| Wheat | 49,065,909 | Wheat | 1,034,322 | Wheat | 12,632,287 |
| Total | 191,256,756 | Total | 2,683,548 | Total | 49,342,904 |

| | |
|---|---|
| All enrolled 2019 base acres: 255,135,147 |
| Total base acres able to be attributed by minority status: 243,283,207 |
| Unattributed ARC-IC and unassigned base acres: 11,851,940 |

29

**48013**

# Rules and Regulations

**Federal Register**

Vol. 86, No. 164

Friday, August 27, 2021

---

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

---

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

**7 CFR Part 9**

**[Docket ID: FSA–2020–0006]**

**RIN 0503–AA71**

### Coronavirus Food Assistance Program 2; Producers of Sale-Based Commodities and Contract Producers

**AGENCY:** Office of the Secretary, Department of Agriculture (USDA).

**ACTION:** Final rule.

**SUMMARY:** This rule amends the Coronavirus Food Assistance Program 2 (CFAP 2) provisions related to assistance for producers of sales-based commodities and contract producers. This rule also announces the deadline for submitting CFAP 2 applications and clarifies general provisions related to equitable relief and refunds.

**DATES:**

*Effective date:* August 27, 2021.

*Comment due date:* With grass seed being added as an eligible crop under CFAP, we will consider comments on the information collection requirements under the Paperwork Reduction Act that we receive by: October 26, 2021.

**ADDRESSES:** We invite you to submit comments on the information collection requirements. You may submit comments by any of the following methods:

∀ *Federal eRulemaking Portal:* Go to: *www.regulations.gov* and search for Docket ID FSA–2020–0006. Follow the online instructions for submitting comments.

∀ *Mail, Hand-Delivery, or Courier:* Director, Safety Net Division, Farm Service Agency, U.S. Department of Agriculture, 1400 Independence Avenue SW, Stop 0510, Washington, DC 20250–0522. In your comment, specify the docket ID FS–2020–0006.

You may also send comments to the Desk Officer for Agriculture, Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

Comments will be available for inspection online at *http://www.regulations.gov.* Copies of the information collection may be requested by contacting Brittany Ramsburg at the above address.

**FOR FURTHER INFORMATION CONTACT:** Kimberly Graham; telephone: (202) 720–6825; email: *Kimberly.Graham@usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:** USDA established CFAP to assist producers of agricultural commodities marketed in 2020 who faced continuing market disruptions, reduced farm-level prices, and increased production and marketing costs due to COVID–19. CFAP went through two rounds of payments (CFAP 1 and CFAP 2), and the Farm Service Agency (FSA) is administering CFAP 2, as directed by the Secretary of Agriculture. USDA announced CFAP 2 through a final rule published in the **Federal Register** on September 22, 2020. 85 FR 59380–59388. A second final rule was published on January 19, 2021. 86 FR 4877–4883. That rule amended CFAP 2 provisions and included assistance for contract producers of swine and poultry (including broilers, pullets, layers, chicken eggs, and turkeys), who were not originally eligible for CFAP 2. After publication of that rule, USDA suspended approval of applications from contract producers while that final rule was under review.

As a result of that review and for consistency with the provisions of the Consolidated Appropriations Act, 2021 (CAA), Public Law 116–260, USDA is making changes to the provisions for CFAP 2 as described below. These changes include adjusting the CFAP 2 application deadline, changing the calculation of payments for sales-based commodities, adding grass seed as an eligible sales-based commodity, changing aspects of the provisions for assistance for contract producers, and clarifying the applicability of equitable relief provisions and provisions requiring refunds.

### Application Deadline

On March 24, 2021, USDA announced in a news release that the application period for CFAP 2 was reopened for all eligible producers for at least 60 days beginning on April 5, 2021. This reopening allowed USDA to improve outreach efforts and ensure that producers in socially disadvantaged communities were informed and aware of the application process. This rule announces that the CFAP 2 application deadline will be October 12, 2021, and amends 7 CFR 9.4 to specify the deadline. This deadline applies to all producers applying for CFAP 2, including producers of sales-based commodities and contract producers who submit new applications or revise previously filed applications due to the changes included in this rule.

### Sales-Based Commodities

Consistent with section 751 of Subtitle B of Title VII of Division N of CAA, USDA is amending the CFAP 2 payment calculation for sales-based commodities in 7 CFR 9.203(i) and (j) to allow eligible producers to substitute 2018 sales for 2019 sales. Previously, payments for producers of sales-based commodities were based only on 2019 sales; however, various conditions occurring in 2019 could have adversely affected a producer's amount of sales and therefore their CFAP 2 payment. CFAP 2 uses a producer's 2019 sales as an approximation of what the producer would have expected to market in 2020, which could not be determined for most producers at the time of application. Under the final rule published on January 19, 2021, crop insurance indemnities under the Federal Crop Insurance Act, 7 U.S.C 1501–1524, and 2019 crop year payments under the Noninsured Crop Disaster Assistance Program (NAP) and Wildfires and Hurricanes Indemnity Program Plus (WHIP+), are included as eligible sales under 7 CFR 9.202(i) in addition to the amount of the producer's 2019 sales, as required by Subtitle B, section 751, of the CAA. That change is intended to more accurately represent what a producer would have expected to have marketed in 2020 by taking into account commodities that would have been available for marketing in 2019 but were lost due to natural events. However, crop insurance indemnities and NAP and WHIP+ program payments for a

crop are less than the full amount that a producer would have expected to receive for marketing the commodity if there was no loss. Giving producers the option to substitute 2018 sales (including 2018 crop insurance indemnities and 2018 crop year NAP and WHIP+ payments) for 2019 sales provides additional flexibility to producers who had reduced sales in 2019.

In addition, USDA has determined that producers of grass seed faced continuing market disruptions, low farm-level prices, and significant marketing costs associated with the COVID–19 outbreak, similar to producers of commodities that were previously determined to be eligible for CFAP 2 assistance. As a result, USDA is amending the definitions of "Ineligible commodities" and "Sales-based commodities" in § 9.201 to make grass seed an eligible commodity.

**Contract Producers**

The final rule published on January 19, 2021, added provisions to provide assistance for contract producers and specified that those payments would be issued with remaining funding authorized by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act; Pub. L. 116–136). Contract producer payments were suspended before any CARES Act funding was used to fund those payments. Subtitle B, section 751 of the CAA specifically directs the Secretary to use not more than $1 billion of the additional funding provided under the CAA to make payments to contract producers of livestock and poultry to cover not more than 80 percent of their revenue losses, as determined by the Secretary of Agriculture, from January 1, 2020, through December 27, 2020. While CAA uses the term "contract grower" and the CFAP 2 regulation uses the term "contract producer" both terms refer to and mean the same people or entities; this rule uses the term "contract producer," for consistency. Payments to contract producers will be funded as authorized by the CAA rather than the CARES Act.

This rule also amends the provisions for contract producers based on additional evaluation of CFAP 2 and stakeholder concerns related to the payment calculation. The previous final rule provided assistance for contract producers of broilers, pullets, layers, chicken eggs, turkeys, hogs, and pigs. After further review, USDA has determined that contract producers of ducks, geese, pheasants, and quail will also be eligible, including contract producers of eggs of all eligible poultry

types. In addition to the listed livestock and poultry types, USDA may determine that additional livestock and poultry types are eligible at a later time. These changes are reflected in a new definition of "eligible contract livestock or poultry" in 7 CFR 9.201, in which USDA is also clarifying that contract producers of breeding stock of those defined eligible livestock and poultry are eligible for CFAP 2. Contract producers of breeding stock are included because those producers may have suffered a revenue loss for the livestock and poultry, regardless of the livestock owner's intended end use of the animals. This rule also amends the definition of "producer" in 7 CFR 9.201 to specify that the requirement that a producer must be in the business of farming at the time of application does not apply to contract producers because contract producers may have had contracts terminated for reasons outside of their control due to COVID–19.

The final rule published on January 19, 2021, specified that payments for contract producers would be based on a comparison of eligible revenue for the periods of January 1, 2019, through December 27, 2019, and January 1, 2020, through December 27, 2020. This rule amends the regulation in 7 CFR 9.202(b) and 9.203(l) to allow a contract producer to elect to use eligible revenue from the period of January 1, 2018, through December 27, 2018, in lieu of during that date range in 2019. This change is intended to provide flexibility and make the program more equitable for contract producers who had reduced revenue in 2019 compared to a normal year for their operation.

The payment calculation in the final rule published on January 19, 2021, specified that payments for contract producers would be equal to the eligible revenue received from January 1, 2019, through December 27, 2019, minus the eligible revenue received from January 1, 2020, through December 27, 2020, multiplied by 80 percent. In response to additional review and stakeholder concerns about certain situations when the original calculation would not accurately capture a contract producer's loss of eligible revenue due to COVID–19, this rule amends the regulation at 7 CFR 9.203(l)(4) to allow FSA to adjust a contract producer's eligible revenue based on information certified by the contract producer on supplemental form AD–3117B if a contract producer did not have a full period of revenue from January 1 to December 27 for either 2018 or 2019, or if the contract producer increased their operation size in 2020. Information required to calculate these adjustments includes a contract

producer's square footage increase to the operation in 2020, or a contract producer's production or number of turns for 2018, 2019, or 2020, as applicable.

This rule also provides assistance in 7 CFR 9.202(d) and 9.203(m) to producers who were not in operation in 2018 or 2019, who would have been ineligible under the previous final rule. Assistance for these producers is based on their 2020 eligible revenue and the average revenue loss level, which will be determined by USDA for a geographic area based on the best available data including, but not limited to, losses reported by other contract producers for the same area and type of livestock or poultry as reported in their CFAP 2 applications.

This rule also specifies that payments to contract producers will be calculated separately for the categories of livestock listed in § 9.203(n). As provided in the previous final rule, payments to contract producers may be factored if total calculated payments exceed the available funding under 7 CFR 9.203(o).

**Other Changes**

This rule amends § 9.7(a) to address situations where FSA determines that the applicant intentionally misrepresented either the total amount or producer's share of the commodities, acres, sales, or revenue on their application. In those cases, the producer's application will be disapproved and the participant must refund the full payment to FSA with interest from the date of disbursement. This rule also amends § 9.7(b) to specify that the equitable relief provisions of 7 CFR part 718, subpart D, apply to CFAP determinations.

**Notice and Comment, Effective Date, and Exemptions**

The Administrative Procedure Act (APA), 5 U.S.C. 553(a)(2), provides that the notice-and-comment and 30-day delay in the effective date requirements do not apply when the rule involves specified actions, including matters relating to benefits. This rule governs CFAP for payments to certain commodity producers and therefore falls within the benefits exemption.

This rule is exempt from the regulatory analysis requirements of the Regulatory Flexibility Act (5 U.S.C. 601–612), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). The requirements for the regulatory flexibility analysis in 5 U.S.C. 603 and 604 are specifically tied to the requirement for a proposed rule by section 553 or any other law; in

addition, the definition of rule in 5 U.S.C. 601 is tied to the publication of a proposed rule.

The Office of Management and Budget (OMB) designated this rule as major under the Congressional Review Act (CRA), as defined by 5 U.S.C. 804(2). Section 808 of the CRA allows an agency to make a major regulation effective immediately if the agency finds there is good cause to do so. The beneficiaries of this rule have been significantly impacted by the COVID–19 outbreak, which has resulted in significant declines in demand and market disruptions. USDA finds that notice and public procedure would be contrary to the public interest. Therefore, even though this rule is a major rule for purposes of the Congressional Review Act, USDA is not required to delay the effective date for 60 days from the date of publication to allow for Congressional review. Accordingly, this rule is effective upon publication in the **Federal Register**.

## Executive Orders 12866 and 13563

Executive Order 12866, "Regulatory Planning and Review," and Executive Order 13563, "Improving Regulation and Regulatory Review," direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects; distributive impacts; and equity). Executive Order 13563 emphasized the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The requirements in Executive Orders 12866 and 13563 for the analysis of costs and benefits apply to rules that are determined to be significant.

The Office of Management and Budget (OMB) designated this rule as economically significant under Executive Order 12866. Therefore, OMB has reviewed this rule.

The costs and benefits of this rule are summarized below. The full cost benefit analysis is available on *regulations.gov*.

## Cost Benefit Analysis Summary

CFAP 1 and CFAP 2 assisted producers of agricultural commodities marketed in 2020 who faced continuing market disruptions, reduced farm-level prices, and increased production and marketing costs due to COVID–19. These additional costs are associated with declines in demand, surplus productions, or disruptions to shipping patterns and marketing channels.

In implementing these programs, additional assistance was deemed necessary. Subdivision B, section 751, of the CAA authorizes payments of up to 80 percent of contract producers' revenue loss and up to $1 billion in funding. To qualify for payment, a producer must demonstrate a drop in revenue ("revenue loss") between 2019 and 2020. The producer can then choose their 2018 revenue in lieu of their 2019 revenue in the revenue loss calculation if their 2018 revenue is more representative of anticipated revenue in 2020. In addition, note that the CFAP Additional Assistance regulation, published on January 19, 2021, provided assistance to contract producers. CFAP Additional Assistance activity was paused in late January 2021. No payments were issued to contract producers under that regulation.

This rule and cost-benefit analysis use an 80 percent payment factor, the maximum allowed by the CAA, and apply it to the individual producer's actual 2019 to 2020 revenue change. Contract producer payments are highly uncertain and can depend on the number of animals received by the contractor and the price paid by the integrator to the contractor. The projections contained in this assessment provide an upper bound at over $1 billion. However, available evidence suggests that year-to-year differences in animal volume may moderate that estimate. Broiler and hog contract producers will receive the bulk of payments.

In contrast to assistance for contract producers, CAA provides authority for, but does not mandate, use of 2018 or 2019 revenue data in the calculation of payments for sales-based[1] commodities. This provision, included in this rule, ensures that farmers who had lower sales in 2019 than in 2018—for example, those unable to plant a 2019 crop—would not be penalized in the payment calculation. Fifty-two percent of sales-based applicants are projected to prefer the use of 2018 revenue data (relative to 2019 data) based on analysis of USDA cash receipts data. The expected cost associated with this change is estimated at $207 million.

Upon implementation of the CFAP 2 rule, FSA became aware that certain commodities had experienced COVID–19 market disruptions but had not been

explicitly included in the initial CFAP 2 rule. For example, grass seed was not included in the initial CFAP 2 rule, but evidence indicates that production and revenue were significantly affected. This rule clarifies that grass seed is now an eligible sales-based commodity, the expected cost is $41 million.

FSA, which implemented CFAP 1 and 2, is implementing these three provisions. Producers must fill out paperwork to participate in these programs, and the associated administrative costs are estimated at $1.5 million for contract producers, $2.2 million for the use of 2018 versus 2019 revenue in the calculations for sales-based commodities, and $0.1 million for grass seed.

## Environmental Review

The environmental impacts of this final rule have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and because USDA will be making the payments to producers the USDA regulations for compliance with NEPA (7 CFR part 1b).

Although OMB has designated this rule as "economically significant" under Executive Order 12866, "economic or social effects are not intended by themselves to require preparation of an environmental impact statement" when not interrelated to natural or physical environmental effects (see 40 CFR 1502.16(b)). CFAP was designed to avoid skewing planting decisions. Producers continue to make their planting and production decisions with the market signals in mind, rather than any expectation of what a new USDA program might look like. The discretionary aspects of CFAP (for example, determining adjusted gross income (AGI) and payment limitations) were designed to be consistent with established USDA and the FSA administered programs and are not expected to have any impact on the human environment, as CFAP payments will only be made after the commodity has been produced. Accordingly, the following Categorical Exclusion in 7 CFR part 1b applies: § 1b.3(a)(2), which applies to activities that deal solely with the funding of programs, such as program budget proposals, disbursements, and the transfer or reprogramming of funds. As such, the implementation of and participation in CFAP do not constitute major Federal actions that would significantly affect the quality of the human environment. Therefore, an environmental assessment

---

[1] This category includes fruits, vegetables, and nuts; dry edible beans, lentils, dry edible peas, and chickpeas; and commodities including aquaculture, turkeys, mink, mohair, rabbits, and others. For more information, see the CFAP 2 cost-benefit assessment at: *https://www.farmers.gov/sites/default/files/documents/CFAP2-CBA-09252020.pdf*.

or environmental impact statement for this regulatory action will not be prepared; this rule serves as documentation of the programmatic environmental compliance decision for this Federal action.

## Executive Order 12988

This rule has been reviewed under Executive Order 12988, "Civil Justice Reform." This rule will not preempt State or local laws, regulations, or policies unless they represent an irreconcilable conflict with this rule. Before any judicial actions may be brought regarding the provisions of this rule, the administrative appeal provisions of 7 CFR parts 11 and 780 are to be exhausted.

## Executive Order 13175

This rule has been reviewed in accordance with the requirements of Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have Tribal implications, including regulations, legislative comments, or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

USDA has assessed the impact of this rule on Indian Tribes and determined that this rule does not, to our knowledge, have Tribal implications that required Tribal consultation under Executive Order 13175 at this time. If a Tribe requests consultation, the USDA Office of Tribal Relations (OTR) will ensure meaningful consultation is provided where changes, additions, and modifications are not expressly mandated by law. Outside of Tribal consultation, USDA is working with Tribes to provide information about CFAP additional assistance and other issues.

## Unfunded Mandates

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104–4, requires Federal agencies to assess the effects of their regulatory actions on State, local, and Tribal governments or the private sector. Agencies generally must prepare a written statement, including a cost benefit analysis, for proposed and final rules with Federal mandates that may result in expenditures of $100 million or more in any 1 year for State, local, or

Tribal governments, in the aggregate, or to the private sector. UMRA generally requires agencies to consider alternatives and adopt the more cost-effective or least burdensome alternative that achieves the objectives of the rule. This rule contains no Federal mandates, as defined in Title II of UMRA, for State, local, and Tribal governments or the private sector. Therefore, this rule is not subject to the requirements of sections 202 and 205 of UMRA.

## Federal Assistance Programs

The title and number of the Federal Domestic Assistance Program found in the Catalog of Federal Domestic Assistance to which this rule applies is 10.132—Coronavirus Food Assistance Program 2.

## Paperwork Reduction Act

In accordance with the Paperwork Reduction Act of 1995, FSA is administering the information collection activities under a currently approved information collection request of OMB control number of 0560–0297. Thus, there are no required changes to the information collection request for FSA in providing assistance for contract producers of eligible contract livestock and poultry and to provide additional assistance for other commodities as described in this rule.

Additionally, the new information collection request for the eligible grass seed that will be included in the CFAP was submitted to OMB for emergency approval. FSA will collect and evaluate the application from the producers and other required paperwork. Following the 60-day public comment period provided by this rule, FSA intends to merge the burden hours associated with the new grass seed information collection request (ICR) into the main CFAP 2 ICR that is currently approved under OMB control number 0560–0297.

*Title:* CFAP 2.

*OMB Control Number:* 0560–New.

*Type of Request:* New Collection.

*Abstract:* This information collection is required to support CFAP 2 information collection activities to provide payments to eligible producers who, with respect to their agricultural commodities, have been impacted by the effects of the COVID–19 pandemic. The information collection is necessary to evaluate the application and other required paperwork for determining the producer's eligibility and assist in the producer's payment calculations.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average

time per response multiplied by the estimated total annual responses.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.43 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collections of information.

*Type of Respondents:* Producers or farmers.

*Estimated Annual Number of Respondents:* 2,204.

*Estimated Number of Responses per Respondent:* 2.005.

*Estimated Total Annual Responses:* 4,419.

*Estimated Average Time per Response:* 0.43 hours.

*Estimated Annual Burden on Respondents:* 1,892 hours.

FSA is requesting comments on all aspects of this information collection to help us to:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of FSA, including whether the information will have practical utility;

(2) Evaluate the accuracy of the FSA's estimate of burden including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this document, including names and addresses when provided, will be a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

## USDA Non-Discrimination Policy

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political

beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or (844) 433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov*.

USDA is an equal opportunity provider, employer, and lender.

**List of Subjects in 7 CFR Part 9**

Agricultural commodities, Agriculture, Disaster assistance, Indemnity payments.

For the reasons discussed above, this final rule amends 7 CFR part 9 as follows:

## PART 9—CORONAVIRUS FOOD ASSISTANCE PROGRAM

■ 1. The authority citation for part 9 continues to read as follows:

**Authority:** 15 U.S.C. 714b and 714c; Division B, Title I, Pub. L. 116–136, 134 Stat. 505; and Division N, Title VII, Subtitle B, Chapter 1, Pub. L. 116–260.

### Subpart A—General Provisions

■ 2. Amend § 9.4 as follows:
■ a. Revise paragraphs (a)(1) and (2); and
■ b. Remove paragraph (a)(3).
The revisions read as follows:

**§ 9.4   Time and method of application.**

(a) * * *
(1) September 11, 2020, for payments issued under § 9.102; and

(2) October 12, 2021, for payments issued under § 9.203.
*    *    *    *    *

■ 3. Amend § 9.7 as follows:
■ a. Revise paragraph (a); and
■ b. In paragraph (b), remove the words "in parts" and add "in part 718, subpart D, and parts" in their place.
The revision reads as follows:

**§ 9.7   Miscellaneous provisions.**

(a) If a CFAP payment resulted from erroneous information provided by a participant, or any person acting on their behalf, the payment will be recalculated and the participant must refund any excess payment with interest calculated from the date of the disbursement of the payment.

(1) If FSA determines that the applicant intentionally misrepresented either the total amount or applicant's share of the commodities, acres, sales, or revenue on their application, the application will be disapproved and the applicant must refund the full payment to FSA with interest from the date of disbursement.

(2) Any required refunds must be resolved in accordance with part 3 of this title.
*    *    *    *    *

### Subpart C—CFAP 2

■ 4. Amend § 9.201 as follows:
■ a. Add the definitions of "Average revenue loss level" and "Eligible contract livestock or poultry" in alphabetical order;
■ b. In the definition of "Eligible revenue", remove the words "broilers, pullets, layers, chicken eggs, turkeys, hogs, or pigs" and add the words "eligible contract livestock or poultry" in their place;
■ c. In the definition of "Ineligible commodities", remove the words "ineligible crops" and add the words "ineligible crops other than grass seed" in their place;
■ d. In the definition of "Producer", in the second sentence, remove the word "Producers" and add the words "Except for contract producers, producers" in its place;
■ e. In the definition of "Sales-based commodities", remove the words "milk, mink (including pelts);" and add the words "milk, grass seed, mink (including pelts)," in its place; and
■ f. Add the definition of "Turn" in alphabetical order.
The additions read as follows:

**§ 9.201   Definitions.**

*    *    *    *    *
*Average revenue loss level* means the average percentage of revenue loss for contract producers determined by USDA for a geographic area based on the best available data including, but not limited to, losses reported by contract producers for the same area and type of livestock or poultry.
*    *    *    *    *

*Eligible contract livestock or poultry* means broilers, pullets, layers, poultry eggs, turkeys, ducks, geese, pheasants, quail, hogs, pigs, and other livestock or poultry types determined eligible and announced by USDA, including breeding stock of those eligible livestock and poultry types.
*    *    *    *    *

*Turn* means a group of eligible contract livestock or poultry that is delivered to a contract producer who provides labor and equipment to produce the livestock or poultry for the integrator or owner.
*    *    *    *    *

■ 5. Amend § 9.202 by revising paragraphs (b)(1) through (3) and adding paragraphs (b)(4) and (d) to read as follows:

**§ 9.202   Eligibility.**

*    *    *    *    *
(b) * * *
(1) Produced eligible contract livestock or poultry under a contract in either the 2018 or 2019 calendar year and in the 2020 calendar year;
(2) Received revenue under such a contract during the period from January 1, 2020, through December 27, 2020;
(3) Had a loss in eligible revenue for the period from January 1, 2020, through December 27, 2020, as compared to the period from:
(i) January 1, 2018, through December 27, 2018; or
(ii) January 1, 2019, through December 27, 2019; and
(4) Meet all other requirements for eligibility under this part.
*    *    *    *    *

(d) Contract producers are eligible for payment under § 9.203(m) if they:
(1) Did not receive eligible revenue from January 1 through December 27 2018 or 2019, but received eligible revenue for the period from January 1, 2020, through December 27, 2020; and
(2) Meet all other requirements for eligibility under this part.

■ 6. Amend § 9.203 as follows:
■ a. Revise paragraph (i);
■ b. In Table 2 to paragraph (j), revise the first column heading;
■ c. Revise paragraph (l); and
■ d. Add paragraphs (m) through (o).
The revisions and additions read as follows:

**§ 9.203   Calculation of payments.**

*    *    *    *    *

(i) Payments for sales-based commodities will be:

(1) Based on one of the following as elected by the producer:

(i) The producer's sales for calendar year 2018 and crop insurance indemnities and NAP and WHIP+ payments for the 2018 crop year for all sales-based commodities; or

(ii) The producer's sales for calendar year 2019 and crop insurance indemnities and NAP and WHIP+ payments for the 2019 crop year for all sales-based commodities.

(2) Equal to the sum of the results for the following calculation for each sales range in Table 2 of paragraph (j) of this section:

(i) The sum of the amount of the producer's eligible sales for the sales-based commodities in the applicable calendar year and the producer's crop insurance indemnities and NAP and WHIP+ payments for the sales commodities for the applicable crop year within the specified range, multiplied by the payment rate for that range in Table 2 of paragraph (j) of this section.

(ii) Eligible sales only includes sales of raw commodities grown by the producer; the portion of sales derived from adding value to the commodity, such as processing and packaging, and from sales of products purchased for resale is not included in the payment calculation unless determined eligible by the Secretary.

(3) Payments for producers of sales commodities who began farming in 2020 and had no sales in 2019, calculated as provided in paragraph (i)(2) of this section, except that the payments will be based on the producer's actual 2020 sales, without crop insurance indemnities, NAP or WHIP+ payments, as of the date the producer submits an application for payment under this section.

(j) * * *

TABLE 2 TO PARAGRAPH (J)—PAYMENT RATES FOR SALES COMMODITIES

| 2018 or 2019 Sales range (including crop insurance indemnities and NAP and WHIP+ payments) | Percent payment factor |
|---|---|
| * | * |
| * | * |
| * | * |
| * | * |

* * * * *

(l) For eligible contract producers, if eligible revenue for the period from January 1, 2020, through December 27, 2020, decreased compared to eligible revenue for the period from January 1, 2018, through December 27, 2018, or the period from January 1, 2019, through December 27, 2019, then payments will be equal to:

(1) Eligible revenue received from January 1, 2018, through December 27, 2018, or from January 1, 2019, through December 27, 2019; minus

(2) Eligible revenue received from January 1, 2020, through December 27, 2020; multiplied by

(3) 80 percent.

(4) USDA will adjust the eligible revenue based on information certified by the contract producer on form AD–3117B for contract producers who did not have a full period of revenue from January 1 to December 27 for either 2018 or 2019, or who increased their operation size in 2020. Information required to calculate these adjustments may include a contract producer's square footage increase to the operation in 2020, or a contract producer's production or number of turns for 2018, 2019, or 2020, as applicable.

(m) For eligible contract producers who did not receive eligible revenue from January 1 through December 27 in 2018 or 2019, but received eligible revenue for the period from January 1, 2020, through December 27, 2020:

(1) FSA will divide the eligible revenue received from January 1, 2020, through December 27, 2020, by the result of 1 minus the average revenue loss level, determined by USDA for a geographic area based on the best available data including, but not limited to, losses reported by other contract producers for the same area and type of livestock or poultry; and

(2) The payment will be equal to:

(i) The result of the calculation in paragraph (m)(1) of this section minus the contract producer's eligible revenue received from January 1, 2020, through December 27, 2020; multiplied by

(ii) 80 percent.

(n) Payments under paragraphs (l) and (m) of this section and the average revenue loss levels under paragraph (m)(1) of this section will be calculated separately for the following categories:

(1) Chickens—broilers, pullets, and layers;

(2) Chicken eggs;

(3) Turkeys;

(4) Hogs and pigs;

(5) Ducks, geese, pheasants, quail; and

(6) All other eligible poultry eggs.

(o) The calculations in paragraphs (l) and (m) of this section are subject to the availability of funds and will be factored, if needed.

**Gloria Montaño Greene,**

*Deputy Under Secretary, Farm Production and Conservation, U.S. Department of Agriculture.*

[FR Doc. 2021–18423 Filed 8–26–21; 8:45 am]

**BILLING CODE 3410–05–P**

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

## 14 CFR Part 71

**[Docket No. FAA–2021–0075; Airspace Docket No. 21–ASO–2]**

**RIN 2120–AA66**

## Amendment of Class E Airspace; Muscle Shoals, AL

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action amends Class E airspace extending upward from 700 feet above the surface in Muscle Shoals, AL, due to the decommissioning of the Muscle Shoals Very High Frequency Omni-Directional Radio Range Tactical Air Navigation Aid (VORTAC), and cancellation of the associated approach at Northwest Alabama Regional Airport. This action also updates the airport name under the Class E surface airspace and makes an editorial change replacing the term Airport/Facility Directory with the term Chart Supplement in the legal descriptions of associated Class E airspace. Controlled airspace is necessary for the safety and management of instrument flight rules (IFR) operations in the area.

**DATES:** Effective 0901 UTC, December 2, 2021. The Director of the Federal Register approves this incorporation by reference action under 1 CFR part 51, subject to the annual revision of FAA Order 7400.11 and publication of conforming amendments.

USDA
United States
Department of
Agriculture

Office of the Secretary

Washington, D.C. 20250

January 18, 2022

The Honorable Glenn Thompson
Republican Leader
Committee on Agriculture
U.S. House of Representatives
1301 Longworth House Office Building
Washington, D.C.  20515

Dear Ranking Member Thompson:

Thank you for your letter of May 19, 2021, regarding gaps and disparities in distribution of COVID relief funds prior to the Biden-Harris Administration. I apologize for the delay in this written response.

Your comments and concerns are appreciated.  On March 24, 2021, I announced the Pandemic Assistance for Producers initiative aimed at addressing gaps and disparities in distributing assistance under the Coronavirus Food Assistance Program (CFAP).  Further assistance to producers and business as part of this initiative was announced on June 15 and again on August 24, 2021. The gaps and disparities we continue to focus on addressing have been brought to our attention by farmers, ranchers, producers, organizations, and members of Congress. We have provided the latest information about the Pandemic Assistance for Producers initiative on www.farmers.gov/coronavirus/pandemic-assistance.

From the start, USDA has sought to engage stakeholders directly to collect information about losses incurred and has invited members of Congress to identify areas for further scrutiny so that we can best target the limited dollars based on demonstrated need.

To that end, we have announced the following programs:

- The **Spot Market Hog Pandemic Program (SMHPP)** provides pandemic assistance to hog producers who sold hogs through a negotiated sale from April 16, 2020 through September 1, 2020, which reflects when producers faced the greatest reduction in market prices due to the pandemic.
- The **Organic and Transitional Education and Certification Program (OTECP)** provides pandemic assistance to cover eligible certification and education expenses for agricultural producers who are certified organic or transitioning to organic. The economic challenges due to the pandemic have made obtaining and renewing USDA organic certification financially challenging for many operations.
- The **Pandemic Livestock Indemnity Program (PLIP)** provides relief to chicken, turkey, and swine producers who suffered losses during the pandemic due to insufficient access to processing.
- The **Pandemic Assistance for Timber Harvesters and Haulers program (PATHH)** provides financial relief to timber harvesting and timber hauling businesses that experienced losses in 2020 due to COVID-19 due to significant disruptions in the logging industry.
- The **Dairy Donation Program (DDP)** allocates $400 million to facilitate dairy product donations and reduce food waste. Under this program, eligible dairy organizations partner with

An Equal Opportunity Employer


The Honorable Glenn Thompson
Page 2

- non-profit feeding organizations that distribute food to individuals and families. Those partnerships may apply for and receive reimbursements to cover some expenses related to eligible dairy product donations.
- USDA opened signup for the **Dairy Margin Coverage (DMC) program** and expanded the program to allow dairy producers to better protect their operations by enrolling supplemental production through Supplemental DMC. **Supplemental DMC** will provide $580 million to better help small- and mid-sized dairy operations that have increased production over the years but were not able to enroll the additional production.
- Through the **Pandemic Market Volatility Assistance Program (PMVAP)**, USDA will provide pandemic assistance payments to dairy farmers who received a lower value due to market abnormalities caused by the pandemic and ensuing Federal policies. Payments will reimburse qualified dairy farmers for 80% of the revenue difference per month based on an annual production of up to 5 million pounds of milk marketed and on fluid milk sales from July through December 2020.
- The **Pandemic Response and Safety (PRS) Grant Program** and the **Seafood Processors Pandemic Response and Safety (Seafood PRS) Block Grant Program** will provide approximately $700 million in assistance to small scale specialty crop producers and processors, shellfish, aquaculture and other select producers, meat and other processors, distributors, farmers markets, seafood facilities, and processing vessels impacted by the coronavirus pandemic and who received insufficient federal support to address the costs they incurred to keep workers safe and help keep the U.S. food supply intact during the crisis.
- The **Pandemic Cover Crop Program (PCCP)** provided premium support to producers who insured their spring crop with most insurance policies and planted a qualifying cover crop during the 2021 crop year due to the additional economic challenges the pandemic created for producers working to maintain cover cropping systems.
- Through the **Biofuel Producer Program**, USDA is providing relief to eligible biofuel producers for unexpected market losses as a result of the pandemic in order to maintain a viable and significant biofuels market for agricultural producers that supply biofuel producers. Payments will be based upon the volume of market loss the biofuel producer experienced in the calendar year 2020.
- USDA re-opened and extended the sign-up period for **CFAP 2** in April 2021 and initiated cooperative agreements to provide additional education and outreach informing all producers of the assistance available and the extended enrollment period. In August 2021, grass seed was added as an eligible commodity and additional flexibility was provided to contract producers and producers of sales-based commodities to reflect challenges experienced. As a result, we saw a fourfold increase in applications from historically underserved producers.

In addition to these new programs, USDA has been able to allocate additional funds targeted for pandemic relief through the following existing programs: Value-Added Producer Grant Program, Specialty Crop Block Grant Program, Gus Schumacher Nutrition Incentive Program, Beginning Farmer and Rancher Development Program, and the Local Agriculture Market Program.

As assistance has been developed and finalized, USDA has conducted congressional notifications and

The Honorable Glenn Thompson
Page 3

briefings. USDA is working to provide relief as expeditiously as possible to America's producers who have felt the impact of COVID–19 market disruptions.

I apologize for the delayed written response. Please let me know if you have further questions.

Thank you for writing and for the opportunity to respond.

Sincerely,

Thomas J. Vilsack
Secretary

Case 2:24-cv-00060-Z Document 33-2 Filed 07/29/24 Page 47 of 272 PageID 1208

Received: 1 April 2022    Accepted: 30 August 2022

DOI: 10.1002/aepp.13325

**SUBMITTED ARTICLE**



# Analysis of the payments from the coronavirus food assistance program and the market facilitation program to minority producers

**Anil K. Giri**  |  **Dipak Subedi**  |  **Kathleen Kassel**

Economic Research Service, USDA, Washington, DC, USA

**Correspondence**
Anil K. Giri, Economic Research Service, USDA, 1400 Independence Avenue, S.W., Washington, DC 20250, USA.
Email: anil.giri@usda.gov

**Funding information**
This research was supported by the U.S. Department of Agriculture, Economic Research Service. The findings and conclusions in this publication are those of the author(s) and should not be construed to represent any official USDA or U.S. Government determination or policy.

**Editor in charge**: Mindy Mallory

**Abstract**
This paper examines the payments made to minority producers, focused on African American producers, from the COVID-19 program, Coronavirus Food Assistance Program (CFAP), of the United States Department of Agriculture (USDA) and compares it with one of the other more recent ad hoc program payments, the Market Facilitation Program (MFP). There were two rounds of the CFAP, and combinedly (as of March 2022), the program made direct payments of $31.0 billion ($11.8 billion from CFAP 1 and $19.2 billion from CFAP 2) starting in 2020. The MFP made a total payment of $23.5 billion (in two rounds, MFP 2018 and MFP 2019) to producers affected by the retaliatory tariffs placed on US producers by trade partners across multiple years. CFAP made almost $600 million in direct payments to minority producers, including Black or African American producers. Black or African American only producers received more than $52 million in CFAP payments. CFAP payments were proportional to the value of agricultural commodity sold for most minority producers. The 2017 Census of Agriculture showed that the majority of minority producers, including African American producers but excluding Asian producers, raised livestock. CFAP made the highest payments to livestock minority producers. The CFAP

Published 2022. This article is a U.S. Government work and is in the public domain in the USA.

APP. 000747

payment distribution pattern shows that payments reached minority producers who often did not receive Government payments. CFAP made more payments and as a share of total program outlays to minority producers compared to MFP. However, for Black or African American only producers, even though the magnitude increased (because CFAP disbursed more funds compared to MFP), the share of payment received did not increase.

**KEYWORDS**

African American, Coronavirus Food Assistance program (CFAP), government payments, Market Facilitation Program (MFP)

**JEL CLASSIFICATION**

Q1 (Agriculture), Q18 (Agricultural Policy), Q28 (Government Policy)

We saw 99% of the money going to White farmers and 1% going to socially disadvantaged farmers and if you break that down to how much went to Black farmers, it's 0.1%.

-Tom Vilsack, Secretary, USDA, as quoted in Washington Post, March 25, 2021 (Riley, 2021)

The above quote was in reference to the CFAP1 fund disbursed by USDA related to the COVID-19 relief program. After the Secretary Vilsack's statement above, USDA implemented changes with the goal of improving access to COVID-19 relief funds for minority farmers, including Black or African American producers. These changes included expanding eligibility to commodities that were initially not eligible to receive payments. For instance, poultry and contract producers initially were ineligible to receive USDA COVID relief payments. However, on August 24, 2021, USDA updated the Coronavirus Food Assistance Program 2 (CFAP 2) for eligible livestock and poultry contract producers and specialty crops, and other sales-based commodity producers (USDA Farm Service Agency, 2021). Furthermore, the USDA emphasized outreach to small and socially disadvantaged producers, specialty crop and organic producers, timber harvesters, and renewable fuel producers (USDA Press Release, 2021).

Recent studies do not show racial discrimination in the delivery of USDA programs to minority producers after some instances in the past. There was no evidence of racial discrimination in loan approval (Escalante et al., 2006) and loan amounts and maturities (Escalante et al., 2018) from the USDA's Farm Service Agency (FSA). Ghimire et al. (2020) provide evidence in support of reforms made by the USDA's FSA to lend without bias, especially to socially disadvantaged producers and ranchers. They found certain minority borrowers with lower loan amounts at higher interest rates and with shorter maturities. However, this was not because of

Case 2:24-cv-00060-Z   Document 33-2   Filed 06/25/24   Page 49 of 272   PageID 1208

discrimination but because of credit risk management considerations (Ghimire et al., 2020). While the lending practice of the USDA has been investigated thoroughly, there are not as many studies that examine the payments made to producers from the USDA. This paper aims to fill that void by examining payments from two recent USDA programs, the CFAP and the Market Facilitation Program (MFP).

This paper examines the payments made to minority producers, focused on African American producers, from the COVID-19 program, CFAP, of the United States Department of Agriculture (USDA) and compares it with one of the other more recent ad hoc program payments. Almost all the payments from CFAP have been made and the USDA is no longer accepting any new applications for the CFAP. Therefore, this paper provides a robust ex-post analysis using a novel dataset of the actual payments and sheds light on payments differentiated by race. It also compares payments from CFAP with payments from the MFP for minority producers, including Black producers. Analysis and findings of this paper have the potential to be useful to policymakers and others when drafting new USDA programs as there is more flexibility in rulemaking and disbursement of payments in ad hoc programs compared to existing farm bill programs.

The CFAP was the main COVID-19 relief program of the USDA. There were two rounds of the CFAP, and combinedly (as of March 2022), the program made direct payments of $31.0 billion ($11.8 billion from CFAP 1 and $19.2 billion from CFAP 2) starting in 2020 (U.S. Department of Agriculture, Farm Service Agency, 2020a, 2020b). Total direct Government payments (in inflation-adjusted 2020 dollars) for 2019, 2020, and the 20-year average (2000 through 2019) were $22.7 billion, $45.7 billion, and $17.8 billion, respectively. These values show that the combined payments from CFAP were significantly larger than the total pre-pandemic year direct Government payments in 2019 and higher than the average total direct Government payment for the past 20 pre-pandemic years.

Figure 1 shows the total direct Government payments from 2000 to 2020 in inflation-adjusted 2020 dollars. Total direct Government payments are payments made from the standing Farm Bill programs and new ad hoc payments to the farm sector. In 2020, the farm sector received the highest recorded direct Government payment in real (inflation-adjusted) dollars. Total direct Government payments for 2020 were $45.7 billion, out of which more than half ($23.5 billion) were from the CFAP program. The other COVID-19 program, the Paycheck Protection Program (PPP), made forgivable loans to offset labor expenses and made up $6.0 billion, or 13% of total direct Government payments. PPP was designed and administered by the Small Business Administration with the help of the Treasury. Combined, the COVID-19 relief programs, CFAP and PPP, made payments of $29.5 billion, or nearly two-thirds of total direct Government payments in 2020. Figure 1 also shows another recent ad hoc program, the MFP. The MFP made a total payment of $23.5 billion (in two rounds, MFP 2018 and MFP 2019) to producers affected by the retaliatory tariffs placed on US producers by trade partners (Giri et al., 2020) across multiple years. The CFAP program was larger than the MFP program, and in 1 year (2020), made more in payments than payments from both rounds of MFP.

The CFAP made direct payments to producers who faced additional pandemic-related marketing costs, market disruptions, increased production costs, and reduced farm-level prices (USDA, 2020a, 2020b). The second round of CFAP 2 was one of the most comprehensive USDA programs as 97% of commodities, measured in terms of cash receipts, were eligible for CFAP 2 funding (Giri et al., 2020). The first round of CFAP (CFAP 1) was also more comprehensive than most of the standing Farm Bill programs, which do not generally make payments to livestock producers. Only 18% of commodities, measured in terms of cash receipts, were ineligible for CFAP 1 funding (Giri et al., 2020).

Case 2:24-cv-00060-Z Document 33-2 Filed 06/25/24 Page 50 of 272 PageID 1308



**FIGURE 1** Direct government payments to U.S. producers, 2000–2020
*Source*: USDA, Economic Research Service, farm income and wealth statistics, data as of February 4, 2022.
Values are adjusted for inflation using the U.S. Bureau of Economic Analysis Gross Domestic Product Price
Index (BEA API series code: A191RG) rebased to 2020 by USDA, Economic Research Service

# DATA

CFAP outlays in this report and their demographic distributions are taken from USDA FSA administrative data. FSA tabulates payment receipts for those who receive a payment directly and those that benefit indirectly from the payment. As an illustration, consider a small farming operation with four shareholders, each with a 25% ownership share. Farm program payments will be made directly to the operation and attributed to the four owner-operators, or beneficiaries, according to their ownership shares. Therefore, when the operation receives a $100 payment each owner is attributed a $25 benefit. This report analyzes the demographic breakdown and payment receipts of the four beneficiaries, not the operation.

To put the payments in context, we use data from the 2017 Census of Agriculture. Every 5 years, the USDA does a comprehensive survey and collects data on land use and ownership, operator characteristics, production practices, income, and expenditures (USDA NASS 2017 Census of Agriculture). The Census of Agriculture is a complete count of U.S. farms and ranches and the people who operate them (USDA NASS Census of Agriculture). The most recent census of Agriculture for which data is available is the 2017 Census of Agriculture (U.S. Department of Agriculture, 2020c).

# MINORITY PRODUCER CHARACTERISTICS

In the subsequent short sections, we provide the producer characteristics of minority producers, including Black producers, from the 2017 Census of Agriculture. These characteristics are financial as well as demographics related. We provide data on the number of producers, the number of farms operated, agricultural products sold, and total Government payments received in 2017 for each minority producer type.

Case 2:24-cv-00060-Z Document 33-2 Filed 07/03/24 Page 51 of 272 PageID 1308

## Black producers

The 2017 Census of Agriculture reported 48,697 producers who were Black, either alone or in combination with another race and they accounted for 1.4% of the country's 3.4 million producers, and they lived and farmed primarily in southeastern and mid-Atlantic states (USDA, 2019a). The same Census found farms operated by Black producers were smaller on average and accounted for $1.4 billion (0.4%) of agricultural products sold, with 61% ($858 million) in crop sales and 39% ($559 million) in sales of livestock and livestock products (USDA, 2019a). Finally, they received $59 million in government payments in 2017 (USDA, 2019a). Nearly half (48%) of Black-operated farms specialized in cattle and dairy production in 2017, almost all in beef cattle production (USDA, 2019a).

## Asian producers

The 2017 Census of Agriculture reported 25,310 producers who were Asian, either alone or in combination with another race, and they accounted for 0.7% of the country's 3.4 million producers (USDA, 2019b). The 2017 Census found farms operated by Asians were highly concentrated in California and Hawaii. Asian producers were younger and more likely to have recently started farming than U.S. producers overall. In 2017, Asian-operated farms sold $7.5 billion in agricultural products, with 58% ($4.3 billion) in crop sales and 42% ($3.2 billion) in sales of livestock and livestock products (USDA, 2019b). In 2017, Asian-operated farms accounted for less than 2% of total U.S. agriculture sales; more than half specialized in the production of specialty crops and received $27 million in Government payments (USDA, 2019b).

## American Indian/Alaska native producers

The 2017 Census of Agriculture reported 79,198 producers who were American Indian or Alaska Natives, either alone or in combination with another race and they accounted for 2.3% of the country's 3.4 million producers (USDA, 2019c). The same Census found that most farms operated by American Indians or Alaska Natives were in Western and Plains states. Furthermore, the Census also revealed that American Indians or Alaska Natives producers were younger and more likely to be female than U.S. producers overall. In 2017, American Indian/Alaska Natives–operated farms sold $3.5 billion in agricultural products, with 40% ($1.4 billion) in crop sales and 60% ($2.1 billion) in sales of livestock and livestock products (USDA, 2019c). In 2017, these farms accounted for 0.9% of U.S. agriculture sales and received $103 million in government payments (USDA, 2019c).

## CORONAVIRUS FOOD ASSISTANCE PROGRAM (CFAP) PAYMENTS

In the following sections, we examine the CFAP payments at the national and state level. The 2017 Census of Agriculture identifies states with the highest number of African American producers. So, we examine the distribution of CFAP payments in those states. Furthermore, we also compare payments by commodity to minority groups at the national level.

Case 2:24-cv-00065-Z　Document 33-2　Filed 07/05/24　Page 52 of 272　PageID 1208

# CORONAVIRUS FOOD ASSISTANCE PROGRAM (CFAP) PAYMENTS AT NATIONAL LEVEL

Table 1 shows total CFAP payments by race in nominal dollars. The largest share—97.92%, or more than $30 billion out of a total of $30.9 billion—went to White producers. Black or African American producers received 0.17% of total CFAP payments, or $52.72 million. In relative terms, this is slightly lower than their reported share of contribution to the total market value of agricultural products sold based on 2017 Agricultural Census data (the last data available). Producers who identified as Black or African American only (and not in combination with other races) contributed 0.27% of the total market value in 2017 (Census of Agriculture 2017) but received 0.17% of total CFAP payments. It is important to note that share of production can and does change year to year. Factors such as the price of commodities planted and harvested by producers, change in commodities produced, and other local and regional factors (such as weather) can affect the market value. Therefore, it is possible that the share of market value for 2020 could be the same as the share of CFAP received by Black producers.

Overall, for producers differentiated by race, the CFAP payments **were more** closely aligned to the market value of products sold at the national level. Where differences existed, the difference was marginal. Producers identified as Asians contributed 1.82% ($7.1 billion) of the market value of agricultural products sold in 2017 and received 0.64% ($196.78 million) of total CFAP dollars. American Indians or Alaska Natives received $261.51 million (0.85% of total CFAP, slightly higher than their share of the market value of agricultural products sold). Native Hawaiian or Other Pacific Islanders received $17.97 million (0.06% of total CFAP, slightly lower than their share of the market value of agricultural products sold). White-only producers received the largest amount at $30.2 billion (97.92% of total CFAP, slightly higher than their

**T A B L E 1**　Coronavirus food assistance program (CFAP) payments and market value of agricultural products sold by race

| Race | Total CFAP payments (in $ million) | Share (%) of total CFAP | Market value of agricultural products sold ($ million) | Share (%) of market value of agricultural products sold |
|---|---|---|---|---|
| American Indian or Alaska Natives only | $261.51 | 0.85% | $2340.80 | 0.60% |
| Asian only | $196.78 | 0.64% | $7106.41 | 1.82% |
| Black or African American only | $52.72 | 0.17% | $1076.05 | 0.27% |
| Native Hawaiian or other Pacific Islander only | $17.97 | 0.06% | $517.03 | 0.13% |
| White only | $30,216.27 | 97.92% | $380,286.34 | 97.18% |

*Note*: This table shows CFAP payments and market value of agricultural products sold by race categories. Among minority American Indian or Alaska Native only producers received the most payments, but the value of production was highest for Asian only producers. Asian only producers tend to produce specialty crops (fruits, vegetables, and nursery crops).
*Source*: CFAP payments are from FSA. Market value of agricultural product sold are from the 2017 Census of Agriculture, Table 61. Race categories used to determine shares of value of production are for producer reporting that race alone, not in combination with other races.

Case 2:24-cv-00060-Z   Document 33-2   Filed 06/26/24   Page 53 of 272   PageID 1308

share of market value at 97.18% of total agricultural products sold). *T*-test showed the share of CFAP payments and share of the market value of agricultural products sold (in Table 1) were not statistically significantly different.

## CORONAVIRUS FOOD ASSISTANCE PROGRAM (CFAP) PAYMENTS AT STATE LEVEL

Figure 2 shows the distribution of total CFAP dollars at the state level. The states where Black or African American only producers received the highest CFAP dollars were Mississippi ($8.9 million), Alabama ($6.4 million), Texas ($5.7 million), Georgia ($5.1 million), Louisiana ($3.5 million), Arkansas ($3.2 million), Florida ($2.8 million), North Carolina ($2.6 million), Oklahoma ($2.5 million), Virginia ($2.4 million), South Carolina ($2.3 million), and Tennessee ($1.9 million). Black or African American only producers of these 12 states received 95% of all CFAP payments made to Black or African American only producers.

Figure 2 also shows the share of total CFAP received by Black or African American only producers for each of the States. Black or African American only producers in five states



| State (top 12) | CFAP payments to Black or African American producers ($) | Share of total State CFAP payments that went to Black or African American producers (%) |
|---|---|---|
| Mississippi | $8,898,798 | 2.60 |
| Alabama | $6,370,186 | 2.44 |
| South Carolina | $2,316,699 | 1.89 |
| Louisiana | $3,516,463 | 1.21 |
| Georgia | $5,116,196 | 1.15 |
| Virginia | $2,426,315 | 0.86 |
| Arkansas | $3,236,312 | 0.65 |
| Florida | $2,774,217 | 0.62 |
| North Carolina | $2,558,449 | 0.56 |
| Tennessee | $1,919,310 | 0.50 |
| Texas | $5,738,958 | 0.32 |
| Oklahoma | $2,531,240 | 0.29 |

**FIGURE 2**  Distribution of total coronavirus food assistance program (CFAP) payments to black or African American only producers by state
*Source*: Farm Service Agency (FSA), USDA.

Case 2:24-cv-00060-Z Document 33-2 Filed 07/05/24 Page 54 of 272 PageID 1208

received more than 1% of the total CFAP dollars received by all producers of that state. Those five states were: Mississippi (2.6%), Alabama (2.4%), South Carolina (1.9%), Louisiana (1.2%), and Georgia (1.2%). Figure 1 suggests that Black or African American only producers in states with higher numbers received more in CFAP dollars and more as a share of total CFAP dollars for the states. This suggests that participation and allocation of CFAP dollars in States with a higher population of African American producers were relatively proportional. We explicitly list the total CFAP dollars and share of total CFAP dollars received by Black or African American only producers for the top 12 states, based on the number of producers, from the 2017 Census of Agriculture.

## CORONAVIRUS FOOD ASSISTANCE PROGRAM PAYMENTS BY COMMODITY AND RACE

Table 2 shows the total CFAP payments (at the national level) by commodities for minority producers. There are a few key observations from Table 2. First, except for Asian producers, the highest CFAP payments were for cattle producers. American Indian or Alaska Natives only producers received the highest CFAP cattle payments ($165.4 million), followed by Black or African American only cattle producers ($28.9 million). Native Hawaiian or other Pacific Islander only cattle producers received $22.7 million in CFAP payments. This aligns with the Census of Agriculture finding that the majority of minority producers, except Asians, are engaged in livestock production, especially cattle production. Asian American producers engaged more in poultry production. It is important to note that cattle producers of all races do not generally receive Government payments from standing Farm Bill programs. Therefore, it is more likely than not that many minority cattle producers, including Black producers, received Government payments for the first time. The CFAP payment distribution pattern shows that payments reached minority producers who often did not receive Government payments.

Cattle producers not only received larger payments but also a larger share of total CFAP payments for that race (i.e., distribution of CFAP payments was skewed toward cattle producers), except for Asian producers. Sixty-six percent, 60%, and 51% of total CFAP payment made to American Indian or Alaska Natives only, Black or African American only, Native Hawaiian or other Pacific Islander only producers, respectively, went to cattle producers of that race. Asian only cattle producers received 3% of total CFAP payments made to all Asian producers. Asian producers received the highest payment in all other categories, which includes specialty crops. This is also consistent with the Census of Agriculture finding that showed more than half of Asian-operated farms specialized in the production of specialty crops. Black or African American only producers received the second largest amount of soybean CFAP dollars at $7.1 million, or 37% of total CFAP dollars.

## CORONAVIRUS FOOD ASSISTANCE PROGRAM PAYMENTS BY COMMODITIES TO BLACK OR AFRICAN AMERICAN ONLY PRODUCERS AT STATE LEVEL

The 2017 Census of Agriculture identifies the share of farms specializing by commodity types for Black producers. The Census shows more than 54% of farms operated by Black producers specialized in livestock enterprises: cattle and dairy (48%), sheep and goats (4%), hogs and pigs

Case 2:24-cv-00060-Z   Document 33-2   Filed 07/25/24   Page 55 of 272   PageID 1359

(1%), and poultry and eggs (1%) operations. Eighteen percent of Black-operated farms special-ized in other crops and 12% in specialty crops. It is not possible, using publicly available Census tabulations, to break down the other crop and specialty crops categories. The Census identifies the top 12 states with Black producers. Therefore, we examine CFAP payments by livestock commodities for those top 12 states.

Table 3 shows CFAP payments by commodity for 12 states with the most Black or African American only producers. We find for half of the 12 States more than half of CFAP dollars went to cattle producers. More than 96% of total CFAP dollars in Oklahoma went to Black or African American only cattle producers. The share was 91%–80% for Black or African American only cattle producers of Texas and Alabama, respectively. For some other states such as North Caro-lina, Arkansas, and Virginia the share of total CFAP payments to cattle producers was less than one-third. In fact, the share of total CFAP dollars going to all livestock enterprises was less than one-third for these states suggesting Black or African American only producers engage more in crop enterprises in these states.

**TABLE 2**  Coronavirus food assistance program payments by commodities to minority producers

| Commodity | American Indian or Alaska natives only | Black or African American only | Asian only | Mixed race | Native Hawaiian or other Pacific islander only |
|---|---|---|---|---|---|
| Alfalfa | $5,183,958 | $15,737 | $242,745 | $860,799 | $210,433 |
| Almonds | $745,282 | $38,854 | $12,148,244 | $2,049,760 | $157,395 |
| Basil | N/A | $1266 | $2,318,190 | N/A | N/A |
| Cattle | $165,374,112 | $28,948,052 | $6,048,560 | $22,669,496 | $8,611,355 |
| Chickens | $6,687,273 | $845,199 | $26,891,495 | $2,302,785 | N/A |
| Corn | $10,940,008 | $2,945,072 | $1,391,221 | $4,215,719 | $2,007,505 |
| Cotton | $5,386,447 | $2,529,984 | $166,815 | $821,401 | $74,337 |
| Guava | N/A | N/A | $7,091,342 | $79,610 | N/A |
| Hogs | $662,214 | $691,670 | $153,779 | $240,906 | $217,482 |
| Milk | $2,470,887 | $166,055 | N/A | $616,796 | $293,934 |
| Milk/Lbs | $2,694,662 | $162,225 | N/A | $377,049 | $141,269 |
| Mushrooms | $2,087,689 | N/A | $102,093 | N/A | N/A |
| Pistachios | $206,494 | $16,259 | $2,271,937 | $195,063 | $2881 |
| Soybeans | $7,999,815 | $7,154,988 | $762,302 | $2,638,996 | $720,628 |
| Squash | $22,810 | $186,593 | $2,338,151 | N/A | N/A |
| Strawberries | $3,098,262 | $14,109 | $1,477,785 | N/A | $73,128 |
| Tomatoes | N/A | $19,458 | $1,833,914 | N/A | $23,766 |
| Walnuts | $964,671 | N/A | $6,723,399 | $537,113 | $40,121 |
| Wheat | $13,053,537 | $847,903 | $553,388 | $2,680,480 | $664,294 |
| All other | $23,862,185 | $3,820,011 | $107,111,575 | $16,409,930 | $3,727,328 |

*Note*: This table shows CFAP payments by commodity differentiated by race. Cattle producers of all races but Asian only received the largest payments.
*Source*: Farm Service Agency, USDA.

Case 2:24-cv-00060-Z   Document 33-2   Filed 07/25/24   Page 56 of 272   PageID 1309

**TABLE 3** Coronavirus food assistance program payments by commodities to Black or African American only producers for census identified top states

| State | Cattle | Hogs and pigs | Poultry and eggs | Sheep and goats | Total CFAP |
|---|---|---|---|---|---|
| Alabama | $5,109,902 | $27,641 | N/A | $6210 | $6,370,186 |
| Arkansas | $762,341 | N/A | N/A | $5921 | $3,236,312 |
| Florida | $969,517 | $128,328 | N/A | $23,430 | $2,774,217 |
| Georgia | $2,335,267 | $95,039 | $291,867 | $38,514 | $5,116,196 |
| Louisiana | $2,201,393 | $4002 | $127,646 | N/A | $3,516,463 |
| Mississippi | $6,007,946 | $57,154 | $215,768 | N/A | $8,898,798 |
| North Carolina | $376,916 | $188,351 | N/A | $7921 | $2,558,449 |
| Oklahoma | $2,440,935 | N/A | N/A | N/A | $2,531,240 |
| South Carolina | $1,203,855 | $83,302 | $48,028 | N/A | $2,316,699 |
| Tennessee | $701,818 | N/A | N/A | N/A | $1,919,310 |
| Texas | $5,225,990 | $29,555 | N/A | $26,757 | $5,738,958 |
| Virginia | $629,915 | $53,505 | $161,890 | N/A | $2,426,315 |
| Total | $28,948,052 | $691,670 | $845,199 | $166,413 | $52,722,269 |

*Note*: This table shows payments to Black or African American producers in states with the largest Black or African American producers. Black or African American producers of Mississippi received the largest CFAP payments.
*Source*: Farm Service Agency, USDA. Top states identified by the 2017 Census of Agriculture.

# COMPARISON OF THE CORONAVIRUS FOOD ASSISTANCE PROGRAM AND MARKET FACILITATION PROGRAM PAYMENTS BY RACE

The MFP and CFAP programs were implemented for entirely different purposes. The MFP made payments to producers impacted by retaliatory tariffs placed on American producers. The CFAP made assistance payments to producers impacted by the COVID-19 pandemic. Fewer commodities were eligible for MFP payments compared to CFAP payments. Finally, payment rates and payment structure were different for the two programs. Therefore, there are significant limitations to drawing conclusions by comparing payments from these two programs. However, the programs had some similarities, including payment limitations. Both programs were new programs designed by the USDA. So, comparing the share of total payments made to producers differentiated by race can still provide insights into designing future programs to reach more minority producers.

Table 4 lists the total and share of MFP and CFAP payments by race and shows a higher share of CFAP payments went to minority producers. While 99.18% of total MFP payments went to White only producers, 97.92% of total CFAP payments went to White only producers. This information provides evidence that more payments as a share of total payments from CFAP went to minority producers compared to MFP. However, this gain was not realized by Black or African American only producers.

An interesting observation from Table 4 is that even though the two programs were significantly different in scope and propose, they both paid 0.17% of total payments to Black or

Case 2:24-cv-00060-Z   Document 33-2   Filed 06/25/24   Page 57 of 272   PageID 1309

**TABLE 4** Payments from the market facilitation program and coronavirus food assistance program differentiated by race

| Race | Total CFAP payments ($ million) | Share (%) of total CFAP | Total MFP ($ million) | Share (%) of total MFP |
|------|--------------------------------|-------------------------|-----------------------|------------------------|
| American Indian or Alaska Natives only | $261.51 | 0.85% | $64.90 | 0.28% |
| Asian only | $196.78 | 0.64% | $26.44 | 0.11% |
| Black or African American only | $52.72 | 0.17% | $40.35 | 0.17% |
| Mixed race | $59.35 | 0.19% | $22.77 | 0.10% |
| Native Hawaiian or other Pacific Islander only | $17.97 | 0.06% | $7.35 | 0.03% |
| Unknown race | $52.40 | 0.17% | $27.30 | 0.12% |
| White only | $30,216.27 | 97.92% | $22,938.39 | 99.18% |
| Total | $30,857.01 | 100.00% | $23,127.52 | 100.00% |

*Note*: This table shows CFAP and MFP payments by race. Among identified minority producers, American Indian or Alaska Natives only producers received the largest total CFAP and MFP payments.
*Source*: Farm Service Agency, USDA.

African American only producers. Table 4 also shows in absolute terms the CFAP's total outlay was $7.7 billion, or 33%, more than MFP. The amount of money received by Black or African American only producers increased from $40.35 million from MFP to $52.72 million from CFAP, a 31% increase.

The gain of more CFAP payments being disbursed (as a share of total payments) to minority producers was realized by American Indian or Alaska Natives only producers, Asian only producers, and Native Hawaiian or other Pacific Islander only producers. These producers received more than double in actual payments and as a share of total payments from CFAP compared to MFP. American Indian or Alaska Natives only producers received a higher share (0.85%) of total CFAP payments compared to (0.28% of total) MFP payments. Asian only producers received a higher share (0.64%) of total CFAP payments compared to (0.11% of total) MFP payments. Native Hawaiian or Other Pacific Islander only producers received a higher share (0.06%) of total CFAP payments compared to (0.03% of total) MFP payments.

## CONCLUSION

The CFAP was the main USDA program that provided economic relief to producers impacted by the COVID-19 pandemic. CFAP made almost $600 million in direct payments to minority producers, including Black or African American producers. Black or African American only producers received more than $52 million in CFAP payments. CFAP payments were proportional to the value of agricultural commodity sold for most minority producers. The 2017 Census of Agriculture showed that the majority of minority producers, including African American producers but excluding Asian producers, raised livestock. CFAP made the highest payments to livestock minority producers. In some States, such as Oklahoma, 96% of CFAP dollars received

Case 2:24-cv-00065-Z Document 33-2 Filed 07/26/24 Page 58 of 272 PageID 1389

by Black or African American only producers went to cattle producers. Producers of almost all commodities, measured in cash receipts, were eligible to receive CFAP payments. Therefore, many producers of all races that do not generally receive Government payments received payments in 2020. CFAP made more payments in actual dollars and as a share of total program outlays to minority producers compared to MFP. However, for Black or African American only producers, even though the magnitude increased (because CFAP disbursed more funds compared to MFP), the share of payment received did not increase. CFAP payments were more than double and as a share of total program dollars to minority producers (except for Black or African- American producers) compared to MFP.

## ACKNOWLEDGMENTS

We thank USDA economists John Jinkins and Melinda Wengrin for the data and review. We also thank USDA economists Jeff Hopkins and Krishna Paudel for their review and input. Finally, we also thank anonymous reviewers and Mindy Mallory for their review and feedback.

## REFERENCES

Escalante, Cesar L., Rodney L. Brooks, James E. Epperson, and Forrest E. Stegelin. 2006. "Credit Risk Assessment and Racial Minority Lending at the Farm Service Agency." *Journal of Agricultural and Applied Economics* 38(1): 61–75.

Escalante, Cesar L., Adenola Osinubi, Charles Dodson, and Carmina E. Taylor. 2018. "Looking beyond Farm Loan Approval Decisions: Loan Pricing and Nonpricing Terms for Socially Disadvantaged Farm Borrowers." *Journal of Agricultural and Applied Economics* 50(1): 129–48.

Ghimire, Jyotsna, Cesar L. Escalante, Ramesh Ghimire, and Charles B. Dodson. 2020. "Do Farm Service Agency borrowers' Double Minority Labels Lead to more Unfavorable Loan Packaging Terms?" *Agricultural Finance Review* 80(5): 633–46.

Anil K. Giri, Tia M. McDonald, Dipak Subedi, and Christine Whitt (2021). COVID-19 Working Paper: Financial Assistance for Farm Operations and Farm Households in the Face of COVID-19 (No. 1962-2021-2204).

Giri, Anil, E. Wesley F. Peterson, Sankalp Sharma, and Iuliia Tetteh. 2020. "Ex-Post Analysis of the 2018–2019 Market Facilitation Programs." *Choices* 35(3): 1–12. Available online: https://www.choicesmagazine.org/choices-magazine/submitted-articles/ex-post-analysis-of-the-2018-and-2019-market-facilitation-programs.

Reiley, Laura. Agriculture Secretary tom Vilsack Says Only 0.1 Percent of Trump administration's Covid Farm Relief Went to Black Farmers. The Washington Post. 2021. Available online: https://www.washingtonpost.com/business/2021/03/25/vilsack-interview-usda-rescue-plan/.

U.S. Department of Agriculture. 2019a. *2017 Census of Agriculture Highlights Black Producers*. Washington, DC: National Agricultural Statistics Service, United States Department of Agriculture. https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Black_Producers.pdf.

U.S. Department of Agriculture. 2019b. *2017 Census of Agriculture Highlights Asian Producers*. Washington, DC: National Agricultural Statistics Service, United States Department of Agriculture. https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Asian_Producers.pdf.

U.S. Department of Agriculture. 2019c. *2017 Census of Agriculture Highlights American Indian/Alaska Native Producers*. Washington, DC: National Agricultural Statistics Service, United States Department of Agriculture. https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_AmericanIndianAlaskaNative_Producers.pdf.

U.S. Department of Agriculture. 2020a. *Coronavirus Food Assistance Program 2 Cost-Benefit Analysis*. Washington, DC: U.S. Department of Agriculture.

U.S. Department of Agriculture. 2020b. *Coronavirus Food Assistance Program Cost-Benefit Analysis*. Washington, DC: U.S. Department of Agriculture.

U.S. Department of Agriculture. 2020c. *Census of Agriculture*. Washington, DC: U.S. Department of Agriculture, National Agricultural Statistics Service. Available online: https://www.nass.usda.gov/AgCensus/.

U.S. Department of Agriculture, Farm Service Agency. 2020a. *Coronavirus Food Assistance Program 1 Data*. Washington, DC: U.S. Department of Agriculture, Farm Service Agency.

Case 2:24-cv-00060-Z   Document 33-2   Filed 06/26/24   Page 59 of 272   PageID 1309

U.S. Department of Agriculture, Farm Service Agency. 2020b. *Coronavirus Food Assistance Program 2 Data*. Washington, DC: U.S. Department of Agriculture, Farm Service Agency.

U.S. Department of Agriculture, Farm Service Agency's Newsroom. 2021. *USDA Updates Pandemic Assistance for Livestock, Poultry Contract Producers and Specialty Crop Growers*. Washington, DC: U.S. Department of Agriculture, Farm Service Agency. Available online: https://www.fsa.usda.gov/news-room/news-releases/2021/usda-updates-pandemic-assistance-for-livestock-poultry-contract-producers-and-specialty-crop-growers.

U.S. Department of Agriculture Press Release. 2021. *After Identifying Gaps in Previous Aid, USDA Announces "Pandemic Assistance for Producers" to Distribute Resources more Equitably*. U.S. Department of Agriculture: Washington, DC. Available online: https://www.usda.gov/media/press-releases/2021/03/24/after-identifying-gaps-previous-aid-usda-announces-pandemic.

**How to cite this article:** Giri, Anil K., Dipak Subedi, and Kathleen Kassel. 2022. "Analysis of the Payments from the Coronavirus Food Assistance Program and the Market Facilitation Program to Minority Producers." *Applied Economic Perspectives and Policy* 1–13. https://doi.org/10.1002/aepp.13325



**OFFICE OF INSPECTOR GENERAL**

U. S. DEPARTMENT OF AGRICULTURE

# USDA Coronavirus Food Assistance Program Data Story

OAI Report 22-033-01
December 2022

Strickland AR 0760

# USDA OFFICE OF INSPECTOR GENERAL
## United States Department of Agriculture

**DATE:**  December 1, 2022

**PRODUCT NUMBER:**  22-033-01

**TO:**  Zach Ducheneaux
Administrator
Farm Service Agency

**ATTN:**  Gary Weishaar
Branch Chief
External Audits and Investigations Division

**FROM:**  Craig M. Goscha
Deputy Assistant Inspector General for Analytics and Innovation

**SUBJECT:**  USDA Coronavirus Food Assistance Program Data Story

The U.S. Department of Agriculture (USDA) Office of Inspector General (OIG) has launched a series of data products called data stories. The purpose of these data stories is to enhance transparency of significant USDA programs using data analytics and visualizations while integrating data storytelling methods.

This data story is the second in the series and focuses on the USDA Coronavirus Food Assistance Program (CFAP). This product utilized data analytics, visualizations, and data storytelling methods to enhance transparency of how the CFAP 1 and CFAP 2 programs evolved over time. The data utilized for this data story were unaudited.

CFAP 1 and CFAP 2 provided payments to agricultural producers to help address the economic hardships created when COVID-19 disrupted the agricultural supply chain. This CFAP data story invites the reader to explore both programs and how they evolved from inception to the end of February 2022 in response to changing pandemic conditions.

Farm Service Agency's written response to the data story is included in its entirety in the data story and this report. OIG applied the established Office of Analytics and Innovation quality assurance standards to ensure the information presented in this product is adequately supported.

We appreciate the courtesies and cooperation extended to us by members of your staff during the development of this data story. The product will be posted in its entirety to our website (usdaoig.oversight.gov) in the near future.

Attachment

| Topic: | Response to the Office of Inspector General Data Story on the Coronavirus Food Assistance Program |
|---|---|

| To: | Craig Goscha, Craig.Goscha@oig.usda.gov<br>Deputy Assistant Inspector General, Analytics and Innovation, Office of Inspector General |
|---|---|
| From: | Zach Ducheneaux, Zach.Ducheneaux@usda.gov<br>Administrator, Farm Service Agency, U.S. Department of Agriculture |

The U.S. Department of Agriculture's (USDA's) Farm Service Agency (FSA) commends the Office of Inspector General's launch of its new product, Data Stories, and its efforts to use this product to enhance the transparency of significant USDA programs using data analytics and visualization while integrating data storytelling methods.  Below are our comments:

FSA agrees with OIG's explanation of the sizable disruptions to food supply chains caused by the onset of the COVID-19 pandemic and the impacts of those disruptions on American farmers, ranchers, and producers. Through funds passed by Congress in response to this unprecedented crisis, USDA under the previous Administration distributed tens of billions of dollars in supplemental assistance to agricultural producers.  Part of this assistance was distributed through the Coronavirus Food Assistance Program (CFAP).

The previous Administration announced the CFAP on April 17, 2020. This program, which totaled over $19 billion, initially provided support to farmers and ranchers impacted by the COVID-19 pandemic.  The vast majority of this funding—$16 billion—was administered as direct payments to producers who suffered price declines and faced additional significant marketing costs as a result of lower demand, surplus production, and disruptions to shipping patterns and the orderly marketing of commodities.

OIG appropriately notes that, following the initial payments under the original CFAP ("CFAP 1"), in September 2020, the previous Administration announced details of another multi-billion "CFAP 2."   Unlike CFAP 1, payments under CFAP 2 were divided into multiple categories, including price trigger commodities, flat-rate commodities, and sales commodities. In December 2021, Congress also approved additional funding for relief to agricultural producers, including a third round of CFAP payments.

As all forms of CFAP assistance were paid out to producers, Congressional leaders and agricultural stakeholders raised concern that the relief was not reaching a broad enough set of producers, and many of the most vulnerable agricultural communities were not receiving the assistance they needed to weather the pandemic.

While the OIG Data Story elevates the fact that more than 200 commodities were ultimately included under both CFAP 1 and CFAP 2—and that both programs were amended over time to include "wider varieties of producers and commodities"—it is important to understand that

Strickland AR 0762

both iterations of the program had very low participation among minority producers. When CFAP 1 was initially implemented, the program had a minority participation rate of 4.4 percent (3.5 percent of payments), and prior to being reopened, CFAP 2 had a minority participation rate of 4.2 percent (3 percent of payments). That is why, one of the first actions of Biden-Harris Administration leadership was to temporarily pause CFAP payments; the Administration paused payments so that USDA could conduct a detailed analysis of the payments that had been issued and the gaps in assistance that remained. The Administration deemed it essential to ensure that future CFAP payments were targeted towards producers and industries that had not yet benefitted from the program.

During its review and analysis of previous CFAP payments, USDA found that, under CFAP 2 in particular, sign-up appeared rushed and lacked normal procedures focused on ensuring effective outreach, from translated forms to partnerships focused on reaching underserved and nontraditional customers.  USDA also found that, while the sales commodity category of payments under CFAP 2 provided a new opportunity to reach specialty crop and diversified producers who normally do not participate in USDA's price support programs, data continued to reflect a lack of nontraditional producers' participation through this category.

After completing its analysis of the program, in March 2021, USDA shared that it would re-open signup for CFAP 2 for at least 60 days beginning on April 5, 2021.  USDA's FSA committed at least $2 million to improve outreach for CFAP 2 and established partnerships with organizations with strong connections to historically underserved communities to ensure they were informed and aware of the application process. The formula payments to finish out CFAP went out under the then-existing CFAP rules due to statutory requirements.  However, future opportunities for USDA pandemic assistance were reviewed for verified need, and during the rulemaking process, USDA was committed to making eligibility more consistent with the Farm Bill.

It is important to note that the re-opening of CFAP sign-up under the Biden-Harris Administration was for all eligible producers and was based on the clear discovery of inadequate outreach under previous iterations of the program. As a result of USDA's efforts, USDA saw a fourfold increase in CFAP 2 participation by underserved producers during the reopening period.

Moreover, in addition to reopening CFAP and intentionally working to expand its reach in underserved communities, USDA concurrently established several new programs and efforts to bring financial assistance to farmers, ranchers, and producers who felt the impacts of COVID-19 market disruptions but had not received assistance through CFAP. USDA dedicated $6 billion to a new Pandemic Assistance for Producers initiative, putting a greater emphasis on outreach to small and underserved producers, including but not limited to specialty crop and organic producers, timber harvesters, and others impacted by COVID.

The Department remains focused on reaching a better understanding of where barriers to accessing USDA programs and services exist, so that they can be better addressed both in program design as authorities allow and in USDA's outreach efforts.  FSA respectfully

requests the OIG CFAP data story reflect the additional context and information this management response provides.

Strickland AR 0764

Learn more about USDA OIG
Visit our website: **https://usdaoig.oversight.gov/**
Follow us on Twitter: @OIGUSDA

How to Report Suspected Wrongdoing in USDA Programs

Fraud, Waste, and Abuse
File complaint online: **https://usdaoig.oversight.gov/hotline**

Monday–Friday, 9:00 a.m.– 3:00 p.m. ET
In Washington, DC 202-690-1622
Outside DC 800-424-9121
TDD (Call Collect) 202-690-1202

Bribes or Gratuities
202-720-7257 (24 hours)

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public
assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

All photographs on the front and back covers are from USDA's Flickr site and are in the public domain. They do not depict any particular audit, inspection, or investigation.

Strickland AR 0765

**Sum of Total Payments**

| Gender /Race | Hispanic Ltno | Not Hispanic | (blank) | Grand Total |
|---|---|---|---|---|
| **Female** | **$407,994.35** | **$8,745,361.80** | **$1,269,534,627.78** | **$49,111,693.19** | **$1,327,799,677.12** |
| Amer Ind/Alaska | | $537,000.49 | $3,309,720.68 | $38,950.25 | $3,885,671.42 |
| Asian | | $2,537.48 | $1,826,391.92 | $1,423.14 | $1,830,352.54 |
| Black | | $40,105.51 | $1,863,168.49 | $67,689.41 | $1,970,963.41 |
| Hawaiian/Pcf Is | | $3,743.44 | $681,090.87 | $95,936.41 | $780,770.72 |
| Two or More | | | $780,263.82 | $13,970.41 | $794,234.23 |
| White | | $8,025,933.42 | $1,261,073,992.00 | $48,893,723.57 | $1,317,993,648.99 |
| (blank) | $407,994.35 | $136,041.46 | | | $544,035.81 |
| **Male** | **$378,893.75** | **$54,853,936.70** | **$11,819,817,640.33** | **$153,764,976.72** | **$12,028,815,447.50** |
| Amer Ind/Alaska | | $2,074,623.73 | $31,609,011.27 | $44,615.36 | $33,728,250.36 |
| Asian | | $4,984.80 | $7,079,422.35 | $12,062.52 | $7,096,469.67 |
| Black | | $54,052.44 | $23,452,369.04 | $385,263.47 | $23,891,684.95 |
| Hawaiian/Pcf Is | | $91,043.92 | $2,752,580.39 | $19,125.51 | $2,862,749.82 |
| Two or More | | $8,700.47 | $11,591,711.88 | $77,580.59 | $11,677,992.94 |
| White | | $52,426,509.60 | $11,743,332,545.40 | $153,226,329.27 | $11,948,985,384.27 |
| (blank) | $378,893.75 | $194,021.74 | | | $572,915.49 |
| **Org Other** | **$223,537,039.84** | **$19,747,940.35** | **$2,454,257,212.33** | **$2,291,564,781.10** | **$4,989,106,973.62** |
| Amer Ind/Alaska | | $611,126.46 | $5,348,391.14 | $6,168,622.58 | $12,128,140.18 |
| Asian | | | $2,793,903.29 | $279,868.80 | $3,073,772.09 |
| Black | | | $3,420,993.34 | $2,597,022.02 | $6,018,015.36 |
| Hawaiian/Pcf Is | | | $818,589.10 | $269,870.76 | $1,088,459.86 |
| Two or More | | $240,759.49 | $3,420,085.84 | $1,843,101.07 | $5,503,946.40 |
| White | | $16,245,125.79 | $2,390,949,266.53 | $2,280,406,295.87 | $4,687,600,688.19 |
| (blank) | $223,537,039.84 | $2,650,928.61 | $47,505,983.09 | | $273,693,951.54 |
| **Org/Fem-Owned** | **$16,878,297.75** | **$787,857.57** | **$126,247,857.93** | **$20,739,265.94** | **$164,653,279.19** |
| Amer Ind/AI | | $25,004.04 | | | $25,004.04 |
| Amer Ind/Ala | | | $493,687.79 | | $493,687.79 |
| Asian | | | $435,460.56 | $15,078.25 | $450,538.81 |
| Black | | | $834,981.05 | $94,668.44 | $929,649.49 |
| Hawaiian/Pcf | | | $49,835.27 | | $49,835.27 |
| Two or More | | | $2,102.40 | $5,122.65 | $7,225.05 |
| White | | $731,206.48 | $120,647,378.31 | $20,624,396.60 | $142,002,981.39 |
| (blank) | $16,878,297.75 | $31,647.05 | $3,784,412.55 | | $20,694,357.35 |
| **Org/Male-Owned** | **$159,701,846.56** | **$10,794,919.82** | **$1,694,682,052.60** | **$281,200,512.84** | **$2,146,379,331.82** |
| Amer Ind/AI | | $315,641.17 | | | $315,641.17 |
| Amer Ind/Ala | | | $3,014,559.88 | | $3,014,559.88 |
| Amer Ind/Alaska | | | | $128,453.14 | $128,453.14 |
| Asian | | | $2,540,893.25 | $339,673.23 | $2,880,566.48 |
| Black | | $21,254.68 | $3,996,578.67 | $227,709.24 | $4,245,542.59 |
| Hawaiian/P | | $2,821.88 | | | $2,821.88 |
| Hawaiian/Pc | | | $2,311,020.89 | | $2,311,020.89 |
| Hawaiian/Pcf Is | | | | $642,293.98 | $642,293.98 |
| Two or More | | $3,772.80 | $174,486.39 | | $178,259.19 |
| White | | $9,492,049.30 | $1,636,764,773.72 | $279,862,383.25 | $1,926,119,206.27 |
| (blank) | $159,701,846.56 | $959,379.99 | $45,879,739.80 | | $206,540,966.35 |
| **Unknown** | **$1,171,100,701.51** | **$3,831,296.21** | **$953,058,008.72** | **$285,633,241.37** | **$2,413,623,247.81** |
| Amer Ind/Alaska | | $165,996.21 | $1,971,170.80 | $254,680.82 | $2,391,847.83 |
| Asian | | $2,918.02 | $1,375,098.88 | $156,542.62 | $1,534,559.52 |
| Black | | | $1,180,264.18 | $4,818.95 | $1,185,083.13 |
| Hawaiian/Pcf Is | | | $532,843.19 | $140,410.59 | $673,253.78 |
| Two or More | | | $322,783.85 | | $322,783.85 |
| White | | $3,425,416.46 | $840,768,635.72 | $285,076,788.39 | $1,129,270,840.57 |
| (blank) | $1,171,100,701.51 | $236,965.52 | $106,907,212.10 | | $1,278,244,879.13 |
| **Grand Total** | **$1,572,004,773.76** | **$98,761,312.45** | **$18,317,597,399.69** | **$3,082,014,471.16** | **$23,070,377,957.06** |

Strickland AR 0766

| Sum of Total Payment (blank) | | | | |
|---|---|---|---|---|
| Gender / Race | | Hispanic Ltno | Not Hispanic | Grand Total |
| **Female** | **$13,973,615.14** | **$5,513,351.78** | **$420,986,891.32** | **$440,473,858.24** |
| | $62,408.07 | $25,316.29 | | $87,724.36 |
| Amer Ind/Alaska | $28,775.52 | $462,505.40 | $8,839,569.91 | $9,330,850.83 |
| Asian | | $5,796.00 | $1,476,769.52 | $1,482,565.52 |
| Black | $34,486.21 | $6,103.24 | $1,412,418.17 | $1,453,007.62 |
| Hawaiian/Pcf Is | $50,841.40 | $8,278.00 | $690,692.56 | $749,811.96 |
| Two or more | $5,214.00 | | $1,034,665.97 | $1,039,879.97 |
| White | $13,791,889.94 | $5,005,352.85 | $407,532,775.19 | $426,330,017.98 |
| **Male** | **$78,717,164.87** | **$41,588,442.05** | **$4,157,572,131.34** | **$4,277,877,738.26** |
| | $393,606.67 | $762,229.12 | | $1,155,835.79 |
| Amer Ind/Alaska | $270,836.88 | $2,604,248.23 | $59,806,027.72 | $62,681,112.83 |
| Asian | $3,284.97 | $121,593.95 | $6,370,541.32 | $6,495,420.24 |
| Black | $405,538.74 | $223,924.46 | $12,067,784.53 | $12,697,247.73 |
| Hawaiian/Pcf Is | $57,466.08 | $164,104.09 | $2,775,287.55 | $2,996,857.72 |
| Two or more | $143,157.86 | $356,638.95 | $10,272,268.77 | $10,772,065.58 |
| White | $77,443,273.67 | $37,355,703.25 | $4,066,280,221.45 | $4,181,079,198.37 |
| **Org Other** | **$1,020,193,249.42** | **$22,623,729.41** | **$1,093,221,189.56** | **$2,136,038,168.39** |
| | $144,356,857.68 | $2,160,507.74 | $21,523,936.91 | $168,041,302.33 |
| Amer Ind/Alaska | $2,852,902.14 | $1,250,201.19 | $3,455,031.09 | $7,558,134.42 |
| Asian | $937,809.24 | | $3,518,203.30 | $4,456,012.54 |
| Black | $726,731.97 | $32,858.74 | $402,733.43 | $1,162,324.14 |
| Hawaiian/Pcf Is | $41,115.03 | | $286,623.33 | $327,738.36 |
| Two or more | $737,690.60 | $1,358.46 | $1,357,702.27 | $2,096,751.33 |
| White | $870,540,142.76 | $19,178,803.28 | $1,062,676,959.23 | $1,952,395,905.27 |
| **Org/Fem-Owned** | **$11,068,471.46** | **$3,179,467.80** | **$42,116,192.52** | **$56,364,131.78** |
| | $4,404,110.83 | $21,299.41 | $725,645.12 | $5,151,055.36 |
| Amer Ind/Alaska | $3,300.00 | $1,656.57 | $187,650.00 | $192,606.57 |
| Asian | | | $891,484.10 | $891,484.10 |
| Black | $5,510.57 | | $92,595.36 | $98,105.93 |
| Hawaiian/Pcf Is | | | $69,160.33 | $69,160.33 |
| Two or more | $655.03 | | $79,682.08 | $80,337.11 |
| White | $6,654,895.03 | $3,156,511.82 | $40,069,975.53 | $49,881,382.38 |
| **Org/Male-Owned** | **$243,714,006.18** | **$22,511,539.55** | **$830,942,959.48** | **$1,097,168,505.21** |
| | $99,853,088.13 | $690,336.77 | $24,400,758.66 | $124,944,183.56 |
| Amer Ind/Alaska | $32,928.58 | $840,339.80 | $2,032,835.28 | $2,906,103.66 |
| Asian | $352,884.26 | | $4,484,638.95 | $4,837,523.21 |
| Black | $364,083.00 | $14,936.47 | $920,450.40 | $1,299,469.87 |
| Hawaiian/Pcf Is | $136,266.30 | $31,680.00 | $1,977,630.72 | $2,145,577.02 |
| Two or more | | $62,606.69 | $587,015.23 | $649,621.92 |
| White | $142,974,755.91 | $20,871,639.82 | $796,539,630.24 | $960,386,025.97 |
| **Unknown** | **$788,795,210.41** | **$4,591,388.32** | **$378,927,878.43** | **$1,172,314,477.16** |
| | $630,595,844.49 | $974,630.68 | $43,823,474.56 | $675,393,949.73 |
| Amer Ind/Alaska | $174,109.07 | $711,575.98 | $1,901,858.34 | $2,787,543.39 |
| Asian | $301,986.06 | $8,556.40 | $821,540.69 | $1,132,083.15 |
| Black | $28,666.11 | $6,270.00 | $99,862.62 | $134,798.73 |
| Hawaiian/Pcf Is | $474,224.63 | | $503,221.60 | $977,446.23 |
| Two or more | | | $73,157.08 | $73,157.08 |
| White | $157,220,380.05 | $2,890,355.26 | $331,704,763.54 | $491,815,498.85 |
| **Grand Total** | **$2,156,461,717.48** | **$100,007,918.91** | **$6,923,767,242.65** | **$9,180,236,879.04** |

Strickland AR 0767

## DEPARTMENT OF AGRICULTURE

**Office of the Secretary**

**7 CFR Part 9**

**Farm Service Agency**

**7 CFR Parts 701 and 760**

**Commodity Credit Corporation**

**7 CFR Parts 1400, 1416, 1437, and 1450**

[Docket ID: USDA–2021–0012]

RIN 0503–AA75

**Pandemic Assistance Programs and Agricultural Disaster Assistance Programs**

**AGENCY:** Commodity Credit Corporation (CCC), Farm Service Agency (FSA), and Office of the Secretary, Department of Agriculture (USDA).

**ACTION:** Final rule.

**SUMMARY:** This rule announces Phase 2 of the Emergency Relief Program (ERP), which provides assistance to producers who suffered crop losses due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, and qualifying droughts occurring in calendar years 2020 and 2021. It also announces Pandemic Assistance Revenue Program (PARP), a new program that provides support for agricultural producers impacted by the COVID–19 pandemic. In addition, this rule makes changes to the Coronavirus Food Assistance Program (CFAP); the Emergency Conservation Program (ECP); the Emergency Forest Restoration Program (EFRP); the Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program (ELAP); the Livestock Forage Disaster Program (LFP); the Livestock Indemnity Program (LIP); the Noninsured Crop Disaster Assistance Program (NAP); and general payment eligibility provisions. This rule also makes a technical correction to the Biomass Crop Assistance Program (BCAP).

**DATES:**
*Effective date:* January 11, 2023.
*Comment due date:* For PARP, ECP, and ERP, we will consider comments on the information collection requirements under the Paperwork Reduction Act that we receive by March 13, 2023.

**ADDRESSES:** We invite you to submit comments on the information collection requirements. You may submit comments by any of the following methods:

∀ *Federal eRulemaking Portal:* Go to: *www.regulations.gov* and search for docket ID USDA–2021–0012. Follow the online instructions for submitting comments.

∀ *Mail, Hand-Delivery, or Courier:* Director, Safety Net Division, FSA, USDA, 1400 Independence Avenue SW, Stop 0510, Washington, DC 20250–0522. In your comment, specify the docket ID USDA–2021–0012.

Comments will be available for inspection online at *http://www.regulations.gov.* Copies of the information collection may be requested by contacting Kathy Sayers or Shanita Landon, respectively (see **FOR FURTHER INFORMATION CONTACT** below). You may also send comments to the Desk Officer for Agriculture, Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

**FOR FURTHER INFORMATION CONTACT:** For CFAP, ERP, ELAP, LFP, LIP, NAP, PARP, and PARP information collection activity, and payment eligibility, Kathy Sayers; telephone: (202) 720–6825; email: kathy.sayers@usda.gov. For ECP, EFRP, and BCAP, Shanita Landon; telephone: (202) 690–1612; email: shanita.landon@usda.gov. Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice).

**SUPPLEMENTARY INFORMATION:**

## Background

This rule announces ERP Phase 2 and PARP, a new program. In addition, this rule amends the CFAP regulations to provide an additional CFAP 2 payment for underserved producers;[1] makes clarifying changes based on previously implemented provisions of the Consolidated Appropriations Act, 2021 (CAA); and amends the payment provisions for producers of swine. It also updates provisions for and makes technical changes to the regulations for BCAP, ECP, ELAP, LFP, LIP, NAP, and payment eligibility provisions of 7 CFR part 1400, as described in this document.

## ERP Phase 2

Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021. FSA previously announced ERP Phase 1 through a notice of funds availability on May 18, 2022 (87 FR 30164–30172),[2] which provided assistance for crop, tree, bush, and vine losses through a streamlined process with pre-filled applications using data already on file with FSA or the Risk Management Agency (RMA), as a result of the producer previously receiving a NAP payment or a crop insurance indemnity. This rule provides the eligibility requirements, application process, and payment calculations for ERP Phase 2, which is intended to address eligible crop losses not included in ERP Phase 1.[3] ERP Phase 2 provides assistance for necessary expenses related to both production and quality losses of eligible crops. Where loss information is not already on file with FSA or RMA through NAP or Federal crop insurance, and therefore included in ERP Phase 1, FSA has determined that the best approximation of such losses is a producer's decrease in gross revenue, which will reflect losses in both production and quality without requiring the more extensive calculations and documentation required under previous programs addressing crop losses due to disaster events.[4] Using a decrease in gross revenue in the calculation of ERP Phase 2 payments also captures a producer's loss due to a qualifying disaster event regardless of whether the loss occurs before harvest or after harvest while the

---

[1] Throughout this document, the term "underserved farmer or rancher" refers to a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

[2] A clarification to the notice of funds availability for ERP Phase 1 was published on August 18, 2022 (87 FR 50828–50830).

[3] Additional assistance authorized by the Extending Government Funding and Delivering Emergency Assistance Act for losses to milk and livestock will be announced in subsequent documents to be published in the **Federal Register**. FSA previously announced Phase 1 of the Emergency Livestock Relief Program (ELRP), which provided payments to producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021 on April 4, 2022 (87 FR 19465–19470).

[4] Assistance for crop losses that occurred prior to harvest due to disaster events in the 2018 and 2019 calendar years was provided through two separate programs: the Wildfires and Hurricanes Indemnity Program Plus (WHIP+) for production losses, and the Quality Loss Adjustment (QLA) Program for quality losses.

Strickland AR 0768

crop is in storage, further streamlining the delivery of assistance.

Decreases in gross revenue are strongly correlated to crop production and quality losses due to disaster events. Gross revenue is essentially the aggregation of the value of all of a producer's crops, and a decrease in gross revenue in a year when a producer suffered a loss due to a disaster event reflects the producer's crop losses resulting from decreased production or from obtaining a lower price due to a reduction in quality for that year. Previous FSA disaster assistance programs have similarly been based on a producer's loss of value compared to their expected value, using payment calculations based on crop acres, price, and yield (or inventory and price for value loss crops) as a way to estimate the value of a crop. While ERP Phase 2 uses a different calculation than previous disaster assistance programs to capture that value loss, it accounts for crop losses in a streamlined way that minimizes the burden on producers and improves efficiency of application processing by FSA county offices.

### ERP Phase 2 Eligibility

To be eligible for ERP Phase 2, a producer must have suffered a loss of an eligible crop due in whole or in part to a qualifying disaster event that occurred in the 2020 or 2021 calendar year (referred to as the "disaster year"). Qualifying disaster events include wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. "Qualifying drought" means an area within the county was rated by the U.S. Drought Monitor as having a drought intensity of D2 (severe drought) for 8 consecutive weeks or D3 (extreme drought) or higher level for any period of time during the applicable calendar year.

To receive a payment for ERP Phase 2, the eligible crop loss must have resulted in a decrease of allowable gross revenue, as described in the next section of this document. "Eligible crop" for ERP Phase 2 means a crop, including eligible aquaculture, that is produced in the United States as part of a farming operation and is intended to be commercially marketed. It excludes crops for grazing, aquatic species that do not meet the definition of aquaculture, *Cannabis sativa L.* and any part of that plant that does not meet the definition of hemp, and timber.

For ERP, "producer" refers to a person or legal entity who was entitled

to a share in the eligible crop available for marketing or would have shared had the eligible crop been produced and marketed. In addition, to be eligible for ERP Phase 2, a producer must be one of the following:

(1) Citizen of the United States;
(2) Resident alien, which for purposes of this subpart means "lawful alien" as defined in 7 CFR part 1400;
(3) Partnership organized under State Law;
(4) Corporation, limited liability company, or other organizational structure organized under State law; or
(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304).

### ERP Phase 2 Allowable Gross Revenue

In general, ERP Phase 2 payments are based on the difference in allowable gross revenue between a benchmark year (2018 or 2019), reflective of a typical year, as elected by the producer, intended to represent a typical year of revenue for the producer's operation, and the applicable disaster year (2020 or 2021). For the purposes of ERP Phase 2, "allowable gross revenue" includes revenue from:

∀ Sales of eligible crops produced by the producer, which includes sales resulting from value added through post-production activities (for example, sales of jam from the processing of strawberries) that were reportable on IRS Schedule F;

∀ Sales of eligible crops a producer purchased for resale that had a change in characteristic due to the time held (for example, a plant purchased at a size of 2 inches and sold as an 18-inch plant after 4 months), less the cost or other basis of such eligible crops;

∀ The taxable amount of cooperative distributions directly related to the sale of the eligible crops produced by the producer;

∀ Benefits under the following agricultural programs: 2017 Wildfires and Hurricanes Indemnity Program (WHIP), Agriculture Risk Coverage (ARC) and Price Loss Coverage (PLC), Biomass Crop Assistance Program (BCAP), Loan Deficiency Payment (LDP) program, marketing loan gains (MLG) under the Marketing Assistance Loan (MAL), 2018 and 2019 Market Facilitation Programs (MFP), Seafood Trade Relief Program (STRP), and the On-Farm Storage Loss Program;

∀ CCC loans, if treated as income and reported to IRS;

∀ Crop insurance proceeds, minus the amount of administrative fees and premiums;

∀ NAP payments, minus the amount of service fees and premiums;

∀ ELAP payments for an aquaculture crop;

∀ Payments issued through grant agreements with FSA for losses of eligible crops;

∀ Grants from the Department of Commerce, National Oceanic and Atmospheric Administration, and State program funds providing direct payments for the loss of eligible crops or the loss of revenue from eligible crops;

∀ Other revenue directly related to the production of eligible crops that IRS requires the producer to report as income;

∀ For the applicable disaster year only, ERP Phase 1 payments issued to another person or entity for the producer's share of an eligible crop, regardless of the tax year in which the payment would be reported to IRS;[5] and

∀ For the benchmark year only, 2018, 2019 and 2020 WHIP+ and QLA payments.

The allowable gross revenue will be based on the year for which the revenue would be reported for the purpose of filing a tax return. Producers who file or would be eligible to file a joint tax return will certify their allowable gross revenue based on what it would have been had they filed taxes separately for the applicable year.

If a producer decreased their operation capacity in a disaster year, as compared to the benchmark year, the producer must certify to an adjusted benchmark revenue on form FSA–521 that represents the producer's reasonably expected allowable gross revenue for the disaster year prior to the impact of the qualifying disaster event. A producer may also certify to an adjusted benchmark revenue on form FSA–521 if the producer did not have a full year of benchmark allowable gross revenue or expanded their operation capacity in a disaster year, compared to their benchmark year. If requested by FSA, producers are required to submit documentation to support these adjustments within 30 calendar days of the request. The documentation to support an adjustment due to a change in operation capacity must show that

---

[5] ERP Phase 1 allowed producers who received pre-filled application forms to indicate shares in the crop. In some cases, payment for a producer's share of a crop may have been issued to a different person or entity than the producer applying for a related revenue loss under ERP Phase 2. Applications for ERP Phase 2 must include any ERP Phase 1 payments issued to another person or entity for the producer's share of an eligible crop in order to prevent duplicate benefits being issued for the same loss.

Strickland AR 0769

the adjustment to the producer's benchmark revenue is due to an:

∀ Addition or decrease in production capacity of the farming operation;

∀ Increase or decrease in the use of existing production capacity; or

∀ Physical alterations that were made to existing production capacity.

Change in production capacity does not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals.

If a producer began farming in 2020 or 2021 and did not have allowable gross revenue in a benchmark year, the producer may certify to an adjusted benchmark allowable gross revenue on form FSA–521 that represents what had been the producer's reasonably expected disaster year revenue prior to the impact of the qualifying disaster event. If requested by FSA, documentation required to support a producer's certification must be provided within 30 calendar days of FSA's request, or the producer will be considered ineligible for ERP Phase 2. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the disaster event and includes, but is not limited to:

∀ Financial documents such as a business plan or cash flow statement that demonstrate an expected level of revenue;

∀ Sales contracts or purchase agreements; and

∀ Documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

FSA is providing an optional form, FSA–521A, Continuation Sheet for Emergency Relief Program (ERP) Adjusted Revenue, to help producers calculate their adjusted benchmark revenue if they are certifying to an adjustment on FSA–521.

In addition to providing their allowable gross revenue for the benchmark and disaster years, producers will certify to the percentage of their expected allowable gross revenue from specialty and high value crops and the percentage from other crops for the applicable disaster year on their application form. This information is used in the payment calculation to determine the amount applied to the separate payment limitations for specialty and high value crops and for all other crops, as described later in this document. The percentages certified must be equal to the percentages that the producer would have reasonably expected for the disaster year if the qualifying disaster event had not occurred. For ERP Phase 2 purposes, ''specialty crop'' has the same meaning as in ERP Phase 1.[6] A crop may be considered a high value crop based on either the crop itself, or how the crop is marketed. High value crop includes any eligible crop not specifically identified as a specialty crop or listed in the definition of ''other crop'' (that is, cotton, peanuts, rice, feedstock, and any crop grown with an intended use of grain, silage, or forage), and it also includes any eligible crop, regardless of whether the crop is identified as a specialty crop or listed in the definition of ''other crop,'' if the crop is a direct market crop, organic crop, or a crop grown for a specific market in which specialized products can be sold resulting in an increased value compared to the typical market for the crops (for example, soybeans intended for tofu production), as determined by the Deputy Administrator for Farm Programs (Deputy Administrator).

## Applying for ERP Phase 2

A completed FSA–521, Emergency Relief Program (ERP) Phase 2 Application, must be submitted to any FSA county office by the close of business on the date announced by the Deputy Administrator. Applications may be submitted in person or by mail, email, facsimile, or other methods announced by FSA.

Producers must also submit the following forms if not already on file with FSA within 60 days of the ERP Phase 2 application deadline:

(1) Form AD–2047, Customer Data Worksheet, for new customers or existing customers who need to update their customer profile;

(2) Form FSA–521A, Continuation Sheet for Emergency Relief Program (ERP) Adjusted Revenue, if applicable;

(3) Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the program year or years for which the producer is applying for ERP;[7]

(4) Form CCC–901, Member Information for Legal Entities, if applicable;

(5) Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

(6) Form FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity, for each applicable program year, including the legal entity's members, partners, or shareholders, as provided in 7 CFR part 1400; and

(7) Form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification, for the ERP Phase 2 applicant and applicable affiliates as provided in 7 CFR part 12.

If requested by FSA, the producer must provide additional documentation that establishes the producer's eligibility for ERP Phase 2. If supporting documentation is requested, the documentation must be submitted to FSA within 30 calendar days from the request or the application will be disapproved by FSA. FSA may request supporting documentation to verify information provided by the producer and the producer's eligibility including, but not limited to, the producer's:

(1) Allowable gross revenue as reported on the ERP Phase 2 application;

(2) Percentages of the expected allowable gross revenue from specialty and high value crops and other crops; and

(3) Ownership share in the agricultural commodities.

## ERP Phase 2 Payment Calculation

Although producers will be able to apply for both the 2020 and 2021 disaster years, as applicable, on one form, ERP Phase 2 payments will be calculated separately for each disaster year. If a producer indicates that they have expected revenue for both specialty and high value crops and other crops for a disaster year, a payment will be calculated separately for specialty

---

[6] As defined for ERP Phase 1, ''specialty crops'' means fruits, tree nuts, vegetables, culinary herbs and spices, medicinal plants, and nursery, floriculture, and horticulture crops. This includes common specialty crops identified by USDA's Agricultural Marketing Service at *https://www.ams.usda.gov/services/grants/scbgp/specialty-crop* and other crops as designated by the Deputy Administrator for Farm Programs.

[7] An individual who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of its status for a later program year because an individual's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what program years the status would apply. An entity that has filed CCC–860 certifying its status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of its status for a later program year unless the entity's status has changed due to changes in membership. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit CCC–860 for each applicable program year.

and high value crops and other crops for a disaster year.

To determine a producer's ERP Phase 2 payment amount, FSA will calculate:

(1) The ERP factor of 70 percent [8] multiplied by the producer's benchmark year allowable gross revenue, adjusted according to 7 CFR 760.1903, if applicable, minus

(2) The producer's disaster year allowable gross revenue; minus

(3) The sum of the producer's net ERP Phase 1 payments for the 2020 program year, if the calculation is for the 2020 disaster year, or for the 2021 and 2022 [9] program years, if the calculation is for the 2021 disaster year; minus

(4) The sum of the producer's net CFAP payments (excluding payments for contract producer revenue), net 2020 WHIP+ payments, and net 2020 Quality Loss Adjustment (QLA) Program payments, if the calculation is for the 2020 disaster year; and

(5) Multiplied by the percentage of the expected disaster year revenue for specialty and high value crops or other crops, as applicable.

ERP Phase 2 payments are subject to the availability of funds. FSA will issue an initial payment equal to the lesser of:

∀ The amount calculated as described above; or

∀ A maximum initial payment of $2,000.

If a producer has also received a payment under ERP Phase 1, FSA will reduce the producer's initial ERP Phase 2 payment amount by subtracting their ERP Phase 1 gross payment amount. [10] If total calculated payments exceed the total funding available for ERP Phase 2, the ERP Factor may be adjusted and the final payment amounts will be prorated to stay within the amount of available funding. If there are insufficient funds, a differential of 15 percent will be used for underserved producers similar to ERP Phase 1, but with a cap at the statutory maximum of 70 percent. [11] For

example, if the ERP Factor is set at 50 percent, the factor used for underserved producers will be 65 percent, but if the factor is set at 55 percent or higher, the factor for underserved producers will be capped at 70 percent. An initial payment to a producer will not be recalculated or reduced if the total calculated ERP Phase 2 factored payment for that producer is less than the initial payment amount.

If a producer receives additional assistance through CFAP or ERP Phase 1 after a producer's ERP Phase 2 payment is calculated, the producer's ERP Phase 2 payment will be recalculated and the producer must refund any resulting overpayment.

**ERP Phase 2 Payment Limitation and Attribution**

As required by the Extending Government Funding and Delivering Emergency Assistance Act and consistent with 7 CFR 760.1507, the payment limitation for ERP is determined by the producer's average adjusted gross farm income (income from activities related to farming, ranching, or forestry). Specifically, if the producer's average adjusted gross farm income is less than 75 percent of the producer's average adjusted gross income (AGI) for the 3 taxable years preceding the most immediately preceding complete tax year, a producer, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments for specialty crops and high value crops [12] and $125,000 in payment for all other crops under:

(1) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(2) ERP Phase 1 for program years 2021 and 2022 [13] and ERP Phase 2 for program year 2021, combined.

If at least 75 percent of the producer's average AGI is derived from farming, ranching, or forestry related activities and the producer provides the required certification and documentation, as discussed above, the producer, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to:

(1) $900,000 for specialty crops and high value crops combined for:

(i) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(ii) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined; and

(2) $250,000 for all other crops for:

(i) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(ii) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined.

The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, or forestry related activities are:

(1) 2016, 2017, and 2018 for program year 2020; and

(2) 2017, 2018, and 2019 for program year 2021.

To receive more than $125,000 in ERP payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certified AGI. If a producer requesting the increased payment limitation is a legal entity, all members of that entity must also complete form FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, ''Attribution of Payments.'' If a legal entity would be eligible for the increased payment limitation based on the legal entity's average AGI derived from farming, ranching, or forestry related activities but a member of that legal entity either does not complete a form FSA–510 and provide the required certification or is not eligible for the increased payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ERP Phase 2 payment attributed to that member.

If a producer files form FSA–510 and the accompanying certification after their ERP Phase 2 payment is issued but

---

[8] The Extending Government Funding and Delivering Emergency Assistance Act provides that the total amount of payments cannot exceed 70 percent of the loss for producers who did not obtain federal crop insurance or NAP coverage for the crop incurring the losses.

[9] For ERP Phase 1, the program year was based on the crop year, as defined in the applicable crop insurance policy or NAP provisions, and 2022 was included because a qualifying disaster event occurring in the 2021 calendar year may have caused a loss of a crop during the 2022 crop year. The program year for ERP Phase 2 is based on the disaster year (2020 or 2021) because the payment is based on a producer's allowable gross revenue, which may include revenue from multiple crops.

[10] If the producer's ERP Phase 1 payment is equal to or exceeds the producer's initial ERP Phase 2 payment amount, the producer will not receive an initial ERP Phase 2 payment.

[11] FSA calculates payments based on a higher payment factor for underserved farmers and

ranchers (or specific groups included in that term) in several programs, such as ECP, ELAP, and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, ELRP Phase 1, and ERP Phase 1. In addition, NAP provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

[12] High value crops were not defined in ERP Phase 1; therefore, only ERP Phase 1 payments to specialty crops, as defined in the ERP Phase 1 notice, will be counted toward the increased payment limitation for specialty and high value crops.

[13] For ERP Phase 1, the program year was based on the crop year, as defined in the applicable crop

insurance policy or NAP provisions, and 2022 was included because a qualifying disaster event occurring in the 2021 calendar year may have caused a loss of a crop during the 2022 crop year. The program year for ERP Phase 2 is based on the disaster year (2020 or 2021) because the payment is based on a producer's allowable gross revenue, which may include revenue from multiple crops.

Strickland AR 0771

before the deadline announced by FSA, FSA will process the form FSA–510 and issue the additional payment amount if a maximum initial payment amount has not been reached.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility. Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as described in § 760.1906.

Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**ERP Phase 2 Miscellaneous Provisions**

If an ERP Phase 2 payment resulted from erroneous information provided by a producer, or any person acting on their behalf, the payment will be recalculated and the producer must refund any excess payment with interest calculated from the date of the disbursement of the payment. If FSA determines that the producer intentionally misrepresented information provided on the producer's application, the application will be disapproved and the producer must refund the full amount of any payments to FSA with interest from the date of disbursement.

**ERP Phase 2 Requirement To Purchase Crop Insurance or NAP Coverage**

All producers who receive ERP Phase 2 payments are statutorily required to purchase federal crop insurance, or NAP coverage where crop insurance is not available, for the next 2 available crop years (Pub. L. 117–43, 135 STAT. 357) as described in this section and as determined by the Secretary. To identify which crops suffered losses that resulted in a revenue loss due to a qualifying disaster event, producers must complete form FSA–522, Crop Insurance and/or NAP Coverage Agreement. For each of those crops, a producer must file an acreage report and obtain federal crop insurance or NAP, as may be applicable:

(1) At a coverage level equal to or greater than 60 percent for insurable crops; or

(2) At the catastrophic level or higher for NAP crops.

The timing for the requirement to purchase federal crop insurance or NAP

for the next 2 available crop years will be determined from the date a producer receives an ERP payment and may vary depending on the timing and availability of crop insurance or NAP for a producer's particular crops. The final crop year to purchase crop insurance or NAP coverage to meet the second year of coverage for this requirement is the 2026 crop year.

In situations where federal crop insurance is unavailable for a crop, a producer must obtain NAP coverage. Section 1001D of the Food Security Act of 1985 (1985 Farm Bill) provides that a person or entity with an AGI greater than $900,000 is not eligible to participate in NAP; however, producers with an AGI greater than $900,000 are eligible for ERP. To reconcile this restriction in the 1985 Farm Bill and the requirement to obtain NAP or crop insurance coverage, a producer may meet the purchase requirement by purchasing Whole-Farm Revenue Protection (WFRP) crop insurance coverage, if eligible, or they may pay the applicable NAP service fee despite their ineligibility for a NAP payment. In other words, the service fee must be paid even though no NAP payment may be made because the AGI of the person or entity exceeds the 1985 Farm Bill limitation.

If both federal crop insurance and NAP coverage are unavailable for a crop, the producer must obtain WFRP crop insurance coverage, if available.

For all crops listed on form FSA–522, any producer who has the crop or crop acreage in subsequent years and who fails to obtain the 2 years of crop insurance or NAP coverage required as specified in this document, must refund the full amount of any ERP Phase 2 payments with interest from the date of disbursement. Any producer who does not plant a crop listed on form FSA–522 in a year for which this requirement applies is not subject to the crop insurance or NAP purchase requirement for the crop for that year.

Producers who received an ERP Phase 1 payment for a crop are not required to obtain additional years of crop insurance or NAP coverage for that crop, to the extent the producer is already complying with the requirement in connection with an ERP Phase 1 payment, if they also receive an ERP Phase 2 payment for a loss associated with that crop.

**PARP**

Secretary Tom Vilsack announced the USDA Pandemic Assistance for Producers initiative on March 24, 2021. Through that initiative, USDA is reaching a broader set of producers than in previous COVID–19 assistance

programs, with a specific focus on strengthening outreach to underserved producers and communities and small and medium agricultural operations. PARP, a new program administered by FSA, is part of that initiative.

PARP will use funding authorized by the Consolidated Appropriations Act, 2021 (CAA; Pub. L. 116–260), which provides funding to prevent, prepare for, and respond to the COVID–19 pandemic by providing support for agricultural producers, growers, and processors impacted by coronavirus. This rule establishes PARP to respond to the COVID–19 pandemic by providing support for eligible producers of agricultural commodities who suffered an eligible revenue loss in calendar year 2020 due to the COVID–19 pandemic. PARP is intended to provide assistance to a wide variety of agricultural producers, including those who produced agricultural commodities that were not eligible for CFAP 1 and 2 (7 CFR part 9).

For PARP, "producer" refers to a person or legal entity (including a general partnership or joint venture) who was in the business of farming to produce an agricultural commodity in calendar year 2020, and who was entitled to a share in the agricultural commodity available for marketing or would have shared had the agricultural commodity been produced and marketed. "Producer" also includes cattle feeder operations, which were not eligible for CFAP 1 and CFAP 2. To be eligible for PARP, a producer must:

∀ Have been in the business of farming during at least part of the 2020 calendar year; and

∀ Have had at least a 15 percent decrease in "allowable gross revenue"[14] for the 2020 calendar year, as compared to:

Æ The 2018 or 2019 calendar year (similar to the benchmark year for ERP Phase 2), reflective of a typical year, as elected by the producer, if they received allowable gross revenue during the 2018 or 2019 calendar years; or

Æ The producer's expected 2020 allowable gross revenue, if the producer had no allowable gross revenue in 2018 and 2019.[15]

In addition, to be eligible for PARP, a producer must be one of the following:

---

[14] "Allowable gross revenue" is explained later in this section of this document.

[15] PARP provides assistance to participants whose allowable gross revenue for the 2020 calendar year was at or below 85 percent of the "benchmark" allowable gross revenue. This uses the same maximum level of coverage available under RMA's Whole Farm Revenue Program (WFRP), coverage that requires 15 percent or more decrease in revenue to trigger a payment.

∀ A citizen of the United States;

∀ A resident alien, which for purposes of this subpart means ''lawful alien'' as defined in 7 CFR part 1400;

∀ A partnership organized under State Law;

∀ A corporation, limited liability company, or other organizational structure organized under State law;

∀ An Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304); or

∀ A foreign person or foreign entity who meets all requirements as described in 7 CFR part 1400.

For PARP, ''agricultural commodity'' means a crop, aquaculture, livestock, livestock byproduct, or other animal or animal byproduct that is produced as part of a farming operation and is intended to be commercially marketed. It includes only commodities produced in the United States, and commodities produced outside the United States by a producer located in the United States and marketed inside the United States. It excludes:

∀ Wild free-roaming animals;

∀ Horses and other animals used or intended to be used for racing or wagering;

∀ Aquatic species that do not meet the definition of aquaculture;

∀ *Cannabis sativa L.* and any part of that plant that does not meet the definition of hemp; and

∀ Timber.

As provided in § 9.304, allowable gross revenue for PARP includes revenue from:

∀ Sales of agricultural commodities produced by the producer, including the sales resulting from value added through post-production activities (for example, sales of jam from the processing of strawberries);

∀ Sales of agricultural commodities a producer purchased for resale, less the cost or other basis of such commodities;

∀ The taxable amount of cooperative distributions directly related to the sale of the agricultural commodities produced by the producer;

∀ Benefits under certain federal agricultural programs and disaster programs (excluding conservation programs, CFAP 1 and 2, 2020 program year ERP, the Pandemic Livestock Indemnity Program (PLIP), and the Spot Market Hog Pandemic Program (SMHPP));

∀ CCC loans, if treated as income and reported to IRS;

∀ Crop insurance proceeds;

∀ Payments issued through grant agreements with FSA for losses of agricultural commodities;

∀ Grants from the Department of Commerce, National Oceanic and Atmospheric Administration and State program funds providing direct payments for the loss of agricultural commodities or the loss of revenue from agricultural commodities;

∀ Revenue from raised breeding livestock;

∀ Revenue earned as a cattle feeder operation;

∀ Other revenue directly related to the production of agricultural commodities that IRS requires the producer to report as income; and

∀ For 2020 allowable gross revenue, payments under the Pandemic Market Volatility Assistance Program regardless of the calendar year in which the payment was received.

An optional worksheet is available to assist producer's in computing their revenue from the sources listed above. Producers who file or would be eligible to file a joint tax return will certify their revenue based on what their revenue would have been had they filed taxes separately for the applicable year. Revenue earned as a contract producer of an agricultural commodity is not included in allowable revenue for PARP.

If a producer did not have a full year of revenue for 2018 or 2019 or physically expanded their operation in 2020, the producer may certify to an adjusted 2018 or 2019 allowable gross revenue on form FSA–1122A. Producers must provide documentation to support the adjusted amount within 30 calendar days of submitting their PARP application. The documentation must show that the producer added production capacity to the farming operation, increased the use of existing production capacity, or made physical alterations to existing production capacity that would have resulted in increased revenue in 2020. Increases in production capacity do not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals.

If a producer did not have allowable gross revenue in 2018 and 2019 but was in the business of farming in 2020, the producer must certify on form FSA–1122A as to what had been their reasonably expected 2020 allowable gross revenue prior to the impact of the COVID–19 pandemic. Producers must provide documentation to support their expected 2020 allowable gross revenue within 30 days of submitting their PARP application. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the COVID–19 pandemic and includes, but is not limited to, financial documents such as a business plan or cash flow statement that demonstrates an expected level of revenue; sales contracts or purchase agreements; and documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

**PARP Application Process**

FSA will accept PARP applications until the date announced by the Deputy Administrator. To apply for PARP, producers must submit a complete FSA–1122, Pandemic Assistance Revenue Program Application, in person, by mail, email, facsimile, or other method announced by FSA to any FSA county office.[16] Applicants must also submit all of the following items, if not previously filed with FSA:

∀ Form AD–2047, Customer Data Worksheet, for new customers or existing customers who need to update their customer profile;

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2020 program year, if the applicant is an underserved farmer or rancher;[17]

∀ Form CCC–901, Member Information for Legal Entities, if applicable;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–941, Average Adjusted Gross Income (AGI) Certification and Consent to Disclosure of Tax Information, for the 2020 program year for the producer, including the legal entity's members, partners, shareholders, heirs, or beneficiaries as provided in 7 CFR part 1400;

∀ Form FSA–1123, Certification of 2020 Adjusted Gross Income, if applicable;

∀ Form FSA–1122A, Pandemic Assistance Revenue Program (PARP) Application, if applicable;

∀ Form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification, for the

---

[16] The FSA county office locator can be found through the ''Find Your Local Service Center'' section on: *https://www.farmers.gov/.*

[17] For PARP, socially disadvantaged groups include the following: American Indians or Alaskan Natives, Asians or Asian-Americans, Blacks or African Americans, Hispanics or Hispanic Americans, Native Hawaiians or other Pacific Islanders, and women. Form CCC–860 is not required for underserved farmers and ranchers to receive a payment; however, failure to submit form CCC–860 will result in an producer's payment being calculated using a lower payment factor. Also, see footnote 7.

PARP applicant and applicable affiliates as provided in 7 CFR part 12.

The required eligibility forms specified above must be submitted no later than 60 days from the PARP application deadline. When the producer does not timely submit the required eligibility forms, or when a member of a legal entity who is required to submit AD–1026 has not done so, FSA will not issue a payment to the producer. When any other required eligibility forms are not timely submitted for a member of a legal entity, FSA will reduce the payment based on that member's ownership share of the legal entity.

In addition, producers must provide documentation within 30 calendar days of submitting the FSA–1122, if applicable, to verify:

∀ The producer's certified expected 2020 allowable gross revenue; and

∀ The physical expansion of a producer's operation in 2020.

If requested by FSA, the producer must provide additional documentation that establishes the producer's eligibility for PARP. If any supporting documentation is requested, the documentation must be submitted to FSA within 30 days from the request or the application will be disapproved by FSA.

**PARP Payment Calculation**

The PARP payment calculation is based on the difference in a producer's revenue compared to a prior "benchmark" year. Producers who had allowable gross revenue in 2018 or 2019 will elect which of those years is most reflective of a typical year to use as a benchmark for the purposes of calculating a PARP payment. FSA will determine the result of the producer's 2018 or 2019 allowable gross revenue, minus the producer's 2020 allowable gross revenue, multiplied by a payment factor. The adjusted 2018 or 2019 allowable gross revenue, as described above, will be used for producers who did not have a full year of revenue for 2019 or increased their operation size in 2020. The payment factor will be 90 percent for underserved farmers and ranchers who have filed CCC–860 certifying their status for the 2020 program year.[18] The payment rate for all other producers will be 80 percent. The PARP payment will be equal to the result of that calculation minus any 2020 program year ERP payments and pandemic assistance received by the producer under CFAP 1 and 2 (not including any CFAP 2 payments for contract producer revenue), PLIP, and

SMHPP. If a producer receives assistance through any of those programs after their PARP payment is calculated, their PARP payment will be recalculated and the producer must refund any resulting overpayment to FSA.

If a producer was in the business of farming in 2020 but did not have allowable gross revenue in 2018 and 2019, then the payment calculation will be equal to the producer's expected 2020 allowable gross revenue minus the producer's actual 2020 allowable gross revenue, multiplied by a payment factor of 90 percent for underserved farmers and ranchers who have filed the form CCC–860, or 80 percent for all other producers. As described above, the PARP payment will be equal to the result of that calculation minus any assistance received by the producer under CFAP 1 and 2 (not including any CFAP 2 payments for contract producer revenue), 2020 program year ERP, PLIP, and SMHPP, and the PARP payment will be recalculated if the producer receives additional payments under those programs. Those producers must provide documentation to support their certification of their expected 2020 allowable gross revenue within 30 days of submitting their PARP application or they will be ineligible for payment.

PARP payments will be issued after the application period ends. PARP payments are subject to the availability of funds and may be factored if total calculated payments exceed the available funding. PARP payments are not subject to offset.

**PARP Payment Limitation, Average AGI Limitation, and Attribution**

PARP payments are subject to a per person or legal entity payment limitation of $125,000. USDA may establish a lower maximum payment amount per person, legal entity, or member of a joint venture or general partnership after the application period has ended if calculated payment amounts exceed available funding. Similar to the manner in which payment limitations are applied in the major commodity and disaster assistance programs administered by FSA, payments will be attributed to an individual through the direct attribution process used in those programs. The total payment amount of PARP payments attributed to an individual will be determined by taking into account the direct and indirect ownership interests of the individual in all legal entities participating in PARP.

A producer, other than a joint venture or general partnership, is ineligible for payments if the producer's average AGI,

using the average of the adjusted gross incomes for the 2016, 2017, and 2018 tax years, is more than $900,000, unless the producer's AGI for 2020 is $900,000 or less. To be eligible for payment, a producer whose average AGI for 2016, 2017, and 2018 exceeds $900,000 but whose 2020 AGI is $900,000 or less must submit form FSA–1123 and provide a certification from a licensed CPA or attorney affirming the producer's 2020 AGI is not more than $900,000. With respect to joint ventures and general partnerships, this AGI provision will be applied to each member of the joint venture and general partnership.

To be eligible for payment and facilitate administration of payment limitation, payment attribution, AGI, and rules applicable to foreign persons, producers that are a legal entity must provide the names, addresses, valid taxpayer identification numbers, and ownership share of each person or each legal entity that holds or acquires a direct or indirect ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share in cases where a person or legal entity holds less than a 10 percent direct or indirect ownership interest and fails to provide a taxpayer identification number to USDA.

**PARP General Requirements**

General requirements that apply to other FSA-administered commodity programs also apply to PARP, including compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation."

The regulations in 7 CFR part 1400, subpart E, are applicable to foreign persons and legal entities containing members, stockholders, or partners who are not U.S. citizens or resident aliens that own more than 10 percent of the legal entity. In order for a foreign person to receive a PARP payment, the person must provide land, capital, and a substantial amount of active personal labor to the farming operation, as required by § 1400.401(a), and comply with the other requirements of subpart E.

Additionally, United States Federal, State, and local governments (including public schools) are not eligible for PARP payments.

Appeal regulations specified in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under PARP. The determination of matters of general applicability that are not in response to, or result from, an individual set of facts in an individual

---

[18] See footnotes 7 and 11.

Strickland AR 0774

producer's application for payment are not matters that can be appealed. Such matters of general applicability include, but are not limited to, eligibility criteria, the payment calculation, and payment rates.

In the event that any application for a PARP payment resulted from erroneous information reported by the producer, the payment will be recalculated, and the producer must refund any excess payment to USDA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information provided on their application, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

## CFAP

USDA established CFAP to assist producers of agricultural commodities marketed in 2020 who faced continuing market disruptions, reduced farm-level prices, and increased production and marketing costs due to COVID–19 under authority provided by the Coronavirus Aid, Relief, and Economic Security Act (CARES Act; Pub. L. 116–136) and sections 5(b), (d), and (e) of the CCC Charter Act (15 U.S.C. 714c(b), (d), and (e)). USDA implemented CFAP through two rounds of payments (CFAP 1 and CFAP 2), administered by FSA. CFAP 1 was implemented through a final rule published in the **Federal Register** on May 21, 2020 (85 FR 30825–30835), with corrections published in the **Federal Register** on June 12, 2020 (85 FR 35799–35800), July 10, 2020 (85 FR 41328–41330), August 14, 2020 (85 FR 49593–49594), and September 21, 2020 (85 FR 59174–59175), and documents published in the **Federal Register** on May 22, 2020 (85 FR 31062–31065), June 12, 2020 (85 FR 35812), July 10, 2020 (85 FR 41321–41323), and August 14, 2020 (85 FR 49589–49593). USDA implemented CFAP 2 through a final rule published in the **Federal Register** on September 22, 2020 (85 FR 59380–59388). USDA also published a final rule in the **Federal Register** on January 19, 2021 (86 FR 4877–4883), to provide additional assistance for certain commodities under CFAP 1 and CFAP 2, but suspended implementation of that rule on January 20, 2021, to allow further evaluation of the assistance offered through CFAP. A final rule published on August 27, 2021 (86 FR 48013–48018), revised the CFAP 2 application deadline, amended

provisions for contract producers, and allowed producers of sales-based commodities to use 2018 sales for their payment calculation.

FSA is issuing an additional CFAP 2 payment to underserved farmers and ranchers.[19] These payments will be issued under the same authority as the producers' previous CFAP 2 payments, using CCC funds as authorized by sections 5(b), (d), and (e) of the CCC Charter Act (15 U.S.C. 714c(b), (d), and (e)), except for payments for tobacco which will use remaining funds authorized by the CARES Act. As provided in § 9.203(p), the additional payment will be equal to 15 percent of a producer's previous CFAP 2 payment, subject to CFAP 2 payment limitation provisions in § 9.7.[20] Contract producers are not eligible for this additional payment because CFAP 2 payments to contract producers were authorized and funded through the CAA, which specified that those payments could "cover not more than 80 percent of revenue losses." Previous CFAP 2 payments to contract producers were already calculated to have covered 80 percent of contract producers' revenue losses.

As specified in § 9.4(e), CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, must be on file with FSA with a certification applicable for the 2020 program year to receive the additional payment.[21] Producers who have not previously certified to their status for the 2020 program year may submit CCC–860 until the date announced by the Deputy Administrator to be eligible for the additional payment.

The final rule published on January 19, 2021, included a provision for an additional CFAP 1 payment for hog and pig inventory owned between April 16, 2020, and May 14, 2020, based on a rate of $17 per head. USDA suspended implementation of that provision and, after further review, USDA has determined that it will not issue the additional CFAP 1 payment for hog and pig inventory. To provide assistance to

hog producers, FSA implemented the Spot Market Hog Pandemic Program (SMHPP), which provided targeted assistance to producers who sold hogs through a spot market sale from April 16, 2020, through September 1, 2020, the period in which those producers faced the greatest reduction in market prices due to the COVID–19 pandemic. Producers of hogs and pigs may also be eligible for PARP as previously discussed in this rule if they suffered an eligible revenue loss in 2020.

FSA previously implemented mandatory provisions of CAA that provide additional assistance for producers of cattle, price trigger crops, and flat-rate crops. Cattle payments are based on inventory owned between April 16, 2020, to May 14, 2020, based on a producer's previously filed CFAP 1 application, multiplied by the following payment rates per head: $14.75 for slaughter cattle—mature cattle, $63 for slaughter cattle—fed cattle, $7 for feeder cattle less than 600 pounds, $25.50 for feeder cattle 600 pounds or more, and $17.25 for all other cattle. Payments for flat-rate and price-trigger crops, as defined in § 9.201, are equal to the eligible acres of the crop included on a producer's CFAP 2 application, multiplied by a payment rate of $20 per eligible acre. This rule amends the payment calculations for cattle in § 9.102(c), price trigger crops in § 9.203(a), and flat-rate crops in § 9.203(b) for consistency with CAA to reflect these additional payments. FSA already issued these payments and producers were not required to take any additional action to qualify. These payments were subject to existing CFAP payment limitations and eligibility requirements.

This rule amends the general CFAP provisions to clarify how FSA will handle applications when the taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest in a business structure is not provided to USDA. To receive a CFAP payment, a person or legal entity must provide their name, address, and taxpayer identification number to USDA. In addition, consistent with most other FSA programs, a legal entity must provide the name, taxpayer identification number, address and ownership share of each person or legal entity that holds or acquires a direct or indirect ownership interest in the legal entity; however, the previous CFAP rules did not specify how the failure to provide such information would affect the producer's payment eligibility. Previously, FSA had implemented this requirement by determining that the

---

[19] See footnote 11.

[20] This additional CFAP payment is similar to FSA's administration of ELRP Phase 1 and ERP Phase 1, which provided a 15 percent increase for payments to underserved producers and Congress has directed for underserved producers in some permanent disaster programs a 15 percent higher payment rate (Emergency Livestock Assistance Program or Emergency Conservation Program). Consistent with those programs, 15 percent has been determined as the increased rate for underserved producers.

[21] See footnote 7 for an explanation of how long an underserved producer's certification remains valid and the requirement to file CCC–860 in subsequent years.

Strickland AR 0775

producer was ineligible for payment. Rather than determining the producer ineligible for payment, in cases where a person or legal entity holding less than 10 percent direct or indirect ownership interest does not submit a taxpayer identification number, FSA will reduce the producer's payment in proportion to a member's ownership share when the taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent at, or above, the fourth level of ownership in the business structure is not provided to USDA as provided in § 9.7(i). Additionally, a legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater at, or above the fourth level of ownership in the business structure is not provided to USDA as provided in § 9.7(i). USDA is making this change because many farm operations suffered sales losses and had increased marketing costs in 2020 due to the COVID–19 pandemic, and the ability to receive a partial CFAP payment will assist those operations in managing those losses and costs. USDA is not reopening the CFAP application period; this change only affects how FSA will process CFAP applications currently on file.

This rule also updates references throughout 7 CFR part 9, subparts A through C, to refer specifically to those subparts rather than part 9 due to the addition of subpart D for PARP.

**ECP, EFRP, and BCAP**

The Agricultural Credit Act of 1978 (16 U.S.C. 2201), amended by section 2403 of the Agriculture Improvement Act of 2018 (Pub. L. 115–334), authorizes ECP, and generally authorizes payments to farmers and ranchers to rehabilitate farmland damaged by certain natural disasters and to implement emergency water conservation measures in periods of severe drought. The ECP regulations are in 7 CFR part 701, subpart B.

Prior to this rule, land owned or controlled by the United States or States, including State agencies or other political subdivisions, as specified in the regulation as ineligible for cost share. This rule amends the general ECP provision at § 701.105 to allow eligibility of that land under certain conditions. The intent of this change is to allow producers who lease Federal and State land the opportunity to participate in ECP. This is consistent with the previous operational policy,

which allowed payments as specified in the FSA Handbook 1–ECP.[22]

This rule also corrects a typographical error in a section number to redesignate § 718.128 to be § 701.128. Prior to this rule, the ECP regulation authorized advance payment only for fence repair or replacement. This rule further amends § 701.128 to allow advance payments for all ECP practices. Consistent with the authorization for fence repair or replacement, ECP will provide advance payments of up to 25 percent of the cost for all ECP practices before the restoration is carried out. In the event this cost share assistance is not spent within 60 calendar days of being issued, the participant will be required to refund the advance cost-share payment. To reflect these changes, we are revising the section heading of § 701.128 to "Advance Payment."

Additionally, this rule clarifies the duplicate benefits provisions in § 701.111. The language was modified to further define parameters surrounding restoration activities being performed on the same piece of land. This will ensure that other Federal program-related benefits do not cover the same or similar expenses so as to create duplicative payments on the same piece of land and that any other Federal cost-share payments would not result in paying more than is authorized for ECP.

This rule also makes minor technical amendments to the existing ECP and EFRP regulations. Specifically, this rule:

∀ Adds the definition of "Socially disadvantaged farmer or rancher" and, within that definition, defines "Socially disadvantaged group" in § 701.2 to be consistent with the definition (7 U.S.C. 2279(a)) used in its authorizing legislation instead of defaulting to using the definition in § 718.2 and makes the same technical correction in § 1450.2 for the BCAP regulation;

∀ Removes outdated provisions, specifically removing: 7 CFR 701.44, 701.45, and 701.150 through 701.157;

∀ Adds the definition for "Forestland," removes the definition of "Commercial forestland," and corrects the definition of "Non-industrial private forestland" to remove the words "commercial forest" in § 701.102.

∀ Recognizes Public Law 117–180, the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023, Division G, section 104(k)(3)(A) authorizing 100 percent Federal assistance for the cost of damages to producers associated with the "Hermit's Peak/Calf Canyon" Fire. This rule is amending the regulations in

7 CFR 701.126, 701.127, and 701.226 to authorize the Secretary to waive the maximum limitations to the maximum extent otherwise allowed by law.

**Supplemental Agricultural Disaster Assistance Programs**

This rule makes discretionary changes to ELAP, LFP, and LIP to amend what is considered eligible livestock. Previously, livestock that were maintained for pleasure, roping, pets, or show were ineligible under ELAP, LFP, and LIP. This rule removes those restrictions in §§ 1416.104, 1416.204, and 1416.304 because FSA recognizes that animals maintained in a commercial operation for those purposes have value and could be available for marketing from the farm. In addition, FSA is clarifying that horses and other animals used or intended to be used for racing or wagering are considered ineligible livestock for ELAP, LFP, and LIP.

This rule also amends §§ 1416.104 and 1416.204 to remove the restriction on ostrich eligibility for LFP and ELAP. FSA is making this change because ostriches satisfy more than 50 percent of their net energy requirement through the consumption of growing forage grasses and legumes; therefore, they are considered "grazing animals," as defined in §§ 1416.102 and 1416.202, for the purpose of LFP and ELAP. This change is effective for the 2022 program year for both LFP and ELAP. ELAP requires a notice of loss to be filed within 30 days of when the loss is first apparent. Because that deadline may have passed for producers' 2022 losses related to ostriches that occurred prior to publication of this rule, FSA is extending the deadline for those notices of loss through February 10, 2023.

This rule removes and reserves § 1416.5, which provides policy related to equitable relief determinations under ELAP, LFP, LIP, and the Tree Assistance Program (TAP). These programs are already subject to the general equitable relief provisions in 7 CFR part 718, subpart C; therefore, the provisions in § 1416.5 are unnecessary. Equitable relief for these programs will be administered in a manner that is consistent with other FSA programs to which part 718 applies. This rule also makes minor clarifications and technical corrections to the definition of "eligible loss condition" in § 1416.102 and to §§ 1416.103(a), 1416.103(d)(6), 1416.304(c)(3), 1416.305(g), and 1416.305(i).

**NAP**

FSA is amending the NAP regulations to update provisions related to

---

[22] See *https://www.fsa.usda.gov/internet/FSA_File/fsa1-ecp_r06_a01.pdf*.

Strickland AR 0776

applications for coverage. This rule updates the definition of "application for coverage" and 7 CFR 1437.7(a) to reflect that the application for coverage may be filed in any FSA county office, rather than only in the producer's administrative county. The definition of "application for coverage" is also amended to provide flexibility as FSA reviews ways to streamline the application process for underserved farmers and ranchers who are eligible for catastrophic coverage without paying a service fee.

Following the change to the regulation, FSA intends to designate the CCC–860 to be an application for catastrophic coverage for NAP if filed before the deadline for application for the coverage period. The catastrophic coverage for underserved producers, once in effect, will be treated as continuous coverage for all eligible crops as long as the producer's certification is valid. [23] Once the applicable status expires, a producer will need to apply for NAP coverage by the deadline and pay the applicable service fee. Many underserved producers have previously filed a certification of their underserved status with FSA, and those producers will be considered as having timely applied for catastrophic coverage for the 2022 crop year if the certification was filed before the deadline for application for the NAP coverage period.

As provided in 7 CFR 1437.2(e), the Deputy Administrator may authorize State and county committees to waive or modify deadlines in cases where lateness or failure to meet such other requirements does not adversely affect the operation of NAP; therefore, FSA is amending 7 CFR 1437.6(a) to remove an unnecessary provision related to applications filed after the deadline. This rule also makes minor clarifications in 7 CFR 1437.7.

**Payment Eligibility**

Notification of interest requirements in § 1400.107 provide that an entity is ineligible for any payment under any program listed in § 1400.1, including certain programs administered by the Natural Resources Conservation Service (NRCS), when the names and taxpayer identification numbers for members holding an ownership interest in the legal entity are not provided to FSA. FSA has determined for the programs that it administers that prohibiting payments to a legal entity when member

information is provided for some, but not all members, may adversely impact a farm operation's sustainability during times when farm program payments may be a large portion of the farm's income. FSA recognizes that names, addresses, valid taxpayer identification numbers, and ownership shares are important elements necessary to facilitate administration of FSA's rules for payment eligibility and establishing maximum payment limitations for each program. However, if a valid taxpayer identification number is not provided for a member of a legal entity, FSA is still able to make applicable determinations of eligibility and establish a maximum payment limitation for the legal entity and its other members.

With this rule change, for programs administered by FSA, FSA will reduce the payment to a legal entity in proportion to a member's ownership share in cases where a person or legal entity holding less than a 10 percent direct or indirect ownership interest fails to provide a valid taxpayer identification number, instead of prohibiting any payment to the legal entity. Additionally, a legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater, at or above the fourth level of ownership in the business structure, is not provided to USDA. This change will allow the legal entity to earn a partial payment based on the ownership shares of the members whose valid taxpayer identification numbers are submitted in cases where a member or members holding less than a 10 percent interest do not submit a valid taxpayer identification number.

NRCS has determined that such change in the notification requirements is not appropriate for the programs it administers. Unlike the intended purposes of FSA program payments, NRCS conservation program payments are not intended to provide economic support, including in times of disaster, to keep operations economically viable. Rather, they are payments made to reimburse a participant for costs incurred by a participant to voluntarily implement conservation practices and activities or payments made for the conveyance of a conservation easement. Therefore, for the programs NRCS administers, the participant is ineligible to receive any payment specified in § 1400.1(a)(7) or as NRCS provides in individual program regulations if the participant fails to provide: (1) the name, address, valid taxpayer identification number, and ownership

share of each person; or (2) the name, address, valid taxpayer identification number, and ownership share of each legal entity, that holds or acquires an ownership interest in the legal entity.

For programs administered by FSA that are subject to the provisions of § 1400.107, this change will be effective for the current and subsequent program years. FSA is also making this change retroactive to the 2020 program year, subject to funding availability, because many farm operations suffered income losses in 2020 due to the COVID–19 pandemic, and the ability to receive a partial payment under the applicable programs will assist those operations in managing those losses. FSA is not reopening sign up periods for programs with payments that could be affected by this change; it will only affect the way payments are processed for legal entities that previously filed applications. Because the notification of interest provisions are general provisions that are applicable to part 1400, subparts B, C, E, and F, FSA is also moving the notification of interest requirement from § 1400.107 in subpart B, Payment Limitation, to § 1400.10 in subpart A, General Provisions.

**Notice and Comment and Effective Date**

The Administrative Procedure Act (APA, 5 U.S.C. 553(a)(2)) provides that the notice and comment and 30-day delay in the effective date provisions do not apply when the rule involves specified actions, including matters relating to benefits or contracts. This rule governs pandemic assistance and disaster assistance payments to certain commodity producers and therefore falls within the benefits exemption for ERP, PARP, ECP, BCAP, and the disaster assistance programs.

As specified in 7 U.S.C. 9091, the regulations to implement the ELAP, LIP, LFP, and NAP are:

∀ Exempt from the notice and comment provisions of 5 U.S.C. 553, and

∀ Exempt from the Paperwork Reduction Act (44 U.S.C. chapter 35).

As specified in 16 U.S.C. 3648, the regulations to implement EFRP are exempt from the Paperwork Reduction Act (44 U.S.C. chapter 35).

This rule is exempt from the regulatory analysis requirements of the Regulatory Flexibility Act (5 U.S.C. 601–612), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). The requirements for the regulatory flexibility analysis in 5 U.S.C. 603 and 604 are specifically tied to the requirement for a proposed rule by section 553 or any other law; in

[23] See footnote 7 for an explanation of how long an underserved producer's certification remains valid and the requirement to file CCC–860 in subsequent years.

Strickland AR 0777

addition, the definition of rule in 5 U.S.C. 601 is tied to the publication of a proposed rule.

The Office of Management and Budget (OMB) designated this rule as major under the Congressional Review Act (CRA), as defined by 5 U.S.C. 804(2). Section 808 of the CRA allows an agency to make a major regulation effective immediately if the agency finds there is good cause to do so. The beneficiaries of this rule have been significantly impacted by the COVID–19 outbreak and disaster events, which has resulted in significant declines in demand and market disruptions. USDA finds that notice and public procedure are contrary to the public interest. Therefore, even though this rule is a major rule for purposes of the Congressional Review Act, USDA is not required to delay the effective date for 60 days from the date of publication to allow for Congressional review. Accordingly, this rule is effective upon publication in the **Federal Register**.

**Executive Orders 12866 and 13563**

Executive Order 12866, "Regulatory Planning and Review," and Executive Order 13563, "Improving Regulation and Regulatory Review," direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasized the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The requirements in Executive Orders 12866 and 13563 for the analysis of costs and benefits apply to rules that are determined to be significant.

The Office of Management and Budget (OMB) designated this rule as economically significant under Executive Order 12866 and therefore, OMB has reviewed this rule. The costs and benefits of this rule are summarized below. The full cost benefit analysis is available on *regulations.gov*.

**Cost Benefit Analysis Summary**

The cost-benefit analysis covers the unrelated programs or program changes, which are included in this rule, that largely address pandemic assistance or natural disaster assistance.

The accompanying rule announces *Phase 2 of the Emergency Relief Program (ERP)*, which addresses eligible crop losses not included in ERP Phase 1. ERP is authorized in the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117–43), which provided $10 billion for expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, and other events occurring in calendar years 2020 and 2021. Targeted outlays for ERP Phase 2 are $1.2 billion; a pro-rate in payments is likely as gross outlays are projected at $1.5 billion (see Table 1).

Two programs—including a new pandemic assistance program and additional assistance for underserved producers—address COVID–19 losses. Prior rules associated with the COVID–19 pandemic, CFAP 1, CFAP 2, and CFAP 2: Producers of Sales-Based Commodities and Contract Producers, assisted producers of agricultural commodities marketed in 2020 who faced continuing market disruptions, reduced farm-level prices, and increased production and marketing costs due to COVID–19. The additional costs are associated with declines in demand, surplus production, or disruptions to shipping patterns and marketing channels.

In implementing the pandemic related programs, USDA determined that additional assistance was necessary:

∇ PARP will assist producers with revenue loss resulting from the COVID–19 pandemic for eligible agricultural commodities. Payments will be made on a whole farm basis and not on a commodity-by-commodity basis. The aggregate allocation for PARP is targeted at $250 million; a pro-rate in payments is likely as gross outlays are projected at $2.7 billion (Table 1).

∇ CFAP 2 recipients who are underserved (beginning, limited resource, socially disadvantaged, and veteran farmers and ranchers), excluding contract producers, will receive a 15-percent top-up payment. Net outlays are estimated at $325 million (Table 1). As few underserved producers are likely to have AGI issues or reach the payment limit, gross and net outlays are assumed to be equal.

The other changes relate to existing FSA programs or requirements:

∇ *Expanded Eligibility of Animals in Livestock Disaster Programs*—This rule makes discretionary changes to ELAP, LFP, and LIP to amend the definition of eligible livestock. Previously, animals that contributed to the commercial viability of an operation and were maintained for the purposes of pleasure, roping, hunting, pets, or show, as well as animals intended for consumption by an owner, lessee, or contract grower, were ineligible for ELAP, LFP, and LIP. This rule removes those restrictions. Estimated net outlays (accounting for AGI considerations, payment limits, and other reductions) are $17.7 million annually.

∇ *Flexibility in Non-Insured Crop Disaster Assistance Program (NAP) Enrollment for Underserved Producers*—FSA is updating NAP provisions regarding program flexibilities for underserved producers. For example, the "application of coverage" is amended to provide flexibility as FSA reviews ways to streamline the application process for underserved farmers and ranchers. Net outlays are estimated at $4.3 million annually (identical to the gross outlay estimate).

∇ *Notification of Interest Changes*—Prior to this rule, a legal entity was ineligible for farm programs when the names and valid taxpayer identification numbers for all members holding an ownership interest in the entity were not provided to USDA. Now, a legal entity can receive a partial payment in cases where a person or legal entity holding less than a 10 percent direct or indirect ownership interest fails to provide a taxpayer identification number. Net outlays are estimated at $3.7 million annually.

∇ *ECP Expansion to Public Lands (that is, Federally- and State-owned Land)*—ECP provides payments to farmers and ranchers to rehabilitate farmland damaged by certain natural disasters and to implement emergency water conservation measures in periods of severe drought. ECP eligibility on public lands has not been included in the regulation until now. ECP coverage of public lands has new FSA policy, as specified in the FSA handbook, for many years, however, and FSA staff in the field have provided ECP assistance to both public and private lands since at least the 1990s. As a result, no increase in net outlays is expected.

∇ *ECP and EFRP and the Hermit's Peak/Calf Canyon Fire*—Section 104(3)(A) of the Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023 authorizes the Federal government to pay 100 percent of the ECP and Emergency Forest Restoration Program (EFRP) cost for damage associated with the Hermit's Peak/Calf Canyon Fire. This fire burned over 340,000 acres from April 2022 to June 2022 and was the largest wildfire in recorded history in New Mexico. The cost-share rate for both ECP and EFRP, prior to this legislation, was generally 75 percent regardless of location. The legislation

Strickland AR 0778

applies only to the locale of the Hermit's Peak/Calf Canyon Fire. The expected net cost is $22.5 million for FY 2023.

Gross outlays for these items are estimated at $4.5 billion (see Table 1). After taking into account AGI considerations and payment limitations,

as well as the targeted caps on ERP Phase 2 and PARP spending, net outlays are estimated at $1.8 billion. ERP Phase 2 accounts for about two-thirds of expected total net outlays.

FSA will administer all programs in Table 1. Producers must fill out

paperwork to participate in these programs, and the associated administrative costs are estimated at $18.4 million. Note that ERP Phase 2, PARP, and the Hermit's Peak/Calf's Canyon ECP/EFRP fire item use exclusively appropriated funds.

TABLE 1—ESTIMATED GROSS AND NET OUTLAYS FOR THE PANDEMIC ASSISTANCE AND AGRICULTURAL DISASTER ASSISTANCE PROGRAMS RULE FOR FY 2023

| Item | Gross estimated outlays in 2023 | Net estimated outlays | Implementing agency | Funding source |
|---|---|---|---|---|
| Item 1—Emergency Relief Program (ERP) Phase 2. | $1.504 billion [a] ...... | $1.2 billion ............ | FSA ...................... | Extending Government Funding and Delivering Emergency Assistance Act. |
| Item 2—PARP ..................................... | $2.662 billion [b] ...... | 250 million ............ | FSA ...................... | CAA. |
| Item 3—15 Percent Top-Up for Underserved Recipients of CFAP 2 Payments. | 325 million ............ | 325 million ............ | FSA ...................... | CCC net transfer except for the tobacco portion, which is from the CARES Act. |
| Item 4—Recreational Animals and Livestock Disaster Programs. | 19.5 million ........... | 17.7 million ........... | FSA ...................... | CCC. |
| Item 5—Flexibility in NAP Enrollment for Underserved Producers [d]. | 4.3 million ............. | 4.3 million ............. | FSA ...................... | CCC. |
| Item 6—Notification of Interest Changes. | 3.7 million ............. | 3.7 million ............. | FSA ...................... | CCC. |
| Item 7—ECP and Public Lands ............ | No change in cost | No change in cost | FSA ...................... | CCC. |
| Item 8—ECP and EFRP and the Hermit's Peak/Calf's Canyon Fire [c]. | 24.2 million ........... | 22.5 million ........... | FSA ...................... | Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023. |
| Total .......................... | 4.54 billion ............ | 1.82 billion ............ | | |

[a] This estimate uses the 50-percent loss scenario. Note that both 2020 and 2021 losses are expected to be paid in FY 2023. The significant difference between gross and net outlays is because the targeted amount for ERP Phase 2 spending is $1.2 billion.

[b] This estimate represents the most plausible scenario but, as discussed below, gross estimated outlays could be considerably higher. Note that the significant difference between gross and net outlays is because the targeted amount for PARP spending is $250 million.

[c] The difference between the gross and net amount is due to adjusted gross income (AGI) considerations, payment limitations, and other reductions.

[d] This estimate uses the 20 percent increase-in-participation scenario.

**Note:** Benefits associated with items 4 through 7 continue in FY 2023 and in perpetuity in each FY beyond. Payments associated with Items 1, 2, 3, and 8 are assumed to be paid in FY 2023 and to not continue beyond.

**Environmental Review**

The environmental impacts of this final rule have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and because USDA will be making the payments to producers, the USDA regulation for compliance with NEPA (7 CFR part 1b).

Although OMB has designated this rule as "economically significant" under Executive Order 12866, ". . . economic or social effects are not intended by themselves to require preparation of an environmental impact statement" when not interrelated to natural or physical environmental effects (see 40 CFR 1502.16(b)). The pandemic assistance and disaster assistance programs were designed to avoid skewing planting decisions. Producers continue to make their planting and production decisions with the market signals in mind, rather than

any expectation of what a new USDA program might look like.

This rule includes discretionary amendments for ECP and EFRP. Accordingly, the discretionary provisions of this action are covered by the Categorical Exclusion, in 7 CFR 799.31(b)(2)(iii) for minor amendments or revisions to previously approved actions and § 799.31(b)(3)(i), for the issuance of minor technical corrections to regulations.

The rule implements discretionary amendments for BCAP, CFAP, ELAP, LIP, LFP, NAP, and PARP. The discretionary aspects are to improve administration of the programs and clarify existing program requirements. The change to BCAP is a technical clarification and does not alter the impacts or alternatives previously considered in the BCAP Programmatic Environmental Impact Statement and Record of Decision dated June 2010. FSA is providing the disaster assistance under ELAP, LIP, LFP, and NAP to eligible producers. The discretionary provisions would not alter any

environmental impacts resulting from implementing the mandatory changes to those programs. Accordingly, these discretionary aspects are coved by the following Categorical Exclusion: in 7 CFR 799.31(b)(6)(vi) safety net programs administered by FSA. ERP Phase 2 is a new regulation, which is a benefit program providing assistance after specific natural disasters; therefore, similar to the other programs discussed in this paragraph, ERP Phase 2 has similar discretionary aspects that are coved by the following Categorical Exclusion: in 7 CFR 799.31(b)(6)(vi) safety net programs administered by FSA.

Through this review, FSA determined that the proposed discretionary changes in this rule fit within the categorical exclusions listed above. Categorical exclusions apply when no extraordinary circumstances (§ 799.33) exist. Therefore, as this rule presents only discretionary amendments that will not have an impact to the human environments, individually or cumulatively, FSA will not prepare an

Strickland AR 0779

environmental assessment or environmental impact statement for this rule; this rule serves as documentation of the programmatic environmental compliance decision for this federal action.

## Executive Order 12988

This rule has been reviewed under Executive Order 12988, "Civil Justice Reform." This rule will not preempt State or local laws, regulations, or policies unless they represent an irreconcilable conflict with this rule. For the payment eligibility regulation changes, payments will be adjusted retroactively, starting in January 2020, as discussed above in the Payment Eligibility section, above. For the ELAP regulation changes, payments will be made retroactively starting at January 1, 2021, as discussed in the Cost Benefit Analysis Summary section, above. Before any judicial actions may be brought regarding the provisions of this rule, the administrative appeal provisions of 7 CFR parts 11 and 780 are to be exhausted.

## Executive Order 13175

This rule has been reviewed in accordance with the requirements of Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have Tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

USDA has assessed the impact of this rule on Indian Tribes and determined that this rule does not, to our knowledge, have Tribal implications that required Tribal consultation under Executive Order 13175 at this time. If a Tribe requests consultation, the USDA Office of Tribal Relations (OTR) will ensure meaningful consultation is provided where changes, additions, and modifications are not expressly mandated by law. Outside of Tribal consultation, USDA is working with Tribes to provide information about pandemic assistance, agricultural disaster assistance, and other issues.

## Unfunded Mandates

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA, Pub. L. 104–4) requires Federal agencies to assess the effects of their regulatory actions of State, local, and Tribal governments or the private sector. Agencies generally must prepare a written statement, including cost benefits analysis, for proposed and final rules with Federal mandates that may result in expenditures of $100 million or more in any 1 year for State, local or Tribal governments, in the aggregate, or to the private sector. UMRA generally requires agencies to consider alternatives and adopt the more cost effective or least burdensome alternative that achieves the objectives of the rule. This rule contains no Federal mandates, as defined in Title II of UMRA, for State, local and Tribal governments or the private sector. Therefore, this rule is not subject to the requirements of sections 202 and 205 of UMRA.

## Federal Assistance Programs

The titles and numbers of the Federal Domestic Assistance Programs found in the Catalog of Federal Domestic Assistance to which this rule applies are:

10.051—Commodity Loans and Loan Deficiency Payments
10.054—Emergency Conservation Program
10.069—Conservation Reserve Program
10.087—Biomass Crop Assistance Program
10.088—Livestock Indemnity Program
10.089—Livestock Forage Disaster Program
10.091—Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program
10.092—Tree Assistance Program
10.112—Price Loss Coverage
10.113—Agriculture Risk Coverage
10.130—Coronavirus Food Assistance Program 1
10.132—Coronavirus Food Assistance Program 2
10.143—Pandemic Assistance Revenue Program
10.451—Noninsured Assistance
10.912—Environmental Quality Incentives Program
10.917—Agricultural Management Assistance
10.964—Emergency Relief Program

## Paperwork Reduction Act

As noted above, the regulations to implement the EFRP, ELAP, LIP, LFP, and NAP changes are exempt from PRA as specified in 7 U.S.C. 9091(c)(2)(B) and 16 U.S.C. 3846(b)(1).

For ECP and BCAP, there are no changes to the information collection activities approved by OMB under control number 0560–0082.

In accordance with the Paperwork Reduction Act of 1995, the PARP

information collection activity was submitted to OMB for emergency approval. FSA will collect and evaluate the application and other required paperwork from the producers for PARP. The forms are described above in the PARP Application Process section. Following the 60-day public comment period provided by this rule, FSA intends to request 3-year OMB approval to cover the PARP information collection request.

*Title:* PARP.

*OMB Control Number:* 0560–New.

*Type of Request:* New Collection.

*Abstract:* This information collection is required to support PARP information collection activities to provide payments to eligible producers who, with respect to their agricultural commodities, have been impacted by the effects of the COVID–19 pandemic. The information collection is necessary to evaluate the application and other required paperwork for determining the producer's eligibility and assist in the producer's payment calculations. The forms are included in the request.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.51385 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collections of information.

*Type of Respondents:* Producers or farmers.

*Estimated Annual Number of Respondents:* 313,901.

*Estimated Number of Responses per Respondent:* 1.6550.

*Estimated Total Annual Responses:* 519,506.

*Estimated Average Time per Response:* 0.51385 hours.

*Estimated Annual Burden on Respondents:* 266,947 hours.

Also, FSA is requesting comments from all interested individuals and organizations on a new information collection associated with ERP Phase 1 and 2. The emergency request was approved for the ERP Phase 1 using OMB control number 0560–0309. The emergency request was approved for the ERP Phase 2 using temporary OMB control number. The ERP Phase 2 will be merged with the approved 0560–0309 information collection request. ERP is for the producers who suffered

Strickland AR 0780

losses of crops, trees, bushes, and vines due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. FSA needs to disburse the payments to the eligible producers to cover the losses of crops, trees, bushes and vines, and the payments will seriously assist the producers not to consider making business decisions to lose the farm business.

*Title:* ERP Phase 2.

*Type of Request:* New.

*Abstract:* ERP is for the producers who suffered losses of crops, trees, bushes, and vines due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. FSA needs to disburse the payments to the eligible producers to cover the losses of crops, trees, bushes and vines, and the payments will seriously assist the producers not to consider making business decisions to lose the farm business.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.54492 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collections of information.

*Type of Respondents:* Producers or farmers.

*Estimated Annual Number of Respondents:* 48,402.

*Estimated Number of Responses per Respondent:* 2.085.

*Estimated Total Annual Responses:* 100,918.

*Estimated Average Time per Response:* 0.54492 hours.

*Estimated Annual Burden on Respondents:* 54,992 hours.

Also, FSA is requesting comments from all interested individuals and organizations on a new information collection associated with CFAP 2. The emergency request was approved under a temporary OMB control number and will merge with CFAP 2 under the OMB control number 0560–0297.

*Title:* CFAP 2.

*Type of Request:* New.

*Abstract:* This information collection is required to support CFAP 2 information collection activities to provide payments to eligible producers who, with respect to their agricultural commodities, have been impacted by the effects of the COVID–19 pandemic. The information collection is necessary to evaluate the application and other required paperwork for determining the producer's eligibility and assist in the producer's payment calculations.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.0999 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collections of information.

*Type of Respondents:* Producers or farmers.

*Estimated Annual Number of Respondents:* 96,973.

*Estimated Number of Responses per Respondent:* 1.

*Estimated Total Annual Responses:* 96,973.

*Estimated Average Time per Response:* 0.0999 hours.

*Estimated Annual Burden on Respondents:* 9,697 hours.

FSA is requesting comments on all aspects of this information collection to help FSA to:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of FSA, including whether the information will have practical utility;

(2) Evaluate the accuracy of the FSA's estimate of burden including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this document, including names and addresses when provided, will be a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or (844) 433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**List of Subjects**

*7 CFR Part 9*

Agricultural commodities, Agriculture, Disaster assistance, Indemnity payments.

*7 CFR Part 701*

Disaster assistance, Environmental protection, Forests and forest products, Grant programs—agriculture, Grant programs—natural resources, Reporting and recordkeeping requirements, Rural

Strickland AR 0781

areas, Soil conservation, Water resources, Wildlife.

*7 CFR Part 760*

Dairy products, Indemnity payments, Reporting and recordkeeping requirements.

*7 CFR Part 1400*

Agriculture, Grant programs—agriculture, Loan programs—agriculture, Natural resources, Price support programs.

*7 CFR Part 1416*

Administrative practice and procedure, Agriculture, Disaster assistance, Fruits, Livestock, Nursery stock, Seafood.

*7 CFR Part 1437*

Acreage allotments, Agricultural commodities, Crop insurance, Disaster assistance, Fraud, Penalties, Reporting and recordkeeping requirements.

*7 CFR Part 1450*

Administrative practice and procedure, Agriculture, Energy, Environmental protection, Grant programs-agriculture, Natural resources, Reporting and recordkeeping requirements, Technical assistance.

For the reasons discussed above, this final rule amends 7 CFR parts 9, 701, 760, 1400, 1416, 1437, and 1450 as follows:

## PART 9—PANDEMIC ASSISTANCE PROGRAMS

■ 1. The authority citation for part 9 continues to read as follows:

**Authority:** 15 U.S.C. 714b and 714c; Division B, Title I, Pub. L. 116–136, 134 Stat. 505; and Division N, Title VII, Subtitle B, Chapter 1, Pub. L. 116–260.

■ 2. Revise the heading for part 9 to read as set forth above.

### Subpart A—CFAP General Provisions

■ 3. Revise the heading for subpart A to read as set forth above.

### §9.1 [Amended]

■ 4. Amend §9.1 as follows:
■ a. In paragraph (a) introductory text, remove the words "This part specifies" and add "Subparts A through C of this part specify" in their place, and remove the words "payment made under this part" and add "CFAP payment" in their place;
■ b. In paragraph (c), remove the words "this part" each time they appear and add "subparts A through C of this part" in their place; and

■ c. In paragraph (d), remove words "the programs of this part" and add "CFAP" in their place.
■ 5. Amend §9.2 as follows:
■ a. In the introductory text, remove the words "this part" and add "subparts A through C of this part" in its place;
■ b. In the definition of "NOFA", remove the words "under this part"; and
■ c. Add a definition for "Ownership interest" in alphabetical order.

The addition reads as follows:

### §9.2 Definitions.

\* \* \* \* \*

*Ownership interest* means to have either legal ownership interest or beneficial ownership interest in a legal entity. For the purposes of administering CFAP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity, and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is also considered to have an ownership interest in such legal entity.

\* \* \* \* \*

### §9.3 [Amended]

■ 6. Amend §9.3 as follows:
■ a. In paragraph (a), remove the words "this part" and add "subparts A through C of this part" in their place; and
■ b. In paragraph (b)(2), remove the words "this part means" and add "subparts A through C of this part means" in its place.

■ 7. Amend §9.4 by adding paragraph (e) to read as follows:

### §9.4 Time and method of application.

\* \* \* \* \*

(e) To receive an additional payment under §9.203(p), a producer must submit form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, with a certification applicable to the 2020 program year by the date announced by the Deputy Administrator.

■ 8. Amend §9.7 as follows:
■ a. In paragraphs (b), (c), (d), and (e)(2)(ii) and (iii), add the words "subparts A through C of" before the words "this part" each time they appear;
■ b. In paragraph (h), remove the words "This part applies" and add "Subparts A through C of this part apply" in their place; and

■ c. Add paragraph (i).
The addition reads as follows.

### §9.7 Miscellaneous provisions.

\* \* \* \* \*

(i) To be eligible to receive a CFAP payment and facilitate administration of paragraphs (d) and (e) of this section, a person or legal entity must provide their name, address, and taxpayer identification number to USDA. In addition, a legal entity must provide the name taxpayer identification number, address and ownership share of each person or legal entity that holds or acquires a direct or indirect ownership interest in the legal entity. CFAP payments to a legal entity will be reduced in proportion to a member's ownership share when the taxpayer identification number for a person or legal entity that holds less than a 10 percent direct or indirect ownership interest at, or above, the fourth level of ownership in the business structure is not provided to USDA. Additionally, a legal entity will not be eligible to receive CFAP payments when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater, at or above the fourth level of ownership in the business structure, is not provided to USDA.

### Subpart B—CFAP 1

### §9.101 [Amended]

■ 9. Amend §9.101, in the definition of "All other cattle", by removing the word "part" and adding "subpart" in its place.
■ 10. Amend §9.102 as follows:
■ a. In paragraph (c) introductory text, remove the word "two" and add "three" in its place;
■ b. In paragraph (c)(1), remove the word "and";
■ c. In paragraph (c)(2), remove the period and add "; and" at the end of the paragraph;
■ d. Add paragraph (c)(3);
■ e. In paragraph (d) introductory text, remove the word "three" and add "two" in its place;
■ f. In paragraph (d)(1), add the word "and" at the end of the paragraph;
■ g. In paragraph (d)(2), remove "; and" and add a period in its place; and
■ h. Remove paragraph (d)(3).
The addition reads as follows.

### §9.102 Calculation of payments.

\* \* \* \* \*

(c) \* \* \*
(3) Cattle inventory owned between April 16, 2020, to May 14, 2020, multiplied by:
(i) $14.75 for slaughter cattle—mature cattle;

Strickland AR 0782

(ii) $63 for slaughter cattle—fed cattle;

(iii) $7 for feeder cattle less than 600 pounds;

(iv) $25.50 for feeder cattle 600 pounds or more; and

(v) $17.25 for all other cattle.

\* \* \* \* \*

## Subpart C—CFAP 2

■ 11. In § 9.201, add definitions for "Beginning farmer or rancher", "Limited resource farmer or rancher", "Socially disadvantaged farmer or rancher", "Underserved farmer or rancher", and "Veteran farmer or rancher" in alphabetical order to read as follows:

### § 9.201 Definitions.

\* \* \* \* \*

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

\* \* \* \* \*

*Limited resource farmer or rancher* means a farmer or rancher:

(1) Who is a person whose:

(i) Direct or indirect gross farm sales did not exceed $180,300 in each calendar year for 2017 and 2018 (the relevant years for the 2020 program year); and

(ii) Total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1)(i) of this definition; [24] or

(2) That is an entity and all members who hold an ownership interest in the entity meet the criteria in paragraph (1) of this definition.

\* \* \* \* \*

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

\* \* \* \* \*

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

\* \* \* \* \*

*Veteran farmer or rancher* means a farmer or rancher:

(1) Who has served in the Armed Forces (as defined in 38 U.S.C. 101(10) [25]) and:

(i) Has not operated a farm or ranch for more than 10 years; or

(ii) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2) [26]) during the most recent 10-year period; or

(2) That is an entity and at least 50 percent of the ownership interest is held by members who meet the criteria in paragraph (1) of this definition.

\* \* \* \* \*

### § 9.202 [Amended]

■ 12. Amend § 9.202 as follows:

■ a. In paragraph (a), remove the words "this part" and add the words "subpart A of this part and this subpart" in their place; and

■ b. In paragraphs (b)(4) and (d)(2), remove the words "this part" and add the words "subpart A of this part and this subpart" in their place.

■ 13. Amend § 9.203 as follows:

■ a. Add paragraph (a)(5);

■ b. In paragraph (b), add a sentence at the end of the paragraph;

■ c. In paragraphs (f)(2) and (h)(2), remove the word "part" and add the word "subpart" in its place; and

■ d. Add paragraph (p).

The additions read as follows:

### § 9.203 Calculation of payments.

(a) \* \* \*

(5) An additional payment will be issued for price trigger crops equal to the eligible acres of the crop multiplied by a payment rate of $20 per acre.

(b) \* \* \* An additional payment will be issued for flat-rate crops equal to the eligible acres of the crop multiplied by a payment rate of $20 per acre.

\* \* \* \* \*

(p) An additional payment equal to 15 percent of a producer's CFAP 2 payment calculated according to paragraphs (a) through (k) of this section will be issued to producers who have certified their status as an underserved farmer or rancher, applicable to the 2020 program year, on CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification.

■ 14. Add subpart D, consisting of §§ 9.301 through 9.310, to read as follows:

### Subpart D—Pandemic Assistance Revenue Program

Sec.
9.301 Applicability and administration.
9.302 Definitions.
9.303 Producer eligibility requirements.
9.304 Allowable gross revenue.
9.305 Time and method of application.
9.306 Payment calculation.
9.307 Adjusted gross income limitation, payment limitation, and attribution.
9.308 Eligibility subject to verification.
9.309 Miscellaneous provisions.
9.310 Perjury.

## Subpart D—Pandemic Assistance Revenue Program

### § 9.301 Applicability and administration.

(a) This subpart specifies the eligibility requirements and payment calculations for the Pandemic Assistance Revenue Program (PARP). FSA is administering PARP to respond to the COVID–19 pandemic by providing support for eligible producers of agricultural commodities who suffered an eligible revenue loss in calendar year 2020 due to the COVID–19 pandemic. To be eligible for PARP payments, participants must comply with all provisions under this subpart.

(b) PARP is administered under the general supervision and direction of the Administrator, Farm Service Agency (FSA).

(c) The FSA State committee will take any action required by this subpart that an FSA county committee has not taken. The FSA State committee will also:

(1) Correct, or require an FSA county committee to correct, any action taken by such county FSA committee that is not in accordance with the regulations of this subpart; or

(2) Require an FSA county committee to withhold taking any action that is not in accordance with this subpart.

(d) No provision or delegation to an FSA State or county committee will preclude the FSA Administrator, the Deputy Administrator, or a designee or other such person, from determining any question arising under the programs of this subpart, or from reversing or

---

[24] Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through Natural Resources Conservation Service at *https://lrftool.sc.egov. usda.gov.*

[25] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[26] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

Strickland AR 0783

modifying any determination made by an FSA State or county committee.

(e) The Deputy Administrator has the authority to permit State and county committees to waive or modify deadlines (except deadlines specified in a law) and other requirements or program provisions not specified in law, in cases where lateness or failure to meet such other requirements or program provisions do not adversely affect operation of PARP.

### § 9.302 Definitions.

The following definitions apply to this subpart. The definitions in part 1400 of this title apply, except where they conflict with the definitions in this section.

*2017 WHIP* means the 2017 Wildfires and Hurricanes Indemnity Program under 7 CFR part 760, subpart O.

*Agricultural commodity* means a crop, aquaculture, livestock, livestock byproduct, or other animal or animal byproduct that is produced as part of a farming operation and is intended to be commercially marketed. It includes only commodities produced in the United States, or produced outside the United States by a producer located in the United States and marketed inside the United States. It excludes:

(1) Wild free-roaming animals;

(2) Horses and other animals used or intended to be used for racing or wagering;

(3) Aquatic species that do not meet the definition of aquaculture;

(4) *Cannabis sativa* L. and any part of that plant that does not meet the definition of hemp; and

(5) Timber.

*Applicable pandemic assistance* includes payments received directly by an applicant under the following programs:

(1) The Coronavirus Food Assistance Program (CFAP);

(2) The Pandemic Livestock Indemnity Program (PLIP); and

(3) The Spot Market Hog Pandemic Program (SMHPP).

*Application* means the PARP application form.

*Aquaculture* means any species of aquatic organisms grown as food for human or livestock consumption or for industrial or biomass uses, fish raised as feed for fish that are consumed by humans, and ornamental fish propagated and reared in an aquatic medium. Eligible aquacultural species must be raised by a commercial operator and in water in a controlled environment.

*ARC and PLC* means the Agriculture Risk Coverage (ARC) and Price Loss Coverage (PLC) programs under 7 CFR part 1412.

*BCAP* means the Biomass Crop Assistance Program under 7 CFR part 1450.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Cattle feeder operation* means an operation that intensely feeds cattle on behalf of another person or entity for finishing purposes and is compensated based on feed, yardage, or weight gain of the cattle.

*CCC* means the Commodity Credit Corporation.

*CFAP* means the Coronavirus Food Assistance Program 1 and 2 under 7 CFR part 9, subparts A through C, excluding assistance for contract producers specified in § 9.203(l) through (o).

*Contract producer* means a producer who grows or produces an agricultural commodity under contract for or on behalf of another person or entity. The contract producer does not have ownership in the commodity and is not entitled to a share from sales proceeds of the commodity. The term "contract producer" does not include cattle feeder operations.

*Controlled environment* means an environment in which everything that can practicably be controlled by the producer with structures, facilities, and growing media (including but not limited to water, soil, or nutrients), is in fact controlled by the producer, as determined by industry standards.

*County* means the county or parish of a state. For Alaska, Puerto Rico, and the Virgin Islands, a county is an area designated by the State committee with the concurrence of the Deputy Administrator.

*County committee* means the FSA county committee.

*Crop insurance* means an insurance policy reinsured by Federal Crop Insurance Corporation under the provisions of the Federal Crop Insurance Act, as amended, or a private plan of insurance.

*Deputy Administrator* means Deputy Administrator for Farm Programs, Farm Service Agency, U.S. Department of Agriculture, or their designee.

*DMC* means the Dairy Margin Coverage Program under 7 CFR part 1430, subpart D.

*ELAP* means the Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program under 7 CFR part 1416, subpart B.

*ERP* means the Emergency Relief Program, which was administered in 2 phases:

(1) ERP Phase 1, administered according to the notice of funds availability published in the **Federal Register** on May 18, 2022 (87 FR 30164–30172) and the clarification to the notice of funds availability that was published on August 18, 2022 (87 FR 50828–50830); and

(2) ERP Phase 2, administered according to 7 CFR part 760, subpart S.

*Farming operation* means a business enterprise engaged in the production of agricultural products, commodities, or livestock, operated by a person, legal entity, or joint operation, and that is eligible to receive payments, directly or indirectly, under this subpart. A person or legal entity may have more than one farming operation if the person or legal entity is a member of one or more legal entity or joint operation.

*Foreign entity* means a corporation, trust, estate, or other similar organization that has more than 10 percent of its beneficial interest held by individuals who are not:

(1) Citizens of the United States; or

(2) Lawful aliens possessing a valid Alien Registration Receipt Card.

*Foreign person* means any person who is not a citizen or national of the United States or who is admitted into the United States for permanent residence under the Immigration and Nationality Act and possesses a valid Alien Registration Receipt Card issued by the United States Citizenship and Immigration Services, Department of Homeland Security.

*Hemp* means the plant species *Cannabis sativa* L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis, that is grown under a license or other required authorization issued by the applicable governing authority that permits the production of the hemp.

*IRS* means the Department of Treasury, Internal Revenue Service.

*LDP* means the Loan Deficiency Payment programs in 7 CFR parts 1421, 1425, 1427, 1434, and 1435.

*Legal entity* means a corporation, joint stock company, association, limited partnership, irrevocable trust, estate, charitable organization, or other similar organization including any such organization participating in a business structure as a partner in a general partnership, a participant in a joint venture, a grantor of a revocable trust,

or as a participant in a similar organization. A business operating as a sole proprietorship is considered a legal entity.

*Limited resource farmer or rancher* means a farmer or rancher:

(1) Who is a person whose:

(i) Direct or indirect gross farm sales did not exceed $180,300 in each calendar year for 2017 and 2018 (the relevant years for the 2020 program year); and

(ii) Total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1)(i) of this definition; [1] or

(2) That is an entity and all members who hold an ownership interest in the entity meet the criteria in paragraph (1) of this definition.

*LFP* means the Livestock Forage Disaster Program under CFR part 1416, subpart C.

*LIP* means the Livestock Indemnity Program under 7 CFR part 1416, subpart D.

*Minor child* means a person who is under 18 years of age as of June 1, 2020.

*MFP* means the 2018 Market Facilitation Program under 7 CFR part 1409, subpart A, and the 2019 Market Facilitation Program under 7 CFR part 1409, subpart B.

*Milk Loss Program* means the Milk Loss Program under 7 CFR part 760, subpart Q.

*MLG* means a marketing loan gain under the Marketing Assistance Loan programs in 7 CFR parts 1421, 1425, 1427, 1434, and 1435.

*MPP-Dairy* means the Margin Protection Program for Dairy under 7 CFR part 1430, subpart A.

*NAP* means the Noninsured Crop Disaster Assistance Program under section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) and 7 CFR part 1437.

*On-Farm Storage Loss Program* means the On-Farm Storage Loss Program under 7 CFR part 760, subpart P.

*Ownership interest* means to have either legal ownership interest or beneficial ownership interest in a legal entity. For the purposes of administering PARP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such

entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is also considered to have a beneficial ownership interest in such legal entity.

*Person* means an individual, natural person and does not include a legal entity.

*PLIP* means the Pandemic Livestock Indemnity Program announced in the notice of funds availability published on July 19, 2021 (86 FR 37990–37994).

*PMVAP* means the Pandemic Market Volatility Assistance Program administered by USDA's Agricultural Marketing Service.

*Producer* means a person or legal entity who was in the business of farming to produce an agricultural commodity in calendar year 2020, and who was entitled to a share in the agricultural commodity available for marketing or would have shared had the agricultural commodity been produced and marketed. For PARP, ''producer'' also includes cattle feeder operations.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*TAP* means the Tree Assistance Program under 7 CFR part 1416, subpart E.

*SMHPP* means the Spot Market Hog Pandemic Program announced in the notice of funds availability published on December 14, 2021 (86 FR 71003–71007).

*STRP* means the Seafood Trade Relief Program announced in the notice of funds availability published on September 14, 2020 (85 FR 56572–56575).

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*United States* means all 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

*Veteran farmer or rancher* means a farmer or rancher:

(1) Who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[2]) and:

(i) Has not operated a farm or ranch for more than 10 years; or

(ii) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[3]) during the most recent 10-year period; or

(2) That is an entity and at least 50 percent of the ownership interest is held by members who meet the criteria in paragraph (1) of this definition.

*WHIP+* means the Wildfires and Hurricanes Indemnity Program Plus under 7 CFR part 760, subpart O.

**§ 9.303  Producer eligibility requirements.**

(a) To be eligible for PARP, a producer must:

(1) Have been in the business of farming in the 2020 calendar year;

(2) Have had at least a 15 percent decrease in allowable gross revenue for the 2020 calendar year, as compared to the:

(i) Actual allowable gross revenue for the 2018 or 2019 calendar year, whichever is reflective of a typical year, as elected by the producer, if the producer had allowable gross revenue in the 2018 or 2019 calendar year; or

(ii) Producer's expected allowable gross revenue for the 2020 calendar year, if the producer had no allowable gross revenue for the 2018 and 2019 calendar years; and

(3) Meet all other requirements for eligibility under this subpart.

(b) To be eligible for a PARP payment, a producer must be a:

(1) Citizen of the United States;

(2) Resident alien, which for purposes of this subpart means ''lawful alien'' as defined in part 1400 of this title;

(3) Partnership organized under State Law;

(4) Corporation, limited liability company, or other organizational structure organized under State law;

(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304); or

---

[1] Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through Natural Resources Conservation Service at *https://lrftool.sc.egov.usda.gov.*

---

[2] The term ''Armed Forces'' means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[3] The term ''veteran'' means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

Strickland AR 0785

(6) Foreign person or foreign entity who meets all requirements as described in 7 CFR part 1400.

### §9.304 Allowable gross revenue.

(a) For the purposes of this subpart, "allowable gross revenue" includes revenue from:

(1) Sales of agricultural commodities produced by the producer, including sales resulting from value added through post-production activities;

(2) Sales of agricultural commodities a producer purchased for resale that had a change in characteristic over the time held (for example, a plant purchased at a size of 2 inches and sold as an 18-inch plant after 4 months), less the cost or other basis of such commodities;

(3) The taxable amount of cooperative distributions directly related to the sale of the agricultural commodities produced by the producer;

(4) Benefits under the following agricultural programs: ARC and PLC, BCAP, DMC, LDP, MFP, MLG, and MPP-Dairy;

(5) CCC loans, if treated as income and reported to IRS;

(6) Crop insurance proceeds;

(7) Federal disaster program payments under the following programs: 2017 WHIP, ELAP, LFP, LIP, NAP, Milk Loss Program, On-Farm Storage Loss Program, STRP, TAP, and WHIP+;

(8) Payments issued through grant agreements with FSA for losses of agricultural commodities;

(9) Grants from the Department of Commerce, National Oceanic and Atmospheric Administration and State program funds providing direct payments for the loss of agricultural commodities or the loss of revenue from agricultural commodities;

(10) Revenue from raised breeding livestock;

(11) Revenue earned as a cattle feeder operation;

(12) Other revenue directly related to the production of agricultural commodities that IRS requires the producer to report as income and

(13) For 2020 allowable gross revenue, payments PMVAP regardless of the calendar year in which the payment was received.

(b) Allowable gross revenue does not include revenue from sources other than those listed in paragraph (a) of this section, including but not limited to, revenue from:

(1) Applicable pandemic assistance;

(2) Sales of commodities that are excluded from "agricultural commodities,"

(3) Resale items not held for characteristic change;

(4) Income from a pass-through entity such as an S Corp or limited liability company;

(5) Conservation program payments;

(6) Any pandemic assistance payments that were not intended to compensate for the loss of agricultural commodities or the loss of revenue from the pandemic (for example, payments to provide assistance with the cost of purchasing personal protective equipment, retrofitting facilities for worker and consumer safety, shifting to online sales platforms, transportation, worker housing, or medical costs);

(7) Custom hire income;

(8) Net gain from hedging or speculation;

(9) Wages, salaries, tips, and cash rent;

(10) Rental of equipment or supplies; and

(11) Acting as a contract producer of an agricultural commodity.

(c) If a producer did not have a full year of revenue for 2018 or 2019, or increased their production capacity in 2020 compared to 2018 or 2019, the producer may certify to an adjusted 2018 or 2019 allowable gross revenue on form FSA–1122A. Increases in production capacity do not include changes due to crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals. Documentation required to support such an adjustment must be provided within 30 calendar days of submitting their PARP application and demonstrate that the producer:

(1) Had the production capacity to support the expected full year revenue;

(2) Added production capacity to the farming operation;

(3) Increased the use of existing production capacity; or

(4) Made physical alterations to existing production capacity.

(d) If a producer did not have allowable gross revenue in 2018 and 2019, the producer must certify on form FSA–1122A as to what had been their reasonably expected 2020 allowable gross revenue prior to the impact of the COVID–19 pandemic. Documentation required to support the producer's certification must be provided within 30 calendar days of submitting the producer's PARP application. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the COVID–19 pandemic and includes, but is not limited to:

(1) Financial documents such as a business plan or cash flow statement

that demonstrate an expected level of revenue;

(2) Sales contracts or purchase agreements; and

(3) Documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

(e) A producer who does not provide acceptable documentation described in paragraph (c) or (d) of this section within 30 calendar days of submitting their application is not eligible for an adjustment to their 2019 allowable gross revenue or to have their payment calculated using an expected 2020 allowable gross revenue, as applicable.

(f) Except as provided in paragraph (a)(13) of this section, the allowable gross revenue for a specific calendar year will be based on the calendar year in which that revenue was received by the producer.

(g) Producers who file or would file a joint tax return will certify their allowable gross revenue based on what it would have been had they filed taxes separately for the applicable year.

### §9.305 Time and method of application.

(a) A completed PARP application under this subpart must be submitted to any FSA county office by the close of business on the date announced by the Deputy Administrator. Applications may be submitted in person or by mail, email, facsimile, or other methods announced by FSA.

(b) Failure of an individual, entity, or a member of an entity to submit the following payment limitation and payment eligibility forms within 60 days from the PARP application deadline, may result in no payment or a reduced payment:

(1) Form AD–2047, Customer Data Worksheet, for new customers or existing customers who need to update their customer profile;

(2) Form FSA–1122A, PARP Application, if applicable;

(3) Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, if applicable;

(4) Form CCC–901, Member Information for Legal Entities, if applicable;

(5) Form CCC–902 Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

(6) Form CCC–941, Average Adjusted Gross Income (AGI) Certification and Consent to Disclosure of Tax Information, for the 2020 program year for the person or legal entity, including the legal entity's members, partners, or shareholders, as provided in 7 CFR part 1400;

Strickland AR 0786

(7) Form FSA–1123, Certification of 2020 Adjusted Gross Income (AGI), if applicable; and

(8) Form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification, for the PARP applicant and applicable affiliates as provided in 7 CFR part 12.

(c) If requested by USDA, the producer must provide additional documentation that establishes the producer's eligibility for PARP. If supporting documentation is requested, the documentation must be submitted to USDA within 30 calendar days from the request or the application will be disapproved by USDA. FSA may request supporting documentation to verify information provided by the producer and their eligibility including, but not limited to, the producer's:

(1) Allowable gross revenue reported on the PARP application; and

(2) Ownership share in the agricultural commodities.

### §9.306  Payment calculation.

(a) If the producer's allowable gross revenue for 2020 decreased by at least 15 percent compared to the producer's allowable gross revenue for 2018 or 2019, as elected by the producer:

(1) FSA will calculate:

(i) The producer's 2018 or 2019 allowable gross revenue, as elected by the producer and as adjusted according to §9.304(c), if applicable; minus

(ii) The producer's 2020 allowable gross revenue; multiplied by

(iii) A payment factor of:

(A) Ninety (90) percent for underserved farmers or ranchers, who have submitted form CCC–860 certifying they meet the definition for at least one of the applicable groups; or

(B) Eighty (80) percent for all other producers; and

(2) The producer's PARP payment will be equal to the result of the calculation in paragraph (a)(1) of this section minus the producer's applicable pandemic assistance, and 2020 program year ERP payments.

(b) If a producer did not have allowable gross revenue in 2018 and 2019 and the producer's allowable gross revenue for 2020 decreased by at least 15 percent compared to the producer's expected 2020 allowable gross revenue:

(1) FSA will calculate:

(i) The producer's expected 2020 allowable gross revenue, as specified in §9.304(d), minus

(ii) The producer's actual 2020 allowable gross revenue;

(iii) Multiplied by a payment factor of:

(A) 90 percent for underserved farmers or ranchers who have submitted form CCC–860 certifying they meet the definition for at least one of the applicable groups; or

(B) 80 percent for all other producers; and

(2) The producer's PARP payment will be equal to the result of the calculation in paragraph (b)(1) of this section minus the producer's applicable pandemic assistance, and 2020 program year ERP payments.

(c) If a producer receives assistance through 2020 program year ERP or any program included under applicable pandemic assistance after their PARP payment is calculated, their PARP payment will be recalculated and the producer must refund any resulting overpayment.

(d) Payments calculated according to this section are subject to the availability of funds and may be factored if total calculated payments exceed the available funding.

### §9.307  Adjusted gross income limitation, payment limitation, and attribution.

(a) To be eligible to receive a PARP payment and facilitate administration of paragraphs (b) through (f) of this section, a person or legal entity must provide their name, address, valid taxpayer identification number, and ownership share to USDA. In addition, a legal entity must provide the name, address, valid taxpayer identification number, and ownership share of each person or legal entity, that holds or acquires a direct or indirect ownership interest in the legal entity. PARP payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds less than a 10 percent direct or indirect ownership interest, at or above the fourth level of ownership in the business structure, is not provided to USDA. Additionally, a legal entity will not be eligible to receive PARP payments when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater, at or above the fourth level of ownership in the business structure, is not provided to USDA.

(b) The $900,000 average adjusted gross income limitation provisions in 7 CFR part 1400 relating to limits on income for persons or legal entities, including members of legal entities, joint ventures, and general partnerships applies to PARP. The average adjusted gross income will be calculated for a person or legal entity based on the 2016, 2017, and 2018 tax years. If the person's or legal entity's average adjusted gross income exceeds $900,000, the applicant is ineligible for PARP except as provided in paragraph (c) of this section.

(c) A person or legal entity that does not meet the average adjusted gross income requirements described in paragraph (b) of this section, may otherwise meet the adjusted gross income requirements, provided the person's or legal entity's 2020 adjusted gross income, as defined under 26 U.S.C. 62 or comparable measure, is not more than $900,000. Except for general partnerships and joint ventures, a PARP applicant that is a person or legal entity, including members holding an ownership interest in the legal entity, is required to:

(1) Certify, on a form that is approved for that purpose by the Deputy Administrator, that their 2020 adjusted gross income or comparable measure is not more than $900,000; and

(2) Submit a certification from a licensed CPA or attorney affirming the person's or legal entity's 2020 adjusted gross income is not more than $900,000.

(d) Members of general partnerships and joint ventures not meeting the income requirements described in paragraph (b) of this section may otherwise meet the income requirements, provided the member's 2020 adjusted gross income, as defined under 26 U.S.C. 62 or comparable measure, is not more than $900,000. The member is required to provide the information described in paragraphs (c)(1) and (2) of this section.

(e) A person or legal entity other than a joint venture or general partnership cannot receive, directly or indirectly, more than $125,000 under PARP. USDA may establish a lower maximum payment amount per person, legal entity, or member of a joint venture or general partnership after the application period has ended if calculated payment amounts exceed available funding. Payments made to a PARP applicant who is a joint operation, including a joint venture or a general partnership, may not exceed the amount determined by multiplying $125,000 (or the reduced maximum payment limitation, if applicable) by the number of persons or legal entities that comprise the first-level membership of the joint operation.

(f) A PARP payment made to a legal entity will be considered in combination with other PARP payments attributed to every person or legal entity with a direct or indirect ownership interest in the legal entity. The maximum limitation described in paragraph (e) of this section for a legal entity is determined based on payments to the legal entity and members who are an individual person or a legal entity. If a member's combined PARP payments

Strickland AR 0787

reach the maximum payment limitation when summed from all businesses in which the person or legal entity has an ownership interest, then subsequent payments to the legal entity will be reduced by the proportionate ownership interest of the member. A payment to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility. Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

(1) *First level of ownership:* Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

(2) *Second level of ownership:* Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

(3) *Third and fourth levels of ownership:* Except as provided in the second-level ownership in paragraph (f)(2) of this section and in the fourth level of ownership in paragraph (f)(4) of this section, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in paragraph (f)(2) of this section; and

(4) *Fourth-level of ownership:* If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first level or payment legal entity by the fourth-level legal entity.

(g) Payments made to a PARP applicant that is an Indian Tribe or Tribal organization, as defined in the section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), are not subject to:

(1) AGI requirements described in paragraphs (b) through (d) of this section;

(2) Payment limitation described in paragraph (e) of this section; and

(3) Attribution of payments described in paragraph (f) of this section.

(h) Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor child's parent or legal guardian.

### §9.308  Eligibility subject to verification.

(a) Producers who are approved for participation in PARP are required to retain documentation in support of their application for 3 years after the date of approval.

(b) Participants receiving PARP payments must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

### §9.309  Miscellaneous provisions.

(a) If a PARP payment resulted from erroneous information provided by a producer, or any person acting on their behalf, the payment will be recalculated and the producer must refund any excess payment with interest calculated from the date of the disbursement of the payment.

(b) If FSA determines that the producer intentionally misrepresented information provided on their application, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement.

(c) Any required refunds must be resolved in accordance with part 3 of this title.

(d) The regulations in 7 CFR part 718, subpart D, and 7 CFR parts 11 and 780 apply to determinations made under this subpart.

(e) A producer, whether a person or legal entity that either fails to timely provide all required documentation or fails to satisfy any eligibility requirement for PARP, is not eligible to receive PARP payments, directly or indirectly. A PARP payment to an eligible legal entity applicant whose member(s) either fails to timely provide all required documentation or fails to satisfy any eligibility requirement for PARP will be reduced proportionate to that member's ownership interest in the legal entity.

(f) Any payment under this subpart will be made without regard to questions of title under State law and without regard to any claim or lien

against the commodity or proceeds from the sale of the commodity. The regulations governing offsets in part 3 of this title do not apply to payments made under this subpart.

(g) For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under PARP but only as to beneficiaries who, as a condition of the waiver, agree to apply the PARP payments to reduce the amount of the judgment lien.

(h) The provisions in 7 CFR 718.3, 718.4, 718.5, 718.6, 718.8, 718.9, 718.10, and 718.11 are applicable to multiple programs and apply to PARP.

(i) In addition to any other Federal laws that apply to PARP, the following laws apply: 15 U.S.C. 714; 18 U.S.C. 286, 287, 371, and 1001.

### §9.310  Perjury.

In either applying for or participating in PARP, or both, the producer is subject to laws against perjury and any resulting penalties and prosecution, including, but not limited to, 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in PARP, or both, then the producer may be guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or without the United States.

## PART 701—EMERGENCY CONSERVATION PROGRAM, EMERGENCY FOREST RESTORATION PROGRAM, AND CERTAIN RELATED PROGRAMS PREVIOUSLY ADMINISTERED UNDER THIS PART

■ 15. The authority citation for part 701 continues to read as follows:

**Authority:** 16 U.S.C. 2201–2206; Sec. 101, Pub. L. 109–148, 119 Stat. 2747; and Pub. L. 111–212, 124 Stat. 2302.

### Subpart A—General

■ 16. Amend §701.2 in paragraph (b) as follows:
■ a. Remove the definition of ''Commercial forest land'';
■ b. Add the definition of ''Forestland'' in alphabetical order;
■ c. In a definition for ''Nonindustrial private forest land'', remove the words ''commercial forest''; and

Strickland AR 0788

■ d. Add a definition for "Socially disadvantaged farmer or rancher" in alphabetical order.

The additions read as follows:

### §701.2 Abbreviations and definitions.

\* \* \* \* \*

(b) \* \* \*

*Forestland* means land that is at least 120 feet wide and 1 acre in size and at least 10 percent covered by live trees of any size.

\* \* \* \* \*

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a socially disadvantaged group. A socially disadvantaged group is a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities.

\* \* \* \* \*

### §§701.44 and 701.45 [Removed and Reserved]

■ 17. Remove and reserve §§701.44 and 701.45.

## Subpart B—Emergency Conservation Program

■ 18. Amend §701.105 as follows:
■ a. Remove paragraphs (b)(1) and (2);
■ b. Redesignate paragraphs (b)(3) through (13) as paragraphs (b)(1) through (11), respectively;
■ c. Add paragraph (d).

The addition reads as set forth below.

### §701.105 Land eligibility.

\* \* \* \* \*

(d) Additional provisions making Government-owned land eligible is specified in §701.106.

■ 19. Add §701.106 to read as follows:

### §701.106 Government-owned land.

(a) *State-owned land.* When land is owned by a State, whether it is eligible for cost share is as specified in this paragraph (a) in addition to the requirements in §701.105.

(1) If an eligible person or legal entity has a lease for the State-owned land that allows cost share, and files a cost share request for the State-owned land, the land is eligible for cost share if, as determined by FSA, the:

(i) Eligible person or legal entity will directly benefit from the practice; or

(ii) The land will remain in agricultural production throughout the established practice life span.

(2) If an eligible person or legal entity files a cost-share request for State-owned land, the land is ineligible for cost share if, as determined by FSA, the:

(i) Practice is for the primary benefit of the State or State agencies; or

(ii) Eligible person or legal entity is prohibited by the lease from accepting cost-share.

(b) *Federally-owned farmland.* When land is federally owned, whether it is eligible for cost-share is as specified in this paragraph (a), in addition to the requirements in §701.105.

(1) If an eligible person or legal entity files a cost-share request on federally owned farmland, the land is eligible if all of the following apply:

(i) An eligible private person or legal entity is farming or ranching the farmland;

(ii) An eligible person or legal entity has a lease that does not prohibit cost-share;

(iii) The practice will primarily benefit nearby or adjacent privately owned farmland of the eligible person or legal entity performing the practice;

(iv) A person or legal entity performing the practice has authorization from a Federal agency to install and maintain the practice;

(v) The Federal land is the most practical location for the eligible practice; and

(vi) During a drought, the practice will primarily benefit the livestock owned or managed by the eligible person or legal entity performing the practice.

(2) If an eligible person or legal entity files a cost share request on federally-owned land, the land is ineligible if the practices performed on these lands are for the benefit of land owned by a Federal agency.

(c) *Federal or State agency.* For the purposes of this subpart, private persons or legal entities exclude Federal and State agencies.

■ 20. Amend §701.111 by revising paragraph (a) to read as follows:

### §701.111 Prohibition on duplicate payments.

(a) *Duplicate payments.* Participants are not eligible to receive funding under ECP on the same piece of land for which the participant has or will receive funding under any other Federal or State program that covers the same or similar expenses so as to create duplicate payments, or, in effect, a higher rate of cost share than is allowed under this part.

\* \* \* \* \*

■ 21. Amend §701.126 by adding paragraph (d) to read as follows.

### §701.126 Maximum cost-share percentages.

\* \* \* \* \*

(d) The Secretary may waive the maximum limitations described in paragraphs (a) through (c) of this section to the maximum extent allowed by law.

■ 22. Amend §701.127 by designating the undesignated paragraph as paragraph (a) and adding paragraph (b) to read as follows.

### §701.127 Maximum ECP payments per person or legal entity.

\* \* \* \* \*

(b) The Secretary may waive the maximum limitations described in paragraph (a) of this section to the maximum extent allowed by law.

■ 23. Amend §701.128 by revising the section heading and paragraph (a) to read as follows.

### §701.128 Advance payment.

(a) With respect to a payment to an agricultural producer for any eligible ECP practice, the agricultural producer has the option of receiving up to 25 percent of the projected payment, determined based on the applicable percentage of the fair market value of the cost of the practice, as determined by FSA, before the agricultural producer carries out the restoration.

\* \* \* \* \*

### §§701.150 through 701.157 [Removed]

■ 25. Remove §§701.150 through 701.157.

## Subpart C—Emergency Forest Restoration Program

■ 26. Amend §701.226 by adding paragraph (c) to read as follows.

### §701.226 Maximum cost-share percentages.

\* \* \* \* \*

(c) The Secretary may waive the maximum limitations described in paragraphs (a) and (b) of this section to the maximum extent allowed by law.

**Farm Service Administration**

**Chapter VII**

## PART 760—INDEMNITY PAYMENT PROGRAMS

■ 27. The authority citation for part 760 is revised to read as follows:

**Authority:** 7 U.S.C. 4501 and 1531; 16 U.S.C. 3801, note; 19 U.S.C. 2497; Title III, Pub. L. 109–234, 120 Stat. 474; Title IX, Pub. L. 110–28, 121 Stat. 211; Sec. 748, Pub. L. 111–80, 123 Stat. 2131; Title I, Pub. L. 115–123, 132 Stat. 65; Title I, Pub. L. 116–20, 133 Stat. 871; Division B, Title VII, Pub. L. 116–94, 133 Stat. 2658; and Division B, Title I, Pub. L. 117– 43, 135 Stat. 344.

■ 28. Add subpart S to read as follows.

**Subpart S—Emergency Relief Program**

Sec.

Strickland AR 0789

760.1900 Applicability and administration.
760.1901 Definitions.
760.1902 Producer eligibility requirements.
760.1903 Allowable gross revenue.
760.1904 Time and method of application.
760.1905 Payment calculation.
760.1906 Payment limitation and attribution.
760.1907 Eligibility subject to verification.
760.1908 Miscellaneous provisions.
760.1909 Perjury.
760.1910 Requirement to purchase crop insurance or NAP coverage.

## Subpart S—Emergency Relief Program

**§ 760.1900 Applicability and administration.**

(a) This subpart specifies the eligibility requirements and payment calculations for Phase 2 of the Emergency Relief Program (ERP). ERP provides payments to producers who suffered eligible crop losses due to qualifying disaster events, which include wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021.[1] To be eligible for ERP Phase 2 payments, participants must comply with all provisions under this subpart.

(b) ERP is administered under the general supervision and direction of the Administrator, Farm Service Agency (FSA).

(c) The FSA State committee will take any action required by this subpart that an FSA county committee has not taken. The FSA State committee will also:

(1) Correct, or require an FSA county committee to correct, any action taken by such county FSA committee that is not in accordance with the regulations of this subpart; or

(2) Require an FSA county committee to withhold taking any action that is not in accordance with this subpart.

(d) No provision or delegation to an FSA State or county committee will preclude the FSA Administrator, the Deputy Administrator, or a designee or other such person, from determining any question arising under the programs of this subpart, or from reversing or modifying any determination made by an FSA State or county committee.

(e) The Deputy Administrator has the authority to permit State and county committees to waive or modify deadlines (except deadlines specified in a law) and other requirements or program provisions not specified in law,

in cases where lateness or failure to meet such other requirements or program provisions do not adversely affect operation of ERP.

**§ 760.1901 Definitions.**

The following definitions apply to this subpart. The definitions in parts 718 and 1400 of this title apply, except where they conflict with the definitions in this section.

*2017 WHIP* means the 2017 Wildfires and Hurricanes Indemnity Program under 7 CFR part 760, subpart O.

*Administrative fee* means the amount an insured producer paid for catastrophic risk protection, and additional coverage for each crop year as specified in the applicable crop insurance policy.

*Application* means the ERP Phase 2 application form.

*Aquaculture* means any species of aquatic organisms grown as food for human or livestock consumption or for industrial or biomass uses, fish raised as feed for fish that are consumed by humans, and ornamental fish propagated and reared in an aquatic medium. Eligible aquacultural species must be raised by a commercial operator and in water in a controlled environment.

*ARC and PLC* means the Agriculture Risk Coverage (ARC) and Price Loss Coverage (PLC) programs under 7 CFR part 1412.

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income derived from farming, ranching, or forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year.

(1) If the resulting average adjusted gross farm income is at least 66.66 percent of the average adjusted gross income of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(i) The sale of equipment to conduct farm, ranch, or forestry operations; and

(ii) The provision of production inputs and services to farmers, ranchers, foresters, and farm operations.

(2) The relevant tax years are:

(i) For the 2020 program year, 2016, 2017, and 2018; and

(ii) For the 2021 program year, 2017, 2018, and 2019.

*Average adjusted gross income* means the average of the adjusted gross income as defined under 26 U.S.C. 62 or comparable measure of the person or legal entity. The relevant tax years are:

(1) For the 2020 program year, 2016, 2017, and 2018; and

(2) For the 2021 program year, 2017, 2018, and 2019.

*BCAP* means the Biomass Crop Assistance Program under 7 CFR part 1450.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Benchmark revenue* means allowable gross revenue for the benchmark year. If a producer began farming in 2020 or 2021 and did not have allowable gross revenue in either 2018 or 2019, the benchmark revenue is the producer's reasonably expected allowable gross revenue for the disaster year prior to the impact of the qualifying disaster event.

*Benchmark year* means the 2018 or 2019 tax year, as elected by the producer.

*Buy-up NAP coverage* means NAP coverage at a payment amount that is equal to an indemnity amount calculated for buy-up coverage computed under section 508(c) or (h) of the Federal Crop Insurance Act and equal to the amount that the buy-up coverage yield for the crop exceeds the actual yield for the crop.

*Catastrophic coverage* has the same meaning as in 7 CFR 1437.3.

*CCC* means the Commodity Credit Corporation.

*Certifying agent* means a private or governmental entity accredited by the USDA Secretary for the purpose of certifying a production, processing, or handling operation as organic.

*CFAP* means the Coronavirus Food Assistance Program 1 and 2 under 7 CFR part 9, subparts A through C, excluding assistance for contract producers specified in § 9.203(l) through (o).

*Controlled environment* means an environment in which everything that can practicably be controlled by the producer with structures, facilities, and growing media (including but not limited to water, soil, or nutrients), is in fact controlled by the producer, as determined by industry standards.

*County* means the county or parish of a state. For Alaska, Puerto Rico, and the Virgin Islands, a county is an area designated by the State committee with the concurrence of the Deputy Administrator.

*County committee* means the FSA county committee.

*Coverage level* means the percentage determined by multiplying the elected yield percentage under a crop insurance

[1] ERP Phase 1 was administered according to the notice of funds availability published in the **Federal Register** on May 18, 2022 (87 FR 30164–30172). A clarification to the notice of funds availability for ERP Phase 1 was published on August 18, 2022 (87 FR 50828–50830).

policy or NAP coverage by the elected price percentage.

*Crop insurance* means an insurance policy reinsured by the Federal Crop Insurance Corporation under the provisions of the Federal Crop Insurance Act, as amended.

*Crop insurance indemnity* means the payment to a participant for crop losses covered under crop insurance administered by RMA in accordance with the Federal Crop Insurance Act (7 U.S.C. 1501–1524).

*Deputy Administrator* means Deputy Administrator for Farm Programs, Farm Service Agency, U.S. Department of Agriculture, or their designee.

*Direct market crop* means a crop sold directly to consumers without the intervention of an intermediary such as a registered handler, wholesaler, retailer, packer, processor, shipper, or buyer (for example, a crop sold at a farmer's market or roadside stand), excluding crops sold for livestock consumption.

*Disaster year* means the calendar year in which the qualifying disaster event occurred (that is, 2020 or 2021).

*Disaster year revenue* means the allowable gross revenue for:

(1) The 2020 or 2021 tax year, as elected by the producer, for the 2020 disaster year; and

(2) The 2021 or 2022 tax year, as elected by the producer, for the 2021 disaster year.

(3) Producers must choose consecutive tax years if they are applying for both the 2020 and 2021 disaster years (that is, they may choose 2020 tax year revenue for the 2020 disaster year, and 2021 tax year revenue for the 2021 disaster year; or they may choose 2021 tax year revenue for the 2020 disaster year and 2022 tax year revenue for the 2021 disaster year).

*ELAP* means the Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program under part 1416, subpart B, of this title.

*Eligible crop* means a crop, including eligible aquaculture, that is produced in the United States as part of a farming operation and is intended to be commercially marketed. It excludes:

(1) Crops for grazing;

(2) Aquatic species that do not meet the definition of aquaculture;

(3) *Cannabis sativa* L. and any part of that plant that does not meet the definition of hemp; and

(4) Timber.

*Farming operation* means a business enterprise engaged in the production of agricultural products, commodities, or livestock, operated by a person, legal entity, or joint operation, and that is eligible to receive payments, directly or indirectly, under this subpart. A person or legal entity may have more than one farming operation if the person or legal entity is a member of one or more legal entity or joint operation.

*FCIC* means the Federal Crop Insurance Corporation, a wholly owned Government Corporation of USDA, administered by RMA.

*Hemp* means the plant species *Cannabis sativa* L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis, that is grown under a license or other required authorization issued by the applicable governing authority that permits the production of the hemp.

*High value crop* means:

(1) Any eligible crop not specifically identified as a specialty crop or listed in the definition of ''other crop''; and

(2) Any eligible crop, regardless of whether it is identified as a specialty crop or listed in the definition of ''other crop,'' if the crop is a direct market crop, organic crop, or a crop grown for a specific market in which specialized products can be sold resulting in an increased value compared to the typical market for the crops (for example, soybeans intended for tofu production), as determined by the Deputy Administrator.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, forestry commodities including renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, Interest Charge Domestic International Sales Corporation (IC–DISC), or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, or forestry activities as defined in this document; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator.

*IRS* means the Department of Treasury, Internal Revenue Service.

*LDP* means the Loan Deficiency Payment programs in 7 CFR parts 1421, 1425, 1427, 1434, and 1435.

*Legal entity* means a corporation, joint stock company, association, limited partnership, irrevocable trust, estate, charitable organization, or other similar organization including any such organization participating in a business structure as a partner in a general partnership, a participant in a joint venture, a grantor of a revocable trust, or as a participant in a similar organization. A business operating as a sole proprietorship is considered a legal entity.

*Limited resource farmer or rancher* means a farmer or rancher:

(1) Who is a person whose:

(i) Direct or indirect gross farm sales did not exceed:

(A) $180,300 in each calendar year for 2017 and 2018 (the relevant years for the 2020 program year); or

(B) $179,000 in each of the 2018 and 2019 calendar years for the 2021 program year; or

and

(ii) Total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1)(i) of this definition; [1] or

---

[1] Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through Natural Resources Conservation Service at *https://lrftool.sc.egov. usda.gov.*

Strickland AR 0791

(2) That is an entity and all members who hold an ownership interest in the entity meet the criteria in paragraph (1) of this definition.

*LFP* means the Livestock Forage Disaster Program under CFR part 1416, subpart C.

*MLG* means marketing loan gains under the Marketing Assistance Loan program provisions in 7 CFR parts 1421, 1425, 1427, 1434, and 1435.

*Minor child* means a person who is under 18 years of age as of June 1, 2020.

*MFP* means the 2018 Market Facilitation Program under 7 CFR part 1409, subpart A, and the 2019 Market Facilitation Program under 7 CFR part 1409, subpart B.

*NAP* means the Noninsured Crop Disaster Assistance Program under section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) and 7 CFR part 1437.

*On-Farm Storage Loss Program* means the On-Farm Storage Loss Program under 7 CFR part 760, subpart P.

*Organic crop* means a crop that is organically produced consistent with section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502) and grown on acreage certified by a certifying agent as conforming to organic standards specified in 7 CFR part 205.

*Other crop* means cotton, peanuts, rice, feedstock, and any crop grown with an intended use of grain, silage, or forage, unless the crop meets the requirements in paragraph (2) of the definition of "high value crop."

*Ownership interest* means to have either legal ownership interest or beneficial ownership interest in a legal entity. For the purposes of administering ERP Phase 2, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is also considered to have a beneficial ownership interest in such legal entity.

*Person* means an individual, natural person and does not include a legal entity.

*Premium* means the premium paid by the producer for crop insurance coverage or NAP buy-up coverage levels.

*Producer* means a legal or person entity who was entitled to a share in the eligible crop available for marketing or

would have shared had the eligible crop been produced and marketed.

*Program year* means:

(1) For ERP Phase 2, the disaster year; and

(2) For all other programs, the program year as defined in the applicable program provisions.

*Qualifying disaster event* means wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions.

*Qualifying drought* means an area within the county was rated by the U.S. Drought Monitor as having a drought intensity of D2 (severe drought) for eight consecutive weeks or D3 (extreme drought) or higher level for any period of time during the applicable calendar year.

*Related condition* means damaging weather and adverse natural occurrences that occurred concurrently with and as a direct result of a specified qualifying disaster event. Related conditions include, but are not limited to:

(1) Excessive wind that occurred as a direct result of a derecho;

(2) Silt and debris that occurred as a direct and proximate result of flooding;

(3) Excessive wind, storm surges, tornados, tropical storms, and tropical depressions that occurred as a direct result of a hurricane; and

(4) Excessive wind and blizzards that occurred as a direct result of a winter storm.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Specialty crops* means fruits, tree nuts, vegetables, culinary herbs and spices, medicinal plants, and nursery, floriculture, and horticulture crops. This includes common specialty crops identified by USDA's Agricultural Marketing Service at *https://*

*www.ams.usda.gov/services/grants/ scbgp/specialty-crop* and other crops as designated by the Deputy Administrator.

*Substantial beneficial interest (SBI)* has the same meaning as specified in the applicable crop insurance policy. For the purposes of ERP Phase 1, Federal crop insurance records for "transfer of coverage, right to indemnity" are considered the same as SBIs.

*STRP* means the Seafood Trade Relief Program announced in the notice of funds availability published on September 14, 2020 (85 FR 56572– 56575).

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*United States* means all 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

*U.S. Drought Monitor* means the system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http://droughtmonitor.unl.edu.*

*Veteran farmer or rancher* means a farmer or rancher:

(1) Who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[2]) and:

(i) Has not operated a farm or ranch for more than 10 years; or

(ii) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[3]) during the most recent 10-year period; or

(2) That is an entity and at least 50 percent of the ownership interest is held by members who meet the criteria in paragraph (1) of this definition.

*WHIP+* means the Wildfires and Hurricanes Indemnity Program Plus under 7 CFR part 760, subpart O.

**§ 760.1902 Producer eligibility requirements.**

(a) To be eligible for ERP Phase 2, a producer must have suffered a loss in

---

[2] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[3] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

Strickland AR 0792

disaster year allowable gross revenue, as compared to the benchmark allowable gross revenue, due to necessary expenses associated with losses of eligible crops due in whole or in part to a qualifying disaster event that occurred in the 2020 or 2021 calendar year.

(b) To be eligible for an ERP Phase 1 payment, a producer must be a:

(1) Citizen of the United States;

(2) Resident alien, which for purposes of this subpart means "lawful alien" as defined in part 1400 of this title;

(3) Partnership organized under State Law;

(4) Corporation, limited liability company, or other organizational structure organized under State law; or

(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304).

### § 760.1903 Allowable gross revenue.

(a) For the purposes of this subpart, "allowable gross revenue" includes revenue from:

(1) Sales of eligible crops produced by the producer, which includes sales resulting from value added through post-production activities that were reportable on IRS Schedule F;

(2) Sales of eligible crops a producer purchased for resale that had a change in characteristic due to the time held (for example, a plant purchased at a size of 2 inches and sold as an 18-inch plant after 4 months), less the cost or other basis of such eligible crops;

(3) The taxable amount of cooperative distributions directly related to the sale of the eligible crops produced by the producer;

(4) Benefits under the following agricultural programs: 2017 WHIP, ARC and PLC, BCAP, LDP, MLG, MFP, the On-Farm Storage Loss Program, and STRP;

(5) CCC loans, if treated as income and reported to IRS;

(6) Crop insurance proceeds for eligible crops, minus the amount of administrative fees and premiums;

(7) NAP payments for eligible crops, minus the amount of service fees and premiums;

(8) ELAP payments for an aquaculture crop;

(9) Payments issued through grant agreements with FSA for losses of eligible crops;

(10) Grants from the Department of Commerce, National Oceanic and Atmospheric Administration and State program funds providing direct payments for the loss of eligible crops or the loss of revenue from eligible crops;

(11) Other revenue directly related to the production of eligible crops that IRS requires the producer to report as income;

(12) For the disaster year only, ERP Phase 1 payments issued to another person or entity for the producer's share of an eligible crop, regardless of the tax year in which the payment would be reported to IRS; and

(13) For the benchmark year only, 2018, 2019 and 2020 WHIP+ and QLA payments.

(b) Allowable gross revenue does not include revenue from sources other than those listed in paragraph (a) of this section, including but not limited to, revenue from:

(1) Federal assistance programs not included in paragraph (a) of this section;

(2) Sales of livestock, animal by-products, and any commodities that are excluded from "eligible crops";

(3) Resale items not held for characteristic change;

(4) Income from a pass-through entity such as an S Corp or limited liability company;

(5) Conservation program payments;

(6) Any pandemic assistance payments that were not for the loss of eligible crops or the loss of revenue from eligible crops;

(7) Custom hire income;

(8) Net gain from hedging or speculation;

(9) Wages, salaries, tips, and cash rent;

(10) Rental of equipment or supplies; and

(11) Acting as a contract producer of an agricultural commodity.

(c) A producer is required to certify to an adjusted allowable gross revenue for the benchmark year on FSA–521 if the producer had a decreased operation capacity in a disaster year for which they are applying for ERP Phase 2, compared to the benchmark year.

(d) A producer may certify to an adjusted allowable gross revenue for the benchmark year on FSA–521 if either of the following apply:

(1) The producer did not have a full year of revenue for 2018 or 2019; or

(2) The producer had expanded their operation capacity in a disaster year for which they are applying for ERP Phase 2, compared to the benchmark year.

(e) Change in operation capacity does not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals. If requested by FSA, producers are required to submit documentation to FSA to support adjustments described in paragraphs (c) and (d) of this section within 30

calendar days of the request. The documentation to support an adjustment due to a change in operation capacity must show that the adjustment to the producer's benchmark revenue is due to an:

(1) Addition or decrease in production capacity of the farming operation;

(2) Increase or decrease in the use of existing production capacity; or

(3) Physical alterations that were made to existing production capacity.

(f) If a producer began farming in 2020 or 2021 and did not have allowable gross revenue in a benchmark year, the producer may certify to an adjusted benchmark allowable gross revenue on form FSA–521 that represents what had been the producer's reasonably expected disaster year revenue prior to the impact of the qualifying disaster event. If requested by FSA, documentation required to support a producer's certification must be provided within 30 calendar days of FSA's request, or the producer will be considered ineligible for ERP Phase 2. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the disaster event and includes, but is not limited to:

(1) Financial documents such as a business plan or cash flow statement that demonstrate an expected level of revenue;

(2) Sales contracts or purchase agreements; and

(3) Documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

(g) The allowable gross revenue will be based on the year for which the revenue would be reported for the purpose of filing a tax return, except for the ERP Phase 1 payments specified in paragraph (a)(12) of this section.

(h) Producers who file or would be eligible to file a joint tax return will certify their allowable gross revenue based on what it would have been had they filed taxes separately for the applicable year.

(i) On form FSA–521, for each applicable disaster year, producers must indicate the percentage of their allowable gross revenue from specialty and high value crops and the percentage from other crops. The percentages certified must be equal to the percentages that the producer would have reasonably expected to receive for the disaster year if not for the qualifying disaster event.

Strickland AR 0795

**§760.1904 Time and method of application.**

(a) A completed FSA–521, Emergency Relief Program (ERP) Phase 2 Application, must be submitted to the producer's recording county office by the close of business on the date announced by the Deputy Administrator. Applications may be submitted in person or by mail, email, facsimile, or other methods announced by FSA.

(b) Failure of an individual, entity, or a member of an entity to submit the following payment limitation and payment eligibility forms within 60 days from the date of the ERP Phase 2 application deadline, may result in no payment or a reduced payment:

(1) Form AD–2047, Customer Data Worksheet, for new customers or existing customers who need to update their customer profile;

(2) Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the program year or years for which the producer is applying for ERP;

(3) Form CCC–901, Member Information for Legal Entities, if applicable;

(4) Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

(5) Form FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity, for each applicable program year, including the legal entity's members, partners, or shareholders, as provided in 7 CFR part 1400; and

(6) Form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification, for the ERP Phase 2 applicant and applicable affiliates as provided in 7 CFR part 12.

(c) If requested by FSA, the producer must provide additional documentation that establishes the producer's eligibility for ERP Phase 2. If supporting documentation is requested, the documentation must be submitted to FSA within 30 calendar days from the request or the application will be disapproved by FSA. FSA may request supporting documentation to verify information provided by the producer and the produce's eligibility including, but not limited to, the producer's:

(1) Allowable gross revenue reported on the ERP Phase 2 application;

(2) Percentage of the expected allowable gross revenue from:

(i) Specialty and high value crops; and

(ii) Other crops; and

(3) Ownership share in the agricultural commodities.

**§760.1905 Payment calculation.**

(a) ERP Phase 2 payments will be calculated separately for each disaster year. If a producer indicates that they have expected revenue for both specialty and high value crops and other crops for a disaster year, a payment will be calculated separately for:

(1) Specialty and high value crops; and

(2) Other crops.

(b) To determine a producer's ERP Phase 2 payment amount, FSA will calculate:

(1) The producer's benchmark year allowable gross revenue, adjusted according to 7 CFR 760.1903, if applicable, multiplied by the ERP factor of 70 percent; minus

(2) The producer's disaster year allowable gross revenue; minus

(3) The sum of the producer's net ERP Phase 1 payments for the 2020 program year, if the calculation is for the 2020 disaster year, or for the 2021 and 2022 program years, if the calculation is for the 2021 disaster year; minus

(4) The sum of the producer's net CFAP payments (excluding payments for contract producer revenue), net 2020 WHIP+ payments, and net 2020 Quality Loss Adjustment (QLA) Program payments, if the calculation is for the 2020 disaster year; and

(5) Multiplied by the percentage of the expected disaster year revenue for specialty and high value crops or other crops, as applicable, to determine the separate payments for specialty and high value crops or other crops.

(c) FSA will issue an initial payment equal to the lesser of the amount calculated according to this section or the maximum initial payment amount of $2,000. If a producer has also received a payment under ERP Phase 1, FSA will reduce the producer's initial ERP Phase 2 payment amount by subtracting the producer's ERP Phase 1 gross payment amount.

(d) After the close of the ERP Phase 2 application period, FSA will issue a final payment equal to the amount calculated according to this section minus the amount of the producer's initial payment. If total calculated payments exceed the total funding available for ERP Phase 2, the ERP factor may be adjusted and the final payment amounts will be prorated to stay within the amount of available funding. If there are insufficient funds, a differential of 15 percent will be used for underserved

producers similar to ERP Phase 1, but with a cap at the statutory maximum of 70 percent. For example, if the ERP Factor is set at 50 percent, the factor used for underserved producers will be 65 percent, but if the factor is set at 55 percent or higher, the factor for underserved producers will be capped at 70 percent.

(e) If a producer receives assistance through CFAP or ERP Phase 1 after their ERP Phase 2 payment is calculated, the producer's ERP Phase 2 payment will be recalculated and the producer must refund any resulting overpayment.

**§760.1906 Payment limitation and attribution.**

(a) The payment limitation for ERP is determined by the person's or legal entity's average adjusted gross farm income (income from activities related to farming, ranching, or forestry). Specifically, if their average adjusted gross farm income is less than 75 percent of their average adjusted gross income (AGI) for the three taxable years preceding the most immediately preceding complete tax year, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments for specialty crops and high value crops [1] and $125,000 in payments for all other crops under:

(1) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(2) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined.

(b) If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities and the producer provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to:

(1) $900,000 for specialty crops and high value crops combined for:

(i) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

(ii) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined.; and

(2) $250,000 for all other crops for:

(i) ERP Phase 1 for program year 2020 and ERP Phase 2 for program year 2020, combined; and

---

[1] High value crops were not defined in ERP Phase 1; therefore, only ERP Phase 1 payments for specialty crops, as defined in the ERP Phase 1 notice of funds availability, will be counted toward the increased payment limitation for specialty and high value crops.

Strickland AR 0794

(ii) ERP Phase 1 for program years 2021 and 2022 and ERP Phase 2 for program year 2021, combined.

(c) The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, or forestry related activities are:

(1) Years 2016, 2017, and 2018 for program year 2020; and

(2) Years 2017, 2018, and 2019 for program year 2021.

(d) To receive more than $125,000 in ERP payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification. If a producer requesting the increased payment limitation is a legal entity, all members of that entity must also complete form FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the increased payment limitation based on the legal entity's average AGI from farming, ranching, or forestry related activities but a member of that legal entity either does not complete a form FSA–510 and provide the required certification or is not eligible for the increased payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ERP Phase 2 payment attributed to that member.

(e) If a producer files form FSA–510 and the accompanying certification after their ERP Phase 2 payment is issued but before the deadline announced by FSA, FSA will process the form FSA–510 and issue the additional payment amount if a maximum initial payment amount has not been reached.

(f) A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility. Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

(1) First level of ownership: Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

(2) Second level of ownership: Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be

attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

(3) Third and fourth levels of ownership: Except as provided in the second-level ownership in paragraph (f)(2) of this section and in the fourth level of ownership in paragraph (f)(4) of this section, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in paragraph (f)(2) of this section; and

(4) Fourth-level of ownership: If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first-level or payment legal entity by the fourth-level legal entity.

(g) Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

(h) A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

(i) If an individual or legal entity is not eligible to receive ERP Phase 2 payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity.

(j) Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**§ 760.1907   Eligibility subject to verification.**

(a) Producers who are approved for participation in ERP Phase 2 are required to retain documentation in support of their application for 3 years after the date of approval.

(b) Participants receiving ERP Phase 2 payments must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

**§ 760.1908   Miscellaneous provisions.**

(a) If an ERP Phase 2 payment resulted from erroneous information provided by a producer, or any person acting on their behalf, the payment will be recalculated and the producer must refund any excess payment with interest calculated from the date of the disbursement of the payment.

(b) If FSA determines that the producer intentionally misrepresented information provided on their application, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement.

(c) Any required refunds must be resolved in accordance with part 3 of this title.

(d) A producer, whether a person or legal entity, that either fails to timely provide all required documentation or fails to satisfy any eligibility requirement for ERP Phase 2, is not eligible to receive ERP Phase 2 payments, directly or indirectly. An ERP Phase 2 payment to an eligible legal entity applicant whose member(s) either fails to timely provide all required documentation or fails to satisfy any eligibility requirement for ERP Phase 2 will be reduced proportionate to that member's ownership interest in the legal entity.

(e) Any payment under this subpart will be made without regard to questions of title under State law and without regard to any claim or lien against the commodity or proceeds from the sale of the commodity. The regulations governing offsets in part 3 of this title apply to payments made under this subpart.

(f) For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ERP Phase 2 but only as to beneficiaries who, as a condition of the waiver, agree

Strickland AR 0795

to apply the ERP Phase 2 payments to reduce the amount of the judgment lien.

(g) In addition to any other Federal laws that apply to ERP Phase 2, the following laws apply: 15 U.S.C. 714; 18 U.S.C. 286, 287, 371, and 1001.

### §760.1909 Perjury.

In either applying for or participating in ERP Phase 2, or both, the producer is subject to laws against perjury and any resulting penalties and prosecution, including, but not limited to, 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ERP Phase 2, or both, then the producer may be guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or without the United States.

### §760.1910 Requirement to purchase crop insurance or NAP coverage.

(a) Producers must report all crops that suffered a revenue loss in whole or in part due to a qualifying disaster event on form FSA–522, Crop Insurance and/or NAP Coverage Agreement.

(b) All producers who receive ERP Phase 2 payments must file an accurate acreage report and purchase crop insurance or NAP coverage where crop insurance is not available, for the next 2 available crop years. For each crop reported according to paragraph (a) of this section, participants must obtain crop insurance or NAP, as may be applicable:

(1) At a coverage level equal to or greater than 60 percent for insurable crops; or

(2) At the catastrophic level or higher for NAP crops.

(c) Availability will be determined from the date a producer receives an ERP payment and may vary depending on the timing and availability of crop insurance or NAP for a producer's particular crops. The final crop year to purchase crop insurance or NAP coverage to meet the second year of coverage for this requirement is the 2026 crop year.

(d) In situations where crop insurance is unavailable for a crop, an ERP participant must obtain NAP coverage. Section 1001D of the Food Security Act of 1985 (1985 Farm Bill) provides that a person or entity with an AGI greater than $900,000 is not eligible to

participate in NAP; however, producers with an AGI greater than $900,000 are eligible for ERP. To reconcile this restriction in the 1985 Farm Bill and the requirement to obtain NAP or crop insurance coverage, ERP participants may meet the purchase requirement by purchasing Whole-Farm Revenue Protection (WFRP) crop insurance coverage, if eligible, or they may pay the applicable NAP service fee despite their ineligibility for a NAP payment. In other words, the service fee must be paid even though no NAP payment may be made because the AGI of the person or entity exceeds the 1985 Farm Bill limitation.

(e) If both Federal crop insurance and NAP coverage are unavailable for a crop, the producer must obtain WFRP crop insurance coverage, if eligible.

(f) For all crops listed on form FSA–522, producers who have the crop or crop acreage in subsequent years and who fail to obtain the 2 years of crop insurance or NAP coverage required as required by this section, must refund the ERP Phase 2 payment with interest from the date of disbursement. Producers who do not plant a crop listed on form FSA–522 in a year for which this requirement applies are not subject to the crop insurance or NAP purchase requirement for that year.

(g) Producers who received an ERP Phase 1 payment for a crop are not required to obtain additional years of crop insurance or NAP coverage for that crop if they also receive an ERP Phase 2 payment for a loss associated with that crop.

## PART 1400—PAYMENT LIMITATION AND PAYMENT ELIGIBILITY

■ 29. The authority citation for part 1400 continues to read as follows:

**Authority:** 7 U.S.C. 1308, 1308–1, 1308–2, 1308–3, 1308–3a, 1308–4, and 1308–5; and Title I, Pub. L. 115–123.

### Subpart A—General Provisions

■ 30. Add §1400.10 to read as follows:

### §1400.10 Notification of interests.

(a) To facilitate administration of subparts B, C, E, and F of this part for programs specified in §1400.1, or any other program as provided in individual program regulations in this chapter, a person or legal entity must provide information in the manner as prescribed by the Deputy Administrator.

(b) The information required to be submitted under paragraph (a) of this section must include:

(1) The name, address, valid taxpayer identification number, and ownership share of each person, or the name, address, valid taxpayer identification

number, and ownership share of each legal entity, that holds or acquires an ownership interest in the legal entity; and

(2) The name, address, valid taxpayer identification number, and ownership share of each legal entity in which the person or legal entity holds an ownership interest.

(c) Except as provided in paragraph (d) of this section, payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent at, or above the fourth level of ownership in the business structure is not provided to USDA. Additionally, a legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater at, or above the fourth level of ownership in the business structure is not provided to USDA.

(d) In order to be eligible to receive any payment specified in §1400.1(a)(7) or as provided by the Natural Resources Conservation Service in individual program regulations in this chapter, a person or legal entity must provide information in the manner as prescribed by the Deputy Administrator as identified in paragraph (b) of this section. Paragraph (c) of this section does not apply to the identified Natural Resources Conservation Service programs (programs specified in §1400.1(a)(7) or any other Natural Resources Conservation Service program as specified in the individual program regulations in this chapter).

### Subpart B—Payment Limitation

### §1400.107 [Removed]

■ 31. Remove §1400.107.

## PART 1416—EMERGENCY AGRICULTURAL DISASTER ASSISTANCE PROGRAMS

■ 32. The authority citation for part 1416 continues to read as follows:

**Authority:** Title I, Pub. L. 113–79, 128 Stat. 649; Title I, Pub. L. 115–123; Title VII, Pub. L. 115–141; and Title I, Pub. L. 116–20.

### Subpart A—General Provisions for Supplemental Agricultural Disaster Assistance Programs

### §1416.5 [Removed and Reserved]

■ 33. Remove and reserve §1416.5.

Strickland AR 0796

## Subpart B—Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program

■ 34. In § 1416.102, in the definition of "eligible loss condition", add a sentence at the end of the definition to read as follows:

### § 1416.102  Definitions.

\*  \*  \*  \*  \*

*Eligible loss condition* \* \* \* All other causes of losses are not covered, including, but not limited to, negligence, mismanagement, or wrongdoing by the producer.

\*  \*  \*  \*  \*

■ 35. Amend § 1416.103 as follows:
■ a. Add a sentence to the end of paragraph (a); and
■ b. In paragraph (d)(6), in the first sentence, remove "transport," and add "transport" in its place.

The addition reads as follows:

### § 1416.103  Eligible losses, adverse weather, and other loss conditions.

(a) \* \* \* All other causes of loss are not considered an eligible loss condition, including, but not limited to, negligence, mismanagement or wrongdoing by the producer.

\*  \*  \*  \*  \*

■ 36. Amend § 1416.104 as follows:
■ a. Redesignate paragraphs (b)(16) and (17) as (b)(17) and (18), respectively;
■ b. Add new paragraph (b)(16);
■ c. Remove paragraph (c)(4);
■ d. Redesignate paragraphs (c)(5) through (8) as paragraphs (c)(4) through (7), respectively;
■ e. In newly redesignated paragraph (c)(6), add the word "and" at the end;
■ f. Revise newly redesignated paragraph (c)(7); and
■ g. Remove paragraph (c)(9).

The addition and revision read as follows.

### § 1416.104  Eligible livestock, honeybees, and farm-raised fish.

\*  \*  \*  \*  \*

(b) \* \* \*

(16) Ostriches,

\*  \*  \*  \*  \*

(c) \* \* \*

(7) Livestock that are not produced for commercial use or those that are not produced or maintained in a commercial operation for livestock products, such as milk from dairy, including, but not limited to:

(i) Any wild free roaming livestock;

(ii) Horses and other animals used or intended to be used for racing or wagering;

(iii) Animals produced or maintained for hunting; and

(iv) Animals produced or maintained for consumption by owner.

\*  \*  \*  \*  \*

## Subpart C—Livestock Forage Disaster Program

■ 37. Amend § 1416.204 as follows:
■ a. In paragraph (a)(1), add "ostriches," after "llamas,";
■ b. Revise paragraph (a)(5);
■ c. Redesignate paragraphs (b)(15) and (16) as (b)(16) and (17), respectively;
■ d. Add new paragraph (b)(15);
■ e. Remove paragraph (c)(4);
■ f. Redesignate paragraphs (c)(5) through (9) as (c)(4) through (8), respectively; and
■ g. Revise newly redesignated paragraph (c)(8).

The revisions and addition read as follows.

### § 1416.204  Covered livestock.

\*  \*  \*  \*  \*

(a) \* \* \*

(5) Not have been produced and maintained for reasons other than commercial use as part of a farming operation. Such excluded uses include, but are not limited to:

(i) Any uses of wild free roaming livestock;

(ii) Racing or wagering;

(iii) Hunting; and

(iv) Consumption by owner; and

\*  \*  \*  \*  \*

(b) \* \* \*

(15) Ostriches,

\*  \*  \*  \*  \*

(c) \* \* \*

(8) Livestock produced or maintained for reasons other than commercial use, including, but not limited to, livestock produced or maintained for racing or wagering purposes, hunting, or consumption by owner.

## Subpart D—Livestock Indemnity Program

■ 38. Amend § 1416.304 as follows:
■ a. In paragraph (c)(3), remove the words "for livestock" and add "for livestock sale or" in their place; and
■ b. Revise paragraph (c)(4).

The revision reads as follows.

### § 1416.304  Eligible livestock.

\*  \*  \*  \*  \*

(c) \* \* \*

(4) Not be produced or maintained for reasons other than commercial use for livestock sale or for the production of livestock products such as milk or eggs. Livestock excluded from being eligible include, but are not limited to:

(i) Wild free roaming livestock;

(ii) Horses and other animals used or intended to be used for racing or wagering;

(iii) Animals produced or maintained for hunting; and

(iv) Animals produced or maintained for consumption by owner.

\*  \*  \*  \*  \*

■ 39. Amend § 1416.305 as follows:
■ a. In paragraph (g) introductory text, remove the words "if reliable" and add the words "if the livestock are not owned by the licensed veterinarian and reliable" in their place;
■ b. Revise paragraph (i) introductory text; and
■ c. In paragraph (i)(1) introductory text, remove the words "For 2017 and subsequent calendar years, livestock inventory reports by livestock unit must be provided to the local county FSA office by the later of December 3, 2018, or" and add "Livestock inventory reports by livestock unit must be provided to the FSA local county office by" in their place.

The revision reads as follows.

### § 1416.305  Application process.

\*  \*  \*  \*  \*

(i) Unweaned livestock operations may provide proof of death by using the LBIH.

\*  \*  \*  \*  \*

## PART 1437—NONINSURED CROP DISASTER ASSISTANCE PROGRAM

■ 40. The authority citation for part 1437 continues to read as follows:

**Authority:** 7 U.S.C. 1501–1508 and 7333; 15 U.S.C. 714–714m; 19 U.S.C. 2497, and 48 U.S.C. 1469a.

### Subpart A—General Provisions

■ 41. In § 1437.3, revise the definition of "Application for coverage" to read as follows:

### § 1437.3  Definitions.

\*  \*  \*  \*  \*

*Application for coverage* means:

(1) The form specified by FSA to be completed by a producer applying for NAP coverage for an eligible crop that is accompanied by the service fee or the service fee waiver form, or

(2) Another applicable form, designated by the Deputy Administrator to qualify as an application for NAP, that the producer has on file with FSA before the deadline for application for the coverage period which certifies they are eligible for a service fee waiver.

\*  \*  \*  \*  \*

### § 1437.6  [Amended]

■ 42. Amend § 1437.6 as follows:
■ a. Remove paragraph (a)(1); and
■ b. Redesignate paragraphs (a)(2) and (3) as (a)(1) and (2), respectively.

Strickland AR 0797

**§ 1437.7 [Amended]**

■ 43. Amend § 1437.7 as follows:

■ a. In paragraph (a), remove the words ''in the administrative county office'';

■ b. In paragraph (b) introductory text, remove the words ''request for'' and add the words ''certification of eligibility for a'' in their place; and

■ c. In paragraph (g) add the words ''for any buy-up coverage elected'' at the end of the first sentence.

## PART 1450—BIOMASS CROP ASSISTANCE PROGRAM (BCAP)

■ 44. The authority citation for part 1450 continues to read as follows:

**Authority:** 7 U.S.C. 8111.

■ 45. In § 1450.2, add a definition for ''Socially disadvantaged farmer or rancher'' in alphabetical order to read as follows.

**§ 1450.2 Definitions.**

\* \* \* \* \*

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a socially disadvantaged group. A socially disadvantaged group is a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities.

\* \* \* \* \*

**Gloria Montaño Greene,**

*Deputy Under Secretary, Farm Production and Conservation, U.S. Department of Agriculture.*

[FR Doc. 2023–00005 Filed 1–9–23; 8:45 am]

**BILLING CODE 3411–E2–P**

Strickland AR 0798

# Notices

Federal Register

Vol. 87, No. 96

Wednesday, May 18, 2022

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

[Docket ID FSA–2022–0004]

### Notice of Funds Availability; Emergency Relief Program (ERP)

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ERP. ERP will provide assistance to producers for losses to crops, trees, bushes, and vines due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. ERP assistance will be provided in two phases. This document provides the eligibility requirements, application process, and payment calculations for ERP Phase 1, which will provide payments for crop production losses and tree, bush, and vine losses calculated using certain data from previously issued crop insurance indemnities and Nonsured Crop Disaster Assistance Program (NAP) payments.

**DATES:**

*Funding availability:* Implementation will begin May 18, 2022.

*Comment Date:* We will consider comments on the Paperwork Reduction Act that we receive by: July 18, 2022.

**ADDRESSES:** We invite you to submit comments on the information collection request. You may submit comments by any of the following methods, although FSA prefers that you submit comments electronically through the Federal eRulemaking Portal:

∀ *Federal eRulemaking Portal:* Go to *http://www.regulations.gov* and search for Docket ID FSA–2022–0004. Follow

the online instructions for submitting comments.

∀ *Mail, Hand-Delivery, or Courier:* Director, Safety Net Division, FSA, USDA, 1400 Independence Avenue SW, Stop 0510, Washington, DC 20250–0522. In your comment, specify the docket ID FSA–2022–0004.

All comments will be posted without change and publicly available on *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Tona Huggins; telephone: (202) 720–6825; email: *tona.huggins@usda.gov*. Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

## Background

Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act (Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of:

∀ Crops;
∀ Trees;
∀ Bushes; and
∀ Vines.

To be eligible for assistance, the loss must be a consequence of one of the following qualifying disaster events occurring in the 2020 or 2021 calendar years:

∀ Droughts;
∀ Wildfires;
∀ Hurricanes;
∀ Floods;
∀ Derechos;
∀ Excessive heat;
∀ Winter storms;
∀ Freeze, including a polar vortex;
∀ Smoke exposure; and
∀ Excessive moisture.

Losses due to drought are only eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity.

FSA is using the funding to assist producers who suffered eligible losses through several programs.[1] In this

document, FSA is announcing ERP, which will assist producers who suffered losses of crops, trees, bushes, or vines due to qualifying disaster events. FSA will administer ERP in two phases:

∀ ERP Phase 1 will use a streamlined process with pre-filled application forms. It will provide payments for crop production losses and tree, bush, and vine losses in certain situations where data are already on file with FSA or the Risk Management Agency (RMA), as a result of the producer previously receiving a NAP payment or a crop insurance indemnity under certain crop insurance policies. This document provides the eligibility requirements, application process, and payment calculations for ERP Phase 1.

∀ ERP Phase 2 will provide payments for other eligible losses through a more traditional application process during which eligible producers will provide all data required to calculate a payment. FSA will announce ERP Phase 2 provisions and application period in a future **Federal Register** document.

## Definitions

The definitions in 7 CFR parts 718 and 1400 apply to ERP, except as otherwise provided in this document. The following definitions also apply.

*Administrative fee* means the amount an insured paid for catastrophic risk protection, and additional coverage for each crop year as specified in the applicable crop insurance policy.

*Average adjusted gross farm income* means the average of the portion of the person or legal entity's adjusted gross income derived from farming, ranching, or forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year. The relevant tax years are:

(1) For the 2020 program year, 2016, 2017, and 2018;

(2) For the 2021 program year, 2017, 2018, and 2019; and

(3) For the 2022 program year,[2] 2018, 2019, and 2020.

*Average adjusted gross income* means the average of the adjusted gross income as defined under 26 U.S.C. 62 or comparable measure of the person or legal entity. The relevant tax years are:

---

[1] FSA previously announced ELRP on April 4, 2022 (87 FR 19465–19470). The Milk Loss Program and On-Farm Stored Commodity Loss Program will be announced in a future rule. These programs and ERP have the same funding source.

[2] The 2022 crop year is included because a qualifying disaster event occurring in the 2021 calendar year may have caused a loss of a crop during the 2022 crop year, based on how "crop year" is defined in the applicable crop insurance policy or NAP provisions.

Strickland AR 0799

(1) For the 2020 program year, 2016, 2017, and 2018;

(2) For the 2021 program year, 2017, 2018, and 2019; and

(3) For the 2022 program year, 2018, 2019, and 2020.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Bush* means a low, branching, woody plant, from which at maturity of the bush, an annual fruit or vegetable crop is produced for commercial market for human consumption, such as a blueberry bush. The definition does not cover nursery stock or plants that produce a bush after the normal crop is harvested.

*Buy-up NAP coverage* means NAP coverage at a payment amount that is equal to an indemnity amount calculated for buy-up coverage computed under section 508(c) or (h) of the Federal Crop Insurance Act and equal to the amount that the buy-up coverage yield for the crop exceeds the actual yield for the crop.

*Catastrophic coverage* has the same meaning as in 7 CFR 1437.3.

*Coverage level* means the percentage determined by multiplying the elected yield percentage under a crop insurance policy or NAP coverage by the elected price percentage.

*Crop insurance* means an insurance policy reinsured by the Federal Crop Insurance Corporation under the provisions of the Federal Crop Insurance Act, as amended. It does not include private plans of insurance.

*Crop insurance indemnity* means the payment to a participant for crop losses covered under crop insurance administered by RMA in accordance with the Federal Crop Insurance Act (7 U.S.C. 1501–1524).

*Crop year* means:

(1) For insured crops, trees, bushes, and vines, the crop year as defined according to the applicable crop insurance policy; and

(2) For NAP-covered crops, the crop year as defined in 7 CFR 1437.3.

*Deputy Administrator* means the FSA Deputy Administrator for Farm Programs.

*FCIC* means the Federal Crop Insurance Corporation, a wholly owned Government Corporation of USDA, administered by RMA.

*Historically underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, forestry commodities including renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, and Interest Charge Domestic International Sales Corporation (IC–DISC) or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, or forestry activities as defined in this document; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales, based on 2 years, did not exceed:

(a) $180,300 in each of the 2017 and 2018 calendar years for the 2020 program year;

(b) $179,000 in each of the 2018 and 2019 calendar years for the 2021 program year; or

(c) $189,200 in each of the 2019 and 2020 calendar years for the 2022 program year; and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the same two previous calendar years referenced in paragraph (1) of this definition. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through National Resource and Conservation Service at *https://lrftool.sc.egov.usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*NAP* means the Noninsured Crop Disaster Assistance Program, which is authorized by section 196 of the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. 7333) and regulations in 7 CFR part 1437.

*NAP service fee* means the fee the producer paid to obtain NAP coverage specified in 7 CFR 1437.7.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ERP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is considered to have a beneficial ownership interest in such legal entity.

*Premium* means the premium paid by the producer for crop insurance coverage or NAP buy-up coverage levels.

*Program year* means the crop year.

*Qualifying disaster event* means wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions.

*Qualifying drought* means an area within the county that was rated by the U.S. Drought Monitor as having a drought intensity of D2 (severe drought) for eight consecutive weeks or D3 (extreme

Strickland AR 0800

drought) or higher level for any period of time during the applicable calendar year.

*Related condition* means damaging weather and adverse natural occurrences that occurred concurrently with and as a direct result of a specified qualifying disaster event. Related conditions include, but are not limited to:

∀ Excessive wind that occurred as a direct result of a derecho;

∀ Silt and debris that occurred as a direct and proximate result of flooding;

∀ Excessive wind, storm surges, tornados, tropical storms, and tropical depressions that occurred as a direct result of a hurricane; and

∀ Excessive wind and blizzards that occurred as a direct result of a winter storm.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Specialty crops* means fruits, tree nuts, vegetables, culinary herbs and spices, medicinal plants, and nursery, floriculture, and horticulture crops. This includes common specialty crops identified by USDA's Agricultural Marketing Service at *https://www.ams.usda.gov/services/grants/scbgp/specialty-crop* and other crops as designated by the Deputy Administrator.

*Substantial beneficial interest (SBI)* has the same meaning as specified in the applicable crop insurance policy. For the purposes of ERP Phase 1, Federal crop insurance records for ''transfer of coverage, right to indemnity'' are considered the same as SBIs.

*Tree* means a tall, woody plant having comparatively great height, and a single trunk from which an annual crop is produced for commercial market for human consumption, such as a maple tree for syrup, or papaya or orchard tree for fruit. It includes immature trees that

are intended for commercial purposes. Nursery stock, banana and plantain plants, and trees used for pulp or timber are not considered eligible trees.

*Unit* means the unit structure as defined under the applicable crop insurance policy for insured crops or in 7 CFR 1437.9 for NAP-covered crops.

*USDA* means the U.S. Department of Agriculture.

*U.S. Drought Monitor* means the system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http://droughtmonitor.unl.edu*

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[3] and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[4]) during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*Vine* means a perennial plant grown under normal conditions from which an annual fruit crop is produced for commercial market for human consumption, such as grape, kiwi, or passion fruit, and that has a flexible stem supported by climbing, twining, or creeping along a surface. Nursery stock, perennials that are normally propagated as annuals such as tomato plants, biennials such as strawberry plants, and annuals such as pumpkin, squash, cucumber, watermelon, and other melon plants, are excluded from the term vine.

## ERP Phase 1

ERP Phase 1 will provide a streamlined application process for eligible losses during the 2020, 2021, or 2022 crop years[5] for which a producer had:

∀ A Federal Crop Insurance policy that provided coverage for crop production losses or tree losses related to the qualifying disaster events and received an indemnity [6] for a crop and unit, excluding perennial crops with an intended use of grazing; livestock policies; nursery; forage seeding; and Margin Protection Plan policies purchased without a base policy; or

∀ NAP coverage and received a NAP payment for a crop and unit.

ERP Phase 1 excludes losses to aquacultural species that were compensated under the Emergency Assistance for Livestock, Honey Bees, and Farm-raised Fish Program (generally referred to as ELAP) to avoid providing duplicate benefits for losses already at least partially compensated for by ELAP.

The applicable crop insurance policies and NAP provide payments to producers for crop, tree, bush, and vine losses due to eligible causes of loss as defined respectively in the producer's crop insurance policy or NAP, which includes crop production losses and tree losses due to the qualifying disaster events eligible for ERP. Where such an overlap has been identified, RMA and FSA are using certain data submitted by producers for crop insurance or NAP purposes to calculate a producer's eligible loss under ERP Phase 1. The ERP calculation is intended to compensate producers for a percentage of that loss determined by the applicable ERP factor, which varies based on the producer's level of crop insurance or NAP coverage, as described later in this document.

Producers who did not qualify for assistance under Phase 1 who experienced losses to crops, trees, bushes, and vines, will be addressed under ERP Phase 2. Other losses to crops, trees, bushes, and vines will also be addressed under ERP Phase 2.[7] ERP Phase 2 will address situations where a producer's records at RMA do not match the records at FSA. Further, producers who apply for payment under ERP Phase 1 may also apply under ERP Phase 2; however, payments under ERP

---

[3] The term ''Armed Forces'' means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[4] The term ''veteran'' means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[5] The 2022 crop year is included because a qualifying disaster event occurring in the 2021 calendar year may have caused a loss of a crop during the 2022 crop year, based on how ''crop

year'' is defined in the applicable crop insurance policy or NAP provisions.

[6] For purposes of this program, indemnity does not include cottonseed endorsement payments, downed rice endorsement payments, sugarcane crop replacement endorsement payments, replant payments, or raisin reconditioning payments.

[7] Losses covered under ERP Phase 2 may include crop quality losses, losses for which the producer did not have an applicable crop insurance policy or NAP coverage for the crop and unit, and losses for which the producer had an applicable crop insurance policy or NAP coverage but the loss was not significant enough to result in a crop insurance indemnity or NAP payment or was otherwise excluded from ERP Phase 1.

Strickland AR 0801

Phase 2 will take into account any amounts received for the crop and unit under ERP Phase 1. ERP Phase 2 provisions will be specified in a future **Federal Register** document.

**Eligibility**

To be eligible for payment under ERP Phase 1, a producer must have suffered a crop, tree, bush, or vine loss that was caused, in whole or in part, by a qualifying disaster event. Because under certain policies the amount of loss due to a qualifying disaster event cannot be separated from the amount of loss caused by other eligible causes of loss as defined by the applicable crop insurance policy or NAP, the ERP Phase 1 payment will be based on the producer's loss as long as those losses are in whole or in part caused by a qualifying disaster event.

In addition, consistent with other FSA disaster assistance programs, a producer must be a:

(1) Citizen of the United States;

(2) Resident alien, which for purposes of ERP means "lawful alien" as defined in 7 CFR 1400.3;

(3) Partnership consisting of solely of citizens of the United States or resident aliens;

(4) Corporation, limited liability company, or other organizational structure organized under State law consisting solely of citizens of the United States or resident aliens; or

(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304).

Eligible crops include all crops for which crop insurance or NAP coverage was available, except for crops intended for grazing.

**Application Process**

FSA and RMA will identify the producers who meet the criteria described above to apply for ERP Phase 1. For each of those producers, FSA will generate an FSA–520, Emergency Relief Program (ERP) Phase 1 Application, with certain items pre-filled with information already on file with USDA. A separate application form will be generated for each applicable program year. FSA expects to begin mailing application forms in May to producers who received crop insurance indemnities, and to begin mailing forms to producers who received NAP payments later in the summer. FSA will mail application forms for policy holders with 2021 crop year coverage under Stacked Income Protection (STAX), Supplemental Coverage Option (SCO), Enhanced Coverage Option

(ECO), Margin Protection (MP), and Area Risk Protection Insurance (ARPI) when data become available.

For producers who received a crop insurance indemnity for eligible policies, the pre-filled application will include the producer's physical State and county codes, pay unit numbers, crops, and gross indemnities. While the majority of crop insurance policies may cover an eligible crop loss, a small number do not and are not eligible for ERP, including livestock policies and margin policies. Even if a policy is included in ERP Phase 1, the producer will need to certify that their payment under any such policy was in whole or in part due to a crop loss related to a qualifying disaster event. For producers who received a NAP payment, the pre-filled applications will include the producer's administrative State and county codes, unit numbers, crops, pay groups, and gross NAP payments. FSA will also pre-fill the calculated ERP Phase 1 payment amounts, prior to any payment reductions. [8] Producers cannot alter the data in these pre-filled items. If a producer believes that any information that has been pre-filled is incorrect, the producer should contact their crop insurance agent for insured crops or their FSA county office for NAP-covered crops.

Receipt of a pre-filled application form is not a confirmation that the producer is eligible to receive an ERP Phase 1 payment. In order to receive a payment, the producer must certify that their crop insurance indemnity or NAP payment on which the ERP Phase 1 payment will be based was due, in whole or in part, to a crop production loss or a loss of trees, bushes, or vines caused by a qualifying disaster event. Producers are responsible for reviewing the list of qualifying disaster events, and if a loss was due to drought, producers must also ensure that the county where the crop and unit was located meets the definition of "qualifying drought." FSA will provide a factsheet and other materials to provide examples and more details on the qualifying disaster events to assist producers. In addition, producers must also certify that they will meet the requirement to purchase crop insurance or NAP coverage for the next 2 available crop years, as described later in this document.

The portion of the form for producers who had crop insurance will also list

the primary policy holder and all producers with an SBI who have a record established with FSA. If one or more producers with an SBI had a share in a crop, the primary policy holder must update the application to show the share in the crop for each of those producers in addition to the primary policy holder. If determined eligible, any payments will be issued to the primary policy holder and to any producers with an SBI who have a share in the crop according to their shares in the crop entered on the application. To receive a payment, each person or entity that is listed as having a share of the ERP Phase 1 payment for a crop and unit must sign the application and agree to purchase crop insurance or NAP coverage for that crop and unit, as described later in this document. If multiple crops and units are listed on an application, producers may agree to purchase crop insurance or NAP coverage for only some of the crops and units; an ERP Phase 1 payment will be issued only for those crops and units for which the producer agrees to meet that requirement.

Producers, including any producers with an SBI who have a share in a crop as indicted on the application, must also have the following forms on file with FSA by within 60 days of the ERP Phase 1 deadline announced by the Deputy Administrator to receive an ERP Phase 1 payment:

▽ Form AD–2047, Customer Data Worksheet;

▽ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

▽ Form CCC–901, Member Information for Legal Entities (if applicable); and

▽ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026 Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the producer and applicable affiliates.

Many producers, especially if they have participated in FSA programs recently, will already have these forms on file with FSA. Producers who are unsure of whether a form is on file may contact their local FSA service center. Contact information for service centers is available at *https://www.farmers.gov/working-with-us/service-center-locator*.

In addition to the forms listed above, certain producers will also need to submit the following forms to qualify for an increased payment rate or payment limitation, as described later in this document:

---

[8] Similar to other disaster programs administered by FSA, payment reductions will be made to account for payment limitation, lack of compliance with highly erodible land conservation and wetland conservation requirements, and prorating of payments to stay within available funding as discussed later in this document.

Strickland AR 0802

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the program year or years for which the producer is applying for ERP;[9] or

∀ Form FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity, for each applicable program year.

FSA will continue to accept forms CCC–860 and FSA–510 from producers for the purpose of establishing eligibility for an increased payment rate or payment limitation until the deadline announced by FSA.

**Payment Calculation**

RMA and FSA will calculate ERP Phase 1 payments based on the data on file with the agencies at the time of calculation. The ERP Phase 1 payment calculation for a crop and unit will depend on the type and level of coverage obtained by the producer. Each calculation will use an ERP factor based on the producer's level of crop insurance or NAP coverage, as specified in the following tables.

| | ERP factor (percent) |
| --- | --- |
| Crop Insurance Coverage Level: | |
| Catastrophic coverage | 75.0 |
| More than catastrophic coverage but less than 55 percent | 80.0 |
| At least 55 percent but less than 60 percent | 82.5 |
| At least 60 percent but less than 65 percent | 85.0 |
| At least 65 percent but less than 70 percent | 87.5 |
| At least 70 percent but less than 75 percent | 90.0 |
| At least 75 percent but less than 80 percent | 92.5 |
| At least 80 percent | 95.0 |
| NAP Coverage Level: | |
| Catastrophic coverage | 75.0 |
| 50 percent | 80.0 |
| 55 percent | 85.0 |
| 60 percent | 90.0 |
| 65 percent | 95.0 |

When determining the ERP factors, analysis was conducted to ensure that payments do not exceed available funding and, in aggregate across all producers, do not exceed 90 percent of losses, as required by the Extending Government Funding and Delivering Emergency Assistance Act. The difference between the ERP payment factor for crop insurance and NAP is due to differences in the available coverage levels. Crop insurance is available at the catastrophic coverage level (50 percent production coverage of 55 percent of the price) and buy-up coverage levels (50 percent to 85 percent of the production for 100 percent of the price). NAP is limited by law to a maximum of 65 percent buy-up coverage. For both NAP and crop insurance, the ERP payment factor for the catastrophic and maximum buy-up levels are 75 percent and 95 percent respectively, with the ERP factors stair-stepping for the buy-up options in-between as shown in the tables above. The Extending Government Funding and Delivering Emergency Assistance Act provides that payments to producers who did not have crop insurance or NAP coverage cannot exceed 70 percent of their loss; therefore, the lowest ERP factor for producers who had crop insurance or NAP is set at 75 percent. Payment limits and other reductions will reduce ERP payments, further lowering the percent of losses covered.

For crop insurance, RMA will use the producer's data that is already on file, which provides the necessary information to determine the producer's amount of loss. Crop insurance provides financial assistance for crop losses due to specified natural disasters and uses a producer's data to calculate a payment based on the type of crop insurance coverage elected by the producer. As previously discussed, ERP is intended to compensate producers for a percentage of their loss determined by the applicable ERP factor based on the level of crop insurance coverage purchased; therefore, RMA will calculate each producer's loss consistent with the loss procedures for the type of coverage purchased [10] but using the ERP factor. This calculated amount would then be adjusted by subtracting out the net crop insurance indemnity, which is equal to the producer's gross crop insurance indemnity already received for those losses minus service fees and premiums.

For NAP-covered crops, FSA will use the producer's crop production or inventory data that is already on file, which provides the necessary information to determine the producer's amount of loss. NAP provides financial assistance for crop losses due to specified natural disasters and uses a producer's crop production or inventory data to calculate a payment based on the level of NAP coverage elected by the producer. As previously discussed, ERP is intended to compensate producers for a percentage of loss determined by the applicable ERP factor based on their NAP coverage level; therefore, FSA will perform a calculation that is consistent with the NAP payment calculation for the crop and unit, as provided in 7 CFR part 1437, but using the ERP factor in the table above applicable to the producer's NAP coverage level as the applicable guarantee in those calculations. For example, the guarantee for a producer that had purchased 60 percent NAP coverage would be

---

[9] A producer who has filed form CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of their status for a later program year because a producer's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what programs years the status would apply. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit form CCC–860 for each applicable program year.

[10] For example, ERP for Area Risk Protection Insurance (ARPI) and STAX is based on area-wide (for example, county) production losses.

Strickland AR 0803

adjusted and recalculated based on a 90 percent ERP factor. The calculated amount using the ERP factor would then be adjusted by subtracting the net NAP calculated payment, which is equal to the producer's gross NAP payment already received by the producer minus service fees and premiums. [11] For NAP, actual value equals the dollar value of the crop and unit at the time of loss as determined by USDA. For example, a producer had a crop that had a value of $150,000 and a 50 percent loss, resulting in a loss of $75,000. They had a NAP coverage level of 60 percent, so their NAP guarantee was $90,000. Their NAP guarantee of $90,000 minus the $75,000 value of the crop that was not lost is equal to a net NAP calculated payment of $15,000. The new ERP guarantee based on the ERP factor of 90 percent is calculated to be $135,000. The ERP guarantee of $135,000 minus the $75,000 value of the crop that was not lost is equal to $60,000, which is reduced by the net NAP calculated payment amount of $15,000, resulting in a calculated ERP Phase 1 payment of $45,000.

Similar to other FSA disaster assistance programs like ELAP and other recent ad hoc disaster programs, historically underserved farmers and ranchers will receive an increase to their ERP Phase 1 payment that is equal to 15 percent of the amount calculated as described above. For example, if a historically underserved farmer or rancher's calculated amount is $1,000, their ERP Phase 1 payment will be $1,150. To qualify for the increased payment amount, a historically underserved farmer or rancher must have certified their status on form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification. FSA will issue ERP Phase 1 payments as applications are processed and approved. If a producer files form CCC–860 after their ERP Phase 1 payment is issued but before the deadline to be announced by FSA, FSA will process the form CCC–860 and issue the additional payment amount.

A total of $10 billion was allocated to certain disaster relief programs. Congress allocated $750 million for livestock assistance, with the first phase of the Emergency Livestock Relief Program (ELRP) already paying over $560 million. ERP Phase 1 payments for crops covered by crop insurance will be

prorated by 75 percent to ensure that total ERP payments, including payments under ERP Phase 2, do not exceed the available funding. ERP Phase 1 payments for NAP-covered crops will not be prorated due to the significantly smaller NAP portfolio that by its nature only covers smaller acreages and specialty crops that are not covered by crop insurance.

**Payment Limitation**

The payment limitation for ERP Phase 1 is determined by the person's or legal entity's average adjusted gross farm income (income from activities related to farming, ranching, or forestry). Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments for specialty crops and $125,000 in payment for all other crops under ERP (for Phase 1 and Phase 2 combined) for a program year if their average adjusted gross farm income is less than 75 percent of their average AGI the three taxable years preceding the most immediately preceding complete tax year. If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to:

∀ $900,000 for each program year for specialty crops; [12] and

∀ $250,000 for each program year for all other crops.

The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, or forestry related activities are:

∀ 2016, 2017, and 2018 for program year 2020;

∀ 2017, 2018, and 2019 for program year 2021; and

∀ 2018, 2019, and 2020 for program year 2022.

To receive more than $125,000 in ERP payments for a program year, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney

as to that person or legal entity's certification. If a producer requesting the increased payment limitation is a legal entity, all members of that entity must also complete form FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the increased payment limitation based on the legal entity's average AGI from farming, ranching, or forestry related activities but a member of that legal entity either does not complete a form FSA–510 and provide the required certification or is not eligible for the increased payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ERP Phase 1 payment attributed to that member. FSA will issue ERP Phase 1 payments as applications are processed and approved. If a producer files form FSA–510 and the accompanying certification after their ERP Phase 1 payment is issued but before the deadline announced by FSA, FSA will process the form FSA–510 and issue the additional payment amount.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ First level of ownership—any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first level or payment legal entity; [13]

∀ Second level of ownership—any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of

---

[11] The gross NAP payment is the amount calculated according to 7 CFR part 1437, prior to any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and the applicant or member of an applicant that is an entity exceeding the average AGI limitation.

[12] The Extending Government Funding and Delivering Emergency Assistance Act provides that in the case of specialty crops or high value crops, as determined by the Secretary, the Secretary shall impose payment limitations consistent with 7 CFR 760.1507(a)(2), which specified that a producer could receive up to $900,000 if not less than 75 percent of the average adjusted gross income of the person or legal entity was average adjusted gross farm income. USDA is continuing to evaluate how to define "high value crops" and will address those crops during ERP Phase 2.

[13] The "first level or payment legal entity" means that the payment entity will have a reduction applied, and if the payment entity happens to be a joint venture, that reduction is applied to the first level, or highest level, for payments. The "first level or payment legal entity" is the highest level of ownership of the applicant to whom payments can be attributed or limited. If the applicant is a business type that does not have a limitation or attribution, the reduction is applied to the first level, but if the business type can have the reduction applied directly to it, then the limitation applies.

Strickland AR 0804

the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ Third and fourth levels of ownership—except as provided in the second level of ownership bullet above and in the fourth level of ownership bullet below, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ Fourth-level of ownership—if the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first level or payment legal entity by the fourth-level legal entity.

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

If an individual or legal entity is not eligible to receive ERP Phase 1 payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity. Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

## Requirement To Purchase Crop Insurance or NAP Coverage

All producers who receive ERP Phase 1 payments, including those receiving a payment based on tree, bush, or vine crop insurance policies, are statutorily required to purchase crop insurance, or NAP coverage where crop insurance is not available, for the next 2 available crop years, as determined by the Secretary. Participants must obtain crop insurance or NAP, as may be applicable:

∀ At a coverage level equal to or greater than 60 percent for insurable crops; or

∀ At the catastrophic level or higher for NAP crops.

Availability will be determined from the date a producer receives an ERP payment, and may vary depending on the timing and availability of crop insurance or NAP for a producer's particular crops. The final crop year to purchase crop insurance or NAP coverage to meet the second year of coverage for this requirement is the 2026 crop year.

In situations where crop insurance is unavailable for a crop, an ERP participant must obtain NAP coverage. Section 1001D of the Food Security Act of 1985 (1985 Farm Bill) provides that a person or entity with an AGI in amount greater than $900,000 is not eligible to participate in NAP; however, producers with an AGI greater than $900,000 are eligible for ERP. To reconcile this restriction in the 1985 Farm Bill and the requirement to obtain NAP or crop insurance coverage, ERP participants may meet the purchase requirement by purchasing Whole-Farm Revenue Protection (WFRP) crop insurance coverage, if eligible, or they may pay the applicable NAP service fee despite their ineligibility for a NAP payment. In other words, the service fee must be paid even though no NAP payment may be made because the AGI of the person or entity exceeds the 1985 Farm Bill limitation. The crop insurance and NAP coverage requirements are specific to the crop and county (which is the county where the crop is physically located for insured crops and the administrative county for NAP-covered crops) for which ERP Phase 1 payments are paid. This means that a producer is required to purchase crop insurance or NAP coverage for the crop in the county for which the producer was issued an ERP Phase 1 payment. Producers who receive an ERP Phase 1 payment that was calculated based on an indemnity under a Pasture, Rangeland, and Forage (PRF); Annual Forage; or WFRP policy must purchase the same type of policy or a combination of individual policies for the crops that had covered losses under ERP to meet the linkage requirement. Producers who receive a payment on a crop in a county and who have the crop or crop acreage in subsequent years, as provided in this document, and who fail to obtain the 2 years of crop insurance or NAP coverage required as specified in this document must refund all ERP Phase 1 payments for that crop in that county with interest from the date of disbursement. Producers who were paid under ERP Phase 1 for a crop in a county, but do not plant that crop in that county in a year for which this requirement applies, are not subject to the crop insurance or NAP purchase requirement for that year.

## Provisions Requiring Refund to FSA

In the event that any ERP Phase 1 payment resulted from erroneous information reported by the producer or if the producer's data are updated after RMA or FSA calculate a producer's ERP Phase 1 payment, the ERP Phase 1 payment will be recalculated and the producer must refund any excess payment to FSA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ERP Phase 1 payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. All persons with a financial interest in a legal entity receiving payments are jointly and severally liable for any refund, including related charges, which is determined to be due to FSA for any reason. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

## General Provisions

Applicable general eligibility requirements, including recordkeeping requirements and required compliance with HELC and Wetland Conservation provisions, are similar to those for the previous ad hoc crop disaster programs and current permanent disaster programs.

General requirements that apply to other FSA-administered commodity programs also apply to ERP, including compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation," and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ERP. As described above, ERP Phase 1 payments are calculated using data on file with RMA and FSA at the

Strickland AR 0805

time of calculation. Producers who receive an ERP Phase 1 application and disagree with the calculated payment amount or data used in the calculation may apply for ERP Phase 2, which will allow them to provide their data to FSA through a traditional application process.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. All information provided to FSA for program eligibility and payment calculation purposes, including certification that a producer suffered a loss due to a qualifying disaster event, is subject to spot check. Participants receiving ERP Phase 1 payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

Applicants have a right to a decision in response to their application. If an applicant files a late ERP Phase 1 application, the application is subject to the following conditions:

∀ A late ERP application will be considered a request to waive the deadline.

∀ Requests to waive or modify program provisions are at the discretion of the Deputy Administrator. The Deputy Administrator has the authority to waive or modify application deadlines and other requirements or program provisions not specified in law in cases where the Deputy Administrator determines it is (1) equitable to do so and (2) where the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ERP.

∀ Applicants who request to waive or modify ERP provisions do not have a right to a decision on those requests.

∀ The Deputy Administrator's refusal to exercise discretion on requests to waive or modify ERP provisions will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ERP will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ERP payments.

If any person who would otherwise be eligible to receive a payment dies before the payment is received, payment may be released as specified in 7 CFR 707.3.

Similarly, if any person or legal entity who would otherwise have been eligible to apply for a payment dies or is dissolved, respectively, before the payment is applied for, payment may be released in accordance with this document if a timely application is filed by an authorized representative. Proof of authority to sign for the deceased producer or dissolved entity must be provided. If a participant is now a dissolved general partnership or joint venture, all members of the general partnership or joint venture at the time of dissolution or their duly authorized representatives must sign the application for payment. Eligibility of such participant will be determined, as it is for other participants, based upon ownership share and risk in producing the crop.

In either applying for or participating in ERP, or both, the producer is subject to laws against perjury (including, but not limited to, 18 U.S.C. 1621). If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ERP, or both, then the producer may be found to be guilty of perjury. Except as otherwise provided by law, if guilty of perjury the applicant may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ERP but only as to beneficiaries who, as a condition of the waiver, agree to apply the ERP payments to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ERP, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

**Paperwork Reduction Act Requirements**

In compliance with the Paperwork Reduction Act of 1995 (44 U.S.C. chapter 35), FSA is requesting comments from interested individuals and organizations on the information collection request associated with ERP. After the 60-day period ends, the information collection request will be submitted to the Office of Management and Budget (OMB) for a 3-year approval to cover ERP information collection. To start the ERP information collection approval, prior to publishing this notice,

FSA received emergency approval from OMB for 6 months. The emergency approval covers ERP information collection activities.

*Title:* ERP.

*OMB Control Number:* 0560–0309.

*Type of Request:* New Collection.

*Abstract:* FSA will make payments to eligible producers who suffered losses to crops, trees, bushes, and vines due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in calendar years 2020 and 2021. This request includes both ERP Phase 1, which uses a streamlined application process for producers whose data is already on file with FSA or RMA, and ERP Phase 2, which will use a traditional application process during which producers will provide the information required to calculate a payment.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hour is the estimated average time per response multiplied by the estimated total annual responses. The estimated average time per response is rounded to 3 decimal places instead of showing all 7 decimal places, so the calculation based on the numbers shown below is not exact.

*Estimate of Respondent Burden:* Public reporting burden for this information collection is estimated to average 0.176 hours per response to include the time for reviewing instructions, searching for information, gathering and maintaining the data, and completing and reviewing the collection of information.

*Type of Respondents:* Individuals or households, businesses or other for profit farms.

*Estimated Annual Number of Respondents:* 505,000.

*Estimated Number of Reponses per Respondent:* 1.

*Estimated Total Annual Responses:* 505,000.

*Estimated Average Time per Response:* 0.176 hours.

*Estimated Total Annual Burden on Respondents:* 88,650.

We are requesting comments on all aspects of this information collection to help us to:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the FSA, including whether the information will have practical utility;

(2) Evaluate the accuracy of the FSA's estimate of burden including the

Strickland AR 0806

validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; or

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this notice, including names and addresses when provided, will be a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

**Environmental Review**

The environmental impacts of this final rule have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799). ERP is authorized by the Extending Government Funding and Delivering Emergency Assistance Act. The intent of ERP Phase 1 is to provide payments to producers who suffered eligible crop, tree, bush, and vine losses due to wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, and qualifying drought, and related conditions occurring in calendar years 2020 and 2021.

The limited discretionary aspects of the program (for example, determining payment limitations) were designed to be consistent with established FSA disaster programs. As such, the Categorical Exclusions found at 7 CFR part 799.31 apply, specifically 7 CFR 799.31(b)(6)(iv) and (vi) (that is, §799.31(b)(6)(iv) Individual farm participation in FSA programs where no ground disturbance or change in land use occurs as a result of the proposed action or participation; and §799.31(b)(6)(vi) Safety net programs administered by FSA). No Extraordinary Circumstances (7 CFR 799.33) exist. As such, FSA has determined that the implementation of ERP and the participation in ERP do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or environmental impact statement for this regulatory action.

**Federal Assistance Programs**

The title and number of the Federal assistance programs, as found in the Assistance Listing, [14] to which this document applies is 10.964—Emergency Relief Program.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or (844) 433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https:// www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@ usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2022–10628 Filed 5–17–22; 8:45 am]

**BILLING CODE 3410–05–P**

---

[14] See *https://sam.gov/content/assistance-listings.*

**COMMISSION ON CIVIL RIGHTS**

**Notice of Public Meetings of the Kansas Advisory Committee**

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Announcement of meeting.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act that the Kansas Advisory Committee (Committee) will hold a series of meeting(s) via web conference on, May 26, 2022; June 9, 2022 and June 23, 2022 at 12:00 p.m. Central Time. The purpose of the meetings is for the committee to discuss potential topics and panelists for the upcoming briefing(s).

**DATES:** The meeting will be held on:

∀ Thursday, May 26, 2022 at 12:00 p.m.–1:00 p.m. Central Time

∀ Thursday, June 9, 2022 at 12:00 p.m.–1:00 p.m. Central Time

∀ Thursday, June 23, 2022 at 12:00 p.m.–1:00 p.m. Central Time

*https://civilrights.webex.com/civilrights/ j.php?MTID=m5f3e3516a1 d9b8db382795f2452d782a* or Join by phone: 800–360–9505, USA Toll Free Access code: 2763 733 5933

**FOR FURTHER INFORMATION CONTACT:** David Barreras, Designated Federal Officer, at *dbarreras@usccr.gov* or (202) 656–8937

**SUPPLEMENTARY INFORMATION:** Members of the public may listen to this discussion through the above call-in number. An open comment period will be provided to allow members of the public to make a statement as time allows. Callers can expect to incur regular charges for calls they initiate over wireless lines, according to their wireless plan. The Commission will not refund any incurred charges. Individuals who are deaf, deafblind and hard of hearing may also follow the proceedings by first calling the Federal Relay Service at 1–800–877–8339 and providing the Service with the conference call number and conference ID number.

Members of the public are entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be emailed to David Barreras at *dbarreras@ usccr.gov.*

Records generated from this meeting may be inspected and reproduced at the Regional Programs Unit Office, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights,

Strickland AR 0807

# Notices

Federal Register

Vol. 87, No. 64

Monday, April 4, 2022

---

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

---

## DEPARTMENT OF AGRICULTURE

### Submission for OMB Review; Notice of Request for Emergency Approval

In compliance with the requirements of the Paperwork Reduction Act of 1995 (PRA), the Department of Agriculture (USDA) has submitted a request to the Office of Management and Budget (OMB) for a six-month emergency approval of the following information collection: ICR 0578–NEW, Urban Agriculture and Innovative Production (UAIP). The requested approval would enable the implementation for NRCS to collect the necessary information to accept and review proposals and manage agreements for the FY22 Urban Agriculture and Innovative Production (UAIP) Grant Program.

### Natural Resources Conservation Service (NRCS)

*Title:* Urban Agriculture and Innovative Production (UAIP) Grant Program.

*OMB Control Number:* 0578–NEW.

*Summary of Collection:* The Natural Resources Conservation Service (NRCS) is requesting emergency clearance and review through 5 CFR 1320.13 for a new information collection for the Urban Agriculture and Innovative Production (UAIP) Grant Program. The NRCS is using funds provided by the American Rescue Plan of 2021 (Pub. L. 117–2) to assist local units of government in implementing projects that improve access to local foods in areas where access to fresh, healthy food is limited or unavailable.

Dated: March 29, 2022.

**Ruth Brown,**
*Departmental Information Collection Clearance Officer.*
[FR Doc. 2022–06947 Filed 4–1–22; 8:45 am]
**BILLING CODE 3410–05–P**

## DEPARTMENT OF AGRICULTURE

### Submission for OMB Review; Notice of Request for Emergency Approval

In compliance with the requirements of the Paperwork Reduction Act of 1995 (PRA), the Department of Agriculture (USDA) has submitted a request to the Office of Management and Budget (OMB) for a six-month emergency approval of the following information collection: ICR 0578–NEW, Composting and Food Waste Reduction (CFWR) Cooperative Agreement Program. The requested approval would enable NRCS to carry out pilot projects under which local units of government, schools, and tribal communities enter into cooperative agreements to develop and test strategies for planning and implementing municipal composting plans and food waste reduction plans.

### Natural Resources Conservation Service (NRCS)

*Title:* Composting and Food Waste Reduction (CFWR) Cooperative Agreements.

*OMB Control Number:* 0578–NEW.

*Summary of Collection:* The Natural Resources Conservation Service (NRCS) is requesting emergency clearance and review through 5 CFR 1320.13 for a new information collection for the NRCS is using CFWR funds provided by the American Rescue Plan of 2021 (Pub. L. 117–2) to assist local units of government, schools, and tribal communities in implementing projects that help their communities generate compost, improve soil quality, and reduce food waste.

Dated: March 29, 2022.

**Ruth Brown,**
*Departmental Information Collection Clearance Officer.*
[FR Doc. 2022–06952 Filed 4–1–22; 8:45 am]
**BILLING CODE 3410–05–P**

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

[Docket ID FSA–2022–0004]

### Notice of Funds Availability; Emergency Livestock Relief Program (ELRP)

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing the new Emergency Livestock Relief Program (ELRP). This document provides the eligibility requirements and payment calculation for the first phase of ELRP assistance, which will provide payments to producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021 using data already submitted to FSA through the Livestock Forage Disaster Program (LFP).

**DATES:** *Funding availability:* Implementation will begin April 4, 2022.

**FOR FURTHER INFORMATION CONTACT:** Kimberly Graham; telephone: (202) 720–6825; email: *Kimberly.Graham@usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

### Background

The Extending Government Funding and Delivering Emergency Assistance Act, (Division B, Title I, Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021. From the $10 billion, the Secretary of Agriculture is to use $750 million to assist producers of livestock for losses incurred during calendar year 2021 due to qualifying droughts or wildfires. The livestock producers who suffered losses due to drought are eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity during the applicable year.

Strickland AR 0808

FSA will assist livestock producers through ELRP. This document provides the eligibility requirements and payment calculation for Phase 1 of ELRP, which will assist eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021. For eligible producers, ELRP Phase 1 will pay for a portion of the increased feed costs in 2021 based on the number of animal units (AU), limited by available grazing acreage, in eligible drought counties. Although payments made under the Livestock Forage Disaster Program (LFP) do not have a direct correlation to the increased feed costs incurred, in order to deliver this assistance quickly, for Phase 1, FSA is using certain LFP data and a percentage of the payment made through LFP applications will be used as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP Phase 1.

According to the US Drought Monitor, more than one-third of the country was categorically in a "D–2 Severe" to "D–3 Exceptional" drought throughout the entire calendar year 2021. Extreme drought predominately affected areas highly concentrated with rangeland needed for livestock production, therefore drought and wildfire caused economic hardship on producers that were reliant on rangeland, requiring them to purchase supplemental feed at elevated prices to sustain production throughout 2021 and not just during the normal grazing periods. Due to the excessive and expansive drought and wildfires in 2021, livestock participants:

∀ Suffered extreme grazing losses;

∀ Incurred related costs to purchase feed in the grazing period, which is limited to a 5-month maximum period under LFP;

∀ Purchased feed, beyond normal for a drought year, to supplement grazing and to support livestock outside of the grazing period because forage was not available for harvest and storage; and

∀ Were faced with higher feed costs during 2021 due to less availability of feed resulting from drought severity and feed cost inflation.

LFP provided payments to eligible owners and contract growers of covered livestock who suffered livestock grazing losses due to qualifying drought or fire [1] not to exceed five months during the grazing period based on the documented livestock inventory eligible for LFP. The gross LFP calculated payment represented a 60 percent reimbursement of monthly feed costs for a maximum of 5 months, based on a feed grain equivalent that is calculated according to 7 CFR 1416.207 as specified in 7 U.S.C. 9081(c), which uses the higher of the national average corn price per bushel for the 12- or 24-month period immediately preceding March 1 of the calendar year. Because LFP uses the use of this period, it does not take into account any increases in price paid for supplemental feed during 2021. For LFP, the 2021 monthly value of forage, resulted in an LFP payment rate of $18.71 per month per eligible animal unit for drought and the rate for fire is based on the number of fire-restricted days and was not a single rate.

LFP does not compensate for the increased costs of supplemental feed during 2021 due to drought and wildfires in 2021.

The actual cost of supplemental feed prices, based on corn, alfalfa, and soybean meal, increased substantially in 2021, compared to previous years. Using the Dairy Margin Coverage (DMC) program model for an adequate supplemental feed ratio, the 5-year average (2016 through 2020) cost to maintain 1 AU for one month was $61.28, compared to the actual average cost from January through October, 2021 of $85.68 per month, an increase of 39.82 percent.

The cost of feeding one AU per month increased in 2021 compared to the 5-year average by $24.40 ($85.68 minus $61.28) for livestock producers affected by drought and wildfires, which was not covered by LFP. See Table 1.

TABLE 1—2021 CALCULATED COSTS (DMC MODEL) TO MAINTAIN 1 AU/MONTH

| 5 Year avg (corn, alfalfa, soybean meal) | 2021 cost (corn, alfalfa, soybean meal) | Increase in cost 2021 | 2021 LFP Payment rate * | ELRP payment percentage | ELRP calculated benefit/month/ eligible AU | % of increased supplemental feed costs in 2021 compensated by ELRP phase 1 |
|---|---|---|---|---|---|---|
| $61.28 ...................................... | $85.68 | $24.40 | $18.71 | 75 | $14.03 | 57.5 |
|  |  |  |  | 90 | 16.84 | 69.0 |

* The 2021 LFP payment rate may be adjusted according to LFP provisions in 7 CFR 1416.207 for mitigated livestock and restricted grazed animal units due to a qualifying fire.

The ELRP Phase 1 calculated benefit is based on using the LFP payment rate of $18.71 per animal unit per month; calculated as follows:

75% · $18.71 = $14.03 (equivalent to 57.5 percent of increased supplemental feed costs in 2021) and

90% · $18.71 = $16.84 (equivalent to 69 percent of increased supplemental feed costs in 2021).

To stay within the available funding, ELRP Phase 1 payments for increased supplemental feed costs in 2021 are 90 percent of the gross LFP calculated payment for historically underserved farmers and ranchers and 75 percent of the gross LFP calculated payment for all other producers, which equates to 57.5 percent and 69 percent, respectively, of the estimated increases in supplemental feed costs in 2021 for eligible producers.

Because FSA is using LFP information to generate a reasonable approximation for the costs covered by ELRP Phase 1, no action is required for eligible

---

[1] A grazing loss due to drought qualifies for LFP only if the grazing loss occurs on land that is native or improved pastureland with permanent vegetative cover or is planted to a crop planted specifically for the purpose of providing grazing for covered livestock, and the land is physically located in a county rated by the U.S. Drought Monitor as having a D2 (severe drought) intensity for at least 8 consecutive weeks or D3 (extreme drought) or D4 (exceptional drought) intensity at any time during the normal grazing period for the specific type of grazing land or pastureland.

A grazing loss due to fire qualifies for LFP only if the grazing loss occurs on rangeland that is managed by a Federal agency and the eligible livestock producer is prohibited by the Federal agency from grazing the normal permitted livestock on the managed rangeland due to a fire.

See 7 CFR 1416.205 for further information on eligible grazing losses under LFP.

Strickland AR 0809

producers to receive these payments. FSA is continuing to evaluate the impacts of drought and wildfire in calendar year 2021, and if additional ELRP assistance for livestock producers is necessary, it will be announced as Phase 2 in a subsequent document to be published in the **Federal Register**.

## Definitions

The definitions in 7 CFR parts 718, 1400, and 1416 apply to ELRP, except as otherwise provided in this document. The following definitions also apply.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Historically underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, forestry commodities including renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, and IC–DISC or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, or forestry activities as defined in this part; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator for Farm Programs (Deputy Administrator).

*LFP* means the Livestock Forage Disaster Program under section 1501 of the Agricultural Act of 2014 (7 U.S.C. 9081) and 7 CFR part 1416, subpart C.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales did not exceed $179,000 (the amount applicable to the 2021 program year) in each of the 2018 and 2019 calendar years; and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1) of this definition. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through National Resources and Conservation Service at *https://lrftool.sc.egov.usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ELRP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is considered to have a beneficial ownership interest in such legal entity.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*U.S. Drought Monitor* is a system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http://drought monitor.unl.edu.*

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[2]) and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[3]) during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*Wildfire* for ELRP Phase 1 means fire as used in 7 CFR part 1416, subpart C.

## Eligible Livestock Producers

Eligible livestock producers for ELRP Phase 1 are producers with an approved 2021 LFP application. For ELRP Phase 1, the eligibility criteria applicable to LFP (7 CFR part 1416, subparts A and C) also applies to ELRP Phase 1, excluding the LFP average adjusted gross income (AGI) limitation. FSA will use livestock inventories, forage acreage, restricted animal units and grazing days due to fire, and drought intensity levels already reported to FSA for the 2021 Livestock Forage Disaster Program Application [4] (on form number CCC–853), to determine eligibility and calculate a ELRP Phase 1 payment, if applicable. Eligible livestock producers are not required to submit an application for ELRP Phase 1; however, they must have the following additional forms on file with FSA within 60-days of ELRP deadline announced by the

---

[2] The term ''Armed Forces'' means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[3] The term ''veteran'' means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[4] As provided in 7 CFR 1416.206 and publicized by FSA, the LFP application deadline for the 2021 program year was January 31, 2022.

Strickland AR 0810

Deputy Administrator to be eligible to receive a payment:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the ELRP producer and applicable affiliates.

For a producer to be eligible for a payment based on the higher payment rate for eligible historically underserved farmers or ranchers or increased payment limitation as described below, the following must be submitted within 60-days of the ELRP deadline announced by the Deputy Administrator:

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2021 program year [5]; or

∀ FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity.

**Payment Calculation**

The ELRP Phase 1 payment will be equal to the eligible livestock producer's gross 2021 LFP calculated payment [6] multiplied by the applicable ELRP payment percentage. The ELRP Phase 1 payment percentage will be 90 percent for historically underserved farmers and ranchers, and 75 percent for all other producers.

---

[5] A producer who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of their status for the 2021 program year because a producer's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what programs years the status would apply. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit CCC–860 for each applicable program year.

[6] The gross LFP calculated payment is the amount calculated according to 7 CFR 1416.207, prior to any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and the applicant or member of an applicant that is an entity exceeding the average AGI limitation.

For example, a historically underserved eligible livestock producer's gross 2021 LFP calculation payment is $10,000 multiplied by the 90 percent ELRP payment percentage results in an ELRP Phase 1 payment of $9,000. This ELRP payment is intended to represent a reasonable approximation of 69 percent of the increased supplemental feed costs for that producer in 2021.

Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, must be on file with FSA with a certification applicable for the 2021 program year to receive the higher ELRP payment rate of 90 percent.

FSA will issue ELRP Phase 1 payments as 2021 LFP applications are processed and approved. If a producer files the CCC–860 or FSA–510 form and the accompanying certification by the deadline announced by the Deputy Administrator but after their ELRP Phase 1 payment is issued, FSA will recalculate the ELRP Phase 1 payment and issue the additional calculated amount as applicable.

**Payment Limitation**

The payment limitation for ELRP is determined by the person's or legal entity's average adjusted gross farm income (income derived from farming, ranching, and forestry operations). Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments under ELRP if their average adjusted gross farm income is less than 75 percent of their average AGI for tax years 2017, 2018, and 2019. If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to $250,000 in ELRP payments. The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, or forestry related activities for ELRP are 2017, 2018, and 2019. To receive more than $125,000 in ELRP payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification. If a producer requesting the $250,000 payment limitation is a legal entity, all members of that entity must also complete FSA–510 and provide the required certification

according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the $250,000 payment limitation based on the legal entity's average AGI from farming, ranching, or forestry related activities but a member of that legal entity either does not complete an FSA–510 and provide the required certification or is not eligible for the $250,000 payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ELRP payment attributed to that member.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ First level of ownership: Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

∀ Second level of ownership: Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ Third and fourth levels of ownership: Except as provided in the second-level of ownership bullet above and in the fourth-level of ownership bullet below, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ Fourth level of ownership: If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first-level or payment legal entity by the fourth-level legal entity.

Strickland AR 0811

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

If an individual or legal entity is not eligible to receive ELRP payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity. Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

### Provisions Requiring Refund to FSA

In the event that any ELRP Phase 1 payment resulted from erroneous information reported by the producer or if the producer's 2021 LFP payment is recalculated after the ELRP Phase 1 payment is issued, the ELRP Phase 1 payment will be recalculated, and the producer must refund any excess payment to FSA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ELRP Phase 1 payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

### General Provisions

General requirements that apply to other FSA-administered commodity programs also apply to ELRP, including compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation," and the

provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ELRP. The determination of matters of general applicability that are not in response to, or result from, an individual set of facts are not matters that can be appealed. Such matters of general applicability include, but are not limited to, the ELRP Phase 1 eligibility criteria and payment calculation.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. Participants receiving ELRP payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

The Deputy Administrator has the discretion and authority to waive or modify filing deadlines and other requirements or program provisions not specified in law, in cases where the Deputy Administrator determines it is equitable to do so and where the Deputy Administrator finds that the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ELRP. Although producers have a right to a decision on whether they filed applications by the deadline or not, producers have no right to a decision in response to a request to waive or modify deadlines or program provisions. The Deputy Administrator's refusal to exercise discretion to consider the request will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ELRP will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ELRP payments.

In either applying for or participating in ELRP, or both, the producer is subject to laws against perjury and any penalties and prosecution resulting therefrom, with such laws including but not limited to 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not

to be true, in the course of either applying for or participating in ELRP, or both, then the producer is guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ELRP but only as to beneficiaries who, as a condition of the waiver, agree to apply the ELRP payments to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ELRP, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

### Paperwork Reduction Act Requirements

In accordance with the Paperwork Reduction Act, the information collection request that supports Emergency Livestock Relief Program (ELRP) was submitted to OMB for emergency approval. OMB approved the 6-month emergency information collection. This new ELRP will be available to the producers up to 6 months only.

### Environmental Review

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799).

As previously stated, ELRP Phase 1 is providing payments to eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2021. The limited discretionary aspects of ELRP do not have the potential to impact the human environment as they are administrative. Accordingly, these discretionary aspects are covered by the FSA Categorical Exclusions specified in §799.31(b)(6)(iv) that applies to individual farm participation in FSA programs where no ground disturbance or change in land use occurs as a result of the proposed action or participation; and §799.31(b)(6)(vi) that applies to safety net programs.

No Extraordinary Circumstances (§799.33) exist. As such, the implementation of ELRP and the

participation in ELRP do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment environmental impact statement for this action and this document serves as documentation of the programmatic environmental compliance decision for this federal action.

**Federal Assistance Programs**

The title and number of the Federal assistance programs, as found in the Assistance Listing [7] (formerly referred to as the Catalog of Federal Domestic Assistance), to which this document applies is 10.148—Emergency Livestock Relief Program.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or 844–433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant

[7] See *https://sam.gov/content/assistance-listings.*

Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**
*Administrator, Farm Service Agency.*
[FR Doc. 2022–06950 Filed 4–1–22; 8:45 am]
**BILLING CODE 3410–05–P**

---

**DEPARTMENT OF AGRICULTURE**

**Food and Nutrition Service**

**Agency Information Collection Activities: Reasons for Underredemption of the WIC Cash-Value Benefit**

**AGENCY:** Food and Nutrition Service (FNS), USDA.

**ACTION:** Notice.

---

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, this notice invites the general public and other public agencies to comment on this proposed information collection. This collection is a NEW information collection. This study informs the U.S. Department of Agriculture's Food and Nutrition Service (FNS) about the reasons behind underredemption of the cash-value benefit (CVB) issued to participants in the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). In particular, the American Rescue Plan Act of 2021 (ARPA), which was signed into law in March 2021, included provisions allowing the USDA to temporarily increase the CVV/B for certain food packages through September 30, 2021. This increased CVB amount may reduce barriers to full utilization of the benefit. FNS is particularly interested in how State agency policies and practices as well as the temporary benefit increase affects CVB redemption rates.

**DATES:** Written comments must be received on or before June 3, 2022.

**ADDRESSES:** Comments may be sent to Ruth Morgan, Food and Nutrition Service, U.S. Department of Agriculture, 1320 Braddock Place, Alexandria, VA 22314. Comments may also be submitted via fax to the attention of Ruth Morgan at 703–305–2576 or via email at *ruth.morgan@usda.gov.* Comments will also be accepted through the Federal eRulemaking Portal. Go to *http://www.regulations.gov,* and follow the online instructions for submitting comments electronically.

All responses to this notice will be summarized and included in the request

for Office of Management and Budget approval. All comments will be a matter of public record.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or copies of this information collection should be directed to Ruth Morgan at 703–457–7759.

**SUPPLEMENTARY INFORMATION:** Comments are invited on (a) whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions that were used; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on those who are to respond, including use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

*Title:* Reasons for Underredemption of the WIC Cash-Value Benefit.
*Form Number:* N/A.
*OMB Number:* Not Yet Assigned.
*Expiration Date:* Not Yet Determined.
*Type of Request:* New Collection.
*Abstract:* The Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) provides nutritious supplemental foods, healthcare referrals, breastfeeding support, and nutrition education to low-income pregnant, breastfeeding, and postpartum women, infants and children up to age 5 who are at nutritional risk. A Final Rule, Special Supplemental Nutrition Program for Women, Infants, and Children (WIC): Revisions in the WIC Food Packages, was published in the **Federal Register** on March 4, 2014 (79 FR 12274) that revised the WIC food packages to add a monthly cash-value benefit (CVB) for the purchase of fruits and vegetables. This rule also detailed specific provisions for the value of the CVB, the types of fruits and vegetables authorized, and other State options for providing this benefit. Recent studies have estimated that redemption rates for CVBs range from 73 percent to 77 percent;[1][2] however, the reasons for

[1] Phillips, D., Bell, L., Morgan, R., & Pooler, J. (2014). *Transition to EBT in WIC: Review of impact and examination of participant redemption patterns: Final report.* Retrieved from *https://altarum.org/sites/default/files/uploaded-publication-files/Altarum_Transition%20to%20WIC%20EBT_Final%20Report_071614.pdf.*

[2] National Academies of Sciences, Engineering, and Medicine. (2017). *Review of WIC food*

Strickland AR 0813

added to the cost of providing the service.

All rates are per-hour except when a per-unit cost is noted. The specific

amounts in each rate calculation are available upon request.

### 2022/2023 RATES

|  | Regular | Overtime | Holiday | Includes travel costs in rate | Start date |
|---|---|---|---|---|---|
| **Specialty Crops Fees** | | | | | |
| **7 CFR Part 51—Fresh Fruits, Vegetables and Other Products (Inspection, Certification, and Standards)** | | | | | |
| Subpart A—Requirements; §§ 51.37–51.44  Schedule of Fees and Charges at Destination Markets  § 51.45  Schedule of Fees and Charges at Shipping Point Areas | | | | | |
| Quality and Condition Inspections for Whole Lots ..................... | $225.00 per lot | | | ............... | Oct. 1, 2022. |
| Quality and Condition Half Lot or Condition-Only Inspections for Whole Lots. | $186.00 per lot | | | ............... | Oct. 1, 2022. |
| Condition—Half Lot ............................................................. | $172.00 per lot | | | ............... | Oct. 1, 2022. |
| Quality and Condition or Condition-Only Inspections for Additional Lots of the Same Product. | $103.00 per lot | | | ............... | Oct. 1, 2022. |
| Dockside Inspections—Each package weighing <30 lbs .......... | $0.044 per pkg. | | | ............... | Oct. 1, 2022. |
| Dockside Inspections—Each package weighing >30 lbs .......... | $0.068/pkg. | | | ............... | Oct. 1, 2022. |
| Charge per Individual Product for Dockside Inspection ........... | $225.00/lot | | | ............... | Oct. 1, 2022. |
| Charge per Each Additional Lot of the Same Product .............. | $103.00/lot | | | ............... | Oct. 1, 2022. |
| Inspections for All Hourly Work ............................................... | $100.00 | $137.00 | $175.00 | ............... | Oct. 1, 2022. |
| Audit Services—Federal ........................................................ | $132.00 | | | ............... | Oct. 1, 2022. |
| Audit Services—State ............................................................ | $132.00 | | | ............... | Oct. 1, 2022. |
| GFSI Certification Fee [1] ........................................................ | $250.00/audit | | | ............... | Oct. 1, 2022. |
| **7 CFR Part 52—Processed Fruits and Vegetables, Processed Products Thereof, and Other Processed Food Products** | | | | | |
| Subpart A—Requirements Governing Inspection and Certification; §§ 52.41—52.51 Fees and Charges | | | | | |
| Lot Inspections ..................................................................... | $85.00 | $112.00 | $139.00 | ............... | Oct. 1, 2022. |
| In-plant Inspections Under Annual Contract (year-round) .......... | $85.00 | $107.00 | $129.00 | ............... | Oct. 1, 2022. |
| Additional Graders (in-plant) or Less Than Year-Round ............ | $91.00 | $120.00 | $149.00 | ............... | Oct. 1, 2022. |
| Audit Services—Federal ........................................................ | $132.00 | | | ............... | Oct. 1, 2022. |
| Audit Services—State ............................................................ | $132.00 | | | ............... | Oct. 1, 2022. |
| GFSI Certification Fee[1] ......................................................... | $250.00/audit | | | ............... | Oct. 1, 2022. |

[1] Global Food Safety Initiative (GFSI) Certification Fee—$250 per GFSI audit to recoup the costs associated with attaining technical equivalency to the GFSI benchmarking requirements.

*Authority:* 7 U.S.C. 1621–1627.

**Melissa Bailey,**
*Associate Administrator, Agricultural Marketing Service.*
[FR Doc. 2022–17744 Filed 8–17–22; 8:45 am]
**BILLING CODE 3410–02–P**

---

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

[Docket ID FSA–2022–0008]

### Emergency Livestock Relief Program (ELRP) and Emergency Relief Program (ERP) Clarification

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notice of funds availability; clarification and revision.

**SUMMARY:** The Farm Service Agency (FSA) is amending the definition of "income derived from farming,

ranching, and forestry operations" for ELRP and ERP and clarifying policy around the filing of certifications of average adjusted gross farm income. FSA is clarifying the ERP Phase 1 policy related to producers who received both a crop insurance indemnity and a Noninsured Crop Disaster Assistance Program (NAP) payment. FSA is also amending ERP Phase 1 to include eligibility for Federal Crop Insurance policies with an intended use for nursery.

**FOR FURTHER INFORMATION CONTACT:** Tona Huggins; telephone: (202) 720–6825; email: *tona.huggins@usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) and (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

**Revision and Clarification**

FSA announced ELRP in a Notification of Funding Availability (NOFA) on April 4, 2022 (87 FR 19465–19470), and ERP in a NOFA on May 18, 2022 (87 FR 30164–30172). Implementation of ELRP Phase 1 began on April 4, 2022. Implementation of ERP Phase 1 began on May 18, 2022. In those documents, FSA provided the eligibility requirements, application process, and payment calculations for Phase 1 of each program. In this document, FSA is making clarifications and revising policy for those programs, as described below.

**Clarification to Income Derived From Farming, Ranching, and Forestry Operations**

The payment limits under both ELRP and ERP are higher for producers whose average adjusted gross farm income is at least 75 percent of their average

adjusted gross income (AGI) based on the 3 taxable years preceding the most immediately preceding complete tax year. Under the ERP and ELRP NOFAs income derived from farming, ranching, and forestry operations includes any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator. The Deputy Administrator considered the definition of "income derived from farming, ranching, and forestry operations" used in prior disaster programs and determined the need to clarify that the sale of equipment to conduct farm, ranch, or forestry operations and the provision of production inputs and services to farmers, ranchers, foresters and farm operations are considered eligible sources of income derived from farming, ranching, and forestry operations under certain conditions. Production inputs are materials to conduct farming operations, such as seeds, chemicals, and fencing supplies. Production services are services provided to support a farming operation, such as custom farming, custom feeding, and custom fencing. In this document, FSA is providing clarification regarding how the sale of equipment to conduct farm, ranch or forestry operations and the provision of production inputs and services will be considered for the purpose of determining whether at least 75 percent of the producer's average AGI was from income derived from farming, ranching, and forestry operations. This is only to the extent a producer's income derived from these sources is not already included under items 1 through 12 of the definition of income derived from farming, ranching, and forestry operations.

The sale of equipment used to conduct farm, ranch, or forestry operations and the provision of production inputs and services to farmers, ranchers, foresters, and farm operations will only be taken into account in an applicant's average adjusted gross farm income if the average adjusted gross farm income is at least 66.66 percent of the applicant's average AGI based on items 1 through 12 of the definition of income derived from farming, ranching, and forestry operations. For clarity, the full definition of "average adjusted gross farm income" is provided below. This definition is applicable to both ELRP and ERP. It replaces the definition provided in the ERP NOFA and will also apply to the ELRP NOFA.

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income derived from farming, ranching, or forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year.

(a) If the resulting average adjusted gross farm income derived from items 1 through 12 of the definition of income derived from farming, ranching and forestry operations is at least 66.66 percent of the average adjusted gross income of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(1) The sale of equipment to conduct farm, ranch, or forestry operations; and

(2) The provision of production inputs and services to farmers, ranchers, foresters, and farm operations.

(b) The relevant tax years are:

(1) For the 2020 program year, 2016, 2017, and 2018;

(2) For the 2021 program year, 2017, 2018, and 2019; and

(3) For the 2022 program year, 2018, 2019, and 2020.

In response to inquiries made by CPAs and attorneys, FSA is providing additional clarity related to the certifications of average adjusted gross farm income. For legal entities not required to file a federal income tax return, or a person or legal entity that did not have taxable income in one or more tax years, the average will be the adjusted gross farm income, including losses, averaged for the 3 taxable years preceding the most immediately preceding complete taxable year, as determined by FSA. A new legal entity will have its adjusted gross farm income averaged only for those years of the base period for which it was in business; however, a new legal entity will not be considered "new" to the extent it takes over an existing operation and has any elements of common ownership interest and land with the preceding person or legal entity. When there is such commonality, income of the previous person or legal entity will be averaged with that of the new legal entity for the base period. For a person filing a joint tax return, the certification of average adjusted farm income will be reported as if the person had filed a separate federal tax return and the calculation is consistent with the information supporting the filed joint return.

ELRP and ERP applicants filing certifications of average adjusted gross farm income are subject to an FSA audit of information submitted for the purpose of increasing the program's payment limitation. As a part of this audit, FSA may request income tax returns, and if requested, must be supplied by all related persons and legal entities. In addition to any other requirement under any Federal statute, relevant Federal income tax returns and documentation must be retained a minimum of 2 years after the end of the calendar year corresponding to the year for which payments or benefits are requested. Failure to provide necessary and accurate information to verify compliance, or failure to comply with these requirements will result in ineligibility for ELRP and ERP benefits. This is consistent with the current requirements for participants in both ERP Phase 1 and ELRP to retain documentation in support of their application for 3 years after the date of approval.

**ERP Phase 1 Payments—Crop Insurance Policies and NAP**

ERP Phase 1 covers certain losses for which a producer received a crop insurance indemnity or Noninsured Crop Disaster Assistance Program (NAP) payment. In some situations, a producer may have received both a NAP payment for a crop loss and an indemnity under a crop insurance policy that was included in ERP Phase 1 to address the same loss. Examples of these policies include Rainfall Index plans for Annual Forage; Pasture, Rangeland, and Forage; or Apiculture. In those situations, the producer's ERP Phase 1 payment will be calculated based only on the data associated with their indemnity under the crop insurance policy; for those producers no ERP Phase 1 payment will be calculated based on the data associated with their NAP payment. This policy is necessary to avoid compensating producers twice for the same loss under ERP Phase 1.

**ERP Phase 1 Payments—Nursery**

The original NOFA for ERP Phase 1 excluded payments for nursery stock covered by a Federal Crop Insurance policy. After further consideration, FSA has determined that nursery stock covered by a Federal Crop Insurance policy suffered qualifying losses similar to other crops covered under ERP Phase 1 and to be consistent with prior disaster programs administered by FSA, we are revising the policy to include eligible nursery losses during the 2020, 2021, or 2022 crop years for which a producer had a Federal Crop Insurance policy that provided coverage for eligible losses related to the qualifying disaster events and received an indemnity for a crop and unit.

**Paperwork Reduction Act**

In compliance with the Paperwork Reduction Act (44 U.S.C. 3501–3520), this NOFA does not change the approved information collection under

Strickland AR 0815

OMB control numbers 0560–0307 and 0560–0309, respectively.

**Federal Assistance Programs**

The titles and numbers of the Federal assistance programs, as found in the Assistance Listing,[1] to which this document applies are 10.148—Emergency Livestock Relief Program, and 10.964—Emergency Relief Program.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 or (844) 433–2774 (toll-free nationwide). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov*.

---

[1] See *https://sam.gov/content/assistance-listings*.

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**
*Administrator, Farm Service Agency.*
[FR Doc. 2022–17795 Filed 8–17–22; 8:45 am]
**BILLING CODE 3410–05–P**

---

## COMMISSION ON CIVIL RIGHTS

### Notice of Public Meeting of the Pennsylvania Advisory Committee to the U.S. Commission on Civil Rights

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Announcement of meeting.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act that the Pennsylvania Advisory Committee (Committee) to the U.S. Commission on Civil Rights will hold a business meeting on Tuesday September 13, 2022 at 2:00 p.m. Eastern time. The Committee will discuss testimony received regarding the study of civil rights and fair housing in the state.

**DATES:** The meeting will take place on Tuesday September 13, 2022 from 2:00 p.m.–3:00 p.m. Eastern time.

**ADDRESSES:**
*Join Online (Audio/Visual): https://www.zoomgov.com/j/1610157596?pwd=YlRaUUdDan MwZTI4TFRaRTZnazJrQT09.*

*Telephone (Audio Only):* Dial 1–669–254–5252 USA Toll Free; Access code: 161 015 7596.

**FOR FURTHER INFORMATION CONTACT:** Melissa Wojnaroski, DFO, at *mwojnaroski@usccr.gov* or 312–353–8311.

**SUPPLEMENTARY INFORMATION:** Members of the public may listen to this discussion. Committee meetings are available to the public through the above listed online registration link or call in number. Any interested member of the public may call this number and listen to the meeting. An open comment period will be provided to allow members of the public to make a statement as time allows. Callers can expect to incur regular charges for calls they initiate over wireless lines, according to their wireless plan. The Commission will not refund any incurred charges. Callers will incur no charge for calls they initiate over land-line connections to the toll-free telephone number. Individuals who are deaf, deafblind and hard of hearing may also follow the proceedings by first

calling the Federal Relay Service at 1–800–877–8339 and providing the Service with the conference call number and conference ID number.

Members of the public are also entitled to submit written comments; the comments must be received in the regional office within 30 days following the meeting. Written comments may be emailed to Corrine Sanders at *csanders@usccr.gov*. Persons who desire additional information may contact the Regional Programs Unit at (312) 353–8311.

Records generated from this meeting may be inspected and reproduced, as they become available, both before and after the meeting. Records of the meeting will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Pennsylvania Advisory Committee link. Persons interested in the work of this Committee are directed to the Commission's website, *http://www.usccr.gov,* or may contact the Regional Programs Unit at the above email address.

**Agenda**

Welcome and Roll Call
Discussion: Civil Rights and Fair Housing in Pennsylvania
Future Plans and Actions
Public Comment
Adjournment

Dated: August 15, 2022.

**David Mussatt,**
*Supervisory Chief, Regional Programs Unit.*
[FR Doc. 2022–17782 Filed 8–17–22; 8:45 am]
**BILLING CODE P**

---

## COMMISSION ON CIVIL RIGHTS

### Notice of Public Meetings of the Ohio Advisory Committee to the U.S. Commission on Civil Rights

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Announcement of meeting.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act, that the Ohio Advisory Committee (Committee) will hold a web-based meeting on Wednesday August 24, 2022, at 12:00 p.m. Eastern Time. The purpose of the meeting is to discuss the concept stage in the planning process and explore various civil rights topics for the Committee's first project.

**DATES:** The meeting will be held on: Wednesday, August 24, 2022, at 12:00 p.m. Eastern Time.

Strickland AR 0816

expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Individuals who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https:// www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@ usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2023–21068 Filed 9–26–23; 8:45 am]

**BILLING CODE 3411–EB–P**

---

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

**[Docket ID FSA–2023–00015]**

### Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ELRP Phase 2. This document provides the eligibility requirements and payment calculation for the second

phase of ELRP assistance. ELRP Phase 2 will provide assistance to eligible livestock producers for the loss of the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by a continued lack of precipitation. This document also makes a correction and amendment to ELRP Phase 1.

**DATES:** *Funding availability:* Implementation will begin September 27, 2023.

**FOR FURTHER INFORMATION CONTACT:** Kathy Sayers, telephone: (202) 720–7649; email: *Kathy.Sayers@usda.gov.* Individuals with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

### Background

The Extending Government Funding and Delivering Emergency Assistance Act, (Division B, Title I, Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021. From the $10 billion, the Secretary of Agriculture is to use $750 million to assist producers of livestock for losses incurred during calendar year 2021 due to qualifying droughts or wildfires. The livestock producers who suffered losses due to drought are eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity during the applicable year.

On April 4, 2022, FSA announced that assistance for livestock producers would be provided through ELRP (87 FR 19465–19470).[1] ELRP Phase 1 paid for a portion of eligible producers' increased supplemental feed costs in 2021 based on the number of animal units (AU), limited by available grazing

acreage, in eligible drought counties. In order to deliver this assistance quickly, FSA used certain 2021 Livestock Forage Disaster Program (LFP) data and a percentage of the payment made through LFP applications as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP Phase 1.

To stay within the available funding, ELRP Phase 1 payments were calculated at 90 percent of the gross LFP calculated payment for underserved farmers and ranchers and 75 percent of the gross LFP calculated payment for all other producers.[2]

This document provides the eligibility requirements and payment calculation for ELRP Phase 2 assistance. It also corrects an error in the ELRP Phase 1 provisions related to payment eligibility and amends ELRP Phase 1 to be consistent with LFP and ELRP Phase 2.

### ELRP Phase 2

For each eligible livestock producer who previously received an ELRP Phase 1 payment, FSA will issue an ELRP Phase 2 payment to assist with losses in the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by the continued lack of precipitation, using the ELRP Phase 1 payment as a proxy to calculate those losses. ELRP Phase 2 assistance is subject to the same ELRP payment limitation provided in the previous notice of funds availability. Because FSA is using LFP and ELRP Phase 1 information to calculate a producer's ELRP Phase 2 payment and determine eligibility due to a qualifying drought or wildfire during the 2021 normal grazing period, no action is required for eligible

---

[1] In addition, a clarification to the notice of funds availability for ELRP Phase 1 was published on August 18, 2022 (87 FR 50828–50830).

[2] "Underserved farmer or rancher" means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher. FSA calculates payments based on a higher payment factor for underserved farmers and ranchers (or specific groups included in that term) in several programs, such as Emergency Conservation Program; Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program; and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, Emergency Relief Program, and Pandemic Assistance Revenue Program. In addition, the Noninsured Crop Disaster Assistance Program provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

Strickland AR 0817

producers to receive ELRP Phase 2 payments.

For eligible producers, ELRP Phase 2 will provide assistance for a portion of the loss in value of winter grazing in 2021 based on the Phase 1 payment which used the number of AU, limited by available grazing acreage, in eligible drought and wildfire counties. In order to deliver this assistance quickly, FSA is using the ELRP Phase 1 payment calculation data as a proxy to issue an additional payment equal to 20 percent of the ELRP Phase 1 payment to pay for a percentage (44 percent or 52 percent) of the estimated losses in the value of winter forage to eliminate the requirement for producers to resubmit information for ELRP Phase 2.

According to the US Drought Monitor, more than one-third of the country was categorically in a ''D2 Severe'' to ''D4 Exceptional'' drought throughout the entire calendar year 2021. Extreme drought predominately affected areas highly concentrated with rangeland needed for livestock production, therefore drought and wildfire caused economic hardship on producers that were reliant on rangeland, requiring them to purchase supplemental feed at elevated prices to sustain production throughout 2021 and not isolated to during the normal grazing periods.

For eligible producers, ELRP Phase 1 compensated 57 to 69 percent of the calculated increased supplemental feed costs. Due to the excessive and expansive drought and wildfires in 2021, these livestock participants suffered extreme grazing losses that were not concentrated only to the normal grazing periods which directly impacted winter grazing. According to

USDA's September 28, 2021, Weekly Weather and Crop Bulletin (see *https://www.fsa.usda.gov/programs-and-services/emergency-relief/index*), ''on August 29, rangeland and pastures were rated more than one-half very poor to poor in every state along and northwest of a line from California to Minnesota,'' that is generally the same area that was determined eligible for 2021 LFP and ELRP Phase 1. According to the report, pasture and range conditions for the week ending September 25, 2021, for the states that triggered for LFP in 2021 and received ELRP Phase 1 assistance, rated 46 percent poor to very poor conditions going into the winter grazing months. The weekly weather data in the bulletin indicated the percentage of normal precipitation at that time in those areas was 79.4 percent, which results as a direct indicator of a 20.6 percent negative impact to winter forage availability beginning in October 2021. LFP calculated the monthly value of forage in 2021, which based on corn prices was $31.18 per AU per month. A 20.6 percent decrease to normal precipitation equates to a $6.42 impact ($31.18 x 20.6 percent) per AU per month.

An additional factor that contributed to the lack of winter grazing availability during the 2021 drought was the lack of optimal grazing use. Recommended grazing use rates or percentages commonly used by the Natural Resource Conservation Service and university extension services provide that a grazing plan should allow for vigorous plant re-growth following a period of grazing and never have more than 50 percent use during the major growing season,

and not more than 65 percent use during the dormant season or slowed growth period to maintain or improve range ecological condition and rangeland health, reduce soil erosion, as well as improve livestock performance. The drought and wildfire impact to the losses to winter grazing were not considered when developing ELRP Phase 1 but have been determined to be significant and, after considering funding limitations, FSA will compensate for the estimated impact of winter forage availability on eligible livestock producers at 52 percent and 44 percent for underserved farmers and ranchers and for all other farmers and ranchers, respectively.

Therefore, for eligible producers, the ELRP Phase 2 payment will be equal to 20 percent of the 2021 gross ELRP Phase 1 payment to compensate for the loss of winter grazing directly affected by the drought and wildfire conditions during the normal grazing period that continued to be exacerbated by conditions in the final quarter of 2021, which was not compensated by LFP or ELRP Phase 1. The payment per AU per month is calculated as follows:

∀ 20 percent of $16.84 = $3.37 (equivalent to 52 percent of the calculated winter grazing loss per month per AU based on percentage of normal precipitation as of October 1, 2021) for underserved farmers and ranchers, and

∀ 20 percent of $14.03 = $2.81 (equivalent to 44 percent of the calculated winter grazing loss per month per AU based on percentage of normal precipitation as of October 1, 2021) for all other farmers and ranchers.

TABLE 1—REVIEW OF 2021 ELRP PHASE 1 CALCULATED ASSISTANCE

| ELRP Phase 1 assistance for increased supplement feed costs | | | |
|---|---|---|---|
| 2021 LFP monthly value of forage | 2021 LFP payment rate—60% per month (max 5 months)* | 2021 ELRP Phase 1 payment percentage | Gross 2021 ELRP Phase 1 calculated benefit per month per eligible AU |
| $31.18 ................................................ | $18.71 | 75 90 | $14.03 16.84 |

TABLE 2—2021 ELRP PHASE 2 CALCULATED ASSISTANCE

| ELRP Phase 2 assistance for winter grazing losses in relation to % of normal precipitation on October 1, 2021 | | | | |
|---|---|---|---|---|
| Gross 2021 ELRP Phase 2 calculated benefit (20% of Phase 1 payment) per month per eligible AU | Oct 1% of normal precipitation | Result of % impact to winter grazing beginning Oct 1 | $ Impact to winter grazing per month per AU on Oct 1 ($31.18 · 20.6%) | % 2021 ELRP Phase 2 assistance coverage of winter grazing loss per month per eligible AU |
| $2.81 ................................................ | 79.4 | 20.6 | $6.42 | 44 |

Strickland AR 0818

TABLE 2—2021 ELRP PHASE 2 CALCULATED ASSISTANCE—Continued

ELRP Phase 2 assistance for winter grazing losses in relation to % of normal precipitation on October 1, 2021

| Gross 2021 ELRP Phase 2 calculated benefit (20% of Phase 1 payment) per month per eligible AU | Oct 1% of normal precipitation | Result of % impact to winter grazing beginning Oct 1 | $ Impact to winter grazing per month per AU on Oct 1 ($31.18 · 20.6%) | % 2021 ELRP Phase 2 assistance coverage of winter grazing loss per month per eligible AU |
|---|---|---|---|---|
| 3.37 | | | | 52 |

\* The 2021 LFP payment rate may be adjusted according to LFP provisions in 7 CFR 1416.207 for mitigated livestock and restricted grazed AU due to a qualifying fire.

Because FSA is using ELRP Phase 1 payment information to generate a reasonable approximation for the loss covered by ELRP Phase 2, no action is required for eligible producers to receive these payments. If funding remains available after initial payments, an additional payment(s) may be issued, not to exceed 80 percent of the calculated winter grazing loss per AU per month based on the percentage of normal precipitation data as of October 1, 2021.[3]

**Definitions**

The definitions in 7 CFR parts 718, 1400, and § 1416.202 apply to ELRP Phase 2, except as otherwise provided in this document. The following definitions also apply.

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income derived from farming, ranching, and forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year.

(a) If the resulting average adjusted gross farm income derived from items 1 through 12 of the definition of income derived from farming, ranching and forestry operations is at least 66.66 percent of the average adjusted gross income of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(1) The sale of equipment to conduct farm, ranch, or forestry operations; and

(2) The provision of production inputs and services to farmers, ranchers, foresters, and farm operations.

(b) The relevant tax years for the 2021 program year are 2017, 2018, and 2019.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, forestry commodities including renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, and Interest Charge Domestic International Sales Corporation (IC–DISC) or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, or forestry activities as defined in this part; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator for Farm Programs (Deputy Administrator).

*LFP* means the Livestock Forage Disaster Program under section 1501 of the Agricultural Act of 2014 (7 U.S.C. 9081) and 7 CFR part 1416, subpart C.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales did not exceed $179,000 (the amount applicable to the 2021 program year) in each of the 2018 and 2019 calendar years; and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the same two previous years referenced in paragraph (1) of this definition. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through National Resources and Conservation Service at *https://lrftool.sc.egov. usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ELRP, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a

---

[3] FSA is using an 80 percent threshold similar to the Coronavirus Food Assistance Program 2 (also known as CFAP 2) which provided pandemic assistance payments to livestock contract growers to cover not more than 80 percent of revenue losses.

Strickland AR 0819

**Federal Register**/Vol. 88, No. 186/Wednesday, September 27, 2023/Notices  **66369**

beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is considered to have a beneficial ownership interest in such legal entity.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10))[4] and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2))[5] during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*Wildfire* for ELRP Phase 2 means fire as used in 7 CFR part 1416, subpart C.

**Eligible Livestock Producers**

Eligible livestock producers for ELRP Phase 2 are producers with an approved 2021 LFP application who received an ELRP Phase 1 payment. For ELRP Phase 2, the eligibility criteria applicable to LFP (7 CFR part 1416, subparts A and C) also applies, excluding the LFP average adjusted gross income (AGI) limitation. FSA will use livestock inventories, forage acreage, restricted

AU and grazing days due to fire, and drought intensity levels already reported to FSA for the 2021 Livestock Forage Disaster Program Application[6] (form number CCC–853), and the ELRP Phase 1 payment to determine eligibility and calculate a ELRP Phase 2 payment. Eligible livestock producers are not required to submit an application for ELRP Phase 2; however, if not already on file, they must have the following additional forms on file with FSA within 60-days of ELRP Phase 2 deadline announced by the Deputy Administrator to be eligible to receive a payment:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the ELRP Phase 2 producer and applicable affiliates.

For a producer to be eligible for a payment based on the higher payment rate for eligible underserved farmers or ranchers or increased payment limitation as described below, the following must be submitted within 60-days of the ELRP Phase 2 deadline announced by the Deputy Administrator:

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2021 program year;[7] or

∀ FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity.

**Payment Calculation**

The ELRP Phase 2 payment will be equal to the eligible livestock producer's gross 2021 ELRP Phase 1 payment[8] multiplied by 20 percent. The same percentage will be applied to underserved farmers and ranchers and all other producers. If funding remains available after initial payments, an additional payment(s) may be issued, not to exceed 80 percent of the calculated winter grazing loss per AU per month based on the percentage of normal precipitation data as of October 1, 2021.

For example, a livestock producer's gross 2021 ELRP Phase 1 calculated payment of $10,000 is multiplied by 20 percent, resulting in an ELRP Phase 2 payment of $2,000. This ELRP Phase 2 payment is intended to represent a reasonable approximation of 44 to 52 percent of the calculated winter grazing loss per AU per month based on the percentage of normal precipitation data as of October 1, 2021.

FSA will issue ELRP Phase 2 payments as 2021 ELRP Phase 1 payments are processed and approved. If a producer files the CCC–860 Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification or FSA–510 form and the accompanying certification by the deadline announced by the Deputy Administrator but after their ELRP Phase 2 payment is issued, FSA will recalculate the ELRP Phase 1 and Phase 2 payment and issue the additional calculated amount as applicable until the ELRP deadline announced by the Deputy Administrator.

**Payment Limitation**

The payment limitation for ELRP is determined by the person's or legal entity's average adjusted gross farm income (as defined above). Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments under ELRP if their average adjusted gross farm income is less than 75 percent of their average AGI for tax years 2017, 2018, and 2019. If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, or forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal

---

[4] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[5] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[6] As provided in 7 CFR 1416.206 and publicized by FSA, the LFP application deadline for the 2021 program year was January 31, 2022.

[7] A producer who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of their status for the 2021 program year because a producer's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what programs years the status would apply. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit CCC–860 for each applicable program year.

[8] The gross ELRP Phase 1 calculated payment is the amount calculated according to the ELRP Phase 1 NOFA, prior to any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and the applicant or member of an applicant that is an entity exceeding the average AGI limitation.

entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to $250,000 in ELRP payments.

To receive more than $125,000 in ELRP payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification. If a producer requesting the $250,000 payment limitation is a legal entity, all members of that entity must also complete FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the $250,000 payment limitation based on the legal entity's average adjusted gross farm income but a member of that legal entity either does not complete an FSA–510 and provide the required certification or is not eligible for the $250,000 payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ELRP payment attributed to that member.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ *First level of ownership:* Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

∀ *Second level of ownership:* Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ *Third and fourth levels of ownership:* Except as provided in the second-level of ownership bullet above and in the fourth-level of ownership bullet below, any payments made to a

legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ *Fourth level of ownership:* If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first-level or payment legal entity by the fourth-level legal entity.

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent, at the first through fourth levels of ownership in the business structure, is not provided to FSA. A legal entity is not eligible to receive ELRP payments when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or more, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

If an individual or legal entity is not eligible to receive ELRP payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity. Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**Provisions Requiring Refund to FSA**

If any ELRP payment resulted from erroneous information reported by the producer or if the producer's 2021 LFP payment is recalculated after the ELRP Phase 1 payment or ELRP Phase 2 payment is issued, the ELRP payment will be recalculated, and the producer must refund any excess payment to

FSA. This includes interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ELRP payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

**General Provisions**

General requirements that apply to other FSA-administered commodity programs also apply to ELRP, including compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation," and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ELRP. The determination of matters of general applicability that are not in response to, or result from, an individual set of facts are not matters that can be appealed. Such matters of general applicability include, but are not limited to, the ELRP eligibility criteria and payment calculation.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. Participants receiving ELRP payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

The Deputy Administrator has the discretion and authority to waive or modify filing deadlines and other requirements or program provisions not specified in law, in cases where the Deputy Administrator determines it is equitable to do so and where the Deputy Administrator finds that the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ELRP. Although producers have a right to a decision on whether they filed applications by the deadline or not, producers have no right to a decision in response to a request to waive or modify deadlines or program

Strickland AR 0821

provisions. The Deputy Administrator's refusal to exercise discretion to consider the request will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ELRP will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ELRP payments.

In either applying for or participating in ELRP, or both, the producer is subject to laws against perjury and any penalties and prosecution resulting therefrom, with such laws including but not limited to 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ELRP, or both, then the producer is guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ELRP but only as to beneficiaries who, as a condition of the waiver, agree to apply the ELRP payments to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ELRP, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

## ELRP Phase 1

FSA announced ELRP Phase 1 in a NOFA published on April 4, 2022 (87 FR 19465–19470). This document corrects an error in that NOFA and amends ELRP Phase 1 related to the requirement to provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in a legal entity. The ELRP Phase 1 NOFA provided that "the eligibility criteria applicable to LFP . . . also applies to ELRP Phase 1," which would include notification of interest provisions applicable to LFP.

LFP is subject to the payment eligibility provisions of 7 CFR part 1400, including the notification of interest requirements. When the ELRP Phase 1 NOFA was published, the provisions in § 1400.107 required a legal entity to provide the names, addresses, ownership share, and valid taxpayer

identification numbers of the members holding an ownership interest in order to receive any LFP payment. This is how FSA has been implementing ELRP Phase 1, consistent with LFP prior to January 2023, despite certain conflicting language in the ELRP Phase 1 NOFA that appears to permit partial ELRP payments to be issued after reduction in proportion to a member's share if the required information was not provided to FSA.

On January 11, 2023, FSA published a final rule (88 FR 1862–1892) that removed § 1400.107 and added a new § 1400.10, which specified that for certain FSA programs, including LFP, payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent, at or above the fourth level of ownership in the business structure, is not provided to USDA. The provisions in § 1400.10 also specify that a legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or greater at, or above the fourth level of ownership in the business structure, is not provided to USDA. This change was made retroactive to the 2020 program year for LFP.

This document amends ELRP Phase 1 to be consistent with these provisions of § 1400.10 that currently apply to LFP for the 2021 program year, and which also apply to ELRP Phase 2.

## Paperwork Reduction Act Requirements

In compliance with the Paperwork Reduction Act (44 U.S.C. chapter 35), the information collection request for ELRP Phase 2 has been approved by OMB under the control number 0503–0028. FSA will collect the information from the livestock producer to qualify for the payment to assist with the loss of winter grazing. This NOFA is the one-time announcement of the new ELRP Phase 2 federal financial assistance. For the ELRP Phase 1 correction, there is no new information collection required.

## Environmental Review

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500 through 1508), and the FSA regulation for compliance with NEPA (7 CFR part 799).

As previously stated, ELRP Phase 2 is providing payments to eligible livestock producers for loss of the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by a continued lack of precipitation. The limited discretionary aspects of ELRP do not have the potential to impact the human environment as they are administrative. Accordingly, these discretionary aspects are covered by the FSA categorical exclusions specified in § 799.31(b)(6)(iv) that applies to individual farm participation in FSA programs where no ground disturbance or change in land use occurs as a result of the proposed action or participation; and § 799.31(b)(6)(vi) that applies to safety net programs.

No Extraordinary Circumstances exist under § 799.33. As such, the implementation of ELRP and the participation in ELRP do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or environmental impact statement for this action and this document serves as documentation of the programmatic environmental compliance decision for this federal action.

## Federal Assistance Programs

The title and number of the Federal assistance program, as found in the Assistance Listing [9] (formerly referred to as the Catalog of Federal Domestic Assistance), to which this document applies is 10.148—Emergency Livestock Relief Program.

## USDA Non-Discrimination Policy

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

---

[9] See https://sam.gov/content/assistance-listings.

Individuals who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or the USDA TARGET Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by: (1) mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410; (2) fax: (202) 690–7442; or (3) email: *program.intake@usda.gov*.

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2023–21088 Filed 9–26–23; 8:45 am]

**BILLING CODE 3410–05–P**

---

## DEPARTMENT OF AGRICULTURE

### Food Safety and Inspection Service

**[Docket No. FSIS–2023–0021]**

### Notice of Request to Renew an Approved Information Collection: Egg Products Hazard Analysis and Critical Control Point and Sanitation Standard Operating Procedures

**AGENCY:** Food Safety and Inspection Service (FSIS), U.S. Department of Agriculture (USDA).

**ACTION:** Notice and request for comments.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995 and the Office of Management and Budget (OMB) regulations, FSIS is announcing its intention to request renewal of the approved information collection regarding egg products Hazard Analysis and Critical Control Point (HACCP) and Sanitation Standard Operating Procedures (Sanitation SOPs). There are no changes to the information
collection. The approval for this information collection will expire on January 31, 2024.

**DATES:** Submit comments on or before November 27, 2023.

**ADDRESSES:** FSIS invites interested persons to submit comments on this **Federal Register** notice. Comments may be submitted by one of the following methods:

∀ *Federal eRulemaking Portal:* This website provides commenters the ability to type short comments directly into the comment field on the web page or to attach a file for lengthier comments. Go to *https://www.regulations.gov*. Follow the on-line instructions at that site for submitting comments.

∀ Mail: Send to Docket Clerk, U.S. Department of Agriculture, Food Safety and Inspection Service, 1400 Independence Avenue SW, Mailstop 3758, Washington, DC 20250–3700.

∀ Hand- or courier-delivered submittals: Deliver to 1400 Independence Avenue SW, Jamie L. Whitten Building, Room 350–E, Washington, DC 20250–3700.

*Instructions:* All items submitted by mail or electronic mail must include the Agency name and docket number FSIS–2023–0021. Comments received in response to this docket will be made available for public inspection and posted without change, including any personal information, to *https://www.regulations.gov*.

*Docket:* For access to background documents or comments received, call (202) 937–4272 to schedule a time to visit the FSIS Docket Room at 1400 Independence Avenue SW, Washington, DC 20250–3700.

**FOR FURTHER INFORMATION CONTACT:** Gina Kouba, Office of Policy and Program Development, Food Safety and Inspection Service, USDA, 1400 Independence Avenue SW, Mailstop 3758, South Building, Washington, DC 20250–3700; (202) 937–4272.

**SUPPLEMENTARY INFORMATION:** *Title:* Egg Products Hazard Analysis and Critical Control Point and Sanitation Standard Operating Procedures

*OMB Number:* 0583–0172.

*Expiration Date of Approval:* January 31, 2024.

*Type of Request:* Renewal of an approved information collection.

*Abstract:* FSIS has been delegated the authority to exercise the functions of the Secretary (7 CFR 2.18, 2.53), as specified in the Egg Products Inspection Act (EPIA) (21 U.S.C. 1031, *et seq.*). This statute mandates that FSIS protect the public by verifying that egg products are safe, wholesome, and properly labeled and packaged.

FSIS is requesting renewal of the approved information collection regarding egg products HACCP and Sanitation SOPs. There are no changes to the information collection. The approval for this information collection will expire on January 31, 2024.

FSIS requires official plants to develop and maintain HACCP plans and Sanitation SOPs, as well as various transaction records. The plant maintains on file the name and a brief resume of the HACCP trained individuals who participate in the hazard analysis and subsequent development of the HACCP plans. Plants develop written HACCP plans that include: identification of hazards reasonably likely to occur in the production process; identification and description of the critical control point (CCP) for each identified hazard; specification of the critical limit which may not be exceeded at the CCP, and, if appropriate, a target limit; description of the monitoring procedure or device to be used; description of the corrective action to be taken if the limit is exceeded; description of the records which would be generated and maintained regarding this CCP; and description of the facility verification activities and the frequency at which they are to be conducted. The adequacy of a plant's HACCP plan must be reassessed at least annually and whenever changes occur that could affect the hazard analysis or alter the HACCP plan.

Each processor is also required to develop and maintain a Sanitation SOP. The Sanitation SOP specifies the cleaning and sanitizing procedures for all equipment and facilities involved in the production of every product. As part of the Sanitation SOP, a plant employee records results of daily sanitation checks at the frequencies stated in the Sanitation SOP. The burden of documenting the adherence to the Sanitation SOP is based on three factors: Recording, reviewing, and storage. Recording encompasses conducting and inscribing the finding from an observation and filing of the document produced.

FSIS has made the following estimates based upon an information collection assessment:

*Respondents:* Official egg products plants.

*Estimated No. of Respondents:* 132.

*Estimated No. of Responses:* 138,596.

*Estimated Total Annual Burden on Respondents:* 76,280 hours.

All responses to this notice will be summarized and included in the request for OMB approval. All comments will also become a matter of public record. Copies of this information collection

# Notices

**Federal Register**

Vol. 88, No. 186

Wednesday, September 27, 2023

---

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

---

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

**[Docket ID FSA–2023–0011]**

### Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ELRP 2022. This document provides the eligibility requirements and payment calculation for ELRP 2022 assistance. ELRP 2022 will provide payments to producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2022, using data already submitted to FSA through the Livestock Forage Disaster Program (LFP).

**DATES:** *Funding availability:* Implementation will begin September 27, 2023.

**FOR FURTHER INFORMATION CONTACT:** Kathy Sayers; telephone: (202) 720–6870; email: *Kathy.Sayers@usda.gov.* Individuals who require alternative means of communication for program information should contact the USDA Target Center at (202) 720–2600 (voice) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone).

**SUPPLEMENTARY INFORMATION:**

## Background

Title I of the Disaster Relief Supplemental Appropriations Act, 2023 (Division N of the Consolidated Appropriations Act, 2023; Public Law 117–328) provides $3,741,715,000 for necessary expenses related to losses of revenue, quality, or production losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2022, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze, including a polar vortex, smoke exposure, and excessive moisture occurring in calendar years 2022. From that amount, the Secretary of Agriculture is to use up to $494.5 million to provide assistance to livestock producers for losses incurred during calendar year 2022 due to qualifying droughts or wildfires. The livestock producers who suffered losses due to drought are eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity during the applicable year.

FSA will assist livestock producers through ELRP 2022. This document provides the eligibility requirements and payment calculation for ELRP 2022, which will assist eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2022. For eligible producers, ELRP 2022 will pay for a portion of the increased feed costs in 2022 based on the number of animal units (AU), limited by available grazing acreage, in eligible drought counties. Although LFP payments do not have a direct correlation to the increased feed costs incurred, in order to deliver this assistance quickly, FSA is using certain LFP data and a percentage of the payment made through LFP applications will be used as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP 2022. The ELRP 2022 payment percentage will be 90 percent for historically underserved farmers and ranchers, and 75 percent for all other producers.

According to the US Drought Monitor, more than one-third of the country was categorically in a "D2 Severe" to "D4 Exceptional" drought throughout the entire calendar year 2022. Extreme drought predominately affected areas highly concentrated with rangeland needed for livestock production. Therefore, drought and wildfire caused economic hardship on producers that were reliant on rangeland, requiring them to purchase supplemental feed at elevated prices to sustain production throughout 2022 and not just during the normal grazing periods. Due to the excessive and expansive drought and wildfires in 2022, livestock participants experienced the following, they:

∀ Suffered extreme grazing losses;

∀ Incurred related costs to purchase feed in the grazing period;

∀ Purchased feed, beyond normal for a drought year, to supplement grazing and to support livestock outside of the grazing period because forage was not available for harvest and storage; and

∀ Were faced with higher feed costs during 2022 due to less availability of feed resulting from drought severity and feed cost inflation.

LFP provided payments to eligible owners and contract growers of covered livestock who suffered livestock grazing losses due to qualifying drought or fire [1] not to exceed 5 months during the grazing period based on the documented livestock inventory eligible for LFP. The gross LFP calculated payment represented a 60 percent reimbursement of monthly feed costs for a maximum of 5 months, based on a feed grain equivalent that is calculated according to 7 CFR 1416.207 as specified in 7 U.S.C. 9081(c), which uses the higher of the national average corn price per bushel for the 12- or 24-month period immediately preceding March 1 of the calendar year. Because LFP requires the use of this period, it does not take into account any increases in price paid for supplemental feed during 2022. For LFP, the 2022 monthly value of forage, resulted in an LFP payment rate of $28.37 per month per eligible animal unit for drought. The rate for fire is

---

[1] A grazing loss due to drought qualifies for LFP only if the grazing loss occurs on land that is native or improved pastureland with permanent vegetative cover or is planted to a crop planted specifically for the purpose of providing grazing for covered livestock, and the land is physically located in a county rated by the U.S. Drought Monitor as having a D2 intensity for at least 8 consecutive weeks or D3 or D4 intensity at any time during the normal grazing period for the specific type of grazing land or pastureland.

A grazing loss due to fire qualifies for LFP only if the grazing loss occurs on rangeland that is managed by a Federal agency and the eligible livestock producer is prohibited by the Federal agency from grazing the normal permitted livestock on the managed rangeland due to a fire.

See 7 CFR 1416.205 for further information on eligible grazing losses under LFP.

Strickland AR 0824

based on the number of fire-restricted days and was not a single rate.

LFP does not compensate for the increased costs of supplemental feed, including during 2022 due to drought and wildfires in 2022.

The actual cost of supplemental feed prices, based on corn, alfalfa, and soybean meal, increased substantially in 2022, compared to previous years. Using the Dairy Margin Coverage (DMC) [2] program model for an adequate supplemental feed ratio, the 5-year average cost to maintain 1 AU for one month was $66.79, compared to the actual average cost from January through December, 2022 of $107.51 per month, an increase of 61 percent.

The cost of feeding one AU per month increased in 2022 compared to the 5-year average by $40.72 ($107.51 ¥ $66.79) for livestock producers affected by drought and wildfires, which was not covered by LFP. See Table 1.

TABLE 1—2022 CALCULATED COSTS (DMC MODEL) TO MAINTAIN 1 AU/MONTH

| 5 Year avg. cost (corn, alfalfa, soybean meal) | 2022 Cost (corn, alfalfa, soybean meal) | 2022 Increase in cost | 2022 LFP payment rate * | ELRP 2022 payment percentage | Gross ELRP 2022 calculated benefit/ month/eligible AU prior to factor | Percentage of increased supplemental feed costs in 2022 compensated by ELRP 2022 prior to factor |
|---|---|---|---|---|---|---|
| $66.79 ...................................... | $107.51 | $40.72 | $28.37 | 75 90 | $21.28 25.53 | 52.2 62.7 |

* The 2022 LFP payment rate may be adjusted according to LFP provisions in 7 CFR 1416.207 for mitigated livestock and restricted grazed animal units due to a qualifying fire.

The ELRP 2022 calculated benefit is based on using the LFP payment rate of $28.37 per animal unit per month, calculated as follows:

75 percent · $28.37 = $21.28 (equivalent to 52.2 percent of increased supplemental feed costs in 2022) and

90 percent · $28.37 = $25.53 (equivalent to 62.7 percent of increased supplemental feed costs in 2022).

To stay within the available funding, ELRP 2022 payments for increased supplemental feed costs in 2022 will be factored initially by 25 percent. If funds remain available after initial payments, a second payment of up to 75 percent may be issued.

Because FSA is using LFP information to generate a reasonable approximation for the costs covered by ELRP 2022, no action is required for eligible producers to receive ELRP 2022 payments.

**Definitions**

The definitions in 7 CFR parts 718, 1400, and 1416 apply to ELRP 2022, except as otherwise provided in this document. The following definitions also apply.

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income derived from farming, ranching, and forestry operations for the 3 taxable years preceding the most immediately preceding complete taxable year.

(a) If the resulting average adjusted gross farm income derived from items 1 through 12 of the definition below for "income derived from farming, ranching and forestry operations" is at least 66.66 percent of the average adjusted gross income of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(1) The sale of equipment to conduct farm, ranch, or forestry operations; and

(2) The provision of production inputs and services to farmers, ranchers, foresters, and farm operations.

(b) The relevant tax years for ELRP 2022 are 2018, 2019, and 2020.

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Income derived from farming, ranching, and forestry operations* means income of an individual or entity derived from:

(1) Production of crops, specialty crops, and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, or forestry commodities including for renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Payments and benefits authorized under any program made available and applicable to payment eligibility and payment limitation rules;

(11) Income reported on Internal Revenue Service (IRS) Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, and IC–DISC (Interest Charge Domestic International Sales Corporation) or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, and forestry activities as defined in this part; and

(13) Any other activity related to farming, ranching, and forestry, as determined by the Deputy Administrator for Farm Programs (Deputy Administrator).

---

[2] ELRP 2022 uses the DMC model to calculate actual feed costs producers experienced in 2022. The DMC formula aims to calculate feed costs to maintain a dairy cow to produce one hundredweight of milk, however FSA is using this model, and converting to maintain 1 animal unit.

DMC, as outlined in 7 CFR part 1430, calculates a national average feed cost using the following three items and are added together:

(1) The product determined by multiplying 1.0728 by the price of corn per bushel;

(2) The product determined by multiplying 0.00735 by the price of soybean meal per ton; and

(3) The product determined by multiplying 0.0137 by the price of alfalfa hay per ton.

Strickland AR 0825

*LFP* means the Livestock Forage Disaster Program under section 1501 of the Agricultural Act of 2014 (7 U.S.C. 9081) and 7 CFR part 1416, subpart C.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales did not exceed $179,000 (the amount applicable to the 2022 program year) in each of the 2019 and 2020 calendar years; and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the same 2 previous years referenced in paragraph (1) of this definition. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through National Resources and Conservation Service at *https://lrftool.sc.egov. usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ELRP 2022, a person or legal entity that owns a share or stock in a legal entity that is a corporation, limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is considered to have a beneficial ownership interest in such legal entity.

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*U.S. Drought Monitor* is a system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http:// droughtmonitor.unl.edu.*

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10)[3]) and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2)[4]) during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*Wildfire* for ELRP 2022 means fire as used in 7 CFR part 1416, subpart C.

**Eligible Livestock Producers**

Eligible livestock producers for ELRP 2022 are producers with an approved 2022 LFP application. For ELRP 2022, the eligibility criteria applicable to LFP (7 CFR part 1416, subparts A and C) also applies to ELRP 2022, excluding the LFP average adjusted gross income (AGI) limitation. FSA will use livestock inventories, forage acreage, restricted animal units, and grazing days due to fire, and drought intensity levels already reported to FSA for the 2022 Livestock Forage Disaster Program application [5] (on form number CCC–853), to determine eligibility and calculate an ELRP 2022 payment, if applicable. Eligible livestock producers are not required to submit an application for ELRP 2022; however, they must have the following additional forms on file

with FSA within 60-days of ELRP 2022 deadline announced by the Deputy Administrator to be eligible to receive a payment:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026, Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the ELRP 2022 producer and applicable affiliates.

For a producer to be eligible for a payment based on the higher payment rate for eligible underserved farmers or ranchers or increased payment limitation as described below, the following must be submitted within 60-days of the ELRP 2022 deadline announced by the Deputy Administrator:

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2022 program year[6]; or

∀ FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification, for a legal entity and all members of that entity.

**Payment Calculation**

The initial ELRP 2022 payment will be equal to the eligible livestock producer's gross 2022 LFP calculated payment [7] multiplied by the applicable

---

[3] The term "Armed Forces" means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[4] The term "veteran" means a person who served in the active military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

[5] As provided in 7 CFR 1416.206 and publicized by FSA, the LFP application deadline for the 2022 program year was January 30, 2023.

---

[6] An individual who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of their status for the 2022 program year because an individual's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what programs years the status would apply. An entity that has filed CCC–860 certifying its status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of its status for a later program year unless the entity's status has changed due to changes in membership. Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales, those producers must submit CCC–860 for each applicable program year.

[7] The gross LFP calculated payment is the amount calculated according to 7 CFR 1416.207, prior to
Continued

Strickland AR 0826

ELRP 2022 payment percentage of 90 percent for underserved farmers and ranchers and 75 percent for all other producers factored by a 25 percent factor to stay within available funding. [8] If funds remain available after initial payments, a second payment of up to 75 percent may be issued. For example, an underserved eligible livestock producer's gross 2022 LFP calculation payment is $10,000 multiplied by the 90 percent ELRP 2022 payment percentage multiplied by the 25 percent factor results in an initial ELRP 2022 payment of $2,250. The ELRP 2022 payment is intended to represent a reasonable approximation of 63 percent, factored by 25 percent, of the increased supplemental feed costs for that producer in 2022.

Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, must be on file with FSA with a certification applicable for the 2022 program year to receive the higher ELRP 2022 payment rate of 90 percent.

FSA will issue ELRP 2022 payments as 2022 LFP applications are processed and approved. If a producer files the CCC–860 or FSA–510 form and the accompanying certification by the deadline announced by the Deputy Administrator but after their ELRP 2022 payment is issued, FSA will recalculate the ELRP 2022 payment and issue the additional calculated amount as applicable.

**Payment Limitation**

The payment limitation for ELRP 2022 is determined by the person's or legal entity's average adjusted gross farm income (as defined above). Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or

---

any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and the applicant or member of an applicant that is an entity exceeding the average AGI limitation.

[8] FSA calculates payments based on a higher payment factor for underserved farmers and ranchers (or specific groups included in that term) in several programs, such as Emergency Conservation Program, Emergency Assistance for Livestock, Honeybees, and Farm-raised Fish Program (also known as ELAP), and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, previous ELRP Phase 1, and ERP. In addition, NAP provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

---

indirectly, more than $125,000 in payments under ELRP 2022 if their average adjusted gross farm income is less than 75 percent of their average AGI for tax years 2018, 2019, and 2020. If at least 75 percent of the person or legal entity's average AGI is derived from farming, ranching, and forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to $250,000 in ELRP 2022 payments. To receive more than $125,000 in ELRP 2022 payments, producers must submit form FSA–510, accompanied by a certification from a certified public accountant or attorney as to that person or legal entity's certification. If a producer requesting the $250,000 payment limitation is a legal entity, all members of that entity must also complete FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the $250,000 payment limitation based on the legal entity's average adjusted gross farm income but a member of that legal entity either does not complete an FSA–510 and provide the required certification or is not eligible for the $250,000 payment limitation, the payment to the legal entity will be reduced for the limitation applicable to the share of the ELRP 2022 payment attributed to that member.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ First level of ownership: Any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first-level or payment legal entity;

∀ Second level of ownership: Any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part

by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ Third and fourth levels of ownership: Except as provided in the second-level of ownership bullet above and in the fourth-level of ownership bullet below, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ Fourth level of ownership: If the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first-level or payment legal entity by the fourth-level legal entity.

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A producer that is a legal entity must provide the names, addresses, ownership share, and valid taxpayer identification numbers of the members holding an ownership interest in the legal entity. Payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent, at the first through fourth levels of ownership in the business structure, is not provided to FSA. A legal entity is not eligible to receive ELRP 2022 payments when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of 10 percent or more, at the first through fourth levels of ownership in the business structure, is not provided to FSA.

If an individual or legal entity is not eligible to receive ELRP 2022 payments due to the individual or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the individual or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible individual or ineligible legal entity. Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education

Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**Provisions Requiring Refund to FSA**

In the event that any ELRP 2022 payment resulted from erroneous information reported by the producer or if the producer's 2022 LFP payment is recalculated after the ELRP 2022 payment is issued, the ELRP 2022 payment will be recalculated, and the producer must refund any excess payment to FSA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ELRP 2022 payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

**General Provisions**

General requirements that apply to other FSA-administered commodity programs also apply to ELRP 2022, including compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation," and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780 and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ELRP 2022. The determination of matters of general applicability that are not in response to, or result from, an individual set of facts are not matters that can be appealed. Such matters of general applicability include, but are not limited to, the ELRP 2022 eligibility criteria and payment calculation.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. Participants receiving ELRP 2022 payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

The Deputy Administrator has the discretion and authority to waive or modify filing deadlines and other requirements or program provisions not specified in law, in cases where the Deputy Administrator determines it is equitable to do so and where the Deputy Administrator finds that the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ELRP 2022. Although producers have a right to a decision on whether they filed applications by the deadline or not, producers have no right to a decision in response to a request to waive or modify deadlines or program provisions. The Deputy Administrator's refusal to exercise discretion to consider the request will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ELRP 2022 will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ELRP 2022 payments.

In either applying for or participating in ELRP 2022, or both, the producer is subject to laws against perjury and any penalties and prosecution resulting therefrom, with such laws including but not limited to 18 U.S.C. 1621. If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ELRP 2022, or both, then the producer is guilty of perjury and, except as otherwise provided by law, may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201Ö), USDA waives the restriction on receipt of funds under ELRP 2022 but only as to beneficiaries who, as a condition of the waiver, agree to apply the ELRP 2022 payments to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ELRP 2022, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

**Paperwork Reduction Act Requirements**

In compliance with the provisions of the Paperwork Reduction Act (44 U.S.C. chapter 35), the information collection request has been approved by OMB under the control number of 0503–0028. FSA will collect the information from the livestock producers to qualify for the payment to assist with increased supplemental feed costs. This NOFA is the one-time announcement of the new ELRP 2022 federal financial assistance funding.

**Environmental Review**

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799).

As previously stated, ELRP 2022 is providing payments to eligible livestock producers who faced increased supplemental feed costs as a result of forage losses due to a qualifying drought or wildfire in calendar year 2022. The limited discretionary aspects of ELRP 2022 do not have the potential to impact the human environment as they are administrative. Accordingly, these discretionary aspects are covered by the FSA Categorical Exclusions specified in § 799.31(b)(6)(iv) that applies to individual farm participation in FSA programs where no ground disturbance or change in land use occurs as a result of the proposed action or participation; and § 799.31(b)(6)(vi) that applies to safety net programs.

No Extraordinary Circumstances (§ 799.33) exist. As such, the implementation of ELRP 2022 and the participation in ELRP 2022 do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or environmental impact statement for this action and this document serves as documentation of the programmatic environmental compliance decision for this federal action.

**Federal Assistance Programs**

The title and number of the Federal assistance programs, as found in the Assistance Listing,[9] to which this document applies is 10.980—Emergency Livestock Relief Program 2022.

**USDA Non-Discrimination Policy**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender

---

[9] See https://sam.gov/content/assistance-listings.

Strickland AR 0828

expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Individuals who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA TARGET Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410 or email: *OAC@usda.gov*.

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency.*

[FR Doc. 2023–21068 Filed 9–26–23; 8:45 am]

**BILLING CODE 3411–EB–P**

---

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

[Docket ID FSA–2023–00015]

### Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notification of funding availability.

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ELRP Phase 2. This document provides the eligibility requirements and payment calculation for the second

phase of ELRP assistance. ELRP Phase 2 will provide assistance to eligible livestock producers for the loss of the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by a continued lack of precipitation. This document also makes a correction and amendment to ELRP Phase 1.

**DATES:** *Funding availability:* Implementation will begin September 27, 2023.

**FOR FURTHER INFORMATION CONTACT:** Kathy Sayers, telephone: (202) 720–7649; email: *Kathy.Sayers@usda.gov*. Individuals with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice) or (844) 433–2774 (toll-free nationwide).

**SUPPLEMENTARY INFORMATION:**

### Background

The Extending Government Funding and Delivering Emergency Assistance Act, (Division B, Title I, Pub. L. 117–43) provides $10 billion for necessary expenses related to losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar years 2020 and 2021. From the $10 billion, the Secretary of Agriculture is to use $750 million to assist producers of livestock for losses incurred during calendar year 2021 due to qualifying droughts or wildfires. The livestock producers who suffered losses due to drought are eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for eight consecutive weeks or a D3 (extreme drought) or higher level of drought intensity during the applicable year.

On April 4, 2022, FSA announced that assistance for livestock producers would be provided through ELRP (87 FR 19465–19470).[1] ELRP Phase 1 paid for a portion of eligible producers' increased supplemental feed costs in 2021 based on the number of animal units (AU), limited by available grazing

acreage, in eligible drought counties. In order to deliver this assistance quickly, FSA used certain 2021 Livestock Forage Disaster Program (LFP) data and a percentage of the payment made through LFP applications as a proxy for these increased supplemental feed costs to eliminate the requirement for producers to resubmit information for ELRP Phase 1.

To stay within the available funding, ELRP Phase 1 payments were calculated at 90 percent of the gross LFP calculated payment for underserved farmers and ranchers and 75 percent of the gross LFP calculated payment for all other producers.[2]

This document provides the eligibility requirements and payment calculation for ELRP Phase 2 assistance. It also corrects an error in the ELRP Phase 1 provisions related to payment eligibility and amends ELRP Phase 1 to be consistent with LFP and ELRP Phase 2.

### ELRP Phase 2

For each eligible livestock producer who previously received an ELRP Phase 1 payment, FSA will issue an ELRP Phase 2 payment to assist with losses in the value of winter forage from the deterioration of grazing cover due to a qualifying drought or wildfire during the 2021 normal grazing period, which has been exacerbated by the continued lack of precipitation, using the ELRP Phase 1 payment as a proxy to calculate those losses. ELRP Phase 2 assistance is subject to the same ELRP payment limitation provided in the previous notice of funds availability. Because FSA is using LFP and ELRP Phase 1 information to calculate a producer's ELRP Phase 2 payment and determine eligibility due to a qualifying drought or wildfire during the 2021 normal grazing period, no action is required for eligible

---

[1] In addition, a clarification to the notice of funds availability for ELRP Phase 1 was published on August 18, 2022 (87 FR 50828–50830).

[2] "Underserved farmer or rancher" means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher. FSA calculates payments based on a higher payment factor for underserved farmers and ranchers (or specific groups included in that term) in several programs, such as Emergency Conservation Program; Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program; and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, Emergency Relief Program, and Pandemic Assistance Revenue Program. In addition, the Noninsured Crop Disaster Assistance Program provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

Strickland AR 0829



# Economic Research Service
## U.S. DEPARTMENT OF AGRICULTURE

Economic
Research
Service

Economic
Information
Bulletin
Number 231

December 2021

# America's Diverse Family Farms

## *2021 Edition*

Christine Whitt, Jessica E. Todd, and Andrew Keller



Strickland AR 0830

For further information, contact

Christine E. Whitt          (202) 694-5288          christine.whitt1@usda.gov
Jessica E. Todd             (202) 694-5363          jessica.todd@usda.gov
Andrew Keller               (202) 694-5610          andrew.keller@usda.gov

**Errata**

On January 10, 2022, the Federal crop insurance figure on page 27 was revised to correct "All family farms" to "Nonfamily farms." No other figures were impacted.

---

Images used in this publication are a derivative of images from Getty Images.

Use of commercial and trade names does not imply approval or constitute endorsement by USDA.

To ensure the quality of its research reports and satisfy governmentwide standards, ERS requires that all research reports with substantively new material be reviewed by qualified technical research peers. This technical peer review process, coordinated by ERS' Peer Review Coordinating Council, allows experts who possess the technical background, perspective, and expertise to provide an objective and meaningful assessment of the output's substantive content and clarity of communication during the publication's review.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

Strickland AR 0831

Broad descriptions of farms based on U.S. averages can mask variation among the many sizes and types of farms. For example, in 2020, the average value of production on the 2 million U.S. farms amounted to $183,467. Few farms, however, are near the average; half of the farms had production valued at $7,000 or less, whereas 66 percent of all production occurred on farms with at least $1 million of agricultural output.

This report uses a farm classification, or typology, developed by the U.S. Department of Agriculture's (USDA) Economic Research Service (ERS) to categorize farms into more homogeneous groupings to better understand conditions across the Nation's diverse farm sector. The classification is based largely on the farm's annual revenue, the main occupation of the farm's principal operator, and family versus nonfamily farm ownership. This report includes many sections that appear in each annual edition; generally, data and statistics for these sections have varied little across the years as changes in the agricultural sector's structure are usually gradual. Some sections in this edition include a comparison with 2011, the first year the current farm typology was in place. These 10-year reflections are not comprehensive over the entire decade, but they do give a sense of how little has changed in farm structure, value of production, and financial risk by farm type.

This edition also reports on some areas in which the coronavirus (COVID-19) pandemic may have affected farms and farm households; exploring changes in direct sales and off-farm employment in farm households; and examines the distribution of farm and non-farm pandemic assistance farms received in 2020. The pandemic and its impacts were not limited to 2020, and the Government response continues into 2021.

Strickland AR 0832

# Farm Typology

The farm typology, developed by USDA, ERS, focuses primarily on the "family farm," or any farm where the majority of the business is owned by the principal operator—the person who is most responsible for making day-to-day decisions for the farm—and by individuals who are related to the principal operator. USDA defines a farm as any place that, during a given year, produced, and sold—or normally would have produced and sold—at least $1,000 of agricultural products. USDA uses acres of crops and head of livestock to determine whether a place with sales of less than $1,000 could normally produce and sell the minimum amount required to be categorized as a farm. Farm size is measured by gross cash farm income (GCFI), a measure of the farm's revenue including sales of crops and livestock, Government payments, and other farm-related income, including fees received by operators from production contracts.

*This report used data from the Agricultural Resource Management Survey (ARMS), an annual survey conducted by USDA, National Agricultural Statistics Service (NASS) and USDA, ERS. Most of the analysis in this report is based on a sample of approximately 11,841 farms from the 2020 ARMS. Some analyses also use earlier years of the survey and the sample size in each year of data varies.*



Strickland AR 0833



**Small family farms (GCFI less than $350,000)**

- **Retirement farms:** Small farms whose principal opera-tors report having retired from farming, though continu-ing to farm on a small scale (219,288 farms; 10.9 percent of U.S. farms in 2020).

- **Off-farm-occupation farms:** Small farms whose prin-cipal operators report a primary occupation other than farming (779,767 farms; 38.8 percent of U.S. farms).

- **Farming-occupation farms:** Small farms whose princi-pal operators report farming as their primary occupation. Farming occupation farms are further sorted into two classes:

  — **Low-sales:** Farms with GCFI less than $150,000 (683,514 farms; 34.0 percent of U.S. farms).

  — **Moderate-sales:** Farms with GCFI between $150,000 and $349,999 (110,865 farms; 5.5 percent of U.S. farms).

**Midsize family farms (GCFI between $350,000 and $999,999)**

- Farms with GCFI between $350,000 and $999,999 (112,122 farms; 5.6 percent of U.S. farms).

**Large-scale family farms (GCFI of $1,000,000 or more)**

- **Large farms:** Farms with GCFI between $1,000,000 and $4,999,999 (51,708 farms; 2.6 percent of U.S. farms).

- **Very large farms:** Farms with GCFI of $5,000,000 or more (6,124 farms; 0.3 percent of U.S. farms).

**Nonfamily farms**

- Any farm where the principal operator and people relat-ed to the principal operator do not own a majority of the business (47,275 farms; 2.4 percent of U.S. farms).

# Farms, Production, and Farmland

**Most U.S. farms are small family farms; these farms operate almost half of U.S. farmland and account for 20 percent of production.**

- In 2020, approximately 89 percent of all farms were small family farms. Compared with 2011—the earliest year using the current farm typology—the share of land operated by small family farms fell from 52 to 48 percent, and the share of the value of production on small family farms declined from 26 to 20 percent.

- Large-scale family farms accounted for 46 percent of the total value of production in 2020, an increase from 35 percent in 2011. These farms also accounted for an increased share of total land operated, up from 16 percent in 2011 to 24 percent in 2020.

- In total, family farms accounted for about 98 percent of total farms and 87 percent of total production in 2020.

- Nonfamily farms accounted for the remaining 2 percent of farms and 13 percent of production. Among nonfamily farms, 18 percent had a GCFI of $1 million or more. Such farms accounted for 90 percent of nonfamily farms' production. Examples of nonfamily farms include partnerships of unrelated partners, closely held nonfamily corporations, farms with a hired operator unrelated to the owners, and publicly held corporations.

Strickland AR 0835

*4* **America's Diverse Family Farms:** 2021 Edition

**Distribution of farms, land operated, and value of production by farm type, 2011 and 2020**



Note: Due to rounding, numbers may not add to 100.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2011 and 2020 Agricultural Resource Management Survey.



America's Diverse Family Farms: 2021 Edition    5

Strickland AR 0836

**Large-scale family farms produce the majority of some—but not all—commodities.**

- The majority of the values of cotton (62 percent), dairy (73 percent), and high-value crops (57 percent) was produced on large-scale family farms in 2020. Small family farms produced the majority of hay (59 percent).

- Most poultry production is done under production contracts with a contractor paying a fee to a farmer who raises poultry to maturity. Small family farms produced 49 percent of U.S. poultry and egg output in 2020.

- Over one-quarter of beef production occurred on small family farms in 2020, whereas another 57 percent occurred on midsized and large-scale family farms. Small family farms generally have cow/calf operations, while large-scale family farms are more likely to operate feedlots.

- Nonfamily farms produced 27 percent of all high-value crops; 57 percent was produced on large-scale family farms in 2020.

**Value of production of selected commodities by farm type, 2020**



Notes: Specialty crops include fruits, nuts, vegetables, and nursery/greenhouse crops. Due to rounding, numbers may not add to 100.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0837

6    America's Diverse Family Farms: 2021 Edition

# Farm Financial Performance

**The Operating Profit Margin (OPM)—the share of gross income that is profit—is one way to gauge a farm's financial performance. Most small family farms have an OPM of less than 10 percent—indicating a higher risk of financial problems—whereas most midsize, large, and very large family farms report higher OPMs.**

- In 2020, between 57 and 83 percent of small family farms—depending on the farm type—had an OPM in the high-risk (red) zone (less than 10 percent OPM). Income from off-farm sources is not reflected in the OPM. Many retirement, off-farm occupation, and low-sales farm households earn little from farming with the majority of their income coming from off-farm sources.

- Large-scale family farms were most likely to have OPMs in the low-risk (green) zone (OPM>25 percent)—between 43 and 45 percent—and least likely to be in the red zone in 2020—between 26 and 30 percent. These farms are more likely to have positive on-farm income.

APP. 000838



**Farms by operating profit margin and type, 2020**

Notes: Due to rounding, sums may not add to 100 percent. Operating profit margin (OPM)=100 times (net farm income plus interest paid minus charges for unpaid labor and management)/gross farm income. OPM ratios are not calculated for operations with zero or negative gross farm income.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0839

**During the past 10 years, small farms were least likely to operate in the low-risk zone and most likely to operate in the high-risk zone.**

- The share of small family farms with an OPM greater than 25 percent declined from 18 percent in 2011 to just over 10 percent in 2020, while the share operating in the red zone—OPM of less than 10 percent—rose from 71 percent to 77 percent.

- Large-scale family farms were the most likely to operate in the low-risk zone and least likely to operate in the high-risk zone. The share of large-scale family farms with low-risk OPMs declined from 48 percent in 2011 to 43 percent in 2020. The share of large-scale family farms operating in the high-risk zone ranged between 27 and 37 percent during the same period.

- Nonfamily farms experienced an increase in the share of farms operating at low risk, and a decrease in the share operating at low risk in 2020 relative to 2019, as did midsize and large-scale family farms.

Strickland AR 0840

**Percent of farms with high- and low-operating profit margins by farm type, 2011–20**





Notes: Operating profit margin (OPM)=100 times (net farm income plus interest paid minus charges for unpaid labor and management)/gross farm income. OPM ratios are not calculated for operations with zero gross farm income.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2011–2020 Agricultural Resource Management Survey.

Strickland AR 0841

# Farm Operating Expenses

**The distribution of farm operating expenses varies across commodity specializations but remains largely unchanged over the 10-year period from 2011 to 2020.**

- A large share of total expenses on field crop farms went toward fertilizers and other chemicals (26 percent) in 2020, which was slightly less than the share spent in 2011 (27 percent). Spending on seed and plants accounted for another 14 percent of expenses on field crop operations in 2020, which was slightly more than in 2011 (13 percent).

- Feed expenses made up 48 percent of all expenses on dairy operations, 19 percent on cattle operations, and 29 percent on other livestock operations in 2020. The share of expenses allocated to feed on dairy and other livestock operations was similar in 2011. Livestock purchases accounted for a greater share of all expenses on beef cattle operations than did feed at 28 percent in 2020.

- The share of labor costs across all farms increased by 24 percent since 2011, despite a 22-percent decrease in the share allocated to labor costs for beef cattle operations. The largest increase in the share of operating expenses allocated to labor was in "other livestock" farms and specialty crops—19- and 13-percent increases, respectively.

- Unlike expenses such as seed or feed that follow closely with crop and livestock operations, respectively, certain expenses had relatively consistent shares across all types of farms in 2020. Machine-hire and custom work ranged from 1 to 5 percent; fuels and oils ranged from 3 to 6 percent; repairs and maintenance ranged from 4 to 8 percent; and other variable expenses ranged from 3 to 7 percent across all farm specializations. These shares of expenses were similar in 2011.

- Conversely, certain costs varied widely across farm specializations. Fixed costs ranged from 9 percent of dairy costs and 30 percent of field crop costs. Additionally, labor cost shares ranged from 6 percent for beef cattle operations to 40 percent of specialty crops.

APP. 000842

## Production expenses by farm specialization category, 2011 and 2020



Percent of total operating expenses

Legend:
- Other variable expenses
- Fixed costs
- Machine-hire and custom work
- Repairs and maintenance
- Fuels and oils
- Labor
- Utilities
- Fertilizer and chemicals
- Seed and plants
- Other livestock-related
- Feed
- Livestock purchases

Categories: All farms, Field crops, Specialty crops, Beef cattle, Dairy, Other livestock (2011 and 2020)

Notes: The field crops category includes farms specializing in wheat, corn, soybeans, sorghum, rice, tobacco, cotton, peanuts, and general crops; specialty crops include farms specializing in fruit and nuts, vegetables, and nursery crops; other livestock includes farms specializing in hogs, poultry, and general livestock. Fixed expenses include insurance, interest, rent and lease payments, and property and estate taxes. Livestock purchases exclude purchases of breeding stock, which is a capital expense. Other livestock-related expenses include livestock leasing, veterinarian services, bedding/litter/straw, removal of dead animals, and any other expense for livestock not counted elsewhere. Utilities includes electricity, telephone, and water/irrigation. Labor costs include all salary and wages paid to hired and contract laborers, including employment taxes and fringe benefits, but excludes wages paid to owner operators.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2011 and 2020 Agricultural Resource Management Survey.

### Definition of Operating Expenses

This section summarizes cash "operating expenses" paid by the operation as excluding any expenses paid by a landlord or contractor as well as capital expenses, such as expenditures on land improvements, new buildings, cars, trucks, and other vehicles, and land purchases.

Strickland AR 0843

# Farm Operator Household Income and Wealth

**As in previous years, the median total income of all family farm households was greater than the median income of all U.S. households in 2020.**

- Median total farm household annual income varied across farm types, with very large family farms having the largest median income at over $1 million compared with low-sales family farms at $55,455. Low-sales and retirement farms ($65,526) had median household income below all U.S. households ($67,521) and the median among U.S. households with self-employment income ($89,492).

- The percent of family farms with income below the U.S. median-income level varied from 9 to 68 percent, depending on the type of farm.

- Operators of small family farms—especially retirement, off-farm occupation, and low-sales farms—often reported losses from farming. In 2020, the average farm income among off-farm occupation farms was –$2,427 and low-sales farms was –$1,637. Retirement farm households reported average farm income of $5,430 in 2020.

- Farm households often use off-farm income to cover farm expenses. While self-employment and wage/salary jobs are the primary sources of off-farm income for farm households, public and private pensions, interest and dividend payments, asset sales, Social Security payments, and other sources of income have provided a significant share of off-farm income, particularly for retirement farms, which—in 2020—reported $42,634 in unearned income on average.

- Most family farms also have higher wealth than the median household in the United States. The share of family farms that have wealth below the median wealth held by all U.S. households ranged from 1 to 5 percent, depending on the type of farm. Land comprises most farm households' wealth.

## Median operator household income by farm type, 2020



Thousand dollars

Legend:
- Median income, all U.S. households with self-employment income, 2020 ($89,492)
- Median income, all U.S. households, 2020 ($67,521)

Bar values:
- Retirement: 65.5
- Off-farm occupation: 107.6
- Low sales: 55.5
- Moderate sales: 112.7
- Midsize family farms: 195.1
- Large: 374.7
- Very large: 1,095.4
- All family farms: 80.1

Categories: Small family farms (Retirement, Off-farm occupation, Low sales, Moderate sales); Midsize family farms; Large-scale family farms (Large, Very large); All family farms

Notes: Farm households are the households of the principal operator on family farms. Operator household income is not estimated for nonfamily farms. Operator household income includes both farm and off-farm income received by household members. Half of all households had incomes above the median, and half had incomes below the median.

Sources: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey; and U.S. Department of Commerce, Bureau of the Census, 2020 Current Population Survey, March supplement, for all U.S. households.

Strickland AR 0845

*14* **America's Diverse Family Farms:** 2021 Edition

**Farm households with income or wealth below the median for all U.S. households, 2020**

| | Farm households with | |
|---|---|---|
| | Income below U.S. median ($67,521) | Wealth below U.S. median ($123,358) |
| | Percent | |
| **Small family farms** | | |
| Retirement | 51.4 | 0.9 |
| Off-farm occupation | 21.1 | 2.7 |
| Low sales | 67.6 | 2.4 |
| Moderate sales | 29.6 | 2.7 |
| **Midsize family farms** | 19.2 | 5.3 |
| **Large-scale family farms** | | |
| Large | 12.7 | 3.6 |
| Very large | 8.5 | 3.1 |
| **All family farms** | 40.8 | 2.6 |

Notes: Farm households are the households of the principal operator on family farms. Operator household income and wealth are not estimated for nonfamily farms. Wealth is the value of household assets minus household debt. Given that net income is a calendar year flow, all income and expenses are included when they occur from January 1 to December 31. U.S. median wealth was adjusted to 2020 dollars using the Gross Domestic Product chain-type price index.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey; U.S. Department of Commerce, Bureau of the Census, 2021 Current Population Survey data; and the Federal Reserve Board, Board of Governors in cooperation with the U.S. Department of the Treasury, 2019 Survey of Consumer Finances.



**America's Diverse Family Farms:** 2021 Edition    *15*

Strickland AR 0846

**Farm operator household income by source and farm type, 2020**

| Farm type | Mean total income | Income from farming | | Mean income from off-farm sources | | |
|---|---|---|---|---|---|---|
| | | Mean amount | Is negative | Total | Earned | Unearned |
| | Dollars per household | | Percent of households | Dollars per household | | |
| **Small family farms** | | | | | | |
| Retirement | 78,028 | 5,430 | 49 | 72,599 | 29,964 | 42,634 |
| Off-farm occupation | 139,571 | −2,427 | 68 | 141,998 | 112,239 | 29,759 |
| Low sales | 61,245 | −1,637 | 59 | 62,883 | 27,331 | 35,552 |
| Moderate sales | 122,814 | 53,695 | 19 | 69,120 | 40,042 | 29,077 |
| **Midsize family farms** | 212,109 | 140,136 | 14 | 71,973 | 41,384 | 30,589 |
| **Large-scale family farms** | | | | | | |
| Large | 438,076 | 361,727 | 11 | 76,350 | 49,580 | 26,770 |
| Very large | 2,000,335 | 1,913,814 | 8 | 86,522 | 52,106 | 34,416 |
| **All family farms** | 122,291 | 25,603 | 54 | 96,688 | 63,530 | 33,158 |

Notes: Operator household income is not estimated for nonfamily farms. Earned income comes from off-farm self-employment or wage/salary jobs. Unearned income includes interest and dividends, benefits from Social Security and other public pensions, alimony, annuities, net income of estates or trusts, private pensions, etc. Components may not sum to total due to rounding.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0847

# Coronavirus (COVID-19) Pandemic and Direct Sales

**Definition of Direct Sales**

Direct sales are the sales of commodities produced, raised, or grown on the farm and sold either direct to the consumer (such as at farmers markets, farm stores, and community supported agriculture (CSA) arrangements) or to intermediary supply chains (such as retail outlets and regional distributors) that are subsequently sold directly to individuals or to institutions (such as schools and hospitals). Christmas trees and flowers, nursery products, craft items, and processed products, such as jellies, sausages, and hams, are excluded from the analysis of direct sales of commodities. Also, commodities produced under production contracts are excluded from this analysis because the farmer does not own the commodity. Farm-size categories used in this section differ from those used in the rest of the report because only a small share of operations participate in direct sales and these operations tend to be quite small.

APP. 000848

**In 2020, 7 percent of all farms sold commodities through direct sales, 7 percent sold direct-to-consumer (DTC), and 1 percent sold through intermediary supply chains.**

- Direct sales amounted to almost $10.7 billion—a nearly $2.8 billion (35 percent) increase from the value reported in the 2019 ARMS. Only 27 percent of total direct sales were DTC, whereas the remaining 73 percent occurred through intermediary supply chains. Among farms with less than $75,000 in GCFI, 85 percent of all direct sales were DTC in 2020.

- Changes in direct sales varied across farm-size categories. Farms with less than $75,000 in GCFI had $2.5 million less in overall direct sales in 2020 than in 2019. These smaller farms accounted for 8 percent of all the direct sales in 2020, down from 10 percent in 2019. Farms with direct sales and a GCFI between $75,000 and $350,000 increased their direct sales by $0.4 billion—which accounted for 11 percent of all direct sales—whereas farms with direct sales and a GCFI greater than $350,000 increased their direct sales by $2.4 billion, which accounted for 81 percent of all direct sales.

- The overall increase in direct sales in 2020 occurred across most direct sales marketing channels. Sales at farmers markets and restaurants increased by 11 and 13 percent, respectively, whereas sales at farm stores, CSAs, and other DTC channels, as well as sales to regional distributors, increased by 79 and 73 percent, respectively. However, sales to institutions declined by 86 percent in 2020 relative to 2019, which was likely due to pandemic closures or restricted operations.

- When reporting direct sales in 2020, operators were asked to recall and compare their sales with 2019 sales. Not all farms experienced increases in direct sales in all marketing channels. A larger share of farms selling at farmers markets, restaurants, and regional distributors in 2020 reported their 2020 sales were lower compared with 2019 than was the share selling in these outlets that reported their 2020 sales were higher than in 2019. On the other hand, a larger share of farms selling directly to consumers through farm stores, CSAs, and/or to grocery stores reported their 2020 sales were higher compared with 2019 than the share that reported 2020 sales were lower compared with their 2019 sales.



*18* **America's Diverse Family Farms:** 2021 Edition

Strickland AR 0849



**Direct sales by marketing channel and farm size, 2019 and 2020**

Notes: GCFI = gross cash farm income. CSA=Community Supported Agriculture. The "Farm store/CSA" category also includes sales from roadside stands, u-pick, and other informal direct-to-consumer sales. Regional distributors include food hubs and internet aggregators that then sell directly to consumers. Institutions include schools, hospitals, and other businesses providing dining services to consumers.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2019 and 2020 Agricultural Resource Management Survey.

**Farm-level direct sales in 2020 relative to 2019 direct sales among farms that had direct sales in 2020 by direct sales channel**



Notes: CSA=Community Supported Agriculture. The above percentages are calculated from respondents who had direct sales in 2019 and/or 2020 as reported in 2020. The "Farm store/CSA" category also includes sales from roadside stands, u-pick, and other informal direct-to-consumer sales. Regional distributors include food hubs and internet aggregators that then sell directly to consumers. Institutions include schools, hospitals, and other businesses providing dining services to consumers.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0851

# Coronavirus (COVID-19) Pandemic and Farm Household Employment

**Over 11 percent of all farm households had at least one household member lose an off-farm job due to the COVID-19 pandemic during 2020.**

- Over half (52 percent) of all family farm operations had at least one household member with an off-farm job in 2020, but the share varies by farm type. Fifty-three percent of households operating small farms, 44 percent of households operating midsize farms, and 33 percent of households operating large-scale farms had household members with off-farm jobs.

- In 2020, COVID-19-related disruptions caused 11 percent of all farm households to experience the loss or furlough of at least one of its member's off-farm jobs. Small-farm households experienced the greatest losses with 12 percent of households affected. On the other hand, 6 percent of households operating midsize and large-scale farms experienced a job loss or furlough.

- Individuals who became unemployed or were furloughed due to the pandemic could file for unemployment benefits. Households operating large-scale farms enjoyed higher rates of approvals of their applications for unemployment benefits. Of those large-scale farm households with someone applying for benefits, 83 percent reported receiving benefits. The acceptance rate was only 74 percent for households operating small farms.

- In total, 4 percent of households operating small farms reported at least one person receiving unemployment benefits in 2020, while only 2 percent and 1 percent of households operating midsize and large-scale farms, respectively, received unemployment benefits. These reports are consistent with the higher rate of job loss among households operating small farms.

Strickland AR 0852

**Off-farm unemployment and receipt of unemployment benefits among farm households by farm type, 2020**



Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0853

# Government Payments and Federal Crop Insurance

**Distribution of direct Government payments varied by farm and program type in 2020.**

- Small family farms received 81 percent of all payments from USDA's Conservation Reserve Program (CRP), which removes environmentally sensitive cropland from production. In contrast, working-land payments—such as those from the Environmental Quality Incentives Program (EQIP) and the Conservation Stewardship Program (CSP)—incentivize certain production practices on agricultural land and were more likely received by midsize family farms, large-scale family farms, and nonfamily farms. Overall, they received 68 percent of all working-land payments.

- The distribution of commodity-linked payments and other payments is similar to the contribution to the total value of production. Midsized and large-scale family farms along with nonfamily farms accounted for 80 percent of the total value of production and received 78 percent of commodity-linked, agricultural disaster programs, and other Federal, State, and local farm program payments.

- Small family farms received 16 percent of all farm-level pandemic assistance from USDA and 22 percent of all other Government payments—excluding pandemic assistance and conservation program payments—which was consistent with the smaller production scale. Large-scale family farms received 52 percent of all farm-level pandemic assistance and 44 percent of all other payments.

Strickland AR 0854

- Additionally, 64 percent of all farm-level pandemic assistance reported as having been received from the Coronavirus Food Assistance Programs (CFAP, programs 1 and 2) in 2020. Another 21 percent came from loans from the Small Business Administration (SBA) under the Paycheck Protection Program (PPP) and advances from the Economic Injury Disaster Loan (EIDL) program. PPP was created in 2020 to help cover employment costs and lost profits for all business sectors, including agriculture, while eligibility for the preexisting EIDL program was extended to agricultural operators in response to the pandemic. Fifteen percent came from other Federal, State, and local pandemic-assistance programs to operators.

- CFAP comprised most of all pandemic assistance reported as having been received among all farm types. The share of total assistance coming from the SBA was greatest among very large family farms (45 percent). This is likely because these farms have the most employees and are also more likely to earn a profit in any given year.

- Overall, 40 percent of all farms reported as having received some type of Government payment in 2020.



*24* **America's Diverse Family Farms:** 2021 Edition

Strickland AR 0855

**Distribution of selected Government agricultural program payments, 2020**



Notes: Pandemic Assistance includes loans from the Small Business Administration through the Paycheck Protection Program (PPP) and advances from the Economic Injury Disaster Loan (EIDL) program, payments from the Coronavirus Food Assistance Program, and other agricultural pandemic assistance. All other payments include commodity-linked programs such as the Agricultural Risk Coverage (ARC), Price Loss Coverage (PLC), and Dairy Margin Coverage program, as well as agricultural disaster payments and ad-hoc programs such as the Market Facilitation Program (MFP). The bars of the same color add to 100 percent.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

APP. 000856

**Distribution of total reported pandemic assistance, by farm type and type of assistance program, 2020**



Notes: CFAP = Coronavirus Food Assistance Program. SBA = Small Business Administration. *Includes loans from Paycheck Protection Program (PPP), all of which are assumed to be forgiven, and advances from the Economic Injury Disaster Loan (EIDL), but not the total amount of EIDL loan, and overlap between PPP and EIDL advances is accounted for. Other pandemic agriculture assistance includes any other Federal, State, or local pandemic assistance to agriculture, excluding CFAP payments and SBA loans.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

Strickland AR 0857

**Indemnities from Federal crop insurance were roughly proportional to acres of harvested cropland and concentrated among midsize and large-scale farms in 2020.**

- Overall, 14 percent of farms participated in Federal crop insurance programs, but participation rates varied widely across farm types. Less than 10 percent of retirement, off-farm occupation, and low-sales farms purchased Federal crop insurance, whereas 40 percent or more of other family farm types participated in these programs. Large family farms were the most likely to participate with 71 percent in 2020.

- Although midsize and large family farms made up 8 percent of all U.S. farms in 2020, they accounted for 38 percent of Federal crop insurance participants and 58 percent of all harvested cropland acres.

- Midsize and large-scale family farms together accounted for 65 percent of all program harvested acres and received 77 percent of indemnities from Federal crop insurance in 2020. These family farms were also the most likely to participate in Federal crop insurance.

**Federal crop insurance participants, harvested cropland, and indemnities, 2020**



Note: The bars of the same color add to 100 percent.

Source: USDA, National Agricultural Statistics Service and USDA, Economic Research Service, 2020 Agricultural Resource Management Survey.

# Conclusions and Implications

- **Farming is still overwhelmingly a family business.** Ninety-eight percent of U.S. farms are family farms, and they account for 87 percent of farm production.

- **Small family farms make up about 90 percent of the farm count and operate almost half of the farmland.** The largest share of the value of farm production (46 percent), however, occurs on large-scale family farms. Small family farms account for 49 percent of the value of poultry and eggs and 59 percent of hay production.

- **The share of farms with a low-risk operating profit margin (OPM) varied by farm size in 2020.** Between 57 and 83 percent of small family farms have an OPM in the high-risk zone—depending on the farm type—compared with 26 and 40 percent of midsize and large-scale family farms, respectively. Some small family farms in each type operate at the low-risk zone, as do more than 37 percent of midsize, large, and very large family farms.

- **The distribution of farm operating expenses varies across commodity specializations.** Crop farms allocate a large share of their total expenses to seed and fertilizer, while feed and livestock purchases comprise a large share of total expenses among cattle and livestock operations. How farm specializations allocate their expenses did not change dramatically between 2011 and 2020.

- **Farm households, in general, are neither low income nor low wealth.** In 2020, median farm household income, which includes both farm and off-farm income sources, exceeded that for all U.S. households, but it was lower than the median income of all U.S. households with self-employment income. About 41 percent of farm households had income below that of the median for all U.S. households, and 3 percent had wealth less than the U.S. median in 2020.



Strickland AR 0859

- **The share of farm operations having reported participating in direct sales fell from 8 percent in 2019 to 7 percent in 2020.** However, total direct sales amounted to about $10.7 billion in 2020, which is $2.8 billion, or 35 percent, higher than in 2019. Direct sales to restaurants and grocery stores made up the largest share of direct sales in 2020—42 percent—and witnessed a nearly $500 million increase in sales from 2019. Likely due to institutional shutdowns in response to COVID-19, direct sales to institutions saw an 86-percent decline in sales in 2020. Sales at farmers markets, on-farm stores, u-pick, roadside stands, and the like, as well as through regional distributors or aggregators, saw an increase in 2020 relative to 2019.

- **Over half of all farm family households had at least one person with an off-farm job.** Eleven percent of all farm households reported either a loss of—or furlough from—an off-farm job in 2020, and 4 percent of all farm households received unemployment benefits.

- **More Conservation Reserve Program (CRP) payments went to different types of farms than other Government payments.** CRP payments target environmentally-sensitive cropland, with most payments going to retirement, off-farm occupation, and low-sales farms. In contrast, most commodity-related and working-land payments went to family farms with a gross cash farm income (GCFI) of $350,000 or more.

- **Most of the pandemic assistance to agriculture was from the Coronavirus Food Assistance Program (CFAP).** Farms also received loans from the Small Business Administration through the Paycheck Protection Program (PPP) and the Economic Injury Disaster Loan (EIDL) program. Very large family farms received a greater share of their pandemic assistance from SBA loans, likely because they employed more workers and are also more likely to earn a profit in any given year.

- **Overall, 14 percent of farms participated in Federal crop insurance in 2020.** Indemnities from Federal crop insurance were roughly proportional to acres of harvested cropland. Midsize and large-scale family farms together accounted for 65 percent of all program harvested acres and received 77 percent of indemnities from Federal crop insurance in 2020.

The mission of USDA's Economic Research Service is to anticipate trends and emerging issues in agriculture, food, the environment, and rural America and to conduct high-quality, objective economic research to inform and enhance public and private decision making. ERS shapes its research program and products to serve those who routinely make or influence public policy and program decisions.

Follow us on Twitter
@USDA_ERS
**www.ers.usda.gov**

Strickland AR 0861

**2022 EMERGENCY RELIEF DECISIONS**
**MAY 19, 2023**

---

**OVERVIEW:**

This memo provides the final decision for the following key items pertaining to ERP 2022:

- ERP Track 1 Payment Calculation using Progressive Factoring
- ERP 2022 Track 2 Determination of Benchmark Year

**ERP Track 1 Payment Calculations**

The basic track 1 ERP payment calculation considers the following data elements and math:

*\*\* RMA calculated gross ERP payment \* share \* progressive factoring + premiums/fees for underserved producers*

This calculation substantiates the highest benefit for the UP producer by adding the premiums/fees after factoring.

Progressive factoring will occur at the Producer Payee Level

**Progressive factor is at the producer level (only using the eligible units the producer selected for payment)**

- RMA Estimated ERP payment \* share calculated for primary insured and SBI producers
- Progressive payment factor applied per producer, including all SBI producers
- Add on premiums and service fees to calculate payment for each underserved producer

  - *Applying progressive factor at the producer level will not have any impact on the application process.*
  - *Results in higher payment to primary policy holder and all SBI's.*
  - *More accurate calculation of a progressive factor based on their calculated Track 1 payment.*
  - *Easily accommodates producer's ability to not select ineligible units and/or crops producers do not want to be required to meet linkage*



EXAMPLE 1: PROGRESSIVE FACTOR AT PRODUCER LEVEL (APPLIES ONLY TO RMA)

1

Strickland AR 0862

## Who will implement the Progressive Factoring (FSA/RMA)

Recommendation: FSA

Pros:

- Ability to easily update the factors/ranges (through a program load table handled within FSA) without a change on the application.
  **Note:** After the application is live, only increases are allowed not decreases to the factors, because obligation has been committed and overpayment would not be due to changed data elements or producer provided information.
- Implementation on FSA's payment side can illustrate how the progressive factoring was calculated for ease of county office/producer.
- Would not require communications with RMA for questions on progressive factoring.
- If progressive factoring is done at a policyholder level, an addition of a record from RMA will not alter the application but only change the Estimated Calculated Payment Report (ECPR).
- Payment factoring is typically done on payment side.
- If progressive factors are changed it may delay implementation of the program if RMA applies the factors because of data calculations and subsequent transmission of information to FSA.
- The progressive factor will need to be built by FSA for Track 2. If utilized in Track 1 code will be existing for Track 2.
- RMA has acknowledged that it would be more difficult for RMA to address corrections if they are doing the progressive payment factor.
- Corrections process can be developed and improved if FSA implements progressive payment factor.
- Would allow FSA to calculate progressive factoring based only on the crops/units elected by the producer. (in cases of no qualifying disaster event/not wanting to meet linkage). RMA can only calculate a progressive payment factor to all crops/units that received an indemnity regardless of whether a producer elects payment.

Cons:

- FSA will be accountable and responsible for calculations and corrections.

2

Strickland AR 0863

**Data to be Shared from RMA to FSA:**

The RMA data elements required would be the same whether FSA implements progressive factoring or not. These are required because of statutory requirements of eligible disaster conditions and linkage requirements, as well as accommodating a simplified and timely corrections process.

The following are the required data elements:

- CCID
- Reinsurance Year
- AIP Code
- AIP Policy Producer Key
- First Name
- Middle Name
- Last Name
- Business Name
- Entity Type Code
- Primary Location State Code
- Primary Location County Code
- Insurance Plan Code
- Commodity Code(s)*
- Commodity Name(s)*
- Commodity Year
- Unit Structure Code
- Unit Number*
- Total Indemnity
- Producer Premium
- Administrative Fees
- Calculated ERP Payment(prior to progressive factoring and applying premiums and administrative fees)

SBI File needs:

- CCID
- Reinsurance Year
- AIP Code
- AIP Policy Producer Key
- First Name
- Last Name
- Middle name
- Business Name
- Entity Type Code
- Landlord/Tenant Flag

3

Strickland AR 0864

**Revenue Calculation for Track 2 - Benchmark Year with option to use Expected Disaster Year Revenue in Comparison to Actual Disaster Year Revenue**

**Background**:

ERP Phase 2 required producers to select either 2018 and 2019 as their benchmark year. For many producers, both 2018 and 2019 were disaster years and were not reflective of a typical year of revenue for the farming operation. This was further exacerbated by high commodity prices in 2021 – 2022. These concerns have been received from producers, state and county offices, and stakeholders as a flaw in the current structure of the program.

Under the 2020/2021 ERP Phase 2, adjustments to benchmark year revenue were only required for new producers who did not have a benchmark year revenue in 2018 or 2019 or if the producer had a decrease in operation capacity in the disaster year as compared to the benchmark year. For new producers, adjusted benchmark year revenue was based on Expected Disaster Year Revenue. As such, Phase 2 policy already has the methodology for calculating expected disaster year revenue which can be expanded and applied to all producers. As a result, benchmark year revenue would be calculated consistently for all producers.

**Decision:**

Based on the identified concerns the decision for ERP 2022, Track 2 benchmark revenue has been expanded and will utilize one of the following:

- Tax Year 2018 or 2019 revenue for benchmark, (Same calculation as Phase 2) or
- Expected disaster year revenue. (Producer calculation of benchmark based on the income expected for the crop year)

Adding the available criteria of expected disaster year revenue for the benchmark year necessitates a change to what is included as revenue in the disaster year. When a producer chooses to utilize expected revenue as their benchmark year revenue, the benchmark will consist of the expected revenue for eligible crops (absent any disaster conditions) compared to *actual disaster year* revenue. This comparison would reflect the actual revenue loss due to qualifying disaster conditions.

Disaster year revenue would only include:

- revenue from actual crop sales,
- revenue from crop insurance indemnities and NAP payments, less premiums and fees, and
- the actual value of the crop for crops not sold (such as wine grapes/forage)

4

*Examples provided are for yield-based crops.

Note: For non-yield-based crops, expected revenue could also easily be certified by the producer using the expected vs actual approach.

Example 1:

Producer A grows NI Yellow corn gr and soybeans com gr. (Price/Yield data from NCT, – McHenry ND)

Expected Disaster Year Revenue (Benchmark):

Corn 1000ac (Planted Acres) x 103 Bu (Expected Yield) x $5.90 (Expected Price) = $607,700 expected revenue

Soybeans 500ac (Planted Acres) x 33 Bu (Expected Yield) x $14.33 (Expected Price)= _$236,445 expected revenue_

*$844,145 Total Expected revenue * 90% factor (over 60% insured/NAP covered) = $759,731*

Actual Disaster Year Revenue:

Corn Sales = $388,960

Soybean Sales = $186,450

Crop insurance indemnity for Corn (less premiums and fees) = $75,000

*$650,410 Total actual revenue*

 ***Payment Calculation: $759,731 - $650,410 = $109,321 * 15% UP =  $125,719***


Example 2:

Expected Disaster Year Revenue: Example 2

Producer B grows, hay for feed, wheat, barley

IGS Mixed Forage for feed (not sold) = $45,867 (Producer certified crop value (since the crop was not sold) based on planted acres (500) x expected yield (1.28 ton) x expected price ($71.6667).

Wheat HRS Gr 500ac(Expected Acres) x 65 Bu (Expected Yield) x $7.22 (Expected Price) = $234,650

Barley Spr Gr 500ac (Expected Acres) x 80 Bu (Expected Yield) x $6.95 (Expected Price)  = _$278,000_

*$ 558,517 Total Expected revenue * $502,666*

Actual Revenue: Example 2

IGS Mixed Forage not sold = $26,875 (producer certified value of actual production)  Producer certified amount based on total acres (500), harvested production (.75 tons), and county expected price ($71.6667).

Wheat sales = $191,250

Barley sales =  $198,900
*$417,025 Total actual revenue*

***Payment Calculation: $502,666 - $417,025 = $85,641 * 15% UP =  $98,487***

5

Strickland AR 0866

| **From:** | White, Jamie - FPAC-FSA, DC |
|---|---|
| **Sent:** | Monday, July 3, 2023 8:49 AM |
| **To:** | Sayers, Kathy - FPAC-FSA, DC; Walter, Michael - FPAC-FSA, DC |
| **Cc:** | Berge, John - FPAC-FSA, NE; Graham, Kimberly - OSEC, DC |
| **Subject:** | FW: Pending ERP 2022 Decision Items - High Priority |

**Importance:**      High

Kathy and Mike,

DAFP met with Mike Schmidt on Friday to review progressive factoring and the two pending ERP 2022 decision items. Please be advised that DAFP and Mike have concurred with the following two recommendations detailed below.

This should close out decision items pending review. Please do not hesitate to reach out if there are any questions or concerns.

Thank you!

**Jamie White**
Assistant to Deputy Administrator for Farm Programs (DAFP)
Farm Service Agency (FSA)
U.S. Department of Agriculture (USDA)

**Phone** 605.352.1181  **Mobile** 605.461.8052
**Email** jamie.white@usda.gov
1400 Independence Ave., Washington, DC 20250

---

**From:** Berge, John - FPAC-FSA, NE <John.Berge@usda.gov>
**Sent:** Monday, June 26, 2023 4:06 PM
**To:** Mehta, Riya - FPAC-FSA, DC <Riya.Mehta@usda.gov>; Gannon, Timothy - OSEC, DC <Timothy.Gannon@usda.gov>; Schmidt, Michael - OSEC, DC <Michael.Schmidt3@usda.gov>
**Cc:** White, Jamie - FPAC-FSA, DC <jamie.white@usda.gov>; Graham, Kimberly - OSEC, DC <kimberly.graham@usda.gov>
**Subject:** FW: Pending ERP 2022 Decision Items - High Priority
**Importance:** High

Good afternoon – per my email earlier, I wanted to share the items below for your review and perhaps for your concurrence. It is my hope that by highlighting these recommendations for each of these decision items, we can keep these moving, but want to be sure that each of you individually and all of you collectively are comfortable with the direction that we are working toward as we have made these recommendations based on the guiding principles that you all have offered. Please let us know if you have objections. Getting these decisions made will allow us to move forward with rule-making and software development. If you would prefer to discuss or offer alternatives, please do. Thanks so much.

**Decision Item 1: Track 2 – Application of Insured (90%) and Uninsured (70%) ERP Factor**

ERP Track 2 has been designed to accommodate an ERP factor of up to 90% for producers who suffer revenue losses attributed to crops covered by crop insurance and/or NAP. Statute is prescriptive and requires that assistance for uninsured losses cannot exceed 70% of the crop's value as determined by the Secretary. ***FSA recommends that application of the ERP Factor of 90% (insured factor) under Track 2 be based on participant certification that ALL CROPS included in claimed revenue are insured or covered by NAP.*** This approach comports with statute and minimizes

1

Strickland AR 0867

the application burden on the participant. Any bifurcation of revenue by crop to support the application of both the insured and uninsured ERP Factor under Track 2 creates additional software complexity and becomes overly burdensome for the participant.

**Decision Item 2: Track 2 – UP Factor Payment Calculation**

To comport with statute, any UP top-up factor (15%) cannot exceed the statutory payment cap of 90% or 70% of the crop value. Track 2 embraces an insured and uninsured payment factor further incentivizing crop insurance and NAP, necessitating the establishment of a payment calculation demonstrating gross ERP Track 2 assistance (including UP top-up) does not exceed the 90% or 70% factor payment cap established by statute.

***FSA recommends calculating the 15% UP top-up AFTER progressive factoring with built in software logic ensuring the final payment issued does not exceed 100% of the gross ERP Track 2 payment. Calculation: Gross ERP Payment x Progressive Factor x UP factor (115%) = Total Payment NTE Gross ERP Payment.*** While the combined Track 2 gross payment and additional UP benefit exceed the statutory limits of 90% or 70%, this approach leverages the use of the progressive factor for levels that do not pay at 100% by demonstrating the statutory limits are not exceeded as the final payment will not exceed the gross calculated ERP benefit. While this methodology will not provide an UP benefit to participants whose gross payment falls within the first bucket (paid at 100%), this approach maximizes available assistance to all small-scale operations while supporting the additional UP top-up benefit for non-traditional operations and participants.

***Example:***
- Progressive Factoring Sample Criteria: First $5K pays at 100%, 2nd $5K pays at 75%, 3rd $5K pays at 50%, Greater than $15K pays at 25%.
- Gross calculated Track 2 payment of $40,000 is progressively factored to $17,500, with UP top-up of 15% the final payment issued to the participant is $20,125 which does not exceed the gross ERP 2 benefit calculated.

Strickland AR 0868





United States
Department of
Agriculture

Farm
Service
Agency **fsa.usda.gov**

Strickland AR 0869

Emergency Relief Program
2022



United States
Department of
Agriculture

## Background

Agricultural losses due to natural disaster were widespread across crops and geography in <u>2022</u>

Funding to address impacts to crops is approximately $3.2 billion

Losses not covered by crop insurance or NAP are estimated at $10 billion - About equal to 2020 and 2021 combined

**This presentation details how the $3.2 billion appropriated for the Emergency Relief Program in 2022 (ERP 2022) will be distributed over $10.6 billion in 2022 losses that were not covered by crop insurance or the Noninsured Crop Disaster Assistance Program (NAP)**

Farm
Service
Agency

fsa.usda.gov

Strickland AR 0870

**United States Department of Agriculture**

**ERP 2022 for crop losses will be implemented in two tracks:**

1. Track 1 (Includes Losses Indemnified by Crop Insurance or NAP) uses data from existing USDA programs to prefill producer applications, streamlining and expediting the process for producers

   A. Track 1A/RMA Records represent around 80% of the $10 billion in uncovered losses and uses crop insurance data from the Risk Management Agency

   B. Track 1B/NAP Records uses program data from FSA's NAP

2. Track 2 (Whole Farm Revenue Model) allows producers to seek relief for losses missed by Track 1

   A. Based on expected revenue vs. actual revenue

**Farm Service Agency**

**fsa.usda.gov**

Strickland AR 0871

APP. 000871

**United States
Department of
Agriculture**

## Comparison of ERP 2022 to ERP 2020/21 Features:

**What's the same?**

1. **The higher the coverage level on producers' crop insurance or NAP policy, the higher the factor that will be used in calculating their gross ERP payment**

2. **Track 1B (NAP Records) gross payments will be paid at a factor of 100%**

3. **Premiums/Fees refunded under Track 1B (NAP Records)**

4. **The types of natural disaster event that establish eligibility:**

   - Qualifying Drought (D2 for 8 weeks, D3 or greater)
   - Wildfires
   - Hurricanes
   - Floods
   - Derechos
   - Excessive Heat
   - Tornadoes – New in ERP 2022
   - Winter Storms
   - Freeze
   - Smoke Exposure
   - Excessive Moisture
   - Related Conditions (occurred as a direct result of a qualifying disaster event)

**Farm
Service
Agency**

**fsa.usda.gov**

Strickland AR 0872



United States
Department of
Agriculture

## Comparison of ERP 2022 to ERP 2020/21 Features:

**What's new?**

1. **Track 1A (RMA Records) and Track 2 (Whole Farm Revenue Model) gross payments will be paid using progressive factors instead of a flat factor**

   A.  This approach targets payments to 2 groups:

      i.   Losses incurred by smaller producers

      ii.  Shallow losses (those that are small relative to overall crop size or those that are already partially indemnified)

2. **Premiums/Fees refunded for underserved producers under Track 1A (RMA Records)**

   A.  Given the reduced funding available for ERP 2022, reducing outlays attributed to the full refund of premiums and fees (estimated $2 billion) under Track 1A (RMA Records) optimizes funding available to support equitable assistance under both tracks of ERP 2022 while targeting assistance to smaller operations and underserved participants

   B.  Refund of premiums and fees for underserved participants under Track 1A (RMA Records) is estimated to be approximately $432 million

3. **On Track 2, a 90% revenue guarantee has been added, and producers can use 2022 expected revenue as a benchmark instead of 2018 or 2019**

4. **Track 1 and 2 applications will be accepted simultaneously**

**Farm
Service
Agency**

fsa.usda.gov

Strickland AR 0873

APP. 000873



United States
Department of
Agriculture

*PRODUCER PAYMENT CALCULATIONS...*

**Farm
Service
Agency**

**fsa.usda.gov**

Strickland AR 0874

# PRODUCER PAYMENT calculation steps: Track 1A/RMA

| Crop Insurance Coverage Level | ERP Factor (percent) |
|---|---|
| Catastrophic coverage | 75.0 |
| More than catastrophic coverage but less than 55 percent | 80.0 |
| At least 55 percent but less than 60 percent | 82.5 |
| At least 60 percent but less than 65 percent | 85.0 |
| At least 65 percent but less than 70 percent | 87.5 |
| At least 70 percent but less than 75 percent | 90.0 |
| At least 75 percent but less than 80 percent | 92.5 |
| At least 80 percent | 95.0 |

1. **Gross payment = (RMA calculated loss - net crop insurance indemnity) * ERP factor associated with coverage level (See table on left)**

   **Note: The greater the crop insurance coverage level, the greater the ERP factor**

2. **Track 1A (RMA Records) gross payments are then progressively factored**

3. **Premiums/fees are refunded for underserved producers (UP)**

**Farm Service Agency**

fsa.usda.gov

Strickland AR 0875

**USDA** United States Department of Agriculture

## PRODUCER PAYMENT calculation steps: Track 1B/NAP Records

| NAP Coverage Level | ERP Factor (percent) |
|---|---|
| Catastrophic coverage | 75.0 |
| 50 percent | 80.0 |
| 55 percent | 85.0 |
| 60 percent | 90.0 |
| 65 percent | 95.0 |

1. Gross payment = new revenue guarantee - salvage value - NAP payment

   **Note: The greater the NAP coverage level, the higher the new revenue guarantee**

2. Track 1B (NAP Records) gross payments are not progressively factored but, instead, are paid at 100%

3. Premiums/fees are refunded for underserved producers (UP); however, budgetary impact is negligible as these were already waived for UPs enrolled in NAP at the catastrophic coverage level

   **Note: > 90% of participants are enrolled in NAP at catastrophic coverage level**

**Farm Service Agency**

**fsa.usda.gov**

Strickland AR 0876

**United States Department of Agriculture**

## PRODUCER PAYMENT calculation steps: Track 2 (Whole Farm Record Model)

1. Gross payment = benchmark year revenue * ERP factor - disaster year revenue - Track 1 payments

   A. Benchmark year can be 2018, 2019, or expected revenue for 2022

   B. ERP factor is 90% for insured crops and 70% for uninsured crops

2. Track 2 gross payments are then progressively factored

3. Payments to underserved producers under Track 2 will then be multiplied by 115%

   Note: The Total Track 2 benefit including the Underserved Producer benefit (Step 3) will not exceed the calculated Gross ERP Track 2 benefit calculated in Step 1 to ensure the payment caps of 70% and 90% prescribed by statute are not exceeded.

**Farm Service Agency**

fsa.usda.gov

Strickland AR 0877

United States Department of Agriculture

Farm Service Agency

fsa.usda.gov

## AGGREGATE - Cost of ERP 2022 Estimated at $2.74 billion:

| | ($ billions) | |
|---|---|---|
| **Track 1A/RMA:** | | |
| The sum of all PRODUCER PAYMENTS after progressively factoring $7.9 billion in losses (effective factor = 27%) | 2.14 | |
| Plus: Premium/fee refund for underserved producers: | 0.43 | |
| Less: Payment limitations, attributions, netting, etc. | 0.26 | |
| | | 2.31 |
| **Track 1B/NAP:** | | |
| The sum of all PRODUCER PAYMENTS made at 100% factor | 0.20 | |
| Less: Payment limitations, attributions, netting, etc. | 0.02 | |
| | | 0.18 |
| **Track 2:** | | |
| The sum of all PRODUCER PAYMENTS after progressively factoring 1.9 billion in losses (effective factor = 13%) | 0.25 | |
| Plus: 15% benefit for underserved producers | 0.02 | |
| Less: Payment limitations, attributions, netting, etc. | 0.03 | |
| | | 0.24 |
| **ERP 2022 Total Payment:** | | **2.74** |

Strickland AR 0878

**United States Department of Agriculture**

**Farm Service Agency**

**fsa.usda.gov**

Strickland AR 0879

# Progressive Factoring

## Used for Track 1A (RMA Records) and Track 2 (Whole Farm Revenue Model)

**United States Department of Agriculture**

| Gross Payment Band | Factor |
|---|---|
| $0 to $2,000 | 100% |
| $2,001 to $4,000 | 80% |
| $4,001 to $6,000 | 60% |
| $6,000 to $8,000 | 40% |
| $8,001 to $10,000 | 20% |
| > $10,000 | 10% |

**Example of how a $5K gross payment for an individual producer would be factored:**

**$2K in band 1 * 100%**

**$2K in band 2 * 80%**

**$1K in band 3 * 60%**

Pays a higher portion of small or shallow losses

Progressive Factoring changes the distribution of payments but does not increase costs

**Farm Service Agency**

**fsa.usda.gov**

Strickland AR 0880

APP. 000880

United States
Department of
Agriculture

**Farm
Service
Agency**

**fsa.usda.gov**

Strickland AR 0881

Progressive Factoring is designed to pay more to program participants who are due a gross payment of less than $30,000 under Track 1A (RMA Records), which is 82% of producers.

**USDA** United States Department of Agriculture

## Ex. Net payment calculation steps under Track 1A/RMA Records for producer with $20,000 gross payment

| Bucket min | Bucket max | Gross | Progressive factor | Net | Flat factor | Net |
|---|---|---|---|---|---|---|
| $0 | $2,000 | $2,000 | 1.00 | $2,000 | 0.27 | $541 |
| $2,001 | $4,000 | $2,000 | 0.80 | $1,600 | 0.27 | $541 |
| $4,001 | $6,000 | $2,000 | 0.60 | $1,200 | 0.27 | $541 |
| $6,001 | $8,000 | $2,000 | 0.40 | $800 | 0.27 | $541 |
| $8,001 | $10,000 | $2,000 | 0.20 | $400 | 0.27 | $541 |
| $10,001 | $12,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $12,001 | $14,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $14,001 | $16,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $16,001 | $18,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $18,001 | $20,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $20,001 | $22,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $22,001 | $24,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $24,001 | $26,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $26,001 | $28,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $28,001 | $30,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $30,001 | $32,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $32,001 | $34,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $34,001 | $36,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $36,001 | $38,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $38,001 | $40,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $40,001 | $42,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $42,001 | $44,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $44,001 | $46,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $46,001 | $48,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $48,001 | $50,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $50,001 | No max | $0 | 0.10 | $0 | 0.27 | $0 |
| Gross Payment | $20,000 | | Net payment | $7,000 | Net payment | $5,409 |

1. **Calculate producer's gross payment**

2. **Divide into standardized "bands"**

3. **Multiply respective factor by amount from each band**

4. **Total across all bands to achieve net payment**

**Note: This producer would receive a 29% higher net payment than under a program using the flat factor of 27%, which has equal outlays to the proposed progressive factoring**

**Farm Service Agency** fsa.usda.gov

Strickland AR 0882

# Ex. Net payment calculation under Track 1A/RMA Records for producer with $30,000 gross payment

| Bucket min | Bucket max | Gross | Progressive factor | Net | Flat factor | Net |
|---|---|---|---|---|---|---|
| $0 | $2,000 | $2,000 | 1.00 | $2,000 | 0.27 | $541 |
| $2,001 | $4,000 | $2,000 | 0.80 | $1,600 | 0.27 | $541 |
| $4,001 | $6,000 | $2,000 | 0.60 | $1,200 | 0.27 | $541 |
| $6,001 | $8,000 | $2,000 | 0.40 | $800 | 0.27 | $541 |
| $8,001 | $10,000 | $2,000 | 0.20 | $400 | 0.27 | $541 |
| $10,001 | $12,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $12,001 | $14,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $14,001 | $16,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $16,001 | $18,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $18,001 | $20,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $20,001 | $22,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $22,001 | $24,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $24,001 | $26,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $26,001 | $28,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $28,001 | $30,000 | $2,000 | 0.10 | $200 | 0.27 | $541 |
| $30,001 | $32,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $32,001 | $34,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $34,001 | $36,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $36,001 | $38,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $38,001 | $40,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $40,001 | $42,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $42,001 | $44,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $44,001 | $46,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $46,001 | $48,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $48,001 | $50,000 | $0 | 0.10 | $0 | 0.27 | $0 |
| $50,001 | No max | $0 | 0.10 | $0 | 0.27 | $0 |
| Gross Payment | $30,000 | | Net payment | $8,000 | Net payment | $8,114 |

**Gross payments $30K and larger would net lower payments under progressive factoring**

**RMA data indicate that 18 percent of producers in Track 1A are due a gross payment of $30k or more**

**By using progressive factoring, the approach increases emergency relief payments to most participants while scaling back those at the top end**

United States Department of Agriculture

**Farm Service Agency**

fsa.usda.gov

Strickland AR 0883

# Conclusion

**Progressive factors allow payments to be targeted to smaller producers and shallower losses, without increasing costs**

**Total aggregate outlays for ERP 2022 (Both Tracks 1 and 2) are estimated at $2.74 billion**

**This includes an additional 5% on track 1A/RMA Records to account for outstanding crop insurance claims**

**Outlays could outpace expectations by nearly 10% and still remain within budget**

**To provide further protection against cost overruns, a 75% max initial payment will be instituted**

**This lowers the projected cost to $2.06 billion**

**Producers will receive 75% of their net payment initially**

**As budget permits, the remaining portion of their net payment will be issued**

**If funds are not exhausted, factors can be increased and additional payments issued**

United States
Department of
Agriculture

**Farm
Service
Agency**

fsa.usda.gov

Strickland AR 0884

United States
Department of
Agriculture

## Notes on Track 1 (Losses Indemnified by Crop Insurance or NAP) cost estimate methodology

### Track 1A/RMA Records

Assumption: some crop year 2023 losses will be paid in program year 2022

For example, winter wheat planted in fall 2022 that experienced winter kill in December 2022 before spring 2023 harvest

Or late-season Florida oranges that were subject to a December 2022 freeze in the middle of the May 1, 2022, to June 30, 2023, crop insurance coverage period

### Track 2B/NAP Records

Assumption: crop units receiving payment had low salvage values

Grass is the largest commodity covered under NAP; however, only grass harvested for forage is eligible for ERP

Assumption: 50% of ERP 1B payments will be for grass

Follows the trend of an increasing share: in 2020, 16 percent of gross ERP 1B payments were on grass and, in 2021, 28% of gross ERP 1B payments were on grass

Widespread drought in the Plains during 2022 supports a higher portion of payments to grass

**Farm
Service
Agency**

fsa.usda.gov

Strickland AR 0885

**USDA**
United States
Department of
Agriculture

## Notes on Track 2 (Whole Farm Revenue Model) cost estimate methodology

Assumption: ERP track 2 gross payments will equal to those of 2020 and 2021 combined

This phenomenon was observed in RMA data and is generalized to track 2
Producers can use expected revenue in lieu of 2018 and 2019 as a benchmark year
More producers will participate, and losses will be inflated by higher commodity prices

Gross ERP track 2 payments from 2020/2021 are summed, then multiplied by 1.29 to account for the higher revenue guarantee available this year

90% / 70% = 1.29

The impacts of progressive factoring are estimated by assuming the same distribution of payments as 2020/2021

Only 6% of total gross payments are in or below the $10K band
Larger gross payments in Track 2 means higher savings by using progressive factoring

**Farm**
**Service**
**Agency**

**fsa.usda.gov**

Strickland AR 0886

Strickland AR 0887



| ☺ | ← Reply | ← Reply All | → Forward | ⋯ |

Tue 8/22/2023 4:07 PM

# RE: Updated cost estimate -- ERP 2022



AC  Aulbur, Chris - FPAC-RMA, MO
To: ● Vuillemin, Jacob - FPAC-FBC, MO
Cc: ● Ferreira, Gustavo - FPAC-FBC, DC

Retention Policy  USDA 7 Year Permanently Delete (7 years)    Expires  8/20/2030

ⓘ You replied to this message on 8/23/2023 7:23 AM.

Here you go, let me know how it works out.



| 0-2000 | 2 | 588274284 |
|---|---|---|
| 2001-4000 | 4 | 460712735 |
| etc | 6 | 387697004 |
| | 8 | 337052421 |
| | 10 | 267520925 |
| | 12 | 242044370 |
| | 14 | 221389577 |
| | 16 | 180509182 |
| | 18 | 174727063 |
| | 20 | 162566340 |
| | 22 | 151399460 |
| | 24 | 142069412 |
| | 26 | 133320844 |
| | 28 | 125442398 |
| | 30 | 118329382 |
| | 32 | 111714457 |
| | 34 | 105627489 |
| | 36 | 99871377 |
| | 38 | 94303575 |
| | 40 | 89740646 |
| | 42 | 85115699 |
| | 44 | 81085260 |
| | 46 | 77253237 |
| | 48 | |
| | 50 | 2767467070 |
| total | | 7716266284 |

| 0-2000 | 2 | 588274284 |
|---|---|---|
| 2001-4000 | 4 | 460712735 |
| etc | 6 | 387697004 |
| | 8 | 337052421 |
| | 10 | 267520925 |
| | 12 | 242044370 |
| | 14 | 221389577 |
| | 16 | 180509182 |
| | 18 | 174727063 |
| | 20 | 162566340 |
| | 22 | 151399460 |
| | 24 | 142069412 |
| | 26 | 133320844 |
| | 28 | 125442398 |
| | 30 | 118329382 |
| | 32 | 111714457 |
| | 34 | 105627489 |
| | 36 | 99871377 |
| | 38 | 94303575 |
| | 40 | 89740646 |
| | 42 | 85115699 |
| | 44 | 81085260 |
| | 46 | 77253237 |
| | 48 | |
| | 50 | 2767467070 |
| total | 7716266284 | |

Strickland AR 0888

ERP 2022 COST ESTIMATE 09272023.xlxs

TAB 1B-NAP

[REDACTED—NOT PART OF ADMINISTRATIVE RECORD]

Strickland AR 0889

ERP 2022 COST ESTIMATE 09272023.xlxs

TAB 1B-NAP grass adj.

[REDACTED—NOT PART OF ADMINISTRATIVE RECORD]

Strickland AR 0890

ERP 2022 COST ESTIMATE 09272023.xlxs

TAB ERP2

[REDACTED—NOT PART OF ADMINISTRATIVE RECORD]

Strickland AR 0891

|  |  | Track 1A – RMA |  |  |  | Track 1B – NAP |  |  |  |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Bucket min | Bucket max | RMA gross | Share | Factor | RMA net | NAP gross | Share | Factor | NAP net |
| $0 | $2,000 | $588,274,284 | 8% | 1.00 | $588,274,284 | $51,579,246 | 23% | 1.00 | $51,579,246 |
| $2,001 | $4,000 | $460,712,735 | 6% | 0.80 | $368,570,188 | $27,921,273 | 13% | 1.00 | $27,921,273 |
| $4,001 | $6,000 | $387,687,004 | 5% | 0.60 | $232,612,202 | $18,638,813 | 8% | 1.00 | $18,638,813 |
| $6,001 | $8,000 | $337,053,421 | 4% | 0.40 | $134,842,968 | $13,849,117 | 6% | 1.00 | $13,849,117 |
| $8,001 | $10,000 | $298,349,898 | 4% | 0.20 | $59,669,980 | $10,848,227 | 5% | 1.00 | $10,848,227 |
| $10,001 | $12,000 | $267,520,925 | 3% | 0.10 | $26,752,093 | $8,734,623 | 4% | 1.00 | $8,734,623 |
| $12,001 | $14,000 | $242,544,370 | 3% | 0.10 | $24,254,437 | $7,230,894 | 3% | 1.00 | $7,230,894 |
| $14,001 | $16,000 | $221,389,577 | 3% | 0.10 | $22,138,958 | $6,113,706 | 3% | 1.00 | $6,113,706 |
| $16,001 | $18,000 | $203,762,809 | 3% | 0.10 | $20,376,281 | $5,267,150 | 2% | 1.00 | $5,267,150 |
| $18,001 | $20,000 | $188,509,182 | 2% | 0.10 | $18,850,918 | $4,520,812 | 2% | 1.00 | $4,520,812 |
| $20,001 | $22,000 | $174,273,063 | 2% | 0.10 | $17,427,306 | $3,937,461 | 2% | 1.00 | $3,937,461 |
| $22,001 | $24,000 | $162,566,340 | 2% | 0.10 | $16,256,634 | $3,481,319 | 2% | 1.00 | $3,481,319 |
| $24,001 | $26,000 | $151,599,860 | 2% | 0.10 | $15,159,986 | $3,058,620 | 1% | 1.00 | $3,058,620 |
| $26,001 | $28,000 | $142,069,412 | 2% | 0.10 | $14,206,941 | $2,730,023 | 1% | 1.00 | $2,730,023 |
| $28,001 | $30,000 | $133,320,844 | 2% | 0.10 | $13,332,084 | $2,461,921 | 1% | 1.00 | $2,461,921 |
| $30,001 | $32,000 | $125,442,398 | 2% | 0.10 | $12,544,240 | $2,218,617 | 1% | 1.00 | $2,218,617 |
| $32,001 | $34,000 | $118,329,382 | 2% | 0.10 | $11,832,938 | $2,009,345 | 1% | 1.00 | $2,009,345 |
| $34,001 | $36,000 | $111,716,437 | 1% | 0.10 | $11,171,644 | $1,793,741 | 1% | 1.00 | $1,793,741 |
| $36,001 | $38,000 | $105,627,489 | 1% | 0.10 | $10,562,749 | $1,646,842 | 1% | 1.00 | $1,646,842 |
| $38,001 | $40,000 | $99,871,377 | 1% | 0.10 | $9,987,138 | $1,520,438 | 1% | 1.00 | $1,520,438 |
| $40,001 | $42,000 | $94,530,575 | 1% | 0.10 | $9,453,058 | $1,404,376 | 1% | 1.00 | $1,404,376 |
| $42,001 | $44,000 | $89,740,646 | 1% | 0.10 | $8,974,065 | $1,303,961 | 1% | 1.00 | $1,303,961 |
| $44,001 | $46,000 | $85,115,699 | 1% | 0.10 | $8,511,570 | $1,222,981 | 1% | 1.00 | $1,222,981 |
| $46,001 | $48,000 | $81,085,250 | 1% | 0.10 | $8,108,525 | $1,143,307 | 1% | 1.00 | $1,143,307 |
| $48,001 | $50,000 | $77,253,237 | 1% | 0.10 | $7,725,324 | $1,058,129 | 0% | 1.00 | $1,058,129 |
| $50,001 | No max | $2,767,467,070 | 36% | 0.10 | $276,746,707 | $36,189,457 | 16% | 1.00 | $36,189,457 |
| Total |  | $7,716,266,284 |  | 0.27 | $2,045,784,947 | $221,884,398 |  | 1.00 | $221,884,398 |
| UP |  | $432,192,149 |  |  | $432,192,149 | $0 |  |  | $0 |
| Less payment limitations, attribution, netting, etc. | 0.10 | ($814,845,843) |  |  | ($247,797,710) | ($22,188,440) |  |  | ($22,188,440) |
| Final |  | $7,333,612,590 |  |  | $2,230,179,387 | $199,695,958 |  |  | $199,695,958 |

Strickland AR 0892

**Track 2**

| ERP 2 gross | Share | Factor | ERP 2 net |
|---|---|---|---|
| $48,607,874 | 1.21% | 1.00 | $48,607,874 |
| $46,441,359 | 1.16% | 0.80 | $37,153,088 |
| $44,511,569 | 1.11% | 0.60 | $26,706,941 |
| $42,786,821 | 1.07% | 0.40 | $17,114,728 |
| $41,145,427 | 1.03% | 0.20 | $8,229,085 |
| $39,562,342 | 0.99% | 0.10 | $3,956,234 |
| $38,047,528 | 0.95% | 0.10 | $3,804,753 |
| $36,736,590 | 0.92% | 0.10 | $3,673,659 |
| $35,631,185 | 0.89% | 0.10 | $3,563,118 |
| $34,567,941 | 0.86% | 0.10 | $3,456,794 |
| $33,756,682 | 0.84% | 0.10 | $3,375,668 |
| $32,592,436 | 0.81% | 0.10 | $3,259,244 |
| $31,673,342 | 0.79% | 0.10 | $3,167,334 |
| $30,811,307 | 0.77% | 0.10 | $3,081,131 |
| $29,935,413 | 0.75% | 0.10 | $2,993,541 |
| $29,101,726 | 0.73% | 0.10 | $2,910,173 |
| $28,315,772 | 0.71% | 0.10 | $2,831,577 |
| $26,896,974 | 0.69% | 0.10 | $2,689,697 |
| $26,182,479 | 0.67% | 0.10 | $2,618,248 |
| $25,545,021 | 0.65% | 0.10 | $2,554,502 |
| $24,912,423 | 0.64% | 0.10 | $2,432,792 |
| $24,327,918 | 0.61% | 0.10 | $2,432,792 |
| $23,763,713 | 0.59% | 0.10 | $2,376,371 |
| $23,215,968 | 0.58% | 0.10 | $2,321,597 |
| $3,185,926,205 | 79.40% | | $318,592,620 |

**All ERP 2022**

| Gross | Gross share | Effective factor | Net | Net share |
|---|---|---|---|---|
| $688,461,405 | 6% | | $688,461,405 | 25% |
| $535,075,368 | 4% | 0.81 | $433,644,549 | 16% |
| $450,837,386 | 4% | 0.62 | $277,957,956 | 10% |
| $353,484,559 | 3% | 0.42 | $165,784,814 | 6% |
| $350,343,552 | 3% | 0.22 | $78,747,292 | 3% |
| $315,817,890 | 3% | 0.12 | $39,442,950 | 1% |
| $287,822,792 | 2% | 0.12 | $35,290,084 | 1% |
| $264,239,874 | 2% | 0.12 | $31,926,323 | 1% |
| $244,661,143 | 2% | 0.12 | $29,206,549 | 1% |
| $227,597,935 | 2% | 0.12 | $26,828,524 | 1% |
| $210,355,536 | 2% | 0.12 | $24,735,525 | 1% |
| $198,640,095 | 2% | 0.12 | $22,957,196 | 1% |
| $186,331,822 | 2% | 0.11 | $21,385,940 | 1% |
| $175,610,743 | 1% | 0.11 | $20,018,095 | 1% |
| $165,718,178 | 1% | 0.11 | $18,787,546 | 1% |
| $156,762,741 | 1% | 0.11 | $17,673,029 | 1% |
| $148,654,499 | 1% | 0.11 | $16,673,860 | 1% |
| $141,101,163 | 1% | 0.11 | $15,873,282 | 1% |
| $134,161,153 | 1% | 0.11 | $14,896,282 | 1% |
| $127,574,293 | 1% | 0.11 | $14,125,823 | 1% |
| $121,479,972 | 1% | 0.11 | $13,411,935 | 0% |
| $115,957,030 | 1% | 0.11 | $12,769,268 | 0% |
| $110,666,599 | 1% | 0.11 | $12,167,343 | 0% |
| $105,992,270 | 1% | 0.11 | $11,628,203 | 0% |
| $103,530,660 | 1% | 0.11 | $11,105,383 | 0% |
| $5,989,582,732 | 50% | 0.11 | $631,529,785 | 23% |

| ERP 2 gross | | Factor | ERP 2 net | | Gross | | Effective factor | Net |
|---|---|---|---|---|---|---|---|---|
| $4,012,387,256 | | 0.13 | $516,701,138 | | $11,950,537,937 | | 0.23 | $2,784,370,483 |
| $300,929,044 | | | $38,752,585 | | $733,121,193 | | | $470,944,734 |
| ($431,331,630) | | | ($855,545,372) | | ($1,268,365,913) | | | ($325,531,522) |
| $3,881,984,670 | | | $499,908,351 | | $11,415,293,217 | | | **$2,929,783,695** |

| | Gross | Net |
|---|---|---|
| Add 2.5 percent | | $3,003,028,288 |
| Add 5 percent | | $3,076,272,880 |
| Add 10 percent | | $3,222,762,065 |

| | Net |
|---|---|
| **Apply 75% max initial payment** | **$2,197,337,772** |
| Add 2.5 percent | $2,252,271,216 |
| Add 5 percent | $2,307,204,660 |
| Add 10 percent | $2,417,071,549 |

bringing about a balance between production, and utilization of agricultural products.'' The collection of information in this request is based on the AMA, title II, subtitle A, § 203, principally, paragraphs (b), (g), and (k) that direct the Secretary of Agriculture to determine agricultural marketing costs and develop efficient marketing methods to reduce the price spread between producer and consumer; to collect and disseminate marketing information to bring about a balance between production and utilization of agricultural products; and to collect, tabulate, and disseminate agricultural marketing statistics.

Under this authority, the Agricultural Marketing Service (AMS) Livestock, Poultry, and Grain Market News (LPGMN) Division works to provide timely information of prices, supply, demands, trends, movement, and other details affecting the trade of livestock, poultry, meat, eggs, grain, and their related products, as well as locally produced and marketed products. The information requested is used to compile and disseminate market reports that provide current, unbiased information to all stakeholders in the U.S. agricultural industry.

*Need and Use of the Information:* Information is used by the private sector to make economic decisions to establish market values for application in contracts or settlement value, and to address specific concerns or issues related to trade agreements and disputes as well as being used by educational institutions, specifically, agricultural colleges and universities. Government agencies such as the Foreign Agricultural Service, Economic Research Service and the National Agricultural Statistics Service use market news data in the performance of their missions. LPGMN reports provide interested segments of the market chain and the general public with unbiased comprehensive livestock, poultry, meat, eggs, wool, grain market data which helps equalize the competitive position of all market participants. The absence of these data would deny primary and secondary users information that otherwise would be available to aid them in their production and marketing decisions, analyses, research and knowledge of current market conditions. The omission of these data could adversely affect prices, supply, and demand.

*Description of Respondents:* Business or other for-profit; Farms.

*Number of Respondents:* 3,220.

*Frequency of Responses:* Reporting: Weekly; Annually.

*Total Burden Hours:* 17,970.

**Levi S. Harrell,**
*Departmental Information Collection Clearance Officer.*

[FR Doc. 2023–23952 Filed 10–30–23; 8:45 am]

**BILLING CODE 3410–02–P**

---

## DEPARTMENT OF AGRICULTURE

### Submission for OMB Review; Comment Request

The Department of Agriculture has submitted the following information collection requirement(s) to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. Comments are requested regarding; whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; ways to enhance the quality, utility and clarity of the information to be collected; and ways to minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

Comments regarding this information collection received by November 30, 2023 will be considered. Written comments and recommendations for the proposed information collection should be submitted within 30 days of the publication of this notice on the following website *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

An agency may not conduct or sponsor a collection of information unless the collection of information displays a currently valid OMB control number and the agency informs potential persons who are to respond to the collection of information that such persons are not required to respond to the collection of information unless it displays a currently valid OMB control number.

### Food and Nutrition Service

*Title:* Understanding States' SNAP Customer Service Strategies (NEW).

*OMB Control Number:* 0584–NEW.

*Summary of Collection:* The Food and Nutrition Service (FNS) is interested in exploring how State agencies define and measure the quality of customer service for Supplemental Nutrition Assistance Program (SNAP) applicants and participants, particularly strategies that go beyond the minimum requirements set by FNS; and how State SNAP agencies implement and refine their customer service approaches. This study will conduct case studies in up to nine states to understand their approaches to defining, measuring, and improving customer service in SNAP.

*Need and Use of the Information:* (1) Review of existing studies, reports, and data on customer service strategies and approaches. (2) Case studies in up to nine states with diverse approaches to supporting and monitoring customer service in SNAP.

The research team will collect case study data during two-day in-person site visits to each selected State that will include interviews with State, regional (*e.g.,* call center), and local SNAP staff and key stakeholders, review of relevant documents and reports, and observations of staff interactions with customer service systems.

*Description of Respondents:* State, Local and Tribal Governments, Businesses.

*Number of Respondents:* 116.

*Frequency of Responses:* Reporting: Once.

*Total Burden Hours:* 144.

**Ruth Brown,**
*Departmental Information Collection Clearance Officer.*

[FR Doc. 2023–23960 Filed 10–30–23; 8:45 am]

**BILLING CODE 3410–30–P**

---

## DEPARTMENT OF AGRICULTURE

### Farm Service Agency

**[Docket ID FSA–2023–0020]**

### Notice of Funds Availability; Emergency Relief Program 2022 (ERP 2022)

**AGENCY:** Farm Service Agency, USDA.

**ACTION:** Notice of funds availability.

---

**SUMMARY:** The Farm Service Agency (FSA) is issuing this notice announcing ERP 2022, which will provide payments to eligible crop producers for losses due to qualifying disaster events including wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions that occurred in calendar year 2022. ERP 2022 will be administered through 2 tracks (referred to as Track 1 and Track 2). Track 1 will

Strickland AR 0893

assist eligible crop producers who received indemnities for eligible crop or tree losses through certain Federal crop insurance policies or payments for crop losses through the Noninsured Crop Disaster Assistance Program (NAP). Track 2 will assist eligible crop producers for other eligible crop and tree losses through a revenue-based approach.

**DATES:**

*Funding availability:* Application period for Track 1 will begin October 31, 2023. Application period for Track 2 will begin October 31, 2023.

*Comments:* We will consider comments we receive by January 2, 2024.

**ADDRESSES:** You may submit comments by the following method: Federal eRulemaking Portal: Go to *https://www.regulations.gov* and search for Docket ID FSA–2023–0020. You may also send comments to the Desk Officer for Agriculture, Office of the Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503. Comments will be available for public inspection online at *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Kathy Sayers; telephone: (202) 720–6825; email: *kathy.sayers@usda.gov.* Individuals who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay service (both voice and text telephone users can initiate this call from any telephone).

**SUPPLEMENTARY INFORMATION:**

**Background**

Title I of the Disaster Relief Supplemental Appropriations Act, 2023 (Division N of the Consolidated Appropriations Act, 2023; Pub. L. 117–328) provides approximately $3.74 billion, to remain available until expended, for necessary expenses related to losses of revenue, quality, or production losses of crops (including milk, on-farm stored commodities, crops prevented from planting in 2022, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze, including a polar vortex, smoke exposure, and excessive moisture occurring in calendar year 2022. Losses due to drought are only eligible for assistance if any area within the county in which the loss occurred was rated by the U.S. Drought Monitor as having a D2 (severe drought) for 8 consecutive weeks

or a D3 (extreme drought) or higher level of drought intensity.

FSA is using the funding to assist eligible producers who suffered eligible losses through several programs.[1] In this document, FSA is announcing ERP 2022, which will assist eligible crop producers who suffered eligible losses due to qualifying disaster events as defined in this document. These producers have been significantly impacted by qualifying disaster events occurring in 2022, which have resulted in significant losses. FSA has designed ERP 2022 consistent with the public interest in streamlining and expediting disaster assistance payments to agricultural producers to the greatest extent possible. ERP 2022 will be administered through 2 tracks:

∀ Track 1 will use a streamlined process with pre-filled application forms, as discussed in this document. It will provide payments for eligible crop losses and tree losses, described below, where data are already on file with FSA or the Risk Management Agency (RMA), as a result of the producer previously receiving a NAP payment or an indemnity under certain Federal crop insurance policies for a loss in the same year that could have been affected by a qualifying disaster event; and

∀ Track 2 will provide payments for eligible crop and tree losses through a revenue-based approach using data provided by eligible producers on application forms.

Producers with losses that are eligible for Track 1 may apply for Track 1, Track 2, or both tracks; however, the Track 2 payment calculation will take into account any payments the producer receives under Track 1 to ensure a producer is not receiving duplicate benefits under both tracks.

Both tracks cover the same eligible crops, as defined below. For payment limitation purposes, ERP 2022 classifies eligible crops into the following categories:

∀ specialty crops;
∀ non-specialty crops;
∀ high value crops; and
∀ other crops.

The term "non-specialty crop" only applies to Track 1, the terms "high value crop" and "other crop" only apply to Track 2, and the term "specialty crop" applies to both tracks; those terms are defined in this

document and discussed below in the payment limitation section.

**Definitions**

The definitions in 7 CFR parts 718 and 1400 apply to ERP 2022, except as otherwise provided in this document. The following definitions also apply.

*2017 WHIP* means the 2017 Wildfires and Hurricanes Indemnity Program (7 CFR part 760, subpart O).

*Administrative fee* means the amount an insured producer paid for catastrophic risk protection and any additional coverage for each crop year as specified in the applicable Federal crop insurance policy.

*Aquaculture* means any species of aquatic organisms grown as food for human or livestock consumption or for industrial or biomass uses, fish raised as feed for fish that are consumed by humans, and ornamental fish propagated and reared in an aquatic medium. Eligible aquacultural species must be raised by a commercial operator and in water in a controlled environment.

*ARC* means the Agriculture Risk Coverage program (7 CFR part 1412).

*Average adjusted gross farm income* means the average of the person or legal entity's adjusted gross income (AGI) derived from farming, ranching, and forestry operations, including losses, for the base period consisting of the 2018, 2019, and 2020 tax years.

If the resulting average adjusted gross farm income derived from items 1 through 12 of the definition of income derived from farming, ranching, and forestry operations is at least 66.66 percent of the average AGI of the person or legal entity, then the average adjusted gross farm income may also take into consideration income or benefits derived from the following:

(1) The sale of equipment to conduct farm, ranch, or forestry operations; and

(2) The provision of production inputs and production services to farmers, ranchers, foresters, and farm operations.

For legal entities not required to file a Federal income tax return, or a person or legal entity that did not have taxable income in one or more tax years during the base period, the average will be the adjusted gross farm income, including losses, averaged for the 2018, 2019, and 2020 tax years, as determined by FSA. A new legal entity will have its adjusted gross farm income averaged only for those years of the base period for which it was in business; however, a new legal entity will not be considered "new" to the extent it takes over an existing operation and has any elements of common ownership interest and land

---

[1] FSA previously announced Emergency Livestock Relief Program 2022 (ELRP 2022) on September 27, 2023 (88 FR 66361–66366) and the Milk Loss Program on September 11, 2023 (88 FR 62285–62292). ELRP 2022 and Milk Loss Program payments for 2022 losses have the same funding source as ERP 2022.

Strickland AR 0894

with the preceding person or legal entity from which it took over. When there is such commonality, income of the previous person or legal entity will be averaged with that of the new legal entity for the base period. For a person filing a joint tax return, the certification of average adjusted farm income may be reported as if the person had filed a separate Federal tax return and the calculation is consistent with the information supporting the filed joint return.

*Average AGI* means the average of the AGI as defined under 26 U.S.C. 62 or comparable measure of the person or legal entity. The relevant tax years for the 2022 program year are 2018, 2019, and 2020.

*BCAP* means the Biomass Crop Assistance Program (7 CFR part 1450).

*Beginning farmer or rancher* means a farmer or rancher who has not operated a farm or ranch for more than 10 years and who materially and substantially participates in the operation. For a legal entity to be considered a beginning farmer or rancher, at least 50 percent of the interest must be beginning farmers or ranchers.

*Buy-up NAP coverage* means NAP coverage at a payment amount that is equal to an indemnity amount calculated for buy-up coverage computed under section 508(c)I or (h) of the Federal Crop Insurance Act and equal to the amount that the buy-up coverage yield for the crop exceeds the actual yield for the crop.

*Catastrophic coverage* has the same meaning as for NAP (in 7 CFR 1437.3), which is:

(1) For insured crops, the coverage offered by the Federal Crop Insurance Corporation (FCIC) under section 508(b) of the Federal Crop Insurance Act.

(2) For eligible NAP crops, coverage at the following levels due to an eligible cause of loss impacting the NAP covered crop during the coverage period:

(i) Prevented planting in excess of 35 percent of the intended acres;

(ii) A yield loss in excess of 50 percent of the approved yield;

(iii) A value loss in excess of 50 percent; or

(iv) An animal-unit-days (AUD) loss greater than 50 percent of expected AUD.

*CFAP* means the Coronavirus Food Assistance Program 1 and 2 under 7 CFR part 9, subparts A through C, excluding assistance for contract producers specified in § 9.203(l) through (o).

*Certifying agent* means a private or governmental entity accredited by the USDA Secretary for the purpose of certifying a production, processing, or handling operation as organic.

*Controlled environment* means an environment in which everything that can practicably be controlled by the producer with structures, facilities, and growing media (including but not limited to water, soil, or nutrients), is in fact controlled by the producer, as determined by industry standards.

*Coverage level* means the percentage determined by multiplying the elected yield percentage under a Federal crop insurance policy or NAP coverage by the elected price percentage.

*Crop year* means:

(1) For insured crops and trees, the crop year as defined according to the applicable Federal crop insurance policy; and

(2) For NAP-covered crops, the crop year as defined in 7 CFR 1437.3.

*Deputy Administrator* means the FSA Deputy Administrator for Farm Programs.

*Direct market crop* means a crop sold directly to consumers without the intervention of an intermediary such as a registered handler, wholesaler, retailer, packer, processor, shipper, or buyer (for example, a crop sold at a farmer's market or roadside stand), excluding crops sold for livestock consumption.

*Disaster year* means the calendar year in which the qualifying disaster event occurred (that is, 2022).

*ELAP* means the Emergency Assistance for Livestock, Honeybees, and Farm-Raised Fish Program (7 CFR part 1416, subpart B).

*Eligible crop* means a crop, including eligible aquaculture, that is produced, or would have been produced if the qualifying disaster event had not occurred (for example, crops prevented from planting), in the United States as part of a farming operation. It excludes:

(1) Crops for grazing;

(2) Aquatic species that do not meet the definition of aquaculture;

(3) *Cannabis sativa L.* and any part of that plant that does not meet the definition of hemp; and

(4) Timber.

*Farming operation* means a business enterprise engaged in the production of agricultural products, commodities, or livestock, operated by a person, legal entity, or joint operation. A person or legal entity may have more than one farming operation if the person or legal entity is a member of one or more legal entity or joint operation.

*FCIC* means the Federal Crop Insurance Corporation, a wholly owned Government Corporation of USDA, administered by RMA.

*Federal crop insurance* means an insurance policy reinsured by FCIC

administered by RMA under the provisions of the Federal Crop Insurance Act (7 U.S.C. 1501–1524), as amended. It does not include private plans of insurance.

*Federal crop insurance indemnity* means the payment to a participant for crop losses covered under Federal crop insurance administered by RMA in accordance with the Federal Crop Insurance Act.

*Feedstock* means a crop including, but not limited to, grassesor legumes, algae, cotton, peanuts, coarse grains, small grains, oilseeds, or short rotation woody crops grown expressly for the purpose of producing a biobased material or product, and does not include residues and by-products of crops grown for any other purpose.

*Hemp* means the plant species *Cannabis sativa* L. and any part of that plant, including the seeds and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis, that is grown under a license or other required authorization issued by the applicable governing authority that permits the production of the hemp.

*High value crop* means, for Track 2:

(1) Any eligible crop that is not specifically identified as a specialty crop or listed in the definition of ''other crop''; and

(2) Any eligible crop, regardless of whether it is identified as a specialty crop or listed in the definition of ''other crop,'' if the crop is a direct market crop, organic crop, or a crop grown for a specific market in which specialized products can be sold resulting in an increased value compared to the typical market for the crops (for example, soybeans intended for tofu production), as determined by the Deputy Administrator.

**Note:** The term ''high value crop'' does not apply to Track 1.

*Income derived from farming, ranching, and forestry operations* means income of a person or legal entity derived from:

(1) Production of crops and unfinished raw forestry products;

(2) Production of livestock, aquaculture products used for food, honeybees, and products derived from livestock;

(3) Production of farm-based renewable energy;

(4) Selling (including the sale of easements and development rights) of farm, ranch, and forestry land, water or hunting rights, or environmental benefits;

Strickland AR 0895

(5) Rental or lease of land or equipment used for farming, ranching, or forestry operations, including water or hunting rights;

(6) Processing, packing, storing, and transportation of farm, ranch, or forestry commodities including for renewable energy;

(7) Feeding, rearing, or finishing of livestock;

(8) Payments of benefits, including benefits from risk management practices, Federal crop insurance indemnities, and catastrophic risk protection plans;

(9) Sale of land that has been used for agricultural purposes;

(10) Benefits (including, but not limited to, cost-share assistance and other payments) from any Federal program made available and applicable to payment eligibility and payment limitation rules, as provided in 7 CFR part 1400;

(11) Income reported on IRS Schedule F or other schedule used by the person or legal entity to report income from such operations to the IRS;

(12) Wages or dividends received from a closely held corporation, an Interest Charge Domestic International Sales Corporation (IC–DISC), or legal entity comprised entirely of family members when more than 50 percent of the legal entity's gross receipts for each tax year are derived from farming, ranching, and forestry activities as defined in this document; and

(13) Any other activity related to farming, ranching, or forestry, as determined by the Deputy Administrator.

*IRS* means the Department of the Treasury, Internal Revenue Service.

*LDP* means the Loan Deficiency Payment programs (7 CFR parts 1421, 1425, 1427, 1434, and 1435).

*Legal entity* means a corporation, joint stock company, association, limited partnership, limited liability company, irrevocable trust, estate, charitable organization, general partnership, joint venture, or other similar organization created under Federal or State law including any such organization participating in a business structure as a partner in a general partnership, a participant in a joint venture, a grantor of a revocable trust, or as a participant in a similar organization. A business operating as a sole proprietorship is considered a legal entity.

*Limited resource farmer or rancher* means a farmer or rancher who is both of the following:

(1) A person whose direct or indirect gross farm sales did not exceed $189,200 in each of the 2019 and 2020

calendar years (the relevant years for the 2022 program year); and

(2) A person whose total household income was at or below the national poverty level for a family of four in each of the 2019 and 2020 calendar years. Limited resource farmer or rancher status can be determined using a website available through the Limited Resource Farmer and Rancher Online Self Determination Tool through the Natural Resources Conservation Service at *https://lrftool.sc.egov.usda.gov.*

For an entity to be considered a limited resource farmer or rancher, all members who hold an ownership interest in the entity must meet the criteria in paragraphs (1) and (2) of this definition.

*LFP* means the Livestock Forage Disaster Program (7 CFR part 1416, subpart C).

*MLG* means marketing loan gains from the Marketing Assistance Loan program (7 CFR parts 1421, 1425, 1427, 1434, and 1435).

*Minor child* means a person who is under 18 years of age as of June 1, 2022.

*MFP* means the 2018 Market Facilitation Program (7 CFR part 1409, subpart A) and the 2019 Market Facilitation Program (7 CFR part 1409, subpart B).

*NAP* means the Noninsured Crop Disaster Assistance Program (7 CFR part 1437).

*NAP service fee* means the fee the producer paid to obtain NAP coverage specified in 7 CFR 1437.7.

*Non-specialty crop* means a crop, under Track 1, that does not meet the definition of specialty crop. Note: The term ''non-specialty crop'' does not apply to Track 2.

*On-Farm Storage Loss Program* means the On-Farm Storage Loss Program (7 CFR part 760, subpart P).

*Organic crop* means a crop that is grown on acreage certified by a certifying agent as conforming to organic standards (7 CFR part 205) and organically produced consistent with section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502).

*Other crop* means, for Track 2, cotton, peanuts, rice, feedstock, and any crop grown with an intended use of grain, silage, or forage, unless the crop meets the requirements in paragraph (2) of the definition of ''high value crop.'' Note: The term ''other crop'' does not apply to Track 1.

*Ownership interest* means to have either a legal ownership interest or a beneficial ownership interest in a legal entity. For the purposes of administering ERP 2022, a person or legal entity that owns a share or stock in a legal entity that is a corporation,

limited liability company, limited partnership, or similar type entity where members hold a legal ownership interest and shares in the profits or losses of such entity is considered to have an ownership interest in such legal entity. A person or legal entity that is a beneficiary of a trust or heir of an estate who benefits from the profits or losses of such entity is also considered to have a beneficial ownership interest in such legal entity.

*Person* means an individual who is a natural person and does not include a legal entity.

*PLC* means the Price Loss Coverage program (7 CFR part 1412).

*Premium* means the premium paid by the producer for Federal crop insurance coverage or NAP buy-up coverage levels.

*Producer* means a person or legal entity who was entitled to a share in the eligible crop or would have shared had the eligible crop been produced.

*Production inputs* mean material to conduct farming operations, such as seeds, chemicals, and fencing supplies.

*Production services* mean services provided to support a farming operation, such as custom farming, custom feeding, and custom fencing.

*Qualifying disaster event* means wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, qualifying drought, and related conditions occurring in 2022.

*Qualifying drought* means an area within the county was rated by the U.S. Drought Monitor as having a drought intensity of D2 (severe drought) for 8 consecutive weeks or D3 (extreme drought) or higher level for any period of time during the applicable calendar year.

*QLA Program* means the Quality Loss Adjustment Program (7 CFR part 760, subpart R).

*Related condition* means damaging weather and adverse natural occurrences that occurred concurrently with and as a direct result of a specified qualifying disaster event. Related conditions include, but are not limited to:

(1) Excessive wind that occurred as a direct result of a derecho;

(2) Silt and debris that occurred as a direct and proximate result of flooding;

(3) Excessive wind, storm surges, tropical storms, and tropical depressions that occurred as a direct result of a hurricane; and

(4) Excessive wind and blizzards that occurred as a direct result of a winter storm.

Strickland AR 0896

*Socially disadvantaged farmer or rancher* means a farmer or rancher who is a member of a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of a group without regard to their individual qualities. For entities, at least 50 percent of the ownership interest must be held by individuals who are members of such a group. Socially disadvantaged groups include the following and no others unless approved in writing by the Deputy Administrator:

(1) American Indians or Alaskan Natives;

(2) Asians or Asian-Americans;

(3) Blacks or African Americans;

(4) Hispanics or Hispanic Americans;

(5) Native Hawaiians or other Pacific Islanders; and

(6) Women.

*Specialty crops* means fruits, tree nuts, vegetables, culinary herbs and spices, medicinal plants, and nursery, floriculture, and horticulture crops. This includes common specialty crops identified by USDA's Agricultural Marketing Service at *https:// www.ams.usda.gov/services/grants/ scbgp/specialty-crop* and other crops as designated by the Deputy Administrator. This term also includes trees covered by Federal crop insurance policies included in Track 1.

*STRP* means the Seafood Trade Relief Program (announced in the notice of funds availability published on September 14, 2020 (85 FR 56572)).

*Substantial beneficial interest (SBI)* has the same meaning as specified in 7 CFR 457.8. For the purposes of ERP 2022 Track 1, Federal crop insurance records for ''transfer of coverage, right to indemnity'' are considered the same as SBIs.

*Tree* means a tall, woody plant having comparatively great height, and a single trunk from which an annual crop is produced for commercial market for human consumption, such as a maple tree for syrup, or papaya or orchard tree for fruit. It includes immature trees that are intended for commercial purposes. Nursery stock, banana and plantain plants, and trees used for pulp or timber are not considered eligible trees.

*Underserved farmer or rancher* means a beginning farmer or rancher, limited resource farmer or rancher, socially disadvantaged farmer or rancher, or veteran farmer or rancher.

*Unit* means the unit structure as defined under the applicable Federal crop insurance policy for insured crops or in 7 CFR 1437.9 for NAP-covered crops.

*United States* means all 50 States of the United States, the District of

Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States.

*USDA* means the U.S. Department of Agriculture.

*U.S. Drought Monitor* means the system for classifying drought severity according to a range of abnormally dry to exceptional drought. It is a collaborative effort between Federal and academic partners, produced on a weekly basis, to synthesize multiple indices, outlooks, and drought impacts on a map and in narrative form. This synthesis of indices is reported by the National Drought Mitigation Center at *http://droughtmonitor.unl.edu.*

*Veteran farmer or rancher* means a farmer or rancher who has served in the Armed Forces (as defined in 38 U.S.C. 101(10))[2] and:

(1) Has not operated a farm or ranch for more than 10 years; or

(2) Has obtained status as a veteran (as defined in 38 U.S.C. 101(2))[3] during the most recent 10-year period.

For an entity to be considered a veteran farmer or rancher, at least 50 percent of the ownership interest must be held by members who have served in the Armed Forces and meet the criteria in paragraph (1) or (2) of this definition.

*WFRP* means Whole-Farm Revenue Protection available through the FCIC, including coverage under the Micro Farm Program.

*WHIP+* means the Wildfires and Hurricanes Indemnity Program Plus (7 CFR part 760, subpart O).

## Producer Eligibility

To be eligible for ERP 2022, a producer must meet all requirements described below for Track 1 or Track 2, as applicable, and be a:

(1) Citizen of the United States;

(2) Resident alien, which for purposes of ERP 2022 means ''lawful alien'' as defined in 7 CFR part 1400;

(3) Partnership organized under State law;

(4) Corporation, limited liability company, or other organizational structure organized under State law;

(5) Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304); or

(6) Foreign person or foreign entity who meets all requirements as described in 7 CFR part 1400.

---

[2] The term ''Armed Forces'' means the United States Army, Navy, Marine Corps, Air Force, Space Force, and Coast Guard, including the reserve components.

[3] The term ''veteran'' means a person who served in the military, naval, air, or space service, and who was discharged or released under conditions other than dishonorable.

## Track 1 Overview

Track 1 will provide a streamlined application process for eligible crop and tree losses during the 2022 or 2023 crop years[4] for which a producer had:

∀ A Federal crop insurance policy that provided coverage for crop production losses or tree losses related to the qualifying disaster events and received an indemnity [5] for a crop and unit, excluding:

—crops with an intended use of grazing,[6]

—livestock policies,

—forage seeding,

—Margin Protection Plan policies purchased without a base policy, [7]

—banana plants insured under the Hawaii Tropical Trees provisions, [8] and

—policies issued in Puerto Rico; [9] or

∀ NAP coverage and received a NAP payment for a crop and unit, excluding crops with an intended use of grazing.

The applicable Federal crop insurance policies and NAP provide payments to producers for crop and tree losses due to eligible causes of loss, as defined in the producer's Federal crop insurance policy or NAP regulations and basic provisions. RMA and FSA are using data submitted by producers for Federal crop insurance or NAP purposes to calculate a producer's eligible loss under Track 1. The Track 1 payment calculation is intended to compensate eligible crop and tree producers for a percentage of that loss determined by the applicable ERP factor, which varies based on the producer's level of Federal crop insurance or NAP coverage, as described later in this document. To be eligible for payment under Track 1, a producer must have suffered a crop or tree loss that was caused, in whole or in part, by a qualifying disaster event. Because the amount of loss due to a

---

[4] The 2023 crop year is included because a qualifying disaster event occurring in the 2022 calendar year may have caused a loss of a crop during the 2023 crop year, based on how ''crop year'' is defined in the applicable Federal crop insurance policy or NAP provisions.

[5] For purposes of Track 1, ''indemnity'' does not include cottonseed endorsement payments, downed rice endorsement payments, sugarcane crop replacement endorsement payments, replant payments, or raisin reconditioning payments.

[6] Crops with an intended use of grazing are covered under ELRP 2022.

[7] While the majority of crop insurance policies cover an eligible crop loss, a small number do not and are not eligible for ERP, including livestock policies, forage seeding, and margin policies.

[8] While bananas are covered under crops, the banana plants are not a tree, bush or a vine.

[9] Federal crop insurance policies issued in Puerto Rico are not transmitted through the standardized Policy Acceptance and Storage System. Therefore, pre-filled applications cannot be automatically generated under Track 1.

Strickland AR 0897

qualifying disaster event cannot be separated from the amount of loss caused by other causes of loss covered by some Federal crop insurance policies or NAP, the Track 1 payment will be based on the producer's loss as long as those losses were caused, in whole or in part, by a qualifying disaster event.

Track 1 excludes losses to aquacultural species for which the producer received a payment under ELAP to avoid providing duplicate benefits for losses already at least partially compensated for by ELAP. It also excludes losses for which the producer received a Phase 1 payment under the previous ERP.[10]

In some situations, a producer may have received both a NAP payment for a crop loss and an indemnity under a Federal crop insurance policy that is included in Track 1 to address the same loss. Examples of these policies include Rainfall Index plans for Annual Forage; Pasture, Rangeland, and Forage; and Apiculture. In those situations, the producer must elect whether to receive the Track 1 payment based only on the data associated with their Federal crop insurance indemnity or their NAP payment, but they cannot receive a Track 1 payment based on both the crop insurance indemnity and NAP payment. This policy is necessary to avoid compensating producers twice for the same loss under Track 1.

**Track 1 Applications**

FSA and RMA will identify the producers who meet the criteria described above to apply for Track 1. For each of those producers, FSA will generate an FSA–523, Emergency Relief Program (ERP) 2022 Track 1 Application, with certain items pre-filled with information already on file with USDA, as listed below. Producers cannot alter the data in these pre-filled items; any alterations in the pre-filled data on the application will result in the producer's Track 1 application being considered incomplete and the application will not be processed by FSA. FSA will not calculate Track 1 payments using data manually submitted by producers. Track 1 payments will only be calculated using data already on file with RMA and FSA. If a producer believes that any information that has been pre-filled is incorrect, the producer should contact their Federal crop insurance agent for insured crops or their FSA county office

for NAP-covered crops. Once the corrected data have been received and processed by RMA and FSA, an updated Track 1 application may be generated for the producer.

For producers who received a Federal crop insurance indemnity for eligible policies, the pre-filled application will include:

∀ the producer's physical State and county codes,
∀ unit numbers,
∀ crops, and
∀ crop years.

For producers who received a NAP payment, the pre-filled applications will include:

∀ the producer's administrative State and county codes,
∀ unit numbers,
∀ crop years,
∀ pay crops, and
∀ pay groups.

FSA will also pre-fill the calculated Track 1 payment amounts, prior to any payment reductions for reasons such as payment limitation and factoring of payments to stay within available funding.

Receipt of a pre-filled application form is not a confirmation that the producer is eligible to receive a Track 1 payment. In order to receive a payment, the producer must certify that their Federal crop insurance indemnity or NAP payment on which the Track 1 payment will be based was due, in whole or in part, to a crop production loss or a tree loss caused by a qualifying disaster event. Producers are responsible for reviewing the list of qualifying disaster events, and if a loss was due to drought, producers must also ensure that the county where the crop and unit was located meets the definition of "qualifying drought." FSA will provide a factsheet and other materials to provide examples and more details on the qualifying disaster events to assist producers (available through FSA county offices and at *https://www.fsa.usda.gov/programs-and-services/emergency-relief/index*). Producers who received a Federal crop insurance indemnity under a WFRP policy or for a whole-farm unit must also certify to the percentage of their expected revenue or total liability for the unit, respectively, from specialty crops for the purpose of administration of ERP 2022 payment limitations. [11]

Producers must also certify on FSA–523 that they will meet the requirement to purchase Federal crop insurance or NAP coverage for the next 2 available crop years, as described later in this document. If multiple crops and units are listed on an application and the producer only agrees to purchase Federal crop insurance or NAP coverage for only some of the crops and units, a Track 1 payment will be issued only for those crops and units for which the producer agrees to purchase Federal crop insurance or NAP coverage for the next 2 available crop years.

The portion of the form for producers who had Federal crop insurance will list the primary policy holder and all producers with an SBI who have a record established with FSA. If one or more producers with an SBI had a share in a crop, the primary policy holder must update the application to show the share in the crop for each of those producers in addition to the primary policy holder. If the producer(s) are determined to be eligible, payments will be issued to the primary policy holder and to any eligible producers with an SBI based on their ownership share of the crop. To receive a payment, each person or entity that is listed as having a share of the Track 1 payment for a crop and unit must sign the application and agree to purchase Federal crop insurance or NAP coverage for that crop and unit.

**Track 1 Payment Calculation**

FSA and RMA will calculate Track 1 payments using the loss data on file with FSA or RMA at the time of payment calculation or as later updated by FSA or RMA upon identification of an error in the data on file at time of payment calculation. [12] The Track 1 payment calculation for a crop and unit will depend on the type and level of Federal crop insurance or NAP coverage obtained by the producer. Crops covered under a WFRP policy or included in a whole-farm unit will be treated as a single crop for payment calculation purposes. Separate payment limitations will apply to the portions of the payments that attributed to specialty and to non-specialty crops, as described later in this document.

Each payment calculation will use an ERP factor based on the producer's level of Federal crop insurance or NAP coverage for that eligible crop or tree, as specified in the following tables.

---

[10] The previous ERP provided assistance for eligible crop losses due to qualifying disaster events in calendar years 2020 and 2021. Phase 1 of that program included 2022 crop year losses if the loss was due, in whole or in part, to a qualifying disaster event that occurred in the 2021 calendar year.

[11] WFRP provides risk management safety for specialty and non-specialty crops under one Federal crop insurance policy. The producer certifies to the percentage of expected revenue or total liability for the unit for specialty crops, which results in the attribution of the specialty and non-specialty crop portions of the ERP 2022 payment to the separate payment limitations.

[12] Track 1 payments will be calculated using only data on file with RMA and FSA. FSA will not calculate Track 1 payments using data manually submitted by producers.

Strickland AR 0898

| Federal crop insurance coverage level | ERP factor (%) |
|---|---|
| Catastrophic coverage .............. | 75.0 |
| More than catastrophic coverage but less than 55 percent | 80.0 |
| At least 55 percent but less than 60 percent ..................... | 82.5 |
| At least 60 percent but less than 65 percent ..................... | 85.0 |
| At least 65 percent but less than 70 percent ..................... | 87.5 |
| At least 70 percent but less than 75 percent ..................... | 90.0 |
| At least 75 percent but less than 80 percent ..................... | 92.5 |
| At least 80 percent .................. | 95.0 |

| NAP coverage level | ERP factor (%) |
|---|---|
| Catastrophic coverage .............. | 75.0 |
| 50 percent ................................. | 80.0 |
| 55 percent ................................. | 85.0 |
| 60 percent ................................. | 90.0 |
| 65 percent ................................. | 95.0 |

When determining the ERP factors, analysis was conducted to ensure that payments do not exceed available funding and, in aggregate across all eligible crop and tree producers, do not exceed 90 percent of losses, as required by Title I of the Disaster Relief Supplemental Appropriations Act, 2023. The difference between the ERP factors for Federal crop insurance and NAP is due to differences in the available coverage levels under Federal crop insurance and NAP. Federal crop insurance is available at the catastrophic coverage level (50 percent production coverage of 55 percent of the price) and buy-up coverage levels (50 percent to 85 percent of the production for 100 percent of the price). The coverage level for NAP is limited by law to a maximum of 65 percent buy-up coverage. For both NAP and Federal crop insurance, the ERP payment factor for the catastrophic and maximum buy-up levels are 75 percent and 95 percent, respectively, with the ERP factors stair-stepping for the buy-up options in-between as shown in the tables above. Title I of the Disaster Relief Supplemental Appropriations Act, 2023, provides that payments to eligible crop and tree producers who did not have Federal crop insurance or NAP coverage cannot exceed 70 percent of their loss. The lowest ERP factor for eligible crop and tree producers who had Federal crop insurance or NAP is set at 75 percent. Payment limits and other reductions will result in reducing ERP 2022 payments, further lowering the percent of losses covered.

For eligible crop producers who received Federal crop insurance

indemnities, RMA will use the producer's data that are already on file, which provide the necessary information to determine the producer's amount of loss. Federal crop insurance provides financial assistance for crop losses due to specified natural disasters and uses a producer's data to calculate a payment based on the type of Federal crop insurance coverage elected by the producer. As previously discussed, Track 1 is intended to compensate eligible crop and tree producers for a percentage of their loss determined by the applicable ERP factor based on the level of Federal crop insurance coverage purchased; therefore, RMA will calculate each producer's loss consistent with the approved RMA loss procedures for the type of coverage purchased [13] but using the ERP factor. This calculated amount will then be adjusted by subtracting the gross Federal crop insurance indemnity.

After calculating the producer's loss and subtracting the gross Federal crop insurance indemnity as described above for each crop and unit, progressive factoring [14] will be applied. Progressive factoring will be applied by payment range, according to the table below, and FSA will calculate the sum of each of those calculations.

| Payment range | Progressive factor (%) |
|---|---|
| Up to $2,000 ............................. | 100 |
| $2,001 to $4,000 ...................... | 80 |
| $4,001 to $6,000 ...................... | 60 |
| $6,001 to $8,000 ...................... | 40 |
| $8,001 to $10,000 .................... | 20 |
| Over $10,000 ............................ | 10 |

For example, to apply progressive factoring to a calculated loss (after subtraction of indemnities) of $5,000, FSA would multiply:
∀ the first $2,000 by a factor of 100 percent ($2,000 · 100% = $2,000),
∀ the second $2,000 by a factor of 80 percent ($2,000 · 80% = $1,600), and
∀ the remaining $1,000 by a factor of 60 percent ($1,000 · 60% = $600).
The sum of those calculations is $4,200, which is the calculated ERP 2022 payment after progressive factoring.

For another example, to apply progressive factoring to a calculated loss (after subtraction of indemnities) of $430,000, FSA would multiply:
∀ the first $2,000 by a factor of 100 percent ($2,000 · 100% = $2,000),
∀ the second $2,000 by a factor of 80 percent ($2,000 · 80% = $1,600),
∀ the third $2,000 by a factor of 60 percent ($2,000 · 60% = $1,200),
∀ the fourth $2,000 by a factor of 40 percent ($2,000 · 40% = $800),
∀ the fifth $2,000 by a factor of 20% ($2,000 · 20% = $400), and
∀ the remaining $420,000 by a factor of 10 percent ($420,000 · 10% = $42,000).
The sum of those calculations is $48,000, which is the calculated ERP 2022 payment after progressive factoring.

For underserved producers, the producer's share of the Federal crop insurance administrative fee and premium will be added to the resulting sum.[15]

For all eligible crop producers, FSA will then apply a final payment factor of 75 percent, resulting in the producer's calculated Track 1 payment.

For NAP-covered crops and trees, FSA will use the producer's crop production or inventory data that are already on file, which provides the necessary information to determine the producer's amount of loss. NAP provides financial assistance for crop losses due to specified natural disasters and uses a producer's crop production or inventory data to calculate a payment based on the level of NAP coverage elected by the producer. As previously discussed, ERP 2022 is intended to compensate eligible crop and tree producers for a percentage of loss determined by the applicable ERP factor based on their NAP coverage level;

---

[13] For example, ERP 2022 for Area Risk Protection Insurance (ARPI) and Stacked Income Protection (STAX) is based on area-wide (for example, county) production losses.

[14] Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

[15] Providing a refund of underserved producers' premiums and fees supports the equitable administration of FSA programs by targeting limited resources to support underserved farmers and ranchers, who are more likely to lack financial reserves and access to capital to invest in future risk protection while coping with losses due to unexpected events outside of their control. The refund of premiums and fees for these more-often vulnerable and smaller operations who often lack financial resources supports access to higher levels of coverage available through Federal crop insurance or NAP. This approach is consistent with the intent to provide reduced service fees and premium reductions to underserved farmers and ranchers for other FSA programs as authorized by law. NAP provides a reduced service fee and premium for underserved farmers and ranchers (7 U.S.C. 7333(k)(2) and 7 U.S.C. 7333(l)(3)). In addition, Federal crop insurance provides an administrative fee waiver for limited resource farmers, beginning farmers or ranchers, and veteran farmers or ranchers; and offers a premium reduction for beginning farmers or ranchers and veteran farmers or ranchers (7 U.S.C. 1508(b)(5)(E)(i) and 7 U.S.C. 1508(e)(8)).

Strickland AR 0899

therefore, FSA will perform a calculation that is consistent with the NAP payment calculation for the pay crop and unit, as provided in 7 CFR part 1437, but using the ERP factor in the table above applicable to the producer's NAP coverage level as the applicable guarantee in those calculations. For example, the guarantee for a producer that had purchased 60 percent NAP coverage would be adjusted and recalculated based on a 90 percent ERP factor. The calculated amount using the ERP factor would then be adjusted by subtracting the producer's gross NAP payment.[16] For underserved producers, the producer's share of the NAP service fees and premium will be added to the result of that calculation.[17]

The calculated amount for NAP-covered crops will not be subject to the progressive factoring[18] that applies to ERP 2022 payments based on Federal crop insurance indemnities; however, it will be multiplied by a final payment factor of 75 percent to ensure that total payments do not exceed the available funding.

FSA will issue Track 1 payments as applications are processed and approved. All ERP 2022 payments are subject to the availability of funding. If additional funding is available after all eligible ERP 2022 applications have

been processed and payments have been issued, FSA may issue an additional payment, not to exceed the maximum amount allowed by law.

**Track 2 Overview**

Track 2 will provide assistance for eligible revenue, production, and quality losses of eligible crops not included in Track 1. FSA has determined that the best estimation of such losses is a producer's decrease in disaster year revenue compared to a benchmark year revenue, where benchmark year revenue represents a producer's revenue prior to the impact of the qualifying disaster event. This difference in revenue will reflect losses in both production and quality due in whole or in part to qualifying disaster events without requiring the more extensive calculations and documentation required under some previous FSA programs addressing crop losses due to disaster events. Decreases in disaster year revenue compared to benchmark revenue also reflect a producer's loss due to a qualifying disaster event regardless of whether the loss occurs before harvest or after harvest while the crop is in storage, further streamlining the delivery of assistance.

To be eligible for Track 2, a producer must certify that they suffered a loss in

disaster year revenue, as compared to a benchmark year revenue, that was due to necessary expenses associated with losses of eligible crops due in whole or in part to a qualifying disaster event that occurred in the 2022 calendar year. Track 2 provides 2 options for determining the benchmark and disaster year revenues:

∀ The tax year option, which allows producers to use certain information located in their tax records to apply for Track 2;[19] or

∀ The expected revenue option, which is intended to better address situations such as a change in operation capacity[20] in the disaster year, as compared to the 2018 or 2019 benchmark year; the 2018 and 2019 tax years not reasonably reflecting a normal year's revenue for reasons including losses due to disaster events in 2018 and 2019 or changes in crop prices; or production of crops that do not generate revenue for the producer directly from the sale of the crop (for example, forage fed to livestock or grapes used by the producer to make wine).

The following table summarizes benchmark and disaster year revenue for the 2 options. Sources of revenue to be included in allowable gross revenue, expected revenue, and actual revenue are explained below in greater detail.

| Option | Benchmark year revenue | Disaster year revenue |
|---|---|---|
| Tax Year ........................ | A producer's allowable gross revenue for the 2018 or 2019 tax year, as elected by the producer. | A producer's allowable gross revenue for the 2022 or 2023 tax year, as elected by the producer. |
| Expected Revenue ....... | A producer's expected revenue from all eligible crops that could have been affected by a qualifying disaster event in calendar year 2022. | A producer's actual revenue from all eligible crops that were included in the producer's expected revenue. |

Although most producers may choose between the 2 options when applying for Track 2, there are two situations that require a producer to use a specific option:

∀ *Situation 1:* Producers who received a payment under the previous ERP for the 2021 disaster year and elected the 2022 tax year for their representative disaster year for Phase 2 can only apply for Track 2 using the tax year option, and they must select 2023

as their representative disaster year to ensure that they are not paid for the same loss under both programs, as those producers had previously certified that 2022 losses were the result of 2021 disaster events.[21]

∀ *Situation 2:* Producers, except those described in Situation 1, must use the expected revenue option if they had a decrease in operating capacity during their disaster year, as compared to the 2018 or 2019 benchmark year, were a

new producer with no benchmark year revenue in 2018 or 2019, or produced any crop or crops that did not generate revenue directly from the sale of the crop and that the producer uses within their ordinary operation.

Producers who had an increase in operation capacity may elect either the tax year option or the expected revenue option; however, they may not adjust benchmark year revenue under the tax year option to reflect the change, which

[16] The gross NAP payment is the amount calculated according to 7 CFR part 1437, prior to any payment reductions for reasons including, but not limited to, sequestration, payment limitation, and average AGI limitations.

[17] See footnote 15. NAP service fees are waived for producers with a CCC–860 certification of underserved status on file; however, if an underserved producer did not previously file CCC–860 to receive a service fee waiver, but files one now, their service fee will be added in the Track 1 payment calculation.

[18] Progressive factoring will not apply to ERP Track 1 payments calculated based on NAP payments as they traditionally support smaller producers and non-traditional crops. Non-traditional crops are not typically covered by Federal crop insurance products so the higher levels of coverage and risk protection under Federal crop insurance are not available to offset losses for producers of those crops in times of disaster.

[19] The tax year option is similar to the approach used in Phase 2 of the previous ERP, which provided assistance for crop losses due to disaster events in 2020 and 2021.

[20] Change in operation capacity does not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or changing the amount of fertilizers or chemicals used.

[21] Producers applying for Phase 2 of the previous ERP for losses due to qualifying disaster events in the 2021 calendar year selected either the 2021 or 2022 tax year as the applicable disaster year. Producers who selected the 2022 tax year have already been compensated for their 2022 tax year losses, but may select the 2023 tax year for the disaster year for Track 2.

Strickland AR 0900

is likely to result in a lower Track 2 payment because the 2018 or 2019 tax year would not accurately reflect their expected revenue at their 2022 operating capacity.

Producers must use the same option to calculate both the benchmark year revenue and disaster year revenue. For example, a producer who uses the expected revenue option for the benchmark year must also use the actual revenue option for the disaster year; they cannot use 2022 or 2023 tax year revenue for the disaster year.

### Track 2 Tax Year Option

Producers who use the tax year option for Track 2 will select 2018 or 2019 for their benchmark year revenue and 2022 or 2023 as their representative tax year for the disaster year revenue and will certify their allowable gross revenue for those years. Allowable gross revenue is based on the year for which the revenue would be reported for the purpose of filing a tax return, except for the ERP 2022 Track 1 payments specified below. Producers who file or would be eligible to file a joint tax return will certify their allowable gross revenue based on what it would have been had they filed taxes separately for the applicable year.

Allowable gross revenue includes revenue from:

(1) Sales of eligible crops produced by the producer, which includes sales resulting from value added through post-production activities (for example, sales of jam from the processing of strawberries) that were reportable on IRS Schedule F;

(2) Sales of eligible crops a producer purchased for resale that had a change in characteristic due to the time held (for example, a plant purchased at a size of 2 inches and sold as an 18-inch plant after 4 months), less the cost or other basis of such eligible crops;

(3) Cooperative distributions directly related to the sale of the eligible crops produced by the producer, such as patronage paid to producers for gross grain sales;

(4) Benefits for eligible crops under the following agricultural programs: 2017 WHIP, ARC and PLC, BCAP, CFAP, ELAP (for aquaculture crops), ERP Phases 1 and 2, LDP, MLG, MFP, the On-Farm Storage Loss Program, Pandemic Assistance Revenue Program, QLA Program, STRP, and WHIP+;

(5) Commodity Credit Corporation loans for eligible crops, if treated as income and reported to the IRS;

(6) Federal crop insurance proceeds for eligible crops, minus the amount of administrative fees and premiums;

(7) NAP payments for eligible crops, minus the amount of service fees and premiums;

(8) Proceeds for eligible crops under private insurance policies;

(9) Payments issued through grant agreements with FSA for losses of eligible crops;

(10) Grants from the Department of Commerce, National Oceanic and Atmospheric Administration (NOAA) and State program funds providing direct payments for the loss of eligible crops or the loss of revenue from eligible crops;

(11) Other revenue directly related to the production of eligible crops that the IRS requires the producer to report as income, such as commodity-specific income received from State or local governments and net gain from hedging; and

(12) For the disaster year only, ERP 2022 Track 1 payments issued to another person or entity for the producer's share of an eligible crop, regardless of the tax year in which the payment would be reported to the IRS.[22]

Allowable gross revenue does not include revenue from sources other than those listed above, including but not limited to, revenue from:

(1) Federal assistance programs not included above;

(2) Sales of livestock, animal by-products, and any commodities that are excluded from "eligible crops;"

(3) Resale items not held for characteristic change;

(4) Income from a pass-through entity such as an S Corp or limited liability company;

(5) Conservation program payments;

(6) Any pandemic assistance payments that were not for the loss of eligible crops or the loss of revenue from eligible crops including, but not limited to, the Pandemic Livestock Indemnity Program, Pandemic Assistance for Timber Harvesters and Haulers, and Spot Market Hog Pandemic Program;

(7) Custom hire income;

(8) Net gain from speculation;

(9) Wages, salaries, tips, and cash rent;

(10) Rental of equipment or supplies; and

(11) Acting as a contract producer of an agricultural commodity.

---

[22] Track 1 allows producers who received pre-filled application forms to indicate shares in the crop. In some cases, payment for a producer's share of a crop may have been issued to a different person or entity than the producer applying for a related revenue loss under Track 2. Applications for Track 2 must include any Track 1 payments issued to another person or entity for the producer's share of an eligible crop in order to prevent duplicate benefits being issued for the same loss.

Form FSA–524–A, Emergency Relief Program (ERP) 2022 Track 2 Tax Year Revenue Worksheet, is an optional form that producers may use to assist in determining their allowable gross revenue. It is available at *https://www.fsa.usda.gov/programs-and-services/emergency-relief/index.*

### Track 2 Tax Year Option Special Provisions for Certain Producers

As stated above, producers who received a payment under the previous ERP for the 2021 program year and elected the 2022 tax year for their representative disaster year revenue are required to use the tax year option for Track 2, and they must use the 2023 tax year for disaster year revenue.

Those producers must certify to an allowable gross revenue for the benchmark year that they adjusted if the producer had a decreased operation capacity in a disaster year for which they are applying for ERP Track 2, compared to the benchmark year. Those producers may certify to an allowable gross revenue that they adjusted for the benchmark year on FSA–524 if either of the following apply:

(1) The producer did not have a full year of revenue for 2018 or 2019; or

(2) The producer had expanded their operation capacity in the disaster year compared to the benchmark year.

Change in operation capacity does not include crop rotation from year to year, changes in farming practices such as converting from conventional tillage to no-till, or increasing the rate of fertilizers or chemicals.

If requested by FSA, producers are required to submit documentation to FSA to support their adjustments within 30 calendar days of the request. The documentation to support an adjustment due to a change in operation capacity must show that the adjustment to the producer's benchmark year revenue is due to:

(1) An addition or decrease in production capacity of the farming operation;

(2) An increase or decrease in the use of existing production capacity; or

(3) Physical alterations that were made to existing production capacity.

If a producer did not have allowable gross revenue in a benchmark year because they began farming in 2020 or later, the producer may adjust benchmark year revenue on FSA–524 that represents the producer's reasonably expected disaster year revenue prior to the impact of the qualifying disaster event.

If requested by FSA, documentation required to support a producer's certification must be provided within 30

Strickland AR 0901

calendar days of FSA's request, or the producer will be considered ineligible for ERP Track 2. Acceptable documentation must be generated in the ordinary course of business and dated prior to the impact of the qualifying disaster event and includes, but is not limited to:

(1) Financial documents such as a business plan or cash flow statement that demonstrate an expected level of revenue;

(2) Sales contracts or purchase agreements; and

(3) Documentation supporting production capacity, use of existing production capacity, or physical alterations that demonstrate production capacity.

Producers who received a payment under the previous ERP for the 2021 program year and elected the 2022 tax year for their representative disaster year must also include in the allowable gross revenue a value for certain crops, when and as determined by the Deputy Administrator, that they produced that did not generate revenue directly from the sale of the crop and that the producer uses within their ordinary operation. This would include, for example, wine makers who grow their own wine grapes and process those grapes into wine and producers of forage crops who store the crop to feed to livestock on their farm. These producers would not have revenue from the sale of the portion of their crop used for these purposes. The determination that producers may include a crop's value is at the Deputy Administrator's discretion. Wine grapes used to process grapes into wine, forage crops that are stored and fed to livestock, and certain other crops, as listed on the FSA website at *https://www.fsa.usda.gov/ programs-and-services/emergency- relief/index,* have been determined by the Deputy administrator to qualify for including the crop's value.

The value of the eligible crop reported in the producer's allowable gross revenue will be based on the producer's actual production of the crop and a price for the crop based on the best available data for each crop, such as published price data for the crop [23] or the average price obtained by other producers in the area, as determined by the Deputy Administrator and published through guidance on FSA's website. This provision is intended to address a gap in how crop losses in these situations may be accounted for in

a producer's payment, and it does not cover crops that were sold by a producer.

These adjustment provisions only apply to producers that received a payment under the previous ERP for the 2021 program year based on the 2022 tax year for their representative disaster year revenue because those producers must use the tax year option. All other producers that would require such adjustments must use the expected revenue option, as previously explained in this document.

**Track 2 Expected Revenue Option**

As mentioned above, for Track 2, as an alternative to using the tax year option, a producer may certify to a benchmark year revenue that represents the producer's reasonably expected revenue prior to the impact of the qualifying disaster event, as well as their actual disaster year revenue. The producer's total expected revenue must include all eligible crops that could have been affected by a qualifying disaster event in calendar year 2022, including crops prevented from being planted, planted crops (including annual, perennial, and inventory), and crops that were in storage. It does not include revenue from crop by-products, such as cotton seed and corn stalks. Expected revenue will be based on:

∀ For perennial, planted, and prevented planted yield-based crops, the producer's expected acres multiplied by their expected yield per acre, multiplied by the expected price;

∀ For inventory crops, the total inventory prior to the impact of the qualifying disaster event multiplied by the expected price; and

∀ For crops in storage, the producer's production in storage multiplied by the expected price.

Expected revenue must be based on realistic projections that can be supported by acceptable documentation of expected inventory, acres, yield, and unit price, such as the following:

∀ sales contracts,
∀ purchase agreements,
∀ market agreements,
∀ settlement sheets,
∀ scale tickets,
∀ lease agreements,
∀ local market prices,
∀ FCIC established yield and prices,
∀ Federal crop insurance documents,
∀ historical yield data,
∀ appraisals,
∀ farm business plans,
∀ acreage reports,
∀ FSA National Crop Table (NCT) data,[24]

∀ ARC and PLC prices and yields [25]
∀ cooperative extension service and university data,
∀ financial institute documentation, and
∀ National Agricultural Statistics Service data.

The producer must maintain sufficient documentation to support that their projection is reasonable and realistic; that documentation must be available if requested.

Actual disaster year revenue for the expected revenue option is equal to the actual revenue from all crops that were included in the producer's expected revenue. Actual disaster year revenue includes:

∀ Revenue from sales of eligible crops;
∀ Federal crop insurance indemnities for eligible crops, minus premiums and administrative fees;
∀ NAP payments for eligible crops, minus premiums and service fees;
∀ Indemnities for eligible crops under private crop insurance policies;
∀ The value of eligible crops produced but not sold (such as crops in storage or inventory, or fed to the producer's livestock);
∀ FSA Payments issued for 2022 calendar year disaster losses, including but not limited to payments under:

Æ ELAP for aquaculture crops,
Æ ARC,
Æ LDP,
Æ MLG,

∀ Net gains from hedging from eligible crops produced;
∀ Grants from NOAA and State programs for the direct loss of eligible crops or the loss of revenue for eligible crops; and
∀ Other revenue directly related to the production of eligible crops that IRS requires the producer to report as income.

For crops produced in the 2022 or 2023 crop years but not sold, the value included in actual disaster year revenue may differ from the expected revenue for the crops due to market price fluctuations between planting and time of marketing, quality losses, or production losses related to qualifying disaster events occurring in the 2022 calendar year. Crops in storage from 2021 or earlier must use the expected price to calculate the value included in actual disaster year revenue if the crop remains in storage at the time of application since ERP 2022 does not pay

---

[23] Published sources of price data that the Deputy Administrator may consider include, but are not limited to, FCIC-established prices, FSA-established NCT prices, and National Agricultural Statistic Service prices.

[24] NCT data are available at *https:// www.fsa.usda.gov/programs-and-services/disaster-*

*assistance-program/noninsured-crop-disaster- assistance/index.*

[25] ARC and PLC information is available at *https://www.fsa.usda.gov/programs-and-services/ arcplc_program/arcplc-program-data/index.*

for market fluctuations for prior year crops.

Form FSA–524–B, Emergency Relief Program (ERP) 2022 Track 2 Expected Revenue Worksheet, is an optional form that producers may use to assist in calculating their expected and actual revenue. It is available at *https:// www.fsa.usda.gov/programs-and- services/emergency-relief/index.*

**Track 2 Applications**

Producers applying for Track 2 must submit FSA–524, Emergency Relief Program (ERP) 2022 Track 2 Application, certifying their benchmark year revenue and disaster year revenue. The FSA–524 Appendix provides a guide for what should be included as applicable revenue for the option elected by the producer. In addition, all producers applying for Track 2 must submit FSA–525, Crop Insurance and/or NAP Coverage Agreement, by the application deadline to have a complete application on file.

For the purpose of administration of the ERP 2022 payment limitations, producers applying for Track 2 must certify to the percentage of their disaster year revenue from specialty and high value crops combined, and from other crops on their application. The percentages certified must be equal to the percentages that the producer would have reasonably expected to receive for the disaster year if not for the qualifying disaster event. Producers must also certify to whether all acreage of all eligible crops (including crops grown, prevented from being planted, and in storage or inventory in the disaster year) were covered by Federal crop insurance or NAP, for the purpose of determining the applicable ERP factor, as explained below.

If requested by FSA, documentation required to support a producer's certifications of revenue and other information provided on the application must be submitted within 30 calendar days of FSA's request, or the producer will be considered ineligible for Track 2.

**Track 2 Payment Calculation**

To determine a producer's Track 2 payment amount, FSA will calculate:

Step 1 The producer's benchmark year revenue, multiplied by the ERP factor of 90 percent if all acres of all eligible crops were covered by Federal crop insurance or NAP, or 70 percent if not all acres of all eligible crops were covered by Federal crop insurance or NAP; minus

Step 2 The producer's disaster year revenue; minus

Step 3 The sum of the producer's gross Track 1 payments.[26]

After performing the calculation described above, progressive factoring[27] will be applied to the calculated amount according to the table below.

| Payment range | Progressive factor (%) |
|---|---|
| Up to $2,000 ............................ | 100 |
| $2,001 to $4,000 ..................... | 80 |
| $4,001 to $6,000 ..................... | 60 |
| $6,001 to $8,000 ..................... | 40 |
| $8,001 to $10,000 ................... | 20 |
| Over $10,000 ........................... | 10 |

For example, to apply progressive factoring to a calculated loss of $5,000, FSA would multiply:

∀ the first $2,000 by a factor of 100 percent ($2,000 · 100% = $2,000),

∀ the second $2,000 by a factor of 80 percent ($2,000 · 80% = $1,600), and

∀ the remaining $1,000 by a factor of 60 percent ($1,000 · 60% = $600).

∀ The sum of those calculations is $4,200.

For another example, to apply progressive factoring to a calculated loss of $430,000, FSA would multiply:

∀ the first $2,000 by a factor of 100 percent ($2,000 · 100% = $2,000),

∀ the second $2,000 by a factor of 80 percent ($2,000 · 80% = $1,600),

∀ the third $2,000 by a factor of 60 percent ($2,000 · 60% = $1,200),

∀ the fourth $2,000 by a factor of 40 percent ($2,000 · 40% = $800),

∀ the fifth $2,000 by a factor of 20% ($2,000 · 20% = $400), and

∀ the remaining $420,000 by a factor of 10 percent ($420,000 · 10% = $42,000).

The sum of those calculations is $48,000, which is the gross ERP 2022 payment after progressive factoring.

FSA will calculate the total of the results for each range above. For underserved producers, the sum of the results will be multiplied by a factor of 115 percent, and the underserved

producer's calculated Track 2 payment will be equal to the lesser of the resulting amount or the amount calculated after step 3 above.[28] For all other eligible producers, the sum of the results for each range will be the calculated Track 2 payment. FSA will multiply that amount by the percentage of the expected disaster year revenue for specialty and high value crops or other crops, as applicable, to determine the amounts that will apply to the payment limitations for specialty and high value crops (combined) and other crops.

For example, the amount calculated after step 3 above is $430,000 and is reduced to $48,000 after progressive factoring. For an underserved producer, FSA would multiply $48,000 times 115 percent which equals $55,200 which is less than the max payment amount of $430,000. The producer certified to 50 percent of expected revenue as being from specialty crops. FSA would multiply $55,200 times 50 percent which equals $27,600 gross payment attributed to specialty crops. FSA would subtract $27,600 from $55,200 which equals $27,600 gross payment attributed to other crops. The producer's total payment is $55,200 ($27,600 + $27,600 = $55,200). FSA will apply a final payment factor of 75 percent to all calculated Track 2 payments, including payments to underserved producers, to ensure payments do not exceed available funding.

If a producer receives a Track 1 payment after their Track 2 payment is calculated, the producer's Track 2 payment will be recalculated and the producer must refund any resulting overpayment.

FSA will issue Track 2 payments as applications are processed and approved. All ERP 2022 payments are subject to the availability of funding. If additional funding is available after ERP

---

[26] The gross ERP Track 1 calculated payment is the calculated payment amount after all applicable factoring and prior to any payment reductions for reasons including, but not limited to, sequestration and payment limitation.

[27] Track 2 applies progressive factoring in a manner consistent with the progressive factoring of Track 1 payments based on Federal crop insurance indemnified losses. Track 2 assistance is calculated based on a decrease in disaster year revenue for eligible revenue, production, and quality losses of eligible insured, non-insurable, and uninsured crops not included in Track 1. While Track 1 payments based on NAP payments are not subject to progressive factoring, Track 2 assistance is calculated based on the overall decrease in disaster year revenue and does not calculate assistance independently for insured crops and NAP crops in a manner similar to Track 1; therefore, progressive factoring is applied to all Track 2 payments.

[28] Underserved producers will receive an increase to their Track 2 payment that is equal to 15 percent of the gross Track 2 payment after progressive factoring not to exceed the calculated Track 2 payment before progressive factoring. FSA calculates payments based on a higher payment factor for underserved farmers and ranchers (or specific groups included in that term) in several programs, such as Emergency Conservation Program, ELAP, and the Tree Assistance Program. FSA has also used higher payment factors for these producers in several recently announced programs: the Food Safety Certification for Specialty Crops Program, the Organic and Transitional Education and Certification Program, Pandemic Assistance Revenue Program, and the previous ELRP and ERP programs for qualifying disaster events in calendar years 2020 and 2021. In addition, NAP provides a reduced service fee and premium for underserved farmers and ranchers. This approach supports the equitable administration of FSA programs, as underserved farmers and ranchers are more likely to lack financial reserves and access to capital that would allow them to cope with losses due to unexpected events outside of their control.

Strickland AR 0903

2022 payments are issued, FSA may issue an additional payment, not to exceed the maximum amount allowed by law as explained above.

**Applying for ERP 2022**

FSA expects to begin mailing Track 1 application forms on or around November 8, 2023, to producers who received Federal crop insurance indemnities, and to begin mailing forms to producers who received NAP payments on or around November 8, 2023. For Track 2, FSA will begin accepting applications on October 31, 2023, and producers may obtain an application form and FSA–525, Crop Insurance and/or Nap Coverage Agreement for ERP 2022, through their county office or online at *https://www.fsa.usda.gov/programs-and-services/emergency-relief/index.*

Applications may be submitted in person or by mail, email, facsimile, or other methods announced by FSA. A complete application for each track a producer is applying for must be submitted to the producer's recording county office by the close of business on the deadline announced by FSA (the ERP 2022 deadline).

To receive an ERP 2022 payment, producers, including any producers with an SBI who have a share in a crop as indicated on a Track 1 application, must also have the following forms on file with FSA within 60 days of the ERP 2022 deadline:

∀ Form AD–2047, Customer Data Worksheet;

∀ Form CCC–902, Farm Operating Plan for an individual or legal entity as provided in 7 CFR part 1400;

∀ Form CCC–901, Member Information for Legal Entities (if applicable); and

∀ A highly erodible land conservation (sometimes referred to as HELC) and wetland conservation certification as provided in 7 CFR part 12 (form AD–1026 Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) Certification) for the producer and applicable affiliates.

Many producers, especially if they have participated in FSA programs recently, will already have these forms on file with FSA.

In addition to the forms listed above, certain producers will also need to submit the following forms in order to have their payment calculated as described above for underserved producers or to qualify for an increased payment limitation, as described in the Payment Limitation section in this document:

∀ Form CCC–860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification, applicable for the 2022 program year; [29] or

∀ Form FSA–510, Request for an Exception to the $125,000 Payment Limitation for Certain Programs, including the certification from a certified public accountant or attorney that the person or legal entity has met the requirements to be eligible for the increased payment limitation, for a person or a legal entity and all members of that entity, for the 2022 program year.

FSA will continue to accept forms CCC–860 and FSA–510 for ERP 2022 until 60 days after the ERP 2022 deadline. If a producer files a CCC–860 or FSA–510 and the accompanying certification after their ERP 2022 payment is issued but before the deadline to submit these forms, FSA will process the form CCC–860 or FSA–510 and issue any resulting additional payment amount.

**Payment Limitation**

As required by Title I of the Disaster Relief Supplemental Appropriations Act, 2023, the payment limitation for ERP 2022 is determined by the person's or legal entity's average adjusted gross farm income. Specifically, a person or legal entity, other than a joint venture or general partnership, cannot receive, directly or indirectly, more than $125,000 in payments for specialty and high value crops combined and $125,000 in payment for all non-specialty crops and other crops under ERP 2022 (for Track 1 and Track 2 combined) if their average adjusted gross farm income is less than 75 percent of their average AGI the 3 taxable years preceding the most immediately preceding complete tax year.

If at least 75 percent of the person or legal entity's average AGI is income derived from farming, ranching, and forestry related activities and the participant provides the required certification and documentation, as discussed below, the person or legal entity, other than a joint venture or general partnership, is eligible to receive, directly or indirectly, up to:

∀ $900,000 for specialty crops under Tracks 1 and 2 and high value crops under Track 2 combined; and

∀ $250,000 for non-specialty crops under Track 1 and other crops under Track 2, combined.

The relevant tax years for establishing a producer's AGI and percentage derived from farming, ranching, and forestry related activities are 2018, 2019, and 2020.

To receive more than $125,000 in ERP 2022 payments, producers must submit form FSA–510, including the certification from a certified public accountant or attorney that the person or legal entity has met the requirements to be eligible for the increased payment limitation. If a producer requesting the increased payment limitation is a legal entity, all members of that entity must also complete form FSA–510 and provide the required certification according to the direct attribution provisions in 7 CFR 1400.105, "Attribution of Payments." If a legal entity would be eligible for the increased payment limitation based on the legal entity's average AGI that is income derived from farming, ranching, and forestry related activities but a member of that legal entity either does not complete a form FSA–510 and provide the required certification or is not eligible for the increased payment limitation, the payment to the legal entity will be reduced for the payment limitation applicable to the share of the payment attributed to that member.

A payment made to a legal entity will be attributed to those members who have a direct or indirect ownership interest in the legal entity, unless the payment of the legal entity has been reduced by the proportionate ownership interest of the member due to that member's ineligibility.

Attribution of payments made to legal entities will be tracked through four levels of ownership in legal entities as follows:

∀ First level of ownership—any payment made to a legal entity that is owned in whole or in part by a person will be attributed to the person in an amount that represents the direct ownership interest in the first level or payment legal entity; [30]

---

[29] A person who has filed CCC–860 certifying their status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent CCC–860 certifying their status for a later program year because a person's status as socially disadvantaged would not change in different years, and their certification as a beginning or veteran farmer or rancher includes the relevant date needed to determine for what program years the status would apply.

An entity that has filed CCC–860 certifying its status as a socially disadvantaged, beginning, or veteran farmer or rancher for a prior program year is not required to submit a subsequent certification of its status for a later program year unless the entity's status has changed due to changes in membership.

Because a producer's status as a limited resource farmer or rancher may change annually depending on the producer's direct and indirect gross farm sales and household income, those producers must submit CCC–860 for each applicable program year.

[30] The "first level or payment legal entity" means that the payment entity will have a reduction

Continued

Strickland AR 0904

∀ Second level of ownership—any payment made to a first-level legal entity that is owned in whole or in part by another legal entity (referred to as a second-level legal entity) will be attributed to the second-level legal entity in proportion to the ownership of the second-level legal entity in the first-level legal entity; if the second-level legal entity is owned in whole or in part by a person, the amount of the payment made to the first-level legal entity will be attributed to the person in the amount that represents the indirect ownership in the first-level legal entity by the person;

∀ Third and fourth levels of ownership—except as provided in the second level of ownership bullet above and in the fourth level of ownership bullet below, any payments made to a legal entity at the third and fourth levels of ownership will be attributed in the same manner as specified in the second level of ownership bullet above; and

∀ Fourth-level of ownership—if the fourth level of ownership is that of a legal entity and not that of a person, a reduction in payment will be applied to the first-level or payment legal entity in the amount that represents the indirect ownership in the first level or payment legal entity by the fourth-level legal entity.

Payments made directly or indirectly to a person who is a minor child will not be combined with the earnings of the minor's parent or legal guardian.

A person or legal entity must provide the name, address, valid taxpayer identification number, and ownership share of each person, or the name, address, valid taxpayer identification number, and ownership share of each legal entity, that holds or acquires an ownership interest in the legal entity. ERP 2022 payments to a legal entity will be reduced in proportion to a member's ownership share when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership interest of less than 10 percent at or above the fourth level of ownership in the business structure is not provided to USDA. A legal entity will not be eligible to receive payment when a valid taxpayer identification number for a person or legal entity that holds a direct or indirect ownership

applied, and if the payment entity happens to be a joint venture, that reduction is applied to the first level, or highest level, for payments. The ''first level or payment legal entity'' is the highest level of ownership of the applicant to whom payments can be attributed or limited. If the applicant is a business type that does not have a limitation or attribution, the reduction is applied to the first level, but if the business type can have the reduction applied directly to it, then the limitation applies.

interest of 10 percent or greater at or above the fourth level of ownership in the business structure is not provided to USDA.

If a person or legal entity is not eligible to receive ERP 2022 payments due to the person or legal entity failing to satisfy payment eligibility provisions, the payment made either directly or indirectly to the person or legal entity will be reduced to zero. The amount of the reduction for the direct payment to the producer will be commensurate with the direct or indirect ownership interest of the ineligible person or ineligible legal entity.

Like other programs administered by FSA, payments made to an Indian Tribe or Tribal organization, as defined in section 4(b) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304), will not be subject to payment limitation.

**Requirement To Purchase Federal Crop Insurance or NAP Coverage**

Title I of the Disaster Relief Supplemental Appropriations Act, 2023, requires all producers who receive ERP 2022 payments, including those receiving a Track 1 payment for a tree loss under a Federal crop insurance policy, to purchase Federal crop insurance, or NAP coverage where Federal crop insurance is not available, for the next 2 available crop years, as determined by the Secretary. Participants must file an accurate acreage report and obtain Federal crop insurance or NAP coverage, as may be applicable:

∀ At a coverage level equal to or greater than 60 percent for insurable crops and trees; or

∀ At the catastrophic level or higher for NAP-eligible crops.

Availability will be determined from the date a producer receives an ERP 2022 payment and may vary depending on the timing and availability of Federal crop insurance or NAP coverage for a producer's particular crops. The final crop year to purchase Federal crop insurance or NAP coverage to meet the second year of coverage for this requirement is the 2027 crop year.

In situations where Federal crop insurance is unavailable for a crop, an ERP 2022 participant must obtain NAP coverage. Section 1001D of the Food Security Act of 1985 (1985 Farm Bill; Pub. L. 99–198) provides that a person or entity with an average AGI greater than $900,000 is not eligible to participate in NAP; however, producers with an average AGI greater than $900,000 are eligible to participate in ERP 2022. To reconcile this restriction in the 1985 Farm Bill and the

requirement to obtain NAP or Federal crop insurance coverage, ERP 2022 participants may meet the purchase requirement by purchasing WFRP coverage, if eligible, or they may pay the applicable NAP service fee despite their ineligibility for a NAP payment. In other words, the service fee must be paid even though no NAP payment may be made because the average AGI of the person or entity exceeds the 1985 Farm Bill limitation.

For Track 1, the Federal crop insurance and NAP coverage requirements are specific to the crop and county (which is the county where the crop is physically located for insured crops and the administrative county for NAP-covered crops) for which Track 1 payments are paid.

Producers who receive a Track 1 payment that was calculated based on an indemnity under a Pasture, Rangeland, and Forage policy; Annual Forage policy; or WFRP policy must purchase the same type of policy or a combination of individual policies for the crops that had covered losses under ERP 2022 to meet the Federal crop insurance and NAP coverage requirement.

Producers who receive a Track 1 payment on a crop in a county and who have the crop or crop acreage in subsequent years, as provided in this document, and who fail to obtain the 2 years of Federal crop insurance or NAP coverage required as specified in this document must refund all Track 1 payments for that crop in that county with interest from the date of disbursement.

Producers who were paid under Track 1 for a crop in a county, but do not plant that crop in that county in a year for which the Federal crop insurance and NAP coverage requirement applies, are not subject to the Federal crop insurance or NAP purchase requirement for that year.

For Track 2, producers must report all crops that suffered a revenue loss in whole or in part due to a qualifying disaster event on form FSA–525, Crop Insurance and/or NAP Coverage Agreement, and obtain the required level of Federal crop insurance or NAP coverage in all counties where the crop is grown for the applicable years. For all crops listed on form FSA–525, producers who have the crop or crop acreage in subsequent years and who fail to obtain the required 2 years of Federal crop insurance or NAP coverage must refund the ERP Track 2 payment with interest from the date of disbursement.

If both Federal crop insurance and NAP coverage are unavailable for a crop,

Strickland AR 0905

the producer must obtain WFRP Federal crop insurance coverage, if eligible.

Producers who receive an ERP Track 1 payment for a crop are not required to obtain additional years of Federal crop insurance or NAP coverage for that crop if they also receive an ERP Track 2 payment for a loss associated with that crop.

Producers who do not plant a crop listed on form FSA–525 in a year for which the Federal crop insurance and NAP coverage requirement applies are not subject to the Federal crop insurance or NAP purchase requirement for that crop for that year.

### Provisions Requiring Refund to FSA

In the event that any ERP 2022 payment resulted from erroneous information reported by the producer, or any person acting on their behalf, or if the producer's data are updated after RMA or FSA calculates a producer's Track 1 payment, the ERP 2022 payment for both Track 1 and Track 2, as applicable, will be recalculated and the producer must refund any excess payment to FSA, including interest to be calculated from the date of the disbursement to the producer. If FSA determines that the producer intentionally misrepresented information used to determine the producer's ERP 2022 payment amount, the application will be disapproved and the producer must refund the full payment to FSA with interest from the date of disbursement. All persons with a financial interest in a legal entity receiving payments are jointly and severally liable for any refund, including related charges, which is determined to be due to FSA for any reason. Any required refunds must be resolved in accordance with debt settlement regulations in 7 CFR part 3.

### General Provisions

Applicable general eligibility requirements, including recordkeeping requirements and required compliance with HELC and Wetland Conservation provisions, are similar to those for previous ad hoc crop disaster programs and current permanent disaster programs.

General requirements that apply to other FSA-administered commodity programs also apply to ERP 2022. Accordingly, producers that receive ERP 2022 must be in compliance with the provisions of 7 CFR part 12, "Highly Erodible Land and Wetland Conservation," and the provisions of 7 CFR 718.6, which address ineligibility for benefits for offenses involving controlled substances. Appeal regulations in 7 CFR parts 11 and 780

and equitable relief and finality provisions in 7 CFR part 718, subpart D, apply to determinations under ERP 2022. As described above, Track 1 payments are calculated using data on file with RMA and FSA at the time of payment calculation, unless that data are later updated. Producers who receive a Track 1 application and disagree with the calculated payment amount or data used in the calculation may apply for Track 2, which will allow them to provide their data to FSA through a traditional application process.

Participants are required to retain documentation in support of their application for 3 years after the date of approval. All information provided to FSA for program eligibility and payment calculation purposes, including certification that a producer suffered a loss due to a qualifying disaster event, is subject to spot check. Participants receiving ERP 2022 payments or any other person who furnishes such information to USDA must permit authorized representatives of USDA or the Government Accountability Office, during regular business hours, to enter the agricultural operation and to inspect, examine, and to allow representatives to make copies of books, records, or other items for the purpose of confirming the accuracy of the information provided by the participant.

If requested by FSA, the producer must provide additional documentation that establishes the producer's eligibility for ERP 2022. If supporting documentation is requested, the documentation must be submitted to FSA within 30 calendar days from the request or the application will be disapproved by FSA. FSA may request supporting documentation to verify information provided by the producer and the producer's eligibility including, but not limited to, the producer's ownership share in the crop or commodity, benchmark year revenue, disaster year revenue, and percentage of expected revenue from specialty and high value crops and other crops.

ERP 2022 applicants filing an FSA–510 are subject to an FSA audit of information submitted for the purpose of increasing the program's payment limitation. As a part of this audit, FSA may request income tax returns, and if requested, must be supplied by all related persons and legal entities. In addition to any other requirement under any Federal statute, relevant Federal income tax returns and documentation must be retained a minimum of 3 years after the end of the calendar year corresponding to the year for which payments or benefits are requested.

Failure to provide necessary and accurate information to verify compliance, or failure to comply with these requirements will result in ineligibility for ERP 2022 benefits and require refund of any ERP 2022 payments, including interest to be calculated from the date of the disbursement to the producer.

Applicants have a right to a decision in response to a timely-filed complete application.

If an applicant files a late ERP 2022 application, the application will be considered a request to waive the deadline. Requests to waive or modify program provisions are at the discretion of the Deputy Administrator. The Deputy Administrator has the authority to waive or modify application deadlines and other requirements or program provisions not specified in law in cases where the Deputy Administrator determines it is equitable to do so and the lateness or failure to meet such other requirements or program provisions do not adversely affect the operation of ERP 2022. Applicants who request to waive or modify program provisions do not have a right to a decision on those requests. The Deputy Administrator's refusal to exercise discretion on requests to waive or modify ERP 2022 provisions will not be considered an adverse decision and is, by itself, not appealable.

Any payment under ERP 2022 will be made without regard to questions of title under State law and without regard to any claim or lien. The regulations governing offsets in 7 CFR part 3 apply to ERP 2022 payments.

If any person who would otherwise be eligible to receive a payment dies before the payment is received, payment may be released as specified in 7 CFR 707.3. Similarly, if any person or legal entity who would otherwise have been eligible to apply for a payment dies or is dissolved, respectively, before the payment is applied for, payment may be released in accordance with this document if a timely application is filed by an authorized representative. Proof of authority to sign for the deceased producer or dissolved entity must be provided. If a participant is now a dissolved general partnership or joint venture, all members of the general partnership or joint venture at the time of dissolution or their duly authorized representatives must sign the application for payment. Eligibility of such participant will be determined, as it is for other participants, based on ownership share and risk in producing the crop.

In either applying for or participating in ERP 2022, or both, the producer is

Strickland AR 0906

subject to laws against perjury (including, but not limited to, 18 U.S.C. 1621). If the producer willfully makes and represents as true any verbal or written declaration, certification, statement, or verification that the producer knows or believes not to be true, in the course of either applying for or participating in ERP 2022, or both, then the producer may be found to be guilty of perjury. Except as otherwise provided by law, if guilty of perjury the applicant may be fined, imprisoned for not more than 5 years, or both, regardless of whether the producer makes such verbal or written declaration, certification, statement, or verification within or outside the United States.

For the purposes of the effect of a lien on eligibility for Federal programs (28 U.S.C. 3201(e)), USDA waives the restriction on receipt of funds under ERP 2022 under the following condition: by applying for ERP 2022, applicants agree, as a condition of the waiver, that the ERP 2022 payments will be applied to reduce the amount of the judgment lien.

In addition to any other Federal laws that apply to ERP 2022, the following laws apply: 15 U.S.C. 714; and 18 U.S.C. 286, 287, 371, and 1001.

**Paperwork Reduction Act Requirements**

In compliance with the provisions of the Paperwork Reduction Act (44 U.S.C. chapter 35), the information collection request has been approved by OMB under an emergency request under control number 0560–0316. FSA will collect the information from producers to qualify for an ERP 2022 payment. ERP 2022 is a one-time funding as described in this NOFA.

In accordance with the Paperwork Reduction Act, FSA is requesting comments from all interested individuals and organizations on a new information collection request that supports ERP 2022.

**Description of Information Collection**

*Title:* Emergency Relief Program 2022 (ERP 2022).

*OMB Control Number:* 0560–0316.

*Type of Request:* New.

*Abstract:* FSA is providing assistance to eligible crop producers to cover the necessary expenses related losses of revenue, quality, or production of crops (including milk, on-farm stored commodities, crops prevented from planting in 2020 and 2021, and harvested adulterated wine grapes), trees, bushes, and vines, as a consequence of droughts, wildfires, hurricanes, tornadoes, floods, derechos,

excessive heat, winter storms, freeze, including a polar vortex, smoke exposure, quality losses of crops, and excessive moisture occurring in calendar year 2022.

FSA is administering ERP in two tracks (referred to as Track 1 and Track 2). ERP Track 1 will use a streamlined process with pre-filled application forms for losses where the data are already on file with FSA or the Risk Management Agency (RMA) as a result of the producers previously receiving a Noninsured Crop Disaster Assistance Program (NAP) payment or a Federal crop insurance indemnity under certain Federal crop insurance policies. ERP Track 2 will provide payments for other eligible losses through a revenue-based approach using a traditional application process during which producers will provide the information required to calculate a payment.

For the following estimated total annual burden on respondents, the formula used to calculate the total burden hours is the estimated average time per response multiplied by the estimated total annual responses.

*Estimate of Average Time to Respond:* Public reporting burden for collecting information under this notice is estimated to average 0.305 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collections of information.

*Type of Respondents:* Producers.

*Estimated Number of Respondents:* 230,000.

*Estimated Average Number of Responses per Respondent:* 1.43.

*Estimated Total Annual Responses:* 327,855.

*Estimated Total Annual Burden on Respondents:* 100,072 hours.

The purpose of this notice is to request comments from the public (as well as affected agencies) concerning the information collection request.

The comments will help us:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of burden of the collection of information including the validity of the methodology and assumptions used;

(3) Evaluate the quality, utility and clarity of the information technology; and

(4) Minimize the burden of the information collection on those who

respond through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology.

All comments received in response to this notice, including names and addresses where provided, will be made a matter of public record. Comments will be summarized and included in the submission for Office of Management and Budget approval.

**Environmental Review**

The environmental impacts have been considered in a manner consistent with the provisions of the National Environmental Policy Act (NEPA, 42 U.S.C. 4321–4347), the regulations of the Council on Environmental Quality (40 CFR parts 1500–1508), and the FSA regulation for compliance with NEPA (7 CFR part 799). ERP 2022 is authorized by Title I of the Disaster Relief Supplemental Appropriations Act, 2023. The intent of ERP 2022 is to provide payments to eligible crop producers who suffered eligible crop and tree losses due to wildfires, hurricanes, floods, derechos, excessive heat, tornadoes, winter storms, freeze (including a polar vortex), smoke exposure, excessive moisture, and qualifying drought, and related conditions occurring in calendar year 2022.

The limited discretionary aspects of the program were designed to be consistent with established FSA disaster programs. As such, the Categorical Exclusions in 7 CFR part 799.31 apply, specifically 7 CFR 799.31(b)(6)(iv) and (vi) (that is, § 799.31(b)(6)(iv) Individual farm participation in FSA programs where no ground disturbance or change in land use occurred as a result of the action or participation; and § 799.31(b)(6)(vi) Safety net programs administered by FSA). No Extraordinary Circumstances (7 CFR 799.33) exist. As such, FSA has determined that the implementation of ERP 2022 and the participation in ERP 2022 do not constitute major Federal actions that would significantly affect the quality of the human environment, individually or cumulatively. Therefore, FSA will not prepare an environmental assessment or environmental impact statement for this regulatory action, and this notice serves as documentation of the programmatic environmental compliance decision.

**Federal Assistance Programs**

The titles and numbers of the Federal assistance programs, as found in the Assistance Listings, to which this document applies are 10.964—

Emergency Relief Program and 10.979—Emergency Relief Program 2022.

## USDA Non-Discrimination Policy

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family or parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Individuals who require alternative means of communication for program information (for example, braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or the USDA TARGET Center at (202) 720–2600 (voice and text telephone (TTY)) or dial 711 for Telecommunications Relay Service (both voice and text telephone users can initiate this call from any telephone). Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *https:// www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint* and at any USDA office or write a letter addressed to USDA and provide in the letter all the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by: (1) mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410; (2) fax: (202) 690–7442; or (3) email: *program.intake@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

**Zach Ducheneaux,**
*Administrator, Farm Service Agency.*
[FR Doc. 2023–24009 Filed 10–30–23; 8:45 am]
**BILLING CODE 3410–05–P**

## COMMISSION ON CIVIL RIGHTS

### Notice of Public Briefing of the Minnesota Advisory Committee to the U.S. Commission on Civil Rights

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Notice of public briefing.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act, that the Minnesota Advisory Committee (Committee) to the U.S. Commission on Civil Rights will hold a public briefing via Zoom at 12 p.m. CT on Wednesday, January 17, 2024. The purpose of this briefing is to hear testimony on housing affordability in the state.

**DATES:** Wednesday, January 17, 2024, from 12 p.m.–2 p.m. Central Time.

**ADDRESSES:** The meeting will be held via Zoom.

*Registration Link (Audio/Visual): https://www.zoomgov.com/j/ 1610159425.*

*Join by Phone (Audio Only):* (833) 435–1820 Toll-Free; Meeting ID: 161 015 9425.

**FOR FURTHER INFORMATION CONTACT:** Ana Victoria Fortes, Designated Federal Officer, at *afortes@usccr.gov* or (202) 519–2938.

**SUPPLEMENTARY INFORMATION:** This committee meeting is available to the public through the registration link above. Any interested member of the public may listen to the meeting. An open comment period will be provided to allow members of the public to make a statement as time allows. Per the Federal Advisory Committee Act, public minutes of the meeting will include a list of persons who are present at the meeting. If joining via phone, callers can expect to incur regular charges for calls they initiate over wireless lines, according to their wireless plan. The Commission will not refund any incurred charges. Callers will incur no charge for calls they initiate over land-line connections to the toll-free telephone number. Closed captioning will be available for individuals who are deaf, hard of hearing, or who have certain cognitive or learning impairments. To request additional accommodations, please email Liliana Schiller, Support Services Specialist, at *lschiller@usccr.gov* at least 10 business days prior to the meeting.

Members of the public are entitled to submit written comments; the comments must be received in the regional office within 30 days following

the meeting. Written comments may be emailed to Ana Victoria Fortes at *afortes@usccr.gov.* Persons who desire additional information may contact the Regional Programs Coordination Unit at (312) 353–8311.

Records generated from this meeting may be inspected and reproduced at the Regional Programs Coordination Unit Office, as they become available, both before and after the meeting. Records of the meetings will be available via *www.facadatabase.gov* under the Commission on Civil Rights, Minnesota Advisory Committee link. Persons interested in the work of this Committee are directed to the Commission's website, *http://www.usccr.gov,* or may contact the Regional Programs Coordination Unit at *lschiller@ usccr.gov.*

### Agenda

I. Welcome & Roll Call
II. Introductory Remarks
III. Panelist Presentations & Committee Q&A
IV. Public Comment
V. Closing Remarks
VI. Adjournment

Dated: October 25, 2023.

**David Mussatt,**
*Supervisory Chief, Regional Programs Unit.*
[FR Doc. 2023–23945 Filed 10–30–23; 8:45 am]
**BILLING CODE P**

## COMMISSION ON CIVIL RIGHTS

### Notice of Public Briefing of the Minnesota Advisory Committee to the U.S. Commission on Civil Rights

**AGENCY:** U.S. Commission on Civil Rights.

**ACTION:** Notice of public briefing.

**SUMMARY:** Notice is hereby given, pursuant to the provisions of the rules and regulations of the U.S. Commission on Civil Rights (Commission) and the Federal Advisory Committee Act, that the Minnesota Advisory Committee (Committee) to the U.S. Commission on Civil Rights will hold a public briefing via Zoom at 12 p.m. CT on Friday, January 26, 2024. The purpose of this briefing is to hear testimony on housing affordability in the state.

**DATES:** Friday, January 26, 2024, from 12 p.m.–2 p.m. Central Time.

**ADDRESSES:** The meeting will be held via Zoom.

*Registration Link (Audio/Visual): https://www.zoomgov.com/j/ 1613104128.*

*Join by Phone (Audio Only):* (833) 435–1820 USA Toll-Free; Meeting ID: 161 310 4128.

Strickland AR 0908

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| RUSTY STRICKLAND, | ) |
| ALAN AND AMY WEST FARMS, | ) |
| ALAN WEST, | ) |
| AMY WEST, | ) |
| DOUBLE B FARMS, LLC, and | ) |
| BRYAN BAKER, | ) |
|      Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 2:24-cv-60 |
| | ) |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, | ) |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | ) |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, and | ) |
| THE UNITED STATES OF AMERICA, | ) |
|      Defendants. | ) |
| | ) |

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND, IN THE
ALTERNATIVE, FOR PARTIAL VACATUR AND REMAND**

---

## <u>INTRODUCTION</u>

1.      Natural disasters do not discriminate, and neither should the Department of Agriculture (USDA). The Constitution promises equal treatment to all Americans regardless of their race or sex. It also promises the separation of powers. USDA broke both promises through

the disaster and pandemic relief programs challenged here that it operates under the "Emergency Relief" umbrella. Plaintiffs are Texas farmers, ranchers, and business entities. They are all eligible for relief under one or more of the programs. Plaintiffs bring this lawsuit to challenge USDA's decision to discriminate based on race and sex through the programs in violation of the Fifth Amendment and the Administrative Procedure Act (APA).

2.      The agricultural industry's contribution to the American economy and quality of life cannot be overstated. According to USDA, in 2022, "[a]griculture, food, and related industries contributed roughly $1.420 trillion to U.S. gross domestic product (GDP), a 5.5-percent share." U.S. Dep't of Agric., Ag and Food Sectors and the Economy (2024), https://perma.cc/MSC2-ZT63.

3.      Agriculture is a risky business. One drought can wipe out an entire season's crops, one wildfire can kill an entire herd, and one hurricane can destroy an entire orchard.

4.      Recognizing the critical importance of sustaining our national agriculture, Congress maintains a farm bill and regularly appropriates funds to USDA to provide financial assistance to America's farmers, ranchers, communities, and businesses[1] that have suffered financial loss due to disasters.

5.      Over the past four years, Congress appropriated $13.7 billion to USDA to implement disaster assistance programs for crop and livestock disaster relief and nearly $11.2 billion to USDA to implement disaster assistance programs for coronavirus-related relief. USDA then took these funds and implemented a suite of programs to aid farmers who had lost income, crops, or livestock due to disasters and the pandemic.

---

[1] Throughout the complaint, "farmers" is used as a general term for all agricultural producers and entities covered by the programs.

2

6.      Unfortunately, USDA made the decision—despite a lack of congressional authorization—to base the amount of financial assistance provided by the programs on race and sex.

7.      Indeed, the relevant portions of the appropriations bills never mention race or sex. Yet, when providing nearly $25 billion in relief, USDA factored it in anyway.

8.      First, USDA created a category of farmers defined strictly by race and sex. It called these farmers "socially disadvantaged." USDA considers the following groups to be socially disadvantaged: (1) American Indians or Alaskan Natives; (2) Asians or Asian-Americans; (3) blacks or African-Americans; (4) Hispanics or Hispanic-Americans; (5) Native Hawaiians or other Pacific Islanders; and (6) women.

9.      Then, in each of the programs, USDA used two different methods for calculating the amount and type of financial assistance for farmers.

10.     One method was used for: (1) veteran farmers, distinguished by having served in the armed forces; (2) beginning farmers, distinguished by being new to the profession; (3) limited-resource farmers, distinguished by having low incomes; and (4) socially disadvantaged farmers, distinguished by being of a particular race or sex. Under this method, USDA awarded significant additional benefits to those groups of farmers, such as refunding insurance premiums, refunding fees, automatically enrolling farmers in programs to cover non-insured crops without the farmer even requesting it, or just giving farmers more money. USDA used a second method for all other farmers.

11.     USDA's message was simple: white men must be veterans, or new farmers, or poor to deserve additional disaster relief. Everyone else is entitled to it based on their race or sex.

3

12.     As a result, across the programs, USDA provided additional disaster relief in the form of more money to some farmers based solely on their race and sex.

13.     Plaintiffs all suffered financial losses due to disasters and/or the pandemic and they all qualified for and received financial assistance from some of the programs. But they did not qualify to receive the disaster relief that USDA provided based on race or sex, and thus received less disaster relief than farmers of a different race or sex.

14.     USDA's actions are both unlawful and unconstitutional. USDA, absent congressional authorization and in violation of the separation of powers, took upon itself the responsibility to use race and sex to decide how much money each disaster victim would get. And even if it had congressional authorization, awarding disaster relief based on race or sex is contrary to the Constitution's guarantee of equality.

15.     Through the programs, USDA acted unilaterally to enshrine into law race and sex classifications that divide American farmers, and which are unmoored from any interest that the government may have in remedying specific, identified instances of past discrimination.

16.     "The difficulty of overcoming the effects of past discrimination is as nothing compared with the difficulty of eradicating from our society the source of those effects, which is the tendency—fatal to a Nation such as ours—to classify and judge men and women on the basis of their country of origin or the color of their skin." *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 520 (1989) (Scalia, J., concurring).

17.     Plaintiffs bring this lawsuit to vindicate their constitutional right to equal protection of the laws, to uphold separation of powers principles, and to give all farmers fair and equal treatment in receiving much-needed disaster relief funding. They ask this Court to declare the programs contrary to constitutional right, power, privilege, or immunity, in excess of USDA's

4

statutory authority, and otherwise not in accordance with law, to set the programs aside, and enjoin USDA from perpetuating race and sex discrimination through regulation. Moreover, to the extent that USDA correctly interpreted relevant statutory authority, those statutory classifications must be declared unconstitutional.

## **PARTIES**

18.     Plaintiff Rusty Strickland lives in Wellington, Texas, and operates a farm with his wife Alison Strickland. Together, their farms grow cotton, peanuts, and wheat. They also raise cattle. Mrs. Strickland received full disaster relief under each of the programs because she is a woman. Because Mr. Strickland is a white man and not a veteran farmer, beginning farmer, or limited resource farmer, he received less disaster relief under the programs than his wife.

19.     The following chart depicts which of the programs Mr. Strickland was eligible for, the amount USDA calculated he had lost due to natural disasters or the pandemic for each, and the disaster relief he received:

| Rusty Strickland | | |
|---|---|---|
| **USDA Program** | **Plaintiff's base program loss** | **Actual USDA payment to plaintiff** |
| ERP 2022 Track 1 | $ 46,970 | $ 7,273 |
| ERP 2021 (Total) | $ 264,794 | $ 207,863 |
| ELRP 2022 | $ 8,240 | $ 1,545 |
| ELRP 2021 Phase 1 | $ 4,056 | $ 3,042 |
| ELRP 2021 Phase 2 | $ 3,042 | $ 608 |
| CFAP 2 Bonus | $ 59,459 | $ - |

20.     On information and belief, the following chart depicts what USDA would have paid Mr. Strickland if he were of a different race or sex:

5

| Rusty Strickland | | |
|---|---|---|
| USDA Program | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $ 71,901 | $ (64,628) |
| ERP 2021 (Total) | $ 239,043 | $ (31,180) |
| ELRP 2022 | $ 1,854 | $ (309) |
| ELRP 2021 Phase 1 | $ 3,650 | $ (608) |
| ELRP 2021 Phase 2 | $ 730 | $ (122) |
| CFAP 2 Bonus | $ 8,919 | $ (8,919) |

21.    Plaintiff Alan and Amy West Farms is a joint venture based in Lubbock, Texas, owned and operated by Plaintiffs Alan West and Amy West. The farm grows cotton, wheat, grain sorghum, and hay. Alan and Amy West Farms is owned 52 percent by Mr. West, a white man who is not a veteran farmer, beginning farmer, or limited resource farmer, and only 48 percent by Mrs. West, a woman. Thus, because Amy West owned less than 50 percent of the joint venture, USDA did not consider Alan and Amy West Farms socially disadvantaged. As a result, Mr. and Mrs. West received less disaster relief.

22.    The following chart depicts which of the programs Alan and Amy West Farms was eligible for, the amount USDA calculated it had lost due to natural disasters for each, and the disaster relief it received:

| Alan and Amy West Farms | | |
|---|---|---|
| USDA Program | Plaintiff's base program loss | Actual USDA payment to plaintiff |
| ERP 2022 Track 1 | $ 208,706 | $ 19,403 |
| ERP 2022 Track 2 | $ 631,289 | $ 51,097 |
| ERP 2021 (Total) | $ 417,547 | $ 327,774 |

6

23.     On information and belief, the following chart depicts what USDA would have paid Alan and Amy West Farms if Alan West were of a different race or sex or if Amy West owned two percent more of the joint venture:

| Alan and Amy West Farms | | |
|---|---|---|
| USDA Program | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $      206,553 | $         (187,151) |
| ERP 2022 Track 2 | $        58,760 | $             (7,664) |
| ERP 2021 (Total) | $      376,941 | $           (49,166) |

24.     Plaintiff Alan West lives in Lubbock, Texas, and co-owns and operates Alan and Amy West Farms as a 52-48 joint venture with Mrs. West. Mr. West owns 52 percent of their joint venture.

25.     Plaintiff Amy West lives in Lubbock, Texas, and co-owns and operates Alan and Amy West Farms as a 52-48 joint venture with Mr. West. Mrs. West owns 48 percent of their joint venture.

26.     Plaintiff Bryan Baker lives in Sudan, Texas, and operates a sole proprietorship farm and a limited liability company, Double B Farms, LLC, which he owns in full. His farms grow cotton, black eyed peas, grain sorghum, and sorghum silage. Because Mr. Baker is a white man who is not a veteran farmer, beginning farmer, or limited resource farmer, USDA did not consider his sole proprietorship socially disadvantaged. As a result, he received less disaster relief.

27.     The following chart depicts which of the programs Bryan Baker was eligible for, the amount USDA calculated he had lost due to natural disasters or the pandemic for each, and the disaster relief he received:

7

| Bryan Baker | | |
|---|---|---|
| **USDA Program** | **Plaintiff's base program loss** | **Actual USDA payment to plaintiff** |
| ERP 2022 Track 1 | $ 53,850 | $ 7,789 |
| ERP 2022 Track 2 | $ 372,890 | $ 31,717 |
| ERP 2021 (Total) | $ 67,990 | $ 53,372 |
| PARP | $ 225,613 | $ 9,448 |

28. On information and belief, the following chart depicts what USDA would have paid Bryan Baker if he were of a different race or sex:

| Bryan Baker | | |
|---|---|---|
| **USDA Program** | **USDA payment if plaintiff was socially disadvantaged** | **Amount USDA withheld because plaintiff was not socially disadvantaged** |
| ERP 2022 Track 1 | $ 48,154 | $ (40,365) |
| ERP 2022 Track 2 | $ 36,474 | $ (4,758) |
| ERP 2021 (Total) | $ 61,378 | $ (8,006) |
| PARP | $ 11,591 | $ (2,143) |

29. Plaintiff Double B Farms, LLC is registered in Sudan, Texas. Mr. Baker owns Double B Farms, LLC in full. Because Mr. Baker is a white man and not a veteran farmer, beginning farmer, or limited resource farmer, Double B Farms, LLC did not receive full disaster relief under any of the programs. The following chart depicts which of the programs Double B Farms, LLC was eligible for, the amount USDA calculated it had lost due to natural disasters for each, and the relief it received.

8

| Double B Farms | | |
|---|---|---|
| **USDA Program** | **Plaintiff's base program loss** | **Actual USDA payment to plaintiff** |
| ERP 2022 Track 1 | $            130,136 | $            13,510 |
| ERP 2022 Track 2 | $            973,083 | $            76,731 |
| ERP 2021 (Total) | $            193,150 | $            151,623 |

30.     On information and belief, the following chart depicts what USDA would have paid Double B Farms, LLC if Bryan Baker were of a different race or sex:

| Double B Farms | | |
|---|---|---|
| **USDA Program** | **USDA payment if plaintiff was socially disadvantaged** | **Amount USDA withheld because plaintiff was not socially disadvantaged** |
| ERP 2022 Track 1 | $            110,689 | $            (97,179) |
| ERP 2022 Track 2 | $            88,241 | $            (11,510) |
| ERP 2021 (Total) | $            174,366 | $            (22,743) |

31.     Defendant USDA is a federal executive department. USDA was given the authority by Congress to spend nearly $25 billion for coronavirus and natural disaster relief. It promulgated the challenged programs.

32.     Defendant Thomas J. Vilsack is the Secretary of Agriculture. He is responsible for leading USDA, including the Farm Service Agency. At all times relevant to this complaint, he enacted and enforced the challenged programs. He is sued in his official capacity.

33.     Defendant Zach Ducheneaux is the Administrator for USDA's Farm Service Agency. At all times relevant to this complaint, his responsibilities included administering loan programs and managing relief programs, including the programs challenged here. He is sued in his official capacity.

9

34.     Defendant United States of America is a government entity. It can be sued under the Administrative Procedure Act. *See* 5 U.S.C. § 703.

## JURISDICTION AND VENUE

35.     This case arises under both the Fifth Amendment to the United States Constitution and the Administrative Procedure Act. *See* 5 U.S.C. § 701 *et seq*.

36.     The Court has jurisdiction over this complaint under 28 U.S.C. § 1331 (federal question) because this case presents substantial questions of federal law, specifically whether USDA has violated the United States Constitution's guarantee of equal protection of the laws and the Administrative Procedure Act. *See* 5 U.S.C. § 701 *et seq*.

37.     This Court has authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act) and Fed. R. Civ. P. 57. It may also set aside the challenged agency actions, postpone their effective date pending judicial review, hold them unlawful, and grant preliminary and permanent injunctive relief. *See* 5 U.S.C. §§ 705, 706; Fed. R. Civ. P. 65.

38.     Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to this claim occurred in this district and a plaintiff resides in this district.

## STATEMENT OF FACTS

**The Biden Administration's Whole-of-Government Approach to Racial Equity**

39.     On day one of his administration, President Biden issued Executive Order 13985, *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*, 86 Fed. Reg. 7009 (Jan. 25, 2021), which declared that his administration was taking

10

a "comprehensive approach to advancing equity for all" and would establish "an ambitious whole-of-government equity agenda."

40.     As Judge Ho recently explained, the difference between equity and equality is "the difference between securing equality of opportunity regardless of race and guaranteeing equality of outcome based on race. It's the difference between color blindness and critical race theory." *See Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 648 (5th Cir. 2021) (Ho, J., concurring in part and concurring in the judgment).

41.     On April 14, 2022, in response to President Biden's directive to "the whole of the federal government to advance an ambitious equity and racial justice agenda," more than ninety federal agencies released their first-ever Equity Action Plans. *See* The White House, Biden-Harris Administration Releases Agency Equity Action Plans to Advance Equity and Racial Justice Across the Federal Government (2022), https://perma.cc/PF3B-D5R6.

42.     On February 16, 2023, President Biden updated his equity initiative through Executive Order 14091, *Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*. *See* 88 Fed. Reg. 10825 (Feb. 22, 2023).

43.     In EO 14091, President Biden proclaimed that his "[a]dministration has embedded a focus on equity into the fabric of Federal policymaking and service delivery" and "vigorously championed racial equity." *Id*.

44.     President Biden then reaffirmed that his policy would be to "advance an ambitious, whole-of-government approach to racial equity and support for underserved communities and to continuously embed equity into all aspects of Federal decision-making" and directed agencies to "support ongoing implementation of a comprehensive equity strategy . . . *to yield equitable outcomes*." *Id*. at 10826, 10828 (emphasis added).

11

45. Every federal agency must comply with these executive orders.

**USDA's Race- and Sex-Based Approach to Equity**

46. In the words of Secretary Vilsack himself, "Under this Administration, equity is more than a catchphrase. It's a promise." U.S. Dep't of Agric., Equity Action Plan 2023 Update, 2 (2024), https://perma.cc/PQH3-4B3W.

47. In February 2022, USDA published its Equity Action Plan. U.S. Dep't of Agric., USDA Equity Action Plan in Support of Executive Order (EO) 13985 Advancing Racial Equity and Support for Underserved Communities through the Federal Government (Feb. 10, 2022), https://perma.cc/9CVL-2FG9.

48. In its Equity Action Plan, USDA declared that "[it] strives to institutionalize this emphasis on equity" and will "remain steadfast in [its] commitment to advance equity in every facet of [its] mission." *Id*. at 1, 5.

49. In January 2024, USDA published an annual report on its Equity Action Plan informing Americans that USDA has "continued meaningful steps to fortify equity and racial justice" by centering equity in everything USDA does. Equity Action Plan 2023 Update, at 1.

50. In furtherance of its commitment to equity, USDA uses a category of farmers that it calls "underserved farmers," which includes veteran farmers, beginning farmers, limited resource farmers, and, most relevant to this complaint, socially disadvantaged farmers. *Id.* at 6.

51. If a farmer wants USDA to classify him as an underserved farmer, he must submit USDA's Form CCC-860. U.S. Dep't of Agric. Commodity Credit Corp., CCC-860, Socially Disadvantaged, Limited Resource, Beginning and Veteran Farmer or Rancher Certification (2020), https://perma.cc/W7BF-Q93Q.

12

52.     Form CCC-860 allows farmers to classify themselves as a veteran farmer (based on veteran status), a beginning farmer (started farming in past 10 years), and/or a limited resource farmer (based on low annual income). *Id.* Plaintiffs do not challenge any these categories because they do not consider the race or sex of the farmer.

53.     Form CCC-860 also allows farmers to classify themselves as a socially disadvantaged farmer, which USDA expressly defines as only members of certain races and one sex. *Id*.

54.     The programs and Form CCC-860 specify that farmers of the following races qualify as socially disadvantaged:

    a.   American Indians or Alaskan Natives;

    b.   Asians or Asian Americans;

    c.   Blacks or African Americans;

    d.   Hispanics or Hispanic Americans; and

    e.   Native Hawaiians or other Pacific Islanders.

*Id.*; *see also* Notice of Funds Availability; Emergency Relief Program (ERP) (ERP 2021 Phase 1), 87 Fed. Reg. 30164, 30166 (May 18, 2022); Pandemic Assistance Programs and Agricultural Disaster Assistance Programs, Subpart S—Emergency Relief Program Phase 2 (ERP 2021 Phase 2), 88 Fed. Reg. 1862, 1886 (Jan. 11, 2023) (codified at 7 C.F.R. § 760.1901); Subpart A—Coronavirus Food Assistance Program 2 (CFAP 2), *id.* at 1877 (codified at 7 C.F.R. § 9.201); Subpart D—Pandemic Assistance Revenue Program (PARP), *id.* at 1879 (codified at 7 C.F.R. § 9.302); Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) (ELRP 2021 Phase 1), 87 Fed. Reg. 19465, 19467 (Apr. 4, 2022); Notice of Funds Availability; 2021 Emergency Livestock Relief Program (ELRP) Phase 2 (ELRP 2021 Phase 2), 88 Fed. Reg. 66366,

13

66369 (Sept. 27, 2023); Notice of Funds Availability; Emergency Relief Program 2022 (ERP 2022), 88 Fed. Reg. 74404, 74408 (Oct. 31, 2023); Notice of Funds Availability; Emergency Livestock Relief Program (ELRP) 2022 (ELRP 2022), 88 Fed. Reg. 66361, 66363 (Sept. 27, 2023).

55.     These definitions also specify that women qualify as socially disadvantaged. *See, e.g.*, ERP 2022, 88 Fed. Reg. at 74408.

56.     For an entity to qualify as socially disadvantaged, members of the listed races and sex must own at least a 50 percent interest in the entity. *Id.*

**Statutory and Regulatory Background**

57.     USDA provides emergency disaster relief to farmers through many different programs.

58.     In 2021, Congress provided $10 billion to USDA for "necessary expenses related to losses" due to natural disasters and other weather events. Extending Government Funding & Delivering Emergency Assistance Act, Pub. L. 117-43, Div. B, Title I, 135 Stat. 344, 356 (2021).

59.     In 2022, Congress provided a further $3.7 billion for substantially the same purpose. Consolidated Appropriations Act, 2023, Pub. L. 117-328, Div. N, Title I, 136 Stat. 4459, 5201 (2022).

60.     And in 2020, Congress provided nearly $11.2 billion to USDA for coronavirus-related relief. Consolidated Appropriations Act, 2021, Pub. L. 116-260, Div. N, Title VII, Subtitle B, 134 Stat. 1182, 2105 (2020).

61.     These appropriations total nearly $25 billion.

62.     Through these three laws, Congress granted USDA the authority to use the appropriated funds to provide financial assistance to farmers who lost crops, livestock, or revenue due to disasters like wildfires, hurricanes, and the pandemic.

14

63.     The relevant provisions of all three laws never mention race or sex and never direct or authorize USDA to consider the race or sex of disaster or pandemic relief recipients.

64.     In response to the congressional appropriations, USDA created and funded numerous relief programs it placed under the umbrella category of "Emergency Relief." U.S. Dep't of Agric., Emergency Relief (2024), https://perma.cc/S7V3-GLY8.

65.     This action is brought to challenge eight different programs within that umbrella: (1) the Emergency Relief Program 2021 Phase 1 (ERP 2021 Phase 1), 87 Fed. Reg. 30164; (2) the Emergency Relief Program 2021 Phase 2 (ERP 2021 Phase 2), 88 Fed. Reg. 1862, 1862−66; (3) the Coronavirus Food Assistance Program 2 (CFAP 2) bonus payment, *id.* at 1869−70; (4) the Pandemic Assistance Revenue Program (PARP), *id.* at 1866−69; (5) the Emergency Livestock Relief Program 2021 Phase 1 (ELRP 2021 Phase 1), 87 Fed. Reg. 19465; (6) the Emergency Livestock Relief Program 2021 Phase 2 (ELRP 2021 Phase 2), 88 Fed. Reg. 66366; (7) the Emergency Relief Program 2022 Track 1 and Track 2 (ERP 2022), 88 Fed. Reg. 74404; and (8) the Emergency Livestock Relief Program 2022 (ELRP 2022), 88 Fed. Reg. 66361.

66.     Apart from CFAP 2, USDA funded these programs with the nearly $25 billion in appropriations from the three laws.

67.     USDA funded the CFAP 2 bonus payment using Commodity Credit Corporation (CCC) funds. CFAP 2, 88 Fed. Reg. at 1869.

68.     The CCC is a USDA-run corporation created by the Commodity Credit Corporation Charter Act that funds and administers USDA programs to stabilize agriculture prices and market conditions. 15 U.S.C. § 714. It can borrow up to $30 billion and operates under the supervision and direction of the Secretary of Agriculture. 15 U.S.C. §§ 714, 714b(i).

15

**Emergency Relief Program (ERP) 2021 Phase 1 and Phase 2**

69.     On May 18, 2022, USDA published a Notice of Funds Availability for the Emergency Relief Program, establishing ERP 2021 Phase 1 to provide emergency relief to farmers who suffered crop losses due to adverse weather events in 2020 or 2021. ERP 2021 Phase 1, 87 Fed. Reg. 30164.

70.     On January 11, 2023, USDA published a Final Rule titled Pandemic Assistance Programs and Agricultural Disaster Assistance Programs, establishing ERP 2021 Phase 2 to provide emergency relief to farmers who suffered crop losses due to adverse weather events in 2020 or 2021. ERP 2021 Phase 2, 88 Fed. Reg. 1862.

71.     USDA funded ERP 2021 Phases 1 and 2 with funds from Division B, Title I, of the Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. 117-43. ERP 2021 Phase 1, 87 Fed. Reg. at 30164; ERP 2021 Phase 2, 88 Fed. Reg. at 1862.

72.     Under ERP 2021, USDA calculated relief payments for farmers who qualified as socially disadvantaged differently than non-underserved farmers.

73.     For ERP 2021 Phase 1, USDA performed a complex series of calculations including: (1) a farmer's level of insurance coverage; (2) a farmer's total crop losses; (3) the amount a farmer already received from insurance; and (4) the amount a farmer paid in premiums and fees for insurance, to arrive at a farmer's "calculated ERP Phase 1 payment," a dollar value. ERP 2021 Phase 1, 87 Fed. Reg. at 30169; *see also id.* at 30168.

74.     USDA paid more money to farmers that had better insurance coverage, more crop losses, or paid more in premiums and fees for insurance. *Id.*

75.     USDA paid less money to farmers who were compensated more by their insurance. *Id.*

16

76.     At the last step of the calculation, USDA increased that payment by 15 percent if the farmer was socially disadvantaged or underserved. *Id.* at 30169.

77.     Non-underserved farmers like Plaintiffs did not receive that 15 percent increase. *Id.*

78.     When it unveiled ERP 2021 Phase 2 on January 11, 2023, USDA announced that it intended to make the difference between socially disadvantaged farmers and non-underserved farmers like Plaintiffs even larger if it ran low on funds. *See* 88 Fed. Reg. at 1888 (codified at 7 C.F.R. § 760.1905(d) (2023) ("If there are insufficient funds, a *differential* of 15 percent will be used for [socially disadvantaged and other] underserved producers similar to ERP [2021] Phase 1 . . . ." (emphasis added)).

79.     A *differential* of 15 percent is very different from the 15 percent *increase* that USDA used in ERP 2021 Phase 1.

80.     For example, if two farmers lose $100,000 and USDA pays one of them $30,000 and the other $15,000, that is a 15 percent differential—despite one farmer getting double what the other got.

81.     If USDA instead paid them $17,250 and $15,000, that would be a 15 percent increase.

82.     USDA thus decided not just to continue discriminating based on race and sex, but to increase the amount of discrimination as remaining funds ran lower.

**Emergency Livestock Relief Program (ELRP) 2021 Phase 1 and Phase 2**

83.     On April 4, 2022, USDA published a Notice of Funds Availability to establish ELRP 2021 Phase 1 to provide emergency relief to farmers for livestock-related losses. ELRP 2021 Phase 1, 87 Fed. Reg. at 19467.

17

84.     On September 27, 2023, USDA published a Notice of Funds Availability to establish ELRP 2021 Phase 2 to provide emergency relief to farmers for livestock-related losses. ELRP 2021 Phase 2, 88 Fed. Reg. at 66369.

85.     USDA funded both phases of ELRP 2021 with funds from the Extending Government Funding & Delivering Emergency Assistance Act. Pub. L. 117-43, Div. B, Title I (2021). ELRP 2021 Phase 1, 87 Fed. Reg. at 19465; ELRP 2021 Phase 2, 88 Fed. Reg. at 66366.

86.     Through ELRP 2021, USDA reimbursed farmers for purchasing feed for livestock due to reduced grazing opportunities caused by droughts or wildfires. *See* ELRP 2021 Phase 1, 87 Fed. Reg. at 19466; ELRP 2021 Phase 2, 88 Fed. Reg. at 66367.

87.     USDA reimbursed farmers based on a measurement called animal unit months (AUMs). ELRP 2021 Phase 1, 87 Fed. Reg. at 19466.

88.     An AUM is a unit of measurement equivalent to "the amount of forage necessary for the sustenance of one cow or its equivalent for a period of 1 month." Grazing Administration Definitions, 43 C.F.R. § 4100.0-5 (2023).

89.     For example, a farmer who owned five cows for which he needed to purchase feed for three months due to reduced grazing opportunities caused by droughts or wildfires would be reimbursed for fifteen AUMs.

90.     USDA calculated ELRP 2021 Phase 1 payments in three steps.

91.     First, USDA selected a base reimbursement rate for ELRP 2021 Phase 1 of $18.71 per AUM worth of feed that a farmer needed to purchase due to lost grazing opportunities. 87 Fed. Reg. at 19466.

18

92. Second, USDA multiplied the $18.71 per AUM base rate by either 90 percent for socially disadvantaged and other underserved farmers or by 75 percent for non-underserved farmers. *Id.*

93. This resulted in an ELRP 2021 Phase 1 per AUM reimbursement price of $16.84 for socially disadvantaged farmers and $14.03 for non-underserved farmers like Plaintiffs. *Id.*

94. Finally, USDA multiplied each farmer's ELRP 2021 Phase 1 per AUM reimbursement price by that farmer's number of AUMs. *Id.*

95. Through this three-step process under ELRP 2021 Phase 1, USDA paid socially disadvantaged farmers 20 percent more than non-underserved farmers like Plaintiffs. *See id.*

96. USDA calculated ELRP 2021 Phase 2 payments by first multiplying each farmer's ELRP 2021 Phase 1 per AUM reimbursement price by 20 percent to get the ELRP 2021 Phase 2 per AUM reimbursement price and then multiplying that per AUM price by that farmer's total AUMs. ELRP 2021 Phase 2, 88 Fed. Reg. at 66367.

97. USDA stated that for ELRP 2021 Phase 2, "[t]he same percentage will be applied to underserved farmers and ranchers and all other producers." *Id.* at 66369.

98. Although USDA did apply the "same percentage" to all farmers, it continued discriminating based on whether recipients were socially disadvantaged or underserved farmers because it applied that same percentage to the earlier, discriminatory payment rates.

99. Under ELRP 2021 Phase 2, USDA paid socially disadvantaged farmers $3.37 per AUM, or 20 percent of the $16.84 they had been paid before. *Id.* at 66367.

100. Under ELRP 2021 Phase 2, USDA paid non-underserved farmers like Plaintiffs $2.81 per AUM, or 20 percent of the lesser $14.03 they had been paid before. *Id.*

19

101.    Thus, even though USDA stated that "[t]he same percentage will be applied to underserved farmers and ranchers and all other producers," *id.* at 66369, it continued to pay more to socially disadvantaged farmers than to non-underserved farmers like Plaintiffs, *id.* at 66366−69.

**Coronavirus Food Assistance Program 2**

102.    On September 22, 2020, under President Trump, USDA announced CFAP 2. Coronavirus Food Assistance Program, 85 Fed. Reg. 59380 (Sept. 22, 2020).

103.    Initially, USDA did not administer CFAP 2 in a discriminatory manner; it calculated CFAP 2 payments the same way for all recipients, regardless of their race or sex. *See id.* at 59380−81.

104.    In furtherance of President Biden's whole-of-government equity agenda, though, USDA began discriminating based on race and sex in CFAP 2 payments in 2023.

105.    On January 11, 2023, USDA announced in the same Notice of Funds Availability establishing ERP 2021 Phase 2 that it would provide an additional payment under CFAP 2 equal to 15 percent of the initial CFAP 2 payment. ERP 2021 Phase 2, 88 Fed. Reg. at 1869.

106.    USDA funded this additional payment using Commodity Credit Corporation funds. *Id.*

107.    USDA only gave this additional payment to socially disadvantaged and other underserved farmers. *Id.*

108.    USDA did not make an additional payment to non-underserved farmers. *See id.*

**Pandemic Assistance Revenue Program**

109.    On January 11, 2023, USDA announced in the same Notice of Funds Availability establishing ERP 2021 Phase 2 a new program called PARP. *Id.* at 1866−69.

20

110.   USDA funded PARP using funds from the Consolidated Appropriations Act, 2021, Pub. L. 116-260. *Id.* at 1866.

111.   Through PARP, USDA paid farmers whose 2020 revenue had decreased from their 2018 or 2019 revenue. *Id.* at 1868.

112.   USDA set the calculated payment rate at 90 percent of lost revenue for socially disadvantaged and other underserved farmers. *Id.*

113.   USDA set the calculated payment rate at 80 percent of lost revenue for non-underserved farmers. *Id.*

114.   USDA determined each farmer's PARP payment by subtracting the amount of assistance a farmer had received from a list of other USDA programs from the calculated payment. *Id.*

115.   Through PARP's higher calculated payment rate for socially disadvantaged farmers, USDA discriminated against non-underserved farmers like Plaintiffs based on race and sex.

**Emergency Livestock Relief Program 2022**

116.   On September 27, 2023, USDA published a Notice of Funds Availability establishing ELRP 2022. 88 Fed. Reg. 66361.

117.   USDA funded ELRP 2022 with funds from Title I of the Disaster Relief Supplemental Appropriations Act, part of Division N of the Consolidated Appropriations Act of 2023, Pub. L. 117-328 (2023). *Id.* at 66361.

118.   Through ELRP 2022, USDA reimbursed farmers for purchasing feed for livestock due to reduced grazing opportunities caused by droughts or wildfires. *Id.* at 66361−62.

21

119.     USDA again used AUMs to calculate ELRP 2022 payments in three steps. *Id.* at 66362.

120.     First, USDA selected a base reimbursement rate for ELRP 2022 of $28.37 per AUM worth of feed that a farmer needed to purchase due to lost grazing opportunities. *Id.*

121.     Second, USDA multiplied the $28.37 per AUM base rate by either 90 percent for socially disadvantaged and other underserved farmers or by 75 percent for non-underserved farmers. *Id.*

122.     This resulted in an ELRP 2022 per AUM reimbursement price of $25.53 for socially disadvantaged farmers and $21.28 for non-underserved farmers like Plaintiffs. *Id.*

123.     Finally, USDA multiplied each farmer's ELRP 2022 per AUM reimbursement price by that farmer's number of AUMs. *Id.*

124.     Through this three-step process under ELRP 2022, USDA paid socially disadvantaged farmers 20 percent more than non-underserved farmers like Plaintiffs. *See id.*

**Emergency Relief Program 2022**

125.     On October 31, 2023, USDA published a Notice of Funds Availability establishing ERP 2022 to provide emergency relief to farmers who suffered crop losses due to adverse weather events that occurred in 2022. 88 Fed. Reg. 74404.

126.     USDA funded ERP 2022 with funds from Title I of the Disaster Relief Supplemental Appropriations Act, part of Division N of the Consolidated Appropriations Act of 2023, Pub. L. 117-328 (2023). *Id.* at 74405.

127.     USDA established ERP 2022 to cover the same kinds of losses as ERP 2021 Phases 1 and 2. *Compare id.* at 74405, *with* ERP 2021 Phase 1, 87 Fed. Reg. at 30164.

APP. 000930

128.    In fact, the funding used for ERP 2022 was appropriated using nearly identical statutory language. *Compare* Extending Government Funding & Delivering Emergency Assistance Act, Pub. L. 117-43, Div. B, Title I (2021), *with* Consolidated Appropriations Act, 2023, Pub. L. 117-328, Div. N, Title I (2023).

129.    USDA split ERP 2022 into Track 1 (losses of crops) and Track 2 (losses of revenue). *Id.* at 74404−05.

130.    USDA made two shifts in policy from ERP 2021 to ERP 2022 without meaningful explanation.

**Shift One: USDA Moves from Flat Factor Payments to "Progressive Factoring"**

131.    The first policy shift occurred when USDA introduced what it termed "progressive factoring." *See* ERP 2022, 88 Fed. Reg. at 74410 & n.14.

132.    In every other program challenged here, USDA paid farmers using a simple formula: the amount lost multiplied by a percentage.

133.    USDA refers to this as a "flat factor." U.S. Dep't of Agric., Emergency Relief Program 2022 (Track 1) Delivery Snapshot for Texas, 1 (2023), https://perma.cc/VPV5-R8JK.

134.    If USDA had used a flat factor for ERP 2022, the rate would have been 27 percent. *See id.* ("If a flat factor was applied, the factor would have been 27%.").

135.    Instead, USDA used its new progressive factoring for ERP 2022 and, as a result, it paid out dramatically less money as a percentage to farmers with greater losses.

136.    Under progressive factoring, USDA pays 100 percent of the first $2,000 in losses; 80 percent of the loss between $2,001 and $4,000; 60 percent of the loss between $4,001 and $6,000; 40 percent of the loss between $6,001 and $8,000; 20 percent of the loss between $8,001 and $10,000; and 10 percent of any losses over $10,000. ERP 2022, 88 Fed. Reg. at 774410.

23

137.    USDA provided a two-sentence footnote explaining this change:

Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

*Id.* at 74410 n.14.

138.    Because of this progressive factoring system, victims of natural disasters who operated comparatively larger farms and were counting on disaster relief from ERP 2022 under the prior formula, like Plaintiffs here, lost out on a significant amount of the disaster relief funds Congress had appropriated for them.

139.    For example, Alan and Amy West Farms had a calculated loss of $208,706.00 for ERP 2022 Track 1.

140.    Because USDA applied progressive factoring to ERP 2022, Alan and Amy West Farms received approximately $19,403 in relief for those losses.

141.    If USDA had applied the flat factor, Alan and Amy West Farms would have received approximately $42,263 in relief—more than double—for those very same losses.

142.    USDA applied progressive factoring to both Track 1 and Track 2. *Id.* at 74410, 74414.

**Shift Two: Only Underserved Farmers Receive Insurance Refunds**

143.    The second policy shift occurred when USDA limited insurance premium refunds available under ERP 2022 to only socially disadvantaged and other underserved farmers. *Id.* at 74410.

24

144.    With ERP 2021, USDA had returned a significant portion of Federal Crop Insurance or Noninsured Crop Disaster Assistance Program (NAP)[2] premiums and fees to all farmers regardless of their race or sex. *See* ERP 2021 Phase 1, 87 Fed. Reg. at 30168−69.

145.    Instead, as part of ERP 2022 Track 1, USDA decided to refund Federal Crop Insurance and NAP premiums and fees only to socially disadvantaged and other underserved farmers, discriminating based on race and sex. 88 Fed. Reg. at 74410.

**The Impact of the Policy Shifts**

*Insurance Premiums and Fees Refunds*

146.    First, USDA funneled much greater benefits to socially disadvantaged and other underserved producers by selectively applying progressive factoring to only certain portions of the payment. *Id.* at 74410−11.

147.    USDA did not subject refunds of insurance premiums and fees to progressive factoring and only gave refunds of insurance premiums and fees under ERP 2022 to socially disadvantaged and other underserved producers. *Id.* at 74411.

148.    Because of this, USDA's progressive factoring system compounded the discriminatory effect of the insurance refunds, because socially disadvantaged and other underserved farmers who received insurance refunds did not lose up to 90 percent of that money to progressive factoring. *See id.*

149.    For example, in every other program challenged here that they were eligible for, USDA paid Plaintiff Rusty Strickland between 10 and 20 percent less than his wife Alison for identical actual losses because USDA classified her as socially disadvantaged.

---

[2] NAP is an insurance program that covers certain kinds of uninsured or specialty crops that are not covered by ordinary crop insurance. *See* 7 C.F.R. §§ 1437.1, 1437.4 (2023).

APP. 000933

150. But for ERP 2022 Track 1, Mrs. Strickland received nearly ten times what Mr. Strickland received: $71,900.96 compared to his $7,272.71, even though they suffered identical actual losses as equal partners.

151. USDA paid her this additional money solely because Mrs. Strickland is a woman and thus received a refund of insurance premiums and fees because of her sex.

152. This entire difference is attributable to the fact that she received a refund of Federal Crop Insurance administrative fees and premiums and he did not.

*Preferential Treatment for NAP*

153. Second, USDA used preferential treatment to steer additional benefits towards socially disadvantaged and other underserved farmers through NAP.

154. USDA awarded preferential treatment to socially disadvantaged farmers who had crops eligible for NAP by: (1) backdating and automatically enrolling them in NAP coverage; (2) fully refunding the cost of NAP; (3) making them eligible for both Track 1 and Track 2 of ERP 2022; (4) not applying progressive factoring to their Track 1 losses of NAP-covered crops; and (5) providing them a higher payment factor of 90 percent instead of 70 percent on Track 2.

155. Although the large additional benefits granted to NAP-covered crops might seem nondiscriminatory, they are just discrimination with extra steps: USDA made sure that *every* farmer who was not a white man had NAP coverage on all of their eligible crops *free of charge*, but white men who were not veterans, beginning farmers, or limited resource farmers had to manually apply for it and pay full price.

156. Normally, farmers must apply specifically for NAP coverage and pay for it by a set closing date, with fees increasing the later a farmer applies for insurance, *see* 7 C.F.R. § 1437.7(a), (b) (2023), but USDA changed that for socially disadvantaged and other underserved farmers.

26

157.    Back when it announced ERP 2021 Phase 2, USDA decided to retroactively construe applications from farmers to be considered socially disadvantaged (Form CCC-860) as applications for catastrophic[3] insurance coverage under NAP. *See* 88 Fed. Reg. at 1871 ("Following the change to the regulation, FSA intends to designate the CCC-860 to be an application for catastrophic coverage for NAP if filed before the deadline for application for the coverage period. . . . Many underserved producers have previously filed a certification of their underserved status with FSA, and those producers will be considered as having timely applied for catastrophic coverage for the 2022 crop year if the certification was filed before the deadline for application for the NAP coverage period.").

158.    Then, in ERP 2022, USDA refunded in full the cost of NAP to socially disadvantaged and other underserved farmers. 88 Fed. Reg. at 74411.

159.    Finally, USDA decided not to apply progressive factoring to losses of crops covered by NAP. *Id.*

160.    To illustrate, consider how USDA treats two hypothetical farmers, one who qualifies as socially disadvantaged and one who qualifies as neither socially disadvantaged nor otherwise underserved.

161.    Both farmers lost $100,000 worth of crops eligible for coverage under NAP, but neither intended to apply for NAP.

162.    USDA completely excludes the non-underserved farmer's NAP-eligible crops from ERP 2022 Track 1 because his crops were not insured and he never received a NAP payment. 88 Fed. Reg. at 74408−09.

163.    Instead, USDA only allows him to apply for ERP 2022 Track 2. *See id.* at 74414.

---

[3] This is the lowest tier of coverage available under NAP. *See* 7 C.F.R. § 1437.3 (2023).

164.    Under Track 2, USDA will apply the minimum ERP factor of 70 percent when calculating his losses because his NAP-eligible crops were not insured by NAP. *Id.*

165.    In fact, because these NAP-eligible crops were not insured by NAP, USDA will apply the minimum factor of 70 percent when calculating *all* his Track 2 losses, even if most of his crops were covered by insurance. *Id.*

166.    In addition, USDA will apply progressive factoring to payments based on his losses of NAP-eligible crops. *Id.* at 74414 n.27.

167.    In contrast, USDA allows the socially disadvantaged farmer to use ERP 2022 Track 1 even though he did not intend to apply for NAP coverage because, back in ERP 2021 Phase 2, USDA retroactively construed his application to be considered socially disadvantaged as an application for catastrophic NAP coverage. *See* ERP 2021 Phase 2, 88 Fed. Reg. at 1871.

168.    USDA calculates the socially disadvantaged farmer's NAP-eligible crop losses using the ERP factor of 75 percent used for minimum insurance coverage, again because USDA construed his application to be considered socially disadvantaged as an application for NAP coverage. ERP 2022, 88 Fed. Reg. at 74410 (providing a table that lists an ERP payment factor of 75 percent for catastrophic NAP coverage).

169.    Then, USDA does not apply progressive factoring because NAP-covered crops are excluded from progressive factoring under Track 1. *Id.* at 74411 ("The calculated amount for NAP-covered crops will not be subject to the progressive factoring that applies to ERP 2022 payments based on Federal [C]rop [I]nsurance indemnities . . . ." (footnote omitted)).

170.    And USDA also refunds the cost of NAP coverage to the socially disadvantaged farmer. *Id.*

28

171.    After the socially disadvantaged farmer has received his Track 1 payment, USDA allows him to apply for ERP 2022 Track 2 to cover any losses he had that were not covered by Track 1. 88 Fed. Reg. at 74414.

172.    USDA calculates the socially disadvantaged farmer's Track 2 losses using a 90 percent ERP factor rather than the 70 percent ERP factor used for the non-underserved farmer, again because USDA construed the socially disadvantaged farmer's application to be considered socially disadvantaged as an application for NAP coverage. *Id.*

173.    Then, at the penultimate step of the calculation, USDA multiplies the socially disadvantaged farmer's payment by 115 percent, additional disaster relief that USDA provides only to socially disadvantaged and other underserved farmers. *Id.* at 74414 & n.28.

**Injury to Plaintiffs**

**Rusty Strickland**

174.    Defendants injured Plaintiff Rusty Strickland through ERP 2022 Track 1, ELRP 2022, ERP 2021 Phases 1 and 2, ELRP 2021 Phases 1 and 2, and CFAP 2 when they provided him less money than they would have under these programs if he were of a different race or sex.

175.    Plaintiff Rusty Strickland operates a farm with his wife Alison Strickland.

176.    USDA paid Mrs. Strickland more money than Mr. Strickland for all losses covered by the programs because she is a woman and he is a white man, even though they operate their farm together.

177.    This is because USDA classifies Mrs. Strickland as socially disadvantaged because she is a woman.

178.    Mr. Strickland is a white man and thus does not qualify as socially disadvantaged.

APP. 000937

179.    Mr. Strickland is not a veteran farmer, beginning farmer, or limited resource farmer, the categories that qualify as underserved other than socially disadvantaged.

180.    On information and belief, the following chart depicts the programs for which Mr. Strickland was eligible, the amount USDA calculated he had lost due to natural disasters or the pandemic for each, the payments received, and the amount USDA would have paid him if Mr. Strickland were of a different race or sex:

| Rusty Strickland | | | | |
|---|---|---|---|---|
| USDA Program | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $ 46,970 | $ 7,273 | $ 71,901 | $ (64,628) |
| ERP 2021 (Total) | $ 264,794 | $ 207,863 | $ 239,043 | $ (31,180) |
| ELRP 2022 | $ 8,240 | $ 1,545 | $ 1,854 | $ (309) |
| ELRP 2021 Phase 1 | $ 4,056 | $ 3,042 | $ 3,650 | $ (608) |
| ELRP 2021 Phase 2 | $ 3,042 | $ 608 | $ 730 | $ (122) |
| CFAP 2 Bonus | $ 59,459 | $ - | $ 8,919 | $ (8,919) |

*ERP 2022 Track 1*

181.    Mr. and Mrs. Strickland each suffered $46,969.50 in losses due to weather events covered by ERP 2022 Track 1.

182.    Mr. Strickland received $7,272.71 from USDA for his losses under ERP 2022 Track 1; Mrs. Strickland received $71,900.96 for hers—nearly ten times as much for the same losses—because she is a woman.

183.    If USDA had applied a flat factor instead of the progressive factor, Mr. and Mrs. Strickland would each have received an additional $2,238.61 under ERP 2022 Track 1.

*ELRP 2022*

184.    Mr. and Mrs. Strickland each suffered calculated livestock losses of $8,240 due to weather events covered by ELRP 2022.

30

185.    Mr. Strickland received $1,545 for his share of losses under ELRP 2022; Mrs. Strickland received $1,854 for hers because she is a woman.

*ERP 2021 Phases 1 and 2*

186.    Mr. and Mrs. Strickland each suffered $264,794 in calculated losses due to weather events covered by ERP 2021 Phase 1 and Phase 2.

187.    Mr. Strickland received $207,863.34 for his share of calculated losses under ERP 2021 Phases 1 and 2; Mrs. Strickland received $239,042.92 for hers because she is a woman.

*ELRP 2021 Phases 1 and 2*

188.    Mr. and Mrs. Strickland each suffered $4,056 in losses covered by ELRP 2021 Phase 1 and Phase 2.

189.    For his losses, Mr. Strickland received $3,042 under ELRP 2021 Phase 1 and $608 under ELRP 2021 Phase 2; Mrs. Strickland received $3,650.40 under ELRP 2021 Phase 1 and $730.08 under ELRP 2021 Phase 2 for hers because she is a woman.

*CFAP 2*

190.    Mr. Strickland suffered $59,459.03 in losses and Mrs. Strickland suffered $59,404.03[4] in losses due to disaster and pandemic events covered by CFAP 2 for 2020.

191.    Mr. Strickland did not receive an additional payment for his losses under CFAP 2; Mrs. Strickland received $8,910.61 for hers because she is a woman.

192.    If USDA considered Mr. Strickland socially disadvantaged, he would have received an additional payment of $8,918.86, similar to what it paid Mrs. Strickland.

---

[4] The $55 discrepancy is owed to a single head of cattle allocated to Mr. Strickland instead of Mrs. Strickland.

31

### Alan and Amy West and Alan and Amy West Farms

193.     Defendants injured Plaintiffs Alan West, Amy West, and Alan and Amy West Farms through ERP 2022 Tracks 1 and 2 and ERP 2021 Phases 1 and 2 when they provided them less money than they would have under these programs if Alan West were of a different race or sex.

194.     Plaintiffs Alan and Amy West operate a farm, Alan and Amy West Farms, together.

195.     Mr. West owns 52 percent of the farm and Mrs. West owns 48 percent.

196.     Mr. West is a white man and thus does not qualify as socially disadvantaged.

197.     Mrs. West is a woman and thus does qualify as socially disadvantaged, but because she owns only 48 percent of the farm, the entity does not qualify as socially disadvantaged with respect to the programs.

198.     Neither Mr. West is not a veteran farmer, beginning farmer, or limited resource farmer, the categories that qualify as underserved other than socially disadvantaged.

199.     On information and belief, the following chart depicts the programs for which Alan and Amy West Farms was eligible, the amount USDA calculated it had lost due to natural disasters or the pandemic for each, the payments received, and the amount USDA would have paid it if Mr. West were of a different race or sex:

| Alan and Amy West Farms | | | | |
|---|---|---|---|---|
| USDA Program | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $          208,706 | $            19,403 | $          206,553 | $          (187,151) |
| ERP 2022 Track 2 | $          631,289 | $            51,097 | $            58,760 | $              (7,664) |
| ERP 2021 (Total) | $          417,547 | $          327,774 | $          376,941 | $            (49,166) |

32

*ERP 2022 Track 1*

200. Alan and Amy West Farms suffered losses of $208,706 due to weather events covered by ERP 2022 Track 1.

201. Alan and Amy West Farms received $19,402.94 from USDA under ERP 2022 Track 1.

202. If it qualified as socially disadvantaged, Alan and Amy West Farms would have received $206,533.44 under the same program—more than ten times as much.

203. If USDA had applied a flat factor instead of the progressive factor, Alan and Amy West Farms would have received an additional $22,860.02 under ERP 2022 Track 1.

*ERP 2022 Track 2*

204. Alan and Amy West Farms suffered losses of $631,289.01 due to weather events covered by ERP 2022 Track 2.[5]

205. Alan and Amy West Farms received $51,096.68 from USDA under ERP 2022 Track 2.

206. If it qualified as socially disadvantaged, Alan and Amy West Farms would have received $58,760.40 under ERP 2022 Track 2.

207. If USDA had applied a flat factor instead of the progressive factor, Alan and Amy West Farms would have received at least an additional $76,739.34 under ERP 2022 Track 2.

*ERP 2021 Phases 1 and 2*

208. Alan and Amy West Farms suffered losses of $417,547.00 due to losses of cotton and forage covered by ERP 2021 Phases 1 and 2.

---

[5] Because one component used in calculating Track 2 losses is the gross Track 1 payment, *see* ERP 2022, 88 Fed. Reg. at 74414, all Track 2 calculations would change if Alan and Amy West Farms' Track 1 payment changed.

APP. 000941

209. Alan and Amy West Farms received $327,774.46 from USDA under ERP 2021 Phases 1 and 2.

210. If it qualified as socially disadvantaged, Alan and Amy West Farms would have received $376,940.55 under the same program.

211. If USDA considered Mr. West socially disadvantaged, Alan and Amy West Farms would have received additional disaster relief because at least 50 percent of the entity would have been owned by socially disadvantaged farmers, benefiting both Mr. and Mrs. West.

**Bryan Baker and Double B Farms, LLC**

212. Defendants injured Plaintiffs Bryan Baker and Double B Farms, LLC through ERP 2021 Phases 1 and 2 and ERP 2022 Tracks 1 and 2 when Defendants provided them less money than they would have received under these programs if Mr. Baker were of a different race or sex.

213. Plaintiff Bryan Baker was also injured through PARP because he suffered losses covered by the program and received less money than he would have from the program if he were of a different race or sex.

214. Mr. Baker operates a sole proprietorship farm and Double B Farms, LLC.

215. Mr. Baker is a white man and thus does not qualify as socially disadvantaged.

216. Mr. Baker is not a veteran farmer, beginning farmer, or limited resource farmer, the categories that qualify as underserved other than socially disadvantaged.

217. On information and belief, the following chart depicts the programs for which Double B Farms, LLC was eligible, the amount USDA calculated it had lost due to natural disasters or the pandemic for each, the payments received, and the amount USDA would have paid it if Mr. Baker were of a different race or sex:

34

| Double B Farms | | | | |
|---|---|---|---|---|
| USDA Program | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $ 130,136 | $ 13,510 | $ 110,689 | $ (97,179) |
| ERP 2022 Track 2 | $ 973,083 | $ 76,731 | $ 88,241 | $ (11,510) |
| ERP 2021 (Total) | $ 193,150 | $ 151,623 | $ 174,366 | $ (22,743) |

### *ERP 2022 Track 1*

218.    Double B Farms, LLC suffered $130,136 in losses due to weather events covered by ERP 2022 Track 1.

219.    It received $13,510.20 under ERP 2022 Track 1.

220.    If it were classified as socially disadvantaged, it would have received $110,688.75 under ERP 2022 Track 1.

221.    If USDA had applied a flat factor instead of the progressive factor, Double B Farms, LLC would have received an additional $12,842.34 under ERP 2022 Track 1.

### *ERP 2022 Track 2*

222.    Double B Farms, LLC suffered $973,083.32 in losses due to weather events covered by ERP 2022 Track 2.

223.    It received $76,731.25 under ERP 2022 Track 2.

224.    If it were classified as socially disadvantaged, it would have received $88,241 under ERP 2022 Track 2.[6]

---

[6] Because one component used in calculating Track 2 losses is the gross Track 1 payment, *see* ERP 2022, 88 Fed. Reg. at 74414, all Track 2 calculations would change if Double B Farms, LLC's Track 1 payment changed.

225. If USDA had applied a flat factor instead of the progressive factor, Double B Farms, LLC would have received an additional $120,318.12 under ERP 2022 Track 2, or $138,365.84 more if it qualified as socially disadvantaged as well.

*ERP 2021 Phase 1*

226. Double B Farms, LLC suffered $193,150 in losses due to weather events covered by ERP 2021 Phase 1.

227. It received $151,622.79 under ERP 2021 Phase 1.

228. If it were classified as socially disadvantaged, it would have received $174,366.16 under ERP 2021 Phase 1.

229. The following chart depicts the programs for which Mr. Baker, through his sole proprietorship farm, was eligible, the amount USDA calculated he had lost due to natural disasters or the pandemic for each, the payments received, and the amount USDA would have paid him if he were of a different race or sex:

| Bryan Baker | | | | |
|---|---|---|---|---|
| USDA Program | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
| ERP 2022 Track 1 | $ 53,850 | $ 7,789 | $ 48,154 | $ (40,365) |
| ERP 2022 Track 2 | $ 372,890 | $ 31,717 | $ 36,474 | $ (4,758) |
| ERP 2021 (Total) | $ 67,990 | $ 53,372 | $ 61,378 | $ (8,006) |
| PARP | $ 225,613 | $ 9,448 | $ 11,591 | $ (2,143) |

*ERP 2022 Track 1*

230. Mr. Baker's sole proprietorship farm suffered $53,850 in losses due to weather events covered by ERP 2022 Track 1.

231. He received $7,788.75 under ERP 2022 Track 1.

36

232.   If he were classified as socially disadvantaged, he would have received $48,153.74 under ERP 2022 Track 1.

233.   If USDA had applied a flat factor instead of the progressive factor, Bryan Baker would have received an additional $3,115.87 under ERP 2022 Track 1.

*ERP 2022 Track 2*

234.   Mr. Baker's sole proprietorship farm suffered $372,889.73 in losses due to weather events covered by ERP 2022 Track 2.

235.   He received $31,716.73 under ERP 2022 Track 2.

236.   If he were classified as socially disadvantaged, he would have received $36,474.24 under ERP 2022 Track 2.[7]

237.   If USDA had applied a flat factor instead of the progressive factor, Bryan Baker would have received at least an additional $43,794.17 under ERP 2022 Track 2.

*ERP 2021 Phase 1*

238.   Mr. Baker's sole proprietorship farm suffered $67,990 in losses due to weather events covered by ERP 2021 Phase 1.

239.   He received $53,372.17 under ERP 2021 Phase 1.

240.   If he were classified as socially disadvantaged, he would have received $61,377.97.

*PARP*

241.   Mr. Baker's sole proprietorship farm suffered calculated losses of $225,612.80 in 2020 covered by PARP.

242.   He received $9,448.03 under PARP.

---

[7] Because one component used in calculating Track 2 losses is the gross Track 1 payment, *see* ERP 2022, 88 Fed. Reg. at 74414, all Track 2 calculations would change if Mr. Baker's Track 1 payment changed.

243.    If he were classified as socially disadvantaged, he would have received $11,591.35.

244.    If USDA considered Mr. Baker socially disadvantaged, both he and Double B Farms, LLC would have received additional relief as detailed above.

**Summary of Injuries to Plaintiffs**

245.    On information and belief, Plaintiffs provide the following chart showing their injuries based on what they believe they would have received had USDA considered them socially disadvantaged:

| USDA Program | Plaintiff | Plaintiff's base program loss | Actual USDA payment to plaintiff | USDA payment if plaintiff was socially disadvantaged | Amount USDA withheld because plaintiff was not socially disadvantaged |
|---|---|---|---|---|---|
| ERP 2022 Track 1 | Alan & Amy West Farms | $ 208,706 | $ 19,403 | $ 206,553 | $ (187,151) |
| ERP 2022 Track 2 | Alan & Amy West Farms | $ 631,289 | $ 51,097 | $ 58,760 | $ (7,664) |
| ERP 2021 (Total) | Alan & Amy West Farms | $ 417,547 | $ 327,774 | $ 376,941 | $ (49,166) |
| ERP 2022 Track 1 | Bryan Baker | $ 53,850 | $ 7,789 | $ 48,154 | $ (40,365) |
| ERP 2022 Track 2 | Bryan Baker | $ 372,890 | $ 31,717 | $ 36,474 | $ (4,758) |
| ERP 2021 (Total) | Bryan Baker | $ 67,990 | $ 53,372 | $ 61,378 | $ (8,006) |
| PARP | Bryan Baker | $ 225,613 | $ 9,448 | $ 11,591 | $ (2,143) |
| ERP 2022 Track 1 | Double B Farms | $ 130,136 | $ 13,510 | $ 110,689 | $ (97,179) |
| ERP 2022 Track 2 | Double B Farms | $ 973,083 | $ 76,731 | $ 88,241 | $ (11,510) |
| ERP 2021 (Total) | Double B Farms | $ 193,150 | $ 151,623 | $ 174,366 | $ (22,743) |
| ERP 2022 Track 1 | Rusty Strickland | $ 46,970 | $ 7,273 | $ 71,901 | $ (64,628) |
| ERP 2021 (Total) | Rusty Strickland | $ 264,794 | $ 207,863 | $ 239,043 | $ (31,180) |
| ELRP 2022 | Rusty Strickland | $ 8,240 | $ 1,545 | $ 1,854 | $ (309) |
| ELRP 2021 Phase 1 | Rusty Strickland | $ 4,056 | $ 3,042 | $ 3,650 | $ (608) |
| ELRP 2021 Phase 2 | Rusty Strickland | $ 3,042 | $ 608 | $ 730 | $ (122) |
| CFAP 2 Bonus | Rusty Strickland | $ 59,459 | $ - | $ 8,919 | $ (8,919) |

246.    If USDA had used a flat factor to calculate payments under ERP 2022, Plaintiffs would have received increased payments under ERP 2022 Tracks 1 and 2.

247.    Plaintiffs are thus injured by USDA's decision to abandon flat factoring and institute progressive factoring.

248.    If Mr. Strickland, Mr. Baker, and Mr. West were women, American Indians, Alaskan Natives, Asians, Asian-Americans, blacks, African-Americans, Hispanics, Hispanic-

38

Americans, Native Hawaiians, or Pacific Islanders, USDA would consider them socially disadvantaged farmers.

249.    Plaintiffs are thus disadvantaged relative to similarly situated farmers because of their race and sex.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
(Administrative Procedure Act)
(*Ultra Vires* Action; Major Questions Doctrine)

250.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

251.    Agencies have only those powers provided to them by statute; agency actions exceeding congressional delegation are unlawful.

252.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(C), instructs courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

253.    Through Executive Orders 13985 and 14091, President Biden made it the policy of his administration to advance racial "equity" by using federal programs to tip the scales of outcomes, rather than working to ensure equal opportunities for all Americans. *See* 86 Fed. Reg. 7009; 88 Fed. Reg. 10825.

254.    The challenged programs seek to advance "equity" by remedying alleged disparities between races and sexes in the United States through the constitutionally suspect and highly disfavored use of race and sex discrimination.

39

255.     The question whether these disparities should be addressed through overt race and sex preferences involves some of the most hotly debated topics and the most politically and economically significant questions facing the country.

256.     The executive orders and USDA's Equity Action Plan show that USDA and the Biden Administration believe that these are among the most important questions facing the country.

257.     The appropriations used to fund the programs total nearly $25 billion.

258.     Thus, through the challenged programs, Defendants seek to answer a "major question" involving vast political and economic significance.

259.     "Major questions" can be answered only by agencies when Congress has articulated a clear statement authorizing such expansive powers. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022).

260.     When Congress does wish to enact a benefit that discriminates based on race or sex, it does so clearly and in express terms.

261.     Congress has provided no authorization whatsoever for Defendants' actions, let alone clear authorization; instead, it simply provided funds for disaster and pandemic relief.

262.     Defendants have thus acted unlawfully and *ultra vires*.

### SECOND CLAIM FOR RELIEF
(Administrative Procedure Act)
(Fifth Amendment Equal Protection Violation – Race Discrimination)

263.     Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

264. The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), instructs courts to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity."

265. The programs discriminate based on race in violation of the Fifth Amendment to the United States Constitution.

266. Plaintiffs, except Amy West, received less money under the programs than a similarly situated farmer of a different race would have.

267. Plaintiff Amy West received less money under the programs than a similarly situated farmer whose business partner were of a different race would have.

268. Plaintiffs are harmed by Defendants' racial classifications because, but for Defendants' racial discrimination, they would be receiving greater disaster and pandemic relief from the programs.

269. The racial classifications of the programs do not satisfy strict scrutiny. *Adarand Constructors v. Peña*, 515 U.S. 200, 224 (1995) ("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.").

270. Defendants do not have a compelling interest in providing enhanced disaster or pandemic relief to farmers simply based on their membership in a particular race. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986) ("This Court never has held that societal discrimination alone is sufficient to justify a racial classification.").

271. Defendants' preference for farmers of certain races is not narrowly tailored to any compelling interest. *See Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-0278, 2024 U.S. Dist. LEXIS 38050, at *99 (N.D. Tex. Mar. 5, 2024) ("It doesn't matter if it's the easiest, most

41

administrable, most well-intentioned program in the world—it cannot be based on race if it is not strictly necessary to achieve the relevant compelling interest.")

272.    The programs are not narrowly tailored since they are both underinclusive—they do not provide additional benefits to groups that have histories of discrimination in the United States, such as Jewish-Americans, Arab-Americans, Italian-Americans, Slavic-Americans, and Irish-Americans—and overinclusive—they include farmers who may meet the racial qualifications, but who have never suffered discrimination on that basis or are wealthy and not in danger of catastrophe absent additional disaster relief.

### THIRD CLAIM FOR RELIEF
(Administrative Procedure Act)
(Fifth Amendment Equal Protection Violation – Sex Discrimination)

273.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

274.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), instructs courts to" hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity."

275.    The programs discriminate based on sex in violation of the Fifth Amendment to the United States Constitution.

276.    Defendants are responsible for implementing the programs.

277.    Plaintiffs, except Amy West, received less money under the programs than a similarly situated farmer of a different sex would have.

278.    Plaintiff Amy West received less money under the programs than a similarly situated farmer whose business partner were of a different sex would have.

42

279.    Plaintiffs are harmed by Defendants' sex classifications because, but for Defendants' sex discrimination, they would be receiving greater disaster and pandemic relief from the programs.

280.    Defendants' preference for women is not substantially related to any exceedingly persuasive objective. *See Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017).

281.    General claims of societal sex discrimination cannot justify the challenged programs. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 727–29 (1982).

282.    The challenged programs are both underinclusive and overinclusive—they fail to include farmers who are not women but who have suffered discrimination based on their sex and they do include farmers who are women but who have never suffered discrimination based on their sex.

### FOURTH CLAIM FOR RELIEF
(Administrative Procedure Act)
(Arbitrary and Capricious – Progressive Factoring and Insurance Refunds)

283.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

284.    In prior years, USDA had used a simple system for disaster relief. First, it would calculate how much each farmer had lost to specific disaster events and sum that up. Second, it would refund a portion of each farmer's Federal Crop Insurance and/or NAP premiums and fees. Third, it would see how much money it had to spend. Fourth, it would divide the money proportional to each farmer's losses using a flat factor.

285.    But it abruptly shifted its policy when it published the Notice of Funding Availability for ERP 2022 in October 2023.

43

286.     Suddenly and without warning, it abandoned flat factoring and implemented what it calls progressive factoring and stopped providing refunds of Federal Crop Insurance and NAP premiums and fees to all farmers.

287.     Under progressive factoring, farmers with large losses are given reduced assistance and farmers with small losses are given additional assistance.

288.     This is a dramatic shift from prior policy, and the agency provided only a cursory, two-sentence explanation of its reasoning for the shift.

289.     USDA's only explanation is found in a footnote in the Notice of Funding Availability, 88 Fed. Reg. at 74410 n.14, saying:

> Progressive factoring is a mechanism that ensures the limited available funding is distributed in a manner benefitting the majority of producers rather than a few. Additionally, progressive factoring increases emergency relief payments to most participants while reducing larger potential payments which increases the proportion of funding provided to smaller producers.

290.     This sudden change had a dramatic effect, which harmed and continues to harm Plaintiffs in two distinct ways.

291.     First, Plaintiffs will receive less in disaster relief because of this change; for instance, Plaintiff Rusty Strickland would have received $9,511.32 under the flat factor system but received only $7,271.71 under the progressive factoring system.

292.     Second, Plaintiffs were injured because they relied on USDA's past practice of disaster relief.

293.     For example, Plaintiffs Alan West and Amy West made plans for the next year in part based on their expected ERP 2022 payment.

44

294.    When USDA's decision to reduce their relief payments via progressive factoring caused Mr. and Mrs. West to suffer shortfalls, they ended up dipping into their retirement savings and using an advance on their operating note to run Alan and Amy West Farms.

295.    In addition, all Plaintiffs expected they would receive a refund of their Federal Crop Insurance premiums and fees as they had in prior years.

296.    Although USDA provided a bare-bones explanation for its institution of progressive factoring, it did not explain its decision to no longer extend a refund of Federal Crop Insurance premiums and fees to all farmers.

297.    Agencies must always provide a reasoned explanation for their actions, and when an agency changes from its past policy, it must at minimum "display awareness that it *is* changing position." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).

298.    This requirement is particularly important where, as here, the agency's "prior policy has engendered serious reliance interests that must be taken into account." *Id.*

299.    USDA's two-sentence explanation fails to provide even the most basic explanation of its reasoning and its implementation of progressive factoring is thus arbitrary and capricious.

300.    The footnote does not consider reliance interests; it does not acknowledge the shift in policy; it does not explain alternatives that USDA considered; it does not explain how its reasoning was based on the factors Congress intended it to consider. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983) (explaining that an agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider").

45

## **RELIEF REQUESTED**

Plaintiffs respectfully request that this Court:

A.  Hold unlawful and set aside the programs under 5 U.S.C. § 706(2);

B.  Enter a declaratory judgment that Congress never authorized USDA to allocate disaster and pandemic relief to individuals based on race or sex;

C.  Enter an order preliminarily and permanently enjoining Defendants from enforcing or implementing any categories based on race or sex absent clear congressional authorization;

D.  In the alternative, enter a declaratory judgment that the race and sex preferences of the challenged programs are unconstitutional under the Equal Protection principles protected by the Due Process Clause of the Fifth Amendment to the United States Constitution, both facially and as applied;

E.  Enter an order preliminarily and permanently enjoining Defendants from enforcing or implementing any race or sex preferences and remand the programs to USDA to remedy the Fifth Amendment violations;

F.  In the alternative, vacate and set aside the provisions of each of the challenged programs that apply race or sex preferences and remand the challenged programs to USDA to remedy the Fifth Amendment violations;

G.  Enter an order permanently enjoining Defendants from reducing or increasing payments using the Notice of Funding Availability's progressive factoring system;

H.  Vacate and set aside the portion of the Notice of Funding Availability instituting progressive factoring and remand to the agency;

46

I.      Exercise its discretion to mandate a 90-day remand timeline, maintain jurisdiction over the action to ensure compliance, and provide guidance to USDA on available curative responses;

J.      Award Plaintiffs such costs and attorneys' fees as allowed by law;

K.      Grant such other and further relief as the Court deems appropriate.


Dated: <u>March 29, 2024</u>.                        Respectfully submitted,


                       <u>/s/ Braden H. Boucek</u>
                       BRADEN H. BOUCEK
                         Georgia Bar No. 396831
                         Tennessee Bar No. 021399
                       BENJAMIN I. B. ISGUR
                         Virginia Bar No. 98812
                       Southeastern Legal Foundation
                       560 W. Crossville Road, Suite 104
                       Roswell, GA  30075
                       (770) 977-2131
                       bboucek@southeasternlegal.org
                       bisgur@southeasternlegal.org

                       WILLIAM E. TRACHMAN
                         Colorado Bar No. 45684
                       Mountain States Legal Foundation
                       2596 South Lewis Way
                       Lakewood, Colorado 80227
                       (303) 292-2021
                       wtrachman@mslegal.org

                       *Attorneys for Plaintiffs*

APP. 000955

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS, | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, | ) | |
| | ) | |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | ) | |
| | ) | |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, and | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendants. | ) | |

---

## DECLARATION OF ALAN WEST

---

I, Alan West, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of Texas, over 18 years of age, and have personal knowledge of the facts set forth herein.

3.      I am fully competent to make this declaration.

4.      I am a farmer in Lubbock, Texas.

5.      I am married to Amy West.

6.      Amy and I own and operate Alan and Amy West Farms as a joint venture, in which I hold a 52% stake and Amy holds a 48% stake.

7.      Alan and Amy West Farms grows cotton, wheat, grain sorghum, and hay.

8.      In 2020, 2021, and 2022, our area experienced excessive heat and drought. For example, 2022 had thirty-four days with a high temperature over 100 degrees, the second greatest number of days over 100 degrees on record. In 2022, we received only 1.12 inches of rain in June, and only 0.20 inches of rain in July. Average rainfall in the months of June and July is around two inches per month. The 2022 drought was especially damaging to our farm because we had experienced below-average rainfall in the months prior, leaving us no underground reserve moisture from which to draw. Weather conditions in 2020 and 2021 in our area also harmed our crops.

9.      I am a Non-Hispanic, Caucasian (white) male.

10.     I am not a "beginning farmer" because I have operated a farm for more than ten years.

11.     I am not a "veteran farmer" because I am not a veteran.

12.     I am not a "limited resource farmer" because our total household income for all relevant calendar years placed me above the national poverty level for a family of four.

13.     As a result of my statuses identified above, I do not qualify as an "underserved farmer or rancher" for purposes of relief programs administered by United States Department of Agriculture (USDA) to help our farm cope with losses due to the excessive heat and drought we have experienced in northwest Texas. Furthermore, because my wife owns only 48% of our joint

2

venture, rather than at least 50%, her ownership share is insufficient for USDA to consider our joint venture "socially disadvantaged."

14.     For losses our area suffered from excessive heat and drought, our farm, Alan and Amy West Farms, applied to USDA under the Emergency Relief Program 2021, Phases 1 and 2, identifying total eligible losses of $417,547.00. USDA issued Alan and Amy West Farms program payments totaling $327,774.46.

15.     For losses our area suffered from excessive heat and drought, our farm, Alan and Amy West Farms, applied to USDA under the Emergency Relief Program 2022, Track 1, identifying an eligible loss of $208,706.00. USDA issued Alan and Amy West Farms a program payment of $19,402.94.

16.     The payment USDA issued to Alan and Amy West Farms under the Emergency Relief Program 2022, Track 1 did not include a refund of federal crop insurance premiums and fees because USDA does not consider our farm underserved. This was a change from prior years.

17.     Additionally, in determining the payment Alan and Amy West Farms received under the Emergency Relief Program 2022, Track 1, USDA applied its newly adopted progressive factoring, resulting in a substantial reduction in the payment to loss ratio compared to past years.

18.     This came as a surprise to me. Prior to USDA announcing its progressive factoring approach, Amy and I created an annual budget based on USDA's prior payment practices, which did not include a reduction in payment based on progressive factoring. As a result of USDA using progressive factoring rather than flat factoring and not refunding our crop insurance premiums, my wife and I were forced to borrow against our retirement funds to cover the lost funding and meet our operating budget and loan obligations. We paid an interest rate of 12% to borrow against our savings. Furthermore, we lacked the necessary operating funds for the 2024 season and had to

APP. 000958

use money from our bank line of credit, at an interest rate of 9%. We will be incurring interest on this line of credit at least until our crops bring a return in September 2024.

19.     Also, in anticipation of receiving funding based on the historical flat factoring calculation, Alan and Amy West Farms invested money to upgrade a cotton harvester that it otherwise would not have upgraded. As a result of the decreased payment, Amy and I were forced to withdraw over $20,000 from our money market account to make the down payment on the replacement cotton harvester. We were also forced to postpone trading in two work trucks with over 240,000 miles on them and trading in one of our tractors.

20.     For losses our area suffered from excessive heat and drought, our farm, Alan and Amy West Farms, applied to USDA under the Emergency Relief Program 2022, Track 2, identifying an eligible loss of $631,289.01. USDA issued Alan and Amy West Farms a program payment of $51,096.68.

21.     Had I not been Caucasian and male, our farm, Alan and Amy West Farm, and I would not have been denied disaster relief from USDA under the Emergency Relief Program 2021, Phases 1 and 2, and the Emergency Relief Program 2022, Tracks 1 and 2.

22.     USDA's decision that I must be a veteran, a new farmer, or struggling to make ends meet to be entitled to the same disaster relief as every other American farmer is stigmatizing and discriminatory. I am aware that USDA is punishing me because of my race and sex.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: _04/04/2024_

Alan West (Apr. 4, 2024 11:33 CDT)
_____
Alan West

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS, | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, | ) | |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | ) | |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, and | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendants. | ) | |

---

## DECLARATION OF AMY WEST

---

I, Amy West, declare the following:

1.      The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.      I am a citizen of the United States, a resident of Texas, over 18 years of age, and have personal knowledge of the facts set forth herein.

3.      I am fully competent to make this declaration.

4. I am a farmer in Lubbock, Texas.

5. I am married to Alan West.

6. Alan and I own and operate Alan and Amy West Farms as a joint venture, in which I hold a 48% stake and Alan holds a 52% stake.

7. Alan and Amy West Farms grows cotton, wheat, grain sorghum, and hay.

8. In 2020, 2021, and 2022, our area experienced excessive heat and drought. For example, 2022 had thirty-four days with a high temperature over 100 degrees, the second greatest number of days over 100 degrees on record. In 2022, we received only 1.12 inches of rain in June, and only 0.20 inches of rain in July. Average rainfall in the months of June and July exceeds two inches per month. The 2022 drought was especially damaging to our farm because we had experienced below-average rainfall in the months prior, leaving us no underground reserve moisture from which to draw. Weather conditions in 2020 and 2021 in our area also harmed our crops.

9. I am a Non-Hispanic, Caucasian (white) female.

10. Although I, personally, qualify as an "underserved farmer or rancher" by virtue of my status as a woman, because I own 48% of our joint venture, rather than 50% or more, Alan and Amy West Farms is not considered a "socially disadvantaged farmer" for purposes of relief programs administered by United States Department of Agriculture (USDA) to help our farm cope with losses due to the excessive heat and drought we have experienced in northwest Texas.

11. For losses our area suffered from excessive heat and drought, our farm, Alan and Amy West Farms, applied to USDA under the Emergency Relief Program 2021, Phases 1 and 2, identifying total eligible losses of $417,547.00. USDA issued Alan and Amy West Farms program payments totaling $327,774.46.

12.     For losses our area suffered from excessive heat and drought, our farm, Alan and Amy West Farms, applied to USDA under the Emergency Relief Program 2022, Track 1, identifying an eligible loss of $208,706.00. USDA issued Alan and Amy West Farms a program payment of $19,402.94.

13.     The payment USDA issued to Alan and Amy West Farms under the Emergency Relief Program 2022, Track 1, did not include a refund of federal crop insurance premiums and fees because USDA does not consider our farm underserved. This was a change from prior years.

14.     Additionally, in determining the payment Alan and Amy West Farms received under the Emergency Relief Program 2022, Track 1, USDA applied its newly adopted progressive factoring, resulting in a substantial reduction in the payment to loss ratio compared to past years.

15.     This came as a surprise to me. Prior to USDA announcing its progressive factoring approach, Alan and I created an annual budget based on USDA's prior payment practices, which did not include a reduction in payment based on progressive factoring. As a result of USDA using progressive factoring rather than flat factoring, my husband and I were forced to borrow against our retirement funds to cover the lost funding and meet our operating budget and loan obligations. We paid an interest rate of 12% to borrow against our savings. Furthermore, we lacked the necessary operating funds for the 2024 season and had to use money from our bank line of credit, at an interest rate of 9%. We will be incurring interest on this line of credit at least until our crops bring a return in September 2024.

16.     Also, in anticipation of receiving funding based on the historical flat factoring calculation, Alan and Amy West Farms invested money to upgrade a cotton harvester that it otherwise would not have upgraded. As a result of the decreased payment, Alan and I were forced to withdraw over $20,000 from our money market account to make the down payment on the

3

replacement cotton harvester. We were also forced to postpone trading in two work trucks with over 240,000 miles on them and trading in one of our tractors.

17.     For losses our area suffered from excessive heat and drought, our farm, Alan and Amy West Farms, applied to USDA under the Emergency Relief Program 2022, Track 2, identifying an eligible loss of $631,289.01. USDA issued Alan and Amy West Farms a program payment of $51,096.68.

18.     Had I owned 2% more of Alan and Amy West Farms, such that my ownership interest was 50% rather than 48%, or if my husband Alan were a woman or non-white, our farm would not have been denied disaster relief from USDA under the Emergency Relief Program 2021, Phases 1 and 2 and the Emergency Relief Program 2022, Tracks 1 and 2.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: 04/04/2024

*Amy West*
Amy West (Apr 4, 2024 12:34 CDT)

Amy West

APP. 000963

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| RUSTY STRICKLAND, | ) |
| ALAN AND AMY WEST FARMS, | ) |
| ALAN WEST, | ) |
| AMY WEST, | ) |
| DOUBLE B FARMS, LLC, and | ) |
| BRYAN BAKER, | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 2:24-cv-60-Z |
| | ) |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, | ) |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | ) |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, and | ) |
| THE UNITED STATES OF AMERICA, | ) |
|     Defendants. | ) |

---

## DECLARATION OF BRYAN BAKER

---

I, Bryan Baker, declare the following:

1.    The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.    I am a citizen of the United States, a resident of Texas, over 18 years of age, and have personal knowledge of the facts set forth herein.

3.    I am fully competent to make this declaration.

4.      I am a farmer in Sudan, Texas and grow cotton, black eyed peas, grain sorghum, and sorghum silage.

5.      I am the sole owner of Double B Farms, LLC.

6.      In 2020, 2021, and 2022, our area experienced excessive heat and drought. These conditions harmed crops and reduced available grazing. My farms have produced less than half the cotton they normally would have. Although I have been fortunate enough not to directly suffer from the wildfires that have struck many neighboring farmers, the ripple effects of these disasters impact everything and everyone around me through the agricultural cooperatives as well as the local economy. These bad years have left me without the capital I need to upgrade my rollers, including a John Deere sprayer and other vehicles my employees use.

7.      I am a Non-Hispanic, Caucasian (white) male.

8.      I am not a "beginning farmer" because I have operated a farm for more than ten years.

9.      I am not a "veteran farmer" because I am not a veteran.

10.     I am not a "limited resource farmer" because my total household income for all relevant calendar years placed me above the national poverty level for a family of four.

11.     As a result of my statuses identified in the paragraphs above, neither I nor Double B Farms, LLC qualified as an "underserved farmer or rancher" for purposes of the relief programs administered by the United States Department of Agriculture (USDA) to help our farm cope with losses due to the pandemic, the excessive heat, and the droughts we experienced in northwest Texas.

12.     I applied to USDA under the Pandemic Assistance Revenue Program, identifying my eligible 2020 program loss as $225,612.80. USDA issued me a program payment of $9,448.03.

13.     For losses our area suffered from droughts and excessive heat in 2020 and 2021, I applied to USDA under the Emergency Relief Program 2021, Phase 1, identifying my eligible program loss as $67,990.00. USDA issued me a program payment of $53,372.17.

14.     For losses our area suffered from droughts and excessive heat in 2020 and 2021, Double B Farms, LLC applied to USDA under the Emergency Relief Program 2021, Phase 1, identifying an eligible program loss of $193,150.00. USDA issued Double B Farms, LLC a program payment of $151,622.79.

15.     For losses our area suffered from droughts and excessive heat in 2022, I applied to USDA under the Emergency Relief Program 2022, Track 1, identifying an eligible program loss of $53,850.00. USDA issued me a program payment of $7,788.75.

16.     For losses our area suffered from droughts and excessive heat in 2022, Double B Farms, LLC applied to USDA under the Emergency Relief Program 2022, Track 1, identifying an eligible program loss of $130,136.00. USDA issued Double B Farms, LLC a program payment of $13,510.20.

17.     The payments USDA issued to Double B Farms, LLC and me under the Emergency Relief Program 2022, Track 1, did not include any refunds of federal crop insurance premiums and fees because it does not consider either Double B Farms, LLC or me underserved. This was a change from prior years.

18.     Additionally, in determining the payments Double B Farms, LLC and I received under the Emergency Relief Program 2022, Track 1, USDA applied its newly adopted progressive factoring, resulting in a substantial reduction in the payment to loss ratio compared to past years. This came as a surprise to me. Prior to USDA announcing its progressive factoring approach, I

3

planned based on USDA's prior payment practices, which did not include a reduction in payment based on progressive factoring.

19. For losses our area suffered from droughts and excessive heat in 2022, I applied to USDA under the Emergency Relief Program 2022, Track 2, identifying an eligible program loss of $372,889.73. USDA issued me a program payment of $31,716.73.

20. For losses our area suffered from droughts and excessive heat in 2022, Double B. Farms, LLC applied to USDA under the Emergency Relief Program 2022, Track 2, identifying an eligible program loss of $973,083.32. USDA issued Double B Farms, LLC a program payment of $76,731.25.

21. Had I not been Caucasian and male, both Double B Farms, LLC and I would not have been denied disaster relief from USDA under the Emergency Relief Program 2021, Phase 1, and the Emergency Relief Program 2022, Tracks 1 and 2. In addition, I would not have been denied disaster relief from USDA under the Pandemic Assistance Revenue Program.

22. USDA's decision that I must be a veteran, a new farmer, or struggling to make ends meet to be entitled to the same disaster relief as every other American farmer is stigmatizing and discriminatory. I am aware that USDA is punishing me because of my race and sex.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge, information, and belief.


Dated: _____

Bryan Baker (Apr 4, 2024 11:20 CDT)
_____
Bryan Baker

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS, | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE, | ) | |
| THOMAS J. VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, | ) | |
| ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service Agency, and | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
|     Defendants. | ) | |

---

## DECLARATION OF RUSTY STRICKLAND

---

I, Rusty Strickland, declare the following:

1.    The facts set forth in this declaration are based on my knowledge and, if called as a witness, I can competently testify to their truthfulness under oath. As to those matters that reflect a matter of opinion, they reflect my personal opinion and judgment upon the matter.

2.    I am a citizen of the United States, a resident of Texas, over 18 years of age, and have personal knowledge of the facts set forth herein.

3.    I am fully competent to make this declaration.

4.      I am a farmer and rancher in Wellington, Texas.

5.      I am married to Alison Strickland.

6.      Together, Alison and I own and operate a farm and ranch.

7.      Together, we grow cotton, peanuts, and wheat. We also raise cattle.

8.      In 2020, 2021, and 2022, our area experienced excessive heat and drought. These conditions harmed crops and reduced available grazing.

9.      I am a Non-Hispanic, Caucasian (white) male.

10.     I am not a "beginning farmer" because I have operated a farm for more than ten years.

11.     I am not a "veteran farmer" because I am not a veteran.

12.     I am not a "limited resource farmer" because my total household income for all relevant calendar years placed me above the national poverty level for a family of four.

13.     As a result of my statuses identified in the paragraphs above, I do not qualify as an "underserved farmer or rancher" for purposes of the relief programs administered by the United States Department of Agriculture (USDA) to help our farm cope with losses due to the pandemic, the excessive heat, and the droughts we experienced in northwest Texas. 2020 and 2021 were bad years, but 2022 and 2023 have been some of the worst I've ever personally experienced. The spring of 2022 was terrible and dry, but we saw a brief glimmer of hope when we got two inches of rain in May of 2022. We rushed out and worked 24 hours a day getting our cotton planted in the dryland while we had the moisture. But the moisture didn't last long. We lost the crop. We also planted an irrigated crop, but we ended up with about 60% of what we would have gotten in a normal year. 2023 started off looking better with snow in January. It gave us all hope again. But we got no other moisture until May. That killed our winter wheat crop. The summer was looking good until it dried

2

up and we started getting 110-degree days that lasted until September. In 2023, I was forced to terminate 90% of my dryland crops and my irrigated crop was the worst I've ever produced in 23 years. Although these disaster relief programs don't cover my 2023 losses, as a result of my 2023 losses things are bad and getting worse. I have never needed a disaster relief payment more than now.

14. I applied to USDA for relief under the Coronavirus Food Assistance Program 2. Initially, my wife and I were paid the same amount. However, when USDA made an additional payment, USDA paid me $0.00 and my wife $8,863.86, solely because she is a woman, and I am a man.

15. For losses our area suffered from droughts and excessive heat in 2020 and 2021, I applied to USDA for relief under the Emergency Relief Program 2021, Phase 1, with a qualifying program loss of $130,147.50. USDA issued me a payment of $102,165.81. For my wife's half, USDA calculated her loss as $149,669.72 and issued her a payment of $117,490.74. Although our actual losses were identical since we share the farm equally, USDA paid my wife $15,324.93 more, solely because she is a woman, and I am a man.

16. For losses our area suffered from droughts and excessive heat in 2020 and 2021, I applied to the USDA for relief under the Emergency Relief Program 2021, Phase 2, with a qualifying program loss of $134,646.50. USDA issued me a payment of $105,697.53. For my wife's half of the venture, USDA calculated her loss as $154,843.53 and issued her a payment of $121,552.18. Although our actual losses were identical since we share the farm equally, USDA paid my wife $15,854.65 more, solely because she is a woman, and I am a man.

17. For grazing losses our area suffered from droughts and excessive heat in 2020 and 2021, I applied to USDA for relief under the Emergency Livestock Relief Program 2021, Phase 1,

3

identifying an eligible loss for my half of the farm of $4,056.00. USDA issued me a program payment of $3,042.00. Meanwhile, my wife applied to USDA for her half, seeking relief for the same loss amount but receiving a payment from USDA of $3,650.40. Although our losses were identical since we share the farm equally, USDA paid my wife $608.40 more, solely because she is a woman, and I am a man.

18.     For grazing losses our area suffered from droughts and excessive heat in 2020 and 2021, I applied to USDA for relief under the Emergency Livestock Relief Program 2021, Phase 2, with a qualifying program loss of $3,042.00. USDA issued me a payment of $608.40. For my wife's half of the venture, USDA calculated her loss as $3,650.40 and issued her a payment of $730.08. Although our losses were identical since we share the farm equally, USDA paid my wife $121.68 more, solely because she is a woman, and I am a man.

19.     For losses our area suffered from droughts and excessive heat in 2022, I applied to USDA for relief under the Emergency Livestock Relief Program 2022, identifying an eligible loss for my half of the venture of $8,240.00. USDA issued me a program payment of $1,545.00. Meanwhile, my wife applied to USDA for her half of the venture, seeking relief for the same loss amount but receiving a payment from USDA of $1,854.00. Although our losses were identical since we share the farm equally, USDA paid my wife $309.00 more, solely because she is a woman, and I am a man.

20.     For losses our area suffered from droughts in 2022, I applied to USDA under the Emergency Relief Program 2022, Track 1, identifying an eligible loss of $46,969.50. USDA issued me a program payment of $7,272.71. Meanwhile, my wife applied to USDA for her half of the venture, seeking relief for the same loss amount but receiving a payment from USDA of $71,900.96. Although our losses were identical since we own an equal share of our farming and

4

ranching venture, USDA paid my wife $64,628.25 more, solely because she is a woman, and I am a man.

21.    In addition to the payment under the Emergency Relief Program 2022, Track 1, being reduced because I am a white man, USDA made two substantial changes to the calculation of payments that reduced my 2022 program payment relative to previous years. First, USDA did not include any refunds of federal crop insurance premiums and fees for non-underserved farmers. Second, USDA applied its newly adopted progressive factoring. These changes came as a surprise.

22.    Had I not been Caucasian and male, I would not have been denied disaster relief from USDA under the Coronavirus Food Assistance Program 2  the Emergency Relief Program 2021, Phases 1 and 2  the Emergency Livestock Relief Program 2021, Phases 1 and 2  the Emergency Livestock Relief Program 2022  and the Emergency Relief Program 2022, Track 1.

23.    USDA's decision that I must be a veteran, a new farmer, or struggling to make ends meet to be entitled to the same disaster relief as every other American farmer is stigmatizing and discriminatory. I am aware that USDA is punishing me because of my race and sex.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: 04/04/2024                                   Rusty Strickland (Apr 4, 2024 15:21 CDT)
                                                    Rusty Strickland

5