## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

RUSTY STRICKLAND, *et al.*,

     *Plaintiffs*,

    v.

THE UNITED STATES DEPARTMENT
OF ARGRICULTURE, *et al.*,

     *Defendants*.

Case No. 2:24-cv-00060-Z

## DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

ALEXANDER V. SVERDLOV
(NY Bar No. 4918793)
FAITH E. LOWRY
(TX Bar No. 24099560)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-5581
Email: faith.e.lowry@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

FACTUAL STATEMENT ............................................................................................. 2

LEGAL STANDARD ..................................................................................................... 8

ARGUMENT .................................................................................................................. 8

I.    ERP 2022's Progressive Factoring Payment Calculation System Is Race- and
      Sex-Neutral, Falls Within USDA's Discretionary Authority, and Reasonable. .......... 8

      A.    Progressive factoring is race- and sex-neutral and was designed for a
            constitutionally permissible purpose. ........................................................... 9

      B.    USDA's decision to use progressive factoring when administering limited
            funds is discretionary, precluding review under the APA. ........................... 10

      C.    Even if the agency's use of progressive factoring were reviewable, it would
            not be arbitrary and capricious .................................................................... 13

            1.    USDA's structure of the progressive factoring payment to more
                  widely distribute disaster relief funds is reasonable. ....................... 13

            2.    USDA's decision to provide benefits at the producer-payee
                  level was also reasonable. ................................................................. 16

II.   USDA's Use of the Socially Disadvantaged Farmer Designation Is Authorized
      by Statute and Consistent with the Constitution. ...................................................... 18

      A.    USDA's use of the socially disadvantaged farmer designation was
            consistent with the statute and does not violate the major questions
            doctrine. ....................................................................................................... 18

      B.    USDA's use of the socially disadvantaged farmer designation to direct
            modest, incremental benefits to farmers based on their membership in
            groups that were subject to past and systemic discrimination satisfies strict
            scrutiny. ........................................................................................................ 21

            1.    USDA has a compelling interest in minimizing and
                  remediating the lingering effects of past discrimination. ................. 22

            2.    Providing modest monetary benefits to socially disadvantaged
                  farmers is narrowly tailored to that compelling interest. ................. 26

III.  Any Remedy Must Be Narrowly Tailored to a Redressable Injury. ........................... 32

      CONCLUSION .......................................................................................................... 35

## TABLE OF AUTHORITIES

### Cases

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995) .................................................................................................... 22

*Ala. Ass'n of Realtors v. HHS*,
   594 U.S. 758 (2021) .................................................................................................... 20

*Arizona v. Biden*,
   31 F.4th 469 (6th Cir. 2022) ...................................................................................... 34

*Aztec Gen. Agency v. FDIC*,
   111 F.3d 893 (5th Cir. 1997) ................................................................................ 16, 33

*Baystate Med. Ctr. v. Leavitt*,
   587 F. Supp. 2d 37 (D.D.C. 2008) ............................................................................. 33

*Bennett v. Spear*,
   520 U.S. 154 (1997) .................................................................................................... 15

*Biden v. Missouri*,
   595 U.S. 87 (2002) ...................................................................................................... 21

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ........................................................................................ 19, 20, 21

*Brazos Elec. Power Coop., Inc. v. Sw. Power Admin.*,
   819 F.2d 537 (5th Cir. 1987) ...................................................................................... 12

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) ...................................................................................... 35

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) .................................................................................. 23, 24, 26, 30

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   144 S. Ct. 2440 (2024) ................................................................................................ 35

*Dennis Melancon, Inc. v. City of New Orleans*,
   703 F.3d 262 (5th Cir. 2012) ...................................................................................... 34

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) .................................................................................................... 13

*Fisher v. Univ. of Tex.*,
    579 U.S. 365 (2016)............................................................................................ 27

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)............................................................................................ 33

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)............................................................................................ 34

*Fullilove v. Klutznick*,
    448 U.S. 448 (1980)............................................................................................ 28

*Garcia v. Vilsack*,
    No. 00-2445 (D.D.C. 2002) .................................................................................. 5

*Gill v. Whitford*,
    585 U.S. 48 (2018)........................................................................................32, 35

*Gilmour v. Gates, McDonald and Co.*,
    382 F.3d 1312 (11th Cir. 2004) ......................................................................... 14

*H.B. Rowe Co. v. Tippett*,
    615 F. 3d 233 (4th Cir. 2010) ............................................................................ 23

*Heckler v. Chaney*,
    470 U.S. 821 (1985)............................................................................................ 11

*Hunt v. Cromartie*,
    526 U.S. 541 (1999)............................................................................................ 23

*In re Black Farmers Discrimination Litigation (Pigford II)*,
    No. 08-mc-0511 (D.D.C. 2008)............................................................................ 5

*Interox Am. v. PPG Indus., Inc.*,
    736 F.2d 194 (5th Cir. 1984) ............................................................................. 34

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*,
    46 F.2d 855 (D.C. Cir. 1984) ............................................................................. 11

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ............................................................................. 34

*Keepseagle v. Veneman*,
    No. 99-03119 (D.D.C. 1999) ............................................................................... 5

*Labrador v. Poe ex rel. Poe*,
　144 S. Ct. 921 (2024) ..................................................................... 35

*Lewis v. Ascension Par. Sch. Bd.*,
　806 F.3d 344 (5th Cir. 2015) ........................................................ 10

*Lincoln v. Vigil*,
　508 U.S. 182 (1993) ........................................................... 11, 12, 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
　140 S. Ct. 2367 (2020) ............................................................ 13, 21

*Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*,
　478 U.S. 421 (1986) ...................................................................... 29

*Love v. Glickman*,
　No. 00-2502 (D.D.C. 2000) ............................................................. 5

*Med-Cert Home Care, LLC v. Becerra*,
　Civil Action No. 3:18-CV-02372-E, 2023 WL 6202050 (N.D. Tex. Sep. 21, 2023)......... 14

*Midwest Fence Corp. v. U.S. DOT*,
　840 F. 3d 932 (7th Cir. 2016) ....................................................... 23

*Milk Train, Inc. v. Veneman*,
　310 F.3d 747 (D.C. Cir. 2002) ....................................................... 12

*Miller v. Vilsack*,
　4:21-cv-00595-O (N.D. Tex. 2021) .................................................... 5

*Motor Vehicle Mfrs. Ass'ns of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
　463 U.S. 29 (1983)) ...................................................................... 33

*Nuziard v. Minority Bus. Dev. Agency*,
　721 F. Supp. 3d 431 (N.D. Tex. 2024)................................................. 33

*Physicians for Soc. Resp. v. Wheeler*,
　956 F.3d 634 (D.C. Cir. 2020) .................................................... 10, 11

*Pigford v. Glickman (Pigford I)*,
　No. 97-1978 (D.D.C. 1997) ............................................................. 5

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
　313 F. Supp. 3d 62 (D.D.C. 2018)..................................................... 12

*Pride v. USDA*,
    1:23-cv-02292 (D.D.C. 2023) ...................................................................... 25

*Provost v. USDA*,
    1:24-cv-920 (D.D.C. 2024)............................................................................ 25

*Schieber v. United States*,
    77 F.4th 806 (D.C. Cir. 2023) , *cert. denied*, 144 S. Ct. 688 (2024) ............................12, 18

*Sec'y of Lab. v. Twentymile Coal Co.*,
    456 F.3d 151 (D.C. Cir. 2006) ...................................................................... 11

*Shaw v. Hunt*,
    517 U.S. 899 (1996).................................................................................... 26

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
    600 U.S. 181 (2023).............................................................................26, 31

*Tex. Clinical Labs, Inc. v. Sebelius*,
    612 F.3d 771 (5th Cir. 2010) ....................................................................... 8

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ...................................................................... 35

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021)....................................................................... 11

*U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*,
    475 F. App'x 521 (5th Cir. 2012) ................................................................ 14

*United States v. Paradise*,
    480 U.S. 149 (1987)........................................................................ 26, 28, 30

*United States v. Texas*,
    599 U.S. 670 (2023)............................................................................32, 34

*W.H. Scott Constr. Co. v. City of Jackson*,
    199 F.3d 206 (5th Cir. 1999) ...................................................................... 23

*West Virginia v. EPA*,
    597 U.S. 697 (2022)............................................................................19, 20

*Willingham v. Dep't of Lab.*,
    475 F. Supp. 2d 607 (N.D. Tex. 2007)........................................................... 8

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ................................................................................. 34

**<u>Statutes</u>**

5 U.S.C. § 553 ....................................................................................... 18

5 U.S.C. § 701 ................................................................................. 10, 11

5 U.S.C. § 703 ....................................................................................... 34

5 U.S.C. § 706 ....................................................................................... 34

7 U.S.C. § 2003 ..................................................................................... 19

7 U.S.C. § 2279 ..................................................................................... 19

7 U.S.C. § 9081 ............................................................................... 20, 30

22 U.S.C. § 2668a .................................................................................. 12

Extending Government Funding and Delivering Emergency Assistance Act,
  Pub. L. No. 117–43, 135 Stat. 344 (2021) ....................................... 2, 18

Pub. L. No. 117-328, 136 Stat 4459 (2022) ................................... 18, 21

**<u>Rules</u>**

Fed. R. Civ. P. 15(a) .............................................................................. 14

