# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| THOMAS J. VILSACK, in his official | ) | |
| Capacity as Secretary of the United States | ) | |
| Department of Agriculture, | ) | |
| ZACH DUCHENEAUX, in his official | ) | |
| Capacity as Administrator of the Farm | ) | |
| Service Agency, and | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendants. | ) | |

---

**BRIEF OF AMICI CURIAE THE AMERICIAN INDIAN MOTHERS, INC.,
CONCERNED CITIZENS OF TILLERY, COTTAGE HOUSE INCORPORATION,
FARM AID, KANSAS BLACK FARMERS ASSOCIATION, LATINO FARMERS AND
RANCHERS INTERNATIONAL, NATIONAL SUSTAINABLE AGRICULTURE
COALITION, NATIONAL YOUNG FARMERS COALITION, NORTH CAROLINA
ASSOCIATION OF BLACK LAWYERS LAND LOSS PREVENTION PROJECT,
OKLAHOMA BLACK HISTORICAL RESEARCH PROJECT, INC., RURAL
ADVANCEMENT FUND OF THE NATIONAL SHARECROPPERS FUND, INC.,
RURAL COALITION,  AND WORLD FARMERS, INC., IN SUPPORT OF
DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................................. iii

**BRIEF STATEMENT OF AMICI CURIAE** ...................................................................... 1

**INTRODUCTION** ................................................................................................................ 1

**ARGUMENT** ....................................................................................................................... 3

I.    The Equal Protection Clause is not an appropriate vehicle for Plaintiffs' claims. ............. 3

A. Congress passed the Fourteenth Amendment to prohibit discrimination against freedmen and to permit the government to address past racial discrimination against Black (and subsequently, other non-white) people—not to protect the property interests of white people. ...................................................................................................................................... 3

B.    Plaintiffs are not similarly situated to socially disadvantaged farmers and ranchers for equal protection purposes because Plaintiffs are not part of a group that faced historical discrimination. ........................................................................................................................ 5

II.    Even if the Court finds that the SDFR designation discriminates based on race and sex, the SDFR designation passes the highest level of scrutiny because it is narrowly tailored to further the USDA's compelling interest in remedying past and ongoing discrmination against socially disadvantaged farmers and ranchers in USDA programs. ........................................... 10

A.    The SDFR designation serves a compelling government interest in remedying past discrimination in USDA programs. ...................................................................................... 11

1. *USDA admissions, federal adjudications, and an extensive collection of government reports demonstrate with particularity that the USDA's remedial SDFR designation furthers a compelling governmental interest* ................................................................. 12

2. *The SDFR designation serves a compelling governmental interest in remedying ongoing discrimination in USDA programs at the county level.* .................................. 15

3. *The statistical disparities between white and socially disadvantaged farmers and ranchers further demonstrate with particularity that the USDA's remedial SDFR designation furthers a compelling governmental interest.*............................................. 18

B.    The USDA's use of the SDFR designation in its disaster and pandemic relief programs is narrowly tailored because race-neutral policies have failed to remedy racial discrimination in these programs. ............................................................................................................ 19

III.    The permanent injunctive relief that Plaintiffs seek is overbroad. .............................. 22

**CONCLUSION** ....................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ..................................................................................................19, 21

*In re Black Farmers Discrimination Litig.,*
  No. 08-MC-0511 (D.D.C. Aug. 15, 2013) ...........................................................14

*Bowlby v. City of Aberdeen, Miss.,*
  681 F.3d 215 (5th Cir. 2012) ...................................................................................6

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ................................................................................................6

*Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia,*
  6 F.3d 990 (3d Cir. 1993) ......................................................................................18

*Craig v. Boren,*
  429 U.S. 190 (1976) ..............................................................................................10

*Dean v. City of Shreveport,* 438 F.3d 448 (5th Cir. 2006) ...............................................19

*Fisher v. Univ. of Tex. at Austin,*
  570 U.S. 297 (2013) ..............................................................................................20

*Franks v. Bowman Transp. Co.,*
  424 U.S. 747 (1976) ..............................................................................................20

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ..............................................................................................10

*Hines v. Quillivan,*
  982 F.3d 266 (5th Cir. 2020) ...................................................................................6

*Katzenbach v. Morgan,*
  384 U.S. 641 (1966) ................................................................................................4

*Keepseagle v. Vilsack,*
  No. 99-cv-3119 (D.D.C. Aug. 30, 2013) ...............................................................14

*Love v. Vilsack*,
    No. 00-cv-2502 (D.D.C. Apr. 12, 2016) ........................................................................14

*Miller v. Vilsack*,
    No. 4:21-CV-00595-O (N.D. Tex. Apr. 26, 2021) .......................................................19

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992) ...........................................................................................................6

*Pigford v. Glickman*,
    185 F.R.D. 82 (D.D.C. 1999) .......................................................................................17

*Pigford v. Vilsack*,
    No. 97-cv-1978, ECF No. 1812 (D.D.C. Apr. 1, 2012) ................................................14

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) .......................................................................................................5

*Richard v. Hinson*,
    70 F.3d 415 (5th Cir. 1995) ...........................................................................................2

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ......................................................................................................4, 5

*Scott v. Schedler*,
    826 F.3d 207 (5th Cir. 2016) ........................................................................................23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) .....................................................................................................10

*Trimble v. Gordon*,
    430 U.S. 762 (1977) (J. Rehnquist dissenting) .............................................................4

*United States v. Carolene Prod. Co.*,
    304 U.S. 144 (1938) .......................................................................................................4

*United States v. Paradise*,
    480 U.S. 149 (1987) .........................................................................................11, 15, 19

*United States v. Virginia*,
    518 U.S. 515 (1996) .....................................................................................................10

*W.H. Scott Const. v. City of Jackson, Miss.*
    199 F.3d 206 (5th Cir. 1999) ........................................................................................11

*Walker v. City of Mesquite*,
    169 F.3d 973 (5th Cir. 1999) ..........................................................................................9

*Wynn v. Vilsack*,
545 F.Supp.3d 1271 (M.D. Fla. 2021) ...................................................16

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................4

**Statutes**

7 U.S.C. § 2003 ...................................................................................11, 12

Agricultural Adjustment Act of 1933, Pub. L. 73-10, ch. 25, 48 Stat. 31 ....................16

Agricultural Credit Act of 1987, Pub. L. No. 100-233, § 355(d), 101 Stat. 1568,
1683 (1988) ...................................................................................11

Agricultural Credit Improvement Act of 1992, Pub. L. No. 102-554, § 21, 106
Stat. 4142, 4161 ...................................................................................11

Civil Rights Act of 1866, Act of April 9, 1866, ch. 31, 14 Stat. 27 ..............................5

Emergency Relief for Farmers of Color Act of 2021, S. 278, 177th Cong. § 2 ....................19

