**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| RUSTY STRICKLAND, | ) |
| ALAN AND AMY WEST FARMS | ) |
| ALAN WEST, | ) |
| AMY WEST, | ) |
| DOUBLE B FARMS, LLC, and | ) |
| BRYAN BAKER, | ) |
|      Plaintiffs, | ) |
| | ) |
| v. | )  Case No. 2:24-cv-60-Z |
| | ) |
| THE UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE, | ) |
| THOMAS J. VILSACK, in his official | ) |
| Capacity as Secretary of the United States | ) |
| Department of Agriculture, | ) |
| ZACH DUCHENEAUX, in his official | ) |
| Capacity as Administrator of the Farm | ) |
| Service Agency, and | ) |
| THE UNITED STATES OF AMERICA, | ) |
|      Defendants. | ) |

---

**<u>APPENDIX</u>**

# AMICI CURIAE

# STATEMENTS OF INTEREST

Amici Curiae are 13 advocacy organizations that work with and represent the interests of farmers and ranchers across the country.

**American Indian Mothers, Inc. (AIMI)** is a non-profit organization serving the diverse agricultural needs of rural farmers, ranchers, and producers in North Carolina. AIMI serves our communities through 12 different programs in order to fill the gaps in services throughout rural communities. The socially disadvantaged and underserved farmers, ranchers, and producers served by AIMI have a host of diverse needs. We believe race should never be a reason someone doesn't receive services. This is one of the foundational reasons our programs exist and was founded upon. We have fought for equal rights for everyone, especially our farmers, ranchers, and producers rights for over 24 years. We offer programs and services through the USDA to assist farmers, ranchers, and producers with the wrap-around technical assistance they need for each of their unique needs. American Indian/Indigenous Mothers Inc. has a long history of working with and fighting for underserved indigenous/people of color in farming/ranching and producer communities.

**The Concerned Citizens of Tillery (CCT)** is a non-profit and volunteer organization that continues to be a catalyst for positive change and development. The mission of CCT is to promote and improve the social, economic, and educational welfare of the citizens of Tillery, the surrounding communities, and beyond through the self-development of its members and others. This has made CCT a national and international leader in a variety of areas, from justice for Black farmers, to health care, to environmental justice. CCT and its members believe that justice can only be served with the dismissal of this baseless lawsuit.

**Cottage House Incorporation (CHI)**, founded in 2007, works to promote sustainable agriculture solutions through education of new and beginning farmers, veterans, youth, and women in agriculture. During the pandemic, the farmers served by CHI have experienced food insecurity; been unable to sell their cows, hogs, pigs, and chickens; and lacked funds to buy feed for their animals. Other producers are also struggling, a situation compounded by rising costs of inputs, at a time when the fresh products they produce are more needed than ever in the poor communities Cottage House serves.

**Farm Aid** is a nonprofit organization whose mission is to keep family farmers on the land. Since the first Farm Aid Concert in 1985, Farm Aid has raised $64 million to promote a strong and resilient family farm system of agriculture. Farm Aid operates 1-800-FARM-AID to provide immediate and effective support services to farm families in crisis. We have worked with thousands of farmers and hear every day how the pandemic has stressed them to the limit — most of all, the nation's socially disadvantaged farmers.

**Kansas Black Farmers Association (KBFA),** a 501(c)(3) nonprofit organization, was founded in 1999 by fourteen African American farmers in Kansas. Today, KBFA represents over 170 members, including rural and urban farmers, agribusiness owners, youth farmers, and affiliate organizations, all united in the mission to sustain Black land ownership and agricultural heritage. Currently, more than 40 KBFA members qualify for USDA disaster assistance due to residing in areas severely affected by drought. The drought's impact has been devastating, forcing some farmers to plow under their wheat fields due to stunted crop growth. Fields that traditionally yielded 60 to 90 bushels of wheat per acre are now producing as little as 12 bushels per acre, highlighting the urgent need for support and resources to overcome these challenges.