**<u>Regulations</u>**

7 C.F.R. § 1400.105 ............................................................................... 17

66 Fed. Reg. 21617-01 (Apr. 30, 2001) ................................................ 29

78 Fed. Reg. 33045 (June 3, 2013) ........................................................ 18

86 Fed. Reg. 7009 (Jan. 20, 2021) .......................................................... 7

86 Fed. Reg. 32013 (June 16, 2021) ........................................................ 7

87 Fed. Reg. 19465 (Apr. 4, 2022) ................................................. 28, 31

87 Fed. Reg. 30164 (May 18, 2022) .......................................... 1, 2, 3, 17

88 Fed. Reg. 74404 (Oct. 31, 2023) ................................................*passim*

88 Fed. Reg. 1862 (Jan. 11, 2023) ................................................................. 2, 26

89 Fed. Reg. 68125 (Aug. 23, 2024) ................................................................ 9

Exec. Order 14091 ........................................................................................... 20

**<u>Other Authorities</u>**

167 Cong. Rec. H765-H766 ........................................................................... 5, 7

167 Cong. Rec. S1262-S1266 ................................................................. 5, 6, 7, 27

Congressional Research Service (CRS), FSA Comms.: In Brief (Jan. 29, 2021) (FSA Comms.), https://perma.cc/HA3L-PDPG ................................................. 27

Dania Francis, Darrick Hamilton, Thomas Mitchell, Nathan Rosenberg, & Bryce Wilson Stucki. How the Government Helped White Americans Steal Black Farmland, New Republic, May 5, 2023, https://perma.cc/WQV6-NRYW ........................................... 22

Economic Research Service, Socially Disadvantaged Farm Operations, https://perma.cc/39LX-5N7V ....................................................................... 10

FSA Fact Sheet (December 2009), https://perma.cc/9V2Y-EUAF ............................................................... 17

FSA, Payment limitations, https://perma.cc/EV6S-4759 ..................................................................... 17

FSA, USDA Announces August 14 Application Deadline for Emergency Relief Program Assistance (July 15, 2024), https://perma.cc/UE3D-XXZY ........................................... 4

GAO-19-464, Indian Issues: Ag'l Credit Needs and Barriers to Lending on Tribal Lands (2019) ................................................................................. 6, 29

GAO-19-539, Ag'l Lending: Info. on Credit & Outreach to [Socially Disadvantaged Farmers and Ranchers] Is Limited (2019) ............................................. 6, 29

House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill (Apr. 21, 2010) ......... 27

House Ag. Comm. Hr'g on USDA Oversight 45 (July 22, 2015) .................................. 27

Jared Hayes, USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers, EWG (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD ........................................ 30

Review of the Off. Of the Assistant Sec'y for Civil Rights, Hr'g before the House Subcomm.
on Nutrition, Oversight, and Dep't Ops., Comm. on Ag., 116th Cong. 25 (2019)
(2019 Civil Rights Hr'g) .................................................................................................. 6

S.278, Emergency Relief for Farmers of Color Act of 2021," (intr'd Feb. 8, 2021) .............. 5

USDA, Common Forms,
https://perma.cc/JAX3-JT3L ...................................................................................... 17

## INTRODUCTION

As part of the support it provides farmers, Congress at times authorizes the U.S. Department of Agriculture (USDA) to provide monetary "assistance to producers for losses" they sustain "due to wildfires, hurricanes, floods," and other natural disasters."  Notice of Funds Availability; Emergency Relief Program, 87 Fed. Reg. 30164 (May 18, 2022).  In doing so, Congress has consistently given USDA wide discretion on how to structure payments under those relief programs, appropriating money subject only to very general terms.  Having already sought a partial preliminary injunction in this case, Plaintiffs now renew both the arguments on which they succeeded and on those they failed.  According to Plaintiffs, USDA improperly paid them less than it did other producers because of their race and sex—and improperly structured payments in the most recent disaster relief program to prioritize more relief to smaller producers who are most in need of the assistance (which the agency did using a race-neutral and sex-neutral methodology called "progressive factoring").  Compl. ¶¶ 13-17, ECF No. 1.

But the race-neutral and sex-neutral choices that USDA has made about how to allocate limited funding are fully consistent with the broad authorization Congress provided and governing law.  Neither the Constitution nor the Administrative Procedure Act (APA) provides a basis to second-guess USDA's reasoned response to a severe shortfall in Congressional appropriations.  Separately, even in areas where USDA has chosen to take account of race or sex, it has done so in an attempt to remedy the lingering effects of historical discrimination in USDA's farm programs that continue to result in gaps in USDA's programs.  USDA's ongoing attempt to rectify the persistent effects of that historic discrimination satisfies strict scrutiny, and Defendants respectfully urge the Court to reconsider its prior conclusions to the contrary.

For these reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and grant summary judgment in favor of USDA on all claims.

## FACTUAL STATEMENT

*Disaster Relief Programs.*   Over the past several years, Congress has regularly appropriated funds to support farmers facing crop loss and other hardships caused by natural disasters and the COVID-19 pandemic.  Ducheneaux Decl. ¶ 3 and Part II (Overview of the eight challenged programs), ECF No. 21-1, attached to Defs.' PI Opp.  These programs provide vital relief that sustains vulnerable farm operations, supplementing federal crop insurance.  *Id.* ¶ 120.  To this end, USDA often advises Congress what level of funding is needed to adequately cover estimated losses, and Congress leaves largely to USDA's discretion how to structure these *ad hoc* relief programs and distribute the funds.  *See id.* ¶¶ 15, 45; PI Order at 6, ECF No. 26.  When appropriated funds are insufficient to cover estimated losses, USDA must determine how to distribute available funds to accomplish Congressional objectives.  AR 870 (ERP 2022 "[f]unding to address impacts to crops is approximately $3.2 billion.  Losses not covered by crop insurance or NAP are estimated at $10 billion."); *see also* Ducheneaux Decl. ¶ 50.

For example, in 2021, Congress passed the Extending Government Funding and Delivering Emergency Assistance Act, which provided $10 billion to cover crop losses due to natural disasters in 2021 and 2022 "under such terms and conditions as determined by the Secretary," to "remain available until December 31, 2023."  Div. B, Tit. I, Pub. L. No. 117–43, 135 Stat. 344, 356 (2021).  USDA used these funds to establish the Emergency Relief Program 2020 and 2021 (ERP 2020/2021).  ERP 2020/2021 Phase 1 relief payments were tied to a farmer's existing crop insurance and Noninsured Crop Disaster Assistance Program (NAP) coverage, applying a flat factor that was designed to ensure that payments would not exceed available funding and, in aggregate across all farmers, would not exceed 90% of losses for insured crops, as required by the Extending Government Funding and Delivering Emergency Assistance Act.  *See, e.g.*, 87 Fed. Reg. at 30168; *see also* 88 Fed. Reg. 1862 (Jan. 11, 2023) (implementing ERP 2020/2021 Phase 2).  Under parts of the program, historically underserved farmers—including veterans, beginning farmers, and limited resource farmers,

2

as well as socially disadvantaged minority and women farmers—received a 15% increase to their calculated ERP payments. *See* 87 Fed. Reg. at 30169.

Plaintiffs Alan & Amy West Farms, Bryan Baker, Double B Farms LLC, and Rusty Strickland each participated in ERP 2020/2021, and received sizeable payments. *See*, *e.g.*, Ducheneaux Decl. ¶¶ 70-73. ERP 2020/2021 is now closed, and funding has expired. *Id.* ¶ 77. Only obligations for payment calculation errors, omissions, and appeals can be created. *Id.*

In 2023, Congress similarly appropriated approximately $3.2 billion in the Disaster Relief Supplemental Appropriations Act, 2023, "to remain available until expended," to cover crop losses due to natural disasters occurring in 2022, again leaving largely to the Secretary's discretion how to distribute the funds. *Id.* ¶¶ 45-46. Based upon this authority, FSA designed the Emergency Relief Program 2022 (ERP 2022) using the same model it had used for 2020 and 2021 emergency disaster assistance, incorporating similar method of calculating payments, and separating the dispersal of assistance into two tracks, Track 1 and Track 2. *Id.* ¶¶ 47-48.

Unlike in 2020 and 2021, however, Congress's appropriated funds for ERP 2022 fell approximately $8 billion short of the expected losses. *Id.* ¶ 50; AR 870. To help address this shortfall in available funding, USDA introduced in ERP 2022 a payment proration method called "progressive factoring," which applied consistently to all producers and covered 100% of initial losses while providing gradually diminishing coverage for higher amounts of loss. Ducheneaux Decl. ¶¶ 51–59 (explaining how the method applies). Under this calculation method, more than 80% of farmers received a greater payment than they would have under a 27% flat rate percentage system. *Id.* ¶ 112 ("If a flat factor had been applied, the factor would have been 27% based on Agency estimates"). For underserved farmers—including veterans, beginning farmers, and limited resource farmers, as well as minority and women farmers— USDA also provides a separate reimbursement for crop insurance administrative fees and premiums, which is added to the calculated payment. *Id.* ¶ 59. That separate payment is not

3

part of the progressive factoring calculation. "[P]rogressive factoring is calculated independent from and prior to any additional benefits added for being an underserved producer." *Id.*

ERP 2022 Track 1 and Track 2 closed for applications on August 14, 2024. FSA, USDA Announces August 14 Application Deadline for Emergency Relief Program Assistance (July 15, 2024), https://perma.cc/UE3D-XXZY. Plaintiffs Bryan Baker, Double B Farms, and Alan & Amy West Farms received funds under both Tracks. Ducheneaux Decl. ¶¶ 70-73. Plaintiff Rusty Strickland applied for and received funds under Track 1 but had not applied for Track 2 as of the time this lawsuit was filed. *Id.* ¶ 73.