Indian Removal Act of 1830, Pub. L. 21-148, 4 Stat. 411 ........................................7

**Constitutional Provisions**

U.S. Const., amend. V ...................................................................1, 2, 5

U.S. Const., amend. XIV ................................................................. *passim*

**Regulations and Congressional Record**

7 C.F.R. §§ 7.23, 7.6 ...................................................................................16

100 Cong. Rec. S33582 (Dec. 2, 1987) ...................................................12

167 Cong. Rec. S1264 (Mar. 5, 2021) ...................................................21

167 Cong. Rec. S1265-66 (Feb. 26, 2021) ...................................................20

**Other Authorities**

*American Rescue Plan Socially Disadvantaged Farmer Debt Payments*,
Farmers.gov, https://www.farmers.gov/blog/american-rescue-plan-socially-
disadvantaged-farmer-debt-payments (Mar. 26, 2021) ........................................21

*Award Distribution*, USDA Discrimination Financial Assistance Program,
https://22007apply.gov/award-distribution.html (last visited Oct. 4, 2024) ....................15

*Beyond Forty Acres and a Mule: African American Landowning Families Since Reconstruction,* (Debra A. Reid and Evan P. Bennett, eds., 2012) ............................6

Civil Rights Action Team, *Civil Rights at the U.S. Dep't of Agric.* (1997) ..................................13

Mehrsa Baradaran, *The Color of Money: Black Banks and the Racial Wealth Gap* (2017), .........................................................................................................................8

County Committee Frequently Asked Questions for Stakeholders, USDA, https://www.fsa.usda.gov/sites/default/files/documents/fsa_coc_stakeholder_faqs_2023_web.pdf ................................................................................................16

Dania V. Francis et al., *Black Land Loss: 1920–1997* ..............................................................12

Eric Schnapper, *Affirmative Action and the Legislative History of the Fourteenth Amendment,* 71 Va. L. Rev. 753 (1985) ...........................................................................4

Claude F. Oubre, *Forty Acres and a Mule: The Freedman's Bureau and Black Land Ownership* (1978) ...................................................................................................7

H.R Rep. No. 101-984 (1990)............................................................................................14

*Hearing to Review the State of Black Farmers in the U.S. Before the H. Comm. on Agric.,* 117th............................................................................................................18

Jackson Lewis LLP Corp. Diversity Counseling Grp., *USDA Civil Rights Assessment* (2011)...........................................................................................................15

Joshua Ulan Galperin, *The Life of Administrative Democracy*, 108 Geo. L.J. 1213 (2020)...............................................................................................................................17

Rural Coalition, *Comments Regarding the Proposed Uniform Guidelines for Conducting Farm Service Agency Committee Elections* (2004)...............................17

U.S. Comm'n on Civil Rights, *Equal Opportunity in Farm Programs* (1965) .............................13

U.S. Comm'n on Civil Rights, *The Decline of Black Farming in America* (1982)......................13

Claudio Saunt, *Unworthy Republic: The Dispossession of Native Americans and the Road to Indian Territory* (W.W. Norton & Co., 2020), at 192-94, 309-10 ........................7

USDA Equity Comm'n, *Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All* (2024), https://www.usda.gov/sites/default/files/documents/usda-equity-commission-final-report.pdf ............................................................................................................17

USDA, *FSA Handbook, Coronavirus Food Assistance Program 2 for State and County Offices* (2021) https://www.fsa.usda.gov/Internet/FSA_File/3-cfap_r00_a08.pdf ...........................................................................................................16

**BRIEF STATEMENT OF AMICI CURIAE**

American Indian Mothers, Inc., Concerned Citizens of Tillery, Cottage House Incorporation, Farm Aid, Kansas Black Farmers Association, Latino Farmers and Ranchers International, Inc., National Sustainable Agriculture Coalition, National Young Farmers Coalition, North Carolina Association of Black Lawyers Land Loss Prevention Project, Oklahoma Black Historical Research Project, Inc., Rural Advancement Fund of the National Sharecroppers Fund, Inc., Rural Coalition, and World Farmers, Inc., file this amicus brief in support of Defendants' Combined Motion for Summary Judgment. Amici curiae are 13 farmers' organizations that work with, on behalf of, or represent socially disadvantaged farmers and ranchers who are eligible for emergency financial relief under the USDA's disaster and pandemic programs, and who would therefore be harmed should the Court grant the relief that Plaintiffs seek by permanently enjoining the USDA from enforcing or implementing any categories based on race or sex in the allocation of such relief.

**INTRODUCTION**

From 2020 to 2022, Congress approved a series of appropriations totaling $25 billion for the USDA to provide emergency disaster and pandemic relief to farmers and ranchers.[1] These congressional acts were racially neutral, and the USDA issued Notices of Funding Availability ("NOFAs") or regulations under each program, earmarking additional funds and benefits for

---

[1] *See* Compl., ECF No. 1 at ¶¶ 57–61.

farmers and ranchers who qualified as socially disadvantaged farmers and ranchers ("SDFR"),[2] a category designated by Congress in 1988.

Plaintiffs are white and predominantly male farmers who challenge the USDA's distribution of these additional disaster and pandemic relief funds and benefits to socially disadvantaged farmers and ranchers as discriminatory on the basis of race and sex under the Fifth Amendment's Equal Protection guarantee.[3] Plaintiffs' central grievance—that they cannot classify themselves as socially disadvantaged for the purpose of receiving the select USDA funds and benefits meant to assist groups that have historically faced race and sex discrimination by the USDA—would turn the Equal Protection inquiry on its head. Plaintiffs are ineligible to receive the limited funding and benefits that the USDA provides to socially disadvantaged farmers and ranchers through the challenged programs[4] for the simple reason that Plaintiffs are not part of a group that has experienced discrimination by the USDA on the basis of race or sex.[5] Their ineligibility for these remedial measures does not itself constitute illegal discrimination.

Plaintiffs ask this Court to ignore the history of the Equal Protection Clause and the purpose for which it was passed; to disregard the history of discrimination within the USDA that led the agency to create and implement remedial measures for socially disadvantaged farmers and ranchers; to ignore the ongoing systemic discrimination in the disbursement of USDA funding at

---

[2] *See id*. at ¶¶ 54–55 (List of NOFAs and regulations implementing the challenged programs and specifying the following groups as socially disadvantaged farmers and ranchers: American Indians or Alaskan Natives; Asians or Asian Americans; Blacks or African Americans; Hispanics or Hispanic Americans; Native Hawaiians or other Pacific Highlanders; and women).

[3] *See id.* at ¶¶ 263–282. Plaintiffs also challenge the USDA's use of progressive factoring, *see id*. ¶¶ 284–300, and amici adopt in full Defendants' response to those claims.

[4] *See id*. at ¶ 65 (list of disaster and pandemic relief programs challenged by Plaintiffs).