**Latino Farmers & Ranchers International, Inc.** is the only organization serving Latino farmworkers and small-to-medium sized Latino farmers with a seasoned leadership team and network that has grassroots on the ground experience with the discriminatory treatment by USDA. To date, the language barriers still haven't been addressed, with USDA failing to provide bilingual personnel to improve basic services at the local, state and federal level. Latino farmers and ranchers are often turned away by USDA staff without providing information or services, including programs like the Emergency Relief Program.

The **National Sustainable Agriculture Coalition (NSAC)**, founded in 2009, is an alliance of 150 member organizations and their combined 2+ million members that advocates for federal policy reform to advance the sustainability of agriculture, food systems, natural resources, and rural communities. NSAC has heard directly from our members how Black, Indigenous and other People of Color (BIPOC) who farm and ranch in their states face undue barriers and outright discrimination when seeking fair and timely access to credit, when attempting to apply for and obtain direct USDA aid through support programs (including the Emergency Relief Program), and when applying to participate in conservation programs. Consequently, these BIPOC producers are at direct risk of losing their livelihoods without urgent relief.

The **National Young Farmers Coalition** (Young Farmers) aims to shift power and change policy to equitably resource a new generation of working farmers. Young Farmers represents aspiring and working farmers, ranchers, and land stewards who are reorienting agriculture in service to our communities. Young Farmers believes justice is foundational to a transformation in our food and farm systems; we've advocated for USDA relief programs that serve to increase the security and accessibility of agricultural livelihoods for farmers of color.

**North Carolina Association of Black Lawyers Land Loss Prevention Project (LLPP)** was founded in 1983 and is a non-profit, public interest organization providing comprehensive legal services and technical assistance to support North Carolina's financially distressed and historically-underserved farmers and landowners seeking to preserve their farms, homes, land, and rural livelihoods. Many of our farmers were struggling to retain their farm operations prior to the COVID-19 Pandemic, which has only worsened their conditions. Debt relief is critical for farmers who have experienced discrimination in the implementation of USDA programs, so that they may receive timely access to credit and secure favorable loan terms and servicing of loans. Farmers have experienced race and/or gender-based discrimination in USDA programs and services, and the Court must consider these factors in its decision making.

The **Oklahoma Black Historical Research Project, Inc.** (OBHRPI) was founded in 1998 to assist historically underserved farmers and ranchers by means of outreach, technical training, and cultural awareness to operate sustainable farms and ranches with an emphasis on sustaining historic American Indian and African American communities. We are advocates for socially disadvantaged farmers and ranchers who have been historically underserved by USDA in disaster assistance programs and across their work.

**Rural Advancement Fund of the National Sharecroppers Fund, Inc. (RAF)** is a 501(c)(3) organization founded in 1937 that continues to represent rural farmers, with special focus on African American farmers and young farmers. RAF works directly with African American farmers across three counties in South Carolina, many of whom own small family farms that have been passed down for generations and who have been directly impacted by recent natural disasters and participate in USDA programs.

A-6

**The Rural Coalition** is an alliance of over 50 diverse, community-based member organizations that have worked for over 45 years to advance the interests of the historically underserved producers and rural communities they represent. Since 1978, the Rural Coalition has helped develop and secure passage of key federal policies to strengthen rural agriculture, with a critical focus on equitable access and building a new generation of diverse producers. These producers' very future in farming is inextricably linked to the outcome of this case, including their ability to fairly access the disaster assistance they, like all producers, need to navigate increasingly volatile weather risks and market conditions. Rural Coalition and our members have provided direct outreach and technical assistance to thousands of producers to help them access USDA programs and are deeply familiar with the many and continuing barriers these mostly small scale, limited resource or socially disadvantaged producers face.

**World Farmers, Inc.** advocates for and supports immigrant, refugee, and historically underserved small-scale farmers from farm to market. Started in 1984, our Flats Mentor Farm Program, located in Lancaster, MA, provides access to the land, farming infrastructure, and technical assistance in agricultural production and marketing necessary for several hundred small-scale diversified farmers to grow and market their produce. USDA programs are critical to supporting farmers without generational wealth in this country, including the immigrant and refugee farmers with whom we work, and to supporting those farmers of color who are operating within an agricultural system of historic exclusion and displacement.