In total, Plaintiffs challenge eight such *ad hoc* disaster relief programs, Pls.' MSJ at 94, ECF No. 32, each of which specifically directed some portion of the appropriated funds to underserved farmers, including minority and women farmers, consistent with Congress and USDA's shared goal of addressing discrimination and other unique challenges faced by underserved farmers. *E.g.*, Ducheneaux Decl. ¶¶ 14, 21, 34, 64. Like ERP 2020/2021, several of the funding sources for these challenged programs have expired and/or application deadlines have passed, including the Emergency Livestock Relief Program 2021, the Emergency Livestock Relief Program 2022, the Pandemic Assistance Revenue Program, and the Coronavirus Food Assistance Program 2. Ducheneaux Decl. ¶¶ 77-79, 94; PI Order at 22. However, funding for each of those programs remains available to reconsider past, timely-submitted applications and to make adjusted benefit payments to those eligible producers who timely applied. *Id.* ¶¶ 77-79, 94.

*USDA's History of Discrimination.* USDA's consideration of the socially disadvantaged designation for women and minority farmers in certain aspects of its programs reflects the agency's goal of remedying the persistent effects of past discrimination that the agency had itself historically inflicted upon certain groups of farmers. Although USDA aims to serve all farmers equitably, decades of evidence shows that not all USDA program participants have received equitable treatment in its services. This history is reflected in several lawsuits against

4

USDA by groups of minority farmers, including *Pigford v. Glickman (Pigford I)*, No. 97-1978 (D.D.C.); *Keepseagle v. Veneman*, No. 99-03119 (D.D.C.); *Garcia v. Vilsack*, No. 00-2445 (D.D.C.); *Love v. Glickman*, No. 00-2502 (D.D.C.); *In re Black Farmers Discrimination Litigation (Pigford II)*, No. 08-mc-0511 (D.D.C.), and was extensively discussed in litigation challenging the American Rescue Plan Act (ARPA) § 1005, including in *Miller v. Vilsack*, 4:21-cv-00595-O (N.D. Tex.) (ECF No. 27), and related cases.

Congress has repeatedly recognized this history. As Chairman of the House Agriculture Committee, David Scott, put it in his floor statement leading to the passage of ARPA, "[t]he systemic discrimination against … farmers of color by USDA is longstanding and well-documented and continues to present barriers for these producers to participate in the agricultural economy." 167 Cong. Rec. H765 (Feb. 26, 2021). As a result of these practices, Black farmers dwindled from 14 to two percent of all farmers and lost about 80% of their land. *See* S.278, "Emergency Relief for Farmers of Color Act of 2021," § 2, ¶ 5(A)-(C) (intr'd Feb. 8, 2021).

At the same time, Congress has acknowledged that its previous efforts to remedy the persistent effects of discrimination against minority farmers in USDA programs "ha[d] fallen short." 167 Cong. Rec. S1262 (Mar. 5, 2021) (Stabenow). Congress began targeting USDA assistance to socially disadvantaged farmers during the agriculture credit crisis in the 1980s, created a program to provide outreach and technical assistance to socially disadvantaged farmers in 1990 (the "2501 Program"), and permanently funded the 2501 Program in 2018. *See id.* S1263-64. In 1998, Congress suspended the Equal Credit Opportunity Act statute of limitations for alleged discrimination by the Department of Agriculture between January 1, 1981 and December 31, 1996, and in 2010, it provided $1.25 billion to ensure that minority claimant groups received payments under their respective settlements. *See id*. S1264. In 2002, Congress created the Office of the Assistant Secretary for Civil Rights at USDA to ensure better compliance with civil rights laws. *See id*. And in 2014, Congress created a permanent Office of Tribal Relations under the Secretary of Agriculture. *See id*.

Despite these efforts, Congress found that minority farmers continued to suffer the persistent effects of discrimination in USDA programs. Two GAO reports mandated by Congress in 2018 illuminated the extent of the problem. *See* GAO-19-539, Ag'l Lending: Info. on Credit & Outreach to [Socially Disadvantaged Farmers and Ranchers] Is Limited 2 (2019) 13; GAO-19-464, Indian Issues: Ag'l Credit Needs and Barriers to Lending on Tribal Lands (2019). Those reports revealed that socially disadvantaged farmers still had "more difficulty getting loans and credit from USDA … [that] can help beginning farmers break into the business and help existing farmers continue running their operations," S1264 (Stabenow) (citing Nat'l Young Farmers Coal., Cal. Young Farmers Rep. 32 (Apr. 2019)).

Congress also found that, due to the persistent effects of the longstanding discrimination against minority farmers, "Black farmers and other farmers of color were in a far more precarious financial situation before the COVID–19 pandemic hit"—and a year into the pandemic, some "ha[d] simply not been able to weather the storm." *Id.* S1265-66 (Booker). For instance, Congress observed that a disproportionate number of Black, Hispanic, Asian-American, and Indigenous farmers were in default on their direct loans, putting farmers of color at risk of "facing yet another wave of foreclosures and potential land loss." *Id.* at S1266 (citing statistics showing that 13% of borrowers with FSA direct loans were currently delinquent and that this number increased to 35% for Black farmers and 24% for Hispanic, Asian-American, and Indigenous farmers); *see also id.* at S1264 (Stabenow) (explaining that socially disadvantaged farmers are more likely to have loans in default because they "are less likely to have the same access to adequate loan servicing … as their White counterparts" due to discrimination in USDA loan programs); Review of the Off. Of the Assistant Sec'y for Civil Rights, Hr'g before the House Subcomm. on Nutrition, Oversight, and Dep't Ops., Comm. on Ag., 116th Cong. 25, 9 (2019) (2019 Civil Rights Hr'g) (Adams) (citing reports that Black farmers were subject to 13% of USDA foreclosures despite being less than 3 percent of direct loan recipients).

Moreover, lawmakers cited reporting that the overwhelming majority of recent

agricultural subsidies and pandemic relief prior to ARPA went to non-minority farmers, despite minority farmers occupying a more vulnerable financial position than their white counterparts. Specifically, the reporting indicated that almost all of USDA's Market Facilitation Program (MFP) payments, *see* S1264-65; *see also id.* H766 and almost all of the $9.2 billion provided through USDA's first Coronavirus Food Assistance Program (CFAP), went to non-minority farmers, *see id.* S1264-65; H766. This disproportionate allocation of funding, Congress again found, was partly due to the persistent effects of discrimination in USDA programs. *Id.* S1264. Additionally, a letter introduced into the Congressional record from 13 professors who specialize in agricultural issues explained that federal farm programs "have perpetuated and exacerbated the problem" of discrimination, by preferring certain crops (those typically produced by white farmers) and "reward[ing] the largest farms the most" (those typically owned by white farmers). *Id.* at S.1266. All of this, the academics concluded, had "distort[ed] credit, land, input costs, and markets" to the disadvantage of minority farmers. *Id.*

USDA has been diligent both in acknowledging this historic discrimination and seeking to remediate its lingering effects. Despite these efforts, USDA continues to receive anecdotal reports of discrimination against minority farms, and to see gaps in the distribution of program funds. *See* A Hearing to Review the State of Black Farmers in the United States Before the House Comm. On Agric., 117th Cong. (Mar. 25, 2021), AR 190–248; Rural Coalition letter to Secretary Vilsack and comment submission in response to 86 Fed Reg 7009, 86 Fed Reg 32013, Aug. 24, 2021, AR 259-432; Letter from Representative Thompson to Secretary Vilsack re: "gaps and disparities" in the level of assistance producers received in initial rounds of COVID-related relief (Feb. 2, 2022), AR 438-94; Secretary Vilsack Letter to House Representative Thompson re: equitable dissemination of pandemic assistance programs (June 23, 2022), AR 513-14.

## LEGAL STANDARD

"[R]eviewing an administrative decision on summary judgment calls for a modified standard: whether the agency acted appropriately given the standards of review set forth by the Administrative Procedure Act or the statute authorizing the agency's action." *Willingham v. Dep't of Lab.*, 475 F. Supp. 2d 607, 611 (N.D. Tex. 2007) (Robinson, J.). The APA allows a federal court to overturn an agency's decision "only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010) (quotation omitted). Overall, the Court's review is "highly deferential to the administrative agency whose final decision is being reviewed." *Id.*

## ARGUMENT

### I.    ERP 2022's Progressive Factoring Payment Calculation System Is Race- and Sex-Neutral, Falls Within USDA's Discretionary Authority, and Reasonable.

When Congress passed the Disaster Relief Supplemental Appropriations Act 2023, on December 28, 2022, the approximately $3.2 billion it appropriated to USDA for disaster relief related to crop losses was less than one third of the funding needed to adequately cover 2022 disaster crop losses, which totaled more than $11 billion. Ducheneaux Decl. ¶ 50. USDA had to design ERP 2022 within these funding constraints. *Id.* For example, following Congressional direction, ERP 2022 imposed limits on the amount of payments a person or legal entity can receive under the program. *Id.*; Notice of Funding Availability, 88 Fed. Reg. 74404 (Oct. 31, 2023). In addition, rather than applying a general flat payment factor (*e.g.*, covering 10% of all uncovered losses) as it had in prior programs, USDA incorporated a "progressive factoring" payment calculation system that covered 100% of losses from 0 to $2,000 and provided diminishing coverage for successive losses. 88 Fed. Reg. 74410.