[5] *See id.* ¶¶ 249, 266, 277 (Plaintiffs claim that they are "disadvantaged" because they "received less money under the [USDA's] programs than a similarly situated farmer of a different" race or sex "would have.").

both the federal and local levels experienced by this category of producers; and to enjoin these programs through sweeping and overly broad injunctive relief. This Court should decline Plaintiffs' invitation and deny their Motion for Summary Judgment. The Court should instead apply settled law and grant Defendants' Motion for Summary Judgment.

## ARGUMENT

### I.    <u>The Equal Protection Clause is not an appropriate vehicle for Plaintiffs' claims.</u>

The Equal Protection Clause is not an appropriate vehicle for Plaintiffs to challenge measures designed specifically to remedy the USDA's well documented and acknowledged history of racial discrimination against socially disadvantaged farmers and ranchers for four primary reasons: 1) the Fourteenth Amendment[6] was passed to prohibit discrimination against freedmen and to permit the U.S. government to address racial discrimination against Black (and, subsequently, other non-white) people; 2) Plaintiffs, as white and predominantly male farmers, are not part of a group that has faced historic discrimination akin to socially disadvantaged farmers and ranchers and are not similarly situated; 3) the SDFR designation in the emergency relief programs is necessary to remedy ongoing race and sex discrimination in USDA programs; and 4) the USDA programs' use of the SDFR designation is narrowly tailored to achieve the USDA's compelling interest in remedying past and current racial discrimination in its programs.

> **A. Congress passed the Fourteenth Amendment to prohibit discrimination against freedmen and to permit the government to address past racial discrimination against Black (and subsequently, other non-white) people—not to protect the property interests of white people.**

---

[6] The Fifth Amendment commands that the Fourteenth Amendment's equal protection guarantee applies to federal actions. *See Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995) ("We employ the same test to evaluate alleged equal protection violations under the Fifth Amendment as we do under the Fourteenth Amendment.").

3

The Fourteenth Amendment was passed in 1866, the same year that President Andrew Johnson declared the formal end to the Civil War. The Equal Protection Clause thus "makes sense only in the context of a recently fought Civil War," and it must be understood to "sort[] the legislative distinctions which are acceptable from those which involve invidiously unequal treatment." *Trimble v. Gordon*, 430 U.S. 762, 779 (1977) (Rehnquist J., dissenting). "Since the Amendment grew out of the Civil War and the freeing of the slaves, the core prohibition was early held to be aimed at the protection of blacks," and "it followed logically that it should" protect "other races" that have faced historical hostility as well. *Id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

The Fourteenth Amendment contains two key equal protection provisions. Section 1 prohibits any government from denying any person equal protection of the laws,[7] while Section 5 grants Congress the "power to enforce, by appropriate legislation, the provisions of this article."[8] U.S. Const. amend. XIV, §§ 1, 5. These provisions encompass the dual purposes of the Equal Protection Clause: to prevent the continued oppression of racial minorities by the racial and political majority and to enable the government to compensate for or remedy racial oppression, past or present.

---

[7] Under Section 1, governments are prohibited from passing legislation that "operate[s] to the peculiar disadvantage of any suspect class," where a "suspect class" is one that is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).

[8] Section 5 "is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Katzenbach v. Morgan,* 384 U.S. 641, 651 (1966). The Thirty-ninth Congress that introduced and adopted the Fourteenth Amendment plainly intended Section 5 to be used as a mechanism to "ameliorat[e] the condition of the freedmen," or, more generally stated, to remediate racial discrimination through racially directed benefits. *See* Eric Schnapper, *Affirmative Action and the Legislative History of the Fourteenth Amendment*, 71 Va. L. Rev. 753, 785 (1985) (quoting Congressman Stevens, who introduced the Fourteenth Amendment in the House).

The Fourteenth Amendment's passage in 1866 must also be viewed in relation to other federal laws passed during the same decade to prevent and remedy discrimination by advancing the economic and social self-determination of freedmen through land acquisition and cultivation.[9] However, the Fourteenth Amendment was never intended to protect the land acquisition or property interests of white people because those interests needed no protection. Thus, Plaintiffs' invocation of the Equal Protection Clause for this purpose is misplaced. White people are not now, nor have they ever been in American history, a "discrete and insular minorit[y]" denied the protection of traditional "political processes." *See United States v. Carolene Prod. Co.*, 304 U.S. 144, 153 n.4 (1938). "Nor do whites as a class have any of the 'traditional indicia of suspectness: the class is not saddled with such disabilities or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 357 (1978) (Brennan, J., concurring in part and dissenting in part) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973)).

### B. Plaintiffs are not similarly situated to socially disadvantaged farmers and ranchers for equal protection purposes because Plaintiffs are not part of a group that faced historical discrimination.

Plaintiffs' claim also lacks merit because Plaintiffs are not similarly situated to socially disadvantaged farmers and ranchers. The Equal Protection Clause of the Fourteenth Amendment, as incorporated into the Fifth Amendment, requires the federal government to refrain from "deny[ing] to any person . . . the equal protection of the laws, which is essentially a direction that

---

[9] *See, e.g.,* Civil Rights Act of 1866, Act of April 9, 1866, ch. 31, 14 Stat. 27 (declaring, with the exception of Native American people, that all persons born in the U.S. "of every race and color," "without regard to any previous condition of slavery or involuntary servitude" were citizens and had the same right to, among other things, "inherit, purchase, lease, sell, hold, and convey real and personal property" as was enjoyed by white citizens).

all persons similarly situated should be treated alike." *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). "Being similarly situated is key." *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020). "The Equal Protection Clause does not forbid classifications," but rather "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

Plaintiffs and socially disadvantaged farmers and ranchers are not alike in all relevant respects and therefore need not be treated alike under the Equal Protection inquiry. Plaintiffs, who are white and predominantly male farmers, do not have a need for the USDA's remedy for historical discrimination. Plaintiffs assert that, "[i]f there were ever a time to enforce the promise of equality under the law, it is in response to natural disasters, which by their nature do not discriminate." Pls. MSJ, ECF No. at 8. Yet the same natural disaster would not impact Plaintiffs and socially disadvantaged farmers and ranchers equally because the groups, by virtue of their historically disparate access to land, resources, and funding, do not stand on equal footing today.

Since the USDA's creation in 1862, minority farmers and ranchers have not had access to the same resources, funding, and opportunities available to their white counterparts. The characterization of the USDA by Black farmers as the "Last Plantation" succinctly describes why Plaintiffs' challenge to the SDFR designation as white, male farmers is not rooted in history or fact.[10] Though Plaintiffs may nominally share the occupation of farming with socially disadvantaged farmers and ranchers, that is where their similarities end.[11]

---

[10] Beyond Forty Acres and A Mule: African American Landowning Families Since Reconstruction, (Debra A. Reid and Evan P. Bennett, eds., 2012) at 15, 272 (discussing the 1999 settlement of the *Pigford* class action lawsuit, alleging that the USDA discriminated against Black farmers).