# DECLARATIONS OF SOCIALLY DISADVANTAGED FARMERS AND RANCHERS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS, | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| THOMAS J. VILSACK, in his official | ) | |
| Capacity as Secretary of the United States | ) | |
| Department of Agriculture, | ) | |
| ZACH DUCHENEAUX, in his official | ) | |
| Capacity as Administrator of the Farm | ) | |
| Service Agency, and | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
|     Defendants. | ) | |

## DECLARATION OF BARBARA SHIPMAN

1.    I, Barbara Shipman, state that I am over the age of 18 and fully competent to make this declaration.

2.    I want amicus Rural Coalition to represent my interests in the above-captioned matter.

3.    I am a long-time resident of Ariton, Alabama, in Barbour County. I have lived here for over 40 years.

4.    I am a farmer.

5.    My husband, Roy Shipman, is a generational farmer who has farmed here in Ariton his entire life.

6.      My husband's father and his grandfather were farmers.

7.      My husband's family has farmed on their land for over 100 years.

8.      When my father-in-law passed away, the portion of the land given to us was 75 acres.

9.      I learned how to farm by starting with a small garden and learning from my husband. He continued with what his father taught and left him.

10.     We raised goats and chickens, but not anymore. We stopped about five years ago.

11.     We now grow fruits and vegetables, peas, watermelon, onions, potatoes, all greens, carrots, and butterbeans. We also have pear trees, peaches, plums, muscadines, and blueberries and blackberries. We make jams and jellies with the blackberries and blueberries. We also have honeybees.

12.     I can say that all our crops are vulnerable to disease and disasters. As a farmer, you just must do your due diligence; however, you don't want to put too many chemicals on them.

13.     To be the best farmer I could be, I took some classes to make sure I was doing the right thing. We wanted to always provide organic produce, so I took classes at Tuskegee University for new/beginning farmers.

14.     We have had times where we have lost crops, but it has always been due to storms. The only crop we have lost due to storms has been collard greens.

15.     Our crops are insured with the USDA and Noninsured Crop Disaster Assistance Program ("NAP").

16.     As an African American woman, I am qualified as a socially disadvantaged farmer.

17.     I have applied for the Covid Food Assistance Program. During the CFAP process, many farmers, including myself, got incorrect or confusing information from USDA office staff.

I raise South African Boar Goats and was told that they were not an eligible product for assistance under CFAP, when, in fact, they were covered under the program.

18.     I submitted an application for CFAP but never got any money for it, even though I was eligible. The USDA staff's communication with me about my application was irregular, and it took them much longer than I would have expected for them to contact me about any clarifications they needed. None of the farmers that I know of received money under CFAP.

19.     For ERP, I would have applied but did not because I was never informed the program was available. I found out about it through another farmer after the application deadline had passed. He said, "Did you get your payment?" I replied, "What payment? What are you talking about?"

20.     I go into my local USDA offices at least once per week to stay up to date and maintain a good relationship with the office staff, and yet I never received or heard any information about the ERP program. Information about programs and other opportunities is usually posted on bulletin boards in the office, but there was nothing about ERP. If you ask a question of staff, they will usually answer it, but they will never volunteer information. Sometimes the USDA employees do not seem to know about the programs, possibly because they are newer hires.

21.     A lot of information ends up being shared between farmers through word of mouth. I tell farmers in my network about programs, application deadlines, and other information.

22.     I have voted in the FSA county committee elections, and I have also worked with members in the county office.

23.     I ran for a couple of positions in the past in Barbour County, and I never won, but I still support the local office. I am always selected to be an alternate.

24.     I have never been invited to serve as a minority advisor for my local county committee.

25.     In the beginning, I believe race was a factor regarding my interactions with the County level FSA staff/elected officials. However, I began to build rapport, and, over time, it has not been the case.

26.     My relationship with the local FSA and NRCS is good. I have done lots of outreach to help other farmers and conduct meetings and have representatives with FSA and NRCS to come to the outreach meetings.