Progressive factoring had not previously been used by FSA for its pandemic or disaster assistance programs because funding for previous *ad hoc* disaster programs was typically sufficient to cover a majority of losses. Ducheneaux Decl. ¶ 50. Under progressive factoring,

8

82% of farmers received larger payments than they would have under a flat factor payment calculation—thus ensuring that, even with limited funds, the agency was able to effectively provide impactful assistance. *Id.* ¶ 112; *see also* AR 881. Plaintiffs appear to be among the 18% of farmers who did not benefit from progressive factoring, as opposed to a flat factor. *See*, *e.g.*, Compl. ¶¶ 140-41. But, while Plaintiffs may well be dissatisfied by this result, this Court correctly rejected Plaintiffs' challenge to this payment framework on constitutional grounds and it should reject the challenges on statutory grounds as well.

A. **Progressive factoring is race- and sex-neutral and was designed for a constitutionally permissible purpose.**

Progressive factoring is both race- and sex-neutral. It "targets … losses incurred by smaller producers." Comparison of ERP 2022 to ERP 2020/21 Features, AR 873; AR 868 ("This approach maximizes available assistance to all small-scale operations."); AR 881 ("Progressive Factoring is designed to pay more to program participants who are due a gross payment of less than $30,000 under Track 1A (RMA Records), which is 82% of producers."). It applies "independent from and prior to any additional benefits added for being an underserved producer." Ducheneaux Decl. ¶ 59. The Court recognized this independence when it permitted USDA to continue applying progressive factoring, "so long as that is done independently of any race- or sex-based considerations." *See* PI Order at 22. And USDA has done so. *See* 89 Fed. Reg. 68125 (Aug. 23, 2024).

The materials cited in Plaintiffs' Motion for Summary Judgment do not show otherwise. Nothing in the record suggests that progressive factoring was designed specifically to benefit minority producers. These materials show—and USDA does not dispute—that the decision to provide insurance premium refunds to underserved producers and to provide a 15% bump-up provide benefits in part based on race- and sex-based classifications. *See* Pls.' MSJ at 26 ("Only then did USDA refund premiums and fees for underserved producers.") (citing AR 862); Compl. ¶ 147 ("USDA did not subject refunds of insurance premiums and fees to progressive factoring and only gave refunds of insurance premiums and fees under

9

ERP 2022 to socially disadvantaged and other underserved producers.") (citing 88 Fed. Reg. at 74410). But these portions of the ERP 2022 payment calculation are discrete and separable from the use of progressive factoring. (And to be clear, USDA's crop insurance refunds and the 15% bump-up did not only benefit women and minority farmers. They were also directed to beginning farmers, veteran farmers, and limited resource farmers. Ducheneaux Decl. ¶ 59.)

In summary, progressive factoring is both race- and sex-neutral and applies without regard to any socially disadvantaged status, serving the constitutionally permissible purpose of increasing the impact of assistance for losses incurred by smaller producers. AR 884 ("Progressive factors allow payments to be targeted to smaller producers and shallower losses, without increasing costs"). Indeed, while fewer than 10% of all farms are considered socially disadvantaged,[1] progressive factoring benefitted more than 80% of farmers, who received a greater benefit under progressive factoring than they would have under a general flat factor. AR 881. Thus, Plaintiffs have failed to demonstrate that race was the "predominant factor" motivating USDA's decision to use progressive factoring as opposed to a flat factor. *See Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 355 (5th Cir. 2015).

### B.    USDA's decision to use progressive factoring when administering limited funds is discretionary, precluding review under the APA.

Apart from their equal protection challenge, Plaintiffs cannot show that the use of progressive factoring violates the APA.

The APA expressly precludes judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). That exception applies to "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)), as well as instances where "the statute is drawn so

---

[1]    Economic Research Service, Socially Disadvantaged Farm Operations, https://perma.cc/39LX-5N7V (last visited May 3, 2024) ("Overall, socially disadvantaged farms accounted for 9.4 percent of the 2 million farms in the United States, according to the 2017 Census of Agriculture.").

that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  In such cases, "'the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion.'"  *Id.* at 643 (quoting *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)).

USDA's decision to adopt progressive factoring to govern the disbursement of funding in ERP 2022 falls well within the category of administrative decisions that have traditionally been regarded as committed to agency discretion.  In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to reallocate funding away from a children's health program was committed to the agency's discretion and thus unreviewable.  508 U.S. at 184.  Although the Court rejected Defendants' committed-to-agency discretion argument as not subject to the "*Heckler* bar," *see* PI Order at 5 (citing *Texas v. Biden*, 20 F.4th 928, 984 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785, 813-14 (2022)), "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."  *Lincoln*, 508 U.S. at 192 (following a discussion of *Heckler* and presumptively unreviewable enforcement decisions).  That is because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192 (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 46 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit") (footnote omitted)).  Thus, "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude."  *Id.* at 193.  Supreme Court precedent thus makes clear that matters unrelated to enforcement can be committed to agency discretion as well.

Indeed, the D.C. Circuit has "extended *Lincoln*'s reasoning to agency decisions

involving *non*-lump sum appropriations as well." *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75 (D.D.C. 2018) (Brown Jackson, J.). In *Milk Train, Inc. v. Veneman*, for example, the D.C. Circuit concluded that USDA's decision to impose a cap on a milk subsidy program was committed to agency discretion because Congress "left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers[.]" 310 F.3d 747, 751 (D.C. Cir. 2002). And just last year, the D.C. Circuit held that the Department of State's administration of a compensation fund was unreviewable because the governing statute did not "direct[] the Secretary to allocate funds in any particular way— it just requires him to 'determine the amounts due.'" *Schieber v. United States*, 77 F.4th 806, 814 (D.C. Cir. 2023) (quoting 22 U.S.C. § 2668a), *cert. denied*, 144 S. Ct. 688 (2024). USDA's administration of ERP 2022 to include progressive factoring is unreviewable for the same reasons.

Title I of the Disaster Relief Supplemental Appropriations Act, 2023 provided $3,741,715,000 in a lump sum "to remain available until expended, for necessary expenses related to losses of revenue, quality, or production losses of [certain] crops" under such terms and conditions "as determined by the Secretary." ERP 2022's payment formula, including the use of progressive factoring as opposed to a flat factor, reflects USDA's response to the changing circumstance of a shortfall in disaster relief funds. The distribution of a lump sum appropriation requires scores of discrete decisions to be made, including many day-to-day decisions of how payments will be calculated, distributed, and administered. This area of agency discretion is separate from *Heckler*'s presumptively unreviewable non-enforcement decisions. PI Order at 6; *see also Lincoln*, 508 U.S. at 192; *c.f. Brazos Elec. Power Coop., Inc. v. Sw. Power Admin.*, 819 F.2d 537, 544 (5th Cir. 1987) (holding that the Flood Control Act's authorization to an agency to "transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof" provided "no meaningful standard by which to judge the propriety of [the agency's] actions" (citation omitted)). For these reasons, the Court should revisit its conclusion that ERP 2022's payment calculation is reviewable under

the APA.

**C.    Even if the agency's use of progressive factoring were reviewable, it would not be arbitrary and capricious.**

As the Court recognized in its preliminary injunction order, "[t]o pass muster under arbitrary-and-capricious review, USDA need only 'articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made.'" PI Order at 5 (citing *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (quotation omitted)).  Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness."  *Id.* (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

Plaintiffs argue that three separate aspects of ERP's payment calculation are arbitrary and capricious: "(1) where to set the payment thresholds and why; (2) why USDA has chosen to steer funds to smaller operations and shallower losses; or (3) why USDA calculated it on a per-producer basis, disadvantaging single-owner businesses and favoring multi-owner businesses independent of size."  Pls.' MSJ at 29.  But their arguments on each of those grounds fails.

1.    *USDA's structure of the progressive factoring payment to more widely distribute disaster relief funds is reasonable.*

USDA's Notice of Funding Availability explains that the decision to cover 100% of initial losses and provide diminishing coverage for subsequent losses through progressive factoring helps ensure the limited available funding is distributed in a manner benefitting more producers.  88 Fed. Reg. at 74408, n.4.  Under this payment structure, more than 80% of farmers received a greater benefit than they would have received under a general flat factor. This generally resulted in smaller farmers receiving a benefit that was more economically significant to their operation than larger farmers because a dollar lost for a smaller farmer has a higher economic impact than a dollar lost for a larger farming operation.  Ducheneaux Decl.

13

¶ 65; AR 597.  That Plaintiffs are among the 18% of farmers who received a relatively smaller benefit does not show that the decision to use progressive factoring was unreasonable.

Looking for an avenue to undermine USDA's decision, Plaintiffs challenge the specific breakpoints and percentages used in ERP 2022 as arbitrary and capricious. Pls.' MSJ at 30. That challenge, however, is not properly presented in this case.  That aspect of ERP's payment calculation is separate from the broader decision to use progressive factoring as opposed to a flat factor, and Plaintiffs gave Defendants no notice of their intent to challenge the particular breakpoints and percentages in their Complaint.  The Complaint mentions the $2,000 breakpoints only once, without any critique. *See* Compl. ¶ 136.  Plaintiffs cannot raise a new claim to a different aspect of the agency's decision for the first time in summary judgment briefing.  *See Med-Cert Home Care, LLC v. Becerra*, Civil Action No. 3:18-CV-02372-E, 2023 WL 6202050, at *11–12 (N.D. Tex. Sep. 21, 2023) (Brown, J.) (citing *U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012) ("[T]he district court did not err in denying DeKort's motion for partial summary judgment because he attempted to raise a new claim, not asserted in his fifth amended complaint."); and *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (Plaintiffs may not "raise new claims at the summary judgment stage. [. . .] At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).")).  To the extent that Plaintiffs identified this potential challenge for the first time while reviewing the administrative record, the proper course would have been to seek leave to amend their complaint to add this challenge.  *Id.*  Plaintiffs' request for summary judgment as to ERP 2022's payment calculation breakpoints and percentages should be denied on this basis alone.