[11] *See, e.g., Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 227 (5th Cir. 2012) (analyzing factors such as the type, size, and location of businesses to determine if they were similarly situated).

Historical disparities, beginning with unequal land acquisition, have created compounding and ongoing disparities that leave socially disadvantaged farmers and ranchers especially vulnerable to emergencies and disasters. Early on in this country's history, the federal government, states, and hostile private actors dictated where and how much land Black and Native American people could purchase and cultivate. Pursuant to the Indian Removal Act of 1830 and subsequent laws and policies, the U.S. government removed Native tribes and nations from their ancestral lands to lands west of the Mississippi River, further displacing other tribes and nations. Across the Deep South, white plantation owners sought to cultivate the fertile lands they took from tribes through the labor of enslaved Black people, and the U.S. government facilitated this agenda by exiling tribes to reservations—confined, federally established and controlled areas where the land was deemed less fertile and less desirable by white settlers.[12]

Land acquisition opportunities for freedmen after the 1863 Emancipation Proclamation were similarly limited, as many of the federal government's land ownership promises during Reconstruction were never realized or expressly rescinded.[13] Freedmen who sought to buy land for cultivation and subsistence were met with resistance by white landowners who often sold them

---

[12] *See, e.g.,* Claudio Saunt, Unworthy Republic: The Dispossession of Native Americans and the Road to Indian Territory (W.W. Norton & Co., 2020) at 192–94, 309–10 (discussing the displacement of Native tribes by white landowners in the South, who first exhausted the farmlands in Georgia and the Carolinas and then sought access to fertile lands in Mississippi and Alabama).

[13] *See, e.g.,* Claude F. Oubre, Forty Acres and A Mule: The Freedmen's Bureau and Black Land Ownership (La. State Univ. Press, 1978), at 31 ("The Freedmen's Bureau never controlled more than two-tenths of one percent of the land in the South and President Johnson's [1865] amnesty proclamation forced restoration of most of that land" to white plantation owners.).

only marginal, poor, or undeveloped lands;[14] increased the sales price of land;[15] or denied the sale of land outright.[16] Some freedmen moved west, where they had a better chance of obtaining Native lands seized and redistributed by the federal government.[17] Black families who managed to purchase land could face violence by hostile whites "for the new crime of landowning."[18] As a result of these obstacles, a majority of freedmen remained landless by the end of Reconstruction.[19]

The location of the lands Black and Native American people were permitted to own and cultivate determined basic conditions, such as the climate, the type of crops farmers could grow,[20] the animals that ranchers could raise, and the vulnerability of their subsistence farms and livelihoods to low yields, disease, and disasters.[21] As is still true today, even where crop cultures were shared by different racial groups, theoretically creating common work routines and a shared vulnerability to catastrophe, the crop cultures "reified various divisions of labor" based on sex,

---

[14] Reid & Bennett, *supra* note 10, at 47–48 (discussing the acquisition of "hard" land that was "not conducive to raising crops" and the overall problem of Black people acquiring "some of the poorest land when they amassed the resources to buy land at all").

[15] Reid & Bennett, *supra* note 10, at 26 (sale of land for $24.13 per acre for Blacks versus $15.28 for whites), 184 (sale of land for $10 to Blacks versus $2 for whites).

[16] *See* Mehrsa Baradaran, The Color of Money: Black Banks and the Racial Wealth Gap (2017), at 18 ("White southerners simply refused to sell land to blacks.").

[17] Reid & Bennett, *supra* note 10, at 165.

[18] Reid & Bennett, *supra* note 10, at 187 (discussing an episode in Vance County, North Carolina, where a Black farming family was killed, and their home burned down in 1915).

[19] *See* Baradaran, *supra* note 16, at 19. Many landless freedmen turned to sharecropping, an exploitative system wherein Black farmers bought supplies, tools, and access to white-owned land on credit and worked the debt off with crop yields. *See id.* at 33. The denial of land ownership still impacts the economic viability of Black tenant farmers today. *See, e.g.*, Marty Strange, Family Farming: A New Economic Vision 23–24, 46–49, 174–75 (1988).

[20] *See, e.g.,* Decl. Ricardo Burke, A-21–22, at ¶ 6 (the USDA recommended that he grow local crops).

[21] *See also* Decl. Don Stephens, A-14, at ¶¶ 15, 17 (ranch and animals vulnerable to disasters and disease); Decl. Phil Campbell, A-18, at ¶ 9 (crops and livestock vulnerable to disasters and disease).

class, age, skill, and race.[22] The profound and compounding effects of these location-specific conditions continue to disadvantage socially disadvantaged farmers and ranchers today, as the local conditions, in turn, determine critical aspects of these farmers' daily operations and longevity, such as whether they can obtain insurance for their crops and animals,[23] the size of their farms and ranches,[24] knowledge of and capacity to seek USDA funding opportunities,[25] and the type and amount of assistance they are eligible to receive from the USDA.

All these factors have the cumulative effect of favoring white, male farmers and ranchers like Plaintiffs, who have been able to purchase or inherit fertile and desirable land, grow more profitable and insurable crops, acquire, and maintain larger farms, and secure capital. Plaintiffs calculate their "injuries" in this case as the additional payments they would have received had they been of a race, ethnicity, or gender qualifying them for the SDFR designation.[26] Yet their calculations are erroneously based on the same acreages and revenues that they currently own as white farmers.[27] But if Plaintiffs were (for example) Black, they would be statistically likely to own substantially smaller farms with correspondingly smaller yields and to have lower revenues

---

[22] Reid & Bennett, *supra* note 10, at 12, 190 (discussing how, even among Black farmers, age, sex, and skill "could make life in the field different for various individuals").

[23] *See, e.g.,* Decl. Phil Campbell, A-18, at ¶ 9 (crops and livestock are not insured).

[24] Based on the 2017 Agricultural Census, the average size of a Black-owned farm is 132 acres—the lowest of any socially disadvantaged group—while the average size of a white-owned farm is 431 acres. *See* ECF No. 30-1 at 260 (Strickland AR 0255).

[25] *See, e.g.,* Decl. Barbara Shipman, A-12, at ¶ 27 (discussing disbursing information to Black farmers that she learns from white farmers); Decl. Ricardo Burke, A-25, at ¶¶ 42–44.

[26] *See* Compl., ECF No. 1, at 245.