27.     The relationships I have built over time have allowed me to help disburse information to some of the other farmers who may or may not always understand all the ins and outs of what is happening. I can take published materials and brochures and piggyback off the knowledge from other white farmers. I have also been able to get attorneys to come to some meetings to explain and bring documents regarding heirs' property.

28.     I have not had any issues with accessing USDA funding. I have been able to set up a good rapport.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

Dated: November 21, 2024                                        */s/ Barbara Shipman*_____
                                                                                 Declarant's Signature

                                                                                 Barbara Shipman_____
                                                                                 Declarant's Printed Name

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS, | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| THOMAS J. VILSACK, in his official | ) | |
| Capacity as Secretary of the United States | ) | |
| Department of Agriculture, | ) | |
| ZACH DUCHENEAUX, in his official | ) | |
| Capacity as Administrator of the Farm | ) | |
| Service Agency, and | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
|     Defendants. | ) | |

## <u>DECLARATION OF DON STEPHENS</u>

1.      I, Don Stephens, state that I am over the age of 18 and fully competent to make this declaration.

2.      I want amicus Rural Coalition to represent me in the above-captioned matter.

3.      I am a long-time resident of Bristow, Oklahoma in Creek County. I have lived here for over 20 years.

4.      I am a rancher.

5.      I own and operate a cow and calf ranch, and I produce hay.

6.      I own 260 acres of land.

7.      I retired from the Tulsa Fire Fighter Department in Oklahoma.

8.      I also worked part time as a cowboy and participated in rodeos.

9.      After I retired, I moved to Bristow, Oklahoma, and purchased my land 20 years ago.

10.     My father owned 40 acres of land in Bristow.

11.     When my parents passed away, the land was divided between myself and my siblings. My two sisters, my brother, and I received ten acres each.

12.     I purchased the shares my siblings were given, and I now own the property my father had.

13.     I wanted to expand, so I purchased more land to make more money.

14.     I only have a hay crop. I decided to offset the price of feeding my cows by growing and harvesting my own hay.

15.     My ranch is vulnerable to all types of natural disasters like tornadoes, hailstorms, lightning, and snowstorms.

16.     I have a vaccination program for my cows.

17.     I may lose one or two cows per year but never a herd. They die from natural diseases, natural causes, or natural disasters, such as lightning or snowstorms.

18.     I have a farm/ranch policy that covers my animals, and the Non-Insured Crop Disaster Assistance Program ("NAP") that covers hay. I also have drought insurance for my hay.

19.     As an African American man, I am qualified as a socially disadvantaged rancher.

20.     I have applied for the following programs and been approved for each of them.

    a.   Emergency Relief Program-2021 (Phases 1 and 2); however, we were only paid once for Phase 2;

    b.   Covid Food Assistance Program;

    c.   Emergency Livestock (Phases 1 and 2); and

    d.   Emergency Relief Program-2022.

21.    I was a part of the *Pigford* lawsuit. I did not get the full amount due to the money being split between two farmers in Mississippi and one farmer in Alabama.

22.    I ran, won, and served one term as FSA committee chair in Creek County.

23.    The makeup of the committee was one woman and three white men. I was the only Black person on the committee.  I was the first Black person to ever be voted in on the committee to my knowledge.

24.    I ran after that term and did not win. I plan to run again, and that vote will be in December of 2024.

25.    I did see discrimination when I tried to get USDA loans. It was suggested that I get a used tractor and that I put up everything I owned as collateral when applying for loans.

26.    I always stayed informed on what to do to get funding and would do my research because nobody was volunteering information.

27.    I do believe that race, ethnicity, and gender have been factors in my interactions with the FSA and NRCS offices, because if I were white, I would be rich. White farmers and ranchers seem to get all the funding and know about the programs. If I had had the same opportunities as white ranchers and farmers, I would have had better access to loans and bought more land to expand my business. Having access to low interest loan rates and other USDA programs would have made a great difference in my operation.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

Dated: November 20, 2024.