This new claim also fails for two additional reasons: *first*, because the intermediate breakpoint model was not a final agency action; and *second*, because the decision to revise the payment breakpoints and percentages to bring the program within available funding limits was reasonable.  While Plaintiffs suggest that ERP 2022's payment structure "could have been

the result of sophisticated calculations or well-placed darts," Pls.' MSJ at 30, their critique reflects their fundamental misunderstanding of how *ad hoc* disaster programs work. Payment calculations must be continually re-modeled as losses are determined to ensure that the program stays within funding limits. *See*, *e.g.*, 88 Fed. Reg. 74411 ("All ERP 2022 payments are subject to the availability of funding."); AR 870 (estimating uncovered losses to be $10.6 billion). So, while the May 19, 2023, memo that Plaintiffs cite sets forth the overall payment structure, it was not "final" as to the specific breakpoints and percentages: those could not be finalized until all losses were more certain, and thus the May 2023 memo did not reflect the culmination of the agency's decision-making process as to this aspect of the program. *See* Memo. re: 2022 Emergency Relief Decisions (May 19, 2023), AR 862; *see generally Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that final agency action must be one by which "rights or obligations have been determined").

This refinement in the final payment calculation was not limited to breakpoints and percentages within progressive factoring. USDA also used additional safeguards "[t]o provide further protection against cost overruns," AR 884, including limits on the initial payment, with the remaining portion of a producer's net payment to be issued "[a]s budget permits." *Id.*; AR 794. On the other hand, if the funds were not exhausted, the initial payment factor could be "increased and additional payments issued." AR 884; AR 900; *see also* 88 Fed. Reg. at 74414 ("All ERP 2022 payments are subject to the availability of funding. If additional funding is available after ERP 2022 payments are issued, FSA may issue an additional payment, not to exceed the maximum amount allowed by law[.]"). This lack of finality means that Plaintiffs cannot challenge the payment breakpoints on the basis of the May 2023 memo—so their challenge fails on that ground as well.

For similar reasons, Plaintiffs cannot show that it was arbitrary and capricious for USDA to alter the breakpoints and percentages between the May 19, 2023, memo and the final Notice of Funding Availability—after the agency had a better understanding of the estimated losses to be covered—because Plaintiffs cannot show that USDA had adequate

funds to cover the higher payment structure.  Regardless, evaluating that alteration as its own final decision would require the examination of a separate record.  To the extent the Court believes that this challenge was fairly raised by the pleadings, and that USDA's reasoning behind the payment structure is not discernible from the existing administrative record, USDA would be well-positioned to provide further explanation for that particular determination upon remand.  *See*, *e.g.*, *Aztec Gen. Agency v. FDIC*, 111 F.3d 893 (5th Cir. 1997) (per curiam) (if "the record before the agency does not support the agency's decision . . . or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional explanation").

2.    *USDA's decision to provide benefits at the producer-payee level was also reasonable.*

Similarly, Plaintiffs' challenge to the "producer-payee" or "per-producer" structure of ERP 2022 as arbitrary and capricious, Pls.' MSJ at 31–33, cannot be raised for the first time at summary judgment.  This aspect of ERP's payment calculation is distinct from progressive factoring—that is, producer-payee vs. operation-payee may be applied to either a flat factor or a progressive factor payment system.  This challenge likewise was not raised in the Complaint, which includes more than a dozen allegations related to progressive factoring, and does not give notice of any challenge to the per-producer structure.  *See* Compl. ¶¶ 283–300.  Like their attack on the breakpoints and percentages used within the progressive factoring payment model, Plaintiffs' request for summary judgment as to the per-producer calculation should be denied on this basis alone.

Even if Plaintiffs' challenge were supported by the pleadings, it fails.  USDA's decision to provide ERP 2022 at the producer level, rather than the entity level, is entirely reasonable, and well within USDA's exercise of expertise.  *First*, USDA was not breaking new ground with this payment method.  This is what is known as "direct attribution," and it is used in myriad USDA programs, tracing back to the 2008 Farm Bill, including ERP 2021.  *See* FSA

16

Fact Sheet (December 2009), https://perma.cc/9V2Y-EUAF; AR 795 (referring to 7 CFR § 1400.105, ''Attribution of Payments''); *see, e.g.*, 87 FR 30167 (May 18, 2022) (applying the same per producer payments in Phase 1 of ERP 2020/2021). And it makes use of the information provided on existing USDA forms, including Form CCC-902 and CCC-901, which are the forms producers use to report information about their farming operation to be used by FSA to determine the structure of entities for payment purposes throughout a given program year, and Form CCC-578, Report of Acreage. *See* https://perma.cc/JAX3-JT3L. *Second*, providing benefits at the producer level is consistent with how overall payment limitations are calculated, since they are similarly imposed at the producer level. *See* FSA, Payment limitations, https://perma.cc/EV6S-4759. And *third*, providing benefits in this manner provides more direct relief to a greater number of producers who have an ownership interest in the crop.

Here too, Plaintiffs' criticisms of the producer-payee structure oversimplify the complexities of these programs. One cannot accurately calculate a projected ERP 2022 payment based on Plaintiffs' incomplete hypotheticals, Pls.' MSJ at n.9, which would depend on a number of additional factors, such as the specific business entities at issue, their farm operating plans, respective ownership interest, and the identification of crop unit(s) attributed to specific entities. *See* 88 Fed. Reg. 74415 (describing ERP 2022 application requirements). There are pros and cons to all ownership arrangements, including particular tax and insurance benefits, and so there will always be business structures that benefit more (or less) under a given program. The APA does not require the USDA to survey the effects of a particular payment structure across potential business formations. And as the Court previously recognized in its preliminary injunction order, *ad hoc* disaster programs are by definition retrospective; no producer should structure their farm enterprise in an effort to maximize the returns in future, unannounced, disaster programs.

Nor does USDA's decision to forgo notice-and-comment rulemaking cast any doubt on the reasonableness of USDA's decision to apply progressive factoring in ERP 2022. As

Plaintiffs concede, full notice and comment rulemaking was not required. *See* 5 U.S.C. § 553(a)(2). Nor was it advisable, as USDA worked to issue time-sensitive disaster relief funds to farmers in need. *See* Revocation of Statement of Policy on Public Participation in Rule Making, 78 Fed. Reg. 33045 (June 3, 2013) ("By revoking the 1971 Statement of Policy, USDA restores the discretion to use notice-and-comment procedures when appropriate, unless otherwise required by law, with regard to this class of rulemakings. This action also improves USDA's ability to implement programs efficiently."). And in any event, USDA did solicit comments on the ERP 2022 Notice of Funding Availability. 88 Fed. Reg. 74405 ("We will consider comments we receive by January 2, 2024").

## II.    USDA's Use of the Socially Disadvantaged Farmer Designation Is Authorized by Statute and Consistent with the Constitution.

Plaintiffs raise two challenges to USDA's use of the socially disadvantaged farmer designation to direct benefits to certain racial minority groups and women, including a challenge under the major questions doctrine, in which they argue that USDA's use of this designation was not statutorily authorized, Pls.' MSJ at 17-24, and an equal protection challenge, *id.* at 24-28. Both of these claims fail.

### A.    USDA's use of the socially disadvantaged farmer designation was consistent with the statute and does not violate the major questions doctrine.

As a starting point, USDA's use of the "socially disadvantaged" designation across its disaster relief programs falls well within its statutory authority. Congress authorized those programs in very broad terms, appropriating funding for USDA to distribute relief for broad categories of agricultural losses "under such terms and conditions as determined by the Secretary[.]" Pub. L. No. 117–43; *see also* Div. N, Tit. I, Pub. L. No. 117-328, 136 Stat 4459, 5201 (funding to be distributed "under such terms and conditions as determined by the Secretary"). On its face, that language is capacious—leaving no "meaningful standard against which to judge the agency's exercise of discretion." *Lincoln*, 508 U.S. at 191; *see, e.g.*, *Schieber*, 77 F.4th at 814 (statute that merely requires Secretary to "determine the amounts due"

without directing him "to allocate funds in any particular way" vests unreviewable discretion); *see supra* I.B. At the very least, the discretion Congress granted the Secretary is sufficient to allow him to structure disaster payments to take account of the socially disadvantaged designation, which was initially codified by Congress and has been a longstanding element of USDA programs for decades. *See, e.g.*, 7 U.S.C. § 2279 (a)(1), (5), (6) (defining socially disadvantaged farmers as those belonging to groups that have been subject to racial or ethnic prejudice); 7 U.S.C. § 2003(e)(1), (2) (including gender as a category).