[27] *See* ECF No. 21 at 40 (ERP Phase 2 uses gross revenues to approximate losses; ELRP Phase I uses grazing acreage and number of animal products to calculate losses; PARP uses benchmark gross revenues to calculate losses); *see also* 7 C.F.R. § 9.203 (CFAP 2 uses crop acreage to calculate payments).

and less access to funding, including through the USDA's own disaster and pandemic programs.[28] Because of these systemic and historical disparities, and their corresponding inequitable results, Plaintiffs are not similarly situated to socially disadvantaged farmers and ranchers and do not require the remedial USDA assistance that socially disadvantaged farmers and ranchers need to achieve equal footing. Plaintiffs' Equal Protection claim is therefore misplaced.

**II.    Even if the Court finds that the SDFR designation discriminates based on race and sex, the SDFR designation passes the highest level of scrutiny because it is narrowly tailored to further the USDA's compelling interest in remedying past and ongoing discrimination against socially disadvantaged farmers and ranchers in USDA programs.**

Government action that employs race classifications is subject to strict scrutiny,[29] "[b]ut not all such uses are invalidated by strict scrutiny." *Grutter v. Bollinger*, 539 U.S. 306, 308 (2003). To withstand strict scrutiny, the challenged race-based government action must undergo "a daunting two-step examination." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). The first consideration is whether the government's use of racial classification is used to "further compelling governmental interests." *Bollinger*, 539 U.S. at 326. If so, courts must determine "whether the government's use of race is 'narrowly tailored,'—meaning 'necessary'—to achieve that interest." *Students for Fair Admissions*, 600 U.S. at 207. For

---

[28] Overwhelmingly, non-socially disadvantaged farmers and ranchers fared better than socially disadvantaged farmers and ranchers with respect to median farm net worth ($464,414 to $298,252); median acres owned (67 to 27); median total value of production ($7,140 to $2,625); and median farm assets ($510,000 to $313,499). ECF No. 30-1 at 255 (Strickland AR 0250).

[29] Courts analyze Fourteenth Amendment claims of sex discrimination under intermediate scrutiny, *see Craig v. Boren*, 429 U.S. 190, 197 (1976), asking whether classifications based on sex serve an important governmental interest and are substantially related to achieving that interest, *see United States v. Virginia*, 518 U.S. 515, 533 (1996). The USDA's SDFR designation serves an important government interest in promoting the economic development and advancement of farmers and ranchers who are women and is substantially related to achieving that interest. *See id.* at 533–34 (discussing permissible uses of sex classifications, including "compensat[ing] women for particular economic disabilities [they have] suffered").

the reasons described below, the SDFR designation withstands strict scrutiny as a narrowly tailored remedy for a longstanding and well-documented history of USDA discrimination against socially disadvantaged farmers and ranchers.

### A. The SDFR designation serves a compelling government interest in remedying past discrimination in USDA programs.

"The Government unquestionably has a compelling interest in remedying past and present discrimination by a state actor," *United States v. Paradise*, 480 U.S. 149, 167 (1987), on the basis of race, *see W.H. Scott Const. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 217 (5th Cir. 1999). The government can enact a race-conscious program where 1) it has "actively discriminated" in the past or been a "passive participant in a system of racial exclusion," and 2) can "identif[y] that discrimination with the particularity required by the Fourteenth Amendment…so that there is a strong basis in evidence for its conclusion that remedial action was necessary." *W.H. Scott Const. Co.*, 199 F.3d at 217 (internal citations and quotation marks omitted).

The SDFR designation exists solely in response to the USDA's active participation in and admission of past discrimination. Congress first defined "socially disadvantaged group"—the basis of the SDFR term—in the Agricultural Credit Act of 1987,[30] in an effort to address past discrimination by the U.S. government[31] against any "group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity." 7 U.S.C. § 2003(e)(1).[32] In support, the author of the Act specifically cited disparities in USDA funding, explaining that "socially

---

[30] Agricultural Credit Act of 1987, Pub. L. No. 100-233, § 355(d), 101 Stat. 1568, 1683 (1988).

[31] The single greatest cause of the decline of Black farmers is directly attributable to the creation of the modern agricultural system as part of the New Deal. *See* ECF No. 30-1 at 506 (Strickland AR 0501).

[32] Congress inserted "or gender" in the Agricultural Credit Improvement Act of 1992, Pub. L. No. 102-554, § 21, 106 Stat. 4142, 4161.

11

disadvantaged producers are receiving far less [USDA loans] than they should in many areas."[33] The Act directed the USDA 1) to establish target participation rates that ensure socially disadvantaged farmers receive USDA loans to purchase or lease farmland, 2) to reserve sufficient funds for the loans, and 3) to allocate those loan funds on the basis of the proportion of socially disadvantaged farmers and the amount of available farmland in each county.[34] The purpose of the Act was to remedy decades of deliberate discrimination against these farmers that caused hundreds of billions of dollars in economic losses.[35] The USDA's use of the SDFR designation in the challenged disaster and pandemic relief programs serves the agency's compelling interest of remedying its well-documented historical discrimination against socially disadvantaged farmers and ranchers and ongoing discrimination in the disbursal of USDA funding at the county level, which are corroborated by statistical and anecdotal data.

1. *USDA admissions, federal adjudications, and an extensive collection of government reports demonstrate with particularity that the USDA's remedial SDFR designation furthers a compelling governmental interest.*

The USDA readily admits to its historic discrimination, which has resulted in "a decline in minority farm ownership, barriers to access to capital, and socially disadvantaged farmers and ranchers receiving a disproportionately smaller share of USDA program funds."[36] Formal government findings of USDA discrimination go back as far as 1965, when the U.S. Commission on Civil Rights found "unmistakable evidence that racial discrimination [by the USDA] has served

---

[33] 100 Cong. Rec. S33582 (daily ed. Dec. 2, 1987).

[34] 7 U.S.C. § 2003(a) & (b).

[35] *See, e.g.*, Dania V. Francis et al., *Black Land Loss: 1920–1997*, AEA Papers and Proceedings, 112:38–42 (May 2022).

[36] *See* Defs.' Opp'n to Pls.' Mot. For Prelim. Inj., ECF No. 21 at 39.

to accelerate the displacement and impoverishment of [Black farmers]."[37] The Commission specifically concluded that the USDA was "perpetuat[ing] . . . a double standard" against Black farmers, including "inferior" Cooperative Extension services, "little service at all" from the Soil Conservation Service, and only "subsistence loans," which denied Black farmers the same level of capital given to white farmers.[38]

Nearly two decades later, the U.S. Commission on Civil Rights found no evidence that anything had changed. In a 1982 report, the Commission reported that the USDA's lending arm—the Farmers Home Administration ("FmHA"), today known as Farm Service Agency ("FSA")—had a "reputation for discriminatory lending," that internal guidelines for enforcing the Equal Credit Opportunity Act were "simply nonexistent," and that nondiscrimination compliance reviews were "worthless[]."[39] The USDA investigated few of the thousands of discrimination complaints it received, but one investigation found glaring discrepancies for Black farmers, including lower real estate appraisals of farmland, longer waiting periods between application submissions and loan approval, a lack of deferred loan payment schedules, loans conditioned on the voluntary liquidation of farmland in case of default, and disparities in the number and amount of economic emergency loans granted.[40]

By 1990, the USDA's discrimination against socially disadvantaged farmers and ranchers was so well-documented that a Congressional House Committee reported that the FmHA had

---

[37] U.S. Comm'n on Civil Rights, *Equal Opportunity in Farm Programs* 99 (1965); *see also* U.S. Comm'n on Civil Rights, *The Decline of Black Farming in America* 35–38 (1982) (describing discrimination against Black farmers beginning in 1930s by U.S. Farm Security Administration, which later became the Farmers Home Administration and, ultimately, the FSA).