_/s/ Don Stephens_____
Declarant's Signature

Don Stephens_____
Declarant's Printed Name

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| RUSTY STRICKLAND, | ) |
| ALAN AND AMY WEST FARMS, | ) |
| ALAN WEST, | ) |
| AMY WEST, | ) |
| DOUBLE B FARMS, LLC, and | ) |
| BRYAN BAKER, | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 2:24-cv-60-Z |
| | ) |
| THE UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE, | ) |
| THOMAS J. VILSACK, in his official | ) |
| Capacity as Secretary of the United States | ) |
| Department of Agriculture, | ) |
| ZACH DUCHENEAUX, in his official | ) |
| Capacity as Administrator of the Farm | ) |
| Service Agency, and | ) |
| THE UNITED STATES OF AMERICA, | ) |
|     Defendants. | ) |

## DECLARATION OF PHIL EUGENE CAMPBELL

1.      I, Phil Eugene Campbell, state that I am over the age of 18 and fully competent to make this declaration.

2.      I want amicus Rural Coalition to represent me in the above-captioned matter.

3.      I am a long-time resident of Luther, Oklahoma.

4.      I am a farmer and rancher.

5.      My family and I acquired our farm in 2014. We have lived on our farm for ten years.

6.      I purchased the farm at 40 acres in size and that is still the acreage of my farm today. The market controlled the size of my farm, but I knew I wanted at least 40 acres.

7.      On the farm, my family and I raise chickens, cows, meat birds, poultry, and pork.

8.      My family and I also grow seasonal fruits and vegetables and have about a quarter of an acre of orchids. In terms of how I decided what crops to grow, I did market research and blended that with crops my family and I enjoy eating.

9.      I lose crops and animals to disasters and diseases annually. My crops and livestock are not insured.

10.     As an African American man, I am qualified as a socially disadvantaged farmer and rancher.

11.     I have applied for the Emergency Livestock Relief Program ("ELRP"), though I cannot recall if it was in 2021 or 2022.

12.     Through the ELRP, I received $500, which is a lot less than I was expecting to receive and was not fair, especially because of my base acreage and yield numbers.

13.     I anticipated receiving at least $5,000. During a drought, I did not have any forage and had no grass to work with at the start. Hay per bale was $100, twice what it would cost in a normal season. In a drought scenario, $500 is not nearly enough for the hay alone, not to mention transportation costs. Specifically, I would have expected to have received about $3,000 for the hay, then another $3,000 for transportation.

14.     My application for ELRP was my first time signing up for a program, except for when I got my farm number with FSA. I did not have much experience to compare the service and application process, but it seemed straightforward.

15.     I have voted in the Farm Service Agency ("FSA") county committee elections but have never worked with county committee members.

16.     I plan to run for election in my county's FSA committee in the future.

17.     I feel as though the elections in my county are not run fairly. There are boundaries that were drawn in terms of where farmers can vote, and they have chopped up the Black farmers into different districts. This affects Black farmers' ability to vote in local FSA committee elections, which makes the elections discriminatory.

18.     My current FSA committee consists of five members. Four members are white males, and one member is a white female. I have inquired about county committee meeting times and locations with my local FSA staff but have not attended any meetings. The FSA employee told me that the meetings are not regularly held and that I needed to call ahead to find out if they plan to hold the meeting. I have never had any interaction with my county committee elected officials. I receive ballots in the mail and know the name of one member but that is the extent of it.

19.     I have never been invited to serve as a minority advisor for my local county committee.

20.     I have participated in the Natural Resource and Conservation Service Program and the Conservation Steward Program in 2017. I was not aware that I qualified for set aside or higher cost shares based on me being a socially disadvantaged farmer and rancher.

21.     I believe race was a factor regarding my interactions with the county-level FSA staff/elected officials. Specifically in terms of accessibility to resources, I have had issues with my local FSA committee and United States Department of Agriculture ("USDA") providing a loan for my grandson. I applied for a youth application loan for my grandson and was told differing information from offices in Oklahoma and Louisiana. This caused me so much frustration and confusion that I ended up taking out a loan myself without the assistance of my local FSA or the USDA. I feel like I was given the runaround by my local FSA because I am Black.