Plaintiffs also invoke the major questions doctrine, arguing that Congress had to explicitly authorize any distribution of benefits "based on race and sex." Pls.' MSJ at 18. But this Court correctly rejected that argument when considering Plaintiffs' preliminary injunction motion, and the same result is warranted now. *See* PI Order at 8-9. The major questions doctrine is reserved for "extraordinary cases" in which an agency asserts "an unheralded power representing a transformative expansion in [its] regulatory authority" by means of "a radical or fundamental change to a statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 722-25 (2022) (citation omitted); *see also Biden v. Nebraska*, 600 U.S. 477, 501-02 (2023) (agency exercised "never previously claimed powers"). Yet there is nothing novel or transformative about the agency using the socially disadvantaged designation when, as the Court observed, the agency has been using those designations across its programs for approximately 20 years. PI Order at 9. This case is far afield from cases where courts have determined that the agency is regulating "outside its wheelhouse," *Nebraska*, 600 U.S. at 518 (Barrett, J., concurring), or lacks "comparative expertise in making [the relevant] policy judgments," *West Virginia*, 597 U.S. at 729. And USDA's use of the longstanding socially-disadvantaged criteria on the basis of broad authorization is equally far removed from prior cases where the Supreme Court explained that an agency's interpretation gave it "virtually unlimited power to rewrite the" statute, *Nebraska*, 600 U.S. at 502, empowered it to "substantially restructure the American energy market," *West Virginia*, 597 U.S. at 724, or

19

identified "no limit" on measures "outside [its] reach," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764–65 (2021).

Plaintiffs cannot overcome these distinctions by observing that USDA previously used the socially disadvantaged category in the context of loans—rather than disaster relief—which was explicitly directed by Congress. Pls.' MSJ at 20. For one thing, Congress expressly included "socially disadvantaged farmer or rancher"—"as determined by the Secretary"— among those producers "eligible" to receive "[s]upplemental agricultural disaster assistance." 7 U.S.C. § 9081(a), (d). As a result, Plaintiffs cannot identify any "sweeping and unprecedented impact" from the Secretary's employing the "socially disadvantaged" category in disaster programs: to the contrary, Congress has expressly provided that the Secretary would do so in certain permanent disaster programs. *Nebraska*, 600 U.S. at 504. And, separately, Congress *kept* appropriating disaster relief under broad grants of discretion to the Secretary even after the Secretary made clear that he would employ the statutory designation in his aid calculations. There is therefore no reason to think that this is an "extraordinary" case where the agency seeks to "assert[] highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. Indeed, the legislative history all indicates otherwise.

Nor can Plaintiffs invoke the major questions doctrine by pointing to the President's Executive Orders announcing the administration's commitment to "advancing equity" in federal programs and otherwise asserting generally that any classification based on race and sex is of great political significance. *See* Pls.' MSJ at 18-20 (quoting Exec. Order 14091, 88 Fed. Reg. 10825 (Feb. 16, 2023)). Contrary to Plaintiffs' suggestions, the Supreme Court has never treated that doctrine as a free-floating license for courts to override statutory text merely because an agency's action may be politically consequential. *See Nebraska*, 600 U.S. at 504 (emphasizing presence of additional "indicators"). Nor has the Court ever created defined categories of action where it presumes that Congress must speak explicitly. *Contra* Pls.' MSJ at 19. To the contrary, the Court has often decided challenges to major policy decisions

20

without invoking the doctrine. *See, e.g., Biden v. Missouri*, 595 U.S. 87, 93 (2002); *Little Sisters*, 591 U.S. at 676-77.

Likewise, Plaintiffs' arguments about the supposed economic significance of USDA's use of the socially disadvantaged category are overstated. Pls.' MSJ at 23. While Plaintiffs focus on the hundreds of millions of dollars they calculate USDA distributed to "underserved producers," they neglect that the *additional* benefit those producers received *because* of their membership in the socially disadvantaged category is far smaller. *See, e.g.*, ECF No. 26 at 3 (noting that, by Plaintiffs' own calculation, "in most cases, the USDA denied Plaintiffs between 10 and 20 percent in [] payments" on account of the "socially disadvantaged" producer designation). And this modest additional amount pales in comparison to billions of dollars that Congress appropriated for disaster relief. *See, e.g.*, Pub. L. No. 117-328, 136 Stat. 5201 (providing $3.74 billion in disaster relief to remain available until expended). Plaintiffs are thus complaining about only a small portion of the total funds Congress allocated. While the Supreme Court has never established a threshold dollar figure above which the major questions doctrine is invoked, there is no reason to believe the modest benefits extended to socially disadvantaged farmers are sufficient. *See Nebraska*, 600 U.S. at 504 (analyzing various "indicators" of Congressional intent).

In short, the modest additional benefits afforded to socially disadvantaged farmers bear none of the indicia of agency action that implicates the major questions doctrine. The Court should therefore follow its prior conclusion that the doctrine does not apply.

> **B. USDA's use of the socially disadvantaged farmer designation to direct modest, incremental benefits to farmers based on their membership in groups that were subject to past and systemic discrimination satisfies strict scrutiny.**

Rejecting Plaintiffs' statutory challenge leaves only their equal protection claim. Defendants recognize that the Court previously concluded that Plaintiffs were likely to succeed on this challenge. *See* PI Order at 9-17. Defendants respectfully submit that a re-

evaluation of that conclusion is warranted.

Unlike progressive factoring, USDA's application of the "historically underserved" and "socially disadvantaged" designations in the challenged policies does consider race and sex, and so their use must satisfy strict scrutiny. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (citation omitted). The Supreme Court has cautioned that although the test for strict scrutiny is demanding, it should not be interpreted as "strict in theory, but fatal in fact." *Id*. at 237. (internal citation omitted). "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Id*.

Here, USDA has used the socially disadvantaged farmer designation to help remedy the lingering effects of its well-documented historical discriminatory practices in farm lending programs, which have prevented minority farmers from accessing credit and capital and competing equally in the market and, by extension, has made them less able to confront natural disasters and sustain farming operations, while also harming trust between minority farmers and the USDA. *See*, *e.g.*, AR 502, Dania Francis, Darrick Hamilton, Thomas Mitchell, Nathan Rosenberg, & Bryce Wilson Stucki. How the Government Helped White Americans Steal Black Farmland, New Republic, May 5, 2023, https://perma.cc/WQV6-NRYW. The Court should revisit its conclusions that minimizing past discrimination is not a compelling interest in this case and that the modest benefits extended to minority and women producers under the socially disadvantaged category are not narrowly tailored. PI Order at 12-17.

1.    *USDA has a compelling interest in minimizing and remediating the lingering effects of past discrimination.*

Remedying the effects of past discrimination constitutes a compelling governmental

22

interest.  *See W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 217 (5th Cir. 1999) (noting that the government may enact race-conscious remedies where the remedy is factually tied to a past injury); *c.f. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (Government "has a compelling interest in assuring that public dollars … do not serve … private prejudice.").  Such an interest exists where the government has a strong basis in evidence to conclude that race-based action is necessary to remedy the discrimination that has stunted the success of socially disadvantaged farmers.  *Croson*, 488 U.S. at 500.  Notably, however, courts do not require the government to "conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence[.]"  *H.B. Rowe Co. v. Tippett*, 615 F. 3d 233, 241 (4th Cir. 2010); *see also Midwest Fence Corp. v. U.S. DOT*, 840 F. 3d 932, 945 (7th Cir. 2016).  Rather, Defendants are permitted to provide either direct or circumstantial evidence to satisfy the strong basis in evidence standard.  *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999).

Here, a vast body of statistical and anecdotal evidence demonstrates historical discrimination against socially disadvantaged farmers in USDA programs, resulting in a decline in minority farm ownership, barriers to access of capital, and socially disadvantaged farmers receiving a disproportionately smaller share of USDA program funds.  *See supra* Factual Statement, *USDA's History of Discrimination*; *see also* AR 209; AR 340 (Statement of Rural Coalition, Committee on Agriculture (March 25, 2021)); AR 239 (describing barriers faced by Native American farmers).  This includes Congressional reports and studies, USDA's own commissioned studies, academic materials, and legal findings resulting from litigation, among other sources.  *See supra* Factual Statement, *USDA's History of Discrimination*; *see also* AR 209; AR 340 (Statement of Rural Coalition, Committee on Agriculture (March 25, 2021)); AR 239 (describing barriers faced by Native American farmers); AR 190-248 (A

Hearing to Review the State of Black Farmers in the United States Before the House Comm. On Agric., 117th Cong. (Mar. 21, 2021) (transcript)). "For years, the participation rates of socially disadvantaged farmers and ranchers (SDFRs) in [commodity, disaster, and other farm] programs have been minuscule, denying SDFRs billions of dollars of federal farm benefits and the opportunity to develop viable operations." AR 0123. This specific evidence, tied to USDA's own programs and practices, is far removed from "general claims of societal [] discrimination" that Plaintiffs suggest USDA is trying to remedy. Pls.' MSJ at 17. Rather, the evidence identifies the lingering effects of USDA's own lamentable history of discrimination—a history the agency is working hard to overcome. *See Croson*, 488 U.S. at 509 ("Nothing we say today precludes a [government] entity from taking action to rectify the effects of identified discrimination within its jurisdiction.").