[38] *Equal Opportunity in Farm Programs* at 100.

[39] *The Decline of Black Farming in America* at 63, 148, 150.

[40] *See id.* at 173.

"categorically and systematically denied minority farmers access and full participation in the multitude of Federal Government programs designed to assist them," and that there was "clear and convincing evidence that" the FmHA's policies were "directly responsible for the loss of land and resources these farmers have experienced."[41] A 1997 USDA report further found that the problem was not limited to Black farmers; it concluded that USDA discrimination "continues to exist to a large degree unabated," against American Indian, Hispanic, Asian-Pacific American, and female farmers.[42] These findings were confirmed in a series of class-action lawsuits brought by Black, American Indian, Hispanic, and female farmers from 1997 to the mid-2010s.[43] Neutral adjudicators in those matters found that approximately 40,200 farmers had adequately substantiated USDA discrimination against them, and consequently awarded $2.67 billion in settlement payouts—a small fraction of the estimated total losses historically suffered by socially disadvantaged farmers and ranchers.[44]

In 2011, a USDA-commissioned multi-year assessment "substantiated . . . wide-spread discrimination" by the USDA against socially disadvantaged groups, resulting in "unfair treatment

---

[41] H.R. Rep. No. 101-984, at § XI (1990) (describing the FmHA as a "catalyst in the decline of minority farming"); *see also id.* at § IV (enumerating seven ways USDA had found that its Arkansas FmHA was discriminating against Black farmers).

[42] Civil Rights Action Team, *Civil Rights at the U.S. Department of Agriculture* 2–4, 6–8 (1997) (basing conclusions on testimony of hundreds of minority farmers and USDA employees).

[43] *See, e.g.,* Pls.' Status Report, *Keepseagle v. Vilsack*, No. 99-cv-3119, ECF No. 646 at 5 n.3 (D.D.C. Aug. 30, 2013).

[44] *See* Monitor's Final Report, *Pigford v. Vilsack*, No. 97-cv-1978, ECF No. 1812 at 7 (D.D.C. Apr. 1, 2012); Preliminary Final Accounting – Corrected, *In re Black Farmers Discrimination Litigation*, No. 8-mc-511, ECF. No. 378-1 at 4 (D.D.C. Aug. 15, 2013); Pls.' Status Report, *Keepseagle v. Vilsack*, No. 99-cv-3119, ECF No. 646 at 2–3 (D.D.C. Aug. 30, 2013); USDA's Status Report, *Love v. Vilsack*, No. 00-cv-2502, ECF No. 266-1 at 39 (D.D.C. Apr. 12, 2016).

and denial of program access which have had a broad and longstanding negative impact."[45] And as recently as August 2024, the USDA distributed almost $2 billion to 43,244 farmers who adequately substantiated USDA discrimination on the basis of race, ethnicity, gender, or other protected classes at any time before January 1, 2021.[46]

    The USDA's employment of the SDFR designation in disaster and pandemic relief programs are among the agency's latest attempts to correct for its past discrimination against socially disadvantaged farmers and ranchers. The USDA's interest in awarding disaster and pandemic relief to socially disadvantaged farmers and ranchers is remedial and compelling.

       2. *The SDFR designation serves a compelling governmental interest in remedying ongoing discrimination in USDA programs at the county level.*

    While there is no clearly articulated difference in the evidentiary burden required to show a compelling interest in remedying "past" versus "present" discrimination, *see Paradise*, 480 U.S. at 166, evidence of recent discrimination is particularly strong evidence that a "gross" racial imbalance or statistical disparity is the product of a pattern and practice of discrimination justifying remedial efforts.[47] In its briefing, USDA admits that discrimination against socially disadvantaged farmers and ranchers remains an ongoing issue.[48]

---

[45] Jackson Lewis LLP Corp. Diversity Counseling Grp., *USDA Civil Rights Assessment* ix (2011); *see also id.* at viii (concluding that "significant numbers of USDA employees do not accept eradication of barriers to equal access or Agency discrimination as enforceable and important").

[46]   *Award Distribution*, USDA Discrimination Financial Assistance Program, https://22007apply.gov/award-distribution.html (last visited Oct. 4, 2024).

[47] *See, e.g., Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1279 (M.D. Fla. 2021) ("[E]vidence of continued discrimination" may be "crucial" for the "Government to show that additional remedial action is warranted" and that "prior remedial measures failed to adequately remedy the harm caused by USDA's past discrimination[.]" (internal quotation marks omitted)).

[48] *See* ECF No. 38 at 16 ("USDA continues to receive anecdotal reports of discrimination against minority farms, and to see gaps in the distribution of program funds"); *id.* (referencing letter from agriculture experts explaining that federal farm programs have "perpetuated and

USDA FSA county committees are a clear example of how discrimination by the USDA against socially disadvantaged farmers and ranchers continues to this day. These county committees are local elected bodies of 3-11 local farmers first established by the Agricultural Adjustment Act of 1933 to allow "grassroots input and local administration" of agricultural programs.[49] The duties of a county committee include, but are not limited to, conducting outreach and sharing information about USDA relief programs to socially disadvantaged farmers and ranchers, and reviewing and approving documents related to those programs.[50] For example, with the Coronavirus Food Assistance Program 2 ("CFAP 2"), county committees played an integral role in determining eligibility for the program and various decisions that directly affected a farmer's ability to use the program on a fair and equal basis.[51]

Since their creation, FSA county committees have discriminated against socially disadvantaged farmers and ranchers and excluded them as voters and committee members.[52] The USDA's own Equity Commission reported that FSA county committees, "by and large, were

---

exacerbated" discrimination by preferring crops typically produced by white farmers and rewarding the largest farms typically owned by white farmers")

[49] *See* County Committee Frequently Asked Questions for Stakeholders, USDA (June 2023), https://www.fsa.usda.gov/sites/default/files/documents/fsa_coc_stakeholder_faqs_2023_web.pdf; 7 C.F.R. § 7.6.

[50] *See* 7 C.F.R. § 7.23(b).