22.     My relationship with the local FSA is nonexistent. I never have interactions with my FSA committee as the committee members do not invite Black farmers to places where we can learn about resources, nor do committee members attend any Black farmer and rancher events. Since these elected officials are not attending Black events, I feel that they are not interested in having relationships with Black farmers and ranchers. A lot of information is spread by word of mouth, and I have never seen any indication or heard about the county committee doing outreach.

23.     My relationship with Natural Resources Conservation Service ("NRCS") is much better. NRCS has a purpose and hosts events for producers, specifically Black producers. These events happen a couple of times a year. I believe they specifically occur in my county once a quarter.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

Dated: November 21, 2024                          */s/ Phil Eugene Campbell*

                                                  Phil Eugene Campbell
                                                  Declarant's Printed Name

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| RUSTY STRICKLAND, | ) | |
| ALAN AND AMY WEST FARMS, | ) | |
| ALAN WEST, | ) | |
| AMY WEST, | ) | |
| DOUBLE B FARMS, LLC, and | ) | |
| BRYAN BAKER, | ) | |
|      Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-60-Z |
| | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| THOMAS J. VILSACK, in his official | ) | |
| Capacity as Secretary of the United States | ) | |
| Department of Agriculture, | ) | |
| ZACH DUCHENEAUX, in his official | ) | |
| Capacity as Administrator of the Farm | ) | |
| Service Agency, and | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
|      Defendants. | ) | |

## DECLARATION OF RICARDO BURKE

1.     My name is Ricardo Burke. I am over the age of 18 and fully competent to make this declaration.

2.     I want amicus Rural Coalition to represent me in the above-captioned matter.

3.     As a Black man, I am qualified as a socially disadvantaged farmer and rancher.

4.     I live in Coffee County in the state of Alabama.

5.     I operate a 55.5-acre farm, which I took out a loan to purchase. My farm has been in my family for about 7 years.

6.     On my farm I raise cows and sheep. I grow blueberries, persimmons, and pecan trees. I decided to grow these local crops because it was suggested to me by my local United States

Department of Agriculture ("USDA") and Natural Resources Conservation Service ("NRCS") offices who gave me this information.

7.      I do not have insurance on my crops or animals.

8.      I felt mistreated, discriminated against, and discouraged by my local FSA offices.

9.      I initially reached out to USDA around 2017 to get a loan and some support through the veterans' program but was making no headway with them.

10.      My first attempt to get a loan through USDA was frustrating because of the poor treatment I received and covert discrimination.

11.      On my initial attempt, I was denied the loan without the FSA agent even asking me for any information, including an application. I was given no assistance for how to properly fill out the application by the Ozark office in Dale County, Alabama.

12.      When I asked that office for a reason, I was given one excuse after another. It felt as if the answer depended on who you talked to at the office. My frustration was building, and I started questioning whether I wanted to go into farming.

13.      I would be sitting in the Ozark office waiting to be served and white farmers would walk in and get preferential treatment while I was being ignored.

14.      These white farmers were people the agents knew, and the agents would have them go ahead of me, even though they came into the office after me. I would just have to sit there until the white farmers left, which happened on numerous occasions.

15.      I was also informed around that time that I could ask to have my paperwork transferred to the New Brocton office because it was closer to me than the Ozark office. I was also told that I might receive better treatment at the New Brocton Office.

16.      Once I started visiting the New Brocton office, I received more information, and the representatives from that office also requested information from me, which was a big change

from the Ozark office.

17.    I was still denied the loan but was told that it was due to their policies, such as limited experience in farming. I was also told that I needed to apply and be denied elsewhere before applying through FSA.

18.    It was still the same denial but told to me in a gentler way by the New Brocton FSA office staff.

19.    It was not until I went to the Black farmers association conference and met Mrs. Barbara Shipman and started sharing my plight of trying to get any kind of assistance through my local office that I felt like I finally had some support.