But USDA's experience confirms that USDA has not been able to remediate these lingering effects with race-neutral criteria. Rather, when USDA uses race-neutral payment criteria in its *ad hoc* programs, those payments consistently fail to benefit minority farmers in proportion to their representation within the producer population. AR 514 ("In February, GAO reported that only 1.9% of all Market Facilitation Program payments went to minorities and women, despite minorities by race and ethnicity making up approximately 8% of the farmers and women being the principal operators of 30% of farms according to the Census of Agriculture. . . . Other major farm, disaster, and conservation programs often show similar disparities.") (footnote omitted). In this way, USDA's use of well-intentioned, logical, race-neutral criteria such as base acres and yields has been found to "compound[] the impact of previous discrimination and consignment to smaller and less productive parcels of land." *Id.* 0268. The use of the socially disadvantaged farmer designation thus helps USDA to structure

24

its programs in a manner that helps it to address these inequities and rebuild trust that was lost as a result of USDA's past history of discrimination. *See* House Agriculture Committee Holds Hearing on State of Black Farmers, AR 209 (Remarks by Rep. Costa, "Mr. Secretary, it's critical that you work to provide and rebuild trust with black and other socially disadvantaged farmers[.]").[2]

Notwithstanding USDA's efforts to rebuild trust and improve the equitable distribution of program benefits across all producers, these persistent gaps leave USDA vulnerable to allegations of widespread, on-going racial discrimination, which USDA vehemently denies. *See Pride v. USDA*, 1:23-cv-02292 (D.D.C.) (putative class action challenging disparities in the Market Facilitation Program, which was dismissed as moot, and USDA's direct farm loan program); *Provost v. USDA*, 1:24-cv-920 (D.D.C.) (putative class action challenging disparities in USDA's direct and guaranteed loan programs). USDA thus has a compelling interest in closing lingering gaps between minority and non-minority producers not only for its own sake—to address the lingering effects of discrimination and demonstrate USDA's commitment to the success of minority farmers—but also to eliminate alleged disparities that produce litigation. Conversely, rejecting USDA's compelling interest in addressing the lingering effects of past discrimination locks USDA in a position of perpetual vulnerability to disparate-impact litigation—including the defense of race-neutral programs—while simultaneously depriving it of the tools necessary to break these cycles for good.

---

[2] The fact that one study found that white farmers are at a greater financial risk than Hispanic farmers on some metrics does not undermine this strong foundation in the evidence. *See* PI Order at 13. Rather, this demonstrates the need for *other* USDA programming, including its designation for limited resources farmers.

2.    *Providing modest monetary benefits to socially disadvantaged farmers is narrowly tailored to that compelling interest.*

For similar reasons, "the means chosen to accomplish" USDA's compelling interest in remedying discrimination are "specifically and narrowly framed to accomplish that purpose." *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) (internal quotation marks and citation omitted); *see generally Croson*, 488 U.S. at 493 (plurality opinion) (narrow tailoring ensures that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype"); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 230 (2023). To assess narrow tailoring, courts consider: (1) the necessity for the relief and the efficacy of alternative remedies, (2) the flexibility and duration of the relief, (3) the relationship of the numerical goals to the relevant labor market (which is not relevant to the programs challenged here), and (4) the impact of the relief on third parties. *United States v. Paradise*, 480 U.S. 149, 171, 187 (1987) (Powell, J., concurring). All of these factors support USDA's use of the challenged classifications here.

*First*, the evidence in the record confirms that providing modest increases in payments to minority and women farmers is narrowly tailored to address USDA's compelling interest. As Plaintiffs recognize, in CFAP 2, USDA provided an additional 15% payment for underserved producers, in part based on race and sex in order to "support[] the equitable administration of FSA programs[.]" 88 Fed. Reg. at 1869 n.19 (cross-referencing n.11). The "extensive analysis" that Plaintiffs cite, Pls.' MSJ at 13, was conducted in 2022, before the 15% bump-up was added to the program in January 2023. *See* 88 Fed. Reg. at 1862, 1869 (January 11, 2023) ("FSA is issuing an additional CFAP 2 payment to underserved farmers and ranchers."). And although that study found that "CFAP payments were proportional to

the value of agricultural commodity sold for most minority producers," *id.* (citing AR 757), other gaps persisted—Black or African American only producers' "share of payment received did not increase." AR 758; 756-57 ("[MFP and CFAP] both paid .17% of total payments to Black or African American only producers.").

USDA's determination that race-based relief was necessary is underscored by the inefficacy of the neutral alternatives that Congress has repeatedly attempted. For example, over the course of the last 20 years Congress changed the role of county committees in USDA loan programs and enacted measures to achieve greater minority representation on those committees in 2002 and 2008, and yet testimony and reporting shows continuing disparities in the number, amounts, and servicing of USDA loans for minority farmers as compared to non-minority farmers. *See* Congressional Research Service (CRS), FSA Comms.: In Brief (Jan. 29, 2021) (FSA Comms.), available at https://perma.cc/HA3L-PDPG. Likewise, Congress created an Assistant Secretary of Civil Rights at USDA to attempt to address the agency's poor civil rights record; and yet subsequent testimony and reports showed continuing issues in processing civil rights complaints, House Ag. Comm. Hr'g on U.S. Ag. Policy and the 2012 Farm Bill (Apr. 21, 2010); House Ag. Comm. Hr'g on USDA Oversight 45, 50 (July 22, 2015). Before that, Congress created the 2501 Program to increase minority farmers' awareness of, and access to, USDA resources, and permanently funded the program in 2018; and yet recent reporting indicated that many minority farmers were still not aware of USDA resources, including recent pandemic relief, *see* 167 Cong. Rec. S1262 (Stabenow). Where, as here, Congress has tried for decades to use race-neutral means to remedy the lingering effects of past discrimination against minority farmers, the relative failure of those race-neutral efforts shows the necessity for race-conscious benefits programs. *See Fisher v. Univ. of Tex.*, 579 U.S.

365, 386 (2016) (race-conscious admissions program was narrowly tailored where university failed to achieve compelling interest after trying to do so for seven years via race-neutral means).

*Second*, in addition to being necessary, the challenged *ad hoc* disaster relief programs are both flexible and time-limited. Each program has different eligibility criteria and payment structures and uses the socially disadvantaged farmer designation in differing ways to provide modest additional benefits. Thus, the Emergency Livestock Relief Program applied a payment factor of 90% for historically underserved farmers compared to 75% for all other farmers, 87 Fed. Reg. 19465 (Apr. 4, 2022); ERP 2022 Track 1 added underserved producers' share of federal crop insurance administrative fees and premiums to their factored awards, 88 Fed. Reg. 74404. USDA's uses of the socially disadvantaged farmer designation (included within the definition of underserved producer) in its disaster relief programs are thus "flexib[le] in administration," *Fullilove v. Klutznick*, 448 U.S. 448, 460 (1980), and "temporary in application," *Paradise*, 480 U.S. at 178, thereby ensuring that the race-conscious measure endures no longer than necessary to serve its purposes. And despite socially disadvantaged farmers being given these modest benefits, Plaintiffs have not shown that minority farmers received an outsized portion of program funds, as one might expect if these race-based classifications were no longer necessary.

*Third*, USDA's provision of supplemental disaster relief to socially disadvantaged farmers does not impose an unacceptable burden on innocent third parties, namely white male farmers. White male farmers are eligible to participate in each of the challenged programs. Plaintiffs themselves received hundreds of thousands of dollars in disaster relief benefits under the challenged programs. Ducheneaux Decl., Part III. And they point to no evidence that

28

white male farmers are either competitively disadvantaged by USDA's additional assistance to socially disadvantaged farmers or that white farmers were historically denied equal treatment by USDA. *See generally supra* Part I. The use of temporary and comparatively small disaster relief to relieve the sizeable burden socially disadvantaged farmers have long borne does not burden Plaintiffs specifically or impose an impermissible burden on white male farmers, who continue to receive the vast majority of agricultural funding. *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 481 (1986) (finding 29.3% nonwhite union membership goal to remedy past discrimination had "only a marginal impact on the interests of white workers" where whites were "denied certain benefits available to their nonwhite counterparts" but still constituted "a majority of those entering the union").

Fourth and finally, USDA's use of the socially disadvantaged farmer designation to provide some additional benefits to minority and female farmers is neither over- nor under-inclusive. As explained, there is a large body of evidence that the minority groups included in USDA's definition of "socially disadvantaged groups" on Form CCC-860 have suffered from historic discrimination at the hands of USDA. USDA has defined socially disadvantaged groups to include racial and ethnic groups who have been shown to have been the victims of that discrimination since at least 2001. *See* 66 Fed. Reg. 21617-01 (Apr. 30, 2001) (interpreting 7 U.S.C. § 2279 to include those groups for purposes of Outreach and Assistance). And studies before and since then have recounted historical discrimination in federal programs against those socially disadvantaged groups, including by addressing a particular socially disadvantaged group, *see, e.g.*, GAO 19-464 (addressing Native Americans), or socially disadvantaged groups as a whole as defined by the USDA, *see, e.g.*, GAO 19-539 at 1. Studies also show that recent agricultural funding has gone disproportionately to those

who do not fall within USDA's definition of socially disadvantaged groups. *See* Jared Hayes, USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers, EWG (Feb. 18, 2021), https://perma.cc/PVZ7-QMFD.  Where particular racial and ethnic groups have historically suffered discrimination in USDA programs and been largely left out of relief efforts, Politico, '*Rampant issues': Black farmers are still left out at USDA* (July 5, 2021), AR 251-58, issuing enhanced disaster relief to those particular groups to ameliorate the effects of that discrimination and unequal funding is not over-inclusive.  *See Paradise*, 480 U.S. at 149. Indeed, the amount of enhanced relief USDA provided is consistent with what Congress has previously authorized, *see* 7 U.S.C. § 9081(a) and 7 U.S.C. § 9081(d)(4) (providing for a 90% reimbursement of losses for covered producers, defined by Congress to specifically include socially disadvantaged producers, in a program that otherwise provided reimbursement at approximately 75%), and reflects appropriate judgment about the measure of additional benefits that are necessary to remedy persistent effects of past discrimination.  *See* Ducheneaux Decl. ¶ 21.