[51] *See* USDA, *FSA Handbook: Coronavirus Food Assistance Program 2*, at 1-8 (2021), https://www.fsa.usda.gov/Internet/FSA_File/3-cfap_r00_a08.pdf (listing county committee responsibilities, including to "review, approve, and disapprove CFAP 2 applications," "handle appeals," and "ensure that the County Office publicizes CFAP 2 provisions").

[52] *See Pigford v. Glickman*, 185 F.R.D. 82, 104 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000) ("There does not appear to be much dispute that … the county committees discriminated against African American farmers for decades in evaluating their applications for farm credit and benefits.); Joshua Ulan Galperin, *The Life of Administrative Democracy*, 108 Geo. L.J. 1213, 1240–41 (2020).

composed of white farmers who had little to no interest in supporting Black farmers[]"[53] and that such discrimination continues into the present.

In its 2024 report, the Commission concluded that "[e]quitable representation of minorities on these influential committees that control access/eligibility to a number of USDA programs is a struggle that continues in 2024," and that the committees' misuse of their powers has "crippled the economic livelihood of minority farmers and ranchers."[54] In short, committees still function as an "old boys network" composed of virtually all white farmers.[55] This culture of brazen discrimination permeates many FSA county offices, which are "often the first and only point of contact for farmers seeking access to government assistance programs."[56] Yet, they exert significant power in a variety of areas, including in administering loans and the USDA emergency relief programs at issue.[57]

Anecdotal evidence[58] demonstrates that socially disadvantaged farmers and ranchers continue to face racist behavior from FSA staff and committee members. Some have experienced longer wait times, mishandled paperwork, a lack of information about protocols, and failure to provide Receipts for Service, hindering farmers from following up on requests.[59] Phil Campbell,

---

[53] USDA Equity Comm'n, *Final Report: Recommendations Made to the U.S. Department of Agriculture to Advance Equity for All*, at 14 (2024), https://www.usda.gov/sites/default/files/documents/usda-equity-commission-final-report.pdf.

[54] *Id*. at 14, 37.

[55] Rural Coalition, *Comments Regarding the Proposed Uniform Guidelines for Conducting Farm Service Agency Committee Elections*, at 3 (2004).

[56] ECF No. 30-1 at 259 (Strickland AR 0254).

[57] *See id.*

[58] *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1003 (3d Cir. 1993) (a "combination of anecdotal and statistical evidence is potent*.*").

[59] *See, e.g.*, Decl. Ricardo Burke, A-22–23, 25–26, at ¶¶ 8–14, 19–21, 23–26, 37–48 (FSA staff denied Black farmer loan application without asking for any information, gave the wrong

a Black farmer and rancher from Oklahoma, has experienced issues accessing information about programs from local FSA officials, stating: "I never have interactions with my FSA committee as the committee members do not invite Black farmers to places where we can learn about resources, nor do committee members attend any Black farmer and rancher events."[60] Nathaniel Bradford, also a Black farmer in Oklahoma, attempted to participate in CFAP, but he and other Black farmers were subjected to extra processes and scrutiny that white farmers were not forced to endure, which he attributed to FSA county committees.[61]

      3.   *The statistical disparities between white and socially disadvantaged farmers and ranchers further demonstrate with particularity that the USDA's remedial SDFR designation furthers a compelling governmental interest.*

There is ample statistical data corroborating that the USDA's acknowledged history of discrimination has resulted in racial disparities among farmers and ranchers. "There is no doubt that . . . gross statistical disparities . . . alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination." *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) (quoting *Croson*, 488 U.S. at 501).

Nationwide, farm ownership by members of a socially disadvantaged group fell from 14.7% in 1920 to only 4.3% in 2017.[62] This disparity is magnified for Black farmers, whose

---

paperwork, prioritized white farmers when waiting in line, requested duplicate documents, failed to provide Receipts of Service, and did not inform about funding opportunities); Decl. Alfonso A. Abeyta, ECF No. 30-1 at 321 (Strickland AR 0316) (FSA staff referred to loan servicing request as: 'trash in – trash out.'").

[60] *See* Decl. Phil Campbell, A-20, at ¶ 22.

[61] ECF No. 30-1 at 304 (Strickland AR 0299).

[62] *Miller v. Vilsack*, No. 4:21-CV-00595-O (N.D. Tex. Apr. 26, 2021), ECF No. 168-2, at 22 (Robb Report at 18).

representation over the last century fell from 14% to less than 2% of all farmers,[63] and who were dispossessed of an astonishing 90% of their land.[64] Based on historical data from 1920 to 1997, it is estimated that Black families lost wealth and income from land totaling approximately $326 billion.[65]

**B. The USDA's use of the SDFR designation in its disaster and pandemic relief programs is narrowly tailored because race-neutral policies have failed to remedy racial discrimination in these programs.**

"When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test . . . [.]" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995); *see also Walker v. City of Mesquite*, 169 F.3d 973, 986 (5th Cir. 1999) (race-conscious remedy is justified if it is the only effective means by which to remedy the effects of past discrimination). When reviewing a race-conscious remedy to ensure that it is narrowly tailored, courts consider: 1) the necessity of the particular relief and the efficacy of alternative remedies; 2) the flexibility and duration of the relief; 3) the relationship of the numerical goals to the relevant labor market (not relevant here); and 4) the impact of the relief on the rights of third parties. *Paradise,* 480 U.S. at 171, 187. Whether race-based state action is narrowly tailored depends on the facts and circumstances of a particular case.[66] However, the government does not need to consider or try every conceivable race-neutral alternative if it undertakes a "serious, good faith consideration of workable race-neutral alternatives" and finds that those

---

[63] *See* Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong. § 2 ¶ 5(A)–(C) (2021).

[64] ECF No. 30-1 at 503 (Strickland AR 498).

[65] *Id*. at 504 (Strickland AR 0499).

[66] *See*, *e.g.*, *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (in workplace discrimination cases, courts can ask whether a race-based benefit makes members of the discriminated class whole).

"available, workable race-neutral alternatives do not suffice." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 313 (2013).

The SDFR designation is a narrowly tailored remedy to address the failure of the USDA's race-neutral policies, compounded by the agency's history of racial discrimination at the federal level and ongoing discrimination at the county level. The challenged programs utilize acreage, insurance coverage, and production revenues—race-neutral metrics on which evidence shows that minority farmers fall behind as a consequence of USDA's past conduct—to measure losses and deliver relief funds.[67] Indeed, race-neutral factors compound race and sex discrimination because they privilege white, male farmers due to their comparative advantages in a discriminatory system.[68]

The USDA's distribution of pandemic relief is illustrative. The Congressional record shows that due to the persistent effects of longstanding discrimination against minority farmers, "Black farmers and other farmers of color were in a far more precarious financial situation before the COVID-19 pandemic hit," and a year into the pandemic, some "ha[d] simply not been able to weather the storm."[69] Senator Debbie Stabenow explained that "[t]he diminished relationships between minority farmers and USDA as a result of both latent barriers and historic discrimination limit[ed]" socially disadvantaged farmers' and ranchers' access to, and participation in, USDA programs, such that "73 percent of Black farmers … were not even aware of the agricultural aid provisions of the[se] coronavirus rescue programs."[70]

---

[67] *See supra* note 27.