20.    Mrs. Shipman started making calls on my behalf, which led to a representative from the FSA's office in Washington, D.C. reaching out to me.

21.    I shared the paperwork I was provided with Mrs. Shipman and the D.C. contact who then informed me I was given the wrong paperwork. The application I was provided with was not the right one for what I was applying.

22.    Once the D.C. contact reached out to the local office, I started receiving phone calls asking me to come into the office and that they would look at my application.

23.     Between trying to get start-up resources and a loan, I would have to go back and forth to the office multiple times because the agents would continuously request documents, including duplicate documents.

24.    After a while, it seemed their purpose was to frustrate me as a new farmer, and they managed to do just that.

25.    I felt like I was begging someone for their personal service, instead of them doing their jobs.

26.    I felt like I did not want to even ask them any more questions but kept persisting as

a determined retired sergeants major for the Army.

27.    I eventually decided to give up and use my savings and cash in some bonds to go towards the down payment. The rest of the money I got as a loan from the bank.

28.    After receiving the bank loan, I bought a property to grow pecans. I was still trying to receive an additional loan for farming equipment, trees, and animals, but I was never able to successfully get one.

29.    Through the NRCS program, I was approved for a well, but I had to use a company that was approved through NRCS, which was a nightmare experience.

30.    I reached out to the company and was told it would take 45 days for them to come out to the property to put in the well.

31.    Based on that timeline, I decided to go ahead and plant the pecan trees (105 trees), which I watered by hand for a month and half.

32.    Eight (8) months after planting, I was still waiting for the company to come out to the property, while still watering 105 pecan trees by hand. My timeline kept getting pushed back to accommodate larger projects.

33.    Only 8 pecan trees survived, which meant I lost that investment, as watering by hand became impossible.

34.    As a new farmer, this was very disappointing because I did everything NRCS asked but received no assistance to prevent the loss of my trees.

35.    Once I lost my trees, I decided to go into livestock to raise goats, turkeys, geese, and chickens.

36.    My woes did not stop there. My first year selling my animals was during the COVID-19 pandemic, so I lost even more of my investment. I was having to spend more on input, including feed, but did not make the necessary sales to offset those expenses.

37.     As I got into farming and got connected with other farmers, I realized that the treatment and the resources given to farmers are not equal.

38.     Something as simple as providing Black farmers a Receipt for Service proved to be too difficult for FSA agents.

39.     It was only after connecting with Mrs. Shipman that I was made aware of a receipt that FSA agents should give to farmers identifying the date, time, and purpose of each appointment.

40.     I started asking for a receipt once I was made aware and only then did I receive it.

41.     Black farmers like me are not afforded the same respect and support as white farmers, which should not be the case from agencies that are supposed to support all farmers.

42.     Black farmers routinely do not receive information about funding opportunities from the local FSA office until funding deadlines have passed.

43.     For example, the FSA office in New Brocton failed to provide me with any information about the COVID-19 payments available to farmers, like the Coronavirus Food Assistance Program ("CFAP").

44.     Ironically, I learned about CFAP from white farmers discussing them at the Co-op, but the deadline had passed by the time I heard about these monies. They were talking about the programs and confirming to each other that they received payments.

45.     One of the white farmers made the comment that we (minority farmers) have our own designated money, and we should "go get some of our own money."

46.     Seeing that I was new, one of the well-established Black farmers pulled me aside and said "son, you're not going to get that money. They tell you at the state that there is money allocated for minorities and women, etc., but I bet you don't get a lot of that money."

47.     He said that the state must break down their budget and some percentage has to go to minorities, but they come up with different ways of not issuing it, and at the close of the budget

cycle they roll the money over into a general fund that typically favors white farmers.

48.     In my thinking, it would only seem fair that we as minority farmers are at least provided the same information, courtesy, and support as white farmers.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON MY PERSONAL KNOWLEDGE.**

Dated: November 18, 2024.                              */s/Ricardo Burke*_____
                                                        Declarant's Signature

                                                        Ricardo Burke_____
                                                        Declarant's Printed Name