Nor is the definition underinclusive because it excludes white male farmers who are not veterans, of limited resources, or beginning farmers.  As noted, the evidence does not show that white male farmers as a group have suffered the same history of discrimination as socially disadvantaged farmers or failed to receive recent funding.  Where Congress sought to remedy the lingering effects of historical discrimination and funding inequities unique to minority farmers, the definition of socially disadvantaged farmers is not under-inclusive because it does not include white farmers who generally have not suffered the same discrimination and unequal treatment.  *See Croson*, 488 U.S. at 506 (noting that if relief program was meant "to compensate black contractors for past discrimination, one might

30

legitimately ask why" remedial relief must be shared with those who were not shown to have been discriminated against). That is true even though some white farmers may also have smaller or less successful farms, or be "in danger of financial ruin," Pls.' MSJ at 15 (citing PI Order at 21)—this still does not show that they have smaller farms because of past race discrimination by USDA conduct, and it therefore does not establish that USDA is prohibited from giving additional help to those farmers who are especially vulnerable to natural disasters because of the lingering effects of USDA's past acts. Moreover, white male farmers with smaller or less successful farms who qualify as limited resource (as well as veterans and beginning farmers) may likewise qualify for benefits as underserved producers—a separate category that seeks to address a different set of important concerns.

In any event, USDA's presumption of social disadvantage in these programs for particular racial or ethnic groups is flexible; the list of those who may qualify for the presumption is not static. While the current categories derive from historical evidence, Plaintiffs have not shown that the statute or regulations limit the ability for USDA to reconsider the eligible categories based on updated evidence. Because the regulations require any presumption to be based in strong evidence, the statute is appropriately tailored. It is not overinclusive because it provides a remedy for groups only where historic discrimination has been shown through evidence. Nor is it under-inclusive because any group may seek approval from the Deputy Administrator for inclusion. *See*, *e.g.*, 87 Fed. Reg. 19465.

For each of these reasons, USDA's use of the socially disadvantaged farmer designation to provide modest benefits to minority farmers is not based on illegitimate racial prejudice, *SFFA*, 600 U.S. at 230, but rather consistent, evidence-based reflection on program results: without providing modest additional payments to minority producers, benefits will

predictably flow to white farmers in excess of their representation in the producer population. Depriving USDA of the tools to address lingering inequities in the distribution of disaster benefits will help perpetuate the lingering effects of effects of past discrimination in USDA's programs.

## III.    Any Remedy Must Be Narrowly Tailored to a Redressable Injury.

Setting aside the merits, Plaintiffs are not entitled to the kind of broad remedy they seek.  Their motion asks the Court to issue a declaratory judgment and an injunction against the use of "race and sex preferences in the challenged program" or in the future and vacate "the race and sex preferences and [] remand [] all eight challenged programs for USDA to consider how to" "correct the payments."  Pls.' MSJ at 33-34.  But Plaintiffs fail to justify that kind of relief.

Under Article III, a court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," and "a plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact.'"  *Gill v. Whitford*, 585 U.S. 48, 66, 72-73 (2018); *see also United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring in the judgment) ("[T]he 'judicial Power' [in U.S. Const. art. III, § 2] is the power to decide cases for parties, not questions for everyone." (cleaned up)).  Here, although Plaintiffs claim constitutional harms, they continue to characterize their injury as financial.  *See, e.g.*, Pls.' MSJ. at 34.  As their own brief explains, to "remedy the [challenged] race and sex preferences, USDA *must correct the payments* [it] made[.]"  *Id.* at 34.

Defendants have previously explained how that can be accomplished.  In opposing the preliminary injunction, Defendants explained that Plaintiffs' asserted monetary injuries can be remedied through "'adjusted benefit payments' for each of the applications they claim were improperly processed."  PI Opp. at 14-15 (quoting Ducheneaux Decl. ¶¶ 89-93).  All that is necessary for that to happen is a remand order directing the agency to recalculate Plaintiffs' payment amounts without the use of any classifications that the Court may find inappropriate.

*Id.* Notably, such a remand would also remedy any stigmatic injury—which this Court found to justify a preliminary injunction—because it would eliminate the differential treatment that Plaintiffs claim is unlawful. *See* PI Order at 19-20. Because Plaintiffs have not been wholly excluded from the programs they challenge and because funds to adjust their payments remain available, no broader relief is necessary. *See generally id.* at 15, 17-18 (explaining the distinction between these circumstances and other programs where money was not available to compensate plaintiffs).

A remand would likewise be appropriate if the Court were to conclude that the record does not support some aspect of USDA's funding decisions. Binding precedent dictates that if the Court finds that "the record before the agency does not support the agency's decision, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional explanation." *Aztec Gen. Agency*, 111 F.3d at 893 (citing, *inter alia, Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985), *Motor Vehicle Mfrs. Ass'ns of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 50-57 (1983)). In doing so, the Court should neither retain jurisdiction nor impose Plaintiffs' drastic 90-day timeline for compliance. Doing so "is typically reserved for cases alleging unreasonable delay of agency action or failure to comply with a statutory deadline, or for cases involving a history of agency noncompliance with court orders or resistance to fulfillment of legal duties"—none of which is true here. *Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 37, 41 (D.D.C. 2008) (citing caselaw).

Given the availability of a full and adequate remedy through a remand order, Plaintiffs cannot show that any additional relief is appropriate. Indeed, although Plaintiffs request a broad injunction, they do not even mention, much less attempt to satisfy, the traditional four-part test for obtaining that type of equitable remedy. *Compare* Pls.' MSJ at 33-34, *with*, *e.g.*, *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 502-09 (N.D. Tex. 2024) (conducting lengthy analysis of irreparable injury, balance of hardship, and public interest).

33

But it is "well-established that" an injunction is inappropriate if the Plaintiffs' claimed injury can "be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984)); *see also Janvey v. Alguire,* 647 F.3d 585, 600 (5th Cir. 2011) (irreparable harm justifying an injunction exists only "where there is no adequate remedy at law, such as monetary damages."). Plaintiffs bore the burden of demonstrating such an injury (along with the other factors) in their summary judgment motion and their failure to do so precludes injunctive relief. *See generally Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). And to the extent their motion suggests that the Court should enter an injunction against the use of "future race and sex preferences" *outside* of the specific programs they challenge—and in connection with which they have demonstrated cognizable injury—such a remedy would not only be inappropriate as a matter of equity but also contravene the Supreme Court's admonition that "federal courts [should] not issue advisory opinions about the law" nor "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378–79 (2024) (citation omitted).Plaintiffs' generalized request for vacatur of the challenged programs fails for similar reasons. Pls.' MSJ at 34. Nothing in the text of Section 706 expressly authorizes vacatur as a remedy. The APA itself does not reference vacatur, providing instead for more traditional equitable remedies like injunctions, 5 U.S.C. § 703. And there is little indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions," *id.* § 706(2); *see Texas*, 599 U.S. at 693 (Gorsuch, J., concurring) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action"). Further, the practice of nationwide vacatur "upset[s] the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring). Reading § 706(2) to authorize hundreds of individual district judges around the Nation to grant

nationwide relief in every APA case would perpetuate all of the well-catalogued problems with overbroad universal remedies. *See, e.g., Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 921-28 (2024) (Mem.) (Gorsuch, J., concurring).

Defendants recognize that binding precedent holds vacatur to be the "default rule" in this Circuit. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023). Even so, the very decisions Plaintiffs cite make clear that vacatur is not a mandatory remedy. *See, e.g., id.*; *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). Rather, recognizing that "'[a] plaintiff's remedy must be tailored to redress the plaintiffs' particular injury,'" the Fifth Circuit has instructed lower courts to consider whether "a more limited remedy" than universal vacatur is appropriate. *Cargill*, 57 F.4th at 472 (quoting *Gill*, 585 U.S. at 73). And here, Plaintiffs do not—and cannot—offer any persuasive argument why vacatur is necessary. As noted above, an increase of payments to Plaintiffs will remedy their asserted financial and (largely unasserted) stigmatic injury. Plaintiffs do not even attempt to explain what additional benefit vacatur would provide Plaintiffs themselves (as opposed to non-parties to this litigation)—or why it would be necessary to effectuate complete relief. *Id.* Indeed, vacatur would serve no such benefit. Plaintiffs have been directly affected by the challenged programs; accordingly, they have no argument that vacatur is necessary to forestall some "adverse downstream effects" that they may suffer from the rule's regulation of *someone else*. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2460 (2024) (Kavanaugh, J., concurring).

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and grant summary judgment in favor of the USDA.

Dated: November 14, 2024                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            LESLEY FARBY
                                            Assistant Branch Director

                                            /s/ Faith E. Lowry
                                            ALEXANDER V. SVERDLOV (NY Bar No.
                                            4918793)
                                            FAITH E. LOWRY (TX Bar No. 24099560)
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Tel: (202) 305-5581
                                            Email: faith.e.lowry@usdoj.gov

                                            *Counsel for Defendants*


## CERTIFICATE OF SERVICE

On November 14, 2024, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

                                            /s/ Faith E. Lowry
                                            FAITH E. LOWRY
                                            Trial Attorney
                                            U.S. Department of Justice