[68] *See* Decl. Don Stephens, A-15, at ¶ 27 (noting that white farmers have better access to USDA information and funding).

[69] *See* 167 Cong. Rec. S1265-66 (Feb. 26, 2021) (Booker).

[70] *See* 167 Cong. Rec. S.1264 (Mar. 5, 2021) (Stabenow).

The FSA Administrator publicly referenced the USDA's "systemic discrimination with cumulative effects" as having robbed minority farmers of land and "contributed to a cycle of debt that was exacerbated during the COVID-19 pandemic."[71] However, the vast majority of agricultural subsidies and pandemic relief went to non-minority farmers. Nearly 97% of the $9.2 billion appropriated through CFAP went to white farmers,[72] even though socially disadvantaged farmers comprise 17% of operations, and only 9% when gender is excluded from the definition.[73] The average white farmer received $3,398 in CFAP relief, and the average Black farmer received only $422.[74]

This statistical evidence and the record show the failure of race-neutral policies in USDA's pandemic relief such that the agency had a compelling interest in remedying these racial disparities. The 15% additional payment to socially disadvantaged farmers and ranchers under CFAP 2 is good example of a narrowly tailored remedy to address this compelling interest because it is a relatively modest amount and limited to the scope and duration of CFAP 2.[75] And this targeted remedy does not impose an unacceptable burden on Plaintiffs. For example, Rusty Strickland who received $220,331.45 in total payments under the challenged programs, including

---

[71] Zach Ducheneaux, *American Rescue Plan Socially Disadvantaged Farmer Debt Payments*, https://www.farmers.gov/blog/american-rescue-plan-socially-disadvantaged-farmer-debt-payments (Mar. 26, 2021).

[72] ECF No. 30-1 at 304 (Strickland AR 299), citing Jared Hayes, USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers, Environmental Working Group (Feb. 18, 2021), https://www.ewg.org/news-insights/news/2021/02/usda-data-nearly-all-pandemic-bailout-funds-went-white-farmers.

[73] ECF No. 30-2 at 7 (Strickland AR 564) (citing the 2017 Census of Agriculture).

[74] ECF No. 30-1 at 308 (Strickland AR 303); *see also* Decl. Barbara Shipman, A-11, at ¶ 18 (Black farmer whose CFAP application was denied even though she was eligible).

[75] *See Adarand Constructors*, 515 U.S. at 237-38 (lower court failed to address the question of narrow tailoring by asking whether the program was appropriately limited such that it would "not last longer than the discriminatory effects it is designed to eliminate[.]" (internal citations omitted).

$59,459 in CFAP 2 payments alone, has failed to show that his operations were burdened in any way by not receiving the so-called "bonus" CFAP 2 payment of $8,919, which represents just 4% of Mr. Strickland's total payments under the challenged programs.[76] By contrast (albeit in a different challenged program), Mr. Phil Campbell who is Black only received $500.00 through Emergency Livestock Relief Program ("ELRP"), which did not even cover the cost of hay.[77] Based on his 40 acres, he expected to receive at least $5,000.00 to cover hay *and* transportation costs.[78]

Because the SDFR designation is narrowly tailored to further the USDA's compelling interest in remedying its historical discrimination against socially disadvantaged farmers and ranchers and ongoing discrimination at the county level, the SDFR designation withstands strict scrutiny. Plaintiffs' Equal Protection Claim therefore lacks merit.

### III.    The permanent injunctive relief Plaintiffs seek is overbroad.

Plaintiffs' request to "enjoin[] Defendants from enforcing or implementing any race or sex preferences" asks the Court to speculate about whether the USDA's use of the SDFR designation or similar categories beyond the specific disaster and pandemic relief programs challenged through this lawsuit would be constitutional and authorized by Congress.[79] This case does not present the relevant facts necessary for this Court to conduct such a sweeping analysis of the constitutionality of other speculative uses of the SDFR designation or similar designations. Although this Court should not grant Plaintiffs a permanent injunction for the reasons explained by USDA, *see* Defs.' Mot. Sum. Judg., ECF No. 38 at 41-44, to the extent the Court entertains any permanent injunction,

---

[76] *See* Decl. Ducheneaux, ECF No. 21-1, at ¶ 73 (USDA payments to Strickland under challenged programs).

[77] *See* Decl. Phil Campbell, A-18, at ¶ 12–13.

[78] *Id.* at ¶¶ 13.

[79] Compl., ECF No. 1 at ¶ 46.

it should mirror the Court's preliminary injunctive relief[80] and be similarly limited to FSA's Emergency Relief Program 2022. *See Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (injunction "is overbroad if it is not narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order") (internal citation and quotation marks omitted)).

## CONCLUSION

The USDA's employment of the SDFR designation created by Congress in its disaster and pandemic relief programs is narrowly tailored to serve the agency's compelling interest in remedying its persistent and ongoing discrimination against socially disadvantaged farmers and ranchers since the agency was established in 1862. For these reasons, amici curiae respectfully urge this Court to deny Plaintiffs' Motion for Summary Judgment and request for sweeping injunctive relief; to grant Defendants' Motion for Summary Judgment; and to permit the USDA to continue providing emergency disaster and pandemic financial assistance to the socially disadvantaged farmers and ranchers who rely on it to overcome the cumulative impacts of over a century and a half of systemic discrimination that Plaintiffs simply did not and do not face.

---

[80] Mem. Op. and Order, ECF No. 26 at 22.

DATE: November 22, 2024        Respectfully submitted,

_____

/s/ Efrén Olivares
Efrén Olivares (he/him)
Texas State Bar No.: 24065844
Federal Bar No.: 1015826
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Ste. 340
Decatur, Georgia 30030
Tel: (404) 821-6443
Fax: (404) 221-5857
E-mail: efrenolivares@splcenter.org


_____

/s/ Ryan Patrick Brown
Ryan Patrick Brown
Texas State Bar No.: 24073967
1222 S. Fillmore
Amarillo, Texas 79101
Tel: (806) 372-5711
E-Mail: info@ryanbrownattorneyatlaw.com

Counsel for Amici Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on this date the foregoing was filed through the Court's CM/ECF filing

system, and by virtue of this filing notice will be sent electronically to all counsel of record.

Dated: Dated November 22, 2024


*/s/ Efrén Olivares*
Efrén Olivares